No. 23-60069

# In the United States Court of Appeals for the Fifth Circuit

STATE OF TEXAS; TEXAS COMMISSION ON ENVIRONMENTAL QUALITY; LUMINANT GENERATION COMPANY, L.L.C.; COLETO CREEK POWER, L.L.C.; ENNIS POWER COMPANY, L.L.C.; HAYS ENERGY, L.L.C.; MIDLOTHIAN ENERGY, L.L.C.; OAK GROVE MANAGEMENT COMPANY, L.L.C.; WISE COUNTY POWER COMPANY, L.L.C.; ASSOCIATION OF ELECTRIC COMPANIES OF TEXAS; BCCA APPEAL GROUP; TEXAS CHEMICAL COUNCIL; TEXAS OIL & GAS ASSOCIATION,

*Petitioners*,

*v.*

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; MICHAEL S. REGAN, ADMINISTRATOR, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

*Respondents.*

## STATE PETITIONERS' OPPOSED MOTION TO STAY

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

JUDD E. STONE II
Solicitor General

BILL DAVIS
Deputy Solicitor General
Bill.Davis@oag.texas.gov

MICHAEL R. ABRAMS
WILLIAM F. COLE
JOSEPH N. MAZZARA
Assistant Solicitors General

Counsel for State of Texas and Texas Commission on Environmental Quality

## CERTIFICATE OF INTERESTED PERSONS

No. 23-60069

STATE OF TEXAS; TEXAS COMMISSION ON ENVIRONMENTAL QUALITY; LUMINANT GENERATION COMPANY, L.L.C.; COLETO CREEK POWER, L.L.C.; ENNIS POWER COMPANY, L.L.C.; HAYS ENERGY, L.L.C.; MIDLOTHIAN ENERGY, L.L.C.; OAK GROVE MANAGEMENT COMPANY, L.L.C.; WISE COUNTY POWER COMPANY, L.L.C.; ASSOCIATION OF ELECTRIC COMPANIES OF TEXAS; BCCA APPEAL GROUP; TEXAS CHEMICAL COUNCIL; TEXAS OIL & GAS ASSOCIATION,

*Petitioners*,

*v.*

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; MICHAEL S. REGAN, ADMINISTRATOR, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

*Respondents.*

Under the fourth sentence of Fifth Circuit Rule 28.2.1, petitioners, as governmental parties, need not furnish a certificate of interested persons.

/s/ Bill Davis
BILL DAVIS
*Counsel of Record for State of Texas and Texas
Commission on Environmental Quality*

i

# TABLE OF CONTENTS

Certificate of Interested Persons ....................................................................i

Table of Contents ...........................................................................................ii

Table of Authorities .......................................................................................iii

Introduction ...................................................................................................1

Background .....................................................................................................2

    I.    Statutory Framework ..........................................................................2

        A.    Operation of the Act's cooperative federalism ...................... 2

        B.    The Act's "good neighbor" provision ................................... 4

    II.    Procedural History .............................................................................6

        A.    EPA issues guidance for SIP revisions.................................. 6

        B.    Texas submits its SIP revisions ............................................7

        C.    EPA issues after-the-fact guidance regarding maintenance receptors. 8

        D.    EPA proposes disapproval of Texas's SIP, and TCEQ submits comments ................................................................. 9

        E.    EPA finalizes its disapproval of Texas's SIP revision .......................10

Stay Standard................................................................................................ 11

Argument...................................................................................................... 11

    I.    Petitioners Are Likely to Succeed on the Merits. ............................. 11

        A.    EPA failed to explain its reversal of previous policy regarding identification of maintenance receptors.............................................12

        B.    EPA's disapproval of Texas's SIP renders the Act's cooperative federalism a dead letter. ............................... 16

    II.    The Remaining Stay Factors Favor Petitioners....................................18

Conclusion....................................................................................................20

Certificate of Conference............................................................................ 21

Certificate of Service.................................................................................... 21

Certificate of Compliance ........................................................................... 21

# Table of Authorities

**Page(s)**

**Cases:**

*Alaska Prof'l Hunters Ass'n v. FAA*,
  177 F.3d 1030 (D.C. Cir. 1999) ......................................................... 15

*BCCA Appeal Grp. v. EPA*,
  355 F.3d 817 (5th Cir. 2003) ........................................................ 3, 16

*Biden v. Texas*,
  10 F.4th 538 (5th Cir. 2021) ............................................................ 15

*Christopher v. SmithKline Beecham Corp.*,
  567 U.S. 142 (2012) ..................................................................... 1, 14

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
  140 S. Ct. 1891 (2020) ................................................................12, 15

*Emp. Sols. Staffing Grp. II, LLC v. Off. of Chief Admin. Hearing Officer*,
  833 F.3d 480 (5th Cir. 2016) ............................................................ 15

*EPA v. EME Homer City Generation, L.P.*,
  572 U.S. 489 (2014) ......................................................................... 5

*ExxonMobil Pipeline Co. v. DOT*,
  867 F.3d 564 (5th Cir. 2017) ............................................................ 14

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ........................................................................ 13

*FCC v. Prometheus Radio Project*,
  141 S. Ct. 1150 (2021) .................................................................... 11

*Gates & Fox Co. v. Occupational Safety & Health Rev. Comm'n*,
  790 F.2d 154 (D.C. Cir. 1986) ............................................................ 1

