No. 23-60069

# In the United States Court of Appeals for the Fifth Circuit

STATE OF TEXAS; TEXAS COMMISSION ON ENVIRONMENTAL QUALITY; LUMINANT GENERATION COMPANY, L.L.C.; COLETO CREEK POWER, L.L.C.; ENNIS POWER COMPANY, L.L.C.; HAYS ENERGY, L.L.C.; MIDLOTHIAN ENERGY, L.L.C.; OAK GROVE MANAGEMENT COMPANY, L.L.C.; WISE COUNTY POWER COMPANY, L.L.C.; ASSOCIATION OF ELECTRIC COMPANIES OF TEXAS; BCCA APPEAL GROUP; TEXAS CHEMICAL COUNCIL; TEXAS OIL & GAS ASSOCIATION,

*Petitioners*,

*v.*

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; MICHAEL S. REGAN, ADMINISTRATOR, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

*Respondents*.

## APPENDIX

### Table of Contents

Tab

1. EPA, *Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I)* (Mar. 27, 2018) ("2018 Transport Guidance") .......................... A

2. Tex. Comm'n on Env't Quality, Fed. Clean Air Act Sections 110(A)(1) and (2) Transport State Implementation Plan Revision for the 2015 Ozone Nat. Ambient Air Quality Standards (Aug. 2018) ("Texas SIP") ....................................................... B

3. EPA, *Considerations for Identifying Maintenance Receptors for Use in Clean Air Act Section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards*, (Oct 18, 2018) ("2018 Maintenance Receptor Memo") ............................................................................. C

4. TCEQ, *Comments on the U.S. EPA's Air Plan Disapproval* 5-6 (Apr. 25, 2022) ("TCEQ Comments") .................................................................................. D

5. Declaration of Dwayne W. "Woody" Rickerson ("ERCOT Decl.") ................. E

**Tab A:**
**EPA, Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I) (Mar. 27, 2018) ("2018 Transport Guidance")**



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
RESEARCH TRIANGLE PARK, NC 27711

MAR 27 2018

OFFICE OF
AIR QUALITY PLANNING
AND STANDARDS

## MEMORANDUM

**SUBJECT:**   Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I)

**FROM:**   Peter Tsirigotis
Director

**TO:**   Regional Air Division Directors, Regions 1–10

The purpose of this memorandum is to provide information to states and the Environmental Protection Agency Regional offices as they develop or review state implementation plans (SIPs) that address section 110(a)(2)(D)(i)(I) of Clean Air Act (CAA), also called the "good neighbor" provision, as it pertains to the 2015 ozone National Ambient Air Quality Standards (NAAQS). Specifically, this memorandum includes EPA's air quality modeling data for ozone for the year 2023, including newly available contribution modeling results, and a discussion of elements previously used to address interstate transport. In addition, the memorandum is accompanied by Attachment A, which provides a preliminary list of potential flexibilities in analytical approaches for developing a good neighbor SIP that may warrant further discussion between EPA and states.

The information in this memorandum provides an update to the contribution modeling analyses provided in EPA's January 2017 Notice of Data Availability (NODA) of ozone transport modeling data for the 2015 ozone NAAQS and builds upon information provided in the October 2017 interstate transport memorandum.[1] The October 2017 memorandum provided projected ozone design values for 2023 based on EPA's updated nationwide ozone modeling with the primary goal of assisting states in completing good neighbor transport actions for the 2008 ozone NAAQS.

---

[1] *See* Notice of Availability of the Environmental Protection Agency's Preliminary Interstate Ozone Transport Modeling Data for the 2015 Ozone National Ambient Air Quality Standard (NAAQS), 82 FR 1733 (January 6, 2017). This memorandum also supplements the information provided in the memorandum, *Supplemental Information on the Interstate Transport State Implementation Plan Submissions for the 2008 Ozone National Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I).* Memorandum from Stephen D. Page, Director, U.S. EPA Office of Air Quality Planning and Standards, to Regional Air Division Directors, Regions 1–10. October 27, 2017. Available at *https://www.epa.gov/sites/production/files/2017-10/documents/final_2008_o3_naaqs_transport_memo_10-27-17b.pdf.* (The October 27, 2017, memorandum includes links to all supporting documentation, including modeling and emissions technical support documents.)

EPA's goal in providing this information is to assist states' efforts to develop good neighbor SIPs for the 2015 ozone NAAQS to address their interstate transport obligations. While the information in this memorandum and the associated air quality analysis data could be used to inform the development of these SIPs, the information is not a final determination regarding states' obligations under the good neighbor provision. Any such determination would be made through notice-and-comment rulemaking.

**The Good Neighbor Provision**

Under CAA sections 110(a)(l) and 110(a)(2), each state is required to submit a SIP that provides for the implementation, maintenance and enforcement of each primary and secondary NAAQS. Section 110(a)(1) requires each state to make this new SIP submission within 3 years after promulgation of a new or revised NAAQS. This type of SIP submission is commonly referred to as an "infrastructure SIP." Section 110(a)(2) identifies specific elements that each plan submission must meet. Conceptually, an infrastructure SIP provides assurance that a state's SIP contains the necessary structural requirements to implement the new or revised NAAQS, whether by demonstrating that the state's SIP already contains or sufficiently addresses the necessary provisions, or by making a substantive SIP revision to update the plan provisions to meet the new standards.

In particular, CAA section 110(a)(2)(D)(i)(I) requires each state to submit to EPA new or revised SIPs that "contain adequate provisions ... prohibiting, consistent with the provisions of this subchapter, any source or other type of emissions activity within the State from emitting any air pollutant in amounts which will ... contribute significantly to nonattainment in, or interfere with maintenance by, any other state with respect to any such national primary or secondary ambient air quality standard." EPA often refers to section 110(a)(2)(D)(i)(I) as the good neighbor provision and to SIP revisions addressing this requirement as good neighbor SIPs.

On October 1, 2015, EPA promulgated a revision to the ozone NAAQS, lowering the level of both the primary and secondary standards to 70 parts per billion (ppb).[2] Pursuant to CAA section 110(a), good neighbor SIPs are, therefore, due by October 1, 2018. As noted earlier, EPA intends that the information conveyed through this memorandum should assist states in their efforts to develop good neighbor SIPs for the 2015 ozone NAAQS to address their interstate transport obligations.

**Framework to Address the Good Neighbor Provision**

Through the development and implementation of several previous rulemakings, including most recently the Cross-State Air Pollution Rule (CSAPR) Update,[3] EPA, working in partnership with states, established the following four-step framework to address the requirements of the good neighbor provision for ozone and fine particulate matter ($PM_{2.5}$) NAAQS: (1) identify downwind air quality problems; (2) identify upwind states that contribute enough to those downwind air

---

[2] National Ambient Air Quality Standards for Ozone Final Rule, 80 FR 65292 (October 26, 2015).

[3] *See* Finding of Significant Contribution and Rulemaking for Certain States in the Ozone Transport Assessment Group Region for Purposes of Reducing Regional Transport of Ozone (also known as the $NO_X$ SIP Call), 63 FR 57356 (October 27, 1998); Clean Air Interstate Rule (CAIR) Final Rule, 70 FR 25162 (May 12, 2005); CSAPR Final Rule, 76 FR 48208 (August 8, 2011); CSAPR Update for the 2008 Ozone NAAQS (CSAPR Update) Final Rule, 81 FR 74504 (October 26, 2016).

quality problems to warrant further review and analysis; (3) identify the emissions reductions necessary (if any), considering cost and air quality factors, to prevent an identified upwind state from contributing significantly to those downwind air quality problems; and (4) adopt permanent and enforceable measures needed to achieve those emissions reductions. EPA notes that, in applying this framework or other approaches consistent with the CAA, various analytical approaches may be used to assess each step. EPA has undertaken several previous regional rulemakings applying this framework, and its analytical approaches have varied over time due to continued evolution of relevant tools and information, as well as their specific application.

This memo presents information regarding EPA's latest analysis for purposes of assisting states in developing SIPs for the 2015 ozone NAAQS, and, in doing so, generally follows approaches that EPA has taken in its regional rulemaking actions addressing prior ozone NAAQS. EPA also notes that, in developing their own rules, states have flexibility to follow the familiar four-step transport framework (using EPA's analytical approach or somewhat different analytical approaches within these steps) or alternative frameworks, so long as their chosen approach has adequate technical justification and is consistent with the requirements of the CAA. In various discussions, states and other stakeholders have suggested specific approaches that may warrant further consideration, and have indicated that they may be exploring other approaches as well. Over the next few months, EPA will be working with states to evaluate potential additional flexibilities for states to consider as they develop their good neighbor SIPs for the 2015 ozone NAAQS. Such potential flexibilities could apply to modeling conducted by states or to states' use of EPA's updated modeling presented here. Attachment A provides a preliminary list of potential flexibilities that may warrant further discussion. EPA looks forward to discussing these and other potential flexibilities with states over the next few months, which will help inform states' development of their good neighbor SIP submittals, as well as EPA's development of further information on good neighbor SIPs.

**Air Quality Modeling Projection of 2023 Ozone Design Values**

As noted previously and as described in more detail in both the 2017 NODA and the October 2017 memorandum, EPA uses modeling to identify potential downwind air quality problems. A first step in the modeling process is selecting a future analytic year that considers both the relevant attainment dates of downwind nonattainment areas impacted by interstate transport[4] and the timeframes that may be required for implementing further emissions reductions as expeditiously as practicable.[5] For the 2015 ozone NAAQS, EPA selected 2023 as the analytic year in our modeling analyses primarily because it aligns with the anticipated attainment year for Moderate ozone nonattainment areas.[6]

---

[4] *North Carolina v. EPA*, 531 F.3d 896, 911–12 (D.C. Cir. 2008) (holding that compliance timeframes for necessary emission reductions must consider downwind attainment deadlines).

[5] *See* October 2017 memorandum, pp. 4-6 (discussion of timing of controls).

[6] On November 16, 2017 (82 FR 54232), EPA established initial air quality designations for most areas in the United States. On December 22, 2017 (83 FR 651), EPA responded to state and tribal recommendations by indicating the anticipated area designations for the remaining portions of the U.S. In addition, EPA proposed the maximum attainment dates for nonattainment areas in each classification, which for Moderate ozone nonattainment is 6 years (81 FR 81276, November 17, 2016). Based on the expected timing for final designations, 6 years from the likely effective date for designations would be summer 2024. Therefore, the 2023 ozone season would be the last full ozone season before the 2024 attainment date.

As noted in the aforementioned October 2017 memorandum, EPA then used the Comprehensive Air Quality Model with Extensions (CAMx v6.40)[7] to model emissions in 2011 and 2023, based on updates provided to EPA from states and other stakeholders.[8] EPA used outputs from the 2011 and 2023 model simulations to project base period 2009-2013 average and maximum ozone design values to 2023 at monitoring sites nationwide. In projecting these future year design values, EPA applied its own modeling guidance,[9] which recommends using model predictions from the "3 x 3" array of grid cells surrounding the location of the monitoring site.[10] In light of comments on the January 2017 NODA and other analyses, EPA also projected 2023 design values based on a modified version of the "3 x 3" approach for those monitoring sites located in coastal areas. Briefly, in this alternative approach, EPA incorporated the flexibility of eliminating from the design value calculations those modeling data in grid cells that are dominated by water (*i.e.*, more than 50 percent of the area in the grid cell is water) and that do not contain a monitoring site (*i.e.*, if a grid cell is more than 50 percent water but contains an air quality monitor, that cell would remain in the calculation).[11] For each individual monitoring site, the base period 2009-2013 average and maximum design values, 2023 projected average and maximum design values based on both the "3 x 3" approach and the alternative approach affecting coastal sites, and 2014-2016 measured design values are provided in an attachment to the October 27 memorandum. The same information is available in Excel format at *https://www.epa.gov/airmarkets/october-2017-memo-and-information-interstate-transport-sips-2008-ozone-naaqs*.

In the CSAPR Update rulemaking process, EPA considered a combination of monitoring data and modeling projections to identify receptor sites that are projected to have problems attaining or maintaining the NAAQS.[12] Specifically, EPA identified nonattainment receptors as those monitoring sites with current measured values exceeding the NAAQS that also have projected (*i.e.*, in 2023) average design values exceeding the NAAQS. EPA identified maintenance receptors as those monitoring sites with maximum design values exceeding the NAAQS. This included sites with current measured values below the NAAQS with projected average and maximum design values exceeding the NAAQS, and monitoring sites with projected average design values below the NAAQS but with projected maximum design values exceeding the NAAQS. The projected 2023 ozone design values and 2014-2016 measured design values for monitors in the United States have not changed since they were first presented in the October 2017 memorandum.

---

[7] CAMx v6.40 was the most recent public release version of CAMx at the time EPA updated its modeling in fall 2017. ("Comprehensive Air Quality Model with Extension version 6.40 User's Guide" Ramboll Environ, December 2016. *http://www.camx.com/*.)

[8] For the updated modeling, EPA used the construct of the modeling platform (*i.e.*, modeling domain and non-emissions inputs) that we used for the NODA modeling, except that the photolysis rates files were updated to be consistent with CAMx v6.40. The NODA Air Quality Modeling Technical Support Document describing the modeling platform is available at *https://www.epa.gov/airmarkets/notice-data-availability-preliminary-interstate-ozone-transport-modeling-data-2015-ozone.*

[9] *http://www.epa.gov/ttn/scram/guidance/guide/Draft_O3-PM-RH_Modeling_Guidance-2014.pdf.*

[10] EPA's modeling uses 12 kilometer$^2$ grid cells.

[11] A model grid cell is identified as a "water" cell if more than 50 percent of the grid cell is water based on the 2006 National Land Cover Database. Grid cells that meet this criterion are treated as entirely over water in the Weather Research Forecast (WRF) modeling used to develop the 2011 meteorology for EPA's air quality modeling.

[12] *See* 81 FR 74530-74532 (October 26, 2016).

4

In this memorandum, EPA is identifying 2023 potential nonattainment and maintenance receptors with respect to the 2015 NAAQS, following its approach taken for previous NAAQS. This information is based on applying the CSAPR method for identifying potential nonattainment and maintenance receptors, and presents the design values in two ways: first, following the "3 x 3" approach to evaluating all sites, and second, following the modified approach for coastal monitoring sites in which "overwater" modeling data were not included in the calculation of future year design values. After incorporating these approaches, the modeling results suggest, based on the approach used for previous NAAQS, 11 monitoring sites outside of California as potential nonattainment receptors and 14 monitoring sites outside of California as potential maintenance receptors. *See* Attachment B for this receptor information.

**Air Quality Modeling of 2023 Contributions**

After identifying potential downwind air quality problems by projecting base period 2009-2013 average and maximum ozone design values to 2023 at monitoring sites nationwide, EPA next performed nationwide, state-level ozone source apportionment modeling using the CAMx Anthropogenic Precursor Culpability Analysis (APCA) technique[13] to provide information regarding the expected contribution of 2023 base case nitrogen oxides ($NO_X$) and volatile organic compound (VOC) emissions from all sources in each state to projected 2023 ozone concentrations at each air quality monitoring site. In the source apportionment model run, EPA tracked the ozone formed from each of the following contribution categories (*i.e.*, "tags"):

- States – anthropogenic $NO_X$ and VOC emissions from each of the contiguous 48 states and the District of Columbia tracked individually (EPA combined emissions from all anthropogenic sectors in a given state);
- Biogenics – biogenic $NO_X$ and VOC emissions domain-wide (*i.e.*, not by state);
- Initial and Boundary Concentrations – concentrations transported into the modeling domain from the lateral boundaries;
- Tribal Lands – the emissions from those tribal lands for which EPA has point source inventory data in the 2011 NEI (EPA did not model the contributions from individual tribes);
- Canada and Mexico – anthropogenic emissions from sources in those portions of Canada and Mexico included in the modeling domain (EPA did not separately model contributions from Canada or Mexico);
- Fires – combined emissions from wild and prescribed fires domain-wide (*i.e.*, not by state); and
- Offshore – combined emissions from offshore marine vessels and offshore drilling platforms (*i.e.*, not by state).

EPA performed the CAMx source apportionment model simulation for the period May 1 through September 30 using the 2023 future base case emissions and 2011 meteorology for this

---

[13] As part of this technique, ozone formed from reactions between biogenic and anthropogenic VOC and $NO_X$ are assigned to the anthropogenic emissions.

time period.[14] EPA processed hourly contributions[15] from each tag to obtain the 8-hour average contributions corresponding to the time period of the 8-hour daily maximum concentration on each day in the 2023 model simulation. This step was performed for those model grid cells containing monitoring sites to obtain 8-hour average contributions for each day at the location of each site. EPA then processed the model-predicted contributions on each day at each monitoring site location to identify the contributions on the subset of days in the 2023 modeling with the top 10 model-predicted maximum daily 8-hour average concentrations. The daily 8-hour average contributions on the top 10 concentration days in 2023 were applied in a relative sense to quantify the contributions to the 2023 average design value at each site.

In the CSAPR and CSAPR Update modeling efforts, EPA had used a slightly different approach by basing the average future year contribution on future year modeled values that exceeded the NAAQS or the top 5 days, whichever was greater. While technically sound, EPA's previous approach resulted in different contributions for an individual linkage depending on the level of the NAAQS. For the modeling effort described in this memorandum, EPA considered comments on the January 2017 NODA and developed and incorporated the flexibility of calculating the contribution metric using contributions on the top 10 future year days. As some commenters have indicated, this approach makes the contribution metric values more consistent across monitoring sites and more robust in terms of being independent of the level of the NAAQS. The contributions from each tag to each monitoring site identified as a potential nonattainment or maintenance receptor in 2023 are provided in Attachment C.[16]

**Conclusion**

States may consider using this national modeling to develop SIPs that address requirements of the good neighbor provision for the 2015 ozone NAAQS. When doing so, EPA recommends that states include in any such submission state-specific information to support their reliance on the 2023 modeling data. Further, states may supplement the information provided in this memorandum with any additional information that they believe is relevant to addressing the good neighbor provision requirements. States may also choose to use other information to identify nonattainment and maintenance receptors relevant to development of their good neighbor SIPs. If this is the case, states should submit that information along with a full explanation and technical analysis. EPA encourages collaboration among states linked to a common receptor and among linked upwind and downwind states in developing and implementing a regionally consistent approach. We recommend that states reach out to EPA Regional offices and work together to accomplish the goal of developing, submitting, and reviewing approvable SIPs that address the good neighbor provision for the 2015 ozone NAAQS.

Finally, as indicated previously in this memorandum, in addition to the flexibilities already incorporated into EPA's modeling effort (*i.e.*, considering the removal of modeled values in "over water" grid cells and EPA's modified approach for calculating the contribution metric), EPA is

---

[14] *See* the October 2017 memorandum for a description of these model inputs.

[15] Ozone contributions from anthropogenic emissions under "NO$_X$-limited" and "VOC-limited" chemical regimes were combined to obtain the net contribution from NO$_X$ and VOC anthropogenic emissions in each state.

[16] Given stakeholder input on the 2017 NODA and other analyses, EPA elected to represent the contribution information in this memorandum using the alternative approach for projecting design values for sites in coastal areas.

evaluating whether states may have additional flexibilities as they work to prepare and submit approvable good neighbor SIPs for the 2015 ozone NAAQS (*see* Attachment A). EPA looks forward to discussing these and other potential flexibilities with states over the next few months, which will help inform states' development of their good neighbor SIP submittals, as well as EPA's development of further information on good neighbor SIPs.

Please share this information with the air agencies in your Region.

**For Further Information**

If you have any questions concerning this memorandum, please contact Norm Possiel at (919) 541-5692, *possiel.norm@epa.gov* for modeling information or Beth Palma at (919) 541-5432, *palma.elizabeth@epa.gov* for any other information.

Attachments

A. Preliminary List of Potential Flexibilities Related to Analytical Approaches for Developing a Good Neighbor State Implementation Plan
B. Projected Ozone Design Values at Potential Nonattainment and Maintenance Receptors Based on EPA's Updated 2023 Transport Modeling
C. Contributions to 2023 8-hour Ozone Design Values at Projected 2023 Nonattainment and Maintenance Sites

**Attachment A**

**Preliminary List of Potential Flexibilities Related to Analytical Approaches for Developing a Good Neighbor State Implementation Plan**

The Environmental Protection Agency believes states may be able to consider certain approaches as they develop good neighbor state implementation plans (SIPs) addressing the 2015 ozone National Ambient Air Quality Standards (NAAQS). To that end, EPA has reviewed comments provided in various forums, including comments on EPA's January 2017 Notice of Data Availability (NODA) regarding ozone transport modeling data for the 2015 ozone NAAQS, and seeks feedback from interested stakeholders on the following concepts. This list is organized in the familiar four-step transport framework discussed on pages 2-3 of the memorandum above, but EPA is open to alternative frameworks to address good neighbor obligations or considerations outside the four-step process. The purpose of this attachment is to identify potential flexibilities to inform SIP development and seek feedback on these concepts. EPA is not at this time making any determination that the ideas discussed below are consistent with the requirements of the CAA, nor are we specifically recommending that states use these approaches. Determinations regarding states' obligations under the good neighbor provision would be made through notice-and-comment rulemaking.

EPA has identified several guiding principles to consider when evaluating the appropriateness of the concepts introduced in this attachment, including:

- Supporting states' position as "first actors" in developing SIPs that address section 110(a)(2)(D) of the CAA;
- Consistency with respect to EPA's SIP actions is legally required by the statute and regulations (*see* CAA § 301(a)(2) and 40 CFR part 56) and is a particularly acute issue with respect to regional transport issues in which multiple states may be implicated;
- Compliance with statutory requirements and legal precedent from court decisions interpreting the CAA requirements;
- Encouraging collaboration among states linked to a common receptor and among linked upwind and downwind states in developing and applying a regionally consistent approach to identify and implement good neighbor obligations; and
- The potential value of considering different modeling tools or analyses in addition to EPA's, provided that any alternative modeling is performed using a credible modeling system which includes "state-of-the-science" and "fit for purpose" models, inputs, and techniques that are relevant to the nature of the ozone problem. The use of results from each alternative technique should be weighed in accordance with the scientific foundation, construct and limitations of the individual techniques.

EPA intends to reflect on feedback received on these concepts and communicate closely with air agencies as they prepare and submit SIPs to address the good neighbor provisions for the 2015 ozone NAAQS.

**Analytics**

- Consideration of appropriate alternate base years to those used in EPA's most recent modeling (*e.g.*, appropriate alternative base years should be selected consistent with EPA's air quality modeling guidance suggesting that years with meteorology conducive to ozone formation are appropriate).
- Consideration of an alternate future analytic year. EPA has identified 2023 as an appropriate analytic year to consider when evaluating transport obligations for the 2015 ozone NAAQS; however, another year may also be appropriate.
- Use of alternative power sector modeling consistent with EPA's emission inventory guidance.
- Consideration of state-specific information in identifying emissions sources [*e.g.*, electric generating units (EGUs) and non-EGUs] and controls (*e.g.*, combustion/process controls, post-combustion controls) that are appropriate to evaluate.

**Step 1 – Identify downwind air quality problems**

- Identification of maintenance receptors.
  - Evaluate alternative methodologies to give independent meaning to the term "interfere with maintenance" under CAA section 110(a)(2)(D)(i)(I).
  - Identify maintenance receptors that are at risk of exceeding the NAAQS (even if they do not currently violate the standard) using an alternative approach that does not rely on the projection of maximum design values.
  - Identify maintenance receptors where current, presumably "clean," measured data are shown through analysis to occur during meteorological conditions conducive to ozone formation such that exceedances are unlikely to reoccur in the future.
- Consideration of downwind air quality context.
  - Consider the role of designations issued in FY 2018 based on approved air quality monitors.
  - Assess current and projected local emissions reductions and whether downwind areas have considered and/or used available mechanisms for regulatory relief.
- Consideration of model performance.
  - Consider removal of certain data from modeling analysis for the purposes of projecting design values and calculating the contribution metric where data removal is based on model performance and technical analyses support the exclusion.

**Step 2 – Identify upwind states that contribute to those downwind air quality problems to warrant further review and analysis**

- Considerations related to determining contributions.
  - EPA has used the Anthropogenic Precursor Culpability Analysis (APCA) approach for the purpose of quantifying contribution to downwind receptors. We have received questions regarding the use of other modeling approaches (*e.g.*, Ozone Source Apportionment Technology, Decoupled Direct Method, and zero-out brute force sensitivity runs) to help quantify ozone impacts from upwind states.
- Considerations related to evaluating contributions (contributions contained in Attachment C are not based upon a particular significance threshold).
  - Establishing a contribution threshold based on variability in ozone design values that leverage some of the analytics and statistical data created to support the development of the Significant Impact Level for ozone.

- Consideration of different contribution thresholds for different regions based on regional differences in the nature and extent of the transport problem.
- An evaluation of "collective contribution" in the receptor region to determine the extent to which a receptor is "transport influenced." The results of this analysis could be applied before assessing whether an individual state is linked to a downwind receptor (*i.e.*, above the contribution threshold).

**Step 3 – Identifying air quality, cost, and emission reduction factors to be evaluated in a multifactor test to identify emissions that significantly contribute to nonattainment or interfere with maintenance of the NAAQS downwind, if any**

- Consideration of international emissions, in a manner consistent with EPA's Ozone Cooperative Compliance Task Force efforts to fully understand the role of background ozone levels and appropriately account for international transport.[17]
  - Develop consensus on evaluation of the magnitude of international ozone contributions relative to domestic, anthropogenic ozone contributions for receptors identified in step 1. As contained in Attachment C, EPA recognizes that a number of non-U.S. and non-anthropogenic sources contribute to downwind nonattainment and maintenance receptors.
  - Consider whether the air quality, cost, or emission reduction factors should be weighted differently in areas where international contributions are relatively high.
- For states that are found to significantly contribute to nonattainment or interfere with maintenance of the NAAQS downwind, apportioning responsibility among states.
  - Consider control stringency levels derived through "uniform-cost" analysis of $NO_X$ reductions.
  - Consider whether the relative impact (*e.g.*, parts per billion/ton) between states is sufficiently different such that this factor warrants consideration in apportioning responsibility.
- Considerations for states linked to maintenance receptors.
  - Consider whether the remedy for upwind states linked to maintenance receptors could be less stringent than for those linked to nonattainment receptors.
  - For example, consider whether upwind states could satisfy linkage(s) to maintenance receptors based on recent historic or base case emissions levels.

**Step 4 – Adopt permanent and enforceable measures needed to achieve emissions reductions (translating the control levels identified in Step 3 into enforceable emissions limits)**

- EPA welcomes concepts from stakeholders regarding Step 4, including potential EPA actions that could serve as a model as well as the relationship to previous transport rules.

---

[17] See *Final Report on Review of Agency Actions that Potentially Burden the Safe, Efficient Development of Domestic Energy Resources Under Executive Order 13783* (October 25, 2017) and *Report to Congress on Administrative Options to Enable States to Enter into Cooperative Agreements to Provide Regulatory Relief for Implementing Ozone Standards* (August 14, 2017).

**Attachment B**

**Projected Ozone Design Values at Potential Nonattainment and Maintenance Receptors Based on EPA's Updated 2023 Transport Modeling**

This attachment contains projected ozone design values at those individual monitoring sites that are projected to be potential nonattainment or maintenance receptors based on the Environmental Protection Agency's updated transport modeling for 2023. The scenario name for the updated modeling is "2023en." The data are in units of parts per billion (ppb).

The following data are provided in the table below:

1. Base period 2009 – 2013 average and maximum design values based on 2009 – 2013 measured data.

2. Projected 2023 average and maximum design values based on the "3 x 3" approach and a modified "3 x 3" approach in which model predictions in grid cells that are predominately water and that do not contain monitors are excluded from the projection calculations ("No Water"). Note that the modified approach only affects the projection of design values for monitoring sites in or near coastal areas.

3. 2016 ozone design values based on 2014 – 2016 measured data (N/A indicates that a 2016 design value is not available). The following Web site has additional information on the 2016 design values: *https://www.epa.gov/air-trends/air-quality-design-values#report*.

Note: A value of 70.9 ppb (or less) is considered to be in attainment of the 2015 ozone NAAQS, and a value of 71.0 ppb (or higher) is considered to be in violation of the 2015 ozone NAAQS.

Note also: Site 550790085 in Milwaukee Co., WI would be a nonattainment receptor using projected design values based on the "No Water" cell approach, but would not be a receptor with the "3 x 3" approach. Conversely, site 360850067 in Richmond Co., NY would be a nonattainment receptor using the "3 x 3" approach, but would not be a receptor with the "No Water" cell approach.

| Site ID | St | County | 2009-2013 Avg | 2009-2013 Max | 2023en "3x3" Avg | 2023en "3x3" Max | 2023en "No Water" Avg | 2023en "No Water" Max | 2014-2016 |
|---------|----|--------|------|------|------|------|------|------|------|
| 40130019 | AZ | Maricopa | 76.7 | 79 | 69.3 | 71.4 | 69.3 | 71.4 | 73 |
| 40131004 | AZ | Maricopa | 79.7 | 81 | 69.8 | 71.0 | 69.8 | 71.0 | 75 |
| 60190007 | CA | Fresno | 94.7 | 95 | 79.2 | 79.4 | 79.2 | 79.4 | 86 |
| 60190011 | CA | Fresno | 93.0 | 96 | 78.6 | 81.2 | 78.6 | 81.2 | 89 |
| 60190242 | CA | Fresno | 91.7 | 95 | 79.4 | 82.2 | 79.4 | 82.2 | 86 |
| 60194001 | CA | Fresno | 90.7 | 92 | 73.3 | 74.4 | 73.3 | 74.4 | 91 |
| 60195001 | CA | Fresno | 97.0 | 99 | 79.6 | 81.2 | 79.6 | 81.2 | 94 |
| 60250005 | CA | Imperial | 74.7 | 76 | 73.3 | 74.6 | 73.3 | 74.6 | 76 |
| 60251003 | CA | Imperial | 81.0 | 82 | 79.0 | 80.0 | 79.0 | 80.0 | 76 |
| 60290007 | CA | Kern | 91.7 | 96 | 77.7 | 81.3 | 77.7 | 81.3 | 87 |

| Site ID | St | County | 2009-2013 Avg | 2009-2013 Max | 2023en "3x3" Avg | 2023en "3x3" Max | 2023en "No Water" Avg | 2023en "No Water" Max | 2014-2016 |
|---------|-----|--------------|-------|-----|------|------|------|------|------|
| 60290008 | CA | Kern | 86.3 | 88 | 71.3 | 72.8 | 71.3 | 72.8 | 81 |
| 60290014 | CA | Kern | 87.7 | 89 | 74.1 | 75.2 | 74.1 | 75.2 | 84 |
| 60290232 | CA | Kern | 87.3 | 89 | 73.7 | 75.2 | 73.7 | 75.2 | 77 |
| 60295002 | CA | Kern | 90.0 | 91 | 75.9 | 76.8 | 75.9 | 76.8 | 87 |
| 60296001 | CA | Kern | 84.3 | 86 | 70.9 | 72.4 | 70.9 | 72.4 | 81 |
| 60311004 | CA | Kings | 87.0 | 90 | 71.7 | 74.2 | 71.7 | 74.2 | 84 |
| 60370002 | CA | Los Angeles | 80.0 | 82 | 73.3 | 75.1 | 73.3 | 75.1 | 88 |
| 60370016 | CA | Los Angeles | 94.0 | 97 | 86.1 | 88.9 | 86.1 | 88.9 | 96 |
| 60371201 | CA | Los Angeles | 90.0 | 90 | 79.8 | 79.8 | 79.8 | 79.8 | 85 |
| 60371701 | CA | Los Angeles | 84.0 | 85 | 78.1 | 79.1 | 78.1 | 79.1 | 90 |
| 60372005 | CA | Los Angeles | 79.5 | 82 | 72.3 | 74.6 | 72.3 | 74.6 | 83 |
| 60376012 | CA | Los Angeles | 97.3 | 99 | 85.9 | 87.4 | 85.9 | 87.4 | 96 |
| 60379033 | CA | Los Angeles | 90.0 | 91 | 76.3 | 77.2 | 76.3 | 77.2 | 88 |
| 60392010 | CA | Madera | 85.0 | 86 | 72.1 | 72.9 | 72.1 | 72.9 | 83 |
| 60470003 | CA | Merced | 82.7 | 84 | 69.9 | 71.0 | 69.9 | 71.0 | 82 |
| 60650004 | CA | Riverside | 85.0 | 85 | 76.7 | 76.7 | 76.7 | 76.7 | N/A |
| 60650012 | CA | Riverside | 97.3 | 99 | 83.6 | 85.1 | 83.6 | 85.1 | 93 |
| 60651016 | CA | Riverside | 100.7 | 101 | 85.2 | 85.5 | 85.2 | 85.5 | 97 |
| 60652002 | CA | Riverside | 84.3 | 85 | 72.4 | 73.0 | 72.4 | 73.0 | 81 |
| 60655001 | CA | Riverside | 92.3 | 93 | 79.5 | 80.1 | 79.5 | 80.1 | 87 |
| 60656001 | CA | Riverside | 94.0 | 98 | 78.3 | 81.6 | 78.3 | 81.6 | 91 |
| 60658001 | CA | Riverside | 97.0 | 98 | 87.0 | 87.9 | 87.0 | 87.9 | 94 |
| 60658005 | CA | Riverside | 92.7 | 94 | 83.2 | 84.4 | 83.2 | 84.4 | 91 |
| 60659001 | CA | Riverside | 88.3 | 91 | 73.7 | 75.9 | 73.7 | 75.9 | 86 |
| 60670012 | CA | Sacramento | 93.3 | 95 | 74.5 | 75.9 | 74.5 | 75.9 | 83 |
| 60675003 | CA | Sacramento | 86.3 | 88 | 69.9 | 71.3 | 69.9 | 71.3 | 79 |
| 60710005 | CA | San Bernardino | 105.0 | 107 | 96.2 | 98.1 | 96.2 | 98.1 | 108 |
| 60710012 | CA | San Bernardino | 95.0 | 97 | 84.1 | 85.8 | 84.1 | 85.8 | 91 |
| 60710306 | CA | San Bernardino | 83.7 | 85 | 76.2 | 77.4 | 76.2 | 77.4 | 86 |
| 60711004 | CA | San Bernardino | 96.7 | 98 | 89.8 | 91.0 | 89.8 | 91.0 | 101 |
| 60712002 | CA | San Bernardino | 101.0 | 103 | 93.1 | 95.0 | 93.1 | 95.0 | 97 |
| 60714001 | CA | San Bernardino | 94.3 | 97 | 86.0 | 88.5 | 86.0 | 88.5 | 90 |
| 60714003 | CA | San Bernardino | 105.0 | 107 | 94.1 | 95.8 | 94.1 | 95.8 | 101 |
| 60719002 | CA | San Bernardino | 92.3 | 94 | 80.0 | 81.4 | 80.0 | 81.4 | 86 |
| 60719004 | CA | San Bernardino | 98.7 | 99 | 88.4 | 88.7 | 88.4 | 88.7 | 104 |
| 60990006 | CA | Stanislaus | 87.0 | 88 | 74.8 | 75.7 | 74.8 | 75.7 | 83 |
| 61070006 | CA | Tulare | 81.7 | 85 | 69.1 | 71.9 | 69.1 | 71.9 | 84 |
| 61070009 | CA | Tulare | 94.7 | 96 | 76.1 | 77.2 | 76.1 | 77.2 | 89 |

| Site ID | St | County | 2009-2013 Avg | 2009-2013 Max | 2023en "3x3" Avg | 2023en "3x3" Max | 2023en "No Water" Avg | 2023en "No Water" Max | 2014-2016 |
|---------|----|--------|------|------|------|------|------|------|------|
| 61072002 | CA | Tulare | 85.0 | 88 | 68.9 | 71.4 | 68.9 | 71.4 | 80 |
| 61072010 | CA | Tulare | 89.0 | 90 | 73.1 | 73.9 | 73.1 | 73.9 | 83 |
| 61112002 | CA | Ventura | 81.0 | 83 | 70.5 | 72.2 | 70.5 | 72.2 | 77 |
| 80050002 | CO | Arapahoe | 76.7 | 79 | 69.3 | 71.3 | 69.3 | 71.3 | N/A |
| 80350004 | CO | Douglas | 80.7 | 83 | 71.1 | 73.2 | 71.1 | 73.2 | 77 |
| 80590006 | CO | Jefferson | 80.3 | 83 | 71.3 | 73.7 | 71.3 | 73.7 | 77 |
| 80590011 | CO | Jefferson | 78.7 | 82 | 70.9 | 73.9 | 70.9 | 73.9 | 80 |
| 80690011 | CO | Larimer | 78.0 | 80 | 71.2 | 73.0 | 71.2 | 73.0 | 75 |
| 81230009 | CO | Weld | 74.7 | 76 | 70.2 | 71.4 | 70.2 | 71.4 | 70 |
| 90010017 | CT | Fairfield | 80.3 | 83 | 69.8 | 72.1 | 68.9 | 71.2 | 80 |
| 90013007 | CT | Fairfield | 84.3 | 89 | 71.2 | 75.2 | 71.0 | 75.0 | 81 |
| 90019003 | CT | Fairfield | 83.7 | 87 | 72.7 | 75.6 | 73.0 | 75.9 | 85 |
| 90099002 | CT | New Haven | 85.7 | 89 | 71.2 | 73.9 | 69.9 | 72.6 | 76 |
| 240251001 | MD | Harford | 90.0 | 93 | 71.4 | 73.8 | 70.9 | 73.3 | 73 |
| 260050003 | MI | Allegan | 82.7 | 86 | 69.0 | 71.8 | 69.0 | 71.7 | 75 |
| 261630019 | MI | Wayne | 78.7 | 81 | 69.0 | 71.0 | 69.0 | 71.0 | 72 |
| 360810124 | NY | Queens | 78.0 | 80 | 70.1 | 71.9 | 70.2 | 72.0 | 69 |
| 360850067 | NY | Richmond | 81.3 | 83 | 71.9 | 73.4 | 67.1 | 68.5 | 76 |
| 361030002 | NY | Suffolk | 83.3 | 85 | 72.5 | 74.0 | 74.0 | 75.5 | 72 |
| 480391004 | TX | Brazoria | 88.0 | 89 | 74.0 | 74.9 | 74.0 | 74.9 | 75 |
| 481210034 | TX | Denton | 84.3 | 87 | 69.7 | 72.0 | 69.7 | 72.0 | 80 |
| 482010024 | TX | Harris | 80.3 | 83 | 70.4 | 72.8 | 70.4 | 72.8 | 79 |
| 482011034 | TX | Harris | 81.0 | 82 | 70.8 | 71.6 | 70.8 | 71.6 | 73 |
| 482011039 | TX | Harris | 82.0 | 84 | 71.8 | 73.6 | 71.8 | 73.5 | 67 |
| 484392003 | TX | Tarrant | 87.3 | 90 | 72.5 | 74.8 | 72.5 | 74.8 | 73 |
| 550790085 | WI | Milwaukee | 80.0 | 82 | 65.4 | 67.0 | 71.2 | 73.0 | 71 |
| 551170006 | WI | Sheboygan | 84.3 | 87 | 70.8 | 73.1 | 72.8 | 75.1 | 79 |

**Attachment C**

**Contributions to 2023 8-hour Ozone Design Values at Projected
2023 Nonattainment and Maintenance Sites**

This attachment contains tables with the projected ozone contributions from 2023 anthropogenic nitrogen oxide and volatile organic compound emissions in each state to each potential nonattainment receptor and maintenance receptor (based on the 2015 ozone National Ambient Air Quality Standards) in the United States, following the approach for identification of such receptors EPA has used in the past, with slight modification.[18] In addition to the state contributions, we have included the contributions from each of the other categories tracked in the contribution modeling, including point source emissions on Tribal lands, anthropogenic emissions in Canada and Mexico, emissions from offshore sources, fires, biogenics, and contributions from initial and boundary concentrations.

The contribution information is provided in a three-part table for all of the projected receptors throughout the country, except California, and a separate three-part table for the projected receptors in California. For each monitoring site, we provide the site ID, county name, and state name in the first three columns of the table. This information is followed by columns containing the projected 2023 average and maximum design values based on the "No Water" cell approach. Next, in Parts 1 and 2 of each table, we provide the contributions from each state and the District of Columbia, individually. Finally, in Part 3 of each table, we provide the contributions from the Tribal lands, Canada and Mexico, offshore, fires, initial and boundary concentrations (Boundary), and biogenics categories. The units of the 2023 design values and contributions are parts per billion (ppb). Note that the contributions presented in these tables may not sum exactly to the 2023 average design value due to truncation of the contributions to two places to the right of the decimal.

---

[18] For the purposes of creating the contribution tables, data are provided for sites identified as potential nonattainment and maintenance receptors using projected design values based on the "No Water" cell approach. In addition, we provide the contributions to the Richmond Co., NY site that would be a nonattainment receptor in the "3 x 3" approach.

Contributions to 2023 Nonattainment and Maintenance Sites Outside of California (Part 1)

| Site ID | County | State | 2023en Average | 2023en Maximum | AL | AZ | AR | CA | CO | CT | DE | DC | FL | GA | ID | IL | IN | IA | KS | KY | LA | ME | MD | MA | MI | MN | MS | MO | MT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 40130019 | Maricopa | AZ | 69.3 | 71.4 | 0.00 | 25.19 | 0.00 | 1.87 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 40131004 | Maricopa | AZ | 69.8 | 71.0 | 0.00 | 27.40 | 0.00 | 2.03 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 80050002 | Arapahoe | CO | 69.3 | 71.3 | 0.00 | 0.29 | 0.00 | 1.20 | 22.94 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.19 | 0.00 | 0.00 | 0.00 | 0.28 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 80350004 | Douglas | CO | 71.1 | 73.2 | 0.00 | 0.38 | 0.01 | 1.27 | 24.71 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.18 | 0.00 | 0.00 | 0.00 | 0.27 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.01 | 0.01 |
| 80590006 | Jefferson | CO | 71.3 | 73.7 | 0.01 | 0.49 | 0.03 | 1.32 | 25.52 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.12 | 0.00 | 0.00 | 0.00 | 0.32 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.03 | 0.03 |
| 80590011 | Jefferson | CO | 70.9 | 73.9 | 0.01 | 0.30 | 0.02 | 1.50 | 24.72 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.12 | 0.00 | 0.00 | 0.00 | 0.10 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 |
| 80690011 | Larimer | CO | 71.2 | 73.0 | 0.00 | 0.46 | 0.02 | 1.55 | 21.74 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.13 | 0.00 | 0.00 | 0.00 | 0.10 | 0.00 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.07 |
| 81230009 | Weld | CO | 70.2 | 71.4 | 0.00 | 0.49 | 0.02 | 0.95 | 24.44 | 0.00 | 0.00 | 0.00 | 0.00 | 0.06 | 0.06 | 0.00 | 0.00 | 0.00 | 0.09 | 0.00 | 0.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.01 | 0.04 |
| 90010017 | Fairfield | CT | 68.9 | 71.2 | 0.08 | 0.03 | 0.07 | 0.03 | 0.07 | 8.70 | 0.18 | 0.04 | 0.02 | 0.09 | 0.01 | 0.39 | 0.44 | 0.11 | 0.09 | 0.34 | 0.11 | 0.01 | 1.18 | 0.06 | 0.50 | 0.17 | 0.03 | 0.21 | 0.03 |
| 90013007 | Fairfield | CT | 71.0 | 75.0 | 0.14 | 0.05 | 0.13 | 0.05 | 0.09 | 4.64 | 0.35 | 0.08 | 0.05 | 0.17 | 0.01 | 0.72 | 0.97 | 0.16 | 0.13 | 0.89 | 0.11 | 0.01 | 1.80 | 0.12 | 0.70 | 0.15 | 0.07 | 0.38 | 0.02 |
| 90019003 | Fairfield | CT | 73.0 | 75.9 | 0.14 | 0.05 | 0.13 | 0.05 | 0.09 | 3.71 | 0.40 | 0.08 | 0.05 | 0.17 | 0.02 | 0.67 | 0.83 | 0.17 | 0.13 | 0.79 | 0.11 | 0.00 | 2.17 | 0.10 | 0.63 | 0.14 | 0.07 | 0.37 | 0.02 |
| 90099002 | New Haven | CT | 69.9 | 72.6 | 0.06 | 0.04 | 0.08 | 0.05 | 0.08 | 9.10 | 0.30 | 0.02 | 0.02 | 0.07 | 0.02 | 0.46 | 0.50 | 0.16 | 0.14 | 0.32 | 0.08 | 0.01 | 1.37 | 0.18 | 0.73 | 0.19 | 0.04 | 0.29 | 0.04 |
| 240251001 | Harford | MD | 70.9 | 73.3 | 0.31 | 0.07 | 0.17 | 0.07 | 0.12 | 0.00 | 0.03 | 0.65 | 0.11 | 0.32 | 0.03 | 0.84 | 1.35 | 0.23 | 0.23 | 1.52 | 0.19 | 0.00 | 22.60 | 0.00 | 0.79 | 0.13 | 0.08 | 0.59 | 0.04 |
| 260050003 | Allegan | MI | 69.0 | 71.7 | 0.35 | 0.08 | 1.64 | 0.09 | 0.18 | 0.00 | 0.00 | 0.00 | 0.09 | 0.18 | 0.03 | 19.62 | 7.11 | 0.77 | 0.77 | 0.58 | 0.70 | 0.00 | 0.01 | 0.00 | 3.32 | 0.11 | 0.40 | 2.61 | 0.06 |
| 261630019 | Wayne | MI | 69.0 | 71.0 | 0.11 | 0.07 | 0.27 | 0.13 | 0.17 | 0.00 | 0.38 | 0.05 | 0.05 | 0.09 | 0.05 | 2.37 | 2.51 | 0.44 | 0.44 | 0.65 | 0.22 | 0.00 | 0.02 | 0.24 | 20.39 | 0.31 | 0.09 | 0.92 | 0.08 |
| 360810124 | Queens | NY | 70.2 | 72.0 | 0.11 | 0.06 | 0.09 | 0.08 | 0.11 | 0.57 | 0.38 | 0.05 | 0.07 | 0.16 | 0.05 | 0.73 | 0.69 | 0.26 | 0.19 | 0.42 | 0.13 | 0.00 | 1.56 | 0.13 | 1.26 | 0.17 | 0.04 | 0.38 | 0.05 |
| 360850067 | Richmond | NY | 67.1 | 68.5 | 0.24 | 0.08 | 0.13 | 0.09 | 0.12 | 0.27 | 0.43 | 0.05 | 0.09 | 0.28 | 0.02 | 0.80 | 0.92 | 0.23 | 0.21 | 0.84 | 0.16 | 0.00 | 1.74 | 0.03 | 0.98 | 0.12 | 0.08 | 0.46 | 0.03 |
| 361030002 | Suffolk | NY | 74.0 | 75.5 | 0.12 | 0.06 | 0.12 | 0.08 | 0.11 | 0.83 | 0.22 | 0.04 | 0.04 | 0.12 | 0.03 | 0.64 | 0.69 | 0.20 | 0.20 | 0.49 | 0.13 | 0.01 | 1.24 | 0.04 | 0.94 | 0.18 | 0.06 | 0.39 | 0.06 |
| 480391004 | Brazoria | TX | 74.0 | 74.9 | 0.35 | 0.08 | 0.90 | 0.21 | 0.30 | 0.00 | 0.00 | 0.00 | 0.21 | 0.14 | 0.08 | 1.00 | 0.32 | 0.40 | 0.47 | 0.14 | 3.80 | 0.00 | 0.00 | 0.00 | 0.22 | 0.34 | 0.63 | 0.88 | 0.10 |
| 481210034 | Denton | TX | 69.7 | 72.0 | 0.49 | 0.07 | 0.58 | 0.13 | 0.22 | 0.00 | 0.00 | 0.00 | 0.27 | 0.34 | 0.06 | 0.23 | 0.16 | 0.10 | 0.40 | 0.11 | 1.92 | 0.00 | 0.01 | 0.00 | 0.08 | 0.11 | 0.33 | 0.24 | 0.07 |
| 482010024 | Harris | TX | 70.4 | 72.8 | 0.39 | 0.04 | 0.29 | 0.12 | 0.13 | 0.00 | 0.00 | 0.00 | 0.39 | 0.26 | 0.04 | 0.34 | 0.13 | 0.17 | 0.17 | 0.10 | 3.06 | 0.00 | 0.00 | 0.00 | 0.06 | 0.06 | 0.50 | 0.38 | 0.05 |
| 482010034 | Harris | TX | 70.8 | 71.6 | 0.32 | 0.03 | 0.54 | 0.10 | 0.15 | 0.00 | 0.00 | 0.00 | 0.53 | 0.16 | 0.05 | 0.51 | 0.12 | 0.27 | 0.32 | 0.05 | 3.38 | 0.00 | 0.00 | 0.00 | 0.17 | 0.23 | 0.39 | 0.63 | 0.05 |
| 482011039 | Harris | TX | 71.8 | 73.5 | 0.37 | 0.08 | 0.99 | 0.12 | 0.15 | 0.00 | 0.00 | 0.00 | 0.18 | 0.13 | 0.05 | 0.88 | 0.24 | 0.33 | 0.33 | 0.11 | 4.72 | 0.00 | 0.00 | 0.00 | 0.27 | 0.20 | 0.79 | 0.88 | 0.07 |
| 484392003 | Tarrant | TX | 72.5 | 74.8 | 0.37 | 0.08 | 0.78 | 0.15 | 0.33 | 0.00 | 0.00 | 0.00 | 0.13 | 0.26 | 0.07 | 0.29 | 0.18 | 0.19 | 0.69 | 0.13 | 1.71 | 0.00 | 0.01 | 0.00 | 0.13 | 0.15 | 0.27 | 0.38 | 0.10 |
| 550790085 | Milwaukee | WI | 71.2 | 73.0 | 0.14 | 0.04 | 0.40 | 0.12 | 0.00 | 0.00 | 0.00 | 0.00 | 0.06 | 0.06 | 0.03 | 15.10 | 5.28 | 0.79 | 0.35 | 0.72 | 0.72 | 0.00 | 0.03 | 0.00 | 2.01 | 0.40 | 0.28 | 0.93 | 0.10 |
| 551170006 | Sheboygan | WI | 72.8 | 75.1 | 0.14 | 0.08 | 0.51 | 0.12 | 0.11 | 0.00 | 0.00 | 0.00 | 0.07 | 0.07 | 0.04 | 15.73 | 7.11 | 0.45 | 0.46 | 0.81 | 0.84 | 0.00 | 0.03 | 0.00 | 2.06 | 0.28 | 0.30 | 1.37 | 0.06 |

C-2

Contributions to 2023 Nonattainment and Maintenance Sites Outside of California (Part 2)

| Site ID | County | State | 2023en Average | 2023en Maximum | NE | NV | NH | NJ | NM | NY | NC | ND | OH | OK | OR | PA | RI | SC | SD | TN | TX | UT | VT | VA | WA | WV | WI | WY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 40130019 | Maricopa | AZ | 69.3 | 71.4 | 0.00 | 0.09 | 0.00 | 0.00 | 0.09 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.22 | 0.06 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.01 |
| 40131004 | Maricopa | AZ | 69.8 | 71.0 | 0.00 | 0.14 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.11 | 0.06 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 |
| 80050002 | Arapahoe | CO | 69.3 | 71.3 | 0.34 | 0.33 | 0.00 | 0.00 | 0.22 | 0.00 | 0.00 | 0.00 | 0.00 | 0.12 | 0.11 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.30 | 1.23 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 1.04 |
| 80350004 | Douglas | CO | 71.1 | 73.2 | 0.32 | 0.32 | 0.00 | 0.00 | 0.22 | 0.00 | 0.00 | 0.00 | 0.00 | 0.12 | 0.10 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.36 | 1.08 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 1.00 |
| 80590006 | Jefferson | CO | 71.3 | 73.7 | 0.41 | 0.31 | 0.00 | 0.00 | 0.70 | 0.00 | 0.00 | 0.00 | 0.00 | 0.24 | 0.10 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 1.02 | 0.83 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.81 |
| 80590011 | Jefferson | CO | 70.9 | 73.9 | 0.36 | 0.38 | 0.00 | 0.00 | 0.38 | 0.00 | 0.00 | 0.00 | 0.00 | 0.18 | 0.10 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.94 | 1.04 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 1.03 |
| 80690011 | Larimer | CO | 71.2 | 73.0 | 0.25 | 0.37 | 0.00 | 0.00 | 0.52 | 0.00 | 0.00 | 0.00 | 0.00 | 0.05 | 0.10 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.40 | 1.05 | 0.00 | 0.00 | 0.10 | 0.00 | 0.00 | 0.88 |
| 81230009 | Weld | CO | 70.2 | 71.4 | 0.27 | 0.24 | 0.00 | 0.00 | 0.77 | 0.00 | 0.00 | 0.00 | 0.00 | 0.08 | 0.04 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 1.05 | 0.54 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.58 |
| 90010017 | Fairfield | CT | 68.9 | 71.2 | 0.06 | 0.00 | 0.01 | 6.24 | 0.04 | 17.31 | 0.29 | 0.07 | 1.04 | 0.15 | 0.00 | 5.11 | 0.01 | 0.06 | 0.03 | 0.15 | 0.30 | 0.03 | 0.01 | 1.27 | 0.02 | 0.68 | 0.26 | 0.07 |
| 90013007 | Fairfield | CT | 71.0 | 75.0 | 0.07 | 0.01 | 0.02 | 6.94 | 0.06 | 14.12 | 0.40 | 0.07 | 1.84 | 0.21 | 0.00 | 6.32 | 0.02 | 0.11 | 0.03 | 0.31 | 0.44 | 0.04 | 0.01 | 1.51 | 0.01 | 1.10 | 0.24 | 0.08 |
| 90019003 | Fairfield | CT | 73.0 | 75.9 | 0.07 | 0.01 | 0.02 | 7.75 | 0.06 | 15.80 | 0.43 | 0.06 | 1.60 | 0.21 | 0.01 | 6.56 | 0.02 | 0.12 | 0.02 | 0.28 | 0.45 | 0.04 | 0.01 | 1.91 | 0.01 | 1.14 | 0.20 | 0.08 |
| 90099002 | New Haven | CT | 69.9 | 72.6 | 0.09 | 0.01 | 0.03 | 5.06 | 0.04 | 15.03 | 0.32 | 0.15 | 1.17 | 0.24 | 0.01 | 4.87 | 0.02 | 0.04 | 0.04 | 0.12 | 0.41 | 0.04 | 0.02 | 1.26 | 0.04 | 0.61 | 0.25 | 0.10 |
| 24025001 | Harford | MD | 70.9 | 73.3 | 0.13 | 0.01 | 0.00 | 7.07 | 0.09 | 0.16 | 0.42 | 0.07 | 2.77 | 0.35 | 0.02 | 4.32 | 0.00 | 0.11 | 0.04 | 0.43 | 0.74 | 0.05 | 0.00 | 5.05 | 0.04 | 2.78 | 0.24 | 0.12 |
| 260050003 | Allegan | MI | 69.0 | 71.7 | 0.16 | 0.02 | 0.00 | 0.00 | 0.16 | 0.00 | 0.05 | 0.09 | 0.19 | 1.31 | 0.01 | 0.05 | 0.00 | 0.04 | 0.05 | 0.65 | 2.39 | 0.06 | 0.00 | 0.04 | 0.05 | 0.11 | 1.95 | 0.12 |
| 26163019 | Wayne | MI | 69.0 | 71.0 | 0.17 | 0.03 | 0.00 | 0.01 | 0.08 | 0.06 | 0.20 | 0.12 | 3.81 | 0.62 | 0.05 | 0.18 | 0.00 | 0.05 | 0.04 | 0.27 | 1.12 | 0.07 | 0.00 | 0.16 | 0.07 | 0.23 | 1.08 | 0.18 |
| 36081012 | Queens | NY | 70.2 | 72.0 | 0.12 | 0.02 | 0.06 | 8.57 | 0.07 | 13.55 | 0.35 | 0.12 | 1.88 | 0.32 | 0.02 | 7.16 | 0.04 | 0.09 | 0.05 | 0.13 | 0.58 | 0.07 | 0.00 | 1.56 | 0.03 | 1.01 | 0.38 | 0.14 |
| 36085007 | Richmond | NY | 67.1 | 68.5 | 0.12 | 0.02 | 0.00 | 10.53 | 0.09 | 6.57 | 0.37 | 0.09 | 2.05 | 0.36 | 0.03 | 10.41 | 0.00 | 0.10 | 0.05 | 0.36 | 0.70 | 0.07 | 0.00 | 1.67 | 0.02 | 1.54 | 0.30 | 0.12 |
| 36103022 | Suffolk | NY | 74.0 | 75.5 | 0.12 | 0.02 | 0.01 | 8.88 | 0.06 | 18.11 | 0.23 | 0.20 | 1.76 | 0.34 | 0.03 | 6.86 | 0.00 | 0.05 | 0.05 | 0.22 | 0.60 | 0.07 | 0.02 | 0.99 | 0.06 | 0.81 | 0.25 | 0.14 |
| 480391004 | Brazoria | TX | 74.0 | 74.9 | 0.23 | 0.06 | 0.00 | 0.00 | 0.08 | 0.00 | 0.04 | 0.06 | 0.06 | 0.90 | 0.05 | 0.01 | 0.00 | 0.04 | 0.05 | 0.28 | 26.00 | 0.14 | 0.00 | 0.02 | 0.06 | 0.02 | 0.40 | 0.27 |
| 481210034 | Denton | TX | 69.7 | 72.0 | 0.15 | 0.04 | 0.00 | 0.00 | 0.13 | 0.01 | 0.09 | 0.03 | 0.08 | 1.23 | 0.03 | 0.04 | 0.00 | 0.09 | 0.03 | 0.14 | 26.69 | 0.10 | 0.00 | 0.05 | 0.05 | 0.04 | 0.08 | 0.25 |
| 482010024 | Harris | TX | 70.4 | 72.8 | 0.08 | 0.03 | 0.00 | 0.00 | 0.05 | 0.00 | 0.14 | 0.04 | 0.05 | 0.20 | 0.03 | 0.02 | 0.00 | 0.14 | 0.03 | 0.26 | 25.62 | 0.07 | 0.00 | 0.06 | 0.03 | 0.05 | 0.07 | 0.14 |
| 482011034 | Harris | TX | 70.8 | 71.6 | 0.16 | 0.03 | 0.00 | 0.00 | 0.04 | 0.00 | 0.09 | 0.04 | 0.05 | 0.68 | 0.03 | 0.01 | 0.00 | 0.10 | 0.03 | 0.09 | 25.66 | 0.08 | 0.00 | 0.03 | 0.03 | 0.03 | 0.22 | 0.15 |
| 482011039 | Harris | TX | 71.8 | 73.5 | 0.19 | 0.03 | 0.00 | 0.00 | 0.06 | 0.00 | 0.04 | 0.06 | 0.05 | 0.58 | 0.03 | 0.01 | 0.00 | 0.03 | 0.04 | 0.30 | 22.82 | 0.08 | 0.00 | 0.02 | 0.04 | 0.01 | 0.28 | 0.20 |
| 484393003 | Tarrant | TX | 72.5 | 74.8 | 0.30 | 0.04 | 0.00 | 0.00 | 0.14 | 0.01 | 0.09 | 0.05 | 0.10 | 1.71 | 0.05 | 0.05 | 0.00 | 0.08 | 0.07 | 0.15 | 27.64 | 0.15 | 0.00 | 0.05 | 0.09 | 0.05 | 0.13 | 0.28 |
| 550790025 | Milwaukee | WI | 71.2 | 73.0 | 0.06 | 0.01 | 0.00 | 0.00 | 0.08 | 0.02 | 0.04 | 0.23 | 0.87 | 0.76 | 0.02 | 0.33 | 0.00 | 0.02 | 0.03 | 0.31 | 1.22 | 0.04 | 0.00 | 0.12 | 0.09 | 0.59 | 13.39 | 0.09 |
| 551170006 | Sheboygan | WI | 72.8 | 75.1 | 0.06 | 0.03 | 0.00 | 0.00 | 0.14 | 0.02 | 0.04 | 0.10 | 1.10 | 0.95 | 0.04 | 0.41 | 0.00 | 0.02 | 0.02 | 0.31 | 1.65 | 0.06 | 0.00 | 0.10 | 0.07 | 0.64 | 9.09 | 0.12 |

Contributions to 2023 Nonattainment and Maintenance Sites Outside of California (Part 3)

| Site ID | County | State | 2023en Average | 2023en Maximum | Tribal | Canada/ Mexco | Offshore | Fire | Boundary | Biogenic |
|---|---|---|---|---|---|---|---|---|---|---|
| 40130019 | Maricopa | AZ | 69.3 | 71.4 | 0.06 | 3.29 | 0.37 | 0.49 | 34.74 | 2.52 |
| 40131004 | Maricopa | AZ | 69.8 | 71.0 | 0.06 | 2.70 | 0.34 | 0.56 | 33.85 | 2.24 |
| 80050002 | Arapahoe | CO | 69.3 | 71.3 | 0.22 | 0.55 | 0.14 | 0.46 | 34.84 | 4.24 |
| 80350004 | Douglas | CO | 71.1 | 73.2 | 0.21 | 0.71 | 0.16 | 0.47 | 34.74 | 4.19 |
| 80590006 | Jefferson | CO | 71.3 | 73.7 | 0.21 | 0.90 | 0.17 | 0.66 | 31.41 | 5.40 |
| 80590011 | Jefferson | CO | 70.9 | 73.9 | 0.16 | 0.70 | 0.16 | 0.45 | 32.96 | 4.74 |
| 80690011 | Larimer | CO | 71.2 | 73.0 | 0.25 | 0.78 | 0.19 | 1.74 | 34.54 | 5.71 |
| 81230009 | Weld | CO | 70.2 | 71.4 | 0.23 | 1.04 | 0.15 | 1.57 | 31.11 | 6.08 |
| 90010017 | Fairfield | CT | 68.9 | 71.2 | 0.00 | 1.64 | 0.65 | 0.20 | 16.73 | 3.28 |
| 90013007 | Fairfield | CT | 71.0 | 75.0 | 0.01 | 1.35 | 1.93 | 0.34 | 17.17 | 4.01 |
| 90019003 | Fairfield | CT | 73.0 | 75.9 | 0.01 | 1.37 | 1.96 | 0.33 | 17.00 | 4.09 |
| 90099002 | New Haven | CT | 69.9 | 72.6 | 0.01 | 1.58 | 2.15 | 0.22 | 17.17 | 4.13 |
| 240251001 | Harford | MD | 70.9 | 73.3 | 0.01 | 0.79 | 0.32 | 0.42 | 15.28 | 5.32 |
| 260050003 | Allegan | MI | 71.7 | 71.7 | 0.02 | 0.54 | 0.36 | 0.93 | 11.85 | 8.91 |
| 261630019 | Wayne | MI | 69.0 | 71.0 | 0.02 | 3.13 | 0.17 | 0.44 | 20.06 | 6.93 |
| 360810124 | Queens | NY | 70.2 | 72.0 | 0.01 | 1.73 | 1.39 | 0.25 | 17.87 | 4.45 |
| 360850067 | Richmond | NY | 67.1 | 68.5 | 0.01 | 1.44 | 0.83 | 0.35 | 15.46 | 4.75 |
| 361030002 | Suffolk | NY | 74.0 | 75.5 | 0.01 | 1.85 | 1.24 | 0.30 | 18.94 | 4.49 |
| 480391004 | Brazoria | TX | 74.0 | 74.9 | 0.02 | 0.44 | 2.31 | 2.05 | 24.02 | 5.60 |
| 481210034 | Denton | TX | 69.7 | 72.0 | 0.01 | 0.92 | 1.23 | 0.87 | 24.69 | 6.42 |
| 482010024 | Harris | TX | 70.4 | 72.8 | 0.01 | 0.28 | 4.83 | 0.77 | 27.83 | 2.66 |
| 482011034 | Harris | TX | 70.8 | 71.6 | 0.01 | 0.24 | 3.91 | 1.75 | 25.71 | 3.44 |
| 482011039 | Harris | TX | 71.8 | 73.5 | 0.01 | 0.47 | 4.04 | 2.09 | 24.67 | 4.50 |
| 484392003 | Tarrant | TX | 72.5 | 74.8 | 0.02 | 1.24 | 1.18 | 1.34 | 24.38 | 6.44 |
| 550790085 | Milwaukee | WI | 71.2 | 73.0 | 0.01 | 0.82 | 0.43 | 0.37 | 16.67 | 6.70 |
| 551170006 | Sheboygan | WI | 72.8 | 75.1 | 0.01 | 0.69 | 0.55 | 0.64 | 17.53 | 7.51 |

C-4

## Contributions to 2023 Nonattainment and Maintenance Sites in California (Part 1)

| Site ID | County | State | 2023 Average | 2023 Maximum | AL | AZ | AR | CA | CO | CT | DE | DC | FL | GA | ID | IL | IN | IA | KS | KY | LA | ME | MD | MA | MI | MN | MS | MO | MT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 60190007 | Fresno | CA | 79.2 | 79.4 | 0.00 | 0.16 | 0.00 | 35.68 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60190011 | Fresno | CA | 78.6 | 81.2 | 0.00 | 0.15 | 0.00 | 35.20 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60190242 | Fresno | CA | 79.4 | 82.2 | 0.00 | 0.21 | 0.00 | 31.98 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60194001 | Fresno | CA | 73.3 | 74.4 | 0.00 | 0.03 | 0.00 | 34.20 | 0.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.09 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60195001 | Fresno | CA | 79.6 | 81.2 | 0.00 | 0.12 | 0.00 | 35.79 | 0.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60256005 | Imperial | CA | 73.3 | 74.6 | 0.00 | 0.62 | 0.00 | 9.28 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60251003 | Imperial | CA | 79.0 | 80.0 | 0.00 | 0.67 | 0.00 | 11.34 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60290007 | Kern | CA | 77.7 | 81.3 | 0.00 | 0.07 | 0.00 | 29.99 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60290008 | Kern | CA | 71.3 | 72.8 | 0.00 | 0.17 | 0.00 | 26.44 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60290014 | Kern | CA | 74.1 | 75.2 | 0.00 | 0.11 | 0.00 | 31.54 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60290232 | Kern | CA | 73.7 | 75.2 | 0.00 | 0.03 | 0.00 | 32.66 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60295002 | Kern | CA | 75.9 | 76.8 | 0.00 | 0.13 | 0.00 | 28.33 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60295001 | Kern | CA | 70.9 | 72.4 | 0.00 | 0.16 | 0.00 | 28.50 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60370002 | Los Angeles | CA | 73.3 | 75.1 | 0.00 | 0.23 | 0.00 | 39.68 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60370016 | Los Angeles | CA | 86.1 | 88.9 | 0.00 | 0.27 | 0.00 | 46.61 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60371201 | Los Angeles | CA | 79.8 | 79.8 | 0.00 | 0.37 | 0.00 | 35.55 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60371701 | Los Angeles | CA | 78.1 | 79.1 | 0.00 | 0.27 | 0.00 | 42.09 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60372005 | Los Angeles | CA | 72.3 | 74.6 | 0.00 | 0.32 | 0.00 | 37.39 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60376012 | Los Angeles | CA | 85.9 | 87.4 | 0.00 | 0.42 | 0.00 | 39.86 | 0.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60379033 | Los Angeles | CA | 76.3 | 77.2 | 0.00 | 0.34 | 0.00 | 25.79 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60392010 | Madera | CA | 72.1 | 72.9 | 0.00 | 0.20 | 0.00 | 28.39 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60470003 | Merced | CA | 69.9 | 71.0 | 0.00 | 0.10 | 0.00 | 28.52 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60650004 | Riverside | CA | 76.7 | 76.7 | 0.00 | 0.22 | 0.00 | 41.92 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60650012 | Riverside | CA | 83.6 | 85.1 | 0.00 | 0.21 | 0.00 | 39.69 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60651016 | Riverside | CA | 85.2 | 85.5 | 0.00 | 0.22 | 0.00 | 38.65 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60652002 | Riverside | CA | 72.4 | 73.0 | 0.00 | 0.27 | 0.00 | 35.47 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60655001 | Riverside | CA | 79.5 | 80.1 | 0.00 | 0.20 | 0.00 | 16.57 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60656001 | Riverside | CA | 78.3 | 81.6 | 0.00 | 0.17 | 0.00 | 24.70 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60658001 | Riverside | CA | 87.0 | 87.9 | 0.00 | 0.27 | 0.00 | 39.14 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60658005 | Riverside | CA | 83.2 | 84.4 | 0.00 | 0.25 | 0.00 | 47.69 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60659001 | Riverside | CA | 73.7 | 75.9 | 0.00 | 0.16 | 0.00 | 45.60 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60670012 | Sacramento | CA | 74.5 | 75.9 | 0.00 | 0.01 | 0.00 | 37.28 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60675003 | Sacramento | CA | 69.9 | 71.3 | 0.00 | 0.00 | 0.00 | 35.91 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60710005 | San Bernardino | CA | 96.2 | 98.1 | 0.00 | 0.23 | 0.00 | 34.18 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60710012 | San Bernardino | CA | 84.1 | 85.8 | 0.00 | 0.46 | 0.00 | 48.09 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60710306 | San Bernardino | CA | 76.2 | 77.4 | 0.00 | 0.14 | 0.00 | 24.28 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60711004 | San Bernardino | CA | 89.8 | 91.0 | 0.00 | 0.35 | 0.00 | 29.72 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60712002 | San Bernardino | CA | 93.1 | 95.0 | 0.00 | 0.14 | 0.00 | 47.69 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60714001 | San Bernardino | CA | 86.0 | 86.0 | 0.00 | 0.21 | 0.00 | 51.11 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60714004 | San Bernardino | CA | 94.1 | 95.8 | 0.00 | 0.10 | 0.00 | 41.23 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60719002 | San Bernardino | CA | 80.0 | 81.4 | 0.00 | 0.45 | 0.00 | 52.53 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60719004 | San Bernardino | CA | 88.4 | 88.7 | 0.00 | 0.10 | 0.00 | 22.21 | 0.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60990006 | Stanislaus | CA | 74.8 | 75.7 | 0.00 | 0.03 | 0.00 | 49.35 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 61070006 | Tulare | CA | 69.1 | 71.9 | 0.00 | 0.06 | 0.00 | 34.16 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 61070009 | Tulare | CA | 76.1 | 77.2 | 0.00 | 0.07 | 0.00 | 7.37 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 61072002 | Tulare | CA | 71.4 | 71.4 | 0.00 | 0.12 | 0.00 | 23.74 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 61072010 | Tulare | CA | 68.9 | 73.9 | 0.00 | 0.03 | 0.00 | 30.91 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 61110007 | Ventura | CA | 73.1 | 73.1 | 0.00 | 0.03 | 0.00 | 30.19 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 61112002 | Ventura | CA | 70.5 | 72.2 | 0.00 | 0.32 | 0.00 | 29.51 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

C-5

## Contributions to 2023 Nonattainment and Maintenance Sites in California (Part 2)

| Site ID | County | State | 2023 Average | 2023 Maximum | NE | NV | NH | NJ | NM | NY | NC | ND | OH | OK | OR | PA | RI | SC | SD | TN | TX | UT | VT | VA | WA | WV | WI | WY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 60190007 | Fresno | CA | 79.2 | 79.4 | 0.00 | 0.51 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.29 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.08 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.01 |
| 60190011 | Fresno | CA | 78.6 | 81.2 | 0.00 | 0.44 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.27 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.09 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.01 |
| 60190242 | Fresno | CA | 79.4 | 82.2 | 0.00 | 0.64 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.35 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.10 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.01 |
| 60194001 | Fresno | CA | 73.3 | 74.4 | 0.00 | 0.27 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.31 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.08 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.00 |
| 60195001 | Fresno | CA | 79.6 | 81.2 | 0.00 | 0.38 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.33 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.20 | 0.05 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 |
| 60250005 | Imperial | CA | 73.3 | 74.6 | 0.00 | 0.09 | 0.00 | 0.00 | 0.12 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.09 | 0.06 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.04 |
| 60251003 | Imperial | CA | 79.0 | 80.0 | 0.00 | 0.25 | 0.00 | 0.00 | 0.11 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.05 | 0.10 | 0.00 | 0.00 | 0.15 | 0.00 | 0.00 | 0.03 |
| 60290007 | Kern | CA | 77.7 | 81.3 | 0.00 | 0.29 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.37 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.02 | 0.00 | 0.00 | 0.10 | 0.00 | 0.00 | 0.03 |
| 60290008 | Kern | CA | 71.3 | 72.8 | 0.00 | 0.31 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.34 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.01 | 0.00 | 0.00 | 0.08 | 0.00 | 0.00 | 0.01 |
| 60290014 | Kern | CA | 74.1 | 75.2 | 0.00 | 0.38 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.34 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.02 | 0.00 | 0.00 | 0.17 | 0.00 | 0.00 | 0.00 |
| 60290232 | Kern | CA | 73.7 | 75.2 | 0.00 | 0.27 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.39 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.06 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.02 |
| 60295002 | Kern | CA | 75.9 | 76.8 | 0.00 | 0.31 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.25 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.16 | 0.03 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.01 |
| 60296001 | Kern | CA | 70.9 | 72.4 | 0.00 | 0.58 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.26 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.03 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.03 |
| 60370002 | Los Angeles | CA | 73.3 | 75.1 | 0.00 | 0.12 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.13 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.18 | 0.03 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.02 |
| 60370016 | Los Angeles | CA | 86.1 | 88.9 | 0.00 | 0.14 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.15 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.13 | 0.09 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.03 |
| 60371201 | Los Angeles | CA | 79.8 | 79.8 | 0.00 | 0.17 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.10 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.09 | 0.06 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.02 |
| 60371701 | Los Angeles | CA | 78.1 | 79.1 | 0.00 | 0.11 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.15 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.21 | 0.08 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.04 |
| 60372005 | Los Angeles | CA | 72.3 | 74.6 | 0.00 | 0.08 | 0.00 | 0.00 | 0.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.10 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.21 | 0.04 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.02 |
| 60376012 | Los Angeles | CA | 85.9 | 87.4 | 0.00 | 0.18 | 0.00 | 0.00 | 0.09 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.16 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.15 | 0.12 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.02 |
| 60379033 | Los Angeles | CA | 76.3 | 77.2 | 0.00 | 0.15 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.19 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.02 |
| 60392010 | Madera | CA | 72.1 | 72.9 | 0.00 | 0.65 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.34 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.13 | 0.03 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 |
| 60470003 | Merced | CA | 69.9 | 71.0 | 0.00 | 0.39 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.42 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.02 | 0.00 | 0.00 | 0.08 | 0.00 | 0.00 | 0.02 |
| 60650004 | Riverside | CA | 76.7 | 76.7 | 0.00 | 0.14 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.13 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.04 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.02 |
| 60650012 | Riverside | CA | 83.6 | 85.1 | 0.00 | 0.24 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 0.15 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.22 | 0.07 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.02 |
| 60651016 | Riverside | CA | 85.2 | 85.5 | 0.00 | 0.28 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 0.09 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.26 | 0.03 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.02 |
| 60652002 | Riverside | CA | 72.4 | 73.0 | 0.00 | 0.18 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 0.07 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.02 |
| 60655001 | Riverside | CA | 79.5 | 80.1 | 0.00 | 0.11 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.12 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.12 | 0.03 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.01 |
| 60656001 | Riverside | CA | 78.3 | 81.6 | 0.00 | 0.19 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.10 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.22 | 0.03 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.01 |
| 60658001 | Riverside | CA | 87.0 | 87.9 | 0.00 | 0.15 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.17 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.13 | 0.05 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.01 |
| 60658005 | Riverside | CA | 83.2 | 84.4 | 0.00 | 0.14 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.17 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.12 | 0.00 | 0.00 | 0.00 | 0.20 | 0.00 | 0.00 | 0.01 |
| 60659001 | Riverside | CA | 73.7 | 75.9 | 0.00 | 0.15 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.16 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.03 | 0.00 | 0.00 | 0.14 | 0.00 | 0.00 | 0.00 |
| 60670012 | Sacramento | CA | 74.5 | 75.9 | 0.00 | 0.30 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.57 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.00 |
| 60675003 | Sacramento | CA | 69.9 | 71.3 | 0.00 | 0.44 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.45 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 |
| 60710005 | San Bernardino | CA | 96.2 | 98.1 | 0.00 | 0.25 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.20 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.13 | 0.03 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.03 |
| 60710012 | San Bernardino | CA | 84.1 | 85.8 | 0.00 | 0.15 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.11 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.12 | 0.06 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.01 |
| 60710306 | San Bernardino | CA | 76.2 | 77.4 | 0.00 | 0.14 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.14 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 0.01 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 |
| 60711004 | San Bernardino | CA | 89.8 | 91.0 | 0.00 | 0.16 | 0.00 | 0.00 | 0.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.15 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.22 | 0.04 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 |
| 60712002 | San Bernardino | CA | 93.1 | 95.0 | 0.00 | 0.22 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.23 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.13 | 0.01 | 0.00 | 0.00 | 0.08 | 0.00 | 0.00 | 0.01 |
| 60714001 | San Bernardino | CA | 86.0 | 88.5 | 0.00 | 0.21 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.15 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.12 | 0.08 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.01 |
| 60714003 | San Bernardino | CA | 94.1 | 95.8 | 0.00 | 0.21 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.05 | 0.25 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.28 | 0.05 | 0.00 | 0.00 | 0.15 | 0.00 | 0.00 | 0.00 |
| 60719002 | San Bernardino | CA | 80.0 | 81.4 | 0.00 | 0.14 | 0.00 | 0.00 | 0.10 | 0.00 | 0.00 | 0.00 | 0.00 | 0.05 | 0.10 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.11 | 0.07 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.01 |
| 60719004 | San Bernardino | CA | 88.4 | 88.7 | 0.00 | 0.20 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.23 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.08 | 0.00 | 0.00 | 0.00 | 0.14 | 0.00 | 0.00 | 0.01 |
| 60990006 | Stanislaus | CA | 74.8 | 75.7 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.47 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.05 | 0.00 | 0.00 | 0.11 | 0.00 | 0.00 | 0.01 |
| 61070006 | Tulare | CA | 69.1 | 71.9 | 0.00 | 0.11 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.11 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 |
| 61070009 | Tulare | CA | 76.1 | 77.2 | 0.00 | 0.21 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.32 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.01 |
| 61072002 | Tulare | CA | 68.9 | 71.4 | 0.00 | 0.20 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.40 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.16 | 0.00 | 0.00 | 0.01 |
| 61072010 | Tulare | CA | 73.1 | 73.9 | 0.00 | 0.20 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.47 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.17 | 0.00 | 0.00 | 0.00 |
| 61112002 | Ventura | CA | 70.5 | 72.2 | 0.00 | 0.18 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.16 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.13 | 0.08 | 0.00 | 0.00 | 0.08 | 0.00 | 0.00 | 0.03 |

C-6

## Contributions to 2023 Nonattainment and Maintenance Sites in California (Part 3)

| Site ID | County | State | 2023 Average | 2023 Maximum | Tribal | Canada/Mexco | Offshore | Fire | Boundary | Biogenic |
|---|---|---|---|---|---|---|---|---|---|---|
| 60190007 | Fresno | CA | 79.2 | 79.4 | 0.00 | 0.29 | 1.19 | 1.39 | 32.52 | 6.85 |
| 60190011 | Fresno | CA | 78.6 | 81.2 | 0.01 | 0.33 | 1.13 | 1.62 | 32.34 | 6.78 |
| 60190242 | Fresno | CA | 79.4 | 82.2 | 0.00 | 0.31 | 1.24 | 1.48 | 34.92 | 7.88 |
| 60194001 | Fresno | CA | 73.3 | 74.4 | 0.00 | 0.12 | 1.68 | 0.87 | 27.76 | 7.90 |
| 60195001 | Fresno | CA | 79.6 | 81.2 | 0.00 | 0.20 | 1.75 | 1.12 | 32.10 | 7.66 |
| 60250005 | Imperial | CA | 73.3 | 74.6 | 0.01 | 19.87 | 1.17 | 0.71 | 38.68 | 2.11 |
| 60251003 | Imperial | CA | 79.0 | 80.0 | 0.01 | 18.74 | 1.14 | 0.61 | 43.58 | 2.08 |
| 60290007 | Kern | CA | 77.7 | 81.3 | 0.00 | 0.30 | 1.59 | 3.27 | 33.68 | 7.70 |
| 60290008 | Kern | CA | 71.3 | 72.8 | 0.01 | 0.67 | 1.96 | 1.05 | 32.77 | 7.30 |
| 60290014 | Kern | CA | 74.1 | 75.2 | 0.00 | 0.31 | 1.68 | 0.85 | 31.31 | 7.37 |
| 60290232 | Kern | CA | 73.7 | 75.2 | 0.00 | 0.13 | 1.67 | 1.11 | 29.43 | 7.73 |
| 60295002 | Kern | CA | 75.9 | 76.8 | 0.00 | 0.35 | 1.34 | 3.80 | 33.45 | 7.68 |
| 60296001 | Kern | CA | 70.9 | 72.4 | 0.00 | 0.50 | 1.59 | 0.63 | 30.55 | 7.98 |
| 60370002 | Los Angeles | CA | 73.3 | 75.1 | 0.01 | 1.47 | 3.53 | 0.82 | 24.67 | 2.15 |
| 60370016 | Los Angeles | CA | 86.1 | 88.9 | 0.01 | 1.73 | 4.14 | 0.97 | 28.98 | 2.53 |
| 60371201 | Los Angeles | CA | 79.8 | 79.8 | 0.02 | 1.74 | 4.20 | 1.29 | 32.92 | 2.83 |
| 60371701 | Los Angeles | CA | 78.1 | 79.1 | 0.01 | 1.82 | 4.16 | 0.97 | 25.57 | 2.35 |
| 60372005 | Los Angeles | CA | 72.3 | 74.6 | 0.01 | 1.76 | 4.10 | 1.17 | 24.34 | 2.37 |
| 60376012 | Los Angeles | CA | 85.9 | 87.4 | 0.02 | 2.27 | 4.69 | 1.22 | 32.85 | 3.43 |
| 60379033 | Los Angeles | CA | 76.3 | 77.2 | 0.01 | 1.82 | 3.52 | 0.45 | 40.73 | 2.75 |
| 60392010 | Madera | CA | 72.1 | 72.9 | 0.00 | 0.23 | 1.22 | 1.30 | 32.12 | 7.30 |
| 60470003 | Merced | CA | 69.9 | 71.0 | 0.00 | 0.37 | 1.94 | 1.12 | 30.92 | 5.97 |
| 60650004 | Riverside | CA | 76.7 | 76.7 | 0.01 | 1.37 | 3.64 | 0.72 | 25.79 | 2.34 |
| 60650012 | Riverside | CA | 83.6 | 85.1 | 0.00 | 1.30 | 3.33 | 0.31 | 36.48 | 2.66 |
| 60651016 | Riverside | CA | 85.2 | 85.5 | 0.00 | 1.60 | 3.00 | 3.09 | 38.71 | 2.54 |
| 60652002 | Riverside | CA | 72.4 | 73.0 | 0.01 | 2.29 | 1.39 | 2.24 | 46.66 | 2.08 |
| 60655001 | Riverside | CA | 79.5 | 80.1 | 0.01 | 2.71 | 2.67 | 3.03 | 42.81 | 2.40 |
| 60656001 | Riverside | CA | 78.3 | 81.6 | 0.00 | 1.13 | 4.03 | 0.53 | 30.14 | 2.55 |
| 60658001 | Riverside | CA | 87.0 | 87.9 | 0.01 | 1.76 | 4.77 | 0.77 | 28.27 | 2.68 |
| 60658005 | Riverside | CA | 83.2 | 84.4 | 0.01 | 1.68 | 4.56 | 0.73 | 27.04 | 2.57 |
| 60659001 | Riverside | CA | 73.7 | 75.9 | 0.00 | 1.71 | 4.96 | 1.03 | 25.56 | 2.43 |
| 60670012 | Sacramento | CA | 74.5 | 75.9 | 0.00 | 0.12 | 0.88 | 1.16 | 29.33 | 5.92 |
| 60675003 | Sacramento | CA | 69.9 | 71.3 | 0.00 | 0.06 | 0.79 | 1.26 | 26.47 | 6.04 |
| 60710005 | San Bernardino | CA | 96.2 | 98.1 | 0.00 | 1.36 | 3.68 | 0.44 | 38.71 | 2.77 |
| 60710012 | San Bernardino | CA | 84.1 | 85.8 | 0.02 | 1.33 | 1.83 | 0.33 | 53.12 | 1.93 |
| 60710306 | San Bernardino | CA | 76.2 | 77.4 | 0.00 | 0.67 | 2.10 | 0.50 | 40.62 | 2.02 |
| 60711004 | San Bernardino | CA | 89.8 | 91.0 | 0.01 | 2.03 | 4.00 | 0.95 | 31.07 | 2.74 |
| 60712002 | San Bernardino | CA | 93.1 | 95.0 | 0.01 | 1.58 | 4.58 | 0.75 | 31.34 | 2.82 |
| 60714001 | San Bernardino | CA | 86.0 | 88.5 | 0.00 | 0.91 | 2.69 | 0.37 | 37.56 | 2.45 |
| 60714003 | San Bernardino | CA | 94.1 | 95.8 | 0.00 | 0.98 | 4.15 | 0.69 | 31.70 | 2.90 |
| 60719002 | San Bernardino | CA | 80.0 | 81.4 | 0.01 | 2.80 | 2.23 | 3.20 | 45.72 | 2.29 |
| 60719004 | San Bernardino | CA | 88.4 | 88.7 | 0.00 | 0.92 | 3.90 | 0.65 | 29.78 | 2.72 |
| 60990006 | Stanislaus | CA | 74.8 | 75.7 | 0.00 | 0.34 | 2.19 | 1.77 | 30.24 | 5.06 |
| 61070006 | Tulare | CA | 69.1 | 71.9 | 0.00 | 0.33 | 0.55 | 4.43 | 53.61 | 2.46 |
| 61070009 | Tulare | CA | 76.1 | 77.2 | 0.00 | 0.43 | 1.44 | 3.40 | 39.41 | 7.08 |
| 61072002 | Tulare | CA | 68.9 | 71.4 | 0.00 | 0.25 | 1.58 | 0.95 | 26.88 | 7.42 |
| 61072010 | Tulare | CA | 73.1 | 73.9 | 0.00 | 0.15 | 1.78 | 1.17 | 30.26 | 8.67 |
| 61112002 | Ventura | CA | 70.5 | 72.2 | 0.02 | 1.65 | 4.60 | 1.01 | 29.69 | 2.75 |

**TAB B:**
**TEX. COMM'N ON ENV'T QUALITY, FED. CLEAN AIR ACT**
**SECTIONS 110(A)(1) AND (2) TRANSPORT STATE**
**IMPLEMENTATION PLAN REVISION FOR THE 2015 OZONE NAT.**
**AMBIENT AIR QUALITY STANDARDS (AUG. 2018) ("TEXAS SIP")**

# TEXAS COMMISSION ON ENVIRONMENTAL QUALITY
# AGENDA ITEM REQUEST
## for State Implementation Plan Revision Adoption

**AGENDA REQUESTED:** August 8, 2018

**DATE OF REQUEST:**    July 20, 2018

**INDIVIDUAL TO CONTACT REGARDING CHANGES TO THIS REQUEST, IF NEEDED:** Joyce Spencer-Nelson, (512) 239-5017

**CAPTION: Docket No. 2017-1762-SIP.** Consideration of the adoption of the Federal Clean Air Act (FCAA), Section 110(a)(1) and 110(a)(2)(D) Transport State Implementation Plan (SIP) Revision for the 2015 ozone National Ambient Air Quality Standards (NAAQS).

The SIP revision outlines the requirements of FCAA, Section 110(a)(2)(D)(i) and (ii) and the Texas provisions supporting the requirements for the 2015 ozone NAAQS. The revision also includes a technical demonstration to support the determination that Texas meets the interstate transport requirements of Section 110(a)(2)(D)(i)(I). The infrastructure requirements of FCAA, Section 110(a)(2)(A) through (C) and (E) through (M) are addressed in a separate SIP revision (Non-Rule Project No. 2017-040-SIP-NR). (Kristin Patton, Amy Browning) (Non-Rule Project No. 2017-039-SIP-NR)

Steve Hagle, P.E.                                    David Brymer

_____            _____
**Deputy Director**                                    **Division Director**

Joyce Nelson

_____
**Agenda Coordinator**

**Copy to CCC Secretary?  NO   X       YES**

# Texas Commission on Environmental Quality
## Interoffice Memorandum

| | | | |
|---|---|---|---|
| **To:** | Commissioners | **Date:** | July 20, 2018 |

**Thru:**   Bridget C. Bohac, Chief Clerk
Stephanie Bergeron Perdue, Interim Executive Director

**From:**   Steve Hagle, P.E., Deputy Director
Office of Air

**Docket No.:**   2017-1762-SIP

**Subject:**   Commission Approval for Adoption of Federal Clean Air Act (FCAA), §110(a)(1) and §110(a)(2)(D) Transport State Implementation Plan (SIP) Revision for the 2015 Ozone National Ambient Air Quality Standards (NAAQS)

2015 Ozone NAAQS Transport SIP Revision
Project No. 2017-039-SIP-NR

**Background and reason(s) for the SIP revision:**
On October 1, 2015, the United States Environmental Protection Agency (EPA) revised the primary and secondary NAAQS for ozone to an eight-hour standard of 0.070 parts per million. Within three years of the promulgation of any new or revised NAAQS, FCAA, §110(a)(1) requires states to submit a SIP revision to provide for the implementation, maintenance, and enforcement of the NAAQS. Section 110(a)(2)(A) through (M), lists the elements that the SIP submissions must contain. This SIP revision specifically addresses transport requirements under FCAA, §110(a)(2)(D). The remaining infrastructure requirements of FCAA, §110(a)(2)(A) through (M) are addressed in a separate SIP revision (Project No. 2017-040-SIP-NR). Infrastructure and transport SIP revisions to address the 2015 ozone NAAQS are due to the EPA by October 1, 2018.

**Scope of the SIP revision:**

**A.) Summary of what the SIP revision will do:**
The proposed SIP revision documents how the transport elements listed in FCAA, §110(a)(2)(D) are currently addressed in the Texas SIP. This SIP revision provides a detailed technical demonstration and other supporting information to meet the interstate transport requirements of FCAA, §110(a)(2)(D)(i) and (ii).

**B.) Scope required by federal regulations or state statutes:**
Pursuant to FCAA, §110(a)(2)(D)(i), this SIP revision must contain several elements that provide supporting information demonstrating that Texas is:
- not contributing significantly to nonattainment of the 2015 ozone NAAQS for areas in other states;
- not interfering with the maintenance of the 2015 ozone NAAQS in any other state;
- not interfering with measures required to meet an implementation plan for any other state related to prevention of significant deterioration (PSD); and
- not interfering with measures required to meet the implementation plan for any other state related to regional haze and visibility.

Commissioners
Page 2
July 20, 2018

Re: Docket No. 2017-1762-SIP

In addition, pursuant to FCAA, §110(a)(2)(D)(ii), the SIP revision must provide information demonstrating compliance with the applicable requirements of FCAA, §126 and §115 relating to interstate and international pollution abatement.

Guidance on development and submission of infrastructure SIPs issued by the EPA on September 13, 2013[1] did not address §110(a)(2)(D)(i)(I), which specifically concerns interstate pollution transport affecting attainment and maintenance of the NAAQS. The EPA did not issue formal transport guidance prior to the development and proposal of this SIP revision. On March 27, 2018, the EPA issued a memo to provide information to assist states' efforts to develop transport SIP revisions for the 2015 ozone NAAQS.[2] The memo notes that in developing transport SIP revisions, states have flexibility to follow the four-step transport framework or alternative frameworks, so long as the chosen approach has adequate technical justification and is consistent with the requirements of the FCAA. The memo also includes a preliminary list of potential flexibilities in analytical approaches for developing transport SIP revisions that may warrant further discussion between the EPA and states. Although this transport SIP revision was developed prior to the EPA's memo, the approach used in developing this SIP revision is consistent with the EPA memo providing states with flexibility in their technical work and submittals. This SIP revision includes an analysis of required transport elements consistent with statutory requirements.

**C.) Additional staff recommendations that are not required by federal rule or state statute:**
None

**Statutory authority:**
The EPA published the final rule establishing the revised NAAQS for ozone in the *Federal Register* on October 26, 2015 (80 FR 65292). The authority to propose and adopt the SIP revision is derived from FCAA, §110, which requires states to submit SIP revisions that contain enforceable measures to achieve the NAAQS, and other general and specific authority in Texas Water Code, Chapters 5 and 7, and Texas Health and Safety Code, Chapter 382.

---

[1] Memorandum from Stephen D. Page, Director of the Office of Air Quality Planning and Standards, September 13, 2013, *Guidance on Infrastructure State Implementation Plan (SIP) Elements under Clean Air Act Sections 110(a)(1) and 110(a)(2)*. EPA Office of Air Quality Planning and Standards. https://www3.epa.gov/airquality/urbanair/sipstatus/docs/Guidance_on_Infrastructure_SIP_Elements_Multipollutant_FINAL_Sept_2013.pdf
[2] Memorandum from Peter Tsirigotis, Director of the Office of Air Quality Planning and Standards, March 27, 2018, *Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I)*. EPA Office of Air Quality Planning and Standards. https://www.epa.gov/sites/production/files/2018-03/documents/transport_memo_03_27_18_1.pdf

Commissioners
Page 3
July 20, 2018

Re: Docket No. 2017-1762-SIP


**Effect on the:**

**A.) Regulated community:**
No effects on the regulated community are anticipated. However, if the EPA were to issue a federal implementation plan (FIP) because the state failed to submit a SIP revision there could ultimately be significant effects on the regulated community.

**B.) Public:**
None

**C.) Agency programs:**
The SIP revision would have no new effect on agency programs.

**Stakeholder meetings:**
The proposed SIP revision went through a public review and comment period including one public hearing.

**Public comment:**
The commission offered a public hearing on the proposed SIP revision in Austin on April 10, 2018. Notice of the public hearing was published in the *Texas Register* and the *Austin American-Statesman*, *Dallas Morning News*, and *Houston Chronicle* newspapers.

The public comment period opened on March 9, 2018 and closed on April 10, 2018. During the comment period, staff received comments from the Lone Star Chapter of the Sierra Club. The comments generally concerned nonattainment designations, ongoing litigation, emissions, and control strategies. A summary of the comments and the TCEQ response is provided as part of the SIP revision in the Response to Comments.

**Significant changes from proposal:**
None

**Potential controversial concerns and legislative interest:**
Section 110(a)(2)(D) of the FCAA requires transport SIPs to contain adequate provisions to prevent emissions from interfering with visibility in another state. As part of the EPA's October 17, 2017 FIP to address best available retrofit technology (BART) requirements for Texas electric generating units, the EPA disapproved portions of the Texas SIP with regard to interstate visibility transport for the 1997 eight-hour ozone, 1997 $PM_{2.5}$ (annual and 24-hour), 2006 $PM_{2.5}$ (24-hour), 2008 eight-hour ozone, 2010 one-hour nitrogen dioxide, and 2010 one-hour sulfur dioxide NAAQS (82 FR 48324). The EPA also made a finding that the BART alternatives adopted as the FIP meet the interstate visibility transport requirements for these NAAQS under FCAA, §110(a)(2)(D)(II). Based on the finding that Texas meets the visibility transport provision for these other NAAQS under the BART FIP, along with the modeling analysis in the proposed SIP revision demonstrating that Texas does not significantly contribute to nonattainment or maintenance in another state for the 2015 ozone NAAQS, the fact that the EPA has not established a separate visibility standard for ozone, and because Texas is included in the Cross-State Air Pollution Rule (CSAPR) Update ozone season nitrogen oxides ($NO_x$) trading

Commissioners
Page 4
July 20, 2018

Re:  Docket No. 2017-1762-SIP

program, it is concluded that Texas meets the visibility transport provision for the 2015 ozone NAAQS as well.

Texas is included in the EPA's CSAPR Update Rule for ozone season $NO_x$, due to the EPA's disapproval of the portion of Texas' 2008 ozone infrastructure and transport SIP revision pertaining to the §110(a)(2)(D)(i)(I) interstate transport requirements and the EPA's determination that Texas significantly contributes to nonattainment or interferes with maintenance of the 2008 eight-hour ozone NAAQS in other states. While the CSAPR Update Rule does not specifically cover the 2015 ozone NAAQS, litigation over the rule is still ongoing and could potentially affect interstate transport requirements in the future.

**Does this SIP revision affect any current policies or require development of new policies?**
No

**What are the consequences if this SIP revision does not go forward? Are there alternatives to this SIP revision?**
Transport SIP revisions are required by §110(a) of the FCAA to be submitted within three years of the EPA promulgating the revised standard. The commission could choose to not comply with requirements to develop and submit a transport SIP revision to the EPA. However, if the required SIP revision is not submitted to the EPA by the October 1, 2018 deadline, the EPA has the authority to issue a finding of failure to submit requiring that the TCEQ submit the SIP revision within a specified time period and potentially imposing sanctions on the state. The EPA would be required to promulgate a FIP if the TCEQ failed to make the submission within two years, or by October 1, 2020.

**Key points in the SIP revision adoption schedule:**
    **Anticipated adoption date:** August 8, 2018
    **EPA due date:** October 1, 2018

**Agency contacts:**
Kristin Patton, SIP Project Manager, Air Quality Division, (512) 239-4907
Amy Browning, Staff Attorney, (512) 239-0891
Joyce Spencer-Nelson, *Texas Register* Rule/Agenda Coordinator, (512) 239-5017

cc:     Chief Clerk, 2 copies
        Executive Director's Office
        Jim Rizk
        Office of General Counsel
        Kristin Patton
        Joyce Spencer-Nelson

REVISIONS TO THE STATE OF TEXAS AIR QUALITY
IMPLEMENTATION PLAN CONCERNING FEDERAL CLEAN AIR
ACT SECTIONS 110(a)(1) AND (2) INFRASTRUCTURE

TRANSPORT DEMONSTRATION FOR OZONE



TEXAS COMMISSION ON ENVIRONMENTAL QUALITY
P.O. BOX 13087
AUSTIN, TEXAS 78711-3087

**FEDERAL CLEAN AIR ACT, SECTIONS 110(A)(1) AND (2)
TRANSPORT STATE IMPLEMENTATION PLAN REVISION FOR
THE 2015 OZONE NATIONAL AMBIENT AIR QUALITY
STANDARDS**

PROJECT NUMBER 2017-039-SIP-NR

Adoption
August 8, 2018

*This page intentionally left blank*

## EXECUTIVE SUMMARY

This revision to the state implementation plan (SIP) is intended to meet the infrastructure and transport requirements of the Federal Clean Air Act (FCAA), §110(a). States are required by FCAA, §110(a)(1) to submit SIP revisions providing for the implementation, maintenance, and enforcement of a new or revised National Ambient Air Quality Standard (NAAQS) within three years after promulgation. On October 1, 2015, the United States Environmental Protection Agency (EPA) revised the primary and secondary NAAQS for ozone to an eight-hour standard of 0.070 parts per million. Infrastructure and transport SIP revisions to address the 2015 Ozone NAAQS are due to the EPA by October 1, 2018.

FCAA, §110(a)(2)(A) through (M), lists the elements that infrastructure and transport SIP submissions must contain. This SIP revision specifically addresses transport requirements under FCAA, §110(a)(2)(D) for the 2015 ozone NAAQS. The remaining infrastructure requirements of FCAA, §110(a)(2)(A) through (M) are addressed in a separate SIP revision (Project No. 2017-040-SIP-NR). This SIP revision documents how the transport elements listed in FCAA, §110(a)(2)(D) are currently addressed in the Texas SIP and provides a detailed technical demonstration and other supporting information to meet the interstate transport requirements of FCAA, §110(a)(2)(D)(i) and (ii).

Pursuant to FCAA, §110(a)(2)(D)(i), this SIP revision must contain several elements that provide supporting information demonstrating that Texas is:

- not contributing significantly to nonattainment of the 2015 ozone NAAQS for areas in other states;

- not interfering with the maintenance of the 2015 ozone NAAQS in any other state;

- not interfering with measures required to meet an implementation plan for any other state related to prevention of significant deterioration (PSD); and

- not interfering with measures required to meet the implementation plan for any other state related to regional haze and visibility.

In addition, pursuant to FCAA, §110(a)(2)(D)(ii), this SIP revision must provide information demonstrating compliance with the applicable requirements of FCAA, §126 and §115 relating to interstate and international pollution abatement.

To meet the requirements of FCAA, §110(a)(2)(D)(i)(I), this SIP revision includes an analysis of ozone design value and emissions trends in Texas, a modeling analysis of the impacts of Texas' emissions on other states, and a discussion of existing ozone control strategies to demonstrate that emissions from Texas do not contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in another state. Information regarding how Texas meets the requirements of FCAA, §110(a)(2)(D)(i)(II) is provided in Chapter 4: *Prevention of Significant Deterioration and Visibility Transport [FCAA, §110(a)(2)(D)(i)(II)]*. Statements regarding

compliance with FCAA, §110(a)(2)(D)(ii) are provided in Chapter 5: *Interstate Pollution Abatement and International Air Pollution [FCAA, §110(a)(2)(D)(ii)]*.

## SECTION V-A: LEGAL AUTHORITY

General
The Texas Commission on Environmental Quality (TCEQ) has the legal authority to implement, maintain, and enforce the National Ambient Air Quality Standards (NAAQS) and to control the quality of the state's air, including maintaining adequate visibility.

The first air pollution control act, known as the Clean Air Act of Texas, was passed by the Texas Legislature in 1965. In 1967, the Clean Air Act of Texas was superseded by a more comprehensive statute, the Texas Clean Air Act (TCAA), found in Article 4477-5, Vernon's Texas Civil Statutes. The legislature amended the TCAA in 1969, 1971, 1973, 1979, 1985, 1987, 1989, 1991, 1993, 1995, 1997, 1999, 2001, 2003, 2005, 2007, 2009, 2011, 2013, 2015, and 2017. In 1989, the TCAA was codified as Chapter 382 of the Texas Health and Safety Code.

Originally, the TCAA stated that the Texas Air Control Board (TACB) is the state air pollution control agency and is the principal authority in the state on matters relating to the quality of air resources. In 1991, the legislature abolished the TACB effective September 1, 1993, and its powers, duties, responsibilities, and functions were transferred to the Texas Natural Resource Conservation Commission (TNRCC). With the creation of the TNRCC, the authority over air quality is found in both the Texas Water Code and the TCAA. Specifically, the authority of the TNRCC is found in Chapters 5 and 7. Chapter 5, Subchapters A - F, H - J, and L, include the general provisions, organization, and general powers and duties of the TNRCC, and the responsibilities and authority of the executive director. Chapter 5 also authorizes the TNRCC to implement action when emergency conditions arise and to conduct hearings. Chapter 7 gives the TNRCC enforcement authority. In 2001, the 77th Texas Legislature continued the existence of the TNRCC until September 1, 2013, and changed the name of the TNRCC to the TCEQ. In 2009, the 81st Texas Legislature, during a special session, amended section 5.014 of the Texas Water Code, changing the expiration date of the TCEQ to September 1, 2011, unless continued in existence by the Texas Sunset Act. In 2011, the 82nd Texas Legislature continued the existence of the TCEQ until 2023.

The TCAA specifically authorizes the TCEQ to establish the level of quality to be maintained in the state's air and to control the quality of the state's air by preparing and developing a general, comprehensive plan. The TCAA, Subchapters A - D, also authorize the TCEQ to collect information to enable the commission to develop an inventory of emissions; to conduct research and investigations; to enter property and examine records; to prescribe monitoring requirements; to institute enforcement proceedings; to enter into contracts and execute instruments; to formulate rules; to issue orders taking into consideration factors bearing upon health, welfare, social and economic factors, and practicability and reasonableness; to conduct hearings; to establish air quality control regions; to encourage cooperation with citizens' groups and other agencies and political subdivisions of the state as well as with industries and the federal government; and to establish and operate a system of permits for construction or modification of facilities.

Local government authority is found in Subchapter E of the TCAA. Local governments have the same power as the TCEQ to enter property and make inspections. They also

i

may make recommendations to the commission concerning any action of the TCEQ that affects their territorial jurisdiction, may bring enforcement actions, and may execute cooperative agreements with the TCEQ or other local governments. In addition, a city or town may enact and enforce ordinances for the control and abatement of air pollution not inconsistent with the provisions of the TCAA and the rules or orders of the commission.

Subchapters G and H of the TCAA authorize the TCEQ to establish vehicle inspection and maintenance programs in certain areas of the state, consistent with the requirements of the Federal Clean Air Act; coordinate with federal, state, and local transportation planning agencies to develop and implement transportation programs and measures necessary to attain and maintain the NAAQS; establish gasoline volatility and low emission diesel standards; and fund and authorize participating counties to implement vehicle repair assistance, retrofit, and accelerated vehicle retirement programs.

<u>Applicable Law</u>
The following statutes and rules provide necessary authority to adopt and implement the state implementation plan (SIP). The rules listed below have previously been submitted as part of the SIP.

<u>Statutes</u>
All sections of each subchapter are included, unless otherwise noted.

| | |
|---|---|
| TEXAS HEALTH & SAFETY CODE, Chapter 382 | September 1, 2017 |
| TEXAS WATER CODE | September 1, 2017 |

Chapter 5: Texas Natural Resource Conservation Commission
    Subchapter A: General Provisions
    Subchapter B: Organization of the Texas Natural Resource Conservation
           Commission
    Subchapter C: Texas Natural Resource Conservation Commission
    Subchapter D: General Powers and Duties of the Commission
    Subchapter E: Administrative Provisions for Commission
    Subchapter F: Executive Director (except §§5.225, 5.226, 5.227, 5.2275,5.231, 5.232,
           and 5.236)
    Subchapter H: Delegation of Hearings
    Subchapter I: Judicial Review
    Subchapter J: Consolidated Permit Processing
    Subchapter L: Emergency and Temporary Orders (§§5.514, 5.5145, and 5.515 only)
    Subchapter M: Environmental Permitting Procedures (§5.558 only)

Chapter 7: Enforcement
    Subchapter A: General Provisions (§§7.001, 7.002, 7.0025, 7.004, and 7.005 only)
    Subchapter B: Corrective Action and Injunctive Relief (§7.032 only)
    Subchapter C: Administrative Penalties
    Subchapter D: Civil Penalties (except §7.109)
    Subchapter E: Criminal Offenses and Penalties: §§7.177, 7.179-7.183

Rules

All of the following rules are found in 30 Texas Administrative Code, as of the following latest effective dates:

Chapter 7: Memoranda of Understanding, §§7.110 and 7.119

December 13, 1996 and May 2, 2002

Chapter 19: Electronic Reporting                                    March 15, 2007

Chapter 35: Subchapters A-C, K: Emergency and Temporary Orders
and Permits; Temporary Suspension or Amendment of Permit
Conditions                                                         July 20, 2006

Chapter 39: Public Notice, §§39.201; 39.401; 39.403(a) and (b)(8)-(10);
39.405(f)(1) and (g); 39.409; 39.411 (a), (b)(1)-(6), and (8)-(10) and (c)(1)-
(6) and (d); 39.413(9), (11), (12), and (14); 39.418(a) and (b)(3) and (4);
39.419(a), (b), (d), and (e); 39.420(a), (b) and (c)(3) and (4); 39.423 (a)
and (b); 39.601-39.605                                           December 29, 2016

Chapter 55: Requests for Reconsideration and Contested Case
Hearings; Public Comment, §§55.1; 55.21(a) - (d), (e)(2), (3), and (12), (f)
and (g); 55.101(a), (b), and (c)(6) - (8); 55.103; 55.150; 55.152(a)(1), (2),
and (6) and (b); 55.154; 55.156; 55.200; 55.201(a) - (h); 55.203; 55.205;
55.209, and 55.211                                              December 29, 2016

Chapter 101: General Air Quality Rules                            October 12, 2017

Chapter 106: Permits by Rule, Subchapter A                         April 17, 2014

Chapter 111: Control of Air Pollution from Visible Emissions and
Particulate Matter                                               August 3, 2017

Chapter 112: Control of Air Pollution from Sulfur Compounds         July 16, 1997

Chapter 113: Standards of Performance for Hazardous Air Pollutants
and for Designated Facilities and Pollutants                       May 14, 2009

Chapter 114: Control of Air Pollution from Motor Vehicles        December 29, 2016

Chapter 115: Control of Air Pollution from Volatile Organic
Compounds                                                       January 5, 2017

Chapter 116: Permits for New Construction or Modification       November 24, 2016

Chapter 117: Control of Air Pollution from Nitrogen Compounds       June 25, 2015

Chapter 118: Control of Air Pollution Episodes                     March 5, 2000

Chapter 122: §122.122: Potential to Emit                        February 23, 2017

Chapter 122: §122.215: Minor Permit Revisions                                          June 3, 2001

Chapter 122: §122.216: Applications for Minor Permit Revisions            June 3, 2001

Chapter 122: §122.217: Procedures for Minor Permit Revisions      December 11, 2002

Chapter 122: §122.218: Minor Permit Revision Procedures for Permit
Revisions Involving the Use of Economic Incentives, Marketable
Permits, and Emissions Trading                                                          June 3, 2001

## SECTION VI: CONTROL STRATEGY

A. Introduction (No change)
B. Ozone (No change)
C. Particulate Matter (No change)
D. Carbon Monoxide (No change)
E. Lead (No change)
F. Oxides of Nitrogen (No change)
G. Sulfur Dioxide (No change)
H. Conformity with the National Ambient Air Quality Standards (No change)
I. Site Specific (No change)
J. Mobile Sources Strategies (No change)
K. Clean Air Interstate Rule (No change)
L. Transport (Revised)
M. Regional Haze (No change)

# TABLE OF CONTENTS

Executive Summary

Section V-A: Legal Authority

Section VI: Control Strategy

Table of Contents

List of Acronyms

List of Tables

List of Figures

List of Appendices

Chapter 1: General

    1.1 Background

    1.2 Introduction

    1.3 Health Effects

    1.4 Public Hearing and Comment Information

    1.5 Social and Economic Considerations

    1.6 Fiscal and Manpower Resources

Chapter 2: Ozone Data

    2.1 Introduction

    2.2 Ozone Design Value Trends in Texas

    2.3 Ozone Emissions Trends in Texas

        2.3.1 General

        2.3.2 Historical Emissions Inventory Trends

    2.4 Ozone Data Summary

Chapter 3: Significant Contribution to Nonattainment and Interference With Maintenance [FCAA, §110(a)(2)(D)(i)(I)]

    3.1 Introduction

    3.2 Step 1: Identification of Projected Nonattainment and Maintenance Monitors

        3.2.1 Modeling Domain

        3.2.2 Modeling Episode

            3.2.2.1 Meteorology of 2012

            3.2.2.2 Ozone Production in 2012

        3.2.3 Base Case Modeling

3.2.3.1 Meteorological Modeling

3.2.3.2 Emissions Modeling

3.2.3.3 Initial and Boundary Conditions

3.2.3.4 Photochemical Modeling

3.2.4 Future Year Modeling

3.2.4.1 Emissions Modeling

3.2.4.2 Initial and Boundary Conditions

3.2.4.3 Photochemical Modeling

3.3 Step 2: Source Apportionment and Identification of Downwind Monitors Tagged For Further Review

3.3.1 Identification of Nonattainment Monitors for Further Review

3.3.2 Identification of Maintenance Monitors for Further Review

3.4 Step 3: Analysis to Determine if Texas Emissions Contribute Significantly to Nonattainment or Interfere with Maintenance at Tagged Monitors

3.4.1 Colorado Monitors

3.4.1.1 Eight-Hour Ozone Design Value Trends

3.4.1.2 Monitored Elevated Ozone Days

3.4.1.3 Back Trajectory Analysis on Elevated Ozone Days

3.4.1.4 Texas Contributions on Projected Future Year Elevated Ozone Days

3.4.1.5 Collective Interstate Contribution to the Future Design Value

3.4.1.6 Direct Decoupled Method and Analysis of MDA8 Ozone Responsiveness to Texas Emissions

3.4.1.7 Conclusion of Weight-of-Evidence Analysis of the Tagged Colorado Monitors

3.4.2 Arizona Monitor(s)

3.4.3 California Monitors

3.4.3.1 Conceptual Model of Eight-Hour Ozone Formation at Tagged California Monitors

3.4.3.2 Eight-Hour Ozone Design Value Trends

3.4.3.3 Monitored Elevated Ozone Days

3.4.3.4 Back Trajectory Analysis on Elevated Ozone Days

3.4.3.5 Texas Contributions on Projected Future Year Elevated Ozone Days

3.4.3.6 Collective Interstate Contribution to the Future Design Value

3.4.3.7 Conclusion of the Weight-of Evidence Analysis of the Tagged California Monitors

3.5 Conclusion

3.6 References

Chapter 4: Control Strategies

4.1 Introduction

4.2 Emissions Reductions from Electric Generating Units (EGU)

4.2.1 Utility Electric Generation in Ozone Nonattainment Areas

4.2.2 Utility Electric Generation in East and Central Texas

4.2.3 Senate Bill 7 (76th Texas Legislature)

4.3 Emission Reductions from Other Sources

4.3.1 East Texas Engines

4.3.2 Mass Emissions Cap and Trade (MECT) Program

4.3.3 Highly Reactive Volatile Organic Compounds (HRVOC) Rules and HRVOC Emissions Cap and Trade (HECT) Program

4.3.4 Cement Kilns

4.4 Additional Measures

4.4.1 SmartWay Transport Partnership and the Blue Skyway Collaborative

4.4.2 Energy Efficiency and Renewable Energy (EE/RE) Measures

4.4.3 Consent Decrees with Refineries

4.4.4 Clean Air Interstate Rule (CAIR) and Cross-State Air Pollution Rule (CSAPR)

4.4.5 Texas Emissions Reduction Plan (TERP)

4.4.6 Clean School Bus Program

4.4.7 Local Initiatives

4.4.8 Voluntary Measures

4.5 2008 Ozone NAAQS SIP Revisions Adopted Since 2015

4.5.1 DFW 2008 Eight Hour Ozone SIP Revisions

4.5.2 HGB 2008 Eight-Hour Ozone SIP Revisions

4.6 Conclusions

Chapter 5: Prevention of Significant Deterioration and Visibility Transport [FCAA, §110(a)(2)(D)(i)(II)]

5.1 Introduction

5.2 PSD

5.3 Visibility Transport

Chapter 6: Interstate Pollution Abatement and International Air Pollution [FCAA, §110(a)(2)(D)(ii)]

6.1 Introduction

6.2 Interstate Pollution Abatement

6.2.1 Compliance with FCAA, §126(a)

6.2.2 Compliance with FCAA, §126(b) and (c)

6.3 International Air Pollution

6.3.1 Compliance with FCAA, §115

Chapter 7: Conclusions

Chapter 8: Future Revisions to the National Ambient Air Quality Standards (NAAQS)

## LIST OF ACRONYMS

| | |
|---|---|
| 3-D | three-dimensional |
| AD | attainment demonstration |
| APCA | Anthropogenic Culpability Precursor Analysis |
| AQS | Air Quality System |
| BART | best available retrofit technology |
| BEIS | Biogenic Emissions Inventory Systems |
| BPA | Beaumont-Port Arthur |
| CAIR | Clean Air Interstate Rule |
| CAMx | Comprehensive Air Quality Model with Extensions |
| CEMS | continuous emissions monitoring system |
| CSAPR | Cross-State Air Pollution Rule |
| CST | Central Standard Time |
| CTM | Chemical Transport Model |
| DDM | Direct Decoupled Method |
| DERA | Diesel Emissions Reduction Act |
| DERI | Diesel Emissions Reduction Incentive Program |
| DFW | Dallas-Fort Worth |
| $DV_B$ | baseline design value |
| $DV_F$ | future year design value |
| EE | energy efficiency |
| EI | emissions inventory |
| EGF | electric generating facility |
| EGU | electric generating unit |
| EPA | United States Environmental Protection Agency |
| EPS3 | Emissions Processor System |
| ESL | Energy Systems Laboratory |
| FCAA | Federal Clean Air Act |
| FINN | Fire Inventory of NCAR |
| FIP | federal implementation plan |
| FR | *Federal Register* |
| FY | fiscal year |
| g/hp-hr | grams per horsepower-hour |

| GEOS | Goddard Earth Observing System |
|------|-------------------------------|
| GHG | greenhouse gas |
| H-GAC | Houston-Galveston Area Council |
| HB | House Bill |
| HECT | Highly Reactive Volatile Organic Compounds Emissions Cap and Trade |
| HGB | Houston-Galveston-Brazoria |
| hp | horsepower |
| HRVOC | Highly Reactive Volatile Organic Compounds |
| HTAP | Hemispheric Transport of Air Pollution |
| HYSPLIT | Hybrid Single Particle Lagrangian Integrated Trajectory |
| km | kilometers |
| Kv | vertical diffusivity |
| LAI | Leaf Area Index |
| lb/MMBtu | pound per million British thermal units |
| m | meters |
| m AGL | meters above ground level |
| MB | mean bias |
| MDA8 | maximum daily average eight-hour (ozone concentration) |
| $MDV_F$ | maintenance future year design value |
| ME | mean error |
| MECT | Mass Emissions Cap and Trade |
| MW | megawatts |
| NAAQS | National Ambient Air Quality Standard |
| NCAR | National Center for Atmospheric Research |
| NCDC | National Climatic Data Center |
| NCEP | National Centers for Environmental Prediction |
| NMB | normalized mean bias |
| NME | normalized mean error |
| NOAA | National Oceanic and Atmospheric Administration |
| NODA | Notice of Data Availability |
| $NO_x$ | nitrogen oxides |
| NSR | New Source Review |
| $O_3$ | ozone |
| PM | particulate matter |

| | |
|---|---|
| PM$_{2.5}$ | particulate matter with an aerodynamic diameter less than or equal to a nominal 2.5 micrometers |
| ppb | parts per billion |
| ppm | parts per million |
| PSD | prevention of significant deterioration |
| PUCT | Public Utility Commission of Texas |
| RACT | reasonably available control technology |
| RE | renewable energy |
| RFP | reasonable further progress |
| RMSE | root mean square error |
| RRF | relative response factor |
| SB | Senate Bill |
| SECO | State Energy Conservation Office |
| SIP | state implementation plan |
| SMOKE | Sparse Matrix Operation Kernel Emissions (System) |
| SO$_2$ | sulfur dioxide |
| TAC | Texas Administrative Code |
| TACB | Texas Air Control Board |
| TCAA | Texas Clean Air Act |
| TCEQ | Texas Commission on Environmental Quality (commission) |
| TCFP | Texas Clean Fleet Program |
| TERP | Texas Emissions Reduction Plan |
| THSC | Texas Health and Safety Code |
| TNGVGP | Texas Natural Gas Vehicle Grant Program |
| TNRCC | Texas Natural Resource Conservation Commission |
| tpd | tons per day |
| tpy | tons per year |
| TUC | Texas Utilities Code |
| TX$_{DVF}$ | Texas contribution to a monitor's future year design value |
| VOC | volatile organic compounds |
| WRF | Weather Research and Forecasting Model |

## LIST OF TABLES

Table 2-1:   2016 Eight-Hour Ozone Design Values by County in Texas

Table 3-1:   2015 Ozone NAAQS Transport SIP Revision CAMx Modeling Domain Definitions

Table 3-2:   2015 Ozone NAAQS Transport SIP Revision CAMx Modeling Domain Vertical Structure

Table 3-3:   2015 Transport SIP Revision WRF Modeling Domain Definitions

Table 3-4:   2015 Transport SIP Revision WRF Modeling Domain Vertical Structure

Table 3-5:   WRF Model Configuration Parameters

Table 3-6:   Emissions Processing Modules

Table 3-7:   Statistical Model Performance Evaluation Metrics for TCEQ's 2015 Ozone NAAQS Transport SIP Revision Configuration

Table 3-8:   Maximum and Minimum Eight-Hour Ozone Design Values for All U.S. Monitors for Each Year from 2007 through 2016

Table 3-9:   Apportion of Total Ozone Concentration for cell index [242, 78] on episode day July 14 at 12:00 p.m. CST to Contribution Categories

Table 3-10:  Downwind Nonattainment Monitors Tagged for Further Review

Table 3-11:  Downwind Maintenance Monitors Tagged for Further Review

Table 3-12:  Monitors Linked to Texas by EPA Modeling in the 2015 Transport NODA

Table 3-13:  Number of HYSPLIT Back Trajectories at Each Tagged Colorado Monitor

Table 3-14:  Modeled Elevated Ozone Days in the Future Year at the Tagged Colorado Monitors

Table 3-15:  Collective Interstate Contribution to Future Design Value at Tagged Colorado Monitors

Table 3-16:  Number of HYSPLIT Back Trajectories at Each Tagged California Monitor

Table 3-17:  Modeled Elevated Ozone Days in the Future Year

Table 3-18:  Collective Interstate Contributions to Future Design Values at Tagged California Monitors

## LIST OF FIGURES

Figure 2-1:   2016 Eight-Hour Ozone Design Values by County in Texas

Figure 2-2:   Eight-Hour Ozone Design Values and Population by Area in Texas

Figure 2-3:   Statewide Historical $NO_x$ Emissions Trends in Tons per Year

Figure 2-4:   Statewide Historical VOC Emissions Trends in Tons per Year

Figure 2-5:   DFW 10-County Nonattainment Area Historical $NO_x$ Emissions Trends in Tons per Year

Figure 2-6:   DFW 10-County Nonattainment Area Historical VOC Emissions Trends in Tons per Year

Figure 2-7:   HGB Eight-County Nonattainment Area Historical $NO_x$ Emissions Trends in Tons per Year

Figure 2-8:   HGB Eight-County Nonattainment Area Historical VOC Emissions Trends in Tons per Year

Figure 3-1:   Map of 2015 Ozone NAAQS Transport SIP Revision CTM Modeling Domain

Figure 3-2:   U.S. Drought Monitor Map of Texas for July 26, 2011

Figure 3-3:   May through October 2012 Statewide NCDC Temperature Ranks

Figure 3-4:   May through October 2012 Statewide NCDC Precipitation Ranks

Figure 3-5:   Change in Texas Drought Conditions from July 2011 to July 2012

Figure 3-6:   Meteorologically-Adjusted Ozone Trends for NCDC Climate Regions for 2000 through 2016

Figure 3-7:   Map of 2015 Ozone NAAQS Transport SIP Revision Meteorological Modeling Domain

Figure 3-8:   Matching of WRF and CAMx Vertical Layers

Figure 3-9:   Wind Speed Mean Bias for May through September 2012

Figure 3-10: Two Meter Temperature Mean Bias for May through September 2012

Figure 3-11: Humidity Mean Bias for May through September 2012

Figure 3-12: Wind Speed Mean Absolute Error for May through September 2012

Figure 3-13: Two Meter Temperature Mean Absolute Error for May through September 2012

Figure 3-14: Humidity Mean Absolute Error for May through September 2012

Figure 3-15: Wind Speed RMSE for May through September 2012

Figure 3-16: Two Meter Temperature RMSE for May through September 2012

Figure 3-17: Humidity RMSE for May through September 2012

Figure 3-18: Base Case Representative Day Total Anthropogenic Precursor Emissions by Geographic Regions

Figure 3-19: Base Case Representative Day Total Anthropogenic Precursor Emissions by Source Category

Figure 3-20: Biogenic VOC Emissions in RPO_12km Domain on July 18, 2012

Figure 3-21: Initial Concentration on April 16, 2012 in the RPO_12km

Figure 3-22: 2012 East Boundary Condition Cross-Section for July 18, 2012 Episode Day

Figure 3-23: 2012 West Boundary Condition Cross-Section for July 18, 2012 Episode Day

Figure 3-24: 2012 North Boundary Condition Cross-Section for July 18, 2012 Episode Day

Figure 3-25: 2012 South Boundary Condition Cross-Section for July 18, 2012 Episode Day

Figure 3-26: Mean Bias for the May through September 2012 Episode at AQS Monitoring Sites

Figure 3-27: RMSE for May through September 2012 Episode at AQS Monitoring Sites

Figure 3-28: Future Year Representative Day Total Anthropogenic Precursor Emissions by Geographic Region

Figure 3-29: Future Year Representative Day Total Anthropogenic Precursor Emissions by Source Category

Figure 3-30: 2023 East Boundary Condition Cross-Section for July 18, 2012 Episode Day

Figure 3-31: 2023 West Boundary Condition Cross-Section for July 18, 2012 Episode Day

Figure 3-32: 2023 North Boundary Condition Cross-Section for July 18, 2012 Episode Day

Figure 3-33: 2023 South Boundary Condition Cross-Section for July 18, 2012 Episode Day

Figure 3-34: Baseline Design Value ($DV_B$) for the 2015 Ozone NAAQS Transport SIP Revision

Figure 3-35: 2023 Future Design Value ($DV_F$) for the AQS Monitors in the RPO_12km Domain

Figure 3-36: 2023 Maintenance Future Year Design Value ($MDV_F$) for the AQS Monitors in the RPO_12km Domain

Figure 3-37: APCA Geographic Regions for the 2015 Ozone NAAQS Transport SIP Revision

Figure 3-38: Breakdown of Total Hourly Modeled Ozone Concentration by APCA Contribution Categories for the Manvel Croix Monitor Grid Cell on July 14 at 12:00 p.m. CST

Figure 3-39: Map of Additional APCA Geographic Regions Based on Location of Tagged Monitors

Figure 3-40: Eight-Hour Ozone Design Values for Monitors in the Denver-Aurora Area

Figure 3-41: Number of Elevated Eight-Hour Ozone Days at the Tagged Colorado Monitors for the years 2007 through 2016

Figure 3-42: HYSPLIT Back Trajectory Endpoints that Meet Filter Criteria from the Tagged Colorado Monitors

Figure 3-43: Number of Trajectories that Reach Texas and the Number of Elevated Eight-Hour Ozone Days at Each Tagged Colorado Monitor

Figure 3-44: Fourth-Highest Eight-Hour Ozone and the Number of Trajectories that Reach Texas

Figure 3-45: DDM Responsiveness of Ozone in July 2023 at Highland Reservoir

Figure 3-46: DDM Responsiveness of Ozone in August 2023 at Highland Reservoir

Figure 3-47: DDM Responsiveness of Ozone in July 2023 at Chatfield State Park

Figure 3-48: DDM Responsiveness of Ozone in August 2023 at Chatfield State Park

Figure 3-49: DDM Responsiveness of Ozone in July 2023 at Rocky Flats

Figure 3-50: DDM Responsiveness of Ozone in August 2023 at Rocky Flats

Figure 3-51: DDM Responsiveness of Ozone in July 2023 at National Renewable Energy Labs-NREL

Figure 3-52: DDM Responsiveness of Ozone in August 2023 at National Renewable Energy Labs-NREL

Figure 3-53: DDM Responsiveness of Ozone in July 2023 at Fort Collins-West

Figure 3-54: DDM Responsiveness of Ozone in August 2023 at Fort Collins-West

Figure 3-55: Design Value Trends from 2007 through 2016 for Chiricahua National Monument (AQS ID: 040038001)

Figure 3-56: Eight-Hour Ozone Design Values for Monitors in the Los Angeles Area

Figure 3-57: Number of Elevated Eight-Hour Ozone Days at the Tagged California Monitors for the years 2012 through 2016

Figure 3-58: HYSPLIT Back Trajectory Endpoints that Meet Filter Criteria from the Tagged California Monitors

## LIST OF APPENDICES

| Appendix | Appendix Name |
| --- | --- |
| Appendix A | Meteorological Modeling for the Transport State Implementation Plan Revision for the 2015 Eight-Hour Ozone National Ambient Air Quality Standard |
| Appendix B | Emissions Modeling for the Transport State Implementation Plan Revision for the 2015 Eight-Hour Ozone National Ambient Air Quality Standard |
| Appendix C | Photochemical Model Performance Evaluation for the Transport State Implementation Plan Revision for the 2015 Eight-Hour Ozone National Ambient Air Quality Standard |
| Appendix D | Photochemical Modeling Protocol for the Transport State Implementation Plan Revision for the 2015 Eight-Hour Ozone National Ambient Air Quality Standard |

## CHAPTER 1: GENERAL

**1.1 BACKGROUND**

Information on the Texas state implementation plan (SIP) and a list of SIP revisions and other air quality plans adopted by the commission can be found on the <u>Texas State Implementation Plan</u> webpage (http://www.tceq.texas.gov/airquality/sip) on the <u>Texas Commission on Environmental Quality's</u> (TCEQ) website (http://www.tceq.texas.gov/).

**1.2 INTRODUCTION**

On October 1, 2015, the United States Environmental Protection Agency (EPA) revised the primary and secondary NAAQS for ozone to an eight-hour standard of 0.070 parts per million (ppm) or 70 parts per billion (ppb) (80 *Federal Register* (FR) 65291, October 26, 2015). Within three years of the promulgation of any new or revised NAAQS, FCAA, §110(a)(1) requires states to submit a SIP revision to provide for the implementation, maintenance, and enforcement of the NAAQS. Section 110(a)(2)(A) through (M), lists the elements that the SIP submissions must contain. This SIP revision specifically addresses transport requirements under FCAA, §110(a)(2)(D). The TCEQ is addressing the infrastructure requirements of FCAA, §110(a)(2)(A) through (C) and (E) through (M) in a separate concurrent SIP revision (Project No. 2017-040-SIP-NR). Submittal of this SIP revision and the infrastructure SIP revision covering FCAA, §110(a)(2)(A) through (C) and (E) through (M) will fulfil the FCAA, §110(a)(1) requirement. Infrastructure and transport SIP revisions to address the 2015 Ozone NAAQS are due to the EPA by October 1, 2018.

Pursuant to FCAA, §110(a)(2)(D)(i), this transport SIP revision must contain adequate provisions that prohibit any source or other type of emissions activity within the state from emitting any NAAQS pollutants in amounts that will:

- contribute significantly to nonattainment of the 2015 ozone NAAQS for areas in other states;

- interfere with the maintenance of the 2015 ozone NAAQS in any other state;

- interfere with measures required to meet an implementation plan for any other state related to prevention of significant deterioration (PSD); and

- interfere with measures required to meet the implementation plan for any other state related to regional haze and visibility.

In addition, pursuant to FCAA, §110(a)(2)(D)(ii), this SIP revision must provide information demonstrating compliance with the applicable requirements of FCAA, §126 and §115 relating to interstate and international pollution abatement.

The EPA has historically failed to issue timely guidance to address transport requirements for previous NAAQS and did not issue formal guidance for states to use in developing transport SIP revisions for the 2015 ozone NAAQS prior to proposal of this SIP revision. In order to meet statutory deadlines, states do not have the option of waiting for the EPA to provide guidance before proceeding with SIP development, review, and submittal and must proceed without the EPA's formal guidance to develop submittals based on information available at the time. On March 27, 2018, the EPA issued a memo to provide information to assist states' efforts to develop transport SIP

revisions for the 2015 ozone NAAQS.[1] The memo notes that in developing transport SIP revisions, states have flexibility to follow the four-step transport framework or alternative frameworks, so long as the chosen approach has adequate technical justification and is consistent with the requirements of the FCAA. The memo also includes a preliminary list of potential flexibilities in analytical approaches for developing transport SIP revisions that may warrant further discussion between the EPA and states. Although this transport SIP revision was developed prior to the EPA's memo, the approach used in developing this SIP revision is consistent with the EPA memo providing states with flexibility in their technical work and submittals.

This SIP revision includes an analysis of required transport elements in FCAA, §110(a)(2)(D)(i) and (ii) consistent with statutory requirements and includes a technical demonstration and various Texas provisions that support the conclusion that Texas meets the requirements of each section. The TCEQ acknowledges that proposed changes to federal regulations may have future impacts on how the TCEQ meets the requirements of FCAA, §110(a)(2)(D); however, this SIP revision reflects the methods and means by which Texas meets these requirements at the time this SIP revision was developed. Should future federal rule changes necessitate state rule changes, the TCEQ will act appropriately at that time.

### 1.3 HEALTH EFFECTS

On October 1, 2015, the EPA revised the primary and secondary eight-hour ozone NAAQS to 70 ppb (80 FR 65291). To support the 2015 ozone NAAQS, the EPA provided information that suggested that health effects may potentially occur at levels lower than the 2008 standard of 75 ppb. Breathing relatively high levels of ground-level ozone can cause acute respiratory problems like cough and decreases in lung function and can aggravate the symptoms of asthma. Repeated exposures to high levels of ozone can potentially make people more susceptible to allergic responses and lung inflammation.

Children are at a relatively higher risk from exposure to ozone when compared to adults since they breathe more air per pound of body weight than adults and because children's respiratory systems are still developing. Children also spend a considerable amount of time outdoors during summer and during the start of the school year (August through October) when high ozone levels are typically recorded. Adults most at risk from exposures to elevated ozone levels are people working or exercising outdoors and individuals with preexisting respiratory diseases.

### 1.4 PUBLIC HEARING AND COMMENT INFORMATION

The commission held a public hearing for this SIP revision on April 10, 2018 at 2:00 p.m. in Austin at the TCEQ Headquarters. Notice of the public hearing was published in

---

[1] Memorandum from Peter Tsirigotis, Director of the Office of Air Quality Planning and Standards, March 27, 2018, *Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I).* EPA Office of Air Quality Planning and Standards. https://www.epa.gov/sites/production/files/2018-03/documents/transport_memo_03_27_18_1.pdf

the *Texas Register* as well as the *Austin American-Statesman, Dallas Morning News, and Houston Chronicle* newspapers.

The public comment period opened on March 9, 2018, and closed on April 10, 2018. Written comments were accepted via mail, fax, or through the eComments (https://www6.tceq.texas.gov/rules/ecomments/) system. During the comment period, staff received comments from the Lone Star Chapter of the Sierra Club. A summary of the comments and the TCEQ response is provided as part of this SIP revision in the Response to Comments.

## 1.5 SOCIAL AND ECONOMIC CONSIDERATIONS

Because rulemaking is not a part of this SIP revision, there are no changes that would impact society or the economy.

## 1.6 FISCAL AND MANPOWER RESOURCES

The TCEQ has determined that its fiscal and manpower resources are adequate and will not be adversely affected through the implementation of this plan.

# CHAPTER 2: OZONE DATA

## 2.1 INTRODUCTION

Ozone ($O_3$) is a secondary pollutant that is created through a photochemical reaction between oxygen ($O_2$), nitrogen oxides ($NO_x$), and volatile organic compounds (VOC). $NO_x$ refers to the combination of nitrogen oxide (NO) and nitrogen dioxide ($NO_2$). The following reactions show how $NO_x$, VOC, and $O_2$ react in the presence of sunlight (hv) to form $O_3$:

$$O_2 + NO_2 \overset{hv}{\leftrightarrow} O_3 + NO$$

$$NO + VOC \rightarrow NO_2$$

The amount of ozone formed depends on several factors. Meteorological conditions, such as wind direction and speed, temperature, mixing height, solar radiation, and other parameters, affect the rates at which ozone formation occurs. The types and the concentration of precursors present can affect net reactivity of precursor compounds found in a plume of emissions.

Precursor compounds, $NO_x$ and VOC, also exist under natural conditions. Ozone is created and destroyed on a natural cycle according to atmospheric conditions and chemical concentrations, even in the absence of additional anthropogenic precursor sources. This natural ozone formation is known as "natural background" ozone and is the starting point for measuring the contribution of ozone and precursors attributable to human activity. Within an urban area, not all ozone formation is necessarily caused by emissions produced locally because anthropogenic precursors, along with ozone formed by them, are often transported over long distances. Because the amount of ozone formed depends on so many other variables, it can be difficult to quantify the exact contribution from specific sources.

The United States Environmental Protection Agency (EPA) revised the eight-hour ozone National Ambient Air Quality Standard (NAAQS) to 0.070 parts per million (ppm) in 2015. On November 16, 2017, the EPA designated the majority of Texas as attainment/unclassifiable for the 2015 eight-hour ozone NAAQS (82 *Federal Register* (FR) 54232). On June 4, 2018, the EPA published final designations for all remaining areas of the state except the eight counties comprising the San Antonio area (83 FR 25776). The EPA finalized nonattainment designations for Collin, Dallas, Denton, Ellis, Johnson, Kaufman, Parker, Tarrant, and Wise Counties in the Dallas-Fort Worth (DFW) area and Brazoria, Chambers, Fort Bend, Galveston, Harris, and Montgomery Counties in the Houston-Galveston-Brazoria (HGB) area. The EPA designated all remaining counties as attainment/unclassifiable. On March 19, 2018, the EPA sent a 120-day letter to the State of Texas regarding designations for the San Antonio area, proposing to designate Atascosa, Bandera, Comal, Guadalupe, Kendall, Medina, and Wilson Counties as attainment/unclassifiable and Bexar County as "at best" unclassifiable. Final designations for the San Antonio area are expected by July 17, 2018. This chapter discusses trends in ozone and ozone precursor emissions in Texas to demonstrate the progress the state has made towards achieving the NAAQS.

## 2.2 OZONE DESIGN VALUE TRENDS IN TEXAS

A design value is a statistic that is used to compare air quality data to the NAAQS. For eight-hour ozone, a design value is the three-year average of the fourth-highest daily-maximum eight-hour averaged ozone. The latest year in the three-year average is used to represent the design value for that three-year period. Design values are calculated at each ozone monitor and the monitor with the highest design value will set the design value for that area. Although the eight-hour ozone NAAQS is reported in ppm, design values in this chapter will be displayed in parts per billion (ppb) for ease of reading.

In 2016, Texas had 76 ozone monitoring sites in 34 counties that reported valid data to the EPA. Eight-hour ozone design values for 2016 are displayed in Figure 2-1: *2016 Eight-Hour Ozone Design Values by County in Texas* and listed in Table 2-1: *2016 Eight-Hour Ozone Design Values by County in Texas*. Figure 2-1 and Table 2-1 show that most Texas counties have 2016 design values below the 2015 ozone NAAQS of 70 ppb. Three areas of Texas: DFW, HGB, and San Antonio, have eight-hour ozone design values above 70 ppb.



**Figure 2-1: 2016 Eight-Hour Ozone Design Values by County in Texas**

**Table 2-1: 2016 Eight-Hour Ozone Design Values by County in Texas**

| CSA/CBSA | County | 2016 Eight-Hour Ozone Design Values (ppb) |
|---|---|---|
| Dallas—Fort Worth | Denton | 80 |
| Houston—The Woodlands | Harris | 79 |
| Houston—The Woodlands | Galveston | 76 |
| Houston—The Woodlands | Brazoria | 75 |
| Dallas—Fort Worth | Tarrant | 75 |
| Dallas—Fort Worth | Collin | 74 |
| San Antonio—New Braunfels | Bexar | 73 |
| Dallas—Fort Worth | Parker | 73 |
| Dallas—Fort Worth | Dallas | 72 |
| Dallas—Fort Worth | Johnson | 72 |
| Houston—The Woodlands | Montgomery | 72 |
| El Paso—Las Cruces | El Paso | 70 |
| Dallas—Fort Worth | Hood | 69 |
| Beaumont—Port Arthur | Jefferson | 68 |
| Killeen-Temple | Bell | 67 |
| Longview-Marshall | Gregg | 66 |
| Dallas—Fort Worth | Rockwall | 66 |
| Austin—Round Rock | Travis | 66 |
| Tyler-Jacksonville | Smith | 65 |
| Victoria—Port Lavaca | Victoria | 65 |
| Amarillo-Borger | Randall | 64 |
| Corpus Christi—Kingsville—Alice | Nueces | 64 |
| Beaumont—Port Arthur | Orange | 64 |
| Dallas—Fort Worth | Ellis | 63 |
| Waco | McLennan | 63 |
| No CSA | Brewster | 62 |
| Longview-Marshall | Harrison | 62 |
| Dallas—Fort Worth | Kaufman | 61 |
| Dallas—Fort Worth | Navarro | 61 |
| No CSA | Polk | 61 |
| Dallas—Fort Worth | Hunt | 60 |
| Brownsville-Harlingen-Raymondville | Cameron | 57 |
| McAllen-Edinburg | Hidalgo | 55 |
| Laredo | Webb | 54 |

Design value trends can be used to determine if various areas in Texas are making progress towards attainment of the ozone NAAQS. Eight-hour ozone design value trends by Texas area are displayed in Figure 2-2: *Eight-Hour Ozone Design Values and Population by Area in Texas*. Figure 2-2 shows that all areas of Texas have shown decreases in design values over the past 25 years. No area has seen an increase in eight-hour ozone design values. As mentioned above, in 2016 only three areas in Texas are measuring above the 2015 ozone NAAQS of 70 ppb. The largest ozone decreases

from 1991 through 2016 were observed in the HGB area, which had a 34% decrease in eight-hour ozone design values, and the Beaumont-Port Arthur (BPA) area, which had a 33% decrease in eight-hour ozone design values.



**Figure 2-2: Eight-Hour Ozone Design Values and Population by Area in Texas**

## 2.3 OZONE EMISSIONS TRENDS IN TEXAS

### 2.3.1 General

The Texas Commission on Environmental Quality (TCEQ) maintains an inventory of current information for sources of ozone precursor emissions ($NO_x$ and VOC) that identifies the types of emissions sources present in an area, the amount of each pollutant emitted, and the types of processes and control devices employed at each plant or source category. The total anthropogenic inventory of $NO_x$ and VOC emissions for an area is derived from estimates developed for three general categories of emissions sources: point, area, and mobile (both non-road and on-road). The emissions inventory also provides data for a variety of air quality planning tasks, including establishing baseline emissions levels, calculating reduction targets, developing control strategies to achieve emissions reductions, developing emissions inputs for air quality models, and tracking actual emissions reductions against established emissions growth and control budgets.

The most current emissions inventory (EI) data were analyzed as part of this ozone transport SIP revision. At the time of preparation of this SIP revision, the TCEQ was

2-4

planning the development of the 2017 periodic EI in accordance with the EPA's Air Emissions Reporting Requirements (40 Code of Federal Regulations Part 51, Subpart A). The calendar year 2014 periodic inventory was the most recent periodic inventory available to develop this SIP revision's EI.

Additionally, 10 years of anthropogenic emissions data (2005 through 2014) were analyzed to develop historical trend data. During this time, the EI for Texas and its two current ozone nonattainment areas (DFW and HGB) showed a significant decrease in ozone precursor emissions from all source categories; reductions range from 15 to 46%, as detailed in Section 2.3.2: *Historical Emissions Inventory Trends*. These reductions contributed to the attainment of both the one-hour and the 1997 eight-hour ozone NAAQS. These reductions were accomplished through a variety of federal, state, and local regulations and programs as detailed below.

### 2.3.2 Historical Emissions Inventory Trends

For the 10-year historical period up to and including 2014 (2005 through 2014), overall anthropogenic ozone precursor emissions in Texas as well as the DFW and HGB ozone nonattainment areas declined substantially. As demonstrated in Figure 2-3: *Statewide Historical NO$_x$ Emissions Trends in Tons per Year* and Figure 2-4: *Statewide Historical VOC Emissions Trends in Tons per Year*, anthropogenic NO$_x$ emissions decreased 35% and anthropogenic VOC emissions decreased 17% from 2005 through 2014. These emissions reductions were the result of regulations implemented at the federal, state, and local levels and innovative programs implemented by the TCEQ.

Both 30 Texas Administrative Code (TAC) Chapter 115: *Control of Air Pollution from Volatile Organic Compounds* and 30 TAC Chapter 117: *Control of Air Pollution from Nitrogen Compounds* regulations have significantly reduced overall ozone precursor emissions at both major and minor (point and area) industrial, commercial, and institutional sources in the DFW and HGB ozone nonattainment areas as well as other portions of the state (e.g., East Texas Combustion Rule).

The implementation of statewide or regional emissions banking and trading programs have also assisted in reducing ozone precursor emissions. For example, the Emissions Banking and Trading of Allowances program has implemented annual NO$_x$ emissions caps for grandfathered and electing electric generating facilities. Similarly, the Highly Reactive Volatile Organic Compound (HRVOC) Emissions Cap and Trade Program and the Mass Emissions Cap and Trade Program have specifically reduced HRVOC and NO$_x$ emissions, respectively, from point sources in the HGB area.

Innovative emissions reduction programs such as the Texas Emissions Reduction Plan and 30 TAC Chapter 114: *Control of Air Pollution from Motor Vehicles*, which includes programs such as the AirCheckTexas Drive a Clean Machine program and vehicle emissions testing, have also reduced mobile source emissions, the primary source of NO$_x$ emissions in the state.

The following graphs illustrate these trends statewide as well as in the DFW and HGB ozone nonattainment areas.



**Figure 2-3: Statewide Historical NO$_X$ Emissions Trends in Tons per Year**



**Figure 2-4: Statewide Historical VOC Emissions Trends in Tons per Year**

Similarly, Figure 2-5: *DFW 10-County Nonattainment Area Historical NOₓ Emissions Trends in Tons per Year* and Figure 2-6: *DFW 10-County Nonattainment Area Historical VOC Emissions Trends in Tons per Year* demonstrate a marked 46% decrease in anthropogenic $NO_x$ emissions and a 15% decrease in anthropogenic VOC emissions from 2005 through 2014.



**Figure 2-5: DFW 10-County Nonattainment Area Historical NOₓ Emissions Trends in Tons per Year**



**Figure 2-6: DFW 10-County Nonattainment Area Historical VOC Emissions Trends in Tons per Year**

Finally, the HGB area shows significant overall progress in reducing anthropogenic emissions. As shown in Figure 2-7: *HGB Eight-County Nonattainment Area Historical NOₓ Emissions Trends in Tons per Year* and Figure 2-8: *HGB Eight-County Nonattainment Area Historical VOC Emissions Trends in Tons per Year*, a 43% decrease in anthropogenic NOₓ emissions and a 37% decrease in anthropogenic VOC emissions has occurred from 2005 through 2014.



**Figure 2-7: HGB Eight-County Nonattainment Area Historical NO$_x$ Emissions Trends in Tons per Year**



**Figure 2-8: HGB Eight-County Nonattainment Area Historical VOC Emissions Trends in Tons per Year**

**2.4 OZONE DATA SUMMARY**

Ozone data in Texas show that there are three areas that have eight-hour ozone design values above 70 ppb: DFW, HGB, and San Antonio. Over the past 25 years, all areas in Texas have observed some decrease in eight-hour ozone design values. The largest eight-hour ozone design value decreases from 1991 through 2016 were observed in the HGB and the BPA areas with decreases of 34% and 33%, respectively.

Statewide trend analysis using the 2005 through 2014 emissions shows a similar reduction in ozone precursor emissions: a 17% reduction in VOC emissions and a 35% reduction in $NO_x$ emissions. These reductions have assisted the state in attaining both the one-hour and 1997 eight-hour ozone NAAQS and are expected to help the state in attaining the 2008 and 2015 NAAQS in the future.

## CHAPTER 3: SIGNIFICANT CONTRIBUTION TO NONATTAINMENT AND INTERFERENCE WITH MAINTENANCE [FCAA, §110(A)(2)(D)(i)(I)]

### 3.1 INTRODUCTION

The Federal Clean Air Act (FCAA), §110(a)(2)(D)(i)(I) requires states to submit a state implementation plan (SIP) revision that contains adequate provisions to prohibit any source or other type of emissions activity within the state from emitting any air pollutants in amounts that will contribute significantly to nonattainment of the National Ambient Air Quality Standards (NAAQS) for areas in other states or interfere with maintenance of the NAAQS in any other state. The purpose of FCAA's §110(a)(2)(D)(i)(I), also known as the "good neighbor" provision, is to ensure that emissions in one state that contribute significantly to nonattainment or interfere with maintenance in another state are addressed appropriately.

For this SIP revision, the key aspect of fulfilling this obligation is to determine if emissions from Texas contribute significantly to nonattainment or interfere with maintenance of the 2015 eight-hour ozone NAAQS in another state. The following sections utilize photochemical modeling and data analysis to demonstrate that emissions from Texas do not contribute significantly to nonattainment or interfere with maintenance of the 2015 eight-hour ozone NAAQS in another state.

The approach used by the Texas Commission on Environmental Quality (TCEQ) to determine if emissions from Texas contribute significantly to nonattainment or interfere with maintenance at downwind monitors in another state is based partly on the United States Environmental Protection Agency's (EPA) *Notice of Data Availability of Preliminary Interstate Ozone Transport Modeling Data for the 2015 Ozone NAAQS* (2015 Transport NODA) published in the January 6, 2017 *Federal Register* (82 FR 1733), with several key improvements. The TCEQ used a three-step approach, detailed below, to determine if emissions from Texas contribute significantly to nonattainment or interfere with maintenance at downwind monitors in another state.

> **Step 1:** Identify monitors projected to be in nonattainment or have maintenance issues in a future year.

> **Step 2:** Identify projected nonattainment and/or maintenance monitors in other states that might be impacted by emissions from Texas, tagging them for further review.

> **Step 3:** Determine if emissions from Texas contribute significantly to nonattainment or interfere with maintenance at the monitors tagged for review in Step 2.

The EPA used a four-step framework, referred to as the Cross-State Air Pollution Rule (CSAPR) framework, to address the requirements of the "good neighbor" provision in the 2015 Transport NODA. From the 2015 Transport NODA, the four steps in the CSAPR framework are as follows (82 FR 1735):

> "[1] Identifying downwind receptors that are expected to have problems attaining or maintaining clean air standards (i.e., NAAQS);

3-1

**62**

[2] determining which states contribute to these problems in amounts sufficient to "link: them to the downwind air quality problems;

[3] for states linked to downwind air quality problems, identifying upwind emissions that significantly contribute to nonattainment or interfere with maintenance of the NAAQS by quantifying upwind reductions in ozone precursor emissions and apportioning emissions reduction responsibility among upwind states; and

[4] for states that are found to have emissions that significantly contribute to nonattainment or interfere with maintenance of the NAAQS downwind, adopting SIPs or FIPs that eliminate such emissions."

The TCEQ's three-step process covers steps [1] and [2] of the four-step framework. Step 1 of the TCEQ's three-step process is the same as step [1] of the EPA's four-step framework. Steps 2 and 3 of the TCEQ's process together are equivalent to step [2] of the EPA's framework. Steps [3] and [4] of EPA's framework are relevant only if emissions from Texas contribute significantly to nonattainment or interfere with maintenance at downwind monitors in another state and are therefore not addressed in this SIP revision.

In the 2015 Transport NODA, upwind states with contributions greater than or equal to 0.7 ppb to a monitor's future year design value are linked to the downwind monitor. Once the linkages have been established, the portion of emissions from linked states that were determined by the EPA to have contributed significantly to nonattainment or interfere with maintenance are identified (Steps 2 and 3, respectively, of the EPA's four-step framework). The EPA's framework establishes the 1% of NAAQS threshold as the default definition of significant contribution to nonattainment or interference with maintenance. The TCEQ has maintained and noted in comments to EPA on its transport modeling, that an arbitrary threshold of 1% of the NAAQS for significant contribution to nonattainment or interference with maintenance is inappropriate and incomplete.[2,3] In the 2015 Transport NODA, the EPA acknowledges that a contribution of 1% of the NAAQS from an upwind state alone does not determine whether the upwind state significantly contributes to nonattainment or interferes with maintenance of a NAAQS to a downwind state (FR 82 1740). The TCEQ believes that it is critical to determine if emissions from an upwind state contribute significantly to nonattainment or interfere with maintenance prior to the identification (and subsequent reduction) of such emissions.

---

[2] "Comments by the Texas Commission on Environmental Quality Regarding the Notice of Availability of the Environmental Protection Agency's Preliminary Interstate Ozone Transport Modeling Data for the 2015 Ozone National Ambient Air Quality Standard", available at https://www.tceq.texas.gov/assets/public/agency/nc/air/TCEQ-Summary-on-EPA%E2%80%93HQ%E2%80%93OAR%E2%80%932016%E2%80%930751.pdf
[3] "Comments by the Texas Commission On Environmental Quality Regarding Disapproval of Air Quality Implementation Plans: Interstate Transport of Air Pollution for the 2008 Ozone National Ambient Air Quality Standards", available at https://www.tceq.texas.gov/assets/public/agency/nc/air/TCEQ-Comments-on-EPA-R06-OAR-2012-0985.docx

In this SIP revision, the TCEQ is partially addressing its concern with the use of the 1% of NAAQS threshold as the definition of significant contribution to nonattainment by adding a step that uses a more comprehensive analysis to determine **if** emissions from an upwind state contribute **significantly** to nonattainment or interfere with maintenance.

For Step 1, the TCEQ used regional photochemical modeling to identify monitors projected to be in nonattainment or have maintenance issues in the future year. In Step 2, if the Texas contribution to a monitor's future year design value was greater than or equal to 1% of the NAAQS (i.e., 0.7 ppb) the monitor was tagged for further review. In Step 3, a comprehensive review of modeling and analysis of monitoring data was used to determine if emissions from Texas contributed significantly to nonattainment or interfered with maintenance for monitors tagged in Step 2.

### 3.2 STEP 1: IDENTIFICATION OF PROJECTED NONATTAINMENT AND MAINTENANCE MONITORS

The TCEQ used photochemical modeling, in accordance with the EPA's 2014 *Draft Modeling Guidance for Demonstrating Attainment of Air Quality Goals for Ozone, PM$_{2.5}$, and Regional Haze* (EPA Modeling Guidance)[4], to identify monitors projected to be in nonattainment in a future year. Photochemical modeling for ozone consists of using a regional Chemical Transport Model (CTM) with appropriate meteorological and emissions inputs, to simulate the formation and transport of ozone.

To assess the future attainment status of monitors, the EPA's Modeling Guidance uses modeling results in a relative sense. This relative approach is based on how the model responds to the change in emissions between a base year and a future year while holding meteorological inputs constant. For this SIP revision, the TCEQ used a 2012 base year and a 2023 future year to identify monitors projected to be in nonattainment or have maintenance issues in the future. The future year of 2023 was chosen based on the assumed attainment date for moderate nonattainment areas as detailed in EPA's 2015 Transport NODA.

The photochemical modeling process began with episode, base year, and domain selection. Base case and future year modeling was conducted, and results were interpreted to determine future year (2023) design values (DV$_F$) at monitoring sites in the modeling domain.

### 3.2.1 Modeling Domain

The geographic extent of the modeling domain used for the 2015 ozone NAAQS Transport SIP revision is shown in Figure 3-1: *Map of 2015 Ozone NAAQS Transport SIP Revision CTM Modeling Domain*. The domain includes the 48 contiguous states of the United States (U.S.), with parts of southern Canada and northern Mexico.

---

[4] https://www3.epa.gov/scram001/guidance/guide/Draft_O3-PM-RH_Modeling_Guidance-2014.pdf



**Figure 3-1: Map of 2015 Ozone NAAQS Transport SIP Revision CTM Modeling Domain**

The CTM used for this SIP revision is the Comprehensive Air Quality Model with Extensions (CAMx), version 6.40. CAMx is a three-dimensional grid-based Eulerian model designed to simulate the formation and transport of ozone and ozone precursor concentrations over regional and urban spatial scales.[5] The modeling domain, referred to as the rpo_12km domain, has a horizontal grid resolution of 12 kilometers (km) by 12 km and 29 vertical layers. The domain definitions are provided in *Table 3-1: 2015 Ozone NAAQS Transport SIP Revision CAMx Modeling Domain Definitions.*

Table 3-2: *2015 Ozone NAAQS Transport SIP Revision CAMx Modeling Domain Vertical Structure* provides details of the modeling domain vertical layers such as the top and center height in meters Above Ground Level (m AGL) and thickness in meters (m).

---

[5] http://www.camx.com/about/default.aspx

**Table 3-1: 2015 Ozone NAAQS Transport SIP Revision CAMx Modeling Domain Definitions**

| Domain | Easting Range (km) | Northing Range (km) | Number of Cells (Easting) | Number of Cells (Northing) | Short Name |
|---|---|---|---|---|---|
| National RPO Domain | (-2736,2592) | (-2088,1944) | 444 | 336 | rpo_12km |

**Table 3-2: 2015 Ozone NAAQS Transport SIP Revision CAMx Modeling Domain Vertical Structure**

| CAMx Layer | Top (m AGL) | Center (m AGL) | Thickness (m) |
|---|---|---|---|
| 29 | 18250 | 16445 | 3611 |
| 28 | 14639 | 13632 | 2015 |
| 27 | 12624 | 10786 | 3675 |
| 26 | 8949 | 7891 | 2115 |
| 25 | 6833 | 6289 | 1088 |
| 24 | 5746 | 5290 | 911 |
| 23 | 4835 | 4449 | 772 |
| 22 | 4063 | 3704 | 717 |
| 21 | 3346 | 3175 | 341 |
| 20 | 3005 | 2840 | 330 |
| 19 | 2675 | 2515 | 320 |
| 18 | 2355 | 2225 | 259 |
| 17 | 2096 | 1969 | 253 |
| 16 | 1842 | 1718 | 248 |
| 15 | 1595 | 1474 | 242 |
| 14 | 1353 | 1281 | 143 |
| 13 | 1210 | 1140 | 141 |
| 12 | 1069 | 1000 | 139 |
| 11 | 930 | 861 | 138 |
| 10 | 792 | 747 | 91 |
| 9 | 702 | 656 | 90 |
| 8 | 612 | 567 | 89 |
| 7 | 522 | 478 | 89 |
| 6 | 433 | 389 | 88 |
| 5 | 345 | 302 | 87 |
| 4 | 258 | 215 | 87 |
| 3 | 171 | 128 | 86 |
| 2 | 85 | 60 | 51 |
| 1 | 34 | 17 | 34 |

**3.2.2 Modeling Episode**

The modeling episode used for this SIP revision was the May 1 through September 30, 2012 period (May through September 2012). A robust modeling platform had been developed for May through September 2012 as part of the Houston-Galveston Brazoria Attainment Demonstration SIP revision for the 2008 Eight-hour Ozone NAAQS (HGB

AD SIP) that was adopted on December 15, 2016 by the commission and submitted to the EPA on December 29, 2016. The May through September 2012 episode was selected in accordance with the episode selection criteria specified in the EPA Modeling Guidance, details of which are documented in the section 3.4: *Episode Selection* of the HGB AD SIP.[6] The EPA, in its 2015 Transport NODA, used May 1 through September 30, 2011 period (May through September 2011) for its transport modeling. However, 2011 was a meteorologically anomalous year for Texas and surrounding states as it was the hottest year on record and the single-worst drought year recorded in Texas since 1895 (Hoerling *et al.*, 2012). Figure 3-2: *U.S. Drought Monitor Map of Texas for July 26, 2011* shows the extent of the drought across the state.



**Figure 3-2: U.S. Drought Monitor Map of Texas for July 26, 2011**

The TCEQ has submitted comments on the unsuitability of the May through September 2011 episode for Texas ozone modeling in response to several EPA actions such as the

---

[6] Revisions to the State of Texas Air Quality Implementation Plan for the Control of Ozone Air Pollution, Houston-Galveston Brazoria Attainment Demonstration SIP revision for the 2008 Eight-hour Ozone Standard Nonattainment Area (pages 3-4 to 3-17)
https://www.tceq.texas.gov/assets/public/implementation/air/sip/hgb/HGB_2016_AD_RFP/AD_Adoption/16016SIP_HGB08AD_ado.pdf

EPA 2011 modeling platform,[7] EPA 2018 Modeling Platform,[8] EPA NODA on Updated Transport Modeling for the 2008 Ozone NAAQS[9] and the 2015 Transport NODA.[10]

### 3.2.2.1 Meteorology of 2012

Meteorology for the May through September 2012 period was analyzed for the rest of the contiguous U.S. The year 2012 had above average temperatures across most of the U.S., except in some states in the southeast. New Hampshire had their highest May through October average temperatures on record. The National Oceanic and Atmospheric Administration's (NOAA) National Climatic Data Center (NCDC) temperature rankings[11] for the May through October average temperature of 2012 relative to the years 1895 through 2012 are shown in Figure 3-3: *May through October 2012 Statewide NCDC Temperature Ranks*. The numbers in each state represent the numerical rank for that state for 2012. Among the NCDC climatic regions,[12] the Northeast had its warmest year on record for the years 1895 through 2012.

---

[7] TCEQ comments on EPA's "Notice of Availability of the EPA's 2011 Modeling Platform." Submitted 3/31/14 and available at https://www.tceq.texas.gov/agency/nc/Air_Issues.html/#033114

[8] TCEQ comments on EPA's "Notice of Availability of the EPA's 2018 Modeling Platform." Submitted 6/24/14 and available at https://www.tceq.texas.gov/agency/nc/Air_Issues.html/#062414

[9] TCEQ comments on EPA's Notice of Data Availability of the Updated Ozone Transport Modeling Data for the 2008 Ozone NAAQS. Submitted 10/15/15 and available at https://www.tceq.texas.gov/agency/nc/Air_Issues.html/#101515

[10] TCEQ comments on EPA's "Preliminary Interstate Ozone Transport Modeling Data for 2015 Ozone NAAQS." Submitted 4/5/17 and available at https://www.tceq.texas.gov/agency/nc/Air_Issues.html/#040517

[11] Explanation of Climatological Rankings available at https://www.ncdc.noaa.gov/monitoring-references/dyk/ranking-definition

[12] NCDC U.S. Climatic Region definitions are available at https://www.ncdc.noaa.gov/monitoring-references/maps/us-climate-regions.php



**Figure 3-3: May through October 2012 Statewide NCDC Temperature Ranks**

Figure 3-4: *May through October 2012 Statewide NCDC Precipitation Ranks* shows the NCDC precipitation rankings for the May through October months of 2012 relative to the years 1895 through 2012. May through October 2012 had below normal or much below normal precipitation in most of the South and Northern Rockies and Plains and parts of the Upper Midwest and Ohio River Valley climate regions with a record driest year for Nebraska and Wyoming. However, the Northeast and parts of the Southeast had above normal or much above normal precipitation.



**Figure 3-4: May through October 2012 Statewide NCDC Precipitation Ranks**

The entire central portion of the U.S. was in some state of drought. However, the drought reported in Texas by July 2011 had diminished in severity by July 2012. Figure 3-5: *Change in Texas Drought Conditions from July 2011 to July 2012* shows the change in drought class from July 26, 2011 to July 24, 2012 with approximately 60 to 70% of Texas showing improvement by three to five drought classes statewide.



**Figure 3-5: Change in Texas Drought Conditions from July 2011 to July 2012**

3.2.2.2 Ozone Production in 2012

The TCEQ analyzed, similar to the EPA's analysis for its transport modeling,[13] the meteorologically adjusted ozone trends for the NCDC climate regions for May through September 2012. Figure 3-6: *Meteorologically-Adjusted Ozone Trends for NCDC Climate Regions for 2000 through 2016*[14] shows the meteorologically-adjusted ozone trends from 2000 through 2016. The 2010 through 2016 time period shows variation in ozone-conducive conditions across years and climate regions. The year 2012 was more conducive (relative to 2010 through 2016) for ozone formation in the Northeast, Upper Midwest, Northwest, Northern Rockies and Plains, and West regions while for the Ohio River Valley, South, Southeast, and Southwest climate regions 2011 was more conducive to ozone production. In the past the EPA has acknowledged that no single year will be representative of "typical" meteorological conditions for ozone for all regions of the U.S. (EPA, August 2016). Based on this analysis, the TCEQ concluded that the well-tested 2012 modeling platform is appropriate for use in this SIP revision.

---

[13] "Air Quality Modeling Technical Support Document for the 2008 Ozone NAAQS Cross-State Air Pollution Rule Proposal", available at https://www.epa.gov/sites/production/files/2015-11/documents/air_quality_modeling_tsd_proposed_rule.pdf
[14] Data for this analysis shown in Figure 3-6 was obtained from the EPA's Air-Trends webpage (https://www.epa.gov/air-trends/trends-ozone-adjusted-weather-conditions)



**Figure 3-6: Meteorologically-Adjusted Ozone Trends for NCDC Climate Regions for 2000 through 2016**

### 3.2.3 Base Case Modeling

Base case modeling was used to evaluate the CTM's ability to replicate measured ozone and precursor concentrations. The adequacy of the model in replicating observations was assessed statistically and graphically. Satisfactory model performance in base case modeling provided a degree of confidence in the use of the model to predict future ozone concentrations and to evaluate transport impacts.

Base case modeling included the generation of initial and boundary conditions, emissions inputs and meteorological inputs for the May through September 2012 period needed by CAMx. Results of base case modeling included modeled ozone and precursor concentrations for every grid cell of the rpo_12km domain for every hour of May through September 2012. The base case modeling results were evaluated by comparisons with observed measurements at monitoring sites across the modeling domain. The model performance evaluation was iterative. Feedback from successive evaluations was incorporated to ensure that the model was adequately replicating observations throughout the modeling domain and episode. Details of the inputs generated for base case modeling are provided below.

#### 3.2.3.1 Meteorological Modeling

The TCEQ used the Weather Research and Forecasting Model (WRF) version 3.8.1 to create the May through September 2012 meteorological inputs for CAMx. The WRF domain was chosen to accommodate the CAMx domain shown in Figure 3-1. Figure 3-7: *Map of 2015 Ozone NAAQS Transport SIP Revision Meteorological Modeling Domain* shows the geographical extent of the WRF modeling domain, along with the CAMx domain for reference.



**Figure 3-7: Map of 2015 Ozone NAAQS Transport SIP Revision Meteorological Modeling Domain**

For the meteorological model, a single domain was used, referred to as na_12km, with horizontal grid resolution of 12 km x 12 km and 44 vertical layers. The WRF model domain definitions are provided in Table 3-3: *2015 Transport SIP Revision WRF Modeling Domain Definitions.* Table 3-4: *2015 Transport SIP Revision WRF Modeling Domain Vertical Structure* provides details of the WRF model domain vertical layers, such as heights and thickness. Figure 3-8: *Matching of WRF and CAMx Vertical Layers* shows how the vertical layers of WRF shown in Table 3-4 are matched to the vertical layers of CAMx shown in Table 3-2.

**Table 3-3:  2015 Transport SIP Revision WRF Modeling Domain Definitions**

| Domain | Easting Range (km) | Northing Range (km) | Number of Cells (Easting) | Number of Cells (Northing) | Short Name |
|---|---|---|---|---|---|
| North America Domain | (-2916,2916) | (-2304,2304) | 489 | 387 | na_12km |

**Table 3-4:  2015 Transport SIP Revision WRF Modeling Domain Vertical Structure**

| WRF Layer | Sigma Level | Top (m AGL) | Center (m AGL) | Thickness (m) |
|---|---|---|---|---|
| 44 | 0.000 | 20581 | 20054 | 1054 |

3-13

**74**

| WRF Layer | Sigma Level | Top (m AGL) | Center (m AGL) | Thickness (m) |
|---|---|---|---|---|
| 43 | 0.010 | 19527 | 18888 | 1278 |
| 42 | 0.025 | 18249 | 17573 | 1353 |
| 41 | 0.045 | 16896 | 16344 | 1103 |
| 40 | 0.065 | 15793 | 15215 | 1156 |
| 39 | 0.090 | 14637 | 14144 | 987 |
| 38 | 0.115 | 13650 | 13136 | 1029 |
| 37 | 0.145 | 12621 | 12168 | 906 |
| 36 | 0.175 | 11716 | 11245 | 941 |
| 35 | 0.210 | 10774 | 10294 | 962 |
| 34 | 0.250 | 9813 | 9379 | 867 |
| 33 | 0.290 | 8946 | 8550 | 792 |
| 32 | 0.330 | 8154 | 7790 | 729 |
| 31 | 0.370 | 7425 | 7128 | 594 |
| 30 | 0.405 | 6830 | 6551 | 559 |
| 29 | 0.440 | 6271 | 6007 | 528 |
| 28 | 0.475 | 5743 | 5492 | 501 |
| 27 | 0.510 | 5242 | 5037 | 410 |
| 26 | 0.540 | 4832 | 4636 | 393 |
| 25 | 0.570 | 4439 | 4250 | 378 |
| 24 | 0.600 | 4061 | 3878 | 365 |
| 23 | 0.630 | 3696 | 3520 | 352 |
| 22 | 0.660 | 3344 | 3173 | 341 |
| 21 | 0.690 | 3003 | 2838 | 330 |
| 20 | 0.720 | 2673 | 2513 | 320 |
| 19 | 0.750 | 2353 | 2224 | 259 |
| 18 | 0.775 | 2094 | 1967 | 253 |
| 17 | 0.800 | 1841 | 1717 | 247 |
| 16 | 0.825 | 1593 | 1472 | 242 |
| 15 | 0.850 | 1352 | 1280 | 143 |
| 14 | 0.865 | 1209 | 1138 | 141 |
| 13 | 0.880 | 1068 | 999 | 139 |
| 12 | 0.895 | 929 | 860 | 137 |
| 11 | 0.910 | 792 | 746 | 91 |
| 10 | 0.920 | 701 | 656 | 90 |
| 9 | 0.930 | 611 | 566 | 89 |
| 8 | 0.940 | 522 | 477 | 89 |
| 7 | 0.950 | 433 | 389 | 88 |
| 6 | 0.960 | 345 | 301 | 87 |
| 5 | 0.970 | 258 | 214 | 87 |
| 4 | 0.980 | 171 | 128 | 86 |
| 3 | 0.990 | 85 | 60 | 51 |
| 2 | 0.996 | 34 | 26 | 17 |
| 1 | 0.998 | 17 | 8 | 17 |
| 0 | 1.000 | 0 | 0 | 0 |

3-14



**Figure 3-8: Matching of WRF and CAMx Vertical Layers**

The initial and boundary conditions for WRF modeling were obtained from the GCIP (GEWEX (Global Energy and Water EXperiment) Continental-Scale International Project) NCEP (National Centers for Environmental Prediction) Eta data archive. Where data were missing from the GCIP NCEP Eta archive, data extracted from the NCEP North American Mesoscale model were used. More details regarding how missing data were handled is presented in Appendix A: *Meteorological Modeling for the Transport State Implementation Plan Revision for the 2015 Eight-Hour Ozone National Ambient Air Quality Standard*. To optimize performance, two types of nudging were utilized. The first type was analysis nudging, both three-dimensional (3-D) and surface. The 3-D analysis nudging was used to nudge the wind, temperature and moisture, while the surface analysis nudging was only used to nudge wind and temperature. The second type of nudging used was observational nudging, which used the radar profiler data for nudging aloft winds towards observed vertical profiles.

The selection of the final meteorological modeling configuration for May through September 2012 resulted from numerous sensitivity tests and model performance evaluation. The final WRF parameterization schemes and options selected are shown in Table 3-5: *WRF Model Configuration Parameters*. Details of the meteorological sensitivity tests are provided in Appendix A.

**Table 3-5: WRF Model Configuration Parameters**

| Domain | Nudging Type | PBL | Cumulus | Radiation | Land-Surface | Microphysics |
|--------|-------------|-----|---------|-----------|--------------|--------------|
| na_12km | 3-D, Surface Analysis, PX Soil Nudging, NPN and CAP Radar Profiler Observations | YSU | Multiscale Kain-Fritsch | RRTM / Dudhia | Pleim-Xiu | WSM5 |

WRF output was post-processed using the WRF2CAMx version 4.6 utility with the Community Multi-Scale Air Quality (CMAQ) modeling system vertical diffusivity (Kv) option to convert the WRF meteorological fields to the appropriate CAMx grid and input format. The 100 m Kv Patch program developed by Ramboll Environ[15] was used to modify the vertical diffusivity coefficients based on a land-use basis to maintain vertical mixing within the first 100 meters of the model over urban areas. Sub grid stratiform cloud diagnostics were applied to better simulate ultraviolet-attenuation in CAMx.

WRF model performance was evaluated for wind speed and direction, temperature, and humidity. Figure 3-9: *Wind Speed Mean Bias for May through September 2012*, Figure 3-10: *Two Meter Temperature Mean Bias for May through September 2012*, and Figure 3-11: *Humidity Mean Bias for May through September 2012* show the mean bias for wind speed, temperature, and humidity, respectively for May through September 2012 for each monitoring station across the na_12km domain.

---

[15] "Dallas-Fort Worth Modeling Support: Improving Vertical Mixing, Plume-in-Grid, and Photolysis Rates in CAMx", TCEQ Project report available at
https://www.tceq.texas.gov/assets/public/implementation/air/am/contracts/reports/pm/5821110365FY1206-20120820-environ_dfw_modeling_support.pdf



**Figure 3-9: Wind Speed Mean Bias for May through September 2012**



**Figure 3-10: Two Meter Temperature Mean Bias for May through September 2012**

3-17



**Figure 3-11:  Humidity Mean Bias for May through September 2012**

Figure 3-9 shows that wind speed had a negative bias along the East Coast, Southeast, and western continental U.S., while eastern Texas, the Ohio River Valley, and the Great Lakes region had a positive bias. Mean bias for temperature in Figure 3-10 does not show strong geographical trends, although slightly more monitors in the western U.S. show a positive bias. Figure 3-11 shows that there was a positive bias for humidity at most monitoring stations in the domain, although a negative bias is seen over much of Oklahoma through eastern Kansas and into southern Nebraska, and also in parts of southern California.

Figure 3-12: *Wind Speed Mean Absolute Error for May through September 2012*, Figure 3-13: *Two Meter Temperature Mean Absolute Error for May through September 2012*, and Figure 3-14: *Humidity Mean Absolute Error for May through September 2012* show the mean absolute error for wind speed, temperature, and humidity, respectively for May through September 2012 at monitoring stations across the na_12km domain.



**Figure 3-12: Wind Speed Mean Absolute Error for May through September 2012**



**Figure 3-13: Two Meter Temperature Mean Absolute Error for May through September 2012**

3-19



**Figure 3-14:  Humidity Mean Absolute Error for May through September 2012**

Figure 3-12 and Figure 3-13 show that the mean absolute error for wind speed and temperature, respectively, were lower in the eastern U.S. than western U.S. Figure 3-14 shows a more north/south regional difference for humidity, with monitors in the northern U.S. having less mean absolute error than monitors in the southern U.S.

Figure 3-15: *Wind Speed RMSE for May through September 2012*, Figure 3-16: *Two Meter Temperature RMSE for May through September 2012*, and Figure 3-17: *Humidity RMSE for May through September 2012* show the Root Mean Square Error (RMSE) for wind speed, temperature, and humidity, respectively, for May through September 2012 at monitoring stations across the na_12km domain.



**Figure 3-15:  Wind Speed RMSE for May through September 2012**



**Figure 3-16:  Two Meter Temperature RMSE for May through September 2012**

3-21



**Figure 3-17: Humidity RMSE for May through September 2012**

Similar to the Mean Absolute Error in Figures 3-12 through 3-14, Figure 3-15 and Figure 3-16 show an east/west regional trend with monitors in the east having lower RMSE than monitors in the west for wind speed and temperature, respectively, while Figure 3-17 shows that RMSE for humidity in the southern and central monitors are greater than RMSE for northern monitors.

Overall, WRF model performance for May through September 2012 was acceptable for the CTM input. More details regarding WRF model performance, including daily, monthly, and regional performance statistics, are presented in Appendix A.

3.2.3.2 Emissions Modeling

Emissions modeling is the process of creating CAMx-ready emissions inputs. For base case modeling, precursor emissions inputs are chemically speciated into the Carbon Bond 6 (CB6) chemical mechanism species used in CAMx, temporally allocated, and spatially distributed to 12 km grid cells for May through September 2012. The main ozone precursors are nitrogen oxides ($NO_x$) and volatile organic compounds (VOC) while carbon monoxide (CO) plays a minor role in ozone formation. Though CO has very low reactivity and does not play a major role in controlling ozone formation, in this subsection details of CO modeling emissions inventories are presented as CO is a chemical species in the model.

Version 3.22 of the Emissions Processor System (EPS3) was used to prepare the gridded emissions inputs. Table 3-6: *Emissions Processing Modules* summarizes many of the steps taken to prepare the required emission files needed by CAMx and the software modules in EPS3 that were used for each step.

**Table 3-6:  Emissions Processing Modules**

| EPS3 Module | Description |
| --- | --- |
| PREAM | Prepare area and non-link based area and mobile source emissions for further processing |
| LBASE | Spatially allocate link-based mobile source emissions among grid cells |
| PREPNT | Group point source emissions into elevated and low-level categories for further processing |
| CNTLEM | Apply controls to model strategies, apply adjustments, make projections, etc. |
| TMPRL | Apply temporal profiles to allocate emissions by day type and hour |
| SPCEMS | Chemically speciate emissions into nitrogen oxide (NO), nitrogen dioxide (NO$_2$), and various CB6 VOC species |
| GRDEM | Spatially distribute emissions by grid cell using source category surrogates |
| MRGUAM | Merge and adjust multiple gridded files for model-ready input |
| PIGEMS | Assign Plume-in-Grid (PiG) emissions and merge elevated point source files |

Figure 3-18: *Base Case Representative Day Total Anthropogenic Precursor Emissions by Geographic Regions* shows the total anthropogenic precursor emissions in the rpo_12km domain by major geographic region (Texas, Non-Texas U.S., southern Canada, northern Mexico, and Oceanic) on a sample 2012 summer weekday in tons per day.



**Figure 3-18:  Base Case Representative Day Total Anthropogenic Precursor Emissions by Geographic Regions**

Emissions modeling includes preparing emissions inventories for anthropogenic emissions source categories such as stationary point sources (power plants, refineries,

etc.), area sources (dry cleaners, gas stations, etc.), on-road mobile sources (cars, trucks, etc.), non-road mobile sources (construction vehicles, lawn mowing equipment, etc.), off-road mobile sources (locomotives, commercial marine, aircraft, etc.), and oceanic (off-shore oil rigs and ocean-going vessels). Figure 3-19: *Base Case Representative Day Total Anthropogenic Precursor Emissions by Source Category* shows the total anthropogenic precursor emissions in the rpo_12km domain by source category for a sample 2012 summer weekday in tons per day.



**Figure 3-19: Base Case Representative Day Total Anthropogenic Precursor Emissions by Source Category**

Emissions inventories for natural emissions source categories, i.e., biogenic sources and fires, were also developed. Version 3.61 of the Biogenic Emissions Inventory System (BEIS) (Bash et al., 2016) within the Sparse Matrix Operation Kernel Emissions (SMOKE) System version 3.7[16] was used to create the biogenic emissions inventory. Figure 3-20: *Biogenic VOC Emissions in RPO_12km Domain on July 18, 2012* shows a sample of biogenic VOC emissions in the rpo_12km domain.

---

[16] Available at https://www.cmascenter.org/smoke/



**Figure 3-20: Biogenic VOC Emissions in RPO_12km Domain on July 18, 2012**

Wildfire emissions were estimated from the daily Fire Inventory from the National Center for Atmospheric Research (NCAR) (FINN) version 1.5 product for 2012 (Wiedinmyer, 2011). The FINN fire estimates were projected to the model grid and grouped together if fires were within 5 km of each other. Each fire was treated as a point source and processed using the EPS3 PREFIR, CHMSPL, TMPRL, and PSTFIR

3-25

modules following the methodology developed in a TCEQ project.[17] The fire emissions were temporally allocated according to the temperate North American diurnal cycle of fires from Mu et al. (2011).

Since the purpose of base case modeling is to evaluate the ability of the model to recreate a past episode, measured and reported emissions data from 2012 with the highest resolution available were relied upon to determine the spatial and temporal allocation of emissions in the modeling domain for each hour of the modeling episode. Details of the development and processing of emissions inventories for base case modeling are provided in Appendix B: *Emissions Modeling for the Transport State Implementation Plan Revision for the 2015 Eight-Hour Ozone National Ambient Air Quality Standard.*

### 3.2.3.3 Initial and Boundary Conditions

In addition to emissions and meteorological inputs, CAMx requires initial and boundary conditions. Initial conditions refer to the state of the atmosphere in the rpo_12km domain at the start of the modeling episode. Boundary conditions refer to the state of the atmosphere at the five edges (North, South, East, West, and Top) of the rpo_12km domain.

The initial and boundary conditions were derived from the output of a three-dimensional global CTM, GEOS-Chem. The GEOS-Chem model simulates atmospheric chemical and physical processes driven by assimilated meteorological observations from the NASA's Goddard Earth Observing System (GEOS).[18] The TCEQ used a modified version of the standard GEOS-Chem version 10-01. The modifications were implemented by Ramboll Environ as part of TCEQ projects[19, 20] that updated the lightning $NO_x$ module (Travis et al., 2016; Zhang et al., 2014) and halogen chemistry (Sherwen et al., 2016; Yarwood et al., 2016), and fixed several model errors.

For the base case simulation, GEOS-Chem was run for 2012 with a grid resolution of 2.0 degrees latitude x 2.5 degrees longitude, using meteorology from the GEOS Model Version 5 (GEOS-5) and global anthropogenic emissions inventory for non-U.S. regions from the Hemispheric Transport of Air Pollution (HTAP) version 2. For U.S. emissions, the U.S. National Emission Inventory 2011 (2011 National Emissions Inventory) was used. GEOS-Chem results were used to provide one-way dynamic boundary concentrations at three-hour intervals and an initial concentration field for the CAMx simulations. Figure 3-21: *Initial Concentration on April 16, 2012 in the RPO_12km* shows a map of the initial ozone concentration field on 12 a.m., April 16, 2012 at the surface layer in the rpo_12km domain. April 16, 2012 is the start date of the CAMx

---

[17] "Boundary Condition and Fire Emissions Modeling", Tai *et al*, September 2008, https://www.tceq.texas.gov/assets/public/implementation/air/am/contracts/reports/pm/5820784005FY0810-20080831-environ-bcic_final_report.pdf
[18] GEOS-Chem Model, http://acmg.seas.harvard.edu/geos/
[19] "Updated Boundary Conditions for CAMx Modeling", Nopmongcol *et al*, July 2016, https://www.tceq.texas.gov/assets/public/implementation/air/am/contracts/reports/pm/5821662241FY1615-20160729-environ-GEOSChem_BC_for_CAMx.pdf
[20] "2013 Boundary Conditions for CAMx Modeling", Nopmongcol *et al*, June 2017, https://www.tceq.texas.gov/assets/public/implementation/air/am/contracts/reports/pm/582177144421-20170627-environ-2013_BC_GEOS_Chem.pdf

simulation with a ramp up period of April 16 through April 30 for the base case modeling.



**Figure 3-21: Initial Concentration on April 16, 2012 in the RPO_12km**

Figure 3-22: *2012 East Boundary Condition Cross-Section for July 18, 2012 Episode Day*, Figure 3-23: *2012 West Boundary Condition Cross-Section for July 18, 2012 Episode Day*, Figure 3-24: *2012 North Boundary Condition Cross-Section for July 18, 2012 Episode Day*, and Figure 3-25: *2012 South Boundary Condition Cross-Section for July 18, 2012 Episode Day* show a samples of the 2012 east, west, north, and south, respectively, boundary conditions for the July 18, 2012 episode day for the three-hour window of 12 p.m. to 3 p.m.



**Figure 3-22: 2012 East Boundary Condition Cross-Section for July 18, 2012 Episode Day**



**Figure 3-23: 2012 West Boundary Condition Cross-Section for July 18, 2012 Episode Day**



**Figure 3-24: 2012 North Boundary Condition Cross-Section for July 18, 2012 Episode Day**



**Figure 3-25: 2012 South Boundary Condition Cross-Section for July 18, 2012 Episode Day**

3.2.3.4 Photochemical Modeling

The TCEQ used CAMx version 6.40,[21] with the following options:

- New gas-phase chemistry mechanism CB6 "revision 4," with condensed halogen chemistry and inline sea salt emissions (CB6r4h); and

- Wesely dry deposition scheme.

In addition to the meteorological, emissions, and initial and boundary condition inputs, CAMx needs spatially resolved surface characteristic parameters, albedo/haze/ozone (i.e., opacity), photolysis rates, and a file with chemistry parameters.

Surface characteristic parameters, including topographic elevation, Leaf Area Index (LAI), vegetative distribution, and water/land boundaries are input to CAMx via a land-use file. The land-use file provides the fractional contribution of 26 land-use categories per grid cell, as defined by Zhang et al (2003). The land use file was developed using version 3 of the Biogenic Emissions Land Use Database for areas outside the U.S. and the 2006 National Land Cover Dataset for the U.S. For Texas and surrounding states, updated land-use files developed by Texas A&M University (Popescu et al., 2012) were used. The land use file, in addition to the land-use categories, has LAI ratios. LAI is the ratio of total upper leaf surface of vegetation divided by the surface area of the land on which the vegetation grows. LAI is a dimensionless value, typically ranging from zero for bare ground to over seven for a dense forest. Monthly averaged LAI was created from the eight-day 1 km resolution MODIS MCD15A2 product.

Spatially resolved opacity and photolysis rates that are specific to the chemistry parameters for the CB6 mechanism are input to CAMx via a photolysis rates file and an opacity file. The chemistry parameters for the CB6 mechanism are provided in the

---

[21] User's Guide Comprehensive Air Quality Model with Extensions (CAMx), Version 6.30, Ramboll Environ, Inc., April 2016, available at http://www.camx.com/files/camxusersguide_v6-30.pdf

chemistry parameters file. Episode-specific satellite data from the Total Ozone Mapping Spectrometer were used to prepare the clear-sky photolysis rates and opacity files. Photolysis rates are internally adjusted by CAMx according to cloud and aerosol properties using the inline Tropospheric Ultraviolet Visible model.

The CAMx model configuration was applied to the 2012 base case using the episode-specific meteorological inputs, biogenic and anthropogenic emission inputs, and initial and boundary conditions described above. The CAMx modeling results were compared to the measured ozone and ozone precursor concentrations at all regulatory monitoring sites in the rpo_12km domain, which resulted in several modeling iterations to implement improvements to the meteorological modeling, emissions modeling, and subsequent CAMx modeling. Various configuration changes such as the choice of biogenic emission models, land-use model used in WRF modeling, impact of cloud assimilation, etc., were evaluated along with updates to various anthropogenic emissions categories.

Statistical metrics such as Mean Bias (MB), Mean Error (ME), Normalized Mean Bias (NMB), Normalized Mean Error (NME), and RMSE were calculated by comparing monitored (measured) and bi-linearly interpolated modeled ozone concentrations for all episode days and monitors. These statistical metrics were used to evaluate the different configurations and arrive at the final configuration used for the 2015 Ozone NAAQS Transport SIP revision.

Episode-wide model performance statistics and graphics for the final modeling configuration are presented below. Figure 3-26: *Mean Bias for the May through September 2012 Episode at AQS Monitoring Sites* shows the mean bias for all the EPA Air Quality System (AQS)[22] monitoring sites for the May through September 2012 episode for days with observed Maximum Daily Average Eight-Hour (MDA8) ozone concentration greater than or equal to 60 ppb. Figure 3-26 shows that the mean biases for days with MDA8 greater than 60 ppb differ by region, with monitors along the East Coast showing positive bias while monitors on the West Coast show negative biases. Most monitors have a mean bias in the range of ± 5 ppb on high ozone days, which is acceptable model performance (Simon *et al.*,2012). Figure 3-27: *RMSE for May through September 2012 Episode at AQS Monitoring Sites* shows the RMSE for each of the AQS monitoring sites on days with observed MDA8 greater than 60 ppb. The RMSE at most monitors in the modeling domain were in the range of 6 to 12 ppb. However, monitors along the northeast and the southwest coast had higher deviations with RMSE in the 16 to 20 ppb range. Table 3-7: *Statistical Model Performance Evaluation Metrics for TCEQ's 2015 Ozone NAAQS Transport SIP Revision Configuration* provides the statistical metrics for the May through September 2012 episode on days with observed MDA8 greater than 60 ppb for each of the NCDC Climate Regions.

---

[22] https://www.epa.gov/aqs



**Figure 3-26: Mean Bias for the May through September 2012 Episode at AQS Monitoring Sites**



**Figure 3-27:  RMSE for May through September 2012 Episode at AQS Monitoring Sites**

**Table 3-7:  Statistical Model Performance Evaluation Metrics for TCEQ's 2015 Ozone NAAQS Transport SIP Revision Configuration**

| Climate Region | No. of Obs | MB (ppb) | ME (ppb) | NMB (%) | NME (%) | RMSE (ppb) |
|---|---|---|---|---|---|---|
| Northeast | 5281 | 4.1 | 8.4 | 5.9 | 12.2 | 11.0 |
| Ohio Valley | 9861 | -2.5 | 6.8 | -3.6 | 10.0 | 8.5 |
| Upper Midwest | 2950 | -6.2 | 8.3 | -8.9 | 11.9 | 9.9 |
| Southeast | 3203 | 3.1 | 6.8 | 4.7 | 10.2 | 8.8 |
| South | 5020 | -3.9 | 6.5 | -5.7 | 9.6 | 8.1 |
| Southwest | 7215 | -5.5 | 7.1 | -8.4 | 10.8 | 9.0 |
| Northern Rockies | 1084 | -7.5 | 8.6 | -11.8 | 13.4 | 10.4 |
| Northwest | 193 | -7.0 | 8.2 | -10.9 | 12.7 | 10.2 |
| West | 10672 | -9.2 | 10.4 | -13.1 | 14.9 | 12.7 |
| National | 45479 | -3.9 | 8.0 | -5.7 | 11.7 | 10.1 |

Overall, the base case modeling showed reasonable model performance and is comparable with the EPA's modeling documented in the 2015 Transport NODA. Although the EPA had better performance in the Northeast climate region, in the South

climate region, which includes Texas and surrounding states, the TCEQ's modeling performed better than the EPA's. Detailed performance evaluation for the 2012 base case modeling episode is included in Appendix C: *Photochemical Model Performance Evaluation for the Transport State Implementation Plan Revision for the 2015 Eight-Hour Ozone National Ambient Air Quality Standard.*

### 3.2.4 Future Year Modeling

Future year modeling is used to predict ozone concentrations and calculate a $DV_F$ at each AQS monitor in the modeling domain in the future year, 2023. In future year modeling, the same modeling episode (May through September 2012) is used, but with projected future anthropogenic emissions. Future year modeling predicts the change in ozone concentrations due to changes in anthropogenic emissions in a future year while keeping the meteorological and natural emissions (biogenic and wildfires) inputs constant. Future year modeling answers the question: what would the ozone concentrations be in the future if the same meteorological conditions (that resulted in a high ozone episode in the past) were to repeat?

The meteorological inputs generated for May through September 2012 using the WRF model and described in section 3.2.3.1: *Meteorological Modeling* were used as inputs to the CTM in the future year modeling.

#### 3.2.4.1 Emissions Modeling

For future year modeling, emissions inventories were developed for the anthropogenic emissions source categories by applying growth and control factors to base year emissions. Growth and control factors are developed based on the projected growth in the demand for goods and services, along with the reduction in emissions expected from state, local, and federal control programs. Figure 3-28: *Future Year Representative Day Total Anthropogenic Precursor Emissions by Geographic Region* shows the total projected anthropogenic precursor emissions in the rpo_12km domain by major geographic region on a representative 2023 summer weekday in tons per day. Figure 3-29: *Future Year Representative Day Total Anthropogenic Precursor Emissions by Source Category* shows the total projected anthropogenic precursor emissions in the rpo_12km domain by source category for a sample 2023 summer weekday in tons per day.



**Figure 3-28:** Future Year Representative Day Total Anthropogenic Precursor Emissions by Geographic Region



**Figure 3-29:** Future Year Representative Day Total Anthropogenic Precursor Emissions by Source Category

Since biogenic emissions are dependent upon the meteorological conditions on a given day, the same episode-specific emissions that were used in the base case modeling

were also used in the 2023 future year modeling. Since future year wildfires cannot be predicted, the wildfire emissions inventory developed for the base case modeling was also used in the 2023 future year modeling. Details regarding the development of the 2023 emissions inventory, including projection tools, projection growth factors and federal/state/local rules and programs incorporated are provided in Appendix B.

3.2.4.2 Initial and Boundary Conditions

For future year modeling, updated 2023 initial and boundary conditions were developed by running GEOS-Chem again. The 2023 initial and boundary conditions were developed by using projected 2023 anthropogenic emissions inventories with the same GEOS-Chem meteorological and CTM configurations as the 2012 base case. The 2023 anthropogenic emissions were updated from the base year using projected growth factors. Emissions in North America (specifically, the continental U.S., southern Canada, and northern Mexico) were projected using the same methods used by the TCEQ to project anthropogenic emissions in the rpo_12km domain as explained in Appendix B. In all other areas of the GEOS-Chem domain, emissions projection factors from the Representative Concentration Pathway (RCP85) Database[23] were used to develop the 2023 anthropogenic emissions. Since the RCP85 data are only available at 5 or 10 year intervals (e.g., 2000, 2005, 2010, 2020, etc.), emission projections factors for 2023 were linearly interpolated from changes between the two nearest projection years. Details of the emissions projections methodology are available in the TCEQ Project FY2016-16 report *Updated Boundary Conditions for CAMx Modeling.*[24]

Figure 3-30: *2023 East Boundary Condition Cross-Section for July 18, 2012 Episode Day*, Figure 3-31: *2023 West Boundary Condition Cross-Section for July 18, 2012 Episode Day*, Figure 3-32: *2023 North Boundary Condition Cross-Section for July 18, 2012 Episode Day*, and Figure 3-33: *2023 South Boundary Condition Cross-Section for July 18, 2012 Episode Day* show samples of the 2023 east, west, north and south boundary conditions for July 18, 2012 episode day for the three-hour window of 12 p.m. to 3 p.m.

---

[23] https://tntcat.iiasa.ac.at/RcpDb/dsd?Action=htmlpage&page=welcome
[24] "Updated Boundary Conditions for CAMx Modeling", Nopmongcol *et al*, July 2016, https://www.tceq.texas.gov/assets/public/implementation/air/am/contracts/reports/pm/5821662241FY1615-20160729-environ-GEOSChem_BC_for_CAMx.pdf



**Figure 3-30: 2023 East Boundary Condition Cross-Section for July 18, 2012 Episode Day**



**Figure 3-31: 2023 West Boundary Condition Cross-Section for July 18, 2012 Episode Day**



**Figure 3-32: 2023 North Boundary Condition Cross-Section for July 18, 2012 Episode Day**



**Figure 3-33:  2023 South Boundary Condition Cross-Section for July 18, 2012 Episode Day**

<u>3.2.4.3 Photochemical Modeling</u>

For future year modeling, the 2023 anthropogenic emissions inventories were input along with the 2012 meteorological, biogenic, and wildfire emissions to the CAMx model configuration detailed in the section 3.2.3: *Base Case Modeling*. The output of the future year modeling, ozone concentrations for each grid cell in the rpo_12km domain, was post-processed to obtain the 2023 $DV_F$ at each AQS monitor in the rpo_12km domain.

*Projected Nonattainment Monitors*

The methodology described in EPA Modeling Guidance was used to determine the 2023 $DV_F$ at each monitor in the rpo_12km domain. A monitor's $DV_F$ is calculated by multiplying the Relative Response Factor (RRF) by a baseline year design value ($DV_B$) as shown in *Equation 3-1: Future Year Design Value Calculation for a Monitor.*

$$DV_F = RRF \times DV_B$$

**Equation 3-1: Future Year Design Value Calculation for a Monitor**

The RRF is the ratio of the average future year modeled MDA8 ozone concentrations to the average base year modeled MDA8 ozone concentrations on the top 10 modeled MDA8 base year days. In accordance with EPA Modeling Guidance, the maximum concentration of the three-by-three grid cell array surrounding each monitor on the top 10 base year days with modeled MDA8 above 60 ppb was used to calculate the RRF for each monitor. The $DV_B$ is the average of the regulatory design values for the three consecutive years containing the base year, as shown in Figure 3-34: *Baseline Design Value ($DV_B$) for the 2015 Ozone NAAQS Transport SIP.*



**Figure 3-34:  Baseline Design Value (DV_B) for the 2015 Ozone NAAQS Transport SIP Revision**

Figure 3-35: *2023 Future Design Value (DV_F) for the AQS Monitors in the RPO_12km Domain* shows a map of the rpo_12km domain with the 2023 DV_F for each AQS monitor.



**Figure 3-35: 2023 Future Design Value (DV$_F$) for the AQS Monitors in the RPO_12km Domain**

*Projected Maintenance Monitors*

In Step 1, in addition to identifying the monitors projected to be in nonattainment in 2023 as described above, monitors projected to have maintenance issues were also identified. To identify monitors that could have maintenance issues in 2023, the TCEQ calculated Maintenance Future Year Design Values (MDV$_F$). The 2023 MDV$_F$ is calculated using the same equation presented in Equation 3-1, except that the DV$_B$ is the most recent, instead of the average, of the three regulatory design values containing the base year. Therefore, since 2012 is the base year, the 2014 design value that is the latest regulatory design value that contains the base year of 2012 is used as DV$_B$. For monitors with no regulatory 2014 design value, the 2013 or 2012 design values were used as applicable. The regulatory design values after 2014, namely 2015 and 2016, are not used since these design values do not include monitored data from the modeling base year of 2012.

The TCEQ's approach for identifying maintenance monitors differs from the approach used by the EPA in the 2015 Transport NODA. The EPA used the maximum of the three consecutive regulatory design values containing the base year as the DV$_B$ to identify maintenance monitors. Both the EPA's approach and the TCEQ's approach account for three years of meteorological variability in their choice of DV$_B$ to identify maintenance monitors since a single design value is a three-year average of the annual fourth-highest MDA8 ozone concentration. The EPA's approach is to choose the maximum of the three consecutive regulatory design values containing the base year as the DV$_B$

while the TCEQ's approach is to choose the latest of the three consecutive regulatory design values containing the base year as the $DV_B$. For the reasons described below, the TCEQ determined that the selection of the most recent $DV_B$ addresses all issues relevant for an independent assessment of maintenance; and therefore, provides a comprehensive assessment of the potential impacts of Texas emissions on potential maintenance monitors.

The EPA's approach to identify maintenance monitors provides independent meaning to "maintenance" by choosing a $DV_B$ that is different from the $DV_B$ used in the identification of nonattainment monitors. As discussed previously, EPA chooses the maximum $DV_B$. The EPA justified this approach by inappropriately under-weighting the role of emissions reductions in the inter-annual variability of design values. Inter-annual variability in design values is mainly a function of both meteorology and emissions. By choosing the maximum $DV_B$, EPA provides less weight to the impact of emission reductions over time at a particular monitor, without justification. The EPA's approach under-emphasizes emissions reductions and future maintenance plan requirements that provide for attainment and maintenance. The EPA's approach assumes that inter-annual variability in design values is mainly attributable to meteorological conditions and any downward trend in design value is due to meteorology not being conducive to ozone formation.

Despite meteorological inter-annual variability there is a well-documented[25] nationwide decrease in ozone design values over time with many monitors attaining and maintaining ever-tightening standards. A nonattainment monitor progresses into maintenance through emissions reductions, not through weather modification. Even accounting for meteorological conditions, ozone formation has been on a downward trajectory in most parts of the country. As shown in Figure 3-6, which depicts the meteorologically adjusted ozone trends for the NCDC climate regions for May through September (ozone season) for years 2000 through 2016, a downward trend in meteorologically adjusted ozone (the blue line) in the later years can be seen for most regions. Table 3-8: *Maximum and Minimum Eight-Hour Ozone Design Values for All U.S. Monitors for Each Year from 2007 through 2016* shows how many monitors had either a maximum or a minimum eight-hour ozone design value for each year from 2007 through 2016, with the five years that are included in the three consecutive regulatory design values containing the base year used in TCEQ's modeling shaded in light blue.

**Table 3-8: Maximum and Minimum Eight-Hour Ozone Design Values for All U.S. Monitors for Each Year from 2007 through 2016**

| Year | Number of Monitors with Maximum Eight-Hour Ozone Design Value | Number of Monitors with Minimum Eight-Hour Ozone Design Value |
|------|---|---|
| 2007 | 582 | 18 |
| 2008 | 106 | 4 |
| 2009 | 10 | 14 |
| 2010 | 24 | 67 |

[25] "Our Nation's Air – Status and Trends though 2015", Interactive web report available at https://gispub.epa.gov/air/trendsreport/2016/

| Year | Number of Monitors with Maximum Eight-Hour Ozone Design Value | Number of Monitors with Minimum Eight-Hour Ozone Design Value |
|------|---|---|
| 2011 | 5 | 44 |
| 2012 | 43 | 13 |
| 2013 | 18 | 47 |
| 2014 | 0 | 51 |
| 2015 | 6 | 362 |
| 2016 | 6 | 180 |

As seen in Table 3-8, the maximum design value occurs more often in the earlier years and the minimum design value occurs more often in later years, though not always the latest years. This further shows that ozone is decreasing despite changes in meteorology from year to year.

In addition, since the maximum design value in the set of three consecutive regulatory design values containing the base year tends to be the oldest design value, the EPA's choice for $DV_B$ can inappropriately emphasize ozone concentrations from the first year (which is farthest from the future year) of the five-year window through its contribution to the oldest of three design values.

The TCEQ approach provides independent meaning to maintenance monitors in a manner consistent with the FCAA's concept of maintenance areas as areas that were formerly in nonattainment and that have since attained the standard and will continue to maintain that status in the future because it accounts for both meteorological variability and the latest emissions impact on the monitor, which could be either increasing or decreasing. The concept of maintenance is forward looking and must account for meteorological variability, the emissions reductions that have occurred in the past (through the establishment of permanent and enforceable measures on major stationary sources and well as trends such as fleet turnover), and commitments regarding contingency measures to address future emission reductions necessary if the area violates the standard.

The EPA's approach would appear to be more appropriate if the goal is to maximize the likelihood that a monitor would attain the NAAQS in a particular future year, since ozone concentrations in a particular year are subject to random meteorological effects, but that is not the focus in the identification of maintenance monitors. Although meteorology plays a role in determining whether or not an attainment monitor maintains that status, the EPA's approach conflates two related but distinct concepts: the likelihood of *attaining* the standard in a future year and the ability of an attainment monitor to *maintain* that attainment status.

Since all nonattainment monitors are simultaneously maintenance monitors and any remedies devised to address nonattainment monitors would have to apply to maintenance monitors due to the overlapping nature of the two methods, another practical consequence of the EPA's approach is that it could easily lead to over-control as well as requiring upwind states to consider or implement controls when the downwind state in which the maintenance monitor is located does not have any obligations to control local emissions. Such an approach was already adopted in CSAPR

3-41

where the EPA treated maintenance monitors identically to the way it treated nonattainment monitors, both in linking states to specific monitors and devising emission limits for the linked states. This conflation of nonattainment and maintenance further results in there being effectively no independent meaning to "maintenance" as opposed to "nonattainment," contrary to *North Carolina v. Environmental Protection Agency,* 531 F.3d 896 (D.C. Cir. 2008) (*North Carolina*).

The TCEQ's recommended approach accounts for meteorological variability, while accounting for possible emissions reductions, since the latest design value itself consists of monitoring data from a three-year period. Using the latest of the three design values acknowledges the progress made by states but still accounts for any recent changes in ozone concentrations. The TCEQ method provides independent meaning of maintenance (*North Carolina*) in a manner that is consistent with the FCAA's concept of maintenance and without penalizing upwind states for old violations at monitors that have seen substantial reductions over a five-year period. By focusing on the latest design value, the approach also harmonizes the requirements of §175A, the maintenance plan requirement for areas that were formerly nonattainment with the requirements of FCAA, §110(a)(2)(D). Since the latest design value will reflect the current state of ozone concentrations in an area and the impact of any maintenance plans that are in place to prevent local emissions from causing an area to slip back into nonattainment, the TCEQ's approach will ensure that only monitors with maintenance issues that are truly driven by interstate transport are tagged as maintenance monitors. Due to the differences in the TCEQ's approach (including choice of base year) and the EPA's approach, the set of monitors projected to be maintenance in 2023 are, not unexpectedly, different from the monitors identified as maintenance monitors in the 2015 Transport NODA.

Figure 3-36: *2023 Maintenance Future Year Design Value (MDV$_F$) for the AQS Monitors in the RPO_12km Domain* shows the MDV$_F$ for all the AQS monitors in the rpo_12km domain.



**Figure 3-36: 2023 Maintenance Future Year Design Value (MDV$_F$) for the AQS Monitors in the RPO_12km Domain**

### 3.3 STEP 2: SOURCE APPORTIONMENT AND IDENTIFICATION OF DOWNWIND MONITORS TAGGED FOR FURTHER REVIEW

Section 3.2 detailed how photochemical modeling was used in the relative sense to identify monitors projected to be in nonattainment or have maintenance issues in 2023. In this section, details on Step 2 and the identification of the subset of monitors that might be impacted by Texas emissions from the approximately 1200 AQS monitors in the rpo_12km domain are presented. The subset of monitors tagged in Step 2 were further reviewed in Step 3 to determine if emissions from Texas contribute significantly to nonattainment or interfere with maintenance at that monitor.

The Anthropogenic Culpability Precursor Analysis (APCA) tool was used to identify and tag the subset of downwind monitors that might be impacted by Texas emissions (and will be further reviewed in Step 3). APCA is a probing tool in CAMx that is used to apportion the modeled ozone concentration at each grid cell at each simulation hour to specific user-defined geographic regions and/or source categories. APCA does this by keeping track of the origin of the NO$_x$ and VOC precursors creating the ozone in each grid cell for each time step during the model run.

The APCA contribution categories chosen were to facilitate better understanding of interstate problems at the monitors within the rpo_12km domain. Since Step 2 is to identify monitors that might be impacted by Texas emissions, the TCEQ considered Texas anthropogenic emissions as a contribution category for this SIP revision. Anthropogenic emissions from other states in the continental U.S. were grouped together as one contribution category. Other contribution categories were chosen to

separate out the impacts of emissions that are not directly related to interstate problems such as biogenics, fires, ocean, etc. The following are source contribution categories that were used in the APCA model run:

- Texas Anthro – $NO_x$ and VOC emissions from Texas anthropogenic sources;

- Non-Texas U.S. Anthro – $NO_x$ and VOC emissions from anthropogenic sources in the 47 other states of the continental U.S.;

- Non-U.S. Anthro – $NO_x$ and VOC emissions from southern Canadian and northern Mexican anthropogenic sources included in the rpo_12km domain;

- Ocean Anthro – $NO_x$ and VOC emissions from ocean-going vessels and off-shore oil and gas platforms;

- Biogenic Emissions;

- Fires; and

- Initial and boundary conditions.

Figure 3-37: *APCA Geographic Regions for the 2015 Ozone NAAQS Transport SIP* shows a map of the APCA contribution categories with Texas in red, Non-Texas U.S. in pink, Non-U.S. in lavender, and Ocean in blue.



**Figure 3-37: APCA Geographic Regions for the 2015 Ozone NAAQS Transport SIP Revision**

The outputs of an APCA model run are the total modeled hourly concentration and the breakdown of the total concentration by each user-specified contribution category for each grid cell of the domain for each hour of the episode. For example, as part of the 2023 APCA simulation, for cell index [242, 78], which contains the Manvel Croix monitor, the hourly modeled ozone concentration is 72.21 ppb on episode day July 14 at 12:00 p.m. Central Standard Time (CST). The total ozone concentration of 72.21 ppb in the cell is apportioned to the specified contribution categories as shown in Table 3-9: *Apportion of Total Ozone Concentration for cell index [242, 78] on episode day July 14 at 12:00 p.m. CST to Contribution* Categories.

**Table 3-9: Apportion of Total Ozone Concentration for cell index [242, 78] on episode day July 14 at 12:00 p.m. CST to Contribution Categories**

| Category | Contribution |
|---|---|
| Texas anthropogenic emissions | 48.41 |
| Non-Texas U.S. anthropogenic emissions | 0.72 |
| Non-U.S. anthropogenic emissions | 0.25 |
| Ocean anthropogenic emissions | 7.71 |
| Fire emissions | 0.32 |
| Biogenic emissions | 4.91 |
| Boundary conditions | 9.90 |

Figure 3-38: *Breakdown of Total Hourly Modeled Ozone Concentration by APCA Contribution Categories for the Manvel Croix Monitor Grid Cell on July 14 at 12:00 p.m. CST* is a graphical representation of the breakdown of the total hourly modeled concentration in the grid cell containing the Manvel Croix monitor on July 14 (contained within the red box) at 12:00 p.m. CST (identified by a gold star) by each APCA contribution category.



**Figure 3-38:  Breakdown of Total Hourly Modeled Ozone Concentration by APCA Contribution Categories for the Manvel Croix Monitor Grid Cell on July 14 at 12:00 p.m. CST**

In an APCA model run, the sum concentrations apportioned to each contribution category will always equal the total modeled concentration for each grid cell for each hour. APCA apportions ozone formed due to the interaction of biogenic and anthropogenic precursor emissions by recognizing that biogenic emissions as a non-controllable category. Therefore, APCA apportions/attributes ozone formed from such interactions to the anthropogenic precursor emissions. Details of how APCA results were used to tag downwind nonattainment and maintenance monitors for further review are presented in this section.

To identify nonattainment and maintenance monitors for further review, Texas contribution to the monitor's 2023 $DV_F$ (2023 $TX_{DVF}$) was evaluated. The following methodology was used to determine the 2023 $TX_{DVF}$.

1. Calculate the 2023 MDA8 total concentration for each grid cell for each episode day.

2. Calculate the 2023 MDA8 Texas contribution using the hourly apportioned concentration for Texas for each grid cell for each episode day, using contributions from the hours that comprised the MDA8 concentration for that day.

3. For each monitor, calculate the ratio of the average of the 2023 MDA8 Texas contribution to the average of the 2023 MDA8 total concentration from the same days and grid cells used in the 2023 $DV_F$ calculation for that monitor.

4. Calculate the 2023 $TX_{DVF}$ for each monitor by multiplying the 2023 $DV_F$ for that monitor by the ratio calculated in the previous step for that monitor.

In addition to determining $TX_{DVF}$, the contribution of each APCA category to the 2023 $DV_F$ for each AQS monitor in the rpo_12km domain was also calculated using the steps outlined above.

### 3.3.1 Identification of Nonattainment Monitors for Further Review

Two criteria were used to tag downwind nonattainment monitors for further review - a monitor's 2023 $DV_F$ is greater than or equal to 71 ppb and the monitor's 2023 $TX_{DVF}$ is greater than or equal to 0.7 ppb. Table 3-10: *Downwind Nonattainment Monitors Tagged for Further Review*, sorted by state, provides details such as AQS ID, site name, state and county, 2023 $DV_F$, and 2023 $TX_{DVF}$, of the downwind nonattainment monitors tagged for further review in Step 3.

**Table 3-10: Downwind Nonattainment Monitors Tagged for Further Review**

| AQS ID | Site Name | State | County | 2023 $DV_F$ (ppb) | 2023 $TX_{DVF}$ (ppb) |
|--------|-----------|-------|--------|-------------------|------------------------|
| 80350004 | Chatfield State Park | Colorado | Douglas | 73 | 1.42 |
| 80590006 | Rocky Flats | Colorado | Jefferson | 72 | 1.26 |
| 80590011 | National Renewable Energy Labs-NREL | Colorado | Jefferson | 71 | 1.26 |
| 80690011 | Fort Collins-West | Colorado | Larimer | 72 | 1.22 |
| 40038001 | Chiricahua National Monument | Arizona | Cochise | 71 | 1.06 |
| 60371201 | Reseda | California | Los Angeles | 80 | 0.76 |
| 60371701 | Pomona | California | Los Angeles | 80 | 0.72 |
| 60376012 | Santa Clarita | California | Los Angeles | 87 | 0.9 |
| 60658001 | Rubidoux | California | Riverside | 88 | 0.73 |
| 60658005 | Mira Loma (Van Buren) | California | Riverside | 84 | 0.71 |
| 60710001 | Barstow | California | San Bernardino | 71 | 0.84 |
| 60710306 | Victorville-Park Avenue | California | San Bernardino | 76 | 0.81 |
| 60711004 | Upland | California | San Bernardino | 91 | 0.88 |
| 60714001 | Hesperia-Olive Street | California | San Bernardino | 82 | 0.86 |
| 60714003 | Redlands | California | San Bernardino | 94 | 0.74 |

### 3.3.2 Identification of Maintenance Monitors for Further Review

Two criteria were used to tag downwind maintenance monitors for further review – a monitor's 2023 $MDV_F$ is greater than or equal to 71 ppb and the monitor's 2023 $TX_{DVF}$ is greater than or equal to 0.7 ppb. Table 3-11: *Downwind Maintenance Monitors Tagged for Further Review*, sorted by state, provides details such as AQS ID, site name, state

and county, 2023 $MDV_F$, and 2023 $TX_{DVF}$, of the downwind maintenance monitors tagged for further review in Step 3.

**Table 3-11: Downwind Maintenance Monitors Tagged for Further Review**

| AQS ID | Site Name | State | County | 2023 $MDV_F$ (ppb) | 2023 $TX_{DVF}$ (ppb) |
|---|---|---|---|---|---|
| 80350004 | Chatfield State Park | Colorado | Douglas | 72 | 1.42 |
| 80590006 | Rocky Flats | Colorado | Jefferson | 73 | 1.26 |
| 80590011 | National Renewable Energy Labs-NREL | Colorado | Jefferson | 71 | 1.26 |
| 80690011 | Fort Collins-West | Colorado | Larimer | 71 | 1.22 |
| 80050002 | Highland Reservoir | Colorado | Arapahoe | 71 | 1.15 |
| 60371201 | Reseda | California | Los Angeles | 78 | 0.76 |
| 60371701 | Pomona | California | Los Angeles | 82 | 0.72 |
| 60376012 | Santa Clarita | California | Los Angeles | 86 | 0.9 |
| 60658001 | Rubidoux | California | Riverside | 85 | 0.73 |
| 60658005 | Mira Loma (Van Buren) | California | Riverside | 83 | 0.71 |
| 60710001 | Barstow | California | San Bernardino | 72 | 0.84 |
| 60710306 | Victorville-Park Avenue | California | San Bernardino | 77 | 0.81 |
| 60711004 | Upland | California | San Bernardino | 90 | 0.88 |
| 60714001 | Hesperia-Olive Street | California | San Bernardino | 79 | 0.86 |
| 60714003 | Redlands | California | San Bernardino | 91 | 0.74 |

Except for the Highland Reservoir (AQS ID: 80050002) monitor in Arapahoe County, Colorado, all the maintenance monitors are also nonattainment monitors.

In the 2015 Transport NODA, the EPA's modeling linked Texas to six monitors based solely because modeled contributions to a monitor's future year design value were greater than or equal to 0.7 ppb. Table 3 12: *Monitors Linked to Texas by EPA Modeling in the 2015 Transport NODA* shows the six monitors, the 2023 $DV_F$ and modeled Texas contributions to $DV_F$ from the EPA's modeling and the corresponding values determined using the TCEQ's modeling.

**Table 3-12: Monitors Linked to Texas by EPA Modeling in the 2015 Transport NODA**

| AQS ID | State | County | 2023 DV$_F$ in EPA Modeling (ppb) | 2023 TX$_{DVF}$ in EPA Modeling (ppb) | 2023 DV$_F$ in TCEQ Modeling (ppb) | 2023 TX$_{DVF}$ in TCEQ Modeling (ppb) |
|---|---|---|---|---|---|---|
| 260050003 | Michigan | Allegan | 68.8 | 2.49 | 71 | 0.59 |
| 551170006 | Wisconsin | Sheboygan | 71.0 | 1.92 | 70 | 0.73 |
| 240251001 | Maryland | Harford | 71.3 | 0.91 | 65 | 0.69 |
| 360850067 | New York | Richmond | 71.2 | 0.77 | 62 | 0.67 |
| 361030002 | New York | Suffolk | 71.3 | 0.71 | 67 | 0.63 |
| 80590011 | Colorado | Jefferson | 69.7 | 1.03 | 71 | 1.26 |

There are significant though not unexpected differences between the TCEQ's modeling results and the EPA's modeling results. For example, in the EPA's modeling, five of the six monitors linked to Texas were located in Eastern states, whereas all the monitors tagged for further review by the TCEQ's modeling are located in Western states.[26] The differences are due to key changes the TCEQ made to modeling inputs, analysis, and methodologies to address several critical concerns with the EPA's modeling and approach in the 2015 Transport NODA, as discussed in this SIP revision as well as the TCEQ's comments on the 2015 Transport NODA. Some of the changes include a different base year, a different EGU projection tool, changes to the methodology used to identify maintenance monitors, and changes to the methodology used to calculate Texas' contribution to downwind monitors. These changes are appropriate since there are no regulatory requirements that specify required modeling parameters for transport analysis. Further, as stated by the EPA in the 2015 Transport NODA, "The EPA believes that states may rely on this or other appropriate modeling, data or analyses to develop approvable Good Neighbor SIPs…" (82 FR 1735); therefore, the TCEQ can make choices different than those made by the EPA as long as the modeling and analysis is technically justifiable. The TCEQ's modeling and analysis, though different from the EPA's modeling and analysis, are valid as they are within the CSAPR framework and follow sound scientific principles and the EPA Modeling Guidance, where applicable. Therefore, the TCEQ focused only on the monitors tagged for further review by TCEQ modeling and shown in Table 3-10 and Table 3-11 to determine if emissions from Texas contribute significantly to nonattainment or interfere with maintenance.

The downwind nonattainment and maintenance monitors tagged for further review are in three states: Arizona, California, and Colorado. To aid further review and analysis of the tagged monitors, APCA runs were conducted with additional contribution categories: California Anthro, Colorado Anthro, New Mexico Anthro, Kansas Anthro, Nebraska Anthro, Wyoming Anthro, Utah Anthro, California Anthro, Arizona Anthro, Nevada Anthro and Oregon Anthro. Figure 3-39: *Map of Additional APCA Geographic Regions Based on Location of Tagged Monitors* shows all the geographic contribution regions used in the APCA runs for this 2015 Ozone NAAQS Transport SIP revision.

---

[26] Per the EPA, Eastern states include all states from Texas northward to North Dakota and eastward to the East Coast while the Western states include the 11 western contiguous states of Arizona, California, Colorado, Idaho, Montana, Nevada, New Mexico, Oregon, Utah, Washington, and Wyoming (FR 82, 1737).



**Figure 3-39: Map of Additional APCA Geographic Regions Based on Location of Tagged Monitors**

### 3.4 STEP 3: ANALYSIS TO DETERMINE IF TEXAS EMISSIONS CONTRIBUTE SIGNIFICANTLY TO NONATTAINMENT OR INTERFERE WITH MAINTENANCE AT TAGGED MONITORS

This section describes the analysis used to determine whether Texas emissions significantly contribute to nonattainment or interfere with maintenance at the sixteen downwind monitors that were tagged for further review in Step 2. To make this determination, a weight-of-evidence approach was used. Interstate transport is a complex problem and a nuanced approach that takes into consideration the factors relevant to the ozone conditions at the tagged monitors is required. Examples of factors considered include the current attainment status of the monitors, design value trends, the meteorological conditions that lead to high ozone formation at the monitor, and the number of days with elevated ozone (observed and modeled).

Since there could be considerable variation in the characteristics of the ozone problem at each monitor, not all factors were considered or analyzed for every monitor. In addition, the use of 1% of the NAAQS threshold for modeled contribution as the sole definition of significant contribution is inappropriate for the 2015 ozone NAAQS since the more stringent 0.7 ppb threshold is an order of magnitude smaller than the biases and errors typically documented for regional photochemical modeling (Simon *et al.*, 2012). The Texas contribution should be deemed "significant" only if there is a persistent and consistent pattern of contribution **on several days with elevated**

**ozone**. Analysis is presented for each state with a tagged downwind monitor in the following sections.

### 3.4.1 Colorado Monitors

Modeling tagged four Colorado nonattainment monitors, as shown in Table 3-10, for further review. In addition to these monitors, modeling also tagged one Colorado maintenance monitor, the Highland Reservoir (AQS ID 080050002) monitor, as shown in Table 3-11 for further review.

Results of in-depth analysis leads to the conclusion that Texas emissions do not contribute to nonattainment or interfere with maintenance at the five Colorado monitors tagged for further review. The conclusion is based on design value trends, number of monitored elevated ozone days, back trajectory analysis on elevated ozone days, average modeled contributions from modeled future elevated ozone days, the collective interstate contribution to the future design values, and the responsiveness to Texas emissions at these monitors. Details of the analysis are presented in the following sections.

<u>3.4.1.1 Eight-Hour Ozone Design Value Trends</u>

Eight-hour ozone design value trends at the tagged monitors, along with the other monitors in the Denver-Aurora combined statistical area (CSA), are displayed in Figure 3-40: *Eight-Hour Ozone Design Values for Monitors in the Denver-Aurora Area*. The Colorado monitors tagged for further review are highlighted in color while the other monitors in the Denver-Aurora CSA are in gray. The four nonattainment monitors tagged for further review have the highest eight-hour ozone design values in the Denver-Aurora CSA, ranging from 80 ppb at National Renewable Energy Labs to 75 ppb at Fort Collins West. The tagged maintenance monitor does not have valid eight-hour ozone in 2016, but its last valid eight-hour ozone design value, 79 ppb in 2013, was one of the five highest eight-hour ozone design values for that year. All other monitors except one, the Welch monitor, in the Denver-Aurora area, have eight-hour ozone design values below the 2015 ozone NAAQS. Overall, eight-hour ozone design values in the Denver-Aurora area have been decreasing from 2007 through 2016. Decreases observed are modest, ranging from a 2% to 10%.



**Figure 3-40: Eight-Hour Ozone Design Values for Monitors in the Denver-Aurora Area**

3.4.1.2 Monitored Elevated Ozone Days

To investigate the contribution of Texas emissions to ozone at the tagged Colorado monitors, days that had elevated ozone at each of the five tagged monitors were identified. Any day with a monitored daily maximum eight-hour average ozone concentration greater than 70 ppb was considered an elevated ozone day. From 2012 through 2016 the number of elevated ozone days at the Colorado monitors ranged from a high of 116 days at Rocky Flats to a low of 46 days at Highland Reservoir. In order to better characterize the ozone problem at the Colorado monitors and have more days with elevated ozone, the number of years evaluated was increased from five to ten. Using ten years of data more than doubled the number of elevated ozone days at some of the monitors, with a high of 237 days at Rocky Flats and a low of 78 days at Highland Reservoir. The number of elevated ozone days at each tagged monitor from the past 10 years is shown in Figure 3-41: *Number of Elevated Eight-Hour Ozone Days at the Tagged Colorado Monitors for the years 2007 through 2016*. Figure 3-41 shows that the five monitors seem to have similar trends with varying levels of severity. Trends in elevated ozone days overall appear to be decreasing, with a peak occurring in 2012. Over the past 10 years, all five tagged monitors in Colorado observed the highest number of elevated ozone days in 2012. The Rocky Flats monitor historically observed the most elevated ozone days until the most recent two years (2015 and 2016), when the National Renewable Energy Labs monitor observed the highest number of elevated ozone days.



**Figure 3-41: Number of Elevated Eight-Hour Ozone Days at the Tagged Colorado Monitors for the years 2007 through 2016**

3.4.1.3 Back Trajectory Analysis on Elevated Ozone Days

The elevated ozone days identified were used as a starting point to examine back trajectories from the tagged monitors. NOAA's HYbrid Single-Particle Lagrangian Integrated Trajectory (HYSPLIT) back trajectory model was used to run 72-hour back trajectories for each elevated ozone day at each tagged monitor. A test run of back trajectories for the top 10 modeled high ozone days showed that some endpoints reached Texas only after 72 hours; therefore, it was determined that 72 hours was an appropriate length of time to determine whether air from Texas reaches Colorado on a given day. The time of daily maximum one-hour ozone on the elevated eight-hour ozone day was used as the starting hour for each trajectory. If the maximum one-hour ozone occurred over multiple hours, then multiple trajectories were run, using each different hour as the starting hour. Three starting heights were used, 500 m AGL, 1000 m AGL, and 1500 m AGL.

To look for probable cases where pollution from Texas was transported to Colorado, back trajectories were filtered for the following two conditions: back trajectories that did not hit the surface (zero m AGL) at any time during the 72-hour run, and back trajectories that started within the HYSPLIT calculated mixing layer in Colorado. The filtering criteria ensured that the back trajectories used were those that capture air that would affect the ground level monitor. The total number of HYSPLIT back trajectories and the number of trajectories that meet the filtering criteria are

summarized in Table 3-13: *Number of HYSPLIT Back Trajectories at Each Tagged Colorado Monitor*.

**Table 3-13: Number of HYSPLIT Back Trajectories at Each Tagged Colorado Monitor**

| AQS ID | Site Name | Number of Back Trajectories | Number of Back Trajectories that Meet Filter Criteria | Percent of Back Trajectories that Meet Filter Criteria |
|--------|-----------|----------------------------|------------------------------------------------------|-------------------------------------------------------|
| 80050002 | Highland Reservoir | 282 | 189 | 67% |
| 80350004 | Chatfield State Park | 594 | 367 | 62% |
| 80590006 | Rocky Flats | 846 | 578 | 68% |
| 80590011 | National Renewable Energy Labs-NREL | 624 | 380 | 61% |
| 80690011 | Fort Collins-West | 663 | 434 | 65% |

The filtered back trajectories are displayed on the map in Figure 3-42: *HYSPLIT Back Trajectory Endpoints that Meet Filter Criteria from the Tagged Colorado Monitors*. For a trajectory (whether run forward or backward in time), the estimated location of the air parcel during each hour of the trajectory is referred to as an endpoint. The green endpoints represent an air parcel that is located above the mixing layer while the purple endpoints represent an air parcel that is located within the mixing layer. It is important to know which endpoints are located within the mixing layer because an endpoint in the mixing layer would demonstrate a clearer case of emissions at that location being transported to the starting location. Although it is difficult to see any detail for specific trajectories in the Colorado area, the map shows back trajectory end points that end in Texas. Out of the 1,948 back trajectories with 134,185 endpoints displayed in Figure 3-42, 116 back trajectories (6%) with a total of 2,019 endpoints (1.5%) reach Texas. Of those 2,019 endpoints, 912 are located within the mixing layer over Texas, meaning 0.68% of endpoints are located within the Texas mixing layer.



**Figure 3-42: HYSPLIT Back Trajectory Endpoints that Meet Filter Criteria from the Tagged Colorado Monitors**

Although most back trajectories do not reach Texas on elevated ozone days in Colorado, further analysis was necessary to indicate whether the days where trajectories that reached Texas had a significant impact on ozone levels in Colorado. To investigate further, the number of trajectories to reach Texas from Colorado were calculated for each year from 2007 through 2016. The number of trajectories reaching Texas from each monitor were then compared to the number of elevated eight-hour ozone days for each year. The results are shown in Figure 3-43: *Number of Trajectories that Reach Texas and the Number of Elevated Eight-Hour Ozone Days at Each Tagged Colorado Monitor.* Figure 3-43 shows that the number of trajectories that reach Texas from Colorado varies by year. Most years from 2007 through 2016 show fewer than five, and some show zero trajectories that reach Texas. Of the trajectories that reach Texas from Colorado, 66% occurred during 2011 and 2012. This spike does not appear to be a pattern that repeats frequently. There were also many more elevated eight-hour ozone days observed in 2012 compared to other years. This may indicate that there were some unusual meteorological patterns that occurred that year that caused a more severe ozone season. There are years where few, if any, trajectories reach Texas and the number of elevated ozone days still remained high. For example, National Renewable Energy Labs had over 15 elevated eight-hour ozone days in 2007, 2008, 2015, and 2016, but only one trajectory reached Texas over those four years combined.



**Figure 3-43: Number of Trajectories that Reach Texas and the Number of Elevated Eight-Hour Ozone Days at Each Tagged Colorado Monitor**

While the number of elevated ozone days can indicate the severity of an ozone season, the fourth-highest eight-hour ozone concentrations provide more information on how close the area is to attaining the standard. The fourth-highest eight-hour ozone values at the tagged Colorado monitors, along with the number of trajectories that reach Texas each year, are shown in Figure 3-44: *Fourth-Highest Eight-Hour Ozone and the Number of Trajectories that Reach Texas.* Overall, trends in the fourth-highest eight-hour ozone concentrations have only slightly decreased. The increase in trajectories that reach Texas in 2012 did not appear to increase the fourth-highest eight-hour ozone values at the tagged Colorado monitors much, if at all. The fourth-highest eight-

hour ozone values in 2015 and 2016 remained above 70 ppb, even though those years observed no trajectories that reached Texas.



**Figure 3-44: Fourth-Highest Eight-Hour Ozone and the Number of Trajectories that Reach Texas**

In summary, trajectory analysis of transport from Texas to Colorado indicates that emissions from Texas are unlikely to affect ozone concentrations in the mixing layer over Colorado on elevated ozone days. Although trajectory analysis can have uncertainty (Stein et al. 2017), the large data set examined greatly reduces the uncertainty related to small sample sizes. Filtering the back trajectories by only looking at trajectories during elevated ozone episodes, that start within Colorado's

mixing layer, that do not hit the surface, and that have endpoints within Texas' mixing layer is an attempt to find a clear case where emissions in Texas would affect the ozone in Colorado. Those filters showed that 6% of elevated ozone days in Colorado had trajectories that reached the mixing layer in Texas. Further analysis of the trajectories by year showed that 66% of days where trajectories reached the Texas mixing layer occurred in 2011 and 2012. There are many years where no trajectories reach Texas from Colorado. In the years where no trajectories reached Texas, the tagged monitors still observed a high number of elevated ozone days and fourth-highest eight-hour ozone concentrations above 70 ppb. Most importantly, the latest data (2015 and 2016) indicate that Texas was not upwind during any elevated ozone days at any of the five sites shown in Figure 3-44. Although air from Texas can reach Colorado, the air from Texas does not appear to significantly affect the ozone concentrations.

3.4.1.4 Texas Contributions on Projected Future Year Elevated Ozone Days

The previous sections showed that although there is possible transport of air parcels from Texas to the Colorado monitors on some historical monitored elevated ozone days, the probability of such transport is small. In addition to monitored elevated ozone days in the past, contributions from Texas on projected future year elevated ozone days were also evaluated. The subset of 2023 days with modeled MDA8 greater than 70 ppb was identified, and the average modeled Texas contributions for this subset of days were computed. Table 3-14: *Modeled Elevated Ozone Days in the Future Year at the Tagged Colorado Monitors* shows the number of days with modeled MDA8 greater than 70 ppb, the average eight-hour Texas ozone contribution, the average MDA8 for each of the tagged Colorado monitors, and the percentage of Texas contribution in the MDA8s.

**Table 3-14: Modeled Elevated Ozone Days in the Future Year at the Tagged Colorado Monitors**

| Site Name | AQS ID | Number of Future Elevated Days | Average Texas Contribution on Future Elevated Ozone Days (ppb) | Average MDA8 on Future Elevated Ozone Days (ppb) | Percentage of Texas Contribution in MDA8 |
|---|---|---|---|---|---|
| Chatfield State Park | 80350004 | 9 | 0.77 | 73.05 | 1.06% |
| Rocky Flats | 80590006 | 10 | 0.89 | 73.64 | 1.21% |
| National Renewable Energy Labs-NREL | 80590011 | 11 | 0.86 | 74.09 | 1.16% |
| Fort Collins-West | 80690011 | 2 | 0.56 | 73.06 | 0.77% |
| Highland Reservoir | 80050002 | 8 | 0.52 | 73.80 | 0.71% |

Table 3-14 shows that for the Colorado monitors, the expected average Texas contribution on projected future elevated ozone days is a small percentage of the projected average MDA8 on these days. The expected impact is not significant, since the average contribution is less than one ppb on very few days, especially when considering the uncertainties associated with model predictions.

### 3.4.1.5 Collective Interstate Contribution to the Future Design Value

The EPA has maintained that the nature of the interstate transport problem varies between the western and eastern states. In the EPA's 2015 Transport NODA, the EPA states "While the 1 percent screening threshold has been traditionally applied to evaluate upwind state linkages in eastern states where such collective contribution was identified, the EPA noted in the CSAPR Update Rule for the 2008 ozone NAAQS that, as to western states, there may be geographically specific factors to consider in determining whether the 1 percent screening threshold is appropriate. For certain receptors, where the collective contribution of emissions from one or more upwind states may not be a considerable portion of the ozone concentration at the downwind receptor, the EPA and states have considered, and could continue to consider, other factors to evaluate those states' planning obligation pursuant to the Good Neighbor provision" (FR 82, 1740). Although the TCEQ does not believe that 1% of the NAAQS is an appropriate threshold for determining significant contribution, it agrees that the collective contribution of interstate transport is an important factor in the overall evaluation. The EPA defines collective contribution as "...the total upwind states' contribution to ozone concentration (from linked[27] and unlinked states) based on modeling..."

The EPA has stated that the collective contribution metric is important to determine if interstate transport is a significant contributor to a monitor's nonattainment or maintenance problems.[28] The collective interstate contribution to the 2023 $DV_F$ for the tagged Colorado monitors was calculated. Table 3-15: *Collective Interstate Contribution to Future Design Value at Tagged Colorado Monitors* provides the percentage of interstate, intra-state, and background contributions to the future design values at the five tagged Colorado monitors.

---

[27] The EPA uses the term "linked" to refer to downwind monitors that have contributions to future design value greater than 1% of the NAAQS from an upwind state.

[28] In approving Nevada's Inter-State Transport SIP the EPA states "One such factor that the EPA considers relevant to determining the nature of a projected receptor's interstate transport problem is the magnitude of ozone attributable to transport from all upwind states collectively contributing to the air quality problem" (81 FR 87859).

**Table 3-15: Collective Interstate Contribution to Future Design Value at Tagged Colorado Monitors**

| Site Name | AQS ID | Percentage of 2023 $DV_F$ from Background Contribution | Percentage of 2023 $DV_F$ from Collective Interstate Contribution | Percentage of 2023 $DV_F$ from Intra-State Contribution |
|---|---|---|---|---|
| Chatfield State Park | 80350004 | 62.12% | 9.86% | 25.44% |
| Rocky Flats | 80590006 | 60.57% | 10.21% | 26.88% |
| National Renewable Energy Labs-NREL | 80590011 | 60.33% | 10.27% | 27.04% |
| Fort Collins-West | 80690011 | 67.42% | 9.32% | 20.88% |
| Highland Reservoir | 80050002 | 62.47% | 9.88% | 25.28% |

The collective interstate contribution at tagged Colorado monitors ranges from 9.32% to 10.27%. It is a small percentage and not as high as the collective interstate contribution percentages the EPA calculated for monitors in Eastern States, which ranged from 17% to 67%.[29] A significant portion of the tagged Colorado monitors' 2023 $DV_F$ is due to background emissions (sum of contributions from to biogenic, fires, and boundary conditions).

3.4.1.6 Direct Decoupled Method and Analysis of MDA8 Ozone Responsiveness to Texas Emissions

Direct Decoupled Method (DDM)[30] is a probing tool available in CAMx that estimates the responsiveness of ozone formation to small changes in any input parameter. The DDM method calculates for each grid cell in the domain for each simulation hour the first-order differential for ozone formation due to changes in a specific input parameter(s). DDM results can explain the responsiveness of ozone formation due to marginal changes of any input parameter. DDM results should be interpreted with care, since the method only calculates the first-order differential which assumes a linear response. Ozone formation is highly non-linear and therefore DDM results are only useful for a limited range of input perturbations, about ±15% of the input parameter value in a given simulation.

DDM was used to gauge the responsiveness of ozone formation to Texas $NO_x$ emissions at the tagged Colorado monitors. For regional ozone problems and long-range transport, $NO_x$ emissions play a major role. As part of the CSAPR final rule the EPA stated, "Authoritative assessments of ozone control approaches have concluded that, for reducing regional scale ozone transport, a $NO_x$ control strategy is most effective, whereas VOC reductions are generally most effective locally, in more dense urbanized areas" (76 FR 48222). For these reasons, the TCEQ focused on Texas $NO_x$

---

[29] "Technical Support Document Evaluation of the Arizona Infrastructure SIP for 2008 O3 Transport (CAA 110(a)(2)(D)), U.S. EPA, Region 9, March 15, 2016, page 8 and footnotes 26 and 27.
[30] CAMx User Guide, page 177 available at http://www.camx.com/files/camxusersguide_v6-40.pdf

emissions while using DDM to evaluate the responsiveness of ozone formation at the tagged Colorado monitors.

Because it is resource intensive to use the DDM tool, it was run for a subset of the episode months, July and August, for the 2023 future year. July and August were chosen because they had the highest number of the top 10 days that went into the 2023 $DV_F$ calculation for the tagged Colorado monitors. In addition to responsiveness to Texas $NO_x$ emissions, responsiveness to Colorado $NO_x$ emissions was also calculated at the tagged monitors. Since DDM calculates the responsiveness of ozone to $NO_x$ emissions, the DDM values can be negative, indicating the destruction of ozone due to $NO_x$ titration.

A series of figures showing the DDM results for each of the tagged Colorado monitors are presented below. Each figure depicts, for every hour of every day for the July and August episode months, the 2023 modeled eight-hour average of ozone responsiveness at a tagged monitor to Texas $NO_x$ emissions, Colorado $NO_x$ emissions, and $NO_x$ emissions from other sources excluding boundary conditions ("Other $NO_x$" emissions) as line graphs in blue, purple, and orange, respectively. The ozone responsiveness in ppb is shown on the primary axis to the left. In addition to the hourly eight-hour average ozone responsiveness, each figure has the hourly modeled 2023 eight-hour average ozone concentration in ppb for the July and August episode months, depicted by a green line graph with circle markers on the secondary axis to the right. The 2015 ozone NAAQS is shown as a black line. Both the ozone responsiveness and the modeled ozone are from the grid cell where the monitor is located.

Figure 3-45: *DDM Responsiveness of Ozone in July 2023 at Highland Reservoir* shows the responsiveness of ozone at the Highland Reservoir monitor (AQS ID: 80050002) to Texas $NO_x$ emissions, Colorado $NO_x$ emissions, and $NO_x$ emissions from other sources (excluding boundary conditions) in the rpo_12km domain for the month of July.



**Figure 3-45:  DDM Responsiveness of Ozone in July 2023 at Highland Reservoir**

In the month of July, Highland Reservoir (AQS ID: 80050002) had two elevated ozone days (July 11 and 22) and on both days, the modeled eight-hour ozone at the monitor is significantly more responsive to Colorado $NO_x$ and "Other $NO_x$" emissions than to Texas $NO_x$ emissions. This is a critical observation because the responsiveness of

ozone at this monitor to Texas NO$_x$ emissions remains flat throughout the month with little change between days with and without elevated ozone.

Figure 3-46: *DDM Responsiveness of Ozone in August 2023 at Highland Reservoir* shows the responsiveness of ozone at the Highland Reservoir monitor (AQS ID: 80050002) to Texas NO$_x$ emissions, Colorado NO$_x$ emissions, and NO$_x$ emissions from other sources in the rpo_12km domain (excluding boundary conditions) for the month of August.



**Figure 3-46: DDM Responsiveness of Ozone in August 2023 at Highland Reservoir**

Similar to the July results, the responsiveness of eight-hour ozone to Texas NO$_x$ emissions at Highland Reservoir (AQS ID: 80050002) is near zero and stays flat in the month of August. Figure 3-45 and Figure 3-46 show that the modeled eight-hour ozone at Highland Reservoir (AQS ID: 80050002) is not responsive to Texas NO$_x$ emissions, during the period studied.

Figure 3-47: *DDM Responsiveness of Ozone in July 2023 at Chatfield State Park* shows the responsiveness of ozone at Chatfield State Park (AQS ID 80350004) to Texas NO$_x$ emissions, Colorado NO$_x$ emissions, and NO$_x$ emissions from other sources in the rpo_12km domain (excluding boundary conditions) for the month of July while Figure 3-48: *DDM Responsiveness of Ozone in August 2023 at Chatfield State Park* does the same for the month of August. Chatfield State Park has fewer elevated ozone days than Highland Reservoir but shows a similar pattern of very limited responsiveness to Texas NO$_x$ emissions.



**Figure 3-47: DDM Responsiveness of Ozone in July 2023 at Chatfield State Park**



**Figure 3-48: DDM Responsiveness of Ozone in August 2023 at Chatfield State Park**

Figure 3-49: *DDM Responsiveness of Ozone in July 2023 at Rocky Flats* and Figure 3-50: *DDM Responsiveness of Ozone in August 2023 at Rocky Flats* show the responsiveness of ozone at Rocky Flat (AQS ID: 80590006) to Texas $NO_x$ emissions, Colorado $NO_x$ emissions, and $NO_x$ emissions from other sources in the rpo_12km domain (excluding boundary conditions) for the months of July and August, respectively.

Rocky Flats (AQS ID: 80590006) shows a small (approximately 2 ppb) responsiveness to Texas $NO_x$ emissions in mid to late July. However, when ozone at the monitor is responsive to Texas $NO_x$ emissions, elevated ozone was not observed except for a minor response on one day, July 23.



**Figure 3-49: DDM Responsiveness of Ozone in July 2023 at Rocky Flats**



**Figure 3-50: DDM Responsiveness of Ozone in August 2023 at Rocky Flats**

Figure 3-51: *DDM Responsiveness of Ozone in July 2023 at National Renewable Energy Labs-NREL* and Figure 3-52: *DDM Responsiveness of Ozone in August 2023 at National Renewable Energy Labs-NREL* show the responsiveness of ozone at National Renewable Energy Labs – NREL (AQS ID: 80590011) to Texas $NO_x$ emissions, Colorado $NO_x$ emissions, and $NO_x$ emissions from other sources in the rpo_12km domain (excluding boundary conditions) for the months of July and August, respectively. In this case, there appears to be some minor responsiveness to Texas' $NO_x$ emissions on two high ozone days in the third week of July, but similar to other Colorado monitors studied the degree of responsiveness is overwhelmed by the responsiveness to Colorado $NO_x$ and "Other $NO_x$" emissions.



**Figure 3-51: DDM Responsiveness of Ozone in July 2023 at National Renewable Energy Labs-NREL**



**Figure 3-52: DDM Responsiveness of Ozone in August 2023 at National Renewable Energy Labs-NREL**

Figure 3-53: *DDM Responsiveness of Ozone in July 2023 at Fort Collins-West* and Figure 3-54: *DDM Responsiveness of Ozone in August 2023 at Fort Collins-West* show the responsiveness of ozone at Fort Collins-West (AQS ID: 80690011) to Texas NO$_x$ emissions, Colorado NO$_x$ emissions, and NO$_x$ emissions from other sources in the rpo_12km domain (excluding boundary conditions) for the months of July and August, respectively. At Fort Collins-West the highest ozone days recorded in July or August were well below 71 ppb, so while ozone peak concentrations showed marginal responsiveness to Texas NO$_x$ emissions on a few days, clearly there was no significant contribution during this period.



**Figure 3-53:  DDM Responsiveness of Ozone in July 2023 at Fort Collins-West**



**Figure 3-54:  DDM Responsiveness of Ozone in August 2023 at Fort Collins-West**

Both at National Renewable Energy Labs-NREL (AQS ID: 80590011) and Fort Collins-West (AQS ID: 80690011), the same pattern of ozone responsiveness to Texas $NO_x$ emissions as the other three tagged Colorado monitors was observed.

In summary, though the DDM analysis may on occasion exhibit a limited responsiveness (two ppb or less) to Texas $NO_x$ emissions at the tagged Colorado monitors, the instances where this occurs are infrequent and rarely coincide with elevated ozone. Of the 62 days that DDM was estimated, the number of days that met the condition of having elevated ozone (MDA8 greater than 70 ppb) and appreciable responsiveness (greater than 1 ppb) ranged from three days at National Renewable Energy Labs-NREL (AQS ID: 80590011) and Rocky flats (AQS ID: 80590006) to zero days at Fort Collins-West (AQS ID: 80690011). In virtually all events, responsiveness to Texas $NO_x$ emissions is dwarfed by that of Colorado $NO_x$ and "Other $NO_x$" emissions.

3.4.1.7 Conclusion of Weight-of-Evidence Analysis of the Tagged Colorado Monitors

Analysis of the design value trends, number of monitored elevated ozone days, back trajectory analysis on elevated ozone days, the modeled contributions on expected elevated ozone days, total interstate contribution, and the responsiveness of ozone formation at the tagged Colorado monitors to Texas $NO_x$ emissions leads to the

conclusion that Texas emissions do not contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS at the tagged monitors in Colorado.

### 3.4.2 Arizona Monitor(s)

Modeling tagged the Chiricahua National Monument (AQS ID: 040038001) monitor in Cochise County, Arizona as a nonattainment monitor with a $TX_{DVF}$ of 1.06 ppb. A survey of the monitor's recent design values shows that the monitor is currently attaining the 2015 eight-hour ozone NAAQS with a design value of 68 and 65 ppb in 2015 and 2016, respectively. In addition, the monitor has never been designated a nonattainment monitor and has been in attainment of both the 1997 and 2008 eight-hour ozone standards. Figure 3-55: *Design Value Trends from 2007 through 2016 for Chiricahua National Monument (AQS ID: 040038001)* shows the design value trends for the monitor.



**Figure 3-55: Design Value Trends from 2007 through 2016 for Chiricahua National Monument (AQS ID: 040038001)**

Since the monitor is already in attainment of the 2015 Eight-Hour Ozone NAAQS, it can be concluded that emissions from Texas do not significantly contribute to nonattainment at this downwind monitor. As detailed in subsection 2.3.2, *Historical Emissions Inventory Trends*, anthropogenic ozone precursor emissions in Texas have decreased significantly due to several federal, state, and local regulations. Since ozone precursor emissions in Texas, particularly $NO_x$, are projected to stay capped or decrease and the design value at this monitor is currently significantly below the 2015 ozone NAAQS (65 ppb in 2016), emissions from Texas are not expected to interfere with maintenance of the 2015 ozone NAAQS.

### 3.4.3 California Monitors

Modeling tagged 10 monitors in California, as shown in Table 3-10 and Table 3-11, for further review to determine if emissions from Texas contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS at the

monitors. The tagged monitors are in the Los Angeles-South Coast Air Basin (South Coast) and the Los Angeles–San Bernardino (Western Mojave Desert) nonattainment areas.

After extensive analysis, it was concluded that Texas emissions do not significantly contribute to nonattainment or interfere with maintenance at the 10 California monitors tagged in Step 2. Analysis included review of the conceptual model developed by the South Coast Air Basin for eight-hour ozone at these monitors, and considered design value trends, number of monitored elevated ozone days, back trajectory analysis on elevated ozone days, average modeled contributions from modeled future elevated ozone days, and the collective interstate contribution to the future design values at these monitors. Details of the analysis are presented in the following sections.

### 3.4.3.1 Conceptual Model of Eight-Hour Ozone Formation at Tagged California Monitors

Both the South Coast and the Western Mojave Desert nonattainment areas have had persistent nonattainment issues and have been designated nonattainment for every federal one-hour and eight-hour ozone NAAQS (1997 and 2008). The ozone problems in the Western Mojave Desert nonattainment area are largely due to transport from the South Coast and San Joaquin Valley.[31] For the South Coast nonattainment area, the EPA,[32] quoting the South Coast Air Quality Management District, described the meteorological conditions that would contribute to ozone formation as follows:

> "The topography and climate of Southern California combine to make the Basin an area of high air pollution potential. During the summer months, a warm air mass frequently descends over the cool, moist marine layer produced by the interaction between the ocean's surface and the lowest layer of the atmosphere. The warm upper layer forms a cap over the cool marine layer and inhibits the pollutants in the marine layer from dispersing upward. In addition, light winds during the summer further limit ventilation. Furthermore, sunlight triggers the photochemical reactions which produce ozone. The region experiences more days of sunlight than any other major urban area in the nation except Phoenix."

> "The Basin's severe air pollution problem is a consequence of the combination of emissions from the nation's second largest urban area and meteorological conditions that are adverse to the dispersion of those emissions. The average wind speed for Los Angeles is the lowest of the nation's ten largest urban areas. In addition, the summertime maximum mixing height (an index of how well pollutants can be dispersed vertically in the atmosphere)

---

[31] "Technical Support Document for 2008 Ozone NAAQS Designations", Technical Analysis for Los Angeles –San Bernardino Counties (West Mojave Desert), pages 7 and 8 of 11. Accessed 8/22/2017 at https://www3.epa.gov/region9/air/ozone/pdf/R9_CA_AllTechAnalyses_FINAL2.pdf
[32] "Technical Support Document for 2008 Ozone NAAQS Designations", Technical Analysis for Los Angeles –South Coast Air Basin, page 7 of 13. Accessed 8/22/2017 at https://www3.epa.gov/region9/air/ozone/pdf/R9_CA_AllTechAnalyses_FINAL2.pdf

in Southern California averages the lowest in the U.S. The Southern California area is also an area with abundant sunshine, which drives the photochemical reactions which form pollutants such as ozone. In the Basin, high concentrations of ozone are normally recorded during the spring and summer months."

### 3.4.3.2 Eight-Hour Ozone Design Value Trends

Eight-hour ozone design value trends at the tagged California monitors along with the other monitors located in the Los Angeles CSA are displayed in Figure 3-56: *Eight-Hour Ozone Design Values for Monitors in the Los Angeles Area*. The tagged California monitors are highlighted in color while the other monitors in the Los Angeles CSA are in gray. The 10 monitors tagged in Step 2 had eight-hour ozone design values, ranging from 101 ppb to 80 ppb in 2016. The Los Angeles CSA had design values ranging from 108 ppb to 63 ppb in 2016, and thus, none of the 10 tagged monitors recorded the highest eight-hour ozone design value for the CSA in 2016. Eight-hour ozone design values in the area have decreased overall for the past 10 years. The 10 monitors tagged for further review have observed eight-hour ozone design value decreases from 2007 through 2016 ranging from 13% at Reseda (AQS ID: 60371201) to 5% at Victorville-Park Avenue (AQS ID: 60710306).



**Figure 3-56: Eight-Hour Ozone Design Values for Monitors in the Los Angeles Area**

### 3.4.3.3 Monitored Elevated Ozone Days

To investigate the Texas contribution to ozone in California, days that had elevated ozone were identified at each of the 10 monitors tagged in Step 2. Any day with a monitored MDA8 ozone concentration greater than 70 ppb was considered an elevated ozone day. The number of elevated ozone days at each tagged monitor from the past five years is shown in Figure 3-57: *Number of Elevated Eight-Hour Ozone Days at the Tagged California Monitors*. As Figure 3-57 shows, the trends in the number of elevated ozone days at the 10 monitors vary. Trends in elevated ozone days overall appear to be flat. The Redlands (AQS ID: 60714003) monitor consistently observed the largest number of elevated ozone days, which ranged from a low of 76 days in 2015 to a high of 98 days in 2012. The Pomona (AQS ID: 60371701), Barstow (AQS ID: 60710001), and Reseda (AQS ID: 60371201) monitors observed the least number of elevated ozone days in the area, with Barstow (AQS ID: 60710001) observing only 18, the lowest number, of elevated ozone days in 2015.



**Figure 3-57: Number of Elevated Eight-Hour Ozone Days at the Tagged California Monitors for the years 2012 through 2016**

### 3.4.3.4 Back Trajectory Analysis on Elevated Ozone Days

The elevated ozone days identified in the previous section were used as a starting point to examine back trajectories from the tagged monitors. NOAA's HYSPLIT back trajectory model was used to run 72-hour back trajectories for each elevated ozone

day at each tagged monitor. The time of daily maximum one-hour ozone on the elevated eight-hour ozone day was used as the starting hour for each trajectory. If the maximum one-hour ozone occurred over multiple hours, then multiple trajectories were run, using each different hour as the starting hour. Three starting heights were used, 500 m AGL, 1000 m AGL, and 1500 m AGL.

To look for probable cases where pollution from Texas was transported to California, back trajectories were filtered for the following two conditions: back trajectories that did not hit the surface (zero m AGL) at any time during the 72-hour run, and back trajectories that started within the HYSPLIT calculated mixing layer in California. The conceptual model of ozone formation outlined for these monitors discusses the significance of the mixing layer height. Per the conceptual model, the area has very low mixing heights and a low-level subsidence inversion that prevents air transported into the basin from mixing to the surface. The filtering criteria ensured that the back trajectories used are those that capture air that would affect the ground level monitor. Due to the geography and topography of the Los Angeles area, many back trajectories hit the ground after several hours back. In addition, on many days, the mixing layer at the tagged monitors was below 1,000 m AGL, which eliminated the trajectories that were run at higher altitudes. The total number of HYSPLIT back trajectories and the number of trajectories that meet the filtering criteria are summarized in Table 3-16: *Number of HYSPLIT Back Trajectories at Each Tagged California Monitor.*

**Table 3-16: Number of HYSPLIT Back Trajectories at Each Tagged California Monitor**

| AQS ID | Site Name | Number of Back Trajectories | Number of Back Trajectories that Meet Filter Criteria | Percent of Back Trajectories that Meet Filter Criteria |
|--------|-----------|-----------------------------|-------------------------------------------------------|--------------------------------------------------------|
| 60371201 | Reseda | 447 | 45 | 10% |
| 60371701 | Pomona | 567 | 44 | 8% |
| 60376012 | Santa Clarita | 1011 | 155 | 15% |
| 60658001 | Rubidoux | 936 | 201 | 21% |
| 60658005 | Mira Loma (Van Buren) | 894 | 0 | 0% |
| 60710001 | Barstow | 504 | 228 | 45% |
| 60710306 | Victorville-Park Avenue | 750 | 259 | 35% |
| 60711004 | Upland | 960 | 90 | 9% |
| 60714001 | Hesperia-Olive Street | 939 | 244 | 26% |
| 60714003 | Redlands | 1371 | 394 | 29% |

A large number of back trajectories were run for each tagged monitor, as shown in Table 3-16; however, few of the back trajectories met the filter criteria. One monitor, Mira Loma (AQS ID: 60658005) had no back trajectories out of 894 that met the criteria. These results show the difficulty in simulating conditions where an air parcel travels from Texas and ends within the mixing layer of the Los Angeles area on an

elevated ozone day. This may indicate that there are not many situations when air from Texas travels to the mixing layer over Los Angeles.

The endpoints for the filtered back trajectories are displayed on the map in Figure 3-58: *HYSPLIT Back Trajectory Endpoints that Meet Filter Criteria from the Tagged California Monitors*. The green endpoints represent an air parcel that is located above the mixing layer while the purple endpoints represent an air parcel that is located within the mixing layer. It is important to know which endpoints are located within the mixing layer because an endpoint in the mixing layer would demonstrate a clearer case of emissions at that location being transported to the starting location. Although it is difficult to see any trajectory detail in the California area, the map clearly shows very few back-trajectory end points end in Texas. Out of the 1,660 back trajectories with 113,467 endpoints displayed in Figure 3-58, only 10 back trajectories with a total of 59 endpoints reach Texas. Of those 10 back trajectories, only 2 back trajectories and 4 endpoints are located within the mixing layer over Texas. Of those two back trajectories that span from California to the mixing layer over Texas, one started at the Rubidoux (AQS ID: 60658001) monitoring site and the other started at the Upland (AQS ID: 60711004) monitoring site. This represents 0.3% of the elevated ozone days from 2012 through 2016 at each monitor.



**Figure 3-58: HYSPLIT Back Trajectory Endpoints that Meet Filter Criteria from the Tagged California Monitors**

While it appears that air from Texas can reach the Los Angeles area, based upon trajectory analysis, this transport seems to occur very infrequently.

In summary, trajectory analysis of transport from Texas to Los Angeles indicates that emissions from Texas are very unlikely to affect ozone concentrations in the mixing layer over Los Angeles on high ozone days. Although trajectory analysis can have uncertainty (Stein et al. 2017), the large data set examined greatly reduces the uncertainty related to small sample sizes. Filtering the back trajectories by only looking at trajectories during elevated ozone episodes that start within California's mixing layer, do not hit the surface, and have endpoints within Texas' mixing layer is an attempt to find a clear case where emissions in Texas could affect the ozone in California. Those filters showed that only 0.03% of days were affected at the Rubidoux and Upland monitors; therefore, Texas does not appear to hinder California's progress toward attaining the 2015 ozone NAAQS.

3.4.3.5 Texas Contributions on Projected Future Year Elevated Ozone Days

Contributions from Texas to projected future year elevated ozone days at the tagged California monitors were evaluated. Similar to the analysis for Colorado monitors, the

subset of 2023 days with modeled MDA8 greater than 70 ppb was identified and the average modeled Texas contributions for this subset of days for each of the 10 tagged California monitors was computed.

Table 3-17: *Modeled Elevated Ozone Days in the Future Year* shows the number of days with modeled MDA8 greater than 70 ppb, the average eight-hour Texas ozone contribution, the average MDA8 for each of the tagged California monitors, and the percentage of Texas contribution to the MDA8s.

**Table 3-17: Modeled Elevated Ozone Days in the Future Year**

| Site Name | AQS ID | Number of Elevated Days in 2023 | Average Texas Contribution on Elevated Ozone Days in 2023 (ppb) | Average MDA8 on Elevated Ozone Days in 2023 (ppb) | Percentage of Texas Contributions in MDA8 |
|---|---|---|---|---|---|
| Reseda | 60371201 | 9 | 0.53 | 73.33 | 0.73% |
| Pomona | 60371701 | 60 | 0.26 | 76.87 | 0.35% |
| Santa Clarita | 60376012 | 13 | 0.41 | 73.94 | 0.56% |
| Rubidoux | 60658001 | 57 | 0.30 | 77.67 | 0.39% |
| Mira Loma (Van Buren) | 60658005 | 57 | 0.30 | 77.67 | 0.39% |
| Barstow | 60710001 | 1 | 0.00[33] | 70.82 | 0.00% |
| Victorville-Park Avenue | 60710306 | 5 | 0.19 | 72.24 | 0.27% |
| Upland | 60711004 | 57 | 0.31 | 77.21 | 0.41% |
| Hesperia-Olive Street | 60714001 | 12 | 0.23 | 73.50 | 0.32% |
| Redlands | 60714003 | 54 | 0.29 | 77.12 | 0.38% |

Table 3-17 shows that the calculated average Texas contribution on projected future elevated ozone days is less than 1% of the projected average MDA8 at all of the monitors on these days.

3.4.3.6 Collective Interstate Contribution to the Future Design Value

The TCEQ calculated the collective interstate contributions[34] to the future design values for the tagged California monitors. Table 3-18: *Collective Interstate Contributions to Future Design Values at Tagged California Monitors* provides the percentage of interstate, intra-state, and background contributions to the future design values at the 10 tagged California monitors.

---

[33] The average Texas contribution on Future Elevated Ozone days for this monitor was 0.00035 ppb which was rounded to 0.00 ppb.

[34] The collective contribution metric was calculated using the same methodology as used to calculate Texas contribution in section 3.3.

**Table 3-18:   Collective Interstate Contributions to Future Design Values at Tagged California Monitors**

| AQS ID | Site Name | Percentage of 2023 DV$_F$ from Background Contribution | Percentage of 2023 DV$_F$ from Collective Interstate Contribution | Percentage of 2023 DV$_F$ from Intra-State Contribution |
|---|---|---|---|---|
| 60371201 | Reseda | 32.49% | 3.62% | 52.55% |
| 60371701 | Pomona | 30.88% | 4.05% | 54.87% |
| 60376012 | Santa Clarita | 37.41% | 3.60% | 49.00% |
| 60658001 | Rubidoux | 29.22% | 3.20% | 57.20% |
| 60658005 | Mira Loma (Van Buren) | 29.22% | 3.20% | 57.20% |
| 60710001 | Barstow | 58.53% | 4.58% | 30.64% |
| 60710306 | Victorville-Park Avenue | 36.58% | 3.98% | 49.55% |
| 60711004 | Upland | 30.74% | 4.22% | 54.69% |
| 60714001 | Hesperia-Olive Street | 32.09% | 3.97% | 53.35% |
| 60714003 | Redlands | 29.70% | 3.25% | 57.19% |

The maximum collective interstate contribution to the future design value is 4.58% at the Barstow (AQS ID: 60710001) monitor, which is insignificant compared to the intra-state contribution of 30.64%. A similar trend is seen at all 10 of the tagged monitors, thereby supporting the conclusion that interstate transport does not contribute significantly to nonattainment at these monitors.

3.4.3.7 Conclusion of the Weight-of Evidence Analysis of the Tagged California Monitors

Based on the detailed analysis at the tagged California monitors, the design value trends, back trajectory analysis on elevated ozone days, average Texas modeled contributions on projected future elevated ozone days, and collective interstate contributions to future design values, Texas emissions do not significantly contribute to nonattainment or interfere with maintenance at the 10 tagged California monitors.

**3.5 CONCLUSION**

Texas emissions do not contribute significantly to nonattainment or interfere with maintenance of the 2015 eight-hour ozone NAAQS at any downwind monitors. Modeling was used to project the nonattainment and maintenance status of downwind monitors in 2023. Among monitors projected to be in nonattainment or have maintenance issues, 16 monitors were tagged for further review, one in Arizona, 10 in California, and five in Colorado. Several factors were examined, such as design value trends, number of elevated ozone days, back trajectory analysis on elevated ozone days, modeled concentrations on future expected elevated ozone days, total interstate contributions at tagged monitors, and responsiveness of ozone to Texas emissions. Based on this rigorous analysis, it was concluded that emissions from Texas do not

contribute significantly to nonattainment or interfere with maintenance of the 2015 eight-hour ozone NAAQS at the tagged downwind monitors.

## 3.6 REFERENCES

Bash, J., Baker, K., Beaver, M., 2016. Evaluation of improved land use and canopy representation in BEIS v3.61 with biogenic VOC measurements in California, *Geoscientific Model Development*, 9, 2191–2207.

Henderson, B.H., Akhtar, F., Pye, H.O.T., Napelenok, S.L., Hutzell, W.T., 2014. A Database and Tool for Boundary Conditions for Regional Air Quality Modeling: Description and Evaluations, *Geoscientific Model Development*, **7**, 339-360.

Hoerling, M., Kumar, A., Dole, R., Nielson-Gammon, J., Eischeid, J., Perlwitz. J., Quan, X., Zhang, T., Pegion, P., and Chen, M., 2012. Anatomy of an Extreme Event. *Journal of Climate*., 29, 2811-2832, doi: 10.1175/JCLI-D-12-00270.1.

Mu, M., et al. (2011), Daily and 3-hourly variability in global fire emissions and consequences for atmospheric model predictions of carbon monoxide, *J. Geophys. Res.*,116, D24303, doi:10.1029/2011JD016245.

Sherwen, T., M.J., Evans, L.J., Carpenter, S.J., Andrews, R.T., Lidster, B., Dix, T.K., Koenig, R., Sinreich, I., Ortega, R., Volkamer, A., and Saiz-Lopez. 2016. Iodine's impact on tropospheric oxidants: a global model study in GEOS-Chem. *Atmospheric Chemistry and Physics*, 16(2), pp.1161-1186.

Simon, H., Baker, K.R., and Phillips, S.B., 2012. Compilation and interpretation of photochemical model performance statistics published between 2006 and 2012, 2012., *Atmospheric Environment*, v61, 124-139. doi: 10.1016/j.atmosenv.2012.07.012.

Stein, A.F., Draxler, R.R, Rolph, G.D., Stunder, B.J.B., Cohen, M.D., and Ngan, F., 2015. NOAA's HYSPLIT atmospheric transport and dispersion modeling system, *Bull. Amer. Meteor. Soc.*, 96, 2059-2077, http://dx.doi.org/10.1175/BAMS-D-14-00110.1.

Travis, K., Jacob, D.J., Fisher, J.A., Kim, P. S., Marais, E.A., Zhu, L., Yu, K., Miller, C.C., Yantosca, R.M., Sulprizio, M.P., Thompson, A.M., Wennberg, P.O., Crounse, J.D., St. Clair, J.M., Cohen, R.C., Laughner, J.L., Dibb, J.E., Hall, S.R., Ullmann, K., Wolfe, G.M., Pollack, I.B., Peischl, J., Neuman, J.A, Zhou, X. 2016. Why do models overestimate surface ozone in the Southeast United States? *Atmos. Chem. Phys.*, 16, 13561-13577, doi:10.5194/acp-16-13561-2016.

Yantosca, B., Sulprizio, M., Yannetti, M., Lundgren, L., Xu, J., 2015. GEOS-Chem v10-01 Online User's Guide. Atmospheric Chemistry Modeling Group, School of Engineering and Applied Sciences, Harvard University, Cambridge, MA. (Available at http://acmg.seas.harvard.edu/geos/doc/man/ ).

Yantosca, B. 2004. GEOS-CHEMv7-01-02 User's Guide, Atmospheric Chemistry Modeling Group, Harvard University, Cambridge, MA.

Yarwood, G., T. Sakulyanontvittaya, U. Nopmongcol, B. Koo. 2014. Ozone Depletion by Bromine and Iodine over the Gulf of Mexico. Final Report for Work Order No. 582-11-10365-FY14-12.

Wiedinmyer, C., Akagi, S. K., Yokelson, R. J., Emmons, L. K., Al-Saadi, J. A., Orlando, J. J., and Soja, A. J., 2011. The Fire INventory from NCAR (FINN): a high resolution global model to estimate the emissions from open burning, *Geosci. Model Dev.*, 4, 625-641, doi:10.5194/gmd-4-625-2011, 2011.

# CHAPTER 4: CONTROL STRATEGIES

## 4.1 INTRODUCTION

On November 16, 2017, the United States Environmental Protection Agency (EPA) made the first round of designations for the 2015 eight-hour ozone National Ambient Air Quality Standards (NAAQS), designating 205 of the 254 counties in Texas as attainment/unclassifiable, effective January 16, 2018 (82 *Federal Register* (FR) 54232). On June 4, 2018, the EPA published final designations for all remaining areas of the state except the eight counties comprising the San Antonio area (83 FR 25776). The EPA finalized nonattainment designations for Collin, Dallas, Denton, Ellis, Johnson, Kaufman, Parker, Tarrant, and Wise Counties in the Dallas-Fort Worth (DFW) area and Brazoria, Chambers, Fort Bend, Galveston, Harris, and Montgomery Counties in the Houston-Galveston-Brazoria (HGB) area. The EPA designated all remaining counties as attainment/unclassifiable. On March 19, 2018, the EPA sent a 120-day letter to the State of Texas regarding designations for the San Antonio area, proposing to designate Atascosa, Bandera, Comal, Guadalupe, Kendall, Medina, and Wilson Counties as attainment/unclassifiable and Bexar County as "at best" unclassifiable. Final designations for the San Antonio area are expected by July 17, 2018.

Attainment demonstration state implementation plan (SIP) revisions for any areas designated as nonattainment for the 2015 eight-hour ozone NAAQS would not be due until after this transport SIP revision is submitted to the EPA. Because designations for Texas under the 2015 eight-hour ozone NAAQS have not been completed, attainment demonstration SIP revision due dates have not been established and potential controls have not yet been contemplated. However, Texas has implemented stringent and innovative regulations that address emissions of nitrogen oxides ($NO_x$) and volatile organic compounds (VOC) from a wide variety of major and minor source types under previous NAAQS. This chapter describes control measures for the DFW and HGB nonattainment areas as well as other areas of the state.

## 4.2 EMISSIONS REDUCTIONS FROM ELECTRIC GENERATING UNITS (EGU)

### 4.2.1 Utility Electric Generation in Ozone Nonattainment Areas

The rules in 30 Texas Administrative Code (TAC) Chapter 117, Subchapter C establish $NO_x$ emission specifications for utility electric generation for each ozone nonattainment area in Texas. These rules apply to each electric generating facility that generates electric energy for compensation, and is owned or operated by a municipality or Public Utility Commission of Texas (PUCT) regulated utility or any of its successors, regardless of whether the successor is a municipality or is regulated by the PUCT.

In the HGB area, the owner or operator of each affected utility boiler, auxiliary steam boiler, or stationary gas turbine must demonstrate compliance with the $NO_x$ emission specifications through a system cap and participation in the HGB area Mass Emissions Cap and Trade (MECT) Program. Affected sources were required to comply with the MECT Program rules beginning January 1, 2002, and comply with the system cap requirements by March 31, 2004. Additional information about the MECT Program is available in Section 4.3.2: *Mass Emissions Cap and Trade (MECT) Program.*

In the DFW area, each utility boiler that is part of a large system[35] must meet a $NO_x$ emission rate of 0.033 pound per million British thermal units (lb/MMBtu) heat input, and each utility boiler that is part of a small system must meet a $NO_x$ emission rate of 0.06 lb/MMBtu heat input. Compliance with the $NO_x$ emission rates may be demonstrated on a daily average basis, a system-wide heat input weighted average basis for utility boilers that are part of a large system, or through the use of emission credits. Affected sources were required to comply with the rules by March 1, 2009.

In the Beaumont-Port Arthur (BPA) 1997 eight-hour ozone maintenance area, each utility boiler must meet a $NO_x$ emission rate of 0.10 lb/MMBtu heat input. Compliance with the $NO_x$ emission rates must be demonstrated on a daily average through the use of either a system cap or emission credits. Affected sources were required to comply with the rules by May 1, 2005.

### 4.2.2 Utility Electric Generation in East and Central Texas

The rules in 30 TAC Chapter 117, Subchapter E, Division 1 limit $NO_x$ emissions from utility electric generation in Atascosa, Bastrop, Bexar, Brazos, Calhoun, Cherokee, Fannin, Fayette, Freestone, Goliad, Gregg, Grimes, Harrison, Henderson, Hood, Hunt, Lamar, Limestone, Marion, McLennan, Milam, Morris, Nueces, Parker, Red River, Robertson, Rusk, Titus, Travis, Victoria, and Wharton Counties. The rules apply to each utility electric power boiler and stationary gas turbine (including duct burners used in turbine exhaust ducts) that generate electric energy for compensation; is owned by an electric cooperative, independent power producer, municipality, river authority, or public utility; and was placed into service before December 31, 1995. Utility electric power boilers must meet a $NO_x$ emission rate of 0.14 lb/MMBtu for gas-fired units and 0.165 lb/MMBtu for coal-fired units. Stationary gas turbines (including duct burners used in turbine exhaust ducts) must meet an annual average $NO_x$ emission rate of 0.14 lb/MMBtu for units subject to Texas Utilities Code (TUC), §39.264 (except §39.264(i)) or 0.15 lb/MMBtu for units not subject to TUC, §39.264 and units designated in accordance with TUC, §39.264(i). Compliance with the $NO_x$ emission rates is based on average heat input for a calendar year. Affected sources were required to comply with the rules by May 1, 2005.

### 4.2.3 Senate Bill 7 (76th Texas Legislature)

Senate Bill (SB) 7 from the 1999 76th Texas Legislature, requires grandfathered, or unpermitted, electric generating facilities (EGFs) and other EGFs that choose to participate to achieve a 50% reduction in $NO_x$ emissions and a 25% reduction in sulfur dioxide ($SO_2$) emissions from the 1997 emission levels. The reductions were implemented via participation in a cap and trade program in which participating EGFs are required to surrender allowances equivalent to the actual emissions each control period. For grandfathered EGFs, the allowance allocations were determined using the following emission rates: 0.14 lb $NO_x$/MMBtu and 1.38 lb $SO_2$/MMBtu in the East Texas region, and 0.195 lb $NO_x$/MMBtu in the West Texas and El Paso regions. For electing EGFs, the allowance allocations were equal to the emissions reported to the EPA's Acid

---

[35] A large utility system is defined in 30 TAC Chapter 117 as: all boilers, auxiliary steam boilers, and stationary gas turbines that are located in the DFW eight-hour ozone nonattainment area, and were part of one electric power generating system on January 1, 2000, that had a combined electric generating capacity equal to or greater than 500 megawatts.

Rain Program in 1997, or if unavailable, by a method approved by the executive director not to exceed any annual emission limitation authorized under Chapter 116, Subchapter B or an applicable state or federal requirement. There are no coal-fired EGFs located in the West Texas and El Paso regions that are subject to the Emissions Banking and Trading Allowances Program. The SB 7 requirements were implemented through rules in 30 TAC Chapter 101, Subchapter H, Division 2 and became effective January 11, 2000. The initial control period for this program began on May 1, 2003.

## 4.3 EMISSION REDUCTIONS FROM OTHER SOURCES

### 4.3.1 East Texas Engines

The rules in 30 TAC Chapter 117, Subchapter E, Division 4 limit $NO_x$ emissions from certain engines located in Anderson, Brazos, Burleson, Camp, Cass, Cherokee, Franklin, Freestone, Gregg, Grimes, Harrison, Henderson, Hill, Hopkins, Hunt, Lee, Leon, Limestone, Madison, Marion, Morris, Nacogdoches, Navarro, Panola, Rains, Robertson, Rusk, Shelby, Smith, Titus, Upshur, Van Zandt, and Wood Counties. The rules apply to stationary, gas-fired, reciprocating internal combustion engines rated 240 horsepower (hp) and larger. Rich-burn gas-fired internal combustion engines rated less than 500 hp must limit $NO_x$ emissions to 1.0 grams per horsepower-hour (g/hp-hr). Rich-burn engines rated 500 hp or greater must limit $NO_x$ emissions to 0.60 g/hp-hr for landfill gas-fired engines or 0.50 g/hp-hr for all other rich-burn engines. Affected sources were required to comply with the rules by March 1, 2010.

The East Texas combustion rules reduce $NO_x$ emissions and ozone air pollution transport into the DFW area. While these rules are part of the May 2007 DFW Attainment Demonstration SIP Revision for the 1997 eight-hour ozone NAAQS, the Northeast Texas area also benefits from $NO_x$ reductions resulting from the rules. Using photochemical modeling sensitivity studies, the Texas Commission on Environmental Quality (TCEQ) estimated that implementation of the rules results in an overall reduction of approximately 22.4 tons per day (tpd) of $NO_x$ emissions in the 33 counties subject to the rules by March 1, 2010. The TCEQ estimated the rules benefit the DFW area by reducing ozone by an average of 0.1 to 0.2 parts per billion.

### 4.3.2 Mass Emissions Cap and Trade (MECT) Program

The MECT Program rules in 30 TAC Chapter 101, Subchapter H, Division 3 establish a mandatory annual $NO_x$ emission cap on sites in the HGB 1997 eight-hour ozone nonattainment area that are either a major source of $NO_x$ with facilities subject to the $NO_x$ emissions specifications in 30 TAC §117.310 or §117.1210, or have an uncontrolled design capacity to emit at least 10.0 tons per year (tpy) of $NO_x$ from facilities subject to 30 TAC §117.2010. Affected facilities include: utility boilers, auxiliary steam boilers, or stationary gas turbines; industrial, commercial, or institutional boilers and process heaters; stationary gas turbines; stationary internal combustion engines; fluid catalytic cracking units (including carbon monoxide boilers, carbon monoxide furnaces, and catalyst regenerator vents); boilers and industrial furnaces that were regulated as existing facilities by the EPA under 40 Code of Federal Regulations Part 266, Subpart H (as in effect on June 9, 1993); duct burners used in turbine exhaust ducts; pulping liquor recovery furnaces; lime kilns; lightweight aggregate kilns; heat treating furnaces and reheat furnaces; magnesium chloride fluidized bed dryers; and incinerators.

The MECT Program cap is enforced by the allocation, trading, and banking of allowances. An allowance is the equivalent of 1.0 ton of $NO_x$ emissions. The MECT Program cap was implemented on January 1, 2002 at historical emission levels with mandatory $NO_x$ reductions increasing over time until achieving the final cap on April 1, 2007. Affected facilities that do not meet the criteria for receiving an allocation of allowances must use allowances allocated to facilities already participating in the program to cover annual $NO_x$ emissions. The projected 2018 MECT cap is 39,866.1 tpy of $NO_x$ emissions.

### 4.3.3 Highly Reactive Volatile Organic Compounds (HRVOC) Rules and HRVOC Emissions Cap and Trade (HECT) Program

The HRVOC rules in 30 TAC Chapter 115, Subchapter H are performance-based, emphasizing monitoring, recordkeeping, reporting, and enforcement rather than establishing individual unit emission rates. The rules apply to HRVOC emissions from flares, process vents, cooling towers, and fugitive emission sources. In addition to the monitoring requirements, affected sources in Harris County must meet an annual HRVOC emission cap and a site-wide short-term HRVOC limit of 1,200 lb/hour from any flare, vent, pressure relief valve, cooling tower, or any combination thereof. Affected sources in Harris County must demonstrate compliance with these HRVOC emission limits through participation in the HECT Program.

The HECT Program rules in 30 TAC Chapter 101, Subchapter H, Division 6 establish a mandatory annual HRVOC emission cap on sites in Harris County with the potential to emit greater than 10.0 tpy of HRVOC from facilities subject to 30 TAC Chapter 115, Subchapter H, Division 1 or Division 2. These facilities include vent gas streams, flares, and cooling tower heat exchange systems. Affected sites in Harris County are required to participate in the HECT Program. The program was implemented on January 1, 2007.

The HECT Program cap is enforced by the allocation, trading, and banking of allowances. An allowance is the equivalent of 1.0 ton of HRVOC emissions. The HECT Program cap was established at a level demonstrated as necessary to allow the HGB area to attain the one-hour ozone standard along with a 5% compliance margin to account for potential emissions variations. The total initial cap was 3,451.5 tpy.

Allowances allocated from 2007 through 2010 were based on historical levels of activity reported by affected sites. For 2011 and beyond, a site's allocation was determined by multiplying the total HECT cap by an industry-sector factor and a site-specific factor. The industry-sector factor was determined by grouping sites into sectors and determining each site's proportion based on actual emissions. The site-specific factor was based on a site's uncontrolled emissions as a proportion of the total uncontrolled emissions from all sites in that industry sector. The reallocation includes a mandatory 10% cap reduction implemented during 2014, with additional 5% reductions implemented at the start of each control period for 2015, 2016, and 2017. The final HECT Program cap is set at 2,588.6 tpy for 2017 and all subsequent control periods. Affected sites that do not receive an allocation of allowances must obtain and use allowances allocated to sites already participating in the program to cover annual HRVOC emissions.

### 4.3.4 Cement Kilns

The rules in 30 TAC Chapter 117, Subchapter E, Division 1 limit $NO_x$ emissions from cement kilns in Bexar, Comal, Ellis, Hays, and McLennan Counties. The rules require cement kilns in Bexar, Comal, Hays, and McLennan Counties to reduce $NO_x$ emissions 30% below 1996 levels or to meet a $NO_x$ emissions cap of 6.0 pounds of $NO_x$ per ton of cement clinker produced (lb $NO_x$/ton of clinker) for wet kilns; 5.1 lb $NO_x$/ton of clinker for dry kilns; 3.8 lb $NO_x$/ton of clinker for preheater kilns; and 2.8 lb $NO_x$/ton of clinker for preheater-precalciner or precalciner kilns. Affected sources were required to comply with the rules by May 1, 2005. The rules also require cement kilns located in Ellis County to meet an ozone season $NO_x$ emission source cap.

Ash Grove Cement Company operated three kilns in Ellis County, with an established source cap under §117.3123 of 4.4 tpd. However, a 2013 consent decree between Ash Grove and the EPA required by September 10, 2014 the shutdown of two kilns and reconstruction of kiln #3 with selective non-catalytic reduction (SNCR) with an emission limit of 1.5 lb $NO_x$/ton of clinker and a 12-month rolling tonnage limit for $NO_x$ of 975 tpy. The reconstructed kiln is a dry kiln with year-round SNCR operation. The redesign allows 949,000 tpy of clinker, or 1.95 tpd of $NO_x$, which is well below the 4.4 tpd source cap. Ash Grove's enforceable limit continues to be 4.4 tpd, although actual emissions are expected to be below the consent decree limit. Any modifications or new construction would be required to meet nonattainment new source review with best available control technology requirements, and would be subject to the same 1.5 lb $NO_x$/ton of clinker emission limit in the New Source Performance Standards for Portland Cement Plants. It would also be subject to other regulatory requirements, including the National Emission Standards for Hazardous Air Pollutants for the Portland Cement Manufacturing Industry.

TXI Operations, LP currently operates one dry preheater/precalciner kiln #5. The permitted capacity of this kiln is 2,800,000 tons of clinker per year, and it has a permitted emission factor of 1.95 lb $NO_x$/ton of clinker. Based on these permit limits, this kiln is therefore limited to a maximum of 7.48 tpd $NO_x$, compared to the current §117.3123 source cap of 7.9 tpd $NO_x$. Kiln #5 typically operates well below the source cap, at an average emission factor below 1.5 lb $NO_x$/ton of clinker.

## 4.4 ADDITIONAL MEASURES

### 4.4.1 SmartWay Transport Partnership and the Blue Skyway Collaborative

Among its various efforts to improve air quality in Texas, the TCEQ continues to promote two voluntary programs in cooperation with the EPA: SmartWay Transport Partnership and Blue Skyways Collaborative.

The SmartWay Transport Partnership is a market-driven partnership aimed at helping businesses move goods in the cleanest most efficient way possible. This is a voluntary EPA program primarily for the freight transport industry that promotes strategies and technologies to help improve fleet efficiency while also reducing air emissions.

There are over 3,000 SmartWay partners in the U.S., including most of the nation's largest truck carriers, all the Class 1 rail companies, and many of the top Fortune 500 companies. Since its founding, SmartWay has reduced oil consumption by 170.3 million barrels and prevented the release of 1,458,000 tons of $NO_x$ and 59,000 tons of

particulate matter into the atmosphere.[36] Ports in the U.S. rely on SmartWay's Port Drayage Truck program to help reduce pollution in and around major national ports. The Port of Houston Authority's (PHA) partnership with the Environmental Defense Fund and the Houston-Galveston Area Council (H-GAC) in the Port Drayage Truck Bridge Loan Program received $9 million from the EPA's Diesel Emissions Reduction Act (DERA) SmartWay Program in 2009. On average, four trucks a month, or about 50 trucks a year, were approved for replacement funding.

In April 2015, the EPA awarded the PHA with a DERA grant of nearly $900,000. This grant award, with matching funds of $1,669,560, had a total commitment of more than $2.5 million. A total of 24 trucks were replaced that operate at the Port of Houston. This included replacing 13 on-road over the road trucks that are only used inside the PHA's Turning Basin terminal. The replacement trucks were on-road terminal tractors, with model year 2015 engines, which are built and designed to work on marine terminals. The other 11 trucks replaced with this grant were older on-road terminal tractors that operate in and around PHA's Barbours Cut and Bayport container terminals. The replacements for these trucks were also on-road terminal tractors with model year 2016 engines.

In February 2015, the EPA awarded the PHA with a DERA grant of nearly $900,000. This grant award, with matching funds of $900,000, had a total commitment of $1.8 million. It is expected, that at the end of this grant, 17 drayage trucks will be replaced. The funding will provide for replacement trucks powered by certified engines that are model year 2011 or newer, which are estimated to be 90% cleaner. These drayage trucks operate in the Port of Houston and along the Houston Ship Channel. The replacement trucks will also have Global Positioning System units to collect data on idling and port operations, which will allow fleet owners and operators to gauge opportunities for additional fuel savings and emissions reduction.

Approximately 170 Texas companies are SmartWay partners. The SmartWay Transport Partnership will continue to benefit the HGB area by reducing emissions as more companies and affiliates join, and additional idle reduction, trailer aerodynamic kits, low-rolling resistance tire, and retrofit technologies are incorporated into SmartWay-verified technologies.

The Blue Skyways Collaborative was created to encourage voluntary air emission reductions by planning or implementing projects that use innovations in diesel engines, alternative fuels, and renewable energy technologies applicable to on-road and non-road sources. The Blue Skyways Collaborative partnerships include international, federal, state, and local governments, non-profit organizations, environmental groups, and private industries.

### 4.4.2 Energy Efficiency and Renewable Energy (EE/RE) Measures

Energy efficiency (EE) measures are typically programs that reduce the amount of electricity and natural gas consumed by residential, commercial, industrial, and municipal energy consumers. Examples of EE measures include: increasing insulation in homes; installing compact fluorescent light bulbs; and replacing motors and pumps

---

[36] https://www.epa.gov/smartway/learn-about-smartway

with high efficiency units. Renewable energy (RE) measures include programs that generate energy from resources that are replenished or are otherwise not consumed as with traditional fuel-based energy production. Examples of renewable energy include wind energy and solar energy projects.

Texas leads the nation in RE generation from wind. As of the first quarter 2018, Texas has 22,799 megawatts (MW) of installed wind generation capacity,[37] 25% of all installed wind capacity in the United States (U.S.). Texas' total net electrical generation from renewable wind generators in 2016 was 57.5 million megawatt-hours (MWh), approximately 25% of the total wind net electrical generation for the U.S. In 2017, total net electrical generation from renewable wind generators in Texas was 67.0 million MWh,[38] approximately 17% more than in 2016.

While EE/RE measures are beneficial and do result in lower overall emissions from fossil fuel-fired power plants in Texas, emission reductions resulting from these programs are not explicitly included in photochemical modeling for SIP purposes because local efficiency or renewable energy efforts may not result in local emissions reductions or may be offset by increased demand in electricity. The complex nature of the electrical grid makes accurately quantifying emission reductions from EE/RE measures difficult. At any given time, it is impossible to determine exactly where a specific user's electricity was produced.

While specific emission reductions from EE/RE measures are not provided in the SIP, persons interested in estimates of energy savings and emission reductions from EE/RE measures can access additional information and reports from the Texas A&M Engineering Experiment Station's Energy Systems Laboratory (ESL) website (http://esl.tamu.edu/). The reports submitted to the TCEQ regarding EE/RE measures are available under Texas Emissions Reduction Plan (TERP) Letters and Reports.

Finally, the Texas Legislature has enacted a number of EE/RE measures and programs. The following is a summary of Texas EE/RE legislation since 1999.

76th Texas Legislature, 1999

- SB 7
- House Bill (HB) 2492
- HB 2960

77th Texas Legislature, 2001

- SB 5
- HB 2277
- HB 2278
- HB 2845

---

[37] U.S. Department of Energy, National Renewable Energy Laboratory, https://windexchange.energy.gov/maps-data/321
[38] U.S. Department of Energy, Energy Information Administration, https://www.eia.gov/electricity/data/browser/

4-7

78th Texas Legislature, 2003

- HB 1365 (Regular Session)

79th Texas Legislature, 2005

- SB 20 (First Called Session)
- HB 2129 (Regular Session)
- HB 2481 (Regular Session)

80th Texas Legislature, 2007

- SB 12
- HB 66
- HB 3070
- HB 3693

81st Texas Legislature, 2009

- None

82nd Texas Legislature, 2011

- SB 898 (Regular Session)
- SB 924 (Regular Session)
- SB 981 (Regular Session)
- SB 1125 (Regular Session)
- SB 1150 (Regular Session)
- HB 51 (Regular Session)
- HB 362 (Regular Session)

83rd Texas Legislature, 2013

- None

84th Texas Legislature, 2015

- SB 1626
- HB 1736

85th Texas Legislature, 2017

- HB 1571 (Regular Session)

*Renewable Energy*

SB 5, 77th Texas Legislature, 2001, set goals for political subdivisions in affected counties to implement measures to reduce energy consumption from existing facilities by 5% each year for five years from January 1, 2002 through January 1, 2006. In 2007, the 80th Texas Legislature passed SB 12, which extended the timeline set in SB 5

through 2007 and made the annual 5% reduction a goal instead of a requirement. The State Energy Conservation Office (SECO) is charged with tracking the implementation of SB 5 and SB 12. Also during the 77th Texas Legislature, the ESL, part of the Texas Engineering Experiment Station, Texas A&M University System, was mandated to provide an annual report on EE/RE efforts in the state as part of the TERP under Texas Health and Safety Code (THSC), §388.003(e).

The 79th Texas Legislature, 2005, Regular and First Called Sessions, amended SB 5 through SB 20, HB 2129, and HB 2481 to add, among other initiatives, renewable energy initiatives that require: 5,880 MW of generating capacity from renewable energy by 2015; the TCEQ to develop a methodology for calculating emission reductions from renewable energy initiatives and associated credits; the ESL to assist the TCEQ in quantifying emissions reductions from EE/RE programs; and the PUCT to establish a target of 10,000 MW of installed renewable technologies by 2025. Wind power producers in Texas exceeded the renewable energy generation target by installing over 10,000 MW of wind electric generating capacity by 2010.

HB 2129, 79th Texas Legislature, 2005, Regular Session, directed the ESL to collaborate with the TCEQ to develop a methodology for computing emission reductions attributable to use of RE and for the ESL to annually quantify such emission reductions. HB 2129 directed the Texas Environmental Research Consortium to use the Texas Engineering Experiment Station to develop this methodology. With the TCEQ's guidance, the ESL produces an annual report, *Statewide Air Emissions Calculations from Energy Efficiency, Wind and Renewables*, detailing these efforts.

In addition to the programs discussed and analyzed in the ESL report, local governments may have enacted measures beyond what has been reported to SECO and the PUCT. The TCEQ encourages local political subdivisions to promote EE/RE measures in their respective communities and to ensure these measures are fully reported to SECO and the PUCT.

SB 981, 82nd Texas Legislature, 2011, Regular Session, allows a retail electric customer to contract with a third party to finance, install, or maintain a distributed renewable generation system on the customer's side of the electric meter, regardless of whether the customer owns the installed system. SB 981 also prohibits the PUCT from requiring registration of the system as an electric utility if the system is not projected to send power to the grid.

HB 362, 82nd Texas Legislature, 2011, Regular Session, helps property owners install solar energy devices such as electric generating solar panels by establishing requirements for property owners associations' approval of installation of solar energy devices. HB 362 specifies the conditions that property owners associations may and may not deny approval of installing solar energy devices.

SB 1626, 84th Texas Legislature, 2015, modifies the provisions established by HB 362 from the 82nd Texas Legislature, 2011, Regular Session, regarding property owners associations' authority to approve and deny installations of solar energy devices such as electric generating solar panels. HB 362 included an exception that allowed developers to prohibit installation of solar energy devices during the development

period. SB 1626 limits the exception during the development period to developments with 50 or fewer units.

*Residential and Commercial Building Codes and Programs*

THSC, Chapter 388, Texas Building Energy Performance Standards, as adopted in SB 5 of the 77th Texas Legislature, 2001, Regular Session, states in §388.003(a) that single-family residential construction must meet the energy efficiency performance standards established in the energy efficiency chapter of the International Residential Code. The Furnace Pilot Light Program includes energy savings accomplished by retrofitting existing furnaces. Also included is a January 2006 federal mandate raising the minimum Seasonal Energy Efficiency Ratio (SEER) for air conditioners in single-family and multi-family buildings from 10 to 13.

THSC, Chapter 388, as adopted in SB 5 of the 77th Texas Legislature, 2001, states in §388.003(b) that non-single-family residential, commercial, and industrial construction must meet the energy efficiency performance standards established in the energy efficiency chapter of the International Energy Conservation Code.

HB 51, 82nd Legislature, 2011, Regular Session, requires municipalities to report implementation of residential and commercial building codes to SECO.

HB 1736, 84th Texas Legislature, 2015, updates THSC §388.003 to adopt, effective September 1, 2016, the energy efficiency chapter of the International Residential Code as it existed on May 1, 2015. HB 1736 also establishes a schedule by which SECO could adopt updated editions of the International Residential Code in the future, not more often than once every six years.

*Federal Facility EE/RE Projects*

Federal facilities are required to reduce energy use by Presidential Executive Order 13123 and the Energy Policy Act of 2005 (Public Law 109-58 EPACT20065).

*Political Subdivisions Projects*

SECO funds loans for energy efficiency projects for state agencies, institutions of higher education, school districts, county hospitals, and local governments. Political subdivisions in nonattainment and affected counties are required by SB 5, 77th Texas Legislature, 2001, to report EE/RE projects to SECO. These projects are typically building systems retrofits, non-building lighting projects, and other mechanical and electrical systems retrofits such as municipal water and waste water treatment systems.

*Electric Utility Sponsored Programs*

Utilities are required by SB 7, 76th Texas Legislature, 1999, and SB 5, 77th Texas Legislature, 2001, to report demand-reducing energy efficiency projects to the PUCT (see THSC, §386.205 and Texas Utilities Code (TUC), §39.905). These projects are typically air conditioner replacements, ventilation duct tightening, and commercial and industrial equipment replacement.

SB 1125, 82nd Texas Legislature, 2011, Regular Session, amended the TUC, §39.905 to require energy efficiency goals to be at least 30% of annual growth beginning in 2013. The metric for the energy efficiency goal remains at 0.4% of peak summer demand when a utility program accrues that amount of energy efficiency. SB 1150, 82nd Texas Legislature, 2011, Regular Session, extended the energy efficiency goal requirements to utilities outside the Electric Reliability Council of Texas area.

*State Energy Efficiency Programs*

HB 3693, 80th Texas Legislature, 2007, amended the Texas Education Code, Texas Government Code, THSC, and TUC. The bill:

- requires state agencies, universities and local governments to adopt energy efficiency programs;

- provides additional incentives for electric utilities to expand energy conservation and efficiency programs;

- includes municipal-owned utilities and cooperatives in efficiency programs;

- increases incentives and provides consumer education to improve efficiency programs; and

- supports other programs such as revision of building codes and research into alternative technology and renewable energy.

HB 51, 82nd Texas Legislature, 2011, Regular Session, requires new state buildings and major renovations to be constructed to achieve certification under an approved high-performance design evaluation system.

HB 51 also requires, if practical, that certain new and renovated state-funded university buildings comply with approved high-performance building standards.

SB 898, 82nd Texas Legislature, 2011, Regular Session, extended the existing requirement for state agencies, state-funded universities, local governments, and school districts to adopt energy efficiency programs with a goal of reducing energy consumption by at least 5% per state fiscal year (FY) for 10 state FYs from September 1, 2011 through August 31, 2021.

SB 924, 82nd Texas Legislature, 2011, Regular Session, requires all municipally owned utilities and electric cooperatives that had retail sales of more than 500,000 MWh in 2005 to report each year to SECO information regarding the combined effects of the energy efficiency activities of the utility from the previous calendar year, including the utility's annual goals, programs enacted to achieve those goals, and any achieved energy demand or savings goals.

HB 1571, 85th Texas Legislature, 2017, Regular Session, expanded Education Code and Government Code provisions for local governmental entities, schools, and state agencies entering into energy saving performance contracts by authorizing the entities to use any available money to pay the provider for energy or water conservation

measures. Previously, only money other than money borrowed from the state could be used to pay for such conservation measures.

### 4.4.3 Consent Decrees with Refineries

The EPA's National Petroleum Refinery Initiative[39] has resulted in multi-issue settlement agreements with the nation's major petroleum refineries. As of October 2016, 112 refineries representing more than 95% of total domestic refining capacity are under settlement. The EPA consent decrees limit emissions from fluidized catalytic cracking units, sulfur recovery units, heaters and boilers, and flares. The EPA estimates that full implementation of the current settlements will result in more than 95,000 tpy of $NO_x$ emission reductions. The EPA also anticipates VOC emission reductions will result from consent decree requirements that reduce hydrocarbon flaring including:

- installing continuous emissions monitoring systems (CEMS) or predictive emissions monitoring systems;
- operating a flare gas recovery system to control continuous or routine flaring;
- limiting flaring to only process upset gases, fuel gas released as a result of relief valve leakage, or gas released due to a malfunction; and
- eliminating the routes of generated fuel gases and monitoring the flare with CEMS or a flow meter.

### 4.4.4 Clean Air Interstate Rule (CAIR) and Cross-State Air Pollution Rule (CSAPR)

In March 2005, the EPA issued CAIR to address EGU emissions that transport from one state to another. The rule incorporated the use of three cap and trade programs to reduce $SO_2$ and $NO_x$: the ozone-season $NO_x$ trading program, the annual $NO_x$ trading program, and the annual $SO_2$ trading program.

Texas was not included in the ozone season $NO_x$ program but was included for the annual $NO_x$ and $SO_2$ programs. As such, Texas was required to make necessary reductions in annual $SO_2$ and $NO_x$ emissions from new and existing EGUs to demonstrate that emissions from Texas do not contribute to nonattainment or interfere with maintenance of the 1997 particulate matter with an aerodynamic diameter less than or equal to a nominal 2.5 micrometers ($PM_{2.5}$) NAAQS in another state. CAIR consisted of two phases for implementing necessary $NO_x$ and $SO_2$ reductions. Phase I addressed required reductions from 2009 through 2014. Phase II was intended to address reductions in 2015 and thereafter.

In July 2006, the commission adopted a SIP revision to address how the state would meet emissions allowance allocation budgets for $NO_x$ and $SO_2$ established by the EPA to meet the federal obligations under CAIR. The commission adopted a second CAIR-related SIP revision in February 2010. This revision incorporated various federal rule revisions that the EPA had promulgated since the TCEQ's initial submittal. It also incorporated revisions to 30 TAC Chapter 101 resulting from legislation during the 80th Texas Legislature, 2007.

---

[39] https://www.epa.gov/enforcement/petroleum-refinery-national-case-results

A December 2008 court decision found flaws in CAIR but kept CAIR requirements in place temporarily while directing the EPA to issue a replacement rule. In July 2011, the EPA finalized CSAPR to meet Federal Clean Air Act (FCAA) requirements and respond to the court's order to issue a replacement program. Texas was included in CSAPR for ozone season $NO_x$, annual $NO_x$, and annual $SO_2$ due to the EPA's determination that Texas significantly contributes to nonattainment or interferes with maintenance of the 1997 eight-hour ozone NAAQS and the 1997 $PM_{2.5}$ NAAQS in other states. As a result of numerous EGU emission reduction strategies already in place in Texas, the annual and ozone season $NO_x$ reduction requirements from CSAPR were relatively small but still significant. CSAPR required an approximate 7% reduction in annual $NO_x$ emissions and less than 5% reduction in ozone season $NO_x$ emissions.

On August 21, 2012, the U.S. Court of Appeals for the District of Columbia (D.C.) Circuit vacated CSAPR. Under the D.C. Circuit Court's ruling, CAIR remained in place until the EPA developed a valid replacement.

The EPA and various environmental groups petitioned the Supreme Court of the United States to review the D.C. Circuit Court's decision on CSAPR. On April 29, 2014, a decision by the Supreme Court reversed the D.C. Circuit and remanded the case. On October 23, 2014, the D.C. Circuit lifted the CSAPR stay and on November 21, 2014, the EPA issued rulemaking, which shifted the effective dates of the CSAPR requirements to account for the time that had passed after the rule was stayed in 2011. Phase 1 of CSAPR took effect January 1, 2015 and Phase 2 began January 1, 2017. On July 28, 2015, the D.C. Circuit Court ruled that the 2014 annual $SO_2$ budgets and the 2014 ozone season $NO_x$ budgets for Texas were invalid because they required over control of Texas emissions, and remanded these budgets back to the EPA without vacatur.

On January 22, 2015, the EPA issued a memorandum to provide information on how it intends to implement FCAA interstate transport requirements for the 2008 ozone NAAQS. The EPA provided preliminary modeling results for 2018, which show contribution to nonattainment of the 2008 ozone NAAQS in the HGB area from sources outside of Texas. On July 23, 2015, the EPA issued a notice of data availability regarding updated ozone transport modeling results for a 2017 attainment year.

On June 27, 2016, the EPA issued a memorandum outlining the agency's approach for responding to the D.C. Circuit's July 2015 remand of the Phase 2 $SO_2$ emissions budgets, providing a choice of two paths for states with remanded budgets. Under the first path, states could voluntarily continue to participate in CSAPR at the state's current Phase 2 $SO_2$ and annual $NO_x$ budget levels through a SIP revision. Under the second path, if a state does not choose to participate in CSAPR, the EPA would initiate rulemaking by fall of 2016 to remove the state's sources from CSAPR's $SO_2$ and annual $NO_x$ programs and address any remaining interstate transport or regional haze obligations on a state-by-state basis. On November 10, 2016, the EPA published a proposed rule to remove Texas sources from the CSAPR $SO_2$ and annual $NO_x$ trading programs. The EPA also proposed to determine that, following withdrawal of the federal implementation plan (FIP) requirements, sources in Texas will not contribute significantly to nonattainment or interfere with maintenance of the 1997 $PM_{2.5}$ NAAQS in any other state and that the EPA therefore will have no obligation to issue new FIP requirements for Texas sources to address transport for the 1997 $PM_{2.5}$ NAAQS (81 FR

78954). The rule was finalized, effective immediately, on September 29, 2017 (82 FR 45481).

On September 7, 2016, the EPA signed the final CSAPR Update Rule for the 2008 eight-hour ozone standard. The EPA's modeling shows that emissions from within Texas no longer significantly contribute to downwind nonattainment or interference with maintenance for the 1997 eight-hour ozone NAAQS even without implementation of the original CSAPR ozone season $NO_x$ emissions budget. Accordingly, sources in Texas are no longer subject to the emissions budget calculated to address the 1997 eight-hour ozone NAAQS. However, this rule finalized a new ozone season $NO_x$ emissions budget for Texas to address interstate transport with respect to the 2008 eight-hour ozone NAAQS. This new budget became effective for the 2017 ozone season, the same period in which the Phase 2 budget that was invalidated by the court was scheduled to become effective.

CSAPR budgets for Texas may be subject to change in the future based on any additional rulemaking to address remanded budgets or changes resulting from further appeals.

### 4.4.5 Texas Emissions Reduction Plan (TERP)

The TERP program was created in 2001 by the 77th Texas Legislature to provide grants to offset the incremental costs associated with reducing $NO_x$ emissions from high-emitting heavy-duty internal combustion engines on heavy-duty vehicles, non-road equipment, marine vessels, locomotives, and some stationary equipment.

The primary emissions reduction incentives are awarded under the Diesel Emissions Reduction Incentive Program (DERI). DERI incentives are awarded to projects to replace, repower, or retrofit eligible vehicles and equipment to achieve $NO_x$ emission reductions in Texas ozone nonattainment areas and other counties identified as affected counties under the TERP program where ground-level ozone is a concern.

From 2001 through August 2017, $1,088,390,866 in DERI grants were awarded for projects projected to help reduce an estimated 179,427 tons of $NO_x$ over the life of the projects. This includes $448,288,693 going to activities in the HGB area and $377,422,749 to activities in the DFW area, with an estimated 78,445 tons of $NO_x$ reduced in the HGB area and 62,731 tons of $NO_x$ reduced in the DFW area over the life of the projects.

Three other incentive programs under the TERP program will result in the reduction in $NO_x$ emissions in the DFW and HGB areas, as well as other TERP areas.

The Drayage Truck Incentive Program was established in 2013 to provide grants for the replacement of drayage trucks operating in and from seaports and rail yards located in nonattainment areas. The name of this program was recently changed to the Seaport and Rail Yard Areas Emissions Reduction Program, and replacement or repower of cargo handling equipment was added to the eligible project list. Through August 2017, the program awarded $6,209,424, with an estimated 357 tons of $NO_x$ reduced over the life of the projects. In the HGB area the funding totaled $5.56 million, with projects estimated to reduce up to 325 tons of $NO_x$, over the life of the projects.

$542,061 was awarded to projects in the DFW area, with an estimated 27 tons of $NO_x$ reduced over the life of the projects.

The Texas Clean Fleet Program (TCFP) was established in 2009 to provide grants for the replacement of light-duty and heavy-duty diesel vehicles with vehicles powered by alternative fuels, including: natural gas, liquefied petroleum gas, hydrogen, methanol (85% by volume), or electricity. This program is for larger fleets, therefore applicants must commit to replacing at least 10 eligible diesel-powered vehicles with qualifying alternative fuel or hybrid vehicles. From 2009 through August 2017, over $58.16 million in TCFP grants were awarded for projects to help reduce an estimated 660 tons of $NO_x$ over the life of the projects. Over $22.9 million in TCFP grants were awarded to projects in the HGB area, with an estimated 216 tons of $NO_x$ reduced over the life of the projects, and over $16.3 million was awarded in the DFW area, with an estimated 245 tons of $NO_x$ reduced over the life of the projects.

The Texas Natural Gas Vehicle Grant Program (TNGVGP) was established in 2011 to provide grants for the replacement of medium-duty and heavy-duty diesel vehicles with vehicles powered by natural gas. This program may include grants for individual vehicles or multiple vehicles. The majority of the vehicle's operation must occur in the Texas nonattainment areas, other counties designated as affected counties under the TERP, and the counties in and between the triangular area between Houston, San Antonio, and DFW. From 2011 through August 2017, over $41.9 million in TNGVGP grants were awarded for projects to help reduce an estimated 1,493 tons of $NO_x$ over the life of the projects. Over $10.59 million in TNGVGP grants were awarded to projects in the HGB area, with an estimated 310 tons of $NO_x$ reduced over the life of the projects, and over $14.6 million was awarded to projects in the DFW area, with an estimated 529 tons of $NO_x$ reduced of the life of the projects.

### 4.4.6 Clean School Bus Program

HB 3469, 79th Texas Legislature, 2005, Regular Session, established the Clean School Bus Program, which provides monetary incentives for school districts in the state for reducing emissions of diesel exhaust from school buses through retrofit of older school buses with diesel oxidation catalysts, diesel particulate filters, and closed crankcase filters. As of August 2017, the TCEQ Clean School Bus Program had reimbursed approximately $34.6 million in grants for over 7,500 retrofit activities. This amount included $4.7 million in federal funds. As a result of recent legislative changes, this program will include replacement of older school buses with newer, lower-emitting models going forward.

### 4.4.7 Local Initiatives

Local strategies in the DFW nonattainment area are being implemented by the North Central Texas Council of Governments and local strategies in the HGB nonattainment area are being implemented by H-GAC. Due to the continued progress of these measures, additional air quality benefits are expected to be gained that will further reduce precursors to ground level ozone formation. A summary of local strategies for the DFW nonattainment area is included in Appendix H: *Local Initiatives Submitted by the North Central Texas Council of Governments* of the DFW 2008 Eight-Hour Ozone Attainment Demonstration for the 2017 Attainment Year and information on local

measures in the HGB nonattainment area is available on the Houston-Galveston Area Council website (http://www.h-gac.com/home/residents.aspx).

### 4.4.8 Voluntary Measures

While the oil and natural gas industry is required to install controls either due to state or federal requirements, the oil and natural gas industry has in some instances voluntarily implemented additional controls and practices to reduce VOC emissions from oil and natural gas operations in the DFW nonattainment area as well as other areas of the state. Examples of these voluntary efforts include: installing vapor recovery units on condensate storage tanks; using low-bleed natural gas actuated pneumatic devices; installing plunger lift systems in gas wells to reduce gas well blowdown emissions; and implementing practices to reduce VOC emissions during well completions (i.e., "Green Completions"). The EPA's Natural Gas STAR Program provides details on these and other practices recommended by the EPA as voluntary measures to reduce emissions from oil and natural gas operations and improve efficiency. Additional information on the EPA Natural Gas STAR Program may be found on the EPA's Natural Gas STAR Program webpage (http://www.epa.gov/gasstar/).

### 4.5 2008 OZONE NAAQS SIP REVISIONS ADOPTED SINCE 2015

All Texas SIP revisions are available on the Texas SIP Revisions webpage (http://www.tceq.texas.gov/airquality/sip/sipplans.html).

Since 2015, Texas has adopted several SIP revisions to further address the 2008 eight-hour ozone standard in the DFW and HGB areas. These latest SIP revisions and plans are detailed in this section.

### 4.5.1 DFW 2008 Eight Hour Ozone SIP Revisions

On June 3, 2015, the commission adopted two revisions to the Texas SIP for the DFW 2008 eight-hour ozone moderate nonattainment area: the DFW 2008 Eight-Hour Ozone Attainment Demonstration SIP Revision and the DFW 2008 Eight-Hour Ozone Reasonable Further Progress (RFP) SIP Revision. On December 7, 2016, the EPA published final approval of the DFW RFP SIP revision (81 FR 88124). Following proposal of these SIP revisions, the attainment date for the DFW 2008 eight-hour ozone moderate nonattainment area changed from December 31, 2018 to July 20, 2018 as a result of the December 23, 2014 D.C. Circuit Court ruling and the EPA's final 2008 ozone standard SIP requirements rule. Because the attainment year ozone season is the ozone season immediately preceding a nonattainment area's attainment date, the attainment year for the DFW moderate nonattainment area also changed from 2018 to 2017. As a result of the change in the attainment year, it was necessary for the TCEQ to develop a revised attainment demonstration. The DFW 2008 eight-hour ozone nonattainment area attainment demonstration SIP revision for the 2017 attainment year was adopted by the commission on July 6, 2016. On June 14, 2017, the EPA approved part of the attainment demonstration SIP revision that describes how FCAA requirements for vehicle inspection and maintenance and nonattainment new source review are met in the DFW area for the 2008 ozone NAAQS (82 FR 22291), effective on September 12, 2017. On September 22, 2017, the EPA conditionally approved the TCEQ's cement kiln $NO_x$ RACT analysis for TXI Operations, LP (82 FR 44320) predicated on the TCEQ's commitment to establish the permitted emission limit of 1.95 lb $NO_x$/ton of clinker for kiln #5 in the SIP. The TCEQ committed to the EPA in a letter

dated July 29, 2016 to prepare a SIP revision containing the 1.95 lb $NO_x$/ton of clinker limit for TXI Operations, LP and subsequently submit the SIP revision to the EPA if it is approved by the commission. In the September 22, 2017 final rule, the EPA also fully approved $NO_x$ RACT for all other affected sources in the 10-county DFW 2008 eight-hour ozone nonattainment area. The EPA published final approval of VOC RACT on December 21, 2017 (82 FR 60546). On May 3, 2018 the EPA proposed approval of the attainment demonstration, reasonably available control measures analysis, contingency measures plan, and motor vehicle emissions budgets (83 FR 19483).

### 4.5.2 HGB 2008 Eight-Hour Ozone SIP Revisions

On December 15, 2016, the commission adopted two revisions to the Texas SIP for the HGB 2008 eight-hour ozone moderate nonattainment area: the HGB 2008 Eight-Hour Ozone Attainment Demonstration SIP Revision (Non-Rule Project No. 2016-016-SIP-NR) and the HGB 2008 Eight-Hour Ozone RFP SIP Revision (Non-Rule Project No. 2016-017-SIP-NR). These SIP revisions were adopted to meet federal obligations for the 2008 eight-hour ozone NAAQS for a moderate nonattainment area with a July 20, 2018 attainment deadline and a 2017 attainment year. The attainment demonstration SIP revision incorporated revisions to 30 TAC Chapter 115 to update reasonably available control technology for VOC storage tanks in the HGB area. The SIP and rule revisions were submitted to the EPA on December 29, 2016. On May 15, 2017, the EPA approved Section 4.9 of the attainment demonstration SIP revision that describes how FCAA requirements for vehicle inspection and maintenance, nonattainment new source review, and emission statements for large stationary point sources are met in the HGB area for the 2008 ozone NAAQS (82 FR 22291). On June 6, 2017, the EPA published its finding that the motor vehicle emissions budgets in the HGB RFP SIP revision are adequate and must be used for transportation conformity determinations in the HGB area (82 FR 26091). These budgets became effective June 21, 2017. On May 29, 2018, the EPA published proposed approval of elements of the HGB attainment demonstration SIP revision, specifically, the attainment demonstration, reasonably available control measures analysis, contingency measures plan, and MVEBs (83 FR 24446).

### 4.6 CONCLUSIONS

Texas has numerous control measures in place to address ozone precursor emissions that are federally enforceable through SIP revisions. These measures have resulted in significant decreases in eight-hour ozone design values in Texas. Any additional control strategies necessary to address requirements for the 2015 eight-hour ozone NAAQS will be evaluated when attainment demonstration and RFP SIP revisions are developed and implemented.

## CHAPTER 5: PREVENTION OF SIGNIFICANT DETERIORATION AND VISIBILITY TRANSPORT [FCAA, §110(A)(2)(D)(i)(II)]

## 5.1 INTRODUCTION

The Federal Clean Air Act (FCAA), §110(a)(2)(D)(i)(II), requires states to submit a state implementation plan (SIP) revision that contains adequate provisions to prohibit any source or other type of emissions activity within the state from emitting any air pollutants in amounts that will interfere with measures required to meet an implementation plan for any other state related to prevention of significant deterioration (PSD) or interfere with measures required to meet the implementation plan for any other state related to regional haze and visibility. The following sections provide information on how Texas meets the requirements of FCAA, §110(a)(2)(D)(i)(II).

## 5.2 PSD

Texas has a SIP-approved PSD and nonattainment New Source Review (NSR) permitting program that contains requirements for sources of air pollutants to obtain an approved permit before beginning construction of a facility and before modifying an existing facility. The Texas Commission on Environmental Quality (TCEQ) has established rules governing the enforcement of control measures, including attainment plans and permitting programs that regulate construction and modification of stationary sources.

On January 6, 2014, the United States Environmental Protection Agency (EPA) published approval of Texas' public participation requirements for air quality permits (79 FR 551).[40] On November 10, 2014, the EPA published partial approval of the October 2010 and April 2014 SIP submittals that revise Texas' PSD program to provide for the regulation of greenhouse gas (GHG) emissions and clarify the applicability of best available control technology for all PSD permit applications (79 FR 66626).[41] The EPA also approved revisions to the NSR permitting program as consistent with federal requirements for PSD permitting of GHG emissions. Although the EPA originally disapproved the Texas infrastructure SIP for the 1997 eight-hour ozone, and for the 1997 and 2006 $PM_{2.5}$ National Ambient Air Quality Standards (NAAQS) for not containing provisions for the permitting of GHGs, on September 4, 2015 the EPA published a direct final rule in the *Federal Register* (FR) to correct the Code of Federal Regulations to reflect that Texas now has a SIP-approved GHG permitting program (80 FR 53467). The rule became effective November 3, 2015.

On June 12, 2015, in response to a petition for rulemaking from the Sierra Club, the EPA finalized a SIP call related to provisions in SIPs concerning how air agency rules in EPA-approved SIPs treat excess emissions during periods of startup, shutdown, and malfunction (SSM) of industrial source process or emission control equipment. Although not one of the states named in the Sierra Club's petition, the EPA's final rule included Texas. The State of Texas and the TCEQ disagree with the EPA that the TCEQ's

---

[40] Approval and Promulgation of Implementation Plans; Texas; Prevention of Significant Deterioration; Greenhouse Gas Tailoring Rule Revisions, 79 FR 66626 (November 10, 2014).

[41] Approval and Promulgation of Implementation Plans; Texas; Public Participation for Air Quality Permit Applications, 79 FR 551 (January 6, 2014).

SIP-approved affirmative defense rule for certain excess emissions is substantially inadequate to meet FCAA requirements and are challenging the EPA's SIP call.

The following chapters of 30 Texas Administrative Code (TAC) contain rules relevant for this federal requirement:

Chap. 35     Emergency and Temporary Orders and Permits; Temporary Suspension or Amendment of Permit Conditions; Subchapters A, B, C, K

Chap. 39     Public Notice

Chap. 55     Requests for Reconsideration and Contested Case Hearings; Public Notice

Chap. 101    General Air Quality Rules

Chap. 106    Permits by Rule, Subchapter A, General Requirements

Chap. 112    Control of Air Pollution from Sulfur Compounds

Chap. 115    Control of Air Pollution from Volatile Organic Compounds

Chap. 116    Control of Air Pollution by Permits for New Construction or Modification

Chap. 117    Control of Air Pollution from Nitrogen Compounds

Texas has a robust, SIP-approved permitting program and therefore has met the infrastructure requirements of §110(a)(2)(D)(i)(II).

### 5.3 VISIBILITY TRANSPORT

On December 16, 2014, the EPA published a proposed rule to partially disapprove the Texas 2009 Regional Haze SIP revision and issue a federal implementation plan (FIP) (79 FR 74818). The EPA also proposed to approve the Texas Best Available Retrofit Technology (BART) rule for non-electric generating units (EGUs), and replace the TCEQ's reliance on the Clean Air Interstate Rule (CAIR) with a FIP implementing the Cross-State Air Pollution Rule (CSAPR) in Texas for BART for EGUs.[42] On January 5, 2016, the EPA partially approved (for non-EGU BART) and partially disapproved the Texas SIP and adopted a FIP for the reasonable progress goals and long-term strategy requirements that were disapproved. The EPA did not finalize the EGU BART portion of the proposal. On July 15, 2016, the 5th Circuit stayed EPA's FIP of the Texas Regional Haze Rule.

Because of litigation since the 2009 Texas Regional Haze SIP submission, EGUs are no longer covered under CAIR or subsequent program provisions; and the EPA did not finalize the disapproval of Texas EGU BART on January 5, 2016. In accordance with a consent decree, the EPA published a proposed BART FIP on January 4, 2017 covering

---

[42] The D.C. Circuit lifted the stay on CSAPR and the EPA began implementing the rule on January 1, 2015. However, on July 28, 2015 the D.C. Circuit ruled that the 2014 annual $SO_2$ budgets and the 2014 ozone season $NO_x$ budgets for Texas were invalid because they required overcontrol of Texas emissions, and remanded these budgets back to the EPA without vacatur.

EGUs. The consent decree required the EPA to sign a final FIP in September 2017. On September 29, 2017, the EPA Administrator signed a FIP to address BART requirements for Texas EGUs, specifically with regard to nitrogen oxides ($NO_x$), particulate matter (PM), and sulfur dioxide ($SO_2$). The final rule was published in the *Federal Register* on October 17, 2017 (82 FR 48324). Additionally, on September 29, 2017, the EPA finalized a rule withdrawing Texas from the CSAPR Group 2 $SO_2$ and Annual $NO_x$ Programs (82 FR 45481). The BART FIP relies on Texas' participation in the CSAPR Ozone Season $NO_x$ Program to fulfill $NO_x$ BART. Because Texas is no longer participating in the CSAPR Group 2 $SO_2$ Program, CSAPR cannot be relied upon to satisfy $SO_2$ BART. Therefore, the FIP establishes an $SO_2$ trading program that applies to select Texas EGUs. The EPA approved the TCEQ's PM screening for EGUs from the 2009 Texas Regional Haze SIP submittal, eliminating the need to require controls for PM BART. Additionally, the EPA disapproved portions of the Texas SIP with regard to interstate visibility transport for the following NAAQS: 1997 eight-hour ozone; 1997 $PM_{2.5}$ (annual and 24-hour); 2006 $PM_{2.5}$ (24-hour); 2008 eight-hour; 2010 one-hour nitrogen dioxide; and 2010 one-hour $SO_2$. The EPA also made a finding that the BART alternatives adopted as the FIP meet the interstate visibility transport requirements for these NAAQS under FCAA §110(a)(2)(D)(i)(II).

Regional haze program requirements include progress reports due to the EPA every five years, to demonstrate progress toward the visibility goal. The 2014 Five-Year Regional Haze Progress Report SIP Revision was submitted to the EPA in March 2014. On January 10, 2017, the EPA published the final Regional Haze Rule Amendments (82 FR 3078) extending the SIP submittal deadline for the second planning period from July 31, 2018 to July 31, 2021 and adjusting the interim progress report submission deadline so that second progress reports would be due by January 31, 2025. The following SIP submittal would be due in 2028 and then every 10 years thereafter, through 2064.

The following chapter of 30 TAC contains rules relevant for this federal requirement:

Chap. 101    General Air Quality Rules

Chap. 122    Subchapter E, Division 2, Clean Air Interstate Rule

Chap. 115    Control of Air Pollution from Volatile Organic Compounds

Chap. 116    Control of Air Pollution by Permits for New Construction or Modification

Chap. 117    Control of Air Pollution from Nitrogen Compounds

The modeling analysis in this SIP revision demonstrates that Texas does not contribute to nonattainment or interfere with maintenance in another state for the 2015 ozone NAAQS. The EPA has not established a separate visibility standard for ozone because ozone does not directly impair visibility or substantially produce or contribute to the production of the secondary air contaminants that cause visibility impairment and regional haze. Particulate matter, rather than ozone, is the pollutant primarily responsible for visibility impairment at Class I areas covered by the Regional Haze Rule. Emissions from Texas EGUs that potentially contribute to both ozone nonattainment and visibility impairment are already controlled under the ozone

NAAQS, BART under the Regional Haze Rule, and interstate transport obligations. Texas is also subject to the ozone season $NO_X$ budget under the CSAPR Update Rule for the 2008 ozone standard. Based on the finding that emissions from Texas do not interfere with measures to protect visibility in nearby states, Texas meets the visibility transport provision for six other NAAQS under the BART FIP (82 FR 48324). When considered alongside the modeling analysis in this SIP revision, and Texas' inclusion in the CSAPR Update Rule ozone season $NO_X$ trading program, it is concluded that Texas meets the visibility transport provision for the 2015 ozone NAAQS as well.

## CHAPTER 6: INTERSTATE POLLUTION ABATEMENT AND INTERNATIONAL AIR POLLUTION [FCAA, §110(A)(2)(D)(ii)]

### 6.1 INTRODUCTION

The requirements of Federal Clean Air Act (FCAA), §110(a)(2)(D)(ii) are satisfied by demonstrating compliance with the applicable requirements of FCAA, §126(a), 126(b) and (c), and 115.

### 6.2 INTERSTATE POLLUTION ABATEMENT

#### 6.2.1 Compliance with FCAA, §126(a)

Under section 126(a)(1) of the FCAA, a state implementation plan (SIP) must contain provisions requiring each new or modified major source required by FCAA title I part C to be subject to prevention of significant deterioration (PSD) permitting to notify neighboring air agencies of potential impacts from the source. Per guidance on development and submission of infrastructure SIPs issued by the United States Environmental Protection Agency (EPA) on September 13, 2013,[43] the EPA considers the notification by the permitting authority to satisfy the requirement of FCAA, §126(a)(1)(A) that a new or modified major source subject to part C notify neighboring air agencies of its potential downwind impact. Texas has a SIP-approved PSD permitting program that contains requirements for the permitting authority to notify air agencies whose lands may be affected by emissions from that source.

#### 6.2.2 Compliance with FCAA, §126(b) and (c)

The required content of an infrastructure SIP with respect to FCAA, §110(a)(2)(D)(ii) is affected by sections 126(b) and 126(c) of the FCAA only if: (1) the Administrator has, in response to a petition, made a finding under section 126(b) of the FCAA that emissions from a source or sources within the air agency's jurisdiction emit prohibited amounts of air pollution relevant to the new or revised NAAQS for which the infrastructure SIP submission is being made; and (2) under section 126(c) of the FCAA, the Administrator has required the source or sources to cease construction, cease or reduce operations, or comply with emissions limitations and compliance schedule requirements for continued operation.

No source or sources within Texas are the subject of an active finding under section 126 of the FCAA with respect to the 2015 ozone NAAQS.

### 6.3 INTERNATIONAL AIR POLLUTION

#### 6.3.1 Compliance with FCAA, §115

Section 115 of the FCAA authorizes the EPA Administrator to require a state to revise its SIP under certain conditions to alleviate international transport into another country. When acting on an infrastructure SIP submission for a new or revised NAAQS, the EPA will look to whether the Administrator has made a finding with respect to

---

[43] Memorandum from Stephen D. Page, Director of the Office of Air Quality Planning and Standards, September 13, 2013, *Guidance on Infrastructure State Implementation Plan (SIP) Elements under Clean Air Act Sections 110(a)(1) and 110(a)(2)*. EPA Office of Air Quality Planning and Standards. https://www3.epa.gov/airquality/urbanair/sipstatus/docs/Guidance_on_Infrastructure_SIP_Elements_Multipollutant_FINAL_Sept_2013.pdf

emissions of the particular NAAQS pollutant and its precursors, if applicable. There are no final findings under section 115 of the FCAA against the State of Texas with respect to the 2015 ozone NAAQS.

# CHAPTER 7: CONCLUSIONS

Texas has numerous control measures in place to address ozone precursor emissions and these measures have resulted in significant decreases in eight-hour ozone design values in Texas. Statewide trend analysis of ozone precursor emissions from 2005 through 2014 shows a 17% reduction in volatile organic compounds and a 35% reduction in nitrogen oxides. These reductions have assisted the state in attaining both the one-hour and 1997 eight-hour ozone National Ambient Air Quality Standards (NAAQS) and are expected to help the state attain the 2008 and 2015 NAAQS in the future. Over the past 25 years, all areas in Texas have observed some decrease in eight-hour ozone design values with the greatest decreases observed in the Houston-Galveston-Brazoria and Beaumont-Port Arthur areas with decreases of 34% and 33% respectively.

The modeling analysis provided in this state implementation plan (SIP) revision demonstrates that Texas emissions do not contribute significantly to nonattainment or interfere with maintenance of the 2015 eight-hour ozone NAAQS at any downwind monitors in 2023. Factors such as design value trends, number of elevated ozone days, back trajectory analysis on elevated ozone days, modeled concentrations on future expected elevated ozone days, total interstate contributions at tagged monitors, and responsiveness of ozone to Texas emissions were examined for 16 monitors projected to be in nonattainment or projected to have maintenance issues in other states. Based on this modeling analysis, it is concluded that emissions from Texas do not contribute significantly to nonattainment or interfere with maintenance of the 2015 eight-hour ozone NAAQS in any other state.

Additionally, Texas has a robust, SIP-approved new source review permitting program and therefore has met the Federal Clean Air Act (FCAA) infrastructure requirements relating to prevention of significant deterioration (PSD). The Texas Commission on Environmental Quality has also determined that Texas meets the visibility transport provisions for the 2015 ozone NAAQS as the state is not contributing significantly to nonattainment or maintenance issues in any other state, the EPA has not established a separate visibility standard for ozone, Texas is subject to the ozone season $NO_x$ budget under the Cross-State Air Pollution Rule Update, and the EPA has made a finding that Texas meets the visibility transport provision for six other NAAQS under the Best Available Retrofit Technology FIP.

Finally, Texas meets the FCAA requirements related to interstate pollution abatement and international air pollution. Texas has a SIP-approved PSD permitting program that contains requirements for the permitting authority to notify air agencies whose lands may be affected by emissions from that source, no sources within Texas are the subject of an active finding under section 126 of the FCAA with respect to the 2015 ozone NAAQS, and there are no final findings under section 115 of the FCAA against the State of Texas with respect to the 2015 ozone NAAQS.

In conclusion, this SIP revision demonstrates that Texas meets the interstate transport requirements of FCAA, §110(a)(2)(D)(i)(I) as well as the requirements of FCAA, §110(a)(2)(D)(i)(II) for prevention of significant deterioration and visibility transport and the interstate pollution abatement and international air pollution requirements of FCAA, §110(a)(2)(D)(ii).

## CHAPTER 8: FUTURE REVISIONS TO THE NATIONAL AMBIENT AIR QUALITY STANDARDS (NAAQS)

Federal Clean Air Act (FCAA), §110(a)(1) requires states to submit state implementation plans within three years after the promulgation of new or revised NAAQS to meet the requirements of FCAA, §110(a)(2), including FCAA, §110(a)(2)(D), relating to interstate transport. Therefore, if the NAAQS are revised in the future, the Texas Commission on Environmental Quality will need to take the adequate steps relating to the interstate transport of air pollution.

*Appendices Available Upon Request*

Kristin Patton
kristin.patton@tceq.texas.gov
512.239.4907

## RESPONSE TO COMMENTS RECEIVED CONCERNING THE TRANSPORT STATE IMPLEMENTATION PLAN (SIP) REVISION FOR THE 2015 EIGHT-HOUR OZONE STANDARD

The Texas Commission on Environmental Quality (commission or TCEQ) conducted a public hearing in Austin on April 10, 2018, at 2:00 p.m. During the comment period, which closed on April 10, 2018, the commission received comments from the Lone Star Chapter of the Sierra Club (Sierra Club).

**TABLE OF CONTENTS**
General Comments
Emissions
Control Strategies

**GENERAL COMMENTS**

Sierra Club commented that the final 2015 Ozone NAAQS Transport SIP revision should include the latest information on nonattainment area designations.

**The TCEQ has updated the SIP revision to include the latest available information related to final area designations for the 2015 ozone NAAQS.**

Sierra Club commented that many EPA rules and decisions are under ongoing litigation and that the SIP revision should be updated for any changes resulting from existing litigation.

**The SIP revision includes the latest information related to ongoing litigation available at the time of development. As noted in Section 1.2: *Introduction* of the SIP revision, the TCEQ acknowledges that proposed changes to federal regulations may have future impacts on how the TCEQ meets the requirements of FCAA, §110(a)(2)(D); however, this SIP revision reflects the methods and means by which Texas meets these requirements at the time this SIP revision was developed. Should future federal rule changes necessitate state rule changes, the TCEQ will act appropriately at that time.**

**EMISSIONS**

Sierra Club suggested that historical $NO_x$ emission trends for Bexar County or the greater San Antonio area be included in the SIP revision.

**$NO_x$ emissions trends for Bexar County and the greater San Antonio area are included as part of the statewide trends discussed in the SIP revision in Section 2.3.2: *Historical Emissions Inventory Trends.* The request for additional emission trend analysis specific to Bexar County or the San Antonio area is outside the scope of this SIP revision.**

Sierra Club commented that the SIP revision should address the extent to which coal plants in northeastern Texas could impact ozone in nearby states, specifically Oklahoma and Arkansas.

**The TCEQ's modeling indicates there are no projected nonattainment or maintenance monitors in Oklahoma and Arkansas for the 2015 ozone NAAQS. Any ozone impacts on Oklahoma or Arkansas specifically from coal-fired power plants in northeastern Texas beyond the requirements of FCAA, §110(a)(2)(D) are not relevant for the purposes of this transport SIP revision. Further analysis presented in this SIP revision was limited to the tagged projected nonattainment and/or maintenance monitors in Arizona, California, and Colorado and determined that emissions from Texas do not contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS at these downwind monitors or in any other state.**

CONTROL STRATEGIES

Sierra Club commented that the SIP revision should include a discussion about control strategies on oil and gas and what is being done to limit ozone formation as a result of oil and gas emissions, particularly in the Permian Basin.

**The SIP revision includes a discussion of existing control strategies related to oil and gas emissions in Chapter 4: *Control Strategies.* Additional controls are not addressed in this SIP revision as Texas emissions do not contribute significantly to nonattainment or interfere with maintenance of the 2015 eight-hour ozone NAAQS in any other state.**

**ORDER ADOPTING**
**REVISIONS TO THE STATE IMPLEMENTATION PLAN**


**Docket No. 2017-1762-SIP**
**Project No. 2017-039-SIP-NR**

On August 8, 2018, the Texas Commission on Environmental Quality (Commission), during a public meeting, considered adoption of revisions to the State Implementation Plan (SIP). The Commission adopts the Transport SIP Revision for the 2015 ozone National Ambient Air Quality Standards (NAAQS). The SIP revision outlines the requirements of FCAA, Section 110(a)(2)(D)(i) and (ii) and the Texas provisions supporting the requirements for the 2015 ozone NAAQS. The revision also includes a technical demonstration to support the determination that Texas meets the interstate transport requirements of Section 110(a)(2)(D)(i)(I). The infrastructure requirements of FCAA, Section 110(a)(2)(A) through (C) and (E) through (M) are addressed in a separate SIP revision (Non-Rule Project No. 2017-040-SIP-NR). Under Tex. Health & Safety Code Ann. §§ 382.011, 382.012, and 382.023 (West 2016), the Commission has the authority to control the quality of the state's air and to issue orders consistent with the policies and purposes of the Texas Clean Air Act, Chapter 382 of the Tex. Health & Safety Code. Notice of the proposed SIP revision was published for comment in the March 23, 2018, issue of the *Texas Register* (43 TexReg 1907).

Pursuant to 40 Code of Federal Regulations § 51.102 and after proper notice, the Commission conducted a public hearing to consider the SIP revision. Proper notice included prominent advertisement in the areas affected at least 30 days prior to the date of the hearing. A public hearing was held in Austin on April 10, 2018.

The Commission circulated hearing notices of its intended action to the public, including interested persons, the Regional Administrator of the EPA, and all applicable local air pollution control agencies. The public was invited to submit data, views, and recommendations on the proposed SIP revision, either orally or in writing, at the hearing or during the comment period. Prior to the scheduled hearing, copies of the proposed SIP revision were available for public inspection at the Commission's central office and on the Commission's website.

Data, views, and recommendations of interested persons regarding the proposed SIP revision were submitted to the Commission during the comment period, and were considered by the Commission as reflected in the analysis of testimony incorporated by reference to this Order. The Commission finds that the analysis of testimony includes the names of all interested groups or associations offering comment on the proposed SIP revision and their position concerning the same.

IT IS THEREFORE ORDERED BY THE COMMISSION that the revisions to the SIP incorporated by reference to this Order are hereby adopted. The adopted revisions to the SIP are incorporated by reference in this Order as if set forth at length verbatim in this Order.

IT IS FURTHER ORDERED BY THE COMMISSION that on behalf of the Commission, the Chairman should transmit a copy of this Order, together with the adopted revisions to the SIP, to the Regional Administrator of EPA as a proposed revision to the Texas SIP pursuant to the Federal Clean Air Act, codified at 42 U.S. Code Ann. §§ 7401 - 7671q, as amended.

If any portion of this Order is for any reason held to be invalid by a court of competent jurisdiction, the invalidity of any portion shall not affect the validity of the remaining portions.

TEXAS COMMISSION ON
ENVIRONMENTAL QUALITY

_____
Bryan W. Shaw, Ph.D., P.E., Chairman


_____
Date Signed

Tab C:
EPA, Considerations for Identifying Maintenance
Receptors for Use in Clean Air Act Section
110(a)(2)(D)(i)(I) Interstate Transport State
Implementation Plan Submis-sions for the 2015
Ozone National Ambient Air Quality Standards,
(Oct 18, 2018) ("2018 Maintenance Receptor
Memo")



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
RESEARCH TRIANGLE PARK, NC 27711

OFFICE OF
AIR QUALITY PLANNING
AND STANDARDS

OCT **1 9** 2018

# MEMORANDUM

**SUBJECT:**   Considerations for Identifying Maintenance Receptors for Use in Clean Air Act
Section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan
Submissions for the 2015 Ozone National Ambient Air Quality Standards

**FROM:**   Peter Tsirigotis
Director

**TO:**   Regional Air Division Directors, Regions 1–10

The purpose of this memorandum is to present information that states may consider as they evaluate the status of monitoring sites that the Environmental Protection Agency (EPA) identified as potential maintenance receptors with respect to the 2015 ozone National Ambient Air Quality Standards (NAAQS) based on EPA's 2023 modeling.[1] States may use this information when developing state implementation plans (SIPs) for the 2015 ozone NAAQS addressing the good neighbor provision in Clean Air Act (CAA) section 110(a)(2)(D)(i)(I). In brief, this document discusses (1) using alternative technical methods for projecting whether future air quality warrants identifying monitors as maintenance receptors and (2) considering current monitoring data when identifying monitoring sites that, although projected to be in attainment, as described below, should be identified as maintenance receptors because of the risk that they could exceed the NAAQS due to year-to-year (*i.e.,* inter-annual) variability in meteorological conditions.

This document does not substitute for provisions or regulations of the CAA, nor is it a regulation itself. Rather, it provides recommendations for states using the included analytical information in developing SIP submissions, and for EPA Regional offices in acting on them. Thus, it does not impose binding, enforceable requirements on any party. State air agencies retain the discretion to develop good neighbor SIP revisions that differ from this guidance.

Following the recommendations in this guidance does not ensure that EPA will approve a SIP revision in all instances where the recommendations are followed, as the guidance may not apply to the facts and circumstances underlying a particular SIP. Final decisions by EPA to approve

---

[1] Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I) (March 2018).
*https://www.epa.gov/airmarkets/2015-ozone-naaqs-mem.*

a particular SIP revision will only be made based on the requirements of the statute following an air agency's final submission of the SIP revision to EPA and after appropriate notice and opportunity for public review and comment. Interested parties may raise comments about the appropriateness of the application of this guidance to a particular SIP revision. EPA and air agencies should consider whether the recommendations in this guidance are appropriate for each situation.

**Introduction**

CAA section 110(a)(2)(D)(i)(I), otherwise known as the good neighbor provision, requires states to prohibit emissions "which will contribute significantly to nonattainment in, or interfere with maintenance by, any other state with respect to any" NAAQS. EPA has historically used a 4-step framework to determine upwind state obligations (if any) under the good neighbor provision for regional pollutants like ozone: (1) identify downwind areas, referred to as "receptors," expected to have problems attaining or maintaining the NAAQS; (2) identify upwind states that contribute to those downwind air quality problems and warrant further review and analysis; (3) identify the emissions reductions (if any) necessary to eliminate an upwind state's significant contribution to nonattainment and/or interference with maintenance of the NAAQS in the downwind areas, considering cost and air quality factors; and (4) adopt permanent and enforceable measures needed to achieve those emissions reductions. EPA notes that, in developing their SIP revisions for the 2015 ozone NAAQS, states have flexibility to follow this framework or develop alternative frameworks to evaluate interstate transport obligations, so long as a state's chosen approach has adequate technical justification and is consistent with the requirements of the CAA.

At Step 1, EPA has historically used base year and future year air quality modeling coupled with base period measured ozone design values to project design values to a future analytic year.[2] In a memo issued in March 2018, EPA released updated modeling, which uses 2011 as the base year and 2023 as the future analytic year, to evaluate interstate transport for the 2015 ozone NAAQS.[3] As part of EPA's 2023 modeling analysis, EPA projected the average and maximum base period 2009 – 2013 design values to 2023.[4,5] EPA evaluated the projected 2023 design values in combination with measured 2016 design values using the same methodology used in the Cross-State Air Pollution Rule Update (CSAPR Update)[6] to identify receptors with anticipated potential nonattainment and maintenance issues with respect to the 2015 ozone NAAQS in 2023. Under the CSAPR Update methodology, those sites that are violating the NAAQS based on 2016 design values (*i.e.*, currently not attaining) and that also have projected 2023 *average* design values that exceed the NAAQS (*i.e.*, 2023 average design values of 71 parts per billion (ppb) or greater) are

---

[2] Air Quality Modeling Technical Support Document for the Final Cross State Air Pollution Rule Update (August 2016). *https://www.epa.gov/airmarkets/air-quality-modeling-technical-support-document-final-cross-state-air-pollution-rule*.

[3] Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I) (March 2018). *https://www.epa.gov/airmarkets/march-2018-memo-and-supplemental-information-regarding-interstate-transport-sips-2015.*

[4] The base period includes the three design values that contain 2011 monitoring data (*i.e.*, 2009-2011, 2010-2012, and 2011-2013).

[5] The base period maximum design value is the highest of the three design values in the period 2009-2013.

[6] *See* 81 FR 74504 (October 26, 2016).

identified as potential nonattainment receptors in 2023.[7] Under the CSAPR Update methodology, those sites with a 2023 *maximum* 3-year design value that exceeds the NAAQS are identified as potential maintenance receptors. This methodology considers the effects of inter-annual variability in ozone-conducive meteorology to identify sites that may have difficulty maintaining the ozone NAAQS. A projected maximum design value that exceeds the NAAQS indicates that when meteorology is conducive to ozone formation, the receptor struggles with maintenance of the standard. Under the CSAPR Update methodology, maintenance-only receptors therefore include both (1) those sites with projected average and maximum design values above the NAAQS that are currently measuring clean data and (2) those sites with projected average design values below the level of the NAAQS but with projected maximum design values of 71 ppb or greater.[8]

**Considerations for Identifying Maintenance Receptors**

The D.C. Circuit's decision in *North Carolina v. EPA* requires that EPA and the states identify separate nonattainment and maintenance receptors to give independent significance to the "contribute significantly" and "interfere with maintenance" clauses of the good neighbor provision when identifying downwind air quality problems that must be addressed.[9] In particular, the court held that the good neighbor provision requires states to address emissions that interfere with maintenance in downwind areas struggling to meet the NAAQS despite air quality modeling projecting attainment.[10] While the court did not specify a particular methodology for identifying downwind areas that would struggle to maintain the NAAQS, the court cited the state petitioner's demonstration regarding historic variability in ozone concentrations in areas otherwise projected to attain the NAAQS in support of its holding.[11]

In rules promulgated after *North Carolina*, EPA has relied on projections of base period maximum design values to identify those sites that are at risk of being nonattainment in the future due to inter-annual variability in ozone-conducive meteorology, as indicated above. EPA acknowledges that there may be other valid methodologies for identifying such areas. However, consistent with the holding in *North Carolina*, EPA believes that any alternative methods used to identify maintenance receptors must be different than those used to identify nonattainment receptors and should demonstrate that the alternative method considers variability in meteorological conditions that are conducive for ozone formation in the area containing the monitoring site.

---

[7] In determining compliance with the NAAQS, EPA truncates ozone design values to integer values. For example, EPA truncates a design value of 70.9 ppb to 70 ppb, which is attainment. Similarly, EPA considers design values at or above 71.0 ppb to be violations of the 2015 ozone NAAQS.

[8] The nonattainment receptors are also identified as maintenance receptors because the maximum design values for each of these sites is always greater than or equal to the average design value.

[9] 531 F.3d 896, 909-911 (2008).

[10] *Id.*

[11] *Id.* at 909.

**Flexibilities Related to Identifying Maintenance Receptors**

In response to comments received through stakeholder outreach, EPA has identified two potential flexibilities that states may use to identify maintenance receptors with an appropriate technical demonstration. First, EPA believes that states may, in some cases, eliminate a site as a maintenance receptor if the site is currently measuring clean data. Second, EPA believes that a state may, in some cases, use a design value from the base period that is not the maximum design value.[12] For either of these alternative methods to satisfy the D.C. Circuit's instruction to consider areas struggling to meet the NAAQS, EPA would expect states to include with their SIP demonstration technical analyses showing that:

(1) meteorological conditions in the area of the monitoring site were conducive to ozone formation during the period of clean data or during the alternative base period design value used for projections;
(2) ozone concentrations have been trending downward at the site since 2011 (and ozone precursor emissions of nitrogen oxide (NOx) and volatile organic compounds (VOC) have also decreased); and
(3) emissions are expected to continue to decline in the upwind and downwind states out to the attainment date of the receptor.

The intent of these analyses is to demonstrate that monitoring sites that would otherwise be identified as maintenance receptors under the CSAPR Update approach, as previously described, are not likely to violate the NAAQS in the future analytic year. EPA expects that, with such analyses, the state could justify exclusion of a monitoring site as a maintenance receptor, notwithstanding modeling projections showing a maximum design value exceeding the 2015 ozone NAAQS.

To assist states with the recommended analyses, EPA is providing the following information related to analyzing meteorological conduciveness and ozone and emissions trends:

(1) information on meteorological conduciveness for ozone formation based on regional and state-level historical and current climatological data for summertime monthly and seasonal temperature (*see* Attachment A);
(2) a data file containing ozone design values for individual monitoring sites nationwide for the years 2008 through 2017 and for 2023, based on EPA's modeling. This information is available on EPA's website at:
*https://www.epa.gov/airmarkets/march-2018-memo-and-supplemental-information-regarding-interstate-transport-sips-2015-0*; and
(3) a data file containing state-level annual NOx and VOC emissions from anthropogenic sources with a breakout by major source category, for individual years from 2011 through 2017 and for 2023, based on EPA's projections. This information is available on EPA's website at:

---

[12] Stakeholder comments on potential 2015 NAAQS transport flexibilities can be found at
*https://www.epa.gov/airmarkets/march-2018-memo-and-supplemental-information-regarding-interstate-transport-sips-2015*.

4

*https://www.epa.gov/airmarkets/march-2018-memo-and-supplemental-information-regarding-interstate-transport-sips-2015-0.*

States developing the technical analyses necessary to support use of the flexibilities described in this memo are encouraged to supplement EPA-provided information with additional data (as appropriate) to support a showing that a specific monitoring site is not at risk of exceeding the NAAQS in the future. For example, states may show that such a site should not be identified as a maintenance receptor by providing (1) a more refined analysis of meteorological conduciveness that considers additional relevant or more locally tailored meteorological parameters, (2) a more temporally or spatially refined emissions trends analysis, and/or (3) an analysis of historical ozone trends that considers, in addition to the design value, trends in other ozone metrics such as annual 4th high 8-hour daily maximum ozone concentrations and the number of days with measured exceedances of the 2015 NAAQS.

Please share this information with the air agencies in your Region.

**For Further Information**

If you have any questions concerning this memorandum, please contact Norm Possiel at (919) 541-5692, *possiel.norm@epa.gov* for modeling information or Chris Werner at (919) 541-5133, *werner.christopher@epa.gov* for any other information.

Attachment

Attachment A

Information on Meteorological Conduciveness
for Ozone Formation

A-1

Meteorological conditions including temperature, humidity, winds, solar radiation, and vertical mixing affect the formation and transport of ambient ozone concentrations. Ozone is more readily formed on warm, sunny days when the air is stagnant and/or when the winds are favorable for transport from upwind source areas. Conversely, ozone production is more limited on days that are cloudy, cool, rainy, and windy (*http://www.epa.gov/airtrends/weather.html*). Statistical modeling analyses have shown that temperature and certain other meteorological variables are highly correlated with the magnitude of ozone concentrations (Camalier, et al., 2007).[1] The overall extent to which meteorological conditions vary from year-to-year (*i.e.*, inter-annual variability) depends on the nature of large scale meteorological drivers such as the strength and position of the jet stream. Inter-annual cycles in the jet stream contribute to inter-annual variability in the degree to which summertime meteorological conditions are favorable for ozone formation within a particular region. Meteorological conditions that frequently correspond with observed 8-hour daily maximum concentrations greater than the National Ambient Air Quality Standards (NAAQS) are referred to as being conducive to ozone formation.

This attachment contains information to help evaluate whether particular summers had ozone-conducive or unconducive meteorology within the 10-year period 2008 through 2017. Information is provided on a state-by-state basis and for individual regions (*see* Figure 1).

- Table A-1 contains tabular summaries of the difference (*i.e.*, anomaly[2]) of monthly average temperature compared to the long-term average.[3]
- Figure A-2 contains maps of the 3-month (June, July, August) statewide anomalies and rank[4] for average temperature compared to the long-term average.
- Figure A-3 contains maps showing spatial fields of daily maximum temperature anomalies (percentiles) for the period June through August for the years 2011 through 2017 (maps are unavailable for years prior to 2011).
- Figure A-4 contains graphical summaries of the total number of cooling degree days for the 3-month period June through August in each region.

The above tabular and graphic information was obtained from the NOAA National Centers for Environmental Information (NCEI) at *https://www.ncdc.noaa.gov/temp-and-precip/us-maps/* and *https://www.ncdc.noaa.gov/cag/.*

---

[1] Additional references related to ozone formation and meteorology are provided on page A-3.

[2] "The term temperature anomaly means a departure from a reference value or long-term average. A positive anomaly indicates that the observed temperature was warmer than the reference value, while a negative anomaly indicates that the observed temperature was cooler than the reference value."
*https://www.ncdc.noaa.gov/monitoring-references/faq/anomalies.php.*

[3] Note that because of the relatively large inter-annual variability in certain meteorological conditions such as temperature and precipitation, long-term "average" conditions, usually referred to as "normal," are often the mathematical mean of extremes and thus, "average" or "normal" values of temperature or precipitation should not necessarily be considered as representing "typical" conditions.

[4] "In order to place each month and season into historical context, the National Centers for Environmental Information assigns ranks for each geographic area (division, state, region, etc.) based on how the temperature or precipitation value compares with other values throughout the entire record when sorted from lowest to highest value. In other words, the numeric rank value within the area represents the position or location of the sorted value throughout the historical record (1895-present)." *https://www.ncdc.noaa.gov/monitoring-references/dyk/ranking-definition.*

A-2

In general, below average temperatures are an indication that meteorological conditions are unconducive for ozone formation, whereas above average temperatures are an indication that meteorology is conducive to ozone formation. Within a particular summer season, the degree that meteorology is conducive for ozone formation can vary from region to region and fluctuate with time within a particular region. For example, the temperature-related information presented below suggests that summer meteorology was generally conducive for ozone formation in 2010, 2011, 2012, and 2016 in most regions. In contrast, the summer of 2009 was generally unconducive for ozone formation, overall, in most regions. In addition, the summers of 2013 and 2014 were not particularly conducive for ozone formation in the Upper Midwest, Ohio Valley, South, Southeast.

Additional information on the relationships between ozone and meteorological conditions can be found in the following publications:

Blanchard et al., 2010 - *NMOC, ozone, and organic aerosol in the southeastern United States, 1999-2007: 2. Ozone trends and sensitivity to NMOC emissions in Atlanta, GA.*
Reinforces the relationship between temperature, relative humidity and winds to ozone formation.
*https://www.sciencedirect.com/science/article/pii/S1352231010005996?via%3Dihub*

Blanchard et al., 2014 - *Ozone in the southeastern United States: An observation-based model using measurements from the SEARCH network.*
Update to the 2007 paper by Camalier with data from the SEARCH network from 2002-2011.
*https://www.sciencedirect.com/science/article/pii/S1352231014001022?via%3Dihub*

Bloomer et al., 2009 – *Observed relationships of ozone air pollution with temperature and emissions.*
Statistical analysis of 21 years of ozone and temperature data (1987-2008). From a climate scenario perspective, authors examine the climate penalty or how ozone levels change as temperature changes. Reinforces the standing that as temperature increases, ozone concentrations increase, but indicates that due to decreasing emissions, the rate is slower in future scenarios.
*https://agupubs.onlinelibrary.wiley.com/doi/full/10.1029/2009GL037308*

Kavassalis & Murphy, 2017 - *Understanding ozone-meteorology correlations: A role for dry deposition.*
Authors observe the strong correlation between temperature and relative humidity, but work to understand other reasoning why models under predict the strength of the correlation between relative humidity and ozone. Includes a statistical analysis of 28 years of data and examines vapor pressure deficit and dry deposition as factors. Reinforces meteorological conditions that lead to high ozone days.
*https://agupubs.onlinelibrary.wiley.com/doi/full/10.1002/2016GL071791*

Reddy & Pfister, 2016 - *Meteorological Factors contributing to the interannaul variability of midsummer surface ozone in Colorado, Utah, and other western US States.*

A-3

Authors found strong correlation between 500-mb and 7008-mb patterns, surface temperature, and zonal winds with the resulting high 8-hour daily maximum ozone values.
*https://agupubs.onlinelibrary.wiley.com/doi/full/10.1002/2015JD023840*

Tawfik and Steiner, 2013 - *A proposed physical mechanism for ozone-meteorology correlations using land-atmosphere coupling regimes.*
Discusses the north-south gradient of temperature and relative humidity correlations with ozone formation. Examines 17 years of ozone, NOx, and isoprene measurements.
*https://linkinghub.elsevier.com/retrieve/pii/S1352231013001672*

White et al., 2007 - *Comparing the impact of meteorological variability on surface ozone during the NEAQS (2002) and ICARTT (2004) field campaigns.*
Authors found that while deep boundary layers are noted during periods of elevated ozone, this is likely due to being coincident with other meteorological factors (high temperatures, high pressure systems, low winds).
*https://agupubs.onlinelibrary.wiley.com/doi/10.1029/2006JD007590*

Zhang et al., 2017 – *Quantifying the relationship between air pollution events and extreme weather events.*
Authors examined ozone from 1980-2009 and built a statistical model to examine the impacts of extreme meteorological events on extreme air quality conditions. Found ozone extremes have decreased over the last 30 years, more rapidly recently, but remain highly correlated to extreme temperature events. Highest correlation was found in the eastern United States (U.S.).
*https://www.sciencedirect.com/science/article/pii/S0169809516306093?via%3Dihub*

A-4

Figure 1. U.S. climate regions.
*http://www.ncdc.noaa.gov/monitoring-references/maps/us-climate-regions.php*



Table A-1. Temperature anomalies by month for May through September for each climate region for the years 2008 through 2017.[1]

| 2008 | May | Jun | Jul | Aug | Sep |
|---|---|---|---|---|---|
| Northeast | C | W | W | C | N |
| Southeast | C | WW | N | C | N |
| Ohio Valley | C | W | C | C | N |
| Upper Midwest | C | N | N | N | W |
| South | N | W | N | C | CC |
| Northern Rockies | C | C | N | N | N |
| Southwest | N | W | W | W | N |
| Northwest | N | N | W | W | N |
| West | N | W | W | WW | W |

[1]Unshaded boxes with the "N" marker represent near-normal temperatures that fall within the interquartile range. Blue colors indicate cooler than normal conditions, with the number of "C"s indicating the degree of the anomaly. CCC = coolest on record, CC = coolest 10th percentile, C = coolest 25th percentile. Red colors indicate warmer than normal conditions, with the number of "W"s indicating the degree of the anomaly. WWW = warmest on record, WW = warmest 10th percentile, W = warmest 25th percentile. N/A = data not available. More on the definition of temperature ranks can be found at:

*https://www.ncdc.noaa.gov/monitoring-content/monitoring-references/dyk/images/ranking-definition-legend.png.*

| 2009 | May | Jun | Jul | Aug | Sep |
|---|---|---|---|---|---|
| Northeast | N | C | CC | W | C |
| Southeast | N | W | CC | N | N |
| Ohio Valley | N | W | CC | C | N |
| Upper Midwest | N | C | CC | C | W |
| South | N | W | N | N | C |
| Northern Rockies | N | C | C | C | WW |
| Southwest | WW | C | W | W | W |
| Northwest | W | C | WW | W | WW |
| West | WW | C | W | N | WWW |

A-6

**180**

| 2010 | May | Jun | Jul | Aug | Sep |
|------|-----|-----|-----|-----|-----|
| Northeast | WW | W | WW | W | W |
| Southeast | WW | W | WW | WW | W |
| Ohio Valley | W | WW | W | WW | N |
| Upper Midwest | W | N | W | WW | C |
| South | W | WW | N | WW | W |
| Northern Rockies | C | N | N | W | N |
| Southwest | C | W | W | W | WWW |
| Northwest | CC | C | N | N | W |
| West | CC | W | W | N | W |

| 2011 | May | Jun | Jul | Aug | Sep |
|------|-----|-----|-----|-----|-----|
| Northeast | W | W | WW | N | WW |
| Southeast | N | WW | WW | WW | N |
| Ohio Valley | N | W | WW | W | C |
| Upper Midwest | N | N | WW | W | W |
| South | N | WW | WWW | WWW | N |
| Northern Rockies | C | N | W | W | W |
| Southwest | C | W | WW | WWW | W |
| Northwest | CC | C | C | W | WW |
| West | C | C | N | W | WW |

| 2012 | May | Jun | Jul | Aug | Sep |
|------|-----|-----|-----|-----|-----|
| Northeast | WW | N | WW | W | N |
| Southeast | WW | C | WW | N | N |
| Ohio Valley | WW | N | WW | N | C |
| Upper Midwest | W | W | WW | N | N |
| South | WW | W | WW | N | N |
| Northern Rockies | W | W | WW | W | W |
| Southwest | WW | WW | W | WW | W |
| Northwest | N | C | W | WW | W |
| West | W | W | N | WWW | WW |

| 2013 | May | Jun | Jul | Aug | Sep |
|------|-----|-----|-----|-----|-----|
| Northeast | W | W | WW | N | N |
| Southeast | C | W | C | C | N |
| Ohio Valley | N | N | C | C | N |
| Upper Midwest | N | N | N | N | W |
| South | C | W | C | N | W |
| Northern Rockies | N | N | N | W | WW |
| Southwest | W | WW | W | W | W |
| Northwest | W | W | WW | WW | WW |
| West | W | WW | WW | N | W |

A-7

| **2014** | May | Jun | Jul | Aug | Sep |
|---|---|---|---|---|---|
| Northeast | W | W | N | N | W |
| Southeast | W | W | C | N | W |
| Ohio Valley | N | W | CC | N | N |
| Upper Midwest | N | W | CC | N | N |
| South | N | N | C | N | N |
| Northern Rockies | N | C | N | N | N |
| Southwest | N | W | W | C | WW |
| Northwest | W | N | WW | W | W |
| West | W | W | WW | N | WW |

| **2015** | May | Jun | Jul | Aug | Sep |
|---|---|---|---|---|---|
| Northeast | WWW | N | N | W | WW |
| Southeast | W | WW | W | N | N |
| Ohio Valley | W | W | N | C | W |
| Upper Midwest | N | N | N | N | WWW |
| South | C | N | W | N | WW |
| Northern Rockies | C | WW | N | N | WW |
| Southwest | C | WW | C | WW | WWW |
| Northwest | W | WWW | W | W | N |
| West | N | WWW | C | WW | WW |

| **2016** | May | Jun | Jul | Aug | Sep |
|---|---|---|---|---|---|
| Northeast | N | W | W | WWW | WW |
| Southeast | N | W | WW | WW | WW |
| Ohio Valley | N | W | W | W | WW |
| Upper Midwest | N | W | N | W | WW |
| South | C | W | WW | N | W |
| Northern Rockies | N | WW | N | N | W |
| Southwest | C | WWW | WW | N | N |
| Northwest | W | WW | C | W | N |
| West | N | WW | W | W | N |

| **2017** | May | Jun | Jul | Aug | Sep |
|---|---|---|---|---|---|
| Northeast | N | W | N | N | WW |
| Southeast | N | N | W | N | N |
| Ohio Valley | N | N | W | CC | N |
| Upper Midwest | N | W | N | C | WW |
| South | C | N | W | C | N |
| Northern Rockies | N | W | WW | N | W |
| Southwest | N | WW | WW | W | W |
| Northwest | W | W | WW | WWW | W |
| West | W | WW | WW | WW | N |

A-8

Figure A-2. Statewide average temperature ranks for the period June through August for the years 2008 through 2017. Note that the NCEI changed the display format of temperature rank maps beginning in 2014.







**June-August 2010 Statewide Ranks**
National Climatic Data Center/NESDIS/NOAA



**June-August 2011 Statewide Ranks**
National Climatic Data Center/NESDIS/NOAA

A-10













Figure A-3. Spatial fields of daily maximum temperature anomalies (percentiles) for the period June through August for the years 2011 through 2017. Note that the NCDC began creating these maps in 2011.







A-15









A-17

Figure A-4. Cooling degree days for June through August for each climate region. Note that (1) data are provided back to 1990 and (2) the range of the y-axis differs in some cases by climate region.



















A-21









Tab D:
TCEQ, Comments on the U.S. EPA's Air Plan
Disapproval 5-6 (Apr. 25, 2022) ("TCEQ Comments)

Jon Niermann, *Chairman*

Emily Lindley, *Commissioner*

Bobby Janecka, *Commissioner*

Toby Baker, *Executive Director*



# TEXAS COMMISSION ON ENVIRONMENTAL QUALITY

*Protecting Texas by Reducing and Preventing Pollution*

April 25, 2022

United States Environmental Protection Agency
Docket ID No. EPA-R06-OAR-2021-0801
[Submitted electronically through www.regulations.gov]

Re:     Comments on the United States Environmental Protection Agency's (EPA's) Air Plan
        Disapproval; Arkansas, Louisiana, Oklahoma, and Texas; Interstate Transport of Air
        Pollution for the 2015 Eight-Hour Ozone National Ambient Air Quality Standards
        (NAAQS), Docket ID No. EPA-R06-OAR-2021-0801

Dear Ms. Fuerst:

The Texas Commission on Environmental Quality (TCEQ) appreciates the opportunity to
comment on the EPA's Air Plan Disapproval; Arkansas, Louisiana, Oklahoma, and Texas;
Interstate Transport of Air Pollution for the 2015 Eight-Hour Ozone NAAQS. Detailed comments
on the guidance are enclosed. If there are any questions concerning the TCEQ's comments,
please contact Donna Huff, Deputy Director, Air Quality Division, at 512-239-6628 or
donna.huff@tceq.texas.gov.

Sincerely,

Toby Baker
Executive Director

Enclosure

**COMMENTS BY THE TEXAS COMMISSION ON ENVIRONMENTAL QUALITY REGARDING AIR PLAN DISAPPROVAL; ARKANSAS, LOUISIANA, OKLAHOMA, AND TEXAS; INTERSTATE TRANSPORT OF AIR POLLUTION FOR THE 2015 EIGHT-HOUR OZONE NATIONAL AMBIENT AIR QUALITY STANDARDS**

## I.  SUMMARY OF NOTICE

On February 22, 2022, the United States Environmental Protection Agency (EPA) released for comment its proposal to disapprove State Implementation Plan (SIP) submittals from Arkansas, Louisiana, Oklahoma, and Texas regarding interstate transport for the 2015 eight-hour ozone national ambient air quality standard (NAAQS). On March 11, 2022 the EPA issued the Agency's proposed Federal Implementation Plan (FIP)[1] to address 26 states' obligations to eliminate significant contribution to nonattainment, or interference with maintenance, of the 2015 ozone NAAQS in other states.

The Texas Commission on Environmental Quality (TCEQ) is providing the following comments on the proposed action.

## II.  COMMENTS

### A.  *General*

**The TCEQ opposes the proposed partial disapproval of Texas' transport SIP revision for the 2015 eight-hour ozone NAAQS pertaining to the federal Clean Air Act (FCAA), §110(a)(2)(D)(i)(I) requirement to address interstate transport.**

The EPA proposes to disapprove the portion of Texas' 2015 Ozone NAAQS Transport SIP Revision, submitted to the EPA on August 17, 2018, pertaining to the FCAA, §110(a)(2)(D)(i)(I) requirement to address the interstate transport of air pollution that will significantly contribute to nonattainment or interfere with maintenance of the 2015 eight-hour ozone NAAQS in other states. The transport analysis provided by the TCEQ in its August 17, 2018, submittal fully addressed the transport requirements of FCAA, §110(a)(2)(D)(i)(I) and for this reason, and as discussed in the TCEQ's other comments below, the TCEQ opposes any disapproval of its 2015 Ozone NAAQS Transport SIP Revision.

**The EPA failed to issue guidance in a timely manner for states to use in developing transport SIP revisions for the 2015 eight-hour ozone NAAQS. It is unreasonable and arbitrary for the EPA to require state SIP revisions to include recommendations from memoranda and/or guidance issued after states have submitted their revisions.**

Developing a SIP revision is a years long process that requires complex technical analysis and compliance with lengthy procedural requirements. Texas timely submitted its 2015 Ozone NAAQS Transport SIP Revision on August 17, 2018, to meet the October 1, 2018, statutory deadline for states to submit infrastructure and transport SIP revisions for the 2015 eight-hour ozone NAAQS. Thirty-one days before

---

[1] https://www.epa.gov/csapr/good-neighbor-plan-2015-ozone-naaqs

the SIP revisions were statutorily required to be submitted, the EPA issued its Analysis of Contribution Thresholds Memo on August 31, 2018. Eighteen days after this statutory deadline, the EPA further issued its Considerations for Identifying Maintenance Receptors Memo[2] (Maintenance Receptor Guidance) on October 18, 2018. It is unreasonable and arbitrary for the EPA to expect, much less require, that states comply with the recommendations in these guidance documents that were issued either mere days before the deadline or after the deadline considering that SIP revisions are complex and time consuming endeavors.

Texas' transport SIP revision was developed prior to these late issued EPA memos. Texas reasonably relied on EPA's September 13, 2013, guidance on development and submission of infrastructure SIPs since that was the only formal guidance available at the time to assist Texas in development of its SIP revision in order to meet the statutory deadline for submittal.

In order to meet statutory deadlines, states do not have the option of waiting for the EPA to provide updated guidance before proceeding with SIP development, review, and submittal; states must proceed to develop submittals based on information available at the time. It is unreasonable to expect states to review and/or incorporate recommendations after a SIP revision has been submitted. As a result of the EPA's lack of timely updated transport guidance for the 2015 eight-hour ozone standard, Texas was forced to expend effort and resources to develop its SIP revision without fully knowing how the EPA would evaluate Texas' transport obligation.

The EPA has previously taken the position that failure to timely submit a SIP revision is sufficient reason for the EPA to issue a FIP. Therefore, states must diligently develop SIP revisions to meet those statutory deadlines. The EPA's failure to update its guidance in a timely manner for the development of transport SIP revisions was arbitrary and unreasonable because states cannot delay and must develop these revisions with guidance currently available. The EPA's actions put states in the untenable position of developing SIP revisions without knowing what the EPA might expect, or simply accepting that EPA will impose its own requirements in a potential FIP. This is an absurd result of the EPA's failure to issue timely guidance.

Finally, guidance documents are non-binding recommendations that have not gone through formal rulemaking. The EPA has consistently failed to promulgate a rule that would instruct states in how, exactly, they should evaluate and meet potential transport actions, much less provide such a rule in a timely fashion that would allow states to meet the statutory requirement to demonstrate they have met their transport obligations within three years of promulgation of a new standard. For example, the EPA could have included criteria for evaluating transport obligations in the promulgation of the 2015 ozone NAAQS itself, and yet made no mention of how states should consider or meet transport obligations. In the absence of either such a rule, or even timely guidance, states such as Texas have tried to meet a target that the EPA has not defined. Furthermore, if the EPA had proposed and finalized a rule that specified requirements for transport at the same time that it proposed or even when it finalized the 2015 ozone NAAQS, states would have been able to evaluate such requirements

---

[2] https://www.epa.gov/sites/default/files/2018-10/documents/maintenance_receptors_flexibility_memo.pdf

and provide appropriate feedback to the EPA on any such rule. That is the purpose of the rulemaking process. The EPA's failure to provide states this opportunity through the rulemaking process without the threat of an already proposed FIP continues to circumvent the cooperative federalism structure that Congress developed in the FCAA.

**The EPA prematurely prepared a proposed FIP before finalizing action on Texas' timely submitted SIP revision to address 2015 eight-hour ozone standard interstate transport requirements.**

Texas submitted its 2015 Ozone NAAQS Transport SIP Revision to the EPA on August 17, 2018. The EPA had over three years to review the SIP revision prior to proposing the February 22, 2022, disapproval of the FCAA, §110(a)(2)(D)(i)(I) interstate transport elements. Further, the EPA has developed a proposed FIP before the proposed disapproval is final. Under FCAA §110(c)(1), the Administrator shall promulgate a FIP at any time within two years *after* the Administrator "disapproves a State Implementation Plan in whole or in part, unless the State corrects the deficiency, and the Administrator approves the plan or plan revisions, before the Administrator promulgates such a Federal Implementation Plan." EPA has not yet disapproved the Texas transport SIP, and yet has clearly signaled that it intends to include Texas in such a FIP directly upon finalizing the disapproval action. Although the Supreme Court has recognized that "disapproval of a SIP, without more, triggers EPA's obligation to issue a FIP" and this action can occur "at any time" within those two years (*EPA v. EME Homer City Generation LP, et. al.,* 572 US 489, 490 (2014)), in this instance EPA has not disapproved Texas' SIP. And unlike the fact pattern in EME Homer, Texas has not had an opportunity to challenge the EPA's disapproval of that SIP. Although EPA is under no obligation to wait two years to issue a FIP, it does have to comply with the congressional scheme. The disapproval of the SIP triggers EPA's authority to issue the FIP. In this case, EPA is indeed "altering Congress' SIP and FIP schedule." *Id.* at 491.

The EPA has conducted extensive work to include Texas in a proposed FIP to address interstate transport for Texas under the 2015 eight-hour ozone standard before disapproval of Texas SIP. Although the EPA proposed disapproving the Texas SIP submittal one month prior to the proposed FIP, there has been no final action on that proposal. Additionally, there was no indication from EPA during the years of work that went into the development of this FIP that the Texas SIP was inadequate, nor was Texas afforded any opportunity to correct the deficiencies that EPA believes are present in the SIP. Had the EPA reviewed the 2015 Ozone NAAQS Transport SIP Revision before developing a proposed FIP, the purpose of which is to correct deficiencies in such a SIP, Texas would have had the opportunity contemplated by the FCAA to correct any problems with its SIP in a timely fashion and avoid the imposition of the FIP.

This is clearly distinguishable from the argument in *EME Homer City* that was dismissed by the Supreme Court. The Court said that EPA did not have to give states an opportunity to correct a SIP before issuing the FIP. Instead, in the present case EPA is stating that they not only can, but "must necessarily be able to" propose a FIP before taking final action to disapprove a SIP. That was not the holding in *EME Homer City* and is inconsistent with the Congress' SIP and FIP schedule in the FCAA.

**The EPA failed to provide Texas with formal comments on the adequacy of its analysis during the public comment period for the SIP revision.**

The EPA did not comment on the adequacy of the TCEQ's analysis during the public comment period for the 2015 Ozone Transport SIP Revision. The TCEQ and EPA Region 6 participated in discussions regarding the proposed SIP revision, and the TCEQ answered questions from the EPA on the planned SIP submittal and provided additional data to the EPA. The EPA did not indicate that the information provided failed to address its concerns. The lack of EPA comment did not allow the TCEQ to address the issues outlined in the EPA's proposed disapproval in the adopted 2015 Ozone Transport SIP revision.

### B. Technical

**The TCEQ has provided a sufficient technical basis for its use of an alternative methodology to identify maintenance monitors.**

The EPA claims that the TCEQ did not provide sufficient technical justification for its approach and that the TCEQ's use of the latest monitored design value did not account for inter-annual variability in ozone conducive conditions. The EPA observes that the TCEQ's maintenance monitor identification methodology accounts for variations in meteorological conditions only over a three-year period compared to the five-year period accounted for in the EPA's method. The EPA does not provide sufficient justification for why five years of meteorological conditions adequately capture inter-annual variability while three years cannot. The latest three years best describe the ozone conditions closest to the future year. The EPA also does not address the fact that the modeled future design values are based on a single base year that is explicitly modeled and are therefore most impacted by the meteorological conditions in that single base year. It should be noted that both the TCEQ's method and the EPA's method use a single base year. The TCEQ's method used the latest three-year design value to reflect the most recent atmospheric conditions of each area, considering meteorology and emissions information.

The EPA states that since the EPA method identifies more monitors as maintenance monitors it is the more rigorous method. However, the "Good Neighbor" provision is not intended to be an exercise to find the greatest number of monitors likely to have air quality issues but to find the monitors mostly likely to have air quality issues due to significant contribution from upwind states.

The EPA further analyzed 21 monitors that had contributions greater than 0.7 ppb in either TCEQ or EPA modeling. The EPA claims that the TCEQ's methodology was flawed because the future year nonattainment design value (determined based on the use of average of three monitored design values as base design value, DVB) is less than the future year maintenance design value (determined based on the use of the latest of three monitored design values as DVB). The EPA discusses in detail how the difference between the nonattainment and maintenance design value in TCEQ's methodology is smaller than the difference in EPA's methodology. However, the EPA fails to discuss that of the 21 monitors, 15 monitors that were identified as maintenance monitors by the EPA's methodology were also identified as maintenance monitors by TCEQ's methodology. In addition, the EPA fails to provide justification on why maintenance design values being lower than nonattainment design values is troubling. For a monitor

to have maintenance issues, the future year design value only needs to exceed the standard of 70 ppb not the nonattainment design value.

The EPA further states that the TCEQ's methodology identified a monitor that would be nonattainment but not maintenance as proof that the TCEQ methodology is flawed. However, the EPA does not provide any justification for why every monitor that is modeled nonattainment should also be a maintenance monitor. If, as the EPA contends, monitors face maintenance issues solely due to inter-annual variability of meteorological conditions, it is also possible that the monitors could attain the standard due to favorable meteorology. In practice, a maintenance monitor should only have a transport linkage if it is in an area redesignated as attainment and a subsequent exceedance was shown to be caused by a transport issue, despite local controls and contingency measures. Otherwise, any reductions that might be required from upwind states to help that particular monitor maintain the standard would be overcontrol on the part of EPA.

Overall, the EPA fails to adequately justify its claim that the TCEQ did not provide sufficient technical basis for its use of an alternative methodology.

**The EPA should not disapprove the TCEQ's Transport SIP Revision based on the TCEQ's use of an alternative methodology for identifying maintenance monitors. The TCEQ's method for identifying maintenance monitors aligns with criteria regarding monitored design value trends specified in the *EPA's Maintenance Receptor Guidance* for the use of an alternative maintenance monitor selection method and is scientifically defensible.**

Despite the EPA issuing the Maintenance Receptor Guidance until after the statutory SIP revision submission deadline has passed and thus, depriving the TCEQ of this information during the preparation of Texas' SIP revision, the TCEQ did show that ozone concentrations have been trending downward since 2011 at monitoring sites for which the TCEQ modeling showed linkages. Such a trend is a condition in the Maintenance Receptor Guidance for states to choose an alternative maintenance monitor selection method. The EPA's disapproval conflates instances in which a design value is greater than the previous year with lack of a downward trend. The TCEQ contends that a downward trend of design values since 2011 can have individual design values that are higher than design values in the previous year and still comprise a downward trend over a longer period. The EPA appears to have misunderstood the TCEQ's reasons for choosing the 2014 regulatory design value as the DVB when estimating modeled future year maintenance design values. The TCEQ chose the 2014 regulatory design value because it was the latest design value and best represented current conditions and not because it is the lowest.

Further, for the monitors the EPA linked to Texas based on its 2016v2 modeling, only five of the seven monitors have valid design values in 2014. Out of those five, three had their highest design values in 2014. Emissions trends from the EPA's National Emissions Inventory (NEI) in Illinois and Wisconsin, where the seven monitors are located, show consistent decreases from 2010 through 2020. The EPA's meteorologically-adjusted ozone trends show that ozone values in the Central and East North Central United States, where the linked monitors are located, are much higher in 2012 due to meteorology, which was represented explicitly in the TCEQ's modeling. However, there hasn't been a consecutive three-year period from 2000 through 2020 that has had ozone conducive conditions similar to 2012. Therefore, if TCEQ had

5

followed the EPA's methodology, TCEQ would have used the 2012 monitored regulatory design value as the DVB, which would have ignored the downward trend in design values and resulted in the misidentification of monitors as maintenance monitors.

**The TCEQ disagrees with the EPA's use of updated 2016 base year modeling to evaluate TCEQ's Transport SIP submittal since the modeling data was unavailable at the time TCEQ developed its SIP revision.**

The EPA's use of modeling platform and monitoring data that was unavailable at the time TCEQ developed its Transport SIP revision is arbitrary and unreasonable. The TCEQ submitted its 2015 Ozone NAAQS Transport SIP Revision to the EPA on August 17, 2018. EPA did not issue the modeling platform it uses in this proposed disapproval until September 2021 (which included the 2016 base year), nearly three years after the statutory deadline for SIP revisions submissions. Obviously, TCEQ did not have access to this modeling platform and data when it developed its SIP revision. However, the TCEQ did use the latest modeling data it had available and made significant improvements on EPA's method. Additionally, the EPA has issued no rules regarding the use of EPA's modeling and monitoring data in the development of Transport SIP revisions.

The only other modeling data available at the time the TCEQ started developing its Transport SIP revision was the EPA's 2011-base year modeling. For monitors identified by EPA as nonattainment or maintenance and linked to Texas in 2023, the TCEQ modeled 2023 design values are similar to the preliminary modeling EPA conducted for the 2015 Ozone NAAQS Preliminary Interstate Transport Assessment, as seen in Table 1, *EPA and TCEQ Modeled Design Values in 2023 from EPA 2016, EPA 2011, and TCEQ 2012 Modeling*. This 2011-base modeling by the EPA is similar to the TCEQ's modeling and also shows attainment with the 2015 NAAQS for the monitors EPA identifies as maintenance or nonattainment linkages in its 2016v2 modeling. In fact, for four of the five monitors for which comparable 2010-2012 monitoring data exist, the TCEQ modeled 2023 design values are higher than the EPA 2011-base modeled design values. The TCEQ contends that the difference in base year and increased projection time may explain the lower TCEQ 2023 design values compared with EPA 2023 design values based on 2016 base year modeling. In Table 1 below, the EPA nonattainment design value is based on the average of the three design values in the five-year base year period and the maintenance design value is based on the maximum of these three design values. If the EPA had acted on the TCEQ's SIP submission in a timely manner, the only available data would have been the EPA's 2011-base modeling. Therefore, it is arbitrary and unreasonable for the EPA to evaluate the TCEQ's submission based upon data that was unavailable to the TCEQ during the development and submittal of its SIP revision.

**Table 1: EPA and TCEQ Modeled Design Values in 2023 from EPA 2016, EPA 2011, and TCEQ 2012 Modeling**

| Receptor (Site ID, County, State) | Nonattainment / Maintenance (EPA 2016v2 2023) | EPA 2016v2: 2023 Nonattainment/ Maintenance Design Value (ppb) | EPA 2011v6.3: 2023[3] Nonattainment/ Maintenance Design Value (ppb) | TCEQ 2012: 2023 Nonattainment/ Maintenance Design Value (ppb) |
|---|---|---|---|---|
| 170310001, Cook County, IL | Maintenance | 69.6/73.4 | 63.3/65.1 | 60/58 |
| 170310032, Cook County, IL | Maintenance | 69.6/73.4 | 57.6/60.0 | 68/66 |
| 170314201, Cook County, IL | Maintenance | 69.9/73.4 | 56.6/58.4 | 64/62 |
| 170317002, Cook County, IL | Maintenance | 70.1/73.0 | 54.1/57.0 | 66/65 |
| 550590019, Kenosha County, WI | Nonattainment | 72.8/73.7 | 59.7/61.9 | 67/66 |
| 550590025, Kenosha County, WI | Maintenance | 69.2/72.3 | No 2010-2012 monitoring data | No 2010-2012 monitoring data |
| 551010020, Racine County, WI | Nonattainment | 71.3/73.2 | No 2010-2012 monitoring data | No 2010-2012 monitoring data |

Based on this information, if the EPA had relied on modeling conducted for 2023 using emission information available when the TCEQ was required to submit its SIP revision, such as the 2011v6.3 platform, it would not have identified the monitors listed above as nonattainment or maintenance monitors because modeled 2023 design values were below 71 ppb.

Analysis of the EPA and TCEQ modeling also shows greater difference between the predicted 2023 design values and the observed 2020 design values as the prediction time lengthens. Figure 2, Difference in Design Value Predicted in 2023 versus Observed in 2020. Predictions are from the EPA 2011 modeling (upper left), TCEQ 2012 modeling (upper right), and EPA 2016 modeling (lower) shows that the mean difference across common monitors decreases from -6.20 ppb for a 12-year prediction time, to -6.08 for an 11-year prediction, to -4.34 for a seven-year prediction time. The shaded interquartile range of the distribution also tightens with decreasing prediction time, indicating uniformly better prediction. Note that the TCEQ 2012 modeling shows a similar design value difference to the EPA 2011 modeling indicating similar performance. The difference in design values is largely explained by the shorter prediction time, as seen in Figure 2, Difference in Design Value Predicted in 2023 versus Observed in 2020 versus Length of Prediction, where the TCEQ 2012 modeling

---

[3] EPA 2011v6.3 data are from https://www.epa.gov/sites/default/files/2016-12/2015_o3_naaqs_preliminary_transport_assessment_design_values_contributions.xlsx

is shown as the eleven-year prediction length roughly on the linear trend of the three models.



Figure 1. Difference in Design Value Predicted in 2023 versus Observed in 2020. Predictions are from the EPA 2011 modeling (upper left), TCEQ 2012 modeling (upper right), and EPA 2016 modeling (lower)



Figure 2. Difference in Design Value Predicted in 2023 versus Observed in 2020 versus Length of Prediction

The TCEQ chose to use a 2012 base year since it was the most comprehensive, non-anomalous, and best modeling platform available when the modeling needed to commence to meet the SIP development and submittal deadlines.

**The TCEQ disagrees with EPA's claim that it does not use the 0.7 ppb contribution threshold as the 'sole' determinant of significant contribution from upwind states because the EPA evaluated potential emission reductions in upwind states to determine whether potential emissions reductions are significant to downwind monitors.**

The EPA claims that by evaluating if a state has sufficient emission reductions to remove the 0.7 ppb contribution to a downwind nonattainment or maintenance monitor, the EPA's 4-step methodology does not use the 0.7 ppb as the 'sole' determinant of significant contribution and that EPA's methodology is similar to the TCEQ's weight of evidence methodology. However, the EPA is conflating the ability to mitigate contributions with whether the contribution itself is significant in its approach. The potential for emissions reductions should not be used as justification for significant contribution. Significant contribution should be established prior to determining if emissions reductions are needed as the TCEQ did in its transport analysis. Further, the TCEQ's use of a weight of evidence approach to determine significant contribution is consistent with the EPA's modeling guidance, "*Modeling Guidance for Demonstrating Air Quality Goals for Ozone, PM$_{2.5}$, and Regional Haze*" (EPA Modeling Guidance) and the approach laid out in "*Guidance on the Preparation of Clean Air Act Section 179B Demonstrations for Nonattainment Areas Affected by International Transport of Emissions,*" (179B Guidance) where a determination of significant contribution is made if sources outside of a nonattainment area impact a nonattainment area in the context of a 179B demonstration. When air quality modeling is used in the context of attainment and 179B demonstrations, the EPA requires states to provide supplemental analysis to support the modeling results, such as local factors

and emission trends. However, in the context of the "Good Neighbor" provision, the EPA dismisses the additional analyses provided by the TCEQ as qualitative assessments that, while informative, do not provide quantitative assessments. The EPA's reliance on chemical transport models as the sole arbiter of significant contribution contradicts its own modeling guidance, which states that "…supplemental analyses may provide information which may provide further support for the outcome of the modeled test or *may indicate a different outcome than the modeled test.*"[4] (Emphasis added.) It should be noted that the 179B Guidance is prescriptive and lays out a weight of evidence approach that relies on more than source apportionment modeling results to determine impacts from international sources. The EPA's heavy reliance on source apportionment modeling and disregard of additional evidence in the context of interstate transport is arbitrary and inconsistent with its guidance on international transport.

**The TCEQ's methodology for determining future contributions is consistent with EPA guidance.**

The EPA Modeling Guidance provides details on the model values and the grid cells to use when estimating the future year design value as part of the modeled attainment test. The TCEQ's methodology to determine a state's contribution to the future aligns with the method used to estimate future year design values. The TCEQ's methodology is internally consistent as the grid cell and top ten days used in the design value calculation are the same as those used to estimate the source (state) contribution. The TCEQ's methodology follows the EPA modeling guidance while the EPA's methodology does not. The TCEQ has repeatedly raised concerns about the EPA's method to determine future year contributions since the EPA approach does not align with the calculation of the future year nonattainment and maintenance design values with respect to the model grid cell and top ten days used.

The TCEQ reiterates that the EPA should only use contributions from days in the calculation of the relative response factor when calculating an upwind state's contributions to future design values. Using one set of days to calculate the future year design value that is the basis for a monitor's future attainment status (attainment/maintenance/nonattainment) and a different set to determine the states' contribution to that design value is inconsistent and arbitrary.

Further, the EPA uses concentrations from the grid cell containing the monitor to determine state contributions while using concentrations at the grid cell with the maximum modeled concentration in a "3x3" array centered on the monitor when calculating design values. The EPA's approach could result in the use of modeled concentrations from different grid cell locations potentially disconnecting the future year contributions from the future year design values.

The TCEQ's approach uses modeled concentrations from the grid cell on the days that were used in the design value calculation to determine future year contributions. The TCEQ's method is consistent, and the EPA failed to provide a rational justification for its concerns with regards to the TCEQ's approach.

---

[4] Page 170 of the EPA Modeling Guidance, https://www.epa.gov/sites/production/files/2020-10/documents/o3-pm-rh-modeling_guidance-2018.pdf

**The EPA did not consider all of the information provided to it by the TCEQ. The TCEQ disagrees with the potential concerns that the EPA raises with regards to the TCEQ's modeling of electric generating units and boundary conditions.**

The EPA in the "*EPA Region 6 2015 8-Hour Ozone Transport SIP Proposal Technical Support Document*" discusses potential concerns about the electric generating unit (EGU) emissions and boundary conditions in TCEQ's modeling. The EPA fails to acknowledge the additional analysis provided to the EPA via email on June 6, 2016, detailing the differences in 2023 EGU emissions by state in the TCEQ modeling with the various EGU emissions projections available at the time TCEQ's SIP was developed. The comparison showed that the EGU emissions included in TCEQ's modeling were comparable to emissions in EPA's Engineering Analysis and the latest emissions available in the Air Market's Program Database. The EPA also fails to acknowledge that the TCEQ provided additional information summarizing the change in modeled ozone contribution at monitors attributable to boundary conditions when boundary conditions accounted for changes in future year emissions. The EPA did not request additional analyses or express concerns with TCEQ's modeling after the additional information was provided in June 2018.

**The EPA mischaracterizes the purpose and analytic details in the TCEQ's weight of evidence, invalidating the EPA's conclusions regarding the impact of Texas emissions.**

In the "*EPA Region 6 2015 8-Hour Ozone Transport SIP Proposal Technical Support Document*" the EPA states that the TCEQ used its weight of evidence to counter the modeling results. This is a misinterpretation of the purpose of the weight of evidence. The TCEQ used the weight of evidence not to determine if Texas contributed *at all* to linked monitors but rather to determine if Texas contributes to those monitors *significantly and persistently.*

In addition, the following errors in the EPA's Technical Support Document (TSD) make its SIP disapproval invalid.

- On pages 81-86 of the TSD, the EPA states concerns with the trajectory parameters used by the TCEQ. The TCEQ's trajectory parameters were set at ranges typically used for analyses of this kind. This is not a legitimate basis for disapproval since the EPA did not provide specific guidance on acceptable parameters for this application. In other applications (for example the Guidance on the Preparation of Clean Air Act Section 179B Demonstrations for Nonattainment Areas Affected by International Transport of Emissions), the EPA has provided specific trajectory parameters required for approval.

- The EPA incorrectly describes the start time of the TCEQ's trajectories. The EPA states "TCEQ used the 1st hour of the 8-hour exceedance as the start time" (page 82). The Texas SIP clearly states on page 3-53 that "The time of daily maximum one-hour ozone on the elevated eight-hour ozone day was used as the starting hour for each trajectory." The EPA's concerns regarding the start time of trajectories are based on an erroneous reading of the document and thus should not be considered in evaluating the Texas SIP revision.

- On page 82, the EPA states that the TCEQ should have also used an additional 100 meters above ground level (m AGL) start height for the trajectories; however, trajectories with too low of a start height may hit the ground. Once a

trajectory hits the ground it loses accuracy and may no longer provide useful data, especially when considering the distance between the source and receptor in the TCEQ's analysis. The National Oceanic and Atmospheric Administration (NOAA) recommends start heights that are located in the middle of the planetary boundary layer. Start heights at 500 m AGL are well within these standard parameters; therefore, disagreement regarding trajectory start height is not a legitimate reason to discount the TCEQ analysis or disapprove this Texas SIP revision.

- The TCEQ used scientifically appropriate filtering criteria on its trajectories. As stated above, NOAA recommends start heights located in the middle of the mixing layer. Trajectories that hit the ground may be inaccurate and removing them to analyze more significant trajectories was appropriate in the context of the weight of evidence analysis. All trajectory endpoints that met these two criteria were presented regardless of whether they were in the mixing layer over Texas. The analysis only filtered endpoints within the mixing layer over Texas as an additional analysis to describe trajectories that show more meaningful transport patterns. The EPA has no scientific basis for concluding that the TCEQ inappropriately filtered trajectories.

**T AB E:
D ECLARATION OF D WAYNE W. "W OODY " R ICKERSON ,
V ICE P RESIDENT OF S YSTEM P LANNING &
W EATHERIZATION FOR E LECTRIC R ELIABILITY C OUNCIL
OF T EXAS , I NC . (ERCOT D ECL .)**

# DECLARATION OF
# DWAYNE W. "WOODY" RICKERSON

1. I am the Vice President of System Planning & Weatherization for Electric Reliability Council of Texas, Inc. (ERCOT), where I am responsible for transmission planning, generator interconnection activities, weatherization inspections, and resource adequacy analyses. I have worked at ERCOT for the past 22 years. I have a Bachelor of Sciences degree in Electrical Engineering from New Mexico State University and a Master of Engineering in Engineering Management from the University of Colorado. I am providing this declaration on behalf of ERCOT.

2. I am submitting this declaration because it is my understanding that the Environmental Protection Agency (EPA)'s disapproval of the Texas state implementation plan (SIP) for addressing regional ozone transport under the 2015 National Ambient Air Quality Standard (NAAQS) could allow EPA to implement the federal implementation plan (FIP) that EPA proposed in April 2022 and that is expected to be adopted by EPA in final form on March 15, 2023.  As further explained in this declaration, I am concerned that the implementation of the EPA's FIP could result in imminent harm to the reliability of the ERCOT grid for the 2023 Ozone Season (defined to be May 1, 2023 through September 30, 2023).

## Background: ERCOT's Role in Managing Texas's Electric Grid and Electricity Market

3. ERCOT is the independent system operator (ISO) designated by the Public Utility Commission of Texas for the purpose of managing the ERCOT transmission grid, which serves approximately 26 million customers in the State of Texas.

4. In its role as the ISO, ERCOT is tasked with a number of critical functions, including "ensur[ing] the reliability and adequacy of the regional electrical network" and administering the wholesale electricity market. Texas Utilities Code section 39.151(a)(2), (4).  One of the most important ways ERCOT ensures system reliability is by managing the flow of electric power on the grid every moment of every day.  ERCOT performs this function by dispatching each of hundreds of generators located across the system to match the system demand of these customers at all times, while also observing the physical limits of the transmission lines that transport that power.

5. ERCOT is also registered with the North American Electric Reliability Corporation (NERC) as the sole Reliability Coordinator and Balancing Authority for the ERCOT region under the reliability framework in section 215 of the Federal Power Act. In these roles, ERCOT has the ultimate responsibility to direct the operation of the ERCOT power grid to ensure generation and load are balanced and to take all appropriate actions needed to ensure the security of the grid during emergency conditions.

6. ERCOT does not engage in advocacy except where its core functions, including electric grid reliability, may be affected. ERCOT's interests in this matter are limited to the reliable operation of the ERCOT grid.

7. Under the statutory design of the ERCOT wholesale electricity market, generation owners bear the risk of investment when deciding the timing and location of new generation or the retirement of existing generation based on market conditions. ERCOT cannot mandate construction of new generation. Rather, the ERCOT market is designed to provide financial signals to generation companies to develop adequate generation capacity. As part of its responsibilities, ERCOT evaluates the impacts to grid reliability of possible and pending changes in generation capacity.

**212**

### Risks Associated with Growth in Renewable Generation

8. Because the ERCOT wholesale market relies on market forces to ensure generation sufficiency, investment dollars tend to favor investments that have the greatest rates of return. For at least the past decade, federal tax incentives for investment in renewable generation have been the primary factor leading investors to strongly favor wind and solar projects to meet the growing demand in the ERCOT region.

9. Whereas wind and solar generators accounted for less than 1% of the total generating capacity in 2007, those generators now account for a combined 40% of the total generating capacity and produce 39% of the energy in the ERCOT region.

10. Wind and solar generation also account for approximately 21,683 MW, or 69%, of the approximately 31,287 MW in generation capacity that is currently proposed to interconnect in the ERCOT region within the next three years, while gas-fired generating units account for only 5%, and coal units account for zero percent of the generation capacity that is proposed to interconnect.

11. Increases in generation capacity from renewables alone are not adequate to supply the future electric energy demands of a growing 26 million customer base in ERCOT. Wind and solar generating units are intermittent sources of generation. During daylight hours, cloud cover can cause fluctuations in solar energy production. Solar energy production also dissipates rapidly in the evening and is nonexistent at night. Wind generation will also vary with weather patterns, time of day, and seasons.

12. Together, the variability of wind and solar power production creates the need for replacement energy that must come from dispatchable sources such as gas and coal units. Battery energy storage devices do not currently have enough installed capacity in the ERCOT grid to provide this replacement energy. The forecasted installation of new batteries in the next three years will not meet the projected demand.

13. Replacement energy from dispatchable sources must also be able to increase and decrease quickly. This ramping capability is needed to match the variability associated with wind and solar energy production. If the amount of dispatchable generation capacity is reduced due to increased emissions limits, the risk that ERCOT will not be able to meet its load demands increases.

### Imminent Harm to ERCOT Reliability for Ozone Season 2023

14. It is my understanding that the EPA's proposed FIP will reduce the availability of allowances for nitrogen oxides (NOx) emissions from electric generation facilities for the Summer 2023 Ozone Season, which is defined as May 1, 2023 through September 30, 2023. This reduction in NOx emission allowances will impact the operation of the gas and coal facilities that are needed to manage the reliability of the grid because gas and coal units produce NOx as a byproduct of generating electricity.

15. Based on data provided to ERCOT by a subset of owners of coal and gas-fired generating units regarding the impacts in the reductions of these allowances, those units would need to reduce their capacity by 26% during summer of 2023.

16. The units for which these owners provided data collectively represented units that have already installed Selective Catalytic Reduction (SCR) technology as well as units that do not currently have SCR technology. Consequently, for this data sample, while some lower-emitting units would be expected to increase generation for summer of 2023 in order for higher-emitting units to run less, a

26% total reduction in capacity was predicted for this subset of units as a whole.

17. ERCOT extrapolated the data from this subset of coal- and gas-fired generating unit owners to understand possible system-wide impacts. ERCOT evaluated the roughly 12,281 megawatts (MW) of generation in the ERCOT footprint that have been identified as being required to install SCR technology by 2026 to meet the EPA's proposed FIP emissions for that year. Assuming those units that currently lack SCR technology are units that would need to reduce emissions in 2023, using the 26% reduction in capacity noted above, ERCOT calculated that under EPA's proposed FIP, there could be a 3,193 MW reduction in thermal capacity for summer of 2023 for the ERCOT system (26% of 12,281 MW.)

18. For Ozone Season 2022, the tightest reserve capacity margin in ERCOT occurred on July 13, 2022 at 3:23 p.m. At that time, ERCOT had 2,408 MW of capacity reserves. If the July 13, 2022 conditions were to occur again in 2023, it is expected that a 3,193 MW reduction in thermal capacity would require ERCOT to direct at least 1785 MW of firm load-shedding in order to maintain 1000 MW of operating reserves. When ERCOT directs firm load-shedding, utilities are required to disconnect customers from the power grid in order to avoid a system-wide blackout.

19. With 3,193 MW less thermal capacity available in summer of 2023, ERCOT estimates that during the 4 p.m. hour on a peak load day, the likelihood that ERCOT would need to direct firm load-shedding would be five times greater than it would be without the reduction of capacity. (The peak load day is the day in ERCOT's long-term load forecast for summer 2023 that ERCOT has the highest load. The 4 p.m. hour is the hour forecasted to be the peak demand hour in that same forecast for summer 2023. Therefore, if load meets or exceeds that forecasted peak demand, the chance of load-shedding would be five times greater than it would be without the reduction in capacity.)

20. With 3,193 MW less thermal capacity available in summer of 2023, ERCOT estimates that during the 7 p.m. hour on a peak load day, the likelihood that ERCOT would need to direct firm load-shedding would be two and a half times greater than it would be without the reduction of capacity.

21. With 3,193 MW less thermal capacity available in summer of 2023, ERCOT estimates that during the 4 p.m. hour on a peak load day, the likelihood that ERCOT would enter Emergency Energy Alert 1 (EEA1)—which means that operating reserves for the Texas grid have dropped below 2,300 megawatts and are not expected to recover within 30 minutes—would be four times as large. Note that during EEA1, there are no controlled outages, but ERCOT can acquire additional resources during capacity scarcity conditions as well as issue calls for conservation.

22. With 3,193 MW less thermal capacity available in summer of 2023, ERCOT estimates that during the 7 p.m. hour on a peak load day, the likelihood that ERCOT would enter EEA1 would double.

23. EPA uses an Integrated Planning Model (IPM) to project future conditions in the electricity market, including unit-specific summer generation expectations. The EPA model results that take into account the impacts of the proposed FIP for 2023 are located on EPA's website at https://www.regulations.gov/document/EPA-HQ-OAR-2021-0668-0161m under the spreadsheet labeled "Proposed Rule RPE File." Column A of that spreadsheet can be filtered for only the year 2023. Column B, "Region Group," can be filtered for only the ERCOT region. Column V "Generation Summer GWh," shows many units for which EPA has assumed will have zero output under the 2023 FIP. When units that have a non-zero output, and therefore are assumed to be operating in summer 2023, are deleted from the sum of column AW "Dispatchable Capacity MW," the remainder for column AW, and therefore what is assumed by EPA to *not* operate in summer 2023 because of the FIP, sums to 17,611 MW. However, this number appears to double-count three units

3

with a total output of 2,568 MW. Subtracting this apparent error from the 17,611 MW amount results in a total of 15,044 MW.

24. Therefore, while ERCOT has evaluated the effects of a reduction in capacity of 3,193 MW for summer 2023, this number actually appears to be quite conservative. EPA's own data indicates a 15,044 MW reduction in capacity for ERCOT for summer 2023.

25. If ERCOT were to have 15,044 MW less thermal capacity available in summer of 2023, it is even more likely that ERCOT would need to direct firm load-shedding. ERCOT estimates that under this scenario during the 4 p.m. hour on a peak load day, the likelihood of needing to direct firm load-shedding would be 77 times greater than it would be without the reduction of capacity.

26. If ERCOT were to have 15,044 MW less thermal capacity available in summer of 2023, ERCOT estimates that under this scenario during the 7 p.m. hour on a peak load day, the likelihood that ERCOT would need to direct firm load-shedding would be eight times greater than without the reduction of capacity.

27. While paragraphs 19-26 address impacts on a single peak load day, it should be noted that numerous non-peak load days from May 1, 2023 through September 30, 2023 will experience similar probabilities that ERCOT would need to direct firm load-shedding.

28. While the above impacts have addressed 2023 system-wide impacts that can be extrapolated from the data provided or available to ERCOT, a reduction in capacity from generators, even when ERCOT has a large enough reserve margin to meet demand, can cause additional stress on the system, leading to operational problems. In effect, this additional stress can mean that even when ERCOT has sufficient generation to meet demand, it may be unable to deploy power to the customers that need it because there are not sufficient available transmission paths to deliver that energy.

29. Based on data provided by a subset of owners of coal- and gas-fired generating units regarding the impacts in the reductions of these allowances, ERCOT determined that the reductions in generating capacity would also cause local and regional reliability issues due to overloads of multiple transmission elements. ERCOT's analysis showed that some of these overloads could not be addressed by existing generation redispatch and would result in some amount of regional firm load-shedding to address these reliability issues. Regional firm load-shedding is used to address specific transmission overloads. This differs from firm loadshedding that may be directed to balance generation and load across an entire grid.

30. These overload issues would also limit ERCOT's ability to deliver available generation capacity using the existing transmission system to address the unavailability of the coal- and gas-fired generating units. This, in turn, would exacerbate the system-wide impacts that are described in paragraphs 14-27.

## Harm to ERCOT Reliability beyond Ozone Season 2023

31. ERCOT has been informed by owners of coal- and gas-fired generating units that the proposed FIP's mandate that owners of certain generating units must install SCR technology by 2026 would be prohibitively expensive and would therefore lead these generation owners to retire their units.

32. ERCOT understands that as much as 10,800 MW of capacity in the ERCOT region—8,200 MW of coal-fired generation and 2,600 MW of gas-fired generation—is at risk of retirement due to the SCR mandate, a loss of thermal capacity that could have catastrophic consequences for the electric grid in

4

2026.

33. The risks associated with the retirements of these units include but are not limited to: the increase in probability that ERCOT will need to direct utilities to shed firm load (i.e., to disconnect customers from the grid) to ensure the reliability of the remaining electric system; the reduced availability of outages for the remaining thermal generation fleet; the reduction in system inertia; and the impact on transmission flows and associated reliability problems.

34. ERCOT performed a study to quantify this risk for summer 2026, assuming the retirement of 10,800 MW of coal and gas generation. In this assessment, ERCOT used its Operating Reserve Risk Model to run 10,000 simulations of conditions during this period. ERCOT's assessment concluded that the probability of the supply of generation being inadequate to serve the demand on the grid during the 7 to 8 p.m. window at some point in summer 2026 increased from 4.5% to 40%.

35. Therefore, while solar energy is dissipating fairly rapidly in the evening, ERCOT will have an approximately nine times greater risk of having insufficient generation to meet demand in 2026 if the proposed FIP is finalized. This vulnerability is most pronounced between 7 to 8 p.m. but extends to other hours of the day.

36. While ERCOT has produced the above data for 2026, ERCOT anticipates that the mandate that owners of certain units must install SCR technology by 2026 could lead to retirement of coal- and gas-fired generating units prior to 2026, causing a gradual increase in the risk of having insufficient generation to meet demand.

**<u>Conclusion</u>**

37. In my opinion, the proposed FIP poses an imminent harm to the reliability of the ERCOT grid in summer of 2023 and in later years.

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed on March 2, 2023.

  /s/ D. W. Rickerson

Dwayne W. "Woody" Rickerson
Vice President of System Planning & Weatherization
Electric Reliability Council of Texas, Inc.