No. 23-60069

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

STATE OF TEXAS, et al.,

*Petitioners*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al.,

*Respondents*.

PETITION FOR REVIEW OF A FINAL AGENCY ACTION OF THE UNITED
STATES ENVIRONMENTAL PROTECTION AGENCY

**RESPONDENTS' CORRECTED CONSOLIDATED RESPONSE IN
OPPOSITION TO THE MOTIONS FOR STAY OF THE FINAL RULE**

TODD KIM
*Assistant Attorney General*

*Of Counsel:*
ROSEMARY HAMBRIGHT KABAN
DANIEL P. SCHRAMM
  *Office of the General Counsel*
  *U.S. Environmental Protection*
    *Agency*
  *Washington, DC*

JIN HYUNG LEE
*U.S. Department of Justice*
*Environment and Natural Resources*
  *Division*
*P.O. Box 7611*
*Washington D.C. 20044-7611*

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

| | |
|---|---|
| STATE OF TEXAS, et al.,<br><br>    Petitioners,<br><br>        v.<br><br>UNITED STATES ENVIRONMENTAL<br>PROTECTION AGENCY, et al.,<br><br>    Respondents. | No. 23-60069 |

## CERTIFICATE OF INTERESTED PERSONS

Under the fourth sentence of Fifth Circuit Rule 28.2.1, Respondents, as governmental parties, need not furnish a certificate of interested persons.


Date: March 31, 2023

> /s/ Jin Hyung Lee
> JIN HYUNG LEE
> U.S. Department of Justice
> Environment & Natural Resources
> Division
> Environmental Defense Section
> P.O. Box 7611
> Washington, D.C. 20044
> (202) 514-2640
> jin.hyung.lee@usdoj.gov
>
> *Counsel for Respondents*

i

## TABLE OF CONTENTS

TABLE OF CONTENTS .......................................................................... ii

TABLE OF AUTHORITIES ................................................................. iv

INTRODUCTION ................................................................................1

BACKGROUND ..................................................................................3

    I.     Statutory Background...........................................................3

    II.    Implementation of the Good Neighbor Provision...............................4

    III.   Procedural History................................................................6

          A.    2015 Ozone NAAQS .................................................6

          B.    EPA's Evaluation of Good Neighbor SIPs ................................7

          C.    EPA's Disapproval of SIPs Submitted by Texas and 20 Other States ...................................................................9

          D.    EPA's Federal Good Neighbor Plan for the 2015 Ozone NAAQS ...................................................................11

          E.    Litigation Over the Final Rule .................................................13

ARGUMENT ........................................................................................14

    I.     The Motion Should be Denied on Venue Grounds or Transferred to the D.C. Circuit.............................................15

    II.    Movants Are Not Entitled to a Stay. .................................................16

          A.    Movants Are Unlikely to Succeed on the Merits.....................16

                 1.    EPA Acted Within Its Statutory Oversight Role............17

2.    EPA Reasonably Determined Texas's SIP
Submission Failed to Comply with the Good
Neighbor Provision. ....................................................... 19

3.    EPA Reasonably Evaluated SIP Submissions
Using the Most Accurate, Up-to-Date Data. ................. 22

4.    EPA Reasonably Determined that Texas's Method
for Identifying Maintenance Receptors was
Legally and Technically Flawed. ................................... 25

5.    EPA Reasonably Determined that Texas's
Alternative Modeling Likely Underestimates
Future Ozone Levels. ..................................................... 29

B.    Movants Have Not Shown Irreparable Harm Absent a
Stay. ......................................................................................... 30

C.    The Balance of Equities and Public Interest Disfavor a
Stay. ......................................................................................... 36

CONCLUSION ................................................................................................. 39

CERTIFICATES OF COMPLIANCE ............................................................. 40

CERTIFICATE OF SERVICE ......................................................................... 41

# TABLE OF AUTHORITIES

## Cases

*BCCA Appeal Grp. v. EPA*,
  355 F.3d 817 (5th Cir. 2003) ................................................................16

*Dalton Trucking, Inc. v. EPA*,
  808 F.3d 875 (D.C. Cir. 2015)...............................................................31

*EPA v. EME Homer City Generation, L.P.*,
  572 U.S. 489 (2014) ................................................. 2, 3, 4, 5, 17, 25, 29, 36, 37

*EME Homer City Generation, L.P. v. EPA*,
  795 F.3d 118 (D.C. Cir. 2015)................................................................5

*Fla. Power & Light Co. v. Costle*,
  650 F.2d 579 (5th Cir. 1981) ................................................................17

*Gen. Motors Corp. v. United States*,
  496 U.S. 530 (1990) ............................................................................3

*Horsehead Res. Dev. Co., Inc. v. EPA*,
  130 F.3d 1090 (D.C. Cir. 1997).............................................................31

*Long Island Care at Home, Ltd. v. Coke*,
  551 U.S. 158 (2007) ...........................................................................26

*Louisiana v. Biden*,
  55 F.4th 1017 (5th Cir. 2022) ......................................................... 30, 31

*Luminant Generation Co. LLC v. EPA*,
  714 F.3d 841 (5th Cir. 2013) ......................................................... 17, 18

*Maybelline Co. v. Noxell Corp.*,
  813 F.2d 901 (8th Cir. 1987) ................................................................15

*Mazurek v. Armstrong*,
  520 U.S. 968 (1997) ...........................................................................14

*Midwest Ozone Grp. v. EPA*,
  61 F.4th 187 (D.C. Cir. 2023) .............................................................5, 7

*New York v. EPA*,
   781 F. App'x 4, No. 19-1019, 2019 WL 5394069 (D.C. Cir. 2019) ...................7

*Nken v. Holder*,
   556 U.S. 418 (2009) ................................................................... 15, 36

*North Carolina v. EPA*,
   531 F.3d 896 (D.C. Cir. 2008)....................................................... 26, 27

*Noxell Corp. v. Firehouse No. 1 Bar-B-Que Restaurant*,
   760 F.2d 312 (D.C. Cir. 1985)...............................................................15

*Oklahoma v. EPA*,
   723 F.3d 1201 (10th Cir. 2013)............................................................24

*Sierra Club v. EPA*,
   671 F.3d 955 (9th Cir. 2012) ........................................................ 23, 25

*Sierra Club v. EPA*,
   939 F.3d 649 (5th Cir. 2019)...............................................................16

*Texas v. EPA,*
   829 F.3d 405 (5th Cir. 2016) ................................... 16, 18, 19, 24, 30

*Train v. NRDC*,
   421 U.S. 60 (1975) .............................................................................17

*Union Elec. Co. v. EPA*,
   427 U.S. 246 (1976) ...................................................................... 16-17

*Westar v. EPA*,
   Nos. 11–1333, 12–1019, 2015 WL 4067382 (D.C. Cir. 2015)...........................18

*Winter v. NRDC*,
   555 U.S. 7 (2008) ........................................................................ 31, 36

*Wis. Gas Co. v. FERC*,
   758 F.2d 669 (D.C. Cir. 1985)............................................................30

*Wisconsin v. EPA*,
   938 F.3d 303 (D.C. Cir. 2019)................................................... passim

**Statutes**

42 U.S.C. § 6976(a)(1)................................................................................................31

42 U.S.C. § 7401(b)(1)................................................................................................3

42 U.S.C. § 7408................................................................................................3

42 U.S.C. § 7409................................................................................................3

42 U.S.C. § 7410(a)................................................................................................3

42 U.S.C. § 7410(a)(2)(D)(i)(I) ................................................................ 1, 4, 17, 23

42 U.S.C. § 7410(c)(1)................................................................ 4, 11, 30

42 U.S.C. § 7410(a)(1)................................................................................................6

42 U.S.C. § 7410(k)(3)................................................................ 1, 4, 17

42 U.S.C. § 7410(k)(5)................................................................................................29

42 U.S.C. § 7502................................................................................................3

42 U.S.C. § 7511................................................................................................3

42 U.S.C. § 7511(a) ................................................................................................3

42 U.S.C. § 7511(a)(1)................................................................................................4

42 U.S.C. § 7601(a)(1)................................................................................................4

42 U.S.C. § 7604(a)(2)................................................................................................24

42 U.S.C. § 7607(b)(1)................................................................ 14, 31

**Regulations**

40 C.F.R. § 51.1303 ................................................................................................4

76 Fed. Reg. 48208 (Aug. 8, 2011)................................................................................................5

