No. 23-60069

# In the United States Court of Appeals for the Fifth Circuit

───────

State of Texas; Texas Commission on Environmental Quality; Luminant Generation Company, L.L.C.; Coleto Creek Power, L.L.C.; Ennis Power Company, L.L.C.; Hays Energy, L.L.C.; Midlothian Energy, L.L.C.; Oak Grove Management Company, L.L.C.; Wise County Power Company, L.L.C.; Association of Electric Companies of Texas; BCCA Appeal Group; Texas Chemical Council; Texas Oil & Gas Association; Public Utility Commission of Texas; Railroad Commission of Texas; State of Mississippi; Mississippi Department of Environmental Quality; Mississippi Power Company; State of Louisiana; Louisiana Department of Environmental Quality,

*Petitioners*,

*v.*

United States Environmental Protection Agency; Michael S. Regan, Administrator, United States Environmental Protection Agency,

*Respondents.*

───────

**REPLY IN SUPPORT OF STATE PETITIONERS' OPPOSED MOTION TO STAY**

───────

# Table of Contents

Table of Contents ................................................................................................. i

Table of Authorities ............................................................................................ ii

Introduction ......................................................................................................... 1

Argument .............................................................................................................. 2

    I.    Petitioners Are Likely to Succeed on the Merits. ...................................... 2

        A.    TCEQ's own data and modeling do not show that Texas has violated its good-neighbor obligations. .......................................................... 3

        B.    EPA acted arbitrarily and capriciously by disapproving Texas's SIP in part by relying on after-the-fact guidance. .......................................... 4

        C.    EPA's disapproval violates the Act's cooperative federalism. ............. 7

    II.    The Remaining Stay Factors Favor Petitioners. ......................................... 9

Conclusion ......................................................................................................... 11

Certificate of Service ......................................................................................... 12

Certificate of Compliance ................................................................................. 12

# Table of Authorities

Page(s)

**Cases:**

*Azar v. Allina Health Servs.*,
   139 S. Ct. 1804 (2019) ................................................................................ 1

*Christopher v. SmithKline Beecham Corp.*,
   567 U.S. 142 (2012) .................................................................................... 1

*DHS v. Regents of the Univ. of Cal.*,
   140 S. Ct. 1891 (2020) ............................................................................ 2, 7

*EME Homer City Generation, L.P. v. EPA*,
   696 F.3d 7 (D.C. Cir. 2012) ....................................................................... 9

*Encino Motorcars, LLC v. Navarro*,
   579 U.S. 211 (2016) .................................................................................... 6

*EPA v. EME Homer City Generation, L.P.*,
   572 U.S. 489 (2014) ................................................................................ 8, 9

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009) .................................................................................... 2

*Sierra Club v. EPA*,
   671 F.3d 955 (9th Cir. 2012) ..................................................................... 7

*Texas v. EPA*,
   829 F.3d 405 (5th Cir. 2016) ................................................... 1, 6, 7, 8, 9

*Wages & White Lion Invs., L.L.C. v. FDA*,
   16 F.4th 1130 (5th Cir. 2021) .................................................................... 6

*Wisconsin v. EPA*,
   938 F.3d 303 (D.C. Cir. 2019) ............................................................... 7, 8

**Statutes:**

5 U.S.C. § 706(2)(A) ........................................................................................ 2

42 U.S.C.:
   § 7410(a)(2)(D)(i)(I) ............................................................................ 3, 10
   § 7410(c)(1) ................................................................................................ 8
   § 7410(c)(1)(B) .......................................................................................... 9
   § 7410(k)(5) ............................................................................................ 7, 8

**Other Authorities:**

Air Plan Disapproval; Arkansas, Louisiana, Oklahoma, and Texas; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone Nat'l Ambient Air Quality Standards, 87 Fed. Reg. 9,798 (Feb. 22, 2022) .................. 4

Air Plan Disapprovals; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone Nat'l Ambient Air Quality Standards, 88 Fed. Reg. 9,336 (Feb. 13, 2023) .............................................................. 1, 4, 5, 6, 11

EPA, Federal "Good Neighbor Plan" for the 2015 Ozone Nat'l Ambient Air Quality Standards (Mar. 15, 2023), *available at* https://tinyurl.com/3ykesfm4 ......................................................................... 2

