No. 23-60069

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

---

**STATE OF TEXAS; TEXAS COMMISSION ON ENVIRONMENTAL QUALITY; LUMINANT GENERATION COMPANY LLC; COLETO CREEK POWER, LLC; ENNIS POWER COMPANY, LLC; HAYS ENERGY, LLC; MIDLOTHIAN ENERGY, LLC; OAK GROVE MANAGEMENT COMPANY LLC; WISE COUNTY POWER COMPANY, LLC; ASSOCIATION OF ELECTRIC COMPANIES OF TEXAS; BCCA APPEAL GROUP; TEXAS CHEMICAL COUNCIL; TEXAS OIL & GAS ASSOCIATION; STATE OF MISSISSIPPI; MISSISSIPPI DEPARTMENT OF ENVIRONMENTAL QUALITY; MISSISSIPPI POWER COMPANY; STATE OF LOUISIANA; LOUISIANA DEPARTMENT OF ENVIRONMENTAL QUALITY,**

Petitioners,

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; MICHAEL S. REGAN, Administrator, United States Environmental Protection Agency,**

Respondents.

---

## TEXAS INDUSTRY PETITIONERS'
## APPENDIX OF EXHIBITS
## IN SUPPORT OF
## REPLY IN SUPPORT OF MOTION TO STAY FINAL ACTION
## OF THE U.S. ENVIRONMENTAL PROTECTION AGENCY

---

**April 10, 2023**

## LIST OF EXHIBITS IN APPENDIX

**Exhibit**                                                    **Page Number
                                                              in Appendix**

Supplemental Declaration of Dwayne W. "Woody" Rickerson, Vice
    President of System Planning & Weatherization, Electric Reliability
    Council of Texas (ERCOT) (Apr. 7, 2023) ("Rickerson Supp.") ........................ 1

Declaration of Kenneth C. Price, Chief Operating Officer, Lower
    Colorado River Authority (Apr. 6, 2023) ("Price Decl.") ..................................... 4

Supplemental Declaration of Dudley Zahn, Vice President, NRG Energy,
    Inc. (Apr. 10, 2023) ("Zahn Supp.") ......................................................... 13

Supplemental Declaration of Randall J. Talley, Vice President, Solid Fuels
    and Environmental Trading, Vistra Corp. (Apr. 10, 2023) ("Talley
    Supp.") ......................................................................................... 21

Declaration of Jacob Krautsch, Senior Director of Environmental, Energy
    Transfer LP (Apr. 10, 2023) ("Krautsch Decl.") .................................... 31

Declaration of Kevin Pollo, Vice President of Energy Supply & Market
    Operations, CPS Energy (Apr. 7, 2023) ("Pollo Decl.")..................................... 36

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that all counsel of record who have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system on this 10th day of April, 2023.  The undersigned counsel also certifies that, pursuant to paragraph A(6) of this Court's ECF Filing Standards, (1) any required privacy redactions have been made in compliance with 5th Cir. R. 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with 5th Cir. R. 25.2.1; and (3) the document has been scanned for viruses with the most recent version of a commercial virus scanning program and is free of viruses.

Dated: April 10, 2023

s/ P. Stephen Gidiere III
*Counsel for Luminant Petitioners*

**Supplemental Declaration of Dwayne W. "Woody" Rickerson, Vice President of System Planning & Weatherization, Electric Reliability Council of Texas (ERCOT) (Apr. 7, 2023)**

**SUPPLEMENTAL DECLARATION OF
DWAYNE W.  "WOODY" RICKERSON, P.E.**

1. I am the Vice President of System Planning & Weatherization for Electric Reliability Council of Texas, Inc. (ERCOT), where I am responsible for transmission planning, generator interconnection activities, weatherization inspections, and resource adequacy analyses. I am providing this Supplemental Declaration on behalf of ERCOT.

2. I previously provided a Declaration dated March 2, 2023 regarding ERCOT's analysis of the impacts of the Environmental Protection Agency's (EPA) *proposed* federal implementation plan (FIP) addressing regional ozone transport under the 2015 National Ambient Air Quality Standard (NAAQS).

3. The EPA posted the *final* FIP on its website on March 15, 2023. The EPA has stated that it expects the FIP to be effective in June or July of 2023.

4. I am submitting this Supplemental Declaration to provide an update to ERCOT's analysis in light of EPA's issuance of the final FIP. Although the final FIP makes a number of incremental changes to the proposed FIP, my assessment is that those incremental changes do not alter my conclusion that the EPA's final FIP could result in imminent harm to the reliability of the ERCOT grid for the 2023 Ozone Season.

5. As explained in my previous Declaration, it is my understanding that the EPA's final FIP will reduce the availability of allowances for nitrogen oxides (NOx) emissions from electric generation facilities for the 2023 Ozone Season.  It is also my understanding that the FIP cannot become effective until 60 days after the final FIP has been published in the *Federal Register*, which has not yet occurred. Due to this timing requirement, at least some portion of the 2023 Ozone Season will be prorated to reflect the applicability of existing emissions limits prior to the effective date of the final FIP.  This uncertainty makes it difficult to predict the exact final emissions budget for 2023 Ozone Season, but the EPA's final FIP estimates a statewide NOx emissions budget for Texas of 40,124 tons, which is about 5% higher than the 38,284 tons originally proposed by the EPA, but well below the current budget of 51,251 tons that has applied in Texas since 2017.

6. According to data provided to ERCOT by a subset of owners of coal- and gas-fired generating units collectively representing approximately half of the coal- and gas-fired generation fleet in the ERCOT region, if the units operated by these entities were operated in Ozone Season 2023 in the same manner that they were operated in Ozone Season 2022, then the total capacity value of the generating units that would exhaust their emissions allowances by August 1, 2023 would be 6,566 MW—even under the more generous unit-specific allowances under the final FIP and the proration of the new, lower emissions budgets after the effective date of the FIP.  Because this figure only accounts for some units, it is almost certainly lower than it would be if the same assumptions were made for all units operating in the ERCOT region.  I have estimated that if 6,566 MW were unavailable during Summer 2023 peak load conditions, then the likelihood of load shed in ERCOT would be four times greater than it would be in the absence of the final FIP.  Although the EPA suggests there will be enough banked or remaining allowances in the ERCOT market that could be purchased to cover the emissions of any units that run out of allowances in 2023, this appears to assume that owners of units that have exhausted their allotments will themselves hold sufficient banked allowances to run their units, or that unit owners with remaining allowances (banked or otherwise) would prefer to sell them instead of retaining them for their own continued operations or for future disposition.  While it is possible that banked or remaining allowances may be available, I do not believe that can be concluded with certainty.

1

7.  The changes in the final FIP also do not resolve my concern that, with summer operating conditions typically experienced in the ERCOT region, ERCOT would be required to direct firm load-shedding if generators are required to operate under the emissions limits established in the FIP. This conclusion is illustrated by considering the example of a reoccurrence of 2022 conditions in 2023. As I noted in my initial Declaration, for Ozone Season 2022, the tightest reserve capacity margin occurred on July 13, 2022 at 3:23 p.m., when ERCOT had 2,408 MW of capacity reserves. If ERCOT experienced the same reserve capacity margin at any point in Ozone Season 2023, a reduction in capacity of 6,566 MW would require ERCOT to direct firm load-shedding. A load-shedding directive would require utilities to disconnect customers from the power grid to avoid a system-wide blackout. Disconnecting customers from the power grid during extreme summer conditions—such as the severe heat that was observed on the afternoon of July 13, 2022—can threaten human life and health.

8.  Based on the data provided by generation owners in the ERCOT region and ERCOT's independent analysis of this data, I conclude that the final FIP continues to pose an imminent risk of harm to the reliability of the ERCOT grid.

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed on April 7, 2023.


/s/ D. Woody Rickerson

Dwayne W. "Woody" Rickerson, P. E.
Vice President of System Planning & Weatherization
Electric Reliability Council of Texas, Inc.

2

**Declaration of Kenneth C. Price, Chief Operating Officer, Lower Colorado
River Authority (Apr. 6, 2023)**

No. 23-60069

## IN THE UNITED STATES COURT OF APPEALS

## FOR THE FIFTH CIRCUIT

**STATE OF TEXAS; TEXAS COMMISSION ON ENVIRONMENTAL QUALITY; LUMINANT GENERATION COMPANY LLC; COLETO CREEK POWER, LLC; ENNIS POWER COMPANY, LLC; HAYS ENERGY, LLC; MIDLOTHIAN ENERGY, LLC; OAK GROVE MANAGEMENT COMPANY LLC; WISE COUNTY POWER**

**COMPANY, LLC; ASSOCIATION OF ELECTRIC COMPANIES OF TEXAS; BCCA APPEAL GROUP; TEXAS CHEMICAL COUNCIL; TEXAS OIL & GAS ASSOCIATION,**

**Petitioners**

**v.**

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; MICHAEL S. REGAN, Administrator, United States Environmental Protection Agency,**

**Respondents**

## DECLARATION IN SUPPORT OF

## ASSOCIATION OF ELECTRIC COMPANIES OF TEXAS'

## MOTION TO STAY FINAL ACTION

## OF THE U.S. ENVIRONMENTAL PROTECTION AGENCY

## DECLARATION OF KENNETH C. PRICE

1. I am the Chief Operating Officer (COO) of the Lower Colorado River Authority (LCRA). As COO, I oversee LCRA activities related to electric power generation. I provide this declaration in support of the Association of Electric Companies of Texas' motion to stay the disapproval of the Texas State Implementation Plan (SIP) good neighbor provisions for the 2015 ozone standard. The disapproval of this SIP will have highly damaging and irreparable impacts on LCRA's operations, as described below. This declaration is based on my personal knowledge of facts and analysis conducted by me and my staff.

