No. 23-60069

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

———————————

STATE OF TEXAS, et al.,

*Petitioners*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al.,

*Respondents*.

———————————

PETITION FOR REVIEW OF A FINAL AGENCY ACTION OF THE UNITED
STATES ENVIRONMENTAL PROTECTION AGENCY

———————————

**RESPONDENTS' APPENDIX II TO RESPONSE IN OPPOSITION TO
LOUISIANA'S MOTION FOR STAY OF THE FINAL RULE**

———————————

TODD KIM
*Assistant Attorney General*

*Of Counsel:*
ROSEMARY HAMBRIGHT KABAN      JIN HYUNG LEE
DANIEL P. SCHRAMM
  *Office of the General Counsel*        *U.S. Department of Justice*
  *U.S. Environmental Protection*        *Environment and Natural Resources*
    *Agency*          *Division*
  *Washington, DC*        *P.O. Box 7611*
            *Washington D.C. 20044-7611*

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2300 UTC 24 Apr 18
### GDAS Meteorological Data



Source ★ at 29.67 N 95.13 W

Meters AGL

Job ID: 156423          Job Start: Fri Nov  1 19:26:38 UTC 2019
Source 1     lat.: 29.670025   lon.: -95.128508    height: 6 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 22 Apr 2018 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2300 UTC 28 Apr 18
### GDAS Meteorological Data

Job ID: 156535          Job Start: Fri Nov  1 19:29:37 UTC 2019
Source 1     lat.: 29.670025    lon.: -95.128508     height: 6 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 22 Apr 2018 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2200 UTC 07 May 18
### GDAS Meteorological Data



Job ID: 156627          Job Start: Fri Nov  1 19:31:46 UTC 2019
Source 1     lat.: 29.670025    lon.: -95.128508    height: 6 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z  1 May 2018 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2200 UTC 26 Jul 18
### GDAS Meteorological Data

Source ★ at 29.67 N 95.13 W

MIXDEPTH

1326

3000
2000
1000

18  12  06  00  18  12  06  00  18  12  06  00  18
        07/26        07/25        07/24

Job ID: 117497          Job Start: Thu Nov 7 19:08:54 UTC 2019
Source 1    lat.: 29.670025    lon.: -95.128508    height: 6 m AMSL

Trajectory Direction: Backward    Duration: 72 hrs
Vertical Motion Calculation Method:    Model Vertical Velocity
Meteorology: 0000Z 22 Jul 2018 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2200 UTC 26 Jul 18
### GDAS Meteorological Data



Source ★ at 29.67 N 95.13 W

MIXDEPTH

1326

Job ID: 117497          Job Start: Thu Nov  7 19:08:54 UTC 2019
Source 1     lat.: 29.670025    lon.: -95.128508     height: 6 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 22 Jul 2018 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2100 UTC 26 Jul 18
### GDAS Meteorological Data



Source ★ at 29.67 N 95.13 W

Meters AGL

Job ID: 156689        Job Start: Fri Nov  1 19:33:28 UTC 2019
Source 1    lat.: 29.670025   lon.: -95.128508   height: 6 m AMSL

Trajectory Direction: Backward    Duration: 72 hrs
Vertical Motion Calculation Method:    Model Vertical Velocity
Meteorology: 0000Z 22 Jul 2018 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2100 UTC 26 Jul 18
### GDAS Meteorological Data

Source ★ at 29.67 N 95.13 W

Meters AGL

1500
1000
500

0

18  12  06  00  18  12  06  00  18  12  06  00  18
07/26              07/25              07/24

Job ID: 156689          Job Start: Fri Nov  1 19:33:28 UTC 2019
Source 1     lat.: 29.670025     lon.: -95.128508     height: 6 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 22 Jul 2018 - GDAS1



# NOAA HYSPLIT MODEL

## Backward trajectories ending at 2200 UTC 27 Jul 18

## GDAS Meteorological Data

Job ID: 120468 Job Start: Thu Nov 7 20:30:25 UTC 2019
Source 1 lat.: 29.670025 lon.: -95.128508 height: 6 m AMSL

Trajectory Direction: Backward Duration: 72 hrs
Vertical Motion Calculation Method: Model Vertical Velocity
Meteorology: 0000Z 22 Jul 2018 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2200 UTC 27 Jul 18
### GDAS Meteorological Data



Job ID: 120468                    Job Start: Thu Nov 7 20:30:25 UTC 2019
Source 1    lat.: 29.670025    lon.: -95.128508    height: 6 m AMSL

Trajectory Direction: Backward    Duration: 72 hrs
Vertical Motion Calculation Method:    Model Vertical Velocity
Meteorology: 0000Z 22 Jul 2018 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2100 UTC 27 Jul 18
### GDAS Meteorological Data



Job ID: 156724          Job Start: Fri Nov  1 19:34:28 UTC 2019
Source 1      lat.: 29.670025      lon.: -95.128508      height: 6 m AMSL

Trajectory Direction: Backward      Duration: 72 hrs
Vertical Motion Calculation Method:      Model Vertical Velocity
Meteorology: 0000Z 22 Jul 2018 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2100 UTC 27 Jul 18
### GDAS Meteorological Data

Source ★ at 29.67 N 95.13 W

Meters AGL

Job ID: 156724          Job Start: Fri Nov  1 19:34:28 UTC 2019
Source 1     lat.: 29.670025   lon.: -95.128508   height: 6 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 22 Jul 2018 - GDAS1

# NOAA HYSPLIT MODEL
# Backward trajectories ending at 2300 UTC 23 Aug 18
## GDAS Meteorological Data



Source ★ at 29.67 N 95.13 W

MIXDEPTH

547

3000
2000
1000

18    12    06    00    18    12    06    00    18    12    06    00    18
       08/23              08/22              08/21

Job ID: 120509          Job Start: Thu Nov  7 20:34:42 UTC 2019
Source 1      lat.: 29.670025    lon.: -95.128508    height: 6 m AMSL

Trajectory Direction: Backward      Duration: 72 hrs
Vertical Motion Calculation Method:      Model Vertical Velocity
Meteorology: 0000Z 22 Aug 2018 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2300 UTC 23 Aug 18
### GDAS Meteorological Data

Source ★ at 29.67 N 95.13 W

MIXDEPTH

547

3000
2000
1000

18   12   06   00   18   12   06   00   18   12   06   00   18
08/23            08/22            08/21

Job ID: 120509          Job Start: Thu Nov  7 20:34:42 UTC 2019
Source 1     lat.: 29.670025    lon.: -95.128508    height: 6 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 22 Aug 2018 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2200 UTC 23 Aug 18
### GDAS Meteorological Data

Source ★ at 29.67 N 95.13 W

Meters AGL

Job ID: 156873          Job Start: Fri Nov  1 19:37:51 UTC 2019
Source 1     lat.: 29.670025    lon.: -95.128508    height: 6 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 22 Aug 2018 - GDAS1





# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2200 UTC 23 Aug 18
### GDAS Meteorological Data

Job ID: 156873 Job Start: Fri Nov 1 19:37:51 UTC 2019
Source 1 lat.: 29.670025 lon.: -95.128508 height: 6 m AMSL

Trajectory Direction: Backward Duration: 72 hrs
Vertical Motion Calculation Method: Model Vertical Velocity
Meteorology: 0000Z 22 Aug 2018 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2200 UTC 17 Sep 18
### GDAS Meteorological Data

Source ★ at 29.67 N 95.13 W

Meters AGL

1500
1000
500

0

18      12      06      00      18      12      06      00      18      12      06      00      18
09/17                     09/16                     09/15

Job ID: 156963        Job Start: Fri Nov  1 19:40:22 UTC 2019
Source 1     lat.: 29.670025     lon.: -95.128508     height: 6 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 15 Sep 2018 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2200 UTC 18 Sep 18
### GDAS Meteorological Data



Source ★ at 29.67 N 95.13 W

Meters AGL

Job ID: 157027          Job Start: Fri Nov 1 19:41:43 UTC 2019
Source 1     lat.: 29.670025     lon.: -95.128508     height: 6 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 15 Sep 2018 - GDAS1







NOAA HYSPLIT MODEL
Backward trajectories ending at 2200 UTC 26 Jul 18
GDAS Meteorological Data
Source ★ at 29.67 N 95.13 W
34
-98
-96
-94
-92
-90
32
30
28
MIXDEPTH
1326
3000
2000
1000
18 12 06 00 18 12 06 00 18 12 06 00 18
07/26
07/25
07/24
Job ID: 117497 Job Start: Thu Nov 7 19:08:54 UTC 2019
Source 1 lat.: 29.670025 lon.: -95.128508 height: 6 m AMSL
Trajectory Direction: Backward Duration: 72 hrs
Vertical Motion Calculation Method: Model Vertical Velocity
Meteorology: 0000Z 22 Jul 2018 - GDAS1

NOAA HYSPLIT MODEL
Backward trajectories ending at 2200 UTC 27 Jul 18
GDAS Meteorological Data
Source ★ at 29.67 N 95.13 W
31
30
28
27
-98
-97
-96
-94
-93
-92
MIXDEPTH
1249
3000
2000
1000
18 12 06 00 18 12 06 00 18 12 06 00 18
07/27
07/26
07/25
Job ID: 120468 Job Start: Thu Nov 7 20:30:25 UTC 2019
Source 1 lat.: 29.670025 lon.: -95.128508 height: 6 m AMSL
Trajectory Direction: Backward Duration: 72 hrs
Vertical Motion Calculation Method: Model Vertical Velocity
Meteorology: 0000Z 22 Jul 2018 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2100 UTC 08 Jun 16
### GDAS Meteorological Data

Source ★ at 33.22 N 97.20 W

Meters AGL

Job ID: 194242          Job Start: Thu Oct 31 17:54:56 UTC 2019
Source 1     lat.: 33.219069   lon.: -97.196284     height: 183 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 8 Jun 2016 - GDAS1





# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2000 UTC 09 Jun 16
### GDAS Meteorological Data

Job ID: 194505 Job Start: Thu Oct 31 18:00:07 UTC 2019
Source 1 lat.: 33.219069 lon.: -97.196284 height: 183 m AMSL

Trajectory Direction: Backward Duration: 72 hrs
Vertical Motion Calculation Method: Model Vertical Velocity
Meteorology: 0000Z 8 Jun 2016 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2200 UTC 10 Jun 16
### GDAS Meteorological Data

Source ★ at 33.22 N 97.20 W

Meters AGL

Job ID: 194575          Job Start: Thu Oct 31 18:01:29 UTC 2019
Source 1    lat.: 33.219069    lon.: -97.196284    height: 183 m AMSL

Trajectory Direction: Backward    Duration: 72 hrs
Vertical Motion Calculation Method:    Model Vertical Velocity
Meteorology: 0000Z  8 Jun 2016 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2300 UTC 20 Jun 16
### GDAS Meteorological Data

Source ★ at 33.22 N 97.20 W

-100          -98          -96          -94

34

32

30

Meters AGL

1500

1000

500

0

18    12    06    00    18    12    06    00    18    12    06    00    18
      06/20              06/19              06/18

Job ID: 194661          Job Start: Thu Oct 31 18:03:08 UTC 2019
Source 1     lat.: 33.219069     lon.: -97.196284     height: 183 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 15 Jun 2016 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2300 UTC 30 Jun 16
### GDAS Meteorological Data

Source ★ at 33.22 N 97.20 W

Meters AGL

Job ID: 194755          Job Start: Thu Oct 31 18:04:45 UTC 2019
Source 1     lat.: 33.219069   lon.: -97.196284     height: 183 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 29 Jun 2016 - GDAS1









# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2200 UTC 01 Jul 16
### GDAS Meteorological Data

Job ID: 194836 Job Start: Thu Oct 31 18:06:28 UTC 2019
Source 1 lat.: 33.219069 lon.: -97.196284 height: 183 m AMSL

Trajectory Direction: Backward Duration: 72 hrs
Vertical Motion Calculation Method: Model Vertical Velocity
Meteorology: 0000Z 1 Jul 2016 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2200 UTC 01 Jul 16
### GDAS Meteorological Data

Source ★ at 33.22 N 97.20 W

Meters AGL

1500
1000
500

0

18    12    06    00    18    12    06    00    18    12    06    00    18
        07/01              06/30              06/29

Job ID: 194836          Job Start: Thu Oct 31 18:06:28 UTC 2019
Source 1    lat.: 33.219069    lon.: -97.196284    height: 183 m AMSL

Trajectory Direction: Backward    Duration: 72 hrs
Vertical Motion Calculation Method:    Model Vertical Velocity
Meteorology: 0000Z  1 Jul 2016 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2300 UTC 21 Sep 16
### GDAS Meteorological Data

Job ID: 124199          Job Start: Thu Nov  7 23:56:32 UTC 2019
Source 1     lat.: 33.219069     lon.: -97.196284     height: 183 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 15 Sep 2016 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2300 UTC 21 Sep 16
### GDAS Meteorological Data



Job ID: 124199      Job Start: Thu Nov  7 23:56:32 UTC 2019
Source 1     lat.: 33.219069     lon.: -97.196284     height: 183 m AMSL

Trajectory Direction: Backward      Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 15 Sep 2016 - GDAS1





NOAA HYSPLIT MODEL
Backward trajectories ending at 2100 UTC 21 Sep 16
GDAS Meteorological Data

Job ID: 144966 Job Start: Fri Nov 1 13:42:39 UTC 2019
Source 1 lat.: 33.219069 lon.: -97.196284 height: 183 m AMSL

Trajectory Direction: Backward Duration: 72 hrs
Vertical Motion Calculation Method: Model Vertical Velocity
Meteorology: 0000Z 15 Sep 2016 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2100 UTC 21 Sep 16
### GDAS Meteorological Data

Job ID: 144966    Job Start: Fri Nov  1 13:42:39 UTC 2019
Source 1    lat.: 33.219069    lon.: -97.196284    height: 183 m AMSL

Trajectory Direction: Backward    Duration: 72 hrs
Vertical Motion Calculation Method:    Model Vertical Velocity
Meteorology: 0000Z 15 Sep 2016 - GDAS1







# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2200 UTC 22 Sep 16
## GDAS Meteorological Data

Job ID: 124336 Job Start: Fri Nov 8 00:02:37 UTC 2019
Source 1 lat.: 33.219069 lon.: -97.196284 height: 183 m AMSL

Trajectory Direction: Backward Duration: 72 hrs
Vertical Motion Calculation Method: Model Vertical Velocity
Meteorology: 0000Z 22 Sep 2016 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2200 UTC 22 Sep 16
## GDAS Meteorological Data

Job ID: 124336 Job Start: Fri Nov 8 00:02:37 UTC 2019
Source 1 lat.: 33.219069 lon.: -97.196284 height: 183 m AMSL

Trajectory Direction: Backward Duration: 72 hrs
Vertical Motion Calculation Method: Model Vertical Velocity
Meteorology: 0000Z 22 Sep 2016 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2200 UTC 22 Sep 16
### GDAS Meteorological Data

Source ★ at 33.22 N 97.20 W

Meters AGL

1500
1000
500

18    12    06    00    18    12    06    00    18    12    06    00    18
       09/22              09/21              09/20

Job ID: 144929          Job Start: Fri Nov  1 13:41:19 UTC 2019
Source 1    lat.: 33.219069    lon.: -97.196284    height: 183 m AMSL

Trajectory Direction: Backward    Duration: 72 hrs
Vertical Motion Calculation Method:    Model Vertical Velocity
Meteorology: 0000Z 22 Sep 2016 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2200 UTC 22 Sep 16
### GDAS Meteorological Data

Source ★ at 33.22 N 97.20 W

Meters AGL

Job ID: 144929          Job Start: Fri Nov  1 13:41:19 UTC 2019
Source 1     lat.: 33.219069    lon.: -97.196284    height: 183 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 22 Sep 2016 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2100 UTC 03 Oct 16
### GDAS Meteorological Data

Source ★ at 33.22 N 97.20 W

Meters AGL

Job ID: 145060        Job Start: Fri Nov  1 13:47:16 UTC 2019
Source 1    lat.: 33.219069    lon.: -97.196284    height: 183 m AMSL

Trajectory Direction: Backward    Duration: 72 hrs
Vertical Motion Calculation Method:    Model Vertical Velocity
Meteorology: 0000Z  1 Oct 2016 - GDAS1







# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2200 UTC 06 May 17
### GDAS Meteorological Data

Job ID: 144436 Job Start: Fri Nov 1 13:18:45 UTC 2019
Source 1 lat.: 33.219069 lon.: -97.196284 height: 183 m AMSL

Trajectory Direction: Backward Duration: 72 hrs
Vertical Motion Calculation Method: Model Vertical Velocity
Meteorology: 0000Z 1 May 2017 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2200 UTC 07 May 17
### GDAS Meteorological Data

Job ID: 145082 Job Start: Fri Nov 1 13:49:04 UTC 2019
Source 1 lat.: 33.219069 lon.: -97.196284 height: 183 m AMSL

Trajectory Direction: Backward Duration: 72 hrs
Vertical Motion Calculation Method: Model Vertical Velocity
Meteorology: 0000Z 1 May 2017 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2100 UTC 31 May 17
### GDAS Meteorological Data

Source ★ at 33.22 N 97.20 W

Meters AGL

Job ID: 145199          Job Start: Fri Nov 1 13:54:53 UTC 2019
Source 1     lat.: 33.219069    lon.: -97.196284    height: 183 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 29 May 2017 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2200 UTC 08 Jun 17
### GDAS Meteorological Data

Source ★ at 33.22 N 97.20 W

Meters AGL

Job ID: 145236          Job Start: Fri Nov  1 13:56:26 UTC 2019
Source 1     lat.: 33.219069    lon.: -97.196284     height: 183 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z  8 Jun 2017 - GDAS1



NOAA HYSPLIT MODEL
Backward trajectories ending at 2300 UTC 24 Jul 17
GDAS Meteorological Data

Source ★ at 33.22 N 97.20 W

Meters AGL

Job ID: 145279        Job Start: Fri Nov  1 13:59:15 UTC 2019
Source 1     lat.: 33.219069    lon.: -97.196284    height: 183 m AMSL

Trajectory Direction: Backward      Duration: 72 hrs
Vertical Motion Calculation Method:      Model Vertical Velocity
Meteorology: 0000Z 22 Jul 2017 - GDAS1





# NOAA HYSPLIT MODEL

## Backward trajectories ending at 2200 UTC 04 Aug 17

### GDAS Meteorological Data

Job ID: 145328 Job Start: Fri Nov 1 14:00:55 UTC 2019
Source 1 lat.: 33.219069 lon.: -97.196284 height: 183 m AMSL

Trajectory Direction: Backward Duration: 72 hrs
Vertical Motion Calculation Method: Model Vertical Velocity
Meteorology: 0000Z 1 Aug 2017 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2200 UTC 14 Sep 17
### GDAS Meteorological Data

Source ★ at 33.22 N 97.20 W

Meters AGL

1500
1000
500

0

18    12    06    00    18    12    06    00    18    12    06    00    18
09/14                09/13                09/12

Job ID: 145365          Job Start: Fri Nov  1 14:02:57 UTC 2019
Source 1    lat.: 33.219069    lon.: -97.196284    height: 183 m AMSL

Trajectory Direction: Backward    Duration: 72 hrs
Vertical Motion Calculation Method:    Model Vertical Velocity
Meteorology: 0000Z  8 Sep 2017 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2300 UTC 18 Sep 17
### GDAS Meteorological Data

Source ★ at 33.22 N 97.20 W

Meters AGL

Job ID: 145462          Job Start: Fri Nov 1 14:06:59 UTC 2019
Source 1     lat.: 33.219069    lon.: -97.196284    height: 183 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 15 Sep 2017 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2200 UTC 19 Oct 17
### GDAS Meteorological Data



Job ID: 145536          Job Start: Fri Nov 1 14:09:35 UTC 2019
Source 1     lat.: 33.219069    lon.: -97.196284    height: 183 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 15 Oct 2017 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2200 UTC 19 Oct 17
### GDAS Meteorological Data

Source ★ at 33.22 N 97.20 W

Meters AGL

18
10/19
12
06
00
18
12
06
00
10/18
18
12
06
00
10/17
18

1500
1000
500
0

Job ID: 145536          Job Start: Fri Nov  1 14:09:35 UTC 2019
Source 1      lat.: 33.219069    lon.: -97.196284    height: 183 m AMSL

Trajectory Direction: Backward      Duration: 72 hrs
Vertical Motion Calculation Method:      Model Vertical Velocity
Meteorology: 0000Z 15 Oct 2017 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2300 UTC 28 Apr 18
### GDAS Meteorological Data



Job ID: 145687      Job Start: Fri Nov  1 14:16:47 UTC 2019
Source 1      lat.: 33.219069      lon.: -97.196284      height: 183 m AMSL

Trajectory Direction: Backward      Duration: 72 hrs
Vertical Motion Calculation Method:      Model Vertical Velocity
Meteorology: 0000Z 22 Apr 2018 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2200 UTC 26 May 18
### GDAS Meteorological Data

Source ★ at 33.22 N 97.20 W

Meters AGL

1500
1000
500

0

18        12        06        00        18        12        06        00        18        12        06        00        18
05/26                              05/25                              05/24

Job ID: 146179          Job Start: Fri Nov  1 14:32:40 UTC 2019
Source 1     lat.: 33.219069    lon.: -97.196284    height: 183 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 22 May 2018 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2200 UTC 29 May 18
### GDAS Meteorological Data



Job ID: 124417          Job Start: Fri Nov  8 00:06:47 UTC 2019
Source 1     lat.: 33.219069    lon.: -97.196284    height: 183 m AMSL

Trajectory Direction: Backward      Duration: 72 hrs
Vertical Motion Calculation Method:      Model Vertical Velocity
Meteorology: 0000Z 29 May 2018 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2200 UTC 29 May 18
### GDAS Meteorological Data

Source ★ at 33.22 N 97.20 W

MIXDEPTH

1696

3000
2000
1000

18    06    00    18    12    06    00    18    12    06    00    18
      05/29            05/28            05/27

Job ID: 124417          Job Start: Fri Nov 8 00:06:47 UTC 2019
Source 1    lat.: 33.219069    lon.: -97.196284    height: 183 m AMSL

Trajectory Direction: Backward    Duration: 72 hrs
Vertical Motion Calculation Method:    Model Vertical Velocity
Meteorology: 0000Z 29 May 2018 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2100 UTC 29 May 18
### GDAS Meteorological Data

Source ★ at 33.22 N 97.20 W

Meters AGL

Job ID: 146190          Job Start: Fri Nov 1 14:34:35 UTC 2019
Source 1     lat.: 33.219069    lon.: -97.196284    height: 183 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 29 May 2018 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2100 UTC 29 May 18
### GDAS Meteorological Data

Source ★ at 33.22 N 97.20 W

Meters AGL

Job ID: 146190          Job Start: Fri Nov 1 14:34:35 UTC 2019
Source 1     lat.: 33.219069     lon.: -97.196284     height: 183 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 29 May 2018 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2200 UTC 05 Jun 18
### GDAS Meteorological Data

Source ★ at 33.22 N 97.20 W

MIXDEPTH

1385

3000
2000
1000

18    12    06    00    18    12    06    00    18    12    06    00    18
06/05              06/04              06/03

Job ID: 124825          Job Start: Fri Nov  8 00:13:54 UTC 2019
Source 1      lat.: 33.219069    lon.: -97.196284    height: 183 m AMSL

Trajectory Direction: Backward    Duration: 72 hrs
Vertical Motion Calculation Method:    Model Vertical Velocity
Meteorology: 0000Z  1 Jun 2018 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2100 UTC 05 Jun 18
### GDAS Meteorological Data



Job ID: 146441          Job Start: Fri Nov  1 14:40:27 UTC 2019
Source 1     lat.: 33.219069    lon.: -97.196284    height: 183 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z  1 Jun 2018 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2100 UTC 05 Jun 18
### GDAS Meteorological Data

Source ★ at 33.22 N 97.20 W

Meters AGL

Job ID: 146441            Job Start: Fri Nov  1 14:40:27 UTC 2019
Source 1    lat.: 33.219069   lon.: -97.196284   height: 183 m AMSL

Trajectory Direction: Backward    Duration: 72 hrs
Vertical Motion Calculation Method:    Model Vertical Velocity
Meteorology: 0000Z  1 Jun 2018 - GDAS1



NOAA HYSPLIT MODEL
Backward trajectories ending at 2200 UTC 25 Jul 18
GDAS Meteorological Data

Source ★ at 33.22 N 97.20 W

Meters AGL

Job ID: 146554          Job Start: Fri Nov  1 14:44:29 UTC 2019
Source 1      lat.: 33.219069    lon.: -97.196284    height: 183 m AMSL

Trajectory Direction: Backward      Duration: 72 hrs
Vertical Motion Calculation Method:      Model Vertical Velocity
Meteorology: 0000Z 22 Jul 2018 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2300 UTC 26 Jul 18
### GDAS Meteorological Data

Job ID: 146649          Job Start: Fri Nov  1 14:45:56 UTC 2019
Source 1     lat.: 33.219069     lon.: -97.196284     height: 183 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 22 Jul 2018 - GDAS1



NOAA HYSPLIT MODEL
Backward trajectories ending at 2200 UTC 02 Aug 18
GDAS Meteorological Data

Source ★ at 33.22 N 97.20 W

Meters AGL

Job ID: 146907          Job Start: Fri Nov  1 14:56:06 UTC 2019
Source 1      lat.: 33.219069    lon.: -97.196284    height: 183 m AMSL

Trajectory Direction: Backward      Duration: 72 hrs
Vertical Motion Calculation Method:      Model Vertical Velocity
Meteorology: 0000Z  1 Aug 2018 - GDAS1





# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2200 UTC 03 Aug 18
## GDAS Meteorological Data

Job ID: 125191 Job Start: Fri Nov 8 00:21:19 UTC 2019
Source 1 lat.: 33.219069 lon.: -97.196284 height: 183 m AMSL

Trajectory Direction: Backward Duration: 72 hrs
Vertical Motion Calculation Method: Model Vertical Velocity
Meteorology: 0000Z 1 Aug 2018 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2200 UTC 03 Aug 18
### GDAS Meteorological Data

Source ★ at 33.22 N 97.20 W

MIXDEPTH

2018

3000
2000
1000

18    12    06    00    18    12    06    00    18    12    06    00    18
          08/03              08/02              08/01

Job ID: 125191          Job Start: Fri Nov  8 00:21:19 UTC 2019
Source 1    lat.: 33.219069    lon.: -97.196284    height: 183 m AMSL

Trajectory Direction: Backward    Duration: 72 hrs
Vertical Motion Calculation Method:    Model Vertical Velocity
Meteorology: 0000Z  1 Aug 2018 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2100 UTC 03 Aug 18
### GDAS Meteorological Data

Job ID: 147775    Job Start: Fri Nov 1 15:49:24 UTC 2019
Source 1    lat.: 33.219069    lon.: -97.196284    height: 183 m AMSL

Trajectory Direction: Backward    Duration: 72 hrs
Vertical Motion Calculation Method:    Model Vertical Velocity
Meteorology: 0000Z 1 Aug 2018 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2100 UTC 03 Aug 18
### GDAS Meteorological Data

Source ★ at 33.22 N 97.20 W

Meters AGL

Job ID: 147775          Job Start: Fri Nov 1 15:49:24 UTC 2019
Source 1      lat.: 33.219069    lon.: -97.196284    height: 183 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:      Model Vertical Velocity
Meteorology: 0000Z 1 Aug 2018 - GDAS1







NOAA HYSPLIT MODEL
Backward trajectories ending at 2300 UTC 01 Jul 16
GDAS Meteorological Data
Source ★ at 33.22 N 97.20 W
34
-98
-96
-94
-92
30
MIXDEPTH
936
3000
2000
1000
18 12 06 00 18 12 06 00 18 12 06 00 18
07/01
06/30
06/29
Job ID: 120834 Job Start: Thu Nov 7 20:46:46 UTC 2019
Source 1 lat.: 33.219069 lon.: -97.196284 height: 183 m AMSL
Trajectory Direction: Backward Duration: 72 hrs
Vertical Motion Calculation Method: Model Vertical Velocity
Meteorology: 0000Z 1 Jul 2016 - GDAS1

NOAA HYSPLIT MODEL
Backward trajectories ending at 2300 UTC 21 Sep 16
GDAS Meteorological Data
Source ★ at 33.22 N 97.20 W
35
34
33
32
31
-99
-98
-97
-96
-95
-94
-93
-92
MIXDEPTH
579
3000
2000
1000
18 12 06 00 18 12 06 00 18 12 06 00 18
09/21
09/20
09/19
Job ID: 124199 Job Start: Thu Nov 7 23:56:32 UTC 2019
Source 1 lat.: 33.219069 lon.: -97.196284 height: 183 m AMSL
Trajectory Direction: Backward Duration: 72 hrs
Vertical Motion Calculation Method: Model Vertical Velocity
Meteorology: 0000Z 15 Sep 2016 - GDAS1

NOAA HYSPLIT MODEL
Backward trajectories ending at 2200 UTC 22 Sep 16
GDAS Meteorological Data
Source ★ at 33.22 N 97.20 W
35
34
33
32
31
-99
-98
-97
-96
-95
-94
-93
-92
MIXDEPTH
1374
3000
2000
1000
18 12 06 00 18 12 06 00 18 12 06 00 18
09/22
09/21
09/20
Job ID: 124336 Job Start: Fri Nov 8 00:02:37 UTC 2019
Source 1 lat.: 33.219069 lon.: -97.196284 height: 183 m AMSL
Trajectory Direction: Backward Duration: 72 hrs
Vertical Motion Calculation Method: Model Vertical Velocity
Meteorology: 0000Z 22 Sep 2016 - GDAS1

NOAA HYSPLIT MODEL
Backward trajectories ending at 2200 UTC 29 May 18
GDAS Meteorological Data
Source ★ at 33.22 N 97.20 W
34
33
32
31
-99
-98
-97
-96
-95
-94
-93
MIXDEPTH
1696
3000
2000
1000
18 12 06 00 18 12 06 00 18 12 06 00 18
05/29
05/28
05/27
Job ID: 124417 Job Start: Fri Nov 8 00:06:47 UTC 2019
Source 1 lat.: 33.219069 lon.: -97.196284 height: 183 m AMSL
Trajectory Direction: Backward Duration: 72 hrs
Vertical Motion Calculation Method: Model Vertical Velocity
Meteorology: 0000Z 29 May 2018 - GDAS1

NOAA HYSPLIT MODEL
Backward trajectories ending at 2200 UTC 05 Jun 18
GDAS Meteorological Data
Source ★ at 33.22 N 97.20 W
35
34
33
32
31
-99
-98
-97
-96
-95
-94
-92
MIXDEPTH
1385
3000
2000
1000
18 12 06 00 18 12 06 00 18 12 06 00 18
06/05
06/04
06/03
Job ID: 124825 Job Start: Fri Nov 8 00:13:54 UTC 2019
Source 1 lat.: 33.219069 lon.: -97.196284 height: 183 m AMSL
Trajectory Direction: Backward Duration: 72 hrs
Vertical Motion Calculation Method: Model Vertical Velocity
Meteorology: 0000Z 1 Jun 2018 - GDAS1

NOAA HYSPLIT MODEL
Backward trajectories ending at 2200 UTC 03 Aug 18
GDAS Meteorological Data
Source ★ at 33.22 N 97.20 W
35
34
33
32
-99
-98
-97
-96
-95
-93
MIXDEPTH
2018
3000
2000
1000
18 12 06 00 18 12 06 00 18 12 06 00 18
08/03
08/02
08/01
Job ID: 125191 Job Start: Fri Nov 8 00:21:19 UTC 2019
Source 1 lat.: 33.219069 lon.: -97.196284 height: 183 m AMSL
Trajectory Direction: Backward Duration: 72 hrs
Vertical Motion Calculation Method: Model Vertical Velocity
Meteorology: 0000Z 1 Aug 2018 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2300 UTC 07 Jun 16
### GDAS Meteorological Data



Source ★ at 32.92 N 97.28 W

Meters AGL

Job ID: 153301          Job Start: Fri Nov  1 18:00:00 UTC 2019
Source 1     lat.: 32.922474    lon.: -97.282088     height: 254 m AMSL

Trajectory Direction: Backward      Duration: 72 hrs
Vertical Motion Calculation Method:      Model Vertical Velocity
Meteorology: 0000Z  1 Jun 2016 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2200 UTC 29 Jun 16
### GDAS Meteorological Data

Source ★ at 32.92 N 97.28 W

Meters AGL

1500

1000

500

18  12  06  00  18  12  06  00  18  12  06  00  18
06/29            06/28            06/27

Job ID: 153468        Job Start: Fri Nov 1 18:04:26 UTC 2019
Source 1     lat.: 32.922474   lon.: -97.282088   height: 254 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:      Model Vertical Velocity
Meteorology: 0000Z 29 Jun 2016 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2100 UTC 26 Jul 16
### GDAS Meteorological Data

Source ★ at 32.92 N 97.28 W

Meters AGL

1500

1000

500

18        12        06        00        18        12        06        00        18        12        06        00        18
07/26                              07/25                              07/24

Job ID: 153042                    Job Start: Fri Nov  1 17:55:22 UTC 2019
Source 1      lat.: 32.922474      lon.: -97.282088      height: 254 m AMSL

Trajectory Direction: Backward      Duration: 72 hrs
Vertical Motion Calculation Method:      Model Vertical Velocity
Meteorology: 0000Z 22 Jul 2016 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2300 UTC 06 May 17
### GDAS Meteorological Data

Source ★ at 32.92 N 97.28 W

Meters AGL

Job ID: 153592          Job Start: Fri Nov  1 18:08:33 UTC 2019
Source 1     lat.: 32.922474    lon.: -97.282088    height: 254 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z  1 May 2017 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2300 UTC 08 Jun 17
### GDAS Meteorological Data

Source ★ at 32.92 N 97.28 W

Meters AGL

Job ID: 153706          Job Start: Fri Nov  1 18:12:41 UTC 2019
Source 1     lat.: 32.922474    lon.: -97.282088    height: 254 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z  8 Jun 2017 - GDAS1





# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2300 UTC 23 Jun 17
## GDAS Meteorological Data

Job ID: 153757 Job Start: Fri Nov 1 18:14:23 UTC 2019
Source 1 lat.: 32.922474 lon.: -97.282088 height: 254 m AMSL

Trajectory Direction: Backward Duration: 72 hrs
Vertical Motion Calculation Method: Model Vertical Velocity
Meteorology: 0000Z 22 Jun 2017 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2300 UTC 04 Aug 17
### GDAS Meteorological Data

Source ★ at 32.92 N 97.28 W

Meters AGL

Job ID: 153852          Job Start: Fri Nov  1 18:17:21 UTC 2019
Source 1      lat.: 32.922474    lon.: -97.282088    height: 254 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z  1 Aug 2017 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2300 UTC 01 Sep 17
### GDAS Meteorological Data

Source ★ at 32.92 N 97.28 W

Meters AGL

1500
1000
500

26

18   12   06   00   18   12   06   00   18   12   06   00   18
09/01                08/31                08/30

Job ID: 153920          Job Start: Fri Nov  1 18:19:32 UTC 2019
Source 1     lat.: 32.922474   lon.: -97.282088   height: 254 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z  1 Sep 2017 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2300 UTC 13 Sep 17
### GDAS Meteorological Data

Source ★ at 32.92 N 97.28 W

Meters AGL

1500
1000
500

Job ID: 154043          Job Start: Fri Nov  1 18:23:38 UTC 2019
Source 1     lat.: 32.922474   lon.: -97.282088    height: 254 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z  8 Sep 2017 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2300 UTC 24 Apr 18
### GDAS Meteorological Data

Source ★ at 32.92 N 97.28 W

Meters AGL

1500
1000
500

26

18  12  06  00  18  12  06  00  18  12  06  00  18
04/24              04/23              04/22

Job ID: 154165          Job Start: Fri Nov  1 18:27:13 UTC 2019
Source 1    lat.: 32.922474    lon.: -97.282088    height: 254 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 22 Apr 2018 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2200 UTC 28 Apr 18
### GDAS Meteorological Data

Source ★ at 32.92 N 97.28 W

Meters AGL

Job ID: 154236          Job Start: Fri Nov  1 18:28:57 UTC 2019
Source 1     lat.: 32.922474     lon.: -97.282088     height: 254 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 22 Apr 2018 - GDAS1



NOAA HYSPLIT MODEL
Backward trajectories ending at 2200 UTC 17 May 18
GDAS Meteorological Data

Source ★ at 32.92 N 97.28 W

Meters AGL

1500
1000
500

Job ID: 154370          Job Start: Fri Nov  1 18:32:45 UTC 2019
Source 1     lat.: 32.922474    lon.: -97.282088    height: 254 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 15 May 2018 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2300 UTC 26 May 18
### GDAS Meteorological Data

Source ★ at 32.92 N 97.28 W

Meters AGL

Job ID: 154422          Job Start: Fri Nov  1 18:34:03 UTC 2019
Source 1      lat.: 32.922474   lon.: -97.282088   height: 254 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 22 May 2018 - GDAS1







# NOAA HYSPLIT MODEL

## Backward trajectories ending at 0100 UTC 22 Jun 18

### GDAS Meteorological Data

Job ID: 129844 Job Start: Fri Nov 8 02:02:14 UTC 2019
Source 1 lat.: 32.922474 lon.: -97.282088 height: 254 m AMSL

Trajectory Direction: Backward Duration: 72 hrs
Vertical Motion Calculation Method: Model Vertical Velocity
Meteorology: 0000Z 22 Jun 2018 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 0100 UTC 22 Jun 18
### GDAS Meteorological Data

Job ID: 129844 Job Start: Fri Nov 8 02:02:14 UTC 2019
Source 1 lat.: 32.922474 lon.: -97.282088 height: 254 m AMSL

Trajectory Direction: Backward Duration: 72 hrs
Vertical Motion Calculation Method: Model Vertical Velocity
Meteorology: 0000Z 22 Jun 2018 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 0000 UTC 22 Jun 18
### GDAS Meteorological Data

Source ★ at 32.92 N 97.28 W

Meters AGL

Job ID: 154558      Job Start: Fri Nov  1 18:37:28 UTC 2019
Source 1     lat.: 32.922474    lon.: -97.282088    height: 254 m AMSL

Trajectory Direction: Backward      Duration: 72 hrs
Vertical Motion Calculation Method:      Model Vertical Velocity
Meteorology: 0000Z 22 Jun 2018 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 0000 UTC 22 Jun 18
### GDAS Meteorological Data



Source ★ at 32.92 N 97.28 W

Meters AGL

Job ID: 154558        Job Start: Fri Nov 1 18:37:28 UTC 2019
Source 1    lat.: 32.922474    lon.: -97.282088    height: 254 m AMSL

Trajectory Direction: Backward    Duration: 72 hrs
Vertical Motion Calculation Method:    Model Vertical Velocity
Meteorology: 0000Z 22 Jun 2018 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2100 UTC 23 Jul 18
### GDAS Meteorological Data

Source ★ at 32.92 N 97.28 W

Meters AGL

1500
1000
500

26

18    12    06    00    18    12    06    00    18    12    06    00    18
       07/23              07/22              07/21

Job ID: 154713          Job Start: Fri Nov  1 18:40:05 UTC 2019
Source 1     lat.: 32.922474     lon.: -97.282088     height: 254 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 22 Jul 2018 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2300 UTC 25 Jul 18
### GDAS Meteorological Data

Source ★ at 32.92 N 97.28 W

Meters AGL

1500
1000
500

26

18  12  06  00  18  12  06  00  18  12  06  00  18
07/25            07/24            07/23

Job ID: 154778          Job Start: Fri Nov  1 18:41:59 UTC 2019
Source 1     lat.: 32.922474     lon.: -97.282088     height: 254 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 22 Jul 2018 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2300 UTC 26 Jul 18
### GDAS Meteorological Data

Source ★ at 32.92 N 97.28 W

Meters AGL

Job ID: 154857          Job Start: Fri Nov 1 18:43:25 UTC 2019
Source 1    lat.: 32.922474    lon.: -97.282088    height: 254 m AMSL

Trajectory Direction: Backward    Duration: 72 hrs
Vertical Motion Calculation Method:    Model Vertical Velocity
Meteorology: 0000Z 22 Jul 2018 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2300 UTC 26 Jul 18
### GDAS Meteorological Data

Source ★ at 32.92 N 97.28 W

Meters AGL

1500
1000
500

Job ID: 154857          Job Start: Fri Nov 1 18:43:25 UTC 2019
Source 1    lat.: 32.922474    lon.: -97.282088    height: 254 m AMSL

Trajectory Direction: Backward    Duration: 72 hrs
Vertical Motion Calculation Method:    Model Vertical Velocity
Meteorology: 0000Z 22 Jul 2018 - GDAS1





# NOAA HYSPLIT MODEL

## Backward trajectories ending at 2100 UTC 27 Jul 18

### GDAS Meteorological Data

Job ID: 154976 Job Start: Fri Nov 1 18:46:10 UTC 2019
Source 1 lat.: 32.922474 lon.: -97.282088 height: 254 m AMSL

Trajectory Direction: Backward Duration: 72 hrs
Vertical Motion Calculation Method: Model Vertical Velocity
Meteorology: 0000Z 22 Jul 2018 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2100 UTC 28 Jul 18
### GDAS Meteorological Data

Source ★ at 32.92 N 97.28 W

Meters AGL

1500
1000
500

18   12   06   00   18   12   06   00   18   12   06   00   18
07/28                   07/27                   07/26

Job ID: 155034          Job Start: Fri Nov  1 18:47:32 UTC 2019
Source 1     lat.: 32.922474    lon.: -97.282088    height: 254 m AMSL

Trajectory Direction: Backward      Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 22 Jul 2018 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 0100 UTC 31 Jul 18
### GDAS Meteorological Data

Source ★ at 32.92 N 97.28 W

Meters AGL

Job ID: 155161        Job Start: Fri Nov  1 18:51:16 UTC 2019
Source 1    lat.: 32.922474   lon.: -97.282088    height: 254 m AMSL

Trajectory Direction: Backward    Duration: 72 hrs
Vertical Motion Calculation Method:    Model Vertical Velocity
Meteorology: 0000Z 29 Jul 2018 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2300 UTC 02 Aug 18
### GDAS Meteorological Data

Source ★ at 32.92 N 97.28 W

Meters AGL

Job ID: 155220          Job Start: Fri Nov  1 18:52:45 UTC 2019
Source 1     lat.: 32.922474   lon.: -97.282088    height: 254 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z  1 Aug 2018 - GDAS1









# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2200 UTC 03 Aug 18
### GDAS Meteorological Data

Job ID: 130005 Job Start: Fri Nov 8 02:05:31 UTC 2019
Source 1 lat.: 32.922474 lon.: -97.282088 height: 254 m AMSL

Trajectory Direction: Backward Duration: 72 hrs
Vertical Motion Calculation Method: Model Vertical Velocity
Meteorology: 0000Z 1 Aug 2018 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2200 UTC 03 Aug 18
### GDAS Meteorological Data

Job ID: 130005 Job Start: Fri Nov 8 02:05:31 UTC 2019
Source 1 lat.: 32.922474 lon.: -97.282088 height: 254 m AMSL

Trajectory Direction: Backward Duration: 72 hrs
Vertical Motion Calculation Method: Model Vertical Velocity
Meteorology: 0000Z 1 Aug 2018 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2100 UTC 03 Aug 18
### GDAS Meteorological Data

Job ID: 155307 Job Start: Fri Nov 1 18:53:54 UTC 2019
Source 1 lat.: 32.922474 lon.: -97.282088 height: 254 m AMSL

Trajectory Direction: Backward Duration: 72 hrs
Vertical Motion Calculation Method: Model Vertical Velocity
Meteorology: 0000Z 1 Aug 2018 - GDAS1

NOAA HYSPLIT MODEL
Backward trajectories ending at 2100 UTC 03 Aug 18
GDAS Meteorological Data

Source ★ at 32.92 N 97.28 W

Meters AGL

1500
1000
500

Job ID: 155307          Job Start: Fri Nov 1 18:53:54 UTC 2019
Source 1      lat.: 32.922474   lon.: -97.282088   height: 254 m AMSL

Trajectory Direction: Backward      Duration: 72 hrs
Vertical Motion Calculation Method:      Model Vertical Velocity
Meteorology: 0000Z 1 Aug 2018 - GDAS1

# Illustration of Semi-Permanent Global Pressure Systems

Louisiana Department of Environmental Quality





Wind Roses Exhibiting Annual Mean Wind Direction and Speed

Louisiana Department of Environmental Quality



**HOUSTON HOBBY AP (TX) - Wind Frequency Table (percentage)**

| | | |
|---|---|---|
| Latitude : 29.6381<br>Longitude : -95.2819<br>Elevation : 44 ft.<br>Element : Mean Wind Speed | Start Date : Jan. 1, 1987<br>End Date : Dec. 31, 2016<br># of Days : 10958 of 10958<br># obs : poss : 202565 of 262992 | Sub Interval Windows<br>Start End<br>Date Jan. 1 Dec. 31<br>Hour 0     23 |

(Greater than or equal to initial interval value and Less than ending interval value.)

| Range (mph) | 0 | 10 | 20 | 30 | 40 | 50 | 60 | 70 | 80 | 90 | 100 | 110 | 120 | 130 | 140 | 150 | 160 | 170 | 180 | 190 | 200 | 210 | 220 | 230 | 240 | 250 | 260 | 270 | 280 | 290 | 300 | 310 | 320 | 330 | 340 | 350 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1.3 - 4 | 0.2 | 0.1 | 0.1 | 0.1 | 0.1 | 0.2 | 0.2 | 0.2 | 0.2 | 0.3 | 0.3 | 0.4 | 0.4 | 0.5 | 0.5 | 0.6 | 0.5 | 0.4 | 0.5 | 0.4 | 0.3 | 0.3 | 0.3 | 0.3 | 0.2 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 9.0 |
| 4 - 8 | 0.8 | 0.6 | 0.5 | 0.7 | 1.0 | 0.9 | 1.0 | 1.0 | 0.8 | 0.9 | 1.1 | 1.3 | 1.6 | 1.8 | 1.7 | 2.2 | 2.5 | 2.2 | 2.0 | 1.3 | 1.1 | 0.8 | 0.7 | 0.7 | 0.5 | 0.4 | 0.4 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.4 | 0.5 | 0.8 | 34.1 |
| 8 - 13 | 1.6 | 1.3 | 0.8 | 0.9 | 1.5 | 1.1 | 0.9 | 1.0 | 0.9 | 1.0 | 1.4 | 1.6 | 1.6 | 1.4 | 1.5 | 2.4 | 3.5 | 2.9 | 2.4 | 1.6 | 1.0 | 0.7 | 0.6 | 0.4 | 0.4 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.4 | 0.5 | 0.6 | 0.9 | 1.2 | 39.7 |
| 13 - 19 | 1.0 | 0.8 | 0.5 | 0.4 | 0.4 | 0.3 | 0.2 | 0.2 | 0.2 | 0.2 | 0.3 | 0.4 | 0.4 | 0.3 | 0.4 | 0.8 | 1.3 | 1.1 | 0.8 | 0.6 | 0.3 | 0.2 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.2 | 0.3 | 0.4 | 0.4 | 0.7 | 0.8 | 14.6 |
| 19 - 25 | 0.2 | 0.1 | 0.1 | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 | 0.1 | 0.1 | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 | 0.1 | 0.1 | 0.2 | 0.2 | 0.2 | 2.3 |
| 25 - 32 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.3 |
| 32 - 39 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 39 - 47 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 47 - | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Total(%) | 3.7 | 2.9 | 2.1 | 2.3 | 3.1 | 2.6 | 2.4 | 2.4 | 2.2 | 2.5 | 3.1 | 3.6 | 4.0 | 4.0 | 4.1 | 6.0 | 7.8 | 6.6 | 5.7 | 3.9 | 2.8 | 2.1 | 1.7 | 1.5 | 1.4 | 1.0 | 0.9 | 0.8 | 0.8 | 0.9 | 1.1 | 1.2 | 1.4 | 1.7 | 2.5 | 3.2 | 100.0 |
| Calm (<1.3) | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 0.0 |
| Ave Speed | 11.1 | 11.3 | 10.9 | 9.8 | 9.4 | 8.6 | 8.1 | 8.1 | 8.3 | 8.1 | 8.5 | 8.5 | 8.1 | 7.6 | 8.0 | 8.7 | 9.3 | 9.2 | 8.9 | 8.9 | 8.3 | 8.1 | 7.7 | 7.2 | 7.0 | 7.1 | 7.6 | 8.1 | 8.8 | 9.1 | 10.2 | 11.1 | 11.6 | 11.8 | 11.6 | 11.2 | 9.1 |

Midwestern Regional Climate Center cli-MATE: MRCC Application Tools Environment Generated at: 8/7/2018 8:37:02 AM CDT

# HOUSTON INTERCONT AP (TX) Wind Rose

Jan. 1, 1987 – Dec. 31, 2016
Sub-Interval: Jan. 1 – Dec. 31, 0 – 23



**Wind Speed (mph)**

- 🔵 1.3 – 4
- ⚫ 4 – 8
- 🟢 8 – 13
- 🟠 13 – 19
- 🔵 19 – 25
- 🔴 25 – 32
- 🟡 32 – 39
- 🟢 39 – 47
- 🔴 47 –

Click and drag to zoom

# HOUSTON INTERCONT AP (TX) - Wind Frequency Table (percentage)

| | |
|---|---|
| Latitude : 29.9800<br>Longitude : -95.3600<br>Elevation : 95 ft.<br>Element : Mean Wind Speed | Start Date : Jan. 1, 1987<br>End Date : Dec. 31, 2016<br># of Days : 10958 of 10958<br># obs : poss : 214570 of 262992 |

Sub Interval Windows
Start    End
Date Jan. 1 Dec. 31
Hour 0       23

(Greater than or equal to initial interval value and Less than ending interval value.)

| Range (mph) | 0 | 10 | 20 | 30 | 40 | 50 | 60 | 70 | 80 | 90 | 100 | 110 | 120 | 130 | 140 | 150 | 160 | 170 | 180 | 190 | 200 | 210 | 220 | 230 | 240 | 250 | 260 | 270 | 280 | 290 | 300 | 310 | 320 | 330 | 340 | 350 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1.3 - 4 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.2 | 0.2 | 0.1 | 0.1 | 0.1 | 0.1 | 0.2 | 0.2 | 0.2 | 0.2 | 0.3 | 0.4 | 0.5 | 0.5 | 0.4 | 0.3 | 0.2 | 0.2 | 0.2 | 0.2 | 0.1 | 0.1 | 0.1 | 0.2 | 0.2 | 0.2 | 0.2 | 0.3 | 0.3 | 0.3 | 0.3 | 8.3 |
| 4 - 8 | 1.2 | 1.1 | 1.2 | 1.1 | 1.2 | 1.2 | 1.1 | 1.0 | 0.7 | 0.8 | 0.8 | 1.1 | 1.3 | 1.2 | 1.2 | 1.3 | 1.8 | 2.2 | 1.9 | 1.3 | 0.9 | 0.7 | 0.6 | 0.5 | 0.5 | 0.4 | 0.4 | 0.4 | 0.4 | 0.5 | 0.6 | 0.6 | 0.7 | 0.8 | 0.9 | 1.1 | 34.6 |
| 8 - 13 | 1.4 | 1.2 | 1.1 | 0.9 | 0.9 | 0.9 | 1.1 | 1.0 | 1.0 | 1.2 | 1.3 | 1.8 | 2.6 | 2.6 | 2.3 | 2.1 | 2.9 | 3.0 | 2.1 | 1.2 | 0.8 | 0.7 | 0.5 | 0.5 | 0.4 | 0.3 | 0.3 | 0.3 | 0.4 | 0.5 | 0.6 | 0.7 | 0.9 | 1.2 | 1.4 | 1.4 | 42.2 |
| 13 - 19 | 0.5 | 0.4 | 0.3 | 0.2 | 0.1 | 0.1 | 0.1 | 0.1 | 0.2 | 0.2 | 0.3 | 0.4 | 0.9 | 1.2 | 1.1 | 1.0 | 1.2 | 1.0 | 0.5 | 0.3 | 0.2 | 0.1 | 0.1 | 0.1 | 0.1 | 0.0 | 0.0 | 0.1 | 0.2 | 0.3 | 0.3 | 0.3 | 0.5 | 0.5 | 0.6 | 0.6 | 13.1 |
| 19 - 25 | 0.1 | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 | 0.1 | 0.2 | 0.2 | 0.1 | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 1.6 |
| 25 - 32 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 |
| 32 - 39 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 39 - 47 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 47 - | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Total(%) | 3.5 | 3.0 | 2.9 | 2.5 | 2.5 | 2.5 | 2.5 | 2.2 | 2.0 | 2.3 | 2.5 | 3.5 | 5.0 | 5.3 | 5.0 | 4.8 | 6.4 | 6.8 | 5.0 | 3.2 | 2.1 | 1.7 | 1.4 | 1.2 | 1.2 | 0.9 | 0.8 | 0.9 | 1.0 | 1.2 | 1.5 | 1.7 | 2.0 | 2.5 | 3.1 | 3.5 | 100.0 |
| Calm (<1.3) | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 0.0 |
| Ave Speed | 8.9 | 8.7 | 8.2 | 7.8 | 7.5 | 7.5 | 7.8 | 8.0 | 8.5 | 8.9 | 9.0 | 9.2 | 10.0 | 10.5 | 10.5 | 10.1 | 9.8 | 9.0 | 8.2 | 7.9 | 7.7 | 7.9 | 7.8 | 7.5 | 7.4 | 7.1 | 7.0 | 7.3 | 7.7 | 7.9 | 8.5 | 9.2 | 9.4 | 9.5 | 9.5 | 9.2 | 8.9 |

Midwestern Regional Climate Center cli-MATE: MRCC Application Tools Environment Generated at: 8/7/2018 8:35:31 AM CDT

# HOUSTON CLOVER FLD (TX) Wind Rose

Jan. 1, 1997 – Dec. 31, 2016
Sub–Interval: Jan. 1 – Dec. 31, 0 – 23



**Wind Speed (mph)**

- 1.3 – 4
- 4 – 8
- 8 – 13
- 13 – 19
- 19 – 25
- 25 – 32
- 32 – 39
- 39 – 47
- 47 –

Click and drag to zoom

**HOUSTON CLOVER FLD (TX) - Wind Frequency Table (percentage)**

Latitude : 29.5189
Longitude : -95.2417
Elevation : 44 ft.
Element : Mean Wind Speed

Start Date : Jan. 1, 1997
End Date : Dec. 31, 2016
# of Days : 7305 of 7305
# obs : poss : 93563 of 175320

Sub Interval Windows
Start   End
Date Jan. 1 Dec. 31
Hour 0      23

(Greater than or equal to initial interval value and Less than ending interval value.)

| Range (mph) | 0 | 10 | 20 | 30 | 40 | 50 | 60 | 70 | 80 | 90 | 100 | 110 | 120 | 130 | 140 | 150 | 160 | 170 | 180 | 190 | 200 | 210 | 220 | 230 | 240 | 250 | 260 | 270 | 280 | 290 | 300 | 310 | 320 | 330 | 340 | 350 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1.3 - 4 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.4 | 0.6 | 0.7 | 0.7 | 0.7 | 0.8 | 0.7 | 0.5 | 0.4 | 0.3 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.3 | 11.7 |
| 4 - 8 | 0.8 | 0.9 | 1.0 | 1.1 | 1.2 | 1.0 | 0.9 | 0.8 | 0.9 | 1.0 | 0.9 | 1.1 | 1.3 | 1.8 | 1.7 | 2.2 | 2.5 | 1.9 | 1.7 | 1.2 | 0.8 | 0.4 | 0.3 | 0.4 | 0.4 | 0.3 | 0.3 | 0.3 | 0.3 | 0.4 | 0.4 | 0.4 | 0.5 | 0.6 | 0.6 | 0.8 | 33.0 |
| 8 - 13 | 1.3 | 1.3 | 1.2 | 1.2 | 1.2 | 1.0 | 0.9 | 1.2 | 1.4 | 1.4 | 1.2 | 1.2 | 1.6 | 2.3 | 3.5 | 4.4 | 3.5 | 2.3 | 1.4 | 0.8 | 0.4 | 0.3 | 0.3 | 0.2 | 0.2 | 0.2 | 0.3 | 0.5 | 0.6 | 0.8 | 1.0 | 1.2 | 1.2 | 1.3 | 1.4 | 1.4 | 42.3 |
| 13 - 19 | 0.5 | 0.4 | 0.3 | 0.2 | 0.2 | 0.1 | 0.1 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.4 | 0.8 | 1.1 | 1.3 | 1.1 | 0.7 | 0.4 | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 | 0.2 | 0.3 | 0.4 | 0.5 | 0.5 | 0.6 | 0.6 | 0.6 | 11.7 |
| 19 - 25 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 1.2 |
| 25 - 32 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 |
| 32 - 39 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 39 - 47 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 47 - | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Total(%) | 2.9 | 2.9 | 2.9 | 2.9 | 2.9 | 2.5 | 2.2 | 2.4 | 2.9 | 2.8 | 2.7 | 2.9 | 3.3 | 4.5 | 5.5 | 7.6 | 9.1 | 7.2 | 5.2 | 3.4 | 2.1 | 1.1 | 0.8 | 0.8 | 0.8 | 0.7 | 0.7 | 0.8 | 0.9 | 1.1 | 1.3 | 1.7 | 2.0 | 2.5 | 2.5 | 3.2 | 100.0 |
| Calm (<1.3) | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 0.0 |
| Ave Speed | 9.5 | 9.0 | 8.6 | 8.2 | 7.8 | 7.7 | 7.7 | 8.2 | 8.3 | 8.4 | 8.2 | 7.9 | 7.5 | 7.8 | 8.8 | 9.1 | 9.3 | 9.3 | 8.9 | 8.6 | 7.6 | 7.0 | 7.1 | 6.9 | 6.8 | 6.3 | 6.4 | 6.4 | 6.9 | 7.6 | 8.2 | 9.5 | 9.7 | 9.7 | 10.0 | 10.0 | 8.6 |

Midwestern Regional Climate Center cli-MATE: MRCC Application Tools Environment Generated at: 8/7/2018 8:22:03 AM CDT

# PORT ARTHUR SE TX AP (TX) Wind Rose

Jan. 1, 1987 – Dec. 31, 2016
Sub-Interval: Jan. 1 – Dec. 31, 0 – 23



Click and drag to zoom

**PORT ARTHUR SE TX AP (TX) - Wind Frequency Table (percentage)**

| | | |
|---|---|---|
| Latitude : 29.9506<br>Longitude : -94.0206<br>Elevation : 16 ft.<br>Element : Mean Wind Speed | Start Date : Jan. 1, 1987<br>End Date : Dec. 31, 2016<br># of Days : 10958 of 10958<br># obs : poss : 232001 of 262992 | Sub Interval Windows<br>Start  End<br><br>Date Jan. 1 Dec. 31<br>Hour 0      23 |

(Greater than or equal to initial interval value and Less than ending interval value.)

| Range (mph) | 0 | 10 | 20 | 30 | 40 | 50 | 60 | 70 | 80 | 90 | 100 | 110 | 120 | 130 | 140 | 150 | 160 | 170 | 180 | 190 | 200 | 210 | 220 | 230 | 240 | 250 | 260 | 270 | 280 | 290 | 300 | 310 | 320 | 330 | 340 | 350 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1.3 - 4 | 0.3 | 0.3 | 0.2 | 0.3 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.1 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.2 | 0.2 | 0.2 | 0.2 | 0.1 | 0.1 | 0.1 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 7.4 |
| 4 - 8 | 1.0 | 1.1 | 1.0 | 1.2 | 1.3 | 1.0 | 0.9 | 0.8 | 0.7 | 0.8 | 0.8 | 0.8 | 0.9 | 0.8 | 0.7 | 0.8 | 1.2 | 1.7 | 1.9 | 1.5 | 1.2 | 1.0 | 0.8 | 0.7 | 0.6 | 0.5 | 0.5 | 0.4 | 0.5 | 0.6 | 0.6 | 0.6 | 0.5 | 0.6 | 0.6 | 0.6 | 31.3 |
| 8 - 13 | 1.5 | 1.6 | 1.6 | 1.5 | 1.4 | 1.3 | 1.1 | 1.1 | 1.0 | 1.3 | 1.5 | 1.4 | 1.5 | 1.9 | 1.7 | 1.2 | 1.4 | 2.3 | 2.8 | 2.6 | 2.1 | 1.6 | 1.0 | 0.6 | 0.4 | 0.3 | 0.3 | 0.3 | 0.4 | 0.4 | 0.5 | 0.7 | 0.7 | 0.6 | 0.8 | 1.0 | 41.7 |
| 13 - 19 | 0.8 | 0.7 | 0.5 | 0.4 | 0.3 | 0.3 | 0.2 | 0.3 | 0.3 | 0.4 | 0.4 | 0.5 | 0.7 | 0.9 | 0.8 | 0.9 | 1.3 | 1.3 | 1.1 | 0.8 | 0.6 | 0.3 | 0.2 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.2 | 0.3 | 0.3 | 0.4 | 0.5 | 0.6 | 0.6 | 16.6 |
| 19 - 25 | 0.1 | 0.1 | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 | 0.1 | 0.1 | 0.1 | 0.2 | 0.2 | 0.3 | 0.2 | 0.1 | 0.1 | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 2.7 |
| 25 - 32 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.3 |
| 32 - 39 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 39 - 47 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 47 - | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Total(%) | 3.7 | 3.8 | 3.4 | 3.4 | 3.2 | 2.9 | 2.4 | 2.4 | 2.2 | 2.6 | 2.7 | 3.0 | 3.8 | 3.7 | 3.1 | 3.6 | 5.3 | 6.3 | 6.0 | 4.7 | 3.7 | 2.6 | 1.9 | 1.5 | 1.2 | 1.1 | 1.0 | 1.0 | 1.0 | 1.2 | 1.5 | 1.9 | 1.8 | 1.7 | 2.1 | 2.5 | 100.0 |
| Calm (<1.3) | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 0.0 |
| Ave Speed | 10.0 | 9.7 | 9.4 | 8.8 | 8.4 | 8.6 | 8.5 | 8.9 | 9.0 | 9.3 | 9.5 | 9.8 | 10.3 | 10.6 | 11.2 | 11.2 | 10.9 | 10.3 | 9.7 | 9.4 | 9.1 | 8.5 | 7.7 | 7.3 | 7.0 | 6.9 | 7.0 | 7.3 | 7.7 | 8.1 | 8.8 | 9.5 | 9.8 | 10.1 | 10.3 | 10.4 | 9.5 |

Midwestern Regional Climate Center cli-MATE: MRCC Application Tools Environment Generated at: 8/7/2018 7:54:43 AM CDT



Click and drag to zoom

**DENTON MUNI AP (TX) - Wind Frequency Table (percentage)**

| | | |
|---|---|---|
| Latitude : 33.2061<br>Longitude : -97.1989<br>Elevation : 642 ft.<br>Element : Mean Wind Speed | Start Date : Jan. 1, 1996<br>End Date : Dec. 31, 2017<br># of Days : 8036 of 8036<br># obs : poss : 150626 of 192864 | Sub Interval Windows<br>Start   End<br>Date Jan. 1 Dec. 31<br>Hour 0      23 |

(Greater than or equal to initial interval value and Less than ending interval value.)

| Range (mph) | 0 | 10 | 20 | 30 | 40 | 50 | 60 | 70 | 80 | 90 | 100 | 110 | 120 | 130 | 140 | 150 | 160 | 170 | 180 | 190 | 200 | 210 | 220 | 230 | 240 | 250 | 260 | 270 | 280 | 290 | 300 | 310 | 320 | 330 | 340 | 350 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1.3 - 4 | 0.3 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.1 | 0.1 | 0.1 | 0.1 | 0.2 | 0.2 | 0.3 | 0.4 | 0.4 | 0.4 | 0.3 | 0.3 | 0.2 | 0.2 | 0.2 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.2 | 0.2 | 0.2 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 7.4 |
| 4 - 8 | 1.1 | 0.8 | 0.6 | 0.7 | 0.7 | 0.7 | 0.6 | 0.5 | 0.5 | 0.5 | 0.6 | 0.9 | 1.3 | 1.9 | 2.2 | 2.0 | 1.7 | 1.2 | 0.9 | 0.7 | 0.6 | 0.4 | 0.3 | 0.2 | 0.2 | 0.2 | 0.3 | 0.3 | 0.3 | 0.4 | 0.5 | 0.6 | 0.8 | 0.9 | 1.0 | 1.1 | 28.3 |
| 8 - 13 | 1.5 | 1.2 | 1.0 | 0.9 | 0.8 | 0.6 | 0.5 | 0.5 | 0.5 | 0.6 | 0.7 | 0.8 | 1.2 | 2.0 | 2.5 | 3.6 | 4.2 | 3.4 | 2.3 | 1.6 | 1.0 | 0.7 | 0.5 | 0.3 | 0.2 | 0.2 | 0.2 | 0.3 | 0.4 | 0.5 | 0.5 | 0.7 | 0.8 | 1.0 | 1.3 | | 39.2 |
| 13 - 19 | 0.7 | 0.6 | 0.5 | 0.3 | 0.2 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.2 | 0.3 | 0.7 | 1.6 | 2.6 | 2.9 | 2.1 | 1.2 | 0.6 | 0.3 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.2 | 0.2 | 0.3 | 0.4 | 0.5 | 0.6 | 0.7 | | 19.0 |
| 19 - 25 | 0.1 | 0.1 | 0.1 | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 | 0.3 | 0.7 | 1.0 | 0.8 | 0.5 | 0.2 | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 | 0.1 | 0.1 | 0.2 | 0.2 | 0.2 | 5.2 |
| 25 - 32 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 | 0.1 | 0.1 | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.8 |
| 32 - 39 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 39 - 47 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 47 - | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Total(%) | 3.7 | 3.1 | 2.4 | 2.1 | 1.9 | 1.6 | 1.3 | 1.2 | 1.2 | 1.3 | 1.6 | 2.1 | 2.9 | 4.6 | 5.9 | 8.0 | 9.6 | 9.0 | 6.4 | 4.2 | 2.6 | 1.6 | 1.1 | 0.7 | 0.6 | 0.7 | 0.8 | 0.9 | 1.2 | 1.5 | 1.8 | 2.4 | 2.8 | 3.1 | 3.6 | | 99.9 |
| Calm (<1.3) | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 0.0 |
| Ave Speed | 9.8 | 10.2 | 10.0 | 9.6 | 8.7 | 8.0 | 7.9 | 7.8 | 8.0 | 8.1 | 8.0 | 7.7 | 7.7 | 8.1 | 8.8 | 10.3 | 11.6 | 12.9 | 12.8 | 12.3 | 11.3 | 10.2 | 9.2 | 8.9 | 8.9 | 9.0 | 8.7 | 8.8 | 8.6 | 9.1 | 9.3 | 9.6 | 9.8 | 10.0 | 10.0 | 9.9 | 10.2 |

Midwestern Regional Climate Center cli-MATE: MRCC Application Tools Environment Generated at: 8/7/2018 8:32:10 AM CDT

# FT WORTH ALLIANCE AP (TX) Wind Rose

Jan. 1, 1991 – Dec. 31, 2017
Sub–Interval: Jan. 1 – Dec. 31, 0 – 23



**Wind Speed (mph)**
- 1.3 – 4
- 4 – 8
- 8 – 13
- 13 – 19
- 19 – 25
- 25 – 32
- 32 – 39
- 39 – 47
- 47 –

Click and drag to zoom

**FT WORTH ALLIANCE AP (TX) - Wind Frequency Table (percentage)**

| Latitude : 32.9733 | Start Date : Jan. 1, 1991 | Sub Interval Windows |
|---|---|---|
| Longitude : -97.3181 | End Date : Dec. 31, 2017 | Start   End |
| Elevation : 685 ft. | # of Days : 9862 of 9862 | Date Jan. 1 Dec. 31 |
| Element : Mean Wind Speed | # obs : poss : 178484 of 236688 | Hour 0        23 |

(Greater than or equal to initial interval value and Less than ending interval value.)

| Range (mph) | 0 | 10 | 20 | 30 | 40 | 50 | 60 | 70 | 80 | 90 | 100 | 110 | 120 | 130 | 140 | 150 | 160 | 170 | 180 | 190 | 200 | 210 | 220 | 230 | 240 | 250 | 260 | 270 | 280 | 290 | 300 | 310 | 320 | 330 | 340 | 350 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1.3 - 4 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.2 | 0.2 | 0.2 | 0.1 | 0.1 | 0.1 | 0.2 | 0.1 | 0.1 | 0.2 | 0.2 | 0.2 | 0.3 | 0.4 | 0.3 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.2 | 0.1 | 0.2 | 0.1 | 5.8 |
| 4 - 8 | 0.5 | 0.5 | 0.7 | 0.7 | 0.7 | 0.7 | 0.6 | 0.7 | 0.5 | 0.6 | 0.6 | 0.7 | 0.9 | 1.0 | 1.1 | 1.2 | 1.7 | 2.3 | 1.9 | 1.1 | 0.9 | 0.7 | 0.6 | 0.5 | 0.4 | 0.3 | 0.3 | 0.3 | 0.3 | 0.4 | 0.3 | 0.4 | 0.4 | 0.7 | 0.8 | 0.7 | 26.6 |
| 8 - 13 | 1.5 | 1.2 | 1.1 | 0.9 | 0.8 | 0.6 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.7 | 1.1 | 1.6 | 2.0 | 2.5 | 4.1 | 5.0 | 3.9 | 2.4 | 1.6 | 1.0 | 0.7 | 0.5 | 0.4 | 0.3 | 0.2 | 0.3 | 0.3 | 0.5 | 0.6 | 0.7 | 0.9 | 1.1 | 1.3 | 1.3 | 43.5 |
| 13 - 19 | 0.9 | 0.5 | 0.3 | 0.2 | 0.2 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.2 | 0.4 | 0.8 | 1.2 | 2.1 | 2.8 | 2.2 | 1.3 | 0.6 | 0.3 | 0.2 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.2 | 0.3 | 0.4 | 0.6 | 0.6 | 0.8 | 0.8 | 0.8 | 0.8 | 18.7 |
| 19 - 25 | 0.2 | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 | 0.2 | 0.3 | 0.6 | 0.8 | 0.5 | 0.3 | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 | 0.2 | 0.2 | 0.2 | 0.3 | 0.2 | 0.3 | 0.2 | 4.7 |
| 25 - 32 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 | 0.1 | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.6 |
| 32 - 39 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 39 - 47 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 47 - | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Total(%) | 3.2 | 2.4 | 2.2 | 2.0 | 1.9 | 1.6 | 1.4 | 1.4 | 1.1 | 1.3 | 1.3 | 1.7 | 2.3 | 3.2 | 4.2 | 5.4 | 8.8 | 11.3 | 8.9 | 5.4 | 3.4 | 2.2 | 1.8 | 1.4 | 1.1 | 0.9 | 0.7 | 0.8 | 0.8 | 1.2 | 1.4 | 1.8 | 2.2 | 2.7 | 3.3 | 3.3 | 99.9 |
| Calm (<1.3) | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 0.1 |
| Ave Speed | 11.9 | 10.6 | 9.4 | 8.8 | 8.4 | 7.6 | 7.5 | 7.3 | 7.8 | 7.7 | 7.6 | 8.1 | 8.7 | 9.3 | 10.3 | 11.0 | 11.3 | 11.5 | 11.1 | 10.8 | 9.7 | 9.1 | 8.3 | 8.1 | 7.7 | 7.9 | 8.0 | 9.0 | 9.1 | 9.7 | 11.2 | 11.9 | 12.0 | 10.7 | 11.1 | 11.3 | 10.2 |

Midwestern Regional Climate Center cli-MATE: MRCC Application Tools Environment Generated at: 8/7/2018 9:45:18 AM CDT



## TERRELL MUNI AP (TX) Wind Rose

Jan. 1, 1998 – Dec. 31, 2017
Sub–Interval: Jan. 1 – Dec. 31, 0 – 23

**Wind Speed (mph)**
- 1.3 – 4
- 4 – 8
- 8 – 13
- 13 – 19
- 19 – 25
- 25 – 32
- 32 – 39
- 39 – 47
- 47 –

Click and drag to zoom

**TERRELL MUNI AP (TX) - Wind Frequency Table (percentage)**

| | |
|---|---|
| Latitude : 32.7100<br>Longitude : -96.2672<br>Elevation : 475 ft.<br>Element : Mean Wind Speed | Start Date : Jan. 1, 1998<br>End Date : Dec. 31, 2017<br># of Days : 7305 of 7305<br># obs : poss : 136422 of 175320 |

Sub Interval Windows

| | Start | End |
|---|---|---|
| Date | Jan. 1 | Dec. 31 |
| Hour | 0 | 23 |

(Greater than or equal to initial interval value and Less than ending interval value.)

| Range (mph) | 0 | 10 | 20 | 30 | 40 | 50 | 60 | 70 | 80 | 90 | 100 | 110 | 120 | 130 | 140 | 150 | 160 | 170 | 180 | 190 | 200 | 210 | 220 | 230 | 240 | 250 | 260 | 270 | 280 | 290 | 300 | 310 | 320 | 330 | 340 | 350 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1.3 - 4 | 0.2 | 0.3 | 0.5 | 0.6 | 0.5 | 0.4 | 0.4 | 0.4 | 0.3 | 0.3 | 0.2 | 0.2 | 0.3 | 0.4 | 0.4 | 0.5 | 0.5 | 0.4 | 0.4 | 0.3 | 0.2 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 8.7 |
| 4 - 8 | 1.0 | 1.2 | 1.4 | 1.4 | 1.0 | 0.9 | 0.8 | 0.9 | 1.0 | 1.0 | 1.0 | 1.2 | 1.4 | 1.5 | 1.8 | 2.1 | 2.1 | 1.9 | 2.0 | 1.4 | 0.7 | 0.4 | 0.3 | 0.3 | 0.2 | 0.2 | 0.2 | 0.2 | 0.3 | 0.3 | 0.4 | 0.5 | 0.5 | 0.6 | 0.7 | 32.7 |
| 8 - 13 | 1.5 | 1.4 | 1.2 | 0.9 | 0.7 | 0.7 | 0.7 | 0.7 | 0.6 | 0.6 | 0.7 | 0.7 | 1.0 | 1.2 | 1.8 | 2.7 | 3.4 | 3.8 | 3.9 | 2.5 | 1.3 | 0.9 | 0.6 | 0.4 | 0.3 | 0.2 | 0.2 | 0.2 | 0.3 | 0.4 | 0.6 | 0.9 | 1.0 | 1.1 | 1.4 | 40.6 |
| 13 - 19 | 0.5 | 0.5 | 0.3 | 0.2 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.2 | 0.4 | 0.9 | 1.7 | 2.1 | 2.0 | 1.2 | 0.7 | 0.4 | 0.2 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.2 | 0.3 | 0.5 | 0.5 | 0.4 | 0.5 | 14.8 |
| 19 - 25 | 0.0 | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.3 | 0.4 | 0.4 | 0.2 | 0.2 | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 | 0.1 | 0.1 | 0.1 | 0.0 | 0.0 | 2.6 |
| 25 - 32 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.2 |
| 32 - 39 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 39 - 47 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 47 - | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Total(%) | 3.2 | 3.5 | 3.5 | 3.1 | 2.4 | 2.1 | 2.0 | 2.0 | 2.0 | 1.9 | 1.9 | 2.2 | 2.7 | 3.3 | 4.4 | 6.2 | 7.9 | 8.7 | 8.6 | 5.6 | 3.1 | 1.9 | 1.2 | 0.9 | 0.6 | 0.6 | 0.5 | 0.5 | 0.7 | 0.8 | 1.0 | 1.5 | 2.2 | 2.2 | 2.2 | 2.7 | 99.8 |

| Calm (<1.3) | | | 0.1 |
|---|---|---|---|

| Ave Speed | 9.3 | 8.8 | 8.0 | 7.1 | 6.9 | 7.1 | 7.2 | 7.0 | 6.8 | 6.9 | 7.2 | 7.1 | 7.3 | 7.4 | 8.1 | 9.0 | 10.2 | 10.8 | 10.7 | 10.5 | 10.8 | 10.4 | 9.5 | 8.9 | 8.4 | 9.0 | 8.9 | 8.9 | 9.4 | 10.0 | 11.0 | 10.9 | 11.0 | 10.6 | 10.0 | 9.9 | 9.2 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

Midwestern Regional Climate Center cli-MATE: MRCC Application Tools Environment Generated at: 8/6/2018 11:24:11 AM CDT



## TYLER POUNDS FLD (TX) Wind Rose

Jan. 1, 1987 – Dec. 31, 2016
Sub–Interval: Jan. 1 – Dec. 31, 0 – 23

**Wind Speed (mph)**

- 1.3 – 4
- 4 – 8
- 8 – 13
- 13 – 19
- 19 – 25
- 25 – 32
- 32 – 39
- 39 – 47
- 47 –

Click and drag to zoom

**TYLER POUNDS FLD (TX) - Wind Frequency Table (percentage)**

| | | |
|---|---|---|
| Latitude : 32.3542<br>Longitude : -95.4022<br>Elevation : 544 ft.<br>Element : Mean Wind Speed | Start Date : Jan. 1, 1987<br>End Date : Dec. 31, 2016<br># of Days : 10958 of 10958<br># obs : poss : 191243 of 262992 | Sub Interval Windows<br>    Start  End<br>Date Jan. 1 Dec. 31<br>Hour 0     23 |

(Greater than or equal to initial interval value and Less than ending interval value.)

| Range (mph) | 0 | 10 | 20 | 30 | 40 | 50 | 60 | 70 | 80 | 90 | 100 | 110 | 120 | 130 | 140 | 150 | 160 | 170 | 180 | 190 | 200 | 210 | 220 | 230 | 240 | 250 | 260 | 270 | 280 | 290 | 300 | 310 | 320 | 330 | 340 | 350 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1.3 - 4 | 0.2 | 0.1 | 0.2 | 0.2 | 0.2 | 0.3 | 0.2 | 0.2 | 0.1 | 0.1 | 0.1 | 0.1 | 0.2 | 0.2 | 0.2 | 0.3 | 0.3 | 0.3 | 0.3 | 0.2 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 6.1 |
| 4 - 8 | 0.9 | 0.8 | 0.8 | 0.8 | 0.8 | 0.9 | 1.0 | 0.9 | 0.7 | 0.7 | 0.7 | 0.9 | 1.2 | 1.6 | 1.9 | 2.2 | 2.1 | 2.3 | 2.1 | 1.5 | 1.0 | 0.8 | 0.8 | 0.7 | 0.5 | 0.4 | 0.3 | 0.3 | 0.3 | 0.4 | 0.5 | 0.6 | 0.5 | 0.6 | 0.8 | 0.8 | 34.1 |
| 8 - 13 | 1.2 | 1.0 | 0.9 | 0.7 | 0.8 | 0.8 | 0.9 | 0.8 | 0.7 | 0.8 | 0.7 | 0.9 | 1.2 | 1.5 | 2.2 | 2.5 | 2.9 | 3.7 | 3.9 | 3.1 | 2.2 | 1.7 | 1.3 | 0.8 | 0.7 | 0.5 | 0.3 | 0.2 | 0.3 | 0.4 | 0.6 | 0.7 | 0.8 | 1.0 | 1.1 | 1.2 | 44.3 |
| 13 - 19 | 0.3 | 0.2 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.2 | 0.2 | 0.3 | 0.5 | 0.8 | 1.3 | 1.7 | 1.6 | 1.1 | 0.6 | 0.3 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.3 | 0.3 | 0.4 | 0.5 | 0.5 | 0.4 | 0.4 | 13.5 |
| 19 - 25 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 | 0.2 | 0.3 | 0.3 | 0.2 | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.0 | 1.8 |
| 25 - 32 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 |
| 32 - 39 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 39 - 47 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 47 - | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Total(%) | 2.6 | 2.2 | 1.9 | 1.9 | 2.0 | 2.1 | 2.3 | 2.0 | 1.7 | 1.7 | 1.7 | 2.0 | 2.8 | 3.6 | 4.7 | 5.5 | 6.1 | 7.8 | 8.2 | 6.7 | 4.7 | 3.4 | 2.5 | 1.7 | 1.2 | 0.9 | 0.8 | 0.8 | 0.8 | 1.0 | 1.5 | 1.9 | 2.0 | 2.4 | 2.6 | 2.6 | 100.0 |
| Calm (<1.3) | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 0.0 |
| Ave Speed | 8.9 | 8.6 | 8.2 | 7.7 | 7.8 | 7.6 | 7.7 | 7.9 | 7.8 | 7.9 | 8.3 | 8.1 | 8.1 | 8.1 | 8.3 | 8.5 | 9.1 | 9.8 | 10.4 | 10.9 | 10.9 | 10.2 | 9.1 | 8.2 | 7.8 | 7.7 | 7.8 | 7.9 | 8.0 | 8.6 | 9.5 | 9.8 | 10.3 | 9.9 | 9.5 | 9.3 | 9.1 |

Midwestern Regional Climate Center cli-MATE: MRCC Application Tools Environment Generated at: 8/6/2018 11:23:08 AM CDT

# LONGVIEW E TX RGNL AP (TX) Wind Rose

Jan. 1, 1987 – Dec. 31, 2016
Sub–Interval: Jan. 1 – Dec. 31, 0 – 23



**Wind Speed (mph)**

- 1.3 – 4
- 4 – 8
- 8 – 13
- 13 – 19
- 19 – 25
- 25 – 32
- 32 – 39
- 39 – 47
- 47 –

Click and drag to zoom

**LONGVIEW E TX RGNL AP (TX) - Wind Frequency Table (percentage)**

Latitude : 32.3847
Longitude : -94.7114
Elevation : 365 ft.
Element : Mean Wind Speed

Start Date : Jan. 1, 1987
End Date : Dec. 31, 2016
# of Days : 10958 of 10958
# obs : poss : 169971 of 262992

Sub Interval Windows
 Start   End
Date Jan. 1 Dec. 31
Hour 0        23

(Greater than or equal to initial interval value and Less than ending interval value.)

| Range (mph) | 0 | 10 | 20 | 30 | 40 | 50 | 60 | 70 | 80 | 90 | 100 | 110 | 120 | 130 | 140 | 150 | 160 | 170 | 180 | 190 | 200 | 210 | 220 | 230 | 240 | 250 | 260 | 270 | 280 | 290 | 300 | 310 | 320 | 330 | 340 | 350 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1.3 - 4 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.2 | 0.3 | 0.3 | 0.4 | 0.4 | 0.5 | 0.5 | 0.4 | 0.3 | 0.2 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.1 | 8.0 |
| 4 - 8 | 0.9 | 0.7 | 0.6 | 0.7 | 1.0 | 1.0 | 1.1 | 1.0 | 1.0 | 1.3 | 1.1 | 1.3 | 1.7 | 2.1 | 2.1 | 2.2 | 2.1 | 2.2 | 2.1 | 1.6 | 1.1 | 0.9 | 0.8 | 0.6 | 0.5 | 0.4 | 0.5 | 0.5 | 0.6 | 0.9 | 1.0 | 0.9 | 0.8 | 0.8 | 0.8 | 0.8 | 39.4 |
| 8 - 13 | 0.9 | 0.6 | 0.5 | 0.6 | 0.8 | 0.7 | 0.7 | 0.7 | 0.7 | 0.8 | 0.7 | 0.8 | 1.1 | 1.5 | 1.8 | 2.3 | 2.7 | 2.9 | 3.0 | 2.5 | 1.9 | 1.4 | 1.1 | 0.7 | 0.5 | 0.4 | 0.3 | 0.3 | 0.3 | 0.5 | 0.7 | 1.1 | 1.1 | 1.1 | 1.1 | 1.1 | 40.3 |
| 13 - 19 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.0 | 0.1 | 0.1 | 0.3 | 0.5 | 0.7 | 1.0 | 1.1 | 1.0 | 0.9 | 0.5 | 0.3 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.2 | 0.3 | 0.5 | 0.5 | 0.5 | 0.4 | 0.3 | | 10.6 |
| 19 - 25 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 | 0.1 | 0.2 | 0.2 | 0.2 | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 | 0.1 | 0.1 | 0.1 | 0.0 | 0.0 | | 1.6 |
| 25 - 32 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 |
| 32 - 39 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 39 - 47 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 47 - | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Total(%) | 2.2 | 1.6 | 1.4 | 1.7 | 2.1 | 2.0 | 2.2 | 2.1 | 2.1 | 2.5 | 2.1 | 2.4 | 3.2 | 4.1 | 4.5 | 5.4 | 6.0 | 6.7 | 6.9 | 5.6 | 4.2 | 2.9 | 2.3 | 1.6 | 1.2 | 1.0 | 0.9 | 1.0 | 1.0 | 1.5 | 2.2 | 3.1 | 2.8 | 2.7 | 2.5 | 2.3 | 100.0 |
| Calm (<1.3) | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 0.0 |
| Ave Speed | 7.9 | 7.7 | 7.6 | 7.5 | 7.5 | 7.2 | 7.0 | 7.0 | 6.8 | 6.9 | 6.9 | 7.1 | 7.2 | 7.3 | 7.7 | 8.3 | 8.8 | 9.1 | 9.6 | 10.0 | 10.2 | 9.7 | 9.2 | 8.7 | 8.1 | 8.1 | 8.3 | 8.2 | 8.9 | 9.0 | 9.6 | 9.8 | 9.9 | 9.3 | 8.7 | | 8.5 |

Midwestern Regional Climate Center cli-MATE: MRCC Application Tools Environment Generated at: 8/6/2018 11:21:49 AM CDT



## LAKE CHARLES RGNL AP (LA) Wind Rose

Jan. 1, 1987 – Dec. 31, 2016
Sub–Interval: Jan. 1 – Dec. 31, 0 – 23

**Wind Speed (mph)**

- 1.3 – 4
- 4 – 8
- 8 – 13
- 13 – 19
- 19 – 25
- 25 – 32
- 32 – 39
- 39 – 47
- 47 –

Click and drag to zoom

**LAKE CHARLES RGNL AP (LA) - Wind Frequency Table (percentage)**

Latitude : 30.1247
Longitude : -93.2283
Elevation : 9 ft.
Element : Mean Wind Speed

Start Date : Jan. 1, 1987
End Date : Dec. 31, 2016
# of Days : 10958 of 10958
# obs : poss : 201506 of 262992

Sub Interval Windows
    Start  End
Date Jan. 1 Dec. 31
Hour 0      23

(Greater than or equal to initial interval value and Less than ending interval value.)

| Range (mph) | 0 | 10 | 20 | 30 | 40 | 50 | 60 | 70 | 80 | 90 | 100 | 110 | 120 | 130 | 140 | 150 | 160 | 170 | 180 | 190 | 200 | 210 | 220 | 230 | 240 | 250 | 260 | 270 | 280 | 290 | 300 | 310 | 320 | 330 | 340 | 350 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1.3 - 4 | 0.2 | 0.2 | 0.3 | 0.3 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.3 | 0.3 | 0.4 | 0.4 | 0.4 | 0.4 | 0.3 | 0.3 | 0.3 | 0.4 | 0.4 | 0.3 | 0.2 | 0.3 | 0.2 | 0.2 | 0.1 | 0.1 | 0.1 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 10.0 |
| 4 - 8 | 0.8 | 0.9 | 0.9 | 1.1 | 1.4 | 1.9 | 1.7 | 1.7 | 1.4 | 1.3 | 1.2 | 1.3 | 1.3 | 1.4 | 1.4 | 1.1 | 1.1 | 1.6 | 1.7 | 1.2 | 1.0 | 0.9 | 0.8 | 0.7 | 0.5 | 0.4 | 0.3 | 0.4 | 0.3 | 0.4 | 0.5 | 0.5 | 0.6 | 0.5 | 0.6 | 0.7 | 35.6 |
| 8 - 13 | 1.4 | 1.4 | 1.4 | 1.5 | 1.6 | 1.8 | 1.5 | 1.3 | 1.1 | 1.0 | 0.9 | 1.0 | 1.3 | 1.4 | 1.2 | 1.1 | 1.5 | 2.1 | 2.1 | 1.8 | 1.9 | 1.7 | 1.2 | 0.7 | 0.4 | 0.3 | 0.2 | 0.2 | 0.3 | 0.3 | 0.4 | 0.6 | 0.7 | 0.8 | 1.0 | | 39.6 |
| 13 - 19 | 0.6 | 0.6 | 0.6 | 0.5 | 0.5 | 0.4 | 0.4 | 0.2 | 0.1 | 0.1 | 0.1 | 0.2 | 0.4 | 0.4 | 0.4 | 0.5 | 0.8 | 0.8 | 0.7 | 0.6 | 0.5 | 0.4 | 0.2 | 0.1 | 0.1 | 0.0 | 0.0 | 0.1 | 0.1 | 0.1 | 0.2 | 0.3 | 0.3 | 0.4 | 0.5 | | 12.7 |
| 19 - 25 | 0.1 | 0.1 | 0.1 | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 | 0.1 | 0.1 | 0.2 | 0.1 | 0.1 | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 | 0.1 | 0.1 | 0.1 | | 1.9 |
| 25 - 32 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.2 |
| 32 - 39 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 39 - 47 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 47 - | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Total(%) | 3.2 | 3.2 | 3.3 | 3.4 | 3.9 | 4.6 | 4.0 | 3.6 | 3.1 | 2.7 | 2.6 | 2.9 | 3.4 | 3.7 | 3.6 | 3.2 | 4.0 | 5.0 | 5.1 | 4.0 | 3.7 | 3.3 | 2.5 | 1.8 | 1.2 | 0.9 | 0.7 | 0.8 | 0.8 | 1.0 | 1.2 | 1.2 | 1.7 | 1.8 | 2.0 | 2.5 | 100.0 |
| Calm (<1.3) | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 0.0 |
| Ave Speed | 10.0 | 9.9 | 9.8 | 9.3 | 8.7 | 8.2 | 8.0 | 7.7 | 7.4 | 7.5 | 7.3 | 7.5 | 8.3 | 8.4 | 8.6 | 9.4 | 10.3 | 9.4 | 9.1 | 9.2 | 9.3 | 9.1 | 8.4 | 7.9 | 7.6 | 7.1 | 6.8 | 7.1 | 7.1 | 7.5 | 7.7 | 8.6 | 9.5 | 10.0 | 10.0 | 9.9 | 8.8 |

Midwestern Regional Climate Center cli-MATE: MRCC Application Tools Environment Generated at: 8/7/2018 7:52:35 AM CDT Midwestern Regional Climate Center cli-MATE: MRCC Application Tools Environment Generated at: 8/7/2018 7:53:22 AM CDT



### SHREVEPORT RGNL AP (LA) Wind Rose

Jan. 1, 1987 – Dec. 31, 2016
Sub–Interval: Jan. 1 – Dec. 31, 0 – 23

**Wind Speed (mph)**

- 1.3 – 4
- 4 – 8
- 8 – 13
- 13 – 19
- 19 – 25
- 25 – 32
- 32 – 39
- 39 – 47
- 47 –

Click and drag to zoom

**SHREVEPORT RGNL AP (LA) - Wind Frequency Table (percentage)**

Latitude : 32.4469
Longitude : -93.8242
Elevation : 254 ft.
Element : Mean Wind Speed

Start Date : Jan. 1, 1987
End Date : Dec. 31, 2016
# of Days : 10958 of 10958
# obs : poss : 215641 of 262992

Sub Interval Windows
Start End
Date Jan. 1 Dec. 31
Hour 0      23

(Greater than or equal to initial interval value and Less than ending interval value.)

| Range (mph) | 0 | 10 | 20 | 30 | 40 | 50 | 60 | 70 | 80 | 90 | 100 | 110 | 120 | 130 | 140 | 150 | 160 | 170 | 180 | 190 | 200 | 210 | 220 | 230 | 240 | 250 | 260 | 270 | 280 | 290 | 300 | 310 | 320 | 330 | 340 | 350 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1.3 - 4 | 0.2 | 0.2 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.2 | 0.2 | 0.2 | 0.3 | 0.4 | 0.5 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.3 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.3 | 0.3 | 0.2 | 0.2 | 0.1 | 0.2 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 7.9 |
| 4 - 8 | 1.1 | 1.0 | 0.9 | 0.7 | 0.5 | 0.6 | 0.8 | 1.0 | 1.0 | 1.0 | 0.9 | 1.3 | 1.8 | 1.7 | 1.8 | 1.7 | 1.6 | 1.8 | 1.8 | 1.4 | 1.3 | 1.1 | 0.9 | 0.8 | 0.8 | 0.6 | 0.5 | 0.4 | 0.4 | 0.6 | 0.7 | 0.7 | 0.5 | 0.5 | 0.6 | 0.8 | 35.7 |
| 8 - 13 | 1.5 | 1.4 | 1.4 | 1.2 | 0.9 | 0.8 | 1.1 | 1.1 | 0.9 | 0.9 | 0.8 | 0.8 | 1.0 | 1.5 | 1.9 | 2.1 | 2.3 | 2.7 | 2.9 | 2.2 | 1.7 | 1.3 | 1.0 | 0.9 | 0.8 | 0.5 | 0.4 | 0.4 | 0.7 | 0.9 | 1.0 | 0.9 | 1.0 | 1.1 | 1.2 | 1.3 | 43.6 |
| 13 - 19 | 0.4 | 0.3 | 0.3 | 0.3 | 0.2 | 0.2 | 0.2 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.2 | 0.3 | 0.4 | 0.7 | 1.0 | 1.1 | 0.6 | 0.4 | 0.3 | 0.2 | 0.2 | 0.2 | 0.1 | 0.1 | 0.1 | 0.2 | 0.3 | 0.4 | 0.5 | 0.5 | 0.4 | 0.4 | 0.3 | 11.2 |
| 19 - 25 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 | 0.1 | 0.1 | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 | 0.1 | 0.1 | 0.1 | 0.0 | 0.0 | 1.4 |
| 25 - 32 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.2 |
| 32 - 39 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 39 - 47 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 47 - | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Total(%) | 3.1 | 2.8 | 2.8 | 2.4 | 1.8 | 1.6 | 2.2 | 2.4 | 2.2 | 2.2 | 2.1 | 2.5 | 3.4 | 3.9 | 4.5 | 4.6 | 5.1 | 6.0 | 6.1 | 4.5 | 3.7 | 2.9 | 2.3 | 2.2 | 2.1 | 1.6 | 1.2 | 1.2 | 1.2 | 1.7 | 2.3 | 2.4 | 2.2 | 2.1 | 2.2 | 2.5 | 100.0 |
| Calm (<1.3) | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 0.0 |
| Ave Speed | 8.9 | 8.9 | 9.0 | 9.2 | 9.1 | 8.7 | 8.6 | 8.1 | 7.6 | 7.5 | 7.4 | 7.0 | 6.8 | 7.5 | 8.0 | 8.4 | 9.1 | 9.5 | 9.6 | 9.3 | 8.8 | 8.5 | 8.4 | 8.2 | 8.0 | 7.8 | 8.0 | 8.6 | 9.2 | 9.5 | 10.0 | 10.2 | 10.7 | 10.5 | 9.7 | 9.2 | 8.7 |

Midwestern Regional Climate Center cli-MATE: MRCC Application Tools Environment Generated at: 8/6/2018 11:09:32 AM CDT



# FT POLK AAF (LA) Wind Rose

Jan. 1, 1987 – Dec. 31, 2016
Sub–Interval: Jan. 1 – Dec. 31, 0 – 23

**Wind Speed (mph)**

- 1.3 – 4
- 4 – 8
- 8 – 13
- 13 – 19
- 19 – 25
- 25 – 32
- 32 – 39
- 39 – 47
- 47 –

Click and drag to zoom

```
FT POLK AAF (LA) - Wind Frequency Table (percentage)

Latitude : 31.0500          Start Date : Jan. 1, 1987        Sub Interval
Longitude : -93.1833        End Date : Dec. 31, 2016         Windows
Elevation : 330 ft.         # of Days : 10958 of 10958          Start  End
Element : Mean Wind Speed   # obs : poss : 131562 of 262992   Date Jan. 1 Dec. 31
                                                              Hour 0      23
```

(Greater than or equal to initial interval value and Less than ending interval value.)

| Range (mph) | 0 | 10 | 20 | 30 | 40 | 50 | 60 | 70 | 80 | 90 | 100 | 110 | 120 | 130 | 140 | 150 | 160 | 170 | 180 | 190 | 200 | 210 | 220 | 230 | 240 | 250 | 260 | 270 | 280 | 290 | 300 | 310 | 320 | 330 | 340 | 350 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1.3 - 4 | 0.7 | 0.5 | 0.7 | 0.8 | 0.7 | 0.6 | 0.7 | 0.6 | 0.5 | 0.7 | 0.5 | 0.5 | 0.7 | 0.6 | 0.8 | 1.1 | 0.9 | 0.8 | 0.8 | 0.5 | 0.5 | 0.5 | 0.3 | 0.3 | 0.3 | 0.3 | 0.2 | 0.3 | 0.2 | 0.2 | 0.3 | 0.2 | 0.3 | 0.5 | 0.7 | 0.7 | 19.9 |
| 4 - 8 | 1.1 | 1.0 | 1.5 | 1.5 | 1.1 | 1.2 | 1.1 | 0.9 | 0.9 | 1.0 | 1.0 | 1.0 | 1.2 | 1.3 | 1.6 | 1.8 | 1.9 | 1.7 | 1.7 | 1.2 | 1.0 | 0.7 | 0.5 | 0.4 | 0.5 | 0.4 | 0.4 | 0.5 | 0.4 | 0.4 | 0.4 | 0.4 | 0.6 | 0.9 | 1.1 | 0.9 | 35.3 |
| 8 - 13 | 1.3 | 1.1 | 1.4 | 1.3 | 0.9 | 0.7 | 0.6 | 0.5 | 0.5 | 0.5 | 0.6 | 0.7 | 1.0 | 1.4 | 1.6 | 1.8 | 2.3 | 2.4 | 2.3 | 1.3 | 1.0 | 0.6 | 0.4 | 0.3 | 0.3 | 0.3 | 0.3 | 0.4 | 0.4 | 0.5 | 0.5 | 0.7 | 1.0 | 1.2 | 1.1 | 1.2 | 33.6 |
| 13 - 19 | 0.2 | 0.2 | 0.2 | 0.1 | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 | 0.1 | 0.2 | 0.3 | 0.5 | 0.7 | 0.6 | 0.5 | 0.2 | 0.1 | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 | 0.1 | 0.2 | 0.2 | 0.2 | 0.3 | 0.2 | 0.2 | 6.1 |
| 19 - 25 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.6 |
| 25 - 32 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 32 - 39 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 39 - 47 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 47 - | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Total(%) | 3.3 | 2.9 | 3.8 | 3.7 | 2.8 | 2.6 | 2.5 | 2.0 | 2.0 | 2.3 | 2.2 | 2.3 | 3.0 | 3.5 | 4.4 | 5.2 | 5.9 | 5.5 | 5.4 | 3.3 | 2.6 | 1.9 | 1.3 | 1.0 | 1.1 | 1.0 | 0.8 | 1.1 | 1.1 | 1.1 | 1.5 | 1.4 | 1.8 | 2.7 | 3.3 | 3.0 | 95.6 |
| Calm (<1.3) | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 4.4 |
| Ave Speed | 7.5 | 7.5 | 7.1 | 6.8 | 6.5 | 6.3 | 6.0 | 5.8 | 6.0 | 5.9 | 6.3 | 6.6 | 6.7 | 7.3 | 7.4 | 7.7 | 8.3 | 8.5 | 8.2 | 7.7 | 7.3 | 6.4 | 6.4 | 6.3 | 6.0 | 6.1 | 6.4 | 6.4 | 7.4 | 8.3 | 8.4 | 9.0 | 8.5 | 7.8 | 7.3 | 7.3 | 7.0 |

Midwestern Regional Climate Center cli-MATE: MRCC Application Tools Environment Generated at: 8/6/2018 10:53:44 AM CDT



# LAFAYETTE RGNL AP (LA) Wind Rose

Jan. 1, 1987 – Dec. 31, 2016
Sub–Interval: Jan. 1 – Dec. 31, 0 – 23

**Wind Speed (mph)**

- 1.3 – 4
- 4 – 8
- 8 – 13
- 13 – 19
- 19 – 25
- 25 – 32
- 32 – 39
- 39 – 47
- 47 –

Click and drag to zoom

**LAFAYETTE RGNL AP (LA) - Wind Frequency Table (percentage)**

Latitude : 30.2050
Longitude : -91.9875
Elevation : 38 ft.
Element : Mean Wind Speed

Start Date : Jan. 1, 1987
End Date : Dec. 31, 2016
# of Days : 10958 of 10958
# obs : poss : 191015 of 262992

Sub Interval Windows
  Start  End
Date Jan. 1  Dec. 31
Hour 0    23

(Greater than or equal to initial interval value and Less than ending interval value.)

| Range (mph) | 0 | 10 | 20 | 30 | 40 | 50 | 60 | 70 | 80 | 90 | 100 | 110 | 120 | 130 | 140 | 150 | 160 | 170 | 180 | 190 | 200 | 210 | 220 | 230 | 240 | 250 | 260 | 270 | 280 | 290 | 300 | 310 | 320 | 330 | 340 | 350 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1.3 - 4 | 0.2 | 0.2 | 0.3 | 0.4 | 0.6 | 0.6 | 0.6 | 0.5 | 0.5 | 0.5 | 0.5 | 0.4 | 0.4 | 0.4 | 0.3 | 0.3 | 0.4 | 0.4 | 0.4 | 0.3 | 0.3 | 0.3 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 11.1 |
| 4 - 8 | 0.9 | 1.2 | 1.4 | 1.4 | 1.7 | 1.6 | 1.6 | 1.2 | 1.1 | 1.1 | 1.2 | 1.2 | 1.2 | 1.1 | 1.1 | 1.2 | 1.4 | 1.6 | 1.4 | 1.3 | 1.3 | 1.1 | 0.9 | 0.8 | 0.7 | 0.6 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.6 | 0.6 | 0.7 | | 37.1 |
| 8 - 13 | 1.5 | 2.1 | 2.3 | 1.7 | 1.4 | 1.2 | 1.0 | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 | 0.8 | 0.9 | 0.9 | 1.2 | 1.6 | 2.2 | 2.1 | 2.0 | 1.4 | 1.0 | 0.9 | 0.8 | 0.7 | 0.5 | 0.5 | 0.4 | 0.4 | 0.5 | 0.5 | 0.7 | 0.8 | 0.9 | 1.0 | | 38.0 |
| 13 - 19 | 0.6 | 0.9 | 0.9 | 0.6 | 0.3 | 0.2 | 0.2 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.2 | 0.3 | 0.6 | 1.0 | 1.1 | 0.9 | 0.5 | 0.3 | 0.3 | 0.2 | 0.2 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.2 | 0.3 | 0.3 | 0.4 | 0.4 | | 11.8 |
| 19 - 25 | 0.1 | 0.1 | 0.1 | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 | 0.1 | 0.2 | 0.2 | 0.2 | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 | 0.1 | 0.1 | 0.1 | | 1.9 |
| 25 - 32 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | | 0.2 |
| 32 - 39 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | | 0.0 |
| 39 - 47 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | | 0.0 |
| 47 - | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | | 0.0 |
| Total(%) | 3.4 | 4.5 | 5.1 | 4.2 | 4.0 | 3.6 | 3.3 | 2.6 | 2.3 | 2.4 | 2.5 | 2.5 | 2.5 | 2.5 | 2.5 | 3.1 | 4.2 | 5.5 | 5.2 | 4.6 | 3.5 | 2.8 | 2.4 | 2.0 | 1.7 | 1.4 | 1.2 | 1.2 | 1.2 | 1.2 | 1.4 | 1.4 | 1.7 | 2.0 | 2.1 | 2.4 | 100.0 |
| Calm (<1.3) | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 0.0 |
| Ave Speed | 9.9 | 10.1 | 9.8 | 8.8 | 7.7 | 7.3 | 6.9 | 6.7 | 6.6 | 6.6 | 6.6 | 6.8 | 6.9 | 7.3 | 7.7 | 8.3 | 9.0 | 9.9 | 9.9 | 10.2 | 9.8 | 9.0 | 8.4 | 8.4 | 8.3 | 8.0 | 7.7 | 7.6 | 7.5 | 7.4 | 7.9 | 8.2 | 8.9 | 9.5 | 9.8 | 9.9 | 8.5 |

Midwestern Regional Climate Center cli-MATE: MRCC Application Tools Environment Generated at: 8/7/2018 10:20:36 AM CDT



# BATON ROUGE RYAN AP (LA) Wind Rose

Jan. 1, 1987 – Dec. 31, 2016
Sub-Interval: Jan. 1 – Dec. 31, 0 – 23

**Wind Speed (mph)**

- 1.3 – 4
- 4 – 8
- 8 – 13
- 13 – 19
- 19 – 25
- 25 – 32
- 32 – 39
- 39 – 47
- 47 –

Click and drag to zoom

**BATON ROUGE RYAN AP (LA) - Wind Frequency Table (percentage)**

Latitude : 30.5372
Longitude : -91.1469
Elevation : 64 ft.
Element : Mean Wind Speed

Start Date : Jan. 1, 1987
End Date : Dec. 31, 2016
# of Days : 10958 of 10958
# obs : poss : 199505 of 262992

Sub Interval Windows

| | Start | End |
|---|---|---|
| Date | Jan. 1 | Dec. 31 |
| Hour | 0 | 23 |

(Greater than or equal to initial interval value and Less than ending interval value.)

| Range (mph) | 0 | 10 | 20 | 30 | 40 | 50 | 60 | 70 | 80 | 90 | 100 | 110 | 120 | 130 | 140 | 150 | 160 | 170 | 180 | 190 | 200 | 210 | 220 | 230 | 240 | 250 | 260 | 270 | 280 | 290 | 300 | 310 | 320 | 330 | 340 | 350 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1.3 - 4 | 0.4 | 0.4 | 0.6 | 0.8 | 0.9 | 1.0 | 1.0 | 0.9 | 0.8 | 0.6 | 0.5 | 0.4 | 0.4 | 0.3 | 0.3 | 0.2 | 0.2 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.2 | 0.2 | 0.2 | 0.3 | 0.2 | 0.3 | 0.3 | 0.2 | 0.2 | 0.3 | 0.3 | 0.3 | 13.3 |
| 4 - 8 | 1.0 | 1.0 | 1.1 | 1.4 | 1.7 | 1.9 | 2.0 | 2.0 | 1.8 | 1.8 | 1.7 | 1.9 | 1.6 | 1.2 | 1.1 | 1.0 | 1.0 | 1.0 | 0.9 | 0.6 | 0.5 | 0.4 | 0.6 | 0.8 | 0.9 | 1.0 | 0.9 | 0.9 | 0.8 | 0.7 | 0.7 | 0.7 | 0.7 | 0.8 | 0.8 | 0.7 | 39.5 |
| 8 - 13 | 1.0 | 0.8 | 0.7 | 0.8 | 0.9 | 1.0 | 1.1 | 1.1 | 1.1 | 1.2 | 1.5 | 1.8 | 1.7 | 1.3 | 1.2 | 1.2 | 1.4 | 1.6 | 1.5 | 1.3 | 1.0 | 0.8 | 1.1 | 1.2 | 1.0 | 0.8 | 0.8 | 0.8 | 0.8 | 0.7 | 0.7 | 0.7 | 0.8 | 0.8 | 0.8 | 0.8 | 37.5 |
| 13 - 19 | 0.2 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.2 | 0.2 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.4 | 0.6 | 0.7 | 0.6 | 0.4 | 0.4 | 0.3 | 0.2 | 0.1 | 0.1 | 0.2 | 0.2 | 0.1 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 8.5 |
| 19 - 25 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 1.0 |
| 25 - 32 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 |
| 32 - 39 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 39 - 47 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 47 - | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Total(%) | 2.6 | 2.3 | 2.5 | 3.1 | 3.6 | 4.0 | 4.1 | 4.2 | 3.8 | 3.7 | 3.9 | 4.3 | 4.0 | 3.1 | 2.9 | 2.8 | 3.1 | 3.4 | 3.3 | 2.7 | 2.0 | 1.8 | 2.2 | 2.3 | 2.2 | 2.2 | 2.0 | 2.1 | 2.0 | 1.8 | 1.9 | 1.9 | 2.0 | 2.0 | 2.1 | 2.0 | 100.0 |
| Calm (<1.3) | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 0.0 |
| Ave Speed | 7.9 | 7.1 | 6.6 | 6.4 | 6.2 | 6.3 | 6.4 | 6.5 | 6.7 | 7.0 | 7.5 | 7.8 | 8.2 | 8.3 | 8.4 | 8.8 | 9.3 | 9.9 | 10.2 | 10.6 | 10.4 | 10.3 | 9.8 | 8.7 | 8.0 | 7.7 | 7.7 | 7.7 | 7.9 | 7.9 | 7.9 | 8.0 | 8.2 | 8.1 | 8.1 | 8.1 | 7.9 |

Midwestern Regional Climate Center cli-MATE: MRCC Application Tools Environment Generated at: 8/7/2018 7:52:35 AM CDT

# HYSPLIT Models for Texas Monitors

Louisiana Department of Environmental Quality

## Hou.DeerPrk2 C35/235/1001/AFH139FP239 (DRPK)

- EPA site number: 48-201-1039
- State: Texas
- County: Harris
- City: Deer Park
- Address: 4514 1/2 Durant St
- Site coordinates:
  - Latitude: 29° 40' 12.09" North (+29.670025°)
  - Longitude: 95° 07' 42.63" West (-95.128508°)
  - Elevation: 6 m (20 ft)
- 2023 Projection: 4.72 ppb

























NOAA HYSPLIT MODEL
Backward trajectory ending at 1500 UTC 22 Sep 11
GDAS Meteorological Data



NOAA HYSPLIT MODEL
Backward trajectory ending at 1300 UTC 29 Sep 11
GDAS Meteorological Data

## Denton Airport South C56/A163/X157 (DENT)

- EPA site number: 48-121-0034
- State: Texas
- County: Denton
- City: Denton
- Address: Denton Airport South
- Site coordinates:
  - Latitude: 33° 13' 8.65" North (+33.219069°)
  - Longitude: 97° 11' 46.62" West (-97.196284°)
  - Elevation: 183 m (600 ft)
- 2023 Projection: 1.92 ppb



























| Site | State | County | 2009-2013 Avg DV | 2009-2013 Max DV | 2023 Avg DV | 2023 Max DV | 2014-2016 DV | In-State Contribution | | Total Contribution from All Upwind States | Total US 2023 Anthropogenic Contribution | Percent of 2023 Avg DV from Upwind States | Percent of Total US Anthropogenic Ozone from Upwind States | | TX | Canada+Mexico | Offshore | Fire | Initial & Boundary | Biogenic |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 220150008 | Louisiana | Bossier | 77.3 | 80 | 63.4 | 65.6 | 65 | 19.29 | | 16.33 | 35.62 | 25.8% | 45.8% | | 11.12 | 0.49 | 1.83 | 0.80 | 20.44 | 3.98 |
| 220170001 | Louisiana | Caddo | 74.7 | 76 | 61.0 | 62.0 | 64 | 14.31 | | 17.73 | 32.04 | 29.1% | 55.3% | | 11.55 | 0.60 | 1.24 | 0.91 | 21.27 | 4.72 |
| 220190002 | Louisiana | Calcasieu | 72.7 | 75 | 66.5 | 68.6 | 68 | 17.02 | | 10.60 | 27.62 | 15.9% | 38.4% | | 5.65 | 0.16 | 7.64 | 7.70 | 21.16 | 2.01 |
| 220190008 | Louisiana | Calcasieu | 67.7 | 69 | 61.7 | 62.8 | N/A | 19.24 | | 8.27 | 27.51 | 13.4% | 30.1% | | 5.08 | 0.19 | 6.12 | 6.29 | 19.66 | 1.72 |
| 220190009 | Louisiana | Calcasieu | 72.0 | 74 | 63.6 | 65.4 | 64 | 8.55 | | 17.59 | 26.14 | 27.7% | 67.3% | | 11.31 | 0.37 | 6.51 | 5.19 | 22.25 | 2.92 |

**Appendix C: International Air Pollution Support Documents**



## Table 8.1 Electricity generating capacity, 2000-15 (MW)

| Energy source | 2000 | 2005 | 2010 | 2015 |
|---|---|---|---|---|
| Natural gas | 4 887 | 16 147 | 19 854 | 21 107 |
| Liquid/gas | 6 984 | 10 330 | 11 787 | 12 107 |
| Liquid fuels, including refinery gas | 11 418 | 7 871 | 9 358 | 10 062 |
| Solid/liquid | 410 | 425 | 428 | 575 |
| Coal | 4 700 | 4 700 | 5 440 | 5 474 |
| Other combustible fuels | 42 | 67 | 47 | 96 |
| **Total combustible fuels** | **28 441** | **39 540** | **46 914** | **49 421** |
| Nuclear | 1 365 | 1 365 | 1 365 | 1 510 |
| Hydro | 9 653 | 10 598 | 11 597 | 12 223 |
| Wind | 17 | 18 | 519 | 3 271 |
| Geothermal | 855 | 960 | 965 | 854 |
| Solar photovoltaics (PV) | 14 | 16 | 29 | 54 |
| **Total capacity** | **40 345** | **52 497** | **61 389** | **67 333** |

Note: Some coal-fired power capacity that previously has been reported as *Solid/liquid* is here moved to the *Coal* category for consistency.

Source: IEA (2016b), *Electricity Information 2016*, www.iea.org/statistics/.

**Electricity generation and energy-related CO₂ emissions, 1990-2040**



Source: IEA (2016c), *World Energy Outlook, Special Report on Mexico*.

Although Mexico reaches (and even surpasses) its clean energy targets in the New Policies Scenario, reaching the overall GHG mitigation goal will be a challenging endeavour. The lower bound of the pledged target requires GHG emissions in total to be reduced to around 760 Mt in 2030. In the New Policies Scenario, energy-related GHG emissions fall modestly to around 460 Mt in 2030, meaning that emissions from other sectors (such as agriculture or waste) would need to roughly stabilise at the present level if the lower end of the GHG target is to be achieved. The higher end of the pledge would require GHG emissions to drop to around 620 Mt in 2030, an emissions budget that, without additional measures, would already be largely absorbed by the energy sector.

Source: IEA (2016c), *World Energy Outlook, Special Report on Mexico*.

## **EXHIBIT 4**

EPA, 2015 Ozone NAAQS Interstate Transport SIP Disapprovals – Response to Comment (RTC) Document (Jan. 31, 2023)

# 2015 Ozone NAAQS Interstate Transport SIP Disapprovals – Response to Comment (RTC) Document

This Response to Comments (RTC) document, together with the notice of final action titled Air Plan Disapprovals; Interstate Transport of Air Pollution for the 2015 8-hour Ozone National Ambient Air Quality Standards (NAAQS), presents the Environmental Protection Agency's (EPA) responses to public comments received on the EPA's proposal of 21 state implementation plan (SIP) actions included in this final action.

The EPA has addressed all significant issues raised in timely public comments. The EPA received 84 individual written comment submissions during the public comment periods. Table 1 provides the commenter name, the commenter abbreviated name which may also be used within this document, and links to the commenter's submission in the docket for this action. This document, together with the notice of final action, should be considered collectively as the EPA's response to all significant comments pertaining to the states included in this action.

## Table 1: Commentor Acronyms & IDs

| Commentor Name | Acronym | ID |
|---|---|---|
| Air Pollution Control Program, Missouri Department of Natural Resources | MDNR | 01 |
| Alabama Department of Environmental Management | ADEM | 02 |
| Alabama Power Company | APC | 03 |
| Alabama Power Company, Southern Power Company, and PowerSouth Energy Cooperative | APC et al. | 04 |
| Ameren Missouri | | 05 |
| Anonymous | | 06 |
| Arkansas Department of Energy and Environment, Division of Environmental Quality | ADEQ | 07 |
| Arkansas Electric Cooperative Corporation | AECC | 08 |
| Arkansas Environmental Federation | AEF | 09 |
| Arkansas Forest & Paper Council | AF&PC | 10 |
| Association of Electric Companies of Texas, BCCA Appeal Group, Texas Chemical Council and Texas Oil & Gas Association | AECT et al. | 11 |
| California Air Resources Board | CARB | 12 |
| City Utilities of Springfield, Missouri | CU | 13 |
| Cleco Corporate Holdings LLC | Cleco | 14 |
| Ducote, Samuel | | 15 |
| Eagle Materials Inc. | Eagle | 16 |
| Emley, Margaret | | 17 |
| Energy Security Partners | ESP | 18 |
| Entergy Services, LLC | ESL | 19 |
| Environmental Federation of Oklahoma | EFO | 20 |
| Evergy, Inc. | | 21 |
| Hagerty, Logan | | 22 |
| Idaho Power Company | IPC | 23 |
| Kaw Nation | | 24 |
| Kentucky Division for Air Quality | KDAQ | 25 |
| Louisiana Chemical Association | LCA | 26 |

2

| | | |
|---|---|---|
| Louisiana Department of Environmental Quality | LDEQ | 27 |
| Louisiana Electric Utility Environmental Group | LEUEG | 28 |
| Maryland Department of the Environment | MDE | 29 |
| Midwest Ozone Group | MOG | 30 |
| Minnesota Pollution Control Agency | MPCA | 31 |
| Mississippi Department of Environmental Quality | MDEQ | 32 |
| Nevada Division of Environmental Protection | NDEP | 33 |
| New Jersey Department of Environmental Protection | NJDEP | 34 |
| NRG Texas Power LLC | NRG | 35 |
| Ohio Utilities and Generators Group | OUG | 36 |
| Oklahoma Department of Environmental Quality | ODEQ | 37 |
| PacifiCorp | | 38 |
| Sierra Club | | 39 |
| Southwestern Electric Power Company | SEPC | 40 |
| Tennessee Department of Environment and Conservation | TDEC | 41 |
| Texas Commission on Environmental Quality | TCEQ | 42 |
| Texas Transport Working Group | | 43 |
| The Luminant Companies | | 44 |
| United States Steel Corporation | U.S. Steel | 45 |
| Utah Associated Municipal Power System | UAMPS | 46 |
| Utah Division of Air Quality | UDAQ | 47 |
| Utah Petroleum Association and the Utah Mining Association | UPA & UMA | 48 |
| West Virginia Department of Environmental Protection | WVDEP | 49 |
| WildEarth Guardians | WEG | 50 |
| Wisconsin Department of Natural Resources | WDNR | 51 |
| Xcel Energy | | 52 |

The responses presented in this document supplement the responses to comments that appear in the notice of final action and addresses comments not discussed in the notice of final action. The EPA took great care in presenting comment excerpts accurately in this document (either verbatim or paraphrased), though did make some formatting adjustments for the ease of use of this document. Complete and original copies of the comment letters, including some footnotes, tables, charts, etc. which were not reproduced in this document are available in the dockets listed in the memo "Regional Dockets Containing Additional Supporting Materials for Final Action on 2015 Ozone NAAQS Good Neighbor SIP Submissions" found in the docket for this action. Although portions of the notice of final action are paraphrased in this response to comment (RTC) document, to the extent such paraphrasing introduces any confusion or apparent inconsistency, the notice of final action itself remains the definitive statement of the rationale for the final action. This document, together with the notice of final action, should be considered collectively as the EPA's response to all significant comments submitted on the EPA's proposed disapprovals of SIPs addressing Clean Air Act (CAA) section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS.

As stated in the preamble, the EPA is not taking final action on Tennessee's SIP submission, and the SIP submission from Alabama which EPA proposed to disapprove on February 22, 2022 has since been

withdrawn by the state. However, the docket that included the EPA's proposed action on Alabama and Tennessee's submissions also included action on other states' SIP submissions (Mississippi and Kentucky) that are being finalized in this action. In an effort to be responsive to all comments that may have broader relevance to this action, EPA has considered all comments submitted in this docket and responded as appropriate. However, where comments address EPA's proposal with respect to issues specific to Tennessee, the Agency defers responding to those comments and has made note of this in this document where appropriate. EPA has included and responds to the comments received on the EPA's proposal of Alabama's June 21, 2022 submission, proposed on October 25, 2022.

# Table of Contents

Table 1: Commentor Acronyms & IDs .......................................................................................... 2

Table 2: Abbreviations and Acronyms ...................................................................................... 8

1    Comments Related to Rulemaking Procedure .................................................................. 12

1.1    Timing of SIP Actions ........................................................................................... 12

1.2    Guidance for SIP Submissions ............................................................................. 29

1.3    Attachment A to the March 2018 Memorandum ................................................. 37

1.4    Use of Updated Modeling .................................................................................... 42

1.5    States' Step 3 Analysis ........................................................................................ 62

1.6    EPA Input During SIP Submission Development ................................................. 68

1.7    Length of Comment Period .................................................................................. 79

1.8    Docket Document Availability .............................................................................. 86

2    Analytic Year of 2023 .................................................................................................... 89

3    Emissions Inventories ................................................................................................... 97

3.1    Emissions Inventory - General ............................................................................ 97

3.2    Emissions Inventory – Non-EGUs ....................................................................... 97

3.3    Emissions Inventory – EGUs ............................................................................. 120

3.3.1    Unit Corrections ........................................................................................ 120

3.3.2    EPA's Integrated Planning Model (IPM) .................................................. 124

3.3.3    Other EGU Inventory-Related Comments ................................................ 130

4    Air Quality Modeling .................................................................................................... 135

4.1    Modeling Design - General ................................................................................ 135

4.1.1    Modeling Design - Lake Michigan ........................................................... 136

4.1.2    Modeling Design - Western States .......................................................... 154

4.2    Model Performance ............................................................................................ 156

4.2.1    Model Performance at Lake Michigan ..................................................... 156

4.2.2    Model Performance at Western States .................................................... 166

4.3    Model Error vs Contribution Threshold .............................................................. 184

5    Updates to Modeling and Changes in Linkages ........................................................... 188

6    Step 1 ......................................................................................................................... 206

6.1    Projected Air Quality Problems .......................................................................... 206

6.1.1    Western Receptors ................................................................................... 206

6.1.2    Receptors Linked to Texas ................................................................. 209

6.1.3    Meteorologically Adjusted Ozone Trends ........................................ 216

6.2    EPA Methodology for Determining Maintenance Receptors ....................... 217

6.3    TCEQ's Alternative Methodology for Determining Maintenance Receptors .......... 220

6.4    October 2018 Memorandum .................................................................... 232

6.5    Certain Monitoring Sites in California at Step 1 ............................................ 234

7    Step 2 ................................................................................................... 238

7.1    Methodology for Determining Future Year Contributions .......................... 238

7.2    Contributions ......................................................................................... 251

7.3    1 Percent as a Contribution Threshold ..................................................... 257

7.4    August 2018 Memorandum ..................................................................... 267

7.5    Maintenance-Only Linkages ................................................................... 300

8    Step 3 ................................................................................................... 303

8.1    Determination of Significant Contribution ............................................... 303

8.2    Alleged De Minimis Contribution ............................................................ 316

8.3    Existing and Future State Controls ......................................................... 321

8.4    Modeling and CAA Section 179B Guidance ............................................ 333

8.5    Air Quality Factors ............................................................................... 339

8.6    Cost Thresholds ................................................................................... 342

8.7    "Consistent and Persistent" Contribution .............................................. 347

8.8    Hybrid Single-Particle Lagrangian Integrated Trajectory (HYSPLIT) Model ........... 354

8.9    Allegations of Inconsistency with Other Recent EPA Actions ..................... 372

9    Controls ................................................................................................ 376

9.1    Supplemental Submission ...................................................................... 376

9.2    Over-Control ........................................................................................ 377

10    Legal Comments Not Otherwise Addressed Elsewhere ................................. 379

10.1    Venue ................................................................................................. 379

10.2    SIP Call .............................................................................................. 394

10.3    Cooperative Federalism and the EPA's Authority .................................... 398

10.4    Reliance on FIP Measures ..................................................................... 437

10.5    Comments Alleging "Pretext" or Intent to Require Generation Shifting ................. 439

10.6    Allegation that Disapprovals of Western State SIP Submissions was Predetermined ........... 440

10.7    EPA's Response to Comment on Proposed Actions Related to Alabama ................................. 446

11     Miscellaneous ............................................................................................................................. 448

11.1    Incorporation of Other's Comments by Reference ................................................... 448

11.2    CAA Section 126 Petitions ....................................................................................... 451

11.3    Transport Policy ...................................................................................................... 452

11.4    Transport Policy- Western State Ozone Regulation ................................................ 458

11.5    International Contributions ...................................................................................... 462

11.6    Economic Impacts ................................................................................................... 463

11.7    Environmental Justice ............................................................................................. 467

11.8    Mobile Sources Emissions ....................................................................................... 468

11.9    Typographical Concerns .......................................................................................... 476

11.10    Tribal Concerns ..................................................................................................... 477

11.11    Executive Order 13132 ......................................................................................... 479

11.12    Consent Decrees .................................................................................................. 480

11.13    General Recommendations ................................................................................... 483

11.14    Out of Scope ......................................................................................................... 486

11.15    Out of Scope - Comments on the Proposed FIP ................................................... 489

## Table 2: Abbreviations and Acronyms

| | |
|---|---|
| ADEM | Alabama Department of Environmental Management |
| ADEQ | Arkansas Department of Energy and Environment, Division of Environmental Quality |
| AECC | Arkansas Electric Cooperative Corporation |
| AECT | Association of Electric Companies of Texas |
| AEF | Arkansas Environmental Federation |
| AEO | Annual Energy Outlook |
| AF&PC | Arkansas Forest & Paper Council |
| AL | Alabama |
| APA | Administrative Procedures Act |
| APC | Alabama Power Company |
| APCA | Anthropogenic Precursor Culpability Assessment |
| AQAT | Air Quality Assessment Tool |
| AQM TSD | Air Quality Modeling Technical Support Document |
| ASC | Air Stewardship Coalition |
| ASTM | American Society of Testing and Materials |
| AZ | Arizona |
| BACM | Best Available Control Measures |
| BACM | Best Available Control Measures |
| BACT | Best Available Control Technology |
| BARCT | Best Available Retrofit Control Technology |
| CA | California |
| CAA | Clean Air Act |
| CAIR | Clean Air Interstate Rule |
| CAMx | Comprehensive Air Quality Model with Extensions |
| CARB | California's Air Resources Board |
| CDPHE | Colorado Department of Public Health and Environment |
| CenSARA | Central States Air Resources Agencies |
| CH4 | Methane |
| CO | Colorado |
| COMAR | Code of Maryland Regulations |
| CSAPR | Cross-State Air Pollution Rule |
| CT | Connecticut |
| CU | City Utilities of Springfield, Missouri |
| D.C. | District of Columbia |
| DE | Delaware |
| DFW | Dallas-Fort Worth |
| DM/NFR | Denver Metro / North Front Range |
| DV | Design value |
| ECHO | Enforcement and Compliance History Online |
| EFO | Environmental Federation of Oklahoma |
| EGUs | Electric Generating Units |

8

| | |
|---|---|
| EMP | Emissions Modeling Platform |
| EO | Executive Order |
| EPA | Environmental Protection Agency |
| ERTAC | Eastern Regional Technical Advisory Committee |
| ESL | Entergy Services, LLC |
| ESP | Energy Security Partners |
| FIP | Federal Implementation Plan |
| FR | Federal Register |
| GHG | Greenhouse gases |
| HEED | Electric generating unit |
| HQ | Headquarters |
| hr | Hour |
| HYSPLIT | Hybrid Single-Particle Lagrangian Integrated Trajectory |
| IL | Illinois |
| IN | Indiana |
| IPC | Idaho Power Company |
| IPM | Integrated Planning Model |
| iSIP | Infrastructure State Implementation Plan (SIP) |
| KDAQ | Kentucky Division for Air Quality |
| Km | Kilometer |
| LADCO | Lake Michigan Air Directors Consortium |
| LCA | Louisiana Chemical Association |
| LDEQ | Louisiana Department of Environmental Quality |
| LEUEG | Louisiana Electric Utility Environmental Group |
| LEV | Low-Emissions Vehicle |
| LMOS | Lake Michigan Ozone Study |
| MACT | Maximum achievable control technology |
| MARAMA | Mid-Atlantic Regional Air Management Association, Inc. |
| MDA8 | Maximum daily 8-h average |
| MDE | Maryland Department of the Environment |
| MDEQ | Mississippi Department of Environmental Quality |
| MDNR | Missouri Department of Natural Resources |
| MI | Michigan |
| MO | Missouri |
| MOG | Midwest Ozone Group |
| MOVES | Motor Vehicle Emissions Simulator |
| MPCA | Minnesota Pollution Control Agency |
| MPE | Model Performance Evaluation |
| MW | Megawatt |
| MWe | Megawatts electric |
| NAAQS | National Ambient Air Quality Standards |
| Nbias | Normalized bias |
| NDEP | Nevada Division of Environmental Protection |

9

| | |
|---|---|
| NEEDS | National Electric Energy Data System |
| NEI | National Emissions Inventory |
| NJ | New Jersey |
| NNSR | Nonattainment New Source Review |
| $NO_2$ | Nitrogen dioxide |
| NODA | Notice of Data Availability |
| NOX | Nitrogen oxides |
| NPRM | Notice of proposed rulemaking |
| NRG | NRG Texas Power LLC |
| NSR | New Source Review |
| NV | Nevada |
| NW | Northwest |
| NWF | Northern Wasatch Front |
| NYMA | New York Metropolitan Area |
| NYS DEC | New York State Department of Conservation |
| $O_3$ | Ozone |
| OAQPS | Office of Air Quality Planning and Standards |
| OAR | Office of Air and Radiation |
| ODEQ | Oklahoma Department of Environmental Quality |
| OH | Ohio |
| OK | Oklahoma |
| OTC | Ozone Transport Commission |
| OUG | Ohio Utilities and Generators Group |
| PA | Pennsylvania |
| PM | Particulate matter |
| PM2.5 | PM with a diameter of 2.5 micrometers or less; fine particulate |
| ppb | Parts per billion |
| PSD | Prevention of Significant Deterioration |
| RACT | Reasonably available control technology |
| RCF | Relative Contribution Factor |
| RCU | Revised CSAPR Update |
| RFF | Relative Response Factors |
| RFG | Reformulated gasoline |
| RTC | Response to Comments |
| SAFETEA | Safe, Accountable, Flexible, Efficient Transportation Equity Act |
| SCCT | Simple cycle and regenerative combustion turbines |
| SCR | Selective catalytic reduction |
| SEPC | Southwestern Electric Power Company |
| SIP | State Implementation Plan |
| SNCR | Selective Non-Catalytic Reduction |
| SSM | Startup, shutdown, and malfunction |
| TCEQ | Texas Commission on Environmental Quality |
| TDEC | Tennessee Department of Environmental Conservation |

| | |
|---|---|
| TIP | Tribal Implementation Plan |
| TN | Tennessee |
| tpy | Tons per year |
| TSD | Technical Support Document |
| TX | Texas |
| U.S. | United States |
| U.S.C. | United States Code |
| UAMPS | Utah Associated Municipal Power System |
| UDAQ | Utah Division of Air Quality |
| UMA | Utah Mining Association |
| UPA | Utah Petroleum Association |
| UT | Utah |
| VOC | Volatile organic compounds |
| WDNR | Wisconsin Department of Natural Resources |
| WEG | WildEarth Guardians |
| WESTAR | Western States Air Resources Council |
| WI | Wisconsin |
| WRAP | Western Regional Air Partnership |
| WVDEP | West Virginia Department of Environmental Protection |
| yr | Year |
| ZEV | Zero-Emissions Vehicle |

11

# 1  Comments Related to Rulemaking Procedure

## 1.1  Timing of SIP Actions

*Comments*

**Commenter:** Air Pollution Control Program, Missouri Department of Natural Resources

**Commenter ID:** 01

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

Further, EPA's proposed disapproval of Missouri's SIP and the imposition of a proposed FIP gives Missouri no real opportunity to address EPA's concerns and revise our SIP at step-3.

**Commenter:** Arkansas Environmental Federation

**Commenter ID:** 09

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

DEQ should be permitted time to analyze, address and/or correct any deficiencies identified by EPA before finalizing a FIP. Although EPA might generally have the authority under Section 7410(c)(1)(B) to issue a FIP at any time prior to the 2-year deadline after disapproval, nevertheless, CAA Section 7410(c)(1) contemplates that a state would be provided time to correct any deficiency and that EPA has the discretion to allow up to two years for correction of any deficiency.  EPA's determination about whether a FIP should be promulgated immediately as to a specific state should be based on a state-specific analysis since a State may bring a particularized, as-applied challenge to a nationwide or regional transport rule.

II. EPA's Proposed SIP Disapproval and FIP Proposal is Out of Sequence.

EPA's approach to taking action to disapprove the DEQ SIP and simultaneously promulgate a FIP, instead of allowing DEQ to submit revisions to its SIP, effectively impairs ADEQ's ability to make a state-specific over-control analysis. EPA does not have the authority to impose requirements that result in over-control, nor does it have the authority to mandate a particular control for a state.  In fact, EPA seeks comment on its proposed FIP as to whether its FIP results in over-control with respect to Arkansas.  EPA has the process backwards. Under EPA's analysis based on the 2016 modeling platform, the single Michigan maintenance receptor that Arkansas analyzed in its SIP submission is no longer an issue.  Yet now, EPA has identified receptors in Texas that it claims are adversely impacted by Arkansas emissions and has imposed control requirements without allowing Arkansas the opportunity to evaluate EPA's newly-purported linkages to Texas and determine the appropriate emissions reductions, if any,

necessary from Arkansas sources to address these purported linkages. Consequently, EPA's SIP disapproval and its proposed FIP are linked, and EPA should not finalize its FIP with respect to Arkansas until DEQ has been given a reasonable amount of time to respond.

**Commenter:** Arkansas Department of Energy and Environment, Division of Environmental Quality

**Commenter ID:** 07

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

Timing of EPA's Proposed Rule

Under the Clean Air Act §110(k), EPA has six months to determine whether or not a state's SIP submittal is complete once it is received from the state. From the time of the completeness determination, EPA has twelve months to finalize an approval or disapproval of the state's submission. For the Arkansas Transport SIP, the deadline for EPA final action was November 7, 2020. EPA failed to meet its statutory deadline for acting on the Arkansas Transport SIP. Not until EPA was sued by environmental organizations and EPA conducted new analyses to effectively supersede analyses provided by the previous EPA administration for use by states in SIP development did EPA issue a proposed action on the Arkansas Transport SIP.

EPA failed to meet its statutory deadline for acting on the Arkansas Transport SIP. Not until EPA was sued by environmental organizations and EPA conducted new analyses to effectively supersede analyses provided by the previous EPA administration for use by states in SIP development did EPA issue a proposed action on the Arkansas Transport SIP.

EPA had all of the information necessary based on the best available science to approve the interstate component of the Arkansas Transport SIP submittal when its action was due on November 7, 2020.

[…]

Simply put, EPA did not act on 2015 Ozone Transport SIPs in a timely manner. As EPA notes in the proposed disapproval, decision points are made based on information available at the time. Had EPA reviewed the SIP in the timeframe required by federal law, the information available at the time—the same information that states used to inform their decisions—would have ensured that states did not waste time on robust analyses of available data for the purposes of making sound, evidence-based decisions. EPA stalled an evaluative action until the perceived "facts" of the situation changed such that timely state analyses were rendered outdated. Because EPA did not act on SIP submissions in a timely manner as required by the Clean Air Act, and instead intended their assessment of Transport SIPs to be "forward looking," states have been put at a clear disadvantage in the final stages of the SIP process.

The Arkansas Transport SIP submittal clearly demonstrated, based on the information available at the time, that the Arkansas SIP contains adequate provisions to ensure that in-state emissions activities do not "significantly" contribute to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in any other state. DEQ requests that EPA withdraw its proposed disapproval and instead fully approve

13

the Arkansas Transport SIP. In the alternative, EPA should allow DEQ the customary two years post-disapproval to address identified deficiencies in the Arkansas Transport SIP and to resubmit to EPA, prior to issuing a federal implementation plan.

[…]

States must undertake SIP development with limited technical resources, so the states rely heavily on EPA data and EPA guidance in their decision-making. The threshold decision is fundamental to further steps in the Interstate Transport Framework analysis. Therefore, this late-stage decision by EPA is unreasonable. DEQ finds that this decision effectively forces states to fail in meeting EPA's vacillating interpretation of what is necessary for SIPs to meet interstate transport obligations.

[…]

DEQ does not believe that EPA has the information necessary to broad-stroke disapprove the Arkansas Transport SIP. DEQ requests that EPA take pause on final SIP and FIP actions for the state until DEQ (or EPA) has completed further analysis of linkages from emission sources and activities in the state to determine if there are sources or emissions activities in the state that significantly contribute to the newly identified nonattainment receptor or interfere with maintenance of the NAAQS in Texas, and if so, to adopt appropriate control strategies to prohibit the significant contribution(s).

**Commenter:** Association of Electric Companies of Texas, BCCA Appeal Group, Texas Chemical Council and Texas Oil & Gas Association

**Commenter ID:** 11

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

If EPA proceeds with disapproval on the basis of its new analysis, EPA should allow Texas to revise its SIP submission.

EPA did not act on Texas's SIP submission within the CAA's statutory timeframe. Due to EPA's own delay in acting, EPA has deviated from its long-standing practice of giving states an opportunity to address new information or analysis and, potentially, develop and submit revisions to EPA before the Agency issues a FIP. In proposing a FIP and announcing that it intends to finalize the FIP concurrently with or soon after it finalizes disapprovals of Transport SIPs, it is clear that EPA is not affording states and other commentors a meaningful opportunity to integrate their concerns into the final action.

The CAA requires that, once a SIP is deemed complete, EPA must act on the SIP within 12 months. TCEQ submitted its SIP on August 17, 2018. To comply with the CAA, EPA should have proposed to approve or disapprove the SIP by February 2020. EPA, however, did not propose to disapprove Texas's SIP submission until February 22, 2022, as the result of a consent decree. Due to EPA's own delay and the accelerated timeline required by the consent decree, EPA is proposing to deny commentors the opportunity to respond to the new data and analysis. Moreover, EPA has previously allowed states to revise disapproved SIPs, consistent with CAA Section 110(c)(1), prior to issuing a FIP. EPA's accelerated

14

timeline for issuing a FIP, which resulted from EPA's own delay, effectively penalizes Texas for timely submitting its SIP.

**Commenter:** City Utilities of Springfield, Missouri

**Commenter ID:** 13

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

EPA decision to disapprove seems arbitrary and capacious in terms of timing, implementation schedule, and level of reductions. Missouri has not been given time to redress EPA disapproval concerns within their current plans to either enhance or supplement the record. EPA changed the modeled receptors in upwind states attributed to Missouri's contribution. Changes at this point in time will unduly burden MDNR's ability to implement rule changes outside the normal review and oversight process. Missouri will be forced to absorb the Federal Plan allocation methodology without appropriate consent, comment and justification.

**Commenter:** Eagle Materials Inc.

**Commenter ID:** 16

**Docket ID:** EPA-R09-OAR-2022-0138

**Comment:**

Under CAA § 110, states retain primary authority to address their ozone transport obligations until EPA has taken *final* action on a SIP submission. If a state submits a SIP that does not adequately fulfill these obligations, EPA is required to disapprove the SIP within 18 months. Because a disapproval is a substantive rule "affecting individual rights and obligations," EPA is required to go through notice-and-comment rulemaking in finalizing its decision. Only after such disapproval is finalized, can EPA promulgate a FIP in its place, which must similarly go through notice-and-comment. Here, however, EPA issued a Proposed FIP *before* issuing its Proposed Disapproval of Nevada's SIP, based on EPA's "anticipate[d]" determination that pending SIP submissions "may not have adequate provisions… to address [the states'] interstate transport obligations for the 2015 ozone NAAQS."

For EPA to issue its Proposed FIP before fulfilling it mandatory duty to timely act on the proposed Nevada SIP is the very hallmark of unreasonable agency action. CAA § 110(k) requires EPA to take final action to approve or disapprove a state's SIP, once submitted, within 18 months. However, EPA exceeded this deadline by over 2 years. Nevada submitted a revised SIP addressing interstate transport obligations under the 2015 Ozone NAAQS on October 1, 2018. Under Section 110(k) of the CAA, EPA was required to act on this submission by April 1, 2020—instead, EPA did not issue its Proposed Disapproval until May 24, 2022.

15

**Commenter:** Environmental Federation of Oklahoma

**Commenter ID:** 20

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

In particular, EFO supports DEQ's assessment that EPA has overstepped its authority by circumventing the normal SIP development and approval process in a number of ways, including but not limited to: […] proposing a replacement Federal Implementation Plan (FIP) before the state even has a chance to review the proposed SIP disapproval.


**Commenter:** Idaho Power Company

**Commenter ID:** 23

**Docket ID:** EPA-R09-OAR-2022-0138

**Comment:**

The Proposed Disapproval circumvents notice-and-comment requirements.

EPA exceeded its authority under the CAA in proposing a FIP prior taking final action on the Proposed Disapproval. The CAA allows EPA to promulgate a FIP only "after the Administrator finds that a State failed to make a require submission . . . or disapproves a state implementation plan submission."

As discussed above, under the CAA, states retain primary authority to address their ozone transport obligations until EPA has taken final action on a SIP submission. If a state submits a SIP that does not adequately fulfill these obligations, EPA is required to disapprove the SIP within 18 months. Because a disapproval is a substantive rule "affecting individual rights and obligations," EPA is required to go through notice-and-comment rulemaking in finalizing its decision.[29] Only after such disapproval is finalized can EPA promulgate a FIP in its place,[30] which must similarly go through notice-and-comment.

Here, EPA proposed a FIP more than two years after it was statutorily obligated to respond to Nevada's SIP submission and more than a month before publishing the Proposed Disapproval—which is largely based on modeling and data *unavailable to Nevada at the time it developed its SIP*. In other words, Nevada held up its side of the cooperative federalism bargain struck by the Clean Air Act, but EPA did not. This is the very hallmark of unreasonable agency action. Nevada submitted a revised SIP addressing interstate transport obligations under the 2015 Ozone NAAQS on October 1, 2018. Under CAA Section 110(k), EPA was required to act on this submission by April 1, 2020, 18 months after Nevada submitted its SIP. EPA published its Proposed Disapproval more than two years after this deadline had passed, on May 24, 2022.

[29] *See, e.g.,* Chrysler Corp. v. Brown, 441 U.S. 281, 302 (1979).
[30] *See* 42 U.S.C. § 7410(c)(1) (requiring Administrator to promulgate FIP "at any time within 2 years after" disapproving a SIP). While the Supreme Court held in *EPA v. EME Homer City Generation* that, under this provision,

"EPA is not obliged to wait two years or postpone its action even a single day," the Court noted that this authority applies "[*a*]*fter* EPA has disapproved a SIP." 572 U.S. 489, 509 (2014) (emphasis added)

**Commenter:** Kentucky Division for Air Quality

**Commenter ID:** 25

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

Lack of Timeliness of EPA Action

Kentucky disagrees with EPA's proposed disapproval of its State Implementation Plan (SIP) regarding the interstate transport requirements for the 2015 8-hour ozone national ambient air quality standards (NAAQS) because EPA's inaction prohibited Kentucky from addressing any deficiencies identified or submitting a revised SIP for approval. Kentucky's final 2015 8-hour Ozone NAAQS Infrastructure SIP (I-SIP) was transmitted to EPA on January 9, 2019, and included the interstate transport requirements. EPA did not make a completeness determination within 60 days, and the SIP was deemed complete by operation of law under 42 U.S.C. § 7410(k)(1)(B) six months later, on July 9, 2019. Once a completeness determination occurs by operation of law, EPA has 12 months to take action on the SIP submittal. EPA was required to act on Kentucky's entire I-SIP by July 9, 2020. EPA approved the majority of the SIP requirements on July 1, 2020, and approved sections addressing Clean Air Act (CAA) sections 110(a)(2)(C), 110(a)(2)(D)(i) Prong 3, 110(a)(2)(J), and 110(a)(2)(K) via a second approval on October 2, 2020.  However, EPA took no action on the requirements for Interstate Transport, specifically prongs 1 and 2, until February 22, 2022, over 12 months past the statutorily required date for action.

EPA's delayed disapproval of Kentucky's I-SIP regarding prongs 1 and 2 of CAA section 110(a)(2)(D)(i)(1) prevented Kentucky from addressing deficiencies or submitting SIP revisions. Kentucky would appreciate the opportunity to address these identified deficiencies through a revised SIP submission, which may eliminate the need for a Federal Implementation Plan.

**Commenter:** Louisiana Department of Environmental Quality

**Commenter ID:** 27

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

Louisiana submitted the Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards SIP on November 12, 2019, and EPA issued a "completeness finding" on November 14, 2019. According to Federal Clean Air Act (FCAA) §110(k)(2), "within 12 months of a determination ... the [EPA] Administrator shall act on the submission in accordance with paragraph (3)." Paragraph three (3) addresses full and partial approval and disapproval. The FCAA is silent on the state's recourse if EPA fails to act, which leads us to the current proposal. In this proposed disapproval, EPA presents modeling results that change the predicted impacts on downwind states. It is important to

17

note that these modeling results were not available to states prior to the initial submittal.  If the disapproval of the proposed SIP is finalized, EPA has a two-year timeframe to develop a Federal Implementation Plan (FIP) to address the relevant interstate transport requirements. Alternatively, EPA could approve a subsequent SIP submittal that meets these requirements. EPA proposed the FIP on April 6, 2022 some 43 days later.

**Commenter:** Midwest Ozone Group

**Commenter ID:** 30

**Docket ID:** EPA-R02-OAR-2021-0673, EPA-R03-OAR-2021-0872, EPA-R03-OAR-2021-0873, EPA-R04-OAR-2021-0841, EPA-R05-OAR-2022-0006, EPA-R06-OAR-2021-0801, EPA-R07-OAR-2021-0851, EPA-R08-OAR-2022-0315, EPA-R09-OAR-2022-0394, EPA-R09-OAR-2022-0138

**Comment:**

EPA's accelerated approach to denial of these plans is inconsistent with the CAA

As evidenced by these several proposals for disapproval of Good Neighbor SIPs that accompanied this, EPA has begun an accelerated denial of the efforts of upwind states' and to implement a new transport rule and in doing so has taken an approach that is inconsistent with applicable law and appropriate science. This accelerated effort disenfranchises not only meaningful technical analysis of the agency's proposals but also curtails meaningful participation by all stakeholders.

Section 110(c) of the CAA states that "The [EPA] Administrator shall promulgate a Federal implementation plan at any time within 2 years after the Administrator" if he: (1) finds that a state has failed to make a required submission or that the state plan submitted "does not satisfy" the minimum criteria in Section 110(k)(1)(A), or (2) "disapproves a State implementation plan submission in whole or in part," unless the State corrects the deficiency and the Administrator approves the correction before the Administrator promulgates the plan.

In the event of a justified disapproval, EPA then is required to promulgate a Federal Implementation Plan ("FIP") within two years unless the State corrects the deficiency before promulgation of the FIP.  At issue in connection with the subject proposed SIP disapprovals are two initial considerations. First, EPA must offer adequate justification for the proposed disapprovals. As will be discussed extensively in these comments, EPA has not adequately demonstrated the basis for its actions.

[...]

Again, these comments will illustrate EPA is improperly advancing implementation plan denials, while threatening with an imminent FIP proposal published in the Federal Register on April 6, 2022.

[...]

The Clean Air Act does not mandate promulgation of a FIP in such an abbreviated time frame.  The CAA allows FIP action any time within 2 years after the Administrator finds that a State has failed to make a required submission or finds that the plan or plan revision submitted by the State does not satisfy the

18

minimum criteria or disapproves a state implementation plan submission in whole or in part. The CAA also specifically provides for the State to be allowed the opportunity to correct any deficiencies. We urge EPA to revise its proposals to allow States an appropriate opportunity to respond to EPS's findings of deficiency.

**Commenter:** Mississippi Department of Environmental Quality

**Commenter ID:** 32

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

However, EPA did not act on [Mississippi's] submittal for nearly two and a half years. Now, within one week of proposing to disapprove the "good neighbor" portion of Mississippi's 2015 $O_3$ NAAQS iSIP, the EPA administrator has signed a proposed Federal Implementation Plan (FIP) to impose on the state. The imposition of the FIP is premature and unnecessary as MDEQ has demonstrated its commitment to develop and submit an approvable iSIP and has historically strived to meet and exceed its obligations.

[...]

[T]he proposed FIP should not be imposed until MDEQ is given a reasonable opportunity to address the alleged deficiencies in the iSIP and to resolve the modeling errors referenced herein.

[...]

MDEQ respectfully requests that EPA work collaboratively with MDEQ, allowing appropriate time for the development and submittal of a revised iSIP, and not impose the proposed FIP on Mississippi, which would be unnecessarily burdensome to Mississippians.

**Commenter:** Nevada Division of Environmental Protection

**Commenter ID:** 33

**Docket ID:** EPA-R09-OAR-2022-0138

**Comment:**

EPA failed to act on the Nevada's iSIP by the 2020 statutory deadline. As of late 2021, despite the long-standing process for review and prioritization of the SIP backlog (namely the SIP Management Plan) EPA provided zero communication to NDEP on any significant aspect of the Nevada iSIP review and approval process nor did EPA provide any substantive feedback on Nevada's 2018 iSIP submission.

[...]

In contrast to its repeated failure for over 3 years to collaborate with NDEP on review of Nevada's 2018 iSIP, in less than 6 months:

- EPA ran and used results from a new modeling platform unavailable to NDEP at the time of the 2018 iSIP;
- Proposed a new ozone FIP; and
- Proposed to disapprove Nevada's iSIP.

EPA has taken these actions over a very short period without providing meaningful state consultation, nor providing Nevada the time and resources to consider the new modeling results in the context of the originally required 2018 iSIP submission.

[…]

NDEP requests that EPA withdraw the Proposed Regulation to provide the opportunity for NDEP to meaningfully collaborate with EPA on this important effort and to evaluate, and if appropriate, propose a revision to Nevada's ISIP to meet our interstate transport obligations for the 2015 ozone NAAQS given EPA's decision to primarily rely on the new emissions platform.

NDEP stands by its commitment to continuing to review new air quality monitoring information as it becomes available to ensure that NDEP's negative declaration in the 2018 ISIP is still supported, if given a reasonable opportunity and resources. NDEP request a reasonable opportunity to consider a) the new information about downwind contribution that is available based on the new modeling platform; b) potentially consider a demonstration of the appropriateness of a different threshold [EPA recognizes that NDEP may not have considered analyzing the reasonableness and appropriateness of a larger threshold of 1% (namely 1 ppb) in the iSIP submittal, because at the time the "State did not contribute above 1 percent of the NAAQS to a projected downwind non-attainment or maintenance receptor" (Section III.A of the proposed rule)]; and c) permanent and federally enforceable control strategies to achieve the emissions reductions determined to be necessary to eliminate downwind contribution.


**Commenter:** Oklahoma Department of Environmental Quality

**Commenter ID:** 37

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

EPA Should Allow States to Submit Revised SIPs Before Issuing a FIP

Oklahoma maintains its SIP is approvable as submitted. However, EPA should afford states the opportunity to address aspects of their SIPs that EPA has identified as deficient. EPA states on page 9801 of the proposed disapproval, "Where states submitted SIPs that rely on any such potential 'flexibilities' as may have been identified or suggested in the past, the EPA will evaluate whether the state adequately justified the technical and legal basis for doing so."  Oklahoma notes that few, if any, of the flexibilities offered by EPA in the 2018 Tsirigotis Memos have been approved when states have developed SIPs relying on those flexibilities. EPA's proposed decision to disapprove states' approaches in their SIPs warrants the opportunity for states to revise their SIPs to address deficiencies identified by EPA. Further, where EPA has decided states have failed to meet "the technical and legal basis" for the

flexibilities, the burden shifts and it is incumbent on EPA to more clearly articulate the justification, both technical and legal, that EPA would find acceptable. Alternatively, it may be the case that EPA finds no justification that satisfies these criteria. If that is the case, then EPA needs to say so. In any event, states should be afforded the opportunity to revise their SIPs, ideally before the proposed disapproval is noticed, but certainly before the disapproval is finalized. Now it appears that EPA is moving forward on a FIP without providing the states the opportunity to modify their SIPs to accommodate the actual policies by which EPA will review those SIPs. This is bad policy and undermines the cooperative and collaborative relationship between states and EPA.

[…]

EPA Failed to Adequately Include State Participation

Oklahoma takes issue with EPA's "wait and then hurry-up" approach to interstate air pollution transport rulemaking. The delay in EPA's evaluation of Oklahoma's ozone transport SIP in combination with the extended wait for EPA to develop the FIP, predictably ended up with EPA responding to a court order to issue a rule in a short time frame with a process that fails to adequately include state participation.  To begin with, the development of the modeling platform should have concluded before EPA used the platform for this rulemaking. ODEQ and other air quality agencies worked together to develop a letter from Michael Vince (the Executive Director of the Central States Air Quality Agencies or CenSARA) to Peter Tsirigotis, dated July 29, 2021 (included as Attachment C hereto). The letter makes the point that, if air agencies are to be given the opportunity to provide meaningful feedback on the emissions inputs used by EPA in rulemaking, they should have the opportunity to review and comment on the Emissions Modeling Platform (EMP) before it is used in federal rulemaking. EPA did allow agencies the opportunity to review an updated version of the EMP, but the version that was ultimately used to develop the proposed disapproval of Oklahoma's ozone transport SIP (and to develop the proposed FIP) had not been released and did not undergo state review in advance of its deployment in support of EPA's rule development.

It should also be noted that EPA's delay shortens the lead time available to address ongoing nonattainment and maintenance problems due to upwind contributions.

[…]

Furthermore, it should be noted that the proposed disapproval was considerably late, as Section 110(k)(2) of the CAA states that EPA must take action within 12 months of a "complete" SIP submission. The maximum amount of time EPA can take to deem a SIP submittal complete is 6 months, therefore, even accounting for this timeline, EPA's action falls way behind the statutory requirement. Had EPA reviewed and approved Oklahoma's SIP submittal during its statutorily required timeframe, EPA would have been measuring Oklahoma's SIP submittal against comparable data. Because EPA took so long to act on SIP submittals, EPA created a situation where the standard under which states developed their SIPs was no longer the standard against which those SIPs were judged.

**Commenter:** PacifiCorp

**Commenter ID:** 38

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

EPA's Proposed Disapproval, and the already-published Proposed FIP, interfere with Utah's right to remedy any problems with its SIP.

In failing to observe the appropriate process, EPA has undermined the cooperative federalism underpinning Section 110 of the CAA. EPA attempts to paper over this role reversal by saying that states can always prepare a SIP later to replace the Proposed FIP. However, EPA will not approve any proposed replacement SIP prior to finalizing the Proposed FIP, and the Proposed FIP sets insurmountable standards for any subsequent SIP revision. The Proposed Disapproval will force Utah sources to begin compliance efforts almost immediately due to the incredibly tight timeframes in the Proposed FIP. The tight deadlines for compliance in the Proposed FIP essentially eliminate any reasonable opportunity for Utah to develop, and EPA to approve, a revised SIP in accordance with EPA's new approach to interstate transport, which goes beyond CAA standards.

As long as Utah can submit evidence to show that emission reductions from sources in its boundaries will not significantly impact the downwind monitors, its SIP satisfies the requirements of the good neighbor provision, and EPA must approve it. However, in the past, EPA has provided states sufficient time to make corrections or submit additional clarifications if necessary to achieve the good neighbor provision via their own SIPs.[22] PacifiCorp asks EPA to do the same in this instance. EPA should acknowledge Utah's authority and, if necessary, allow Utah time to provide additional evidence for Step 2 and, if necessary, to re-evaluate Steps 3 and 4 of EPA's four-step methodology. Utah is uniquely positioned to identify the right mix of requirements for the unique emission sources in its jurisdiction and to determine how best to align those requirements with other regional regulatory efforts that target some of the same units and pollutants, like regional haze. EPA's extended delay in issuing the Proposed Disapproval should not serve as a pretext for preventing Utah from finalizing an approvable SIP.

[22] *See, e.g.,* 84 FR 3,389, 3,390 (Feb. 12, 2019) (approving Wyoming's good neighbor SIP after Wyoming submitted supplemental information requested by EPA).

**Commenter:** PacifiCorp (Attachment - Berkshire Hathaway Energy (BHE) Company Comments on Proposed Ozone Transport Rule)

**Commenter ID:** 38

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

EPA Should Work with Western States to Prepare SIPs that Achieve Necessary Ozone Reductions as Part of a Just and Orderly Transition.

The western states where BHE operates affected EGUs (Nevada, Wyoming, and Utah) submitted their good neighbor SIPs to EPA between October 2018 and October 2019, years in advance of EPA's Proposed Rule. Each of these SIPs, in reliance upon EPA guidance and modeling, demonstrated that there were no significant impacts on ozone nonattainment and maintenance in downwind states. Yet EPA took no action on these SIP submissions for two and a half to three and a half years. It was not until February 2022, when EPA signed the Proposed Rule imposing a FIP on these states (later publishing it for public notice and comment on April 6), that these states learned that EPA did not intend to approve their good neighbor SIPs. EPA did not even propose disapproval for these SIPs until May 23, 2022, a full month and a half after proposing its FIP. And EPA has yet to finalize disapproval (the proper legal predicate for a FIP). What's more, EPA's disapproval of these SIPs is based on a shift in its thinking in the years since the SIPs were originally submitted.

[…]

EPA attempts to paper over the role reversal of the Proposed Rule by saying that states can always prepare a SIP later for EPA approval. However, EPA has not yet finalized disapproval of the Nevada, Utah, and Wyoming SIPs. In the past, EPA has provided states sufficient time to implement the good neighbor provision via their own SIPs, even when supplemental information and analysis may have been required. BHE asks EPA to do the same in this instance. Provisions in the Proposed Rule impose SIP requirements not found in the CAA and essentially eliminate any reasonable opportunity for states to make a future SIP submission. BHE encourages EPA to respect the cooperative federalism principles in the CAA as the right way to achieve the best path forward.

[…]

EPA has now disavowed its prior guidance without allowing states an opportunity to react. In doing so, EPA has claimed for itself the authority Congress granted to states, not to EPA. EPA attempts to paper over this role reversal by saying that states can always prepare a SIP later for EPA approval. BHE supports the opportunity for states to submit their own SIP to replace the proposed FIP, but unless EPA can approve the SIP prior to finalizing the Proposed Rule, the Proposed Rule will nevertheless force covered sources to begin compliance efforts almost immediately due to the incredibly tight timeframes in the rule. The tight deadlines for compliance in the Proposed Rule will essentially eliminate any reasonable opportunity for states to develop and EPA to approve a SIP in accordance with EPA's new approach to interstate transport unless EPA can commit to a more rapid review and approval process than it has conducted in the past.

For EPA's recognition of the states' authority to submit a replacement SIP to have any real meaning, EPA would need to move at least as quickly in reviewing and approving replacement SIPs as it has moved in imposing the federal plan contained in the Proposed Rule. In addition, states would need sufficient time to develop a replacement SIP, which would require the same kinds of complex analyses EPA conducted to develop the Proposed Rule. In the past, EPA has provided states sufficient time to implement the good neighbor provision via their own SIPs, and BHE asks EPA to do the same in this instance.

Regardless of timing, EPA should also acknowledge state authority to re-evaluate steps 3 and 4 of EPA's four-step methodology by identifying and implementing the measures needed to eliminate what EPA has defined to be a significant contribution to downwind receptors, rather than requiring states to

23

demonstrate that their measures, along with federal measures, will achieve reductions commensurate with installation of SCR on coal-fired EGUs by the 2026 ozone season. States are uniquely positioned to identify the right mix of requirements for the unique emission sources in their jurisdictions and to determine how best to align those requirements with other regulatory efforts that target some of the same units and pollutants, like regional haze. As long as a state can submit modeling to show that emission reductions from sources in its state will eliminate the downwind impact that EPA has defined as significant, its SIP should satisfy the requirements of the good neighbor provision and EPA must approve it.

**Commenter:** Tennessee Department of Environment and Conservation

**Commenter ID:** 41

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

EPA has put states in an impossible position by waiting to take action on SIP submittals that occurred in 2018 and basing such actions on modeling that has been consistently changing since 2018 and is still undergoing public comment. EPA quickly followed its proposed iSIP Disapproval with the proposed Federal Implementation Plan EPA will put in place as it is highly unlikely that states will have the time to revise their SIPs and resubmit them to EPA for consideration before the final Federal Implementation Plan will take effect. EPA must respect states' role in creating a compliant SIP.

**Commenter:** Texas Commission on Environmental Quality

**Commenter ID:** 42

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

The EPA prematurely prepared a proposed FIP before finalizing action on Texas' timely submitted SIP revision to address 2015 eight-hour ozone standard interstate transport requirements. Texas submitted its 2015 Ozone NAAQS Transport SIP Revision to the EPA on August 17, 2018. The EPA had over three years to review the SIP revision prior to proposing the February 22, 2022, disapproval of the FCAA, §110(a)(2)(D)(i)(I) interstate transport elements. Further, the EPA has developed a proposed FIP before the proposed disapproval is final. Under FCAA §110(c)(1), the Administrator shall promulgate a FIP at any time within two years *after* the Administrator "disapproves a State Implementation Plan in whole or in part, unless the State corrects the deficiency, and the Administrator approves the plan or plan revisions, before the Administrator promulgates such a Federal Implementation Plan." EPA has not yet disapproved the Texas transport SIP, and yet has clearly signaled that it intends to include Texas in such a FIP directly upon finalizing the disapproval action. Although the Supreme Court has recognized that "disapproval of a SIP, without more, triggers EPA's obligation to issue a FIP" and this action can occur "at any time" within those two years (*EPA v. EME Homer City Generation LP, et. al.*, 572 US 489, 490 (2014)),

in this instance EPA has not disapproved Texas' SIP. And unlike the fact pattern in EME Homer, Texas has not had an opportunity to challenge the EPA's disapproval of that SIP. Although EPA is under no obligation to wait two years to issue a FIP, it does have to comply with the congressional scheme. The disapproval of the SIP triggers EPA's authority to issue the FIP. In this case, EPA is indeed "altering Congress' SIP and FIP schedule." *Id.* at 491.

The EPA has conducted extensive work to include Texas in a proposed FIP to address interstate transport for Texas under the 2015 eight-hour ozone standard before disapproval of Texas SIP. Although the EPA proposed disapproving the Texas SIP submittal one month prior to the proposed FIP, there has been no final action on that proposal. Additionally, there was no indication from EPA during the years of work that went into the development of this FIP that the Texas SIP was inadequate, nor was Texas afforded any opportunity to correct the deficiencies that EPA believes are present in the SIP. Had the EPA reviewed the 2015 Ozone NAAQS Transport SIP Revision before developing a proposed FIP, the purpose of which is to correct deficiencies in such a SIP, Texas would have had the opportunity contemplated by the FCAA to correct any problems with its SIP in a timely fashion and avoid the imposition of the FIP.

This is clearly distinguishable from the argument in *EME Homer City* that was dismissed by the Supreme Court. The Court said that EPA did not have to give states an opportunity to correct a SIP before issuing the FIP. Instead, in the present case EPA is stating that they not only can, but "must necessarily be able to" propose a FIP before taking final action to disapprove a SIP. That was not the holding in *EME Homer City* and is inconsistent with the Congress' SIP and FIP schedule in the FCAA.

[...]

If the EPA had acted on the TCEQ's SIP submission in a timely manner, the only available data would have been the EPA's 2011-base modeling. Therefore, it is arbitrary and unreasonable for the EPA to evaluate the TCEQ's submission based upon data that was unavailable to the TCEQ during the development and submittal of its SIP revision.


**Commenter:** The Luminant Companies

**Commenter ID:** 44

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

In satisfaction of its obligation under Section 110(a)(2)(D), TCEQ submitted a timely SIP revision addressing its good neighbor obligation for the 2015 ozone NAAQS on August 17, 2018. A SIP submittal is deemed complete by operation of law if EPA has not otherwise found the submittal to be insufficient within six months. Then, EPA has twelve months following a completeness determination to act on that SIP. Therefore, the Clean Air Act required EPA to approve or disapprove Texas's SIP no later than February 17, 2020. Rather than review Texas's submittal in a timely manner, EPA delayed its action beyond the statutorily prescribed deadline and developed non-statutory, post-hoc modeling and analyses by which it now proposes to judge Texas's submittal.

**Commenter:** United States Steel Corporation

**Commenter ID:** 45

**Docket ID:** EPA-R05-OAR-2022-0006

**Comment:**

U. S. Steel respectfully notes that in its proposed disapproval, U.S. EPA made some critical errors and, therefore, we believe that in the spirit of cooperative federalism, that U.S. EPA reconsider the State submittals and approve the SIP submittals; or if U.S. EPA still finds deficiencies with the SIPs, that the states be given the opportunity to correct any asserted deficiencies before U.S. EPA proceeds with promulgating a final rule disapproving the SIPs and issuing a Federal Implementation Plan (FIP). It is significant to note that Congress contemplated States be given an opportunity to correct deficiencies with SIPs (before U. S. EPA proceeds with a FIP) when enacting the Clean Air Act. The actions in disapproving the SIP and proceeding with issuing a FIP (even before the SIP is disapproved) runs afoul of the process afforded to States and federal cooperative federalism.

[...]

<u>Even if the SIPs Did Not Satisfy EPA Approval Criteria, States Should be Given the Opportunity to Supplement the SIP Submittal or Otherwise Correct the Asserted Deficiencies Before U.S. EPA finalizes Disapproval of the SIP and Proceeds with a Federal Implementation Plan</u>

U. S. Steel notes that U.S. EPA's action in disapproving SIPs that were submitted to U.S. EPA years ago and now years later is proposing to disapprove the SIPs and not giving the State an opportunity to supplement the SIP submittal or otherwise correct the asserted deficiencies is inconsistent with Congress' intent for the Federal government and States to work collaboratively on ensuring the NAAQS are maintained.

**Commenter:** United States Steel Corporation

**Commenter ID:** 45

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

EPA's Proposal to disapprove Arkansas's SIP while also promulgating a FIP is not the proper timing of rulemaking on this issue. EPA not allowing DEQ to submit revisions to the SIP, this action impairs the state's ability to make state specific analyses regarding over-reach on controls by EPA. DEQ should be permitted time to analyze, address and/or correct any deficiencies identified by EPA before finalizing a FIP. Although EPA might generally have the authority under Section 7410(c)(1)(B) to issue a FIP at any time prior to the 2-year deadline after disapproval (<u>EME Homer</u> S.Ct., 134 S.Ct. 1584 (2014)), nevertheless, CAA Section 7410(c)(1) contemplates that a state would be provided time to correct any deficiency and that EPA has the discretion to allow up to two years for correction of any deficiency.

26

EPA's determination about whether a FIP should be promulgated immediately as to a specific state should be based on a state-specific analysis since a State may bring a particularized, as-applied challenge to a nationwide or regional transport rule (EME Homer on remand, 795 F.3d 118 (D.C. Cir. 2015). EPA should not move to finalize the proposed FIP with respect to Arkansas until DEQ has been provided adequate time to review and respond.

**Commenter:** Utah Petroleum Association and the Utah Mining Association

**Commenter ID:** 48

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

Utah relied on the guidance in good faith and EPA should honor that in good faith. If EPA persists on disavowing its still intact guidance, it should at a minimum offer Utah an opportunity to make corrections and updates to its IT SIP before imposing a FIP.

**Commenter:** Xcel Energy

**Commenter ID:** 52

**Docket IDs:** EPA-R05-OAR-2022-0006

**Comment:**

Timeframe allowed for state response to SIP Disapproval:

While the Clean Air Act (CAA) allows states up to 2 years from SIP disapproval to issue a response to EPA, the proposed FIP, with a scheduled final date of December 15, 2022, does not allow for that two-year commitment period to take place. We believe that Congress provided for that timeline for a reason. There are cases, such as this one, where is appears there are reasonable technical disagreements that should be fully evaluated and resolved before EPA moves on to the next step in the process.

**Commenter:** Xcel Energy

**Commenter ID:** 52

**Docket IDs:** EPA-R06-OAR-2021-0801

**Comment:**

Timeframe allowed for state response to SIP Disapproval:

While the Clean Air Act (CAA) allows states up to 2 years from SIP disapproval to issue a response to EPA, the proposed FIP, with a scheduled final date of December 15, 2022, does not allow for that two-

year commitment period to take place. Xcel Energy believes that Congress provided for that timeline for a reason. There are cases, like here, where is appears there are reasonable technical disagreements that should be fully evaluated and resolved before EPA moves on to the next step in the process.

*Response*

As a general matter, the EPA disagrees that the EPA is forgoing the process required by statute, or that the EPA is taking "accelerated action" on interstate transport state implementation plans (SIPs) for the 2015 ozone NAAQS. See Section V.A.1. of the preamble for responses to comments related to the relationship between timing of proposals to disapprove SIPs and promulgate federal implementation plans (FIPs), Section V.A.2. of the preamble for responses to comments related to requests for more time to revise SIP submissions, and Section V.A.3. of the preamble for responses to comments related to alleged harms to states caused by time between SIP submission and the EPA's action.

Some commenters argue that the EPA should approve the SIP submissions. However, the EPA disagrees that the SIP submissions for any state included in this final rule provided an approvable interstate transport analysis or adequate provisions to eliminate significant contribution or interference with maintenance. Rather, following review of comments received on the proposed notices and in consideration of all additional data made available through the notice and comment process, the EPA finds the SIP submissions covered by this action are deficient to address the statutory requirements of the Clean Air Act (CAA), as detailed in the proposals and reiterated in this final action. See generally preamble Section IV.

In response to PacifiCorp's claim that EPA has historically "provided states sufficient time to make corrections or submit additional clarifications if necessary to achieve the good neighbor provision via their own SIPs" which points to the EPA's approval of Wyoming's prong 2 good neighbor SIP for the 20188 ozone NAAQS, the EPA notes that the EPA initially disapproved prong 2 of Wyoming's 2008 ozone NAAQS good neighbor SIP submission. 82 FR 9153 (February 3, 2017). EPA later approved a subsequent submission from Wyoming addressing prong 2, which the state submitted on October 17, 2018. 84 FR 3389 (February 12, 2019, signed February 6, 2019). CAA section 110(c)(1) requires EPA to promulgate a federal implementation plan (FIP) "at any time within 2 years" after disapproving a SIP submission, unless the State corrects the deficiency, and the EPA approves the plan. In the case of Wyoming for the 2008 ozone NAAQS, the state submitted, and the EPA approved, a SIP, so the EPA did not promulgate a FIP. While EPA generally seeks to work with states on the development of approvable SIPs, the timing depends on each situation and is always subject to the procedural requirements and deadlines of CAA section 110 as well as ensuring the substantive requirements of the Act will be met.

The EPA notes in response to PacifiCorp's comment that the Agency is not taking final action on Wyoming's good neighbor SIP submission for the 2015 ozone NAAQS in this action and also that the EPA is not using the proposed FIP (87 FR 20036; April 6, 2022) as a benchmark for any state in this final action.

The EPA notes in response to Xcel's comment that no consent decree established a deadline for the EPA to finalize a 2015 ozone NAAQS good neighbor FIP for any state by December 15, 2022.

Other issues raised by these comments are addressed in Sections II.C, III, and V.A.4 of the preamble and in the following sections: Sections 1.3 (Attachment A to the March 2018 Memorandum), 1.4 (Use of Updated Modeling), 1.6 (EPA Input During SIP Submission Development), 1.7 (Length of Comment Period), 4 (Air Quality Modeling), 5 (Updates to Modeling and Changes in Linkages), 9.2 (Over-Control), 10.3 (Cooperative Federalism and the EPA's Authority), 10.6 (Allegation that Disapprovals of Western State SIP Submissions was Predetermined), 11.6 (Economic Impacts), and 11.12 (Consent Decrees).

## 1.2   Guidance for SIP Submissions

*Comments*

**Commenter:** Air Pollution Control Program, Missouri Department of Natural Resources

**Commenter ID:** 01

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

[T]he Air Program notes that EPA has not ever provided any guidance on what an appropriate step-3 analysis would entail, which makes any decision where it rejects a step-3 analysis arbitrary and capricious.

[…]

EPA has offered no guidance to states on developing step-3 demonstrations in their good neighbor SIPs.

**Commenter:** Arkansas Department of Energy and Environment, Division of Environmental Quality

**Commenter ID:** 07

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

In the Proposed Rule, EPA seeks comment on rescinding recommendations presented to states in EPA's March 2018 Memorandum upon which many states relied in their analyses. By changing the rules so late in the game, EPA has left its partner states with no room for participation in the implementation process. Ultimately, a state that was unresponsive to obligations set in motion by the 2015 ozone NAAQS would be in the same position as any other state that submitted a well supported Transport Plan.

**Commenter:** Maryland Department of the Environment

29

**Commenter ID:** 29

**Docket ID:** EPA-R03-OAR-2021-0872

**Comment:**

EPA has not developed any official guidance on the necessary elements or analysis that a state is required to submit as part of an approvable Good Neighbor SIP. It is unreasonable for EPA to propose to disapprove Maryland's 2015 Good Neighbor SIP, in part, on the basis that Maryland did not submit a "sufficient technical evaluation" that is not defined, mandated, or required.

The Good Neighbor SIP has been a required SIP element since the implementation of the 1997 8- hour ozone standard. In the intervening 24 years, EPA has issued no official guidance for states to use in developing an approvable Good Neighbor SIP. It is unclear what standard or criteria EPA uses to determine approvability. The lack of guidance allows EPA broad latitude to disapprove SIPs for a variety of reasons and disincentivizes states from submitting a required CAA element. Inevitably, the lack of guidance creates an uneven playing field between the states.

The only direction EPA has supplied is a March 2018 memorandum entitled *Information on the Interstate Transport Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I)*. This memo included an extended discussion on potential flexibilities in analytical approaches that states *could* use in developing their Good Neighbor SIPs. EPA stated:

> *…EPA is open to alternative frameworks to address good neighbor obligations or considerations outside the four-step process. The purpose of this attachment [Attachment A] is to identify potential flexibilities to inform SIP development and seek feedback on these concepts*. EPA is not at this time making any determination that the ideas considered below are consistent with the requirements of the CAA, nor are we specifically recommending states use these approaches. Determinations regarding states' obligations under the good neighbor provision would be made through notice-and-comment rulemaking.

The potential flexibilities included nearly 20 alternate analytical approaches for states to use in their Good Neighbor SIPs. However, as EPA made clear, the document and accompanying flexibilities was not a final determination on an approvable Good Neighbor SIP structure, and final determinations on any flexibilities in a state's SIP would be made through notice-and-comment rulemaking on that submittal.

[…]

The only thing states have to rely on is the four-step framework that EPA uses to assess interstate transport. EPA has never expounded upon what elements are required to ensure an approvable SIP in each of the four steps. States are thus left to address each of the four steps as best they can.

**Commenter:** Midwest Ozone Group

**Commenter ID:** 30

**Docket ID:** EPA-R02-OAR-2021-0673, EPA-R03-OAR-2021-0872, EPA-R03-OAR-2021-0873, EPA-R04-OAR-2021-0841, EPA-R05-OAR-2022-0006, EPA-R06-OAR-2021-0801, EPA-R07-OAR-2021-0851

**Comment:**

EPA improperly asserts that its three 2015 ozone NAAQS Good Neighbor SIP flexibility guidance memoranda should no longer be considered applicable to development of the SIPs that are the subject of its proposed disapprovals.

In 2018, EPA published three guidance documents describing the process by which states could incorporate various "flexibilities" into their Good Neighbor SIPs. All of the documents were issued by the USEPA, Director of Office of Air Quality Planning and Standards Peter Tsirigotis.

The March 27, 2018, Tsirigotis memo, styled "Information on Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards Under Clean Air Act Section 110(a)(2)(D)(i)(I)," was addressed to EPA Regional Air Directors in all EPA Regions.  The memo states,

> [t]he purpose of this memorandum is to provide information to states and the Environmental Protection Agency Regional offices as they develop or review state implementation plans (SIPs) that address section 110(a)(2)(D)(i)(I) of Clean Air Act (CAA), also called the "good neighbor" provision, as it pertains to the 2015 ozone National Ambient Air Quality Standards (NAAQS). Specifically, this memorandum includes EPA's air quality modeling data for ozone for the year 2023, including newly available contribution modeling results, and a discussion of elements previously used to address interstate transport. In addition, the memorandum is accompanied by Attachment A, which provides a preliminary list of potential flexibilities in analytical approaches for developing a good neighbor SIP that may warrant further discussion between EPA and states.

The August 13, 2018, Tsirigotis guidance memo, styled "Analysis of Contribution Thresholds for Use in Clean Air Act Section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards," also was addressed to EPA Regional Air Directors in all EPA Regions. The memo states,

> "[t]he purpose of this memorandum is to provide analytical information regarding the degree to which certain air quality threshold amounts capture the collective amount of upwind contribution from upwind states to downwind receptors for the 2015 ozone National Ambient Air Quality Standards (NAAQS). It also interprets that information to make recommendations about what thresholds may be appropriate for use in state implementation plan (SIP) revisions addressing the good neighbor provision for that NAAQS . . . [t]his document does not substitute for provisions or regulations of the Clean Air Act (CAA), nor is it a regulation itself. Rather, it provides recommendations for states using the included analytical information in developing SIP submissions, and for the Environmental Protection Agency (EPA) Regional offices in acting on them. Thus, it does not impose binding, enforceable requirements on any party. State air agencies retain the discretion to develop good neighbor SIP revisions that differ from this guidance.

31

The October 19, 2018, Tsirigotis guidance memo is titled "Considerations for Identifying Maintenance Receptors for Use in Clean Air Act Section 11 0(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards," also was addressed to EPA Regional Air Directors in all EPA Regions. As in the first two memoranda, the memo stated,

> [t]he purpose of this memorandum is to present information that states may consider as they evaluate the status of monitoring sites that the Environmental Protection Agency (EPA) identified as potential maintenance receptors with respect to the 2015 ozone national Ambient Air Quality Standards (NAAQS) based on EPA' s 2023 modeling. <u>States may use this information when developing state implementation plans (SIPs) for the 2015 ozone AAQS addressing the good neighbor provision in Clean Air Act (CAA) section 110(a)(2)(D)(i)(I).</u> In brief this document discusses (1) using alternative technical methods for projecting whether future air quality warrants identifying monitors as maintenance receptors and (2) considering current monitoring data when identifying monitoring sites that although projected to be in attainment as described below, should be identified as maintenance receptors because of the risk that they could exceed the NAAQS due to yearto-year (i.e., inter-annual) variability in meteorological conditions.(emphasis added).

In the ensuing two years and six months since the last guidance document was published, EPA has known that states might be incorporating the 2018 guidance into Good Neighbor SIP submittals and has made no public statement saying that it would not honor its guidance. Moreover, all of the subject 19 Good Neighbor SIPs have been pending before the Agency between two and one-half and almost four years with only one proposed action by EPA – the proposed approval of Iowa's Good Neighbor SIP that incorporated the 2018 guidance in a March 2, 2020, proposal at 85 Fed. Reg. 12,232. Now, nearly three years after the first Tsirigotis memo was published and two and a half years after the last was published, EPA is attempting to assert that these documents are archival in nature and trying to walk back the proposed Iowa approval (*See* 87 Fed. Reg. 9,477, February 22, 2022).

As EPA states in the proposed disapproval notices for Illinois, Indiana, Michigan, Minnesota, Ohio, and Wisconsin (87 Fed. Reg. 9,838 at 9,841)):

> In the March, August, and October 2018 memoranda, the EPA recognized that states may be able to establish alternative approaches to addressing their interstate transport obligations for the 2015 8-hour ozone NAAQS that vary from a nationally uniform framework. The EPA emphasized in these memoranda, however, that such alternative approaches must be technically justified and appropriate considering the facts and circumstances of each state's submittal.  In general, the EPA continues to believe that deviation from a nationally consistent approach to ozone transport must be substantially justified and have a well-documented technical basis that is consistent with relevant case law. Where states submitted SIPs that rely on any such potential "flexibilities" as may have been identified or suggested in the past, the EPA will evaluate whether the state adequately justified the technical and legal basis for doing so.
>
> EPA notes that certain concepts included in an attachment to the March 2018 memorandum require unique consideration, and these ideas do not constitute Agency guidance with respect to transport obligations for the 2015 ozone NAAQS. Attachment A to the March 2018

32

memorandum identified a "Preliminary List of Potential Flexibilities" that could potentially inform SIP development. However, EPA made clear in that Attachment that the list of ideas were not suggestions endorsed by the Agency but rather "comments provided in various forums" on which the  EPA  sought "feedback from interested stakeholders." Further, Attachment A stated, "EPA is not at this time making any determination that the ideas discussed below are consistent with the requirements of the CAA, nor are we specifically recommending that states use these approaches." Attachment A to the March 2018 memorandum, therefore, does not constitute Agency guidance, but was intended to generate further discussion around potential approaches to addressing ozone transport among interested stakeholders.  To the extent states sought to develop or rely on these ideas in support of their SIP submittals, EPA will thoroughly review the technical and legal justifications for doing so.

This disavowal of EPA's guidance this late SIP development process is an arbitrary abuse of authority. The Administrative Procedures Act allows federal agencies such as EPA to issue guidance without following rulemaking procedures. 5 U.S.C. § 553. Although Agency guidance is not binding on regulated parties, such parties are permitted to rely on Agency guidance as the Agency's public statement of how it intends to construe the statutes and rules it governs. *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96–97 (2015). Indeed, Tsirigotis expressly notes in his 2018 memos that states could rely on the information provided in the memos, including the "alternative technical methods" authorized by the memos, when developing their SIPs in compliance with CAA Good Neighbor Provisions.

Once an agency issues guidance to regulated parties, the agency cannot "simply disregard" the substance of its guidance and rely on "post hoc justifications" when deciding whether regulated parties have acted in accordance with such guidance. *Hoosier Env't Council v. Nat. Prairie Indiana Farmland Holdings, LLC*, No. 4:19-CV-71 DRL-JEM, 2021 WL 4477152, at **13, 16 (N.D. Ind. Sept. 29, 2021). Doing so constitutes an arbitrary and capricious action by the agency. Id. at *17. By waiting for years and until after states complied with EPA's 2018 guidance to backtrack on the guidance, add a new requirement, not in the guidance, that alternative methods used by states in their SIPs must be "substantially justified and have a well-documented technical basis," and disapprove SIPs on that basis, EPA is engaging in arbitrary and capricious actions. EPA should alter its position and encourage states to take advantage of these flexibilities, as appropriate, and to incorporate these guidance flexibilities into their Good Neighbor SIPs.


**Commenter:** Midwest Ozone Group

**Commenter ID:** 30

**Docket ID:** EPA-R08-OAR-2022-0315, EPA-R09-OAR-2022-0394, EPA-R09-OAR-2022-0138

**Comment:**

In the ensuing period of time since the last guidance document was published, EPA has known that states might be incorporating the 2018 guidance into Good Neighbor SIP submittals and has made no public statement saying that it would not honor its guidance.

**Commenter:** Ohio Utilities and Generators Group

**Commenter ID:** 36

**Docket ID:** EPA-R05-OAR-2022-0006

**Comment:**

US EPA's proposed disapproval is inconsistent with its own guidance.


**Commenter:** Oklahoma Department of Environmental Quality

**Commenter ID:** 37

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

Oklahoma objects to the proposed disapproval. This objection is based on many reasons, generally including the unfair outcomes for states created by EPA's refusal to acknowledge and apply in good faith legitimate guidance memoranda issued by EPA in 2018.

[…]

In 2018, EPA's Office of Air Quality Planning and Standards Director, Peter Tsirigotis, issued three memoranda regarding SIP development for interstate transport for the 2015 ozone NAAQS. These memoranda were held out to states as providing possible guidance for development of ozone transport SIPs, and states relied on these memos accordingly. Notably, states' infrastructure SIPs for the 2015 ozone NAAQS, including the transport portion of the SIP, were due to EPA on October 1, 2018. Yet, EPA issued these memos in March, August, and October of 2018. The October EPA memo was issued *after* the deadline for SIP submittal.

[…]

EPA's failure to recognize its own guidance, and the predicament it has now put states in that face a SIP disapproval and subsequent FIP, undermines the cooperative nature of the EPA-state relationship.

[…]

EPA has, without explanation, arbitrarily and capriciously changed its policy position through its refusal to acknowledge the legitimacy of states' good faith reliance on EPA guidance memoranda.

[…]

During the preparation of its SIP, a state agency cannot move forward unless the flexibilities, design values, and general guidance offered in the memos may be relied upon

**Commenter:** PacifiCorp

**Commenter ID:** 38

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

EPA's rejection of flexibilities identified by its own Guidance is arbitrary and not well founded.

States have wide discretion in determining how to achieve the NAAQS, including their interstate transport obligations, and EPA cannot force the states to adopt approaches reflecting the Agency's policy preferences. A "SIP basically embodies a set of choices . . . that the state must make for itself in attempting to reach the NAAQS with minimum dislocation."[65] EPA also cannot substitute its own judgment or a one-size-fits-all approach for that of the states when crafting a SIP, as the courts have recognized over and over. This is especially true when a state's SIP relied on guidance put forth by EPA.

[65] *Concerned Citizens of Bridesburg v. EPA*, 836 F.2d 777, 780–81 (3rd Cir. 1987); *see also Com. of Virginia.*, 108 F.3d at 1410 (CAA Section 110 "does not enable EPA to force particular control measures on the states.").

**Commenter:** Texas Commission on Environmental Quality

**Commenter ID:** 42

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

The EPA failed to issue guidance in a timely manner for states to use in developing transport SIP revisions for the 2015 eight-hour ozone NAAQS. It is unreasonable and arbitrary for the EPA to require state SIP revisions to include recommendations from memoranda and/or guidance issued after states have submitted their revisions.

Developing a SIP revision is a years long process that requires complex technical analysis and compliance with lengthy procedural requirements. Texas timely submitted its 2015 Ozone NAAQS Transport SIP Revision on August 17, 2018, to meet the October 1, 2018, statutory deadline for states to submit infrastructure and transport SIP revisions for the 2015 eight-hour ozone NAAQS. Thirty-one days before the SIP revisions were statutorily required to be submitted, the EPA issued its Analysis of Contribution Thresholds Memo on August 31, 2018. Eighteen days after this statutory deadline, the EPA further issued its Considerations for Identifying Maintenance Receptors Memo (Maintenance Receptor Guidance) on October 18, 2018. It is unreasonable and arbitrary for the EPA to expect, much less require, that states comply with the recommendations in these guidance documents that were issued either days before the deadline or after the deadline considering that SIP revisions are complex and time consuming endeavors.

Texas' transport SIP revision was developed prior to these late issued EPA memos. Texas reasonably relied on EPA's September 13, 2013, guidance on development and submission of infrastructure SIPs

since that was the only formal guidance available at the time to assist Texas in development of its SIP revision in order to meet the statutory deadline for submittal.

In order to meet statutory deadlines, states do not have the option of waiting for the EPA to provide updated guidance before proceeding with SIP development, review, and submittal; states must proceed to develop submittals based on information available at the time. It is unreasonable to expect states to review and/or incorporate recommendations after a SIP revision has been submitted. As a result of the EPA's lack of timely updated transport guidance for the 2015 eight-hour ozone standard, Texas was forced to expend effort and resources to develop its SIP revision without fully knowing how the EPA would evaluate Texas' transport obligation.

The EPA has previously taken the position that failure to timely submit a SIP revision is sufficient reason for the EPA to issue a FIP. Therefore, states must diligently develop SIP revisions to meet those statutory deadlines. The EPA's failure to update its guidance in a timely manner for the development of transport SIP revisions was arbitrary and unreasonable because states cannot delay and must develop these revisions with guidance currently available. The EPA's actions put states in the untenable position of developing SIP revisions without knowing what the EPA might expect, or simply accepting that EPA will impose its own requirements in a potential FIP. This is an absurd result of the EPA's failure to issue timely guidance.

Finally, guidance documents are non-binding recommendations that have not gone through formal rulemaking. The EPA has consistently failed to promulgate a rule that would instruct states in how, exactly, they should evaluate and meet potential transport actions, much less provide such a rule in a timely fashion that would allow states to meet the statutory requirement to demonstrate they have met their transport obligations within three years of promulgation of a new standard. For example, the EPA could have included criteria for evaluating transport obligations in the promulgation of the 2015 ozone NAAQS itself, and yet made no mention of how states should consider or meet transport obligations. In the absence of either such a rule, or even timely guidance, states such as Texas have tried to meet a target that the EPA has not defined. Furthermore, if the EPA had proposed and finalized a rule that specified requirements for transport at the same time that it proposed or even when it finalized the 2015 ozone NAAQS, states would have been able to evaluate such requirements and provide appropriate feedback to the EPA on any such rule. That is the purpose of the rulemaking process. The EPA's failure to provide states this opportunity through the rulemaking process without the threat of an already proposed FIP continues to circumvent the cooperative federalism structure that Congress developed in the FCAA.


**Commenter:** West Virginia Department of Environmental Protection

**Commenter ID:** 49

**Docket ID:** EPA-R03-OAR-2021-0873

**Comment:**

During the three years following DAQ's SIP submittal and EPA's failure to timely review it, which culminated in this proposed disapproval, EPA reevaluated and modified without communication to states what it considers as acceptable "necessary provisions" to meet the requirements of the 2015 Ozone Good Neighbor SIP. DAQ contends it is impossible for states to predict, much less meet, SIP requirements which are in constant fluctuation, poorly or not defined, and never acted upon by EPA.

Historically DAQ prepared and assembled state implementation plans per a generally standardized acceptable structure that included the four-step interstate framework. DAQ utilized this format when it assembled the WV 2015 Ozone Good Neighbor SIP per the 2018 SIP Interstate Transport Information Memorandum. EPA's apparent abandonment of the standard in this disapproval perplexes DAQ and further underscores EPA's inability to timely communicate required shifting SIP structure to the states. This disfunction violates cooperative federalism and lends uncertainty to the states and the regulated community.

*Response*

See Section V.A.6. of the preamble for the EPA's general responses to these comments.

In response to Arkansas Department of Environmental Quality, the EPA clarifies that the EPA took comment on rescinding the August 2018 Memorandum, and that all states must comply with CAA section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS.

In response to Midwest Ozone Group, the EPA did in fact formally rescind the first proposed approval of Iowa's good neighbor SIP submission. 87 FR 9477 (February 22, 2022). The EPA re-proposed and finalized an approval of Iowa's good neighbor SIP on an entirely different basis. 87 FR 9477 (February 22, 2022); 87 FR 22463 (April 15, 2022).  This was explained at proposal. *See, e.g.*, 87 FR 9498, 9509 (February 22, 2022). Midwest Ozone Group is incorrect about the number of actions the EPA has taken through April 2022 on good neighbor SIP submissions for the 2015 ozone NAAQS; the EPA also approved 23 good neighbor SIP submissions through that time, which is detailed in Section V.A.1 of the preamble.

Other issues raised by these comments are addressed in Sections II.D., V.B.2., V.B.3. and V.B.7. of the preamble and the following sections: Sections 1.4 (Use of Updated Modeling), 5 (Updates to Modeling and Changes in Linkages), 6.4 (October 2018 Memorandum), 7.4 (August 2018 Memorandum), 8.1 (Determination of Significant Contribution), 10.2 (SIP Call), and 10.3 (Cooperative Federalism and the EPA's Authority).

## 1.3   Attachment A to the March 2018 Memorandum

*Comments*

**Commenter:** Eagle Materials Inc.

**Commenter ID:** 16

**Docket ID:** EPA-R09-OAR-2022-0138

**Comment:**

States Have Significant Discretion to Determine Measures Needed to Fulfill Their Interstate Transport Obligations.

Section 110(a)(2)(D)(i)(I) of the CAA requires states to address interstate transport by preparing SIPs that "contain adequate provisions prohibiting . . . any source or other type of emissions activity within the State from emitting any air pollutant in amounts which will contribute significantly to nonattainment in, or interfere with maintenance by, any other State with respect to any such national primary or secondary ambient air quality standard." This language leaves substantial discretion to the states in determining both their significant contributions and the reduction measures necessary to eliminate them.

EPA has recognized, in guidance, that states have discretion to apply their own analyses to both assess and address their interstate transport obligations—in its March 2018 Guidance, EPA explicitly noted that "in developing their own rules, states have flexibility to follow the familiar four-step transport framework (using EPA's analytical approach or somewhat different analytical approaches within these steps) or alternative frameworks, so long as their chosen approach has adequate technical justification and is consistent with the requirements of the CAA." EPA also evaluated certain flexibilities proposed by states and other stakeholders, consistent with EPA's "guiding principle" of "supporting states' position as 'first actors' in developing SIPs that address section 110(a)(2)(D) of the CAA." While EPA emphasized that it was not concluding that the particular flexibilities assessed were consistent with the requirements of the CAA, these flexibilities demonstrate the broad range of analyses states can conduct that can fulfill interstate transport obligations. Further, EPA recognized broad state flexibility in its Proposed Disapproval, noting that "EPA has not prescribed to states any specific methodology for developing SIP submissions."

In performing its limited oversight role under the CAA, EPA cannot substitute its own judgment for that of the states, and in particular, cannot "force particular control measures on the states."

**Commenter:** Hagerty, Logan

**Commenter ID:** 22

**Docket ID:** EPA-R05-OAR-2022-0006

**Comment:**

One common issue prevented several of the five states from drafting an adequate SIP. The states sharing this common issue were Illinois, Michigan, and Ohio. The issue was a document titled "Attachment A to the March 2018 Memorandum." The states erroneously used this EPA-provided memorandum as justification for how their SIPs met the EPA standards. The modeling data within that memorandum was only intended to "generate further discussion around potential approaches to addressing ozone transport among interested stakeholders." The proposed rule also states the

38

memorandum included a provision that the memorandum was not intended to be a formal determination in meeting required components of an SIP.

If Attachment A to the March 2018 Memorandum is easily understood to not be agency guidance in drafting an SIP, there are two explanations as to why Illinois, Michigan, and Ohio committed this large error. Either (1) state environmental offices recognized this Memorandum was not agency guidance and intentionally used it to create an invalid SIP, or (2) the state agencies unintentionally used the Memorandum as guidance owed to a lack of clarity of the part of the EPA. The latter explanation seems more likely, because all the states who misused the 2018 Memorandum are in EPA Region 5.


**Commenter:** Idaho Power Company

**Commenter ID:** 23

**Docket ID:** EPA-R09-OAR-2022-0138

**Comment:**

EPA has recognized in guidance that states have discretion to apply their own analyses to both assess and address their interstate transport obligations—in its March 2018 Guidance, EPA explicitly noted that "in developing their own rules, states have flexibility to follow the familiar four-step transport framework (using EPA's analytical approach or somewhat different analytical approaches within these steps) or alternative frameworks, so long as their chosen approach has adequate technical justification and is consistent with the requirements of the CAA."

EPA also evaluated and approved certain flexibilities proposed by states and other stakeholders, consistent with EPA's "guiding principle" of "supporting states' position as 'first actors' in developing SIPs that address section 110(a)(2)(D) of the CAA." While EPA emphasized that it was not concluding that the particular flexibilities assessed were consistent with the requirements of the CAA, these flexibilities demonstrate the broad range of analyses states can conduct that can fulfill interstate transport obligations. Further, EPA recognized broad state flexibility in its Proposed Disapproval, noting that "EPA has not prescribed to states any specific methodology for developing SIP submissions."


**Commenter:** Oklahoma Department of Environmental Quality

**Commenter ID:** 37

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

As EPA stated in the March 2018 Tsirigotis Memo, the memo was intended to be used not only by states, but as guidance for the EPA regions, as well. Generally, staff from the states and regions work together in developing SIP submittals and, accordingly, states provide EPA regional staff with periodic updates on progress toward SIP submittals. During the development process of Oklahoma's ozone transport SIP, Oklahoma discussed with EPA Region 6 its intent to use the flexibilities offered in the

Tsirigotis memos. Therefore, during the final stages of SIP development in 2018, EPA Region 6 was on notice of Oklahoma's intent to use the flexibilities offered in the Tsirigotis memos.

**Commenter:** PacifiCorp

**Commenter ID:** 38

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

EPA published the Flexibility Guidance in 2018 to assist the states with developing their SIPs, and again, Utah relied on that guidance. The Guidance emphasized that flexibility is allowed when developing a good neighbor SIP:

> states have flexibility to follow the familiar four-step transport framework (using EPA's analytical approach or somewhat different analytical approaches within these steps) or alternative frameworks, so long as their chosen approach has adequate technical justification and is consistent with the requirements of the CAA. . . . Over the next few months, EPA will be working with states to evaluate potential additional flexibilities for states to consider as they develop their good neighbor SIPs for the 2015 ozone NAAQS. Attachment A provides a preliminary list of potential flexibilities that may warrant additional discussion. *EPA looks forward to discussing these and other potential flexibilities with states over the next few months, which will help inform states' development of their good neighbor SIP submittals*. [(emphasis added)]

The list of potential flexibilities included "identify[ing] the emissions reductions (if any)" from a downwind state that could "prevent an identified upwind state from contributing significantly to those downwind air quality problems" in the Step 3 analysis. The Attachment A flexibilities also included analyzing the impact of international emissions on the downwind state.

Again, Utah (and numerous other states) followed EPA's suggestions in the Flexibility Guidance to consider "the relatively large impact of so-called 'uncontrollable' emissions (i.e., international and non-anthropogenic emissions) and home state emissions at the Colorado receptors, as well as emissions reductions already achieved as a result of other regulatory programs." EPA agrees that these factors were identified in Attachment A to the Flexibility Guidance, and EPA has recognized the flexibility afforded to states in developing good neighbor provisions in this and other guidance documents.

Nonetheless, EPA rejected Utah's analysis of each of the flexibilities without informing any of the states that it had changed course and would not accept the considerations listed in Attachment A. And this rejection came too late for Utah to make adjustments or provide additional information in response. For example, Attachment A recommended considering international emissions and "the role of background ozone levels [to] appropriately account for international transport." Attachment A also suggested that "air quality, cost, or emission reduction factors **should be weighed differently** in areas where international contributions are relatively high." Utah analyzed this factor, reasonably determining that international emissions contributed in excess of 50% of ozone at the subject monitors and that such "relatively high" international contributions should be considered in Step 3.

40

But EPA now says the "flexibilities could not be considered by the states," and specifically states that international emissions and "other non-anthropogenic" emissions are "*irrelevant*." After informing the states that they could, even should, consider international emissions, EPA now, without warning or notice, says its guidance is "irrelevant". Such actions are arbitrary and capricious.

In the Proposed Disapproval, EPA treated the other considerations Utah relied on in the Step 3 analysis in a similar fashion. Utah considered another "flexibility" from the Flexibility Guidance – the "current and projected local emissions and whether downwind areas have considered and/or used available mechanisms for regulatory relief," and determined that this factor impacted Utah's good neighbor SIP analysis. Again, EPA now finds these in-state emissions are not "relevant" for the Denver area nonattainment receptors. This about face was all the more shocking to Utah because it had worked closely with EPA throughout developing and submitting what it had been assured was an approvable SIP. EPA has rejected the use of these "flexibilities" in numerous SIP disapproval actions across the country, catching state after state by surprise.

**Commenter:** Utah Division of Air Quality

**Commenter ID:** 47

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

The UDAQ disagrees with EPA's disapproval of the SIP for the following reasons. First, through coordination with EPA Region 8, UDAQ developed and submitted what the agency thought to be a fully approvable SIP that met EPA's guidance and requirements at the time. The EPA's change of position at these late stages of the SIP process wastes the state's resources and time devoted to this rulemaking.

**Commenter:** West Virginia Department of Environmental Protection

**Commenter ID:** 49

**Docket ID:** EPA-R03-OAR-2021-0873

**Comment:**

DAQ contends that at the time of submittal the WV 2015 Ozone Good Neighbor SIP contained all "necessary provisions" as were then currently required by EPA to constitute an approvable SIP. DAQ utilized the March 27, 2018 EPA memorandum guidance from Office of Air Quality Planning and Standards ("OAQPS") Director Peter Tsirigotis titled *Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I)* ("2018 Interstate Transport SIP Information Memorandum" and included as Appendix C of the SIP) during preparation of the SIP. During the three years following DAQ's SIP submittal and EPA's failure to timely review it, which culminated in this proposed disapproval, EPA

reevaluated and modified without communication to states what it considers as acceptable "necessary provisions" to meet the requirements of the 2015 Ozone Good Neighbor SIP.

*Response*

Attachment A to the March 2018 Memorandum is not Agency guidance. See Sections II.D and V.B.2 of the preamble for the EPA's general response to these comments.

In response to comments from West Virginia Department of Environmental Protection, the EPA's explanation of the deficiencies in West Virginia's SIP submission were explained at proposal. See 87 FR 9524-9532 (February 22, 2022). In response to PacifiCorp, the EPA's explanation of the deficiencies in Nevada's SIP submission were explained at proposal. See 87 FR 31492-31494 (May 24, 2022).

Other issues raised by these comments are addressed in Section V.C.2. of the preamble and in Sections 1.6 (EPA Input During SIP Submission Development), 4.2 (Model Performance), 5 (Updates to Modeling and Changes in Linkages), 10.3 (Cooperative Federalism and the EPA's Authority), and 11.4 (Transport Policy – Western State Ozone Regulation).


## 1.4   Use of Updated Modeling


*Comments*


**Commenter:** Air Pollution Control Program, Missouri Department of Natural Resources

**Commenter ID:** 01

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

The Air Program notes that EPA's proposed disapproval goes on to point out that the updated modeling has identified four additional receptors (all in the Lake Michigan area) that Missouri is now linked to. These receptors were not identified as linked receptors in the previous modeling relied upon in our SIP submission. EPA uses this as further evidence to justify their proposed disapproval. This sleight-of-hand move by EPA is a direct attack on Missouri's right to develop its own SIP. If EPA is going to move the target more than two years after the submission is made and use that tactic to justify its action, then a proposed disapproval cannot be the appropriate action. […] Such action would instead favor stripping states of their rights and imposing hundreds of millions of dollars in compliance costs without adequate justification or the opportunity for states to update and retain control over their SIP. For these reasons, EPA must withdraw the proposed disapproval and take action to approve Missouri's submission.


**Commenter:** Alabama Department of Environmental Management

**Commenter ID:** 02

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

ADEM submitted its 8-hr Ozone iSIP in August 2018, and after that date several rounds of additional modeling were performed evaluating the impacts of upwind States on predicted future nonattainment and maintenance monitors, including modeling in both 2021 and 2022 for the 2023 and 2026 future years. This modeling was based on data that EPA collected, analyzed and published years after Alabama's submittal. In an effort to quickly provide a SIP based on the newer modeling (February 2022), ADEM rescinded the 2018 SIP, and presented EPA with a revised SIP, including a Weight of Evidence (WOE) argument based on the readily available data.

[…]

The revised SIP package was submitted largely because of the impossible task of evaluating the revised modeling, given the time and resources involved. EPA cannot expect States to evaluate future scenarios when submitting SIPs, especially when the modeling is performed years after the original SIP submission is made.

Additionally, it should be noted that the purpose of an iSIP is to verify that the State has the authority to address the regulations of the Clean Air Act (CAA), not to determine if, and by how much, an upwind State may impact a downwind monitor. If EPA intended to use updated modeling to assess impacts at future nonattaining and maintenance receptors, a call for plan revisions should have occurred, allowing EPA to incorporate and rely on modeling and monitoring data, while providing States the opportunity to review the data and incorporate any changes, if needed, without the need for a FIP call.

Further, based on the timeline after submittal of the 2018 SIP, EPA did not meet its statutory review time to determine completeness, which should have taken place in February 2020. Given that the modeling, which EPA is basing the disapproval on, was not available until February 2022, EPA cannot hold States to an impossible standard when developing SIPS.

**Commenter:** Alabama Power Company

**Commenter ID:** 03

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

Notably, EPA's proposal to rely on recent analysis and data not available to the state either at the time of its SIP submission or during EPA's statutory review period is unfair to the state. Just as "[a]gency actions must be assessed according to the statutes and regulations in effect at the time of the relevant activity," EPA's approval or disapproval of a SIP should adhere to the guidance, data, and evidence available and on the record at the time of EPA's timely review of the SIP.[18] Under Section 110 of the Act, EPA has 12 months after its completeness determination to fully or partially approve, disapprove, or

43

conditionally approve the SIP.[19] Taking into account the time EPA is afforded to determine "completeness" of a SIP submittal, EPA had at most until the end of February 2020 to act on ADEM's SIP. The recent modelling EPA has decided to rely on in its current review of Alabama's 2018 SIP submittal was not available in February 2020. Nor has it been available for thorough and complete review and analysis by Alabama. EPA should not disapprove a SIP based on extra-record data not available either to the state during its development of the SIP nor to EPA during the period statutorily allotted for EPA to take final action on SIP submissions.[20]

[18] *Texas v. EPA*, 829 F.3d 405, 430 (5th Cir. 2016) (citing *Caring Hearts Pers. Home Servs., Inc. v. Burwell*, No. 14-3243, 2016 WL 3064870 (10th Cir. May 31, 2016)); *see also Wisconsin v. EPA*, 938 F.3d 303, 336 (D.C. Cir. 2019) (suggesting in dicta that the state may attack EPA's "reliance on data compiled after the SIP action deadline" in challenging EPA's disapproval of a SIP (but not if challenging the subsequent FIP)).

[19] 42 U.S.C. § 7410(k)(2)

[20] *See Sierra Club v. EPA*, 356 F.3d 296, 308 (D.C. Cir. 2004) ("To require states to revise completed plans every time a new model is announced would lead to significant costs and potentially endless delays in the approval process."). Where new information arises, and if the criteria applicable to the provision are satisfied, EPA can exercise its authority under section 7410(k)(5) to ensure SIPs satisfy the Act. This procedure guarantees states the opportunity to draft SIPs in light of any such new data or analysis, which would not be available if EPA could act on post-record material to disapprove a SIP.

**Commenter:** Ameren Missouri

**Commenter ID:** 05

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

USEPA has improperly proposed to disapprove of Missouri's good neighbor SIP based on modeling which was not in the SIP submittal and was unavailable to Missouri or the public during the development of the Missouri Good Neighbor SIP.

**Commenter:** Arkansas Department of Energy and Environment, Division of Environmental Quality

**Commenter ID:** 07

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

Timing of EPA's Proposed Rule.

EPA had all of the information necessary based on the best available science to approve the interstate component of the Arkansas Transport SIP submittal when its action was due on November 7, 2020. Yet, EPA Headquarters "red-lighted" work by the EPA regions on these submittals unless EPA's 2017 modeling results indicated that a state's overall contribution to identified nonattainment and maintenance areas was less than the threshold EPA had previously used to identify linkages for its Cross-State Air Pollution Rule FIP for the 1997 ozone NAAQS. It is DEQ's understanding that EPA regions did

not begin drafting actions on other submittals until after Downwinders at Risk, et al., sued EPA for failure to act within Clean Air Act time frames.

Had EPA reviewed the SIP in the timeframe required by federal law, the information available at the time—the same information that states used to inform their decisions—would have ensured that states did not waste time on robust analyses of available data for the purposes of making sound, evidence-based decisions. EPA stalled an evaluative action until the perceived "facts" of the situation changed such that timely state analyses were rendered outdated.

EPA released two "updates" for modeling that were not made available to states in a timeframe reasonable for inclusion in national program goals or state plans. 2016v1 was made available two years after state plans were due to EPA, but EPA contends this data is useful for determining design values and linkages to downwind areas (Step 1 of EPA's recommended four-step framework for evaluating interstate transport). EPA's 2016v2 modeling—which EPA now purports is the measuring rod by which state plans should be evaluated—was released by EPA to the states at the same time EPA was writing its proposed disapproval and proposed FIP. EPA thus moved the target on what should be evaluated for transport SIPs one and one-half years after the AR Transport SIP was deemed complete by EPA and four years after the SIPs were due.

[…]

EPA proposes to primarily rely on a different modeling platform (EPA's 2016 v2 modeling12) for its evaluation of Arkansas's SIP submittal instead of the modeling data that EPA made available to the states for development of the Transport SIPs for the 2015 ozone NAAQS (EPA's March 2018 Memorandum). The EPA's 2016v2 modeling platform was developed as an update to EPA's 2016v1 modeling platform. A 2011 modeling platform was used to generate the data provided to states for SIP development in the March 2018 Memorandum. Among other updates to 2016v2, this platform incorporated updated emissions data, which represent emissions for the 2016 base year, as well as projected emissions for the 2023, 2026, and 2032 future years. As ADEQ pointed out in its SIP submittal, different modeling platforms and inventory assumptions can yield different results. It is no surprise then that changing the modeling platform may yield different ozone source apportionment results. ADEQ finds that it is not reasonable for EPA to provide states with modeling data for use in SIP development only to perform new modeling years later and then tell states that their decision-making, which was based on the data available to them at the time is flawed.

[…]

If EPA believes insists that it must consider newer data in its review of state Transport SIPs, then DEQ requests that EPA correct its emissions inventories, rerun the model using the updated 2016v2 platform, and issue a Notice of Data Availability based on its updated modeling prior to finalizing action on the Arkansas Transport SIP.

[…]

DEQ expended hundreds of hours of staff time and other resources to perform a robust analysis and scientifically-based evaluation of the information that was available at the time of SIP development. EPA's disapproval moves the target on nonattainment and maintenance receptors that must be

45

evaluated by primarily relying on data that was not available to the state at the time of SIP development and was not available when EPA was statutorily required to act on the Arkansas Transport SIP. This conduct is inconsistent with the cooperative federalism framework for air quality protection under the Clean Air Act.

**Commenter:** Association of Electric Companies of Texas, BCCA Appeal Group, Texas Chemical Council and Texas Oil & Gas Association

**Commenter ID:** 11

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

In the Proposed Disapproval, EPA relied on a new modeling platform that was released years after Texas's timely SIP submittal and mere months before EPA proposed to deny Texas's SIP. Texas and the public had no notice of the post-statutory period analysis EPA intended to apply to determine whether to approve the SIP and now has no opportunity to evaluate EPA's new platform and associated analytical framework. In fact, the modeling files supporting EPA's new analysis were provided just days before the comment deadline on this action.

EPA's new modeling, which EPA used in an attempt to quantify Texas's "significant contribution," is not a lawful basis for disapproving Texas's SIP. Before finalizing its disapproval, EPA should provide Texas stakeholders an opportunity to evaluate the new modeling platform. The CAA grants states the primary authority to implement the NAAQS and allows EPA to step in only where the state has failed in its duty. Here, Texas did not fail in its duty. TCEQ relied on the most current information available to it at the time the SIP was drafted and timely submitted a complete SIP meeting the CAA's requirements and EPA should judge the SIP solely on that basis.

**Commenter:** Cleco Corporate Holdings LLC

**Commenter ID:** 14

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

The Agency reviewed the Louisiana SIP, for which LDEQ relied on modeling data found in the March 27, 2018 guidance memorandum (March 27, 2018, *Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act Section (D)(i)(I)*)), and used the 2016v2 emissions platform to evaluate the Louisiana SIP. The Technical Support Document for 2016v2 was not made available until 2022 which was after the Louisiana SIP submittal. In addition, EPA relied on the air quality modeling performed using CAMx version 7.10, which was released in January 2021. This release also took place after the Louisiana SIP was submitted.

Although EPA is issuing an invitation in the Proposal for public comment on the updated 2023 modeling, which uses the 2016v2 emissions platform, EPA should not rely on modeling and data that was not available at the time of the SIP submittal deadline and has not been updated based on public comment. Instead, EPA should evaluate the Louisiana SIP based on the modeling data referred to in the March 27, 2018 memorandum (March 27, 2018, *Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act Section (D)(i)(I)*) and subsequent 2018 guidance documents. At least, EPA should incorporate needed revisions to the 2016v2 modeling platform based on comments provided by the states and other stakeholders as provided in this docket and then re-analyze the Louisiana SIP based on the updated/corrected modeling platform before issuing a final rule on the Louisiana SIP.

**Commenter:** Eagle Materials Inc.

**Commenter ID:** 16

**Docket ID:** EPA-R09-OAR-2022-0138

**Comment:**

Nevada adopted a broad and intentionally overinclusive approach to assessing its interstate transport obligations, using EPA's latest contribution modeling, released just months prior in March 2018, "to identify and quantify contributions greater than 0.5 percent of the 2015 ozone NAAQS resulting from Nevada's anthropogenic emissions" for further analysis. [. . .] Nevada relied on EPA's modeling, emphasizing that "[a]lthough models can always be refined and there may be differences in certain approaches to technical issues as the NDEP has commented, it is the NDEP's position that the USEPA's modeling is state-of-the-science given the USEPA's constraints."

Nevada reviewed its contributions to receptors in California and Colorado under this framework, considering relative intrastate contributions and overall interstate contributions. Based on this extensive analysis, Nevada determined that "the contribution of 2023 base case anthropogenic NOx and VOC emissions from sources within Nevada to any projected 2023 nonattainment or maintenance receptor at greater than 0.5 percent of the NAAQS is limited to two states, California and Colorado." However, for each of these receptors, "Nevada's contribution… [was] less than one percent of the 2015 ozone NAAQS," meaning that under EPA's own analytical approach, Nevada was not linked to downwind air quality problems and that no further reductions measures were necessary.

Despite Nevada's highly conservative assessment of its interstate transport obligations, EPA's Proposed Disapproval nevertheless concludes, based on new air quality modeling using the 2016v2 emissions platform, that Nevada is now linked to 2 receptors in Utah. Nevada's contribution to these receptors is between 0.86 ppb and 0.89 ppb, which falls below the 1 ppb linkage threshold determined by Nevada to be more appropriate for Western states, where "interstate contributions… are relatively small, especially given the large contributions from background and intrastate emissions." EPA unreasonably imposes its own analysis in evaluating Nevada's SIP, rather than determining whether Nevada's analysis was reasonable.

Further, EPA's analysis relies on modeling that was not available until 3 years after Nevada was required to submit its SIP revision in response to EPA's revision to the ozone NAAQS on October 1, 2015. Under the CAA, states are required to submit revised SIPs within 3 years after EPA revises the NAAQS. Nevada met this 3-year deadline by submitting its revised SIP on October 1, 2018, relying on modeling that EPA released just 6 months prior. Nevada specifically determined that EPA's data represented the "best available data with which to conduct Nevada's transport analysis," which EPA does not dispute in its Proposed Disapproval. Rather, EPA asserts that "[b]y using the updated modeling results, the EPA is using the most current and technically appropriate information for this proposed rulemaking." However, EPA fails to consider whether Nevada's analysis using the best available data at the time was reasonable and fails to even acknowledge the substantial change imposed by EPA's new modeling, increasing Nevada's contribution to Utah receptors from under 0.5% of the NAAQS to above EPA's 1% threshold.

**Commenter:** Environmental Federation of Oklahoma

**Commenter ID:** 20

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

In particular, EFO supports DEQ's assessment that EPA has overstepped its authority by circumventing the normal SIP development and approval process in a number of ways, including but not limited to: … fourth, relying on data not available to the state for either review or use.

**Commenter:** Evergy, Inc.

**Commenter ID:** 21

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

EPA's updated modeling for Missouri identified four new receptors near Lake Michigan. This comes two years after the Missouri Department of Natural Resources (MDNR) Public submitted the Missouri SIP.

**Commenter:** Kentucky Division for Air Quality

**Commenter ID:** 25

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

EPA's Use of Revised Modeling Data Not Available to States prior to Deadline for 2015 Infrastructure Submittal

At the time of Kentucky's final 2015 Ozone I-SIP submittal, there were several guidance documents from EPA as well as modeling data available to review and use for the Interstate Transport demonstration. Specifically, two memos from EPA's Office of Air Quality Planning and Standards (OAQPS), dated March 27, 2018, and August 31, 2018, were available. Additionally, EPA provided updated modeling information with the March 27, 2018 memo for states to consider in developing their Interstate Transport SIPs. Kentucky used the information provided in EPA's March 27, 2018 memo and associated modeling, and the recommended 1 part per billion (ppb) threshold from the August 31, 2018 memo to evaluate the impacts that Kentucky emissions may have on downwind monitors.

In the current action, EPA has proposed disapproval of Kentucky's Interstate Transport requirements of the I-SIP submittal based on a second version of newly modeled data that was not made available to Kentucky until well past the statutory deadline for Kentucky's I-SIP submittal and EPA's action regarding that submittal. Specifically, EPA states, "EPA must act on SIP submittals using the information available at the time it takes such action." In the spirit of cooperative federalism, Kentucky would appreciate and expect the opportunity to submit a revised SIP in accordance with the revised data and modeling, rather than having the SIP disapproved after the fact.

Identification of newly impacted monitors without opportunity for States to review and develop an appropriate SIP submittal

EPA is taking action to disapprove the remaining Interstate Transport portion of Kentucky's SIP submittal using newly updated data, specifically the 2016v2 platform, which was not available at the time of Kentucky's I-SIP submittal. Additionally, the monitors previously linked as being impacted by Kentucky have changed with the newly available data. Kentucky was not afforded the opportunity to evaluate the potential linkages or provide additional information regarding these potential linkages. Specifically, using the 2016v2 platform, EPA has identified the Bucks County, PA monitor and the New Haven, CT monitor as linked to Kentucky in using the newly updated data. The Bucks County, MD monitor was not listed as either a nonattainment or maintenance monitor in the modeling data provided with the March 2018 memo. As such, Kentucky was not afforded the opportunity to evaluate the potential impact of emissions for either area prior to submitting the 2015 Ozone I-SIP. An opportunity to submit a revised SIP would provide Kentucky with the ability to review the 2016v2 platform, as well as the data and modeling associated with the platform.


**Commenter:** Louisiana Chemical Association

**Commenter ID:** 26

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

EPA failed to act on the Louisiana Transport SIP timely, which led to LDEQ and the EPA performing the required analysis under differing modeling data sets.

Pursuant to CAA §110(k), SIP submissions are deemed complete by operation of law six months after receipt by EPA. Thus, the Louisiana Transport SIP was deemed complete by operation of law on May 19,

49

2020. EPA must approve or disapprove, in whole or in a part, SIP submissions within 12 months of the SIP submissions being deemed complete. CAA §110(k)(2). Thus EPA was required to act on the Louisiana Transport SIP by May 19, 2021. EPA did not publish its proposed disapproval of the Louisiana Transport SIP until February 22, 2022, nearly a year after it was due. [footnote: EPA entered into a consent decree in the case of *Downwinders at Risk et al. v. Regan*, No. 21-cv-03551 (N.D. Cal), which required EPA to issue proposed rules to act on a number of pending 2015 ozone NAAQS interstate transport SIP submissions, including Louisiana's, by April 30, 2022. Under that consent decree, EPA agreed to take final action by December 15, 2022. The Consent Decree became effective upon by the Court on January 12, 2022.]. The deadlines in the CAA were purposefully enacted by Congress to prevent the exact situation that has arisen here – state reliance on current data and guidance being reviewed by an EPA that later has changed information, guidance, or methods.

The Louisiana Transport SIP relies on the 2023 modeling data released in the October 2017 Guidance and presented in the March 27, 2018 guidance document entitled: *Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act Section (D)(i)(I)* ("2015 Ozone NAAQS Memo"). The EPA issued two more guidance documents, the August 2018 and October 2018 Guidance, which provide additional information to states developing interstate transport SIP submissions for the 2015 Ozone NAAQS.

One month before LDEQ submitted the Louisiana Transport SIP, EPA released an updated modeling platform using 2016-based emissions. The platform was developed by the National Emissions Inventory Collaborative. The EPA used the 2016v1 emissions inventory in its subsequent modeling to project ozone design values and contributions for 2023. Thereafter, the platform was updated as 2016v2. In addition to reviewing the Louisiana Transport SIP under the March 2018 Guidance, EPA used the 2016v2 emissions platform to evaluate the Louisiana Transport SIP. The Technical Support Document for 2016v2 was not available until 2022. The EPA also relied on the air quality modeling performed using Comprehensive Air-quality Model with extensions (CAMx) version 7.10, which was released in January 2021, long after the Louisiana Transport SIP was submitted.

LCA supports the use of the most current and technically appropriate information in developing and reviewing SIP submissions. However, EPA is only now accepting comments on the updated 2023 modeling, which uses the 2016v2 emissions inventory platform. It is not reasonable for EPA to rely on modeling and data that (i) was not available at the time of the SIP submittal deadline and (ii) has not been updated based on public comment. EPA must evaluate the Louisiana Transport SIP based on the modeling data referred to in the *2015 Ozone NAAQS Memo* and subsequent guidance documents. At a minimum, EPA must incorporate needed revisions to the 2016v2 modeling platform based on comments provided by the states and other stakeholders as provided in this docket and then re-analyze the Louisiana Transport SIP based on the updated/corrected modeling platform before issuing a final rule on the Louisiana Transport SIP.

**Commenter:** Louisiana Department of Environmental Quality

**Commenter ID:** 27

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

LDEQ submitted the mandatory 2015 ozone transport SIP on Nov. 12, 2019, based on EPA's Model 2016v1. However, EPA unjustly and prejudicially based the disapproval on the updated version, 2016v2, which includes refinements that have not been peer reviewed. Furthermore, this modeling was performed after the SIP deadline.

Significant differences are present in EPA's modeling used for LDEQ's 2019 submittal and the modeling used to theorize the disapproval proposal. This points to substantial alterations to model inputs parameters. States were not allowed to review or comment on the newer model and or inputs prior to use in the disapproval process.

**Commenter:** Midwest Ozone Group

**Commenter ID:** 30

**Docket ID:** EPA-R02-OAR-2021-0673, EPA-R03-OAR-2021-0872, EPA-R03-OAR-2021-0873, EPA-R04-OAR-2021-0841, EPA-R05-OAR-2022-0006, EPA-R06-OAR-2021-0801, EPA-R07-OAR-2021-0851, EPA-R08-OAR-2022-0315, EPA-R09-OAR-2022-0394, EPA-R09-OAR-2022-0138

**Comment:**

EPA's intention to revise its emission inventory and to conduct new air quality modeling without allowing an appropriate opportunity for stakeholder review and comment is inappropriate

EPA notes in the proposed disapprovals that, after the modeling it conducted in support of earlier transport rules, e.g., CAIR, CSAPR, CSAPR Update, CSAPR Closeout, and Revised CSAPR Update, the agency revised the emission inventory used in the modeling to assess the efficacy of prior transport rules. EPA conducted new modeling using the revised inventory. The agency describes the process as follows:

> Following the Revised CSAPR Update final rule, the EPA made further updates to the 2016 emissions platform to include mobile emissions from the EPA's Motor Vehicle Emission Simulator MOVES3 model 17 and updated emissions projections for electric generating units (EGUs) that reflect the emissions reductions from the Revised CSAPR Update, recent information on plant closures, and other sector trends. The construct of the updated emissions platform, 2016v2, is described in the emissions modeling technical support document (TSD) for this proposed rule. (emphasis added).

In December 2021, MOG and other stakeholders submitted detailed comments on the 2016v2 emission inventory platform in an effort to correct errors that existed in that platform. EPA's efforts to revise this emission inventory platform at this time raises the question about whether EPA intends to update the modeling that has been used as the basis for the SIP disapprovals and the proposed FIP - but only in support of the final rule.

While MOG urges EPA to rely on modeling that accurately reflects current on-the-books regulatory requirements and up-to-date emission inventories, we strenuously object to the possibility that EPA

51

would conduct any such additional modeling to support a final rule and not provide the opportunity for that data to be reviewed, analyzed and commented on in advance of any final decision on the subject SIP disapproval (or for that matter the related proposed FIP). These concerns were also expressed earlier, in July 2021, by several MJOs (Westar, LADCO, SESARM, MARAMA, and CENSARA).

**Commenter:** Minnesota Pollution Control Agency

**Commenter ID:** 31

**Docket ID:** EPA-R05-OAR-2022-0006

**Comment:**

EPA's proposed disapproval of Minnesota's 2015 Ozone Transport SIP does not assess the quality of Minnesota's original submittal. Minnesota was identified as a non-significant contributor (below 0.7 parts per billion) to any ozone monitors in the 2018 modeling performed by both EPA and Lake Michigan Air Directors Consortium (LADCO). Minnesota did not complete steps three or four of the 2015 Ozone Transport SIP based on that information. Minnesota's original submittal should have been approved based on contribution information available from both EPA and LADCO at that time.

EPA is now proposing to use a revised 2016 modeling platform, EPA 2016 version 2 emissions modeling platform (2016v2 EMP) to support a remedy for the Interstate Transport Rule for the 2015 Ozone National Ambient Air Quality Standard (NAAQS).

**Commenter:** Maryland Department of the Environment

**Commenter ID:** 29

**Docket ID:** EPA-R03-OAR-2021-0872

**Comment:**

Additionally, MDE has been disadvantaged by EPA's delay in acting to approve or disapprove its 2015 Good Neighbor SIP, which was submitted to EPA on October 16, 2019. EPA published its proposed disapproval on February 22, 2022, and relied in part on "newer, updated modeling performed by the EPA which was not available when MDE submitted its supplemental SIP." By delaying its decision on Maryland's submittal for nearly 2.5 years, EPA moved the goal post for Maryland—an act the DC Circuit admonished in *New York v. EPA*, 964 F.3d 1214, 1223 (D.C. Cir. 2020). While MDE agrees that EPA should use current data and look toward the next applicable attainment date when approving SIPs or issuing FIPs, an over 2-year gap between submittal and approval allows for newer technology to be developed and relied upon, with no notice to states. If EPA were to review and approve or disapprove SIPs within the timeframes required by the CAA, EPA would likely conduct its review based on the same modeling and data that is available at the time SIPs are submitted by states. This would not only provide clear parameters to both EPA and states, but could also result in timely emissions reductions and attainment of the 2015 ozone NAAQS.

**Commenter:** Nevada Division of Environmental Protection

**Commenter ID:** 33

**Docket ID:** EPA-R09-OAR-2022-0138

**Comment:**

EPA then suddenly released a new modeling platform for ozone interstate transport in October 2021, and then failed to provide or allow states such as Nevada adequate time, resources, and technical support to critically review the model. Instead, EPA abruptly announced that is expected "to use this information in upcoming rulemaking actions, including ozone transport actions" and did not provide NDEP time to check critical model inputs, such as background contributions and emissions from the transportation sector.

**Commenter:** Oklahoma Department of Environmental Quality

**Commenter ID:** 37

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

EPA Has Unpredictably Changed the Rules Mid-Process

The proposed disapproval dismisses ODEQ's analysis regarding the six monitors that established the initial linkage between Oklahoma and downwind nonattainment and maintenance problems. 87 Fed. Reg. 9818. In accord with the flexibilities offered in the 2018 Tsirigotis memos, the Oklahoma SIP demonstrated that Oklahoma emissions had impacts below the significance threshold at three of the monitors. Oklahoma's SIP included a weight-of-evidence prediction that the remaining three receptors would be in attainment in 2023. In fact, EPA's more recent modeling confirms the accuracy of that prediction for two of these receptors. However, in the proposed disapproval EPA now argues Oklahoma's emissions are linked to only two monitors, one of which is completely different than any originally identified.

Notably, ODEQ relied on EPA's modeling released with its March 2018 Memo to identify the initial six impacted receptors in step 1 of the 4-step framework. Yet, in a surprising development, EPA moved the goal posts by using completely different modeling for its decision to disapprove Oklahoma's SIP and thereby identified a new receptor supposedly impacted by Oklahoma. It stands to reason that, were Oklahoma to address impacts to those monitors in a SIP modification, it is entirely possible that EPA would find one or more different monitors to establish the linkage in a future rulemaking. This type of whiplash decision-making by EPA leaves states unable to predict the outcomes of their efforts— or even where to aim. There should be some basic measure of predictability for where the goal posts stand.

Furthermore, it should be noted that the proposed disapproval was considerably late, as Section 110(k)(2) of the CAA states that EPA must take action within 12 months of a "complete" SIP submission.

The maximum amount of time EPA can take to deem a SIP submittal complete is 6 months, therefore, even accounting for this timeline, EPA's action falls way behind the statutory requirement. Had EPA reviewed and approved Oklahoma's SIP submittal during its statutorily required timeframe, EPA would have been measuring Oklahoma's SIP submittal against comparable data. Because EPA took so long to act on SIP submittals, EPA created a situation where the standard under which states developed their SIPs was no longer the standard against which those SIPs were judged.

[…]

EPA failed to Adequately Include State Participation

[…] To begin with, the development of the modeling platform should have concluded before EPA used the platform for this rulemaking. ODEQ and other air quality agencies worked together to develop a letter from Michael Vince (the Executive Director of the Central States Air Quality Agencies or CenSARA) to Peter Tsirigotis, dated July 29, 2021 (included as Attachment C hereto). The letter makes the point that, if air agencies are to be given the opportunity to provide meaningful feedback on the emissions inputs used by EPA in rulemaking, they should have the opportunity to review and comment on the Emissions Modeling Platform (EMP) before it is used in federal rulemaking. EPA did allow agencies the opportunity to review an updated version of the EMP, but the version that was ultimately used to develop the proposed disapproval of Oklahoma's ozone transport SIP (and to develop the proposed FIP) had not been released and did not undergo state review in advance of its deployment in support of EPA's rule development.


**Commenter:** Tennessee Department of Environment and Conservation

**Commenter ID:** 41

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

Comment #1: EPA's Poorly Timed Model Releases Undermine States' Abilities to Demonstrate Compliance with CAA §110(a)(2)(D)

The proposed disapproval discusses EPA's modeling efforts at some length, and that discussion is informative regarding the frequency of model updates and the total amount of time required for EPA to finish its own modeling work—modeling that EPA now indicates states should have been using to develop their iSIPs.

1. January 2017- EPA Notice of Data Availability- EPA requested comment on preliminary interstate ozone transport data including projected ozone design values and interstate contributions for 2023 using a 2011 base year platform.
2. October 2017- EPA issued a memorandum containing updated modeling data "which incorporated changes made in response to comments on the [January 2017] NODA."

3. March 2018 – EPA issued a new memorandum including newly available contribution modeling data for 2023 to assist states in evaluating their impact on potential downwind air quality problems for the 2015 8-hour ozone NAAQS

EPA then states that since the release of all the modeling information noted above, and subsequent to the 2018 submittal of Tennessee's iSIP, EPA performed updated modeling using a 2016-based emissions modeling platform (2016v1) to project ozone design values and contributions for 2023. Specifically, on October 30, 2020, the Notice of Proposed Rulemaking for the Revised CSAPR Update included updated 2023 modeling that used the 2016v1 emissions platform. Following the revised CSAPR update final rule, EPA states it continued to make updates to the 2016 emission platform, updated emissions projections, etc. and performed air quality modeling of the 2016v2 emissions using the most recent version of the Comprehensive Air Quality Modeling with Extensions (CAMx) photochemical modeling version 7.10.

EPA proposes to primarily rely on modeling based on "the updated and newly available" 2016v2 emissions platform in evaluating the state iSIP submission and is, in fact, accepting public comment on this updated 2023 modeling using the 2016v2 emissions platform at the very same time EPA proposes to disapprove Tennessee's ISIP. EPA has spent the greater part of five years revising and updating the modeling that it now relies upon to disapprove Tennessee's iSIP. This approach establishes an impossible standard for states and leaves open the very real possibility that no state will be successful in developing an iSIP under future standards.

[...]

Comment #3: EPA may not disapprove Tennessee's Infrastructure SIP based on Prong 2 of CAA §110(a)(2)(D)(i)(I) because Tennessee satisfied its Good Neighbor obligations in its 2018 iSIP submission.

EPA now proposes to disapprove Tennessee's SIP submission, based on data EPA published in 2021 and 2022 finding that Tennessee is "linked" to a single maintenance receptor in Denton County, Texas. EPA is suggesting that Tennessee's 2018 technical analysis was flawed because it failed to consider future data that were not collected until years after the original submission was made, which would have required Tennessee to perform Steps 3 and 4. As EPA puts it: "Because the entire technical basis for Tennessee's submittal is that the State is not linked at Step 2, EPA proposes to disapprove Tennessee's SIP submission based on EPA's finding that a linkage does exist."

Nonetheless, EPA now proposes to disapprove Tennessee's SIP submission, based on data EPA published in 2021 and 2022 finding that Tennessee is "linked" to a single maintenance receptor in Denton County, Texas. EPA is suggesting that Tennessee's 2018 technical analysis was flawed because it failed to consider *future* data that were not collected until years after the original submission was made, which would have required Tennessee to perform Steps 3 and 4. As EPA puts it: "Because the entire technical basis for Tennessee's submittal is that the State is not linked at Step 2, EPA proposes to disapprove Tennessee's SIP submission based on EPA's finding that a linkage does exist."

As we noted in Comment #1, EPA's entire approach and rationale in this proposed disapproval makes it impossible for any SIPs a state might submit under the 2015 ozone standard or any future NAAQS to demonstrate compliance with CAA §110(a)(2)(D) because not only must a state consider the evidence available at the time of submission, but a state must also possess the ability to consider *future* evidence that might demonstrate significant contributions to downwind nonattainment or interference with

55

maintenance in a downwind state. The proposed disapproval of Delaware's iSIP in the *Federal Implementation Plan Addressing Regional Ozone Transport for the 2015 Ozone National Ambient Air Quality Standard* perfectly illustrates this point. In Section IV.C.1 of the preamble to the proposed rule ("Correction of EPA's Determination Regarding Delaware's SIP Submission and Its Impact on EPA's FIP Authority for Delaware"), EPA addresses Delaware's Good Neighbor obligations as follows:

> In 2020, the EPA approved an infrastructure SIP submission from Delaware for the 2015 ozone NAAQS, which in part addressed the good neighbor provision at CAA section 110(a)(2)(D)(i)(I). The EPA concluded that, based on the modeling results presented in a 2018 March memorandum and using a 2023 analytic year, Delaware's largest impact on any potential downwind nonattainment or maintenance receptor was less than 1 percent of the NAAQS. As a result, the EPA found that Delaware would not significantly contribute to nonattainment or interfere with maintenance in any other state. Therefore, ***the EPA approved the portion of Delaware's infrastructure SIP that addressed CAA section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS*** . . . .

> Subsequent to the release of the modeling data shared in the March 2018 memorandum and EPA's approval of Delaware's 2015 ozone NAAQS good neighbor SIP submission, the EPA performed updated modeling, as described in Section V of this action. The data from this updated air quality modeling now show that Delaware is projected to contribute more than 1 percent of the NAAQS to downwind receptors in Bristol, Pennsylvania, in the 2023 analytic year. Therefore, in light of the modeling data, ***EPA is proposing to find that its approval of Delaware's 2015 ozone NAAQS infrastructure SIP submission, with regard only to the portion addressing the good neighbor provision at CAA section 110(a)(2)(D)(i)(I), was in error. Section 110(k)(6) of the CAA gives the Administrator authority, without any further submission from a state, to revise certain prior actions, including actions to approve SIPs, upon determining that those actions were in error***. The modeling data demonstrate that EPA's prior conclusion that Delaware will not significantly contribute to nonattainment or interfere with maintenance in any other state in the 2023 analytic year was incorrect, which means that EPA's approval of Delaware's good neighbor SIP submission was in error. . . .

> As discussed in greater detail in the sections that follow, the EPA is proposing to determine that there are additional emissions reductions that are required for Delaware to satisfy its good neighbor obligations for the 2015 ozone NAAQS. The analysis on which the EPA proposes this conclusion for Delaware is the same, regionally consistent analytical framework25 on which the Agency proposes FIP action for the other states included in this proposal. The Agency recognizes that it is possible, based on updated information for the final rule—as applied within a regionally consistent analytical framework—that Delaware (or other states for which the EPA proposes FIPs in this action) may be found to have no further interstate transport obligation for the 2015 ozone NAAQS. If such a circumstance were to occur, the EPA anticipates that it would not finalize this proposed error correction or may modify the error correction such that the approval of Delaware's portion of the SIP as it relates to its good neighbor obligations may be affirmed.

This structure runs contrary to the principle articulated by the Supreme Court in *EPA v. EME Homer City Generation, L.P.* that EPA must work toward an "efficient and equitable solution to the allocation

56

problem the Good Neighbor Provision requires the Agency to address." Instead, EPA's imposition of such an unworkable approach is a textbook failure to comply with EPA's obligation to "select from among reasonable options" under the *Chevron* framework [footnote: 572 U.S. at 492 (citing *United States v. Mead Corp.*, 533 U.S. 218, 229 (2001))] and imposes an entirely arbitrary and capricious standard that states are effectively incapable of following.

The Clean Air Act does not envision nor suggest that states be held to an impossible standard when developing SIPs. Because EPA has provided no evidence that Tennessee was "linked" to any downwind states when it submitted its 2018 SIP revision, EPA may not disapprove Tennessee's Infrastructure SIP based on Prong 2 of CAA §110(a)(2)(D)(i)(I) and therefore should withdraw its proposed disapproval.

[...]

EPA has put states in an impossible position by waiting to take action on SIP submittals that occurred in 2018 and basing such actions on modeling that has been consistently changing since 2018 and is still undergoing public comment.


**Commenter:** The Luminant Companies

**Commenter ID:** 44

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

Rather than review Texas's submittal in a timely manner, EPA delayed its action beyond the statutorily prescribed deadline and developed non-statutory, post-hoc modeling and analyses by which it now proposes to judge Texas's submittal.

[...]

And EPA cannot consider its post-hoc modeling and analyses that were not available as of its statutory deadline to act to justify its action.[41] Accordingly, EPA must approve Texas's SIP based on the data available by the statutory deadline so long as it satisfies the statutory requirements, which it does, as discussed below.[42]

[...]

In support of Texas's SIP, consistent with its expertise, TCEQ conducted modeling to discharge its statutory duty to ensure its SIP contains adequate provisions to ensure that emissions from Texas will not "contribute significantly" to downwind nonattainment or maintenance receptors for purposes of the 2015 ozone NAAQS. It was not until after TCEQ developed and proposed its SIP revision, including its modeling, that EPA issued guidance to states on their development of interstate transport SIP revisions for the 2015 ozone NAAQS. Nonetheless Texas's SIP revision was consistent with the guidance EPA had provided at the time of TCEQ's submittal. EPA points to modeling it released in 2022, nearly four years after TCEQ submitted its SIP, to support its proposed disapproval.  EPA's post hoc modeling is not a lawful ground for disapproval.

[...]

41 *See Wisconsin v. EPA*, 938 F.3d 303, 336 (D.C. Cir. 2019) (suggesting that a state may challenge EPA's "reliance on data compiled after the SIP action deadline"); *see also Sierra Club v. EPA*, 356 F.3d 296, 308 (D.C. Cir. 2004) ("To require states to revise completed plans every time a new model is announced would lead to significant costs and potentially endless delays in the approval process.").

42 If necessary in light of new data, EPA may later issue a SIP call requiring a state to amend its SIP.

**Commenter:** PacifiCorp

**Commenter ID:** 38

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

When formulating its Interstate Transport Ozone SIP, Utah properly relied on the modeling data provided by EPA to the states in 2017-18 and the Modeling Guidance[1]. However, rather than judge Utah's SIP by using the same 2017-18 modeling data it had provided, EPA instead chose to analyze a newer data set that was unavailable to Utah at the time it developed its SIP. Notably, instead of the 2018 Modeling Guidance data, EPA relied on "the Agency's most recently available modeling (2016v2) to identify upwind contributions and linkages to downwind air quality problems in 2023." This is the same modeling EPA relied on for the Proposed FIP. This reliance is arbitrary because Utah has not been afforded a meaningful opportunity to review and incorporate the same modeling upon which EPA bases its decisions.

[...]

*EPA should not evaluate Utah by newer modeling data not available when the Utah SIP was submitted.*

Notably, EPA's reliance on recent analysis and data not available to the state at the time of Utah's SIP submission and never provided during EPA's statutory review period is unfair to the state, resulting in an arbitrary and capricious action. Just as "[a]gency actions must be assessed according to the statutes and regulations in effect at the time of the relevant activity,"[29] EPA's approval or disapproval of a SIP should adhere to the guidance, data, and evidence available and on the record at the time of a state's required submission of the SIP.

In relation to the Proposed Disapproval, Utah submitted the Utah Ozone Transport SIP to EPA on January 29, 2020. The SIP submission was determined complete by operation of law. Rather than rely on the same data and information available to Utah at the time it drafted its SIP, EPA primarily relies "on modeling based on the updated and newly available 2016v2 emissions platform in evaluating these submissions with respect to Steps 1 and 2 of the 4-step interstate transport framework." EPA's "updated" modeling wasn't even released until 2021, a year after Utah submitted its SIP. EPA should not disapprove a SIP based on extra-record data not available to the State during its development of the SIP.

1 U.S. Environmental Protection Agency, 2018. Modeling Guidance for Demonstrating Attainment of Air Quality Goals for Ozone, PM2.5, and Regional Haze, Research Triangle Park, NC. https://www3.epa.gov/ttn/scram/guidance/guide/O3-PM-RH-Modeling_Guidance-2018.pdf

[29] *See Texas v. EPA*, 829 F.3d 405, 430 (5th Cir. 2016).

**Commenter:** Utah Division of Air Quality

**Commenter ID:** 47

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

[T]he proposed disapproval relies heavily on modeling results that were unavailable to the state during the development of the SIP.

EPA's Proposed Disapproval Relies on the Modeling Results That Were Unavailable During the SIP Development

 The EPA indicates that its proposed decision to disapprove Utah's SIP relies heavily on using the updated modeling platform 2016v2. The EPA explains that "by using the updated modeling results, the EPA is using the most current and technically appropriate information for this proposed rulemaking." However, as EPA knows, these results were not available to the states during the development and submittal of the interstate transport SIPs. Because SIP planning is a lengthy process, it is unacceptable for EPA to use modeling results for their rulemaking that were developed after state SIP preparation. As with all planning, SIP revisions are a representation of the best available data and modeling at that time. Using results from a modeling effort that post-dated the states' SIP development period is an additional example of EPA changing expectations without issuing appropriate and timely guidance. By relying on modeling results not available during the time of state SIP development, EPA is setting a precedent that creates significant uncertainty for any planning effort, further eroding the trust required for effective state and federal cooperation. This is clearly inconsistent with the cooperative federalism structure of the CAA.

**Commenter:** West Virginia Department of Environmental Protection

**Commenter ID:** 49

**Docket ID:** EPA-R03-OAR-2021-0873

**Comment:**

In the WV 2015 Ozone Good Neighbor SIP, DAQ applied independent modeling performed by Alpine Geophysics utilizing 2023 projected emissions. Alpine modeled at a finer 4-km grid within the maintenance and nonattainment receptor areas rather than the 12-km grid utilized by EPA. Also, at this time, the Lake Michigan Air Directors Consortium ("LADCO") regional planning organization ("RPO") performed similar modeling. All three of these efforts modeled remarkably comparable impacts at the downwind monitor locations. As such, DAQ is further puzzled by EPA's abandonment of its own modeling results by this proposed disapproval action.

*Response*

See Section V.A.4. of the preamble for our general response to comments on the use of updated modeling to support the EPA's action. The EPA notes that the EPA is not disapproving any SIP submission for its choice of modeling. The EPA's evaluations of each SIP submission were explained at proposal. *See, e.g.,* 87 FR 9867-9869 (February 22, 2022) (Minnesota); 87 FR 9818-9824 (February 22, 2022) (Oklahoma); 87 FR 31492-31493 (May 24, 2022) (Nevada); and 87 FR 31477-31483 (May 24, 2022) (Utah). We respond to several additional specific comments here.

One commenter claimed, "By delaying its decision on Maryland's submittal for nearly 2.5 years, the EPA moved the goal post for Maryland—an act the DC Circuit admonished in *New York v. EPA*, 964 F.3d 1214, 1223 (D.C. Cir. 2020)." First, as explained in the preamble, the timing of the EPA's action is not moving the goal posts, nor does availing ourselves of the most recent 2015 ozone transport modeling and monitoring information do so. Second, *New York* is inapposite. The court there found fault with the EPA's denial of a CAA section 126(b) petition from New York, which had identified many upwind-state sources with relatively large $NO_x$ emissions that the state alleged significantly contributed in violation of the good neighbor provision. The court found the EPA's explanation for why the state had not made out at least a facially plausible showing of significant contribution to be arbitrary and capricious. The court noted that downwind petitioning states may lack the ability to conduct the kinds of analysis the Agency's denial suggested may be required and also found internal inconsistencies in the Agency's position during litigation. None of that is relevant here. First, this holding was not about air quality determinations, but rather Step 3 analysis of source emissions reduction potential. Second, upwind states are charged by the Act with evaluating, defining, and prohibiting their sources' significant contribution. Unlike a downwind jurisdiction, they possess all requisite authority to undertake an analysis of emissions and emissions reduction potential within their borders. *See generally* CAA section 110(a)(2). Nor is the Agency obligated to define "significant contribution" for upwind states before acting on these SIP submissions. *See EPA v. EME Homer City*, 572 U.S. 489, 508-09 (2014).

APC and PacifiCorp both cite *Texas v. EPA*, 829 F.3d 405 (5th Cir. 2016) to argue that "EPA's approval or disapproval of a SIP should adhere to the guidance, data, and evidence available and on the record at the time of EPA's timely review of the SIP." In *Texas*, the 5th Circuit granted a preliminary stay of the EPA's disapproval of Oklahoma's and Texas' regional haze SIP submissions and promulgation of FIPs and did not reach the merits of either the EPA's assessment of the SIP submissions' compliance with the requirements of the CAA or the FIPs.[2] Although the court noted that the EPA proposed amendments to the regional haze rule subsequent to Texas and Oklahoma submitting regional haze SIP submissions, that proposal was not relevant to the submissions before the court.[3] Moreover, the EPA has not promulgated any regulations to implement CAA section 110(a)(2)(D)(i)(I). Rather, EPA is applying its

---

[2] *Texas v. EPA*, 829 F.3d 405 (5th. Cir. 2016)

[3] *See, e.g.*, Protection of Visibility: Amendments to Requirements for State Plans; Proposed Rule, 81 Fed. Reg. 26941, 26944 (May 4, 2016) (explaining that the proposed "changes would apply to periodic comprehensive state implementation plans developed for the second and subsequent implementation periods and for progress reports submitted subsequent to those plans." And that EPA "[did] not intend for the proposed changes to affect the development of state plans for the first implementation period or the first progress reports due under the existing Regional Haze Rule.")

longstanding framework for implementing CAA section 110(a)(2)(D)(i)(I) while recognizing and considering any alternative approaches states presented. EPA further notes that to the extent APC objects to EPA's consideration of 2016v2 modeling or the updated 2016v3 modeling (adjusted in response to public comment on this action), Alabama's June 21, 2022, SIP submission was submitted after the EPA made the 2016v2 modeling available and included arguments with respect to that modeling, which the EPA has evaluated in this final action.

APC, The Luminant Companies, and PacifiCorp quote *Sierra Club v. EPA*, 356 F.3d 296, 308 (D.C. Cir. 2004): "To require states to revise completed plans every time a new model is announced would lead to significant costs and potentially endless delays in the approval process." In that case, Sierra Club challenged EPA's conditional approval of Maryland, Virginia, and Washington, D.C.'s attainment plans to address the Washington, D.C. Metropolitan Area's "Severe" classification for several reasons. 356 F.3d at 300. One reason was that the rate-of-progress plans relied on an older emissions model (MOBILE5 as opposed to the more recent MOBILE6). *Id.* EPA regulation specifically required states to use the latest emission model available during the development their rate-of-progress plans for the purposes of meeting Severe requirements, CAA section 172(c)(3); 40 CFR 51.112(a)(1), but because MOBILE6 became available one month before these SIP submissions were submitted, the EPA accepted the rate-of-progress plan based on MOBILE5. 356 F.3d at 308. The court agreed it was reasonable for EPA to not require Maryland, Virginia, and Washington, D.C. to revise their rate-of-progress plans using MOBILE6. *Id.* The EPA notes the timing consideration quoted by commenters related to attainment planning in a Serious nonattainment area. Here, however, the EPA has no regulations that require any state to use any particular type of model to address statutory requirements under CAA section 110(a)(2)(D)(i)(I), nor is the EPA disapproving any SIP submission on the basis of its choice of modeling (as compared to EPA's evaluation of the *results* of the modeling). Further, the *Sierra Club* case does not stand for the proposition that EPA is prevented from considering the most up-to-date data in assessing whether upwind states may be potentially significantly contributing to downwind nonattainment or maintenance.

APC and The Luminant Companies cite *Wisconsin v. EPA*, 938 F.3d 303, 336 (D.C. Cir. 2019) for the premise that the EPA's disapproval of a SIP submission on the basis of "reliance on data compiled after the SIP action deadline" may be challenged.  The EPA acknowledges that *Wisconsin* noted such was the States' argument, but the D.C. Circuit did not opine on the validity of the assertion since it was not relevant to the court's evaluation of the CSPAR Update FIP.

A comment specifically pointed to the EPA's proposed error correction of its approval of Delaware's SIP submission (which is a component of the proposed FIP rulemaking published April 6, 2022) to suggest the EPA had created an unworkable standard for states. The commenter went on to argue that the EPA must approve Tennessee's SIP submission based on the information available at the time Tennessee submitted it to the EPA. However, this argument is illogical. If the EPA were to do that, it would be treating Delaware and Tennessee dissimilarly. In fact, the proposed error correction for Delaware only illustrates the futility of commenters' arguments for using outdated information to approve their SIP submissions. Had the EPA done that, then just as it proposed for Delaware, the Agency would likely have simply conducted error corrections of those approvals in light of the updated projections of air quality and contributions in 2023 that are now available.

61

Finally, it bears observance that if the EPA's evaluation of information regarding 2023 projections was arrested at the time of some deadline in the past or with the issuance of some older set of modeling results, then the purpose of notice and comment rulemaking would itself be frustrated, because no matter what arguments commenters could make about more recent or current real-world conditions or updated projections regarding 2023, the Agency would be forced to ignore them. As an example, the EPA would be obligated to ignore many of the comments on these proposals providing updates to the EPA's emissions inventories, which we have considered in developing the 2016v3 modeling of 2023.

In response to Louisiana Chemical Association, the EPA clarifies that the Agency found Louisiana's SIP submission complete on November 15, 2019. In response to Tennessee Department of Environment and Conservation, the EPA notes that the Agency is deferring final action on Tennessee's good neighbor SIP submission at this time. In response to Midwest Ozone Group, the EPA notes that the Agency met with Multi-Jurisdictional Organizations such as Central States Air Resource Agencies and others in Summer 2021 to discuss the concerns outlined in the July 2021 letter cited in the comment.[4] The EPA subsequently made emissions data available on September 20, 2021, as discussed in more detail in the preamble in Sections II.C and III.A.1.

Other issues raised by these comments are addressed in the preamble in Sections II.C, II.D, III.A.1., V.A., and V.B.2, and V.A.6 , as well as in Section 1.2 (Guidance for SIP Submissions), Section 5 (Updates to Modeling and Changes in Linkages), 6.1.2 (Step 1 Receptors Linked to Texas), 7.4 (August 2018 Memorandum), 8.1 (Determination of Significant Contribution), 10.2 (SIP Call), and 10.3 (Cooperative Federalism and the EPA's Authority).

## 1.5   States' Step 3 Analysis

*Comments*

**Commenter:** Air Pollution Control Program, Missouri Department of Natural Resources

**Commenter ID:** 01

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

[T]he Air Program notes that EPA has not ever provided any guidance on what an appropriate step-3 analysis would entail, which makes any decision where it rejects a step-3 analysis arbitrary and capricious. The following paragraphs explain the flaws of EPA's step-3 analysis that it has proposed in the FIPs for 26 states, including Missouri.

[…] Further, EPA's step 3 process completely ignores the real question at hand with the enabling statute, which ties contribution to an amount which contributes significantly to downwind maintenance or

---

[4] See "Meeting With States and MJOs on 8-18-2021" in the docket for this action.

nonattainment problems. Instead, EPA completely ignores the statutory contribution issue and instead is imposing controls that suit federal policy choices regardless of their impact on the downwind receptors that EPA used as justification for disapproving the SIPs to begin with.

[...]

The mere fact that it appears extremely unreasonable, if not impossible, for many states to attempt to address their good neighbor obligations through application of step-3 magnifies the overreach of the federal executive branch in these actions. EPA has offered no guidance to states on developing step-3 demonstrations in their good neighbor SIPs Not a single state has successfully made a step-3 demonstration to avoid a FIP. Every single state that is contributing above the 1 percent threshold (except for Oregon, as noted previously) is having their SIP disapproved, and the proposed FIP will control and impose unnegotiable costs on citizens and sources in those states. This shows again that EPA's action will strip state energy choices from the states and place them into the hands of EPA if these disapprovals are held to stand.

**Commenter:** Arkansas Environmental Federation

**Commenter ID:** 09

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

EPA also cannot substitute its own judgement for that of the state's in crafting a SIP, as the courts have recognized.).[15] Accordingly, the fact that EPA has consistently applied Step 3 of its 4-Step framework to identify "significant" emissions contributions for its ozone transport Federal Implementation Plans ("FIPs") and "this interpretation of the statute has been upheld by the Supreme Court," has no bearing on whether a state's different choices for its own SIP are approvable under the CAA. In determining whether a state's emissions significantly contribute to nonattainment or interfere with maintenance, EPA explains that "states must complete an analysis similar to the EPA's. Yet there is no requirement in the CAA that states must complete an analysis similar to EPA's nor has EPA attempted to adopt regulatory standards that purport to define the regulatory requirements for interstate transport SIPS. The very cases cited by EPA, the Supreme Court and the D.C. Circuit Court of Appeals have ruled that such plans may not result in controls that reduce emission by more than the amount necessary to achieve attainment.[18]

---

[15] *Bridesburg*, 836 F.2d at 781 (quoting *Train v. Natural Res. Def. Council, Inc.*, 421 U.S. 60, 79 (1975)) (internal citations and quotations omitted) ("EPA has limited authority to reject a SIP . . . . The [CAA] gives the Agency no authority to question the wisdom of a State's choices of emission limitations if they are part of a plan which satisfies the standards of [Section 110(a)(2)], and the Agency may devise and promulgate a specific plan of its own only if a State fails to submit an implementation plan which satisfies those standards.").

[18] EPA acknowledges that pursuant to *EME Homer City* decision, it cannot "require [] an upwind state to reduce emissions by more than the amount necessary to achieve attainment in every downwind state to which it is linked" for to do so would be "over-control". 87 Fed. Reg. 200098-99. It further admits that its current modeling demonstrates weakness in its conclusions regarding Arkansas' linkages, and calls into question inclusion of non - EGUs in the state plan. *Id.* One tenet of EPA proposed disapproval is that Arkansas' analysis did not include non -

EGUs (87 Fed. Reg. 9810), yet EPA's own modeling seems to indicate that the opposite - that to go beyond is in fact over control. Id. Either way - and without waiver - this confusion regarding modeled results, ever-changing linkages, and phantom necessity of control, particularly in Arkansas, highlights the unfairness and inefficiency of EPA's chosen process for this rule making, its numerous dockets, and the companion rule making proposing to institute a FIP for Arkansas on the heels of this ill-conceived proposed disapproval.

**Commenter:** Louisiana Electric Utility Environmental Group

**Commenter ID:** 28

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

EPA also cannot substitute its own judgment for that of the state's in crafting a SIP, as the courts have recognized.[11] Accordingly, the fact that EPA has consistently applied Step 3 of its 4- Step framework to identify "significant" emissions contributions for its ozone transport Federal Implementation Plans ("FIPs") and "this interpretation of the statute has been upheld by the Supreme Court," has no bearing on whether a state's different choices for its own SIP are approvable under the CAA. In determining whether a state's emissions significantly contribute to nonattainment or interfere with maintenance, EPA explains that "states must complete an analysis similar to the EPA's (or an alternative approach to defining "significance" that comports with CAA requirements.)" Yet, there is no requirement in the CAA that states must complete an analysis similar to EPA's and EPA has not attempted to adopt regulatory standards that purport to define the regulatory requirements for interstate transport SIPs.

[11] *Bridesburg*, 836 F.2d at 781 (quoting *Train v. Natural Res. Def. Council, Inc.*, 421 U.S. 60, 79 (1975)) (internal citations and quotations omitted) ("EPA has limited authority to reject a SIP . . . . The [CAA] gives the Agency no authority to question the wisdom of a State's choices of emission limitations if they are part of a plan which satisfies the standards of [Section 110(a)(2)], and the Agency may devise and promulgate a specific plan of its own only if a State fails to submit an implementation plan which satisfies those standards.").

**Commenter:** The Luminant Companies

**Commenter ID:** 44

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

EPA proposes to go beyond the actual requirements of the Clean Air Act and evaluate Texas's SIP according to new, non-statutory standards. Specifically, EPA proposes to reject TCEQ's expert modeling projections of future design values and TCEQ's quantification and assessment of Texas's "significant contribution" in favor of its own modeling. However, EPA's quantification and assessment of a State's "significant contribution" to downwind nonattainment or maintenance issues is *not* a requirement of the Act.[30] The Clean Air Act does not provide EPA the authority to second-guess TCEQ and disapprove its SIP simply because TCEQ's modeling does not match EPA's modeling or because EPA believes TCEQ's modeling "*may* understate" projected design values or there is "*potential* underestimation."[31] The

standard that EPA applies to Texas's SIP and its supporting technical analysis in the Proposed Disapproval has no basis in the Clean Air Act. EPA has announced its preference for a "nationally consistent approach," but this preference cannot override the clear and settled intent of Congress that states be permitted to implement different and varying approaches if they choose. Nor can EPA's policy goal heighten or alter the standard set out in the Clean Air Act for a state's SIP submittal such that a "deviation" from EPA's preferred approach "must be substantially justified," as EPA claims. Plainly put, EPA does not write SIPs. EPA's competing view of Texas's contribution or its potential to interfere with maintenance in downwind States, and EPA's overconservative methodology for determining these things, are not requirements of the Act, nor has EPA promulgated regulations addressing this. In fact, EPA has recognized that it "has not directed states that they must conduct [their] analysis in precisely the manner the EPA has done in its prior regional transport rulemakings[.]" In fact, EPA has taken inconsistent approaches (none of which are grounded in the statute), previously stating that states must only use an assessment of significant contribution that is "comparable" to EPA's preferred approach in order to have its SIP approved.[34]

[30] [*EME Homer City Generation, L.P. v. EPA*, 696 F.3d 7 (D.C. Cir. 2012)] at 47 (Id. at 47 ("Nowhere does the [Clean Air Act] place a requirement on EPA to quantify each State's amount of 'significant contribution' to be eliminated pursuant to the 'good neighbor' provision[.]").

[31] EPA Region 6, 2015 8-Hour Ozone Transport SIP Proposal, Technical Support Document, Docket No. EPAR06-OAR-2021-0801-0002, at 39, 66 (Feb. 2022) ("Proposed TSD") (emphasis added).

[34] *See* [Guidance for State Implementation Plan (SIP) Submissions to Meet Current Outstanding Obligations Under Section 110(a)(2)(D)(i) for the 8-Hour Ozone and PM2.5 National Ambient Air Quality Standards (Aug. 15, 2006)] at 5.

**Commenter:** Oklahoma Department of Environmental Quality

**Commenter ID:** 37

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

EPA's Proposal is a Fundamental Change in Policy and is Not in Line With Previous CSAPR Policy-Making

As mentioned previously, under current EPA policy it is not possible for a state to be certain that any quantity of NOx emissions reductions will comply with the good neighbor requirements without waiting for the completion of Step 3 of the CSAPR framework. Because Step 3 is to be undertaken during the development of the FIP, the approach adopted by EPA in its proposed FIP represents a substantive change in policy, rather than an extension of the current approach. EPA's CSAPR approach was challenged in the courts and survived those challenges, giving EPA confidence in the fundamental appropriateness of actions taken previously. However, the previous CSAPR remedies constitute a different policy approach than the present EPA proposed action, which has metamorphosed into a form substantively different from its previous versions

**Commenter:** Midwest Ozone Group

**Commenter ID:** 30

**Docket ID:** EPA-R02-OAR-2021-0673, EPA-R03-OAR-2021-0872, EPA-R03-OAR-2021-0873, EPA-R04-OAR-2021-0841, EPA-R05-OAR-2022-0006, EPA-R06-OAR-2021-0801, EPA-R07-OAR-2021-0851

**Comment:**

In the absence of any guidance from EPA related to the assessment of Step 3 control measures, EPA should defer to state plans which evaluate such control measures.

While EPA's proposed disapprovals criticize states for failing to conduct an appropriate Step 3 analysis, EPA makes it clear that it has not established guidelines for how states should conduct that analysis. EPA's treatment of this issues is illustrated by the following statement made by EPA in addressing the Tennessee SIP:

> While the EPA has not directed states that they must conduct a Step 3 analysis in precisely the manner the EPA has done in its prior regional transport rulemakings, state implementation plans addressing the obligations in CAA section 110(a)(2)(D)(i)(I) must prohibit "any source or other type of emissions activity within the State" from emitting air pollutants which will contribute significantly to downwind air quality problems. Thus, states must complete something like the EPA's analysis (or an alternative approach to defining "significance" that comports with the statute's objectives) to determine whether and to what degree emissions from a state should be "prohibited" to eliminate emissions that will "contribute significantly to nonattainment in or interfere with maintenance of" the NAAQS in any other state. Tennessee did not conduct such an analysis in its SIP submission.

It is apparent that most states did little or no Step 3 analysis because, with many incorporating the 2018 flexibilities that EPA advised could be used in 2015 NAAQS Good Neighbor SIPs, they concluded in either Step 1 or 2 that no controls were required.  The proposed Good Neighbor SIP disapprovals should therefore not impose a FIP without first allowing the states, working with their respective MJOs for a regional approach, an opportunity to conduct a Step 3 analysis better tailored to their state and/or region.

Rather than a wholesale disapproval of 19 state Good Neighbor SIPs, EPA should propose an 18-month period for states to proceed with Steps 3 and 4, especially since the EGU-only approach is insufficient and the other source contributions provide even more opportunity for the development of state- and region-specific control strategies that would likely be more cost effective and avoid the over-control that occurs with a generic FIP approach.


**Commenter:** Midwest Ozone Group

**Commenter ID:** 30

**Docket ID:** EPA-R08-OAR-2022-0315, EPA-R09-OAR-2022-0394, EPA-R09-OAR-2022-0138

**Comment:**

Rather than a wholesale disapproval of state Good Neighbor SIPs, EPA should propose an 18-month period for states to proceed with Steps 3 and 4, especially since the EGU-only approach is insufficient and the other source contributions provide even more opportunity for the development of state- and region-specific control strategies that would likely be more cost effective and avoid the over-control that occurs with a generic FIP approach.

**Commenter:** PacifiCorp

**Commenter ID:** 38

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

The CAA does not require states to address their Good Neighbor obligations in a specific manner, nor does it "enable EPA to force particular control measures on the states." EPA has not adopted any nationwide regulatory standards that purport to define the requirements for interstate transport SIPs with respect to the 2015 ozone NAAQS. Specifically, EPA has previously explained that "[t]he precise nature and contents of such a submission is not stipulated in the statute. [Therefore,] EPA believes that the contents of the SIP submission required by section 110(a)(2)(D)(i) may vary depending upon the facts and circumstances related to the specific NAAQS." This is one of the reasons the CAA assigns development of implementation plans to the states – they are able to use their local knowledge and familiarity with regional conditions to best design the right type of plan for their location and citizens' values and priorities.

EPA claims it "has not directed states that they must conduct a Step 3 analysis in precisely the manner the EPA has done in its prior regional transport rulemakings." But EPA rejects the flexibilities it previously provided to the states and instead insists on a one-size-fits-all approach when assessing significant contribution to NAAQS. In fact, EPA's disapprovals force Utah and other states to "complete something similar to EPA's analysis" or "an alternative approach" that meets EPA's policy choices and preferred methods.

The Proposed Disapproval fails to recognize EPA's limited role and obligation: "the Administrator shall approve [a SIP or SIP revision] as a whole if it meets all of the applicable requirements of this chapter." EPA has long recognized its limited role, as stated in a recent SIP approval: [T]he Administrator is required to approve a SIP submission that complies with the provisions of the CAA and applicable Federal regulations. 42 U.S.C. 7410(k); 40 CFR 52.02(a). Thus, in reviewing SIP submissions, EPA's role is to approve state choices, provided that they meet the criteria of the CAA.

*Response*
The EPA did not define "significant contribution" for any state in this action, nor is the EPA required to do so. *EPA v. EME Homer City*, 572 U.S. 489, 508-09 (2014). See Section V.B.8. of the preamble for the EPA's general response to these comments.

A comment cites a notice in the *Federal Register* as "87 Fed. Reg. 200098-99" regarding the EPA's interpretation of the *EME Homer City* decision related to over control. Based on context, the EPA assumes the comment was referring to the proposed good neighbor FIPs for Arkansas and other states for the 2015 ozone NAAQS. *See* 87 FR 20098-99 (April 6, 2022). In that proposal the EPA stated, "Although the court described over control as going beyond what is needed to address nonattainment, EPA interprets the holding as not impacting its approach to defining and addressing both nonattainment and maintenance receptors."

In any case, this comment is inapposite as it relates to the EPA's non-final analysis of potential emissions controls in the proposed FIP rather than to the EPA's evaluation of Arkansas's SIP submission. In the proposed SIP submission disapproval, the EPA explained that Arkansas' reliance on air quality information or factors was generally not sufficient at Step 3 to establish that no further emissions controls would be appropriate in Arkansas. *See* 87 FR at 9808-10 (February 22, 2022). The EPA further explained that Arkansas' analysis was deficient for failing to fully analyze both additional electric generating unit (EGU)and non-EGU controls. *See id.* at 9810-11. While in the proposed FIP the EPA acknowledged that there was a potential for overcontrol if the full suite of the non-EGU controls as proposed were included in the FIP's control strategy for Arkansas, the EPA ultimately proposed to determine that such over-control was not sufficiently established to justify not proposing the full suite of non-EGU controls for Arkansas sources. *See* 87 FR 20099. Thus, there is no inconsistency between the two proposals: the EPA's evaluation of the SIP submission established that the state had not conducted a proper Step 3 analysis of either EGU or non-EGU control opportunities; and in the proposed FIP, the EPA proposed to apply both the EGU and non-EGU control strategies in Arkansas and proposed to find there was insufficient evidence of overcontrol. Even if the EPA were to determine in a final FIP rulemaking that no further emissions controls are warranted for some sub-set of these sources, that would not change the fact that the Arkansas SIP submission's Step 3 analysis is deficient and not approvable.

The EPA explained the deficiencies of Texas's SIP submission at proposal. *See* 87 FR 9826-9834 (February 22, 2022) and in the technical support document (TSD) titled "Region 6 2015 8-Hour Ozone Transport SIP Proposal TSD", in Docket ID No. EPA-R06-OAR-2021-0801 (hereinafter Evaluation of Texas Commission on Environmental Quality (TCEQ) Modeling TSD). The EPA is not taking final action on Tennessee's Good Neighbor SIP submission for the 2015 ozone NAAQS in this action.

Other issues raised by these comments are addressed in Sections III, V.A.2., V.A.6., V.B.2., V.B.3., and V.B.7. of the preamble and the following Sections: 4.2 (Model Performance), 6.4 (October 2018 Memorandum), 6.5 (Certain Monitoring Sites in California at Step 1) 10.2 (SIP Call), 10.3 (Cooperative Federalism and the EPA's Authority), 11.6 (Economic Impacts).


## 1.6   EPA Input During SIP Submission Development


*Comments*

**Commenter:** Air Pollution Control Program, Missouri Department of Natural Resources

**Commenter ID:** 01

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

EPA shared no information as to its basis for the SIP disapproval prior to promulgating it, and the FIP, as proposed, will impose hundreds of millions of dollars in compliance costs per year on all Missouri citizens who purchase electricity, and potentially, on any citizen of the state that may depend on power plants and other manufacturing industries in the state for their work and their livelihood. Prior to the proposed FIP, EPA has offered no indication as to what might be acceptable under a step-3 analysis. This puts states in an impossible position to submit an approvable SIP if they are unable to avoid obligations under steps 1 and 2. However, EPA's proposed FIPs shows that it is willing and eager to impose crippling costs on states to pursue federal policy choices over state-protected decisions with no regard for the impact that such costly controls have on the upwind states where EPA imposes the FIPs.

[...]

EPA should be required to submit comments on SIPs if it thinks the proposed SIPs have the potential for controversial action and explain the issues EPA has with any proposed SIP submission. It is unreasonable for EPA to sit on SIP submittals for years with no communication to states as to its intentions for disapprovals and proposed FIPs that will impose hundreds of millions of dollars in annual compliance costs that will be passed down to citizens in their state. EPA's current action with the proposed FIP shows that it intends to invoke its power from the Homer City case to impose whatever costs it determines to be reasonable on any state where it can produce modeling showing that the state hits the low and arbitrary 1 percent threshold.

**Commenter:** Arkansas Department of Energy and Environment, Division of Environmental Quality

**Commenter ID:** 07

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

Arkansas DEQ discussed methodology, modeling, and rationale with EPA early in the process and throughout SIP development. EPA offered suggestions for refinement based on initial drafts, and provided additional input during the public comment period for the 2015 Ozone Transport SIP draft and associated rulemaking. There was at no point during this process any indication from EPA that this plan or DEQ's rationale was not approvable as DEQ was developing it, as long as the state provided rational, science-based justification for the state's decisions. DEQ did so.

In addition, EPA provided input on DEQ's HYSPLIT modeling analysis during the comment period for the SIP and DEQ made adjustments to its modeling in response to EPA's comments. If EPA contends that HYSPLIT modeling is not informative for the purposes of SIP decision-making, this should have been

69

stated in early conversations between the agency and DEQ, before DEQ performed HYSPLIT modeling, or during the public comment period (rather than suggesting modifications to DEQ's methodology, resulting in additional state resources invested in HYSPLIT modeling to bolster the SIP submittal in response to EPA comments). See EPA comments and DEQ responses to comments on 2015 Ozone Transport SIP, included here as Appendix A.

**Commenter:** Arkansas Environmental Federation

**Commenter ID:** 09

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

[Arkansas] DEQ has worked diligently to meet the NAAQS requirements for the 2015 ozone standard, as outlined below. Significant work was required to develop the information necessary to formulate the SIP based on EPA guidance at the time as shown by the following chronology, which involved interaction with local stakeholders including AEF. Once that information was developed and a proposed plan prepared, DEQ undertook the required state-rulemaking and legislative action. DEQ worked collaboratively with EPA Region 6 throughout the process. Numerous discussions were held by DEQ and EPA Region 6 to inform DEQ's development of an appropriate SIP. DEQ responded to questions and comments from EPA Region 6 to develop the SIP. Additionally, DEQ developed additional information in response to EPA Region 6's comments in a collaborative effort that EPA has now abandoned. In spite of these efforts, EPA missed the statutorily mandated deadline to act on DEQ's SIP submission even though the SIP was approvable.

**Commenter:** Association of Electric Companies of Texas, BCCA Appeal Group, Texas Chemical Council and Texas Oil & Gas Association

**Commenter ID:** 11

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

Due to EPA's own delay and the accelerated timeline required by the consent decree, EPA is proposing to deny commentors the opportunity to respond to the new data and analysis.[29]

---

[29] This is further compounded by the fact that EPA did not submit comments on Texas's proposed SIP during TCEQ's public comment period. If EPA had concerns about TCEQ's SIP submission, EPA should have raised concerns during TCEQ's public comment period for the draft SIP. This would have allowed TCEQ to revise the SIP submission to address EPA's concerns prior to finalizing it and submitting it to the Agency. See EPA, SIP PROCESSING MANUAL, WHAT IS A SIP?, https://cfpub.epa.gov/oarwebadmin/sipman/sipman/mContent.cfm?chap=1&filePos=4 (last visited Apr. 25, 2022) ("EPA should prepare comments on the proposed revisions and either testify at the hearing and submit comments, or submit comments during the state's public comment period. States are required by law to provide the public and EPA 30 days to review and comment on proposed revisions to the SIP.").

**Commenter:** Environmental Federation of Oklahoma

**Commenter ID:** 20

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

In particular, EFO supports DEQ's assessment that EPA has overstepped its authority by circumventing the normal SIP development and approval process in a number of ways, including but not limited to: […]providing no indication of the upcoming SIP disapproval[.]

**Commenter:** Evergy, Inc.

**Commenter ID:** 21

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

MDNR claims that EPA did not reach out to discuss new modeling results nor identify any issues with Missouri's SIP during the course of those two years prior to proposing to disapprove the SIP and to implement a Federal Implementation Plan (FIP).

**Commenter:** Maryland Department of the Environment

**Commenter ID:** 29

**Docket ID:** EPA-R03-OAR-2021-0872

**Comment:**

Maryland did adopt the CSAPR Update into its SIP. Maryland submitted its CSAPR Update Incorporation by Reference ("IBR") SIP #20-03 in response to direction from EPA Region 3 that Maryland could not continue to be subject to the CSAPR Update and also submit a Good Neighbor SIP. In order for the Good Neighbor SIP for the 2008 Ozone NAAQS to be approved, EPA Region 3 directed that CSAPR and the CSAPR Update must be incorporated into Maryland's regulations if MDE wanted to cite the rule(s) when addressing the state's Good Neighbor obligations.[3]

MDE committed to including the CSAPR Update in Maryland's SIP in August 2019. The regulation was proposed in December 2019, and was finalized into Maryland's regulations at COMAR 26.11.28 on March 23, 2020. Maryland's Good Neighbor SIP for the 2015 Ozone NAAQS states:

On October 26, 2016, the EPA finalized an update to CSAPR for the 2008 ozone NAAQS by issuing the CSAPR Close-Out [text error - "CSAPR Update"]. Maryland has been complying with the CSAPR Update limits and has committed to incorporating the Federal regulation into state

71

regulations and a State SIP. This will resolve any outstanding issues related to replacement of the CSAPR Update and FIP in Maryland or additional analysis of Maryland's regulations.[4]

On October 16, 2019, Maryland submitted its 2015 Good Neighbor SIP, which committed to the CSAPR Update IBR. The incorporation was finalized within 6 months and effective for over a year and a half after Maryland's 2015 Good Neighbor SIP was submitted to EPA. It was therefore reasonable to cite it and rely on it (in part) in Maryland's 2015 Good Neighbor SIP.

On March 15, 2021, EPA finalized the Revised CSAPR Update ("RCU") in order to resolve 21 states' transport obligations for the 2008 Ozone NAAQS. EPA made a procedural error[5] by finalizing the RCU as the FIP solution prior to disapproving Good Neighbor SIPs submitted by the states. EPA realized this error and to remedy it, EPA Region 3 asked Maryland to withdraw both the Good Neighbor SIP for the 2008 Ozone NAAQS and Maryland's IBR of the CSAPR Update into the state SIP. EPA stated that Maryland's transport obligations for the 2008 Ozone NAAQS were met by the RCU and that withdrawing the SIP would not affect any other Maryland actions.

It is unreasonable for EPA to use Maryland's compliance with EPA's directive against it now. EPA is estopped from such action because Maryland reasonably relied on EPA's direction that withdrawal of the 2008 Good Neighbor SIP and IBR would not affect its pending 2015 Good Neighbor SIP submittal. At least, in the spirit of public transparency and consistent with the concept of cooperative federalism upon which the CAA is based, EPA should have acknowledged in the proposed disapproval that the IBR SIP was withdrawn at EPA's request to correct EPA's procedural error. The federal/state relationship is built on trust and that trust is jeopardized when EPA regional offices are not fully transparent with their state counterparts.

[3] See August 2019 letter from MDE to Mr. Cosmo Servidio: "EPA has informed MDE that Maryland cannot continue to be subject to the CSAPR Update and the Federal Implementation Plan (FIP) and also submit a good neighbor SIP... In an effort to expedite EPA's approval process [for SIP #18-05 - Good Neighbor SIP for the 2008 ozone NAAQS] and based on guidance of EPA Region 3 staff, MDE is currently working to incorporate by reference the federal CSAPR Update into the Code of Maryland Regulations. This should resolve any outstanding issues that were related to replacement of the CSAPR Update and the FIP in Maryland or additional analysis of Maryland's regulations."
[4] Maryland SIP #19-02: *Implementation, Maintenance, and Enforcement of the 0.070 ppm 8-hour Ozone National Ambient Air Quality Standard State Implementation Plan §110(a)(2)(D) MD 70 ppb Ozone Transport SIP*. Pg. 10
[5] See discussion related to submission of CSAPR IBR SIP #20-03 and message from C. Servidio

**Commenter:** Mississippi Department of Environmental Quality

**Commenter ID:** 32

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

MDEQ worked collaboratively with EPA Region 4 to properly respond to interstate transport, or "good neighbor," requirements and submitted what we believed EPA considered an approvable iSIP in September 2019.

**Commenter:** Nevada Division of Environmental Protection

**Commenter ID:** 33

**Docket ID:** EPA-R09-OAR-2022-0138

**Comment:**

EPA has repeatedly failed to meaningfully collaborate with NDEP on how to best address Nevada's interstate ozone transport obligations.

After EPA revised the ozone NAAQS in 2015, NDEP spent its limited resources to prepare and submit Nevada's iSIP by the required deadline of October 1, 2018, relying on EPA's March 2018 modeling results to establish that no out-of-state downwind receptors were impacted by Nevada sources.

EPA failed to act on Nevada's iSIP by the 2020 statutory deadline. As of late 2021, despite the long-standing process for review and prioritization of the SIP backlog (namely the SIP Management Plan) EPA provided zero communication to NDEP on any significant aspect of the Nevada iSIP review and approval process nor did EPA provide any substantive feedback on Nevada's 2018 iSIP submission.

**Commenter:** Oklahoma Department of Environmental Quality

**Commenter ID:** 37

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

EPA Comments on Oklahoma's SIP Submittal Did Not Reflect Its Intent to Disapprove, Indicating Implied Consent for Use of 1 ppb Significance Threshold

As EPA stated in the March 2018 Tsirigotis Memo, the memo was intended to be used not only by states, but as guidance for the EPA regions, as well. Generally, staff from the states and regions work together in developing SIP submittals and, accordingly, states provide EPA regional staff with periodic updates on progress toward SIP submittals. During the development process of Oklahoma's ozone transport SIP, Oklahoma discussed with EPA Region 6 its intent to use the flexibilities offered in the Tsirigotis memos. Therefore, during the final stages of SIP development in 2018, EPA Region 6 was on notice of Oklahoma's intent to use the flexibilities offered in the Tsirigotis memos.

On August 14, 2018, Oklahoma published for public comment Oklahoma's I-SIP Submittal, which included the ozone transport SIP. On September 17, 2018 (the final day of the comment period), Oklahoma received a letter containing comments on said SIP submittal from EPA Region 6 (Attachment B). In its comments, EPA Region 6 suggested that ODEQ incorporate information from the August 2018 Tsirigotis Memo into the SIP submittal, stating:

> We suggest you factor in information from the EPA memo of August 31, 2018, "Analysis of Contribution Thresholds for Use in Clean Air Act Section 110(a)(2)(D)(i)(I) Interstate Transport

State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards." The results of the analysis found in this memo would be a better justification for use of 1 parts per billion (ppb) threshold than the current narrative on a 1 ppb threshold.

Thus, not only is there an absence of comment on the record from EPA that Oklahoma should not rely on the 2018 Tsirigotis Memos or use the 1 ppb threshold, but EPA actually encouraged ODEQ to rely further on said memos to support the use of a 1 ppb threshold in the final SIP, which amounts to implied consent from EPA for the reasonableness of the 1 ppb threshold and reliance on the 2018 Tsirigotis Memos in demonstrating that reasonableness. Thus, EPA's position in the proposed SIP disapproval contradicts the 2018 Tsirigotis Memos and the comment letter from Region 6.


**Commenter:** Texas Commission on Environmental Quality

**Commenter ID:** 42

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

The EPA failed to provide Texas with formal comments on the adequacy of its analysis during the public comment period for the SIP revision.

The EPA did not comment on the adequacy of the TCEQ's analysis during the public comment period for the 2015 Ozone Transport SIP Revision. The TCEQ and EPA Region 6 participated in discussions regarding the proposed SIP revision, and the TCEQ answered questions from the EPA on the planned SIP submittal and provided additional data to the EPA. The EPA did not indicate that the information provided failed to address its concerns. The lack of EPA comment did not allow the TCEQ to address the issues outlined in the EPA's proposed disapproval in the adopted 2015 Ozone Transport SIP revision.


**Commenter:** United States Steel Corporation

**Commenter ID:** 45

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

[Arkansas] DEQ has expended an enormous amount of time and worked diligently to meet the NAAQS for ozone. DEQ worked to develop the information necessary to formulate the SIP, developed a proposed plan, and undertook the required state-rulemaking and legislative action. DEQ also worked collaboratively with EPA Region 6. Numerous discussions were held by DEQ and EPA Region 6 to inform DEQ's development of an appropriate SIP.  DEQ responded to questions and comments from EPA Region 6 to develop the SIP.  Additionally, DEQ developed additional information in response to EPA Region 6's comments as a part of a collaborative process that EPA has now abandoned.

**Commenter:** Utah Division of Air Quality

**Commenter ID:** 47

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

The benefit of cooperative federalism is having the autonomy to do what's best for the state, but do so in partnership with EPA to ensure that the CAA intent and requirements are met.

In this same spirit, UDAQ engaged early and often with our counterparts at Region 8 in the development of our interstate transport SIP. Through this collaboration and EPA's guidance, Utah selected the alternative threshold of 1 ppb. […] Thus, UDAQ was surprised when EPA proposed to include Utah in the proposed FIP, and subsequently disapproved the state's SIP based in large part on the selection of the 1 ppb over the 1% of the NAAQS threshold. If the 1 ppb threshold was in fact inappropriate for the development of this SIP, EPA should have communicated that view to UDAQ during the early engagement and development process or during the state's public comment period. Additionally, EPA released no new guidance directing states to use a 1% threshold either prior to or after SIP submittal deadlines.

*Response*

Some commenters assert that the EPA did not provide sufficient input to states during the development of the SIP submissions, while others allege that the EPA led the states astray or implied to states that the SIP submissions were approvable. The EPA is required under CAA section 110 to review a SIP submission revision that has been formally submitted; based on the EPA's determination of whether that submission meets applicable CAA requirements, the EPA must then approve or disapprove the SIP submission. There is no CAA requirement that the EPA must review, evaluate, and comment on a state's draft SIP submission revision during the state rulemaking process, and no legal basis for states to assume that the EPA's silence during a state public comment period constitutes the Agency's endorsement of such SIP submission revision. Where the EPA did communicate views to these states on draft SIP submission revisions, the EPA disagrees that such preliminary feedback should now bind the Agency, and the EPA disagrees that we could in any way lawfully provide "implied consent" to states regarding their draft SIP submissions before they have completed the required rulemaking processes at both the state and federal level. After all, EPA cannot assure any state in advance of the EPA's public notice and comment process what the EPA's final action on a SIP submission will be. *Catawba County v. EPA*, 571 F.3d 20, 34 (D.C. Cir. 2009) ("[a]n agency pronouncement is not deemed a binding regulation merely because it may have some substantive impact, as long as it leave[s] the administrator free to exercise his informed discretion.") citing *Panhandle Producers & Royalty Owners Ass'n v. Econ. Regulatory Admin.*, 822 F.2d 1105, 1110 (D.C. Cir. 1987) (quoting *Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533, 537 (D.C. Cir. 1986) (internal quotation marks omitted))).

The EPA encourages state air agencies to engage as early as possible with the Agency on the development of any SIP submission revisions in an effort to address all technical and policy approvability issues prior to submitting a final SIP submission package and appreciates states' willingness to involve

regional offices at the initial SIP submission development stage. Further, the EPA makes its best efforts to work closely with states, but EPA cannot be expected to provide states definitive guidance on what will ultimately be approvable. Nonetheless, the suggestions we made to states on their SIP submissions in this instance are not inconsistent with the final action we are now taking.

Other issues raised by these comments are addressed in Section V.A.3., V.A.6., and V.B.7. of the preamble and the following sections: 1.1 (Timing of SIP Actions), 1.2 (Guidance for SIP Submissions), 7.4 (August 2018 Memorandum), 10.3 (Cooperative Federalism and the EPA's Authority), 11.6 (Economic Impacts), and 11.12 (Consent Decrees).

We now address specific concerns about the EPA input during the SIP development process of specific states.

<u>Arkansas</u>

Regarding Arkansas, the EPA specifically commented on Arkansas' draft SIP submission that "EPA disagrees with ADEQ on the applicability of the prevention of significant deterioration (PSD) significant impact level (SIL) to a one parts per billion (ppb) threshold for assessing linkages to downwind receptors because EPA's analysis for the SIL did not contain information that could be used to evaluate the collective contribution from upwind states at downwind receptors, a key element for consideration given the regional nature of ozone transport." This is consistent with the EPA's position on this topic in this action. Further, in response to this comment, ADEQ made no changes to its final SIP submission. This is one example (of many) where the EPA provided feedback to a state during the SIP submission development process that the state chose not to include or act upon. It is inauthentic to characterize the disapproval of Arkansas' SIP submission as being an abandonment of collaborative process when there were specific EPA comments that went unaddressed by the state SIP submission, which contributed to the final SIP submission being deficient.

The EPA noted in our comments to ADEQ on their draft SIP submissions, the state's back trajectory analysis "would give additional perspective on the representativeness of EPA's modeling to examine the yearly frequency" and that "[c]omparing the frequency in 2011 to the other years analyzed would help determine if the frequency for 2011 was anomalous."[5] The EPA noted a number of concerns with the analysis. *Id.* The EPA's review found that Arkansas' analysis did not suggest that the modeled base year of 2011 used in EPA's 2011-based modeling was anomalous compared with other years. 87 FR 9809. We address additional comments related to the EPA's technical concerns and conclusions from ADEQ's HYSPLIT analysis in Section 8.8.

<u>Maryland</u>

EPA's proposed disapproval of Maryland's SIP submission made the point that "relying on a FIP at Step 3 is per se not approvable if the state has not adopted that program into its SIP . . ." 87 FR 9463, 9471 (Feb. 22, 2022). This point was made in the context of addressing Maryland's argument that the Cross-State Air Pollution Rule (CSAPR) Update FIP (which the EPA promulgated to partially address good neighbor obligations for the 2008 ozone NAAQS) satisfied the state's good neighbor obligations for the

---

[5]  The EPA's comment letter on ADEQ's draft SIP submission was attached to their SIP submission and is available in Docket ID. No. EPA-R06-OAR-2021-0801 (Document ID No. EPA-R06-2021-00801-0003).

2015 ozone NAAQS The statement that the EPA made at proposal is a correct statement of the EPA's interpretation of CAA section 110(a)(2), which is that FIP provisions cannot be relied upon to meet SIP obligations unless the FIP provisions are incorporated into the SIP.  (This aspect of Maryland Department of the Environment (MDE's) comment is further responded to in Section V.B.9 of the preamble regarding reliance on FIP measures. MDE complains, however, that EPA itself encouraged the state to withdraw its August 2018 SIP submission, which would have incorporated the CSAPR Update into its SIP and replaced the CSAPR Update FIP. MDE claims the EPA's change in advice to the state leading to the withdrawal of that submission was due to our own "procedural error," and that the EPA cannot now use the lack of incorporation into its SIP submission of the CSAPR Update as a basis for disapproval. These comments reflect a misunderstanding of the procedural history and omit certain key facts.

First, to review the series of actions we took to address Maryland's good neighbor obligations for the 2008 ozone NAAQS: On December 31, 2012, Maryland submitted a SIP submission to address the requirements of CAA section 110(a)(2)(D)(i)(I) with respect to the 2008 ozone NAAQS. On April 20, 2016, Maryland withdrew its good neighbor SIP submission. On July 20, 2016, the EPA published a finding of failure to submit a complete good neighbor SIP submission to address the requirements of CAA section 110(a)(2)(D)(i)(I) with respect to the 2008 ozone NAAQS for Maryland (81 FR 47040). On October 26, 2016, the EPA published a FIP for Maryland in the CSAPR Update addressing the requirements of CAA section 110(a)(2)(D)(i)(I) with respect to the 2008 ozone NAAQS. However, the EPA did not determine that the CSAPR Update FIP fully addressed the requirements of CAA section 110(a)(2)(D)(i)(I). On August 8, 2018, Maryland submitted a new SIP submission intended to fully address good neighbor requirements for the 2008 ozone NAAQS by adopting the CSAPR Update emissions trading program into its SIP. On December 21, 2018, the EPA published a determination in the CSAPR Close-Out that the CSAPR Update FIP for Maryland fully addressed the requirements of CAA section 110(a)(2)(D)(i)(I) for the 2008 ozone NAAQS (83 FR 65878, effective February 19, 2019).

However, following the D.C. Circuit decisions in 2019 in *Wisconsin v. EPA*, 938 F.3d 303 (D.C. Cir. 2019) and *New York v. EPA*, 781 Fed. App'x 4, 7 (D.C. Cir. 2019), to remand the CSAPR Update and vacate the CSAPR Close-Out, the CSAPR Update FIP could no longer be said to fully correct the CAA section 110(a)(2)(D)(i)(I) deficiency identified in the July 20, 2016 finding of failure to submit. EPA promulgated an updated FIP for Maryland and several other states in the Revised CSAPR Update, and this FIP established a new emissions budget for Maryland's EGUs as well as a new Group 3 emissions trading program, which entirely replaced the Group 2 program that had been promulgated in the CSAPR Update. 86 FR 23054 (April 30, 2021).

At that point, Maryland's August 2018 submission adopting the CSAPR Update program was no longer approvable as a remedy to its "significant contribution" under the 2008 ozone NAAQS, because the CSAPR Update FIP for Maryland was replaced by a new, more stringent emissions control program. It was at that point that the EPA encouraged Maryland to withdraw its August 2018 submission. The withdraw of the submission saved resources for all parties as it avoided the EPA having to go through a rulemaking process to disapprove that submission. Maryland remained free to adopt the Revised CSAPR Update FIP requirements into its SIP should it have chosen to do so.

In any case, the EPA's disapproval of Maryland's 2015 ozone NAAQS good neighbor SIP submission was not based solely upon non-incorporation of the CSAPR Update requirements into Maryland's SIP. Even if

the CSAPR Update—or even the Revised CSAPR Update—had been incorporated into the SIP, it wouldn't have even *partially* satisfied an appropriate Step 3 and Step 4 analysis. This is because the EPA has already included the emissions-reducing effects of both the CSAPR Update and the Revised CSAPR Update in its baseline air quality modeling at Steps 1 and 2 (in both the 2016v2 and 2016v3 modeling), and so pointing to either of those rules as measures that would eliminate significant contribution at Step 3, for purposes of the 2015 ozone NAAQS, would be impermissible double-counting. Further, the CSAPR Update only partially addressed interstate transport obligations for the less protective 2008 ozone NAAQS. Maryland offered no explanation why those requirements would be sufficient to satisfy Maryland's good neighbor obligations for the more protective 2015 ozone NAAQS. And there are yet additional reasons cited in the EPA's proposed disapproval that this comment does not address, such as Maryland's failure to evaluate other nitrogen oxides (NOx) emitting sources at Step 3 and to analyze potential NOx emission controls, costs, and effect on downwind receptors. These were independently sufficient bases to disapprove Maryland's 2015 ozone NAAQS good neighbor SIP submission. *See* 87 FR 9463 (Feb. 22, 2022).

<u>Mississippi</u>

The EPA agrees with the commenter's (MDEQ) statement about the collaborative efforts from both MDEQ and EPA Region 4 (as well as headquarters) to support the state's development of their 2015 ozone NAAQS transport SIP submission in 2019. The EPA worked with MDEQ to develop their 2015 ozone NAAQS transport SIP submissions based on information available at the time that Mississippi initiated their SIP development process through the final SIP submission. At that time, it was believed based on the 2011-based modeling that Mississippi would not be linked above 1 percent of the NAAQS to any out of state receptors in 2023. However, as discussed in the proposal and elsewhere in this final action, the EPA's updated modeling now shows the state is projected to be linked.

<u>Oklahoma</u>

During the development of Oklahoma's SIP submission, the EPA did suggest to Oklahoma that it "factor in information" from the August 2018 memorandum in their rationale for using a 1 ppb contribution threshold at Step 2, as that would be a "better justification" than arguments the state had drafted.[6] This suggestion, standing alone, cannot reasonably be understood as a final endorsement of the appropriateness of a 1 ppb contribution threshold for Oklahoma. The EPA did not indicate that the August 2018 memorandum pre-approved the use of a 1 ppb contribution threshold. Rather, it suggested Oklahoma improve the draft rationale. The topics of the August 2018 memorandum and Oklahoma's arguments related to the appropriateness of an alternative contribution threshold for the state are addressed in more detail in the preamble in Section V.B.7 and in Section 7.4 (August 2018 Memorandum).

<u>Texas</u>

Commenters (AECT et al., TCEQ) claim the EPA gave no indication that TCEQ's submission may not be approvable, additionally citing the EPA's SIP Processing Manual, available on EPA's website, to support

---

[6] A copy of the EPA's comments on Oklahoma's draft SIP submission are included in Docket ID No. EPA-HQ-OAR-2021-0663.

their argument that EPA should have done so.[7]  However, as TCEQ acknowledges, the EPA staff did in fact meet with TCEQ staff to discuss the submission. As explained elsewhere in this response, there is no obligation or requirement that EPA needed to have done so. Further, given the technical complexity of TCEQ's submittal (which included its own modeling efforts), it is understandable that EPA staff would not have been able to offer views at that point as to how the Agency may ultimately act on the submission.

## 1.7   Length of Comment Period

*Comments*

**Commenter:** Alabama Power Company, Southern Power Company, and PowerSouth Energy Cooperative

**Commenter ID:** 04

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

Further, commenters note that EPA did not provide affected stakeholders sufficient time to analyze and comment on EPA's proposed disapproval. EPA provided only 30 days for comments, which ended on the Friday within the Thanksgiving holiday. The State of Alabama made a reasonable request for additional time to provide comments on this highly technical and data-intensive issue, but EPA refused to grant that or any extension. EPA offered no rationale or explanation as to why additional time could not be afforded, only claiming it was "unnecessary." But EPA should defer to the State of Alabama to determine whether additional time to prepare its comments is necessary and only deny such a request for compelling reasons. EPA offered no such reasons and none exist. By denying the State's request for an extension to the notice and comment period, EPA failed to provide stakeholders with adequate time to evaluate the proposed requirements and failed to acknowledge that this is the only opportunity for stakeholders to identify and comment on the flaws in EPA's analysis. Allowing adequate time for comments is also significant because stakeholders provide comments to EPA in order to preserve their opportunity to bring errors to the attention of a reviewing court.

**Commenter:** Ameren Missouri

**Commenter ID:** 05

---

[7] EPA SIP Manual, available at https://cfpub.epa.gov/oarwebadmin/sipman/sipman/mIntro.cfm?chap=0&i=1. Though cited by commenters for the proposition that the EPA must provide comments to states on draft SIP submissions, the page cited by commenters notes that "Drafts are not required but can benefit the State if the submittal is controversial or if the State anticipates requesting parallel processing by resolving the majority of issues up front."

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

USEPA needs to provide additional time to comment on the Missouri SIP disapproval for post processing of model data review and comment per APA.

**Commenter:** Arkansas Department of Energy and Environment, Divison of Environmental Quality

**Commenter ID:** 07

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

[A]DEQ has performed a preliminary review of whether additional control measures for Arkansas are necessary to fulfill its interstate obligations for the 2015 ozone NAAQS based on the new EPA identified linkages. The length of the comment period does not provide adequate time to perform HYSPLIT modeling, which based on EPA's proposal, would be dismissed without adequate consideration, or photochemical modeling.

**Commenter:** Cleco Corporate Holdings LLC

**Commenter ID:** 14

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

Cleco requests a 60-day extension of the comment period for the Proposal.

Cleco again requests a 60-day extension of the comment deadline for the Proposal. Due to the great volume of information in which EPA based its SIP disapprovals, additional time is necessary for review of the material which includes the state-specific 4-Step Interstate Transport results, the EPA's Ozone Transp01i Modeling under the 2016v2 platform, and the EPA's after-the-fact change from the EPA 2018 memorandum (2011 base year) to the 20 l 6v2 modeling (2016 base year).

Any of these reasons should be sufficient justification to extend the comment deadline. Taken together, these reasons should convince EPA to grant Cleco' s request for a 60-day extension. Cleco asks EPA to reconsider this request.

**Commenter:** Eagle Materials Inc.

**Commenter ID:** 16

**Docket ID:** EPA-R09-OAR-2022-0138

**Comment:**

EPA has unlawfully circumvented notice-and-comment requirements for its Proposed SIP Disapproval.

[…]

In addition, EPA is effectively depriving members of the public from meaningfully engaging with its Proposed Disapproval by issuing it after its Proposed FIP. The comment period for this Proposed Disapproval did not open until over a month after EPA published its Proposed FIP—the comment period for the Proposed FIP closed before *any* commenters had a chance to submit comments on the Proposed SIP Disapproval. This puts commenters in the untenable position of having to provide feedback on EPA's comprehensive and complex Proposed FIP without first understanding Nevada's obligations under the CAA.

**Commenter:** Idaho Power Company

**Commenter ID:** 23

**Docket ID:** EPA-R09-OAR-2022-0138

**Comment:**

Additionally, by proposing the FIP first, EPA has made clear that the finalization of the Proposed Disapproval was a foregone conclusion, effectively circumventing required rulemaking procedures by treating the Proposed Disapproval as final before giving any consideration to public comments. The Administrative Procedure Act's ("APA's") notice-and-comment procedures require EPA to "give interested persons an opportunity to participate in the rule making" before a rule is finalized.[32] Soliciting public comment "allow[s] the agency to benefit from the expertise and input of the parties who file comments with regard to the proposed rule" and "see[s] to it that the agency maintains a flexible and open-minded attitude towards its own rules," creating important safeguards against arbitrary or unreasonable agency action.[33] EPA cannot remain flexible and open-minded in its consideration of the Proposed Disapproval where the Proposed FIP depends on this disapproval being finalized. EPA has effectively finalized the Proposed Disapproval in a manner that circumvents its responsibility to respond to public comments.[34] Such a procedural shortcut is anathema to the APA's carefully crafted rulemaking structure.[35]

Finally, the CAA gives EPA up to *two years* after the disapproval of a SIP to promulgate a FIP. Because of EPA's own failure to act on SIP submissions in a timely manner and the resulting consent decree, the Agency has accelerated the process, issuing a proposed FIP prior to issuing proposed SIP disapprovals. The comment period for EPA's Proposed Disapproval did not open until ***over a month after*** EPA published its proposed FIP, meaning that the comment period for the proposed FIP closed before many commenters had a chance to submit comments on the Proposed Disapproval. This put commenters in the untenable position of having to provide feedback on EPA's comprehensive and complex Good Neighbor Plan without first understanding Nevada's obligations under the CAA. Such an accelerated timeline, with multiple overlapping comment periods out-of-sync with the CAA, significantly limited the public's ability to fully assess EPA's action and provide meaningful comment.

81

[29] *See, e.g.,* Chrysler Corp. v. Brown, 441 U.S. 281, 302 (1979).

[30] *See* 42 U.S.C. § 7410(c)(1) (requiring Administrator to promulgate FIP "at any time within 2 years after" disapproving a SIP). While the Supreme Court held in *EPA v. EME Homer City Generation* that, under this provision, "EPA is not obliged to wait two years or postpone its action even a single day," the Court noted that this authority applies "[*a*]*fter* EPA has disapproved a SIP." 572 U.S. 489, 509 (2014) (emphasis added)

[32] 5 U.S.C. § 553(c).

[33] *See McLouth Steel Prod. Corp. v. Thomas*, 838 F.2d 1317, 1325 (D.C. Cir. 1988) (internal citations omitted).

[34] *See City of Portland, Oregon v. EPA*, 507 F.3d 706, 715 (D.C. Cir. 2007) (emphasizing that an agency must respond to comments that "raise points relevant to the agency's decision and ... if adopted, would require a change in an agency's proposed rule").

[35] *See Metcalf v. Daley*, 214 F.3d 1135, 1142 (9th Cir. 2000) (emphasizing that agency action "must be timely, and it must be taken objectively and in good faith, not as an exercise in form over substance, and not as a subterfuge designed to rationalize a decision already made").


**Commenter:** Louisiana Electric Utility Environmental Group

**Commenter ID:** 28

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

As a part of these comments, LEUEG also requests a 60-day extension of the comment deadline for EPA's Proposed SIP Disapproval relating to Louisiana. LEUEG is aware of numerous requests for extensions by industry stakeholders and believes EPA's rejections of these requests to date is unreasonable and unwarranted under the circumstances. As noted in other requests, more time is plainly necessary for review of the 4-step Interstate Transport results, EPA's Ozone Transport Modeling under the 2016v2 platform, and EPA's after-the-fact change from its 2018 memorandum (2011 base year) to the 2016v2 modeling (2016 base year) by the state agencies and stakeholders.


**Commenter:** Midwest Ozone Group

**Commenter ID:** 30

**Docket ID:** EPA-R02-OAR-2021-0673, EPA-R03-OAR-2021-0872, EPA-R03-OAR-2021-0873, EPA-R04-OAR-2021-0841, EPA-R05-OAR-2022-0006, EPA-R06-OAR-2021-0801, EPA-R07-OAR-2021-0851

**Comment:**

This accelerated effort disenfranchises not only meaningful technical analysis of the agency's proposals but also curtails meaningful participation by all stakeholders.

[...]

Second, EPA has not provided adequate public notice and comment as required by law.

[...]

The 60-day comment period is too short to allow review and analysis of the proposed denials for multiple states.

EPA eight proposed Good Neighbor SIP disapprovals would result in disapproval of Good Neighbor SIPs submitted by 19 states regarding interstate transport for the 2015 8-hour ozone national ambient air quality standard. Significantly, EPA established a comment period of only 63 days that applies to all eight proposals for all 19 states. The sheer number of EPA proposed actions regarding these Good Neighbor SIPs alone is evidence that the comment period allowed by EPA is grossly insufficient.  Compounding the challenge for stakeholders of the inadequate comment period on these eight proposed disapprovals, EPA also proposed a 181-page transport rule on April 6, 2022, during the pendency of the comment period on these eight proposed disapprovals. The comment period on the transport rule is also 60 days, ending June 6, 2022.

MOG has been an active participant in transport rule development since the 1997 NOx SIP Call and continues to be keenly interested in the development of air pollution regulations that are based on sound science.  MOG has undertaken independent modeling and verification of EPA modeling in the past and offered comments on how to improve the accuracy and completeness of those efforts in prior comments on various transport rules.

As a result of its continued interest in the transport issue, MOG has developed technical capabilities that allow it to analyze and verify the science behind both Good Neighbor SIPs proposed by states and EPA actions to approve or disapprove them. MOG is acutely aware that preparation of proper technical analyses of Good Neighbor SIPs involves the use of complicated dispersion models that take substantial execution time.  MOG's significant experience in these matters also makes clear that simultaneous analysis of eight proposed rulemakings in addition to analyzing a 181-page transport rule that involves the same ozone NAAQS as the Good Neighbor SIPs dramatically complicates the analysis process.

The totality of these now nine pending rulemakings necessitates a period substantially longer than the allowed 63 days to allow stakeholders, including MOG, to analyze the proposed rules in parallel and prepare comprehensive comments that will better inform the rulemaking process, and EPA has utterly failed to allow sufficient time for that to happen.


**Commenter:** Midwest Ozone Group

**Commenter ID:** 30

**Docket ID:** EPA-R08-OAR-2022-0315, EPA-R09-OAR-2022-0394, EPA-R09-OAR-2022-0138

**Comment:**

The 60-day comment period is too short to allow review and analysis of the proposed denials for multiple states. EPA proposed Good Neighbor SIP disapprovals would result in disapproval of Good Neighbor SIPs submitted by states regarding interstate transport for the 2015 8-hour ozone national ambient air quality standard. Significantly, EPA established a comment period of only 60 days that applies to all proposals.

[…]

The totality of these pending rulemakings necessitates a period substantially longer than the allowed 63 days to allow stakeholders, including MOG, to analyze the proposed rules in parallel and prepare comprehensive comments that will better inform the rulemaking process, and EPA has utterly failed to allow sufficient time for that to happen.

**Commenter:** Utah Petroleum Association and the Utah Mining Association

**Commenter ID:** 48

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

Even though EPA jumped the gun, it must consider comments on this action fairly and completely.

[…]

EPA jumped the gun. The timing of this Proposed Disapproval, six weeks after proposing a FIP as part of the GNR, is out of order and contrary to the requirements of the CAA, which requires that a Disapproval **be finalized** before EPA promulgates a FIP such as the GNR.

The timeline suggests that EPA has no intention of paying heed to the comments on the Proposed Disapproval. Such disregard for comments would be a violation of required administrative procedures. EPA must fairly and completely consider all comments submitted.

Furthermore, with both actions in the proposal phase, comments on the Proposed Disapproval and the Proposed GNR are inextricably linked.

*Response*

The EPA disagrees that it provided insufficient time for public comment. The EPA has provided more than adequate time for the public to review the technical bases underlying this action. Congress' presumptive minimum period for public comment on CAA regulations is 30 days. *See* CAA section 307(h). The comment period of at least 60 days for each of the proposed disapprovals is twice that amount of time. (Due to time constraints, EPA was only able to provide a 30-day comment period on its proposed disapproval of Alabama's June 21, 2022 SIP submission—although there were 60 days to comment on the February 24, 2022 proposed disapproval of its earlier submission, which the state withdrew during the comment period). Some commenters state that that the EPA failed to provide sufficient public process, however the commenters here actually participated in this public notice and comment process, in many cases submitting detailed and lengthy comments.

Furthermore, the 2016-based meteorology and boundary conditions used in the modeling have been available through the 2016v1 platform, which was used for the Revised CSAPR Update (proposed in October of 2020, 85 FR 68964; October 30, 2020). The updated emissions inventory files used in the current modeling were publicly released September 21, 2021, for stakeholder feedback, and have been

available on our website since that time.[8] The Comprehensive Air Quality Modeling with Extensions (CAMx) modeling software that EPA used has likewise been publicly available for some time: CAMx version 7.10 was released by the model developer, Ramboll, in December 2020. And on January 19, 2022, we released on our website and notified a wide range of stakeholders of the availability of both the modeling results for 2023 and 2026 (including contribution data) along with many key underlying input files.[9]

By providing the 2016 meteorology and boundary conditions (used in the 2016v1 version) in fall of 2020, and by releasing updated emissions inventory information used in 2016v2 in September of 2021 we gave states and other interested parties multiple opportunities prior to our February 2022 proposals to consider how our modeling updates could affect their status for purposes of evaluating potential linkages for the 2015 ozone NAAQS. We also supplied the full suite of modeling files (roughly 15 terabytes) to those who requested them; while the EPA acknowledges the process of delivering such large files can take time, we do not believe having all of those files is necessary for the public to be able to comment meaningfully on the proposals here.

In any case, for those who wished to comment on the EPA's modeling through reviewing all of those files and/or through running their own modeling, we note that the EPA used the same 2016v2 modeling of 2023 for all of its proposed SIP submission actions and the proposed FIP. Commenters could comment (and did comment) through any of those public comment periods on the modeling, and the EPA has an obligation to consider such comments to the extent in-scope in taking this final action. Given the overlapping timing of most of the EPA's proposals, there was at least one public comment period open at all times on the proposals using that modeling from Feb. 22, 2022, when the first set of disapprovals were issued, through July 25, 2022 (the close of the public comment period on the proposed disapprovals of several western states). That is effectively a combined comment period of 153 days, and is more than sufficient, in the EPA's view, to allow for meaningful comment.[10]

Finally, it is true that the EPA has consent decree deadlines to take final action on most SIP submissions covered by this action by January 31, 2023 (extended by stipulation of the parties from December 15, 2022).[11] But the amount of time the EPA could provide for public comment was also informed by our substantive obligation to see that interstate transport obligations for the 2015 ozone NAAQS are addressed as expeditiously as practicable and no later than the next attainment date. *See Wisconsin*, 938 F.3d at 313-20.

---

[8] *See* https://www.epa.gov/air-emissions-modeling/2016v2-platform.

[9] *See* https://www.epa.gov/scram/photochemical-modeling-applications.

[10] Further, because EPA is acting on a new SIP submission from Alabama using the 2016v2 modeling, we note that yet another comment period was open with respect to the application of the 2016v2 modeling in assessing good neighbor obligations for the 2015 ozone NAAQS from the date of that proposal, October 25, 2022, through November 25, 2022. *See* 87 FR 64412.

[11] *New York et al. v. Regan, et al.*, No. 1:21-CV-00252 (S.D.N.Y.) (IN, KY, MI, OH, TX, WV); *Our Children's Earth Foundation v. EPA*, No. 20-8232 (S.D.N.Y.) (NY); *Downwinders at Risk et al. v. Regan*, No. 21-cv-03551 (N.D. Cal.) (AR, CA, IL, IN, KY, LA, MD, MI, MN, MS, MO, NV, NJ, NY, OH, OK, TX, WV, WI).

Under these circumstances, and mindful of the legal and procedural obligations applicable to the EPA, as established by Congress and the courts, the comment period length was appropriate and consistent with the requirements of the CAA and the Administrative Procedure Act (APA).[12]

The EPA disagrees with Arkansas Division of Environmental Quality's characterization of EPA's analysis of Arkansas's good neighbor SIP submission for the 2015 ozone NAAQS. 87 FR 9798, 9806-9811 (February 22, 2022).

Other issues raised by these comments are addressed in Section V.A.1. of the preamble and in the following sections: Sections 1.2 (Guidance for SIP Submissions), 1.5 (State's Step 3 Analysis), 1.8 (Docket Document Availability), and 10.6 (Allegation that Disapprovals of Western State SIP Submissions was Predetermined).


## 1.8    Docket Document Availability

*Comment*

**Commenter:** Ameren Missouri

**Commenter ID:** 05

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

USEPA has not made available post processing of model data from the revised modeling in the Docket for the proposed disapproval of the Missouri Good Neighbor SIP and only references the files in another docket[9] which wasn't posted until 40 days after the proposed Missouri GNS disapproval. Making matters worse, interested parties were required to request the files from USEPA directly because the files were not in the posted public docket decreasing the available review time even more. Requiring interested parties to search two dockets and then request USEPA's data and analysis underlying this action and wait for a response from USEPA fails to meet the transparency in government standard set by this administration. USEPA needs to provide additional time to comment on the Missouri SIP disapproval so that the post processing of model data can be reviewed and commented on in accordance with the intent of the Administrative Procedures Act.

[9] The modeling relied upon as further proof of Missouri being linked to nonattainment in another state was included as part of USEPA's proposed CSAPR FIP for the 2015 Ozone Standard published in the Federal Register on April 6, 2022 under a separate docket. The public docket available on the internet for the proposed FIP did not contain any of the model post processing files with modeled contribution data for Missouri so that it could be reviewed. That data had to be requested separately (after searching both dockets).

---

[12] Section 553 of the Administrative Procedure Act requires that federal agencies provide general notice of proposed rulemaking by publication in the Federal Register and to "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation." 5 U.S.C. 553(b), (c).

*Response*

All information supporting the proposed disapproval of Missouri's SIP submission, including the data to which the commenter refers, was publicly docketed on or before February 22, 2022. Because of their size (around 15 terabytes), the full modeling files could not be posted online and so were held on data drives at EPA's Docket Center, as is routine for extremely large files, where it could be requested by interested parties. See 87 FR 9534 (February 22, 2022). Comments on the length of the comment period are addressed in Section 1.7 (Length of Comment Period).

*Comment*

**Commenter:** Louisiana Department of Environmental Quality

**Commenter ID:** 27

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

EPA formulated part of their proposed disapproval on results from the journal article "Improved estimation of trends in U.S. ozone concentrations adjusted for interannual variability in meteorological conditions," authored by several EPA members/employees and one external author. This article was not peer reviewed, neither is it available without purchase. The article should be made available in the Docket with other supplementary materials. "Although this article has been reviewed by the U.S. EPA and approved for publication, it does not necessarily reflect the U.S. EPA's policies or views." Atypically, the subject matter of the article is accounted for in tweaks to the 2016v2 modeling.

*Response*

The EPA does not place certain docket materials, such as copyrighted material or documents protected as Confidential Business Information on the Internet (*i.e.*, regulations.gov), but such docket materials are available for public review in person in the EPA Regional office or at the EPA Docket Center Reading Room in Washington, D.C., as applicable.[13]  The article cited by the EPA to which the Louisiana Department of Environmental Quality (LDEQ) is referring is protected by copyright, so the article's title was listed in the online Docket (EPA-R06-OAR-2021-0801), while the hard copy of the article is available for public viewing in person at the EPA Region 6 office. Further, the preamble to the proposed rulemaking directed the public to https://www.epa.gov/dockets for further information on the EPA Docket Center Services, which include assisting the public with accessing particular documents in the docket.

---

[13] Access EPA Dockets, *available at* https://www.epa.gov/dockets/access-epa-dockets (last accessed January 31, 2023).

Regarding the comment about peer review, the article was published in the *Atmospheric Environment* journal, [14] which requires peer review. The peer review requirement for the journal is listed in their author's guide:

> This journal operates a single anonymized review process. All contributions will be initially assessed by the editor for suitability for the journal. Papers deemed suitable are then typically sent to a minimum of two independent expert reviewers to assess the scientific quality of the paper. [15]

The article in question was reviewed by three independent experts and accepted for publication with minor revisions.

---

[14] Atmospheric Environment, *available at* https://www.sciencedirect.com/journal/atmospheric-environment (last accessed January 31, 2023).

[15] Atmospheric Environment, Author Information Pack at 9, *available at* https://www.elsevier.com/wps/find/journaldescription.cws_home/246?generatepdf=true. (Last accessed January 13, 2023).

## 2   Analytic Year of 2023

*Comments*

**Commenter:** Midwest Ozone Group

**Commenter ID:** 30

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

These comments highlight the agency's failure to align the responsibilities of upwind and downwind states as it selected the analytical year for evaluating the Good Neighbor Provisions of the CAA. In the case on the Kentucky plan, this failure is even more significant because Kentucky specifically noted the disparity that exists between upwind states and those downwind states that significantly delayed the imposition of nonattainment controls on sources within their own nonattainment areas. 87 Fed. Reg. at 9505. Kentucky demonstrated emissions from local sources in nonattainment areas were not properly regulated resulting in on-going nonattainment impermissibly shifting the burden of emission controls to upwind states. EPA response to the Kentucky plan fails to address the alignment issue and defaults to the selection of 2023 as the appropriate analytic year. EPA did not assess the extent of delay of downwind states emissions reductions programs on nonattainment. *Id.* at 9512.

**Commenter:** Midwest Ozone Group

**Commenter ID:** 30

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

These comments also highlight the agency's failure to align the responsibilities of upwind and downwind states as it selected the analytical year for evaluating the Good Neighbor Provisions of the CAA. EPA's response to the Missouri plan failed to address the alignment issue defaulting to the selection of 2023 as the appropriate analytic year. EPA failed to assess the extent of delay of downwind states emissions reductions programs on nonattainment.

**Commenter:** Midwest Ozone Group

**Commenter ID:** 30

**Docket ID:** EPA-R02-OAR-2021-0673, EPA-R03-OAR-2021-0872, EPA-R03-OAR-2021-0873, EPA-R04-OAR-2021-0841, EPA-R05-OAR-2022-0006, EPA-R06-OAR-2021-0801, EPA-R07-OAR-2021-0851, EPA-R08-OAR-2022-0315, EPA-R09-OAR-2022-0394, EPA-R09-OAR-2022-0138

**Comment:**

EPA's selection of 2023 as the analytical year for its assessments of the state plans fails to align the obligation of upwind states with downwind states inasmuch as certain nonattainment areas have delayed implementation of nonattainment controls until 2025 and beyond

Comment: EPA's statutory duty is to harmonize the Good Neighbor Provision of CAA §110(a)(2)(D)(i) with nonattainment and maintenance requirements of CAA §172 so that compliance burdens are aligned among upwind and downwind states.  MOG is not critical of the downwind state plans to the extent those plans are designed and demonstrated to achieve attainment within the attainment deadlines.  MOG is, however, critical of EPA for disapproving upwind state Good Neighbor Plans without consideration of the timing of the implementation of nonattainment controls by downwind states - effectively shifting the burden of additional controls to the upwind states.

The Wisconsin remand concluded that EPA exceeded its statutory authority under the Good Neighbor Provision "by issuing a Rule that does not call for upwind States to eliminate their substantial contributions to downwind nonattainment in concert with the attainment deadlines."

Wisconsin, 938 F.3d at 318.  The Wisconsin remand directed EPA to address the downwind state "deadline" in such a manner as to "harmonize" the deadlines of upwind and downwind states and to apply "parallel timeframes." Id. at 312, 314. The D.C. Circuit repeatedly has explained the CAA directive to "harmonize" and manage the relationship described as parallel between the Good Neighbor obligations for upwind states and statutory attainment deadlines for downwind areas. That relationship is one of "par," using the Court's term, meaning to be judged on a common level with the other. With this proposed disapproval, EPA ignores the obvious relationship between the downwind states' obligation to implement controls to attain the standard relative to the obligation of an upwind state to not significantly contribute to the nonattainment at issue.

This Court in North Carolina v. EPA, 531 F.3d 896 (D.C. Cir. 2008), found that EPA did not explain why it did not coordinate the Good Neighbor Provision with the Clean Air Interstate Rule to provide a sufficient level of protection to downwind states.

Despite CAA §110(a)(2)(D)(i)'s requirement that upwind contributions to downwind nonattainment be "consistent with the provisions of [Title I]," EPA did not make any effort to harmonize CAIR's Phase Two deadline for upwind contributors to eliminate their significant contribution with the attainment deadlines for downwind areas... As a result, downwind nonattainment areas must attain NAAQS for ozone and PM2.5 without the elimination of upwind states' significant contribution to downwind nonattainment, forcing downwind areas to make greater reductions than CAA §110(a)(2)(D)(i)(I) requires. Id. (emphasis added).  The D.C. Circuit described its North Carolina ruling in the Wisconsin remand as follows:

> We explained that EPA needed to "harmonize" the "Phase Two deadline for upwind contributors to eliminate their significant contribution with the attainment deadlines for

downwind areas." ... .  Otherwise, downwind areas would need to attain the NAAQS "without the elimination of upwind states' significant contribution."

Wisconsin, 938 F.3d at 314 (emphasis added). The Wisconsin remand explained, "In sum, under our decision in North Carolina, the Good Neighbor Provision calls for elimination of upwind States' significant contributions on par with the relevant downwind attainment deadlines." Id. at 315 (emphasis added). The Wisconsin opinion explains further:

> The Good Neighbor Provision, as North Carolina emphasized, requires upwind States to eliminate their significant contributions to downwind pollution "consistent with the provisions of this subchapter," i.e., Title I of the Clean Air Act.  42 U.S.C.  §7410(a)(2). One of the "provisions of this subchapter" is §7511(a)(1), which in turn requires downwind areas in moderate non-attainment to attain the NAAQS by July 20, 2018.

Id. at 315-16. The Wisconsin remand summarizes that "it is the statutorily designed relationship between the Good Neighbor Provision's obligations for upwind states and the statutory attainment deadlines for downwind areas that generally calls for parallel timeframes." Id. at 316.

EPA, however, takes the following actions.   It interprets the court's holding in Maryland v. EPA, 958 F. 3d 1185 (D.C. Cir. 2020) as requiring the states and the Agency, under the good neighbor provision, to assess downwind air quality as expeditiously as practicable and no later than the next applicable attainment date, which is now the Moderate area attainment date under CAA §181 for ozone nonattainment. The Moderate area attainment date for the 2015 8-hour ozone NAAQS is August 3, 2024.  The EPA provides that it believes that 2023 is now the appropriate year for analysis of interstate transport obligations for the 2015 8-hour ozone NAAQS because the 2023 ozone season is the last relevant ozone season during which achieved emissions reductions in linked upwind states could assist downwind states with meeting the August 3, 2024, Moderate area attainment date for the 2015 8-hour ozone NAAQS."  87 Fed.  Reg.  9,487-8. EPA is inappropriately shifting the burden to the transport states.

For New York's disapproved transport plan, EPA offers the following criticism, "under the Wisconsin decision, states and the EPA may not delay implementation of measures necessary to address good neighbor requirements beyond the next applicable attainment date without a showing of impossibility or necessity. See 938 F.3d at 320. In those cases where the measures identified by the State had implementation timeframes beyond the next relevant attainment dates the submission did not offer a demonstration of impossibility of earlier implementation of those control measures.  Similarly, the State's submittal is insufficient to the extent the implementation timeframes for identified control measures were left unidentified, unexplained, or too uncertain to permit the EPA to form a judgment as to whether the timing requirements for good neighbor obligations have been met. 87 Fed.  Reg.  9,494. This narrative illustrates the disconnect between standards to which downwind plans are held versus the standards to which upwind plans are held.  Both plans must be aligned with the same timeframes.

Within the Clean Air Act, Subchapter 1, Part D titled "Plan Requirements for Nonattainment Areas" is found Subpart 1 titled "Nonattainment Areas in General." Subpart 1 includes Section 177 addressing new motor vehicle emissions standards in state plans for nonattainment areas. It is apparent that the CAA contemplated the option of developing nonattainment plans per Section 172 to address certain new motor vehicles or new motor vehicle emissions. For those approved downwind nonattainment

91

plans that include motor vehicle emissions reduction strategies for achieving attainment, delay in implementation beyond the attainment date is unacceptable under CAA §179.  Delay in implementation of committed controls by a downwind state shifts the emissions reduction burdens onto upwind states if EPA fails to engage in alignment of the dates upon which each of the states must satisfy nonattainment strategy performance.

This issue of imbalance was specifically addressed by D.C.  Circuit in the Wisconsin remand as an appropriate basis for extending the compliance deadline for upwind states. In that case the Court stated that: "if a modified attainment deadline applies to downwind States, EPA may be able, if justified, to make a corresponding extension for an upwind State's good neighbor obligations." Wisconsin, 938 F.3d at 317.

Nowhere in its discussion of the regulatory framework underlying these proposals does EPA recognize the alignment obligation as articulated in the Wisconsin remand.


*Response*

Although the commenter criticizes the EPA's selection of 2023 as an appropriate analytic year, they do not identify their preferred alternative, nor are their arguments against 2023 compelling. The EPA maintains its position that 2023 is an appropriate analytic year and comports with the relevant caselaw.

The commenter misreads the *North Carolina v. EPA*, 550 F.3d 1176 (D.C. 2008), *Wisconsin v. EPA*, 938 F.3d 303 (D.C. Cir. 2019), and *Maryland v. EPA*, 958 F.3d 1185 (D.C. Cir. 2020) decisions as calling for good neighbor emissions controls to be aligned with the timing of the *implementation* of nonattainment controls by downwind states. However, the D.C. Circuit has never held that, and such a requirement is both untethered to the statute and almost certainly unworkable in practice. It would necessitate coordinating the activities of multiple states with the EPA regional and headquarters offices to a level of fine-tuning that effectively could preclude the implementation of good neighbor obligations altogether. Indeed, the commenter offers no explanation how the EPA or upwind states should coordinate upwind emissions control obligations for states linked to multiple downwind receptors whose states may be implementing their requirements on different timetables. Far less drastic mechanisms than subjecting people living in downwind receptor areas to continuing high levels of air pollution caused in part by upwind-state pollution are available if the actual implementation of mandatory CAA requirements in the downwind areas is delayed: CAA section 304(a)(2) provides for judicial recourse where there is an alleged failure by the Agency to perform a nondiscretionary duty, and that recourse is for the Agency to be placed on a court-ordered deadline to address the relevant obligations. *Accord Oklahoma v. U.S. EPA*, 723 F.3d 1201, 1223-24 (10th Cir. 2013); *Montana Sulphur and Chemical Co. v. U.S. EPA*, 666 F.3d 1174, 1190-91 (9th Cir. 2012).

What in fact the D.C. Circuit has repeatedly emphasized is that the *statutory attainment dates* are the relevant downwind deadlines the EPA must align with in implementing the good neighbor provision. In *Wisconsin*, the court held, "In sum, under our decision in *North Carolina*, the Good Neighbor Provision calls for elimination of upwind States' significant contributions on par with the relevant downwind attainment deadlines." *Wisconsin*, 938 F.3d. at 321. After that decision, the EPA interpreted *Wisconsin* as limited to the attainment dates for Moderate or higher classifications under CAA section 181 on the

basis that Marginal nonattainment areas have reduced planning requirements and other considerations. *See, e.g.,* 85 FR 29882, 29888–89 (May 19, 2020) (proposed approval of South Dakota's 2015 ozone NAAQS good neighbor SIP). However, on May 19, 2020, the D.C. Circuit in *Maryland v. EPA*, 958 F.3d 1185 (D.C. Cir. 2020), applying the *Wisconsin* decision, held that the EPA must assess air quality at the next downwind attainment date, including Marginal area attainment dates under CAA section 181, in evaluating the basis for the EPA's denial of a petition under CAA section 126(b). 958 F.3d at 1203-04. After *Maryland*, the EPA acknowledged that the Marginal attainment date is the first attainment date to consider in evaluating good neighbor obligations. *See, e.g.,* 85 FR 67653, 67654 (Oct. 26, 2020) (final approval of South Dakota's 2015 ozone NAAQS good neighbor SIP).

The relevance of CAA sections 172, 177, and 179 to the selection of the analytic year in this action is not clear. The commenter cites these provisions to conclude that EPA did not appropriately consider downwind attainment deadlines and the timing of upwind good neighbor obligations. These provisions are found in subpart I, and while they may have continuing relevance or applicability to aspects of ozone nonattainment planning requirements, the nonattainment dates for the 2015 ozone NAAQS flow from subpart 2 of title I of the CAA, and specifically CAA section 181(a). Applying that statutory schedule to the designations for the 2015 ozone NAAQS, the EPA has promulgated the applicable attainment dates in its regulations at 40 CFR 51.1303. The effective date of the initial designations for the 2015 ozone NAAQS was August 3, 2018 (83 FR 25776, June 4, 2018, effective August 3, 2018).[16] Thus, the first deadline for attainment planning under the 2015 ozone NAAQS was the Marginal attainment date of August 3, 2021, and the second deadline for attainment planning is the Moderate attainment date of August 3, 2024. If a Marginal area fails to attain by the attainment date it is reclassified, or "bumped up," to Moderate. Indeed, the EPA has just completed a rulemaking action reclassifying many areas of the country from Marginal to Moderate nonattainment, including all of the areas where downwind receptors have been identified in our 2023 modeling as well as many other areas of the country. 87 FR 60897, 60899 (Oct. 7, 2022).

Other than under the narrow circumstances of CAA section 181(a)(5) (discussed further below), the EPA is not permitted under the CAA to extend the attainment dates for areas under a given classification; that is, no matter when the EPA finalizes a determination that an area failed to attain by its attainment date and reclassifies that area, the attainment date remains fixed, based on the number of years from the area's initial designation. *See, e.g.,* CAA section 182(i) (authorizing the EPA to adjust any applicable deadlines for newly reclassified areas "other than attainment dates"). As the D.C. Circuit has repeatedly made clear, the statutory attainment schedule of the downwind nonattainment areas under subpart 2 is rigorously enforced and is not subject to change based on policy considerations of the EPA or the states.

> [T]he attainment deadlines, the Supreme Court has said, are "the heart" of the Act. *Train v. Nat. Res. Def. Council*, 421 U.S. 60, 66, 95 S. Ct. 1470, 43 L.Ed.2d 731 (1975); *see Sierra Club v. EPA*, 294 F.3d 155, 161 (D.C. Cir. 2002) ("the attainment deadlines are central to the regulatory scheme") (alteration and internal quotation marks omitted). The Act's central object is the "attain[ment] [of] air quality of specified standards [within] a specified period of time." *Train*, 421 U.S. at 64–65, 95 S. Ct. 1470.

---

[16] September 24, 2018, for the San Antonio area. 83 FR 35136 (July 25, 2018).

*Wisconsin*, 938 F.3d at 316. *See also Natural Resources Defense Council v. EPA*, 777 F.3d 456, 466-68 (D.C. Cir. 2014) (*NRDC*) (holding the EPA cannot adjust the section 181 attainment schedule to run from any other date than from the date of designation). *See also id.* at 468 ("EPA identifies no statutory provision giving it free-form discretion to set Subpart 2 compliance deadlines based on its own policy assessment concerning the number of ozone seasons within which a nonattainment area should be expected to achieve compliance.") (citing and quoting *Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 484, (2001)) ("The principal distinction between Subpart 1 and Subpart 2 is that the latter eliminates regulatory discretion that the former allowed."). Furthermore, as the court in *NRDC* noted, "[T]he 'attainment deadlines ... leave no room for claims of technological or economic infeasibility.'" 777 F.3d at 488 (quoting *Sierra Club,* 294 F.3d at 161) (internal quotation marks and brackets omitted).

With the exception of the Uinta Basin, which does not have an identified receptor in this action, no Marginal nonattainment area met the conditions of CAA section 181(a)(5) to obtain a one-year extension of the Moderate area attainment date. 87 FR 60899. Thus, all Marginal areas (other than Uinta) that failed to attain have been reclassified to Moderate. *Id.* (And the New York City Metropolitan nonattainment area was initially classified as Moderate (see below for further details).). Even if the EPA had extended the attainment date for any of the downwind areas, it is not clear that it would necessarily follow that the EPA must correspondingly extend or delay the implementation of good neighbor obligations. While the *Wisconsin* court recognized extensions under CAA section 181(a)(5) as a possible source of timing flexibility in implementing the good neighbor provision, 938 F.3d at 320, the EPA and the states are still obligated to implement good neighbor reductions as expeditiously as practicable and are also obligated under the good neighbor provision to address "interference with maintenance." Areas that have obtained an extension under section 181(a)(5) or which are not designated as in nonattainment could still be identified as struggling to maintain the NAAQS, and the EPA is obligated under the good neighbor provision to eliminate upwind emissions interfering with the ability to maintain the NAAQS as well. *North Carolina*, 531 F.3d at 908-11. Thus, while an extension under CAA 181(a)(5) may be a source of *flexibility* in the timing of implementation of good neighbor obligations, as *Wisconsin* recognized, it is not the case that the EPA *must* delay or defer good neighbor obligations for that reason, and neither the D.C. Circuit nor any other court has so held.

The commenter is therefore incorrect to the extent that they argue the selection of 2023 as an analytic year for upwind obligations results in the misalignment of downwind and upwind state obligations. To the contrary, both downwind and upwind state obligations are driven by the statutory attainment date of August 3, 2024, for Moderate areas, and the last year that air quality data may impact whether nonattainment areas are found to have attained by the attainment date is 2023. That is why, in the recent final rulemaking determinations that certain Marginal areas failed to attain by the attainment date, bumping those areas up to Moderate, and giving them SIP submission deadlines and reasonably available control measures (RACM) and reasonably available control technology (RACT) implementation deadlines, the EPA set the attainment SIP submission deadlines for the bumped up Moderate areas to be January 1, 2023. *See* 87 FR 60897, 60900 (Oct. 7, 2022). The implementation deadline for RACM and RACT is also January 1, 2023. *Id.* This was in large part driven by the EPA's ozone implementation regulations, 40 CFR 51.1312(a)(3)(i), which previously established a RACT implementation deadline for initially classified Moderate as no later than January 1, 2023, and the modeling and attainment demonstration requirements in 40 CFR 51.1308(d), which requires a state to provide for implementation

of all control measures needed for attainment no later than the beginning of the attainment year ozone season (i.e., 2023). Given this regulatory history, the EPA can hardly be accused of letting states with nonattainment areas for the 2015 ozone NAAQS avoid or delay their mandatory CAA obligations.

The commenter focuses on the EPA's evaluation of New York's good neighbor SIP submission to argue the EPA is treating upwind and downwind states dissimilarly. The argument conflates New York's role as both a downwind and an upwind state. In evaluating the Good Neighbor SIP submission that New York submitted, the EPA identified as a basis for disapproval that the state emissions control programs New York cited included implementation timeframes to achieve the reductions, let alone ensure they were achieved by 2023. 87 FR 9484, 9494 (Feb. 22, 2022). The EPA conducted the same inquiry into other states' claims regarding their existing or proposed state laws or other emissions reductions claimed in their SIP submissions. *See, e.g.,* 87 FR at 9472-73 (evaluating claims regarding emissions reductions anticipated under Maryland's state law); 87 FR at 9854 (evaluating claims regarding emissions reductions anticipated under Illinois' state law). Consistent with its treatment of the other upwind states included in this action, the EPA is disapproving New York's good neighbor SIP submission for the 2015 ozone NAAQS because its arguments did not demonstrate that it had fully prohibited emissions significantly contributing to out of state nonattainment or maintenance problems.

The commenter attempts to contrast this evaluation with what it believes is the EPA's permissive attitude toward delays by downwind states, specifically claiming that "certain nonattainment areas have delayed implementation of nonattainment controls until 2025 and beyond." This apparently references New York's simple cycle and regenerative combustion turbines (SCCT) controls, which the commenter cited elsewhere in its comments. New York's SCCT controls were not included by New York in the submission under the EPA review in this action, nor was the prior approval of the SCCT controls reexamined by the EPA or reopened for consideration by the Agency in this action. Although not part of this rulemaking, the EPA notes that the SCCT controls were approved by the EPA as a SIP strengthening measure and not to satisfy any specific planning requirements for the 2015 ozone NAAQS under CAA section 182. 86 FR 43956, 43958 (Aug. 11, 2021). The SCCT controls submitted to the EPA were already a state rule, and the only effect under the CAA of the EPA approving them into New York's SIP was to make them federally enforceable. 86 FR 43956, 43959 (Aug. 11, 2021). In other words, approval of the SCCT controls did not relieve New York of its nonattainment planning obligations for the 2015 ozone NAAQS.

The EPA notes that the New York-Northern New Jersey-Long Island, NY-NJ-CT nonattainment area was initially designated as in Moderate nonattainment. 83 FR 25776 (June 4, 2018). Pursuant to this designation, New York was required to submit a RACT SIP submission and an attainment demonstration no later than 24 months and 36 months, respectively, after the effective date of the Moderate designation. CAA section 182; 40 CFR 51.1308(a), 51.1312(a)(2). NY submitted a RACT SIP plan for the 2015 ozone standards on January 29, 2021,[17] and the EPA is currently evaluating that submission. New York has not yet submitted its attainment demonstration, which was due August 3, 2021. Further, the New York-Northern New Jersey-Long Island, NY-NJ-CT nonattainment area remains subject to the Moderate nonattainment area date of August 3, 2024; if it fails to attain the 2015 ozone NAAQS by

---

[17] See https://edap.epa.gov/public/extensions/S4S_Public_Dashboard_2/S4S_Public_Dashboard_2.html.

August 3, 2024, it will be reclassified to Serious nonattainment, resulting in additional requirements on the New York nonattainment area.

In any case, regardless of the status of New York's and the EPA's efforts in relation to the New York-Northern New Jersey-Long Island, NY-NJ-CT nonattainment area (which are outside the scope of this action), the EPA's evaluation of 2023 as the relevant analytic year in assessing New York's and other states' good neighbor obligations is entirely consistent with the statutory framework and court decisions calling on the agency to align these obligations with the downwind areas' statutory attainment schedule. That principle holds regardless of the specific timing of the implementation of downwind states' emissions controls.

# 3    Emissions Inventories

## 3.1    Emissions Inventory - General

*Comment*

**Commenter:** Arkansas Department of Energy and Environment, Division of Environmental Quality

**Commenter ID:** 07

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

Arkansas and more than 20 other states and regional groups submitted comments, suggestions, and corrections to EPA for the emissions inventories datasets for the 2016v2 modeling platform.[14] However, the modeling data that EPA proposes to primarily rely upon in its disapproval of the Arkansas Transport Plan does not reflect corrections to the modeling platform in response to state comments. EPA should understand that failing to incorporate state-provided corrections to that data while moving forward with issuing proposed actions essentially bars states from performing their role under the CAA.

[...]

In response to comments from the MJOs and states, EPA partially updated the 2016v2 platform emissions inventories datasets for future modeling runs.[15] However, the modeling that EPA is primarily relying upon in its disapproval was performed before states could offer feedback and still contains all the errors that states previously identified. Although DEQ disagrees with EPA's choice to substitute new modeling data for the data that was available when the state was developing its plan, EPA should understand that failing to incorporate state-provided corrections to that data while moving forward with issuing proposed actions essentially bars states from performing their role under the Clean Air Act.

[14] Index of /Air/emismod/2016/v2/reports/comments at
https://gaftp.epa.gov/Air/emismod/2016/v2/reports/comments/
[15] https://gaftp.epa.gov/Air/emismod/2016/v3/preliminary_updates/

*Response:*
The EPA has incorporated updates as appropriate into its 2016v3 modeling platform based on pre-proposal feedback and information provided in public comments on the 2016v2 platform.

## 3.2    Emissions Inventory – Non-EGUs

*Comment*

97

**Commenter:** Arkansas Department of Energy and Environment, Division of Environmental Quality

**Commenter ID:** 07

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

For point sources (ptnonipm) DEQ suggests that EPA consider examining the use of 2017 NEI data and adjusting the dataset to create a 2016 base year. The 2017 data is more recent and if a backward base year projection is necessary, then it would be a one year projection (2017 to 2016) and not two years (2014 to 2016).

According to EPA's 2016v2 TSD, for sources outside of the Mid-Atlantic Regional Air Management Association (MARAMA) region, the maximum future year projection factor was capped at 1.25. Also the future year projection factor was capped at a maximum of 2.5 if SCC/NAICS combinations with criteria pollutant emissions >100 tons/year for the ptnonipm sector. However, the ptnonipm includes future year projection factors that are greater than 1.25 for various facilities outside of MARAMA region where the total annual emissions are less than 100 tons, including a future year projection factor as high as 1.468. DEQ does not know the origin of these greater than 1.25 exceptions to the TSD language and whether they are possibly a result of state-submitted refinement data, which would be reliable sources.

The future year projection factor for NOx emissions from "Honeywell International Inc. – Hopewell" (unit# 20375813) in Virginia is 6.79 for 2026 in the 2016v2 platform and was 0.63 for 2028 in 2016v1 platform. DEQ conducted trend analyses to evaluate some future year projection factors and DEQ's analysis for this source does not appear to support a future year projection factor of 6.79 and may support a future year projection factor of 0.62; however, Virginia may have suggested the 6.79 as the appropriate value and, if so, would likely be the best source of this data. DEQ suggests that EPA verify the above example, possibly with Virginia if data was not already provided by Virginia, and other similar examples. [Figure 1 available in full comment]


*Response*

The EPA concurs with the suggestion by the commenter to use 2017 National Emissions Inventory (NEI) data to represent 2016 instead of data projected from 2014. The EPA implemented this approach into the 2016v3 platform where a matching source could be identified in the 2017 NEI, however, data submitted specifically for the year 2016 are used, where available. The EPA also updated the approach for developing 2023 non-EGU point source emissions in the 2016v3 platform to make use of 2019 NEI point source data as the basis for 2023 non-EGU point source emissions for source not related to oil and gas production. Thus, the maximum projection factor of 1.25 is no longer relevant in the 2016v3 inventory for 2023.  This approach applies to Honeywell International Inc. – Hopewell for 2023 emissions.  As the analytic year for this action is 2023, projections for years later than 2023 are not relevant for the identification of receptors and linkages at Steps 1 and 2 of the 4-step interstate transport framework.

*Comment*

**Commenter:** Cleco Corporate Holdings LLC

**Commenter ID:** 14

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

EPA should incorporate needed revisions to the 2016v2 modeling platform based on comments provided by the states and other stakeholders as provided in this docket and then re-analyze the Louisiana SIP based on the updated/corrected modeling platform before issuing a final rule on the Louisiana SIP.

*Response*

In response to the commenter's requests that the EPA reanalyze its modeling based on comments received, the EPA has re-evaluated its emissions inventories to create the 2016v3 emissions modeling platform and re-run the air quality models and related analyses using the 2016v3 inventories. Specifically, with regards to Louisiana, the state continues to have a linkage to one or more downwind receptors as indicated in the preamble in Sections III.C and IV.G.

*Comment*

**Commenter:** Eagle Materials Inc.

**Commenter ID:** 16

**Docket ID:** EPA-R09-OAR-2022-0138

**Comment:**

EPA's new modeling fails to account for significant emissions reductions that have occurred since 2016.

The Proposed SIP Disapproval is based on updated air quality modeling, using EPA's newly released 2016v2 Model. This modeling platform relies on emissions inventory data from the base year of 2016 to develop future year emissions inventories using sector-specific methods. The 2016v2 update "draws on data from the 2017 National Emissions Inventory," incorporating "2016-specific state and local data along with adjustment methods appropriate for each sector." Based on projected future emissions inventories from this model for 2023, 2026, and 2032, EPA assessed nonattainment and maintenance-only receptors, as well as linked states, for purposes of evaluating state SIP submittals. While EPA's updated modeling accounts for certain updates between 2014 and 2016 in developing its baseline emissions inventory for 2016, 2016v2 does not capture enforceable emissions limits and emissions reductions from 2016 to present in modeling emissions in 2023 and 2026. These emissions reductions significantly impact EPA's assessment of nonattainment and maintenance-only receptors in these future years, and call into question EPA's determination that Nevada remains linked to downwind air quality problems.

Since 2016, at least fifteen Nevada facilities, identified in Table 1, have entered consent decrees requiring enforceable NOx emissions reduction totaling at least 1,676 tpy, apart from additional reductions that EPA has not quantified. EPA's determination that Nevada is linked to downwind air quality problems fails to account for these enforceable emission reductions because they fall outside EPA's 2016v2 modeling update.

Eagle believes that the marginal link between Nevada and downwind receptors has been eliminated by these additional enforceable emission reductions. In its Proposed SIP Disapproval, EPA determined that Nevada was linked to downwind air quality problems based on air quality projections and state contributions identified in Table 2 [(table in full comment)], below. Nevada's maximum contribution to these receptors is 0.19 ppb above EPA's 0.70 ppb linkage threshold. Because Nevada's modeled contribution to downwind receptors is so low, even a small reduction in projected emissions could reduce Nevada's level of contribution to these receptors below the 0.70 ppb threshold. Accordingly, Eagle urges EPA account for these additional NOx reductions in evaluating Nevada's interstate transport obligations in its SIP submittal.

**Table 1: Enforceable Consent Decrees Impacting Nevada NOx Emissions,
2016 – Present**

| EPA Case No. | Facility Name | Date of Final Order | Estimated NO$_x$ Emissions Reductions |
|---|---|---|---|
| NVCCHA200162193 | Lhoist North America of Arizona – Apex Plant | 7/5/2016 | Unknown |
| NVCCHA200162109 | Titanium Metals Corp. Henderson Facility | 5/17/2017 | Unknown |
| 09-2011-0506 | Fernley Plant | 10/30/2018 | 1676 tpy |
| NVCCHA200171077 | Republic Services Renewable Energy LLC | 1/29/2019 | Unknown |
| NVCCHA200172874 | Caesars Entertainment Corp. | 3/28/2019 | Unknown |
| NVCCHA200172890 | Robertsons Ready Mix | 3/28/2019 | Unknown |
| NVCCHA200172891 | Wells Cargo Inc. | 3/28/2019 | Unknown |
| NVCCHA200179749 | Nevada Ready Mix | 9/26/2019 | Unknown |
| NVCCHA200191116 | Aggregate Industries Sloan Quarry | 7/22/2020 | Unknown |
| NVCCHA200192550 | Blue Diamond Hill Gypsum | 09/24/2020 | Unknown |
| NVCCHA200192633 | Titanium Metals Corp. Henderson Facility | 11/30/2020 | Unknown |
| NVCCHA200196170 | Pabco Building Products, LLC | 5/26/2021 | Unknown |
| NVCCHA200199608 | Robertsons Ready Mix | 08/02/2021 | Unknown |
| NVCCHA200199945 | EMD Acquisition LLC | 9/23/2021 | Unknown |
| NVCCHA200199607 | Blue Diamond Hill Gypsum | 10/1/2021 | Unknown |

*Response*

In response to commenter's claims that the EPA's emissions inventories did not include emissions reductions from the facilities identified in the comment, the EPA has evaluated the information provided by the commenter regarding these consent decrees.

Regarding commenter's statement that the EPA has not quantified Nevada facilities subject to enforcement related consent decree for $NO_X$ emissions reductions, the commenter tabulated names of these facilities and their estimated $NO_X$ emissions reductions in Table 1 of the comment letter that is duplicated above. For each row of the table, the comment document provides footnotes with web links to the EPA's database Enforcement and Compliance History Online (ECHO). However, with the exception of the Fernley Plant, the estimated $NO_X$ emissions reductions for 14 of the 15 sources in the table are reported as "Unknown". To develop the 2023 non-EGU emissions in the 2016v3 platform, the EPA started with the 2019 NEI point source inventory, as it was the latest complete point source inventory at the time of the modeling. The EPA was able to identify some of the sources in the commenter's table in the NEI, although four facilities could not be found in the NEI with $NO_X$, volatile organic compound (VOC), or particulate matter (PM) emissions. The facilities that could not be found and the civil penalty from ECHO listed in parentheses were Caesars Entertainment Corp. ($9,125), Robertsons Ready Mix ($7,250 and $3,120), Nevada Ready Mix (case not found in ECHO), and EMD Acquisition LLC ($12,640). The penalties were modest with a maximum of $12,640. For the facilities that were found in the NEI, the actual annual $NO_X$ emissions in tons from the 2016 inventory in the 2016v3 platform and the 2019 NEI point inventory plus the modeled emissions in the modeled 2016v3 2023 inventory are shown in Table 3-1. The emissions in Table 3-1 were derived from facility and unit-level summaries of 2016v3 point source emissions provided in the docket for this action.

*Table 3-1 Recent and Projected Emissions for Nevada Facilities in Table 1*

| Facility Name | 2016 NOx (tons) | 2019 NOx (tons) | 2023 NOx (tons) |
|---|---|---|---|
| Lhoist North America of Arizona – Apex Plant | 1,219 | 1,108 | 1,151 |
| Titanium Metals Corp. Henderson Facility | 10 | 24 | 24 |
| Fernley Plant | 1,090 | 1,796 | 1,796 |
| Republic Services Renewable Energy LLC | 43 | 14 | 14 |
| Wells Cargo Inc. | 20 | 7 | 7 |
| Aggregate Industries Sloan Quarry | 7 | 19 | 19 |
| Blue Diamond Hill Gypsum | N/A | 66 | 66 |
| Titanium Metals Corp. Henderson Facility | 10 | 24 | 24 |
| Pabco Building Products, LLC | 218 | 198 | 198 |

The only facilities in Table 3-1 with more than 70 tons of $NO_X$ emissions in 2019 are: Lhoist North America of Arizona – Apex Plant, Fernley Plant, and Pabco Building Products, LLC. In ECHO[18], the Lhoist case is marked as resolved as of 2/1/2017, with a civil penalty of $7,500. We presume that any resulting

---

[18] *https://echo.epa.gov/enforcement-case-report?activity_id=3601452966*

emission reductions would have been implemented in time to be reflected in the 2019 NEI. The Pabco Building Products consent decree was from 2021, so any impacts would not be reflected in the 2019 NEI. The ECHO status for Pabco[19] is listed as resolved as of 6/8/2021 and the civil penalty was $7,600.  Given the actual $NO_X$ emissions in the 2019 NEI, the likely reduction in 2023 that could have been achieved even if all emissions were eliminated in 2023 is about 200 tons per year (tpy) of $NO_X$, while the total annual modeled anthropogenic $NO_X$ in Nevada in 2023 is projected at 42,260 tons.
Thus, even a reduction of that level would not impact Nevada's contribution to other states.

The summary for the Fernley case in ECHO[20] is, "U.S. Environmental Protection Agency reached a settlement with the Nevada Cement Company to install new air pollution control technology at its Fernley, Nev. facility and replace a heavy-duty diesel truck and a diesel railcar mover at the facility with clean emissions vehicles to address alleged violations of federal CAA regulations. The pollution controls and clean emissions vehicles will reduce NOx emissions by approximately 1,140 tpy. Nevada Cement Company also paid a civil penalty of $550,000 as part of the settlement."

The EPA located the consent decree in *United States* v. *Nevada Cement Company, Inc.,* Civil Action No. 17-302 (D. Nev.), which was amended in 2018. As amended, Section V.A of the consent decree requires installation and operation either of Selective Non-Catalytic Reduction (SNCR) or catalytic filter bags with ammonia injection and provides that EPA may require installation of low NOx burners. A copy of these documents are available in the docket for this action.

A review of a June 19, 2020 issuance of two minor revisions to the operating permit for the Nevada Cement Company shows an allowance of discharge of $NO_X$ to the atmosphere that will not exceed 475.84 pounds per hour, nor more than 2,084.20 tons per 12-month rolling period from the #1 Kiln, and an allowance of discharge of $NO_X$ to the atmosphere that will not exceed 475.84 pounds per hour, nor more than 2,084.20 tons per 12-month rolling period from the #2 Kiln.   The EPA contacted the Permitting Branch, Bureau of Air Pollution Control Nevada Division of Environmental Protection, Department of Conservation and Natural Resources seeking the status of installation and operation of SNCR at the Nevada Cement Company's Fernley Plant. The supervisor promptly responded that she has confirmed with the facility that the SNCR has been installed and is operational on the kilns prior to October 2022.   A copy of this document is made available in docket for this action. We note that the actual 2019 emissions and the modeled 2023 emissions listed in Table 3-1 are about 1,800 tons, which is significantly less than the total of the modified operating permit level of 4,168 tpy total for the two kilns and is therefore a reasonable representation of the $NO_X$ emissions from this facility for 2023.

In summary, for all facilities except the Fernley Plant, the commenter has not provided adequate information regarding $NO_X$ decreases for the EPA to fully evaluate commenter's dispute of the linkage results for these sources.  Following the EPA's analysis, the civil penalties for the cases other than Fernley in the ECHO database were modest, indicating that the level of reductions would have been minimal. Furthermore, an examination of the EPA-approved Regulations at 40 CFR 52.1470(c), and the EPA-approved state source-specific permits at 40 CFR 52.1470(d) for Nevada did not show any of these sources to have made these reductions pursuant to enforceable and permanent requirements of the

---

[19] *https://echo.epa.gov/enforcement-case-report?activity_id=3602495139*
[20] *https://echo.epa.gov/enforcement-case-report?activity_id=2600059825*

state's SIP. For Fernley, the modeled emissions are substantially less than the permitted emissions, so while the installation of the SNCR will reduce emissions once they are fully installed and operating, the EPA modeled the emissions in 2023 at only 43% of the modified level in the permit and therefore was at a reasonable level to support the contribution analysis.

Given the detailed review of the consent decrees listed in Table 1 and their expected impacts all being too small to make a difference, except potentially for Fernley (which we have otherwise accounted for per above), we have sufficiently accounted for these comments in the final rule emissions inventory. Our analysis projects Nevada to contribute more than 1 percent of the NAAQS to downwind receptors, as noted in the preamble in Section III.C. and Section IV.M.

*Comment*

**Commenter:** Louisiana Chemical Association

**Commenter ID:** 26

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

EPA failed to take into account population decreases based on the 2020 census.

In addition to the inventory issues discussed above, EPA did not take into account the population decrease in Louisiana based on the 2020 census. This affects various source emission calculations, including many nonpoint source emissions. For Louisiana (and other states outside of the MARAMA), the EPA used historical census populations to project nonpoint sources. A ratio of 2016 population to 2014 population was used to create a growth factor that was applied to certain sources. This analysis was then used to calculate census-based growth for certain sectors and certain activities, including: industrial solvent maintenance coatings, industrial adhesive applications, residential and commercial portable gas cans, wastewater treatment recovery, etc.

In performing this analysis, EPA did not consider the 2020 census which showed that Louisiana's population growth from 2010-2020 was only 2.7 percent overall.[53] The majority of parishes in Louisiana experienced decreases in population. For example, Cameron Parish, which shares a border with southeast Texas experienced a -17.9% population change from 2010 to 2020 and Caddo Parish, which shares a border with Texas near Dallas experienced a -6.7% population change over the same time period. In fact, of the seven parishes that share a border with Texas, four experienced a negative change in population and two experienced an increase less than 3%.

At a minimum, EPA must incorporate needed revisions to the 2016v2 inventory based on the population changes shown in the 2020 Census and then re-analyze the Louisiana Transport SIP based on the updated/corrected modeling platform before issuing a final rule on the Louisiana Transport SIP.

[53] *See Louisiana State Profile, 2020 Census, available at: https://www.census.gov/library/stories/state-bystate/louisiana-population-change-between-census-decade.html; see also Louisiana's population continues to shrink: Stats show nearly 13K decline between 2019, 2020*, The Advocate, January 29, 2020 (available at: https://www.theadvocate.com/baton_rouge/news/business/article_3833634c-5cdc-11eb-951d-

b39a30651d28.html); *Population declines in most Louisiana parishes, except for the suburbs, new estimates show*, Nola.com, March 25, 2022 (available at: https://www.nola.com/news/politics/article_fc5ff816-aba5-11ec-b605-234640609e50.html) ("The vast majority of Louisiana's parishes continued to shrink in the year after the 2020 census, drops that represented a continuation of a long-term trend that was exacerbated and sped up – in some cases dramatically – by the impacts of the pandemic and the devastation of Hurricane Laura, according to new estimates.").

*Response*

The EPA disagrees with the Louisiana Chemical Association's (LCA's) claim that EPA's emissions inventory projections are flawed because the EPA failed to consider that the population in Louisiana is projected to decrease, impacting the growth factor used to project non-point source emissions in the state. The population-based growth method from 2014 to 2016 for the base year was used in the 2016v2 platform used at proposal.  For the final rule modeling with 2016v3, data from 2017 NEI were used instead of using population-based factors to grow from 2014 to 2016, as 2017 NEI is a more recent inventory than 2014 NEI.  Based on U.S. Census data,[21] the population of Louisiana increased by 2% from 2010 to 2021. The commenter seems to contradict their own claim that Louisiana's population is decreasing by identifying that between 2010 and 2020, Louisiana's population increased overall by 2.7 percent. Further, and as the commenter notes, population data are only used to project emissions for a few Source Classifications Codes (SCCs) that impact $NO_x$ in the EPA's 2016v2 and 2016v3 platforms. A spreadsheet listing the SCCs that are projected based on human population is available in the docket for this action.  These factors increased Louisiana's $NO_x$ emissions in 2023 by only 2 tons statewide in 2016v2.  A spreadsheet showing state total emissions by SCC is available with the 2016v3 state total summaries in the docket for this action. Human population change is also used to project solvent VOC emissions. In the 2016v3 platform, the solvent emissions were projected to grow by 3.7% from 2016 to 2023. This is equivalent to 1,400 tons additional VOC out of 231,000 tons of anthropogenic VOC and 1.6M tons of VOC including biogenic and fire emissions. A change in VOC emissions of this magnitude would not have a noticeable result in ozone concentrations or contributions. Overall, the limited use of human population changes in projecting emissions from 2016 to 2023 does not have a significant impact on ozone precursor emissions in Louisiana.

*Comment*

**Commenter:** Louisiana Chemical Association

**Commenter ID:** 26

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

*The 2016v2 inventory contains sources that are permanently closed and fails to include emissions reduction projects in Louisiana.*

---

[21] *https://www.census.gov/quickfacts/fact/table/LA/PST045221.*

Some of the discrepancies may be explained by issues with the inventory used. According to the Technical Support Document for the 2016v2 platform ("2016v2 TSD"), the platform "draws on data from the 2017 National Emissions Inventory (NEI), although the inventory was updated to represent the year 2016 through the incorporation of 2016-specific state and local data along with adjustment methods appropriate for each sector."

For instance, the non-EGU point source sector emissions in the 2016v2 platform have been updated from the 2016 NEI point inventory and 2016v1 with certain changes. However, LCA believes that EPA has failed to include a number of federally enforceable consent decrees for non-EGUs in its model, which has served to overestimate emissions from Louisiana. In addition to the Cabot Facility consent decree referenced in the 2016v2 TSD, the following consent decrees were also entered since 2016:

[See pages 12-14 of comment letter for specific list of consent decrees and facility information identified by commenter.].


*Response*

In response to LCA's claims that the EPA's emissions inventories include emissions from sources in Louisiana that have permanently shut down, the EPA has evaluated the information provided by the commenter regarding these reductions and the status of the emissions at the facilities listed as planned closures is as follows:

Sterlington Power is not in the 2016v3 inventories for 2023 and is therefore modeled as closed.

US Convent Refinery has 234 tons $NO_X$ in 2016 and 290 tons $NO_X$ in 2023 in the 2016v3 platform and is not closed. The commenter claims this facility closed in 2019, although LA DEQ reported 290 tons of $NO_X$ in the preliminary 2020 NEI.  In addition, on February 24, 2022, *The Baton Rouge Advocate* reported that Shell confirmed the refinery will be revived as an alternative fuel complex,[22] and therefore it is not appropriate to remove the emissions in the 2023 modeling.

Phillips 66 Alliance Refinery $NO_X$ emissions in the 2016v3 platform are approximately the same in 2016 at 813 tons as the modeled emissions in 2023 at 872 tons.  The commenter states that this will be converting to a terminal facility, but no details are provided on the timing for this conversion or the expected impact to the emissions and thus the emissions are retained in the 2016v3 platform.

Emissions for point sources used in the modeling by facility and unit are included in the docket for this action. Regarding reductions in emissions due to consent decrees or other enforceable measures: The installation of controls at Firestone Polymers by August 15, 2022, was too late to be reflected in the 2023 emissions used for modeling, although the 2023 NOx emissions are a minimal 44 tpy and a reduction would have virtually no impact on the contribution analysis.

The general approach used by the EPA to develop the 2016v3 platform point source emissions for 2023 was to start with the 2019 NEI point source inventory, as the most recent complete point inventory at

---

[22] *See* https://www.theadvocate.com/baton_rouge/news/business/shell-confirms-shuttered-convent-facility-will-become-an-alternative-fuels-complex/article_ad522d06-95ad-11ec-9457-bb64f61e4803.html.