# United States Court of Appeals for the Fifth Circuit

―――――――――

No. 23-60069

―――――――――

STATE OF TEXAS; TEXAS COMMISSION ON ENVIRONMENTAL QUALITY; LUMINANT GENERATION COMPANY, L.L.C.; COLETO CREEK POWER, L.L.C.; ENNIS POWER COMPANY, L.L.C.; HAYS ENERGY, L.L.C.; MIDLOTHIAN ENERGY, L.L.C.; OAK GROVE MANAGEMENT COMPANY, L.L.C.; WISE COUNTY POWER COMPANY, L.L.C.; ASSOCIATION OF ELECTRIC COMPANIES OF TEXAS; BCCA APPEAL GROUP; TEXAS CHEMICAL COUNCIL; TEXAS OIL & GAS ASSOCIATION; PUBLIC UTILITY COMMISSION OF TEXAS; RAILROAD COMMISSION OF TEXAS; STATE OF MISSISSIPPI; MISSISSIPPI DEPARTMENT OF ENVIRONMENTAL QUALITY; MISSISSIPPI POWER COMPANY; STATE OF LOUISIANA; LOUISIANA DEPARTMENT OF ENVIRONMENTAL QUALITY; ENTERGY LOUISIANA, L.L.C.; LOUISIANA CHEMICAL ASSOCIATION; MID-CONTINENT OIL AND GAS ASSOCIATION; LOUISIANA ELECTRIC UTILITY ENVIRONMENTAL GROUP, L.L.C.; TEXAS LEHIGH CEMENT COMPANY, LP,

*Petitioners,*

*versus*

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; MICHAEL S. REGAN, *Administrator, United States Environmental Protection Agency,*

*Respondents.*

---

Petition for Review of a Final Rule
by the Environmental Protection Agency
88 Fed. Reg. 9336-9384

---

<u>UNPUBLISHED ORDER</u>

Before Engelhardt, Wilson, and Douglas, *Circuit Judges*.

Per Curiam:

There are five motions before us. The first two concern whether venue should be transferred to the D.C. Circuit. It should not; so, we DENY the motions. The third, fourth, and fifth motions concern whether the case should be stayed pending review of the EPA's disapproval of Texas's and Louisiana's State Implementation Plans. It should; so, we GRANT the three motions.

## I.

We first (A) detail the relevant statutory and regulatory background. Then we (B) describe the factual and procedural background.

## A.

The Clean Air Act ("CAA" or "the Act"), 42 U.S.C. § 7401 *et seq.*, "establishes a comprehensive program for controlling and improving the nation's air quality." *BCCA Appeal Grp. v. EPA*, 355 F.3d 817, 821–22 (5th Cir. 2003). But unlike many other federal statutes, the CAA divides enforcement responsibility between the federal and State governments. *See Texas v. EPA*, 829 F.3d 405, 411 (5th Cir. 2016) ("*Texas 2016*") ("The Clean Air Act is 'an experiment in cooperative federalism.'" (quoting *Michigan v. EPA*, 268 F.3d 1075, 1083 (D.C. Cir. 2001))); *see also New York v. United States*, 505 U.S. 144, 167–68 (1992) (listing a handful of similar statutes); *Hodel v. Virginia Surface Min. & Reclamation Ass'n*, 452 U.S. 264, 289 & n.30 (1981) (same). Namely, the EPA identifies air pollutants and sets air quality

standards, while the States implement those standards. 42 U.S.C. §§ 7408–10. Though the EPA and the States both have statutory responsibilities under the CAA, Congress gave the States "primary" authority in this context. *Id.* § 7401(a)(3) ("[A]ir pollution prevention . . . and air pollution control at its source is the primary responsibility of States and local governments."); *id.* § 7407(a) ("Each State shall have the primary responsibility for assuring air quality within the entire geographic area comprising such State . . . ."); *see also Texas 2016*, 829 F.3d at 411 ("The structure of the Clean Air Act indicates a congressional preference that [S]tates, not EPA, drive the regulatory process.").

For its part, the EPA is required to set national ambient air quality standards ("NAAQS") for pollutants that "may reasonably be anticipated to endanger public health or welfare." *See* 42 U.S.C. §§ 7408, 7409. "Once a NAAQS has been promulgated, the [EPA] Administrator must [continue to] review the standard (and the criteria on which it is based) 'at five-year intervals' and make 'such revisions . . . as may be appropriate.'" *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 462–63 (2001) (third alteration in original) (quoting 42 U.S.C. § 7409(d)(1)).

After the EPA promulgates or revises a NAAQS, "[e]ach State must submit a State Implementation Plan"—or "SIP"—"within three years of any new or revised NAAQS." *EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489, 498 (2014) (citing 42 U.S.C. § 7410(a)(1)). Of course, SIPs need to comply with the CAA generally and the NAAQS specifically. *See* 42 U.S.C. § 7410(a)(2) (listing elements that must be included in all SIPs). But States otherwise have "wide discretion" in formulating their SIPs. *Union Elec. Co. v. EPA*, 427 U.S. 246, 250 (1976); *see also BCCA*, 355 F.3d at 822 ("[S]tates have broad authority to determine the methods and particular control strategies they will use to achieve the statutory requirements." (citation omitted)). Indeed: "So long as the ultimate effect of a State's choice of

emission limitations is compliance with the [NAAQS], the State is at liberty to adopt whatever [approach] it deems best suited to its particular situation." *Train v. NRDC*, 421 U.S. 60, 79 (1975).

Next—after States submit their SIPs—the EPA conducts a "limited" review. *Texas v. EPA*, 690 F.3d 670, 675 (5th Cir. 2012) ("*Texas 2012*"). The Agency's review is "limited" in the sense that the CAA "confines the EPA to the ministerial function of reviewing SIPs for consistency with the Act's requirements." *Luminant Generation Co. v. EPA*, 675 F.3d 917, 921 (5th Cir. 2012) ("*Luminant 2012*") (citations omitted); *see also* 42 U.S.C. § 7410(k) (detailing the EPA's timeline for reviewing SIPs). "Thus, if a SIP or a revised SIP meets the statutory criteria of the CAA, then the EPA *must* approve it." *Texas 2012*, 690 F.3d at 676 (emphasis added); *see* 42 U.S.C. § 7410(k)(3) ("[T]he [EPA] Administrator *shall* approve [a SIP] as a whole if it meets all of the applicable requirements of this chapter." (emphasis added)). But if (and only if) a SIP is inadequate, "the Act requires the Agency to promulgate a Federal Implementation Plan"—or "FIP"—"within two years." *EME Homer*, 572 U.S. at 498 (citation omitted); *see* 42 U.S.C. § 7410(c)(1)(B); *see also Texas 2016*, 829 U.S. at 412 ("Only if the [S]tate has not complied with the requirements of the Clean Air Act does EPA assume the role of primary regulator by drafting a state-specific plan."). A FIP "fill[s] all or a portion of . . . an inadequacy in a [SIP]" and binds the State. 42 U.S.C. § 7602(y).

