# Exhibit A

# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

| | |
|---|---|
| STATE OF MISSISSIPPI and MISSISSIPPI DEPARTMENT OF ENVIRONMENTAL QUALITY,<br><br>　　　　*Petitioners*,<br><br>v.<br><br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, and MICHAEL S. REGAN, ADMINISTRATOR, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,<br><br>　　　　*Respondents*. | No. 23-60069 |

**DECLARATION OF CHRIS WELLS IN SUPPORT OF PETITIONER MISSISSIPI'S MOTION TO STAY FINAL RULE**

I, Chris Wells, hereby declare and state under penalty of perjury that the following is true and correct to the best of my knowledge, based on my personal knowledge and information provided by Mississippi Department of Environmental Quality personnel:

1. My name is Chris Wells, and my business address is 515 E. Amite St., Jackson, MS 39201. I am over the age of eighteen, have personal knowledge of the subject matter and am competent to testify concerning the matters in this declaration.

2. I have served as Executive Director of the Mississippi Department of Environmental Quality (MDEQ) since October of 2020. After practicing law in the private sector, I began my career with MDEQ in November 2007 and was appointed Chief of Staff in 2014. I graduated from the Mississippi College School of Law in 1999. I earned a degree in Chemical Engineering from Mississippi State University in 1996 and am a registered professional engineer.

Purpose of Declaration

3. I am providing this declaration in support of Mississippi's motion to stay the disapproval of Mississippi's state implementation plan (SIP), published by the EPA on February 13, 2023, titled "Air Plan Disapprovals; Interstate Transport of Air Pollution for the 2015 8-hour Ozone National Ambient Air Quality Standards," 88 F.R. 9,336 (February 13, 2023) (Final Rule). The Final Rule is EPA's final action after having proposed rejection of Mississippi's SIP, provided a proposed federal implementation plan (FIP), and reviewed comments from MDEQ and stakeholders.

State Regulation

4. The mission of the Mississippi Department of Environmental Quality (MDEQ) is to safeguard the health, safety, and welfare of present and future generations of Mississippians by conserving and improving our environment and fostering wise economic growth through focused research and responsible regulation.

5. It is MDEQ's responsibility to ensure that the air in Mississippi meets public health and welfare standards established under the federal

Clean Air Act (CAA), particularly the National Ambient Air Quality Standards (NAAQS) promulgated by the Environmental Protection Agency (EPA).

6. Pursuant to Title 11, Part 4, Rule 4.1 of the Mississippi Administrative Code, "the ambient air quality standards for Mississippi shall be the . . . National Ambient Air Quality Standards as duly promulgated by the U.S. Environmental Protection Agency in . . . 40 CFR Part 50, pursuant to the Federal Clean Air Act, as amended."

<u>Federal Regulation Addressing State Implementation Plan</u>

7. Section 110(a)(1) of the CAA, 42 U.S.C. § 7410(a)(1), requires Mississippi to submit an infrastructure SIP to the EPA describing how it will implement, maintain, and enforce the National Ambient Air Quality Standards (NAAQS), which address six pollutants including ozone. The SIP must contain "adequate provisions" prohibiting "any source or other type of emissions activity within the State from emitting any air pollutant in amounts which will . . . contribute **significantly** to nonattainment in, or interfere with maintenance by, any other State with respect to any" primary

or secondary NAAQS. CAA § 110(a)(2)(D)(i), 42 U.S.C. § 7410(a)(2)(D)(i) (emphasis added). This CAA provision is referred to as the "Good Neighbor" or "Interstate Transport" Provision.

8. In 2015, EPA revised the 8-hour ozone NAAQS from 75 parts per billion (ppb) to 70 ppb. 80 Fed. Reg. 6,6291 (Oct. 26, 2015) ("the 2015 Ozone NAAQS"). Mississippi was therefore required to submit a SIP describing how it would comply with the new ozone NAAQS, including compliance with the Interstate Transport Provision, within three years. *See* CAA § 110(a)(1), 42 U.S.C. § 7410(a)(1).

