No. 23-60069

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

———————————

STATE OF TEXAS, et al.,

*Petitioners*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al.,

*Respondents*.

———————————

PETITION FOR REVIEW OF A FINAL AGENCY ACTION OF THE UNITED
STATES ENVIRONMENTAL PROTECTION AGENCY

———————————

**RESPONDENTS' APPENDIX TO RESPONSE IN OPPOSITION
TO THE MOTION FOR STAY OF THE FINAL RULE**

———————————

TODD KIM
*Assistant Attorney General*

*Of Counsel:*
ROSEMARY HAMBRIGHT KABAN          JIN HYUNG LEE
DANIEL P. SCHRAMM                 SARAH IZFAR
   *Office of the General Counsel*        *U.S. Department of Justice*
   *U.S. Environmental Protection*       *Environment and Natural Resources*
     *Agency*                              *Division*
   *Washington, DC*                      *P.O. Box 7611*
                         *Washington D.C. 20044-7611*

# **TABLE OF CONTENTS**

EPA, Final Rule, *Air Plan Disapprovals; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards*, 88 Fed. Reg. 9336 (Feb. 13, 2023) ...................................................................................... Ex. 1

EPA, 2015 Ozone NAAQS Interstate Transport SIP Disapprovals – Response to Comment (RTC) Document (Jan. 31, 2023)...................................................... Ex. 2

EPA, Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I) (Mar. 27, 2018) ("March Memo").... Ex. 3

EPA, Analysis of Contribution Thresholds for Use in Clean Air Act Section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards (Aug. 31, 2018) ("August Memo") ........................................................................................................... Ex. 4

EPA, Considerations for Identifying Maintenance Receptors for Use in Clean Air Act Section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards (Oct. 19, 2018) ("October Memo").................................................... Ex. 5

MDEQ, Mississippi 2015 Ozone Infrastructure SIP Prongs 1 and 2 (Sept. 3, 2019) ("Submission") ......................................... Ex. 6

EPA, Proposed Rule, *Air Plan Disapproval; AL, MS, TN; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards*, 87 Fed. Reg. 9545 (Feb. 22, 2022) .................................................................... Ex. 7

Declaration of Rona Birnbaum, Director of the Clean Air Markets Division, Office of Atmospheric Protection, Office of Air and Radiation, EPA .......................... Ex. 8

## CERTIFICATE OF COMPLIANCE

I hereby certify that, pursuant to paragraph A(6) of this Court's ECF Filing Standards, (1) any required privacy redactions have been made in compliance with 5th Cir. R. 25.2.13; (2) the electronic submission will be an exact copy of any paper document served in compliance with 5th Cir. R.25.2.1; and (3) the document has been scanned for viruses with the most recent version of a commercial virus scanning program and is free of viruses.

Date: May 30, 2023                    */Sarah Izfar*
                                       SARAH IZFAR

                                       *Counsel for Respondents*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Motion was filed with the Clerk of the Court using the CM/ECF system, which will send notification of said filing to the attorneys of record, who are required to have registered with the Court's CM/ECF system.

Date: May 30, 2023                    */Sarah Izfar*
                                       SARAH IZFAR

                                       *Counsel for Respondents*

**EXHIBIT 1**

EPA, Final Rule, *Air Plan Disapprovals; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards*, 88 Fed. Reg. 9336 (Feb. 13, 2023)

## ENVIRONMENTAL PROTECTION AGENCY

### 40 CFR Part 52

[EPA–HQ–OAR–2021–0663; EPA–R02–OAR–2021–0673; EPA–R03–OAR–2021–0872; EPA–R03–OAR–2021–0873; EPA–R04–OAR–2021–0841; EPA–R05–OAR–2022–0006; EPA–R06–OAR–2021–0801; EPA–R07–OAR–2021–0851; EPA–R08–OAR–2022–0315; EPA–R09–OAR–2022–0394; EPA–R09–OAR–2022–0138; FRL–10209–01–OAR]

### Air Plan Disapprovals; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule; final agency action.

**SUMMARY:** Pursuant to the Federal Clean Air Act (CAA or the Act), the Environmental Protection Agency (EPA or the Agency) is finalizing the disapproval of State Implementation Plan (SIP) submissions for 19 states regarding interstate transport and finalizing a partial approval and partial disapproval of elements of the SIP submission for two states for the 2015 8-hour ozone national ambient air quality standards (NAAQS). The "good neighbor" or "interstate transport" provision requires that each state's SIP contain adequate provisions to prohibit emissions from within the state from significantly contributing to nonattainment or interfering with maintenance of the NAAQS in other states. This requirement is part of the broader set of "infrastructure" requirements, which are designed to ensure that the structural components of each state's air quality management program are adequate to meet the state's responsibilities under the CAA. Disapproving a SIP submission establishes a 2-year deadline for the EPA to promulgate Federal Implementation Plans (FIPs) to address the relevant requirements, unless the EPA approves a subsequent SIP submission that meets these requirements. Disapproval does not start a mandatory sanctions clock. The EPA is deferring final action at this time on the disapprovals it proposed for Tennessee and Wyoming.

**DATES:** The effective date of this final rule is March 15, 2023.

**ADDRESSES:** The EPA has established a docket for this action under Docket ID No. EPA–HQ–OAR–2021–0663. Additional supporting materials associated with this final action are included in certain regional dockets.

*See* the memo "Regional Dockets Containing Additional Supporting Materials for Final Action on 2015 Ozone NAAQS Good Neighbor SIP Submissions" in the docket for this action. All documents in the dockets are listed on the *https://www.regulations.gov* website. Although listed in the index, some information is not publicly available, *i.e.,* confidential business information (CBI) or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, is not placed on the internet and will be publicly available only in hard copy form. Publicly available docket materials are available through *https://www.regulations.gov* or please contact the person identified in the **FOR FURTHER INFORMATION CONTACT** section for additional information.

**FOR FURTHER INFORMATION CONTACT:** General questions concerning this document should be addressed to Mr. Thomas Uher, Office of Air Quality Planning and Standards, Air Quality Policy Division, Mail Code C539–04, 109 TW Alexander Drive, Research Triangle Park, NC 27711; telephone number: (919) 541–5534; email address: *uher.thomas@epa.gov.*

**SUPPLEMENTARY INFORMATION:** Throughout this document "we," "us," and "our" refer to the EPA.

References to section numbers in roman numeral refer to sections of this preamble unless otherwise specified.

## I. General Information

### A. How can I get copies of this document and other related information?

The EPA established a Headquarters docket for this action under Docket ID No. EPA–HQ–OAR–2021–0663 and several regional dockets. All documents in the docket are listed in the electronic indexes, which, along with publicly available documents, are available at *https://www.regulations.gov.* Publicly available docket materials are also available in hard copy at the Air and Radiation Docket and Information Center, EPA/DC, William Jefferson Clinton West Building, Room 3334, 1301 Constitution Avenue NW, Washington, DC. Some information in the docket may not be publicly available via the online docket due to docket file size restrictions, such as certain modeling files, or content (*e.g.,* CBI). For further information on the EPA Docket Center services and the current status, please visit us online at *https://www.epa.gov/dockets.*

The EPA also established dockets in each of the EPA Regional offices to help support the proposals that are now being finalized in this national action. These include all public comments, technical support materials, and other files associated with this final action. Each regional docket contains a memorandum directing the public to the headquarters docket for this final action. While all documents in regional dockets are listed in the electronic indexes at *https://www.regulations.gov,* some information may not be publicly available via the online dockets due to docket file size restrictions, such as certain modeling files, or content (*e.g.,* CBI). Please contact the EPA Docket Center Services for further information.

### B. How is the preamble organized?

**Table of Contents**

I. General Information
  A. How can I get copies of this document and other related information?
  B. How is the preamble organized?
  C. Where do I go if I have state-specific questions?
II. Background and Overview
  A. Description of Statutory Background
  B. Description of the EPA's 4-Step Interstate Transport Framework
  C. Background on the EPA's Ozone Transport Modeling Information
  D. The EPA's Approach to Evaluating Interstate Transport SIPs for the 2015 8-Hour Ozone NAAQS
III. The EPA's Updated Air Quality and Contribution Analysis
  A. Description of Air Quality Modeling for the Final Action
  B. Air Quality Modeling To Identify Nonattainment and Maintenance Receptors
  C. Air Quality Modeling To Quantify Upwind State Contributions
IV. Summary of Bases for Disapproval
  A. Alabama
  B. Arkansas
  C. California
  D. Illinois
  E. Indiana
  F. Kentucky
  G. Louisiana
  H. Maryland
  I. Michigan
  J. Minnesota
  K. Mississippi
  L. Missouri
  M. Nevada
  N. New Jersey
  O. New York
  P. Ohio
  Q. Oklahoma
  R. Texas
  S. Utah
  T. West Virginia
  U. Wisconsin
V. Response to Key Comments
  A. SIP Evaluation Process
  B. Application of the 4-Step Interstate Transport Framework
  C. Good Neighbor Provision Policy
VI. Statutory and Executive Orders Reviews
  A. Executive Orders 12866: Regulatory Planning and Executive Order 13563:

Improving Regulation and Regulatory Review
B. Paperwork Reduction Act (PRA)
C. Regulatory Flexibility Act (RFA)
D. Unfunded Mandates Reform Act of 1995 (UMRA)
E. Executive Order 13132: Federalism
F. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments
G. Executive Order 13045: Protection of Children From Environmental Health and Safety Risks
H. Executive Order 13211: Actions That Significantly Affect Energy Supply, Distribution or Use
I. National Technology Transfer and Advancement Act (NTTAA)
J. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations
K. Congressional Review Act (CRA)
L. Judicial Review

*C. Where do I go if I have state-specific questions?*

The following table identifies the states covered by this final action along with an EPA Regional office contact who can respond to questions about specific SIP submissions.

| Regional offices | States |
|---|---|
| EPA Region 2: Kenneth Fradkin, Air and Radiation Division/Air Programs Branch, EPA Region 2, 290 Broadway, 25th Floor, New York, NY 10007. | New Jersey, New York. |
| EPA Region 3: Mike Gordon, Planning and Implementation Branch, EPA Region III, 1600 JFK Boulevard, Philadelphia, Pennsylvania 19103. | Maryland, West Virginia. |
| EPA Region 4: Evan Adams, Air and Radiation Division/Air Planning and Implementation Branch, EPA Region IV, 61 Forsyth Street SW, Atlanta, Georgia 30303. | Alabama, Kentucky, Mississippi. |
| EPA Region 5: Olivia Davidson, Air & Radiation Division/Air Programs Branch, EPA Region V, 77 W. Jackson Boulevard, Chicago, Illinois 60604–3511. | Indiana, Illinois, Michigan, Minnesota, Ohio, Wisconsin. |
| EPA Region 6: Sherry Fuerst, Air and Radiation Division, EPA Region 6, 1201 Elm Street, Suite 500, Dallas, Texas 75270. | Arkansas, Louisiana, Oklahoma, Texas. |
| EPA Region 7: William Stone, Air and Radiation Division, Air Quality Planning Branch, EPA Region VII, 11201 Renner Boulevard, Lenexa, Kansas 66219. | Missouri. |
| EPA Region 8: Adam Clark, Air and Radiation Division, EPA, Region VIII, Mailcode 8ARD–IO, 1595 Wynkoop Street, Denver, Colorado 80202. | Utah. |
| EPA Region 9: Tom Kelly, Air and Radiation Division, EPA Region IX, 75 Hawthorne St., San Francisco, California 94105. | California, Nevada. |

## II. Background and Overview

The following provides background for the EPA's final action on these SIP submissions related to the interstate transport requirements for the 2015 8-hour ozone NAAQS (2015 ozone NAAQS).

*A. Description of Statutory Background*

On October 1, 2015, the EPA promulgated a revision to the ozone NAAQS (2015 ozone NAAQS), lowering the level of both the primary and secondary standards to 0.070 parts per million (ppm) for the 8-hour standard.[1] Section 110(a)(1) of the CAA requires states to submit, within 3 years after promulgation of a new or revised standard, SIP submissions[2] meeting the applicable requirements of section 110(a)(2).[3] One of these applicable requirements is found in CAA section 110(a)(2)(D)(i)(I), otherwise known as the "good neighbor" or "interstate

transport" provision, which generally requires SIPs to contain adequate provisions to prohibit in-state emissions activities from having certain adverse air quality effects on other states due to interstate transport of pollution. There are two so-called "prongs" within CAA section 110(a)(2)(D)(i)(I). A SIP for a new or revised NAAQS must contain adequate provisions prohibiting any source or other type of emissions activity within the state from emitting air pollutants in amounts that will significantly contribute to nonattainment of the NAAQS in another state (prong 1) or interfere with maintenance of the NAAQS in another state (prong 2). The EPA and states must give independent significance to prong 1 and prong 2 when evaluating downwind air quality problems under CAA section 110(a)(2)(D)(i)(I).[4]

On February 22, 2022, the EPA proposed to disapprove 19 good neighbor SIP submissions from the States of Alabama, Arkansas, Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, Minnesota, Mississippi, Missouri, New Jersey, New York, Ohio, Oklahoma, Tennessee, Texas, West Virginia, and Wisconsin.[5]

On May 24, 2022, the EPA proposed to disapprove four additional good neighbor SIP submissions from the States of California, Nevada, Utah, and Wyoming.[6] On October 25, 2022, the EPA proposed to disapprove a new good neighbor SIP submission from Alabama submitted on June 21, 2022.[7] The EPA is deferring action on the proposals related to the good neighbor SIP submissions from Tennessee and Wyoming at this time. As explained in the notifications of proposed disapproval, the EPA's justification for each of these proposals applies uniform, nationwide analytical methods, policy judgments, and interpretation with respect to the same CAA obligations, *i.e.*, implementation of good neighbor requirements under CAA section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS for states across the country. The EPA's final action is likewise based on this common core of determinations. As indicated at proposal, the EPA is taking a consolidated, single final action

---

[1] National Ambient Air Quality Standards for Ozone, Final Rule, 80 FR 65292 (October 26, 2015). Although the level of the standard is specified in the units of ppm, ozone concentrations are also described in parts per billion (ppb). For example, 0.070 ppm is equivalent to 70 ppb.

[2] The terms "submission," "revision," and "submittal" are used interchangeably in this document.

[3] SIP revisions that are intended to meet the applicable requirements of section 110(a)(1) and (2) of the CAA are often referred to as infrastructure SIPs and the applicable elements under CAA section 110(a)(2) are referred to as infrastructure requirements.

[4] *See North Carolina* v. *EPA*, 531 F.3d 896, 909–11 (D.C. Cir. 2008) (*North Carolina*).

[5] 87 FR 9545 (February 22, 2022) (Alabama, Mississippi, Tennessee); 87 FR 9798 (February 22, 2022) (Arkansas, Louisiana, Oklahoma, Texas); 87 FR 9838 (February 22, 2022) (Illinois, Indiana, Michigan, Minnesota, Ohio, Wisconsin); 87 FR 9498

(February 22, 2022) (Kentucky); 87 FR 9484 (February 22, 2022) (New Jersey, New York); 87 FR 9463 (February 22, 2022) (Maryland); 87 FR 9533 (February 22, 2022) (Missouri); 87 FR 9516 (February 22, 2022) (West Virginia).

[6] 87 FR 31443 (May 24, 2022) (California); 87 FR 31485 (May 24, 2022) (Nevada); 87 FR 31470 (May 24, 2022) (Utah); 87 FR 31495 (May 24, 2022) (Wyoming).

[7] 87 FR 64412 (October 25, 2022) (Alabama). Alabama withdrew its original good neighbor SIP submission on April 21, 2022. *Id.* at 64419.

on the proposed SIP disapprovals.[8] Included in this document is final action on 2015 ozone NAAQS interstate transport SIPs addressing CAA section 110(a)(2)(D)(i)(I) for Alabama, Arkansas, California, Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, Minnesota, Mississippi, Missouri, Nevada, New Jersey, New York, Ohio, Oklahoma, Texas, Utah, West Virginia, and Wisconsin. The 2015 ozone NAAQS interstate transport SIP submissions addressing CAA section 110(a)(2)(D)(i)(I) for Tennessee and Wyoming will be addressed in a separate action.

## B. Description of the EPA's 4-Step Interstate Transport Framework

The EPA used a 4-step interstate transport framework (or 4-step framework) to evaluate each state's implementation plan submission addressing the interstate transport provision for the 2015 ozone NAAQS. The EPA has addressed the interstate transport requirements of CAA section 110(a)(2)(D)(i)(I) with respect to prior NAAQS in several regulatory actions, including the Cross-State Air Pollution Rule (CSAPR), which addressed interstate transport with respect to the 1997 ozone NAAQS as well as the 1997 and 2006 fine particulate matter standards,[9] the Cross-State Air Pollution Rule Update (CSAPR Update)[10] and the Revised CSAPR Update, both of which addressed the 2008 ozone NAAQS.[11]

Shaped through the years by input from state air agencies[12] and other stakeholders on EPA's prior interstate transport rulemakings and SIP actions,[13] as well as a number of court decisions, the EPA has developed and used the following 4-step interstate transport framework to evaluate a state's obligations to eliminate interstate transport emissions under the interstate transport provision for the ozone NAAQS: (1) Identify monitoring sites that are projected to have problems attaining and/or maintaining the NAAQS (*i.e.*, nonattainment and/or maintenance receptors); (2) identify states that impact those air quality problems in other (*i.e.*, downwind) states sufficiently such that the states are considered "linked" and therefore warrant further review and analysis; (3) identify the emissions reductions necessary (if any), applying a multifactor analysis, to eliminate each linked upwind state's significant contribution to nonattainment or interference with maintenance of the NAAQS at the locations identified in Step 1; and (4) adopt permanent and enforceable measures needed to achieve those emissions reductions.

The general steps of this framework allow for some methodological variation, and this can be seen in the evolution of the EPA's analytical process across its prior rulemakings. This also means states have some flexibility in developing analytical methods within this framework (and may also attempt to justify an alternative framework altogether). The four steps of the framework simply provide a reasonable organization to the analysis of the complex air quality challenge of interstate ozone transport. As discussed further throughout this document, the EPA has organized its evaluation of the states' SIP submissions around this analytical framework (including the specific methodologies within each step as evolved over the course of the CSAPR rulemakings since 2011), but where states presented alternative approaches either to the EPA's methodological approaches within the framework, or organized their analysis in some manner that differed from it entirely, we have evaluated those analyses on their merits or, in some cases, identified why even if those approaches were acceptable, the state still does not have an approvable SIP submission as a whole.

## C. Background on the EPA's Ozone Transport Modeling Information

In general, the EPA has performed nationwide air quality modeling to project ozone design values, which are used in combination with measured data to identify nonattainment and maintenance receptors at Step 1. To quantify the contribution of emissions from specific upwind states on 2023 ozone design values for the identified downwind nonattainment and maintenance receptors at Step 2, the EPA performed nationwide, state-level ozone source apportionment modeling for 2023. The source apportionment modeling projected contributions to ozone at receptors from precursor emissions of anthropogenic nitrogen oxides ($NO_X$) and volatile organic compounds (VOCs) in individual upwind states.

The EPA has released several documents containing projected design values, contributions, and information relevant to air agencies for evaluating interstate transport with respect to the 2015 ozone NAAQS. First, on January 6, 2017, the EPA published a notice of data availability (NODA) in which the Agency requested comment on preliminary interstate ozone transport data including projected ozone design values and interstate contributions for 2023 using a 2011 base year platform.[14] In the NODA, the EPA used the year 2023 as the analytic year for this preliminary modeling because that year aligns with the expected attainment year for Moderate ozone nonattainment areas for the 2015 ozone NAAQS.[15] On October 27, 2017, the EPA released a memorandum (October 2017 memorandum) containing updated modeling data for 2023, which incorporated changes made in response to comments on the NODA, and was intended to provide information to assist states' efforts to develop SIP submissions to address interstate transport obligations for the 2008 ozone NAAQS.[16] On March 27, 2018, the EPA issued a memorandum (March 2018 memorandum) noting that the same 2023 modeling data released in the

---

[8] In its proposals, the EPA stated "The EPA may take a consolidated, single final action on all the proposed SIP disapproval actions with respect to obligations under CAA section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS. Should EPA take a single final action on all such disapprovals, this action would be nationally applicable, and the EPA would also anticipate, in the alternative, making and publishing a finding that such final action is based on a determination of nationwide scope or effect." E.g., 87 FR 9463, 9475 n.51.

[9] *See* Federal Implementation Plans: Interstate Transport of Fine Particulate Matter and Ozone and Correction of SIP Approvals, 76 FR 48208 (August 8, 2011).

[10] Cross-State Air Pollution Rule Update for the 2008 Ozone NAAQS, 81 FR 74504 (October 26, 2016).

[11] In 2019, the United States Court of Appeals for the District of Columbia Circuit (D.C. Circuit) remanded CSAPR Update to the extent it failed to require upwind states to eliminate their significant contribution by the next applicable attainment date by which downwind states must come into compliance with the NAAQS, as established under CAA section 181(a). *Wisconsin* v. *EPA*, 938 F.3d 303, 313 (D.C. Cir. 2019) (*Wisconsin*). The Revised CSAPR Update for the 2008 Ozone NAAQS, 86 FR 23054 (April 30, 2021), responded to the remand of CSAPR Update in *Wisconsin* and the vacatur of a separate rule, the "CSAPR Close-Out," 83 FR 65878 (December 21, 2018), in *New York* v. *EPA*, 781 F. App'x. 4 (D.C. Cir. 2019).

[12] *See* 63 FR 57356, 57361 (October 27, 1998).

[13] In addition to CSAPR rulemakings, other regional rulemakings addressing ozone transport include the "$NO_X$ SIP Call," 63 FR 57356 (October 27, 1998), and the "Clean Air Interstate Rule" (CAIR), 70 FR 25162 (May 12, 2005).

[14] *See* Notice of Availability of the Environmental Protection Agency's Preliminary Interstate Ozone Transport Modeling Data for the 2015 8-hour Ozone National Ambient Air Quality Standards (NAAQS), 82 FR 1733 (January 6, 2017).

[15] *See* 82 FR 1733, 1735 (January 6, 2017).

[16] *See* Information on the Interstate Transport State Implementation Plan Submissions for the 2008 Ozone National Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I), October 27, 2017 ("October 2017 memorandum"), available in Docket No. EPA–HQ–OAR–2021–0663 or at *https://www.epa.gov/interstate-air-pollution-transport/interstate-air-pollution-transport-memos-and-notices*.

October 2017 memorandum could also be useful for identifying potential downwind air quality problems with respect to the 2015 ozone NAAQS at Step 1 of the 4-step interstate transport framework.[17] The March 2018 memorandum also included the then newly available contribution modeling data for 2023 to assist states in evaluating their impact on potential downwind air quality problems for the 2015 ozone NAAQS under Step 2 of the 4-step interstate transport framework.[18] The EPA subsequently issued two more memoranda in August and October 2018, providing additional information to states developing interstate transport SIP submissions for the 2015 ozone NAAQS concerning, respectively, potential contribution thresholds that may be appropriate to apply in Step 2 of the 4-step interstate transport framework, and considerations for identifying downwind areas that may have problems maintaining the standard at Step 1 of the 4-step interstate transport framework.[19]

Following the release of the modeling data shared in the March 2018 memorandum, the EPA performed updated modeling using a 2016-based emissions modeling platform (*i.e.,* 2016v1). This emissions platform was developed under the EPA/Multi-Jurisdictional Organization (MJO)/state collaborative project.[20] This collaborative project was a multi-year joint effort by the EPA, MJOs, and states to develop a new, more recent emissions platform for use by the EPA and states in regulatory modeling as an improvement over the dated, 2011-based platform that the EPA had used to project ozone design values and contribution data provided in the 2017 and 2018 memoranda. The EPA used the 2016v1 emissions to project ozone design values and contributions for 2023. On October 30, 2020, in the notice of proposed rulemaking for the Revised CSAPR Update, the EPA released and accepted public comment on 2023 modeling that used the 2016v1 emissions platform.[21] Although the Revised CSAPR Update addressed transport for the 2008 ozone NAAQS, the projected design values and contributions from the 2016v1 platform were also useful for identifying downwind ozone problems and linkages with respect to the 2015 ozone NAAQS.[22]

Following the final Revised CSAPR Update, the EPA made further updates to the 2016-based emissions platform to include updated onroad mobile emissions from Version 3 of the EPA's Motor Vehicle Emission Simulator (MOVES) model (MOVES3)[23] and updated emissions projections for electric generating units (EGUs) that reflect the emissions reductions from the Revised CSAPR Update, recent information on plant closures, and other inventory improvements. The construct of the updated emissions platform, 2016v2, is described in the "Technical Support Document (TSD): Preparation of Emissions Inventories for the 2016v2 North American Emissions Modeling Platform," hereafter known as the 2016v2 Emissions Modeling TSD, and is included in Docket No. EPA–HQ–OAR–2021–0663. The EPA performed air quality modeling using the 2016v2 emissions to provide projections of ozone design values and contributions in 2023 that reflect the effects on air quality of the 2016v2 emissions platform. The results of the 2016v2 modeling were used by the EPA as part of the Agency's evaluation of state SIP submissions with respect to Steps 1 and 2 of the 4-step interstate transport framework at the proposal stage of this action. By using the 2016v2 modeling results, the EPA used the most current and technically appropriate information for the proposed rulemakings that were issued earlier in 2022.

The EPA invited and received comments on the 2016v2 emissions inventories and modeling that were used to support proposals related to 2015 ozone NAAQS interstate transport. (The EPA had earlier published the emissions inventories on its website in September of 2021 and invited initial feedback from states and other interested stakeholders.[24]) In response to these comments, the EPA made a number of updates to the 2016v2 inventories and model design to construct a 2016v3 emissions platform which was used to update the air quality modeling. The EPA made additional updates to its modeling in response to comments as well. The EPA is now using this updated modeling to inform its final action on these SIP submissions. Details on the air quality modeling and the methods for projecting design values and determining contributions in 2023 are described in Section III and in the TSD titled "Air Quality Modeling TSD for the 2015 8-hour ozone NAAQS Transport SIP Final Actions", hereafter known as the Final Action AQM TSD.[25][26] Additional details related to the updated 2016v3 emissions platform are located in the TSD titled "Preparation of Emissions Inventories for the 2016v3 North American Emissions Modeling Platform," hereafter known as the 2016v3 Emissions Modeling TSD, included in Docket ID No. EPA–HQ–OAR–2021–0663.[27]

*D. The EPA's Approach To Evaluating Interstate Transport SIPs for the 2015 Ozone NAAQS*

The EPA is applying a consistent set of policy judgments across all states for purposes of evaluating interstate transport obligations and the approvability of interstate transport SIP submissions for the 2015 ozone NAAQS under CAA section 110(a)(2)(D)(i)(I). These policy judgments conform with relevant case law and past agency practice as reflected in CSAPR and related rulemakings. Employing a nationally consistent approach is

---

[17] *See* Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I), March 27, 2018 ("March 2018 memorandum"), available in Docket No. EPA–HQ–OAR–2021–0663 or at *https://www.epa.gov/interstate-air-pollution-transport/interstate-air-pollution-transport-memos-and-notices.*

[18] The March 2018 memorandum, however, provided, "While the information in this memorandum and the associated air quality analysis data could be used to inform the development of these SIPs, the information is not a final determination regarding states' obligations under the good neighbor provision. Any such determination would be made through notice-and-comment rulemaking." March 2018 memorandum at 2.

[19] *See* Analysis of Contribution Thresholds for Use in Clean Air Act Section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards, August 31, 2018 ("August 2018 memorandum"); Considerations for Identifying Maintenance Receptors for Use in Clean Air Act Section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards, October 19, 2018 ("October 2018 memorandum"), available in Docket No. EPA–HQ–OAR–2021–0663 or at *https://www.epa.gov/airmarkets/memo-and-supplemental-information-regarding-interstate-transport-sips-2015-ozone-naaqs.*

[20] The results of this modeling, as well as the underlying modeling files, are included in Docket No. EPA–HQ–OAR–2021–0663.

[21] *See* 85 FR 68964, 68981 (October 30, 2020).

[22] *See* the Air Quality Modeling Technical Support Document for the Final Revised Cross-State Air Pollution Rule Update, included in Docket No. EPA–HQ–OAR–2021–0663.

[23] 86 FR 1106. Additional details and documentation related to the MOVES3 model can be found at *https://www.epa.gov/moves/latest-version-motor-vehicle-emission-simulator-moves.*

[24] *https://www.epa.gov/air-emissions-modeling/2016v2-platform.*

[25] *See* Final Action AQM TSD in Docket ID No. EPA–HQ–OAR–2021–0663

[26] References to section numbers in roman numeral refer to sections of this preamble unless otherwise specified, and references to section numbers in numeric form refer to the Response to Comments document for this final action included in the docket.

[27] *See* 2016v3 Emissions Modeling TSD in Docket ID No. EPA–HQ–OAR–2021–0663.

particularly important in the context of interstate ozone transport, which is a regional-scale pollution problem involving many smaller contributors. Effective policy solutions to the problem of interstate ozone transport going back to the NOₓ SIP Call have necessitated the application of a uniform framework of policy judgments to ensure an "efficient and equitable" approach. *See EPA* v. *EME Homer City Generation, LP,* 572 U.S. 489, 519 (2014) (*EME Homer City*). Some comments on EPA's proposed SIP disapprovals claim the EPA is imposing non-statutory requirements onto SIPs or that the EPA must allow states to take inconsistent approaches to implementing good neighbor requirements. Both views are incorrect; the EPA's use of its longstanding framework to evaluate these SIP submissions reflects a reasonable and consistent approach to implementing the requirements of CAA section 110(a)(2)(D)(i)(I), while remaining open to alternative approaches states may present. These comments are further addressed in Section V and the Response to Comment (RTC) document contained in the docket for this action, Docket ID No. EPA–HQ–OAR–2021–0663.

In the March, August, and October 2018 memoranda, the EPA recognized that states may be able to establish alternative approaches to addressing their interstate transport obligations for the 2015 ozone NAAQS that vary from a nationally uniform framework. The EPA emphasized in these memoranda, however, that such alternative approaches must be technically justified and appropriate in light of the facts and circumstances of each particular state's submission.[28] In general, the EPA continues to believe that deviation from a nationally consistent approach to ozone transport must be substantially justified and have a well-documented technical basis that is consistent with CAA obligations and relevant case law. Where states submitted SIP submissions that rely on any such potential concepts

as the EPA or others may have identified or suggested in the past, the EPA evaluated whether the state adequately justified the technical and legal basis for doing so. For example, the EPA has considered the arguments put forward by Alabama, Missouri, Ohio, Oklahoma, Texas, and Utah related to alternative methods of identifying receptors.[29] The EPA also has considered the arguments attempting to justify an alternative contribution threshold at Step 2 pursuant to the August 2018 memorandum made by Alabama, Arkansas, Illinois, Indiana, Kentucky, Louisiana, Michigan, Mississippi, Missouri, Oklahoma, and Utah,[30] as well as criticisms of the 1 percent of the NAAQS contribution threshold made by Nevada and Ohio.[31] These topics are further addressed in Section V.B as well as the RTC document.

The EPA notes that certain potential concepts included in an attachment to the March 2018 memorandum require unique consideration, and these ideas do not constitute agency guidance with respect to interstate transport obligations for the 2015 ozone NAAQS. Attachment A to the March 2018 memorandum identified a "Preliminary List of Potential Flexibilities" that could potentially inform SIP development. However, the EPA made clear in both the March 2018 memorandum [32] and in Attachment A that the list of ideas was not endorsed by the Agency but rather "comments provided in various forums" on which the EPA sought "feedback from interested stakeholders." [33] Further, Attachment A stated, "EPA is not at this time making any determination that the ideas discussed below are consistent with the requirements of the CAA, nor are we specifically recommending that states use these approaches." [34] Attachment A to the March 2018 memorandum, therefore, does not constitute agency

guidance, but was intended to generate further discussion around potential approaches to addressing ozone transport among interested stakeholders. To the extent states sought to develop or rely on one or more of these ideas in support of their SIP submissions, the EPA reviewed their technical and legal justifications for doing so.[35]

The remainder of this section describes the EPA's analytical framework with respect to analytic year, definition of nonattainment and maintenance receptors, selection of contribution threshold, and multifactor control strategy assessment.

### 1. Selection of Analytic Year

In general, the states and the EPA must implement the interstate transport provision in a manner "consistent with the provisions of [title I of the CAA.]" *See* CAA section 110(a)(2)(D)(i). This requires, among other things, that these obligations are addressed consistently with the timeframes for downwind areas to meet their CAA obligations. With respect to ozone NAAQS, under CAA section 181(a), this means obligations must be addressed "as expeditiously as practicable" and no later than the schedule of attainment dates provided in CAA section 181(a)(1).[36] Several D.C. Circuit court decisions address the issue of the relevant analytic year for the purposes of evaluating ozone transport air-quality problems. On September 13, 2019, the D.C. Circuit issued a decision in *Wisconsin,* remanding the CSAPR Update to the extent that it failed to require upwind states to eliminate their significant contribution by the next applicable attainment date by which downwind states must come into compliance with the NAAQS, as established under CAA section 181(a). *See* 938 F.3d 303, 313.

On May 19, 2020, the D.C. Circuit issued a decision in *Maryland* v. *EPA* that cited the *Wisconsin* decision in holding that the EPA must assess the impact of interstate transport on air quality at the next downwind attainment date, including Marginal area attainment dates, in evaluating the basis for the EPA's denial of a petition under CAA section 126(b) *Maryland* v.

---

[28] March 2018 memorandum at 3 ("EPA also notes that, in developing their own rules, states have flexibility to follow the familiar four-step transport framework (using EPA's analytical approach or somewhat different analytical approaches within this steps) or alternative framework, so long as their chosen approach has adequate technical justification and is consistent with the requirements of the CAA."); August 2018 memorandum at 1 ("The EPA and air agencies should consider whether the recommendations in this guidance are appropriate for each situation."); October 2018 memorandum at 1 ("Following the recommendations in this guidance does not ensure that EPA will approve a SIP revision in all instances where the recommendations are followed, as the guidance may not apply to the facts and circumstances underlying a particular SIP.").

[29] 87 FR 64421–64422 (Alabama); 87 FR 9540–9541 (Missouri); 87 FR 9869–9870 (Ohio); 87 FR 9820–9822 (Oklahoma); 87 FR 9826–9829 (Texas); and 87 FR 31480–31481 (Utah).

[30] 87 FR 64423–64424 (Alabama); 87 FR 9806–9807 (Arkansas); 87 FR 9852–9853 (Illinois); 87 FR 9855–9856 (Indiana); 87 FR 9509–9510 (Kentucky); 87 FR 9815–9816 (Louisiana); 87 FR 9861–9862 (Michigan); 87 FR 9557 (Mississippi); 87 FR 9541–9544 (Missouri); 87 FR 9819 (Oklahoma); 87 FR 31478 (Utah).

[31] 87 FR 31492 (Nevada); 87 FR 9871 (Ohio).

[32] "In addition, the memorandum is accompanied by Attachment A, which provides a preliminary list of potential flexibilities in analytical approaches for developing a good neighbor SIP that may warrant further discussion between EPA and states." March 2018 memorandum at 1.

[33] March 2018 memorandum, Attachment A at A–1.

[34] *Id.*

[35] E.g., 87 FR 64423–64425 (Alabama); 87 FR 31453–31454 (California); 87 FR 9852–9854 (Illinois); 87 FR 9859–9860 (Indiana); 87 FR 9508, 9515 (Kentucky); 87 FR 9861–9862 (Michigan); 87 FR 9869–9870 (Ohio); 87 FR 9798, 9818–9820 (Oklahoma); 87 FR 31477–31481 (Utah); 87 FR 9526–9527 (West Virginia).

[36] For attainment dates for the 2015 ozone NAAQS, refer to CAA section 181(a), 40 CFR 51.1303, and Additional Air Quality Designations for the 2015 Ozone National Ambient Air Standards, 83 FR 25776 (June 4, 2018, effective August 3, 2018).

*EPA,* 958 F.3d 1185, 1203–04 (D.C. Cir. 2020) (*Maryland*). The court noted that "section 126(b) incorporates the Good Neighbor Provision," and, therefore, "EPA must find a violation [of section 126] if an upwind source will significantly contribute to downwind nonattainment at the *next downwind attainment deadline.* Therefore, the agency must evaluate downwind air quality at that deadline, not at some later date." *Id.* at 1204 (emphasis added). The EPA interprets the court's holding in *Maryland* as requiring the states and the Agency, under the good neighbor provision, to assess downwind air quality as expeditiously as practicable and no later than the next applicable attainment date,[37] which at the time of EPA's proposed and final actions on the SIPs addressed in this action is the Moderate area attainment date under CAA section 181 for ozone nonattainment. The Moderate area attainment date for the 2015 ozone NAAQS is August 3, 2024.[38] Thus, 2023 is now the appropriate year for analysis of interstate transport obligations for the 2015 ozone NAAQS, because the 2023 ozone season is the last relevant ozone season during which achieved emissions reductions in linked upwind states could assist downwind states with meeting the August 3, 2024, Moderate area attainment date for the 2015 ozone NAAQS.

The EPA recognizes that the attainment date for nonattainment areas classified as Marginal for the 2015 ozone NAAQS was August 3, 2021. Under the *Maryland* holding, any necessary emissions reductions to satisfy interstate transport obligations should have been implemented by no later than this date. At the time of the statutory deadline to submit interstate transport SIPs (October 1, 2018), many states relied upon the EPA's modeling of the year 2023, and no state provided an alternative analysis using a 2021 analytic year (or the prior 2020 ozone season). However, the EPA must act on SIP submissions using the information available at the time it takes such action,

and it is now past 2021. In this circumstance, the EPA does not believe it would be appropriate to evaluate states' obligations under CAA section 110(a)(2)(D)(i)(I) as of an attainment date that is wholly in the past, because the Agency interprets the interstate transport provision as forward looking. *See* 86 FR 23054, 23074; *see also Wisconsin,* 938 F.3d at 322 (rejecting Delaware's argument that the EPA should have used an analytic year of 2011 instead of 2017). Consequently, in this proposal the EPA will use the analytical year of 2023 to evaluate each state's CAA section 110(a)(2)(D)(i)(I) SIP submission with respect to the 2015 ozone NAAQS.

2. Step 1 of the 4-Step Interstate Transport Framework

In Step 1, the EPA identifies monitoring sites that are projected to have problems attaining and/or maintaining the NAAQS in the 2023 analytic year. Where the EPA's analysis shows that a site does not fall under the definition of a nonattainment or maintenance receptor, that site is excluded from further analysis under the EPA's 4-step interstate transport framework. For sites that are identified as a nonattainment or maintenance receptor in 2023, the EPA proceeds to the next step of the 4-step interstate transport framework by identifying which upwind states contribute to those receptors above the contribution threshold.

The EPA's approach to identifying ozone nonattainment and maintenance receptors in this action gives independent consideration to both the "contribute significantly to nonattainment" and the "interfere with maintenance" prongs of CAA section 110(a)(2)(D)(i)(I), consistent with the D.C. Circuit's direction in *North Carolina.*[39]

The EPA identifies nonattainment receptors as those monitoring sites that are projected to have average design values that exceed the NAAQS and that are also measuring nonattainment based on the most recent monitored design values. This approach is consistent with prior transport rulemakings, such as the CSAPR Update, where the EPA defined nonattainment receptors as those areas that both currently measure nonattainment and that the EPA projects will be in nonattainment in the analytic year (*i.e.,* 2023).[40]

In addition, the EPA identifies a receptor to be a "maintenance" receptor for purposes of defining interference with maintenance, consistent with the method used in CSAPR and upheld by the D.C. Circuit in *EME Homer City Generation, L.P.* v. *EPA,* 795 F.3d 118, 136 (D.C. Cir. 2015) (*EME Homer City II*).[41] Specifically, the EPA identified maintenance receptors as those receptors that would have difficulty maintaining the relevant NAAQS in a scenario that takes into account historical variability in air quality at that receptor. The variability in air quality was determined by evaluating the "maximum" future design value at each receptor based on a projection of the maximum measured design value over the relevant period. The EPA interprets the projected maximum future design value to be a potential future air quality outcome consistent with the meteorology that yielded maximum measured concentrations in the ambient data set analyzed for that receptor (*i.e.,* ozone conducive meteorology). The EPA also recognizes that previously experienced meteorological conditions (*e.g.,* dominant wind direction, temperatures, air mass patterns) promoting ozone formation that led to maximum concentrations in the measured data may reoccur in the future. The maximum design value gives a reasonable projection of future air quality at the receptor under a scenario in which such conditions do, in fact, reoccur. The projected maximum design value is used to identify upwind emissions that, under those circumstances, could interfere with the downwind area's ability to maintain the NAAQS.

Recognizing that nonattainment receptors are also, by definition, maintenance receptors, the EPA often uses the term "maintenance-only" to refer to those receptors that are not nonattainment receptors. Consistent with the concepts for maintenance receptors, as described earlier, the EPA identifies "maintenance-only" receptors as those monitoring sites that have projected average design values above the level of the applicable NAAQS, but that are not currently measuring nonattainment based on the most recent official design values. In addition, those

---

[37] The EPA notes that the court in *Maryland* did not have occasion to evaluate circumstances in which the EPA may determine that an upwind linkage to a downwind air quality problem exists at Steps 1 and 2 of the interstate transport framework by a particular attainment date, but for reasons of impossibility or profound uncertainty the Agency is unable to mandate upwind pollution controls by that date. *See Wisconsin,* 938 F.3d at 320. The D.C. Circuit noted in *Wisconsin* that upon a sufficient showing, these circumstances may warrant flexibility in effectuating the purpose of the interstate transport provision.

[38] *See* CAA section 181(a); 40 CFR 51.1303; Additional Air Quality Designations for the 2015 Ozone National Ambient Air Quality Standards, 83 FR 25776 (June 4, 2018, effective August 3, 2018).

[39] *See North Carolina,* 531 F.3d at 910–11 (holding that the EPA must give "independent significance" to each prong of CAA section 110(a)(2)(D)(i)(I)).

[40] *See* 81 FR 74504 (October 26, 2016). This same concept, relying on both current monitoring data

and modeling to define nonattainment receptor, was also applied in CAIR. *See* 70 FR 25241, 25249 (January 14, 2005); *see also North Carolina,* 531 F.3d at 913–14 (affirming as reasonable the EPA's approach to defining nonattainment in CAIR).

[41] *See* 76 FR 48208 (August 8, 2011). The CSAPR Update and Revised CSAPR Update also used this approach. *See* 81 FR 74504 (October 26, 2016) and 86 FR 23054 (April 30, 2021).

monitoring sites with projected average design values below the NAAQS, but with projected maximum design values above the NAAQS are also identified as "maintenance-only" receptors, even if they are currently measuring nonattainment based on the most recent official design values.

As discussed further in Section III.B., in response to comments, the Agency has also taken a closer look at measured ozone levels at monitoring sites in 2021 and 2022 for the purposes of informing the identification of additional receptors in 2023. We find there is a basis to consider certain sites with elevated ozone levels that are not otherwise identified as receptors to be an additional type of maintenance-only receptor given the likelihood that ozone levels above the NAAQS could persist at those locations through at least 2023. We refer to these as violating-monitor maintenance-only receptors ("violating monitors"). For purposes of this action, we use this information only in a confirmatory way for states that are otherwise found to be linked using the modeling-based methodology. The EPA intends to take separate action to address states that are linked only to one or more violating-monitor receptors.

3. Step 2 of the 4-Step Interstate Transport Framework

In Step 2, the EPA quantifies the contribution of each upwind state to each receptor in the 2023 analytic year. The contribution metric used in Step 2 is defined as the average impact from each state to each receptor on the days with the highest ozone concentrations at the receptor based on the 2023 modeling. If a state's contribution value does not equal or exceed the threshold of 1 percent of the NAAQS (*i.e.*, 0.70 ppb for the 2015 ozone NAAQS), the upwind state is not "linked" to a downwind air quality problem, and the EPA, therefore, concludes that the state does not contribute significantly to nonattainment or interfere with maintenance of the NAAQS in the downwind states. However, if a state's contribution equals or exceeds the 1 percent threshold, the state's emissions are further evaluated in Step 3, considering both air quality and cost as part of a multi-factor analysis, to determine what, if any, emissions might be deemed "significant" and, thus, must be eliminated pursuant to the requirements of CAA section 110(a)(2)(D)(i)(I).

In this final action, the EPA relies in the first instance on the 1 percent threshold for the purpose of evaluating a state's contribution to nonattainment or maintenance of the 2015 ozone

NAAQS (*i.e.*, 0.70 ppb) at downwind receptors. This is consistent with the Step 2 approach that the EPA applied in CSAPR for the 1997 ozone NAAQS, which has subsequently been applied in the CSAPR Update and Revised CSAPR Update when evaluating interstate transport obligations for the 2008 ozone NAAQS, and in the EPA's proposals for this action. The EPA continues to find 1 percent to be an appropriate threshold. For ozone, as the EPA found in the CAIR, CSAPR, and CSAPR Update, a portion of the nonattainment problems from anthropogenic sources in the U.S. result from the combined impact of relatively small contributions, typically from multiple upwind states and, in some cases, substantially larger contributions from a subset of particular upwind states, along with contributions from in-state sources. The EPA's analysis shows that much of the ozone transport problem being analyzed in this action is still the result of the collective impacts of contributions from upwind states. Therefore, application of a consistent contribution threshold is necessary to identify those upwind states that should have responsibility for addressing their contribution to the downwind nonattainment and maintenance problems to which they collectively contribute. Continuing to use 1 percent of the NAAQS as the screening metric to evaluate collective contribution from many upwind states also allows the EPA (and states) to apply a consistent framework to evaluate interstate emissions transport under the interstate transport provision from one NAAQS to the next. *See* 81 FR 74518; *see also* 86 FR 23085 (reviewing and explaining rationale from CSAPR, 76 FR 48237–38, for selection of 1 percent threshold).

The EPA's August 2018 memorandum recognizes that in certain circumstances, a state may be able to establish that an alternative contribution threshold of 1 ppb is justifiable. Where a state relies on this alternative threshold in their SIP submission, and where that state determined that it was not linked at Step 2 using the alternative threshold, the EPA evaluated whether the state provided a technically sound assessment of the appropriateness of using this alternative threshold based on the facts and circumstances underlying its application in the particular SIP submission. The states covered by this action that rely on a contribution threshold other than 1 percent of the NAAQS in their 2015 ozone NAAQS good neighbor SIP submission are Alabama, Arkansas, Illinois, Indiana, Kentucky, Louisiana, Michigan,

Mississippi, Missouri, Oklahoma, and Utah. Ohio also criticized the 1 percent of the NAAQS threshold, though it acknowledged it was linked above either a 1 percent of the NAAQS or 1 ppb contribution threshold. Nevada also criticized the 1 percent of the NAAQS contribution threshold, but ultimately relied on it to support its submission.

In the proposals for this action, the EPA evaluated each states' support for the use of an alternative threshold at Step 2 (*e.g.*, 1 ppb), and additionally shared its experience since the issuance of the August 2018 memorandum regarding use of alternative thresholds at Step 2. The EPA solicited comment on the subject as it considered the appropriateness of rescinding the memorandum.[42] The EPA received numerous comments related to both the EPA's evaluation of SIP submissions relying on an alternative threshold, and the EPA's experience with alternative thresholds. The EPA is not, at this time rescinding the August 2018 memorandum; however, for purposes of evaluating contribution thresholds for the 2015 ozone NAAQS, the EPA continues to find the use of an alternative threshold problematic for the reasons stated at proposal. Regardless of the EPA's position on the August 2018 memorandum, the EPA continues to find that the arguments put forth in the SIP submissions of by Alabama, Arkansas, Illinois, Indiana, Kentucky, Louisiana, Michigan, Mississippi, Missouri, Oklahoma, and Utah, as well as arguments in comments received on these actions, to be inadequate. *See* Section V.B.7 and the RTC Document for additional detail.

4. Step 3 of the 4-Step Interstate Transport Framework

Consistent with the EPA's longstanding approach to eliminating significant contribution and interference with maintenance, at Step 3, a multifactor assessment of potential emissions controls is conducted for states linked at Steps 1 and 2. The EPA's analysis at Step 3 in prior Federal actions addressing interstate transport requirements has primarily focused on an evaluation of cost-effectiveness of potential emissions controls (on a marginal cost-per-ton basis), the total emissions reductions that may be achieved by requiring such controls (if applied across all linked upwind states), and an evaluation of the air quality impacts such emissions reductions would have on the downwind receptors to which a state is linked; other factors may potentially be relevant if

---

[42] *See, e.g.,* 87 FR 9551.

adequately supported. In general, where the EPA's or state-provided alternative air quality and contribution modeling establishes that a state is linked at Steps 1 and 2, it will be insufficient at Step 3 for a state merely to point to its existing rules requiring control measures as a basis for SIP approval. In general, the emissions-reducing effects of all existing emissions control requirements are already reflected in the future year projected air quality results of the modeling for Steps 1 and 2. If the state is shown to still be linked to one or more downwind receptor(s) despite these existing controls, but that state believes it has no outstanding good neighbor obligations, the EPA expects the state to provide sufficient justification to support a conclusion by the EPA that the state has adequate provisions prohibiting ''any source or other type of emissions activity within the State from emitting any air pollutant in amounts which will'' ''contribute significantly to nonattainment in, or interfere with maintenance by,'' any other State with respect to the NAAQS. *See* CAA section 110(a)(2)(D)(i)(I). While the EPA has not prescribed a particular method for this assessment, as many commenters note, the EPA expects states at a minimum to present a sufficient technical evaluation. This would typically include information on emissions sources, applicable control technologies, emissions reductions, costs, cost effectiveness, and downwind air quality impacts of the estimated reductions, before concluding that no additional emissions controls should be required.[43] The EPA responds to comment on issues related to Step 3 in Section V.B.8. and in the RTC document.

### 5. Step 4 of the 4-Step Interstate Transport Framework

At Step 4, states (or the EPA) develop permanent and federally-enforceable control strategies to achieve the emissions reductions determined to be necessary at Step 3 to eliminate significant contribution to nonattainment or interference with

maintenance of the NAAQS.[44] For a state linked at Steps 1 and 2 to rely on an emissions control measure at Step 3 to address its interstate transport obligations, that measure must be included in the state's SIP so that it is permanent and federally enforceable. *See* CAA section 110(a)(2)(D) (''Each such [SIP] shall . . . contain adequate provisions. . . .''). *See also* CAA section 110(a)(2)(A); *Committee for a Better Arvin* v. *EPA,* 786 F.3d 1169, 1175–76 (9th Cir. 2015) (holding that measures relied on by a state to meet CAA requirements must be included in the SIP).

### III. The EPA's Updated Air Quality and Contribution Analysis

As noted in Section II, the EPA relied in part on its 2016v2 emissions platform-based air quality modeling to support its proposed interstate transport actions taken in 2022. Following receipt of comments, the EPA updated this modeling, incorporating new information received to create the 2016v3 emissions inventory and making additional updates to improve model performance. Using the 2016v3 emissions inventory, the EPA evaluated modeling projections for air quality monitoring sites and considered current ozone monitoring data at these sites to identify receptors that are anticipated to have problems attaining or maintaining the 2015 ozone NAAQS.

This section presents a summary of the methodology and results of the 2016v3 modeling of 2023, along with the application of the EPA's Step 1 and Step 2 methodology for identifying receptors and upwind states that contribute to those receptors. We also explain that current measured ozone levels based on data for 2021 and preliminary data for 2022 at other monitoring sites (*i.e.,* monitoring sites that are not projected to be receptors in 2023 based on air quality modeling) confirm the likely continuation of elevated ozone levels in 2023 at these locations and confirm that nearly all upwind states in this action are also linked above 1 percent of the NAAQS to one or more of these monitors.

While all of this information compiled by the EPA (both the modeling and monitoring data) plays a critical role in the basis for this final action, the EPA has also thoroughly evaluated the modeling information and other analyses and arguments presented by the upwind states in their SIP submittals. Our evaluation of the states' analyses was generally set forth in the

proposals, and the EPA in this final action has responded to comments on our evaluation of the various information and arguments made by states. The EPA's final decision to disapprove these states' SIP submittals is based on our evaluation of the entire record, recognizing that states possess the authority in the first instance to propose how they would address their significant contribution to air quality problems in other states. Nonetheless, as explained in the proposals, and in this document and supporting materials in the docket, we conclude that no state included in this action effectively demonstrated that it will not be linked to at least one air quality receptor in 2023, and none of these states' various arguments for alternative approaches ultimately present a satisfactory basis for the EPA to approve these states' SIP submissions.

### A. Description of Air Quality Modeling for the Final Action

In this section, the Agency describes the air quality modeling performed consistent with Steps 1 and 2 of the 4-step interstate transport framework to (1) Identify locations where it expects nonattainment or maintenance problems with respect to the 2015 ozone NAAQS for the 2023 analytic year, and (2) quantify the contributions from anthropogenic emissions from upwind states to downwind ozone concentrations at monitoring sites projected to be in nonattainment or have maintenance problems for the 2015 ozone NAAQS in 2023. This section includes information on the air quality modeling platform used in support of the final SIP disapproval action with a focus on the base year and future base case emissions inventories. The EPA also provides the projection of 2023 ozone concentrations and the interstate contributions for 8-hour ozone. The Final Action AQM TSD in Docket ID No. EPA–HQ–OAR–2021–0663 contains more detailed information on the air quality modeling aspects supporting our final action on these SIP submissions.

### 1. Public Review of Air Quality Modeling Information for the Proposed Action

The EPA provided several opportunities to comment on the emissions modeling platform and air quality modeling results that were used for the proposed SIP submission actions. On September 20, 2021, the EPA publicly released via our web page updated emissions inventories (2016v2) and requested comment from states and

---

[43] Because no state included new enforceable emissions control measures in the submissions under review here, we focus our analysis on whether states justified that no additional controls were required. As examples of general approaches for how a Step 3 analysis could be conducted for their sources, states could look to the CSAPR Update, 81 FR 74504, 74539–51; CSAPR, 76 FR 48208, 48246–63; CAIR, 70 FR 25162, 25195–229; or the NO$_X$ SIP Call, 63 FR 57356, 57399–405. *See also* Revised CSAPR Update, 86 FR 23054, 23086–23116. Consistently across these rulemakings, the EPA has developed emissions inventories, analyzed different levels of control stringency at different cost thresholds, and assessed resulting downwind air quality improvements.

[44] The EPA notes that any controls included in an approved SIP are federally-enforceable.

MJOs on these data.[45] In January 2022, the EPA released air quality modeling results including projected ozone design values and contributions from 2023 based on the 2016v2 emissions. At that time the EPA indicated its intent to use these data to support upcoming transport rulemakings. Then, on February 22, 2022, the EPA published proposed disapprovals for 19 interstate transport SIP submissions using the modeling data released in January 2022 and the emissions inventories shared in September 2021.[46] The EPA provided a 60-day comment period on these proposals. On May 24, 2022, the EPA proposed disapprovals for an additional four states' interstate transport SIP submissions using the same modeling platform, and provided a 62-day comment period.[47] The EPA provided a 30-day comment period beginning on October 25, 2022, on the proposed disapproval of Alabama's June 21, 2022, SIP submission, which relied on the same modeling platform as the other noted proposals.[48] In addition to its proposed disapprovals, the EPA also proposed approval of Iowa's, Arizona's, and Colorado's SIP submissions using the 2016v2 modeling and provided 30-day comment periods. 87 FR 9477 (February 22, 2022) (Iowa); 87 FR 37776 (June 24, 2022) (Arizona); and 87 FR 27050 (May 6, 2022) (Colorado).

2. Overview of Air Quality Modeling Platform

The EPA used version 3 of the 2016-based modeling platform (*i.e.,* 2016v3) for the air quality modeling for this final SIP disapproval action. This modeling platform includes 2016 base year emissions from anthropogenic and natural sources and future year projected anthropogenic emissions for 2023.[49] The emissions data contained in the 2016v3 platform represent an update to the 2016 version 2 inventories used for the proposal modeling.

The air quality modeling for this final disapproval action was performed for a

modeling region (*i.e.,* modeling domain) that covers the contiguous 48 states using a horizontal resolution of 12 x 12 km. The EPA used the CAMx version 7.10 for air quality modeling which is the same model that the EPA used for the proposed rule air quality modeling.[50] Additional information on the 2016-based air quality modeling platform can be found in the Final Action AQM TSD.

*Comments:* Commenters noted that the 2016 base year summer maximum daily average 8-hour (MDA8) ozone predictions from the proposal modeling were biased low compared to the corresponding measured concentrations in certain locations. In this regard, commenters said that model performance statistics for a number of monitoring sites, particularly those in portions of the West and in the area around Lake Michigan, were outside the range of published performance criteria for normalized mean bias (NMB) and normalized mean error (NME) of less than plus or minus 15 percent and less than 25 percent, respectively.[51] Commenters say the EPA must investigate the factors contributing to low bias and make necessary corrections to improve model performance in the modeling supporting final SIP actions. Some commenters said that the EPA should include $NO_X$ emissions from lightning strikes and assess the treatment of other background sources of ozone to improve model performance for the final action. Additional information on the comments on model performance can be found in the RTC document for this final SIP disapproval action.

*EPA Response:* In response to these comments the EPA examined the temporal and spatial characteristics of model under prediction to investigate the possible causes of under prediction of MDA8 ozone concentrations in different regions of the U.S. in the proposal modeling. The EPA's analysis indicates that the under prediction was most extensive during May and June with less bias during July and August in most regions of the U.S. For example, in the Upper Midwest region model under prediction was larger in May and June compared to July through September. Specifically, the normalized mean bias for days with measured concentrations greater than or equal to 60 ppb

improved from a 21.4 percent under prediction for May and June to a 12.6 percent under prediction in the period July through September. As described in the AQM TSD, the seasonal pattern in bias in the Upper Midwest region improves somewhat gradually with time from the middle of May to the latter part of June. In view of the seasonal pattern in bias in the Upper Midwest and in other regions of the U.S., the EPA focused its investigation of model performance on model inputs that, by their nature, have the largest temporal variation within the ozone season. These inputs include emissions from biogenic sources and lightning $NO_X$, and contributions from transport of international anthropogenic emissions and natural sources into the U.S. Both biogenic and lightning $NO_X$ emissions in the U.S. dramatically increase from spring to summer.[52][53] In contrast, ozone transported into the U.S. from international anthropogenic and natural sources peaks during the period March through June, with lower contributions during July through September.[54][55] To investigate the impacts of the sources, the EPA conducted sensitivity model runs which focused on the effects on model performance of adding $NO_X$ emissions from lightning strikes, using updated biogenic emissions, and using an alternative approach (described in more detail later in this section) for quantifying transport of ozone and precursor pollutants into the U.S. from international anthropogenic and natural sources. In the air quality modeling for proposal, the amount of transport from international sources was based on a simulation of the hemispheric version of the Community Multi-scale Air Quality

[45] *https://www.epa.gov/air-emissions-modeling/2016v2-platform.*

[46] These proposals are listed in footnote 5 of this action.

[47] The EPA also relied on this same modeling data to support proposed Federal Implementation Plans (FIPs) resolving interstate transport obligations for 27 states for the 2015 ozone NAAQS. 87 FR 20036 (April 6, 2022). The EPA allowed 60 days to receive comments on the proposed FIP rule, including acceptance of comment on the 2016v2 emissions inventory-based modeling platform. The EPA then allowed for an additional 15 days via an extension of the comment period. 87 FR 29108 (May 12, 2022).

[48] 87 FR 64412, 64413.

[49] The 2016v3 platform also includes projected emissions for 2026. However, the 2026 data are not applicable and were not used in this final action.

[50] Ramboll Environment and Health, January 2021, *https://www.camx.com.*

[51] Christopher Emery, Zhen Liu, Armistead G. Russell, M. Talat Odman, Greg Yarwood & Naresh Kumar (2017) Recommendations on statistics and benchmarks to assess photochemical model performance, Journal of the Air & Waste Management Association, 67:5, 582–598, DOI: 10.1080/10962247.1265027.

[52] Guenther, A.B., 1997. Seasonal and spatial variations in natural volatile organic compound emissions. Ecol. Appl. 7, 34–45. *http://dx.doi.org/10.1890/1051-0761(1997)007[0034:SASVIN]2.0.CO;2.* Guenther, A., Hewitt, C.N., Erickson, D., Fall, R.

[53] Kang D, Mathur R, Pouliot GA, Gilliam RC, Wong DC. Significant ground-level ozone attributed to lightning-induced nitrogen oxides during summertime over the Mountain West States. NPJ Clim Atmos Sci. 2020 Jan 30;3:6. doi: 10.1038/s41612–020–0108–2. PMID: 32181370; PMCID: PMC7075249.

[54] Jaffe DA, Cooper OR, Fiore AM, Henderson BH, Tonnesen GS, Russell AG, Henze DK, Langford AO, Lin M, Moore T. Scientific assessment of background ozone over the U.S.: Implications for air quality management. Elementa (Wash DC). 2018;6(1):56. doi: 10.1525/elementa.309. PMID: 30364819; PMCID: PMC6198683.

[55] Henderson, B.H., P. Dolwick, C. Jang, A., Eyth, J. Vukovich, R. Mathur, C. Hogrefe, N. Possiel, G. Pouliot, B. Timin, K.W. Appel, 2019. Global Sources of North American Ozone. Presented at the 18th Annual Conference of the UNC Institute for the Environment Community Modeling and Analysis System (CMAS) Center, October 21–23, 2019.

Model (H–CMAQ) [56] for 2016. The outputs from this hemispheric modeling were then used to provide boundary conditions for the national scale air quality modeling at proposal.[57] Overall, H–CMAQ tends to under predict daytime ozone concentrations at rural and remote monitoring sites across the U.S. during the spring of 2016 whereas the predictions from the GEOS-Chem global model [58] were generally less biased.[59] During the summer of 2016 both models showed varying degrees of over prediction with GEOS-Chem showing somewhat greater over prediction, compared to H–CMAQ. In view of those results, the EPA examined the impacts of using GEOS-Chem as an alternative to H–CMAQ for providing boundary conditions for the modeling supporting this final action.

For the lightning $NO_X$, biogenics, and GEOS-Chem sensitivity runs, the EPA reran the proposal modeling using each of these inputs, individually. Results from these sensitivity runs indicate that each of the three updates provides an improvement in model performance. However, by far the greatest improvement in modeling performance is attributable to the use of GEOS-Chem. In view of these results the EPA has included lightning $NO_X$ emissions, updated biogenic emissions, and international transport from GEOS-Chem in the air quality modeling supporting final SIP actions. Details on the results of the individual sensitivity runs can be found in the AQM TSD. For the air quality modeling supporting final SIP actions, model performance based on days in 2016 with measured MDA8 ozone greater than or equal to 60 ppb is considerably improved (i.e., less bias and error) compared to the proposal modeling in nearly all regions. For example, in the Upper Midwest, which includes monitoring sites along Lake Michigan, the normalized mean bias improved from a 19 percent under prediction to a 6.9 percent under prediction and in the Southwest region, which includes monitoring sites in Denver, Las Cruces, El Paso, and Salt Lake City, normalized mean bias improved from a 13.6 percent under prediction to a 4.8 percent under prediction.[60] In all regions, the normalized mean bias and normalized mean error statistics for high ozone days based on the modeling supporting final SIP actions are within the range of performance criteria benchmarks (i.e., less than plus or minus 15 percent for normalized mean bias and less than 25 percent for normalized mean error).[61] Additional information on model performance information is provided in the AQM TSD. In summary, the EPA included emissions of lightning $NO_X$, as requested by commenters, and investigated and addressed concerns about model performance for the modeling supporting final SIP actions.

### 3. Emissions Inventories

The EPA developed emissions inventories to support air quality modeling for this final action, including emissions estimates for EGUs, non-EGU point sources (i.e., stationary point sources), stationary nonpoint sources, onroad mobile sources, nonroad mobile sources, other mobile sources, wildfires, prescribed fires, and biogenic emissions that are not the direct result of human activities. The EPA's air quality modeling relies on this comprehensive set of emissions inventories because emissions from multiple source categories are needed to model ambient air quality and to facilitate comparison of model outputs with ambient measurements.

Prior to the modeling of air quality, the emissions inventories must be processed into a format that is appropriate for the air quality model to use. To prepare the emissions inventories for air quality modeling, the EPA processed the emissions inventories using the Sparse Matrix Operator Kernel Emissions (SMOKE) Modeling System version 4.9 to produce the gridded, hourly, speciated, model-ready emissions for input to the air quality model. Additional information on the development of the emissions inventories and on data sets used during the emissions modeling process are provided in the document titled ''Technical Support Document (TSD): Preparation of Emissions Inventories for the 2016v3 North American Emissions Modeling Platform,'' hereafter known as the ''2016v3 Emissions Modeling TSD.'' This TSD is available in the docket for this action.[62]

### 4. Foundation Emissions Inventory

The 2016v3 platform is comprised of data from various sources including data developed using models, methods, and source datasets that became available in calendar years 2020 through 2022, in addition to data retained from the Inventory Collaborative 2016 version 1 (2016v1) Emissions Modeling Platform, released in October 2019. The 2016v1 platform was developed through a national collaborative effort between the EPA and state and local agencies along with MJOs. The 2016v2 platform used to support the proposed action included updated data, models and methods as compared to 2016v1. The 2016v3 platform includes updates implemented in response to comments along with other updates to the 2016v2 platform such as corrections and the incorporation of updated data sources that became available prior to the 2016v3 inventories being developed. Several commenters noted that the 2016v2 platform did not include $NO_X$ emissions that resulted from lightning strikes. To address this, lightning $NO_X$ emissions were computed and included in the 2016v3 platform.

For this final action, the EPA developed emissions inventories for the base year of 2016 and the projected year of 2023. The 2023 inventories represent changes in activity data and of predicted emissions reductions from on-the-books actions, planned emissions control installations, and promulgated Federal measures that affect anthropogenic emissions. The 2016 emissions inventories for the U.S. primarily include data derived from the 2017 National Emissions Inventory (2017

[56] Mathur, R., Gilliam, R., Bullock, O.R., Roselle, S., Pleim, J., Wong, D., Binkowski, F., and 1 Streets, D.: Extending the applicability of the community multiscale air quality model to 2 hemispheric scales: motivation, challenges, and progress. In: Steyn DG, Trini S (eds) Air 3 pollution modeling and its applications, XXI. Springer, Dordrecht, pp 175–179, 2012.

[57] Boundary conditions are the concentrations of pollutants along the north, east, south, and west boundaries of the air quality modeling domain. Boundary conditions vary in space and time and are typically obtained from predictions of global or hemispheric models. Information on how boundary conditions were developed for modeling supporting EPA's final SIP actions can be found in the AQM TSD.

[58] I. Bey, D.J. Jacob, R.M. Yantosca, J.A. Logan, B.D. Field, A.M. Fiore, Q. Li, H.Y. Liu, L.J. Mickley, M.G. Schultz. Global modeling of tropospheric chemistry with assimilated meteorology: model description and evaluation. J. Geophys. Res. Atmos., 106 (2001), pp. 23073–23095, 10.1029/2001jd000807.

[59] Henderson, B.H., P. Dolwick, C. Jang, A., Eyth, J. Vukovich, R. Mathur, C. Hogrefe, G. Pouliot, N. Possiel, B. Timin, K.W. Appel, 2022. Meteorological and Emission Sensitivity of Hemispheric Ozone and PM2.5. Presented at the 21st Annual Conference of the UNC Institute for the Environment Community Modeling and Analysis System (CMAS) Center, October 17–19, 2022.

[60] A comparison of model performance from the proposal modeling to the final modeling for individual monitoring sites can be found in the docket for this final action.

[61] Christopher Emery, Zhen Liu, Armistead G. Russell, M. Talat Odman, Greg Yarwood & Naresh Kumar (2017) Recommendations on statistics and benchmarks to assess photochemical model performance, Journal of the Air & Waste Management Association, 67:5, 582–598, DOI: 10.1080/10962247.1265027.

[62] See Preparation of Emissions Inventories for the 2016v3 North American Emissions Modeling Platform TSD, also available at https://www.epa.gov/air-emissions-modeling/2016v3-platform.

NEI [63] and data specific to the year of 2016. The following sections provide an overview of the construct of the 2016v3 emissions and projections. The fire emissions were unchanged between the 2016v2 and 2016v3 emissions platforms. For the 2016v3 platform, the biogenic emissions were updated to use the latest available versions of the Biogenic Emissions Inventory System and associated land use data to help address comments related to a degradation in model performance in the 2016v2 platform as compared to the 2016v1 platform. Details on the construction of the inventories are available in the 2016v3 Emissions Modeling TSD. Details on how the EPA responded to comments related to emissions inventories are available in the RTC document for this action.

Development of emissions inventories for annual $NO_X$ and sulfur dioxide ($SO_2$) emissions for EGUs in the 2016 base year inventory are based primarily on data from continuous emissions monitoring systems (CEMS) and other monitoring systems allowed for use by qualifying units under 40 CFR part 75, with other EGU pollutants estimated using emissions factors and annual heat input data reported to the EPA. For EGUs not reported under part 75, the EPA used data submitted to the NEI by state, local, and tribal agencies. The final action inventories include updates made in response to comments on the proposed actions including the proposed SIP submission disapprovals and the proposed FIP. The Air Emissions Reporting Rule, (80 FR 8787; February 19, 2015), requires that Type A point sources large enough to meet or exceed specific thresholds for emissions be reported to the EPA via the NEI every year, while the smaller Type B point sources must only be reported to EPA every 3 years. In response to comments, emissions data for EGUs that did not have data submitted to the NEI specific to the year 2016 were filled in with data from the 2017 NEI. For more information on the details of how the 2016 EGU emissions were developed and prepared for air quality modeling, *see* the 2016v3 Emissions Modeling TSD.

The EPA projected 2023 baseline EGU emissions using version 6 of the Integrated Planning Model (IPM) (*www.epa.gov/airmarkets/powersector-modeling*). IPM, developed by ICF Consulting, is a state-of-the-art, peer-reviewed, multi-regional, dynamic, deterministic linear programming model

of the contiguous U.S. electric power sector. It provides forecasts of least cost capacity expansion, electricity dispatch, and emissions control strategies while meeting energy demand and environmental, transmission, dispatch, and reliability constraints. The EPA has used IPM for over two decades to better understand power sector behavior under future business-as-usual conditions and to evaluate the economic and emissions impacts of prospective environmental policies. The model is designed to reflect electricity markets as accurately as possible. The EPA uses the best available information from utilities, industry experts, gas and coal market experts, financial institutions, and government statistics as the basis for the detailed power sector modeling in IPM. The model documentation provides additional information on the assumptions discussed here as well as all other model assumptions and inputs.[64] The EPA relied on the same model platform as in the proposals but made substantial updates to reflect public comments on near-term fossil fuel market price volatility and updated fleet information reflecting Summer 2022 U.S. Energy Information Agency (EIA) 860 data, unit-level comments, and additional updates to the National Electric Energy Data System (NEEDS) inventory.

The IPM version 6—Updated Summer 2021 Reference Case incorporated recent updates through the summer 2022 to account for updated Federal and state environmental regulations (including Renewable Portfolio Standards (RPS), Clean Energy Standards (CES) and other state mandates), fleet changes (committed EGU retirements and new builds), electricity demand, technology cost and performance assumptions from recent data for renewables adopting from National Renewable Energy Lab (NREL's) Annual Technology Baseline 2020 and for fossil sources from the EIA's Annual Energy Outlook (AEO) 2020. Natural gas and coal price projections reflect data developed in fall 2020 but updated in summer 2022 to capture near-term price volatility and current market conditions. The inventory of EGUs provided as an input to the model was the NEEDS fall 2022 version and is available on the EPA's website.[65] This version of NEEDS reflects announced retirements and

under construction new builds known as of early summer 2022. This projected base case accounts for the effects of the final Mercury and Air Toxics Standards rule, CSAPR, the CSAPR Update, the Revised CSAPR Update, New Source Review enforcement settlements, the final Effluent Limitation Guidelines (ELG) Rule, the Coal Combustion Residual (CCR) Rule, and other on-the-books Federal and state rules (including renewable energy tax credit extensions from the Consolidated Appropriations Act of 2021) through early 2021 impacting emissions of $SO_2$, $NO_X$, directly emitted particulate matter, carbon dioxide ($CO_2$), and power plant operations. It also includes final actions, up through the Summer 2022, the EPA has taken to implement the Regional Haze Rule and best available retrofit technology (BART) requirements. Documentation of IPM version 6 and NEEDS, along with updates, is in Docket ID No. EPA–HQ–OAR–2021–0663 and available online at *https://www.epa.gov/airmarkets/power-sector-modeling.*

Non-EGU point source emissions are mostly consistent with those in the proposal modeling except where they were updated in response to comments. Several commenters mentioned that point source emissions carried forward from 2014 NEI were not the best estimates of 2017 emissions. Thus, emissions sources in 2016v2 that had been projected from the 2014 NEI in the proposal were replaced with emissions based on the 2017 NEI. Point source emissions submitted to the 2016 NEI or to the 2016v1 platform development process specifically for the year 2016 were retained in 2016v3.

The 2023 non-EGU point source emissions were grown from 2016 to 2023 using factors based on AEO 2022 and reflect emissions reductions due to known national and local rules, control programs, plant closures, consent decrees, and settlements that could be computed as reductions to specific units by July 2022.

Aircraft emissions and ground support equipment at airports are represented as point sources and are based on adjustments to emissions in the January 2021 version of the 2017 NEI. The EPA developed and applied factors to adjust the 2017 airport emissions to 2016 and 2023 based on activity growth projected by the Federal Aviation Administration Terminal Area Forecast 2021,[66] the latest available version at the time the factors were developed.

[63] *https://www.epa.gov/air-emissions-inventories/2017-national-emissions-inventory-nei-technical-support-document-tsd.*

[64] Detailed information and documentation of the EPA's Base Case, including all the underlying assumptions, data sources, and architecture parameters can be found on the EPA's website at: *https://www.epa.gov/airmarkets/power-sector-modeling.*

[65] Available at *https://www.epa.gov/airmarkets/national-electric-energy-data-system-needs-v6.*

[66] *https://www.faa.gov/data_research/aviation/taf/.*

Emissions at rail yards were represented as point sources. The 2016 rail yard emissions are largely consistent with 2017 NEI rail yard emissions. The 2016 and 2023 rail yard emissions were developed through the 2016v1 Inventory Collaborative process. Class I rail yard emissions were projected based on the AEO freight rail energy use growth rate projections for 2023 with the fleet mix assumed to be constant throughout the period.

The EPA made multiple updates to point source oil and gas emissions in response to comments. For the 2016v3 modeling, the point source oil and gas emissions for 2016 were based on the 2016v2 point inventory except that most 2014 NEI-based emissions were replaced with 2017 NEI emissions. Additionally, in response to comments, state-provided emissions equivalent to those in the 2016v1 platform were used for Colorado, and some New Mexico emissions were replaced with data backcast from 2020 to 2016. To develop inventories for 2023 for the 2016v3 platform, the year 2016 oil and gas point source inventories were first projected to 2021 values based on actual historical production data, then those 2021 emissions were projected to 2023 using regional projection factors based on AEO 2022 projections. This was an update from the 2016v2 approach in which actual data were used only through the year 2019, because 2021 data were not yet available. $NO_X$ and VOC reductions resulting from co-benefits to New Source Performance Standards (NSPS) for Stationary Reciprocating Internal Combustion Engines (RICE) are reflected, along with Natural Gas Turbine and Process Heater NSPS $NO_X$ controls and Oil and Gas NSPS VOC controls. In some cases, year 2019 point source inventory data were used instead of the projected future year emissions except for the Western Regional Air Partnership (WRAP) states of Colorado, New Mexico, Montana, Wyoming, Utah, North Dakota, and South Dakota. The WRAP future year inventory [67] was used in these WRAP states in all future years except in New Mexico where the WRAP base year emissions were projected using the EIA historical and AEO forecasted production data. Estimated impacts from the recent oil and gas rule in the New Mexico Administrative code 20.2.50 [68] were also included. Details on the development of the projected point

and nonpoint oil and gas emissions inventories are available in the 2016v3 Emissions Modeling TSD in Docket ID No. EPA–HQ–OAR–2021–0663.

Onroad mobile sources include exhaust, evaporative, and brake and tire wear emissions from vehicles that drive on roads, parked vehicles, and vehicle refueling. Emissions from vehicles using regular gasoline, high ethanol gasoline, diesel fuel, and electric vehicles were represented, along with buses that used compressed natural gas. The EPA developed the onroad mobile source emissions for states other than California using the EPA's Motor Vehicle Emissions Simulator (MOVES). MOVES3 was released in November 2020 and has been followed by some minor releases that improved the usage of the model but that do not have substantive impacts on the emissions estimates. For 2016v2, MOVES3 was run using inputs provided by state and local agencies through the 2017 NEI where available, in combination with nationally available data sets to develop a complete inventory. Onroad emissions were developed based on emissions factors output from MOVES3 run for the year 2016, coupled with activity data (*e.g.,* vehicle miles traveled and vehicle populations) representing the year 2016. The 2016 activity data were provided by some state and local agencies through the 2016v1 process, and the remaining activity data were derived from those used to develop the 2017 NEI. The onroad emissions were computed within SMOKE by multiplying emissions factors developed using MOVES with the appropriate activity data. Prior to computing the final action emissions for 2016, updates to some onroad inputs were made in response to comments and to implement corrections. Onroad mobile source emissions for California were consistent with the updated emissions data provided by the state for the final action.

The 2023 onroad emissions reflect projected changes to fuel properties and usage, along with the impact of the rules included in MOVES3 for each of those years. MOVES emissions factors for the year 2023 were used. A comprehensive list of control programs included for onroad mobile sources is available in the 2016v3 Emissions Modeling TSD. Year 2023 activity data for onroad mobile sources were provided by some state and local agencies, and otherwise were projected to 2023 by first projecting the 2016 activity to year 2019 based on county level vehicle miles traveled (VMT) from the Federal Highway Administration. The VMT were held flat from 2019 to 2021 to

account for pandemic impacts, and then projected from 2021 to 2023 using AEO 2022-based factors.[69] Recent updates to inspection and maintenance programs in North Carolina and Tennessee were reflected in the MOVES inputs for the modeling supporting this final action. The 2023 onroad mobile emissions were computed within SMOKE by multiplying the respective emissions factors developed using MOVES with the year-specific activity data. Prior to computing the final action emissions for 2023, the EPA made updates to some onroad inputs in response to comments and to implement corrections.

The commercial marine vessel (CMV) emissions in the 2016 base case emissions inventory for this action were based on those in the 2017 NEI. Factors were applied to adjust the 2017 NEI emissions backward to represent emissions for the year 2016. The CMV emissions are consistent with the emissions for the 2016v1 platform CMV emissions released in February 2020 although, in response to comments, the EPA implemented an improved process for spatially allocating CMV emissions along state and county boundaries for the modeling supporting this final action.

The EPA developed nonroad mobile source emissions inventories (other than CMV, locomotive, and aircraft emissions) for 2016 and 2023 from monthly, county, and process level emissions output from MOVES3. Types of nonroad equipment include recreational vehicles, pleasure craft, and construction, agricultural, mining, and lawn and garden equipment.[70] The nonroad emissions for the final action were unchanged from those at the proposal. The nonroad mobile emissions control programs include reductions to locomotives, diesel engines, and recreational marine engines, along with standards for fuel sulfur content and evaporative emissions. A comprehensive list of

[67] *http://www.wrapair2.org/pdf/WRAP_OGWG_ 2028_OTB_RevFinalReport_05March2020.pdf.*

[68] *https://www.env.nm.gov/air-quality/ozone- draft-rule/* and *https://www.srca.nm.gov/parts/ title20/20.002.0050.html.*

[69] VMT data for 2020 were the latest available at the time of final rule data development but were heavily impacted by the pandemic and unusable to project to 2023; in addition, it was determined that chaining factors based on AEO 2020 and AEO2021 obtain the needed factors led to unrealistic artifacts, thus only AEO 2022 data were used.

[70] Line haul locomotives are also considered a type of nonroad mobile source but the emissions inventories for locomotives were not developed using MOVES3. Year 2016 and 2023 locomotive emissions were developed through the 2016v1 process, and the year 2016 emissions are mostly consistent with those in the 2017 NEI. The projected locomotive emissions for 2023 were developed by applying factors to the base year emissions using activity data based on AEO freight rail energy use growth rate projections along with emissions rates adjusted to account for recent historical trends.

control programs included for mobile sources is available in the 2016v3 Emissions Modeling TSD.

For stationary nonpoint sources, some emissions in the 2016 base case emissions inventory come directly from the 2017 NEI, others were adjusted from the 2017 NEI to represent 2016 levels, and the remaining emissions including those from oil and gas, fertilizer, and solvents were computed specifically to represent 2016. Stationary nonpoint sources include evaporative sources, consumer products, fuel combustion that is not captured by point sources, agricultural livestock, agricultural fertilizer, residential wood combustion, fugitive dust, and oil and gas sources. The emissions sources derived from the 2017 NEI include agricultural livestock, fugitive dust, residential wood combustion, waste disposal (including composting), bulk gasoline terminals, and miscellaneous non-industrial sources such as cremation, hospitals, lamp breakage, and automotive repair shops. A recent method to compute solvent VOC emissions was used.[71]

Where comments were provided about projected control measures or changes in nonpoint source emissions, those inputs were first reviewed by the EPA. Those found to be based on reasonable data for affected emissions sources were incorporated into the projected inventories for 2023 to the extent possible. Where possible, projection factors based on the AEO used data from AEO 2022, the most recent AEO at the time available at the time the inventories were developed. Federal regulations that impact the nonpoint sources were reflected in the inventories. Adjustments for state fuel sulfur content rules for fuel oil in the Northeast were included along with solvent controls applicable within the northeast ozone transport region (OTR) states. Details are available in the 2016v3 Emissions Modeling TSD.

Nonpoint oil and gas emissions inventories for many states were developed based on outputs from the 2017 NEI version of the EPA Oil and Gas Tool using activity data for year 2016. Production-related emissions data from the 2017 NEI were used for Oklahoma, 2016v1 emissions were used for Colorado and Texas production-related sources to respond to comments. Data for production-related nonpoint oil and gas emissions in the States of Colorado, Montana, New Mexico, North Dakota, South Dakota, Utah, and Wyoming were obtained from the

WRAP baseline inventory.[72] A California Air Resources Board-provided inventory was used for 2016 oil and gas emissions in California. Nonpoint oil and gas inventories for 2023 were developed by first projecting the 2016 oil and gas inventories to 2021 values based on actual production data. Next, those 2021 emissions were projected to 2023 using regional projection factors by product type based on AEO 2022 projections. A 2017–2019 average inventory was used for oil and natural gas exploration emissions in 2023 everywhere except for California and in the WRAP states in which data from the WRAP future year inventory[73] were used. NO$_X$ and VOC reductions that are co-benefits to the NSPS for RICE are reflected, along with Natural Gas Turbines and Process Heaters NSPS NO$_X$ controls and NSPS Oil and Gas VOC controls. The WRAP future year inventory was used for oil and natural gas production sources in 2023 except in New Mexico where the WRAP Base year emissions were projected using the EIA historical and AEO forecasted production data. Estimated impacts from the New Mexico Administrative Code 20.2.50 were included.

*B. Air Quality Modeling To Identify Nonattainment and Maintenance Receptors*

This section describes the air quality modeling and analyses that the EPA performed in Step 1 to identify locations where the Agency expects there to be nonattainment or maintenance receptors for the 2015 ozone NAAQS in 2023. Where the EPA's analysis shows that an area or site does not fall under the definition of a nonattainment or maintenance receptor in 2023, that site is excluded from further analysis under the EPA's good neighbor framework.

1. Approach for Identifying Receptors

In the proposed actions, the EPA applied the same approach used in the CSAPR Update and the Revised CSAPR Update to identify nonattainment and maintenance receptors for the 2008 ozone NAAQS.[74] The EPA's approach gives independent effect to both the "contribute significantly to nonattainment" and the "interfere with maintenance" prongs of section 110(a)(2)(D)(i)(I), consistent with the D.C. Circuit's direction in *North Carolina*. Further, in its decision on the remand of CSAPR from the Supreme Court in the *EME Homer City II* case, the

D.C. Circuit confirmed that the EPA's approach to identifying maintenance receptors in CSAPR comported with the court's prior instruction to give independent meaning to the "interfere with maintenance" prong in the good neighbor provision.[75]

In the CSAPR Update and the Revised CSAPR Update, the EPA identified nonattainment receptors as those monitoring sites that are projected to have average design values that exceed the NAAQS and that are also measuring nonattainment based on the most recent monitored design values. This approach is consistent with prior transport rulemakings, such as the NO$_X$ SIP Call and CAIR, where the EPA defined nonattainment receptors as those areas that both currently monitor nonattainment and that the EPA projects will be in nonattainment in the future compliance year.

The Agency explained in the NO$_X$ SIP Call and CAIR and then reaffirmed in the CSAPR Update that the EPA has the most confidence in our projections of nonattainment for those counties that also measure nonattainment for the most recent period of available ambient data. The EPA separately identified maintenance receptors as those receptors that would have difficulty maintaining the relevant NAAQS in a scenario that accounts for historical variability in air quality at that receptor. The variability in air quality was determined by evaluating the "maximum" future design value at each receptor based on a projection of the maximum measured design value over the relevant period. The EPA interprets the projected maximum future design value to be a potential future air quality outcome consistent with the meteorology that yielded maximum measured concentrations in the ambient data set analyzed for that receptor (*i.e.,* ozone conducive meteorology). The EPA also recognizes that previously experienced meteorological conditions (*e.g.,* dominant wind direction, temperatures, and air mass patterns) promoting ozone formation that led to maximum concentrations in the measured data may reoccur in the future. The maximum design value gives a reasonable projection of future air quality at the receptor under a scenario in which such conditions do, in fact, reoccur. The projected maximum design value is used to identify upwind emissions that, under those circumstances, could interfere with the downwind area's ability to maintain the NAAQS.

[71] *https://doi.org/10.5194/acp-21-5079-2021.*

[72] *http://www.wrapair2.org/pdf/WRAP_OGWG_Report_Baseline_17Sep2019.pdf.*

[73] *http://www.wrapair2.org/pdf/WRAP_OGWG_2028_OTB_RevFinalReport_05March2020.pdf.*

[74] *See* 86 FR 23078–79.

[75] *EME Homer City II,* 795 F.3d at 136.

Therefore, applying this methodology for this action, the EPA assessed the magnitude of the maximum projected design values for 2023 at each receptor in relation to the 2015 ozone NAAQS and, where such a value exceeds the NAAQS, the EPA determined that receptor to be a ''maintenance'' receptor for purposes of defining interference with maintenance, consistent with the method used in CSAPR and upheld by the D.C. Circuit in *EME Homer City II*.[76] That is, monitoring sites with a maximum design value that exceeds the NAAQS are projected to have maintenance problems in the future analytic years.

Recognizing that nonattainment receptors are also, by definition, maintenance receptors, the EPA often uses the term ''maintenance-only'' to refer to receptors that are not also nonattainment receptors. Consistent with the concepts for maintenance receptors, as described earlier, the EPA identifies ''maintenance-only'' receptors as those monitoring sites that have projected average design values above the level of the applicable NAAQS, but that are not currently measuring nonattainment based on the most recent official design values. In addition, those monitoring sites with projected average design values below the NAAQS, but with projected maximum design values above the NAAQS are also identified as ''maintenance only'' receptors, even if they are currently measuring nonattainment based on the most recent official certified design values.[77]

*Comment:* The EPA received comments claiming that the projected design values for 2023 were biased low compared to recent measured data. Commenters noted that a number of monitoring sites that are projected to be below the NAAQS in 2023 based on the EPA's modeling for the proposed action are currently measuring nonattainment based on data from 2020 and 2021. One commenter requested that the EPA determine whether its past modeling tends to overestimate or underestimate actual observed design values. If EPA finds that the agency's model tends to underestimate future year design values, the commenter requests that EPA re-run its ozone modeling, incorporating parameters that account for this tendency.

*EPA Response:* In response to comments, the EPA compared the projected 2023 design values based on the proposal modeling to recent trends in measured data. As a result of this analysis, the EPA agrees that current data indicate that there are monitoring sites at risk of continued nonattainment in 2023 even though the model projected average and maximum design values at these sites are below the NAAQS (*i.e.,* these sites would not be modeling-based receptors at Step 1). While the EPA has confidence in the reliability of the modeling for projecting air quality conditions and contributions in future years, it would not be reasonable to ignore recent measured ozone levels in many areas that are clearly not fully consistent with certain concentrations in the Step 1 analysis for 2023. Therefore, the EPA has developed an additional maintenance-only receptor category, which includes what we refer to as ''violating monitor'' receptors, based on current ozone concentrations measured by regulatory ambient air quality monitoring sites.

Specifically, the EPA has identified monitoring sites with measured 2021 and preliminary 2022 design values *and* 4th high maximum daily 8-hour average (MDA8) ozone in both 2021 and 2022 (preliminary data) that exceed the NAAQS as having the greatest risk of continuing to have a problem attaining the standard in 2023. These criteria sufficiently consider measured air quality data so as to avoid including monitoring sites that have measured nonattainment data in recent years but could reasonably be anticipated to not have a nonattainment or maintenance problem in 2023, in line with our modeling results. Our methodology is intended only to identify those sites that have sufficiently poor ozone levels that there is clearly a reasonable expectation that an ozone nonattainment or maintenance problem will persist in the 2023 ozone season. Moreover, the 2023 ozone season is so near in time that recent measured ozone levels can be used to reasonably project whether an air quality problem is likely to persist. We view this approach to identifying additional receptors in 2023 as the best means of responding to the comments on this issue in this action, while also identifying all transport receptors.

For purposes of this action, we will treat these violating monitors as an additional type of maintenance-only receptor. We acknowledge that traditional modeling plus monitoring methodology we used at proposal and in prior ozone transport rules would otherwise have identified such sites as being in attainment in 2023. Because our modeling did not identify these sites as receptors, we do not believe it is sufficiently certain that these sites will be in nonattainment that they should be considered nonattainment receptors. In the face of this uncertainty in the record, we regard our ability to consider such sites as receptors for purposes of good neighbor analysis under CAA section 110(a)(2)(D)(i)(I) to be a function of the requirement to prohibit emissions that interfere with maintenance of the NAAQS; even if an area may be projected to be in attainment, we have reliable information indicating that there is a clear risk that attainment will not in fact be achieved in 2023. Thus, our authority for treating these sites as receptors at Step 1 in 2023 flows from the responsibility in CAA section 110(a)(2)(i)(I) to prohibit emissions that interfere with maintenance of the NAAQS. *See, e.g., North Carolina,* 531 F.3d at 910–11 (failing to give effect to the interfere with maintenance clause ''provides no protection for downwind areas that, *despite EPA's predictions,* still find themselves struggling to meet NAAQS due to upwind interference . . . .'') (emphasis added). Recognizing that no modeling can perfectly forecast the future, and ''a degree of imprecision is inevitable in tackling the problem of interstate air pollution,'' this approach in the Agency's judgement best balances the need to avoid both ''under-control'' and ''overcontrol,'' *EME Homer City,* 572 U.S. at 523. The EPA's analysis of these additional receptors further is explained in Section III.C.

However, because we did not propose to apply this expansion of the basis for regulation under the good neighbor provision receptor-identification methodology as the sole basis for finding an upwind state linked, in this action we are only using this receptor category on a confirmatory basis. That is, for states that we find linked based on our traditional modeling-based methodology in 2023, we find in this final analysis that the linkage at Step 2 is strengthened and confirmed if that state is also linked to one or more ''violating-monitor'' receptors. If a state is only linked to a violating-monitor receptor in this final analysis, we are deferring taking final action on that state's SIP submittal. This is the case for the State of Tennessee. Among the states that previously had their transport SIPs approved for the 2015 ozone NAAQS, the EPA has also identified a linkage to violating-monitor receptors for the State of Kansas. The EPA intends to further review its air quality modeling results and recent measured ozone levels, and we intend to address these states' good

---

[76] *EME Homer City II,* 795 F.3d at 136.

[77] *See https://www.epa.gov/air-trends/air-quality-design-values* for design value reports. At the time of this action, the most recent reports of certified design values available are for the calendar year 2021. The 2022 values are considered ''preliminary'' and therefore subject to change before certification.

neighbor obligations as expeditiously as practicable in a future action.

2. Methodology for Projecting Future Year Ozone Design Values

Consistent with the EPA's modeling guidance, the 2016 base year and future year air quality modeling results were used in a relative sense to project design values for 2023.[78] That is, the ratios of future year model predictions to base year model predictions are used to adjust ambient ozone design values up or down depending on the relative (percent) change in model predictions for each location. The EPA's modeling guidance recommends using measured ozone concentrations for the 5-year period centered on the base year as the air quality data starting point for future year projections. This average design value is used to dampen the effects of inter-annual variability in meteorology on ozone concentrations and to provide a reasonable projection of future air quality at the receptor under average conditions. In addition, the Agency calculated maximum design values from within the 5-year base period to represent conditions when meteorology is more favorable than average for ozone formation. Because the base year for the air quality modeling used in this final action is 2016, measured data for 2014–2018 (i.e., design values for 2016, 2017, and 2018) were used to project average and maximum design values in 2023.

The ozone predictions from the 2016 and future year air quality model simulations were used to project 2016–2018 average and maximum ozone design values to 2023 using an approach similar to the approach in the EPA's guidance for attainment demonstration modeling. This guidance recommends using model predictions from the 3 x 3 array of grid cells surrounding the location of the monitoring site to calculate a Relative Response Factor (RRF) for that site. However, the guidance also notes that an alternative array of grid cells may be used in certain situations where local topographic or geographical feature (e.g., a large water body or a significant elevation change) may influence model response.

The 2016–2018 base period average and maximum design values were multiplied by the RRF to project each of these design values to 2023. In this manner, the projected design values are grounded in monitored data, and not the absolute model-predicted future year

concentrations. Following the approach in the CSAPR Update and the Revised CSAPR Update, the EPA also projected future year design values based on a modified version of the "3 x 3" approach for those monitoring sites located in coastal areas. In this alternative approach, the EPA eliminated from the RRF calculations the modeling data in those grid cells that are dominated by water (i.e., more than 50 percent of the area in the grid cell is water) and that do not contain a monitoring site (i.e., if a grid cell is more than 50 percent water but contains an air quality monitor, that cell would remain in the calculation). The choice of more than 50 percent of the grid cell area as water as the criteria for identifying overwater grid cells is based on the treatment of land use in the Weather Research and Forecasting model (WRF). Specifically, in the WRF meteorological model those grid cells that are greater than 50% overwater are treated as being 100 percent overwater. In such cases the meteorological conditions in the entire grid cell reflect the vertical mixing and winds over water, even if part of the grid cell also happens to be over land with land-based emissions, as can often be the case for coastal areas. Overlaying land-based emissions with overwater meteorology may be representative of conditions at coastal monitors during times of on-shore flow associated with synoptic conditions or sea-breeze or lake-breeze wind flows. But there may be other times, particularly with off-shore wind flow, when vertical mixing of land-based emissions may be too limited due to the presence of overwater meteorology. Thus, for our modeling the EPA projected average and maximum design values at individual monitoring sites based on both the "3 x 3" approach as well as the alternative approach that eliminates overwater cells in the RRF calculation for near-coastal areas (i.e., "no water" approach). The projected 2023 design values using both the "3 x 3" and "no-water" approaches are provided in the docket for this final action. Both approaches result in the same set of receptors in 2023. That is, monitoring sites that are identified as receptors in 2023 based on the "3 x 3" approach are also receptors based on the "no water" approach.

Consistent with the truncation and rounding procedures for the 8-hour ozone NAAQS, the projected design values are evaluated after truncation to integers in units of ppb. Therefore, projected design values that are greater than or equal to 71 ppb are considered to be violating the 2015 ozone NAAQS.

For those sites that are projected to be violating the NAAQS based on the average design values in 2023, the Agency examined the measured design values for 2021, which are the most recent official measured design values at the time of this final action.

As noted earlier, the Agency proposes to identify nonattainment receptors in this rulemaking as those sites that are violating the NAAQS based on current measured air quality through 2021 and have projected average design values of 71 ppb or greater. Maintenance-only receptors include both: (1) Those sites with projected average design values above the NAAQS that are currently measuring clean data (i.e., ozone design values below the level of the 2015 ozone NAAQS in 2021) and (2) those sites with projected average design values below the level of the NAAQS, but with projected maximum design values of 71 ppb or greater. In addition to the maintenance-only receptors, ozone nonattainment receptors are also maintenance receptors because the projected maximum design values for each of these sites is always greater than or equal to the average design value. Further, as explained previously in this section, the EPA identifies certain monitoring sites as "violating monitor" maintenance-only receptors based on 2021 and 2022 measured ozone levels.

The monitoring sites that the Agency projects to be nonattainment and maintenance receptors for the ozone NAAQS in the 2023 base case are used for assessing the contribution of emissions in upwind states to downwind nonattainment and maintenance of the 2015 ozone NAAQS as part of this final action.

3. 2023 Nonattainment and Maintenance-Only Receptors for the Final Action

In this section we provide information on modeling-based design values and measured data for monitoring sites identified as nonattainment or maintenance-only receptors in 2023 for this final action. Table III.B–1 of this action contains the 2016-centered base period average and maximum 8-hour ozone design values, the 2023 projected average and maximum design values and the measured 2021 design values for monitoring sites that are projected to be nonattainment receptors in 2023. Table III.B–2 of this action contains this same information for monitoring sites that are projected to be maintenance-only receptors in 2023, based on air quality modeling. Table III.B–3 of this action contains the 2023 projected average and maximum design values and 2021 design values and 4th high

---

[78] U.S. Environmental Protection Agency, 2018. Modeling Guidance for Demonstrating Attainment of Air Quality Goals for Ozone, PM$_{2.5}$, and Regional Haze, Research Triangle Park, NC. *https://www.epa.gov/scram/state-implementation-plan-sip-attainment-demonstration-guidance.*

MDA8 ozone concentrations and preliminary 2020 design values and 4th high MDA8 ozone concentrations for monitoring sites identified as violating

monitor maintenance-only receptors. The design values for all monitoring sites in the U.S. are provided in the docket for this action. Additional details

on the approach for projecting average and maximum design values are provided in the AQM TSD.

TABLE III.B–1—AVERAGE AND MAXIMUM 2016-CENTERED AND 2023 BASE CASE 8-HOUR OZONE DESIGN VALUES AND 2021 DESIGN VALUES (PPB) AT PROJECTED NONATTAINMENT RECEPTORS[a]

| Monitor ID | State | County | 2016 centered average | 2016 centered maximum | 2023 average | 2023 maximum | 2021 |
|---|---|---|---|---|---|---|---|
| 060650016 ................ | CA | Riverside ................... | 79.0 | 80.0 | 72.2 | 73.1 | 78 |
| 060651016 ................ | CA | Riverside ................... | 99.7 | 101 | 91.0 | 92.2 | 95 |
| 080350004 ................ | CO | Douglas ................... | 77.3 | 78 | 71.3 | 71.9 | 83 |
| 080590006 ................ | CO | Jefferson ................... | 77.3 | 78 | 72.8 | 73.5 | 81 |
| 080590011 ................ | CO | Jefferson ................... | 79.3 | 80 | 73.5 | 74.1 | 83 |
| 090010017 ................ | CT | Fairfield ................... | 79.3 | 80 | 71.6 | 72.2 | 79 |
| 090013007 ................ | CT | Fairfield ................... | 82.0 | 83 | 72.9 | 73.8 | 81 |
| 090019003 ................ | CT | Fairfield ................... | 82.7 | 83 | 73.3 | 73.6 | 80 |
| 481671034 ................ | TX | Galveston ................... | 75.7 | 77 | 71.5 | 72.8 | 72 |
| 482010024 ................ | TX | Harris ................... | 79.3 | 81 | 75.1 | 76.7 | 74 |
| 490110004 ................ | UT | Davis ................... | 75.7 | 78 | 72.0 | 74.2 | 78 |
| 490353006 ................ | UT | Salt Lake ................... | 76.3 | 78 | 72.6 | 74.2 | 76 |
| 490353013 ................ | UT | Salt Lake ................... | 76.5 | 77 | 73.3 | 73.8 | 76 |
| 551170006 ................ | WI | Sheboygan ................... | 80.0 | 81 | 72.7 | 73.6 | 72 |

[a] 2016-centered base period average design values and projected average and maximum design values are reported with 1 digit to the right of the decimal, as recommended in the EPA's modeling guidance. The 2016 maximum design values and 2021 design values are truncated to integer values consistent with ozone design value reporting convention in appendix U of 40 CFR part 50.

TABLE III.B–2—AVERAGE AND MAXIMUM 2016-CENTERED AND 2023 BASE CASE 8-HOUR OZONE DESIGN VALUES AND 2021 DESIGN VALUES (PPB) AT PROJECTED MAINTENANCE-ONLY RECEPTORS

| Monitor ID | State | County | 2016 centered average | 2016 centered maximum | 2023 average | 2023 maximum | 2021 |
|---|---|---|---|---|---|---|---|
| 040278011 ................ | AZ | Yuma ................... | 72.3 | 74 | 70.4 | 72.1 | 67 |
| 080690011 ................ | CO | Larimer ................... | 75.7 | 77 | 70.9 | 72.1 | 77 |
| 090099002 ................ | CT | New Haven ................ | 79.7 | 82 | 70.5 | 72.6 | 82 |
| 170310001 ................ | IL | Cook ................... | 73.0 | 77 | 68.2 | 71.9 | 71 |
| 170314201 ................ | IL | Cook ................... | 73.3 | 77 | 68.0 | 71.5 | 74 |
| 170317002 ................ | IL | Cook ................... | 74.0 | 77 | 68.5 | 71.3 | 73 |
| 350130021 ................ | NM | Dona Ana ................ | 72.7 | 74 | 70.8 | 72.1 | 80 |
| 350130022 ................ | NM | Dona Ana ................ | 71.3 | 74 | 69.7 | 72.4 | 75 |
| 350151005 ................ | NM | Eddy ................... | 69.7 | 74 | 69.7 | 74.1 | 77 |
| 350250008 ................ | NM | Lea ................... | 67.7 | 70 | 69.8 | 72.2 | 66 |
| 480391004 ................ | TX | Brazoria ................... | 74.7 | 77 | 70.4 | 72.5 | 75 |
| 481210034 ................ | TX | Denton ................... | 78.0 | 80 | 69.8 | 71.6 | 74 |
| 481410037 ................ | TX | El Paso ................... | 71.3 | 73 | 69.8 | 71.4 | 75 |
| 482010055 ................ | TX | Harris ................... | 76.0 | 77 | 70.9 | 71.9 | 77 |
| 482011034 ................ | TX | Harris ................... | 73.7 | 75 | 70.1 | 71.3 | 71 |
| 482011035 ................ | TX | Harris ................... | 71.3 | 75 | 67.8 | 71.3 | 71 |
| 530330023 ................ | WA | King ................... | 73.3 | 77 | 67.6 | 71.0 | 64 |
| 550590019 ................ | WI | Kenosha ................... | 78.0 | 79 | 70.8 | 71.7 | 74 |
| 551010020 ................ | WI | Racine ................... | 76.0 | 78 | 69.7 | 71.5 | 73 |

In total, in 2023 there are a total of projected 33 modeling-based receptors nationwide including 14 nonattainment receptors in 9 different counties and 19 maintenance-only receptors in 13 additional counties (Harris County, TX, has both nonattainment and maintenance-only receptors).

As shown in Table III.B–3 of this action, there are 49 monitoring sites that

are identified as "violating-monitor" maintenance-only receptors in 2023. As noted earlier in this section, the EPA uses the approach of considering "violating-monitor" maintenance-only receptors as confirmatory of the proposal's identification of receptors and does not implicate additional linked states in this final action, Rather, using this approach serves to strengthen

the analytical basis for our Step 2 findings by establishing that many upwind states covered in this action are also projected to contribute above 1 percent of the NAAQS to these additional "violating monitor" maintenance-only receptors.

TABLE III.B–3—AVERAGE AND MAXIMUM 2023 BASE CASE 8-HOUR OZONE, AND 2021 AND PRELIMINARY 2022 DESIGN VALUES (PPB) AND 4TH HIGH CONCENTRATIONS AT VIOLATING MONITORS[a]

| Monitor ID | State | County | 2023 average | 2023 maximum | 2021 | 2022 P | 2021 4th high | 2022 P 4th high |
|---|---|---|---|---|---|---|---|---|
| 40070010 | AZ | Gila | 67.9 | 69.5 | 77 | 76 | 75 | 74 |
| 40130019 | AZ | Maricopa | 69.8 | 70.0 | 75 | 77 | 78 | 76 |
| 40131003 | AZ | Maricopa | 70.1 | 70.7 | 80 | 80 | 83 | 78 |
| 40131004 | AZ | Maricopa | 70.2 | 70.8 | 80 | 81 | 81 | 77 |
| 40131010 | AZ | Maricopa | 68.3 | 69.2 | 79 | 80 | 80 | 78 |
| 40132001 | AZ | Maricopa | 63.8 | 64.1 | 74 | 78 | 79 | 81 |
| 40132005 | AZ | Maricopa | 69.6 | 70.5 | 78 | 79 | 79 | 77 |
| 40133002 | AZ | Maricopa | 65.8 | 65.8 | 75 | 75 | 81 | 72 |
| 40134004 | AZ | Maricopa | 65.7 | 66.6 | 73 | 73 | 73 | 71 |
| 40134005 | AZ | Maricopa | 62.3 | 62.3 | 73 | 75 | 79 | 73 |
| 40134008 | AZ | Maricopa | 65.6 | 66.5 | 74 | 74 | 74 | 71 |
| 40134010 | AZ | Maricopa | 63.8 | 66.9 | 74 | 76 | 77 | 75 |
| 40137020 | AZ | Maricopa | 67.0 | 67.0 | 76 | 77 | 77 | 75 |
| 40137021 | AZ | Maricopa | 69.8 | 70.1 | 77 | 77 | 78 | 75 |
| 40137022 | AZ | Maricopa | 68.2 | 69.1 | 76 | 78 | 76 | 79 |
| 40137024 | AZ | Maricopa | 67.0 | 67.9 | 74 | 76 | 74 | 77 |
| 40139702 | AZ | Maricopa | 66.9 | 68.1 | 75 | 77 | 72 | 77 |
| 40139704 | AZ | Maricopa | 65.3 | 66.2 | 74 | 77 | 76 | 76 |
| 40139997 | AZ | Maricopa | 70.5 | 70.5 | 76 | 79 | 82 | 76 |
| 40218001 | AZ | Pinal | 67.8 | 69.0 | 75 | 76 | 73 | 77 |
| 80013001 | CO | Adams | 63.0 | 63.0 | 72 | 77 | 79 | 75 |
| 80050002 | CO | Arapahoe | 68.0 | 68.0 | 80 | 80 | 84 | 73 |
| 80310002 | CO | Denver | 63.6 | 64.8 | 72 | 74 | 77 | 71 |
| 80310026 | CO | Denver | 64.5 | 64.8 | 75 | 77 | 83 | 72 |
| 90079007 | CT | Middlesex | 68.7 | 69.0 | 74 | 73 | 78 | 73 |
| 90110124 | CT | New London | 65.5 | 67.0 | 73 | 72 | 75 | 71 |
| 170310032 | IL | Cook | 67.3 | 69.8 | 75 | 75 | 77 | 72 |
| 170311601 | IL | Cook | 63.8 | 64.5 | 72 | 73 | 72 | 71 |
| 181270024 | IN | Porter | 63.4 | 64.6 | 72 | 73 | 72 | 73 |
| 260050003 | MI | Allegan | 66.2 | 67.4 | 75 | 75 | 78 | 73 |
| 261210039 | MI | Muskegon | 67.5 | 68.4 | 74 | 79 | 75 | 82 |
| 320030043 | NV | Clark | 68.4 | 69.4 | 73 | 75 | 74 | 74 |
| 350011012 | NM | Bernalillo | 63.8 | 66.0 | 72 | 73 | 76 | 74 |
| 350130008 | NM | Dona Ana | 65.6 | 66.3 | 72 | 76 | 79 | 78 |
| 361030002 | NY | Suffolk | 66.2 | 68.0 | 73 | 74 | 79 | 74 |
| 390850003 | OH | Lake | 64.3 | 64.6 | 72 | 74 | 72 | 76 |
| 480290052 | TX | Bexar | 67.1 | 67.8 | 73 | 74 | 78 | 72 |
| 480850005 | TX | Collin | 65.4 | 66.0 | 75 | 74 | 81 | 73 |
| 481130075 | TX | Dallas | 65.3 | 66.5 | 71 | 71 | 73 | 72 |
| 481211032 | TX | Denton | 65.9 | 67.7 | 76 | 77 | 85 | 77 |
| 482010051 | TX | Harris | 65.3 | 66.3 | 74 | 73 | 83 | 72 |
| 482010416 | TX | Harris | 68.8 | 70.4 | 73 | 73 | 78 | 71 |
| 484390075 | TX | Tarrant | 63.8 | 64.7 | 75 | 76 | 76 | 77 |
| 484391002 | TX | Tarrant | 64.1 | 65.7 | 72 | 77 | 76 | 80 |
| 484392003 | TX | Tarrant | 65.2 | 65.9 | 72 | 72 | 74 | 72 |
| 484393009 | TX | Tarrant | 67.5 | 68.1 | 74 | 75 | 75 | 75 |
| 490571003 | UT | Weber | 69.3 | 70.3 | 71 | 74 | 77 | 71 |
| 550590025 | WI | Kenosha | 67.6 | 70.7 | 72 | 73 | 72 | 71 |
| 550890008 | WI | Ozaukee | 65.2 | 65.8 | 71 | 72 | 72 | 72 |

[a] 2022 preliminary design values are based on 2022 measured MDA8 concentrations provided by state air agencies to the EPA's Air Quality System (AQS), as of January 3, 2023.

*C. Air Quality Modeling To Quantify Upwind State Contributions*

This section documents the procedures the EPA used to quantify the impact of emissions from specific upwind states on ozone design values in 2023 for the identified downwind nonattainment and maintenance receptors. The EPA used CAMx photochemical source apportionment modeling to quantify the impact of emissions in specific upwind states on downwind nonattainment and maintenance receptors for 8-hour ozone.

CAMx employs enhanced source apportionment techniques that track the formation and transport of ozone from specific emissions sources and calculates the contribution of sources and precursors to ozone for individual receptor locations. The benefit of the photochemical model source apportionment technique is that all modeled ozone at a given receptor location in the modeling domain is tracked back to specific sources of emissions and boundary conditions to fully characterize culpable sources.

The EPA performed nationwide, state-level ozone source apportionment modeling using the CAMx Ozone Source Apportionment Technology/ Anthropogenic Precursor Culpability Analysis (OSAT/APCA) technique[79] to quantify the contribution of 2023 $NO_X$ and VOC emissions from all sources in each state to the corresponding projected ozone design values in 2023 at

[79] As part of this technique, ozone formed from reactions between biogenic VOC and $NO_X$ with anthropogenic $NO_X$ and VOC are assigned to the anthropogenic emissions.

air quality monitoring sites. The CAMx OSAT/APCA model run was performed for the period May 1 through September 30 using the projected future base case emissions and 2016 meteorology for this time period. In the source apportionment modeling the Agency tracked (i.e., tagged) the amount of ozone formed from anthropogenic emissions in each state individually as well as the contributions from other sources (e.g., natural emissions).

In the state-by-state source apportionment model run, the EPA tracked the ozone formed from each of the following tags:

• States—anthropogenic NO$_X$ emissions and VOC emissions from individual state (emissions from all anthropogenic sectors in a given state were combined);

• Biogenics—biogenic NO$_X$ and VOC emissions domain-wide (i.e., not by state);

• Boundary Concentrations—concentrations transported into the air quality modeling domain;

• Tribes—the emissions from those tribal lands for which the Agency has point source data emissions modeling platform (EPA did not model the contributions from individual tribes);

• Canada and Mexico—anthropogenic emissions from those sources in the portions of Canada and Mexico included within the modeling domain (the EPA did not model the contributions from Canada and Mexico separately);

• Fires—combined emissions from wild and prescribed fires domain-wide (i.e., not by state); and

• Offshore—combined emissions from offshore marine vessels and offshore drilling platforms within the modeling domain.

The contribution modeling provided contributions to ozone from anthropogenic NO$_X$ and VOC emissions in each state, individually. The contributions to ozone from chemical reactions between biogenic NO$_X$ and VOC emissions were modeled and assigned to the "biogenic" category. The contributions from wildfire and prescribed fire NO$_X$ and VOC emissions were modeled and assigned to the "fires" category. That is, the contributions from the "biogenic" and "fires" categories are not assigned to individual states nor are they included in the state contributions.

For the Step 2 analysis, the EPA calculated a contribution metric that considers the average contribution on the 10 highest ozone concentration days (i.e., top 10 days) in 2023 using the same approach as the EPA used in the proposed action and in the Revised CSAPR Update.[80] This average contribution metric is intended to provide a reasonable representation of the contribution from individual states to projected future year design values, based on modeled transport patterns and other meteorological conditions generally associated with modeled high ozone concentrations at the receptor. An average contribution metric constructed in this manner ensures the magnitude of the contributions is directly related to the magnitude of the ozone design value at each site.

The analytic steps for calculating the contribution metric for the 2023 analytic year are as follows:

(1) Calculate the 8-hour average contribution from each source tag to individual ozone monitoring site for the time period of the 8-hour daily maximum modeled concentrations in 2023;

(2) Average the contributions and average the concentrations for the top 10 modeled ozone concentration days in 2023;

(3) Divide the average contribution by the corresponding average concentration to obtain a Relative Contribution Factor (RCF) for each monitoring site;

(4) Multiply the 2023 average design value by the 2023 RCF at each site to produce the average contribution metric values in 2023;[81]

(5) Truncate the average contribution metric values to two digits to the right of the decimal for comparison to the 1 percent of the NAAQS screening threshold (0.70 ppb)

The resulting contributions from each tag to each monitoring site in the U.S. for 2023 can be found in the docket for this final action. Additional details on the source apportionment modeling and the procedures for calculating contributions can be found in the AQM TSD. The EPA's response to comments on the method for calculating the contribution metric can be found in the RTC document for this final action.

The largest contribution from each state that is the subject of this final action to modeled 8-hour ozone nonattainment and modeling-based maintenance receptors in downwind states in 2023 are provided in Table III.C–1 of this action. The largest contribution from each state to the additional "violating monitor" maintenance-only receptors is provided in Table III.C–2 of this action. All states that are linked to one or more nonattainment or maintenance-only receptors are also linked to one or more violating monitor maintenance receptors, except for Minnesota.

TABLE III.C–1—LARGEST CONTRIBUTION BY STATE TO DOWNWIND 8-HOUR OZONE NONATTAINMENT AND MAINTENANCE RECEPTORS IN 2023 (ppb)

| Upwind state | Largest contribution to a downwind nonattainment receptor | Largest contribution to a downwind maintenance-only receptor |
| --- | --- | --- |
| Alabama | 0.75 | 0.65 |
| Arkansas | 0.94 | 1.21 |
| California | 35.27 | 6.31 |
| Illinois | 13.89 | 19.09 |
| Indiana | 8.90 | 10.03 |
| Kentucky | 0.84 | 0.79 |
| Louisiana | 9.51 | 5.62 |

[80] The use of daily contributions on the top 10 concentration days for calculating the average contribution metric is designed to be consistent with the method specified in the modeling guidance in terms of the number of days to use when projecting future year design values.

[81] Note that a contribution metric value was not calculated for any receptor at which there were fewer than 5 days with model-predicted MDA8 ozone concentrations greater than or equal to 60 ppb in 2023. Eliminating from the Step 2 evaluation any receptors for which the modeling does not meet this criterion ensures that upwind state

contributions are based on the days with the highest ozone projections. This criterion is consistent with the criterion for projecting design values, as recommended in the EPA's modeling guidance. In the modeling for this final action, the monitoring site in Seattle, Washington (530330023), was the only receptor that did not meet this criterion.

TABLE III.C–1—LARGEST CONTRIBUTION BY STATE TO DOWNWIND 8-HOUR OZONE NONATTAINMENT AND MAINTENANCE RECEPTORS IN 2023 (ppb)—Continued

| Upwind state | Largest contribution to a downwind nonattainment receptor | Largest contribution to a downwind maintenance-only receptor |
|---|---|---|
| Maryland | 1.13 | 1.28 |
| Michigan | 1.59 | 1.56 |
| Minnesota | 0.36 | 0.85 |
| Mississippi | 1.32 | 0.91 |
| Missouri | 1.87 | 1.39 |
| Nevada | 1.11 | 1.13 |
| New Jersey | 8.38 | 5.79 |
| New York | 16.10 | 11.29 |
| Ohio | 2.05 | 1.98 |
| Oklahoma | 0.79 | 1.01 |
| Texas | 1.03 | 4.74 |
| Utah | 1.29 | 0.98 |
| West Virginia | 1.37 | 1.49 |
| Wisconsin | 0.21 | 2.86 |

TABLE III.C–2—LARGEST CONTRIBUTION TO DOWNWIND 8-HOUR OZONE "VIOLATING MONITOR" MAINTENANCE-ONLY RECEPTORS (ppb)

| Upwind State | Largest contribution to a downwind violating monitor maintenance-only receptor |
|---|---|
| Alabama | 0.79 |
| Arkansas | 1.16 |
| California | 6.97 |
| Illinois | 16.53 |
| Indiana | 9.39 |
| Kentucky | 1.57 |
| Louisiana | 5.06 |
| Maryland | 1.14 |
| Michigan | 3.47 |
| Minnesota | 0.64 |
| Mississippi | 1.02 |
| Missouri | 2.95 |
| Nevada | 1.11 |
| New Jersey | 8.00 |
| New York | 12.08 |
| Ohio | 2.25 |
| Oklahoma | 1.57 |
| Texas | 3.83 |
| Utah | 1.46 |
| West Virginia | 1.79 |
| Wisconsin | 5.10 |

## IV. Summary of Bases for Disapproval

As explained in Section II, the EPA relies on the 4-step interstate transport framework to evaluate obligations under CAA section 110(a)(2)(D)(i)(I). At proposal, the EPA used this framework to guide its evaluation of each state's SIP submission. While the EPA used this framework to maintain a nationally consistent and equitable approach to interstate transport, the contents of each individual state's submission were evaluated on their own merits, and the EPA considered the facts and information, including information from the Agency, available to the state at the time of its submission, in addition to

more recent air quality and contribution information. Here we provide a brief, high level overview of the SIP submissions and the EPA's evaluation and key bases for disapproval. These summaries are presented for ease of reference and to direct the public to the most relevant portions of the proposals and final rule record for further information. The full basis for the EPA's disapprovals is available in relevant **Federal Register** notifications of proposed disapproval for each state, in the technical support documents informing the proposed and final action, and in the responses to comments in Section V and the RTC document. In general, except as otherwise noted, the comments and updated air quality information did not convince the Agency that a change from proposal was warranted for any state. The exceptions are that the EPA is deferring action at this time on the proposed disapprovals for Tennessee and Wyoming. Further, the EPA is finalizing partial approvals of prong 1 ("significant contribution to nonattainment") for Minnesota and Wisconsin because they are linked only to maintenance-only receptors; the EPA is finalizing a partial disapproval with respect to prong 2 ("interference with maintenance") obligations for these two states.

### A. Alabama

In the 2016v3 modeling, Alabama is projected to be linked above 1 percent of the NAAQS to one nonattainment receptor. It is also linked to one violating-monitor maintenance-only receptor. Its highest-level contribution is 0.75 ppb to Galveston County, Texas (AQS Site ID 481671034).[82] A full

---

[82] The highest-magnitude downwind contribution from each state is based on the contributions to

summary of Alabama's June 21, 2022, SIP submission, as well as Alabama's previous submission history, was provided in the proposed SIP submission disapproval.[83] In its submission, Alabama advocated for discounting maintenance receptors through use of historical data trends. The EPA finds Alabama's approach is not adequately justified.[84] The EPA disagrees with Alabama's assessment of the 2016v2 modeling,[85] and further responds to comments on model performance in Section III. The EPA disagrees with Alabama's arguments for application of a higher contribution threshold than 1 percent of the NAAQS at Step 2,[86] and further addresses the relevance of "significant impact levels" within the Prevention of Significant Deterioration program ("PSD SILs") in Section V.B.6. The EPA found technical flaws in Alabama's back trajectory analysis.[87] The State did not conduct an adequate Step 3 analysis, and the EPA identified several unsupported assertions in the SIP submission.[88] Alabama also argued in its SIP submission that it had already implemented all cost-effective controls. However, the State included an insufficient evaluation of additional emissions control opportunities to support such a conclusion.[89] The EPA further addresses arguments related to

modeling-based receptors and does not consider the contributions to violating-monitor maintenance-only receptors. Each state's maximum contribution to downwind violating-monitor maintenance-only receptors is available in the Final Action AQM TSD.

[83] 87 FR 64419–64421.

[84] Id. at 64421–64422.

[85] Id. at 64422–64423.

[86] Id. at 64423–64424.

[87] Id. at 64424–64425.

[88] Id. at 64425–64426.

[89] Id.

mobile sources in Section V.C.1.[90] Additionally, as explained in Section V.B.9,[91] reliance on prior transport FIPs such as the CSAPR Update is not a sufficient analysis at Step 3. The State included no permanent and enforceable emissions controls in its SIP submission.[92] We provide further response to comments regarding Alabama's SIP submission in the RTC document. The EPA is finalizing disapproval of Alabama's interstate transport SIP submission for the 2015 ozone NAAQS.

*B. Arkansas*

In the 2016v3 modeling, Arkansas is projected to be linked above 1 percent of the NAAQS to one nonattainment receptor and five maintenance-only receptors. It is also linked to seven violating-monitor maintenance-only receptor. Its highest-level contribution is 1.21 ppb to Brazoria County Texas (AQS Site ID 480391004). A full summary of Arkansas's October 10, 2019, SIP submission was provided in the proposed SIP submission disapproval.[93] The EPA disagrees with Arkansas's arguments for application of a higher contribution threshold than 1 percent of the NAAQS at Step 2, and further addresses the relevance of PSD SILs in Section V.B.6.[94] The EPA also found technical flaws in Arkansas's "consistent and persistent" claims and back trajectory analysis,[95] and legal flaws in the state's arguments related to relative contribution.[96] The State did not conduct an adequate Step 3 analysis.[97] Arkansas argued in its SIP submission that it had already implemented all cost-effective controls. However, the State included an insufficient evaluation of additional emissions control opportunities to support such a conclusion.[98] Further, the State's reliance on the cost-effectiveness thresholds in the CSAPR and CSAPR Update is insufficient for the more protective 2015 ozone NAAQS.[99] The State included no permanent and enforceable controls in its SIP submission.[100] We provide further response to comments regarding Arkansas's SIP submission in the RTC document. The EPA is finalizing disapproval of Arkansas's interstate

transport SIP submission for the 2015 ozone NAAQS.

*C. California*

In the 2016v3 modeling, California is projected to be linked above 1 percent of the NAAQS to eight nonattainment receptors and four maintenance-only receptors. It is also linked to 26 violating-monitor maintenance-only receptor. Its highest-level contribution is 35.27 ppb to the nonattainment receptor located on the Morongo Band of Missions Indians reservation (AQS Site ID 060651016).[101] A full summary of California's October 1, 2018, SIP submission was provided in the proposed SIP submission disapproval.[102] The EPA found technical and legal flaws in California's geographic, meteorological, wildfire, and trajectories analysis, and the State's arguments related to local, international, and non-anthropogenic emissions.[103] The EPA further addresses the topic of international emissions in Section V.C.2. The State did not conduct an adequate Step 3 analysis.[104] California in its SIP submission argued that it had already implemented all cost-effective controls. However, California provided an insufficient evaluation of additional control opportunities to support such a conclusion.[105] Further, the State's reliance on the cost-effectiveness threshold in the CSAPR Update is insufficient for the more protective 2015

ozone NAAQS.[106] California included no permanent and enforceable emissions controls in its SIP submission[107] and argued that interstate transport is fundamentally different in the western U.S. than in the eastern U.S., to which the EPA responds in Section V.C.3.[108] We provide further response to comments regarding California's SIP submission in the RTC document. The EPA is finalizing disapproval of California's interstate transport SIP submission for the 2015 ozone NAAQS.

*D. Illinois*

In the 2016v3 modeling, Illinois is projected to be linked above 1 percent of the NAAQS to two nonattainment receptors and three maintenance-only receptors. It is also linked to six violating-monitor maintenance-only receptor. Its highest-level contribution is 19.09 ppb to Kenosha County, Wisconsin (AQS Site ID 550590019). A full summary of Illinois's May 21, 2019, SIP submission was provided in the proposed SIP submission disapproval.[109] The EPA disagrees with Illinois's arguments for application of a higher contribution threshold than 1 percent of the NAAQS at Step 2.[110] The state did not conduct an adequate Step 3 analysis.[111] The State included an insufficient evaluation of additional emissions control opportunities in its SIP submission.[112] The EPA also found technical and legal flaws in Illinois' arguments related to "on-the-way" controls, participation in the Lake Michigan Air Directors Consortium (LADCO), and international contributions.[113] The EPA further addresses the topic of international contribution in Section V.C.2. Further, as explained in Section V.B.9., states may not rely on non-SIP measures to meet SIP requirements, and reliance on prior transport FIPs such as the CSAPR Update is not a sufficient analysis at Step 3.[114] The State included no permanent and enforceable controls in its SIP submission.[115] We provide further response to comments regarding Illinois's SIP submission in the RTC document. The EPA is finalizing disapproval of Illinois's interstate

---

[90] *See also* id. at 64425–64426.

[91] *See also* id. at 64426.

[92] Id.

[93] 87 FR 9798, 9803–9806 (February 22, 2022).

[94] Id. at 9806–9807.

[95] Id. at 9808–9809.

[96] Id. at 9809–9810.

[97] Id. at 9809–9810.

[98] Id. at 9810.

[99] Id.

[100] Id. at 9811.

[101] We note that, consistent with the EPA's prior good neighbor actions in California, the regulatory ozone monitor located on the Morongo Band of Mission Indians ("Morongo") reservation is a projected downwind receptor in 2023. *See* monitoring site 060651016 in Table V.D–1. of this action. We also note that the Temecula, California, regulatory ozone monitor is a projected downwind receptor in 2023 and in past regulatory actions has been deemed representative of air quality on the Pechanga Band of Luiseño Indians ("Pechanga") reservation. *See, e.g.,* Approval of Tribal Implementation Plan and Designation of Air Quality Planning Area; Pechanga Band of Luiseño Mission Indians, 80 FR 18120, at 18121–18123 (April 3, 2015); *see also* monitoring site 060650016 in Table V.D–1. of this action. The presence of receptors on, or representative of, the Morongo and Pechanga reservations do not trigger obligations for the Morongo and Pechanga Tribes. Nevertheless, these receptors are relevant to the EPA's assessment of any linked upwind states' good neighbor obligations. *See, e.g.,* Approval and Promulgation of Air Quality State Implementation Plans; California; Interstate Transport Requirements for Ozone, Fine Particulate Matter, and Sulfur Dioxide, 83 FR 65093 (December 19, 2018). Under 40 CFR 49.4(a), tribes are not subject to the specific plan submittal and implementation deadlines for NAAQS-related requirements, including deadlines for submittal of plans addressing transport impacts. We also note that California's maximum contribution to a downwind state receptor is 6.31 ppb in Yuma County, Arizona (AQS Site ID 040278011).

[102] 87 FR 31448–31452.

[103] Id. at 31454–31457, 31460.

[104] Id. at 31458–31461.

[105] Id. at 31458.

[106] Id. at 31458–31459.

[107] Id. at 31461.

[108] *See also* id. at 31453.

[109] Id. at 9845.

[110] Id. at 9852–9853.

[111] Id. at 9853–9855.

[112] Id. at 9853.

[113] Id. at 9853–9854.

[114] *See also* id. at 9854.

[115] Id. at 9855.

transport SIP submission for the 2015 ozone NAAQS.

*E. Indiana*

In the 2016v3 modeling, Indiana is projected to be linked above 1 percent of the NAAQS to four nonattainment receptors and six maintenance-only receptors. It is also linked to 10 violating-monitor maintenance receptors. Its highest-level contribution is 10.03 ppb to Racine County, Wisconsin (AQS Site ID 551010020). A full summary of Indiana's November 2, 2018, SIP submission was provided in the proposed SIP submission disapproval.[116] The EPA disagrees with Indiana's arguments for application of a higher contribution threshold than 1 percent of the NAAQS at Step 2.[117] The State did not conduct an adequate Step 3 analysis.[118] The EPA found technical and legal flaws in Indiana's arguments related to ozone concentration and design value trends, the timing of expected source shutdowns, local emissions, international and offshore contributions, Indiana's portion of contribution, and Indiana's back trajectory analysis.[119] The EPA further addresses the topic of international emissions in Section V.C.2. Indiana argued that it would not be cost-effective to implement controls on non-EGUs. However, the State included an insufficient evaluation of additional emissions control opportunities, for any type of source, to support that conclusion.[120] The EPA also confirmed that EGU shutdowns identified by Indiana were included in the 2016v2 modeling,[121] and if they were valid and not included in the 2016v2 modeling, then they were incorporated into the 2016v3 modeling as explained in Section III and the 2016v3 Emissions Modeling TSD. Further, in Section V.B.9., states may not rely on non-SIP measures to meet SIP requirements.[122] The State included no permanent and enforceable emissions controls in its SIP submission.[123] We provide further response to comments regarding Indiana's SIP submission in the RTC document. The EPA is finalizing disapproval of Indiana's interstate transport SIP submission for the 2015 ozone NAAQS.

*F. Kentucky*

In the 2016v3 modeling, Kentucky is projected to be linked above 1 percent of the NAAQS to two nonattainment receptors and one maintenance-only receptor. It is also linked to four violating-monitor maintenance-only receptor. Its highest-level contribution based on the 2016v3 modeling is 0.84 ppb to Fairfield County, Connecticut (AQS Site ID 090019003). A full summary of Kentucky's January 11, 2019, SIP submission was provided in the proposed SIP submission disapproval.[124] Although the EPA's 2016v3 modeling indicated a highest-level contribution below 1 ppb, the EPA disagrees with Kentucky's arguments for application of a higher contribution threshold than 1 percent of the NAAQS at Step 2.[125] Further, Kentucky is linked above 1 ppb to a violating-monitor receptor. The EPA addresses the relevance of the PSD SILs in Section V.B.6. The Commonwealth did not conduct an adequate Step 3 analysis.[126] The EPA found technical and legal flaws in Kentucky's arguments related to the level and timing of upwind versus downwind-state responsibilities, $NO_X$ emissions trends and other air quality information, and back-trajectory analyses.[127] The EPA also found technical and legal flaws in certain State-level comments submitted by Midwest Ozone Group and attached to Kentucky's submission, including arguments related to international emissions.[128] The EPA further addresses the topics of international emissions in Section V.C.2. Kentucky in its SIP submission also argued that it had already implemented all cost-effective controls. However, the Commonwealth included an insufficient evaluation of additional emissions control opportunities to support such a conclusion.[129] As explained in Section V.B.9., states may not rely on non-SIP measures to meet SIP requirements, and reliance on prior transport FIPs such as the CSAPR Update is not a sufficient analysis at Step 3.[130] The EPA also confirmed in the proposed SIP submission disapproval that EGU shutdowns identified by Kentucky were included in the 2016v2 modeling, and yet Kentucky was still linked in that

modeling.[131] Kentucky in its SIP submission advocated for lower interstate ozone transport responsibility for states linked only to maintenance-only receptors. The EPA finds Kentucky's arguments in this regard inadequately supported.[132] The Commonwealth included no permanent and enforceable emissions controls in its SIP submission.[133] We provide further response to comments regarding Kentucky's SIP submission in the RTC document. The EPA is finalizing disapproval of Kentucky's interstate transport SIP submission for the 2015 ozone NAAQS.

*G. Louisiana*

In the 2016v3 modeling, Louisiana is projected to be linked above 1 percent of the NAAQS to two nonattainment receptors and five maintenance-only receptors. It is also linked to 10 violating-monitor maintenance-only receptor. Its highest-level contribution is 9.51 ppb to Galveston County Texas (AQS Site ID 481671034). A full summary of Louisiana's November 13, 2019, SIP submission was provided in the proposed SIP submission disapproval.[134] The EPA disagrees with Louisiana's arguments for application of a higher contribution threshold than 1 percent of the NAAQS and disagrees with Louisiana's criticisms of a 1 percent of the NAAQS contribution threshold at Step 2.[135] The EPA further addresses technical comments on the 1 percent of the NAAQS contribution threshold in Section V.B.4. Louisiana did not conduct an adequate Step 3 analysis.[136] The State included an insufficient evaluation of additional emissions control opportunities in its SIP submission.[137] The EPA also found technical flaws in Louisiana's "consistent and persistent" claims, assessment of seasonal weather patterns, surface wind directions, and back trajectory analysis.[138] The State included no permanent and enforceable controls in its SIP submission.[139] We provide further response to comments regarding Louisiana's SIP submission in the RTC document. The EPA is finalizing disapproval of Louisiana's interstate transport SIP submission for the 2015 ozone NAAQS.

---

[116] Id. at 9845–9847.
[117] Id. at 9855–9856.
[118] Id. at 9857–9861.
[119] Id. at 9858–9861.
[120] Id. at 9857–9858.
[121] Id. at 9858–9859.
[122] *See also* id. at 9861.
[123] Id.

[124] 87 FR 9498, 9503–9507 (February 22, 2022).
[125] Id. at 9509–9510.
[126] Id. at 9511–9515.
[127] Id. at 9512–9514.
[128] Id. at 9508, 9515. The state also did not explain its own views regarding the relevance of these materials to its submission. Id.
[129] Id. at 9511–9512.
[130] See also id. at 9512.

[131] Id. at 9511–9512.
[132] Id. at 9514–9515.
[133] Id. at 9515.
[134] Id. at 9811–9812.
[135] Id. at 9812, 9815–9816.
[136] Id. at 9814–9816.
[137] Id. at 9814, 9816.
[138] Id. at 9814–9816.
[139] Id. at 9816.

*H. Maryland*

In the 2016v3 modeling, Maryland is projected to be linked above 1 percent of the NAAQS to three nonattainment receptors and one maintenance-only receptor. It is also linked to three violating-monitor maintenance receptors. Its highest-level contribution is 1.28 ppb to New Haven County, Connecticut (AQS Site ID 090099002). A full summary of Maryland's October 16, 2019, SIP submission was provided in the proposed SIP submission disapproval.[140] The state did not conduct an adequate Step 3 analysis.[141] The State included an insufficient evaluation of additional emissions control opportunities in its SIP submission.[142] Further, as explained in Section V.B.9, states may not rely on non-SIP measures to meet SIP requirements, and reliance on prior transport FIPs such as the CSAPR Update is not a sufficient analysis at Step 3.[143] The EPA also confirmed in the proposed SIP submission disapproval that state emissions controls and regulations identified by Maryland were generally included in the 2016v2 modeling, and yet Maryland was still linked in that modeling.[144] The State included no permanent and enforceable controls in its SIP submission.[145] We provide further response to comments regarding Maryland's SIP submission in the RTC document. The EPA is finalizing disapproval of Maryland's interstate transport SIP submission for the 2015 ozone NAAQS.

*I. Michigan*

In the 2016v3 modeling, Michigan is projected to be linked above 1 percent of the NAAQS to four nonattainment receptors and six maintenance-only receptors. It is also linked to eight violating-monitor maintenance receptors. Its highest-level contribution is 1.59 to Sheboygan County, Wisconsin (AQS Site ID 551170006). A full summary of Michigan's March 5, 2019, SIP submission was provided in the proposed SIP submission disapproval.[146] The EPA disagrees with Michigan's arguments for application of a higher contribution threshold than 1 percent of the NAAQS as well as criticisms of a 1 percent of the NAAQS contribution threshold at Step 2.[147] The

EPA further addresses technical comments on the 1 percent of the NAAQS contribution threshold in Section V.B.4 and addresses comments regarding the relevance of the PSD SILs in Section V.B.6. The State did not conduct an adequate Step 3 analysis.[148] Michigan argued in its SIP submission that additional controls would be premature and burdensome. However, the State included an insufficient evaluation of additional emissions control opportunities to support such a conclusion.[149] The EPA found technical and legal flaws in Michigan's arguments related to upwind-state obligations as to maintenance-only receptors, international emissions, relative contribution, apportionment, and upwind versus downwind-state responsibilities.[150] The EPA further addresses the topics of mobile sources and international emissions in Sections V.C.1 and V.C.2, respectively. The EPA also confirmed in the proposed SIP submission disapproval that the EGU retirements identified by Michigan as not included in the 2011-based EPA modeling, as well as various Federal rules, were included in the 2016v2 modeling, and yet Michigan was still linked in that modeling.[151] The State included no permanent and enforceable emissions controls in its SIP submission.[152] We provide further response to comments regarding Michigan's SIP submission in the RTC document. The EPA is finalizing disapproval of Michigan's interstate transport SIP submission for the 2015 ozone NAAQS.

*J. Minnesota*

In the 2016v3 modeling, Minnesota is projected to be linked above 1 percent of the NAAQS to one maintenance-only receptor. It is not linked to a violating-monitor maintenance-only receptor. Its highest-level contribution is 0.85 ppb to Cook County, Illinois (AQS Site ID 170310001). A full summary of Minnesota's October 1, 2018, SIP submission was provided in the proposed SIP submission disapproval.[153] Because Minnesota was not projected to be linked to any receptor in 2023 in the EPA's 2011-based modeling, commenters argued that the EPA must approve the SIP submission and not rely on new modeling. The EPA responds to these comments in Section V.A.4. Although

the EPA acknowledges that Minnesota's Step 3 analysis was insufficient in part because the State assumed it was not linked at Step 2, this is ultimately inadequate to support a conclusion that the State's sources do not interfere with maintenance of the 2015 ozone NAAQS in other states in light of more recent air quality analysis.[154] The State included no permanent and enforceable emissions controls in its SIP submission.[155] We provide further response to comments regarding Minnesota's SIP submission in the RTC document. Although EPA proposed to disapprove both prong 1 and prong 2 of Minnesota's SIP submission, the present record, including the results of the 2016v3 modeling, indicates that Minnesota is not linked to any nonattainment receptors.[156] The EPA is finalizing a partial approval of Minnesota's interstate transport SIP submission for the 2015 ozone NAAQS as to prong 1 and a partial disapproval as to prong 2.

*K. Mississippi*

In the 2016v3 modeling, Mississippi is projected to be linked above 1 percent of the NAAQS to one nonattainment receptor and two maintenance-only receptors. It is also linked to eight violating-monitor maintenance receptors. Its highest-level contribution is 1.32 ppb to Galveston County, Texas (AQS Site ID 481671034). A full summary of Mississippi's September 3, 2019, SIP submission was provided in the proposed SIP submission disapproval.[157] In its submission, Mississippi advocated for discounting receptors through use of historical data trends. The EPA finds Mississippi's approach is not adequately justified.[158] In the 2011-based modeling, Mississippi's contribution to receptors was above 1 percent of the NAAQS, but below 1 ppb. The EPA disagrees with Mississippi's arguments for application of a higher contribution threshold than

140 Id. at 9469.
141 Id. at 9470–9473.
142 Id. at 9471, 9473.
143 *See also* id. at 9471, 9473 n.46, 9474.
144 Id. at 9472–9473.
145 Id. at 9473–9474.
146 Id. at 9847–9848.
147 Id. at 9861–9862.

148 Id. at 9863–9867.
149 Id. at 9864.
150 Id. at 9864–9867.
151 Id. at 9866.
152 Id. at 9867.
153 Id. at 9867.

154 Id. at 9868–9869.
155 Id. at 9869.
156 The EPA received a comment that it would be arbitrary and capricious for the EPA to finalize a full disapproval of Tennessee's good neighbor SIP submission (both prong 1 and prong 2) if EPA concluded the state is linked only to a maintenance-only receptor (prong 2). EPA is deferring final action on Tennessee's good neighbor SIP submission, but in reviewing linkages in the 2016v3 modeling we determined that Minnesota and Wisconsin are not linked above 1 percent of the NAAQS to any nonattainment receptors (prong 1) but are linked to maintenance-only receptors (prong 2); these states are receiving partial approvals and partial disapprovals.
157 87 FR 9554.
158 Id. at 9556.

1 percent of the NAAQS at Step 2,[159] and further addresses the relevance of the PSD SILs in Section V.B.6. The state did not conduct a Step 3 analysis.[160] The State included no evaluation of additional emissions control opportunities in its SIP submission.[161] The State included no permanent and enforceable emissions controls in its SIP submission.[162] We provide further response to comments regarding Mississippi's SIP submission in the RTC document. The EPA is finalizing disapproval of Mississippi's interstate transport SIP submission for the 2015 ozone NAAQS.

*L. Missouri*

In the 2016v3 modeling, Missouri is projected to be linked above 1 percent of the NAAQS to one nonattainment receptor and three maintenance-only receptors. It is also linked to five violating-monitor maintenance receptors. Its highest-level contribution is 1.87 ppb to Sheboygan County, Wisconsin (AQS Site ID 551170006). A full summary of Missouri's June 10, 2019, SIP submission was provided in the proposed SIP submission disapproval.[163] In its submission, Missouri advocated for discounting certain maintenance receptors through use of historical data trends. The EPA finds Missouri's approach is not adequately justified.[164] The EPA disagrees with Missouri's arguments for application of a higher contribution threshold than 1 percent of the NAAQS at Step 2, and further addresses comments regarding the August 2018 memorandum in Section V.B.7.[165] The State did not conduct a Step 3 analysis.[166] The State included no evaluation of additional emissions control opportunities in its SIP submission.[167] The State included no permanent and enforceable emissions controls in its SIP submission.[168] We provide further response to comments regarding Missouri's SIP submission in the RTC document. The EPA is

finalizing disapproval of Missouri's June 10, 2019, interstate transport SIP submission for the 2015 ozone NAAQS.

*M. Nevada*

In the 2016v3 modeling, Nevada is projected to be linked above 1 percent of the NAAQS to three nonattainment receptors and one maintenance-only receptor. It is also linked to one violating-monitor maintenance receptor. Its highest-level contribution is 1.13 ppb to Weber County, Utah (AQS Site ID 490570002). A full summary of Nevada's October 1, 2018, SIP submission was provided in the proposed SIP submission disapproval.[169] Because Nevada was not projected to be linked to any receptor in 2023 in the EPA's 2011-based modeling, commenters on the proposed SIP submission disapproval argued that the EPA must approve the SIP submission and not rely on new modeling. The EPA responds to these comments in Section V.A.4. The EPA also responds to technical criticisms of the 1 percent of the NAAQS contribution threshold and the relevance of the PSD SILs in Section V.B.4 and in Section V.B.6, respectively. The State did not conduct a Step 3 analysis.[170] The State included no evaluation of additional emissions control opportunities in its SIP submission.[171] The State included no additional emissions controls in its SIP submission.[172] We provide response to comments specific to interstate transport policy in the western U.S. in Section V.C.3. We provide further response to comments regarding Nevada's SIP submission in the RTC document. The EPA is finalizing disapproval of Nevada's interstate transport SIP submission for the 2015 ozone NAAQS.

*N. New Jersey*

In the 2016v3 modeling, New Jersey is projected to be linked above 1 percent of the NAAQS to three nonattainment receptors and one maintenance-only receptor. It is also linked to three violating-monitor maintenance receptors. Its highest-level contribution is 8.38 ppb to Fairfield County, Connecticut (AQS Site ID 090019003). A full summary of New Jersey's May 13, 2019, SIP submission was provided in the proposed SIP submission disapproval.[173] The State did not conduct an adequate Step 3 analysis.[174]

New Jersey argued in its SIP submission that existing controls were sufficient to address the State's good neighbor obligations. However, the State included an insufficient evaluation of additional emissions control opportunities to support such a conclusion.[175] The State's reliance on the cost-effectiveness threshold in the CSAPR Update is insufficient for a more protective NAAQS.[176] The State included no permanent and enforceable emissions controls in its SIP submission.[177] We provide further response to comments regarding New Jersey's SIP submission in the RTC document. The EPA is finalizing disapproval of New Jersey's interstate transport SIP submission for the 2015 ozone NAAQS.

*O. New York*

In the 2016v3 modeling, New York is projected to be linked above 1 percent of the NAAQS to three nonattainment receptors and one maintenance-only receptor. It is also linked to two violating-monitor maintenance receptors. Its highest-level contribution is 16.10 ppb to Fairfield County, Connecticut (AQS Site ID 090010017). A full summary of New York's September 25, 2018, SIP submission was provided in the proposed SIP submission disapproval.[178] The state did not conduct an adequate Step 3 analysis.[179] New York argued in its SIP submission that existing controls were sufficient to address the State's good neighbor obligations. However, the state included an insufficient evaluation of additional emissions control opportunities to support such a conclusion.[180] The State's reliance on the cost-effectiveness threshold in the CSAPR Update is insufficient for the more protective 2015 ozone NAAQS.[181] The State included no permanent and enforceable emissions controls in its SIP submission.[182] We provide further response to comments regarding New York's SIP submission in the RTC document. The EPA is finalizing disapproval of New York's interstate transport SIP submission for the 2015 ozone NAAQS.

*P. Ohio*

In the 2016v3 modeling, Ohio is projected to be linked above 1 percent of the NAAQS to four nonattainment receptors and five maintenance-only

---

[159] Id. at 9557.
[160] Id. at 9558.
[161] Id.
[162] Id.
[163] Id. at 9538–9540.
[164] Id. at 9540–9541.
[165] *See also* id. at 9541–9544.
[166] Id. at 9544.
[167] Id.
[168] We note that in comments, Missouri indicated its intent to submit a new SIP submission to the EPA, which would re-evaluate good neighbor obligations based on its 2016v2 linkages and provide an analysis that would include emissions reductions requirements. The EPA received this submission on November 1, 2022. The EPA explains its consideration of this new submission as separate SIP submission in the RTC document for this final action.

[169] 87 FR 31485, 31492–31493 (May 24, 2022).
[170] Id. at 31493.
[171] Id.
[172] Id.
[173] Id. at 9490–9491.
[174] Id. at 9496.

[175] Id.
[176] Id.
[177] Id. at 9496–9497.
[178] Id. at 9489–9490.
[179] Id. at 9492–9494.
[180] Id. at 9493.
[181] Id. at 9493–9494.
[182] Id. at 9494–9495.

receptors. It is also linked to nine violating-monitor maintenance receptors. Its highest-level contribution is 2.05 ppb to Fairfield County, Connecticut (AQS Site ID 090019003). A full summary of Ohio's September 28, 2018, SIP submission was provided in the proposed SIP submission disapproval.[183] In its submission, Ohio advocated for use of the Texas Commission on Environmental Quality (TCEQ)'s definition of maintenance receptors. The EPA finds that TCEQ's definition is legally and technically flawed,[184] and as a result Ohio's approach is also not adequately justified.[185] The EPA further evaluates TCEQ's technical arguments in a TSD prepared by regional modeling staff.[186] The EPA disagrees with Ohio's arguments for application of a higher contribution threshold than 1 percent of the NAAQS at Step 2.[187] The EPA responds to technical criticisms of the 1 percent of the NAAQS contribution threshold in Section V.B.4. The State did not conduct an adequate Step 3 analysis.[188] The State included an insufficient evaluation of additional emissions control opportunities in its SIP submission.[189] The EPA found technical deficiencies in Ohio's unsubstantiated claims that emissions are overestimated.[190] The EPA also confirmed in the proposed SIP submission disapproval that several EGU and non-EGUs identified by Ohio were included in the 2016v2 modeling, and yet Ohio was still linked in that modeling.[191] The EPA summarizes the emissions inventories used in the 2016v3 modeling in Section III.A. Further, as explained in Section V.B.9, states may not rely on non-SIP measures to meet SIP requirements, and reliance on prior transport FIPs such as the CSAPR Update is not a sufficient analysis at Step 3.[192] The EPA finds legal flaws and deficiencies in Ohio's arguments related to upwind versus downwind-state responsibilities, the role of international emissions, relative contribution, and overcontrol.[193] The EPA discusses international emissions in Section V.C.2. The EPA disagrees with Ohio's arguments related to mobile

sources.[194] We further address this topic in Section V.C.1. Ohio also argued in its SIP submission that it had already implemented all cost-effective controls. However, the state included no evaluation of additional emissions control opportunities to support such a claim.[195] Further, the State's reliance on the cost-effectiveness threshold in the CSAPR Update is insufficient for the more protective 2015 ozone NAAQS.[196] The State included no permanent and enforceable emissions controls in its SIP submission.[197] We provide further response to comments regarding Ohio's SIP submission in the RTC document. The EPA is finalizing disapproval of Ohio's interstate transport SIP submission for the 2015 ozone NAAQS.

*Q. Oklahoma*

In the 2016v3 modeling, Oklahoma is projected to be linked above 1 percent of the NAAQS to one nonattainment receptor and one maintenance-only receptor. It is also linked to eight violating-monitor maintenance receptors. Its highest-level contribution is 1.01 ppb to Denton County, Texas (AQS Site ID 481210034). A full summary of Oklahoma's October 25, 2018, SIP submission was provided in the proposed SIP submission disapproval.[198] In its submission, Oklahoma advocated for use of TCEQ's definition of maintenance receptors and modeling to discount receptors in Texas. The EPA finds that TCEQ's definition is legally and technically flawed[199] and, as a result, Oklahoma's approach is also not adequately justified.[200] The EPA further evaluates TCEQ's technical arguments in the EPA Region 6 2015 8-Hour Ozone Transport SIP Proposal TSD (Evaluation of TCEQ Modeling TSD) prepared by regional modeling staff.[201] Comments argued against the use of updated modeling where linkages in the EPA's 2011-based modeling and later iterations of EPA modeling differ. The EPA addressed the change in identified linkages between the 2011-based modeling and the 2016v2 modeling in the proposed SIP disapproval,[202] and further responds to comments on the use of updated modeling in Section V.A.4. The EPA disagrees with Oklahoma's arguments for application of a higher contribution

threshold than 1 percent of the NAAQS at Step 2 [203] and further addresses comments regarding the relevance of the PSD SILs in Section V.B.6. The State did not conduct an adequate Step 3 analysis.[204] Oklahoma argued in its SIP submission that it had already implemented all cost-effective controls. However, the State included an insufficient evaluation of additional emissions control opportunities to support such a conclusion.[205] As explained in Section V.B.9, states may not rely on non-SIP measures to meet SIP requirements, and reliance on prior transport FIPs such as the CSAPR Update is not a sufficient analysis at Step 3.[206] Further, the State's reliance on the cost-effectiveness threshold in the CSAPR Update is insufficient for the more protective 2015 ozone NAAQS.[207] The EPA finds legal flaws in Oklahoma's argument related to collective contribution.[208] The State included no permanent and enforceable emissions controls in its SIP submission.[209] We provide further response to comments regarding Oklahoma's SIP submission in the RTC document. The EPA is finalizing disapproval of Oklahoma's interstate transport SIP submission for the 2015 ozone NAAQS.

*R. Texas*

In the 2016v3 modeling, Texas is projected to be linked above 1 percent of the NAAQS to one nonattainment receptor and nine maintenance-only receptors. It is also linked to ten violating-monitor maintenance-only receptor. Its highest-level contribution is 4.74 ppb to Dona Ana County, New Mexico (AQS Site ID 350130021). A full summary of Texas's August 17, 2018, SIP submission was provided in the proposed SIP submission disapproval,[210] and additional details were provided in the Evaluation of TCEQ Modeling TSD. The EPA identified several technical flaws in TCEQ's modeling and analysis of modeling results.[211] In its submission, Texas advocated for use of its own definition of maintenance receptors and modeling. The EPA finds Texas's approach inadequately justified and

[183] Id. at 9849–9851.
[184] Id. at 9826–9829.
[185] Id. at 9869–9870.
[186] 2015 8-Hour Ozone Transport SIP Proposal TSD, in Docket ID No. EPA–R06–OAR–2021–0801 (hereinafter Evaluation of TCEQ Modeling TSD).
[187] Id. at 9871.
[188] Id. at 9871–9875.
[189] Id. at 9871–9875.
[190] Id. at 9872.
[191] Id.
[192] See also id. at 9874–9875.
[193] Id. at 9873–9874.

[194] Id.
[195] Id. at 9872–9873.
[196] Id. at 9874.
[197] Id. at 9875.
[198] Id. at 9816–9818.
[199] Id. at 9826–9829.
[200] Id. at 9820–9822.
[201] Evaluation of TCEQ Modeling TSD in Docket ID No. EPA–R06–OAR–2021–0801.
[202] 87 FR 9823.

[203] Id. at 9819.
[204] Id. at 9822–9824.
[205] Id. at 9822–9824.
[206] See also id. at 9822–9823.
[207] Id.
[208] Id. at 9823.
[209] Id. at 9824.
[210] Id. at 9824–9826.
[211] Id. at 9829–9830; Evaluation of TCEQ Modeling TSD.

legally and technically flawed.[212] The EPA further evaluated TCEQ's technical arguments in the Evaluation of TCEQ Modeling TSD. In comment on the proposal, Texas pointed to differences in linkages in the EPA's 2011-based modeling and 2016v2 modeling. The EPA addressed the change in identified linkages between the 2011-based modeling and the 2016v2 modeling in the proposed SIP submission disapproval,[213] and further responds to comments on the use of updated modeling in Section V.A.4. The State did not conduct an adequate Step 3 analysis.[214] The State included an insufficient evaluation of additional emissions control opportunities in its SIP submission.[215] The EPA found technical flaws in Texas's arguments related to ''consistent and persistent'' claims and its other assessments, including analysis of back trajectories.[216] The State included no permanent and enforceable emissions controls in its SIP submission.[217] We provide further response to comments regarding Texas's SIP submission in the RTC document. The EPA is finalizing disapproval of Texas's interstate transport SIP submission for the 2015 ozone NAAQS.

*S. Utah*

In the 2016v3 modeling, Utah is projected to be linked above 1 percent of the NAAQS to three nonattainment receptors and one maintenance-only receptor. It is also linked to four violating-monitor maintenance receptors. Its highest-level contribution is 1.29 ppb to Douglas County, Colorado (AQS Site ID 080350004). A full summary of Utah's January 29, 2020, SIP submission was provided in the proposed SIP submission disapproval.[218] In its submission, Utah argued that certain receptors in Colorado should not be counted as receptors for the purpose of 2015 ozone NAAQS interstate transport, but Utah's explanation is insufficient to discount those receptors.[219] The EPA disagrees with Utah's arguments for application of a higher contribution threshold than 1 percent of the NAAQS at Step 2.[220] Utah suggested in its SIP submission that interstate transport is fundamentally different in the western U.S. than in the eastern U.S., an argument we have previously rejected and respond to further in Section V.C.3.[221] The State did not conduct an adequate Step 3 analysis.[222] The State included an insufficient evaluation of additional emissions control opportunities in its SIP submission.[223] The EPA finds technical and legal flaws in the State's arguments related to relative contribution, international and non-anthropogenic emissions, and the relationship of upwind versus downwind-state responsibilities.[224] The EPA further addresses the topics of international emissions in Section V.C.2 and wildfires in the RTC document. The EPA also confirmed in the proposed SIP submission disapproval that several anticipated controls identified by Utah were included in the 2016v2 modeling, and yet Utah was still linked in that modeling.[225] The State included no permanent and enforceable emissions controls in its SIP submission.[226] We provide further response to comments regarding Utah's SIP submission in the RTC document. The EPA is finalizing disapproval of Utah's interstate transport SIP submission for the 2015 ozone NAAQS.

*T. West Virginia*

In the 2016v3 modeling, West Virginia is projected to be linked above 1 percent of the NAAQS to three nonattainment receptors and one maintenance-only receptor. It is also linked to four violating-monitor maintenance receptors. Its highest-level contribution is 1.49 ppb to New Haven County, Connecticut (AQS Site ID 090099002). A full summary of West Virginia's February 4, 2019, SIP submission was provided in the proposed SIP submission disapproval.[227] The EPA finds technical and legal flaws in the State's examination of back trajectories and arguments related to mobile sources and international emissions.[228] The EPA further addresses the topics of mobile sources and international emissions in Section V.C.1 and in Section V.C.2, respectively. The State did not conduct an adequate Step 3 analysis.[229] West Virginia argued in its SIP submission that it had already implemented all cost-effective controls. However, the State included an insufficient evaluation of additional emissions control opportunities to support such a conclusion.[230] The EPA also confirmed in the proposed SIP submission disapproval that specific EGU shutdowns identified by West Virginia were included in the 2016v2 modeling, which continued to show West Virginia was linked at Step 2.[231] As explained in Section V.B.9, a state may not rely on non-SIP measures to satisfy SIP requirements, and reliance on prior transport FIPs such as the CSAPR Update is not a sufficient analysis at Step 3.[232] Further, the State's reliance on the cost-effectiveness threshold in the CSAPR Update is insufficient for a more protective NAAQS.[233] The State included no permanent and enforceable emissions controls in its SIP submission.[234] We provide further response to comments regarding West Virginia's SIP submission in the RTC document. The EPA is finalizing disapproval of West Virginia's interstate transport SIP submission for the 2015 ozone NAAQS.

*U. Wisconsin*

In the 2016v3 modeling, Wisconsin is projected to be linked above 1 percent of the NAAQS to three maintenance-only receptors. It is also linked to five violating-monitor maintenance receptors. Its highest-level contribution is 2.86 ppb to Cook County, Illinois (AQS Site ID 170314201). A full summary of Wisconsin's September 14, 2018, SIP submission was provided in the proposed SIP submission disapproval.[235] The State did not assess in its SIP submission whether the state was linked at Step 2,[236] and did not conduct an adequate Step 3 analysis.[237] The State included an insufficient evaluation of additional emissions control opportunities.[238] Further, as explained in Section V.B.9, reliance on prior transport FIPs such as the CSAPR Update is not a sufficient analysis at Step 3.[239] The EPA found additional inadequacies and legal flaws in Wisconsin's submission.[240] The State included no permanent and enforceable emissions controls in its SIP submission.[241] We provide further response to comments regarding

---

[212] 87 FR 9826–9829.

[213] Id. at 9831.

[214] Id. at 9831–9834.

[215] Id. at 9831, 9834.

[216] Id. at 9832–9833, Evaluation of TCEQ Modeling TSD.

[217] 87 FR 9834.

[218] Id. at 31475–31477.

[219] Id. at 31480–31481.

[220] Id. at 31478.

[221] *See also* id. at 31479–31481, 31482.

[222] Id. at 31481–31483.

[223] Id. at 31482

[224] Id. at 31481–31483.

[225] Id. at 31483.

[226] Id.

[227] Id. at 9522–9524.

[228] Id. at 9526–9527, 9528.

[229] Id. at 9527–9532.

[230] Id. at 9528–9529.

[231] Id. at 9529–9530.

[232] *See also* id. at 9530–9532.

[233] Id. at 9531.

[234] Id. at 9532.

[235] Id. at 9851.

[236] Id. at 9875.

[237] Id. at 9875–9876.

[238] Id. at 9876.

[239] *See also* id.

[240] Id.

[241] Id. at 9876–9877.

Wisconsin's SIP submission in the RTC document. Although EPA proposed to disapprove both prong 1 and prong 2 of Wisconsin's SIP submission, the present record, including the results of the 2016v3 modeling, indicates that Wisconsin is not linked to any nonattainment receptors.[242] The EPA is finalizing a partial approval of Wisconsin's interstate transport SIP submission for the 2015 ozone NAAQS as to prong 1 and a partial disapproval as to prong 2.

**V. Response to Key Comments**

The EPA received numerous comments on the proposed action which are summarized in the RTC document along with the EPA's responses to those comments in Docket ID No. EPA–HQ–OAR–2021–0663. Each comment in its entirety is available in the relevant regional docket(s) for this action.[243] The following sections summarize key comments and the EPA's responses.

*A. SIP Evaluation Process*

1. Relationship Between Timing of Proposals To Disapprove SIPs and Promulgate FIPs

*Comment:* Comments alleged generally that the timing of the EPA's proposed actions on the SIP submissions in relation to proposed FIPs was unlawful, unfair, or both. Some comments claimed that the sequence of the EPA's actions is improper, unreasonable, or bad policy. Several commenters asserted that because the EPA proposed FIPs (or, according to some, promulgated FIPs, which is not factually correct) prior to finalizing disapproval of the state SIP submission, the EPA allegedly exceeded its statutory authority and overstepped the states' primary role in addressing the good neighbor provision under CAA section 110.[244]

*EPA Response:* The EPA disagrees. The EPA has followed the Clean Air Act provisions, which prescribe specified maximum amounts of time for states to make SIP submissions, for the EPA to act on those submissions, and for the EPA to promulgate FIPs if necessary, but do not prohibit the EPA from acting before that time elapses. Nothing relieves the EPA from its statutory obligation to take final action on complete SIP submissions before the Agency within the timeframes prescribed by the statute.[245] The EPA's proposed FIP does not constitute the ''promulgation'' of a FIP because the proposed FIP is not a final action that imposes any requirements on sources or states. And although the EPA's FIP authority is not at issue in this action, the EPA notes the Agency has been clear that it will not finalize a FIP for any state until predicate authority is established for doing so under CAA section 110(c)(1). 87 FR 20036, 20057 (April 6, 2022) (''The EPA is proposing this FIP action now to address twenty-six states' good neighbor obligations for the 2015 ozone NAAQS, but the EPA will not finalize this FIP action for any state unless and until it has issued a final finding of failure to submit or a final disapproval of that state's SIP submission.''). The EPA strongly disagrees that *proposing* a FIP prior to proposing or finalizing disapproval of a SIP submission oversteps the Agency's authority. Indeed, the ability to propose a FIP before finalizing a SIP disapproval follows ineluctably from the structure of the statute, which, as the Supreme Court recognized in *EME Homer City,* does not oblige the EPA ''to wait two years or postpone its [FIP] action even a single day.'' 572 U.S. at 509. If the EPA can finalize a FIP immediately upon disapproving a SIP, then surely the EPA must have the authority to propose that FIP before taking final action on the SIP submission. *Accord Oklahoma* v. *U.S.*

*EPA,* 723 F.3d 1201, 1223 (10th Cir. 2013).

It is true that the EPA would not be legally authorized to *finalize* a FIP for any state unless and until the EPA formally *finalizes* a disapproval of that state's SIP submission (or makes a finding of failure to submit for any state that fails to make a complete SIP submission), per CAA section 110(c), but the EPA has not yet finalized a FIP for any state for good neighbor obligations for the 2015 ozone NAAQS. Further, the sequencing of our actions here is consistent with the EPA's past practice in our efforts to timely address good neighbor obligations. For example, at the time the EPA proposed the CSAPR Update FIPs in December of 2015, we had not yet proposed action on several states' SIP submissions but finalized those SIP disapproval actions prior to finalization of the FIP.[246]

Additional comments on cooperative federalism are addressed in Section V.B.5.

Further, The D.C. Circuit in *Wisconsin* held that states and the EPA are obligated to fully address good neighbor obligations for ozone ''as expeditiously as practical'' and in no event later than the next relevant downwind attainment dates found in CAA section 181(a),[247] and states and the EPA may not delay implementation of measures necessary to address good neighbor requirements beyond the next applicable attainment date without a showing of impossibility or necessity.[248] It is important for the states and the EPA to assure that necessary emissions reductions are achieved, to the extent feasible, by the 2023 ozone season to assist downwind areas with meeting the August 3, 2024, attainment deadline for Moderate nonattainment areas. Further, the D.C. Circuit in *Wisconsin* emphasized that the EPA has the authority under CAA section 110 to structure its actions so as to ensure necessary reductions are achieved by the downwind attainment

---

[242] The EPA received a comment that it would be arbitrary and capricious for the EPA to finalize a full disapproval of Tennessee's good neighbor SIP submission (both prong 1 and prong 2) if EPA concluded the State is linked only to a maintenance-only receptor (prong 2).The EPA is deferring final action on Tennessee's good neighbor SIP submission, but in reviewing linkages in the 2016v3 modeling we determined that Minnesota and Wisconsin are not linked above 1 percent of the NAAQS to any nonattainment receptors (prong 1) but are linked to maintenance-only receptors (prong 2); these States are receiving partial approvals and partial disapprovals.

[243] *See* the memo ''Regional Dockets Containing Additional Supporting Materials for Final Action on 2015 Ozone NAAQS Good Neighbor SIP Submissions'' in the docket for this action, for a list of all regional dockets.

[244] The EPA notes the commenters' reference to FIPs is to proposed good neighbor FIPs for the 2015 ozone NAAQS that were proposed separately from this rulemaking action. 87 FR 20036 (April 6, 2022).

[245] Although the EPA anticipates responding to comments related to the EPA's FIP authority in a separate FIP rulemaking, the EPA notes with regard to the procedural timing concerns raised in comments on this action that the Supreme Court confirmed in *EME Homer City Generation,* ''EPA is not obliged to wait two years or postpone its action even a single day: The Act empowers the Agency to promulgate a FIP 'at any time' within the two-year limit.'' 572 U.S. 489 at 509. The procedural timeframes under CAA section 110 do not function to establish a norm or expectation that the EPA must or should use the full amount of time allotted, particularly when doing so would place the Agency in conflict with the more ''central'' statutory objective of meeting the NAAQS attainment deadlines in the Act. *EME Homer City,* 572 U.S. 489, 509 (2014). *See also Wisconsin,* 938 F.3d at 318, 322; *Sierra Club* v. *EPA,* 294 F.3d 155, 161 (D.C. Cir. 2002) (*Sierra Club*).

[246] The proposed CSAPR Update was published on December 3, 2015, and included proposed FIPs for Indiana, Louisiana, New York, Ohio, Texas, and Wisconsin. 80 FR 75705. At that time, the EPA had not yet even proposed action on good neighbor SIP submissions for the 2008 ozone NAAQS from Indiana, Louisiana, New York, Ohio, Texas, and Wisconsin; however, the EPA subsequently proposed and finalized these disapprovals before finalizing the CSAPR Update FIPs, published on October 26, 2016 (81 FR 74504). *See* 81 FR 38957 (June 15, 2016) (Indiana); 81 FR 53308 (August 12, 2016) (Louisiana); 81 FR 58849 (August 26, 2016) (New York); 81 FR 38957 (June 15, 2016) (Ohio); 81 FR 53284 (August 12, 2016) (Texas); 81 FR 53309 (August 12, 2016) (Wisconsin).

[247] *Wisconsin,* 938 F.3d at 313–14 (citing *North Carolina,* 531 F.3d at 911–12.

[248] *See Wisconsin,* 938 F.3d at 320.

dates,[249] the next of which for the 2015 ozone NAAQS is now the Moderate area attainment date of August 3, 2024.[250] The court pointed out that the CAA section 110 schedule of SIP and FIP deadlines is procedural whereas the attainment schedule is "central to the regulatory scheme[.]"[251] Thus, the sequence and timing of the EPA's action in disapproving these SIP submissions is informed by the need to ensure that any necessary good neighbor obligations identified in the separate FIP rulemaking are implemented as expeditiously as practicable and no later than the next attainment date. As explained in our proposed disapproval, analysis (and, if possible, implementation) of good neighbor obligations should begin in the 2023 ozone season. *See, e.g.,* 87 FR 9798, 9801–02 (Feb. 22, 2022). Indeed, states' and the EPA's analysis would have been more appropriately aligned with 2020, rather than 2023 (as had been presented in the EPA's March 2018 memorandum [252]), corresponding with the 2021 Marginal area attainment date. However, that clarification in legal obligations was not established by case law until 2020. *See Maryland,* 958 F.3d at 1203–04.

In short, nothing in the language of CAA section 110(c) prohibits the EPA from proposing a FIP as a backstop, to be finalized and implemented only in the event that a SIP submission is first found to be deficient and final disapproval action on the SIP submission is taken. Such an approach is a reasonable and prudent means of assuring that the statutory obligation to reduce air pollution affecting the health and welfare of those living in downwind states is implemented without delay, either via a SIP, or where such plan is deficient, via a FIP. The sequencing of the EPA's actions here is therefore reasonably informed by its legal obligations under the CAA, including in recognition of the fact that the implementation of necessary emissions reductions to eliminate

significant contribution and thereby protect human health and welfare is already several years delayed. The EPA shares additional responses related to the timing of 2015 ozone NAAQS good neighbor actions in Section V.A.

*Comment:* Some comments allege the EPA is depriving States of the opportunity to target specific emissions reductions opportunities, or the opportunity to revise their submissions at any point in the future.

*EPA Response:* The EPA disagrees. The EPA has repeatedly emphasized that states have the freedom at any time to develop a revised SIP submission and submit that to the EPA for approval, and this remains true. *See* 87 FR 20036, 20051 (April 6, 2022); 86 FR 23054, 23062 (April 30, 2021); 81 FR 74504, 74506 (Oct. 26, 2016). In the proposed FIPs, as in prior transport actions, the EPA discusses a number of ways in which states could take over or replace a FIP, *see* 87 FR 20036, 20149–51 (Section VII.D: "Submitting A SIP"); *see also id.* at 20040 (noting as one purpose in proposing the FIP that "this proposal will provide states with as much information as the EPA can supply at this time to support their ability to submit SIP revisions to achieve the emissions reductions the EPA believes necessary to eliminate significant contribution"). If, and when, the EPA receives a SIP submission that satisfies the requirements of CAA section 110(a)(2)(D)(i)(I), the Agency will take action to approve that SIP submission.

*Comment:* Some commenters assert that the EPA is disapproving SIP submissions for the sole purpose of pursuing an alleged objective of establishing nation-wide standards in FIPs. Other commenters point to the proposed FIPs to make arguments that the EPA's decision to finalize disapproval of the SIPs is an allegedly foregone conclusion or that the EPA has allegedly failed to provide the opportunity for meaningful public engagement on the proposed disapproval of the SIPs.

*EPA Response:* The EPA disagrees as the facts do not support this assertion. To date, the EPA has approved 24 good neighbor SIPs for the 2015 ozone NAAQS: Alaska,[253] Colorado,[254] Connecticut,[255] Delaware,[256] District of Columbia,[257] Florida,[258] Georgia,[259]

Hawaii,[260] Idaho,[261] Iowa,[262] Kansas,[263] Maine,[264] Massachusetts,[265] Montana,[266] Nebraska,[267] New Hampshire,[268] North Carolina,[269] North Dakota,[270] Oregon,[271] Rhode Island,[272] South Carolina,[273] South Dakota,[274] Vermont,[275] and Washington.[276]

The policy judgments made by the EPA in all actions on 2015 ozone NAAQS good neighbor SIP submissions, including approval actions, reflect consistency with relevant good neighbor case law and past agency practice implementing the good neighbor provision as reflected in the original CSAPR, CSAPR Update, Revised CSAPR Update, and related rulemakings. Employing a nationally consistent approach is particularly important in the context of interstate ozone transport, which is a regional-scale pollution problem involving many smaller contributors. Effective policy solutions to the problem of interstate ozone transport dating back to the $NO_X$ SIP Call [63 FR 57356 (October 27, 1998)] have necessitated the application of a uniform framework of policy judgments to ensure an "efficient and equitable" approach. *See EME Homer City,* 572 U.S. at 519. In any case, the approach of the proposed transport FIP is not the subject of this SIP disapproval. This rulemaking does not impose any specific emissions control measures on the states. Nor is the EPA disapproving these SIP submittals because they did not follow exactly the control strategies in the proposed FIP—the EPA has repeatedly indicated openness to alternative approaches to addressing interstate pollution obligations, but for reasons explained elsewhere in the rulemaking record, the EPA finds that none of the states included in this action submitted approvable approaches to addressing those obligations.

The EPA disputes the contentions that the FIP proposal itself indicates that the EPA did not earnestly examine the SIP submissions for compliance with the CAA or have an appropriate rationale

---

[249] *Wisconsin,* 938 F.3d at 318 ("When EPA determines a State's SIP is inadequate, the EPA presumably must issue a FIP that will bring that State into compliance before upcoming attainment deadlines, even if the outer limit of the statutory timeframe gives the EPA more time to formulate the FIP.") (citing *Sierra Club,* 294 F.3d at 161).

[250] *See* CAA section 181(a); 40 CFR 51.1303; Additional Air Quality Designations for the 2015 Ozone National Ambient Air Quality Standards, 83 FR 25776 (June 4, 2018, effective August 3, 2018).

[251] *Wisconsin,* 938 F.3d at 322 ("Delaware's argument leans too heavily on the SIP submission deadline. SIP submission deadlines, unlike attainment deadlines, are 'procedural' and, therefore, not 'central to the regulatory scheme.'") (citing *Sierra Club,* 294 F.3d at 161).

[252] *See* March 2018 memorandum.

[253] 84 FR 69331 (December 18, 2019).

[254] 87 FR 61249 (October 11, 2022).

[255] 86 FR 71830 (December 20, 2021).

[256] 85 FR 25307 (May 1, 2020).

[257] 85 FR 5570 (January 31, 2020).

[258] 86 FR 68413 (December 2, 2021).

[259] Id.

[260] 86 FR 73129 (December 27, 2021).

[261] 85 FR 65722 (October 16, 2020).

[262] 87 FR 22463 (April 15, 2022).

[263] 87 FR 19390 (April 4, 2022).

[264] 86 FR 45870 (August 17, 2021).

[265] 85 FR 5572 (January 31, 2020).

[266] 87 FR 21578 (April 12, 2022).

[267] 85 FR 21325 (April 17, 2020).

[268] 86 FR 45870 (August 17, 2021).

[269] 86 FR 68413 (December 2, 2021).

[270] 85 FR 20165 (April 10, 2020).

[271] 84 FR 22376 (May 17, 2019).

[272] 86 FR 70409 (December 10, 2021).

[273] 86 FR 68413 (December 2, 2021).

[274] 85 FR 67653 (October 26, 2020).

[275] 85 FR 34357 (June 4, 2020).

[276] 83 FR 47568 (September 20, 2018).

for proposing to disapprove certain SIP submissions. The EPA also disputes that the FIP proposal indicates that the EPA did not intend to consider comments on the proposed disapprovals. Comments making claims the EPA did not follow proper administrative procedure have been submitted utilizing the very notice and comment process these comments claim the EPA is skipping, and these claims are factually unsupported. Comments related to the length of the comment period and claims of ''pretext'' are addressed in the RTC document.

*Comment:* Several comments pointed out how hard many states have worked to develop an approvable SIP submission.

*EPA Response:* The EPA acknowledges and appreciates states' efforts to develop approvable SIPs. Cooperative federalism is a cornerstone of CAA section 110, and the EPA strives to collaborate with its state partners. The timing of the EPA's 2015 ozone NAAQS good neighbor actions is not in any way intended to call into question any state's commitment to develop approvable SIPs. The EPA evaluated each SIP submission on its merits. The EPA relies on collaboration with state air agencies to ensure SIP submissions are technically and legally defensible, and the Agency's action here is in no way meant to undermine that collaboration between state and Federal partners respecting SIP development.

*Comment:* Several comments make various arguments about when the EPA can finalize FIPs. Some commenters argue that CAA section 110(c)(1) guarantees states an additional two years to correct their SIP submissions before the EPA finalizes a FIP. Others argue that the notice and comment requirements of the Administrative Procedures Act mandate that the EPA finalize a SIP submission disapproval before proposing a FIP. One commenter suggested that a state must be allowed to fully exhaust its judicial remedies to challenge a SIP submission disapproval before the EPA can promulgate a FIP. Commenters also raise concerns about the analysis and requirements in the proposed FIPs.

*EPA Response:* Comments opining on when the EPA is legally authorized to propose or finalize a FIP are outside the scope of this action. While the EPA acknowledges that the Agency has no obligation or authority to finalize a FIP until finalizing a disapproval of a SIP submission or determining that a state failed to submit a complete SIP submission (CAA section 110(c)(1)), this action is limited to determining whether the covered SIP submissions meet the requirements of CAA section

110(a)(2)(D)(i)(I). For the same reason, comments criticizing specific substantive requirements or implementation timelines in the proposed FIPs are beyond the scope of this action.

2. Requests for Additional Time To Revise SIP Submissions

*Comment:* Some commenters argue that the EPA must or should delay action on these SIP submissions so that states can reexamine and resubmit SIP submissions. Other commenters argue that states must be given more time to re-examine and resubmit their SIP submission for various reasons, including the substantive requirements in the proposed FIPs.

*EPA Response:* The EPA notes that there is no support in the Clean Air Act for such a delay. CAA section 110(a)(1) requires states to adopt and submit SIP submissions meeting certain requirements including the requirements of CAA section 110(a)(2)(D)(i)(I), ''within 3 years (or such shorter period as the Administrator prescribe) after the promulgation of a national primary ambient air quality standard (or any revision thereof).'' CAA section 110(a)(1). The submission deadline clearly runs from the date of promulgation of the NAAQS, which for the 2015 ozone NAAQS was October 1, 2015. 80 FR 65291 (Oct. 26, 2015). In addition, while the Administrator is given authority to prescribe a period shorter than three years for the states to adopt and submit such SIP submissions, the Act does not give the Administrator authority to lengthen the time allowed for CAA section 110(a)(2) submissions. And the EPA would be in violation of court-ordered deadlines if it deferred taking final action beyond January 31, 2023, for all but two of the states covered by this action.[277]

Comments asserting that the EPA must give more time to states to correct deficiencies and re-submit conflict with the controlling caselaw in that they would elevate the maximum timeframes allowable within the procedural framework of CAA section 110 over the attainment schedule of CAA section 181 that the D.C. Circuit has now held multiple times must be the animating focus in the timing of good neighbor obligations. The D.C. Circuit in *Wisconsin* held that states and the EPA are obligated to fully address good neighbor obligations for ozone ''as expeditiously as practical'' and in no

event later than the next relevant downwind attainment dates found in CAA section 181(a),[278] and the EPA may not delay implementation of measures necessary to address good neighbor requirements beyond the next applicable attainment date without a showing of impossibility or necessity.[279] Further, the court pointed out that the CAA section 110 schedule of SIP and FIP deadlines is procedural, and while the EPA has complied with the mandatory sequence of actions required under section 110 here, we are mindful of the court's observation that, as compared with the fundamental substantive obligations of title I of the CAA to attain and maintain the NAAQS, the maximum timeframes allotted under section 110 are less ''central to the regulatory scheme[.]'' [280]

*Comment:* Other comments take the position that states are owed a second opportunity to submit SIP submissions before the EPA takes final action for various reasons, including claims that the EPA failed to issue adequate guidance or is otherwise walking back previously issued guidance. They allege that a state cannot choose controls to eliminate significant contribution until the EPA quantifies the contribution. Other comments argue that the EPA should not or cannot base the disapprovals on alleged shifts in policy that occurred after the Agency received the SIP submissions.

*EPA Response:* The EPA disagrees that the Agency was required to issue guidance or quantify individual states' level of significant contribution for 2015 ozone NAAQS good neighbor obligations, because as noted in *EME Homer City,* the Supreme Court clearly held that ''nothing in the statute places EPA under an obligation to provide specific metrics to States before they undertake to fulfill their good neighbor obligations.'' [281] The Agency issued three memoranda in 2018 to provide modeling results and some ideas to states in the development of their SIP submissions. However, certain aspects of those discussions were specifically

---

[277] The EPA has no court-ordered deadline to take final action on the good neighbor SIP submission from Alabama dated June 21, 2022, or Utah's good neighbor SIP submission.

[278] *Wisconsin,* 938 F.3d at 313–14 (citing *North Carolina,* 531 F.3d at 911–12). On May 19, 2020, the D.C. Circuit in *Maryland,* applying the *Wisconsin* decision, held that the EPA must assess air quality at the next downwind attainment date, including Marginal area attainment dates, in evaluating the basis for the EPA's denial of a petition under CAA section 126(b). *Maryland,* 958 F.3d at 1203–04.

[279] *See Wisconsin,* 938 F.3d at 320.

[280] *Wisconsin,* 938 F.3d at 322 (''Delaware's argument leans too heavily on the SIP submission deadline. SIP submission deadlines, unlike attainment deadlines, are 'procedural' and therefore not 'central to the regulatory scheme.''') (citing *Sierra Club,* 294 F.3d at 161).

[281] *EME Homer City,* 572 U.S. at 510.

identified as not constituting agency guidance (especially Attachment A to the March 2018 memorandum, which comprised an unvetted list of outside stakeholders' ideas). Further, states' submissions did not meet the terms of the August or October 2018 memoranda addressing contribution thresholds and maintenance receptors, respectively. (*See* Section V.B for further discussion of these memoranda.) We acknowledge that the EPA reassessed air quality and states' contribution levels through additional modeling before proposing action on these SIP submissions. But that is not in any way an effort to circumvent the SIP/FIP process; rather it is an outcome of the reality that the EPA updated its modeling platform from a 2011 to a 2016 base year and updated its emissions inventory information along with other updates. There is nothing improper in the Agency improving its understanding of a situation before taking action, and the Agency reasonably must be able to act on SIP submissions using the information available at the time it takes such action. Those updates have not uniformly been used to disapprove SIPs—the new modeling for instance supported the approval of Montana's and Colorado's SIPs.[282] Nor has the new modeling prevented states from submitting new SIP submissions based on that modeling. For instance, the State of Alabama withdrew its prior submission in April of 2022, following our proposed disapproval, and submitted a new submission (further updated in June of 2022) analyzing the 2016v2 modeling used at proposal. The EPA is acting on that new submission and evaluating the new arguments the State developed regarding the more recent modeling. Nonetheless, as explained in the EPA's proposed disapproval of Alabama's new submission and in Section IV.A, the new arguments that Alabama has presented in its more recent submission do not lead the EPA to a contrary conclusion that its SIP submission should be approved.[283] This demonstrates two points contrary to commenters' contentions: first, the EPA is following the science and is making nationally consistent determinations at Steps 1 and 2, based on its review of each state's submission; and second, the fact that states made submissions based on the 2011-based modeling results presented in the March 2018

memorandum rather than on the most recent modeling results is not prejudicial to the outcome of the EPA's analysis, as our action on Alabama's more recent submission evaluating the State's arguments with respect to the newer, 2016-based modeling makes clear.

Contrary to commenters' arguments, the EPA had no obligation to issue further guidance, define obligations, or otherwise clarify or attempt to interpret states' responsibilities since the issuance of the 2018 memoranda, prior to acting on these SIP submissions. States themselves were aware or should have been aware of the case law developments in *Wisconsin* and in *Maryland*, which called into question the EPA's use of 2023 as the analytical year in the March 2018 memorandum. Those decisions were issued in 2019 and 2020 respectively, yet no state moved to amend or supplement their SIP submissions with analysis of an earlier analytical year or to otherwise bring their analyses into conformance with those decisions (*e.g.*, through fuller analysis of non-EGU emissions reduction potential or through treatment of international contribution). Given the Supreme Court's 2014 holding in *EME Homer City*, 572 U.S. at 508–510, which reversed a D.C. Circuit holding that the EPA *was* obligated to define good neighbor obligations,[284] states had no reason to expect the EPA would be obligated to issue further guidance to clarify requirements in the wake of those decisions. The EPA agrees with those commenters who point out that states have the first opportunity to assess and address obligations in implementing the NAAQS, but with that understanding in mind, it is notable that prior to the proposed disapprovals in February of 2022, no state moved to amend or supplement their SIP submission as the case law on good neighbor obligations evolved or in response to new modeling information as it became available.

Further, the EPA has evaluated state SIP submissions on the merits of what is contained in the submission, not the use of any particular modeling platform. The EPA disagrees with commenters' assertions that the EPA has proposed disapproval of a state's proposed SIP due to the use of a particular modeling platform. As noted previously, the EPA approved state SIP submissions that have used the earlier modeling. The EPA did not reach its conclusion to disapprove states' SIP submissions based on the use of the 2016v2

emissions platform standing alone. Use of that platform, or any other modeling platform, is not *ipso facto* grounds for disapproval at all. As evident in the proposed disapprovals and summarized in Section IV, the EPA evaluated the SIP submissions based on the merits of the arguments put forward in each SIP submission.

3. Alleged Harm to States Caused by Time Between SIP Submission and the EPA's Action

*Comment:* Many comments pointed to the EPA's statutory deadlines to take action on the SIP submissions to argue that the EPA's delay harmed the upwind state's interests because now the EPA may conclude they need to reduce their emissions to satisfy their good neighbor obligations in the separate FIP rulemaking whereas had the EPA acted by statutory deadlines using the older modeling, they might have had their SIP submissions approved. Some commenters suggest that the EPA never gave the state SIP submissions the appropriate review or suggest that the EPA's review of the SIP submissions was prejudiced by the FIP it had proposed.

*EPA Response:* The EPA acknowledges that the Agency's statutory deadlines to take final action on these SIP submissions generally fell in 2020 and 2021. However, the delay in acting caused no prejudice to the upwind states. First, this action to disapprove SIP submissions itself will not impose any requirements or penalties on any state or sources within that state. Second, these delays have primarily had the effect of deferring relief to downwind states and their citizens from excessive levels of ozone pollution under the good neighbor provision. Further, the EPA has generally had a practice of correcting its action on good neighbor SIP submittals if later information indicates that a prior action was in error—thus, it is not the case that simply having obtained an approval based on earlier modeling would have meant a state would be forever insulated from later being subject to corrective or remedial good neighbor actions. *See, e.g.,*86 FR 23056, 23067–68 (April 30, 2021) (error correcting Kentucky's approval to a disapproval and promulgating FIP addressing Kentucky's outstanding 2008 ozone NAAQS good neighbor obligations); 87 FR 20036, 20041 (April 6, 2022) (proposing error correction for Delaware's 2015 ozone NAAQS SIP approval to a disapproval based on updated air quality modeling). Finally, there is no basis in the CAA to use the Agency's own delay as a basis to nullify

[282] 87 FR 6095, 6097 at n. 15 (February 3, 2022) (Montana proposal); 87 FR 27050, 27056 (May 6, 2022) (Colorado, proposal), 87 FR 61249 (October 11, 2022) (Colorado, final).

[283] 87 FR 64412 (October 25, 2022).

[284] *EME Homer City Generation, L.P.* v. *EPA*, 696 F.3d 7 (D.C. Cir. 2012) (*EME Homer City I*).

the authority granted in the Act to address the nation's air pollution problems, as the statute itself contains other forms of adequate remedy. CAA section 304(a)(2) provides for judicial recourse where there is an alleged failure by the agency to perform a nondiscretionary duty, and that recourse is for the Agency to be placed on a court-ordered deadline to address the relevant obligations. *Accord Oklahoma,* 723 F.3d at 1223–24; *Montana Sulphur and Chemical Co.* v. *U.S. EPA,* 666 F.3d 1174, 1190–91 (9th Cir. 2012).

*Comment:* Some comments contend that the EPA's delay in acting on SIP submissions was a deliberate attempt to circumvent the SIP/FIP process, unduly burden the states, or to defer making information available to states. Comments allege that the EPA intentionally stalled an evaluative action until the perceived ''facts'' of the situation changed such that the analyses submitted by states were rendered outdated.

*EPA Response:* The EPA disagrees with both allegations. In this respect, it is important to review the recent history of the EPA's regulatory actions and litigation with respect to good neighbor obligations for both the 2008 and 2015 ozone NAAQS, and in particular, the substantial additional workload the Agency took on in the wake of the remand of the CSAPR Update in *Wisconsin.* In 2018, as the EPA issued the memoranda cited by commenters and planned to shift its focus to implementing the 2015 standards, it also issued the CSAPR Close-out, which made an analytical finding that there were no further obligations for 21 states for the 2008 standards following the CSAPR Update. 83 FR 65878 (Dec. 21, 2018). However, contrary to the EPA's understanding that it had fully addressed good neighbor obligations for the 2008 ozone NAAQS, the D.C. Circuit's decisions in *Wisconsin* (remanding the CSAPR Update) and in *New York* (vacating the CSAPR Close-out), forced the Agency to quickly pivot back to addressing remaining obligations under the 2008 standards. *Wisconsin* v. *EPA,* 938 F.3d 303 (D.C. Cir. 2019); *New York* v. *EPA,* 781 F. App'x. 4 (D.C. Cir. 2019). The EPA was subject to renewed deadline suit litigation under CAA section 304, which led to a March 15, 2021, deadline to take final action on several states whose FIPs had been remanded and were incomplete in the wake of the CSAPR Close-out vacatur. *New Jersey* v. *Wheeler,* 475 F.Supp.3d 308 (S.D.N.Y. 2020). Throughout 2020 and 2021, the EPA was therefore focused on an

unexpected rulemaking obligation to complete good neighbor requirements as to the states with remanded CSAPR Update FIPs. This led to the EPA proposing and then issuing an economically significant, major rule assessing additional EGU emissions reduction obligations as well as presenting updated air quality modeling analysis using novel techniques and presenting information on a host of non-EGU industrial sources for the first time, *i.e.,* the Revised CSAPR Update, 86 FR 23054 (April 30, 2021). That rule is now currently subject to judicial review in the D.C. Circuit, *Midwest Ozone Group* v. *EPA,* No. 21–1146 (D.C. Cir. argued Sept. 28, 2022).[285] The EPA has also been in the process of reviewing and acting upon many states' good neighbor SIPs where the available information indicates that an approval of the state's submission was appropriate.[286]

Finally, the Agency needed time to review and evaluate the SIP submissions in a coordinated fashion to act on all the states' submissions in a consistent manner. As the EPA explained in the proposed disapproval action, consistency in defining CAA obligations is critically important in the context of addressing a regional-scale pollutant like ozone. *See, e.g.,* 87 FR 9807 n.48. Through coordinated development of the bases for how the Agency could act on the SIP submissions, while also evaluating the contours of a potential Federal plan to implement obligations where required, the EPA sequenced its deliberations and decision making to maximize efficient, consistent, and timely action, in recognition of the need to implement any necessary obligations ''as

expeditiously as practicable.''[287] The downsides of commenters' policy preference in favor of giving states another opportunity to develop SIP submissions, or in first acting on each SIP submission before proposing a FIP, are that such a sequence of actions would have led to multiple years of additional delay in addressing good neighbor obligations. Even if such a choice was available to the Agency using the CAA section 110(k)(5) SIP call mechanism, it was entirely reasonable for the EPA to decline to use that mechanism in this instance. (EPA further addresses comments in support of a SIP call approach in the RTC document.)

In short, commenters' notion that the EPA was deliberately or intentionally deferring or delaying action on these SIP submissions to circumvent any required legal process or reach any specific result is simply incorrect. Commenters have not supplied any evidence to support the claim either that any legal process was circumvented or that the Agency's conduct was in bad faith. *See Biden* v. *Texas,* 142 S.Ct. 2528, 2546–47 (2022) (presumption of regularity attends agency action absent a ''strong showing of bad faith or improper behavior'') (citing *Citizens to Protect Overton Park* v. *Volpe,* 401 U.S. 302, 420 (1971); *SEC* v. *Chenery,* 318 U.S. 80, 87 (1943)).

### 4. Use of Updated Modeling

*Comment:* Comments allege that by relying on modeling not available at the time of SIP submission development, the EPA ''moved the goal post.'' Comments note the timeframes set out for action on SIPs, citing section 110 of the Act, and allege that by failing to act on SIP submissions in a timely manner and basing such actions on new modeling, the EPA imposes an arbitrary and capricious standard. Comments state that the EPA should not disapprove a SIP based on data not available to states during development of the SIP submissions or to the EPA during the period statutorily allotted for the EPA to take final action on SIP submissions.

*EPA Response:* In response to comments' claims that the EPA has inappropriately changed states' obligations for interstate transport by relying on updated modeling not available to states at the time they prepared their SIP submissions, the EPA disagrees. As an initial matter, the EPA disagrees with comment's claiming that the agency expected state air agencies to develop a SIP submission based on

---

[285] During this time, the EPA also fulfilled its obligations to act on several petitions brought by downwind states under section 126(b) of the CAA. These actions culminated in litigation and ultimately adverse decisions in *Maryland* and *New York* v. *EPA. Maryland v,* 958 F.3d; *New York* v. *EPA,* 964 F.3d 1214, 2020 WL 3967838 (D.C. Cir. 2020). Further review and action on these remands remains pending before the agency.

[286] In chronological order: 83 FR 47568 (September 20, 2018) (Washington); 84 FR 69331 (December 18, 2019) (Alaska); 84 FR 22376 (May 17, 2019) (Oregon); 85 FR 5570 (January 31, 2020) (Washington, DC); 85 FR 5572 (January 31, 2020) (Massachusetts); 85 FR 20165 (April 10, 2020) (North Dakota); 85 FR 21325 (April 17, 2020) (Nebraska); 85 FR 25307 (May 1, 2020) (Delaware); 85 FR 34357 (June 4, 2020) (Vermont); 85 FR 65722 (October 16, 2020) (Idaho); 85 FR 67653 (October 26, 2020) (South Dakota); 86 FR 45870 (August 17, 2021) (Maine and New Hampshire); 86 FR 68413 (December 2, 2021) (Florida, Georgia, North Carolina, and South Carolina); 86 FR 70409 (December 10, 2021) (Rhode Island); 86 FR 71830 (December 20, 2021) (Connecticut); 86 FR 73129 (December 27, 2021) (Hawaii); 87 FR 19390 (April 4, 2022) (Kansas); 87 FR 21578 (April 12, 2022) (Montana); 87 FR 22463 (April 15, 2022) (Iowa); and 87 FR 61249 (October 11, 2022) (Colorado).

[287] CAA section 181(a); *Wisconsin,* 938 F.3d at 313–14 (citing *North Carolina,* 531 F.3d at 911–12).

some unknown future data. The EPA recognizes that states generally developed their SIP submissions with the best available information at the time of their development. As stated in the proposals, the EPA did not evaluate states' SIP submissions based solely on the 2016v2 emissions platform (or the 2016v3 platform, which incorporates comments generated during the public comment period on the proposed SIP actions and which supports these final SIP disapproval actions). We evaluated the SIP submissions based on the merits of the arguments put forward in each SIP submission, which included any analysis put forward by states to support their conclusions. Thus, we disagree with commenters who allege the Agency has ignored the information provided by the states in their submissions. Indeed, the record for this action reflects our extensive evaluation of states' air quality and contribution analyses. *See* generally Section IV, which summarizes our evaluation for each state.

We disagree with commenters who advocate that the EPA's evaluation of these submissions must be limited to the information available to states at the time they made their submissions, or information at the time of the deadline for the EPA to act on their submissions. It can hardly be the case that the EPA is prohibited from taking rulemaking action using the best information available to it at the time it takes such action. Nothing in the CAA suggests that the Agency must deviate from that general principle when acting on SIP submissions. While CAA section 110(k)(2) specifies a time period in which the Administrator is to act on a state submission, neither this provision nor any other provision of the CAA specifies that the remedy for the EPA's failure to meet a statutory deadline is to arrest or freeze the information the EPA may consider to what was available at the time of a SIP submission deadline under CAA section 110. Indeed, in the interstate transport context, this would lead to an anomalous result. For example, the D.C. Circuit rejected an argument made by Delaware against the CSAPR Update air quality analysis that the EPA was limited to reviewing air quality conditions in 2011 (rather than 2017) at the time of the statutory deadline for SIP submittals. The court explained,

Delaware's argument leans too heavily on the SIP submission deadline. SIP submission deadlines, unlike attainment deadlines, are ''procedural'' and therefore not ''central to the regulatory scheme.'' *Sierra Club*, 294 F.3d at 161. Nor can Delaware's argument be reconciled with the text of the Good Neighbor Provision, which prohibits upwind States from emitting in amounts ''which *will*'' contribute to downwind nonattainment. 42 U.S.C. 7410(a)(2)(D)(i) (emphasis added). Given the use of the future tense, it would be anomalous for EPA to subject upwind States to good neighbor obligations in 2017 by considering which downwind States were once in nonattainment in 2011.

*Wisconsin,* 903 F.3d at 322. By the same token, here, holding the EPA to a consideration only of what information states had available regarding the 2023 analytic year at the time of their SIP submissions or at the time of a deadline under CAA section 110, would likewise elevate the ''procedural'' deadlines of CAA section 110 above the substantive requirements of the CAA that are ''central to the regulatory scheme.'' Doing so here would force the Agency to act on these SIP submissions knowing that more recent refined, high quality, state-of-the-science modeling and monitoring data would produce a different result in our forward-looking analysis of 2023 than the information available in 2018. Nothing in the CAA dictates that the EPA must be forced into making substantive errors in its good neighbor analysis on this basis.

We relied on CAMx Version 7.10 and the 2016v2 emissions platform to make updated determinations regarding which receptors would likely exist in 2023 and which states are projected to contribute above the contribution threshold to those receptors. As explained in the preamble of the EPA's proposed actions and further detailed in the document titled ''Air Quality Modeling TSD: 2015 Ozone National Ambient Air Quality Standards Proposed Interstate Transport Air Plan Disapproval'' and 2016v2 Emissions Inventory TSD, both available in Docket ID no. EPA–HQ–OAR–2021–0663, the 2016v2 modeling built off previous modeling iterations used to support the EPA's action on interstate transport obligations. The EPA continuously refines its modeling to ensure the results are as indicative as possible of air quality in future years. This includes adjusting our modeling platform and updating our emissions inventories to reflect current information.

Additionally, we disagree with comments claiming that the 2016v2 modeling results were sprung upon the states with the publication of the proposed disapprovals. The EPA has been publishing a series of data and modeling releases beginning as early as the publication of the 2016v1 modeling with the proposed Revised CSAPR Update in November of 2020, which could have been used to track how the EPA's modeling updates were potentially affecting the list of possible receptors and linkages for the 2015 ozone NAAQS in the 2023 analytic year. The 2016-based meteorology and boundary conditions used in the modeling have been available through the 2016v1 platform, which was used for the Revised CSAPR Update (proposed in November of 2020, 85 FR 68964). The updated emissions inventory files used in the current modeling were publicly released September 21, 2021, for stakeholder feedback, and have been available on our website since that time.[288] The CAMx modeling software that the EPA used has likewise been publicly available for over a year. CAMx version 7.10 was released by the model developer, Ramboll, in December 2020. On January 19, 2022, we released on our website and notified a wide range of stakeholders of the availability of both the modeling results for 2023 and 2026 (including contribution data) along with many key underlying input files.[289]

By providing the 2016 meteorology and boundary conditions (used in the 2016v1 version) in fall of 2020, and by releasing updated emissions inventory information used in 2016v2 in September of 2021,[290] states and other interested parties had multiple opportunities prior to the proposed disapprovals in February of 2022 to consider how our modeling updates could affect their status for purposes of evaluating potential linkages for the 2015 ozone NAAQS. Further, by using the updated modeling results, the EPA is using the most current and technically appropriate information for this rulemaking. This modeling was not performed to ''move the goal posts'' for states but meant to provide updated emissions projections, such as additional emissions reductions for EGUs following promulgation of the Revised CSAPR Update for the 2008 ozone NAAQS, more recent information on plant closures and fuel switches, and sector trends, including non-EGU sectors. The construct of the 2016v2 emissions platform is described in the 2016v2 Emissions Modeling TSD contained in Docket ID No. EPA–HQ–OAR–2021–0663.

Finally, comments related to the timing of the EPA's action to disapprove these SIP submissions are addressed in Section V.A.1. The EPA notes the statute provides a separate remedy for agency action unlawfully delayed. In section 304 of the CAA, there is a

process for filing suit against the EPA for its failure to comply with a non-discretionary statutory duty under the CAA. The appropriate remedy in such cases is an order to compel agency action, not a determination that the agency, by virtue of missing a deadline, has been deprived of or constrained in its authority to act. *See Oklahoma,* 723 F.3d at 1224 ("[W]hen 'there are less drastic remedies available for failure to meet a statutory deadline'—such as a motion to compel agency action—'courts should not assume that Congress intended the agency to lose its power to act.' The Court 'would be most reluctant to conclude that every failure of an agency to observe a procedural requirement voids subsequent agency action, especially when important public rights are at stake.'") (cleaned up) (quoting *Brock* v. *Pierce County,* 476 U.S. 253, 260 (1986)).

*Comment:* Comment states that it is inappropriate for the EPA to revise its emissions inventory and to conduct new air quality modeling without allowing an appropriate opportunity for stakeholder review and comment and that the EPA must allow public comment on any updated (*i.e.,* 2016v3) modeling prior to use by the EPA in a final action. Comments claim that the EPA must withdraw the proposed disapproval and provide states time to develop new SIP submissions based on the updated information.

*EPA Response:* The EPA has evaluated a wide range of technical information and critiques of its 2016v2 emissions inventory and modeling platform following a solicitation of public feedback as well the public comment period on this action (and the proposed FIP action) and has responded to those comments and incorporated updates into the version of the modeling being used in this final action (2016v3). *See* Section III, the Final Action AQM TSD, and Section 4 of the RTC document for further discussion.

The EPA's development of and reliance on newer modeling to confirm modeling used at the proposal stage is in no way improper and is simply another iteration of the EPA's longstanding scientific and technical work to improve our understanding of air quality issues and causes going back decades. Where the 2016v3 modeling produced a potentially different outcome for states from proposal, that is reflected in this action (*e.g.,* our deferral of final action on Tennessee and Wyoming's SIP submissions).

*Comment:* Comments allege that EPA's modeling results have been inconsistent, questioning the reliability of the results.

*EPA Response:* Although some commenters indicate that our modeling iterations have provided differing outcomes and are therefore unreliable, this is not what the overall record indicates. Rather, in general, although the specifics of states' linkages may change slightly, our modeling overall has provided consistent outcomes regarding which states are linked to downwind air quality problems. For example, the EPA's modeling shows that most states that were linked to one or more receptors using the 2011-based platform (*i.e.,* the March 2018 data release) are also linked to one or more receptors using the newer 2016-based platform. Because each platform uses different meteorology (*i.e.,* 2011 and 2016) it is not at all unexpected that an upwind state could be linked to different receptors using 2011 versus 2016 meteorology.

In addition, although a state may be linked to a different set of receptors, states are often linked to receptors in the same area that has a persistent air quality problem. These differing results regarding receptors and linkages can be affected by the varying meteorology from year to year, but this does not indicate that the modeling or the EPA or the state's methodology for identifying receptors or linkages is inherently unreliable. Rather, for many states these separate modeling runs all indicated: (i) that there would be receptors in areas that would struggle with nonattainment or maintenance in the future, and (ii) that the state was linked to some set of these receptors, even if the receptors and linkages differed from one another in their specifics (*e.g.,* a different set of receptors were identified to have nonattainment or maintenance problems, or a state was linked to different receptors in one modeling run versus another).

The EPA interprets this common result as indicative that a state's emissions have been substantial enough to generate linkages at Step 2 to varying sets of downwind receptors generated under varying assumptions and meteorological conditions, even if the precise set of linkages changed between modeling runs. Under these circumstances, we think it is appropriate to proceed to a Step 3 analysis to determine what portion of a particular state's emissions should be deemed "significant." We also note that only four states included in the proposed disapprovals went from being unlinked to being linked between the 2011-based modeling provided in the March 2018 memorandum and the 2016v2-based modeling—Alabama, Minnesota, Nevada, and Tennessee.

### 5. Cooperative Federalism and the EPA's Authority

*Comment:* Many comments point to the concept of cooperative federalism as embodied in the CAA to make various arguments as to why the EPA cannot or should not be allowed to exercise its independent judgment in evaluating the arguments presented by the states in the SIP submissions, and some also argue that the EPA must approve each state's submission in deference to how states choose to interpret the CAA requirements they must meet.

*EPA Response:* The CAA establishes a framework for state-Federal partnership to implement the NAAQS based on cooperative federalism. Under the general model of cooperative federalism, the Federal Government establishes broad standards or goals, states are given the opportunity to determine how they wish to achieve those goals, and if states choose not to or fail to adequately implement programs to achieve those goals, a Federal agency is empowered to directly regulate to achieve the necessary ends. Under the CAA, once the EPA establishes or revises a NAAQS, states have the obligation and opportunity in the first instance to develop an implementation plan under CAA section 110 and the EPA will approve SIP submissions under CAA section 110 that fully satisfy the requirements of the CAA. This sequence of steps is not in dispute.

The EPA does not, however, agree with the comments' characterization of the EPA's role in the state-Federal relationship as being "secondary" such that the EPA must defer to state choices heedless of the substantive objectives of the Act; such deference would be particularly inappropriate in the context of addressing interstate pollution. The EPA believes that the comments fundamentally misunderstand or inaccurately describe this action, as well as the "'division of responsibilities' between the states and the federal government" they identify in CAA section 110 citing the *Train-Virginia* line of cases [291] and other cases.[292]

[291] *See Virginia* v. *EPA,* 108 F.3d 1397, 1407 (D.C. Cir. 1997) (*Virginia*) (quoting *Train* v. *Natural Resources Defense Council, Inc.,* 421 U.S. 60, 79 (1975) (*Train*)). The "Train-Virginia line of cases" are named for the U.S. Supreme Court case *Train,* 421 U.S. and to the D.C. Circuit case *Virginia,* 108 F.3d. The D.C. Circuit has described these cases as defining a "federalism bar" that generally recognizes states' ability to select emissions control measures in their SIPs so long as CAA requirements are met. *See, e.g., Michigan* v. *EPA,* 213 F.3d 663, 687 (D.C. Cir. 2000) (*Michigan*).

[292] *Union Elec. Co.* v. *EPA,* 427 U.S. 246 (1976), *Am. Elec. Power Co.* v. *Connecticut,* 565 U.S. 410 (2011), *Fla. Power & Light* v. *Costle,* 650 F.2d 579

Continued

Those cases, some of which pre-date the CAA amendments of 1990 resulting in the current Good Neighbor Provision,[293] stand only for the proposition that the EPA must approve state plans *if they* meet the applicable CAA requirements. But these cases say nothing about what those applicable requirements are. The EPA is charged under CAA section 110 with reviewing states' plans for compliance with the CAA and approving or disapproving them based on EPA's determinations. Thus, the EPA must ultimately determine whether state plans satisfy the requirements of the Act or not. Abundant case law reflects an understanding that the EPA must evaluate SIP submissions under the CAA section 110(k)(2) and (3).[294] If they are deficient, the EPA must so find, and become subject to the obligation to directly implement the relevant requirements through a Federal implementation plan under CAA section 110(c), unless EPA approves an applicable SIP first.[295]

The EPA responds in greater detail to these comments in the RTC document.

6. Availability of Guidance for SIP Submissions

*Comment:* Comments contend the EPA failed to issue guidance in a timely fashion by releasing its August 2018 memorandum 31 days prior to when SIPs addressing interstate ozone transport were due and issuing the October 2018 memorandum 18 days

after those SIPs were due. Some comments additionally claim that it is unreasonable for the EPA to disapprove SIP submissions based on standards that were not defined, mandated, or required by official guidance.

*EPA Response:* Comments' contention is unsupported by the statute or applicable case law. Regarding the need for the EPA's guidance in addressing good neighbor obligations, in *EME Homer City,* the Supreme Court clearly held that "nothing in the statute places the EPA under an obligation to provide specific metrics to States before they undertake to fulfill their good neighbor obligations." [296]

Nonetheless, as comments point out, the EPA issued three "memoranda" in 2018 to provide some assistance to states in developing these SIP submissions. In acting on the SIP submissions in this action, the EPA is neither rescinding nor acting inconsistently with the memoranda—to the extent the memoranda constituted agency guidance (not all the information provided did constitute guidance), information or ideas in the memoranda had not at that time been superseded by case law developments, and the memoranda's air quality and contribution data had not at that time been overtaken by updated modeling and other updated air quality information. While comments specific to each of those memoranda are addressed elsewhere in this record, we note in brief that each memorandum made clear that the EPA's action on SIP submissions would be through a separate notice-and-comment rulemaking process and that SIP submissions seeking to rely on or take advantage of any information or concepts in these memoranda would be carefully reviewed against the relevant legal requirements and technical information available to the EPA at the time it would take such rulemaking action.

*B. Application of the 4-Step Interstate Transport Framework*

1. Analytic Year

*Comment:* One comment asserted that 2023 is not an appropriate analytical year because, according to the commenter, the EPA and at least some downwind states have not in fact implemented mandatory emissions control requirements associated with their nonattainment areas, and *North Carolina* and *Wisconsin* require that upwind and downwind state obligations must be implemented "on par." The

comment also characterizes the EPA's invocation of *Maryland* as an inappropriate shifting of regulatory burden to upwind states.

*EPA Response:* This is an incorrect interpretation of the D.C. Circuit's holdings in *North Carolina, Wisconsin,* and *Maryland,* which held that the EPA and the states must align good neighbor obligations to the extent possible with the downwind areas' attainment dates. These are set by the statute and remain fixed regardless of whether downwind areas are delayed in implementing their own obligations. It would be unworkable to expect that upwind states' obligations could be perfectly aligned with each downwind area's actual timetable for implementing the relevant emissions controls, and no court has held that this is the EPA's or the states' obligation under the good neighbor provision. Further, this ignores the fact that upwind states must also address their interference with maintenance of the NAAQS, as well as the *Maryland* court's holding that good neighbor obligations should be addressed by the Marginal area attainment date for ozone under subpart 2 of part D of title I of the CAA. Both circumstances may involve situations in which the home state for an identified downwind receptor does not have a specific obligation to plan for and implement specific emissions controls while an upwind state may nonetheless be found to have good neighbor obligations. But, as the *Maryland* court recognized, the absence of specific enumerated requirements does not mean the downwind state does not have a statutorily binding obligation subject to burdensome regulatory consequences: "Delaware must achieve attainment 'as expeditiously as practicable,'" and "an upgrade from a marginal to a moderate nonattainment area carries significant consequences . . . ." *Maryland,* 958 F.3d at 1204.

Further, where any downwind-state delays are unreasonable or violate statutory timeframes, the CAA provides recourse to compel the completion of such duties in CAA section 304, not to defer the elimination of significant contribution and thereby expose the public in downwind areas to the elevated pollution levels caused in part by upwind states' pollution. Regardless, in this action, 2023 aligns with the Moderate area attainment date in 2024, and all of the downwind nonattainment areas corresponding to receptor locations identified at Step 1 in this action are already classified as being in Moderate nonattainment or have been reclassified to Moderate and the relevant states face obligations to submit

(5th Cir. 1981), *Bethlehem Steel Corp.* v. *Gorsuch,* 742 F.2d 1028 (7th Cir. 1984), *Concerned Citizens of Bridesburg* v. *EPA,* 836 F.2d 777 (3d Cir. 1987), *North Carolina,* 531 F.3d 896, *Luminant,* 675 F.3d 917 (5th Cir. 2012), *Luminant Co. LLC* v. *EPA,* 714 F.3d 841 (5th. Cir. 2013), *North Dakota* v. *EPA,* 730 F.3d 750 (8th. Cir. 2013), *EME Homer City II,* 795 F.3d 118 (D.C. Cir. 2015), and *Texas* v. *USEPA,* 829 F.3d 405 (5th Cir. 2016).

[293] The 1970 version of the Act required SIPs to include "adequate provisions for intergovernmental cooperation" concerning interstate air pollution. CAA section 110(a)(2)(E), 84 Stat. 1681, 42 U.S.C. 1857c–5(a)(2)(D). In 1977, Congress amended the Good Neighbor Provision to direct States to submit SIP submissions that included provisions "adequate" to "prohibit[t] any stationary source within the State from emitting any air pollutant in amounts which will . . . prevent attainment or maintenance [of air quality standards] by any other State." CAA section 108(a)(4), 91 Stat. 693, 42 U.S.C. 7410(a)(2)(E) (1976 ed., Supp. II). Congress again amended the Good Neighbor Provision in 1990 to its current form.

[294] *See, e.g., Virginia,* 108 F.3d at 1406. *See also, e.g., Westar Energy* v. *EPA,* 608 Fed. App'x 1, 3 (D.C. Cir. 2015) ("EPA acted *well within the bounds* of its delegated authority when it disapproved of Kansas's proposed [good neighbor] SIP.") (emphasis added); *Oklahoma,* 723 F.3d at 1209 (upholding the EPA's disapproval of "best available retrofit technology" (BART) SIP, noting BART "does not differ from other parts of the CAA—states have the ability to create SIPs, but they are subject to EPA review").

[295] *EME Homer City Generation,* 572 U.S. at 508– 510.

[296] *EME Homer City,* 572 U.S. at 510.

SIP submissions and implement reasonably available control technologies (RACT) by January 1, 2023. *See* 87 FR 60897, 60899 (October 7, 2022). The EPA further responds to this comment in the RTC document.

### 2. Attachment A to the March 2018 Memorandum

*Comment:* Comments state that states conducted their analyses based on the flexibilities listed in Attachment A of the March 2018 Memorandum. Comments cite the part of the memorandum where the EPA notes that "in developing their own rules, states have flexibility to follow the familiar four-step transport framework (using [the] EPA's analytical approach or somewhat different analytical approaches within these steps) or alternative frameworks, so long as their chosen approach has adequate technical justification and is consistent with the requirements of the CAA." Comments state that the EPA's disapproval of SIP submissions that took advantage of the flexibilities is arbitrary and capricious because the EPA has changed, without communication, its consideration of what is deemed to be the "necessary provisions" required for an approvable SIP submission too late in the SIP submission process and because, in disapproving these SIPs, the EPA is applying a consistent set of policy judgments across all states.

*EPA Response:* Comments mistakenly view Attachment A to the March 2018 memorandum releasing modeling results as constituting agency guidance. The EPA further disagrees with commenters' characterization of the EPA's stance regarding the "flexibilities" listed (without analysis) in Attachment A. Attachment A to the March 2018 memorandum identified a "Preliminary List of Potential Flexibilities" that could potentially inform SIP development.[297] However, the EPA made clear in that attachment that the list of ideas were not suggestions endorsed by the Agency but rather "comments provided in various forums" from outside parties on which the EPA sought "feedback from interested stakeholders." [298] Further, Attachment A stated, "EPA is not at this time making any determination that the ideas discussed later are consistent with the requirements of the CAA, nor are we specifically recommending that states use these approaches." [299] Attachment A to the March 2018 memorandum, therefore, does not constitute agency

guidance, but was intended to generate further discussion around potential approaches to addressing ozone transport among interested stakeholders. The EPA emphasized in this memorandum that any such alternative approaches must be technically justified and appropriate in light of the facts and circumstances of each particular state's submittal.[300] As stated in the proposed SIP disapprovals,[301] the March 2018 memorandum provided that, "While the information in this memorandum and the associated air quality analysis data could be used to inform the development of these SIPs, the information is not a final determination regarding states' obligations under the good neighbor provision." [302] In this final SIP disapproval action, the EPA again affirms that certain concepts included in Attachment A to the March 2018 memorandum require unique consideration, and these ideas do not constitute agency guidance with respect to transport obligations for the 2015 ozone NAAQS.

In response to comments' claims that since the time transport SIP submissions were submitted to the EPA for review, the EPA has changed, without communication, its consideration of what is deemed to be the "necessary provisions" required for an approvable SIP submission, the EPA disagrees. As comments note, and as stated in the proposed disapproval notifications, the EPA recognizes that states have discretion to develop their own SIP transport submissions and agrees that states are not bound to using the 4-step interstate transport framework the EPA has historically used. However, states must then provide sufficient justification and reasoning to support their analytical conclusions and emissions control strategies. *See, e.g.,* 87 FR 9798, 9801. In the SIP submissions being disapproved in this action, no state provided any enforceable emissions control strategies for approval into their SIP. The EPA has evaluated the merits of each state's arguments as to why no additional emissions reduction requirements are needed to satisfy their obligations under CAA section 110(a)(2)(D)(i)(I) for the more protective 2015 ozone NAAQS. While the EPA used its own 4-step interstate

transport framework as a guide for its review to ensure a consistent and equitable evaluation of each states' submissions, the EPA has also considered states' individual arguments without predetermining the EPA's conclusions about the state's transport obligations.

It was never the Agency's intent in sharing Attachment A that states would invoke one or more of the potential "flexibilities" that outside parties advocated for as a basis for concluding that no additional emissions controls were necessary to address interstate transport for the more protective 2015 ozone NAAQS without proper justification. Nothing in Attachment A suggested that was the Agency's intended objective. Indeed, where certain approaches identified in Attachment A might have produced analytical conclusions requiring upwind states to reduce their emissions, no state invoking Attachment A followed through with implementing those controls. We observe this dynamic at work in Kentucky's submission, because Kentucky appended comments from the Midwest Ozone Group to its submission that demonstrated that applying a "weighted" approach to allocating upwind-state responsibility at Step 3 would have resulted in an emissions control obligation on Kentucky's sources, yet the State offered no explanation in its submittal why it was not adopting that approach or even what its views on that approach were. *See* 87 FR 9515. As another example, Michigan cited Attachment A to the March 2018 in developing a methodology for calculating significant contribution under which Michigan would have been responsible for eliminating up to 0.12 ppb of contribution to downwind receptors; however, the State suggested that uncertainty caused by modeling "noise" was too great to either require emissions reductions or demonstrate that Michigan had any linkages to receptors at all. *See* 87 FR 9860–9861. However, this explanation did not, as an analytical matter, demonstrate a level of scientific uncertainty which might allow for ignoring the results,[303]

---

[297] March 2018 memorandum, Attachment A.
[298] *Id.*
[299] *Id.*

[300] March 2018 memorandum.
[301] E.g., 87 FR 9487.
[302] *See* Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I), March 27, 2018, available in docket EPA–HQ–OAR–2021–0663 or at *https://www.epa.gov/interstate-air-pollution-transport/interstate-air-pollution-transport-memos-and-notices.*

[303] Scientific uncertainty may only be invoked to avoid comporting with the requirements of the CAA when "the scientific uncertainty is so profound that it precludes . . . reasoned judgment" *Massachusetts* v. *EPA,* 127 S.Ct. 1438 (2007). *See Wisconsin,* 938 F.3d at 318–19 ("Scientific uncertainty, however, does not excuse EPA's failure to align the deadline for eliminating upwind States' significant contributions with the deadline for downwind attainment of the NAAQS."). *See also EME Homer City,* 795 F.3d at 135–36 ("We will not invalidate EPA's predictions solely because there might be discrepancies between those predictions
Continued

particularly when the Agency has implemented good neighbor requirements at levels of "significant contribution" comparable to or even less than 0.12 ppb. *See Wisconsin,* 938 F.3d at 322–23 (rejecting Wisconsin's argument that it should not face good neighbor obligations for the 2008 ozone NAAQS on the basis that its emission reductions would only improve a downwind receptor by two ten-thousandths of a part per billion).

The EPA continues to neither endorse the "flexibilities" in Attachment A, nor stakes a position that states are precluded from relying on these concepts in the development of their good neighbor SIP submissions, assuming they could be adequately justified both technically and legally. This has been demonstrated through the EPA's extensive evaluation of the merits of each states' SIP submissions, including their attempted use of flexibilities and derivatives of the EPA's historically applied 4-step interstate transport framework.[304]

3. Step 1: October 2018 Memorandum

*Comments:* Comments claimed that the EPA is not honoring its October 2018 memorandum, which they claim would allow for certain monitoring sites identified as maintenance-only receptors in the EPA's methodology to be excluded as receptors based on historical data trends. They assert that the EPA is inappropriately disapproving SIP submissions where the state sufficiently demonstrated certain monitoring sites should not be considered to have a maintenance problem in 2023.

*EPA Response:* The October 2018 memorandum recognized that states may be able to demonstrate in their SIPs that conditions exist that would justify treating a monitoring site as not being a maintenance receptor despite results from our modeling methodology identifying it as such a receptor. The EPA explained that this demonstration could be appropriate under two circumstances: (1) the site currently has "clean data" indicating attainment of the 2015 ozone NAAQS based on measured air quality concentrations, or (2) the state believes there is a technical

reason to justify using a design value from the baseline period that is lower than the maximum design value based on monitored data during the same baseline period. To justify such an approach, the EPA anticipated that any such showing would be based on an analytical demonstration that: (1) Meteorological conditions in the area of the monitoring site were conducive to ozone formation during the period of clean data or during the alternative base period design value used for projections; (2) ozone concentrations have been trending downward at the site since 2011 (and ozone precursor emissions of $NO_X$ and VOC have also decreased); and (3) emissions are expected to continue to decline in the upwind and downwind states out to the attainment date of the receptor. EPA evaluated state's analyses and found no state successfully applied these criteria to justify the use of one of these alternative approaches. The air quality data and projections in Section III indicate that trends in historic measured data do not necessarily support adopting a less stringent approach for identifying maintenance receptors for purposes of the 2015 ozone NAAQS. In fact, as explained in Section III, the EPA has found in its analysis for this final action that, in general, recent measured data from regulatory ambient air quality ozone monitoring sites suggest a number of receptors with elevated ozone levels will persist in 2023 even though our traditional methodology at Step 1 did not identify these monitoring sites as receptors in 2023. Thus, the EPA is not acting inconsistently with that memorandum—the factual conditions that would need to exist for the suggested approaches of that memorandum to be applicable have not been demonstrated as being applicable or appropriate based on the relevant data.

We further respond to comments related to the identification of receptors at Step 1 the RTC document.

4. Step 2: Technical Merits of a 1 Percent of the NAAQS Contribution Threshold

*Comment:* Several comments contend that for technical reasons, the 0.70 ppb threshold is inappropriate for determining whether a state is linked to a downwind receptor at Step 2 of the 4-step interstate transport framework. Comments state that the degree to which errors exist in modeling ozone concentrations and contributions make it inappropriate for a threshold as low as 0.70 ppb to be used. Some comments further state that the 0.70 ppb threshold is inappropriate because the

concentration threshold is lower than what monitoring devices are capable of detecting. Comments reference the reported precision of Federal reference monitors for ozone and the rounding requirements found in 40 CFR part 50, appendix U, Interpretation of the Primary and Secondary National Ambient Air Quality Standards for Ozone, for support. Comments note that the 1 percent contribution threshold of 0.70 ppb is lower than the manufacturer's reported precision of Federal reference monitors for ozone and that the requirements found in appendix U truncates monitor values of 0.70 ppb to 0 ppb.

*EPA Response:* The EPA disagrees that a 1 percent of the NAAQS contribution threshold at Step 2 is "inappropriate" for the 2015 ozone NAAQS due to modeling biases and errors. The explanation for how the 1 percent contribution threshold was originally derived is available in the 2011 CSAPR rulemaking. *See* 76 FR 48208, 48236–38 (Aug. 8, 2011). The EPA has effectively applied a 1 percent of the NAAQS threshold to identify linked upwind states in three prior FIP rulemakings and numerous state-specific actions. The D.C. Circuit has declined to establish bright line criteria for model performance. In upholding the EPA's approach to evaluating interstate transport in CSAPR, the D.C. Circuit held that it would not "invalidate EPA's predictions solely because there might be discrepancies between those predictions and the real world. That possibility is inherent in the enterprise of prediction." *EME Homer City II,* 795 F.3d at 135. The court continued to note that "the fact that a 'model does not fit every application perfectly is no criticism; a model is meant to simplify reality in order to make it tractable.' " *Id.* at 135–36 (quoting *Chemical Manufacturers Association* v. *EPA,* 28 F.3d 1259, 1264 (DC Cir. 1994). *See also Sierra Club* v. *EPA,* 939 F.3d 649, 686–87 (5th Cir. 2019) (upholding the EPA's modeling in the face of complaints regarding an alleged "margin of error," noting challengers face a "considerable burden" in overcoming a "presumption of regularity" afforded "the EPA's choice of analytical methodology") (citing *BCCA Appeal Grp.* v. *EPA,* 355 F.3d 817, 832 (5th Cir. 2003)).

Furthermore, it is not appropriate to compare the bias/error involved in the estimation of total ozone to the potential error in the estimation of the subset of ozone that is contributed by a single state.[305] For example, on a specific day

---

and the real world. That possibility is inherent in the enterprise of prediction.").

[304] Nor in the course of this evaluation has the EPA uniformly ruled out the concepts in Attachment A. For example, we noted at proposal that California's identification of a flexibility in Attachment A related to excluding certain air quality data associated with atypical events may be generally consistent with the EPA's modeling guidance, but this does not affect the ultimate determination that California's SIP is not approvable. *See* 87 FR 31454.

[305] See, *e.g.,* 87 FR 9798 at 9816.

the modeled versus monitored ozone value may differ by 2 ppb but that is a relatively small percentage of the total modeled ozone, which for a receptor of interest would be on the order of 70 ppb. It would be unrealistic to assign all of the 2 ppb discrepancy in the earlier example to the estimated impact from a single state because the 2 ppb error would be the combination of the error from all sources of ozone that contribute to the total, including estimated impacts from other states, the home state of the receptor, and natural background emissions.

To address comments that compare the 0.70 ppb threshold to the Federal reference monitors for ozone and the rounding requirements found in 40 CFR part 50, appendix U, the EPA notes that the comment is mistaken in applying criteria related to the precision of monitoring data to the modeling methodology by which we project contributions when quantifying and evaluating interstate transport at Step 2. Indeed, contributions by source or state cannot be derived from the total ambient concentration of ozone at a monitor at all but must be apportioned through modeling. Under our longstanding methodology for doing so, the contribution values identified from upwind states are based on a robust assessment of the average impact of each upwind state's ozone-precursor emissions over a range of scenarios, as explained in the Final Action AQM TSD. This analysis is in no way connected with or dependent on monitoring instruments' precision of measurement. *See EME Homer City II,* 795 F.3d 118, 135–36 ("'[A] model is meant to simplify reality in order to make it tractable.'").

5. Step 2: Justification of a 1 Percent of the NAAQS Contribution Threshold

*Comment:* Comments contend that the EPA has not provided enough basis for reliance on the 0.70 ppb threshold, claiming that its use is therefore arbitrary and capricious.

*EPA Response:* The EPA is finalizing its proposed approach of consistently using a 1 percent of the NAAQS contribution threshold at Step 2. This approach ensures both national consistency across all states and consistency and continuity with our prior interstate transport actions for other NAAQS. Comments have not established that this approach is either unlawful or arbitrary and capricious.

The 1 percent threshold is consistent with the Step 2 approach that the EPA applied in CSAPR for the 1997 ozone NAAQS, which has subsequently been applied in the CSAPR Update and

revised CSAPR Update when evaluating interstate transport obligations for the 2008 ozone NAAQS. The EPA continues to find 1 percent to be an appropriate threshold. For ozone, as the EPA found in CAIR, CSAPR, and CSAPR Update, a portion of the nonattainment and maintenance problems in the U.S. results from the combined impact of relatively small contributions from many upwind states, along with contributions from in-state sources and other sources. The EPA's analysis shows that much of the ozone transport problem being analyzed for purposes of evaluating 2015 ozone NAAQS SIP obligations is still the result of the collective impacts of contributions from many upwind states. Therefore, application of a consistent contribution threshold is necessary to identify those upwind states that should have responsibility for addressing their contribution to the downwind nonattainment and maintenance problems to which they collectively contribute. Where a great number of geographically dispersed emissions sources contribute to a downwind air quality problem, which is the case for ozone, EPA believes that, in the context of CAA section 110(a)(2)(D)(i)(I), a state-level threshold of 1 percent of the NAAQS is a reasonably small enough value to identify only the greater-than-de minimis contributers yet is not so large that it unfairly focuses attention for further action only on the largest single or few upwind contributors. Continuing to use 1 percent of the NAAQS as the screening metric to evaluate collective contribution from many upwind states also allows the EPA (and states) to apply a consistent framework to evaluate interstate emissions transport under the interstate transport provision from one NAAQS to the next. *See* 81 FR 74504, 74518. *See also* 86 FR 23054, 23085 (reviewing and explaining rationale from CSAPR, 76 FR 48208, 48236–38, for selection of 1 percent threshold).

Further, the EPA notes that the role of the Step 2 threshold is limited and just one step in the 4-Step interstate transport framework. It serves to screen in states for further evaluation of emissions control opportunities applying a multifactor analysis at Step 3. Thus, as the Supreme Court has recognized, the contribution threshold essentially functions to exclude states with "de minimis" impacts. *EME Homer City,* 572 U.S. at 500.

*Comment:* Commenters contend that the EPA cannot use the 1 percent threshold as a determination for significance.

*EPA Response:* To clarify, the EPA does not use the 1 percent of the NAAQS threshold as the definition of "significance." Rather, where a state's contribution equals or exceeds the 1 percent of the NAAQS threshold, the EPA expects states to further evaluate their emissions to determine whether their emissions constitute significant contribution or interference with maintenance. The contribution threshold is a screening threshold to identify states which may be "contributing" to an out of state receptor. The EPA has maintained this interpretation of the relevant statutory language across many rulemakings, though commenters continue to confuse the Step 2 threshold with a determination of "significance," which it is not. *See EME Homer City,* 572 U.S. at 500–502 (explaining the difference between the "screening" analysis at Steps 1 and 2 whereby the EPA "excluded as de minimis any upwind State that contributed less than one percent of the . . . NAAQS" and the "control" analysis at Step 3 whereby the EPA determined "cost thresholds" to define significance).

Further, the EPA's air quality and contribution modeling for ozone transport is based on application of the model in a relative sense rather than relying upon absolute model predictions. All models have limitations resulting from uncertainties in inputs and scientific formulation. To minimize the effects of these uncertainties, the modeling is anchored to base period measured data in the EPA's guidance approach for projecting design values. Notably, the EPA also uses our source apportionment modeling in a relative sense when calculating the average contribution metric (used to identify linkages). In this method the magnitude of the contribution metric is tied to the magnitude of the projected average design value which is tied to the base period average measured design value. The EPA's guidance has recommended against applying bright-line criteria for judging whether statistical measures of model performance constitute acceptable or unacceptable model performance.

The Agency continues to find that this method using the CAMx model to evaluate contributions from upwind states to downwind areas is reliable. The agency has used CAMx routinely in previous notice and comment transport rulemakings to evaluate contributions relative to the 1 percent threshold for both ozone and PM$_{2.5}$. In fact, in the original CSAPR, the EPA found that "[t]here was wide support from commenters for the use of CAMx as an

appropriate, state-of-the science air quality tool for use in [Cross-State Air Pollution] Rule. There were no comments that suggested that the EPA should use an alternative model for quantifying interstate transport.'' 76 FR 48229 (August 8, 2011). In this action, the EPA has taken a number of steps based on comments and new information to ensure to the greatest extent the accuracy and reliability of its modeling projections at Step 1 and 2, as discussed elsewhere in this document.

### 6. Step 2: Prevention of Significant Deterioration Significant Impact Levels

*Comment:* Several comments insist that when identifying an appropriate linkage threshold at Step 2 of the 4-step framework, the EPA should consider or rely on the 1 ppb significant impact level (SIL) for ozone used as part of the prevention of significant deterioration PSD permitting process. Comments reference the EPA's April 17, 2018, guidance memorandum, ''Significant Impact Levels for Ozone and Fine Particles in the Prevention of Significant Deterioration Permitting Program'' (SIL guidance), as well as the EPA's March 2018 memorandum's Attachment A flexibilities to lend support to their opinion that the 1 ppb SIL should also be used to determine linkages at Step 2.

*EPA Response:* The EPA's SIL guidance relates to a different provision of the Clean Air Act regarding implementation of the prevention of significant deterioration (PSD) permitting program. This program applies in areas that have been designated attainment of the NAAQS and is intended to ensure that such areas remain in attainment even if emissions were to increase as a result of new sources or major modifications to existing sources located in those areas. This purpose is different than the purpose of the good neighbor provision, which is to assist downwind areas (in some cases hundreds or thousands of miles away) in resolving ongoing nonattainment of the NAAQS or difficulty maintaining the NAAQS through eliminating the emissions from other states that are significantly contributing to those problems. In addition, as discussed earlier, the purpose of the Step 2 threshold within the EPA's interstate transport framework for ozone is to broadly sweep in all states contributing to identified receptors above a de minimis level in recognition of the collective-contribution problem associated with regional-scale ozone transport. The threshold used in the context of PSD SIL serves an entirely different purpose, and so it does not follow that they should be made equivalent. Further, comments incorrectly associate the EPA's Step 2 contribution threshold with the identification of ''significant'' emissions (which does not occur until Step 3), and so it is not the case that the EPA is interpreting the same term differently.

The EPA has previously explained this distinction between the good neighbor framework and PSD SILs. *See* 70 FR 25162, 25190–25191 (May 12, 2005); 76 FR 48208, 48237 (August 8, 2011). Importantly, the implication of the PSD SIL threshold is not that single-source contribution below this level indicates the absence of a contribution or that no emissions control requirements are warranted. Rather, the PSD SIL threshold addresses whether further, more comprehensive, multi-source review or analysis of air quality impacts are required of the source to support a demonstration that it meets the criteria for a permit. A source with estimated impacts below the PSD SIL may use this to demonstrate that it will not cause or contribute (as those terms are used within the PSD program) to a violation of an ambient air quality standard, but is still subject to meeting applicable control requirements, including best available control technology, designed to moderate the source's impact on air quality.

Moreover, other aspects of the technical methodology in the SIL guidance compared to the good neighbor framework make a direct comparison between these two values misleading. For instance, in PSD permit modeling using a single year of meteorology the maximum single-day 8-hour contribution is evaluated with respect to the SIL. The purpose of the contribution threshold at Step 2 of the 4-step good neighbor framework is to determine whether the average contribution from a collection of sources in a state is small enough not to warrant any additional control for the purpose of mitigating interstate transport, even if that control were highly cost effective. Using a 1 percent of the NAAQS threshold is more appropriate for evaluating multi-day average contributions from upwind states than a 1 ppb threshold applied for a single day, since that lower value of 1 percent of the NAAQS will capture variations in contribution. If EPA were to use a single day reflecting the maximum amount of contribution from an upwind state to determine whether a linkage exists at Step 2, comments' arguments for use of the PSD SIL might have more force. However, that would likely cause more states to become linked, not less. And in any case, consistent with the method in our modeling guidance for projecting future attainment/nonattainment, the good neighbor methodology of using multiple days provides a more robust approach to establishing that a linkage exists at the state level than relying on a single day of data.

### 7. Step 2: August 2018 Memorandum

*Comment:* Comments assert that in the August 2018 memorandum the EPA committed itself to approving SIP submissions from states with contributions below 1 ppb, and so now the EPA should or must approve the good neighbor SIP submission from any state with a contribution below 1 ppb, either based on modeling available at the time of the state's SIP submission or at any time.

*EPA Response:* These comments mischaracterize the content and the EPA's application of August 2018 memorandum. Further, the EPA disputes that the EPA misled states or that the EPA has not appropriately reviewed SIP submissions from states that attempted to rely on an alternative contribution threshold at Step 2.

Specifically, the EPA's August 2018 memorandum provided an analysis regarding ''the degree to which certain air quality threshold amounts capture the collective amount of upwind contribution from upwind states.'' [306] It interpreted ''that information to make recommendations about what thresholds *may* be appropriate for use in'' SIP submissions (emphasis added).[307] Specifically, the August 2018 memorandum said, ''Because the amount of upwind collective contribution capture with the 1 percent and the 1 ppb thresholds is generally comparable, overall, we believe it *may* be reasonable and appropriate for states to use a 1 ppb contribution threshold, as an alternative to a 1 percent threshold, at Step 2 of the 4-step framework in developing their SIP revisions addressing the good neighbor provision for the 2015 ozone NAAQS.'' (emphasis added).[308] Thus, the text of the August 2018 memorandum does not guarantee that any state with a contribution below 1 ppb has an automatically approvable good neighbor SIP. In fact, the August 2018 memorandum indicated that ''[f]ollowing these recommendations does not ensure that EPA will approve a SIP revision in all instances where the recommendations are followed, as the guidance may not apply to the facts and circumstances underlying a particular SIP. Final decisions by the EPA to approve a particular SIP revision will

---

[306] August 2018 memorandum, page 1.
[307] August 2018 memorandum, page 1.
[308] August 2018 memorandum, page 4.

only be made based on the requirements of the statute and will only be made following an air agency's final submission of the SIP revision to the EPA, and after appropriate notice and opportunity for public review and comment.'' [309] The August 2018 memorandum also stated, ''EPA and air agencies should consider whether the recommendations in this guidance are appropriate for each situation.'' [310] The EPA's assessment of every SIP submission that invoked the August 2018 memorandum considered the particular arguments raised by the state.[311]

*Comment:* Some comments allege that the EPA representatives led the states to believe that their SIP submission would be approved on the basis of a 1 ppb contribution threshold. The comments further claim that the EPA has now since reversed course on its August 2018 memorandum and imposed new requirements on states that were not included in the EPA's guidance. One comment suggested EPA switched position without explanation from the August 2018 guidance to its proposed disapprovals, which it viewed as unlawful under *FCC* v. *Fox TV Stations, Inc.,* 556 U.S. 502 (2009).

*EPA Response:* As an initial matter, we note that the salience of these comments is limited to only a handful of states. The August 2018 memorandum made clear that the Agency had substantial doubts that any threshold greater than 1 ppb (such as 2 ppb) would be acceptable, and the Agency is affirming that a threshold higher than 1 ppb would not be justified under any circumstance for purposes of this action. No comment provided a credible basis for using a threshold even higher than 1 ppb. So this issue is primarily limited to the difference between a 0.70 ppb threshold and a 1.0 ppb threshold. Therefore, we note that this issue is only relevant to a small number of states whose only contributions to any receptor are above 1 percent of the NAAQS but lower than 1 ppb. Under the 2016v3 modeling of 2023 being used in this final action, those states with contributions that fall between 0.70 ppb and 1 ppb included in this action are Alabama, Kentucky, and Minnesota.

The EPA disagrees with comments' claims that the Agency has reversed course on applying the August 2018 memorandum. In line with the memorandum, the EPA evaluated every justification put forward by every state covered by this SIP disapproval action that attempted to justify an alternative threshold under the August 2018 memorandum, which are Alabama,[312] Arkansas,[313] Illinois,[314] Indiana,[315] Kentucky,[316] Louisiana,[317] Michigan,[318] Mississippi,[319] Missouri,[320] and Oklahoma,[321] and Utah.[322] The EPA also addressed criticisms of the 1 percent of the NAAQS contribution threshold made by Ohio [323] and Nevada.[324] (The topic of the EPA's input during state's SIP-development processes is further discussed in the RTC document.)

For this reason, the EPA disagrees with comment that case law reviewing changes in agency positions as articulated in *FCC* v. *Fox TV Stations, Inc.,* is applicable to this action. The Agency has not imposed a requirement that states must use a 1 percent of the NAAQS threshold (which would reflect a change in position from the August 2018 memorandum). Rather, under the terms of the August 2018 memorandum, the Agency has found that Alabama, Arkansas, Illinois, Indiana, Kentucky, Louisiana, Michigan, Mississippi, Missouri, Nevada, Ohio, Oklahoma, and Utah have not made a sufficient showing that the use of an alternative contribution threshold is justified for those States. Even if it were found that the Agency's position had fundamentally changed between this rulemaking action and the August 2018 memorandum (which we do not concede to be the case), we do not believe that any state had a legitimate reliance interest that would be sufficient to overcome the countervailing public interest that is served in declining to approve a state's use of the 1 ppb threshold where the state did not have adequate technical justification. First, neither states nor the emissions sources located in those states have incurred any compliance costs based on the August 2018 memorandum. Second, it

is not clear that any states invested much of their own public resources in developing state-specific arguments in support of a 1 ppb threshold. As the EPA observed at proposal, in nearly all submittals, the states did not provide the EPA with analysis specific to their state or the receptors to which its emissions are potentially linked. In one case, the EPA's proposed approval of Iowa's SIP submittal, ''the *EPA expended its own resources to attempt to supplement the information submitted by the state,* in order to more thoroughly evaluate the state-specific circumstances that could support approval.'' E.g., 87 FR 9806–07 (emphasis added). The EPA emphasizes again that it was the EPA's sole discretion to perform this analysis in support of the state's submittal, and the Agency is not obligated to conduct supplemental analysis to fill the gaps whenever it believes a state's analysis is insufficient. *Id.*

We acknowledge that certain states may have assumed the EPA would approve SIP submissions from states whose contribution to any receptor was below 1 ppb, but that assumption reflected a misunderstanding of the August 2018 memorandum, and in any case, an assumption is not, as a legal matter, the same thing as a reliance interest.

The EPA is not formally rescinding the August 2018 memorandum in this action or at this time, but since guidance memoranda are not binding in the first place, it is not required that agencies must ''rescind'' a guidance the moment it becomes outdated or called into question. As the Agency made clear in the August 2018 memorandum, all of EPA's proposals for action on interstate transport SIP submissions are subject to rulemaking procedure, including public notice and comment, before the EPA makes a final decision.

Although the EPA is not formally revoking the August 2018 memorandum at this time, and we have separately found that no state successfully established a basis for use of a 1 ppb threshold, we also continue to believe, as set forth in our proposed disapprovals, that national ozone transport policy associated with addressing obligations for the 2015 ozone NAAQS is not well-served by allowing for less protective thresholds at Step 2. Furthermore, the EPA disagrees that national consistency is an inappropriate consideration in the context of interstate ozone transport. The Good Neighbor provision, CAA section 110(a)(2)(D)(i)(I), requires to a unique degree of concern for consistency, parity, and equity across

---

[309] August 2018 memorandum, page 1.

[310] August 2018 memorandum, page 1.

[311] 87 FR 64423–64424 (Alabama); 87 FR 9806–9807 (Arkansas); 87 FR 9852–9853 (Illinois); 87 FR 9855–9856 (Indiana); 87 FR 9508–9511 (Kentucky); 87 FR 9812–9813 (Louisiana); 87 FR 9861–9862 (Michigan); 87 FR 9557 (Mississippi); 87 FR 9541–9543 (Missouri); 87 FR 31492 (Nevada); 87 FR 9870–9871 (Ohio); 87 FR 9818–9820 (Oklahoma); 87 FR 31477–31451 (Utah).

[312] 87 FR 64423–64424.

[313] 87 FR 9806–9807.

[314] 87 FR 9852–9853.

[315] 87 FR 9855–9856.

[316] 87 FR 9508–9511.

[317] 87 FR 9812–9813.

[318] 87 FR 9861–9862.

[319] 87 FR 9557.

[320] 87 FR 9541–9543.

[321] 87 FR 9818–9820.

[322] 87 FR 31477–31451.

[323] 87 FR 9870–9871.

[324] 87 FR 31492.

state lines.[325] For a regional air pollutant such as ozone, consistency in requirements and expectations across all states is essential. Based on the EPA's review of good neighbor SIP submissions to-date and after further consideration of the policy implications of attempting to recognize an alternative Step 2 threshold for certain states, the Agency now believes the attempted use of different thresholds at Step 2 with respect to the 2015 ozone NAAQS raises substantial policy consistency and practical implementation concerns. The availability of different thresholds at Step 2 has the potential to result in inconsistent application of good neighbor obligations based solely on the strength of a state's SIP submission at Step 2 of the 4-step interstate transport framework. From the perspective of ensuring effective regional implementation of good neighbor obligations, the more important analysis is the evaluation of the emissions reductions needed, if any, to address a state's significant contribution after consideration of a multifactor analysis at Step 3, including a detailed evaluation that considers air quality factors and cost. While alternative thresholds for purposes of Step 2 may be "similar" in terms of capturing the relative amount of upwind contribution (as described in the August 2018 memorandum), nonetheless, use of an alternative threshold would allow certain states to avoid further evaluation of potential emissions controls while other states with a similar level of contribution would proceed to a Step 3 analysis. This can create significant equity and consistency problems among states.

One comment suggested that the EPA could address this potentially inequitable outcome by simply adopting a 1 ppb contribution threshold for all states. However, the August 2018 memorandum did not conclude that 1 ppb would be appropriate for all states, and the EPA does not view that conclusion to be supported at present. The EPA recognized in the August 2018 memorandum that on a nationwide basis there was some similarity in the amount of total upwind contribution captured between 1 percent and 1 ppb. However, while this may be true in some sense, that is hardly a compelling basis to move to a 1 ppb threshold for

every state. Indeed, the 1 ppb threshold has the disadvantage of losing a certain amount of total upwind contribution for further evaluation at Step 3 (*e.g.,* roughly 7 percent of total upwind state contribution was lost according to the modeling underlying the August 2018 memorandum; in the EPA's 2016v2 and 2016v3 modeling, the amount lost is 5 percent). Further, this logic has no end point. A similar observation could be made with respect to any incremental change. For example, should the EPA next recognize a 1.2 ppb threshold because that would only cause some small additional loss in capture of upwind state contribution as compared to 1 ppb? If the only basis for moving to a 1 ppb threshold is that it captures a "similar" (but actually smaller) amount of upwind contribution, then there is no basis for moving to that threshold at all. Considering the core statutory objective of ensuring elimination of all significant contribution to nonattainment or interference with maintenance of the NAAQS in other states as well as the broad, regional nature of the collective contribution problem with respect to ozone, we continue to find no compelling policy reason to adopt a new threshold for all states of 1 ppb.

It also is unclear why use of a 1 ppb threshold would be appropriate for all states under a more protective NAAQS when a 1 percent of the NAAQS contribution threshold has been used for less protective NAAQS. To illustrate, a state contributing greater than 0.75 ppb but less than 1 ppb to a receptor under the 2008 ozone NAAQS was "linked" at Step 2 using the 1 percent of the NAAQS contribution threshold, but if a 1 ppb threshold were used for the 2015 ozone NAAQS, then that same state would not be "linked" to a receptor at Step 2 under a NAAQS that is set to be more protective of human health and the environment. Consistency with past interstate transport actions such as CSAPR, and the CSAPR Update and Revised CSAPR Update rulemakings (which used a Step 2 threshold of 1 percent of the NAAQS for two less protective ozone NAAQS), is an important consideration. Continuing to use a 1 percent of NAAQS approach ensures that if the NAAQS are revised and made more protective, an appropriate increase in stringency at Step 2 occurs, to ensure an appropriately larger amount of total upwind-state contribution is captured for purposes of fully addressing interstate transport obligations. *See* 76 FR 48208, 48237–38.

One comment identified that if the EPA were to use a 1 percent of the

NAAQS contribution threshold, the EPA would be obligated to seek feedback on that contribution threshold through a public notice and comment process. The EPA's basis and rationale for every SIP submission covered by this final SIP disapproval action, including the use of a 1 percent of the NAAQS contribution threshold, was in fact presented for public comment. The EPA received, and is addressing in this action, many detailed comments about contribution thresholds. Further, the EPA's application of a 1 percent of the NAAQS threshold has been consistently used in notice-and-comment rulemakings beginning with the CSAPR rulemaking in 2010–2011 and including both FIP actions (CSAPR Update and Revised CSAPR Update) and numerous actions on ozone transport SIP submissions. In each case, the 1 percent of the NAAQS threshold was subject to rigorous vetting through public comment and the Agency's response to those comments, including through analytical evaluations of alternative thresholds. *See, e.g.,* 81 FR 74518–19. By contrast, the August 2018 memorandum was not issued through notice-and-comment rulemaking procedures, and the EPA was careful to caveat its utility and ultimate reliability for that reason.

*Comment:* Some comments claim that the EPA is applying the August 2018 memorandum inconsistently based on the EPA's actions with regard to action good neighbor SIP submissions from Iowa and Oregon for the 2015 ozone NAAQS and Arizona's good neighbor SIP submission for the 2008 ozone NAAQS.

*EPA Response:* The EPA disagrees that there is any such inconsistency. The EPA withdrew a previously proposed approval of Iowa's SIP submission where the Agency had attempted to substantiate the use of a 1 ppb contribution threshold, and re-proposed and finalized approval of that SIP based on a different rationale using a 1 percent of the NAAQS contribution threshold. 87 FR 9477 (Feb. 22, 2022); 87 FR 22463 (April 15, 2022). As explained earlier in this section, this experience of the EPA attempting to justify 1 ppb for a state through additional air quality analysis, where the state had not conducted an analysis the Agency considered to be sufficient is part of the reason the Agency is moving away from attempting to justify use of this alternative contribution threshold.

The EPA also disputes the claim that Oregon and Arizona were the only states "allowed" to use a 1 ppb threshold. The EPA approved Oregon's SIP submission for the 2015 ozone NAAQS on May 17,

---

[325] The EPA notes that Congress has placed on the EPA a general obligation to ensure the requirements of the CAA are implemented consistently across states and regions. *See* CAA section 301(a)(2). Where the management and regulation of interstate pollution levels spanning many states is at stake, consistency in application of CAA requirements is paramount.

2019, and both Oregon and the EPA relied on a 1 percent of the NAAQS contribution threshold. 84 FR 7854, 7856 (March 5, 2019) (proposal); 84 FR 22376 (May 17, 2019) (final). In our FIP proposal for the 2015 ozone NAAQS, the EPA explained it was not proposing to conduct an error correction for Oregon even though updated modeling indicated Oregon contributed above 1 percent of the NAAQS to monitors in California, because the specific monitors in California are not interstate ozone transport "receptors" at Step 1. *See* 87 FR 20036, 20074–20075 (April 6, 2022). The EPA solicited public comment on its approach to Oregon's contribution to California receptors as part of the 2015 ozone NAAQS transport FIP development, and the Agency has not yet taken final action on that FIP. In 2016, the EPA previously approved Arizona's good neighbor SIP for the earlier 2008 ozone NAAQS based on a similar rationale with regard to certain monitors in California in 2016. 81 FR 15200 (March 22, 2016) (proposal); 81 FR 31513 (May 19, 2016) (final rule). The Agency's view with respect to its evaluation of both Arizona and Oregon is that specific monitors in California are not interstate ozone transport "receptors" at Step 1. The EPA has not approved or applied an alternative Step 2 threshold for any state.

Comments related to the specific circumstances of an individual state and/or its arguments put forth in its SIP submission as it pertains to the August 2018 Memorandum are further addressed in the RTC document.

8. Step 3: States' Step 3 Analyses for the 2015 Ozone NAAQS

*Comment:* Comments state that the EPA has not provided any guidance on what an appropriate Step 3 analysis would entail, and therefore any decision where the Agency rejects a Step 3 analysis is arbitrary and capricious. One comment claims that not a single state has successfully made a Step 3 demonstration leading to an approvable interstate transport SIP for the 2015 ozone NAAQS. Comments note that there is no requirement in the CAA that states must complete an analysis similar to the EPA's, and the EPA cannot substitute its own judgment for that of the state's in crafting a SIP. Rather, the EPA is obligated to defer to state choices. One comment asserts that the EPA is required to interpret the term "significant contribution" in a manner "which ties contribution to an amount which contributes significantly to downwind maintenance or nonattainment problems." Another comment claims the EPA is

intentionally exploiting the Supreme Court decision in *EME Homer City* to justify any requirements it deems necessary to further Federal policy decisions. Some comments identify that some states did not conduct a Step 3 analysis in their submitted SIPs because, using the flexibilities provided in the 2018 memoranda, these states concluded in Step 1 and Step 2 that no controls were required. One comment suggests that the EPA propose an 18-month period to allow these states to proceed with Steps 3 and 4.

*EPA Response:* The EPA disagrees that it is obligated to defer to states' choices in the development of good neighbor SIP submissions. As required by the Act, the EPA has evaluated each of the SIP submissions for compliance with the CAA, including whether an adequate Step 3 analysis was conducted—or whether states had offered an approvable alternative approach to evaluating their good neighbor obligations—and found in each case that what these states submitted was not approvable. The Supreme Court has recognized that the EPA is not obligated to provide states with guidance before taking action to disapprove a SIP submission. *EME Homer City,* 572 U.S. at 508–10. Nonetheless, throughout the entire history of the EPA's actions to implement the good neighbor provision for ozone, starting with the 1998 NOₓ SIP Call, we have consistently adopted a similar approach at Step 3 that evaluates emissions reduction opportunities for linked states applying a multifactor analysis. States could have performed a similar analysis of emissions control opportunities. The EPA has not directed states that they must conduct a Step 3 analysis in precisely the manner the EPA has done in its prior regional transport rulemakings; however, SIPs addressing the obligations in CAA section 110(a)(2)(D)(i)(I) must prohibit "any source or other type of emissions activity within the State" from emitting air pollutants which will contribute significantly to downwind air quality problems. Thus, States seeking to rely on an alternative approach to defining "significance" must use an approach that comports with the statute's objectives to determine whether and to what degree emissions from a state should be "prohibited" to eliminate emissions that will "contribute significantly to nonattainment in, or interfere with maintenance of" the NAAQS in any other state. Further, the approach selected must be reasonable and technically justified. Therefore,

while the EPA does not direct states to use a particular framework, nonetheless, each state must show that its decision-making was based on a "technically appropriate or justifiable" evaluation.

Further, the Agency has a statutory obligation to review and approve or disapprove SIP submittals according to the requirements of the Clean Air Act. *See* CAA section 110(k)(3). And the Agency is empowered to interpret those statutory requirements and exercise both technical and policy judgment in acting on SIP submissions. Indeed, the task of allocating responsibility for interstate pollution particularly necessitates Federal involvement. *See EME Homer City,* 572 U.S. at 514 ("The statute . . . calls upon the Agency to address a thorny causation problem: How should EPA allocate among multiple contributing upwind States responsibility for a downwind State's excess pollution?"); *see also Wisconsin,* 938 F.3d at 320. Further, we have consistently disapproved states' good neighbor SIP submissions addressing prior ozone NAAQS when we have found those states linked through our air quality modeling and yet the state failed to conduct an analysis of emissions control opportunities, or such analysis was perfunctory or otherwise unsatisfactory. We have been upheld in our judgment that such SIPs are not approvable. *See Westar Energy* v. *EPA,* 608 Fed. App'x 1, 3 (DC Cir. 2015) ("EPA acted *well within the bounds* of its delegated authority when it disapproved of Kansas's proposed SIP.") (emphasis added).

With respect to the assertion that no state has successfully avoided a FIP with an approvable Step 3 analysis, we note first that at this time, no final FIP addressing the 2015 ozone NAAQS has been promulgated. More directly to the point, no state submission that is the subject of this disapproval action offered any additional emissions control measures. While it is conceivable that a Step 3 analysis may result in a determination that no additional controls are needed, EPA expects that such circumstances will generally be rare, else the CAA's interstate transport provisions are rendered ineffective. For example, the EPA determined in the CSAPR Update that even though the District of Columbia and Delaware were linked to out of state receptors at Steps 1 and 2 of the 4-step interstate transport framework, no additional control measures were required of either jurisdiction. As to the District of Columbia, we found that there were no affected EGU sources that would fall under the CSAPR Update's control program. For Delaware, we found that

there were no emissions reductions available from any affected sources for any of the emissions control stringencies that were analyzed. *See* 81 FR 74504, 74553. No state's submission covered in this action contained an emissions control analysis that would allow for these types of conclusions to be reached for all of its sources.[326] States generally did not conduct any comparative analysis of available emissions control strategies—nor did they prohibit any additional ozone-precursor emissions.

We are unclear what another comment intends in asserting that the EPA is required to interpret "significant contribution" in a manner "which ties contribution to an amount which contributes significantly to downwind maintenance or nonattainment problems." The EPA disagrees that: (1) It has imposed or mandated a specific approach to Step 3 in this action, (2) this action established a particular level of emissions reduction that states were required to achieve, or (3) it mandated a particular methodology for making such a determination. To the extent the comment suggests that the Agency cannot mandate that states use cost as a method of allocating responsibility in their transport SIPs, first, the Agency has not done so. Further, as to whether cost could be used as a permissible method of allocating responsibility, the comment ignores the Supreme Court's holding to the contrary in *EME Homer City,* 572 U.S. at 518, and the D.C. Circuit's earlier holding to the same effect in *Michigan,* 213 F.3d at 687–88, both of which upheld the EPA's approach of using uniform cost-effectiveness thresholds to allocate upwind state responsibilities under the good neighbor provision for prior NAAQS. While this approach may be reasonable to apply again for the 2015 ozone NAAQS (and the EPA has proposed to do so in the CSAPR FIP action published on April 6, 2022), the EPA did not impose such a requirement on states in developing SIP submissions, nor is the EPA finding any SIP submission not approvable based on a

failure to use this particular methodology.

In its March 2018 memorandum, Attachment A, the Agency acknowledged that there could be multiple ways of conducting a Step 3 analysis. The Agency did not endorse any particular approach and noted the Attachment was merely a list of stakeholder ideas that the EPA was not recommending any state follow. The apparent result of this "flexibility," however, was that no state presented a Step 3 analysis that resulted in including any enforceable emissions reductions to address good neighbor obligations for the 2015 ozone NAAQS in their interstate transport SIP submittals. Likewise, the comment here did not include information or analysis establishing that any particular alternative Step 3 approach should have been approved or that any state performed such an analysis in a manner that would have addressed "significant contribution" even in the manner the comment appears to be suggesting.

Notably, materials appended to one State's SIP submission, developed by the Midwest Ozone Group (MOG), did present an analysis applying an approach to "significant contribution" that was based on calculating a proportional share of each state's contribution to a downwind receptor, and this methodology would have imposed on that State's, Kentucky's, sources an obligation to eliminate 0.02 ppb of ozone at the relevant receptor. *See* 87 FR 9507. While the EPA does not endorse or here evaluate the merits of such an approach, it is noteworthy that the State in that instance did not adopt that approach, did not impose that obligation on its sources through enforceable measures by revising its SIP, and offered no explanation for its decision not to do so. *See id.* 9516 ("This approach would have imposed additional emissions reductions for Kentucky sources. Kentucky's final SIP did not consider MOG's proposal and did not provide an explanation for why it was rejecting this approach to allocating upwind emissions reductions, even though it appended this recommendation to its SIP submittal.").

### 9. Step 4: Attempt To Rely on FIPs in a SIP Submission

*Comment:* One comment states that FIPs or other Federal emissions control measures do not have to be incorporated into and enforceable under state law to be an approvable SIP measure. They view it as acceptable for a state to rely in its SIP Submission on the emissions reductions achieved by prior ozone transport FIPs, such as the CSAPR

Update or the Revised CSAPR Update, as a permissible means of achieving emissions reductions to eliminate significant contribution for the 2015 ozone NAAQS.

*EPA Response:* The EPA disagrees. As the EPA has noted on page 16 of our September 2013 memorandum "Guidance on Infrastructure State Implementation Plan (SIP) Elements under Clean Air Act sections 110(a)(1) and 110(a)(2)" (2013 Infrastructure SIP Guidance): "a FIP is not a state plan and thus cannot serve to satisfy the state's obligation to submit a SIP." [327] Indeed, the general principle that measures relied on to meet states' CAA obligations must be part of the SIP has been recognized by courts, such as in *Committee for a Better Arvin,* 786 F.3d 1169 (9th Cir. 2015).

This principle is grounded in the recognition that if such measures are not rendered enforceable within the SIP itself, then they may be modified or amended in ways that would undermine the basis for the state's reliance on them, while the approved SIP itself would purport to have addressed the relevant obligation merely by outdated reference to that modified or nonexistent control measure residing outside the SIP. For example, to be credited for attainment demonstration purposes, requirements that may otherwise be federally enforceable (such as new source review permit limits or terms in federally enforceable consent orders), must be in the state's implementation plan so that they could not later be changed without being subject to the EPA's approval. This principle is instrumental to ensuring that states cannot take credit for control measures that might be changed (even by the EPA itself) without the EPA's required approval action under CAA section 110, which includes the obligation to ensure there is no interference or backsliding with respect to all applicable CAA requirements. *See* CAA section 110(l). *See also Montana Sulfur and Chemical Co.* v. *EPA,* 666 F.3d 1174, 1195–96 (9th Cir. 2012) ("The EPA correctly reads 42 U.S.C. 7410(a)(2) as requiring states to include enforceable emissions limits and other control measures *in the plan itself.*") (emphasis in original); 40 CFR 51.112(a) ("Each plan must demonstrate that the measures, rules, and regulations *contained in it* are adequate to provide for the timely attainment and

---

[326] We note that California's SIP submission is not approvable at Step 3, despite the fact that the EPA has not identified NO$_X$ emissions control opportunities at the state's EGUs. Nonetheless, the SIP submission is not approvable because the state attempted to rely on the CSAPR Update cost threshold to justify a no-control determination when that threshold was in relation to a partial remedy for a less protective NAAQS, and even if it could be reasonably concluded that no emissions reductions are appropriate at EGUs in California, the SIP submission did not conduct an adequate analysis of emissions control opportunities at its non-EGU industrial sources. *See* 87 FR 31459–60.

[327] Guidance on Infrastructure State Implementation Plan (SIP) Elements under Clean Air Act Sections 110(a)(1) and 110(a)(2), September 13, 2013 (available at *https://www.epa.gov/sites/default/files/2015-12/documents/guidance_on_infrastructure_sip_elements_multipollutant_final_sept_2013.pdf*).

maintenance of the national standard that it implements.'') (emphasis added).

The EPA has applied this same interpretation in implementing other infrastructure SIP requirements found in CAA section 110(a)(2). For example, in implementing CAA section 110(a)(2)(C), (D)(i)(II), (D)(ii), and (J) relating to the permitting program for PSD, the EPA has developed FIPs that incorporate by reference provisions codified at 40 CFR 51.21, and some states have taken delegation of that FIP to implement the relevant requirements. But the EPA does not and cannot approve the state as having met these infrastructure SIP elements, even by virtue of taking delegation of the FIP. *See, e.g.,* 83 FR 8818, 8820 (March 1, 2018). Likewise, under one of the pathways presented in our 2013 Infrastructure SIP Guidance, the EPA does not approve SIPs addressing interstate visibility transport obligations under CAA section 110(a)(2)(D)(i)(II) (''prong 4'') until the state itself has a fully approved regional haze plan, and states cannot rely on the CSAPR ''better than BART'' FIPs to meet their prong 4 requirements until they have replaced that FIP with an approved SIP. *See, e.g.,* 84 FR 13800, 13801 (April 8, 2019); 84 FR 43741, 43744 (Aug. 22, 2019).

The comment does not provide contrary examples where the EPA has approved, as a SIP-based emissions control program, requirements that are established through Federal regulation or other types of emissions control programs that are outside the SIP. It is true that in the first two steps of the 4-step interstate transport framework, the EPA conducts air quality modeling based on emissions inventories reflective of on-the-books state and Federal emissions control requirements, to make determinations about air quality conditions and contribution levels that can be anticipated *in the baseline* in a future analytic year. If the comment's examples were intended to reference this consideration of Federal measures in prior actions on SIP submittals, the EPA agrees that it does consider such measures at these steps of its analysis, and the EPA has consistently taken this approach throughout its prior ozone transport actions. But here we are discussing Step 3 and 4 of the framework, where states that have been found to contribute to downwind nonattainment and maintenance problems, *e.g.,* are linked at Steps 1 and 2 to an out of state receptor, would need to evaluate their continuing emissions to determine what if any of those emissions should be deemed ''significant'' (*e.g.,* Step 3) and eliminated through enforceable

emissions control requirements (*e.g.,* Step 4). The EPA is not aware of any good neighbor SIP submission that it has approved where a state purported to eliminate its significant contribution (*e.g.,* satisfy Steps 3 and 4) simply by referring to Federal measures that were not included in its SIP and enforceable as a matter of state law. Finally, it bears emphasizing that the EPA's assessment of the 2015 ozone transport SIPs has already accounted for the emissions-reducing effects of both the CSAPR Update and the Revised CSAPR Update in its baseline air quality modeling at Steps 1 and 2, and so pointing to either of those rules as measures that would eliminate significant contribution at Step 3, for purposes of the 2015 ozone NAAQS, would be impermissible double-counting.

## C. Good Neighbor Provision Policy

### 1. Mobile Source Emissions

*Comment:* Several comments assert that mobile source emissions within the home state of the location of receptors are the primary source of nonattainment problems in downwind areas. Some comments additionally state that a larger portion of their own upwind state emissions is from mobile source emissions. These comments request that the EPA focus on these emissions sources rather than stationary sources to reduce ongoing nonattainment problems. These comments claim mobile sources are federally regulated and, therefore, the EPA bears the responsibility to either take action to reduce mobile source emissions nationwide or encourage downwind states to implement strategies to reduce their own local mobile source emissions.

*Response:* The EPA recognizes that nationwide, mobile sources represent a large portion of ozone-precursor emissions and, as such, would be expected to have a large impact on nonattainment and maintenance receptors.

The EPA has been regulating mobile source emissions since it was established as a Federal agency in 1970 and is committed to continuing the effective implementation and enforcement of current mobile source emissions standards and evaluating the need for additional standards.[328] The

EPA believes that the $NO_X$ reductions from its Federal programs are an important reason for the historical and long-running trend of improving air quality in the United States. The trend helps explain why the overall number of receptors and severity of ozone nonattainment problems under the 1997 and 2008 ozone NAAQS have declined. As a result of this long history, $NO_X$ emissions from onroad and nonroad mobile sources have substantially decreased and are predicted to continue to decrease into the future as newer vehicles and engines that are subject to the more recent and more stringent standards replace older vehicles and engines.[329]

The EPA included mobile source emissions in the 2016v2 modeling used to support the proposal of these SIP disapproval actions to help determine state linkages at Steps 1 and 2 of the 4-step interstate transport framework and has done likewise in its 2016v3 modeling. However, whether mobile source emissions are a large portion of an upwind or downwind state's $NO_X$ emissions, and whether they represent a large portion of the contribution to downwind nonattainment and maintenance receptors, does not answer the question regarding the adequacy of an upwind state's SIP submission. The question is whether ''any source or other type of emissions activity'' (in the collective) in an upwind state is contributing significantly to downwind receptors, *see* CAA section 110(a)(2)(D)(i). A state's transport SIP must include a technical and adequate justification to support its conclusion that the state has satisfied its interstate transport obligations for the 2015 ozone NAAQS.

To the extent that comments argue that mobile source emissions should be the focus of emissions reductions for the purposes of resolving interstate transport obligations, states could have provided such an analysis for how mobile source reductions might achieve necessary reductions. *See, e.g.,* 70 FR 25209. However, states conducted no such analysis of methods or control techniques that could be used to reduce mobile source emissions, instead claiming that states cannot control mobile source emissions, as this is a federally-regulated sector, or states cannot reasonably control these emissions. States do have options, however, to reduce emissions from certain aspects of their mobile source

---

[328] On December 20, 2022, the EPA finalized more stringent emissions standards for $NO_X$ and other pollutants from heavy-duty vehicles and engines, beginning with model year 2027. *See https://www.epa.gov/regulations-emissions-vehicles-and-engines/final-rule-and-related-materials-control-air-pollution.* The EPA is also developing new multi-pollutant standards for light-

and medium-duty vehicles as well as options to address pollution from locomotives.

[329] *https://gispub.epa.gov/air/trendsreport/2022/#home.*

sectors, and to the extent a state is attributing its contribution to out of state receptors to its mobile sources, it could have conducted an analysis of possible programs or measures that could achieve emissions reductions from those sources. (For example, a general list of types of transportation control measures can be found in CAA section 108(f).[330])

State-specific issues raised by comments are further addressed in the RTC document.

## 2. International Contributions

*Comment:* Several comments state that international emissions contribute to nonattainment and maintenance receptors downwind, and these emissions are not within the jurisdiction of the states. They advocate for the EPA should considering this when acting on SIP submissions. Some comments claim that, in the west, international contributions are even greater than in eastern portions of the U.S. and support their notion that the EPA's evaluation of interstate transport should take special consideration of unique regional factors when determining upwind state obligations, or that the Agency should otherwise explain why it is still inappropriate to factor in higher international contributions, as the Agency has done in Oregon's case.

*Response:* The EPA responded to similar arguments related to international emissions included in the SIP submissions of Arkansas, California, Illinois, Indiana, Kentucky, Michigan, Missouri, Ohio, Utah, Wyoming, and West Virginia in the proposed disapprovals.[331] No comments on the proposed disapprovals provided new information to indicate the EPA's initial assessment was incorrect. These comments' reasoning related to international emissions is inapplicable to the requirements of CAA section 110(a)(2)(D)(i)(I). The good neighbor provision requires states and the EPA to address interstate transport of air pollution that significantly contributes

to downwind states' ability to attain and maintain the NAAQS. Whether emissions from other states or other countries also contribute to the same downwind air quality issue is typically not relevant in assessing whether a downwind state has an air quality problem, or whether an upwind state is significantly contributing to that problem. (Only in rare cases has EPA concluded that certain monitoring sites should not be considered receptors at Step 1 due to the very low collective upwind-state contribution at those receptors. *See* the RTC document.) States are not obligated under CAA section 110(a)(2)(D)(i)(I) to act alone to reduce emissions in amounts sufficient to resolve a downwind receptor's nonattainment or maintenance problem. Rather, states are obligated to eliminate their own "significant contribution" to that receptor or "interference" with the ability of other states to attain or maintain the NAAQS. The statutory standard is, fundamentally, one of contribution, not causation.

Indeed, the D.C. Circuit in *Wisconsin* specifically rejected petitioner arguments suggesting that upwind states should be excused from good neighbor obligations on the basis that some other source of emissions (whether international or another upwind state) could be considered the "but-for" cause of downwind air quality problem. *See Wisconsin,* 938 F.3d at 323–324. The court viewed petitioners' arguments as essentially an argument "that an upwind state 'contributes significantly' to downwind nonattainment only when its emissions are the sole cause of downwind nonattainment." *Id.* at 324. The court explained that "an upwind state can 'contribute' to downwind nonattainment even if its emissions are not the but-for cause." *Id.* at 324–325. *See also Catawba County* v. *EPA,* 571 F.3d 20, 39 (DC Cir. 2009) (rejecting the argument "that 'significantly contribute' unambiguously means 'strictly cause'" because there is "no reason why the statute precludes EPA from determining that [an] addition of [pollutant] into the atmosphere is significant even though a nearby county's nonattainment problem would still persist in its absence"); *Miss. Comm'n on Envtl. Quality* v. *EPA,* 790 F.3d 138, 163 n.12 (DC Cir. 2015) (observing that the argument that "there likely would have been no violation at all . . . if it were not for the emissions resulting from [another source]" is "merely a rephrasing of the but-for causation rule that we rejected in Catawba County"). Therefore, a state is not excused from eliminating its significant contribution on the basis that

international emissions also contribute some amount of pollution to the same receptors to which the state is linked.

To the extent comments compare the influence of international emissions with the EPA's treatment of receptors in California to which Oregon contributes greater than 0.70 ppb, the EPA responds to these comments in the RTC document.

## 3. Western Interstate Transport Policy

*Comment:* Several comments argue that the EPA should consider an alternative approach to evaluating interstate transport in the western U.S. Comments assert there are considerations unique to the western states, such as increased background, international, and wildfire contributions to ozone concentrations in the west. Some commenters believe a "case-by-case" assessment is more appropriate for evaluating western states' interstate transport obligations, as they claim the EPA had done for the 2008 ozone standards. They additionally argue that the EPA modeling is not able to accurately project ozone concentrations in the west because of these factors, along with the west's unique topographical influence on ozone transport.

*Response:* The EPA disagrees that either its nationwide photochemical grid modeling or the 4-step interstate transport framework for ozone cannot generally be applied to states in the western region of the U.S. and has maintained that position consistently throughout numerous actions.[332] Though at times the EPA has found it appropriate to examine more closely discreet issues for some western states,[333] the 4-step interstate transport framework itself is appropriate for assessing good neighbor obligations of western states in the absence of those circumstances. The EPA evaluated the contents of the western states' SIP submissions covered by this action on the merits of the information the states provided. As described at proposal and reiterated in Section IV, the EPA is finalizing its disapproval of California,

---

[330] In making this observation, the EPA is not suggesting that mobile source emissions reductions are necessarily required to address a state's good neighbor obligations, but merely pointing out that if the state itself attributes the problem to mobile sources, then it is reasonable to expect that further analysis of such control strategies would be explored.

[331] 87 FR 9798, 9809–9810 (Feb. 22, 2022) (Arkansas); 87 FR 31443, 31460–31461 (May 24, 2022) (California); 87 FR 9854 (Illinois); 87 FR 9859–9860 (Indiana); 87 FR 9498, 9508 (Feb. 22, 2022) (Kentucky); 87 FR 9838, 9865 (Michigan); 87 FR 9533, 9543 (Feb. 22, 2022) (Missouri); 87 FR 9838 at 9874 (Ohio); 87 FR 31470, 31482 (May 24, 2022) (Utah); 87 FR 9516, 9527 (Feb. 22, 2022) (West Virginia); 87 FR 31495, 31507 (May 24, 2022) (Wyoming).

[332] For a discussion of this history, *see* for example 87 FR 31480–81 (proposed disapproval of Utah SIP submission) and 87 FR 31453–56 (proposed disapproval of California SIP submission).

[333] *See, e.g.,* Approval of Arizona's 2008 ozone NAAQS interstate transport SIP submission, 81 FR 15200 (March 22, 2016) (Step 1 analysis concluding certain monitors in California should not be considered interstate transport receptors for purposes of the good neighbor provision for the 2008 ozone NAAQS); *see also* 87 FR 61249, 61254–55 (Oct. 11, 2022) (in approving Colorado's interstate transport SIP for the 2015 ozone NAAQS, analyzing unique issues associated with wintertime inversion conditions in certain western areas).

Nevada, and Utah's SIP submissions. This final determination is based on these evaluations, as well as the EPA's 2016v2 and 2016v3 modeling following stakeholder feedback.

The EPA continues to find it appropriate to rely on the results of its nationwide modeling in the western U.S., despite comments concerning the ability for the EPA's modeling to accurately project ozone concentrations and contributions in western states, as well as its ability to support the EPA's 4-step framework for assessing interstate transport. The EPA's nationwide photochemical grid modeling considers multiple complex factors, including those raised in comments, such as terrain complexities, variability in emissions (*e.g.,* wildfire emissions), meteorology, and topography. While the EPA continues to believe its 2016v2 modeling performs equally as well in both the west and the east, the EPA has adjusted its 2016v3 modeling to ensure its predictions more closely replicate the relative magnitude of concentrations and day-to-day variability that are characteristic of observed 8-hour daily maximum ozone concentrations in each region, as explained in Section III.A and the RTC document. As such, the EPA continues to find its modeling reliable for characterizing ozone concentrations and contribution values in the western U.S. Further responses regarding the reliability of the EPA's modeling in the western U.S. is provided in the RTC document.

The EPA disagrees with comments noting that the Agency took an alternative approach for western states when assessing interstate transport obligations under the 2008 ozone NAAQS. As explained in our proposed disapproval of California's 2015 ozone NAAQS interstate transport SIP submission, while the EPA has in limited circumstances found unique issues associated with addressing ozone transport in western states, the EPA has consistently applied the 4-step interstate transport framework in western states, as it has done here, and has identified ozone transport problems in the west that are similar to those in the east.[334][335] At proposal, the EPA addressed states' arguments regarding the impact of unique factors such as topography and, as part of the EPA's evaluation of the contents of the SIP submission, provided explanation as to why the EPA found the states' arguments did not

support their conclusions regarding long range transport of ozone in the west.[336]

While comments point to relatively higher level of contributions from non-anthropogenic, local, or international contributions in the west as reason for evaluating interstate transport differently in the west, a state is not excused from eliminating its significant contribution due to contributions from these sources, where the data shows that anthropogenic emissions from upwind states also contribute collectively to identified receptors at levels that indicate there to be an interstate contribution problem as well. As stated in Section V.C.2, a state is not excused from eliminating its significant contribution on the basis that international emissions also contribute some amount of pollution to the same receptors to which the state is linked. This same principle applies broadly to other arguments as to which emissions are the "cause" of the problem; the good neighbor provision established a contribution standard, not a but-for causation standard. *See Wisconsin,* 938 F.3d at 323–25.

## VI. Statutory and Executive Order Reviews

Additional information about these statutes and Executive orders can be found at *https://www.epa.gov/laws-regulations/laws-and-executive-orders.*

### A. Executive Orders 12866: Regulatory Planning and Executive Order 13563: Improving Regulation and Regulatory Review

This action is not a significant regulatory action and was, therefore, not submitted to the Office of Management and Budget for review.

### B. Paperwork Reduction Act (PRA)

This action does not impose an information collection burden under the provisions of the Paperwork Reduction Act. This final action does not establish any new information collection requirement apart from what is already required by law. This finding relates to the requirement in the CAA for states to submit SIPs under CAA section 110(a)(2)(D)(i)(I) addressing interstate transport obligations associated with the 2015 ozone NAAQS.

### C. Regulatory Flexibility Act (RFA)

I certify that this action will not have a significant economic impact on a substantial number of small entities under the RFA. This action will not impose any requirements on small entities. This action is disapproving SIP submissions for not containing the necessary provisions to satisfy interstate transport requirements under CAA section 110(a)(2)(D)(i)(I).

### D. Unfunded Mandates Reform Act of 1995 (UMRA)

This action does not contain any unfunded mandate as described in UMRA 2 U.S.C. 1531–1538 and does not significantly or uniquely affect small governments. The action imposes no enforceable duty on any state, local or tribal governments or the private sector.

### E. Executive Order 13132: Federalism

This action does not have federalism implications. It will not have substantial direct effects on the states, on the relationship between the National Government and the states, or on the distribution of power and responsibilities among the various levels of government.

### F. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments

This action has tribal implications. However, this action does not impose substantial direct compliance costs on federally recognized tribal governments, nor preempt tribal law. This action includes disapproving the portion of Oklahoma's SIP submission addressing the state's good neighbor obligations under CAA section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS and applies to certain areas of Indian country as discussed in Section IV.C of the proposed action, "Air Plan Disapproval; Arkansas, Louisiana, Oklahoma, and Texas; Interstate Transport of Air Pollution for the 2015 Ozone National Ambient Air Quality Standards" (87 FR 9798 at 9824, February 2, 2022). However, this action does not impose substantial direct compliance costs on federally recognized tribal governments because no actions will be required of tribal governments. This action will also not preempt tribal law as no Oklahoma tribe implements a regulatory program under the CAA, and thus does not have applicable or related tribal laws. The EPA consulted with tribal officials under the EPA Policy on Consultation and Coordination with Indian Tribes early in the process of developing this regulation to permit them to have meaningful and timely input into its development. A summary of that

---

[334] 87 FR 31443, 31453.

[335] 81 FR 74503, 74523.

[336] *See, e.g.,* 87 FR 31443, 31457. The EPA evaluated California's qualitative consideration of unique topographic factors that may influence the transport of emissions from sources within the state to downwind receptors in Colorado and Arizona. The EPA concluded that the State's arguments do not present sufficient evidence that called into question the results of the EPA's modeling.

consultation is provided in the file "2015 Ozone Transport OK Tribal Consultation Meeting Record 3–3–2022," in the docket for this action.

*G. Executive Order 13045: Protection of Children From Environmental Health and Safety Risks*

The EPA interprets Executive Order 13045 as applying only to those regulatory actions that concern health or safety risks that the EPA has reason to believe may disproportionately affect children, per the definition of "covered regulatory action" in section 2–202 of the Executive order. This action is not subject to Executive Order 13045 because it merely disapproves SIP submissions as not containing the necessary provisions to satisfy interstate transport requirements under CAA section 110(a)(2)(D)(i)(I).

*H. Executive Order 13211: Actions That Significantly Affect Energy Supply, Distribution or Use*

This action is not subject to Executive Order 13211, because it is not a significant regulatory action under Executive Order 12866.

*I. National Technology Transfer and Advancement Act (NTTAA)*

This rulemaking does not involve technical standards.

*J. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations*

Executive Order 12898 (Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations, 59 FR 7629, Feb. 16, 1994) directs Federal agencies to identify and address "disproportionately high and adverse human health or environmental effects" of their actions on minority populations and low-income populations to the greatest extent practicable and permitted by law. The EPA defines environmental justice (EJ) as "the fair treatment and meaningful involvement of all people regardless of race, color, national origin, or income with respect to the development, implementation, and enforcement of environmental laws, regulations, and policies." The EPA further defines the term fair treatment to mean that "no group of people should bear a disproportionate burden of environmental harms and risks, including those resulting from the negative environmental consequences of industrial, governmental, and commercial operations or programs and policies."

Under the CAA, the Administrator is required to approve a SIP submission that complies with the provisions of the Act and applicable Federal regulations. 42 U.S.C. 7410(k); 40 CFR 52.02(a). Thus, in reviewing SIP submissions, the EPA's role is to review state choices, and approve those choices if they meet the minimum criteria of the Act. As articulated in this final action, the EPA is determining that certain SIPs do not meet certain minimum requirements, and the EPA is disapproving those SIPs. Specifically, this action disapproves certain SIP submissions as not containing the necessary provisions to satisfy "good neighbor" requirements under CAA section 110(a)(2)(D)(i)(I). The EPA did not perform an EJ analysis and did not consider EJ in this action. The CAA and applicable implementing regulations neither prohibit nor require such an evaluation. In a wholly separate regulatory action, the EPA will fully address the CAA "good neighbor" requirements under section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS as it regards the SIP disapprovals included in this final action. Consideration of EJ is not required as part of this action, and there is no information in the record inconsistent with the stated goal of E.O. 12898 of achieving EJ for people of color, low-income populations, and Indigenous peoples.

*K. Congressional Review Act (CRA)*

This action is subject to the CRA, and the EPA will submit a rule report to each House of the Congress and to the Comptroller General of the United States. This action is not a "major rule" as defined by 5 U.S.C. 804(2).

*L. Judicial Review*

Section 307(b)(1) of the CAA governs judicial review of final actions by the EPA. This section provides, in part, that petitions for review must be filed in the D.C. Circuit: (i) when the agency action consists of "nationally applicable regulations promulgated, or final actions taken, by the Administrator," or (ii) when such action is locally or regionally applicable, but "such action is based on a determination of nationwide scope or effect and if in taking such action the Administrator finds and publishes that such action is based on such a determination." For locally or regionally applicable final actions, the CAA reserves to the EPA complete discretion whether to invoke the exception in (ii).[337]

This rulemaking is "nationally applicable" within the meaning of CAA section 307(b)(1). In this final action, the EPA is applying a uniform legal interpretation and common, nationwide analytical methods with respect to the requirements of CAA section 110(a)(2)(D)(i)(I) concerning interstate transport of pollution (*i.e.,* "good neighbor" requirements) to disapprove SIP submissions that fail to satisfy these requirements for the 2015 ozone NAAQS. Based on these analyses, the EPA is disapproving SIP submittals for the 2015 ozone NAAQS for 21 states located across a wide geographic area in eight of the ten EPA Regions and ten Federal judicial circuits. Given that on its face this action addresses implementation of the good neighbor requirements of CAA section 110(a)(2)(D)(i)(I) in a large number of states located across the country and given the interdependent nature of interstate pollution transport and the common core of knowledge and analysis involved in evaluating the submitted SIPs, this is a "nationally applicable" action within the meaning of CAA section 307(b)(1).

In the alternative, to the extent a court finds this action to be locally or regionally applicable, the Administrator is exercising the complete discretion afforded to him under the CAA to make and publish a finding that this action is based on a determination of "nationwide scope or effect" within the meaning of CAA section 307(b)(1). In this final action, the EPA is interpreting and applying section 110(a)(2)(D)(i)(I) of the CAA for the 2015 ozone NAAQS based on a common core of nationwide policy judgments and technical analysis concerning the interstate transport of pollutants throughout the continental U.S. In particular, the EPA is applying here the same, nationally consistent 4-step interstate transport framework for assessing obligations for the 2015 ozone NAAQS that it has applied in other nationally applicable rulemakings, such as CSAPR, the CSAPR Update, and the Revised CSAPR Update. The EPA is relying on the results from nationwide photochemical grid modeling using a 2016 base year and 2023 projection year as the primary basis for its assessment of air quality conditions and pollution contribution levels at Step 1 and Step 2 of that 4-step framework and applying a nationally uniform approach to the identification of nonattainment and

---

[337] In deciding whether to invoke the exception by making and publishing a finding that an action is based on a determination of nationwide scope or

effect, the Administrator takes into account a number of policy considerations, including his judgment balancing the benefit of obtaining the D.C. Circuit's authoritative centralized review versus allowing development of the issue in other contexts and the best use of agency resources.

maintenance receptors across the entire geographic area covered by this final action.[338] The EPA has also evaluated each state's arguments for the use of alternative approaches or alternative sets of data with an eye to ensuring national consistency and avoiding inconsistent or inequitable results among upwind states (*i.e.,* those states for which good neighbor obligations are being evaluated in this action) and between upwind and downwind states (*i.e.,* those states that contain receptors signifying ozone nonattainment or maintenance problems).

The Administrator finds that this is a matter on which national uniformity in judicial resolution of any petitions for review is desirable, to take advantage of the D.C. Circuit's administrative law expertise, and to facilitate the orderly development of the basic law under the Act. The Administrator also finds that consolidated review of this action in the D.C. Circuit will avoid piecemeal litigation in the regional circuits, further judicial economy, and eliminate the risk of inconsistent results for different states, and that a nationally consistent approach to the CAA's mandate concerning interstate transport of ozone pollution constitutes the best use of agency resources. The EPA's responses to comments on the appropriate venue for petitions for review are contained in the RTC document.

For these reasons, this final action is nationally applicable or, alternatively, the Administrator is exercising the complete discretion afforded to him by the CAA and finds that this final action is based on a determination of nationwide scope or effect for purposes of CAA section 307(b)(1) and is publishing that finding in the **Federal Register**. Under section 307(b)(1) of the CAA, petitions for judicial review of this action must be filed in the United States Court of Appeals for the District of Columbia Circuit by April 14, 2023.

## List of Subjects in 40 CFR Part 52

Environmental protection, Air pollution control, Incorporation by reference, Ozone.

**Michael S. Regan,**
*Administrator.*

For the reasons set forth in the preamble, 40 CFR part 52 is amended as follows:

## PART 52—APPROVAL AND PROMULGATION OF IMPLEMENTATION PLANS

■ 1. The authority citation for part 52 continues to read as follows:

**Authority:** 42 U.S.C. 7401 *et seq.*

## Subpart B—Alabama

■ 2. Section 52.56 is added to read as follows:

### § 52.56   Control strategy: Ozone.

(a) The state implementation plan (SIP) revision submitted on June 21, 2022, addressing Clean Air Act section 110(a)(2)(D)(i)(I) (prongs 1 and 2) for the 2015 ozone national ambient air quality standards (NAAQS) is disapproved.

(b) [Reserved]

## Subpart E—Arkansas

■ 3. Section 52.174 is amended by adding paragraph (b) to read as follows:

### § 52.174   Control strategy and regulations: Ozone.

*       *       *       *       *

(b) The portion of the SIP submittal from October 10, 2019, addressing Clean Air Act section 110(a)(2)(D)(i)(I) for the 2015 ozone national ambient air quality standards (NAAQS) is disapproved.

## Subpart F—California

■ 4. Section 52.223 is amended by adding paragraph (p)(7) to read as follows:

### § 52.223   Approval status.

*       *       *       *       *

(p) * * *

(7) The interstate transport requirements for Significant Contribution to Nonattainment (Prong 1) and Interstate Transport—Interference with Maintenance (Prong 2) of Clean Air Act (CAA) section 110(a)(2)(D)(i)(I).

■ 5. Section 52.283 is amended by adding paragraph (h) to read as follows:

### § 52.283   Interstate Transport.

*       *       *       *       *

(h) *2015 ozone NAAQS.* The 2018 Infrastructure SIP Revision, submitted on October 1, 2018, does not meet the following specific requirements of Clean Air Act section 110(a)(2)(D)(i)(I) for the 2015 ozone national ambient air quality standards (NAAQS).

(1) The requirements of CAA section 110(a)(2)(D)(i)(I) regarding significant contribution to nonattainment of the 2015 ozone NAAQS in any other State and interference with maintenance of the 2015 ozone NAAQS by any other State.

(2) [Reserved]

## Subpart O—Illinois

■ 6. Section 52.720 is amended in the table in paragraph (e), under the heading "Section 110(a)(2) Infrastructure Requirements," by revising the entry for "2015 Ozone NAAQS Infrastructure Requirements" to read as follows:

### § 52.720   Identification of plan.

*       *       *       *       *

(e) * * *

### EPA-Approved Illinois Nonregulatory and Quasi-Regulatory Provisions

| Name of SIP provision | Applicable geographic or non-attainment area | State submittal date | EPA approval date | Comments |
|---|---|---|---|---|
| * | * | * | * | * |
| **Section 110(a)(2) Infrastructure Requirements** | | | | |

---

[338] In the report on the 1977 Amendments that revised section 307(b)(1) of the CAA, Congress noted that the Administrator's determination that the "nationwide scope or effect" exception applies would be appropriate for any action that has a scope or effect beyond a single judicial circuit. *See* H.R. Rep. No. 95–294 at 323, 324, reprinted in 1977 U.S.C.C.A.N. 1402–03.

### EPA-Approved Illinois Nonregulatory and Quasi-Regulatory Provisions—Continued

| Name of SIP provision | Applicable geographic or non-attainment area | State submittal date | EPA approval date | Comments |
|---|---|---|---|---|
| * | * | * | * | * |
| 2015 Ozone NAAQS Infrastructure Requirements. | Statewide ... | 5/16/2019 and 9/22/2020. | 2/13/2023, [INSERT **FEDERAL REGISTER** CITATION]. | All CAA infrastructure elements under 110(a)(2) have been approved except (D)(i)(I) Prongs 1, 2, which are disapproved, and no action has been taken on (D)(i)(II) Prong 4. |

### Subpart P—Indiana

■ 7. Section 52.770 is amended in the table in paragraph (e) by adding an entry for "Section 110(a)(2) Infrastructure Requirements for the 2015 Ozone NAAQS" after the entry for "Section 110(a)(2) Infrastructure Requirements for the 2008 8-Hour Ozone NAAQS" to read as follows:

**§ 52.770   Identification of plan.**

* * * * *

(e) * * *

### EPA-Approved Indiana Nonregulatory Provisions and Quasi-Regulatory Provisions

| Title | Indiana date | EPA approval | Explanation |
|---|---|---|---|
| * | * | * | * |
| Section 110(a)(2) Infrastructure Requirements for the 2015 Ozone NAAQS. | 11/2/2018 | 2/13/2023, [INSERT **FEDERAL REGISTER** CITATION]. | All CAA infrastructure elements have been approved except (D)(i)(I) Prongs 1 and 2, which are disapproved, and no action has been taken on the visibility portion of (D)(i)(II). |
| * | * | * | * |

### Subpart S—Kentucky

■ 8. Section 52.930 is amended by adding paragraph (n) to read as follows:

**§ 52.930   Control strategy: Ozone.**

* * * * *

(n) *Disapproval.* The state implementation plan (SIP) revision submitted on January 11, 2019, addressing Clean Air Act section 110(a)(2)(D)(i)(I) (prongs 1 and 2) for the 2015 ozone national ambient air quality standards (NAAQS) is disapproved.

### Subpart T—Louisiana

■ 9. Section 52.996 is amended by adding paragraph (b) to read as follows:

**§ 52.996   Disapprovals.**

* * * * *

(b) The SIP submittal from November 13, 2019, addressing Clean Air Act section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS is disapproved.

### Subpart V—Maryland

■ 10. Section 52.1076 is amended by adding paragraph (gg) to read as follows:

**§ 52.1076   Control strategy plans for attainment and rate-of-progress: Ozone.**

* * * * *

(gg) *Disapproval.* EPA is disapproving Maryland's October 16, 2019, State Implementation Plan (SIP) revision intended to address the Clean Air Act (CAA) section 110(a)(2)(D)(i)(I) interstate transport requirements for the 2015 8-hour ozone national ambient air quality standard (NAAQS).

### Subpart X—Michigan

■ 11. Section 52.1170 is amended in the table in paragraph (e), under the heading "Infrastructure," by revising the entry for "Section 110(a)(2) infrastructure requirements for the 2015 ozone NAAQS" to read as follows:

**§ 52.1170   Identification of plan.**

* * * * *

(e) * * *

### EPA-Approved Michigan Nonregulatory and Quasi-Regulatory Provisions

| Name of nonregulatory SIP provision | Applicable geographic or non-attainment area | State submittal date | EPA approval date | Comments |
|---|---|---|---|---|
| * | * | * | * | * |
| **Infrastructure** | | | | |

EPA-APPROVED MICHIGAN NONREGULATORY AND QUASI-REGULATORY PROVISIONS—Continued

| Name of nonregulatory SIP provision | Applicable geographic or non-attainment area | State submittal date | EPA approval date | Comments |
|---|---|---|---|---|
| * | * | * | * | * |
| Section 110(a)(2) infrastructure requirements for the 2015 ozone NAAQS. | Statewide ... | 3/8/2019 | 2/13/2023, [INSERT **FEDERAL REGISTER** CITATION]. | *Approved CAA elements:* 110(a)(2)(A), (B), (C), (D)(i)(II) Prong 3, D(ii), (E)(i), (F), (G), (H), (J), (K), (L), and (M). *Disapproved CAA elements:* 110(a)(2)(D)(i)(I) Prongs 1 and 2, and 110(a)(2)(D)(i)(II) Prong 4. No action on CAA element 110(1)(2)(E)(ii). |
| * | * | * | * | * |

## Subpart Y—Minnesota

■ 12. Section 52.1220 is amended in the table in paragraph (e) by revising the entry for "Section 110(a)(2) Infrastructure Requirements for the 2015 Ozone NAAQS" to read as follows:

**§ 52.1220    Identification of plan.**

*    *    *    *    *

(e) * * *

EPA-APPROVED MINNESOTA NONREGULATORY PROVISIONS

| Name of nonregulatory SIP provision | Applicable geographic or non-attainment area | State submittal date/ effective date | EPA approved date | Comments |
|---|---|---|---|---|
| * | * | * | * | * |
| Section 110(a)(2) Infrastructure Requirements for the 2015 Ozone NAAQS. | Statewide ... | 10/1/2018 | 2/13/2023, [INSERT **FEDERAL REGISTER** CITATION]. | Fully approved for all CAA elements except transport elements of (D)(i)(I) Prong 2, which are disapproved, and no action has been taken on the visibility protection requirements of (D)(i)(II). |

## Subpart Z—Mississippi

■ 13. Section 52.1273 is amended by adding paragraph (b) read as follows:

**§ 52.1273    Control strategy: Ozone.**

*    *    *    *    *

(b) *Disapproval.* The state implementation plan (SIP) revision submitted on September 3, 2019, addressing Clean Air Act section 110(a)(2)(D)(i)(I) (prongs 1 and 2) for the 2015 ozone national ambient air quality standards (NAAQS) is disapproved.

## Subpart AA—Missouri

■ 14. Section 52.1323 is amended by adding paragraph (p) to read as follows:

**§ 52.1323    Approval status.**

*    *    *    *    *

(p) For the 2015 8-hour ozone NAAQS:

(1) *Disapproval.* Missouri state implementation plan (SIP) revision submitted on June 10, 2019, to address the Clean Air Act (CAA) infrastructure requirements of section 110(a)(2) for the 2015 8-hour ozone NAAQS, is

disapproved for section 110(a)(2)(D)(i)(I) (prongs 1 and 2).

(2) [Reserved]

## Subpart DD—Nevada

■ 15. Section 52.1472 is amended by adding paragraph (k) to read as follows:

**§ 52.1472    Approval status.**

*    *    *    *    *

(k) *2015 8-hour ozone NAAQS.* The SIP submittal from October 1, 2018, is disapproved for Clean Air Act (CAA) section 110(a)(2)(D)(i)(I) (prongs 1 and 2) for the NDEP, Clark County, and Washoe County portions of the Nevada SIP submission.

## Subpart FF—New Jersey

■ 16. Section 52.1586 is amended by adding paragraph (c) and reserved paragraph (d) to read as follows:

**§ 52.1586    Section 110(a)(2) infrastructure requirements.**

*    *    *    *    *

(c) *2015 8-hour ozone NAAQS*—(1) *Disapproval.* New Jersey SIP revision submitted on May 13, 2019, to address

the CAA infrastructure requirements of section 110(a)(2) for the 2015 8-hour ozone NAAQS, is disapproved for section 110(a)(2)(D)(i)(I) (prongs 1 and 2).

(2) [Reserved]

(d) [Reserved]

## Subpart HH—New York

■ 17. Section 52.1683 is amended by adding paragraph (v) to read as follows:

**§ 52.1683    Control strategy: Ozone.**

*    *    *    *    *

(v) *Disapproval.* The portion of the SIP revision submitted on September 25, 2018, addressing Clean Air Act section 110(a)(2)(D)(i)(I) (prongs 1 and 2) for the 2015 ozone NAAQS is disapproved.

## Subpart KK—Ohio

■ 18. Section 52.1870 is amended in the table in paragraph (e), under "Infrastructure Requirements," by revising the entry for "Section 110(a)(2) infrastructure requirements for the 2015 ozone NAAQS" to read as follows:

**§ 52.1870    Identification of plan.**    (e) * * *

\*    \*    \*    \*    \*

EPA-APPROVED OHIO NONREGULATORY AND QUASI-REGULATORY PROVISIONS

| Title | Applicable geographic or non-attainment area | State date | EPA approval | Comments |
|---|---|---|---|---|
| \* | \* | \* | \* | \* |
| **Infrastructure Requirements** | | | | |
| Section 110(a)(2) infrastructure requirements for the 2015 ozone NAAQS. | Statewide ... | 9/28/2018 | 2/13/2023, [INSERT **FEDERAL REGISTER** CITATION]. | Approved CAA elements: 110(a)(2)(A), (B), (C), (D)(i)(II) prongs 3 and 4, (E), (F), (G), (H), (J), (K), (L), and (M). Elements (D)(i)(I) prongs 1 and 2 are disapproved. |
| \* | \* | \* | \* | \* |

## Subpart LL—Oklahoma

■ 19. Section 52.1922 is amended by adding paragraph (c) to read as follows:

**§ 52.1922    Approval status.**

\*    \*    \*    \*    \*

(c) The portion of the SIP submittal from October 25, 2018, addressing Clean Air Act section 110(a)(2)(D)(i)(I) for the 2015 ozone national ambient air quality standards (NAAQS) is disapproved.

## Subpart SS—Texas

■ 20. Section 52.2275 is amended by:
■ a. Removing the first paragraph (m); and
■ b. Adding paragraph (o).

The addition reads as follows:

**§ 52.2275    Control strategy and regulations: Ozone.**

\*    \*    \*    \*    \*

(o) *Disapproval.* The portion of the SIP submittal from September 12, 2018, addressing Clean Air Act section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS is disapproved.

## Subpart XX—West Virginia

■ 21. Section 52.2520 is amended in the table in paragraph (e) by adding the entry ''Section 110(a)(2) Infrastructure Requirements for the 2015 8-Hour Ozone NAAQS'' at the end of the table to read as follows:

**§ 52.2520    Identification of plan.**

\*    \*    \*    \*    \*

(e) * * *

| Name of non-regulatory SIP revision | Applicable geographic area | State submittal date | EPA approval date | Additional explanation |
|---|---|---|---|---|
| \* | \* | \* | \* | \* |
| Section 110(a)(2) Infrastructure Requirements for the 2015 8-Hour Ozone NAAQS. | Statewide ... | 2/4/2019 | 2/13/2023, [INSERT **FEDERAL REGISTER** CITATION]. | Disapproval—EPA is disapproving West Virginia's February 4, 2019, State Implementation Plan (SIP) revision intended to address the CAA section 110(a)(2)(D)(i)(I) interstate transport requirements for the 2015 8-hour ozone national ambient air quality standard (NAAQS). |

## Subpart YY—Wisconsin

■ 22. Section 52.2591 is amended by adding paragraph (l) to read as follows:

**§ 52.2591    Section 110(a)(2) infrastructure requirements.**

\*    \*    \*    \*    \*

(l) *Partial approval/disapproval.* In a September 14, 2018, submission, WDNR certified that the State has satisfied the infrastructure SIP requirements of section 110(a)(2)(A) through (H), and (J) through (M) for the 2015 ozone NAAQS. For section 110(a)(2)(D)(i)(I), prong 1 is approved and prong 2 is disapproved.

EPA did not take action on any other elements. We will address the remaining requirements in a separate action.

[FR Doc. 2023–02407 Filed 2–10–23; 8:45 am]

**BILLING CODE 6560–50–P**

**EXHIBIT 2**

EPA, 2015 Ozone NAAQS Interstate Transport SIP Disapprovals – Response to Comment (RTC) Document (Jan. 31, 2023)

**2015 Ozone NAAQS Interstate Transport SIP Disapprovals –
Response to Comment (RTC) Document**

# Table of Contents

Table 1: Commentor Acronyms & IDs .................................................................................. 2

Table 2: Abbreviations and Acronyms ............................................................................... 8

1    Comments Related to Rulemaking Procedure ..................................................... 12

   1.1    Timing of SIP Actions ........................................................................................ 12

   1.2    Guidance for SIP Submissions ....................................................................... 29

   1.3    Attachment A to the March 2018 Memorandum ..................................... 37

   1.4    Use of Updated Modeling .............................................................................. 42

   1.5    States' Step 3 Analysis ..................................................................................... 62

   1.6    EPA Input During SIP Submission Development ...................................... 68

   1.7    Length of Comment Period ........................................................................... 79

   1.8    Docket Document Availability ....................................................................... 86

2    Analytic Year of 2023 ............................................................................................... 89

3    Emissions Inventories ............................................................................................. 97

   3.1    Emissions Inventory - General ...................................................................... 97

   3.2    Emissions Inventory – Non-EGUs ................................................................ 97

   3.3    Emissions Inventory – EGUs ........................................................................ 120

     3.3.1    Unit Corrections .................................................................................... 120

     3.3.2    EPA's Integrated Planning Model (IPM) .......................................... 124

     3.3.3    Other EGU Inventory-Related Comments ....................................... 130

4    Air Quality Modeling ............................................................................................. 135

   4.1    Modeling Design - General ........................................................................... 135

     4.1.1    Modeling Design - Lake Michigan ................................................... 136

     4.1.2    Modeling Design - Western States .................................................. 154

   4.2    Model Performance ...................................................................................... 156

     4.2.1    Model Performance at Lake Michigan ........................................... 156

     4.2.2    Model Performance at Western States .......................................... 166

   4.3    Model Error vs Contribution Threshold .................................................... 184

5    Updates to Modeling and Changes in Linkages ............................................. 188

6    Step 1 ......................................................................................................................... 206

   6.1    Projected Air Quality Problems .................................................................. 206

     6.1.1    Western Receptors ............................................................................. 206

6.1.2    Receptors Linked to Texas ................................................................ 209

6.1.3    Meteorologically Adjusted Ozone Trends ........................................ 216

6.2    EPA Methodology for Determining Maintenance Receptors ..................... 217

6.3    TCEQ's Alternative Methodology for Determining Maintenance Receptors .......................... 220

6.4    October 2018 Memorandum ......................................................................... 232

6.5    Certain Monitoring Sites in California at Step 1 ......................................... 234

7    Step 2 .................................................................................................................... 238

7.1    Methodology for Determining Future Year Contributions ....................... 238

7.2    Contributions ................................................................................................ 251

7.3    1 Percent as a Contribution Threshold ...................................................... 257

7.4    August 2018 Memorandum .......................................................................... 267

7.5    Maintenance-Only Linkages ........................................................................ 300

8    Step 3 .................................................................................................................... 303

8.1    Determination of Significant Contribution ................................................ 303

8.2    Alleged De Minimis Contribution ................................................................ 316

8.3    Existing and Future State Controls ............................................................. 321

8.4    Modeling and CAA Section 179B Guidance ................................................ 333

8.5    Air Quality Factors ....................................................................................... 339

8.6    Cost Thresholds ............................................................................................ 342

8.7    "Consistent and Persistent" Contribution ................................................. 347

8.8    Hybrid Single-Particle Lagrangian Integrated Trajectory (HYSPLIT) Model ............................ 354

8.9    Allegations of Inconsistency with Other Recent EPA Actions .................. 372

9    Controls ................................................................................................................ 376

9.1    Supplemental Submission ............................................................................ 376

9.2    Over-Control ................................................................................................. 377

10    Legal Comments Not Otherwise Addressed Elsewhere .................................. 379

10.1    Venue ............................................................................................................. 379

10.2    SIP Call .......................................................................................................... 394

10.3    Cooperative Federalism and the EPA's Authority .................................... 398

10.4    Reliance on FIP Measures ........................................................................... 437

10.5    Comments Alleging "Pretext" or Intent to Require Generation Shifting .................................. 439

10.6    Allegation that Disapprovals of Western State SIP Submissions was Predetermined ............ 440

10.7    EPA's Response to Comment on Proposed Actions Related to Alabama ................................. 446

11    Miscellaneous ...................................................................................................................... 448

11.1    Incorporation of Other's Comments by Reference ................................................... 448

11.2    CAA Section 126 Petitions........................................................................................... 451

11.3    Transport Policy .......................................................................................................... 452

11.4    Transport Policy- Western State Ozone Regulation ................................................. 458

11.5    International Contributions ......................................................................................... 462

11.6    Economic Impacts ....................................................................................................... 463

11.7    Environmental Justice ................................................................................................. 467

11.8    Mobile Sources Emissions .......................................................................................... 468

11.9    Typographical Concerns .............................................................................................. 476

11.10    Tribal Concerns ........................................................................................................... 477

11.11    Executive Order 13132................................................................................................. 479

11.12    Consent Decrees .......................................................................................................... 480

11.13    General Recommendations ......................................................................................... 483

11.14    Out of Scope................................................................................................................. 486

11.15    Out of Scope - Comments on the Proposed FIP.......................................................... 489

*Response*

See Section V.A.4. of the preamble for our general response to comments on the use of updated modeling to support the EPA's action. The EPA notes that the EPA is not disapproving any SIP submission for its choice of modeling. The EPA's evaluations of each SIP submission were explained at proposal. *See, e.g.,* 87 FR 9867-9869 (February 22, 2022) (Minnesota); 87 FR 9818-9824 (February 22, 2022) (Oklahoma); 87 FR 31492-31493 (May 24, 2022) (Nevada); and 87 FR 31477-31483 (May 24, 2022) (Utah). We respond to several additional specific comments here.

One commenter claimed, "By delaying its decision on Maryland's submittal for nearly 2.5 years, the EPA moved the goal post for Maryland—an act the DC Circuit admonished in *New York v. EPA*, 964 F.3d 1214, 1223 (D.C. Cir. 2020)." First, as explained in the preamble, the timing of the EPA's action is not moving the goal posts, nor does availing ourselves of the most recent 2015 ozone transport modeling and monitoring information do so. Second, *New York* is inapposite. The court there found fault with the EPA's denial of a CAA section 126(b) petition from New York, which had identified many upwind-state sources with relatively large NO$_X$ emissions that the state alleged significantly contributed in violation of the good neighbor provision. The court found the EPA's explanation for why the state had not made out at least a facially plausible showing of significant contribution to be arbitrary and capricious. The court noted that downwind petitioning states may lack the ability to conduct the kinds of analysis the Agency's denial suggested may be required and also found internal inconsistencies in the Agency's position during litigation. None of that is relevant here. First, this holding was not about air quality determinations, but rather Step 3 analysis of source emissions reduction potential. Second, upwind states are charged by the Act with evaluating, defining, and prohibiting their sources' significant contribution. Unlike a downwind jurisdiction, they possess all requisite authority to undertake an analysis of emissions and emissions reduction potential within their borders. *See generally* CAA section 110(a)(2). Nor is the Agency obligated to define "significant contribution" for upwind states before acting on these SIP submissions. *See EPA v. EME Homer City*, 572 U.S. 489, 508-09 (2014).

APC and PacifiCorp both cite *Texas v. EPA*, 829 F.3d 405 (5th Cir. 2016) to argue that "EPA's approval or disapproval of a SIP should adhere to the guidance, data, and evidence available and on the record at the time of EPA's timely review of the SIP." In *Texas*, the 5th Circuit granted a preliminary stay of the EPA's disapproval of Oklahoma's and Texas' regional haze SIP submissions and promulgation of FIPs and did not reach the merits of either the EPA's assessment of the SIP submissions' compliance with the requirements of the CAA or the FIPs.[2] Although the court noted that the EPA proposed amendments to the regional haze rule subsequent to Texas and Oklahoma submitting regional haze SIP submissions, that proposal was not relevant to the submissions before the court.[3] Moreover, the EPA has not promulgated any regulations to implement CAA section 110(a)(2)(D)(i)(I). Rather, EPA is applying its

---

[2] *Texas v. EPA*, 829 F.3d 405 (5th Cir. 2016)

[3] *See, e.g.*, Protection of Visibility: Amendments to Requirements for State Plans; Proposed Rule, 81 Fed. Reg. 26941, 26944 (May 4, 2016) (explaining that the proposed "changes would apply to periodic comprehensive state implementation plans developed for the second and subsequent implementation periods and for progress reports submitted subsequent to those plans." And that EPA "[did] not intend for the proposed changes to affect the development of state plans for the first implementation period or the first progress reports due under the existing Regional Haze Rule.")

longstanding framework for implementing CAA section 110(a)(2)(D)(i)(I) while recognizing and considering any alternative approaches states presented. EPA further notes that to the extent APC objects to EPA's consideration of 2016v2 modeling or the updated 2016v3 modeling (adjusted in response to public comment on this action), Alabama's June 21, 2022, SIP submission was submitted after the EPA made the 2016v2 modeling available and included arguments with respect to that modeling, which the EPA has evaluated in this final action.

APC, The Luminant Companies, and PacifiCorp quote *Sierra Club v. EPA*, 356 F.3d 296, 308 (D.C. Cir. 2004): "To require states to revise completed plans every time a new model is announced would lead to significant costs and potentially endless delays in the approval process." In that case, Sierra Club challenged EPA's conditional approval of Maryland, Virginia, and Washington, D.C.'s attainment plans to address the Washington, D.C. Metropolitan Area's "Severe" classification for several reasons. 356 F.3d at 300. One reason was that the rate-of-progress plans relied on an older emissions model (MOBILE5 as opposed to the more recent MOBILE6). *Id*. EPA regulation specifically required states to use the latest emission model available during the development their rate-of-progress plans for the purposes of meeting Severe requirements, CAA section 172(c)(3); 40 CFR 51.112(a)(1), but because MOBILE6 became available one month before these SIP submissions were submitted, the EPA accepted the rate-of-progress plan based on MOBILE5. 356 F.3d at 308. The court agreed it was reasonable for EPA to not require Maryland, Virginia, and Washington, D.C. to revise their rate-of-progress plans using MOBILE6. *Id*. The EPA notes the timing consideration quoted by commenters related to attainment planning in a Serious nonattainment area. Here, however, the EPA has no regulations that require any state to use any particular type of model to address statutory requirements under CAA section 110(a)(2)(D)(i)(I), nor is the EPA disapproving any SIP submission on the basis of its choice of modeling (as compared to EPA's evaluation of the *results* of the modeling). Further, the *Sierra Club* case does not stand for the proposition that EPA is prevented from considering the most up-to-date data in assessing whether upwind states may be potentially significantly contributing to downwind nonattainment or maintenance.

APC and The Luminant Companies cite *Wisconsin v. EPA*, 938 F.3d 303, 336 (D.C. Cir. 2019) for the premise that the EPA's disapproval of a SIP submission on the basis of "reliance on data compiled after the SIP action deadline" may be challenged.  The EPA acknowledges that *Wisconsin* noted such was the States' argument, but the D.C. Circuit did not opine on the validity of the assertion since it was not relevant to the court's evaluation of the CSPAR Update FIP.

A comment specifically pointed to the EPA's proposed error correction of its approval of Delaware's SIP submission (which is a component of the proposed FIP rulemaking published April 6, 2022) to suggest the EPA had created an unworkable standard for states. The commenter went on to argue that the EPA must approve Tennessee's SIP submission based on the information available at the time Tennessee submitted it to the EPA. However, this argument is illogical. If the EPA were to do that, it would be treating Delaware and Tennessee dissimilarly. In fact, the proposed error correction for Delaware only illustrates the futility of commenters' arguments for using outdated information to approve their SIP submissions. Had the EPA done that, then just as it proposed for Delaware, the Agency would likely have simply conducted error corrections of those approvals in light of the updated projections of air quality and contributions in 2023 that are now available.

61

regulations and a State SIP. This will resolve any outstanding issues related to replacement of the CSAPR Update and FIP in Maryland or additional analysis of Maryland's regulations.[4]

On October 16, 2019, Maryland submitted its 2015 Good Neighbor SIP, which committed to the CSAPR Update IBR. The incorporation was finalized within 6 months and effective for over a year and a half after Maryland's 2015 Good Neighbor SIP was submitted to EPA. It was therefore reasonable to cite it and rely on it (in part) in Maryland's 2015 Good Neighbor SIP.

On March 15, 2021, EPA finalized the Revised CSAPR Update ("RCU") in order to resolve 21 states' transport obligations for the 2008 Ozone NAAQS. EPA made a procedural error[5] by finalizing the RCU as the FIP solution prior to disapproving Good Neighbor SIPs submitted by the states. EPA realized this error and to remedy it, EPA Region 3 asked Maryland to withdraw both the Good Neighbor SIP for the 2008 Ozone NAAQS and Maryland's IBR of the CSAPR Update into the state SIP. EPA stated that Maryland's transport obligations for the 2008 Ozone NAAQS were met by the RCU and that withdrawing the SIP would not affect any other Maryland actions.

It is unreasonable for EPA to use Maryland's compliance with EPA's directive against it now. EPA is estopped from such action because Maryland reasonably relied on EPA's direction that withdrawal of the 2008 Good Neighbor SIP and IBR would not affect its pending 2015 Good Neighbor SIP submittal. At least, in the spirit of public transparency and consistent with the concept of cooperative federalism upon which the CAA is based, EPA should have acknowledged in the proposed disapproval that the IBR SIP was withdrawn at EPA's request to correct EPA's procedural error. The federal/state relationship is built on trust and that trust is jeopardized when EPA regional offices are not fully transparent with their state counterparts.

---

[3] See August 2019 letter from MDE to Mr. Cosmo Servidio: "EPA has informed MDE that Maryland cannot continue to be subject to the CSAPR Update and the Federal Implementation Plan (FIP) and also submit a good neighbor SIP... In an effort to expedite EPA's approval process [for SIP #18-05 - Good Neighbor SIP for the 2008 ozone NAAQS] and based on guidance of EPA Region 3 staff, MDE is currently working to incorporate by reference the federal CSAPR Update into the Code of Maryland Regulations. This should resolve any outstanding issues that were related to replacement of the CSAPR Update and the FIP in Maryland or additional analysis of Maryland's regulations."
[4] Maryland SIP #19-02: *Implementation, Maintenance, and Enforcement of the 0.070 ppm 8-hour Ozone National Ambient Air Quality Standard State Implementation Plan §110(a)(2)(D) MD 70 ppb Ozone Transport SIP*. Pg. 10
[5] See discussion related to submission of CSAPR IBR SIP #20-03 and message from C. Servidio

**Commenter:** Mississippi Department of Environmental Quality

**Commenter ID:** 32

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

MDEQ worked collaboratively with EPA Region 4 to properly respond to interstate transport, or "good neighbor," requirements and submitted what we believed EPA considered an approvable iSIP in September 2019.

Thus, the EPA inventory used for the modeling does not account for all relevant emission reductions. As discussed above, at a minimum, EPA must incorporate needed revisions to the 2016v2 inventory and then re-analyze the Louisiana Transport SIP based on the updated/corrected modeling platform before issuing a final rule on the Louisiana Transport SIP.

**Commenter:** Mississippi Department of Environmental Quality

**Commenter ID:** 32

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

EMISSION SOURCES The air quality modeling results from the 2016v2 Emissions Modeling Platform indicate that by 2026, emissions occurring in Mississippi will no longer contribute to nonattainment nor significantly contribute/interfere with maintenance at any downwind receptor, even without actions to reduce emissions from Mississippi sources. However, it is important to note that many emissions reductions are scheduled or have taken place at Mississippi facilities since 2016, which is the emissions year the 2016v2 platform is based on. These include:

- Mississippi Power Company's plan to shut down Plant Watson Unit 4, a 2,760 MMBtu natural gas fired boiler, in December 2023 and to retire all coal units at Plant Daniel no later than December 2027.
- Cooperative Energy Plant RD Morrow's retirement of all coal units in 2018 and replacement with natural gas combined cycle units.
- Entergy Mississippi Plant Baxter Wilson's retirement of Unit 2, a 6,680 MMBtu natural gas fired boiler with fuel oil backup, in 2018 and plans to shut down the remaining Unit 1, a 4,790 MMBtu natural gas fired boiler with fuel oil backup, in May 2023.
- Entergy Mississippi Plant Rex Brown's retirement of Unit 4, a 2,130 MMBtu natural gas fired boiler with fuel oil backup, in 2018 and the remaining Unit 5, a fuel oil fired combustion turbine, in 2019.  Plant Rex Brown is now completely shut down.

These significant emissions reductions from Mississippi sources alone should be adequate to allow EPA to approve a revised Mississippi iSIP.


**Commenter:** Oklahoma Department of Environmental Quality

**Commenter ID:** 37

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

ODEQ has provided informal feedback to the EPA concerning the 2016 v2 EMP and those comments are also provided below.

**Comment:**

[technical support document] shows significant levels of bias and error (+/-7.8 to 9.1 ppb) in the South region, the region which both Mississippi and Texas are considered a part of for the purpose of this model. The imperceivable contributions from Mississippi sources (i.e., ≤ 1.14 ppb) on modeled concentrations at any monitor in Texas fall well within the error range and should be further scrutinized to evaluate whether Mississippi's contribution is, in fact, significant.

**Commenter:** Utah Petroleum Association and the Utah Mining Association

**Commenter ID:** 48

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

Photochemical modeling, especially for the western United States, lacks the level of accuracy needed to reliably differentiate a contribution of 0.7 ppb hundreds of miles downwind. Utah described this in their comments on EPA's March 27, 2018, guidance memo regarding Interstate Transport SIPs for the 2015 Ozone NAAQS: Due to the complex terrain, meteorology, distance between sources and receptors, and somewhat coarse-grained modeling inputs the margin of error in the transport modeling in the Intermountain West is about 15%. If we applied this margin of error to determine those States that contribute significantly to ozone in downwind States, 15% of the 70-ppb ozone NAAQS suggests that controls would only be required in States contributing 10 ppb or more to downwind ozone. This is more in line with the contributions to downwind States in the northeastern part of the United States.

*Response*

EPA generally responds to these comments in Section V.B.4 of the preamble, and further addresses these commenters here.

Commenters indicate that when the amount of contributions calculated is within the EPA's margin of error, the EPA should apply additional scrutiny to evaluate whether the upwind contribution is deemed significant.

The EPA does consider additional factors beyond whether the state is linked at step 2 before determining what emissions, if any, are deemed significant and require emissions reductions. The EPA performs this determination at Step 3 of the 4-step interstate transport framework, where the EPA considers additional factors, such as cost and the impact of emissions reductions to identify what emissions have a significant impact on nonattainment or interference with maintenance of the NAAQS at a downwind receptor.

To the extent that commenters suggest the EPA consider a less stringent threshold as a result of modeling uncertainty at Step 2, the EPA disagrees with this notion. The Agency uses the CAMx model to evaluate contributions from upwind states to downwind areas. The Agency has used CAMx in previous notice and comment rulemakings to evaluate contributions relative to the 1 percent threshold for both

ozone and PM2.5. In fact, in the original CSAPR, the EPA found that "[t]here was wide support from commenters for the use of CAMx as an appropriate, state-of-the science air quality tool for use in the [Cross-State Air Pollution] Rule. There were no comments that suggested that EPA should use an alternative model for quantifying interstate transport." 75 FR 48229 (August 8, 2011).

The comments related to the EPA's action on Alabama's SIP submission do not provide any additional technical analysis that would prevent the Agency from reasonably determining that Alabama contributes above 1 percent of the NAAQS at one nonattainment receptor based on the updated 2016v3 modeling platform for 2023. Moreover, comments misunderstand the ozone model performance evaluation and how the Agency assess linkages.

As discussed in the proposal, the EPA evaluates linkages using the multi-day average contribution from each upwind state to each downwind receptor based on daily contributions from the state to the receptor for the days with the highest model-predicted future year concentrations. 87 FR 64412 at 64423, (October 25, 2022). The modeled data are intended to represent future year ozone concentrations and contributions associated with ozone conducive meteorological conditions and transport patterns typical for high ozone episodes at the receptor. In this regard, base year model performance statistics that are derived from measured and modeled data strictly paired in space and time are not useful as the sole measure for gauging the ability of the model to adequately estimate future year average contributions on the order of 0.70 ppb on high ozone days representative of the magnitude of measured concentrations at the receptor. As explained in EPA's Final Action AQM TSD in the docket for this action, the performance of our modeling is within the generally accepted performance parameters for modeling of this type.

The EPA concedes that its modeling cannot perfectly project air quality levels and contributions in a future year; however, that is not the relevant standard. *See Appalachian Power Co. v. EPA*, 135 F.3d 791, 805-6 (D.C. Cir. 1998) (explaining that a model need not perfectly fit every data point). The EPA has successfully applied its CAMx modeling platform across many CAA regulatory actions. The EPA continues to find the modeling reliable for purposes of the Step 1 and Step 2 analyses of the 4-step interstate transport framework. The EPA further responds to these and related comments in sections V.B.4-6 of the preamble.

Federalism and the EPA's Authority), 11.3 (Transport Policy), 11.4 (Transport Policy-Western State Ozone Regulation), 11.6 (Economic Impacts), and 11.15. (Out of Scope – Comments on the Proposed FIP).

<u>Different Linkages</u>

With regard to ADEQ's claims, we recognize that the results of the EPA's 2011-based modeling released in the March 2018 memorandum and the 2016v2 modeling (2016 base year) identified different linkages for Arkansas at Steps 1 and 2 of the 4-step framework. In Arkansas's SIP submission, based on a 1 ppb contribution threshold and relying primarily on EPA's 2011-based modeling, ADEQ identified only one projected maintenance receptor, Allegan County, MI, and no projected nonattainment receptors linked to Arkansas in 2023. The EPA summarized Arkansas's analysis of this linkage at proposal. 87 FR at 9803-05. The EPA evaluated ADEQ's analysis and identified substantial technical concerns with the basis for ADEQ's conclusions that it should not be considered linked to that receptor. 87 FR at 9808-09. In other words, the EPA finds Arkansas's submission deficient on its own terms.

ADEQ also argues that changes in linkages between modeling iterations suggests that the EPA's modeling is unreliable. Here, the EPA disagrees. When multiple rounds of modeling, each more up-to-date than the last, continue to confirm certain upwind states are linked, it actually *reinforces* the EPA's conclusion that the upwind state is contributing to receptors at Step 2 of the 4-step framework. A change in modeling output from the 2011-based modeling to the 2016-based modeling results in part from the shift to a more recent meteorological year and other updates. It is completely reasonable and acceptable for the Agency to update its modeling platform periodically, and it is imminently reasonable to do so before taking final rulemaking action.

ADEQ explains that it would have spent a greater effort examining linkages to Texas receptors if it had known the 2016v2 modeling results when it was preparing its SIP submission. The EPA responds that the 2011-based modeling, 2016v2 modeling, and 2016v3 modeling all identify that Arkansas contributes more than 1 percent of the NAAQS to the Brazoria County, Texas receptor (AQS Site ID 480391004), but Arkansas chose to apply a 1 ppb contribution threshold and did not closely examine that linkage in its submission.

We do not think the differing results between the 2011-based and 2016-based modeling of 2023 mean that the modeling or the EPA methodology for identifying Arkansas's receptors or linkages is inherently unreliable. Rather, these separate modeling runs indicated (1) that there were receptors that would struggle with nonattainment or maintenance in the future, and (2) that Arkansas was linked to some set of these receptors, even if the receptors and linkages differed from one another in their specifics (e.g., a different set of receptors were identified to have nonattainment or maintenance problems, or Arkansas was linked to different receptors in one modeling run versus another). We think this common result indicates that Arkansas's emissions were substantial enough to generate linkages at Steps 1 and 2 to some set of downwind receptors, under varying assumptions and meteorological conditions, even if the precise set of linkages changed between modeling runs. Under these circumstances, we think it would have been appropriate for the state to proceed to a Step 3 analysis to determine what portion of Arkansas's emissions should be deemed "significant." In making this observation, we do not now consider the earlier modeling results included in the EPA's March 2018 memorandum to be of equal reliability relative to the more recent EPA 2016v2 or 2016v3 modeling. However, where alternative or

recent 3-year design values (DV) from the analytic years rather than the highest 3-year DVs from the 5-year period. This was further supported with declining VOC and NOx emission trends and observed air quality improvement at each of the impacted monitors. OEPA also supported its calculations with information on interannual meteorological variability and the divergence from long-term temperature trends in the years 2011, 2012, and 2013 (the early years of the 5-year period). With these data and their supporting calculations, OEPA was able to demonstrate that the monitoring sites identified as maintenance are not reasonably expected to have difficulty maintaining the standards in 2023. EPA's rejection of that demonstration is clearly in error.

**Commenter:** Mississippi Department of Environmental Quality

**Commenter ID:** 32

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

Also, in EPA's proposed decision to disapprove Mississippi's iSIP, EPA suggests that MDEQ failed to use the most recent (i.e., 2018) available data. However, EPA fails to recognize that certified 2018 Texas monitor data had not been released at the time MDEQ began the public comment period for the proposed iSIP; therefore, MDEQ did in fact use the most recent certified Texas monitor data when drafting the "good neighbor" portion of the Mississippi iSIP. While it is our position that to disapprove Mississippi's iSIP on this basis is, at best, arbitrary and capricious, at the very least the proposed FIP should not be imposed until MDEQ is given a reasonable opportunity to address the alleged deficiencies in the iSIP and to resolve the modeling errors referenced herein.

*Response*

We respond to general comments about the October 2018 memorandum in Section V.B.3 of the preamble.

In response to one commenter's (MDEQ) contention that they did rely on the most recent monitoring data available at the time of its submission to support its use of an alternative maintenance receptor definition, and that EPA's evaluation of their submittal was therefore erroneous, the EPA disagrees. The Specifically, the commenter is referring to the available ozone design value for the Harris County, Texas Deer Park monitoring site (ID 482011039) in Houston and EPA's statement that the SIP submission did not meet the criteria set out in the October 2018 memorandum including an assessment of the available ozone design values at the monitor at the time. The state relied on the 2014 to 2017 design values at the Deer Park receptor (i.e., 69 ppb, 67 ppb, and 68 ppb, respectively) as the basis for stating that this receptor met EPA's definition of a maintenance receptor.

The EPA disagrees with the commenter that the 2018 design value for the Deer Park monitor was not available at the time Mississippi gave public notice of their transport SIP submission. In fact, the EPA's official comments on the draft SIP submission during the state's public comment period indicates that the 2015-2017 3-year design value of 68 ppb was not the most current available data for the Deer Park

233

monitor but rather 2016-2018 design value of 71 ppb for the site was above the 2015 standard, suggesting that the 2018 data for the monitor was in fact available at the time the state public noticed the submission in August of 2019. In addition, the 2018 data would have been certified by the time the state made its submission.

The EPA responds to APC et al.'s comment related to the October 2018 memorandum in Section 6.2. The EPA responds to comments on timing in the preamble in Section V.A.

## 6.5   Certain Monitoring Sites in California at Step 1

*Comments*

**Commenter:** Alabama Department of Environmental Management

**Commenter ID:** 02

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

EPA also argues that the threshold should not be permitted at 1 ppb to retain national consistency within the program. However, EPA's own action in its approval of the Oregon SIP negates this argument. A review of the EPA modeling data indicates that Oregon had contribution to 14 monitors in California that are predicted to exceed the standard in 2023, some with contributions greater than 1 ppb. Yet, EPA approved the Oregon SIP stating that Oregon did not significantly contribute to nonattainment or maintenance sites. National consistency was obviously not an obstacle to approval in this case.

**Commenter:** Alabama Power Company, Southern Power Company, and PowerSouth Energy Cooperative

**Commenter ID:** 04

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

Even if EPA were able to show that a 1 ppb threshold is unreasonable and unjustified, EPA could find that the Denton and Harris County monitoring sites are not properly regarded as receptors under Step 1 of its "FIP" analysis. EPA did just that for Oregon—allowing an exception to the 1 percent threshold for Oregon's transport SIP for the 2015 ozone NAAQS. As explained in EPA's recently published proposed FIP, EPA found that, although Oregon was linked above the 1 percent threshold "to several monitoring sites in California," it determined that these monitoring sites "should not be treated as receptors for purposes of determining interstate transport obligations of upwind states" because Oregon's total cumulative contribution to any of the sites was only 2.8 percent, each site only had one upwind state contribution above the 1 percent of the NAAQS, and the monitoring sites were "overwhelmingly

*Response*

Our primary response to these comments is in Section V.B.7 of the preamble. Here we address in more detail several specific arguments raised by commenters.

The EPA disagrees with some commenters' assertion that the EPA's proposed approval of Iowa's SIP submission is proof the EPA previously viewed the 1 ppb alternative threshold was "adequate and approvable" in all instances, but subsequently changed position. As the EPA explained at proposal, the first proposal for Iowa specifically examined "state-specific circumstances" as contemplated by the August 2018 Memorandum. *See, e.g.*, 87 FR 66418 (citing 87 FR 9477 (Feb. 22, 2022)) Even if the EPA had finalized the Iowa approval on the basis of the first proposal, doing so would have been specific to Iowa's state-specific circumstances. The EPA evaluated each interstate transport SIP submission based on the merits of the arguments put forward in each SIP submission.  However, in all submissions that relied on the EPA's August 2018 memo—where that threshold would have been a dispositive basis to exclude the state from further analysis—the EPA determined the submissions did not provide the EPA with analysis specific to their state or the receptors to which its emissions are potentially linked. This is true even for Iowa's submission, as explained at proposal. *See, e.g.,* 87 FR 64418.

Other topics raised by these comments are addressed in the preamble in Sections V.A.4. (technical merits), V.A.5. (justification), V.A.6. (guidance), V.B.6. (PSD SILs), V.B.7. (basis for approval of Iowa's SIP), and in the following sections: Sections 1.2 (Guidance for SIP Submissions), 1.4 (Use of Updated Modeling), 1.6 (EPA Input During SIP Submission Development), 4.2 (Model Performance), 5 (Updates to Modeling and Changes in Linkages), 7.2 (Contributions), 10.3 (Cooperative Federalism and the EPA's Authority), 11.3 (Transport Policy), and 11.8 (Mobile Sources).

The EPA responds to specific issues raised by commenters about the appropriateness of an alternative contribution threshold for specific states:

<u>Alabama</u>

Alabama did not provide a sufficient technical analysis to justify the use of an alternative 1 ppb threshold in its submission. 87 FR 64423-25. Alabama's SIP submission simply states that ADEM agrees with EPA's rationale set out in the August 2018 memorandum that the amount of upwind collective contribution captured with the 1 percent and 1 ppb thresholds was generally comparable. But the August 2018 Memorandum anticipated that states would evaluate whether the alternative threshold was appropriate under their specific facts and circumstances, not that the use of the alternative threshold would be automatically approvable.

ADEM and Alabama Power Company (APC) et al. claim that 1 ppb is an appropriate contribution threshold to use for Alabama and conduct an assessment fashioned to emulate the EPA's assessment in the now withdrawn proposal related to Iowa. Concluding that 1 ppb is generally similar to 1 percent, they next examine the factors that the EPA considered in the now withdrawn proposal related to Iowa to conclude that 1 ppb is an appropriate contribution threshold for Alabama.

The EPA does not agree that this assessment justifies the use of a 1 ppb contribution threshold for Alabama. As an initial matter, ADEM did not supply anything like this analysis in their SIP submission. This highlights the potential unfairness we identified as a policy concern at proposal, in that allowing some states to attempt to justify alternative thresholds could result in inconsistent treatment of states

295

based on the quality of the analysis they conducted. Further, as EPA explained at proposal, there is an administrative cost to public agencies, including the EPA, in going through the burden of conducting this type of analysis for each state, or for each set of comments on SIP actions, where the difference being evaluated is merely between a 1% and 1 ppb threshold, and the objective of using 1 ppb for certain states and sources is to excuse themselves from further analysis, thus shifting the burden of addressing interstate transport onto other upwind states and the downwind home state. Further, although commenter attempts to replicate the *proposal* analysis for Iowa, we never finalized that analysis and withdrew it. The factors in that analysis do not constitute a final agency policy or precedent on how a state-specific, 1 ppb-threshold analysis should be conducted. At proposal for this state's disapproval and others included in this action, we explained that we would not be undertaking this analysis where states failed to conduct it themselves.

All of that said, we further conclude that these comments still fail, even under the terms of the Iowa-proposal factors, to justify the use of a 1 ppb threshold for Alabama. Alabama's contribution alone at the Denton County (Airport) and Harris County (Houston Bayland Park) receptors in Texas in the 2016v2 modeling represents about 6 and 7 percent respectively of the total upwind state contribution at either monitor. Further, the loss in capture of total upwind-state contribution at 1 ppb versus 1 percent at these receptors is not trivial and well exceeds the ~7% losses contemplated in the August 2018 memorandum. For example, as noted by these comments, two other states are identified with contribution to the Denton County, TX receptor between 1 percent of NAAQS and 1 ppb. If we were to approve a 1 ppb threshold, one of those state's contributions would go unaddressed as well (Tennessee), constituting a loss, when in addition to Alabama's, of about 18 percent of the upwind state contribution over 1 percent at this receptor. That value is more than twice the 7% loss of upwind contribution figure that was identified as *potentially* acceptable in the August 2018 memorandum. Further, the treatment of Arkansas in this analysis would discount the loss of its contribution to this receptor, solely on the basis of its linkage above 1 ppb to other receptors—the idea being that if Arkansas were required to make emissions reductions in relation to those receptors, then it might incidentally benefit this receptor. While the EPA proposed to consider contribution in this way in the Iowa proposal, this is actually not consistent with the way EPA has considered the relevance of incidental effects in prior transport actions such as CSAPR Update and the Revised CSAPR Update. Reliance on such incidental effects introduces an inequitable situation in which states may be able to evade good neighbor obligations in reliance on the incidental effects of other states' efforts. *See* 81 FR at 74550. The EPA cannot agree that it is appropriate to treat Arkansas' contribution to this receptor as irrelevant simply because it contributes above 1 ppb to other receptors. If Arkansas's contribution were to be included in this analysis, then the total loss of contribution at the Denton receptor (using 2016v2) is actually on the order of 25 percent of total upwind state contribution.

Turning to the 2016v3 modeling used for this final action, these results are reinforced. In the 2016v3 modeling Alabama is linked in 2023 to the modeling-based receptor in Galveston, Texas. The total collective contribution from all upwind states is 26 percent of total ozone at this receptor. Of the 5 upwind states linked to this receptor, 3 contribute between 1 percent and 1 ppb. Using a 1 ppb threshold would represent a loss of about 19 percent of the total upwind contribution above 1 percent. In addition, Alabama's contribution to this receptor represents 30 percent of the total contribution that would be lost using a 1 ppb threshold. In addition, in our final rule analysis we note that Alabama is also

linked to the Pilot Point violating-monitor maintenance-only receptor in Denton County, Texas at which the collective contribution from upwind states is 18 percent of the total ozone at this receptor in 2023. Of the 6 upwind states linked to this receptor, 4 contribute between 1 percent and 1 ppb. Using a 1 ppb threshold would represent a loss of about 41 percent of the total upwind contribution above 1 percent at the Denton Pilot Point receptor. In addition, Alabama's contribution to this receptor represents 25 percent of the total contribution that would be lost using a 1 ppb threshold.

As we explain in the proposals and in the preamble of the final action, interstate ozone transport remains a collective-contribution problem involving many smaller contributors, and so the effect of approving a 1 ppb threshold needs to be reviewed for its holistic impacts. In this case, we do not find that the record would support approving a 1 ppb threshold for Alabama, even if we were to apply the factors used in the withdrawn Iowa proposal. ADEM observes that "it is unclear how lower NOx emissions in the 2022 modeling resulted in higher concentrations relative to the 2021 modeling" despite "continued reductions in NOx." If ADEM meant to question the validity of EPA's modeling with this statement, the EPA responds to comments on model performance in Section 4.2. If ADEM meant to say "contributions" instead of "concentrations," the EPA addresses a similar comment in Section 7.2. In response to the claim that EPA ignored evidence in the record when evaluating Alabama's SIP submission, specifically APC's comments submitted on the draft SIP submission during the state's public notice and comment period, which were included as attachment to Alabama's submission, the EPA disagrees. As noted in the proposal, Alabama did not explicitly discuss the comments it received during their state public comment period from Alabama Power Company and Sierra Club; Alabama only identified one specific assertion from their state public comment period as part of their response to public comments. Additionally, because SIP submissions are required to include a compilation of public comments received, it is not notable that these comment letters were attached to Alabama's SIP submission. 40 CFR Part 51, Appx V, 2.1(h). Thus, the EPA determined that Alabama's June 21, 2022, SIP submission did not rely on the legal, technical, or policy arguments provided in comments except as expressly stated by Alabama. In their own comment on this action, Alabama did not indicate that the EPA's assumption of Alabama's intention regarding the purpose of the inclusion of the comments from Alabama Power Company and Sierra Club on the submission was incorrect. *See* EPA-R04-OAR-2021-0841-0033. It remains unclear what the state's view is of and whether and to what extent the comments from APC and Sierra Club constitute an expression of the state's own position on its submission. Therefore, the EPA believes that the commenter is mistaken that the APC and Sierra Club comments received during the state's public comment process were explicitly embraced by Alabama as part of the state's SIP submission package. The EPA evaluated the information the state put forth in the SIP submission package and those specific arguments the state specifically acknowledged as part of their final SIP submission package.

Arkansas

One commenter argues that Arkansas provided sufficient analysis in the state's SIP submission to justify a conclusion that a 1 ppb contribution threshold is appropriate for the state. The EPA disagrees. The EPA's August 2018 memorandum explained that a 1 ppb contribution threshold "may" be appropriate,[70] and that "air agencies should consider whether the recommendations in this guidance are appropriate

---

[70] August 2018 memorandum, page 4.



The EPA addresses comments about EPA's input during SIP development in Section 1.6.

*Comment*

**Commenter:** Mississippi Department of Environmental Quality

**Commenter ID:** 32

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

METEOROLOGY/MONITORED DATA

Meteorological research regarding EPA's reliance on the air quality modeling for the 2016v2 Emissions Modeling Platform and Mississippi's alleged significant (i.e., ≥1% threshold) contributions to receptors in Texas is attached to this correspondence. This research indicates Mississippi has no significant contributions to monitors in Brazoria (Manvel Croix Park, site ID# 48031004), Denton (Denton Airport South, site ID# 481210034), or Harris County (Houston Bayland Park, site ID# 482010055), TX for nitrogen oxide ($NO_x$) and volatile organic compounds (VOC) pollutants to contribute to secondary O3 formation. In most occurrences of high $O_3$ days in Brazoria, Denton, and Harris County, TX, the Houston and/or Dallas core-based statistical areas (CBSA), as applicable, are under very stagnant conditions with minimal mixing, allowing $O_3$ to build. Thorough research shows no correlation when Brazoria, Denton, and Harris County, TX experience an easterly fetch (i.e., easterly winds), which is the only time Mississippi emissions could conceivably contribute to high $O_3$ in these areas.

[…]

Attachment: Meteorological Review of Contributions from Mississippi to Brazoria, Denton, and Harris County, TX National Ambient Air Quality Standards for Ozone Exceedances

Based upon air quality modeling for the 2016v2 Emissions Platform, the Environmental Protection Agency (EPA) has proposed that Mississippi significantly contributes to nonattainment or interferes with maintenance of the national ambient air quality standards (NAAQS) for ozone ($O_3$) for the following monitors in Texas:

- Site ID #480391004 - Manvel Croix Park in Brazoria County (located in Houston, TX core-based statistical area (CBSA))
- Site ID #481210034 - Denton Airport South in Denton County (located in Dallas, TX CBSA)
- Site ID #482010055 - Houston Bayland Park in Harris County (located in Houston, TX CBSA)

Regarding meteorological influence, Mississippi has a negligible effect on VOC/NOx transport to contribute downwind to Texas air monitoring sites. On days where Harris, Brazoria, and Denton NAAQS exceedances occur, the $O_3$ development was locally driven, as shown by the following back trajectories.

[Images in comment]

*Response*

The EPA disagrees with the commenter that Mississippi does not contribute to high ozone at downwind receptors in Texas. In the EPA's 2016v3 modeling for this final action the Agency found that Mississippi contributes above the 0.70 ppb screening threshold to three receptors in 2023: Denton County (monitor 481210034), Galveston County (monitor 481671034), and Houston/Bayland (monitor 482010055). The EPA ran HYSPLIT to create back trajectories from each of these receptors, among others, on days with measured ozone exceedances during the 12 years from 2010 through 2021. The maps below show the back trajectories from the Denton and Houston receptors for elevations of 500 m and 750 m (i.e., generally in the mid portion of the daytime mixed layer).[86] These maps provide a visual representation of areas typically upwind wind of the Denton and Houston/Bayland receptors on days with measured exceedances at these locations. The trajectories indicate that the air can travel from east to west such that Mississippi is upwind of the Denton and Houston receptors on days when ozone exceeds the NAAQS. This result confirms the EPA's finding that Mississippi is linked to these receptors in Texas.

---

[86] The back trajectory map is provided in a response to other comments in this section of the document.

minimum, we believe a more detailed technical discussion is warranted to first fully understand the differences, and second, reach some technical consensus on the proper manner in which to evaluate impacts and determine whether the proposed SIP is truly not approvable

*Response*

The EPA responded generally to comments related to cooperative federalism in Section V.A.5 of the preamble. Here, the EPA responds in further detail to comments related to cooperative federalism and the EPA's authority.

The EPA does not agree that it has in any way overstepped its authority in disapproving the SIP submissions in this action. Commenters offer a cavalcade of arguments as to why the EPA cannot or should not be allowed to exercise its independent judgment in evaluating the arguments presented by the states and must approve each state's submission in deference to how states choose to interpret the CAA requirements they must meet. These arguments generally fail to acknowledge the past quarter-century of the EPA's efforts to implement the good neighbor provision through an efficient and equitable allocation of states' responsibility for interstate air pollution and the related case law generally upholding that interstate transport implementation framework.  They also generally misstate the roles and responsibilities of the EPA and the states within the structure of the modern CAA as enacted by Congress in 1970 and reflected in fundamental CAA case law. Nonetheless, we will address these arguments in turn.[96]

As an initial matter, the EPA agrees that the CAA establishes a framework for state-federal partnership to implement the NAAQS based on "cooperative federalism." Under the general model of cooperative federalism, the federal government establishes broad standards or goals, states are given the opportunity to determine how they wish to achieve those goals, and if states choose not to or fail to adequately implement programs to achieve those goals, a federal agency is empowered to directly regulate to achieve the necessary ends. Thus, the EPA also agrees that states have the obligation and opportunity in the first instance to develop an implementation plan to achieve the NAAQS under CAA section 110, that state air agencies are fully capable of developing SIP submissions that satisfy the requirements of the CAA, and that the EPA will approve SIP submissions under CAA section 110 that fully satisfy the requirements of the CAA. This sequence of steps is not in dispute.

---

[96] Some topics raised by these comments are addressed in the preamble or in this RTC ("post hoc" justification, alleged changes in EPA practice and policy, CAA section 126 petitions, requests for EPA to delay final action on SIP submission disapprovals and on proposing or finalizing FIPs, EPA's modeling, TCEQ's modeling, comments about EPA's application of the guidance memoranda, and SIP calls). EPA's response to comments about the withdrawal of Alabama's first good neighbor SIP submission for the 2015 ozone NAAQS is also addressed elsewhere in this document. Some commenters argued that EPA should judge a state's SIP submission based only on the information available at some past date; some commenters pointed to the time of the statutory deadline of the state submitting a SIP submission to EPA, while others pointed to the date a date submitted a SIP submission or EPA's statutory deadline to take action on a complete SIP submission. This topic is addressed elsewhere in the preamble and RTC. Other topics raised in these comments are beyond the scope of this rulemaking (i.e., substantive requirements of proposed FIP in separate rulemaking).

The EPA does not, however, agree with the commenters' characterization of the EPA's role in the state-federal relationship as being "secondary" such that the EPA must defer to state choices heedless of the substantive objectives of the Act; such deference would be particularly inappropriate in the context of addressing interstate pollution. The EPA acknowledges that its role could be considered "secondary" in that it occurs "second" in time, after the states submit SIP submissions. The EPA believes that the commenters fundamentally misunderstand or inaccurately describe this action, as well as the "'division of responsibilities' between the states and the federal government" they identify in CAA section 110 citing the *Train-Virginia* line of cases[97] and other cases.[98] Those cases, some of which pre-date the CAA amendments of 1990 resulting in the current good neighbor provision,[99] stand only for the proposition that EPA must approve state plans *if* they meet the applicable CAA requirements. But these cases say nothing about what those applicable requirements are. The EPA is charged under CAA section 110 with reviewing states' plans and approving or disapproving them. Thus, the EPA must ultimately determine whether state plans satisfy the requirements of the Act or not. Abundant case law, including these cases themselves, reflect an understanding that the EPA must evaluate SIP submissions under CAA section 110(k)(2) and (3).[100] If they are deficient, the EPA must so find, and directly implement the relevant requirements through a federal implementation plan under CAA section 110(c).[101]

In CAA section 110(a)(1), Congress imposed the duty upon all states to have a SIP that provides for "the implementation, maintenance, and enforcement" of the NAAQS. In section 110(a)(2), Congress clearly

[97] *See Virginia v. EPA*, 108 F.3d 1397, 1407 (D.C. Cir. 1997) (quoting *Train v. Natural Resources Defense Council, Inc.*, 421 U.S. at 79). The "Train-Virginia line of cases" are named for the U.S. Supreme Court case *Train v. Natural Resources Defense Council, Inc.*, 421 U.S. 60 (1975) (Train) and to the D.C. Circuit case *Virginia v. EPA*, 108 F.3d 1397 (D.C. Cir. 1997). The D.C. Circuit has described these cases as defining a "federalism bar" that constrains the EPA's authority with respect to evaluation of state SIP submissions under CAA section 110. *See, e.g., Michigan v. EPA*, 213 F.3d 663, 687 (D.C. Cir. 2000).
[98] Commenters also cited the following to characterize the nature of the state-federal partnership in the CAA: *Union Elec. Co. v. EPA*, 427 U.S. 246 (1976), *Am. Elec. Power Co. v. Connecticut*, 565 U.S. 410 (2011), *Fla. Power & Light v. Costle*, 650 F.2d 579 (5th Cir. 1981), *North Carolina v. EPA*, 531 F.3d 896 (D.C. Cir. 2008), *Luminant*, 675 F.3d 917 (5th Cir. 2012), *Concerned Citizens of Bridesburg v. EPA*, 836 F.2d 777 (3d Cir. 1987), *Bethlehem Steel Corp. v. Gorsuch*, 742 F.2d 1028 (7th Cir. 1984), *Luminant Co. LLC v. EPA*, 714 F.3d 841 (5th. Cir. 2013), *North Dakota v. EPA*, 730 F.3d 750 (8th. Cir. 2013), and *Texas v. USEPA*, 829 F.3d 405 (5th. Cir. 2016).
[99] The 1970 version of the Act required SIPs to include "adequate provisions for intergovernmental cooperation" concerning interstate air pollution. CAA section 110(a)(2)(E), 84 Stat. 1681, 42 U.S.C. section 1857c–5(a)(2)(E). In 1977, Congress amended the Good Neighbor Provision to direct States to submit SIP submissions that included provisions "adequate" to "prohibi[t] any stationary source within the State from emitting any air pollutant in amounts which will ... prevent attainment or maintenance [of air quality standards] by any other State." CAA section 108(a)(4), 91 Stat. 693, 42 U.S.C. § 7410(a)(2)(E) (1976 ed., Supp. II). Congress again amended the Good Neighbor Provision in 1990. The Act, in its current form, requires SIPs to "contain adequate provisions ... prohibiting ... any source or other type of emissions activity within the State from emitting any air pollutant in amounts which will ... contribute significantly to nonattainment in, or interfere with maintenance by, any other State with respect to any ... [NAAQS]." CAA section 110(a)(2)(D)(i)(I), 42 U.S.C. § 7410(a)(2)(D)(i) (2006 ed.).
[100] *See, e.g., Virginia*, 108 F.3d at 1406. *See also, e.g., Westar Energy v. EPA*, 608 Fed. App'x 1, 3 (D.C. Cir. 2015) ("EPA acted *well within the bounds* of its delegated authority when it disapproved of Kansas's proposed [good neighbor] SIP.") (emphasis added); *Oklahoma v. EPA*, 723 F.3d 1201, 1209 (10th Cir. 2013) (upholding EPA's disapproval of "best available retrofit technology" (BART) SIP, noting BART "does not differ from other parts of the CAA—states have the ability to create SIPs, but they are subject to EPA review").
[101] *EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489, 495 (2014).

set forth the basic SIP requirements that "[e]ach such plan *shall*" satisfy.[102] By using the mandatory "shall" in section 110(a)(2), Congress established a framework of mandatory requirements *within which* states may exercise their discretion to design SIPs to provide for attainment and maintenance of the NAAQS and to meet other CAA requirements, including the good neighbor provision. In other sections of the Act, Congress also imposed additional, more specific SIP requirements (e.g., the requirements in CAA section 182 associated with ozone nonattainment areas depending on their level of classification).

The U.S. Supreme Court's review of the original CSAPR rulemaking in *EME Homer City* directly affirms the critical role the EPA plays in interpreting and, if necessary, implementing the good neighbor provision and directly contradicts commenters' assertions that the EPA has only a limited role to play in reviewing states' approaches to addressing good neighbor requirements. In the original 2012 decision of the D.C. Circuit in *EME Homer City Generation, L.P. v. EPA* (*EME Homer City I*), the D.C. Circuit vacated the Cross-State Air Pollution Rule for two reasons, one being related to statutory interpretation of CAA section 110(a)(2)(D)(i), the other being "a second, entirely independent problem" based on EPA's purported overstep of the federalism bar identified in the *Train-Virginia* line of cases.[103] After recounting a list of decisions that recognize the cooperative federalism structure of the CAA, the D.C. Circuit concluded that even though states have the "primary responsibility" for implementing the NAAQS, in this case the states had no responsibility to address interstate transport until EPA first quantified the obligations of the states.[104] The dissent, however, described the majority's application of the *Train-Virginia* cases as "a redesign of Congress's vision of cooperative federalism in implementing the CAA . . . ."[105] In reversing the *EME Homer City I* case in 2014, the U.S. Supreme Court held that the touchstone for identifying the division of responsibility between the EPA and the states is the text of CAA section 110(a)(2) itself.[106] The Court noted that pursuant to the CAA, after a NAAQS has been issued, a state must propose a SIP submission that meets the requirements of the CAA, including the good neighbor provision. [107] The Court went on to say that "nothing in the statute places EPA under an obligation to provide specific metrics to States before they undertake to fulfill their good neighbor obligations."[108] More relevant here, the Court upheld certain of EPA's interpretations of CAA section 110(a)(2)(D)(i)(I).[109]

After the U.S. Supreme Court's ruling in *EME Homer City*, the EPA's role under CAA section 110's cooperative federalism framework—as the agency charged with interpreting, applying, and, if necessary, ultimately achieving at the national level the fundamental requirements of CAA section 110(a)(2), and applying those reasonably interpreted requirements in evaluating state SIP submissions—cannot

---

[102] CAA section 110(a)(2) (emphasis added); *see EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489, 509 (2014) (holding that section 110(a)(2) "speaks without reservation" regarding what "components" a SIP "'shall' include"); H. Rept. 101–490, at 217 (calling the provisions of section 110(a)(2)(A) through (M) "the basic requirements of SIPs").

[103] *EME Homer City Generation, L.P. v. EPA*, 696 F.3d 7, 28 (D.C. Cir. 2012) (*EME Homer City I*), rev'd, 572 U.S. 489 (2014).

[104] Id at

[105] *Id.* at 38 (Rogers, J., dissenting).

[106] *EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489 (2014) at 507-510.

[107] *Id.* at 509 (citing, *inter alia*, CAA section 110(a)(2)).

[108] *Id.* at 509.

[109] *Id.* at 518-524.

reasonably be in doubt.[110] Several commenters cite the dissent in *EME Homer City I* to argue that states are primarily responsible for quantifying and preventing their own significant contribution. EPA does not dispute that the CAA requires a state to prepare a SIP submission in the first instance before the EPA reviews it, but the EPA does dispute the implication that the EPA must defer in all instances to a state's interpretation of the requirements of the CAA, including a state's determination that its own sources of emissions and other emissions activities do not significantly contribute to nonattainment or interfere with maintenance in other states. The U.S. Supreme Court in *EME Homer City* reiterated that EPA's interpretation of ambiguous statutory language is afforded deference and determined that "[t]he Good Neighbor Provision delegates authority to EPA at least as certainly as the CAA provisions involved in *Chevron*[, *U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984)]."[111] EPA is therefore granted deference in its interpretation of the requirements of CAA section 110(a)(2)(D)(i)(I) and is not required to accept at face value a state's interpretation in its own SIP submission that the state has fully satisfied the requirements of the CAA. The EPA notes also that courts have been deferential to the EPA's technical expertise in evaluating scientific data, which is particularly relevant in the context of the complex analyses undertaken to implement the good neighbor provision. *Wisconsin v. EPA*, 938 F.3d 303, 328 (D.C. Cir. 2019) (citing *North Carolina v. EPA*, 531 F.3d 896, 925 (D.C. Cir. 2008) (affording "substantial deference to EPA's technical expertise"); *Westar Energy, Inc. v. EPA*, 608 F. App'x 1 (D.C. Cir. 2015) (agency action "regarding technical matters within its area of expertise warrants particular deference") (citing *Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 103 (1983); *W. Virginia v. EPA*, 361 F.3d 861, 867-68 (D.C. Cir. 2004)); *see also, e.g., Catawba County v. EPA*, 571 F.3d 20, 41 (D.C. Cir. 2009) (we give an "extreme degree of deference to [EPA] when it is evaluating scientific data within its technical expertise") citing *City of Waukesha v. EPA*, 320 F.3d 228, 247 (D.C. Cir. 2003) (internal quotation marks omitted).

Notwithstanding the directly applicable holdings in *EME Homer City* concerning EPA's authority in implementing the good neighbor provision, commenters cite several other cases for arguments that EPA cannot substantively question the conclusions a state reaches about its own good neighbor obligations in a SIP submission: *Alaska Dep't of Env't Conservation v. EPA*, 540 U.S. 461 (2004), *North Carolina v. EPA*, 531 F.3d 896 (D.C. Cir.), *modified on reh'g in part*, 550 F.3d 1176 (D.C. Cir. 2008), *Michigan v. EPA*, 213 F.3d 663 (D.C. Cir. 2000), *Virginia v. EPA*, 108 F.3d 1397 (D.C. Cir. 1997) *modified on reh'g*, 116 F.3d 499 (D.C. Cir. 1997), *Concerned Citizens of Bridesburg v. EPA*, 836 F.2d 777 (3d Cir. 1987), *Fla. Power & Light v. Costle*, 650 F.2d 579 (5th Cir. 1981), *Luminant Generation Company v. EPA*, 675 F.3d 917 (5th Cir. 2012), *Luminant Co. LLC v. EPA*, 714 F.3d 841 (5th. Cir. 2013), *Texas v. EPA*, 829 F.3d 405 (5th. Cir. 2016), *Bethlehem Steel Corp. v. Gorsuch*, 742 F.2d 1028 (7th Cir. 1984), *Oklahoma v. EPA*, 723 F.3d 1201 (10th Cir. 2013), *North Dakota v. EPA*, 730 F.3d 750, 761 (8th Cir. 2013), and *Westar Energy, Inc. v. EPA*, 608 F. App'x 1 (D.C. Cir. 2015).

None of these cases actually support this proposition.

First, *Alaska Dep't of Envt'l Conservation* does not stand for the premise that the EPA's role in the state-federal partnership is limited to rote application of the exact language of the CAA. To the contrary, the Supreme Court in that case held that the EPA's "oversight role" in CAA sections 113(a)(5) and 167

---

[110] *See id.* at 495 (citing *Chevron*, 467 U.S. 837).
[111] *Id.* at 513.

included the authority to inquire whether a state's best available control technology (BACT) determination in a prevention of significant deterioration (PSD) permit is reasonable. Under those provisions, the Court held, "[O]nly when a state agency's BACT determination is 'not based on a reasoned analysis' may EPA step in to ensure that the statutory requirements are honored."[112] The Court went on to note, however, that the EPA's discretion in issuing a "stop order" under these provisions was more constrained than issuing initial approvals or disapprovals: "in contrast, a required approval may be withheld if EPA would come to a different determination on the merits."[113] The court further elaborated that "EPA's limited but vital role in enforcing BACT is consistent with a scheme that 'places primary responsibilities and authority with the States, backed by the Federal Government.'"[114] This case only underscores the role the EPA must play in assessing whether a SIP submission satisfies the requirements of the CAA. The Court noted, "We fail to see why Congress, having expressly endorsed an expansive surveillance role for the EPA in two independent CAA provisions, would then implicitly preclude the Agency from verifying substantive compliance with the BACT provisions and, instead, limit EPA's superintendence to the insubstantial question whether the state permitting authority had uttered the key words 'BACT.'"[115]

Commenters quote *North Carolina v. EPA*, 531 F.3d 896 (D.C. Cir. 2008) *modified on reh'g in part*, 550 F.3d. 1176 (DC Cir. 2008), the D.C. Circuit's review of the Clean Air Interstate Rule, for the sentence that a state is "the appropriate primary administrative unit to address interstate transport of emissions," but that quote was used in the context of the court determining that EPA may select an entire state, as opposed to part of a state, as the "unit of measurement" in either a SIP Call or a FIP rulemaking.[116] *North Carolina* cannot fairly be described as a case holding that EPA does not have authority to interpret the requirements of CAA section 110(a)(2)(D)(i)(I) when reviewing a good neighbor SIP submission.

Commenters cite *Michigan v. EPA*, 213 F.3d 663 (D.C. Cir. 2000) to argue that states get the first opportunity to identify which sources should be controlled and to what degree under the CAA. One commenter argues that the *Michigan* holding means that EPA can only identify the level of emissions reductions to be achieved by states under CAA section 110(a)(2)(D)(i)(I) and states themselves choose the controls. The *Michigan* court found that the $NO_X$ budgets established in the $NO_X$ SIP call did not impermissibly trigger the 'federalism bar' outlined in the *Train-Virginia* line of cases in part because the action did not dictate which individual sources would be subject to controls.[117] In any event though, the action at issue in *Michigan* was a SIP call, not a SIP disapproval. In this SIP disapproval, EPA is not requiring any controls on any states. The *Michigan* case does not prohibit EPA from interpreting the requirements of CAA section 110(a)(2)(D)(i)(I) in reviewing a SIP submission. *Michigan* noted that under the state-federal partnership in the CAA, even though "states have considerable latitude in fashioning SIPs, the CAA 'nonetheless subject[s] the States to strict minimum compliance requirements' and gives EPA the authority to determine a state's compliance with the requirements."[118]

---

[112] *Alaska Dep't of Envt'l Conservation*, 540 U.S. 461, 490 (2004).

[113] *Id.* at 491.

[114] *Id.* at 491 (citing S. Rep. No. 95-217, p. 29).

[115] *Id.* at 490.

[116] *North Carolina v. EPA*, 531 F.3d 896, 923 (D.C. Cir. 2008).

[117] *Michigan*, 213 F.3d 663, 687 (D.C. Cir. 2000).

[118] *Id.* (citing *Union Elec. Co. v. EPA*, 427 US 246, 256-257 (1976)).

Commenters cite *Virginia v. EPA*, 108 F.3d 1397 (D.C. Cir. 1997), *modified on reh'g*, 116 F.3d 499 (D.C. Cir. 1997) for the arguments that states have a primary role and responsibility in implementing NAAQS, the EPA cannot substitute states' judgement with its own, and the EPA cannot require specific controls in a SIP or condition approval of a SIP on specific controls.  In *Virginia,* the Court remanded an EPA SIP call that sought to require states in the Northeast Ozone Transport Region to adopt restrictions on the sale of new cars to either match California's vehicle emission program or adopt a "Substitute Program" in their SIPs.[119] The *Virginia* court determined the Substitute Program was not a meaningful alternative and so EPA had impermissibly sought to specify particular controls in SIPs.[120] However, the D.C. Circuit clarified in *Appalachian Power Co. v. EPA*, 249 F.3d 1032 (D.C. Cir. 2001), "We did not suggest [in *Virginia*] that under § 110 states may develop their plans free of extrinsic legal constraints. Indeed, SIP development . . . commonly involves decision-making subject to various legal constraints."[121] Therefore, *Virginia* cannot be viewed as supporting an argument that EPA is not permitted to assess a state's judgements in a SIP submission for adherence with the requirements of CAA section 110(a)(2)(D)(i)(I). Furthermore, in these SIP disapprovals, EPA is not requiring any controls in any SIP.

One comment, citing *Virginia*, argued that the EPA cannot disapprove Maryland's choices of emissions limitations and replace them with EPA's preferred emissions limitations in a FIP. However, Maryland concluded in its SIP submission that the state has no obligations to reduce any emissions beyond existing levels under the good neighbor provision for the 2015 ozone NAAQS and made no choice of any emissions limitations to include in its SIP. [87 FR 9463, 9469 (February 22, 2022); *see also* Maryland's October 16, 2019, SIP submittal included in docket ID No. EPA–R03–OAR–2021– 0872. (No other state included any enforceable emissions controls in their SIP submissions either.)

Commenters cite *Concerned Citizens of Bridesburg v. EPA*, 836 F.2d 777 (3d Cir. 1987) for the argument that the EPA is not allowed to make states adopt non-statutory, after the fact policy preferences through the SIP review process. In that case, the court reviewed EPA's action to rescind certain regulations addressing odor, for which there is no NAAQS, in Pennsylvania's SIP, approved by the EPA 13 years previously.[122] The court reached a decision on procedural challenges brought against EPA's action; the court determined that the EPA's action constituted a SIP revision, under an earlier version of the CAA, which was subject to certain procedural requirements, which the EPA failed to follow.[123] However, in this action the EPA is not modifying any prior approval of a SIP addressing CAA section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS by EPA. Instead, the EPA is disapproving SIP submissions that fail to satisfy the requirements of CAA section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS. Here, the EPA is not seeking to modify any previously approved SIP to account for updated understanding of the breadth of the EPA's legal authority.

Commenters cite *Fla. Power & Light v. Costle*, 650 F.2d 579 (5th Cir. 1981) to argue states have "extensive discretion" in the contents of their SIPs. In that case, under an earlier version of the CAA, Florida submitted a PSD SIP revision submission to accommodate Florida Power & Light's request for an

---

[119] *Virginia v. EPA*, 108 F.3d 1397 (D.C. Cir. 1997).

[120] *Id at* 1415.

[121] *Appalachian Power Co. v. EPA*, 249 F.3d 1032, 1047 (D.C. Cir. 2001)

[122] *Concerned Citizens of Bridesburg v. EPA*, 836 F.2d 777 (3d Cir. 1987).

[123] *Id.* at 784, 788.

exemption from the approved SIP related to sulfur dioxide emissions.[124] A subsequent "attachment" to the SIP revision submission to the EPA contained a 2-year limit on the exemption, which the EPA approved. Florida later requested to withdraw the 2-year limit, which EPA disapproved. Citing *Train*, the 5th Circuit rejected EPA's inclusion of the 2-year limit in the SIP revision approval on the basis that a 2-year limit was not a substantive requirement of the CAA, and the court rejected EPA's interpretation of Florida law that a 2-year limit would be necessary for the SIP revision to be enforceable under state law. The court's description of the EPA's role under the CAA in that the case did not stand for the premise that the EPA is not permitted to interpret the requirements of CAA; rather that the case concluded that EPA is confined to interpreting the requirements of the CAA. Here, the EPA is not approving, or disapproving, any aspect of a SIP revision that a state no longer wishes to be part of its SIP; the EPA is disapproving these SIP submissions for failing to demonstrate they satisfy the requirements of CAA section 110(a)(2)(D)(i)(I).

Commenters cite *Luminant Generation Company, L.L.C. et al. v. EPA*, 675 F.3d 917 (5th. Cir. 2012), for the premise that the EPA cannot disapprove SIP submissions on the basis of non-statutory policy preferences. Another version of this argument is that the EPA is not allowed to make states adopt non-statutory, after the fact policy preferences through the SIP review process. In *Luminant*, the 5th Circuit remanded the EPA's disapproval of a Texas SIP submission under CAA section 110(*l*) related to New Source Review (NSR) to consider whether the SIP submission comported with the requirements of CAA section 110(a)(2)(C) and 110(*l*); the court found it impermissible for EPA to inquire whether the SIP submission at issue comported with Texas law or satisfied "similar source" and "replicability" requirements, which the court found did not exist in the text of the CAA.

However, the EPA does not view the basis of the EPA's conclusions in the rule at issue in *Luminant* as analogous to this disapproval action. Alabama Power Company did not identify specifically what "non-statutory, policy preferences" they allege the EPA utilized in proposing to disapprove Alabama's earlier SIP submission. Association of Electric Companies of Texas, et. al. cite the EPA's methodology and quantification of Texas's "significant contribution" and "interference with maintenance" as well as EPA's rejection of Texas's analysis as non-statutory factors that cannot be used to assess Texas's SIP submission. A commenter also identifies the EPA modeling as a non-statutory requirement that cannot be used to disapprove Texas's SIP submission. They further argue that EPA has no authority to "second-guess" TCEQ's modeling, particularly because the EPA has not promulgated regulations on modeling. Commenters further argue that the EPA is coercing the states to develop SIP submissions 'comparable' to the EPA's approach, which they say is not a statutory requirement.

The EPA is not disapproving any SIP submission because it did not use the EPA's modeling or methodology for assessing good neighbor obligations, nor is the EPA promulgating a SIP call seeking new SIP submissions. The EPA is disapproving the SIP submissions for failing to support a conclusion that the states have no good neighbor obligations under the 2015 ozone NAAQS. The EPA used its own modeling to inform its assessment of the SIP submissions with the requirements of CAA section 110(a)(2)(D)(i)(I).[125] Additionally, the EPA is authorized in its oversight role under the CAA to examine the analysis put forward by states, so the EPA is well within its authority to "second-guess" TCEQ's

---

[124] *See* 42 U.S.C. section 7410(a)(2) (Supp. 1979).
[125] *See, e.g.*, 87 FR 9798, 9800-9801.

modeling.[126] The EPA is not required by the CAA to promulgate regulations governing the good neighbor analysis. Further, the EPA is not required to provide guidelines for CAA section 110(a)(2)(D)(i)(I).[127] However, each step in the EPA's analysis in this action is guided by the EPA's interpretation and application of each of the key terms of the CAA in this provision, reflecting over a quarter-century of administrative and judicial precedent. The good neighbor provision remains unchanged from the statutory text the EPA first applied in the $NO_x$ SIP Call, and both the D.C. Circuit and the Supreme Court have had occasion to review the EPA's interpretation and application of those terms across several major rulemakings. In each of these rulemakings, the EPA has applied a consistent analytical approach to addressing the problem of interstate pollution, and that approach faithfully adheres to the terms of the statute as Congress enacted it. Each step of this process is tied to the statute: the identification of "nonattainment" and "maintenance" receptors (Step 1); the identification of "contribution" to those receptors by analyzing emissions from "any source or other type of emissions activity" within each state (Step 2); the analysis of what "amount" of that contribution is "significant" (or "interferes" with maintenance) (Step 3); and finally, the evaluation of whether the SIP "contains adequate provisions" "prohibiting" those emissions (Step 4).

*Luminant Co. LLC v. EPA*, 714 F.3d 841 (5th. Cir. 2013) is cited to support an argument that Congress tasked the EPA with setting NAAQS but gave states authority to implement it. Although the court in that case did say that "[T]he Act confines the EPA to the ministerial function of reviewing SIPs for consistency with the Act's requirements[,]" the court nevertheless upheld EPA's judgement of Texas's SIP submission that affirmative defenses for unplanned startup, shutdown, and maintenance/malfunction (SSM) activity conformed with the requirements of the CAA, and the EPA was afforded deference in concluding that affirmative defenses for planned SSM activity did not conform with the requirements of the CAA.[128] That court, citing *Fla. Power & Light Co.* and *Bethlehem Steel*, found the EPA was not arbitrary and capricious in partially approving and partially disapproving Texas's SIP submission.[129] The court also found that CAA section 110(*l*) did not require EPA, in disapproving a SIP submission, to prove a violation of the NAAQS would occur if the Agency approved part of an iSIP submission; rather, the EPA needs to provide "reasoning supporting its conclusion that the disapproved provision would interfere with an applicable requirements of the Act."[130] While the court used the term "ministerial" to describe EPA's role, this case actually reinforces that EPA's role includes interpreting the requirements of the CAA to determine whether a SIP submission comports with those requirements.

Commenters cite *Texas v. EPA*, 829 F.3d 405 (5th. Cir. 2016) to argue that the structure of the CAA itself indicates Congress wanted states to drive the regulatory process, not the EPA. In *Texas*, the 5th Circuit granted a preliminary stay of the EPA's disapproval of Oklahoma's and Texas' regional haze SIP submissions and promulgation of FIPs and did not reach the merits of either the EPA's assessment of the SIP submissions' compliance with the requirements of the CAA or the FIPs.[131] The decision cannot

---

[126] For specific details on EPA's assessment of TCEQ modeling, please refer to the Evaluation of TCEQ Modeling TSD.

[127] *See EME Homer City* at 510.

[128] *Luminant Co. LLC v. EPA*, 714 F.3d 841, 846 (5th. Cir. 2013)

[129] *Id.* at 858-859.

[130] *Id.* at 858.

[131] *Texas v. EPA*, 829 F.3d 405 (5th. Cir. 2016)

reasonably be interpreted to stand for the proposition that the EPA is not authorized to interpret the requirements of CAA section 110(a)(2)(D)(i)(I) in reviewing good neighbor SIP submissions.

Commenters cite *Bethlehem Steel Corp. v. Gorsuch*, 742 F.2d 1028 (7th Cir. 1984) for the argument that the EPA is not allowed to make states adopt non-statutory, after the fact policy preferences through the SIP review process. In that case, examining an earlier version of the CAA, the court found that EPA did not follow appropriate procedure in partially approving Indiana's SIP revision but disapproving an exemption provision, because the effect of doing that increased the stringency of the SIP for certain emissions above what Indiana had intended.[132] In the court's view, the EPA could have disapproved the SIP submission and followed the required procedure to promulgate a replacement plan.[133] The case did not conclude the EPA is barred from interpreting the requirements of the CAA in determining whether a SIP submission comports with the requirements of the CAA. Further, in this action the EPA's partial approval and partial disapproval of the SIP submissions from Minnesota and Wisconsin has no effect on the stringency of the states' SIPs, since neither SIP submission included any emissions controls to begin with.

Commenters cited *North Dakota v. EPA*, 730 F.3d 750 (8th. Cir. 2013) for the premise that states have primary responsibility to address interstate transport and the EPA is limited to only reviewing a SIP submission for compliance with the CAA. In *North Dakota*, the court dismissed all challenges but one to an action that simultaneously disapproved two SIP submissions and promulgated FIPs for North Dakota under CAA sections 110 and 169A (the court remanded EPA's best available retrofit technology (BART) determination in a FIP).[134] On one of the cited pages in *North Dakota*, 730 F.3d at 757, the court cited cases including *EME Homer City I*, a case later overturned by the Supreme Court, in its background section characterizing cooperative federalism. On the other page of *North Dakota* cited by commenters, *id.* at 761, the court, citing *Oklahoma v. EPA*, 723 F.3d 1201, 1213 n. 7 (10th. Cir. 2013), said, "Although the CAA grants states the primary role of determining the appropriate pollution controls within their borders, the EPA is left with more than the ministerial task of routinely approving SIP submissions."[135] The *North Dakota* court similarly cited the reasoning in *Alaska Department of Environmental Conservation v. EPA*, 540 U.S. 461 (2004) related to the EPA's authority under CAA section 167, finding it "persuasive" in the context of CAA section 169A.[136] This case does not support an argument that the EPA is not permitted to interpret the requirements of the CAA in reviewing a SIP submission for compliance with them. On the contrary, the case reinforces that EPA may (indeed, must) do so.

Commenters cite *Oklahoma v. EPA*, 723 F.3d 1201 (10th Cir. 2013) to argue that although SIPs are subject to federal oversight, the EPA's ability to reject a SIP submission is more limited compared to its authority to promulgate a FIP. The implication appears to be that the EPA somehow is so limited in its ability to review a SIP submission that the Agency cannot actually disapprove a SIP submission. But in that case, the court did not suggest that the EPA is barred from interpreting the requirements of the

---

[132] *Bethlehem Steel Corp. v. Gorsuch*, 742 F.2d 1028 (7th Cir. 1984).
[133] *Id.* at 1035.
[134] *North Dakota v. EPA*, 730 F.3d 750 (8th Cir. 2013).
[135] *Id.* at 760-761.
[136] *Id.* at 761.

**EXHIBIT 3**

EPA, Information on the Interstate Transport State Implementation Plan

Submissions for the 2015 Ozone National Ambient Air Quality Standards under

Clean Air Act Section 110(a)(2)(D)(i)(I) (Mar. 27, 2018)



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
RESEARCH TRIANGLE PARK, NC 27711

MAR 2 7 2018

OFFICE OF
AIR QUALITY PLANNING
AND STANDARDS

## MEMORANDUM

**SUBJECT:**  Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I)

**FROM:**  Peter Tsirigotis
Director

**TO:**  Regional Air Division Directors, Regions 1–10

The purpose of this memorandum is to provide information to states and the Environmental Protection Agency Regional offices as they develop or review state implementation plans (SIPs) that address section 110(a)(2)(D)(i)(I) of Clean Air Act (CAA), also called the "good neighbor" provision, as it pertains to the 2015 ozone National Ambient Air Quality Standards (NAAQS). Specifically, this memorandum includes EPA's air quality modeling data for ozone for the year 2023, including newly available contribution modeling results, and a discussion of elements previously used to address interstate transport. In addition, the memorandum is accompanied by Attachment A, which provides a preliminary list of potential flexibilities in analytical approaches for developing a good neighbor SIP that may warrant further discussion between EPA and states.

The information in this memorandum provides an update to the contribution modeling analyses provided in EPA's January 2017 Notice of Data Availability (NODA) of ozone transport modeling data for the 2015 ozone NAAQS and builds upon information provided in the October 2017 interstate transport memorandum.[1] The October 2017 memorandum provided projected ozone design values for 2023 based on EPA's updated nationwide ozone modeling with the primary goal of assisting states in completing good neighbor transport actions for the 2008 ozone NAAQS.

---

[1] *See* Notice of Availability of the Environmental Protection Agency's Preliminary Interstate Ozone Transport Modeling Data for the 2015 Ozone National Ambient Air Quality Standard (NAAQS), 82 FR 1733 (January 6, 2017). This memorandum also supplements the information provided in the memorandum, *Supplemental Information on the Interstate Transport State Implementation Plan Submissions for the 2008 Ozone National Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I)*. Memorandum from Stephen D. Page, Director, U.S. EPA Office of Air Quality Planning and Standards, to Regional Air Division Directors, Regions 1–10. October 27, 2017. Available at *https://www.epa.gov/sites/production/files/2017-10/documents/final_2008_o3_naaqs_transport_memo_10-27-17b.pdf.* (The October 27, 2017, memorandum includes links to all supporting documentation, including modeling and emissions technical support documents.)

EPA's goal in providing this information is to assist states' efforts to develop good neighbor SIPs for the 2015 ozone NAAQS to address their interstate transport obligations. While the information in this memorandum and the associated air quality analysis data could be used to inform the development of these SIPs, the information is not a final determination regarding states' obligations under the good neighbor provision. Any such determination would be made through notice-and-comment rulemaking.

**The Good Neighbor Provision**

Under CAA sections 110(a)(l) and 110(a)(2), each state is required to submit a SIP that provides for the implementation, maintenance and enforcement of each primary and secondary NAAQS. Section 110(a)(1) requires each state to make this new SIP submission within 3 years after promulgation of a new or revised NAAQS. This type of SIP submission is commonly referred to as an "infrastructure SIP." Section 110(a)(2) identifies specific elements that each plan submission must meet. Conceptually, an infrastructure SIP provides assurance that a state's SIP contains the necessary structural requirements to implement the new or revised NAAQS, whether by demonstrating that the state's SIP already contains or sufficiently addresses the necessary provisions, or by making a substantive SIP revision to update the plan provisions to meet the new standards.

In particular, CAA section 110(a)(2)(D)(i)(I) requires each state to submit to EPA new or revised SIPs that "contain adequate provisions ... prohibiting, consistent with the provisions of this subchapter, any source or other type of emissions activity within the State from emitting any air pollutant in amounts which will ... contribute significantly to nonattainment in, or interfere with maintenance by, any other state with respect to any such national primary or secondary ambient air quality standard." EPA often refers to section 110(a)(2)(D)(i)(I) as the good neighbor provision and to SIP revisions addressing this requirement as good neighbor SIPs.

On October 1, 2015, EPA promulgated a revision to the ozone NAAQS, lowering the level of both the primary and secondary standards to 70 parts per billion (ppb).[2] Pursuant to CAA section 110(a), good neighbor SIPs are, therefore, due by October 1, 2018. As noted earlier, EPA intends that the information conveyed through this memorandum should assist states in their efforts to develop good neighbor SIPs for the 2015 ozone NAAQS to address their interstate transport obligations.

**Framework to Address the Good Neighbor Provision**

Through the development and implementation of several previous rulemakings, including most recently the Cross-State Air Pollution Rule (CSAPR) Update,[3] EPA, working in partnership with states, established the following four-step framework to address the requirements of the good neighbor provision for ozone and fine particulate matter ($PM_{2.5}$) NAAQS: (1) identify downwind air quality problems; (2) identify upwind states that contribute enough to those downwind air

---

[2] National Ambient Air Quality Standards for Ozone Final Rule, 80 FR 65292 (October 26, 2015).

[3] *See* Finding of Significant Contribution and Rulemaking for Certain States in the Ozone Transport Assessment Group Region for Purposes of Reducing Regional Transport of Ozone (also known as the $NO_X$ SIP Call), 63 FR 57356 (October 27, 1998); Clean Air Interstate Rule (CAIR) Final Rule, 70 FR 25162 (May 12, 2005); CSAPR Final Rule, 76 FR 48208 (August 8, 2011); CSAPR Update for the 2008 Ozone NAAQS (CSAPR Update) Final Rule, 81 FR 74504 (October 26, 2016).

quality problems to warrant further review and analysis; (3) identify the emissions reductions necessary (if any), considering cost and air quality factors, to prevent an identified upwind state from contributing significantly to those downwind air quality problems; and (4) adopt permanent and enforceable measures needed to achieve those emissions reductions. EPA notes that, in applying this framework or other approaches consistent with the CAA, various analytical approaches may be used to assess each step. EPA has undertaken several previous regional rulemakings applying this framework, and its analytical approaches have varied over time due to continued evolution of relevant tools and information, as well as their specific application.

This memo presents information regarding EPA's latest analysis for purposes of assisting states in developing SIPs for the 2015 ozone NAAQS, and, in doing so, generally follows approaches that EPA has taken in its regional rulemaking actions addressing prior ozone NAAQS. EPA also notes that, in developing their own rules, states have flexibility to follow the familiar four-step transport framework (using EPA's analytical approach or somewhat different analytical approaches within these steps) or alternative frameworks, so long as their chosen approach has adequate technical justification and is consistent with the requirements of the CAA. In various discussions, states and other stakeholders have suggested specific approaches that may warrant further consideration, and have indicated that they may be exploring other approaches as well. Over the next few months, EPA will be working with states to evaluate potential additional flexibilities for states to consider as they develop their good neighbor SIPs for the 2015 ozone NAAQS. Such potential flexibilities could apply to modeling conducted by states or to states' use of EPA's updated modeling presented here. Attachment A provides a preliminary list of potential flexibilities that may warrant further discussion. EPA looks forward to discussing these and other potential flexibilities with states over the next few months, which will help inform states' development of their good neighbor SIP submittals, as well as EPA's development of further information on good neighbor SIPs.

**Air Quality Modeling Projection of 2023 Ozone Design Values**
    As noted previously and as described in more detail in both the 2017 NODA and the October 2017 memorandum, EPA uses modeling to identify potential downwind air quality problems. A first step in the modeling process is selecting a future analytic year that considers both the relevant attainment dates of downwind nonattainment areas impacted by interstate transport[4] and the timeframes that may be required for implementing further emissions reductions as expeditiously as practicable.[5] For the 2015 ozone NAAQS, EPA selected 2023 as the analytic year in our modeling analyses primarily because it aligns with the anticipated attainment year for Moderate ozone nonattainment areas.[6]

---

[4] *North Carolina v. EPA*, 531 F.3d 896, 911–12 (D.C. Cir. 2008) (holding that compliance timeframes for necessary emission reductions must consider downwind attainment deadlines).

[5] *See* October 2017 memorandum, pp. 4-6 (discussion of timing of controls).

[6] On November 16, 2017 (82 FR 54232), EPA established initial air quality designations for most areas in the United States. On December 22, 2017 (83 FR 651), EPA responded to state and tribal recommendations by indicating the anticipated area designations for the remaining portions of the U.S. In addition, EPA proposed the maximum attainment dates for nonattainment areas in each classification, which for Moderate ozone nonattainment is 6 years (81 FR 81276, November 17, 2016). Based on the expected timing for final designations, 6 years from the likely effective date for designations would be summer 2024. Therefore, the 2023 ozone season would be the last full ozone season before the 2024 attainment date.

As noted in the aforementioned October 2017 memorandum, EPA then used the Comprehensive Air Quality Model with Extensions (CAMx v6.40)[7] to model emissions in 2011 and 2023, based on updates provided to EPA from states and other stakeholders.[8] EPA used outputs from the 2011 and 2023 model simulations to project base period 2009-2013 average and maximum ozone design values to 2023 at monitoring sites nationwide. In projecting these future year design values, EPA applied its own modeling guidance,[9] which recommends using model predictions from the "3 x 3" array of grid cells surrounding the location of the monitoring site.[10] In light of comments on the January 2017 NODA and other analyses, EPA also projected 2023 design values based on a modified version of the "3 x 3" approach for those monitoring sites located in coastal areas. Briefly, in this alternative approach, EPA incorporated the flexibility of eliminating from the design value calculations those modeling data in grid cells that are dominated by water (*i.e.*, more than 50 percent of the area in the grid cell is water) and that do not contain a monitoring site (*i.e.*, if a grid cell is more than 50 percent water but contains an air quality monitor, that cell would remain in the calculation).[11] For each individual monitoring site, the base period 2009-2013 average and maximum design values, 2023 projected average and maximum design values based on both the "3 x 3" approach and the alternative approach affecting coastal sites, and 2014-2016 measured design values are provided in an attachment to the October 27 memorandum. The same information is available in Excel format at *https://www.epa.gov/airmarkets/october-2017-memo-and-information-interstate-transport-sips-2008-ozone-naaqs*.

In the CSAPR Update rulemaking process, EPA considered a combination of monitoring data and modeling projections to identify receptor sites that are projected to have problems attaining or maintaining the NAAQS.[12] Specifically, EPA identified nonattainment receptors as those monitoring sites with current measured values exceeding the NAAQS that also have projected (*i.e.*, in 2023) average design values exceeding the NAAQS. EPA identified maintenance receptors as those monitoring sites with maximum design values exceeding the NAAQS. This included sites with current measured values below the NAAQS with projected average and maximum design values exceeding the NAAQS, and monitoring sites with projected average design values below the NAAQS but with projected maximum design values exceeding the NAAQS. The projected 2023 ozone design values and 2014-2016 measured design values for monitors in the United States have not changed since they were first presented in the October 2017 memorandum.

---

[7] CAMx v6.40 was the most recent public release version of CAMx at the time EPA updated its modeling in fall 2017. ("Comprehensive Air Quality Model with Extension version 6.40 User's Guide" Ramboll Environ, December 2016. *http://www.camx.com/*.)

[8] For the updated modeling, EPA used the construct of the modeling platform (*i.e.*, modeling domain and non-emissions inputs) that we used for the NODA modeling, except that the photolysis rates files were updated to be consistent with CAMx v6.40. The NODA Air Quality Modeling Technical Support Document describing the modeling platform is available at *https://www.epa.gov/airmarkets/notice-data-availability-preliminary-interstate-ozone-transport-modeling-data-2015-ozone*.

[9] *http://www.epa.gov/ttn/scram/guidance/guide/Draft_O3-PM-RH_Modeling_Guidance-2014.pdf.*

[10] EPA's modeling uses 12 kilometer$^2$ grid cells.

[11] A model grid cell is identified as a "water" cell if more than 50 percent of the grid cell is water based on the 2006 National Land Cover Database. Grid cells that meet this criterion are treated as entirely over water in the Weather Research Forecast (WRF) modeling used to develop the 2011 meteorology for EPA's air quality modeling.

[12] *See* 81 FR 74530-74532 (October 26, 2016).

In this memorandum, EPA is identifying 2023 potential nonattainment and maintenance receptors with respect to the 2015 NAAQS, following its approach taken for previous NAAQS. This information is based on applying the CSAPR method for identifying potential nonattainment and maintenance receptors, and presents the design values in two ways: first, following the "3 x 3" approach to evaluating all sites, and second, following the modified approach for coastal monitoring sites in which "overwater" modeling data were not included in the calculation of future year design values. After incorporating these approaches, the modeling results suggest, based on the approach used for previous NAAQS, 11 monitoring sites outside of California as potential nonattainment receptors and 14 monitoring sites outside of California as potential maintenance receptors. *See* Attachment B for this receptor information.

**Air Quality Modeling of 2023 Contributions**
After identifying potential downwind air quality problems by projecting base period 2009-2013 average and maximum ozone design values to 2023 at monitoring sites nationwide, EPA next performed nationwide, state-level ozone source apportionment modeling using the CAMx Anthropogenic Precursor Culpability Analysis (APCA) technique[13] to provide information regarding the expected contribution of 2023 base case nitrogen oxides ($NO_X$) and volatile organic compound (VOC) emissions from all sources in each state to projected 2023 ozone concentrations at each air quality monitoring site. In the source apportionment model run, EPA tracked the ozone formed from each of the following contribution categories (*i.e.*, "tags"):

- States – anthropogenic $NO_X$ and VOC emissions from each of the contiguous 48 states and the District of Columbia tracked individually (EPA combined emissions from all anthropogenic sectors in a given state);
- Biogenics – biogenic $NO_X$ and VOC emissions domain-wide (*i.e.*, not by state);
- Initial and Boundary Concentrations – concentrations transported into the modeling domain from the lateral boundaries;
- Tribal Lands – the emissions from those tribal lands for which EPA has point source inventory data in the 2011 NEI (EPA did not model the contributions from individual tribes);
- Canada and Mexico – anthropogenic emissions from sources in those portions of Canada and Mexico included in the modeling domain (EPA did not separately model contributions from Canada or Mexico);
- Fires – combined emissions from wild and prescribed fires domain-wide (*i.e.*, not by state); and
- Offshore – combined emissions from offshore marine vessels and offshore drilling platforms (*i.e.*, not by state).

EPA performed the CAMx source apportionment model simulation for the period May 1 through September 30 using the 2023 future base case emissions and 2011 meteorology for this

[13] As part of this technique, ozone formed from reactions between biogenic and anthropogenic VOC and $NO_X$ are assigned to the anthropogenic emissions.

time period.[14] EPA processed hourly contributions[15] from each tag to obtain the 8-hour average contributions corresponding to the time period of the 8-hour daily maximum concentration on each day in the 2023 model simulation. This step was performed for those model grid cells containing monitoring sites to obtain 8-hour average contributions for each day at the location of each site. EPA then processed the model-predicted contributions on each day at each monitoring site location to identify the contributions on the subset of days in the 2023 modeling with the top 10 model-predicted maximum daily 8-hour average concentrations. The daily 8-hour average contributions on the top 10 concentration days in 2023 were applied in a relative sense to quantify the contributions to the 2023 average design value at each site.

In the CSAPR and CSAPR Update modeling efforts, EPA had used a slightly different approach by basing the average future year contribution on future year modeled values that exceeded the NAAQS or the top 5 days, whichever was greater. While technically sound, EPA's previous approach resulted in different contributions for an individual linkage depending on the level of the NAAQS. For the modeling effort described in this memorandum, EPA considered comments on the January 2017 NODA and developed and incorporated the flexibility of calculating the contribution metric using contributions on the top 10 future year days. As some commenters have indicated, this approach makes the contribution metric values more consistent across monitoring sites and more robust in terms of being independent of the level of the NAAQS. The contributions from each tag to each monitoring site identified as a potential nonattainment or maintenance receptor in 2023 are provided in Attachment C.[16]

**Conclusion**

States may consider using this national modeling to develop SIPs that address requirements of the good neighbor provision for the 2015 ozone NAAQS. When doing so, EPA recommends that states include in any such submission state-specific information to support their reliance on the 2023 modeling data. Further, states may supplement the information provided in this memorandum with any additional information that they believe is relevant to addressing the good neighbor provision requirements. States may also choose to use other information to identify nonattainment and maintenance receptors relevant to development of their good neighbor SIPs. If this is the case, states should submit that information along with a full explanation and technical analysis. EPA encourages collaboration among states linked to a common receptor and among linked upwind and downwind states in developing and implementing a regionally consistent approach. We recommend that states reach out to EPA Regional offices and work together to accomplish the goal of developing, submitting, and reviewing approvable SIPs that address the good neighbor provision for the 2015 ozone NAAQS.

Finally, as indicated previously in this memorandum, in addition to the flexibilities already incorporated into EPA's modeling effort (*i.e.*, considering the removal of modeled values in "over water" grid cells and EPA's modified approach for calculating the contribution metric), EPA is

[14] *See* the October 2017 memorandum for a description of these model inputs.
[15] Ozone contributions from anthropogenic emissions under "NOx-limited" and "VOC-limited" chemical regimes were combined to obtain the net contribution from NOx and VOC anthropogenic emissions in each state.
[16] Given stakeholder input on the 2017 NODA and other analyses, EPA elected to represent the contribution information in this memorandum using the alternative approach for projecting design values for sites in coastal areas.

evaluating whether states may have additional flexibilities as they work to prepare and submit approvable good neighbor SIPs for the 2015 ozone NAAQS (*see* Attachment A). EPA looks forward to discussing these and other potential flexibilities with states over the next few months, which will help inform states' development of their good neighbor SIP submittals, as well as EPA's development of further information on good neighbor SIPs.

Please share this information with the air agencies in your Region.

**For Further Information**

If you have any questions concerning this memorandum, please contact Norm Possiel at (919) 541-5692, *possiel.norm@epa.gov* for modeling information or Beth Palma at (919) 541-5432, *palma.elizabeth@epa.gov* for any other information.

Attachments

A. Preliminary List of Potential Flexibilities Related to Analytical Approaches for Developing a Good Neighbor State Implementation Plan
B. Projected Ozone Design Values at Potential Nonattainment and Maintenance Receptors Based on EPA's Updated 2023 Transport Modeling
C. Contributions to 2023 8-hour Ozone Design Values at Projected 2023 Nonattainment and Maintenance Sites

**Attachment A**

**Preliminary List of Potential Flexibilities Related to Analytical Approaches for Developing a Good Neighbor State Implementation Plan**

The Environmental Protection Agency believes states may be able to consider certain approaches as they develop good neighbor state implementation plans (SIPs) addressing the 2015 ozone National Ambient Air Quality Standards (NAAQS). To that end, EPA has reviewed comments provided in various forums, including comments on EPA's January 2017 Notice of Data Availability (NODA) regarding ozone transport modeling data for the 2015 ozone NAAQS, and seeks feedback from interested stakeholders on the following concepts. This list is organized in the familiar four-step transport framework discussed on pages 2-3 of the memorandum above, but EPA is open to alternative frameworks to address good neighbor obligations or considerations outside the four-step process. The purpose of this attachment is to identify potential flexibilities to inform SIP development and seek feedback on these concepts. EPA is not at this time making any determination that the ideas discussed below are consistent with the requirements of the CAA, nor are we specifically recommending that states use these approaches. Determinations regarding states' obligations under the good neighbor provision would be made through notice-and-comment rulemaking.

EPA has identified several guiding principles to consider when evaluating the appropriateness of the concepts introduced in this attachment, including:

- Supporting states' position as "first actors" in developing SIPs that address section 110(a)(2)(D) of the CAA;
- Consistency with respect to EPA's SIP actions is legally required by the statute and regulations (*see* CAA § 301(a)(2) and 40 CFR part 56) and is a particularly acute issue with respect to regional transport issues in which multiple states may be implicated;
- Compliance with statutory requirements and legal precedent from court decisions interpreting the CAA requirements;
- Encouraging collaboration among states linked to a common receptor and among linked upwind and downwind states in developing and applying a regionally consistent approach to identify and implement good neighbor obligations; and
- The potential value of considering different modeling tools or analyses in addition to EPA's, provided that any alternative modeling is performed using a credible modeling system which includes "state-of-the-science" and "fit for purpose" models, inputs, and techniques that are relevant to the nature of the ozone problem. The use of results from each alternative technique should be weighed in accordance with the scientific foundation, construct and limitations of the individual techniques.

EPA intends to reflect on feedback received on these concepts and communicate closely with air agencies as they prepare and submit SIPs to address the good neighbor provisions for the 2015 ozone NAAQS.

**Analytics**

- Consideration of appropriate alternate base years to those used in EPA's most recent modeling (*e.g.*, appropriate alternative base years should be selected consistent with EPA's air quality modeling guidance suggesting that years with meteorology conducive to ozone formation are appropriate).
- Consideration of an alternate future analytic year. EPA has identified 2023 as an appropriate analytic year to consider when evaluating transport obligations for the 2015 ozone NAAQS; however, another year may also be appropriate.
- Use of alternative power sector modeling consistent with EPA's emission inventory guidance.
- Consideration of state-specific information in identifying emissions sources [*e.g.*, electric generating units (EGUs) and non-EGUs] and controls (*e.g.*, combustion/process controls, post-combustion controls) that are appropriate to evaluate.

**Step 1 – Identify downwind air quality problems**

- Identification of maintenance receptors.
  - Evaluate alternative methodologies to give independent meaning to the term "interfere with maintenance" under CAA section 110(a)(2)(D)(i)(I).
  - Identify maintenance receptors that are at risk of exceeding the NAAQS (even if they do not currently violate the standard) using an alternative approach that does not rely on the projection of maximum design values.
  - Identify maintenance receptors where current, presumably "clean," measured data are shown through analysis to occur during meteorological conditions conducive to ozone formation such that exceedances are unlikely to reoccur in the future.
- Consideration of downwind air quality context.
  - Consider the role of designations issued in FY 2018 based on approved air quality monitors.
  - Assess current and projected local emissions reductions and whether downwind areas have considered and/or used available mechanisms for regulatory relief.
- Consideration of model performance.
  - Consider removal of certain data from modeling analysis for the purposes of projecting design values and calculating the contribution metric where data removal is based on model performance and technical analyses support the exclusion.

**Step 2 – Identify upwind states that contribute to those downwind air quality problems to warrant further review and analysis**

- Considerations related to determining contributions.
  - EPA has used the Anthropogenic Precursor Culpability Analysis (APCA) approach for the purpose of quantifying contribution to downwind receptors. We have received questions regarding the use of other modeling approaches (*e.g.*, Ozone Source Apportionment Technology, Decoupled Direct Method, and zero-out brute force sensitivity runs) to help quantify ozone impacts from upwind states.
- Considerations related to evaluating contributions (contributions contained in Attachment C are not based upon a particular significance threshold).
  - Establishing a contribution threshold based on variability in ozone design values that leverage some of the analytics and statistical data created to support the development of the Significant Impact Level for ozone.

- Consideration of different contribution thresholds for different regions based on regional differences in the nature and extent of the transport problem.
- An evaluation of "collective contribution" in the receptor region to determine the extent to which a receptor is "transport influenced." The results of this analysis could be applied before assessing whether an individual state is linked to a downwind receptor (*i.e.*, above the contribution threshold).

**Step 3 – Identifying air quality, cost, and emission reduction factors to be evaluated in a multifactor test to identify emissions that significantly contribute to nonattainment or interfere with maintenance of the NAAQS downwind, if any**

- Consideration of international emissions, in a manner consistent with EPA's Ozone Cooperative Compliance Task Force efforts to fully understand the role of background ozone levels and appropriately account for international transport.[17]
    - Develop consensus on evaluation of the magnitude of international ozone contributions relative to domestic, anthropogenic ozone contributions for receptors identified in step 1. As contained in Attachment C, EPA recognizes that a number of non-U.S. and non-anthropogenic sources contribute to downwind nonattainment and maintenance receptors.
    - Consider whether the air quality, cost, or emission reduction factors should be weighted differently in areas where international contributions are relatively high.
- For states that are found to significantly contribute to nonattainment or interfere with maintenance of the NAAQS downwind, apportioning responsibility among states.
    - Consider control stringency levels derived through "uniform-cost" analysis of $NO_X$ reductions.
    - Consider whether the relative impact (*e.g.*, parts per billion/ton) between states is sufficiently different such that this factor warrants consideration in apportioning responsibility.
- Considerations for states linked to maintenance receptors.
    - Consider whether the remedy for upwind states linked to maintenance receptors could be less stringent than for those linked to nonattainment receptors.
    - For example, consider whether upwind states could satisfy linkage(s) to maintenance receptors based on recent historic or base case emissions levels.

**Step 4 – Adopt permanent and enforceable measures needed to achieve emissions reductions (translating the control levels identified in Step 3 into enforceable emissions limits)**

- EPA welcomes concepts from stakeholders regarding Step 4, including potential EPA actions that could serve as a model as well as the relationship to previous transport rules.

---

[17] See *Final Report on Review of Agency Actions that Potentially Burden the Safe, Efficient Development of Domestic Energy Resources Under Executive Order 13783* (October 25, 2017) and *Report to Congress on Administrative Options to Enable States to Enter into Cooperative Agreements to Provide Regulatory Relief for Implementing Ozone Standards* (August 14, 2017).

**Attachment B**

**Projected Ozone Design Values at Potential Nonattainment and Maintenance Receptors Based on EPA's Updated 2023 Transport Modeling**

This attachment contains projected ozone design values at those individual monitoring sites that are projected to be potential nonattainment or maintenance receptors based on the Environmental Protection Agency's updated transport modeling for 2023. The scenario name for the updated modeling is "2023en." The data are in units of parts per billion (ppb).

The following data are provided in the table below:

1. Base period 2009 – 2013 average and maximum design values based on 2009 – 2013 measured data.

2. Projected 2023 average and maximum design values based on the "3 x 3" approach and a modified "3 x 3" approach in which model predictions in grid cells that are predominately water and that do not contain monitors are excluded from the projection calculations ("No Water"). Note that the modified approach only affects the projection of design values for monitoring sites in or near coastal areas.

3. 2016 ozone design values based on 2014 – 2016 measured data (N/A indicates that a 2016 design value is not available). The following Web site has additional information on the 2016 design values: *https://www.epa.gov/air-trends/air-quality-design-values#report*.

Note: A value of 70.9 ppb (or less) is considered to be in attainment of the 2015 ozone NAAQS, and a value of 71.0 ppb (or higher) is considered to be in violation of the 2015 ozone NAAQS.

Note also: Site 550790085 in Milwaukee Co., WI would be a nonattainment receptor using projected design values based on the "No Water" cell approach, but would not be a receptor with the "3 x 3" approach. Conversely, site 360850067 in Richmond Co., NY would be a nonattainment receptor using the "3 x 3" approach, but would not be a receptor with the "No Water" cell approach.

| Site ID | St | County | 2009-2013 Avg | 2009-2013 Max | 2023en "3x3" Avg | 2023en "3x3" Max | 2023en "No Water" Avg | 2023en "No Water" Max | 2014-2016 |
|---------|----|--------|------|------|------|------|------|------|------|
| 40130019 | AZ | Maricopa | 76.7 | 79 | 69.3 | 71.4 | 69.3 | 71.4 | 73 |
| 40131004 | AZ | Maricopa | 79.7 | 81 | 69.8 | 71.0 | 69.8 | 71.0 | 75 |
| 60190007 | CA | Fresno | 94.7 | 95 | 79.2 | 79.4 | 79.2 | 79.4 | 86 |
| 60190011 | CA | Fresno | 93.0 | 96 | 78.6 | 81.2 | 78.6 | 81.2 | 89 |
| 60190242 | CA | Fresno | 91.7 | 95 | 79.4 | 82.2 | 79.4 | 82.2 | 86 |
| 60194001 | CA | Fresno | 90.7 | 92 | 73.3 | 74.4 | 73.3 | 74.4 | 91 |
| 60195001 | CA | Fresno | 97.0 | 99 | 79.6 | 81.2 | 79.6 | 81.2 | 94 |
| 60250005 | CA | Imperial | 74.7 | 76 | 73.3 | 74.6 | 73.3 | 74.6 | 76 |
| 60251003 | CA | Imperial | 81.0 | 82 | 79.0 | 80.0 | 79.0 | 80.0 | 76 |
| 60290007 | CA | Kern | 91.7 | 96 | 77.7 | 81.3 | 77.7 | 81.3 | 87 |

| Site ID | St | County | 2009-2013 Avg | 2009-2013 Max | 2023en "3x3" Avg | 2023en "3x3" Max | 2023en "No Water" Avg | 2023en "No Water" Max | 2014-2016 |
|---|---|---|---|---|---|---|---|---|---|
| 60290008 | CA | Kern | 86.3 | 88 | 71.3 | 72.8 | 71.3 | 72.8 | 81 |
| 60290014 | CA | Kern | 87.7 | 89 | 74.1 | 75.2 | 74.1 | 75.2 | 84 |
| 60290232 | CA | Kern | 87.3 | 89 | 73.7 | 75.2 | 73.7 | 75.2 | 77 |
| 60295002 | CA | Kern | 90.0 | 91 | 75.9 | 76.8 | 75.9 | 76.8 | 87 |
| 60296001 | CA | Kern | 84.3 | 86 | 70.9 | 72.4 | 70.9 | 72.4 | 81 |
| 60311004 | CA | Kings | 87.0 | 90 | 71.7 | 74.2 | 71.7 | 74.2 | 84 |
| 60370002 | CA | Los Angeles | 80.0 | 82 | 73.3 | 75.1 | 73.3 | 75.1 | 88 |
| 60370016 | CA | Los Angeles | 94.0 | 97 | 86.1 | 88.9 | 86.1 | 88.9 | 96 |
| 60371201 | CA | Los Angeles | 90.0 | 90 | 79.8 | 79.8 | 79.8 | 79.8 | 85 |
| 60371701 | CA | Los Angeles | 84.0 | 85 | 78.1 | 79.1 | 78.1 | 79.1 | 90 |
| 60372003 | CA | Los Angeles | 79.5 | 82 | 72.3 | 74.6 | 72.3 | 74.6 | 83 |
| 60376012 | CA | Los Angeles | 97.3 | 99 | 85.9 | 87.4 | 85.9 | 87.4 | 96 |
| 60379033 | CA | Los Angeles | 90.0 | 91 | 76.3 | 77.2 | 76.3 | 77.2 | 88 |
| 60392010 | CA | Madera | 85.0 | 86 | 72.1 | 72.9 | 72.1 | 72.9 | 83 |
| 60470003 | CA | Merced | 82.7 | 84 | 69.9 | 71.0 | 69.9 | 71.0 | 82 |
| 60650004 | CA | Riverside | 85.0 | 85 | 76.7 | 76.7 | 76.7 | 76.7 | N/A |
| 60650012 | CA | Riverside | 97.3 | 99 | 83.6 | 85.1 | 83.6 | 85.1 | 93 |
| 60651016 | CA | Riverside | 100.7 | 101 | 85.2 | 85.5 | 85.2 | 85.5 | 97 |
| 60652002 | CA | Riverside | 84.3 | 85 | 72.4 | 73.0 | 72.4 | 73.0 | 81 |
| 60655001 | CA | Riverside | 92.3 | 93 | 79.5 | 80.1 | 79.5 | 80.1 | 87 |
| 60656001 | CA | Riverside | 94.0 | 98 | 78.3 | 81.6 | 78.3 | 81.6 | 91 |
| 60658001 | CA | Riverside | 97.0 | 98 | 87.0 | 87.9 | 87.0 | 87.9 | 94 |
| 60658005 | CA | Riverside | 92.7 | 94 | 83.2 | 84.4 | 83.2 | 84.4 | 91 |
| 60659001 | CA | Riverside | 88.3 | 91 | 73.7 | 75.9 | 73.7 | 75.9 | 86 |
| 60670012 | CA | Sacramento | 93.3 | 95 | 74.5 | 75.9 | 74.5 | 75.9 | 83 |
| 60675003 | CA | Sacramento | 86.3 | 88 | 69.9 | 71.3 | 69.9 | 71.3 | 79 |
| 60710005 | CA | San Bernardino | 105.0 | 107 | 96.2 | 98.1 | 96.2 | 98.1 | 108 |
| 60710012 | CA | San Bernardino | 95.0 | 97 | 84.1 | 85.8 | 84.1 | 85.8 | 91 |
| 60710306 | CA | San Bernardino | 83.7 | 85 | 76.2 | 77.4 | 76.2 | 77.4 | 86 |
| 60711004 | CA | San Bernardino | 96.7 | 98 | 89.8 | 91.0 | 89.8 | 91.0 | 101 |
| 60712002 | CA | San Bernardino | 101.0 | 103 | 93.1 | 95.0 | 93.1 | 95.0 | 97 |
| 60714001 | CA | San Bernardino | 94.3 | 97 | 86.0 | 88.5 | 86.0 | 88.5 | 90 |
| 60714003 | CA | San Bernardino | 105.0 | 107 | 94.1 | 95.8 | 94.1 | 95.8 | 101 |
| 60719002 | CA | San Bernardino | 92.3 | 94 | 80.0 | 81.4 | 80.0 | 81.4 | 86 |
| 60719004 | CA | San Bernardino | 98.7 | 99 | 88.4 | 88.7 | 88.4 | 88.7 | 104 |
| 60990006 | CA | Stanislaus | 87.0 | 88 | 74.8 | 75.7 | 74.8 | 75.7 | 83 |
| 61070006 | CA | Tulare | 81.7 | 85 | 69.1 | 71.9 | 69.1 | 71.9 | 84 |
| 61070009 | CA | Tulare | 94.7 | 96 | 76.1 | 77.2 | 76.1 | 77.2 | 89 |

| Site ID | St | County | 2009-2013 Avg | 2009-2013 Max | 2023en "3x3" Avg | 2023en "3x3" Max | 2023en "No Water" Avg | 2023en "No Water" Max | 2014-2016 |
|---|---|---|---|---|---|---|---|---|---|
| 61072002 | CA | Tulare | 85.0 | 88 | 68.9 | 71.4 | 68.9 | 71.4 | 80 |
| 61072010 | CA | Tulare | 89.0 | 90 | 73.1 | 73.9 | 73.1 | 73.9 | 83 |
| 61112002 | CA | Ventura | 81.0 | 83 | 70.5 | 72.2 | 70.5 | 72.2 | 77 |
| 80050002 | CO | Arapahoe | 76.7 | 79 | 69.3 | 71.3 | 69.3 | 71.3 | N/A |
| 80350004 | CO | Douglas | 80.7 | 83 | 71.1 | 73.2 | 71.1 | 73.2 | 77 |
| 80590006 | CO | Jefferson | 80.3 | 83 | 71.3 | 73.7 | 71.3 | 73.7 | 77 |
| 80590011 | CO | Jefferson | 78.7 | 82 | 70.9 | 73.9 | 70.9 | 73.9 | 80 |
| 80690011 | CO | Larimer | 78.0 | 80 | 71.2 | 73.0 | 71.2 | 73.0 | 75 |
| 81230009 | CO | Weld | 74.7 | 76 | 70.2 | 71.4 | 70.2 | 71.4 | 70 |
| 90010017 | CT | Fairfield | 80.3 | 83 | 69.8 | 72.1 | 68.9 | 71.2 | 80 |
| 90013007 | CT | Fairfield | 84.3 | 89 | 71.2 | 75.2 | 71.0 | 75.0 | 81 |
| 90019003 | CT | Fairfield | 83.7 | 87 | 72.7 | 75.6 | 73.0 | 75.9 | 85 |
| 90099002 | CT | New Haven | 85.7 | 89 | 71.2 | 73.9 | 69.9 | 72.6 | 76 |
| 240251001 | MD | Harford | 90.0 | 93 | 71.4 | 73.8 | 70.9 | 73.3 | 73 |
| 260050003 | MI | Allegan | 82.7 | 86 | 69.0 | 71.8 | 69.0 | 71.7 | 75 |
| 261630019 | MI | Wayne | 78.7 | 81 | 69.0 | 71.0 | 69.0 | 71.0 | 72 |
| 360810124 | NY | Queens | 78.0 | 80 | 70.1 | 71.9 | 70.2 | 72.0 | 69 |
| 360850067 | NY | Richmond | 81.3 | 83 | 71.9 | 73.4 | 67.1 | 68.5 | 76 |
| 361030002 | NY | Suffolk | 83.3 | 85 | 72.5 | 74.0 | 74.0 | 75.5 | 72 |
| 480391004 | TX | Brazoria | 88.0 | 89 | 74.0 | 74.9 | 74.0 | 74.9 | 75 |
| 481210034 | TX | Denton | 84.3 | 87 | 69.7 | 72.0 | 69.7 | 72.0 | 80 |
| 482010024 | TX | Harris | 80.3 | 83 | 70.4 | 72.8 | 70.4 | 72.8 | 79 |
| 482011034 | TX | Harris | 81.0 | 82 | 70.8 | 71.6 | 70.8 | 71.6 | 73 |
| 482011039 | TX | Harris | 82.0 | 84 | 71.8 | 73.6 | 71.8 | 73.5 | 67 |
| 484392003 | TX | Tarrant | 87.3 | 90 | 72.5 | 74.8 | 72.5 | 74.8 | 73 |
| 550790085 | WI | Milwaukee | 80.0 | 82 | 65.4 | 67.0 | 71.2 | 73.0 | 71 |
| 551170006 | WI | Sheboygan | 84.3 | 87 | 70.8 | 73.1 | 72.8 | 75.1 | 79 |

**Attachment C**

**Contributions to 2023 8-hour Ozone Design Values at Projected
2023 Nonattainment and Maintenance Sites**

This attachment contains tables with the projected ozone contributions from 2023 anthropogenic nitrogen oxide and volatile organic compound emissions in each state to each potential nonattainment receptor and maintenance receptor (based on the 2015 ozone National Ambient Air Quality Standards) in the United States, following the approach for identification of such receptors EPA has used in the past, with slight modification.[18] In addition to the state contributions, we have included the contributions from each of the other categories tracked in the contribution modeling, including point source emissions on Tribal lands, anthropogenic emissions in Canada and Mexico, emissions from offshore sources, fires, biogenics, and contributions from initial and boundary concentrations.

The contribution information is provided in a three-part table for all of the projected receptors throughout the country, except California, and a separate three-part table for the projected receptors in California. For each monitoring site, we provide the site ID, county name, and state name in the first three columns of the table. This information is followed by columns containing the projected 2023 average and maximum design values based on the "No Water" cell approach. Next, in Parts 1 and 2 of each table, we provide the contributions from each state and the District of Columbia, individually. Finally, in Part 3 of each table, we provide the contributions from the Tribal lands, Canada and Mexico, offshore, fires, initial and boundary concentrations (Boundary), and biogenics categories. The units of the 2023 design values and contributions are parts per billion (ppb). Note that the contributions presented in these tables may not sum exactly to the 2023 average design value due to truncation of the contributions to two places to the right of the decimal.

---

[18] For the purposes of creating the contribution tables, data are provided for sites identified as potential nonattainment and maintenance receptors using projected design values based on the "No Water" cell approach. In addition, we provide the contributions to the Richmond Co., NY site that would be a nonattainment receptor in the "3 x 3" approach.

Contributions to 2023 Nonattainment and Maintenance Sites Outside of California (Part 1)

| Site ID | County | State | 2023en Average | 2023en Maximum | AL | AZ | AR | CA | CO | CT | DE | DC | FL | GA | ID | IL | IN | IA | KS | KY | LA | ME | MD | MA | MI | MN | MS | MO | MT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 40130019 | Maricopa | AZ | 69.3 | 71.4 | 0.00 | 25.19 | 0.00 | 1.87 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 40131004 | Maricopa | AZ | 69.8 | 71.0 | 0.00 | 27.40 | 0.00 | 2.03 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 80050002 | Arapahoe | CO | 69.3 | 71.3 | 0.00 | 0.29 | 0.00 | 1.20 | 22.94 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.19 | 0.00 | 0.00 | 0.00 | 0.28 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.02 |
| 80350004 | Douglas | CO | 71.1 | 73.2 | 0.00 | 0.38 | 0.01 | 1.27 | 24.71 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.18 | 0.00 | 0.00 | 0.00 | 0.26 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.01 |
| 80590006 | Jefferson | CO | 71.3 | 73.7 | 0.01 | 0.49 | 0.03 | 1.32 | 25.52 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.13 | 0.00 | 0.00 | 0.00 | 0.27 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.03 | 0.03 |
| 80590011 | Jefferson | CO | 70.9 | 73.9 | 0.01 | 0.30 | 0.02 | 1.50 | 24.72 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.12 | 0.00 | 0.00 | 0.00 | 0.32 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.02 | 0.02 |
| 80690011 | Larimer | CO | 71.2 | 73.0 | 0.00 | 0.46 | 0.00 | 1.55 | 21.74 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.13 | 0.00 | 0.00 | 0.00 | 0.10 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.07 |
| 81230009 | Weld | CO | 70.2 | 71.4 | 0.01 | 0.49 | 0.02 | 0.95 | 24.44 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.06 | 0.00 | 0.00 | 0.00 | 0.09 | 0.00 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.01 | 0.04 |
| 90010017 | Fairfield | CT | 68.9 | 71.2 | 0.08 | 0.03 | 0.07 | 0.03 | 0.07 | 8.70 | 0.18 | 0.04 | 0.02 | 0.09 | 0.01 | 0.39 | 0.44 | 0.11 | 0.09 | 0.34 | 0.05 | 0.01 | 1.18 | 0.06 | 0.50 | 0.17 | 0.03 | 0.21 | 0.03 |
| 90013007 | Fairfield | CT | 71.0 | 75.0 | 0.14 | 0.05 | 0.13 | 0.05 | 0.09 | 4.64 | 0.35 | 0.06 | 0.05 | 0.17 | 0.01 | 0.72 | 0.97 | 0.16 | 0.13 | 0.89 | 0.11 | 0.01 | 1.80 | 0.12 | 0.70 | 0.15 | 0.07 | 0.38 | 0.02 |
| 90019003 | Fairfield | CT | 73.0 | 75.9 | 0.14 | 0.05 | 0.13 | 0.05 | 0.09 | 3.71 | 0.40 | 0.08 | 0.05 | 0.17 | 0.01 | 0.67 | 0.83 | 0.17 | 0.13 | 0.79 | 0.11 | 0.00 | 2.17 | 0.10 | 0.63 | 0.14 | 0.07 | 0.37 | 0.02 |
| 90099002 | New Haven | CT | 69.9 | 72.6 | 0.06 | 0.04 | 0.08 | 0.05 | 0.08 | 9.10 | 0.30 | 0.04 | 0.02 | 0.07 | 0.02 | 0.46 | 0.50 | 0.16 | 0.14 | 0.32 | 0.08 | 0.01 | 1.37 | 0.18 | 0.73 | 0.19 | 0.04 | 0.29 | 0.04 |
| 240251001 | Harford | MD | 70.9 | 73.3 | 0.31 | 0.07 | 0.17 | 0.07 | 0.12 | 0.00 | 0.03 | 0.65 | 0.11 | 0.32 | 0.02 | 0.84 | 1.35 | 0.23 | 0.23 | 1.52 | 0.19 | 0.00 | 22.60 | 0.00 | 0.79 | 0.13 | 0.08 | 0.59 | 0.04 |
| 260050003 | Allegan | MI | 69.0 | 71.7 | 0.35 | 0.08 | 1.64 | 0.09 | 0.18 | 0.00 | 0.00 | 0.00 | 0.09 | 0.18 | 0.03 | 19.62 | 7.11 | 0.77 | 0.77 | 0.58 | 0.70 | 0.00 | 0.01 | 0.00 | 3.32 | 0.11 | 0.40 | 2.61 | 0.06 |
| 261630019 | Wayne | MI | 69.0 | 71.0 | 0.11 | 0.07 | 0.27 | 0.13 | 0.17 | 0.00 | 0.00 | 0.00 | 0.05 | 0.09 | 0.05 | 2.37 | 2.51 | 0.44 | 0.44 | 0.65 | 0.22 | 0.00 | 0.02 | 0.00 | 20.39 | 0.31 | 0.09 | 0.92 | 0.08 |
| 360810124 | Queens | NY | 70.2 | 72.0 | 0.11 | 0.06 | 0.09 | 0.08 | 0.11 | 0.57 | 0.38 | 0.05 | 0.07 | 0.16 | 0.03 | 0.73 | 0.69 | 0.26 | 0.19 | 0.42 | 0.13 | 0.00 | 1.56 | 0.24 | 1.26 | 0.17 | 0.04 | 0.38 | 0.05 |
| 360850067 | Richmond | NY | 67.1 | 68.5 | 0.24 | 0.08 | 0.13 | 0.09 | 0.12 | 0.27 | 0.43 | 0.05 | 0.09 | 0.28 | 0.02 | 0.80 | 0.92 | 0.23 | 0.21 | 0.84 | 0.16 | 0.00 | 1.74 | 0.03 | 0.98 | 0.12 | 0.08 | 0.46 | 0.03 |
| 361030002 | Suffolk | NY | 74.0 | 75.5 | 0.12 | 0.06 | 0.12 | 0.08 | 0.11 | 0.83 | 0.22 | 0.04 | 0.04 | 0.12 | 0.03 | 0.64 | 0.69 | 0.20 | 0.20 | 0.49 | 0.13 | 0.01 | 1.24 | 0.04 | 0.94 | 0.18 | 0.06 | 0.39 | 0.06 |
| 480391004 | Brazoria | TX | 74.0 | 74.9 | 0.35 | 0.08 | 0.90 | 0.21 | 0.30 | 0.00 | 0.00 | 0.00 | 0.21 | 0.14 | 0.08 | 1.00 | 0.32 | 0.40 | 0.47 | 0.14 | 3.80 | 0.00 | 0.00 | 0.00 | 0.22 | 0.34 | 0.63 | 0.88 | 0.10 |
| 481210034 | Denton | TX | 69.7 | 72.0 | 0.49 | 0.07 | 0.58 | 0.13 | 0.27 | 0.00 | 0.00 | 0.00 | 0.27 | 0.34 | 0.06 | 0.23 | 0.16 | 0.10 | 0.40 | 0.11 | 1.92 | 0.00 | 0.01 | 0.00 | 0.08 | 0.11 | 0.33 | 0.24 | 0.07 |
| 482010024 | Harris | TX | 70.4 | 72.8 | 0.39 | 0.04 | 0.29 | 0.12 | 0.13 | 0.00 | 0.00 | 0.00 | 0.39 | 0.26 | 0.05 | 0.34 | 0.13 | 0.17 | 0.17 | 0.10 | 3.06 | 0.00 | 0.00 | 0.00 | 0.06 | 0.06 | 0.50 | 0.38 | 0.05 |
| 482011034 | Harris | TX | 70.8 | 75.6 | 0.32 | 0.03 | 0.54 | 0.10 | 0.15 | 0.00 | 0.00 | 0.00 | 0.53 | 0.16 | 0.04 | 0.51 | 0.12 | 0.27 | 0.32 | 0.05 | 3.38 | 0.00 | 0.00 | 0.00 | 0.17 | 0.23 | 0.39 | 0.63 | 0.05 |
| 482011039 | Harris | TX | 71.8 | 73.5 | 0.37 | 0.04 | 0.99 | 0.12 | 0.20 | 0.00 | 0.00 | 0.00 | 0.23 | 0.13 | 0.05 | 0.88 | 0.24 | 0.33 | 0.33 | 0.11 | 4.72 | 0.00 | 0.00 | 0.00 | 0.27 | 0.20 | 0.79 | 0.88 | 0.07 |
| 484392003 | Tarrant | TX | 72.5 | 74.8 | 0.37 | 0.08 | 0.78 | 0.15 | 0.33 | 0.00 | 0.00 | 0.00 | 0.18 | 0.26 | 0.07 | 0.29 | 0.18 | 0.19 | 0.69 | 0.13 | 1.71 | 0.00 | 0.01 | 0.00 | 0.13 | 0.15 | 0.27 | 0.38 | 0.10 |
| 550790085 | Milwaukee | WI | 71.2 | 73.0 | 0.14 | 0.04 | 0.40 | 0.07 | 0.08 | 0.00 | 0.00 | 0.00 | 0.06 | 0.06 | 0.03 | 15.10 | 5.28 | 0.79 | 0.35 | 0.77 | 0.72 | 0.00 | 0.03 | 0.00 | 2.01 | 0.40 | 0.28 | 0.93 | 0.10 |
| 551170006 | Sheboygan | WI | 72.8 | 75.1 | 0.14 | 0.08 | 0.51 | 0.12 | 0.11 | 0.00 | 0.00 | 0.00 | 0.07 | 0.07 | 0.04 | 15.73 | 7.11 | 0.45 | 0.46 | 0.81 | 0.84 | 0.00 | 0.03 | 0.00 | 2.06 | 0.28 | 0.30 | 1.37 | 0.06 |

Contributions to 2023 Nonattainment and Maintenance Sites Outside of California (Part 2)

| Site ID | County | State | 2023en Average | 2023en Maximum | NE | NV | NH | NJ | NM | NY | NC | ND | OH | OK | OR | PA | RI | SC | SD | TN | TX | UT | VT | VA | WA | WV | WI | WY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 40130019 | Maricopa | AZ | 69.3 | 71.4 | 0.00 | 0.09 | 0.00 | 0.00 | 0.09 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.22 | 0.06 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.01 |
| 40131004 | Maricopa | AZ | 69.8 | 71.0 | 0.00 | 0.14 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.11 | 0.06 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 |
| 80050002 | Arapaho | CO | 69.3 | 71.3 | 0.34 | 0.33 | 0.00 | 0.00 | 0.22 | 0.00 | 0.00 | 0.00 | 0.00 | 0.12 | 0.11 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.30 | 1.23 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 1.04 |
| 80350004 | Douglas | CO | 71.1 | 73.2 | 0.32 | 0.32 | 0.00 | 0.00 | 0.22 | 0.00 | 0.00 | 0.00 | 0.00 | 0.12 | 0.10 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.36 | 1.08 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 1.00 |
| 80590006 | Jefferson | CO | 71.3 | 73.7 | 0.41 | 0.31 | 0.00 | 0.00 | 0.70 | 0.00 | 0.00 | 0.00 | 0.00 | 0.24 | 0.10 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 1.02 | 0.83 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.81 |
| 80590011 | Jefferson | CO | 70.9 | 73.9 | 0.36 | 0.38 | 0.00 | 0.00 | 0.38 | 0.00 | 0.00 | 0.00 | 0.00 | 0.18 | 0.10 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.94 | 1.04 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 1.03 |
| 80690011 | Larimer | CO | 71.2 | 73.0 | 0.25 | 0.37 | 0.00 | 0.00 | 0.52 | 0.00 | 0.00 | 0.00 | 0.00 | 0.05 | 0.10 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.40 | 1.05 | 0.00 | 0.00 | 0.10 | 0.00 | 0.00 | 0.88 |
| 81230009 | Weld | CO | 70.2 | 71.4 | 0.27 | 0.24 | 0.00 | 0.00 | 0.77 | 0.00 | 0.00 | 0.00 | 0.00 | 0.08 | 0.04 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 1.05 | 0.54 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.58 |
| 90010017 | Fairfield | CT | 68.9 | 71.2 | 0.06 | 0.00 | 0.01 | 6.24 | 0.04 | 17.31 | 0.29 | 0.07 | 1.04 | 0.15 | 0.00 | 5.11 | 0.01 | 0.06 | 0.03 | 0.15 | 0.30 | 0.03 | 0.01 | 1.27 | 0.02 | 0.68 | 0.26 | 0.07 |
| 90013007 | Fairfield | CT | 71.0 | 75.0 | 0.07 | 0.01 | 0.02 | 6.94 | 0.06 | 14.12 | 0.40 | 0.07 | 1.84 | 0.21 | 0.00 | 6.32 | 0.02 | 0.11 | 0.02 | 0.31 | 0.44 | 0.04 | 0.01 | 1.51 | 0.01 | 1.10 | 0.24 | 0.08 |
| 90019003 | Fairfield | CT | 73.0 | 75.9 | 0.07 | 0.01 | 0.02 | 7.75 | 0.06 | 15.80 | 0.43 | 0.06 | 1.60 | 0.21 | 0.01 | 6.56 | 0.02 | 0.12 | 0.02 | 0.28 | 0.45 | 0.04 | 0.01 | 1.91 | 0.01 | 1.14 | 0.20 | 0.08 |
| 90099002 | New Haven | CT | 69.9 | 72.6 | 0.09 | 0.01 | 0.03 | 5.06 | 0.04 | 15.03 | 0.32 | 0.15 | 1.17 | 0.24 | 0.01 | 4.87 | 0.02 | 0.04 | 0.04 | 0.12 | 0.41 | 0.04 | 0.02 | 1.26 | 0.04 | 0.61 | 0.25 | 0.10 |
| 240251001 | Harford | MD | 70.9 | 73.3 | 0.13 | 0.01 | 0.00 | 0.07 | 0.09 | 0.16 | 0.42 | 0.07 | 2.77 | 0.35 | 0.02 | 4.32 | 0.00 | 0.11 | 0.04 | 0.43 | 0.74 | 0.05 | 0.00 | 5.05 | 0.04 | 2.78 | 0.24 | 0.12 |
| 260050003 | Allegan | MI | 69.0 | 71.7 | 0.16 | 0.02 | 0.00 | 0.00 | 0.16 | 0.00 | 0.05 | 0.09 | 0.19 | 1.31 | 0.01 | 0.05 | 0.00 | 0.04 | 0.05 | 0.65 | 2.39 | 0.06 | 0.00 | 0.04 | 0.05 | 0.11 | 1.95 | 0.12 |
| 261630019 | Wayne | MI | 69.0 | 71.0 | 0.17 | 0.03 | 0.00 | 0.01 | 0.08 | 0.06 | 0.20 | 0.12 | 3.81 | 0.62 | 0.05 | 0.18 | 0.00 | 0.05 | 0.04 | 0.27 | 1.12 | 0.09 | 0.00 | 0.16 | 0.07 | 0.23 | 1.08 | 0.18 |
| 360810124 | Queens | NY | 70.2 | 72.0 | 0.12 | 0.02 | 0.06 | 8.57 | 0.07 | 13.55 | 0.35 | 0.12 | 1.88 | 0.32 | 0.02 | 7.16 | 0.04 | 0.09 | 0.05 | 0.13 | 0.58 | 0.07 | 0.07 | 1.56 | 0.03 | 1.01 | 0.38 | 0.14 |
| 360850067 | Richmond | NY | 67.1 | 68.5 | 0.12 | 0.02 | 0.00 | 10.53 | 0.09 | 6.57 | 0.37 | 0.09 | 2.05 | 0.36 | 0.01 | 10.41 | 0.00 | 0.10 | 0.04 | 0.36 | 0.70 | 0.07 | 0.00 | 1.67 | 0.02 | 1.54 | 0.30 | 0.12 |
| 361030002 | Suffolk | NY | 74.0 | 75.5 | 0.12 | 0.02 | 0.01 | 8.88 | 0.06 | 18.11 | 0.23 | 0.20 | 1.76 | 0.34 | 0.03 | 6.86 | 0.00 | 0.05 | 0.05 | 0.22 | 0.60 | 0.07 | 0.02 | 0.99 | 0.06 | 0.81 | 0.25 | 0.14 |
| 480391004 | Brazoria | TX | 74.0 | 74.9 | 0.23 | 0.06 | 0.00 | 0.00 | 0.08 | 0.00 | 0.04 | 0.06 | 0.06 | 0.90 | 0.05 | 0.01 | 0.00 | 0.04 | 0.05 | 0.28 | 26.00 | 0.14 | 0.00 | 0.02 | 0.06 | 0.02 | 0.40 | 0.27 |
| 481210034 | Denton | TX | 69.7 | 72.0 | 0.15 | 0.04 | 0.00 | 0.00 | 0.13 | 0.01 | 0.09 | 0.03 | 0.08 | 1.23 | 0.03 | 0.04 | 0.00 | 0.09 | 0.03 | 0.14 | 26.69 | 0.10 | 0.00 | 0.05 | 0.05 | 0.04 | 0.08 | 0.25 |
| 482010024 | Harris | TX | 70.4 | 72.8 | 0.08 | 0.03 | 0.00 | 0.00 | 0.05 | 0.00 | 0.14 | 0.04 | 0.05 | 0.20 | 0.03 | 0.02 | 0.00 | 0.14 | 0.02 | 0.26 | 25.62 | 0.08 | 0.00 | 0.06 | 0.03 | 0.05 | 0.07 | 0.14 |
| 482011034 | Harris | TX | 70.8 | 71.6 | 0.16 | 0.03 | 0.00 | 0.00 | 0.04 | 0.00 | 0.09 | 0.04 | 0.05 | 0.68 | 0.02 | 0.01 | 0.00 | 0.10 | 0.03 | 0.09 | 25.66 | 0.07 | 0.00 | 0.03 | 0.02 | 0.03 | 0.22 | 0.15 |
| 482011039 | Harris | TX | 71.8 | 73.5 | 0.19 | 0.03 | 0.00 | 0.00 | 0.06 | 0.00 | 0.04 | 0.06 | 0.05 | 0.58 | 0.03 | 0.01 | 0.00 | 0.03 | 0.04 | 0.30 | 22.82 | 0.08 | 0.00 | 0.02 | 0.04 | 0.01 | 0.28 | 0.20 |
| 484392003 | Tarrant | TX | 72.5 | 74.8 | 0.30 | 0.04 | 0.00 | 0.00 | 0.14 | 0.01 | 0.09 | 0.05 | 0.10 | 1.71 | 0.05 | 0.05 | 0.00 | 0.08 | 0.07 | 0.15 | 27.64 | 0.15 | 0.00 | 0.05 | 0.09 | 0.05 | 0.13 | 0.28 |
| 550790085 | Milwaukee | WI | 71.2 | 73.0 | 0.06 | 0.01 | 0.00 | 0.00 | 0.08 | 0.02 | 0.04 | 0.23 | 0.87 | 0.76 | 0.02 | 0.33 | 0.00 | 0.02 | 0.03 | 0.31 | 1.22 | 0.04 | 0.00 | 0.12 | 0.09 | 0.59 | 13.39 | 0.09 |
| 551170006 | Sheboygan | WI | 72.8 | 75.1 | 0.06 | 0.03 | 0.00 | 0.00 | 0.14 | 0.02 | 0.04 | 0.10 | 1.10 | 0.95 | 0.04 | 0.41 | 0.00 | 0.02 | 0.02 | 0.31 | 1.65 | 0.06 | 0.00 | 0.10 | 0.07 | 0.64 | 9.09 | 0.12 |

Contributions to 2023 Nonattainment and Maintenance Sites Outside of California (Part 3)

| Site ID | County | State | 2023en Average | 2023en Maximum | Tribal | Canada/ Mexco | Offshore | Fire | Boundary | Biogenic |
|---|---|---|---|---|---|---|---|---|---|---|
| 40130019 | Maricopa | AZ | 69.3 | 71.4 | 0.06 | 3.29 | 0.37 | 0.49 | 34.74 | 2.52 |
| 40131004 | Maricopa | AZ | 69.8 | 71.0 | 0.06 | 2.70 | 0.34 | 0.56 | 33.85 | 2.24 |
| 80050002 | Arapahoe | CO | 69.3 | 71.3 | 0.22 | 0.55 | 0.14 | 0.46 | 34.84 | 4.24 |
| 80350004 | Douglas | CO | 71.1 | 73.2 | 0.21 | 0.71 | 0.16 | 0.47 | 34.74 | 4.19 |
| 80590006 | Jefferson | CO | 71.3 | 73.7 | 0.21 | 0.90 | 0.17 | 0.66 | 31.41 | 5.40 |
| 80590011 | Jefferson | CO | 70.9 | 73.9 | 0.16 | 0.70 | 0.16 | 0.45 | 32.96 | 4.74 |
| 80690011 | Larimer | CO | 71.2 | 73.0 | 0.25 | 0.78 | 0.19 | 1.74 | 34.54 | 5.71 |
| 81230009 | Weld | CO | 70.2 | 71.4 | 0.23 | 1.04 | 0.15 | 1.57 | 31.11 | 6.08 |
| 90010017 | Fairfield | CT | 68.9 | 71.2 | 0.00 | 1.64 | 0.65 | 0.20 | 16.73 | 3.28 |
| 90013007 | Fairfield | CT | 71.0 | 75.0 | 0.01 | 1.35 | 1.93 | 0.34 | 17.17 | 4.01 |
| 90019003 | Fairfield | CT | 73.0 | 75.9 | 0.01 | 1.37 | 1.96 | 0.33 | 17.00 | 4.09 |
| 90099002 | New Haven | CT | 69.9 | 72.6 | 0.01 | 1.58 | 2.15 | 0.22 | 17.17 | 4.13 |
| 240251001 | Harford | MD | 70.9 | 73.3 | 0.01 | 0.79 | 0.32 | 0.42 | 15.28 | 5.32 |
| 260050003 | Allegan | MI | 69.0 | 71.7 | 0.02 | 0.54 | 0.36 | 0.93 | 11.85 | 8.91 |
| 261630019 | Wayne | MI | 69.0 | 71.0 | 0.02 | 3.13 | 0.17 | 0.44 | 20.06 | 6.93 |
| 360810124 | Queens | NY | 70.2 | 72.0 | 0.01 | 1.73 | 1.39 | 0.25 | 17.87 | 4.45 |
| 360850067 | Richmond | NY | 67.1 | 68.5 | 0.01 | 1.44 | 0.83 | 0.35 | 15.46 | 4.75 |
| 361030002 | Suffolk | NY | 74.0 | 75.5 | 0.01 | 1.85 | 1.24 | 0.30 | 18.94 | 4.49 |
| 480391004 | Brazoria | TX | 74.0 | 74.9 | 0.02 | 0.44 | 2.31 | 2.05 | 24.02 | 5.60 |
| 481210034 | Denton | TX | 69.7 | 72.0 | 0.01 | 0.92 | 1.23 | 0.87 | 24.69 | 6.42 |
| 482010024 | Harris | TX | 70.4 | 72.8 | 0.01 | 0.28 | 4.83 | 0.77 | 27.83 | 2.66 |
| 482011034 | Harris | TX | 70.8 | 71.6 | 0.01 | 0.24 | 3.91 | 1.75 | 25.71 | 3.44 |
| 482011039 | Harris | TX | 71.8 | 73.5 | 0.01 | 0.47 | 4.04 | 2.09 | 24.67 | 4.50 |
| 484392003 | Tarrant | TX | 72.5 | 74.8 | 0.02 | 1.24 | 1.18 | 1.34 | 24.38 | 6.44 |
| 550790085 | Milwaukee | WI | 71.2 | 73.0 | 0.01 | 0.82 | 0.43 | 0.37 | 16.67 | 6.70 |
| 551170006 | Sheboygan | WI | 72.8 | 75.1 | 0.01 | 0.69 | 0.55 | 0.64 | 17.53 | 7.51 |

Contributions to 2023 Nonattainment and Maintenance Sites in California (Part 1)

| Site ID | County | State | 2023 Average | 2023 Maximum | AL | AZ | AR | CA | CO | CT | DE | DC | FL | GA | ID | IL | IN | IA | KS | KY | LA | ME | MD | MA | MI | MN | MS | MO | MT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 60190007 | Fresno | CA | 79.2 | 79.4 | 0.00 | 0.16 | 0.00 | 35.68 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60190011 | Fresno | CA | 78.6 | 81.2 | 0.00 | 0.15 | 0.00 | 35.20 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60190242 | Fresno | CA | 79.4 | 82.2 | 0.00 | 0.21 | 0.00 | 31.98 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60194001 | Fresno | CA | 73.3 | 74.4 | 0.00 | 0.03 | 0.00 | 34.20 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60195001 | Fresno | CA | 79.6 | 81.2 | 0.00 | 0.12 | 0.00 | 35.79 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60250005 | Imperial | CA | 73.3 | 74.6 | 0.00 | 0.62 | 0.00 | 9.28 | 0.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60251003 | Imperial | CA | 79.0 | 80.0 | 0.00 | 0.67 | 0.00 | 11.34 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60290007 | Kern | CA | 77.7 | 81.3 | 0.00 | 0.07 | 0.00 | 29.99 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60290008 | Kern | CA | 71.3 | 72.8 | 0.00 | 0.17 | 0.00 | 26.44 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60290014 | Kern | CA | 74.1 | 75.2 | 0.00 | 0.11 | 0.00 | 31.54 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60290232 | Kern | CA | 73.7 | 75.2 | 0.00 | 0.03 | 0.00 | 32.66 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60295002 | Kern | CA | 75.9 | 76.8 | 0.00 | 0.13 | 0.00 | 28.33 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60296001 | Kern | CA | 70.9 | 72.4 | 0.00 | 0.16 | 0.00 | 28.50 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60370002 | Los Angeles | CA | 73.3 | 75.1 | 0.00 | 0.23 | 0.00 | 39.68 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60370016 | Los Angeles | CA | 86.1 | 88.9 | 0.00 | 0.27 | 0.00 | 46.61 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60371201 | Los Angeles | CA | 79.8 | 79.8 | 0.00 | 0.37 | 0.00 | 35.55 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60371701 | Los Angeles | CA | 78.1 | 79.1 | 0.00 | 0.27 | 0.00 | 42.09 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60372005 | Los Angeles | CA | 72.3 | 74.6 | 0.00 | 0.32 | 0.00 | 37.39 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60376012 | Los Angeles | CA | 85.9 | 87.4 | 0.00 | 0.42 | 0.00 | 39.86 | 0.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60379033 | Los Angeles | CA | 76.3 | 77.2 | 0.00 | 0.34 | 0.00 | 25.79 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60392010 | Madera | CA | 72.1 | 72.9 | 0.00 | 0.20 | 0.00 | 28.39 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60470003 | Merced | CA | 69.9 | 71.0 | 0.00 | 0.10 | 0.00 | 28.52 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60650004 | Riverside | CA | 76.7 | 76.7 | 0.00 | 0.22 | 0.00 | 41.92 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60650012 | Riverside | CA | 83.6 | 85.1 | 0.00 | 0.21 | 0.00 | 38.65 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60651016 | Riverside | CA | 85.2 | 85.5 | 0.00 | 0.22 | 0.00 | 35.47 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60652002 | Riverside | CA | 72.4 | 73.0 | 0.00 | 0.27 | 0.00 | 16.57 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60655001 | Riverside | CA | 79.5 | 80.1 | 0.00 | 0.20 | 0.00 | 24.70 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60656001 | Riverside | CA | 78.3 | 81.6 | 0.00 | 0.17 | 0.00 | 39.14 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60658001 | Riverside | CA | 87.0 | 87.9 | 0.00 | 0.27 | 0.00 | 47.69 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60658005 | Riverside | CA | 83.2 | 84.4 | 0.00 | 0.25 | 0.00 | 45.60 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60659001 | Riverside | CA | 73.7 | 75.9 | 0.00 | 0.16 | 0.00 | 37.28 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60670012 | Sacramento | CA | 74.5 | 75.9 | 0.00 | 0.01 | 0.00 | 35.91 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60675003 | Sacramento | CA | 69.9 | 71.3 | 0.00 | 0.00 | 0.00 | 34.18 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60710005 | San Bernardino | CA | 96.2 | 98.1 | 0.00 | 0.23 | 0.00 | 48.09 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60710012 | San Bernardino | CA | 84.1 | 85.8 | 0.00 | 0.46 | 0.00 | 24.28 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60710306 | San Bernardino | CA | 76.2 | 77.4 | 0.00 | 0.14 | 0.00 | 29.72 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60711004 | San Bernardino | CA | 89.8 | 91.0 | 0.00 | 0.35 | 0.00 | 47.69 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60712002 | San Bernardino | CA | 93.1 | 95.0 | 0.00 | 0.14 | 0.00 | 51.11 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60714001 | San Bernardino | CA | 86.0 | 88.5 | 0.00 | 0.21 | 0.00 | 41.23 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60714003 | San Bernardino | CA | 94.1 | 95.8 | 0.00 | 0.10 | 0.00 | 52.53 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60719002 | San Bernardino | CA | 80.0 | 81.4 | 0.00 | 0.45 | 0.00 | 22.21 | 0.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60719004 | San Bernardino | CA | 88.4 | 88.7 | 0.00 | 0.10 | 0.00 | 49.35 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60990006 | Stanislaus | CA | 74.8 | 75.7 | 0.00 | 0.03 | 0.00 | 34.16 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 61070006 | Tulare | CA | 69.1 | 71.9 | 0.00 | 0.06 | 0.00 | 7.37 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 61070009 | Tulare | CA | 76.1 | 77.2 | 0.00 | 0.07 | 0.00 | 23.74 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 61072002 | Tulare | CA | 68.9 | 71.4 | 0.00 | 0.12 | 0.00 | 30.91 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 61072010 | Tulare | CA | 73.1 | 73.9 | 0.00 | 0.03 | 0.00 | 30.19 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 61112002 | Ventura | CA | 70.5 | 72.2 | 0.00 | 0.32 | 0.00 | 29.51 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

Contributions to 2023 Nonattainment and Maintenance Sites in California (Part 2)

| Site ID | County | State | 2023 Average | 2023 Maximum | NE | NV | NH | NJ | NM | NY | NC | ND | OH | OK | OR | PA | RI | SC | SD | TN | TX | UT | VT | VA | WA | WV | WI | WY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 60190007 | Fresno | CA | 79.2 | 79.4 | 0.00 | 0.51 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.29 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.08 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.01 |
| 60190011 | Fresno | CA | 78.6 | 81.2 | 0.00 | 0.44 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.27 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.09 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.01 |
| 60190242 | Fresno | CA | 79.4 | 82.2 | 0.00 | 0.64 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.35 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.10 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.01 |
| 60194001 | Fresno | CA | 73.3 | 74.4 | 0.00 | 0.27 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.31 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.00 |
| 60195001 | Fresno | CA | 79.6 | 81.2 | 0.00 | 0.38 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.33 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 |
| 60250005 | Imperial | CA | 73.3 | 74.6 | 0.00 | 0.09 | 0.00 | 0.00 | 0.12 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.20 | 0.05 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.04 |
| 60251003 | Imperial | CA | 79.0 | 80.0 | 0.00 | 0.25 | 0.00 | 0.00 | 0.11 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.09 | 0.06 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.03 |
| 60290007 | Kern | CA | 77.7 | 81.3 | 0.00 | 0.29 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.37 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.10 | 0.00 | 0.00 | 0.15 | 0.00 | 0.00 | 0.03 |
| 60290008 | Kern | CA | 71.3 | 72.8 | 0.00 | 0.31 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.34 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.02 | 0.00 | 0.00 | 0.10 | 0.00 | 0.00 | 0.01 |
| 60290014 | Kern | CA | 74.1 | 75.2 | 0.00 | 0.38 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.34 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.08 | 0.00 | 0.00 | 0.00 |
| 60290232 | Kern | CA | 73.7 | 75.2 | 0.00 | 0.27 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.39 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.02 | 0.00 | 0.00 | 0.17 | 0.00 | 0.00 | 0.00 |
| 60295002 | Kern | CA | 75.9 | 76.8 | 0.00 | 0.31 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.25 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.06 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.02 |
| 60296001 | Kern | CA | 70.9 | 72.4 | 0.00 | 0.58 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.26 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.02 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 |
| 60370002 | Los Angeles | CA | 73.3 | 75.1 | 0.00 | 0.12 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.13 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.16 | 0.03 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.01 |
| 60370016 | Los Angeles | CA | 86.1 | 88.9 | 0.00 | 0.14 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.15 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.18 | 0.03 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.02 |
| 60371201 | Los Angeles | CA | 79.8 | 79.8 | 0.00 | 0.17 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.10 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.13 | 0.09 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.03 |
| 60371701 | Los Angeles | CA | 78.1 | 79.1 | 0.00 | 0.11 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.15 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.19 | 0.03 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.02 |
| 60372005 | Los Angeles | CA | 72.3 | 74.6 | 0.00 | 0.08 | 0.00 | 0.00 | 0.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.10 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.21 | 0.06 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.02 |
| 60376012 | Los Angeles | CA | 85.9 | 87.4 | 0.00 | 0.18 | 0.00 | 0.00 | 0.09 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.16 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.21 | 0.08 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.04 |
| 60379033 | Los Angeles | CA | 76.3 | 77.2 | 0.00 | 0.15 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.19 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.15 | 0.04 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.02 |
| 60392010 | Madera | CA | 72.1 | 72.9 | 0.00 | 0.65 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.34 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.12 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.02 |
| 60470003 | Merced | CA | 69.9 | 71.0 | 0.00 | 0.39 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.42 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.00 |
| 60650004 | Riverside | CA | 76.7 | 76.7 | 0.00 | 0.14 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.13 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.13 | 0.03 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.01 |
| 60650012 | Riverside | CA | 83.6 | 85.1 | 0.00 | 0.24 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.15 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.02 | 0.00 | 0.00 | 0.08 | 0.00 | 0.00 | 0.00 |
| 60651016 | Riverside | CA | 85.2 | 85.5 | 0.00 | 0.28 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.09 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.02 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 |
| 60652002 | Riverside | CA | 72.4 | 73.0 | 0.00 | 0.18 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.22 | 0.04 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.02 |
| 60655001 | Riverside | CA | 79.5 | 80.1 | 0.00 | 0.11 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 0.12 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.26 | 0.03 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.02 |
| 60656001 | Riverside | CA | 78.3 | 81.6 | 0.00 | 0.19 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.10 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 0.07 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.02 |
| 60658001 | Riverside | CA | 87.0 | 87.9 | 0.00 | 0.15 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.17 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.12 | 0.03 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.01 |
| 60658005 | Riverside | CA | 83.2 | 84.4 | 0.00 | 0.14 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.17 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.11 | 0.03 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.01 |
| 60659001 | Riverside | CA | 73.7 | 75.9 | 0.00 | 0.15 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.16 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.05 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.01 |
| 60670012 | Sacramento | CA | 74.5 | 75.9 | 0.00 | 0.30 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.57 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.20 | 0.00 | 0.00 | 0.00 |
| 60675003 | Sacramento | CA | 69.9 | 71.3 | 0.00 | 0.44 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.45 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.14 | 0.00 | 0.00 | 0.00 |
| 60710005 | San Bernardino | CA | 96.2 | 98.1 | 0.00 | 0.25 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.20 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.13 | 0.03 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.01 |
| 60710012 | San Bernardino | CA | 84.1 | 85.8 | 0.00 | 0.15 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.11 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.12 | 0.06 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.03 |
| 60710306 | San Bernardino | CA | 76.2 | 77.4 | 0.00 | 0.06 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.14 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 0.01 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 |
| 60711004 | San Bernardino | CA | 89.8 | 91.0 | 0.00 | 0.14 | 0.00 | 0.00 | 0.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.15 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.22 | 0.04 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.02 |
| 60712002 | San Bernardino | CA | 93.1 | 95.0 | 0.00 | 0.16 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.23 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.13 | 0.01 | 0.00 | 0.00 | 0.08 | 0.00 | 0.00 | 0.00 |
| 60714001 | San Bernardino | CA | 86.0 | 88.5 | 0.00 | 0.19 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.15 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.01 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 |
| 60714003 | San Bernardino | CA | 94.1 | 95.8 | 0.00 | 0.21 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.25 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.12 | 0.08 | 0.00 | 0.00 | 0.15 | 0.00 | 0.00 | 0.01 |
| 60719002 | San Bernardino | CA | 80.0 | 81.4 | 0.00 | 0.14 | 0.00 | 0.00 | 0.10 | 0.00 | 0.00 | 0.00 | 0.00 | 0.05 | 0.10 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.28 | 0.05 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.04 |
| 60719004 | San Bernardino | CA | 88.4 | 88.7 | 0.00 | 0.20 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.23 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.11 | 0.07 | 0.00 | 0.00 | 0.14 | 0.00 | 0.00 | 0.01 |
| 60990006 | Stanislaus | CA | 74.8 | 75.7 | 0.00 | 0.24 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.47 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.05 | 0.00 | 0.00 | 0.11 | 0.00 | 0.00 | 0.01 |
| 61070006 | Tulare | CA | 69.1 | 71.9 | 0.00 | 0.05 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.11 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 |
| 61070009 | Tulare | CA | 76.1 | 77.2 | 0.00 | 0.11 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.21 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.00 |
| 61072002 | Tulare | CA | 68.9 | 71.4 | 0.00 | 0.21 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.32 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.16 | 0.00 | 0.00 | 0.00 |
| 61072010 | Tulare | CA | 73.1 | 73.9 | 0.00 | 0.20 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.40 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.17 | 0.00 | 0.00 | 0.00 |
| 61112002 | Ventura | CA | 70.5 | 72.2 | 0.00 | 0.18 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.16 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.13 | 0.08 | 0.00 | 0.00 | 0.08 | 0.00 | 0.00 | 0.03 |

Contributions to 2023 Nonattainment and Maintenance Sites in California (Part 3)

| Site ID | County | State | 2023 Average | 2023 Maximum | Tribal | Canada/ Mexco | Offshore | Fire | Boundary | Biogenic |
|---|---|---|---|---|---|---|---|---|---|---|
| 60190007 | Fresno | CA | 79.2 | 79.4 | 0.00 | 0.29 | 1.19 | 1.39 | 32.52 | 6.85 |
| 60190011 | Fresno | CA | 78.6 | 81.2 | 0.01 | 0.33 | 1.13 | 1.62 | 32.34 | 6.78 |
| 60190242 | Fresno | CA | 79.4 | 82.2 | 0.00 | 0.31 | 1.24 | 1.48 | 34.92 | 7.88 |
| 60194001 | Fresno | CA | 73.3 | 74.4 | 0.00 | 0.12 | 1.68 | 0.87 | 27.76 | 7.90 |
| 60195001 | Fresno | CA | 79.6 | 81.2 | 0.00 | 0.20 | 1.75 | 1.12 | 32.10 | 7.66 |
| 60250005 | Imperial | CA | 73.3 | 74.6 | 0.01 | 19.87 | 1.17 | 0.71 | 38.68 | 2.11 |
| 60251003 | Imperial | CA | 79.0 | 80.0 | 0.01 | 18.74 | 1.14 | 0.61 | 43.58 | 2.08 |
| 60290007 | Kern | CA | 77.7 | 81.3 | 0.00 | 0.30 | 1.59 | 3.27 | 33.68 | 7.70 |
| 60290008 | Kern | CA | 71.3 | 72.8 | 0.01 | 0.67 | 1.96 | 1.05 | 32.77 | 7.30 |
| 60290014 | Kern | CA | 74.1 | 75.2 | 0.00 | 0.31 | 1.68 | 0.85 | 31.31 | 7.37 |
| 60290232 | Kern | CA | 73.7 | 75.2 | 0.00 | 0.13 | 1.67 | 1.11 | 29.43 | 7.73 |
| 60295002 | Kern | CA | 75.9 | 76.8 | 0.00 | 0.35 | 1.34 | 3.80 | 33.45 | 7.68 |
| 60296001 | Kern | CA | 70.9 | 72.4 | 0.00 | 0.50 | 1.59 | 0.63 | 30.55 | 7.98 |
| 60370002 | Los Angeles | CA | 73.3 | 75.1 | 0.01 | 1.47 | 3.53 | 0.82 | 24.67 | 2.15 |
| 60370016 | Los Angeles | CA | 86.1 | 88.9 | 0.01 | 1.73 | 4.14 | 0.97 | 28.98 | 2.53 |
| 60371201 | Los Angeles | CA | 79.8 | 79.8 | 0.02 | 1.74 | 4.20 | 1.29 | 32.92 | 2.83 |
| 60371701 | Los Angeles | CA | 78.1 | 79.1 | 0.01 | 1.82 | 4.16 | 0.97 | 25.57 | 2.35 |
| 60372005 | Los Angeles | CA | 72.3 | 74.6 | 0.01 | 1.76 | 4.10 | 1.17 | 24.34 | 2.37 |
| 60376012 | Los Angeles | CA | 85.9 | 87.4 | 0.02 | 2.27 | 4.69 | 1.22 | 32.85 | 3.43 |
| 60379033 | Los Angeles | CA | 76.3 | 77.2 | 0.01 | 1.82 | 3.52 | 0.45 | 40.73 | 2.75 |
| 60392010 | Madera | CA | 72.1 | 72.9 | 0.00 | 0.23 | 1.22 | 1.30 | 32.12 | 7.30 |
| 60470003 | Merced | CA | 69.9 | 71.0 | 0.00 | 0.37 | 1.94 | 1.12 | 30.92 | 5.97 |
| 60650004 | Riverside | CA | 76.7 | 76.7 | 0.01 | 1.37 | 3.64 | 0.72 | 25.79 | 2.34 |
| 60650012 | Riverside | CA | 83.6 | 85.1 | 0.00 | 1.30 | 3.33 | 0.31 | 36.48 | 2.66 |
| 60651016 | Riverside | CA | 85.2 | 85.5 | 0.00 | 1.60 | 3.00 | 3.09 | 38.71 | 2.54 |
| 60652002 | Riverside | CA | 72.4 | 73.0 | 0.01 | 2.29 | 1.39 | 2.24 | 46.66 | 2.08 |
| 60655001 | Riverside | CA | 79.5 | 80.1 | 0.01 | 2.71 | 2.67 | 3.03 | 42.81 | 2.40 |
| 60656001 | Riverside | CA | 78.3 | 81.6 | 0.00 | 1.13 | 4.03 | 0.53 | 30.14 | 2.55 |
| 60658001 | Riverside | CA | 87.0 | 87.9 | 0.01 | 1.76 | 4.77 | 0.77 | 28.27 | 2.68 |
| 60658005 | Riverside | CA | 83.2 | 84.4 | 0.01 | 1.68 | 4.56 | 0.73 | 27.04 | 2.57 |
| 60659001 | Riverside | CA | 73.7 | 75.9 | 0.00 | 1.71 | 4.96 | 1.03 | 25.56 | 2.43 |
| 60670012 | Sacramento | CA | 74.5 | 75.9 | 0.00 | 0.12 | 0.88 | 1.16 | 29.33 | 5.92 |
| 60675003 | Sacramento | CA | 69.9 | 71.3 | 0.00 | 0.06 | 0.79 | 1.26 | 26.47 | 6.04 |
| 60710005 | San Bernardino | CA | 96.2 | 98.1 | 0.00 | 1.36 | 3.68 | 0.44 | 38.71 | 2.77 |
| 60710012 | San Bernardino | CA | 84.1 | 85.8 | 0.02 | 1.33 | 1.83 | 0.33 | 53.12 | 1.93 |
| 60710306 | San Bernardino | CA | 76.2 | 77.4 | 0.00 | 0.67 | 2.10 | 0.50 | 40.62 | 2.02 |
| 60711004 | San Bernardino | CA | 89.8 | 91.0 | 0.01 | 2.03 | 4.00 | 0.95 | 31.07 | 2.74 |
| 60712002 | San Bernardino | CA | 93.1 | 95.0 | 0.01 | 1.58 | 4.58 | 0.75 | 31.34 | 2.82 |
| 60714001 | San Bernardino | CA | 86.0 | 88.5 | 0.00 | 0.91 | 2.69 | 0.37 | 37.56 | 2.45 |
| 60714003 | San Bernardino | CA | 94.1 | 95.8 | 0.00 | 0.98 | 4.15 | 0.69 | 31.70 | 2.90 |
| 60719002 | San Bernardino | CA | 80.0 | 81.4 | 0.01 | 2.80 | 2.23 | 3.20 | 45.72 | 2.29 |
| 60719004 | San Bernardino | CA | 88.4 | 88.7 | 0.00 | 0.92 | 3.90 | 0.65 | 29.78 | 2.72 |
| 60990006 | Stanislaus | CA | 74.8 | 75.7 | 0.00 | 0.34 | 2.19 | 1.77 | 30.24 | 5.06 |
| 61070006 | Tulare | CA | 69.1 | 71.9 | 0.00 | 0.33 | 0.55 | 4.43 | 53.61 | 2.46 |
| 61070009 | Tulare | CA | 76.1 | 77.2 | 0.00 | 0.43 | 1.44 | 3.40 | 39.41 | 7.08 |
| 61072002 | Tulare | CA | 68.9 | 71.4 | 0.00 | 0.25 | 1.58 | 0.95 | 26.88 | 7.42 |
| 61072010 | Tulare | CA | 73.1 | 73.9 | 0.00 | 0.15 | 1.78 | 1.17 | 30.26 | 8.67 |
| 61112002 | Ventura | CA | 70.5 | 72.2 | 0.02 | 1.65 | 4.60 | 1.01 | 29.69 | 2.75 |

**EXHIBIT 4**

EPA, Analysis of Contribution Thresholds for Use in Clean Air Act Section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards (Aug. 31, 2018)



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
RESEARCH TRIANGLE PARK, NC  27711

OFFICE OF
AIR QUALITY PLANNING
AND STANDARDS

**AUG 3 1 2018**

**MEMORANDUM**

**SUBJECT:**     Analysis of Contribution Thresholds for Use in Clean Air Act Section
110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for
the 2015 Ozone National Ambient Air Quality Standards

**FROM:**     Peter Tsirigotis
Director

**TO:**     Regional Air Division Directors, Regions 1–10

    The purpose of this memorandum is to provide analytical information regarding the degree
to which certain air quality threshold amounts capture the collective amount of upwind
contribution from upwind states to downwind receptors for the 2015 ozone National Ambient Air
Quality Standards (NAAQS). It also interprets that information to make recommendations about
what thresholds may be appropriate for use in state implementation plan (SIP) revisions addressing
the good neighbor provision for that NAAQS. This document does not substitute for provisions or
regulations of the Clean Air Act (CAA), nor is it a regulation itself. Rather, it provides
recommendations for states using the included analytical information in developing SIP
submissions, and for the Environmental Protection Agency (EPA) Regional offices in acting on
them. Thus, it does not impose binding, enforceable requirements on any party. State air agencies
retain the discretion to develop good neighbor SIP revisions that differ from this guidance.

    Following these recommendations does not ensure that the EPA will approve a SIP revision
in all instances where the recommendations are followed, as the guidance may not apply to the
facts and circumstances underlying a particular SIP. Final decisions by the EPA to approve a
particular SIP revision will only be made based on the requirements of the statute and will only be
made following an air agency's final submission of the SIP revision to the EPA, and after
appropriate notice and opportunity for public review and comment. Interested parties may raise
comment about the appropriateness of the application of this guidance to a particular SIP revision.
The EPA and air agencies should consider whether the recommendations in this guidance are
appropriate for each situation.

**Introduction**

CAA section 110(a)(2)(D)(i)(I), otherwise known as the good neighbor provision, requires SIPs to prohibit emissions "which will contribute significantly to nonattainment in, or interfere with maintenance by, any other state with respect to any" NAAQS. The EPA has historically used a 4-step framework to address upwind state obligations under the good neighbor provision for regional pollutants like ozone, which includes the following steps: (1) identify downwind areas, referred to as "receptors," expected to have problems attaining or maintaining the NAAQS; (2) identify upwind states that contribute to those downwind air quality problems and warrant further review and analysis; (3) identify the emissions reductions (if any) necessary to eliminate an upwind state's significant contribution to nonattainment and/or interference with maintenance of the NAAQS in the downwind areas, considering cost and air quality factors; and (4) adopt permanent and enforceable measures needed to achieve those emissions reductions. The EPA notes that, in developing their SIP revisions for the 2015 ozone NAAQS, states have flexibility to follow this framework or develop alternative frameworks to evaluate interstate transport obligations, so long as a state's chosen approach has adequate technical justification and is consistent with the requirements of the CAA

At Step 2, the EPA has used an air quality screening threshold to determine whether or not a state contributes to a downwind air quality problem in amounts that warrant further evaluation as part of a multi-factor analysis in Step 3. Upwind states that impact a downwind receptor by less than the screening threshold do not contribute to the downwind air quality problem at Step 2. The EPA has previously determined that such states do not significantly contribute to nonattainment or interfere with maintenance of the NAAQS under the good neighbor provision without additional analysis. Upwind states that impact a downwind receptor at or above the threshold are identified as contributing to a downwind air quality problem (i.e., they are said to be "linked" to that downwind receptor). The Step 3 analysis is then used to determine if the linked upwind state's contribution is "significant" or will "interfere with maintenance" of the NAAQS at the downwind receptor(s).[1]

Determining an appropriate screening threshold is a critical component of designing and then applying Step 2. Each time EPA sets a new or revised NAAQS, states and EPA can evaluate collective contribution to identify an appropriate threshold for that NAAQS. This assessment uses data and air quality analyses that are specifically applicable to the NAAQS being considered and the relevant air quality conditions (e.g., pollutant concentrations and the magnitude of interstate transport). As a result, conclusions made with respect to one NAAQS are not by default applicable to another NAAQS. In previous federal actions,[2] EPA's analysis of collective contribution concluded that a screening threshold equivalent to 1 percent of the 1997 and 2008 ozone NAAQS was appropriate at Step 2. In this document, we evaluate data pertinent to several alternative thresholds that could be applicable to the development of SIP revisions to address the 2015 ozone

---

[1] Note that upwind states that are linked to a downwind receptor at Step 2 may nevertheless be found to not significantly contribute to nonattainment or interfere with maintenance at the receptor depending on the outcome of the Step 3 analysis.

[2] In the Cross-State Air Pollution Rule (CSAPR), the EPA used 0.80 parts per billion (ppb) as the threshold, which is 1 percent of the 1997 ozone NAAQS. 76 FR 48208, 48238 (August 8, 2011). Most recently, in the Cross-State Air Pollution Rule Update for the 2008 Ozone NAAQS (CSAPR Update), the EPA used 0.75 ppb as the threshold, which is 1 percent of the 2008 ozone NAAQS. 81 FR 74504, 74518 (October 26, 2016).

NAAQS of 70 ppb. We compare a threshold equivalent to 1 percent of the 2015 ozone NAAQS (i.e., a threshold of 0.70 ppb), consistent with EPA's previously applied screening thresholds at Step 2, as well as two alternative thresholds: 1 ppb and 2 ppb. The purpose of this analysis is to examine the amount of collective upwind contribution—i.e., the sum of contributions from states that are linked to each receptor—for each of these alternative thresholds. The data provided in this analysis are drawn from the results of EPA's updated 2023 modeling, which was released in a memorandum in March 2018.[3] The analysis presented here is similar to the analysis of alternative thresholds conducted to select the screening thresholds used in both the CSAPR and CSAPR Update rulemakings.[4,5] Based on the data and analysis summarized here, the EPA believes that a threshold of 1 ppb may be appropriate for states to use to develop SIP revisions addressing the good neighbor provision for the 2015 ozone NAAQS.

**Methodology for Analyzing Alternative Thresholds**

The EPA's 2023 state-by-state contribution modeling is used to calculate the absolute and relative amount of total upwind "collective contribution" captured by each of the three alternative thresholds evaluated in this analysis: 0.70 ppb (1 percent of the 2015 ozone NAAQS), 1 ppb, and 2 ppb. The ozone concentration and collective contribution data for each alternative threshold are provided in several tables, as described below. In the analysis of alternative screening thresholds, the EPA focused on data for the receptors outside of California since no other states were projected to impact any of the receptors in California at or above a threshold equivalent to 1 percent of the 2015 ozone NAAQS.[6] Data are therefore provided for each of the 2023 nonattainment and maintenance receptors outside of California identified using the CSAPR methodology for determining future year receptors.[7] In Table 1 below, we provide the projected 2023 average design value and the sum of the contributions from all upwind states (i.e., total upwind contribution) for each of these receptors. Table 1 further provides data on the amount of the total upwind contribution (ppb) that is captured by each of the three thresholds (i.e., the collective contribution) and at each receptor considered in this analysis. In Table 2 below, we express the amount of contribution captured at each alternative threshold considered in this analysis as a percent of the amount of the total upwind contribution. Finally, in Table 3 below, we compare the net amount of contribution captured at the 1 ppb and 2 ppb thresholds as a percentage of the amount of contribution captured at the 0.70 ppb, 1 percent threshold.

---

[3] Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I) (March 2018). *https://www.epa.gov/airmarkets/march-2018-memo-and-supplemental-information-regarding-interstate-transport-sips-2015.*

[4] Air Quality Modeling Technical Support Document for the Final Cross State Air Pollution Rule Update (August 2016). *https://www.epa.gov/airmarkets/air-quality-modeling-technical-support-document-final-cross-state-air-pollution-rule.*

[5] Air Quality Modeling Final Rule Technical Support Document (for the Final Transport Rule now known as CSAPR; June 2011). *https://www.epa.gov/csapr/air-quality-modeling-final-rule-technical-support-document.*

[6] March 2018 Memo and Supplemental Information Regarding Interstate Transport SIPs for the 2015 Ozone NAAQS (March 2018). *https://www.epa.gov/airmarkets/march-2018-memo-and-supplemental-information-regarding-interstate-transport-sips-2015.*

[7] *See* 81 FR 74530-531.

3

**Results**

The data in the tables below indicate that, for the 2015 ozone NAAQS, the amount of upwind collective contribution captured using a 1 ppb threshold is generally comparable to the amount captured using a threshold equivalent to 1 percent of the NAAQS. In particular, the data in Table 1 indicate that using a 1 percent threshold captures 77 percent of the total upwind contribution when summed across all receptors. Overall, using a 1 ppb threshold captures 70 percent, which is a similar and only slightly lower amount of contribution. By contrast, using a 2 ppb threshold captures 55 percent, much less of the total contribution summed across all receptors. The data in Table 2 indicate that the percent of upwind contribution captured by a 1 percent and 1 ppb threshold at individual receptors are also of a similar magnitude at most sites. However, a 2 ppb threshold captures a notably lower portion of the total upwind contribution at most receptors. Finally, the data in Table 3 indicate that, on average across all receptors, a 1 ppb threshold captures 86 percent of the net contribution captured using a 1 percent threshold, whereas, a 2 ppb threshold captures only half of the net contribution using 1 percent.

Because the amount of upwind collective contribution captured with the 1 percent and 1 ppb thresholds is generally comparable, overall, we believe it may be reasonable and appropriate for states to use a 1 ppb contribution threshold, as an alternative to a 1 percent threshold, at Step 2 of the 4-step framework in developing their SIP revisions addressing the good neighbor provision for the 2015 ozone NAAQS. Although the 1 ppb threshold captures somewhat less upwind contribution across receptors than the 1 percent threshold, the 1 ppb threshold still generally captures a substantial amount of transported contribution from upwind states to downwind receptors. Thus, the use of a 1 ppb threshold to identify linked upwind states still provides the potential, at Step 3, for meaningful emission reductions in linked upwind states in order to aid downwind states with attainment and maintenance of the 2015 ozone NAAQS. However, the amount of upwind contribution captured using a 2 ppb threshold is notably less at most receptors than the amount captured with either a 1 ppb or 1 percent threshold, and therefore emission reductions from states linked at that higher threshold may be insufficient to address collective upwind state contribution to downwind air quality problems.

Please share this information with the air agencies in your Region.

**For Further Information**

If you have any questions concerning this memorandum, please contact Norm Possiel at (919) 541-5692, *possiel.norm@epa.gov* for modeling information or Beth Palma at (919) 541-5432, *palma.elizabeth@epa.gov* for any other information.

Table 1. Total upwind contribution and the sum of upwind contribution at each receptor captured using each alternative threshold (units are ppb).

| Site | State | County | 2023 Average Design Value | Total Upwind State Contribution | Sum of Upwind Contribution Captured with 0.70 ppb Threshold | Sum of Upwind Contribution Captured with 1 ppb Threshold | Sum of Upwind Contribution Captured with 2 ppb Threshold |
|---|---|---|---|---|---|---|---|
| 40130019 | AZ | Maricopa | 69.3 | 2.55 | 1.87 | 1.87 | 0.00 |
| 40131004 | AZ | Maricopa | 69.8 | 2.58 | 2.03 | 2.03 | 2.03 |
| 80050002 | CO | Arapahoe | 69.3 | 5.98 | 3.47 | 3.47 | 0.00 |
| 80350004 | CO | Douglas | 71.1 | 5.94 | 3.35 | 3.35 | 0.00 |
| 80590006 | CO | Jefferson | 71.3 | 7.06 | 4.68 | 2.34 | 0.00 |
| 80590011 | CO | Jefferson | 70.9 | 6.98 | 4.51 | 3.57 | 0.00 |
| 80690011 | CO | Larimer | 71.2 | 6.33 | 3.48 | 2.60 | 0.00 |
| 81230009 | CO | Weld | 70.2 | 5.63 | 2.77 | 1.05 | 0.00 |
| 90010017 | CT | Fairfield | 68.9 | 37.44 | 32.15 | 32.15 | 28.66 |
| 90013007 | CT | Fairfield | 71.0 | 41.29 | 36.91 | 33.63 | 27.38 |
| 90019003 | CT | Fairfield | 73.0 | 44.24 | 38.55 | 36.93 | 32.28 |
| 90099002 | CT | New Haven | 69.9 | 35.25 | 29.49 | 28.76 | 24.96 |
| 240251001 | MD | Harford | 70.9 | 25.88 | 20.16 | 17.79 | 14.92 |
| 260050003 | MI | Allegan | 69.0 | 42.90 | 38.87 | 36.63 | 31.73 |
| 261630019 | MI | Wayne | 69.0 | 17.63 | 11.81 | 10.89 | 8.69 |
| 360810124 | NY | Queens | 70.2 | 30.68 | 23.73 | 23.00 | 15.73 |
| 361030002 | NY | Suffolk | 74.0 | 28.82 | 22.31 | 18.74 | 15.74 |
| 480391004 | TX | Brazoria | 74.0 | 13.36 | 7.48 | 4.80 | 3.80 |
| 481210034 | TX | Denton | 69.7 | 8.64 | 3.15 | 3.15 | 0.00 |
| 482010024 | TX | Harris | 70.4 | 8.19 | 3.06 | 3.06 | 3.06 |
| 482011034 | TX | Harris | 70.8 | 9.86 | 3.38 | 3.38 | 3.38 |
| 482011039 | TX | Harris | 71.8 | 13.01 | 8.26 | 4.72 | 4.72 |
| 484392003 | TX | Tarrant | 72.5 | 10.06 | 4.20 | 3.42 | 0.00 |

| Site | State | County | 2023 Average Design Value | Total Upwind State Contribution | Sum of Upwind Contribution Captured with 0.70 ppb Threshold | Sum of Upwind Contribution Captured with 1 ppb Threshold | Sum of Upwind Contribution Captured with 2 ppb Threshold |
|---|---|---|---|---|---|---|---|
| 550790085 | WI | Milwaukee | 71.2 | 32.58 | 28.45 | 23.61 | 22.39 |
| 551170006 | WI | Sheboygan | 72.8 | 36.53 | 31.62 | 29.02 | 24.90 |
| | | | | | | | |
| Percent of Overall Upwind Contribution Captured => | | | | | 77% | 70% | 55% |

Table 2. Percent of the upwind contribution captured by each alternative threshold at each receptor.

| Site | State | County | Percent of Upwind Contribution Captured using a 0.70 ppb Threshold | Percent of Upwind Contribution Captured using a 1 ppb Threshold | Percent of Upwind Contribution Captured using a 2 ppb Threshold |
|---|---|---|---|---|---|
| 40130019 | AZ | Maricopa | 73.3% | 73.3% | 0.0% |
| 40131004 | AZ | Maricopa | 78.7% | 78.7% | 78.7% |
| 80050002 | CO | Arapahoe | 58.0% | 58.0% | 0.0% |
| 80350004 | CO | Douglas | 56.4% | 56.4% | 0.0% |
| 80590006 | CO | Jefferson | 66.3% | 33.1% | 0.0% |
| 80590011 | CO | Jefferson | 64.6% | 51.1% | 0.0% |
| 80690011 | CO | Larimer | 55.0% | 41.1% | 0.0% |
| 81230009 | CO | Weld | 49.2% | 18.7% | 0.0% |
| 90010017 | CT | Fairfield | 85.9% | 85.9% | 76.5% |
| 90013007 | CT | Fairfield | 89.4% | 81.4% | 66.3% |
| 90019003 | CT | Fairfield | 87.1% | 83.5% | 73.0% |
| 90099002 | CT | New Haven | 83.7% | 81.6% | 70.8% |
| 240251001 | MD | Harford | 77.9% | 68.7% | 57.7% |
| 260050003 | MI | Allegan | 90.6% | 85.4% | 74.0% |

| Site | State | County | Percent of Upwind Contribution Captured using a 0.70 ppb Threshold | Percent of Upwind Contribution Captured using a 1 ppb Threshold | Percent of Upwind Contribution Captured using a 2 ppb Threshold |
|---|---|---|---|---|---|
| 261630019 | MI | Wayne | 67.0% | 61.8% | 49.3% |
| 360810124 | NY | Queens | 77.3% | 75.0% | 51.3% |
| 361030002 | NY | Suffolk | 77.4% | 65.0% | 54.6% |
| 480391004 | TX | Brazoria | 56.0% | 35.9% | 28.4% |
| 481210034 | TX | Denton | 36.5% | 36.5% | 0.0% |
| 482010024 | TX | Harris | 37.4% | 37.4% | 37.4% |
| 482011034 | TX | Harris | 34.3% | 34.3% | 34.3% |
| 482011039 | TX | Harris | 63.5% | 36.3% | 36.3% |
| 484392003 | TX | Tarrant | 41.7% | 34.0% | 0.0% |
| 550790085 | WI | Milwaukee | 87.3% | 72.5% | 68.7% |
| 551170006 | WI | Sheboygan | 86.6% | 79.4% | 68.2% |

Table 3. Percent of the contribution captured with a 0.70 ppb threshold that is captured using 1 ppb and 2 ppb thresholds.

| Site | State | County | Contribution Captured with 1 ppb Threshold vs a 0.70 ppb Threshold | Contribution Captured with 2 ppb Threshold vs a 0.70 ppb Threshold |
|---|---|---|---|---|
| 40130019 | AZ | Maricopa | 100.0% | 0.0% |
| 40131004 | AZ | Maricopa | 100.0% | 100.0% |
| 80050002 | CO | Arapahoe | 100.0% | 0.0% |
| 80350004 | CO | Douglas | 100.0% | 0.0% |
| 80590006 | CO | Jefferson | 50.0% | 0.0% |
| 80590011 | CO | Jefferson | 79.2% | 0.0% |
| 80690011 | CO | Larimer | 74.7% | 0.0% |
| 81230009 | CO | Weld | 37.9% | 0.0% |
| 90010017 | CT | Fairfield | 100.0% | 89.1% |

| Site | State | County | Contribution Captured with 1 ppb Threshold vs a 0.70 ppb Threshold | Contribution Captured with 2 ppb Threshold vs a 0.70 ppb Threshold |
|---|---|---|---|---|
| 90013007 | CT | Fairfield | 91.1% | 74.2% |
| 90019003 | CT | Fairfield | 95.8% | 83.7% |
| 90099002 | CT | New Haven | 97.5% | 84.6% |
| 240251001 | MD | Harford | 88.2% | 74.0% |
| 260050003 | MI | Allegan | 94.2% | 81.6% |
| 261630019 | MI | Wayne | 92.2% | 73.6% |
| 360810124 | NY | Queens | 96.9% | 66.3% |
| 361030002 | NY | Suffolk | 84.0% | 70.6% |
| 480391004 | TX | Brazoria | 64.2% | 50.8% |
| 481210034 | TX | Denton | 100.0% | 0.0% |
| 482010024 | TX | Harris | 100.0% | 100.0% |
| 482011034 | TX | Harris | 100.0% | 100.0% |
| 482011039 | TX | Harris | 57.1% | 57.1% |
| 484392003 | TX | Tarrant | 81.4% | 0.0% |
| 550790085 | WI | Milwaukee | 83.0% | 78.7% |
| 551170006 | WI | Sheboygan | 91.8% | 78.7% |
| | | | | |
| Average Percent Captured => | | | 86% | 51% |

**EXHIBIT 5**

EPA, Considerations for Identifying Maintenance Receptors for Use in Clean Air Act Section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards (Oct. 19, 2018)



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
RESEARCH TRIANGLE PARK, NC  27711

OFFICE OF
AIR QUALITY PLANNING
AND STANDARDS

OCT **19** 2018

# MEMORANDUM

**SUBJECT:**   Considerations for Identifying Maintenance Receptors for Use in Clean Air Act
Section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan
Submissions for the 2015 Ozone National Ambient Air Quality Standards

**FROM:**   Peter Tsirigotis
Director

**TO:**   Regional Air Division Directors, Regions 1–10

The purpose of this memorandum is to present information that states may consider as they evaluate the status of monitoring sites that the Environmental Protection Agency (EPA) identified as potential maintenance receptors with respect to the 2015 ozone National Ambient Air Quality Standards (NAAQS) based on EPA's 2023 modeling.[1] States may use this information when developing state implementation plans (SIPs) for the 2015 ozone NAAQS addressing the good neighbor provision in Clean Air Act (CAA) section 110(a)(2)(D)(i)(I). In brief, this document discusses (1) using alternative technical methods for projecting whether future air quality warrants identifying monitors as maintenance receptors and (2) considering current monitoring data when identifying monitoring sites that, although projected to be in attainment, as described below, should be identified as maintenance receptors because of the risk that they could exceed the NAAQS due to year-to-year (*i.e.,* inter-annual) variability in meteorological conditions.

This document does not substitute for provisions or regulations of the CAA, nor is it a regulation itself. Rather, it provides recommendations for states using the included analytical information in developing SIP submissions, and for EPA Regional offices in acting on them. Thus, it does not impose binding, enforceable requirements on any party. State air agencies retain the discretion to develop good neighbor SIP revisions that differ from this guidance.

Following the recommendations in this guidance does not ensure that EPA will approve a SIP revision in all instances where the recommendations are followed, as the guidance may not apply to the facts and circumstances underlying a particular SIP. Final decisions by EPA to approve

---

[1] Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I) (March 2018).
*https://www.epa.gov/airmarkets/2015-ozone-naaqs-mem.*

a particular SIP revision will only be made based on the requirements of the statute following an air agency's final submission of the SIP revision to EPA and after appropriate notice and opportunity for public review and comment. Interested parties may raise comments about the appropriateness of the application of this guidance to a particular SIP revision. EPA and air agencies should consider whether the recommendations in this guidance are appropriate for each situation.

**Introduction**

CAA section 110(a)(2)(D)(i)(I), otherwise known as the good neighbor provision, requires states to prohibit emissions "which will contribute significantly to nonattainment in, or interfere with maintenance by, any other state with respect to any" NAAQS. EPA has historically used a 4-step framework to determine upwind state obligations (if any) under the good neighbor provision for regional pollutants like ozone: (1) identify downwind areas, referred to as "receptors," expected to have problems attaining or maintaining the NAAQS; (2) identify upwind states that contribute to those downwind air quality problems and warrant further review and analysis; (3) identify the emissions reductions (if any) necessary to eliminate an upwind state's significant contribution to nonattainment and/or interference with maintenance of the NAAQS in the downwind areas, considering cost and air quality factors; and (4) adopt permanent and enforceable measures needed to achieve those emissions reductions. EPA notes that, in developing their SIP revisions for the 2015 ozone NAAQS, states have flexibility to follow this framework or develop alternative frameworks to evaluate interstate transport obligations, so long as a state's chosen approach has adequate technical justification and is consistent with the requirements of the CAA.

At Step 1, EPA has historically used base year and future year air quality modeling coupled with base period measured ozone design values to project design values to a future analytic year.[2] In a memo issued in March 2018, EPA released updated modeling, which uses 2011 as the base year and 2023 as the future analytic year, to evaluate interstate transport for the 2015 ozone NAAQS.[3] As part of EPA's 2023 modeling analysis, EPA projected the average and maximum base period 2009 – 2013 design values to 2023.[4],[5] EPA evaluated the projected 2023 design values in combination with measured 2016 design values using the same methodology used in the Cross-State Air Pollution Rule Update (CSAPR Update)[6] to identify receptors with anticipated potential nonattainment and maintenance issues with respect to the 2015 ozone NAAQS in 2023. Under the CSAPR Update methodology, those sites that are violating the NAAQS based on 2016 design values (*i.e.*, currently not attaining) and that also have projected 2023 *average* design values that exceed the NAAQS (*i.e.*, 2023 average design values of 71 parts per billion (ppb) or greater) are

---

[2] Air Quality Modeling Technical Support Document for the Final Cross State Air Pollution Rule Update (August 2016). *https://www.epa.gov/airmarkets/air-quality-modeling-technical-support-document-final-cross-state-air-pollution-rule.*

[3] Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I) (March 2018). *https://www.epa.gov/airmarkets/march-2018-memo-and-supplemental-information-regarding-interstate-transport-sips-2015.*

[4] The base period includes the three design values that contain 2011 monitoring data (*i.e.*, 2009-2011, 2010-2012, and 2011-2013).

[5] The base period maximum design value is the highest of the three design values in the period 2009-2013.

[6] *See* 81 FR 74504 (October 26, 2016).

identified as potential nonattainment receptors in 2023.[7] Under the CSAPR Update methodology, those sites with a 2023 *maximum* 3-year design value that exceeds the NAAQS are identified as potential maintenance receptors. This methodology considers the effects of inter-annual variability in ozone-conducive meteorology to identify sites that may have difficulty maintaining the ozone NAAQS. A projected maximum design value that exceeds the NAAQS indicates that when meteorology is conducive to ozone formation, the receptor struggles with maintenance of the standard. Under the CSAPR Update methodology, maintenance-only receptors therefore include both (1) those sites with projected average and maximum design values above the NAAQS that are currently measuring clean data and (2) those sites with projected average design values below the level of the NAAQS but with projected maximum design values of 71 ppb or greater.[8]

### Considerations for Identifying Maintenance Receptors

The D.C. Circuit's decision in *North Carolina v. EPA* requires that EPA and the states identify separate nonattainment and maintenance receptors to give independent significance to the "contribute significantly" and "interfere with maintenance" clauses of the good neighbor provision when identifying downwind air quality problems that must be addressed.[9] In particular, the court held that the good neighbor provision requires states to address emissions that interfere with maintenance in downwind areas struggling to meet the NAAQS despite air quality modeling projecting attainment.[10] While the court did not specify a particular methodology for identifying downwind areas that would struggle to maintain the NAAQS, the court cited the state petitioner's demonstration regarding historic variability in ozone concentrations in areas otherwise projected to attain the NAAQS in support of its holding.[11]

In rules promulgated after *North Carolina*, EPA has relied on projections of base period maximum design values to identify those sites that are at risk of being nonattainment in the future due to inter-annual variability in ozone-conducive meteorology, as indicated above. EPA acknowledges that there may be other valid methodologies for identifying such areas. However, consistent with the holding in *North Carolina*, EPA believes that any alternative methods used to identify maintenance receptors must be different than those used to identify nonattainment receptors and should demonstrate that the alternative method considers variability in meteorological conditions that are conducive for ozone formation in the area containing the monitoring site.

---

[7] In determining compliance with the NAAQS, EPA truncates ozone design values to integer values. For example, EPA truncates a design value of 70.9 ppb to 70 ppb, which is attainment. Similarly, EPA considers design values at or above 71.0 ppb to be violations of the 2015 ozone NAAQS.

[8] The nonattainment receptors are also identified as maintenance receptors because the maximum design values for each of these sites is always greater than or equal to the average design value.

[9] 531 F.3d 896, 909-911 (2008).

[10] *Id.*

[11] *Id.* at 909.

**Flexibilities Related to Identifying Maintenance Receptors**

In response to comments received through stakeholder outreach, EPA has identified two potential flexibilities that states may use to identify maintenance receptors with an appropriate technical demonstration. First, EPA believes that states may, in some cases, eliminate a site as a maintenance receptor if the site is currently measuring clean data. Second, EPA believes that a state may, in some cases, use a design value from the base period that is not the maximum design value.[12] For either of these alternative methods to satisfy the D.C. Circuit's instruction to consider areas struggling to meet the NAAQS, EPA would expect states to include with their SIP demonstration technical analyses showing that:

(1) meteorological conditions in the area of the monitoring site were conducive to ozone formation during the period of clean data or during the alternative base period design value used for projections;

(2) ozone concentrations have been trending downward at the site since 2011 (and ozone precursor emissions of nitrogen oxide (NOx) and volatile organic compounds (VOC) have also decreased); and

(3) emissions are expected to continue to decline in the upwind and downwind states out to the attainment date of the receptor.

The intent of these analyses is to demonstrate that monitoring sites that would otherwise be identified as maintenance receptors under the CSAPR Update approach, as previously described, are not likely to violate the NAAQS in the future analytic year. EPA expects that, with such analyses, the state could justify exclusion of a monitoring site as a maintenance receptor, notwithstanding modeling projections showing a maximum design value exceeding the 2015 ozone NAAQS.

To assist states with the recommended analyses, EPA is providing the following information related to analyzing meteorological conduciveness and ozone and emissions trends:

(1) information on meteorological conduciveness for ozone formation based on regional and state-level historical and current climatological data for summertime monthly and seasonal temperature (*see* Attachment A);

(2) a data file containing ozone design values for individual monitoring sites nationwide for the years 2008 through 2017 and for 2023, based on EPA's modeling. This information is available on EPA's website at: *https://www.epa.gov/airmarkets/march-2018-memo-and-supplemental-information-regarding-interstate-transport-sips-2015-0*; and

(3) a data file containing state-level annual NOx and VOC emissions from anthropogenic sources with a breakout by major source category, for individual years from 2011 through 2017 and for 2023, based on EPA's projections. This information is available on EPA's website at:

---

[12] Stakeholder comments on potential 2015 NAAQS transport flexibilities can be found at *https://www.epa.gov/airmarkets/march-2018-memo-and-supplemental-information-regarding-interstate-transport-sips-2015.*

*https://www.epa.gov/airmarkets/march-2018-memo-and-supplemental-information-regarding-interstate-transport-sips-2015-0.*

States developing the technical analyses necessary to support use of the flexibilities described in this memo are encouraged to supplement EPA-provided information with additional data (as appropriate) to support a showing that a specific monitoring site is not at risk of exceeding the NAAQS in the future. For example, states may show that such a site should not be identified as a maintenance receptor by providing (1) a more refined analysis of meteorological conduciveness that considers additional relevant or more locally tailored meteorological parameters, (2) a more temporally or spatially refined emissions trends analysis, and/or (3) an analysis of historical ozone trends that considers, in addition to the design value, trends in other ozone metrics such as annual 4th high 8-hour daily maximum ozone concentrations and the number of days with measured exceedances of the 2015 NAAQS.

Please share this information with the air agencies in your Region.

**For Further Information**

If you have any questions concerning this memorandum, please contact Norm Possiel at (919) 541-5692, *possiel.norm@epa.gov* for modeling information or Chris Werner at (919) 541-5133, *werner.christopher@epa.gov* for any other information.

Attachment

Attachment A

Information on Meteorological Conduciveness
for Ozone Formation

Meteorological conditions including temperature, humidity, winds, solar radiation, and vertical mixing affect the formation and transport of ambient ozone concentrations. Ozone is more readily formed on warm, sunny days when the air is stagnant and/or when the winds are favorable for transport from upwind source areas. Conversely, ozone production is more limited on days that are cloudy, cool, rainy, and windy (*http://www.epa.gov/airtrends/weather.html*). Statistical modeling analyses have shown that temperature and certain other meteorological variables are highly correlated with the magnitude of ozone concentrations (Camalier, et al., 2007).[1] The overall extent to which meteorological conditions vary from year-to-year (*i.e.*, inter-annual variability) depends on the nature of large scale meteorological drivers such as the strength and position of the jet stream. Inter-annual cycles in the jet stream contribute to inter-annual variability in the degree to which summertime meteorological conditions are favorable for ozone formation within a particular region. Meteorological conditions that frequently correspond with observed 8-hour daily maximum concentrations greater than the National Ambient Air Quality Standards (NAAQS) are referred to as being conducive to ozone formation.

This attachment contains information to help evaluate whether particular summers had ozone-conducive or unconducive meteorology within the 10-year period 2008 through 2017. Information is provided on a state-by-state basis and for individual regions (*see* Figure 1).

- Table A-1 contains tabular summaries of the difference (*i.e.*, anomaly[2]) of monthly average temperature compared to the long-term average.[3]
- Figure A-2 contains maps of the 3-month (June, July, August) statewide anomalies and rank[4] for average temperature compared to the long-term average.
- Figure A-3 contains maps showing spatial fields of daily maximum temperature anomalies (percentiles) for the period June through August for the years 2011 through 2017 (maps are unavailable for years prior to 2011).
- Figure A-4 contains graphical summaries of the total number of cooling degree days for the 3-month period June through August in each region.

The above tabular and graphic information was obtained from the NOAA National Centers for Environmental Information (NCEI) at *https://www.ncdc.noaa.gov/temp-and-precip/us-maps/* and *https://www.ncdc.noaa.gov/cag/.*

---

[1] Additional references related to ozone formation and meteorology are provided on page A-3.

[2] "The term temperature anomaly means a departure from a reference value or long-term average. A positive anomaly indicates that the observed temperature was warmer than the reference value, while a negative anomaly indicates that the observed temperature was cooler than the reference value." *https://www.ncdc.noaa.gov/monitoring-references/faq/anomalies.php.*

[3] Note that because of the relatively large inter-annual variability in certain meteorological conditions such as temperature and precipitation, long-term "average" conditions, usually referred to as "normal," are often the mathematical mean of extremes and thus, "average" or "normal" values of temperature or precipitation should not necessarily be considered as representing "typical" conditions.

[4] "In order to place each month and season into historical context, the National Centers for Environmental Information assigns ranks for each geographic area (division, state, region, etc.) based on how the temperature or precipitation value compares with other values throughout the entire record when sorted from lowest to highest value. In other words, the numeric rank value within the area represents the position or location of the sorted value throughout the historical record (1895-present)." *https://www.ncdc.noaa.gov/monitoring-references/dyk/ranking-definition.*

In general, below average temperatures are an indication that meteorological conditions are unconducive for ozone formation, whereas above average temperatures are an indication that meteorology is conducive to ozone formation. Within a particular summer season, the degree that meteorology is conducive for ozone formation can vary from region to region and fluctuate with time within a particular region. For example, the temperature-related information presented below suggests that summer meteorology was generally conducive for ozone formation in 2010, 2011, 2012, and 2016 in most regions. In contrast, the summer of 2009 was generally unconducive for ozone formation, overall, in most regions. In addition, the summers of 2013 and 2014 were not particularly conducive for ozone formation in the Upper Midwest, Ohio Valley, South, Southeast.

Additional information on the relationships between ozone and meteorological conditions can be found in the following publications:

Blanchard et al., 2010 - *NMOC, ozone, and organic aerosol in the southeastern United States, 1999-2007: 2. Ozone trends and sensitivity to NMOC emissions in Atlanta, GA.*
Reinforces the relationship between temperature, relative humidity and winds to ozone formation.
*https://www.sciencedirect.com/science/article/pii/S1352231010005996?via%3Dihub*

Blanchard et al., 2014 - *Ozone in the southeastern United States: An observation-based model using measurements from the SEARCH network.*
Update to the 2007 paper by Camalier with data from the SEARCH network from 2002-2011.
*https://www.sciencedirect.com/science/article/pii/S1352231014001022?via%3Dihub*

Bloomer et al., 2009 – *Observed relationships of ozone air pollution with temperature and emissions.*
Statistical analysis of 21 years of ozone and temperature data (1987-2008). From a climate scenario perspective, authors examine the climate penalty or how ozone levels change as temperature changes. Reinforces the standing that as temperature increases, ozone concentrations increase, but indicates that due to decreasing emissions, the rate is slower in future scenarios.
*https://agupubs.onlinelibrary.wiley.com/doi/full/10.1029/2009GL037308*

Kavassalis & Murphy, 2017 - *Understanding ozone-meteorology correlations: A role for dry deposition.*
Authors observe the strong correlation between temperature and relative humidity, but work to understand other reasoning why models under predict the strength of the correlation between relative humidity and ozone. Includes a statistical analysis of 28 years of data and examines vapor pressure deficit and dry deposition as factors. Reinforces meteorological conditions that lead to high ozone days.
*https://agupubs.onlinelibrary.wiley.com/doi/full/10.1002/2016GL071791*

Reddy & Pfister, 2016 - *Meteorological Factors contributing to the interannaul variability of midsummer surface ozone in Colorado, Utah, and other western US States.*

Authors found strong correlation between 500-mb and 7008-mb patterns, surface temperature, and zonal winds with the resulting high 8-hour daily maximum ozone values.
*https://agupubs.onlinelibrary.wiley.com/doi/full/10.1002/2015JD023840*

Tawfik and Steiner, 2013 - *A proposed physical mechanism for ozone-meteorology correlations using land-atmosphere coupling regimes.*
Discusses the north-south gradient of temperature and relative humidity correlations with ozone formation. Examines 17 years of ozone, NOx, and isoprene measurements.
*https://linkinghub.elsevier.com/retrieve/pii/S1352231013001672*

White et al., 2007 - *Comparing the impact of meteorological variability on surface ozone during the NEAQS (2002) and ICARTT (2004) field campaigns.*
Authors found that while deep boundary layers are noted during periods of elevated ozone, this is likely due to being coincident with other meteorological factors (high temperatures, high pressure systems, low winds).
*https://agupubs.onlinelibrary.wiley.com/doi/10.1029/2006JD007590*

Zhang et al., 2017 – *Quantifying the relationship between air pollution events and extreme weather events.*
Authors examined ozone from 1980-2009 and built a statistical model to examine the impacts of extreme meteorological events on extreme air quality conditions. Found ozone extremes have decreased over the last 30 years, more rapidly recently, but remain highly correlated to extreme temperature events. Highest correlation was found in the eastern United States (U.S.).
*https://www.sciencedirect.com/science/article/pii/S0169809516306093?via%3Dihub*

Figure 1. U.S. climate regions.
*http://www.ncdc.noaa.gov/monitoring-references/maps/us-climate-regions.php*



Table A-1. Temperature anomalies by month for May through September for each climate region for the years 2008 through 2017.[1]

| 2008 | May | Jun | Jul | Aug | Sep |
|---|---|---|---|---|---|
| Northeast | C | W | W | C | N |
| Southeast | C | WW | N | C | N |
| Ohio Valley | C | W | C | C | N |
| Upper Midwest | C | N | N | N | W |
| South | N | W | N | C | CC |
| Northern Rockies | C | C | N | N | N |
| Southwest | N | W | W | W | N |
| Northwest | N | N | W | W | N |
| West | N | W | W | WW | W |

[1]Unshaded boxes with the "N" marker represent near-normal temperatures that fall within the interquartile range. Blue colors indicate cooler than normal conditions, with the number of "C"s indicating the degree of the anomaly. CCC = coolest on record, CC = coolest 10th percentile, C = coolest 25th percentile. Red colors indicate warmer than normal conditions, with the number of "W"s indicating the degree of the anomaly. WWW = warmest on record, WW = warmest 10th percentile, W = warmest 25th percentile. N/A = data not available. More on the definition of temperature ranks can be found at:

*https://www.ncdc.noaa.gov/monitoring-content/monitoring-references/dyk/images/ranking-definition-legend.png.*

| 2009 | May | Jun | Jul | Aug | Sep |
|---|---|---|---|---|---|
| Northeast | N | C | CC | W | C |
| Southeast | N | W | CC | N | N |
| Ohio Valley | N | W | CC | C | N |
| Upper Midwest | N | C | CC | C | W |
| South | N | W | N | N | C |
| Northern Rockies | N | C | C | C | WW |
| Southwest | WW | C | W | W | W |
| Northwest | W | C | WW | W | WW |
| West | WW | C | W | N | WWW |

| 2010 | May | Jun | Jul | Aug | Sep |
|---|---|---|---|---|---|
| Northeast | WW | W | WW | W | W |
| Southeast | WW | WW | WW | WW | W |
| Ohio Valley | W | WW | W | WW | N |
| Upper Midwest | W | N | W | WW | C |
| South | W | WW | N | WW | W |
| Northern Rockies | C | N | N | W | W |
| Southwest | C | W | W | W | WWW |
| Northwest | CC | C | N | N | W |
| West | CC | W | W | N | W |

| 2011 | May | Jun | Jul | Aug | Sep |
|---|---|---|---|---|---|
| Northeast | W | W | WW | N | WW |
| Southeast | N | WW | WW | WW | N |
| Ohio Valley | N | W | WW | W | C |
| Upper Midwest | N | N | WW | W | W |
| South | N | WW | WWW | WWW | N |
| Northern Rockies | C | N | W | W | W |
| Southwest | C | W | WW | WWW | W |
| Northwest | CC | C | C | W | WW |
| West | C | C | N | W | WW |

| 2012 | May | Jun | Jul | Aug | Sep |
|---|---|---|---|---|---|
| Northeast | WW | N | WW | W | N |
| Southeast | WW | C | WW | N | N |
| Ohio Valley | WW | N | WW | N | C |
| Upper Midwest | W | W | WW | N | N |
| South | WW | W | WW | N | N |
| Northern Rockies | W | W | WW | W | W |
| Southwest | WW | WW | W | WW | W |
| Northwest | N | C | W | WW | W |
| West | W | W | N | WWW | WW |

| 2013 | May | Jun | Jul | Aug | Sep |
|---|---|---|---|---|---|
| Northeast | W | W | WW | N | N |
| Southeast | C | W | C | C | N |
| Ohio Valley | N | N | C | C | N |
| Upper Midwest | N | N | N | N | W |
| South | C | W | C | N | W |
| Northern Rockies | N | N | N | W | WW |
| Southwest | W | WW | W | W | W |
| Northwest | W | W | WW | WW | WW |
| West | W | WW | WW | N | W |

| 2014 | May | Jun | Jul | Aug | Sep |
|---|---|---|---|---|---|
| Northeast | W | W | N | N | W |
| Southeast | W | W | C | N | W |
| Ohio Valley | N | W | CC | N | N |
| Upper Midwest | N | W | CC | N | N |
| South | N | N | C | N | N |
| Northern Rockies | N | C | N | N | N |
| Southwest | N | W | W | C | WW |
| Northwest | W | N | WW | W | W |
| West | W | W | WW | N | WW |

| 2015 | May | Jun | Jul | Aug | Sep |
|---|---|---|---|---|---|
| Northeast | WWW | N | N | W | WW |
| Southeast | W | WW | W | N | N |
| Ohio Valley | W | W | N | C | W |
| Upper Midwest | N | N | N | N | WWW |
| South | C | N | W | N | WW |
| Northern Rockies | C | WW | N | N | WW |
| Southwest | C | WW | C | WW | WWW |
| Northwest | W | WWW | W | W | N |
| West | N | WWW | C | WW | WW |

| 2016 | May | Jun | Jul | Aug | Sep |
|---|---|---|---|---|---|
| Northeast | N | W | W | WWW | WW |
| Southeast | N | W | WW | WW | WW |
| Ohio Valley | N | W | W | W | WW |
| Upper Midwest | N | W | N | W | WW |
| South | C | W | WW | N | W |
| Northern Rockies | N | WW | N | N | W |
| Southwest | C | WWW | WW | N | N |
| Northwest | W | WW | C | W | N |
| West | N | WW | W | W | N |

| 2017 | May | Jun | Jul | Aug | Sep |
|---|---|---|---|---|---|
| Northeast | N | W | N | N | WW |
| Southeast | N | N | W | N | N |
| Ohio Valley | N | N | W | CC | N |
| Upper Midwest | N | W | N | C | WW |
| South | C | N | W | C | N |
| Northern Rockies | N | W | WW | N | W |
| Southwest | N | WW | WW | W | W |
| Northwest | W | W | WW | WWW | W |
| West | W | WW | WW | WW | N |

Figure A-2. Statewide average temperature ranks for the period June through August for the years 2008 through 2017. Note that the NCEI changed the display format of temperature rank maps beginning in 2014.





















Figure A-3. Spatial fields of daily maximum temperature anomalies (percentiles) for the period June through August for the years 2011 through 2017. Note that the NCDC began creating these maps in 2011.















Figure A-4. Cooling degree days for June through August for each climate region. Note that (1) data are provided back to 1990 and (2) the range of the y-axis differs in some cases by climate region.



















**EXHIBIT 6**

MDEQ, Mississippi 2015 Ozone Infrastructure SIP Prongs 1 and 2 (Sept. 3, 2019)



# STATE OF MISSISSIPPI

PHIL BRYANT
GOVERNOR

## MISSISSIPPI DEPARTMENT OF ENVIRONMENTAL QUALITY

GARY C. RIKARD, EXECUTIVE DIRECTOR

September 3, 2019

Ms. Mary Walker, Regional Administrator
U.S. Environmental Protection Agency
61 Forsyth Street, S.W.
Atlanta, Georgia 30303-3104

Dear Ms. Walker:

Re:     Mississippi 2015 Ozone Infrastructure SIP
Prongs 1 & 2

Enclosed are documents with additional information related to Prongs 1 and 2 of Mississippi's Infrastructure State Implementation Plan (SIP) to comply with the requirements of Section 110(a)(1) and (2) of the Federal Clean Air Act regarding the 2015 National Ambient Air Quality Standard for Ozone.

We certify that a 30-day public comment period was held regarding the SIP. The public comment period ended August 30, 2019. EPA Region 4 submitted a comment letter during the public comment period. There were no other comments received.

We feel that this revised Ozone Infrastructure SIP for Prongs 1 & 2 submittal is complete. Therefore, we are requesting EPA approval of this SIP into the federally approved Mississippi State Implementation Plan.

If you have any questions or need further information, please contact me or Keith Head of my staff at (601) 961-5577.

Very truly yours,

Gary Rikard
Executive Director

CF/KH
Enclosures

# Mississippi Certification
# Clean Air Act Section 110(a)(1) and (2)
# Ozone Requirements
# Section 110(a)(2)(D) Prongs 1 and 2

This certification addresses Mississippi's obligations under Section 110(a)(1) and (2) of the Clean Air Act for the Ozone National Ambient Air Quality Standards (NAAQS). The following state regulations are part of the State Implementation Plan (SIP) and are referred to in this document:

11 MISSISSIPPI ADMINISTRATIVE CODE, PART 2, CHAPTER 1
>    Mississippi Commission on Environmental Quality
>    "Air Emission Regulations for the Prevention, Abatement, and Control of Air Contaminants"

11 MISSISSIPPI ADMINISTRATIVE CODE, PART 2, CHAPTER 2
>    Mississippi Commission on Environmental Quality
>    "Permit Regulation for the Construction and/or Operation of Air Emissions Equipment"

11 MISSISSIPPI ADMINISTRATIVE CODE, PART 2, CHAPTER 3
>    Mississippi Commission on Environmental Quality "Mississippi Regulations for the Prevention of Air Pollution Emergency Episodes"

11 MISSISSIPPI ADMINISTRATIVE CODE, PART 2, CHAPTER 5
>    Mississippi Commission on Environmental Quality "Mississippi Regulations for the Prevention of Significant Deterioration of Air Quality"

Appendix A-9          Mississippi Code Title 49

Appendix A-10         State Ethics Law as of July 1, 2011 and Mississippi Ethics Commission Advisory Opinion No. 95-042-E, May 5, 1995

Appendix A-11         State Constitution Provisions as of July 1, 2011

Appendix R            State Implementation Plan Revision Regarding Regional Haze Program Requirements: SIP Narrative Addressing Visibility Improvement in Federal Class I Areas

**Section 110(a)(2)(D)**

*Contain adequate provisions—*
*(i) prohibiting, consistent with the provisions of this subchapter, any source or other type of emissions activity within the State from emitting any air pollutant in amounts which will—*

> *(I) contribute significantly to nonattainment in, or interfere with maintenance by, any other State with respect to any such national primary or secondary ambient air quality standard, or*
>
> *(II) interfere with measures required to be included in the applicable implementation plan for any other State under part C of this subchapter to prevent significant deterioration of air quality or to protect visibility*

> *1. Contribute significantly to nonattainment of NAAQS for areas in another state (Prong 1).*

On March 27, 2018, EPA issued a memorandum titled *Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under CAA §110(a)(2)(D)(i)(I)*. EPA states that the information provided in the memorandum is designed to assist states in their efforts to develop good neighbor SIPs for the 2015 ozone NAAQS to address their interstate transport obligations. EPA conducted photochemical modeling to project ambient ozone levels in 2023, since this date aligns with the anticipated attainment year for Moderate ozone nonattainment areas. The Comprehensive Air Quality Model with Extensions (CAMx, version 6.4) was used with a base year of 2011, and the future year of 2023. Considering a combination of modeling projections and recent monitoring data, EPA identified projected nonattainment and maintenance receptors with respect to the 2015 NAAQS. EPA identified nonattainment receptors as those monitoring sites with current measured ozone values exceeding the NAAQS that also have projected (in 2023) average design values exceeding the NAAQS. EPA identified maintenance receptors as those monitoring sites with maximum design values exceeding the NAAQS. Outside of California, there are 26 monitoring sites that were identified as either potential nonattainment or maintenance receptors.

After identifying these receptors, EPA then performed nationwide, state-level ozone source apportionment modeling using the CAMx Anthropogenic Precursor Culpability Analysis (APCA) technique to provide information regarding the expected contribution of 2023 base case nitrogen oxides (NOx) and volatile organic compound (VOC) emissions from all sources in each state to projected 2023 ozone concentrations at each air quality monitoring site. In previous federal regulatory actions, such as the Clean Air Interstate Rule (CAIR), the Cross-State Air Pollution Rule (CSAPR), and the CSAPR Update Rule, EPA has used a threshold of 1% of the ozone NAAQS standard to determine if a state significantly contributes to nonattainment or interferes with maintenance of a downwind receptor. One percent (1%) of the 70 ppb standard is 0.70 ppb.

The following table lists Mississippi's model Ozone $O_3$ contributions (ppb) to 2023 Nonattainment and Maintenance Sites.

| Site ID | County | State | 2014-16 Design Value | Projected Status in 2023 | Mississippi O$_3$ Contribution (ppb) |
|---|---|---|---|---|---|
| 80590006 | Jefferson | CO | 77 | Nonattainment | 0.01 |
| 80590011 | Jefferson | CO | 80 | Maintenance | 0.01 |
| 81230009 | Weld | CO | 70 | Maintenance | 0.01 |
| 90010017 | Fairfield | CT | 80 | Maintenance | 0.03 |
| 90013007 | Fairfield | CT | 81 | Nonattainment | 0.07 |
| 90019003 | Fairfield | CT | 85 | Nonattainment | 0.07 |
| 90099002 | New Haven | CT | 76 | Maintenance | 0.04 |
| 240251001 | Harford | MD | 73 | Maintenance | 0.08 |
| 260050003 | Allegan | MI | 75 | Maintenance | 0.40 |
| 261630019 | Wayne | MI | 72 | Maintenance | 0.09 |
| 360810124 | Queens | NY | 69 | Maintenance | 0.04 |
| 360850067 | Richmond | NY | 76 | Maintenance | 0.08 |
| 361030002 | Suffolk | NY | 72 | Nonattainment | 0.06 |
| 480391004 | Brazoria | TX | 75 | Nonattainment | 0.63 |
| 481210034 | Denton | TX | 80 | Maintenance | 0.33 |
| 482010024 | Harris | TX | 79 | Maintenance | 0.50 |
| 482011034 | Harris | TX | 73 | Maintenance | 0.39 |
| 482011039 | Harris | TX | 67 | Nonattainment | 0.79 |
| 484392003 | Tarrant | TX | 73 | Nonattainment | 0.27 |
| 550790085 | Milwaukee | WI | 71 | Nonattainment | 0.28 |
| 551170006 | Sheboygan | WI | 79 | Nonattainment | 0.30 |

Table 1: Mississippi's model Ozone (O$_3$) contributions (ppb) to 2023 Nonattainment and Maintenance Sites.

Mississippi's modeled contributions is below 1% of the NAAQS to all monitors modeled to be in nonattainment or in maintenance of the 2015 O$_3$ NAAQS except for Site ID# 482011039 in Harris County, TX. For this monitor, Mississippi's contribution is modeled to be 0.79 ppb, which is 1.12% of the standard but below 1.0 ppb of O$_3$. It must be noted, however, that though the design value for this monitored was projected to be over the 2015 O$_3$ NAAQS, the actual design value is 68 ppb for 2015-2017. The table below lists the design values for 2015-2017.

| Years | Design Value (ppb) |
|---|---|
| 2013-2015 | 69 |
| 2014-2016 | 67 |
| 2015-2017 | 68 |

Table 2: Design Values for Site ID# 482011039 - Harris County, TX

On August 31, 2018, EPA released a memorandum titled *Analysis of Contribution Thresholds for Use in Clean Air Act Section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards*. In this memorandum, EPA provided analytical information regarding the degree to which certain air quality threshold amounts capture the collective amount of upwind contribution from upwind states to downwind receptors for the 2015 O$_3$ NAAQS. Because the amount of upwind collective contribution captured with the 1% and 1 ppb thresholds is generally comparable, EPA concluded that it may be reasonable and appropriate for states to use a 1 ppb contribution threshold

as an alternative to a 1% threshold in developing SIP revisions addressing the good neighbor provision for the 2015 O₃ standard.

Based on EPA's modeling, Mississippi is below the 1ppb threshold for all monitoring sites in Table 1, which are projected to be nonattainment or maintenance, indicating that Mississippi does not significantly contribute to the nonattainment of the 2015 Ozone Standard in another state. MDEQ hereby confirms that the SIP contains adequate provisions to prevent sources and other types of emissions activities within the state from contributing significantly to nonattainment in (prong 1) any other state with respect to the 2015 Ozone NAAQS.


*2. Interfere with maintenance of NAAQS by any other State (Prong 2).*

On March 27, 2018, EPA issued a memorandum titled *Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under CAA §110(a)(2)(D)(i)(I)*. EPA states that the information provided in the memorandum is designed to assist states in their efforts to develop good neighbor SIPs for the 2015 ozone NAAQS to address their interstate transport obligations. EPA conducted photochemical modeling to project ambient ozone levels in 2023, since this date aligns with the anticipated attainment year for Moderate ozone nonattainment areas. The Comprehensive Air Quality Model with Extensions (CAMx, version 6.4) was used with a base year of 2011, and the future year of 2023. Considering a combination of modeling projections and recent monitoring data, EPA identified projected nonattainment and maintenance receptors with respect to the 2015 NAAQS. EPA identified nonattainment receptors as those monitoring sites with current measured ozone values exceeding the NAAQS that also have projected (in 2023) average design values exceeding the NAAQS. EPA identified maintenance receptors as those monitoring sites with maximum design values exceeding the NAAQS. Outside of California, there are 26 monitoring sites that were identified as either potential nonattainment or maintenance receptors.

After identifying these receptors, EPA then performed nationwide, state-level ozone source apportionment modeling using the CAMx Anthropogenic Precursor Culpability Analysis (APCA) technique to provide information regarding the expected contribution of 2023 base case nitrogen oxides (NOx) and volatile organic compound (VOC) emissions from all sources in each state to projected 2023 ozone concentrations at each air quality monitoring site. In previous federal regulatory actions, such as the Clean Air Interstate Rule (CAIR), the Cross-State Air Pollution Rule (CSAPR), and the CSAPR Update Rule, EPA has used a threshold of 1% of the ozone NAAQS standard to determine if a state significantly contributes to nonattainment or interferes with maintenance of a downwind receptor. One percent (1%) of the 70 ppb standard is 0.70 ppb. Additionally, the EPA issued final guidance entitled Guidance on Significant Impact Levels for Ozone and Fine Particles in the Prevention of Significant Deterioration Permitting Program. In that guidance, the EPA recommends an ozone

significant impact level (SIL) of 1.0 ppb, based on an air quality variability analysis and the fourth highest daily maximum 8-hour concentration (averaged over three years).

Table 1 lists Mississippi's model nitrogen oxide ($NO_x$) contributions (ppb) to 2023 Nonattainment and Maintenance Sites.

Mississippi's modeled contributions is below 1% of the NAAQS to all monitors modeled to be in nonattainment or in maintenance of the 2015 $O_3$ NAAQS except for Site ID# 482011039 in Harris County, TX. For this monitor, Mississippi's contribution is modeled to be 0.79 ppb, which is 1.12% of the standard but below 1.0 ppb of $O_3$. It must be noted, however, that though the design value for this monitored was projected to be over the 2015 O3 NAAQS, the actual design value is 68 ppb for 2015-2017. The Table 2 lists the design values for 2015-2017.

On August 31, 2018, EPA released a memorandum titled *Analysis of Contribution Thresholds for Use in Clean Air Act Section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards*. In this memorandum, EPA provided analytical information regarding the degree to which certain air quality threshold amounts capture the collective amount of upwind contribution from upwind states to downwind receptors for the 2015 $O_3$ NAAQS. Because the amount of upwind collective contribution captured with the 1% and 1 ppb thresholds is generally comparable, EPA concluded that it may be reasonable and appropriate for states to use a 1 ppb contribution threshold as an alternative to a 1% threshold in developing SIP revisions addressing the good neighbor provision for the 2015 $O_3$ standard.

Based on EPA's modeling, Mississippi is below the 1ppb threshold for all monitoring sites in Table 1, which are projected to be nonattainment or maintenance, indicating that Mississippi does not significantly contribute to nonattainment or interfere with maintenance of a downwind receptor in another state.

Additionally, on October 19, 2018, EPA released a memorandum titled *Considerations for Identifying Maintenance Receptors for Use in Clean Air Act Section 11 0(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards*. In this memorandum, EPA stated its conclusion that "states may, in some cases, eliminate a site as a maintenance receptor if the site is currently measuring clean data."

Furthermore, the memo states: "EPA would expect states to include with their SIP demonstration technical analyses showing that:

(a) meteorological conditions in the area of the monitoring site were conducive to ozone formation during the period of clean data or during the alternative base period design value used for projections;

(b) ozone concentrations have been trending downward at the site since 2011 (and ozone precursor emissions of nitrogen oxide (NOx) and volatile organic compounds (VOC) have also decreased); and

(c) emissions are expected to continue to decline in the upwind and downwind states out to the attainment date of the receptor."

(a)     The ozone 8-Hour design values for Deer Park (site ID 482011039) in Houston has been meeting the 2015 ozone standard of 70ppb since 2015. In 2014, the site met attainment status for the 2008 standard of 75ppb. Analysis of additional information provided within the memorandum (Table 3) show that during the 2014-17 timeframe, two out of the four summers, temperatures were above average, specifically 2015 and 2016 while the summers of 2014 and 2017, temperatures were near normal.

| Year | Ozone DV | JJA Temp Trend |
|------|----------|----------------|
| 2014 | 72 | Near Normal |
| 2015 | 69 | Above Normal |
| 2016 | 67 | Above Normal |
| 2017 | 68 | Near Normal |

Table 3: Ozone Design Values and Temperature Anomalies for Houston, TX - Deer Park (Site ID 48201139)
Source: National Oceanic and Atmospheric Administration – National Weather Service

(b)    Ozone concentration at the Deer Park site have been trending downward since 2011.  Table 4 lists the ozone design values for the site.

| Year | Ozone DV (ppb) |
|------|----------------|
| 2011 | 83 |
| 2012 | 84 |
| 2013 | 79 |
| 2014 | 72 |
| 2015 | 69 |
| 2016 | 67 |
| 2017 | 68 |

Table 4: Ozone Design Values for Houston, TX - Deer Park
(Site ID 48201139)
Source: EPA AirNow Database

Ozone precursor emissions of nitrogen oxide (NOx) and volatile organic compounds (VOC) in Texas and in Mississippi have been trending downward since 2011.  Table 5 lists the NOx and VOC emissions for the Houston, TX Metropolitan Statistical Area (MSA).  Table 6 and Table 7 lists the NOx and VOC emissions in Texas and Mississippi.

| Houston, TX MSA Emissions | | |
|------|------|------|
| Year | NOX (tons) | VOC (tons) |
| 2008 | 196,341 | 261,388 |
| 2011 | 163,013 | 190,976 |
| 2014 | 155,620 | 166,618 |

Table 5: NOx and VOC emissions in the Houston, TX MSA
Source: EPA National Emissions Inventory

| Texas Emissions | | |
|------|------|------|
| Year | NOX (tons) | VOC (tons) |
| 2008 | 1,515,343 | 2,184,281 |
| 2011 | 1,266,530 | 1,740,849 |
| 2014 | 1,224,196 | 1,750,979 |

Table 6: NOx and VOC emissions in Texas
Source: EPA National Emissions Inventory

| Mississippi Emissions | | |
|---|---|---|
| Year | NOx (tons) | VOC (tons) |
| 2008 | 230,289 | 163,383 |
| 2011 | 196,856 | 193,753 |
| 2014 | 166,226 | 139,237 |

Table 7: NOx and VOC emissions in Mississippi
Source: EPA National Emissions Inventory

Additional resources provided with the October 18, 2018 memorandum also show analysis of emissions decreasing throughout the region.

(c)    Based on national and regional emissions trends, and current regulations on point sources and mobile sources, emissions are expected to continue to decline in the upwind and downwind states.

Therefore, under the criteria set in the October 19, 2018 memorandum, Mississippi proposes to eliminate the Deer Park site in Harris County, TX (site ID 48201139) as a maintenance receptor.

Based on the information provide above for Prong 2 (Interfere with maintenance of NAAQS by any other State), Mississippi does not significantly interfere with maintenance of the 2015 Ozone Standard in another state.  MDEQ hereby confirms that the SIP contains adequate provisions to continue maintenance of the 2015 Ozone NAAQS and prevent sources and other types of emissions activities within the state from interfering with maintenance (prong 2) in any other state with respect to the 2015 Ozone NAAQS.

*(ii) Each such Plan shall […] contain adequate provisions insuring compliance with the applicable requirements of sections 115 and 126(b) that involve ozone precursor emissions (relating to interstate and international pollution abatement)."  EPA has no reason to approve or disapprove any existing state rules with regard to these provisions.*

11 MISSISSIPPI ADMINISTRATIVE CODE, PART 2, CHAPTER 5 shows where 40 CFR 51.166 was adopted by reference into the SIP.  These regulations require notification of potential impacts from new or modified sources to state and local agencies of neighboring states.  Therefore, the SIP meets the requirements of this criterion.

**<u>Response to Comments for Mississippi 2015 Ozone Infrastructure SIP
for Clean Air Act Requirements Section 110(a)(2)(D) Prongs 1 and 2.</u>**

EPA Region IV submitted a comment letter dated August 28, 2019.  No other
comments were received during the public comment period.  The EPA comment letter
follows this page.



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION 4
ATLANTA FEDERAL CENTER
61 FORSYTH STREET
ATLANTA, GEORGIA 30303-8960

August 28, 2019

Chad Lafontaine, Director
Air Division
Office of Pollution Control
Mississippi Department of
  Environmental Quality
P.O. Box 2261
Jackson, Mississippi  39225-2261

Dear Mr. Lafontaine:

Thank you for the letter dated July 30, 2019, transmitting a prehearing package regarding Mississippi's State Implementation Plan (SIP) submittal. Specifically, the prehearing package addresses the Clean Air Act Section 110(a)(2)(D)(i)(I) Interstate Transport Prongs 1 and 2 requirements for the 2015 8-hour Ozone National Ambient Air Quality Standard (NAAQS). We understand that this submittal is the subject of a public hearing that will take place on August 30, 2019, if requested, with written comments due by the close of business on August 30, 2019. We have completed our review of the prehearing submittal and offer comments in the enclosure.

We look forward to continuing to work with you and your staff. If you have any questions, please contact Ms. Lynorae Benjamin, Chief of the Air Regulatory Management Section at 404-562-9040, or have your staff contact Ms. Tiereny Bell at 404-562-9088.

Sincerely,

R. Todd Rinck
Acting Chief
Air Planning & Implementation Branch

Enclosure

cc:   Keith Head, Mississippi Department of Environmental Quality

**The U.S. Environmental Protection Agency Comments on Mississippi's Prehearing State
Implementation Plan (SIP) Submittal Addressing the Clean Air Act Section 110(a)(2)(D)(i)(I)
Interstate Transport Prongs 1 and 2 Requirements for the 2015 Ozone
National Ambient Air Quality Standard (NAAQS)**

**General Comment**

1. On page 5 of Mississippi's 2015 ozone prehearing transport SIP, the air agency notes that its
   modeled contribution to the Harris County, Texas nonattainment receptor is above 1 percent of the
   2015 ozone national ambient air quality standards (NAAQS) but below the 1 part per billion (ppb)
   alternative contribution threshold discussed in the EPA's August 31, 2018 memorandum entitled
   *Analysis of Contribution Thresholds for Use in Clean Air Act Section 110(a)(2)(D)(i)(I) Interstate
   Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality
   Standards*. The EPA believes it would be helpful if Mississippi include additional information
   regarding the appropriateness of the 1 ppb alternative threshold for the Harris County, Texas
   nonattainment receptor. The EPA is available for further discussion regarding the 1 ppb alternative
   contribution threshold guidance.

2. The EPA notes that the Harris County, Texas downwind receptor, to which Mississippi is linked, is a
   nonattainment and maintenance receptor. If a receptor meets the criteria for being a nonattainment
   receptor (i.e. projected average design values is above the level of the ozone standard), it, by
   definition, must also be a maintenance receptor since there must be a projected maximum design
   value above the NAAQS in order for the projected average design value to be above the ozone
   NAAQS. On page 7 of Mississippi's prehearing SIP the air agency states that the Harris County,
   Texas receptor has a 2015-2017, 3-year design value of 68 ppb. However, the current 2016-2018
   3-year design value for this monitor is 71 ppb which is above the level of the 2015 8-hour ozone
   NAAQS. The EPA recommends Mississippi clarify in the prehearing transport SIP (page 5) that the
   current 2016-2018 3-year design value for the Harris County, Texas receptor is above the level of
   the 2015 ozone standard. The EPA is available for further discussion regarding the Harris County,
   Texas receptor.

3. The 2015 ozone prehearing transport SIP divides the discussion of the section 110(a)(2)(D)(I)
   requirements into separate sections addressing prong 1 (contribute significantly to nonattainment)
   and prong 2 (interfere with maintenance). The discussion of the two separate prongs, however,
   appears to be duplicative. The section on prong 1 discusses prong 2 issues and vice versa. For ease
   of reading and understanding, the EPA recommends that Mississippi either combine the two
   discussions to avoid duplication or refine the two sections to focus more narrowly on the prong
   under discussion. For example, if Mississippi chooses to retain the two separate sections, the prong 1
   discussion could focus just on the monitors that were identified as potential nonattainment receptors
   (based on both current air quality data and the projected average design value) rather than to also
   discuss potential maintenance receptors (such as the Harris County, Texas receptor discussed on
   page 5). A prong 2 discussion could also refer back to the documents and information discussed in
   the prior section rather than repeat.

4. The EPA recommends Mississippi provide a list of SIP-approved provisions that regulate sources of
   ozone precursor emissions (i.e. nitrogen oxide and volatile organic compounds emissions) in the
   State. Mississippi also has the option of identifying state-only regulations that control ozone
   precursor emissions.

## Public participation for Mississippi 2015 Ozone Infrastructure SIP
## for Clean Air Act Requirements Section 110(a)(2)(D) Prongs 1 and 2.

Public participation for the above referenced infrastructure SIP was achieved by a public comment period that began on July 31, 2019 and ended on August 30, 2019. The public notice was published consistent with procedures approved by EPA.

The notice of public comment period was published on July 31, August 7 and August 14, 2019 in daily newspapers in the cities of Gulfport and Jackson in the State of Mississippi. The notice of public hearing and the draft SIP was made available for public review in the main branches of the public libraries in Gulfport, Jackson and Tupelo, Mississippi and at the Mississippi Department of Environmental Quality, 515 E. Amite St., Jackson, Mississippi, 39201 and was also made available on the Department's website http://www.mdeq.ms.gov.

The public notice and proofs of publication follows this page.

Public Notice
Mississippi Commission on Environmental Quality
P. O. Box 2261
Jackson, MS 39225
Telephone No. (601) 961-5171

Public Notice Start Date: July 31, 2019                    MDEQ Contact: Keith Head
Deadline for Comment: August 30, 2019

Please take note that the Mississippi Commission on Environmental Quality ("Commission") is providing draft information for comment regarding the Mississippi Certification that the State Implementation Plan for the Control of Air Pollution is adequate to comply with the requirements of Section 110(a)(1) and (2) of the Federal Clean Air Act as it pertains to the National Ambient Air Quality Standards for Ozone as promulgated by the U.S. Environmental Protection Agency (EPA).

Copies of the draft certification may be obtained by writing or calling the Public Records Officer at the address and telephone number listed above.  The draft certification information is also available for public review from Wednesday, July 31, 2019, through Friday, August 30, 2019 at the main branch of public libraries in cities of Gulfport, Jackson, and Tupelo.  For those persons with internet access, the draft certification information may be found on the Mississippi Department of Environmental Quality's website at http://www.mdeq.ms.gov.

Persons wishing to comment on the draft certification are invited to submit comments in writing to Keith Head at the Commission's address shown above, no later than 5:00 p.m. on Friday, August 30, 2019.  All comments received by this date will be considered in preparation of the final submission of the certification information to EPA.  A public hearing may be held if the Commission finds a significant degree of public interest in the draft certification.

Please bring the foregoing to the attention of persons whom you know will be interested.

# AFFIDAVIT OF PUBLICATION
# THE CLARION-LEDGER

TO: MDEQ, OFFICE OF POLLUTION CONT
515 E AMITE ST
JACKSON, MS 39201
Acct# TCL-C35417

Ad Number: 0003703724

STATE OF WISCONSIN
COUNTY OF BROWN

Before the undersigned authority personally appeared, who on oath says that he or she is a Legal Advertising Representative of The Clarion-Ledger, a newspaper as defined and prescribed in Sections 13-3-31 and 13-3-32, of the Mississippi Code of 1972, as amended, who, being duly sworn, states that the notice, a true copy of which is hereto attached, appeared in the issues of said newspaper as follows:

Was published in said newspaper in the issue(s) of:

07/31/19, 08/07/19, 08/14/19

Size: 341 words / 1 col. x 56 lines
Published: 3 time(s)

Now due on said account is $122.70

Signed _____
Authorized Clerk of The Clarion-Ledger

SWORN to and subscribed before me on August 14, 2019.

_____
Notary Public, State of Wisconsin, County of Brown

5·15·23
_____
My commission expires

(SEAL)

NANCY HEYRMAN
Notary Public
State of Wisconsin

MDEQ-PURCHASING
RECEIVED

2019 AUG 21 AM 10: 06

Case: 23-60069    Document: 327    Page: 156    Date Filed: 05/30/2023

**Public Notice**
**Mississippi Commission on Environmental**
**Quality**
**P. O. Box 2261**
**Jackson, MS 39225**
**Telephone No. (601) 961-5171**

Public Notice Start Date: July 31, 2019
MDEQ Contact: Keith Head
Deadline for Comment: August 30, 2019

Please take note that the Mississippi Com-
mission on Environmental Quality ("Com-
mission") is providing draft information
for comment regarding the Mississippi
Certification that the State Implementa-
tion Plan for the Control of Air Pollution is
adequate to comply with the require-
ments of Section 110(a)(1) and (2) of the
Federal Clean Air Act as it pertains to the
National Ambient Air Quality Standards
for Ozone as promulgated by the U.S. En-
vironmental Protection Agency (EPA).

Copies of the draft certification may be
obtained by writing or calling the Public
Records Officer at the address and tele-
phone number listed above. The draft
certification information is also available
for public review from Wednesday, July
31, 2019, through Friday, August 30, 2019
at the main branch of public libraries in
cities of Gulfport, Jackson, and Tupelo.
For those persons with internet access the
draft certification information may be
found on the Mississippi Department of
Environmental Quality's website at http://
www.mdeq.ms.gov.

Persons wishing to comment on the draft
certification are invited to submit com-
ments in writing to Keith Head at the
Commission's address shown above, no
later than 5:00 p.m. on Friday, August 30,
2019. All comments received by this date
will be considered in preparation of the fi-
nal submission of the certification infor-
mation to EPA. A public hearing may be
held if the Commission finds a significant
degree of public interest in the draft cer-
tification.

Please bring the foregoing to the atten-
tion of persons whom you know will be
interested.
07/31, 08/07, 08/14/19

—————————————————————0003703724-01

# SunHerald

## AFFIDAVIT OF PUBLICATION RECEIVED MDEQ PURCHASING

| Account # | Ad Number | Identification | PO | Amount | Cols | Depth |
|---|---|---|---|---|---|---|
| 661741 | 0004316188 | Public Notice Mississippi Commission on Environ | Legal Notice | $91.00 | 1 | 5.30 In |

**Attention:** Keith Head

MS DEPT OF ENVIRONMENTAL QUALI
PO BOX 2369
JACKSON, MS 39225

Public Notice
Mississippi Commission on
Environmental Quality
P. O. Box 2261
Jackson, MS 39225
Telephone No. (601) 961-5171
Public Notice Start Date: July 31, 2019
Deadline for Comment:
August 30, 2019
MDEQ Contact: Keith Head
Please take note that the Mississippi
Commission on Environmental Quality
("Commission") is providing draft infor-
mation for comment regarding the
Mississippi Certification that the State
Implementation Plan for the Control of
Air Pollution is adequate to comply with
the requirements of Section 110(a)(1)
and (2) of the Federal Clean Air Act as it
pertains to the National Ambient Air
Quality Standards for Ozone as promul-
gated by the U.S. Environmental Protec-
tion Agency (EPA).
Copies of the draft certification may be
obtained by writing or calling the Public
Records Officer at the address and tele-
phone number listed above. The draft
certification information is also available
for public review from Wednesday, July
31, 2019, through Friday, August 30,
2019 at the main branch of public libra-
ries in cities of Gulfport, Jackson, and
Tupelo. For those persons with internet
access, the draft certification informa-
tion may be found on the Mississippi
Department of Environmental Quality's
website at http://www.mdeq.ms.gov.
Persons wishing to comment on the
draft certification are invited to submit
comments in writing to Keith Head at
the Commission's address shown
above, no later than 5:00 p.m. on Fri-
day, August 30, 2019. All comments re-
ceived by this date will be considered in
preparation of the final submission of
the certification information to EPA. A
public hearing may be held if the
Commission finds a significant degree
of public interest in the draft certifica-
tion.
Please bring the foregoing to the atten-
tion of persons whom you know will be
interested.

**STATE OF MISSISSIPPI**

**COUNTY OF HARRISON**

Before me, the undersigned Notary of
Dallas County, Texas personally
appeared VICTORIA RODELA, who,
being by me first duly sworn, did
depose and say that she is a clerk of
The Sun Herald, a daily newspaper
published in the city of Gulfport, in
Harrison County, Mississippi and the
publication of the notice, a copy of
which is hereto attached, has been
made in said paper in the issue(s) of:

___3___ Insertion(s)

Published On:
July 31, 2019, August 07, 2019,
August 14, 2019

Affidavit further states on oath that said
newspaper has been established and
published continuously in said county
for a period of more than twelve months
next prior to the first publication of said
notice.

_V Rodela_
Clerk

Sworn to and subscribed before me this
14th day of August in the year of 2019

Notary Public

* The Sun Herald has been deemed eligible
for publishing legal notices in Jackson County
to meet the requirements of Miss. Code 1972
Section 13-3-31 and 13-3-32.

**Extra charge for lost or duplicate affidavits.**
**Legal document please do not destroy!**

AMBAR LIZARRAGA
My Notary ID # 132031291
Expires May 30, 2023

Date Filed: 05/30/2023   Page: 157   Document: 327   Case: 23-60069

**<u>EXHIBIT 7</u>**

EPA, Proposed Rule, *Air Plan Disapproval; AL, MS, TN; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards*, 87 Fed. Reg. 9545 (Feb. 22, 2022)



not significantly or uniquely affect small governments. The action imposes no enforceable duty on any state, local or tribal governments or the private sector.

*E. Executive Order 13132: Federalism*

This action does not have federalism implications. It will not have substantial direct effects on the states, on the relationship between the national government and the states, or on the distribution of power and responsibilities among the various levels of government.

*F. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments*

This action does not have tribal implications as specified in Executive Order 13175. This action does not apply on any Indian reservation land, any other area where the EPA or an Indian tribe has demonstrated that a tribe has jurisdiction, or non-reservation areas of Indian country. Thus, Executive Order 13175 does not apply to this action.

*G. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks*

The EPA interprets Executive Order 13045 as applying only to those regulatory actions that concern environmental health or safety risks that the EPA has reason to believe may disproportionately affect children, per the definition of "covered regulatory action" in section 2–202 of the Executive Order. This action is not subject to Executive Order 13045 because it merely proposes to disapprove a SIP submission as not meeting the CAA.

*H. Executive Order 13211, Actions That Significantly Affect Energy Supply, Distribution or Use*

This action is not subject to Executive Order 13211, because it is not a significant regulatory action under Executive Order 12866.

*I. National Technology Transfer and Advancement Act*

This rulemaking does not involve technical standards.

*J. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations*

The EPA believes the human health or environmental risk addressed by this action will not have potential disproportionately high and adverse human health or environmental effects on minority, low-income or indigenous populations. This action merely proposes to disapprove a SIP submission as not meeting the CAA.

*K. CAA Section 307(b)(1)*

Section 307(b)(1) of the CAA governs judicial review of final actions by the EPA. This section provides, in part, that petitions for review must be filed in the D.C. Circuit: (i) When the agency action consists of "nationally applicable regulations promulgated, or final actions taken, by the Administrator," or (ii) when such action is locally or regionally applicable, if "such action is based on a determination of nationwide scope or effect and if in taking such action the Administrator finds and publishes that such action is based on such a determination." For locally or regionally applicable final actions, the CAA reserves to the EPA complete discretion whether to invoke the exception in (ii).[37]

If the EPA takes final action on this proposed rulemaking the Administrator intends to exercise the complete discretion afforded to him under the CAA to make and publish a finding that the final action (to the extent a court finds the action to be locally or regionally applicable) is based on a determination of "nationwide scope or effect" within the meaning of CAA section 307(b)(1). Through this rulemaking action (in conjunction with a series of related actions on other SIP submissions for the same CAA obligations), the EPA interprets and applies section 110(a)(2)(d)(i)(I) of the CAA for the 2015 ozone NAAQS based on a common core of nationwide policy judgments and technical analysis concerning the interstate transport of pollutants throughout the continental U.S. In particular, the EPA is applying here (and in other proposed actions related to the same obligations) the same, nationally consistent 4-step framework for assessing good neighbor obligations for the 2015 ozone NAAQS. The EPA relies on a single set of updated, 2016-base year photochemical grid modeling results of the year 2023 as the primary basis for its assessment of air quality conditions and contributions at steps 1 and 2 of that framework. Further, the EPA proposes to determine and apply a set of nationally consistent policy judgments to apply the 4-step framework. The EPA has selected a nationally uniform analytic year (2023) for this analysis and is applying a nationally uniform approach to nonattainment and maintenance receptors and a nationally uniform approach to contribution threshold analysis.[38] For these reasons, the Administrator intends, if this proposed action is finalized, to exercise the complete discretion afforded to him under the CAA to make and publish a finding that this action is based on one or more determinations of nationwide scope or effect for purposes of CAA section 307(b)(1).[39]

List of Subjects in 40 CFR Part 52

Environmental protection, Air pollution control, Incorporation by reference, Ozone.

**Authority:** 42 U.S.C. 7401 *et seq.*

Dated: February 9, 2022.

**Meghan A. McCollister,**

*Regional Administrator, Region 7.*

[FR Doc. 2022–03183 Filed 2–18–22; 8:45 am]

**BILLING CODE 6560–50–P**

# ENVIRONMENTAL PROTECTION AGENCY

## 40 CFR Part 52

[EPA–R04–OAR–2021–0841; EPA–HQ–OAR–2021–0663; FRL–9421–01–R4]

## Air Plan Disapproval; AL, MS, TN; Interstate Transport Requirements for the 2015 8-Hour Ozone National Ambient Air Quality Standards

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Proposed rule and withdrawal of proposed rule.

---

**SUMMARY:** Pursuant to the Federal Clean Air Act (CAA or the Act), the Environmental Protection Agency (EPA or Agency) is proposing to disapprove State Implementation Plan (SIP) submittals from Alabama, Mississippi,

---

[37] In deciding whether to invoke the exception by making and publishing a finding that an action is based on a determination of nationwide scope or effect, the Administrator takes into account a number of policy considerations, including his judgment balancing the benefit of obtaining the D.C. Circuit's authoritative centralized review versus allowing development of the issue in other contexts and the best use of Agency resources.

[38] A finding of nationwide scope or effect is also appropriate for actions that cover states in multiple judicial circuits. In the report on the 1977 Amendments that revised section 307(b)(1) of the CAA, Congress noted that the Administrator's determination that the "nationwide scope or effect" exception applies need not be appropriate for any action that has a scope or effect beyond a single judicial circuit. See H.R. Rep. No. 95–294 at 323, 324, reprinted in 1977 U.S.C.C.A.N. 1402–03.

[39] The EPA may take a consolidated, single final action on all of the proposed SIP disapproval actions with respect to obligations under CAA section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS. Should EPA take a single final action on all such disapprovals, this action would be nationally applicable, and the EPA would also anticipate, in the alternative, making and publishing a finding that such final action is based on a determination of nationwide scope or effect.

and Tennessee regarding the interstate transport requirements for the 2015 8-hour ozone national ambient air quality standards (NAAQS or standard). The "Good Neighbor" or "Interstate Transport" provision requires that each state's implementation plan contain adequate provisions to prohibit emissions from within the state from significantly contributing to nonattainment or interfering with maintenance of the NAAQS in other states. This requirement is part of the broader set of "infrastructure" requirements, which are designed to ensure that the structural components of each state's air quality management program are adequate to meet the state's responsibilities under the CAA. These disapprovals, if finalized, will establish a 2-year deadline for EPA to promulgate a Federal Implementation Plan (FIP) to address the relevant interstate transport requirements, unless EPA approves a subsequent SIP submittal that meets these requirements. Disapproval does not start a mandatory sanctions clock.

**DATES:** *Comments.* Comments on this proposed rule must be received on or before April 25, 2022.

*Withdrawal:* As of February 22, 2022, the proposed rule published December 30, 2019, at 84 FR 71854, is withdrawn.

**ADDRESSES:** You may submit comments, identified by Docket No. EPA–R04–OAR–2021–0841, through the Federal eRulemaking Portal at *https://www.regulations.gov* following the online instructions for submitting comments.

*Instructions:* All submissions received must include the Docket No. EPA–R04–OAR–2021–0841 for this rulemaking. Comments received may be posted without change to *https://www.regulations.gov/,* including any personal information provided. For detailed instructions on submitting comments and additional information on the rulemaking process, see the "Public Participation" heading of this document. Out of an abundance of caution for members of the public and staff, the EPA Docket Center and Reading Room are open to the public by appointment only to reduce the risk of transmitting COVID–19. The Docket Center staff also continues to provide remote customer service via email, phone, and webform. For further information on EPA Docket Center services and the current status, please visit EPA online at *https://www.epa.gov/dockets.*

**FOR FURTHER INFORMATION CONTACT:** Evan Adams of the Air Regulatory Management Section, Air Planning and Implementation Branch, Air and Radiation Division, U.S. Environmental Protection Agency, Region 4, 61 Forsyth Street SW, Atlanta, Georgia 30303–8960. Mr. Adams can be reached by telephone at (404) 562–9009, or via electronic mail at *adams.evan@epa.gov.*

**SUPPLEMENTARY INFORMATION:** *Public Participation:* Submit your comments, identified by Docket No. EPA–R04–OAR–2021–0841, at *https://www.regulations.gov.* Once submitted, comments cannot be edited or removed from the docket. EPA may publish any comment received to its public docket. Do not submit to EPA's docket at *https://www.regulations.gov* any information you consider to be Confidential Business Information (CBI) or other information whose disclosure is restricted by statute. Multimedia submissions (audio, video, etc.) must be accompanied by a written comment. The written comment is considered the official comment and should include discussion of all points you wish to make. EPA will generally not consider comments or comment contents located outside of the primary submission (*i.e.,* on the web, cloud, or other file sharing system).

There are two dockets supporting this action, EPA–R04–OAR–2021–0841 and EPA–HQ–OAR–2021–0663. Docket No. EPA–R04–OAR–2021–0841 contains information specific to Alabama, Mississippi, and Tennessee, including this notice of proposed rulemaking. Docket No. EPA–HQ–OAR–2021–0663 contains additional modeling files, emissions inventory files, technical support documents, and other relevant supporting documentation regarding interstate transport of emissions for the 2015 8-hour ozone NAAQS which are being used to support this action. All comments regarding information in either of these dockets are to be made in Docket No. EPA–R04–OAR–2021–0841. For the full EPA public comment policy, information about CBI or multimedia submissions, and general guidance on making effective comments, please visit *https://www.epa.gov/dockets/commenting-epa-dockets.* Due to public health concerns related to COVID–19, the EPA Docket Center and Reading Room are open to the public by appointment only. The Docket Center staff also continues to provide remote customer service via email, phone, and webform. For further information and updates on EPA Docket Center services, please visit EPA online at *https://www.epa.gov/dockets.*

EPA continues to carefully and continuously monitor information from the Centers for Disease Control and Prevention (CDC), local area health departments, and Federal partners so that EPA can respond rapidly as conditions change regarding COVID–19.

The indices to Docket No. EPA–R04–OAR–2021–0841 and Docket No. EPA–R04–OAR–2021–0841 are available electronically at *www.regulations.gov.* While all documents in each docket are listed in their respective index, some information may not be publicly available due to docket file size restrictions or content (*e.g.,* CBI).

**Table of Contents**

I. Background
   A. Description of Statutory Background
   B. Description of EPA's Four Step Interstate Transport Regulatory Process
   C. Background on EPA's Ozone Transport Modeling Information
   D. EPA's Approach To Evaluating Interstate Transport SIPs for the 2015 8-hour Ozone NAAQS
II. SIP Submissions and EPA's Evaluation
   A. Alabama
   B. Mississippi
   C. Tennessee
III. Proposed Actions
IV. Statutory and Executive Order Reviews

**I. Background**

The following provides background for EPA's proposed actions related to the interstate transport requirements for the 2015 8-hour ozone NAAQS for the states of Alabama, Mississippi, and Tennessee.

*A. Description of Statutory Background*

On October 1, 2015, EPA promulgated a revision to the ozone NAAQS (2015 8-hour ozone NAAQS), lowering the level of both the primary and secondary standards to 0.070 parts per million (ppm).[1] Section 110(a)(1) of the CAA requires states to submit, within 3 years after promulgation of a new or revised standard, SIP submissions meeting the applicable requirements of section 110(a)(2).[2] One of these applicable requirements is found in CAA section 110(a)(2)(D)(i)(I), otherwise known as the "good neighbor" or "interstate transport" provision, which generally requires SIPs to contain adequate provisions to prohibit in-state emissions activities from having certain adverse air quality effects on other states due to

---

[1] National Ambient Air Quality Standards for Ozone, Final Rule, 80 FR 65292 (October 26, 2015). Although the level of the standard is specified in the units of ppm, ozone concentrations are also described in parts per billion (ppb). For example, 0.070 ppm is equivalent to 70 ppb.

[2] SIP revisions that are intended to meet the applicable requirements of section 110(a)(1) and (2) of the CAA are often referred to as infrastructure SIPs and the applicable elements under section 110(a)(2) are referred to as infrastructure requirements.

interstate transport of pollution. There are two so-called "prongs" within CAA section 110(a)(2)(D)(i)(I). A SIP for a new or revised NAAQS must contain adequate provisions prohibiting any source or other type of emissions activity within the state from emitting air pollutants in amounts that will significantly contribute to nonattainment of the NAAQS in another state (prong 1) or interfere with maintenance of the NAAQS in another state (prong 2). EPA and states must give independent significance to prong 1 and prong 2 when evaluating downwind air quality problems under CAA section 110(a)(2)(D)(i)(I).[3]

## B. Description of EPA's Four Step Interstate Transport Regulatory Process

EPA is using the 4-step interstate transport framework (or 4-step framework) to evaluate the states' implementation plan submittals addressing the interstate transport provision for the 2015 8-hour ozone NAAQS. EPA has addressed the interstate transport requirements of CAA section 110(a)(2)(D)(i)(I) with respect to prior ozone NAAQS in several regional regulatory actions, including the Cross-State Air Pollution Rule (CSAPR), which addressed interstate transport with respect to the 1997 ozone NAAQS as well as the 1997 and 2006 fine particulate matter standards,[4] the Cross-State Air Pollution Rule Update (CSAPR Update)[5] and the Revised CSAPR Update, both of which addressed the 2008 ozone NAAQS.[6]

Through the development and implementation of the CSAPR rulemakings and prior regional rulemakings pursuant to the interstate transport provision,[7] EPA, working in partnership with states, developed the following 4-step interstate transport framework to evaluate a state's obligations to eliminate interstate transport emissions under the interstate transport provision for the ozone NAAQS: (1) Identify monitoring sites that are projected to have problems attaining and/or maintaining the NAAQS (i.e., nonattainment and/or maintenance receptors); (2) identify states that impact those air quality problems in other (i.e., downwind) states sufficiently such that the states are considered "linked" and therefore warrant further review and analysis; (3) identify the emissions reductions necessary (if any), applying a multifactor analysis, to eliminate each linked upwind state's significant contribution to nonattainment or interference with maintenance of the NAAQS at the locations identified in Step 1; and (4) adopt permanent and enforceable measures needed to achieve those emissions reductions.

## C. Background on EPA's Ozone Transport Modeling Information

In general, EPA has performed nationwide air quality modeling to project ozone design values which are used in combination with measured data to identify nonattainment and maintenance receptors. To quantify the contribution of emissions from specific upwind states on 2023 ozone design values for the identified downwind nonattainment and maintenance receptors, EPA performed nationwide, state-level ozone source apportionment modeling for 2023. The source apportionment modeling provided contributions to ozone at receptors from precursor emissions of anthropogenic nitrogen oxides ($NO_X$) and volatile organic compounds (VOCs) in individual upwind states.

EPA has released several documents containing projected design values, contributions, and information relevant to evaluating interstate transport with respect to the 2015 8-hour ozone NAAQS. First, on January 6, 2017, EPA published a notice of data availability (NODA) in which the Agency requested comment on preliminary interstate ozone transport data including projected ozone design values and interstate contributions for 2023 using a 2011 base year platform.[8] In the NODA, EPA used the year 2023 as the analytic year for this preliminary modeling because that year aligns with the expected attainment year for Moderate ozone nonattainment areas for the 2015 8-hour ozone NAAQS.[9] On October 27, 2017, EPA released a memorandum (October 2017 memorandum) containing updated modeling data for 2023, which incorporated changes made in response to comments on the NODA, and noted that the modeling may be useful for states developing SIPs to address interstate transport obligations for the 2008 ozone NAAQS.[10] On March 27, 2018, EPA issued a memorandum (March 2018 memorandum) noting that the same 2023 modeling data released in the October 2017 memorandum could also be useful for identifying potential downwind air quality problems with respect to the 2015 8-hour ozone NAAQS at Step 1 of the 4-step interstate transport framework.[11] The March 2018 memorandum also included the then newly available contribution modeling data for 2023 to assist states in evaluating their impact on potential downwind air quality problems for the 2015 8-hour ozone NAAQS under Step 2 of the 4-step interstate transport framework.[12] EPA subsequently issued two more memoranda in August and October 2018, providing additional information to states developing interstate transport SIP submissions for the 2015 8-hour ozone NAAQS concerning, respectively, potential contribution thresholds that may be appropriate to apply in Step 2 of the 4-step interstate transport framework, and considerations for identifying downwind areas that may have problems maintaining the standard at

---

[3] See North Carolina v. EPA, 531 F.3d 896, 909–11 (D.C. Cir. 2008).

[4] See Federal Implementation Plans: Interstate Transport of Fine Particulate Matter and Ozone and Correction of SIP Approvals, 76 FR 48208 (August 8, 2011).

[5] Cross-State Air Pollution Rule Update for the 2008 Ozone NAAQS, 81 FR 74504 (October 26, 2016).

[6] In 2019, the United States Court of Appeals for the District of Columbia Circuit (D.C. Circuit) remanded CSAPR Update to the extent it failed to require upwind states to eliminate their significant contribution by the next applicable attainment date by which downwind states must come into compliance with the NAAQS, as established under CAA section 181(a). Wisconsin v. EPA, 938 F.3d 303, 313 (D.C. Cir. 2019). The Revised CSAPR Update for the 2008 Ozone NAAQS, 86 FR 23054 (April 30, 2021), responded to the remand of CSAPR Update in Wisconsin and the vacatur of a separate rule, the "CSAPR Close-Out," 83 FR 65878 (December 21, 2018), in New York v. EPA, 781 F. App'x. 4 (D.C. Cir. 2019).

[7] In addition to CSAPR rulemakings, other regional rulemakings addressing ozone transport include the "$NO_X$ SIP Call," 63 FR 57356 (October 27, 1998), and the "Clean Air Interstate Rule" (CAIR), 70 FR 25162 (May 12, 2005).

[8] See Notice of Availability of the Environmental Protection Agency's Preliminary Interstate Ozone Transport Modeling Data for the 2015 8-hour Ozone National Ambient Air Quality Standard (NAAQS), 82 FR 1733 (January 6, 2017).

[9] See 82 FR 1733, 1735 (January 6, 2017).

[10] See Information on the Interstate Transport State Implementation Plan Submissions for the 2008 Ozone National Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I), October 27, 2017 ("October 2017 memorandum"), available in Docket No. EPA–HQ–OAR–2021–0663 or at https://www.epa.gov/interstate-air-pollution-transport/interstate-air-pollution-transport-memos-and-notices.

[11] See Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I), March 27, 2018 ("March 2018 memorandum"), available in Docket No. EPA–HQ–OAR–2021–0663 or at https://www.epa.gov/interstate-air-pollution-transport/interstate-air-pollution-transport-memos-and-notices.

[12] The March 2018 memorandum, however, provided, "While the information in this memorandum and the associated air quality analysis data could be used to inform the development of these SIPs, the information is not a final determination regarding states' obligations under the good neighbor provision. Any such determination would be made through notice-and-comment rulemaking."

Step 1 of the 4-step interstate transport framework.[13]

Since the release of the modeling data shared in the March 2018 memorandum, EPA performed updated modeling using a 2016-based emissions modeling platform (*i.e.,* 2016v1). This emissions platform was developed under the EPA/Multi-Jurisdictional Organization (MJO)/state collaborative project.[14] This collaborative project was a multi-year joint effort by EPA, MJOs, and states to develop a new, more recent emissions platform for use by EPA and states in regulatory modeling as an improvement over the dated 2011-based platform that EPA had used to project ozone design values and contribution data provided in the 2017 and 2018 memoranda. EPA used the 2016v1 emissions to project ozone design values and contributions for 2023. On October 30, 2020, in the Notice of Proposed Rulemaking for the Revised CSAPR Update, EPA released and accepted public comment on 2023 modeling that used the 2016v1 emissions platform.[15] Although the Revised CSAPR Update addressed transport for the 2008 ozone NAAQS, the projected design values and contributions from the 2016v1 platform are also useful for identifying downwind ozone problems and linkages with respect to the 2015 8-hour ozone NAAQS.[16]

Following the Revised CSAPR Update final rule, EPA made further updates to the 2016 emissions platform to include mobile emissions from EPA's Motor Vehicle Emission Simulator (MOVES) model [17] and updated emissions projections for electric generating units (EGUs) that reflect the emissions reductions from the Revised CSAPR Update, recent information on plant

closures, and other sector trends. The construct of the updated emissions platform, 2016v2, is described in the Preparation of Emissions Inventories for the 2016v2 North American Emissions Modeling Platform technical support document (TSD) for this proposed rule and is included in Docket No. EPA–HQ–OAR–2021–0663. EPA performed air quality modeling of the 2016v2 emissions using the most recent public release version of the Comprehensive Air Quality Modeling with Extensions (CAMx) photochemical modeling, version 7.10.[18] EPA proposes to primarily rely on modeling based on the updated and newly available 2016v2 emissions platform in evaluating these submissions with respect to Steps 1 and 2 of the 4-step interstate transport framework. By using the updated modeling results, EPA is using the most current and technically appropriate information for this proposed rulemaking. Section II of this notice and the Air Quality Modeling TSD included in Docket No. EPA–HQ–OAR–2021–0663 for this proposal contain additional detail on the modeling performed using the 2016v2 emissions modeling.

In this notice, EPA is accepting public comment on this updated 2023 modeling, which uses the 2016v2 emissions platform. Details on the air quality modeling and the methods for projecting design values and determining contributions in 2023 are described in the Air Quality Modeling TSD for 2015 8-hour ozone NAAQS Transport SIP Proposed Actions. Comments on EPA's air quality modeling should be submitted in Docket No. EPA–R04–OAR–2021–0841. Comments are not being accepted in Docket No. EPA–HQ–OAR–2021–0663.

States may have chosen to rely on the results of EPA modeling and/or alternative modeling performed by states or Multi-Jurisdictional Organizations (MJOs) to evaluate downwind air quality problems and contributions as part of their submissions. In Section II, EPA evaluates how Alabama, Mississippi, and Tennessee used air quality modeling information in their submissions.

### D. EPA's Approach to Evaluating Interstate Transport SIPs for the 2015 8-Hour Ozone NAAQS

EPA proposes to apply a consistent set of policy judgments across all states for purposes of evaluating interstate transport obligations and the

approvability of interstate transport SIP submittals for the 2015 8-hour ozone NAAQS. These policy judgments reflect consistency with relevant case law and past agency practice as reflected in CSAPR and related rulemakings. Nationwide consistency in approach is particularly important in the context of interstate ozone transport, which is a regional-scale pollution problem involving many smaller contributors. Effective policy solutions to the problem of interstate ozone transport going back to the $NO_X$ SIP Call have necessitated the application of a uniform framework of policy judgments in order to ensure an "efficient and equitable" approach. *See EME Homer City Generation, LP* v. *EPA,* 572 U.S. 489, 519 (2014).

In the March, August, and October 2018 memoranda, EPA recognized that states may be able to establish alternative approaches to addressing their interstate transport obligations for the 2015 8-hour ozone NAAQS that vary from a nationally uniform framework. EPA emphasized in these memoranda, however, that such alternative approaches must be technically justified and appropriate in light of the facts and circumstances of each particular state's submittal. In general, EPA continues to believe that deviation from a nationally consistent approach to ozone transport must be substantially justified and have a well-documented technical basis that is consistent with relevant case law. Where states submitted SIPs that rely on any such potential concepts as may have been identified or suggested in the past, EPA will evaluate whether the state adequately justified the technical and legal basis for doing so.

EPA notes that certain potential concepts included in an attachment to the March 2018 memorandum require unique consideration, and these ideas do not constitute agency guidance with respect to transport obligations for the 2015 8-hour ozone NAAQS. Attachment A to the March 2018 memorandum identified a "Preliminary List of Potential Flexibilities" that could potentially inform SIP development.[19] However, EPA made clear in that attachment that the list of ideas were not suggestions endorsed by the Agency but rather "comments provided in various forums" on which EPA sought "feedback from interested stakeholders." [20] Further, Attachment A stated, "EPA is not at this time making any determination that the ideas discussed below are consistent with the requirements of the CAA, nor is EPA specifically recommending that states

---

[13] *See* Analysis of Contribution Thresholds for Use in Clean Air Act Section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards, August 31, 2018) ("August 2018 memorandum"), and Considerations for Identifying Maintenance Receptors for Use in Clean Air Act Section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards, October 19, 2018 ("October 2018 memorandum"), available in Docket No. EPA–HQ–OAR–2021–0663 or at *https://www.epa.gov/airmarkets/memo-and-supplemental-information-regarding-interstate-transport-sips-2015-ozone-naaqs.*

[14] The results of this modeling, as well as the underlying modeling files, are included in Docket No. EPA–HQ–OAR–2021–0663.

[15] *See* 85 FR 68964, 68981 (October 30, 2020).

[16] *See* the Air Quality Modeling Technical Support Document for the Final Revised Cross-State Air Pollution Rule Update, included in Docket No. EPA–HQ–OAR–2021–0663.

[17] Additional details and documentation related to the MOVES3 model can be found at *https://www.epa.gov/moves/latest-version-motor-vehicle-emission-simulator-moves.*

[18] Ramboll Environment and Health, January 2021, *www.camx.com.*

[19] March 2018 memorandum, Attachment A.
[20] *Id.* at A–1.

use these approaches." [21] Attachment A to the March 2018 memorandum, therefore, does not constitute agency guidance, but was intended to generate further discussion around potential approaches to addressing ozone transport among interested stakeholders. To the extent states sought to develop or rely on these ideas in support of their SIP submittals, EPA will thoroughly review the technical and legal justifications for doing so.

The remainder of this section describes the EPA's proposed framework with respect to analytic year, definition of nonattainment and maintenance receptors, selection of contribution threshold, and multifactor control strategy assessment.

### 1. Selection of Analytic Year

In general, the states and EPA must implement the interstate transport provision in a manner "consistent with the provisions of [title I of the CAA]." *See* CAA section 110(a)(2)(D)(i). This requires, among other things, that these obligations are addressed consistently with the timeframes for downwind areas to meet their CAA obligations. With respect to ozone NAAQS, under CAA section 181(a), this means obligations must be addressed "as expeditiously as practicable" and no later than the schedule of attainment dates provided in CAA section 181(a)(1).[22] Several D.C. Circuit court decisions address the issue of the relevant analytic year for the purposes of evaluating ozone transport air-quality problems. On September 13, 2019, the D.C. Circuit issued a decision in *Wisconsin* v. *EPA,* remanding the CSAPR Update to the extent that it failed to require upwind states to eliminate their significant contribution by the next applicable attainment date by which downwind states must come into compliance with the NAAQS, as established under CAA section 181(a). *See* 938 F.3d 303, 313.

On May 19, 2020, the D.C. Circuit issued a decision in *Maryland* v. *EPA* that cited the *Wisconsin* decision in holding that EPA must assess the impact of interstate transport on air quality at the next downwind attainment date, including Marginal area attainment dates, in evaluating the basis for EPA's denial of a petition under CAA section 126(b). *Maryland* v. *EPA,* 958 F.3d 1185, 1203–04 (D.C. Cir. 2020). The court noted that "section 126(b) incorporates

the Good Neighbor Provision," and, therefore, "EPA must find a violation [of section 126] if an upwind source will significantly contribute to downwind nonattainment at the *next downwind attainment deadline.* Therefore, the agency must evaluate downwind air quality at that deadline, not at some later date." *Id.* at 1204 (emphasis added). EPA interprets the court's holding in *Maryland* as requiring the states and the Agency, under the good neighbor provision, to assess downwind air quality as expeditiously as practicable and no later than the next applicable attainment date,[23] which is now the Moderate area attainment date under CAA section 181 for ozone nonattainment. The Moderate area attainment date for the 2015 8-hour ozone NAAQS is August 3, 2024.[24] EPA believes that 2023 is now the appropriate year for analysis of interstate transport obligations for the 2015 8-hour ozone NAAQS, because the 2023 ozone season is the last relevant ozone season during which achieved emissions reductions in linked upwind states could assist downwind states with meeting the August 3, 2024, Moderate area attainment date for the 2015 8-hour ozone NAAQS.

EPA recognizes that the attainment date for nonattainment areas classified as Marginal for the 2015 8-hour ozone NAAQS was August 3, 2021. Under the *Maryland* holding, any necessary emissions reductions to satisfy interstate transport obligations should have been implemented by no later than this date. At the time of the statutory deadline to submit interstate transport SIPs (October 1, 2018), many states relied upon EPA modeling of the year 2023, and no state provided an alternative analysis using a 2021 analytic year (or the prior 2020 ozone season). However, EPA must act on SIP submittals using the information available at the time it takes such action. In this circumstance, EPA does not believe it would be appropriate to evaluate states' obligations under CAA section 110(a)(2)(D)(i)(I) as of an attainment date that is wholly in the

past, because the Agency interprets the interstate transport provision as forward looking. *See* 86 FR 23054, 23074; *see also Wisconsin,* 938 F.3d at 322. Consequently, in this proposal EPA will use the analytical year of 2023 to evaluate each state's CAA section 110(a)(2)(D)(i)(I) SIP submission with respect to the 2015 8-hour ozone NAAQS.

### 2. Step 1 of the 4-Step Interstate Transport Framework

In Step 1, EPA identifies monitoring sites that are projected to have problems attaining and/or maintaining the NAAQS in the 2023 analytic year. Where EPA's analysis shows that a site does not fall under the definition of a nonattainment or maintenance receptor, that site is excluded from further analysis under EPA's 4-step interstate transport framework. For sites that are identified as a nonattainment or maintenance receptor in 2023, EPA proceeds to the next step of the 4-step interstate transport framework by identifying the upwind state's contribution to those receptors.

EPA's approach to identifying ozone nonattainment and maintenance receptors in this action is consistent with the approach used in previous transport rulemakings. EPA's approach gives independent consideration to both the "contribute significantly to nonattainment" and the "interfere with maintenance" prongs of CAA section 110(a)(2)(D)(i)(I), consistent with the D.C. Circuit's direction in *North Carolina* v. *EPA.*[25]

For the purpose of this proposal, EPA identifies nonattainment receptors as those monitoring sites that are projected to have average design values that exceed the NAAQS and that are also measuring nonattainment based on the most recent monitored design values. This approach is consistent with prior transport rulemakings, such as the CSAPR Update, where EPA defined nonattainment receptors as those areas that both currently measure nonattainment and that EPA projects will be in nonattainment in the future analytic year (*i.e.,* 2023).[26]

In addition, in this proposal, EPA identifies a receptor to be a "maintenance" receptor for purposes of

---

[21] *Id.*

[22] For attainment dates for the 2015 8-hour ozone NAAQS, refer to CAA section 181(a), 40 CFR 51.1303, and Additional Air Quality Designations for the 2015 Ozone National Ambient Air Quality Standards, 83 FR 25776 (June 4, 2018, effective August 3, 2018).

[23] EPA notes that the court in *Maryland* did not have occasion to evaluate circumstances in which EPA may determine that an upwind linkage to a downwind air quality problem exists at Steps 1 and 2 of the interstate transport framework by a particular attainment date, but for reasons of impossibility or profound uncertainty the Agency is unable to mandate upwind pollution controls by that date. *See Wisconsin,* 938 F.3d at 320. The D.C. Circuit noted in *Wisconsin* that upon a sufficient showing, these circumstances may warrant flexibility in effectuating the purpose of the interstate transport provision.

[24] *See* CAA section 181(a); 40 CFR 51.1303; Additional Air Quality Designations for the 2015 Ozone National Ambient Air Quality Standards, 83 FR 25776 (June 4, 2018, effective August 3, 2018).

[25] *See North Carolina* v. *EPA,* 531 F.3d 896, 910–11 (D.C. Cir. 2008) (holding that EPA must give "independent significance" to each prong of CAA section 110(a)(2)(D)(i)(I)).

[26] *See* 81 FR 74504 (October 26, 2016). This same concept, relying on both current monitoring data and modeling to define nonattainment receptor, was also applied in CAIR. *See* 70 FR at 25241, 25249 (January 14, 2005); *see also North Carolina,* 531 F.3d at 913–14 (affirming as reasonable EPA's approach to defining nonattainment in CAIR).

defining interference with maintenance, consistent with the method used in CSAPR and upheld by the D.C. Circuit in *EME Homer City Generation, L.P.* v. *EPA,* 795 F.3d 118, 136 (D.C. Cir. 2015).[27] Specifically, EPA identified maintenance receptors as those receptors that would have difficulty maintaining the relevant NAAQS in a scenario that takes into account historical variability in air quality at that receptor. The variability in air quality was determined by evaluating the ''maximum'' future design value at each receptor based on a projection of the maximum measured design value over the relevant period. EPA interprets the projected maximum future design value to be a potential future air quality outcome consistent with the meteorology that yielded maximum measured concentrations in the ambient data set analyzed for that receptor (*i.e.,* ozone conducive meteorology). EPA also recognizes that previously experienced meteorological conditions (*e.g.,* dominant wind direction, temperatures, air mass patterns) promoting ozone formation that led to maximum concentrations in the measured data may reoccur in the future. The maximum design value gives a reasonable projection of future air quality at the receptor under a scenario in which such conditions do, in fact, reoccur. The projected maximum design value is used to identify upwind emissions that, under those circumstances, could interfere with the downwind area's ability to maintain the NAAQS.

Recognizing that nonattainment receptors are also, by definition, maintenance receptors, the EPA often uses the term ''maintenance-only'' to refer to those receptors that are not nonattainment receptors. Consistent with the concepts for maintenance receptors, as described above, the EPA identifies ''maintenance-only'' receptors as those monitoring sites that have projected average design values above the level of the applicable NAAQS, but that are not currently measuring nonattainment based on the most recent official design values. In addition, those monitoring sites with projected average design values below the NAAQS, but with projected maximum design values above the NAAQS are also identified as ''maintenance-only'' receptors, even if they are currently measuring nonattainment based on the most recent official design values.

**3. Step 2 of the 4-Step Interstate Transport Framework**

In Step 2, EPA quantifies the contribution of each upwind state to each receptor in the 2023 analytic year. The contribution metric used in Step 2 is defined as the average impact from each state to each receptor on the days with the highest ozone concentrations at the receptor based on the 2023 modeling. If a state's contribution value does not equal or exceed the threshold of 1 percent of the NAAQS (*i.e.,* 0.70 ppb for the 2015 8-hour ozone NAAQS), the upwind state is not ''linked'' to a downwind air quality problem, and EPA, therefore, concludes that the state does not significantly contribute to nonattainment or interfere with maintenance of the NAAQS in the downwind states. However, if a state's contribution equals or exceeds the 1 percent threshold, the state's emissions are further evaluated in Step 3, considering both air quality and cost as part of a multi-factor analysis, to determine what, if any, emissions might be deemed ''significant'' and, thus, must be eliminated under CAA section 110(a)(2)(D)(i)(I).

EPA is proposing to rely in the first instance on the 1 percent threshold for the purpose of evaluating a state's contribution to nonattainment or maintenance of the 2015 8-hour ozone NAAQS (*i.e.,* 0.70 ppb) at downwind receptors. This is consistent with the Step 2 approach that EPA applied in CSAPR for the 1997 ozone NAAQS, which has subsequently been applied in the CSAPR Update when evaluating interstate transport obligations for the 2008 ozone NAAQS. EPA continues to find 1 percent to be an appropriate threshold. For ozone, as EPA found in the CAIR, CSAPR, and CSAPR Update, a portion of the nonattainment problems from anthropogenic sources in the U.S. result from the combined impact of relatively small contributions from many upwind states, along with contributions from in-state sources and, in some cases, substantially larger contributions from a subset of particular upwind states. EPA's analysis shows that much of the ozone transport problem being analyzed in this proposed rule is still the result of the collective impacts of contributions from many upwind states. Therefore, application of a consistent contribution threshold is necessary to identify those upwind states that should have responsibility for addressing their contribution to the downwind nonattainment and maintenance problems to which they collectively contribute. Continuing to use 1 percent

of the NAAQS as the screening metric to evaluate collective contribution from many upwind states also allows EPA (and states) to apply a consistent framework to evaluate interstate emissions transport under the interstate transport provision from one NAAQS to the next. *See* 81 FR at 74518; *see also* 86 FR at 23085 (reviewing and explaining rationale from CSAPR, 76 FR at 48237–38, for selection of 1 percent threshold).

*(a) EPA's Experience With Alternative Step 2 Thresholds*

EPA's August 2018 memorandum recognized that in certain circumstances, a state may be able to establish that an alternative contribution threshold of 1 ppb is justifiable. Where a state relies on this alternative threshold, and where that state determined that it was not linked at Step 2 using the alternative threshold, EPA will evaluate whether the state provided a technically sound assessment of the appropriateness of using this alternative threshold based on the facts and circumstances underlying its application in the particular SIP submission.

EPA here shares further evaluation of its experience since the issuance of the August 2018 memorandum regarding use of alternative thresholds at Step 2. This experience leads the Agency to now believe it may not be appropriate to continue to attempt to recognize alternative contribution thresholds at Step 2. The August 2018 memorandum stated that ''it may be reasonable and appropriate'' for states to rely on an alternative threshold of 1 ppb threshold at Step 2.[28] (The memorandum also indicated that any higher alternative threshold, such as 2 ppb, would likely not be appropriate.) However, EPA also provided that ''air agencies should consider whether the recommendations in this guidance are appropriate for each situation.'' Following receipt and review of 49 good neighbor SIP submittals for the 2015 8-hour ozone NAAQS, EPA's experience has been that nearly every state that attempted to rely on a 1 ppb threshold did not provide sufficient information and analysis to support a determination that an alternative threshold was reasonable or appropriate for that state.

For instance, in nearly all submittals, the states did not provide EPA with analysis specific to their state or the receptors to which its emissions are potentially linked. In one case, the proposed approval of Iowa's SIP submittal, EPA expended its own

---

[27] *See* 76 FR 48208 (August 8, 2011). The CSAPR Update and Revised CSAPR Update also used this approach. *See* 81 FR 74504 (October 26, 2016) and 86 FR 23054 (April 30, 2021).

[28] *See* August 2018 memorandum at 4.

resources to attempt to supplement the information submitted by the state, in order to more thoroughly evaluate the state-specific circumstances that could support approval.[29] It was at EPA's sole discretion to perform this analysis in support of the state's submittal, and the Agency is not obligated to conduct supplemental analysis to fill the gaps whenever it believes a state's analysis is insufficient. The Agency no longer intends to undertake supplemental analysis of SIP submittals with respect to alternative thresholds at Step 2 for purposes of the 2015 8-hour ozone NAAQS.

Furthermore, EPA's experience since 2018 is that allowing for alternative Step 2 thresholds may be impractical or otherwise inadvisable for a number of additional policy reasons. For a regional air pollutant such as ozone, consistency in requirements and expectations across all states is essential. Based on its review of submittals to-date and after further consideration of the policy implications of attempting to recognize an alternative Step 2 threshold for certain states, the Agency now believes the attempted use of different thresholds at Step 2 with respect to the 2015 8-hour ozone NAAQS raises substantial policy consistency and practical implementation concerns.[30] The availability of different thresholds at Step 2 has the potential to result in inconsistent application of good neighbor obligations based solely on the strength of a state's implementation plan submittal at Step 2 of the 4-step interstate transport framework. From the perspective of ensuring effective regional implementation of good neighbor obligations, the more important analysis is the evaluation of the emissions reductions needed, if any, to address a state's significant contribution after consideration of a multifactor analysis at Step 3, including a detailed evaluation that considers air quality factors and cost. Where alternative thresholds for purposes of Step 2 may be "similar" in terms of capturing the relative amount of upwind contribution (as described in the August 2018 memorandum), nonetheless, use of

an alternative threshold would allow certain states to avoid further evaluation of potential emission controls while other states must proceed to a Step 3 analysis. This can create significant equity and consistency problems among states.

Further, it is not clear that national ozone transport policy is best served by allowing for less stringent thresholds at Step 2. EPA recognized in the August 2018 memorandum that there was some similarity in the amount of total upwind contribution captured (on a nationwide basis) between 1 percent and 1 ppb. However, EPA notes that while this may be true in some sense, that is hardly a compelling basis to move to a 1 ppb threshold. Indeed, the 1 ppb threshold has the disadvantage of losing a certain amount of total upwind contribution for further evaluation at Step 3 (e.g., roughly 7 percent of total upwind state contribution was lost according to the modeling underlying the August 2018 memorandum;[31] in EPA's updated modeling, the amount lost is 5 percent). Considering the core statutory objective of ensuring elimination of all significant contribution to nonattainment or interference of the NAAQS in other states and the broad, regional nature of the collective contribution problem with respect to ozone, there does not appear to be a compelling policy imperative in allowing some states to use a 1 ppb threshold while others rely on a 1 percent of the NAAQS threshold.

Consistency with past interstate transport actions such as CSAPR, and the CSAPR Update and Revised CSAPR Update rulemakings (which used a Step 2 threshold of 1 percent of the NAAQS for two less stringent ozone NAAQS), is also important. Continuing to use a 1 percent of NAAQS approach ensures that as the NAAQS are revised and made more stringent, an appropriate increase in stringency at Step 2 occurs, so as to ensure an appropriately larger amount of total upwind-state contribution is captured for purposes of fully addressing interstate transport. See 76 FR 48208, 48237–38 (August 8, 2011).

Therefore, notwithstanding the August 2018 memorandum's recognition of the potential viability of alternative Step 2 thresholds, and in particular, a potentially applicable 1 ppb threshold, EPA's experience since the issuance of that memorandum has revealed substantial programmatic and policy difficulties in attempting to implement this approach. Nonetheless, EPA is not at this time rescinding the August 2018 memorandum. As

discussed further below, the basis for disapproval of Alabama, Mississippi, and Tennessee's SIP submissions with respect to the Step 2 analysis is, in the Agency's view, warranted even under the terms of the August 2018 memorandum. EPA invites comment on this broader discussion of issues associated with alternative thresholds at Step 2. Depending on comment and further evaluation of this issue, EPA may determine to rescind the August 2018 memorandum in the future.

## 4. Step 3 of the 4-Step Interstate Transport Framework

Consistent with EPA's longstanding approach to eliminating significant contribution or interference with maintenance, at Step 3, states linked at Steps 1 and 2 are generally expected to prepare a multifactor assessment of potential emissions controls. EPA's analysis at Step 3 in prior Federal actions addressing interstate transport requirements has primarily focused on an evaluation of cost-effectiveness of potential emissions controls (on a marginal cost-per-ton basis), the total emissions reductions that may be achieved by requiring such controls (if applied across all linked upwind states), and an evaluation of the air quality impacts such emissions reductions would have on the downwind receptors to which a state is linked; other factors may potentially be relevant if adequately supported. In general, where EPA's or alternative air quality and contribution modeling establishes that a state is linked at Steps 1 and 2, it will be insufficient at Step 3 for a state merely to point to its existing rules requiring control measures as a basis for approval. In general, the emissions-reducing effects of all existing emissions control requirements are already reflected in the air quality results of the modeling for Steps 1 and 2. If the state is shown to still be linked to one or more downwind receptor(s), states must provide a well-documented evaluation determining whether their emissions constitute significant contribution or interference with maintenance by evaluating additional available control opportunities by preparing a multifactor assessment. While EPA has not prescribed a particular method for this assessment, EPA expects states at a minimum to present a sufficient technical evaluation. This would typically include information on emissions sources, applicable control technologies, emissions reductions, costs, cost effectiveness, and downwind air quality impacts of the estimated reductions, before concluding that no

---

[29] Air Plan Approval; Iowa; Infrastructure State Implementation Plan Requirements for the 2015 Ozone National Ambient Air Quality Standard, 85 FR 12232 (March 2, 2020). The Agency received adverse comment on this proposed approval and has not taken final action with respect to this proposal.

[30] EPA notes that Congress has placed on EPA a general obligation to ensure the requirements of the CAA are implemented consistently across states and regions. See CAA section 301(a)(2). Where the management and regulation of interstate pollution levels spanning many states is at stake, consistency in application of CAA requirements is paramount.

[31] See August 2018 memorandum at 4.

additional emissions controls should be required.[32]

5. Step 4 of the 4-Step Interstate Transport Framework

At Step 4, states (or EPA) develop permanent and federally enforceable control strategies to achieve the emissions reductions determined to be necessary at Step 3 to eliminate significant contribution to nonattainment or interference with maintenance of the NAAQS. For a state linked at Steps 1 and 2 to rely on an emissions control measure at Step 3 to address its interstate transport obligations, that measure must be included in the state's implementation plan so that it is permanent and federally enforceable. *See* CAA section 110(a)(2)(D) ("Each such [SIP] shall . . . contain adequate provisions . . . ."). *See also* CAA section 110(a)(2)(A); *Committee for a Better Arvin* v. *EPA,* 786 F.3d 1169, 1175–76 (9th Cir. 2015) (holding that measures relied on by a state to meet CAA requirements must be included in the SIP).

## II. SIP Submissions and EPA's Evaluation

### A. Alabama

The following section provides information related to Alabama's SIP submission addressing interstate transport requirements for the 2015 8-hour ozone NAAQS, and EPA's analysis of Alabama's submission.

1. Summary of Alabama's 2015 Ozone Interstate Transport SIP Submission

On August 20, 2018,[33] Alabama submitted a SIP revision addressing the CAA section 110(a)(2)(D)(i)(I) good neighbor interstate transport requirements for the 2015 8-hour ozone NAAQS.[34] The SIP submission provided Alabama's analysis of its impact to downwind states and concluded that emissions from the State will not significantly contribute to nonattainment or interfere with

maintenance of the 2015 8-hour ozone NAAQS in other states, based on modeling results included in EPA's March 2018 memorandum. Alabama's submission relied on the results of EPA's modeling of 2023 using a 2011 base year, as contained in the March 2018 memorandum (which the State attached to its submittal), to identify downwind nonattainment and maintenance receptors that may be impacted by emissions from sources in the State at Step 1 of the 4-step framework.[35]

Alabama Department of Environmental Management (ADEM) reviewed this modeling, concurred with the results, and determined that the future year projections were appropriate for the purposes of evaluating Alabama's impact on nonattainment and maintenance receptors in other states at Step 1. Alabama used this information to find that emissions from Alabama would not contribute above 1 percent of the NAAQS at any projected nonattainment or maintenance receptors at Step 2 of the 4-step framework (using EPA's approach to defining such receptors).

Alabama's August 20, 2018, submittal also identified existing SIP-approved regulations and Federal programs[36] that ADEM noted regulate ozone-precursor emissions from sources in the State, including CSAPR trading programs.[37] Alabama's submission acknowledges that CSAPR does not address interstate transport for the 2015 ozone standard but does provide residual $NO_X$ emissions reductions and notes the adoption of CSAPR $NO_X$ ozone season trading programs into the Alabama SIP

on August 31, 2016, and October 6, 2017.[38] Alabama notes that the implementation of the existing SIP-approved regulations and Federal programs provide for a decline in ozone precursors emissions in the State. Alabama also stated that ozone-precursor emissions would continue to decline in the State.

Based on the information from Alabama's transport SIP, ADEM concluded that emissions from Alabama sources will not significantly contribute to nonattainment or interfere with maintenance of the 2015 8-hour ozone NAAQS in any other state.

2. Prior Notices Related to Alabama's SIP Submission

Previously, EPA proposed approval of Alabama's interstate transport provisions for the 2015 8-hour ozone NAAQS as addressed in Alabama's August 20, 2018 submission and based on the contribution modeling provided in the March 2018 memorandum. *See* 84 FR 71854 (December 30, 2019). When EPA completed updated modeling of 2023 in 2020 using a 2016-based emissions modeling platform (2016v1), it became evident that Alabama was projected to be linked to downwind nonattainment and maintenance receptors (see footnote 40 below). As a result, EPA deferred acting on Alabama's SIP submittal when it published a supplemental proposal in 2021 to approve four other southeastern states' good neighbor SIP submissions using the updated 2023 modeling. *See* 86 FR 37942, 37943 (July 19, 2021). The updated 2023 modeling using an updated 2016-based emissions modeling platform (2016v2) confirms the prior 2016-based modeling of 2023 in that it continues to show Alabama is linked to at least one downwind nonattainment or maintenance receptor. Based on this updated modeling using the 2016-based emissions modeling platform, discussed in section I.C above, EPA is now withdrawing its 2019 proposed approval on Alabama's September 13, 2018, interstate transport SIP as published on December 30, 2019, at 84 FR 71854.

3. EPA's Evaluation of Alabama's 2015 Ozone Interstate Transport SIP Submission

EPA is proposing to find that Alabama's August 20, 2018, SIP submission does not meet Alabama's obligations with respect to prohibiting emissions that contribute significantly

---

[32] As examples of general approaches for how such an analysis could be conducted for their sources, states could look to the CSAPR Update, 81 FR 74504, 74539–51; CSAPR, 76 FR 48208, 48246–63; CAIR, 70 FR 25162, 25195–229; or the $NO_X$ SIP Call, 63 FR 57356, 57399–405. *See also* Revised CSAPR Update, 86 FR 23054, 23086–23116. Consistently across these rulemakings, EPA has developed emissions inventories, analyzed different levels of control stringency at different cost thresholds, and assessed resulting downwind air quality improvements.

[33] The August 20, 2018, SIP submission provided by ADEM was received by EPA on August 27, 2018.

[34] On August 20, 2018, Alabama submitted multiple SIP revisions under one cover letter. EPA is only acting on Alabama's 2015 ozone good neighbor interstate transport SIP requirements in this notice.

[35] EPA notes that Alabama's SIP submission is not organized around EPA's 4-step framework for assessing good neighbor obligations, but EPA summarizes the submission using that framework for clarity here.

[36] Alabama's submission cites the following SIP approved regulations: Administrative Code Rule 335–3–6, "Control of Organic Emissions", 335–3–8, "Control of Nitrogen Oxides Emissions", 335–3–14–.01, "General Provisions", 335–3–14–.02, "Permit Procedures", 335–3–14–.03, "Standards for Granting Permits", 335–3–14–.04, "Air Permits Authorizing Construction in in Clean Air Areas [Prevention of Significant Deterioration Permitting (PSD)]" and 335–3–14–.05, "Air Permits Authorizing Construction in or Near Nonattainment Areas." Alabama's Submission cites the following Federal Rules: EPA's Tier 1 and 2 mobile source rules, EPA's nonroad Diesel Rule, EPA's 2007 Heavy-duty Highway Rule, New Source Performance Standards, National Emission Standards for Hazardous Air Pollutants, and CSAPR.

[37] Alabama's SIP references CSAPR, which covers the $NO_X$ ozone season trading program established in EPA's 2011 CSAPR, 76 FR 48208 (August 8, 2011). In addition, Alabama's submittal includes a reference to the SIP-approved rules that adopted the CSAPR Update, 81 FR 74504 (October 26, 2016). *See* 82 FR 46674 (October 6, 2017).

[38] *See* 81 FR 59869 (August 31, 2016), 82 FR 46674 (October 6, 2017) (adopting Alabama Administrative Code Rule 335–3–8, "Control of Nitrogen Oxides Emissions" and adopting revisions to Rule 335–3–8 into the SIP).

to nonattainment or interfere with maintenance of the 2015 8-hour ozone NAAQS in any other state based on EPA's evaluation of the SIP submission using the 4-step interstate transport framework, and EPA is therefore proposing to disapprove Alabama's SIP submission.

(a) Results of EPA's Step 1 and Step 2 Modeling and Findings for Alabama

As described in section I, EPA performed updated air quality modeling to project design values and contributions for 2023. These data were examined to determine if Alabama contributes at or above the threshold of 1 percent of the 2015 8-hour ozone NAAQS (0.70 ppb) to any downwind nonattainment or maintenance receptor. As shown in Table 1, the data [39] indicate that in 2023, emissions from Alabama contribute greater than 1 percent of the standard to a nonattainment receptor in Harris County, Texas (ID#: 482010055) and a maintenance-only receptor in Denton County, Texas (ID#: 481210034).[40]

TABLE 1—ALABAMA LINKAGE RESULTS BASED ON EPA UPDATED 2023 MODELING

| Receptor ID | Location | Nonattainment/maintenance | 2023 Average design value (ppb) | 2023 Maximum design value (ppb) | Alabama contribution (ppb) |
|---|---|---|---|---|---|
| 482010055 ............................. | Harris County, Texas ............ | Nonattainment ...................... | 71.0 | 72.0 | 0.88 |
| 481210034 ............................. | Denton County, Texas ........... | Maintenance ......................... | 70.4 | 72.2 | 0.71 |

(b) Evaluation of Information Provided by Alabama Regarding Step 1

At Step 1 of the 4-step interstate transport framework, Alabama relied on EPA modeling included in the March 2018 memorandum to identify nonattainment and maintenance receptors in 2023. As described in section II.A.3.a, EPA has recently updated this modeling using the most current and technically appropriate information. EPA proposes to rely on EPA's most recent modeling to identify nonattainment and maintenance receptors in 2023. That information establishes that there are two receptors to which Alabama is projected to be linked in 2023.

(c) Evaluation of Information Provided by Alabama Regarding Step 2

At Step 2 of the 4-step interstate transport framework, Alabama relied on EPA modeling released in the March 2018 memorandum to identify upwind state linkages to nonattainment and maintenance receptors in 2023. As described in section I.C of this notice, EPA has recently updated modeling to identify upwind state contributions to nonattainment and maintenance receptors in 2023. In this action, EPA proposes to rely on the Agency's most recently available modeling to identify upwind contributions and "linkages" to downwind air quality problems in 2023 using a threshold of 1 percent of the NAAQS. *See* section I.D for a general explanation of the use of 1 percent of the NAAQS.

As shown in Table 1, updated EPA modeling identifies Alabama's maximum contribution to downwind nonattainment and maintenance receptors as greater than 1 percent of the standard (*i.e.,* 0.70 ppb). Therefore, the State is linked to a downwind air quality problem at Steps 1 and 2. Because the entire technical basis for Alabama's interstate transport SIP submission is that Alabama is not linked at Step 2, and thus Alabama's SIP contains the necessary provisions to eliminate emissions that will contribute significantly to nonattainment or interfere with maintenance of the 2015 8-hour ozone NAAQS in any other state, EPA proposes to disapprove Alabama's SIP submission based on EPA's finding that such a linkage does exist.[41]

Although Alabama did not rely on the 1 ppb threshold in its SIP submittal, EPA recognizes that the most recently available EPA modeling at the time Alabama submitted its SIP submittal indicated that Alabama did not contribute above 1 percent of the NAAQS to a projected downwind nonattainment or maintenance receptor. Therefore, Alabama may not have considered analyzing the reasonableness and appropriateness of a 1 ppb threshold at Step 2 of the 4-step interstate transport framework per the August 2018 memorandum. However, EPA's August 2018 memorandum provided that whether use of a 1 ppb threshold is appropriate must be based on an evaluation of state-specific circumstances, and no such evaluation

was included in the submittal. EPA's experience with the alternative Step 2 thresholds is further discussed in section I.D.3.a. As discussed there, EPA is considering withdrawing the August 2018 memorandum.

(d) Evaluation of Information Provided by Alabama Regarding Step 3

At Step 3 of the 4-step interstate transport framework, a state's emissions are further evaluated, in light of multiple factors, including air quality and cost considerations, to determine what, if any, emissions significantly contribute to nonattainment or interfere with maintenance and, thus, must be eliminated under CAA section 110(a)(2)(D)(i)(I).

To effectively evaluate which emissions in the state should be deemed "significant" and therefore prohibited, states generally should prepare an accounting of sources and other emissions activity for relevant pollutants and assess potential, additional emissions reduction opportunities and resulting downwind air quality improvements. EPA has consistently applied this general approach (*i.e.,* Step 3 of the 4-step interstate transport framework) when identifying emissions contributions that the Agency has determined to be "significant" (or interfere with maintenance) in each of its prior Federal, regional ozone transport rulemakings, and this interpretation of the statute has been upheld by the Supreme Court. *See EME Homer City,*

[39] The ozone design values and contributions at individual monitoring sites nationwide are provided in the file "2016v2_DVs_state_contributions.xlsx" which is included in Docket No. EPA–HQ–OAR–2021–0663.

[40] These modeling results are consistent with the results of a prior round of 2023 modeling using the 2016v1 emissions platform which became available to the public in the fall of 2020 in the Revised CSAPR Update, as noted in section I. That modeling showed that Alabama had a maximum contribution greater than 0.70 ppb to at least one nonattainment or maintenance-only receptor in 2023. That modeling results are included in the file "Ozone Design Values And Contributions Revised CSAPR

Update.xlsx" in Docket No. EPA–HQ–OAR–2021–0663.

[41] To the extent that Alabama's submittal included information regarding emissions controls that could be interpreted as relevant to a step 3 analysis, EPA evaluates that information in section II.A.3.d.

572 U.S. 489, 519 (2014). While EPA has not directed states that they must conduct a Step 3 analysis in precisely the manner EPA has done in its prior regional transport rulemakings, state implementation plans addressing the obligations in CAA section 110(a)(2)(D)(i)(I) must prohibit "any source or other type of emissions activity within the State" from emitting air pollutants which will contribute significantly to downwind air quality problems. Thus, states must complete something similar to EPA's analysis (or an alternative approach to defining "significance" that comports with the statute's objectives) to determine whether and to what degree emissions from a state should be "prohibited" to eliminate emissions that will "contribute significantly to nonattainment in or interfere with maintenance of" the NAAQS in any other state. Alabama did not conduct such an analysis in its SIP submission.

Based on Alabama's finding that emissions from Alabama do not contribute above 1 percent of the NAAQS at any monitors that are projected to be in nonattainment or maintenance, the SIP submission identified SIP-approved provisions and Federal programs in the context that no further emissions reductions were necessary, and determined that the SIP contained adequate provisions to prohibit emissions that will significantly contribute to nonattainment or interfere with maintenance of the 2015 8-hour ozone NAAQS in any other state. However, the State did not analyze total ozone precursors that continue to be emitted from sources and other emissions activity within the State, evaluate the emissions reduction potential of any additional controls using cost or other metrics, nor evaluate any resulting downwind air quality improvements that could result from such controls.

Among the Federal programs referenced in Alabama's submission was the NO$_X$ ozone season trading program of CSAPR for the 2008 ozone standard, which ADEM adopted into the Alabama SIP.[42] This reference suggests that Alabama may have intended to rely on its electric generating units (EGUs) being subject to CSAPR Update (which reflected a stringency at the nominal marginal cost threshold of $1,400/ton (in 2011 dollars) for the 2008 8-hour ozone NAAQS) to argue that it has

already implemented all cost-effective emissions reductions at EGUs.

EPA does not support the concept that reliance on CSAPR Update is appropriate to conclude that no further emissions reductions are necessary under Step 3 for the 2015 8-hour ozone NAAQS. First, CSAPR Update did not regulate non-electric generating units (non-EGUs), and thus this analysis, even for the 2008 ozone NAAQS, was incomplete, and EPA acknowledged at the time that CSAPR Update was not a full remedy for interstate transport under that NAAQS. *See Wisconsin,* 938 F.3d at 318–20. Second, relying on CSAPR Update's (or any other CAA program's) determination of cost-effectiveness without further Step 3 analysis is not approvable. Cost-effectiveness must be assessed in the context of the specific CAA program; assessing cost-effectiveness in the context of ozone transport should reflect a more comprehensive evaluation of the nature of the interstate transport problem, the total emissions reductions available at several cost thresholds, and the air quality impacts of the reductions at downwind receptors. While EPA has not established a benchmark cost-effectiveness value for 2015 8-hour ozone NAAQS interstate transport obligations, it is reasonable to expect control measures or strategies to address interstate transport under this NAAQS to reflect higher marginal control costs because the 2015 8-hour ozone NAAQS is a more stringent and more protective air quality standard. As such, the marginal cost threshold of $1,400/ton for the CSAPR Update (which addresses the 2008 ozone 8-hour NAAQS and is in 2011 dollars) is not an appropriate cost threshold and cannot be approved as a benchmark to use for interstate transport SIP submissions for the 2015 8-hour ozone NAAQS. In addition, the updated EPA modeling captures all existing CSAPR trading programs in the baseline, and that modeling confirms that these control programs were not sufficient to eliminate the Alabama's linkage at Steps 1 and 2 under the 2015 8-hour ozone NAAQS even if the CSAPR Update provisions had been adopted into Alabama's SIP. The State was therefore obligated at Step 3 to assess *additional* control measures using a multifactor analysis.

As mentioned above, EPA has newly available information that indicates sources in Alabama are linked to downwind air quality problems for the 2015 ozone standard. Therefore, EPA proposes to disapprove Alabama's August 20, 2018, interstate transport SIP submission on the separate, additional basis that the SIP submittal did not

assess additional emissions control opportunities.

(e) Evaluation of Information Provided by Alabama Regarding Step 4

Step 4 of the 4-step interstate transport framework calls for development of permanent and federally enforceable control strategies to achieve the emissions reductions determined to be necessary at Step 3 to eliminate significant contribution to nonattainment or interference with maintenance of the NAAQS. As mentioned in section II.A.3.d, Alabama's SIP submission did not contain an evaluation of additional emissions control opportunities (or establish that no additional controls are required), thus, no information was provided at Step 4. As a result, EPA proposes to disapprove Alabama's August 20, 2018, submittal on the separate, additional basis that the State has not developed permanent and enforceable emissions reductions necessary to meet the obligations of CAA section 110(a)(2)(D)(i)(I).

4. Conclusion for Alabama

Based on EPA's evaluation of Alabama's SIP submission and after consideration of updated EPA modeling using the 2016-based emissions modeling platform, EPA is proposing to find that the 2015 8-hour ozone NAAQS good neighbor interstate transport portion of Alabama's August 20, 2018, SIP submission addressing CAA section 110(a)(2)(D)(i)(I) does not meet the State's interstate transport obligations because it fails to contain the necessary provisions to eliminate emissions that will contribute significantly to nonattainment or interfere with maintenance of the 2015 8-hour ozone NAAQS in any other state.

*B. Mississippi*

The following section provides information related to Mississippi's SIP submission addressing interstate transport requirements for the 2015 8-hour ozone NAAQS, and EPA's analysis of Mississippi's submission.

1. Summary of Mississippi's 2015 Ozone Interstate Transport SIP Submission

On September 3, 2019, the Mississippi Department of Environmental Quality (MDEQ) submitted a SIP revision addressing the CAA section 110(a)(2)(D)(i)(I) interstate transport requirements for the 2015 8-hour ozone NAAQS.[43] The SIP

---

[42] *See* 81 FR 59869 (August 31, 2016), 82 FR 46674 (October 6, 2017) (adopting Alabama Administrative Code Rule 335–3–8, "Control of Nitrogen Oxides Emissions" and adopting revisions to Rule 335–3–8 into the SIP).

[43] The September 3, 2019, SIP submission provided by MDEQ was received by EPA on September 6, 2019.

submission provided Mississippi's analysis of its impact to downwind states and concluded that emissions from the State will not significantly contribute to nonattainment or interfere with maintenance of the 2015 8-hour ozone NAAQS in other states.

MDEQ's submission relied on the results of EPA's modeling for the 2015 8-hour ozone NAAQS, contained in the March 2018 memorandum, to identify projected downwind nonattainment and maintenance receptors and contribution linkages in 2023 that may be impacted by emissions from sources in Mississippi at Steps 1 and 2 of the 4-step interstate transport framework,[44] respectively. MDEQ reviewed EPA's March 2018 modeling and found that the modeled contributions for Mississippi were below 1 percent of the NAAQS for all nonattainment and maintenance receptors, except the Deer Park nonattainment receptor in Harris County, Texas (Monitor ID: 482011039). The SIP submission identified Mississippi as linked to the Deer Park receptor with an upwind contribution of 0.79 ppb.

In its submittal, MDEQ discussed EPA's August 2018 memorandum, explaining that 0.79 ppb is 1.12 percent of the 2015 8-hour ozone NAAQS, which is greater than the 1 percent contribution threshold of 0.70 ppb but less than a 1 ppb alternative contribution threshold. The SIP submission also states that the Deer Park receptor design value was projected to be greater than the 2015 ozone standard in 2023, but that the actual 2015–2017 design value was below the NAAQS at 68 ppb. Based on the modeling in the March 2018 memo, along with application of a 1 ppb alternative contribution threshold and information regarding 2015–2017 monitored values at the Deer Park receptor, MDEQ concluded that sources in Mississippi were not linked to downwind nonattainment or maintenance receptors at Step 2, and therefore, the State does not significantly contribute to nonattainment in another state for the 2015 ozone standard. Further, MDEQ stated that the SIP contains adequate provisions to prohibit sources and other types of emissions activities within the State from contributing to nonattainment in another state with respect to the 2015 8-hour ozone NAAQS.

In its submission, MDEQ treated the Deer Park receptor as a maintenance receptor because the most recent measured design value at the time of its submission (i.e., the 2017 design value of 68 ppb) was below the level of the NAAQS at this monitor. Based on MDEQ's interpretation of EPA's October 19, 2018, memorandum, the State eliminated the Deer Park monitor site in Harris County, Texas, as a maintenance receptor in 2023 (although EPA's modeling of 2023 released with the October 2017 memorandum had identified this monitoring site as a nonattainment receptor).

To support eliminating the Deer Park monitor as a receptor, MDEQ's demonstration included: (1) Evaluating ozone season temperatures in the period 2014–2017 in Harris County to determine if conditions were conducive for ozone formation; (2) assessing monitored ozone design values from 2011–2017 at the Deer Park monitor; and (3) reviewing ozone precursor emission trends in the Houston Area, Texas (statewide), and Mississippi (statewide). In its demonstration, MDEQ stated that temperatures in 2015 and 2016 were above average, and in 2014 and 2017 temperatures were near normal. Based on this information, MDEQ concluded that conditions were conducive to ozone formation during this three-year time period (i.e., 2015 to 2017). MDEQ's submission also states that design values from 2011 to 2017 at the Deer Park receptor showed a downward trend and that design values have been meeting the 2015 8-hour ozone NAAQS since 2015. Further, according to the submittal, ozone precursor emissions in Texas and Mississippi both showed a downward trend based on data from 2008, 2011, and 2014. Based on the downward trend in emissions and the fact that the Deer Park monitor was measuring attainment in 2015, 2016, and 2017, MDEQ determined that the Deer Park receptor should be eliminated as a maintenance receptor. Thus, based on the elimination of the Deer Park receptor, along with application of a 1 ppb threshold, Mississippi concluded that the State did not significantly interfere with maintenance (prong 2) in another state for the 2015 ozone standard.

In summary, MDEQ concluded that sources in the State do not significantly contribute to nonattainment or interfere with maintenance in another state, that no further emission reductions were necessary, and that Mississippi's SIP contains adequate provisions to prevent sources and other types of emissions activities within the State from contributing significantly to nonattainment or interfering with maintenance in another state with respect to the 2015 8-hour ozone NAAQS.

2. EPA's Evaluation of Mississippi's 2015 Ozone Interstate Transport SIP Submission

EPA is proposing to find that Mississippi's September 3, 2019, SIP submission does not meet Mississippi's obligations with respect to prohibiting emissions that contribute significantly to nonattainment or interfere with maintenance of the 2015 8-hour ozone NAAQS in any other state based on EPA's evaluation of the SIP submission using the 4-step interstate transport framework, and EPA is therefore proposing to disapprove Mississippi's submission.

(a) Evaluation of Information Provided by Mississippi Regarding Step 1

At Step 1 of the 4-step interstate transport framework, MDEQ relied on EPA modeling released in the March 2018 memorandum to identify nonattainment and maintenance receptors in 2023.

In its submittal, MDEQ attempted to utilize the October 2018 memorandum along with 2014 to 2017 ozone design values (the most recent data available at the time of submittal) to eliminate the Deer Park receptor in Harris County, Texas (Monitor ID: 482011039) as a maintenance receptor. Table 2 of the submittal correctly indicates that this monitoring site was a projected nonattainment receptor, not a maintenance-only receptor, in 2023 based on the EPA's modeling data included in the March 2018 memorandum. However, in its submittal, the State relied on the 2014 to 2017 design values at the Deer Park receptor (i.e., 69 ppb, 67 ppb, and 68 ppb, respectively) as the basis for stating that this receptor met EPA's definition of a maintenance receptor. Based on this information, the State applied an alternative definition of a maintenance receptor utilizing the potential concepts included in the October 2018 memorandum. This memorandum included a description of the approach that EPA has historically used to identify maintenance-only receptors [45] and identified potential alternate ways to define maintenance receptors based on certain criteria suggested in the memorandum including an evaluation of meteorology conductive to ozone formation, review of ozone monitored concentrations, and precursor emissions trends.

[44] EPA notes that Mississippi's September 2, 2019, SIP submission is not organized around EPA's 4-step interstate transport framework for assessing good neighbor obligations, but EPA summarizes the submission using that framework for clarity here.

[45] See section I.D, above for a discussion of EPA's approach to identify maintenance receptors.

EPA recognized in the October 2018 memorandum that states could potentially, with sufficient justification, establish an approach to addressing maintenance receptors that gives independent significance to prong 2 in some manner different than EPA's approach. In addition, the October 2018 memorandum identified two potential concepts that states could use to identify maintenance receptors: (1) States may, in some cases, eliminate a site as a maintenance receptor if the site is currently measuring clean data, or (2) in some cases, use a design value from the base period that is not the maximum design value. For either of these alternative methods, to adequately consider areas struggling to meet the NAAQS, EPA also indicated that it expects states to include with their SIP demonstration technical analyses showing that the following three criteria are met:

• Meteorological conditions in the area of the monitoring site were conducive to ozone formation during the period of clean data or during the alternative base period design value used for projections;[46]

• Ozone concentrations have been trending downward at the site since 2011 (and ozone precursor emissions of $NO_X$ and VOC have also decreased); and

• Emissions are expected to continue to decline in the upwind and downwind states out to the attainment date of the receptor.

EPA's October 2018 memorandum explained that the intent of these analyses is to demonstrate that monitoring sites that would be identified as maintenance receptors under EPA's historical approach could nonetheless be shown to be very unlikely to violate the NAAQS in the future analytic year.

However, the analysis provided by Mississippi in its submission has not met the criteria laid out in the guidance. With respect to the first criterion (meteorological conditions), MDEQ assessed ozone design values at the Deer Park site in Houston from 2014 to 2017

and anomalies (*i.e.,* difference compared to the long-term mean) of average temperatures in June, July, and August, summarized from EPA's October 2018 memorandum, to determine whether particular summers had ozone-conducive or unconducive meteorology during the period of clean data. MDEQ stated that temperatures were above average in 2015 and 2016 when the Deer Park monitor measured ozone concentrations below the 2015 8-hour ozone NAAQS and near normal in 2014 and 2017. However, MDEQ's review of meteorological conditions in the vicinity of the Deer Park monitor was limited to temperature anomalies and did not discuss or consider how other meteorological factors identified in the October 2018 memorandum (such as humidity, solar radiation, vertical mixing, and/or other meteorological indicators such as cooling-degree days) confirm whether conditions affecting the monitor may have been conducive to ozone formation in 2015 and 2016 and unconducive in 2014 and 2017.

With respect to the second criterion, MDEQ's submission included information related to ozone design values and ozone precursors. Specifically, the submission included an assessment of ozone design values at the Deer Park monitor from 2011 to 2017, which showed a downward trend in ozone concentrations. However, MDEQ's SIP submission did not include a discussion of the 2018 design value, which showed a violation of the 2015 standard at 71 ppb, even though that data was available and could have been considered in the State's analysis at the time of the submission in 2019.[47] In addition, the 2019 and 2020 design values, 75 ppb and 78 ppb, respectively, also exceeded the NAAQS. The preliminary design value for 2021 is 74 ppb.[48] Although not available at the time of the SIP submission, these more recent data suggest a continuous trend in measured ozone concentrations above the 2015 ozone standard at the Deer Park monitor. Even though MDEQ's review of ozone monitoring data may have shown a decrease in measured concentration from 2011 to 2017, EPA notes a significant increase between the 2017 and 2018 4th highest daily maximum concentration, from 68 ppb to 85 ppb. MDEQ's SIP submission did not consider the 2018 4th high daily maximum concentration as part of its

trends analysis even though the information was available at the time the SIP was submitted to EPA. Thus, at the time of the submission, the Deer Park monitor had a 3-year design value of 71 ppb, which violated the 70 ppb ozone standard. Thus, under the terms of the October 2018 memorandum, Mississippi's SIP submission does not adequately establish a basis for eliminating the Deer Park monitoring site as an ozone transport receptor.

MDEQ also assessed total ozone precursor emissions data in 2008, 2011, and 2014, which MDEQ claimed indicated a decrease in ozone precursor ($NO_X$ and VOC) emissions in the Houston metropolitan statistical area, Texas (statewide), and Mississippi (statewide). While EPA acknowledges the general downward trends in $NO_X$ and VOC emissions, the Deer Park monitor ozone concentrations design values through 2020 show recent measured ozone concentrations that exceed the 2015 ozone standard. Further, even accounting for emissions trends, EPA's latest air quality modeling, as presented below, shows that there are now three receptors to which Mississippi contributes in 2023, not just one. Thus, the apparent downward trend in ozone precursors in Texas and Mississippi alone cannot support elimination of either the Deer Park monitor as a receptor (under the information Mississippi relied on) or the three Texas receptors to which EPA now finds Mississippi to be contributing. *See* section II.B.2.c and Table 2 below for results of EPA's 2016v2 Step 1 and Step 2 modeling and findings for Mississippi.

With respect to the third criterion, MDEQ stated that, "[b]ased on national and regional emissions trends, and current regulations on point sources and mobile sources, emissions are expected to continue to decline in the upwind and downwind states." However, the State did not cite any specific regulations controlling sources of ozone precursors or mobile sources or quantify the $NO_X$ emission reduction potential of current regulations for point and mobile sources.

Based on the reasons stated above, EPA does not believe Mississippi's SIP submission provided sufficient justification to eliminate the Deer Park monitor as a maintenance receptor.

(b) Evaluation of Information Provided by Mississippi Regarding Step 2

At Step 2 of the 4-step interstate transport framework, Mississippi relied on EPA's modeling released in the March 2018 memorandum to identify upwind state linkages to nonattainment and maintenance receptors in 2023.

---

[46] *See* Attachment A of EPA's October 2018 memorandum from EPA to assess whether particular summers had ozone-conducive or unconducive meteorology within the 10-year period 2008 through 2017. The memorandum states that meteorological conditions including temperature, humidity, winds, solar radiation, and vertical mixing affect the formation and transport of ambient ozone concentrations. The memorandum suggests generally that above average temperatures are an indication that meteorology is conducive to ozone formation and below average temperatures indicate that conditions are unconducive to ozone formation. Within a particular summer season, the degree that meteorology is conducive for ozone formation can vary from region to region and fluctuate with time within a particular region.

[47] The data are given in "2010_thru_2020 Ozone Design Values.xlsx," which is included in Docket No. EPA–HQ–OAR–2021–0663.

[48] This is based on preliminary 2021 data available from the Air Quality System (AQS) as of January 3, 2022. The design values for 2021 have not been certified by state agencies.

As described in section I.C of this notice, EPA has recently updated modeling to identify upwind state contributions to nonattainment and maintenance receptors in 2023. In this proposal, EPA relies on the Agency's most recently available modeling to identify upwind contributions and "linkages" to downwind air quality problems in 2023 using a threshold of 1 percent of the NAAQS. *See* section I.D for general explanation of the use of 1 percent of the NAAQS. As shown in Table 2, updated EPA modeling identifies Mississippi's maximum contribution to downwind nonattainment and maintenance receptors to be greater than 1 percent of the standard (*i.e.,* 0.70 ppb). Therefore, the State is linked to a downwind air quality problem at Steps 1 and 2.

MDEQ relied on EPA's August 2018 memorandum in an attempt justify using a 1 ppb alternative contribution threshold at Step 2 as a basis to assert that Mississippi would not be "linked" to any projected downwind nonattainment or maintenance receptors. As discussed in EPA's August 2018 memorandum, EPA had suggested that, with appropriate additional analysis, it may be reasonable for states to use a 1 ppb contribution threshold, as an alternative to a 1 percent threshold, at Step 2 of the 4-step interstate transport framework, for the purposes of identifying linkages to downwind receptors. However, based on EPA's updated modeling, the State is projected to contribute greater than both the 1 percent and alternative 1 ppb thresholds. While EPA does not, in this action, approve of the State's application of the 1 ppb threshold, based on its linkages greater than 1 ppb to projected downwind nonattainment or maintenance receptors, the State's use of this alternative threshold at Step 2 of the 4-step interstate framework is inconsequential to EPA's proposed action on this SIP.

In addition, MDEQ's SIP does not include a technical analysis to sufficiently justify use of an alternative 1 ppb threshold at the Deer Park monitor. Echoing EPA's August 2018 memorandum, MDEQ stated that the amount of upwind collective contribution captured with the 1 percent and 1 ppb thresholds is *generally* comparable. In this memorandum, EPA also determined

that by capturing a percentage of upwind state emissions comparable to the amount captured at 1 percent, the alternative threshold *may* be appropriate, indicating that a more determinative conclusion of appropriateness would require further analysis. In this regard, MDEQ did not provide any further technical justification to make that determination.

MDEQ also referred to an EPA Guidance on Significant Impact Levels for Ozone and Fine Particles in the Prevention of Significant Deterioration Permitting Program ("SILs Guidance") as additional justification for use of a 1 ppb threshold. However, MDEQ did not provide discussion or analysis containing information specific to Mississippi or the receptors to which its emissions are potentially linked, which is necessary to thoroughly evaluate the state-specific circumstances that could support approval. In addition, the State did not explain the relevance or applicability of a SILs Guidance to which it made reference. EPA's SILs guidance relates to a different provision of the CAA regarding implementation of the prevention of significant deterioration (PSD) permitting program, *i.e.,* a program that applies in areas that have been designated attainment [49] or unclassifiable for the NAAQS, and it is not applicable to the good neighbor provision, which requires states to eliminate significant contribution or interference with maintenance of the NAAQS at known and ongoing air quality problem areas in other states.

The analytical gaps identified indicate that the submittal's use of a 1 ppb threshold for the State is not approvable. EPA's experience with the

alternative Step 2 thresholds is further discussed in section I.D.3.a. As discussed there, EPA is considering withdrawing the August 2018 memorandum.

Despite the linkage EPA determines exists at Step 2, the State argued in its submittal that it should not be considered to significantly contribute to nonattainment or interfere with maintenance of the NAAQS in other states. EPA finds that conclusion is not approvable at Steps 1 or 2. Therefore, based on EPA's evaluation of the information submitted by Mississippi, and based on EPA's most recent modeling results for 2023, EPA proposes to find that Mississippi is linked at Steps 1 and 2 and has an obligation to assess potential emissions reductions from sources or other emissions activity at Step 3 of the 4-step framework.

(c) Results of EPA's 2016v2 Step 1 and Step 2 Modeling and Findings for Mississippi

As described in section I, EPA performed air quality modeling using the 2016v2 emissions platform to project design values and contributions for 2023. These data were examined to determine if Mississippi contributes at or above the threshold of 1 percent of the 2015 8-hour ozone NAAQS (0.70 ppb) to any downwind nonattainment or maintenance receptor. As shown in Table 2, the data [50] indicate that in 2023, emissions from Mississippi contribute greater than 1 percent of the standard to nonattainment or maintenance-only receptors in Denton County, Texas (Monitor ID: 481210034), Harris County, Texas (Monitor ID: 482010055), and Brazoria County, Texas (Monitor ID: 480391004).[51] Note that each of these monitors is currently measuring nonattainment based on 2020 design values of 72 ppb, 76 ppb, and 73 ppb at the Denton County, Harris County, and Brazoria County receptors, respectively.

---

[49] Pursuant to section 107(d) of the CAA, EPA must designate areas as either "nonattainment," "attainment," or "unclassifiable." Historically for ozone, the EPA has designated most areas that do not meet the definition of nonattainment as "unclassifiable/attainment." This category includes areas that have air quality monitoring data meeting the NAAQS and areas that do not have monitors but for which the EPA has no evidence that the areas may be violating the NAAQS or contributing to a nearby violation. In the designations for the 2015 ozone NAAQS, the EPA reversed the order of the label to be "attainment/unclassifiable" to better convey the definition of the designation category and so that the category is more easily distinguished from the separate unclassifiable category. An "attainment" designation is reserved for a previous nonattainment area that has been redesignated to attainment as a result of the EPA's approval of a CAA section 175A maintenance plan submitted by the state air agency.

[50] The ozone design values and contributions at individual monitoring sites nationwide are provided in the file "2016v2_DVs_state_contributions.xlsx" which is included in Docket No. EPA–HQ–OAR–2021–0663.

[51] These modeling results are consistent with the results of a prior round of 2023 modeling using a the 2016v1 emissions platform that became available to the public in the fall of 2020 in the Revised CSAPR Update, as noted in section I.

TABLE 2—MISSISSIPPI LINKAGE RESULTS BASED ON EPA UPDATED 2023 MODELING

| Receptor ID | Location | Nonattainment/maintenance | 2023 average design value (ppb) | 2023 maximum design value (ppb) | Mississippi contribution (ppb) |
|---|---|---|---|---|---|
| 481210034 ........................... | Denton County, Texas ......... | Maintenance ........................... | 70.4 | 72.2 | 1.14 |
| 482010055 ........................... | Harris County, Texas ........... | Nonattainment ...................... | 71.0 | 72.0 | 1.04 |
| 480391004 ........................... | Brazoria County, Texas ....... | Maintenance ........................... | 70.1 | 72.3 | 0.92 |

(d) Evaluation of Information Provided by Mississippi Regarding Step 3

At Step 3 of the 4-step interstate transport framework, a state's emissions are further evaluated, in light of multiple factors, including air quality and cost considerations, to determine what, if any, emissions significantly contribute to nonattainment or interfere with maintenance and, thus, must be eliminated under CAA section 110(a)(2)(D)(i)(I).

To effectively evaluate which emissions in the state should be deemed "significant," and therefore prohibited, states generally should prepare an accounting of sources and other emissions activity for relevant pollutants and assess potential, additional emissions reduction opportunities and resulting downwind air quality improvements. EPA has consistently applied this general approach (i.e., Step 3 of the 4-step interstate transport framework) when identifying emissions contributions that the Agency has determined to be "significant" (or interfere with maintenance) in each of its prior Federal, regional ozone transport rulemakings, and this interpretation of the statute has been upheld by the Supreme Court. See EME Homer City, 572 U.S. 489, 519 (2014). While EPA has not directed states that they must conduct a Step 3 analysis in precisely the manner EPA has done in its prior regional transport rulemakings, state implementation plans addressing the obligations in CAA section 110(a)(2)(D)(i)(I) must prohibit "any source or other type of emissions activity within the State" from emitting air pollutants which will contribute significantly to downwind air quality problems. Thus, states must complete something similar to the EPA's analysis (or an alternative approach to defining "significance" that comports with the statute's objectives) to determine whether and to what degree emissions from a state should be "prohibited" to eliminate emissions that will "contribute significantly to nonattainment in or interfere with maintenance of" the NAAQS in any other state. Mississippi did not conduct

such an analysis in its SIP submission. Mississippi did not include an accounting of sources or other emissions activity in the State along with an analysis of potential $NO_X$ emissions control technologies, their associated costs, estimated emissions reductions, and downwind air quality improvements.

EPA's evaluation of Mississippi's submittal, in conjunction with its 2016-based modeling of 2023, indicates that ozone-precursor emissions from Mississippi are linked to downwind air quality problems for the 2015 ozone standard at Steps 1 and 2. However, Mississippi's SIP submittal does not include a Step 3 analysis. EPA proposes to find that Mississippi was required to analyze emissions from the sources and other emissions activity from within the State to determine whether its contributions were significant, and EPA proposes to disapprove its submission because Mississippi's submittal failed to do so.

(e) Evaluation of Information Provided by Mississippi Regarding Step 4

Step 4 of the 4-step interstate transport framework calls for development of permanent and federally enforceable control strategies to achieve the emissions reductions determined to be necessary at Step 3 to eliminate significant contribution to nonattainment or interference with maintenance of the NAAQS. As mentioned previously, Mississippi's SIP submittal did not contain an evaluation of additional emission control opportunities (or establish that no additional controls are required), thus, no information was provided at Step 4. As a result, EPA proposes to disapprove Mississippi's submittal on the separate, additional basis that the State has not developed permanent and enforceable emissions reductions necessary to meet the obligations of CAA section 110(a)(2)(d)(i)(I).

3. Conclusion for Mississippi

Based on EPA's evaluation of Mississippi's SIP submission, EPA is proposing to find that Mississippi's September 3, 2019, SIP submission

addressing CAA section 110(a)(2)(D)(i)(I) does not meet the State's interstate transport obligations because it fails to contain the necessary provisions to eliminate emissions that will contribute significantly to nonattainment or interfere with maintenance of the 2015 8-hour ozone NAAQS in any other state.

C. Tennessee

The following section provides information related to Tennessee's SIP submission addressing interstate transport requirements for the 2015 8-hour ozone NAAQS, and EPA's analysis of Tennessee's submission.

1. Summary of Tennessee's 2015 Ozone Interstate Transport SIP Submission

On September 13, 2018, Tennessee submitted a SIP revision addressing the CAA section 110(a)(2)(D)(i)(I) interstate transport requirements for the 2015 8-hour ozone NAAQS.[52][53] The SIP submission provided Tennessee's analysis of its impact to downwind states and concluded that emissions from the State will not significantly contribute to nonattainment or interfere with maintenance of the 2015 8-hour ozone NAAQS in other states. Tennessee's submission relied on EPA's modeling results for the 2015 8-hour ozone NAAQS, contained in the March 2018 memorandum, to identify downwind nonattainment and maintenance receptors that may be impacted by emissions from sources in the State at Steps 1 and 2 of the 4-step framework.[54] The Tennessee Department of Environmental Control (TDEC) reviewed EPA's 2023 modeling, concurred with the results, and determined that EPA's future year $NO_X$ projections were reasonable and account

---

[52] The September 13, 2019, SIP submission provided by TDEC was received by EPA on September 17, 2018.

[53] On September 18, 2018, Tennessee submitted multiple SIP revisions under one cover letter. EPA is only acting on Tennessee's 2015 ozone good neighbor interstate transport SIP requirements in this notice.

[54] EPA notes that Tennessee's SIP submission is not organized around EPA's 4-step framework for assessing good neighbor transport, but EPA summarizes the submission using that framework for clarity here.

for source shutdowns, new controls, and fuel switches. TDEC summarized the State's upwind contribution to 26 nonattainment and maintenance receptors and noted Tennessee's largest impact on any potential downwind receptor in 2023 would be 0.31 ppb and 0.65 ppb, respectively. Tennessee found that—based on EPA's 2023 modeling—emissions from Tennessee do not contribute above 1 percent of the NAAQS or above 1 ppb at any monitors that are projected to be in nonattainment or maintenance.

Tennessee's September 13, 2018, SIP submittal asserted that $NO_X$ emissions are considered the primary cause of formation of ozone in the southeast United States, and emphasized a significant reduction in $NO_X$ emissions reductions from coal-fired EGUs and other large $NO_X$ sources leading to improvements in air quality, including reductions attributable to previous transport rulemakings.[55] Additionally, TDEC identifies existing SIP-approved provisions, Federal regulations and programs, court settlements, and statewide source shutdowns that TDEC believes limit ozone precursor emissions in the State.[56]

Based on the information contained in Tennessee's transport SIP, TDEC concluded that Tennessee does not significantly contribute to nonattainment or interfere with maintenance in another state of the 2015 8-hour ozone NAAQS, and that the SIP provides for adequate measures to control ozone precursor emissions.

2. Prior Notices Related to Tennessee's SIP Submission

Previously, EPA proposed approval of Tennessee's interstate transport provisions for the 2015 8-hour ozone NAAQS as addressed in Tennessee's September 13, 2018, SIP submission and based on the contribution modeling provided in the March 2018 memorandum. *See* 84 FR 71854 (December 30, 2019). When EPA completed updated modeling of 2023 in 2020 using a 2016-based emissions modeling platform (2016v1), it became evident that Tennessee was projected to be linked to downwind nonattainment and maintenance receptors (see footnote 57 below). As a result, EPA deferred acting on Tennessee's SIP submittal when it published a supplemental proposal in 2021 to approve four other southeastern states' good neighbor SIP submissions, using the updated 2023 modeling. *See* 86 FR 37942, 37943 (July 19, 2021). The updated 2023 modeling presented in this proposal using an updated 2016-based emissions modeling platform (2016v2) confirms the prior 2016-based modeling of 2023 in that it continues to show Tennessee is linked to at least one downwind nonattainment or maintenance receptor. Based on this updated modeling using the 2016-based emissions modeling platform, discussed in section I.C above, EPA is now withdrawing its 2019 proposed approval on Tennessee's September 13, 2018, interstate transport SIP as published on December 30, 2019 at 84 FR 71854.

3. EPA's Evaluation of Tennessee's 2015 Ozone Interstate Transport SIP Submission

EPA is proposing to find that Tennessee's September 13, 2018, SIP submission does not meet the State's obligations with respect to prohibiting emissions that contribute significantly to nonattainment or interfere with maintenance of the 2015 8-hour ozone NAAQS in any other state based on EPA's evaluation of the SIP submission using the 4-step interstate transport framework, and EPA is therefore proposing to disapprove Tennessee's SIP submission.

(a) Results of EPA's Step 1 and Step 2 Modeling and Findings for Tennessee

As described in section I, EPA performed updated air quality modeling to project design values and contributions for 2023. These data were examined to determine if Tennessee contributes at or above the threshold of 1 percent of the 2015 8-hour ozone NAAQS (0.70 ppb) to any downwind nonattainment or maintenance receptor. As shown in Table 3, the data [57] indicate that in 2023, emissions from Tennessee contribute greater than 1 percent of the standard to the maintenance-only receptor in Denton County, Texas (ID#: 481210034).[58]

TABLE 3—TENNESSEE LINKAGE RESULTS BASED ON EPA UPDATED 2023 MODELING

| Receptor ID | Location | Nonattainment/maintenance | 2023 Average design value (ppb) | 2023 Maximum design value (ppb) | Tennessee contribution (ppb) |
|---|---|---|---|---|---|
| 481210034 ........................... | Denton County, Texas .......... | Maintenance ........................ | 70.4 | 72.2 | 0.94 |

(b) Evaluation of Information Provided by Tennessee Regarding Step 1

At Step 1 of the 4-step interstate transport framework, Tennessee relied on EPA modeling included in the March 2018 memorandum to identify nonattainment and maintenance receptors in 2023. As described previously in section II.C.3.a, EPA has recently updated this modeling using the most current and technically appropriate information. EPA proposes to rely on EPA's most recent modeling to identify nonattainment and maintenance receptors in 2023. That information establishes that there is one receptor to which Tennessee is projected to be linked in 2023.

(c) Evaluation of Information Provided by Tennessee Regarding Step 2

At Step 2 of the 4-step interstate transport framework, Tennessee relied on EPA modeling released in the March 2018 memorandum to identify upwind state linkages to nonattainment and maintenance receptors in 2023. As described in section I.C of this notice,

---

[55] The Tennessee SIP revision specifically cites the Federal $NO_X$ Budget Trading Program, CAIR, and CSAPR. In addition, the Tennessee SIP revision discusses Tennessee rule 1200–03–27–.12 ($NO_X$ SIP Call requirements for Stationary Boilers and Combustion Turbines), which had not been approved into the SIP at the time of the September 13, 2018, submittal. EPA finalized approval of TAPR 1200–03–27–.12 into the Tennessee SIP on March 2, 2021. *See* 86 FR 12092.

[56] See page 9 through 12 of Tennessee's September 13, 2018, SIP submission for a list of SIP-approved State rules and Federal rules. This can be found in Docket No. EPA–R04–OAR–2021–0841.

[57] The ozone design values and contributions at individual monitoring sites nationwide are provided in the file "2016v2_DVs_state_contributions.xlsx" which is included in Docket No. EPA–HQ–OAR–2021–0663.

[58] These modeling results are consistent with the results of a prior round of 2023 modeling using the 2016v1 emissions platform which became available to the public in the fall of 2020 in the Revised CSAPR Update, as noted in section I. That modeling showed that Tennessee had a maximum contribution greater than 0.70 ppb to at least one nonattainment or maintenance-only receptor in 2023. These modeling results are included in the file "Ozone Design Values And Contributions Revised CSAPR Update.xlsx" in Docket No. EPA–HQ–OAR–2021–0663.

EPA has recently updated modeling to identify upwind state contributions to nonattainment and maintenance receptors in 2023. In this proposal, EPA relies on the Agency's most recently available modeling to identify upwind contributions and "linkages" to downwind air quality problems in 2023 using a threshold of 1 percent of the NAAQS. *See* section I.D for a general explanation of the use of 1 percent of the NAAQS.

As shown in Table 3, updated EPA modeling identifies Tennessee's maximum contribution to a downwind maintenance receptor as greater than 1 percent of the standard (*i.e.,* 0.70 ppb). Therefore, the State is linked to a downwind air quality problem at Steps 1 and 2. Because the entire technical basis for Tennessee's submittal is that the State is not linked at Step 2, EPA proposes to disapprove Tennessee's SIP submission based on EPA's finding that a linkage does exist.[59]

Tennessee references a 1 ppb threshold in its submittal, citing to EPA's SILs Guidance as justification for the use of a 1 ppb threshold. However, Tennessee did not provide additional discussion or analysis containing information specific to Tennessee or the receptors to which its emissions are potentially linked, which is necessary to evaluate the state-specific circumstances that could support approval of an alternative threshold. Nevertheless, EPA recognizes that the most recently available EPA modeling at the time Tennessee submitted its SIP submittal indicated the State did not contribute above 1 percent of the NAAQS to a projected downwind nonattainment or maintenance receptor. Therefore, the State may not have considered conducting an in-depth analysis as to the reasonableness and appropriateness of a 1 ppb threshold at Step 2 of the 4-step interstate transport framework per the August 2018 memorandum. However, EPA's August 2018 memorandum provided that whether use of a 1 ppb threshold is appropriate must be based on an evaluation of state-specific circumstances. Tennessee provided no such analysis. Further, the State did not explain the relevance of the SILs Guidance to which it made reference. This guidance relates to a different provision of the CAA regarding implementation of the PSD permitting program, *i.e.,* a program that applies in areas that have been designated

attainment[60] or unclassifiable for the NAAQS, and it is not applicable to the good neighbor provision, which requires states to eliminate significant contribution or interference with maintenance of the NAAQS at known and ongoing air quality problem areas in other states.

EPA's experience with the alternative Step 2 thresholds is further discussed in section I.D.3.a above. As discussed there, EPA is considering withdrawing the August 2018 memorandum.

**(d) Evaluation of Information Provided by Tennessee Regarding Step 3**

At Step 3 of the 4-step interstate transport framework, a state's emissions are further evaluated, in light of multiple factors, including air quality and cost considerations, to determine what, if any, emissions significantly contribute to nonattainment or interfere with maintenance and, thus, must be eliminated under CAA section 110(a)(2)(D)(i)(I).

To effectively evaluate which emissions in the state should be deemed "significant" and therefore prohibited, states generally should prepare an accounting of sources and other emissions activity for relevant pollutants and assess potential, additional emissions reduction opportunities and resulting downwind air quality improvements. EPA has consistently applied this general approach (*i.e.,* Step 3 of the 4-step interstate transport framework) when identifying emissions contributions that the Agency has determined to be "significant" (or interfere with maintenance) in each of its prior Federal, regional ozone transport rulemakings, and this interpretation of the statute has been upheld by the Supreme Court. *See EME Homer City,* 572 U.S. 489, 519 (2014). While the EPA has not directed states that they must conduct a Step 3 analysis in precisely the manner the EPA has done in its prior regional transport rulemakings, state implementation plans addressing the obligations in CAA section 110(a)(2)(D)(i)(I) must prohibit "any source or other type of emissions activity within the State" from emitting air pollutants which will contribute significantly to downwind air quality problems. Thus, states must complete something similar to the EPA's analysis (or an alternative approach to defining "significance" that comports with the statute's objectives) to determine whether and to what degree emissions from a state should be "prohibited" to eliminate emissions that will

"contribute significantly to nonattainment in or interfere with maintenance of" the NAAQS in any other state. Tennessee did not conduct such an analysis in its SIP submission.

The State did not analyze total ozone precursors that continue to be emitted from sources and other emissions activity within the State, evaluate the emissions reduction potential of any additional controls using cost or other metrics, nor evaluate any resulting downwind air quality improvements that could result from such controls. Instead, Tennessee included in its submittal a list of existing emissions control programs and measures in the State. However, EPA's modeling already takes account of such measures. Despite these existing emissions controls, the State is projected in the most recent modeling to be linked to at least one downwind nonattainment or maintenance receptor. The State was therefore obligated at Step 3 to assess *additional* control measures using a multifactor analysis.

As mentioned above, EPA has newly available information that indicates sources in Tennessee are linked to downwind air quality problems for the 2015 ozone standard. Therefore, EPA proposes to disapprove Tennessee's September 18, 2018, SIP submission on the separate, additional basis that the SIP submittal did not assess additional emissions control opportunities.

**(e) Evaluation of Information Provided by Tennessee Regarding Step 4**

Step 4 of the 4-step interstate transport framework calls for development of permanent and federally enforceable control strategies to achieve the emissions reductions determined to be necessary at Step 3 to eliminate significant contribution to nonattainment or interference with maintenance of the NAAQS. As mentioned in section II.C.3.d, Tennessee's SIP submission did not contain an evaluation of additional emissions control opportunities (or establish that no additional controls are required), thus, no information was provided at Step 4. As a result, EPA proposes to disapprove Tennessee's September 18, 2018, submittal on the separate, additional basis that the State has not developed permanent and enforceable emissions reductions necessary to meet the obligations of CAA section 110(a)(2)(d)(i)(I).

**4. Conclusion for Tennessee**

Based on EPA's evaluation of Tennessee's SIP submission and after consideration of updated EPA modeling using the 2016-based emissions

---

[59] To the extent the Tennessee submittal included information regarding emissions controls that could be interpreted as relevant to a Step 3 analysis, EPA evaluates that information in section II.C.3.d.

[60] *See* footnote 49.

modeling platform, EPA is proposing to find that the portion of Tennessee's September 13, 2018, SIP submission addressing CAA section 110(a)(2)(D)(i)(I) does not meet the State's interstate transport obligations because it fails to contain the necessary provisions to eliminate emissions that will contribute significantly to nonattainment or interfere with maintenance of the 2015 8-hour ozone NAAQS in any other state.

## III. Proposed Actions

EPA is proposing to disapprove the 2015 ozone good neighbor interstate transport SIP revisions from Alabama, dated August 20, 2018; from Mississippi, dated September 3, 2019; and from Tennessee, dated September 13, 2018. Under CAA section 110(c)(1), if finalized, these disapprovals would establish a 2-year deadline for EPA to promulgate a FIP for Alabama, Mississippi, and Tennessee to address the CAA section 110(a)(2)(D)(i)(I) interstate transport requirements pertaining to significant contribution to nonattainment and interference with maintenance of the 2015 8-hour ozone NAAQS in other states, unless EPA approves a SIP that meets these requirements. However, under the CAA, a good neighbor SIP disapproval does not start a mandatory sanctions clock.

## IV. Statutory and Executive Order Reviews

### A. Executive Order 12866: Regulatory Planning and Review and Executive Order 13563: Improving Regulation and Regulatory Review

These proposed actions are not significant regulatory actions and were therefore not submitted to the Office of Management and Budget for review.

### B. Paperwork Reduction Act (PRA)

These proposed actions do not impose an information collection burden under the PRA because they do not contain any information collection activities.

### C. Regulatory Flexibility Act (RFA)

These actions merely propose to disapprove SIP submissions as not meeting the CAA for Alabama, Mississippi, and Tennessee. EPA certifies that these proposed rules will not have a significant economic impact on a substantial number of small entities under the RFA (5 U.S.C. 601 *et seq.*)

### D. Unfunded Mandates Reform Act (UMRA)

These proposed actions do not contain any unfunded mandate as described in UMRA, 2 U.S.C. 1531–1538, and do not significantly or

uniquely affect small governments. These proposed actions impose no enforceable duty on any state, local, or tribal governments or the private sector.

### E. Executive Order 13132: Federalism

These proposed actions do not have federalism implications. They will not have substantial direct effects on the states, on the relationship between the national government and the states, or on the distribution of power and responsibilities among the various levels of government.

### F. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments

These proposed actions do not have tribal implications as specified in Executive Order 13175. These proposed actions do not apply on any Indian reservation land, any other area where EPA or an Indian tribe has demonstrated that a tribe has jurisdiction, or non-reservation areas of Indian country. Thus, Executive Order 13175 does not apply to these actions.

### G. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks

EPA interprets Executive Order 13045 as applying only to those regulatory actions that concern environmental health or safety risks that EPA has reason to believe may disproportionately affect children, per the definition of "covered regulatory action" in section 2–202 of the Executive Order. These proposed actions are not subject to Executive Order 13045 because they merely propose to disapprove SIP submissions from Alabama, Mississippi, and Tennessee as not meeting the CAA.

### H. Executive Order 13211, Actions That Significantly Affect Energy Supply, Distribution or Use

These proposed actions are not subject to Executive Order 13211, because they are not significant regulatory actions under Executive Order 12866.

### I. National Technology Transfer and Advancement Act

This proposed rulemaking does not involve technical standards.

### J. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations

EPA believes the human health or environmental risk addressed by these proposed actions will not have potential disproportionately high and adverse

human health or environmental effects on minority, low-income or indigenous populations. These proposed actions merely propose to disapprove SIP submissions as not meeting the CAA.

### K. CAA Section 307(b)(1)

Section 307(b)(1) of the CAA governs judicial review of final actions by EPA. This section provides, in part, that petitions for review must be filed in the D.C. Circuit: (i) When the agency action consists of "nationally applicable regulations promulgated, or final actions taken, by the Administrator," or (ii) when such action is locally or regionally applicable, if "such action is based on a determination of nationwide scope or effect and if in taking such action the Administrator finds and publishes that such action is based on such a determination." For locally or regionally applicable final actions, the CAA reserves to EPA complete discretion whether to invoke the exception in (ii).[61]

EPA anticipates that this proposed rulemaking, if finalized, would be "nationally applicable" within the meaning of CAA section 307(b)(1) because it would take final action on SIP submittals for the 2015 8-hour ozone NAAQS for the states of Alabama, Mississippi, and Tennessee, which are located in three different Federal judicial circuits (the Eleventh Circuit, the Fifth Circuit, and the Sixth Circuit, respectively). It would apply uniform, nationwide analytical methods, policy judgments, and interpretation with respect to the same CAA obligations, *i.e.*, implementation of good neighbor requirements under CAA section 110(a)(2)(D)(i)(I) for the 2015 8-hour ozone NAAQS for states across the country, and final action would be based on this common core of determinations, described in further detail below.

If EPA takes final action on this proposed rulemaking, in the alternative, the Administrator intends to exercise the complete discretion afforded to him under the CAA to make and publish a finding that the final action (to the extent a court finds the action to be locally or regionally applicable) is based on a determination of "nationwide scope or effect" within the meaning of CAA section 307(b)(1). Through this

---

[61] In deciding whether to invoke the exception by making and publishing a finding that an action is based on a determination of nationwide scope or effect, the Administrator takes into account a number of policy considerations, including his judgment balancing the benefit of obtaining the D.C. Circuit's authoritative centralized review versus allowing development of the issue in other contexts and the best use of agency resources.

rulemaking action (in conjunction with a series of related actions on other SIP submissions for the same CAA obligations), EPA interprets and applies section 110(a)(2)(d)(i)(I) of the CAA for the 2015 8-hour ozone NAAQS based on a common core of nationwide policy judgments and technical analysis concerning the interstate transport of pollutants throughout the continental U.S. In particular, EPA is applying here (and in other proposed actions related to the same obligations) the same, nationally consistent 4-step framework for assessing good neighbor obligations for the 2015 8-hour ozone NAAQS. EPA relies on a single set of updated, 2016-base year photochemical grid modeling results of the year 2023 as the primary basis for its assessment of air quality conditions and contributions at Steps 1 and 2 of that framework. Further, EPA proposes to determine and apply a set of nationally consistent policy judgments to apply the 4-step framework. EPA has selected a nationally uniform analytic year (2023) for this analysis and is applying a nationally uniform approach to nonattainment and maintenance receptors and a nationally uniform approach to contribution threshold analysis.[62] For these reasons, the Administrator intends, if this proposed action is finalized, to exercise the complete discretion afforded to him under the CAA to make and publish a finding that this action is based on one or more determinations of nationwide scope or effect for purposes of CAA section 307(b)(1).[63]

## List of Subjects in 40 CFR Part 52

Environmental protection, Air pollution control, Incorporation by reference, Ozone.

**Authority:** 42 U.S.C. 7401 *et seq.*

Dated: February 3, 2022.

**Daniel Blackman,**

*Regional Administrator, Region 4.*

[FR Doc. 2022–02948 Filed 2–18–22; 8:45 am]

**BILLING CODE 6560–50–P**

---

[62] A finding of nationwide scope or effect is also appropriate for actions that cover states in multiple judicial circuits. In the report on the 1977 Amendments that revised section 307(b)(1) of the CAA, Congress noted that the Administrator's determination that the "nationwide scope or effect" exception applies would be appropriate for any action that has a scope or effect beyond a single judicial circuit. *See* H.R. Rep. No. 95–294 at 323, 324, reprinted in 1977 U.S.C.C.A.N. 1402–03.

[63] EPA may take a consolidated, single final action on all of the proposed SIP disapproval actions with respect to obligations under CAA section 110(a)(2)(D)(i)(I) for the 2015 8-hour ozone NAAQS. Should EPA take a single final action on all such disapprovals, this action would be nationally applicable, and EPA would also anticipate, in the alternative, making and publishing a finding that such final action is based on a determination of nationwide scope or effect.

## **EXHIBIT 8**

Declaration of Rona Birnbaum, Director of the Clean Air Markets Division,

Office of Atmospheric Protection, Office of Air and Radiation, EPA

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

| | | |
|---|---|---|
| STATE OF TEXAS, et al., | ) ) ) | |
| Petitioners, | ) ) | |
| v. | ) ) | No. 23-60069 |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al., | ) ) ) | |
| Respondents. | ) ) | |

**DECLARATION OF RONA BIRNBAUM AS TO THE STATE OF MISSISSIPPI**

1.      I, Rona Birnbaum, under penalty of perjury, affirm and declare that the following statements are true and correct to the best of my knowledge and belief, and are based on my own personal knowledge, or on information contained in the records of the United States Environmental Protection Agency ("EPA"), or supplied to me by EPA employees under my supervision.

2.      I am the Director of the Clean Air Markets Division in the Office of Atmospheric Protection within the Office of Air and Radiation at EPA. The Clean Air Markets Division, which was initially created to implement the acid rain provisions of the Clean Air Act Amendments of 1990, designs and operates market-based programs to reduce emissions of sulfur dioxide ("$SO_2$") and nitrogen oxides ("$NO_X$"), generates and provides public access to power plant emissions data, facilitates and oversees emissions monitoring and reporting, assesses emissions control technology options, conducts atmospheric deposition monitoring and analysis, develops information systems for market-based programs, assesses environmental and human health effects, assesses benefits and costs of programs, and educates the public regarding regional air pollution problems and market-based programs. The currently operated market-based programs were established under the Acid Rain Program, the Cross-State Air Pollution Rule ("CSAPR"), the CSAPR Update, and the Revised CSAPR Update.

3.     In my current capacity as Director of the Clean Air Markets Division, I oversee EPA's implementation of components of the Clean Air Act including Title IV (acid deposition control) and parts of Title I (air quality standards and associated emission limitations). In coordination with other EPA offices, I manage the promulgation and implementation of regulations pursuant to the Clean Air Act including the suite of CSAPR programs. I manage all of the Clean Air Markets Division's activities as listed in paragraph 2, including overseeing EPA's collection of emissions data from the power sector (and some other stationary emissions sources) under the Acid Rain Program and the suite of CSAPR programs.

4.     Prior to becoming Director of the Clean Air Markets Division in 2022, I held several management positions in the Office of Atmospheric Protection including in the early years of the Acid Rain Program.  I joined EPA in 1988 and the Office of Atmospheric Protection in 1991.  I hold a bachelor's and master's degree in environmental and natural resource policy from The George Washington University.

5.     The purpose of this declaration is to provide information responsive to certain allegations made in the Mississippi Petitioners' Motion for Stay filed on May 11, 2023, based on the Declarations of Michael Smith and Chris Wells. This declaration also updates and clarifies certain information supplied in my declaration signed on March 27, 2023, filed in support of EPA's opposition to Texas Petitioners' motions for a stay of the Final Rule.


I.     **The Emission Allowance Trading Program Established by the Federal "Good Neighbor Plan" for the 2015 Ozone National Ambient Air Quality Standards.**

A.     Overview of the Good Neighbor Plan

6.     Once EPA sets new or revised national ambient air quality standards ("NAAQS," or "air quality standard"), states must submit state implementation plans ("SIPs") to satisfy certain Clean Air Act requirements, including the good neighbor provision. 42 U.S.C. § 7410(a)(2)(D)(i)(I). With respect to the 2015 NAAQS for ozone, EPA reviewed states' good neighbor SIPs, and it approved 24 plans, disapproved 19 plans, including Mississippi's, and partially approved / partially disapproved 2 plans. *See* 88 FR 9336 (Feb. 13, 2023). (Ozone is commonly referred to as smog pollution.) A SIP disapproval imposes no legal

obligation on the state or sources within the state, but rather imposes a legal obligation on EPA to promulgate a federal implementation plan ("FIP"), at any time, within two years of the disapproval. 42 U.S.C. § 7410(c)(1).

7.     EPA Administrator Michael S. Regan signed a FIP action related to these requirements, referred to as the "Good Neighbor Plan"[1] (or the "Plan"), on March 15, 2023, to achieve emissions reductions required by the good neighbor provision of the Clean Air Act, 42 U.S.C. § 7410(a)(2)(D)(i)(I), with respect to the 2015 NAAQS for ozone. The Plan establishes federal requirements for qualifying power-plant and industrial sources in 23 covered states, to reduce ozone pollution during the May 1-to-September 30 "ozone season" by reducing emissions of $NO_X$, which is an ozone precursor pollutant.

8.     The objective of the Plan is to eliminate the covered states' significant contribution to nonattainment and interference with maintenance of the ozone air quality standard in other states as expeditiously as practicable and in alignment with the statutory attainment schedule.

9.     With respect to fossil fuel-fired power plants in 22 states, including Mississippi, this action will prohibit those emissions by implementing an allowance-based trading program beginning in the 2023 ozone season, although the majority of the emission reductions captured in the trading program will not begin until the phase-in of reductions associated with new post-combustion control technology retrofits over the 2026 and 2027 ozone seasons. The Plan also prohibits emissions through emissions limitations and associated requirements for certain

---

[1] "Federal 'Good Neighbor Plan' for the 2015 Ozone National Ambient Air Quality Standards," pre-publication copy, *available at* https://www.epa.gov/csapr/good-neighbor-plan-2015-ozone-naaqs. The EPA routinely makes available pre-publication copies of signed rules on its website to assist the public and regulated community in understanding the requirements of its signed final actions. However, this is not the "official" version of the Good Neighbor Plan, which will not be established until publication occurs in the Federal Register. Typically, minor typographical and formatting changes are executed by the Office of Federal Register in consultation with the Agency prior to Federal Register publication. For purposes of this Declaration, references to the "Good Neighbor Plan" or "Plan" and associated citations refer to this pre-publication version, which is available on EPA's website along with a number of key supporting materials. The rulemaking docket is EPA-HQ-OAR-2021-0668 and can be accessed through www.regulations.gov.

other industrial stationary sources in 19 of those 22 states, and one other state, beginning in the 2026 ozone season.[2]

10.    In assisting downwind states with attaining and maintaining the 2015 ozone NAAQS, the Plan will deliver substantial public health and environmental benefits across wide swaths of the United States. The benefits of the Plan far exceed its anticipated costs. Its predecessor programs, the $NO_X$ SIP Call,[3] Clean Air Interstate Rule ("CAIR"),[4] and CSAPR,[5] each were successfully implemented without disruption to the reliability or affordability of the electrical power supply.

**Estimated Monetized Health and Climate Benefits, Compliance Costs, and Net Benefits of the Good Neighbor Plan, 2023 Through 2042 (Millions 2016$, Discounted to 2023)[6]**

|  |  | 3% Discount Rate | 7% Discount Rate |
|---|---|---|---|
| **Present Value** | Health Benefits | $200,000 | $130,000 |
|  | Climate Benefits | $15,000 | $15,000 |
|  | Compliance Costs | $14,000 | $9,400 |

[2] Information and data presented in this declaration regarding the Good Neighbor Plan are reflective of the rule as it was signed on March 15, 2023, and do not account for potential impacts of the Fifth Circuit's order of May 1, *Texas, et al. v. EPA*, No. 23-60069 (5th Cir. May 1, 2023), ECF No. 269, or other judicial action.

[3] "Finding of Significant Contribution and Rulemaking for Certain States in the Ozone Transport Assessment Group Region for Purposes of Reducing Regional Transport of Ozone," 63 FR 57356 (Oct. 27, 1998).

[4] "Rule to Reduce Interstate Transport of Fine Particulate Matter and Ozone (Clean Air Interstate Rule)," 70 FR 25162 (May 12, 2005).

[5] "Federal Implementation Plans: Interstate Transport of Fine Particulate Matter and Ozone and Correction of SIP Approvals," 76 FR 48208 (Aug. 8, 2011) (generally referred to as the Cross-State Air Pollution Rule, or "CSAPR").

[6] Adapted from Good Neighbor Plan Executive Summary. For explanations, caveats, and table notes associated with these figures, please refer to the pre-publication version of the Good Neighbor Plan, pp. 48-49.

| | | | |
|---|---|---|---|
| | **Net Benefits** | **$200,000** | **$140,000** |
| **Equivalent Annualized Value** | Health Benefits | $13,000 | $12,000 |
| | Climate Benefits | $970 | $970 |
| | Compliance Costs | $910 | $770 |
| | **Net Benefits** | **$13,000** | **$12,000** |

The estimated annualized compliance costs for the Plan of $910 million (3% discount rate, 2016$) or $770 million (7% discount rate, 2016$) are comparable to prior interstate transport rulemakings EPA has undertaken. For example, EPA estimated that the $NO_X$ SIP Call would cost $1.7 billion (1990$) annually to implement. 63 FR at 57478. Similarly, CAIR was estimated to cost the power sector $2.4 billion in 2010 and $3.4 billion in 2015 (1999$). 70 FR at 25305. CSAPR was estimated to cost the power sector $810 million in 2014 (2007$). 76 FR at 48215.

11.    The Plan will deliver substantial public health and environmental benefits. On average, the ozone levels at the identified "receptor" locations around the country are projected to decrease by 0.66 parts per billion (ppb). Good Neighbor Plan, Table V.D.3-1. The Plan will help many downwind areas make substantial progress toward coming into compliance with the 2015 ozone NAAQS. In some cases, such as for receptors in Colorado, coastal Connecticut, and Texas, the Plan is projected to make substantial progress toward achieving full attainment of the standard.

12.    According to the air quality analysis for the SIP disapproval Final Rule, there are 43 air quality monitoring sites throughout the United States that are identified as "receptors"—i.e., these are areas that are projected to struggle to attain or maintain the 2015 ozone NAAQS. *See* 88 FR at 9351-52. The combined population of the designated ozone nonattainment areas associated with these receptors in 2021 is 82.3 million people, representing roughly 25 percent of the total U.S. population.

13.    The air quality benefits of the Plan will also reach many other people beyond the specific areas where receptor sites are located. The map below

graphically illustrates the reduction in ozone levels that is projected to occur across the United States with full implementation of the Plan.



Impact on Top 10 Day Average MDA8 Ozone of the Final FIP Emissions Reductions in 2026

data = [8]2026gf_cntl_ussa_apca.tagged.O3NV.12US2.camx.O3_8hrmax_LST.5-9.top10avg.loapl

14.    The emissions control strategies on which the Plan is premised are all conventional, widely-used, at-the-source technologies that have been available to power plants and industrial sources for decades. This level of control is widely mandated for these types of sources in downwind areas with ozone air quality problems. For example, selective catalytic reduction ("SCR") control technology is already installed at roughly two-thirds of the coal-fired power plant capacity in the U.S. fleet. Good Neighbor Plan, p. 395.

15.    As can be seen in the figures below, several fossil fuel-fired power plants in the State of Mississippi that are included in the Good Neighbor Plan have relatively high, poorly controlled $NO_X$ emissions contributing to ozone pollution. It is not surprising that these sources along with other anthropogenic emissions sources in Mississippi are impacting air quality hundreds of miles away.





Emissions from Mississippi power plants are highlighted in red.

16.    A delay in the implementation of the Plan would result in the continuation of significant contribution to harmful levels of air pollution across the United States. Delays of as long as three years in the implementation of two prior good neighbor rulemakings ($NO_X$ SIP Call and CSAPR) have been experienced as a result of stay litigation. In both cases, the regulations were largely upheld once courts were able to adjudicate the merits. EPA is applying this same, now-Supreme Court-upheld analytical framework in this Plan. A delay of three years or more here would delay the full elimination of significant contribution under this Plan until 2029 or later. This would be eight years after the 2021 Marginal area

attainment deadline, five years after the 2024 Moderate area attainment deadline, and two years after the 2027 Serious area attainment deadline. In the meantime, many Americans could suffer illness and premature death from the harmful pollution that would be allowed to continue, while downwind areas that fail to attain the health-based NAAQS will be subject to ever more stringent regulatory requirements under the Act without relief from the contributing effects of upwind-state pollution. For example, the forgone emissions reductions in 2023 alone could result in forgone reductions in avoided ozone-related premature mortalities and illnesses equal to as much as $820 million (2016$, 3% discount rate).

B.    Establishment, Applicability, and Relationship to Other Trading Programs

17.    Among other things, the Plan implements a revised and expanded allowance trading program for electricity generating units – the CSAPR $NO_X$ Ozone Season Group 3 Trading Program (the "Trading Program"). This program generally applies to fossil fuel-fired boilers and combustion turbines that are located in covered states and serve generators larger than 25 megawatts producing electricity for sale. 40 CFR 97.1004.

18.    The Plan amends the existing CSAPR $NO_X$ Ozone Season Group 3 Trading Program established for twelve states in 2021 under the Revised CSAPR Update.[7] The CSAPR $NO_X$ Ozone Season Group 3 Trading Program was first established to achieve emissions reductions required by the good neighbor provision with respect to the 2008 ozone NAAQS. For several other states, the Trading Program will replace the CSAPR $NO_X$ Ozone Season Group 2 Trading Program established in 2016 under the CSAPR Update and currently still being implemented for ten states, including Mississippi.[8] The CSAPR $NO_X$ Ozone Season Group 1 Trading Program was first established in the original CSAPR rulemaking in 2011 to address good neighbor obligations associated with the 1997 ozone NAAQS, and currently applies only in the State of Georgia.[9]

19.    Under the Plan, power plants in seven states, including Mississippi, will transition from the CSAPR Group 2 Trading Program to the CSAPR Group 3 Trading Program, and power plants in three states not currently covered by a

---

[7] "Revised CSAPR Update for the 2008 Ozone NAAQS," 86 FR 23054 (April 30, 2021).

[8] "CSAPR Update for the 2008 Ozone NAAQS," 81 FR 74504 (October 26, 2016).

[9] CSAPR, 76 FR 48208 (Aug. 8, 2011).

CSAPR trading program for seasonal $NO_X$ emissions will be added to the CSAPR Group 3 Trading Program.

20.     Virtually all of the electric generating units covered by the Plan, including those in the three states not currently covered by a seasonal $NO_X$ emissions program, nonetheless participate in the Acid Rain emissions trading program under Title IV of the Clean Air Act and already meet rigorous monitoring and reporting requirements in compliance with 40 CFR Part 75.[10]

21.     Power plants have deep familiarity with Clean Air Act compliance assurance and permitting obligations and face minimal administrative burdens associated with entry into the Trading Program. All the Mississippi units that will participate in the Trading Program already participate in another CSAPR trading program.

22.     The emissions reduction requirements associated with the new Trading Program emissions budgets established by the Plan will only apply as of the effective date of the Plan, which will be 60 days after publication of the Plan in the Federal Register.[11]

23.     Based on communication with the Office of Federal Register, my understanding is that the Good Neighbor Plan is expected to publish in the Federal Register in early June. A publication date in June would mean the Plan would become effective 60 days later, i.e., sometime in August.

24.     For units in the states already covered by either the CSAPR $NO_X$ Ozone Season Group 2 or Group 3 trading programs, the Plan has transitional provisions so that the new budgets will apply only after the Plan's effective date.[12] For units in the remaining states that will be newly covered by the Trading Program, no requirements, either in terms of emissions reductions or in terms of other administrative requirements, will apply until the effective date.

---

[10] Approximately 97 percent of ozone season $NO_X$ emissions reported under Part 75 are determined using continuous emissions monitoring systems ("CEMS"). Gas- or oil-fired units that qualify as peaking units or low mass emissions units under the regulations have options to determine reported emissions using other methodologies.

[11] *See* Good Neighbor Plan Preamble Section VI.B.12.a.

[12] *See* Good Neighbor Plan Preamble Section VI.B.12.a.

C.   How Emissions Trading Programs Work and the Enhancements to the Trading Program

25.    The Clean Air Markets Division operates or has operated a number of allowance trading programs, the earliest of which started more than 25 years ago. These include the $NO_X$ Budget Trading Program for ozone-season $NO_X$ emissions under the $NO_X$ SIP Call,[13] programs for ozone-season and annual $NO_X$ emissions under CSAPR and CAIR,[14] and programs for annual $SO_2$ emissions under CSAPR, CAIR, and the Acid Rain Program.[15] Most of the units that participate in the Trading Program also participate or participated in some of these other programs. There has not been, nor have Declarants identified, a single instance where implementation of these EPA trading programs has caused an adverse reliability impact.

26.    EPA provides robust technical analysis for identifying its emission reduction requirements. For power plants, this includes starting with reported data for recent historical operations. It further tests these requirements against future expectations for the sector by using a state-of-the-art, peer-reviewed programming model of the contiguous U.S. electric power sector (the Integrated Planning Model, or IPM). IPM provides forecasts of least-cost capacity expansion, electricity dispatch, and emissions control strategies while meeting energy demand and environmental, transmission, dispatch, and reliability constraints.

27.    The Trading Program, like the other current and former allowance trading programs operated by the Clean Air Markets Division, does not impose any fixed limits on the operations or emissions of individual affected units. Instead, each affected unit is required to monitor and report its emissions, and each source with affected units is required to hold quantities of emission "allowances" based on the reported emissions from all its affected units for each "control period" for the program. (For the Trading Program, the control period is the May-September ozone season.) Allowances can be traded with other sources covered by the program in the same or other states or with third parties (e.g., brokers). The

[13] "Finding of Significant Contribution and Rulemaking for Certain States in the Ozone Transport Assessment Group Region for Purposes of Reducing Regional Transport of Ozone," 63 FR 57356 (Oct. 27, 1998).

[14] "Rule to Reduce Interstate Transport of Fine Particulate Matter and Ozone (Clean Air Interstate Rule)," 70 FR 25162 (May 12, 2005).

[15] CAA subchapter IV-A, 42 U.S.C. 7651-7651*o*; 40 CFR parts 72-78.

aggregated emissions from all the affected units under such a program are limited by the total number of allowances issued for use in the program, each of which authorizes the emission of up to one ton of $NO_X$.

28.    The Trading Program budgets are set based on an evaluation of available $NO_X$ mitigation control technologies. As in the prior CSAPR rulemakings, as well as the earlier CAIR and $NO_X$ SIP Call rulemakings, EPA assessed several well-understood, widely-available, at-the-source emissions control strategies. Following a multifactor assessment at "Step 3" of the interstate transport framework, EPA arrived at a suite of control strategies that obtain cost-effective emissions reductions delivering meaningful downwind air quality benefits. EPA's assessment of these technologies is set forth in Section V.B-C of the Plan preamble.

29.    The primary strategies for power plants that emerged from this analysis are: starting in 2023, optimizing existing post-combustion controls; starting in 2024, upgrading to state-of-the-art combustion controls at the few remaining coal facilities without them; and, over the 2026-2027 ozone seasons, retrofitting post-combustion controls on large emitting units currently lacking them. *See* Good Neighbor Plan Preamble Section VI.A.

30.    It bears noting that the 2023 and 2024 strategies of optimizing existing post-combustion controls and upgrading combustion controls are essentially identical to the emissions control strategies that were identified in CSAPR, the CSAPR Update, and the Revised CSAPR Update. EPA's analysis in the Good Neighbor Plan is that these strategies remain widely available on a relatively near-term basis and additional, cost-effective emissions reductions can be obtained from these strategies across the fleet of existing power plants in the covered upwind states.

31.    For each control period, the total quantity of allowances is initially allocated among the affected units.[16] Allocations in Good Neighbor trading programs have followed a similar methodology for many years, relying on historical heat input and emissions data to determine how many allowances to allocate to each unit, as well as to new units. The Plan generally follows this approach with some minor changes from prior programs. *See generally* Good

---

[16] CSAPR trading programs are designed to allow states to easily replace EPA's allocation methodology with their own. States may also leave the FIP through adopting the trading program in full (in addition to replacing EPA's allocation methodology) into their state program or developing their own approaches for approvable SIPs that can replace the FIP. *See* Good Neighbor Plan Preamble Section VI.D.

Neighbor Plan Preamble Section VI.B.9. Among the features of the Plan's allocation methodology, similar to prior programs, is a "new unit set aside," which is available for any power plants that would not otherwise receive allocations, mainly (but not exclusively) new power plants that come online after the Plan is issued. Power plants that have gone offline but are then returned to operation also qualify to receive allocations from the new unit set aside if the plants are no longer eligible to receive allocations as existing units. Often, there are allowances remaining in each state's new unit set aside, and if so, these are recycled back to existing units in proportion to their original allocation. Thus, the entire budget for each compliance period is fully allocated, and units typically will receive more allowances than their initial allocation figures suggest.

32.    The allowance allocation methodology is distinct from the method of determining the emissions budget for each state. The number of initial allocations each affected unit receives is not an emission limit, nor is it an express or implied prohibition on how much that source may emit; rather, sources may buy or sell allowances with any other party and use them for compliance. This incentivizes units that can reduce their emissions easily or cheaply to make those reductions and reap the benefits from selling their unneeded allowances, while units with relatively more expensive reduction opportunities can comply by purchasing those allowances. For a more comprehensive overview of emissions trading programs, see the Division's website at *https://www.epa.gov/emissions-trading-resources*.

33.    Sources with affected units under the Trading Program are not required to hold allowances to cover their emissions before or at the actual time of the emissions (e.g., in or during the 2023 ozone season). Instead, each source is obligated to surrender allowances to cover its affected units' emissions for a control period by the program's "allowance transfer deadline," which is June 1 of the year *after* the year of the control period.  40 CFR 97.1002, 97.1006(c)(1). For the 2023 ozone season, the allowance transfer deadline will be June 1, 2024. Thus, a source in the Trading Program has an extended period of time—eight months after the end of the ozone-season control period on September 30—in which to acquire any additional allowances that may be needed for compliance.

34.    Each state's budget determines the total number of allowances to be allocated among the state's affected units for each control period. However, a state budget is not a limit on how much $NO_X$ a state's affected units may emit, in the aggregate, during the control period. Under the Trading Program (like the trading programs under the original CSAPR), the aggregated emissions from a state's affected units can exceed the state's budget up to a certain level, called the "assurance level," without triggering any further obligations beyond each source's

basic compliance obligation to hold allowances equal to the sum of its affected units' emissions. If the aggregated emissions from the affected units in a single state exceed the state's assurance level during a control period, the sources that contributed to the state's exceedance must surrender two additional allowances for each ton of their respective shares of the exceedance. 40 CFR 97.1025. The assurance levels include "variability limits" beyond the respective state emissions budgets that allow for potential inter-annual variability in operating needs for each state. At the same time, the assurance levels function within the structure of an interstate trading program to meet the Act's requirement that each state's sources are held to the elimination of the state's significant contribution.

35.    The Trading Program is fully achievable without any need for sources to reduce their operations or retire, because the emission budgets are premised on widely available pollution control technologies described above whose use would achieve the required emission reductions without need to reduce operations or retire any affected EGU. However, under the Trading Program, no power plant is *required* to follow these strategies. In general, a power plant owner has options to operate the emissions controls identified by the EPA for a type of unit (including installation or upgrade of controls), operate other types of emissions controls, or adapt the unit's levels of operation to produce less emissions. The Plan generally preserves the compliance flexibility of prior transport trading programs in reserving these decisions to sources' owners and operators.

36.    In addition to the intrinsic emissions trading compliance flexibilities noted above that are preserved in the Plan, the Trading Program contains several enhancements relative to prior trading programs. These enhancements operate together to ensure that, within the structure of an interstate trading program, sources continue to achieve a degree of emissions reduction consistent with the Act's requirement to eliminate "significant contribution" and "interference with maintenance." As EPA discusses in the Plan, experience with prior trading programs has produced evidence that over time sources may not be properly incentivized to operate emissions controls to the degree needed to eliminate significant contribution on an ongoing basis. The enhancements included in the Trading Program continue to provide flexibility while providing greater assurance that significant contribution will be eliminated on the most critical days of the ozone season and will remain eliminated on a permanent basis. EPA made several adjustments to these enhancements from the proposal in light of comments regarding grid reliability, as discussed in the following section beginning at paragraph 37.

37.    There are four enhancements to the Trading Program in the final Plan, compared to prior CSAPR programs: dynamic budgeting; annual bank recalibration; unit-specific backstop daily emissions rates; and a secondary emissions limitation:

    a.   *Dynamic Budgets:* Prior trading rules used a single, fixed emissions budget, set based on power sector data as of the date of the action. In the Revised CSAPR Update, EPA established preset budgets for several years into the future, to better reflect known changes in the power sector over time. In the Good Neighbor Plan, EPA is again establishing preset budgets as floors for the 2023 to 2029 control periods. Beginning in 2026, dynamic budgets (i.e., budgets set by applying the emission control strategies selected in the Plan to more recent operating data) will be calculated for each control period. From 2026 through 2029, a state's dynamic budget will be used only if it is higher than the state's preset budget for that control period. Beginning in 2030, dynamic budgeting will be the sole method of budget calculation. *See* Good Neighbor Plan Preamble Section VI.B.4.

    b.   *Bank Recalibration:* If a source does not use all of its allowances to demonstrate compliance in a given control period, the Trading Program, like all the other allowance trading programs operated by the Clean Air Markets Division, allows the unused allowances to be banked for use in the program in future control periods. In the CSAPR Update and the Revised CSAPR Update, EPA executed one-time conversions of available banked allowances from prior trading programs into initial allowance banks appropriately scaled to the budgets under the new trading programs. The Plan carries that process forward by limiting the collective allowable number of banked allowances for the Trading Program that can be carried over each year to 21% of the sum of the states' emissions budgets, starting with the 2024 ozone season. This will prevent the buildup of an excessively large bank of allowances that would undermine program stringency in the latter years of a program. *See* Good Neighbor Plan Preamble Section VI.B.6.

    c.   *Unit-specific Backstop Daily Emissions Rates:* To ensure more consistent operation of installed controls on sources with the highest level of emissions potential throughout each day of ozone seasons going forward, the Plan includes backstop daily emission rates applied to each of a subset of the covered sources. This rate applies beginning in 2024

for large, coal-fired sources that have SCR post-combustion emissions controls already installed. The rate is set at a level that reflects seasonal optimization of the control (not daily maximal performance), and sources must surrender additional allowances for the emissions associated with exceedances of this rate (after a 50-ton threshold, which accommodates the potential unavoidable emissions sources might have above the daily rate associated with activities like start-up). The same rate is applied for large coal-fired units with SCR-retrofit potential in the second control period after such control is installed or in 2030, whichever occurs first. *See* Good Neighbor Plan Preamble Section VI.B.7.

d. *Secondary Emissions Limitations:* To avoid foreseeable exceedances of the state-by-state assurance levels, the Plan establishes the conditions for an enforceable Clean Air Act violation in defined circumstances of egregious failure to operate existing pollution controls, starting with the 2024 ozone season. *See* Good Neighbor Plan Preamble Section VI.B.8.

D.   Key Changes in the Good Neighbor Plan from Proposal

38.   The proposal underwent a comment period of 76 days, and EPA held many stakeholder meetings, including with electricity reliability coordinators, to receive feedback as well. This public engagement provided useful information to the Agency and produced a number of important changes in the Good Neighbor Plan.

39.   It is standard practice in EPA rulemaking development that changes to a proposal contemplated by the Agency are considered deliberative and are not shared on an *ex parte* basis prior to finalization and public release of an action. Therefore, the information regarding the contents of the Good Neighbor Plan, reflective of these changes, became available to the general public on or about March 15, 2023, with the release of the unofficial, pre-publication copy of the Plan on EPA's website.

40.   Several changes in the Good Neighbor Plan bear directly on the claims of harm put forward by Declarants. These changes respond to concerns raised by commenters that the Plan, as proposed, could have unintended effects on power sector grid-reliability.

41.     Commenters observed that the fleet of fossil-fuel fired power plants is undergoing a period of transition to cleaner fuels and technologies. Many power plant owners and operators highlighted their interest in seeing flexibility in this program that would facilitate their business decisions, while, in their view, the Plan as proposed could force uneconomical decisions either to retire power plants earlier than intended or to force expensive pollution-control retrofits for sources that in their judgment would otherwise not continue in operation for much longer. *See* Good Neighbor Plan Preamble Section VI.B.1.d.

42.     During rule development, EPA also actively engaged with key stakeholders in the electricity sector, including system operators, regional transmission operators ("RTOs"), the U.S. Department of Energy ("DOE"), the Federal Energy Regulatory Commission ("FERC"), and other parties that have the responsibility for ensuring reliability. EPA hosted a series of meetings with reliability organizations who had commented on the proposal to ensure we had a solid understanding of their concerns and perspectives. *See* Good Neighbor Plan Preamble Section III.B.1.c.

43.     In light of these viewpoints, EPA adopted multiple changes from the proposal to address the reliability-related concerns identified in comments and brought into greater focus through consultations with RTOs and other agencies. These changes have been carefully crafted to ensure the statutory mandate to eliminate significant contribution to interstate pollution problems under the Clean Air Act is met without disrupting the reliable operation of the bulk power grid. *See* Good Neighbor Plan Preamble Section VI.B.1.d.

   a.   EPA had proposed to apply "preset" state emissions budgets only for the control periods in 2023 and 2024, with dynamic budgeting allowing for changes in the budget both upward and downward beginning in 2025. EPA had proposed to use only one year of data in the dynamic budget-setting process. In the Final Good Neighbor Plan, preset budgets will operate as floors from 2023 through 2029. This will establish predictable minimum quantities of allowances available during the period when commenters have expressed concern that the reliability-related need for such predictability is greatest. In addition, the dynamic budgets will be set using multiple years of operating data to prevent an anomalous year of data from skewing the budgets. *See* Good Neighbor Plan Preamble Section VI.B.1.b.i.

16

b. The target percentage of the state emission budgets used to annually recalibrate the allowance bank will not be set at the proposed 10.5 percent level until the 2030 control period. For the control periods from 2024 through 2029, a target percentage of 21 percent will be used instead. The adoption of the higher target percentage for use through the 2029 control period is intended to enhance the availability of allowances during this period by allowing power plant owners and operators to "bank" allowances at a higher level through 2030. *See* Good Neighbor Plan Preamble Section VI.B.1.b.ii.

c. The application of the backstop daily emissions rate for units without existing SCR controls is deferred until the 2030 control period from the 2027 control period as EPA had proposed. This change extends by several years the period during which the highest emitting sources in the fleet may continue surrendering only one allowance per ton emitted, as opposed to three allowances per ton emitted, while operating without widely available pollution control technology within the Trading Program. *See* Good Neighbor Plan Preamble Section VI.B.1.c.i.

44.    Additionally, EPA made several other key changes in the Good Neighbor Plan from the proposal that will also help ensure it can be implemented on a feasible and cost-effective basis in light of comments and other record-based considerations that in EPA's judgment warranted attention:

a. The Good Neighbor Plan does not require any emission reductions associated with projected generation shifting using EPA's Integrated Planning Model. *See* Good Neighbor Plan Preamble Section V.B.1.f.

b. EPA finalized a phase-in approach for emission reductions associated with the SCR-retrofit strategy. These reductions are phased in over 2026-2027 in the final Good Neighbor Plan, as opposed to just 2026 at proposal. This change provides an additional year for the full implementation of reductions associated with this strategy relative to the proposal. *See* Good Neighbor Plan Preamble Section VI.A.

c. Emissions control stringency associated with combustion control upgrades does not go into effect for any state until the start of the 2024 ozone season. *See* Good Neighbor Plan Preamble Section V.A.

## II.    NOₓ Mitigation Strategies and Timing: Further Detail

45.    The Plan assumes two mitigation strategies in setting emission budgets for the 2023 ozone season. This is the optimization of two types of existing post-combustion controls—SCR and selective non-catalytic reduction ("SNCR"). Therefore, no new pollution control equipment is assumed in 2023, only the operation of existing equipment. EPA uses its database of reported historical power sector operations and emissions performance to derive state emissions budgets based on these (and other) strategies. According to EPA data, power plants have demonstrated through their historical operation (for more than 90% of such units) that they have already achieved this level in the past, in many cases significantly out-performing the representative performance rates used by EPA to establish budgets based on these strategies.

46.    The vast majority of SCR-controlled units (nationwide and in the 22 states subject to the Trading Program) at least partially operated these controls during the 2021 and 2022 ozone seasons, based on reported emissions rates. Existing SCRs operating at partial capacity still provide functioning, maintained systems that may only require increased frequency or quantity of delivered chemical reagents (i.e., ammonia or urea), which can be accomplished within a few weeks. In many cases, units with SCR have historically achieved more efficient NOₓ removal rates than their current performance and therefore are capable of reverting to earlier operation and maintenance plans that achieved demonstrably better SCR performance.

47.    There is ample evidence of units restoring optimal performance of post-combustion controls within a timeframe of two months or less. *See* Good Neighbor Plan Preamble Section V.B.1.a. Not only have units reactivated SCR performance levels at the start of an ozone season or when requirements took effect, but unit-level data also shows instances where sources demonstrated the ability to quickly alter their emissions rate within an ozone-season and even within the same day in some cases. Moreover, this emissions control technique is familiar to sources and was analyzed and included in the Revised CSAPR Update emissions budgets finalized in 2021 and the CSAPR Update emissions budgets finalized in 2016.

48.    The recently implemented Revised CSAPR Update was finalized on March 15, 2021, with emissions reductions premised on the same technology and nearly identical implementation schedules as this Plan regarding existing control optimization. See paragraph 52. Sources were able to comply with a 100% success rate in meeting their allowance-holding requirements, and units optimized their

18

controls, showing significant improvement in emissions performance relative to prior years.  Neither sources nor state agencies and reliability authorities reported any difficulty maintaining compliance with electric reliability standards as a function of achieving compliance with the Revised CSAPR Update.

49.     The recent experiences with both the Revised CSAPR Update and CSAPR Update underscore the eminently achievable nature of the control strategies informing the establishment of the Trading Program budgets for 2023 and 2024.

50.     In the Plan, EPA finds that new SCR retrofit installation is cost-effective and is included as part of the overall strategy to eliminate significant contribution. Corresponding emission reductions are reflected in state emissions budgets, phasing in over the 2026 and 2027 ozone seasons. EPA extended the timeframe for installation of SCR controls from 36 months at proposal to 36-48 months in the final Plan. There are many instances of individual SCR-retrofit projects being completed well within a three-year timeframe; however, a 36-48 month period corresponds with EPA's expectations regarding timing needs for fleetwide implementation of this strategy. There is significant engineering literature and third-party testimonials as to the feasibility of this timing for sources pursing this compliance option. This technology is widely available. SCR controls already exist on over 60 percent of the coal fleet in the states covered by the Trading Program. Nearly every pulverized coal unit larger than 100 MW built in the last 30 years has installed this control.

51.     The timeframes by which the requirements of the Plan go into effect are all keyed to the finalization of the Plan. Thus, the phasing in of the SCR-retrofit stringency over the 2026-2027 ozone seasons corresponds to a 36-48 month period from the date of issuance of the Plan. *See* Good Neighbor Plan Preamble Sections V.B.1.e and VI.A.

52.     Even for near-term measures like optimization of existing controls in 2023, EPA's record shows that no work need have occurred prior to finalization of the Plan. The implementation of the Plan's budgets reflecting that control strategy as of the effective date 60 days after publication in the Federal Register accommodates the two-month period EPA finds to be the maximum amount of time needed to implement these strategies. These exact technology and timing assumptions were just successfully implemented on an identical schedule in the Agency's Revised CSAPR Update rule, which was finalized on March 15, 2021 and included emission reduction requirements premised on optimization of existing

controls going into effect upon the effective date of the rule during the 2021 ozone season. *See* Good Neighbor Plan Preamble Section V.B.1.a. and 86 FR 23054.

53.     EPA had observed in the proposal that sources could begin "planning now" for compliance, and this would afford them additional time. 87 FR at 20101. Such preparation may indeed be prudent and likely not costly, but it was never required. Preliminary analysis and engineering steps involve no capital costs; these include pre-construction activities, such as engineering studies, conceptual design, schedule, specifications, and cost estimates.[17]

## III.   Achievability of the Good Neighbor Plan

54.     The emissions reductions implemented through the Plan's Trading Program are readily achievable for the covered power plants, and the Program is designed so as not to threaten resource adequacy or otherwise degrade electric system reliability in any state or region.

55.     Under the Trading Program, for each control period EPA allocates an amount of allowances equal to each state budget among the affected units in the respective state. For control periods after 2023, a state may submit a state implementation plan revision replacing EPA's unit-level allocations with unit-level allocations of its choosing, provided that the total number of allocations does not exceed the state budget. 40 CFR 52.38.

56.     The sum of the preset state budgets under the Trading Program for 2023 is 208,119 tons. (This does not account for an almost-certain budget increase associated with the need to prorate the budgets to the effective date of the Plan, discussed in paragraphs 22-23.) Adding the amount of allowances in the anticipated starting bank (see paragraph below), EPA estimates that the total number of allowances that will be available for compliance in 2023 will be approximately 269,479 allowances.

57.     In addition to allowances allocated for each control period and already banked under the Group 3 Trading Program, the EPA will convert for use in the Trading Program an amount of allowances banked under the existing CSAPR $NO_X$ Ozone Season Group 2 trading program. 40 CFR 97.826. Any affected unit (or other entity) that holds banked allowances issued under the CSAPR Group 2 program will be issued a proportional number of converted allowances that can be used under the Trading Program just like allowances allocated from the Trading

---

[17] *See* document titled "Typical SCR and SNCR Schedules 2023" in the docket for the Good Neighbor Plan (EPA-HQ-OAR-2021-0668).

Program state budgets. Based on preliminary emissions data for 2022, in total, the already-banked and converted allowances collectively will constitute a "starting bank" of approximately 61,360 allowances available for 2023 compliance.

58.     Total emissions from the sources that would be covered by the Trading Program in 2021 were 239,450 tons, and in 2022 were 207,605 tons. As EPA has observed in prior CSAPR trading programs, EPA fully anticipates that sources will in fact optimize existing controls during the 2023 ozone season and/or pursue other emissions reduction opportunities, in response to the allowance price signal and in order to maintain or increase the respective amounts of banked allowances they hold for their own use or for sale to others. Nonetheless, these numbers indicate that even if no sources chose to reduce emissions in 2023 below where they already were in 2022, there would be adequate allowances available for compliance.

59.     EPA conducted a "resource adequacy" assessment for the Good Neighbor Plan. This assessment shows that accredited capacity projections, and therefore reserve margins, are expected to be virtually identical for the power sector between the baseline and the Good Neighbor Plan "policy case." In particular, in 2023, 2025, and 2030, reserve margin projections under the Plan remain consistent with baseline projections and are at or above target reserve margins.[18]

60.     For all North American Electric Reliability Corporation (NERC) reliability assessment regions and for all years, adequate reserve margins are projected to be maintained under the Good Neighbor Plan. Projected changes in reserve margins under the Plan through 2030 are exceedingly small relative to the baseline without the rule.[19]

61.     The Plan's projected effect on retail electricity prices relative to baseline projections is also projected to be exceedingly small. In 2023, there is a 0% change projected. In 2025, the changes are on the order of -1% to 1%. In 2030,

---

[18] *See* Resource Adequacy and Reliability Analysis Final Rule TSD 2, Tbl. 1, *available at* https://www.epa.gov/system/files/documents/2023-03/Resource%20Adequacy%20and%20Reliability%20Analysis%20TSD.pdf.

[19] *Id.* Tbl. A3, B3, C3.

the changes are of a similar magnitude, with only one area (not covering Mississippi) projected to see a greater than 2% change in electricity prices.[20]

62.    Compliance with the Good Neighbor Plan is anticipated to be even less costly than EPA's primary analysis of compliance costs in the Plan's regulatory impact analysis (RIA) suggests (see paragraph 10). EPA conducted a supplementary analysis to assess the effects of the Inflation Reduction Act of 2022, Pub. L. 117-169 ("IRA"). That analysis indicates that the annualized cost of the Plan for the power sector over the 2023-2045 period declines under the IRA from $449 million/year to $196 million/year (2016$). *See* RIA Appendix 4A, Table 4A-2. For comparison, the annualized costs of the $NO_X$ SIP Call were estimated at $1.7 billion (1990$), which would be $2.8 billion in 2016$.

B.    Allowance Market Transparency, Liquidity, and Pricing

63.    There has never been a shortage of allowances in any allowance trading program operated by the Clean Air Markets Division from 1995 – the first year of the Acid Rain Program's trading program for $SO_2$ emissions – to the present. After the allowance transfer deadline for every control period for every such program, a bank of unused allowances has always been available for carryover to future control periods.  See the Division's progress reports at *https://www3.epa.gov/airmarkets/progress/reports/index.html*.

64.    Under the Trading Program, like EPA's other allowance trading programs, affected units are required to report their hourly emissions data to the Clean Air Markets Division on a quarterly basis, and all allowance allocations and transfers are also recorded by the Division. 40 CFR 97.1020—97.1035. The Division maintains publicly accessible databases of the reported emissions data and the recorded allocation and transfer data at *https://campd.epa.gov/*. Sources and other participants in the market for emissions allowances, such as brokers, can use these data to assess the potential supply of and demand for allowances and to identify potential buyers and sellers.

65.    Buyers and sellers of allowances are generally not required to report transaction prices to the Clean Air Markets Division. However, subscription data services regularly survey and report market prices for allowances in EPA's

---

[20] *See* Regulatory Impact Analysis for the Final Federal Good Neighbor Plan Addressing Regional Ozone Transport for the 2015 Ozone National Ambient Air Quality Standard 166-68, Tbl. 4-15, 4-16, 4-17, *available at* https://www.epa.gov/system/files/documents/2023-03/SAN%208670%20Federal%20Good%20Neighbor%20Plan%2020230315%20RIA_Final.pdf.

allowance trading programs. As of May 16, 2023, one such service reported a market price of $1,313 per Group 2 allowance and $9,250 per Group 3 allowance.[21] The recently reported Group 3 allowance price of $9,250/ton represents a decline of about one-third from reported prices immediately prior to the mid-March pre-publication release of the Plan.

66.    While prices reported for the first part of the 2022 ozone season were higher than prices in the later part of and after the ozone season, relatively few allowance transfers among unrelated parties took place during the period of the highest reported prices. Moreover, EPA's data indicates that there were more than enough allowances available for compliance with the Group 3 program in 2022. Our data indicate total emissions in the Group 3 program of around 90,458 tons in the 2022 ozone season, while available allowances (including banked allowances) total 128,724 tons.

67.    The allowance price increase that was observed in the summer of 2022 in the pre-existing Group 3 trading program has since declined about 80 percent from its reported peak of $47,250 (see "CSAPR Allowance Price Data" in the docket for the Good Neighbor Plan). Mississippi sources would not have experienced these prices because they currently participate in the CSAPR Group 2 trading program. It is notable that reported Group 3 allowance trading prices are now close to (and in fact less than) the representative SCR retrofit costs that EPA calculated in the Plan ($11,000/ton as a representative figure).

68.    Finally, reported allowance prices do not necessarily reflect actual costs to sources for each ton emitted. EPA allocates allowances for free to existing source owners and operators. Most sources have all or nearly all of their allowances freely available to them through allocations or existing banks. Therefore, these sources only need to purchase a minority, if any at all, of their total needed allowances, as well as pursuing further emissions reductions as desired.

69.    Multiplying total expected emissions by the highest historically reported allowance price would generate a wildly inflated estimate of compliance burden, not only because that highest historical price is by no means indicative of the average allowance price going forward, but also because it ignores the fundamental expectation within a market-based program that sources will

---

[21] Price data are reported by S&P Global Market Intelligence and are available by subscription at https://www.SNL.com.

rationally pursue any emissions-reduction opportunities that are less costly than the purchase of additional allowances.

## IV.    Achievability of the Plan for Mississippi Power Plants

70.    The proposed and final rules are implemented through an interstate trading program. While there are state emission budgets, no state is limited to its budget level, and if sources in the state need additional allowances to emit up to the state's assurance level, they can use banked allowances or allowances purchased from other states.

71.    In the final Good Neighbor Plan, the Mississippi budgets are 6,210 tons in 2023 and 3,484 tons in 2026. Mississippi's budget is 2,084 tons in 2027 (reflecting the two-year phase in of SCR-retrofit stringency).

72.    As explained in paragraphs 22-23, based on EPA's expectation of an effective date after the start of the 2023 ozone season, at time of signature, EPA expected a prorated 2023 state emissions budget for Mississippi in the range of 6,233 tons.[22]

73.    The Plan includes provisions to convert most allowances banked under the CSAPR Group 2 $NO_X$ Ozone Season Group 2 trading program into a quantity of banked Group 3 allowances available for use in the Trading Program. This is no different than the conversion of banked allowances for use in updated trading programs that was done in two prior Good Neighbor rules, the CSAPR Update and the Revised CSAPR Update. While the number of new Group 3 allowances created in the conversion is smaller than the number of Group 2 allowances converted, the new Group 3 allowances each carry a higher value.[23] Based on the estimated effective date, and the number of Group 2 allowances held

---

[22] Because the Plan has not published in the Federal Register, the actual 2023 pro-rated budget for Mississippi will be higher than the estimate provided at time of signature.

[23] Declarant (Smith Decl. ¶ 10) conflates the allowances used for compliance with the Group 2 trading program with the allowances used for compliance with the Group 3 trading program. As described in the Plan (Good Neighbor Plan Preamble Section VI.B.12.b), EPA is creating an initial bank of Group 3 allowances in an amount consistent with addressing states' Good Neighbor obligations under the 2015 ozone NAAQS. EPA is allocating this initial bank of Group 3 allowances to current holders of Group 2 allowances (which will no longer be needed following the transition of sources from the Group 2 program to the Group 3 trading program) in proportion to their holdings of Group 2 allowances. The conversion of Group 2 allowances to Group 3 allowances maintains continuity in the incentive to bank allowances and in no way undermines the ability of Mississippi sources to meet their compliance obligations under the Group 3 trading program.

by sources in Mississippi that are available for conversion, Mississippi EGUs are anticipated to start with at least 950 banked Group 3 allowances created through conversion of Group 2 allowances in addition to receiving unit-level Group 3 allowance allocations of the 2023 emissions budget for Mississippi.

74.    This brings the combined anticipated number of allowances initially held by affected EGUs in Mississippi for the 2023 ozone season to around 7,183 allowances. Under the interstate Trading Program, Mississippi EGUs will also have the opportunity to purchase additional allowances from account holders in other states. Based on preliminary emissions data for 2022, in total, we estimate the already-banked and converted allowances collectively will constitute a "starting bank" of approximately 61,360 Group 3 allowances available for 2023 compliance (inclusive of the 950 converted allowances estimated above to be initially held by Mississippi EGUs).

75.    For the Trading Program, each state's variability limit is 21 percent of the state budget, and each state's assurance level is therefore the state budget plus 21 percent. 40 CFR 97.1025. *See* paragraph 34. Mississippi's assurance level in 2023 is therefore 7,514 tons (before any increase because of prorating). No enhanced allowance-surrender penalty is applied for emissions up to the assurance level.

76.    Mississippi's 2021 ozone season $NO_X$ emissions were 5,790 tons. While its emissions rose in 2022, Mississippi is unique among all states covered by the Plan in that its 2023 budget is greater than the 2021 reported emissions from the covered units. This change reflects that the budget is set based on the application of the emissions control strategies described in paragraphs 45-50 above to the expected operating parameters of the power plants. (As explained in section VI.B.4 of the Plan Preamble, EPA made an upwards adjustment to Mississippi's budget to allow to accommodate operation of a unit that had an outage in 2021.).

77.    Mississippi's state emissions budget is 5,058 and 5,037 tons in 2024 and 2025 respectively, reflecting known, planned fleet changes in the State and the availability of a combustion-control upgrade at a single plant (See Good Neighbor Plan Preamble Section VI.B.4). However, a carryover of banked allowances from 2023 is expected, in light of the above figures and the incentive for sources to reduce emissions and bank allowances when doing so is economical.

78.    Table 1 summarizes the Trading Program final state budgets and assurance levels in the final Plan, and the actual 2021 and 2022 ozone-season $NO_X$

emissions reported to the Clean Air Markets Division by affected units (available at *https://campd.epa.gov/*). The table also shows the estimated prorated 2023 budget and the estimated starting emissions bank for Mississippi.

**Table 1: Comparison of Expected 2023 Allowance Holdings and Recently Reported Emissions at Mississippi EGUs**

| 2023 Mississippi emissions budget (tons) | 2023 Estimated Prorated Mississippi Budget (tons) | 2023 Estimated Banked Allowances Held by Mississippi EGUs | 2023 Mississippi Variability Limit (tons) | 2023 Mississippi Assurance Level (tons) | 2021 Reported Emissions from Mississippi EGUs (tons) | 2022 Reported Emissions from Mississippi EGUs (tons) |
|---|---|---|---|---|---|---|
| 6,210 | 6,233 | 950 | 1,304 | 7,514 | 5,790 | 6,822 |

79.    Declarants' allegation that electric reliability in Mississippi is threatened by a shortfall in allowances relative to historical emissions is not borne out at the state-level by the evidence provided above and in the power sector emissions and operating data in the final Plan. There are sufficient allowances available for compliance in 2023 even if emissions were held constant at 2022 levels. While the Mississippi emissions budget will continue to adjust in 2024 and 2025, these changes reflect planned fleet changes and the upgrade of a combustion control at a single plant This control stringency through 2025 is effectively no different than what EPA previously set for Mississippi in the CSAPR Update rulemaking seven years ago.

80.    Over the 2026 and 2027 control periods, the Trading Program budgets reflect the onset of emissions control strategies (i.e., the retrofit of post-combustion controls such as SCR) that were found to be achievable and cost-effective to eliminate significant contribution in the final Plan, with sufficient lead time built in. See paragraphs 50-51. The fact that budgets will decline as the final Plan is implemented simply reflects the emission reduction measures needed to ensure the elimination of significant contribution as required by the Clean Air Act. See paragraphs 7-8.

81.    Declarants' claims, for any year, that the state-level budgets and unit-level allocations will require unobtainable emission reductions, Wells Decl. ¶¶ 26-28, or will drive uneconomical compliance choices, Smith Decl. ¶ 17, are not consistent with how the Trading Program is designed and ignore key flexibilities included in the final Plan. The Trading Program establishes emissions budgets

*premised* on widely-available and already-widely-implemented pollution control technologies (and so does not force any source to retire). But the Program does not require or mandate any specific pollution control installation either. Rather, it requires allowance surrender for each ton of emissions. For those units facing relatively costly pollution-control retrofit decisions or already-planned retirements,[24] the Plan reflects input from power sector stakeholders by deferring the start of a daily backstop emissions rate to 2030 (among other changes). See paragraphs 37-43. Even after 2030, units without SCR may continue to operate so long as they comply with enhanced allowance-surrender requirements for those emissions subject to the backstop rate. See paragraph 37.c.


SO DECLARED:


RONA
BIRNBAUM      Digitally signed by RONA BIRNBAUM
              Date: 2023.05.26 11:11:16 -04'00'

_____

Rona Birnbaum, Director
Clean Air Markets Division


DATED:  May 26, 2023

---

[24] Of note, Mississippi Power Company's Integrated Resource Plan (IRP) explains that Plant Daniel is already slated for closure in 2027 resulting in savings to its customers of $80 to $90 million. Mississippi Power 2021 IRP Filing, Mississippi Power Company, Docket No. 2019-UA-231 (April 15, 2021), *available at* https://www.psc.state.ms.us/InSiteConnect/InSiteView.aspx?model=INSITE_CON NECT&queue=CTS_ARCHIVEQ&docid=658803. This reflects plans for this facility's retirement that were set in place over two years ago, following a report by Mississippi Public Service Commission staff showing the plant is no longer economic. *Review and Assessment of Mississippi Power Company's Reserve Margin Plan,* Bates White Economic Consulting (September 17, 2020), *available at* https://www.psc.state.ms.us/InSiteConnect/InSiteView.aspx?model=INSITE_C ONNECT&queue=CTS_ARCHIVEQ&docid=655508. *See also* Darrell Proctor, "More Coal Cuts—AEP, Mississippi Power Detail Closures," Power Magazine (Apr. 23, 2021), *available at* https://www.powermag.com/more-coal-cuts-aep-mississippi-power-detail-closures/. Facilities with pre-planned retirements as early as 2027 will have clear compliance pathways under the Trading Program that will not entail capital-intensive pollution-control installations.