No. 23-60069

# In the United States Court of Appeals for the Fifth Circuit

STATE OF TEXAS; TEXAS COMMISSION ON ENVIRONMENTAL QUALITY; LUMINANT GENERATION COMPANY, L.L.C.; COLETO CREEK POWER, L.L.C.; ENNIS POWER COMPANY, L.L.C.; HAYS ENERGY, L.L.C.; MIDLOTHIAN ENERGY, L.L.C.; OAK GROVE MANAGEMENT COMPANY, L.L.C.; WISE COUNTY POWER COMPANY, L.L.C.; ASSOCIATION OF ELECTRIC COMPANIES OF TEXAS; BCCA APPEAL GROUP; TEXAS CHEMICAL COUNCIL; TEXAS OIL & GAS ASSOCIATION; PUBLIC UTILITY COMMISSION OF TEXAS; RAILROAD COMMISSION OF TEXAS; STATE OF MISSISSIPPI; MISSISSIPPI DEPARTMENT OF ENVIRONMENTAL QUALITY; MISSISSIPPI POWER COMPANY; STATE OF LOUISIANA; LOUISIANA DEPARTMENT OF ENVIRONMENTAL QUALITY; ENTERGY LOUISIANA, L.L.C; LOUISIANA CHEMICAL ASSOCIATION; MID-CONTINENT OIL AND GAS ASSOCIATION; LOUISIANA ELECTRIC UTILITY ENVIRONMENTAL GROUP, L.L.C.; TEXAS LEHIGH CEMENT COMPANY, LP,

*Petitioners*,

*v.*

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; MICHAEL S. REGAN, ADMINISTRATOR, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

*Respondents.*

On Petitions for Review of a Final Action
of the United States Environmental Protection Agency

## OPENING BRIEF FOR TEXAS STATE PETITIONERS

*(Counsel Listed on Inside Cover)*

BRENT WEBSTER
First Assistant Attorney General
Performing the Duties of the
Attorney General

LANORA C. PETTIT
Acting Solicitor General

BILL DAVIS
Deputy Solicitor General
Bill.Davis@oag.texas.gov

MICHAEL R. ABRAMS
WILLIAM F. COLE
Assistant Solicitors General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

Counsel for the State of Texas, Texas
Commission on Environmental
Quality, Public Utility Commission of
Texas, and Railroad Commission of
Texas

## Certificate of Interested Persons

No. 23-60069

State of Texas; Texas Commission on Environmental Quality; Luminant Generation Company, L.L.C.; Coleto Creek Power, L.L.C.; Ennis Power Company, L.L.C.; Hays Energy, L.L.C.; Midlothian Energy, L.L.C.; Oak Grove Management Company, L.L.C.; Wise County Power Company, L.L.C.; Association of Electric Companies of Texas; BCCA Appeal Group; Texas Chemical Council; Texas Oil & Gas Association; Public Utility Commission of Texas; Railroad Commission of Texas; State of Mississippi; Mississippi Department of Environmental Quality; Mississippi Power Company; State of Louisiana; Louisiana Department of Environmental Quality; Entergy Louisiana, L.L.C; Louisiana Chemical Association; Mid-Continent Oil and Gas Association; Louisiana Electric Utility Environmental Group, L.L.C.; Texas Lehigh Cement Company, LP,

*Petitioners,*

*v.*

United States Environmental Protection Agency; Michael S. Regan, Administrator, United States Environmental Protection Agency,

*Respondents.*

Under the fourth sentence of Fifth Circuit Rule 28.2.1, the Texas State Petitioners, as governmental parties, need not furnish a certificate of interested persons.

/s/ Bill Davis
Bill Davis
*Counsel of Record for the State of Texas, Texas Commission on Environmental Quality, Public Utility Commission of Texas, and Railroad Commission of Texas*

i

## STATEMENT REGARDING ORAL ARGUMENT

This case merits oral argument. The State of Texas, Texas Commission on Environmental Quality ("TCEQ"), Public Utility Commission of Texas, and Railroad Commission of Texas (collectively, the "Texas State Petitioners") challenge the final action of the United States Environmental Protection Agency ("EPA") disapproving Texas's state implementation plan ("SIP") addressing the federal Clean Air Act's interstate-transport requirements for the 2015 8-hour ozone national ambient air quality standards ("NAAQS"). Absent this Court's May 1, 2023, stay order, EPA would have been able to enforce its federal implementation plan ("FIP") for Texas, which would have wrought havoc on the State's economy and energy sector.

Although the stay preserves the status quo, the threat of further EPA action will persist unless and until the final SIP disapproval is set aside. This matter therefore continues to carry significant consequences for the State and its citizens. EPA's disapproval undermines the State's congressionally assigned role in meeting air-quality standards. And it is the necessary precursor to a FIP that would impose EPA's policy preferences on Texas and its industries. Based on the importance of the issues presented and the consequences of the case, the Texas State Petitioners submit that oral argument is warranted and would aid the Court's decisional process.

# Table of Contents

Page(s)

Certificate of Interested Persons ................................................................. i

Statement Regarding Oral Argument ........................................................... ii

Table of Authorities ................................................................................... iv

Glossary .................................................................................................... iix

Record References ...................................................................................... x

Statement of Jurisdiction ............................................................................ 1

Issues Presented ......................................................................................... 1

Introduction............................................................................................... 2

Statement of the Case ................................................................................. 4

    I.   Statutory Framework ........................................................................ 4

        A.  The Act's cooperative federalism ................................................ 4

        B.  The "good neighbor" provision .................................................. 6

    II.  Factual Background and Administrative History ................................. 6

        A.  EPA revises the ozone NAAQS .................................................. 6

        B.  EPA issues data and guidance for SIP revisions ........................... 7

            1.  The 2017 notice of data availability .................................... 8

            2.  The March 2018 transport guidance .................................... 8

        C.  Texas timely submits its SIP revisions......................................... 9

        D.  EPA issues after-the-fact maintenance guidance ........................ 12

        E.  EPA proposes disapproval of Texas's SIP and publishes a proposed FIP for Texas ............................................................ 13

        F.  TCEQ submits comments on EPA's proposed SIP disapproval ........ 14

        G.  EPA finalizes its disapproval of Texas's SIP revision ................... 15

    III.  Litigation History ........................................................................ 16

Summary of the Argument.......................................................................... 18

Standard of Review .................................................................................... 20

Argument............................................................................................. 21

  I.  In Disapproving Texas's SIP, EPA Failed to Account for Relevant
      Factors and Relied on Non-Statutory Grounds for Its Decision. .............. 21

      A.  EPA's disapproval disregarded the Act's cooperative federalism...... 21

      B.  EPA's disapproval relied on non-statutory factors. ........................... 25

  II.  EPA Deprived Texas of Fair Notice of the Standards by Which Its SIP
      Would be Judged. ............................................................................... 28

      A.  EPA failed to explain the reversal of its prior policy regarding the
           identification of maintenance receptors............................................. 29

      B.  EPA relied on new modeling platforms that were unavailable to
           Texas before its SIP-submission deadline.......................................... 34

Conclusion.......................................................................................... 39

Certificate of Service............................................................................ 40

Certificate of Compliance ..................................................................... 40

## Table of Authorities

Page(s)

**Cases:**

*Alaska Prof'l Hunters Ass'n v. FAA,*
    177 F.3d 1030 (D.C. Cir. 1999) .................................................. 28, 34

*Azar v. Allina Health Servs.,*
    139 S. Ct. 1804 (2019) ..................................................................... 28

*BCCA Appeal Grp. v. EPA,*
    355 F.3d 817 (5th Cir. 2003) ....................................... 4, 5, 21, 24, 35

*Christopher v. SmithKline Beecham Corp.,*
    567 U.S. 142 (2012)......................................................... 28, 31, 34, 39

*DHS v. Regents of the Univ. of Cal.,*
    140 S. Ct. 1891 (2020)...................................................... 20, 29, 33

*Emp. Sols. Staffing Grp. II, LLC v. Off. of Chief Admin. Hearing Officer,*
    833 F.3d 480, 488 (5th Cir. 2016).................................................... 34

*Encino Motorcars, LLC v. Navarro,*
    579 U.S. 211 (2016) ........................................................................ 32

*Env'tl Integrity Project v. EPA*,
    425 F.3d 992 (D.C. Cir. 2005) ................................................. 28, 31

*EPA v. EME Homer City Generation, L.P.*,
    572 U.S. 489 (2014) ................................................................ 6, 27

*ExxonMobil Pipeline Co. v. DOT*,
    867 F.3d 564 (5th Cir. 2017) ........................................................ 31

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) ..................................................................... 29

*FCC v. Prometheus Radio Project*,
    141 S. Ct. 1150 (2021) ................................................................... 20

*FDA v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000) ..................................................................... 22

*Fla. Power & Light Co. v. Costle*,
    650 F.2d 579 (5th Cir. Unit B June 1981) ...................................... 21

*Gen. Elec. Co. v. EPA*,
    290 F.3d 377 (D.C. Cir. 2002) ....................................................... 32

*Luminant Generation Co. v. EPA*,
    675 F.3d 917 (5th Cir. 2012) ......................... 3-5, 18, 21-22, 25, 27-28

*Marsh v. Or. Nat. Res. Council*,
    490 U.S. 360 (1989) ..................................................................... 20

*Maryland v. EPA*,
    958 F.3d 1185 (D.C. Cir. 2020) ..................................................... 33

*Michigan v. EPA*,
    576 U.S. 743 (2015) ..................................................................... 21

*Michigan v. EPA*,
    268 F.3d 1075 (D.C. Cir. 2001) ............................................... 21, 25

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ............................................................ 20, 21, 25

*Perez v. Mortg. Bankers Ass'n*,
    575 U.S. 92 (2015) ....................................................................... 28

*Physicians for Soc. Resp. v. Wheeler*,
    956 F.3d 634 (D.C. Cir. 2020) ....................................................... 29

