No. 23-60069

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

---

**STATE OF TEXAS; TEXAS COMMISSION ON ENVIRONMENTAL QUALITY; LUMINANT GENERATION COMPANY L.L.C.; COLETO CREEK POWER, L.L.C.; ENNIS POWER COMPANY, L.L.C.; HAYS ENERGY, L.L.C.; MIDLOTHIAN ENERGY, L.L.C.; OAK GROVE MANAGEMENT COMPANY L.L.C.; WISE COUNTY POWER COMPANY, L.L.C.; ASSOCIATION OF ELECTRIC COMPANIES OF TEXAS; BCCA APPEAL GROUP; TEXAS CHEMICAL COUNCIL; TEXAS OIL & GAS ASSOCIATION; PUBLIC UTILITY COMMISSION OF TEXAS; RAILROAD COMMISSION OF TEXAS; STATE OF MISSISSIPPI; MISSISSIPPI DEPARTMENT OF ENVIRONMENTAL QUALITY; MISSISSIPPI POWER COMPANY; STATE OF LOUISIANA; LOUISIANA DEPARTMENT OF ENVIRONMENTAL QUALITY; ENTERGY LOUISIANA, L.L.C.; LOUISIANA CHEMICAL ASSOCIATION; MID-CONTINENT OIL AND GAS ASSOCIATION; LOUISIANA ELECTRIC UTILITY ENVIRONMENTAL GROUP, L.L.C.; TEXAS LEHIGH CEMENT COMPANY, LP,**

Petitioners,
v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; MICHAEL S. REGAN, Administrator, United States Environmental Protection Agency,**

Respondents.

---

Petition for Review of Action of the U.S. Environmental Protection Agency

---

## BRIEF OF TEXAS INDUSTRY PETITIONERS

---

*Counsel Listed on Inside Cover*

Aaron M. Streett
Matthew L. Kuryla
BAKER BOTTS L.L.P.
910 Louisiana St.
Houston, Texas 77002
Tel.: (713) 229-1234
Fax: (713) 229-1522
aaron.streett@bakerbotts.com

*Counsel for Petitioners Association of
Electric Companies of Texas, BCCA
Appeal Group, Texas Chemical Council,
and Texas Oil & Gas Association*


Megan H. Berge
BAKER BOTTS L.L.P.
700 K Street N.W.
Washington, D.C. 20001
(415) 291-6233
(202) 639-7733

J. Mark Little
BAKER BOTTS L.L.P.
910 Louisiana Street
Houston, Texas 77002
(713) 229-1489

*Counsel for Petitioner Texas Lehigh
Cement Company*

P. Stephen Gidiere III
Julia B. Barber
BALCH & BINGHAM LLP
1901 6th Ave. N., Ste. 1500
Birmingham, Alabama 35203
205-251-8100
sgidiere@balch.com

Stephanie Z. Moore
Executive Vice President & General
Counsel
Daniel J. Kelly
Senior Vice President & Deputy
General Counsel
David W. Mitchell
Senior Counsel, Environmental
VISTRA CORP.
6555 Sierra Drive
Irving, Texas 75039

*Counsel for Petitioners Luminant
Generation Company LLC, Coleto Creek
Power, LLC, Ennis Power Company,
LLC, Hays Energy, LLC, Midlothian
Energy, LLC, Oak Grove Management
Company LLC, and Wise County Power
Company, LLC*

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

- Abrams, Michael R., Assistant Solicitor General, Office of the Attorney General for the State of Texas (Counsel for Petitioners State of Texas and Texas Commission on Environmental Quality)

- Association of Electric Companies of Texas (Petitioner)

  The Association of Electric Companies of Texas ("AECT") represents electric generators, transmission & distribution utilities, fully-integrated utilities and retail electric providers that span Texas. Its members generate power from diverse resources, including natural gas, coal, wind and solar, plus investments in energy storage.

- Baake, David R. (Counsel for Amicus Curiae New Mexico Environmental Department)

- Baake Law, LLC (Counsel for Amicus Curiae New Mexico Environment Department)

- Balch & Bingham LLP (Counsel for Petitioners Luminant Generation Company LLC, Coleto Creek Power, LLC, Ennis Power Company, LLC, Hays Energy, LLC, Midlothian Energy, LLC, Oak Grove Management Company LLC, and Wise County Power Company, LLC and Petitioner Mississippi Power Company)

- Baker Botts L.L.P. (Counsel for Petitioners AECT, BCCA Appeal Group, TCC, and TXOGA, Petitioner Entergy Louisiana, L.L.C., and Petitioner Texas Lehigh Cement Company, LP)

- Barber, Julia B. (Counsel for Petitioners Luminant Generation Company LLC, Coleto Creek Power, LLC, Ennis Power Company, LLC, Hays Energy, LLC, Midlothian Energy, LLC, Oak Grove Management Company LLC, and Wise County Power Company, LLC)

- BCCA Appeal Group (Petitioner)

  BCCA Appeal Group is a Texas non-profit corporation whose mission is to support the goals of environmental protection and a strong economy. Its members own and operate industrial facilities in Texas. The Group was formed from the Business Coalition for Clean Air. The Group played a key role in the successful attainment strategies that have achieved real and sustained progress on air quality goals in Texas. BCCA Appeal Group continues to evaluate and pursue regulatory decisions that are based on sound science and achieve environmental and air quality goals while maintaining a strong economy.

- Berge, Megan H. (Counsel for Petitioner Texas Lehigh Cement Company)

- Blackman, Daniel (Region 4 Administrator, United States Environmental Protection Agency)

- Brookfield Asset Management Inc. (together with its affiliates and managed entities owns 10% or more of Vistra Corp.'s stock)

- Burdette, Courtney J., Executive Counsel, Louisiana Department of Environmental Quality (Counsel for Petitioner Louisiana Department of Environmental Quality)

- Clark, Jill C., General Counsel, Louisiana Department of Environmental Quality (Counsel for Petitioner Louisiana Department of Environmental Quality)

- Coleto Creek Power, LLC (Petitioner)

- Cole, Williams F., Assistant Solicitor General, Office of the Attorney General for the State of Texas (Counsel for Petitioners State of Texas and Texas Commission on Environmental Quality)

- Davis, Bill, Deputy Solicitor General, Office of the Attorney General for the State of Texas (Counsel for Petitioners State of Texas and Texas Commission on Environmental Quality)

- Eagle Materials Inc. (Parent Company of Petitioner Texas Lehigh Cement Company)

- Ennis, Bradley A. (Counsel for Petitioner Mississippi Power Company)

- Ennis Power Company, LLC (Petitioner)

- Entergy Louisiana, L.L.C. (Petitioner)

- Fitch, Lynn, Attorney General, Office of the Attorney General for the State of Mississippi (Counsel for Petitioners State of Mississippi and Mississippi Department of Environmental Quality)

- Garland, Merrick B., Attorney General, United States Department of Justice (Counsel for Respondents)

- Gidiere, P. Stephen III (Counsel for Petitioners Luminant Generation Company LLC, Coleto Creek Power, LLC, Ennis Power Company, LLC, Hays Energy, LLC, Midlothian Energy, LLC, Oak Grove Management Company LLC, and Wise County Power Company, LLC)

- Hall, Machelle, Assistant Attorney General, Louisiana Department of Justice (Counsel for Petitioners State of Louisiana and Louisiana Department of Environmental Quality)

- Harbourt, Maureen N. (Counsel for Petitioners Louisiana Chemical Association, Louisiana Mid-Continent Oil and Gas Association, and Louisiana Electric Utility Environmental Group LLC)

- Hays Energy, LLC  (Petitioner)

- Izfar, Sarah, Trial Attorney, United States Department of Justice, Environment & Natural Resources Division, Environmental Defense Section (Counsel for Respondents)

- Jezouit, Debra J. (Counsel for Petitioner Entergy Louisiana, L.L.C.)

- Kean Miller, L.L.P. (Counsel for Petitioners Louisiana Chemical Association, Louisiana Mid-Continent Oil and Gas Association, and Louisiana Electric Utility Environmental Group LLC)

- Kelly, Daniel J. (Counsel for Petitioners Luminant Generation Company LLC, Coleto Creek Power, LLC, Ennis Power Company, LLC, Hays Energy, LLC, Midlothian Energy, LLC, Oak Grove Management Company LLC, and Wise County Power Company, LLC and Senior Vice President and Deputy General Counsel for Vistra Corp.)

- Kim, Todd, Assistant Attorney General, Environment and Natural Resources Division, United States Department of Justice (Counsel for Respondents)

- Kollmeyer, Josiah, M. (Counsel for Petitioners Louisiana Chemical Association, Louisiana Mid-Continent Oil and Gas Association, and Louisiana Electric Utility Environmental Group LLC)

- Kuryla, Matthew L. (Counsel for Petitioners AECT, BCCA Appeal Group, TCC, and TXOGA)

- Landry, Jeff, Attorney General, Louisiana Department of Justice (Counsel for Petitioners State of Louisiana and Louisiana Department of Environmental Quality)

- Lee, Jin Hyung (Counsel for Respondents)

- Lee, Joshua (Counsel for Petitioner Entergy Louisiana, L.L.C.)

- Lehotsky Keller Cohn LLP (Counsel for Petitioners State of Mississippi and Mississippi Department of Environmental Quality)

- Lipscomb, Whitney H., Deputy Attorney General, Office of the Attorney General for the State of Mississippi (Counsel for Petitioners State of Mississippi and Mississippi Department of Environmental Quality)

- Little, J. Mark (Counsel for Petitioner Texas Lehigh Cement Company)

- Louisiana Chemical Association (Petitioner)

- Louisiana Department of Environmental Quality (Petitioner)

- Louisiana Department of Justice (Counsel for Petitioners State of Louisiana and Louisiana Department of Environmental Quality)

- Louisiana Electric Utility Environmental Group, L.L.C. (Petitioner)

- Louisiana Mid-Continent Oil and Gas Association (Petitioner)

- Luminant Generation Company LLC (Petitioner)

- Mansinghani, Mithun (Counsel for Petitioners State of Mississippi and Mississippi Department of Environmental Quality)

- Matheny, Justin L., Deputy Solicitor General, Office of the Attorney General for the State of Mississippi (Counsel for Petitioners State of Mississippi and Mississippi Department of Environmental Quality)

- Mazzara, Joseph N., Assistant Solicitor General, Office of the Attorney General for the State of Texas (Counsel for Petitioners State of Texas and Texas Commission on Environmental Quality)

- McPhee, Shae, Deputy Solicitor General, Louisiana Department of Justice, Office of the Attorney General (Counsel for Petitioners State of Louisiana and Louisiana Department of Environmental Quality)

- Midlothian Energy, LLC (Petitioner)

- Mississippi Department of Environmental Quality (Petitioner)

- Mississippi Power Company (Petitioner)

- Mitchell, David W. (Counsel for Petitioners Luminant Generation Company LLC, Coleto Creek Power, LLC, Ennis Power Company, LLC, Hays Energy, LLC, Midlothian Energy, LLC, Oak Grove Management Company LLC, and Wise County Power Company, LLC and Senior Counsel, Environmental for Vistra Corp.)

- Moore, C. Grady III (Counsel for Petitioner Mississippi Power Company)

- Moore, Stephanie Zapata (Counsel for Petitioners Luminant Generation Company LLC, Coleto Creek Power, LLC, Ennis Power Company, LLC, Hays Energy, LLC, Midlothian Energy, LLC, Oak Grove Management Company LLC, and Wise County Power Company, LLC and Executive Vice President and General Counsel for Vistra Corp.)

- Murrill, Elizabeth B., Solicitor General, Louisiana Department of Justice (Counsel for Petitioners State of Louisiana and Louisiana Department of Environmental Quality)

- Nance, Earthea (Regional Administrator for Respondent United States Environmental Protection Agency)

- New Mexico Environment Department (*Amicus Curiae*)

- Oak Grove Management Company LLC (Petitioner)

- Office of the Attorney General for the State of Louisiana (Counsel for Petitioners State of Louisiana and Louisiana Department of Environmental Quality)

- Office of the Attorney General for the State of Mississippi (Counsel for Petitioners State of Mississippi and Mississippi Department of Environmental Quality)

- Office of the Attorney General for the State of Texas (Counsel for Petitioners State of Texas and Texas Commission on Environmental Quality)

- Paxton, Ken, Attorney General of Texas (Counsel for Petitioners State of Texas and Texas Commission on Environmental Quality)

- Prieto, Jeffrey M. (General Counsel for Respondent United States Environmental Protection Agency)

- Public Utility Commission of Texas (Petitioner)

- Railroad Commission of Texas (Petitioner)

- Regan, Michael S., Administrator, United States Environmental Protection Agency (Respondent)

- Rucinski, Lauren (Counsel for Petitioners Louisiana Chemical Association, Louisiana Mid-Continent Oil and Gas Association, and Louisiana Electric Utility Environmental Group, LLC)

- Schon, Michael B. (Counsel for Petitioners State of Mississippi and Mississippi Department of Environmental Quality)

- Shurden, Shawn (Counsel for Petitioner Mississippi Power Company)

- Southern Company (Parent Company of Petitioner Mississippi Power Company)

- State of Louisiana (Petitioner)

- State of Mississippi (Petitioner)

- State of Texas (Petitioner)

- St. John, Joseph S., Deputy Solicitor General, Louisiana Department of Justice, Office of the Attorney General (Counsel for Petitioners State of Louisiana and Louisiana Department of Environmental Quality)

- Stone, Judd, Solicitor General, Office of the Attorney General for the State of Texas (Counsel for Petitioners State of Texas and Texas Commission on Environmental Quality)

- Streett, Aaron M. (Counsel for Petitioners AECT, BCCA Appeal Group, TCC, and TXOGA)

- Stutts, Susan Scaggs (Counsel for Petitioner Mississippi Power Company)

- Texas Chemical Council (Petitioner)

  The Texas Chemical Council ("TCC") represents approximately 70 companies who own or operate more than 200 manufacturing and research facilities across the state of Texas. Its members have invested more than $150 billion in physical assets in the state, directly employ more than 75,000 Texans, and indirectly employ over 500,000 Texans. The Texas chemical industry represents the #1 non-energy Texas export with over $45 billion in exports annually and pays more than $1.5 billion in state and local taxes each year.

- Texas Commission on Environmental Quality (Petitioner)

- Texas Lehigh Cement Company (Petitioner)

- Texas Oil & Gas Association (Petitioner)

  The Texas Oil & Gas Association ("TXOGA") is a statewide trade association representing every facet of the Texas oil and gas industry including small independents and major producers. Collectively, the membership of TXOGA produces in excess of 80 percent of Texas' crude oil and natural gas, operates over 80 percent of the state's refining capacity, and is responsible for the vast majority of the state's pipelines. In fiscal year 2022, the oil and natural gas industry supported 443,000 direct jobs and paid $24.7 billion in state and local taxes and state royalties, funding schools, roads and first responders.

- The Vanguard Group, Inc. (together with its affiliates and managed entities owns 10% or more of Vistra Corp.'s stock)

- United States Environmental Protection Agency (Respondent)

- Vistra Asset Company LLC (Parent company of Petitioners Luminant Generation Company LLC, Coleto Creek Power, LLC, Ennis Power Company, LLC, Hays Energy, LLC, Midlothian Energy, LLC, Oak Grove Management Company LLC, and Wise County Power Company, LLC)

- Vistra Corp. (Parent company of Petitioners Luminant Generation Company LLC, Coleto Creek Power, LLC, Ennis Power Company, LLC, Hays Energy, LLC, Midlothian Energy, LLC, Oak Grove Management Company LLC, and Wise County Power Company, LLC)

- Vistra Intermediate Company LLC (Parent company of Petitioners Luminant Generation Company LLC, Coleto Creek Power, LLC, Ennis Power Company, LLC, Hays Energy, LLC, Midlothian Energy, LLC, Oak Grove Management Company LLC, and Wise County Power Company, LLC)

- Vistra Operations Company LLC (Parent company of Petitioners Luminant Generation Company LLC, Coleto Creek Power, LLC, Ennis Power Company, LLC, Hays Energy, LLC, Midlothian Energy, LLC, Oak Grove Management Company LLC, and Wise County Power Company, LLC)

- Webster, Brent, First Assistant Attorney General, Office of the Attorney General for the State of Texas (Counsel for Petitioners State of Texas and Texas Commission on Environmental Quality)

- Wise County Power Company, LLC (Petitioner)

Respectfully submitted,

s/ P. Stephen Gidiere III
*Counsel for Luminant Petitioners*

## STATEMENT REGARDING ORAL ARGUMENT

Texas Industry Petitioners believe that oral argument will assist the Court in resolving this case.  As explained in the Court's Order granting a stay of the U.S. Environmental Protection Agency's ("EPA") disapproval of the State of Texas's Clean Air Act State Implementation Plan ("SIP") at issue here, EPA's disapproval "was the statutory prerequisite for the EPA to [] impose its preferred system of emissions controls and reductions on [Texas industrial facilities]," forcing them "to spend billions of dollars in compliance costs" and "dramatically increas[ing] the probability of price spikes and 'load-shedding'" on the Texas electric power grid.  Order at 22-23, Doc. 269-1, *State of Texas v. EPA*, No. 23-60069 (5th Cir. May 1, 2023) ("*Texas 2023*").  This Court further concluded that Texas Industry Petitioners "[made] a strong showing that the EPA acted unlawfully" in taking that action "by considering factors listed nowhere in the [statute]," among other reasons.  *Id.* at 14.  Oral argument will assist the Court in final resolution of these important issues.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS .............................................. ii

STATEMENT REGARDING ORAL ARGUMENT ............................ x

TABLE OF CONTENTS ........................................................................ xi

TABLE OF AUTHORITIES ................................................................ xiii

GLOSSARY ........................................................................................ xix

JURISDICTIONAL STATEMENT ....................................................... 1

STATEMENT OF THE ISSUES ........................................................... 1

STATEMENT OF THE CASE .............................................................. 1

I.  Statutory and Regulatory Background ...................................... 2

II.  Factual Background ................................................................... 5

    A.  Texas's Interstate Transport SIP for the 2008 Ozone NAAQS ............. 5

    B.  The 2015 Ozone NAAQS ................................................ 6

    C.  Texas's Interstate Transport SIP for the 2015 Ozone NAAQS ............ 10

    D.  EPA Region 6's Determinations Regarding Texas's SIP ........ 19

    E.  EPA's Final Disapproval ................................................ 23

III.  Procedural History in this Court ............................................ 25

SUMMARY OF THE ARGUMENT ................................................... 28

STANDARD OF REVIEW .................................................................. 29

ARGUMENT ....................................................................................... 30

I.  EPA's Disapproval Is Unlawful Because EPA Failed to Apply the Clean Air Act's Cooperative Federalism Framework to its Review of Texas's SIP ....................................................................... 30

II.  EPA's Disapproval Is Unlawful Because it Is Based on Non-Statutory Factors .................................................................. 34

    A.  EPA Unlawfully Imposed its Preferred "4-Step Framework" on Texas's SIP ................................................. 35

    B.  EPA's Preferred Approach to Maintenance Monitors Is Not a Statutory Requirement .............................................. 37

    C.  EPA's Rejection of Texas's Weight-of-Evidence Analysis Was Unlawful ................................................................ 42

III.  EPA's Disapproval of Texas's SIP Was Arbitrary and Capricious .................... 44

     A.      EPA's Rejection of Texas's Air Quality Modeling in Favor of
"Ballpark Estimates" Was Arbitrary and Capricious ................................ 44

     B.      EPA Failed to Treat Like Cases Alike ........................................................ 45

CONCLUSION ........................................................................................................ 48

CERTIFICATE OF SERVICE ................................................................................ 50

CERTIFICATE OF COMPLIANCE ...................................................................... 51

ADDENDUM............................................................................................................ 52

# TABLE OF AUTHORITIES

**Cases**                                                              **Page(s)**

*BCCA Appeal Grp. v. EPA,*
    355 F.3d 817 (5th Cir. 2003) ....................................................................... 2

*Burlington Truck Lines v. United States,*
    371 U.S. 156 (1962) ................................................................................... 45

*Cent. Power & Light Co. v. United States,*
    634 F.2d 137 (5th Cir. 1980) ..................................................................... 47

*Data Mktg. P'ship, LP v. U.S. Dep't of Labor,*
    45 F.4th 846 (5th Cir. 2022) ..................................................................... 30

*EME Homer City Generation, L.P. v. EPA,*
    696 F.3d 7 (D.C. Cir. 2012) ...................................................................... 44

*EME Homer City Generation, L.P. v. EPA,*
    795 F.3d 118 (D.C. Cir. 2015) .............................................................. 7, 42

*EPA v. EME Homer City Generation, L.P.,*
    572 U.S. 489 (2014) ....................................... 3, 7, 24, 32, 33, 36, 40

*Exelon Wind 1, L.L.C. v. Nelson,*
    766 F.3d 380 (5th Cir. 2014) ..................................................................... 37

*Fla. Power & Light Co. v. Costle,*
    650 F.2d 579 (5th Cir. Unit B June 1981) ......................................... 2, 30, 32

*Jama v. Immigration & Customs Enf't,*
    543 U.S. 335 (2005) ............................................................................ 33, 34

*Jupiter Energy Corp. v. FERC,*
    407 F.3d 346 (5th Cir. 2005) ..................................................................... 46

*La. Envtl. Action Network v. EPA,*
    382 F.3d 575 (5th Cir. 2004) ..................................................................... 43

*Luminant Generation Co., LLC v. EPA,*
  675 F.3d 917 (5th Cir. 2012) ........................... 3, 29, 31, 32, 33, 34, 35, 36, 37, 38, 44

*Midwest Ozone Grp. v. EPA,*
  61 F.4th 187 (D.C. Cir. 2023) ........................................................................ 44

*Motor Vehicle Mfrs. Ass'n v. State Farm,*
  463 U.S. 29 (1983) .......................................................................... 30, 45, 46

*North Carolina v. EPA,*
  531 F.3d 896 (D.C. Cir. 2008) ................................................................ 38, 40, 41

*Prill v. NLRB,*
  755 F.2d 941 (D.C. Cir. 1985) ............................................................................ 34

*Sackett v. EPA,*
  598 U.S. __ (2023) .............................................................................................. 37

*SEC v. Chenery Corp.,*
  318 U.S. 80 (1943) ............................................................................................ 34

*Texas v. EPA,*
  690 F.3d 670 (5th Cir. 2012) .......................................................................... 4, 35

*Texas v. EPA,*
  829 F.3d 405 (5th Cir. 2016) ........................... 2, 3, 4, 6, 27, 29, 30, 31, 32, 37, 38, 45

*Texas v. EPA,*
  983 F.3d 826 (5th Cir. 2020) .......................................................................... 3, 43

*Tex. Oil & Gas Ass'n v. EPA,*
  161 F.3d 923 (5th Cir. 1998) ............................................................................ 30

*Train v. Nat. Res. Def. Council, Inc.,*
  421 U.S. 60 (1975) ....................................................................................... 4, 31, 32

*Union Elec. Co. v. EPA,*
  427 U.S. 246 (1976) ..................................................................................... 3, 32

*Univ. of Tex. M.D. Anderson Cancer Ctr. v. U.S. Dep't of Health & Human Servs.*, 985 F.3d 472 (5th Cir. 2021) ....................................................45, 46, 47

## Federal Statutes

5 U.S.C. §706(2) ............................................................................................ 29

42 U.S.C. §7401(a)(3) ............................................................................... 2, 31

42 U.S.C. §7409 ............................................................................................... 3

42 U.S.C. §7410(a) ................................................................................... 36, 37

42 U.S.C. §7410(a)(1) ..................................................................................... 6

42 U.S.C. §7410(a)(2) .........................................................................32, 33, 35

42 U.S.C. §7410(a)(2)(D) ................................................................................ 5

42 U.S.C. §7410(a)(2)(D)(i) ...................................................................... 4, 39

42 U.S.C. §7410(a)(2)(D)(i)(I) .............................................35, 38, 39, 40, 41

42 U.S.C. §7410(c)(1) ..................................................................................... 4

42 U.S.C. §7410(k)(3) .........................................................................3, 4, 34, 40

42 U.S.C. §7410(k)(5) ................................................................................... 33

42 U.S.C. §7505a ...................................................................................... 39, 40

42 U.S.C. §7602(y) ......................................................................................... 4

42 U.S.C. §7607(b)(1) ..........................................................................1, 26, 27

## Federal Regulations

40 C.F.R. §§51.1300-51.1318 ..................................................................... 6, 38

40 C.F.R. Part 51, App. W, §1.a. ................................................................... 44

## Federal Register

73 Fed. Reg. 16,436 (Mar. 27, 2008) ................................................................ 5

80 Fed. Reg. 65,292 (Oct. 26, 2015) ................................................................ 6

81 Fed. Reg. 296 (Jan. 5, 2016) ...................................................................... 5

81 Fed. Reg. 15,200 (Mar. 22, 2016) .......................................................... 9, 46

81 Fed. Reg. 53,284 (Aug. 12, 2016) ............................................................... 6

81 Fed. Reg. 62,375 (Sept. 9, 2016) ............................................................... 6

81 Fed. Reg. 71,991 (Oct. 19, 2016) ............................................................ 47

82 Fed. Reg. 1,733 (Jan. 6, 2017) .................................................. 7, 8, 9, 43, 46

82 Fed. Reg. 9,155 (Feb. 3, 2017) ................................................................ 37

83 Fed. Reg. 10,376 (Mar. 9, 2018) ............................................................... 6

83 Fed. Reg. 62,998 (Dec. 6, 2018) ............................................................... 6

87 Fed. Reg. 9,798 (Feb. 22, 2022) ...................... 7, 10, 11, 16, 19, 20, 21, 22, 23, 37, 38,
39, 40, 41, 42, 44, 47

88 Fed. Reg. 9,336 (Feb. 13, 2023) ........................ 2, 8, 22, 23, 24, 25, 31, 32, 33, 35,
42, 43, 44

## Miscellaneous

32 Charles Alan Wright & Charles H. Koch, *Federal Practice and Procedure*
§ 8248 (2006) ........................................................................................ 45

EPA, *2015 Ozone NAAQS Interstate SIP Disapprovals – Response to Comment
(RTC) Document*, EPA-HQ-OAR-2021-0663-0083 (Jan. 31, 2023)
("RTC") (C.I. HQ-83) .................................................. 24, 25, 31, 32, 34, 36, 37, 42

EPA, *Air Quality Modeling Technical Support Document 2015 Ozone NAAQS SIP Disapproval Final Action*, EPA-HQ-OAR-2021-0663-0085 (Jan. 31, 2023) ("Final Air Quality Modeling TSD") (C.I. HQ-85) ............................ 25

EPA, *Infrastructure SIP Requirements and Guidance*, *available at* https://www.epa.gov/air-quality-implementation-plans/infrastructure-sip-requirements-and-guidance ("EPA Infrastructure SIP Guidance") ................................................................. 4

EPA Region 6, *2015 8-Hour Ozone Transport SIP Proposal Technical Support Document*, EPA-R06-OAR-2021-0801-0002 (Feb. 2022) ("Region 6 Texas TSD") (C.I. R6-2) ......................... 16, 19, 20, 21, 35, 39, 42, 43, 44, 45, 46

Memorandum from Peter Tsirigotis, Director, Office of Air Quality Planning and Standards, *Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I)*, EPA-HQ-OAR-2021-0663-0003 (Mar. 27, 2018) ("EPA March 2018 Transport Guidance") (C.I. HQ-3)..................................................... 3, 9

Memorandum from Stephen D. Page, Director, Office of Air Quality Planning and Standards, *Guidance on Infrastructure State Implementation Plan (SIP) Elements under Clean Air Act Sections 110(a)(1) and 110(a)(2)* (Sept. 13, 2013), *available at* https://tinyurl.com/2p8c7885 ("Page Memo") ................................................................................................ 4

Pet. for Review, *Sierra Club v. EPA*, No. 16-60755 (5th Cir. Nov. 7, 2016) ................................................................................ 6

TCEQ, *Comments by the Texas Commission on Environmental Quality Regarding EPA's Air Plan Disapproval; Arkansas, Louisiana, Oklahoma, and Texas; Interstate Transport of Air Pollution for the 2015 Eight-Hour Ozone National Ambient Air Quality Standards*, EPA-R06-OAR-2021-0801-0028 (Apr. 25, 2022) ("TCEQ Comments") (C.I. R6-28) ................................. 22

TCEQ, *SIP Revision: 2008 Ozone Infrastructure and Transport* (Dec. 5, 2012) ("TCEQ 2008 Ozone SIP"), *available at* https://tinyurl.com/732y52mc............................................................... 5

TCEQ, *Transport State Implementation Plan (SIP) Revision for the 2015 Ozone National Ambient Air Quality Standards (NAAQS),* EPA-R06-OAR-2021-0801-0006 (Aug. 8, 2018) ("Texas SIP") (C.I. R6-6) ............................... 10, 11, 12, 13, 14, 15, 16, 17, 18, 39, 40, 41, 42, 47

## GLOSSARY

| | |
|---|---|
| **CAA or the Act** | Clean Air Act |
| **DV** | Design value |
| **EPA** | United States Environmental Protection Agency |
| **ERCOT** | Electric Reliability Council of Texas |
| **FIP** | Federal Implementation Plan |
| **MW** | Megawatts |
| **NAAQS** | National Ambient Air Quality Standards |
| **NO$_X$** | Nitrogen Oxides |
| **O$_3$** | Ozone |
| **ppb** | Parts per billion |
| **RRF** | Relative Response Factor |
| **SIP** | State Implementation Plan |
| **TCEQ** | Texas Commission on Environmental Quality |
| **Texas Industry Petitioners** | Association of Electric Companies of Texas, BCCA Appeal Group, Texas Chemical Council, Texas Oil & Gas Association, Luminant Generation Company LLC, Coleto Creek Power, LLC, Ennis Power Company, LLC, Hays Energy, LLC, Midlothian Energy, LLC, Oak Grove Management Company LLC, Wise County Power Company, LLC, Texas Lehigh Cement Company, LP |

## JURISDICTIONAL STATEMENT

This Court has jurisdiction to review the U.S. Environmental Protection Agency's ("EPA") disapproval of Texas's State Implementation Plan ("SIP") pursuant to 42 U.S.C. §7607(b)(1). Texas Industry Petitioners timely filed their petitions for review of EPA's disapproval action in this Court within 60 days of publication of EPA's action. Docs. 3-1, 5-1, 221-1.