*Luminant Generation Co. v. EPA*,
  675 F.3d 917 (5th Cir. 2012) ................................................2-4, 16, 18

*Marsh v. Or. Nat. Res. Council*,
  490 U.S. 360 (1989) ........................................................................ 12

*Maryland v. EPA*,
  958 F.3d 1185 (D.C. Cir. 2020) ......................................................... 14

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) .......................................................................... 11

*Nken v. Holder*,
  556 U.S. 418 (2009) ................................................................. 11, 18-19

*Physicians for Soc. Resp. v. Wheeler*,
    956 F.3d 634 (D.C. Cir. 2020) .................................................... 12-13
*Smiley v. Citibank (S.D.), N.A.*,
    517 U.S. 735 (1996) ................................................................... 13
*Sw. Airlines Co. v. FERC*,
    926 F.3d 851 (D.C. Cir. 2019) .................................................. 12-13
*Tate Access Floors, Inc. v. Interface Architecture Res., Inc.*,
    279 F.3d 1357 (Fed. Cir. 2002) ................................................... 19
*Tex. Oil & Gas Ass'n v. EPA*,
    161 F.3d 923 (5th Cir. 1998) .................................................. 11, 18
*Texas v. EPA*,
    690 F.3d 670 (5th Cir. 2012) ........................................................ 4
*Texas v. EPA*,
    829 F.3d 405 (5th Cir. 2016) ............................................ 3-5, 16, 18-19
*Train v. Nat. Res. Def. Council, Inc.*,
    421 U.S. 60 (1975) ........................................................................ 4
*Union Elec. Co. v. EPA*,
    427 U.S. 246 (1976) ...................................................................... 3
*Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS*,
    985 F.3d 472 (5th Cir. 2021) ............................................ 12, 16, 18
*Veasey v. Abbott*,
    870 F.3d 387 (5th Cir. 2017) ....................................................... 19
*Wages & White Lion Invs. v. FDA*,
    16 F.4th 1130 (5th Cir. 2021) ...................................................... 12
*Wisconsin v. EPA*,
    938 F.3d 303 (D.C. Cir. 2019) ..................................................... 14

**Constitutional Provisions, Statutes, and Rules:**

5 U.S.C. § 706(2)(A) .......................................................................... 11
42 U.S.C.:
    § 7407(a) .................................................................................... 3, 16
    § 7407(d)(1)(A)(i)-(ii) ..................................................................... 3
    § 7408(a) ......................................................................................... 2
    § 7409(a) ......................................................................................... 2
    § 7409(d)(1) ................................................................................ 2, 3
    § 7410(a)(1) ......................................................................... 3-4, 6, 16
    § 7410(a)(2) ................................................................................. 3-4

§ 7410(a)(2)(D)(i)(I) ............................................................... 1, 5
§ 7410(a)(2)(D)(i)(II) .................................................................. 5
§ 7410(a)(2)(H) ......................................................................... 3
§ 7410(c)(1) .............................................................................. 4
§ 7410(k)(1)-(2) ...................................................................... 17
§ 7410(k)(1)(B) ......................................................................... 4
§ 7410(k)(2)-(3) ......................................................................... 4
§ 7410(k)(3) .............................................................................. 4
§ 7410(k)(5) ............................................................................ 14
§ 7410(l) .................................................................................. 4
§ 7501(2) .................................................................................. 3

40 C.F.R.:
pt. 50 ....................................................................................... 6
§ 52.02(a) ................................................................................. 4

Nat'l Ambient Air Quality Standards for Ozone, 80 Fed. Reg. 65,292
    (Oct. 26, 2015) ...................................................................... 6

Interstate Transport of Air Pollution for the 2015 8-Hour Ozone
    Nat'l Ambient Air Quality Standards, 87 Fed. Reg. 9,798
    (Feb. 22, 2022) ............................................................ 7-10, 17

Fed. Implementation Plan Addressing Regl. Ozone Transport for the
    2015 Ozone Nat'l Ambient Air Quality Standard, 87 Fed. Reg.
    20,036 (Apr. 6, 2022) .................................................... 5-6, 10

Interstate Transport of Air Pollution for the 2015 8-Hour Ozone
    National Ambient Air Quality Standards, 88 Fed. Reg. 9,336
    (Feb. 13, 2023) ........................................... 1, 10-11, 14, 17

Fed. R. App. P:
18 ............................................................................................. 1
18(a)(2)(A)(i) ............................................................................ 1
18(a)(2)(C) ............................................................................... 1

**Other Authorities:**

Consent Decree, *Sierra Club v. Michael S. Regan*, No. 3:22-cv-1992
    (N.D. Cal. Jan. 24, 2023) ........................................................ 19

Memorandum from Peter Tsirigotis, Director, Office of Air Quality
    Planning and Standards, *Considerations for Identifying Maintenance
    Receptors for Use in Clean Air Act Section 110(a)(2)(D)(i)(I) Interstate
    Transport State Implementation Plan Submissions for the 2015 Ozone
    National Ambient Air Quality Standards* (Oct. 19, 2018) .......... 8-10, 14