80 Fed. Reg. 65292 (Oct. 26, 2015)................................................................................................6

81 Fed. Reg. 74504 (Oct. 26, 2016)................................................................................................5

86 Fed. Reg. 23054 (Apr. 30, 2021) ..........................................................5, 7

87 Fed. Reg. 20036 (Apr. 6, 2022) ...........................................................31

87 Fed. Reg. 9798 (Feb. 22, 2022) ................................................. passim

88 Fed. Reg. 9336 (Feb. 13, 2023) ................................................ passim

## INTRODUCTION

Because air pollutants heed no state boundaries, the "Good Neighbor Provision" of the Clean Air Act ("CAA" or "Act"), 42 U.S.C. § 7410(a)(2)(D)(i)(I), requires states to ensure that their emissions do not significantly contribute to other states' air-quality problems. This is a particularly critical requirement for ozone, which is formed from many sources' emissions and travels great distances to impact downwind states' air quality. *Wisconsin v. EPA*, 938 F.3d 303, 309 (D.C. Cir. 2019). The Act requires EPA to review a state's plan for compliance with the Good Neighbor Provision and to disapprove a noncompliant plan. 42 U.S.C. § 7410(k)(3).

In the action under review (the "Final Rule"), EPA reasonably determined that plans submitted by Texas and 20 other states failed to comply with the Good Neighbor Provision for ozone. Air Plan Disapprovals; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards, 88 Fed. Reg. 9336, 9338 (Feb. 13, 2023) (Ex. 1). Governmental and non-governmental entities from seven states petitioned for review of the Final Rule in four regional circuit courts, and several, including two groups of Texas Petitioners in this Court ("Texas" and "Texas Industry Groups," and together "Movants"), have moved to stay the Final Rule.

The motions should be denied.  At the outset, Movants are not entitled to relief of any kind because venue is improper; this threshold issue should be resolved before the stay motions.  *See* ECF No. 50.  Regardless, Movants are not entitled to a stay.

First, Movants' challenge to the Final Rule is unlikely to succeed.  In *EPA v. EME Homer City Generation, L.P.*, the Supreme Court discerned in the Good Neighbor Provision "a delegation of authority to EPA to select from reasonable options," 572 U.S. 489, 515 (2014), and upheld as reasonable the very framework for evaluating state plans that EPA employed in this rule, *see id.* at 518-24.  EPA thoroughly evaluated Texas's data, methodology, and modeling and reasonably found Texas's submission deficient, even on its own (flawed) terms.

Second, Movants have not established irreparable harm from the Final Rule—which does not require Movants to do *anything*—or from the federal plan that the Rule compelled EPA to promulgate, which is a separate action that is not under review here.  Movants misapprehend that federal plan and cite features of the *proposed* federal plan that were never finalized.

Third, the balance of the harms and the public interest disfavor a stay.  Texas's power plants are among the highest emitters of ozone precursors in the United States, impacting many states hundreds of miles away.  Suspending EPA's Good Neighbor authority as to Texas while this litigation proceeds would harm the

health and welfare of millions of people who live in the areas impacted by

pollution originating in Texas.

## BACKGROUND

### I.     Statutory Background

The Clean Air Act seeks "to protect and enhance the quality of the Nation's

air resources so as to promote the public health and welfare."  42 U.S.C.

§ 7401(b)(1).  To that end, the Act controls air pollution through a system of

shared federal and state responsibility.  *See Gen. Motors Corp. v. United States*,

496 U.S. 530, 532 (1990).  The Act tasks EPA to establish, periodically review,

and, if appropriate, revise National Ambient Air Quality Standards ("NAAQS"),

which are set to limit the concentration of certain pollutants in the ambient air to

protect against the pollutants' effect on public health and welfare.  42 U.S.C.

§§ 7408-7409.  Once EPA sets new or revised NAAQS, the Act shifts

responsibility to states to propose for EPA's review a state implementation plan

("SIP") that implements, maintains, enforces, and brings "nonattainment" areas

into compliance with, the NAAQS.  *Id.* §§ 7410(a), 7502, 7511-7511a.

Many states have problems attaining and maintaining NAAQS due, in part,

to emissions transported from other states.  *EME Homer*, 572 U.S. at 496.  This is

particularly true for ozone, which can travel great distances.  *Id.* at 497.  When a

state's pollution problems are caused in part by emissions from "upwind" states,

the "downwind" state must regulate its own emission sources more stringently to compensate; even then, some downwind areas still cannot attain healthy air quality. *Id.* at 496-97.  The Good Neighbor Provision addresses interstate pollution transport by requiring each SIP to prohibit emissions that "contribute significantly to nonattainment . . . or interfere with maintenance" of the NAAQS in downwind states.  42 U.S.C. § 7410(a)(2)(D)(i)(I); *see also EME Homer*, 572 U.S. at 499. States must meet their Good Neighbor obligations "as expeditiously as practicable" but no later than the next applicable attainment date, which is now August 3, 2024. *See* 42 U.S.C. §§ 7410(a)(2)(D)(i)(I), 7511(a)(1)*; 40 C.F.R. § 51.1303; *see also* Wisconsin*, 938 F.3d at 315-19, 321.

EPA reviews states' submissions and must disapprove a SIP that does not comply with the Good Neighbor Provision.  42 U.S.C. § 7410(k)(3).  EPA's disapproval of a SIP does not require a state or sources within that state to do anything, but EPA must promulgate a federal implementation plan ("FIP") for the state "at any time within 2 years" of disapproving a SIP, unless the state corrects the deficiency in the interim.  *Id.* § 7410(c)(1); *EME Homer*, 572 U.S. at 508.

## II.     Implementation of the Good Neighbor Provision

EPA issues rules to carry out its CAA functions, *see* 42 U.S.C. § 7601(a)(1), and one of those functions is to determine whether states' SIP submissions "meet[] all of the applicable requirements of the [Act]," *id.* § 7410(k)(3).  EPA has

interpreted the Act's Good Neighbor requirements over decades in several rulemakings.[1]  Courts, including the Supreme Court, have consistently upheld the 4-step framework EPA developed for evaluating and defining Good Neighbor obligations as being consistent with the Act and "permissible, workable, and equitable." *EME Homer*, 572 U.S. at 524; *see also, e.g., Midwest Ozone Grp. v. EPA*, 61 F.4th 187 (D.C. Cir. 2023); *Wisconsin*, 938 F.3d 303; *EME Homer City Generation, L.P. v. EPA*, 795 F.3d 118 (D.C. Cir. 2015).

Under this framework, the regulating agency (whether EPA or a state) must:

(1) identify downwind states expected to have problems attaining or maintaining their NAAQS;

(2) identify upwind states whose pollution is linked to those downwind states above a contribution threshold;

(3) evaluate whether the linked states "significantly" contribute to downwind states' nonattainment or interfere with their maintenance of the NAAQS by evaluating potential cost-effective emissions reduction opportunities to determine what amount of contribution is "significant"; and

(4) implement necessary emissions reductions through enforceable controls.

---

[1] *See, e.g.,* Federal Implementation Plans: Interstate Transport of Fine Particulate Matter and Ozone and Correction of SIP Approvals, 76 Fed. Reg. 48208 (Aug. 8, 2011); Cross-State Air Pollution Rule Update for the 2008 Ozone NAAQS, 81 Fed. Reg. 74504 (Oct. 26, 2016); Revised CSAPR Update for the 2008 Ozone NAAQS, 86 Fed. Reg. 23054 (Apr. 30, 2021).

*See Wisconsin*, 938 F.3d at 312-20.  EPA does not require states to use the 4-step framework, but alternative approaches must be reasonable and achieve the goal of Good Neighbor compliance.  Final Rule, 88 Fed. Reg. at 9338, 9381.