# Introduction

Federal administrative agencies must provide "regulated parties fair warning of the conduct [a regulation] prohibits or requires." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 156 (2012). EPA's disapproval of Texas's State Implementation Plan ("SIP") violates that principle. It depends on guidance, models, and modes of analysis that became available *after* Texas was statutorily required to submit its SIP. That "surprise switcheroo," *Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1810 (2019), vitiates core principles of administrative law and disregards the Clean Air Act's cooperative federalism, *Texas v. EPA*, 829 F.3d 405, 411 (5th Cir. 2016).

EPA defends the agency's actions by arguing that Texas misunderstands the basis for its disapproval. But the part of the rule that Texas challenges belies EPA's shifting claims about the reasons for its actions. *See* Air Plan Disapprovals; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone Nat'l Ambient Air Quality Standards, 88 Fed. Reg. 9,336, 9,364, 9,370 (Feb. 13, 2023) ("Final Rule"). And EPA struggles to explain how, consistent with the Act's cooperative federalism, it can hold a State to the Act's SIP-revision deadline but ignore its own statutory deadline and use after-acquired data and guidance to disapprove a State's timely submission.

EPA's arbitrary-and-capricious actions doom the challenged part of the Final Rule. And because the rule's implementation threatens irreparable harm to the State's economy and power grid, the equities and public interest favor entering a stay pending review by this Court. Texas respectfully requests that relief, or else an

administrative stay, by May 1, 2023—the date by which EPA intends to subject Texas facilities to the rule "regardless of the rule's effective date." *See* EPA, Federal "Good Neighbor Plan" for the 2015 Ozone Nat'l Ambient Air Quality Standards 420 (Mar. 15, 2023), *available at* https://tinyurl.com/3ykesfm4.

### ARGUMENT

### I. Petitioners Are Likely to Succeed on the Merits.

EPA's disapproval of Texas's SIP constitutes quintessential arbitrary-and-capricious agency action, *see* 5 U.S.C. § 706(2)(A), for at least two reasons. First, without any "detailed justification," *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009), or accounting for reliance interests, *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020), EPA altered its policy regarding how States should identify maintenance receptors *after* Texas submitted its SIP—and then disapproved the SIP in part based on that after-the-fact guidance. *See* Mot. 12-15. Second, by basing its disapproval on emissions-modeling data that were available only after Texas was statutorily required to submit its SIP revisions, EPA violated the structural principles of cooperative federalism undergirding the Act. *See id.* at 16-18.

In addition to reasserting (at 15-16) its venue argument, which fails for the reasons Texas previously explained, *see* Doc. 102, EPA makes three overarching rejoinders. None withstands scrutiny.

### A. TCEQ's own data and modeling do not show that Texas has violated its good-neighbor obligations.

EPA's lead argument (at 19) is that "Texas's own data, modeling, and methodology showed that Texas was linked to both nonattainment and maintenance receptors at Steps 1 and 2" of EPA's preferred four-step analytical framework, so "regardless of which data, modeling, or methodology is used, Texas's contribution to downwind nonattainment is not in dispute." That is a sleight-of-hand. Emissions from Texas, like emissions from most upwind States, are present in downwind States. But the statutory language at issue requires a SIP to contain adequate provisions to prohibit emissions that "contribute *significantly* to nonattainment," or that interfere with maintenance, of the NAAQS in other States. 42 U.S.C. § 7410(a)(2)(D)(i)(I) (emphasis added). The *significance* of Texas emissions' contribution to nonattainment in downwind States, and the degree to which they interfere with maintenance in such States, was hotly disputed; Texas disagrees that TCEQ's own data, modeling, and methodology demonstrate significant contributions to nonattainment, or interference with maintenance, in downwind States. *See, e.g.*, Appendix D to Texas State Petitioners' Stay Motion at 6-12 ("TCEQ Comments"); *see also* Appendix B to Texas State Petitioners' Stay Motion at 3-41, 3-42, 3-75 ("Texas SIP").