2. I have been responsible for LCRA's activities related to electric power generation since I joined the company in 2014. When I joined in 2014, my original title was Chief Commercial Officer. In 2021, I was named as Executive Vice President of Generation and Telecommunications, and in 2022, I was named as Chief Operating Officer.

3. Before joining LCRA, I worked for Luminant and its predecessor companies for 34 years. My final role was as Senior Director of Power Operations. In my time at Luminant, I held several roles where I was responsible for or involved in analyzing the impacts on Luminant's generation fleet from proposed environmental laws or rules.

4. I graduated with a Bachelor of Science degree in Electrical Engineering from the University of Texas at Austin. I also am a senior member and member of the honor society of the Institute of Electrical and Electronics Engineers (IEEE). I was a licensed professional engineer in the state of Texas for over 30 years.

5. This Declaration has been updated to reflect the EPA adoption of the Federal Implementation Plan (FIP)[1], and replaces my previous declaration. Nothing in the adoption changes the reality that LCRA is facing imminent and substantial harm by the disapproval of the Texas good neighbor SIP.

## LCRA ELECTRIC GENERATING UNIT FLEET

6. LCRA is a Texas conservation and reclamation district. It has no taxing authority and operates solely on utility revenues and fees generated from supplying energy, water and community services. LCRA and its affiliates supply wholesale electricity to more than 42 retail utilities, including cities and electric cooperatives that serve more than 1 million people in 77 counties. LCRA's well-rounded

---

[1] Pre-publication of "Federal "Good Neighbor Plan" for the 2015 Ozone National Ambient Air Quality Standards" released on EPA website March 15, 2023.

2

generation portfolio includes combined-cycle gas-fired plants, a traditional natural gas-fired power plant, a coal-fired plant, a gas peaker plant, and renewable energy.

7. LCRA's generation fleet resides entirely in the Electric Reliability Council of Texas (ERCOT) power region. LCRA owns approximately 3,000 MW total generating capacity. The LCRA Fayette Power Project (FPP, also known as Sam Seymour in some EPA data files), located in Fayette County, Texas, is a coal-fired electric generating facility consisting of three electric-generating units (EGUs), two of which are co-owned by the City of Austin. LCRA also owns a share of the Sandy Creek Energy Station in McLennan County, a facility with a single coal-fired EGU. The LCRA Sim Gideon Power Plant (SGP) consists of three natural gas-fired steam EGUs. The LCRA Thomas C. Ferguson Power Plant and Lost Pines 1 Power Project (LP1) are combined-cycle combustion turbine plants. The LCRA Winchester Power Park consists of four simple cycle combustion turbines.

8. LCRA provides power to its wholesale electric customers affordably, reliably, and in compliance with all applicable environmental requirements, and takes pride in being a good steward of the environment. LCRA has made major investments in its generation assets and in pollution controls required to operate those assets in compliance with applicable environmental requirements.

9. LCRA is a member of the Association of Electric Companies of Texas (AECT).

## IMPACT OF EPA DISAPPROVAL OF TEXAS STATE IMPLEMENTATION PLAN

10. EPA published its final disapproval of the Texas SIP regarding ozone transport, also called the "good neighbor" SIP, on February 13, 2023. This disapproval was proposed on February 22, 2022, with a comment period ending April 25, 2022.

11. Well before the Texas SIP disapproval was finalized, and even prior to the end of the comment period on the proposed disapproval, EPA published a proposed Federal Implementation Plan (proposed FIP) on April 6, 2022. It is clear that these two actions are inextricably linked. The direct result of EPA's disapproval of the Texas SIP is EPA's adoption of a FIP. On March 15, 2023, EPA released a pre-publication version of the adopted FIP titled, "Federal "Good Neighbor Plan for the 2015 Ozone National Ambient Air Quality Standards."

12. EPA's disapproval of the SIP and subsequent FIP adoption will have a dramatic impact on the electric grid in Texas. The requirement that almost all existing electric generating facilities limit their nitrogen oxide (NOx) emissions to levels only achievable by installing selective catalytic

3

reduction (SCR), and for some plants not achievable even then, is beyond any level of NOx reductions required of the electric industry under any prior program. Due to the great cost of these controls and the uncertainty of the market, it is anticipated that a significant number of units would retire early instead of attempting to meet the aggressive emission rates EPA requires.

13. Following the disapproval of the Texas SIP and adoption of the FIP, Texas EGUs would have their total allowance budget reduced from 52,301 under the current CSAPR program to 40,134 in 2023, a 23% reduction. Then in 2027, the budget would be reduced further to 23,009, which is a reduction of 43% between 2023 and 2027. These large reductions are expected to reduce the number of allowances available and increase the price of allowances dramatically.

14. The Texas SIP contained an extensive demonstration of compliance with the good neighbor requirements of the CAA. It concluded that Texas EGUs do not contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in another state's downwind monitors. That conclusion was based in part on the current extensive NOx emission controls already in place for EGUs, including the current Cross-State Air Pollution Rule (CSAPR), Group 2.

15. The impact of EPA's disapproval of the SIP and adoption of the FIP requires immediate action on the part of existing EGUs to comply with the new requirements. The installation of control equipment is a process that can take years to complete. EPA explained in the proposed FIP that to achieve the lower emission budgets in 2026, "source owners and operators . . . should begin engineering and financial planning now to be prepared to meet this implementation timetable."[2]

16. Even those sources that do make the significant expenditures to install or upgrade selective catalytic reduction controls will still likely need to purchase allowances in the trading market. Currently Texas trades in the Group 2 Trading program but would be moved to Group 3, which has tended to have higher prices and more scarcity even prior to the FIP proposal.

## LCRA UNIT IMPACTS

17. The most immediate impacts of the EPA actions to the LCRA EGU fleet occur as the result of allowance allocation reductions associated with the three coal-fired units at FPP and the three gas-fired units at SGP. The FIP imposes allowance reductions based on the assumption that SCR is

---

[2] 87 Fed. Reg. at 21,101 (April 6, 2022).

4

installed on these LCRA units. Additional impacts occur to several LCRA units resulting from the shrinking Texas budget, especially for units without SCR, including the three gas units at SGP.

18. All of the allocation numbers below use numbers EPA included in spreadsheets made available with the FIP.

19. EPA identifies a maximum emission rate for the three FPP coal units of 3,523 tons based on the highest NOx emissions during ozone seasons between 2017 and 2021. Under the FIP, FPP would be reduced to 2,791 allowances in 2023. EPA did not provide estimated unit allowances for years 2026 and beyond, therefore, the following numbers are based upon LCRA's best allocation estimates, with assumptions including 2021 unit emission rates, no allowances are purchased, and published preset Texas allowance budgets remain unchanged through 2029. The FPP allowances would be reduced further to 1,467 in 2026, as EPA shrinks the Texas budget based on the assumption that half of the applicable units would meet a NOx emission rate of 0.05 lb/MMBtu after installing SCR. In 2027, the FPP allowances would again be reduced, this time to approximately 1,050 as EPA further shrinks the Texas budget based on the assumption that the other half of the applicable units will install SCR and will coal-fired units will be capped at an 0.08 lb/MMBtu assumed rate. This represents a reduction in FPP 2027 allowances of 70% from its highest emission rate during the baseline years.

20. EPA identifies a maximum emission rate for the SGP gas units of 597 tons based on the highest NOx emissions during ozone seasons between 2017 and 2021. Under the FIP, SGP would be reduced to 261 allowances in 2023. The SGP allowances would be reduced further to 142 in 2026 and to 74 in 2027. EPA shrinks the Texas budget in 2026 and 2027 by assuming that half of the applicable units would meet a NOx emission rate of 0.05 lb/MMBtu after installing SCR in 2026 and the other half in 2027. This represents a reduction in SGP allowances of 88% from its highest emission rate during the baseline years.

21. Given these projected reductions in allowances, the LCRA units will run out of allowances during their control season (from May 1 to Sept 30) if they operate as they did in 2022 and do not install or optimize SCR. The chart below demonstrates the date each unit would have to shut down under those circumstances if they could not obtain additional allowances. It is important to note that the gas units at Sim Gideon (SGP) have been relied upon in recent years to protect grid reliability but the units will deplete their allocations early in ozone season 2023, and earlier in future years.