## B.

This case involves the EPA's 2015 revision of the ozone NAAQS. On October 26, 2015, the EPA lowered the allowable concentration of ozone in the ambient air from 75 parts per billion ("ppb") to 70 ppb. Ozone NAAQS, 80 Fed. Reg. 65,292 (Oct. 26, 2015).

That triggered the States' duty to craft SIPs implementing the revised NAAQS—including plans for compliance with the CAA's so-called "Good

Neighbor Provision." *See EME Homer*, 572 U.S. at 495–99. Because the wind is "heedless of state boundaries," pollution emitted in upwind States can undermine downwind States' ability to satisfy NAAQS. *Id.* at 495. To address this aspect of national air quality, Congress included the Good Neighbor Provision in the CAA. It requires that, in addition to meeting NAAQS emissions thresholds within a State's borders, SIPs must also "contain adequate provisions" prohibiting emissions in amounts that will "contribute significantly to nonattainment in, or interfere with maintenance by, any other State with respect to any [NAAQS]." 42 U.S.C. § 7410(a)(2)(D)(i)(I).[1] Although the EPA did not promulgate any regulations regarding the States' Good Neighbor obligations under the 2015 ozone NAAQS, *see* 42 U.S.C. § 7601(a), it did issue various memos designed to help States satisfy the Provision.[2]

---

[1] Areas where concentrations of regulated pollutants satisfy the NAAQS are called "attainment" areas, while those that don't are called "nonattainment" areas. 42 U.S.C. § 7407(d)(1)(A)(i)–(ii).

[2] *See* Memorandum from Peter Tsirigotis, Director, Office of Air Quality Planning and Standards, *Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I)* (Mar. 27, 2018) [hereinafter March 2018 Memo]; Memorandum from Peter Tsirigotis, Director, Office of Air Quality Planning and Standards, *Considerations for Identifying Maintenance Receptors for Use in Clean Air Act Section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards* (Oct. 19, 2018) [hereinafter October 2018 Memo]; *see also* Notice of Availability of the EPA's Preliminary Interstate Ozone Transport Modeling Data for the 2015 Ozone NAAQS, 82 Fed. Reg. 1,733 (Jan. 6, 2017) [hereinafter 2017 Data Announcement]. None, however, was supposed to be binding. *See* October 2018 Memo at 1 ("States may use this information when developing [SIPs] for the 2015 ozone NAAQS addressing the [G]ood [N]eighbor [P]rovision," but "[t]his document . . . does not impose binding, enforceable requirements on any party."); March 2018 Memo at 2–3, 6 (similar); 2017 Data Announcement at 1,735 ("[S]tates may rely on this or other appropriate modeling, data or analyses to develop approvable Good Neighbor SIPs.").

No. 23-60069

After the States submitted their SIPs, the EPA promulgated a final rule on February 13, 2023, disapproving more than 20 States' SIPs for lack of compliance with the Good Neighbor Provision. *See* Interstate Transport of Air Pollution for the 2015 8-Hour Ozone NAAQS, 88 Fed. Reg. 9,336 (Feb. 13, 2023) [hereinafter Final SIP Denial]. Then on March 15, 2023, the EPA signed the Federal Good Neighbor Plan for the 2015 Ozone NAAQS ("Final FIP"), which provides FIPs for 23 upwind States. Three of those States—Louisiana, Mississippi, and Texas, and a variety of other governmental and non-governmental entities therein—petitioned this court for review of the EPA's February 13, 2023 disapproval of their SIPs. *See* 42 U.S.C. § 7607(b).

Our court will consider those petitions in due course. Before us now are five prefatory motions: (1) the EPA's motion to transfer all petitions to the D.C. Circuit; (2) the EPA's motion to dismiss based on improper venue; (3) Texas-based petitioners' two motions to stay the Final SIP Denial as it relates to Texas; and (4) the State of Louisiana's motion to stay the Final SIP Denial as it relates to Louisiana. For the reasons that follow, we DENY the first two motions and GRANT the rest.

## II.

We begin with the EPA's motion to transfer venue to the D.C. Circuit under 42 U.S.C. § 7607(b)(1). We assess the "applicability" of § 7607(b)(1) *de novo* and without deference to the agency. *Texas 2016*, 829 F.3d at 417–21. Section 7607(b)(1) states, in relevant part:

> A petition for review of action of the Administrator in promulgating any national primary or secondary ambient air quality standard . . . or any other nationally applicable regulations promulgated, or final action taken, by the Administrator *under this chapter* may be filed only in the United States Court of Appeals for the District of Columbia. A petition

No. 23-60069

for review of the Administrator's action in approving or promulgating any implementation plan . . . or any other final action of the Administrator *under this chapter* . . . which is *locally or regionally applicable* may be filed only in the United States Court of Appeals for the appropriate circuit. Notwithstanding the preceding sentence a petition for review of any action referred to in such sentence may be filed only in the United States Court of Appeals for the District of Columbia if such action is *based on a determination of nationwide scope or effect* and if in taking such action the Administrator *finds and publishes* that such action is based on such a determination.

42 U.S.C. § 7607(b)(1) (emphasis added).

In other words, the CAA's venue statute divides challenges to EPA "actions" into three general categories. First, "nationally applicable" actions—which must be filed in or transferred to the D.C. Circuit. Second, "locally or regionally applicable" actions—which must be filed in or transferred to the appropriate regional circuit. Third, locally or regionally applicable actions that are "based on a determination of nationwide scope or effect" and accompanied by the EPA's published finding to that effect— which must be filed in or transferred to the D.C. Circuit. *See Texas 2016*, 829 F.3d at 419; *see also Am. Rd. & Transp. Builders Ass'n v. EPA*, 705 F.3d 453, 455 (D.C. Cir. 2013).

As a preliminary matter, the parties dispute what the relevant "action" is for purposes of § 7607(b)(1). We have said that § 7607(b)(1)'s use of "action" means "the rule or other final action taken by the agency that the petitioner seeks to prevent or overturn." *See Texas 2016*, 829 F.3d at 419.