Submission of State Implementation Plan

9. On September 4, 2019, Mississippi submitted its SIP to EPA concluding that Mississippi would not significantly contribute to another state's attainment or interfere with a downwind state's ability to maintain the 2015 Ozone NAAQS.

10. In the spirit of cooperative federalism built within the CAA, MDEQ worked collaboratively with EPA Region 4 staff and complied with written guidance from the EPA in the development of the Mississippi's SIP

regarding the Interstate Transport Provision as applicable to the 8-hour ozone standards from the 2015 Ozone NAAQS.

11. Pursuant to CAA § 110(k)(1)(B) and (2)-(3), 42 U.S.C. § 7410(k)(1)(B) and (2)-(3), EPA must act upon a SIP within 18 months of submission and is mandated to approve it if it complies with the minimum requirements of the statute. If EPA finds that a state's SIP is substantially inadequate, EPA must notify the state and may establish deadlines for the state to revise the SIP. CAA § 110(k)(5), 42 U.S.C. § 7410(k)(5).

Alleged Deficiency in Mississippi's SIP

12. EPA failed to act on Mississippi's plan in a reasonable timeframe, much less the eighteen-month time limit mandated by the CAA. EPA neglected its responsibility to Mississippi by failing to timely notify it of alleged deficiencies and working with MDEQ to produce a SIP EPA believed is approvable. Even more egregious, EPA penalized Mississippi for complying with the very guidance and information which was being provided by EPA and relied upon by Mississippi in drafting and submitting its SIP.

13. On February 22, 2022, more than 29 months after Mississippi submitted its SIP, EPA's Regional Administrator for Region 4 (the EPA region in which Mississippi is located) proposed to reject Mississippi's SIP. 87 Fed. Reg. 9,545 (Feb. 22, 2022).

14. EPA based its proposed denial of Mississippi's SIP on its own, rather than Mississippi's, evaluation of Mississippi emission sources' contribution to other states' ozone. See 86 Fed. Reg. at 9,557-58. And it performed that evaluation based on an updated modeling platform called the 2016 Emissions Model Platform (2016v2). *Id.* The 2016 Emissions Model Platform (2016v2) was not released until February 2022, more than two years after Mississippi submitted its SIP and long after Mississippi was required by the CAA to perform the analysis necessary to prepare the SIP.

15. On April 22, 2022, and June 20, 2022, MDEQ submitted detailed comments to EPA explaining its objections to assumptions made in the modeling and explaining the scientific basis for its objections, some of which are listed below. The lack of attention by EPA to address these comments is demonstrated by both the finalization of the disapproval of the SIP and the

absence of substantive change in its prematurely proposed and finalized FIP. *See paragraphs* 16-18, below.

16. For example, meteorological data reflects that, on the high ozone days recorded by the three air quality monitors ("receptors") in Texas that Mississippi emissions were allegedly affecting per the 2016v2 model, the atmospheric conditions were stagnant (*i.e.*, the wind was not blowing, much less blowing from Mississippi to Texas against the prevailing winds).

17. Similarly, EPA's "Air Quality Modeling for 2016v2 Emissions Platform Technical Support Document: Appendix A" shows a significant margin for error (+/- 7.8 to 9.1 ppb) in the South region, in which Mississippi and Texas are grouped. Mississippi's alleged minute contributions to the receptors in Texas in the 2016v2 model (generally around 1 ppb) fall well within this margin of error and merit further scientific scrutinization. Yet EPA rejected Mississippi's further scrutiny of its model.