*R.J. Reynolds Vapor Co. v. FDA*,
    65 F.4th 182 (5th Cir. 2023) .......................... 21, 22, 28-29, 33, 36, 39

*Smiley v. Citibank (S.D.), N.A.*,
    517 U.S. 735 (1996) ................................................................ 29, 36

*Sw. Airlines Co. v. FERC*,
    926 F.3d 851 (D.C. Cir. 2019) ...................................................29

*Tex. Oil & Gas Ass'n v. EPA*,
    161 F.3d 923 (5th Cir. 1998) ...................................................20

*Texas v. EPA*,
    No. 23-60069 (5th Cir. May 1, 2023) (order) ................. 17, 19, 22, 24-25, 27, 32

*Texas v. EPA*,
    983 F.3d 826 (5th Cir. 2020) ...................................................27

*Texas v. EPA*,
    829 F.3d 405 (5th Cir. 2016) .................................. 2, 4, 5, 6, 21-22, 25

*Texas v. EPA*,
    690 F.3d 670 (5th Cir. 2012) ................................................ 2, 5, 21

*Train v. Nat. Res. Def. Council, Inc.*,
    421 U.S. 60 (1975) .....................................................5, 25, 35

*Union Elec. Co. v. EPA*,
    427 U.S. 246 (1976) ..................................................... 5, 21

*Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS*,
    985 F.3d 472 (5th Cir. 2021) ............................................ 20, 23, 25

*Wages & White Lion Invs. v. FDA*,
    16 F.4th 1130 (5th Cir. 2021) ...................................................20

*Wisconsin v. EPA*,
    938 F.3d 303 (D.C. Cir. 2019) ...................................................33

**Statutes, Rules, and Regulations:**

5 U.S.C.:

    § 706(2)(A) ...................................................................20

    § 706(2)(C) ...................................................................20

42 U.S.C.:

    § 7407(a) ................................................................... 4, 21

    § 7407(d)(1)(A)(i) ...............................................................4

    § 7407(d)(1)(A)(ii) ..............................................................4

    § 7408(a) ......................................................................4

    § 7409(a) ......................................................................4

    § 7409(d)(1) ...................................................................4

    § 7410(a) .....................................................................37

    § 7410(a)(1) ............................................................. 4, 5, 7, 21, 23

§ 7410(a)(2) ................................................................. 4, 6
§ 7410(a)(2)(D)(i)(I) ...............................................1, 2, 6, 26
§ 7410(a)(2)(D)(i)(II) ......................................................... 6
§ 7410(a)(2)(H) ................................................................ 4
§ 7410(c)(1) ..................................................................... 5
§ 7410(k)(1) ...................................................... 13, 22, 23
§ 7410(k)(1)(B) ................................................................ 6
§ 7410(k)(2) ................................................... 6, 13, 22, 23
§ 7410(k)(3) ..................................................... 5, 6, 13, 22
§ 7410(k)(5) ..................................................... 24, 33, 37
§ 7410(*l*) .............................................................. 5, 21
§ 7501(2) ........................................................................ 4
§ 7602(y) ........................................................................ 5
§ 7607(b)(1) ............................................................... 1, 17
§ 7607(d)(9)(A) ............................................................. 20
§ 7607(d)(9)(C) ............................................................. 20

40 C.F.R.:
§ 51.102 ....................................................................... 37
§ 52.02(a) .............................................................. 5, 22

Fed. R. App. P.:
17(b)(1)(B) ..................................................................... x
30.2(a) ........................................................................... x

**Federal Register Materials:**

Air Plan Disapproval; Arkansas, Louisiana, Oklahoma and Texas;
    Interstate Transport of Air Pollution for the 2015 8-Hour Ozone
    National Ambient Air Quality Standards, 87 Fed. Reg. 9,798 (Feb. 22,
    2022) ...........................................ix, 7, 9-11, 13-14, 23, 26-27, 30, 34-35

Air Plan Disapprovals; Interstate Transport of Air Pollution for the 2015 8-
    Hour Ozone National Ambient Air Quality Standards, 88 Fed. Reg.
    9,336 (Feb. 13, 2023) .......................ix, 1, 14-16, 24, 26-27, 30-33, 36-38

Approval and Promulgation of Air Quality State Implementation Plans;
    California; San Joaquin Valley, 81 Fed. Reg. 59,876 (Aug. 31, 2016) ............... 36

Federal Implementation Plan Addressing Regional Ozone Transport for
    the 2015 Ozone National Ambient Air Quality Standard, 87 Fed. Reg.
    20,036 (Apr. 6, 2022) .............................................................. 10, 14

National Ambient Air Quality Standards for Ozone, 80 Fed. Reg. 65,292
(Oct. 26, 2015) ................................................................................... 6-7
Notice of Availability of the EPA's Preliminary Interstate Ozone Transport
Modeling Data for the 2015 Ozone National Ambient Air Quality
Standard (NAAQS), 82 Fed. Reg. 1,733 (Jan. 6, 2017) .............. 8-9, 11, 26, 34-35

# GLOSSARY

| | |
|---|---|
| 2017 NODA | Notice of Availability of the EPA's Preliminary Interstate Ozone Transport Modeling Data for the 2015 Ozone National Ambient Air Quality Standard (NAAQS), 82 Fed. Reg. 1,733 (Jan. 6, 2017) |
| Act | Clean Air Act, as codified in 42 U.S.C. ch. 85 |
| APA | Administrative Procedure Act, as codified in 5 U.S.C. pt. I |
| Doc. | CM/ECF document number in this case, No. 23-60069 |
| EPA | U.S. Environmental Protection Agency |
| Final Rule | Air Plan Disapprovals; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards, 88 Fed. Reg. 9,336 (Feb. 13, 2023) (C.I. HQ-20) |
| FIP | Federal Implementation Plan |
| March 2018 Transport Guidance | Memorandum from Peter Tsirigotis, Director, EPA Office of Air Quality Planning and Standards, Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I) (Mar. 27, 2018) (C.I. R7-18) |
| NAAQS | National Ambient Air Quality Standard(s) |
| October 2018 Maintenance Receptor Memo | Memorandum from Peter Tsirigotis, Director, EPA Office of Air Quality Planning and Standards, Considerations for Identifying Maintenance Receptors for Use in Clean Air Act Section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards (Oct. 19, 2018) (C.I. R7-11) |
| Proposed Rule | Air Plan Disapproval; Arkansas, Louisiana, Oklahoma and Texas; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards, 87 Fed. Reg. 9,798 (Feb. 22, 2022) (C.I. R6-1) |

| | |
|---|---|
| PUC | Public Utility Commission of Texas |
| SIP | State Implementation Plan |
| TCEQ | Texas Commission on Environmental Quality |
| Texas SIP | Texas Commission on Environmental Quality, Federal Clean Air Act Sections 110(a)(1) and (2) Transport State Implementation Plan Revision for the 2015 Ozone National Ambient Air Quality Standards (Aug. 8, 2018) (C.I. R6-6) |
| Texas State Petitioners | The State of Texas, Texas Commission on Environmental Quality, Public Utility Commission of Texas, and Railroad Commission of Texas |

## Record References

In this brief, "C.I." refers to the certified index of record contents that EPA filed on April 13, 2023. *See* Fed. R. App. P. 17(b)(1)(B). Documents are identified by the EPA office listed as the custodian of the documents after the first hyphen in the "Document ID" numbers on the certified index (either "HQ" for EPA headquarters or "R" for an EPA regional office, with a number indicating which regional office), as well as the final four digits (minus leading zeros) of the "Document ID" number. For example, the first document listed in the certified index would be cited as C.I. HQ-20, and the second document would be cited as C.I. R2-15. In accordance with Fifth Circuit Rule 30.2(a), the Texas State Petitioners will file an appendix containing the portions of the record cited in their, the other parties', and any amici's briefs. The appendix will be tabbed according to the citation format just described.

# Statement of Jurisdiction

On February 13, 2023, EPA published in the Federal Register its disapproval of Texas's SIP addressing the requirements of 42 U.S.C. § 7410(a)(2)(D)(i)(I) for the 2015 8-hour ozone NAAQS. That final action was part of Air Plan Disapprovals; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards, 88 Fed. Reg. 9,336 (Feb. 13, 2023) ("Final Rule") (C.I. HQ-20). The Texas State Petitioners timely petitioned for review of the Texas SIP disapproval, Docs. 1-1, 44-1, invoking this Court's jurisdiction under 42 U.S.C. § 7607(b)(1).

# Issues Presented

1.    Whether EPA's disapproval of Texas's SIP was unlawful because EPA ignored the Act's cooperative federalism and impermissibly relied on factors not mentioned in the Act.

2.    Whether EPA's disapproval of Texas's SIP was unlawful because EPA failed to provide fair notice of the standards by which Texas's SIP would ultimately be evaluated.

## Introduction

The Clean Air Act is "an experiment in cooperative federalism" through which Congress "establishe[d] a comprehensive program for controlling and improving the nation's air quality through state and federal regulation." *Texas v. EPA*, 829 F.3d 405, 411 (5th Cir. 2016) ("*Texas 2016*"). In particular, Congress tasked EPA with setting NAAQS, but it ensured that States would play the primary role in implementing them. *Id.*

This case concerns the regulation of ozone, a pollutant when present at ground level. In 2015, EPA set new primary and secondary ozone NAAQS, triggering Texas's obligation to revise its SIP for ozone to demonstrate how it would meet the new standards. The SIP revision had to demonstrate compliance with the Act's "good neighbor" provision, which required Texas to show that in-state emissions of ozone precursors would not "contribute significantly to nonattainment in" or "interfere with maintenance" of the ozone NAAQS by downwind States. 42 U.S.C. § 7410(a)(2)(D)(i)(I).

Preparation of a SIP revision of this variety takes years. It is a complex, time-consuming, and technical undertaking. Texas timely submitted its SIP revisions to EPA, which is statutorily tasked with reviewing SIPs for compliance with the Act's requirements.