For the reasons stated in the Court's Order dated May 1, 2023, this Court is the correct venue. *See* Order at 6-13, Doc. 269-1, *State of Texas v. EPA*, No. 23-60069 (5th Cir. May 1, 2023) ("*Texas 2023*").

## STATEMENT OF THE ISSUES

I. Whether EPA's disapproval of Texas's SIP was unlawful because EPA failed to apply the cooperative federalism framework in the Clean Air Act, which limits EPA to a secondary role in the SIP approval process and requires EPA to defer to a State's preferred approach for complying with the Act?

II. Whether EPA's disapproval of Texas's SIP was contrary to law because it was based on non-statutory factors, including EPA's "4-step framework," its preferred approach to "maintenance" monitors, and its one-percent threshold from its prior federal implementation plans ("FIPs")?

III. Whether EPA's disapproval of Texas's SIP was arbitrary and capricious because it was not supported by substantial evidence and treated Texas differently than other similarly-situated States?

## STATEMENT OF THE CASE

Texas Industry Petitioners challenge EPA's action disapproving the State of Texas's Clean Air Act SIP that demonstrates the State's compliance with respect to the interstate transport of emissions under the 2015 National Ambient Air Quality

Standards ("NAAQS") for ozone. *See* 88 Fed. Reg. 9,336, 9,359-60 (Feb. 13, 2023). As this Court found in granting Texas Petitioners' motions to stay, EPA's disapproval of Texas's SIP is the trigger for a federal implementation plan drafted by EPA that would "impose [EPA's] preferred system of emissions controls and reductions on [Texas and Texas industry]." *Texas 2023* at 22. EPA's plan, in turn, would force Texas industry "to spend billions of dollars in compliance costs" and "dramatically increase the probability of price spikes and 'load-shedding'" on the Texas electric power grid. *Id.* at 22-23.

## I.    Statutory and Regulatory Background

The Clean Air Act "establishes a comprehensive program for controlling and improving the nation's air quality through state and federal regulation." *BCCA Appeal Grp. v. EPA*, 355 F.3d 817, 821-22 (5th Cir. 2003). Congress chose a "cooperative federalism" structure to implement the statute, dividing authority between the federal government and the States. *Fla. Power & Light Co. v. Costle*, 650 F.2d 579, 581 (5th Cir. Unit B June 1981) ("Congress chose a balanced scheme of state-federal interaction to implement the goals of the [Clean Air] Act."). Within this framework, "air pollution prevention . . . is the primary responsibility of States and local governments." 42 U.S.C. §7401(a)(3). "The structure of the Clean Air Act," this Court has explained, "indicates a congressional preference that [S]tates, not EPA, drive the regulatory process." *Texas v. EPA*, 829 F.3d 405, 411 (5th Cir. 2016) ("*Texas 2016*").

For its part, EPA's job is to set the level of the NAAQS for certain pollutants, including ozone.[1] *See* 42 U.S.C. §7409(a)-(b).  After EPA sets the level, States develop SIPs to implement and enforce the new NAAQS and demonstrate compliance "with the Act's requirements." *EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489, 507 (2014) ("*EME Homer*").  A State may do so "by demonstrating that the [S]tate's [existing] SIP *already* contains or sufficiently addresses the necessary provisions, *or* by making a substantive SIP revision to update the plan provisions to meet the new standards." EPA March 2018 Transport Guidance (C.I. HQ-3[2]) at 2 (emphases added). The statute affords "each state 'wide discretion in formulating its plan' for achieving the air quality standards set by EPA." *Texas 2016*, 829 F.3d at 411 (quoting *Union Elec. Co. v. EPA*, 427 U.S. 246, 250 (1976)).

EPA's role in reviewing SIPs is narrow and limited.  "With regard to implementation, the Act confines the EPA to the ministerial function of reviewing [State plans] *for consistency with the Act's requirements.*" *Luminant Generation Co., LLC v. EPA*, 675 F.3d 917, 921 (5th Cir. 2012) ("*Luminant 2012*") (emphasis added) (citing 42

---

[1] Ground-level ozone ($O_3$) is not emitted directly by human activities but is formed when nitrogen oxides ($NO_X$) and volatile organic compounds (VOCs) react in the atmosphere with sunlight. *See Texas v. EPA*, 983 F.3d 826, 830 (5th Cir. 2020) ("*Texas 2020*").  "Because states cannot regulate sunlight, ozone regulation focuses on" the regulation of $NO_X$ and VOC emissions as ozone precursors. *Id.*

[2] This brief cites to items in the administrative record compiled by EPA using the location identifier and last four digits of the Document ID (minus leading zeros) in EPA's certified list filed on April 13, 2023.  Thus, Document ID EPA-HQ-OAR-2021-0663-0003 is cited as "C.I. HQ-3."

U.S.C. §7410(k)(3)). In reviewing a State's plan, EPA does not have the authority to substitute its own judgment for that of the State, and it cannot disapprove a State plan for failing to conform with requirements beyond those expressly set out in the Act. *Texas 2016*, 829 F.3d at 426-27. "Thus, if a SIP or a revised SIP meets the statutory criteria of the CAA, then the EPA *must* approve it." *Texas v. EPA*, 690 F.3d 670, 676 (5th Cir. 2012) ("*Texas 2012*") (emphasis added). Only if the SIP does not meet a statutory requirement may EPA disapprove it and then "devise and promulgate a specific plan of its own"—called a federal implementation plan or "FIP."[3] *Train v. Nat. Res. Def. Council, Inc.*, 421 U.S. 60, 79 (1975). Thus, a SIP is drafted by the State, and a FIP is drafted by EPA if a State fails to meet its statutory obligation.

The statutory provision at issue here is the "interstate transport" provision of the Act. 42 U.S.C. §7410(a)(2)(D)(i). This provision contains four "prongs" that States must address in their SIPs—1) "significant contribution"; 2) "interference with maintenance"; 3) "prevention of significant deterioration"; and 4) "protection of visibility." *See* Page Memo at 30-35 (listing the four prongs of the "interstate pollution transport" provision, 42 U.S.C. §7410(a)(2)(D)(i)); *see also* EPA Infrastructure SIP Guidance (listing the four "Interstate transport" prongs of 42 U.S.C. §7410(a)(2)(D)(i)).

---

[3] Specifically, a FIP is "a plan (or portion thereof) promulgated by the Administrator to fill all or a portion of a gap or otherwise correct all or a portion of an inadequacy in a [SIP]." 42 U.S.C. §7602(y). EPA "shall promulgate a [FIP] at any time within 2 years *after*" it "disapproves a [SIP] submission in whole or in part." *Id.* §7410(c)(1)(A)-(B) (emphasis added).

EPA's action at issue here disapproved the prong 1 and prong 2 portions of Texas's SIP. Prongs 1 and 2, which are often referred to as the "good neighbor" prongs, provide:

> Each such [state implementation] plan shall—
>
> > (D)  contain adequate provisions—
> >
> > > (i)  prohibiting, consistent with the provisions of this subchapter, any source or other type of emissions activity within the State from emitting any air pollutant in amounts which will—
> > >
> > > > (I)  contribute significantly to nonattainment in, or interfere with maintenance by, any other State with respect to any such national primary or secondary ambient air quality standard[.]

42 U.S.C. §7410(a)(2)(D). Key here, neither the statute nor any EPA regulation defines "contribute significantly to nonattainment in" or "interfere with maintenance by" any other State.

## II.  Factual Background

### A.  Texas's Interstate Transport SIP for the 2008 Ozone NAAQS

This is not the first case in this Court about the State of Texas's implementation of the Act's interstate transport requirements under an ozone NAAQS. In 2008, EPA revised the ozone NAAQS downward from 80 ppb to 75 ppb. 73 Fed. Reg. 16,436 (Mar. 27, 2008). In 2012, Texas revised its SIP to address interstate transport under the 2008 NAAQS. *See* TCEQ 2008 Ozone SIP. EPA's actions on Texas's SIP were published in three Federal Register notices: 81 Fed. Reg. 296, 302 (Jan. 5, 2016)

(disapproval as to prong 4); 81 Fed. Reg. 53,284 (Aug. 12, 2016) (disapproval as to prongs 1 and 2); 81 Fed. Reg. 62,375 (Sept. 9, 2016) (approval as to prong 3).

EPA's actions generated three cases in this Court, two of which remain pending. In one (prongs 1 and 2, No. 16-60670), EPA raised no objection to venue, and the case is being held in abeyance awaiting EPA's action on Texas's interstate-transport SIP for the 2015 NAAQS (the subject of this case). *See Texas v. EPA*, No. 16-60670, Docs. 97, 104-2. In another (prong 3, No. 16-60755) Sierra Club asserted that "[j]urisdiction and venue for this petition are proper in this Court under 42 U.S.C. § 7607(b)[.]" Pet. for Review, 2, *Sierra Club v. EPA*, No. 16-60755 (5th Cir. Nov. 7, 2016). In the third (prong 4, No. 16-60118, consolidated), the Court denied EPA's motion to transfer the petitions to the D.C. Circuit and granted petitioners' motion to stay the rule. *Texas 2016*, 829 F.3d at 411, 435-36. That case remains pending.

## B. The 2015 Ozone NAAQS

In 2015, EPA lowered the ozone NAAQS again, down to 70 ppb, 80 Fed. Reg. 65,292 (Oct. 26, 2015), triggering a deadline of October 1, 2018, for States to submit their SIPs. 42 U.S.C. §7410(a)(1). EPA subsequently conducted notice-and-comment rulemaking to promulgate regulations containing "state implementation plan (SIP) requirements for the 2015 ozone NAAQS[.]" 83 Fed. Reg. 62,998, 62,998 (Dec. 6, 2018); 83 Fed. Reg. 10,376 (Mar. 9, 2018) (codified at 40 C.F.R. §§51.1300–51.1318). Those regulations did *not* include requirements for SIPs related to the "good neighbor" prongs of the interstate transport provision.

Instead, EPA issued a series of guidance documents on those prongs. On January 6, 2017, EPA published a notice of available modeling data that EPA said was "intended to help inform state efforts to address interstate transport with respect to the 2015 ozone NAAQS." 82 Fed. Reg. 1,733, 1,735 (Jan. 6, 2017). EPA's modeling predicted ozone levels in 2023 at monitoring sites across the country and the contributions to those ozone levels from other States. *Id.* EPA's modeling used actual emissions in 2011 as the "base year" and projected forward to predict 2023 ozone levels (EPA said that 2023 was the earliest expected deadline for downwind areas to come into attainment with the 2015 ozone NAAQS). *Id.*

EPA's January 2017 modeling notice stated that States *could* develop their SIPs using a "4-step framework" that EPA had used in prior FIPs it had drafted to address prior NAAQS for the eastern portion of the country where States had failed to develop SIPs.[4] *Id.* at 1,734-35. Under that 4-step framework, EPA explained, "a contribution from an individual [upwind] state [to a monitor in a downwind state] at or above 1 percent of the NAAQS [is treated] *as significant*," requiring the upwind state to implement "reductions in ozone precursor emissions." *Id.* at 1,735, 1,740 (emphasis

---

[4] Specifically, EPA developed its 4-step framework as part of its Cross-State Air Pollution Rule ("CSAPR"), which was a collection of FIPs issued in 2011 to address the 1997 ozone NAAQS. *See EME Homer*, 572 U.S. at 503; 87 Fed. Reg. 9,798 9,799 (Feb. 22, 2022). After several years of litigation (during which CSAPR was stayed), EPA's CSAPR FIP was held to be unlawful as to Texas. *See EME Homer City Generation, L.P. v. EPA*, 795 F.3d 118, 129 (D.C. Cir. 2015).

added).  Accordingly, EPA's modeling notice identified upwind States (including Texas) with a one percent or greater modeled contribution to ozone levels at a monitor site in a downwind State that EPA's modeling predicted would not attain the ozone NAAQS in 2023 (a "nonattainment" monitor) or was at risk of not attaining (a "maintenance" monitor).  *Id.* at 1,739-40.

EPA's modeling notice explained, however, that its 4-step framework and its modeling approach were not mandatory for States to follow in their SIPs.  *Id.* at 1,735. EPA advised "that states may rely on this or other appropriate modeling, data or analyses to develop approvable Good Neighbor SIPs" and "may choose to modify or supplement these data in developing their Good Neighbor SIPs."  *Id.*

Moreover, EPA explained that in certain circumstances "states have considered, and could continue to consider, *other factors* [besides EPA's one-percent contribution threshold] to evaluate those states' planning obligation pursuant to the Good Neighbor provision."  *Id.* at 1,740 (emphasis added).  For example, EPA explained that its one-percent threshold was developed for its CSAPR FIPs "to evaluate upwind state linkages in *eastern* states" "because that threshold captures a high percentage of the total pollution transport affecting downwind receptors" in such States.[5]  *Id.*  In western States, however, EPA explained "there may be geographically specific factors to

_____

[5]  88 Fed. Reg. at 9,370 (EPA's one-percent threshold was "originally derived" from EPA's CSAPR FIPs in 2011).

consider in determining whether the 1 percent screening threshold is appropriate." *Id.* EPA cited its prior approval of Arizona's SIP for the 2008 ozone NAAQS, *id.* at 1,740 n.17, where EPA had "considered the total weight of all the evidence taken together to evaluate whether Arizona significantly contributes to nonattainment or interferes with maintenance of the 2008 ozone NAAQS in [downwind] areas." 81 Fed. Reg. 15,200, 15,203 (Mar. 22, 2016).

EPA issued further guidance in March 2018 to assist States in developing their interstate transport SIP revisions for the 2015 ozone NAAQS. As in the January 2017 modeling notice, EPA explained that States *could* use the "four-step transport framework" that EPA had used in FIPs for previous NAAQS "using EPA's analytical approach or *somewhat different analytical approaches* within these steps" "*or alternative frameworks.*" EPA March 2018 Transport Guidance (C.I. HQ-3) at 3 (emphases added). EPA further explained that States "*may consider*" using EPA's modeling results in the development of their SIPs; "*may supplement* the information provided in this memorandum with any additional information that they believe is relevant to addressing the good neighbor provision requirements"; and "*may also choose to use other information* to identify nonattainment and maintenance receptors relevant to development of their good neighbor SIPs." *Id.* at 6 (emphases added). Finally, EPA's memorandum "recommend[ed] that states reach out to *EPA Regional offices* and work together to accomplish the goal of developing, submitting, and reviewing approvable SIPs." *Id.* (emphasis added).

### C.     Texas's Interstate Transport SIP for the 2015 Ozone NAAQS

On August 8, 2018, TCEQ adopted its SIP to address all four prongs of the interstate transport requirement for the 2015 ozone NAAQS and timely submitted it to EPA on August 17, 2018. *See* 87 Fed. Reg. at 9,824. Based on its review and analysis of multiple factors, including emission trends and relative contributions, TCEQ demonstrated that the existing emission limitations in the Texas SIP prohibited emissions from Texas sources from contributing significantly to nonattainment in, or interfering with maintenance by, any other State with respect to the 2015 ozone NAAQS. *See* Texas SIP (C.I. R6-6) at 7-1.

As TCEQ documented in its SIP, from 2005 through 2014, "overall anthropogenic [man-made] ozone precursor emissions in Texas . . . declined substantially." *Id.* at 2-5. "$NO_X$ emissions decreased 35%" as "the result of regulations implemented at the federal, state, and local levels." *Id.* In particular, "regulations [in the existing Texas SIP] have significantly reduced overall ozone precursor emissions at both major and minor (point and area) industrial, commercial, and institutional sources." *Id.* Figure 2-3 from Texas's SIP (at 2-6) illustrates these reductions.

**Texas Statewide Historic NO$_X$ Emissions Trends in Tons Per Year**



To demonstrate that these reductions, along with on-the-books future reductions, satisfied the interstate transport provision, TCEQ's plan included nationwide photochemical modeling and analysis of the impact of Texas emissions on ozone concentrations in downwind States. 87 Fed. Reg. at 9,825. TCEQ used the same model as EPA had in its 2017 modeling—the Comprehensive Air Quality Model with Extensions (CAMx)—with some adjustments to the model's inputs (such as meteorology and base year) to account for regional and local emission patterns. Texas SIP (C.I. R6-6) at 3-4. TCEQ's demonstration of compliance with the NAAQS "us[ed] a framework similar to EPA's 4-Step framework [for FIPs]," 87 Fed. Reg. at 9,824, but "with several key improvements," Texas SIP (C.I. R6-6) at 3-1.

*First*, using CAMx modeling, TCEQ identified monitors in other States that were projected in 2023 either to be in nonattainment ("nonattainment monitors") or have maintenance issues ("maintenance monitors"), whether or not they were impacted by Texas emissions. TCEQ's modeling used more recent data than EPA's modeling from its January 2017 notice. For example, TCEQ used 2012 as the base year, instead of 2011, in part because "2011 was a meteorologically anomalous year for Texas and surrounding states as it was the hottest year on record and the single-worst drought year recorded in Texas since 1895." *Id.* at 3-6.

From its modeling results, TCEQ identified out-of-state monitors projected to be in nonattainment in 2023 using the *average* of the regulatory design values for the three consecutive years containing its modeling base year (*i.e.*, the average of the design value for 2010-2012, 2011-2013, and 2012-2014).[6] *Id.* at 3-37 – 3-38. To identify monitors where Texas emissions may "interfere with maintenance," TCEQ used the *most recent* three-year design value as the starting point (*i.e.*, the 2012-2014 period). *Id.* at 3-39. TCEQ found that the most recent data "reflect[s] the current state of ozone concentrations . . . and the impact of any maintenance plans [by downwind States] that

---

[6] The level of the ozone NAAQS is stated as a "design value," which is "a statistic that is used to compare air quality data to the NAAQS." Texas SIP (C.I. R6-6) at 2-2. For the 2015 ozone NAAQS, the regulatory design value is "the three-year average of the fourth-highest daily-maximum eight-hour averaged ozone" from each year. *Id.* If that calculated value is 70.9 ppb (or less), the monitor is considered to be in attainment; if it is 71.0 (or higher), it is considered to be in nonattainment. *See id.* at 3-47.

are in place to prevent local emissions from causing an area to slip back into nonattainment." *Id.* at 3-42. Any downwind monitor with a modeled value of 71 ppb or greater under either approach was identified by TCEQ as a nonattainment and/or maintenance monitor requiring further review. *Id.* at 3-47 – 3-48.

**Second**, from among those downwind monitors, TCEQ identified the ones potentially linked to Texas emissions using the default contribution threshold recommended in EPA's guidance—one percent of the NAAQS or 0.7 ppb. *Id.* at 3-2. If TCEQ's modeling predicted a Texas contribution at or above 0.7 ppb, the monitor was identified for further review. *Id.* at 3-3. In total, TCEQ identified sixteen monitors in three States (Arizona, California, and Colorado) for further review. *Id.* at 3-47 – 3-48.

TCEQ's modeling included the same downwind monitors that EPA had identified in its January 2017 modeling notice as linked to Texas (among others). The table below, reproduced from Texas's SIP (at 3-49), compares EPA's modeling results (using 2011 data as the starting point) to TCEQ's modeling results (using updated 2012 data) at the six downwind monitors that EPA identified as linked to Texas in its January 2017 modeling notice.

**Comparison of EPA and Texas Modeling at Monitors Linked to Texas in EPA's January 2017 Notice**

| Monitor ID | State | County | EPA Modeled Design Value (ppb) | EPA Modeled Texas Contribution (ppb) | TCEQ Modeled Design Value (ppb) | TCEQ Modeled Texas Contribution (ppb) |
|---|---|---|---|---|---|---|
| 260050003 | Michigan | Allegan | 68.8 | 2.49 | 71 | 0.59 |
| 551170006 | Wisconsin | Sheboygan | 71.0 | 1.92 | 70 | 0.73 |
| 240251001 | Maryland | Harford | 71.3 | 0.91 | 65 | 0.69 |
| 360850067 | New York | Richmond | 71.2 | 0.77 | 62 | 0.67 |
| 361030002 | New York | Suffolk | 71.3 | 0.71 | 67 | 0.63 |
| 80590011 | Colorado | Jefferson | 69.7 | 1.03 | 71 | 1.26 |

As the table shows, at five of the six monitors identified by EPA, TCEQ's updated modeling showed that the downwind monitor was in compliance with the NAAQS (for example, Sheboygan, Wisconsin, which is below 71 ppb) and/or Texas's contribution was below one percent of the NAAQS (for example, Allegan, Michigan, which is below 0.7 ppb). *Id.* at 3-49.

***Third***, TCEQ conducted a multi-factor weight-of-evidence analysis to determine whether Texas emissions significantly contribute to nonattainment or interfere with maintenance at the identified monitors. *Id.* at 3-50. As a conservative measure, TCEQ used a one-percent linkage to identify monitors for its weight-of-evidence analysis, even though such a threshold was overly-inclusive of monitors in western States with significantly lower collective interstate contribution than eastern States. *Id.* at 3-50 & 3-60. The monitors identified by TCEQ included the Jefferson,

Colorado monitor identified by both EPA's and TCEQ's modeling, as well as others in Colorado, California, and Arizona that EPA's outdated modeling had not identified. *Id.* at 3-47 – 3-48. TCEQ considered whether there was a "persistent and consistent pattern of contribution" from Texas emissions to the identified downwind monitors using a variety of technical analyses. *Id.* at 3-50.

Consistent with EPA's January 2017 notice and March 2018 guidance (and EPA's prior actions with respect to downwind monitors in western States), TCEQ's weight-of-evidence analysis considered "factors relevant to the ozone conditions at the [downwind] monitors" to determine if "Texas emissions significantly contribute to nonattainment or interfere with maintenance." *Id.* These included design value trends, the responsiveness of ozone levels at the downwind monitors to Texas emissions, back trajectory analyses on high ozone days, and the collective interstate contribution to the modeled designed values. *Id.* at 7-1.

For example, TCEQ used a tool within the CAMx model to examine the responsiveness of ozone formation at the monitor to changes in Texas $NO_X$ emissions as compared to changes in other $NO_X$ emissions (such as in-State $NO_X$ emissions). In other words, TCEQ examined whether reducing Texas $NO_X$ emissions would have any meaningful impact at the downwind monitor. As the graph below shows (from the Texas SIP (C.I. R6-6) at 3-65), at the Jefferson County, Colorado monitor (ID 80590011), changes in ozone concentrations at the monitor (green line) track changes

in $NO_X$ emissions from Colorado (purple line) and other sources (orange line), but not

changes in Texas $NO_X$ emissions (blue line).

**Responsiveness of Ozone at Jefferson County, Colorado, to Changes in $NO_X$ Emissions**



TCEQ also conducted "back trajectory analyses" on days of elevated ozone at

the downwind monitors to "look for probable cases where pollution from Texas was

transported to [the downwind monitors]" on those days. *Id.* at 3-70 – 3-74. These

analyses were conducted using the National Oceanic and Atmospheric Administration's

("NOAA") HYSPLIT model. 87 Fed. Reg. at 9,832. As EPA has explained: the

HYSPLIT model is used to "estimate the most likely route of an air parcel transported

from a particular location at a specified time. The method essentially follows a parcel

of air backward in hourly steps for a specified length of time." Region 6 Texas TSD

(C.I. R6-2) at 83. The graphic below (from the Texas SIP (C.I. R6-6) at 3-73) shows

the back trajectories from the California monitors on elevated ozone days in 2012-2016.

**HYSPLIT Back Trajectory Endpoints for California Monitors**



TCEQ's analysis thus showed that very few back trajectories from the California monitors originate in Texas.  Texas SIP (C.I. R6-6) at 3-72.  Specifically, "[o]ut of the 1,660 back trajectories" evaluated from 2012-2016 "only 10 back trajectories" reach Texas.  *Id.*  Further, of the ten that reach Texas, only two of them (purple dots) "are located within the mixing layer over Texas," and thus TCEQ did not "find a clear case where emissions in Texas could affect the ozone in California."  *Id.* at 3-72 – 3-73.  Based on these results, TCEQ concluded that "emissions from Texas are very unlikely

to affect ozone concentrations in the mixing layer over Los Angeles on high ozone days." *Id.* at 3-73.

TCEQ also evaluated the "collective interstate contribution" of emissions from all upwind States (not just Texas) to the modeled ozone values at the downwind monitors, as EPA had done in its prior actions for western State monitors. Consistent with EPA's guidance, TCEQ found that the collective contribution from all out-of-State emissions ranged from 9.32% to 10.27% at the Colorado monitors and from 3.20% to 4.58% at the California monitors, which TCEQ found to be "a small percentage and not as high as the collective interstate contribution percentages the EPA calculated for monitors in Eastern States [in CSAPR], which ranged from 17% to 67%." *Id.* at 3-60, 3-75. Thus, unlike in eastern States, where a substantial portion of ozone precursors originate from out-of-state, in Colorado and California, ozone conditions are dominated by in-State or background emissions. *Id.*

Based on an assessment of these factors at the downwind monitors, TCEQ concluded that Texas emissions do not contribute significantly to nonattainment or interfere with maintenance by any other State with respect to the 2015 ozone NAAQS and thus the existing emission reduction requirements in the Texas SIP were sufficient to demonstrate compliance with prongs 1 and 2 of the Act's interstate transport provision. *Id.* at 7-1.

18

**D.    EPA Region 6's Determinations Regarding Texas's SIP**

On February 22, 2022—three-and-a-half years after TCEQ submitted its SIP and *after* EPA's statutory deadline to act on the SIP—EPA's Region 6 proposed to disapprove Texas's SIP as to prongs 1 and 2 of the interstate transport provision. *See* 87 Fed. Reg. at 9,798.[7]   Region 6's determinations that formed the basis for the disapproval were set out in a Texas-only Technical Support Document prepared by the Region 6 Lead Modeler. *See* Region 6 Texas TSD (C.I. R6-2).

Region 6's proposed disapproval used EPA's "4-Step interstate framework (or 4-Step framework)" from its prior CSAPR FIPs "to evaluate [Texas's] SIP submittal[] addressing the interstate transport provision for the 2015 ozone NAAQS."  87 Fed. Reg. at 9,799.  The Region asserted that for Texas to "deviat[e] from" EPA's CSAPR 4-step framework, it "must be substantially justified" to EPA. *Id.* at 9,801.  Ultimately, based on differences between TCEQ's approach and EPA's 4-step framework, Region 6 concluded that Texas's plan "does not meet the State's interstate transport obligations" and must be disapproved. *Id.* at 9,834.