Memorandum from Peter Tsirigotis, Director, Office of Air Quality
    Planning and Standards, *Information on the Interstate Transport State
    Implementation Plan Submissions for the 2015 Ozone National Ambient
    Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I)*
    (Mar. 27, 2018) ................................................................... 6-10, 13-15
TCEQ, *Comments on the U.S. EPA's Air Plan Disapproval*
    (Apr. 25, 2022) ............................................................................10, 17
TCEQ, Fed. Clean Air Act Sections 110(A)(1) and (2) Transport State
    Implementation Plan Revision for the 2015 Ozone Nat. Ambient Air
    Quality Standards (Aug. 2018) ..........................................................7

Pursuant to Federal Rule of Appellate Procedure 18, petitioners the State of Texas and the Texas Commission on Environmental Quality ("TCEQ"), move for a stay pending review of the final action of the U.S. Environmental Protection Agency ("EPA") disapproving the State of Texas's State Implementation Plan ("SIP"), part of "Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards," 88 Fed. Reg. 9,336 (Feb. 13, 2023) ("Final Rule"). Seeking a stay from EPA would be impracticable given the imminence of harm and EPA's agreement to finalize a federal implementation plan ("FIP") by March 15, 2023. *See* Fed. R. App. P. 18(a)(2)(A)(i); *infra* Part II. On March 2, 2023, all parties were informed that this motion would be filed. *See* Fed. R. App. P. 18(a)(2)(C). The respondents oppose it. The other petitioners consent.

## Introduction

The Final Rule violates a bedrock principle of administrative law: agencies must "provide regulated parties 'fair warning of the conduct [a regulation] prohibits or requires.'" *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 156 (2012) (alterations in original) (quoting *Gates & Fox Co. v. Occupational Safety & Health Rev. Comm'n*, 790 F.2d 154, 156 (D.C. Cir. 1986) (Scalia, J.)). In 2018, after years of complex work that tracked—and, in some instances, improved upon—EPA's existing methodologies and guidance, TCEQ submitted a revision of Texas's SIP to demonstrate compliance with the Clean Air Act's "good neighbor" provision, 42 U.S.C. § 7410(a)(2)(D)(i)(I).

EPA should have approved that SIP. Instead, EPA judged it using models and modes of analysis published *after* the SIP revision was due. But by then, Texas could

not redo its SIP, and the new, previously unannounced standards all but guaranteed a disapproval. Nothing in the Act or controlling precedent authorizes such arbitrary and capricious agency action.

The challenged part of the Final Rule should be stayed. Not only are Texas and TCEQ likely to succeed on the merits, but they face irreparable harm in the interim. The Final Rule is the predicate act to EPA's imposition of a FIP that will strain, to potentially devastating effect, Texas's economy and its electrical grid. For those reasons, the public interest and balance of harms tilt in Texas's favor. A stay pending review is therefore warranted.

## Background

### I.   Statutory Framework

The Clean Air Act is an "experiment in cooperative federalism" that "establishes a comprehensive program for controlling and improving the nation's air quality through state and federal regulation." *Luminant Generation Co. v. EPA*, 675 F.3d 917, 921 (5th Cir. 2012). Under this statutory structure, the federal government sets national ambient air quality standards ("NAAQS"), and the States develop and implement SIPs to enforce the NAAQS.

#### A.   Operation of the Act's cooperative federalism

The Act first tasks EPA with identifying air pollutants and establishing NAAQS that set maximum allowable concentrations for pollutants that are harmful to public health and welfare. 42 U.S.C. §§ 7408(a), 7409(a). Every five years, EPA must revise each NAAQS as appropriate. *Id.* § 7409(d)(1). An area that meets a NAAQS is

called an "attainment" area; an area that does not is a "nonattainment" area. *Id.* § 7407(d)(1)(A)(i)-(ii); *see id.* § 7501(2).

Although the Act tasks EPA with setting NAAQS, it assigns the States "primary responsibility for ensuring that the ambient air meets the NAAQS for the identified pollutants." *BCCA Appeal Grp. v. EPA*, 355 F.3d 817, 822 (5th Cir. 2003); *see* 42 U.S.C. § 7407(a). "This division of responsibility between the states and the federal government 'reflects the balance of state and federal rights and responsibilities characteristic of our federal system of government.'" *Texas v. EPA*, 829 F.3d 405, 411 (5th Cir. 2016) (quoting *Luminant*, 675 F.3d at 921). It "indicates a congressional preference that states, not EPA, drive the regulatory process." *Id.*

To implement the NAAQS, "states must adopt and administer [SIPs]," *Luminant*, 675 F.3d at 921, which "provide[] for implementation, maintenance, and enforcement" of the NAAQS within their borders, 42 U.S.C. § 7410(a)(1). After EPA sets the NAAQS, States have three years to submit SIPs or SIP revisions specifying how they will meet the NAAQS for certain pollutants. *Id.* § 7407(a); *id.* § 7410(a)(1), (a)(2), (a)(2)(H). In discharging that obligation, States have "broad authority to determine the methods and particular control strategies they will use to achieve the statutory requirements," *BCCA Appeal Grp.*, 355 F.3d at 822, and "'wide discretion in formulating [their SIPs]'" for meeting the NAAQS, *Luminant*, 675 F.3d at 921 (quoting *Union Elec. Co. v. EPA*, 427 U.S. 246, 250 (1976)). Indeed, "'[s]o long as the ultimate effect of a State's choice of emission limitations is compliance with the [NAAQS], the State is at liberty to adopt whatever mix of emission limitations it

deems best suited to its particular situation.'" *Texas*, 829 F.3d at 411 (quoting *Train v. Nat. Res. Def. Council, Inc.*, 421 U.S. 60, 79 (1975)).