## III.  Procedural History

### A.  2015 Ozone NAAQS

In 2015, EPA revised the ozone NAAQS to be more protective of public health and welfare.  National Ambient Air Quality Standards for Ozone, 80 Fed. Reg. 65292 (Oct. 26, 2015) ("2015 ozone NAAQS").  Each state had to submit a SIP to implement, attain, and enforce the 2015 ozone NAAQS, including a plan to comply with the Good Neighbor Provision.  *See* 42 U.S.C. § 7410(a)(1).

EPA issued memoranda, including the March 2018 Memo and October 2018 Memo, to provide modeling results and other information that may aid states in the development of their Good Neighbor SIP submissions for the 2015 ozone NAAQS. *See* U.S. EPA, Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I) (Mar. 27, 2018) ("March 2018 Memo") (Ex. 6); U.S. EPA, Consideration for Identifying Maintenance Receptors for Use in Clean Air Act Section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards

(Oct. 19, 2018) ("October 2018 Memo") (Ex. 7).  These memoranda expressly

stated that they were "not a final determination regarding states' obligations under

the good neighbor provision."  March 2018 Memo at 2; *see also* October 2018

Memo at 1.

### B.    EPA's Evaluation of Good Neighbor SIPs

Texas submitted its SIP for the 2015 Ozone NAAQS to EPA on August 17,

2018.  *See* Air Plan Disapproval; Arkansas, Louisiana, Oklahoma, and Texas;

Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient

Air Quality Standards, 87 Fed. Reg. 9798, 9824 (Feb. 22, 2022) ("Proposed Rule")

(Ex. 2).  EPA's assessment of Texas's SIP, along with other SIPs addressing Good

Neighbor obligations for the 2015 ozone NAAQS, was delayed due to EPA's

unanticipated responsibility to address the D.C. Circuit's limited remand of EPA's

FIP addressing the Good Neighbor Provision for an earlier ozone NAAQS.[2]  Final

Rule, 88 Fed. Reg. at 9365.

EPA organized its evaluation of every Good Neighbor SIP submission

around the usual 4-step framework.  *Id.* at 9338.  EPA explained that the

framework "allow[s] for some methodological variation" within each step and

---

[2] *Wisconsin*, 938 F.3d at 313; *New York v. EPA*, 781 F. App'x 4, No. 19-1019,
2019 WL 5394069 (D.C. Cir. 2019) (per curiam); *see also* Revised CSAPR
Update, 86 Fed. Reg. 23054 (action taken in response to remand, which was
upheld in *Midwest Ozone Group*, 61 F.4th 187).

"provide[s] a reasonable organization to the analysis of the complex air quality challenge of interstate ozone transport." *Id.* Many states likewise applied the 4-step framework in their submissions. *See, e.g.*, Proposed Rule, 87 Fed. Reg. at 9816 (addressing Oklahoma's submission).

EPA first identified the "analytic year" for evaluating a downwind state's air quality and upwind states' contributions. Since the next attainment date is in 2024, EPA identified the appropriate analytic year as 2023, "the last relevant ozone season during which achieved emissions reductions in linked upwind states could assist downwind states with meeting" the next attainment date. Final Rule, 88 Fed. Reg. at 9340-41.

At Step 1, EPA used air quality modeling to project downwind nonattainment or maintenance "receptors" (i.e., sites that will not attain or will struggle to maintain, respectively, the NAAQS) in 2023. *See id.* at 9341. At Step 2, EPA calculated upwind states' contributions to receptors in 2023, using a contribution threshold of 1% of the NAAQS to identify linkages. *Id.* at 9342. At Step 3, EPA evaluated states' conclusions as to whether their linked contributions are "significant." *Id.* at 9342-43. At Step 4, EPA assessed whether the states included permanent and enforceable emissions reductions to eliminate contributions determined to be "significant" at Step 3. *Id.* at 9343. When states presented alternative approaches to EPA's methodologies, EPA evaluated those

analyses on their merits, but did so with an eye towards ensuring national

consistency and satisfaction of the Act's minimum requirements. *Id.* at 9338,

9381.

    **C.    EPA's Disapproval of SIPs Submitted by Texas and 20 Other States**

For the most part, Texas's SIP submission followed a methodology similar

to EPA's 4-step framework. S*ee* TEX. COMM'N ON ENV'T QUALITY, TRANSPORT

STATE IMPLEMENTATION PLAN (SIP) REVISION FOR THE 2015 OZONE NATIONAL

AMBIENT AIR QUALITY STANDARDS (NAAQS) (Aug. 8, 2018) ("TCEQ

Submission") (Ex. 3), 3-2. Texas first identified nonattainment and maintenance

receptors for analytic year 2023 using its own modeling and methodology, which

differed in certain respects from EPA's. *See id.* 3-3 to 3-43. Then, Texas

identified for further review projected nonattainment and maintenance receptors in

downwind states impacted by Texas's emissions, using the same 1% contribution

threshold as EPA. *See id.* 3-43 to 3-50. Lastly, Texas considered whether its

emissions would contribute significantly to nonattainment or interfere with

maintenance at the linked receptors by assessing whether there was "a persistent

and consistent pattern of contribution on several days with elevated ozone"; Texas

used a "weight-of-evidence" approach to determine whether such a pattern existed.

*Id.* 3-50 to 3-76. Based on its analysis, Texas concluded that its emissions did not

contribute significantly to nonattainment or interfere with maintenance of the 2015

ozone NAAQS at any downwind receptor because there was no "persistent and consistent pattern," and thus the state did not have to reduce any of its emissions. *Id.* at 3-75.

EPA evaluated Texas's submission and found several flaws in Texas's methodology. For example, Texas's modeling likely underestimated 2023 ozone levels and Texas's method for identifying maintenance receptors failed to account for variable conditions that could cause an area sometimes attaining the NAAQS to fall into nonattainment. Proposed Rule, 87 Fed. Reg. at 9827, 9829; U.S. EPA, 2015 8-HOUR OZONE TRANSPORT SIP PROPOSAL TECHNICAL SUPPORT DOCUMENT (Feb. 2022) ("TSD") (Ex. 5) at 2-38, 4-37; U.S. EPA, 2015 OZONE NAAQS INTERSTATE TRANSPORT SIP DISAPPROVALS – RESPONSE TO COMMENTS (RTC) DOCUMENT (Jan. 31, 2023) ("RTC") (Ex. 4) at 215-16 (Table 6-2), 227-32. Despite these flaws, Texas's method still showed that Texas contributed above 1% of the NAAQS to several nonattainment and maintenance receptors. *See* TCEQ Submission, 3-47, 3-48. In other words, Texas was linked to downwind receptors at its own chosen contribution threshold, even according to its own methodology and modeling.

Continuing to the Step 3 analysis, EPA disagreed with Texas that there must be a "persistent and consistent" pattern to demonstrate "significant" contribution but observed that, even if such a pattern was required, it was present in Texas's

10

own modeling.  Proposed Rule, 87 Fed Reg. at 9831-32; TSD at 76-100; RTC at 350-354.  EPA further found numerous technical shortcomings in Texas's "weight-of-evidence" approach and determined that the approach did not support Texas's conclusion that it has no Good Neighbor obligation for the 2015 ozone NAAQS. Proposed Rule, 87 Fed. Reg. at 9832-34.  Consequently, EPA determined that Texas's proposed plan, which did nothing to reduce its emissions impacting downwind states, did not comply with the Good Neighbor Provision.  *Id.*; Final Rule, 88 Fed. Reg. at 9359-60.

For these reasons, EPA proposed to and ultimately disapproved Texas's SIP, along with 20 others for similar reasons, in the Final Rule.  Final Rule, 88 Fed. Reg. at 9338.