EPA responds (at 20-22) by arguing that "Texas's failure to 'conduct an adequate Step 3 analysis' was EPA's basis for disapproval—not the flaws EPA identified in [its] data, modeling, and methodology," so the Court should overlook its administrative-law violations at earlier steps of the analysis. But EPA errs at the outset by

embracing a rigid construction of its concededly non-binding four-step transport framework. As EPA has acknowledged, its framework "allow[s] for some methodological variation," and "states have some flexibility in developing analytical methods within this framework" or in developing an "alternative framework." 88 Fed. Reg. 9,338.

TCEQ employed a similar, but not identical, approach here, with its "Steps 2 and 3" approximating EPA's Step 2. *See* Air Plan Disapproval; Arkansas, Louisiana, Oklahoma, and Texas; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone Nat'l Ambient Air Quality Standards, 87 Fed. Reg. 9,798, 9,824 (Feb. 22, 2022) ("Proposed Rule"). And even under EPA's four-step framework, the analysis at each step is not hermetically sealed off from the others. To the contrary, the inputs at Steps 1 and 2 for identifying maintenance receptors and assessing linkages are relevant to the outputs produced at Steps 3 and 4 in determining whether emissions are interfering with maintenance of the NAAQS in downwind States such that emissions reductions are required. Were it otherwise, EPA would not have spent six of its ten pages of analysis erroneously criticizing TCEQ's data, methodologies, and modeling and faulting TCEQ for supposedly underestimating future emissions. 87 Fed. Reg. 9,826-31.

### B. EPA acted arbitrarily and capriciously by disapproving Texas's SIP in part by relying on after-the-fact guidance.

EPA next claims (at 26) that it did not act arbitrarily or capriciously because it did not reject TCEQ's methodology for identifying maintenance receptors as inconsistent with the standards announced in its after-the-fact October 2018 guidance. But

EPA stated in the Final Rule that "states' submissions did not meet the terms of the August or October 2018 memoranda addressing contribution thresholds and maintenance receptors, respectively." 88 Fed. Reg. 9,364. EPA now characterizes that statement (at 26 n.10) as a mere "response to comments regarding why [it] was not required to provide states a second opportunity to submit SIPs." Yet as the Final Rule states, it was also a response to "comments argu[ing] that the EPA should not or cannot base the disapprovals on alleged shifts in policy that occurred after the Agency received the SIP submissions." 88 Fed. Reg. 9,363. And EPA later explained that "EPA evaluated state's [sic] analyses and found no state successfully applied the[] criteria [in the October 2018 guidance] to justify the use of one of these alternative approaches." 88 Fed. Reg. 9,370. So the assertion (at 26) that Texas cannot show that "EPA reject[ed] Texas's method for being inconsistent with the October 2018 memo" fails.

Similarly flawed is EPA's argument (at 28) that there is nothing inconsistent between the pre-SIP-submission March 2018 guidance and the post-SIP-submission October 2018 guidance. The March 2018 guidance suggested that States could identify maintenance receptors "using an alternative approach that does not rely on the projection of maximum design values" and in locations "where current, presumably 'clean,' measured data are shown through analysis to occur during meteorological conditions conducive to ozone formation." Appendix A to Texas State Petitioners' Stay Motion at A-2 ("2018 Transport Guidance"). Yet in the October 2018 guidance, EPA added the requirement that, for a State to "use a design value . . . that is not the maximum design value" or eliminate a site as a maintenance receptor, EPA

5

"*would expect* states to include with their SIPs" evidence that "ozone concentrations have been trending downward at the site since 2011." Appendix C to Texas State Petitioners' Stay Motion at 4 ("2018 Maintenance Receptor Memo") (emphasis added).

That is a material change. The October 2018 memorandum added a new SIP requirement for States to meet before they could rely on an alternative method for identifying maintenance receptors: evidence of a downward trend in ozone concentrations at the site of the receptor since 2011. And despite EPA's assurance that nothing in the October 2018 guidance imposed "binding, enforceable requirements on any party," 2018 Maintenance Receptor Memo at 1, the agency nevertheless disapproved Texas's SIP in part because of a failure to "meet the terms of the . . . October 2018 memoranda addressing . . . maintenance receptors." 88 Fed. Reg. 9,364; *accord* 88 Fed. Reg. 9,370. That is the height of arbitrary-and-capricious action: it "pull[s] a surprise switcheroo on regulated entities" like Texas. *Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130, 1138 (5th Cir. 2021).