5

| LCRA Unit | Maximum TPY (2017 – 2021 highest rate) | 2023 Allowances (Date depleted) | 2026 Estimated Allowances (Date depleted) | 2027 Estimated Allowances (Date depleted) |
|-----------|------------------|-----------------|-----------------|-----------------|
| SGP1 | 98 | 42 (July 8) | 20 (Jun3 6) | 11 (May 15) |
| SGP2 | 83 | 48 (July 23) | 25 (June 23) | 13 (June 5) |
| SGP3 | 416 | 171 (July 28) | 97 (June 23) | 50 (May 26) |
| FPP1 | 1202 | 991 | 602 (Sept. 2) | 360 (July 28) |
| FPP2 | 1355 | 1026 | 667 (Aug. 5) | 398 (June 28) |
| FPP3 | 966 | 774 (Sept. 23) | 491 (July 27) | 292 (June 21) |

## TIMELINE OF CONTROL INSTALLATION

22. If LCRA were to install SCR controls on FPP and/or SGP3, LCRA must start that process immediately in order to have the installation complete by May 1, 2027. LCRA would need to hire contractors to design the new units and to place major equipment orders immediately, in order to complete the planned installations.  Once equipment orders are placed, cancellation penalties will apply if LCRA changes course.

23. The timeline set up by the FIP to require that as many as 211 units nationwide install SCR by 2027 is untenable. While EPA evaluates how long it would take an individual plant to install this equipment, it does not adequately consider the supply chain and workforce issues associated with so many units doing the same work at one time.

24. EPA assumes a timetable of 36 - 48 months for installation of SCR. However, in a report[3] prepared for the American Public Power Association (APPA) and which APPA submitted to EPA during the FIP comment period, a review of 18 SCR installations demonstrates that the typical time necessary for installation on one unit is 40 months. However, plants with multiple units typically require 45 months. Other plants took as long as 62 months to complete installation. LCRA believes the APPA report reflects a more realistic timeline, especially for plants operated by public entities who typically have more obstacles for new capital projects.

25. Installation of SCR technology has significantly decreased over the last decade, raising the question whether there is enough expertise and supply to ramp back up before 2027. The FIP would require

---

[3] J. Edward Cichanowicz, James Marchetti, Michael C. Hein, and Shirley Rivera, Technical Comments on Control Technology Options and Emission Allocations Proposed by the Environmental Protection Agency in Support of the Proposed 2015 Ozone NAAQS Transport Rule at [8] (June17, 2022) (Technical Report).

6

that as many as 211 units nationwide install SCR by the May 1, 2027 deadline. Given today's serious supply chain and labor shortage issues, the schedule imposed by EPA is infeasible.

## COST OF CONTROLS

26. According to EPA's own cost evaluation in the proposed FIP, the cost of installing SCR at the three FPP units is $662,157,342 in 2021 dollars. Further, operation and maintenance of the SCR at the three FPP units will run $11,150,622 per year in 2021 dollars. LCRA believes these numbers to be on the low side given the current high inflation rate as well as competition for equipment and contractors. Much of that money must be committed immediately to have installation complete by May 2027. Given this high cost, EPA concludes in its proposed FIP that FPP will not install SCR as it is cost prohibitive due to the limited emission reductions possible from the emissions which are already relatively low.

27. According to EPA's own cost evaluation in the FIP, the cost of installing SCR at SGP3 is $61,196,310 in 2021 dollars. Further, operation and maintenance of the SCR is $644,112 in 2021 dollars. LCRA believes these numbers to be on the low side given the current high inflation rate as well as competition for equipment and contractors. Much of that money must be committed immediately to have installation complete by May 2027.

## COST OF ALLOWANCES

28. Since EPA's proposal of the FIP in April 2022, the CSAPR NOx allowance market has fluctuated greatly. This year, we saw allowance prices go as high as $50,000 for Group 3 in August 2022 following the FIP proposal. Currently, prices seem to have settled just below $20,000, a threefold increase over pre-FIP proposal prices, but more volatility is anticipated with the adoption of the FIP.

29. Given the great volume of reductions required by the FIP, it is anticipated that allowances may not be readily available in the future. Given the current uncertainty, there is an incentive for EGUs to hold onto allowances for future use as opposed to selling them.

30. The three FPP coal unit allocations would be significantly lower than their highest NOx emission rate between 2017-2021 of 3523 tons. In 2023, it would receive 2791 allowances, which is 732 tons below that maximum. Further, in 2027, based on the allowance cap associated with a NOx emission rate of 0.08 lb/MMBtu, the units would receive 1,050 allowances, which is 2473 less than the highest baseline rate. Assuming that these allowances are available in the marketplace and do not

7

cause an exceedance of the state variability limit, and pricing them conservatively at $50,000/ton which is a price seen recently after EPA proposed the FIP, would cost LCRA as much as $123,650,000 per year to make up the difference.

31. The SGP gas unit allocations would be significantly lower that its highest NOx emission rate between 2017-2021 of 597 tons. In 2023, they would receive 261 allowances, which is 336 allowances below that maximum. Further, in 2027, they are estimated to receive 74 allowances which is 523 less than the highest baseline rate. Assuming that these allowances are available in the marketplace and do not cause an exceedance of the state variability limit, and pricing them conservatively at $50,000/ton which is a price seen recently after EPA proposed the FIP, would cost LCRA as much as $26,150,000 per year to make up the difference.

## CONCLUSION

32. For the reasons described above, LCRA is facing imminent and substantial harm by the disapproval of the Texas good neighbor SIP.


I, Kenneth C. Price, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 6th day of April, 2023.


Kenneth C. Price

8

**Declaration of Dudley Zahn, Vice President, NRG Energy, Inc. (Apr. 10, 2023)**

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

| | |
|---|---|
| STATE OF TEXAS; TEXAS COMMISSION ON ENVIRONMENTAL QUALITY; LUMINANT GENERATION COMPANY LLC; COLETO CREEK POWER, LLC; ENNIS POWER COMPANY, LLC; HAYS ENERGY, LLC; MIDLOTHIAN ENERGY, LLC; OAK GROVE MANAGEMENT COMPANY LLC; WISE COUNTY POWER COMPANY, LLC; ASSOCIATION OF ELECTRIC COMPANIES OF TEXAS; BCCA APPEAL GROUP; TEXAS CHEMICAL COUNCIL; TEXAS OIL & GAS ASSOCIATION | ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Petitioners, | ) ) |
| v. | ) ) ) |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and MICHAEL S. REGAN, Administrator, United States Environmental Protection Agency, | ) ) ) ) ) |
| Respondents. | ) ) |

Case No. 23-60069

## **SUPPLEMENTAL DECLARATION OF DUDLEY ZAHN**

1.    I am a Vice President at NRG Energy, Inc (NRG), which owns NRG Texas Power LLC ("NRG Texas"), which in turn owns power plants in Texas.  NRG Texas is a member of the Association of Electric Companies of Texas (AECT), and I am providing this supplemental declaration in support of AECT's motion to stay the disapproval of the Texas State Implementation Plan (SIP) rule promulgated by the U.S. Environmental Protection Agency (EPA or the Agency) on February 13, 2023. *See Air Plan Disapprovals; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards*, 88 Fed. Reg. 9,336 (Feb. 13, 2023)

1

("Final Rule"). This declaration is based on my knowledge and analysis conducted by my colleagues and me.

2.      As Vice President, Gulf Asset Management at NRG, I am familiar with the Texas electricity market and NRG Texas's business, day-to-day operations, financial matters, the value of its assets, and its underlying books and records.

3.      This declaration supplements and affirms my declaration in support of AECT's motion to stay the Final Rule, filed on March 3, 2023, in light of EPA's release of the final Federal Implementation Plan (FIP) addressing interstate transport for the 2015 ozone National Ambient Air Quality Standards (NAAQS) (the "Final FIP").[1] The Final FIP made changes to several aspects of the control regime. These changes do not materially change the harms to NRG Texas, should the Final Rule be upheld, as detailed below.

4.      The Final FIP will go into effect 60 days after publication in the *Federal Register*. EPA uses an estimated effective date of June 3, 2023—33 days after the start of the 2023 ozone season. Starting on the effective date of the Final FIP, EPA would be subject to a significantly reduced ozone season budget.