No. 23-60069

However, such a broad articulation can be difficult to apply when the Agency takes multiple actions in a single rule. What guides us in those cases?[3]

We look primarily to the text of the statute. *See Massachusetts v. EPA*, 549 U.S. 497, 528–32 (2007); *CleanCOALition v. TXU Power*, 536 F.3d 469, 473–74 (5th Cir. 2008). The applicable statute (here the CAA) is the legal source of the agency's (here the EPA's) authority to take the challenged actions (here the SIP denials).[4] And the CAA makes clear that the EPA's relevant actions for purposes of the present litigation are its various SIP denials. Specifically, we consider how the EPA's Final SIP Denial fits into CAA's step-by-step procedure. First, the EPA sets NAAQS. 42 U.S.C. § 7409(b)(1). Next, "each State" submits its own SIP implementing those NAAQS. *Id.* § 7410(a). Then the EPA approves or disapproves *each State's* SIP. *See id.* 7410(k)(1)–(3) ("the State," singular). This final step is the relevant "action," and it is precisely what the EPA did here. As required by § 7410(k)(3), the EPA *separately considered and disapproved* Texas's SIP,

---

[3] The precise contours of the Petitioners' challenges do not define the relevant "action" for § 7607(b)(1)'s purposes. *See, e.g.*, *ATK Launch Sys., Inc. v. EPA*, 651 F.3d 1194, 1199 (10th Cir. 2011) ("The nature of the regulation, not the challenge, controls."). Nor do the "practical effects" of the action. *Am. Rd. & Transp. Builders*, 705 F.3d at 456. Nor does the EPA's chosen method of publishing or labeling the action. *See Brown Express, Inc. v. United States*, 607 F.2d 695, 700 (5th Cir. 1979); *accord Lewis-Mota v. Sec'y of Labor*, 469 F.2d 478, 481 (2d Cir. 1972) ("[T]he label that the particular agency puts upon its given exercise of administrative power is not, for our purposes, conclusive; rather it is what the agency does in fact." (citation omitted)). Accordingly, we do not consider these as guidance in deciding the motion before us.

[4] *See* 42 U.S.C. § 7607(b)(1)("final action ... *under this chapter*" (emphasis added)); *ibid.* ("any other final action of the Administrator *under this chapter*" (emphasis added)). The phrase "under this chapter" in § 7607(b)(1) refers to the Chapter 85 of Title 42 (*i.e.*, the Clean Air Act). *See generally* 42 U.S.C. §§ 7501–7671q; 42 U.S.C. Ch. 85: Front Matter, Editorial Note ("Act July 14, 1955, ch. 360, 69 Stat. 322 , as amended, known as the Clean Air Act, which was formerly classified to chapter 15B (§1857 et seq.) of this title, was completely revised by Pub. L. 95–95, Aug. 7, 1977, 91 Stat. 685, and was reclassified to this chapter.").

No. 23-60069

Louisiana's SIP, and Mississippi's SIP because (in its judgment) each failed to comply with the Good Neighbor Provision. Yes, the EPA packaged these disapprovals together with the disapprovals of eighteen other States in the Final SIP Denial. *See* 88 Fed. Reg. 9,336. But again, the EPA's chosen method of publishing an action isn't controlling. What controls is the CAA. And the CAA is very clear: The relevant unit of administrative action here is the EPA's individual SIP denials.

Having isolated the relevant EPA actions at issue, we next (A) explain why the EPA's SIP denials for Texas, Louisiana, and Mississippi are locally or regionally applicable. Then we (B) reject the EPA's argument that § 7607(b)(1)'s exception applies.

A.

Under § 7607(b)(1), "nationally applicable" actions must be transferred to the D.C. Circuit, whereas "locally or regionally applicable" actions must not.

The question of whether the three EPA SIP disapprovals at issue are "nationally applicable" "turns on the legal impact" of the three SIP disapprovals. *Texas 2016*, 829 F.3d at 419; *see also, e.g.*, *Texas v. EPA*, 2011 WL 710598, at *3 (5th Cir. 2011) ("*Texas 2011*") (concluding a nationwide SIP call under 42 U.S.C. § 7410(k)(5) is nationally applicable); *Am. Rd. & Transp. Builders*, 705 F.3d at 455–56 (action disapproving California's SIP is locally applicable and must be filed in the Ninth Circuit); *ATK Launch Sys., Inc. v. EPA*, 651 F.3d 1194, 1199 (10th Cir. 2011) (observing that SIPs are "undisputedly regional action[s]" and "the nature of the regulation . . . controls").

Courts have long held that "SIP rulemakings" are the "prototypical locally or regionally applicable action that may be challenged only in the appropriate regional court of appeals." *Am. Rd. & Transp. Builders*, 705 F.3d

No. 23-60069

at 455 (quotation and citation omitted); *accord Tex. Mun. Power Agency v. EPA*, 89 F.3d 858, 866 (D.C. Cir. 1996). That is unsurprising: the vast majority of actions involving SIPs are necessarily about individual States and are thus "purely local" and "undisputedly regional." *ATK Launch Sys., Inc.*, 651 F.3d at 1199. Of course, some final actions related to SIPs may be "nationally applicable"—such as when the EPA promulgates regulations that apply to *all* States equally, *Puerto Rican Cement Co. v. EPA*, 889 F.2d 292, 299–300 (1st Cir. 1989), or issues a SIP call, *see* 42 U.S.C. § 7410(k)(5), requiring States to revise their SIPs in light of a new requirement that applies to *all* States, *Texas 2011*, 2011 WL 710598, at *4. In those cases, transfer to the D.C. Circuit is appropriate because the actions uniformly apply to a broad swath of States. *See id.* (concluding that "Congress intended the D.C. Circuit to review matters on which national uniformity is desirable" as a means to take advantage of the D.C. Circuit's "administrative law expertise" and facilitate "the orderly development of the basic law under the Act," and because "[c]entralized review of national issues is preferable to piecemeal review of national issues in the regional circuits, which risks potentially inconsistent results" (quotations and citations omitted)).

But here, the "legal impact" of the three SIP disapprovals is plainly local or regional. Consider "the location of the persons or enterprises that the action[s] regulate[]." *Texas 2011*, 2011 WL 710598, at *3. The EPA's three SIP disapprovals at issue involve only the regulation of Texas, Louisiana, and Mississippi emission sources and have legal consequences only for Texas, Louisiana, and Mississippi facilities. The EPA doesn't point to a single example of our circuit (or any of our sister circuits) granting a similar motion to transfer a petition challenging a SIP approval/denial to the D.C. Circuit, and for good reason: the *State* Implementation Plans, of course, primarily involve individual *States*. Given that the "legal impact" of the EPA's three SIP disapprovals is in Texas, Louisiana, and Mississippi

respectively, we conclude that the EPA's actions at issue in this case are "locally or regionally applicable."