18. As a third example, the constantly shifting nature of the modeling which EPA used to deny Mississippi's SIP demonstrates its unreliability. In its proposed SIP disapproval, EPA indicated that

Mississippi's largest contribution at a downwind receptor that was not in compliance with the NAAQS (a "nonattainment receptor") was in Harris County, Texas, at 1.04 ppb. However, EPA's final SIP disapproval indicates that Mississippi's largest contribution to a nonattainment receptor is 1.32 ppb in Galveston County, Texas—a receptor not even identified in the 2016v2 model results.[1]

<u>EPA Disapproves the SIP and Simultaneously Promulgates a FIP</u>

19. Despite the numerous flaws in its previously undisclosed model, EPA finalized its rejection of Mississippi's SIP in a final rule issued on February 13, 2023, more than 41 months after Mississippi submitted its SIP. 88 Fed. Reg. 9,336 (Feb. 13, 2023). EPA rejected Mississippi's proposed SIP based on yet another new model platform (2016v3) that that did not adequately address the problems Mississippi identified in the 2016v2 model.

20. EPA normally begins the FIP process only when a state cannot provide an approvable SIP. However, after having Mississippi's SIP for over

---

[1] Likewise, in the proposed FIP, EPA found that the states of Arizona, New Mexico, Kansas, and Iowa did not significantly contribute to ozone attainment or maintenance in downwind states; however, in the final FIP, EPA reversed course and concluded that all four states were significant contributors.

two and a half years, EPA proposed to disapprove Mississippi's plan on February 22, 2022. Approximately one week later (February 28, 2022), without giving Mississippi a meaningful opportunity to revise its SIP, as the CAA contemplates, and without any attempt to address the legitimate concerns with the science employed, EPA issued the proposed FIP. *See* U.S. EPA, Rule History, Good Neighbor Plan for 2015 Ozone NAAQS *available at* https://www.epa.gov/csapr/good-neighbor-plan-2015-ozone-naaqs.

21. EPA finalized its FIP on March 15, 2023, although it has not yet been published in the Federal Register.

22. The purpose of a SIP is to protect ambient air quality by ensuring compliance with NAAQS. The CAA allows states full flexibility to determine whether and what emission reductions are necessary from all in-state sources to ensure compliance. EPA's proposed FIP, by contrast, requires that **every source in specified industry sectors** that "potentially" impact air quality to install the maximum level of emissions control. *See, e.g.,* "Good Neighbor Plan" for the 2015 Ozone NAAQS (March 15, 2023) (prepublication version) at 29 *available at* https://www.epa.gov/system/files/documents/

2023-03/FRL%208670-02-OAR_Good%20Neighbor_Final_20230314_ Signature_ADMIN%20%281%29.pdf. This demonstrates a failure by the EPA to perform the due diligence necessary to understand the feasibility and availability of such controls and their potential benefits versus projected duration and costs.

23. EPA's final FIP purportedly had to be implemented to address the miniscule reductions EPA demanded at the downwind receptors in Texas. However, because of the flaws, wide variabilities, and large uncertainties in EPA's models, it is not even clear that the emissions reductions the FIP will impose on Mississippi will make any appreciable difference in whether ozone levels at those Texas receptors will attain or maintain the NAAQS.

Impact on Mississippi

24. If the Rule is not stayed, Mississippi and regulated entities within Mississippi will be required to immediately comply with the FIP after it is published (which could be any day) and effective (60 days after publication). This will deprive Mississippi of its sovereign right to develop

its own air quality regulations and its statutory right to develop a plan which provides for the implementation, maintenance, and enforcement of the NAAQS.

25. Mississippi currently participates in the Cross State Air Pollution Ozone Transport Group 2 trading program. Under this program, electric generating units in Mississippi must comply with a NOx emissions allowance allocation of 6,315 tons during the Ozone season. Mississippi's proposed SIP would have allowed our generating units to continue operating under that cap. Under the new FIP, however, Mississippi generating units will be required to reduce those emissions by 105 tons below the current limits in the 2023 ozone season and 1,257 tons in the 2024 ozone season. Those requirements get progressively stricter thereafter, dropping 1,278 tons below our current limits in 2025. For 2026-2029, the preset budget requirements get even more stringent, resulting in a minimum allowance reflecting a 4,563-ton decrease. In fact, of the 22 states with EGU units impacted by this rule, Mississippi has some of the most onerous reduction requirements, with a 65% reduction in ozone-season NOx

allocation (when comparing 2027 to 2021 emissions), second only to Utah. After 2029, it is impossible to know what the actual allocations will be because EPA plans to adjust them based on a process called "dynamic budgeting," which has never been implemented before.