Under the Act's structure of cooperative federalism, EPA's role at the SIP-stage is "ministerial." *Texas 2016*, 829 F.3d at 411. If a SIP meets statutory requirements, "EPA must approve it." *Texas v. EPA*, 690 F.3d 670, 676 (5th Cir. 2012) ("*Texas 2012*"). At this stage, "EPA does not possess any 'discretionary authority'"; that

authority rests "[o]nly [with] the states." *Luminant Generation Co. v. EPA*, 675 F.3d 917, 928 n.8 (5th Cir. 2012).

EPA eschewed that congressional design. It delayed final action on Texas's SIP for more than four years after Texas's timely submission—and more than three years after it was statutorily required to act. In the meantime, however, EPA developed new data, models, and methodologies by which to judge Texas's submission. And when it eventually did act on Texas's SIP, EPA deployed those previously unavailable tools to reject Texas's technical analysis and disapprove Texas's SIP. That disapproval set the stage for EPA's imposition of a FIP that, absent this Court's intervention earlier this month, would have strained, to potentially devastating effect, Texas's economy and electrical grid.

EPA's disapproval of Texas's SIP flouts two fundamental administrative-law precepts enshrined in the Administrative Procedure Act ("APA"). The first is that agency action must not exceed the scope of congressionally conferred authority. EPA ignored that principle, discarding the Act's cooperative federalism and relying on factors that Congress did not make relevant. The second precept is that agencies must give regulated parties fair notice of the standards by which their conduct will be judged. EPA failed to do so here. Its disapproval of Texas's SIP relied on a "nonbinding" federal policy announced *after* Texas's SIP revisions were statutorily due, and the agency judged Texas's SIP based on data and modeling that were not available at the time Texas was statutorily required to submit—and did submit—its SIP. Because EPA's disapproval of Texas's SIP violates these cardinal principles of administrative law, it is unlawful and should be set aside.

**STATEMENT OF THE CASE**

## I.  Statutory Framework

### A.  The Act's cooperative federalism

The Clean Air Act requires EPA to identify air pollutants and establish NAAQS. 42 U.S.C. §§ 7408(a), 7409(a). Every five years, EPA must revise each NAAQS as appropriate. *Id.* § 7409(d)(1). A geographic area that meets the NAAQS is called an "attainment" area; an area that does not is a "nonattainment" area. *Id.* § 7407(d)(1)(A)(i)-(ii); *see id.* § 7501(2).

Although the Act requires EPA to set the NAAQS, it assigns the States "primary responsibility for ensuring that the ambient air meets the NAAQS." *BCCA Appeal Grp. v. EPA*, 355 F.3d 817, 822 (5th Cir. 2003); *see* 42 U.S.C. § 7407(a). "This division of responsibility between the states and the federal government 'reflects the balance of state and federal rights and responsibilities characteristic of our federal system of government.'" *Texas 2016*, 829 F.3d at 411 (quoting *Luminant*, 675 F.3d at 921). It "indicates a congressional preference that states, not EPA, drive the regulatory process." *Id.*

To implement the NAAQS, "states must adopt and administer [SIPs]," *Luminant*, 675 F.3d at 921, which "provide[] for implementation, maintenance, and enforcement" of the NAAQS within their borders, 42 U.S.C. § 7410(a)(1). After EPA establishes or revises a NAAQS, States have three years to submit SIPs or SIP revisions specifying how the NAAQS will be met and including numerous congressionally mandated SIP components. *Id.* § 7407(a); *id.* § 7410(a)(1), (a)(2), (a)(2)(H). In discharging that obligation, States have "broad authority to determine the methods

and particular control strategies they will use to achieve the statutory requirements," *BCCA Appeal Grp.*, 355 F.3d at 822, and "'wide discretion in formulating [their SIPs]'" to meet the NAAQS, *Luminant*, 675 F.3d at 921 (quoting *Union Elec. Co. v. EPA*, 427 U.S. 246, 250 (1976)). Indeed, "[s]o long as the ultimate effect of a State's choice of emission limitations is compliance with the [NAAQS], the State is at liberty to adopt whatever mix of emission limitations it deems best suited to its particular situation." *Texas 2016*, 829 F.3d at 411 (quoting *Train v. Nat. Res. Def. Council, Inc.*, 421 U.S. 60, 79 (1975)).

Consistent with this preference for state implementation and enforcement, the Act "confines EPA's role in implementing air quality standards 'to the ministerial function of reviewing SIPs for consistency with the Act's requirements.'" *Id.* (quoting *Luminant*, 675 F.3d at 921); *see* 42 U.S.C. § 7410(a)(1), (*l*). In other words, if a SIP meets the statutory requirements, "EPA must approve it." *Texas 2012*, 690 F.3d at 676; *see* 42 U.S.C. § 7410(k)(3) (providing that "the Administrator *shall* approve [a SIP] as a whole if it meets all of the applicable requirements of [the Act]" (emphasis added)); 40 C.F.R. § 52.02(a). "Only if the state has not complied with the requirements of the Clean Air Act does EPA assume the role of primary regulator by drafting a [FIP]." *Texas 2016*, 829 F.3d at 412; *see* 42 U.S.C. § 7410(c)(1); *id.* § 7602(y) (defining a FIP, in part, as "a plan . . . promulgated by the [EPA] Administrator to fill all or a portion of a gap or otherwise correct all or a portion of an inadequacy in a [SIP]").

The Act requires EPA to take action on a SIP within 18 months of its submission. Congress directed EPA to determine, within the first six months, whether a SIP is

technically and administratively complete. 42 U.S.C. § 7410(k)(1)(B). If EPA does not issue a completeness finding within six months, the SIP is deemed to meet the minimum criteria by operation of law. *Id.* Upon its issuance of a completeness finding, EPA has 12 months to approve or disapprove the SIP. *Id.* § 7410(k)(2)-(3).

## B. The "good neighbor" provision

As noted, the Act enumerates several substantive requirements for SIPs. *Id.* § 7410(a)(2). Relevant here is the "good neighbor" provision, which requires "upwind States to reduce emissions to account for pollution exported beyond their borders." *EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489, 499 (2014). The text of this provision requires that a SIP "contain adequate provisions" prohibiting emissions that "will . . . contribute significantly to nonattainment in, or interfere with maintenance by, any other State with respect to any [NAAQS]." 42 U.S.C. § 7410(a)(2)(D)(i)(I); *see also id.* § 7410(a)(2)(D)(i)(II) (requiring a SIP to prohibit emissions that will "interfere with measures required to be included" in other States' SIPs "to prevent significant deterioration of air quality or to protect visibility"); *Texas 2016*, 829 F.3d at 411 (involving action taken under subsection (a)(2)(D)(i)(II)).

## II. Factual Background and Administrative History

### A. EPA revises the ozone NAAQS

The story here begins with EPA's October 2015 revision of the ozone NAAQS. National Ambient Air Quality Standards for Ozone, 80 Fed. Reg. 65,292 (Oct. 26, 2015) (promulgated Oct. 1, 2015). That action replaced the preexisting ozone

NAAQS of 0.075 parts per million (ppm) with a more stringent 0.070 ppm. *Id.* at 65,293-94. EPA's October 1, 2015, revision of the NAAQS triggered Texas's statutory obligation to revise its SIP within three years, or by October 1, 2018. 42 U.S.C. § 7410(a)(1).

## B. EPA issues data and guidance for SIP revisions

Between the time that EPA revised the NAAQS and the date that Texas's SIP revisions were due, EPA issued guidance documents to assist the States with their SIP-revision task. Two of those documents are relevant here. But before diving into them, a bit of technical background is needed.

First, EPA's guidance spoke in terms of base-year modeling of ozone concentrations. In that type of modeling, the base year is the "center" year in a multi-year period of data collected from air-quality monitors. So, for example, when monitored values are from 2009-2011, 2010-2012, and 2011-2013, the base year would be 2011. That year is EPA's "starting point for projecting air quality concentrations in future years." Air Plan Disapproval; Arkansas, Louisiana, Oklahoma and Texas; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards, 87 Fed. Reg. 9,798, 9,826 (Feb. 22, 2022) ("Proposed Rule") (C.I. R6-1).

Second, the guidance talked about design values. A "design value" is just "a statistic that describes the air quality status of a given location relative to the level of the NAAQS." *Id.* at 9,800 n.8; *see id.* at 9,826.

### 1. The 2017 notice of data availability

In January 2017, EPA issued a document making available to the States "preliminary air quality modeling data" to "help states as they develop[ed] SIPs to address" their good-neighbor obligations for the 2015 ozone NAAQS. Notice of Availability of the Environmental Protection Agency's Preliminary Interstate Ozone Transport Modeling Data for the 2015 Ozone National Ambient Air Quality Standard (NAAQS), 82 Fed. Reg. 1,733, 1,735 (Jan. 6, 2017) ("2017 NODA"). EPA, however, assured the States that they could "choose to modify or supplement these data in developing their" SIPs. *Id.*

In the 2017 NODA, EPA "used a 2011-based modeling platform to develop base year and future year emissions." *Id.* The "platform included meteorology for 2011, base year emissions for 2011, and future year base case emissions for 2023." *Id.* These "2011 and 2023 air quality modeling results were used to identify areas [of the United States] that [we]re projected to be in nonattainment or have problems maintaining the 2015 ozone NAAQS in 2023." *Id.*

### 2. The March 2018 transport guidance

In March 2018, seven months before Texas's statutory deadline to revise its SIP, EPA issued another document designed to "assist states in their efforts to develop good neighbor SIPs for the 2015 ozone NAAQS." C.I. R7-18 ("March 2018 Transport Guidance") at 2. This memorandum provided two forms of guidance for flexible approaches to transport analysis that are relevant here.