***First***, Region 6 determined that TCEQ "used a different methodology than the EPA to identify monitors projected to be maintenance receptors," *id.* at 9,825, which the Region asserted was "less likely to successfully identify maintenance receptors than

---

[7] EPA deferred action on Texas's SIP as to prongs 3 and 4 and, to date, has not proposed to approve or disapprove those aspects of Texas's SIP.

19

the EPA method," which used the *maximum* three-year design value from prior years (*i.e.*, 2009-2011, 2010-2012, or 2011-2013, whichever was highest). Region 6 Texas TSD (C.I. R6-2) at 11. The Region found that data "*tend to suggest* that the three years that comprise the 2014 design values (*i.e.*, 2012, 2013, and 2014) used in TCEQ's analysis *may* not have had meteorological conditions *particularly* conducive for formation of high ozone concentrations," "at least for many receptors." *Id.* at 9 (emphasis added). This determination formed the basis for Region 6's proposed disapproval. 87 Fed. Reg. at 9,826-29.

**Second**, Region 6 proposed to disapprove Texas's SIP based on its Lead Modeler's determination that "TCEQ's modeling underestimates future ozone levels" in 2023. *Id.* at 9,829; Region 6 Texas TSD (C.I. R6-2) at 38-41. Region 6 found no "clear cause" of any underestimation or error in TCEQ's modeling. 87 Fed. Reg. at 9,830. Instead, to support this assertion, the Region's Lead Modeler compared Texas's CAMx modeling results for the year 2023, not to EPA's modeling results, but to a "ballpark estimate" of future ozone conditions in 2023. Region 6 Texas TSD (C.I. R6-2) at 40. The Lead Modeler explained that this "ballpark estimate" of 2023 ozone levels was "*not as exact* as developing new modeling"; "*not usable* in any other CAA action"; and *not "a defensible basis* on which to reach *any* conclusions regarding future air quality conditions," but nevertheless would be used "to evaluate whether TCEQ's modeling *might be* underestimating 2023 future [ozone levels]." *Id.* at 40 & n.23 (emphases added). Based on this analysis, the Lead Modeler determined that "TCEQ's modeling is

*potentially* underestimating future [ozone levels]," *id.* at 45 (emphasis added), and the Region concluded that this determination required disapproval of Texas's SIP, 87 Fed. Reg. at 9,829.

***Third***, Region 6 determined that TCEQ's multi-factor weight-of-evidence analysis was not sufficiently "compelling" to "counter" "EPA's [one-percent] contribution methodology" from EPA's CSAPR FIPs for determining "whether its contributions were significant." *Id.* at 9,833-34; Region 6 Texas TSD (C.I. R6-2) at 78. Specifically, the Region's Lead Modeler found that "these additional factors [assessed by TCEQ] can be informative to supplement an air quality modeling-based analysis of some of the complexities of ozone formation in downwind areas," but that "[c]hemical transport modeling is the most technically credible tool available to project future year ozone levels." Region 6 Texas TSD (C.I. R6-2) at 77. The Region determined that "TCEQ's Other factors/[weight-of-evidence] analysis does not provide sufficiently compelling technically supported information to counter the conclusions from photochemical modeling in terms of [one-percent] linkages from Texas to downwind receptors." *Id.* at 100.

***Finally***, Region 6 relied on "newly available" modeling results—not previously released by EPA or provided to the States—to justify its disapproval of Texas's SIP. 87 Fed. Reg. at 9,800. EPA dubbed its new modeling the "2016v2 modeling."[8] EPA's

_____

[8] EPA's new "2016v2" modeling used 2016 (instead of 2011) as the base year, and it was "version 2" of modeling that EPA had released in October 2020 as part of a FIP

new 2016v2 modeling showed that all of the downwind areas identified in EPA's January 2017 modeling notice and in TCEQ's SIP modeling had been resolved—*i.e.*, based on the new modeling, all of the downwind monitors of concern either were modeled in attainment or Texas's contribution was below one percent. *Compare* 87 Fed. Reg. at 9,826 (Table TX-2), *with id.* at 9,831 (Table TX-4). Nevertheless, the new modeling purported to show *new* Texas "linkages" above one percent at three monitors in Wisconsin and four monitors in Illinois—*none* of which had been identified as nonattainment or maintenance monitors in either EPA's January 2017 modeling or TCEQ's SIP modeling. *Id.* at 9,831 (Table TX-4); *see also* TCEQ Comments (C.I. R6-28) at 7.

Region 6 "recognize[d] that the results of the EPA (2011 and 2016 base year) and TCEQ (2012 base year) modeling indicated different receptors and linkages." 87 Fed. Reg. at 9,831. Nevertheless, Region 6 claimed that "the differing results" do not mean that EPA's modeling "is inherently unreliable." *Id.* Instead, Region 6 claimed that the "differing results" are "further evidence" that Texas "is *required* to proceed to Step 3 [of EPA's framework]" to impose further emission reductions for sources in the State. *Id.* (emphasis added). Because, Region 6 reasoned, Texas was linked above one

---

for a different NAAQS—two years *after* Texas's SIP submission and six months *after* EPA's deadline to act on Texas's submission. 87 Fed. Reg. at 9,800; *see also* 88 Fed. Reg. at 9,366 (2016v2 modeling was part of "Revised CSAPR Update," a FIP action addressing the 2008 ozone NAAQS).

percent "to *some set* of downwind receptors"—regardless of location, the total upwind contribution, or the unique conditions at those monitors—Region 6 concluded that Texas "has an obligation to assess potential emissions reductions from sources or other emissions activity at Step 3 of [EPA's CSAPR] 4-step framework." *Id.* at 9,831, 9,834.

### E.    EPA's Final Disapproval

On February 13, 2023, EPA published its final disapproval of Texas's SIP. 88 Fed. Reg. at 9,359-60. EPA's Texas disapproval was published in a consolidated notice that included full or partial disapprovals of twenty other States' SIPs, which explained that each was judged "in light of the facts and circumstances of each particular state's submission" and that "the contents of each individual state's submission were evaluated on their own merits." *Id.* at 9,337, 9,340, 9,354.

As in the proposal, EPA asserted that "deviation from [the CSAPR 4-step] approach to ozone transport must be *substantially justified* and have a well-documented technical basis." *Id.* at 9,340 (emphasis added). With respect to its prior guidance that had advised States that they could use "alternative frameworks," EPA said that it now found "problematic" and "outdated" certain aspects of that guidance, *id.* at 9,342, 9,373, but it was not "formally rescinding" the guidance because "it [was] not required" to do so, *id.* at 9,368, 9,373. EPA further asserted that "EPA had no obligation to issue further guidance, define obligations, or otherwise clarify or attempt to interpret states' responsibilities since the issuance of the 2018 memoranda" before it could disapprove

State submissions based on EPA's 4-step framework and EPA's "additional modeling." *Id.* at 9,364; RTC (C.I. HQ-83) at 434 (same).

EPA's disapproval further stated that the agency "does not . . . agree [that] the EPA's role in the state-Federal relationship [is] 'secondary' such that the EPA must defer to state choices." 88 Fed. Reg. at 9,367. Instead, EPA concluded that "its role could be considered 'secondary'" only in the sense that "it occurs 'second' in time, after the states submit SIP submissions." RTC (C.I. HQ-83) at 425. And EPA further asserted that deference to a State's determinations in its SIP was not warranted "in the context of addressing interstate pollution" under the interstate transport provision. 88 Fed. Reg. at 9,367. As support, EPA cited the Supreme Court's decision in *EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489 (2014), which involved challenges to EPA's CSAPR *FIPs*, which EPA asserted was "directly applicable" to EPA's review of Texas's *SIP* and "affirms the critical role" of EPA in "*implementing* the good neighbor provision." RTC (C.I. HQ-83) at 426-27 (emphasis added).

With this understanding (88 Fed. Reg. at 9,354), EPA concluded that Texas's "use of its own definition of maintenance receptors and modeling" was "inadequately justified and legally and technically flawed." *Id.* at 9,359-60. EPA asserted that it "is not required by the CAA to promulgate regulations governing the good neighbor analysis" before it may disapprove a State's SIP based on non-statutory metrics. RTC (C.I. HQ-83) at 431. EPA further contended that it "is well within its authority to 'second-guess' TCEQ's modeling" and to instead "use[] its own modeling to inform its

assessment of the [Texas] SIP." *Id.* at 430-31. To support the final disapproval, EPA adopted wholesale the determinations by Region 6 in its Texas TSD. 88 Fed. Reg. at 9,359-60.

EPA's final disapproval cites *yet another* new set of modeling results—which EPA dubbed "2016v3"—that also had not previously been provided for review. For the first time in *any* of the various modeling that had been conducted to date, EPA's new 2016v3 modeling "linked" Texas to four monitors in New Mexico. *See* Final Air Quality Modeling TSD (C.I. HQ-85) at C-3. EPA's new 2016v3 modeling also provided the "collective upwind contribution" at the monitors of concern, including the Colorado monitors evaluated by TCEQ in its SIP. For example, in EPA's new modeling, the collective upwind contribution from all States at the Jefferson, Colorado monitor (ID 80590011) had fallen to 6.7% (down from the 10.27% determined by TCEQ). *See id.* at D-2 (Table D-1).

## III.   Procedural History in this Court

On February 13, 2023—the day that EPA's final disapproval was published in the Federal Register—the Association of Electric Companies of Texas, BCCA Appeal Group, Texas Chemical Council, Texas Oil & Gas Association, Luminant Generation Company LLC, Coleto Creek Power, LLC, Ennis Power Company, LLC, Hays Energy, LLC, Midlothian Energy, LLC, Oak Grove Management Company LLC, and Wise County Power Company, LLC filed their petitions for review in this Court. Docs. 3-1 & 5-1. The State of Texas and the Texas Commission on Environmental Quality filed

their petition that same day.  Doc. 1-1.  On March 8, 2023, the Public Utility Commission of Texas and Railroad Commission of Texas filed their petition.  Doc. 44-1.  Texas Lehigh Cement Company, LP, filed its petition on April 13, 2023.  Doc. 221-1.  All of these petitions sought review of EPA's disapproval of Texas's SIP.

Petitioners from the State of Louisiana and the State of Mississippi also filed petitions for review of EPA's disapproval of their respective SIP.  Docs. 52-1, 58-1, 63-1.  These petitions were docketed under the same case number as the Texas petitions.

On March 3, 2023, Texas Industry Petitioners[9] and the State of Texas and TCEQ filed motions to stay EPA's disapproval of Texas's SIP pending judicial review.  Docs. 31-1, 32-1.  On March 15, 2023, EPA filed a motion to transfer the petitions to the D.C. Circuit or to dismiss based on improper venue.  Doc. 50-1.  On March 27, the Louisiana Petitioners filed a motion to stay EPA's disapproval of Louisiana's SIP.  Doc. 112-1.

On May 1, 2023, this Court denied EPA's motion to transfer or dismiss and granted the Petitioners' motions to stay.  In a per curiam opinion, Judges Engelhardt and Wilson held that EPA's disapproval of Texas's SIP was "locally or regionally applicable" under the Clean Air Act's venue provision, 42 U.S.C. §7607(b)(1), and thus venue was proper in this Court.  *Texas 2023* at 9-11.  The Court further concluded that

---

[9] Petitioner Texas Lehigh Cement Company LP was not a party at the time the motion to stay was filed.

the "exception" to the "default presumption" of regional circuit review for EPA actions that are "based on a determination of nationwide scope or effect," 42 U.S.C. §7607(b)(1), did not apply here because EPA's disapproval was "based 'on a number of intensely factual determinations' unique to each State." *Texas 2023* at 11 (quoting *Texas 2016*, 829 F.3d at 421).[10]

In granting the motion to stay EPA's disapproval of Texas's SIP, the Court held that Petitioners "satisf[ied] their burden" of showing a likelihood of success on the merits "in two ways":

> They (1) make a strong showing that the EPA acted unlawfully by considering factors listed nowhere in the CAA. And they (2) are likely to prevail on the claim that the EPA arbitrarily and capriciously based its Final SIP Denial in part on information available only after Texas and Louisiana had submitted their SIPs.

*Id.* at 14. The Court further found that Petitioners will be irreparably harmed absent a stay because "[t]he Final SIP Denial was the statutory prerequisite for the EPA to create [a federal implementation plan that will] impose [EPA's] preferred system of emissions

---

[10] Judge Douglas filed a dissenting opinion, contending that venue is not proper in this Court. *Texas 2023* at 25. Because Judge Douglas "determined venue to be improper," she "[found] it [not] necessary to reach Petitioners' motions to stay." *Id.* at 30.

controls and reductions on the States" and "many regulated entities have already commenced compliance efforts or will soon be required to do so." *Id.* at 22.

## SUMMARY OF THE ARGUMENT

This case concerns EPA's latest attempt to usurp the State of Texas's authority under the Clean Air Act's cooperative federalism framework and force billions of dollars of unnecessary costs on Texas's energy infrastructure. Texas spent years developing its plan to address the Act's interstate transport requirements for the new 2015 ozone NAAQS. Because Texas's plan complies with the Act, EPA had one job: approve it. EPA had other plans—a *federal* implementation plan for Texas filled with *EPA's* policy preferences.

EPA's disapproval of Texas's SIP was unlawful for several reasons. At the threshold, EPA applied the wrong standard of review—it believed that EPA's choices, not Texas's, were entitled to primacy in the SIP-review process and that Texas was required to substantially justify its approach to EPA, in direct contravention of this Court's well-established precedent. Based on this upside-down view of the law, EPA proceeded to disapprove Texas's SIP based on several *non-statutory* policy preferences— like EPA's 4-step framework for applying the good neighbor provision in FIPs and its one-percent threshold for determining "significant contribution," neither of which is found in the statutory text or any duly-promulgated regulation. Untethered from its secondary role in the SIP-review process, EPA committed further error by discounting TCEQ's modeling based, not on any actual error, but on its comparison to EPA's

"ballpark estimates" and rejecting TCEQ's weighing of admittedly relevant factors for determining "significant contribution," contrary to EPA's own approach in prior actions.

This Court's precedent draws a clear line: "With regard to implementation, the Act confines the EPA to the ministerial function of reviewing [State plans] *for consistency with the Act's requirements.*" *Luminant 2012*, 675 F.3d at 921 (emphasis added). As the stay panel held, EPA stepped over that line here in judging Texas's SIP against EPA's 4-step framework and other non-statutory requirements. EPA's actions must also be supported by substantial evidence and rationally based, treating like cases alike—tests that EPA likewise failed here. For each of these reasons, EPA's disapproval of Texas's SIP is unlawful and should be vacated.

## STANDARD OF REVIEW

Under the Clean Air Act, this Court will invalidate EPA's action if it is "not permitted by the statute" or is "arbitrary [or] capricious[.]" *Texas 2016*, 829 F.3d at 425-26; *see also Luminant 2012*, 675 F.3d at 925 (standard of review of Clean Air Act actions mirrors standards under Administrative Procedure Act); 5 U.S.C. §706(2)(A), (C). The Clean Air Act only authorizes EPA to review a SIP "*for consistency with the Act's requirements.*" *Luminant 2012*, 675 F.3d at 921. Thus, EPA's disapproval of a SIP is contrary to law, and must be vacated, where EPA relies on non-statutory requirements. *Texas 2016*, 829 F.3d at 426-27.

EPA action "is arbitrary and capricious 'if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Tex. Oil & Gas Ass'n v. EPA*, 161 F.3d 923, 933 (5th Cir. 1998) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43 (1983)); *see also Data Mktg. P'ship, LP v. U.S. Dep't of Labor*, 45 F.4th 846, 856 (5th Cir. 2022) (this Court's review of agency action is "not toothless"; rather, "it has serious bite" (internal quotation marks and citations omitted)).

## ARGUMENT

### I.    EPA's Disapproval Is Unlawful Because EPA Failed to Apply the Clean Air Act's Cooperative Federalism Framework to its Review of Texas's SIP

This Court's precedent setting out the respective roles of States and EPA in the SIP process extends back over four decades.  Consistently, this Court has held that "the Clean Air Act limits EPA to a deferential role"; that EPA must accord "deference" to "Texas's application of the [Act's] statutory factors"; and that EPA acts *ultra vires* when it disapproves a SIP based on requirements "not found in the Act." *Texas 2016*, 829 F.3d at 428 (citing, *inter alia, Florida Power & Light*).  In recent years, this Court has corrected EPA's "misapprehension" of "its authorized role in the SIP-approval process," noting that "EPA does not possess *any* 'discretionary authority'" at the SIP

stage and that "[o]nly the [S]tates enjoy discretion in implementing the dictates of the CAA." *Luminant 2012*, 675 F.3d at 928 n.8 (emphases added).

EPA's disapproval of Texas's SIP openly contravenes these fundamental principles, and for that reason alone it must be vacated. In disapproving Texas's SIP, EPA candidly states, contrary to the Supreme Court and this Court's repeated admonitions, that it "disagrees that it is obligated to defer to [S]tates' choices in the development of good neighbor SIP submissions." 88 Fed. Reg. at 9,375; *contra Texas 2016*, 829 F.3d at 428 (EPA "failed to defer to Texas's application of the [Act's] statutory factors" in interstate-visibility transport SIP). And EPA asserted here that its role is "secondary" only "in time" because its review occurs *chronologically* after the State makes its SIP submission, not because the State has the primary role in determining how to substantively comply with the statutory requirements. RTC (C.I. HQ-83) at 425; 88 Fed. Reg. at 9,367-68; *contra* 42 U.S.C. §7401(a)(3) ("[A]ir pollution prevention . . . and air pollution control at its source is the primary responsibility of States and local governments."); *Train*, 421 U.S. at 79 (EPA "is relegated by the Act to a secondary role."); *Texas 2016*, 829 F.3d at 411 ("The structure of the Clean Air Act indicates a congressional preference that states, not EPA, drive the regulatory process.").

EPA justifies its current legal position by asserting that the Supreme Court and this Court's jurisprudence that reinforces the Act's cooperative federalism framework is outdated and does not apply to interstate transport. *See* 88 Fed. Reg. at 9,367-68. It

claims that "the *Train*-*Virginia* line of cases" "pre-date" the 1990 amendments to the Act's interstate transport provision such that EPA deference "to state choices" is now "inappropriate in the context of addressing interstate pollution." *Id.* But the interstate-transport requirements are part of the same statutory provision as other State plan requirements, *see* 42 U.S.C. §7410(a)(2), and there is no indication in the statutory text or otherwise that Congress intended in 1990 (or at any other time) to upend the normal order when States address interstate transport. This Court applies the same standard of review to judge EPA action on Clean Air Act SIPs whether or not interstate transport is involved. *See Texas 2016*, 829 F.3d at 411-12 (applying *Train*, *Union Electric*, *Florida Power & Light*, and *Luminant 2012* to EPA disapproval of Texas interstate-visibility transport SIP).

EPA further claimed here that this long-standing precedent was altered by "the directly applicable holdings [of the Supreme Court] in *EME Homer City*." RTC (C.I. HQ-83) at 427. In EPA's view, *EME Homer* gives EPA the primary role in the SIP review process for interstate transport and holds that EPA, not the State, is "afforded deference" "in evaluating state SIP submissions." *Id.* at 426-27. Not so. *EME Homer* dealt exclusively with EPA's promulgation of *federal* implementation plans, not SIPs. *See EME Homer*, 572 U.S. at 503. EPA's antecedent SIP disapprovals, which had largely gone "unchallenged," were not even before the Supreme Court. *Id.* at 503 n.11, & 507 ("[The] State respondents' challenge is not that EPA's disapproval of any particular SIP was erroneous."). Thus, *EME Homer* does not help EPA here.

32

Quite the opposite, the Supreme Court confirmed in *EME Homer* that, for SIPs, the "deference" that EPA claims for itself runs to the State, not EPA. The Supreme Court explained that its references to "EPA's task" in issuing FIPs should be construed to refer to States in the SIP context because "the Good Neighbor Provision is initially directed to upwind States." *Id.* at 514 & n.15. *EME Homer* is thus consistent with this Court's precedent that, at the SIP stage, "[o]nly the [S]tates enjoy discretion in implementing the [Act]." *Luminant 2012*, 675 F.3d at 928 n.8.

EPA's mistake of law was consequential. It caused EPA to "believe that deviation from a nationally consistent approach to ozone transport"—*i.e.*, EPA's policy preferences embodied in its 4-step CSAPR FIP framework—"must be *substantially justified*" to EPA. 88 Fed. Reg. at 9,340 (emphasis added). Such a heightened standard is "inconsistent with the statute and jurisprudence applying it." *Texas 2023* at 16. Nothing in the statute requires a State to "substantially justify" its choices to EPA. Where Congress intended for a heightened standard to apply in the SIP review process, it was explicit. For example, before EPA can require a State to *revise* an existing SIP through a "SIP call," EPA must demonstrate that the SIP is "substantially inadequate" to "comply with any requirement of [the statute.]" 42 U.S.C. §7410(k)(5). No comparable hurdle exists for a State when it drafts and adopts its SIP for a new NAAQS and submits it to EPA for approval, which is the posture here. *See* 42 U.S.C. §7410(a)(2). Had Congress intended that a State "substantially justify" its SIP to EPA, it would have included a similar directive in Section 7410(a)(2), but it did not. *See Jama*

*v. Immigration & Customs Enf't*, 543 U.S. 335, 341 (2005) ("We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and our reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest.").  Not only did Congress omit such a requirement, the statute is explicit that at the SIP-submission stage, just like with a SIP call, the State has broad discretion and EPA's role is limited and narrowly-cabined. *See* 42 U.S.C. §7410(k)(3) (EPA "shall approve" a SIP submittal that "meets" the statutory requirements).

The heightened standard that EPA applied here in disapproving Texas's SIP thus inverts the statute's cooperative-federalism mandate and "reflects a misapprehension by the EPA of its authorized role in the SIP-approval process." *Luminant 2012*, 675 F.3d at 928 n.8.  EPA's erroneous legal position was the cornerstone of its entire analysis (*see* RTC (C.I. HQ-83) at 424-37) and alone warrants vacatur.  *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943) (agency action "may not stand if the agency has misconceived the law"); *Prill v. NLRB*, 755 F.2d 941, 947 (D.C. Cir. 1985) ("An agency decision cannot be sustained, however, where it is based . . . on an erroneous view of the law.").

## II.  EPA's Disapproval Is Unlawful Because it Is Based on Non-Statutory Factors

EPA's disapproval is also unlawful because EPA did not limit its review of Texas's plan "for consistency with the Act's requirements." *Luminant 2012*, 675 F.3d

at 921.    Instead, EPA disapproved Texas's SIP based on several non-statutory requirements derived from EPA's earlier *federal* plans.

A.    **EPA Unlawfully Imposed its Preferred "4-Step Framework" on Texas's SIP**

EPA unlawfully disapproved Texas's SIP based on its conclusion that the SIP did not measure up to EPA's preferred "4-step framework" from its CSAPR FIPs.    As EPA explained in its disapproval, "[t]he EPA used a 4-step interstate transport framework (or 4-step framework) to evaluate each state's [SIP] addressing the [Good Neighbor] [P]rovision for the 2015 ozone NAAQS."    88 Fed. Reg. at 9,338.    In so doing, EPA required that "deviation from [the 4-step] approach to ozone transport *must be substantially justified* and have a well-documented technical basis."    *Id.* at 9,340 (emphasis added); *see also* Region 6 Texas TSD (C.I. R6-2) at 78 (claiming that Texas's SIP did not provide "substantial evidence that counters" EPA's framework).

But EPA's preferred "4-step framework" is not part of the interstate-transport provision of the statute.    *See* 42 U.S.C. §7410(a)(2)(D)(i)(I).    Nor does the statute authorize EPA to disapprove a SIP based on a comparison to a previous or proposed FIP.    EPA's review is specifically limited to "the statutory criteria of the CAA," *Texas 2012*, 690 F.3d at 676, which do not require that a SIP conform in any way to a FIP, *see* 42 U.S.C. §7410(a)(2).    A requirement that States must fit themselves into an EPA-devised straitjacket would nullify the statute's guarantee that States enjoy flexibility in devising their own policies to satisfy the statute.

Moreover, contrary to EPA's belief, the Supreme Court's decision in *EME Homer* does not support the application of EPA's 4-step framework to EPA's "evaluat[ion] [of] state SIP submissions" under 42 U.S.C. §7410(a). RTC (C.I. HQ-83) at 426. Because *EME Homer* did not concern SIPs (*supra* at 32), it is irrelevant that, according to EPA, the Supreme Court may have "granted deference [to EPA] in its interpretation of the [good neighbor provision]" in that case. RTC (C.I. HQ-83) at 427. While EPA's framework may (or may not) be a reasonable interpretation for a particular FIP, Texas has the discretion to adopt a *different* reasonable approach under its statutory SIP authority granted by 42 U.S.C. §7410(a). *Luminant 2012*, 675 F.3d at 928 n.8 ("Only the [S]tates enjoy discretion in implementing the dictates of the CAA."); *Texas 2023* at 15 (EPA's 4-step framework is "one 'permissible' way to effectuate the CAA's Good Neighbor Provision, . . . but it is by no means the only way.").

The Supreme Court confirmed Texas's primary role when it held that States were delegated the authority to address interstate transport in the first instance in a SIP *without* "EPA's input"—*i.e.*, without EPA's 4-step framework. *EME Homer*, 572 U.S. at 509-10 ("When Congress elected to make EPA's input a prerequisite to state action under the Act, it did so expressly," but it did not "include[] a similar direction in [the good neighbor] section."). Thus, because "nothing in the statute places EPA under an obligation to provide specific metrics to States before they undertake to fulfill their good neighbor obligations," EPA's analytical framework and modeling cannot be the standard used to judge a SIP. *Id.* at 510. Instead, in exercising its independent statutory

authority under 42 U.S.C. §7410(a), Texas may interpret and apply the good-neighbor provision and select a reasonable approach for its SIP, even if that approach deviates from EPA's. *Luminant 2012*, 675 F.3d at 928 n.8; *see also Exelon Wind 1, L.L.C. v. Nelson*, 766 F.3d 380, 394-95 (5th Cir. 2014) (deferring to Texas PUC's implementation of federal statute).

Further, even if it could, EPA has not promulgated any regulations that bind States to a particular good-neighbor framework—indeed, EPA has disavowed an obligation to do so. RTC (C.I. HQ-83) at 431 ("The EPA is not required by the CAA to promulgate regulations governing the good neighbor analysis."). "Given the absence of a regulation or statute requiring [EPA's 4-step framework]," EPA's disapproval is contrary to the statute and must be vacated. *Texas 2016*, 829 F.3d at 429; *see also Sackett v. EPA*, 598 U.S. __, __ (2023) (slip op. at 24) ("And, in any event, the [statute] never mentions the 'significant nexus' test, so the EPA has no statutory basis to impose it.").

## B.    EPA's Preferred Approach to Maintenance Monitors Is Not a Statutory Requirement

EPA unlawfully rejected Texas's approach to "maintenance" monitors—not based on any statutory requirement, but because TCEQ "used a different methodology than the EPA to identify monitors projected to be maintenance receptors in 2023." 87 Fed. Reg. at 9,824-29. The statute, however, does not require any particular methodology for identifying maintenance monitors, as EPA itself has conceded. *See* 82 Fed. Reg. 9,155, 9,156 (Feb. 3, 2017) ("[T]he statute[] [is] silen[t] on how nonattainment

and maintenance should be identified under the good neighbor provision[.]'"). Neither do EPA's regulations. While EPA issued regulations establishing SIP requirements for some aspects of the 2015 ozone NAAQS, they do *not* include requirements for interstate transport, much less for identifying "maintenance" monitors. *See* 40 C.F.R. §§51.1300-51.1318. Because neither the statute nor EPA's duly-promulgated regulations require EPA's preferred "maintenance" methodology, EPA's disapproval on that basis was unlawful. *Texas 2016*, 829 F.3d at 429.

EPA's disapproval claimed that TCEQ did not "give[] meaning to the CAA's instruction" regarding "interfering with the maintenance of the NAAQS in another state." 87 Fed. Reg. at 9,826. But the interstate-transport provision does not give an "instruction" to follow EPA's preferred method for identifying maintenance monitors. *See* 42 U.S.C. §7410(a)(2)(D)(i)(I). Thus, EPA's insistence on its own approach was *ultra vires* and requires vacatur. *See Luminant 2012*, 675 F.3d at 932.