Consistent with this preference for state implementation and enforcement, the Act "confines EPA's role in implementing air quality standards 'to the ministerial function of reviewing SIPs for consistency with the Act's requirements.'" *Id.* (quoting *Luminant*, 675 F.3d at 921); 42 U.S.C. § 7410(a)(1), (*l*). Consequently, if a SIP meets the statutory requirements, "EPA *must* approve it." *Texas v. EPA*, 690 F.3d 670, 676 (5th Cir. 2012) (emphasis added); *see* 42 U.S.C. § 7410(k)(3) ("the Administrator *shall* approve [a SIP] as a whole if it meets all of the applicable requirements of this chapter" (emphasis added)); 40 C.F.R. § 52.02(a). "Only if the state has not complied with the requirements of the [Act] . . . does EPA assume the role of primary regulator by drafting a [FIP]." *Texas*, 829 F.3d at 412; *see* 42 U.S.C. § 7410(c)(1).

The Act requires EPA to take action on a SIP within 18 months of its submission. Congress directed EPA to determine, within the first six months, whether a SIP is technically and administratively complete. 42 U.S.C. § 7410(k)(1)(B). If EPA does not issue a completeness finding within six months, the SIP is deemed to meet the minimum criteria by operation of law. 42 U.S.C. § 7410(k)(1)(B). Upon its issuance of a completeness finding, EPA has—according to Congress—12 months to approve or deny the SIP. *Id.* § 7410(k)(2)-(3).

## B.  The Act's "good neighbor" provision

The Act enumerates several substantive requirements for SIPs. *Id.* § 7410(a)(2). Relevant here is the Act's "good neighbor" provision, which requires "upwind

States to reduce emissions to account for pollution exported beyond their borders." *EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489, 499 (2014). The text of this provision requires that a SIP "contain adequate provisions" prohibiting emissions that "will . . . contribute significantly to nonattainment in, or interfere with maintenance by, any other State with respect to any [NAAQS]." 42 U.S.C. § 7410(a)(2)(D)(i)(I). The next subsection requires a SIP to prohibit emissions that will "interfere with measures required to be included" in other States' SIPs "to prevent significant deterioration of air quality or to protect visibility." *Id.* § 7410(a)(2)(D)(i)(II); *see Texas*, 829 F.3d at 411 (involving action taken under subsection (a)(2)(D)(i)(II)).

To evaluate whether a SIP satisfies the good-neighbor provision, a four-step process has evolved through EPA's imposition of FIPs. As relevant here, the first step is "[i]dentifying downwind receptors that are expected to have problems attaining the NAAQS (nonattainment receptors) or maintaining the NAAQS (maintenance receptors)." Fed. Implementation Plan Addressing Regl. Ozone Transport for the 2015 Ozone Nat'l Ambient Air Quality Standard, 87 Fed. Reg. 20,036, 20,054 (Apr. 6, 2022) (proposed rule). The process involves gathering historical data from downwind monitors and using modeling to assess future air-quality problems. *Id.* The second step is "determining which upwind states are 'linked' to these identified downwind receptors based on a numerical contribution threshold." *Id.* Under EPA's preferred approach, a State that contributes more than one percent of the NAAQS to a downwind State is "linked" to that State. *Id.* The third step, for any State "linked to downwind air quality problems," is "identifying upwind emissions on a statewide

basis that significantly contribute to downwind nonattainment or interfere with downwind maintenance of the NAAQS, considering cost- and air quality-based factors." *Id.* The fourth step, for any upwind State "found to have emissions that significantly contribute to nonattainment or interfere with maintenance of the NAAQS in any downwind state," is "implementing the necessary emissions reductions through enforceable measures." *Id*.

## II.  Procedural History

This case concerns EPA's October 2015 revision of the NAAQS for ozone, a pollutant at ground level. Nat'l Ambient Air Quality Standards for Ozone, 80 Fed. Reg. 65,292 (Oct. 26, 2015); *see also* 40 C.F.R. pt. 50. In 2015, EPA replaced the preexisting ozone NAAQS of 0.075 parts per million (ppm) with a more stringent 0.070 ppm. NAAQS for Ozone, 80 Fed. Reg. at 65,293-65,294. EPA's October 2015 revision of the NAAQS triggered Texas's statutory obligation to revise its SIP within three years, or by October 1, 2018. 42 U.S.C. § 7410(a)(1).

### A.  EPA issues guidance for SIP revisions

In March 2018, seven months before Texas's statutory deadline to revise its SIP, EPA issued a guidance memorandum designed to "assist states in their efforts to develop good neighbor SIPs for the 2015 ozone NAAQS." Memorandum from Peter Tsirigotis, Director, Office of Air Quality Planning and Standards, *Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I)* at 2 (Mar. 27, 2018) ("2018 Transport Guidance") (App. A).