### D.   EPA's Federal Good Neighbor Plan for the 2015 Ozone NAAQS

EPA's disapproval triggered its statutory duty to promulgate a FIP, "at any time within 2 years," to address the Good Neighbor Provision in those states whose submissions were disapproved.  42 U.S.C. §7410(c)(1).  On March 15, 2023, after the stay motions were filed, the EPA Administrator signed and publicized a final action to resolve the Good Neighbor obligations for 23 states for the 2015 ozone NAAQS (the "Federal Good Neighbor Plan for the 2015 Ozone National Ambient Air Quality Standards" or "Final FIP").  Declaration of Rona Birnbaum ("Birnbaum Decl.") (Ex. 8) ¶ 6; Declaration of Scott Mathias ("Mathias Decl.")

(Ex. 9) ¶ 4.  The Final FIP relies on EPA's well-established 4-step framework to eliminate significant contribution to downwind states as expeditiously as practicable by requiring emissions reductions each year, beginning in 2023. Birnbaum Decl. ¶¶ 8, 15.  It phases in emissions reductions in alignment with the statutory attainment dates that EPA, in its judgment and based on extensive record evidence, determined to be achievable.  *See id.* ¶¶ 7, 43-51.  The Final FIP achieves emissions reductions through a trading program for power plants based on similar programs that have been operating for over 25 years.  *Id.* ¶¶ 16-18.  Certain other types of industrial sources are subject to emissions control requirements as well.  Mathias Decl. ¶¶ 6-11.

The Final FIP's effective date is tied to the rule's publication in the *Federal Register*, which has not yet occurred.  Birnbaum Decl. ¶¶ 21-22.  Texas's participation in the trading program during the 2023 ozone season will begin 60 days after the Final FIP is published in the *Federal Register* and thus is likely to occur around late June to early July.  *Id.*

### E.    Litigation Over the Final Rule

States and interested parties have petitioned the Sixth, Eighth, and Tenth Circuits to review the Final Rule.[3]  EPA's motions to transfer the petitions to the D.C. Circuit or dismiss based on improper venue are pending in each court,[4] as are motions to stay the Final Rule that have been filed in the Tenth Circuit.[5]  The Tenth Circuit has abated stay motions and other proceedings until EPA's venue motion is resolved.  *See, e.g.*, Minute Order, *PacifiCorp*, No. 23-9512, ECF No. 10984083.

---

[3] *Kentucky v. EPA*, No. 23-3216 (6th Cir. filed Mar. 13, 2023); *Ky. Energy & Env't Cabinet v. EPA*, No. 23-3225 (6th Cir. filed Mar. 17, 2023); *Arkansas v. EPA*, No. 23-1320 (8th Cir. filed Feb. 16, 2023); *Utah v. EPA*, No. 23-9509 (10th Cir. filed Feb. 13, 2023); *PacifiCorp v. EPA*, No. 23-9512 (10th Cir. filed Feb. 24, 2023); *Oklahoma v. EPA*, No. 23-9514 (10th Cir. filed Mar. 2, 2023); *Utah Associated Mun. Power Sys. v. EPA*, No. 23-9520 (10th Cir. filed Mar. 15, 2023); *Okla. Gas & Elec. Co. v. EPA*, No. 23-9521 (10th Cir. filed Mar. 16, 2023).

[4] *Kentucky*, No. 23-3216, ECF No. 8; *Ky. Energy*, No. 23-3225, ECF No. 4; *Arkansas*, No. 23-1320, ECF No. 5256958; *Utah*, No. 23-9509, ECF No. 010110827314; *PacifiCorp*, No. 23-9512, ECF No. 010110827491; *Oklahoma*, No. 23-9514, ECF No. 010110827570; *Utah Associated*, No. 23-9520, ECF No. 010110827491; *Okla. Gas & Elec.*, No. 23-9521, ECF No. 010110828405.

[5] Utah Stay Mot., *Utah*, No. 23-9509, ECF No. 010110823083; PacifiCorp Stay Mot., *PacifiCorp*, No. 23-9512, ECF No. 010110827245.

In this Court, Movants petitioned for review of the Final Rule on February 14, 2023,[6] followed by two Texas agencies,[7] entities in Mississippi,[8] and entities in Louisiana,[9] all of which are part of this docket (collectively, "Petitioners").  On March 3, 2023, Movants moved to stay the Final Rule as it relates to EPA's disapproval of Texas's SIP.  Tex. Stay Mot. at 20, ECF No. 31; Tex. Indus. Stay Mot. at 1, ECF No. 32-1.  On March 15, 2023, EPA moved to transfer each petition to the D.C. Circuit or dismiss them based on improper venue.  ECF No. 50, ECF No. 70.  This venue motion remains pending.

## ARGUMENT

This Court should deny the motions to stay the Final Rule.  First, venue is improper in this Court.  Second, Movants fail to make a "clear showing" that the "extraordinary and drastic remedy" of a stay is warranted here.  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).  All four factors that courts consider when determining whether a stay is warranted—(1) strong likelihood of success on the merits, (2) irreparable injury to movant absent a stay, (3) substantial injury to other

---

[6] Tex. Pet., ECF No. 1-1; Tex. Utils. Pet., ECF No. 3-1; Tex. Indus. Grp. Pet, ECF No. 5-1.

[7] Tex. PUC Pet., ECF No. 44-1.

[8] Miss. Pet., ECF No. 52-1; Miss. Power Pet., ECF No. 58-1.

[9] La. Pet., ECF No. 63-1.

parties interested in the proceeding, and (4) the public interest—weigh against a stay. *See Nken v. Holder*, 556 U.S. 418, 433 (2009).

## I.   The Motion Should be Denied on Venue Grounds or Transferred to the D.C. Circuit.

As detailed in EPA's Venue Motion, Congress has vested the D.C. Circuit with exclusive jurisdiction to review the Final Rule. *See* ECF No. 50; 42 U.S.C. § 7607(b)(1). Venue is "inextricably bound up with the remedial decision" of whether a stay should issue. *Noxell Corp. v. Firehouse No. 1 Bar-B-Que Restaurant*, 760 F.2d 312, 315 (D.C. Cir. 1985) (Ginsburg, J., joined by Scalia, J.) (quoting CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 3921, at 17 (1977)); *see also Maybelline Co. v. Noxell Corp.*, 813 F.2d 901, 902-03 (8th Cir. 1987) (vacating preliminary injunction on venue grounds). Whether Movants are likely to succeed on the merits, for example, turns on the law in the forum where Congress has directed that the merits be decided.

Deciding the proper venue now and deferring consideration of the stay motions, as the Tenth Circuit is doing, makes sense because many petitioners have moved to stay portions of the Final Rule in separate courts based on the same or similar arguments. *Compare, e.g.*, Tex. Indus. Stay Mot. at 13-16, *with* Utah Stay Mot. at 12-21. Because this is a nationwide rule addressing a nationwide problem, it is imperative that, and efficient to have, the proper court evaluate these arguments in the context of requests for preliminary relief. Therefore, this Court

should either deny the motions for stay or transfer them to the D.C. Circuit along with the petitions as a whole.

## II.    Movants Are Not Entitled to a Stay.

### A.    Movants Are Unlikely to Succeed on the Merits.

To make a clear showing of a strong likelihood of success on the merits, Movants must demonstrate that the Final Rule is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *Texas v. EPA* (*2016 Texas*), 829 F.3d 405, 424-25 (5th Cir. 2016) (quotation omitted).  This standard is "narrow"; EPA must simply engage in "reasoned decisionmaking" and provide a "rational connection between the facts found and the choice made." *Sierra Club v. EPA*, 939 F.3d 649, 664 (5th Cir. 2019) (quotation omitted).  Particular deference is owed when EPA's decision "is based upon its evaluation of complex scientific data within its technical expertise." *BCCA Appeal Grp. v. EPA*, 355 F.3d 817, 824 (5th Cir. 2003).