EPA falls back (at 28) on the argument that Texas could not have legitimately relied on the March and October 2018 memoranda because they were not "guidance." That misses the point. It is *EPA* that should not have used the guidance to disapprove Texas's SIP after representing it as nonbinding. 88 Fed. Reg. 9,364. EPA failed to recognize that its earlier representations "may have engendered serious reliance interests that must be taken into account." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016) (citation omitted). The bare assertion that States should not have relied on EPA's representations about the nonbinding nature of its guidance

6

documents is no substitute for "assess[ing] whether there were reliance interests, determin[ing] whether they were significant, and weigh[ing] any such interests against competing policy concerns." *Regents*, 140 S. Ct. at 1915.

### C. EPA's disapproval violates the Act's cooperative federalism.

EPA also doubles down (at 22-25) on the argument that it appropriately disapproved Texas's SIP based in part on modeling and data not available to TCEQ at the time of the statutory deadline for SIP revisions. EPA's principal point is that nothing in the Act prohibits it from using "the most accurate, up-to-date data." Resp. 23. Yet Texas does not contend that EPA "must" confine itself to outdated data, which was what Delaware unsuccessfully argued in *Wisconsin v. EPA*, 938 F.3d 303, 321-22 (D.C. Cir. 2019) (per curiam), and EPA unsuccessfully argued in *Sierra Club v. EPA*, 671 F.3d 955, 963-65 (9th Cir. 2012).

Instead, Texas argues that EPA's decision to disapprove Texas's SIP based on data and modeling that was unavailable to TCEQ at the time the State was statutorily required to submit its SIP violates the Act's structure of cooperative federalism. *See* Mot. at 16-18. If EPA wanted to rely on that data, which were available only because EPA missed its own statutory deadline for acting on the SIP by a long shot, then EPA should have issued a SIP call to allow Texas to address that new information in the first instance. *See* 42 U.S.C. § 7410(k)(5). To hold otherwise would impermissibly allow EPA to "use its own delay as an excuse for imposing burdens on Texas that" the Act "does not permit." *Texas*, 829 F.3d at 430. And it would subvert Congress's

7

"preference that states, not EPA, drive the regulatory process" by rewriting the statute, which assigns EPA only the "ministerial function of reviewing SIPs for consistency with the Act's requirements." *Id.* at 411.

EPA's response (at 24, 29 & n.11) is that Texas's only remedy was to sue the agency to force it to adhere to its statutory deadlines because EPA's authority to issue a SIP call is wholly "discretionary." *But see* 42 U.S.C. § 7410(k)(5) ("shall"). The "structure" of the Act, *Wisconsin*, 938 F.3d at 317-18, defeats that response. "[A]n experiment in cooperative federalism," the Act assigns States "the primary responsibility for implementing" the NAAQS through SIPs—a task over which the States retain "wide discretion." *Texas*, 829 F.3d at 411 (citation omitted). "Only if the state has not complied with the requirements of the Clean Air Act does EPA assume the role of primary regulator." *Id.* at 412. A SIP call was the only statutorily permissible means for EPA to bring the new data into the picture. Surprising the State with those data through a SIP disapproval long after EPA's own deadline had passed clashes with the Act's core structure. This Court should not condone a federal takeover of the Texas economy by allowing EPA to flout a statutory deadline that is a key piece of the Act's cooperative federalism.

The Supreme Court's decision in *EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489 (2014), is not to the contrary. *Contra* Resp. 29 n.11. *EME Homer* explains that, once EPA validly disapproves a SIP, nothing in the Act requires EPA to give the State a second chance to issue a compliant SIP before issuing a Federal Implementation Plan ("FIP"); instead, section 7410(c)(1) allows EPA to act "at any time"

8

within two years of the disapproval. 572 U.S. at 509. But here, Texas does not challenge EPA's FIP, but rather the disapproval of Texas's SIP. Mot. 1. The Act's cooperative federalism is at its zenith at the SIP stage. *See generally Texas*, 829 F.3d at 411.