5.      Assuming EPA's estimated effective date, Texas EGUs would be subject to a $NO_X$ ozone season budget 18% less than under the current Cross-State Air Pollution Rule ("CSAPR") $NO_X$ Ozone Season Group 2 Trading Program—52,301 to 42,758 allowances. EPA bases Texas's 2023 budget on $NO_X$ reductions that EPA assumes can be achieved through "optimization" of certain units' existing $NO_X$ controls. If this requirement is adopted and upheld, units that cannot conduct the work in the minimal time allotted by EPA, or cannot achieve the level of reduction EPA

---

[1]  The pre-publication version of the Final FIP was released on March 15, 2023 and is available at: https://www.epa.gov/system/files/documents/2023-03/FRL%208670-02-OAR_Good%20Neighbor_Final_20230314_Signature_ADMIN%20%281%29.pdf

anticipates, will be required to purchase additional allowances to cover any shortage (if they are available) or reduce their thermal generation in a market that is actively reviewing various mechanisms to ensure sufficient thermal dispatchable resources are available to maintain a standard of reliability, or a combination of both.

6.      Beginning in 2026, the Final FIP relies on EPA's assumption that dozens of units in Texas will be able to achieve $NO_X$ reductions through the installation and operation of new and exorbitantly costly selective catalytic reduction (SCR) controls and selective non-catalytic reduction (SNCR) controls.  While EPA has finalized a phased approach—requiring half of the reductions from installation of post-combustion controls in 2026 and the remaining half in 2027— this change to the Final FIP does not meaningfully affect the date by which units would need to install SCR (May 1, 2026) to meet EPA's significantly reduced 2026 budget.  EPA's preset Texas budget for 2026 would be a 40% reduction from the current Group 2 trading program.  If this requirement is adopted and upheld, units that cannot conduct the work in the time allotted by EPA, or cannot achieve the level of reduction EPA anticipates, would be required to purchase additional allowances to cover any shortage (if they are available) and/or reduce the generation of electricity (*i.e.*, de-rate or retire) in a market that is actively reviewing various mechanisms to ensure sufficient thermal dispatchable resources are available to maintain a standard of reliability.

7.      EPA assumes that the EGU owners will make investment decisions and begin incurring costs now, even before the effective date of the FIP, to install post-combustion controls to meet the stricter $NO_X$ budget by 2026.   In my prior declaration, I noted that the proposed FIP stated that generators "should begin engineering and financial planning now" (*i.e.*, before the promulgation of the final rule).  87 Fed. Reg. at 20,101 (emphasis added).  EPA has reiterated that position in the Final FIP, stating that the proposed FIP provided a year of notice to generators that

"they should begin engineering and financial planning (steps that can be taken prior to any capital investment) to be prepared to meet this implementation timetable." *See* Final FIP at PDF page 347. While EPA has added additional language in the Final FIP that these steps allegedly do not require capital investment, they nonetheless require NRG Texas and other generators to incur costs as described below and in my prior declaration.

8.      As discussed in my earlier declaration, retrofit of SCRs as finalized in the FIP would likely take more than three years. This minimum lead-time does not provide for potential delays in equipment fabrication and delivery due to high demand, weather-related delays due to high winds, storms, or extreme weather conditions, or site-specific conditions. In other words, retrofits may not be possible within the timeframe set forth in the Final FIP.

9.      The installation of SCRs on the affected NRG units is estimated to cost over $1 billion. A substantial portion of that cost would be required to be expended in 2023 in order to meet EPA's unrealistic compliance timeframe.

10.      The cost to "optimize" existing controls is also significant and potential recovery of investments highly speculative. EPA assumes reductions from these optimizations will be complete by the effective date of the Final Rule. Specifically, such reductions are built into Texas's ozone season $NO_X$ budget that will go into effect following publication of the Final Rule. EPA's assumptions regarding emission rates are unrealistic, with EPA assuming that NRG Texas units can reduce their $NO_X$ by an additional 21% compared to historic emission rates.

11.      Based on EPA's estimated prorated budget for 2023, the estimated allocation to NRG's Texas units is 6,920 in 2023, 1,831 fewer than the baseline shown in the chart below. NRG Texas would see a 21% allowance reduction from the baseline. As indicated in the chart below, the baseline is based on the most recent ozone season emissions data available (2022) with the notable

4

exception of the W A Parish station.  Because W A Parish Unit 8 did not operate during the 2022 ozone season due to an incident that damaged the steam turbine generator, 2022 emissions data were not representative for W A Parish going forward, as NRG is working diligently to bring that unit back to service.

| Account Name | Ozone Season NOx (tons) | Year | Pro-Rated 2023 Group 3 Allocation | 2027 Group 3 Allocation | 2023 NOx Reductions | 2027 NOx Reductions |
|---|---|---|---|---|---|---|
| Limestone | 3679.1 | 2022 | 2581 | 1297 | -30% | -65% |
| Cedar Bayou | 866 | 2022 | 576 | 344 | -33% | -60% |
| Greens Bayou | 262 | 2022 | 89 | 45 | -66% | -83% |
| T H Wharton | 480 | 2022 | 194 | 103 | -60% | -79% |
| W A Parish | 3192 | 2021 | 3132 | 1798 | -2% | -44% |
| San Jacinto Steam Electric Station | 44.9 | 2022 | 68 | 41 | 51% | -9% |
| Gregory Power Facility | 57.2 | 2022 | 81 | 48 | 42% | -16% |
| Cottonwood Energy Project | 120 | 2022 | 145 | 145 | 21% | 21% |
| Cedar Bayou 4 | 50 | 2022 | 54 | 32 | 8% | -36% |
|  |  |  |  |  |  |  |
|  | 8751.2 |  | 6920 | 3853 | -21% | -56% |

12.    Based on the Final FIP, the estimated allocation to NRG Texas's units is 3,853 allowances in 2027, 4,898 allowances fewer than the historic baseline in the chart above, a 56% allowance reduction from the baseline.

13.    EGUs cannot rely on banked allowances or allowance trading to make up this allowance shortfall.  First, it is still unknown what number of "banked" allowances units hold because EPA will convert banked Group 2 allowances to Group 3 allowances in August 2023 at a yet to be determined conversion ratio.  The conversion will significantly reduce the number of banked allowances available.  Without factoring in proration and assuming no changes to the number of allowances, EPA estimates that the conversion factor would be 6.5 Group 2 allowances for every one Group 3 allowance.  On May 1—the start of the 2023 ozone season—generators will not know

the quantity of their own banked allowances. Second, there is no certainty that generators will trade any of their banked or surplus allowances. EPA has finalized a process that would recalibrate the number of banked allowances to a set target amount every year thereby decreasing the number of allowances that are able to be banked over time. Consequently, there is significant uncertainty in whether banked allowances will be sufficient for compliance and whether any allowances will be available in the market for facilities with an initial allowance shortfall.

14.    Texas's variability limit further compounds this issue and adds uncertainty to the availability of allowances in the market. The variability limit is, at a minimum, 21 percent of Texas's budget. Exceedance of Texas's assurance level (the state budget plus the variability limit) may result in increased surrender requirements and potentially enforcement action for certain sources. Because sources do not know how much other sources in the state are emitting, sources may be unwilling to exceed their initial allowance allocations because of the risk of assurance level exceedance.

15.    As stated in my prior declaration and reiterated here, costs resulting from EPA's significantly more stringent emission budgets, including new SCR costs, the cost of "optimizing" existing SCRs or SNCRs, or the cost of purchasing additional allowances, cannot be recovered from EPA or others if EPA's disapproval of Texas's SIP is later determined to be unlawful. Because of the deregulated nature of the ERCOT market, there is no mechanism for NRG Texas to recover costs it spends in the near-term in preparation for compliance with the FIP (which would not apply but for EPA's disapproval of Texas's SIP) even if the Court ultimately vacates EPA's disapproval.

16.    The Final Rule, if upheld, will have significant impacts on NRG Texas's operations and the cost to service retail customers in Texas. These harms are irreversible and imminent. As

detailed below and in my earlier declaration, these harms will begin to occur in 2023 and 2024 without a stay.  In summary, EPA's rule would:

    a.      Require substantial compliance costs to operate under restricted $NO_X$ budgets.

    b.      Place significant financial burden on generators that seek to comply with the Final Rule by fast tracking large-scale, capital-intensive construction projects to meet EPA's exceedingly stringent $NO_X$ budgets beginning in 2026.

    c.      Exacerbate the current strain on ERCOT and the need for thermal generation by requiring hundreds of millions of dollars of capital investment which operate in a competitive wholesale market with no guarantee of cost recovery or rate of return on investment.

I, Dudley Zahn, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 10th day of April 2023.

Dudley (Skip) Zahn,
Vice President, Gulf Asset Management
NRG Texas Power LLC.