## B.

Next, the § 7601(b)(1) exception. To overcome the "default presumption" that petitions for review of locally or regionally applicable actions "may only be filed in the United States Court of Appeal for the appropriate circuit," *Texas 2016*, 829 F.3d at 419 (quoting 42 U.S.C. § 7607(b)(1)) (internal quotation omitted), the EPA must meet both prongs of the § 7601(b)(1) exception. Because the EPA can't meet the first, we need not consider the second.

To satisfy prong one, the EPA must show that the three SIP disapprovals here were "based on a determination of nationwide scope or effect." 42 U.S.C. § 7607(b)(1). And we must make an "independent assessment of the scope of the determinations." *Texas 2016*, 829 F.3d at 421. The EPA faces a steep hurdle given that SIP disapprovals are usually "highly fact-bound and particular to the individual [S]tate." *Id.* at 421 n.24. That is particularly true here where the EPA itself stated in the Final SIP Denial that each SIP was judged "in light of the *facts and circumstances of each particular state's submission.*" Final SIP Denial at 9,340 (emphasis added).

The EPA cannot meet its burden. Just like the SIP disapprovals at issue in *Texas 2016*, the three SIP disapprovals at issue here were plainly based "on a number of intensely factual determinations" unique to each State. 829 F.3d at 421. Tellingly, the Final Rule's explanations for the Texas, Louisiana, and Mississippi SIP denials rely on the individual EPA *regional* offices' assessments of the unique features of the Texas, Mississippi, and Louisiana SIPs. *See, e.g.*, Final SIP Denial at 9,343; *id.* at 9,354 (disapproving Texas's SIP based on Region 6's evaluation of the "individual" attributes of

No. 23-60069

Texas's SIP). Consider Texas, for example. The EPA's Region 6 determined: that Texas's use of the most recent three-year period (2012–2014) to identify downwind maintenance monitors "is less likely to successfully identify maintenance receptors than the EPA method," EPA Region 6, *2015 8-Hour Ozone Transport SIP Proposal Technical Support Document* 11 (Feb. 2022); that Texas's "modeling underestimates future ozone levels" in 2023, 87 Fed. Reg. at 9,829; and that Texas's multi-factor weight-of-evidence analysis was not sufficiently "compelling" to "counter" "EPA's [one-percent] contribution methodology," *id.* at 9,833–34. These "intensely factual determinations" do not have nationwide scope or effect because they all relate "to the particularities of the emission sources in Texas" and their alleged impact on downwind air quality. *Texas 2016*, 829 F.3d at 421.[5] The same pattern holds true for Louisiana and Mississippi.

---

[5] The dissent acknowledges that "the SIP process is generally highly fact-bound and particular to the individual state." *Post*, at 28 (quoting *Texas 2016*, 829 F.3d at 421 n.24). However, notes the dissent, "EPA has made determinations in other SIP approvals that may have nationwide scope or effect." *Id.* (quoting *Texas 2016*, 829 F.3d at 421 n.24). True, in *Texas 2016*, we noted that "[a] determination that a national standard satisfies a particular requirement in each state *may* be a determination that has nationwide scope or effect." *Texas 2016*, 829 F.3d at 421 n.24 (emphasis added). But "may" implies the Court's discretion. On the facts before us, the intensely factual determinations do not have nationwide scope or effect.

No. 23-60069

Because the EPA fails to rebut the default presumption that locally or regionally applicable actions must not be transferred to the D.C. Circuit,[6] the EPA's transfer motion[7] is DENIED.[8]

III.

Satisfied that venue is proper, we turn to the stay motions.

The Texas and Louisiana Petitioners ("Stay Petitioners") moved for a stay pending review of the EPA's Final SIP Denial. *See* Fed. R. App. P. 18. To prevail, they must satisfy this familiar four-prong test:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Nken v. Holder*, 556 U.S. 418, 426 (2009) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)). We consider each prong in turn.

---

[6] The dissent contends that the EPA "*explicitly* chose to make" a published finding that the Final Rule was based on a determination of nationwide scope or effect. *Post*, at 29 (citing Final SIP Denial at 9,380-81). But the EPA's position on the matter is not determinative. "Because 'the determination of our jurisdiction is exclusively for the court to decide,'" we do not defer to the agency when determining venue. *Texas 2016*, 829 F.3d at 417–18 (citations omitted).

[7] The EPA also filed a motion to dismiss based on improper venue. For the reasons set forth above, venue in the Fifth Circuit is proper. Accordingly, the motion to dismiss is DENIED.

[8] Our decision today accords with that of the Eighth Circuit. *See Arkansas v. EPA*, No. 23-1320, ECF No. 5269098 (8th Cir. Apr. 25, 2023) (denying EPA's motion to transfer Arkansas's petition to the D.C. Circuit or dismiss for improper venue); *see also State of Utah v. U.S. Environmental Protection Agency*, No. 23-9509, ECF No. 10110851072 (10th Cir. Apr. 28, 2023) (referring respondents' motions to transfer petitions to the D.C. Circuit or dismiss for improper venue to merits panel).

No. 23-60069

A.

First, likelihood of success on the merits. To prevail, Stay Petitioners must demonstrate that the EPA likely "acted arbitrarily, capriciously, or unlawfully." *Texas 2016*, 829 F.3d at 424–25; *see also Luminant Generation Co. LLC v. EPA*, 714 F.3d 841, 850 (5th Cir. 2013) ("*Luminant 2013*") ("A petition to review the EPA's approval or disapproval of a SIP is governed by the Administrative Procedure Act. *See* 5 U.S.C. § 706.").

Stay Petitioners satisfy their burden in two ways. They (1) make a strong showing that the EPA acted unlawfully by considering factors listed nowhere in the CAA. And they (2) are likely to prevail on the claim that the EPA arbitrarily and capriciously based its Final SIP Denial in part on information only available after Texas and Louisiana had submitted their SIPs.

1.

The EPA exceeded its authority under the CAA by giving undue weight to non-statutory factors when evaluating Stay Petitioners' SIPs. *See* 5 U.S.C. § 706(2)(A), (C) ("The reviewing court shall . . . hold unlawful and set aside agency action . . . not in accordance with law" and/or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."); *see also Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43 (1983) ("[A]n agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider . . . ."). Under the CAA's cooperative federalism framework, Congress gave the States "'wide discretion' in formulating their SIPs, including the 'broad authority to determine the methods and particular control strategies they will use to achieve the statutory requirements.'" *Luminant 2013*, 714 F.3d 841 at 845 (first quoting *Union Elec.*, 427 U.S. at 250; then quoting *BCCA*, 355 F.3d at 822). The CAA, by contrast, "confines the EPA to the ministerial function

No. 23-60069

of reviewing SIPs for consistency with the Act's requirements." *Id.* at 846 (citing 42 U.S.C. § 7410(k)(3)).