26. The proposed FIP requires unobtainable emissions reductions that will essentially require a shift to renewables for power generation, as projected in EPA's Integrated Planning Model for power plants relied on in the formulation of the FIP.

27. For the first time ever, EPA targets sources other than just electric generating units, including broad industrial sectors such as natural gas compressor stations and industrial boilers. EPA suggests that the additional control requirements in these sectors, the implications of which are not fully understood or quantified, will result in "meaningful air quality improvements." However, the final FIP indicates otherwise. Upon compliance with the final FIP, the average decrease in ozone quality at the modeled receptors is only 0.19 ppb from non-EGU industries.

28. The costly requirements of the FIP will likely lead to power plants in Mississippi shutting down operations prematurely or reducing power generation, rather than choosing to absorb compliance costs that would render operations economically unfeasible.

29. Any such reductions in power generation will have significant consequences for Mississippi's electric grid. Mississippians rely on fuel diversity, which is necessary to meet demands. Renewables alone cannot currently provide enough reliable power and increases in generation capacity from renewables cannot feasibly meet future needs in the near term—especially as Mississippi approaches the summer months in 2023. Solar electricity-generating units are intermittent power sources. Even during the day, cloud cover can impact solar energy production. Wind generation has limited viability in Mississippi. Thus, reductions in fossil fuel plant generation will lead to grid instability.

30. The reliability of Mississippi's electric grid has significant importance to individual consumers who rely on electricity to cool and

power their homes, to Mississippi businesses and the Mississippi's economy, and to public safety.

31. Moreover, all remaining plants will likely need to reduce or shift their capacity to their lowest-emitting EGUs, not necessarily their most efficient EGUs, in order to comply with the required emissions reductions, all at an increased cost to the power generator. Or, they will be forced to purchase emissions credits/allowances pursuant to EPA's FIP trading program, which also increases costs.

32. These increased costs will inevitably be passed on to the ratepayer. The Final Rule thus harms Mississippi's sovereign interest in not only being able to determine for itself the laws regulating emission limitations for the 2015 ozone NAAQS (because those laws will be dictated by the new FIP), but also in keeping rates low and electricity available and reliable for its citizens.

33. Along this line, EPA neglects addressing the complex issues regarding the likely reduction in production of electricity versus sufficient

generation and transmission to meet demand in conjunction with grid instability.

34. Adoption of the FIP will disproportionally affect lower-income, disadvantaged, and minority Mississippians, as restrictions on energy production and transmission will inevitably cause the costs of electricity and essential goods to rise. This outcome is completely at odds with the environmental justice concerns touted by EPA.

35. The Final Rule also harms Mississippi as a ratepayer, as Mississippi maintains offices and facilities throughout the state and must pay for electricity like any other market participant.

36. Mississippi, as an electricity consumer, is likewise harmed by a less reliable power grid for the State. If and when blackouts or price shocks were to occur, Mississippi would need to spend money and divert resources to alleviate harm suffered by its citizens.

37. As soon as the FIP is published, which could be any day, it will impose an immediate permitting burden on Mississippi, which will be required to begin planning and preparing to permit the new controls

associated with the FIP for any affected facilities. This process is time consuming and resource intensive. It will require staff to review draft permits, provide public notice, potentially engage in public hearings and receive public input. The State will then review and respond to any public comments on proposed permit changes. This process will put a significant burden on MDEQ staff and limited resources, impeding MDEQ's ability to perform its many other duties in service of Mississippians.

Lack of Harm by Entry of Stay

38. A stay would not disrupt Mississippi's current downward trend in ozone precursor emissions. Further, EPA is not subject to statutory constraints, a judgment, or a consent decree which mandates implementation of the FIP by a date certain if a SIP disapproval is not effective.

39. This the 11th day of May 2023.

_____
Chris Wells
Executive Director
Miss. Dept. of Environmental Quality