First, EPA described an "alternative approach" for identifying maintenance receptors "that d[id] not rely on the projection of maximum design values." *Id.* at A-

2. The March 2018 Transport Guidance also suggested that maintenance receptors could be identified "where current, presumably 'clean,' measured data are shown through analysis to occur during meteorological conditions conducive to ozone formation such that exceedances are unlikely to reoccur in the future." *Id.* at A-2.

Second, to carry out the modeling of future ozone concentrations, EPA explained that States could use EPA's modeling, which was based on data gathered from the years 2009-2013 (base year 2011). *Id.* at 3-4. That recommendation aligned with the analysis EPA used in the 2017 NODA. *See* 82 Fed. Reg. at 1,735.

Yet it was still, according to EPA, just a recommendation. EPA reassured States that they could "supplement the information provided in [the March 2018 Transport Guidance] with any additional information that they believe[d] [wa]s relevant" and "choose to use other information to identify nonattainment and maintenance receptors relevant to development of their good neighbor SIPs." *Id.* at 6. EPA also noted that States could use "appropriate alternative base years." *Id.* at A-2.

## C. Texas timely submits its SIP revisions

On August 17, 2018, TCEQ timely submitted revisions to Texas's SIP. C.I. R6-6 ("Texas SIP"); *see* Proposed Rule, 87 Fed. Reg. at 9,798. Once again, a bit of background is necessary to put those revisions in context.

In FIPs promulgated to satisfy previous NAAQS, EPA has followed a four-step, nonstatutory, nonregulatory, and nonbinding approach under the good-neighbor provision. EPA's first step is "[i]dentifying downwind receptors that are expected to have problems attaining the NAAQS (nonattainment receptors) or maintaining the NAAQS (maintenance receptors)." Federal Implementation Plan Addressing

Regional Ozone Transport for the 2015 Ozone National Ambient Air Quality Standard, 87 Fed. Reg. 20,036, 20,054 (Apr. 6, 2022) (proposed rule). The process involves gathering historical data from downwind air-quality receptors and using modeling to assess future air-quality problems. *Id.* EPA's second step is "determining which upwind states are 'linked' to these identified downwind receptors based on a numerical contribution threshold." *Id.* Under EPA's preferred (but, again, nonbinding) approach, a State that contributes more than one percent of the NAAQS to a downwind State is "linked" to that State. *Id.* EPA's third step, for any State "linked to downwind air quality problems," is "identifying upwind emissions on a statewide basis that significantly contribute to downwind nonattainment or interfere with downwind maintenance of the NAAQS, considering cost- and air quality-based factors." *Id.* And EPA's fourth step, for any upwind State "found to have emissions that significantly contribute to nonattainment or interfere with maintenance of the NAAQS in any downwind state," is "implementing the necessary emissions reductions through enforceable measures." *Id.*

In preparing Texas's SIP revision, TCEQ referred to EPA's 2017 NODA and March 2018 Transport Guidance, "using a framework similar to EPA's 4-Step framework," Proposed Rule, 87 Fed. Reg. at 9,824, for assessing interstate ozone pollution. But TCEQ included "several key improvements." C.I. R6-6 at 3-1.

TCEQ's approach entailed: (1) identifying receptors projected to be in nonattainment status or to have maintenance issues in a future year; (2) identifying receptors in other States that might be affected by emissions from Texas; and (3) determining whether Texas emissions contribute significantly to nonattainment in, or

interfere with maintenance of the ozone NAAQS by, downwind States. *Id*. Step 1 of TCEQ's three-step process corresponded to step 1 of EPA's four-step process, while steps 2 and 3 corresponded to EPA's step 2. *Id*. at 3-2. Only if TCEQ's analysis identified a good-neighbor violation would TCEQ proceed to what EPA calls steps 3 and 4. *Id*.

At step 1, TCEQ used an EPA-recommended approach to identify nonattainment receptors. *Id*. at 3-37. But for identifying maintenance receptors, TCEQ took a slightly different approach. It used the *most recent* three-year average design value that included the base year 2012 (2010-2012, 2011-2013, and 2012-2014 periods), whereas EPA had recommended using the *maximum* of the three-year average design value that included the base year 2011 (i.e., the highest value from the 2010-2012, 2011-2013, 2012-2014 periods). *Id*. at 3-3, 3-39; *see* Proposed Rule, 87 Fed. Reg. at 9,827; March 2018 Transport Guidance at 3-4; 2017 NODA, 82 Fed. Reg. at 1,735. TCEQ utilized this alternate approach because it found that the most recent design value "reflect[ed] the current state of ozone concentrations in [a downwind] area and the impact of any maintenance plans that [we]re in place to prevent local emissions from causing an area to slip back into nonattainment[.]" C.I. R6-6 at 3-42.

At step 2, in line with EPA guidance, TCEQ identified nonattainment and maintenance receptors with projected Texas contributions to ozone design values of greater than one percent of the NAAQS and selected those receptors for further review at step 3. *Id*. at 3-47 to 3-48.

And at step 3, TCEQ employed a "weight-of-evidence" analysis to determine whether Texas's ozone contributions to downwind States were "significant." *Id*. at

3-50. Under that analysis, Texas's ozone contributions would be deemed "significant" "only if there [were] a persistent and consistent pattern of contribution on several days with elevated ozone." *Id.* at 3-50 to 3-51. To determine whether such a pattern existed, TCEQ weighed a variety of factors for each linked receptor, including trends in the design values, the meteorological conditions that lead to high ozone formation at the downwind receptor, and the number of days with elevated ozone. *Id.* at 3-50. Applying those factors to the nonattainment and maintenance receptors identified at step 2, TCEQ concluded that Texas's emissions do not contribute significantly to nonattainment of the NAAQS in, or interfere with maintenance of the NAAQS by, any downwind State. *Id.* at 3-50 to 3-76.

### D.  EPA issues after-the-fact maintenance guidance

On October 19, 2018—more than two weeks *after* the statutory deadline for Texas to submit SIP revisions—EPA issued a memorandum providing updated guidance for use in identifying downwind maintenance receptors. C.I. R7-11 ("October 2018 Maintenance Receptor Memo"). That memorandum materially departed from the March 2018 Transport Guidance.

As noted, EPA indicated in the March 2018 Transport Guidance that States could identify maintenance receptors that are currently meeting the NAAQS but may struggle to do so in the future by "using an alternative approach that does not rely on the projection of maximum design values" and in locations "where current, presumably 'clean,' measured data are shown through analysis to occur during meteorological conditions conducive to ozone formation such that exceedances are unlikely to re-occur in the future." C.I. R7-18 at A-2. But in the October 2018

Maintenance Receptor Memo, EPA added a requirement, stating that if a State "use[d] a design value . . . that [wa]s not the maximum design value" or eliminated a site as a maintenance receptor, EPA "would expect [the State] to include with [its] SIP demonstration" evidence that "ozone concentrations ha[d] been trending downward at the site since 2011." C.I. R7-11 at 4; *cf.* C.I. R7-18 at A-2.

EPA stated, however, that its October 2018 memorandum did "not impose binding, enforceable requirements on any party" and that "State air agencies retain[ed] the discretion to develop good-neighbor SIP revisions that differ[ed] from" EPA's after-the-fact guidance. C.I. R7-11 at 1. As one might expect from that statement, nothing in the guidance indicated that compliance with EPA's new recommendations would be dispositive of a SIP submission.

## E. EPA proposes disapproval of Texas's SIP and publishes a proposed FIP for Texas

In February 2022, two years after it was statutorily required to act, EPA proposed a combined disapproval of Texas's, Oklahoma's, Louisiana's, and Arkansas's SIPs. Proposed Rule, 87 Fed. Reg. at 9,798; *see* 42 U.S.C. § 7410(k)(1)-(3) (reflecting that EPA has a maximum of 18 months to act after a SIP is submitted). In that proposed rule, EPA first took issue with TCEQ's methodology for identifying maintenance receptors, concluding that use of the most recent three-year average design value over a five-year period—as opposed to the maximum three-year average design value over a five-year period—failed to sufficiently account for "meteorological variability in identifying those areas that" may currently be meeting the NAAQS but may struggle to maintain the NAAQS in the future. 87 Fed. Reg. at 9,826-29.

EPA next criticized TCEQ's modeling methodology, stating that TCEQ's modeling (base year 2012) "underestimate[d] future ozone levels." *Id.* at 9,829. EPA instead used a new "2016v2" modeling platform (base year 2016), which it developed long after TCEQ had submitted Texas's SIP. *Id.* at 9,800, 9,829-30. Using that new platform, EPA faulted TCEQ's modeling for "not adequately identifying nonattainment and/or maintenance receptors in 2023." *Id.* at 9,829.

EPA also rejected TCEQ's weight-of-evidence approach to determining "significance" of contributions for linked receptors. *Id.* at 9,831-34. EPA concluded that, because even TCEQ's own modeling showed ozone contributions greater than one percent of the NAAQS at certain downwind receptors in California and Colorado, "significance" was "already established." *Id.* at 9,833. EPA therefore rejected TCEQ's multi-factor analysis demonstrating that no Texas ozone contribution greater than one percent of the NAAQS was "significant" within the meaning of the Act because it did not show a "persistent and consistent pattern of contribution on several days with elevated ozone." *Id.* at 9,832-33.

Even though EPA had not finally acted on Texas's SIP revisions, a mere month-and-a-half after proposing to disapprove the SIP, EPA published a proposed FIP for Texas. 87 Fed. Reg. at 20,036.

## F.  TCEQ submits comments on EPA's proposed SIP disapproval

In response to the proposed SIP disapproval, TCEQ submitted comments identifying several problems with EPA's analysis. TCEQ first explained that EPA's attempt to leverage its disregard for Congress's deadline for acting on Texas's SIP to introduce new guidance, modeling, and data violated the Act's cooperative

federalism. C.I. R6-28 at 1-3 ("TCEQ Comments"). TCEQ next argued that it was improper for EPA to disapprove the SIP in part by relying on maintenance-receptor guidance issued *after* Texas submitted its SIP, *id.* at 5-6, and by using a modeling platform and data from 2014-2018 that were not available to TCEQ until long after Texas's SIP-revision deadline had passed, *id.* at 6-9. Finally, TCEQ challenged EPA's use of its one-percent contribution threshold as the sole proxy for determining whether emissions by an upwind State "significant[ly]" contribute to nonattainment of the NAAQS in a downwind State. *Id.* at 9-10.