Regardless, Texas's approach to addressing the "maintenance" prong was true to the text of Section 7410(a)(2)(D)(i)(I) in every respect. ***First***, the text requires the State to give meaning to *both* prongs. *See* 42 U.S.C. §7410(a)(2)(D)(i)(I) ("contribute significantly to nonattainment in, *or* interfere with maintenance by") (emphasis added); *see also North Carolina v. EPA*, 531 F.3d 896, 910 (D.C. Cir. 2008) ("[§7410(a)(2)(D)(i)(I)] is written in the disjunctive"). EPA concedes that TCEQ's methodology meets this requirement and gives both prongs independent meaning. 87 Fed. Reg. at 9,825 (TCEQ separately identified receptors "projected to be in nonattainment" *or* "projected to have

problems attaining and maintaining the 2015 ozone NAAQS"); *id.* (Table TX-1) (showing both nonattainment and maintenance monitors); Region 6 Texas TSD (C.I. R6-2) at 6 ("TCEQ's method identified one receptor in [its] SIP submission as a nonattainment receptor in 2023 that is separately characterized under its maintenance methodology as not having a problem maintaining the NAAQS.").

**Second**, TCEQ's approach honors Section 7410(a)(2)(D)(i)'s directive that the "interfere with maintenance" prong be applied "consistent with the provisions of this subchapter." 42 U.S.C. §7410(a)(2)(D)(i). One such "provision of this subchapter" is 42 U.S.C. §7505a, which requires States to implement a "maintenance" plan for any area redesignated as nonattainment that "shall contain such additional measures, if any, as may be necessary to ensure such maintenance" of the NAAQS. TCEQ found that using the most recent three-year average design value to identify downwind "maintenance" monitors "reflect[s] the current state of ozone concentrations . . . and the impact of any maintenance plans that are in place to prevent local emissions from causing an area to slip back into nonattainment." Texas SIP (C.I. R6-6) at 3-42. EPA claimed that TCEQ's consideration of "maintenance plans" under 42 U.S.C. §7505a "is irrelevant and misplaced," 87 Fed. Reg. at 9,828, but the text of the interstate-transport provision explicitly *requires* consideration of this other "provision[] of this subchapter" in determining "interfer[ence] with maintenance." *See* 42 U.S.C. §7410(a)(2)(D)(i).

**Third**, TCEQ's approach gives meaning to the phrase "maintenance *by* . . . any other State." *Id.* §7410(a)(2)(D)(i)(I) (emphasis added). EPA would rewrite this

provision as "maintenance of the NAAQS *in* another state."  87 Fed. Reg. at 9,826 (emphasis added).  But the statute does not require upwind States to bear the burden of maintaining the NAAQS in another State without regard to the home State's obligations, as EPA's careful edit would do.  Instead, as the Supreme Court has explained, the "interfere with maintenance" prong only authorizes emission reductions from upwind States "by just enough to permit an already-attaining State to maintain satisfactory air quality."  *EME Homer*, 572 U.S. at 515 n.18.  Accordingly, Section 7410(a)(2)(D)(i)(I) assumes that the downwind State is "already attaining" the NAAQS through its own in-State measures and focuses the upwind State's SIP demonstration on "maintenance *by*" the downwind State.  42 U.S.C. §7410(a)(2)(D)(i)(I) (emphasis added).  Texas's approach gives meaning to this plain language by incorporating into its SIP demonstration the concepts of "maintenance" plans by already-attaining States under 42 U.S.C. §7505a and decreasing ozone trends in downwind States to ensure that it does not needlessly and unlawfully over-control Texas sources.  *See* Texas SIP (C.I. R6-6) at 3-41 – 3-42; *see also EME Homer*, 572 U.S. at 515 n. 18.  Because Texas's approach in its SIP was consistent with the plain language of the statute, EPA was bound to approve it.  *See* 42 U.S.C. §7410(k)(3).

Ignoring the statute's plain language, EPA claimed in its disapproval that its approach to "maintenance" monitors was compelled by the D.C. Circuit's decision in *North Carolina v. EPA*, 531 F.3d 896 (D.C. Cir. 2008), which concerned an EPA FIP called the "Clean Air Interstate Rule."  87 Fed. Reg. at 9,826-27.  EPA claims that

"variable meteorology" was "the issue at the heart of the D.C. Circuit's finding on 'interference with maintenance'" in that case. *Id.* at 9,827. But nothing in the D.C. Circuit's decision in *North Carolina* requires that a State give primary consideration to "inter-annual variability in ozone-conducive meteorology" under the "maintenance" prong of Section 7410(a)(2)(D)(i)(I), which was EPA's pretext for disapproving Texas's SIP here. 87 Fed. Reg. at 9,827. In *North Carolina*, the D.C. Circuit held that EPA's FIP action (for a different NAAQS) was contrary to the statute because it "read[] [the maintenance prong] out of [the] statute" entirely by giving it "no independent significance." 531 F.3d at 910. The D.C. Circuit *did not* hold that "variable meteorology" must or should be the primary consideration in identifying downwind "maintenance" monitors in a FIP (much less a SIP). Indeed, the Court there was responding to North Carolina's argument that "several of its counties are at risk of returning to nonattainment due to interference *from upwind sources,*" not simply from changes in the weather. *Id.* at 909 (emphasis added). Thus, unlike EPA's unlawful FIPs in *North Carolina,* TCEQ's maintenance methodology here—which "accounts for *both* meteorological variability *and* the latest emissions impact on the monitor" from upwind sources, Texas SIP (C.I. R6-6) at 3-41 (emphases added)—is consistent with the D.C. Circuit's decision *and* the statutory text.[11]

---

[11] In any case, EPA was also incorrect that Texas's approach "did not give *any consideration* to interannual variability in ozone-conducive meteorology as does the EPA's method." 87 Fed. at 9,827 (emphasis added). That claim is belied by the record, which demonstrated that, nationally, the year 2012—which was included in TCEQ's

### C.    EPA's Rejection of Texas's Weight-of-Evidence Analysis Was Unlawful

EPA also unlawfully rejected Texas's weight-of-evidence approach to determining whether the State's emissions "contribute significantly to nonattainment" or "interfere with maintenance." EPA did so, not based on any statutory requirement, but based on Region 6's determination that TCEQ's approach did not "counter" EPA's bright-line one-percent threshold from EPA's CSAPR FIPs with "substantial evidence." *See* Region 6 Texas TSD (C.I. R6-2) at 78; 87 Fed. Reg. at 9,831-34. EPA said it would impose the one-percent threshold over Texas's weight-of-evidence approach absent a "compelling policy reason." 88 Fed. Reg. at 9,374.

In its CSAPR FIPs, EPA chose to use a one-percent contribution threshold to define "significance." As the D.C. Circuit held in reviewing EPA's CSAPR FIPs (and finding the Texas CSAPR FIP unlawful), a one-percent contribution establishes definitively, for EPA, that "th[e] upwind State [has] 'contributed significantly.'" *EME Homer*, 795 F.3d at 125.

EPA applied that standard here in disapproving Texas's SIP: "If a state's contribution value does not equal or exceed the threshold of 1 percent of the

---

maintenance methodology—"was among the highest ozone years since 2005-2007," which meant that "[a]ny ozone design value that included 2012 [as TCEQ's did] would have included at least one year with exceptionally conducive meteorology for high ozone." RTC (C.I. HQ-83) at 223; *see also* Region 6 Texas TSD (C.I. R6-2) at 32 (conceding that "2012, the year TCEQ selected as its base year, was conducive to ozone formation.").

NAAQS . . . the state does not contribute significantly to nonattainment or interfere with maintenance of the NAAQS in the downwind states." *See* 88 Fed. Reg. at 9,342; *see also* 82 Fed. Reg. at 1,740 ("[T]he CSAPR framework treats a contribution from an individual state at or above 1 percent of the NAAQS as significant."). But the term "significantly contribute" is not defined by the statute or EPA's regulations, much less as a one-percent threshold calculated per EPA's 4-step framework. Indeed, this Court has already held that EPA's "one-percent threshold" is non-statutory and "does not appear in the text of [the interstate-transport] provision." *Texas 2020*, 983 F.3d at 839. By requiring Texas to "counter" EPA's one-percent threshold, Region 6 Texas TSD (C.I. R6-2) at 100, EPA applied a non-statutory requirement and unlawfully "relied on factors which Congress has not intended it to consider." *La. Envtl. Action Network v. EPA*, 382 F.3d 575, 582 (5th Cir. 2004) (internal quotation marks and citation omitted).

In this way, EPA's disapproval turns cooperative federalism on its head. EPA claims that Texas's SIP did not provide "substantial evidence that counters . . . the contribution analysis using EPA's [one-percent] contribution methodology." Region 6 Texas TSD (C.I. R6-2) at 78. And EPA says it would review Texas's SIP based on the one-percent threshold absent a "compelling policy reason to adopt" a different approach. 88 Fed. Reg. at 9,374. But the Clean Air Act does not require Texas to "counter[]" EPA's preferred approach with "substantial evidence," nor does it authorize EPA to judge a SIP based on EPA's preferred approach from a FIP. EPA must defer to a State's choices that comply with the Act, not reject them absent a

"compelling" reason to deviate from EPA's non-statutorily-mandated approach. *Luminant 2012*, 675 F.3d at 928 n.8.

## III. EPA's Disapproval of Texas's SIP Was Arbitrary and Capricious

### A. EPA's Rejection of Texas's Air Quality Modeling in Favor of "Ballpark Estimates" Was Arbitrary and Capricious

TCEQ performed its modeling here using the most up-to-date version of the same model that EPA had used—the CAMx model—and *more recent* emissions data than EPA had used. 87 Fed. Reg. at 9,825. EPA did not dispute that TCEQ used the correct model; found no "clear cause" of any underestimation in TCEQ's results, *id.* at 9,830; and did not conclude that TCEQ violated any modeling protocols in EPA's regulations that "provide[] air quality modeling techniques that should be applied to State Implementation Plan (SIP) submittals," 40 C.F.R. Part 51, App. W, §1.a.

TCEQ is widely recognized as an authoritative source on photochemical modeling of interstate transport of emissions.[12] Yet, despite finding no error in TCEQ's modeling, EPA cast it aside based on Region 6's speculation that "TCEQ's modeling is *potentially* underestimating future [ozone levels]." Region 6 Texas TSD (C.I. R6-2) at 45 (emphasis added); 88 Fed. Reg. at 9,359 (citing Region 6 Texas TSD). The Region's

---

[12] *See Midwest Ozone Grp. v. EPA*, 61 F.4th 187, 190 n.2 (D.C. Cir. 2023) (citing TCEQ on photochemical modeling); *see also EME Homer City Generation, L.P. v. EPA*, 696 F.3d 7, 49 & n.13 (D.C. Cir. 2012) (Rogers, J, dissenting) ("State air quality divisions are no strangers to complex air quality and meteorological modeling of interstate transport of emissions." "To cite one example: the State of Texas."), *rev'd on other grounds*, 572 U.S. 489 (2014).

speculation was based, not on any modeling protocol or error in the modeling, but on the Region's comparison of TCEQ's results to a "ballpark estimate" of 2023 ozone conditions. Region 6 Texas TSD (C.I. R6-2) at 40. Region 6, however, conceded that its "ballpark estimate" was "*not as exact* as developing new modeling"; "*not usable* in any other CAA action"; and not even "*a defensible basis* on which to reach any conclusions regarding future air quality conditions." *Id.* at 40 & n.23 (emphases added).

These concessions render EPA's disapproval unlawful. EPA's factual findings must be "supported by substantial evidence." *Texas 2016*, 829 F.3d at 425. To withstand review, EPA "must examine the relevant data and *articulate a satisfactory explanation* for its action including a '*rational* connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962) (emphases added). By basing its disapproval on a "ballpark estimate" that was admittedly not "a defensible basis" for "*any* conclusions regarding future air quality conditions," Region 6 Texas TSD (C.I. R6-2) at 40 & n.23 (emphasis added), EPA utterly failed to meet that standard here.

## B.     EPA Failed to Treat Like Cases Alike

"It is a bedrock principle of administrative law that an agency must 'treat like cases alike.'" *Univ. of Tex. M.D. Anderson Cancer Ctr. v. U.S. Dep't of Health & Human Servs.*, 985 F.3d 472, 479 (5th Cir. 2021) (quoting 32 Charles Alan Wright & Charles H. Koch, *Federal Practice and Procedure* §8248, at 431 (2006)). "This principle," the Court has explained, "is an outgrowth of the old adage from *State Farm* that 'an agency changing

its course must supply a reasoned analysis.'" *Id.* (quoting *State Farm*, 463 U.S. at 57); *see also Jupiter Energy Corp. v. FERC*, 407 F.3d 346, 349 (5th Cir. 2005) (agency action is arbitrary and capricious when it fails to "supply a reasoned analysis for any departure from other agency decisions" (internal quotation marks and citations omitted)). Were the law otherwise, an administrative agency like EPA "could give free passes to its friends and hammer its enemies." *Univ. of Tex.,* 985 F.3d at 480. The law "prohibits that approach." *Id.*

But that is exactly what EPA did here in rejecting Texas's weight-of-evidence approach to evaluating whether the State's emissions "contribute significantly to nonattainment" or "interfere with maintenance." EPA initially explained in its guidance to States that, even with a modeled contribution above EPA's "1 percent screening threshold," States "could continue to consider[] other factors to evaluate [their] planning obligation pursuant to the Good Neighbor provision." 82 Fed. Reg. at 1,739-40. In doing so, EPA cited its approval of Arizona's SIP, where, even though Arizona "contributes greater than the 1% threshold," "EPA [] considered the total weight of all the evidence taken together to evaluate whether Arizona significantly contributes." 81 Fed. Reg. at 15,203. For Arizona, EPA did not require the State to "counter" with "substantial evidence" "EPA's [one-percent] contribution methodology," as it did in disapproving Texas's SIP here. *See* Region 6 Texas TSD (C.I. R6-2) at 78. Nor has EPA applied such a heightened standard in evaluating other States' SIPs where impacts to western-State monitors are above EPA's one-percent threshold—but has instead

invited those other States to do exactly what Texas did here. *See, e.g.,* 81 Fed. Reg. 71,991, 71,994 (Oct. 19, 2016) ("If [Utah] believes that the EPA should consider additional factors with respect to its linkage to the Denver receptors, it should identify those factors in its SIP submission.").

Here, TCEQ *did* provide an extensive weight-of-evidence analysis to support its conclusion that Texas emissions did not significantly contribute to nonattainment in, or interfere with maintenance by, any other State. *See* Texas SIP (C.I. R6-6) at 3-5 – 3-75. Among other things, TCEQ examined the total collective contribution of out-of-state emissions at the downwind monitors, using the benchmark EPA had used in acting on Arizona's SIP, and concluded that it was "a small percentage and not as high as the collective interstate contribution percentages the EPA calculated for monitors in Eastern States, which ranged from 17% to 67%." *Id.* at 3-60, 3-75. EPA's response was only to say that an exception to its one-percent threshold "has never been applied outside of California," but it did not explain why the small collective contribution calculated by TCEQ (and demonstrated by EPA's own data) should not be considered "insignificant" as compared to the much higher ranges calculated for the eastern States in EPA's CSAPR FIPs. 87 Fed. Reg. at 9,833. Because EPA applied a different standard to Texas, without explanation, its disapproval was arbitrary and capricious and should be vacated. *See Univ. of Texas*, 985 F.3d at 479; *see also Cent. Power & Light Co. v. United States*, 634 F.2d 137, 150 (5th Cir. 1980) ("[A]n agency must either conform itself to its prior norms and decisions or explain the reason for its departure.").

## CONCLUSION

For any one of these reasons, EPA's disapproval of Texas's SIP is unlawful and should be vacated.

Dated: May 30, 2023                 Respectfully submitted,

s/ P. Stephen Gidiere III
P. Stephen Gidiere III
Julia B. Barber
BALCH & BINGHAM LLP
1901 6th Ave. N., Ste. 1500
Birmingham, Alabama 35203
205-251-8100
sgidiere@balch.com

Stephanie Z. Moore
Executive Vice President & General Counsel
Daniel J. Kelly
Senior Vice President & Deputy General
Counsel
David W. Mitchell
Senior Counsel, Environmental
VISTRA CORP.
6555 Sierra Drive
Irving, Texas 75039

*Counsel for Petitioners Luminant Generation Company LLC, Coleto Creek Power, LLC, Ennis Power Company, LLC, Hays Energy, LLC, Midlothian Energy, LLC, Oak Grove Management Company LLC, and Wise County Power Company, LLC*

s/ Aaron M. Streett
Aaron M. Streett
Matthew L. Kuryla
BAKER BOTTS L.L.P.
910 Louisiana St.
Houston, Texas 77002
Tel.: (713) 229-1234
Fax: (713) 229-1522
aaron.streett@bakerbotts.com

*Counsel for Petitioners Association of Electric Companies of Texas, BCCA Appeal Group, Texas Chemical Council, and Texas Oil & Gas Association*

s/ Megan Berge
Megan H. Berge
BAKER BOTTS L.L.P.
700 K Street N.W.
Washington, D.C. 20001
(415) 291-6233
(202) 639-7733

J. Mark Little
BAKER BOTTS L.L.P.
910 Louisiana Street
Houston, Texas 77002
(713) 229-1489

*Counsel for Petitioners Texas Lehigh Cement Company*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that all counsel of record who have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system on this 30th day of May, 2023.

s/ P. Stephen Gidiere III
*Counsel for Luminant Petitioners*

**<u>CERTIFICATE OF COMPLIANCE</u>**

The undersigned counsel states that this brief complies with Fed. R. App. P. 32(a)(7)(B) because it contains 11,643 words, excluding the items allowed to be excluded pursuant to Fed. R. App. P. 32(f), as counted by a word processing system and, therefore, is within the word limit. This brief also complies with typeface requirements of Fed. R. App. P. 32(a)(5) because it has been prepared in a proportionally spaced typeface in 14-point Garamond font.

The undersigned counsel also certifies that, pursuant to paragraph A(6) of this Court's ECF Filing Standards, (1) any required privacy redactions have been made in compliance with 5th Cir. R. 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with 5th Cir. R. 25.2.1; and (3) the document has been scanned for viruses with the most recent version of a commercial virus scanning program and is free of viruses.

Dated: May 30, 2023

s/ P. Stephen Gidiere III
*Counsel for Luminant Petitioners*

# ADDENDUM OF RULES AND REGULATIONS
## TO PRINCIPAL BRIEF OF
## TEXAS INDUSTRY PETITIONERS

For the Court's ease of reference, this Addendum reproduces the following statutory, regulatory, and supporting materials:

## Federal Statutes

42 U.S.C. § 7401 ........................................................................................................ A-1

42 U.S.C. § 7410 ........................................................................................................ A-6

42 U.S.C. § 7505a ...................................................................................................... A-15

42 U.S.C. § 7602 ........................................................................................................ A-16

## Federal Regulatory Materials

40 C.F.R. § 51.1300, *et seq.* .................................................................................... A-19

Sec.
7671k.   Safe alternatives policy.
7671l.   Federal procurement.
7671m.   Relationship to other laws.
7671n.   Authority of Administrator.
7671o.   Transfers among Parties to Montreal Protocol.
7671p.   International cooperation.
7671q.   Miscellaneous provisions.

SUBCHAPTER VII—AMERICAN INNOVATION AND MANUFACTURING

7675.   American innovation and manufacturing.

**Editorial Notes**

CODIFICATION

Act July 14, 1955, ch. 360, 69 Stat. 322, as amended, known as the Clean Air Act, which was formerly classified to chapter 15B (§ 1857 et seq.) of this title, was completely revised by Pub. L. 95–95, Aug. 7, 1977, 91 Stat. 685, and was reclassified to this chapter.

SUBCHAPTER I—PROGRAMS AND ACTIVITIES

PART A—AIR QUALITY AND EMISSION LIMITATIONS

**Editorial Notes**

CODIFICATION

Pub. L. 95–95, title I, § 117(a), Aug. 7, 1977, 91 Stat. 712, designated sections 7401 to 7428 of this title as part A.

## § 7401. Congressional findings and declaration of purpose

**(a) Findings**

The Congress finds—

(1) that the predominant part of the Nation's population is located in its rapidly expanding metropolitan and other urban areas, which generally cross the boundary lines of local jurisdictions and often extend into two or more States;

(2) that the growth in the amount and complexity of air pollution brought about by urbanization, industrial development, and the increasing use of motor vehicles, has resulted in mounting dangers to the public health and welfare, including injury to agricultural crops and livestock, damage to and the deterioration of property, and hazards to air and ground transportation;

(3) that air pollution prevention (that is, the reduction or elimination, through any measures, of the amount of pollutants produced or created at the source) and air pollution control at its source is the primary responsibility of States and local governments; and

(4) that Federal financial assistance and leadership is essential for the development of cooperative Federal, State, regional, and local programs to prevent and control air pollution.

**(b) Declaration**

The purposes of this subchapter are—

(1) to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population;

(2) to initiate and accelerate a national research and development program to achieve the prevention and control of air pollution;

(3) to provide technical and financial assistance to State and local governments in connection with the development and execution of their air pollution prevention and control programs; and

(4) to encourage and assist the development and operation of regional air pollution prevention and control programs.

**(c) Pollution prevention**

A primary goal of this chapter is to encourage or otherwise promote reasonable Federal, State, and local governmental actions, consistent with the provisions of this chapter, for pollution prevention.

(July 14, 1955, ch. 360, title I, § 101, formerly § 1, as added Pub. L. 88–206, § 1, Dec. 17, 1963, 77 Stat. 392; renumbered § 101 and amended Pub. L. 89–272, title I, § 101(2), (3), Oct. 20, 1965, 79 Stat. 992; Pub. L. 90–148, § 2, Nov. 21, 1967, 81 Stat. 485; Pub. L. 101–549, title I, § 108(k), Nov. 15, 1990, 104 Stat. 2468.)

**Editorial Notes**

CODIFICATION

Section was formerly classified to section 1857 of this title.

PRIOR PROVISIONS

Provisions similar to those in this section were contained in a prior section 1857 of this title, act of July 14, 1955, ch. 360, § 1, 69 Stat. 322, prior to the general amendment of this chapter by Pub. L. 88–206.

AMENDMENTS

1990—Subsec. (a)(3). Pub. L. 101–549, § 108(k)(1), amended par. (3) generally. Prior to amendment, par. (3) read as follows: ''that the prevention and control of air pollution at its source is the primary responsibility of States and local governments; and''.

Subsec. (b)(4). Pub. L. 101–549, § 108(k)(2), inserted ''prevention and'' after ''pollution''.

Subsec. (c). Pub. L. 101–549, § 108(k)(3), added subsec. (c).

1967—Subsec. (b)(1). Pub. L. 90–148 inserted ''and enhance the quality of'' after ''to protect''.

1965—Subsec. (b). Pub. L. 89–272 substituted ''this title'' for ''this Act'', which for purposes of codification has been changed to ''this subchapter''.

**Statutory Notes and Related Subsidiaries**

EFFECTIVE DATE OF 1990 AMENDMENT

Pub. L. 101–549, title VII, § 711(b), Nov. 15, 1990, 104 Stat. 2684, provided that:

''(1) Except as otherwise expressly provided, the amendments made by this Act [see Tables for classification] shall be effective on the date of enactment of this Act [Nov. 15, 1990].

''(2) The Administrator's authority to assess civil penalties under section 205(c) of the Clean Air Act [42 U.S.C. 7524(c)], as amended by this Act, shall apply to violations that occur or continue on or after the date of enactment of this Act. Civil penalties for violations that occur prior to such date and do not continue after such date shall be assessed in accordance with the provisions of the Clean Air Act [42 U.S.C. 7401 et seq.] in effect immediately prior to the date of enactment of this Act.

''(3) The civil penalties prescribed under sections 205(a) and 211(d)(1) of the Clean Air Act [42 U.S.C. 7524(a), 7545(d)(1)], as amended by this Act, shall apply to violations that occur on or after the date of enactment of this Act. Violations that occur prior to such

date shall be subject to the civil penalty provisions prescribed in sections 205(a) and 211(d) of the Clean Air Act in effect immediately prior to the enactment of this Act. The injunctive authority prescribed under section 211(d)(2) of the Clean Air Act, as amended by this Act, shall apply to violations that occur or continue on or after the date of enactment of this Act.

''(4) For purposes of paragraphs (2) and (3), where the date of a violation cannot be determined it will be assumed to be the date on which the violation is discovered.''

EFFECTIVE DATE OF 1977 AMENDMENT; PENDING ACTIONS; CONTINUATION OF RULES, CONTRACTS, AUTHORIZATIONS, ETC.; IMPLEMENTATION PLANS

Pub. L. 95–95, title IV, §406, Aug. 7, 1977, 91 Stat. 795, as amended by Pub. L. 95–190, §14(b)(6), Nov. 16, 1977, 91 Stat. 1405, provided that:

''(a) No suit, action, or other proceeding lawfully commenced by or against the Administrator or any other officer or employee of the United States in his official capacity or in relation to the discharge of his official duties under the Clean Air Act [this chapter], as in effect immediately prior to the date of enactment of this Act [Aug. 7, 1977] shall abate by reason of the taking effect of the amendments made by this Act [see Short Title of 1977 Amendment note below]. The court may, on its own motion or that of any party made at any time within twelve months after such taking effect, allow the same to be maintained by or against the Administrator or such officer or employee.

''(b) All rules, regulations, orders, determinations, contracts, certifications, authorizations, delegations, or other actions duly issued, made, or taken by or pursuant to the Clean Air Act [this chapter], as in effect immediately prior to the date of enactment of this Act [Aug. 7, 1977], and pertaining to any functions, powers, requirements, and duties under the Clean Air Act, as in effect immediately prior to the date of enactment of this Act, and not suspended by the Administrator or the courts, shall continue in full force and effect after the date of enactment of this Act until modified or rescinded in accordance with the Clean Air Act as amended by this Act [see Short Title of 1977 Amendment note below].

''(c) Nothing in this Act [see Short Title of 1977 Amendment note below] nor any action taken pursuant to this Act shall in any way affect any requirement of an approved implementation plan in effect under section 110 of the Clean Air Act [section 7410 of this title] or any other provision of the Act in effect under the Clean Air Act before the date of enactment of this section [Aug. 7, 1977] until modified or rescinded in accordance with the Clean Air Act [this chapter] as amended by this Act [see Short Title of 1977 Amendment note below].

''(d)(1) Except as otherwise expressly provided, the amendments made by this Act [see Short Title of 1977 Amendment note below] shall be effective on date of enactment [Aug. 7, 1977].

''(2) Except as otherwise expressly provided, each State required to revise its applicable implementation plan by reason of any amendment made by this Act [see Short Title of 1977 Amendment note below] shall adopt and submit to the Administrator of the Environmental Protection Administration such plan revision before the later of the date—

''(A) one year after the date of enactment of this Act [Aug. 7, 1977], or

''(B) nine months after the date of promulgation by the Administrator of the Environmental Protection Administration of any regulations under an amendment made by this Act which are necessary for the approval of such plan revision.''

SHORT TITLE OF 1999 AMENDMENT

Pub. L. 106–40, §1, Aug. 5, 1999, 113 Stat. 207, provided that: ''This Act [amending section 7412 of this title and enacting provisions set out as notes under section 7412

of this title] may be cited as the 'Chemical Safety Information, Site Security and Fuels Regulatory Relief Act'.''

SHORT TITLE OF 1998 AMENDMENT

Pub. L. 105–286, §1, Oct. 27, 1998, 112 Stat. 2773, provided that: ''This Act [amending section 7511b of this title and enacting provisions set out as a note under section 7511b of this title] may be cited as the 'Border Smog Reduction Act of 1998'.''

SHORT TITLE OF 1990 AMENDMENT

Pub. L. 101–549, Nov. 15, 1990, 104 Stat. 2399, is popularly known as the ''Clean Air Act Amendments of 1990''. See Tables for classification.

SHORT TITLE OF 1981 AMENDMENT

Pub. L. 97–23, §1, July 17, 1981, 95 Stat. 139, provided: ''That this Act [amending sections 7410 and 7413 of this title] may be cited as the 'Steel Industry Compliance Extension Act of 1981'.''