This memorandum provided two forms of guidance for flexible approaches to the transport analysis relevant here. First, to identify maintenance receptors at the first step of the four-step analysis, EPA recommended use of an alternative methodology to assess (a) receptors in areas at risk of exceeding the NAAQS (even if they do not currently violate the NAAQS) using an approach that does not rely on the projection of maximum design values and (b) receptors in clean areas where ozone formation is likely to occur but does not. *Id.* at A-2. Second, to carry out the modeling of future ozone emissions, EPA recommended that States utilize historical data gathered from the years 2009-2013. *Id.* at 6. Despite this guidance, EPA reassured States that they could "supplement the information provided in this memorandum with any additional information that they believe is relevant" and "choose to use other information to identify nonattainment and maintenance receptors relevant to development of their good neighbor SIPs." *Id.*

## B. Texas submits its SIP revisions

On August 17, 2018, TCEQ timely submitted revisions to Texas's SIP. *See* Tex. Comm'n on Env't Quality, Fed. Clean Air Act Sections 110(A)(1) and (2) Transport State Implementation Plan Revision for the 2015 Ozone Nat. Ambient Air Quality Standards (Aug. 2018) ("Texas SIP") (App. B).

Per EPA's March 2018 guidance, TCEQ "us[ed] a framework similar to EPA's 4-Step framework," 87 Fed. Reg. at 9,824, for assessing interstate pollution related to ozone but included "several key improvements." Texas SIP at 3-1. To determine its contributions to other States' pollution, TCEQ used historical data from the 2010-2014 period. *Id.* at 3-38. Then, to identify maintenance receptors, TCEQ used

7

the *most recent* three-year average design value from its modeling (i.e., the 2012-2014 period), whereas EPA recommended using the maximum of the three-year average design value (i.e., the highest value from the 2009-2011, 2010-2012, and 2011-2013 periods). *Id*. at 3-3, 3-39. TCEQ found that the most recent design value "reflect[ed] the current state of ozone concentrations in [a downwind] area and the impact of any maintenance plans that [we]re in place to prevent local emissions from causing an area to slip back into nonattainment[.]" *Id*. at 3-42.

## C. EPA issues after-the-fact guidance regarding maintenance receptors

On October 19, 2018—nineteen days *after* the statutory deadline for Texas to submit SIP revisions—EPA issued a memo providing updated expectations for what maintenance receptors States should use when determining their contributions to other States' pollution. Memorandum from Peter Tsirigotis, Director, Office of Air Quality Planning and Standards, *Considerations for Identifying Maintenance Receptors for Use in Clean Air Act Section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards*, (Oct. 19, 2018) ("2018 Maintenance Receptor Memo") (App. C).

The 2018 Maintenance Receptor Memo materially changed EPA guidance given in the 2018 Transport Guidance for identifying maintenance receptors. In contrast to EPA's previous suggestion that States identify at-risk maintenance receptors and consistently clean receptors susceptible to ozone formation, the 2018 Maintenance Receptor Memo for the first time "recommended" that States find receptors in areas where ozone has been trending downward since 2011; that States take additional

steps when looking at receptors in clean areas beyond those described in the 2018 Transport Guidance; and that States identify receptors where "emissions are expected to continue to decline in the upwind and downwind states out to the attainment date of the receptor." *Compare* 2018 Transport Guidance at A-2 *with* 2018 Maintenance Receptor Memo at 4. EPA stated, however, that the guidance contained in that memorandum was "not impos[ing] binding, enforceable requirements on any party" and that "State air agencies retain[ed] the discretion to develop good neighbor SIP revisions that differ[ed] from" the guidance in the 2018 Maintenance Receptor Memo. 2018 Maintenance Receptor Memo at 1. Nothing in the guidance otherwise indicated that compliance with EPA's new recommendations would be dispositive of a SIP submission.

## D. EPA proposes disapproval of Texas's SIP, and TCEQ submits comments

In February 2022, two years after EPA was statutorily required to act, EPA proposed a combined disapproval of Texas's, Oklahoma's, Louisiana's, and Arkansas's SIPs. Air Plan Disapproval; Arkansas, Louisiana, Oklahoma & Texas; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone Nat'l Ambient Air Quality Standards, 87 Fed. Reg. 9,798 (Feb. 22, 2022) (proposed rule). Relevant here, EPA took issue with TCEQ's methodology for identifying maintenance receptors, concluding that its methodology failed to account for "meteorological variability in identifying those areas that" may currently be meeting the NAAQS but may struggle to maintain the NAAQS in the future. *Id.* at 9,826-9,829. EPA also criticized TCEQ's modeling methodology because it believed that TCEQ's use of a historical data set

from 2010-2014 "underestimate[d] future ozone levels" as compared to an "updated" set of data used by EPA from the years 2014-2018. *Id.* at 9,829-9,830. Even though EPA had not finally acted on Texas's SIP revisions, a mere month-and-a-half after proposing to deny the SIP, EPA published a proposed FIP for Texas. 87 Fed. Reg. at 20,036.

In response to the proposed SIP disapproval, TCEQ submitted comments identifying several problems with EPA's analysis. Relevant here, TCEQ pointed out that it was arbitrary and capricious for EPA to deny the SIP in part by relying on guidance issued *after* Texas submitted its SIP. *See* TCEQ, *Comments on the U.S. EPA's Air Plan Disapproval* at 5-6 (Apr. 25, 2022) ("TCEQ Comments") (App. D). TCEQ also argued that it was arbitrary and capricious for EPA to deny the SIP in part by using modeling data from 2014-2018 that was not available to TCEQ until long after Texas's SIP revision deadline had passed. *Id.* at 6.