Movants fail to demonstrate that EPA unlawfully promulgated the Final Rule.  Their arguments on this factor boil down to one main contention—that cooperative federalism prohibits EPA from evaluating SIP submissions to ensure that each plan satisfies the Act.  *See* Tex. Stay Mot. at 12-15; Tex. Indus. Stay Mot. at 11-16.  That is incorrect.  Cooperative federalism does not relegate EPA to rubberstamping SIP submissions.  *Union Elec. Co. v. EPA*, 427 U.S. 246, 250

(1976) (recognizing that while each state is "given wide discretion in formulating its plan," EPA may approve it only "if it meets [the Act]"); *see also Fla. Power & Light Co. v. Costle*, 650 F.2d 579, 581 (5th Cir. 1981).  As explained below, the Act requires EPA to approve only those submissions that meet the Act's requirements; EPA properly disapproved Texas's SIP because it did not.

## 1.    EPA Acted Within Its Statutory Oversight Role.

EPA may approve a SIP submission only "*if* it meets all of the applicable requirements of [the Act]," including the Good Neighbor Provision.  42 U.S.C. § 7410(k)(3) (emphasis added); *see id.* § 7410(a)(2)(D)(i)(I).  While states enjoy discretion in "*formulating*" SIPs to implement the dictates of the Act, EPA must ensure that SIPs meet the Act's statutory requirements and need not defer to a state's interpretation of the statute.  *Luminant Generation Co. LLC v. EPA*, 714 F.3d 841, 845 (5th Cir. 2013) (emphasis added); *see also Train v. NRDC*, 421 U.S. 60, 86-88 (1975).

As relevant here, SIPs must prohibit emissions that significantly contribute to nonattainment or interfere with maintenance of the NAAQS in downwind states. 42 U.S.C. § 7410(a)(2)(D)(i)(I).  The Supreme Court has held that EPA's 4-step framework provides a permissible and workable approach for implementing these requirements.  *EME Homer*, 572 U.S. at 514-15, 518, 524.  Here, EPA reasonably applied this longstanding, statutorily-based 4-step framework to evaluate each SIP

17

submission for compliance with the Good Neighbor Provision.  *See* Final Rule, 88 Fed. Reg. at 9338.  When states presented alternative approaches, EPA did not reject them out of hand but "evaluated those analyses on their merits" and disapproved them only after determining they did not satisfy the Good Neighbor Provision.  *Id.*  Thus, EPA acted within its statutory oversight role when evaluating each SIP submission for compliance with the Good Neighbor Provision.  *See, e.g.*, *Westar v. EPA*, Nos. 11-1333, 12-1019, 2015 WL 4067382, at 3-4 (D.C. Cir. 2015) (per curiam) (holding that EPA reasonably disapproved a SIP for failure to comply with the Good Neighbor Provision upon evaluating the submission's alternative analyses on their merits); *see also Luminant*, 714 F.3d at 856-57 (deferring to EPA's CAA interpretation and upholding EPA's disapproval of a Texas SIP).

Consequently, Movants' various arguments that EPA unlawfully failed to defer to Texas's methodology and applied non-statutory factors are incorrect.  *See, e.g.*, Tex. Indus. Stay Mot. at 11-15.  Further, these arguments miss the actual basis for EPA's disapproval of Texas's SIP—the submission did not contain the necessary provisions to eliminate emissions that will contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in downwind states and therefore failed to comply with the Good Neighbor Provision. Lastly, arguments comparing EPA's action here with the action in *2016 Texas*, *see, e.g.*, Tex. Indus. Stay Mot. at 2, are inapposite.  In *2016 Texas*, the Court faulted

EPA for disapproving a SIP on the basis that the state failed to conduct a source-specific, reasonable progress analysis under a separate CAA program when neither the statute nor the relevant implementing regulations contained a requirement that the required statutory analysis had to be source-specific.  829 F.3d at 428.  There is no comparable issue here.

>       2.       **EPA Reasonably Determined Texas's SIP Submission Failed to Comply with the Good Neighbor Provision.**

Movants misunderstand EPA's reasons for disapproving Texas's SIP submission.  They assert that EPA unlawfully rejected Texas's data, modeling, and methodology at Step 1, arguing that EPA (1) unlawfully used data that was not available when Texas submitted its SIP to reject its submission, Tex. Stay Mot. at 16-18; (2) unlawfully rejected Texas's method for identifying maintenance receptors, *id.* at 12-14; Tex. Indus. Stay Mot. at 13-15; and (3) arbitrarily and capriciously used "ballpark estimates" to reject Texas's modeling for likely underestimating future ozone levels, Tex. Indus. Stay Mot. at 16-18.

Not only do these arguments lack merit on their own terms, *see infra* Argument II.A.3-5, but more importantly, Movants fail to acknowledge that Texas's own data, modeling, and methodology showed that Texas was linked to both nonattainment and maintenance receptors at Steps 1 and 2, TCEQ Submission 3-44, 3-45.  In other words, regardless of which data, modeling, or methodology is used, Texas's contribution to downwind nonattainment is not in dispute.

Accepting Texas's modeling results at face value for purposes of evaluation, EPA considered Texas's arguments at Step 3 for why its contributions to other states' air quality problems should not be deemed "significant" and found them inconsistent with the Good Neighbor Provision.  Proposed Rule, 87 Fed. Reg. at 9831; Final Rule, 88 Fed. Reg. at 9360.  Texas's failure to "conduct an adequate Step 3 analysis" was EPA's basis for disapproval —not the flaws EPA identified in Texas's data, modeling, and methodology.  Final Rule, 88 Fed. Reg. at 9360.

Movants do not explain why EPA's evaluation of Texas's SIP submission at Step 3 was unlawful.  The only argument to this effect is Texas Industry Groups' inaccurate assertion that EPA "unlawfully rejected Texas's weight-of-evidence approach to determining 'significant contribution'" on the basis that Texas's "approach was not consistent with EPA's bright-line one-percent threshold."  Tex. Indus. Stay Mot. at 15-16.  That argument misconstrues both Texas's and EPA's analysis.  Neither Texas nor EPA used the 1% contribution threshold to define "significance" at Step 3, but as "a screening threshold to identify states which may be 'contributing' to an out of state receptor."  Final Rule, 88 Fed. Reg. at 9371; Proposed Rule, 87 Fed. Reg. at 9830; TCEQ Submission, 3-3 ("[I]f the Texas contribution to a [downwind receptor] was greater than or equal to 1% of the NAAQS," then Texas "tagged [the receptor] for further review.").

Instead, EPA's evaluation of Texas's SIP submission at Step 3 was patently reasonable.  At Step 3, Texas asserted that there must be a "persistent and consistent" pattern to demonstrate "significant" contribution.  TCEQ Submission, 3-50.  But Texas's own modeling had already established that a persistent and consistent pattern existed when it found that the state was linked to downwind receptors.  *See* Proposed Rule, 87 Fed. Reg. at 9832.  As EPA explained, "that argument . . . [wa]s not supportable as a Step 3 factor when the Step 2 analysis ha[d] already confirmed that the contribution from a state is in fact impacting receptors on the days when they are projected to have high ozone levels," or in other words, was persistent and consistent.  RTC at 350-51.

Nonetheless, Texas attempted to prove its contributions to downwind air quality problems exhibited no "consistent and persistent" pattern, using a "weight-of-evidence" approach that relied on factors such as historic air quality trends and additional modeling assessments.  TCEQ Submission, 3-51 to 3-76.  EPA evaluated Texas's "weight-of-evidence" approach and determined that none of the evidence presented could technically support Texas's conclusion.  Proposed Rule, 87 Fed. Reg. at 9832-34.  EPA found no support for Texas's conclusion that air quality trends would suddenly and rapidly improve.  *Id.* at 9832; TSD at 78-80.  Texas's additional modeling assessments could not be used to refute its own or EPA's use of highly sophisticated photochemical modeling.  Proposed Rule, 87

21

Fed. Reg. at 9832-33; TSD at 81-86, 92-97.  And Texas's argument that the total contribution from upwind states ("collective contribution") was insignificant at certain receptors did not address the fact that Texas's modeling showed that it was also linked to other receptors, which did suffer from a "collective contribution" problem.  Proposed Rule, 87 Fed. Reg. at 9833; TSD at 89-91.