## II. The Remaining Stay Factors Favor Petitioners.

EPA's response confirms that the equities favor Texas. EPA's core argument (at 30-31) is that disapproval of Texas's SIP does not require the State "to do *anything* and thus itself effects no irreparable harm"—and that if Texas wants to challenge the FIP, it must wait until the FIP is published.

But allowing the SIP disapproval to take effect "would disrupt the system of cooperative federalism enshrined in the Clean Air Act," which by itself constitutes irreparable injury, as EPA appears (at 31 n.12) to concede. *Texas*, 829 F.3d at 433. And the SIP disapproval is, of course, the legal prerequisite to EPA's imposition of a FIP, 42 U.S.C. § 7410(c)(1)(B), that will threaten Texas's economy and electrical grid. *See* Mot. at 19. EPA anticipates the FIP will be published later this month. Ex. 8 to EPA's Opposition ¶ 22 (Birnbaum Declaration). But EPA is wrong that Petitioners must wait to challenge the FIP. As Judge Rogers explained in an earlier stage of the *EME Homer* litigation, if States "wish to avoid enforcement of the Transport Rule FIPs because they contend EPA's SIP disapprovals were in error, the proper course is to seek a stay of EPA's disapprovals." *EME Homer City Generation, L.P. v. EPA*, 696 F.3d 7, 44 n.6 (D.C. Cir. 2012) (Rogers, J., dissenting).

9

That may be why EPA retreats (at 32) to an argument that the final FIP "alleviated" any harms associated with the FIP by extending certain deadlines for compliance. Yet the incremental changes in the final FIP do not eliminate the harms that will be visited on Texas's economy and electrical grid in mere months absent a stay. *See* Supplemental Declaration of Dwayne W. Rickerson ¶¶ 4-8.

Finally, EPA argues (at 36) that the balance of equities and public interest militate against a stay, which would allow Texas power plants, "among the highest emitters of ozone precursors in the United States," to continue emitting while neighboring States will be required to lower their emissions. But Texas's level of emissions just reflects its status as the second-largest State in the Union and the top energy producer. It says nothing about whether, under the Act, Texas "contribute[s] significantly," 42 U.S.C. § 7410(a)(2)(D)(i)(I), to nonattainment or interferes with maintenance of the NAAQS in downwind States—a contention that TCEQ vigorously disputes. *See* Texas SIP at 3-41, 3-42, 3-75; TCEQ Comments at 12. EPA's sudden preference for haste, moreover, is inconsistent with the agency's nearly four-year delay in acting on Texas's SIP, thus undercutting its claim that a stay, pending review by this Court, will cause harm.

## Conclusion

The Court should stay, pending review, the part of the Final Rule that disapproves Texas's SIP.

Respectfully submitted.

| | |
|---|---|
| Ken Paxton<br>Attorney General of Texas | Judd E. Stone II<br>Solicitor General |
| Brent Webster<br>First Assistant Attorney General | /s/ Bill Davis<br>Bill Davis<br>Deputy Solicitor General<br>Bill.Davis@oag.texas.gov |
| Office of the Attorney General<br>P.O. Box 12548 (MC 059)<br>Austin, Texas 78711-2548<br>Tel.: (512) 936-1700<br>Fax: (512) 474-2697 | Michael R. Abrams<br>William F. Cole<br>Joseph N. Mazzara<br>Assistant Solicitors General<br><br>Counsel for State of Texas and<br>Texas Commission on<br>Environmental Quality |

## Certificate of Service

On April 10, 2023, this motion was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

/s/ Bill Davis
BILL DAVIS

## Certificate of Compliance

This document complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 2,595 words, excluding the parts of the document exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the same program used to calculate the word count).

/s/ Bill Davis
BILL DAVIS

# Exhibit A

**SUPPLEMENTAL DECLARATION OF**
**DWAYNE W. "WOODY" RICKERSON, P.E.**

1. I am the Vice President of System Planning & Weatherization for Electric Reliability Council of Texas, Inc. (ERCOT), where I am responsible for transmission planning, generator interconnection activities, weatherization inspections, and resource adequacy analyses. I am providing this Supplemental Declaration on behalf of ERCOT.