**Supplemental Declaration of Randall J. Talley, Vice President, Solid Fuels and Environmental Trading, Vistra Corp. (Apr. 10, 2023)**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

| | |
|---|---|
| STATE OF TEXAS; TEXAS COMMISSION ON ENVIRONMENTAL QUALITY; LUMINANT GENERATION COMPANY LLC; COLETO CREEK POWER, LLC; ENNIS POWER COMPANY, LLC; HAYS ENERGY, LLC; MIDLOTHIAN ENERGY, LLC; OAK GROVE MANAGEMENT COMPANY LLC; WISE COUNTY POWER COMPANY, LLC; ASSOCIATION OF ELECTRIC COMPANIES OF TEXAS; BCCA APPEAL GROUP; TEXAS CHEMICAL COUNCIL; TEXAS OIL & GAS ASSOCIATION; STATE OF MISSISSIPPI; MISSISSIPPI DEPARTMENT OF ENVIRONMENTAL QUALITY; MISSISSIPPI POWER COMPANY; STATE OF LOUISIANA; LOUISIANA DEPARTMENT OF ENVIRONMENTAL QUALITY, | Case No. 23-60069 |
| Petitioners, | |
| v. | |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and MICHAEL S. REGAN, Administrator, United States Environmental Protection Agency, | |
| Respondents. | |

**SUPPLEMENTAL DECLARATION OF RANDALL J. TALLEY**

1.    I am the Vice President of Solid Fuels and Environmental Trading at Vistra

Corp. (Vistra), a leading Fortune 500 integrated retail electricity and power

generation company based in Irving, Texas. I previously provided a declaration in support of the motion to stay the U.S. Environmental Protection Agency's (EPA) disapproval of Texas's interstate transport state implementation plan (SIP) for the 2015 ozone National Ambient Air Quality Standards (NAAQS) filed by Luminant Petitioners[1] in the case. EPA has since signed its final Federal Implementation Plan (FIP) for Texas.[2] Although EPA made minor changes in its final FIP, the irreparable harm to Luminant and its operations that will occur as a result of EPA's disapproval of Texas's SIP remains substantially the same, as detailed in my prior declaration and below.

2.      This declaration is based on my personal knowledge of facts and information available at this time and analyses conducted by me and my staff and colleagues.

## EPA'S FINAL FIP FOR TEXAS

3.      EPA signed its final FIP for Texas on March 15, 2023. The key components of EPA's final FIP remain substantially the same as in its proposed FIP.

4.      In the FIP, EPA has finalized a more restrictive ozone season $NO_X$ budget for Texas starting in the 2023 ozone season of 40,134 tons, a 23% reduction from

---

[1] The Luminant Petitioners are indirect subsidiaries of Vistra. They are: Luminant Generation Company LLC, Coleto Creek Power, LLC, Ennis Power Company, LLC, Hays Energy, LLC, Midlothian Energy, LLC, Oak Grove Management Company LLC, and Wise County Power Company, LLC (collectively "Luminant" in this declaration).

[2] EPA, *Federal "Good Neighbor Plan" for the 2015 Ozone National Ambient Air Quality Standards* (Mar. 15, 2023), *available at* https://tinyurl.com/2k2e3nwb (Final FIP).

Texas's existing ozone season $NO_X$ budget. This budget relies primarily on the amount of $NO_X$ reductions that EPA projects can be achieved by Texas units by conducting "optimization" work on their existing $NO_X$ controls.

5.    As in the proposal, the final FIP also requires significant reductions in Texas's budget beginning in 2026 that are based on the amount of $NO_X$ reductions that EPA projects will be achieved at Texas units by the installation of new and exorbitantly costly selective catalytic reduction (SCR) controls and selective non-catalytic reduction (SNCR) controls. EPA has now divided these further reductions between the 2026 and 2027 budget years to address supply chain constraints and outage scheduling; however, this still results in a 40% reduction from Texas's existing $NO_X$ budget in 2026 and a 56% reduction in 2027.

6.    EPA also maintained the concept of an "assurance level" in the final FIP. EPA made slight revisions to how it defines the "variability limit," now defining it as the higher of 21% of Texas's budget or the percentage by which the State's heat input in a given year exceeds the historical heat input used to calculate that year's budget. Final FIP at 455. Therefore, it is impossible to know the assurance level prior to or even during a given ozone season. Nonetheless, as in the proposal, sources in Texas would be penalized if emissions from the State as a whole exceed the assurance level for the 2023 ozone season, and operators whose sources exceeded their respective

share of the assurance level would be penalized and required to surrender three allowances for every one ton emitted above that level.

7.     EPA also finalized the new draconian "enhancements" to its trading program that it had proposed, including unit-specific backstop daily emission rates, a revised emissions budget-setting process (called "Dynamic Budgeting"), secondary emission limits, and an annual recalibration of banked allowances.  EPA made limited refinements to the functionality of these "enhancements," but they all still generally remain applicable and will serve to further limit operations of Texas units and further ratchet down the emissions budget allocated to Texas units.

## EPA'S DISAPPROVAL OF TEXAS'S SIP IS CAUSING IMMEDIATE AND IRREPARABLE HARM TO LUMINANT AS A RESULT OF 2023 BUDGET IMPACTS

8.     Under EPA's final FIP, sources in Texas "will begin to participate in the Group 3 trading program as of May 1, 2023, regardless of the rule's effective date[.]" Final FIP at 543.  Although EPA claims it has incorporated "prorating procedures" to "ensure that the transition from the Group 2 trading program to the Group 3 trading program will not substantively affect the sources' requirements prior to the rule's effective date," *id.*, EPA's final FIP does not resolve Luminant's irreparable harms; rather, it confirms the necessity of the actions identified in my prior declaration.  Operators must make irreversible compliance decisions now in preparation for the 2023 ozone season.

4

9.     Notably, EPA continues to identify 14 EGUs at Luminant's facilities that EPA says are able to optimize their SCR, and EPA relies on reductions from these optimizations when establishing Texas's 2023 ozone season $NO_X$ budget. Therefore, Luminant continues to be faced with the choice of "optimizing" its existing emission controls now, purchasing costly allowances (if any are available), reducing operations during the ozone season, or a combination of the three.

10.     The steps and timing necessary to optimize the SCRs for these units have not changed from my prior declaration. And Luminant has already begun making irreversible compliance decisions and spending money that cannot later be recovered. For example, Luminant has already started performing the combustion tuning activities detailed in my prior declaration.

11.     Further, although there is variation in allowance prices, the cost of Group 3 allowances increased significantly after EPA proposed the FIP, as detailed in my prior declaration. EPA acknowledges that this increased price reflects market participants' anticipation of the final FIP. *See* Birnbaum Decl. ¶ 65. And such prices have remained elevated following EPA's finalization of the FIP, as EPA itself explained. Therefore, the cost of complying through the purchase of additional allowances continues to be significantly elevated.

12.     Moreover, although EPA made slight changes to unit-specific allocations, the allocations for Luminant's peaking units remain largely unchanged—two of the

units I previously identified received a single ton increase (Lake Hubbard Unit 1 and Graham Unit 2), for a total increase of two allocations at those peaking units. Even considering the "pro-rated" budgets for 2023, these peaking units will run out of allocations well before the end of the 2023 ozone season if they operate similar to their 2022 operations.

13.     Even with a final FIP, operators are faced with the reality of making many irreversible compliance and trading decisions based on incomplete information, as many facets of the Group 3 trading program will not be finalized until after the 2023 ozone season has begun or even after the end of the 2023 ozone season. For example, sources have historically relied on banked allowances from prior ozone seasons to comply with their obligations. Sources may continue to do so under the Group 3 trading program; however, EPA will be converting all Group 2 allowances banked by sources in Texas to Group 3 allowances "as soon as practicable on or after August 1, 2023." Final FIP at 548. EPA has tried to estimate the number of banked Group 3 allowances that will be held by Texas operators in 2023; however, there is significant uncertainty in this calculation. Therefore, it is impossible for Luminant to know how many allowances it will have for compliance for the 2023 ozone season, which begins on May 1, 2023.

14.     This allowance conversion, in conjunction with the continued uncertainty from EPA's "enhancements" and significant budget reductions, creates significant

challenges for operational planning.  Although EPA made limited adjustments to its "enhancements" and budgets, these adjustments do not remedy the uncertainty in the market, and Luminant must continue to make irreversible trading decisions, as I explained in my prior declaration.  EPA itself recognizes that the "allowance price signal" is incentivizing operators to not sell their allowances "in order to maintain or increase the respective amounts of banked allowances they hold."  Birnbaum Decl. ¶ 56.  Given the continuing uncertainty, Luminant and other Texas generators must prepare for the worst and make immediate and irreparable compliance and trading decisions to ensure their compliance for the 2023 ozone season and beyond.

15.    As I stated previously, if EPA's disapproval of Texas's SIP is not stayed, Luminant must take steps now to achieve the reductions identified by EPA for the 2023 ozone season.  Indeed, Luminant has already begun taking those steps.  If EPA's SIP disapproval is later vacated by the Court, the cost of this work cannot be recovered from EPA.  And, because ERCOT is a deregulated competitive energy market, versus a regulated rate-recovery system, Luminant cannot recover these costs from ratepayers either.