The EPA exceeded its "ministerial" role. Rather than merely ensuring that Texas's and Louisiana's SIPs complied with the text of the CAA, *see* 42 U.S.C. § 7410(k)(3), the EPA instead subjected Stay Petitioners' submissions to a range of factors "not found in the Act," *Texas 2016*, 829 F.3d at 428. For example, "[t]he EPA used a 4-step interstate transport framework (or 4-step framework) to evaluate each [S]tate's [SIP] addressing the [Good Neighbor] [P]rovision for the 2015 ozone NAAQS." Final SIP Denial at 9,338. In its words:

> [T]he EPA has developed and used the following 4-step interstate transport framework to evaluate a [S]tate's [Good Neighbor] obligations . . . : (1) Identify monitoring sites that are projected to have problems attaining and/or maintaining the NAAQS (i.e., nonattainment and/or maintenance receptors); (2) identify states that impact those air quality problems in other (i.e., downwind) states sufficiently such that the states are considered "linked" and therefore warrant further review and analysis; (3) identify the emissions reductions necessary (if any), applying a multifactor analysis, to eliminate each linked upwind state's significant contribution to nonattainment or interference with maintenance of the NAAQS at the locations identified in Step 1; and (4) adopt permanent and enforceable measures needed to achieve those emissions reductions.

*Ibid.* This is one "permissible" way to effectuate the CAA's Good Neighbor Provision, *EME Homer*, 572 U.S. at 524 (holding as much in the FIP context), but it is by no means the only way. That is because the EPA's preferred "4-step framework" is nowhere to be found in the Good Neighbor Provision. *See* 42 U.S.C. § 7410(a)(2)(D)(i)(I) (only requiring that SIPs "contain adequate provisions" prohibiting emissions that will "contribute significantly to

No. 23-60069

nonattainment in, or interfere with maintenance by, any other State with respect to any [NAAQS]").

True, the EPA "recognized" in its Final SIP Denial "that [S]tates may be able to establish alternative approaches to addressing their [Good Neighbor] obligations for the 2015 ozone NAAQS that vary from [the 4-step] framework." Final SIP Denial at 9,340. But the Agency backtracks in the next breath: "deviation from [the 4-step] approach to ozone transport *must be substantially justified* and have a well-documented technical basis." *Ibid.* (emphasis added). Put differently: If a State wants to evaluate its Good Neighbor obligations in any way other than the EPA's 4-step approach, it must first "substantially justif[y]" that decision to the Agency. *Ibid.* If not violative of the CAA itself, this is at least inconsistent with the statute and jurisprudence applying it.

The EPA's approach inverts the CAA and "reflects a misapprehension by the EPA of its authorized role in the SIP-approval process." *Luminant 2012*, 675 F.3d at 928 n.8. The CAA's text and our precedent compel that "the EPA does not possess *any* discretionary authority in th[e] [SIP-approval] process. *Only* the states enjoy discretion in implementing the dictates of the CAA." *Ibid.* (emphasis added) (quotation and citations omitted); *see also Fla. Power & Light Co. v. Costle*, 650 F.2d 579, 587 (5th Cir. 1981) ("The great flexibility accorded the states under the Clean Air Act is further illustrated by the sharply contrasting, narrow role to be played by EPA."). Of course, if the EPA were instead defending a FIP (a *Federal* Implementation Plan) the Agency would be entitled to exercise far more discretion in how to effectuate the Good Neighbor Provision— including by using its preferred 4-step framework. *E.g.*, *EME Homer*, 572 U.S. 489. But unless and until a SIP is lawfully denied, the State remains "primary." *Compare* 42 U.S.C. § 7401(a)(3) ("[A]ir pollution prevention . . . is the primary responsibility of States . . . ."), *and id.* § 7407(a)

No. 23-60069

("Each State shall have the primary responsibility for assuring air quality . . . ."), *and Train*, 421 U.S. at 79 ("The Agency is plainly . . . relegated by the [CAA] to a secondary role . . . ."), *with* Final SIP Denial at 9,367 ("The EPA does not, however, agree with the comments' characterization of the EPA's role in the [S]tate-[f]ederal relationship as being 'secondary.'").

The EPA's imposition of its preferred 4-step framework is just one example of how the Agency "improperly failed to defer to [Stay Petitioners'] application of the [CAA]." *Texas 2016*, 829 F.3d at 428. Others abound— including the EPA's rejection of "Texas['s] . . . definition of maintenance receptors" and "Louisiana's . . . application of a higher contribution threshold than 1 percent of the NAAQS." Final SIP Denial at 9,356, 9,359; *cf.* 42 U.S.C. § 7410(a)(2)(D)(i)(I) (offering no definition of "maintenance"); *Texas v. EPA*, 983 F.3d 826, 839 (5th Cir. 2020) ("*Texas 2020*") ("[T]he text of the [CAA] does not require EPA to adopt a one-percent threshold."). In sum, because the "EPA's lack of deference to the [S]tate[s] inverts the agency's 'ministerial function' in this system of 'cooperative federalism,'" *Texas 2016*, 829 F.3d at 428 (citation omitted), Stay Petitioners have made a strong showing that the EPA acted unlawfully. *See also Texas 2012*, 690 F.3d at 675 ("The Clean Air Act is an experiment in federalism, and the EPA may not run roughshod over [it] . . . ." (quotation omitted)).

2.

The EPA's actions are also constrained by the Administrative Procedure Act's arbitrary-and-capricious standard. *See* 5 U.S.C. § 706(2)(A). When an agency acts, it must "reasonably consider[] the relevant issues and reasonably explain[]" its actions. *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021) (citations omitted); *see also Michigan v. EPA*, 576 U.S. 743, 751–52 (2015) ("[A]gency action is lawful

only if it rests on a consideration of the relevant factors" and "important aspect[s] of the problem." (internal quotations and citations omitted)). We cannot "substitute" our "own policy judgment for that of the agency." *Prometheus*, 141 S. Ct. at 1158. But we must still ensure that "the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained its decision." *Ibid.* The upshot is that we "must set aside any action premised on reasoning that fails to account for 'relevant factors' or evinces 'a clear error of judgment.'" *Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS*, 985 F.3d 472, 475 (5th Cir. 2021) (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989)).

Stay Petitioners have demonstrated a strong likelihood of success on their claim that the EPA acted arbitrarily and capriciously. The EPA likely violated § 706(2)(A) when it based its SIP disapprovals in part on policies and modeling data developed *after* Texas and Louisiana had already submitted their SIPs and *after* the EPA's statutory deadline to act had expired. Two of those decisions are exemplars.