## G.  EPA finalizes its disapproval of Texas's SIP revision

On February 13, 2023, three years after its statutory deadline to act, EPA issued the Final Rule disapproving Texas's SIP. 88 Fed. Reg. at 9,359-60. The Final Rule utilized a new modeling platform—different even from the one EPA used in the Proposed Rule—that EPA published just one month before promulgating the Final Rule. *See id.* at 9,343-44, 9,359. That new platform projected that Texas was "linked above 1 percent of the NAAQS to one nonattainment receptor and nine maintenance-only receptors" as well as "ten violating-monitor maintenance-only receptor[s]." *Id.* at 9,359; *see id.* at 9,342 (explaining what EPA meant by a "violating-monitor maintenance-only receptor"). Invoking its analysis in the Proposed Rule, EPA asserted that TCEQ's "definition of maintenance receptors and modeling" were "inadequately justified and legally and technically flawed." *Id.* at 9,359-60. And because Texas was linked to receptors at greater than one percent of the NAAQS, EPA concluded that TCEQ was required to, but did not, include "permanent and enforceable emissions controls in its SIP submission." *Id.* at 9,360.

The Final Rule also offered several responses to TCEQ comments on the Proposed Rule. First, in response to TCEQ's points about cooperative federalism, EPA summarily stated that it "does not . . . agree" with the "characterization" of its role in the SIP process as "secondary" and that such comments "fundamentally misunderstand or inaccurately describe this action." *Id.* at 9,367. Second, EPA asserted that it "does not use the 1 percent of the NAAQS threshold as the definition of 'significance'" but instead uses it as a "screening threshold" for determining which States must "further evaluat[e] . . . emissions control opportunities." *Id.* at 9,371. Third, EPA contended that it did not reject TCEQ's methodology for selecting maintenance receptors based on the October 2018 Maintenance Receptor Memo; that TCEQ could not have legitimately relied on any statements in the March 2018 Transport Guidance because it was expressly made nonbinding; and that, in any event, after-arising D.C. Circuit case law undermined the March 2018 Transport Guidance, rendering it unsound. *Id.* at 9,364, 9369-70. Finally, EPA asserted that it had not improperly sprung its new modeling platform on Texas because EPA had been publishing a series of updated modeling platforms since November 2020 and the States could have "consider[ed] how [EPA's] modeling updates could affect" the status of their SIPs "for purposes of evaluating potential linkages for" the 2015 ozone NAAQS. *Id.* at 9,366.

## III. Litigation History

Among other parties, the Texas State Petitioners timely petitioned this Court for review of EPA's disapproval of the Texas SIP. Docs. 1, 44. Texas and TCEQ moved to stay that disapproval, arguing that they were likely to succeed on the merits

for two reasons: (1) EPA failed to explain its after-the-fact reversal of prior guidance regarding how States should identify maintenance receptors, Doc. 31 at 12-15; and (2) EPA disregarded the Act's cooperative federalism by utilizing information available only after Texas was statutorily required to submit its SIP revisions, *id.* at 16-18. Texas and TCEQ also argued that they would be irreparably injured absent a stay, and that the public interest and balance of equities favored a stay, because the SIP disapproval was the predicate act to EPA's imposition of a FIP that would strain, to potentially devastating effect, Texas's economy and electrical grid. *Id.* at 18-19. Several Texas industry parties also sought a stay of the Texas SIP disapproval. Doc. 32.

EPA filed a consolidated opposition to the stay motions. Doc. 179; *see also* Docs. 197, 203 (replies). It also moved to transfer the case to the D.C. Circuit, contending that venue for challenges to the Final Rule, or any part of it, lay only in that Court. Doc. 50.

On May 1, 2023, a panel of this Court denied EPA's motion to transfer venue (over Judge Douglas's dissent) and stayed the Texas SIP disapproval. Doc. 269-1 (Order, *Texas v. EPA*, No. 23-60069 (5th Cir. May 1, 2023) (per curiam) ("*Texas 2023*")). The panel majority first concluded that venue was proper in this Court because, under the plain language of 42 U.S.C. § 7607(b)(1), EPA's disapproval of Texas's SIP was a "locally or regionally applicable" action and venue for a petition for review challenging such an action lies in the "appropriate" regional circuit (here, this Court). *Id.* at 9-11. The panel majority also rejected EPA's argument based on section 7607(b)(1)'s exception making the D.C. Circuit the proper venue when an EPA action is "based on a determination of nationwide scope or effect" and EPA

publishes a finding to that effect, explaining that EPA's disapproval of each State's SIP was "based on a number of intensely factual determinations unique to each State." *Id.* at 11-12 (citation omitted).

The panel also granted a stay. *Id.* at 13-24. It concluded that Texas and TCEQ were likely to succeed on the merits of their APA claims because they had made "a strong showing that the EPA acted unlawfully by considering factors listed nowhere" in the Act and "are likely to prevail on the claim that the EPA arbitrarily and capriciously based [the Texas SIP disapproval] in part on information only available after Texas . . . had submitted [its] SIP[]." *Id.* at 14. The panel further concluded that Texas and TCEQ had demonstrated irreparable harm and that the public interest and balance of equities favored a stay. *Id.* at 22-24; *see also id.* at 30 (reflecting that, because of her view on venue, Judge Douglas found it unnecessary "to reach Petitioners' motions to stay").

## SUMMARY OF THE ARGUMENT

The Court should hold unlawful and set aside EPA's disapproval of Texas's SIP for at least two reasons.

**I.**   In disapproving Texas's SIP, EPA both disregarded factors that Congress instructed it to consider when analyzing SIPs and simultaneously imposed requirements that Congress did not authorize. Either ground is sufficient to doom agency action. *See Luminant*, 675 F.3d at 925-26.

EPA failed to consider relevant factors because its disapproval ran roughshod over the Act's cooperative federalism, which makes the States the primary drivers of implementing the NAAQS through SIPs. As the motions panel correctly

explained, the Act's cooperative federalism cabins EPA's timeframe for acting on States' SIP submissions and confines EPA to the ministerial role of reviewing SIPs for consistency with the Act's requirements. *Texas 2023* at 21. EPA ignored those limitations. It missed its statutory deadline by years, then used its own delay to develop new data, models, and methodologies that were unavailable to Texas at the time its SIP revisions were due.

EPA's disapproval also held Texas to requirements found nowhere in the Act. Specifically, EPA treated any ozone contribution by Texas to a downwind receptor at greater than one percent of the NAAQS as a presumptively "significant" contribution. Congress imposed no such threshold.

**II.**    EPA also failed to provide fair notice of the standards by which Texas's SIP would be judged. EPA denied that basic procedural right in two ways.

First, even though Texas's SIP followed an approach that EPA had previously endorsed, EPA ultimately rejected Texas's method for identifying maintenance receptors based on its post-deadline, supposedly nonbinding alteration of that preferred approach. EPA failed to explain that dispositive policy change or account for Texas's reliance interests.

Second, in disapproving Texas's SIP, EPA utilized new modeling platforms, which identified new linkages to downwind receptors, that the agency developed long after Texas's SIP-submission deadline had passed. Indeed, the modeling platform EPA used in the Final Rule was issued a mere month before the Final Rule was published. Texas and TCEQ therefore had no opportunity to explore inconsistences

in the results of the new modeling platform or otherwise explore the propriety of its use.

## STANDARD OF REVIEW

The APA empowers this Court to "hold unlawful and set aside" certain "agency action"—including, as relevant here, action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C); *accord* 42 U.S.C. § 7607(d)(9)(A), (C).

"The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). An action will be found arbitrary or capricious "'if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Tex. Oil & Gas Ass'n v. EPA*, 161 F.3d 923, 933 (5th Cir. 1998) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). "Put simply, [the Court] must set aside any action premised on reasoning that fails to account for 'relevant factors' or evinces a 'clear error of judgment.'" *Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS*, 985 F.3d 472, 475 (5th Cir. 2021) (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989)). This review is "not toothless." *Wages & White Lion Invs. v. FDA*, 16 F.4th 1130, 1136 (5th Cir. 2021). Indeed, "after [*DHS v. Regents of the University of California*, 140 S. Ct. 1891 (2020)], it has serious bite." *Id.*

**ARGUMENT**

## I. In Disapproving Texas's SIP, EPA Failed to Account for Relevant Factors and Relied on Non-Statutory Grounds for Its Decision.

"[F]ailure to consider 'relevant factors' will render 'an agency's decreed result' unlawful." *R.J. Reynolds Vapor Co. v. FDA*, 65 F.4th 182, 189 (5th Cir. 2023) (quoting *Michigan v. EPA*, 576 U.S. 743, 750 (2015)). So will "reli[ance] on factors which Congress has not intended it to consider." *Luminant*, 675 F.3d at 930 (quoting *State Farm*, 463 U.S. at 43). EPA committed both of those administrative transgressions.

### A. EPA's disapproval disregarded the Act's cooperative federalism.

**1.** As already noted, the Act assigns the States "primary responsibility for ensuring that the ambient air meets the NAAQS." *BCCA Appeal Grp.*, 355 F.3d at 822; *see* 42 U.S.C. § 7407(a). It confers "broad authority [on the States] to determine the methods and particular control strategies they will use to achieve the statutory requirements," *BCCA Appeal Grp.*, 355 F.3d at 822, and gives them "'wide discretion in formulating [SIPs],'" *Luminant*, 675 F.3d at 921 (quoting *Union Elec.*, 437 U.S. at 250).