SHORT TITLE OF 1977 AMENDMENT

Pub. L. 95–95, §1, Aug. 7, 1977, 91 Stat. 685, provided that: ''This Act [enacting sections 4362, 7419 to 7428, 7450 to 7459, 7470 to 7479, 7491, 7501 to 7508, 7548, 7549, 7551, 7617 to 7625, and 7626 of this title, amending sections 7403, 7405, 7407 to 7415, 7417, 7418, 7521 to 7525, 7541, 7543, 7544, 7545, 7550, 7571, 7601 to 7605, 7607, 7612, 7613, and 7616 of this title, repealing section 1857c–10 of this title, and enacting provisions set out as notes under this section, sections 7403, 7422, 7470, 7479, 7502, 7521, 7548, and 7621 of this title, and section 792 of Title 15, Commerce and Trade] may be cited as the 'Clean Air Act Amendments of 1977'.''

SHORT TITLE OF 1970 AMENDMENT

Pub. L. 91–604, §1, Dec. 31, 1970, 84 Stat. 1676, provided: ''That this Act [amending this chapter generally] may be cited as the 'Clean Air Amendments of 1970'.''

SHORT TITLE OF 1967 AMENDMENT

Pub. L. 90–148, §1, Nov. 21, 1967, 81 Stat. 485, provided: ''That this Act [amending this chapter generally] may be cited as the 'Air Quality Act of 1967'.''

SHORT TITLE OF 1966 AMENDMENT

Pub. L. 89–675, §1, Oct. 15, 1966, 80 Stat. 954, provided: ''That this Act [amending sections 7405 and 7616 of this title and repealing section 1857f–8 of this title] may be cited as the 'Clean Air Act Amendments of 1966'.''

SHORT TITLE

Act July 14, 1955, ch. 360, title III, §317, formerly §14, as added by Pub. L. 88–206, §1, Dec. 17, 1963, 77 Stat. 401; renumbered §307 by Pub. L. 89–272, title I, §101(4), Oct. 20, 1965, 79 Stat. 992; renumbered §310 by Pub. L. 90–148, §2, Nov. 21, 1967, 81 Stat. 499; renumbered §317 by Pub. L. 91–604, §12(a), Dec. 31, 1970, 84 Stat. 1705, provided that: ''This Act [enacting this chapter] may be cited as the 'Clean Air Act'.''

Act July 14, 1955, ch. 360, title II, §201, as added by Pub. L. 89–272, title I, §101(8), Oct. 20, 1965, 79 Stat. 992, and amended by Pub. L. 90–148, §2, Nov. 21, 1967, 81 Stat. 499, provided that: ''This title [enacting subchapter II of this chapter] may be cited as the 'National Emission Standards Act'.'' Prior to its amendment by Pub. L. 90–148, title II of act June 14, 1955, was known as the ''Motor Vehicle Air Pollution Control Act''.

Act July 14, 1955, ch. 360, title IV, §401, as added by Dec. 31, 1970, Pub. L. 91–604, §14, 84 Stat. 1709, provided that: ''This title [enacting subchapter IV of this chapter] may be cited as the 'Noise Pollution and Abatement Act of 1970'.''

SAVINGS PROVISION

Pub. L. 101–549, title VII, §711(a), Nov. 15, 1990, 104 Stat. 2684, provided that: ''Except as otherwise ex-

pressly provided in this Act [see Tables for classification], no suit, action, or other proceeding lawfully commenced by the Administrator or any other officer or employee of the United States in his official capacity or in relation to the discharge of his official duties under the Clean Air Act [42 U.S.C. 7401 et seq.], as in effect immediately prior to the date of enactment of this Act [Nov. 15, 1990], shall abate by reason of the taking effect of the amendments made by this Act.''

IMPACT ON SMALL COMMUNITIES

Pub. L. 101–549, title VIII, §810, Nov. 15, 1990, 104 Stat. 2690, provided that: ''Before implementing a provision of this Act [see Tables for classification], the Administrator of the Environmental Protection Agency shall consult with the Small Communities Coordinator of the Environmental Protection Agency to determine the impact of such provision on small communities, including the estimated cost of compliance with such provision.''

RADON ASSESSMENT AND MITIGATION

Pub. L. 99–499, title I, §118(k), Oct. 17, 1986, 100 Stat. 1659, as amended by Pub. L. 105–362, title V, §501(i), Nov. 10, 1998, 112 Stat. 3284, provided that:

''(1) NATIONAL ASSESSMENT OF RADON GAS.—No later than one year after the enactment of this Act [Oct. 17, 1986], the Administrator shall submit to the Congress a report which shall, to the extent possible—

''(A) identify the locations in the United States where radon is found in structures where people normally live or work, including educational institutions;

''(B) assess the levels of radon gas that are present in such structures;

''(C) determine the level of radon gas and radon daughters which poses a threat to human health and assess for each location identified under subparagraph (A) the extent of the threat to human health;

''(D) determine methods of reducing or eliminating the threat to human health of radon gas and radon daughters; and

''(E) include guidance and public information materials based on the findings or research of mitigating radon.

''(2) RADON MITIGATION DEMONSTRATION PROGRAM.—

''(A) DEMONSTRATION PROGRAM.—The Administrator shall conduct a demonstration program to test methods and technologies of reducing or eliminating radon gas and radon daughters where it poses a threat to human health. The Administrator shall take into consideration any demonstration program underway in the Reading Prong of Pennsylvania, New Jersey, and New York and at other sites prior to enactment. The demonstration program under this section shall be conducted in the Reading Prong, and at such other sites as the Administrator considers appropriate.

''(B) LIABILITY.—Liability, if any, for persons undertaking activities pursuant to the radon mitigation demonstration program authorized under this subsection shall be determined under principles of existing law.

''(3) CONSTRUCTION OF SECTION.—Nothing in this subsection shall be construed to authorize the Administrator to carry out any regulatory program or any activity other than research, development, and related reporting, information dissemination, and coordination activities specified in this subsection. Nothing in paragraph (1) or (2) shall be construed to limit the authority of the Administrator or of any other agency or instrumentality of the United States under any other authority of law.''

SPILL CONTROL TECHNOLOGY

Pub. L. 99–499, title I, §118(n), Oct. 17, 1986, 100 Stat. 1660, provided that:

''(1) ESTABLISHMENT OF PROGRAM.—Within 180 days of enactment of this subsection [Oct. 17, 1986], the Secretary of the United States Department of Energy is di-

rected to carry out a program of testing and evaluation of technologies which may be utilized in responding to liquefied gaseous and other hazardous substance spills at the Liquefied Gaseous Fuels Spill Test Facility that threaten public health or the environment.

''(2) TECHNOLOGY TRANSFER.—In carrying out the program established under this subsection, the Secretary shall conduct a technology transfer program that, at a minimum—

''(A) documents and archives spill control technology;

''(B) investigates and analyzes significant hazardous spill incidents;

''(C) develops and provides generic emergency action plans;

''(D) documents and archives spill test results;

''(E) develops emergency action plans to respond to spills;

''(F) conducts training of spill response personnel; and

''(G) establishes safety standards for personnel engaged in spill response activities.

''(3) CONTRACTS AND GRANTS.—The Secretary is directed to enter into contracts and grants with a non-profit organization in Albany County, Wyoming, that is capable of providing the necessary technical support and which is involved in environmental activities related to such hazardous substance related emergencies.

''(4) USE OF SITE.—The Secretary shall arrange for the use of the Liquefied Gaseous Fuels Spill Test Facility to carry out the provisions of this subsection.''

RADON GAS AND INDOOR AIR QUALITY RESEARCH

Pub. L. 99–499, title IV, Oct. 17, 1986, 100 Stat. 1758, provided that:

''SEC. 401. SHORT TITLE.

''This title may be cited as the 'Radon Gas and Indoor Air Quality Research Act of 1986'.

''SEC. 402. FINDINGS.

''The Congress finds that:

''(1) High levels of radon gas pose a serious health threat in structures in certain areas of the country.

''(2) Various scientific studies have suggested that exposure to radon, including exposure to naturally occurring radon and indoor air pollutants, poses a public health risk.

''(3) Existing Federal radon and indoor air pollutant research programs are fragmented and underfunded.

''(4) An adequate information base concerning exposure to radon and indoor air pollutants should be developed by the appropriate Federal agencies.

''SEC. 403. RADON GAS AND INDOOR AIR QUALITY RESEARCH PROGRAM.

''(a) DESIGN OF PROGRAM.—The Administrator of the Environmental Protection Agency shall establish a research program with respect to radon gas and indoor air quality. Such program shall be designed to—

''(1) gather data and information on all aspects of indoor air quality in order to contribute to the understanding of health problems associated with the existence of air pollutants in the indoor environment;

''(2) coordinate Federal, State, local, and private research and development efforts relating to the improvement of indoor air quality; and

''(3) assess appropriate Federal Government actions to mitigate the environmental and health risks associated with indoor air quality problems.

''(b) PROGRAM REQUIREMENTS.—The research program required under this section shall include—

''(1) research and development concerning the identification, characterization, and monitoring of the sources and levels of indoor air pollution, including radon, which includes research and development relating to—

''(A) the measurement of various pollutant concentrations and their strengths and sources,

''(B) high-risk building types, and

''(C) instruments for indoor air quality data collection;

"(2) research relating to the effects of indoor air pollution and radon on human health;

"(3) research and development relating to control technologies or other mitigation measures to prevent or abate indoor air pollution (including the development, evaluation, and testing of individual and generic control devices and systems);

"(4) demonstration of methods for reducing or eliminating indoor air pollution and radon, including sealing, venting, and other methods that the Administrator determines may be effective;

"(5) research, to be carried out in conjunction with the Secretary of Housing and Urban Development, for the purpose of developing—

"(A) methods for assessing the potential for radon contamination of new construction, including (but not limited to) consideration of the moisture content of soil, porosity of soil, and radon content of soil; and

"(B) design measures to avoid indoor air pollution; and

"(6) the dissemination of information to assure the public availability of the findings of the activities under this section.

"(c) ADVISORY COMMITTEES.—The Administrator shall establish a committee comprised of individuals representing Federal agencies concerned with various aspects of indoor air quality and an advisory group comprised of individuals representing the States, the scientific community, industry, and public interest organizations to assist him in carrying out the research program for radon gas and indoor air quality.

"(d) IMPLEMENTATION PLAN.—Not later than 90 days after the enactment of this Act [Oct. 17, 1986], the Administrator shall submit to the Congress a plan for implementation of the research program under this section. Such plan shall also be submitted to the EPA Science Advisory Board, which shall, within a reasonable period of time, submit its comments on such plan to Congress.

"(e) REPORT.—Not later than 2 years after the enactment of this Act [Oct. 17, 1986], the Administrator shall submit to Congress a report respecting his activities under this section and making such recommendations as appropriate.

"SEC. 404. CONSTRUCTION OF TITLE.

"Nothing in this title shall be construed to authorize the Administrator to carry out any regulatory program or any activity other than research, development, and related reporting, information dissemination, and coordination activities specified in this title. Nothing in this title shall be construed to limit the authority of the Administrator or of any other agency or instrumentality of the United States under any other authority of law.

"SEC. 405. AUTHORIZATIONS.

"There are authorized to be appropriated to carry out the activities under this title and under section 118(k) of the Superfund Amendments and Reauthorization Act of 1986 (relating to radon gas assessment and demonstration program) [section 118(k) of Pub. L. 99–499, set out as a note above] not to exceed $5,000,000 for each of the fiscal years 1987, 1988, and 1989. Of such sums appropriated in fiscal years 1987 and 1988, two-fifths shall be reserved for the implementation of section 118(k)(2)."

STUDY OF ODORS AND ODOROUS EMISSIONS

Pub. L. 95–95, title IV, §403(b), Aug. 7, 1977, 91 Stat. 792, directed Administrator of Environmental Protection Agency to conduct a study and report to Congress not later than Jan. 1, 1979, on effects on public health and welfare of odors and odorous emissions, source of such emissions, technology or other measures available for control of such emissions and costs of such technology or measures, and costs and benefits of alternative measures or strategies to abate such emissions.

LIST OF CHEMICAL CONTAMINANTS FROM ENVIRONMENTAL POLLUTION FOUND IN HUMAN TISSUE

Pub. L. 95–95, title IV, §403(c), Aug. 7, 1977, 91 Stat. 792, directed Administrator of EPA, not later than twelve months after Aug. 7, 1977, to publish throughout the United States a list of all known chemical contaminants resulting from environmental pollution which have been found in human tissue including blood, urine, breast milk, and all other human tissue, such list to be prepared for the United States and to indicate approximate number of cases, range of levels found, and mean levels found, directed Administrator, not later than eighteen months after Aug. 7, 1977, to publish in same manner an explanation of what is known about the manner in which chemicals entered the environment and thereafter human tissue, and directed Administrator, in consultation with National Institutes of Health, the National Center for Health Statistics, and the National Center for Health Services Research and Development, to, if feasible, conduct an epidemiological study to demonstrate the relationship between levels of chemicals in the environment and in human tissue, such study to be made in appropriate regions or areas of the United States in order to determine any different results in such regions or areas, and the results of such study to be reported, as soon as practicable, to appropriate committee of Congress.

STUDY ON REGIONAL AIR QUALITY

Pub. L. 95–95, title IV, §403(d), Aug. 7, 1977, 91 Stat. 793, directed Administrator of EPA to conduct a study of air quality in various areas throughout the country including the gulf coast region, such study to include analysis of liquid and solid aerosols and other fine particulate matter and contribution of such substances to visibility and public health problems in such areas, with Administrator to use environmental health experts from the National Institutes of Health and other outside agencies and organizations.

RAILROAD EMISSION STUDY

Pub. L. 95–95, title IV, §404, Aug. 7, 1977, 91 Stat. 793, as amended by H. Res. 549, Mar. 25, 1980, directed Administrator of EPA to conduct a study and investigation of emissions of air pollutants from railroad locomotives, locomotive engines, and secondary power sources on railroad rolling stock, in order to determine extent to which such emissions affect air quality in air quality control regions throughout the United States, technological feasibility and current state of technology for controlling such emissions, and status and effect of current and proposed State and local regulations affecting such emissions, and within one hundred and eighty days after commencing such study and investigation, Administrator to submit a report of such study and investigation, together with recommendations for appropriate legislation, to Senate Committee on Environment and Public Works and House Committee on Energy and Commerce.

STUDY AND REPORT CONCERNING ECONOMIC APPROACHES TO CONTROLLING AIR POLLUTION

Pub. L. 95–95, title IV, §405, Aug. 7, 1977, 91 Stat. 794, directed Administrator, in conjunction with Council of Economic Advisors, to undertake a study and assessment of economic measures for control of air pollution which could strengthen effectiveness of existing methods of controlling air pollution, provide incentives to abate air pollution greater than that required by Clean Air Act, and serve as primary incentive for controlling air pollution problems not addressed by Clean Air Act, and directed that not later than 2 years after Aug. 7, 1977, Administrator and Council conclude study and submit a report to President and Congress.

Executive Documents

TRANSFER OF FUNCTIONS

Reorg. Plan No. 3 of 1970, §2(a)(3), eff. Dec. 2, 1970, 35 F.R. 15623, 84 Stat. 2086, transferred to Administrator of

Environmental Protection Agency functions vested by law in Secretary of Health, Education, and Welfare or in Department of Health, Education, and Welfare which are administered through Environmental Health Service, including functions exercised by National Air Pollution Control Administration, and Environmental Control Administration's Bureau of Solid Waste Management, Bureau of Water Hygiene, and Bureau of Radiological Health, except insofar as functions carried out by Bureau of Radiological Health pertain to regulation of radiation from consumer products, including electronic product radiation, radiation as used in healing arts, occupational exposure to radiation, and research, technical assistance, and training related to radiation from consumer products, radiation as used in healing arts, and occupational exposure to radiation.

NATIONAL INDUSTRIAL POLLUTION CONTROL COUNCIL

For provisions relating to establishment of National Industrial Pollution Control Council, see Ex. Ord. No. 11523, Apr. 9, 1970, 35 F.R. 5993, set out as a note under section 4321 of this title.

FEDERAL COMPLIANCE WITH POLLUTION CONTROL STANDARDS

For provisions relating to responsibility of head of each Executive agency for compliance with applicable pollution control standards, see Ex. Ord. No. 12088, Oct. 13, 1978, 43 F.R. 47707, set out as a note under section 4321 of this title.

EXECUTIVE ORDER NO. 10779

Ex. Ord. No. 10779, Aug. 21, 1958, 23 F.R. 6487, which related to cooperation of Federal agencies with State and local authorities, was superseded by Ex. Ord. No. 11282, May 26, 1966, 31 F.R. 7663, formerly set out under section 7418 of this title.

EXECUTIVE ORDER NO. 11507

Ex. Ord. No. 11507, Feb. 4, 1970, 35 F.R. 2573, which provided for prevention, control, and abatement of air pollution at Federal facilities, was superseded by Ex. Ord. No. 11752, Dec. 17, 1973, 38 F.R. 34793, formerly set out as a note under section 4331 of this title.

PROMOTING DOMESTIC MANUFACTURING AND JOB CREATION—POLICIES AND PROCEDURES RELATING TO IMPLEMENTATION OF AIR QUALITY STANDARDS

Memorandum of President of the United States, Apr. 12, 2018, 83 F.R. 16761, which related to State Implementation Plans for the Regional Haze Program, was revoked by Ex. Ord. No. 13990, § 7(d), Jan. 20, 2021, 86 F.R. 7042, set out in a note under section 4321 of this title.

## § 7402. Cooperative activities

### (a) Interstate cooperation; uniform State laws; State compacts

The Administrator shall encourage cooperative activities by the States and local governments for the prevention and control of air pollution; encourage the enactment of improved and, so far as practicable in the light of varying conditions and needs, uniform State and local laws relating to the prevention and control of air pollution; and encourage the making of agreements and compacts between States for the prevention and control of air pollution.

### (b) Federal cooperation

The Administrator shall cooperate with and encourage cooperative activities by all Federal departments and agencies having functions relating to the prevention and control of air pollution, so as to assure the utilization in the Federal air pollution control program of all appro-

priate and available facilities and resources within the Federal Government.

### (c) Consent of Congress to compacts

The consent of the Congress is hereby given to two or more States to negotiate and enter into agreements or compacts, not in conflict with any law or treaty of the United States, for (1) cooperative effort and mutual assistance for the prevention and control of air pollution and the enforcement of their respective laws relating thereto, and (2) the establishment of such agencies, joint or otherwise, as they may deem desirable for making effective such agreements or compacts. No such agreement or compact shall be binding or obligatory upon any State a party thereto unless and until it has been approved by Congress. It is the intent of Congress that no agreement or compact entered into between States after November 21, 1967, which relates to the control and abatement of air pollution in an air quality control region, shall provide for participation by a State which is not included (in whole or in part) in such air quality control region.

(July 14, 1955, ch. 360, title I, § 102, formerly § 2, as added Pub. L. 88–206, § 1, Dec. 17, 1963, 77 Stat. 393; renumbered § 102, Pub. L. 89–272, title I, § 101(3), Oct. 20, 1965, 79 Stat. 992; amended Pub. L. 90–148, § 2, Nov. 21, 1967, 81 Stat. 485; Pub. L. 91–604, § 15(c)(2), Dec. 31, 1970, 84 Stat. 1713.)

### Editorial Notes

CODIFICATION

Section was formerly classified to section 1857a of this title.

PRIOR PROVISIONS

Provisions similar to those in the first clause of subsec. (a) of this section were contained in subsec. (b)(1) of a prior section 1857a, of this title, act July 14, 1955, ch. 360, § 2, 69 Stat. 322, prior to the general amendment of this chapter by Pub. L. 88–206.

AMENDMENTS

1970—Subsecs. (a), (b). Pub. L. 91–604 substituted "Administrator" for "Secretary" wherever appearing.

1967—Subsec. (c). Pub. L. 90–148 inserted declaration that it is the intent of Congress that no agreement or compact entered into between States after the date of enactment of the Air Quality Act of 1967, which for purposes of codification was changed to November 21, 1967, the date of approval of such Act, relating to the control and abatement of air pollution in an air quality control region, shall provide for participation by a State which is not included (in whole or in part) in such air quality control region.

## § 7403. Research, investigation, training, and other activities

### (a) Research and development program for prevention and control of air pollution

The Administrator shall establish a national research and development program for the prevention and control of air pollution and as part of such program shall—

(1) conduct, and promote the coordination and acceleration of, research, investigations, experiments, demonstrations, surveys, and studies relating to the causes, effects (including health and welfare effects), extent, prevention, and control of air pollution;

other actions duly issued, made, or taken by or pursuant to act July 14, 1955, the Clean Air Act, as in effect immediately prior to the date of enactment of Pub. L. 95–95 [Aug. 7, 1977] to continue in full force and effect until modified or rescinded in accordance with act July 14, 1955, as amended by Pub. L. 95–95 [this chapter], see section 406(b) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

### TERMINATION OF ADVISORY COMMITTEES

Advisory committees established after Jan. 5, 1973, to terminate not later than the expiration of the 2-year period beginning on the date of their establishment, unless, in the case of a committee established by the President or an officer of the Federal Government, such committee is renewed by appropriate action prior to the expiration of such 2-year period, or in the case of a committee established by the Congress, its duration is otherwise provided for by law. See section 14 of Pub. L. 92–463, Oct. 6, 1972, 86 Stat. 776, set out in the Appendix to Title 5, Government Organization and Employees.

### ROLE OF SECONDARY STANDARDS

Pub. L. 101–549, title VIII, §817, Nov. 15, 1990, 104 Stat. 2697, provided that:

"(a) REPORT.—The Administrator shall request the National Academy of Sciences to prepare a report to the Congress on the role of national secondary ambient air quality standards in protecting welfare and the environment. The report shall:

"(1) include information on the effects on welfare and the environment which are caused by ambient concentrations of pollutants listed pursuant to section 108 [42 U.S.C. 7408] and other pollutants which may be listed;

"(2) estimate welfare and environmental costs incurred as a result of such effects;

"(3) examine the role of secondary standards and the State implementation planning process in preventing such effects;

"(4) determine ambient concentrations of each such pollutant which would be adequate to protect welfare and the environment from such effects;

"(5) estimate the costs and other impacts of meeting secondary standards; and

"(6) consider other means consistent with the goals and objectives of the Clean Air Act [42 U.S.C. 7401 et seq.] which may be more effective than secondary standards in preventing or mitigating such effects.

"(b) SUBMISSION TO CONGRESS; COMMENTS; AUTHORIZATION.—(1) The report shall be transmitted to the Congress not later than 3 years after the date of enactment of the Clean Air Act Amendments of 1990 [Nov. 15, 1990].

"(2) At least 90 days before issuing a report the Administrator shall provide an opportunity for public comment on the proposed report. The Administrator shall include in the final report a summary of the comments received on the proposed report.

"(3) There are authorized to be appropriated such sums as are necessary to carry out this section."

## § 7410. State implementation plans for national primary and secondary ambient air quality standards

### (a) Adoption of plan by State; submission to Administrator; content of plan; revision; new sources; indirect source review program; supplemental or intermittent control systems

(1) Each State shall, after reasonable notice and public hearings, adopt and submit to the Administrator, within 3 years (or such shorter period as the Administrator may prescribe) after the promulgation of a national primary ambient air quality standard (or any revision thereof) under section 7409 of this title for any pollut-

ant, a plan which provides for implementation, maintenance, and enforcement of such primary standard in each air quality control region (or portion thereof) within such State. In addition, such State shall adopt and submit to the Administrator (either as a part of a plan submitted under the preceding sentence or separately) within 3 years (or such shorter period as the Administrator may prescribe) after the promulgation of a national ambient air quality secondary standard (or revision thereof), a plan which provides for implementation, maintenance, and enforcement of such secondary standard in each air quality control region (or portion thereof) within such State. Unless a separate public hearing is provided, each State shall consider its plan implementing such secondary standard at the hearing required by the first sentence of this paragraph.

(2) Each implementation plan submitted by a State under this chapter shall be adopted by the State after reasonable notice and public hearing. Each such plan shall—

(A) include enforceable emission limitations and other control measures, means, or techniques (including economic incentives such as fees, marketable permits, and auctions of emissions rights), as well as schedules and timetables for compliance, as may be necessary or appropriate to meet the applicable requirements of this chapter;

(B) provide for establishment and operation of appropriate devices, methods, systems, and procedures necessary to—

(i) monitor, compile, and analyze data on ambient air quality, and

(ii) upon request, make such data available to the Administrator;

(C) include a program to provide for the enforcement of the measures described in subparagraph (A), and regulation of the modification and construction of any stationary source within the areas covered by the plan as necessary to assure that national ambient air quality standards are achieved, including a permit program as required in parts C and D;

(D) contain adequate provisions—

(i) prohibiting, consistent with the provisions of this subchapter, any source or other type of emissions activity within the State from emitting any air pollutant in amounts which will—

(I) contribute significantly to nonattainment in, or interfere with maintenance by, any other State with respect to any such national primary or secondary ambient air quality standard, or

(II) interfere with measures required to be included in the applicable implementation plan for any other State under part C to prevent significant deterioration of air quality or to protect visibility,

(ii) insuring compliance with the applicable requirements of sections 7426 and 7415 of this title (relating to interstate and international pollution abatement);

(E) provide (i) necessary assurances that the State (or, except where the Administrator deems inappropriate, the general purpose local government or governments, or a regional

agency designated by the State or general purpose local governments for such purpose) will have adequate personnel, funding, and authority under State (and, as appropriate, local) law to carry out such implementation plan (and is not prohibited by any provision of Federal or State law from carrying out such implementation plan or portion thereof), (ii) requirements that the State comply with the requirements respecting State boards under section 7428 of this title, and (iii) necessary assurances that, where the State has relied on a local or regional government, agency, or instrumentality for the implementation of any plan provision, the State has responsibility for ensuring adequate implementation of such plan provision;

(F) require, as may be prescribed by the Administrator—

(i) the installation, maintenance, and replacement of equipment, and the implementation of other necessary steps, by owners or operators of stationary sources to monitor emissions from such sources,

(ii) periodic reports on the nature and amounts of emissions and emissions-related data from such sources, and

(iii) correlation of such reports by the State agency with any emission limitations or standards established pursuant to this chapter, which reports shall be available at reasonable times for public inspection;

(G) provide for authority comparable to that in section 7603 of this title and adequate contingency plans to implement such authority;

(H) provide for revision of such plan—

(i) from time to time as may be necessary to take account of revisions of such national primary or secondary ambient air quality standard or the availability of improved or more expeditious methods of attaining such standard, and

(ii) except as provided in paragraph (3)(C), whenever the Administrator finds on the basis of information available to the Administrator that the plan is substantially inadequate to attain the national ambient air quality standard which it implements or to otherwise comply with any additional requirements established under this chapter;

(I) in the case of a plan or plan revision for an area designated as a nonattainment area, meet the applicable requirements of part D (relating to nonattainment areas);

(J) meet the applicable requirements of section 7421 of this title (relating to consultation), section 7427 of this title (relating to public notification), and part C (relating to prevention of significant deterioration of air quality and visibility protection);

(K) provide for—

(i) the performance of such air quality modeling as the Administrator may prescribe for the purpose of predicting the effect on ambient air quality of any emissions of any air pollutant for which the Administrator has established a national ambient air quality standard, and

(ii) the submission, upon request, of data related to such air quality modeling to the Administrator;

(L) require the owner or operator of each major stationary source to pay to the permitting authority, as a condition of any permit required under this chapter, a fee sufficient to cover—

(i) the reasonable costs of reviewing and acting upon any application for such a permit, and

(ii) if the owner or operator receives a permit for such source, the reasonable costs of implementing and enforcing the terms and conditions of any such permit (not including any court costs or other costs associated with any enforcement action),

until such fee requirement is superseded with respect to such sources by the Administrator's approval of a fee program under subchapter V; and

(M) provide for consultation and participation by local political subdivisions affected by the plan.

(3)(A) Repealed. Pub. L. 101–549, title I, §101(d)(1), Nov. 15, 1990, 104 Stat. 2409.