### E. EPA finalizes its disapproval of Texas's SIP revision

On February 13, 2023, four years after its statutory deadline to act, EPA issued a final disapproval of Texas's SIP. 88 Fed. Reg. at 9,336. Contrary to its statements in the 2018 Maintenance Receptor Memo, EPA expressly disapproved Texas's SIP in part because Texas's identification of maintenance receptors "did not meet the terms of the . . . October 2018 memoranda." *Id.* at 9,340, 9,364. Similarly contradicting its 2018 Transport Guidance, EPA said that it was disapproving Texas's SIP because Texas used a model that relied on five years of data from 2010-2014, which

underestimated future ozone levels. *Id.* at 9,359-60. In attempting to justify this decision, EPA did not point to the statute or any regulation. It instead said that it was just "following the science." *Id.* at 9,364.

## Stay Standard

Courts consider four factors when determining whether to grant a stay: (1) likelihood of success on the merits; (2) the prospect of irreparable injury; (3) the possibility of harm to other parties; and (4) the public interest. *Nken v. Holder*, 556 U.S. 418, 434 (2009). As explained below, each factor favors a stay here.

## Argument

### I.  Petitioners Are Likely to Succeed on the Merits.

The Administrative Procedure Act ("APA") instructs courts to "hold unlawful and set aside agency action[s]" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). Agency action qualifies as arbitrary and capricious "'if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Tex. Oil & Gas Ass'n v. EPA*, 161 F.3d 923, 933 (5th Cir. 1998) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). "Put simply, [the Court]

must set aside any action premised on reasoning that fails to account for 'relevant factors' or evinces a 'clear error of judgment.'" *Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS*, 985 F.3d 472, 475 (5th Cir. 2021) (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989)). This review is "not toothless," and "after [*Department of Homeland Security v. Regents of the University of California*, 140 S. Ct. 1891 (2020)], it has serious bite." *Wages & White Lion Invs. v. FDA*, 16 F.4th 1130, 1136 (5th Cir. 2021).

EPA's final disapproval of Texas's SIP violates these foundational principles of administrative law in two ways. First, it fails to explain EPA's after-the-fact reversal of prior guidance regarding how States should identify maintenance receptors. And second, it disregards the Act's cooperative federalism by denying the SIP based on emissions-modeling data available only *after* Texas was statutorily required to submit its SIP revisions.

## A.  EPA failed to explain its reversal of previous policy regarding identification of maintenance receptors.

"It is axiomatic that the APA requires an agency to explain its basis for a decision." *Physicians for Soc. Resp. v. Wheeler*, 956 F.3d 634, 644 (D.C. Cir. 2020). "This foundational precept of administrative law is especially important where, as here, an agency changes course." *Id.* Consequently, "[r]easoned decision-making requires that when departing from precedents or practices, an agency must 'offer a reason to distinguish them or explain its apparent rejection of their approach.'" *Id.* (quoting *Sw. Airlines Co. v. FERC*, 926 F.3d 851, 856 (D.C. Cir. 2019)). In other words, when

an agency reverses "prior policy," it must provide a "detailed justification" for doing so. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009) (plurality op.).

That is particularly true where the agency's new policy depends upon "factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests that must be taken into account." *Id.* at 515. Indeed, "[s]udden and unexplained change, or change that does not take account of legitimate reliance on prior interpretation, may be arbitrary, capricious [or] an abuse of discretion." *Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735, 742 (1996) (cleaned up). But regardless of how "the agency justifies its new position, what it may not do is 'gloss[] over or swerve[] from prior precedents without discussion.'" *Physicians for Soc. Resp.*, 956 F.3d at 645 (quoting *Sw. Airlines*, 926 F.3d at 856).

EPA's disapproval of Texas's SIP revisions violates those principles. It is premised in part on the agency's rejection of a method for identifying maintenance receptors that EPA endorsed before Texas's submission of its SIP revisions, then changed *after* Texas submitted its SIP revisions. In its March 2018 guidance document, EPA instructed States to identify maintenance receptors by focusing on receptors found in maintenance areas that were at risk of nonattainment and receptors found in clean areas where ozone formation was likely to occur but did not. 2018 Transport Guidance at A-2. But in its October 2018 memorandum—issued *after* the deadline for submitting Texas's SIP revisions—EPA changed course, instructing States to use receptors located in areas where ozone has been trending downward since 2011 and receptors where "emissions are expected to continue to decline in the upwind and

13

downwind states out to the attainment date of the receptor." 2018 Maintenance Receptor Memo at 4. Critically, although EPA insisted in its October 2018 guidance that its instructions were not binding or enforceable, it relied on the standards articulated in that memorandum as a basis for denying Texas's SIP. *See* 88 Fed. Reg. at 9,364.

This is the definition of an "unfair surprise" that penalizes a party for "good-faith reliance" on an agency's prior positions. *Christopher*, 567 U.S. at 156-57; *see ExxonMobil Pipeline Co. v. DOT*, 867 F.3d 564, 580 (5th Cir. 2017). EPA offers no meaningful justification for its sudden and unexpected policy reversal beyond vague assertions that it was "following the science" and that Texas should have known that out-of-circuit cases "called into question" the 2018 Transport Guidance on which Texas relied. 88 Fed. Reg. at 9,364. Neither of those assertions has merit.