In sum, because EPA's evaluation of Texas's data, modeling, and methodology was not dispositive to its SIP disapproval, Movants' arguments regarding these topics are irrelevant to this Court's evaluation of whether Movants are likely to succeed on the merits.  In fact, no Movant calls into question EPA's *actual* reason for disapproving Texas's SIP: Texas's inadequate explanation for why its contribution was not significant.  EPA reasonably determined that Texas's explanation on that dispositive issue based on a "weight-of-evidence" analysis was technically flawed.

Consequently, Movants are unlikely to succeed on the merits of their claim, and this Court need not consider Movants' particular data, modeling, or methodology arguments.  But, even if this Court decides to do so, those arguments fail for the reasons below.

### 3.    EPA Reasonably Evaluated SIP Submissions Using the Most Accurate, Up-to-Date Data.

Texas argues that EPA unlawfully used data that was not available when the SIP was submitted.  Tex. Stay Mot. at 16-18.  The Act does not prohibit EPA from

using the most accurate, up-to-date data to evaluate Good Neighbor SIP

submissions, even if that data was not available when a state submitted its SIP.  In

*Wisconsin*, the D.C. Circuit rejected a similar argument that EPA arbitrarily used

data made available after a SIP submission to evaluate a downwind state's air

quality conditions (i.e., whether it had nonattainment or maintenance receptors).

938 F.3d at 321-22.  Because the Good Neighbor Provision is forward looking and

prohibits upwind states from emitting amounts "which *will*" contribute to

nonattainment and interfere with maintenance of NAAQS in downwind states,

EPA may use better data available when it evaluates a SIP submission.  *Id.* at 322

(quoting 42 U.S.C. § 7410(a)(2)(D)(i) (emphasis added)); *see also id.* (holding that

"SIP submission deadlines . . . are procedural and therefore not central to the

regulatory scheme" (quotation omitted)); *cf. Sierra Club v. EPA*, 671 F.3d 955,

967-68 (9th Cir. 2012) (finding it arbitrary and capricious for EPA to not consider

newly available emissions data in evaluating a SIP).

Indeed, Texas's argument that it is unfair for EPA to use updated data, Tex.

Stay Mot. at 17, is undercut by the full history:  First, EPA's disapproval could

have rested solely on Texas's own data and modeling.  *See supra* Argument II.A.2.

Second, EPA made multiple rounds of newer modeling available over several

years before taking final action.  *See* Final Rule, 88 Fed. Reg. at 9364, 9366.

Third, EPA explained that only using data available at some point in the past

would frustrate the use of the most current and technically appropriate information, including being able to fully consider public comments, to determine the Good Neighbor obligations owed to downwind states. *Id.*; RTC 60-62, 84-86. EPA provided notice that it would evaluate SIP submissions using updated data, and Movants even commented on the use, inputs to, and performance of EPA's updated modeling. Final Rule, 88 Fed. Reg. at 9344, 9366; *see, e.g.,* RTC at 46, 57, 126.

Texas's attempt to point fingers at EPA's delay in finalizing its SIP disapproval to argue that EPA cannot use the most accurate data to evaluate SIP submissions is unmeritorious. *See* Tex. Stay Mot. at 16-17. Texas's SIP submission would have been denied regardless of whether earlier data had been used. *See supra* Argument II.A.2. And delay by EPA cannot alter what it may consider. The Act provides only one remedy for EPA's failure to meet a nondiscretionary duty to act by a date certain—a court-ordered deadline to address the relevant obligation. *See* 42 U.S.C. § 7604(a)(2); *see also Oklahoma v. EPA*, 723 F.3d 1201, 1223-24 (10th Cir. 2013) (holding that EPA does not lose authority to act because it failed to do so within the time period imposed by the Act). Movants' citation to *2016 Texas* is again inapposite, Tex. Stay Mot. at 18; that case concerned whether EPA could impose emissions-control requirements outside a planning period set by EPA regulations, 829 F.3d at 430. Here, however, EPA is

simply applying the best information available at the time it takes rulemaking action—which can hardly be considered unlawful or arbitrary.  *See Sierra Club*, 671 F.3d at 967.

### 4. EPA Reasonably Determined that Texas's Method for Identifying Maintenance Receptors was Legally and Technically Flawed.

Movants argue that EPA unlawfully rejected Texas's method for identifying maintenance receptors by (1) imposing non-statutory factors for such identification, Tex. Indus. Stay Mot. at 13-15; and (2) applying guidance from the October 2018 Memo, which was not available to Texas when it submitted its SIP, Tex. Stay Mot. at 12-14.  Because both Texas's and EPA's modeling demonstrated links to at least one *nonattainment* receptor, Texas would have needed to proceed to Step 3 regardless.  *See supra* Background III.C; Final Rule, 88 Fed. Reg. at 9354.  Moreover, Movants' arguments fail.

Movants' first argument—that EPA must accept Texas's approach for identifying maintenance receptors because the Act provides no instruction on when an upwind state's emissions are "interfering with the maintenance" of the NAAQS in another state—distorts the principle of cooperative federalism, disregards EPA's "statutory obligation … to maximize achievement of attainment downwind," *EME Homer*, 572 U.S. at 523, and lacks merit.  *See supra* Argument II.A.1.

Movants' second argument misconstrues EPA's administrative process and determination. EPA did not "unfair[ly] surprise" Texas with the October 2018 Memo, nor did it reject Texas's method for failing to comply with the Memo. *See* Tex. Stay Mot. at 14. EPA explained in the Final Rule that it gave due consideration to all states' arguments with respect to the Memo and responded to comments on its proposed assessment in the Final Rule. *See* Final Rule, 88 Fed. Reg. at 9368, 9370; *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 170-71 (2007) (holding that an ability to comment in rulemaking was "unlikely" to create "unfair surprise"). Texas provides no record citation (nor can it) of EPA rejecting Texas's method for being inconsistent with the October 2018 Memo.[10] Tex. Stay Mot. at 13-15.

Rather, EPA found Texas's method for identifying maintenance receptors inadequate because it failed to comport with *North Carolina v. EPA*, 531 F.3d 896 (D.C. Cir. 2008). *See* Proposed Rule, 87 Fed. Reg. at 9826-29. In *North Carolina*, the court made clear that EPA must give the "interfere with maintenance" clause of the Good Neighbor Provision independent effect from the "significant contribution" to nonattainment clause used to identify downwind receptors. 531

---

[10] The only citation to the record provides EPA's response to comments regarding why EPA was not required to provide states a second opportunity to submit SIPs. Tex. Stay Mot. at 14 (citing Final Rule, 88 Fed. Reg. at 9364).

F.3d at 910.  Consequently, the identification of maintenance receptors should account for variable conditions that could cause an area that is sometimes attaining the NAAQS to fall into nonattainment.  *Id.* at 908-11; *see also Wisconsin*, 938 F.3d at 327 ("Variations in atmospheric conditions and weather patterns can bring maintenance receptors into nonattainment even without elevated emissions.").

Texas's SIP submission did not do so.  *See* Proposed Rule, 87 Fed. Reg. at 9827-9829.  It used only the latest three years of a five-year baseline period to identify maintenance receptors, and the meteorology in those years was not conducive to ozone formation.  *See id.*  EPA reasonably concluded that Texas "fail[ed] to adequately consider interannual variability in ozone-conductive meteorology" and that its plan would "have the effect of making it appear that an area is closer to attaining the NAAQS than would otherwise be the case."  RTC at 227.

Texas's related argument that EPA arbitrarily and capriciously rejected its method for identifying maintenance receptors based on ideas listed in Attachment A of the March 2018 Memo is again unsupported by the record.  *See* Tex. Stay Mot. at 12-14 (providing no record citation for this contention); Final Rule, 88 Fed. Reg. at 9340 (stating that where states submitted SIPs that relied on past memoranda, including Attachment A, "EPA evaluated whether the state adequately justified the technical and legal basis for doing so").  Even if this Court considers

the merits of this argument and the related argument that EPA changed its policy

by issuing the October 2018 Memo after Texas submitted its SIP, they fall flat for

two reasons.