2. I previously provided a Declaration dated March 2, 2023 regarding ERCOT's analysis of the impacts of the Environmental Protection Agency's (EPA) *proposed* federal implementation plan (FIP) addressing regional ozone transport under the 2015 National Ambient Air Quality Standard (NAAQS).

3. The EPA posted the *final* FIP on its website on March 15, 2023. The EPA has stated that it expects the FIP to be effective in June or July of 2023.

4. I am submitting this Supplemental Declaration to provide an update to ERCOT's analysis in light of EPA's issuance of the final FIP. Although the final FIP makes a number of incremental changes to the proposed FIP, my assessment is that those incremental changes do not alter my conclusion that the EPA's final FIP could result in imminent harm to the reliability of the ERCOT grid for the 2023 Ozone Season.

5. As explained in my previous Declaration, it is my understanding that the EPA's final FIP will reduce the availability of allowances for nitrogen oxides (NOx) emissions from electric generation facilities for the 2023 Ozone Season. It is also my understanding that the FIP cannot become effective until 60 days after the final FIP has been published in the *Federal Register*, which has not yet occurred. Due to this timing requirement, at least some portion of the 2023 Ozone Season will be prorated to reflect the applicability of existing emissions limits prior to the effective date of the final FIP. This uncertainty makes it difficult to predict the exact final emissions budget for 2023 Ozone Season, but the EPA's final FIP estimates a statewide NOx emissions budget for Texas of 40,124 tons, which is about 5% higher than the 38,284 tons originally proposed by the EPA, but well below the current budget of 51,251 tons that has applied in Texas since 2017.

6. According to data provided to ERCOT by a subset of owners of coal- and gas-fired generating units collectively representing approximately half of the coal- and gas-fired generation fleet in the ERCOT region, if the units operated by these entities were operated in Ozone Season 2023 in the same manner that they were operated in Ozone Season 2022, then the total capacity value of the generating units that would exhaust their emissions allowances by August 1, 2023 would be 6,566 MW—even under the more generous unit-specific allowances under the final FIP and the proration of the new, lower emissions budgets after the effective date of the FIP. Because this figure only accounts for some units, it is almost certainly lower than it would be if the same assumptions were made for all units operating in the ERCOT region. I have estimated that if 6,566 MW were unavailable during Summer 2023 peak load conditions, then the likelihood of load shed in ERCOT would be four times greater than it would be in the absence of the final FIP. Although the EPA suggests there will be enough banked or remaining allowances in the ERCOT market that could be purchased to cover the emissions of any units that run out of allowances in 2023, this appears to assume that owners of units that have exhausted their allotments will themselves hold sufficient banked allowances to run their units, or that unit owners with remaining allowances (banked or otherwise) would prefer to sell them instead of retaining them for their own continued operations or for future disposition. While it is possible that banked or remaining allowances may be available, I do not believe that can be concluded with certainty.

7. The changes in the final FIP also do not resolve my concern that, with summer operating conditions typically experienced in the ERCOT region, ERCOT would be required to direct firm load-shedding if generators are required to operate under the emissions limits established in the FIP. This conclusion is illustrated by considering the example of a reoccurrence of 2022 conditions in 2023. As I noted in my initial Declaration, for Ozone Season 2022, the tightest reserve capacity margin occurred on July 13, 2022 at 3:23 p.m., when ERCOT had 2,408 MW of capacity reserves. If ERCOT experienced the same reserve capacity margin at any point in Ozone Season 2023, a reduction in capacity of 6,566 MW would require ERCOT to direct firm load-shedding. A load-shedding directive would require utilities to disconnect customers from the power grid to avoid a system-wide blackout. Disconnecting customers from the power grid during extreme summer conditions—such as the severe heat that was observed on the afternoon of July 13, 2022—can threaten human life and health.

8. Based on the data provided by generation owners in the ERCOT region and ERCOT's independent analysis of this data, I conclude that the final FIP continues to pose an imminent risk of harm to the reliability of the ERCOT grid.

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed on April 7, 2023.


/s/ D. Woody Rickerson

Dwayne W. "Woody" Rickerson, P. E.
Vice President of System Planning & Weatherization
Electric Reliability Council of Texas, Inc.