**EPA'S DISAPPROVAL OF TEXAS'S SIP IS ALSO CAUSING IMMEDIATE AND IRREPARABLE HARM TO LUMINANT AS A RESULT OF EVEN MORE STRINGENT BUDGET REDUCTIONS IN 2026 AND 2027**

16.    The immediate and irreparable harms occurring now from future years also remain unchanged based on EPA's final FIP.  EPA continues to rely on the

installation of SCRs in the future to drive significant budget reductions.  Luminant's same five units remain targeted by EPA for SCR installation.

17.    As noted above, EPA has divided the sharp drop-off in Texas's budget between 2026 and 2027, but this does not alleviate the need for operators to make compliance decisions now.  Neither the timeline nor the costs for installation of SCR have changed.  Based on the available information from EPA, costs for installation of SCRs on the Luminant units identified by EPA for retrofit, in EPA's own estimation, would exceed one billion dollars.

18.    It is clear that sources cannot wait until litigation over EPA's disapproval of Texas's SIP is resolved before they must begin making costly, unrecoverable compliance decisions.  Luminant is taking steps now to comply with near-term and long-term obligations under EPA's FIP, which sources in Texas would not be subject to but for EPA's disapproval of Texas's SIP.  Therefore, even if the disapproval of Texas's SIP is ultimately overturned, Luminant faces immediate and irreparable harm, as Luminant will have undertaken significant compliance efforts and costs that cannot later be recovered.

I, Randall J. Talley, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this _10_ day of April, 2023.

_____
Randall J. Talley
Vice President, Solid Fuels and
Environmental Trading
Vistra Corp.

**Declaration of Jacob Krautsch, Senior Director of Environmental, Energy Transfer LP (Apr. 10, 2023)**

No. 23-60069

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

**STATE OF TEXAS; TEXAS COMMISSION ON ENVIRONMENTAL QUALITY; LUMINANT GENERATION COMPANY LLC; COLETO CREEK POWER, LLC; ENNIS POWER COMPANY, LLC; HAYS ENERGY, LLC; MIDLOTHIAN ENERGY, LLC; OAK GROVE MANAGEMENT COMPANY LLC; WISE COUNTY POWER COMPANY, LLC; ASSOCIATION OF ELECTRIC COMPANIES OF TEXAS; BCCA APPEAL GROUP; TEXAS CHEMICAL COUNCIL; TEXAS OIL & GAS ASSOCIATION; STATE OF MISSISSIPPI; MISSISSIPPI DEPARTMENT OF ENVIRONMENTAL QUALITY; MISSISSIPPI POWER COMPANY; STATE OF LOUISIANA; LOUISIANA DEPARTMENT OF ENVIRONMENTAL QUALITY,**

Petitioners,

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; MICHAEL S. REGAN, Administrator, United States Environmental Protection Agency,**

Respondents.

## DECLARATION OF JACOB KRAUTSCH

I, Jacob Krautsch, am the Senior Director of Environmental at Energy Transfer LP[1]. As the Sr. Director of Environmental, I manage the environmental support group for Energy Transfer LP. I am providing this updated declaration, which is filed in support of Texas Industry Petitioners' Reply in Support of Motion to Stay Final Action of the U.S. Environmental Protection Agency (EPA) related to EPA's disapproval of Texas's interstate transport state implementation plan (SIP) for the 2015 ozone National Ambient Air Quality Standards (NAAQS) and implementation of EPA's final federal implementation plan (FIP) in place of the Texas SIP. Energy Transfer is a member of the Texas Oil & Gas Association (TxOGA), one of the Petitioners above. EPA's final

---

[1] This Declaration is provided by me for Energy Transfer LP, on behalf of itself and its subsidiaries and affiliates, collectively referred to herein as Energy Transfer.

FIP includes changes to the proposed FIP which reduce the impact on non-electric generating units (non-EGUs), however, the final FIP will result in irreparable harm to Energy Transfer's operations nonetheless, as set forth below. This declaration is based on my personal knowledge of facts and information available at this time and analysis conducted by me and my staff. I reserve the right to revise or update this declaration should new information become available.

## I.    Company and Assets in Texas

Energy Transfer is, *inter alia*, involved in the "pipeline transportation of natural gas" as addressed in EPA's final FIP, Docket No. EPA-HQ-OAR-2021-0668, FRL 8670-02-OAR (March 15, 2023), addressing regional ozone transport for the 2015 ozone national ambient air quality standards (NAAQS). Energy Transfer's pipeline transportation of natural gas, which places the company within the category of a non-EGU, includes operation of its natural gas fired two stroke lean burn (2SLB), four stroke lean burn (4SLB), and four stroke rich burn (4SRB) spark-ignited reciprocating internal combustion engines (RICE) at pipeline compressor stations in Texas. Although EPA limited applicability of "pipeline transportation of natural gas" in the final FIP specifically to the natural gas transmission and storage segment, *i.e.,* eliminating compressor stations in gathering service, and exempting emergency engines, Energy Transfer is still impacted. As a result, EPA's efforts to disapprove Texas' SIP and institute EPA's FIP directly affects Energy Transfer.

## II.    What Texas SIP Disapproval and Implementation of EPA's FIP Means to non-EGUs

EPA finalized its FIP upon disapproval of Texas's SIP (actions which are being challenged) while continuing to require immediate expenditures, including those related to engineering and financial planning, to meet implementation deadlines. As a result, costs associated with planning, engineering, permitting and procurement of controls and/or engines if EPA's SIP disapproval and/or final FIP is later held invalid will produce irreparable harm associated with compliance that will be suffered immediately by Texas non-EGUs. Such costs are either nonrecoverable or only recoverable through increased customer rates and are irreparable as they are not easily calculable.

## III.    Specific Harm to Energy Transfer, a Texas Non-EGU

To meet the final FIP's NOx emissions reductions for non-EGU sources, it is necessary for Energy Transfer to make expenditures and to begin budgeting, planning, engineering, and construction on controls immediately. For the reasons described herein, full satisfaction of the final FIP's 2026 compliance deadlines will nonetheless remain uncertain even if efforts to comply begin immediately. In addition to the non-recoverability of expended funds should the FIP be held invalid after such expenses are undertaken, the harm caused to Energy Transfer is irreparable in nature due to the monetary harm which cannot be calculated, as set forth here, and the nonmonetary harm as described below.

A.    Control Costs, NOx Performance Testing, and Monitoring are Monetary Harms to Energy Transfer which Cannot be Calculated

1.    Energy Transfer estimates, based on the final FIP, that 22 of its natural gas fired engines in Texas will require additional controls or complete engine replacement.

Although the precise costs associated with the work necessary for these engines cannot be calculated, the estimated cost is $34 million to $40 million, depending on whether the engine technology involved for each engine has available controls or if the engine must be replaced to meet the FIP requirements. This will require an engine-by-engine review and analysis. The cost and timing for completion of work would be further impacted by supply chain concerns discussed below.

2.  In addition to control costs or engine replacement costs, NOx performance testing expenditures will be necessary according to EPA's final FIP for all applicable engines in Texas. Energy Transfer estimates approximately 118 engines will subject to performance testing, the cost for which is not easily calculable because the engines to be replaced or to which controls must be added cannot be ascertained until an engine-by-engine review and analysis can be completed. As stated above, the costs and timing for completion of such work could also be impacted by supply chain concerns discussed below.

3.  EPA's final FIP also contains requirements related to monitoring engine operation, continuous parametric monitoring systems, recordkeeping, and reporting, which will require additional expenditures. Energy Transfer estimates approximately 118 engines will be subject to the monitoring, recordkeeping, and reporting requirements, the cost for which is not easily calculable and may also be impacted by supply chain concerns.

B.  **Implementation, Supply Chain, and Reliability Issues are Non-Monetary Harms to Energy Transfer**

1.  Implementation of the changes by 2026 as necessitated by EPA's final FIP for Texas is not feasible. Although the final FIP permits a compliance alternative using facility-wide emissions averaging or, in certain situations, approval of alternative emissions limits, both processes are subject to a case-by-case review and require ultimate approval by EPA before an operator could rely on that which is proposed. Therefore, timing cannot be ascertained, and ultimate approval of such plans is not guaranteed. As a result, Energy Transfer would be required, for each affected engine (of which it has many as set forth above), to proceed with the implementation process which requires budgeting, planning, engineering, and construction (with associated outages) in parallel with its evaluation and proposal of facility-wide emissions averaging and, to the extent applicable, alternative emissions limits.

2.  Further, all impacted companies involved in "pipeline transportation of natural gas" will be vying for the same equipment and contractor resources which were limited at best even prior to EPA's final FIP. These supply chain issues, coupled with the time required to obtain necessary permits which may be triggered after planning and engineering is complete, will likely require a longer lead time than available under the final FIP. The FIP applies to several states, not just Texas, which will further exacerbate supply chain issues while also driving up costs due

3

to the increased demand created by the 2026 deadline for all applicable sources in each of those states.