First, the EPA based its disapproval of Texas's SIP in part on policies that the EPA released on October 19, 2018—months after Texas submitted its SIP, and eighteen days after the October 1 deadline for all States to submit theirs. *See* October 2018 Memo; 42 U.S.C. § 7410(a)(1) (SIP deadline). Worse yet, the October 2018 Memo represented a material shift from earlier guidance, because it changed the EPA's previous March 2018 guidance by adding *new* hurdles for States to clear when identifying maintenance receptors—such as by proffering evidence of a downward trend in ozone concentrations at the site since 2011. October 2018 Memo at 4; *cf.* March 2018 Memo at A-2 (no such hurdles). The EPA disapproved Texas's SIP in part because of its failure to abide by the October 2018 Memo—which, to reiterate, was issued *after* the statutory deadline for Texas to submit its SIP.

Final SIP Denial at 9,364 ("[The] [S]tates' submissions did not meet the terms of the . . . October 2018 [Memo] addressing . . . maintenance receptors."); *see also id.* at 9,370 ("EPA evaluated [S]tate's [sic] analyses and found no [S]tate successfully applied the[] criteria [in the October 2018 Memo] to justify the use of one of these alternative approaches."). Such a "[s]udden . . . change" after the SIP submission window was likely arbitrary and capricious. *Smiley v. Citibank*, 517 U.S. 735, 742 (1996). That is particularly true where, as here, the EPA apparently disavowed its initial assurance that its after-the-statutory-deadline memo would "not impose binding, enforceable requirements on any party." October 2018 Memo at 1.

Second, the EPA also acted arbitrarily and capriciously by grounding its Final SIP Denial in modeling data that wasn't available when Louisiana and Texas submitted their SIPs. Louisiana's SIP submission was finalized on November 14, 2019; Texas submitted its SIP on August 17, 2018. Under the CAA, the EPA was required to "act on the submission[s]" by either approving or disapproving them "within 12 months." *See* 42 U.S.C. § 7410(k)(2). The EPA therefore had until November 14, 2020 to render a final decision on Louisiana's submission, and almost a year less for Texas's. Instead of rendering a timely decision, the EPA slow-walked for *years* beyond CAA's statutory deadline—finally acting on *February 13, 2022*. And when it eventually got around to evaluating Stay Petitioners' SIPs, the EPA did not use the modeling data that it had published on the eve of the SIP-submission deadline "to assist [S]tates' efforts to develop [G]ood [N]eighbor SIPs for the 2015 ozone NAAQS." March 2018 Memo at 1–2. Instead, it relied upon various significant changes to its modeling data that it adopted long *after* the statutory deadline. *See* Final SIP Denial at 9,366 (the "meteorology and boundary conditions used in modeling" became available in November 2020, the "updated emissions inventory files used in the current modeling were

No. 23-60069

publicly released" in September 2021, and the modeling software the EPA used was not public until December 2020).

At best, these choices evince a "clear error of judgment" on the EPA's part. *Anderson Cancer Ctr.*, 985 F.3d at 475 (quotation omitted). And at worst they perpetrate a "surprise switcheroo" on both Texas and Louisiana. *Env't Integrity Project v. EPA*, 425 F.3d 992, 996 (D.C. Cir. 2005) (Sentelle, J.); *accord Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1810 (2019) ("surprise switcheroo"). Agencies have wide discretion to deploy their expertise, but they cannot move the administrative goalpost in so doing. *See Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 156 (2012) ("[A]gencies should provide regulated parties fair warning of the conduct a regulation prohibits or requires." (quotation and alteration omitted)).

The EPA responds that the "Act does not prohibit EPA from using the most accurate, up-to-date data to evaluate Good Neighbor SIP submissions, even if that data was not available when a state submitted its SIP." *See also* Final SIP Denial at 9,366 ("It can hardly be the case that the EPA is prohibited from taking rulemaking action using the best information available to it at the time it takes such action. Nothing in the CAA suggests that the Agency must deviate from that general principle when acting on SIP submissions."). That response is unavailing for at least two reasons.

First, regardless of whether the CAA "prohibit[s] EPA from using the most accurate, up-to-date data," it was nevertheless arbitrary and capricious of the EPA to do so without giving due consideration to the reliance the EPA itself had engendered by publishing guidance and data that—in its words— was designed "to assist [S]tates' efforts to develop [G]ood [N]eighbor SIPs for the 2015 ozone NAAQS." March 2018 Memo at 1–2. The EPA isn't required to issue such guidance to help States discharge their obligations

under the Good Neighbor Provision. *See EME Homer*, 572 U.S. at 509–10; Final SIP Denial at 9,363–64. But when the EPA *does* issue such guidance and modeling data—like it did in March 2018—it must take due account of the State's "serious reliance interests" before "chang[ing] course." *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020) (citing *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016)). The EPA's failure to adequately consider the States' reliance interests before holding them to new guidance and modeling data issued long after the States were statutorily required to submit their SIPs was arbitrary and capricious.

Second, the EPA's decision to consider after-the-statutory-deadline information also "fail[ed] to account for 'relevant factors'"—namely, the CAA's system of cooperative federalism. *Anderson Cancer Ctr.*, 985 F.3d at 475 (quoting *Marsh*, 490 U.S. 360 at 378). Congress decided that the States should "drive the regulatory process." *Texas 2016*, 829 F.3d at 411. This choice is clearly reflected throughout the CAA, such as the provisions cabining the Agency's decisional timeframe, 42 U.S.C. § 7410(k)(1)–(2), and the sections "confin[ing] the EPA to the ministerial function of reviewing SIPs for consistency with the Act's requirements," *Luminant 2012*, 675 F.3d at 921; *e.g.*, 42 U.S.C. § 7410(k)(3) ("shall approve"). Here, however, the EPA ignored its statutory deadline by a measure of *years*; used that extra time to collect more data, issue novel guidance, and develop new modeling; denied Stay Petitioners' SIPs in part based on that new information; then created FIPs imposing the EPA's policy preferences on the States. Even if, as the EPA suggests, the CAA "does not [explicitly] prohibit EPA from using the most accurate, up-to-date data to evaluate Good Neighbor SIP submissions," the EPA must still recognize the tension between what it did and what the Act's system of cooperative federalism requires, then account for that "relevant factor[]," *Marsh*, 490 U.S. 360 at 378. Otherwise, the EPA could easily flout the CAA's deadlines with impunity, then leverage that disregard

No. 23-60069

to summarily reject SIPs based on the States' failure to consider information that only became available after the SIP-submission deadline.