By contrast, EPA's "overarching role is in setting standards, not in implementation." *Michigan v. EPA*, 268 F.3d 1075, 1083 (D.C. Cir. 2001). EPA's "narrow role" at the SIP stage, *Fla. Power & Light Co. v. Costle*, 650 F.2d 579, 578 (5th Cir. Unit B June 1981), is limited "'to the ministerial function of reviewing SIPs for consistency with the Act's requirements,'" *Texas 2016*, 829 F.3d at 411 (quoting *Luminant*, 675 F.3d at 921); *see* 42 U.S.C. § 7410(a)(1), (*l*). If a SIP meets the statutory requirements, "EPA *must* approve it." *Texas 2012*, 690 F.3d at 676 (emphasis

added); *see* 42 U.S.C. § 7410(k)(3) ("the Administrator *shall* approve [a SIP] as a whole if it meets all of the applicable requirements of [the Act]" (emphasis added)); 40 C.F.R. § 52.02(a). Stated differently, "EPA does not possess *any* discretionary authority in th[e] [SIP-approval] process. *Only* the states enjoy discretion in implementing the dictates of the [Act]." *Texas 2023* at 16 (quoting *Luminant*, 675 F.3d at 928 n.8) (alterations in original).

This division of responsibility "reflects the balance of state and federal rights and responsibilities characteristic of our federal system of government" and "indicates a congressional preference that states, not EPA, drive the regulatory process." *Texas 2016*, 829 F.3d at 411. As the motions panel explained, this congressional choice "is clearly reflected throughout the [Act], such as [in] the provisions cabining the Agency's decisional timeframe, 42 U.S.C. § 7410(k)(1)-(2), and the sections 'confin[ing] the EPA to the ministerial function of reviewing SIPs for consistency with the Act's requirements.'" *Texas 2023* at 21 (quoting *Luminant*, 675 F.3d at 921) (first and second alterations in original).

**2.** An "agency . . . may not exercise its authority 'in a manner inconsistent with the administrative structure that Congress enacted into law.'" *R.J. Reynolds*, 65 F.4th at 194 (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125 (2000)). Yet that is what happened here. EPA's disapproval of Texas's SIP leveraged the agency's own disregard of its statutory deadline for acting on SIP submissions to disapprove Texas's SIP based on data that was not available at the time the State was statutorily required to—and did—submit its SIP revisions. EPA flouted

the Act's cooperative federalism and thereby "fail[ed] to account for 'relevant factors' or evince[d] a 'clear error of judgment.'" *Univ. of Tex.*, 985 F.3d at 475.

As described above, EPA's October 1, 2015, revision of the NAAQS triggered Texas's three-year deadline to revise its SIP, 42 U.S.C. § 7410(a)(1), and Texas timely submitted its revised SIP on August 17, 2018, *see* Proposed Rule, 87 Fed. Reg. at 9,798. Relevant here, TCEQ's SIP revisions reflected an assessment of the impact that Texas's ozone contributions had on downwind States using data from a five-year period from 2010-2014, C.I. R6-6 at 3-3 to 3-6—an approach similar to what EPA recommended, mere months before Texas's submission deadline, in its March 2018 Transport Guidance. *See* C.I. R7-18 at 3-6. Following that approach, TCEQ concluded that "Texas emissions do not contribute significantly to nonattainment or interfere with maintenance of the 2015 eight-hour ozone NAAQS at any downwind" receptor. C.I. R6-6 at 3-75.

Despite having a maximum of 18 months to approve or disapprove the SIP, 42 U.S.C. § 7410(k)(1)-(2), EPA did not act on Texas's timely SIP revisions until two years after the statutory deadline had passed. Proposed Rule, 87 Fed. Reg. at 9,798. By that time, EPA had accumulated new data and developed a new modeling platform. *Id*. at 9,828. And it used the information derived from its new data set, which included data from the same year that Texas's SIP revision was due, as a basis for disapproval of Texas's SIP. *Id.*

Commenters, including TCEQ, raised the impropriety of using data not available at the relevant time (and available to EPA only because of its failure to meet its statutory deadline) as a basis upon which to reject Texas's SIP. C.I. R6-28 at 6; Final

Rule, 88 Fed. Reg. at 9,366 (EPA's concession that this new data set was published in "November of 2020," seven months after EPA was statutorily required to approve or disapprove Texas's SIP). In response, EPA stated in the Final Rule that it should not be "prohibited from taking rulemaking action using the best information available to it at the time it takes such action." 88 Fed. Reg. at 9,366. And it concluded that "[n]othing in the [Act] suggests that the Agency must deviate from that general principle when acting on SIP submissions." *Id.*

Contrary to EPA's suggestion, *id.*, Texas does not argue that EPA must confine itself to outdated data when assessing States' SIP submissions. But if EPA wishes to rely on data that became available only after the SIP-submission deadline, the Act provides a mechanism for introducing those new data into the SIP process: issue a "SIP call" to allow the State to address the new information in the first instance. *See* 42 U.S.C. § 7410(k)(5); *see also BCCA Appeal Grp.*, 355 F.3d at 822 (confirming the States' "primary responsibility" for ensuring compliance with the NAAQS).

Were it otherwise, the Act's cooperative federalism would become little more than a suggestion. As the motions panel recognized, under EPA's view of the law, the agency could ignore its statutorily assigned deadlines with impunity, collect new data after the expiration of a State's statutory deadline to act, reject a SIP revision based on inconsistency with the new data, and then impose a FIP that ensures a federal takeover of a State's economy. *See Texas 2023* at 21-22 (observing that, if accepted, EPA's argument would free the agency to "easily flout the [Act]'s deadlines with impunity, then leverage that disregard to summarily reject SIPs based on the

States' failure to consider information that only became available after the SIP-submission deadline").

That is not how Congress structured the Act. "EPA may not use its own delay as an excuse for imposing burdens on Texas that" the Act "does not permit." *Texas 2016*, 829 F.3d at 430. And nothing in the Act authorizes EPA to second-guess TCEQ's technical analysis based on data that became available after Texas's SIP-revision deadline. EPA's approach would invert the Act's structure by constricting the States' "'wide discretion' in formulating [their SIPs]" and "transform the EPA's statutory role from that of a 'ministerial' overseer to one of a freewheeling dictatorial regulator.'" *Texas 2023* at 3, 22 (quoting *Luminant*, 675 F.3d at 921). Yet nothing in the Act "suggests that the agency has some overarching jurisdiction to implement federal programs," much less "default ... jurisdiction, authority, or power." *Michigan*, 268 F.3d at 1083. Instead, the Act establishes the opposite approach, relegating EPA "to a secondary role" at the SIP stage. *Train*, 421 U.S. at 79. EPA's "fail[ure] to account for" this "'relevant factor[],'" *Univ. of Tex.*, 985 F.3d at 475, was arbitrary and capricious. The Court could hold unlawful and set aside the disapproval on that ground alone.

## B.  EPA's disapproval relied on non-statutory factors.

"It is beyond cavil that the EPA may consider only the requirements of the [Act] when reviewing SIP submissions." *Luminant*, 675 F.3d at 926. EPA acts unlawfully when it relies on factors that Congress did not intend for it to consider. *Id.* at 930 (citing *State Farm*, 463 U.S. at 43). EPA violated those principles by treating its one-percent contribution threshold as a binding proxy for determining whether a State

"contribute[s] significantly to [NAAQS] nonattainment in" or "interfere[s] with maintenance [of the NAAQS] by" one or more downwind States. 42 U.S.C. § 7410(a)(2)(D)(i)(I).

As EPA has explained, "[i]f a state's contribution value does not equal or exceed the threshold of 1 percent of the NAAQS[,] . . . the state does not contribute significantly to nonattainment or interfere with maintenance of the NAAQS in downwind states." Final Rule, 88 Fed. Reg. at 9,342. But if "a state's contribution value" *does* "equal or exceed the 1 percent of the NAAQS threshold," the State is "'linked' to a downwind air quality problem," and EPA expects States to engage in a further analysis of "both air quality and cost as part of a multi-factor analysis" to establish binding emissions limitations. *Id.*

True, EPA has repeatedly claimed that any State whose contribution meets or exceeds the one-percent threshold does not automatically violate its good-neighbor obligations; instead, such a State is "screen[ed] in . . . for further evaluation of emissions control opportunities." *Id.* at 9,371; *see* Proposed Rule, 87 Fed. Reg. at 9,803. But in practice, EPA deploys the one-percent threshold as a presumption of significant contribution that a State must rebut on pain of SIP disapproval. *See* 2017 NODA, 82 Fed. Reg. at 1,740.

That is how EPA wielded its one-percent threshold in disapproving Texas's SIP. As discussed above, after identifying receptors reflecting ozone contributions of greater than one percent of the NAAQS, TCEQ employed a multi-factor "weight-of-evidence" analysis to determine whether Texas's downwind contributions at greater than one percent were "significant" because they represented a "persistent

and consistent pattern of contribution" to downwind States on multiple days and years. C.I. R6-6 at 3-50 to 3-51. EPA, however, rejected that analysis, stating that it did not "refute" TCEQ's own modeling results showing contributions by Texas to downwind receptors at greater than one percent of the NAAQS. Proposed Rule, 87 Fed. Reg at 9,833; *see id.* at 9,832. That was because EPA considers "significance," as measured by "a persistent and consistent pattern of contribution on several days with elevated ozone," to be "*already established* by a modeled linkage at [EPA's] Step 2." *Id.* at 9,833 (emphasis added); *see supra* p. 10.

Having concluded that a linkage alone establishes significance, EPA purported to disapprove Texas's SIP on the ground that TCEQ failed to analyze "whether and to what degree emissions from [Texas] should be 'prohibited' to eliminate emissions" that violate the State's good-neighbor obligations. *Id.* at 9,831. EPA incorporated that analysis by reference in the Final Rule, contending that Texas had "insufficient[ly] evaluat[ed] emissions control opportunities." 88 Fed. Reg. at 9,360.