(B) As soon as practicable, the Administrator shall, consistent with the purposes of this chapter and the Energy Supply and Environmental Coordination Act of 1974 [15 U.S.C. 791 et seq.], review each State's applicable implementation plans and report to the State on whether such plans can be revised in relation to fuel burning stationary sources (or persons supplying fuel to such sources) without interfering with the attainment and maintenance of any national ambient air quality standard within the period permitted in this section. If the Administrator determines that any such plan can be revised, he shall notify the State that a plan revision may be submitted by the State. Any plan revision which is submitted by the State shall, after public notice and opportunity for public hearing, be approved by the Administrator if the revision relates only to fuel burning stationary sources (or persons supplying fuel to such sources), and the plan as revised complies with paragraph (2) of this subsection. The Administrator shall approve or disapprove any revision no later than three months after its submission.

(C) Neither the State, in the case of a plan (or portion thereof) approved under this subsection, nor the Administrator, in the case of a plan (or portion thereof) promulgated under subsection (c), shall be required to revise an applicable implementation plan because one or more exemptions under section 7418 of this title (relating to Federal facilities), enforcement orders under section 7413(d)[1] of this title, suspensions under subsection (f) or (g) (relating to temporary energy or economic authority), orders under section 7419 of this title (relating to primary nonferrous smelters), or extensions of compliance in decrees entered under section 7413(e)[1] of this title (relating to iron- and steel-producing operations) have been granted, if such plan would have met the requirements of this section if no such exemptions, orders, or extensions had been granted.

(4) Repealed. Pub. L. 101–549, title I, §101(d)(2), Nov. 15, 1990, 104 Stat. 2409.

---

[1] See References in Text note below.

(5)(A)(i) Any State may include in a State implementation plan, but the Administrator may not require as a condition of approval of such plan under this section, any indirect source review program. The Administrator may approve and enforce, as part of an applicable implementation plan, an indirect source review program which the State chooses to adopt and submit as part of its plan.

(ii) Except as provided in subparagraph (B), no plan promulgated by the Administrator shall include any indirect source review program for any air quality control region, or portion thereof.

(iii) Any State may revise an applicable implementation plan approved under this subsection to suspend or revoke any such program included in such plan, provided that such plan meets the requirements of this section.

(B) The Administrator shall have the authority to promulgate, implement and enforce regulations under subsection (c) respecting indirect source review programs which apply only to federally assisted highways, airports, and other major federally assisted indirect sources and federally owned or operated indirect sources.

(C) For purposes of this paragraph, the term "indirect source" means a facility, building, structure, installation, real property, road, or highway which attracts, or may attract, mobile sources of pollution. Such term includes parking lots, parking garages, and other facilities subject to any measure for management of parking supply (within the meaning of subsection (c)(2)(D)(ii)), including regulation of existing off-street parking but such term does not include new or existing on-street parking. Direct emissions sources or facilities at, within, or associated with, any indirect source shall not be deemed indirect sources for the purpose of this paragraph.

(D) For purposes of this paragraph the term "indirect source review program" means the facility-by-facility review of indirect sources of air pollution, including such measures as are necessary to assure, or assist in assuring, that a new or modified indirect source will not attract mobile sources of air pollution, the emissions from which would cause or contribute to air pollution concentrations—

(i) exceeding any national primary ambient air quality standard for a mobile source-related air pollutant after the primary standard attainment date, or

(ii) preventing maintenance of any such standard after such date.

(E) For purposes of this paragraph and paragraph (2)(B), the term "transportation control measure" does not include any measure which is an "indirect source review program".

(6) No State plan shall be treated as meeting the requirements of this section unless such plan provides that in the case of any source which uses a supplemental, or intermittent control system for purposes of meeting the requirements of an order under section 7413(d)[1] of this title or section 7419 of this title (relating to primary nonferrous smelter orders), the owner or operator of such source may not temporarily reduce the pay of any employee by reason of the use of such supplemental or intermittent or other dispersion dependent control system.

**(b) Extension of period for submission of plans**

The Administrator may, wherever he determines necessary, extend the period for submission of any plan or portion thereof which implements a national secondary ambient air quality standard for a period not to exceed 18 months from the date otherwise required for submission of such plan.

**(c) Preparation and publication by Administrator of proposed regulations setting forth implementation plan; transportation regulations study and report; parking surcharge; suspension authority; plan implementation**

(1) The Administrator shall promulgate a Federal implementation plan at any time within 2 years after the Administrator—

(A) finds that a State has failed to make a required submission or finds that the plan or plan revision submitted by the State does not satisfy the minimum criteria established under subsection (k)(1)(A), or

(B) disapproves a State implementation plan submission in whole or in part,

unless the State corrects the deficiency, and the Administrator approves the plan or plan revision, before the Administrator promulgates such Federal implementation plan.

(2)(A) Repealed. Pub. L. 101–549, title I, §101(d)(3)(A), Nov. 15, 1990, 104 Stat. 2409.

(B) No parking surcharge regulation may be required by the Administrator under paragraph (1) of this subsection as a part of an applicable implementation plan. All parking surcharge regulations previously required by the Administrator shall be void upon June 22, 1974. This subparagraph shall not prevent the Administrator from approving parking surcharges if they are adopted and submitted by a State as part of an applicable implementation plan. The Administrator may not condition approval of any implementation plan submitted by a State on such plan's including a parking surcharge regulation.

(C) Repealed. Pub. L. 101–549, title I, §101(d)(3)(B), Nov. 15, 1990, 104 Stat. 2409.

(D) For purposes of this paragraph—

(i) The term "parking surcharge regulation" means a regulation imposing or requiring the imposition of any tax, surcharge, fee, or other charge on parking spaces, or any other area used for the temporary storage of motor vehicles.

(ii) The term "management of parking supply" shall include any requirement providing that any new facility containing a given number of parking spaces shall receive a permit or other prior approval, issuance of which is to be conditioned on air quality considerations.

(iii) The term "preferential bus/carpool lane" shall include any requirement for the setting aside of one or more lanes of a street or highway on a permanent or temporary basis for the exclusive use of buses or carpools, or both.

(E) No standard, plan, or requirement, relating to management of parking supply or preferential bus/carpool lanes shall be promulgated after June 22, 1974, by the Administrator pursuant to this section, unless such promulgation has been subjected to at least one public hearing

which has been held in the area affected and for which reasonable notice has been given in such area. If substantial changes are made following public hearings, one or more additional hearings shall be held in such area after such notice.

(3) Upon application of the chief executive officer of any general purpose unit of local government, if the Administrator determines that such unit has adequate authority under State or local law, the Administrator may delegate to such unit the authority to implement and enforce within the jurisdiction of such unit any part of a plan promulgated under this subsection. Nothing in this paragraph shall prevent the Administrator from implementing or enforcing any applicable provision of a plan promulgated under this subsection.

(4) Repealed. Pub. L. 101–549, title I, § 101(d)(3)(C), Nov. 15, 1990, 104 Stat. 2409.

(5)(A) Any measure in an applicable implementation plan which requires a toll or other charge for the use of a bridge located entirely within one city shall be eliminated from such plan by the Administrator upon application by the Governor of the State, which application shall include a certification by the Governor that he will revise such plan in accordance with subparagraph (B).

(B) In the case of any applicable implementation plan with respect to which a measure has been eliminated under subparagraph (A), such plan shall, not later than one year after August 7, 1977, be revised to include comprehensive measures to:

(i) establish, expand, or improve public transportation measures to meet basic transportation needs, as expeditiously as is practicable; and

(ii) implement transportation control measures necessary to attain and maintain national ambient air quality standards,

and such revised plan shall, for the purpose of implementing such comprehensive public transportation measures, include requirements to use (insofar as is necessary) Federal grants, State or local funds, or any combination of such grants and funds as may be consistent with the terms of the legislation providing such grants and funds. Such measures shall, as a substitute for the tolls or charges eliminated under subparagraph (A), provide for emissions reductions equivalent to the reductions which may reasonably be expected to be achieved through the use of the tolls or charges eliminated.

(C) Any revision of an implementation plan for purposes of meeting the requirements of subparagraph (B) shall be submitted in coordination with any plan revision required under part D.

**(d), (e) Repealed. Pub. L. 101–549, title I, § 101(d)(4), (5), Nov. 15, 1990, 104 Stat. 2409**

**(f) National or regional energy emergencies; determination by President**

(1) Upon application by the owner or operator of a fuel burning stationary source, and after notice and opportunity for public hearing, the Governor of the State in which such source is located may petition the President to determine that a national or regional energy emergency exists of such severity that—

(A) a temporary suspension of any part of the applicable implementation plan or of any requirement under section 7651j of this title (concerning excess emissions penalties or offsets) may be necessary, and

(B) other means of responding to the energy emergency may be inadequate.

Such determination shall not be delegable by the President to any other person. If the President determines that a national or regional energy emergency of such severity exists, a temporary emergency suspension of any part of an applicable implementation plan or of any requirement under section 7651j of this title (concerning excess emissions penalties or offsets) adopted by the State may be issued by the Governor of any State covered by the President's determination under the condition specified in paragraph (2) and may take effect immediately.

(2) A temporary emergency suspension under this subsection shall be issued to a source only if the Governor of such State finds that—

(A) there exists in the vicinity of such source a temporary energy emergency involving high levels of unemployment or loss of necessary energy supplies for residential dwellings; and

(B) such unemployment or loss can be totally or partially alleviated by such emergency suspension.

Not more than one such suspension may be issued for any source on the basis of the same set of circumstances or on the basis of the same emergency.

(3) A temporary emergency suspension issued by a Governor under this subsection shall remain in effect for a maximum of four months or such lesser period as may be specified in a disapproval order of the Administrator, if any. The Administrator may disapprove such suspension if he determines that it does not meet the requirements of paragraph (2).

(4) This subsection shall not apply in the case of a plan provision or requirement promulgated by the Administrator under subsection (c) of this section, but in any such case the President may grant a temporary emergency suspension for a four month period of any such provision or requirement if he makes the determinations and findings specified in paragraphs (1) and (2).

(5) The Governor may include in any temporary emergency suspension issued under this subsection a provision delaying for a period identical to the period of such suspension any compliance schedule (or increment of progress) to which such source is subject under section 1857c–10[1] of this title, as in effect before August 7, 1977, or section 7413(d)[1] of this title, upon a finding that such source is unable to comply with such schedule (or increment) solely because of the conditions on the basis of which a suspension was issued under this subsection.

**(g) Governor's authority to issue temporary emergency suspensions**

(1) In the case of any State which has adopted and submitted to the Administrator a proposed plan revision which the State determines—

(A) meets the requirements of this section, and

(B) is necessary (i) to prevent the closing for one year or more of any source of air pollution, and (ii) to prevent substantial increases in unemployment which would result from such closing, and

which the Administrator has not approved or disapproved under this section within 12 months of submission of the proposed plan revision, the Governor may issue a temporary emergency suspension of the part of the applicable implementation plan for such State which is proposed to be revised with respect to such source. The determination under subparagraph (B) may not be made with respect to a source which would close without regard to whether or not the proposed plan revision is approved.

(2) A temporary emergency suspension issued by a Governor under this subsection shall remain in effect for a maximum of four months or such lesser period as may be specified in a disapproval order of the Administrator. The Administrator may disapprove such suspension if he determines that it does not meet the requirements of this subsection.

(3) The Governor may include in any temporary emergency suspension issued under this subsection a provision delaying for a period identical to the period of such suspension any compliance schedule (or increment of progress) to which such source is subject under section 1857c–10[1] of this title as in effect before August 7, 1977, or under section 7413(d)[1] of this title upon a finding that such source is unable to comply with such schedule (or increment) solely because of the conditions on the basis of which a suspension was issued under this subsection.

**(h) Publication of comprehensive document for each State setting forth requirements of applicable implementation plan**

(1) Not later than 5 years after November 15, 1990, and every 3 years thereafter, the Administrator shall assemble and publish a comprehensive document for each State setting forth all requirements of the applicable implementation plan for such State and shall publish notice in the Federal Register of the availability of such documents.

(2) The Administrator may promulgate such regulations as may be reasonably necessary to carry out the purpose of this subsection.

**(i) Modification of requirements prohibited**

Except for a primary nonferrous smelter order under section 7419 of this title, a suspension under subsection (f) or (g) (relating to emergency suspensions), an exemption under section 7418 of this title (relating to certain Federal facilities), an order under section 7413(d)[1] of this title (relating to compliance orders), a plan promulgation under subsection (c), or a plan revision under subsection (a)(3); no order, suspension, plan revision, or other action modifying any requirement of an applicable implementation plan may be taken with respect to any stationary source by the State or by the Administrator.

**(j) Technological systems of continuous emission reduction on new or modified stationary sources; compliance with performance standards**

As a condition for issuance of any permit required under this subchapter, the owner or operator of each new or modified stationary source which is required to obtain such a permit must show to the satisfaction of the permitting authority that the technological system of continuous emission reduction which is to be used at such source will enable it to comply with the standards of performance which are to apply to such source and that the construction or modification and operation of such source will be in compliance with all other requirements of this chapter.

**(k) Environmental Protection Agency action on plan submissions**

**(1) Completeness of plan submissions**

**(A) Completeness criteria**

Within 9 months after November 15, 1990, the Administrator shall promulgate minimum criteria that any plan submission must meet before the Administrator is required to act on such submission under this subsection. The criteria shall be limited to the information necessary to enable the Administrator to determine whether the plan submission complies with the provisions of this chapter.

**(B) Completeness finding**

Within 60 days of the Administrator's receipt of a plan or plan revision, but no later than 6 months after the date, if any, by which a State is required to submit the plan or revision, the Administrator shall determine whether the minimum criteria established pursuant to subparagraph (A) have been met. Any plan or plan revision that a State submits to the Administrator, and that has not been determined by the Administrator (by the date 6 months after receipt of the submission) to have failed to meet the minimum criteria established pursuant to subparagraph (A), shall on that date be deemed by operation of law to meet such minimum criteria.

**(C) Effect of finding of incompleteness**

Where the Administrator determines that a plan submission (or part thereof) does not meet the minimum criteria established pursuant to subparagraph (A), the State shall be treated as not having made the submission (or, in the Administrator's discretion, part thereof).

**(2) Deadline for action**

Within 12 months of a determination by the Administrator (or a determination deemed by operation of law) under paragraph (1) that a State has submitted a plan or plan revision (or, in the Administrator's discretion, part thereof) that meets the minimum criteria established pursuant to paragraph (1), if applicable (or, if those criteria are not applicable, within 12 months of submission of the plan or revision), the Administrator shall act on the submission in accordance with paragraph (3).

**(3) Full and partial approval and disapproval**

In the case of any submittal on which the Administrator is required to act under paragraph (2), the Administrator shall approve such submittal as a whole if it meets all of the applicable requirements of this chapter. If a portion of the plan revision meets all the applicable requirements of this chapter, the Administrator may approve the plan revision in part and disapprove the plan revision in part. The plan revision shall not be treated as meeting the requirements of this chapter until the Administrator approves the entire plan revision as complying with the applicable requirements of this chapter.

**(4) Conditional approval**

The Administrator may approve a plan revision based on a commitment of the State to adopt specific enforceable measures by a date certain, but not later than 1 year after the date of approval of the plan revision. Any such conditional approval shall be treated as a disapproval if the State fails to comply with such commitment.

**(5) Calls for plan revisions**

Whenever the Administrator finds that the applicable implementation plan for any area is substantially inadequate to attain or maintain the relevant national ambient air quality standard, to mitigate adequately the interstate pollutant transport described in section 7506a of this title or section 7511c of this title, or to otherwise comply with any requirement of this chapter, the Administrator shall require the State to revise the plan as necessary to correct such inadequacies. The Administrator shall notify the State of the inadequacies, and may establish reasonable deadlines (not to exceed 18 months after the date of such notice) for the submission of such plan revisions. Such findings and notice shall be public. Any finding under this paragraph shall, to the extent the Administrator deems appropriate, subject the State to the requirements of this chapter to which the State was subject when it developed and submitted the plan for which such finding was made, except that the Administrator may adjust any dates applicable under such requirements as appropriate (except that the Administrator may not adjust any attainment date prescribed under part D, unless such date has elapsed).

**(6) Corrections**

Whenever the Administrator determines that the Administrator's action approving, disapproving, or promulgating any plan or plan revision (or part thereof), area designation, redesignation, classification, or reclassification was in error, the Administrator may in the same manner as the approval, disapproval, or promulgation revise such action as appropriate without requiring any further submission from the State. Such determination and the basis thereof shall be provided to the State and public.

**(l) Plan revisions**

Each revision to an implementation plan submitted by a State under this chapter shall be adopted by such State after reasonable notice and public hearing. The Administrator shall not approve a revision of a plan if the revision would interfere with any applicable requirement concerning attainment and reasonable further progress (as defined in section 7501 of this title), or any other applicable requirement of this chapter.

**(m) Sanctions**

The Administrator may apply any of the sanctions listed in section 7509(b) of this title at any time (or at any time after) the Administrator makes a finding, disapproval, or determination under paragraphs (1) through (4), respectively, of section 7509(a) of this title in relation to any plan or plan item (as that term is defined by the Administrator) required under this chapter, with respect to any portion of the State the Administrator determines reasonable and appropriate, for the purpose of ensuring that the requirements of this chapter relating to such plan or plan item are met. The Administrator shall, by rule, establish criteria for exercising his authority under the previous sentence with respect to any deficiency referred to in section 7509(a) of this title to ensure that, during the 24-month period following the finding, disapproval, or determination referred to in section 7509(a) of this title, such sanctions are not applied on a statewide basis where one or more political subdivisions covered by the applicable implementation plan are principally responsible for such deficiency.

**(n) Savings clauses**

**(1) Existing plan provisions**

Any provision of any applicable implementation plan that was approved or promulgated by the Administrator pursuant to this section as in effect before November 15, 1990, shall remain in effect as part of such applicable implementation plan, except to the extent that a revision to such provision is approved or promulgated by the Administrator pursuant to this chapter.

**(2) Attainment dates**

For any area not designated nonattainment, any plan or plan revision submitted or required to be submitted by a State—

(A) in response to the promulgation or revision of a national primary ambient air quality standard in effect on November 15, 1990, or

(B) in response to a finding of substantial inadequacy under subsection (a)(2) (as in effect immediately before November 15, 1990),

shall provide for attainment of the national primary ambient air quality standards within 3 years of November 15, 1990, or within 5 years of issuance of such finding of substantial inadequacy, whichever is later.

**(3) Retention of construction moratorium in certain areas**

In the case of an area to which, immediately before November 15, 1990, the prohibition on construction or modification of major stationary sources prescribed in subsection (a)(2)(I) (as in effect immediately before November 15, 1990) applied by virtue of a finding

of the Administrator that the State containing such area had not submitted an implementation plan meeting the requirements of section 7502(b)(6) of this title (relating to establishment of a permit program) (as in effect immediately before November 15, 1990) or 7502(a)(1) of this title (to the extent such requirements relate to provision for attainment of the primary national ambient air quality standard for sulfur oxides by December 31, 1982) as in effect immediately before November 15, 1990, no major stationary source of the relevant air pollutant or pollutants shall be constructed or modified in such area until the Administrator finds that the plan for such area meets the applicable requirements of section 7502(c)(5) of this title (relating to permit programs) or subpart 5 of part D (relating to attainment of the primary national ambient air quality standard for sulfur dioxide), respectively.

**(o) Indian tribes**

If an Indian tribe submits an implementation plan to the Administrator pursuant to section 7601(d) of this title, the plan shall be reviewed in accordance with the provisions for review set forth in this section for State plans, except as otherwise provided by regulation promulgated pursuant to section 7601(d)(2) of this title. When such plan becomes effective in accordance with the regulations promulgated under section 7601(d) of this title, the plan shall become applicable to all areas (except as expressly provided otherwise in the plan) located within the exterior boundaries of the reservation, notwithstanding the issuance of any patent and including rights-of-way running through the reservation.

**(p) Reports**

Any State shall submit, according to such schedule as the Administrator may prescribe, such reports as the Administrator may require relating to emission reductions, vehicle miles traveled, congestion levels, and any other information the Administrator may deem necessary to assess the development[2] effectiveness, need for revision, or implementation of any plan or plan revision required under this chapter.

(July 14, 1955, ch. 360, title I, §110, as added Pub. L. 91–604, §4(a), Dec. 31, 1970, 84 Stat. 1680; amended Pub. L. 93–319, §4, June 22, 1974, 88 Stat. 256; Pub. L. 95–95, title I, §§107, 108, Aug. 7, 1977, 91 Stat. 691, 693; Pub. L. 95–190, §14(a)(1)–(6), Nov. 16, 1977, 91 Stat. 1399; Pub. L. 97–23, §3, July 17, 1981, 95 Stat. 142; Pub. L. 101–549, title I, §§101(b)–(d), 102(h), 107(c), 108(d), title IV, §412, Nov. 15, 1990, 104 Stat. 2404–2408, 2422, 2464, 2466, 2634.)

**Editorial Notes**

REFERENCES IN TEXT

The Energy Supply and Environmental Coordination Act of 1974, referred to in subsec. (a)(3)(B), is Pub. L. 93–319, June 22, 1974, 88 Stat. 246, as amended, which is classified principally to chapter 16C (§791 et seq.) of Title 15, Commerce and Trade. For complete classification of this Act to the Code, see Short Title note set out under section 791 of Title 15 and Tables.

---

[2] So in original. Probably should be followed by a comma.

Section 7413 of this title, referred to in subsecs. (a)(3)(C), (6), (f)(5), (g)(3), and (i), was amended generally by Pub. L. 101–549, title VII, §701, Nov. 15, 1990, 104 Stat. 2672, and, as so amended, subsecs. (d) and (e) of section 7413 no longer relates to final compliance orders and steel industry compliance extension, respectively.

Section 1857c–10 of this title, as in effect before August 7, 1977, referred to in subsecs. (f)(5) and (g)(3), was in the original "section 119, as in effect before the date of the enactment of this paragraph", meaning section 119 of act July 14, 1955, ch. 360, title I, as added June 22, 1974, Pub. L. 93–319, §3, 88 Stat. 248, (which was classified to section 1857c–10 of this title) as in effect prior to the enactment of subsecs. (f)(5) and (g)(3) of this section by Pub. L. 95–95, §107, Aug. 7, 1977, 91 Stat. 691, effective Aug. 7, 1977. Section 112(b)(1) of Pub. L. 95–95 repealed section 119 of act July 14, 1955, ch. 360, title I, as added by Pub. L. 93–319, and provided that all references to such section 119 in any subsequent enactment which supersedes Pub. L. 93–319 shall be construed to refer to section 113(d) of the Clean Air Act and to paragraph (5) thereof in particular which is classified to section 7413(d)(5) of this title. Section 7413 of this title was subsequently amended generally by Pub. L. 101–549, title VII, §701, Nov. 15, 1990, 104 Stat. 2672, see note above. Section 117(b) of Pub. L. 95–95 added a new section 119 of act July 14, 1955, which is classified to section 7419 of this title.

CODIFICATION

Section was formerly classified to section 1857c–5 of this title.

PRIOR PROVISIONS

A prior section 110 of act July 14, 1955, was renumbered section 117 by Pub. L. 91–604 and is classified to section 7417 of this title.

AMENDMENTS

1990—Subsec. (a)(1). Pub. L. 101–549, §101(d)(8), substituted "3 years (or such shorter period as the Administrator may prescribe)" for "nine months" in two places.

Subsec. (a)(2). Pub. L. 101–549, §101(b), amended par. (2) generally, substituting present provisions for provisions setting the time within which the Administrator was to approve or disapprove a plan or portion thereof and listing the conditions under which the plan or portion thereof was to be approved after reasonable notice and hearing.

Subsec. (a)(3)(A). Pub. L. 101–549, §101(d)(1), struck out subpar. (A) which directed Administrator to approve any revision of an implementation plan if it met certain requirements and had been adopted by the State after reasonable notice and public hearings.

Subsec. (a)(3)(D). Pub. L. 101–549, §101(d)(1), struck out subpar. (D) which directed that certain implementation plans be revised to include comprehensive measures and requirements.

Subsec. (a)(4). Pub. L. 101–549, §101(d)(2), struck out par. (4) which set forth requirements for review procedure.

Subsec. (c)(1). Pub. L. 101–549, §102(h), amended par. (1) generally, substituting present provisions for provisions relating to preparation and publication of implementation plan, after opportunity for a hearing, upon failure of a State to make required submission or revision.

Subsec. (c)(2)(A). Pub. L. 101–549, §101(d)(3)(A), struck out subpar. (A) which required a study and report on necessity of parking surcharge, management of parking supply, and preferential bus/carpool lane regulations to achieve and maintain national primary ambient air quality standards.

Subsec. (c)(2)(C). Pub. L. 101–549, §101(d)(3)(B), struck out subpar. (C) which authorized suspension of certain regulations and requirements relating to management of parking supply.

Subsec. (c)(4). Pub. L. 101–549, § 101(d)(3)(C), struck out par. (4) which permitted Governors to temporarily suspend measures in implementation plans relating to retrofits, gas rationing, and reduction of on-street parking.

Subsec. (c)(5)(B). Pub. L. 101–549, § 101(d)(3)(D), struck out "(including the written evidence required by part D)," after "include comprehensive measures".

Subsec. (d). Pub. L. 101–549, § 101(d)(4), struck out subsec. (d) which defined an applicable implementation plan for purposes of this chapter.

Subsec. (e). Pub. L. 101–549, § 101(d)(5), struck out subsec. (e) which permitted an extension of time for attainment of a national primary ambient air quality standard.

Subsec. (f)(1). Pub. L. 101–549, § 412, inserted "or of any requirement under section 7651j of this title (concerning excess emissions penalties or offsets)" in subpar. (A) and in last sentence.

Subsec. (g)(1). Pub. L. 101–549, § 101(d)(6), substituted "12 months of submission of the proposed plan revision" for "the required four month period" in closing provisions.

Subsec. (h)(1). Pub. L. 101–549, § 101(d)(7), substituted "5 years after November 15, 1990, and every three years thereafter" for "one year after August 7, 1977, and annually thereafter" and struck out at end "Each such document shall be revised as frequently as practicable but not less often than annually."

Subsecs. (k) to (n). Pub. L. 101–549, § 101(c), added subsecs. (k) to (n).

Subsec. (o). Pub. L. 101–549, § 107(c), added subsec. (o).

Subsec. (p). Pub. L. 101–549, § 108(d), added subsec. (p).

1981—Subsec. (a)(3)(C). Pub. L. 97–23 inserted reference to extensions of compliance in decrees entered under section 7413(e) of this title (relating to iron- and steel-producing operations).

1977—Subsec. (a)(2)(A). Pub. L. 95–95, § 108(a)(1), substituted "(A) except as may be provided in subparagraph (I)(i) in the case of a plan" for "(A)(i) in the case of a plan".

Subsec. (a)(2)(B). Pub. L. 95–95, § 108(a)(2), substituted "transportation controls, air quality maintenance plans, and preconstruction review of direct sources of air pollution as provided in subparagraph (D)" for "land use and transportation controls".

Subsec. (a)(2)(D). Pub. L. 95–95, § 108(a)(3), substituted "it includes a program to provide for the enforcement of emission limitations and regulation of the modification, construction, and operation of any stationary source, including a permit program as required in parts C and D and a permit or equivalent program for any major emitting facility, within such region as necessary to assure (i) that national ambient air quality standards are achieved and maintained, and (ii) a procedure" for "it includes a procedure".

Subsec. (a)(2)(E). Pub. L. 95–95, § 108(a)(4), substituted "it contains adequate provisions (i) prohibiting any stationary source within the State from emitting any air pollutant in amounts which will (I) prevent attainment or maintenance by any other State of any such national primary or secondary ambient air quality standard, or (II) interfere with measures required to be included in the applicable implementation plan for any other State under part C to prevent significant deterioration of air quality or to protect visibility, and (ii) insuring compliance with the requirements of section 7426 of this title, relating to interstate pollution abatement" for "it contains adequate provisions for intergovernmental cooperation, including measures necessary to insure that emissions of air pollutants from sources located in any air quality control region will not interfere with the attainment or maintenance of such primary or secondary standard in any portion of such region outside of such State or in any other air quality control region".

Subsec. (a)(2)(F). Pub. L. 95–95, § 108(a)(5), added cl. (vi).

Subsec. (a)(2)(H). Pub. L. 95–190, § 14(a)(1), substituted "1977;" for "1977".