**1.** "Following the science" is an empty phrase. It explains nothing about why EPA's tardy guidance addressing maintenance-receptor selection—guidance that EPA characterized as "[non]binding" and "[un]enforceable"—suddenly became binding, enforceable, and indeed dispositive four-and-a-half years after it was issued. The two cases that EPA claims "called into question" the 2018 Transport Guidance, and thus the science upon which Texas relied, are inapposite. If *Maryland v. EPA*, 958 F.3d 1185 (D.C. Cir. 2020), and *Wisconsin v. EPA*, 938 F.3d 303 (D.C. Cir. 2019) (per curiam), had somehow changed the science and triggered EPA policy reversals affecting SIP submissions, EPA should have issued a SIP call under 42 U.S.C. § 7410(k)(5). EPA could have explained its policy reversal and requested revisions from States for their Transport SIPs. Had it done so, there would be no "surprise,"

14

and Texas would have "know[n] the rules by which the game [would] be played"—knowledge Texas was entitled to but did not receive. *Alaska Prof'l Hunters Ass'n v. FAA*, 177 F.3d 1030, 1035 (D.C. Cir. 1999), *abrogated on other grounds by Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92 (2015).

Instead, EPA waited almost five years to inform Texas that its reliance on EPA's 2018 Transport Guidance was misplaced because the science had supposedly changed three years prior due to D.C. Circuit opinions in unrelated cases that, unsurprisingly, did not purport to announce any scientific discoveries. An agency must "give the person of ordinary intelligence a reasonable opportunity to know" what is required or prohibited, "so that he may act accordingly." *Emp. Sols. Staffing Grp. II, LLC v. Off. of Chief Admin. Hearing Officer*, 833 F.3d 480, 488 (5th Cir. 2016). EPA failed to do that here.

**2.**    Not only did EPA fail to provide a reasoned explanation for its policy reversal, it also failed to account for Texas's reliance interests. *See, e.g.*, *Regents*, 140 S. Ct. at 1913. EPA "was required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Id.* at 1915. But EPA did not—and indicated no awareness that its policies may have "engendered serious reliance interests that must be taken into account." *Id.* at 1913. Failing to "adequately assess reliance interests," like those of Texas, made it "impossible" for EPA "to properly weigh the relevant interests against competing policy concerns while considering alternatives," as the APA requires. *Biden v. Texas*, 10 F.4th 538, 555 (5th Cir. 2021) (per curiam).

## B.  EPA's disapproval of Texas's SIP renders the Act's cooperative federalism a dead letter.

The Act's cooperative federalism assigns the States "primary responsibility for ensuring that the ambient air meets the NAAQS for the identified pollutants." *BCCA Appeal Grp.*, 355 F.3d at 822; *see* 42 U.S.C. § 7407(a). Indeed, the Act confers "broad authority [on the States] to determine the methods and particular control strategies they will use to achieve the statutory requirements," *BCCA Appeal Grp.*, 355 F.3d at 822, and "'wide discretion in formulating [their] plan[s]'" for meeting the NAAQS, *Luminant*, 675 F.3d at 921. As noted, this division of responsibility "reflects the balance of state and federal rights and responsibilities characteristic of our federal system of government" and "indicates a congressional preference that states, not EPA, drive the regulatory process," *Texas*, 829 F.3d at 411.

EPA's disapproval of Texas's SIP revisions disregards that statutory structure. For that reason, it "fails to account for 'relevant factors' or evinces a 'clear error of judgment.'" *Univ. of Tex.*, 985 F.3d at 475. Indeed, EPA's disapproval of Texas's SIP leverages the agency's own disregard of its statutory deadline for acting on a SIP submission to disapprove the SIP based on data that was not available to Texas at the time the State was statutorily required to—and did—submit its revisions.

As described above, EPA's October 1, 2015, revision of the NAAQS triggered Texas's three-year deadline to revise its SIP, 42 U.S.C. § 7410(a)(1), and Texas timely submitted its revised SIP on August 17, 2018, *see* Texas SIP. Relevant here, TCEQ's SIP revisions reflected an assessment of the impact Texas's ozone emissions had on downwind States using modeling data from a five-year period from

16

2010-2014, Texas SIP at 3-3 to 3-6—an approach similar to what EPA recommended mere months before Texas's submission deadline. *See* 2018 Transport Guidance at 3-6. Following that approach, TCEQ concluded that "Texas emissions do not contribute significantly to nonattainment or interfere with maintenance of the 2015 eight-hour ozone NAAQS at any downwind monitors." Texas SIP at 3-75.