*First*, EPA made abundantly clear that Attachment A is not guidance.

March 2018 Memo at 1 (stating that Attachment A "provides a preliminary list of

potential flexibilities in analytical approaches for developing a good neighbor SIP

that *may warrant* further discussion between EPA and states" (emphasis added));

*id.*, Att. A, A-1 (introducing the attachment as "ideas" for which EPA "seek[s]

feedback" and stating that EPA is not "specifically recommending that states use

these approaches"); *see also* Final Rule, 88 Fed. Reg. at 9340.

*Second*, Texas fails to, and cannot, demonstrate inconsistency between

Attachment A and the October 2018 Memo, each of which simply "recognize[s]

that states may be able to establish alternative approaches to addressing their

interstate transport obligations for the 2015 ozone NAAQS." Final Rule, 88 Fed.

Reg. at 9340; *see also* March 2018 Memo at 1; Oct. 2018 Memo at 1 ("present[ing]

information that states may consider as they evaluate the status of monitoring sites

. . . identified as potential maintenance receptors").

Therefore, EPA did not unlawfully reject Texas's method for identifying

maintenance receptors, and instead provided a reasoned explanation for why the

approach was legally and technically flawed.  Nor did EPA make any policy reversal, or rely on any memorandum, to disapprove Texas's SIP.[11]

**5.    EPA Reasonably Determined that Texas's Alternative Modeling Likely Underestimates Future Ozone Levels.**

Texas Industry Groups' argument that EPA arbitrarily and capriciously used "ballpark estimates" to reject Texas's modeling misconstrues EPA's analysis.  *See* Tex. Indus. Stay Mot. at 16-18.  The "ballpark estimate" EPA made was part of a "bounding assumption" analysis supporting EPA's assessment of Texas's modeling by making a generous estimate of how much ozone concentrations could realistically be expected to decrease.  TSD at 40; *id.* at 41 (concluding that the analysis "supports a finding" that the modeling likely underestimates future ozone levels); Proposed Rule, 87 Fed. Reg. at 9829 (noting that it was only "[o]ne analysis" that supported EPA's finding).

EPA compared Texas's modeling, which projected future ozone levels in 2023, with recently measured ozone levels from 2020 and 2021.  *See* Proposed Rule, 87 Fed. Reg. at 9829.  EPA's comparison showed that air quality would need to experience dramatic improvements to match Texas's modeling projections,

---

[11] Because EPA made no policy reversal and relied on neither memorandum to disapprove Texas's SIP, Texas's argument that EPA should have issued a "SIP call" warrants no consideration.  *See* Tex. Stay Mot. at 14.  Regardless, EPA's authority to issue a SIP call under 42 U.S.C. § 7410(k)(5) is discretionary.  *See EME Homer*, 572 U.S. at 509-10.

which would be unrealistic without "an unusually large change in emissions or

. . . in meteorological [conditions]," neither of which Texas identified would occur

in its SIP submission. *Id.* at 9829; *see also* RTC at 215-16.

Based on this and other findings, *see generally* TSD at 38-72, EPA

reasonably determined that Texas's modeling likely underestimates future ozone

levels.

### B.     Movants Have Not Shown Irreparable Harm Absent a Stay.

To establish irreparable harm, Movants must demonstrate an injury that is

"both certain and great," i.e., "actual and not theoretical." *Wis. Gas Co. v. FERC*,

758 F.2d 669, 674 (D.C. Cir. 1985); *see also Louisiana v. Biden*, 55 F.4th 1017,

1034 (5th Cir. 2022) (explaining that harm must be more than "speculative" to be

considered irreparable). Such harm must be imminent and substantial, and not

reparable through the normal course of judicial review. *2016 Texas*, 829 F.3d at

434. Movants identify no such harm.

The Final Rule does not require Movants to do *anything* and thus itself

effects no irreparable harm. *See* Final Rule, 88 Fed. Reg. at 9364 ("[T]his action to

disapprove SIP submissions itself will not impose any requirements or penalties on

any state or sources within that state."); *id.* at 9336 ("Disapproval does not start a

mandatory sanctions clock."); *cf.* 42 U.S.C. § 7410(c)(1) (requiring EPA to

promulgate a FIP within two years). And to the extent Movants' intend to attack

the merits of EPA's recently promulgated FIP in their reply briefs, they cannot do so here because this Court lacks jurisdiction over that separate, not-yet-published agency action. *See* 42 U.S.C. § 7607(b)(1) (petitions for review can only be filed "within sixty days" from publication in the Federal Register); *Dalton Trucking, Inc. v. EPA,* 808 F.3d 875, 879-80 (D.C. Cir. 2015); *see also Horsehead Res. Dev. Co., Inc. v. EPA*, 130 F.3d 1090, 1092 (D.C. Cir. 1997) (similar language at 42 U.S.C. § 6976(a)(1) creates a "filing window" that is "jurisdictional"). Once the Final FIP is published in the *Federal Register*, Movants and others alleging harm from its terms are free to petition for review of the FIP—in the appropriate forum, the D.C. Circuit—and may seek to stay the Final FIP, based on what is actually in that rule, if they believe it to be unlawful.

Further, Movants' harm allegations focus on the *proposed* FIP, 87 Fed. Reg. 20036 (Apr. 6, 2022), which is materially different from the Final FIP, rendering their harm allegations speculative.[12] *See Louisiana*, 55 F.4th at 1034; *Winter v. NRDC*, 555 U.S. 7, 23 (2008) (explaining that harm is irreparable only if it is a "near certainty"). When Movants filed their stay motions, the Final FIP had not been signed and was not available to the public. Birnbaum Decl. ¶¶ 6, 22. So

---

[12] The only alleged harm directly associated with the Final Rule itself is Texas's general contention that its sovereign interests will be harmed, Texas Stay. Mot. at 18, which is premised on the state's success-on-the-merits argument and fails for the reasons explained above, *supra* Argument II.A.1.

Movants' declarants relied upon the proposed FIP to predict the harms they may

suffer as an indirect consequence of the Final Rule challenged here. *See, e.g.*,

Declaration of Dwayne W. "Woody" Rickerson ("Rickerson Decl.") ¶ 37 (basing

conclusion that there is imminent harm to the reliability of the ERCOT grid on

proposed FIP); Declaration of Kenneth C. Price ("Price Decl.") ¶ 14 (anticipating

immediate compliance action by power plants based on the proposed FIP);

Declaration of Randall J. Talley ("Talley Decl.") ¶¶ 13-14 (predicting required

installations at Luminant plants based on proposed FIP); Declaration of Dudley

Zahn ("Zahn Decl.") ¶¶ 15-17 (predicting costs associated with retrofitting existing

emission limitation technology based on the proposed FIP); Declaration of Jacob

Krautsch ("Krautsch Decl.") Sect. III (concluding that immediate cost expenditures

will be necessary to meet the proposed FIP's compliance deadlines).

But these alleged speculative harms were alleviated by substantive

alterations that EPA made in the Final FIP based on comments that it received.

*See* Birnbaum Decl. ¶¶ 36-42.  For example, Movants allege that they will be

irreparably harmed by grid unreliability resulting from the FIP.  Tex. Stay Mot. at

19; Tex. Indus. Stay Mot. at 20.  But EPA made changes from the proposed to

Final FIP "to ensure the statutory mandate to eliminate significant contribution to

interstate pollution problems under the Clean Air Act is met without disrupting the

reliable operation of the bulk power grid."  Birnbaum Decl. ¶¶ 40-42; *see also id.*

¶¶ 52, 57-58 (explaining that emissions reductions through the Final FIP are "readily achievable" and "designed so as not to threaten resource adequacy or otherwise degrade electric system reliability in any state or region"). Additionally, Texas Industry Groups contend that certain enhancements to the proposed FIP's trading program create too much uncertainty for industry and will further limit operation of power plants. Talley Decl. ¶¶ 15, 25. But in the Final FIP, EPA adjusted the dates upon which these enhancements could come into play to address predictability and reliability-related concerns. Birnbaum Decl. ¶ 41.a; *see also id.* ¶ 35 (summarizing the way dynamic budgeting and bank recalibration will be implemented). The same can be said of Texas Industry Groups' allegation that the compliance deadlines for non-power plant industry sources are not achievable. *Compare* Krautsch Decl. Sect. III (expressing concerns with meeting the 2026 compliance deadlines), *with* Mathias Decl. ¶¶ 7-10 (summarizing changes in the Final FIP meant to address feasibility of compliance).