3.     Extended outages necessary for installing controls or replacing engines pursuant to EPA's disapproval of the Texas SIP and implementation of EPA's FIP will be unavoidable and thereby reduce throughput throughout Texas, potentially leading to reliability issues which may result from inability to satisfy FERC requirements and/or meet customer delivery obligations.

4.     Lastly, although the final FIP allows for potential compliance alternatives using facility-wide emissions averaging or, in certain situations, alternative emissions limits, there is no guarantee the same will be approved by EPA or that, if approved, it will occur early enough to overcome the challenges identified above. Likewise, although the final FIP allows operators to request an initial compliance extension of one year, such extension is available in limited circumstances and subject to EPA review and approval.

While Energy Transfer cannot calculate the full scale of the impact, it has been able to articulate the above-referenced immediate and irreparable harm to Energy Transfer as a result of EPA's disapproval of the Texas SIP and adoption of EPA's final FIP as it pertains to Energy Transfer's Texas operations. To the extent that a small portion of the harms can be calculated however, the monetary harm resulting from the same is estimated to be between $34 million and $40 million, which will further increase as the evaluation of what is necessary for each applicable engine to come into compliance is complete.

I, Jacob Krautsch, declare under penalty of perjury that the foregoing is true and correct. Executed this 10th day of April 2023.

Jacob Krautsch
Sr. Director, Environmental
Energy Transfer

**Declaration of Kevin Pollo, Vice President of Energy Supply & Market Operations, CPS Energy (Apr. 7, 2023)**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

|  |  |
|---|---|
| STATE OF TEXAS; TEXAS COMMISSION ON ENVIRONMENTAL QUALITY; LUMINANT GENERATION COMPANY LLC; COLETO CREEK POWER, LLC; ENNIS POWER COMPANY, LLC; HAYS ENERGY, LLC; MIDLOTHIAN ENERGY, LLC; OAK GROVE MANAGEMENT COMPANY LLC; WISE COUNTY POWER COMPANY, LLC; ASSOCIATION OF ELECTRIC COMPANIES OF TEXAS; BCCA APPEAL GROUP; TEXAS CHEMICAL COUNCIL; TEXAS OIL & GAS ASSOCIATION )<br><br>Petitioners, )<br><br>v. )<br><br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and MICHAEL S. REGAN, Administrator, United States Environmental Protection Agency, )<br><br>Respondents. ) | Case No. 23-60069 |

<u>**DECLARATION OF KEVIN POLLO**</u>

I, Kevin Pollo, hereby state as follow:

1.  I am the Vice President of Energy Supply & Market Operations at CPS Energy.  I am making this declaration in support of the Texas Industry Petitioners' motion to stay the U.S. Environmental Protection Agency's (EPA's) disapproval of Texas's interstate transport State Implementation Plan (SIP) (the "<u>Texas SIP Disapproval</u>") published in the *Federal Register* on February 13, 2023.[1]  As a result of the Texas SIP Disapproval, EPA has now finalized Federal Implementation Plan (FIP) requirements for Texas and 22 other states to eliminate significant contribution to nonattainment, or interference with maintenance, of the 2015 ozone NAAQS in downwind states (the "<u>Final FIP</u>").

---

[1] *See* Air Plan Disapprovals; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards, 88 Fed. Reg. 9,336 (Feb. 13, 2023).

2.    I am over 18 years of age, of sound mind, and in all respects competent to make this declaration. I have personal knowledge of all facts stated in this declaration and those facts are true and correct.

3.    I have worked at CPS Energy for approximately 17 years, about 10 of which have been in the Energy Supply business group. I graduated from the University of Missouri in 1992 with degrees in electrical and computer engineering.

4.    From my experience and role at CPS Energy, I am familiar with and manage CPS Energy's day-to-day Energy Supply operations and have experience managing capital improvement projects. I also am familiar with various costs incurred by CPS Energy associated with environmental compliance.

5.    Without a stay of the Texas SIP Disapproval, CPS Energy will incur substantial costs to meet EPA's stringent nitrogen oxide (NOx) emissions requirements. Though the requirements of the Final FIP will become effective 60 days after the date of publication in the *Federal Register*, CPS Energy will have to immediately begin taking steps to comply with EPA's significantly reduced state NOx budgets. These costs threaten the continued viability of CPS Energy's coal-fired units which are critical to CPS Energy's transition to alternative energy sources over the next several years, as discussed below.

## CPS Energy's Operations

6.    CPS Energy is the nation's largest municipally owned electric and gas utility, providing service to more than 900,000 electric customers in San Antonio, Texas, substantially all of Bexar County, and portions of several adjoining counties.

7.    CPS Energy owns, operates, and/or has contracted for approximately 8 gigawatts (GW) of nameplate power generation within ERCOT, comprised of a diverse portfolio of coal, natural gas, nuclear, wind, solar, and landfill gas generation assets (as well as battery storage).

8.    CPS Energy is among the top public power wind energy buyers in the nation and a leader in Texas for solar generation. Building upon that foundation, CPS Energy recently reached agreements with three companies, closing out the utility's FlexPOWER Bundle initiative stemming from a 2020 request for proposal. In total, the FlexPOWER Bundle will deliver 580 megawatts (MW) of solar, 50 MW of storage, and 500 MW of natural gas firming capacity. CPS Energy also plans to procure additional renewable generation.

9.    In 2019, CPS Energy's Board of Trustees (the "Board") passed a resolution to support the City of San Antonio's (the "City") Climate Action & Adaptation Plan (CAAP). All the efforts that reduce carbon for the CAAP have the co-benefit of reducing ozone precursors, including NOx emissions. The City's CAAP commitment is to reach carbon neutrality by 2050 with interim emission reduction targets of 41% reduction (compared to 2016) by 2030 and 71% reduction by 2040.

10.    In 2022, CPS Energy partnered with the community to develop a new Power Generation Resource Plan focused on transitioning to low or non-emitting sources of energy by 2030

while balancing customer affordability and system reliability; and on January 23, 2023, CPS Energy's Board passed a resolution approving the updated generation plan and associated portfolio of power generation resources. As a result, CPS Energy anticipates retiring 859 MW of natural gas-fired generation in 2025 (Braunig Units 1–3), 420 MW of natural gas-fired generation in 2027 (Sommers Unit 1), 560 MW of coal-fired generation by the end of 2028 (Spruce Unit 1), and 410 MW of natural gas-fired generation by the end of 2029 (Sommers Unit 2). CPS Energy also anticipates converting Spruce Unit 2 from coal to natural gas.

11.   Continued operation of the Braunig Units 1–3, Sommers Unit 1, and Spruce Unit 1 until their scheduled retirements is critical to CPS Energy's ability to maintain reliable service for its customers during this transition.

12.   The updated generation plan is projected to result in an over 40% reduction in Carbon Intensity and an almost 80% reduction in overall NOx emissions by 2030 as compared to 2016. In addition to these planned future emission reductions, CPS Energy reduced NOx emissions by nearly 80% from 1997 to 2021 by implementing and operating NOx emission controls on power plants, including low NOx burners, separated overfire air (SOFA), and selective catalytic reduction (SCR) control. CPS Energy also decommissioned the J.T. Deely coal-fired power plant at the end of 2018 resulting in a reduction of approximately 3,000 tons of NOx per year.

13.   Despite the responsible emission reduction efforts noted above, the FIP will challenge CPS Energy's ability to generate sufficient power for its community as early as this summer, particularly if there is a period of extended extreme heat during the summer ozone season (as happened in 2022).

14.   The significant costs that CPS Energy must incur as a result of the Texas SIP Disapproval and the EPA's issuance of the Final FIP are in addition to the many costs CPS Energy has already incurred and the proactive steps CPS Energy has already taken to address the reduction of NOx and other pollutants.

15.   CPS Energy provided comments on the EPA's proposed FIP in June 2022, requesting (i) flexibility in its application to units that have formally initiated or have initiated the process of repowering with natural gas by 2026 and (ii) that the EPA allow coal-fired units and gas-steam units that attest to a reasonable shutdown date to operate beyond the 2026 implementation date without a SCR. The Final FIP, however, does not exempt those with known retirement or conversion dates and still requires those units to meet NOx performance levels that reflect immediate significant costs.

**Impact of EPA's Final Action on CPS Energy's Units**

16.   On February 13, 2023, EPA published the Texas SIP Disapproval which allowed the Agency to finalize the Final FIP. It is my understanding that EPA cannot implement a FIP until a SIP disapproval is finalization (*see* 42 U.S.C. § 7410(c)(1)) and, therefore, the Final FIP would not be implemented as to Texas without the Texas SIP Disapproval.

17.    The Texas SIP Disapproval and the EPA's adoption of the Final FIP will have a significant impact on Texas electric power generating resources, including CPS Energy—whose fossil fuel powered generating assets include Spruce Units 1 & 2 (coal), Sommers Units 1 & 2 (natural gas), Braunig Units 1–3 (natural gas), and natural gas-fired combustion turbines and combined-cycle units at the Leon Creek Station, Braunig Power Station, Rio Nogales Power Plant, and Arthur von Rosenberg (AvR) Power Plant.