In so thwarting the CAA, this would also transform the EPA's statutory role from that of a "ministerial" overseer to one of a freewheeling dictatorial regulator. *Luminant 2012*, 675 F.3d at 921; *see also Texas 2016*, 829 F.3d at 430 ("EPA may not use its own delay as an excuse for imposing burdens on [the States] that the [CAA] does not permit."); *Texas 2012*, 690 F.3d at 675 ("The Clean Air Act is an experiment in federalism, and the EPA may not run roughshod over [it]." (quotation omitted)). Accordingly, Stay Petitioners have made a strong showing that the EPA "acted arbitrarily, capriciously, [and] unlawfully." *Texas 2016*, 829 F.3d at 424–25.

## B.

The remaining factors likewise favor a stay.

Stay Petitioners "will be irreparably injured absent a stay" of the EPA's Final SIP Denial. *Nken*, 556 U.S. at 426 (quotation omitted). The Final SIP Denial was the statutory prerequisite for the EPA to create the Final FIP and impose its preferred system of emissions controls and reductions on the States. 42 U.S.C. § 7410(c)(1)(B). As Stay Petitioners point out, those changes will soon become operative, including for the 2023 ozone season: "The EPA posted the [F]inal FIP on its website on March 15, 2023 . . . [and] has stated that it expects the FIP to be effective in June or July of 2023." And many regulated entities have already commenced compliance efforts or will soon be required to do so. *See* Final FIP at 420 (providing that certain of Stay Petitioners' facilities "will begin participating in the [FIP's] Group 3 trading program on May 1, 2023, regardless of the rule's effective date"); 87 Fed. Reg. 20,036 (Apr. 6, 2022) ("[Regulated entities] should begin engineering and financial planning *now* to be prepared to meet this

implementation timetable." (emphasis added)). The EPA's Final SIP Denial has thus already caused irreparable injury. Unless stayed, it will do even more harm.

First, "allowing the Final [SIP Denial] to stand pending the appeal would disrupt the system of cooperative federalism enshrined in the Clean Air Act." *Texas 2016*, 829 F.3d at 433.

Second, Stay Petitioners will be forced to spend billions of dollars in compliance costs to achieve the Final FIP's emissions-reduction targets. That includes the costs of buying new equipment and retrofitting existing equipment; installing, operating, and maintaining that machinery; and purchasing allowances (at greater cost) on the emissions-trading market. These harms are undoubtedly irreparable because—as the EPA does not contest—"[n]o mechanism here exists for the [Stay Petitioners] to recover the compliance costs they will incur." *Id.* at 434; *see also BST Holdings, LLC v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021) ("[C]omplying with a regulation later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs." (quotation and emphasis omitted)); *Texas 2016*, 829 F.3d at 433 ("The tremendous costs of the emissions controls impose a substantial financial injury on the petitioner power companies which, in this circuit, may also be sufficient to show irreparable injury." (quotation omitted)).

Third, the Final FIP will strain Texas's and Louisiana's power grids. That's particularly true here because the Final FIP will become operative in the middle of the summer 2023 peak load conditions. This simultaneous change to Stay Petitioners' emissions budgets alongside the increased seasonal demand on their power grids will dramatically increase the probability of price spikes and "load-shedding"—*i.e.*, as Stay Petitioners observe, "requir[ing] utilities to disconnect customers from the power grid

to avoid a system-wide blackout." And we have recognized that "the threat of grid instability and potential brownouts alone constitute irreparable injury." *Texas 2016*, 829 F.3d at 434.

Accordingly, Stay Petitioners have made a strong showing of irreparable harm. The EPA, by contrast, has not demonstrated that "issuance of the stay will substantially injure the[m]" or undermine the "public interest." *Nken*, 556 U.S. at 426 (quotation omitted). As Stay Petitioners point out, the EPA's multi-year delay in disapproving Texas's and Louisiana's SIPs undercuts any claim that time is of the essence when it comes to imposing the EPA's Final FIP. But time *is* of the essence with respect to "the public's interest in ready access to affordable electricity," *Texas 2016*, 829 F.3d at 405, and "a steady supply of electricity during the summer months," *Sierra Club v. Ga. Power Co.*, 180 F.3d 1309, 1311 (11th Cir. 1999).

## IV.

For the foregoing reasons, the EPA's motion to transfer all petitions to the D.C. Circuit and motion to dismiss for improper venue are DENIED. Stay Petitioners' three motions to stay the Final SIP Denial as it relates to Texas and Louisiana are GRANTED. Our ruling here concerns only the motion for transfer, the motion to dismiss, and the motions for stay pending review; "our determinations are for that purpose" only "and do not bind the merits panel." *Veasey v. Abbott*, 870 F.3d 387, 392 (5th Cir. 2017).

No. 23-60069

Dana M. Douglas, *Circuit Judge*, dissenting:

The instant matter concerns the EPA's Final Rule of February 13, 2023, disapproving 21 States' SIPs for lack of compliance with the Good Neighbor Provision. 42 U.S.C. § 7607(b)(1) determines the proper venue for petitions for review of a final rule. Under its provisions, petitions for review of actions that are "nationally applicable" or that the EPA found and published based on determinations of "nationwide scope or effect" may be filed only in the D.C. Circuit. Here, the EPA applied a uniform national approach to evaluate state plans and ensure equity among them, making the Final Rule at issue nationally applicable on its face. But even assuming the Final Rule to be regional, the EPA made and published a finding that its Final Rule was based on a determination of "nationwide scope or effect." Because I find venue to be improper in this circuit, I dissent.

In its motion to dismiss or transfer the petitions, the EPA raises the threshold question of whether the petitions are properly adjudicated in this court or whether they belong in the D.C. Circuit under the judicial review provision of the Clean Air Act. *See* 42 U.S.C. § 7607(b)(1). The inquiry begins by determining if the challenged regulation is "nationally applicable" or "locally or regionally applicable." Applicability turns on "the legal impact of the action as a whole." *Texas v. EPA*, 829 F.3d 405, 419 (5th Cir. 2016) (*"Texas 2016"*). Whether an action is "nationally applicable" is based on "the face of the rulemaking, rather than its practical effects." *Texas v. EPA*, 706 F. App'x 159, 163 (5th Cir. 2017) ("*Texas 2017*") (quoting *Dalton Trucking, Inc. v. EPA*, 808 F.3d 875, 881 (D.C. Cir. 2015)).

On its face, the Final Rule is nationally applicable. It applied a

consistent four-step interstate transport framework[9] to evaluate plans submitted by states across the country and disapproved of SIPs from 21 states throughout eight of the ten EPA Regions and ten federal judicial circuits. *See Texas v. EPA*, 2011 WL 710598, at *3 (5th Cir. Feb. 24, 2011) (transferring petition challenging an EPA action notifying 13 states that their SIPs were inadequate) ("*Texas 2011*"); *ATK Launch Sys., Inc. v. EPA*, 651 F.3d 1194, 1200 (10th Cir. 2011) (transferring challenge to an action designating portions of 18 states as failing to comply with a NAAQS because it employed a single uniform regulatory approach across states nationwide); *S. Ill. Power Coop v. EPA*, 863 F.3d 666, 671 (7th Cir. 2017) (transferring challenge to an action "of broad geographic scope containing air quality attainment designations covering 61 geographic regions across 24 states," which was "promulgated pursuant to a common, nationwide analytical method").