The fundamental problem here is that the "one-percent threshold does not appear in the text of" the good-neighbor provision. *Texas v. EPA*, 983 F.3d 826, 839 (5th Cir. 2020). For that reason, EPA lacked statutory authority to treat that threshold as a presumptive finding of "significance" that States must "rebut" to secure approval of a SIP. *See Luminant*, 975 F.3d at 930. Maybe EPA could proceed this way if it "were instead defending a FIP," where the agency is "entitled to exercise far more discretion." *Texas 2023* at 16 (citing *EME Homer*, 572 U.S. at 489). In any event, EPA's one-percent threshold is not a congressional prerequisite to *SIP approval*. "EPA's insistence upon [the one-percent threshold] here was unjustified,"

"in excess of statutory . . . authority," and therefore unlawful. *Luminant*, 675 F.3d at 930.

## II. EPA Deprived Texas of Fair Notice of the Standards by Which Its SIP Would be Judged.

EPA's disapproval also violated a second foundational principle of administrative law: fair notice. "Dealing with administrative agencies is all too often a complicated and expensive game, and players like [Texas] are 'entitled to know the rules.'" *R.J. Reynolds*, 65 F.4th at 189 (quoting *Alaska Prof'l Hunters Ass'n v. FAA*, 177 F.3d 1030, 1035 (D.C. Cir. 1999), *abrogated on other grounds by Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92 (2015)). "To keep things fair, agencies must give notice of conduct the agency 'prohibits or requires' and cannot 'surprise' a party by penalizing it for 'good-faith reliance' on the agency's prior positions." *Id.* (quoting *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 156-57 (2012)). Courts have therefore "refused to allow agencies to use the rulemaking process to pull a surprise switcheroo on regulated entities." *Env'tl Integrity Project v. EPA*, 425 F.3d 992, 996 (D.C. Cir. 2005); *accord Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1810 (2019) (acknowledging the "surprise switcheroo" doctrine); *R.J. Reynolds*, 65 F.4th at 189 n.6 (same).

Here, EPA violated that core principle of administrative law in two ways. *First*, EPA premised its SIP disapproval in part on a rejection of Texas's chosen method for identifying maintenance receptors—a method that EPA itself endorsed before Texas's SIP revisions were due, then altered after Texas submitted its SIP revisions. *Second*, EPA utilized platforms for modeling ozone developed long after Texas's

SIP-submission deadline, depriving the State of fair notice of the standards by which its SIP would be judged.

### A. EPA failed to explain the reversal of its prior policy regarding the identification of maintenance receptors.

**1.** "It is axiomatic that the APA requires an agency to explain its basis for a decision." *Physicians for Soc. Resp. v. Wheeler*, 956 F.3d 634, 644 (D.C. Cir. 2020). "This foundational precept of administrative law is especially important where, as here, an agency changes course." *Id.* "Reasoned decision-making requires that when departing from precedents or practices, an agency must 'offer a reason to distinguish them or explain its apparent rejection of their approach.'" *Id.* (quoting *Sw. Airlines Co. v. FERC*, 926 F.3d 851, 856 (D.C. Cir. 2019)).

In other words, when an agency reverses "prior policy," it must provide a "detailed justification" for doing so, *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009), and "must take into account 'serious reliance interests' its 'longstanding policies may have engendered' along with 'alternatives that are within the ambit of the existing policy,'" *R.J. Reynolds*, 65 F.4th at 189 (quoting *Regents*, 140 S. Ct. at 1913). "Sudden and unexplained change, or change that does not take account of legitimate reliance on prior interpretation, may be arbitrary, capricious, or an abuse of discretion." *Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735, 742 (1996) (cleaned up). But regardless of how "the agency justifies its new position, what it may not do is 'gloss[] over or swerve[] from prior precedents without discussion.'" *Physicians for Soc. Resp.*, 956 F.3d at 645 (quoting *Sw. Airlines*, 926 F.3d at 856).

**2.**   EPA's disapproval violates these commonsense standards. In its March 2018 Transport Guidance, EPA suggested that States could identify maintenance receptors "using an alternative approach that does not rely on the projection of maximum design values" and in locations "where current, presumably 'clean,' measured data are shown through analysis to occur during meteorological conditions conducive to ozone formation such that exceedances are unlikely to reoccur in the future." C.I. R7-18 at A-2. TCEQ followed EPA's advice, identifying maintenance receptors that reflected the most recent three-year average design values over a five-year period, as opposed to the maximum three-year average design values over a five-year period. C.I. R6-6 at 3-39 to 3-40; *see* Proposed Rule, 87 Fed. Reg. 9,826-27. But in its October 2018 Maintenance Receptor Memo—issued *after* Texas's deadline for submitting SIP revisions—EPA changed course, adding that, for a State to "use a design value . . . that is not the maximum design value" or eliminate a site as a maintenance receptor, EPA "would expect states to include with their SIP[s]" evidence that "ozone concentrations have been trending downward at the site since 2011." C.I. R7-11 at 4.

That is a material change. The October 2018 Maintenance Receptor Memo added a new SIP requirement for States to meet before they could rely on an alternative method for identifying maintenance receptors: evidence of a downward trend in ozone concentrations at the site of the receptor since 2011. And critically, although EPA insisted in the October 2018 Maintenance Receptor Memo that its instructions were not binding or enforceable, *id.* at 1, it relied on the standards articulated there as a basis for disapproving Texas's SIP, *see* Final Rule, 88 Fed. Reg. at 9,364

(explaining, as a basis for disapproval, that "states' submissions did not meet the terms of the August or October 2018 memoranda addressing contribution thresholds and maintenance receptors, respectively"); *id.* at 9,370 ("EPA evaluated state's [sic] analyses and found no state successfully applied the[] criteria [in the October 2018 Maintenance Receptor Memo] to justify the use of one of these alternative approaches.").

A law professor could not fairly fault her students for neglecting to discuss, in an exam, a Supreme Court decision that changed the legal landscape *after* the exam was administered. Yet that is closely akin to what EPA did here. If anything, the situation is even starker, given EPA's representation of its guidance as nonbinding. C.I. R7-11 at 1. This is a classic case of "unfair surprise" that penalizes a party for "good-faith reliance" on an agency's prior positions. *Christopher*, 567 U.S. at 156-57; *see ExxonMobil Pipeline Co. v. DOT*, 867 F.3d 564, 579-80 (5th Cir. 2017); *Env'tl Integrity Project*, 425 F.3d at 996.

**3.** In the Final Rule, EPA offered two justifications for its policy reversal. Neither has merit.

**a.** EPA first argued that Texas could not have legitimately relied on the March 2018 Transport Guidance because it was not "agency guidance" and EPA did not "endorse" the methods advocated in it. 88 Fed. Reg. at 9,364, 9369-70. For that reason, EPA suggested that Texas could not have been prejudiced by the agency's about-face in the disapproval. *Id.* at 9,370.

But EPA cannot downplay the arbitrary and capricious nature of its "surprise switcheroo," *Env'tl Integrity Project*, 425 F.3d at 996, by claiming that the March

2018 Transport Guidance was never meant to be binding. "[A]n agency pronounce-ment will be considered binding as a practical matter if it either appears on its face to be binding . . . or is applied by the agency in a way that indicates it is binding." *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 383 (D.C. Cir. 2002) (citation omitted).

Both of those boxes are checked here. The March 2018 Transport Guidance ex-pressly stated that it "was designed 'to assist [S]tates' efforts to develop [G]ood [N]eighbor SIPs for the 2015 ozone NAAQS.'" *Texas 2023* at 20 (quoting C.I. R7-18 at 2). And EPA treated the guidance as binding, reaffirming it in the October 2018 Maintenance Receptor Memo, *see* C.I. R7-11 at 4 & n.12, and, in the Final Rule, con-tinuing to suggest that States are not "precluded from relying on the[] concepts" in the March 2018 Transport Guidance "in the development of their good neighbor SIP submissions." 88 Fed. Reg. 9,370.

Yet EPA ultimately concluded that "no state successfully applied the[] criteria" mentioned for the first time in the October 2018 Maintenance Receptor Memo "to justify the use of one of the[] alternative approaches" to identifying maintenance receptors. *Id.* Indeed, the Final Rule invoked the requirement added in the October 2018 Maintenance Receptor Memo as a basis for disapproving Texas's SIP. *Id.* (ex-plaining that "[t]he air quality data and projections" that EPA amassed after the SIP-revision deadline "indicate that trends in historic measured data do not necessarily support adopting a less stringent approach for identifying maintenance receptors").

EPA failed to acknowledge that its recommendations in the March 2018 Tran-sport Guidance "may have engendered serious reliance interests that must be taken into account." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016)

(quotation marks omitted). The bare assertion that States should not have relied on EPA's guidance documents because the agency considered them to be nonbinding is no substitute for "assess[ing] whether there were reliance interests, determin[ing] whether they were significant, and weigh[ing] any such interests against competing policy concerns." *Regents*, 140 S. Ct. at 1915.

**b.**  EPA also argued that Texas should have known that two D.C. Circuit deci-sions—*Maryland v. EPA*, 958 F.3d 1185 (D.C. Cir. 2020) (per curiam), and *Wisconsin v. EPA*, 938 F.3d 303 (D.C. Cir. 2019) (per curiam)—"called into question" the March 2018 Transport Guidance and that Texas should have submitted its own SIP revision in light of those decisions. Final Rule, 88 Fed. Reg. at 9,364. But EPA's premise is faulty: nothing in either *Maryland* or *Wisconsin* addressed the proper method for identifying maintenance receptors for purposes of the good-neighbor provision. For that reason, EPA's invocation of them explains nothing about why its tardy guidance addressing the selection of maintenance receptors—guidance that EPA characterized as "[non]binding" and "[un]enforceable," C.I. R7-11 at 1—be-came binding, enforceable, and indeed dispositive four-and-a-half years after it was issued.