Pub. L. 95–95, § 108(a)(6), inserted "except as provided in paragraph (3)(C)," after "or (ii)" and "or to otherwise comply with any additional requirements established under the Clean Air Act Amendments of 1977" after "to achieve the national ambient air quality primary or secondary standard which it implements".

Subsec. (a)(2)(I). Pub. L. 95–95, § 108(b), added subpar. (I).

Subsec. (a)(2)(J). Pub. L. 95–190, § 14(a)(2), substituted "; and" for ", and".

Pub. L. 95–95, § 108(b), added subpar. (J).

Subsec. (a)(2)(K). Pub. L. 95–95, § 108(b) added subpar. (K).

Subsec. (a)(3)(C). Pub. L. 95–95, § 108(c), added subpar. (C).

Subsec. (a)(3)(D). Pub. L. 95–190, § 14(a)(4), added subpar. (D).

Subsec. (a)(5). Pub. L. 95–95, § 108(e), added par. (5).

Subsec. (a)(5)(D). Pub. L. 95–190, § 14(a)(3), struck out "preconstruction or premodification" before "review".

Subsec. (a)(6). Pub. L. 95–95, § 108(e), added par. (6).

Subsec. (c)(1). Pub. L. 95–95, § 108(d)(1), (2), substituted "plan which meets the requirements of this section" for "plan for any national ambient air quality primary or secondary standard within the time prescribed" in subpar. (A) and, in provisions following subpar. (C), directed that any portion of a plan relating to any measure described in first sentence of 7421 of this title (relating to consultation) or the consultation process required under such section 7421 of this title not be required to be promulgated before the date eight months after such date required for submission.

Subsec. (c)(3) to (5). Pub. L. 95–95, § 108(d)(3), added pars. (3) to (5).

Subsec. (d). Pub. L. 95–95, § 108(f), substituted "and which implements the requirements of this section" for "and which implements a national primary or secondary ambient air quality standard in a State".

Subsec. (f). Pub. L. 95–95, § 107(a), substituted provisions relating to the handling of national or regional energy emergencies for provisions relating to the postponement of compliance by stationary sources or classes of moving sources with any requirement of applicable implementation plans.

Subsec. (g). Pub. L. 95–95, § 108(g), added subsec. (g) relating to publication of comprehensive document.

Pub. L. 95–95, § 107(b), added subsec. (g) relating to Governor's authority to issue temporary emergency suspensions.

Subsec. (h). Pub. L. 95–190, § 14(a)(5), redesignated subsec. (g), added by Pub. L. 95–95, § 108(g), as (h). Former subsec. (h) redesignated (i).

Subsec. (i). Pub. L. 95–190, § 14(a)(5), redesignated subsec. (h), added by Pub. L. 95–95, § 108(g), as (i). Former subsec. (i) redesignated (j) and amended.

Subsec. (j). Pub. L. 95–190 § 14(a)(5), (6), redesignated subsec. (i), added by Pub. L. 95–95, § 108(g), as (j) and in subsec. (j) as so redesignated, substituted "will enable such source" for "at such source will enable it".

1974—Subsec. (a)(3). Pub. L. 93–319, § 4(a), designated existing provisions as subpar. (A) and added subpar. (B).

Subsec. (c). Pub. L. 93–319, § 4(b), designated existing provisions as par. (1) and existing pars. (1), (2), and (3) as subpars. (A), (B), and (C), respectively, of such redesignated par. (1), and added par. (2).

### Statutory Notes and Related Subsidiaries

#### Effective Date of 1977 Amendment

Amendment by Pub. L. 95–95 effective Aug. 7, 1977, except as otherwise expressly provided, see section 406(d) of Pub. L. 95–95, set out as a note under section 7401 of this title.

#### Pending Actions and Proceedings

Suits, actions, and other proceedings lawfully commenced by or against the Administrator or any other officer or employee of the United States in his official capacity or in relation to the discharge of his official

duties under act July 14, 1955, the Clean Air Act, as in effect immediately prior to the enactment of Pub. L. 95–95 [Aug. 7, 1977], not to abate by reason of the taking effect of Pub. L. 95–95, see section 406(a) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

MODIFICATION OR RESCISSION OF RULES, REGULATIONS, ORDERS, DETERMINATIONS, CONTRACTS, CERTIFICATIONS, AUTHORIZATIONS, DELEGATIONS, AND OTHER ACTIONS

All rules, regulations, orders, determinations, contracts, certifications, authorizations, delegations, or other actions duly issued, made, or taken by or pursuant to act July 14, 1955, the Clean Air Act, as in effect immediately prior to the date of enactment of Pub. L. 95–95 [Aug. 7, 1977] to continue in full force and effect until modified or rescinded in accordance with act July 14, 1955, as amended by Pub. L. 95–95 [this chapter], see section 406(b) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

MODIFICATION OR RESCISSION OF IMPLEMENTATION PLANS APPROVED AND IN EFFECT PRIOR TO AUG. 7, 1977

Nothing in the Clean Air Act Amendments of 1977 [Pub. L. 95–95] to affect any requirement of an approved implementation plan under this section or any other provision in effect under this chapter before Aug. 7, 1977, until modified or rescinded in accordance with this chapter as amended by the Clean Air Act Amendments of 1977, see section 406(c) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

SAVINGS PROVISION

Pub. L. 91–604, §16, Dec. 31, 1970, 84 Stat. 1713, provided that:

"(a)(1) Any implementation plan adopted by any State and submitted to the Secretary of Health, Education, and Welfare, or to the Administrator pursuant to the Clean Air Act [this chapter] prior to enactment of this Act [Dec. 31, 1970] may be approved under section 110 of the Clean Air Act [this section] (as amended by this Act) [Pub. L. 91–604] and shall remain in effect, unless the Administrator determines that such implementation plan, or any portion thereof, is not consistent with applicable requirements of the Clean Air Act [this chapter] (as amended by this Act) and will not provide for the attainment of national primary ambient air quality standards in the time required by such Act. If the Administrator so determines, he shall, within 90 days after promulgation of any national ambient air quality standards pursuant to section 109(a) of the Clean Air Act [section 7409(a) of this title], notify the State and specify in what respects changes are needed to meet the additional requirements of such Act, including requirements to implement national secondary ambient air quality standards. If such changes are not adopted by the State after public hearings and within six months after such notification, the Administrator shall promulgate such changes pursuant to section 110(c) of such Act [subsec. (c) of this section].

"(2) The amendments made by section 4(b) [amending sections 7403 and 7415 of this title] shall not be construed as repealing or modifying the powers of the Administrator with respect to any conference convened under section 108(d) of the Clean Air Act [section 7415 of this title] before the date of enactment of this Act [Dec. 31, 1970].

"(b) Regulations or standards issued under this title II of the Clean Air Act [subchapter II of this chapter] prior to the enactment of this Act [Dec. 31, 1970] shall continue in effect until revised by the Administrator consistent with the purposes of such Act [this chapter]."

FEDERAL ENERGY ADMINISTRATOR

"Federal Energy Administrator", for purposes of this chapter, to mean Administrator of Federal Energy Ad-

ministration established by Pub. L. 93–275, May 7, 1974, 88 Stat. 97, which is classified to section 761 et seq. of Title 15, Commerce and Trade, but with the intent to mean any officer of the United States designated as such by the President until Federal Energy Administrator takes office and after Federal Energy Administration ceases to exist, see section 798 of Title 15, Commerce and Trade.

Federal Energy Administration terminated and functions vested by law in Administrator thereof transferred to Secretary of Energy (unless otherwise specifically provided) by sections 7151(a) and 7293 of this title.

## § 7411. Standards of performance for new stationary sources

### (a) Definitions

For purposes of this section:

(1) The term "standard of performance" means a standard for emissions of air pollutants which reflects the degree of emission limitation achievable through the application of the best system of emission reduction which (taking into account the cost of achieving such reduction and any nonair quality health and environmental impact and energy requirements) the Administrator determines has been adequately demonstrated.

(2) The term "new source" means any stationary source, the construction or modification of which is commenced after the publication of regulations (or, if earlier, proposed regulations) prescribing a standard of performance under this section which will be applicable to such source.

(3) The term "stationary source" means any building, structure, facility, or installation which emits or may emit any air pollutant. Nothing in subchapter II of this chapter relating to nonroad engines shall be construed to apply to stationary internal combustion engines.

(4) The term "modification" means any physical change in, or change in the method of operation of, a stationary source which increases the amount of any air pollutant emitted by such source or which results in the emission of any air pollutant not previously emitted.

(5) The term "owner or operator" means any person who owns, leases, operates, controls, or supervises a stationary source.

(6) The term "existing source" means any stationary source other than a new source.

(7) The term "technological system of continuous emission reduction" means—

(A) a technological process for production or operation by any source which is inherently low-polluting or nonpolluting, or

(B) a technological system for continuous reduction of the pollution generated by a source before such pollution is emitted into the ambient air, including precombustion cleaning or treatment of fuels.

(8) A conversion to coal (A) by reason of an order under section 2(a) of the Energy Supply and Environmental Coordination Act of 1974 [15 U.S.C. 792(a)] or any amendment thereto, or any subsequent enactment which supersedes such Act [15 U.S.C. 791 et seq.], or (B) which qualifies under section 7413(d)(5)(A)(ii)[1]

---

[1] See References in Text note below.

23, and such planning processes shall take into account the requirements of this part.

**(c) Joint planning**

In the case of a nonattainment area that is included within more than one State, the affected States may jointly, through interstate compact or otherwise, undertake and implement all or part of the planning procedures described in this section.

(July 14, 1955, ch. 360, title I, § 174, as added Pub. L. 95–95, title I, § 129(b), Aug. 7, 1977, 91 Stat. 748; amended Pub. L. 101–549, title I, § 102(d), Nov. 15, 1990, 104 Stat. 2417.)

#### Editorial Notes

##### AMENDMENTS

1990—Pub. L. 101–549 amended section generally, substituting present provisions for provisions which related to: in subsec. (a), preparation of implementation plan by designated organization; and in subsec. (b), coordination of plan preparation.

### § 7505. Environmental Protection Agency grants

**(a) Plan revision development costs**

The Administrator shall make grants to any organization of local elected officials with transportation or air quality maintenance planning responsibilities recognized by the State under section 7504(a) of this title for payment of the reasonable costs of developing a plan revision under this part.

**(b) Uses of grant funds**

The amount granted to any organization under subsection (a) shall be 100 percent of any additional costs of developing a plan revision under this part for the first two fiscal years following receipt of the grant under this paragraph, and shall supplement any funds available under Federal law to such organization for transportation or air quality maintenance planning. Grants under this section shall not be used for construction.

(July 14, 1955, ch. 360, title I, § 175, as added Pub. L. 95–95, title I, § 129(b), Aug. 7, 1977, 91 Stat. 749.)

### § 7505a. Maintenance plans

**(a) Plan revision**

Each State which submits a request under section 7407(d) of this title for redesignation of a nonattainment area for any air pollutant as an area which has attained the national primary ambient air quality standard for that air pollutant shall also submit a revision of the applicable State implementation plan to provide for the maintenance of the national primary ambient air quality standard for such air pollutant in the area concerned for at least 10 years after the redesignation. The plan shall contain such additional measures, if any, as may be necessary to ensure such maintenance.

**(b) Subsequent plan revisions**

8 years after redesignation of any area as an attainment area under section 7407(d) of this title, the State shall submit to the Administrator an additional revision of the applicable State implementation plan for maintaining the national primary ambient air quality standard for 10 years after the expiration of the 10-year period referred to in subsection (a).

**(c) Nonattainment requirements applicable pending plan approval**

Until such plan revision is approved and an area is redesignated as attainment for any area designated as a nonattainment area, the requirements of this part shall continue in force and effect with respect to such area.

**(d) Contingency provisions**

Each plan revision submitted under this section shall contain such contingency provisions as the Administrator deems necessary to assure that the State will promptly correct any violation of the standard which occurs after the redesignation of the area as an attainment area. Such provisions shall include a requirement that the State will implement all measures with respect to the control of the air pollutant concerned which were contained in the State implementation plan for the area before redesignation of the area as an attainment area. The failure of any area redesignated as an attainment area to maintain the national ambient air quality standard concerned shall not result in a requirement that the State revise its State implementation plan unless the Administrator, in the Administrator's discretion, requires the State to submit a revised State implementation plan.

(July 14, 1955, ch. 360, title I, § 175A, as added Pub. L. 101–549, title I, § 102(e), Nov. 15, 1990, 104 Stat. 2418.)

### § 7506. Limitations on certain Federal assistance

**(a), (b) Repealed. Pub. L. 101–549, title I, § 110(4), Nov. 15, 1990, 104 Stat. 2470**

**(c) Activities not conforming to approved or promulgated plans**

(1) No department, agency, or instrumentality of the Federal Government shall engage in, support in any way or provide financial assistance for, license or permit, or approve, any activity which does not conform to an implementation plan after it has been approved or promulgated under section 7410 of this title. No metropolitan planning organization designated under section 134 of title 23, shall give its approval to any project, program, or plan which does not conform to an implementation plan approved or promulgated under section 7410 of this title. The assurance of conformity to such an implementation plan shall be an affirmative responsibility of the head of such department, agency, or instrumentality. Conformity to an implementation plan means—

(A) conformity to an implementation plan's purpose of eliminating or reducing the severity and number of violations of the national ambient air quality standards and achieving expeditious attainment of such standards; and

(B) that such activities will not—

(i) cause or contribute to any new violation of any standard in any area;

(ii) increase the frequency or severity of any existing violation of any standard in any area; or

(iii) delay timely attainment of any standard or any required interim emission reductions or other milestones in any area.

14, 1955, as amended by Pub. L. 95–95 [this chapter], see section 406(b) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

DISADVANTAGED BUSINESS CONCERNS; USE OF QUOTAS PROHIBITED

Pub. L. 101–549, title X, Nov. 15, 1990, 104 Stat. 2708, provided that:

"SEC. 1001. DISADVANTAGED BUSINESS CONCERNS.

"(a) IN GENERAL.—In providing for any research relating to the requirements of the amendments made by the Clean Air Act Amendments of 1990 [Pub. L. 101–549, see Tables for classification] which uses funds of the Environmental Protection Agency, the Administrator of the Environmental Protection Agency shall, to the extent practicable, require that not less than 10 percent of total Federal funding for such research will be made available to disadvantaged business concerns.

"(b) DEFINITION.—

"(1)(A) For purposes of subsection (a), the term 'disadvantaged business concern' means a concern—

"(i) which is at least 51 percent owned by one or more socially and economically disadvantaged individuals or, in the case of a publicly traded company, at least 51 percent of the stock of which is owned by one or more socially and economically disadvantaged individuals; and

"(ii) the management and daily business operations of which are controlled by such individuals.

"(B)(i) A for-profit business concern is presumed to be a disadvantaged business concern for purposes of subsection (a) if it is at least 51 percent owned by, or in the case of a concern which is a publicly traded company at least 51 percent of the stock of the company is owned by, one or more individuals who are members of the following groups:

"(I) Black Americans.

"(II) Hispanic Americans.

"(III) Native Americans.

"(IV) Asian Americans.

"(V) Women.

"(VI) Disabled Americans.

"(ii) The presumption established by clause (i) may be rebutted with respect to a particular business concern if it is reasonably established that the individual or individuals referred to in that clause with respect to that business concern are not experiencing impediments to establishing or developing such concern as a result of the individual's identification as a member of a group specified in that clause.

"(C) The following institutions are presumed to be disadvantaged business concerns for purposes of subsection (a):

"(i) Historically black colleges and universities, and colleges and universities having a student body in which 40 percent of the students are Hispanic.

"(ii) Minority institutions (as that term is defined by the Secretary of Education pursuant to the General Education Provision Act (20 U.S.C. 1221 et seq.)).

"(iii) Private and voluntary organizations controlled by individuals who are socially and economically disadvantaged.

"(D) A joint venture may be considered to be a disadvantaged business concern under subsection (a), notwithstanding the size of such joint venture, if—

"(i) a party to the joint venture is a disadvantaged business concern; and

"(ii) that party owns at least 51 percent of the joint venture.

A person who is not an economically disadvantaged individual or a disadvantaged business concern, as a party to a joint venture, may not be a party to more than 2 awarded contracts in a fiscal year solely by reason of this subparagraph.

"(E) Nothing in this paragraph shall prohibit any member of a racial or ethnic group that is not listed in subparagraph (B)(i) from establishing that they have been impeded in establishing or developing a business concern as a result of racial or ethnic discrimination.

"SEC. 1002. USE OF QUOTAS PROHIBITED.—Nothing in this title shall permit or require the use of quotas or a requirement that has the effect of a quota in determining eligibility under section 1001."

## § 7602. Definitions

When used in this chapter—

(a) The term "Administrator" means the Administrator of the Environmental Protection Agency.

(b) The term "air pollution control agency" means any of the following:

(1) A single State agency designated by the Governor of that State as the official State air pollution control agency for purposes of this chapter.

(2) An agency established by two or more States and having substantial powers or duties pertaining to the prevention and control of air pollution.

(3) A city, county, or other local government health authority, or, in the case of any city, county, or other local government in which there is an agency other than the health authority charged with responsibility for enforcing ordinances or laws relating to the prevention and control of air pollution, such other agency.

(4) An agency of two or more municipalities located in the same State or in different States and having substantial powers or duties pertaining to the prevention and control of air pollution.

(5) An agency of an Indian tribe.

(c) The term "interstate air pollution control agency" means—

(1) an air pollution control agency established by two or more States, or

(2) an air pollution control agency of two or more municipalities located in different States.

(d) The term "State" means a State, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, and American Samoa and includes the Commonwealth of the Northern Mariana Islands.

(e) The term "person" includes an individual, corporation, partnership, association, State, municipality, political subdivision of a State, and any agency, department, or instrumentality of the United States and any officer, agent, or employee thereof.

(f) The term "municipality" means a city, town, borough, county, parish, district, or other public body created by or pursuant to State law.

(g) The term "air pollutant" means any air pollution agent or combination of such agents, including any physical, chemical, biological, radioactive (including source material, special nuclear material, and byproduct material) substance or matter which is emitted into or otherwise enters the ambient air. Such term includes any precursors to the formation of any air pollutant, to the extent the Administrator has identified such precursor or precursors for the particular purpose for which the term "air pollutant" is used.

(h) All language referring to effects on welfare includes, but is not limited to, effects on soils,

water, crops, vegetation, manmade materials, animals, wildlife, weather, visibility, and climate, damage to and deterioration of property, and hazards to transportation, as well as effects on economic values and on personal comfort and well-being, whether caused by transformation, conversion, or combination with other air pollutants.

(i) The term "Federal land manager" means, with respect to any lands in the United States, the Secretary of the department with authority over such lands.

(j) Except as otherwise expressly provided, the terms "major stationary source" and "major emitting facility" mean any stationary facility or source of air pollutants which directly emits, or has the potential to emit, one hundred tons per year or more of any air pollutant (including any major emitting facility or source of fugitive emissions of any such pollutant, as determined by rule by the Administrator).

(k) The terms "emission limitation" and "emission standard" mean a requirement established by the State or the Administrator which limits the quantity, rate, or concentration of emissions of air pollutants on a continuous basis, including any requirement relating to the operation or maintenance of a source to assure continuous emission reduction, and any design, equipment, work practice or operational standard promulgated under this chapter.,[1]

(l) The term "standard of performance" means a requirement of continuous emission reduction, including any requirement relating to the operation or maintenance of a source to assure continuous emission reduction.

(m) The term "means of emission limitation" means a system of continuous emission reduction (including the use of specific technology or fuels with specified pollution characteristics).

(n) The term "primary standard attainment date" means the date specified in the applicable implementation plan for the attainment of a national primary ambient air quality standard for any air pollutant.

(o) The term "delayed compliance order" means an order issued by the State or by the Administrator to an existing stationary source, postponing the date required under an applicable implementation plan for compliance by such source with any requirement of such plan.

(p) The term "schedule and timetable of compliance" means a schedule of required measures including an enforceable sequence of actions or operations leading to compliance with an emission limitation, other limitation, prohibition, or standard.

(q) For purposes of this chapter, the term "applicable implementation plan" means the portion (or portions) of the implementation plan, or most recent revision thereof, which has been approved under section 7410 of this title, or promulgated under section 7410(c) of this title, or promulgated or approved pursuant to regulations promulgated under section 7601(d) of this title and which implements the relevant requirements of this chapter.

(r) INDIAN TRIBE.—The term "Indian tribe" means any Indian tribe, band, nation, or other organized group or community, including any Alaska Native village, which is Federally recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians.

(s) VOC.—The term "VOC" means volatile organic compound, as defined by the Administrator.

(t) PM–10.—The term "PM–10" means particulate matter with an aerodynamic diameter less than or equal to a nominal ten micrometers, as measured by such method as the Administrator may determine.

(u) NAAQS AND CTG.—The term "NAAQS" means national ambient air quality standard. The term "CTG" means a Control Technique Guideline published by the Administrator under section 7408 of this title.

(v) $NO_x$.—The term "$NO_x$" means oxides of nitrogen.

(w) CO.—The term "CO" means carbon monoxide.

(x) SMALL SOURCE.—The term "small source" means a source that emits less than 100 tons of regulated pollutants per year, or any class of persons that the Administrator determines, through regulation, generally lack technical ability or knowledge regarding control of air pollution.

(y) FEDERAL IMPLEMENTATION PLAN.—The term "Federal implementation plan" means a plan (or portion thereof) promulgated by the Administrator to fill all or a portion of a gap or otherwise correct all or a portion of an inadequacy in a State implementation plan, and which includes enforceable emission limitations or other control measures, means or techniques (including economic incentives, such as marketable permits or auctions of emissions allowances), and provides for attainment of the relevant national ambient air quality standard.

(z) STATIONARY SOURCE.—The term "stationary source" means generally any source of an air pollutant except those emissions resulting directly from an internal combustion engine for transportation purposes or from a nonroad engine or nonroad vehicle as defined in section 7550 of this title.

(July 14, 1955, ch. 360, title III, §302, formerly §9, as added Pub. L. 88–206, §1, Dec. 17, 1963, 77 Stat. 400, renumbered Pub. L. 89–272, title I, §101(4), Oct. 20, 1965, 79 Stat. 992; amended Pub. L. 90–148, §2, Nov. 21, 1967, 81 Stat. 504; Pub. L. 91–604, §15(a)(1), (c)(1), Dec. 31, 1970, 84 Stat. 1710, 1713; Pub. L. 95–95, title II, §218(c), title III, §301, Aug. 7, 1977, 91 Stat. 761, 769; Pub. L. 95–190, §14(a)(76), Nov. 16, 1977, 91 Stat. 1404; Pub. L. 101–549, title I, §§101(d)(4), 107(a), (b), 108(j), 109(b), title III, §302(e), title VII, §709, Nov. 15, 1990, 104 Stat. 2409, 2464, 2468, 2470, 2574, 2684.)

### Editorial Notes

#### CODIFICATION

Section was formerly classified to section 1857h of this title.

#### PRIOR PROVISIONS

Provisions similar to those in subsecs. (b) and (d) of this section were contained in a section 1857e of this title, act July 14, 1955, ch. 360, §6, 69 Stat. 323, prior to

---

[1] So in original.

the general amendment of this chapter by Pub. L. 88–206.

#### Amendments

1990—Subsec. (b)(1) to (3). Pub. L. 101–549, §107(a)(1), (2), struck out "or" at end of par. (3) and substituted periods for semicolons at end of pars. (1) to (3).

Subsec. (b)(5). Pub. L. 101–549, §107(a)(3), added par. (5).

Subsec. (g). Pub. L. 101–549, §108(j)(2), inserted at end "Such term includes any precursors to the formation of any air pollutant, to the extent the Administrator has identified such precursor or precursors for the particular purpose for which the term 'air pollutant' is used."

Subsec. (h). Pub. L. 101–549, §109(b), inserted before period at end ", whether caused by transformation, conversion, or combination with other air pollutants".

Subsec. (k). Pub. L. 101–549, §303(e), inserted before period at end ", and any design, equipment, work practice or operational standard promulgated under this chapter."

Subsec. (q). Pub. L. 101–549, §101(d)(4), added subsec. (q).

Subsec. (r). Pub. L. 101–549, §107(b), added subsec. (r).

Subsecs. (s) to (y). Pub. L. 101–549, §108(j)(1), added subsecs. (s) to (y).

Subsec. (z). Pub. L. 101–549, §709, added subsec. (z).

1977—Subsec. (d). Pub. L. 95–95, §218(c), inserted "and includes the Commonwealth of the Northern Mariana Islands" after "American Samoa".

Subsec. (e). Pub. L. 95–190 substituted "individual, corporation" for "individual corporation".

Pub. L. 95–95, §301(b), expanded definition of "person" to include agencies, departments, and instrumentalities of the United States and officers, agents, and employees thereof.

Subsec. (g). Pub. L. 95–95, §301(c), expanded definition of "air pollutant" so as, expressly, to include physical, chemical, biological, and radioactive substances or matter emitted into or otherwise entering the ambient air.

Subsecs. (i) to (p). Pub. L. 95–95, §301(a), added subsecs. (i) to (p).

1970—Subsec. (a). Pub. L. 91–604, §15(c)(1), substituted definition of "Administrator" as meaning Administrator of the Environmental Protection Agency for definition of "Secretary" as meaning Secretary of Health, Education, and Welfare.

Subsecs. (g), (h). Pub. L. 91–604, §15(a)(1), added subsec. (g) defining "air pollutant", redesignated former subsec. (g) as (h) and substituted references to effects on soil, water, crops, vegetation, manmade materials, animals, wildlife, weather, visibility, and climate for references to injury to agricultural crops and livestock, and inserted references to effects on economic values and on personal comfort and well being.

1967—Pub. L. 90–148 reenacted section without change.

#### Statutory Notes and Related Subsidiaries

##### Effective Date of 1977 Amendment

Amendment by Pub. L. 95–95 effective Aug. 7, 1977, except as otherwise expressly provided, see section 406(d) of Pub. L. 95–95, set out as a note under section 7401 of this title.

### § 7603. Emergency powers

Notwithstanding any other provision of this chapter, the Administrator, upon receipt of evidence that a pollution source or combination of sources (including moving sources) is presenting an imminent and substantial endangerment to public health or welfare, or the environment, may bring suit on behalf of the United States in the appropriate United States district court to immediately restrain any person causing or contributing to the alleged pollution to stop the emission of air pollutants causing or contributing to such pollution or to take such other action as may be necessary. If it is not practicable to assure prompt protection of public health or welfare or the environment by commencement of such a civil action, the Administrator may issue such orders as may be necessary to protect public health or welfare or the environment. Prior to taking any action under this section, the Administrator shall consult with appropriate State and local authorities and attempt to confirm the accuracy of the information on which the action proposed to be taken is based. Any order issued by the Administrator under this section shall be effective upon issuance and shall remain in effect for a period of not more than 60 days, unless the Administrator brings an action pursuant to the first sentence of this section before the expiration of that period. Whenever the Administrator brings such an action within the 60-day period, such order shall remain in effect for an additional 14 days or for such longer period as may be authorized by the court in which such action is brought.

(July 14, 1955, ch. 360, title III, §303, as added Pub. L. 91–604, §12(a), Dec. 31, 1970, 84 Stat. 1705; amended Pub. L. 95–95, title III, §302(a), Aug. 7, 1977, 91 Stat. 770; Pub. L. 101–549, title VII, §704, Nov. 15, 1990, 104 Stat. 2681.)

#### Editorial Notes

##### Codification

Section was formerly classified to section 1857h–1 of this title.

##### Prior Provisions

A prior section 303 of act July 14, 1955, was renumbered section 310 by Pub. L. 91–604 and is classified to section 7610 of this title.

##### Amendments

1990—Pub. L. 101–549, §704(2)–(5), struck out subsec. (a) designation before "Notwithstanding any other", struck out subsec. (b) which related to violation of or failure or refusal to comply with subsec. (a) orders, and substituted new provisions for provisions following first sentence which read as follows: "If it is not practicable to assure prompt protection of the health of persons solely by commencement of such a civil action, the Administrator may issue such orders as may be necessary to protect the health of persons who are, or may be, affected by such pollution source (or sources). Prior to taking any action under this section, the Administrator shall consult with the State and local authorities in order to confirm the correctness of the information on which the action proposed to be taken is based and to ascertain the action which such authorities are, or will be, taking. Such order shall be effective for a period of not more than twenty-four hours unless the Administrator brings an action under the first sentence of this subsection before the expiration of such period. Whenever the Administrator brings such an action within such period, such order shall be effective for a period of forty-eight hours or such longer period as may be authorized by the court pending litigation or thereafter."