Despite a maximum of 18 months to approve or deny the SIP, 42 U.S.C. § 7410(k)(1)-(2), EPA did not take action on Texas's timely SIP revisions until three years *after* the statutory deadline had passed. 87 Fed. Reg. at 9,798. By that time, EPA had accumulated a new data set on which to base its modeling: ozone emissions from the years 2014-2018. *Id.* at 9,828. And it used the information derived from that new data set, which included data from the same year that Texas's SIP revision was statutorily due, as a basis upon which to disapprove Texas's SIP. *Id.*

Commenters, including TCEQ, raised the fundamental impropriety of using data not available at the relevant time—and available to EPA only because of its characteristic failure to meet its statutory deadlines by a long shot—as a basis upon which to reject Texas's SIP. *See* TCEQ Comments at 6; 88 Fed. Reg. 9,366 (EPA's concession that this new data set was published in "November of 2020," seven months *after* EPA was statutorily required to approve or deny Texas's SIP). In response, EPA stated in the Final Rule that it should not be "prohibited from taking rulemaking action using the best information available to it at the time it takes such action." 88 Fed. Reg. at 9,366. And it concluded that "[n]othing in the [Act] suggests that the Agency must deviate from that general principle when acting on SIP submissions." *Id.*

If EPA's response were correct, the Act's cooperative-federalism framework would become little more than a suggestion. EPA could ignore its statutorily assigned deadlines with impunity, assemble new data after the expiration of a State's statutory deadline to act, reject a SIP revision based on inconsistency with the new data, and then impose a FIP that ensures a federal takeover of a State's economy.

That is not how Congress structured the Act. "EPA may not use its own delay as an excuse for imposing burdens on Texas that" the Act "does not permit." *Texas*, 829 F.3d at 430. And nothing in the Act authorizes EPA to second-guess TCEQ's technical analysis based on data that became available *after* Texas's statutory deadline to act. EPA's approach would invert the Act's structure by constricting the States' "wide discretion in formulating [their SIPs]" and expanding EPA's role from a "ministerial function of [timely] reviewing SIPs for consistency with the Act's requirements" to a freewheeling power to override state discretion on EPA's own preferred schedule, rather than Congress's. *Luminant*, 675 F.3d at 921. EPA's "fail[ure] to account for" these "'relevant factors,'" *Univ. of Tex.*, 985 F.3d at 475, and its "reli[ance] on factors which Congress has not intended it to consider," *Tex. Oil & Gas Ass'n*, 161 F.3d at 933, to substitute its judgment for Texas's was arbitrary and capricious.

## II. The Remaining Stay Factors Favor Petitioners.

Petitioners will be irreparably injured absent a stay. *See Nken*, 556 U.S. at 434. As explained above, allowing the SIP to take effect "would disrupt the system of cooperative federalism enshrined in the Clean Air Act." *Texas*, 829 F.3d at 433. Moreover, a SIP disapproval is the necessary condition for EPA's imposition of a

FIP—which EPA has legally bound itself to finalize in less than two weeks. *See* Consent Decree, *Sierra Club v. Michael S. Regan*, No. 3:22-cv-1992 (N.D. Cal. Jan. 24, 2023). Imposition of the FIP will lead to an onerous regulatory regime likely to result in a reduction of at least 10,800 MW of capacity, the disconnecting of customers from the electrical grid, and a strain on existing sources by a decreased ability to conduct planned periodic outages. Declaration of Dwayne W. "Woody" Rickerson (App. E). And it is black-letter law that "plant closures, the threat of grid instability and potential brownouts alone constitute irreparable injury to Texans." *Texas*, 829 F.3d at 434.

In contrast, EPA will suffer no harm if the SIP is stayed pending review. Indeed, if time really were of the essence, EPA would not have taken almost five years to disapprove Texas's SIP and impose a FIP. *See Tate Access Floors, Inc. v. Interface Architecture Res., Inc.*, 279 F.3d 1357, 1364 (Fed. Cir. 2002) (identifying the absence of a threat to public health as a significant factor favoring a preliminary injunction). Moreover, as Texas's SIP demonstrated, emissions from Texas do not significantly contribute to nonattainment in downwind States or interfere with maintenance of the 2015 ozone NAAQS. Texas SIP at 3-75.

Finally, the public interest also favors a stay. *See Nken*, 556 U.S. at 434. When, as here, a State seeks a stay pending appeal, "its interest and harm merge with that of the public." *Veasey v. Abbott*, 870 F.3d 387, 391 (5th Cir. 2017) (per curiam). Moreover, preserving a functioning Texas power grid and the State's ability to deliver "ready access to affordable electricity," *Texas*, 829 F.3d at 435, outweighs any interest in enforcement of the disapproval of Texas's SIP and the imposition of a FIP.

## Conclusion

The Court should stay, pending review, the part of the Final Rule that disapproves Texas's SIP.

Respectfully submitted.

<div style="display:flex">
<div>

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

</div>
<div>

Judd E. Stone II
Solicitor General

/s/ Bill Davis
Bill Davis
Deputy Solicitor General
Bill.Davis@oag.texas.gov

Michael R. Abrams
William F. Cole
Joseph N. Mazzara
Assistant Solicitors General

Counsel for State of Texas and
Texas Commission on
Environmental Quality

</div>
</div>

## CERTIFICATE OF CONFERENCE

On March 2 and 3, 2023, counsel for the State of Texas and TCEQ conferred with counsel for all other parties. The respondents oppose the relief sought in this motion. The other petitioners consent to it.

/s/ Bill Davis
BILL DAVIS

## CERTIFICATE OF SERVICE

On March 3, 2023, this motion was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

/s/ Bill Davis
BILL DAVIS

## CERTIFICATE OF COMPLIANCE

This document complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5,150 words, excluding the parts of the document exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the same program used to calculate the word count).

/s/ Bill Davis
BILL DAVIS