Movants' attempt to point to non-speculative harms by linking certain consequences of the FIP directly to the Final Rule. But these alleged harms are riddled with inaccuracies and analytic errors. For example, Texas Industry Groups contend that they are irreparably harmed by the Final Rule because the Proposed FIP "has instructed companies to begin work 'now' on the installation of billions of dollars of emissions control equipment to meet EPA's compliance schedule."

Tex. Indus. Stay Mot. at 19; *see, e.g.,* Talley Decl. ¶ 28.  The Proposed FIP did no

such thing; rather, it recommended that covered power plant owners and operators

"begin engineering and financial planning now to be prepared to meet this

implementation timetable."  Proposed FIP, 87 Fed. Reg. at 20101.  But EPA

provided adequate time from the date of the final FIP to the onset of compliance

obligations to accommodate both the control strategy in 2023, which is based

solely on better operation of *existing* pollution controls, as well as the control

strategies of later years.  *See* Birnbaum Decl. ¶¶ 43-51.

Relatedly, Texas Industry Groups' declarants state that covered power plant

owners and operators will need to begin optimizing existing technology prior to the

finalization of the FIP to meet the 2023 compliance timelines in the proposed FIP.

Zahn Decl. ¶¶ 20-21; Talley Decl. ¶¶ 20-21.  As an initial matter, the declarants

misstate the 2023 compliance timelines:  Compliance will not start on May 1, 2023

(the start of the 2023 ozone season).  *See* Zahn Decl. ¶ 21; Talley Decl. ¶ 21.

Rather, it will start sixty days after the Final FIP is published in the *Federal

Register*, and the 2023 budget will be prorated so that the Final FIP's requirements

are imposed only from the effective date forward.  Birnbaum Decl. ¶¶ 21-22.

Moreover, both the proposed and Final FIP contain record-based findings that:

(1) optimization of existing technologies is already widely available; (2) most units

with this existing emissions control technology are already at least partially

operating these controls; and (3) restoring optimal performance can occur within two months or less. *Id.* ¶¶ 28, 43-45 ("[N]o new pollution control equipment is assumed in 2023, only the operation of existing equipment."). Further, there are anticipated to be sufficient allowances available for compliance in 2023 and subsequent years, both in Texas and the program as a whole. *Id.* ¶¶ 53-56, 69-74. Movants' concerns about the feasibility of compliance are, in short, baseless.

Finally, Movants contend that they have already altered trading decisions because of claimed disruptions resulting from the proposed FIP. Talley Decl. ¶ 25, Price Decl. ¶ 28. But allowance prices in the market are uncertain in cause, did not reflect a shortage of allowances, and do not reflect actual compliance costs. Birnbaum Decl. ¶¶ 62-67. Petitioners demonstrated no causality, and, since summer 2022, allowance prices have decreased by over 60 percent. *Id.* ¶ 65. What EPA can control is ensuring that the budgets it sets provide for achievable compliance with the Act's Good Neighbor Provision. The Final FIP does just that.

Because Movants have not met their burden of establishing that they will likely experience irreparable harm as a result of the Final Rule, their stay motions should be denied.

**C.    The Balance of Equities and Public Interest Disfavor a Stay.**

Movants have failed to show "that the balance of equities tip in [their] favor, and that a[] [stay] is in the public interest." *Winter*, 555 U.S. at 20.  These factors "merge when the Government is the opposing party." *Nken*, 556 U.S. at 435.

Congress passed the Good Neighbor Provision to address the intractable problem of upwind states' emissions significantly contributing to pollution problems in downwind states. *See, e.g., EME Homer,* 572 U.S. at 497-99.  Texas's power plants are among the highest emitters of ozone precursors in the United States, impacting states hundreds of miles away, and Texas knows this; yet, it proposed to do *nothing* to limit its in-state emissions.  Birnbaum Decl. ¶ 14-15; *see supra* Argument II.A.2.  A stay would leave no law on the books to address these harmful emissions.

Staying the Final Rule would delay EPA's efforts to effectuate Congress's directive for upwind states to lower emissions as expeditiously as practicable and would harm the downwind states, as well as the health and welfare of millions of citizens who live in the areas impacted by Texas's pollution. *See* Birnbaum Decl. ¶¶ 9-15 (summarizing nationwide benefits of the Final FIP).  Further, staying the Final Rule only as it relates to Texas would lead to inequitable results—sources in other upwind states would be required to lower emissions while Texas's sources would not, which in turn would impede downwind states affected by Texas's

emissions from attaining the NAAQS by the next attainment date. Compounding the inequity, Texas, as a downwind state, would enjoy the benefit of its neighbors mitigating their impact on its air quality without reciprocation. *See* Final Rule, 88 Fed. Reg. at 9351-52 (identifying 18 downwind receptors in Texas). In short, staying the Final Rule allows Texas to "reap[] the benefits of the economic activity causing the pollution without bearing all the costs," contrary to Congress's intent in the Good Neighbor Provision. *EME Homer*, 572 U.S. at 495.

Movants' contrary arguments are unpersuasive, as they reiterate points made in their merits- and harm-factors arguments, which fail for the reasons described above. *Compare* Tex. Stay Mot. at 19 (arguing that the balance of equities supports a stay because EPA has sanctioned a stay with its delay), *with supra* Argument II.A.3 (explaining that EPA's delay was not prejudicial to upwind states); *compare* Tex. Stay Mot. at 19 & Tex. Indus. Stay Mot. at 21 (reiterating grid reliability concerns), *with supra* Argument II.B (explaining that grid reliability concerns are unsupported); *compare* Tex. Indus. Stay Mot. at 21 (arguing that Texas emissions do not significantly contribute to downwind air quality problems, *with supra* Argument II.A.2 (explaining the flaws with Texas's SIP).

Given that Movants are not irreparably harmed by the Final Rule, and that Texas's failure to address its significant contributions to downwind areas is occurring now, the balance of harms weighs heavily in favor of protecting the

health and welfare of the millions of Americans continuing to suffer from poor air

quality.

## CONCLUSION

The motions for stay should be denied or transferred, along with these

petitions, to the D.C. Circuit.


Respectfully submitted,

TODD KIM
Assistant Attorney General

Of Counsel:                     */s/ Jin Hyung Lee*

ROSEMARY HAMBRIGHT KABAN    JIN HYUNG LEE
DANIEL P. SCHRAMM           U.S. Department of Justice
U.S. Environmental Protection Agency  Environment and Natural Resources Division
Office of General Counsel        Environmental Defense Section
Washington, DC              P.O. Box 7611
                                 Washington, D.C. 20044-7611
                                 (202) 514-2640
                                 jin.hyung.lee@usdoj.gov


March 31, 2023

## CERTIFICATES OF COMPLIANCE

I hereby certify that this motion complies with the requirements of Fed. R. App. P. 27(d)(2)(A) and the court's March 21, 2023 order, ECF No. 76-2, because it contains 8,568 words according to the count of Microsoft Word, excluding the parts of the motion exempted by Fed. R. App. P. 32(f), and therefore is within the word limit of 9,000 words.

I further certify that this motion complies with the requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in 14-point Times New Roman, a proportionally-spaced font, and is double-spaced, except for headings, block quotes, and footnotes.

Dated: March 31, 2023

_/s/ Jin Hyung Lee_____
JIN HYUNG LEE

## CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing EPA's consolidated response in opposition to the motions for stay of the Final Rule on all registered counsel through the Court's electronic filing system (CM/ECF).


Dated: March 31, 2023

*/s/ Jin Hyung Lee*
JIN HYUNG LEE