18.    It is my understanding the Final FIP reduces Texas's current CSAPR Group 2 ozone season NOx allowance budget from 52,301 tons to 40,134 tons in 2023 (subject to proration) and 2024 under the Final FIP's revised CSAPR Group 3 ozone season NOx trading program, a reduction of 23 percent.  The statewide budget continues to become increasingly more stringent thereafter, with the most significant reductions required in the 2026 and 2027 time frames.  Projected statewide budgets in 2026 and 2027 total 31,123 and 23,009 tons, respectively, reflecting NOx emission reductions of 40% and 56% from Texas's existing CSAPR Group 2 ozone season NOx CSAPR budget.

19.    Because of EPA's assumptions about the installation of post-combustion controls by 2026 and 2027, the Final FIP requires significant emission reductions on units without existing post-combustion NOx controls.

20.    Table 1 provides a comparison of the 2023, 2024, 2025, 2026, and 2027 assumed CPS Energy allocations to the actual 2022 ozone season NOx emissions of 3,403 tons.

Table 1 – Comparison of 2022 Ozone Season
NOx Emissions to the Final FIP Allocations

| Year | Allocations | Percent *Reduction* from 2022 Actual Emission |
|------|-------------|-----------------------------------------------|
| 2023* | 2,570 | 24% |
| 2024 | 2,571 | 24% |
| 2025 | 2,368 | 30% |
| 2026** | 1,864 | 45% |
| 2027** | 1,280 | 62% |

* The 2023 allocations will be prorated based on the percentage of days in the ozone season occurring before the effective date of the Final FIP.

** Note that the 2026 and 2027 allocations are indicative only and were calculated based by applying the percentage reduction in the statewide Texas budget to the CPS Energy Units.

Page **4** of **8**

21.    Table 2 provides a comparison of the estimated Group 2 conversion to Group 3 for CPS Energy's 2023 allocation and CPS Energy's 2024 allocation compared to the actual 2022 ozone season NOx emissions of 3,403 tons.

Table 2 – Comparison of the 2022 Ozone Season
Actual NOx Emissions to the Final FIP Allocations for 2023 and 2024

| Year | Ozone Season FIP Allocations (tons) | Allowance (Deficit) |
|------|-------------------------------------|---------------------|
| 2023 | 2,570* + 544 (Group 2 converted to Group 3) | (288) |
| 2024 | 2,571 | (832) |

* The 2023 allocations will be prorated based on the percentage of days in the ozone season occurring before the effective date of the Final FIP.

22.    CPS Energy expects to have a significant deficit of several hundred allowances in 2023 depending on the effective date of the Final FIP, which would not allow CPS Energy to bank any additional allowances.  If CPS Energy experiences a summer in 2024 similar to the summer in 2022, then we expect a deficit of over 800 allowances in 2024, as shown in Table 2. The Texas SIP Disapproval and the Final FIP will require CPS Energy to take immediate steps to identify and implement plans to comply with the new requirements. The Final FIP requires CPS Energy to achieve significant NOx emission reductions starting in 2023, with additional reductions by the 2026/2027 ozone seasons. To meet its 2023 allowance allocations, CPS Energy must reduce systemwide NOx emissions by approximately 24% from its 2022 actual ozone season emissions (i.e., from 3,403 to approximately 2,570 tons). CPS Energy must achieve additional NOx reductions of approximately 15% in 2026 (from 2025 levels) and 17% in 2027 (from 2026 levels) to continue to meet its allowance obligations.

23.    Additionally, starting with the 2024 control period, EPA will annually recalibrate the quantity of accumulated banked allowances under the program to prevent the quantity of allowances carried over from each control period to the next from exceeding a target bank level, further restricting the amount of allowances available to meet EPA's stringent requirements and likely discouraging near-term management and reduction of emissions.

24.    Given the anticipated shortfall in 2023 allowances and the amount of time needed to install emission controls to meet EPA's assumptions in 2026 and beyond, CPS Energy must immediately take steps and incur costs to meet EPA's allowance reductions.  Specifically, CPS Energy must use its banked CSAPR Group 2 NOx allowances (that EPA is converting to Group 3 allowances at a significantly discounted rate of approximately 6.5 Group 2 allowances for every Group 3 allowance), begin incurring costs to purchase additional Group 3 NOx allowances if available, and/or installing post-combustion controls.

25. If CPS Energy chooses to install post-combustion controls to mitigate the risk of insufficient allowances, then it must immediately proceed with steps to install retrofit SCR control systems on Spruce Unit 1 and Sommers Units 1 & 2, and compare the economic impact of installing advanced air pollution controls to the economic impact of early unit retirements in the context of meeting its CAAP commitments. SCR is a complex and expensive control system that can take several years to engineer, procure, and install. Because CPS Energy needs to begin the process immediately, the Final FIP will effectively force CPS Energy to use customer funding to drive towards the installation of SCRs for units that will be retired shortly after the SCRs could be installed—an inefficient use of customer funds that CPS Energy has sought and continues to seek to avoid.

26. Figure 1 shows a typical SCR implementation schedule prepared by Sargent & Lundy, LLC showing a 46-month period between the decision to proceed and commercial operation of the control system. The schedule includes durations for initial studies and conceptual design, preparation of control system and balance-of-plant specifications, project award, equipment procurement, and project implementation.

Figure 1.  SCR Implementation – Typical Project Schedule

| No. | Description | Months | Year 1 | Year 2 | Year 3 | Year 4 |
|---|---|---|---|---|---|---|
| 1 | Decision to Proceed with SCR | Milestone | ● | | | |
| **Project Development** | | | | | | |
| 2 | Conceptual Studies/Design Basis | 6 months | | | | |
| 3 | Specifications/Awards | 12 months | | | | |
| 4 | Permits | 15 months | | | | |
| **Project Implementation** | | | | | | |
| 5 | Detailed Engineering | 16 months | | | | |
| 6 | Site Work/Mobilization | 4 months | | | | |
| 7 | Construction | 18 months | | | | |
| 8 | Startup and Testing | 3 months | | | | |
| 9 | Commercial Operation | Mielstone | | | | ● |

27. The SCR implementation schedule provided in Figure 1 generally aligns with the Final FIP's requirement to reduce NOx emissions to a level commensurate with the installation of SCR by the 2026 or 2027 ozone season. However, even assuming a 42-month project schedule, CPS Energy would have to start that process immediately in order to have any chance of installing the control systems by May 1, 2026, or May 1, 2027, and a decision to install SCR controls would obligate CPS Energy to expend significant funds beginning in 2023, expenditures that would be sunk costs from which CPS Energy and its customers would not benefit if its compliance plans changed.

28. Based on high-level preliminary cost estimates, the total cost to install SCR controls on Spruce Unit 1 and Sommers Units 1 & 2 would be approximately $320 million, and could be significantly higher given the recent escalation in material costs, labor costs, and competition for equipment manufacturers and contractors.

29. Regardless of the final cost, CPS Energy must incur a significant amount of money immediately to have the control systems operational by the 2026/2027 ozone seasons. Figure 2 shows a typical cash flow for the design, specification, procurement, and construction of an SCR control system.

30. CPS Energy would immediately incur costs to engineer and design the control system. Process equipment must be procured early in the process to meet an aggressive project schedule, with significant expenditures incurred following approximately 6-months of engineering and design. These costs would represent several million dollars of unrecoverable expenditures to CPS Energy, and once major equipment orders are placed significant cancellation penalties would apply.

Figure 2.  SCR Implementation – Typical Cash Flow



31. The Final FIP would impose substantial costs on CPS Energy and its customers during the next three years and would threaten the long-term economic viability of several of CPS Energy's electric generating units.  Were CPS Energy to determine that the installation of SCR control systems was not economically viable given the high capital costs and its CAAP Carbon Reduction commitments, the only remaining compliance alternatives would be to purchase Group 3 allowances—if any are available—or retire one or more units prematurely.

32. The future cost and availability of allowances is not known but fluctuated to as high as $48,000 per ton following the proposal of the FIP.  Should circumstances require that CPS Energy purchase allowances to achieve compliance with the Final FIP, CPS Energy would incur costs between $16.7 to $41.7 million per ozone season based on allowance costs of $20,000 to $50,000 per ton.  However, under such circumstances and in the event Group 3 allowances are unavailable or purchase of additional allowances is not economically feasible, CPS Energy would have to shut down one or more existing units before their scheduled retirement date(s) because they could not operate economically under the rule. Closing these plants would exacerbate potential transmission grid and reliability issues and impose additional significant financial burdens on CPS Energy and its customers.

33.   For the reasons described above, CPS Energy would incur imminent and substantial financial harm if the effectiveness of the Texas SIP Disapproval is not stayed.

I, Kevin Pollo, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this ⎯7⎯ day of April 2023.

*Kevin Pollo*

Kevin Pollo