The face of the Final Rule indicates it is nationally applicable, but I am further convinced by the arguments raised by Petitioners in their motions to stay which clearly show that Petitioners are challenging a nationally applicable aspect of the Final Rule. Naturally, Texas, Louisiana, and Mississippi frame the challenged actions as particularized SIP denials to support their regional venue argument. However, their own briefing indicates that this is not the action the Petitioners are challenging. Instead,

---

[9] The EPA utilized a four-step framework to evaluate compliance with the Good Neighbor Provision for prior ozone NAAQS. The EPA (1) identified nonattainment and maintenance "receptors"; (2) identified upwind states that impact air quality problems in downwind states sufficiently such that the states are considered "linked"; (3) identified any necessary emissions reductions to eliminate each upwind state's significant contribution to nonattainment or interference with maintenance of the NAAQS at the locations identified in Step 1; and (4) adopted permanent and enforceable measures needed to achieve those emissions reductions. Final Rule, 88 Fed. Reg. 9336, 9338 (Feb. 13, 2023).

the State Petitioners' Opposed Motion to Stay challenges the Final Rule on a national scale. The State parties argue that the Final Rule is being challenged because "it fails to explain EPA's after-the-fact reversal of prior guidance regarding how States should identify maintenance receptors," and "disregards the Act's cooperative federalism by denying the SIP based on emissions-modeling data available only *after* Texas [or insert any other state] was statutorily required to submit its SIP provisions." (emphasis in original).

Put differently, the State parties are challenging the EPA's actions of reversing a prior policy that applied to and impacted *all* the states and not providing necessary data to *all* the states prior to the statutory deadline to submit SIP revisions. When framed in the context of the State parties' *own* arguments against the agency action, it becomes clear that they are not challenging the denial of their state SIPs such that the legal impact is only felt in this region, but the framework in which the EPA determined denial was necessary to 21 states throughout this country. *See ATK Launch Systems, Inc.*, 651 F.3d at 1199-1200. Accordingly, the nature of Petitioners' challenge is inextricably intertwined with arguments applicable to challenges to *all other* SIP disapprovals in the Final Rule because they were based on a common EPA rationale and methodology that Petitioners now seek to attack.

The D.C. Circuit, then, is the proper venue for such a challenge. This is supported by our circuit's decision in *Texas 2011*. There, Texas argued its challenge to the SIP call implicated a local, rather than national, aspect of the rule. 2011 WL 7140598 at *4. However, our court noted that Texas's "merits argument in its motion to stay the SIP call challenge only national features of the rulemaking" including that the SIP call was procedurally unlawful. *Id.* We stated "[n]one of these issues turn on the particulars of the SIP Call's impact within this Circuit." *Id.* Likewise, here, none of the issues raised by Texas, Louisiana, and Mississippi turn on particulars within this circuit, but instead on EPA determinants of a national scale that should be

No. 23-60069

considered by the D.C. Circuit. *See also Puerto Rican Cement Co. v. EPA*, 889 F.2d 292, 299-300 (1st Cir. 1989) (finding EPA regulations to be "nationally applicable" where they applied to any SIP "that ha[d] been disapproved with respect to prevention of significant deterioration of air quality in any portion of any State where the existing air quality is better than the national ambient air quality standards" and the list of states governed by the regulations changed as SIPs were approved and disapproved by the EPA).

Accordingly, I would find that our venue inquiry ends there because the State Petitioners challenge nationally applicable regulations, and thus any challenges should be considered by the D.C. Circuit.

However, for the same reasons, this case satisfies the § 7601(b)(1) exception for actions that have nationwide scope or effect. The exception involves a two-pronged inquiry, and the majority finds that the EPA fails at prong one. The majority relies on the disapprovals being based "on a number of intensely factual determinations" which "do not have nationwide scope or effect" because they relate to particularities of emissions sources. However, as noted, although there may be factual determinations relevant to each state, the challenged action is the *nationally applied framework* in which the EPA reviewed the SIPs of all states and denied 21 of them.

The majority relies on *Texas 2016*, which also provides support for a finding of a nationwide scope or effect under the instant allegations. Specifically, *Texas 2016* provides that "[a]lthough the SIP process is generally highly fact-bound and particular to the individual state, EPA has made determinations in other SIP approvals that may have nationwide scope or effect." *Id*. at 421, fn. 24. Moreover, "[a] determination that a national standard satisfies a particular requirement in each state may be a determination that has nationwide scope or effect." *Id*. That is precisely the case here.

No. 23-60069

To the second prong, in *Texas 2016*, the EPA explicitly did not make a finding that its Final Rule had a nationwide scope or effect, and thus, our court concluded that this venue was proper. Here, however, the EPA *explicitly* chose to make this finding, stating that its justification for the Final Rule is based on a determination of nationwide scope or effect. Final Rule, 88 Fed. Reg. 9,336, 9380-81 (Feb. 13, 2023) ("[T]o the extent a court finds this action to be locally or regionally applicable, the Administrator is exercising the complete discretion afforded to him under the CAA to make and publish a finding that this action is based on a determination of 'nationwide scope or effect' within the meaning of CAA section 307(b)(1).").

Finally, it is clear from the briefing that these petitions concern "matters on which national uniformity is desirable" and raise the kinds of issues Congress intended for the D.C. Circuit to decide. *Texas 2011*, 2011 WL 710598, at *4. Petitioners here invite multiple circuits to concurrently review the merits of the same legal interpretation, policy decisions, and analytical methodology that the EPA applied consistently in a single agency action to SIPs throughout the United States. Courts may well reach inconsistent outcomes on matters of interstate pollution, which were clearly meant to be filed and considered together in the D.C. Circuit. This is not just a hypothetical problem—states in other circuits are bringing practically the same challenges, which are currently before the Eighth and Tenth Circuits. If this circuit were to determine that the underlying standard utilized by the EPA was wrong, this would impact the EPA's determinations in other states and would gut the underlying policy of the venue provision: uniformity in standards that have national effect and centralization of SIP review. *See id.* ("Centralized review of national issues is preferable to piecemeal review of national issues in the regional circuits, which risks potentially inconsistent results.").

No. 23-60069

Having determined venue to be improper, I respectfully dissent, not finding it necessary to reach Petitioners' motions to stay.