Further, EPA's attempt to put the onus on Texas to account for these D.C. Cir-cuit decisions again inverts the Act's cooperative federalism. If *Maryland* and *Wis-consin* had somehow triggered EPA policy reversals affecting SIP submissions, EPA should have issued a SIP call under 42 U.S.C. § 7410(k)(5) to explain its policy re-versal and request SIP revisions from States. *Cf. R.J. Reynolds*, 65 F.4th at 191 (not-ing that "the FDA could have invited [petitioner] to submit supplemental filings to

shore up its . . . application" if it wanted to change agency policy). Had it done so, there would have been no "surprise," *Christopher*, 567 U.S. at 156-57, and Texas would have "know[n] the rules by which the game [would] be played," *Alaska Prof'l Hunters*, 177 F.3d at 1035.

Instead, EPA waited *years* to inform Texas that reliance on its March 2018 Transport Guidance was misplaced because two after-arising D.C. Circuit decisions had supposedly undermined that guidance. An agency must "give the person of ordinary intelligence a reasonable opportunity to know" what is required or prohibited, "so that he may act accordingly." *Emp. Sols. Staffing Grp. II, LLC v. Off. of Chief Admin. Hearing Officer*, 833 F.3d 480, 488 (5th Cir. 2016). EPA failed to do that here.

## B. EPA relied on new modeling platforms that were unavailable to Texas before its SIP-submission deadline.

EPA violated fair-notice principles in a second way. Its proposed and final disapprovals of Texas's SIP utilized a shifting array of platforms for modeling future ozone, each of which was adopted long after Texas's SIP-submission deadline.

**1.** To estimate future ozone concentrations, both TCEQ and EPA use modeling platforms that rely on historical data. *See, e.g.*, C.I. R6-6 at 3-3; Proposed Rule, 87 Fed. Reg. at 9,800. Before the SIP-submission deadline, EPA published data projecting ozone levels in 2023 using a platform with a 2011 base year. *See* Proposed Rule, 87 Fed. Reg. at 9,800 & n.9. In that publication, EPA acknowledged that "states have the primary responsibility to submit timely SIPs" and "may choose to modify or supplement these data in developing" SIPs. 82 Fed. Reg. at 1,735. EPA

further stated that it was supplying this modeling to "help states as they develop SIPs." *Id.*

In accordance with those statements, TCEQ estimated future ozone concentrations in 2023 using its own modeling platform with a 2012 base year because the 2011 base year that EPA selected "was a meteorologically anomalous year for Texas and surrounding states as it was the hottest year on record and the single-worst drought year recorded in Texas since 1895." C.I. R6-6 at 3-6; *see id.* at 3-3 to 3-43. But when EPA got around to assessing Texas's SIP submission more than three years later, it proposed to evaluate that SIP under its new 2016v2 modeling platform, which used a 2016 base year. Proposed Rule, 87 Fed. Reg. at 9,800, 9,828. The 2016v2 platform was developed well after Texas's SIP-submission deadline, so it was unavailable when TCEQ was preparing Texas's SIP. *See id.*; C.I. R6-28 at 6-9. And the shift in modeling platforms was material. As TCEQ observed in comments on the proposed SIP disapproval, EPA's 2016v2 platform identified seven maintenance or nonattainment receptors in Illinois and Wisconsin that purportedly exceeded EPA's one-percent significance threshold but were neither tagged by the model TCEQ had used nor would have been identified by the model EPA recommended in its 2017 guidance. C.I. R6-28 at 7.

Under the Act's cooperative federalism, TCEQ should have had a chance to assess these new linkages in the first instance. *See Train*, 421 U.S. at 79; *BCCA Appeal Grp.*, 355 F.3d at 822. And EPA's use of a new modeling platform to disapprove Texas's SIP long after the SIP-submission deadline had passed was arbitrary and capricious; it constituted a change that was not only "[s]udden and unexplained," but

that also failed to "take account of legitimate reliance on [EPA's] prior interpretation" in its 2017 guidance. *Smiley*, 517 U.S. at 742.

In the Final Rule, EPA denied the claim that the 2016v2 platform was sprung on the States. It noted that EPA had been publishing a series of updated modeling platforms since November 2020 and that States could have "consider[ed] how [EPA's] modeling updates could affect" the status of their SIPs "for purposes of evaluating potential linkages for" the 2015 ozone NAAQS. 88 Fed. Reg. at 9,366. But nothing in the Act authorizes EPA to impose a rolling obligation on the States to rework their SIPs anytime EPA chooses to issue updated guidance, new data, or new modeling after a SIP-submission deadline. To the contrary, EPA has a "longstanding policy" of "requiring states to use the most current emissions estimate models available *at the time of SIP development.*" Approval and Promulgation of Air Quality State Implementation Plans; California; San Joaquin Valley, 81 Fed. Reg. 59,876, 59,879 n.15 (Aug. 31, 2016) (emphasis added). If EPA meant to depart from that "longstanding policy," *id.*, that is yet another unexplained reversal, making EPA's conduct arbitrary and capricious twice over. *See R.J. Reynolds*, 65 F.4th at 189.

EPA's suggestion is particularly hard to accept here. As EPA notes, it issued the first version of its updated modeling platform ("2016v1") in November 2020 and the second version, 2016v2, in September 2021. *Id.* It would have been neither sensible nor practical for TCEQ to have begun to revise its SIP to account for the 2016v1 modeling platform in November 2020 only to be required to restart the process anew ten months later to account for the 2016v2 platform. That is especially true because both the Act and EPA regulations require SIP revisions to undergo notice-and-

comment procedures at the state level. 42 U.S.C. § 7410(a); 40 C.F.R. § 51.102. As Texas has explained, if EPA wanted to introduce this new modeling platform into the SIP process, it had a statutory option to facilitate its introduction: a SIP call. *See* 42 U.S.C. § 7410(k)(5). What EPA may not do is spring a new modeling platform on a State long after its SIP-submission deadline has passed, then use data generated by that platform as a basis to disapprove a SIP.

**2.** Rather than rectify this administrative-law error before promulgating the Final Rule, EPA compounded it. In the Final Rule, EPA disapproved Texas's SIP using yet another modeling platform: 2016v3, issued just one month before the Final Rule's publication. 88 Fed. Reg. at 9,343-44; *see also* C.I. HQ-29 (2016v3 Technical Support Document issued January 28, 2023). TCEQ could hardly have known, much less accounted for, the fact that EPA would utilize yet another modeling platform—different from the one used in the Proposed Rule—to ultimately disapprove Texas's SIP more than four years after the State's SIP submission was due and just one month before the SIP disapproval became final. And once again, the change to a different modeling platform was material: under the 2016v3 platform, Texas was "linked . . . to one nonattainment receptor and nine maintenance-only receptors" as well as "ten violating-monitor maintenance-only receptor[s]." Final Rule, 88 Fed. Reg. at 9,359. At least two of those receptors—ones in "Do[ñ]a Ana County, New Mexico," where EPA now says that Texas contributes 4.74 ppb of ozone—appear to have been linked to Texas only under the 2016v3 platform. *Id.*

The specific linkages to receptors in Doña Ana County under the 2016v3 modeling platform are noteworthy, given their inconsistency with the position EPA took

in a separate proposed rulemaking less than one month after issuing the Final Rule. In that proposed rule, which concerned the designation for the El Paso–Las Cruces, Texas–New Mexico nonattainment area, EPA proposed to find that this "nonattainment area would have attained" the 2015 NAAQS "but for emissions emanating from outside the United States." Determination of Attainment by the Attainment Date but for International Emissions for the 2015 Ozone National Ambient Air Quality Standard; El Paso-Las Cruces, Texas-New Mexico, 88 Fed. Reg. 14,095, 14,095 (Mar. 7, 2023) (proposed rule). Two of the receptors listed in that rule proposing to determine that the El Paso–Las Cruces nonattainment area would have attained the 2015 ozone NAAQS but for international emissions are the same Doña Ana County receptors identified in the Final Rule under EPA's 2016v3 modeling platform showing *Texas* as contributing to a failure to attain the NAAQS. *Compare id.* at 14,098 (identifying two New Mexico receptors with monitor IDs of "35-013-0021" and "35-013-0022") *with* Final Rule, 88 Fed. Reg. at 9,351 (identifying two New Mexico receptors with monitor IDs of "350130021" and "350130022").

It is unclear how EPA can, on the one hand, link Texas to these receptors for SIP-disapproval purposes and, on the other, propose a rule finding that the receptors would have registered attainment of the NAAQS with no maintenance issues but for international emissions. Because EPA sprung this new modeling platform on Texas without notice or any ability to account for it before the SIP-revision deadline, Texas was unable to identify and assess this apparent inconsistency.

The APA does not countenance this moving-target approach to rulemaking. Texas was "entitled to know the rules" that would govern its SIP submission, and

an agency "must give notice of conduct the agency 'prohibits or requires.'" *R.J. Reynolds*, 65 F.4th at 189 (quoting *Christopher*, 567 U.S. at 156-57). EPA's failure to heed that core principle of administrative law was unlawful.

## Conclusion

The Court should set aside the part of the Final Rule that disapproved Texas's SIP.

Respectfully submitted.

Brent Webster
First Assistant Attorney General
Performing the Duties of the
Attorney General

Lanora C. Pettit
Acting Solicitor General

/s/ Bill Davis
Bill Davis
Deputy Solicitor General
Bill.Davis@oag.texas.gov

Michael R. Abrams
William F. Cole
Assistant Solicitors General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

Counsel for the State of Texas, Texas
Commission on Environmental
Quality, Public Utility Commission of
Texas, and Railroad Commission of
Texas

## CERTIFICATE OF SERVICE

On May 30, 2023, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

/s/ Bill Davis
BILL DAVIS

## CERTIFICATE OF COMPLIANCE

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 10,770 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the same program used to calculate the word count).

/s/ Bill Davis
BILL DAVIS