Pub. L. 101–549, §704(1), which directed that "public health or welfare, or the environment" be substituted for "the health of persons and that appropriate State or local authorities have not acted to abate such sources", was executed by making the substitution for

and may require that the air agency conduct updated air quality modeling for the area and submit it to the EPA within 12 months.

(2) An air agency will no longer be subject to the requirements of this paragraph (b) for a particular area if it provides air quality modeling demonstrating that air quality values at all receptors in the analysis are no greater than 50 percent of the 1-hour $SO_2$ NAAQS, and such demonstration is approved by the EPA Regional Administrator.

(c) Any air agency that demonstrates that an area would meet the 2010 $SO_2$ NAAQS with allowable emissions is not required pursuant to paragraph (b) of this section to submit future annual reports for the area.

(d) If modeling or monitoring information required to be submitted by the air agency to the EPA pursuant to this subpart indicates that an area is not attaining the 2010 $SO_2$ NAAQS, the EPA may take appropriate action, including but not limited to requiring adoption of enforceable emission limits to ensure continued attainment of the 2010 $SO_2$ NAAQS, designation or redesignation of the area to nonattainment, or issuance of a SIP Call.

## Subpart CC—Provisions for Implementation of the 2015 Ozone National Ambient Air Quality Standards

SOURCE: 83 FR 10382, Mar. 9, 2018, unless otherwise noted.

### § 51.1300  Definitions.

The following definitions apply for purposes of this subpart. Any term not defined herein shall have the meaning as defined in § 51.100.

(a) *2015 NAAQS.* The 2015 8-hour primary and secondary ozone NAAQS codified at 40 CFR 50.19.

(b) *8-hour ozone design value.* The 8-hour ozone concentration calculated according to 40 CFR part 50, appendix P, for the 2008 NAAQS, and 40 CFR part 50, appendix U, for the 2015 NAAQS.

(c) *CAA.* The Clean Air Act as codified at 42 U.S.C. 7401–7671q (2010).

(d) *Designation for a NAAQS.* The effective date of the designation for an area for that NAAQS.

(e) *Higher classification/lower classification.* For purposes of determining whether a classification is higher or lower, classifications under subpart 2 of part D of title I of the CAA are ranked from lowest to highest as follows: Marginal; Moderate; Serious; Severe-15; Severe-17; and Extreme.

(f) *2008 ozone NAAQS* means the 2008 8-hour primary and secondary ozone NAAQS codified at 40 CFR 50.15.

(g) *Attainment year ozone season* shall mean the ozone season immediately preceding a nonattainment area's maximum attainment date.

(h) *Initially designated* means the first designation that becomes effective for an area for a specific NAAQS and does not include a redesignation to attainment or nonattainment for that specific NAAQS.

(i) *Nitrogen Oxides* ($NO_X$) means the sum of nitric oxide and nitrogen dioxide in the flue gas or emission point, collectively expressed as nitrogen dioxide.

(j) *Ozone season* means for each state (or portion of a state), the ozone monitoring season as defined in 40 CFR part 58, appendix D, section 4.1(i) for that state (or portion of a state).

(k) *Ozone transport region* (OTR) means the area established by CAA section 184(a) or any other area established by the Administrator pursuant to CAA section 176A for purposes of ozone.

(l) *Reasonable further progress* (RFP) means the emissions reductions required under CAA sections 172(c)(2), 182(c)(2)(B), 182(c)(2)(C), and § 51.1310. The EPA interprets RFP under CAA section 172(c)(2) to be an average 3 percent per year emissions reduction of either VOC or $NO_X$.

(m) *Rate-of-progress* (ROP) means the 15 percent progress reductions in VOC emissions over the first 6 years after the baseline year required under CAA section 182(b)(1).

(n) *I/M* refers to the inspection and maintenance programs for in-use vehicles required under the 1990 CAA Amendments and defined by subpart S of 40 CFR part 51.

426

**Environmental Protection Agency** §51.1306

(o) *Current ozone NAAQS* means the most recently promulgated ozone NAAQS at the time of application of any provision of this subpart.

(p) *Base year inventory* for the nonattainment area means a comprehensive, accurate, current inventory of actual emissions from sources of VOC and $NO_X$ emitted within the boundaries of the nonattainment area as required by CAA section 182(a)(1).

(q) *Ozone season day emissions* means an average day's emissions for a typical ozone season work weekday. The state shall select, subject to EPA approval, the particular month(s) in the ozone season and the day(s) in the work week to be represented, considering the conditions assumed in the development of RFP plans and/or emissions budgets for transportation conformity.

[83 FR 10382, Mar. 9, 2018, as amended at 83 FR 63032, Dec. 6, 2018]

## §51.1301 Applicability of this part.

The provisions in subparts A through Y and AA of this part apply to areas for purposes of the 2015 ozone NAAQS to the extent they are not inconsistent with the provisions of this subpart.

## §51.1302 Classification and nonattainment area planning provisions.

An area designated nonattainment for the 2015 ozone NAAQS will be classified in accordance with CAA section 181, as interpreted in §51.1303(a), and will be subject to the requirements of subpart 2 of part D of title I of the CAA that apply for that classification.

## §51.1303 Application of classification and attainment date provisions in CAA section 181 to areas subject to §51.1302.

(a) In accordance with CAA section 181(a)(1), each area designated nonattainment for the 2015 ozone NAAQS shall be classified by operation of law at the time of designation. The classification shall be based on the 8-hour design value for the area at the time of designation, in accordance with Table 1 of this paragraph (a). A state may request a higher or lower classification as provided in paragraphs (b) and (c) of this section. For each area classified under this section, the attainment date for the 2015 NAAQS shall be as expeditious as practicable, but not later than the date provided in Table 1 as follows:

TABLE 1 TO PARAGRAPH (a)—CLASSIFICATIONS AND ATTAINMENT DATES FOR 2015 8-HOUR OZONE NAAQS (0.070 ppm) FOR AREAS SUBJECT TO §51.1302

| Area class | | 8-hour ozone design value (ppm) | Primary standard attainment date (years after the effective date of designation for 2015 primary NAAQS) |
|---|---|---|---|
| Marginal | from up to * | 0.071 0.081 | 3 |
| Moderate | from up to * | 0.081 0.093 | 6 |
| Serious | from up to * | 0.093 0.105 | 9 |
| Severe-15 | from up to * | 0.105 0.111 | 15 |
| Severe-17 | from up to * | 0.111 0.163 | 17 |
| Extreme | equal to or above | 0.163 | 20 |

* But not including.

(b) A state may request, and the Administrator must approve, a higher classification for an area for any reason in accordance with CAA section 181(b)(3).

(c) A state may request, and the Administrator may in the Administrator's discretion approve, a higher or lower classification for an area in accordance with CAA section 181(a)(4).

## §§51.1304–51.1305 [Reserved]

## §51.1306 Redesignation to nonattainment following initial designations.

For any area that is initially designated attainment for the 2015 ozone

427

NAAQS and that is subsequently redesignated to nonattainment for the 2015 ozone NAAQS, any absolute, fixed date applicable in connection with the requirements of this part other than an attainment date is extended by a period of time equal to the length of time between the effective date of the initial designation for the 2015 ozone NAAQS and the effective date of the redesignation, except as otherwise provided in this subpart. The maximum attainment date for a redesignated area would be based on the area's classification, consistent with Table 1 in § 51.1303.

[83 FR 63033, Dec. 6, 2018]

### § 51.1307 Determining eligibility for 1-year attainment date extensions for an 8-hour ozone NAAQS under CAA section 181(a)(5).

(a) A nonattainment area will meet the requirement of CAA section 181(a)(5)(B) pertaining to 1-year extensions of the attainment date if:

(1) For the first 1-year extension, the area's 4th highest daily maximum 8-hour average in the attainment year is no greater than the level of that NAAQS.

(2) For the second 1-year extension, the area's 4th highest daily maximum 8-hour value, averaged over both the original attainment year and the first extension year, is no greater than the level of that NAAQS.

(b) For purposes of paragraph (a)(1) of this section, the area's 4th highest daily maximum 8-hour average for a year shall be from the monitor with the highest 4th highest daily maximum 8-hour average for that year of all the monitors that represent that area.

(c) For purposes of paragraph (a)(2) of this section, the area's 4th highest daily maximum 8-hour value, averaged over both the original attainment year and the first extension year, shall be from the monitor in each year with the highest 4th highest daily maximum 8-hour average of all monitors that represent that area.

[83 FR 63033, Dec. 6, 2018]

### § 51.1308 Modeling and attainment demonstration requirements.

(a) An area classified Moderate under § 51.1303(a) shall submit an attainment demonstration that provides for such specific reductions in emissions of VOCs and $NO_X$ as necessary to attain the primary NAAQS by the applicable attainment date, and such demonstration is due no later than 36 months after the effective date of the area's designation for the 2015 ozone NAAQS.

(b) An area classified Serious or higher under § 51.1303(a) shall be subject to the attainment demonstration requirement applicable for that classification under CAA section 182(c), and such demonstration is due no later than 48 months after the effective date of the area's designation for the 2015 ozone NAAQS.

(c) An attainment demonstration due pursuant to paragraph (a) or (b) of this section must meet the requirements of Appendix W of this part and shall include inventory data, modeling results, and emission reduction analyses on which the state has based its projected attainment date; the adequacy of an attainment demonstration shall be demonstrated by means of a photochemical grid model or any other analytical method determined by the Administrator, in the Administrator's discretion, to be at least as effective.

(d) *Implementation of control measures.* For each nonattainment area for which an attainment demonstration is required pursuant to paragraph (a) or (b) of this section, the state must provide for implementation of all control measures needed for attainment as expeditiously as practicable. All control measures in the attainment plan and demonstration must be implemented no later than the beginning of the attainment year ozone season, notwithstanding any alternate RACT and/or RACM implementation deadline requirements in § 51.1312.

[83 FR 63033, Dec. 6, 2018]

### § 51.1309 [Reserved]

### § 51.1310 Requirements for reasonable further progress (RFP).

(a) *RFP for nonattainment areas classified pursuant to § 51.1303.* The RFP requirements specified in CAA section 182 for that area's classification shall apply.

(1) *Submission deadline.* For each area classified Moderate or higher pursuant

**Environmental Protection Agency** §51.1310

to §51.1303, the state shall submit a SIP revision no later than 36 months after the effective date of designation as nonattainment for the 2015 ozone NAAQS that provides for RFP as described in paragraphs (a)(2) through (4) of this section.

(2) *RFP requirements for areas with an approved prior ozone NAAQS 15 percent VOC ROP plan.* An area classified Moderate or higher that has the same boundaries as an area, or is entirely composed of several areas or portions of areas, for which the EPA fully approved a 15 percent plan for a prior ozone NAAQS is considered to have met the requirements of CAA section 182(b)(1) for the 2015 ozone NAAQS and instead:

(i) If classified Moderate, the area is subject to the RFP requirements under CAA section 172(c)(2) and shall submit a SIP revision that:

(A) Provides for a 15 percent emission reduction from the baseline year within 6 years after the baseline year; and

(B) Relies on either NO$_X$ or VOC emissions reductions (or a combination) to meet the requirements of paragraph (a)(2)(i)(A) of this section. Use of NO$_X$ emissions reductions must meet the criteria in CAA section 182(c)(2)(C).

(ii) If classified Serious or higher, the area is subject to RFP under CAA sections 172(c)(2) and 182(c)(2)(B), and shall submit a SIP revision no later than 48 months after the effective date of designation providing for an average emissions reduction of 3 percent per year:

(A) For the first 6-year period after the baseline year and all remaining 3-year periods until the year of the area's attainment date; and

(B) That relies on either NO$_X$ or VOC emissions reductions (or a combination) to meet the requirements of (a)(2)(ii)(A). Use of NO$_X$ emissions reductions must meet the criteria in CAA section 182(c)(2)(C).

(3) *RFP requirements for areas for which an approved 15 percent VOC ROP plan for a prior ozone NAAQS exists for only a portion of the area.* An area that contains one or more portions for which the EPA fully approved a 15 percent VOC ROP plan for a prior ozone NAAQS (as well as portions for which the EPA has not fully approved a 15 percent plan for a prior ozone NAAQS)

shall meet the requirements of either paragraph (a)(3)(i) or (ii) of this section.

(i) The state shall not distinguish between the portion of the area with a previously approved 15 percent ROP plan and the portion of the area without such a plan, and shall meet the requirements of paragraph (a)(4) of this section for the entire nonattainment area.

(ii) The state shall treat the area as two parts, each with a separate RFP target as follows:

(A) For the portion of the area without an approved 15 percent VOC ROP plan for a prior ozone NAAQS, the state shall submit a SIP revision as required under paragraph (a)(4) of this section.

(B) For the portion of the area with an approved 15 percent VOC ROP plan for a prior ozone NAAQS, the state shall submit a SIP as required under paragraph (a)(2) of this section.

(4) *ROP Requirements for areas without an approved prior ozone NAAQS 15 percent VOC ROP plan.* (i) For each area, the state shall submit a SIP revision consistent with CAA section 182(b)(1). The 6-year period referenced in CAA section 182(b)(1) shall begin January 1 of the year following the year used for the baseline emissions inventory.

(ii) For each area classified Serious or higher, the state shall submit a SIP revision consistent with CAA section 182(c)(2)(B). The final increment of progress must be achieved no later than the attainment date for the area.

(5) *Creditability of emission control measures for RFP plans.* Except as specifically provided in CAA section 182(b)(1)(C) and (D), CAA section 182(c)(2)(B), and 40 CFR 51.1310(a)(6), all emission reductions from SIP-approved or federally promulgated measures that occur after the baseline emissions inventory year are creditable for purposes of the RFP requirements in this section, provided the reductions meet the requirements for creditability, including the need to be enforceable, permanent, quantifiable, and surplus.

(6) *Creditability of out-of-area emissions reductions.* For purposes of meeting the RFP requirements in §51.1310, in addition to the restrictions on the creditability of emission control measures

429

listed in §51.1310(a)(5), creditable emission reductions for fixed percentage reduction RFP must be obtained from emissions sources located within the nonattainment area.

(7) *Calculation of non-creditable emissions reductions.* The following four categories of control measures listed in CAA section 182(b)(1)(D) are no longer required to be calculated for exclusion in RFP analyses because the Administrator has determined that due to the passage of time the effect of these exclusions would be *de minimis:*

(i) Measures related to motor vehicle exhaust or evaporative emissions promulgated by January 1, 1990;

(ii) Regulations concerning Reid vapor pressure promulgated by November 15, 1990;

(iii) Measures to correct previous RACT requirements; and

(iv) Measures required to correct previous I/M programs.

(b) *Baseline emissions inventory for RFP plans.* For the RFP plans required under this section, at the time of designation as nonattainment for an ozone NAAQS the baseline emissions inventory shall be the emissions inventory for the most recent calendar year for which a complete triennial inventory is required to be submitted to the EPA under the provisions of subpart A of this part. States may use an alternative baseline emissions inventory provided that the year selected corresponds with the year of the effective date of designation as nonattainment for that NAAQS. All states associated with a multi-state nonattainment area must consult and agree on using the alternative baseline year. The emissions values included in the inventory required by this section shall be actual ozone season day emissions as defined by §51.1300(q).

(c) *Milestones*—(1) *Applicable milestones.* Consistent with CAA section 182(g)(1) for each area classified Serious or higher, the state shall determine at specified intervals whether each area has achieved the reduction in emissions required under paragraphs (a)(2) through (4) of this section. The initial determination shall occur 6 years after the baseline year, and at intervals of every 3 years thereafter. The reduction in emissions required by the end of each interval shall be the applicable milestone.

(2) *Milestone compliance demonstrations.* For each area subject to the milestone requirements under paragraph (c)(1) of this section, not later than 90 days after the date on which an applicable milestone occurs (not including an attainment date on which a milestone occurs in cases where the ozone standards have been attained), each state in which all or part of such area is located shall submit to the Administrator a demonstration that the milestone has been met. The demonstration under this paragraph must provide for objective evaluation of RFP toward timely attainment of the ozone NAAQS in the area, and may take the form of:

(i) Such information and analysis as needed to quantify the actual reduction in emissions achieved in the time interval preceding the applicable milestone; or

(ii) Such information and analysis as needed to demonstrate progress achieved in implementing the approved SIP control measures, including RACM and RACT, corresponding with the reduction in emissions achieved in the time interval preceding the applicable milestone.

[83 FR 63033, Dec. 6, 2018]

§ 51.1311 **[Reserved]**

§ 51.1312 **Requirements for reasonably available control technology (RACT) and reasonably available control measures (RACM).**

(a) *RACT requirement for areas classified pursuant to § 51.1303.* (1) For each nonattainment area classified Moderate or higher, the state shall submit a SIP revision that meets the VOC and NO$_X$ RACT requirements in CAA sections 182(b)(2) and 182(f).

(2) *SIP submission deadline.* (i) For a RACT SIP required pursuant to initial nonattainment area designations, the state shall submit the RACT SIP for each area no later than 24 months after the effective date of designation for a specific ozone NAAQS.

(ii) For a RACT SIP required pursuant to reclassification, the SIP revision deadline is either 24 months from the effective date of reclassification, or the

deadline established by the Administrator in the reclassification action.

(iii) For a RACT SIP required pursuant to the issuance of a new Control Techniques Guideline (CTG) under CAA section 183, the SIP revision deadline is either 24 months from the date of CTG issuance, or the deadline established by the Administrator in the action issuing the CTG.

(3) *RACT implementation deadline.* (i) For RACT required pursuant to initial nonattainment area designations, the state shall provide for implementation of such RACT as expeditiously as practicable, but no later than January 1 of the fifth year after the effective date of designation.

(ii) For RACT required pursuant to reclassification, the state shall provide for implementation of such RACT as expeditiously as practicable, but no later than the start of the attainment year ozone season associated with the area's new attainment deadline, or January 1 of the third year after the associated SIP revision submittal deadline, whichever is earlier; or the deadline established by the Administrator in the final action issuing the area reclassification.

(iii) For RACT required pursuant to issuance of a new CTG under CAA section 183, the state shall provide for implementation of such RACT as expeditiously as practicable, but either no later than January 1 of the third year after the associated SIP submission deadline or the deadline established by the Administrator in the final action issuing the CTG.

(b) *Determination of major stationary sources for applicability of RACT provisions.* The amount of VOC and $NO_X$ emissions are to be considered separately for purposes of determining whether a source is a major stationary source as defined in CAA section 302.

(c) *RACM requirements.* For each nonattainment area required to submit an attainment demonstration under § 51.1308(a) and (b), the state shall submit with the attainment demonstration a SIP revision demonstrating that it has adopted all RACM necessary to demonstrate attainment as expeditiously as practicable and to meet any RFP requirements. The SIP revision shall include, as applicable, other con-

trol measures on sources of emissions of ozone precursors located outside the nonattainment area, or portion thereof, located within the state if doing so is necessary or appropriate to provide for attainment of the applicable ozone NAAQS in such area by the applicable attainment date.

[83 FR 63033, Dec. 6, 2018]

**§ 51.1313  Section 182(f) $NO_X$ exemption provisions.**

(a) A person or a state may petition the Administrator for an exemption from $NO_X$ obligations under CAA section 182(f) for any area designated nonattainment for a specific ozone NAAQS and for any area in a CAA section 184 ozone transport region.

(b) The petition must contain adequate documentation that the criteria in CAA section 182(f) are met.

(c) A CAA section 182(f) $NO_X$ exemption granted for a prior ozone NAAQS does not relieve the area from any $NO_X$ obligations under CAA section 182(f) for a current ozone NAAQS.

[83 FR 63033, Dec. 6, 2018]

**§ 51.1314  New source review requirements.**

The requirements for nonattainment NSR for the ozone NAAQS are located in § 51.165. For each nonattainment area, the state shall submit a nonattainment NSR plan or plan revision for a specific ozone NAAQS no later than 36 months after the effective date of the area's designation of nonattainment or redesignation to nonattainment for that ozone NAAQS.

[83 FR 63033, Dec. 6, 2018]

**§ 51.1315  Emissions inventory requirements.**

(a) For each nonattainment area, the state shall submit a base year inventory as defined by § 51.1300(p) to meet the emissions inventory requirement of CAA section 182(a)(1). This inventory shall be submitted no later than 24 months after the effective date of designation. The inventory year shall be selected consistent with the baseline year for the RFP plan as required by § 51.1310(b).

(b) For each nonattainment area, the state shall submit a periodic emissions

inventory of emissions sources in the area to meet the requirement in CAA section 182(a)(3)(A). With the exception of the inventory year and timing of submittal, this inventory shall be consistent with the requirements of paragraph (a) of this section. Each periodic inventory shall be submitted no later than the end of each 3-year period after the required submission of the base year inventory for the nonattainment area. This requirement shall apply until the area is redesignated to attainment.

(c) The emissions values included in the inventories required by paragraphs (a) and (b) of this section shall be actual ozone season day emissions as defined by § 51.1300(q).

(d) In the inventories required by paragraphs (a) and (b) of this section, the state shall report emissions from point sources according to the point source emissions thresholds of the Air Emissions Reporting Requirements, 40 CFR part 51, subpart A.

(e) The data elements in the emissions inventories required by paragraphs (a) and (b) of this section shall be consistent with the detail required by 40 CFR part 51, subpart A. Since only emissions within the boundaries of the nonattainment area shall be included as defined by § 51.1300(q), this requirement shall apply to the emissions inventories required in this section instead of any total county requirements contained in 40 CFR part 51, subpart A.

[83 FR 63033, Dec. 6, 2018]

## § 51.1316 Requirements for an Ozone Transport Region.

(a) *In general.* CAA sections 176A and 184 apply for purposes of the 2015 ozone NAAQS.

(b) *RACT requirements for certain portions of an ozone transport region.* (1) The state shall submit a SIP revision that meets the RACT requirements of CAA section 184(b) for all portions of the state located in an ozone transport region.

(2) *SIP submission deadline.* (i) For a RACT SIP required pursuant to initial nonattainment area designations, the state shall submit the RACT SIP revision no later than 24 months after the effective date of designation for a specific ozone NAAQS.

(ii) For a RACT SIP required pursuant to reclassification, the SIP revision deadline is either 24 months from the effective date of reclassification, or the deadline established by the Administrator in the reclassification action.

(iii) For a RACT SIP required pursuant to the issuance of a new CTG under CAA section 183, the SIP revision deadline is either 24 months from the date of CTG issuance, or the deadline established by the Administrator in the action issuing the CTG.

(3) *RACT implementation deadline.* (i) For RACT required pursuant to initial nonattainment area designations, the state shall provide for implementation of RACT as expeditiously as practicable, but no later than January 1 of the fifth year after the effective date of designation.

(ii) For RACT required pursuant to reclassification, the state shall provide for implementation of such RACT as expeditiously as practicable, but no later than the start of the attainment year ozone season associated with the area's new attainment deadline, or January 1 of the third year after the associated SIP revision submittal deadline, whichever is earlier; or the deadline established by the Administrator in the final action issuing the area reclassification.

(iii) For RACT required pursuant to issuance of a new CTG under CAA section 183, the state shall provide for implementation of such RACT as expeditiously as practicable, but either no later than January 1 of the third year after the associated SIP submission deadline or the deadline established by the Administrator in the final action issuing the CTG.

[83 FR 63033, Dec. 6, 2018]

## § 51.1317 Fee programs for Severe and Extreme nonattainment areas that fail to attain.

For each area classified Severe or Extreme for a specific ozone NAAQS, the state shall submit a SIP revision within 10 years of the effective date of designation for that ozone NAAQS that meets the requirements of CAA section 185.

[83 FR 63033, Dec. 6, 2018]

## § 51.1318 Suspension of SIP planning requirements in nonattainment areas that have air quality data that meet an ozone NAAQS.

Upon a determination by the EPA that an area designated nonattainment for a specific ozone NAAQS has attained that NAAQS, the requirements for such area to submit attainment demonstrations and associated RACM, RFP plans, contingency measures for failure to attain or make reasonable progress, and other planning SIPs related to attainment of the ozone NAAQS for which the determination has been made, shall be suspended until such time as: The area is redesignated to attainment for that NAAQS, at which time the requirements no longer apply; or the EPA determines that the area has violated that NAAQS, at which time the area is again required to submit such plans.

[83 FR 63033, Dec. 6, 2018]

## § 51.1319 [Reserved]

APPENDIXES A–K TO PART 51 [RESERVED]

APPENDIX L TO PART 51—EXAMPLE REGULATIONS FOR PREVENTION OF AIR POLLUTION EMERGENCY EPISODES

The example regulations presented herein reflect generally recognized ways of preventing air pollution from reaching levels that would cause imminent and substantial endangerment to the health of persons. States are required under subpart H to have emergency episodes plans but they are not required to adopt the regulations presented herein.

1.0 *Air pollution emergency.* This regulation is designed to prevent the excessive buildup of air pollutants during air pollution episodes, thereby preventing the occurrence of an emergency due to the effects of these pollutants on the health of persons.

1.1 *Episode criteria.* Conditions justifying the proclamation of an air pollution alert, air pollution warning, or air pollution emergency shall be deemed to exist whenever the Director determines that the accumulation of air pollutants in any place is attaining or has attained levels which could, if such levels are sustained or exceeded, lead to a substantial threat to the health of persons. In making this determination, the Director will be guided by the following criteria:

(a) *Air Pollution Forecast:* An internal watch by the Department of Air Pollution Control shall be actuated by a National Weather Service advisory that Atmospheric Stagnation Advisory is in effect or the equivalent local forecast of stagnant atmospheric condition.

(b) *Alert:* The Alert level is that concentration of pollutants at which first stage control actions is to begin. An Alert will be declared when any one of the following levels is reached at any monitoring site:

$SO_2$—800 µg/m³ (0.3 p.p.m.), 24-hour average.
$PM_{10}$—350 µg/m³, 24-hour average.
CO—17 mg/m³ (15 p.p.m.), 8-hour average.
Ozone ($O_3$) = 400 µg/m³ (0.2 ppm)-hour average.
$NO_2$—1130 µg/m³ (0.6 p.p.m.), 1-hour average, 282 µg/m³ (0.15 p.p.m.), 24-hour average.

In addition to the levels listed for the above pollutants, meterological conditions are such that pollutant concentrations can be expected to remain at the above levels for twelve (12) or more hours or increase, or in the case of ozone, the situation is likely to reoccur within the next 24-hours unless control actions are taken.

(c) *Warning:* The warning level indicates that air quality is continuing to degrade and that additional control actions are necessary. A warning will be declared when any one of the following levels is reached at any monitoring site:

$SO_2$—1,600 µg/m³ (0.6 p.p.m.), 24-hour average.
$PM_{10}$—420 µg/m³, 24-hour average.
CO—34 mg/m³ (30 p.p.m.), 8-hour average.
Ozone ($O_3$)—800 µg/m³ (0.4 p.p.m.), 1-hour average.
$NO_2$—2,260 µg/m³ (1.2 ppm)—1-hour average; 565 µg/m³ (0.3 ppm), 24-hour average.

In addition to the levels listed for the above pollutants, meterological conditions are such that pollutant concentrations can be expected to remain at the above levels for twelve (12) or more hours or increase, or in the case of ozone, the situation is likely to reoccur within the next 24-hours unless control actions are taken.

(d) *Emergency:* The emergency level indicates that air quality is continuing to degrade toward a level of significant harm to the health of persons and that the most stringent control actions are necessary. An emergency will be declared when any one of the following levels is reached at any monitoring site:

$SO_2$—2,100 µg/m³ (0.8 p.p.m.), 24-hour average.
$PM_{10}$—500 µg/m³, 24-hour average.
CO—46 mg/m³ (40 p.p.m.), 8-hour average.
Ozone ($O_3$)—1,000 µg/m³ (0.5 p.p.m.), 1-hour average.
$NO_2$—3,000 µg/m³ (1.6 ppm), 1-hour average; 750 µg/m³ (0.4 ppm), 24-hour average.

In addition to the levels listed for the above pollutants, meterological conditions are such that pollutant concentrations can be expected to remain at the above levels for twelve (12) or more hours or increase, or in the case of ozone, the situation is likely to