No. 23-60069

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

---

**STATE OF TEXAS; TEXAS COMMISSION ON ENVIRONMENTAL QUALITY; LUMINANT GENERATION COMPANY L.L.C.; COLETO CREEK POWER, L.L.C.; ENNIS POWER COMPANY, L.L.C.; HAYS ENERGY, L.L.C.; MIDLOTHIAN ENERGY, L.L.C.; OAK GROVE MANAGEMENT COMPANY L.L.C.; WISE COUNTY POWER COMPANY, L.L.C.; ASSOCIATION OF ELECTRIC COMPANIES OF TEXAS; BCCA APPEAL GROUP; TEXAS CHEMICAL COUNCIL; TEXAS OIL & GAS ASSOCIATION; PUBLIC UTILITY COMMISSION OF TEXAS; RAILROAD COMMISSION OF TEXAS; STATE OF MISSISSIPPI; MISSISSIPPI DEPARTMENT OF ENVIRONMENTAL QUALITY; MISSISSIPPI POWER COMPANY; STATE OF LOUISIANA; LOUISIANA DEPARTMENT OF ENVIRONMENTAL QUALITY; ENTERGY LOUISIANA, L.L.C.; LOUISIANA CHEMICAL ASSOCIATION; MID-CONTINENT OIL AND GAS ASSOCIATION; LOUISIANA ELECTRIC UTILITY ENVIRONMENTAL GROUP, L.L.C.; TEXAS LEHIGH CEMENT COMPANY, LP,**

Petitioners,

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; MICHAEL S. REGAN, Administrator, United States Environmental Protection Agency,**

Respondents.

---

Petition for Review of Action of the U.S. Environmental Protection Agency

---

## RECORD EXCERPTS OF TEXAS INDUSTRY PETITIONERS

---

*Counsel Listed on Inside Cover*

Aaron M. Streett
Matthew L. Kuryla
BAKER BOTTS L.L.P.
910 Louisiana St.
Houston, Texas 77002
Tel.: (713) 229-1234
Fax: (713) 229-1522
aaron.streett@bakerbotts.com

*Counsel for Petitioners Association of
Electric Companies of Texas, BCCA
Appeal Group, Texas Chemical Council,
and Texas Oil & Gas Association*

Megan H. Berge
BAKER BOTTS L.L.P.
700 K Street N.W.
Washington, D.C. 20001
(415) 291-6233
(202) 639-7733

J. Mark Little
BAKER BOTTS L.L.P.
910 Louisiana Street
Houston, Texas 77002
(713) 229-1489

*Counsel for Petitioner Texas Lehigh
Cement Company*

P. Stephen Gidiere III
Julia B. Barber
BALCH & BINGHAM LLP
1901 6th Ave. N., Ste. 1500
Birmingham, Alabama 35203
205-251-8100
sgidiere@balch.com

Stephanie Z. Moore
Executive Vice President & General
Counsel
Daniel J. Kelly
Senior Vice President & Deputy
General Counsel
David W. Mitchell
Senior Counsel, Environmental
VISTRA CORP.
6555 Sierra Drive
Irving, Texas 75039

*Counsel for Petitioners Luminant
Generation Company LLC, Coleto Creek
Power, LLC, Ennis Power Company,
LLC, Hays Energy, LLC, Midlothian
Energy, LLC, Oak Grove Management
Company LLC, and Wise County Power
Company, LLC*

# **TABLE OF CONTENTS**

1. Final Rule, 88 Fed. Reg. 9,336 (Feb. 13, 2023) ............................................................. 1

2. Proposed Rule, 87 Fed. Reg. 9,798 (Feb. 22, 2022) .................................................. 50

3. EPA Region 6, *2015 8-Hour Ozone Transport SIP Proposal Technical Support Document*, EPA-R06-OAR-2021-0801-0002 (Feb. 2022) .......................................... 88

4. Certificate of Service ................................................................................................. 188

TAB 1: FINAL RULE, 88 FED. REG. 9,336 (FEB. 13, 2023)

## ENVIRONMENTAL PROTECTION AGENCY

### 40 CFR Part 52

[EPA–HQ–OAR–2021–0663; EPA–R02–OAR–2021–0673; EPA–R03–OAR–2021–0872; EPA–R03–OAR–2021–0873; EPA–R04–OAR–2021–0841; EPA–R05–OAR–2022–0006; EPA–R06–OAR–2021–0801; EPA–R07–OAR–2021–0851; EPA–R08–OAR–2022–0315; EPA–R09–OAR–2022–0394; EPA–R09–OAR–2022–0138; FRL–10209–01–OAR]

**Air Plan Disapprovals; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule; final agency action.

**SUMMARY:** Pursuant to the Federal Clean Air Act (CAA or the Act), the Environmental Protection Agency (EPA or the Agency) is finalizing the disapproval of State Implementation Plan (SIP) submissions for 19 states regarding interstate transport and finalizing a partial approval and partial disapproval of elements of the SIP submission for two states for the 2015 8-hour ozone national ambient air quality standards (NAAQS). The "good neighbor" or "interstate transport" provision requires that each state's SIP contain adequate provisions to prohibit emissions from within the state from significantly contributing to nonattainment or interfering with maintenance of the NAAQS in other states. This requirement is part of the broader set of "infrastructure" requirements, which are designed to ensure that the structural components of each state's air quality management program are adequate to meet the state's responsibilities under the CAA. Disapproving a SIP submission establishes a 2-year deadline for the EPA to promulgate Federal Implementation Plans (FIPs) to address the relevant requirements, unless the EPA approves a subsequent SIP submission that meets these requirements. Disapproval does not start a mandatory sanctions clock. The EPA is deferring final action at this time on the disapprovals it proposed for Tennessee and Wyoming.

**DATES:** The effective date of this final rule is March 15, 2023.

**ADDRESSES:** The EPA has established a docket for this action under Docket ID No. EPA–HQ–OAR–2021–0663. Additional supporting materials associated with this final action are included in certain regional dockets.

*See* the memo "Regional Dockets Containing Additional Supporting Materials for Final Action on 2015 Ozone NAAQS Good Neighbor SIP Submissions" in the docket for this action. All documents in the dockets are listed on the *https://www.regulations.gov* website. Although listed in the index, some information is not publicly available, *i.e.*, confidential business information (CBI) or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, is not placed on the internet and will be publicly available only in hard copy form. Publicly available docket materials are available through *https://www.regulations.gov* or please contact the person identified in the **FOR FURTHER INFORMATION CONTACT** section for additional information.

**FOR FURTHER INFORMATION CONTACT:** General questions concerning this document should be addressed to Mr. Thomas Uher, Office of Air Quality Planning and Standards, Air Quality Policy Division, Mail Code C539–04, 109 TW Alexander Drive, Research Triangle Park, NC 27711; telephone number: (919) 541–5534; email address: *uher.thomas@epa.gov.*

**SUPPLEMENTARY INFORMATION:** Throughout this document "we," "us," and "our" refer to the EPA.

References to section numbers in roman numeral refer to sections of this preamble unless otherwise specified.

## I. General Information

*A. How can I get copies of this document and other related information?*

The EPA established a Headquarters docket for this action under Docket ID No. EPA–HQ–OAR–2021–0663 and several regional dockets. All documents in the docket are listed in the electronic indexes, which, along with publicly available documents, are available at *https://www.regulations.gov.* Publicly available docket materials are also available in hard copy at the Air and Radiation Docket and Information Center, EPA/DC, William Jefferson Clinton West Building, Room 3334, 1301 Constitution Avenue NW, Washington, DC. Some information in the docket may not be publicly available via the online docket due to docket file size restrictions, such as certain modeling files, or content (*e.g.*, CBI). For further information on the EPA Docket Center services and the current status, please visit us online at *https://www.epa.gov/dockets.*

The EPA also established dockets in each of the EPA Regional offices to help support the proposals that are now being finalized in this national action. These include all public comments, technical support materials, and other files associated with this final action. Each regional docket contains a memorandum directing the public to the headquarters docket for this final action. While all documents in regional dockets are listed in the electronic indexes at *https://www.regulations.gov,* some information may not be publicly available via the online dockets due to docket file size restrictions, such as certain modeling files, or content (*e.g.*, CBI). Please contact the EPA Docket Center Services for further information.

*B. How is the preamble organized?*

**Table of Contents**

I. General Information
  A. How can I get copies of this document and other related information?
  B. How is the preamble organized?
  C. Where do I go if I have state-specific questions?
II. Background and Overview
  A. Description of Statutory Background
  B. Description of the EPA's 4-Step Interstate Transport Framework
  C. Background on the EPA's Ozone Transport Modeling Information
  D. The EPA's Approach to Evaluating Interstate Transport SIPs for the 2015 8-Hour Ozone NAAQS
III. The EPA's Updated Air Quality and Contribution Analysis
  A. Description of Air Quality Modeling for the Final Action
  B. Air Quality Modeling To Identify Nonattainment and Maintenance Receptors
  C. Air Quality Modeling To Quantify Upwind State Contributions
IV. Summary of Bases for Disapproval
  A. Alabama
  B. Arkansas
  C. California
  D. Illinois
  E. Indiana
  F. Kentucky
  G. Louisiana
  H. Maryland
  I. Michigan
  J. Minnesota
  K. Mississippi
  L. Missouri
  M. Nevada
  N. New Jersey
  O. New York
  P. Ohio
  Q. Oklahoma
  R. Texas
  S. Utah
  T. West Virginia
  U. Wisconsin
V. Response to Key Comments
  A. SIP Evaluation Process
  B. Application of the 4-Step Interstate Transport Framework
  C. Good Neighbor Provision Policy
VI. Statutory and Executive Orders Reviews
  A. Executive Orders 12866: Regulatory Planning and Executive Order 13563:

1

Improving Regulation and Regulatory Review
B. Paperwork Reduction Act (PRA)
C. Regulatory Flexibility Act (RFA)
D. Unfunded Mandates Reform Act of 1995 (UMRA)
E. Executive Order 13132: Federalism
F. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments

G. Executive Order 13045: Protection of Children From Environmental Health and Safety Risks
H. Executive Order 13211: Actions That Significantly Affect Energy Supply, Distribution or Use
I. National Technology Transfer and Advancement Act (NTTAA)
J. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations

K. Congressional Review Act (CRA)
L. Judicial Review

*C. Where do I go if I have state-specific questions?*

The following table identifies the states covered by this final action along with an EPA Regional office contact who can respond to questions about specific SIP submissions.

| Regional offices | States |
| --- | --- |
| EPA Region 2: Kenneth Fradkin, Air and Radiation Division/Air Programs Branch, EPA Region 2, 290 Broadway, 25th Floor, New York, NY 10007. | New Jersey, New York. |
| EPA Region 3: Mike Gordon, Planning and Implementation Branch, EPA Region III, 1600 JFK Boulevard, Philadelphia, Pennsylvania 19103. | Maryland, West Virginia. |
| EPA Region 4: Evan Adams, Air and Radiation Division/Air Planning and Implementation Branch, EPA Region IV, 61 Forsyth Street SW, Atlanta, Georgia 30303. | Alabama, Kentucky, Mississippi. |
| EPA Region 5: Olivia Davidson, Air & Radiation Division/Air Programs Branch, EPA Region V, 77 W. Jackson Boulevard, Chicago, Illinois 60604–3511. | Indiana, Illinois, Michigan, Minnesota, Ohio, Wisconsin. |
| EPA Region 6: Sherry Fuerst, Air and Radiation Division, EPA Region 6, 1201 Elm Street, Suite 500, Dallas, Texas 75270. | Arkansas, Louisiana, Oklahoma, Texas. |
| EPA Region 7: William Stone, Air and Radiation Division, Air Quality Planning Branch, EPA Region VII, 11201 Renner Boulevard, Lenexa, Kansas 66219. | Missouri. |
| EPA Region 8: Adam Clark, Air and Radiation Division, EPA, Region VIII, Mailcode 8ARD–IO, 1595 Wynkoop Street, Denver, Colorado 80202. | Utah. |
| EPA Region 9: Tom Kelly, Air and Radiation Division, EPA Region IX, 75 Hawthorne St., San Francisco, California 94105. | California, Nevada. |

## II. Background and Overview

The following provides background for the EPA's final action on these SIP submissions related to the interstate transport requirements for the 2015 8-hour ozone NAAQS (2015 ozone NAAQS).

*A. Description of Statutory Background*

On October 1, 2015, the EPA promulgated a revision to the ozone NAAQS (2015 ozone NAAQS), lowering the level of both the primary and secondary standards to 0.070 parts per million (ppm) for the 8-hour standard.[1] Section 110(a)(1) of the CAA requires states to submit, within 3 years after promulgation of a new or revised standard, SIP submissions[2] meeting the applicable requirements of section 110(a)(2).[3] One of these applicable requirements is found in CAA section 110(a)(2)(D)(i)(I), otherwise known as the "good neighbor" or "interstate

transport" provision, which generally requires SIPs to contain adequate provisions to prohibit in-state emissions activities from having certain adverse air quality effects on other states due to interstate transport of pollution. There are two so-called "prongs" within CAA section 110(a)(2)(D)(i)(I). A SIP for a new or revised NAAQS must contain adequate provisions prohibiting any source or other type of emissions activity within the state from emitting air pollutants in amounts that will significantly contribute to nonattainment of the NAAQS in another state (prong 1) or interfere with maintenance of the NAAQS in another state (prong 2). The EPA and states must give independent significance to prong 1 and prong 2 when evaluating downwind air quality problems under CAA section 110(a)(2)(D)(i)(I).[4]

On February 22, 2022, the EPA proposed to disapprove 19 good neighbor SIP submissions from the States of Alabama, Arkansas, Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, Minnesota, Mississippi, Missouri, New Jersey, New York, Ohio, Oklahoma, Tennessee, Texas, West Virginia, and Wisconsin.[5]

On May 24, 2022, the EPA proposed to disapprove four additional good neighbor SIP submissions from the States of California, Nevada, Utah, and Wyoming.[6] On October 25, 2022, the EPA proposed to disapprove a new good neighbor SIP submission from Alabama submitted on June 21, 2022.[7] The EPA is deferring action on the proposals related to the good neighbor SIP submissions from Tennessee and Wyoming at this time. As explained in the notifications of proposed disapproval, the EPA's justification for each of these proposals applies uniform, nationwide analytical methods, policy judgments, and interpretation with respect to the same CAA obligations, *i.e.,* implementation of good neighbor requirements under CAA section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS for states across the country. The EPA's final action is likewise based on this common core of determinations. As indicated at proposal, the EPA is taking a consolidated, single final action

---

[1] National Ambient Air Quality Standards for Ozone, Final Rule, 80 FR 65292 (October 26, 2015). Although the level of the standard is specified in the units of ppm, ozone concentrations are also described in parts per billion (ppb). For example, 0.070 ppm is equivalent to 70 ppb.

[2] The terms "submission," "revision," and "submittal" are used interchangeably in this document.

[3] SIP revisions that are intended to meet the applicable requirements of section 110(a)(1) and (2) of the CAA are often referred to as infrastructure SIPs and the applicable elements under CAA section 110(a)(2) are referred to as infrastructure requirements.

[4] *See North Carolina* v. *EPA,* 531 F.3d 896, 909–11 (D.C. Cir. 2008) (*North Carolina*).

[5] 87 FR 9545 (February 22, 2022) (Alabama, Mississippi, Tennessee); 87 FR 9798 (February 22, 2022) (Arkansas, Louisiana, Oklahoma, Texas); 87 FR 9838 (February 22, 2022) (Illinois, Indiana, Michigan, Minnesota, Ohio, Wisconsin); 87 FR 9498

(February 22, 2022) (Kentucky); 87 FR 9484 (February 22, 2022) (New Jersey, New York); 87 FR 9463 (February 22, 2022) (Maryland); 87 FR 9533 (February 22, 2022) (Missouri); 87 FR 9516 (February 22, 2022) (West Virginia).

[6] 87 FR 31443 (May 24, 2022) (California); 87 FR 31485 (May 24, 2022) (Nevada); 87 FR 31470 (May 24, 2022) (Utah); 87 FR 31495 (May 24, 2022) (Wyoming).

[7] 87 FR 64412 (October 25, 2022) (Alabama). Alabama withdrew its original good neighbor SIP submission on April 21, 2022. *Id.* at 64419.

on the proposed SIP disapprovals.[8] Included in this document is final action on 2015 ozone NAAQS interstate transport SIPs addressing CAA section 110(a)(2)(D)(i)(I) for Alabama, Arkansas, California, Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, Minnesota, Mississippi, Missouri, Nevada, New Jersey, New York, Ohio, Oklahoma, Texas, Utah, West Virginia, and Wisconsin. The 2015 ozone NAAQS interstate transport SIP submissions addressing CAA section 110(a)(2)(D)(i)(I) for Tennessee and Wyoming will be addressed in a separate action.

*B. Description of the EPA's 4-Step Interstate Transport Framework*

The EPA used a 4-step interstate transport framework (or 4-step framework) to evaluate each state's implementation plan submission addressing the interstate transport provision for the 2015 ozone NAAQS. The EPA has addressed the interstate transport requirements of CAA section 110(a)(2)(D)(i)(I) with respect to prior NAAQS in several regulatory actions, including the Cross-State Air Pollution Rule (CSAPR), which addressed interstate transport with respect to the 1997 ozone NAAQS as well as the 1997 and 2006 fine particulate matter standards,[9] the Cross-State Air Pollution Rule Update (CSAPR Update) [10] and the Revised CSAPR Update, both of which addressed the 2008 ozone NAAQS.[11]

Shaped through the years by input from state air agencies [12] and other stakeholders on EPA's prior interstate transport rulemakings and SIP actions,[13] as well as a number of court decisions, the EPA has developed and used the following 4-step interstate transport framework to evaluate a state's obligations to eliminate interstate transport emissions under the interstate transport provision for the ozone NAAQS: (1) Identify monitoring sites that are projected to have problems attaining and/or maintaining the NAAQS (*i.e.,* nonattainment and/or maintenance receptors); (2) identify states that impact those air quality problems in other (*i.e.,* downwind) states sufficiently such that the states are considered "linked" and therefore warrant further review and analysis; (3) identify the emissions reductions necessary (if any), applying a multifactor analysis, to eliminate each linked upwind state's significant contribution to nonattainment or interference with maintenance of the NAAQS at the locations identified in Step 1; and (4) adopt permanent and enforceable measures needed to achieve those emissions reductions.

The general steps of this framework allow for some methodological variation, and this can be seen in the evolution of the EPA's analytical process across its prior rulemakings. This also means states have some flexibility in developing analytical methods within this framework (and may also attempt to justify an alternative framework altogether). The four steps of the framework simply provide a reasonable organization to the analysis of the complex air quality challenge of interstate ozone transport. As discussed further throughout this document, the EPA has organized its evaluation of the states' SIP submissions around this analytical framework (including the specific methodologies within each step as evolved over the course of the CSAPR rulemakings since 2011), but where states presented alternative approaches either to the EPA's methodological approaches within the framework, or organized their analysis in some manner that differed from it entirely, we have evaluated those analyses on their merits or, in some cases, identified why even if those approaches were acceptable, the state still does not have an approvable SIP submission as a whole.

*C. Background on the EPA's Ozone Transport Modeling Information*

In general, the EPA has performed nationwide air quality modeling to project ozone design values, which are used in combination with measured data to identify nonattainment and maintenance receptors at Step 1. To quantify the contribution of emissions from specific upwind states on 2023 ozone design values for the identified downwind nonattainment and maintenance receptors at Step 2, the EPA performed nationwide, state-level ozone source apportionment modeling for 2023. The source apportionment modeling projected contributions to ozone at receptors from precursor emissions of anthropogenic nitrogen oxides ($NO_X$) and volatile organic compounds (VOCs) in individual upwind states.

The EPA has released several documents containing projected design values, contributions, and information relevant to air agencies for evaluating interstate transport with respect to the 2015 ozone NAAQS. First, on January 6, 2017, the EPA published a notice of data availability (NODA) in which the Agency requested comment on preliminary interstate ozone transport data including projected ozone design values and interstate contributions for 2023 using a 2011 base year platform.[14] In the NODA, the EPA used the year 2023 as the analytic year for this preliminary modeling because that year aligns with the expected attainment year for Moderate ozone nonattainment areas for the 2015 ozone NAAQS.[15] On October 27, 2017, the EPA released a memorandum (October 2017 memorandum) containing updated modeling data for 2023, which incorporated changes made in response to comments on the NODA, and was intended to provide information to assist states' efforts to develop SIP submissions to address interstate transport obligations for the 2008 ozone NAAQS.[16] On March 27, 2018, the EPA issued a memorandum (March 2018 memorandum) noting that the same 2023 modeling data released in the

---

[8] In its proposals, the EPA stated "The EPA may take a consolidated, single final action on all the proposed SIP disapproval actions with respect to obligations under CAA section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS. Should EPA take a single final action on all such disapprovals, this action would be nationally applicable, and the EPA would also anticipate, in the alternative, making and publishing a finding that such final action is based on a determination of nationwide scope or effect." E.g., 87 FR 9463, 9475 n.51.

[9] *See* Federal Implementation Plans: Interstate Transport of Fine Particulate Matter and Ozone and Correction of SIP Approvals, 76 FR 48208 (August 8, 2011).

[10] Cross-State Air Pollution Rule Update for the 2008 Ozone NAAQS, 81 FR 74504 (October 26, 2016).

[11] In 2019, the United States Court of Appeals for the District of Columbia Circuit (D.C. Circuit) remanded CSAPR Update to the extent it failed to require upwind states to eliminate their significant contribution by the next applicable attainment date by which downwind states must come into compliance with the NAAQS, as established under CAA section 181(a). *Wisconsin* v. *EPA,* 938 F.3d 303, 313 (D.C. Cir. 2019) (*Wisconsin*). The Revised CSAPR Update for the 2008 Ozone NAAQS, 86 FR 23054 (April 30, 2021), responded to the remand of CSAPR Update in *Wisconsin* and the vacatur of a separate rule, the "CSAPR Close-Out," 83 FR 65878 (December 21, 2018), in *New York* v. *EPA,* 781 F. App'x. 4 (D.C. Cir. 2019).

[12] *See* 63 FR 57356, 57361 (October 27, 1998).

[13] In addition to CSAPR rulemakings, other regional rulemakings addressing ozone transport include the "$NO_X$ SIP Call," 63 FR 57356 (October 27, 1998), and the "Clean Air Interstate Rule" (CAIR), 70 FR 25162 (May 12, 2005).

[14] *See* Notice of Availability of the Environmental Protection Agency's Preliminary Interstate Ozone Transport Modeling Data for the 2015 8-hour Ozone National Ambient Air Quality Standard (NAAQS), 82 FR 1733 (January 6, 2017).

[15] *See* 82 FR 1733, 1735 (January 6, 2017).

[16] *See* Information on the Interstate Transport State Implementation Plan Submissions for the 2008 Ozone National Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I), October 27, 2017 ("October 2017 memorandum"), available in Docket No. EPA–HQ–OAR–2021–0663 or at *https://www.epa.gov/interstate-air-pollution-transport/interstate-air-pollution-transport-memos-and-notices.*

October 2017 memorandum could also be useful for identifying potential downwind air quality problems with respect to the 2015 ozone NAAQS at Step 1 of the 4-step interstate transport framework.[17] The March 2018 memorandum also included the then newly available contribution modeling data for 2023 to assist states in evaluating their impact on potential downwind air quality problems for the 2015 ozone NAAQS under Step 2 of the 4-step interstate transport framework.[18] The EPA subsequently issued two more memoranda in August and October 2018, providing additional information to states developing interstate transport SIP submissions for the 2015 ozone NAAQS concerning, respectively, potential contribution thresholds that may be appropriate to apply in Step 2 of the 4-step interstate transport framework, and considerations for identifying downwind areas that may have problems maintaining the standard at Step 1 of the 4-step interstate transport framework.[19]

Following the release of the modeling data shared in the March 2018 memorandum, the EPA performed updated modeling using a 2016-based emissions modeling platform (*i.e.*, 2016v1). This emissions platform was developed under the EPA/Multi-Jurisdictional Organization (MJO)/state collaborative project.[20] This collaborative project was a multi-year

joint effort by the EPA, MJOs, and states to develop a new, more recent emissions platform for use by the EPA and states in regulatory modeling as an improvement over the dated, 2011-based platform that the EPA had used to project ozone design values and contribution data provided in the 2017 and 2018 memoranda. The EPA used the 2016v1 emissions to project ozone design values and contributions for 2023. On October 30, 2020, in the notice of proposed rulemaking for the Revised CSAPR Update, the EPA released and accepted public comment on 2023 modeling that used the 2016v1 emissions platform.[21] Although the Revised CSAPR Update addressed transport for the 2008 ozone NAAQS, the projected design values and contributions from the 2016v1 platform were also useful for identifying downwind ozone problems and linkages with respect to the 2015 ozone NAAQS.[22]

Following the final Revised CSAPR Update, the EPA made further updates to the 2016-based emissions platform to include updated onroad mobile emissions from Version 3 of the EPA's Motor Vehicle Emission Simulator (MOVES) model (MOVES3)[23] and updated emissions projections for electric generating units (EGUs) that reflect the emissions reductions from the Revised CSAPR Update, recent information on plant closures, and other inventory improvements. The construct of the updated emissions platform, 2016v2, is described in the "Technical Support Document (TSD): Preparation of Emissions Inventories for the 2016v2 North American Emissions Modeling Platform," hereafter known as the 2016v2 Emissions Modeling TSD, and is included in Docket No. EPA–HQ–OAR–2021–0663. The EPA performed air quality modeling using the 2016v2 emissions to provide projections of ozone design values and contributions in 2023 that reflect the effects on air quality of the 2016v2 emissions platform. The results of the 2016v2 modeling were used by the EPA as part of the Agency's evaluation of state SIP submissions with respect to Steps 1 and 2 of the 4-step interstate transport framework at the proposal stage of this action. By using the 2016v2 modeling results, the EPA used the most current

and technically appropriate information for the proposed rulemakings that were issued earlier in 2022.

The EPA invited and received comments on the 2016v2 emissions inventories and modeling that were used to support proposals related to 2015 ozone NAAQS interstate transport. (The EPA had earlier published the emissions inventories on its website in September of 2021 and invited initial feedback from states and other interested stakeholders.[24]) In response to these comments, the EPA made a number of updates to the 2016v2 inventories and model design to construct a 2016v3 emissions platform which was used to update the air quality modeling. The EPA made additional updates to its modeling in response to comments as well. The EPA is now using this updated modeling to inform its final action on these SIP submissions. Details on the air quality modeling and the methods for projecting design values and determining contributions in 2023 are described in Section III and in the TSD titled "Air Quality Modeling TSD for the 2015 8-hour ozone NAAQS Transport SIP Final Actions", hereafter known as the Final Action AQM TSD.[25][26] Additional details related to the updated 2016v3 emissions platform are located in the TSD titled "Preparation of Emissions Inventories for the 2016v3 North American Emissions Modeling Platform," hereafter known as the 2016v3 Emissions Modeling TSD, included in Docket ID No. EPA–HQ–OAR–2021–0663.[27]

*D. The EPA's Approach To Evaluating Interstate Transport SIPs for the 2015 Ozone NAAQS*

The EPA is applying a consistent set of policy judgments across all states for purposes of evaluating interstate transport obligations and the approvability of interstate transport SIP submissions for the 2015 ozone NAAQS under CAA section 110(a)(2)(D)(i)(I). These policy judgments conform with relevant case law and past agency practice as reflected in CSAPR and related rulemakings. Employing a nationally consistent approach is

---

[17] *See* Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I), March 27, 2018 ("March 2018 memorandum"), available in Docket No. EPA–HQ–OAR–2021–0663 or at *https://www.epa.gov/interstate-air-pollution-transport/interstate-air-pollution-transport-memos-and-notices.*

[18] The March 2018 memorandum, however, provided, "While the information in this memorandum and the associated air quality analysis data could be used to inform the development of these SIPs, the information is not a final determination regarding states' obligations under the good neighbor provision. Any such determination would be made through notice-and-comment rulemaking." March 2018 memorandum at 2.

[19] *See* Analysis of Contribution Thresholds for Use in Clean Air Act Section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards, August 31, 2018 ("August 2018 memorandum"); Considerations for Identifying Maintenance Receptors for Use in Clean Air Act Section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards, October 19, 2018 ("October 2018 memorandum"), available in Docket No. EPA–HQ–OAR–2021–0663 or at *https://www.epa.gov/airmarkets/memo-and-supplemental-information-regarding-interstate-transport-sips-2015-ozone-naaqs.*

[20] The results of this modeling, as well as the underlying modeling files, are included in Docket No. EPA–HQ–OAR–2021–0663.

[21] *See* 85 FR 68964, 68981 (October 30, 2020).

[22] *See* the Air Quality Modeling Technical Support Document for the Final Revised Cross-State Air Pollution Rule Update, included in Docket No. EPA–HQ–OAR–2021–0663.

[23] 86 FR 1106. Additional details and documentation related to the MOVES3 model can be found at *https://www.epa.gov/moves/latest-version-motor-vehicle-emission-simulator-moves.*

[24] *https://www.epa.gov/air-emissions-modeling/2016v2-platform.*

[25] *See* Final Action AQM TSD in Docket ID No. EPA–HQ–OAR–2021–0663.

[26] References to section numbers in roman numeral refer to sections of this preamble unless otherwise specified, and references to section numbers in numeric form refer to the Response to Comments document for this final action included in the docket.

[27] *See* 2016v3 Emissions Modeling TSD in Docket ID No. EPA–HQ–OAR–2021–0663.

particularly important in the context of interstate ozone transport, which is a regional-scale pollution problem involving many smaller contributors. Effective policy solutions to the problem of interstate ozone transport going back to the NO$_X$ SIP Call have necessitated the application of a uniform framework of policy judgments to ensure an ''efficient and equitable'' approach. *See EPA* v. *EME Homer City Generation, LP,* 572 U.S. 489, 519 (2014) (*EME Homer City*). Some comments on EPA's proposed SIP disapprovals claim the EPA is imposing non-statutory requirements onto SIPs or that the EPA must allow states to take inconsistent approaches to implementing good neighbor requirements. Both views are incorrect; the EPA's use of its longstanding framework to evaluate these SIP submissions reflects a reasonable and consistent approach to implementing the requirements of CAA section 110(a)(2)(D)(i)(I), while remaining open to alternative approaches states may present. These comments are further addressed in Section V and the Response to Comment (RTC) document contained in the docket for this action, Docket ID No. EPA–HQ–OAR–2021–0663.

In the March, August, and October 2018 memoranda, the EPA recognized that states may be able to establish alternative approaches to addressing their interstate transport obligations for the 2015 ozone NAAQS that vary from a nationally uniform framework. The EPA emphasized in these memoranda, however, that such alternative approaches must be technically justified and appropriate in light of the facts and circumstances of each particular state's submission.[28] In general, the EPA continues to believe that deviation from a nationally consistent approach to ozone transport must be substantially justified and have a well-documented technical basis that is consistent with CAA obligations and relevant case law. Where states submitted SIP submissions that rely on any such potential concepts

as the EPA or others may have identified or suggested in the past, the EPA evaluated whether the state adequately justified the technical and legal basis for doing so. For example, the EPA has considered the arguments put forward by Alabama, Missouri, Ohio, Oklahoma, Texas, and Utah related to alternative methods of identifying receptors.[29] The EPA also has considered the arguments attempting to justify an alternative contribution threshold at Step 2 pursuant to the August 2018 memorandum made by Alabama, Arkansas, Illinois, Indiana, Kentucky, Louisiana, Michigan, Mississippi, Missouri, Oklahoma, and Utah,[30] as well as criticisms of the 1 percent of the NAAQS contribution threshold made by Nevada and Ohio.[31] These topics are further addressed in Section V.B as well as the RTC document.

The EPA notes that certain potential concepts included in an attachment to the March 2018 memorandum require unique consideration, and these ideas do not constitute agency guidance with respect to interstate transport obligations for the 2015 ozone NAAQS. Attachment A to the March 2018 memorandum identified a ''Preliminary List of Potential Flexibilities'' that could potentially inform SIP development. However, the EPA made clear in both the March 2018 memorandum[32] and in Attachment A that the list of ideas was not endorsed by the Agency but rather ''comments provided in various forums'' on which the EPA sought ''feedback from interested stakeholders.''[33] Further, Attachment A stated, ''EPA is not at this time making any determination that the ideas discussed below are consistent with the requirements of the CAA, nor are we specifically recommending that states use these approaches.''[34] Attachment A to the March 2018 memorandum, therefore, does not constitute agency

guidance, but was intended to generate further discussion around potential approaches to addressing ozone transport among interested stakeholders. To the extent states sought to develop or rely on one or more of these ideas in support of their SIP submissions, the EPA reviewed their technical and legal justifications for doing so.[35]

The remainder of this section describes the EPA's analytical framework with respect to analytic year, definition of nonattainment and maintenance receptors, selection of contribution threshold, and multifactor control strategy assessment.

1. Selection of Analytic Year

In general, the states and the EPA must implement the interstate transport provision in a manner ''consistent with the provisions of [title I of the CAA.]'' *See* CAA section 110(a)(2)(D)(i). This requires, among other things, that these obligations are addressed consistently with the timeframes for downwind areas to meet their CAA obligations. With respect to ozone NAAQS, under CAA section 181(a), this means obligations must be addressed ''as expeditiously as practicable'' and no later than the schedule of attainment dates provided in CAA section 181(a)(1).[36] Several D.C. Circuit court decisions address the issue of the relevant analytic year for the purposes of evaluating ozone transport air-quality problems. On September 13, 2019, the D.C. Circuit issued a decision in *Wisconsin,* remanding the CSAPR Update to the extent that it failed to require upwind states to eliminate their significant contribution by the next applicable attainment date by which downwind states must come into compliance with the NAAQS, as established under CAA section 181(a). *See* 938 F.3d 303, 313.

On May 19, 2020, the D.C. Circuit issued a decision in *Maryland* v. *EPA* that cited the *Wisconsin* decision in holding that the EPA must assess the impact of interstate transport on air quality at the next downwind attainment date, including Marginal area attainment dates, in evaluating the basis for the EPA's denial of a petition under CAA section 126(b) *Maryland* v.

[28] March 2018 memorandum at 3 (''EPA also notes that, in developing their own rules, states have flexibility to follow the familiar four-step transport framework (using EPA's analytical approach or somewhat different analytical approaches within this steps) or alternative framework, so long as their chosen approach has adequate technical justification and is consistent with the requirements of the CAA.''); August 2018 memorandum at 1 (''The EPA and air agencies should consider whether the recommendations in this guidance are appropriate for each situation.''); October 2018 memorandum at 1 (''Following the recommendations in this guidance does not ensure that EPA will approve a SIP revision in all instances where the recommendations are followed, as the guidance may not apply to the facts and circumstances underlying a particular SIP.'').

[29] 87 FR 64421–64422 (Alabama); 87 FR 9540–9541 (Missouri); 87 FR 9869–9870 (Ohio); 87 FR 9820–9822 (Oklahoma); 87 FR 9826–9829 (Texas); and 87 FR 31480–31481 (Utah).

[30] 87 FR 64423–64424 (Alabama); 87 FR 9806–9807 (Arkansas); 87 FR 9852–9853 (Illinois); 87 FR 9855–9856 (Indiana); 87 FR 9509–9510 (Kentucky); 87 FR 9815–9816 (Louisiana); 87 FR 9861–9862 (Michigan); 87 FR 9557 (Mississippi); 87 FR 9541–9544 (Missouri); 87 FR 9819 (Oklahoma); 87 FR 31478 (Utah).

[31] 87 FR 31492 (Nevada); 87 FR 9871 (Ohio).

[32] ''In addition, the memorandum is accompanied by Attachment A, which provides a preliminary list of potential flexibilities in analytical approaches for developing a good neighbor SIP that may warrant further discussion between EPA and states.'' March 2018 memorandum at 1.

[33] March 2018 memorandum, Attachment A at A–1.

[34] *Id.*

[35] E.g., 87 FR 64423–64425 (Alabama); 87 FR 31453–31454 (California); 87 FR 9852–9854 (Illinois); 87 FR 9859–9860 (Indiana); 87 FR 9508, 9515 (Kentucky); 87 FR 9861–9862 (Michigan); 87 FR 9869–9870 (Ohio); 87 FR 9798, 9818–9820 (Oklahoma); 87 FR 31477–31481 (Utah); 87 FR 9526–9527 (West Virginia).

[36] For attainment dates for the 2015 ozone NAAQS, refer to CAA section 181(a), 40 CFR 51.1303, and Additional Air Quality Designations for the 2015 Ozone National Ambient Air Quality Standards, 83 FR 25776 (June 4, 2018, effective August 3, 2018).

*EPA,* 958 F.3d 1185, 1203–04 (D.C. Cir. 2020) (*Maryland*). The court noted that "section 126(b) incorporates the Good Neighbor Provision," and, therefore, "EPA must find a violation [of section 126] if an upwind source will significantly contribute to downwind nonattainment at the *next downwind attainment deadline.* Therefore, the agency must evaluate downwind air quality at that deadline, not at some later date." *Id.* at 1204 (emphasis added). The EPA interprets the court's holding in *Maryland* as requiring the states and the Agency, under the good neighbor provision, to assess downwind air quality as expeditiously as practicable and no later than the next applicable attainment date,[37] which at the time of EPA's proposed and final actions on the SIPs addressed in this action is the Moderate area attainment date under CAA section 181 for ozone nonattainment. The Moderate area attainment date for the 2015 ozone NAAQS is August 3, 2024.[38] Thus, 2023 is now the appropriate year for analysis of interstate transport obligations for the 2015 ozone NAAQS, because the 2023 ozone season is the last relevant ozone season during which achieved emissions reductions in linked upwind states could assist downwind states with meeting the August 3, 2024, Moderate area attainment date for the 2015 ozone NAAQS.

The EPA recognizes that the attainment date for nonattainment areas classified as Marginal for the 2015 ozone NAAQS was August 3, 2021. Under the *Maryland* holding, any necessary emissions reductions to satisfy interstate transport obligations should have been implemented by no later than this date. At the time of the statutory deadline to submit interstate transport SIPs (October 1, 2018), many states relied upon the EPA's modeling of the year 2023, and no state provided an alternative analysis using a 2021 analytic year (or the prior 2020 ozone season). However, the EPA must act on SIP submissions using the information available at the time it takes such action,

and it is now past 2021. In this circumstance, the EPA does not believe it would be appropriate to evaluate states' obligations under CAA section 110(a)(2)(D)(i)(I) as of an attainment date that is wholly in the past, because the Agency interprets the interstate transport provision as forward looking. *See* 86 FR 23054, 23074; *see also Wisconsin,* 938 F.3d at 322 (rejecting Delaware's argument that the EPA should have used an analytic year of 2011 instead of 2017). Consequently, in this proposal the EPA will use the analytical year of 2023 to evaluate each state's CAA section 110(a)(2)(D)(i)(I) SIP submission with respect to the 2015 ozone NAAQS.

2. Step 1 of the 4-Step Interstate Transport Framework

In Step 1, the EPA identifies monitoring sites that are projected to have problems attaining and/or maintaining the NAAQS in the 2023 analytic year. Where the EPA's analysis shows that a site does not fall under the definition of a nonattainment or maintenance receptor, that site is excluded from further analysis under the EPA's 4-step interstate transport framework. For sites that are identified as a nonattainment or maintenance receptor in 2023, the EPA proceeds to the next step of the 4-step interstate transport framework by identifying which upwind states contribute to those receptors above the contribution threshold.

The EPA's approach to identifying ozone nonattainment and maintenance receptors in this action gives independent consideration to both the "contribute significantly to nonattainment" and the "interfere with maintenance" prongs of CAA section 110(a)(2)(D)(i)(I), consistent with the D.C. Circuit's direction in *North Carolina.*[39]

The EPA identifies nonattainment receptors as those monitoring sites that are projected to have average design values that exceed the NAAQS and that are also measuring nonattainment based on the most recent monitored design values. This approach is consistent with prior transport rulemakings, such as the CSAPR Update, where the EPA defined nonattainment receptors as those areas that both currently measure nonattainment and that the EPA projects will be in nonattainment in the analytic year (*i.e.,* 2023).[40]

In addition, the EPA identifies a receptor to be a "maintenance" receptor for purposes of defining interference with maintenance, consistent with the method used in CSAPR and upheld by the D.C. Circuit in *EME Homer City Generation, L.P.* v. *EPA,* 795 F.3d 118, 136 (D.C. Cir. 2015) (*EME Homer City II*).[41] Specifically, the EPA identified maintenance receptors as those receptors that would have difficulty maintaining the relevant NAAQS in a scenario that takes into account historical variability in air quality at that receptor. The variability in air quality was determined by evaluating the "maximum" future design value at each receptor based on a projection of the maximum measured design value over the relevant period. The EPA interprets the projected maximum future design value to be a potential future air quality outcome consistent with the meteorology that yielded maximum measured concentrations in the ambient data set analyzed for that receptor (*i.e.,* ozone conducive meteorology). The EPA also recognizes that previously experienced meteorological conditions (*e.g.,* dominant wind direction, temperatures, air mass patterns) promoting ozone formation that led to maximum concentrations in the measured data may reoccur in the future. The maximum design value gives a reasonable projection of future air quality at the receptor under a scenario in which such conditions do, in fact, reoccur. The projected maximum design value is used to identify upwind emissions that, under those circumstances, could interfere with the downwind area's ability to maintain the NAAQS.

Recognizing that nonattainment receptors are also, by definition, maintenance receptors, the EPA often uses the term "maintenance-only" to refer to those receptors that are not nonattainment receptors. Consistent with the concepts for maintenance receptors, as described earlier, the EPA identifies "maintenance-only" receptors as those monitoring sites that have projected average design values above the level of the applicable NAAQS, but that are not currently measuring nonattainment based on the most recent official design values. In addition, those

---

[37] The EPA notes that the court in *Maryland* did not have occasion to evaluate circumstances in which the EPA may determine that an upwind linkage to a downwind air quality problem exists at Steps 1 and 2 of the interstate transport framework by a particular attainment date, but for reasons of impossibility or profound uncertainty the Agency is unable to mandate upwind pollution controls by that date. *See Wisconsin,* 938 F.3d at 320. The D.C. Circuit noted in *Wisconsin* that upon a sufficient showing, these circumstances may warrant flexibility in effectuating the purpose of the interstate transport provision.

[38] *See* CAA section 181(a); 40 CFR 51.1303; Additional Air Quality Designations for the 2015 Ozone National Ambient Air Quality Standards, 83 FR 25776 (June 4, 2018, effective August 3, 2018).

[39] *See North Carolina,* 531 F.3d at 910–11 (holding that the EPA must give "independent significance" to each prong of CAA section 110(a)(2)(D)(i)(I)).

[40] *See* 81 FR 74504 (October 26, 2016). This same concept, relying on both current monitoring data

and modeling to define nonattainment receptor, was also applied in CAIR. *See* 70 FR 25241, 25249 (January 14, 2005); *see also North Carolina,* 531 F.3d at 913–14 (affirming as reasonable the EPA's approach to defining nonattainment in CAIR).

[41] *See* 76 FR 48208 (August 8, 2011). The CSAPR Update and Revised CSAPR Update also used this approach. *See* 81 FR 74504 (October 26, 2016) and 86 FR 23054 (April 30, 2021).

monitoring sites with projected average design values below the NAAQS, but with projected maximum design values above the NAAQS are also identified as ''maintenance-only'' receptors, even if they are currently measuring nonattainment based on the most recent official design values.

As discussed further in Section III.B., in response to comments, the Agency has also taken a closer look at measured ozone levels at monitoring sites in 2021 and 2022 for the purposes of informing the identification of additional receptors in 2023. We find there is a basis to consider certain sites with elevated ozone levels that are not otherwise identified as receptors to be an additional type of maintenance-only receptor given the likelihood that ozone levels above the NAAQS could persist at those locations through at least 2023. We refer to these as violating-monitor maintenance-only receptors (''violating monitors''). For purposes of this action, we use this information only in a confirmatory way for states that are otherwise found to be linked using the modeling-based methodology. The EPA intends to take separate action to address states that are linked only to one or more violating-monitor receptors.

3. Step 2 of the 4-Step Interstate Transport Framework

In Step 2, the EPA quantifies the contribution of each upwind state to each receptor in the 2023 analytic year. The contribution metric used in Step 2 is defined as the average impact from each state to each receptor on the days with the highest ozone concentrations at the receptor based on the 2023 modeling. If a state's contribution value does not equal or exceed the threshold of 1 percent of the NAAQS (*i.e.,* 0.70 ppb for the 2015 ozone NAAQS), the upwind state is not ''linked'' to a downwind air quality problem, and the EPA, therefore, concludes that the state does not contribute significantly to nonattainment or interfere with maintenance of the NAAQS in the downwind states. However, if a state's contribution equals or exceeds the 1 percent threshold, the state's emissions are further evaluated in Step 3, considering both air quality and cost as part of a multi-factor analysis, to determine what, if any, emissions might be deemed ''significant'' and, thus, must be eliminated pursuant to the requirements of CAA section 110(a)(2)(D)(i)(I).

In this final action, the EPA relies in the first instance on the 1 percent threshold for the purpose of evaluating a state's contribution to nonattainment or maintenance of the 2015 ozone NAAQS (*i.e.,* 0.70 ppb) at downwind receptors. This is consistent with the Step 2 approach that the EPA applied in CSAPR for the 1997 ozone NAAQS, which has subsequently been applied in the CSAPR Update and Revised CSAPR Update when evaluating interstate transport obligations for the 2008 ozone NAAQS, and in the EPA's proposals for this action. The EPA continues to find 1 percent to be an appropriate threshold. For ozone, as the EPA found in the CAIR, CSAPR, and CSAPR Update, a portion of the nonattainment problems from anthropogenic sources in the U.S. result from the combined impact of relatively small contributions, typically from multiple upwind states and, in some cases, substantially larger contributions from a subset of particular upwind states, along with contributions from in-state sources. The EPA's analysis shows that much of the ozone transport problem being analyzed in this action is still the result of the collective impacts of contributions from upwind states. Therefore, application of a consistent contribution threshold is necessary to identify those upwind states that should have responsibility for addressing their contribution to the downwind nonattainment and maintenance problems to which they collectively contribute. Continuing to use 1 percent of the NAAQS as the screening metric to evaluate collective contribution from many upwind states also allows the EPA (and states) to apply a consistent framework to evaluate interstate emissions transport under the interstate transport provision from one NAAQS to the next. *See* 81 FR 74518; *see also* 86 FR 23085 (reviewing and explaining rationale from CSAPR, 76 FR 48237–38, for selection of 1 percent threshold).

The EPA's August 2018 memorandum recognizes that in certain circumstances, a state may be able to establish that an alternative contribution threshold of 1 ppb is justifiable. Where a state relies on this alternative threshold in their SIP submission, and where that state determined that it was not linked at Step 2 using the alternative threshold, the EPA evaluated whether the state provided a technically sound assessment of the appropriateness of using this alternative threshold based on the facts and circumstances underlying its application in the particular SIP submission. The states covered by this action that rely on a contribution threshold other than 1 percent of the NAAQS in their 2015 ozone NAAQS good neighbor SIP submission are Alabama, Arkansas, Illinois, Indiana, Kentucky, Louisiana, Michigan, Mississippi, Missouri, Oklahoma, and Utah. Ohio also criticized the 1 percent of the NAAQS threshold, though it acknowledged it was linked above either a 1 percent of the NAAQS or 1 ppb contribution threshold. Nevada also criticized the 1 percent of the NAAQS contribution threshold, but ultimately relied on it to support its submission.

In the proposals for this action, the EPA evaluated each states' support for the use of an alternative threshold at Step 2 (*e.g.,* 1 ppb), and additionally shared its experience since the issuance of the August 2018 memorandum regarding use of alternative thresholds at Step 2. The EPA solicited comment on the subject as it considered the appropriateness of rescinding the memorandum.[42] The EPA received numerous comments related to both the EPA's evaluation of SIP submissions relying on an alternative threshold, and the EPA's experience with alternative thresholds. The EPA is not, at this time rescinding the August 2018 memorandum; however, for purposes of evaluating contribution thresholds for the 2015 ozone NAAQS, the EPA continues to find the use of an alternative threshold problematic for the reasons stated at proposal. Regardless of the EPA's position on the August 2018 memorandum, the EPA continues to find that the arguments put forth in the SIP submissions of by Alabama, Arkansas, Illinois, Indiana, Kentucky, Louisiana, Michigan, Mississippi, Missouri, Oklahoma, and Utah, as well as arguments in comments received on these actions, to be inadequate. *See* Section V.B.7 and the RTC Document for additional detail.

4. Step 3 of the 4-Step Interstate Transport Framework

Consistent with the EPA's longstanding approach to eliminating significant contribution and interference with maintenance, at Step 3, a multifactor assessment of potential emissions controls is conducted for states linked at Steps 1 and 2. The EPA's analysis at Step 3 in prior Federal actions addressing interstate transport requirements has primarily focused on an evaluation of cost-effectiveness of potential emissions controls (on a marginal cost-per-ton basis), the total emissions reductions that may be achieved by requiring such controls (if applied across all linked upwind states), and an evaluation of the air quality impacts such emissions reductions would have on the downwind receptors to which a state is linked; other factors may potentially be relevant if

[42] *See, e.g.,* 87 FR 9551.

adequately supported. In general, where the EPA's or state-provided alternative air quality and contribution modeling establishes that a state is linked at Steps 1 and 2, it will be insufficient at Step 3 for a state merely to point to its existing rules requiring control measures as a basis for SIP approval. In general, the emissions-reducing effects of all existing emissions control requirements are already reflected in the future year projected air quality results of the modeling for Steps 1 and 2. If the state is shown to still be linked to one or more downwind receptor(s) despite these existing controls, but that state believes it has no outstanding good neighbor obligations, the EPA expects the state to provide sufficient justification to support a conclusion by the EPA that the state has adequate provisions prohibiting ''any source or other type of emissions activity within the State from emitting any air pollutant in amounts which will'' ''contribute significantly to nonattainment in, or interfere with maintenance by,'' any other State with respect to the NAAQS. *See* CAA section 110(a)(2)(D)(i)(I). While the EPA has not prescribed a particular method for this assessment, as many commenters note, the EPA expects states at a minimum to present a sufficient technical evaluation. This would typically include information on emissions sources, applicable control technologies, emissions reductions, costs, cost effectiveness, and downwind air quality impacts of the estimated reductions, before concluding that no additional emissions controls should be required.[43] The EPA responds to comment on issues related to Step 3 in Section V.B.8. and in the RTC document.

5. Step 4 of the 4-Step Interstate Transport Framework

At Step 4, states (or the EPA) develop permanent and federally-enforceable control strategies to achieve the emissions reductions determined to be necessary at Step 3 to eliminate significant contribution to nonattainment or interference with

maintenance of the NAAQS.[44] For a state linked at Steps 1 and 2 to rely on an emissions control measure at Step 3 to address its interstate transport obligations, that measure must be included in the state's SIP so that it is permanent and federally enforceable. *See* CAA section 110(a)(2)(D) (''Each such [SIP] shall . . . contain adequate provisions. . . .''). *See also* CAA section 110(a)(2)(A); *Committee for a Better Arvin* v. *EPA*, 786 F.3d 1169, 1175–76 (9th Cir. 2015) (holding that measures relied on by a state to meet CAA requirements must be included in the SIP).

**III. The EPA's Updated Air Quality and Contribution Analysis**

As noted in Section II, the EPA relied in part on its 2016v2 emissions platform-based air quality modeling to support its proposed interstate transport actions taken in 2022. Following receipt of comments, the EPA updated this modeling, incorporating new information received to create the 2016v3 emissions inventory and making additional updates to improve model performance. Using the 2016v3 emissions inventory, the EPA evaluated modeling projections for air quality monitoring sites and considered current ozone monitoring data at these sites to identify receptors that are anticipated to have problems attaining or maintaining the 2015 ozone NAAQS.

This section presents a summary of the methodology and results of the 2016v3 modeling of 2023, along with the application of the EPA's Step 1 and Step 2 methodology for identifying receptors and upwind states that contribute to those receptors. We also explain that current measured ozone levels based on data for 2021 and preliminary data for 2022 at other monitoring sites (*i.e.*, monitoring sites that are not projected to be receptors in 2023 based on air quality modeling) confirm the likely continuation of elevated ozone levels in 2023 at these locations and confirm that nearly all upwind states in this action are also linked to 1 percent of the NAAQS to one or more of these monitors.

While all of this information compiled by the EPA (both the modeling and monitoring data) plays a critical role in the basis for this final action, the EPA has also thoroughly evaluated the modeling information and other analyses and arguments presented by the upwind states in their SIP submittals. Our evaluation of the states' analyses was generally set forth in the

proposals, and the EPA in this final action has responded to comments on our evaluation of the various information and arguments made by states. The EPA's final decision to disapprove these states' SIP submittals is based on our evaluation of the entire record, recognizing that states possess the authority in the first instance to propose how they would address their significant contribution to air quality problems in other states. Nonetheless, as explained in the proposals, and in this document and supporting materials in the docket, we conclude that no state included in this action effectively demonstrated that it will not be linked to at least one air quality receptor in 2023, and none of these states' various arguments for alternative approaches ultimately present a satisfactory basis for the EPA to approve these states' SIP submissions.

*A. Description of Air Quality Modeling for the Final Action*

In this section, the Agency describes the air quality modeling performed consistent with Steps 1 and 2 of the 4-step interstate transport framework to (1) Identify locations where it expects nonattainment or maintenance problems with respect to the 2015 ozone NAAQS for the 2023 analytic year, and (2) quantify the contributions from anthropogenic emissions from upwind states to downwind ozone concentrations at monitoring sites projected to be in nonattainment or have maintenance problems for the 2015 ozone NAAQS in 2023. This section includes information on the air quality modeling platform used in support of the final SIP disapproval action with a focus on the base year and future base case emissions inventories. The EPA also provides the projection of 2023 ozone concentrations and the interstate contributions for 8-hour ozone. The Final Action AQM TSD in Docket ID No. EPA–HQ–OAR–2021–0663 contains more detailed information on the air quality modeling aspects supporting our final action on these SIP submissions.

1. Public Review of Air Quality Modeling Information for the Proposed Action

The EPA provided several opportunities to comment on the emissions modeling platform and air quality modeling results that were used for the proposed SIP submission actions. On September 20, 2021, the EPA publicly released via our web page updated emissions inventories (2016v2) and requested comment from states and

---

[43] Because no state included new enforceable emissions control measures in the submissions under review here, we focus our analysis on whether states justified that no additional controls were required. As examples of general approaches for how a Step 3 analysis could be conducted for their sources, states could look to the CSAPR Update, 81 FR 74504, 74539–51; CSAPR, 76 FR 48208, 48246–63; CAIR, 70 FR 25162, 25195–229; or the NOₓ SIP Call, 63 FR 57356, 57399–405. *See also* Revised CSAPR Update, 86 FR 23054, 23086–23116. Consistently across these rulemakings, the EPA has developed emissions inventories, analyzed different levels of control stringency at different cost thresholds, and assessed resulting downwind air quality improvements.

[44] The EPA notes that any controls included in an approved SIP are federally-enforceable.

MJOs on these data.[45] In January 2022, the EPA released air quality modeling results including projected ozone design values and contributions from 2023 based on the 2016v2 emissions. At that time the EPA indicated its intent to use these data to support upcoming transport rulemakings. Then, on February 22, 2022, the EPA published proposed disapprovals for 19 interstate transport SIP submissions using the modeling data released in January 2022 and the emissions inventories shared in September 2021.[46] The EPA provided a 60-day comment period on these proposals. On May 24, 2022, the EPA proposed disapprovals for an additional four states' interstate transport SIP submissions using the same modeling platform, and provided a 62-day comment period.[47] The EPA provided a 30-day comment period beginning on October 25, 2022, on the proposed disapproval of Alabama's June 21, 2022, SIP submission, which relied on the same modeling platform as the other noted proposals.[48] In addition to its proposed disapprovals, the EPA also proposed approval of Iowa's, Arizona's, and Colorado's SIP submissions using the 2016v2 modeling and provided 30-day comment periods. 87 FR 9477 (February 22, 2022) (Iowa); 87 FR 37776 (June 24, 2022) (Arizona); and 87 FR 27050 (May 6, 2022) (Colorado).

### 2. Overview of Air Quality Modeling Platform

The EPA used version 3 of the 2016-based modeling platform (*i.e.,* 2016v3) for the air quality modeling for this final SIP disapproval action. This modeling platform includes 2016 base year emissions from anthropogenic and natural sources and future year projected anthropogenic emissions for 2023.[49] The emissions data contained in the 2016v3 platform represent an update to the 2016 version 2 inventories used for the proposal modeling.

The air quality modeling for this final disapproval action was performed for a

modeling region (*i.e.,* modeling domain) that covers the contiguous 48 states using a horizontal resolution of 12 x 12 km. The EPA used the CAMx version 7.10 for air quality modeling which is the same model that the EPA used for the proposed rule air quality modeling.[50] Additional information on the 2016-based air quality modeling platform can be found in the Final Action AQM TSD.

*Comments:* Commenters noted that the 2016 base year summer maximum daily average 8-hour (MDA8) ozone predictions from the proposal modeling were biased low compared to the corresponding measured concentrations in certain locations. In this regard, commenters said that model performance statistics for a number of monitoring sites, particularly those in portions of the West and in the area around Lake Michigan, were outside the range of published performance criteria for normalized mean bias (NMB) and normalized mean error (NME) of less than plus or minus 15 percent and less than 25 percent, respectively.[51] Commenters say the EPA must investigate the factors contributing to low bias and make necessary corrections to improve model performance in the modeling supporting final SIP actions. Some commenters said that the EPA should include NO$_X$ emissions from lightning strikes and assess the treatment of other background sources of ozone to improve model performance for the final action. Additional information on the comments on model performance can be found in the RTC document for this final SIP disapproval action.

*EPA Response:* In response to these comments the EPA examined the temporal and spatial characteristics of model under prediction to investigate the possible causes of under prediction of MDA8 ozone concentrations in different regions of the U.S. in the proposal modeling. The EPA's analysis indicates that the under prediction was most extensive during May and June with less bias during July and August in most regions of the U.S. For example, in the Upper Midwest region model under prediction was larger in May and June compared to July through September. Specifically, the normalized mean bias for days with measured concentrations greater than or equal to 60 ppb

improved from a 21.4 percent under prediction for May and June to a 12.6 percent under prediction in the period July through September. As described in the AQM TSD, the seasonal pattern in bias in the Upper Midwest region improves somewhat gradually with time from the middle of May to the latter part of June. In view of the seasonal pattern in bias in the Upper Midwest and in other regions of the U.S., the EPA focused its investigation of model performance on model inputs that, by their nature, have the largest temporal variation within the ozone season. These inputs include emissions from biogenic sources and lightning NO$_X$, and contributions from transport of international anthropogenic emissions and natural sources into the U.S. Both biogenic and lightning NO$_X$ emissions in the U.S. dramatically increase from spring to summer.[52][53] In contrast, ozone transported into the U.S. from international anthropogenic and natural sources peaks during the period March through June, with lower contributions during July through September.[54][55] To investigate the impacts of the sources, the EPA conducted sensitivity model runs which focused on the effects on model performance of adding NO$_X$ emissions from lightning strikes, using updated biogenic emissions, and using an alternative approach (described in more detail later in this section) for quantifying transport of ozone and precursor pollutants into the U.S. from international anthropogenic and natural sources. In the air quality modeling for proposal, the amount of transport from international sources was based on a simulation of the hemispheric version of the Community Multi-scale Air Quality

[45] *https://www.epa.gov/air-emissions-modeling/ 2016v2-platform.*

[46] These proposals are listed in footnote 5 of this action.

[47] The EPA also relied on this same modeling data to support proposed Federal Implementation Plans (FIPs) resolving interstate transport obligations for 27 states for the 2015 ozone NAAQS. 87 FR 20036 (April 6, 2022). The EPA allowed 60 days to receive comments on the proposed FIP rule, including acceptance of comment on the 2016v2 emissions inventory-based modeling platform. The EPA then allowed for an additional 15 days via an extension of the comment period. 87 FR 29108 (May 12, 2022).

[48] 87 FR 64412, 64413.

[49] The 2016v3 platform also includes projected emissions for 2026. However, the 2026 data are not applicable and were not used in this final action.

[50] Ramboll Environment and Health, January 2021, *https://www.camx.com.*

[51] Christopher Emery, Zhen Liu, Armistead G. Russell, M. Talat Odman, Greg Yarwood & Naresh Kumar (2017) Recommendations on statistics and benchmarks to assess photochemical model performance, Journal of the Air & Waste Management Association, 67:5, 582–598, DOI: 10.1080/10962247.1265027.

[52] Guenther, A.B., 1997. Seasonal and spatial variations in natural volatile organic compound emissions. Ecol. Appl. 7, 34–45. *http://dx.doi.org/ 10.1890/1051-0761(1997) 007[0034:SASVIN]2.0.CO;2.* Guenther, A., Hewitt, C.N., Erickson, D., Fall, R.

[53] Kang D, Mathur R, Pouliot GA, Gilliam RC, Wong DC. Significant ground-level ozone attributed to lightning-induced nitrogen oxides during summertime over the Mountain West States. NPJ Clim Atmos Sci. 2020 Jan 30;3:6. doi: 10.1038/ s41612–020–0108–2. PMID: 32181370; PMCID: PMC7075249.

[54] Jaffe DA, Cooper OR, Fiore AM, Henderson BH, Tonnesen GS, Russell AG, Henze DK, Langford AO, Lin M, Moore T. Scientific assessment of background ozone over the U.S.: Implications for air quality management. Elementa (Wash DC). 2018;6(1):56. doi: 10.1525/elementa.309. PMID: 30364819; PMCID: PMC6198683.

[55] Henderson, B.H., P. Dolwick, C. Jang, A., Eyth, J. Vukovich, R. Mathur, C. Hogrefe, N. Possiel, G. Pouliot, B. Timin, K.W. Appel, 2019. Global Sources of North American Ozone. Presented at the 18th Annual Conference of the UNC Institute for the Environment Community Modeling and Analysis System (CMAS) Center, October 21–23, 2019.

Model (H–CMAQ) [56] for 2016. The outputs from this hemispheric modeling were then used to provide boundary conditions for the national scale air quality modeling at proposal.[57] Overall, H–CMAQ tends to under predict daytime ozone concentrations at rural and remote monitoring sites across the U.S. during the spring of 2016 whereas the predictions from the GEOS-Chem global model [58] were generally less biased.[59] During the summer of 2016 both models showed varying degrees of over prediction with GEOS-Chem showing somewhat greater over prediction, compared to H–CMAQ. In view of those results, the EPA examined the impacts of using GEOS-Chem as an alternative to H–CMAQ for providing boundary conditions for the modeling supporting this final action.

For the lightning $NO_X$, biogenics, and GEOS-Chem sensitivity runs, the EPA reran the proposal modeling using each of these inputs, individually. Results from these sensitivity runs indicate that each of the three updates provides an improvement in model performance. However, by far the greatest improvement in modeling performance is attributable to the use of GEOS-Chem. In view of these results the EPA has included lightning $NO_X$ emissions, updated biogenic emissions, and international transport from GEOS-Chem in the air quality modeling supporting final SIP actions. Details on the results of the individual sensitivity runs can be found in the AQM TSD. For the air quality modeling supporting final SIP actions, model performance based on days in 2016 with measured MDA8 ozone greater than or equal to 60 ppb is considerably improved (i.e., less bias and error) compared to the proposal modeling in nearly all regions. For example, in the Upper Midwest, which includes monitoring sites along Lake Michigan, the normalized mean bias improved from a 19 percent under prediction to a 6.9 percent under prediction and in the Southwest region, which includes monitoring sites in Denver, Las Cruces, El Paso, and Salt Lake City, normalized mean bias improved from a 13.6 percent under prediction to a 4.8 percent under prediction.[60] In all regions, the normalized mean bias and normalized mean error statistics for high ozone days based on the modeling supporting final SIP actions are within the range of performance criteria benchmarks (i.e., less than plus or minus 15 percent for normalized mean bias and less than 25 percent for normalized mean error).[61] Additional information on model performance information is provided in the AQM TSD. In summary, the EPA included emissions of lightning $NO_X$, as requested by commenters, and investigated and addressed concerns about model performance for the modeling supporting final SIP actions.

### 3. Emissions Inventories

The EPA developed emissions inventories to support air quality modeling for this final action, including emissions estimates for EGUs, non-EGU point sources (i.e., stationary point sources), stationary nonpoint sources, onroad mobile sources, nonroad mobile sources, other mobile sources, wildfires, prescribed fires, and biogenic emissions that are not the direct result of human activities. The EPA's air quality modeling relies on this comprehensive set of emissions inventories because emissions from multiple source categories are needed to model ambient air quality and to facilitate comparison of model outputs with ambient measurements.

Prior to the modeling of air quality, the emissions inventories must be processed into a format that is appropriate for the air quality model to use. To prepare the emissions inventories for air quality modeling, the EPA processed the emissions inventories using the Sparse Matrix Operator Kernel Emissions (SMOKE) Modeling System version 4.9 to produce the gridded, hourly, speciated, model-ready emissions for input to the air quality model. Additional information on the development of the emissions inventories and on data sets used during the emissions modeling process are provided in the document titled "Technical Support Document (TSD): Preparation of Emissions Inventories for the 2016v3 North American Emissions Modeling Platform," hereafter known as the "2016v3 Emissions Modeling TSD." This TSD is available in the docket for this action.[62]

### 4. Foundation Emissions Inventory

The 2016v3 emissions platform is comprised of data from various sources including data developed using models, methods, and source datasets that became available in calendar years 2020 through 2022, in addition to data retained from the Inventory Collaborative 2016 version 1 (2016v1) Emissions Modeling Platform, released in October 2019. The 2016v1 platform was developed through a national collaborative effort between the EPA and state and local agencies along with MJOs. The 2016v2 platform used to support the proposed action included updated data, models and methods as compared to 2016v1. The 2016v3 platform includes updates implemented in response to comments along with other updates to the 2016v2 platform such as corrections and the incorporation of updated data sources that became available prior to the 2016v3 inventories being developed. Several commenters noted that the 2016v2 platform did not include $NO_X$ emissions that resulted from lightning strikes. To address this, lightning $NO_X$ emissions were computed and included in the 2016v3 platform.

For this final action, the EPA developed emissions inventories for the base year of 2016 and the projected year of 2023. The 2023 inventories represent changes in activity data and of predicted emissions reductions from on-the-books actions, planned emissions control installations, and promulgated Federal measures that affect anthropogenic emissions. The 2016 emissions inventories for the U.S. primarily include data derived from the 2017 National Emissions Inventory (2017

---

[56] Mathur, R., Gilliam, R., Bullock, O.R., Roselle, S., Pleim, J., Wong, D., Binkowski, F., and 1 Streets, D.: Extending the applicability of the community multiscale air quality model to 2 hemispheric scales: motivation, challenges, and progress. In: Steyn DG, Trini S (eds) Air 3 pollution modeling and its applications, XXI. Springer, Dordrecht, pp 175–179, 2012.

[57] Boundary conditions are the concentrations of pollutants along the north, east, south, and west boundaries of the air quality modeling domain. Boundary conditions vary in space and time and are typically obtained from predictions of global or hemispheric models. Information on how boundary conditions were developed for modeling supporting EPA's final SIP actions can be found in the AQM TSD.

[58] I. Bey, D.J. Jacob, R.M. Yantosca, J.A. Logan, B.D. Field, A.M. Fiore, Q. Li, H.Y. Liu, L.J. Mickley, M.G. Schultz. Global modeling of tropospheric chemistry with assimilated meteorology: model description and evaluation. J. Geophys. Res. Atmos., 106 (2001), pp. 23073–23095, 10.1029/2001jd000807.

[59] Henderson, B.H., P. Dolwick, C. Jang, A., Eyth, J. Vukovich, R. Mathur, C. Hogrefe, G. Pouliot, N. Possiel, B. Timin, K.W. Appel, 2022. Meteorological and Emission Sensitivity of Hemispheric Ozone and $PM_{2.5}$. Presented at the 21st Annual Conference of the UNC Institute for the Environment Community Modeling and Analysis System (CMAS) Center, October 17–19, 2022.

[60] A comparison of model performance from the proposal modeling to the final modeling for individual monitoring sites can be found in the docket for this final action.

[61] Christopher Emery, Zhen Liu, Armistead G. Russell, M. Talat Odman, Greg Yarwood & Naresh Kumar (2017) Recommendations on statistics and benchmarks to assess photochemical model performance, Journal of the Air & Waste Management Association, 67:5, 582–598, DOI: 10.1080/10962247.1265027.

[62] See Preparation of Emissions Inventories for the 2016v3 North American Emissions Modeling Platform TSD, also available at https://www.epa.gov/air-emissions-modeling/2016v3-platform.

NEI [63] and data specific to the year of 2016. The following sections provide an overview of the construct of the 2016v3 emissions and projections. The fire emissions were unchanged between the 2016v2 and 2016v3 emissions platforms. For the 2016v3 platform, the biogenic emissions were updated to use the latest available versions of the Biogenic Emissions Inventory System and associated land use data to help address comments related to a degradation in model performance in the 2016v2 platform as compared to the 2016v1 platform. Details on the construction of the inventories are available in the 2016v3 Emissions Modeling TSD. Details on how the EPA responded to comments related to emissions inventories are available in the RTC document for this action.

Development of emissions inventories for annual $NO_X$ and sulfur dioxide ($SO_2$) emissions for EGUs in the 2016 base year inventory are based primarily on data from continuous emissions monitoring systems (CEMS) and other monitoring systems allowed for use by qualifying units under 40 CFR part 75, with other EGU pollutants estimated using emissions factors and annual heat input data reported to the EPA. For EGUs not reporting under part 75, the EPA used data submitted to the NEI by state, local, and tribal agencies. The final action inventories include updates made in response to comments on the proposed actions including the proposed SIP submission disapprovals and the proposed FIP. The Air Emissions Reporting Rule, (80 FR 8787; February 19, 2015), requires that Type A point sources large enough to meet or exceed specific thresholds for emissions be reported to the EPA via the NEI every year, while the smaller Type B point sources must only be reported to EPA every 3 years. In response to comments, emissions data for EGUs that did not have data submitted to the NEI specific to the year 2016 were filled in with data from the 2017 NEI. For more information on the details of how the 2016 EGU emissions were developed and prepared for air quality modeling, *see* the 2016v3 Emissions Modeling TSD.

The EPA projected 2023 baseline EGU emissions using version 6 of the Integrated Planning Model (IPM) (*www.epa.gov/airmarkets/powersector-modeling*). IPM, developed by ICF Consulting, is a state-of-the-art, peer-reviewed, multi-regional, dynamic, deterministic linear programming model

of the contiguous U.S. electric power sector. It provides forecasts of least cost capacity expansion, electricity dispatch, and emissions control strategies while meeting energy demand and environmental, transmission, dispatch, and reliability constraints. The EPA has used IPM for over two decades to better understand power sector behavior under future business-as-usual conditions and to evaluate the economic and emissions impacts of prospective environmental policies. The model is designed to reflect electricity markets as accurately as possible. The EPA uses the best available information from utilities, industry experts, gas and coal market experts, financial institutions, and government statistics as the basis for the detailed power sector modeling in IPM. The model documentation provides additional information on the assumptions discussed here as well as all other model assumptions and inputs.[64] The EPA relied on the same model platform as in the proposals but made substantial updates to reflect public comments on near-term fossil fuel market price volatility and updated fleet information reflecting Summer 2022 U.S. Energy Information Agency (EIA) 860 data, unit-level comments, and additional updates to the National Electric Energy Data System (NEEDS) inventory.

The IPM version 6—Updated Summer 2021 Reference Case incorporated recent updates through the summer 2022 to account for updated Federal and state environmental regulations (including Renewable Portfolio Standards (RPS), Clean Energy Standards (CES) and other state mandates), fleet changes (committed EGU retirements and new builds), electricity demand, technology cost and performance assumptions from recent data for renewables adopting from National Renewable Energy Lab (NREL's) Annual Technology Baseline 2020 and for fossil sources from the EIA's Annual Energy Outlook (AEO) 2020. Natural gas and coal price projections reflect data developed in fall 2020 but updated in summer 2022 to capture near-term price volatility and current market conditions. The inventory of EGUs provided as an input to the model was the NEEDS fall 2022 version and is available on the EPA's website.[65] This version of NEEDS reflects announced retirements and

under construction new builds known as of early summer 2022. This projected base case accounts for the effects of the final Mercury and Air Toxics Standards rule, CSAPR, the CSAPR Update, the Revised CSAPR Update, New Source Review enforcement settlements, the final Effluent Limitation Guidelines (ELG) Rule, the Coal Combustion Residual (CCR) Rule, and other on-the-books Federal and state rules (including renewable energy tax credit extensions from the Consolidated Appropriations Act of 2021) through early 2021 impacting emissions of $SO_2$, $NO_X$, directly emitted particulate matter, carbon dioxide ($CO_2$), and power plant operations. It also includes final actions, up through the Summer 2022, the EPA has taken to implement the Regional Haze Rule and best available retrofit technology (BART) requirements. Documentation of IPM version 6 and NEEDS, along with updates, is in Docket ID No. EPA–HQ–OAR–2021–0663 and available online at *https://www.epa.gov/airmarkets/power-sector-modeling*.

Non-EGU point source emissions are mostly consistent with those in the proposal modeling except where they were updated in response to comments. Several commenters mentioned that point source emissions carried forward from 2014 NEI were not the best estimates of 2017 emissions. Thus, emissions sources in 2016v2 that had been projected from the 2014 NEI in the proposal were replaced with emissions based on the 2017 NEI. Point source emissions submitted to the 2016 NEI or to the 2016v1 platform development process specifically for the year 2016 were retained in 2016v3.

The 2023 non-EGU point source emissions were grown from 2016 to 2023 using factors based on AEO 2022 and reflect emissions reductions due to known national and local rules, control programs, plant closures, consent decrees, and settlements that could be computed as reductions to specific units by July 2022.

Aircraft emissions and ground support equipment at airports are represented as point sources and are based on adjustments to emissions in the January 2021 version of the 2017 NEI. The EPA developed and applied factors to adjust the 2017 airport emissions to 2016 and 2023 based on activity growth projected by the Federal Aviation Administration Terminal Area Forecast 2021,[66] the latest available version at the time the factors were developed.

[63] *https://www.epa.gov/air-emissions-inventories/2017-national-emissions-inventory-nei-technical-support-document-tsd.*

[64] Detailed information and documentation of the EPA's Base Case, including all the underlying assumptions, data sources, and architecture parameters can be found on the EPA's website at: *https://www.epa.gov/airmarkets/power-sector-modeling.*

[65] *Available at https://www.epa.gov/airmarkets/national-electric-energy-data-system-needs-v6.*

[66] *https://www.faa.gov/data_research/aviation/taf/.*

Emissions at rail yards were represented as point sources. The 2016 rail yard emissions are largely consistent with the 2017 NEI rail yard emissions. The 2016 and 2023 rail yard emissions were developed through the 2016v1 Inventory Collaborative process. Class I rail yard emissions were projected based on the AEO freight rail energy use growth rate projections for 2023 with the fleet mix assumed to be constant throughout the period.

The EPA made multiple updates to point source oil and gas emissions in response to comments. For the 2016v3 modeling, the point source oil and gas emissions for 2016 were based on the 2016v2 point inventory except that most 2014 NEI-based emissions were replaced with 2017 NEI emissions. Additionally, in response to comments, state-provided emissions equivalent to those in the 2016v1 platform were used for Colorado, and some New Mexico emissions were replaced with data backcast from 2020 to 2016. To develop inventories for 2023 for the 2016v3 platform, the year 2016 oil and gas point source inventories were first projected to 2021 values based on actual historical production data, then those 2021 emissions were projected to 2023 using regional projection factors based on AEO 2022 projections. This was an update from the 2016v2 approach in which actual data were used only through the year 2019, because 2021 data were not yet available. $NO_X$ and VOC reductions resulting from co-benefits to New Source Performance Standards (NSPS) for Stationary Reciprocating Internal Combustion Engines (RICE) are reflected, along with Natural Gas Turbine and Process Heater NSPS $NO_X$ controls and Oil and Gas NSPS VOC controls. In some cases, year 2019 point source inventory data were used instead of the projected future year emissions except for the Western Regional Air Partnership (WRAP) states of Colorado, New Mexico, Montana, Wyoming, Utah, North Dakota, and South Dakota. The WRAP future year inventory [67] was used in these WRAP states in all future years except in New Mexico where the WRAP base year emissions were projected using the EIA historical and AEO forecasted production data. Estimated impacts from the recent oil and gas rule in the New Mexico Administrative code 20.2.50 [68] were also included. Details on the development of the projected point

and nonpoint oil and gas emissions inventories are available in the 2016v3 Emissions Modeling TSD in Docket ID No. EPA–HQ–OAR–2021–0663.

Onroad mobile sources include exhaust, evaporative, and brake and tire wear emissions from vehicles that drive on roads, parked vehicles, and vehicle refueling. Emissions from vehicles using regular gasoline, high ethanol gasoline, diesel fuel, and electric vehicles were represented, along with buses that used compressed natural gas. The EPA developed the onroad mobile source emissions for states other than California using the EPA's Motor Vehicle Emissions Simulator (MOVES). MOVES3 was released in November 2020 and has been followed by some minor releases that improved the usage of the model but that do not have substantive impacts on the emissions estimates. For 2016v2, MOVES3 was run using inputs provided by state and local agencies through the 2017 NEI where available, in combination with nationally available data sets to develop a complete inventory. Onroad emissions were developed based on emissions factors output from MOVES3 run for the year 2016, coupled with activity data (*e.g.*, vehicle miles traveled and vehicle populations) representing the year 2016. The 2016 activity data were provided by some state and local agencies through the 2016v1 process, and the remaining activity data were derived from those used to develop the 2017 NEI. The onroad emissions were computed within SMOKE by multiplying emissions factors developed using MOVES with the appropriate activity data. Prior to computing the final action emissions for 2016, updates to some onroad inputs were made in response to comments and to implement corrections. Onroad mobile source emissions for California were consistent with the updated emissions data provided by the state for the final action.

The 2023 onroad emissions reflect projected changes to fuel properties and usage, along with the impact of the rules included in MOVES3 for each of those years. MOVES emissions factors for the year 2023 were used. A comprehensive list of control programs included for onroad mobile sources is available in the 2016v3 Emissions Modeling TSD. Year 2023 activity data for onroad mobile sources were provided by some state and local agencies, and otherwise were projected to 2023 by first projecting the 2016 activity to year 2019 based on county level vehicle miles traveled (VMT) from the Federal Highway Administration. The VMT were held flat from 2019 to 2021 to

account for pandemic impacts, and then projected from 2021 to 2023 using AEO 2022-based factors.[69] Recent updates to inspection and maintenance programs in North Carolina and Tennessee were reflected in the MOVES inputs for the modeling supporting this final action. The 2023 onroad mobile emissions were computed within SMOKE by multiplying the respective emissions factors developed using MOVES with the year-specific activity data. Prior to computing the final action emissions for 2023, the EPA made updates to some onroad inputs in response to comments and to implement corrections.

The commercial marine vessel (CMV) emissions in the 2016 base case emissions inventory for this action were based on those in the 2017 NEI. Factors were applied to adjust the 2017 NEI emissions backward to represent emissions for the year 2016. The CMV emissions are consistent with the emissions for the 2016v1 platform CMV emissions released in February 2020 although, in response to comments, the EPA implemented an improved process for spatially allocating CMV emissions along state and county boundaries for the modeling supporting this final action.

The EPA developed nonroad mobile source emissions inventories (other than CMV, locomotive, and aircraft emissions) for 2016 and 2023 from monthly, county, and process level emissions output from MOVES3. Types of nonroad equipment include recreational vehicles, pleasure craft, and construction, agricultural, mining, and lawn and garden equipment.[70] The nonroad emissions for the final action were unchanged from those at the proposal. The nonroad mobile emissions control programs include reductions to locomotives, diesel engines, and recreational marine engines, along with standards for fuel sulfur content and evaporative emissions. A comprehensive list of

[67] http://www.wrapair2.org/pdf/WRAP_OGWG_2028_OTB_RevFinalReport_05March2020.pdf.

[68] https://www.env.nm.gov/air-quality/ozone-draft-rule/ and https://www.srca.nm.gov/parts/title20/20.002.0050.html.

[69] VMT data for 2020 were the latest available at the time of final rule data development but were heavily impacted by the pandemic and unusable to project to 2023; in addition, it was determined that chaining factors based on AEO 2020 and AEO2021 obtain the needed factors led to unrealistic artifacts, thus only AEO 2022 data were used.

[70] Line haul locomotives are also considered a type of nonroad mobile source but the emissions inventories for locomotives were not developed using MOVES3. Year 2016 and 2023 locomotive emissions were developed through the 2016v1 process, and the year 2016 emissions are mostly consistent with those in the 2017 NEI. The projected locomotive emissions for 2023 were developed by applying factors to the base year emissions using activity data based on AEO freight rail energy use growth rate projections along with emissions rates adjusted to account for recent historical trends.

control programs included for mobile sources is available in the 2016v3 Emissions Modeling TSD.

For stationary nonpoint sources, some emissions in the 2016 base case emissions inventory come directly from the 2017 NEI, others were adjusted from the 2017 NEI to represent 2016 levels, and the remaining emissions including those from oil and gas, fertilizer, and solvents were computed specifically to represent 2016. Stationary nonpoint sources include evaporative sources, consumer products, fuel combustion that is not captured by point sources, agricultural livestock, agricultural fertilizer, residential wood combustion, fugitive dust, and oil and gas sources. The emissions sources derived from the 2017 NEI include agricultural livestock, fugitive dust, residential wood combustion, waste disposal (including composting), bulk gasoline terminals, and miscellaneous non-industrial sources such as cremation, hospitals, lamp breakage, and automotive repair shops. A recent method to compute solvent VOC emissions was used.[71]

Where comments were provided about projected control measures or changes in nonpoint source emissions, those inputs were first reviewed by the EPA. Those found to be based on reasonable data for affected emissions sources were incorporated into the projected inventories for 2023 to the extent possible. Where possible, projection factors based on the AEO used data from AEO 2022, the most recent AEO at the time available at the time the inventories were developed. Federal regulations that impact the nonpoint sources were reflected in the inventories. Adjustments for state fuel sulfur content rules for fuel oil in the Northeast were included along with solvent controls applicable within the northeast ozone transport region (OTR) states. Details are available in the 2016v3 Emissions Modeling TSD.

Nonpoint oil and gas emissions inventories for many states were developed based on outputs from the 2017 NEI version of the EPA Oil and Gas Tool using activity data for year 2016. Production-related emissions data from the 2017 NEI were used for Oklahoma, 2016v1 emissions were used for Colorado and Texas production-related sources to respond to comments. Data for production-related nonpoint oil and gas emissions in the States of Colorado, Montana, New Mexico, North Dakota, South Dakota, Utah, and Wyoming were obtained from the

WRAP baseline inventory.[72] A California Air Resources Board-provided inventory was used for 2016 oil and gas emissions in California. Nonpoint oil and gas inventories for 2023 were developed by first projecting the 2016 oil and gas inventories to 2021 values based on actual production data. Next, those 2021 emissions were projected to 2023 using regional projection factors by product type based on AEO 2022 projections. A 2017–2019 average inventory was used for oil and natural gas exploration emissions in 2023 everywhere except for California and in the WRAP states in which data from the WRAP future year inventory[73] were used. NO$_X$ and VOC reductions that are co-benefits to the NSPS for RICE are reflected, along with Natural Gas Turbines and Process Heaters NSPS NO$_X$ controls and NSPS Oil and Gas VOC controls. The WRAP future year inventory was used for oil and natural gas production sources in 2023 except in New Mexico where the WRAP Base year emissions were projected using the EIA historical and AEO forecasted production data. Estimated impacts from the New Mexico Administrative Code 20.2.50 were included.

*B. Air Quality Modeling To Identify Nonattainment and Maintenance Receptors*

This section describes the air quality modeling and analyses that the EPA performed in Step 1 to identify locations where the Agency expects there to be nonattainment or maintenance receptors for the 2015 ozone NAAQS in 2023. Where the EPA's analysis shows that an area or site does not fall under the definition of a nonattainment or maintenance receptor in 2023, that site is excluded from further analysis under the EPA's good neighbor framework.

1. Approach for Identifying Receptors

In the proposed actions, the EPA applied the same approach used in the CSAPR Update and the Revised CSAPR Update to identify nonattainment and maintenance receptors for the 2008 ozone NAAQS.[74] The EPA's approach gives independent effect to both the "contribute significantly to nonattainment" and the "interfere with maintenance" prongs of section 110(a)(2)(D)(i)(I), consistent with the D.C. Circuit's direction in *North Carolina*. Further, in its decision on the remand of CSAPR from the Supreme Court in the *EME Homer City II* case, the

D.C. Circuit confirmed that the EPA's approach to identifying maintenance receptors in CSAPR comported with the court's prior instruction to give independent meaning to the "interfere with maintenance" prong in the good neighbor provision.[75]

In the CSAPR Update and the Revised CSAPR Update, the EPA identified nonattainment receptors as those monitoring sites that are projected to have average design values that exceed the NAAQS and that are also measuring nonattainment based on the most recent monitored design values. This approach is consistent with prior transport rulemakings, such as the NO$_X$ SIP Call and CAIR, where the EPA defined nonattainment receptors as those areas that both currently monitor nonattainment and that the EPA projects will be in nonattainment in the future compliance year.

The Agency explained in the NO$_X$ SIP Call and CAIR and then reaffirmed in the CSAPR Update that the EPA has the most confidence in our projections of nonattainment for those counties that also measure nonattainment for the most recent period of available ambient data. The EPA separately identified maintenance receptors as those receptors that would have difficulty maintaining the relevant NAAQS in a scenario that accounts for historical variability in air quality at that receptor. The variability in air quality was determined by evaluating the "maximum" future design value at each receptor based on a projection of the maximum measured design value over the relevant period. The EPA interprets the projected maximum future design value to be a potential future air quality outcome consistent with the meteorology that yielded maximum measured concentrations in the ambient data set analyzed for that receptor (*i.e.*, ozone conducive meteorology). The EPA also recognizes that previously experienced meteorological conditions (*e.g.*, dominant wind direction, temperatures, and air mass patterns) promoting ozone formation that led to maximum concentrations in the measured data may reoccur in the future. The maximum design value gives a reasonable projection of future air quality at the receptor under a scenario in which such conditions do, in fact, reoccur. The projected maximum design value is used to identify upwind emissions that, under those circumstances, could interfere with the downwind area's ability to maintain the NAAQS.

[71] *https://doi.org/10.5194/acp-21-5079-2021.*

[72] *http://www.wrapair2.org/pdf/WRAP_OGWG_Report_Baseline_17Sep2019.pdf.*
[73] *http://www.wrapair2.org/pdf/WRAP_OGWG_2028_OTB_RevFinalReport_05March2020.pdf.*
[74] *See* 86 FR 23078–79.

[75] *EME Homer City II,* 795 F.3d at 136.

Therefore, applying this methodology for this action, the EPA assessed the magnitude of the maximum projected design values for 2023 at each receptor in relation to the 2015 ozone NAAQS and, where such a value exceeds the NAAQS, the EPA determined that receptor to be a "maintenance" receptor for purposes of defining interference with maintenance, consistent with the method used in CSAPR and upheld by the D.C. Circuit in *EME Homer City II*.[76] That is, monitoring sites with a maximum design value that exceeds the NAAQS are projected to have maintenance problems in the future analytic years.

Recognizing that nonattainment receptors are also, by definition, maintenance receptors, the EPA often uses the term "maintenance-only" to refer to receptors that are not also nonattainment receptors. Consistent with the concepts for maintenance receptors, as described earlier, the EPA identifies "maintenance-only" receptors as those monitoring sites that have projected average design values above the level of the applicable NAAQS, but that are not currently measuring nonattainment based on the most recent official design values. In addition, those monitoring sites with projected average design values below the NAAQS, but with projected maximum design values above the NAAQS are also identified as "maintenance only" receptors, even if they are currently measuring nonattainment based on the most recent official certified design values.[77]

*Comment:* The EPA received comments claiming that the projected design values for 2023 were biased low compared to recent measured data. Commenters noted that a number of monitoring sites that are projected to be below the NAAQS in 2023 based on the EPA's modeling for the proposed action are currently measuring nonattainment based on data from 2020 and 2021. One commenter requested that the EPA determine whether its past modeling tends to overestimate or underestimate actual observed design values. If EPA finds that the agency's model tends to underestimate future year design values, the commenter requests that EPA re-run its ozone modeling, incorporating parameters that account for this tendency.

*EPA Response:* In response to comments, the EPA compared the projected 2023 design values based on the proposal modeling to recent trends in measured data. As a result of this analysis, the EPA agrees that current data indicate that there are monitoring sites at risk of continued nonattainment in 2023 even though the model projected average and maximum design values at these sites are below the NAAQS (*i.e.,* these sites would not be modeling-based receptors at Step 1). While the EPA has confidence in the reliability of the modeling for projecting air quality conditions and contributions in future years, it would not be reasonable to ignore recent measured ozone levels in many areas that are clearly not fully consistent with certain concentrations in the Step 1 analysis for 2023. Therefore, the EPA has developed an additional maintenance-only receptor category, which includes what we refer to as "violating monitor" receptors, based on current ozone concentrations measured by regulatory ambient air quality monitoring sites.

Specifically, the EPA has identified monitoring sites with measured 2021 and preliminary 2022 design values *and* 4th high maximum daily 8-hour average (MDA8) ozone in both 2021 and 2022 (preliminary data) that exceed the NAAQS as having the greatest risk of continuing to have a problem attaining the standard in 2023. These criteria sufficiently consider measured air quality data so as to avoid including monitoring sites that have measured nonattainment data in recent years but could reasonably be anticipated to not have a nonattainment or maintenance problem in 2023, in line with our modeling results. Our methodology is intended only to identify those sites that have sufficiently poor ozone levels that there is clearly a reasonable expectation that an ozone nonattainment or maintenance problem will persist in the 2023 ozone season. Moreover, the 2023 ozone season is so near in time that recent measured ozone levels can be used to reasonably project whether an air quality problem is likely to persist. We view this approach to identifying additional receptors in 2023 as the best means of responding to the comments on this issue in this action, while also identifying all transport receptors.

For purposes of this action, we will treat these violating monitors as an additional type of maintenance-only receptor. We acknowledge that traditional modeling plus monitoring methodology we used at proposal and in prior ozone transport rules would otherwise have identified such sites as being in attainment in 2023. Because our modeling did not identify these sites as receptors, we do not believe it is sufficiently certain that these sites will be in nonattainment that they should be considered nonattainment receptors. In the face of this uncertainty in the record, we regard our ability to consider such sites as receptors for purposes of good neighbor analysis under CAA section 110(a)(2)(D)(i)(I) to be a function of the requirement to prohibit emissions that interfere with maintenance of the NAAQS; even if an area may be projected to be in attainment, we have reliable information indicating that there is a clear risk that attainment will not in fact be achieved in 2023. Thus, our authority for treating these sites as receptors at Step 1 in 2023 flows from the responsibility in CAA section 110(a)(2)(i)(I) to prohibit emissions that interfere with maintenance of the NAAQS. *See, e.g., North Carolina,* 531 F.3d at 910–11 (failing to give effect to the interfere with maintenance clause "provides no protection for downwind areas that, *despite EPA's predictions,* still find themselves struggling to meet NAAQS due to upwind interference . . . .") (emphasis added). Recognizing that no modeling can perfectly forecast the future, and "a degree of imprecision is inevitable in tackling the problem of interstate air pollution," this approach in the Agency's judgement best balances the need to avoid both "under-control" and "overcontrol," *EME Homer City,* 572 U.S. at 523. The EPA's analysis of these additional receptors further is explained in Section III.C.

However, because we did not propose to apply this expansion of the basis for regulation under the good neighbor provision receptor-identification methodology as the sole basis for finding an upwind state linked, in this action we are only using this receptor category on a confirmatory basis. That is, for states that we find linked based on our traditional modeling-based methodology in 2023, we find in this final analysis that the linkage at Step 2 is strengthened and confirmed if that state is also linked to one or more "violating-monitor" receptors. If a state is only linked to a violating-monitor receptor in this final analysis, we are deferring taking final action on that state's SIP submittal. This is the case for the State of Tennessee. Among the states that previously had their transport SIPs approved for the 2015 ozone NAAQS, the EPA has also identified a linkage to violating-monitor receptors for the State of Kansas. The EPA intends to further review its air quality modeling results and recent measured ozone levels, and we intend to address these states' good

---

[76] *EME Homer City II,* 795 F.3d at 136.

[77] *See https://www.epa.gov/air-trends/air-quality-design-values* for design value reports. At the time of this action, the most recent reports of certified design values available are for the calendar year 2021. The 2022 values are considered "preliminary" and therefore subject to change before certification.

neighbor obligations as expeditiously as practicable in a future action.

2. Methodology for Projecting Future Year Ozone Design Values

Consistent with the EPA's modeling guidance, the 2016 base year and future year air quality modeling results were used in a relative sense to project design values for 2023.[78] That is, the ratios of future year model predictions to base year model predictions are used to adjust ambient ozone design values up or down depending on the relative (percent) change in model predictions for each location. The EPA's modeling guidance recommends using measured ozone concentrations for the 5-year period centered on the base year as the air quality data starting point for future year projections. This average design value is used to dampen the effects of inter-annual variability in meteorology on ozone concentrations and to provide a reasonable projection of future air quality at the receptor under average conditions. In addition, the Agency calculated maximum design values from within the 5-year base period to represent conditions when meteorology is more favorable than average for ozone formation. Because the base year for the air quality modeling used in this final action is 2016, measured data for 2014–2018 (i.e., design values for 2016, 2017, and 2018) were used to project average and maximum design values in 2023.

The ozone predictions from the 2016 and future year air quality model simulations were used to project 2016–2018 average and maximum ozone design values to 2023 using an approach similar to the approach in the EPA's guidance for attainment demonstration modeling. This guidance recommends using model predictions from the 3 x 3 array of grid cells surrounding the location of the monitoring site to calculate a Relative Response Factor (RRF) for that site. However, the guidance also notes that an alternative array of grid cells may be used in certain situations where local topographic or geographical feature (e.g., a large water body or a significant elevation change) may influence model response.

The 2016–2018 base period average and maximum design values were multiplied by the RRF to project each of these design values to 2023. In this manner, the projected design values are grounded in monitored data, and not the absolute model-predicted future year

concentrations. Following the approach in the CSAPR Update and the Revised CSAPR Update, the EPA also projected future year design values based on a modified version of the "3 x 3" approach for those monitoring sites located in coastal areas. In this alternative approach, the EPA eliminated from the RRF calculations the modeling data in those grid cells that are dominated by water (i.e., more than 50 percent of the area in the grid cell is water) and that do not contain a monitoring site (i.e., if a grid cell is more than 50 percent water but contains an air quality monitor, that cell would remain in the calculation). The choice of more than 50 percent of the grid cell area as water as the criteria for identifying overwater grid cells is based on the treatment of land use in the Weather Research and Forecasting model (WRF). Specifically, in the WRF meteorological model those grid cells that are greater than 50% overwater are treated as being 100 percent overwater. In such cases the meteorological conditions in the entire grid cell reflect the vertical mixing and winds over water, even if part of the grid cell also happens to be over land with land-based emissions, as can often be the case for coastal areas. Overlaying land-based emissions with overwater meteorology may be representative of conditions at coastal monitors during times of on-shore flow associated with synoptic conditions or sea-breeze or lake-breeze wind flows. But there may be other times, particularly with off-shore wind flow, when vertical mixing of land-based emissions may be too limited due to the presence of overwater meteorology. Thus, for our modeling the EPA projected average and maximum design values at individual monitoring sites based on both the "3 x 3" approach as well as the alternative approach that eliminates overwater cells in the RRF calculation for near-coastal areas (i.e., "no water" approach). The projected 2023 design values using both the "3 x 3" and "no-water" approaches are provided in the docket for this final action. Both approaches result in the same set of receptors in 2023. That is, monitoring sites that are identified as receptors in 2023 based on the "3 x 3" approach are also receptors based on the "no water" approach.

Consistent with the truncation and rounding procedures for the 8-hour ozone NAAQS, the projected design values are evaluated after truncation to integers in units of ppb. Therefore, projected design values that are greater than or equal to 71 ppb are considered to be violating the 2015 ozone NAAQS.

For those sites that are projected to be violating the NAAQS based on the average design values in 2023, the Agency examined the measured design values for 2021, which are the most recent official measured design values at the time of this final action.

As noted earlier, the Agency proposes to identify nonattainment receptors in this rulemaking as those sites that are violating the NAAQS based on current measured air quality through 2021 and have projected average design values of 71 ppb or greater. Maintenance-only receptors include both: (1) Those sites with projected average design values above the NAAQS that are currently measuring clean data (i.e., ozone design values below the level of the 2015 ozone NAAQS in 2021) and (2) those sites with projected average design values below the level of the NAAQS, but with projected maximum design values of 71 ppb or greater. In addition to the maintenance-only receptors, ozone nonattainment receptors are also maintenance receptors because the projected maximum design values for each of these sites is always greater than or equal to the average design value. Further, as explained previously in this section, the EPA identifies certain monitoring sites as "violating monitor" maintenance-only receptors based on 2021 and 2022 measured ozone levels.

The monitoring sites that the Agency projects to be nonattainment and maintenance receptors for the ozone NAAQS in the 2023 base case are used for assessing the contribution of emissions in upwind states to downwind nonattainment and maintenance of the 2015 ozone NAAQS as part of this final action.

3. 2023 Nonattainment and Maintenance-Only Receptors for the Final Action

In this section we provide information on modeling-based design values and measured data for monitoring sites identified as nonattainment or maintenance-only receptors in 2023 for this final action. Table III.B–1 of this action contains the 2016-centered base period average and maximum 8-hour ozone design values, the 2023 projected average and maximum design values and the measured 2021 design values for monitoring sites that are projected to be nonattainment receptors in 2023. Table III.B–2 of this action contains this same information for monitoring sites that are projected to be maintenance-only receptors in 2023, based on air quality modeling. Table III.B–3 of this action contains the 2023 projected average and maximum design values and 2021 design values and 4th high

---

[78] U.S. Environmental Protection Agency, 2018. Modeling Guidance for Demonstrating Attainment of Air Quality Goals for Ozone, $PM_{2.5}$, and Regional Haze, Research Triangle Park, NC. *https://www.epa.gov/scram/state-implementation-plan-sip-attainment-demonstration-guidance.*

MDA8 ozone concentrations and preliminary 2020 design values and 4th high MDA8 ozone concentrations for monitoring sites identified as violating

monitor maintenance-only receptors. The design values for all monitoring sites in the U.S. are provided in the docket for this action. Additional details

on the approach for projecting average and maximum design values are provided in the AQM TSD.

TABLE III.B–1—AVERAGE AND MAXIMUM 2016-CENTERED AND 2023 BASE CASE 8-HOUR OZONE DESIGN VALUES AND 2021 DESIGN VALUES (PPB) AT PROJECTED NONATTAINMENT RECEPTORS [a]

| Monitor ID | State | County | 2016 centered average | 2016 centered maximum | 2023 average | 2023 maximum | 2021 |
|---|---|---|---|---|---|---|---|
| 060650016 | CA | Riverside | 79.0 | 80.0 | 72.2 | 73.1 | 78 |
| 060651016 | CA | Riverside | 99.7 | 101 | 91.0 | 92.2 | 95 |
| 080350004 | CO | Douglas | 77.3 | 78 | 71.3 | 71.9 | 83 |
| 080590006 | CO | Jefferson | 77.3 | 78 | 72.8 | 73.5 | 81 |
| 080590011 | CO | Jefferson | 79.3 | 80 | 73.5 | 74.1 | 83 |
| 090010017 | CT | Fairfield | 79.3 | 80 | 71.6 | 72.2 | 79 |
| 090013007 | CT | Fairfield | 82.0 | 83 | 72.9 | 73.8 | 81 |
| 090019003 | CT | Fairfield | 82.7 | 83 | 73.3 | 73.6 | 80 |
| 481671034 | TX | Galveston | 75.7 | 77 | 71.5 | 72.8 | 72 |
| 482010024 | TX | Harris | 79.3 | 81 | 75.1 | 76.7 | 74 |
| 490110004 | UT | Davis | 75.7 | 78 | 72.0 | 74.2 | 78 |
| 490353006 | UT | Salt Lake | 76.3 | 78 | 72.6 | 74.2 | 76 |
| 490353013 | UT | Salt Lake | 76.5 | 77 | 73.3 | 73.8 | 76 |
| 551170006 | WI | Sheboygan | 80.0 | 81 | 72.7 | 73.6 | 72 |

[a] 2016-centered base period average design values and projected average and maximum design values are reported with 1 digit to the right of the decimal, as recommended in the EPA's modeling guidance. The 2016 maximum design values and 2021 design values are truncated to integer values consistent with ozone design value reporting convention in appendix U of 40 CFR part 50.

TABLE III.B–2—AVERAGE AND MAXIMUM 2016-CENTERED AND 2023 BASE CASE 8-HOUR OZONE DESIGN VALUES AND 2021 DESIGN VALUES (PPB) AT PROJECTED MAINTENANCE-ONLY RECEPTORS

| Monitor ID | State | County | 2016 centered average | 2016 centered maximum | 2023 average | 2023 maximum | 2021 |
|---|---|---|---|---|---|---|---|
| 040278011 | AZ | Yuma | 72.3 | 74 | 70.4 | 72.1 | 67 |
| 080690011 | CO | Larimer | 75.7 | 77 | 70.9 | 72.1 | 77 |
| 090099002 | CT | New Haven | 79.7 | 82 | 70.5 | 72.6 | 82 |
| 170310001 | IL | Cook | 73.0 | 77 | 68.2 | 71.9 | 71 |
| 170314201 | IL | Cook | 73.3 | 77 | 68.0 | 71.5 | 74 |
| 170317002 | IL | Cook | 74.0 | 77 | 68.5 | 71.3 | 73 |
| 350130021 | NM | Dona Ana | 72.7 | 74 | 70.8 | 72.1 | 80 |
| 350130022 | NM | Dona Ana | 71.3 | 74 | 69.7 | 72.4 | 75 |
| 350151005 | NM | Eddy | 69.7 | 74 | 69.7 | 74.1 | 77 |
| 350250008 | NM | Lea | 67.7 | 70 | 69.8 | 72.2 | 66 |
| 480391004 | TX | Brazoria | 74.7 | 77 | 70.4 | 72.5 | 75 |
| 481210034 | TX | Denton | 78.0 | 80 | 69.8 | 71.6 | 74 |
| 481410037 | TX | El Paso | 71.3 | 73 | 69.8 | 71.4 | 75 |
| 482010055 | TX | Harris | 76.0 | 77 | 70.9 | 71.9 | 77 |
| 482011034 | TX | Harris | 73.7 | 75 | 70.1 | 71.3 | 71 |
| 482011035 | TX | Harris | 71.3 | 75 | 67.8 | 71.3 | 71 |
| 530330023 | WA | King | 73.3 | 77 | 67.6 | 71.0 | 64 |
| 550590019 | WI | Kenosha | 78.0 | 79 | 70.8 | 71.7 | 74 |
| 551010020 | WI | Racine | 76.0 | 78 | 69.7 | 71.5 | 73 |

In total, in 2023 there are a total of projected 33 modeling-based receptors nationwide including 14 nonattainment receptors in 9 different counties and 19 maintenance-only receptors in 13 additional counties (Harris County, TX, has both nonattainment and maintenance-only receptors).

As shown in Table III.B–3 of this action, there are 49 monitoring sites that

are identified as "violating-monitor" maintenance-only receptors in 2023. As noted earlier in this section, the EPA uses the approach of considering "violating-monitor" maintenance-only receptors as confirmatory of the proposal's identification of receptors and does not implicate additional linked states in this final action, Rather, using this approach serves to strengthen

the analytical basis for our Step 2 findings by establishing that many upwind states covered in this action are also projected to contribute above 1 percent of the NAAQS to these additional "violating monitor" maintenance-only receptors.

TABLE III.B–3—AVERAGE AND MAXIMUM 2023 BASE CASE 8-HOUR OZONE, AND 2021 AND PRELIMINARY 2022 DESIGN VALUES (PPB) AND 4TH HIGH CONCENTRATIONS AT VIOLATING MONITORS[a]

| Monitor ID | State | County | 2023 average | 2023 maximum | 2021 | 2022 P | 2021 4th high | 2022 P 4th high |
|---|---|---|---|---|---|---|---|---|
| 40070010 ............... | AZ | Gila ......................... | 67.9 | 69.5 | 77 | 76 | 75 | 74 |
| 40130019 ............... | AZ | Maricopa ................. | 69.8 | 70.0 | 75 | 77 | 78 | 76 |
| 40131003 ............... | AZ | Maricopa ................. | 70.1 | 70.7 | 80 | 80 | 83 | 78 |
| 40131004 ............... | AZ | Maricopa ................. | 70.2 | 70.8 | 80 | 81 | 81 | 77 |
| 40131010 ............... | AZ | Maricopa ................. | 68.3 | 69.2 | 79 | 80 | 80 | 78 |
| 40132001 ............... | AZ | Maricopa ................. | 63.8 | 64.1 | 74 | 78 | 79 | 81 |
| 40132005 ............... | AZ | Maricopa ................. | 69.6 | 70.5 | 78 | 79 | 79 | 77 |
| 40133002 ............... | AZ | Maricopa ................. | 65.8 | 65.8 | 75 | 75 | 81 | 72 |
| 40134004 ............... | AZ | Maricopa ................. | 65.7 | 66.6 | 73 | 73 | 73 | 71 |
| 40134005 ............... | AZ | Maricopa ................. | 62.3 | 62.3 | 73 | 75 | 79 | 73 |
| 40134008 ............... | AZ | Maricopa ................. | 65.6 | 66.5 | 74 | 74 | 74 | 71 |
| 40134010 ............... | AZ | Maricopa ................. | 63.8 | 66.9 | 74 | 76 | 77 | 75 |
| 40137020 ............... | AZ | Maricopa ................. | 67.0 | 67.0 | 76 | 77 | 77 | 75 |
| 40137021 ............... | AZ | Maricopa ................. | 69.8 | 70.1 | 77 | 77 | 78 | 75 |
| 40137022 ............... | AZ | Maricopa ................. | 68.2 | 69.1 | 76 | 78 | 76 | 79 |
| 40137024 ............... | AZ | Maricopa ................. | 67.0 | 67.9 | 74 | 76 | 74 | 77 |
| 40139702 ............... | AZ | Maricopa ................. | 66.9 | 68.1 | 75 | 77 | 72 | 77 |
| 40139704 ............... | AZ | Maricopa ................. | 65.3 | 66.2 | 74 | 77 | 76 | 76 |
| 40139997 ............... | AZ | Maricopa ................. | 70.5 | 70.5 | 76 | 79 | 82 | 76 |
| 40218001 ............... | AZ | Pinal ....................... | 67.8 | 69.0 | 75 | 76 | 73 | 77 |
| 80013001 ............... | CO | Adams ..................... | 63.0 | 63.0 | 72 | 77 | 79 | 75 |
| 80050002 ............... | CO | Arapahoe ................ | 68.0 | 68.0 | 80 | 80 | 84 | 73 |
| 80310002 ............... | CO | Denver .................... | 63.6 | 64.8 | 72 | 74 | 77 | 71 |
| 80310026 ............... | CO | Denver .................... | 64.5 | 64.8 | 75 | 77 | 83 | 72 |
| 90079007 ............... | CT | Middlesex ............... | 68.7 | 69.0 | 74 | 73 | 78 | 73 |
| 90110124 ............... | CT | New London ........... | 65.5 | 67.0 | 73 | 72 | 75 | 71 |
| 170310032 ............. | IL | Cook ....................... | 67.3 | 69.8 | 75 | 75 | 77 | 72 |
| 170311601 ............. | IL | Cook ....................... | 63.8 | 64.5 | 72 | 73 | 72 | 71 |
| 181270024 ............. | IN | Porter ..................... | 63.4 | 64.6 | 72 | 73 | 72 | 73 |
| 260050003 ............. | MI | Allegan ................... | 66.2 | 67.4 | 75 | 75 | 78 | 73 |
| 261210039 ............. | MI | Muskegon ............... | 67.5 | 68.4 | 74 | 79 | 75 | 82 |
| 320030043 ............. | NV | Clark ...................... | 68.4 | 69.4 | 73 | 75 | 74 | 74 |
| 350011012 ............. | NM | Bernalillo ............... | 63.8 | 66.0 | 72 | 73 | 76 | 74 |
| 350130008 ............. | NM | Dona Ana ............... | 65.6 | 66.3 | 72 | 76 | 79 | 78 |
| 361030002 ............. | NY | Suffolk .................... | 66.2 | 68.0 | 73 | 74 | 79 | 74 |
| 390850003 ............. | OH | Lake ....................... | 64.3 | 64.6 | 72 | 74 | 72 | 76 |
| 480290052 ............. | TX | Bexar ...................... | 67.1 | 67.8 | 73 | 74 | 78 | 72 |
| 480850005 ............. | TX | Collin ...................... | 65.4 | 66.0 | 75 | 74 | 81 | 73 |
| 481130075 ............. | TX | Dallas ..................... | 65.3 | 66.5 | 71 | 71 | 73 | 72 |
| 481211032 ............. | TX | Denton .................... | 65.9 | 67.7 | 76 | 77 | 85 | 77 |
| 482010051 ............. | TX | Harris ..................... | 65.3 | 66.3 | 74 | 73 | 83 | 72 |
| 482010416 ............. | TX | Harris ..................... | 68.8 | 70.4 | 73 | 73 | 78 | 71 |
| 484390075 ............. | TX | Tarrant ................... | 63.8 | 64.7 | 75 | 76 | 76 | 77 |
| 484391002 ............. | TX | Tarrant ................... | 64.1 | 65.7 | 72 | 77 | 76 | 80 |
| 484392003 ............. | TX | Tarrant ................... | 65.2 | 65.9 | 72 | 72 | 74 | 72 |
| 484393009 ............. | TX | Tarrant ................... | 67.5 | 68.1 | 74 | 75 | 75 | 75 |
| 490571003 ............. | UT | Weber ..................... | 69.3 | 70.3 | 71 | 74 | 77 | 71 |
| 550590025 ............. | WI | Kenosha .................. | 67.6 | 70.7 | 72 | 73 | 72 | 71 |
| 550890008 ............. | WI | Ozaukee ................. | 65.2 | 65.8 | 71 | 72 | 72 | 72 |

[a] 2022 preliminary design values are based on 2022 measured MDA8 concentrations provided by state air agencies to the EPA's Air Quality System (AQS), as of January 3, 2023.

### C. Air Quality Modeling To Quantify Upwind State Contributions

This section documents the procedures the EPA used to quantify the impact of emissions from specific upwind states on ozone design values in 2023 for the identified downwind nonattainment and maintenance receptors. The EPA used CAMx photochemical source apportionment modeling to quantify the impact of emissions in specific upwind states on downwind nonattainment and maintenance receptors for 8-hour ozone.

CAMx employs enhanced source apportionment techniques that track the formation and transport of ozone from specific emissions sources and calculates the contribution of sources and precursors to ozone for individual receptor locations. The benefit of the photochemical model source apportionment technique is that all modeled ozone at a given receptor location in the modeling domain is tracked back to specific sources of emissions and boundary conditions to fully characterize culpable sources.

The EPA performed nationwide, state-level ozone source apportionment modeling using the CAMx Ozone Source Apportionment Technology/ Anthropogenic Precursor Culpability Analysis (OSAT/APCA) technique [79] to quantify the contribution of 2023 $NO_X$ and VOC emissions from all sources in each state to the corresponding projected ozone design values in 2023 at

[79] As part of this technique, ozone formed from reactions between biogenic VOC and $NO_X$ with anthropogenic $NO_X$ and VOC are assigned to the anthropogenic emissions.

17

air quality monitoring sites. The CAMx OSAT/APCA model run was performed for the period May 1 through September 30 using the projected future base case emissions and 2016 meteorology for this time period. In the source apportionment modeling the Agency tracked (i.e., tagged) the amount of ozone formed from anthropogenic emissions in each state individually as well as the contributions from other sources (e.g., natural emissions).

In the state-by-state source apportionment model run, the EPA tracked the ozone formed from each of the following tags:

• States—anthropogenic $NO_X$ emissions and VOC emissions from individual state (emissions from all anthropogenic sectors in a given state were combined);

• Biogenics—biogenic $NO_X$ and VOC emissions domain-wide (i.e., not by state);

• Boundary Concentrations— concentrations transported into the air quality modeling domain;

• Tribes—the emissions from those tribal lands for which the Agency has point source inventory data emissions modeling platform (EPA did not model the contributions from individual tribes);

• Canada and Mexico— anthropogenic emissions from those sources in the portions of Canada and Mexico included within the modeling domain (the EPA did not model the contributions from Canada and Mexico separately);

• Fires—combined emissions from wild and prescribed fires domain-wide (i.e., not by state); and

• Offshore—combined emissions from offshore marine vessels and offshore drilling platforms within the modeling domain.

The contribution modeling provided contributions to ozone from anthropogenic $NO_X$ and VOC emissions in each state, individually. The contributions to ozone from chemical reactions between biogenic $NO_X$ and VOC emissions were modeled and assigned to the "biogenic" category. The contributions from wildfire and prescribed fire $NO_X$ and VOC emissions were modeled and assigned to the "fires" category. That is, the contributions from the "biogenic" and "fires" categories are not assigned to individual states nor are they included in the state contributions.

For the Step 2 analysis, the EPA calculated a contribution metric that considers the average contribution on the 10 highest ozone concentration days (i.e., top 10 days) in 2023 using the same approach as the EPA used in the proposed action and in the Revised CSAPR Update.[80] This average contribution metric is intended to provide a reasonable representation of the contribution from individual states to projected future year design values, based on modeled transport patterns and other meteorological conditions generally associated with modeled high ozone concentrations at the receptor. An average contribution metric constructed in this manner ensures the magnitude of the contributions is directly related to the magnitude of the ozone design value at each site.

The analytic steps for calculating the contribution metric for the 2023 analytic year are as follows:

(1) Calculate the 8-hour average contribution from each source tag to individual ozone monitoring site for the time period of the 8-hour daily maximum modeled concentrations in 2023;

(2) Average the contributions and average the concentrations for the top 10 modeled ozone concentration days in 2023;

(3) Divide the average contribution by the corresponding average concentration to obtain a Relative Contribution Factor (RCF) for each monitoring site;

(4) Multiply the 2023 average design value by the 2023 RCF at each site to produce the average contribution metric values in 2023;[81]

(5) Truncate the average contribution metric values to two digits to the right of the decimal for comparison to the 1 percent of the NAAQS screening threshold (0.70 ppb)

The resulting contributions from each tag to each monitoring site in the U.S. for 2023 can be found in the docket for this final action. Additional details on the source apportionment modeling and the procedures for calculating contributions can be found in the AQM TSD. The EPA's response to comments on the method for calculating the contribution metric can be found in the RTC document for this final action.

The largest contribution from each state that is the subject of this final action to modeled 8-hour ozone nonattainment and modeling-based maintenance receptors in downwind states in 2023 are provided in Table III.C–1 of this action. The largest contribution from each state to the additional "violating monitor" maintenance-only receptors is provided in Table III.C–2 of this action. All states that are linked to one or more nonattainment or maintenance-only receptors are also linked to one or more violating monitor maintenance receptors, except for Minnesota.

TABLE III.C–1—LARGEST CONTRIBUTION BY STATE TO DOWNWIND 8-HOUR OZONE NONATTAINMENT AND MAINTENANCE RECEPTORS IN 2023 (ppb)

| Upwind state | Largest contribution to a downwind nonattainment receptor | Largest contribution to a downwind maintenance-only receptor |
|---|---|---|
| Alabama | 0.75 | 0.65 |
| Arkansas | 0.94 | 1.21 |
| California | 35.27 | 6.31 |
| Illinois | 13.89 | 19.09 |
| Indiana | 8.90 | 10.03 |
| Kentucky | 0.84 | 0.79 |
| Louisiana | 9.51 | 5.62 |

---

[80] The use of daily contributions on the top 10 concentration days for calculating the average contribution metric is designed to be consistent with the method specified in the modeling guidance in terms of the number of days to use when projecting future year design values.

[81] Note that a contribution metric value was not calculated for any receptor at which there were fewer than 5 days with model-predicted MDA8 ozone concentrations greater than or equal to 60 ppb in 2023. Eliminating from the Step 2 evaluation any receptors for which the modeling does not meet this criterion ensures that upwind state

contributions are based on the days with the highest ozone projections. This criterion is consistent with the criterion for projecting design values, as recommended in the EPA's modeling guidance. In the modeling for this final action, the monitoring site in Seattle, Washington (530330023), was the only receptor that did not meet this criterion.

TABLE III.C–1—LARGEST CONTRIBUTION BY STATE TO DOWNWIND 8-HOUR OZONE NONATTAINMENT AND MAINTENANCE RECEPTORS IN 2023 (ppb)—Continued

| Upwind state | Largest contribution to a downwind nonattainment receptor | Largest contribution to a downwind maintenance-only receptor |
|---|---|---|
| Maryland | 1.13 | 1.28 |
| Michigan | 1.59 | 1.56 |
| Minnesota | 0.36 | 0.85 |
| Mississippi | 1.32 | 0.91 |
| Missouri | 1.87 | 1.39 |
| Nevada | 1.11 | 1.13 |
| New Jersey | 8.38 | 5.79 |
| New York | 16.10 | 11.29 |
| Ohio | 2.05 | 1.98 |
| Oklahoma | 0.79 | 1.01 |
| Texas | 1.03 | 4.74 |
| Utah | 1.29 | 0.98 |
| West Virginia | 1.37 | 1.49 |
| Wisconsin | 0.21 | 2.86 |

TABLE III.C–2—LARGEST CONTRIBUTION TO DOWNWIND 8-HOUR OZONE "VIOLATING MONITOR" MAINTENANCE-ONLY RECEPTORS (ppb)

| Upwind State | Largest contribution to a downwind violating monitor maintenance-only receptor |
|---|---|
| Alabama | 0.79 |
| Arkansas | 1.16 |
| California | 6.97 |
| Illinois | 16.53 |
| Indiana | 9.39 |
| Kentucky | 1.57 |
| Louisiana | 5.06 |
| Maryland | 1.14 |
| Michigan | 3.47 |
| Minnesota | 0.64 |
| Mississippi | 1.02 |
| Missouri | 2.95 |
| Nevada | 1.11 |
| New Jersey | 8.00 |
| New York | 12.08 |
| Ohio | 2.25 |
| Oklahoma | 1.57 |
| Texas | 3.83 |
| Utah | 1.46 |
| West Virginia | 1.79 |
| Wisconsin | 5.10 |

## IV. Summary of Bases for Disapproval

As explained in Section II, the EPA relies on the 4-step interstate transport framework to evaluate obligations under CAA section 110(a)(2)(D)(i)(I). At proposal, the EPA used this framework to guide its evaluation of each state's SIP submission. While the EPA used this framework to maintain a nationally consistent and equitable approach to interstate transport, the contents of each individual state's submission were evaluated on their own merits, and the EPA considered the facts and information, including information from the Agency, available to the state at the time of its submission, in addition to

more recent air quality and contribution information. Here we provide a brief, high level overview of the SIP submissions and the EPA's evaluation and key bases for disapproval. These summaries are presented for ease of reference and to direct the public to the most relevant portions of the proposals and final rule record for further information. The full basis for the EPA's disapprovals is available in relevant **Federal Register** notifications of proposed disapproval for each state, in the technical support documents informing the proposed and final action, and in the responses to comments in Section V and the RTC document. In general, except as otherwise noted, the comments and updated air quality information did not convince the Agency that a change from proposal was warranted for any state. The exceptions are that the EPA is deferring action at this time on the proposed disapprovals for Tennessee and Wyoming. Further, the EPA is finalizing partial approvals of prong 1 ("significant contribution to nonattainment") for Minnesota and Wisconsin because they are linked only to maintenance-only receptors; the EPA is finalizing a partial disapproval with respect to prong 2 ("interference with maintenance") obligations for these two states.

### A. Alabama

In the 2016v3 modeling, Alabama is projected to be linked above 1 percent of the NAAQS to one nonattainment receptor. It is also linked to one violating-monitor maintenance-only receptor. Its highest-level contribution is 0.75 ppb to Galveston County, Texas (AQS Site ID 481671034).[82] A full

[82] The highest-magnitude downwind contribution from each state is based on the contributions to

summary of Alabama's June 21, 2022, SIP submission, as well as Alabama's previous submission history, was provided in the proposed SIP submission disapproval.[83] In its submission, Alabama advocated for discounting maintenance receptors through use of historical data trends. The EPA finds Alabama's approach is not adequately justified.[84] The EPA disagrees with Alabama's assessment of the 2016v2 modeling,[85] and further responds to comments on model performance in Section III. The EPA disagrees with Alabama's arguments for application of a higher contribution threshold than 1 percent of the NAAQS at Step 2,[86] and further addresses the relevance of "significant impact levels" within the Prevention of Significant Deterioration program ("PSD SILs") in Section V.B.6. The EPA found technical flaws in Alabama's back trajectory analysis.[87] The State did not conduct an adequate Step 3 analysis, and the EPA identified several unsupported assertions in the SIP submission.[88] Alabama also argued in its SIP submission that it had already implemented all cost-effective controls. However, the State included an insufficient evaluation of additional emissions control opportunities to support such a conclusion.[89] The EPA further addresses arguments related to

modeling-based receptors and does not consider the contributions to violating-monitor maintenance-only receptors. Each state's maximum contribution to downwind violating-monitor maintenance-only receptors is available in the Final Action AQM TSD.

[83] 87 FR 64419–64421.
[84] Id. at 64421–64422.
[85] Id. at 64422–64423.
[86] Id. at 64423–64424.
[87] Id. at 64424–64425.
[88] Id. at 64425–64426.
[89] Id.

mobile sources in Section V.C.1.[90] Additionally, as explained in Section V.B.9,[91] reliance on prior transport FIPs such as the CSAPR Update is not a sufficient analysis at Step 3. The State included no permanent and enforceable emissions controls in its SIP submission.[92] We provide further response to comments regarding Alabama's SIP submission in the RTC document. The EPA is finalizing disapproval of Alabama's interstate transport SIP submission for the 2015 ozone NAAQS.

### B. Arkansas

In the 2016v3 modeling, Arkansas is projected to be linked above 1 percent of the NAAQS to one nonattainment receptor and five maintenance-only receptors. It is also linked to seven violating-monitor maintenance-only receptor. Its highest-level contribution is 1.21 ppb to Brazoria County Texas (AQS Site ID 480391004). A full summary of Arkansas's October 10, 2019, SIP submission was provided in the proposed SIP submission disapproval.[93] The EPA disagrees with Arkansas's arguments for application of a higher contribution threshold than 1 percent of the NAAQS at Step 2, and further addresses the relevance of PSD SILs in Section V.B.6.[94] The EPA also found technical flaws in Arkansas's "consistent and persistent" claims and back trajectory analysis,[95] and legal flaws in the state's arguments related to relative contribution.[96] The State did not conduct an adequate Step 3 analysis.[97] Arkansas argued in its SIP submission that it had already implemented all cost-effective controls. However, the State included an insufficient evaluation of additional emissions control opportunities to support such a conclusion.[98] Further, the state's reliance on the cost-effectiveness thresholds in the CSAPR and CSAPR Update is insufficient for the more protective 2015 ozone NAAQS.[99] The State included no permanent and enforceable controls in its SIP submission.[100] We provide further response to comments regarding Arkansas's SIP submission in the RTC document. The EPA is finalizing disapproval of Arkansas's interstate transport SIP submission for the 2015 ozone NAAQS.

### C. California

In the 2016v3 modeling, California is projected to be linked above 1 percent of the NAAQS to eight nonattainment receptors and four maintenance-only receptors. It is also linked to 26 violating-monitor maintenance-only receptor. Its highest-level contribution is 35.27 ppb to the nonattainment receptor located on the Morongo Band of Missions Indians reservation (AQS Site ID 060651016).[101] A full summary of California's October 1, 2018, SIP submission was provided in the proposed SIP submission disapproval.[102] The EPA found technical and legal flaws in California's geographic, meteorological, wildfire, and trajectories analysis, and the State's arguments related to local, international, and non-anthropogenic emissions.[103] The EPA further addresses the topic of international emissions in Section V.C.2. The State did not conduct an adequate Step 3 analysis.[104] California in its SIP submission argued that it had already implemented all cost-effective controls. However, California provided an insufficient evaluation of additional control opportunities to support such a conclusion.[105] Further, the State's reliance on the cost-effectiveness threshold in the CSAPR Update is insufficient for the more protective 2015

ozone NAAQS.[106] California included no permanent and enforceable emissions controls in its SIP submission[107] and argued that interstate transport is fundamentally different in the western U.S. than in the eastern U.S., to which the EPA responds in Section V.C.3.[108] We provide further response to comments regarding California's SIP submission in the RTC document. The EPA is finalizing disapproval of California's interstate transport SIP submission for the 2015 ozone NAAQS.

### D. Illinois

In the 2016v3 modeling, Illinois is projected to be linked above 1 percent of the NAAQS to two nonattainment receptors and three maintenance-only receptors. It is also linked to six violating-monitor maintenance-only receptor. Its highest-level contribution is 19.09 ppb to Kenosha County, Wisconsin (AQS Site ID 550590019). A full summary of Illinois's May 21, 2019, SIP submission was provided in the proposed SIP submission disapproval.[109] The EPA disagrees with Illinois's arguments for application of a higher contribution threshold than 1 percent of the NAAQS at Step 2.[110] The state did not conduct an adequate Step 3 analysis.[111] The State included an insufficient evaluation of additional emissions control opportunities in its SIP submission.[112] The EPA also found technical and legal flaws in Illinois' arguments related to "on-the-way" controls, participation in the Lake Michigan Air Directors Consortium (LADCO), and international contributions.[113] The EPA further addresses the topic of international contribution in Section V.C.2. Further, as explained in Section V.B.9., states may not rely on non-SIP measures to meet SIP requirements, and reliance on prior transport FIPs such as the CSAPR Update is not a sufficient analysis at Step 3.[114] The State included no permanent and enforceable controls in its SIP submission.[115] We provide further response to comments regarding Illinois's SIP submission in the RTC document. The EPA is finalizing disapproval of Illinois's interstate

---

[90] *See also* id. at 64425–64426.

[91] *See also* id. at 64426.

[92] Id.

[93] 87 FR 9798, 9803–9806 (February 22, 2022).

[94] Id. at 9806–9807.

[95] Id. at 9808–9809.

[96] Id. at 9809–9810.

[97] Id. at 9809–9810.

[98] Id. at 9810.

[99] Id.

[100] Id. at 9811.

[101] We note that, consistent with the EPA's prior good neighbor actions in California, the regulatory ozone monitor located on the Morongo Band of Mission Indians ("Morongo") reservation is a projected downwind receptor in 2023. *See* monitoring site 060651016 in Table V.D–1. of this action. We also note that the Temecula, California, regulatory ozone monitor is a projected downwind receptor in 2023 and in past regulatory actions has been deemed representative of air quality on the Pechanga Band of Luiseño Indians ("Pechanga") reservation. *See, e.g.,* Approval of Tribal Implementation Plan and Designation of Air Quality Planning Area; Pechanga Band of Luiseño Mission Indians, 80 FR 18120, at 18121–18123 (April 3, 2015); *see also* monitoring site 060650016 in Table V.D–1. of this action. The presence of receptors on, or representative of, the Morongo and Pechanga reservations do not trigger obligations for the Morongo and Pechanga Tribes. Nevertheless, these receptors are relevant to the EPA's assessment of any linked upwind states' good neighbor obligations. *See, e.g.,* Approval and Promulgation of Air Quality State Implementation Plans; California; Interstate Transport Requirements for Ozone, Fine Particulate Matter, and Sulfur Dioxide, 83 FR 65093 (December 19, 2018). Under 40 CFR 49.4(a), tribes are not subject to the specific plan submittal and implementation deadlines for NAAQS-related requirements, including deadlines for submittal of plans addressing transport impacts. We also note that California's maximum contribution to a downwind state receptor is 6.31 ppb in Yuma County, Arizona (AQS Site ID 040278011).

[102] 87 FR 31448–31452.

[103] Id. at 31454–31457, 31460.

[104] Id. at 31458–31461.

[105] Id. at 31458.

[106] Id. at 31458–31459.

[107] Id. at 31461.

[108] *See also* id. at 31453.

[109] Id. at 9845.

[110] Id. at 9852–9853.

[111] Id. at 9853–9855.

[112] Id. at 9853.

[113] Id. at 9853–9854.

[114] *See also* id. at 9854.

[115] Id. at 9855.

transport SIP submission for the 2015 ozone NAAQS.

### E. Indiana

In the 2016v3 modeling, Indiana is projected to be linked above 1 percent of the NAAQS to four nonattainment receptors and six maintenance-only receptors. It is also linked to 10 violating-monitor maintenance receptors. Its highest-level contribution is 10.03 ppb to Racine County, Wisconsin (AQS Site ID 551010020). A full summary of Indiana's November 2, 2018, SIP submission was provided in the proposed SIP submission disapproval.[116] The EPA disagrees with Indiana's arguments for application of a higher contribution threshold than 1 percent of the NAAQS at Step 2.[117] The State did not conduct an adequate Step 3 analysis.[118] The EPA found technical and legal flaws in Indiana's arguments related to ozone concentration and design value trends, the timing of expected source shutdowns, local emissions, international and offshore contributions, Indiana's portion of contribution, and Indiana's back trajectory analysis.[119] The EPA further addresses the topic of international emissions in Section V.C.2. Indiana argued that it would not be cost-effective to implement controls on non-EGUs. However, the State included an insufficient evaluation of additional emissions control opportunities, for any type of source, to support that conclusion.[120] The EPA also confirmed that EGU shutdowns identified by Indiana were included in the 2016v2 modeling,[121] and if they were valid and not included in the 2016v2 modeling, then they were incorporated into the 2016v3 modeling as explained in Section III and the 2016v3 Emissions Modeling TSD. Further, in Section V.B.9., states may not rely on non-SIP measures to meet SIP requirements.[122] The State included no permanent and enforceable emissions controls in its SIP submission.[123] We provide further response to comments regarding Indiana's SIP submission in the RTC document. The EPA is finalizing disapproval of Indiana's interstate transport SIP submission for the 2015 ozone NAAQS.

### F. Kentucky

In the 2016v3 modeling, Kentucky is projected to be linked above 1 percent of the NAAQS to two nonattainment receptors and one maintenance-only receptor. It is also linked to four violating-monitor maintenance-only receptor. Its highest-level contribution based on the 2016v3 modeling is 0.84 ppb to Fairfield County, Connecticut (AQS Site ID 090019003). A full summary of Kentucky's January 11, 2019, SIP submission was provided in the proposed SIP submission disapproval.[124] Although the EPA's 2016v3 modeling indicated a highest-level contribution below 1 ppb, the EPA disagrees with Kentucky's arguments for application of a higher contribution threshold than 1 percent of the NAAQS at Step 2.[125] Further, Kentucky is linked above 1 ppb to a violating-monitor receptor. The EPA addresses the relevance of the PSD SILs in Section V.B.6. The Commonwealth did not conduct an adequate Step 3 analysis.[126] The EPA found technical and legal flaws in Kentucky's arguments related to the level and timing of upwind versus downwind-state responsibilities, NOₓ emissions trends and other air quality information, and back-trajectory analyses.[127] The EPA also found technical and legal flaws in certain State-level comments submitted by Midwest Ozone Group and attached to Kentucky's submission, including arguments related to international emissions.[128] The EPA further addresses the topics of international emissions in Section V.C.2. Kentucky in its SIP submission also argued that it had already implemented all cost-effective controls. However, the Commonwealth included an insufficient evaluation of additional emissions control opportunities to support such a conclusion.[129] As explained in Section V.B.9., states may not rely on non-SIP measures to meet SIP requirements, and reliance on prior transport FIPs such as the CSAPR Update is not a sufficient analysis at Step 3.[130] The EPA also confirmed in the proposed SIP submission disapproval that EGU shutdowns identified by Kentucky were included in the 2016v2 modeling, and yet Kentucky was still linked in that

modeling.[131] Kentucky in its SIP submission advocated for lower interstate ozone transport responsibility for states linked only to maintenance-only receptors. The EPA finds Kentucky's arguments in this regard inadequately supported.[132] The Commonwealth included no permanent and enforceable emissions controls in its SIP submission.[133] We provide further response to comments regarding Kentucky's SIP submission in the RTC document. The EPA is finalizing disapproval of Kentucky's interstate transport SIP submission for the 2015 ozone NAAQS.

### G. Louisiana

In the 2016v3 modeling, Louisiana is projected to be linked above 1 percent of the NAAQS to two nonattainment receptors and five maintenance-only receptor. It is also linked to 10 violating-monitor maintenance-only receptor. Its highest-level contribution is 9.51 ppb to Galveston County Texas (AQS Site ID 481671034). A full summary of Louisiana's November 13, 2019, SIP submission was provided in the proposed SIP submission disapproval.[134] The EPA disagrees with Louisiana's arguments for application of a higher contribution threshold than 1 percent of the NAAQS and disagrees with Louisiana's criticisms of a 1 percent of the NAAQS contribution threshold at Step 2.[135] The EPA further addresses technical comments on the 1 percent of the NAAQS contribution threshold in Section V.B.4. Louisiana did not conduct an adequate Step 3 analysis.[136] The State included an insufficient evaluation of additional emissions control opportunities in its SIP submission.[137] The EPA also found technical flaws in Louisiana's "consistent and persistent" claims, assessment of seasonal weather patterns, surface wind directions, and back trajectory analysis.[138] The State included no permanent and enforceable controls in its SIP submission.[139] We provide further response to comments regarding Louisiana's SIP submission in the RTC document. The EPA is finalizing disapproval of Louisiana's interstate transport SIP submission for the 2015 ozone NAAQS.

[116] Id. at 9845–9847.
[117] Id. at 9855–9856.
[118] Id. at 9857–9861.
[119] Id. at 9858–9861.
[120] Id. at 9857–9858.
[121] Id. at 9858–9859.
[122] See also id. at 9861.
[123] Id.

[124] 87 FR 9498, 9503–9507 (February 22, 2022).
[125] Id. at 9509–9510.
[126] Id. at 9511–9515.
[127] Id. at 9512–9514.
[128] Id. at 9508, 9515. The state also did not explain its own views regarding the relevance of these materials to its submission. Id.
[129] Id. at 9511–9512.
[130] See also id. at. 9512.

[131] Id. at 9511–9512.
[132] Id. at 9514–9515.
[133] Id. at 9515.
[134] Id. at 9811–9812.
[135] Id. at 9812, 9815–9816.
[136] Id. at 9814–9816.
[137] Id. at 9814. 9816.
[138] Id. at 9814–9816.
[139] Id. at 9816.

## H. Maryland

In the 2016v3 modeling, Maryland is projected to be linked above 1 percent of the NAAQS to three nonattainment receptors and one maintenance-only receptor. It is also linked to three violating-monitor maintenance receptors. Its highest-level contribution is 1.28 ppb to New Haven County, Connecticut (AQS Site ID 090099002). A full summary of Maryland's October 16, 2019, SIP submission was provided in the proposed SIP submission disapproval.[140] The state did not conduct an adequate Step 3 analysis.[141] The State included an insufficient evaluation of additional emissions control opportunities in its SIP submission.[142] Further, as explained in Section V.B.9, states may not rely on non-SIP measures to meet SIP requirements, and reliance on prior transport FIPs such as the CSAPR Update is not a sufficient analysis at Step 3.[143] The EPA also confirmed the proposed SIP submission disapproval that state emissions controls and regulations identified by Maryland were generally included in the 2016v2 modeling, and yet Maryland was still linked in that modeling.[144] The State included no permanent and enforceable controls in its SIP submission.[145] We provide further response to comments regarding Maryland's SIP submission in the RTC document. The EPA is finalizing disapproval of Maryland's interstate transport SIP submission for the 2015 ozone NAAQS.

## I. Michigan

In the 2016v3 modeling, Michigan is projected to be linked above 1 percent of the NAAQS to four nonattainment receptors and six maintenance-only receptors. It is also linked to eight violating-monitor maintenance receptors. Its highest-level contribution is 1.59 to Sheboygan County, Wisconsin (AQS Site ID 551170006). A full summary of Michigan's March 5, 2019, SIP submission was provided in the proposed SIP submission disapproval.[146] The EPA disagrees with Michigan's arguments for application of a higher contribution threshold than 1 percent of the NAAQS as well as criticisms of a 1 percent of the NAAQS contribution threshold at Step 2.[147] The

EPA further addresses technical comments on the 1 percent of the NAAQS contribution threshold in Section V.B.4 and addresses comments regarding the relevance of the PSD SILs in Section V.B.6. The State did not conduct an adequate Step 3 analysis.[148] Michigan argued in its SIP submission that additional controls would be premature and burdensome. However, the State included an insufficient evaluation of additional emissions control opportunities to support such a conclusion.[149] The EPA found technical and legal flaws in Michigan's arguments related to upwind-state obligations as to maintenance-only receptors, international emissions, relative contribution, apportionment, and upwind versus downwind-state responsibilities.[150] The EPA further addresses the topics of mobile sources and international emissions in Sections V.C.1 and V.C.2, respectively. The EPA also confirmed in the proposed SIP submission disapproval that the EGU retirements identified by Michigan as not included in the 2011-based EPA modeling, as well as various Federal rules, were included in the 2016v2 modeling, and yet Michigan was still linked in that modeling.[151] The State included no permanent and enforceable emissions controls in its SIP submission.[152] We provide further response to comments regarding Michigan's SIP submission in the RTC document. The EPA is finalizing disapproval of Michigan's interstate transport SIP submission for the 2015 ozone NAAQS.

## J. Minnesota

In the 2016v3 modeling, Minnesota is projected to be linked above 1 percent of the NAAQS to one maintenance-only receptor. It is not linked to a violating-monitor maintenance-only receptor. Its highest-level contribution is 0.85 ppb to Cook County, Illinois (AQS Site ID 170310001). A full summary of Minnesota's October 1, 2018, SIP submission was provided in the proposed SIP submission disapproval.[153] Because Minnesota was not projected to be linked to any receptor in 2023 in the EPA's 2011-based modeling, commenters argued that the EPA must approve the SIP submission and not rely on new modeling. The EPA responds to these comments in Section V.A.4. Although

the EPA acknowledges that Minnesota's Step 3 analysis was insufficient in part because the State assumed it was not linked at Step 2, this is ultimately inadequate to support a conclusion that the State's sources do not interfere with maintenance of the 2015 ozone NAAQS in other states in light of more recent air quality analysis.[154] The State included no permanent and enforceable emissions controls in its SIP submission.[155] We provide further response to comments regarding Minnesota's SIP submission in the RTC document. Although EPA proposed to disapprove both prong 1 and prong 2 of Minnesota's SIP submission, the present record, including the results of the 2016v3 modeling, indicates that Minnesota is not linked to any nonattainment receptors.[156] The EPA is finalizing a partial approval of Minnesota's interstate transport SIP submission for the 2015 ozone NAAQS as to prong 1 and a partial disapproval as to prong 2.

## K. Mississippi

In the 2016v3 modeling, Mississippi is projected to be linked above 1 percent of the NAAQS to one nonattainment receptor and two maintenance-only receptors. It is also linked to eight violating-monitor maintenance receptors. Its highest-level contribution is 1.32 ppb to Galveston County, Texas (AQS Site ID 481671034). A full summary of Mississippi's September 3, 2019, SIP submission was provided in the proposed SIP submission disapproval.[157] In its submission, Mississippi advocated for discounting receptors through use of historical data trends. The EPA finds Mississippi's approach is not adequately justified.[158] In the 2011-based modeling, Mississippi's contribution to receptors was above 1 percent of the NAAQS, but below 1 ppb. The EPA disagrees with Mississippi's arguments for application of a higher contribution threshold than

---

[140] Id. at 9469.
[141] Id. at 9470–9473.
[142] Id. at 9471, 9473.
[143] *See also* id. at 9471, 9473 n.46, 9474.
[144] Id. at 9472–9473.
[145] Id. at 9473–9474.
[146] Id. at 9847–9848.
[147] Id. at 9861–9862.

[148] Id. at 9863–9867.
[149] Id. at 9864.
[150] Id. at 9864–9867.
[151] Id. at 9866.
[152] Id. at 9867.
[153] Id. at 9867.

[154] Id. at 9868–9869.
[155] Id. at 9869.
[156] The EPA received a comment that it would be arbitrary and capricious for the EPA to finalize a full disapproval of Tennessee's good neighbor SIP submission (both prong 1 and prong 2) if EPA concluded the state is linked only to a maintenance-only receptor (prong 2). EPA is deferring final action on Tennessee's good neighbor SIP submission, but in reviewing linkages in the 2016v3 modeling we determined that Minnesota and Wisconsin are not linked above 1 percent of the NAAQS to any nonattainment receptors (prong 1) but are linked to maintenance-only receptors (prong 2); these states are receiving partial approvals and partial disapprovals.
[157] 87 FR 9554.
[158] Id. at 9556.

1 percent of the NAAQS at Step 2,[159] and further addresses the relevance of the PSD SILs in Section V.B.6. The state did not conduct a Step 3 analysis.[160] The State included no evaluation of additional emissions control opportunities in its SIP submission.[161] The State included no permanent and enforceable emissions controls in its SIP submission.[162] We provide further response to comments regarding Mississippi's SIP submission in the RTC document. The EPA is finalizing disapproval of Mississippi's interstate transport SIP submission for the 2015 ozone NAAQS.

### L. Missouri

In the 2016v3 modeling, Missouri is projected to be linked above 1 percent of the NAAQS to one nonattainment receptor and three maintenance-only receptors. It is also linked to five violating-monitor maintenance receptors. Its highest-level contribution is 1.87 ppb to Sheboygan County, Wisconsin (AQS Site ID 551170006). A full summary of Missouri's June 10, 2019, SIP submission was provided in the proposed SIP submission disapproval.[163] In its submission, Missouri advocated for discounting certain maintenance receptors through use of historical data trends. The EPA finds Missouri's approach is not adequately justified.[164] The EPA disagrees with Missouri's arguments for application of a higher contribution threshold than 1 percent of the NAAQS at Step 2, and further addresses comments regarding the August 2018 memorandum in Section V.B.7.[165] The State did not conduct a Step 3 analysis.[166] The State included no evaluation of additional emissions control opportunities in its SIP submission.[167] The State included no permanent and enforceable emissions controls in its SIP submission.[168] We provide further response to comments regarding Missouri's SIP submission in the RTC document. The EPA is

finalizing disapproval of Missouri's June 10, 2019, interstate transport SIP submission for the 2015 ozone NAAQS.

### M. Nevada

In the 2016v3 modeling, Nevada is projected to be linked above 1 percent of the NAAQS to three nonattainment receptors and one maintenance-only receptor. It is also linked to one violating-monitor maintenance receptor. Its highest-level contribution is 1.13 ppb to Weber County, Utah (AQS Site ID 490570002). A full summary of Nevada's October 1, 2018, SIP submission was provided in the proposed SIP submission disapproval.[169] Because Nevada was not projected to be linked to any receptor in 2023 in the EPA's 2011-based modeling, commenters on the proposed SIP submission disapproval argued that the EPA must approve the SIP submission and not rely on new modeling. The EPA responds to these comments in Section V.A.4. The EPA also responds to technical criticisms of the 1 percent of the NAAQS contribution threshold and the relevance of the PSD SILs in Section V.B.4 and in Section V.B.6, respectively. The State did not conduct a Step 3 analysis.[170] The State included no evaluation of additional emissions control opportunities in its SIP submission.[171] The State included no additional emissions controls in its SIP submission.[172] We provide response to comments specific to interstate transport policy in the western U.S. in Section V.C.3. We provide further response to comments regarding Nevada's SIP submission in the RTC document. The EPA is finalizing disapproval of Nevada's interstate transport SIP submission for the 2015 ozone NAAQS.

### N. New Jersey

In the 2016v3 modeling, New Jersey is projected to be linked above 1 percent of the NAAQS to three nonattainment receptors and one maintenance-only receptor. It is also linked to three violating-monitor maintenance receptors. Its highest-level contribution is 8.38 ppb to Fairfield County, Connecticut (AQS Site ID 090019003). A full summary of New Jersey's May 13, 2019, SIP submission was provided in the proposed SIP submission disapproval.[173] The State did not conduct an adequate Step 3 analysis.[174]

New Jersey argued in its SIP submission that existing controls were sufficient to address the State's good neighbor obligations. However, the State included an insufficient evaluation of additional emissions control opportunities to support such a conclusion.[175] The State's reliance on the cost-effectiveness threshold in the CSAPR Update is insufficient for a more protective NAAQS.[176] The State included no permanent and enforceable emissions controls in its SIP submission.[177] We provide further response to comments regarding New Jersey's SIP submission in the RTC document. The EPA is finalizing disapproval of New Jersey's interstate transport SIP submission for the 2015 ozone NAAQS.

### O. New York

In the 2016v3 modeling, New York is projected to be linked above 1 percent of the NAAQS to three nonattainment receptors and one maintenance-only receptor. It is also linked to two violating-monitor maintenance receptors. Its highest-level contribution is 16.10 ppb to Fairfield County, Connecticut (AQS Site ID 090010017). A full summary of New York's September 25, 2018, SIP submission was provided in the proposed SIP submission disapproval.[178] The state did not conduct an adequate Step 3 analysis.[179] New York argued in its SIP submission that existing controls were sufficient to address the State's good neighbor obligations. However, the state included an insufficient evaluation of additional emissions control opportunities to support such a conclusion.[180] The State's reliance on the cost-effectiveness threshold in the CSAPR Update is insufficient for the more protective 2015 ozone NAAQS.[181] The State included no permanent and enforceable emissions controls in its SIP submission.[182] We provide further response to comments regarding New York's SIP submission in the RTC document. The EPA is finalizing disapproval of New York's interstate transport SIP submission for the 2015 ozone NAAQS.

### P. Ohio

In the 2016v3 modeling, Ohio is projected to be linked above 1 percent of the NAAQS to four nonattainment receptors and five maintenance-only

---

[159] Id. at 9557.
[160] Id. at 9558.
[161] Id.
[162] Id.
[163] Id. at 9538–9540.
[164] Id. at 9540–9541.
[165] See also id. at 9541–9544.
[166] Id. at 9544.
[167] Id.
[168] We note that in comments, Missouri indicated its intent to submit a new SIP submission to the EPA, which would re-evaluate good neighbor obligations based on its 2016v2 linkages and provide an analysis that would include emissions reductions requirements. The EPA received this submission on November 1, 2022. The EPA explains its consideration of this new submission as separate SIP submission in the RTC document for this final action.

[169] 87 FR 31485, 31492–31493 (May 24, 2022).
[170] Id. at 31493.
[171] Id.
[172] Id.
[173] Id. at 9490–9491.
[174] Id. at 9496.

[175] Id.
[176] Id.
[177] Id. at 9496–9497.
[178] Id. at 9489–9490.
[179] Id. at 9492–9494.
[180] Id. at 9493.
[181] Id. at 9493–9494.
[182] Id. at 9494–9495.

receptors. It is also linked to nine violating-monitor maintenance receptors. Its highest-level contribution is 2.05 ppb to Fairfield County, Connecticut (AQS Site ID 090019003). A full summary of Ohio's September 28, 2018, SIP submission was provided in the proposed SIP submission disapproval.[183] In its submission, Ohio advocated for use of the Texas Commission on Environmental Quality (TCEQ)'s definition of maintenance receptors. The EPA finds that TCEQ's definition is legally and technically flawed,[184] and as a result Ohio's approach is also not adequately justified.[185] The EPA further evaluates TCEQ's technical arguments in a TSD prepared by regional modeling staff.[186] The EPA disagrees with Ohio's arguments for application of a higher contribution threshold than 1 percent of the NAAQS at Step 2.[187] The EPA responds to technical criticisms of the 1 percent of the NAAQS contribution threshold in Section V.B.4. The State did not conduct an adequate Step 3 analysis.[188] The State included an insufficient evaluation of additional emissions control opportunities in its SIP submission.[189] The EPA found technical deficiencies in Ohio's unsubstantiated claims that emissions are overestimated.[190] The EPA also confirmed in the proposed SIP submission disapproval that several EGU and non-EGUs identified by Ohio were included in the 2016v2 modeling, and yet Ohio was still linked in that modeling.[191] The EPA summarizes the emissions inventories used in the 2016v3 modeling in Section III.A. Further, as explained in Section V.B.9, states may not rely on non-SIP measures to meet SIP requirements, and reliance on prior transport FIPs such as the CSAPR Update is not a sufficient analysis at Step 3.[192] The EPA finds legal flaws and deficiencies in Ohio's arguments related to upwind versus downwind-state responsibilities, the role of international emissions, relative contribution, and overcontrol.[193] The EPA discusses international emissions in Section V.C.2. The EPA disagrees with Ohio's arguments related to mobile sources.[194] We further address this topic in Section V.C.1. Ohio also argued in its SIP submission that it had already implemented all cost-effective controls. However, the state included no evaluation of additional emissions control opportunities to support such a claim.[195] Further, the State's reliance on the cost-effectiveness threshold in the CSAPR Update is insufficient for the more protective 2015 ozone NAAQS.[196] The State included no permanent and enforceable emissions controls in its SIP submission.[197] We provide further response to comments regarding Ohio's SIP submission in the RTC document. The EPA is finalizing disapproval of Ohio's interstate transport SIP submission for the 2015 ozone NAAQS.

*Q. Oklahoma*

In the 2016v3 modeling, Oklahoma is projected to be linked above 1 percent of the NAAQS to one nonattainment receptor and one maintenance-only receptor. It is also linked to eight violating-monitor maintenance receptors. Its highest-level contribution is 1.01 ppb to Denton County, Texas (AQS Site ID 481210034). A full summary of Oklahoma's October 25, 2018, SIP submission was provided in the proposed SIP submission disapproval.[198] In its submission, Oklahoma advocated for use of TCEQ's definition of maintenance receptors and modeling to discount receptors in Texas. The EPA finds that TCEQ's definition is legally and technically flawed[199] and, as a result, Oklahoma's approach is also not adequately justified.[200] The EPA further evaluates TCEQ's technical arguments in the EPA Region 6 2015 8-Hour Ozone Transport SIP Proposal TSD (Evaluation of TCEQ Modeling TSD) prepared by regional modeling staff.[201] Comments argued against the use of updated modeling where linkages in the EPA's 2011-based modeling and later iterations of EPA modeling differ. The EPA addressed the change in identified linkages between the 2011-based modeling and the 2016v2 modeling in the proposed SIP disapproval,[202] and further responds to comments on the use of updated modeling in Section V.A.4. The EPA disagrees with Oklahoma's arguments for application of a higher contribution threshold than 1 percent of the NAAQS at Step 2[203] and further addresses comments regarding the relevance of the PSD SILs in Section V.B.6. The State did not conduct an adequate Step 3 analysis.[204] Oklahoma argued in its SIP submission that it had already implemented all cost-effective controls. However, the State included an insufficient evaluation of additional emissions control opportunities to support such a conclusion.[205] As explained in Section V.B.9, states may not rely on non-SIP measures to meet SIP requirements, and reliance on prior transport FIPs such as the CSAPR Update is not a sufficient analysis at Step 3.[206] Further, the State's reliance on the cost-effectiveness threshold in the CSAPR Update is insufficient for the more protective 2015 ozone NAAQS.[207] The EPA finds legal flaws in Oklahoma's argument related to collective contribution.[208] The State included no permanent and enforceable emissions controls in its SIP submission.[209] We provide further response to comments regarding Oklahoma's SIP submission in the RTC document. The EPA is finalizing disapproval of Oklahoma's interstate transport SIP submission for the 2015 ozone NAAQS.

*R. Texas*

In the 2016v3 modeling, Texas is projected to be linked above 1 percent of the NAAQS to one nonattainment receptor and nine maintenance-only receptors. It is also linked to ten violating-monitor maintenance-only receptor. Its highest-level contribution is 4.74 ppb to Dona Ana County, New Mexico (AQS Site ID 350130021). A full summary of Texas's August 17, 2018, SIP submission was provided in the proposed SIP submission disapproval,[210] and additional details were provided in the Evaluation of TCEQ Modeling TSD. The EPA identified several technical flaws in TCEQ's modeling and analysis of modeling results.[211] In its submission, Texas advocated for use of its own definition of maintenance receptors and modeling. The EPA finds Texas's approach inadequately justified and

[183] Id. at 9849–9851.
[184] Id. at 9826–9829.
[185] Id. at 9869–9870.
[186] 2015 8-Hour Ozone Transport SIP Proposal TSD, in Docket ID No. EPA–R06–OAR–2021–0801 (hereinafter Evaluation of TCEQ Modeling TSD).
[187] Id. at 9871.
[188] Id. at 9871–9875.
[189] Id. at 9871–9875.
[190] Id. at 9872.
[191] Id.
[192] See also id. at 9874–9875.
[193] Id. at 9873–9874.

[194] Id.
[195] Id. at 9872–9873.
[196] Id. at 9874.
[197] Id. at 9875.
[198] Id. at 9816–9818.
[199] Id. at 9826–9829.
[200] Id. at 9820–9822.
[201] Evaluation of TCEQ Modeling TSD in Docket ID No. EPA–R06–OAR–2021–0801.
[202] 87 FR 9823.

[203] Id. at 9819.
[204] Id. at 9822–9824.
[205] Id. at 9822–9824.
[206] See also id. at 9822–9823.
[207] Id.
[208] Id. at 9823.
[209] Id. at 9824.
[210] Id. at 9824–9826.
[211] Id. at 9829–9830; Evaluation of TCEQ Modeling TSD.

legally and technically flawed.[212] The EPA further evaluated TCEQ's technical arguments in the Evaluation of TCEQ Modeling TSD. In comment on the proposal, Texas pointed to differences in linkages in the EPA's 2011-based modeling and 2016v2 modeling. The EPA addressed the change in identified linkages between the 2011-based modeling and the 2016v2 modeling in the proposed SIP submission disapproval,[213] and further responds to comments on the use of updated modeling in Section V.A.4. The State did not conduct an adequate Step 3 analysis.[214] The State included an insufficient evaluation of additional emissions control opportunities in its SIP submission.[215] The EPA found technical flaws in Texas's arguments related to ''consistent and persistent'' claims and its other assessments, including analysis of back trajectories.[216] The State included no permanent and enforceable emissions controls in its SIP submission.[217] We provide further response to comments regarding Texas's SIP submission in the RTC document. The EPA is finalizing disapproval of Texas's interstate transport SIP submission for the 2015 ozone NAAQS.

*S. Utah*

In the 2016v3 modeling, Utah is projected to be linked above 1 percent of the NAAQS to three nonattainment receptors and one maintenance-only receptor. It is also linked to four violating-monitor maintenance receptors. Its highest-level contribution is 1.29 ppb to Douglas County, Colorado (AQS Site ID 080350004). A full summary of Utah's January 29, 2020, SIP submission was provided in the proposed SIP submission disapproval.[218] In its submission, Utah argued that certain receptors in Colorado should not be counted as receptors for the purpose of 2015 ozone NAAQS interstate transport, but Utah's explanation is insufficient to discount those receptors.[219] The EPA disagrees with Utah's arguments for application of a higher contribution threshold than 1 percent of the NAAQS at Step 2.[220] Utah suggested in its SIP submission that interstate transport is fundamentally different in the western U.S. than in the

eastern U.S., an argument we have previously rejected and respond to further in Section V.C.3.[221] The State did not conduct an adequate Step 3 analysis.[222] The State included an insufficient evaluation of additional emissions control opportunities in its SIP submission.[223] The EPA finds technical and legal flaws in the State's arguments related to relative contribution, international and non-anthropogenic emissions, and the relationship of upwind versus downwind-state responsibilities.[224] The EPA further addresses the topics of international emissions in Section V.C.2 and wildfires in the RTC document. The EPA also confirmed in the proposed SIP submission disapproval that several anticipated controls identified by Utah were included in the 2016v2 modeling, and yet Utah was still linked in that modeling.[225] The State included no permanent and enforceable emissions controls in its SIP submission.[226] We provide further response to comments regarding Utah's SIP submission in the RTC document. The EPA is finalizing disapproval of Utah's interstate transport SIP submission for the 2015 ozone NAAQS.

*T. West Virginia*

In the 2016v3 modeling, West Virginia is projected to be linked above 1 percent of the NAAQS to three nonattainment receptors and one maintenance-only receptor. It is also linked to four violating-monitor maintenance receptors. Its highest-level contribution is 1.49 ppb to New Haven County, Connecticut (AQS Site ID 090099002). A full summary of West Virginia's February 4, 2019, SIP submission was provided in the proposed SIP submission disapproval.[227] The EPA finds technical and legal flaws in the State's examination of back trajectories and arguments related to mobile sources and international emissions.[228] The EPA further addresses the topics of mobile sources and international emissions in Section V.C.1 and in Section V.C.2, respectively. The State did not conduct an adequate Step 3 analysis.[229] West Virginia argued in its SIP submission that it had already implemented all cost-effective controls. However, the State included an insufficient evaluation of

additional emissions control opportunities to support such a conclusion.[230] The EPA also confirmed in the proposed SIP submission disapproval that specific EGU shutdowns identified by West Virginia were included in the 2016v2 modeling, which continued to show West Virginia was linked at Step 2.[231] As explained in Section V.B.9, a state may not rely on non-SIP measures to satisfy SIP requirements, and reliance on prior transport FIPs such as the CSAPR Update is not a sufficient analysis at Step 3.[232] Further, the State's reliance on the cost-effectiveness threshold in the CSAPR Update is insufficient for a more protective NAAQS.[233] The State included no permanent and enforceable emissions controls in its SIP submission.[234] We provide further response to comments regarding West Virginia's SIP submission in the RTC document. The EPA is finalizing disapproval of West Virginia's interstate transport SIP submission for the 2015 ozone NAAQS.

*U. Wisconsin*

In the 2016v3 modeling, Wisconsin is projected to be linked above 1 percent of the NAAQS to three maintenance-only receptors. It is also linked to five violating-monitor maintenance receptors. Its highest-level contribution is 2.86 ppb to Cook County, Illinois (AQS Site ID 170314201). A full summary of Wisconsin's September 14, 2018, SIP submission was provided in the proposed SIP submission disapproval.[235] The State did not assess in its SIP submission whether the state was linked at Step 2,[236] and did not conduct an adequate Step 3 analysis.[237] The State included an insufficient evaluation of additional emissions control opportunities.[238] Further, as explained in Section V.B.9, reliance on prior transport FIPs such as the CSAPR Update is not a sufficient analysis at Step 3.[239] The EPA found additional inadequacies and legal flaws in Wisconsin's submission.[240] The State included no permanent and enforceable emissions controls in its SIP submission.[241] We provide further response to comments regarding

---

[212] 87 FR 9826–9829.

[213] Id. at 9831.

[214] Id. at 9831–9834.

[215] Id. at 9831, 9834.

[216] Id. at 9832–9833, Evaluation of TCEQ Modeling TSD.

[217] 87 FR 9834.

[218] Id. at 31475–31477.

[219] Id. at 31480–31481.

[220] Id. at 31478.

[221] *See also* id. at 31479–31481, 31482.

[222] Id. at 31481–31483.

[223] Id. at 31482

[224] Id. at 31481–31483.

[225] Id. at 31483.

[226] Id.

[227] Id. at 9522–9524.

[228] Id. at 9526–9527, 9528.

[229] Id. at 9527–9532.

[230] Id. at 9528–9529.

[231] Id. at 9529–9530.

[232] *See also* id. at 9530–9532.

[233] Id. at 9531.

[234] Id. at 9532.

[235] Id. at 9851.

[236] Id. at 9875.

[237] Id. at 9875–9876.

[238] Id. at 9876.

[239] *See also* id.

[240] Id.

[241] Id. at 9876–9877.

Wisconsin's SIP submission in the RTC document. Although EPA proposed to disapprove both prong 1 and prong 2 of Wisconsin's SIP submission, the present record, including the results of the 2016v3 modeling, indicates that Wisconsin is not linked to any nonattainment receptors.[242] The EPA is finalizing a partial approval of Wisconsin's interstate transport SIP submission for the 2015 ozone NAAQS as to prong 1 and a partial disapproval as to prong 2.

## V. Response to Key Comments

The EPA received numerous comments on the proposed action which are summarized in the RTC document along with the EPA's responses to those comments in Docket ID No. EPA–HQ–OAR–2021–0663. Each comment in its entirety is available in the relevant regional docket(s) for this action.[243] The following sections summarize key comments and the EPA's responses.

### A. SIP Evaluation Process

1. Relationship Between Timing of Proposals To Disapprove SIPs and Promulgate FIPs

*Comment:* Comments alleged generally that the timing of the EPA's proposed actions on the SIP submissions in relation to proposed FIPs was unlawful, unfair, or both. Some comments claimed that the sequence of the EPA's actions is improper, unreasonable, or bad policy. Several commenters asserted that because the EPA proposed FIPs (or, according to some, promulgated FIPs, which is not factually correct) prior to finalizing disapproval of the state SIP submission, the EPA allegedly exceeded its statutory authority and overstepped the states' primary role in addressing the good neighbor provision under CAA section 110.[244]

*EPA Response:* The EPA disagrees. The EPA has followed the Clean Air Act provisions, which prescribe specified maximum amounts of time for states to make SIP submissions, for the EPA to act on those submissions, and for the EPA to promulgate FIPs if necessary, but do not prohibit the EPA from acting before that time elapses. Nothing relieves the EPA from its statutory obligation to take final action on complete SIP submissions before the Agency within the timeframes prescribed by the statute.[245] The EPA's proposed FIP does not constitute the ''promulgation'' of a FIP because the proposed FIP is not a final action that imposes any requirements on sources or states. And although the EPA's FIP authority is not at issue in this action, the EPA notes the Agency has been clear that it will not finalize a FIP for any state until finalizing disapproval of that state's SIP submission, and its authority to predicate action is established for doing so under CAA section 110(c)(1). 87 FR 20036, 20057 (April 6, 2022) (''The EPA is proposing this FIP action now to address twenty-six states' good neighbor obligations for the 2015 ozone NAAQS, but the EPA will not finalize this FIP action for any state unless and until it has issued a final finding of failure to submit or a final disapproval of that state's SIP submission.''). The EPA strongly disagrees that *proposing* a FIP prior to proposing or finalizing disapproval of a SIP submission oversteps the Agency's authority. Indeed, the ability to propose a FIP before finalizing a SIP disapproval follows ineluctably from the structure of the statute, which, as the Supreme Court recognized in *EME Homer City,* does not oblige the EPA ''to wait two years or postpone its [FIP] action even a single day.'' 572 U.S. at 509. If the EPA can finalize a FIP immediately upon disapproving a SIP, then surely the EPA must have the authority to propose that FIP before taking final action on the SIP submission. *Accord Oklahoma* v. *U.S.*

*EPA,* 723 F.3d 1201, 1223 (10th Cir. 2013).

It is true that the EPA would not be legally authorized to *finalize* a FIP for any state unless and until the EPA formally *finalizes* a disapproval of that state's SIP submission (or makes a finding of failure to submit for any state that fails to make a complete SIP submission), per CAA section 110(c), but the EPA has not yet finalized a FIP for any state for good neighbor obligations for the 2015 ozone NAAQS. Further, the sequencing of our actions here is consistent with the EPA's past practice in our efforts to timely address good neighbor obligations. For example, at the time the EPA proposed the CSAPR Update FIPs in December of 2015, we had not yet proposed action on several states' SIP submissions but finalized those SIP disapproval actions prior to finalization of the FIP.[246]

Additional comments on cooperative federalism are addressed in Section V.B.5.

Further, The D.C. Circuit in *Wisconsin* held that states and the EPA are obligated to fully address good neighbor obligations for ozone ''as expeditiously as practical'' and in no event later than the next relevant downwind attainment dates found in CAA section 181(a),[247] and states and the EPA may not delay implementation of measures necessary to address good neighbor requirements beyond the next applicable attainment date without a showing of impossibility or necessity.[248] It is important for the states and the EPA to assure that necessary emissions reductions are achieved, to the extent feasible, by the 2023 ozone season to assist downwind areas with meeting the August 3, 2024, attainment deadline for Moderate nonattainment areas. Further, the D.C. Circuit in *Wisconsin* emphasized that the EPA has the authority under CAA section 110 to structure its actions so as to ensure necessary reductions are achieved by the downwind attainment

---

[242] The EPA received a comment that it would be arbitrary and capricious for the EPA to finalize a full disapproval of Tennessee's good neighbor SIP submission (both prong 1 and prong 2) if EPA concluded the State is linked only to a maintenance-only receptor (prong 2).The EPA is deferring final action on Tennessee's good neighbor SIP submission, but in reviewing linkages in the 2016v3 modeling we determined that Minnesota and Wisconsin are not linked above 1 percent of the NAAQS to any nonattainment receptors (prong 1) but are linked to maintenance-only receptors (prong 2); these States are receiving partial approvals and partial disapprovals.

[243] *See* the memo ''Regional Dockets Containing Additional Supporting Materials for Final Action on 2015 Ozone NAAQS Good Neighbor SIP Submissions'' in the docket for this action, for a list of all regional dockets.

[244] The EPA notes the commenters' reference to FIPs is to proposed good neighbor FIPs for the 2015 ozone NAAQS that were proposed separately from this rulemaking action. 87 FR 20036 (April 6, 2022).

[245] Although the EPA anticipates responding to comments related to the EPA's FIP authority in a separate FIP rulemaking, the EPA notes with regard to the procedural timing concerns raised in comments on this action that the Supreme Court confirmed in *EME Homer City Generation,* ''EPA is not obliged to wait two years or postpone its action even a single day: The Act empowers the Agency to promulgate a FIP 'at any time' within the two-year limit.'' 572 U.S. 489 at 509. The procedural timeframes under CAA section 110 do not function to establish a norm or expectation that the EPA must or should use the full amount of time allotted, particularly when doing so would place the Agency in conflict with the more ''central'' statutory objective of meeting the NAAQS attainment deadlines in the Act. *EME Homer City,* 572 U.S. 489, 509 (2014). *See also Wisconsin,* 938 F.3d at 318, 322; *Sierra Club* v. *EPA,* 294 F.3d 155, 161 (D.C. Cir. 2002) (*Sierra Club*).

[246] The proposed CSAPR Update was published on December 3, 2015, and included proposed FIPs for Indiana, Louisiana, New York, Ohio, Texas, and Wisconsin. 80 FR 75705. At that time, the EPA had not yet even proposed action on good neighbor SIP submissions for the 2008 ozone NAAQS from Indiana, Louisiana, New York, Ohio, Texas, and Wisconsin; however, the EPA subsequently proposed and finalized these disapprovals before finalizing the CSAPR Update FIPs, published on October 26, 2016 (81 FR 74504). *See* 81 FR 38957 (June 15, 2016) (Indiana); 81 FR 53308 (August 12, 2016) (Louisiana); 81 FR 58849 (August 26, 2016) (New York); 81 FR 38957 (June 15, 2016) (Ohio); 81 FR 53284 (August 12, 2016) (Texas); 81 FR 53309 (August 12, 2016) (Wisconsin).

[247] *Wisconsin,* 938 F.3d at 313–14 (citing *North Carolina,* 531 F.3d at 911–12.

[248] *See Wisconsin,* 938 F.3d at 320.

dates,[249] the next of which for the 2015 ozone NAAQS is now the Moderate area attainment date of August 3, 2024.[250] The court pointed out that the CAA section 110 schedule of SIP and FIP deadlines is procedural whereas the attainment schedule is "central to the regulatory scheme[.]"[251] Thus, the sequence and timing of the EPA's action in disapproving these SIP submissions is informed by the need to ensure that any necessary good neighbor obligations identified in the separate FIP rulemaking are implemented as expeditiously as practicable and no later than the next attainment date. As explained in our proposed disapproval, analysis (and, if possible, implementation) of good neighbor obligations should begin in the 2023 ozone season. *See, e.g.,* 87 FR 9798, 9801–02 (Feb. 22, 2022). Indeed, states' and the EPA's analysis would have been more appropriately aligned with 2020, rather than 2023 (as had been presented in the EPA's March 2018 memorandum[252]), corresponding with the 2021 Marginal area attainment date. However, that clarification in legal obligations was not established by case law until 2020. *See Maryland,* 958 F.3d at 1203–04.

In short, nothing in the language of CAA section 110(c) prohibits the EPA from proposing a FIP as a backstop, to be finalized and implemented only in the event that a SIP submission is first found to be deficient and final disapproval action on the SIP submission is taken. Such an approach is a reasonable and prudent means of assuring that the statutory obligation to reduce air pollution affecting the health and welfare of those living in downwind states is implemented without delay, either via a SIP, or where such plan is deficient, via a FIP. The sequencing of the EPA's actions here is therefore reasonably informed by its legal obligations under the CAA, including in recognition of the fact that the implementation of necessary emissions reductions to eliminate significant contribution and thereby protect human health and welfare is already several years delayed. The EPA shares additional responses related to the timing of 2015 ozone NAAQS good neighbor actions in Section V.A.

*Comment:* Some comments allege the EPA is depriving States of the opportunity to target specific emissions reductions opportunities, or the opportunity to revise their submissions at any point in the future.

*EPA Response:* The EPA disagrees. The EPA has repeatedly emphasized that states have the freedom at any time to develop a revised SIP submission and submit that to the EPA for approval, and this remains true. *See* 87 FR 20036, 20051 (April 6, 2022); 86 FR 23054, 23062 (April 30, 2021); 81 FR 74504, 74506 (Oct. 26, 2016). In the proposed FIPs, as in prior transport actions, the EPA discusses a number of ways in which states could take over or replace a FIP, *see* 87 FR 20036, 20149–51 (Section VII.D: "Submitting A SIP"); *see also id.* at 20040 (noting as one purpose in proposing the FIP that "this proposal will provide states with as much information as the EPA can supply at this time to support their ability to submit SIP revisions to achieve the emissions reductions the EPA believes necessary to eliminate significant contribution"). If, and when, the EPA receives a SIP submission that satisfies the requirements of CAA section 110(a)(2)(D)(i)(I), the Agency will take action to approve that SIP submission.

*Comment:* Some commenters assert that the EPA is disapproving SIP submissions for the sole purpose of pursuing an alleged objective of establishing nation-wide standards in FIPs. Other commenters point to the proposed FIPs to make arguments that the EPA's decision to finalize disapproval of the SIPs is an allegedly foregone conclusion or that the EPA has allegedly failed to provide the opportunity for meaningful public engagement on the proposed disapproval of the SIPs.

*EPA Response:* The EPA disagrees as the facts do not support this assertion. To date, the EPA has approved 24 good neighbor SIPs for the 2015 ozone NAAQS: Alaska,[253] Colorado,[254] Connecticut,[255] Delaware,[256] District of Columbia,[257] Florida,[258] Georgia,[259] Hawaii,[260] Idaho,[261] Iowa,[262] Kansas,[263] Maine,[264] Massachusetts,[265] Montana,[266] Nebraska,[267] New Hampshire,[268] North Carolina,[269] North Dakota,[270] Oregon,[271] Rhode Island,[272] South Carolina,[273] South Dakota,[274] Vermont,[275] and Washington.[276]

The policy judgments made by the EPA in all actions on 2015 ozone NAAQS good neighbor SIP submissions, including approval actions, reflect consistency with relevant good neighbor case law and past agency practice implementing the good neighbor provision as reflected in the original CSAPR, CSAPR Update, Revised CSAPR Update, and related rulemakings. Employing a nationally consistent approach is particularly important in the context of interstate ozone transport, which is a regional-scale pollution problem involving many smaller contributors. Effective policy solutions to the problem of interstate ozone transport dating back to the NOₓ SIP Call [63 FR 57356 (October 27, 1998)] have necessitated the application of a uniform framework of policy judgments to ensure an "efficient and equitable" approach. *See EME Homer City,* 572 U.S. at 519. In any case, the approach of the proposed transport FIP is not the subject of this SIP disapproval. This rulemaking does not impose any specific emissions control measures on the states. Nor is the EPA disapproving these SIP submittals because they did not follow exactly the control strategies in the proposed FIP—the EPA has repeatedly indicated openness to alternative approaches to addressing interstate pollution obligations, but for reasons explained elsewhere in the rulemaking record, the EPA finds that none of the states included in this action submitted approvable approaches to addressing those obligations.

The EPA disputes the contentions that the FIP proposal itself indicates that the EPA did not earnestly examine the SIP submissions for compliance with the CAA or have an appropriate rationale

---

[249] *Wisconsin,* 938 F.3d at 318 ("When EPA determines a State's SIP is inadequate, the EPA presumably must issue a FIP that will bring that State into compliance before upcoming attainment deadlines, even if the outer limit of the statutory timeframe gives the EPA more time to formulate the FIP.") (citing *Sierra Club,* 294 F.3d at 161).

[250] *See* CAA section 181(a); 40 CFR 51.1303; Additional Air Quality Designations for the 2015 Ozone National Ambient Air Quality Standards, 83 FR 25776 (June 4, 2018, effective August 3, 2018).

[251] *Wisconsin,* 938 F.3d at 322 ("Delaware's argument leans too heavily on the SIP submission deadline. SIP submission deadlines, unlike attainment deadlines, are 'procedural' and, therefore, not 'central to the regulatory scheme.' ") (citing *Sierra Club,* 294 F.3d at 161).

[252] *See* March 2018 memorandum.

[253] 84 FR 69331 (December 18, 2019).
[254] 87 FR 61249 (October 11, 2022).
[255] 86 FR 71830 (December 20, 2021).
[256] 85 FR 25307 (May 1, 2020).
[257] 85 FR 5570 (January 31, 2020).
[258] 86 FR 68413 (December 2, 2021).
[259] Id.

[260] 86 FR 73129 (December 27, 2021).
[261] 85 FR 65722 (October 16, 2020).
[262] 87 FR 22463 (April 15, 2022).
[263] 87 FR 19390 (April 4, 2022).
[264] 86 FR 45870 (August 17, 2021).
[265] 85 FR 5572 (January 31, 2020).
[266] 87 FR 21578 (April 12, 2022).
[267] 85 FR 21325 (April 17, 2020).
[268] 86 FR 45870 (August 17, 2021).
[269] 86 FR 68413 (December 2, 2021).
[270] 85 FR 20165 (April 10, 2020).
[271] 84 FR 22376 (May 17, 2019).
[272] 86 FR 70409 (December 10, 2021).
[273] 86 FR 68413 (December 2, 2021).
[274] 85 FR 67653 (October 26, 2021).
[275] 85 FR 34357 (June 4, 2020).
[276] 83 FR 47568 (September 20, 2018).

for proposing to disapprove certain SIP submissions. The EPA also disputes that the FIP proposal indicates that the EPA did not intend to consider comments on the proposed disapprovals. Comments making claims the EPA did not follow proper administrative procedure have been submitted utilizing the very notice and comment process these comments claim the EPA is skipping, and these claims are factually unsupported. Comments related to the length of the comment period and claims of "pretext" are addressed in the RTC document.

*Comment:* Several comments pointed out how hard many states have worked to develop an approvable SIP submission.

*EPA Response:* The EPA acknowledges and appreciates states' efforts to develop approvable SIPs. Cooperative federalism is a cornerstone of CAA section 110, and the EPA strives to collaborate with its state partners. The timing of the EPA's 2015 ozone NAAQS good neighbor actions is not in any way intended to call into question any state's commitment to develop approvable SIPs. The EPA evaluated each SIP submission on its merits. The EPA relies on collaboration with state air agencies to ensure SIP submissions are technically and legally defensible, and the Agency's action here is in no way meant to undermine that collaboration between state and Federal partners respecting SIP development.

*Comment:* Several comments make various arguments about when the EPA can finalize FIPs. Some commenters argue that CAA section 110(c)(1) guarantees states an additional two years to correct their SIP submissions before the EPA finalizes a FIP. Others argue that the notice and comment requirements of the Administrative Procedures Act mandate that the EPA finalize a SIP submission disapproval before proposing a FIP. One commenter suggested that a state must be allowed to fully exhaust its judicial remedies to challenge a SIP submission disapproval before the EPA can promulgate a FIP. Commenters also raise concerns about the analysis and requirements in the proposed FIPs.

*EPA Response:* Comments opining on when the EPA is legally authorized to propose or finalize a FIP are outside the scope of this action. While the EPA acknowledges that the Agency has no obligation or authority to finalize a FIP until finalizing a disapproval of a SIP submission or determining that a state failed to submit a complete SIP submission (CAA section 110(c)(1)), this action is limited to determining whether the covered SIP submissions meet the requirements of CAA section

110(a)(2)(D)(i)(I). For the same reason, comments criticizing specific substantive requirements or implementation timelines in the proposed FIPs are beyond the scope of this action.

**2. Requests for Additional Time To Revise SIP Submissions**

*Comment:* Some commenters argue that the EPA must or should delay action on these SIP submissions so that states can reexamine and resubmit SIP submissions. Other commenters argue that states must be given more time to re-examine and resubmit their SIP submission for various reasons, including the substantive requirements in the proposed FIPs.

*EPA Response:* The EPA notes that there is no support in the Clean Air Act for such a delay. CAA section 110(a)(1) requires states to adopt and submit SIP submissions meeting certain requirements of CAA section 110(a)(2)(D)(i)(I), "within 3 years (or such shorter period as the Administrator prescribe) after the promulgation of a national primary ambient air quality standard (or any revision thereof)." CAA section 110(a)(1). The submission deadline clearly runs from the date of promulgation of the NAAQS, which for the 2015 ozone NAAQS was October 1, 2015. 80 FR 65291 (Oct. 26, 2015). In addition, while the Administrator is given authority to prescribe a period shorter than three years for the states to adopt and submit such SIP submissions, the Act does not give the Administrator authority to lengthen the time allowed for CAA section 110(a)(2) submissions. And the EPA would be in violation of court-ordered deadlines if it deferred taking final action beyond January 31, 2023, for all but two of the states covered by this action.[277]

Comments asserting that the EPA must give more time to states to correct deficiencies and re-submit conflict with the controlling caselaw in that they would elevate the maximum timeframes allowable within the procedural framework of CAA section 110 over the attainment schedule of CAA section 181 that the D.C. Circuit has now held multiple times must be the animating focus in the timing of good neighbor obligations. The D.C. Circuit in *Wisconsin* held that states and the EPA are obligated to fully address good neighbor obligations for ozone "as expeditiously as practical" and in no

event later than the next relevant downwind attainment dates found in CAA section 181(a),[278] and the EPA may not delay implementation of measures necessary to address good neighbor requirements beyond the next applicable attainment date without a showing of impossibility or necessity.[279] Further, the court pointed out that the CAA section 110 schedule of SIP and FIP deadlines is procedural, and while the EPA has complied with the mandatory sequence of actions required under section 110 here, we are mindful of the court's observation that, as compared with the fundamental substantive obligations of title I of the CAA to attain and maintain the NAAQS, the maximum timeframes allotted under section 110 are less "central to the regulatory scheme[.]"[280]

*Comment:* Other comments take the position that states are owed a second opportunity to submit SIP submissions before the EPA takes final action for various reasons, including claims that the EPA failed to issue adequate guidance or is otherwise walking back previously issued guidance. They allege that a state cannot choose controls to eliminate significant contribution until the EPA quantifies the contribution. Other comments argue that the EPA should not or cannot base the disapprovals on alleged shifts in policy that occurred after the Agency received the SIP submissions.

*EPA Response:* The EPA disagrees that the Agency was required to issue guidance or quantify individual states' level of significant contribution for 2015 ozone NAAQS good neighbor obligations, because as noted in *EME Homer City,* the Supreme Court clearly held that "nothing in the statute places EPA under an obligation to provide specific metrics to States before they undertake to fulfill their good neighbor obligations."[281] The Agency issued three memoranda in 2018 to provide modeling results and some ideas to states in the development of their SIP submissions. However, certain aspects of those discussions were specifically

---

[277] The EPA has no court-ordered deadline to take final action on the good neighbor SIP submission from Alabama dated June 21, 2022, or Utah's good neighbor SIP submission.

[278] *Wisconsin,* 938 F.3d at 313–14 (citing *North Carolina,* 531 F.3d at 911–12). On May 19, 2020, the D.C. Circuit in *Maryland,* applying the *Wisconsin* decision, held that the EPA must assess air quality at the next downwind attainment date, including Marginal area attainment dates, in evaluating the basis for the EPA's denial of a petition under CAA section 126(b). *Maryland,* 958 F.3d at 1203–04.

[279] *See Wisconsin,* 938 F.3d at 320.

[280] *Wisconsin,* 938 F.3d at 322 ("Delaware's argument leans too heavily on the SIP submission deadline. SIP submission deadlines, unlike attainment deadlines, are 'procedural' and therefore not 'central to the regulatory scheme.'") (citing *Sierra Club,* 294 F.3d at 161).

[281] *EME Homer City,* 572 U.S. at 510.

identified as not constituting agency guidance (especially Attachment A to the March 2018 memorandum, which comprised an unvetted list of outside stakeholders' ideas). Further, states' submissions did not meet the terms of the August or October 2018 memoranda addressing contribution thresholds and maintenance receptors, respectively. (*See* Section V.B for further discussion of these memoranda.) We acknowledge that the EPA reassessed air quality and states' contribution levels through additional modeling before proposing action on these SIP submissions. But that is not in any way an effort to circumvent the SIP/FIP process; rather it is an outcome of the reality that the EPA updated its modeling platform from a 2011 to a 2016 base year and updated its emissions inventory information along with other updates. There is nothing improper in the Agency improving its understanding of a situation before taking action, and the Agency reasonably must be able to act on SIP submissions using the information available at the time it takes such action. Those updates have not uniformly been used to disapprove SIPs—the new modeling for instance supported the approval of Montana's and Colorado's SIPs.[282] Nor has the new modeling prevented states from submitting new SIP submissions based on that modeling. For instance, the State of Alabama withdrew its prior submission in April of 2022, following our proposed disapproval, and submitted a new submission (further updated in June of 2022) analyzing the 2016v2 modeling used at proposal. The EPA is acting on that new submission and evaluating the new arguments the State developed regarding the more recent modeling. Nonetheless, as explained in the EPA's proposed disapproval of Alabama's new submission and in Section IV.A, the new arguments that Alabama has presented in its more recent submission do not lead the EPA to a contrary conclusion that its SIP submission should be approved.[283] This demonstrates two points contrary to commenters' contentions: first, the EPA is following the science and is making nationally consistent determinations at Steps 1 and 2, based on its review of each state's submission; and second, the fact that states made submissions based on the 2011-based modeling results presented in the March 2018

memorandum rather than on the most recent modeling results is not prejudicial to the outcome of the EPA's analysis, as our action on Alabama's more recent submission evaluating the State's arguments with respect to the newer, 2016-based modeling makes clear.

Contrary to commenters' arguments, the EPA had no obligation to issue further guidance, define obligations, or otherwise clarify or attempt to interpret states' responsibilities since the issuance of the 2018 memoranda, prior to acting on these SIP submissions. States themselves were aware or should have been aware of the case law developments in *Wisconsin* and in *Maryland*, which called into question the EPA's use of 2023 as the analytical year in the March 2018 memorandum. Those decisions were issued in 2019 and 2020 respectively, yet no state moved to amend or supplement their SIP submissions with analysis of an earlier analytical year or to otherwise bring their analyses into conformance with those decisions (*e.g.*, through fuller analysis of non-EGU emissions reduction potential or through treatment of international contribution). Given the Supreme Court's 2014 holding in *EME Homer City*, 572 U.S. at 508–510, which reversed a D.C. Circuit holding that the EPA *was* obligated to define good neighbor obligations,[284] states had no reason to expect the EPA would be obligated to issue further guidance to clarify requirements in the wake of those decisions. The EPA agrees with those commenters who point out that states have the first opportunity to assess and address obligations in implementing the NAAQS, but with that understanding in mind, it is notable that prior to the proposed disapprovals in February of 2022, no state moved to amend or supplement their SIP submission as the case law on good neighbor obligations evolved or in response to new modeling information as it became available.

Further, the EPA has evaluated state SIP submissions on the merits of what is contained in the submission, not the use of any particular modeling platform. The EPA disagrees with commenters' assertions that the EPA has proposed disapproval of a state's proposed SIP due to the use of a particular modeling platform. As noted previously, the EPA approved state SIP submissions that have used the earlier modeling. The EPA did not reach its conclusion to disapprove states' SIP submissions based on the use of the 2016v2

emissions platform standing alone. Use of that platform, or any other modeling platform, is not *ipso facto* grounds for disapproval at all. As evident in the proposed disapprovals and summarized in Section IV, the EPA evaluated the SIP submissions based on the merits of the arguments put forward in each SIP submission.

3. Alleged Harm to States Caused by Time Between SIP Submission and the EPA's Action

*Comment:* Many comments pointed to the EPA's statutory deadlines to take action on the SIP submissions to argue that the EPA's delay harmed the upwind state's interests because now the EPA may conclude they need to reduce their emissions to satisfy their good neighbor obligations in the separate FIP rulemaking whereas had the EPA acted by statutory deadlines using the older modeling, they might have had their SIP submissions approved. Some commenters suggest that the EPA never gave the state SIP submissions the appropriate review or suggest that the EPA's review of the SIP submissions was prejudiced by the FIP it had proposed.

*EPA Response:* The EPA acknowledges that the Agency's statutory deadlines to take final action on these SIP submissions generally fell in 2020 and 2021. However, the delay in acting caused no prejudice to the upwind states. First, this action to disapprove SIP submissions itself will not impose any requirements or penalties on any state or sources within that state. Second, these delays have primarily had the effect of deferring relief to downwind states and their citizens from excessive levels of ozone pollution under the good neighbor provision. Further, the EPA has generally had a practice of correcting its action on good neighbor SIP submittals if later information indicates that a prior action was in error—thus, it is not the case that simply having obtained an approval based on earlier modeling would have meant a state would be forever insulated from later being subject to corrective or remedial good neighbor actions. *See, e.g.,*86 FR 23056, 23067–68 (April 30, 2021) (error correcting Kentucky's approval to a disapproval and promulgating FIP addressing Kentucky's outstanding 2008 ozone NAAQS good neighbor obligations); 87 FR 20036, 20041 (April 6, 2022) (proposing error correction for Delaware's 2015 ozone NAAQS SIP approval to a disapproval based on updated air quality modeling). Finally, there is no basis in the CAA to use the Agency's own delay as a basis to nullify

---

[282] 87 FR 6095, 6097 at n. 15 (February 3, 2022) (Montana proposal); 87 FR 27050, 27056 (May 6, 2022) (Colorado, proposal), 87 FR 61249 (October 11, 2022) (Colorado, final).

[283] 87 FR 64412 (October 25, 2022).

[284] *EME Homer City Generation, L.P.* v. *EPA,* 696 F.3d 7 (D.C. Cir. 2012) (*EME Homer City I*).

the authority granted in the Act to address the nation's air pollution problems, as the statute itself contains other forms of adequate remedy. CAA section 304(a)(2) provides for judicial recourse where there is an alleged failure by the agency to perform a nondiscretionary duty, and that recourse is for the Agency to be placed on a court-ordered deadline to address the relevant obligations. *Accord Oklahoma,* 723 F.3d at 1223–24; *Montana Sulphur and Chemical Co.* v. *U.S. EPA,* 666 F.3d 1174, 1190–91 (9th Cir. 2012).

*Comment:* Some comments contend that the EPA's delay in acting on SIP submissions was a deliberate attempt to circumvent the SIP/FIP process, unduly burden the states, or to defer making information available to states. Comments allege that the EPA intentionally stalled an evaluative action until the perceived "facts" of the situation changed such that the analyses submitted by states were rendered outdated.

*EPA Response:* The EPA disagrees with both allegations. In this respect, it is important to review the recent history of the EPA's regulatory actions and litigation with respect to good neighbor obligations for both the 2008 and 2015 ozone NAAQS, and in particular, the substantial additional workload the Agency took on in the wake of the remand of the CSAPR Update in *Wisconsin.* In 2018, as the EPA issued the memoranda cited by commenters and planned to shift its focus to implementing the 2015 standards, it also issued the CSAPR Close-out, which made an analytical finding that there were no further obligations for 21 states for the 2008 standards following the CSAPR Update. 83 FR 65878 (Dec. 21, 2018). However, contrary to the EPA's understanding that it had fully addressed good neighbor obligations for the 2008 ozone NAAQS, the D.C. Circuit's decisions in *Wisconsin* (remanding the CSAPR Update) and in *New York* (vacating the CSAPR Close-out), forced the Agency to quickly pivot back to addressing remaining obligations under the 2008 standards. *Wisconsin* v. *EPA,* 938 F.3d 303 (D.C. Cir. 2019); *New York* v. *EPA,* 781 F. App'x 4 (D.C. Cir. 2019). The EPA was subject to renewed deadline suit litigation under CAA section 304, which led to a March 15, 2021, deadline to take final action on several states whose FIPs had been remanded and were incomplete in the wake of the CSAPR Close-out vacatur. *New Jersey* v. *Wheeler,* 475 F.Supp.3d 308 (S.D.N.Y. 2020). Throughout 2020 and 2021, the EPA was therefore focused on an

unexpected rulemaking obligation to complete good neighbor requirements as to the states with remanded CSAPR Update FIPs. This led to the EPA proposing and then issuing an economically significant, major rule assessing additional EGU emissions reduction obligations as well as presenting updated air quality modeling analysis using novel techniques and presenting information on a host of non-EGU industrial sources for the first time, *i.e.,* the Revised CSAPR Update, 86 FR 23054 (April 30, 2021). That rule is now currently subject to judicial review in the D.C. Circuit, *Midwest Ozone Group* v. *EPA,* No. 21–1146 (D.C. Cir. argued Sept. 28, 2022).[285] The EPA has also been in the process of reviewing and acting upon many states' good neighbor SIPs where the available information indicates that an approval of the state's submission was appropriate.[286]

Finally, the Agency needed time to review and evaluate the SIP submissions in a coordinated fashion to act on all the states' submissions in a consistent manner. As the EPA explained in the proposed disapproval action, consistency in defining CAA obligations is critically important in the context of addressing a regional-scale pollutant like ozone. *See, e.g.,* 87 FR 9807 n.48. Through coordinated development of the bases for how the Agency could act on the SIP submissions, while also evaluating the contours of a potential Federal plan to implement obligations where required, the EPA sequenced its deliberations and decision making to maximize efficient, consistent, and timely action, in recognition of the need to implement any necessary obligations "as

expeditiously as practicable."[287] The downsides of commenters' policy preference in favor of giving states another opportunity to develop SIP submissions, or in first acting on each SIP submission before proposing a FIP, are that such a sequence of actions would have led to multiple years of additional delay in addressing good neighbor obligations. Even if such a choice was available to the Agency using the CAA section 110(k)(5) SIP call mechanism, it was entirely reasonable for the EPA to decline to use that mechanism in this instance. (EPA further addresses comments in support of a SIP call approach in the RTC document.)

In short, commenters' notion that the EPA was deliberately or intentionally deferring or delaying action on these SIP submissions to circumvent any required legal process or reach any specific result is simply incorrect. Commenters have not supplied any evidence to support the claim either that any legal process was circumvented or that the Agency's conduct was in bad faith. *See Biden* v. *Texas,* 142 S.Ct. 2528, 2546–47 (2022) (presumption of regularity attends agency action absent a "strong showing of bad faith or improper behavior") (citing *Citizens to Protect Overton Park* v. *Volpe,* 401 U.S. 302, 420 (1971); *SEC* v. *Chenery,* 318 U.S. 80, 87 (1943)).

### 4. Use of Updated Modeling

*Comment:* Comments allege that by relying on modeling not available at the time of SIP submission development, the EPA "moved the goal post." Comments note the timeframes set out for action on SIPs, citing section 110 of the Act, and allege that by failing to act on SIP submissions in a timely manner and basing such actions on new modeling, the EPA imposes an arbitrary and capricious standard. Comments state that the EPA should not disapprove a SIP based on data not available to states during development of the SIP submissions or to the EPA during the period statutorily allotted for the EPA to take final action on SIP submissions.

*EPA Response:* In response to comments' claims that the EPA has inappropriately changed states' obligations for interstate transport by relying on updated modeling not available to states at the time they prepared their SIP submissions, the EPA disagrees. As an initial matter, the EPA disagrees with comment's claiming that agency expected state air agencies to develop a SIP submission based on

---

[285] During this time, the EPA also fulfilled its obligations to act on several petitions brought by downwind states under section 126(b) of the CAA. These actions culminated in litigation and ultimately adverse decisions in *Maryland* and *New York* v. *EPA. Maryland v,* 958 F.3d; *New York* v. *EPA,* 964 F.3d 1214, 2020 WL 3967838 (D.C. Cir. 2020). Further review and action on these remands remains pending before the agency.

[286] In chronological order: 83 FR 47568 (September 20, 2018) (Washington); 84 FR 69331 (December 18, 2019) (Alaska); 84 FR 22376 (May 17, 2019) (Oregon); 85 FR 5570 (January 31, 2020) (Washington, DC); 85 FR 5572 (January 31, 2020) (Massachusetts); 85 FR 20165 (April 10, 2020) (North Dakota); 85 FR 21325 (April 17, 2020) (Nebraska); 85 FR 25307 (May 1, 2020) (Delaware); 85 FR 34357 (June 4, 2020) (Vermont); 85 FR 65722 (October 16, 2020) (Idaho); 85 FR 67653 (October 26, 2020) (South Dakota); 86 FR 45870 (August 17, 2021) (Maine and New Hampshire); 86 FR 68413 (December 2, 2021) (Florida, Georgia, North Carolina, and South Carolina); 86 FR 70409 (December 10, 2021) (Rhode Island); 86 FR 71830 (December 20, 2021) (Connecticut); 86 FR 73129 (December 27, 2021) (Hawaii); 87 FR 19390 (April 4, 2022) (Kansas); 87 FR 21578 (April 12, 2022) (Montana); 87 FR 22463 (April 15, 2022) (Iowa); and 87 FR 61249 (October 11, 2022) (Colorado).

[287] CAA section 181(a); *Wisconsin,* 938 F.3d at 313–14 (citing *North Carolina,* 531 F.3d at 911–12).

some unknown future data. The EPA recognizes that states generally developed their SIP submissions with the best available information at the time of their development. As stated in the proposals, the EPA did not evaluate states' SIP submissions based solely on the 2016v2 emissions platform (or the 2016v3 platform, which incorporates comments generated during the public comment period on the proposed SIP actions and which supports these final SIP disapproval actions). We evaluated the SIP submissions based on the merits of the arguments put forward in each SIP submission, which included any analysis put forward by states to support their conclusions. Thus, we disagree with commenters who allege the Agency has ignored the information provided by the states in their submissions. Indeed, the record for this action reflects our extensive evaluation of states' air quality and contribution analyses. *See* generally Section IV, which summarizes our evaluation for each state.

We disagree with commenters who advocate that the EPA's evaluation of these submissions must be limited to the information available to states at the time they made their submissions, or information at the time of the deadline for the EPA to act on their submissions. It can hardly be the case that the EPA is prohibited from taking rulemaking action using the best information available to it at the time it takes such action. Nothing in the CAA suggests that the Agency must deviate from that general principle when acting on SIP submissions. While CAA section 110(k)(2) specifies a time period in which the Administrator is to act on a state submission, neither this provision nor any other provision of the CAA specifies that the remedy for the EPA's failure to meet a statutory deadline is to arrest or freeze the information the EPA may consider to what was available at the time of a SIP submission deadline under CAA section 110. Indeed, in the interstate transport context, this would lead to an anomalous result. For example, the D.C. Circuit rejected an argument made by Delaware against the CSAPR Update air quality analysis that the EPA was limited to reviewing air quality conditions in 2011 (rather than 2017) at the time of the statutory deadline for SIP submittals. The court explained,

Delaware's argument leans too heavily on the SIP submission deadline. SIP submission deadlines, unlike attainment deadlines, are "procedural" and therefore not "central to the regulatory scheme." *Sierra Club*, 294 F.3d at 161. Nor can Delaware's argument be reconciled with the text of the Good Neighbor Provision, which prohibits upwind States from emitting in amounts "which *will*" contribute to downwind nonattainment. 42 U.S.C. 7410(a)(2)(D)(i) (emphasis added). Given the use of the future tense, it would be anomalous for EPA to subject upwind States to good neighbor obligations in 2017 by considering which downwind States were once in nonattainment in 2011.

*Wisconsin*, 903 F.3d at 322. By the same token, here, holding the EPA to a consideration only of what information states had available regarding the 2023 analytic year at the time of their SIP submissions or at the time of a deadline under CAA section 110, would likewise elevate the "procedural" deadlines of CAA section 110 above the substantive requirements of the CAA that are "central to the regulatory scheme." Doing so here would force the Agency to act on these SIP submissions knowing that more recent refined, high quality, state-of-the-science modeling and monitoring data would produce a different result in our forward-looking analysis of 2023 than the information available in 2018. Nothing in the CAA dictates that the EPA must be forced into making substantive errors in its good neighbor analysis on this basis.

We relied on CAMx Version 7.10 and the 2016v2 emissions platform to make updated determinations regarding which receptors would likely exist in 2023 and which states are projected to contribute above the contribution threshold to those receptors. As explained in the preamble of the EPA's proposed actions and further detailed in the document titled "Air Quality Modeling TSD: 2015 Ozone National Ambient Air Quality Standards Proposed Interstate Transport Air Plan Disapproval" and 2016v2 Emissions Inventory TSD, both available in Docket ID no. EPA–HQ–OAR–2021–0663, the 2016v2 modeling built off previous modeling iterations used to support the EPA's action on interstate transport obligations. The EPA continuously refines its modeling to ensure the results are as indicative as possible of air quality in future years. This includes adjusting our modeling platform and updating our emissions inventories to reflect current information.

Additionally, we disagree with comments claiming that the 2016v2 modeling results were sprung upon the states with the publication of the proposed disapprovals. The EPA has been publishing a series of data and modeling releases beginning as early as the publication of the 2016v1 modeling with the proposed Revised CSAPR Update in November of 2020, which could have been used to track how the EPA's modeling updates were potentially affecting the list of possible receptors and linkages for the 2015 ozone NAAQS in the 2023 analytic year. The 2016-based meteorology and boundary conditions used in the modeling have been available through the 2016v1 platform, which was used for the Revised CSAPR Update (proposed in November of 2020, 85 FR 68964). The updated emissions inventory files used in the current modeling were publicly released September 21, 2021, for stakeholder feedback, and have been available on our website since that time.[288] The CAMx modeling software that the EPA used has likewise been publicly available for over a year. CAMx version 7.10 was released by the model developer, Ramboll, in December 2020. On January 19, 2022, we released on our website and notified a wide range of stakeholders of the availability of both the modeling results for 2023 and 2026 (including contribution data) along with many key underlying input files.[289]

By providing the 2016 meteorology and boundary conditions (used in the 2016v1 version) in fall of 2020, and by releasing updated emissions inventory information used in 2016v2 in September of 2021,[290] states and other interested parties had multiple opportunities prior to the proposed disapprovals in February of 2022 to consider how our modeling updates could affect their status for purposes of evaluating potential linkages for the 2015 ozone NAAQS. Further, by using the updated modeling results, the EPA is using the most current and technically appropriate information for this rulemaking. This modeling was not performed to "move the goal posts" for states but meant to provide updated emissions projections, such as additional emissions reductions for EGUs following promulgation of the Revised CSAPR Update for the 2008 ozone NAAQS, more recent information on plant closures and fuel switches, and sector trends, including non-EGU sectors. The construct of the 2016v2 emissions platform is described in the 2016v2 Emissions Modeling TSD contained in Docket ID No. EPA–HQ–OAR–2021–0663.

Finally, comments related to the timing of the EPA's action to disapprove these SIP submissions are addressed in Section V.A.1. The EPA notes the statute provides a separate remedy for agency action unlawfully delayed. In section 304 of the CAA, there is a

[288] *See* https://www.epa.gov/air-emissions-modeling/2016v2-platform.

[289] *See* https://www.epa.gov/scram/photochemical-modeling-applications.

[290] https://www.epa.gov/air-emissions-modeling/2016v2-platform.

process for filing suit against the EPA for its failure to comply with a non-discretionary statutory duty under the CAA. The appropriate remedy in such cases is an order to compel agency action, not a determination that the agency, by virtue of missing a deadline, has been deprived of or constrained in its authority to act. *See Oklahoma,* 723 F.3d at 1224 ("[W]hen 'there are less drastic remedies available for failure to meet a statutory deadline'—such as a motion to compel agency action— 'courts should not assume that Congress intended the agency to lose its power to act.' The Court 'would be most reluctant to conclude that every failure of an agency to observe a procedural requirement voids subsequent agency action, especially when important public rights are at stake.'") (cleaned up) (quoting *Brock* v. *Pierce County,* 476 U.S. 253, 260 (1986)).

*Comment:* Comments state that it is inappropriate for the EPA to revise its emissions inventory and to conduct new air quality modeling without allowing an appropriate opportunity for stakeholder review and comment and that the EPA must allow public comment on any updated (*i.e.,* 2016v3) modeling prior to use by the EPA in a final action. Comments claim that the EPA must withdraw the proposed disapproval and provide states time to develop new SIP submissions based on the updated information.

*EPA Response:* The EPA has evaluated a wide range of technical information and critiques of its 2016v2 emissions inventory and modeling platform following a solicitation of public feedback as well the public comment period on this action (and the proposed FIP action) and has responded to those comments and incorporated updates into the version of the modeling being used in this final action (2016v3). *See* Section III, the Final Action AQM TSD, and Section 4 of the RTC document for further discussion.

The EPA's development of and reliance on newer modeling to confirm modeling used at the proposal stage is in no way improper and is simply another iteration of the EPA's longstanding scientific and technical work to improve our understanding of air quality issues and causes going back decades. Where the 2016v3 modeling produced a potentially different outcome for states from proposal, that is reflected in this action (*e.g.,* our deferral of final action on Tennessee and Wyoming's SIP submissions).

*Comment:* Comments allege that EPA's modeling results have been inconsistent, questioning the reliability of the results.

*EPA Response:* Although some commenters indicate that our modeling iterations have provided differing outcomes and are therefore unreliable, this is not what the overall record indicates. Rather, in general, although the specifics of states' linkages may change slightly, our modeling overall has provided consistent outcomes regarding which states are linked to downwind air quality problems. For example, the EPA's modeling shows that most states that were linked to one or more receptors using the 2011-based platform (*i.e.,* the March 2018 data release) are also linked to one or more receptors using the newer 2016-based platform. Because each platform uses different meteorology (*i.e.,* 2011 and 2016) it is not at all unexpected that an upwind state could be linked to different receptors using 2011 versus 2016 meteorology.

In addition, although a state may be linked to a different set of receptors, states are often linked to receptors in the same area that has a persistent air quality problem. These differing results regarding receptors and linkages can be affected by the varying meteorology from year to year, but this does not indicate that the modeling or the EPA or the state's methodology for identifying receptors or linkages is inherently unreliable. Rather, for many states these separate modeling runs all indicated: (i) that there would be receptors in areas that would struggle with nonattainment or maintenance in the future, and (ii) that the state was linked to some set of these receptors, even if the receptors and linkages differed from one another in their specifics (*e.g.,* a different set of receptors were identified to have nonattainment or maintenance problems, or a state was linked to different receptors in one modeling run versus another).

The EPA interprets this common result as indicative that a state's emissions have been substantial enough to generate linkages at Step 2 to varying sets of downwind receptors generated under varying assumptions and meteorological conditions, even if the precise set of linkages changed between modeling runs. Under these circumstances, we think it is appropriate to proceed to a Step 3 analysis to determine what portion of a particular state's emissions should be deemed "significant." We also note that only four states included in the proposed disapprovals went from being unlinked to being linked between the 2011-based modeling provided in the March 2018 memorandum and the 2016v2-based modeling—Alabama, Minnesota, Nevada, and Tennessee.

## 5. Cooperative Federalism and the EPA's Authority

*Comment:* Many comments point to the concept of cooperative federalism as embodied in the CAA to make various arguments as to why the EPA cannot or should not be allowed to exercise its independent judgment in evaluating the arguments presented by the states in the SIP submissions, and some also argue that the EPA must approve each state's submission in deference to how states choose to interpret the CAA requirements they must meet.

*EPA Response:* The CAA establishes a framework for state-Federal partnership to implement the NAAQS based on cooperative federalism. Under the general model of cooperative federalism, the Federal Government establishes broad standards or goals, states are given the opportunity to determine how they wish to achieve those goals, and if states choose not to or fail to adequately implement programs to achieve those goals, a Federal agency is empowered to directly regulate to achieve the necessary ends. Under the CAA, once the EPA establishes or revises a NAAQS, states have the obligation and opportunity in the first instance to develop an implementation plan under CAA section 110 and the EPA will approve SIP submissions under CAA section 110 that fully satisfy the requirements of the CAA. This sequence of steps is not in dispute.

The EPA does not, however, agree with the comments' characterization of the EPA's role in the state-Federal relationship as being "secondary" such that the EPA must defer to state choices heedless of the substantive objectives of the Act; such deference would be particularly inappropriate in the context of addressing interstate pollution. The EPA believes that the comments fundamentally misunderstand or inaccurately describe this action, as well as the "'division of responsibilities' between the states and the federal government" they identify in CAA section 110 citing the *Train-Virginia* line of cases [291] and other cases.[292]

---

[291] *See Virginia* v. *EPA,* 108 F.3d 1397, 1407 (D.C. Cir. 1997) (*Virginia*) (quoting *Train* v. *Natural Resources Defense Council, Inc.,* 421 U.S. 60, 79 (1975) (*Train*)). The "Train-Virginia line of cases" are named for the U.S. Supreme Court case *Train,* 421 U.S. and to the D.C. Circuit case *Virginia,* 108 F.3d. The D.C. Circuit has described these cases as defining a "federalism bar" that generally recognizes states' ability to select emissions control measures in their SIPs so long as CAA requirements are met. *See, e.g., Michigan* v. *EPA,* 213 F.3d 663, 687 (D.C. Cir. 2000) (*Michigan*).

[292] *Union Elec. Co.* v. *EPA,* 427 U.S. 246 (1976), *Am. Elec. Power Co.* v. *Connecticut,* 565 U.S. 410 (2011), *Fla. Power & Light* v. *Costle,* 650 F.2d 579
Continued

Those cases, some of which pre-date the CAA amendments of 1990 resulting in the current Good Neighbor Provision,[293] stand only for the proposition that the EPA must approve state plans *if they meet the applicable CAA requirements.* But these cases say nothing about what those applicable requirements are. The EPA is charged under CAA section 110 with reviewing states' plans for compliance with the CAA and approving or disapproving them based on EPA's determinations. Thus, the EPA must ultimately determine whether state plans satisfy the requirements of the Act or not. Abundant case law reflects an understanding that the EPA must evaluate SIP submissions under the CAA section 110(k)(2) and (3).[294] If they are deficient, the EPA must so find, and become subject to the obligation to directly implement the relevant requirements through a Federal implementation plan under CAA section 110(c), unless EPA approves an applicable SIP first.[295]

The EPA responds in greater detail to these comments in the RTC document.

6. Availability of Guidance for SIP Submissions

*Comment:* Comments contend the EPA failed to issue guidance in a timely fashion by releasing its August 2018 memorandum 31 days prior to when SIPs addressing interstate ozone transport were due and issuing the October 2018 memorandum 18 days

after those SIPs were due. Some comments additionally claim that it is unreasonable for the EPA to disapprove SIP submissions based on standards that were not defined, mandated, or required by official guidance.

*EPA Response:* Comments' contention is unsupported by the statute or applicable case law. Regarding the need for the EPA's guidance in addressing good neighbor obligations, in *EME Homer City,* the Supreme Court clearly held that "nothing in the statute places the EPA under an obligation to provide specific metrics to States before they undertake to fulfill their good neighbor obligations." [296]

Nonetheless, as comments point out, the EPA issued three "memoranda" in 2018 to provide some assistance to states in developing these SIP submissions. In acting on the SIP submissions in this action, the EPA is neither rescinding nor acting inconsistently with the memoranda—to the extent the memoranda constituted agency guidance (not all the information provided did constitute guidance), information or ideas in the memoranda had not at that time been superseded by case law developments, and the memoranda's air quality and contribution data had not at that time been overtaken by updated modeling and other updated air quality information. While comments specific to each of those memoranda are addressed elsewhere in this record, we note in brief that each memorandum made clear that the EPA's action on SIP submissions would be through a separate notice-and-comment rulemaking process and that SIP submissions seeking to rely on or take advantage of any information or concepts in these memoranda would be carefully reviewed against the relevant legal requirements and technical information available to the EPA at the time it would take such rulemaking action.

*B. Application of the 4-Step Interstate Transport Framework*

1. Analytic Year

*Comment:* One comment asserted that 2023 is not an appropriate analytical year because, according to the commenter, the EPA and at least some downwind states have not in fact implemented mandatory emissions control requirements associated with their nonattainment areas, and *North Carolina* and *Wisconsin* require that upwind and downwind state obligations must be implemented "on par." The

comment also characterizes the EPA's invocation of *Maryland* as an inappropriate shifting of regulatory burden to upwind states.

*EPA Response:* This is an incorrect interpretation of the D.C. Circuit's holdings in *North Carolina, Wisconsin,* and *Maryland,* which held that the EPA and the states must align good neighbor obligations to the extent possible with the downwind areas' attainment dates. These are set by the statute and remain fixed regardless of whether downwind areas are delayed in implementing their own obligations. It would be unworkable to expect that upwind states' obligations could be perfectly aligned with each downwind area's actual timetable for implementing the relevant emissions controls, and no court has held that this is the EPA's or the states' obligation under the good neighbor provision. Further, this ignores the fact that upwind states must also address their interference with maintenance of the NAAQS, as well as the *Maryland* court's holding that good neighbor obligations should be addressed by the Marginal area attainment date for ozone under subpart 2 of part D of title I of the CAA. Both circumstances may involve situations in which the home state for an identified downwind receptor does not have a specific obligation to plan for and implement specific emissions controls while an upwind state may nonetheless be found to have good neighbor obligations. But, as the *Maryland* court recognized, the absence of specific enumerated requirements does not mean the downwind state does not have a statutorily binding obligation subject to burdensome regulatory consequences: "Delaware must achieve attainment 'as expeditiously as practicable,'" and "an upgrade from a marginal to a moderate nonattainment area carries significant consequences . . . ." *Maryland,* 958 F.3d at 1204.

Further, where any downwind-state delays are unreasonable or violate statutory timeframes, the CAA provides recourse to compel the completion of such duties in CAA section 304, not to defer the elimination of significant contribution and thereby expose the public in downwind areas to the elevated pollution levels caused in part by upwind states' pollution. Regardless, in this action, 2023 aligns with the Moderate area attainment date in 2024, and all of the downwind nonattainment areas corresponding to receptor locations identified at Step 1 in this action are already classified as being in Moderate nonattainment or have been reclassified to Moderate and the relevant states face obligations to submit

---

(5th Cir. 1981), *Bethlehem Steel Corp.* v. *Gorsuch,* 742 F.2d 1028 (7th Cir. 1984), *Concerned Citizens of Bridesburg* v. *EPA,* 836 F.2d 777 (3d Cir. 1987), *North Carolina,* 531 F.3d 896, *Luminant,* 675 F.3d 917 (5th Cir. 2012), *Luminant Co. LLC* v. *EPA,* 714 F.3d 841 (5th. Cir. 2013), *North Dakota* v. *EPA,* 730 F.3d 750 (8th. Cir. 2013), *EME Homer City II,* 795 F.3d 118 (D.C. Cir. 2015), and *Texas* v. *USEPA,* 829 F.3d 405 (5th Cir. 2016).

[293] The 1970 version of the Act required SIPs to include "adequate provisions for intergovernmental cooperation" concerning interstate air pollution. CAA section 110(a)(2)(E), 84 Stat. 1681, 42 U.S.C. 1857c–5(a)(2)(D). In 1977, Congress amended the Good Neighbor Provision to direct States to submit SIP submissions that included provisions "adequate" to "prohibit[] any stationary source within the State from emitting any air pollutant in amounts which will . . . prevent attainment or maintenance [of air quality standards] by any other State." CAA section 108(a)(4), 91 Stat. 693, 42 U.S.C. 7410(a)(2)(E) (1976 ed., Supp. II). Congress again amended the Good Neighbor Provision in 1990 to its current form.

[294] *See, e.g., Virginia,* 108 F.3d at 1406. *See also, e.g., Westar Energy* v. *EPA,* 608 Fed. App'x 1, 3 (D.C. Cir. 2015) ("EPA acted *well within the bounds* of its delegated authority when it disapproved of Kansas's proposed [good neighbor] SIP.") (emphasis added); *Oklahoma,* 723 F.3d at 1209 (upholding the EPA's disapproval of "best available retrofit technology" (BART) SIP, noting BART "does not differ from other parts of the CAA—states have the ability to create SIPs, but they are subject to EPA review").

[295] *EME Homer City Generation,* 572 U.S. at 508–510.

[296] *EME Homer City,* 572 U.S. at 510.

SIP submissions and implement reasonably available control technologies (RACT) by January 1, 2023. *See* 87 FR 60897, 60899 (October 7, 2022). The EPA further responds to this comment in the RTC document.

## 2. Attachment A to the March 2018 Memorandum

*Comment:* Comments state that states conducted their analyses based on the flexibilities listed in Attachment A of the March 2018 Memorandum. Comments cite the part of the memorandum where the EPA notes that "in developing their own rules, states have flexibility to follow the familiar four-step transport framework (using [the] EPA's analytical approach or somewhat different analytical approaches within these steps) or alternative frameworks, so long as their chosen approach has adequate technical justification and is consistent with the requirements of the CAA." Comments state that the EPA's disapproval of SIP submissions that took advantage of the flexibilities is arbitrary and capricious because the EPA has changed, without communication, its consideration of what is deemed to be the "necessary provisions" required for an approvable SIP submission too late in the SIP submission process and because, in disapproving these SIPs, the EPA is applying a consistent set of policy judgments across all states.

*EPA Response:* Comments mistakenly view Attachment A to the March 2018 memorandum releasing modeling results as constituting agency guidance. The EPA further disagrees with commenters' characterization of the EPA's stance regarding the "flexibilities" listed (without analysis) in Attachment A. Attachment A to the March 2018 memorandum identified a "Preliminary List of Potential Flexibilities" that could potentially inform SIP development.[297] However, the EPA made clear in that attachment that the list of ideas were not suggestions endorsed by the Agency but rather "comments provided in various forums" from outside parties on which the EPA sought "feedback from interested stakeholders."[298] Further, Attachment A stated, "EPA is not at this time making any determination that the ideas discussed later are consistent with the requirements of the CAA, nor are we specifically recommending that states use these approaches."[299] Attachment A to the March 2018 memorandum, therefore, does not constitute agency

guidance, but was intended to generate further discussion around potential approaches to addressing ozone transport among interested stakeholders. The EPA emphasized in this memorandum that any such alternative approaches must be technically justified and appropriate in light of the facts and circumstances of each particular state's submittal.[300] As stated in the proposed SIP disapprovals,[301] the March 2018 memorandum provided that, "While the information in this memorandum and the associated air quality analysis data could be used to inform the development of these SIPs, the information is not a final determination regarding states' obligations under the good neighbor provision."[302] In this final SIP disapproval action, the EPA again affirms that certain concepts included in Attachment A to the March 2018 memorandum require unique consideration, and these ideas do not constitute agency guidance with respect to transport obligations for the 2015 ozone NAAQS.

In response to comments' claims that since the time transport SIP submissions were submitted to the EPA for review, the EPA has changed, without communication, its consideration of what is deemed to be the "necessary provisions" required for an approvable SIP submission, the EPA disagrees. As comments note, and as stated in the proposed disapproval notifications, the EPA recognizes that states have discretion to develop their own SIP transport submissions and agrees that states are not bound to using the 4-step interstate transport framework the EPA has historically used. However, states must then provide sufficient justification and reasoning to support their analytical conclusions and emissions control strategies. *See, e.g.,* 87 FR 9798, 9801. In the SIP submissions being disapproved in this action, no state provided any enforceable emissions control strategies for approval into their SIP. The EPA has evaluated the merits of each state's arguments as to why no additional emissions reduction requirements are needed to satisfy their obligations under CAA section 110(a)(2)(D)(i)(I) for the more protective 2015 ozone NAAQS. While the EPA used its own 4-step interstate

transport framework as a guide for its review to ensure a consistent and equitable evaluation of each states' submissions, the EPA has also considered states' individual arguments without predetermining the state's conclusions about the state's transport obligations.

It was never the Agency's intent in sharing Attachment A that states would invoke one or more of the potential "flexibilities" that outside parties advocated for as a basis for concluding that no additional emissions controls were necessary to address interstate transport for the more protective 2015 ozone NAAQS without proper justification. Nothing in Attachment A suggested that was the Agency's intended objective. Indeed, where certain approaches identified in Attachment A might have produced analytical conclusions requiring upwind states to reduce their emissions, no state invoking Attachment A followed through with implementing those controls. We observe this dynamic at work in Kentucky's submission, because Kentucky appended comments from the Midwest Ozone Group to its submission that demonstrated that applying a "weighted" approach to allocating upwind-state responsibility at Step 3 would have resulted in an emissions control obligation on Kentucky's sources, yet the State offered no explanation in its submittal why it was not adopting that approach or even what its views on that approach were. *See* 87 FR 9515. As another example, Michigan cited Attachment A to the March 2018 in developing a methodology for calculating significant contribution under which Michigan would have been responsible for eliminating up to 0.12 ppb of contribution to downwind receptors; however, the State suggested that uncertainty caused by modeling "noise" was too great to either require emissions reductions or demonstrate that Michigan had any linkages to receptors at all. *See* 87 FR 9860–9861. However, this explanation did not, as an analytical matter, demonstrate a level of scientific uncertainty which might allow for ignoring the results,[303]

---

[297] March 2018 memorandum, Attachment A.
[298] *Id.*
[299] *Id.*

[300] March 2018 memorandum.
[301] E.g., 87 FR 9487.
[302] *See* Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I), March 27, 2018, available in docket EPA–HQ–OAR–2021–0663 or at *https://www.epa.gov/interstate-air-pollution-transport/interstate-air-pollution-transport-memos-and-notices.*

[303] Scientific uncertainty may only be invoked to avoid comporting with the requirements of the CAA when "the scientific uncertainty is so profound that it precludes . . . reasoned judgment" *Massachusetts* v. *EPA*, 127 S.Ct. 1438 (2007). *See Wisconsin,* 938 F.3d at 318–19 ("Scientific uncertainty, however, does not excuse EPA's failure to align the deadline for eliminating upwind States' significant contributions with the deadline for downwind attainment of the NAAQS."). *See also EME Homer City,* 795 F.3d at 135–36 ("We will not invalidate EPA's predictions solely because there might be discrepancies between those predictions
Continued

particularly when the Agency has implemented good neighbor requirements at levels of "significant contribution" comparable to or even less than 0.12 ppb. *See Wisconsin*, 938 F.3d at 322–23 (rejecting Wisconsin's argument that it should not face good neighbor obligations for the 2008 ozone NAAQS on the basis that its emission reductions would only improve a downwind receptor by two ten-thousandths of a part per billion).

The EPA continues to neither endorse the "flexibilities" in Attachment A, nor stakes a position that states are precluded from relying on these concepts in the development of their good neighbor SIP submissions, assuming they could be adequately justified both technically and legally. This has been demonstrated through the EPA's extensive evaluation of the merits of each states' SIP submissions, including their attempted use of flexibilities and derivatives of the EPA's historically applied 4-step interstate transport framework.[304]

**3. Step 1: October 2018 Memorandum**

*Comments:* Comments claimed that the EPA is not honoring its October 2018 memorandum, which they claim would allow for certain monitoring sites identified as maintenance-only receptors in the EPA's methodology to be excluded as receptors based on historical data trends. They assert that the EPA is inappropriately disapproving SIP submissions where the state sufficiently demonstrated certain monitoring sites should not be considered to have a maintenance problem in 2023.

*EPA Response:* The October 2018 memorandum recognized that states may be able to demonstrate in their SIPs that conditions exist that would justify treating a monitoring site as not being a maintenance receptor despite results from our modeling methodology identifying it as such a receptor. The EPA explained that this demonstration could be appropriate under two circumstances: (1) the site currently has "clean data" indicating attainment of the 2015 ozone NAAQS based on measured air quality concentrations, or (2) the state believes there is a technical

and the real world. That possibility is inherent in the enterprise of prediction.").

[304] Nor in the course of this evaluation has the EPA uniformly ruled out the concepts in Attachment A. For example, we noted at proposal that California's identification of a flexibility in Attachment A related to excluding certain air quality data associated with atypical events may be generally consistent with the EPA's modeling guidance, but this does not affect the ultimate determination that California's SIP is not approvable. *See* 87 FR 31454.

reason to justify using a design value from the baseline period that is lower than the maximum design value based on monitored data during the same baseline period. To justify such an approach, the EPA anticipated that any such showing would be based on an analytical demonstration that: (1) Meteorological conditions in the area of the monitoring site were conducive to ozone formation during the period of clean data or during the alternative base period design value used for projections; (2) ozone concentrations have been trending downward at the site since 2011 (and ozone precursor emissions of $NO_X$ and VOC have also decreased); and (3) emissions are expected to continue to decline in the upwind and downwind states out to the attainment date of the receptor. EPA evaluated state's analyses and found no state successfully applied these criteria to justify the use of one of these alternative approaches. The air quality data and projections in Section III indicate that trends in historic measured data do not necessarily support adopting a less stringent approach for identifying maintenance receptors for purposes of the 2015 ozone NAAQS. In fact, as explained in Section III, the EPA has found in its analysis for this final action that, in general, recent measured data from regulatory ambient air quality ozone monitoring sites suggest a number of receptors with elevated ozone levels will persist in 2023 even though our traditional methodology at Step 1 did not identify these monitoring sites as receptors in 2023. Thus, the EPA is not acting inconsistently with that memorandum—the factual conditions that would need to exist for the suggested approaches of that memorandum to be applicable have not been demonstrated as being applicable or appropriate based on the relevant data.

We further respond to comments related to the identification of receptors at Step 1 in the RTC document.

**4. Step 2: Technical Merits of a 1 Percent of the NAAQS Contribution Threshold**

*Comment:* Several comments contend that for technical reasons, the 0.70 ppb threshold is inappropriate for determining whether a state is linked to a downwind receptor at Step 2 of the 4-step interstate transport framework. Comments state that the degree to which errors exist in modeling ozone concentrations and contributions make it inappropriate for a threshold as low as 0.70 ppb to be used. Some comments further state that the 0.70 ppb threshold is inappropriate because the

concentration threshold is lower than what monitoring devices are capable of detecting. Comments reference the reported precision of Federal reference monitors for ozone and the rounding requirements found in 40 CFR part 50, appendix U, Interpretation of the Primary and Secondary National Ambient Air Quality Standards for Ozone, for support. Comments note that the 1 percent contribution threshold of 0.70 ppb is lower than the manufacturer's reported precision of Federal reference monitors for ozone and that the requirements found in appendix U truncates monitor values of 0.70 ppb to 0 ppb.

*EPA Response:* The EPA disagrees that a 1 percent of the NAAQS contribution threshold at Step 2 is "inappropriate" for the 2015 ozone NAAQS due to modeling biases and errors. The explanation for how the 1 percent contribution threshold was originally derived is available in the 2011 CSAPR rulemaking. *See* 76 FR 48208, 48236–38 (Aug. 8, 2011). The EPA has effectively applied a 1 percent of the NAAQS threshold to identify linked upwind states in three prior FIP rulemakings and numerous state-specific actions. The D.C. Circuit has declined to establish bright line criteria for model performance. In upholding the EPA's approach to evaluating interstate transport in CSAPR, the D.C. Circuit held that it would not "invalidate EPA's predictions solely because there might be discrepancies between those predictions and the real world. That possibility is inherent in the enterprise of prediction." *EME Homer City II*, 795 F.3d at 135. The court continued to note that "the fact that a 'model does not fit every application perfectly is no criticism; a model is meant to simplify reality in order to make it tractable.'" *Id.* at 135–36 (quoting *Chemical Manufacturers Association* v. *EPA*, 28 F.3d 1259, 1264 (DC Cir. 1994). *See also Sierra Club* v. *EPA*, 939 F.3d 649, 686–87 (5th Cir. 2019) (upholding the EPA's modeling in the face of complaints regarding an alleged "margin of error," noting challengers face a "considerable burden" in overcoming a "presumption of regularity" afforded "the EPA's choice of analytical methodology") (citing *BCCA Appeal Grp.* v. *EPA*, 355 F.3d 817, 832 (5th Cir. 2003)).

Furthermore, it is not appropriate to compare the bias/error involved in the estimation of total ozone to the potential error in the estimation of the subset of ozone that is contributed by a single state.[305] For example, on a specific day

[305] See, *e.g.*, 87 FR 9798 at 9816.

the modeled versus monitored ozone value may differ by 2 ppb but that is a relatively small percentage of the total modeled ozone, which for a receptor of interest would be on the order of 70 ppb. It would be unrealistic to assign all of the 2 ppb discrepancy in the earlier example to the estimated impact from a single state because the 2 ppb error would be the combination of the error from all sources of ozone that contribute to the total, including estimated impacts from other states, the home state of the receptor, and natural background emissions.

To address comments that compare the 0.70 ppb threshold to the Federal reference monitors for ozone and the rounding requirements found in 40 CFR part 50, appendix U, the EPA notes that the comment is mistaken in applying criteria related to the precision of monitoring data to the modeling methodology by which we project contributions when quantifying and evaluating interstate transport at Step 2. Indeed, contributions by source or state cannot be derived from the total ambient concentration of ozone at a monitor at all but must be apportioned through modeling. Under our longstanding methodology for doing so, the contribution values identified from upwind states are based on a robust assessment of the average impact of each upwind state's ozone-precursor emissions over a range of scenarios, as explained in the Final Action AQM TSD. This analysis is in no way connected with or dependent on monitoring instruments' precision of measurement. *See EME Homer City II,* 795 F.3d 118, 135–36 ("'[A] model is meant to simplify reality in order to make it tractable.'").

5. Step 2: Justification of a 1 Percent of the NAAQS Contribution Threshold

*Comment:* Comments contend that the EPA has not provided enough basis for reliance on the 0.70 ppb threshold, claiming that its use is therefore arbitrary and capricious.

*EPA Response:* The EPA is finalizing its proposed approach of consistently using a 1 percent of the NAAQS contribution threshold at Step 2. This approach ensures both national consistency across all states and consistency and continuity with our prior interstate transport actions for other NAAQS. Comments have not established that this approach is either unlawful or arbitrary and capricious.

The 1 percent threshold is consistent with the Step 2 approach that the EPA applied in CSAPR for the 1997 ozone NAAQS, which has subsequently been applied in the CSAPR Update and

revised CSAPR Update when evaluating interstate transport obligations for the 2008 ozone NAAQS. The EPA continues to find 1 percent to be an appropriate threshold. For ozone, as the EPA found in CAIR, CSAPR, and CSAPR Update, a portion of the nonattainment and maintenance problems in the U.S. results from the combined impact of relatively small contributions from many upwind states, along with contributions from in-state sources and other sources. The EPA's analysis shows that much of the ozone transport problem being analyzed for purposes of evaluating 2015 ozone NAAQS SIP obligations is still the result of the collective impacts of contributions from many upwind states. Therefore, application of a consistent contribution threshold is necessary to identify those upwind states that should have responsibility for addressing their contribution to the downwind nonattainment and maintenance problems to which they collectively contribute. Where a great number of geographically dispersed emissions sources contribute to a downwind air quality problem, which is the case for ozone, EPA believes that, in the context of CAA section 110(a)(2)(D)(i)(I), a state-level threshold of 1 percent of the NAAQS is a reasonably small enough value to identify only the greater-than-de minimis contributers yet is not so large that it unfairly focuses attention for further action only on the largest single or few upwind contributers. Continuing to use 1 percent of the NAAQS as the screening metric to evaluate collective contribution from many upwind states also allows the EPA (and states) to apply a consistent framework to evaluate interstate emissions transport under the interstate transport provision from one NAAQS to the next. *See* 81 FR 74504, 74518. *See also* 86 FR 23054, 23085 (reviewing and explaining rationale from CSAPR, 76 FR 48208, 48236–38, for selection of 1 percent threshold).

Further, the EPA notes that the role of the Step 2 threshold is limited and just one step in the 4-Step interstate transport framework. It serves to screen in states for further evaluation of emissions control opportunities applying a multifactor analysis at Step 3. Thus, as the Supreme Court has recognized, the contribution threshold essentially functions to exclude states with "de minimis" impacts. *EME Homer City,* 572 U.S. at 500.

*Comment:* Commenters contend that the EPA cannot use the 1 percent threshold as a determination for significance.

*EPA Response:* To clarify, the EPA does not use the 1 percent of the NAAQS threshold as the definition of "significance." Rather, where a state's contribution equals or exceeds the 1 percent of the NAAQS threshold, the EPA expects states to further evaluate their emissions to determine whether their emissions constitute significant contribution or interference with maintenance. The contribution threshold is a screening threshold to identify states which may be "contributing" to an out of state receptor. The EPA has maintained this interpretation of the relevant statutory language across many rulemakings, though commenters continue to confuse the Step 2 threshold with a determination of "significance," which it is not. *See EME Homer City,* 572 U.S. at 500–502 (explaining the difference between the "screening" analysis at Steps 1 and 2 whereby the EPA "excluded as de minimis any upwind State that contributed less than one percent of the . . . NAAQS" and the "control" analysis at Step 3 whereby the EPA determined "cost thresholds" to define significance).

Further, the EPA's air quality and contribution modeling for ozone transport is based on application of the model in a relative sense rather than relying upon absolute model predictions. All models have limitations resulting from uncertainties in inputs and scientific formulation. To minimize the effects of these uncertainties, the modeling is anchored to base period measured data in the EPA's guidance approach for projecting design values. Notably, the EPA also uses our source apportionment modeling in a relative sense when calculating the average contribution metric (used to identify linkages). In this method the magnitude of the contribution metric is tied to the magnitude of the projected average design value which is tied to the base period average measured design value. The EPA's guidance has recommended against applying bright-line criteria for judging whether statistical measures of model performance constitute acceptable or unacceptable model performance.

The Agency continues to find that this method using the CAMx model to evaluate contributions from upwind states to downwind areas is reliable. The agency has used CAMx routinely in previous notice and comment transport rulemakings to evaluate contributions relative to the 1 percent threshold for both ozone and $PM_{2.5}$. In fact, in the original CSAPR, the EPA found that "[t]here was wide support from commenters for the use of CAMx as an

appropriate, state-of-the science air quality tool for use in [Cross-State Air Pollution] Rule. There were no comments that suggested that the EPA should use an alternative model for quantifying interstate transport.'' 76 FR 48229 (August 8, 2011). In this action, the EPA has taken a number of steps based on comments and new information to ensure to the greatest extent the accuracy and reliability of its modeling projections at Step 1 and 2, as discussed elsewhere in this document.

6. Step 2: Prevention of Significant Deterioration Significant Impact Levels

*Comment:* Several comments insist that when identifying an appropriate linkage threshold at Step 2 of the 4-step framework, the EPA should consider or rely on the 1 ppb significant impact level (SIL) for ozone used as part of the prevention of significant deterioration PSD permitting process. Comments reference the EPA's April 17, 2018, guidance memorandum, ''Significant Impact Levels for Ozone and Fine Particles in the Prevention of Significant Deterioration Permitting Program'' (SIL guidance), as well as the EPA's March 2018 memorandum's Attachment A flexibilities to lend support to their opinion that the 1 ppb SIL should also be used to determine linkages at Step 2.

*EPA Response:* The EPA's SIL guidance relates to a different provision of the Clean Air Act regarding implementation of the prevention of significant deterioration (PSD) permitting program. This program applies in areas that have been designated attainment of the NAAQS and is intended to ensure that such areas remain in attainment even if emissions were to increase as a result of new sources or major modifications to existing sources located in those areas. This purpose is different than the purpose of the good neighbor provision, which is to assist downwind areas (in some cases hundreds or thousands of miles away) in resolving ongoing nonattainment of the NAAQS or difficulty maintaining the NAAQS through eliminating the emissions from other states that are significantly contributing to those problems. In addition, as discussed earlier, the purpose of the Step 2 threshold within the EPA's interstate transport framework for ozone is to broadly sweep in all states contributing to identified receptors above a de minimis level in recognition of the collective-contribution problem associated with regional-scale ozone transport. The threshold used in the context of PSD SIL serves an entirely different purpose, and so it does not follow that they should be

made equivalent. Further, comments incorrectly associate the EPA's Step 2 contribution threshold with the identification of ''significant'' emissions (which does not occur until Step 3), and so it is not the case that the EPA is interpreting the same term differently.

The EPA has previously explained this distinction between the good neighbor framework and PSD SILs. *See* 70 FR 25162, 25190–25191 (May 12, 2005); 76 FR 48208, 48237 (August 8, 2011). Importantly, the implication of the PSD SIL threshold is not that single-source contribution below this level indicates the absence of a contribution or that no emissions control requirements are warranted. Rather, the PSD SIL threshold addresses whether further, more comprehensive, multi-source review or analysis of air quality impacts are required of the source to support a demonstration that it meets the criteria for a permit. A source with estimated impacts below the PSD SIL may use this to demonstrate that it will not cause or contribute (as those terms are used within the PSD program) to a violation of an ambient air quality standard, but is still subject to meeting applicable control requirements, including best available control technology, designed to moderate the source's impact on air quality.

Moreover, other aspects of the technical methodology in the SIL guidance compared to the good neighbor framework make a direct comparison between these two values misleading. For instance, in PSD permit modeling using a single year of meteorology the maximum single-day 8-hour contribution is evaluated with respect to the SIL. The purpose of the contribution threshold at Step 2 of the 4-step good neighbor framework is to determine whether the average contribution from a collection of sources in a state is small enough not to warrant any additional control for the purpose of mitigating interstate transport, even if that control were highly cost effective. Using a 1 percent of the NAAQS threshold is more appropriate for evaluating multi-day average contributions from upwind states than a 1 ppb threshold applied for a single day, since that lower value of 1 percent of the NAAQS will capture variations in contribution. If EPA were to use a single day reflecting the maximum amount of contribution from an upwind state to determine whether a linkage exists at Step 2, comments' arguments for use of the PSD SIL might have more force. However, that would likely cause more states to become linked, not less. And in any case, consistent with the method in our modeling guidance for projecting

future attainment/nonattainment, the good neighbor methodology of using multiple days provides a more robust approach to establishing that a linkage exists at the state level than relying on a single day of data.

7. Step 2: August 2018 Memorandum

*Comment:* Comments assert that in the August 2018 memorandum the EPA committed itself to approving SIP submissions from states with contributions below 1 ppb, and so now the EPA should or must approve the good neighbor SIP submission from any state with a contribution below 1 ppb, either based on modeling available at the time of the state's SIP submission or at any time.

*EPA Response:* These comments mischaracterize the content and the EPA's application of August 2018 memorandum. Further, the EPA disputes that the EPA misled states or that the EPA has not appropriately reviewed SIP submissions from states that attempted to rely on an alternative contribution threshold at Step 2.

Specifically, the EPA's August 2018 memorandum provided an analysis regarding ''the degree to which certain air quality threshold amounts capture the collective amount of upwind contribution from upwind states.'' [306] It interpreted ''that information to make recommendations about what thresholds *may* be appropriate for use in'' SIP submissions (emphasis added).[307] Specifically, the August 2018 memorandum said, ''Because the amount of upwind collective contribution capture with the 1 percent and the 1 ppb thresholds is generally comparable, overall, we believe it *may* be reasonable and appropriate for states to use a 1 ppb contribution threshold, as an alternative to a 1 percent threshold, at Step 2 of the 4-step framework in developing their SIP revisions addressing the good neighbor provision for the 2015 ozone NAAQS.'' (emphasis added).[308] Thus, the text of the August 2018 memorandum does not guarantee that any state with a contribution below 1 ppb has an automatically approvable good neighbor SIP. In fact, the August 2018 memorandum indicated that ''[f]ollowing these recommendations does not ensure that EPA will approve a SIP revision in all instances where the recommendations are followed, as the guidance may not apply to the facts and circumstances underlying a particular SIP. Final decisions by the EPA to approve a particular SIP revision will

---

[306] August 2018 memorandum, page 1.
[307] August 2018 memorandum, page 1.
[308] August 2018 memorandum, page 4.

only be made based on the requirements of the statute and will only be made following an air agency's final submission of the SIP revision to the EPA, and after appropriate notice and opportunity for public review and comment.'' [309] The August 2018 memorandum also stated, ''EPA and air agencies should consider whether the recommendations in this guidance are appropriate for each situation.'' [310] The EPA's assessment of every SIP submission that invoked the August 2018 memorandum considered the particular arguments raised by the state.[311]

*Comment:* Some comments allege that the EPA representatives led the states to believe that their SIP submission would be approved on the basis of a 1 ppb contribution threshold. The comments further claim that the EPA has now since reversed course on its August 2018 memorandum and imposed new requirements on states that were not included in the EPA's guidance. One comment suggested EPA switched position without explanation from the August 2018 guidance to its proposed disapprovals, which it viewed as unlawful under *FCC* v. *Fox TV Stations, Inc.,* 556 U.S. 502 (2009).

*EPA Response:* As an initial matter, we note that the salience of these comments is limited to only a handful of states. The August 2018 memorandum made clear that the Agency had substantial doubts that any threshold greater than 1 ppb (such as 2 ppb) would be acceptable, and the Agency is affirming that a threshold higher than 1 ppb would not be justified under any circumstance for purposes of this action. No comment provided a credible basis for using a threshold even higher than 1 ppb. So this issue is primarily limited to the difference between a 0.70 ppb threshold and a 1.0 ppb threshold. Therefore, we note that this issue is only relevant to a small number of states whose only contributions to any receptor are above 1 percent of the NAAQS but lower than 1 ppb. Under the 2016v3 modeling of 2023 being used in this final action, those states with contributions that fall between 0.70 ppb and 1 ppb included in this action are Alabama, Kentucky, and Minnesota.

The EPA disagrees with comments' claims that the Agency has reversed course on applying the August 2018 memorandum. In line with the memorandum, the EPA evaluated every justification put forward by every state covered by this SIP disapproval action that attempted to justify an alternative threshold under the August 2018 memorandum, which are Alabama,[312] Arkansas,[313] Illinois,[314] Indiana,[315] Kentucky,[316] Louisiana,[317] Michigan,[318] Mississippi,[319] Missouri,[320] and Oklahoma,[321] and Utah.[322] The EPA also addressed criticisms of the 1 percent of the NAAQS contribution threshold made by Ohio [323] and Nevada.[324] (The topic of the EPA's input during state's SIP-development processes is further discussed in the RTC document.)

For this reason, the EPA disagrees with comment that case law reviewing changes in agency positions as articulated in *FCC* v. *Fox TV Stations, Inc.,* is applicable to this action. The Agency has not imposed a requirement that states must use a 1 percent of the NAAQS threshold (which would reflect a change in position from the August 2018 memorandum). Rather, under the terms of the August 2018 memorandum, the Agency has found that Alabama, Arkansas, Illinois, Indiana, Kentucky, Louisiana, Michigan, Mississippi, Missouri, Nevada, Ohio, Oklahoma, and Utah have not made a sufficient showing that the use of an alternative contribution threshold is justified for those States. Even if it were found that the Agency's position had fundamentally changed between this rulemaking action and the August 2018 memorandum (which we do not concede to be the case), we do not believe that any state had a legitimate reliance interest that would be sufficient to overcome the countervailing public interest that is served in declining to approve a state's use of the 1 ppb threshold where the state did not have adequate technical justification. First, neither states nor the emissions sources located in those states have incurred any compliance costs based on the August 2018 memorandum. Second, it

is not clear that any states invested much of their own public resources in developing state-specific arguments in support of a 1 ppb threshold. As the EPA observed at proposal, in nearly all submittals, the states did not provide the EPA with analysis specific to their state or the receptors to which its emissions are potentially linked. In one case, the EPA's proposed approval of Iowa's SIP submittal, ''the *EPA expended its own resources to attempt to supplement the information submitted by the state,* in order to more thoroughly evaluate the state-specific circumstances that could support approval.'' E.g., 87 FR 9806–07 (emphasis added). The EPA emphasizes again that it was the EPA's sole discretion to perform this analysis in support of the state's submittal, and the Agency is not obligated to conduct supplemental analysis to fill the gaps whenever it believes a state's analysis is insufficient. *Id.*

We acknowledge that certain states may have assumed the EPA would approve SIP submissions from states whose contribution to any receptor was below 1 ppb, but that assumption reflected a misunderstanding of the August 2018 memorandum, and in any case, an assumption is not, as a legal matter, the same thing as a reliance interest.

The EPA is not formally rescinding the August 2018 memorandum in this action or at this time, but since guidance memoranda are not binding in the first place, it is not required that agencies must ''rescind'' a guidance the moment it becomes outdated or called into question. As the Agency made clear in the August 2018 memorandum, all of EPA's proposals for action on interstate transport SIP submissions are subject to rulemaking procedure, including public notice and comment, before the EPA makes a final decision.

Although the EPA is not formally revoking the August 2018 memorandum at this time, and we have separately found that no state successfully established a basis for use of a 1 ppb threshold, we also continue to believe, as set forth in our proposed disapprovals, that national ozone transport policy associated with addressing obligations for the 2015 ozone NAAQS is not well-served by allowing for less protective thresholds at Step 2. Furthermore, the EPA disagrees that national consistency is an inappropriate consideration in the context of interstate ozone transport. The Good Neighbor provision, CAA section 110(a)(2)(D)(i)(I), requires to a unique degree of concern for consistency, parity, and equity across

[309] August 2018 memorandum, page 1.

[310] August 2018 memorandum, page 1.

[311] 87 FR 64423–64424 (Alabama); 87 FR 9806–9807 (Arkansas); 87 FR 9852–9853 (Illinois); 87 FR 9855–9856 (Indiana); 87 FR 9508–9511 (Kentucky); 87 FR 9812–9813 (Louisiana); 87 FR 9861–9862 (Michigan); 87 FR 9557 (Mississippi); 87 FR 9541–9543 (Missouri); 87 FR 31492 (Nevada); 87 FR 9870–9871 (Ohio); 87 FR 9818–9820 (Oklahoma); 87 FR 31477–31451 (Utah).

[312] 87 FR 64423–64424.

[313] 87 FR 9806–9807.

[314] 87 FR 9852–9853.

[315] 87 FR 9855–9856.

[316] 87 FR 9508–9511.

[317] 87 FR 9812–9813.

[318] 87 FR 9861–9862.

[319] 87 FR 9557.

[320] 87 FR 9541–9543.

[321] 87 FR 9818–9820.

[322] 87 FR 31477–31451.

[323] 87 FR 9870–9871.

[324] 87 FR 31492.

state lines.[325] For a regional air pollutant such as ozone, consistency in requirements and expectations across all states is essential. Based on the EPA's review of good neighbor SIP submissions to-date and after further consideration of the policy implications of attempting to recognize an alternative Step 2 threshold for certain states, the Agency now believes the attempted use of different thresholds at Step 2 with respect to the 2015 ozone NAAQS raises substantial policy consistency and practical implementation concerns. The availability of different thresholds at Step 2 has the potential to result in inconsistent application of good neighbor obligations based solely on the strength of a state's SIP submission at Step 2 of the 4-step interstate transport framework. From the perspective of ensuring effective regional implementation of good neighbor obligations, the more important analysis is the evaluation of the emissions reductions needed, if any, to address a state's significant contribution after consideration of a multifactor analysis at Step 3, including a detailed evaluation that considers air quality factors and cost. While alternative thresholds for purposes of Step 2 may be "similar" in terms of capturing the relative amount of upwind contribution (as described in the August 2018 memorandum), nonetheless, use of an alternative threshold would allow certain states to avoid further evaluation of potential emissions controls while other states with a similar level of contribution would proceed to a Step 3 analysis. This can create significant equity and consistency problems among states.

One comment suggested that the EPA could address this potentially inequitable outcome by simply adopting a 1 ppb contribution threshold for all states. However, the August 2018 memorandum did not conclude that 1 ppb would be appropriate for all states, and the EPA does not view that conclusion to be supported at present. The EPA recognized in the August 2018 memorandum that on a nationwide basis there was some similarity in the amount of total upwind contribution captured between 1 percent and 1 ppb. However, while this may be true in some sense, that is hardly a compelling basis to move to a 1 ppb threshold for

every state. Indeed, the 1 ppb threshold has the disadvantage of losing a certain amount of total upwind contribution for further evaluation at Step 3 (e.g., roughly 7 percent of total upwind state contribution was lost according to the modeling underlying the August 2018 memorandum; in the EPA's 2016v2 and 2016v3 modeling, the amount lost is 5 percent). Further, this logic has no end point. A similar observation could be made with respect to any incremental change. For example, should the EPA next recognize a 1.2 ppb threshold because that would only cause some small additional loss in capture of upwind state contribution as compared to 1 ppb? If the only basis for moving to a 1 ppb threshold is that it captures a "similar" (but actually smaller) amount of upwind contribution, then there is no basis for moving to that threshold at all. Considering the core statutory objective of ensuring elimination of all significant contribution to nonattainment or interference with maintenance of the NAAQS in other states as well as the broad, regional nature of the collective contribution problem with respect to ozone, we continue to find no compelling policy reason to adopt a new threshold for all states of 1 ppb.

It also is unclear why use of a 1 ppb threshold would be appropriate for all states under a more protective NAAQS when a 1 percent of the NAAQS contribution threshold has been used for less protective NAAQS. To illustrate, a state contributing greater than 0.75 ppb but less than 1 ppb to a receptor under the 2008 ozone NAAQS was "linked" at Step 2 using the 1 percent of the NAAQS contribution threshold, but if a 1 ppb threshold were used for the 2015 ozone NAAQS, then that same state would not be "linked" to a receptor at Step 2 under a NAAQS that is set to be more protective of human health and the environment. Consistency with past interstate transport actions such as CSAPR, and the CSAPR Update and Revised CSAPR Update rulemakings (which used a Step 2 threshold of 1 percent of the NAAQS for two less protective ozone NAAQS), is an important consideration. Continuing to use a 1 percent of NAAQS approach ensures that if the NAAQS are revised and made more protective, an appropriate increase in stringency at Step 2 occurs, to ensure an appropriately larger amount of total upwind-state contribution is captured for purposes of fully addressing interstate transport obligations. See 76 FR 48208, 48237–38.

One comment identified that if the EPA were to use a 1 percent of the

NAAQS contribution threshold, the EPA would be obligated to seek feedback on that contribution threshold through a public notice and comment process. The EPA's basis and rationale for every SIP submission covered by this final SIP disapproval action, including the use of a 1 percent of the NAAQS contribution threshold, was in fact presented for public comment. The EPA received, and is addressing in this action, many detailed comments about contribution thresholds. Further, the EPA's application of a 1 percent of the NAAQS threshold has been consistently used in notice-and-comment rulemakings beginning with the CSAPR rulemaking in 2010–2011 and including both FIP actions (CSAPR Update and Revised CSAPR Update) and numerous actions on ozone transport SIP submissions. In each case, the 1 percent of the NAAQS threshold was subject to rigorous vetting through public comment and the Agency's response to those comments, including through analytical evaluations of alternative thresholds. See, e.g., 81 FR 74518–19. By contrast, the August 2018 memorandum was not issued through notice-and-comment rulemaking procedures, and the EPA was careful to caveat its utility and ultimate reliability for that reason.

*Comment:* Some comments claim that the EPA is applying the August 2018 memorandum inconsistently based on the EPA's actions with regard to action good neighbor SIP submissions from Iowa and Oregon for the 2015 ozone NAAQS and Arizona's good neighbor SIP submission for the 2008 ozone NAAQS.

*EPA Response:* The EPA disagrees that there is any such inconsistency. The EPA withdrew a previously proposed approval of Iowa's SIP submission where the Agency had attempted to substantiate the use of a 1 ppb contribution threshold, and re-proposed and finalized approval of that SIP based on a different rationale using a 1 percent of the NAAQS contribution threshold. 87 FR 9477 (Feb. 22, 2022); 87 FR 22463 (April 15, 2022). As explained earlier in this section, this experience of the EPA attempting to justify 1 ppb for a state through additional air quality analysis, where the state had not conducted an analysis the Agency considered to be sufficient is part of the reason the Agency is moving away from attempting to justify use of this alternative contribution threshold.

The EPA also disputes the claim that Oregon and Arizona were the only states "allowed" to use a 1 ppb threshold. The EPA approved Oregon's SIP submission for the 2015 ozone NAAQS on May 17,

---

[325] The EPA notes that Congress has placed on the EPA a general obligation to ensure the requirements of the CAA are implemented consistently across states and regions. See CAA section 301(a)(2). Where the management and regulation of interstate pollution levels spanning many states is at stake, consistency in application of CAA requirements is paramount.

2019, and both Oregon and the EPA relied on a 1 percent of the NAAQS contribution threshold. 84 FR 7854, 7856 (March 5, 2019) (proposal); 84 FR 22376 (May 17, 2019) (final). In our FIP proposal for the 2015 ozone NAAQS, the EPA explained it was not proposing to conduct an error correction for Oregon even though updated modeling indicated Oregon contributed above 1 percent of the NAAQS to monitors in California, because the specific monitors in California are not interstate ozone transport "receptors" at Step 1. *See* 87 FR 20036, 20074–20075 (April 6, 2022). The EPA solicited public comment on its approach to Oregon's contribution to California receptors as part of the 2015 ozone NAAQS transport FIP development, and the Agency has not yet taken final action on that FIP. In 2016, the EPA previously approved Arizona's good neighbor SIP for the earlier 2008 ozone NAAQS based on a similar rationale with regard to certain monitors in California in 2016. 81 FR 15200 (March 22, 2016) (proposal); 81 FR 31513 (May 19, 2016) (final rule). The Agency's view with respect to its evaluation of both Arizona and Oregon is that specific monitors in California are not interstate ozone transport "receptors" at Step 1. The EPA has not approved or applied an alternative Step 2 threshold for any state.

Comments related to the specific circumstances of an individual state and/or its arguments put forth in its SIP submission as it pertains to the August 2018 Memorandum are further addressed in the RTC document.

**8. Step 3: States' Step 3 Analyses for the 2015 Ozone NAAQS**

*Comment:* Comments state that the EPA has not provided any guidance on what an appropriate Step 3 analysis would entail, and therefore any decision where the Agency rejects a Step 3 analysis is arbitrary and capricious. One comment claims that not a single state has successfully made a Step 3 demonstration leading to an approvable interstate transport SIP for the 2015 ozone NAAQS. Comments note that there is no requirement in the CAA that states must complete an analysis similar to the EPA's, and the EPA cannot substitute its own judgment for that of the state's in crafting a SIP. Rather, the EPA is obligated to defer to state choices. One comment asserts that the EPA is required to interpret the term "significant contribution" in a manner "which ties contribution to an amount which contributes significantly to downwind maintenance or nonattainment problems." Another comment claims the EPA is

intentionally exploiting the Supreme Court decision in *EME Homer City* to justify any requirements it deems necessary to further Federal policy decisions. Some comments identify that some states did not conduct a Step 3 analysis in their submitted SIPs because, using the flexibilities provided in the 2018 memoranda, these states concluded in Step 1 and Step 2 that no controls were required. One comment suggests that the EPA propose an 18-month period to allow these states to proceed with Steps 3 and 4.

*EPA Response:* The EPA disagrees that it is obligated to defer to states' choices in the development of good neighbor SIP submissions. As required by the Act, the EPA has evaluated each of the SIP submissions for compliance with the CAA, including whether an adequate Step 3 analysis was conducted—or whether states had offered an approvable alternative approach to evaluating their good neighbor obligations—and found in each case that what these states submitted was not approvable. The Supreme Court has recognized that the EPA is not obligated to provide states with guidance before taking action to disapprove a SIP submission. *EME Homer City*, 572 U.S. at 508–10. Nonetheless, throughout the entire history of the EPA's actions to implement the good neighbor provision for ozone, starting with the 1998 NO$_X$ SIP Call, we have consistently adopted a similar approach at Step 3 that evaluates emissions reduction opportunities for linked states applying a multifactor analysis. States could have performed a similar analysis of emissions control opportunities. The EPA has not directed states that they must conduct a Step 3 analysis in precisely the manner the EPA has done in its prior regional transport rulemakings; however, SIPs addressing the obligations in CAA section 110(a)(2)(D)(i)(I) must prohibit "any source or other type of emissions activity within the State" from emitting air pollutants which will contribute significantly to downwind air quality problems. Thus, States seeking to rely on an alternative approach to defining "significance" must use an approach that comports with the statute's objectives to determine whether and to what degree emissions from a state should be "prohibited" to eliminate emissions that will "contribute significantly to nonattainment in, or interfere with maintenance of" the NAAQS in any other state. Further, the approach selected must be reasonable and technically justified. Therefore,

while the EPA does not direct states to use a particular framework, nonetheless, each state must show that its decision-making was based on a "technically appropriate or justifiable" evaluation.

Further, the Agency has a statutory obligation to review and approve or disapprove SIP submittals according to the requirements of the Clean Air Act. *See* CAA section 110(k)(3). And the Agency is empowered to interpret those statutory requirements and exercise both technical and policy judgment in acting on SIP submissions. Indeed, the task of allocating responsibility for interstate pollution particularly necessitates Federal involvement. *See EME Homer City*, 572 U.S. at 514 ("The statute . . . calls upon the Agency to address a thorny causation problem: How should EPA allocate among multiple contributing upwind States responsibility for a downwind State's excess pollution?"); *see also Wisconsin*, 938 F.3d at 320. Further, we have consistently disapproved states' good neighbor SIP submissions addressing prior ozone NAAQS when we have found those states linked through our air quality modeling and yet the state failed to conduct an analysis of emissions control opportunities, or such analysis was perfunctory or otherwise unsatisfactory. We have been upheld in our judgment that such SIPs are not approvable. *See Westar Energy* v. *EPA*, 608 Fed. App'x 1, 3 (DC Cir. 2015) ("EPA acted *well within the bounds* of its delegated authority when it disapproved of Kansas's proposed SIP.") (emphasis added).

With respect to the assertion that no state has successfully avoided a FIP with an approvable Step 3 analysis, we note first that at this time, no final FIP addressing the 2015 ozone NAAQS has been promulgated. More directly to the point, no state submission that is the subject of this disapproval action offered any additional emissions control measures. While it is conceivable that a Step 3 analysis may result in a determination that no additional controls are needed, EPA expects that such circumstances will generally be rare, else the CAA's interstate transport provisions are rendered ineffective. For example, the EPA determined in the CSAPR Update that even though the District of Columbia and Delaware were linked to out of state receptors at Steps 1 and 2 of the 4-step interstate transport framework, no additional control measures were required of either jurisdiction. As to the District of Columbia, we found that there were no affected EGU sources that would fall under the CSAPR Update's control program. For Delaware, we found that

there were no emissions reductions available from any affected sources for any of the emissions control stringencies that were analyzed. *See* 81 FR 74504, 74553. No state's submission covered in this action contained an emissions control analysis that would allow for these types of conclusions to be reached for all of its sources.[326] States generally did not conduct any comparative analysis of available emissions control strategies—nor did they prohibit any additional ozone-precursor emissions.

We are unclear what another comment intends in asserting that the EPA is required to interpret "significant contribution" in a manner "which ties contribution to an amount which contributes significantly to downwind maintenance or nonattainment problems." The EPA disagrees that: (1) It has imposed or mandated a specific approach to Step 3 in this action, (2) this action established a particular level of emissions reduction that states were required to achieve, or (3) it mandated a particular methodology for making such a determination. To the extent the comment suggests that the Agency cannot mandate that states use cost as a method of allocating responsibility in their transport SIPs, first, the Agency has not done so. Further, as to whether cost could be used as a permissible method of allocating responsibility, the comment ignores the Supreme Court's holding to the contrary in *EME Homer City,* 572 U.S. at 518, and the D.C. Circuit's earlier holding to the same effect in *Michigan,* 213 F.3d at 687–88, both of which upheld the EPA's approach of using uniform cost-effectiveness thresholds to allocate upwind state responsibilities under the good neighbor provision for prior NAAQS. While this approach may be reasonable to apply again for the 2015 ozone NAAQS (and the EPA has proposed to do so in the proposed FIP action published on April 6, 2022), the EPA did not impose such a requirement on states in developing SIP submissions, nor is the EPA finding any SIP submission not approvable based on a

failure to use this particular methodology.

In its March 2018 memorandum, Attachment A, the Agency acknowledged that there could be multiple ways of conducting a Step 3 analysis. The Agency did not endorse any particular approach and noted the Attachment was merely a list of stakeholder ideas that the EPA was not recommending any state follow. The apparent result of this "flexibility," however, was that no state presented a Step 3 analysis that resulted in including any enforceable emissions reductions to address good neighbor obligations for the 2015 ozone NAAQS in their interstate transport SIP submittals. Likewise, the comment here did not include information or analysis establishing that any particular alternative Step 3 approach should have been approved or that any state performed such an analysis in a manner that would have addressed "significant contribution" even in the manner the comment appears to be suggesting.

Notably, materials appended to one State's SIP submission, developed by the Midwest Ozone Group (MOG), did present an analysis applying an approach to "significant contribution" that was based on calculating a proportional share of each state's contribution to a downwind receptor, and this methodology would have imposed on that State's, Kentucky's, sources an obligation to eliminate 0.02 ppb of ozone at the relevant receptor. *See* 87 FR 9507. While the EPA does not endorse or here evaluate the merits of such an approach, it is noteworthy that the State in that instance did not adopt that approach, did not impose that obligation on its sources through enforceable measures by revising its SIP, and offered no explanation for its decision not to do so. *See id.* 9516 ("This approach would have imposed additional emissions reductions for Kentucky sources. Kentucky's final SIP did not consider MOG's proposal and did not provide an explanation for why it was rejecting this approach to allocating upwind emissions reductions, even though it appended this recommendation to its SIP submittal.").

### 9. Step 4: Attempt To Rely on FIPs in a SIP Submission

*Comment:* One comment states that FIPs or other Federal emissions control measures do not have to be incorporated into and enforceable under state law to be an approvable SIP measure. They view it as acceptable for a state to rely in its SIP Submission on the emissions reductions achieved by prior ozone transport FIPs, such as the CSAPR

Update or the Revised CSAPR Update, as a permissible means of achieving emissions reductions to eliminate significant contribution for the 2015 ozone NAAQS.

*EPA Response:* The EPA disagrees. As the EPA has noted on page 16 of our September 2013 memorandum "Guidance on Infrastructure State Implementation Plan (SIP) Elements under Clean Air Act sections 110(a)(1) and 110(a)(2)" (2013 Infrastructure SIP Guidance): "a FIP is not a state plan and thus cannot serve to satisfy the state's obligation to submit a SIP." [327] Indeed, the general principle that measures relied on to meet states' CAA obligations must be part of the SIP has been recognized by courts, such as in *Committee for a Better Arvin,* 786 F.3d 1169 (9th Cir. 2015).

This principle is grounded in the recognition that if such measures are not rendered enforceable within the SIP itself, then they may be modified or amended in ways that would undermine the basis for the state's reliance on them, while the approved SIP itself would purport to have addressed the relevant obligation merely by outdated reference to that modified or nonexistent control measure residing outside the SIP. For example, to be credited for attainment demonstration purposes, requirements that may otherwise be federally enforceable (such as new source review permit limits or terms in federally enforceable consent orders), must be in the state's implementation plan so that they could not later be changed without being subject to the EPA's approval. This principle is instrumental to ensuring that states cannot take credit for control measures that might be changed (even by the EPA itself) without the EPA's required approval action under CAA section 110, which includes the obligation to ensure there is no interference or backsliding with respect to all applicable CAA requirements. *See* CAA section 110(l). *See also Montana Sulfur and Chemical Co.* v. *EPA,* 666 F.3d 1174, 1195–96 (9th Cir. 2012) ("The EPA correctly reads 42 U.S.C. 7410(a)(2) as requiring states to include enforceable emissions limits and other control measures *in the plan itself.*") (emphasis in original); 40 CFR 51.112(a) ("Each plan must demonstrate that the measures, rules, and regulations *contained in it* are adequate to provide for the timely attainment and

---

[326] We note that California's SIP submission is not approvable at Step 3, despite the fact that the EPA has not identified $NO_X$ emissions control opportunities at the state's EGUs. Nonetheless, the SIP submission is not approvable because the state attempted to rely on the CSAPR Update cost threshold to justify a no-control determination when that threshold was in relation to a partial remedy for a less protective NAAQS, and even if it could be reasonably concluded that no emissions reductions are appropriate at EGUs in California, the SIP submission did not conduct an adequate analysis of emissions control opportunities at its non-EGU industrial sources. *See* 87 FR 31459–60.

[327] Guidance on Infrastructure State Implementation Plan (SIP) Elements under Clean Air Act Sections 110(a)(1) and 110(a)(2), September 13, 2013 (available at *https://www.epa.gov/sites/default/files/2015-12/documents/guidance_on_infrastructure_sip_elements_multipollutant_final_sept_2013.pdf*).

maintenance of the national standard that it implements.'') (emphasis added).

The EPA has applied this same interpretation in implementing other infrastructure SIP requirements found in CAA section 110(a)(2). For example, in implementing CAA section 110(a)(2)(C), (D)(i)(II), (D)(ii), and (J) relating to the permitting program for PSD, the EPA has developed FIPs that incorporate by reference provisions codified at 40 CFR 51.21, and some states have taken delegation of that FIP to implement the relevant requirements. But the EPA does not and cannot approve the state as having met these infrastructure SIP elements, even by virtue of taking delegation of the FIP. *See, e.g.,* 83 FR 8818, 8820 (March 1, 2018). Likewise, under one of the pathways presented in our 2013 Infrastructure SIP Guidance, the EPA does not approve SIPs addressing interstate visibility transport obligations under CAA section 110(a)(2)(D)(i)(II) (''prong 4'') until the state itself has a fully approved regional haze plan, and states cannot rely on the CSAPR ''better than BART'' FIPs to meet their prong 4 requirements until they have replaced that FIP with an approved SIP. *See, e.g.,* 84 FR 13800, 13801 (April 8, 2019); 84 FR 43741, 43744 (Aug. 22, 2019).

The comment does not provide contrary examples where the EPA has approved, as a SIP-based emissions control program, requirements that are established through Federal regulation or other types of emissions control programs that are outside the SIP. It is true that in the first two steps of the 4-step interstate transport framework, the EPA conducts air quality modeling based on emissions inventories reflective of on-the-books state and Federal emissions control requirements, to make determinations about air quality conditions and contribution levels that can be anticipated *in the baseline* in a future analytic year. If the comment's examples were intended to reference this consideration of Federal measures in prior actions on SIP submittals, the EPA agrees that it does consider such measures at these steps of its analysis, and the EPA has consistently taken this approach throughout its prior ozone transport actions. But here we are discussing Step 3 and 4 of the framework, where states that have been found to contribute to downwind nonattainment and maintenance problems, *e.g.,* are linked at Steps 1 and 2 to an out of state receptor, would need to evaluate their continuing emissions to determine what if any of those emissions should be deemed ''significant'' (*e.g.,* Step 3) and eliminated through enforceable

emissions control requirements (*e.g.,* Step 4). The EPA is not aware of any good neighbor SIP submission that it has approved where a state purported to eliminate its significant contribution (*e.g.,* satisfy Steps 3 and 4) simply by referring to Federal measures that were not included in its SIP and enforceable as a matter of state law. Finally, it bears emphasizing that the EPA's assessment of the 2015 ozone transport SIPs has already accounted for the emissions-reducing effects of both the CSAPR Update and the Revised CSAPR Update in its baseline air quality modeling at Steps 1 and 2, and so pointing to either of those rules as measures that would eliminate significant contribution at Step 3, for purposes of the 2015 ozone NAAQS, would be impermissible double-counting.

### C. Good Neighbor Provision Policy

#### 1. Mobile Source Emissions

*Comment:* Several comments assert that mobile source emissions within the home state of the location of receptors are the primary source of nonattainment problems in downwind areas. Some comments additionally state that a larger portion of their own upwind state emissions is from mobile source emissions. These comments request that the EPA focus on these emissions sources rather than stationary sources to reduce ongoing nonattainment problems. These comments claim mobile sources are federally regulated and, therefore, the EPA bears the responsibility to either take action to reduce mobile source emissions nationwide or encourage downwind states to implement strategies to reduce their own local mobile source emissions.

*Response:* The EPA recognizes that nationwide, mobile sources represent a large portion of ozone-precursor emissions and, as such, would be expected to have a large impact on nonattainment and maintenance receptors.

The EPA has been regulating mobile source emissions since it was established as a Federal agency in 1970 and is committed to continuing the effective implementation and enforcement of current mobile source emissions standards and evaluating the need for additional standards.[328] The

EPA believes that the $NO_X$ reductions from its Federal programs are an important reason for the historical and long-running trend of improving air quality in the United States. The trend helps explain why the overall number of receptors and severity of ozone nonattainment problems under the 1997 and 2008 ozone NAAQS have declined. As a result of this long history, $NO_X$ emissions from onroad and nonroad mobile sources have substantially decreased and are predicted to continue to decrease into the future as newer vehicles and engines that are subject to the more recent and more stringent standards and engines replace older vehicles and engines.[329]

The EPA included mobile source emissions in the 2016v2 modeling used to support the proposal of these SIP disapproval actions to help determine state linkages at Steps 1 and 2 of the 4-step interstate transport framework and has done likewise in its 2016v3 modeling. However, whether mobile source emissions are a large portion of an upwind or downwind state's $NO_X$ emissions, and whether they represent a large portion of the contribution to downwind nonattainment and maintenance receptors, does not answer the question regarding the adequacy of an upwind state's SIP submission. The question is whether ''any source or other type of emissions activity'' (in the collective) in an upwind state is contributing significantly to downwind receptors, *see* CAA section 110(a)(2)(D)(i). A state's transport SIP must include a technical and adequate justification to support its conclusion that the state has satisfied its interstate transport obligations for the 2015 ozone NAAQS.

To the extent that comments argue that mobile source emissions should be the focus of emissions reductions for the purposes of resolving interstate transport obligations, states could have provided such an analysis for how mobile source reductions might achieve necessary reductions. *See, e.g.,* 70 FR 25209. However, states conducted no such analysis of methods or control techniques that could be used to reduce mobile source emissions, instead claiming that states cannot control mobile source emissions, as this is a federally-regulated sector, or states cannot reasonably control these emissions. States do have options, however, to reduce emissions from certain aspects of their mobile source

---

[328] On December 20, 2022, the EPA finalized more stringent emissions standards for $NO_X$ and other pollutants from heavy-duty vehicles and engines, beginning with model year 2027. *See* *https://www.epa.gov/regulations-emissions-vehicles-and-engines/final-rule-and-related-materials-control-air-pollution.* The EPA is also developing new multi-pollutant standards for light-

and medium-duty vehicles as well as options to address pollution from locomotives.

[329] *https://gispub.epa.gov/air/trendsreport/2022/#home.*

sectors, and to the extent a state is attributing its contribution to out of state receptors to its mobile sources, it could have conducted an analysis of possible programs or measures that could achieve emissions reductions from those sources. (For example, a general list of types of transportation control measures can be found in CAA section 108(f).[330])

State-specific issues raised by comments are further addressed in the RTC document.

## 2. International Contributions

*Comment:* Several comments state that international emissions contribute to nonattainment and maintenance receptors downwind, and these emissions are not within the jurisdiction of the states. They advocate for the EPA should considering this when acting on SIP submissions. Some comments claim that, in the west, international contributions are even greater than in eastern portions of the U.S. and support their notion that the EPA's evaluation of interstate transport should take special consideration of unique regional factors when determining upwind state obligations, or that the Agency should otherwise explain why it is still inappropriate to factor in higher international contributions, as the Agency has done in Oregon's case.

*Response:* The EPA responded to similar arguments related to international emissions included in the SIP submissions of Arkansas, California, Illinois, Indiana, Kentucky, Michigan, Missouri, Ohio, Utah, Wyoming, and West Virginia in the proposed disapprovals.[331] No comments on the proposed disapprovals provided new information to indicate the EPA's initial assessment was incorrect. These comments' reasoning related to international emissions is inapplicable to the requirements of CAA section 110(a)(2)(D)(i)(I). The good neighbor provision requires states and the EPA to address interstate transport of air pollution that significantly contributes

to downwind states' ability to attain and maintain the NAAQS. Whether emissions from other states or other countries also contribute to the same downwind air quality issue is typically not relevant in assessing whether a downwind state has an air quality problem, or whether an upwind state is significantly contributing to that problem. (Only in rare cases has EPA concluded that certain monitoring sites should not be considered receptors at Step 1 due to the very low collective upwind-state contribution at those receptors. *See* the RTC document.) States are not obligated under CAA section 110(a)(2)(D)(i)(I) to act alone to reduce emissions in amounts sufficient to resolve a downwind receptor's nonattainment or maintenance problem. Rather, states are obligated to eliminate their own "significant contribution" to that receptor or "interference" with the ability of other states to attain or maintain the NAAQS. The statutory standard is, fundamentally, one of contribution, not causation.

Indeed, the D.C. Circuit in *Wisconsin* specifically rejected petitioner arguments suggesting that upwind states should be excused from good neighbor obligations on the basis that some other source of emissions (whether international or another upwind state) could be considered the "but-for" cause of downwind air quality problem. *See Wisconsin,* 938 F.3d at 323–324. The court viewed petitioners' arguments as essentially an argument "that an upwind state 'contributes significantly' to downwind nonattainment only when its emissions are the sole cause of downwind nonattainment." *Id.* at 324. The court explained that "an upwind state can 'contribute' to downwind nonattainment even if its emissions are not the but-for cause." *Id.* at 324–325. *See also Catawba County* v. *EPA,* 571 F.3d 20, 39 (DC Cir. 2009) (rejecting the argument "that 'significantly contribute' unambiguously means 'strictly cause'" because there is "no reason why the statute precludes EPA from determining that [an] addition of [pollutant] into the atmosphere is significant even though a nearby county's nonattainment problem would still persist in its absence"); *Miss. Comm'n on Envtl. Quality* v. *EPA,* 790 F.3d 138, 163 n.12 (DC Cir. 2015) (observing that the argument that "there likely would have been no violation at all . . . if it were not for the emissions resulting from [another source]" is "merely a rephrasing of the but-for causation rule that we rejected in Catawba County"). Therefore, a state is not excused from eliminating its significant contribution on the basis that

international emissions also contribute some amount of pollution to the same receptors to which the state is linked.

To the extent comments compare the influence of international emissions with the EPA's treatment of receptors in California to which Oregon contributes greater than 0.70 ppb, the EPA responds to these comments in the RTC document.

## 3. Western Interstate Transport Policy

*Comment:* Several comments argue that the EPA should consider an alternative approach to evaluating interstate transport in the western U.S. Comments assert there are considerations unique to the western states, such as increased background, international, and wildfire contributions to ozone concentrations in the west. Some commenters believe a "case-by-case" assessment is more appropriate for evaluating western states' interstate transport obligations, as they claim the EPA had done for the 2008 ozone standards. They additionally argue that the EPA modeling is not able to accurately project ozone concentrations in the west because of these factors, along with the west's unique topographical influence on ozone transport.

*Response:* The EPA disagrees that either its nationwide photochemical grid modeling or the 4-step interstate transport framework for ozone cannot generally be applied to states in the western region of the U.S. and has maintained that position consistently throughout numerous actions.[332] Though at times the EPA has found it appropriate to examine more closely discreet issues for some western states,[333] the 4-step interstate transport framework itself is appropriate for assessing good neighbor obligations of western states in the absence of those circumstances. The EPA evaluated the contents of the western states' SIP submissions covered by this action on the merits of the information the states provided. As described at proposal and reiterated in Section IV, the EPA is finalizing its disapproval of California,

---

[330] In making this observation, the EPA is not suggesting that mobile source emissions reductions are necessarily required to address a state's good neighbor obligations, but merely pointing out that if the state itself attributes the problem to mobile sources, then it is reasonable to expect that further analysis of such control strategies would be explored.

[331] 87 FR 9798, 9809–9810 (Feb. 22, 2022) (Arkansas); 87 FR 31443, 31460–31461 (May 24, 2022) (California); 87 FR 9854 (Illinois); 87 FR 9859–9860 (Indiana); 87 FR 9498, 9508 (Feb. 22, 2022) (Kentucky); 87 FR 9838, 9865 (Michigan); 87 FR 9533, 9543 (Feb. 22, 2022) (Missouri); 87 FR 9838 at 9874 (Ohio); 87 FR 31470, 31482 (May 24, 2022) (Utah); 87 FR 9516, 9527 (Feb. 22, 2022) (West Virginia); 87 FR 31495, 31507 (May 24, 2022) (Wyoming).

[332] For a discussion of this history, *see* for example 87 FR 31480–81 (proposed disapproval of Utah SIP submission) and 87 FR 31453–56 (proposed disapproval of California SIP submission).

[333] *See, e.g.,* Approval of Arizona's 2008 ozone NAAQS interstate transport SIP submission, 81 FR 15200 (March 22, 2016) (Step 1 analysis concluding certain monitors in California should not be considered interstate transport receptors for purposes of the good neighbor provision for the 2008 ozone NAAQS); *see also* 87 FR 61249, 61254–55 (Oct. 11, 2022) (in approving Colorado's interstate transport SIP for the 2015 ozone NAAQS, analyzing unique issues associated with wintertime inversion conditions in certain western areas).

Nevada, and Utah's SIP submissions. This final determination is based on these evaluations, as well as the EPA's 2016v2 and 2016v3 modeling following stakeholder feedback.

The EPA continues to find it appropriate to rely on the results of its nationwide modeling in the western U.S., despite comments concerning the ability for the EPA's modeling to accurately project ozone concentrations and contributions in western states, as well as its ability to support the EPA's 4-step framework for assessing interstate transport. The EPA's nationwide photochemical grid modeling considers multiple complex factors, including those raised in comments, such as terrain complexities, variability in emissions (*e.g.*, wildfire emissions), meteorology, and topography. While the EPA continues to believe its 2016v2 modeling performs equally as well in both the west and the east, the EPA has adjusted its 2016v3 modeling to ensure its predictions more closely replicate the relative magnitude of concentrations and day-to-day variability that are characteristic of observed 8-hour daily maximum ozone concentrations in each region, as explained in Section III.A and the RTC document. As such, the EPA continues to find its modeling reliable for characterizing ozone concentrations and contribution values in the western U.S. Further responses regarding the reliability of the EPA's modeling in the western U.S. is provided in the RTC document.

The EPA disagrees with comments noting that the Agency took an alternative approach for western states when assessing interstate transport obligations under the 2008 ozone NAAQS. As explained in our proposed disapproval of California's 2015 ozone NAAQS interstate transport SIP submission, while the EPA has in limited circumstances found unique issues associated with addressing ozone transport in western states, the EPA has consistently applied the 4-step interstate transport framework in western states, as it has done here, and has identified ozone transport problems in the west that are similar to those in the east.[334][335] At proposal, the EPA addressed states' arguments regarding the impact of unique factors such as topography and, as part of the EPA's evaluation of the contents of the SIP submission, provided explanation as to why the EPA found the states' arguments did not

support their conclusions regarding long range transport of ozone in the west.[336]

While comments point to relatively higher level of contributions from non-anthropogenic, local, or international contributions in the west as reason for evaluating interstate transport differently in the west, a state is not excused from eliminating its significant contribution due to contributions from these sources, where the data shows that anthropogenic emissions from upwind states also contribute collectively to identified receptors at levels that indicate there to be an interstate contribution problem as well. As stated in Section V.C.2, a state is not excused from eliminating its significant contribution on the basis that international emissions also contribute some amount of pollution to the same receptors to which the state is linked. This same principle applies broadly to other arguments as to which emissions are the "cause" of the problem; the good neighbor provision established a contribution standard, not a but-for causation standard. *See Wisconsin,* 938 F.3d at 323–25.

## VI. Statutory and Executive Order Reviews

Additional information about these statutes and Executive orders can be found at *https://www.epa.gov/laws-regulations/laws-and-executive-orders.*

### A. Executive Orders 12866: Regulatory Planning and Executive Order 13563: Improving Regulation and Regulatory Review

This action is not a significant regulatory action and was, therefore, not submitted to the Office of Management and Budget for review.

### B. Paperwork Reduction Act (PRA)

This action does not impose an information collection burden under the provisions of the Paperwork Reduction Act. This final action does not establish any new information collection requirement apart from what is already required by law. This finding relates to the requirement in the CAA for states to submit SIPs under CAA section 110(a)(2)(D)(i)(I) addressing interstate transport obligations associated with the 2015 ozone NAAQS.

### C. Regulatory Flexibility Act (RFA)

I certify that this action will not have a significant economic impact on a substantial number of small entities under the RFA. This action will not impose any requirements on small entities. This action is disapproving SIP submissions for not containing the necessary provisions to satisfy interstate transport requirements under CAA section 110(a)(2)(D)(i)(I).

### D. Unfunded Mandates Reform Act of 1995 (UMRA)

This action does not contain any unfunded mandate as described in UMRA 2 U.S.C. 1531–1538 and does not significantly or uniquely affect small governments. The action imposes no enforceable duty on any state, local or tribal governments or the private sector.

### E. Executive Order 13132: Federalism

This action does not have federalism implications. It will not have substantial direct effects on the states, on the relationship between the National Government and the states, or on the distribution of power and responsibilities among the various levels of government.

### F. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments

This action has tribal implications. However, this action does not impose substantial direct compliance costs on federally recognized tribal governments, nor preempt tribal law. This action includes disapproving the portion of Oklahoma's SIP submission addressing the state's good neighbor obligations under CAA section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS and applies to certain areas of Indian country as discussed in Section IV.C of the proposed action, "Air Plan Disapproval; Arkansas, Louisiana, Oklahoma, and Texas; Interstate Transport of Air Pollution for the 2015 Ozone National Ambient Air Quality Standards" (87 FR 9798 at 9824, February 2, 2022). However, this action does not impose substantial direct compliance costs on federally recognized tribal governments because no actions will be required of tribal governments. This action will also not preempt tribal law as no Oklahoma tribe implements a regulatory program under the CAA, and thus does not have applicable or related tribal laws. The EPA consulted with tribal officials under the EPA Policy on Consultation and Coordination with Indian Tribes early in the process of developing this regulation to permit them to have meaningful and timely input into its development. A summary of that

---

[334] 87 FR 31443, 31453.
[335] 81 FR 74503, 74523.

[336] *See, e.g.,* 87 FR 31443, 31457. The EPA evaluated California's qualitative consideration of unique topographic factors that may influence the transport of emissions from sources within the state to downwind receptors in Colorado and Arizona. The EPA concluded that the State's arguments do not present sufficient evidence that called into question the results of the EPA's modeling.

consultation is provided in the file "2015 Ozone Transport OK Tribal Consultation Meeting Record 3–3–2022,'' in the docket for this action.

*G. Executive Order 13045: Protection of Children From Environmental Health and Safety Risks*

The EPA interprets Executive Order 13045 as applying only to those regulatory actions that concern health or safety risks that the EPA has reason to believe may disproportionately affect children, per the definition of "covered regulatory action" in section 2–202 of the Executive order. This action is not subject to Executive Order 13045 because it merely disapproves SIP submissions as not containing the necessary provisions to satisfy interstate transport requirements under CAA section 110(a)(2)(D)(i)(I).

*H. Executive Order 13211: Actions That Significantly Affect Energy Supply, Distribution or Use*

This action is not subject to Executive Order 13211, because it is not a significant regulatory action under Executive Order 12866.

*I. National Technology Transfer and Advancement Act (NTTAA)*

This rulemaking does not involve technical standards.

*J. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations*

Executive Order 12898 (Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations, 59 FR 7629, Feb. 16, 1994) directs Federal agencies to identify and address "disproportionately high and adverse human health or environmental effects" of their actions on minority populations and low-income populations to the greatest extent practicable and permitted by law. The EPA defines environmental justice (EJ) as "the fair treatment and meaningful involvement of all people regardless of race, color, national origin, or income with respect to the development, implementation, and enforcement of environmental laws, regulations, and policies." The EPA further defines the term fair treatment to mean that "no group of people should bear a disproportionate burden of environmental harms and risks, including those resulting from the negative environmental consequences of industrial, governmental, and commercial operations or programs and policies."

Under the CAA, the Administrator is required to approve a SIP submission that complies with the provisions of the Act and applicable Federal regulations. 42 U.S.C. 7410(k); 40 CFR 52.02(a). Thus, in reviewing SIP submissions, the EPA's role is to review state choices, and approve those choices if they meet the minimum criteria of the Act. As articulated in this final action, the EPA is determining that certain SIPs do not meet certain minimum requirements, and the EPA is disapproving those SIPs. Specifically, this action disapproves certain SIP submissions as not containing the necessary provisions to satisfy "good neighbor" requirements under CAA section 110(a)(2)(D)(i)(I). The EPA did not perform an EJ analysis and did not consider EJ in this action. The CAA and applicable implementing regulations neither prohibit nor require such an evaluation. In a wholly separate regulatory action, the EPA will fully address the CAA "good neighbor" requirements under section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS as it regards the SIP disapprovals included in this final action. Consideration of EJ is not required as part of this action, and there is no information in the record inconsistent with the stated goal of E.O. 12898 of achieving EJ for people of color, low-income populations, and Indigenous peoples.

*K. Congressional Review Act (CRA)*

This action is subject to the CRA, and the EPA will submit a rule report to each House of the Congress and to the Comptroller General of the United States. This action is not a "major rule" as defined by 5 U.S.C. 804(2).

*L. Judicial Review*

Section 307(b)(1) of the CAA governs judicial review of final actions by the EPA. This section provides, in part, that petitions for review must be filed in the D.C. Circuit: (i) when the agency action consists of "nationally applicable regulations promulgated, or final actions taken, by the Administrator," or (ii) when such action is locally or regionally applicable, but "such action is based on a determination of nationwide scope or effect and if in taking such action the Administrator finds and publishes that such action is based on such a determination." For locally or regionally applicable final actions, the CAA reserves to the EPA complete discretion whether to invoke the exception in (ii).[337]

This rulemaking is "nationally applicable" within the meaning of CAA section 307(b)(1). In this final action, the EPA is applying a uniform legal interpretation and common, nationwide analytical methods with respect to the requirements of CAA section 110(a)(2)(D)(i)(I) concerning interstate transport of pollution (*i.e.*, "good neighbor" requirements) to disapprove SIP submissions that fail to satisfy these requirements for the 2015 ozone NAAQS. Based on these analyses, the EPA is disapproving SIP submittals for the 2015 ozone NAAQS for 21 states located across a wide geographic area in eight of the ten EPA Regions and ten Federal judicial circuits. Given that on its face this action addresses implementation of the good neighbor requirements of CAA section 110(a)(2)(D)(i)(I) in a large number of states located across the country and given the interdependent nature of interstate pollution transport and the common core of knowledge and analysis involved in evaluating the submitted SIPs, this is a "nationally applicable" action within the meaning of CAA section 307(b)(1).

In the alternative, to the extent a court finds this action to be locally or regionally applicable, the Administrator is exercising the complete discretion afforded to him under the CAA to make and publish a finding that this action is based on a determination of "nationwide scope or effect" within the meaning of CAA section 307(b)(1). In this final action, the EPA is interpreting and applying section 110(a)(2)(D)(i)(I) of the CAA for the 2015 ozone NAAQS based on a common core of nationwide policy judgments and technical analysis concerning the interstate transport of pollutants throughout the continental U.S. In particular, the EPA is applying here the same, nationally consistent 4-step interstate transport framework for assessing obligations for the 2015 ozone NAAQS that it has applied in other nationally applicable rulemakings, such as CSAPR, the CSAPR Update, and the Revised CSAPR Update. The EPA is relying on the results from nationwide photochemical grid modeling using a 2016 base year and 2023 projection year as the primary basis for its assessment of air quality conditions and pollution contribution levels at Step 1 and Step 2 of that 4-step framework and applying a nationally uniform approach to the identification of nonattainment and

---

[337] In deciding whether to invoke the exception by making and publishing a finding that an action is based on a determination of nationwide scope or

effect, the Administrator takes into account a number of policy considerations, including his judgment balancing the benefit of obtaining the D.C. Circuit's authoritative centralized review versus allowing development of the issue in other contexts and the best use of agency resources.

maintenance receptors across the entire geographic area covered by this final action.[338] The EPA has also evaluated each state's arguments for the use of alternative approaches or alternative sets of data with an eye to ensuring national consistency and avoiding inconsistent or inequitable results among upwind states (*i.e.,* those states for which good neighbor obligations are being evaluated in this action) and between upwind and downwind states (*i.e.,* those states that contain receptors signifying ozone nonattainment or maintenance problems).

The Administrator finds that this is a matter on which national uniformity in judicial resolution of any petitions for review is desirable, to take advantage of the D.C. Circuit's administrative law expertise, and to facilitate the orderly development of the basic law under the Act. The Administrator also finds that consolidated review of this action in the D.C. Circuit will avoid piecemeal litigation in the regional circuits, further judicial economy, and eliminate the risk of inconsistent results for different states, and that a nationally consistent approach to the CAA's mandate concerning interstate transport of ozone pollution constitutes the best use of agency resources. The EPA's responses to comments on the appropriate venue for petitions for review are contained in the RTC document.

For these reasons, this final action is nationally applicable or, alternatively, the Administrator is exercising the complete discretion afforded to him by the CAA and finds that this final action is based on a determination of nationwide scope or effect for purposes of CAA section 307(b)(1) and is publishing that finding in the **Federal Register**. Under section 307(b)(1) of the CAA, petitions for judicial review of this action must be filed in the United States Court of Appeals for the District of Columbia Circuit by April 14, 2023.

**List of Subjects in 40 CFR Part 52**

Environmental protection, Air pollution control, Incorporation by reference, Ozone.

**Michael S. Regan,**
*Administrator.*

For the reasons set forth in the preamble, 40 CFR part 52 is amended as follows:

## PART 52—APPROVAL AND PROMULGATION OF IMPLEMENTATION PLANS

■ 1. The authority citation for part 52 continues to read as follows:

**Authority:** 42 U.S.C. 7401 *et seq.*

### Subpart B—Alabama

■ 2. Section 52.56 is added to read as follows:

### § 52.56   Control strategy: Ozone.

(a) The state implementation plan (SIP) revision submitted on June 21, 2022, addressing Clean Air Act section 110(a)(2)(D)(i)(I) (prongs 1 and 2) for the 2015 ozone national ambient air quality standards (NAAQS) is disapproved.

(b) [Reserved]

### Subpart E—Arkansas

■ 3. Section 52.174 is amended by adding paragraph (b) to read as follows:

### § 52.174   Control strategy and regulations: Ozone.

*    *    *    *    *

(b) The portion of the SIP submittal from October 10, 2019, addressing Clean Air Act section 110(a)(2)(D)(i)(I) for the 2015 ozone national ambient air quality standards (NAAQS) is disapproved.

### Subpart F—California

■ 4. Section 52.223 is amended by adding paragraph (p)(7) to read as follows:

### § 52.223   Approval status.

*    *    *    *    *

(p) *  *  *

(7) The interstate transport requirements for Significant Contribution to Nonattainment (Prong 1) and Interstate Transport—Interference with Maintenance (Prong 2) of Clean Air Act (CAA) section 110(a)(2)(D)(i)(I).

■ 5. Section 52.283 is amended by adding paragraph (h) to read as follows:

### § 52.283   Interstate Transport.

*    *    *    *    *

(h) *2015 ozone NAAQS*. The 2018 Infrastructure SIP Revision, submitted on October 1, 2018, does not meet the following specific requirements of Clean Air Act section 110(a)(2)(D)(i)(I) for the 2015 ozone national ambient air quality standards (NAAQS).

(1) The requirements of CAA section 110(a)(2)(D)(i)(I) regarding significant contribution to nonattainment of the 2015 ozone NAAQS in any other State and interference with maintenance of the 2015 ozone NAAQS by any other State.

(2) [Reserved]

### Subpart O—Illinois

■ 6. Section 52.720 is amended in the table in paragraph (e), under the heading "Section 110(a)(2) Infrastructure Requirements," by revising the entry for "2015 Ozone NAAQS Infrastructure Requirements" to read as follows:

### § 52.720   Identification of plan.

*    *    *    *    *

(e) *  *  *

EPA-APPROVED ILLINOIS NONREGULATORY AND QUASI-REGULATORY PROVISIONS

| Name of SIP provision | Applicable geographic or non-attainment area | State submittal date | EPA approval date | Comments |
|---|---|---|---|---|
| * | * | * | * | * |
| **Section 110(a)(2) Infrastructure Requirements** | | | | |

---

[338] In the report on the 1977 Amendments that revised section 307(b)(1) of the CAA, Congress noted that the Administrator's determination that the "nationwide scope or effect" exception applies would be appropriate for any action that has a scope or effect beyond a single judicial circuit. *See*

H.R. Rep. No. 95–294 at 323, 324, reprinted in 1977 U.S.C.C.A.N. 1402–03.

EPA-APPROVED ILLINOIS NONREGULATORY AND QUASI-REGULATORY PROVISIONS—Continued

| Name of SIP provision | Applicable geographic or non-attainment area | State submittal date | EPA approval date | Comments |
|---|---|---|---|---|
| * | * | * | * | * |
| 2015 Ozone NAAQS Infrastructure Requirements. | Statewide ... | 5/16/2019 and 9/22/2020. | 2/13/2023, [INSERT **FEDERAL REGISTER** CITATION]. | All CAA infrastructure elements under 110(a)(2) have been approved except (D)(i)(I) Prongs 1, 2, which are disapproved, and no action has been taken on (D)(i)(II) Prong 4. |

## Subpart P—Indiana

■ 7. Section 52.770 is amended in the table in paragraph (e) by adding an entry for "Section 110(a)(2) Infrastructure Requirements for the 2015 Ozone NAAQS" after the entry for "Section 110(a)(2) Infrastructure Requirements for the 2008 8-Hour Ozone NAAQS" to read as follows:

**§ 52.770   Identification of plan.**

*    *    *    *    *

(e) *    *    *

EPA-APPROVED INDIANA NONREGULATORY PROVISIONS AND QUASI-REGULATORY PROVISIONS

| Title | Indiana date | EPA approval | Explanation |
|---|---|---|---|
| * | * | * | * |
| Section 110(a)(2) Infrastructure Requirements for the 2015 Ozone NAAQS. | 11/2/2018 | 2/13/2023, [INSERT **FEDERAL REGISTER** CITATION]. | All CAA infrastructure elements have been approved except (D)(i)(I) Prongs 1 and 2, which are disapproved, and no action has been taken on the visibility portion of (D)(i)(II). |
| * | * | * | * |

## Subpart S—Kentucky

■ 8. Section 52.930 is amended by adding paragraph (n) to read as follows:

**§ 52.930   Control strategy: Ozone.**

*    *    *    *    *

(n) *Disapproval.* The state implementation plan (SIP) revision submitted on January 11, 2019, addressing Clean Air Act section 110(a)(2)(D)(i)(I) (prongs 1 and 2) for the 2015 ozone national ambient air quality standards (NAAQS) is disapproved.

## Subpart T—Louisiana

■ 9. Section 52.996 is amended by adding paragraph (b) to read as follows:

**§ 52.996   Disapprovals.**

*    *    *    *    *

(b) The SIP submittal from November 13, 2019, addressing Clean Air Act section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS is disapproved.

## Subpart V—Maryland

■ 10. Section 52.1076 is amended by adding paragraph (gg) to read as follows:

**§ 52.1076   Control strategy plans for attainment and rate-of-progress: Ozone.**

*    *    *    *    *

(gg) *Disapproval.* EPA is disapproving Maryland's October 16, 2019, State Implementation Plan (SIP) revision intended to address the Clean Air Act (CAA) section 110(a)(2)(D)(i)(I) interstate transport requirements for the 2015 8-hour ozone national ambient air quality standard (NAAQS).

## Subpart X—Michigan

■ 11. Section 52.1170 is amended in the table in paragraph (e), under the heading "Infrastructure," by revising the entry for "Section 110(a)(2) infrastructure requirements for the 2015 ozone NAAQS" to read as follows:

**§ 52.1170   Identification of plan.**

*    *    *    *    *

(e) *    *    *

EPA-APPROVED MICHIGAN NONREGULATORY AND QUASI-REGULATORY PROVISIONS

| Name of nonregulatory SIP provision | Applicable geographic or non-attainment area | State submittal date | EPA approval date | Comments |
|---|---|---|---|---|
| * | * | * | * | * |
| **Infrastructure** | | | | |

### EPA-APPROVED MICHIGAN NONREGULATORY AND QUASI-REGULATORY PROVISIONS—Continued

| Name of nonregulatory SIP provision | Applicable geographic or non-attainment area | State submittal date | EPA approval date | Comments |
|---|---|---|---|---|
| * | * | * | * | * |
| Section 110(a)(2) infrastructure requirements for the 2015 ozone NAAQS. | Statewide ... | 3/8/2019 | 2/13/2023, [INSERT **FEDERAL REGISTER** CITATION]. | *Approved CAA elements:* 110(a)(2)(A), (B), (C), (D)(i)(II) Prong 3, D(ii), (E)(i), (F), (G), (H), (J), (K), (L), and (M). *Disapproved CAA elements:* 110(a)(2)(D)(i)(I) Prongs 1 and 2, and 110(a)(2)(D)(i)(II) Prong 4. No action on CAA element 110(1)(2)(E)(ii). |
| * | * | * | * | * |

## Subpart Y—Minnesota

■ 12. Section 52.1220 is amended in the table in paragraph (e) by revising the entry for "Section 110(a)(2) Infrastructure Requirements for the 2015 Ozone NAAQS" to read as follows:

**§ 52.1220  Identification of plan.**

* * * * *

(e) * * *

### EPA-APPROVED MINNESOTA NONREGULATORY PROVISIONS

| Name of nonregulatory SIP provision | Applicable geographic or non-attainment area | State submittal date/ effective date | EPA approved date | Comments |
|---|---|---|---|---|
| * | * | * | * | * |
| Section 110(a)(2) Infrastructure Requirements for the 2015 Ozone NAAQS. | Statewide ... | 10/1/2018 | 2/13/2023, [INSERT **FEDERAL REGISTER** CITATION]. | Fully approved for all CAA elements except transport elements of (D)(i)(I) Prong 2, which are disapproved, and no action has been taken on the visibility protection requirements of (D)(i)(II). |

## Subpart Z—Mississippi

■ 13. Section 52.1273 is amended by adding paragraph (b) read as follows:

**§ 52.1273  Control strategy: Ozone.**

* * * * *

(b) *Disapproval.* The state implementation plan (SIP) revision submitted on September 3, 2019, addressing Clean Air Act section 110(a)(2)(D)(i)(I) (prongs 1 and 2) for the 2015 ozone national ambient air quality standards (NAAQS) is disapproved.

## Subpart AA—Missouri

■ 14. Section 52.1323 is amended by adding paragraph (p) to read as follows:

**§ 52.1323  Approval status.**

* * * * *

(p) For the 2015 8-hour ozone NAAQS:

(1) *Disapproval.* Missouri state implementation plan (SIP) revision submitted on June 10, 2019, to address the Clean Air Act (CAA) infrastructure requirements of section 110(a)(2) for the 2015 8-hour ozone NAAQS, is

disapproved for section 110(a)(2)(D)(i)(I) (prongs 1 and 2).

(2) [Reserved]

## Subpart DD—Nevada

■ 15. Section 52.1472 is amended by adding paragraph (k) to read as follows:

**§ 52.1472  Approval status.**

* * * * *

(k) *2015 8-hour ozone NAAQS.* The SIP submittal from October 1, 2018, is disapproved for Clean Air Act (CAA) section 110(a)(2)(D)(i)(I) (prongs 1 and 2) for the NDEP, Clark County, and Washoe County portions of the Nevada SIP submission.

## Subpart FF—New Jersey

■ 16. Section 52.1586 is amended by adding paragraph (c) and reserved paragraph (d) to read as follows:

**§ 52.1586  Section 110(a)(2) infrastructure requirements.**

* * * * *

(c) *2015 8-hour ozone NAAQS*—(1) *Disapproval.* New Jersey SIP revision submitted on May 13, 2019, to address

the CAA infrastructure requirements of section 110(a)(2) for the 2015 8-hour ozone NAAQS, is disapproved for section 110(a)(2)(D)(i)(I) (prongs 1 and 2).

(2) [Reserved]

(d) [Reserved]

## Subpart HH—New York

■ 17. Section 52.1683 is amended by adding paragraph (v) to read as follows:

**§ 52.1683  Control strategy: Ozone.**

* * * * *

(v) *Disapproval.* The portion of the SIP revision submitted on September 25, 2018, addressing Clean Air Act section 110(a)(2)(D)(i)(I) (prongs 1 and 2) for the 2015 ozone NAAQS is disapproved.

## Subpart KK—Ohio

■ 18. Section 52.1870 is amended in the table in paragraph (e), under "Infrastructure Requirements," by revising the entry for "Section 110(a)(2) infrastructure requirements for the 2015 ozone NAAQS" to read as follows:

**§ 52.1870   Identification of plan.**

(e) * * *

* * * * *

### EPA-APPROVED OHIO NONREGULATORY AND QUASI-REGULATORY PROVISIONS

| Title | Applicable geographic or non-attainment area | State date | EPA approval | Comments |
|---|---|---|---|---|
| * | * | * | * | * |
| **Infrastructure Requirements** | | | | |
| Section 110(a)(2) infrastructure requirements for the 2015 ozone NAAQS. | Statewide ... | 9/28/2018 | 2/13/2023, [INSERT **FEDERAL REGISTER** CITATION]. | Approved CAA elements: 110(a)(2)(A), (B), (C), (D)(i)(II) prongs 3 and 4, (E), (F), (G), (H), (J), (K), (L), and (M). Elements (D)(i)(I) prongs 1 and 2 are disapproved. |
| * | * | * | * | * |

## Subpart LL—Oklahoma

■ 19. Section 52.1922 is amended by adding paragraph (c) to read as follows:

**§ 52.1922   Approval status.**

* * * * *

(c) The portion of the SIP submittal from October 25, 2018, addressing Clean Air Act section 110(a)(2)(D)(i)(I) for the 2015 ozone national ambient air quality standards (NAAQS) is disapproved.

## Subpart SS—Texas

■ 20. Section 52.2275 is amended by:

■ a. Removing the first paragraph (m); and

■ b. Adding paragraph (o).

The addition reads as follows:

**§ 52.2275   Control strategy and regulations: Ozone.**

* * * * *

(o) *Disapproval.* The portion of the SIP submittal from September 12, 2018, addressing Clean Air Act section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS is disapproved.

## Subpart XX—West Virginia

■ 21. Section 52.2520 is amended in the table in paragraph (e) by adding the entry ''Section 110(a)(2) Infrastructure Requirements for the 2015 8-Hour Ozone NAAQS'' at the end of the table to read as follows:

**§ 52.2520   Identification of plan.**

* * * * *

(e) * * *

| Name of non-regulatory SIP revision | Applicable geographic area | State submittal date | EPA approval date | Additional explanation |
|---|---|---|---|---|
| * | * | * | * | * |
| Section 110(a)(2) Infrastructure Requirements for the 2015 8-Hour Ozone NAAQS. | Statewide ... | 2/4/2019 | 2/13/2023, [INSERT **FEDERAL REGISTER** CITATION]. | Disapproval—EPA is disapproving West Virginia's February 4, 2019, State Implementation Plan (SIP) revision intended to address the CAA section 110(a)(2)(D)(i)(I) interstate transport requirements for the 2015 8-hour ozone national air quality standard (NAAQS). |

## Subpart YY—Wisconsin

■ 22. Section 52.2591 is amended by adding paragraph (l) to read as follows:

**§ 52.2591   Section 110(a)(2) infrastructure requirements.**

* * * * *

(l) *Partial approval/disapproval.* In a September 14, 2018, submission, WDNR certified that the State has satisfied the infrastructure SIP requirements of section 110(a)(2)(A) through (H), and (J) through (M) for the 2015 ozone NAAQS. For section 110(a)(2)(D)(i)(I), prong 1 is approved and prong 2 is disapproved.

EPA did not take action on any other elements. We will address the remaining requirements in a separate action.

[FR Doc. 2023–02407 Filed 2–10–23; 8:45 am]

**BILLING CODE 6560–50–P**

Tab 2: Proposed Rule, 87 Fed. Reg. 9,798 (Feb. 22, 2022)

## ENVIRONMENTAL PROTECTION AGENCY

### 40 CFR Part 52

**[EPA–R06–OAR–2021–0801, EPA–HQ–OAR–2021–0663; FRL–9338–01–R6]**

**Air Plan Disapproval: Arkansas, Louisiana, Oklahoma, and Texas; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Proposed rule.

**SUMMARY:** Pursuant to the Federal Clean Air Act (CAA or the Act), the Environmental Protection Agency (EPA or Agency) is proposing to disapprove State Implementation Plan (SIP) submittals from Arkansas, Louisiana, Oklahoma and Texas regarding interstate transport for the 2015 8-hour ozone national ambient air quality standard (NAAQS). This provision requires that each state's SIP contain adequate provisions to prohibit emissions from within the state from significantly contributing to nonattainment or interfering with maintenance of the NAAQS in other states. The "good neighbor" or "interstate transport" requirement is part of the broader set of "infrastructure" requirements, which are designed to ensure that the structural components of each state's air quality management program are adequate to meet the state's responsibilities under the CAA. This disapproval, if finalized, will establish a 2-year deadline for the EPA to promulgate a Federal Implementation Plan (FIP) to address the relevant interstate transport requirements, unless the EPA approves a subsequent SIP submittal that meets these requirements. Disapproval does not start a mandatory sanctions clock.

**DATES:** Written comments must be received on or before April 25, 2022.

**ADDRESSES:** You may send comments, identified as Docket No. EPA–R06–OAR–2021–0801, by any of the following methods: Federal eRulemaking Portal at *https://www.regulations.gov* following the online instructions for submitting comments or via email to *fuerst.sherry@epa.gov*. Include Docket ID No. EPA–R06–OAR–2021–0801 in the subject line of the message.

*Instructions:* All comments submitted must include the Docket ID No. for this rulemaking. Comments received may be posted without change to *https://www.regulations.gov/*, including any

personal information provided. For detailed instructions on sending comments and additional information on the rulemaking process, see the "Public Participation" heading of the **SUPPLEMENTARY INFORMATION** section of this document. Out of an abundance of caution for members of the public and our staff, the EPA Docket Center and Reading Room are open to the public by appointment only to reduce the risk of transmitting COVID–19. Our Docket Center staff also continues to provide remote customer service via email, phone, and webform. For further information on the EPA Docket Center services and the current status, please visit us online at *https://www.epa.gov/dockets*.

**FOR FURTHER INFORMATION CONTACT:** Sherry Fuerst, EPA Region 6 Office, AR–SI, 214–665–6454, *fuerst.sherry@epa.gov*. We encourage the public to submit comments via *https://www.regulations.gov*, as there will be a delay in processing mail and no courier or hand deliveries will be accepted. Please call or email the contact above if you need alternative access to material indexed but not provided in the docket.

**SUPPLEMENTARY INFORMATION:** *Public Participation:* Submit your comments, identified by Docket ID No. EPA–R06–OAR–2021–0801, at *https://www.regulations.gov* (our preferred method), or the other methods identified in the **ADDRESSES** section. Once submitted, comments cannot be edited or removed from the docket. The EPA may publish any comment received to its public docket. Do not submit to the EPA's docket at *https://www.regulations.gov* any information you consider to be Confidential Business Information (CBI) or other information whose disclosure is restricted by statute. Multimedia submissions (audio, video, etc.) must be accompanied by a written comment. The written comment is considered the official comment and should include discussion of all points you wish to make. The EPA will generally not consider comments or comment contents located outside of the primary submission (*i.e.,* on the web, cloud, or other file sharing system).

There are two dockets supporting this action, EPA–R06–OAR–2021–0801 and EPA–HQ–OAR–2021–0663. Docket No. EPA–R06–OAR–2021–0801 contains information specific to Arkansas, Louisiana, Oklahoma, and Texas, including the notice of proposed rulemaking, submittals from the states, and the EPA Region 6 2015 8-Hour Ozone Transport SIP Proposal Technical Support Document (EPA Region 6 TSD).

Docket No. EPA–HQ–OAR–2021–0663 contains additional modeling files, emissions inventory files, technical support documents, and other relevant supporting documentation regarding interstate transport of emissions for the 2015 8-hour ozone NAAQS which are being used to support this action, including Preparation of Emissions Inventories for the 2016v2 North American Emissions Modeling Platform, and Air Quality Modeling TSD for 2015 ozone NAAQS Transport SIP Proposed Actions. All comments regarding information in either of these dockets are to be made in Docket No. EPA–R06–OAR–2021–0801. For additional submission methods, please contact Sherry Fuerst, 214–665–6454, *fuerst.sherry@epa.gov*. For the full EPA public comment policy, information about CBI or multimedia submissions, and general guidance on making effective comments, please visit *https://www.epa.gov/dockets/commenting-epa-dockets*. Due to public health concerns related to COVID–19, the EPA Docket Center and Reading Room are open to the public by appointment only. Our Docket Center staff also continues to provide remote customer service via email, phone, and webform. For further information and updates on EPA Docket Center services, please visit us online at *https://www.epa.gov/dockets*.

The EPA continues to carefully and continuously monitor information from the Centers for Disease Control and Prevention (CDC), local area health departments, and our Federal partners so that we can respond rapidly as conditions change regarding COVID–19.

The index to the dockets for this action, Docket No. EPA–R06–OAR–2021–0801 and EPA–HQ–OAR–2021–0663, are available electronically at *https://www.regulations.gov*. While all documents in the docket are listed in the index, some information may not be publicly available due to docket file size restrictions or content (*e.g.,* CBI).

Throughout this document, "we," "us," and "our" means the EPA.

### Table of Contents

I. Background
  A. Description of Statutory Background
  B. Description of the EPA's 4-Step Interstate Transport Regulatory Process
  C. Background on the EPA's Ozone Transport Modeling Information
  D. The EPA's Approach to Evaluating Interstate Transport SIPs for the 2015 Ozone NAAQS
    1. Selection of Analytic Year
    2. Step 1 of the 4-Step Interstate Transport Framework
    3. Step 2 of the 4-Step Interstate Transport Framework

4. Step 3 of the 4-Step Interstate Transport Framework
5. Step 4 of the 4-Step Interstate Transport Framework
II. Arkansas SIP Submission Addressing Interstate Transport of Air Pollution for the 2015 Ozone NAAQS and the EPA Evaluation of the SIP Submission
A. Summary of ADEQ SIP Submission Addressing Interstate Transport of Air Pollution for the 2015 Ozone NAAQS
B. EPA Evaluation of the ADEQ SIP Submission
1. Evaluation of Information Provided by ADEQ Regarding Step 1
2. Evaluation of Information Provided by ADEQ Regarding Step 2
3. Results of the EPA's Step 1 and Step 2 Modeling and Findings for Arkansas
4. Evaluation of Information Provided by ADEQ Regarding Step 3
5. Evaluation of Information Provided by ADEQ Regarding Step 4
6. Conclusion
III. Louisiana SIP Submission Addressing Interstate Transport of Air Pollution for the 2015 Ozone NAAQS and the EPA Evaluation of the SIP Submission
A. Summary of LDEQ SIP Submission Addressing Interstate Transport of Air Pollution for the 2015 Ozone NAAQS
B. EPA Evaluation of the LDEQ SIP Submission
1. Evaluation of Information Provided by LDEQ Regarding Steps 1 and 2
2. Results of the EPA's Step 1 and Step 2 Modeling and Findings for Louisiana
3. Evaluation of Information Provided by LDEQ Regarding Step 3
4. Evaluation of Information Provided by LDEQ Regarding Step 4
5. Conclusion
IV. Oklahoma SIP Submission Addressing Interstate Transport of Air Pollution for the 2015 Ozone NAAQS and the EPA Evaluation of the SIP Submission
A. Summary of ODEQ SIP Submission Addressing Interstate Transport of Air Pollution for the 2015 Ozone NAAQS
B. EPA Evaluation of the ODEQ SIP Submission
1. Evaluation of Information Provided by ODEQ Regarding Steps 1 and 2
2. Results of the EPA's Step 1 and Step 2 Modeling and Findings for Oklahoma
3. Evaluation of Information Provided by ODEQ Regarding Step 3
4. Evaluation of Information Provided by ODEQ Regarding Step 4
5. Conclusion
C. Impact on Areas of Indian Country
V. Texas SIP Submission Addressing Interstate Transport of Air Pollution for the 2015 Ozone NAAQS and the EPA Evaluation of the SIP Submission
A. Summary of TCEQ SIP Submission Addressing Interstate Transport of Air Pollution for the 2015 Ozone NAAQS
B. EPA Evaluation of the TCEQ SIP Submission
1. Evaluation of Information Provided by TCEQ Regarding Step 1
i. Evaluation of TCEQ's Methodology for Identifying Maintenance Receptors
ii. Evaluation of the TCEQ Modeling
2. Evaluation of Information Provided by TCEQ Regarding Step 2
3. Results of the EPA's Step 1 and Step 2 Modeling and Findings for Texas
4. Evaluation of Information Provided by TCEQ Regarding Step 3
5. Evaluation of Information Provided by TCEQ Regarding Step 4
6. Conclusion
VI. Proposed Action
VII. Statutory and Executive Order Reviews

# I. Background

## A. Description of Statutory Background

On October 1, 2015, the EPA promulgated a revision to the 2015 8-hour ozone NAAQS (2015 ozone NAAQS), lowering the level of both the primary and secondary standards to 0.070 parts per million (ppm).[1] Section 110(a)(1) of the CAA requires states to submit, within 3 years after promulgation of a new or revised standard, SIP submissions meeting the applicable requirements of section 110(a)(2).[2] One of these applicable requirements is found in CAA section 110(a)(2)(D)(i)(I), otherwise known as the "interstate transport" or "good neighbor" provision, which generally requires SIPs to contain adequate provisions to prohibit in-state emissions activities from having certain adverse air quality effects on other states due to interstate transport of pollution. There are two requirements, often referred to as "prongs" within CAA section 110(a)(2)(D)(i)(I). A SIP for a new or revised NAAQS must contain adequate provisions prohibiting any source or other type of emissions activity within the state from emitting air pollutants in amounts that will significantly contribute to nonattainment of the NAAQS in another state (prong 1) or interfere with maintenance of the NAAQS in another state (prong 2). The EPA and states must give independent significance to prong 1 and prong 2 when evaluating downwind air quality problems under CAA section 110(a)(2)(D)(i)(I).[3]

## B. Description of the EPA's 4-Step Interstate Transport Regulatory Process

The EPA is using the 4-Step interstate transport framework (or 4-Step framework) described in detail below to evaluate states' SIP submittals

addressing the interstate transport provision for the 2015 ozone NAAQS. The EPA has addressed the interstate transport requirements of CAA section 110(a)(2)(D)(i)(I) with respect to prior ozone NAAQS in several regional regulatory actions, including the Cross-State Air Pollution Rule (CSAPR), which addressed interstate transport with respect to the 1997 ozone NAAQS as well as the 1997 and 2006 fine particulate matter standards,[4] and the Cross-State Air Pollution Rule Update (CSAPR Update)[5] and the Revised CSAPR Update, both of which addressed the 2008 ozone NAAQS.[6]

Through the development and implementation of the CSAPR rulemakings and prior regional rulemakings pursuant to the interstate transport provision,[7] the EPA, working in partnership with states, developed the following 4-Step framework to evaluate a state's obligations to eliminate interstate transport emissions under the interstate transport provision for the ozone NAAQS: (1) Identify monitoring sites that are projected to have problems attaining and/or maintaining the NAAQS (*i.e.,* nonattainment and/or maintenance receptors); (2) identify states that impact those air quality problems in other (*i.e.,* downwind) states sufficiently such that the states are considered "linked" and therefore warrant further review and analysis; (3) identify the emissions reductions necessary (if any), applying a multifactor analysis, to eliminate each linked upwind state's significant contribution to nonattainment or interference with maintenance of the NAAQS at the locations identified in Step 1; and (4) adopt permanent and enforceable measures needed to achieve those emissions reductions.

---

[1] "National Ambient Air Quality Standards for Ozone", Final Rule, 80 FR 65292 (October 26, 2015). Although the level of the standard is specified in the units of ppm, ozone concentrations are also described in parts per billion (ppb). For example, 0.070 ppm is equivalent to 70 ppb.

[2] SIP revisions that are intended to meet the applicable requirements of section 110(a)(1) and (2) of the CAA are often referred to as infrastructure SIPs and the applicable elements under section 110(a)(2) are referred to as infrastructure requirements.

[3] *See North Carolina* v. *EPA,* 531 F.3d 896, 909–11 (D.C. Cir. 2008).

[4] *See* "Federal Implementation Plans: Interstate Transport of Fine Particulate Matter and Ozone and Correction of SIP Approvals", 76 FR 48208 (Aug. 8, 2011).

[5] *See* "Cross-State Air Pollution Rule Update for the 2008 Ozone NAAQS", 81 FR 74504 (Oct. 26, 2016).

[6] In 2019, the D.C. Circuit Court of Appeals remanded the CSAPR Update to the extent it failed to require upwind states to eliminate their significant contribution by the next applicable attainment date by which downwind states must come into compliance with the NAAQS, as established under CAA section 181(a). *Wisconsin* v. *EPA,* 938 F.3d 303, 313 (D.C. Cir. 2019). The Revised CSAPR Update for the 2008 Ozone NAAQS, 86 FR 23054 (April 30, 2021), responded to the remand of the CSAPR Update in *Wisconsin* and the vacatur of a separate rule, the "CSAPR Close-Out," 83 FR 65878 (December 21, 2018), in *New York* v. *EPA,* 781 F. App'x. 4 (D.C. Cir. 2019).

[7] In addition to the CSAPR rulemakings, other regional rulemakings addressing ozone transport include the "NO$_X$ SIP Call," 63 FR 57356 (October 27, 1998), and the "Clean Air Interstate Rule" (CAIR), 70 FR 25162 (May 12, 2005).

*C. Background on the EPA's Ozone Transport Modeling Information*

In general, the EPA has performed nationwide air quality modeling to project ozone design values (DVs)[8] which are used in combination with measured data to identify nonattainment and maintenance receptors. To quantify the contribution of emissions from specific upwind states on 2023 ozone DVs for the identified downwind nonattainment and maintenance receptors, the EPA performed nationwide, state-level ozone source apportionment modeling for 2023. The source apportionment modeling provided contributions to ozone at receptors from precursor emissions of anthropogenic nitrogen oxides ($NO_X$) and volatile organic compounds (VOCs) in individual upwind states.

The EPA has released several documents containing projected ozone design values, contributions, and information relevant to evaluating interstate transport with respect to the 2015 ozone NAAQS. First, on January 6, 2017, the EPA published a notice of data availability (NODA) in which we requested comment on preliminary interstate ozone transport data including projected ozone DVs and interstate contributions for 2023 using a 2011 base year platform.[9] In the NODA, the EPA used the year 2023 as the analytic year for this preliminary modeling because that year aligns with the expected attainment year for Moderate ozone nonattainment areas for the 2015 NAAQS.[10] On October 27, 2017, we released a memorandum (October 2017 memorandum) containing updated modeling data for 2023, which incorporated changes made in response to comments on the NODA, and noted that the modeling may be useful for states developing SIPs to address interstate transport obligations for the 2008 ozone NAAQS.[11] On March 27,

2018, we issued a memorandum (March 2018 memorandum) noting that the same 2023 modeling data released in the October 2017 memorandum could also be useful for identifying potential downwind air quality problems with respect to the 2015 ozone NAAQS at Step 1 of the 4-Step framework.[12] The March 2018 memorandum also included the then newly available contribution modeling data to assist states in evaluating their impact on potential downwind air quality problems for the 2015 ozone NAAQS under Step 2 of the 4-Step framework.[13] The EPA subsequently issued two more memoranda in August and October 2018, providing additional information to states developing interstate transport SIP submissions for the 2015 ozone NAAQS concerning, respectively, potential contribution thresholds that may be appropriate to apply in Step 2 of the 4-Step interstate transport framework, and considerations for identifying downwind areas that may have problems maintaining the standard at Step 1 of the 4-Step interstate transport framework.[14]

Since the release of the modeling data shared in the March 2018 memorandum, the EPA performed updated modeling using a 2016-based emissions modeling platform (*i.e.,* 2016v1). This emissions platform was developed under the EPA/Multi-Jurisdictional Organization (MJO)/state

collaborative project.[15] This collaborative project was a multi-year joint effort by the EPA, MJOs, and states to develop a new, more recent emissions platform for use by the EPA and states in regulatory modeling as an improvement over the dated 2011-based platform that the EPA had used to project ozone DVs and contribution data provided in the 2017 and 2018 memoranda. The EPA used the 2016v1 emissions to project ozone DVs and contributions for 2023. On October 30, 2020, in the Notice of Proposed Rulemaking for the Revised CSAPR Update, the EPA released and accepted public comment on 2023 modeling that used the 2016v1 emissions platform.[16] *See* 85 FR 68964, 68981. Although the Revised CSAPR Update addressed transport for the 2008 ozone NAAQS, the projected DVs and contributions from the 2016v1 platform are also useful for identifying downwind ozone problems and linkages with respect to the 2015 ozone NAAQS.[17]

Following the Revised CSAPR Update final rule, the EPA made further updates to the 2016 emissions platform to include mobile emissions from the EPA's Motor Vehicle Emission Simulator MOVES3 model[18] and updated emissions projections for electric generating units (EGUs) that reflect the emissions reductions from the Revised CSAPR Update, recent information on plant closures, and other sector trends. The construct of the updated emissions platform, 2016v2, is described in the Technical Support Document (TSD) Preparation of Emissions Inventories for the 2016v2 North American Emissions Modeling Platform, which is included in Docket ID No. EPA–HQ–OAR–2021–0663. The EPA performed air quality modeling of the 2016v2 emissions using the most recent publicly released version of the Comprehensive Air-quality Model with extensions (CAMx) photochemical modeling, version 7.10.[19] The EPA now proposes to rely on the air quality modeling performed using CAMx, version 7.10, and the newly available 2016v2 emissions platform in evaluating states' submissions with respect to Steps

---

[8] A design value is a statistic that describes the air quality status of a given location relative to the level of the NAAQS. Design values are typically used to designate and classify nonattainment areas, as well as to assess progress towards meeting the NAAQS. *See https://www.epa.gov/air-trends/air-quality-design-values#report.*

[9] *See* "Notice of Availability of the Environmental Protection Agency's Preliminary Interstate Ozone Transport Modeling Data for the 2015 8-hour Ozone National Ambient Air Quality Standard (NAAQS)", 82 FR 1733 (January 6, 2017).

[10] 82 FR at 1735.

[11] *See* EPA memorandum, "Information on the Interstate Transport State Implementation Plan Submissions for the 2008 Ozone National Ambient Air Quality Standards under Clean Air Act section 110(a)(2)(D)(i)(I)", October 27, 2017, ("October 2017 memorandum") available in Docket ID No. EPA–HQ–OAR–2021–0663 or at *https://www.epa.gov/*

*interstate-air-pollution-transport/interstate-air-pollution-transport-memos-and-notices.*

[12] *See* EPA memorandum, "Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act section 110(a)(2)(D)(i)(I)", March 27, 2018, ("March 2018 memorandum") available in Docket ID No. EPA–HQ–OAR–2021–0663 or at *https://www.epa.gov/ interstate-air-pollution-transport/interstate-air-pollution-transport-memos-and-notices.*

[13] The March 2018 memorandum, however, provided, "While the information in this memorandum and the associated air quality analysis data could be used to inform the development of these SIPs, the information is not a final determination regarding states' obligations under the interstate transport provision. Any such determination would be made through notice-and-comment rulemaking."

[14] *See* EPA memorandums, "Analysis of Contribution Thresholds for Use in Clean Air Act section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards", August 31, 2018 ("August 2018 memorandum"), and "Considerations for Identifying Maintenance Receptors for Use in Clean Air Act section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards", October 19, 2018 ("October 2018 memorandum"), available in Docket ID No. EPA–HQ–OAR–2021–0663 or at *https://www.epa.gov/airmarkets/memo-and-supplemental-information-regarding-interstate-transport-sips-2015-ozone-naaqs.*

[15] The results of this modeling, as well as the underlying modeling files, are included in Docket ID No. EPA–HQ–OAR–2021–0663.

[16] *See* 85 FR 68964, 68981 (Oct. 30, 2020).

[17] *See* the Air Quality Modeling Technical Support Document for the Final Revised Cross-State Air Pollution Rule Update, available in Docket ID No. EPA–HQ–OAR–2021–0663 for this action.

[18] Additional details and documentation related to the MOVES3 model can be found at *https:// www.epa.gov/moves/latest-version-motor-vehicle-emission-simulator-moves.*

[19] Ramboll Environment and Health, January 2021, *www.camx.com.*

1 and 2 of the 4-Step framework and generally referenced within this action as 2016v2 modeling for 2023. By using the updated modeling results, the EPA is using the most current and technically appropriate information for this proposed rulemaking. Sections II–V of this action and the Air Quality Modeling TSD for 2015 ozone NAAQS Transport SIP Proposed Actions, included in Docket ID No. EPA–HQ–OAR–2021–0663 for this proposal, contain additional detail on the EPA's 2016v2 modeling. In this action, the EPA is inviting public comment on this updated 2023 modeling, which uses a 2016v2 emissions platform. Per the instructions in the Supplementary Information section above, all public comments, including comments on the EPA's air quality modeling should be submitted in the Regional docket for this action, Docket ID No. EPA–R06–OAR–2021–0801. Comments are not being accepted in Docket No. EPA–HQ–OAR–2021–0663.

States may have chosen to rely on the results of EPA modeling and/or alternative modeling performed by states or Multi-Jurisdictional Organizations (MJOs) to evaluate downwind air quality problems and contributions as part of their submissions. In Sections II–V of this action, we evaluate how the states used air quality modeling information in their submissions.

## D. The EPA's Approach to Evaluating Interstate Transport SIPs for the 2015 Ozone NAAQS

The EPA proposes to apply a consistent set of policy judgments across all states for purposes of evaluating interstate transport obligations and the approvability of interstate transport SIP submittals for the 2015 ozone NAAQS. These policy judgments reflect consistency with relevant case law and past agency practice as reflected in the CSAPR and related rulemakings. Nationwide consistency in approach is particularly important in the context of interstate ozone transport, which is a regional-scale pollution problem involving many smaller contributors. Effective policy solutions to the problem of interstate ozone transport going back to the 1998 $NO_X$ SIP Call [20] have necessitated the application of a uniform framework of policy judgments in order to ensure an "efficient and equitable" approach. See

*EME Homer City Generation, LP* v. *EPA,* 572 U.S. 489, 519 (2014).

In the March, August, and October 2018 memoranda, the EPA recognized that states may be able to establish alternative approaches to addressing their interstate transport obligations for the 2015 ozone NAAQS that vary from a nationally uniform framework. The EPA emphasized in these memoranda, however, that such alternative approaches must be technically justified and appropriate in light of the facts and circumstances of each particular state's submittal. In general, the EPA continues to believe that deviation from a nationally consistent approach to ozone transport must be substantially justified and have a well-documented technical basis that is consistent with relevant case law. Where states submitted SIPs that rely on any such potential "flexibilities" as may have been identified or suggested in the past, the EPA will evaluate whether the state adequately justified the technical and legal basis for doing so.

The EPA notes that certain concepts included in an attachment to the March 2018 memorandum require unique consideration, and these ideas do not constitute agency guidance with respect to transport obligations for the 2015 ozone NAAQS. Attachment A to the March 2018 memorandum identified a "Preliminary List of Potential Flexibilities" that could potentially inform SIP development.[21] However, the EPA made clear in Attachment A that the list of ideas were not suggestions endorsed by the Agency but rather "comments provided in various forums" on which the EPA sought "feedback from interested stakeholders." [22] Further, Attachment A stated, "EPA is not at this time making any determination that the ideas discussed below are consistent with the requirements of the CAA, nor are we specifically recommending that states use these approaches." [23] Attachment A to the March 2018 memorandum, therefore, does not constitute agency guidance, but was intended to generate further discussion around potential approaches to addressing ozone transport among interested stakeholders. To the extent states sought to develop or rely on these ideas in support of their SIP submittals, the EPA will review the technical and legal justifications for doing so.

The remainder of this section describes the EPA's proposed framework with respect to analytic year,

definition of nonattainment and maintenance receptors, selection of contribution threshold, and multifactor control strategy analysis.

## 1. Selection of Analytic Year

In general, the states and the EPA must implement the interstate transport provision in a manner "consistent with the provisions of [title I of the CAA.]" CAA section 110(a)(2)(D)(i). This requires, among other things, that these obligations are addressed consistently with the timeframes for downwind areas to meet their CAA obligations. With respect to ozone NAAQS, under CAA section 181(a), this means obligations must be addressed "as expeditiously as practicable" and no later than the schedule of attainment dates provided in CAA section 181(a)(1).[24] Several D.C. Circuit court decisions address the issue of the relevant analytic year for the purposes of evaluating downwind air quality problems. On September 13, 2019, the D.C. Circuit issued a decision in *Wisconsin* v. *EPA,* remanding the CSAPR Update to the extent that it failed to require upwind states to eliminate their significant contribution by the next applicable attainment date by which downwind states must come into compliance with the NAAQS, as established under CAA section 181(a). 938 F.3d at 313.

On May 19, 2020, the D.C. Circuit issued a decision in *Maryland* v. *EPA* that cited the *Wisconsin* decision in holding that the EPA must assess the impact of interstate transport on air quality at the next downwind attainment date, including Marginal area attainment dates, in evaluating the basis for the EPA's denial of a petition under CAA section 126(b). *Maryland* v. *EPA,* 958 F.3d 1185, 1203–04 (D.C. Cir. 2020). The court noted that "section 126(b) incorporates the Good Neighbor Provision," and, therefore, "EPA must find a violation [of section 126] if an upwind source will significantly contribute to downwind nonattainment at the *next downwind attainment deadline.* Therefore, the agency must evaluate downwind air quality at that deadline, not at some later date." *Id.* at 1204 (emphasis added). The EPA interprets the court's holding in *Maryland* as requiring the states and the Agency, under the interstate transport provision, to assess downwind air quality as expeditiously as practicable and no later than the next applicable

---

[20] *See* 63 FR 57356. The $NO_X$ SIP Call required 22 eastern states and the District of Columbia to submit state implementation plans (SIPs) that set statewide ozone season NOx budgets which would reduce emissions of $NO_X$.

[21] March 2018 memorandum, Attachment A.
[22] *Id.* at A–1.
[23] *Id.*

[24] For attainment dates for the 2015 8-hour ozone NAAQS, refer to CAA section 181(a), 40 CFR 51.1303, and "Additional Air Quality Designations for the 2015 Ozone National Ambient Air Quality Standards", 83 FR 25776 (June 4, 2018, effective Aug. 3, 2018).

attainment date,[25] which is now the Moderate area attainment date under CAA section 181 for ozone nonattainment. The Moderate area attainment date for the 2015 ozone NAAQS is August 3, 2024.[26] The EPA believes that 2023 is now the appropriate year for analysis of interstate transport obligations for the 2015 ozone NAAQS, because the 2023 ozone season is the last relevant ozone season during which achieved emissions reductions in linked upwind states could assist downwind states with meeting the August 3, 2024, Moderate area attainment date for the 2015 ozone NAAQS.

The EPA recognizes that the attainment date for nonattainment areas classified as Marginal for the 2015 ozone NAAQS was August 3, 2021. Under the *Maryland* holding, any necessary emissions reductions to satisfy interstate transport obligations should have been implemented no later than this date. At the time of the statutory deadline to submit interstate transport SIPs (October 1, 2018), many states relied upon the EPA modeling of the year 2023, and no state provided an alternative analysis using a 2021 analytic year (or the prior 2020 ozone season). However, the EPA must act on SIP submittals using the information available at the time it takes such action. In this circumstance, the EPA does not believe it would be appropriate to evaluate states' obligations under CAA section 110(a)(2)(D)(i)(I) as of an attainment date that is wholly in the past, because the Agency interprets the interstate transport provision as forward looking. *See* 86 FR at 23074; *see also Wisconsin,* 938 F.3d at 322. Consequently, in this proposal the EPA proposes to use the analytical year of 2023 to evaluate each state's CAA section 110(a)(2)(D)(i)(I) SIP submission with respect to the 2015 ozone NAAQS.

### 2. Step 1 of the 4-Step Interstate Transport Framework

In Step 1, the EPA identifies monitoring sites that are projected to

have problems attaining and/or maintaining the NAAQS in the 2023 analytic year. Where the EPA's analysis shows that a site does not fall under the definition of a nonattainment or maintenance receptor, that site is excluded from further analysis under the EPA's 4-Step framework. For sites that are identified as a nonattainment or maintenance receptor in 2023, we proceed to the next step of our 4-Step framework by identifying the upwind state's contribution to those receptors.

The EPA's approach to identifying ozone nonattainment and maintenance receptors in this action is consistent with the approach used in previous transport rulemakings. The EPA's approach gives independent consideration to both the "contribute significantly to nonattainment" and the "interfere with maintenance" prongs of CAA section 110(a)(2)(D)(i)(I), consistent with the D.C. Circuit's direction in *North Carolina* v. *EPA.*[27]

For the purpose of this proposal, the EPA identifies "nonattainment" receptors as those monitoring sites that are projected to have average DVs in 2023 that exceed the NAAQS and that are also measuring nonattainment based on the most recent monitored DVs. This approach is consistent with prior transport rulemakings, such as the CSAPR Update, where the EPA defined nonattainment receptors as those areas that both currently measure nonattainment and that the EPA projects will be in nonattainment in the future analytic year (*i.e.,* 2023).[28]

In addition, in this proposal, the EPA defines a receptor to be a "maintenance" receptor for purposes of defining interference with maintenance, consistent with the method used in the CSAPR and upheld by the D.C. Circuit in *EME Homer City Generation, L.P.* v. *EPA,* 795 F.3d 118, 136 (D.C. Cir. 2015).[29] Specifically, the EPA identified maintenance receptors as those receptors that would have difficulty maintaining the relevant NAAQS in a scenario that takes into account historical variability in air quality at that receptor. The variability in air

quality was determined by evaluating the "maximum" future DV at each receptor based on a projection of the maximum measured DV over the relevant period. The EPA interprets the projected maximum future DV to be a potential future air quality outcome consistent with the meteorology that yielded maximum measured concentrations in the ambient data set analyzed for that receptor (*i.e.,* ozone conducive meteorology). The EPA also recognizes that previously experienced meteorological conditions (*e.g.,* dominant wind direction, temperatures, air mass patterns) promoting ozone formation that led to maximum concentrations in the measured data may reoccur in the future. The maximum DV gives a reasonable projection of future air quality at the receptor under a scenario in which such conditions do, in fact, reoccur. The projected maximum DV is used to identify upwind emissions that, under those circumstances, could interfere with the downwind area's ability to maintain the NAAQS.

Recognizing that nonattainment receptors are also, by definition, maintenance receptors, the EPA often uses the term "maintenance-only" to refer to those receptors that are not nonattainment receptors. Consistent with the concepts for maintenance receptors, as described above, the EPA identifies "maintenance-only" receptors as those monitoring sites that have projected average DVs above the level of the applicable NAAQS, but that are not currently measuring nonattainment based on the most recent official DVs. In addition, those monitoring sites with projected average DVs below the NAAQS, but with projected maximum DVs above the NAAQS are also identified as "maintenance only" receptors, even if they are currently measuring nonattainment based on the most recent official DVs.

### 3. Step 2 of the 4-Step Interstate Transport Framework

In Step 2, the EPA quantifies the contribution of each upwind state to each receptor in the 2023 analytic year. The contribution metric used in Step 2 is defined as the average impact from each state to each receptor on the days with the highest ozone concentrations at the receptor based on the 2023 modeling. If a state's contribution value does not equal or exceed the threshold of 1 percent of the NAAQS (*i.e.,* 0.70 ppb for the 2015 ozone NAAQS), the upwind state is not "linked" to a downwind air quality problem, and the EPA, therefore, concludes that the state does not significantly contribute to

---

[25] We note that the court in *Maryland* did not have occasion to evaluate circumstances in which the EPA may determine that an upwind linkage to a downwind air quality problem exists at Steps 1 and 2 of the 4-Step interstate transport framework by a particular attainment date, but for reasons of impossibility or profound uncertainty the Agency is unable to mandate upwind pollution controls by that date. *See Wisconsin,* 938 F.3d at 320. The D.C. Circuit noted in *Wisconsin* that upon a sufficient showing, these circumstances may warrant flexibility in effectuating the purpose of the interstate transport provision.

[26] *See* CAA section 181(a); 40 CFR 51.1303; "Additional Air Quality Designations for the 2015 Ozone National Ambient Air Quality Standards", 83 FR 25776 (June 4, 2018, effective Aug. 3, 2018).

[27] *See North Carolina* v. *EPA,* 531 F.3d 896, 910–11 (D.C. Cir. 2008) (holding that the EPA must give "independent significance" to each prong of CAA section 110(a)(2)(D)(i)(I)).

[28] *See* 81 FR 74504 (October 26, 2016). This same concept, relying on both current monitoring data and modeling to define nonattainment receptor, was also applied in CAIR. *See* 70 FR at 25241, 25249 (January 14, 2005); *see also North Carolina,* 531 F.3d at 913–14 (affirming as reasonable EPA's approach to defining nonattainment in CAIR).

[29] *See* 76 FR 48208 (August 8, 2011). CSAPR Update and Revised CSAPR Update also used this approach. See 81 FR 74504 (October 26, 2016) and 86 FR 23054 (April 30, 2021).

nonattainment or interfere with maintenance of the NAAQS in the downwind states. However, if a state's contribution equals or exceeds the 1 percent threshold, the state's emissions are further evaluated in Step 3, considering both air quality and cost of controls as part of a multifactor analysis, to determine what, if any, emissions might be deemed ''significant'' and, thus, must be eliminated under CAA section 110(a)(2)(D)(i)(I). The EPA is proposing to continue to rely in the first instance on the 1 percent threshold for the purpose of evaluating a state's contribution to nonattainment or maintenance of the 2015 ozone NAAQS (*i.e.,* 0.70 ppb) at downwind receptors. This is consistent with the Step 2 approach that the EPA applied in CSAPR for the 1997 ozone NAAQS, which has subsequently been applied in the CSAPR Update when evaluating interstate transport obligations for the 2008 ozone NAAQS. For ozone, as the EPA found in the Clean Air Interstate Rule (CAIR), CSAPR, and CSAPR Update, a portion of the nonattainment problem from anthropogenic sources in the U.S. results from the combined impact of relatively small contributions from many upwind states, along with contributions from in-state sources and, in some cases, substantially larger contributions from a subset of upwind states. The EPA's analysis shows that much of the ozone transport problem being analyzed in this proposed rule is still the result of the collective impacts of contributions from many upwind states. Therefore, application of a consistent contribution threshold is necessary to identify those upwind states that should have responsibility for addressing their contribution to the downwind nonattainment and maintenance problems to which they collectively contribute. Continuing to use 1 percent of the NAAQS as the screening metric to evaluate collective contribution from many upwind states also allows the EPA (and states) to apply a consistent framework to evaluate interstate emissions transport under the interstate transport provision from one NAAQS to the next. *See* 81 FR at 74518. *See also* 86 FR at 23085 (reviewing and explaining rationale from CSAPR); 76 FR at 48237–38 (for selection of 1 percent threshold).

The EPA's August 2018 memorandum recognized that in certain circumstances, a state may be able to establish that an alternative contribution threshold of 1 ppb is justifiable. Where a state relies on this alternative threshold, and where that state determined that it was not linked at

Step 2 using the alternative threshold, the EPA will evaluate whether the state provided a technically sound assessment of the appropriateness of using this alternative threshold based on the facts and circumstances underlying its application in the particular SIP submission.

### 4. Step 3 of the 4-Step Interstate Transport Framework

Consistent with the EPA's longstanding approach to eliminating significant contribution or interference with maintenance, at Step 3, states linked at Steps 1 and 2 are generally expected to prepare a multifactor analysis of potential emissions controls. The EPA's analysis at Step 3 in prior Federal actions addressing interstate transport requirements has primarily focused on an evaluation of cost-effectiveness of potential emissions controls (on a marginal cost-per-ton basis), the total emissions reductions that may be achieved by requiring such controls (if applied across all linked upwind states), and an evaluation of the air quality impacts such emissions reductions would have on the downwind receptors to which a state is linked; other factors may potentially be relevant if adequately supported. In general, where the EPA's or alternative air quality and contribution modeling establishes that a state is linked at Steps 1 and 2, it will be insufficient at Step 3 for a state merely to point to its existing rules requiring control measures as a basis for approval. In general, the emissions-reducing effects of all existing emissions control requirements are already reflected in the air quality results of the modeling for Steps 1 and 2. If the state is shown to still be linked to one or more downwind receptor(s), states must provide a well-documented evaluation determining whether their emissions constitute significant contribution or interference with maintenance by preparing a multifactor assessment that evaluates additional available control opportunities. While the EPA has not prescribed a particular method for this assessment, the EPA expects states at a minimum to present a sufficient technical evaluation. This would typically include information on emissions sources, applicable control technologies, emissions reductions, costs, cost effectiveness, and downwind air quality impacts of the estimated reductions, before concluding that no additional emissions controls should be required.[30]

### 5. Step 4 of the 4-Step Interstate Transport Framework

In Step 4, states (or the EPA) develop permanent and federally enforceable control strategies to achieve the emissions reductions determined to be necessary in Step 3 to eliminate significant contribution to nonattainment or interference with maintenance of the NAAQS. For a state linked in Steps 1 and 2 to rely on an emissions control measure in Step 3 to address its interstate transport obligations, that measure must be included in the state's SIP so that it is permanent and federally enforceable. *See* CAA section 110(a)(2)(D) (''Each such [SIP] shall . . . contain adequate provisions. . . .''). *See also* CAA section 110(a)(2)(A); *Committee for a Better Arvin* v. *U.S. E.P.A.,* 786 F.3d 1169, 1175–76 (9th Cir. 2015) (holding that measures relied on by state to meet CAA requirements must be included in the SIP).

## II. Arkansas SIP Submission Addressing Interstate Transport of Air Pollution for the 2015 Ozone NAAQS and the EPA Evaluation of the SIP Submission

*A. Summary of ADEQ SIP Submission Addressing Interstate Transport of Air Pollution for the 2015 Ozone NAAQS*

On October 10, 2019, the Arkansas Division of Environmental Quality (ADEQ) of the Arkansas Department of Energy and Environment made a SIP submission addressing interstate transport of air pollution for the 2015 ozone NAAQS. The ADEQ SIP submission provided an analysis of Arkansas's air emissions impact to downwind states using the EPA's 4-Step framework and an analytic year of 2023 and concluded that the State's air emissions will not contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in other states.

To identify downwind monitors projected to be in nonattainment and/or have maintenance issues in 2023 (Step 1), ADEQ relied on the EPA's interstate transport modeling results that are included as an attachment to the March 2018 memorandum. The EPA modeling results included with the March 2018 memorandum provide: (1) Projected

---

[30] As examples of general approaches for how such an analysis could be conducted for their

sources, states could look to the CSAPR Update, 81 FR 74504, 74539–51; CSAPR, 76 FR 48208, 48246–63; CAIR, 70 FR 25162, 25195–229; or the NOX SIP Call, 63 FR 57356, 57399–405. *See also* Revised CSAPR Update, 86 FR 23054, 23086–23116. Consistently across these rulemakings, the EPA has developed emissions inventories, analyzed different levels of control stringency at different cost thresholds, and assessed resulting downwind air quality improvements.

average DV and maximum DV for the future year 2023 (fy 2023) for ozone monitors projected to be potential nonattainment or maintenance receptors in the 48 contiguous States and (2) the expected contribution of State emissions to the projected ozone concentrations at each ozone monitor.

At Step 2, ADEQ identified those states to which Arkansas contributes emissions and then applied a 1 ppb contribution threshold to determine projected nonattainment and/or maintenance receptors in other states that might be significantly impacted by emissions from Arkansas. ADEQ provided three rationales as a basis to support their decision to rely on a 1 ppb contribution threshold. First, ADEQ cited to the August 2018 memorandum [31] that compares the collective contribution captured by

three different contribution thresholds: 1 Percent of the NAAQS, 1 ppb, and 2 ppb. ADEQ summarized the August 2018 memorandum and concluded that the 1 percent and 1 ppb contribution thresholds are generally comparable. Second, ADEQ referenced an April 2018 memorandum [32] in which the EPA examined the use of a significant impact level (SIL) value of 1 ppb for determining whether a proposed prevention of significant deterioration (PSD) source causes or contributes to a violation of the corresponding 2015 ozone NAAQS. Despite recognizing that a contribution threshold is not the same as a significance level, ADEQ claimed that a contribution threshold and significance level are sufficiently analogous to support the use of a 1 ppb contribution threshold. The final

rationale ADEQ provided was based on the consistency with the reported precision of Federal reference monitors for ozone and the rounding requirements found in 40 CFR part 50, Appendix U, Interpretation of the Primary and Secondary National Ambient Air Quality Standards for Ozone. ADEQ noted that the 1 percent contribution threshold of 0.7 ppb is lower than the manufacturer's reported precision of Federal reference monitors for ozone and that the requirements found in Appendix U truncates monitor values of 0.7 ppb to 0 ppb.

As stated previously, ADEQ identified all potential nonattainment and maintenance receptors for fy 2023 showing a contribution of emissions from Arkansas.[33] These receptors are included in Table AR–1.

TABLE AR–1—PROJECTED NONATTAINMENT AND MAINTENANCE RECEPTORS IDENTIFIED BY ARKANSAS BASED ON THE EPA'S MARCH 2018 MEMORANDUM

| Receptor (site ID, county, state) | 2023 average DV (ppb) | 2023 maximum DV (ppb) | Arkansas contribution (ppb) |
|---|---|---|---|
| 260050003, Allegan, MI | 69 | 71.7 | 1.64 |
| 482011039, Harris, TX | 71.8 | 73.5 | 0.99 |
| 480391004, Brazoria, TX | 74 | 74.9 | 0.90 |
| 484392003, Tarrant, TX | 72.5 | 74.8 | 0.78 |
| 481210034, Denton, TX | 69.7 | 72 | 0.58 |
| 482011034, Harris, TX | 70.8 | 71.6 | 0.54 |
| 551170006, Sheboygan, WI | 72.8 | 75.1 | 0.51 |
| 550790085, Milwaukee, WI | 71.2 | 73 | 0.40 |
| 482010024, Harris, TX | 70.4 | 72.8 | 0.29 |
| 261630019, Wayne, MI | 69 | 71 | 0.27 |
| 240251001, Harford, MD | 70.9 | 73.3 | 0.17 |
| 90019003, Fairfield, CT | 73 | 75.9 | 0.13 |
| 90013007, Fairfield, CT | 71 | 75 | 0.13 |
| 361030002, Suffolk, NY | 74 | 75.5 | 0.12 |
| 360810124, Queens, NY | 70.2 | 72 | 0.09 |
| 90099002, New Haven, CT | 69.9 | 72.6 | 0.08 |
| 90010017, Fairfield, CT | 68.9 | 71.2 | 0.07 |
| 80590006, Jefferson, CO | 71.3 | 73.7 | 0.03 |
| 80590011, Jefferson, CO | 70.9 | 73.9 | 0.02 |
| 81230009, Weld, CO | 70.2 | 71.4 | 0.02 |
| 80350004, Douglas, CO | 71.1 | 73.2 | 0.01 |

Based on a 1 ppb contribution threshold, ADEQ identified only one fy 2023 projected maintenance receptor, Allegan County, MI, and no fy 2023 projected nonattainment receptors linked to Arkansas. ADEQ also cited other modeling performed by TCEQ and Midwest Ozone Group, which showed

that when different modeling protocols were employed, future year DV projections and contributions could differ considerably. ADEQ therefore elected to consider other evidence regarding its linkage to air quality in Allegan County, MI. Specifically, ADEQ analyzed back trajectory information to

infer that there is no consistent or persistent relationship between elevated ozone days in Allegan County, MI and air traveling through Arkansas. ADEQ assessed wind patterns on elevated ozone days—days with a maximum daily average 8-hour ozone (MDA8) greater than 70.9 ppb in Allegan County,

---

[31] "Analysis of Contribution Thresholds for Use in Clean Air Act section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards", August 31, 2018, available in Docket ID No. EPA–HQ–OAR–2021–0663 or at *https://www.epa.gov/airmarkets/memo-and-supplemental-information-regarding-interstate-transport-sips-2015-ozone-naaqs*.

[32] *See* EPA memorandum from Peter Tsirigotis, Director of the Office of Air Quality planning and

Standards, April 17, 2018, "Guidance on Significant Impact Levels for Ozone and Fine Particles in the Prevention of Significant Deterioration Permitting Program" ("SILs Guidance" or "April 2018 memorandum"), available at: *https://www.epa.gov/sites/default/files/2018-04/documents/sils_policy_guidance_document_final_signed_4-17-18.pdf*.

[33] Table AR–1 lists all sites that the EPA projected to have a fy 2023 average DV or fy 2023 maximum DV greater than 70.9 ppb in our March 2018 memorandum. As Arkansas stated in the SIP

submission, the EPA considers sites matching these criteria to be projected nonattainment areas and projected maintenance areas, respectively. ADEQ ranked these sites by Arkansas's potential contribution, which the EPA determined based on the daily eight-hour average contributions on the top ten concentration days in 2023.

MI. ADEQ used the National Oceanic and Atmospheric Administration (NOAA) HYbrid Single Particle Lagrangian Integrated Trajectory (HYSPLIT)[34] model to evaluate wind back trajectories from over a 10-year period (2008–2017).[35] Over the course of the 10-year period, ADEQ identified 95 elevated ozone days (MDA8 > 70.9 ppb) for the Allegan County, MI monitor.[36] Next, ADEQ identified the maximum ozone value within these elevated ozone days.[37] Using HYSPLIT, ADEQ ran 72-hour back trajectories using the hour of the maximum ozone value for each elevated day as the back trajectory start time. To consider the effects of vertical variations in wind flows on transport patterns, ADEQ used the following starting heights above ground level: 100m, 500m, 1000m, and 1500m. ADEQ obtained 40 km grid meteorological data for the back trajectory analysis using Eta Data Assimilation System (EDAS) data.[38] In total, ADEQ ran 152 back trajectories for each mixing height.[39] ADEQ filtered the back trajectories to determine whether further analysis is warranted using two criteria. First, ADEQ filtered out back trajectories that had a starting hour mixing height below the back trajectory start height because ADEQ asserted these air parcels would not have reached ambient air[40] at the Allegan County, MI monitor site. Second, ADEQ filtered out any back trajectory that did not have a path through any portion of Arkansas. After ADEQ applied their filter criteria, 41 out of 608 back trajectories (6.74%) remained from 22 out of the 95 elevated ozone days (23%) examined. Of the 10 years examined, ADEQ also found that air passing through Arkansas only reached Allegan County, MI on four or more days in one year: 2012.[41] For 2012, HYSPLIT analyses indicated 14 Arkansas-Allegan County, MI linked back trajectories for 7 days in total in 2012, whereas for 2011, 2013, 2014, and 2016 the HYSPLIT analyses indicated three, two, zero and one days with Arkansas-Allegan County, MI linked back trajectories, respectively. For the 10 years ADEQ's performed HYSPLITs, ADEQ's HYSPLIT analysis indicated on average 2.2 days per year had trajectories with Arkansas-Allegan County, MI linked back trajectories. ADEQ also noted that these trajectories passed through other states and through Metropolitan Statistical Areas (MSAs)[42] both before and after traversing through Arkansas. Specifically, ADEQ stated that 37 trajectories passed through the Chicago-Naperville-Elgin, IL–IN–WI MSA prior to reaching Allegan County, MI. Based on these results, ADEQ concluded that other states and MSAs were more likely to have influenced ozone concentrations at the Allegan County, MI monitor on the days with back trajectories linked to Arkansas.

In Step 3, ADEQ also considered air quality trends in Allegan County, MI, emission trends in other upwind states, relative contribution from other upwind states, and cost factors. ADEQ presented that ozone DVs in Allegan County, MI fluctuated over the 2008–2017 period with higher concentration occurring from 2012 through 2014 but declining since 2014. ADEQ also mentioned that despite the most recent 2017 DV for the Allegan County monitor continuing to show an exceedance of the 2015 ozone NAAQS, the EPA-projected 2023 ozone average DV at the Allegan County, MI monitor, based on data provided in the March 2018 memorandum, is 69.0 ppb, which would be in attainment of the 2015 ozone NAAQS in 2023.

Next, ADEQ included an evaluation of the relative contribution and the emission trends from the eight states[43] with contributions greater than 1 ppb to the Allegan County, MI receptor. The emission trends evaluation examined ozone precursors, nitrogen oxides (NO$_X$) and volatile organic compounds (VOC), from 2011 to 2017 and the model projected fy 2023 emissions level. ADEQ noted that the two states with the highest contributions to Allegan County, MI—Illinois and Indiana—have both experienced year-over-year decreases in NO$_X$ emissions in excess of 20,000 tons of NO$_X$ reduced per year. Arkansas had also experienced decreases in NO$_X$ emissions each evaluated year and emitted less NO$_X$ than any other of the potentially linked states. In addition, ADEQ referenced the EPA projections showing that most potentially linked states will continue to realize reductions in NO$_X$, as well as VOCs, through 2023. ADEQ confirmed that based on this analysis, the overall general trends of NO$_X$ and VOC emissions are declining from Arkansas and the other linked states. The continuation of trends in the emissions reductions observed, particularly from Illinois and Indiana, are anticipated by ADEQ to result in air quality improvements in Allegan County, MI.

In terms of cost analysis, ADEQ focused only on the cost of NO$_X$ controls at electric generating units (EGUs) in the State because EGUs are the largest source of NO$_X$ emissions that ADEQ regulates. In its analysis, ADEQ found that the costs to install additional NO$_X$ controls (selective catalytic reduction, SCR and selective noncatalytic reduction, SNCR) at EGUs exceed the EPA's cost thresholds used for the CSAPR and CSAPR Update rules.[44] Based on ADEQ's evaluation of the evidence, ADEQ concluded that no additional controls beyond pre-existing

---

[34] HYbrid Single-Particle Lagrangian Integrated Trajectory (HYSPLIT) model is a complete system for computing both simple air parcel trajectories and complex dispersion and deposition simulations. The model is designed to support a wide range of simulations related to the atmospheric transport and dispersion of pollutants and hazardous materials to the Earth's surface.

[35] ADEQ analyzed ten years of HYSPLIT back trajectories to examine potential relationships between elevated ozone days at the Allegan County, MI monitor and emissions from Arkansas. In the SIP submission ADEQ stated their rationale for looking at an extended period of time is to gain a more complete picture of how Arkansas's emissions might contribute to elevated ozone in Allegan County, MI, rather than relying entirely on the EPA's modeling simulation, which is based on a single base year.

[36] *See* the AirNow-Tech website at *https://www.airnowtech.org/*. AirNow-Tech is a website for air quality data management analysis, and decision support used by the Federal, State, Tribal, and local air quality organizations.

[37] If the same maximum eight-hour value occurred multiple times a day, ADEQ evaluated all incidences of the value for that day.

[38] EDAS is an intermittent data assimilation system that uses successive three-hour model forecasts to generate gridded meteorological fields that reflect observations covering the continental United States. EDAS is accessible at *https://ready.arl.noaa.gov/edas40.php*.

[39] Mixing heights (m), defined as the height above ground level of the layer adjacent to the ground over which an emitted or entrained inert non-buoyant tracer will be mixed by turbulence.

[40] Ambient air is the "portion of the atmosphere, external to buildings, to which the general public has access." 40 CFR 50.1(e).

[41] The number of days in a given year and the number of consecutive years is of particular relevance for the ozone NAAQS, which is calculated based the annual fourth-highest daily maximum eight-hour concentration averaged over three consecutive years.

[42] MSA is defined as a geographic region with a high population density at its core and close economic ties throughout the area.

[43] The eight linked states include Illinois, 42%; Indiana, 15%; Michigan, 7%; Missouri, 6%; Texas, 5%; Wisconsin, 4%; Oklahoma, 3% and Arkansas, 4%. The remaining contribution is labeled at "Other". The linkages are based on the EPA's modeling results that are attached to the March 2018 memorandum.

[44] The EPA's Revised CSAPR Update, 86 FR 23054 (April 20, 2021), states ". . . EPA adjusted its representative cost for optimizing existing SNCR control to $1,800 per ton in response to comments received on the proposed rule . . . EPA views $1,600 per ton for optimization of existing SCR control and installation of state-of-the are NO$_X$ combustion controls and $1,800 per ton for optimization of existing SNCRs as comparable for policy purposes." ADEQ's screening analysis using the EPA tools (referencing the EPA's Air Pollution Control Cost Estimation Spreadsheet for SCR) shows that cost-effectiveness values for ozone-season operation of SCR and SNCR are: $12,605–$31,580/ton for SCR and $4,221–$45,581 for SNCR. ADEQ notes that any costs imposed to install controls at the examined EGUs would be passed on to Arkansas ratepayers.

state and Federal regulations were warranted for Arkansas sources to satisfy interstate transport obligations for the 2015 ozone NAAQS.

Based on the determinations made by ADEQ at Steps 1 through 3, ADEQ did not include any new control measures in the SIP submission to reduce ozone precursor emissions as part of a Step 4 analysis.

*B. EPA Evaluation of the ADEQ SIP Submission*

The EPA is proposing to find that ADEQ's October 10, 2019, SIP submission does not meet the State's obligations with respect to prohibiting emissions that contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in any other state based on the EPA's evaluation of the SIP submission using the 4-Step interstate transport framework, and the EPA is therefore proposing to disapprove ADEQ's SIP submission.

1. Evaluation of Information Provided by ADEQ Regarding Step 1

At Step 1 of the 4-Step framework, ADEQ relied on the EPA modeling released in the March 2018 memorandum to identify nonattainment and maintenance receptors in 2023. As described in Section I of this action, the EPA has recently performed updated modeling using the 2016v2 platform to evaluate interstate transport of ozone for a fy 2023.[45] The EPA proposes to primarily rely on the EPA's modeling using the 2016v2 platform (EPA 2016v2 modeling), to identify projected nonattainment and maintenance receptors in fy 2023. Updating the base period from 2011 (base period used in data included in the March 2018 memorandum) to a more recent year (2016) allows for better projections of which monitors will have problems attaining and/or maintaining the 2015 ozone NAAQS and factors in more recent base year DVs. The EPA notes that with a switch from 2011 base period meteorology to 2016 base period meteorology, it is normal and expected that the potential downwind nonattainment or maintenance receptors would change due to the different weather patterns that occurred in the different base periods, which impacts both the transport of pollutants from upwind states and what receptors have

higher monitored values within nonattainment/maintenance regions.[46] Modeling using both the 2011 and 2016 based years consistently project that certain areas will have problems attaining and/or maintaining the 2015 ozone NAAQS including receptors in Texas.

2. Evaluation of Information Provided by ADEQ Regarding Step 2

As noted earlier, ADEQ utilized a 1 ppb threshold at Step 2 to identify whether the State was "linked" to a projected downwind nonattainment or maintenance receptor. ADEQ identified linkages for Arkansas to one 2023 projected maintenance receptor, Allegan County, MI, and no 2023 projected nonattainment receptors.

As discussed in the EPA's August 2018 memorandum, with appropriate additional analysis it may be reasonable for states to use a 1 ppb contribution threshold as an alternative to a 1 percent threshold, at Step 2 of the 4-Step interstate transport framework, for the purposes of identifying linkages to downwind receptors. However, the EPA's August 2018 memorandum provided that whether or not a 1 ppb threshold is appropriate must be based on an evaluation of state-specific circumstances, and no such evaluation was included in the state's submittal. Instead, ADEQ cited to the EPA's SILs Guidance as a basis to support the use of a 1 ppb threshold; however, ADEQ did not explain the relevance of the SILs Guidance to ADEQ's statutory obligation under the interstate transport provision. The SILs Guidance relates to a different provision of the Clean Air Act regarding implementation of the prevention of significant deterioration (PSD) permitting program, *i.e.,* a program that applies in areas that have been designated attainment of the NAAQS. The SILs Guidance is not applicable to

the interstate transport provision, which requires states to eliminate significant contribution or interference with maintenance of the NAAQS at known and ongoing air quality problem areas in other states. The EPA does not, in this action, agree that the State has justified its application of the 1 ppb threshold. In any case, both the EPA's most recent modeling, EPA 2016v2 modeling, and the modeling relied on by ADEQ in its SIP submittal, indicate that the State is projected to contribute greater than both the 1 percent and alternative 1 ppb thresholds. While the EPA does not, in this action, propose to approve of the State's application of the 1 ppb threshold, because the State has linkages greater than 1 ppb to projected downwind nonattainment or maintenance receptors, (as shown in Table AR–2) the State's use of this alternative threshold at Step 2 of the 4-Step interstate framework would not alter our review and proposed disapproval of this SIP submittal.

Additionally, the EPA here shares further evaluation of its experience since the issuance of the August 2018 memorandum regarding use of alternative thresholds at Step 2. This experience leads the Agency to now believe it may not be appropriate to continue to attempt to recognize alternative contribution thresholds at Step 2. The August 2018 memorandum stated that "it may be reasonable and appropriate" for states to rely on an alternative threshold of 1 ppb threshold at Step 2. (The memorandum also indicated that any higher alternative threshold, such as 2 ppb, would likely not be appropriate.) However, the EPA also provided that "air agencies should consider whether the recommendations in this guidance are appropriate for each situation." Following receipt and review of 49 interstate transport SIP submittals for the 2015 ozone NAAQS, the EPA's experience has been that nearly every state that attempted to rely on a 1 ppb threshold did not provide sufficient information and analysis to support a determination that an alternative threshold was reasonable or appropriate for that state.

For instance, in nearly all submittals, the states did not provide the EPA with analysis specific to their state or the receptors to which its emissions are potentially linked. In one case, the proposed approval of Iowa's SIP submittal, the EPA expended its own resources to attempt to supplement the information submitted by the state, in order to more thoroughly evaluate the state-specific circumstances that could

---

[45] Per the instructions in the Supplementary Information section above, all public comments, including comments on the EPA's air quality modeling should be submitted in the Regional docket for this action, Docket ID No. EPA–R06–OAR–2021–0801. Comments are not being accepted in Docket No. EPA–HQ–OAR–2021–0663.

[46] We note that ADEQ identified additional modeling performed by TCEQ and Midwest Ozone Group, but simply concluded that different modeling can lead to differences in DV projections and ozone contributions of these two alternative modeling analyses, only TCEQ's modeling using a 2012 base year identified receptors in Texas that projected different DVs for the Texas receptors identified in the EPA's 2011 base year. We discuss the EPA's review of the TCEQ's modeling elsewhere in this action and the Technical Support Document for this action "EPA Region 6 2015 8-Hour Ozone Transport SIP Proposal Technical Support Document" (EPA Region 6 2015 Ozone Transport SIP TSD.pdf) included in the Regional docket for this action (Docket ID No. EPA–R06–OAR–2021–0801), but we do conclude that TCEQ and recent monitoring data indicate that there are problematic receptors that are expected to be either nonattainment or maintenance receptors in 2023 including the Texas receptors identified in our March 2018 memorandum with Arkansas linkages.

support approval.[47] It was at the EPA's sole discretion to perform this analysis in support of the state's submittal, and the Agency is not obligated to conduct supplemental analysis to fill the gaps whenever it believes a state's analysis is insufficient. The Agency no longer intends to undertake supplemental analysis of SIP submittals with respect to alternative thresholds at Step 2 for purposes of the 2015 ozone NAAQS.

Furthermore, the EPA's experience since 2018 is that allowing for alternative Step 2 thresholds may be impractical or otherwise inadvisable for a number of additional policy reasons. For a regional air pollutant such as ozone, consistency in requirements and expectations across all states is essential. Based on its review of submittals to-date and after further consideration of the policy implications of attempting to recognize an alternative Step 2 threshold for certain states, the Agency now believes the attempted use of different thresholds at Step 2 with respect to the 2015 ozone NAAQS raises substantial policy consistency and practical implementation concerns.[48] The availability of different thresholds at Step 2 has the potential to result in inconsistent application of interstate transport obligations based solely on the strength of a state's SIP submittal at Step 2 of the 4-Step interstate transport framework. From the perspective of ensuring effective regional implementation of interstate transport obligations, the more important analysis is the evaluation of the emissions reductions needed, if any, to address a state's significant contribution after consideration of a multifactor analysis at Step 3, including a detailed evaluation that considers air quality factors and cost. Where alternative thresholds for purposes of Step 2 may be "similar" in terms of capturing the relative amount of upwind contribution (as described in the August 2018 memorandum), nonetheless, use of an alternative threshold would allow certain states to avoid further evaluation of potential emission controls while other states must proceed to a Step 3 analysis. This can create significant

equity and consistency problems among states.

Further, it is not clear that national ozone transport policy is best served by allowing for less stringent thresholds at Step 2. The EPA recognized in the August 2018 memorandum that there was some similarity in the amount of total upwind contribution captured (on a nationwide basis) between 1 percent and 1 ppb. However, the EPA notes that while this may be true in some sense, that is hardly a compelling basis to move to a 1 ppb threshold. Indeed, the 1 ppb threshold has the disadvantage of losing a certain amount of total upwind contribution for further evaluation at Step 3 (e.g., roughly seven percent of total upwind state contribution was lost according to the modeling underlying the August 2018 memorandum;[49] in EPA 2016v2 modeling, the amount lost is five percent). Considering the core statutory objective of ensuring elimination of all significant contribution to nonattainment or interference of the NAAQS in other states and the broad, regional nature of the collective contribution problem with respect to ozone, there does not appear to be a compelling policy imperative in allowing some states to use a 1 ppb threshold while others rely on a 1 percent of NAAQS threshold.

Consistency with past interstate transport actions such as CSAPR, and the CSAPR Update and Revised CSAPR Update rulemakings (which used a Step 2 threshold of 1 percent of the NAAQS for two less stringent ozone NAAQS), is also important. Continuing to use a 1 percent of NAAQS approach ensures that as the NAAQS are revised and made more stringent, an appropriate increase in stringency at Step 2 occurs, so as to ensure an appropriately larger amount of total upwind-state contribution is captured for purposes of fully addressing interstate transport. *Accord* 76 FR 48237–38.

Therefore, notwithstanding the August 2018 memorandum's recognition of the potential viability of alternative Step 2 thresholds, and in particular, a potentially applicable 1 ppb threshold, the EPA's experience since the issuance of that memorandum has revealed substantial programmatic and policy difficulties in attempting to implement this approach. Nonetheless, the EPA is not, at this time, rescinding the August 2018 memorandum. The basis for the EPA's proposed disapproval of ADEQ's SIP submission with respect to the Step 2 analysis is, in the Agency's view, warranted even under the terms of the August 2018

memorandum. The EPA invites comment on this broader discussion of issues associated with alternative thresholds at Step 2. (See Supplementary Information section above for details and docket to submit comments). Depending on public comments received in relation to this action and further evaluation of this issue, the EPA may determine to rescind the 2018 memorandum in the future.

ADEQ included information in its SIP submission regarding back trajectories, emissions trends, and EGU source controls to conclude that emissions from Arkansas should not be considered to contribute significantly to nonattainment or interfere with maintenance of the NAAQS in other states because there is not a persistent and consistent pattern of contribution from the State. While it is not entirely clear whether ADEQ was analyzing these factors under Step 2 or Step 3, the EPA is evaluating such arguments under Step 3, as we view these statements in the SIP submission to speak to whether or not a contribution is "significant" once a linkage is established.

### 3. Results of the EPA's Step 1 and Step 2 Modeling and Findings for Arkansas

As described in Section I of this action, the EPA performed air quality modeling using the 2016v2 emissions platform to project DVs and contributions for 2023 (EPA 2016v2 modeling). This data was examined to determine if Arkansas contributes at or above the threshold of 1 percent of the 2015 ozone NAAQS (0.70 ppb) to any downwind nonattainment or maintenance receptor. As shown in Table AR–2, the data[50] indicate that in 2023, emissions from Arkansas contribute greater than 1 percent of the standards to nonattainment or maintenance-only receptors in Texas: Denton County (Monitor ID. 481210034), Brazoria County (Monitor ID. 480391004), Harris County (Monitor ID. 482010055, Monitor ID. 482011034,

---

[47] "Air Plan Approval; Iowa; Infrastructure State Implementation Plan Requirements for the 2015 Ozone National Ambient Air Quality Standard", 85 FR 12232 (March 2, 2020). The agency received adverse comments on this proposed approval and has not taken final action with respect to this proposal.

[48] We note that Congress has placed on the EPA a general obligation to ensure the requirements of the CAA are implemented consistently across states and regions. *See* CAA section 301(a)(2). Where the management and regulation of interstate pollution levels spanning many states is at stake, consistency in application of CAA requirements is paramount.

[49] *See* August 2018 memorandum, at page 4.

[50] Design values and contributions at individual monitoring sites nationwide are provided in the file: 2016v2_DVs_state_contributions.xlsx which is included in docket ID No. EPA–HQ–OAR–2021–0663.

**9808**    **Federal Register** / Vol. 87, No. 35 / Tuesday, February 22, 2022 / Proposed Rules

and Monitor ID. 482011035).[51][52] Therefore, based on the EPA's evaluation of the information submitted by ADEQ, and based on the EPA model 2016v2 results for 2023, the EPA proposes to find that Arkansas is linked at Steps 1 and 2 and has an obligation to assess potential emissions reductions from sources or other emissions activity at Step 3 of the 4-Step framework.

TABLE AR–2—PROJECTED NONATTAINMENT AND MAINTENANCE RECEPTORS WITH ARKANSAS LINKAGES IN 2023 BASED ON EPA 2016v2 MODELING

| Receptor (site ID, county, state) | Nonattainment/ maintenance | 2023 average DV (ppb) | 2023 maximum DV (ppb) | Arkansas contribution (ppb) |
|---|---|---|---|---|
| 481210034, Denton, TX | Maintenance | 70.4 | 72.2 | 0.76 |
| 480391004, Brazoria, TX | Maintenance | 70.1 | 72.3 | 1.39 |
| 482010055, Harris, TX | Nonattainment | 71.0 | 72.0 | 1.00 |
| 482011034, Harris, TX | Maintenance | 70.3 | 71.6 | 1.38 |
| 482011035, Harris, TX | Maintenance | 68.0 | 71.6 | 1.34 |

We recognize that the results of the EPA modeling released in the March 2018 memorandum (2011 base year) and the EPA 2016v2 modeling (2016 base year) identified different receptors and linkages at Steps 1 and 2 of the 4-Step framework. These differing results about receptors and linkages can be affected by the varying meteorology from year to year, but we do not think the differing results mean that the modeling or the EPA methodology for identifying receptors or linkages is inherently unreliable. Rather, these separate modeling runs indicated (1) that there were receptors that would struggle with nonattainment or maintenance in the future, and (2) that Arkansas was linked to some set of these receptors, even if the receptors and linkages differed from one another in their specifics (e.g., a different set of receptors were identified to have nonattainment or maintenance problems, or Arkansas was linked to different receptors in one modeling run versus another). We think this common result indicates that Arkansas's emissions were substantial enough to generate linkages at Steps 1 and 2 to some set of downwind receptors, under varying assumptions and meteorological conditions, even if the precise set of linkages changed between modeling runs. Under these circumstances, we think it is appropriate to proceed to a Step 3 analysis to determine what portion of Arkansas's emissions should be deemed "significant." In doing so, we are not concluding our own earlier

modeling results included in EPA's March 2018 memorandum to be of equal reliability relative to more recent EPA 2016v2 modeling. However, where alternative or older modeling generated linkages, even if those linkages differ from linkages in EPA 2016v2 modeling, that information provides further evidence, not less, in support of a conclusion that the state is required to proceed to Step 3 to further evaluate its emissions.

### 4. Evaluation of Information Provided by ADEQ Regarding Step 3

At Step 3 of the 4-Step framework, a state's emissions are further evaluated, in light of multiple factors, including air quality and cost considerations, to determine what, if any, emissions contribute significantly to nonattainment or interfere with maintenance and, thus, must be eliminated under CAA section 110(a)(2)(D)(i)(I).

ADEQ included in their SIP submission a further analysis of its modeled linkage to Allegan, MI (the only linked receptor it analyzed, based on its application of a 1 ppb threshold). Arkansas stated that the purpose and its conclusion of this analysis was that it would not contribute significantly to the Allegan, MI monitor because the state's emissions did not result in a consistent and persistent pattern of ozone contribution. As stated earlier, EPA 2016v2 modeling projects that the Allegan County, MI receptor will be

attaining and is not expected to have difficulty maintaining the standard in 2023. As such, the EPA is not relying on the comparative analysis of emissions trends that ADEQ provided in order to conclude that Arkansas's emissions do not contribute significantly to a nonattainment or maintenance problem in Allegan, MI. We note however, that ADEQ's SIP submission and response to comments do not clearly define what ADEQ considers to be persistent and consistent pattern of contribution. Rather, the SIP submission simply states that contribution should be deemed "significant" only if there is a persistent and consistent pattern of several days with elevated ozone.

To be clear, the modeling establishing linkages of Arkansas to downwind nonattainment and maintenance receptors already establishes that there is a consistent and persistent pattern of contribution on elevated ozone days from Arkansas to other states. That is because EPA's methodology for projecting future year ozone concentrations accounts for precisely these concerns—the relative response factor[53] that is applied to historic monitored data to generate projections is calculated by looking only at days with elevated ozone levels (ten days is preferred with a minimum of five days). The EPA notes that monitored attainment with the ozone standard is determined by averaging the fourth high value recorded each year for three years. So, the EPA believes it is important to

[51] These modeling results are consistent with the results of a prior round of 2023 modeling using the 2016v1 emissions platform which became available to the public in the fall of 2020 in the Revised CSAPR Update, as noted in Section I of this action. That modeling showed that Arkansas had a maximum contribution greater than 0.70 ppb to at least one nonattainment or maintenance-only receptor in 2023. These modeling results are included in the file "Ozone Design Values And Contributions Revised CSAPR Update.xlsx" in docket EPA–HQ–OAR–2021–0663.

[52] Allegan County Monitor ID. 260050003 is not a receptor in 2023 in the EPA 2016v2 modeling. 2023 avg DV is 67.3 ppb and 2023 Max. DV is 68.4 ppb, so the Allegan County monitor is not a receptor in 2023 for nonattainment or maintenance.

[53] The relative response factor (RRF) is a ratio developed using the modeled changes between the base case and future case for high ozone modeled days. Typically, the 10 highest MDA8 modeled days in the base case are found and the maximum value from the 3x3 grid centered on the monitor for each day is used to calculate a 10-day average base case

modeled value. Then a similar concentration average is developed for same 10 base case days and the same grid cell that provided the base case concentration to calculate a future year 10-day average modeled value using the future year modeling results. The RRF is then calculated by using this future year 10-day average model value divided by the base case 10-day average model value to develop a ratio representing the change in modeled ozone. The RRF is then multiplied times the base DV value to result in a projected future year DV.

estimate impacts on the days with highest projected ozone levels. The EPA's approach, as detailed in the Air Quality Modeling Technical Support Document for 2015 Ozone NAAQS Transport SIP Proposed Actions included in Docket ID No. EPA–HQ–OAR–2021–0663, does this by estimating the average fy 2023 impact from an upwind state on the days with the highest projected ozone levels at the downwind nonattainment or maintenance receptor. The days chosen to analyze the future impacts are chosen initially by the selecting the ten highest days in the base period modeling that are projected to be above 65 ppb in the base period. If there are not ten days above 65 ppb at a potential receptor, the number of days above 65 ppb are used as long as there is at least five days above 65 ppb in the base period. If the air quality modeling shows fewer than five days above 65 ppb in the base period, then the data for impacts at that receptor in fy 2023 are not calculated. The base and future year modeling for these five to ten days is then used to project fy 2023 ozone DVs to determine whether it is projected to be a nonattainment or maintenance receptor in 2023. For the same five to ten days identified, the future year modeling provides the estimated daily contribution at a potential receptor's future year daily MDA8 and these daily contributions are averaged for the five to ten days to result in the average contribution from the upwind area.

As mentioned previously, ADEQ used HYSPLIT back trajectories to assess wind patterns on elevated ozone days in an attempt to demonstrate that there is not persistent and consistent pattern of contribution from Arkansas to the Allegan County, MI receptor. HYSPLIT back trajectory analyses use archived meteorological modeling that includes actual observed data (surface, upper air, airplane data, etc.) and modeled meteorological fields to estimate the most likely route of an air parcel transported to a receptor at a specified time. The method essentially follows a parcel of air backward in hourly steps for a specified length of time. HYSPLIT estimates the central path in both the vertical and horizontal planes. The HYSPLIT central path represents the centerline with the understanding that there are areas on each side horizontally and vertically that also contribute to the concentration at the end point monitor. The horizontal and vertical areas that potentially contribute to the end point concentration grow wider from the centerline the further back in time the trajectory goes. Therefore, a HYSPLIT

centerline does not have to pass directly over emissions sources or emission source areas but merely relatively near emission source areas for those areas to contribute to concentrations at the endpoint. The EPA relies on back trajectory analysis as a corollary analysis along with observation-based meteorological wind fields at multiple heights to examine the general plausibility of the photochemical model "linkages." Since the back trajectory calculations do not account for any air pollution formation, dispersion, transformation, or removal processes as influenced by emissions, chemistry, deposition, etc., the trajectories cannot be used to develop quantitative contributions. Therefore, back trajectories cannot be used to quantitatively evaluate the magnitude of the existing photochemical contributions from upwind states to downwind receptors. Chemical transport models, such as the one relied upon by Arkansas to establish the linkage between Arkansas and those downwind receptors in the first instance, do take these factors into account and therefore provide a more robust assessment of ozone contribution.

During ADEQ's public comment period, the EPA submitted comments noting concerns regarding the methodology ADEQ used in their HYSPLIT back trajectories analysis.[54] While we are not providing a detailed evaluation of ADEQ's HYSPLIT analysis in this rulemaking, we do note that our review identified a number of concerns with how ADEQ screened out a number of back trajectories, which invalidates ADEQ's conclusions.[55] While we disagree with ADEQ's methodologies and conclusions, we note that ADEQ's

HYSPLIT back trajectory information did not show that the base years used in the EPA modeling (2011 and 2016) demonstrated an unusual amount of transport of air parcels from Arkansas to nonattainment or maintenance receptors in downwind states (*i.e.,* the modeling years used by the EPA do not skew the results toward finding linkages).[56] Therefore, although Arkansas asserted that its additional air quality factor analysis using back trajectory analysis is a permissible way to interpret which contributions are "significant" because that analysis examines whether there was a "persistent and consistent pattern of contribution on several days with elevated ozone," the modeled linkage at Step 2 is a superior approach for assessing the persistence of a state's contribution. It is superior because it is based on the average of the contributions on the five to ten highest ozone days. Considering the form of the standard, this is a sufficient number of days to determine if an impact is persistent enough to impact an area's ability to attain or maintain the standard. The modeling is also a better method because it accounts for dispersion while back trajectory analysis as performed by Arkansas only shows the centerline of air parcel travel and otherwise will leave out days when Arkansas would have contributed to downwind problems. Finally, because the modeling accounts for dispersion and chemical reactions, it can provide a quantitative estimate of contribution.

ADEQ also contested the significance of its modeled contribution above 1 ppb based on the relatively larger contributions of other upwind states to the receptor to which it was linked. The EPA disagrees that a state's small contribution relative to other upwind states is a permissible basis for finding no obligation under the interstate transport provision. CAA 110(a)(2)(D)(i)(I) requires states and the EPA to address interstate transport of air pollution that *contributes to* downwind states' ability to attain and maintain the NAAQS. Whether emissions from other states also contribute to the same downwind air quality issue is irrelevant in assessing whether a downwind state has an air quality problem, or whether an upwind state is significantly contributing to that problem. States are not obligated under CAA section 110(a)(2)(D)(i)(I) to reduce emissions sufficient on their own to resolve

[54] The EPA reviewed the ADEQ SIP submission and provided comments during the State's public comment period for the proposed SIP action. The EPA's comment letter and ADEQ's response to comments are included in ADEQ's October 19, 2019, SIP submission, which is available in the Regional docket for this action (Docket ID No. EPA–R06–OAR–2021–0801).

[55] Concerns included removing of HYSPLIT back trajectories based on start height, the start time that Arkansas used for the back trajectories and removing of back trajectories when the centerline passed near but not through Arkansas because Arkansas has some very large point sources near the Arkansas state line that could be contributing. Texas also screened their HYPSLIT back trajectories similarly to Arkansas and we have further discussed our concerns and why such screening invalidates conclusions from the HYSPLIT back trajectory analyses. *See* EPA's review and conclusions in discussion of TCEQ's HYSPLIT analyses in the "EPA Region 6 2015 8-Hour Ozone Transport SIP Proposal Technical Support Document" (EPA Region 6 2015 Ozone Transport SIP TSD.pdf) included in the Regional docket for this action (Docket ID No. EPA–R06–OAR–2021–0801).

[56] ADEQ's summary of trajectories indicated that 2011 had three linked back trajectories and 2016 had one linked back trajectories and the EPA calculated the average for 2008–2017 in ADEQ's table was 2.2 linked back trajectories per year.

downwind receptors' nonattainment or maintenance problems. Rather, states are obligated to eliminate their own ''significant contribution'' or ''interference'' with the ability of other states to attain or maintain the NAAQS. Indeed, the D.C. Circuit in *Wisconsin* specifically rejected arguments suggesting that upwind states should be excused from interstate transport obligations on the basis that some other source of emissions (whether international or another upwind state) could be considered the ''but-for'' cause of downwind air quality problem. 938 F.3d 303 at 323–324. The court viewed these arguments as essentially an argument ''that an upwind State 'contributes significantly' to downwind nonattainment only when its emissions are the sole cause of downwind nonattainment.'' 938 F.3d 303 at 324. The court explained that ''an upwind State can 'contribute' to downwind nonattainment even if its emissions are not the but-for cause.'' *Id.* At 324–325. *See also Catawba County* v. *EPA,* 571 F.3d 20, 39 (D.C. Cir. 2009) (rejecting the argument ''that 'significantly contribute' unambiguously means 'strictly cause''' because there is ''no reason why the statute precludes EPA from determining that [an] addition of [pollutant] into the atmosphere is significant even though a nearby county's nonattainment problem would still persist in its absence''); *Miss. Comm'n on Envtl. Quality* v. *EPA,* 790 F.3d 138, 163 n.12 (D.C. Cir. 2015) (observing that the argument that ''there likely would have been no violation at all . . . if it were not for the emissions resulting from [another source]'' is ''merely a rephrasing of the but-for causation rule that we rejected in *Catawba County.*''). Therefore, a state is not excused from eliminating its significant contribution on the basis that emissions from other states also contribute some amount of pollution to the same receptors to which the state is linked.

ADEQ did not provide additional analysis for other receptors to which it was linked above 1 percent in the air quality modeling upon which it relied, and to which it continues to be linked in EPA 2016v2 modeling. To effectively evaluate which emissions in the state should be deemed ''significant'' and therefore prohibited, states generally should prepare an accounting of sources and other emissions activity for relevant pollutants and assess potential, additional emissions reduction opportunities and resulting downwind air quality improvements. The EPA has consistently applied this general

approach (*i.e.,* Step 3 of the 4-Step interstate transport framework) when identifying emissions contributions that the Agency has determined to be ''significant'' (or interfere with maintenance) in each of its prior Federal, regional ozone transport rulemakings, and this interpretation of the statute has been upheld by the Supreme Court. *See EME Homer City,* 572 U.S. 489, 519 (2014). While the EPA has not directed states that they must conduct a Step 3 analysis in precisely the manner the EPA has done in its prior regional transport rulemakings, state implementation plans addressing the obligations in CAA section 110(a)(2)(D)(i)(I) must prohibit ''any source or other type of emissions activity within the State'' from emitting air pollutants which will contribute significantly to downwind air quality problems. Thus, states must complete something similar to the EPA's analysis (or an alternative approach to defining ''significance'' that comports with the statute's objectives) to determine whether and to what degree emissions from a state should be ''prohibited'' to eliminate emissions that will ''contribute significantly to nonattainment in, or interfere with maintenance of'' the NAAQS in any other state. As discussed below, ADEQ did not conduct an adequate analysis in their SIP submission. We therefore propose that ADEQ was required to analyze emissions from the sources and other emissions activity from within the State to determine whether its contributions were significant, and we propose to disapprove its submission because Arkansas failed to adequately do so.

In analyzing potential additional $NO_X$ controls, ADEQ found that additional controls on its EGUs would exceed the cost-effectiveness thresholds identified in the CSAPR and CSAPR Update rules. For the cost analysis, Arkansas only focused on the potential costs of $NO_X$ controls for EGUs. As stated above, Arkansas found that the costs to install additional $NO_X$ controls (selective catalytic reduction, SCR, and selective noncatalytic reduction, SNCR) at electric generating units (EGUs) exceed EPA's cost thresholds used for the CSAPR and CSAPR Update rules. Based on the projected cost of these controls relative to the thresholds used in those two prior EPA rules, Arkansas concluded that no new controls beyond those Federal and State regulations already in existence were cost-effective, especially considering that Allegan County, MI is projected to be in attainment with the 2015 ozone NAAQS

and Arkansas's small contribution relative to other states potentially linked to Allegan County, MI based on EPA's modeling.

Arkansas's analysis is inadequate because its focus is only on EGUs.[57] *See Wisconsin,* 938 F.3d at 318–20. We also find Arkansas's conclusions as to the availability of cost-effective controls for EGUs to be inadequate. Relying on the CSAPR Update's (or any other CAA program's) determination of cost-effectiveness without further Step 3 analysis is not approvable. Cost-effectiveness must be assessed in the context of the specific CAA program; assessing cost-effectiveness in the context of ozone transport should reflect a more comprehensive evaluation of the nature of the interstate transport problem, the total emissions reductions available at several cost thresholds, and the potential air quality impacts of those reductions at downwind receptors. While the EPA has not established a benchmark cost-effectiveness value for 2015 ozone NAAQS interstate transport obligations, because the 2015 ozone NAAQS is a more stringent and more protective air quality standard, it is reasonable to expect control measures or strategies to address interstate transport under this NAAQS to reflect higher marginal control costs. ADEQ's submission failed to provide a justification for why the $1400/ton threshold used in the CSAPR Update is appropriate to rely on for the 2015 ozone NAAQS. ADEQ's analysis does not consider any air quality impacts of assessed controls at downwind receptors. As stated above, assessing cost-effectiveness in the context of ozone transport requires more than just assessing the cost of controls per ton of $NO_X$ removed. As such, ADEQ's assessment of the cost of controls and reliance on the marginal cost threshold of $1,400/ton used for the CSAPR Update is inadequate. Furthermore, EPA 2016v2 modeling captures all existing CSAPR trading programs in the baseline and confirms that these control programs were not sufficient to eliminate Arkansas's linkage at Steps 1 and 2 under the 2015 ozone NAAQS. The State was therefore obligated at Step 3 to assess *additional* control measures using a multifactor analysis.

---

[57] In 2017, National Emission Inventory (NEI) $NO_X$ emissions from EGU sources represent 56% percent of the total NOx emissions categories in Arkansas that report emissions to the NEI. *See* AR NOx.xlsx datasheet included in the Regional docket for this action (Docket ID No. EPA–R06–OAR–2021–0801).

5. Evaluation of Information Provided by ADEQ Regarding Step 4

Step 4 of the 4-Step interstate transport framework calls for the development of permanent and federally enforceable control strategies to achieve the emissions reductions determined to be necessary at Step 3 to eliminate significant contribution to nonattainment or interference with maintenance of the NAAQS. ADEQ's SIP submission, which looked only at additional $NO_X$ controls at EGUs and dismissed such controls as not cost-effective relative to the thresholds established in earlier EPA transport rules, did not constitute an adequate emission reduction analysis at Step 3. Based on its conclusions, ADEQ did not revise its SIP to include any emission reductions. As a result, the EPA proposes to disapprove ADEQ's submittal on the separate, additional basis that Arkansas has not developed or included permanent and enforceable emissions reductions in its SIP necessary to meet the obligations of CAA section 110(a)(2)(D)(i)(I).

6. Conclusion

Based on the EPA's evaluation of ADEQ's SIP submission, the EPA is proposing to find that ADEQ's October 19, 2019, SIP submission addressing CAA section 110(a)(2)(D)(i)(I) does not meet the State's interstate transport obligations because it fails to contain the necessary provisions to eliminate emissions that will contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in any other state.

### III. Louisiana SIP Submission Addressing Interstate Transport of Air Pollution for the 2015 Ozone NAAQS and the EPA Evaluation of the SIP Submission

*A. Summary of LDEQ SIP Submission Addressing Interstate Transport of Air Pollution for the 2015 Ozone NAAQS*

On November 13, 2019, the Louisiana Department of Environmental Quality

(LDEQ) made a SIP submission addressing the State of Louisiana's interstate transport of air pollution for the 2015 ozone NAAQS. The SIP submission provided LDEQ's analysis of Louisiana's impact to downwind states and concluded that emissions from Louisiana will not contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in other states.

The LDEQ's SIP submission provided an analysis of Louisiana's air emissions impact to downwind states using a 3-Step alternative framework similar to the EPA's 4-Step framework. LDEQ's 3-Step alternative framework includes: Step 1: Identify monitors projected to be in nonattainment or have maintenance issues in a future year; Step 2: Identify projected nonattainment and/or maintenance monitors in other states that might be impacted by emissions from Louisiana, tagging them for further review; and, Step 3: Determine if emissions from Louisiana contribute significantly to nonattainment or interfere with maintenance at the monitors tagged for review in Step 2. LDEQ noted that its Step 1 is identical to the EPA's Step 1, and its Steps 2 and 3 are equivalent to the EPA's Step 2. Louisiana further noted that Steps 3 and 4 of the EPA's 4-Step framework are relevant only if emissions from Louisiana contribute significantly to nonattainment or interfere with maintenance at downwind monitors in another state.

LDEQ's Step 1 was to identify downwind monitors projected to be in nonattainment and/or have maintenance issues in future year 2023 (fy 2023). At this step, LDEQ relied on the EPA's interstate transport modeling results that are included as an attachment to the March 2018 memorandum. The EPA March 2018 modeling results provided: (1) Projected average DV and maximum DV for 2023 for the ozone monitors (or "receptors") in the 48 contiguous states and (2) the expected contribution of

state emissions to the projected ozone concentrations at each ozone monitor.

LDEQ used a contribution threshold of 1 ppb in LDEQ's Step 2 to identify projected nonattainment and/or maintenance receptors in other states that might be impacted by emissions from Louisiana and tagged them for further review. To support a 1 ppb contribution threshold, LDEQ's submission stated that a 1 percent threshold is inappropriate because that value is not detectable by a monitor and the value of 1 percent of the 2015 ozone NAAQS would be truncated to zero if calculated in accordance with the method for determining DVs for the ozone NAAQS. LDEQ also stated that the more stringent threshold of 1 percent of the NAAQS (0.7 ppb) is an order of magnitude smaller than the biases and errors typically documented for regional photochemical modeling.[58] Based on LDEQ's approach of evaluating linkages at the 1 ppb threshold, five Texas receptors were identified by Louisiana for analysis. The Texas receptors and corresponding receptor data presented in Louisiana's SIP are summarized further in this notice in Table LA–1.[59] The March 2018 memorandum identified monitors in Allegan, Michigan and Milwaukee and Sheboygan, Wisconsin as potential nonattainment and maintenance-only receptors linked to emissions from Louisiana based on 1 percent of the NAAQS threshold. However, Louisiana did not include the Allegan, Michigan and Milwaukee and Sheboygan, Wisconsin receptors in the State's analysis because the March 2018 memorandum shows that Louisiana's projected modeled contribution values to each receptor is less than 1 ppb.

TABLE LA–1—PROJECTED NONATTAINMENT AND MAINTENANCE RECEPTORS IDENTIFIED BY LOUISIANA BASED ON THE EPA'S MARCH 2018 MEMORANDUM

| Receptor (site ID, county, state) | 2023 Average DV (ppb)[60] | 2023 Maximum DV (ppb)[61] | Louisiana Contribution (ppb) |
|---|---|---|---|
| 480391004, Brazoria, TX | 74.0 | 74.9 | 3.80 |

[58] The Louisiana SIP submittal did not provide a specific citation to the Simon et al., 2012 reference to support this assertion. However, we believe the reference is associated with the following article: Simon, H., Baker, K.R., Phillips, S., 2012. "Compilation and interpretation of photochemical model performance statistics published between 2006 and 2012". Atmospheric Environment 61, 124–139.

[59] The five potential nonattainment and maintenance receptor monitors identified by LDEQ are from the Dallas-Fort Worth and Houston-Galveston-Brazoria, TX nonattainment areas for the

2015 ozone NAAQS. The Louisiana SIP submittal appears to have inadvertently omitted Harris County, TX Monitor ID No. 482011034 for analysis. EPA's March 2018 memorandum identified this monitor as a maintenance receptor with a contribution of 3.38 ppb from Louisiana emissions.

TABLE LA–1—PROJECTED NONATTAINMENT AND MAINTENANCE RECEPTORS IDENTIFIED BY LOUISIANA BASED ON THE EPA'S MARCH 2018 MEMORANDUM—Continued

| Receptor (site ID, county, state) | 2023 Average DV (ppb)[60] | 2023 Maximum DV (ppb)[61] | Louisiana Contribution (ppb) |
|---|---|---|---|
| 482011039, Harris, TX | 71.8 | 73.5 | 4.72 |
| 484392003, Tarrant, TX | 72.5 | 74.8 | 1.71 |
| 481210034, Denton, TX | 69.7 | 72.0 | 1.92 |
| 482010024, Harris, TX | 70.4 | 72.8 | 4.72 |

ForLDEQ's Step 3, Louisiana stated that an air emission contribution from the State should only be considered significant if there is a persistent and consistent pattern of contribution on several days with elevated ozone. In trying to determine whether there is a persistent and consistent pattern of contribution, LDEQ analyzed seasonal weather patterns, surface wind directions, and periodic back trajectories. LDEQ used the National Oceanic and Atmospheric Administration (NOAA) Hybrid Single Particle Lagrangian Integrated Trajectory (HYSPLIT)[62] model to perform 99 back trajectories for exceedances from the receptor monitors identified in Table LA–1 for 2016, 2017, and 2018. Based on an analysis of the HYSPLIT results, LDEQ stated that approximately 28% of the trajectories travel in or through Louisiana, and only 8% of those back trajectories originate in the State. The SIP submission also stated that a comparison of the EPA's modeled contribution between Texas and Louisiana monitors indicates that a far greater proportion of the total ozone detected in Louisiana originates in Texas rather than vice versa. Therefore, Louisiana concluded that the impact from the State's air emissions was insignificant to the overall attainment at the receptor monitors identified in Table LA–1 and does not significantly contribute to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in other states.

*B. EPA Evaluation of the LDEQ SIP Submission*

The EPA is proposing to find that LDEQ's November 13, 2019, SIP submission does not meet the State's obligations with respect to prohibiting emissions that contribute significantly to nonattainment or interfere with maintenance of the 2015 NAAQS in any other state based on the EPA's evaluation of the SIP submission using the 4-Step interstate transport

framework, and the EPA is therefore proposing to disapprove Louisiana's SIP submission.

1. Evaluation of Information Provided by LDEQ Regarding Steps 1 and 2

At Step 1 of the 4-Step interstate transport framework, LDEQ relied on EPA modeling released in the March 2018 memorandum to identify nonattainment and maintenance receptors in 2023. At Step 2 of the 4-Step interstate transport framework, LDEQ relied on the EPA modeling released in the March 2018 memorandum to identify upwind state linkages to nonattainment and maintenance receptors in 2023. LDEQ additionally utilized a 1 ppb threshold at Step 2 to identify whether the state was "linked" to a projected downwind nonattainment or maintenance receptor. As discussed in the EPA's August 2018 memorandum, with appropriate additional analysis it may be reasonable for states to use a 1 ppb contribution threshold, as an alternative to a 1 percent threshold, at Step 2 of the 4-Step interstate transport framework, for the purposes of identifying linkages to downwind receptors. In any case, the State is projected to contribute greater than both the 1 percent and the alternative 1 ppb thresholds to receptors in Texas, regardless of whether we look at LDEQ's analysis (which relied on the EPA's older modeling) or updated modeling the EPA has performed in advance of this proposal. As seen in the tables LA–1 and LA–2, Louisiana contributes nearly five times the 1 ppb threshold to nonattainment or maintenance receptors in Texas. Therefore, while the EPA does not, in this action, approve of the State's application of a 1 ppb threshold, because the State has linkages greater than 1 ppb to projected downwind nonattainment or maintenance receptors, the State's use of this alternative threshold at Step 2 of the 4-Step interstate framework would not alter our review and proposed disapproval of this SIP submittal.

The EPA here shares further evaluation of its experience since the

issuance of the August 2018 memorandum regarding use of alternative thresholds at Step 2. This experience leads the Agency to now believe it may not be appropriate to continue to attempt to recognize alternative contribution thresholds at Step 2. The August 2018 memorandum stated that "it may be reasonable and appropriate" for states to rely on an alternative threshold of 1 ppb threshold at Step 2.[63] (The memorandum also indicated that any higher alternative threshold, such as 2 ppb, would likely not be appropriate.) However, the EPA also provided that "air agencies should consider whether the recommendations in this guidance are appropriate for each situation." Following receipt and review of 49 interstate transport SIP submittals for the 2015 ozone NAAQS, the EPA's experience has been that nearly every state that attempted to rely on a 1 ppb threshold did not provide sufficient information and analysis to support a determination that alternative threshold was reasonable or appropriate for that state.

For instance, in nearly all submittals, the states did not provide the EPA with analysis specific to their state or the receptors to which its emissions are potentially linked. In one case, the proposed approval of Iowa's SIP submittal, the EPA expended its own resources to attempt to supplement the information submitted by the state, in order to more thoroughly evaluate the state-specific circumstances that could support approval.[64] The Agency no longer intends to undertake supplemental analysis of SIP submittals with respect to alternative thresholds at Step 2 for purposes of the 2015 ozone NAAQS.

Furthermore, the EPA's experience since 2018 is that allowing for alternative Step 2 thresholds may be

---

[60] Information added from the EPA's March 2018 memorandum.

[61] *Id.*

[62] *See* FN 34.

[63] *See* August 2018 memorandum, at page 4.

[64] "Air Plan Approval; Iowa; Infrastructure State Implementation Plan Requirements for the 2015 Ozone National Ambient Air Quality Standard", 85 FR 12232 (March 2, 2020). The Agency received adverse comments on this proposed approval and has not taken final action with respect to this proposal.

impractical or otherwise inadvisable for a number of additional policy reasons. For a regional air pollutant such as ozone, consistency in requirements and expectations across all states is essential. Based on its review of submittals to-date and after further consideration of the policy implications of attempting to recognize an alternative Step 2 threshold for certain states, the Agency now believes the attempted use of different thresholds at Step 2 with respect to the 2015 ozone NAAQS raises substantial policy consistency and practical implementation concerns.[65] The availability of different thresholds at Step 2 has the potential to result in inconsistent application of interstate transport obligations based solely on the strength of a state's SIP submittal at Step 2 of the 4-Step interstate transport framework. From the perspective of ensuring effective regional implementation of interstate transport obligations, the more important analysis is the evaluation of the emissions reductions needed, if any, to address a state's significant contribution after consideration of a multifactor analysis at Step 3, including a detailed evaluation that considers air quality factors and cost. Where alternative thresholds for purposes of Step 2 may be ''similar'' in terms of capturing the relative amount of upwind contribution (as described in the August 2018 memorandum), nonetheless, use of an alternative threshold would allow certain states to avoid further evaluation of potential emission controls while other states must proceed to a Step 3 analysis. This can create significant equity and consistency problems among states.

Further, it is not clear that national ozone transport policy is best served by allowing for less stringent thresholds at Step 2. The EPA recognized in the August 2018 memorandum that there was some similarity in the amount of total upwind contribution captured (on a nationwide basis) between 1 percent and 1 ppb. However, the EPA notes that while this may be true in some sense, that is not a compelling basis to move to a 1 ppb threshold. Indeed, the 1 ppb threshold has the disadvantage of losing a certain amount of total upwind contribution for further evaluation at Step 3 (*e.g.*, roughly seven percent of total upwind state contribution was lost according to the modeling underlying the August 2018 memorandum;[66] in the EPA's updated modeling, the amount lost is five percent). Considering the core statutory objective of ensuring elimination of all significant contribution to nonattainment or interference of the NAAQS in other states and the broad, regional nature of the collective contribution problem with respect to ozone, there does not appear to be a compelling policy imperative in allowing some states to use a 1 ppb threshold while others rely on a 1 percent of NAAQS threshold.

Consistency with past interstate transport actions such as CSAPR, and the CSAPR Update and Revised CSAPR Update rulemakings (which used a Step 2 threshold of 1 percent of the NAAQS for two less stringent ozone NAAQS), is also important. Continuing to use a 1 percent of NAAQS approach ensures that as the NAAQS are revised and made more stringent, an appropriate increase in stringency at Step 2 occurs, so as to ensure an appropriately larger amount of total upwind-state contribution is captured for purposes of fully addressing interstate transport. *Accord* 76 FR 48237–38.

Therefore, notwithstanding the August 2018 memorandum's recognition of the potential viability of alternative Step 2 thresholds, and in particular, a potentially applicable 1 ppb threshold, the EPA's experience since the issuance of that memorandum has revealed substantial programmatic and policy difficulties in attempting to implement this approach. Nonetheless, the EPA is not at this time rescinding the August 2018 memorandum. The basis for a proposed disapproval of LDEQ's SIP submission with respect to the Step 2 analysis we believe is warranted under the terms of the August 2018 memorandum. The EPA invites comment on this broader discussion of issues associated with alternative thresholds at Step 2. Depending on public comments received and further evaluation of this issue, the EPA may determine to rescind the 2018 memorandum in the future.

2. Results of the EPA's Step 1 and Step 2 Modeling and Findings for Louisiana

As described in Section I of this action, the EPA performed air quality modeling using the 2016v2 emissions platform to project DVs and contributions for 2023.[67] This data was examined to determine if Louisiana contributes at or above the threshold of 1 percent of the 2015 ozone NAAQS (0.70 ppb) to any downwind nonattainment or maintenance receptor. As shown in Table LA–2, the data[68] indicate that in 2023, emissions from Louisiana contributed greater than 1 percent of the standards to nonattainment or maintenance-only receptors in Texas.[69] Therefore, based on the EPA's evaluation of the information submitted by LDEQ, and based on the EPA's most recent modeling results for 2023, the EPA proposes to find that Louisiana is linked at Steps 1 and 2 and has an obligation to assess potential emissions reductions from sources or other emissions activity at Step 3 of the 4-Step framework.

TABLE LA–2—PROJECTED NONATTAINMENT AND MAINTENANCE RECEPTORS WITH LOUISIANA LINKAGES BASED ON EPA 2016v2 MODELING

| Receptor (site ID, county, state) | Nonattainment/maintenance | 2023 Average DV (ppb) | 2023 Maximum DV (ppb) | Louisiana Contribution (ppb) |
|---|---|---|---|---|
| 482010024, Harris, TX ................................. | Nonattainment ................................................. | 75.2 | 76.8 | 4.31 |
| 482010055, Harris, TX ................................. | Nonattainment ................................................. | 71.0 | 72.0 | 5.39 |
| 480391004, Brazoria, TX ............................. | Maintenance ................................................. | 70.1 | 72.3 | 7.03 |

[65] We note that Congress has placed on the EPA a general obligation to ensure the requirements of the CAA are implemented consistently across states and regions. *See* CAA section 301(a)(2). Where the management and regulation of interstate pollution levels spanning many states is at stake, consistency in application of CAA requirements is paramount.

[66] *See* August 2018 memorandum, at page 4.

[67] Per the instructions in the Supplementary Information section above, all public comments, including comments on the EPA's air quality

modeling should be submitted in the Regional docket for this action, Docket ID No. EPA–R06–OAR–2021–0801. Comments are not being accepted in Docket No. EPA–HQ–OAR–2021–0663.

[68] DVs and contributions at individual monitoring sites nationwide are provided in the file: ''2016v2_DVs_state_contributions.xlsx'', which is included in Docket ID No. EPA–HQ–OAR–2021–0663.

[69] These modeling results are consistent with the results of a prior round of 2023 modeling using the 2016v1 emissions platform, which became available

to the public in the fall of 2020 in the Revised CSAPR Update, as noted in Section I of this action. That modeling showed that Louisiana had a maximum contribution greater than 0.70 ppb to at least one nonattainment or maintenance-only receptor in 2023. These modeling results are included in the file ''Ozone DVs And Contributions Revised CSAPR Update.xlsx'' in Docket No. EPA–HQ–OAR–2021–0663.

TABLE LA–2—PROJECTED NONATTAINMENT AND MAINTENANCE RECEPTORS WITH LOUISIANA LINKAGES BASED ON EPA 2016v2 MODELING—Continued

| Receptor (site ID, county, state) | Nonattainment/ maintenance | 2023 Average DV (ppb) | 2023 Maximum DV (ppb) | Louisiana Contribution (ppb) |
|---|---|---|---|---|
| 481210034, Denton, TX ................................ | Maintenance ...................................................... | 70.4 | 72.2 | 3.22 |
| 482011034, Harris, TX ................................ | Maintenance ...................................................... | 70.3 | 71.6 | 4.93 |
| 482011035, Harris, TX ................................ | Maintenance ...................................................... | 68.0 | 71.6 | 4.77 |

3. Evaluation of Information Provided by LDEQ Regarding Step 3

At Step 3 of the 4-Step interstate transport framework, a state's emissions are further evaluated, in light of multiple factors, including air quality and cost considerations, to determine what, if any, emissions contribute significantly to nonattainment or interfere with maintenance and, thus, must be eliminated under CAA section 110(a)(2)(D)(i)(I).

To effectively evaluate which emissions in the state should be deemed "significant" and therefore prohibited, states generally should prepare an accounting of sources and other emissions activity for relevant pollutants and assess potential, additional emissions reduction opportunities and resulting downwind air quality improvements. The EPA has consistently applied this approach (i.e., Step 3 of the 4-Step interstate transport framework) when identifying emissions contributions that the Agency has determined to be "significant" (or interfere with maintenance) in each of its prior Federal, regional ozone transport rulemakings, and this interpretation of the statute has been upheld by the Supreme Court. See EME Homer City, 572 U.S. 489, 519 (2014). While the EPA has not directed states that they must conduct a Step 3 analysis in precisely the manner the EPA has done in its prior regional transport rulemakings, state implementation plans addressing the obligations in CAA section 110(a)(2)(D)(i)(I) must prohibit "any source or other type of emissions activity within the State" from emitting air pollutants which will contribute significantly to downwind air quality problems. Thus, states must complete an analysis similar to the EPA's (or an alternative approach to defining "significance" that comports with CAA requirements) to determine whether, and to what degree, emissions from a state should be "prohibited" to eliminate emissions that will "contribute significantly to nonattainment, or interfere with maintenance of" the NAAQS in any other state. LDEQ did not conduct such

an analysis in their SIP submission. Instead LDEQ interpreted the Act's requirements as only requiring an analysis of emission reductions where there was a "consistent and persistent" pattern of contribution and conducted an air-quality-only analysis in order to refute such a pattern. We propose to find that LDEQ was required to analyze emissions from the sources and other emissions activity from within Louisiana to determine whether its contributions were significant, and we propose to disapprove its submission because LDEQ did not do so.

As noted, LDEQ stated in its SIP submission that emissions from Louisiana should not be considered to contribute significantly to nonattainment or interfere with maintenance of the NAAQS in other states because there is not a "persistent and consistent" pattern of contribution from the State. The SIP submission does not explain what LDEQ considers to be a persistent and consistent pattern of contribution, even after the LDEQ received a comment during its state comment period that requested that the LDEQ define "persistent and consistent" in terms of impacts on downwind states. The LDEQ responded, "Louisiana has defined the pattern and has provided back trajectories on those monitored exceedances for the 2016–2018 ozone seasons, which will show that the definition is applicable to the conclusion."[70] We do not agree that this suffices as an explanation as to why LDEQ does not need to further analyze its potential emission reductions under Step 3 before determining it has no statutory obligation under the interstate transport provision. In the case of Louisiana, modeling in the March 2018 memorandum and the EPA's more recent 2016v2 modeling both project that receptors in the Houston-Galveston-Brazoria (HGB) and Dallas-Fort Worth (DFW) ozone nonattainment areas in Texas will have difficulty attaining or maintaining the 2015 ozone NAAQS, and Louisiana's contribution to these

areas exceed both a 1 percent or a 1 ppb threshold. While linkages to specific receptors may change with updated modeling, both modeling analyses consistently show emissions from Louisiana impact both downwind nonattainment receptors and downwind maintenance receptors in Texas.

The LDEQ SIP submission stated that Louisiana's contribution should be deemed "significant" per CAA section 110(a)(2)(D)(i)(I) only if there is a persistent and consistent pattern of contribution on several days with elevated ozone. LDEQ asserted that its linkages to Texas do not warrant further analysis because, according to LDEQ, emissions from Louisiana do not persistently and consistently contribute on several days of elevated ozone. However, the EPA modeling that LDEQ relied upon to demonstrate linkages in the first instance already establishes that there is a consistent and persistent pattern of contribution from Louisiana to Texas receptors on elevated ozone days. The EPA's methodology for projecting future year ozone concentrations accounts for precisely these concerns—the relative response factor[71] that is applied to historic monitored data to generate projections is calculated by looking only at days with elevated ozone levels. The EPA notes that monitored attainment with the ozone standard is determined by averaging the fourth high value recorded each year for three years. So, the EPA believes it is important to estimate impacts on the days with highest projected ozone levels. The days chosen to analyze the future impacts are chosen initially by the selecting the 10 highest days in the base period modeling that are projected to be above 65 ppb in the base period. If there are not 10 days above 65 ppb at a potential receptor, the number of days above 65 ppb are used so long as there is at least five days above 65 ppb in the base period. If the air quality modeling shows fewer than five days above 65 ppb in the base period, then the data for impacts at that receptor in 2023 are not calculated. The base and future year modeling for these

---

[70] See LDEQ SIP Submission, Appendix A, available in the Regional docket for this action (Docket ID No. EPA–R06–OAR–2021–0801).

[71] See FN 53.

5–10 days are then used to project 2023 ozone DVs to determine whether it is projected to be a nonattainment or maintenance receptor in 2023. For these same 5–10 days identified, the future year modeling provides the estimated daily contribution at a potential receptor's future year daily MDA8 and these daily contributions are averaged for the 5–10 days to result in the average contribution from the upwind area.

LDEQ's air quality analysis used to dismiss its linkages to Texas receptors as not "significant" consists of an evaluation of seasonal weather patterns, surface wind directions, and periodic back trajectories. The State's weather pattern analysis relied on large-scale weather patterns as they relate to commonly observed wind directions rather than weather patterns and conditions that are specifically conducive to ozone formation or tied to specific days when high ozone was monitored in the downwind areas. General weather pattern discussions that are not associated with specific ozone episodes are not generally informative of interstate transport decisions. It is necessary to investigate specific instances of high ozone, because as discussed previously, violations of the ozone standard can be driven by as few as 4 days per year because the compliance with the standard is evaluated based on the average of the fourth high value measured each of three consecutive years.

LDEQ's wind rose analysis is based on surface sites in the Dallas-Fort Worth areas, Houston-Galveston-Brazoria areas, and other areas in Texas and Louisiana, but the analysis does not address transport winds between Louisiana and the Texas areas with receptors on high ozone days at the identified receptors. There are several limitations associated with LDEQ's wind rose analysis: (1) Wind directions measured at the surface are not necessarily good indicators of the wind direction occurring at higher elevations, which tend to have a stronger influence on interstate ozone transport; (2) wind directions change spatially over the range of distance involved in transport from Louisiana to Texas; (3) wind directions change temporally over the range of time involved in ozone transport from Louisiana to Texas; and (4) the wind roses are based on wind data measured throughout the year, not just during either ozone season or monitored ozone episode days. In addition, as discussed previously, LDEQ's wind rose analysis is not limited to the wind conditions that are conducive to high ozone, so it does not

provide information directly pertinent to when ozone is high at areas in Texas and whether Louisiana is a contributing area during those specific times.

LDEQ also included 99 back trajectory analyses during the 2016, 2017, and 2018 years for the dates of ozone exceedances at the monitors referenced in Table LA–1 of this action. HYSPLIT back trajectory analyses use archived meteorological modeling that includes actual observed data (surface, upper air, airplane data, etc.) and modeled meteorological fields to estimate the most likely route of an air parcel transported to a receptor at a specified time. The method essentially follows a parcel of air backward in hourly steps for a specified length of time. HYSPLIT estimates the central path in both the vertical and horizontal planes. The HYSPLIT central path represents the centerline with the understanding that there are areas on each side horizontally and vertically that also contribute to the concentrations at the end point. The horizontal and vertical areas that potentially contribute to concentrations at the endpoint grow wider from the centerline the further back in time the trajectory goes. Therefore, a HYSPLIT centerline does not have to pass directly over emissions sources or emission source areas but merely relatively near emission source areas for those areas to contribute to concentrations at the trajectory endpoint. The EPA relies on back trajectory analysis as a corollary analysis along with observation-based meteorological wind fields at multiple heights to examine the general plausibility of the photochemical model "linkages." Since the back trajectory calculations do not account for any air pollution formation, dispersion, transformation, or removal processes as influenced by emissions, chemistry, deposition, etc., the trajectories cannot be used to develop quantitative contributions. Therefore, back trajectories cannot be used to quantitatively evaluate the magnitude of the existing photochemical contributions from upwind states to downwind receptors. LDEQ's HYSPLIT back trajectory analysis for 2016, 2017, and 2018 showed that on high ozone days in Texas at the receptors identified by the EPA in the 2018 memorandum that 28% of the trajectories passed through Louisiana. LDEQ proffered that some of these back trajectories did not pass directly over areas with emissions but did not consider that the back trajectories only represent a centerline and there are areas on either side of the centerline that would be contributing areas. LDEQ's trajectory analysis

confirmed that Louisiana is an upwind area for the receptors in Texas often enough to potentially contribute to nonattainment or interfere with maintenance. The analysis did not provide evidence that was contrary to the conclusions of the EPA's photochemical modeling analyses (*i.e.,* the EPA's modeling results in the March 2018 memorandum and EPA 2016v2 model).

Photochemical modeling simulations for ozone interstate transport assessment is relied upon by the EPA to simulate the formation and fate of oxidant precursors, primary and secondary particulate matter concentrations, and deposition over regional and urban spatial scales. Photochemical modeling is the most sophisticated tool available to estimate future ozone levels and contributions to those modeled future ozone levels. Consideration of the different processes that affect primary and secondary pollutants at the regional scale in different locations is fundamental to understanding and assessing the effects of emissions on air quality concentrations. For the 2015 ozone NAAQS interstate transport analysis, the EPA performed nationwide, state-level ozone source apportionment modeling using CAMx to quantify the contribution of $NO_X$ and VOC emissions from all sources in each state to project 2023 ozone concentrations at ozone monitoring sites. Detailed information for the EPA's modeling may be found in the Air Quality Modeling TSD in Docket No. EPA–HQ–OAR–2021–0663.

LDEQ concluded in the SIP submittal, citing an article[72] published in 2012, that the use of 1 percent of the standard for modeled contribution as the sole definition of significant contribution is inappropriate for the 2015 ozone NAAQS. LDEQ's reasoning for this conclusion is that the more stringent 0.7 ppb threshold "is an order of magnitude smaller than the biases and errors typically documented for regional photochemical modeling." First, the EPA does not use the 1 percent threshold as the sole definition of significant contribution; at Step 2 of the analysis, the 1 percent threshold is used to identify contributions between states and downwind problem areas for further analysis at Step 3. Second, photochemical transport models such as CAMx have been extensively peer reviewed and used to support SIPs and explore relationships between inputs and air quality impacts in the U.S. and beyond. The EPA works to continually develop and update both the guidelines

---

[72] Simon et al., *supra* FN 58.

on using modeling results and the latest versions of photochemical model platforms to support scientific assessments and regulatory determinations. Prior to using photochemical modeling to support a regulatory assessment, a model performance evaluation is completed to establish a benchmark to assess how accurately the model predicts observed concentrations and to identify model limitations. The model performance evaluation provides a better understanding of the model's limitations and biases and serves as a diagnostic evaluation for further model development and improvement. As discussed in Section I of this document and the Air Quality Modeling TSD in Docket No. EPA–HQ–OAR–2021–0663, the EPA follows the most recent established modeling guidance and provides with this action the updated modeling analysis based on the recent CAMx model update. By using the most recent 2016v2 photochemical modeling enhancements (EPA 2016v2 modeling) results are more representative of the projected local and regional air quality as it is based on more recent emission estimates with fewer years between the base case year (2016) and the future year (2023). In addition, to reduce the impact of any potential biases or errors, the EPA uses the modeling results in a relative sense rather than rely on absolute model predictions.[73]

Furthermore, it is not appropriate to compare the bias/error involved in the estimation of total ozone to the potential error in the estimation of the subset of ozone that is contributed by a single state. For example, on a specific day the modeled vs. monitored ozone value may differ by 2 ppb but that is relatively small percentage of the total modeled ozone, which for a receptor of interest would be on the order of 70 ppb. It would be unrealistic to assign all the 2 ppb, in the above example, to the estimated impact from a single state as the 2 ppb error would be the combination of the error from all sources of ozone that contribute to the total, including estimated impacts from other states, the home state of the

receptor and natural background emissions.

In sum, the EPA disagrees that the estimates of potential error in the models estimates of total ozone, call into question the use of 1 percent as a threshold for linkage. As noted earlier, in the case of Louisiana, the difference between a 1 percent threshold and a 1 ppb threshold is irrelevant to the decision here because linkages are present at both threshold levels. As to Louisiana's conclusion that the impacts from Louisiana's emissions are not persistent, the contribution analysis is the average impact for at least 5 days and up to 10 days for the 2016 base period which is sufficiently persistent considering the first through fourth highest monitored values set the monitored DV.

We recognize that the results of the EPA (2011 and 2016 base year) modeling indicated different receptors and linkages at Steps 1 and 2 of the 4-Step interstate transport framework. These differing results regarding receptors and linkages can be affected by the varying meteorology from year to year, but we do not think the differing results means that the modeling or the EPA or the state's methodology for identifying receptors or linkages is inherently unreliable. Rather, these separate modeling runs all indicated: (1) That there are receptors that would struggle with nonattainment or maintenance in the future; and (2) that Louisiana is linked to some set of these receptors, even if the receptors and linkages differed from one another in their specifics (*e.g.*, Louisiana was linked to a different set of receptors in one modeling run versus another). These results indicates that Louisiana's emissions were substantial enough to generate linkages at Steps 1 and 2 to at least some set of downwind receptors, under varying assumptions and meteorological conditions, even if the precise set of linkages changed between modeling runs.

4. Evaluation of Information Provided by LDEQ Regarding Step 4

Step 4 of the 4-Step interstate transport framework calls for development of permanent and federally enforceable control strategies to achieve the emissions reductions determined to be necessary at Step 3 to eliminate significant contribution to nonattainment or interference with maintenance of the NAAQS. As mentioned previously, LDEQ's SIP submission did not contain an evaluation of additional emission control opportunities (or establish that no additional controls are required), thus, no information was provided at

Step 4. To the extent that LDEQ discussed emissions reductions, the State only provided a summary of existing already implemented enforceable control regulations. The EPA's 2016v2 modeling analyses have already accounted for the implementation of the regulations cited by LDEQ's submission—including the CSAPR rulemakings and prior regional rulemakings—and even with those reductions in place, the modeling results consistently show receptors that are projected to be in nonattainment or to struggle with maintenance, and Louisiana contributing to those receptors. Relying only on the existing enforceable control regulations is insufficient to address the Louisiana air emission contributions to linked downwind air quality problems. As a result, the EPA proposes to disapprove LDEQ's submittal on the separate, additional basis that the State has not developed permanent and enforceable emissions reductions necessary to meet the obligations of CAA section 110(a)(2)(D)(i)(I).

5. Conclusion

Based on the EPA's evaluation of LDEQ's SIP submission, the EPA is proposing to find that LDEQ's November 13, 2019, SIP submission pertaining to interstate transport of air pollution does not meet the State's interstate transport obligations because it fails to contain the necessary provisions to eliminate emissions that will contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in any other state.

**IV. Oklahoma SIP Submission Addressing Interstate Transport of Air Pollution for the 2015 Ozone NAAQS and the EPA Evaluation of the SIP Submission**

*A. Summary of ODEQ SIP Submission Addressing Interstate Transport of Air Pollution for the 2015 Ozone NAAQS*

On October 25, 2018, the Oklahoma Department of Environmental Quality (ODEQ) made a SIP submission addressing interstate transport of air pollution for the 2015 ozone NAAQS. The SIP submission provided ODEQ's analysis of their impact to downwind states using the EPA's 4-Step framework and an analytic year of 2023 and concluded that emissions from Oklahoma will not contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in other states.

To identify downwind air quality problems that are linked to emissions

---

[73] *See* ''Modeling Guidance for Demonstrating Air Quality Goals for Ozone, PM$_{2.5}$ and Regional Haze'', Nov. 29, 2018, at 101, available at *https://www.epa.gov/sites/default/files/2020-10/documents/o3-pm-rh-modeling_guidance-2018.pdf* (''2018 Air Quality Modeling Guidance''). *See also* ''Draft Modeling Guidance for Demonstrating Attainment of Air Quality Goals for Ozone, PM$_{2.5}$, and Regional Haze'', Dec. 3, 2014, at 97–98, available at *https://www.epa.gov/sites/default/files/2020-10/documents/draft-o3-pm-rh-modeling_guidance-2014.pdf* (''2014 Draft Air Quality Modeling Guidance'').

from Oklahoma and therefore warrant further review and analysis (Steps 1 and 2), ODEQ used EPA interstate transport modeling results found in the March 2018 memorandum. The EPA modeling results projected: (1) An average DV and a maximum DV for the year 2023 for ozone monitors in the 48 contiguous States and (2) the expected contribution from emissions in each state to the ozone concentrations at each ozone monitor.

ODEQ used the information from the March 2018 EPA memorandum to

identify six downwind nonattainment and maintenance receptors [74] with a contribution from Oklahoma of 1 percent of the 2015 ozone NAAQS (0.70 parts ppb) or greater. ODEQ then applied a 1 ppb threshold to remove from further analysis three receptors with a contribution from Oklahoma of less than 1 ppb. ODEQ noted that the possibility of using an alternative contribution threshold was one of the areas of flexibility identified in the March 2018 EPA memorandum and discussed further in the August 2018

EPA memorandum. To support its alternative contribution threshold, ODEQ referenced an EPA memorandum from April 17, 2018, which recommended a Significant Impact Level (SIL) for ozone of 1.0 ppb for proposed sources subject to the Prevention of Significant Deterioration (PSD) permitting program.[75] Table OK–1 provides information on the six nonattainment and maintenance receptors identified by ODEQ, including the three receptors ODEQ identified for further analysis.

TABLE OK–1—NONATTAINMENT AND MAINTENANCE RECEPTORS IDENTIFIED BY ODEQ BASED ON THE EPA'S MARCH 2018 MEMORANDUM

| Receptor (site ID, county, state) | 2023 average DV (ppb) | 2023 maximum DV (ppb) | Oklahoma contribution (ppb) | ODEQ's step 1 and 2 determination |
|---|---|---|---|---|
| 260050003, Allegan, MI ................................. | 69.0 | 71.7 | 1.31 | Maintenance receptor identified for further analysis. |
| 481210034, Denton, TX ................................. | 69.7 | 72.0 | 1.23 | Maintenance receptor identified for further analysis. |
| 484392003, Tarrant, TX ................................. | 72.5 | 74.8 | 1.71 | Nonattainment receptor identified for further analysis. |
| 480391004, Brazoria, TX ............................... | 74.0 | 74.9 | 0.90 | Nonattainment receptor with contribution less than 1 ppb; no further analysis. |
| 550790085, Milwaukee, WI .......................... | 71.2 | 73.0 | 0.76 | Nonattainment receptor with contribution less than 1 ppb; no further analysis. |
| 551170006, Sheboygan, WI .......................... | 72.8 | 75.1 | 0.95 | Nonattainment receptor with contribution less than 1 ppb; no further analysis. |

ODEQ further evaluated the two Texas receptors (Tarrant County and Denton County) and the receptor in Allegan County, MI. ODEQ did not further evaluate the contribution from Oklahoma to the receptors in Brazoria County, TX, Milwaukee County, WI, and Sheboygan County, WI because the contributions from Oklahoma to these receptors were less than 1 ppb.

For the two remaining Texas receptors, ODEQ returned to Steps 1 and 2 of the 4-Step interstate transport framework using modeling performed by the Texas Commission on Environmental Quality (TCEQ). The TCEQ modeling results are included in the Regional docket for this action (Docket ID No. EPA–R06–OAR–2021–0801). ODEQ stated that the primary difference between the EPA modeling and the TCEQ modeling is that the TCEQ modeling used 2012 as the "base year" for assessing interstate transport

of ozone pollution in 2023 whereas the EPA modeling used 2011 as the base year for that assessment. In addition, the ODEQ stated that TCEQ used a method different from the EPA's method to identify whether a monitor would have trouble maintaining the 2015 ozone NAAQS (i.e., a maintenance receptor). To identify maintenance receptors, TCEQ calculated a "maintenance future year (fy) DV" by projecting to 2023 the most recent regulatory DV that contains the base year (i.e., the 2012–2014 DV for a base year of 2012), whereas the EPA's methodology for identifying maintenance receptors uses the maximum DV, which is the highest monitored DV from among the three DVs that contain the base year (i.e., the 2009–2011, 2010–2012 and 2011–2013 DVs for a base year of 2011).

To assess whether Oklahoma is linked to nonattainment of the 2015 ozone standard at the Denton and Tarrant

County sites, ODEQ switched to using the 2023 average DV projected by TCEQ rather than the EPA's projected average DVs. The ODEQ noted that the projected 2023 average DV was 68 ppb for the Denton County site and 66 ppb for the Tarrant County site based on the TCEQ modeling. ODEQ then claimed that these results demonstrate that both of these sites are in attainment in 2023.

To assess whether Oklahoma interferes with maintenance of the 2015 ozone standard at these two sites, ODEQ used (1) the Texas method to calculate a "maintenance future year DV" for 2023 and (2) a maximum DV calculated using the highest of the three base year DVs multiplied by a relative response factor derived from TCEQ's modeling (i.e., EPA's method for identifying maintenance receptors but using TCEQ's modeling rather than EPA's modeling). This assessment is summarized in Table OK–2.

---

[74] Nonattainment receptors are monitoring sites that are anticipated to have problems attaining and maintaining the 2015 ozone NAAQS (i.e., average

projected 2023 DV greater than 70.9 ppb). Maintenance receptors are monitoring sites that are anticipated to have problems maintaining the 2015

ozone NAAQS (i.e., maximum projected 2023 DV greater than 70.9 ppb).

[75] See FN 32.

TABLE OK–2—SUMMARY OF TCEQ MODELING (2012 BASE PERIOD) USED BY ODEQ TO ASSESS MAINTENANCE RECEPTORS

| Receptor (site ID, county, state) | 2023 average DV (ppb) | 2023 maximum DV (ppb) (EPA method)* | Maintenance DV (ppb)(TCEQ method) | ODEQ's step 1 and step 2 determination |
|---|---|---|---|---|
| 481210034 Denton, TX .................................. | 68 | 70.7 | 65.9 | Future DVs project no attainment or maintenance problems. |
| 484392003 Tarrant, TX .................................. | 66 | 69.9 | 62.4 | Future DVs project no attainment or maintenance problems. |

* These values are not based on calculations made by the EPA. ODEQ calculated these values by using the maximum DV for the 2010–2014 5-year period (i.e., the highest of the DVs in 2012, 2013, and 2014) multiplied by relative response factor for the receptor obtained from TCEQ's modeling.

ODEQ noted in their assessment that based on the TCEQ modeling and TCEQ definition of maintenance receptor, it is expected that the Denton and Tarrant sites will not experience nonattainment or maintenance problems in 2023. Because ODEQ claimed that the Denton and Tarrant County sites will not be nonattainment or maintenance receptors in 2023, ODEQ did not analyze potential emissions reductions at Step 3 to address its contribution to these two sites.

With respect to the remaining receptor at Allegan County, MI, ODEQ provided an analysis of projected 2023 DVs for this site and information on emissions trends in Oklahoma to assert that emissions from Oklahoma do not significantly contribute to nonattainment or interfere with maintenance of the 2015 ozone NAAQS at the Allegan County, MI site.

ODEQ noted that (1) the DV for the Allegan County, MI site has had a substantial reduction in the last 6 years from 84 ppb in 2012 to 73 ppb in 2017, a 1.8 ppb per year decrease, on average and (2) the Allegan County, MI site is substantially influenced by mobile sources from the Chicago area and these emissions are expected to be greatly reduced in the near future, by roughly a 1 ppb per year decrease, leading to attainment of the 2015 ozone standard. The ODEQ then calculated a projected 2023 maintenance DV for the Allegan County, MI site using the EPA's method, but assuming that the base year was 2016 rather than 2011, as in the EPA's modeling or 2012 as in the TCEQ modeling. The ODEQ noted that the maximum DV in the 2016-centered base period (i.e., 2014–2016, 2015–2017, and 2016–2018) was 75 ppb at the Allegan County, Michigan site. The ODEQ then calculated the difference between the 2011-centered base period maximum DV of 86 ppb and the 2023 projected maximum DV of 71.7 ppb, using data from the EPA's modeling. The ODEQ calculated a ''ppb per year'' reduction of 1.1917 ppb per year, based on the 14.3

ppb difference between the 2011-centered and 2023 maximum DVs over the 12 years from 2011 to 2023. Finally, ODEQ applied the 1.1917 ppb per year value to the 2016-centered maximum DV of 75 ppb to estimate a 2023 maximum DV of 66.66 ppb.

ODEQ also asserted that the relatively small contribution from Oklahoma (3% of total upwind state contributions) combined with the distance between Oklahoma sources and the Allegan County, Michigan site, warrants a focus on nearby states with greater proportional contributions as the most prudent approach to addressing interstate transport of ozone precursors for this receptor.

The ODEQ also provided the anthropogenic $NO_X$ and VOC data of Oklahoma's emissions from EPA's emission trends and modeling to demonstrate an anticipated substantial reduction of $NO_X$ and VOC from 2011 to 2023: (1) Reductions of $NO_X$ from 405,000 to 235,000 tons per year and (2) reductions of VOC from 414,000 to 295,000 tons per year.[76] ODEQ noted these reductions should result in considerable reductions in ozone concentrations. The ODEQ stated that due to the emissions reductions required by rules like CSAPR, the 2016 CSAPR Update, and the regional haze requirements, the $NO_X$ emissions from electric generation in Oklahoma have dropped significantly during the ozone season from 38,285 tons per year in 2011 to 10,435 tons per year in 2017. ODEQ also stated that changes in the Southwest Power Pool[77], building of

additional windfarms, and electric utilities installing solar generation facilities have led to Oklahoma $NO_X$ emissions reductions; and that any additional $NO_X$ reductions from the electric generation section would require more costly emissions controls. ODEQ concluded that the existing controls in Oklahoma have resulted in significant decreases in ozone DVs in Oklahoma and that additional controls would not be cost-effective. Given these conclusions, ODEQ did not adopt additional controls to reduce ozone precursor emissions (Step 4).

*B. EPA Evaluation of the ODEQ SIP Submission*

The EPA is proposing to find that ODEQ's October 25, 2018, SIP submission does not demonstrate that the State's obligations with respect to prohibiting emissions that contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in any other state based on the EPA's evaluation of the SIP submission using the 4-Step interstate transport framework have been met. The EPA is therefore proposing to disapprove ODEQ's submission.

1. Evaluation of Information Provided by ODEQ Regarding Steps 1 and 2

As noted earlier, ODEQ first used the information from the EPA's March 2018 memorandum to identify nonattainment and maintenance receptors with a contribution from Oklahoma of 0.70 ppb or greater (i.e., ODEQ identified receptors that would be deemed nonattainment and maintenance receptors under its methodology for Steps 1 and 2). ODEQ then utilized a 1 ppb threshold and elected not to further analyze any receptors to which it did not contribute greater than 1 ppb.

---

[76] ODEQ used the EPA's emissions data shared alongside the October 2018 memorandum, ''state-sector_annual_emissions_data_1.xlsx'' available at *https://www.epa.gov/airmarkets/memo-and-supplemental-information-regarding-interstate-transport-sips-2015-ozone-naaqs.*

[77] The Southwest Power Pool is a regional electric transmission organization regulated by the Federal Energy Regulatory Commission whose purpose is promoting efficiency and reliability in the operation and planning of the electric transmission grid and ensuring non-discrimination in the provision of electric transmission services. It manages electric

transmission in portions of fourteen states: Arkansas, Iowa, Kansas, Louisiana, Minnesota, Missouri, Montana, Nebraska, New Mexico, North Dakota, Oklahoma, South Dakota, Texas and Wyoming. *See* 18 CFR 35.34 and *https://www.ferc.gov/electric-power-markets.*

ODEQ provided further evaluation of the State's emissions to those receptors to which Oklahoma contributes greater than 1 ppb (*i.e.,* Allegan County, MI, Denton County, TX and Tarrant County, TX).

As discussed in the EPA's August 2018 memorandum, with appropriate additional analysis it may be reasonable for states to use a 1 ppb contribution threshold, as an alternative to a 1 percent threshold, at Step 2 of the 4-Step interstate transport framework, for the purposes of identifying linkages to downwind receptors. However, the EPA's August 2018 memorandum provided that whether or not a 1 ppb threshold is appropriate must be based on an evaluation of state-specific circumstances, and no such evaluation was included in the ODEQ's submittal. Instead, ODEQ's SIP submission justified the State's use of a 1 ppb threshold based on the threshold's use in the SILs Guidance.[78] ODEQ did not explain the relevance of the SILs Guidance to Oklahoma's statutory obligation under the interstate transport provision. The SILs Guidance relates to a different provision of the CAA regarding implementation of the prevention of significant deterioration (PSD) permitting program, *i.e.,* a program that applies in areas that have been designated attainment of the NAAQS, and it is not applicable to the interstate transport provision, which requires states to eliminate emissions that contribute significantly or interfere with maintenance of the NAAQS at known, ongoing, or projected air quality problem areas in other states. The EPA does not, in this action, agree that the State has justified its application of the 1 ppb threshold.

Additionally, the EPA here shares further evaluation of its experience since the issuance of the August 2018 memorandum regarding use of alternative thresholds at Step 2. This experience leads the Agency to now believe it may not be appropriate to continue to attempt to recognize alternative contribution thresholds at Step 2. The August 2018 memorandum stated that "it may be reasonable and appropriate" for states to rely on an alternative threshold of 1 ppb threshold at Step 2. (The memorandum also indicated that any higher alternative threshold, such as 2 ppb, would likely not be appropriate.) However, the EPA also provided that "air agencies should consider whether the recommendations in this guidance are appropriate for each situation." Following receipt and review of 49 interstate transport SIP submittals

for the 2015 ozone NAAQS, the EPA's experience has been that nearly every state that attempted to rely on a 1 ppb threshold did not provide sufficient information and analysis to support a determination that an alternative threshold was reasonable or appropriate for that state.

For instance, in nearly all submittals, the states did not provide the EPA with analysis specific to their state or the receptors to which its emissions are potentially linked. In one case, the proposed approval of Iowa's SIP submittal, the EPA expended its own resources to attempt to supplement the information submitted by the state, in order to more thoroughly evaluate the state-specific circumstances that could support approval.[79] It was at the EPA's sole discretion to perform this analysis in support of the state's submittal, and the Agency is not obligated to conduct supplemental analysis to fill the gaps whenever it believes a state's analysis is insufficient. The Agency no longer intends to undertake supplemental analysis of SIP submittals with respect to alternative thresholds at Step 2 for purposes of the 2015 ozone NAAQS.

Furthermore, the EPA's experience since 2018 is that allowing for alternative Step 2 thresholds may be impractical or otherwise inadvisable for a number of additional policy reasons. For a regional air pollutant such as ozone, consistency in requirements and expectations across all states is essential. Based on its review of submittals to-date and after further consideration of the policy implications of attempting to recognize an alternative Step 2 threshold for certain states, the Agency now believes the attempted use of different thresholds at Step 2 with respect to the 2015 ozone NAAQS raises substantial policy consistency and practical implementation concerns.[80] The availability of different thresholds at Step 2 has the potential to result in inconsistent application of interstate transport obligations based solely on the strength of a state's SIP submittal at Step 2 of the 4-Step interstate transport framework. From the perspective of ensuring effective regional

implementation of interstate transport obligations, the more important analysis is the evaluation of the emissions reductions needed, if any, to address a state's significant contribution after consideration of a multifactor analysis at Step 3, including a detailed evaluation that considers air quality factors and cost. Where alternative thresholds for purposes of Step 2 may be "similar" in terms of capturing the relative amount of upwind contribution (as described in the August 2018 memorandum), nonetheless, use of an alternative threshold would allow certain states to avoid further evaluation of potential emission controls while other states must proceed to a Step 3 analysis. This can create significant equity and consistency problems among states.

Further, it is not clear that national ozone transport policy is best served by allowing for less stringent thresholds at Step 2. The EPA recognized in the August 2018 memorandum that there was some similarity in the amount of total upwind contribution captured (on a nationwide basis) between 1 percent and 1 ppb. However, the EPA notes that while this may be true in some sense, that is hardly a compelling basis to move to a 1 ppb threshold. Indeed, the 1 ppb threshold has the disadvantage of losing a certain amount of total upwind contribution for further evaluation at Step 3 (*e.g.,* roughly seven percent of total upwind state contribution was lost according to the modeling underlying the August 2018 memorandum;[81] in EPA 2016v2 modeling, the amount lost is five percent). Considering the core statutory objective of ensuring elimination of all significant contribution to nonattainment or interference of the NAAQS in other states and the broad, regional nature of the collective contribution problem with respect to ozone, there does not appear to be a compelling policy imperative in allowing some states to use a 1 ppb threshold while others rely on a 1 percent of NAAQS threshold.

Consistency with past interstate transport actions such as CSAPR, and the CSAPR Update and Revised CSAPR Update rulemakings (which used a Step 2 threshold of 1 percent of the NAAQS for two less stringent ozone NAAQS), is also important. Continuing to use a 1 percent of NAAQS approach ensures that as the NAAQS are revised and made more stringent, an appropriate increase in stringency at Step 2 occurs, so as to ensure an appropriately larger amount of total upwind-state contribution is captured for purposes of

---

[78] *See* FN 32.

[79] "Air Plan Approval; Iowa; Infrastructure State Implementation Plan Requirements for the 2015 Ozone National Ambient Air Quality Standard", 85 FR 12232 (March 2, 2020). The agency received adverse comments on this proposed approval and has not taken final action with respect to this proposal.

[80] We note that Congress has placed on the EPA a general obligation to ensure the requirements of the CAA are implemented consistently across states and regions. *See* CAA section 301(a)(2). Where the management and regulation of interstate pollution levels spanning many states is at stake, consistency in application of CAA requirements is paramount.

[81] *See* August 2018 memorandum, at page 4.

fully addressing interstate transport. *Accord* 76 FR 48237–38.

Therefore, notwithstanding the August 2018 memorandum's recognition of the potential viability of alternative Step 2 thresholds, and in particular, a potentially applicable 1 ppb threshold, the EPA's experience since the issuance of that memorandum has revealed substantial programmatic and policy difficulties in attempting to implement this approach. Nonetheless, the EPA is not, at this time, rescinding the August 2018 memorandum. The basis for the EPA's proposed disapproval of ADEQ's SIP submission with respect to the Step 2 analysis is, in the Agency's view, warranted even under the terms of the August 2018 memorandum. The EPA invites comment on this broader discussion of issues associated with alternative thresholds at Step 2. (See Supplementary Information section above for details and docket to submit comments). Depending on public comments received in relation to this action and further evaluation of this issue, the EPA may determine to rescind the 2018 memorandum in the future.

In any case, as discussed in the following subsection, based on the EPA's most recent modeling, the State is projected to contribute greater than both the one percent and alternative 1 ppb thresholds at the Denton County, TX receptor, (Monitor ID. 481210034). Based on the EPA's modeling results included in the March 2018 memorandum, Oklahoma was also projected to contribute 1.23 ppb to the Denton County, TX receptor. (In the EPA 2016v2 modeling the Allegan County, MI and Tarrant County, TX receptors are not projected to have problems attaining or maintaining the 2015 ozone NAAQS. Even under ODEQ's own analysis, the State was linked to receptors with contributions exceeding 1 ppb. Therefore, based on Oklahoma's linkages greater than 1 ppb to projected downwind nonattainment or maintenance receptors, the State's use of this alternative threshold at Step 2 of the 4-Step interstate framework is inconsequential to our proposed action on the state's SIP.

In the remainder of this section, EPA evaluates ODEQ's conclusions that emissions from Oklahoma do not contribute to nonattainment or interfere with maintenance at receptors in Tarrant County, TX (Monitor ID. 484392003) and Denton County, TX (Monitor ID. 481210034). We evaluate ODEQ's conclusions as to the Allegan, MI (Monitor ID. 260050003) in Section IV.B.3 of this action.

With regard to the Denton County and Tarrant County, TX receptors cited in ODEQ's submission, ODEQ chose to rely on the TCEQ's modeling and methodology, instead of the EPA modeling, and trends in ozone DVs and emissions to conclude that these monitoring sites will be in attainment by 2023 and will not have a problem maintaining the 2015 ozone NAAQS. As noted in Section IV.A of this action, ODEQ used modeling results from the TCEQ along with the TCEQ alternative method for identifying maintenance receptors to claim that using the TCEQ modeling and methods, the Denton County and Tarrant County monitors would not have a problem maintaining the NAAQS in 2023. The ODEQ supplemented that analysis by citing the downward trend in NOₓ and VOC emissions in Oklahoma. ODEQ also provided TCEQ modeling and emissions data for the Dallas-Fort Worth nonattainment area to show that mobile sources represent the largest emissions category in this area and that emissions from this sector have declined since 2005 and are expected to continue to decline in the future. As described in Table OK–2, ODEQ (1) provided the average 2023 DV for the Denton County, TX receptor from the TCEQ modeling and (2) used TCEQ modeling data with a 2012 base year to calculate a 2023 maintenance DV of 65.9 ppb (using the TCEQ methodology for identifying maintenance receptors) and a 2023 maximum DV of 70.7 ppb (using the EPA methodology for identifying maintenance receptors, combined with TCEQ's modeling results). ODEQ relied on this information, which is based on TCEQ modeling with a 2012 base year, to conclude that the Denton County, TX and Tarrant County, TX monitors would not have problems attaining and maintaining the 2015 ozone NAAQS.

ODEQ's SIP submission (or TCEQ, to the extent that Oklahoma is merely incorporating and relying on Texas' submission) does not adequately explain or justify how relying on TCEQ's method for identifying maintenance receptors reasonably identifies areas that will have difficulty maintaining the NAAQS. EPA proposes to find that ODEQ has provided no sound technical basis (either on its own or through reliance on Texas) for how its chosen methodology gives meaning to the CAA's instruction that states submit interstate transport SIPs that prohibit their states' emissions from interfering with the maintenance of the NAAQS in another state.

In *North Carolina* v. *EPA,* 531 F.3d 896, 909–11 (D.C. Cir. 2008), the D.C. Circuit rejected the EPA's CAIR on the basis that the EPA had not adequately given meaning to the phrase ''interfere with maintenance'' in the interstate transport provision. Specifically, North Carolina argued that it had counties that were projected to attain the NAAQS in the future analytic year, but were at risk of falling back into nonattainment due to interference from upwind sources, particularly given year-to-year variability in ozone levels. The court agreed, holding that the EPA's rule did not adequately protect ''[a]reas that find themselves barely meeting attainment.'' *Id.* at 910. Consequently, the EPA has developed a methodology, used in its 2011 CSAPR and its 2016 CSAPR Update and Revised CSAPR Update, for identifying areas that may struggle to maintain the NAAQS. *See* 76 FR at 48227–28. EPA's approach to addressing maintenance receptors was upheld in the *EME Homer City* litigation. *See* 795 F.3d 118, 136–37. It was also upheld in *Wisconsin.* 938 F.3d at 325–26. In *Wisconsin,* the court noted that four upwind states were linked only to maintenance receptors and rejected the argument that application of the same control level as EPA imposes for those states linked to nonattainment receptors was unreasonable or unlawful absent a particularized showing of overcontrol. *Id.* at 327.

In order to explain the differences between TCEQ's and the EPA's methodology for identifying maintenance receptors, it is helpful to provide some additional context of how the EPA projects future air quality.

The EPA's air quality modeling guidance has long recommended developing a base DV (*i.e.,* the DV that will be used as a starting point to model and analyze for purposes of projecting future air quality concentrations) that is the average of three DVs spanning a five-year period, centered around one year for which an emissions inventory will be submitted (*e.g.,* if 2011 was the base emissions inventory year, a state would use monitored values from 2009– 2011, 2010–2012, 2011–2013 as the starting point for projecting air quality concentrations in future years).[82] The average of these three DVs is then multiplied by a relative response factor [83] to generate an average DV for the future year.[84] If a receptor's average

---

[82] *See* FN 73.

[83] *See* FN 53.

[84] While it is not critical to this discussion, for purposes of explanation, the relative response factor is a fractional change that represents how ozone at a given receptor responds to changes in emissions when all other variables are constant. For more explanation of the RRF, please see 2018 Air Quality Modeling Guidance or 2014 Draft Air Quality Modeling Guidance.

future year DV is greater than or equal to the level of the NAAQS, and the receptor has recent monitored data that violates the NAAQS, that receptor is considered a "nonattainment" receptor at Step 1. To identify maintenance receptors, the EPA's methodology looks to the highest DV of the three DVs used to calculate the 5-year weighted average DV (e.g., in the 2011 example, if 2009–2011 had the highest DV of 2009–2011, 2010–2012, and 2011–2013). The EPA then applies the same relative response factor to that highest DV to generate a projected future maximum DV. Where a receptor's maximum DV exceeds the level of the NAAQS, the EPA has deemed those receptors to be "maintenance" receptors. This methodology was designed to address the D.C. Circuit's holding that the CAA's "interference with maintenance" prong requires states and the EPA to protect areas that may struggle with maintaining the standard in the face of variable conditions.

In its modeling, TCEQ adopted an identical approach to the EPA's for identifying nonattainment receptors—it looked at three sets of DVs over a five-year period and averaged those DVs to generate a base year DV. TCEQ then applied a relative response factor to that base year DV to project a receptor's average DV in the future year. For maintenance receptors, however, TCEQ elected not to examine variability in DVs over a five-year period by using the highest DV of the three DVs making up the base year DV. Instead, TCEQ (and by extension, ODEQ) used only the most recent DV of the three DVs, regardless of whether the most recent DV was highest or lowest. TCEQ's proffered explanation for using the most recent DV to identify maintenance receptors was that the latest DV "takes into consideration . . . any emissions reductions that might have occurred." [85] TCEQ in its submission does not explain why or how this methodology identifies those areas that may be meeting the NAAQS or that may be projected to meet the NAAQS but may nevertheless struggle to maintain the NAAQS, given meteorological variability. In fact, because TCEQ's stated purpose in using the most recent DV was to capture more recent emissions reductions, Texas' methodology appears to be aimed at *limiting* receptors which could be identified as maintenance receptors, compared to the EPA's methodology, which was designed to identify those

areas that might struggle to maintain the NAAQS in particularly ozone conducive conditions.

As discussed further in the EPA Region 6 TSD [86] for this action, the EPA has reviewed the set of 21 receptors for which Texas had contributions of 0.7 ppb or more in the EPA's 2016 base year modeling analyses, or TCEQ's modeling (2012 base year), and evaluated the results of using TCEQ's alternate maintenance methodology. For these 21 receptors, TCEQ's method resulted in 15 of the 21 2023 maintenance DVs predicted to be lower than the 2023 nonattainment DVs from the nonattainment methodology that uses the 5-year center weighted average. Of these 15 receptors, three receptors have 2023 maintenance DVs that are 3 ppb lower, five receptors have 2023 maintenance DVs that are 2 ppb lower, and seven receptors have 2023 maintenance DVs that are 1 ppb lower. In comparison, using the EPA's maintenance methodology results in all 21 2023 maintenance DVs being equal or up to 4 ppb higher than the 2023 nonattainment DVs. Again, the EPA uses the average of the three DVs that contain the base year modeled for the nonattainment methodology and the maximum of these three DVs for the maintenance methodology. Because TCEQ's maintenance methodology of just using the most recent DV (2012–2014 DV) often results in maintenance DVs lower than the 2023 nonattainment DVs methodology results, the EPA finds that the TCEQ methodology is not adequately identifying conditions when a receptor would have more difficulty maintaining the standard. In fact, the TCEQ's method also identified one receptor in their SIP submission as a nonattainment receptor in 2023 that would not have been identified as a maintenance receptor, which further highlights the concern that TCEQ's method did not adequately identify areas that may struggle to maintain the standard. TCEQ did not address whether the three years that comprise the most recent design value (i.e., 2012, 2013, and 2014) had meteorological conditions highly conducive for formation of high ozone concentrations and thus would be an appropriate time period to assess whether area could have difficulty maintaining the standard and the EPA's analysis confirms that this time period is not highly conducive to ozone formation, at least for many

receptors. The consequence of TCEQ's maintenance method is that it often results in lower DVs than the nonattainment method as demonstrated by our analysis, which indicates that it is often not considering conditions when an area would have difficulty maintaining the standard. Further, it is unreasonable to have a method that would not identify nonattainment receptors also as maintenance receptors.

Again, EPA also assessed a number of monitored DV trends that were provided in TCEQ's SIP and previous TCEQ attainment demonstration SIPs indicating that there are at times large annual fluctuations upward from year to year in monitored DVs (sometimes 2–3 ppb increase in one year) that are due to variations in meteorology. Neither TCEQ nor ODEQ addressed in their SIP submissions whether the three years that comprise the most recent DV (i.e., 2012, 2013, and 2014) had meteorological conditions conducive for formation of high ozone concentrations. On the other hand, the EPA methodology can identify variations in ozone levels that might result in difficulty in maintaining the standard over a longer period of time. The TCEQ method will only identify areas that have difficulty maintaining the standard for a single design value period and, as a result, does not address the meteorological variability issue sufficiently.

In its SIP submittal, ODEQ contended that, based on TCEQ's use of a 2012 base year, and using TCEQ's air quality modeling, even if Texas had used the EPA's method of identifying maintenance receptors, the projected maximum DV for the Denton County and Tarrant County receptors would be 70.7 ppb and 69.9 ppb, respectively, which are considered to be in attainment of the 2015 ozone NAAQS in 2023. However, this conclusion relied upon a relative response factor derived from the TCEQ modeling and TCEQ's modeling results, which are discussed in more detail in Section V of this action and in the EPA Region 6 TSD.[87] TCEQ's modeled projections for 2023 including nonattainment and maintenance values (using either TCEQ' or EPA's methodology) are much lower than recent monitored values (2018–2020 DV and preliminary 2019–2021 DVs) [88] for

---

[85] TCEQ submission at 3–39 to 3–40, available in the Regional docket for this action (Docket ID No. EPA–R06–OAR–2021–0801).

[86] "EPA Region 6 2015 8-Hour Ozone Transport SIP Proposal Technical Support Document" (EPA Region 6 2015 Ozone Transport SIP TSD.pdf) included in Docket ID No. EPA–R06–OAR–2021–0801.

[87] Id.

[88] Monitoring data from the EPA's Air Quality System (AQS) (https://www.epa.gov/aqs). 2021 monitoring data is preliminary and still has to undergo Quality Assurance/Quality Control analysis and be certified by the State of Texas, submitted to EPA, and reviewed and concurred on by EPA. 2018–2020 DVs are 72 ppb and 73 ppb at
Continued

many monitors and the amount of further DV reductions needed to match TCEQ's modeling is more than is reasonably expected to occur for many monitors/receptors. This underestimation of future DVs results in mis-identifying these two receptors and other receptors as not being nonattainment or maintenance receptors. Specifically, these two receptors would need to have at least a 3–4 ppb decrease in the next 2–3 years just to attain the 2015 Ozone NAAQS in 2023. As discussed in the EPA Region 6 TSD, TCEQ's previous DFW Attainment Demonstration SIP includes long-term DV trends analysis that indicates that DFW DVs decrease approximately 1 ppb per year.[89] Moreover, as discussed in Section IV.B.2 of this action, the EPA's updated modeling, which relies upon more recent data and the latest information on emissions reductions, indicates that the

maximum design value in 2023 for the Denton County receptor is 72.2 ppb. Recent monitored air quality data at the Denton receptor are consistent with the EPA's projections that this is an area that will struggle to maintain the 2015 ozone NAAQS in 2023; the 2020 DV for Denton was 72 ppb.[90]

Finally, in its submittal, ODEQ pointed to the significant reductions in emissions that have occurred in the State, but the EPA believes these reductions have already been accounted for in the most recent modeling; therefore, even with these reductions, the Denton County, TX receptor is projected to struggle with maintenance of the 2015 ozone NAAQS in 2023.

### 2. Results of the EPA's Step 1 and Step 2 Modeling Analysis and Findings for Oklahoma

As described in Section I of this action, the EPA performed air quality modeling using the 2016v2 platform to project DVs and contributions for 2023.

This data was examined to determine if Oklahoma contributes at or above the threshold of 1 percent of the 2015 ozone NAAQS (0.70 ppb) to any downwind nonattainment or maintenance receptor. As shown in Table OK–3, the most recent modeling data [91] indicate that in 2023, emissions from Oklahoma contribute greater than one percent of the standard to maintenance-only receptors in Denton County, TX and in Cook County, IL. Oklahoma is not linked to any nonattainment receptors in EPA's most recent modeling (EPA 2016v2 modeling). Therefore, based on the EPA's evaluation of the information submitted by ODEQ and based on the EPA's most recent modeling results for 2023, the EPA proposes to find that Oklahoma is linked at Steps 1 and 2 and has an obligation to assess potential emissions reductions from sources or other emissions activity at Step 3 of the 4-Step framework.

TABLE OK–3—PROJECTED NONATTAINMENT AND MAINTENANCE RECEPTORS WITH OKLAHOMA LINKAGES IN 2023 BASED ON EPA 2016v2 MODELING

| Receptor (site ID, county, state) | Nonattainment/maintenance | 2020 DV | 2023 average DV (ppb) | 2023 maximum DV (ppb) | Oklahoma contribution (ppb) |
|---|---|---|---|---|---|
| 481210034, Denton, TX | Maintenance | 72 | 70.4 | 72.2 | 1.19 |
| 170310032, Cook, IL | Maintenance | 74 | 69.8 | 72.4 | 0.75 |

### 3. Evaluation of Information Provided by ODEQ Regarding Step 3

At Step 3 of the 4-Step interstate transport framework, a state's emissions are further evaluated, in light of multiple factors, including air quality and cost considerations, to determine what, if any, emissions contribute significantly to nonattainment or interfere with maintenance and, thus, must be eliminated under CAA section 110(a)(2)(D)(i)(I).

To effectively evaluate which emissions in the state should be deemed "significant" and therefore prohibited, states generally should prepare an accounting of sources and other emissions activity for relevant pollutants and assess potential, additional emissions reduction opportunities and resulting downwind air quality improvements. The EPA has consistently applied this general approach (*i.e.,* Step 3 of the 4-Step

interstate transport framework) when identifying emissions contributions that the Agency has determined to be "significant" (or interfere with maintenance) in each of its prior Federal, regional ozone transport rulemakings, and this interpretation of the statute has been upheld by the Supreme Court. *See EME Homer City,* 572 U.S. at 519. While the EPA has not directed states that they must conduct a Step 3 analysis in precisely the manner the EPA has done in its prior regional transport rulemakings, state implementation plans addressing the obligations in CAA section 110(a)(2)(D)(i)(I) must prohibit "any source or other type of emissions activity within the State" from emitting air pollutants which will contribute significantly to downwind air quality problems. Thus, states must complete something similar to the EPA's analysis (or an alternative approach to defining "significance" that comports with the

statute's objectives) to determine whether and to what degree emissions from a state should be "prohibited" to eliminate emissions that will "contribute significantly to nonattainment in, or interfere with maintenance of" the NAAQS in any other state. ODEQ did not conduct such an analysis in their SIP submission.

As noted earlier, ODEQ provided some data on emissions and already implemented emissions reductions for sources in Oklahoma and stated that the 2016 CSAPR Update is the only reasonable control warranted based on Oklahoma's limited contributions to the Michigan and Texas receptors. Thus, Oklahoma relied on its EGUs being subject to the CSAPR Update (which reflected a stringency at the nominal marginal cost threshold of $1400/ton (2011$) for the 2008 ozone NAAQS) to argue that it had already implemented all cost-effective emissions reductions, and had no additional statutory

---

the Denton County and Tarrant County monitors/receptors respectively. Preliminary 2019–2021 DVs are 74 ppb and 72 ppb at the Denton County and Tarrant County monitors/receptors respectively.

[89] EPA also analyzed trends using AQS data, See EPA Region 6 TSD.

[90] DVs and contributions at individual monitoring sites nationwide are provide in the file: "2016v2_DVs_state_contributions.xlsx" which is included in Docket ID No. EPA–HQ–OAR–2021–0663.

[91] These modeling results are consistent with the results of a prior round of 2023 modeling using the 2016v1 emissions platform which became available to the public in the fall of 2020 in the Revised

CSAPR Update, as noted above. That modeling showed that Oklahoma had a maximum contribution greater than 0.70 ppb to at least one nonattainment or maintenance-only receptor in 2023. These modeling results are included in "Ozone DVs And Contributions Revised CSAPR Update.xlsx" in Docket ID No. EPA–HQ–OAR–2021–0663.

obligation to prohibit emissions under CAA section 110(a)(2)(D)(i)(I) with respect to the 2015 ozone NAAQS.

The EPA disagrees with ODEQ's conclusions for the following reasons: First, the CSAPR Update did not regulate non-electric generating units, and thus this analysis is incomplete. *See Wisconsin,* 938 F.3d at 318–20. Second, relying on the CSAPR Update's (or any other CAA program's) determination of cost-effectiveness without further Step 3 analysis is not approvable. Cost-effectiveness must be assessed in the context of the specific CAA program; assessing cost-effectiveness in the context of ozone transport should reflect a more comprehensive evaluation of the nature of the interstate transport problem, the total emissions reductions available at several cost thresholds, and the air quality impacts of the reductions at downwind receptors. While the EPA has not established a benchmark cost-effectiveness value for 2015 ozone NAAQS interstate transport obligations, because the 2015 ozone NAAQS is a more stringent and more protective air quality standard, it is reasonable to expect control measures or strategies to address interstate transport under this NAAQS to reflect higher marginal control costs. As such, the marginal cost threshold of \$1,400/ton for the CSAPR Update (which addresses the 2008 ozone NAAQS and is in 2011\$) is not an appropriate cost threshold and cannot be approved as a benchmark to use for interstate transport SIP submissions for the 2015 ozone NAAQS.

In addition, the most recent EPA modeling captures all existing CSAPR trading programs in the baseline, and that modeling confirms that these control programs were not sufficient to eliminate Oklahoma's linkage at Steps 1 and 2 under the 2015 ozone NAAQS. The State was therefore obligated at Step 3 to assess *additional* control measures using a multifactor analysis.

Finally, relying on a FIP at Step 3 is per se not approvable if the state has not adopted that program into its SIP and instead continues to rely on the FIP. States may not rely on FIP measures to meet SIP requirements. *See* CAA section 110(a)(2)(D) ("Each such [SIP] shall . . . contain adequate provisions . . . ."). *See also* CAA section 110(a)(2)(A); *Committee for a Better Arvin* v. *U.S. E.P.A.,* 786 F.3d 1169, 1175–76 (9th Cir. 2015) (holding that measures relied on by state to meet CAA requirements must be included in the SIP).

In addition, ODEQ's submission included a weight of evidence evaluation of its contribution to the Allegan County, MI receptor to

conclude that it does not contribute significantly to nonattainment or maintenance at the receptor.

The EPA disagrees with respect to ODEQ's assertion regarding the relatively small contribution of emissions from Oklahoma to the Allegan County, MI receptor compared to emissions from other upwind states such as Illinois. Whether emissions from other states or countries also contribute to the same downwind air quality issue is irrelevant in assessing whether a downwind state has an air quality problem, or whether an upwind state is contributing significantly to that problem. States are not obligated under CAA section 110(a)(2)(D)(i)(I) to reduce emissions sufficient on their own to resolve downwind receptors' nonattainment or maintenance problems. Rather, states are obligated to eliminate their own significant contribution or interference with the ability of other states to attain or maintain the NAAQS.

Further, the court in *Wisconsin* explained that downwind jurisdictions often may need to heavily rely on emissions reductions from upwind states in order to achieve attainment of the NAAQS, 938 F.3d at 316–17; such states would face increased regulatory burdens including the risk of bumping up to a higher nonattainment classification if attainment is not reached by the relevant deadline, *Maryland,* 958 F.3d at 1204. Indeed, the D.C. Circuit in *Wisconsin* specifically rejected petitioner arguments suggesting that upwind states should be excused from interstate transport obligations on the basis that some other sources of emissions (whether international or another upwind state) could be considered the "but-for" cause of downwind air quality problem. 938 F.3dat 323–324. The court viewed petitioners' arguments as essentially an argument "that an upwind state 'contributes significantly' to downwind nonattainment only when its emissions are the sole cause of downwind nonattainment." 938 F.3d at 324. The court explained that "an upwind state can 'contribute' to downwind nonattainment even if its emissions are not the but-for cause." *Id.*at 324–325. *See also Catawba County* v. *EPA,* 571 F.3d 20, 39 (D.C. Cir. 2009) (rejecting the argument "that 'significantly contribute' unambiguously means 'strictly cause'" because there is "no reason why the statute precludes EPA from determining that [an] addition of [pollutant] into the atmosphere is significant even though a nearby county's nonattainment problem would still persist in its absence"); *Miss.*

*Comm'n on Envtl. Quality* v. *EPA,*790 F.3d 138, 163 n. 12 (D.C. Cir. 2015) (observing that the argument the "there likely would have been no violation at all . . . if it were not for the emissions resulting from [another source is "merely a rephrasing of the but-for causation rule that we rejected in *Catawba County.*"). Therefore, a state is not excused from eliminating its significant contribution on the basis that other upwind states also contribute some amount of pollution to the same receptors to which the state is linked.

As explained in Section IV.A of this action, ODEQ's weight of evidence also concluded that the Allegan receptor would be attaining the NAAQS in 2023 based on an analysis that assumed a projection of a linear reduction in DVs across a 12-year period (2011 to projected 2023 values), and then applied that annual reduction (1.1917 ppb/year) to the receptor's 2016-centered base period maximum DV (75 ppb). The EPA does not necessarily agree that the assumptions made in Oklahoma's weight-of-evidence analysis are reasonable; however, because the updated modeling also shows that Allegan County, MI is no longer a receptor in 2023, we propose to find such assumptions are inconsequential to our action on Oklahoma's SIP.

We recognize that the results of the EPA (2011 and 2016 base year) modeling indicated different receptors and linkages at Steps 1 and 2 of the 4-Step interstate transport framework. These differing results regarding receptors and linkages can be affected by the varying meteorology from year to year, but we do not think the differing results mean that the modeling or the EPA methodology for identifying receptors or linkages is inherently unreliable. Rather, these separate modeling runs all indicated: (1) That there are receptors that would struggle with nonattainment or maintenance in the future; and (2) that Oklahoma was linked to some set of these receptors, even if the receptors and linkages differed from one another in their specifics (*e.g.,* Oklahoma was linked to a different set of receptors in one modeling run versus another). These results indicate that emissions from Oklahoma are substantial enough to generate linkages at Steps 1 and 2 to at least some downwind receptors, under varying assumptions and meteorological conditions, even if the precise set of linkages changed between modeling runs.

We therefore propose that ODEQ was required to analyze emissions from the sources and other emissions activity from within the State to determine

whether its contributions were significant. Because ODEQ failed to perform this analysis, we propose to disapprove its submission.

4. Evaluation of Information Provided by ODEQ Regarding Step 4

Step 4 of the 4-Step interstate transport framework calls for development of permanent and federally enforceable control strategies to achieve the emissions reductions determined to be necessary at Step 3 to eliminate significant contribution to nonattainment or interference with maintenance of the NAAQS. As mentioned previously, ODEQ's SIP submission did not contain an evaluation of additional emission control opportunities (or establish that no additional controls are required), thus, no information was provided at Step 4. As a result, EPA proposes to disapprove ODEQ's submittal on the separate, additional basis that the State has not developed permanent and enforceable emissions reductions necessary to meet the obligations of CAA section 110(a)(2)(d)(i)(I).

5. Conclusion

Based on the EPA's evaluation of ODEQ's SIP submission, the EPA is proposing to find that the portion of ODEQ's SIP submission addressing CAA section 110(a)(2)(D)(i)(I) does not meet the State's interstate transport obligations because it fails to contain the necessary provisions to eliminate emissions which will interfere with maintenance of the 2015 ozone NAAQS in any other state.

C. Impact on Areas of Indian Country

Following the U.S. Supreme Court decision in *McGirt* v *Oklahoma,* 140 S Ct. 2452 (2020), the Governor of the State of Oklahoma requested approval under Section 10211(a) of the Safe, Accountable, Flexible, Efficient Transportation Equity Act of 2005: A Legacy for Users, Public Law 109–59, 119 Stat. 1144, 1937 (August 10, 2005) ("SAFETEA"), to administer in certain areas of Indian country (as defined at 18 U.S.C. 1151) the State's environmental regulatory programs that were previously approved by the EPA for areas outside of Indian country. The State's request excluded certain areas of Indian country further described below. In addition, the State only sought approval to the extent that such approval is necessary in light of *Oklahoma Dept. of Environmental Quality* v. *EPA,* 740 F.3d 185 (D.C. Cir. 2014).[92]

On October 1, 2020, the EPA approved Oklahoma's SAFETEA request to administer all of the State's EPA-approved environmental regulatory programs, including the Oklahoma SIP, in the requested areas of Indian country. As requested by Oklahoma, the EPA's approval under SAFETEA does not include Indian country lands, including rights-of-way running through the same, that: (1) Qualify as Indian allotments, the Indian titles to which have not been extinguished, under 18 U.S.C. 1151(c); (2) are held in trust by the United States on behalf of an individual Indian or Tribe; or (3) are owned in fee by a Tribe, if the Tribe (a) acquired that fee title to such land, or an area that included such land, in accordance with a treaty with the United States to which such Tribe was a party, and (b) never allotted the land to a member or citizen of the Tribe.

The EPA's approval under SAFETEA expressly provided that to the extent the EPA's prior approvals of Oklahoma's environmental programs excluded Indian country, any such exclusions are superseded for the geographic areas of Indian country covered by the EPA's approval of Oklahoma's SAFETEA request.[93] The approval also provided that future revisions or amendments to Oklahoma's approved environmental regulatory programs would extend to the covered areas of Indian country (without any further need for additional requests under SAFETEA).[94]

[92] In *ODEQ* v. *EPA,* the D.C. Circuit held that under the CAA, a state has the authority to implement a SIP in non-reservation areas of Indian country in the state, where there has been no demonstration of tribal jurisdiction. Under the D.C. Circuit's decision, the CAA does not provide authority to states to implement SIPs in Indian reservations. *ODEQ* did not, however, substantively address any request under the separate authority in Indian country provided specifically to Oklahoma under SAFETEA. That separate authority was not invoked until the State submitted its request under SAFETEA, and was not approved until the EPA's decision, described in this section, on October 1, 2020.

[93] The EPA's prior approvals relating to Oklahoma's SIP frequently noted that the SIP was not approved to apply in areas of Indian country (consistent with the D.C. Circuit's decision in *ODEQ* v. *EPA*) located in the state. *See, e.g.,* 85 FR 20178, 20180 (April 10, 2020). Such prior expressed limitations are superseded by the EPA's approval of Oklahoma's SAFETEA request.

[94] On December 22, 2021, the EPA proposed to withdraw and reconsider the October 1, 2020 SAFETEA approval. *See https://www.epa.gov/ok/ proposed-withdrawal-and-reconsideration-and-supporting-information.* The EPA is engaging in further consultation with tribal governments and expects to have discussions with the State of Oklahoma as part of this reconsideration. The EPA also notes that the October 1, 2020 approval is the subject of a pending challenge in federal court. *Pawnee Nation of Oklahoma* v *Regan,* No. 20–9635 (10th Cir.). The EPA may make further changes to

As explained earlier, the EPA is proposing to find that the portion of Oklahoma's SIP submission addressing CAA section 110(a)(2)(D)(i)(I) does not meet the State's interstate transport obligations, because it fails to contain the necessary provisions to eliminate emissions which will contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in any other state. Consistent with the D.C. Circuit's decision in *ODEQ* v. *EPA* and the EPA's October 1, 2020, SAFETEA approval, this disapproval if finalized as proposed will extend to areas of Indian country in Oklahoma where the State has SIP planning authority.

V. Texas SIP Submission Addressing Interstate Transport of Air Pollution for the 2015 Ozone NAAQS and the EPA Evaluation of the SIP Submission

A. Summary of TCEQ SIP Submission Addressing Interstate Transport of Air Pollution for the 2015 Ozone NAAQS

On August 17, 2018, the Texas Commission on Environmental Quality (TCEQ) made a SIP submission addressing interstate transport of air pollution for the 2015 ozone NAAQS. The SIP submission provided TCEQ's analysis of their impact to downwind states using a framework similar to EPA's 4-Step framework and concluded that emissions from Texas will not contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in other states.

In the submittal, TCEQ provided the steps they used to assess whether emissions from Texas contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in other States: (1) Identify monitors projected to be in nonattainment or have maintenance issues in future year 2023; (2) identify for further review projected nonattainment and/or maintenance monitors in other states that are impacted by emissions from Texas; and (3) determine if emissions from Texas contribute significantly to nonattainment or interfere with maintenance at the monitors identified in TCEQ Step 2. TCEQ stated that their Step 1 is the same as EPA's Step 1 and that their Steps 2 and 3 are equivalent to EPA's Step 2. TCEQ used a

the approval of Oklahoma's program to reflect the outcome of the proposed withdrawal and reconsideration of the October 1, 2020 SAFETEA approval. To the extent any change occurs in the scope of Oklahoma's SIP authority in Indian country before the finalization of this proposed rule, such a change may affect the scope of the EPA's final action on the proposed rule.

contribution threshold of one percent of the NAAQS (0.7 ppb) in their Step 2 analysis to identify nonattainmentand/ or maintenance monitors in other states that are impacted by emissions from Texas. TCEQ further stated that EPA's Steps 3 and 4 are relevant only if emissions from Texas contribute significantly to nonattainment or interfere with maintenance at downwind monitors in another state. Because Texas TCEQ concluded that it has no such emissions, EPA's Steps 3 and 4 are not addressed in the SIP submission.

To identify monitors projected to be in nonattainment or have maintenance issues in 2023, (EPA Step 1 and TCEQ Step 1), TCEQ conducted its own regional photochemical modeling using a 2012 base year. TCEQ's modeling and EPA's modeling differ in significant respects, which are discussed in detail in the EPA Region 6 2015 8-Hour Ozone Transport SIP Proposal Technical Support Document (EPA Region 6 TSD).[95] In particular, TCEQ used a 2012 base year, stating that (1) the year 2012 had above average temperatures across most of the U.S., except in some states in the southeast and (2) the year 2011, (which was used by the EPA in the NODA published on January 6, 2017

and the October 2017 updated modeling data for 2023),[96] was a meteorologically anomalous year for Texas and surrounding states as it was the hottest year on record and the single-worst drought year recorded in Texas since 1895. TCEQ's modeling also used some different emissions estimates for the base year and future year 2023 emissions, including different future year emissions for EGUs. There were also some differences in methods used in the model results analysis and the model performance evaluation. TCEQ also used a different methodology than the EPA to identify monitors projected to be maintenance receptors in 2023. TCEQ used only the most recent DV containing the base year 2012, (*i.e.*, the monitored DV for 2012–2014), to project a 2023 "maintenance DV" for assessing whether a monitor would have maintenance issues. The EPA's methodology uses the maximum of the three consecutive regulatory DVs containing the base year, which is the highest monitored DV from among the three DVs that contain the 2011 base year (*i.e.*, the 2009–2011 DV, 2010–2012 DV or and 2011–2013 DV that all contain modeled base year of 2011), to project a 2023 maximum DV for

assessing whether a monitor would have maintenance issues. Texas explained that it chose to define maintenance receptors in this way to capture more recent emission reductions. The SIP submittal also included a discussion of why TCEQ believes their approach for identifying maintenance receptors is appropriate. The TCEQ modeling and differences with the EPA modeling is discussed in detail in the EPA Region 6 TSD for this action.

Based on their modeling, TCEQ provided: (1) A table of downwind receptors projected to be in nonattainment of the 2015 ozone NAAQS in 2023 and have a contribution from Texas emissions at a threshold of 0.7 ppb or greater and (2) a table of downwind maintenance receptors projected to have problems attaining and maintaining the 2015 ozone NAAQS in 2023 and have a contribution from Texas emissions at a threshold of 0.7 ppb or greater. TCEQ identified these receptors for further analysis. The nonattainment and maintenance receptors provided by TCEQ are listed in Table TX–1. TCEQ noted that except for Arapahoe County, CO (Monitor ID. 80050002) all the maintenance receptors are also nonattainment receptors.

TABLE TX–1—PROJECTED 2023 NONATTAINMENT AND MAINTENANCE RECEPTORS IDENTIFIED BY TCEQ MODELING USING 2012 BASE YEAR

| Receptor (site ID, county, state) | 2023 average DV (ppb) | 2023 maintenance DV (ppb) (TCEQ method) | Texas contribution (ppb) |
|---|---|---|---|
| 80350004, Douglas, CO | 73 | 72 | 1.42 |
| 80590006, Jefferson, CO | 72 | 73 | 1.26 |
| 80590011, Jefferson, CO | 71 | 71 | 1.26 |
| 80690011, Larimer, CO | 72 | 71 | 1.22 |
| 80050002, Arapahoe, CO | *70 | 71 | 1.15 |
| 40038001, Cochise, AZ | 71 | **69 | 1.06 |
| 60371201, Los Angeles, CA | 80 | 78 | 0.76 |
| 60371701, Los Angeles, CA | 80 | 82 | 0.72 |
| 60376012, Los Angeles, CA | 87 | 86 | 0.9 |
| 60658001, Riverside, CA | 88 | 85 | 0.73 |
| 60658005, Riverside, CA | 84 | 83 | 0.71 |
| 60710001, San Bernardino, CA | 71 | 72 | 0.84 |
| 60710306, San Bernardino, CA | 76 | 77 | 0.81 |
| 60711004, San Bernardino, CA | 91 | 90 | 0.88 |
| 60714001, San Bernardino, CA | 82 | 79 | 0.86 |
| 60714003, San Bernardino, CA | 94 | 91 | 0.74 |

* TCEQ did not include this value in their SIP narrative (this cell was blank). The EPA obtained this value from data that was in TCEQ's spreadsheet of future 2023 DVs with state contributions.
** TCEQ did not provide this calculation. The EPA used TCEQ's modeling information to calculate this value using the Relative Response Factor in TCEQ spreadsheet of future 2023 DVs with state contributions and the monitor's 2012–2014 DV (0.983 X 71 ppb, truncation applied).

TCEQ also noted that in the EPA's 2017 Transport NODA, the EPA's modeling linked Texas to six receptors

based on the receptors being identified as nonattainment or maintenance receptors and based on a 0.7 ppb

contribution threshold. TCEQ provided a table of those monitors along with the EPA and TCEQ modeling results for

---

[95] "EPA Region 6 2015 8-Hour Ozone Transport SIP Proposal Technical Support Document" (EPA Region 6 2015 Ozone Transport SIP TSD.pdf)

included in Docket ID No. EPA–R06–OAR–2021–0801.

[96] The NODA and the October 2017 modeling are discussed in Section I.C of this action.

those receptors (Table TX–2).[97] TCEQ stated that the differences are due to changes the TCEQ made to modeling inputs (primarily the different base year of 2012 versus the EPA's 2011),

analysis, and methodologies (primarily TCEQ's alternate maintenance receptor methodology), see the EPA Region 6 TSD included in the Regional docket for this action (Docket ID No. EPA–R06–

OAR–2021–0801) for more details. With exception of the Jefferson County, CO receptor (Monitor ID. 80590011) TCEQ did not further review its linkages to any of the receptors in Table TX–2.

TABLE TX–2—TCEQ INFORMATION ON RECEPTORS LINKED TO TEXAS BY EPA MODELING IN THE TRANSPORT NODA PUBLISHED ON JANUARY 6, 2017

| Receptor (site ID, county, state) | EPA 2023 average DV (ppb) | EPA Texas contribution (ppb) | TCEQ 2023 average DV (ppb) | TCEQ Texas contribution (ppb) |
|---|---|---|---|---|
| 260050003, Allegan, MI | 68.8 | 2.49 | 71 | 0.59 |
| 551170006, Sheboygan, WI | 71.0 | 1.92 | 70 | 0.73 |
| 240251001, Harford, MD | 71.3 | 0.91 | 65 | 0.69 |
| 360850067, Richmond, NY | 71.2 | 0.77 | 62 | 0.67 |
| 361030002, Suffolk, NY | 71.3 | 0.71 | 67 | 0.63 |
| 80590011, Jefferson, CO | 69.7 | 1.03 | 71 | 1.26 |

TCEQ then used a weight of evidence approach to assess whether emissions from Texas contribute significantly to nonattainment or interfere with maintenance at the receptors listed in Table TX–1. TCEQ stated that the Texas contribution to a receptor should be deemed "significant" only if there is a persistent and consistent pattern of contribution on several days with elevated ozone. Consideration was given to factors such as DV trends, number of elevated ozone days, back trajectory analysis on elevated ozone days, modeled concentrations on future expected elevated ozone days, total interstate contributions at tagged monitors, and responsiveness of ozone to emissions from Texas. Based on their assessment, TCEQ concluded that emissions from Texas do not contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS at any downwind monitors. Our evaluation of the TCEQ submission is further discussed in Section V.B and in the EPA Region 6 TSD for this action.

*B. EPA Evaluation of the TCEQ SIP Submission*

Based on the EPA's evaluation of the SIP submission, the EPA is proposing to find that TCEQ's August 17, 2018, SIP submission does not meet the State's obligations with respect to prohibiting emissions that contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in any other state.

1. Evaluation of Information Provided by TCEQ Regarding Step 1

As explained in Section I of this action, at Step 1 of the 4-Step interstate transport framework, the EPA identifies

monitoring sites that are projected to have problems attaining and/or maintaining the NAAQS (*i.e.,* nonattainment and maintenance receptors). In executing this step, TCEQ elected to rely on their own modeling and methodology for identifying receptors. The EPA is evaluating the TCEQ's modeling and methodology here at Step 1.

i. Evaluation of TCEQ's Methodology for Identifying Maintenance Receptors

As discussed in Section V.A of this action, in addition to the use of an alternative modeling platform, TCEQ also created its own method for identifying maintenance receptors. TCEQ has not adequately explained or justified how its method for identifying maintenance receptors reasonably identifies areas that will have difficulty maintaining the NAAQS. The EPA proposes to find that TCEQ has not provided a sufficient technical basis for how its chosen methodology gives meaning to the CAA's instruction that states submit good neighbor SIPs that prohibit their states' emissions from interfering with the maintenance of the NAAQS in another state.

In *North Carolina* v. *EPA,* 531 F.3d 896, 909–11 (D.C. Cir. 2008), the D.C. Circuit rejected the EPA's CAIR on the basis that the EPA had not adequately given meaning to the phrase "interfere with maintenance" in the good neighbor provision. Specifically, North Carolina argued that it had counties that were projected to attain the NAAQS in the future analytic year but were at risk of falling back into nonattainment due to interference from upwind sources, particularly given year-to-year variability in ozone levels. The court agreed, holding that the EPA's rule did

not adequately protect "[a]reas that find themselves barely meeting attainment." *Id.* at 910. Consequently, the EPA has developed a methodology, as described elsewhere in this action and used in its 2011 CSAPR and its 2016 CSAPR Update and Revised CSAPR Update, for identifying areas that may struggle to maintain the NAAQS. *See* 76 FR at 48227–28. The EPA's approach to addressing maintenance receptors was upheld in the *EME Homer City* litigation. *See* 795 F.3d 118, 136–37. It was also upheld in *Wisconsin.* 938 F.3d at 325–26. In *Wisconsin,* the court noted that four upwind states were linked only to maintenance receptors and rejected the argument that application of the same control level as the EPA imposes for those states linked to nonattainment receptors was unreasonable or unlawful absent a particularized showing of overcontrol. *Id.* at 327.

To explain the differences between TCEQ's and the EPA's methodology for identifying maintenance receptors, it is helpful to provide some additional context of how the EPA projects future air quality. The EPA's air quality modeling guidance has long recommended developing a base design value (DV) [98] (*i.e.,* the design value that will be used as a starting point to model and analyze for purposes of projecting future air quality concentrations) that is the average of three DVs spanning a five-year period, centered around one year for which an emissions inventory will be submitted (*e.g.,* if 2011 was the base emissions inventory year, a state would use monitored values from 2009–2011, 2010–2012, 2011–2013 as the starting point for projecting air quality concentrations in future years).[99] The

---

[97] TCEQ SIP Submission, at page 3–49 (Table 3–12).

[98] *See* FN 8.

[99] *See* FN 73.

average of these three DVs is then multiplied by a relative response factor (RRF) [100] to generate an average DV for the future year. If a receptor's average future year DV is greater than or equal to the level of the NAAQS, and the receptor has recent monitored data that violates the NAAQS, that receptor is considered a "nonattainment" receptor at Step 1. To identify maintenance receptors, the EPA's methodology looks to the highest DV of the three DVs used to calculate the 5-year weighted average design value (*e.g.,* in the 2011 example, if 2009–2011 had the highest design value of 2009–2011, 2010–2012, and 2011–2013). The EPA then applies the same relative response factor to that highest design value to generate a projected future maximum design value. Where a receptor's maximum design value exceeds the level of the NAAQS, the EPA has deemed those receptors to be "maintenance" receptors. This methodology was designed to address the D.C. Circuit's holding that the CAA's "interference with maintenance" prong requires states and the EPA to protect areas that may struggle with maintaining the standard in the face of inter-annual variability in ozone-conducive conditions.

In its modeling, TCEQ adopted an identical approach to the EPA's for identifying nonattainment receptors—it looked at three sets of DVs over a five-year period and averaged those DVs to generate a base year DV. TCEQ then applied a relative response factor to that base year design value to project a receptor's average design value in the future year. For its maintenance receptors, however, TCEQ used only the most recent design value of the set of three DVs, regardless of whether the most recent design value was highest or lowest, instead of considering variability in conditions over a five-year period, or using the highest DV of the three DVs making up the base year design value. TCEQ's proffered explanation for using the most recent DV to identify maintenance receptors was that the latest DV "takes into consideration . . . any emissions reductions that might have occurred." [101] However, TCEQ in its submission does not explain how this methodology takes into account meteorological variability in identifying those areas that may be meeting the NAAQS or that may be projected to meet the NAAQS but may nevertheless struggle to maintain the NAAQS.

TCEQ argued that the 3-year DV used includes some meteorological variability. Unfortunately, the three years of variation that TCEQ accounted for is already built into the structure of the standard. Thus, the TCEQ method gave no consideration to the variability between calculated DVs which provides a direct indication of the difficulty a receptor will have in maintaining the standard. In other words, to determine whether a receptor will have difficulty maintaining the standard, one must consider the variation in the metric that will be used to determine compliance with the standard. An indication of the variability of a metric cannot be determined by only considering a single estimate of that metric.

TCEQ's stated purpose in using the most recent DV was to capture more recent emissions reductions. TCEQ's methodology, however, limits receptors which could be identified as maintenance receptors, compared to the EPA's methodology largely because it only looks at one design value period rather than selecting the maximum of the three DV periods EPA's methodology considers. Thus, TCEQ's methodology greatly reduces the probability that meteorological conditions which make it difficult to maintain the standard will be considered. As discussed further below, the effects of emissions trends are already captured through other aspects of the methodology to identify receptors. So, in trying to give more weight to emission reductions, by selecting only one design value (2012–2014) for its base year, TCEQ's methodology did not give any consideration to interannual variability in ozone-conducive meteorology as does the EPA's method.

The EPA's methodology, using the maximum DV which accounts for the variability in ozone concentrations and DVs due to changes in meteorology over the five years of the base year DV period, was designed to identify those areas that might struggle to maintain the NAAQS in particularly ozone conducive conditions. TCEQ claimed that the EPA's method undervalues changes in air quality due to emission reductions and overvalues changes due to variation in meteorology. TCEQ pointed out that emissions nationwide are generally trending downward as a result of Federal motor vehicle standards and other technological improvements. The EPA agrees that ozone levels generally trend downward, but there is not a steady decline from year to year in ozone concentrations. Rather, ozone levels tend to vary from year to year with some years showing an increase instead of a decrease mainly due to inter-annual variability in ozone-

conducive meteorology. [102] The variation of DVs at individual monitors from year to year can be significant, even where emissions trend downwards. The EPA also assessed a number of monitored DV trends that were provided in TCEQ's SIP submission and previous TCEQ attainment demonstration SIPs indicating that there are at times large annual fluctuations upward from year to year in monitored DVs (sometimes 2–3 ppb increase in one year) that are due to variations in meteorology. [103] This is precisely why it is important to consider highly variable meteorology and its influence on DVs—the issue at the heart of the D.C. Circuit's finding on "interference with maintenance" in *North Carolina.* Areas that are required under the Act to attain by an attainment date may fail to attain because of a combination of both local emissions, upwind emissions, and ozone conducive meteorology, among other factors. The *North Carolina* decision made clear that in interpreting the good neighbor provision, upwind state and the EPA obligations to reduce emissions must account for variable conditions that could cause an area that is sometimes attaining the NAAQS to fall out of attainment. *See also Wisconsin,* 938 F.3d at 327 ("Variations in atmospheric conditions and weather patterns can bring maintenance receptors into nonattainment even *without* elevated emissions.").

In addition, TCEQ claimed that its use of the 2012–2014 DV (*i.e.,* the most recent in the 5-year base period it examined) is more reliable than the EPA's method, because that more recent DV accounts for both emission reductions and because there is a shorter interval between the monitored DV and the projected DV. As we note elsewhere, the TCEQ's base year modeled inventory is 2012 emissions and the TCEQ's model projections for 2023 include the expected emission reductions from 2012 thru 2014 and to 2023. By just using the 2012–2014 DV data, TCEQ claimed they are giving weight to emission reductions during the final base years where EPA's method does not. The effect of emission reductions, however, is already factored in the method since the modeling projection to 2023 is explicitly designed to project the changes in ozone due to emission reductions from the 2012 base year emission levels. So, in fact, the EPA method does give weight to emission reductions. Furthermore, since

<hr>

[100] *See* FN 53.
[101] TCEQ SIP submission at 3–39 to 3–40.

[102] *See* EPA Region 6 TSD, included in Docket ID No. EPA–R06–OAR–2021–0801.
[103] *Id.*

TCEQ agrees that the average of the DVs based on 2010–2014 ozone levels are reliable enough to use in the identification of nonattainment receptors, it is unclear how the 2012–2014 period is deemed more reliable for the maintenance test since the modeled emissions are still for 2012. We also note, as discussed throughout this action, the EPA has updated its modeling to use a 2016 base year—that is, a five year period spanning 2014–2018, and applied its methodology for defining maintenance receptors using that five year base period. Using a more recent base period (EPA's 2016v2) provides the most recent design values, shorter period of projection (2016 to 2023 versus a 2011 or 2012 base year) and a more accurate basis for projections of future air quality. We note that the EPA undertook a large collaborative multi-year effort with states (including TCEQ) and other stakeholders input and review in developing the 2016v2 emission inventories. By virtue of this update, any monitored DV used by the EPA to identify maintenance receptors in this action accounts for more recent emission reductions and provides a shorter interval between base year monitored DV and the projected future analytic year.

As discussed further in the EPA Region 6 TSD [104] for this action, the EPA has reviewed the set of 21 receptors for which Texas had contributions of 0.7 ppb or more in the EPA's 2016 base year modeling analyses, or TCEQ's modeling (2012 base year), and evaluated the results of using TCEQ's alternate maintenance methodology. For these 21 receptors, TCEQ's method resulted in 15 of the 21 2023 maintenance DVs predicted to be lower than the 2023 nonattainment DVs from the nonattainment methodology that uses the 5-year carrier weighted average. Of these 15 receptors, three receptors have 2023 maintenance DVs that are 3 ppb lower, five receptors have 2023 maintenance DVs that are 2 ppb lower, and seven receptors have 2023 maintenance DVs that are 1 ppb lower. In comparison, using the EPA's maintenance methodology results in all 21 2023 maintenance DVs being equal or up to 4 ppb higher than the 2023 nonattainment DVs. Again, the EPA uses the average of the three DVs that contain the base year modeled for the nonattainment methodology and the

maximum of these three DVs for the maintenance methodology. Because TCEQ's maintenance methodology of just using the most recent DV (2012–2014 DV) often results in maintenance DVs lower than the 2023 nonattainment DVs methodology results, the EPA finds that the TCEQ methodology is not adequately identifying conditions when a receptor would have more difficulty maintaining the standard. In fact, the TCEQ's method also identified one receptor in their SIP submission as a nonattainment receptor in 2023 that would not have been identified as a maintenance receptor, which further highlights the concern that TCEQ's method did not adequately identify areas that may struggle to maintain the standard. TCEQ did not address whether the three years that comprise the most recent design value (*i.e.,* 2012, 2013, and 2014) had meteorological conditions highly conducive for formation of high ozone concentrations and thus would be an appropriate time period to assess whether area could have difficulty maintaining the standard and the EPA's analysis confirms that this time period is not highly conducive to ozone formation, at least for many receptors. The consequence of TCEQ's maintenance method is that it often results in lower DVs than the nonattainment test as demonstrated by our analysis, which indicates that it is often not considering conditions when an area would have difficulty maintaining the standard. It is also unreasonable to have a test that would not identify nonattainment receptors also as maintenance receptors.

TCEQ also made several additional assertions in support of their conclusion that their method for identifying maintenance receptors was the better reading of the CAA, compared to the EPA's. TCEQ claimed that its approach was more consistent with the CAA's concept of maintenance as areas that were formerly nonattainment and that have since attained and will continue to maintain by accounting for: (1) Emissions reductions occurring in the later design values of the base DV period; (2) ''commitments regarding contingency measures to address future emission reductions;'' and (3) the impact of any maintenance plans that are in place. TCEQ also asserted that the EPA's approach conflates the likelihood of attaining the standard in a future year and the ability of an attainment monitor to maintain that attainment status. Specifically, TCEQ argued that because any remedies devised to address nonattainment monitors would have to apply to maintenance monitors, a

practical consequence of the EPA's approach is that it could lead to over-control and that it might require upwind states to consider or implement controls when the downwind state in which the monitor is located does not have any obligations to control local emissions. TCEQ argued that this ''conflation'' of nonattainment and maintenance results in there being no independent meaning to ''maintenance.''

With respect to the first of these assertions from TCEQ, we note that TCEQ's methodology for identifying receptors (like the EPA's) is entirely distinct from ozone designations under the Clean Air Act; neither TCEQ nor the EPA take current or presumed future designations of areas into account, and any implementation requirements like a maintenance plan under CAA section 175A, in identifying receptors. TCEQ's discussion, therefore, of maintenance plan contingency measures or maintenance plans generally is irrelevant and misplaced. None of the areas to which Texas is linked in the EPA 2016v2 modeling has been redesignated to attainment for the 2015 ozone NAAQS, and none of the areas to which Texas is linked in its own modeling has been redesignated to attainment for that NAAQS. We also fail to see how TCEQ's approach to identifying maintenance receptors differs in any relevant respect from the EPA's approach with regard to the alleged ''conflation'' of projecting attainment in a future year rather than the ability of an attainment receptor to maintain attainment. Both TCEQ and the EPA identify maintenance receptors based on projections of air quality in a future year to determine whether the receptor will have difficulty attaining or maintaining the standard. TCEQ's arguments about overcontrol based on the application of a uniform remedy to states linked to both nonattainment and maintenance receptors were also not germane; in this case, TCEQ had identified *no* remedy to apply whatsoever because it had failed to identify that the emissions from Texas cause a problem in the first instance. The D.C. Circuit has already rejected the idea that the application of a uniform control to both nonattainment and maintenance receptors is on its face overcontrol or impermissible under the interstate transport provision. *See Wisconsin,* 938 F.3d at 327. Based on our evaluation of TCEQ's approach to identify maintenance receptors for 2023, we propose to find the State's approach is inadequate as it does not sufficiently identify maintenance receptors. Further, TCEQ had not explained how its

[104] ''EPA Region 6 2015 8-Hour Ozone Transport SIP Proposal Technical Support Document'' (EPA Region 6 2015 Ozone Transport SIP TSD.pdf) included in Docket ID No. EPA–R06–OAR–2021–0801.

approach meets the statutory requirement to address areas that, even if meeting the NAAQS, may struggle to maintain the standard in years where conditions are conducive to ozone formation. Rather, the TCEQ had created its own approach to identify these areas that they describe as designed to account for the most emission reductions possible—*i.e.,* the most recent DV of the three under analysis; an approach that likely under-identifies areas that will struggle to maintain the NAAQS and that certainly is not designed to capture potential air quality problems.

ii. Evaluation of the TCEQ Modeling

As discussed in Section V.A of this action, TCEQ conducted regional photochemical modeling to identify nonattainment and maintenance receptors in 2023 using a 2012 base year. As discussed further in the EPA Region 6 TSD, we have several concerns with the reliability of TCEQ's modeling results. States are free to develop their own modeling, but that modeling must be technically supportable, and the EPA is obligated to assess and evaluate the reliability of that technical demonstration when determining whether the Act's requirements are met.

The TCEQ's modeling underestimates future ozone levels. When the TCEQ 2023 projected concentrations are compared to 2020 and preliminary 2021 monitor values, it is clear that the TCEQ modeling is projecting an unusual decline in ozone levels without there being an unusual level of emission reductions to support the decline. The EPA compared recent monitoring values and reasonably anticipated decreases in DVs by 2023 both within Texas and in other parts of the country. These underestimations likely result in TCEQ's modeling not adequately identifying nonattainment and/or maintenance receptors in 2023. These underestimations also result in smaller projected contributions from Texas

emissions to downwind states. See EPA Region 6 TSD for full analysis details.

One analysis included in the EPA Region 6 TSD examined the average amount of improvement that would have to occur for the 9 monitors with the highest measured design values in the Dallas-Ft. Worth and Houston-Galveston-Brazoria nonattainment areas (those with an observed 2018–2020 DV of 74 ppb or greater) to reach the level of ozone projected by the TCEQ modeling. The average decrease needed by 2023 to meet TCEQ's 2023 projected DVs is 7.56 ppb. Improvements of this magnitude do not occur in three years unless there is an unusually large change in emissions or a large change in meteorological conduciveness for ozone generation. TCEQ did not identify any large emission reductions not already accounted for in the modeling to be implemented in the 2021–2023 timeframe nor is the EPA aware of such a change. This information supports our finding that that TCEQ's modeling is underestimating future ozone levels in the two nonattainment areas in Texas that make up a large proportion of the total ozone and a large portion of emissions of ozone pre-cursors that transport to downwind areas. This underestimation of future year ozone levels from Texas emissions can cause both an underestimation of ozone in downwind areas and also an underestimation of Texas's impact on downwind State's ozone nonattainment and maintenance receptors.

TCEQ's modeling also underestimates 2023 ozone levels outside of the State of Texas including areas of interest in California, Colorado and the Midwest Region (Illinois, Wisconsin, and Michigan). The EPA discusses this underprediction for all of these areas in the EPA Region 6 TSD. In Table TX–3, we present only the results for the Midwest Region along with the EPA's modeling prediction. We note that TCEQ's 2023 modeled DVs are significantly lower than the EPA's 2023 modeled DVs. The table also provides

recent monitored 2020 DVs and preliminary 2021 DVs, which shows that recent monitored ozone concentrations are significantly higher than TCEQ's modeling projected for 2023. TCEQ's ozone DVs for these receptors would need to drop on the order of 7–15 ppb in two to three years for TCEQ's projections to bear out. As noted previously, this would require an unusual amount of emission reductions without any control measures identified of sufficient magnitude. We note that the EPA's projected 2023 ozone DVs based on EPA 2016v2 modeling show ozone DVs that are also lower than recent monitoring data. However, EPA 2016v2 modeling projections are much closer to anticipated 2023 ozone levels as compared to TCEQ's modeling. This indicates that the EPA's modeling is more accurate in identifying nonattainment and/or maintenance receptors in the Midwest Region. While the TCEQ modeling projects much lower overall ozone levels for the Midwest Region in 2023, the modeling does tend to corroborate the projected amount emissions that Texas may be contributing to projected ozone levels at 5 of the 7 nonattainment and maintenance receptors identified in the EPA's modeling.[105] Thus, despite the differences in identification of nonattainment and maintenance receptors, both sets of modeling indicate that Texas's contribution to receptors in the Midwest Region are greater than 0.7 ppb (*i.e.,* 1 percent of the 2015 ozone NAAQS). Table TX–3 provides information on those receptors, including the amount of contribution attributed to emissions from Texas based on EPA's 2016v2 modeling and TCEQ's modeling. Despite the differences in identification of nonattainment and maintenance receptors, both sets of modeling indicate that Texas's contribution to receptors in the Midwest are greater than 0.7 ppb (*i.e.,* 1 percent of the 2015 ozone NAAQS).

TABLE TX–3—EPA AND TCEQ MODELING RESULTS FOR DOWNWIND RECEPTORS IDENTIFIED BY EPA 2016v2 MODELING

| Receptor (site ID, county, state) | 2023 nonattainment/ maintenance (EPA 2016v2) | EPA: 2023 average DV/ maximum DV (ppb) | TCEQ: 2023 average DV/ maintenance DV (ppb)* | Monitored 2018–2020 DV/preliminary 2019–2021 DV** (ppb) | EPA: Texas contribution (ppb) | TCEQ: Texas contribution (ppb) |
|---|---|---|---|---|---|---|
| 170310001, Cook, IL | Maintenance | 69.6/73.4 | 60/58 | 75/71 | 0.86 | 1.6. |
| 170310032, Cook, IL | Maintenance | 69.8/72.4 | 68/66 | 74/75 | 1.46 | 1.31. |
| 170314201, Cook, IL | Maintenance | 69.9/73.4 | 64/62 | 77/74 | 1.15 | 1.25. |
| 170317002, Cook, IL | Maintenance | 70.1/73.0 | 66/65 | 75/73 | 1.58 | 1.22. |

[105] We note that for two of the Wisconsin receptors, TCEQ's modeling does not provide information to generate 2023 DVs, so only 5 of the 7 monitors can be compared.

Table TX–3—EPA and TCEQ Modeling Results for Downwind Receptors Identified by EPA 2016v2 Modeling—Continued

| Receptor (site ID, county, state) | 2023 nonattainment/ maintenance (EPA 2016v2) | EPA: 2023 average DV/ maximum DV (ppb) | TCEQ: 2023 average DV/ maintenance DV (ppb)* | Monitored 2018–2020 DV/preliminary 2019–2021 DV** (ppb) | EPA: Texas contribution (ppb) | TCEQ: Texas contribution (ppb) |
|---|---|---|---|---|---|---|
| 550590019, Kenosha, WI .... | Nonattainment ...................... | 72.8/73.7 | 67/66 ............ | 74/74 | 1.72 | 1.44. |
| 550590025, Kenosha, WI .... | Maintenance ......................... | 69.2/72.3 | No data*** .... | 74/72 | 1.81 | No data.*** |
| 551010020, Racine, WI ....... | Nonattainment ...................... | 71.3/73.2 | No data*** .... | 73/73 | 1.34 | No data.*** |

*TCEQ did not provide sufficient data and analysis of the meteorology for the 2010–2014 period to support their claim that 2012–2014 period was a worst-case combination of meteorology compared to the 2010–2012 and 2011–2013 periods. If the future DV projected from this highest value is below the standard, one can be reasonably certain the receptor will not have difficulty maintaining the standard and, as such, upwind states will not interfere with maintenance in downwind states. Because the TCEQ method only looks at one DV and does not account for the variability in DVs due to meteorological conditions, it is less likely to identify maintenance receptors than the EPA method. *See https://www.epa.gov/air-trends/air-quality-design-values*

** Preliminary 2019–2021 DVs. Monitoring data from the EPA's Air Quality System (AQS) (*https://www.epa.gov/aqs*). 2021 monitoring data is preliminary and still has to undergo Quality Assurance/Quality Control analysis and be certified by the State of Texas, submitted to the EPA, and reviewed and concurred on by EPA. 2018–2020 DVs are 72 ppb and 73 ppb at the Denton County and Tarrant County monitors/receptors respectively. Preliminary 2019–2021 DVs are 74 ppb and 72 ppb at the Denton County and Tarrant County monitors/receptors respectively.

*** Kenosha, WI Monitor ID. 550590025 was installed and began operating May 13, 2013, so the first three year DV available is 2013–2015. Racine, WI Monitor ID. 551010020 was installed on April 14, 2014 so the first three year DV available is 2015–2017. TCEQ's modeling used monitored DV data for 2010–2012, 2011–2013, and 2012–2014 to project to the future year. Since these monitors do not have valid DVs for these periods, TCEQ's modeling can't be used to project 2023 values and identify if they would be nonattainment or maintenance receptors.

The EPA investigated TCEQs modeling and the underestimation for the future year. See the EPA Region 6 TSD for further information on our review. Our review indicated some underestimation bias in the base case and general model performance concerns but nothing that was a clear cause of the much lower 2023 DVs that TCEQ's modeling is projecting. For the EPA's 2016 base year modeling, the EPA undertook a large collaborative multi-year effort with states (including Texas) and other stakeholder input in developing the 2016 emission inventories including 2016v2, so that the EPA's modeling would be based on the best data available. Using a 2016 base year also provides a more recent platform that shortens the number of years to project emission changes, reducing uncertainties in the 2023 projection compared to TCEQ's projection from a 2012 base to 2023 or the EPA's earlier 2011 base year modeling. Use of a more recent 2016 base year also allows for the use of monitored DVs from a more recent period. The combination of these and other issues discussed in the EPA Region 6 TSD result in less model uncertainty compared to TCEQ's 2012 base year modeling and has provided a better estimate of 2023 ozone levels and therefore, we believe a more reliable tool for predicting which areas of the country will be nonattainment or have difficulty maintaining the standard as well as assessing contributions from upwind states.

The EPA's modeling using both 2011 and 2016 base year periods identified that Texas was linked to nonattainment

and/or maintenance receptors in 2023 in the Midwest Region (Illinois, Wisconsin, and Michigan), while TCEQ's modeling using a 2012 base year indicated only linkages to western receptors. As discussed above and in the EPA Region 6 TSD, the TCEQ's modeling is underestimating projected ozone levels in the Midwest Region for 2023. If TCEQ's 2023 modeled DVs were closer to recent observed monitoring data and anticipated 2023 monitored DVs, TCEQ would likely have also identified nonattainment and/or maintenance receptors in the Midwest Region.

To summarize, TCEQ did its own modeling at Step 1. Our analysis shows that TCEQ's modeling likely underestimates ozone levels at potential receptors and that TCEQ's methodology for identifying maintenance receptors used to identify maintenance receptors fails to reasonably identify areas that will have difficulty maintaining the NAAQS.

2. Evaluation of Information Provided by TCEQ Regarding Step 2

TCEQ, like the EPA, used a 1 percent of the ozone NAAQS (or 0.7 ppb) as the "linkage" threshold to identify states as "linked" for contributions it made to areas with projected air quality problems. Although TCEQ asserted that the EPA treats the 1 percent threshold as the threshold by which the EPA determines "significant contribution" this is in fact incorrect. The EPA, like TCEQ, uses the 1 percent contribution threshold to identify those linkages between a contributing upwind state and a receptor projected to have air

quality problems that warrant further review and additional analysis. We therefore endorse TCEQ' use of the 1 percent contribution threshold to identify linkages requiring further analysis. However, because we propose to disapprove TCEQ's identification of nonattainment and/or maintenance receptors (at Step 1) due to underestimations in TCEQ's modeling and their unsupported methodology of identifying maintenance receptors, their submission as to Step 2 is also flawed. We note, however, that even in its own modeling, TCEQ has identified nonattainment and/or maintenance receptors to which it contributed more than 1 percent of the NAAQS (*i.e.*, identified linkages warranting additional analysis at Step 3).

3. Results of the EPA's Step 1 and Step 2 Modeling and Findings for Texas

As described in Section I and elsewhere in this action, the EPA performed air quality modeling using the 2016v2 emissions platform to project design values and contributions for 2023. This data was examined to determine if Texas contributes at or above the threshold of 1 percent of the 2015 ozone NAAQS (0.70 ppb) to any downwind nonattainment or maintenance receptor. As shown in Table TX–4, the data [106] indicate that in 2023, emissions from Texas are projected to contribute greater than 1 percent of the standard to both

---

[106] Design values and contributions at individual monitoring sites nationwide are provided in the file: "2016v2_DVs_state_contributions.xlsx", which is included in docket ID No. EPA–HQ–OAR–2021–0663.

nonattainment and maintenance-only receptors in the Chicago, IL–IN–WI nonattainment area (4 Cook County, IL receptors and 2 Kenosha County, WI receptors) and the Milwaukee, WI nonattainment area (one Racine County receptor).[107]

### TABLE TX–4—PROJECTED NONATTAINMENT AND MAINTENANCE RECEPTORS WITH TEXAS LINKAGES BASED ON EPA 2016v2

| Receptor (site ID, county, state) | Nonattainment/maintenance | 2023 average DV (ppb) | 2023 maximum DV (ppb) | Texas contribution (ppb) |
|---|---|---|---|---|
| 170310001, Cook, IL | Maintenance | 69.6 | 73.4 | 0.86 |
| 170310032, Cook, IL | Maintenance | 69.8 | 72.4 | 1.46 |
| 170314201, Cook, IL | Maintenance | 69.9 | 73.4 | 1.15 |
| 170317002, Cook, IL | Maintenance | 70.1 | 73.0 | 1.58 |
| 550590019, Kenosha, WI | Nonattainment | 72.8 | 73.7 | 1.72 |
| 550590025, Kenosha, WI | Maintenance | 69.2 | 72.3 | 1.81 |
| 551010020, Racine, WI | Nonattainment | 71.3 | 73.2 | 1.34 |

We recognize that the results of the EPA (2011 and 2016 base year) and TCEQ (2012 base year) modeling indicated different receptors and linkages at Steps 1 and 2 of the 4-Step interstate transport framework. These differing results regarding receptors and linkages can be affected by the varying meteorology from year to year, but we do not think the differing results mean that the modeling or the EPA or the State's methodology for identifying receptors or linkages is inherently unreliable. Rather, the three separate modeling runs all indicated: (1) There were receptors that would struggle with nonattainment or maintenance in the future; and (2) Texas was linked to some set of these receptors, even if the receptors and linkages differed from one another in their specifics (e.g., a different set of receptors were identified to have nonattainment or maintenance problems, or Texas was linked to different receptors in one modeling run versus another). These results indicate that emissions from Texas were substantial enough to generate linkages at Steps 1 and 2 to some downwind receptors, under varying assumptions and meteorological conditions, even if the precise set of linkages changed between modeling runs. Under these circumstances, we think it is appropriate to proceed to a Step 3 analysis to determine what portion of emissions from Texas should be deemed "significant." In doing so, we are not agreeing with the methods and assumptions contained in TCEQ's modeling (see previous discussion and the EPA Region 6 TSD included in the docket for this proposal for further discussion on evaluation of that modeling), or that we consider our own

earlier modeling to be of equal reliability relative to more recent modeling. However, where alternative or older modeling generated linkages, even if those linkages differ from linkages in the EPA's most recent set of modeling (EPA 2016v2), that information provides further evidence, not less, in support of a conclusion that the State is required to proceed to Step 3 to further evaluate its emissions.

Therefore, based on the EPA's evaluation of the information submitted by TCEQ and based on the EPA 2016v2 modeling results for 2023, the EPA proposes to find that Texas is linked at Steps 1 and 2 and has an obligation to assess potential emissions reductions from sources or other emissions activity at Step 3 of the 4-Step framework.

#### 4. Evaluation of Information Provided by TCEQ Regarding Step 3

At Step 3 of the 4-Step interstate transport framework, a state's emissions are further evaluated, considering multiple factors, including air quality and cost considerations, to determine what, if any, emissions significantly contribute to nonattainment or interfere with maintenance and, thus, must be eliminated under CAA section 110(a)(2)(D)(i)(I).

To effectively evaluate which emissions in the state should be deemed "significant" and therefore prohibited, states generally should prepare an accounting of sources and other emissions activity for relevant pollutants and assess potential additional emissions reduction opportunities and resulting downwind air quality improvements. The EPA has consistently applied this approach (i.e., Step 3 of the 4-Step interstate transport

framework) when identifying emissions contributions that the Agency has determined to be "significant" (contribution to nonattainment or interfere with maintenance) in each of its prior Federal, regional ozone transport rulemakings, and this interpretation of the statute has been upheld by the Supreme Court. See EME Homer City, 572 U.S. 489, 519 (2014). While the EPA has not directed states that they must conduct a Step 3 analysis in precisely the manner the EPA has done in its prior regional transport rulemakings, state implementation plans addressing the obligations in CAA section 110(a)(2)(D)(i)(I) must prohibit "any source or other type of emissions activity within the State" from emitting air pollutants which will contribute significantly to downwind air quality problems. Thus, states must complete something similar to the EPA's analysis (or an alternative approach to defining "significance" that comports with the statute's objectives) to determine whether and to what degree emissions from a state should be "prohibited" to eliminate emissions that will "contribute significantly to nonattainment in, or interfere with maintenance of" the NAAQS in any other state. TCEQ did not demonstrate such an analysis in their SIP submission. We therefore propose that TCEQ was required to analyze emissions from the sources and other emissions activity from within the State to determine whether its contributions were significant, and we propose to disapprove its submission because Texas failed to do so.

Instead, as noted in Section V.A of this action, TCEQ interpreted the Act's requirements as only requiring an

---

[107] These modeling results are consistent with the results of a prior round of 2023 modeling using the 2016v1 emissions platform which became available to the public in the fall of 2020 in the Revised

CSAPR Update, as noted in Section I of this action. That modeling showed that Texas had a maximum contribution greater than 0.70 ppb to at least one nonattainment or maintenance-only receptor in

2023. These modeling results are included in the file "Ozone Design Values And Contributions Revised CSAPR Update.xlsx" in Docket No. EPA–HQ–OAR–2021–0663.

analysis of emission reductions where "there is a persistent and consistent pattern of contribution on several days with elevated ozone." TCEQ asserted that it would make the determination of whether such pattern existed based on a weight-of-evidence approach that takes into consideration air quality factors such as: Current attainment status of the monitors, design value trends, the meteorological conditions that lead to high ozone formation at the monitor, the number of days with elevated observed ozone, back trajectories, Texas' relative contribution on modeled high ozone days, Texas' contribution as part of the collective interstate contribution to future modeled DVs, alternate contribution method analysis, and model sensitivity runs to reductions of Texas' emissions on receptors. However, TCEQ stated that it did not consider or analyze all factors for every monitor. Thus, different factors were analyzed for the receptors in different regions (Colorado, Arizona, and Southern California). The EPA has reviewed the different factors that TCEQ provided for each of the regions in the EPA Region 6 TSD, but we will provide a brief summary of the evaluation below. TCEQ also asserted that use of the 1 percent threshold as the "sole" definition of significant contribution for the 2015 ozone NAAQS is inappropriate. Based on the application of selected factors for each of the monitors to which TCEQ's modeling found that it was linked, TCEQ concluded that none of its contributions to any other states were significant.

As explained above, TCEQ has mischaracterized the EPA's interpretation of the CAA in stating that the EPA defines significant contribution "solely" using a 1 percent threshold. The EPA, like TCEQ, uses the 1 percent threshold to identify areas for further analysis. The difference is that the EPA in past analyses has examined potential emission reductions in linked upwind states and the air quality impacts at downwind receptors that would result from the implementation of those reductions to assess which contributions are "significant." This interpretation of significant contribution, as discussed above, has been upheld by the Supreme Court and the D.C. Circuit.

As an initial matter, the EPA believes source apportionment modeling, as performed by the EPA and also by TCEQ, to determine which states are linked is an appropriate tool to identify impacts that are persistent enough to impact a downwind receptors ability to attain or maintain the standard. This approach is described in more detail

above in Section II.B.4 of this action, but, in summary, averages the contributions from an upwind state for up to 10 days, which is preferred, (but a minimum 5 days) at a given receptor. Given the ozone dataset is an average of the fourth high value from each of three years, the EPA technique, also used by Texas, is appropriate to identify impacts of sufficient persistence to impact a downwind receptor's ability to attain or maintain the standard.

The EPA reviewed TCEQ's evaluation of the current attainment status of the monitors and design value trends, and concludes, as described in more detail in the EPA Region 6 TSD, that the provided information does not support the large decreases in ozone levels that TCEQ's modeling projects will occur by 2023. The analysis for California and Colorado receptors provides evidence that TCEQ's photochemical modeling is overestimating the ozone reductions expected at these receptors between 2012 and 2023 and actually presents evidence that more nonattainment and/ or maintenance receptors should have been identified.

The EPA also reviewed the trends in the number of high ozone days per year provided by TCEQ for Colorado and California. While this data supports that the number of ozone exceedance days is improving, neither the analysis of the number of high ozone days in Colorado or California provide any evidence to refute the TCEQ's photochemical modeling results that show these areas should be considered nonattainment and/or maintenance receptors. TCEQs modeling overestimates ozone reductions yet still shows Texas linked to receptors at both nonattainment and maintenance levels in 2023.

The TCEQ cited a conceptual model of ozone formation for areas in Southern California. TCEQ indicated that Southern California is isolated and transport into the basin is unlikely on a frequent basis, but this information does not refute the TCEQ's modeling. As discussed in Section III.B.3 of this action, photochemical modeling is the most sophisticated tool available to estimate future ozone levels and contributions to those modeled future ozone levels. Consideration of the different processes that affect primary and secondary pollutants at the regional scale in different locations is fundamental to understanding and assessing the effects of emissions on air quality concentrations. TCEQ's modeling showed transport at 10 monitors having contributions greater than 0.7 ppb on average for the 5–10 days used in the modeling analyses. Considering the form of the standard,

this is a sufficient number of days to determine if an impact is persistent enough to impact an area's ability to attain or maintain the standard.

TCEQ used the National Oceanic and Atmospheric Administration (NOAA) HYSPLIT [108] model to produce back trajectories for all the monitored ozone exceedance days (2007–2016) for the five receptors in Colorado and 10 receptors in Southern California to evaluate how many of the back trajectories went through Texas. TCEQ also used data from these back trajectories to do an endpoint count analysis. We note that we have several concerns with how TCEQ performed the back trajectories including start time and heights, length (number of hours) of the back trajectory, inappropriate removal of some back trajectories based on start height, center-line height touch down, and trajectory center-line height when over Texas, and inappropriate counting of trajectories by not considering that the center-line represents the centerline of a much wider area of air parcels that could have reached the monitor/receptor. Due to these concerns, as discussed in more detail in the EPA Region 6 TSD, the EPA finds the results of TCEQ's back trajectory and endpoint analysis flawed (underestimates back trajectories that reach Texas) and do not provide evidence that refutes the TCEQ photochemical modeling analysis results.

We note that even valid back trajectories are of limited use as HYSPLIT simply estimates the path a parcel of air backward in hourly steps for a specified length of time. HYSPLIT estimates the central path in both the vertical and horizontal planes. The HYSPLIT central path represents the centerline with the understanding that there are areas on each side horizontally and vertically that also contribute to the concentrations at the end point. The horizontal and vertical areas that potentially contribute to concentrations at the endpoint (monitor) grow wider from the centerline the further back in time the trajectory goes. Therefore, a HYSPLIT centerline does not have to pass directly over emissions sources or emission source areas, but merely relatively near emission source areas for those areas, to contribute to concentrations at the trajectory endpoint. The EPA relies on back trajectory analysis as a corollary analysis along with observation-based meteorological wind fields at multiple heights to examine the general plausibility of the photochemical model

[108] *See* FN 34.

"linkages." Since the back trajectory calculations do not account for any air pollution formation, dispersion, transformation, or removal processes as influenced by emissions, chemistry, deposition, etc., the trajectories cannot be used to develop quantitative contributions. Therefore, back trajectories cannot be used to quantitatively evaluate the magnitude of the existing photochemical contributions from upwind states to downwind receptors. It is interesting to note that TCEQ's analysis of the back trajectories indicates that the 2012 meteorology used by TCEQ seemed to yield more back trajectories that reach Texas than most years for many of the Colorado receptors. This seems to be consistent with TCEQ identifying linkages to Colorado when the EPA's modeling of 2016 does not.

TCEQ performed an alternate contribution analysis for the ten California receptors and the five Colorado receptors using all days modeled in 2023 that had values over 70 ppb rather than focus on just the 5–10 highest values under the EPA's technique. Particularly for California, this meant many more days could be included in the average which had the effect of showing a smaller estimated contribution. We believe it is appropriate to focus on the highest values as these are the ones that ultimately will have to be reduced for the standard to be attained. As discussed in the EPA Region 6 TSD, the EPA's review of TCEQ's alternate contribution method analysis for California and Colorado receptors is that it does not provide substantial evidence that refutes the TCEQ's photochemical modeling analysis results, including the contribution analysis using the EPA's contribution methodology.

TCEQ provided an analysis of collective interstate contribution to the 2023 DV for the five Colorado and ten California receptors. The collective interstate contribution at tagged Colorado receptors ranges from 9.32% to 10.27%. The collective interstate contribution at tagged California receptors ranges from 3.2% to 4.58%. TCEQ argues that these are small percentages (Colorado and California) and not as high as the collective interstate contribution percentages the EPA calculated for monitors in Eastern States, which ranged from 17% to 67%. TCEQ also notes that a significant portion of the tagged Colorado monitors' 2023 modeled DVs is due to background emissions (sum of contributions from to biogenic, fires, and boundary conditions). For the California receptors TCEQ argues that these percentages are

small compared to Intra-State contribution.

As an initial matter, the EPA is not solely relying on TCEQ's findings of linkages to Colorado and California but is also relying on its own findings of linkages to areas in the Midwest Region. As such, TCEQ's analysis of relative contributions to Colorado and California does not provide justification for not addressing downwind impacts. Nonetheless, EPA has found in the past that certain California receptors are so heavily impacted by local emissions, and total upwind contribution is so low, that those receptors may not be considered to be affected by interstate ozone transport. *See* 81 FR 15200 (Mar. 22, 2016). However, this is a narrow circumstance that does not apply in the vast majority of cases and has never been applied outside of California. EPA has previously found, for instance, that receptors in Colorado are heavily impacted by upwind-state contribution. *See* 82 FR 9155 (Feb. 3, 2017); 81 FR 71991 (Oct. 19, 2016). EPA need not draw any conclusions here regarding whether the California sites TCEQ identified should or should not be considered receptors for ozone-transport purposes. EPA affirms, contrary to TCEQ's suggestion, that the Colorado receptors TCEQ analyzed are impacted by upwind state contributions. However, the EPA's finding that Texas is linked to receptors in other states is based on still other linkages found in EPA's modeling to receptors in other states, which are clearly impacted by the collective contribution of multiple upwind states, including Texas. Under CAA section 110(a)(2)(D)(i)(I) downwind states are not obligated to reduce emissions on their own to resolve nonattainment or maintenance problems. Rather, states are obligated to eliminate their own significant contribution or interference with the ability of other states to attain or maintain the NAAQS.

TCEQ also performed photochemical modeling analysis using the Direct Decoupled Method (DDM) tool for receptors in Colorado. DDM provides a first derivative of the changes in ozone (linear relationship where the DDM value is the slope of the line for changes in ozone) resulting from changes in $NO_X$ emissions from all Texas' $NO_X$ emissions. The DDM modeling does show some response to Texas $NO_X$ emissions but from the scale it is hard to discern the level of response but it appears to be in the 0–2 ppb range in general with some values in the 0.2 –2 ppb range for modeled values over 60 ppb. Since the modeling has underprediction and underestimation

issues, these values could be higher. Not surprisingly, the DDM tool shows that monitors in Colorado are much more responsive to intra-state reductions than reductions in Texas. That said, the results of the DDM tool showing only a relatively small response to reductions is not inconsistent with the finding that Texas emissions contribute significantly to elevated readings in Colorado. As has been discussed elsewhere, the EPA believes a contribution of 1 percent of the standard is an appropriate threshold such that further analysis is warranted.

Overall, these additional analyses performed by TCEQ do not provide sufficient evidence to refute the modeling results that TCEQ's modeling indicates downwind nonattainment and/or maintenance receptors in Colorado and Southern California are impacted by Texas emissions and Texas' contribution is 0.7 ppb or greater.[109] In fact, the monitored ozone design value trends provide evidence that future year modeled ozone levels are underestimated by TCEQ's modeling and there are likely more receptors that should have been identified with additional potential linkages. Although Texas asserted that its additional air quality factor analysis is a permissible way to interpret which contributions are "significant" because that analysis examines whether there was a "persistent and consistent pattern of contribution on several days with elevated ozone" we find that such pattern is already established by a modeled linkage at Step 2.

In addition, EPA 2016v2 modeling using 2016 base year meteorology indicates linkages from Texas to receptors in the Midwest Region but does not indicate impacts from Texas emissions on the Colorado and other western receptors identified by TCEQ. With a different base period such as TCEQ's 2012 base period meteorology and the EPA's 2016 base period meteorology, it is not uncommon that the potential downwind nonattainment or maintenance receptors could change. These differing results about receptors and linkages can be affected by the varying meteorology from year to year and the selection of different base years, but we do not think the differing results mean that the modeling or the EPA methodology for identifying receptors or linkages is inherently unreliable. Rather, these separate modeling runs indicated (1) that there were receptors that would

---

[109] TCEQ also identified a monitor in Cochise County, Arizona (ID 40038001), but the monitor's recent DVs are below the NAAQS. From AQS, the 2014–2016 and 2015–2017 DVs are each 65 ppb; 2016–2018, 2017–2019, and 2018–2020 DVs are 66 ppb; and preliminary 2019–2021 DV is 66 ppb.

struggle with nonattainment or maintenance in the future, and (2) that Texas was linked to some set of these receptors, even if the receptors and linkages differed from one another in their specifics (e.g., a different set of receptors were identified to have nonattainment or maintenance problems, or Texas was linked to different receptors in one modeling run versus another). We think this common result indicates that Texas's emissions were substantial enough to generate linkages at Steps 1 and 2 to some set of downwind receptors, under varying assumptions and meteorological conditions, even if the precise set of linkages changed between modeling runs.

In sum, the EPA's more recent and robust 2016 base year modeling platform indicates that Texas is linked to several receptors in the Midwest Region as does the EPA's earlier 2011 base year modeling. TCEQ's 2012 base case modeling showed linkages to states in the west. As discussed, the EPA does not find the additional weight of evidence evaluations conducted by TCEQ provide compelling reasons to discount the impacts indicated in Colorado and California by the TCEQ modeling. In fact, we think TCEQ's modeling likely underestimates these issues. We therefore propose that Texas was required to analyze emissions from the sources and other emissions activity from within the State to determine whether its contributions were significant, and we propose to disapprove its submission because Texas failed to do so.

5. Evaluation of Information Provided by TCEQ Regarding Step 4

Step 4 of the 4-Step interstate transport framework calls for development of permanent and federally enforceable control strategies to achieve the emissions reductions determined to be necessary at Step 3 to eliminate significant contribution to nonattainment or interference with maintenance of the NAAQS. Texas indicated that because a number of counties in its state had been designated nonattainment for the 2015 ozone NAAQS, there could be attainment demonstration and potential controls contemplated in association with those nonattainment designations.[110]

However, the State's interstate transport submission did not revise its SIP to identify any specific emission reductions, nor did it include a revision to its SIP to ensure any such reductions were permanent and enforceable. The other control measures identified in TCEQ's submission are, as noted by TCEQ, already adopted and implemented measures and do not contain an evaluation of additional emission control opportunities (or establish that no additional controls are required). As a result, the EPA proposes to disapprove TCEQ's submittal on the separate, additional basis that the Texas has not included permanent and enforceable emissions reductions in its SIP as necessary to meet the obligations of CAA section 110(a)(2)(d)(i)(I).

6. Conclusion

Based on the EPA's evaluation of TCEQ's SIP submission, the EPA is proposing to find that the Texas August 17, 2018, SIP submission pertaining to interstate transport of air pollution does not meet the State's interstate transport obligations, because it fails to contain the necessary provisions to eliminate emissions that will contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in any other state.

VI. Proposed Action

We are proposing to disapprove the SIP submissions from Arkansas, Louisiana, Oklahoma, and Texas pertaining to interstate transport of air pollution which will significantly contribute to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in other states. Under CAA section 110(c)(1), the disapprovals would establish a 2-year deadline for the EPA to promulgate FIPs for these states to address the CAA section 110(a)(2)(D)(i)(I) interstate transport requirements pertaining to significant contribution to nonattainment and interference with maintenance of the 2015 ozone NAAQS in other states, unless the EPA approves SIPs that meet these requirements. Disapproval does not start a mandatory sanctions clock for Arkansas, Louisiana, Oklahoma, or Texas.

VII. Statutory and Executive Order Reviews

A. Executive Order 12866: Regulatory Planning and Review and Executive Order 13563: Improving Regulation and Regulatory Review

This action is not a significant regulatory action and was therefore not submitted to the Office of Management and Budget for review

B. Paperwork Reduction Act (PRA)

This proposed action does not impose an information collection burden under the PRA because it does not contain any information collection activities

C. Regulatory Flexibility Act (RFA)

I certify that this action will not have a significant economic impact on a substantial number of small entities under the RFA. This action merely proposes to disapprove a SIP submission as not meeting the CAA.

D. Unfunded Mandates Reform Act (UMRA)

This action does not contain any unfunded mandate as described in UMRA, 2 U.S.C. 1531–1538, and does not significantly or uniquely affect small governments. The action imposes no enforceable duty on any state, local or tribal governments or the private sector.

E. Executive Order 13132: Federalism

This action does not have federalism implications. It will not have substantial direct effects on the states, on the relationship between the national government and the states, or on the distribution of power and responsibilities among the various levels of government.

F. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments

This proposed action disapproving the portion of Oklahoma's SIP submission addressing the State's interstate transport obligations under CAA section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS will apply to certain areas of Indian country as discussed in Section IV.C of this action, and, therefore, has tribal implications as specified in E.O. 13175 (65 FR 67249, November 9, 2000). However, this proposed action will neither impose substantial direct compliance costs on federally recognized tribal governments, nor preempt tribal law. This proposed action will not impose substantial direct compliance costs on federally recognized tribal governments because no actions will be required of tribal governments. This proposed action will

---

[110] Pointing to anticipated upcoming emission reductions, even if they were not included in the analysis at Steps 1 and 2, is not sufficient as a Step 3 analysis, for the reasons discussed in Section V.B.4 of this action. In this section, we explain that to the extent such anticipated reductions are not included in the SIP and rendered permanent and

enforceable, reliance on such anticipated reductions is also insufficient at Step 4.

also not preempt tribal law as no Oklahoma tribe implements a regulatory program under the CAA, and thus does not have applicable or related tribal laws. Consistent with the EPA Policy on Consultation and Coordination with Indian Tribes (May 4, 2011), the EPA will offer consultation to tribal governments whose lands are located within the exterior boundaries of the State of Oklahoma that may be affected by this action.

### G. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks

The EPA interprets Executive Order 13045 as applying only to those regulatory actions that concern environmental health or safety risks that the EPA has reason to believe may disproportionately affect children, per the definition of "covered regulatory action" in section 2–202 of the Executive Order. This action is not subject to Executive Order 13045 because it merely proposes to disapprove a SIP submission as not meeting the CAA.

### H. Executive Order 13211, Actions That Significantly Affect Energy Supply, Distribution or Use

This action is not subject to Executive Order 13211, because it is not a significant regulatory action under Executive Order 12866.

### I. National Technology Transfer and Advancement Act

This rulemaking does not involve technical standards.

### J. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations

The EPA believes the human health or environmental risk addressed by this action will not have potential disproportionately high and adverse human health or environmental effects on minority, low-income or indigenous populations. This action merely proposes to disapprove a SIP submission as not meeting the CAA.

### K. CAA Section 307(b)(1)

Section 307(b)(1) of the CAA governs judicial review of final actions by the EPA. This section provides, in part, that petitions for review must be filed in the D.C. Circuit: (i) When the agency action consists of "nationally applicable

regulations promulgated, or final actions taken, by the Administrator," or (ii) when such action is locally or regionally applicable, if "such action is based on a determination of nationwide scope or effect and if in taking such action the Administrator finds and publishes that such action is based on such a determination." For locally or regionally applicable final actions, the CAA reserves to the EPA complete discretion whether to invoke the exception in (ii).[111]

The EPA anticipates that this proposed rulemaking, if finalized, would be "nationally applicable" within the meaning of CAA section 307(b)(1) because it would take final action on SIP submittals for the 2015 ozone NAAQS for four states, which are located in three different Federal judicial circuits. It would apply uniform, nationwide analytical methods, policy judgments, and interpretation with respect to the same CAA obligations, *i.e.*, implementation of interstate transport requirements under CAA section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS for states across the country, and final action would be based on this common core of determinations, described in further detail below.

If the EPA takes final action on this proposed rulemaking[, in the alternative,] the Administrator intends to exercise the complete discretion afforded to him under the CAA to make and publish a finding that the final action (to the extent a court finds the action to be locally or regionally applicable) is based on a determination of "nationwide scope or effect" within the meaning of CAA section 307(b)(1). Through this rulemaking action (in conjunction with a series of related actions on other SIP submissions for the same CAA obligations), the EPA interprets and applies section 110(a)(2)(d)(i)(I) of the CAA for the 2015 ozone NAAQS based on a common core of nationwide policy judgments and technical analysis concerning the interstate transport of pollutants throughout the continental U.S. In

particular, the EPA is applying here (and in other proposed actions related to the same obligations) the same, nationally consistent 4-Step framework for assessing interstate transport obligations for the 2015 ozone NAAQS. The EPA relies on a single set of updated, 2016 base year photochemical grid modeling results of the year 2023 as the primary basis for its assessment of air quality conditions and contributions at Steps 1 and 2 of the 4-Step framework. Further, the EPA proposes to determine and apply a set of nationally consistent policy judgments to apply the 4-Step framework. The EPA has selected a nationally uniform analytic year (2023) for this analysis and is applying a nationally uniform approach to nonattainment and maintenance receptors and a nationally uniform approach to contribution threshold analysis.[112] For these reasons, the Administrator intends, if this proposed action is finalized, to exercise the complete discretion afforded to him under the CAA to make and publish a finding that this action is based on one or more determinations of nationwide scope or effect for purposes of CAA section 307(b)(1).[113]

### List of Subjects in 40 CFR Part 52

Environmental protection, Air pollution control, Incorporation by reference, Ozone.

*Authority:* 42 U.S.C. 7401 *et seq.*

Dated: February 1, 2022.

**Earthea Nance,**

*Regional Administrator, Region 6.*

[FR Doc. 2022–02961 Filed 2–18–22; 8:45 am]

**BILLING CODE 6560–50–P**

---

[111] In deciding whether to invoke the exception by making and publishing a finding that an action is based on a determination of nationwide scope or effect, the Administrator takes into account a number of policy considerations, including his judgment balancing the benefit of obtaining the D.C. Circuit's authoritative centralized review versus allowing development of the issue in other contexts and the best use of agency resources.

[112] A finding of nationwide scope or effect is also appropriate for actions that cover states in multiple judicial circuits. In the report on the 1977 Amendments that revised section 307(b)(1) of the CAA, Congress noted that the Administrator's determination that the "nationwide scope or effect" exception applies would be appropriate for any action that has a scope or effect beyond a single judicial circuit. See H.R. Rep. No. 95–294 at 323, 324, reprinted in 1977 U.S.C.C.A.N. 1402–03.

[113] The EPA may take a consolidated, single final action on all of the proposed SIP disapproval actions with respect to obligations under CAA section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS. Should the EPA take a single final action on all such disapprovals, this action would be nationally applicable, and the EPA would also anticipate, in the alternative, making and publishing a finding that such final action is based on a determination of nationwide scope or effect.

**TAB 3: EPA REGION 6,** *2015 8-HOUR OZONE TRANSPORT SIP PROPOSAL TECHNICAL SUPPORT DOCUMENT***, EPA-R06-OAR-2021-0801-0002 (FEB. 2022)**

**EPA REGION 6**

**2015 8-HOUR OZONE TRANSPORT SIP PROPOSAL**

**TECHNICAL SUPPORT DOCUMENT**

**FDMS Docket No. EPA-R06-OAR-2021-0801**

**February 2022**

**By**

**Erik Snyder**

**Lead Regional Air Quality Modeler**

**EPA Region 6 – Dallas, TX**

# Contents

Introduction ............................................................................................................. 3

1. Maintenance Receptor Methodology ............................................................... 4

    1.a. Use of Single DV To Project Maintenance Receptors ........................................ 4

    1.b. Review of History of EPA's Guidance ............................................................ 10

    1.c. Relative Effects of Long-Term Emissions Trends ........................................... 12

    1.d. Meteorological Adjusted Trends Analysis of 2010-2014 Monitored Ozone Data ........... 31

2. Potential Underestimation of Projected Design Values and Model Performance Evaluation ......
.............................................................................................................. 38

    2.a. Potential Underestimation in TCEQ's Modeling 2023 Future year projections at DFW &
    HGB receptors and High DV monitors .................................................................... 39

    2.b. Potential Underestimation in TCEQ's 2023 Future year projections at downwind areas . 44

    2.c. Model Performance Evaluation of TCEQ's 2012 base case at downwind areas in the
    Midwest and West ..................................................................................................... 51

    2.d. Model Performance Evaluation of TCEQ's 2012 base case at DFW and HGB monitors  57

    2.e. Summary .................................................................................................... 66

3. Comparison of TCEQ and EPA 2023 future modeling and identified maintenance and
nonattainment receptors ..................................................................................... 67

4.       Other Potential Modeling Concerns ................................................................. 72

    4.a. EGU Emissions .............................................................................................. 72

    4.b. Contribution Calculation ............................................................................... 73

    4.c. Future Year Boundary Conditions .................................................................. 76

5. TCEQ Other Factor Analysis (Weight of Evidence) ................................................ 76

    5.a. TCEQ indicated that there are problems with DV trends ................................... 78

    5.b. TCEQ evaluated the number of elevated ozone days (over 70 ppb) annually for monitors
    in the Denver and Southern California areas. ......................................................... 81

    5.c. TCEQ Back Trajectory Analysis ................................................................. 81

    5.d. Texas contribution on all days in 2023 with ozone greater than 70 ppb. ................ 86

    5.e. Collective Interstate Contribution to Future DV ............................................. 89

    5.f. TCEQ also performed Direct Decoupled Method (DDM) modeling for receptors in
    Colorado ................................................................................................................. 92

    5.g. Southern California Ozone Conceptual Model ............................................... 97

    5.h. Summary ..................................................................................................... 97

6. EPA Summary ............................................................................................... 99

**Introduction**

This Technical Support Document (TSD) provides additional analysis of the Texas Commission on Environmental Quality's (TCEQ) air quality modeling relied upon in its August 17, 2018, State Implementation Plan (SIP) submission addressing interstate transport obligations for the 2015 ozone national ambient air quality standards (NAAQS). As discussed in the notice of proposed disapproval, the EPA has identified several concerns with the reliability of TCEQ's modeling and the application of those modeling results in assessing Texas's potential contributions to downwind ozone. States are free to develop their own modeling in support of SIP submissions. That modeling, its application, and other technical analyses must be technically supportable, and the EPA is obligated to assess and evaluate the reliability of each state's technical demonstration when determining whether the Clean Air Act's (the Act, or CAA) requirements are met. Based on the EPA's evaluation of the SIP submission, the EPA is proposing to find that TCEQ's August 17, 2018, SIP submission does not meet the State's obligations with respect to prohibiting emissions that contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in any other state. *See* Federal Register Notice, "Air Plan Disapproval; Arkansas, Louisiana, Oklahoma and Texas; Interstate Transport of Air Pollution for the 2015 8-hour Ozone National Ambient Air Quality Standards" (Docket ID No. EPA-R06-OAR-2021-0801; proposed action). Certain legal, policy, and technical bases for that determination are discussed in the preamble of the notice of proposed disapproval. In addition, the Oklahoma Department of Environmental Quality (ODEQ) also relied on TCEQ's modeling analysis in their SIP. Thus, the EPA's concerns with TCEQ's modeling also impact the approvability of the Oklahoma 2015 Ozone Transport SIP. The EPA's further assessment and evaluation of the reliability of the technical demonstration in TCEQ's SIP is discussed in this

4

document. In Section 1, we evaluate TCEQ's maintenance receptor methodology. In Section 2, we analyze TCEQ's modeling results, both future year projections and base case model performance. In Section 3, we provide results of EPA's modeling and analyze results of TCEQ's modeling compared with recent monitoring data. In Section 4, we analyze other potential concerns with TCEQ's modeling analysis. In Section 5, we evaluate TCEQ's other factors analysis. In Section 6, we summarize our technical evaluation.

## 1.        Maintenance Receptor Methodology

As discussed in Section V.A of the notice of proposed disapproval, in addition to the use of an alternative modeling platform, TCEQ also created its own method for identifying maintenance receptors. This section of the TSD provides further discussion as to why the EPA proposes TCEQ has not provided a sufficient technical basis for its chosen method. In subsection 1.a, we evaluate the effect of using TCEQ's approach and find that it produces anomalous results. In subsection 1.b, we review the history of EPA's modeling guidance recommending the use of a 5-year (i.e., spanning three design values) rather than a 3-year (i.e., only one design value) base period. In subsection 1.c, we evaluate inter-annual variation in design values (DVs) due to meteorological variability and long-term ozone trends due to emissions trends. In subsection 1.d, we analyze meteorological adjusted ozone concentrations for the 2010-2014 period.

### *1.a. Use of Single DV To Project Maintenance Receptors*

As explained in the preamble, in defining maintenance receptors, TCEQ used only the most recent DV of the set of three DVs it relied on for its base period modeling, regardless of whether that most recent design value was the highest of the three. TCEQ's proffered explanation for using the most recent DV to identify maintenance receptors was that the latest

5

DV "takes into consideration both meteorological variability (since the latest regulatory design value is itself an average of the fourth highest measured concentrations for three years) and any emissions reductions that might have occurred."[1] However, as discussed below, the EPA does not believe this approach adequately takes into account meteorological variability in identifying those areas that are projected to meet the NAAQS but may nevertheless struggle to maintain the NAAQS.

To develop a better technical understanding of the effects of TCEQ's approach (in addition to those reasons presented in the preamble), the EPA conducted a review of potential receptors to which Texas has been linked in differing modeling analyses. The EPA identified 21 potential receptors to which Texas contributed 0.7 parts per billion (ppb) or more in either EPA's 2016v2-based modeling for 2023, or TCEQ's 2012-based modeling for 2023. The EPA then evaluated the results of using TCEQ's alternate maintenance methodology. To identify nonattainment receptors, the nonattainment methodology calculates 2023 average DVs (also referred to as 2023 Nonattainment DVs) using the 5-year center weighted average ambient design values centered on the base modeling years and the Relative Response factors (RRFs).[2]

In Table 1.1 below, the EPA compiled the 2023 average DVs used for identifying nonattainment receptors, for potential receptors in Illinois, Wisconsin, Colorado, Arizona, and California. The EPA then utilized TCEQ's 2012-based modeling results to obtain the data needed to calculate 2023 maintenance DVs using TCEQ's approach.

---

[1] TCEQ Interstate Transport State Implementation Plan Revision for the 2015 Ozone National Ambient Air Quality Standards, August 17, 2018 (TCEQ SIP Submission) at pages 3-39 to 3-40.
[2] The approach used by TCEQ for identifying nonattainment receptors is consistent with EPA's air quality modeling guidance. U.S. Environmental Protection Agency, 2018. Modeling Guidance for Demonstrating Attainment of Air Quality Goals for Ozone, PM2.5, and Regional Haze, Research Triangle Park, NC, included in Docket ID No. EPA-HQ-OAR-2021-0663.

6

Of the identified 21 receptors, 15 receptors would have 2023 DVs based on TCEQ's methodology for identifying *maintenance* receptors that are lower than the 2023 average DVs at these same locations using the methodology for identifying *nonattainment* receptors. This is highly anomalous since the maintenance methodology should result in either equal or slightly higher 2023 DVs than the methodology to identify future year nonattainment receptors in order to capture conditions under which areas expected to be in attainment may still struggle to maintain the NAAQS. The EPA found that, under TCEQ's method, of these 15 receptors, three have 2023 maintenance DVs that are 3 ppb lower than their 2023 nonattainment methodology DVs, five have 2023 maintenance DVs that are 2 ppb lower than their 2023 nonattainment methodology DVs, and seven receptors have 2023 maintenance DVs that are 1 ppb lower than their 2023 nonattainment methodology DVs. In fact, TCEQ's method identified one receptor in their SIP submission as a nonattainment receptor in 2023 that it separately characterized under its maintenance methodology as not having a problem maintaining the NAAQS.

In comparison, using the EPA's maintenance methodology and EPA's 2016v2 modeling results all 21 2023 maintenance DVs have maximum DVs that are equal to or up to 4 ppb higher than the 2023 nonattainment DVs. (Again, the EPA uses the average of the three DVs that contain the base year modeled for the nonattainment methodology and the maximum of these three DVs for the maintenance methodology.) Under the EPA's methodology all nonattainment receptors are also considered to be maintenance receptors.

**Table 1.1 Comparison of Nonattainment methodology (Avg DV) and Maintenance methodology results for receptors identified by EPA and TCEQ in modeling of 2012 and 2016 base case years.**

| Receptor (AQS Monitor ID, County, State) | TCEQ 2023 Average DV (ppb) | TCEQ 2023 Maintenance DV (ppb) | TCEQ DV Delta (Maintenance - Average) (ppb) | EPA 2023 Average DV (ppb)[3] | EPA 2023 Maximum DV (ppb)[4] | EPA DV Delta (Maximum - Avg) (ppb) |
|---|---|---|---|---|---|---|
| 80350004, Douglas, CO | 73 | 72 | -1 | 71 | 72 | 1 |
| 80590006, Jefferson, CO | 72 | 73 | 1 | 72 | 73 | 1 |
| 80590011, Jefferson, CO | 71 | 71 | 0 | 73 | 74 | 1 |
| 80690011, Larimer, CO | 72 | 71 | -1 | 71 | 72 | 1 |
| 80050002, Arapahoe, CO | 70* | 71 | 1 | 68 | 68 | 0 |
| 40038001, Cochise, AZ | 71 | 69** | -2 | - | - | - |
| 60371201, Los Angeles, CA | 80 | 78 | -2 | 82 | 85 | 3 |
| 60371701, Los Angeles, CA | 80 | 82 | 2 | 85 | 88 | 3 |
| 60376012, Los Angeles, CA | 87 | 86 | -1 | 91 | 93 | 2 |
| 60658001, Riverside, CA | 88 | 85 | -3 | 89 | 90 | 1 |
| 60658005, Riverside, CA | 84 | 83 | -1 | 87 | 90 | 3 |
| 60710001, San Bernardino, CA | 71 | 72 | 1 | 74 | 75 | 1 |
| 60710306, San Bernardino, CA | 76 | 77 | 1 | 76 | 78 | 2 |
| 60711004, San Bernardino, CA | 91 | 90 | -1 | 97 | 100 | 3 |
| 60714001, San Bernardino, CA | 82 | 79 | -3 | 82 | 83 | 1 |
| 60714003, San Bernardino, CA | 94 | 91 | -3 | 95 | 98 | 3 |
| 170310001, Cook, IL | 60 | 58 | -2 | 69 | 73 | 4 |
| 170310032, Cook, IL | 68 | 66 | -2 | 69 | 72 | 3 |
| 170314201, Cook, IL | 64 | 62 | -2 | 69 | 73 | 4 |

[3] Projected DVs were not calculated for the Cochise monitor in EPA's modeling because the 2016 base year model predictions did not meet the criteria in EPA's modeling guidance for calculating a valid RRF.

[4] Projected DVs were not calculated for the Cochise monitor in EPA's modeling because the 2016 base year model predictions did not meet the criteria in EPA's modeling guidance for calculating a valid RRF.

8

| Receptor (AQS Monitor ID, County, State) | TCEQ 2023 Average DV (ppb) | TCEQ 2023 Maintenance DV (ppb) | TCEQ DV Delta (Maintenance - Average) (ppb) | EPA 2023 Average DV (ppb)[3] | EPA 2023 Maximum DV (ppb)[4] | EPA DV Delta (Maximum - Avg) (ppb) |
|---|---|---|---|---|---|---|
| 170317002, Cook, IL | 66 | 65 | -1 | 70 | 73 | 3 |
| 550590019, Kenosha, WI | 67 | 66 | -1 | 72 | 73 | 1 |
| 550590025, Kenosha, WI | No data*** | No data*** | No data*** | 69 | 72 | 3 |
| 551010020, Racine, WI | No data*** | No data*** | No data*** | 71 | 73 | 2 |

* TCEQ did not include this value in their SIP submission narrative (this cell was blank). The EPA obtained this value from data that was in TCEQ's spreadsheet of future 2023 DVs with state contribution.

** Calculated from the Relative Response Factor in TCEQ spreadsheet of future 2023 DVs with state contributions and the monitor's 2012-2014 DV (0.983 X 71 ppb, truncation applied).

*** Monitors were installed in 2013 and 2014 so they did not have a 3-year DV period (2012-2014) or previous years, so no projections of future year DVs are possible with TCEQ's modeling. Kenosha 550590025 was installed and began operating May 13, 2013, so the first three-year DV available is 2013-2015. Racine 551010020 was installed April 14, 2014 so the first three-year DV available is 2015-2017

NOTE: TCEQ's SIP reported projected 2023 DVs as whole numbers. Consistent with the EPA's modeling guidance, the EPA reported projected DVs with one digit to the right of the decimal. For comparison with TCEQ's SIP data, the EPA DVs were truncated to whole numbers for the purpose of the analysis in this TSD. Note that including one digit to the right of the decimal in both the TCEQ and the EPA data would result in a slight difference in outcome in terms of the magnitude of the differences between the average DVs and the corresponding TCEQ maintenance DVs and the EPA's maximum DVs; however, TCEQ's maintenance methodology still results in values lower than nonattainment methodology DVs for many receptors.

In short, because TCEQ's maintenance methodology uses only the most recent DV from its base period 2014 DV (that includes 2012-2014 monitoring data)[5], this very frequently results in "maintenance" DVs at potential receptors that are lower than the 2023 "nonattainment" DVs. TCEQ did not explain this anomalous result. These findings also tend to suggest that the three years that comprise the 2014 design values (i.e., 2012, 2013, and 2014) used in TCEQ's analysis may not have had meteorological conditions particularly conducive for formation of high ozone concentrations. This calls into question whether 2012-2014 would be an appropriate time period for use in projecting whether an area could have difficulty maintaining the standard under ozone conducive meteorology. The EPA's analysis in this TSD confirms that the 2012 to 2014 time period is not particularly conducive to ozone formation, at least for many receptors compared to the other 3-year DV periods of 2012 DV (2010-2012 monitoring data) and 2013 DV (2011-2013 monitoring data). See subsection 1.d below for analysis of meteorology adjusted values for monitors in the continental U.S for 2010-2014. The consequence of TCEQ's maintenance method, as demonstrated by our analysis, is that it often results in lower projected DVs than TCEQ's nonattainment method for the same receptors. This indicates that TCEQ's method often fails to account for conditions when an area would have difficulty maintaining the standard. From a technical perspective, it is unreasonable and internally inconsistent to apply a methodology that identifies receptors as being in nonattainment while at the same time concluding that same receptor will not have a problem maintaining the NAAQS. The EPA finds that the TCEQ methodology does not adequately identify conditions when receptors would have difficulty maintaining the NAAQS.

---

[5] For nomenclature purposes, the 3-year design value is referred to by the last year of the averaging period. That is, DV 2014 represents ozone air quality data averaged over 2012, 2013, and 2014.

### 1.b. Review of History of EPA's Guidance

Since 2007 and up through its current 2018 version, the EPA's modeling guidance for attainment demonstrations and other analyses has recommended the use of a 5-year center weighted average DV (i.e., the average of the three DVs that include the modeled year). The development of this guidance reflects the EPA's longstanding understanding that meteorological variability should be accounted for in the projection of future design values for the purpose of evaluating whether or not a particular monitoring site is expected to attain the NAAQS in a future year.

The EPA's modeling guidance for 8-hour ozone NAAQS attainment demonstrations (1999-2007) initially considered using a 3-year period that included the modeled year (i.e., the emissions-inventory year modeled) as the middle year of the 3-year period.[6] However, the EPA ultimately recommended using five consecutive years with the modeled being the middle year (i.e., covering the three DVs that include the base year) to consider potential variability in meteorological/ozone conduciveness and emissions. The EPA analyzed the variability of using this 5-year center-weighted average method compared with using a 3-year average DV and found that the 5-year center-weighted approach was more stable and had a lower standard deviation.[7] Using 5 years of measured data provides a more robust estimate of future design

---

[6] "Draft Guidance on the Use of Models and Other Analyses in Attainment Demonstrations for the 8-Hour Ozone NAAQS", EPA-454/R-99-004, May 1999; "Guidance on the Use of Models and Other Analyses in Attainment Demonstrations for the 8-hour Ozone NAAQS", EPA-454/R-05-002, October 2005; and "Guidance on the Use of Models and Other Analyses for Demonstrating Attainment of Air Quality Goals for Ozone PM2.5, and Regional Haze", EPA-454/B-07-002, April 2007.

[7] The April 2007 guidance states on page 23, "Additionally, the average design value will be more stable (less year to year variability) than any single design value period. An analysis of recent ambient design value data at 471 ozone monitors, over the period 1993-2004, shows that the median standard deviation of design values was 3.3 ppb whereas the standard deviation of the 5 year weighted average design values was 2.4 ppb (Timin, 2005a). Also, moving from the period ending in 2003 to the period ending in 2004, the median change in the ozone design values was 4.0 ppb. The median change in the 5 year weighted average ozone design values was only 0.8 ppb (there was not a long enough data record to do the same analyses for PM2.5). These analyses show that the average design values are clearly more stable and will therefore provide a 'best estimate' baseline year design value (DVBI) for use in future year model projections."

values that are not solely influenced by the particular meteorological conditions that occurred during the three years centered on the base year of emissions. In this respect, using 5 years of measured data is expected to provide ozone DVs that average out the effects of interannual variability in meteorological conditions on ozone concentrations. The guidance also notes that one may want to consider selecting a base design value this is the highest of the relevant base period design values to ensure attainment even in periods with meteorological conditions especially conducive to high ozone concentrations. Consistent with this guidance, the EPA's use of the maximum DV during the 5-year base period is intended to identify areas that may have difficulty maintaining the NAAQS under ozone conducive meteorological conditions.

While it is not mandatory to follow the EPA's modeling guidance, the different approach used by TCEQ lacked adequate justification. TCEQ did not support their claim that there were large reductions in emissions occurring between 2010 and 2014 that would yield lower DVs in 2012-2014 compared to 2010-2012 or 2011-2013 thus making these earlier DVs inappropriate to use for determining a maintenance receptor. Furthermore, TCEQ did not provide sufficient data and analysis of the 2010-2014 period to support their claim that the 2012-2014 period reflects higher ozone-conducive meteorology compared to the 2010-2012 and 2011-2013 periods. By comparison, under the EPA's approach, if the future DV projected from the maximum base period DV is below the NAAQS, one can be reasonably certain the receptor will not have difficulty maintaining the standard due to fluctuations in meteorology and, as such, upwind states will not interfere with maintenance in downwind states. Because the TCEQ method only looks at one DV and does not account for the variability in DVs due to meteorological conditions, it is less likely to successfully identify maintenance receptors than the EPA method.

12

### 1.c. Relative Effects of Long-Term Emissions Trends

TCEQ asserts that the EPA's maintenance methodology puts too much weight on meteorological variation and not enough weight on emissions changes (i.e., specifically, alleged emissions reductions). TCEQ asserts that the last DV in the period should be used based on the premise that ozone-precursor emissions always trend downward, and therefore, the last DV in the period will always capture the most likely emissions levels going forward. The EPA explained in the preamble why this is not necessarily justified and why TCEQ's method may effectively "double count" emissions trends (because such trends are already accounted for in making the future year projection). To further examine TCEQ's assertion that only the last DV period including the modeled base year should be used in the maintenance methodology, the EPA reviewed a number of ozone DV trends to assess long-term average changes in ozone due to emission changes, including several that were included in TCEQ's SIP submission for this action and in two previous attainment demonstration SIP submissions for the Dallas-Fort Worth Nonattainment Area (DFW) and the Houston-Galveston-Brazoria Nonattainment Area (HGB).[8] TCEQ provided ozone trends analysis in their SIP submission for this action for the areas where TCEQ's modeling identified potential receptors in Colorado, Arizona, and Southern California. TCEQ used this information to indicate that ozone levels are decreasing, as shown in the figures below, and further discussed in Section 5. The EPA also looked at monitoring trends for the most recent 10 years of data (2011 DV up to 2020 DV) using ozone monitoring data from the EPA's

---

[8] TCEQ's "Dallas-Fort Worth (DFW) Attainment Demonstration State Implementation Plan Revision for the 2008 Eight-Hour Ozone Standard Nonattainment Area" Adopted July 6, 2016 (DFW AD SIP) and TCEQ's "Houston-Galveston-Brazoria Serious Classification Attainment Demonstration State Implementation Plan Revision for the 2008 Eight-Hour Ozone National Ambient Air Quality Standard", Adopted March 4, 2020 (HGB AD SIP). The EPA, in this action, is not evaluating the suitability of the modeling presented by TCEQ for purposes of demonstrating attainment of the 2008 NAAQS. Rather, the EPA is simply examining long-term air quality trends that have occurred in both the Dallas-Fort Worth area as well as the Houston-Galveston-Brazoria area. The EPA will evaluate the suitability of modeling presented by TCEQ for purposes of demonstrating attainment of the 2008 Ozone NAAQS in a separate action.

Air Quality System (AQS). The EPA used these data to assess the magnitude of year-to-year variation in ozone levels compared to the long-term trend in ozone levels (i.e., 9 years or more) that may be mainly attributable to overall changes in ozone-precursor emissions.

In general, as shown in the figures below, our evaluation of monitor data for Dallas-Fort Worth and Houston-Galveston-Brazoria as well as at receptors to which TCEQ is linked (that have been identified either by the EPA or TCEQ) in Colorado, Arizona, Southern California, and Midwest Region (Illinois, Michigan, and Wisconsin) demonstrates that the long-term average annual decreases in ozone expected to be the result of emissions reductions are generally on the order of 0-1 ppb/year at monitors in these areas. However, variations in monitored DVs do not always trend downward from year to year and sometimes increase by 2 to 4 ppb from one year to the next. These variations are likely due to inter-annual variations in meteorological conditions which the EPA's method is designed to capture (although this analysis cannot rule out the possibility that short-term increases and decreases in ozone DVs may, in part, be the result of countervailing economic factors that affect short-term or localized emissions increases and decreases).

*DFW and HGB Areas*

For the DFW area, looking at Figures 1.1 and 1.2 (obtained from the DFW attainment demonstration SIP submission),[9] the long-term DFW DV[10] trend is less than 1 ppb/year[11] from 1991 to 2015 (see Figure 1.1) and 1.1 ppb/year from 1997 to 2014 (see Figure 1.2). Focusing on these time periods is a way to assess the average change in ozone DVs due to long-term changes

---

[9] *See* DFW AD SIP, Figure 1-1 at page 1-4 and Figure 5-1 at page 5-5.

[10] DFW DV is the highest DV at any regulatory monitor in the DFW Nonattainment Area, so it can be a different monitor year-to-year that sets the DFW Nonattainment area DV.

[11] *See* DFW AD SIP, at page 1-3. 2015 DV was 83 ppb and 1991 DV was 105 ppb. (105ppb-83ppb)/(24 years)= 0.917 ppb/year.

14

in emissions. The EPA also evaluated trends in more recent monitoring data. For DFW, we started with the 2012 DV (2010-2012 monitoring data) as there were some emission reductions from a previous DFW ozone SIP that had compliance dates in early 2010. Based on the trends shown in Figure 1.3, the DVs at most of the monitors that are currently monitoring nonattainment, based on 2018-2020 DVs, have been decreasing at approximately 1 ppb/year for the last 9 years of DVs.[12]

---

[12] EPA Analysis of 8-hour Ozone monitor trends. Data and calculations available in "Ozone_Trends_R6_TSD.xlsx" included in Docket ID No. EPA-R06-OAR-2021-0801.

15

Figure 1.1 – TCEQ's Figure 1-1: One-Hour and 8-Hour Ozone Design Values
from 1991 to 2015 and Population in the DFW Area,
*from* DFW 2008 8-Hour Attainment Demonstration SIP (July 6, 2016).



16

Figure 1.2 – TCEQ's Figure 5-1: One-Hour and 8-Hour Ozone DVs in the DFW Area
from 1997 through 2014
*from* DFW 2008 8-hour Attainment Demonstration SIP (July 6, 2016).



Figure 1.3 – 8-hour Ozone DV trends at DFW Monitors, 2012-2020.



For the Houston-Galveston-Brazoria area, TCEQ implemented multiple emission reductions for both nitrogen oxides ($NO_X$) and a subset of volatile organic compounds (VOCs) that resulted in large decreases of ozone from 2000 to 2007 in this area. In this regard, the EPA is evaluating trends for DVs from 2010 to 2020. For HGB, looking at Figures 1.4, 1.5, and 1.6 (obtained from the HGB attainment demonstration SIP)[13] the long-term HGB DV trend at most monitors and DV trends at the monitors in the HGB area with higher ozone DVs from 2009 to 2018 shows a decline of less than 1.0 ppb/year. The EPA also evaluated the trends using the most recent DVs (2020 DVs) in Figure 1.7. In Figure 1.7, the DVs at most of the higher HGB

---

[13] *See* HGB AD SIP, Figure 1-1 at page 1-11, Figure 5-1 at page 5-7, and Figure 5-5 at page 5-8.

area monitors (2018, 2019, and 2020 DVs greater than 70 ppb) are decreasing at 1 ppb/year or less for the last 10 years of DVs (2011-2020 DVs).[14]

Figure 1.4 – TCEQ's Figure 1-1: Ozone DVs and Population in HGB Area, *from* TCEQ's HGB Serious Area Attainment Demonstration SIP Revision for 2008 Ozone (2020).



Figure 1-1:  Ozone Design Values and Population in the HGB Area

[14] EPA Analysis of  8-hour Ozone monitor trends. Data and calculations available in "Ozone_Trends_R6_TSD.xlsx" included in Docket ID No. EPA-R06-OAR-2021-0801.

Figure 1.5 – TCEQ's Figure 5-4: 8-Hour and One-Hour Ozone DVs in the HGB Area
*from*
TCEQ's HGB Serious Area Attainment Demonstration SIP Revision for 2008 Ozone (2020)



Figure 1.6 – TCEQ's Figure 5-5: Eight-Hour Ozone DVs by Monitor in the HGB Area
*from*
HGB Serious Area Attainment Demonstration SIP Revision for 2008 Ozone (2020)



Figure 1.7 – 8-hour Ozone DV Trends at Monitors in HGB, 2011-2020



*Potential receptors outside of Texas*

As mentioned above, TCEQ provided ozone trends analysis in their SIP submission for this action for the areas where TCEQ's modeling identified potential receptors (Colorado, Arizona, and Southern California) to indicate that ozone levels are decreasing as shown in the Figures below. The EPA analyzed TCEQ's trends analysis to assess the magnitude of year-to-year variation in ozone levels compared to the long-term trend in ozone levels (i.e., 10 years or more) that may be attributed to overall changes in ozone-precursor emissions. The EPA also analyzed DV trends using the most recent DVs for the last 10 years for receptors outside the State of Texas identified by the EPA's 2011 base year modeling, the EPA's 2016 base year (2016v2) modeling analyses, and/or TCEQ's modeling (2012 base year). These potential

receptor areas are located in Colorado, Arizona, Southern California, and the Midwest Region (specifically, Illinois, Wisconsin, and Michigan).

For the Colorado receptors identified in TCEQ's modeling, this analysis shows ozone DVs from 2007-2016 decreased less than 1 ppb/year on average. See Figure 3-40 from TCEQ's transport SIP submission (included as Figure 1.8 below). The EPA also examined the trends at the Colorado receptors identified in TCEQ's modeling using the most recent DVs. This analysis is reflected in Figure 1.9, which shows that the DVs at Colorado receptors have either increased or slightly decreased at less than 0.5 ppb/year for the last 10 years of DVs (2011-2020 DVs).[15]

---

[15] EPA Analysis of 8-hour Ozone monitor trends. Data and calculations available in "Ozone_Trends_R6_TSD.xlsx" included in Docket ID No. EPA-R06-OAR-2021-0801.____

23

Figure 1.8 – 8-hour Ozone DVs for Monitors in the Denver-Aurora Area
*from* TCEQ's SIP Submission Figure 3-40



**Figure 3-40:  Eight-Hour Ozone Design Values for Monitors in the Denver-Aurora Area**

Figure 1.9 – Denver Nonattainment Area DV Trends at Receptors Identified
in TCEQ Modeling for 2023



For the Arizona receptor identified in TCEQ's modeling, TCEQ's SIP Figure 3-55 (included as Figure 1.10 below) shows ozone DVs from 2007-2016 decreased less than 1 ppb/year on average but had increases or decreases of several ppb from one year to the next. The EPA also examined the trends at the Arizona receptor identified in TCEQ's modeling using the most recent DVs available (see Figure 1.11) which shows that the DVs at the Arizona receptor have decreased at less than 1.0 ppb/year on average for the last 10 years of DVs (2011-2020 DVs).[16]

---

[16] *Id.*

Figure 1.10 DV Tends from 2007 through 2016 for Chiricahua National Monument Monitor *from* TCEQ's SIP Submission Figure 3-55



**Figure 3-55:  Design Value Trends from 2007 through 2016 for Chiricahua National Monument (AQS ID: 040038001)**

Figure 1.11 – Arizona DV Trend at Receptor Identified in TCEQ Modeling for 2023



At the California receptors identified in TCEQ's modeling, TCEQ's SIP Figure 3-56 (included as Figure 1.12 below) shows ozone DVs from 2007-2016 decreased less than 1 ppb/year on average. The EPA also evaluated the trends at the California receptors identified in TCEQ's modeling using the most recent DVs (see Figure 1.13), which show that the DVs at the California receptors identified by TCEQ have either increased or slightly decreased at less than 0.5 ppb/year on average for the last 10 years of DVs (2011-2020 DVs).[17]

---

[17] *Id.*

Figure 1.12 – 8-Hour Ozone DV for Monitors in Los Angeles Area
*from* TCEQ's SIP Figure 3-56



**Figure 3-56: Eight-Hour Ozone Design Values for Monitors in the Los Angeles Area**

Figure 1.13 – Southern California Receptors DV trends at Receptors
Identified in TCEQ Modeling for 2023



Using the most recent DVs, the EPA examined the trends at the monitoring sites in the

Chicago IL-IN-WI Nonattainment Area in Illinois and in Wisconsin that were identified as

receptors in EPA's 2016v2 modeling (see Figure 1.14). This figure shows that the DVs at these

receptors have either increased or have decreased at less than 0.7 ppb/year on average for the last

10 years of DVs (2011-2020 DVs).[18]

---

[18] *Id.*

Figure 1.14 – Chicago IL-IN-WI Nonattainment Area DV Trends at Receptors
Identified in EPA's 2016v2 Modeling for 2023



The EPA evaluated the trends at the previously identified potential Wisconsin and
Michigan receptors in the EPA's March 2018 memorandum using the most recent DVs in Figure
1.15, which show that the DVs at Sheboygan County, Wisconsin and Allegan County, Michigan
receptors identified previously in EPA's 2011 modeling have decreased approximately 1
ppb/year on average for the last 10 years of DVs (2011-2020 DVs).[19]

---

[19] *Id.*

Figure 1.15 – Wisconsin and Michigan DV Trends at Receptors Identified in EPA's 2011 Base Year Modeling for 2023



Conclusions of this analysis: Reviewing this information in total, the long-term average decreases in ozone due to emissions reductions are usually on the order of 0-1 ppb/year at monitors in DFW and HGB, and at the receptors that have been identified in Colorado, Arizona, Southern California, and Midwest Region (Illinois and Wisconsin). However, critically, the evidence presented here demonstrates that there can be wide variations in monitored ozone DVs from year to year. These year-to-year variations in DVs are not always toward lower ozone DVs, and sometimes DVs can increase by 2-4 ppb from one year to the next. These variations may be primarily due to meteorological variations. We note for instance that TCEQ's monitored trends figure for the Arizona receptor it identified shows increases of 2 ppb and 3 ppb annually, from 66 ppb to 73 ppb. That is a 7 ppb increase over three years from 2009 to 2012. Large annual

fluctuations upward in DVs such as this demonstrate the degree of variation that is possible in DV due to meteorological differences between different three-year design value periods, and/or may indicate increasing emissions activity in upwind states or from local sources. In either case, however, this analysis demonstrates that it cannot simply be assumed, as TCEQ's analysis suggests, that ozone levels will only continue to decline or always track with the general, long-term emissions trends.

### 1.d. Meteorological Adjusted Trends Analysis of 2010-2014 Monitored Ozone Data

A recent analysis was published that included updated techniques to analyze trends in continental U.S ozone concentrations adjusted for interannual variability in meteorological conditions (Wells, et al.).[20] This analysis adjusted long-term trends in monitored maximum daily average 8-hour (MDA8) ozone concentrations for meteorological effects using various statistical and mathematical methods in order to get a better estimate of the long-term changes in ozone concentrations due to changes in precursor emissions such as nitrogen oxides ($NO_X$) and volatile organic compounds (VOCs). This analysis included meteorological adjusted MDA8 ozone values (mean, median, 90th percentile, and 98th percentile) for monitors in the continental U.S for each year from 2010 through 2014. Of particular note is the 98th percentile values as they would correspond with the 4th High MDA8 monitored ozone that is used in the calculation of DVs. In Figure 1.16 (a-e) below are maps showing the magnitude of the adjustments in the May to September MDA8 ozone concentrations for each year, with monitoring site locations colored according to the difference between the adjusted and observed trend values. Red dots represent

---

[20] Wells, Benjamin; Dolwick, Pat; Eder, Brian; Evangelista, Mark; Foley, Kristen; Mannshardt, Elizabeth; Misenis, Chris; Weishampel, Anthon; "Improved Estimation of Trends in U.S. Ozone Concentrations Adjusted for Interannual Variability in Meteorological Conditions." *Atmospheric Environment* 248 (2021) 118234; Wells, Benjamin; Dolwick, Pat; Eder, Brian; Evangelista, Mark; Foley, Kristen; Mannshardt, Elizabeth; Misenis, Chris; Weishampel, Anthon "Supplemental Information for: Improved Estimation of Trends in U.S. Ozone Concentrations Adjusted for Interannual Variability in Meteorological Conditions."

32

downward adjustments of MDA8 ozone concentrations when meteorological conditions were more favorable to ozone formation than normal, while blue dots represent upward adjustments of MDA8 ozone concentrations when meteorological conditions were less favorable to ozone formation than normal. Figures 1.16 (a-e) are for the years 2010, 2011, 2012, 2013 and 2014 respectively. In each Figure, 90th percentile (top), and 98th percentile (bottom) MDA8 ozone concentrations are shown. In other words, the red dots in the images below indicate when monitored ozone levels at a particular monitor are higher due to ozone conducive meteorological conditions, while blue dots indicate when monitored ozone levels are lower at a particular monitor due to meteorological conditions unfavorable for ozone formation. Since the DVs are calculated using the 98th percentile values and the 90th percentile is representative of other relatively high ozone monitored values, these are the values we focus on for this analysis as they are most relevant to the policy concerns of identifying maintenance receptors.

It is noteworthy that while 2012, the year TCEQ selected as its base year, was conducive to ozone formation in the upper Midwest area around Lake Michigan (Illinois, Wisconsin, and Michigan), 2013 and especially 2014 were not conducive to ozone formation. 2014 was the least conducive year for ozone formation in the upper Midwest area around Lake Michigan of the 2010 through 2014 period. The years 2010 and 2011 both appear to have had meteorological conditions more conducive to ozone formation in the area where the EPA has identified receptors in the EPA's 2011 base case and 2016v2 modeling compared to 2013 and 2014. The 2012 DV (2010-2012 monitoring data) or 2013 DV (2011-2013 monitoring data) both seem to have had meteorological conditions more conducive to ozone formation than the 2014 DV (2012-2014 monitoring data). This may partially explain why TCEQ's methodology, which relied solely on the 2014 DV, failed to identify receptors in this region using its maintenance methodology.

Figure 1.16(a) – Maps showing the magnitude of the adjustments in May to September 90th percentile (top), and 98th percentile (bottom) MDA8 ozone concentrations for the year 2010



34

Figure 1.16(b) – Maps showing the magnitude of the adjustments in May to September
90th percentile (top), and 98th percentile (bottom) MDA8 ozone concentrations for the year 2011



Figure 1.16(c) – Maps showing the magnitude of the adjustments in May to September 90th percentile (top), and 98th percentile (bottom) MDA8 ozone concentrations for the year 2012



Figure 1.16(d) – Maps showing the magnitude of the adjustments in May to September 90th percentile (top), and 98th percentile (bottom) MDA8 ozone concentrations for the year 2013



37

Figure 1.16(e) – Maps showing the magnitude of the adjustments in May to September 90th percentile (top), and 98th percentile (bottom) MDA8 ozone concentrations for the year 2014



**2.    Potential Underestimation of Projected Design Values and Model Performance Evaluation**

As discussed in this section and in Section 3, below, the EPA has analyzed TCEQ's future-year model projections for the DFW and HGB areas within Texas and also at downwind areas in Colorado, Arizona, Southern California, Illinois, Wisconsin, and Michigan to which Texas contributes at or above 1 percent of the NAAQS in the EPA's 2011 base case modeling, and/or the EPA's 2016v2 modeling, and/or TCEQ's modeling. The EPA also compared TCEQ's 2023 projections with recent DVs (2020) and preliminary DVs (2021) in these areas together with potential changes in DVs in the next two to three years. The results of this comparison indicate that TCEQ's projections likely underestimate future ozone levels. TCEQ's projected ozone concentrations in 2023 are much lower than measured DVs in 2020 and preliminary 2021 DVs without there being an unusual level of emission reductions to support the projected sharp decline in DVs. The EPA compared recent monitoring values and reasonably anticipated decreases (e.g., on the order of approximately 0-1 ppb/year – see discussion on ozone trends in Section 1 above) in DVs by 2023 both within Texas and in other parts of the country. These underestimations likely result in TCEQ's modeling not adequately identifying nonattainment and/or maintenance receptors in 2023.

In subsection 2.a, we evaluate the potential underestimation of TCEQ's DFW and HGB 2023 modeled DVs based on a comparison to recent monitoring and potential DV changes assuming that the average long-term trend in DVs continues over the next 2-3 years. In subsection 2.b, we evaluate the potential underestimation of TCEQ's 2023 modeled DVs in downwind areas (Chicago Nonattainment Area, Wisconsin, Colorado, Arizona, and Southern California) that have receptors identified in either the EPA or TCEQ's modeling compared with recent monitoring and potential DV changes assuming that the average long-term trend in DVs

continues over the next 2-3 years.  In subsections 2.c. and 2.d. we review TCEQ's 2012 base case model performance in the DFW and HGB areas and in downwind receptor areas (Chicago NAA, Wisconsin, Colorado, Arizona and Southern California) to assess whether TCEQ's modeling platform provides technically sound data for projecting future year ozone design values and interstate contributions. In subsection 2.e, we summarize the findings of the EPA's review in this Section 2.

### 2.a. Potential Underestimation in TCEQ's Modeling 2023 Future year projections at DFW & HGB receptors and High DV monitors

TCEQ's modeling includes projections of future year 2023 design values for monitors within the large metropolitan areas of DFW and HGB, both of which continue to monitor ozone nonattainment and have been designated as 2015 8-hour ozone nonattainment areas. TCEQ has previously developed attainment demonstration SIP submissions for both of the HGB and DFW nonattainment areas.[21] TCEQ also included in these previous attainment demonstration SIPs long-term ozone monitored DV trend analysis for both the HGB and DFW areas that indicate the average annual decrease in ozone DVs was approximately 1 to 1.2 ppb/year.[22] In Section 1, above, the EPA's analysis  in Section 1 above of the most recent 9 years of DVs in DFW and 10 years of DVs in HGB indicate a similar trend of 1 ppb/year or less. Using these DV monitored (not modeled) trends indicates that emissions decreases between 2020 and 2023 could potentially be anticipated to result in a drop in ozone concentrations of approximately 3-4 ppb at most receptors if no variability in meteorology is considered and no large emission reduction

---

[21] TCEQ's "Dallas-Fort Worth (DFW) Attainment Demonstration State Implementation Plan Revision for the 2008 Eight-Hour Ozone Standard Nonattainment Area" Adopted July 6, 2016 and TCEQ's "Houston-Galveston-Brazoria Serious Classification Attainment Demonstration State Implementation Plan Revision for the 2008 Eight-Hour Ozone National Ambient Air Quality Standard", Adopted March 4, 2020.
[22] Id.

programs are implemented in Texas or on a national level. [23] That is to say, without significant unexpected reductions beyond the effects of existing control measures, a 3-4 ppb decline in ozone concentrations during this 3-year period is the most that could be anticipated at DFW/HGB monitors. To assess if TCEQ's ozone transport modeling is potentially underestimating future year 2023 modeled DVs in DFW and HGB areas, the EPA compared 2020 monitored DVs (2018-2020 monitored data) at several of the typically higher ozone monitors in the DFW and HGB area with TCEQ's projected 2023 DVs in Table 2.1. While not as exact as developing new modeling of emission changes from 2020 to 2023 to project 2023 DVs (nor appropriate for use in any other context), using the general 3-4 ppb approximation provides a ballpark estimate to evaluate whether TCEQ's modeling might be underestimating 2023 future DVs. As can be seen in Table 2.1, there are many monitors in DFW and HGB that would need a drop in ozone DVs over the next 3 years of > 5 ppb (values of -5 ppb or more in the far right column) to reach TCEQ's 2023 modeled projected levels. The EPA also evaluated just the 2023 DVs for monitors with 2020 DVs ≥ 74 ppb (2018-2020 monitored DV), and for the monitors that TCEQ projected to be attaining (DV < 71 ppb) EPA examined all monitors that had a 2020 DV ≥ 71 ppb and also the subset of these monitors with a 2020 DV ≥ 74 ppb. For monitors with a 2020 DV ≥ 74 ppb, ozone concentrations would have to drop by 3-4 ppb for these monitors to attain by 2023. For the 15 monitors that TCEQ projected to be attaining in 2023 (red font in table) and had a 2020 DVs ≥ 71 ppb, the average amount of decrease in DVs

---

[23] We use this ballpark figure here only as a bounding assumption relevant to an analytical exercise establishing why the TCEQ modeling submitted in its transport SIP submittal likely under-projects future ozone concentrations. The 3 to 4 ppb figure does not represent any analysis or conclusions regarding actual emissions reductions in Texas or any other state. The EPA has no basis to assume even this level of reduction in ozone concentrations will actually occur, nor is this estimate based on any assessment of the effects of permanent and enforceable emissions reductions in any SIP or FIP or resulting from any other known or upcoming CAA requirements. As such, this estimate is not usable in any other CAA action, nor would it be a defensible basis on which to reach any conclusions regarding future air quality conditions, without far greater technical and legal analysis than the Agency can provide at this time.

needed to match TCEQ's 2023 projection is 8.0 ppb. For the eight monitors that TCEQ projected to be attaining in 2023 and had a 2020 DV of ≥ 74 ppb, the average amount of decrease in DVs needed to match TCEQ's 2023 projection is 9.25 ppb, and they would have to drop at least 3-4 ppb (up to 8-9 ppb) to have a DV of 70 ppb.[24] In other words, for all the monitors with the highest 2020 monitored DVs, TCEQ's modeling projections of 2023 would necessitate average reductions in DVs over this three year period of 9.25 ppb, much larger than the 3-4 ppb that would be  considered as a possible upper bound based on an extrapolation of long-term trends. Drops in 8-hour ozone DVs on average of 7.56 ppb over three years at many monitors in these areas do not typically occur unless there is an unexpectedly large change in emissions and/or large change in meteorological conduciveness for ozone generation (see multiple trends analysis figures in Section 1). TCEQ did not identify any such large emission reductions to be implemented in the 2021-2023 timeframe. This analysis supports a finding that TCEQ's modeling is likely underestimating future ozone DVs in the two nonattainment areas in Texas.

---

[24] Due to the uncertainty with using the whole number DVs, the truncation method used at the end of the DV calculation impacts the exact value. For a monitor with a 2020 DV of 74 ppb it would take at least a value of 3 ppb or greater and could be 4 ppb or more prior to truncation.

**Table 2.1 TCEQ Projected Future 2023 DVs Compared to 2020 Monitored DVs**

| State | County | AQS ID | TCEQ 2023 Future Design Value-DV (ppb) | Monitored Data from AQS 2020 DV (ppb) | Delta in 3 years 2020 Monitor DV - TCEQ 2023 DV (ppb) |
|---|---|---|---|---|---|
| Texas | Brazoria | 480391004 | 78 | 73 | 5 |
| Texas | Brazoria | 480391016 | 60 | 65 | -5 |
| Texas | Collin | 480850005 | 66 | 75 | -9 |
| Texas | Dallas | 481130069 | 64 | 69 | -5 |
| Texas | Dallas | 481130075 | 63 | 74 | -11 |
| Texas | Dallas | 481130087 | 61 | 69 | -8 |
| Texas | Denton | 481210034 | 68 | 72 | -4 |
| Texas | Denton | 481211032 | 66 | 72 | -6 |
| Texas | Ellis | 481390016 | 60 | 64 | -4 |
| Texas | Ellis | 481391044 | 57 | 63 | -6 |
| Texas | Galveston | 481671034 | 67 | 74 | -7 |
| Texas | Harris | 482010024 | 68 | 79 | -11 |
| Texas | Harris | 482010026 | 66 | 69 | -3 |
| Texas | Harris | 482010029 | 67 | 73 | -6 |
| Texas | Harris | 482010046 | 66 | 64 | 2 |
| Texas | Harris | 482010047 | 69 | 72 | -3 |
| Texas | Harris | 482010051 | 68 | 70 | -2 |
| Texas | Harris | 482010055 | 68 | 76 | -8 |
| Texas | Harris | 482010062 | 72 | 67 | 5 |
| Texas | Harris | 482010066 | 68 | 69 | -1 |
| Texas | Harris | 482010416 | 72 | 73 | -1 |
| Texas | Harris | 482011015 | 64 | 67 | -3 |
| Texas | Harris | 482011034 | 71 | 73 | -2 |
| Texas | Harris | 482011035 | 68 | 70 | -2 |
| Texas | Harris | 482011039 | 74 | 78 | -4 |
| Texas | Harris | 482011050 | 68 | 70 | -2 |
| Texas | Johnson | 482510003 | 62 | 73 | -11 |
| Texas | Kaufman | 482570005 | 58 | 64 | -6 |
| Texas | Montgomery | 483390078 | 64 | 74 | -10 |
| Texas | Tarrant | 484390075 | 65 | 75 | -10 |
| Texas | Tarrant | 484391002 | 63 | 72 | -9 |
| Texas | Tarrant | 484392003 | 66 | 73 | -7 |
| Texas | Tarrant | 484393009 | 68 | 76 | -8 |
| Texas | Tarrant | 484393011 | 62 | 69 | -7 |
| | | | | Avg ALL | -4.97 |
| | | | | Avg if 2020 DV ≥ 74 ppb | -7.56 |
| | | | Avg if TCEQ 2023 DV <71 ppb but 2020 DV ≥71 ppb | | -8.00 |
| | | | Avg if TCEQ 2023 DV <71 ppb but 2020 DV ≥74 ppb | | -9.25 |

We also note that ODEQ relied on TCEQ's future year 2023 modeled DVs at three nonattainment/maintenance receptors in their SIP submission. Oklahoma was linked to these three receptors in the EPA's previous modeling results included in the EPA's March 2018 memorandum. These monitors included 2 monitors in the DFW area (Tarrant County AQS ID 484392003 and Denton County AQS ID 481210034) and one monitor in the HGB area (Brazoria County AQS ID 480391004). The EPA's 2016v2 modeling indicates that Oklahoma is linked to the Denton County monitor (AQS ID 48120034) that is identified as a maintenance receptor. Included as Table 2.2 is information from the Oklahoma 2015 Ozone Transport SIP submission that utilized information from the EPA's March 2018 memorandum on Transport Modeling Results.

**Table 2.2 Oklahoma's Transport SIP Information Referring to Linkages to Texas Receptors (EPA March 2018 memorandum)**

| Receptor (Site ID, County, State) | 2023 Average DV (ppb) | 2023 Maximum DV (ppb) | Oklahoma Contribution (ppb) | Oklahoma's Step 1 and 2 Determination |
|---|---|---|---|---|
| 481210034, Denton, TX | 69.7 | 72.0 | 1.23 | Maintenance receptor identified for further analysis. |
| 484392003, Tarrant, TX | 72.5 | 74.8 | 1.71 | Nonattainment receptor identified for further analysis. |
| 480391004, Brazoria, TX | 74.0 | 74.9 | 0.90 | Nonattainment receptor with contribution less than 1 ppb; no further analysis. |

From Table 2.1 we note that the two receptors in the DFW area (based on EPA's March 2018 memorandum) are currently monitoring nonattainment with a 2020 DV of 72 ppb at the Denton County maintenance receptor and a 2020 DV of 73 ppb at the Tarrant County

nonattainment receptor. TCEQ projected 2023 DVs of 68 ppb for the Denton County monitor

and 66 ppb for the Tarrant County nonattainment receptor. We note that the nonattainment

receptor in HGB (Brazoria County AQS ID 480391004) is currently monitoring a 73 ppb (2020

DV) but was projected to be 78 ppb in TCEQ's 2023 modeled projections. We note that in the

HGB area the maximum monitored values can vacillate between monitors depending upon the

variations in local and synoptic meteorology from one year to the next. Based on most recent

DVs at these three monitors, it is possible that they may reach attainment by 2023; however even

if they attain, it is likely that they would be close to the NAAQS, and therefore, may still be

considered maintenance receptors. A drop of 3 ppb (1 ppb/year) would result in DVs of 70 ppb at

two monitors and 69 ppb at the Denton monitor. As discussed above, TCEQ's 2023 model

projections for these three monitors raises likely underestimation concerns for the two DFW

monitors and raises concerns with the adequacy of relying on TCEQ's modeling to conclude that

the two DFW monitors are not at least maintenance receptors in 2023 for which Oklahoma is

linked. The EPA's more recent modeling (2016v2) also indicates Oklahoma is linked to the

Denton monitor which is identified as a maintenance receptor.

### 2.b. Potential Underestimation in TCEQ's 2023 Future year projections at downwind areas

As discussed above, absent variability in meteorology and any unexpectedly large

local/regional/national implementation of emission reductions, the drop in monitored ozone DVs

from 2020 to 2023 would be expected to be at most 3-4 ppb, based on an assumed continuation

of long-term trends at large nonattainment metropolitans that have been identified in TCEQ's

modeling or the EPA's 2011 and 2016v2 modeling. (Once again, we emphasize that this estimate

serves as a bounding exercise in this technical analysis and does not reflect any legal or policy

judgments regarding whether even this degree of reduction in ozone concentrations is reasonable

to assume for any given receptor.) While not as exact as developing new modeling of emission changes from 2020 to 2023 to project 2023 DVs, using the general 3-4 ppb figure provides a ballpark estimate to evaluate if TCEQ's modeling might be underpredicting 2023 future DVs at areas in the Chicago, IL/Wisconsin/Michigan area; the Denver, CO area; Cochise County, AZ receptor; and Southern California areas.[25] We note that in our evaluation of the most recent DV trends in these areas that the annual average change from 2010 to 2020 DVs ranged from increasing to decreasing at most approximately 1 ppb/year, so use of 3-4 ppb is an indicator of the most by which DVs could potentially be estimated to drop between 2020 and 2023. Further, the trends data for these areas indicate the change will likely be less than a 3-4 ppb decrease for many monitors. To assess if TCEQ's modeling is potentially underestimating future year 2023 modeled DVs in these downwind areas, the EPA has compared 2020 monitored DVs at many typically higher ozone monitors in these areas with TCEQ's projected 2023 DVs in Table 2.3, Table 2.4, and Table 2.5.

---

[25] We use this ballpark figure here only as a bounding assumption relevant to an analytical exercise establishing why the TCEQ modeling submitted in its transport SIP submittal likely under-projects future ozone concentrations. The 3 to 4 ppb figure does not represent any analysis or conclusions regarding actual emissions reductions in Texas or any other state. The EPA has no basis to assume even this level of reduction in ozone concentrations will actually occur, nor is this estimate based on any assessment of the effects of permanent and enforceable emissions reductions in any SIP or FIP or resulting from any other known or upcoming CAA requirements. As such, this estimate is not usable in any other CAA action, nor would it be a defensible basis on which to reach any conclusions regarding future air quality conditions, without far greater technical and legal analysis than the Agency can provide at this time.

**Table 2.3 TCEQ Projected Future 2023 DVs Compared to 2020 Monitored DVs (IL, WI, & MI)**

| Chicago and Downwind areas in Wisconsin and Michigan | | | | | |
|---|---|---|---|---|---|
| **State** | **County** | **AQS ID** | **TCEQ 2023 Future Design Value-DV (ppb)** | **Monitored 2020 DV (ppb)** | **Delta in 3 years 2020 Monitor DV - TCEQ 2023 DV (ppb)** |
| Illinois | Cook | 170310001 | 60 | 75 | -15 |
| Illinois | Cook | 170310032 | 68 | 74 | -6 |
| Illinois | Cook | 170310076 | 61 | 69 | -8 |
| Illinois | Cook | 170311003 | 60 | 73 | -13 |
| Illinois | Cook | 170311601 | 61 | 71 | -10 |
| Illinois | Cook | 170314002 | 61 | 71 | -10 |
| Illinois | Cook | 170314007 | 57 | 71 | -14 |
| Illinois | Cook | 170314201 | 64 | 77 | -13 |
| Illinois | Cook | 170317002 | 66 | 75 | -9 |
| Michigan | Allegan | 260050003 | 71 | 73 | -2 |
| Wisconsin | Door | 550290004 | 64 | 72 | -8 |
| Wisconsin | Kenosha | 550590019 | 67 | 74 | -7 |
| Wisconsin | Manitowoc | 550710007 | 65 | 70 | -5 |
| Wisconsin | Milwaukee | 550790010 | 58 | 62 | -4 |
| Wisconsin | Milwaukee | 550790085 | 66 | 70 | -4 |
| Wisconsin | Sheboygan | 551170006 | 70 | 75 | -5 |
| | | | | Avg ALL | -8.31 |
| | | | | Avg if Current DV ≥ 74 ppb | -9.17 |
| | | | Avg if TCEQ 2023 < 71 ppb but 2020 DV ≥ 71 ppb | | -10.00 |
| | | | Avg if TCEQ 2023 <71 ppb but 2020 DV ≥ 74 ppb | | -9.17 |

**Table 2.4 TCEQ Projected Future 2023 DVs Compared to 2020 Monitored DVs (CO)**

| State | County | AQS ID | TCEQ 2023 Future Design Value-DV (ppb) | Monitored 2020 DV (ppb) | Delta in 3 years 2020 Monitor DV - TCEQ 2023 DV (ppb) |
|---|---|---|---|---|---|
| | | | Denver and downwind areas in Colorado | | |
| Colorado | Adams | 80013001 | 65 | 69 | -4 |
| Colorado | Arapahoe | 80050002 | 70 | 77 | -7 |
| Colorado | Arapahoe | 80050006 | 66 | 71 | -5 |
| Colorado | Boulder | 80130011 | 67 | 74 | -7 |
| Colorado | Denver | 80310002 | 57 | 70 | -13 |
| Colorado | Douglas | 80350004 | 73 | 81 | -8 |
| Colorado | Jefferson | 80590005 | 68 | 71 | -3 |
| Colorado | Jefferson | 80590006 | 72 | 79 | -7 |
| Colorado | Jefferson | 80590011 | 71 | 80 | -9 |
| Colorado | Larimer | 80690007 | 69 | 70 | -1 |
| Colorado | Larimer | 80690011 | 72 | 75 | -3 |
| Colorado | Larimer | 80691004 | 65 | 67 | -2 |
| Colorado | Weld | 81230009 | 70 | 70 | 0 |
| Avg ALL | | | | | -5.31 |
| Avg if Current DV ≥ 74 ppb | | | | | -6.83 |
| Avg if TCEQ 2023 < 71 ppb but 2020 DV ≥ 71 ppb | | | | | -5.50 |
| Avg if TCEQ 2023 < 71 ppb but 2020 DV ≥ 74 ppb | | | | | -7.00 |

**Table 2.5 TCEQ Projected Future 2023 DVs Compared to 2020 Monitored DVs (AZ & CA)**

| State | County | AQS ID | TCEQ 2023 Future Design Value-DV (ppb) | Monitored 2020 DV (ppb) | Delta in 3 years 2020 Monitor DV – TCEQ 2023 DV (ppb) |
|---|---|---|---|---|---|
| Arizona | Cochise | 40038001 | 71 | 66 | 4 |
| California | Los Angeles | 60370002 | 74 | 97 | -23 |
| California | Los Angeles | 60370016 | 87 | 107 | -20 |
| California | Los Angeles | 60370113 | 59 | 70 | -11 |
| California | Los Angeles | 60371103 | 63 | 76 | -13 |
| California | Los Angeles | 60371201 | 80 | 92 | -12 |
| California | Los Angeles | 60371302 | 52 | 64 | -12 |
| California | Los Angeles | 60371602 | 70 | 78 | -8 |
| California | Los Angeles | 60371701 | 80 | 88 | -8 |
| California | Los Angeles | 60372005 | 72 | 93 | -21 |
| California | Los Angeles | 60375005 | 57 | 62 | -5 |
| California | Los Angeles | 60376012 | 87 | 101 | -14 |
| California | Riverside | 60650012 | 85 | 99 | -14 |
| California | Riverside | 60650016 | 63 | 78 | -15 |
| California | Riverside | 60651016 | 87 | 99 | -12 |
| California | Riverside | 60652002 | 75 | 84 | -9 |
| California | Riverside | 60655001 | 78 | 88 | -10 |
| California | Riverside | 60656001 | 78 | 94 | -16 |
| California | Riverside | 60658001 | 88 | 96 | -8 |
| California | Riverside | 60658005 | 84 | 98 | -14 |
| California | Riverside | 60659001 | 73 | 87 | -14 |
| California | San Bernardino | 60710001 | 71 | 81 | -10 |
| California | San Bernardino | 60710005 | 96 | 90 | 6 |
| California | San Bernardino | 60710012 | 83 | 90 | -7 |
| California | San Bernardino | 60710306 | 76 | 83 | -7 |
| California | San Bernardino | 60711004 | 91 | 106 | -15 |
| California | San Bernardino | 60712002 | 94 | 102 | -8 |
| California | San Bernardino | 60714001 | 82 | 87 | -5 |
| California | San Bernardino | 60714003 | 94 | 114 | -20 |
| California | San Bernardino | 60719002 | 79 | 86 | -7 |
| California | San Bernardino | 60719004 | 88 | 110 | -22 |
| | | | | Avg ALL | -11.29 |
| | | | | Avg if Current DV ≥ 74 ppb | -12.07 |
| | | | Avg if TCEQ 2023 < 71 ppb but 2020 DV ≥ 71 ppb | | -12.00 |
| | | | Avg if TCEQ 2023 < 71 ppb but 2020 DV ≥ 74 ppb | | -12.00 |

As can be seen in Tables 2.3, 2.4, 2.5 there are many monitors in these downwind areas that would need a drop in ozone DVs over the next 3 years of ≥ 5 ppb (values of -5 ppb or more in the far-right column) to reach TCEQ's 2023 modeled projected levels. For each of these downwind areas, the EPA also examined the TCEQ modeled 2023 DVs for monitors with 2020 DVs ≥ 74 ppb, and for the monitors that TCEQ projected to be attaining (DV < 71 ppb) EPA examined all monitors that had a 2020 DV ≥ 71 ppb, and also the subset of these monitors with a 2020 DV ≥ 74 ppb. This DV concentration was chosen since a 2020 DV of 74 ppb or less would drop to a DV below the NAAQS with a 3 to 4 ppb reduction between 2020 and 2023. However even if these monitors show attainment in 2023, it is likely that their DVs would be close to the NAAQS, and therefore, may still be considered maintenance receptors.[26]

For the subset of monitors in Illinois, Wisconsin, and Michigan with 2020 DVs ≥ 74 ppb, the average amount of decrease in DVs needed to match TCEQ's 2023 projection is 9.17 ppb, which is more than the 3-4 ppb that could be anticipated at most for monitors in these areas. For the 11 monitors that TCEQ projected to be attaining in 2023 (red font in table) and had a 2020 DVs ≥ 71 ppb, the average amount of decrease in DVs needed to match TCEQ's 2023 projection is 10.0 ppb. For the six monitors that TCEQ projected to be attaining in 2023 and had a 2020 DV of ≥ 74 ppb, the average amount of decrease in DVs needed to match TCEQ's 2023 projection is 9.17 ppb, and they would have to drop a minimum of 3-4 ppb (up to 7 ppb) to have a DV of 70 ppb. Drops in 8-hour ozone DVs on average of 9.17 ppb or more in three years at many monitors in these areas do not typically occur unless there is an unexpectedly large change in emissions and/or large change in meteorological conduciveness for ozone generation (see figures in Section

---

[26] The EPA is not concluding that the sites identified by TCEQ are or are not "receptors" for purposes of ozone interstate transport policy. Rather, we are analyzing the technical reliability of the TCEQ modeling to project future design values.

1.c). TCEQ did not identify any such large emission reductions to be implemented in the 2021-2023 timeframe. Based on this information, TCEQ's modeling is likely underestimating future ozone levels at monitors/receptors in Illinois, Wisconsin, and Michigan. These underestimations likely prevented TCEQ from identifying nonattainment/maintenance receptors. The EPA's modeling results included in the March 2018 memorandum and/or EPA's 2016v2 modeling collectively have identified nonattainment/maintenance receptors in the Chicago area of Illinois and downwind areas in Wisconsin and Michigan that have or had projected linkages to emissions from Texas (Texas's contribution was greater than 0.7 ppb).

As can be seen in Table 2.4, for the monitors in Colorado with 2020 DVs $\geq$ 74 ppb, the average amount of decrease in DVs needed to match TCEQ's 2023 projection is 6.83 ppb, which is more than the 3-4 ppb that could be anticipated at most for monitors in these areas. For the four monitors that TCEQ projected to be attaining in 2023 (red font in table) and had a 2020 DVs $\geq$ 71 ppb, the average amount of decrease in DVs needed to match TCEQ's 2023 projection is 5.50 ppb. For the two monitors that TCEQ projected to be attaining in 2023 and had a 2020 DV of $\geq$ 74 ppb, the average amount of decrease in DVs needed to match TCEQ's 2023 projection is 7.00 ppb, and they would have to drop a minimum of 3-4 ppb (up to 7 ppb) to have a DV of 70 ppb. Drops in 8-hour ozone DVs on average of 7 ppb or more in three years at multiple monitors in this area would not typically be expected to occur unless there is an unexpectedly large change in emissions and/or large change in meteorological conduciveness for ozone generation (see Figures in Section 1.c).

As can be seen in Table 2.5, for the monitors in Southern California with 2020 DVs $\geq$ 74 ppb, the average amount of decrease in DVs needed to match TCEQ's 2023 projection is 12.07 ppb, which is more than the 3-4 ppb (see Section 1) that could be anticipated at most for

monitors in these areas. For the three monitors that TCEQ projected to be attaining in 2023 and had a 2020 DV of $\geq$ 74 ppb, the average amount of decrease in DVs needed to match TCEQ's 2023 projection is 12.00 ppb, and they would have to drop a minimum of 5-6 ppb (up to 8 ppb) to have a DV of 70 ppb. Drops in 8-hour ozone DVs on average of 9.17 ppb or more in three years at many monitors in these areas would not typically be expected to occur unless there is an unexpectedly large change in emissions and/or large change in meteorological conduciveness for ozone generation (see figures in Section 1.c).

Based on this information, TCEQ's modeling appears to be underestimating future ozone levels at monitors/receptors in Illinois, Wisconsin, Michigan, Colorado, and Southern California areas, and these underestimations may have prevented TCEQ from identifying nonattainment/maintenance receptors. Even with the underestimation of projected DVs, TCEQ identified several nonattainment/maintenance receptors in Colorado and California with linkages to Texas with contributions $\geq$ 0.7 ppb. The EPA's modeling results included in the March 2018 memorandum also identified nonattainment/maintenance receptors in the greater Denver area of Colorado (Jefferson County) that also had linkages to emissions from Texas. (Texas' contribution was greater than 0.7 ppb).

### 2.c. Model Performance Evaluation of TCEQ's 2012 base case at downwind areas in the Midwest and West.

TCEQ included a Model Performance Evaluation (MPE) analysis of their 2012 base case modeling in their SIP submission and in an Appendix to the SIP submission "Appendix C – Photochemical Model Performance Evaluation for the Transport State Implementation Plan Revision for the 2015 Eight-Hour Ozone National Ambient Air Quality Standard." TCEQ included MPE by climate regions of the U.S. Included as Figure 2.1 below is TCEQ's Table 3-7 in their SIP submission which provides statistical model performance evaluation metrics for

TCEQ's 2012 base case modeling. The EPA reviewed the information in the appendix as well as model performance information available on TCEQ's websites.[27]

The EPA agrees with findings by TCEQ in Appendix C that model performance varied across the U.S. and that TCEQ's 2012 base case under predicted the high end of the distribution of observed MDA8 ozone concentrations in the Midwest and West, including the Chicago area, Southeast Wisconsin, Denver, Arizona, and Southern California areas.[28] These areas include sites that were identified in TCEQ's modeling and in the EPA's 2016v2 modeling as nonattainment/maintenance receptors.

Overall, the modeling indicates some model underestimation in the Upper Midwest, Ohio Valley, Southwest (includes Colorado monitors), and in the West (includes Southern California) regions. While this is mostly within typical ranges seen for Continental U.S. chemical transport modeling, underestimation bias may play some role in the much lower 2023 DVs that TCEQ's modeling is projecting at a number of potential receptor sites.

---

[27] TCEQ's Model Performance Evaluation was reviewed for downwind areas using information from TCEQ's websites (hyperlinks are embedded): 2015 Ozone NAAQS Transport SIP Modeling - Interactive Bar Chart - Texas Commission on Environmental Quality - www.tceq.texas.gov and 2015 Ozone NAAQS Transport SIP Modeling - Model Performance Statistics by Area and Day - Texas Commission on Environmental Quality - www.tceq.texas.gov.
[28] TCEQ SIP Submission, Table 3-7 at page 3-32; TCEQ SIP Submission "Appendix C Photochemical Model Performance Evaluation for the Transport State Implementation Plan Revision for the 2015 Eight-Hour Ozone National Ambient Air Quality Standard."

Figure 2.1 - TCEQ's SIP Submission Table 3-7 Model performance evaluation statistical metrics by Region for TCEQ's 2012 base case

**Table 3-7: Statistical Model Performance Evaluation Metrics for TCEQ's 2015 Ozone NAAQS Transport SIP Revision Configuration**

| Climate Region | No. of Obs | MB (ppb) | ME (ppb) | NMB (%) | NME (%) | RMSE (ppb) |
|---|---|---|---|---|---|---|
| Northeast | 5281 | 4.1 | 8.4 | 5.9 | 12.2 | 11.0 |
| Ohio Valley | 9861 | -2.5 | 6.8 | -3.6 | 10.0 | 8.5 |
| Upper Midwest | 2950 | -6.2 | 8.3 | -8.9 | 11.9 | 9.9 |
| Southeast | 3203 | 3.1 | 6.8 | 4.7 | 10.2 | 8.8 |
| South | 5020 | -3.9 | 6.5 | -5.7 | 9.6 | 8.1 |
| Southwest | 7215 | -5.5 | 7.1 | -8.4 | 10.8 | 9.0 |
| Northern Rockies | 1084 | -7.5 | 8.6 | -11.8 | 13.4 | 10.4 |
| Northwest | 193 | -7.0 | 8.2 | -10.9 | 12.7 | 10.2 |
| West | 10672 | -9.2 | 10.4 | -13.1 | 14.9 | 12.7 |
| National | 45479 | -3.9 | 8.0 | -5.7 | 11.7 | 10.1 |

We have included two figures from TCEQ's SIP submission that show Mean Bias and Root Mean Square Error (RMSE) for each monitor in the domain. Included as Figure 2.2 is TCEQ's Figure 3-26 in their SIP submission, which provides mean bias for May through September 2012 at all of the EPA Air Quality System (AQS) monitoring sites for days with observed MDA8 ozone concentration ≥ 60 ppb. Figure 2.2 shows that the mean biases for days with MDA8 ozone concentrations ≥ 60 ppb differ by region, but at a number of monitors in the Chicago, southeastern Wisconsin, Denver, Arizona, and southern California areas, TCEQ's modeling has a negative mean bias.

Figure 2.3 (TCEQ's Figure 3-27 in their SIP submission) provides RMSE[29] for the May through September 2012 at AQS Monitoring Sites for each of the days with observed MDA8 > 60 ppb. The RMSE at most monitors in the modeling domain were in the range of 6 to 12 ppb. However, many monitors in the Midwest, including in the Chicago area and southeastern

---

[29] Root Mean Square Error (RMSE): This performance statistic (in units of ppb or micrograms per cubic meter($\mu$g/m$^3$)) is a measure of the average distance between predicted and observed values. It is calculated as the standard deviation of the difference between modeled and observed values

Wisconsin as well as monitors in Arizona and California, have higher deviations with RMSE in the 8 to 14 ppb range.

Figure 2.2 – TCEQ's SIP Submission Figure 3-26 showing Mean Bias at each monitor



**Figure 3-26:** Mean Bias for the May through September 2012 Episode at AQS Monitoring Sites

Figure 2.3 – TCEQ's SIP Figure 3-27 showing Root Mean Square Error (RMSE) at each monitor



**Figure 3-27: RMSE for May through September 2012 Episode at AQS Monitoring Sites**

The EPA examined TCEQ's model performance at monitors in Cook County, Illinois, Wisconsin, and Michigan that were identified in EPA's 2011-based modeling and its 2016v2 modeling as receptors to which Texas contributes ≥ 1 percent of the NAAQS. TCEQ's modeling underestimates MDA8 ozone at these monitors and TCEQ's modeling also underestimates observed values at key monitor/receptors in Colorado. Even with these underprediction concerns, TCEQ's modeling analysis still identified 4 nonattainment/maintenance receptors in Colorado including the Jefferson County (AQS ID 80590011), which the EPA also identified as a receptor with Texas linkage in modeling results included in our March 2018 memorandum. The ability of TCEQ's modeling to replicate the highest days both in Texas and at downwind areas is important to having an adequate modeling analysis to both assess potential nonattainment/maintenance receptors and linkages to upwind states. Both the EPA's modeling included in the March 2018 memorandum and TCEQ's modeling identified nonattainment/maintenance receptors in Jefferson County, CO. We also note that TCEQ's analysis also identified one additional receptor in Jefferson County, CO, one monitor in Larimer County, CO, and one receptor in Douglas County, CO with linkage impacts greater than 0.7 ppb from Texas emissions.

TCEQ's modeling also underestimates observed values at key monitor/receptors in Arizona and California that TCEQ identified as nonattainment and/or maintenance receptors with linkages to Texas. TCEQ did identify Texas emissions as having impacts of more than 0.7 ppb, and thus, linked to some nonattainment/maintenance receptors in Arizona and California.

The EPA finds that although TCEQ's modeling under predicts the highest measured MDA8 concentrations in downwind areas, including downwind areas that have been identified by TCEQ or EPA's 2016v2 modeling to have nonattainment/maintenance receptors, overall model performance does not indicate that TCEQ's modeling was egregiously flawed. That is,

the results of the base year model performance provided by TCEQ in their submittal does not appear to be a clear factor contributing to the likely underestimation of future year 2023 model-predicted DVs.

### 2.d. Model Performance Evaluation of TCEQ's 2012 base case at DFW and HGB monitors

In this section we present an evaluation of TCEQ's 2012 base case model performance in the DFW & HGB areas. We conducted this analysis to identify if there were any serious problems with TCEQ's 2012 base year model performance that might potentially affect the projection of future year DVs. TCEQ provides some model performance evaluation data for their 2012 base case modeling for this transport SIP on a website,[30] which the EPA used to generate the figures below, indicating some low bias at key monitor/receptors in the DFW and HGB area (Figures 2.4 a-f). The EPA has provided a time series using TCEQ's model performance information that indicates the observed Maximum Daily Average 8-hour ozone (MDA8) value in red and modeled value in blue for two monitors in the DFW area and one in the HGB area that were identified in the EPA's March 2018 memorandum that Oklahoma was linked (AQS ID 481210034 Denton County, AQS ID 484392003 Tarrant County, and AQS ID 480391004 Brazoria County). We also evaluated three additional monitors (Eagle Mountain Lake, Grapevine, and Frisco) in the DFW area, which are among the monitors that often have the highest DVs the DFW area. These figures also include quantile-quantile (Q-Q) scatter plots, comparing observed to modeled MDA8.In Table 2.6 the EPA provides statistical metrics for this

---

[30] TCEQ's Model Performance Evaluation was reviewed for DFW, HGB, and downwind areas using information from TCEQ's websites: 2015 Ozone NAAQS Transport SIP Modeling - Interactive Bar Chart - Texas Commission on Environmental Quality - www.tceq.texas.gov
 and 2015 Ozone NAAQS Transport SIP Modeling - Model Performance Statistics by Area and Day - Texas Commission on Environmental Quality - www.tceq.texas.gov

58

subset of DFW area monitors and for some of the HGB area monitors including the Manvel

Croix monitor (AQS ID 480391004) that typically have the highest DVs in the HGB area.

Figure 2.4(a) – Brazoria County – Manvel Croix Time Series MDA8
Observed (red) and Modeled (blue) and Scatter Q-Q plots





Figure 2.4(b) – Denton County – Denton Airport South Time Series MDA8
Observed (red) and Modeled (blue) and Scatter Q-Q plots





Figure 2.4(c) – Tarrant County – FAA Site Time Series MDA8
Observed (red) and Modeled (blue) and Scatter Q-Q plots





Figure 2.4(d) – Tarrant County – Eagle Mountain Lake Time Series MDA8
Observed (red) and Modeled (blue) and Scatter Q-Q plots





Figure 2.4(e) – Tarrant County – Grapevine Time Series MDA8
Observed (red) and Modeled (blue) and Scatter Q-Q plots





Figure 2.4(f) – Collin County – Frisco Time Series MDA8
Observed (red) and Modeled (blue) and Scatter Q-Q plots





Table 2.6 Model Performance Statistics for Select DFW and HGB monitors including sites identified as receptors in EPA's March 2018 Memorandum and EPA's 2016v2 modeling

| | Site | Valid Data | Mo ppb | Mm ppb | MB ppb | ME ppb | RMSE ppb | NMB % | NME % | FB % | FE % | R2 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Select DFW Sites : Data with Observed ≥ 60 ppb** | | | | | | | | | | | | |
| Frisco | 480850005 | 68 | 69.25 | 65.49 | -3.76 | 6.43 | 7.95 | -5.43 | 9.28 | -5.66 | 9.55 | 0.345 |
| Denton Airport South | 481210034 | 51 | 69.82 | 65.92 | -3.91 | 5.20 | 6.99 | -5.60 | 7.44 | -5.86 | 7.73 | 0.529 |
| Eagle Mtn. Lake | 483670081 | 45 | 67.20 | 61.19 | -6.01 | 6.86 | 7.92 | -8.94 | 10.21 | -9.40 | 10.69 | 0.501 |
| FAA | 484390075 | 41 | 68.07 | 65.04 | -3.04 | 5.60 | 6.79 | -4.46 | 8.22 | -4.67 | 8.56 | 0.495 |
| Grapevine | 484392003 | 51 | 68.20 | 66.15 | -2.05 | 4.67 | 6.03 | -3.00 | 6.85 | -3.14 | 7.05 | 0.532 |
| | | | | | | | | | | | | |
| **Select HGB Sites : Data with Observed ≥ 60 ppb** | | | | | | | | | | | | |
| Brazoria -Manvel Croix | 480391004 | 36 | 72.25 | 66.9 | -5.35 | 8.44 | 11.08 | -7.40 | 11.68 | -6.80 | 11.39 | 0.566 |
| Harris - Aldine | 482010024 | 18 | 68.00 | 72.76 | 4.76 | 6.37 | 8.61 | 6.99 | 9.37 | 6.47 | 8.90 | 0.424 |
| Harris - Northwest | 482010029 | 24 | 70.04 | 66.2 | -3.84 | 5.10 | 7.70 | -5.49 | 7.29 | -5.74 | 7.54 | 0.547 |
| Harris - Bayland Park | 482010055 | 28 | 70.39 | 72.76 | 2.37 | 6.03 | 7.98 | 3.36 | 8.57 | 3.28 | 8.18 | 0.537 |
| Harris -Deer Park #2 | 482011035 | 20 | 68.35 | 72.35 | 4.00 | 9.19 | 10.8 | 5.85 | 13.45 | 6.13 | 13.03 | 0.215 |

The time series and scatter/Q-Q plots along with the performance statistics show that there is a tendency for some underprediction of high observed ozone levels at these DFW and HGB monitors. However, overall, the ozone model performance statistics in Table 2.6 for the TCEQ 2012 modeling at these monitors are within or close to the ranges found in other recent peer-reviewed photochemical model applications (e.g., Simon et al, 2012 and Emory et al, 2017).[31,32] In this respect, base year model performance does not appear to be a factor in the potential under prediction of 2023 DVs at DFW and HGB area monitors.

### 2.e. Summary

TCEQ's 2023 future year projections may understate anticipated ozone levels at high ozone monitors in DFW and HGB and also in areas downwind of Texas including the Chicago area and downwind receptors in Wisconsin and Michigan, greater Denver area of Colorado, and in Southern California, as shown above by comparing 2020 monitored DVs to the projected 2023 DVs and examining the amount of ozone reductions that would be necessary to meet those projections compared with reasonably anticipated DV reductions based on long-term monitored DV trends. These likely underestimations in 2023 DVs may have prevented TCEQ from identifying nonattainment/maintenance receptors in the Chicago area and downwind receptors in Wisconsin and Michigan. Despite the underprediction, TCEQ's modeling did identify a number of receptors in Colorado and California that Texas emissions were linked (contribution equal or greater than 0.70 ppb).

---

[31] Simon, H., K.R. Baker, and S.B. Phillips, 2012. Compilation and Interpretation of Photochemical Model Performance Statistics Published between 2006 and 2012, *Atmospheric Environment*, 61, 124-139.

[32] Emery, C., Z. Liu, A. Russell, M. T. Odom, G. Yarwood, and N. Kumar, 2017. Recommendations on Statistics and Benchmarks to Assess Photochemical Model Performance. *J. Air and Waste Management Association*, 67, 582-598.

TCEQ's 2012 base case modeling tends to underestimate high MDA8 ozone concentrations at ozone monitors in the DFW and HGB areas and also at monitors in the Chicago, IL area (as well as downwind receptors in Wisconsin and Michigan), the greater Denver area of Colorado, and in Southern California to which Texas is linked in TCEQ's modeling and/or EPA's modeling. However, in view EPA's modeling guidance section 4.1 and as discussed above, the magnitude of MDA8 ozone bias in TCEQ's modeling in Texas and for downwind receptors is unlikely to have been a factor in the underestimating of projected DVs by TCEQ.

3.     **Comparison of TCEQ and EPA 2023 future modeling and identified maintenance and nonattainment receptors**

As described in the notice of proposed disapproval, the EPA has recently updated its air quality modeling for transport using the 2016v2 emissions platform. Using 2016 as a base year shortens the number of years to project ozone concentrations in 2023, compared to TCEQ's projection from a 2012 base year or the EPA's earlier projection from a 2011 base year. Also, using 2016 as a base year versus 2012 or 2011 allows for the use of monitored DVs from a more recent period. The combination of starting with more recent base period DVs and shortening the length of time between the base year and the future year provides more certainty compared to TCEQ's 2012-based or the EPA's 2011-based modeling. Thus, the 2016-based modeling is expected to provide more reliable projection of receptors and contributions in 2023.

The EPA's modeling using both 2011 and 2016 base year periods identified that Texas was linked to nonattainment and/or maintenance receptors in 2023 in the Midwest Region (Illinois, Wisconsin, and Michigan), while TCEQ's modeling using a 2012 base year indicated only linkages to western receptors.

In Table 3.1, the EPA provides the projected 2023 average and maximum DVs based on EPA's 2016v2 modeling, and projected average and maintenance DVs based on TCEQ's modeling for the nonattainment and/or maintenance receptors to which Texas is linked (Texas contributions of ≥ 0.7 ppb) based on EPA's 2016v2 modeling. This table also includes the contributions to these receptors from TCEQ's modeling and EPA's 2016v2 modeling, as well as the 2020 DVs and preliminary 2021 DVs at these receptors.[33]

---

[33] Monitoring data from the EPA's Air Quality System (AQS) (https://www.epa.gov/aqs). 2021 monitoring data is preliminary and still has to undergo Quality Assurance/Quality Control analysis and be certified by the State of Texas, submitted to the EPA, and reviewed and concurred on by the EPA.

**Table 3.1 Projected 2023 Nonattainment/Maintenance Receptors Identified by EPA Using EPA's 2016 base year modeling**

| Receptor (Site ID, County, State) | Nonattainment/Maintenance (EPA 2023) | EPA: 2023 Average DV/Maximum DV (ppb) | TCEQ: 2023 Average DV/Maintenance DV (ppb) | 2020 DV/Preliminary 2021 DV** (ppb) | EPA: Texas Contribution (ppb) | TCEQ: Texas Contribution (ppb) |
|---|---|---|---|---|---|---|
| 170310001, Cook County, IL | Maintenance | 69.6/73.4 | 60/58 | 75/71 | 0.86 | 1.6 |
| 170310032, Cook County, IL | Maintenance | 69.8/72.4 | 68/66 | 74/75 | 1.46 | 1.31 |
| 170314201, Cook County, IL | Maintenance | 69.9/73.4 | 64/62 | 77/74 | 1.15 | 1.25 |
| 170317002, Cook County, IL | Maintenance | 70.1/73.0 | 66/65 | 75/73 | 1.58 | 1.22 |
| 550590019, Kenosha County, WI | Nonattainment | 72.8/73.7 | 67/66 | 74/74 | 1.72 | 1.44 |
| 550590025, Kenosha County, WI | Maintenance | 69.2/72.3 | No data* | 74/72 | 1.81 | No data* |
| 551010020, Racine County, WI | Nonattainment | 71.3/73.2 | No data* | 73/73 | 1.34 | No data* |

* Kenosha AQS ID 550590025 was installed and began operating May 13, 2013, so the first three-year DV available is 2013-2015. Racine AQS ID 551010020 was installed on April 14, 2014 so the first three year DV available is 2015-2017. TCEQ's modeling used monitored DV data for 2010-2012, 2011-2013, and 2012-2014 to project to the future year. Since these monitors do not have valid DVs for these periods, TCEQ's modeling can't be used to project 2023 values and identify if they would be nonattainment or maintenance receptors.

** 2021 monitoring data is preliminary and still has to undergo Quality Assurance/Quality Control analysis and be certified by the State of Texas, submitted to the EPA, and reviewed and concurred on by the EPA.

The likely underestimation of anticipated 2023 DVs in the Midwest is a concern, especially in light of the fact that TCEQ did not identify any receptors in the Chicago area and downwind of Chicago areas of Wisconsin and Michigan while the EPA did identify receptors in these areas.

*Cook County, IL*

As shown in Table 3.1, the EPA identified four receptors as maintenance receptors in Cook County, IL. TCEQ's 2023 nonattainment DVs are 9-15 ppb lower than recent monitoring data. The four monitors that the EPA's 2016v2 modeling identified as maintenance receptors to which Texas is linked, all have 2020 DVs $\geq$ 74 ppb that would need their DVs to drop from a minimum 3-4 ppb up to 7 ppb in the next 3 years. Based on the trends analysis included in Section 1, typical ozone DV changes (no large changes in emissions and/or meteorology ozone conduciveness) would be anticipated to be 0-3 ppb for 3 years, indicating that it is unlikely that all these monitors will attain the NAAQS and would likely need even more ozone DV decreases to not be considered a maintenance receptor. TCEQ's modeling did not identify these four receptors as nonattainment and/or maintenance receptors. In TCEQ's modeling they project 2023 nonattainment DVs of 60 to 68 ppb for the four maintenance receptors that the EPA identified (2016v2), where EPA's 2023 nonattainment DVs range from 69 to 70 ppb for the four receptors. EPA's projected 2023 nonattainment DVs are higher than TCEQ's projected 2023 nonattainment DVs and closer to the recently monitored data. The EPA identified all four receptors as maintenance receptors. TCEQ's maintenance DVs, using only the 2012-2014 monitored DVs, projected 2023 maintenance DVs between 58 ppb and 66 ppb, which is 1 to 2 ppb lower than TCEQ's nonattainment DVs. As discussed above, TCEQ's methodology for identifying maintenance receptors does not identify areas that may struggle with maintaining the standard in

the face of inter-annual variability in ozone-conducive conditions. It is worth noting that if

TCEQ's modeling had identified any of these four receptors as maintenance receptors, TCEQ's

modeling estimates contributions from Texas sources ranging from 1.22 ppb to 1.6 ppb, and

therefore Texas would have been linked to these receptors for further analysis of potential

emission reductions.

*Wisconsin*

As shown in Table 3.1, the EPA identified two receptors as nonattainment receptors and

one as a maintenance receptor in Wisconsin. As footnoted in Table 3.1, TCEQ modeled a 2012

base case so TCEQ's modeling can only be used for monitors that had a one or more valid DVs

in the 2010-2014 period. Only the Kenosha County AQS ID 550590019 monitor had a valid DV

during this time, as the other two monitors were not installed until 2013-2014. The EPA's

modeling uses a 2016 base case, so the EPA had valid DVs for all three monitors in Wisconsin to

project 2023 DVs. TCEQ's projected nonattainment DV is 5 ppb lower than EPA's 2023

nonattainment DV and 7 ppb lower than recent monitored data. The three monitors that the

EPA's 2016v2 modeling identified as a nonattainment and/or maintenance receptors to which

Texas is linked have 2020 DVs of 73ppb, 74ppb, and 74 ppb and preliminary 2021 DV of 72

ppb, 73 ppb, and 74 ppb. TCEQ's modeling only had projections for one of these receptors but

did not identify it as a nonattainment and/or maintenance receptor. Again, TCEQ's maintenance

methodology proved to be less stringent than the nonattainment methodology and resulted in the

maintenance methodology DV being 1 ppb lower than the nonattainment methodology DV. It is

worth noting that if TCEQ's modeling had identified the one Wisconsin receptor that they had

valid base DVs as nonattainment or maintenance, TCEQ's modeling indicated that contributions

from Texas sources was 1.44 ppb and therefore Texas would have been linked to these receptors for further analysis of potential emission reductions.

Overall, TCEQ's modeling resulted in no receptors being identified in the Illinois, Wisconsin, Michigan areas. The analysis here shows that by comparing current measured DVs that are only 2 to 3 years from 2023 with the TCEQ 2023 DVs used for identifying maintenance receptors, it is clear that the TCEQ method is flawed. TCEQ claims that five receptors will not have a problem maintaining the NAAQS when, in fact, the current DVs for these five sites are 4 to 7 ppb above the NAAQS using 2020 DVs and 1 to 5 ppb above the NAAQS using preliminary 2021 DVs, indicating that it is unlikely that all these monitors will attain the NAAQS and would likely need even more ozone DV decreases to not be considered a maintenance receptor. While the TCEQ modeling projects lower overall ozone levels for these areas in 2023, TCEQ's modeling does tend to corroborate the amount of projected impact that emissions from Texas may be contributing to 5 of the 7 nonattainment and maintenance receptors identified by the EPA's most recent air quality modeling, EPA MP2016v2 modeling, as having a Texas contribution greater than or equal to one percent of the 2015 ozone NAAQS (0.7 ppb). The EPA MP2016v2 modeling found that Texas is linked to nonattainment and maintenance receptors in Cook County Illinois, and Wisconsin Counties (Kenosha and Racine).

## 4.    Other Potential Modeling Concerns

### 4.a. EGU Emissions

TCEQ did not use the latest EGU emissions available at the time they proposed the SIP that incorporated reductions from the CSAPR Update/latest ERTAC projections in their modeling. It is unclear if this made any substantial changes in the modeling analysis without updating the EGU emissions and redoing the modeling.

### *4.b. Contribution Calculation*

TCEQ used an alternate methodology for calculating contributions in determining the contributions from Texas emissions at each monitor Texas identified as a receptor in Colorado, Arizona, and Southern California.

To understand the differences, we first describe the EPA's method for calculating the contribution from an upwind state's emissions at downwind monitors. We note that in the Federal Register Notice Section II.B.4 and Section III.B.3, that is also referred to elsewhere in the Federal Register Notice, there is an error in describing how the EPA calculates future year 2023 contributions. The EPA's approach for calculating contributions is summarized below followed by a more detailed four step description of the methodology. For more details on how EPA calculates contributions see the "Air Quality Modeling TSD for 2015 Ozone NAAQS Transport SIP Proposed Actions".[34]

The EPA's approach for calculating 2023 average contribution metric values at individual monitoring sites is to first average daily contributions on the days with the highest predicted MDA8 ozone concentrations in the grid cell containing the monitor based on the air quality modeling for 2023 and then calculate the ratio of the average contribution to the corresponding average MDA8 concentration across the selected days. The resulting ratio is applied to the projected 2023 design value to provide contribution metric values for each state at each monitoring site nationwide. As part of this method, contributions and concentrations are selected from the days with the top-10 MDA8 ozone concentrations in 2023. Note that EPA does not calculate contributions for those monitoring sites where there are fewer than 5 days with 2023 MDA8 ozone concentrations $\geq$ 60 ppb for that monitor.

---

[34] This TSD can be found in Docket ID No. EPA-HQ-OAR-2021-0663

For clarity and further analysis of the differences with TCEQ's methodology we are including a more detailed four step description of the EPA's methodology (see "Air Quality Modeling TSD for 2015 Ozone NAAQS Transport SIP Proposed Actions").[35]

(1) For the model grid cells containing an ozone monitoring site, calculate the 8-hour average contribution from each source tag[36] to each monitoring site for the time period of the 8-hour daily maximum modeled (i.e., MDA8) concentration on each day in 2023;

(2) Average the MDA8 concentrations for each of the top 10 modeled ozone concentration days in 2023 and average the 8-hour contributions for each of these same days for each tag;[37]

(3) Divide the 10-day average contribution for each tag by the corresponding 10-day average concentration to obtain a Relative Contribution Factor (RCF) for each tag for each monitoring site;

(4) Multiply the 2023 average design values by the corresponding RCF to produce the average contribution metric values at each monitoring site in 2023.

TCEQ's methodology differs in that it selects 2023 contributions from the days with the highest MDA8 ozone concentrations in 2012, not 2023 as in EPA's method. In addition, TCEQ selects contributions from among the 3 x 3 set of model grid cells including and adjacent to the

---

[35] This TSD can be found in Docket ID No. EPA-HQ-OAR-2021-0663.

[36] A "tag" is a contribution category. For example, in the state-by-state source apportionment model run, we "tagged" anthropogenic NOx and VOC emissions for individual states to track the formation of ozone from these emissions.

[37] When calculating the contribution metric values EPA applied a criterion that 5 or more of the top 10 model-predicted concentration days must have MDA8 concentrations >= 60 ppb in the future year in order to calculate a valid contribution metric. The criterion of having at least 5 days with MDA8 ozone concentrations >= 60 ppb was chosen to avoid including contributions on days that are well below the NAAQS in the calculation of the contribution metric. Using 5 days with MDA8 ozone >= 60 ppb aligns with recommendations in EPA's air quality modeling guidance for projecting future year design values, as described above. The EPA did not calculate contribution metric values for any monitor that did not meet this criterion.

grid cell containing the monitor based on whatever grid cells are included in the calculation of projected design values. The EPA's method, on the other hand, uses 2023 contributions from just the grid cell containing the monitor.

More specifically, TCEQ's methodology differs from step 1, above, in that they use the contribution for the cell that had the maximum 2012 MDA8 value from a 3x3 matrix centered around the grid cell that has the monitor, whereas the EPA uses the contribution for the cell that includes the monitor. Note TCEQ is using the 2012 modeled values for selecting the MDA8 value. TCEQ's methodology differs in step 2 in that they use the 10 highest MDA8 days in the 2012 modeling instead of the EPA's method that uses the 10 highest MDA8 days in the 2023 modeling. One artifact of TCEQ's method is that the modeled contributions used to calculate the average contribution metric may be based on contributions on different days and in different grid cells than EPA's method.

TCEQ's also uses 2012 modeled values in step 3 to calculate the Relative Contribution Factor and in step 4 to produce the average contribution metric using the 2012 total modeled concentration values. Whereas the EPA uses the 2023 data in steps 3 and 4.

It is unclear how the methodological differences ultimately affect the contribution values and which receptors Texas is linked compared to the EPA's methodology. As noted in Section 3 for receptors that EPA identified in Illinois and Wisconsin, TCEQ's contribution method did result in contributions that were relatively similar in magnitude compared to EPA's 2016v2 contribution results. The EPA does not agree with TCEQ's use of the 2012 modeled days for selecting the days in 2023 to calculated contribution. Regardless of this issue, TCEQ's methodology  did identify contributions above 0.7 ppb at nonattainment/maintenance receptors in Colorado, Arizona, and Southern California.

*4.c. Future Year Boundary Conditions*

In generating their future year boundary conditions, TCEQ used estimated 2023 emissions from the Representative Concentration Pathway (RCP) scenario 8.5 developed by the Intergovernmental Panel on Climate Change (IPCC). This includes some estimated changes based on climate modeling. The EPA typically has not seen adjustment in future year boundary conditions for climate changes included in SIP modeling; without a modeling sensitivity analysis, the actual impact cannot be quantified. The actual impact is expected to be a relatively small contribution to the total modeled concentrations in TCEQ's transport SIP modeling and would not be expected to significantly change the total modeled concentrations.

## 5.     TCEQ Other Factor Analysis (Weight of Evidence)

TCEQ stated that the Texas contribution to a receptor should be deemed "significant" only if there is a persistent and consistent pattern of contribution on several days with elevated ozone. To try and assess persistent and consistent patterns, TCEQ did some additional analysis of several different factors such as DV trends, number of elevated ozone days, back trajectory analyses on elevated ozone days, modeled concentrations on future expected elevated ozone days, total interstate contributions at tagged monitors, consideration of conceptual model of downwind area, and responsiveness of ozone to emissions from Texas. Based on their assessment, TCEQ concluded that emissions from Texas do not contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS at any downwind monitors.

*TCEQ Summary*

For Colorado receptors, TCEQ provided analysis of: current attainment status and design value trends, number of days with elevated observed ozone, back trajectory analysis on elevated

ozone days, the modeled contributions on expected elevated ozone days, collective interstate contribution, alternate contribution method analysis, and the responsiveness of ozone formation at the tagged Colorado monitors to Texas $NO_X$ emissions. TCEQ evaluated these factors in a general weight of evidence approach and concluded that Texas emissions do not contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS at the tagged monitors in Colorado.

For California receptors, TCEQ provided analysis of: current attainment status and design value trends, number of days with elevated observed ozone, back trajectory analysis on elevated ozone days, the modeled contributions on expected elevated ozone days, collective interstate contribution, TCEQ evaluated these factors in a general weight of evidence approach and concluded that Texas emissions do not contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS at the tagged monitors in California.

While these additional factors can be informative to supplement an air quality modeling-based analysis of some of the complexities of ozone formation in downwind areas, how ozone is changing in those areas, areas that may contribute to downwind areas, modeled contributions from upwind areas, and potential responsiveness to upwind changes in emissions, most of these analyses do not provide the quantitative assessment that chemical transport modeling with source contribution analyses that air quality modeling provides. Chemical transport modeling is the most technically credible tool available to project future year ozone levels, contributions from upwind states, and frequency of the impacts of upwind states.

The EPA has reviewed these analyses that TCEQ provided in a Weight of Evidence approach for receptors in Colorado and California and found significant concerns with some of the analyses. Specifically, the EPA's assessment of the totality of TCEQ's Weight of Evidence

factors for Colorado and California receptors is that they were in conclusive or do not provide sufficient, substantial evidence that counters the results of photochemical modeling, including the contribution analysis using EPA's contribution methodology. The EPA does not concur with TCEQ's conclusion that Texas emissions do not contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS at the tagged monitors in California. The EPA has included some comments, concerns, and limitations with using these factors that Texas used to negate the findings of the chemical transport model below.

### 5.a. TCEQ indicated that there are problems with DV trends

TCEQ provided analyses of recent DV trends at the 4 Colorado monitors that TCEQ identified as nonattainment/maintenance receptors. TCEQ stated that 2013 was a high monitored ozone year but that the most recent DVs at the time of their SIP submittal (2016 DVs) at most monitors show attainment and long-term ozone decreases are modest for the time evaluated (see Figure 1.8 above that is TCEQ's SIP Figure 3-40).

TCEQ also provided analyses of recent DV trends at the tagged California monitors along with the other monitors located in the Los Angeles CSA. These trends are displayed in TCEQ's SIP Figure 3-56: Eight-Hour Ozone Design Values for Monitors in the Los Angeles Area that is included above (see Figure 1.12 above that is TCEQ's SIP Figure 3-56). TCEQ colored the tagged California monitors and used gray coloring for the other monitors in the Los Angeles CSA. The 10 monitors tagged had eight-hour ozone design values ranging from 101 ppb to 80 ppb in 2016. TCEQ indicated that 8-hour ozone DVs values in the area have decreased overall for the past 10 years and the 10 monitors tagged for further review have observed eight-hour ozone design value decreases from 2007 through 2016 ranging from 13% at Reseda (AQS ID: 60371201) to 5% at Victorville-Park Avenue (AQS ID: 60710306).

The most recent monitoring data and trends are useful to help identify whether the monitors are currently near or above the 8-hour ozone NAAQS. See Figures 1.9 and 1.13, above, and Table 5.1 below, which includes the 2021 preliminary DV.[38] We note that the AQS ID 80590011 (Jefferson County, Colorado) monitor 2016 DV is similar to the 2012 monitor DV despite four more years of fleet turnover in the Denver area. Overall, the DV trends show that ozone levels are reducing at a slow pace. Based on the data for the Colorado monitors and the ten California area monitors identified by TCEQ as receptors, the 2020 DVs and the long-term trends do not clearly show that the receptors in California or Colorado are expected to be below the NAAQS, and thus, not be potential nonattainment or maintenance receptors in 2023. The modeling trends analysis for California and Colorado receptors do not provide evidence that these receptors will attain by 2023.

---

[38] EPA Analysis of 8-hour Ozone monitor trends. Data and calculations available in "Ozone_Trends_R6_TSD.xlsx" included in Docket ID No. EPA-R06-OAR-2021-0801.

**Table 5.1   2020 DV and Preliminary 2021 DV and TCEQ 2023 projections and contributions for receptors identified by TCEQ**

| Receptor<br><br>(Monitor ID, County, State) | TCEQ 2023 Average DV (ppb) | TCEQ 2023 Maintenance DV (ppb)* | Texas Contribution (ppb) | 2020 DV / Preliminary 2021 DV** (ppb) |
|---|---|---|---|---|
| 80350004, Douglas, CO | 73 | 72 | 1.42 | 81/83 |
| 80590006, Jefferson, CO | 72 | 73 | 1.26 | 79/81 |
| 80590011, Jefferson, CO | 71 | 71 | 1.26 | 80/83 |
| 80690011, Larimer, CO | 72 | 71 | 1.22 | 75/77 |
| 80050002, Arapahoe, CO | 70*** | 71 | 1.15 | 77/80 |
| 40038001, Cochise, AZ | 71 | 69**** | 1.06 | 66/66 |
| 60371201, Los Angeles, CA | 80 | 78 | 0.76 | 92/87 |
| 60371701, Los Angeles, CA | 80 | 82 | 0.72 | 88/90 |
| 60376012, Los Angeles, CA | 87 | 86 | 0.9 | 101/101 |
| 60658001, Riverside, CA | 88 | 85 | 0.73 | 96/95 |
| 60658005, Riverside, CA | 84 | 83 | 0.71 | 98/97 |
| 60710001, San Bernardino, CA | 71 | 72 | 0.84 | 81/77 |
| 60710306, San Bernardino, CA | 76 | 77 | 0.81 | 83/83 |
| 60711004, San Bernardino, CA | 91 | 90 | 0.88 | 106/103 |
| 60714001, San Bernardino, CA | 82 | 79 | 0.86 | 87/87 |
| 60714003, San Bernardino, CA | 94 | 91 | 0.74 | 114/114 |

    \* Uses TCEQ's Maintenance receptor methodology that EPA has concerns (see Section 1 on maintenance receptor methodology discussion).

    \*\* 2021 monitoring data is preliminary and still has to undergo Quality Assurance/Quality Control analysis and be certified by the State of Texas, submitted to the EPA, and reviewed and concurred on by EPA.

    \*\*\* From TCEQ spreadsheet of future 2023 DVs with state contributions.

    \*\*\*\* TCEQ did not provide calculations for this receptor so EPA calculated from the Relative Response Factor in TCEQ spreadsheet of future 2023 DVs with state contributions and the monitor's 2012-2014 DV (0.983 X 71 ppb, truncation applied).

***5.b. TCEQ evaluated the number of elevated ozone days (over 70 ppb) annually for monitors in the Denver and Southern California areas.***

For the greater Denver area Colorado, TCEQ provided number of days over 70 ppb trends for 2007-2016 indicating decreases in the number of such days over the long-term and that 2012 was the highest year in terms of the number of exceedance days at the five monitors evaluated. However, in 2016 3 of 5 monitors had more than 10 days of monitored exceedances and one monitor had more exceedances in 2016 than it had in 2014 and 2015. TCEQ also provided a similar analysis of trends in California for 2012 thru 2016, which shows a general decrease in monitored ozone days above 70 ppb from 2012 for most of the 10 monitors tagged by TCEQ's modeling, but most monitors still have 30-95 monitored exceedance days (MDA8 > 70 ppb) in 2016. This data supports that the number of ozone exceedance days are improving but neither the Colorado nor California analysis of number of exceedance days annually provide any evidence to refute the photochemical modeling analysis results.

***5.c. TCEQ Back Trajectory Analysis***

TCEQ provided multi-year back trajectory analyses (2012-2016) for all the monitored ozone exceedance days at the five monitors in Colorado and at the 10 monitors in Southern California using National Oceanic and Atmospheric Administration (NOAA) HYbrid Single Particle Lagrangian Integrated Trajectory (HYSPLIT)[39]. TCEQ performed 72-hour back trajectories for both Colorado and California monitors. Given the large distance from Texas to Colorado and Texas to California, 120-hour back trajectories should have been considered. Most

---

[39] HYbrid Single-Particle Lagrangian Integrated Trajectory (HYSPLIT) model is a complete system for computing both simple air parcel trajectories and complex dispersion and deposition simulations. The model is designed to support a wide range of simulations related to the atmospheric transport and dispersion of pollutants and hazardous materials to the Earth's surface.

of the Colorado back trajectories only reached central or northern Texas so longer back trajectories should have been completed (see TCEQ SIP submission, Figure 3-42). TCEQ used start heights of 500 m Above Ground Level (AGL), 1000 m AGL, and 1500 m AGL. The EPA would also recommend running a 100 m AGL start height as well since both areas have complex terrain nearby or in the potential pathways that could result in different back trajectory paths due to the difference in meteorology between 100 m AGL and 500 m AGL. Another concern is that TCEQ used the 1st hour of the 8-hour exceedance as the start time instead of mid 8-hour or highest 1-hour number as the start time. The EPA typically uses a mid-8-hour or later start time, or runs multiple trajectories with varying start times as the transport patterns often change throughout the monitored 8-hour exceedance. Not running multiple hours for the start time, or at least the highest 1-hour or the middle of the 8-hour period when monitored 1-hour values are typically higher than the 1st hour of the 8-hour period, results in uncertainty and a general concern that the analysis is not complete. This translates into a concern that trajectories provided by TCEQ are incomplete and may not be representative of transport patterns that occurred during monitored 8-hr ozone exceedances because of the way TCEQ structured and performed the HYSPLIT analyses that results in only a limited set of trajectories. For example, just the trajectory length time results in a number of trajectories for Colorado and California that could have crossed Texas if a longer trajectory time had been used.

TCEQ also screened the back trajectories out if they touched the ground at some point and also screened out any trajectories that were not below the Planetary Boundary Layer (PBL) over Texas. TCEQ also screened out back trajectories if the back trajectory start height at the point above the receptor was above the PBL. The EPA has multiple concerns with the screening out of trajectories that TCEQ performed.

83

Before we explain our specific concerns with the screening out of back trajectories, it is important to understand what HYSPLIT back trajectories represent and their limitations. HYSPLIT back trajectory analyses use archived meteorological modeling that includes actual observed data (surface, upper air, airplane data, etc.) and modeled meteorological fields to estimate the most likely route of an air parcel transported from a particular location at a specified time. The method essentially follows a parcel of air backward in hourly steps for a specified length of time. HYSPLIT estimates the central path in both the vertical and horizontal planes. The HYSPLIT central path represents the centerline with the understanding that there are areas on each side horizontally and vertically that also contribute to the end point at the monitor. The horizontal and vertical areas from the centerline grow wider the further back in time the trajectory goes. Therefore, a HYSPLIT centerline does not have to pass directly over emissions sources or emission source areas, but merely relatively near emission source areas. Nor does the HYPSLIT centerline have to be below the PBL over Texas as the vertical spread area on the centerline for distances of 300 to 600 miles or more would most likely be below the PBL even if the centerline was well above the PBL. Likewise, even if a centerline is indicated as touching down, that adds some uncertainty but does not void the back trajectory. Given the distance from Texas to Colorado receptors and Texas to California receptors, it is unclear how many back trajectories TCEQ inappropriately screened out when the centerline was close to Texas such that the horizontal spread area could encompass areas of Texas but did not directly cross any parts of Texas. In addition, Figure 3-42 in TCEQ's SIP submission indicates that many of the 72-hour trajectories that pass over Texas end before they have fully traversed Texas. Some of these trajectories may have been screened out because they were not below the PBL, but may have been below the mix layer in Texas and thus retained for the analysis if longer than 72-hour

trajectories had been performed. Starting the back trajectories with only the 1st hour of the 8-hour ozone exceedance means that the trajectory is started when the PBL is usually the lowest. With a later start hour (middle of the 8-hour, multiple start hours, etc.) the PBL would be higher in most cases. Thus, the TCEQ only using the 1st hour may have resulted in back trajectories not being performed or being screened out when a later start time would have resulted in a back trajectory that passed TCEQ's screening based on start height and PBL. Regardless, the EPA does not agree with screening out of trajectories as TCEQ has done in their analysis. The multiple ways that TCEQ inappropriately screened out trajectories, along with the several other issues mentioned above, limits the information that can be gleaned from TCEQ's HYSPLIT and Endpoint trajectory analysis for receptors in Colorado and California.

The EPA finds back trajectory analysis can be potentially useful as a corollary analysis along with observation-based meteorological wind fields at multiple heights to examine the general plausibility of the photochemical model "linkages." Since the back trajectory calculations do not account for any air pollution formation, dispersion, transformation, or removal processes as influenced by emissions, chemistry, deposition, etc., the trajectories cannot be used to develop quantitative contributions. Therefore, back trajectories cannot be used to quantitatively evaluate the magnitude of contributions from upwind states to downwind receptors.

For Colorado, TCEQ proffered that their trajectory analysis of transport from Texas to Colorado indicates that emissions from Texas are unlikely to affect ozone concentrations in the mixing layer over Colorado on elevated ozone days and Texas contribution should not be deemed significant. TCEQ asserted that filtering the back trajectories by only looking at trajectories from the beginning of elevated ozone episodes, that start within Colorado's mixing

layer, that do not hit the surface, and that have endpoints within Texas' mixing layer is an attempt to find a clear case where emissions in Texas would affect the ozone in Colorado. TCEQ concluded that, using those filters, 6% of elevated ozone days in Colorado had trajectories that reached the mixing layer in Texas, and 66% of those days during the 2007-2016 period occurred in 2011 and 2012. The EPA finds this analysis is flawed by the way TCEQ performed the HYSPLIT back trajectories and by the inappropriate screening out of back trajectories. TCEQ concluded that there are many years where no back trajectories reach Texas from Colorado and that in the years where TCEQ determined that no back trajectories reached Texas, the tagged monitors still observed a high number of elevated ozone days and fourth-highest eight-hour ozone concentrations above 70 ppb. The EPA finds these conclusions to be inadequately supported due to the way TCEQ performed and generated the back trajectories and TCEQ's excessive use of filters. For these reasons, EPA also disagrees with TCEQ's conclusion that Texas may not be upwind in 2015 and 2016 during any elevated ozone days at any of the five sites shown in Figure 3-44 of TCEQ's SIP submission. The EPA notes that endpoint analysis and percentage of endpoints generally provides limited value but due to the concerns with the overall back trajectory analysis, the EPA finds little value in the endpoint analysis that TCEQ provided.

TCEQ did indicate that there were also many more elevated eight-hour ozone days observed in 2012 compared to other years and that this may indicate that there were some unusual meteorological patterns that occurred in 2012 that resulted in a more severe ozone season. TCEQ noted that overall, trends in the fourth-highest eight-hour ozone concentrations have only slightly decreased at the Colorado receptors that TCEQ identified. The EPA concludes that TCEQ's HYSPLIT back trajectory analysis for the Colorado receptors is flawed and does

not in itself provide sufficient evidence to counter the results of TCEQ's modeling regarding the downwind distance of interstate transport due to emissions from Texas.

For California, TCEQ performed a similar HYSPLIT back trajectory analysis for ozone exceedance days at the 10 monitors that TCEQ identified in Southern California to which TCEQ found Texas potentially linked. TCEQ performed the HYPSLITs the same way that they did for the Colorado receptors including the inappropriate screening of trajectories, and other issues discussed above in review of TCEQ's back trajectory and endpoint analysis for ozone exceedances for the Colorado receptors.

For the same reasons the EPA finds TCEQ's Colorado back trajectory and endpoint analyses flawed, we conclude that TCEQ's HYSPLIT back trajectory and endpoint analyses for the California receptors is flawed and does not provide evidence rebutting TCEQ's photochemical modeling that Texas may be linked to these California receptors.

### 5.d. Texas contribution on all days in 2023 with ozone greater than 70 ppb.

TCEQ evaluated contributions from Texas on projected future year elevated ozone days in their chemical transport modeling. TCEQ evaluated the subset of 2023 days with modeled MDA8 greater than 70 ppb, and TCEQ calculated the average modeled Texas contributions for this subset of days (i.e., the "TX-ALT" method). Table 3-14 in TCEQ's SIP submission is included below as Table 5.2. TCEQ also provided this same analysis for the receptors identified in Southern California and included the results in its SIP submission in Table 3-17, which is included below as Table 5.3.

**Table 5.2 TCEQ evaluation of Texas contribution to 2023 modeled days with MDA8 values greater than 70 ppb at receptors in Colorado**

Table 3-14: Modeled Elevated Ozone Days in the Future Year at the Tagged Colorado Monitors

| Site Name | AQS ID | Number of Future Elevated Days | Average Texas Contribution on Future Elevated Ozone Days (ppb) | Average MDA8 on Future Elevated Ozone Days (ppb) | Percentage of Texas Contribution in MDA8 |
|---|---|---|---|---|---|
| Chatfield State Park | 80350004 | 9 | 0.77 | 73.05 | 1.06% |
| Rocky Flats | 80590006 | 10 | 0.89 | 73.64 | 1.21% |
| National Renewable Energy Labs-NREL | 80590011 | 11 | 0.86 | 74.09 | 1.16% |
| Fort Collins-West | 80690011 | 2 | 0.56 | 73.06 | 0.77% |
| Highland Reservoir | 80050002 | 8 | 0.52 | 73.80 | 0.71% |

TCEQ proffered in assessing this information that for the Colorado monitors, the expected average Texas contribution using all days greater than 70 ppb is a small percentage of the projected average MDA8 on these days. As a result, TCEQ argued that these impacts are not significant, since the average contribution is less than one ppb for all the monitors and high ozone occurs on relatively few days (2-11 days). TCEQ further discounted these results by alleging that there are uncertainties associated with model predictions.

**Table 5.3 TCEQ evaluation of Texas contribution to 2023 modeled days with MDA8 values greater than 70 ppb at receptors in Southern California**

| Table 3-17: Modeled Elevated Ozone Days in the Future Year | | | | | |
|---|---|---|---|---|---|
| Site Name | AQS ID | Number of Elevated Days in 2023 | Average Texas Contribution on Elevated Ozone Days in 2023 (ppb) | Average MDA8 on Elevated Ozone Days in 2023 (ppb) | Percentage of Texas Contributions in MDA8 |
| Reseda | 60371201 | 9 | 0.53 | 73.33 | 0.73% |
| Pomona | 60371701 | 60 | 0.26 | 76.87 | 0.35% |
| Santa Clarita | 60376012 | 13 | 0.41 | 73.94 | 0.56% |
| Rubidoux | 60658001 | 57 | 0.30 | 77.67 | 0.39% |
| Mira Loma (Van Buren) | 60658005 | 57 | 0.30 | 77.67 | 0.39% |
| Barstow | 60710001 | 1 | 0.00[33] | 70.82 | 0.00% |
| Victorville-Park Avenue | 60710306 | 5 | 0.19 | 72.24 | 0.27% |
| Upland | 60711004 | 57 | 0.31 | 77.21 | 0.41% |
| Hesperia-Olive Street | 60714001 | 12 | 0.23 | 73.50 | 0.32% |
| Redlands | 60714003 | 54 | 0.29 | 77.12 | 0.38% |

For California monitors, TCEQ indicated that the calculated average Texas contribution on projected future elevated ozone days (2023 modeled days with MDA8 greater than 70 ppb) is less than 1% of the projected average MDA8 at all of the monitors on these days.

As stated earlier in Section 4 of this TSD, TCEQ's methodology for calculating contributions from Texas to downwind receptors is based on the average contribution on the same days and grid cells that TCEQ used for calculating RRFs to project base period DVs to 2023. Specifically, in that method, TCEQ used the 2023 contributions for the top 10 days (with a minim of five days) in the 2012 modeling among the 3 x 3 matrix of grid cells that include and surround the location of the monitoring (i.e., the "TX-Primary" method). The EPA's concerns with this method are described in Section 4.b, above. For comparison with this alternative contribution analysis that uses all days with modeled 2023 MDA8 values over 70 ppb (TX-ALT

method), contributions based on TCEQ's TX-Primary method using 5 to 10 days for these Colorado and California receptors is included in Table 5.1 above. The EPA notes that there are large differences in contributions at individual receptors in Colorado and, in particular, California between the two methods. Both methods demonstrate that Texas contributes above the 1 percent of the NAAQS threshold to receptors Colorado. However, this is not the case for the California receptors where the contributions based on the TX-ALT method are below the 1 percent threshold to all receptors to which Texas was linked using the TX-Primary method. For example, the contributions from Texas to the Reseda, CA receptor are 0.76 ppb and 0.53 ppb using the TX-Primary and TX-ALT-based methods, respectively. In addition, the contributions to the Hesperia-Olive Street receptor are 0.86 ppb and 0.23 ppb using the TX-Primary and TX-ALT-based methods, respectively. For both receptors, the TX-Primary contributions represent the average contribution in 2023 over approximately the top-10 modeled days whereas the TX-ALT method represents the average contribution for all days with 2023 MDA8 values above 70 ppb. Thus, the only known difference between the two methods is the number of days used in calculating the average contribution and that TX-ALT only uses days with 2023 modeled MDA8 values > 70 ppb (without a minimum or maximum number of days) which is different than TX-Primary method. In their submittal, TCEQ did not provide any explanation for the large inconsistencies in contributions between the two methods at these and other sites. These inconsistencies call into question the ability of either or both of the TCEQ methods to provide technically credible robust estimates of 2023 contributions from Texas to downwind receptors.

### 5.e. Collective Interstate Contribution to Future DV

TCEQ provided an analysis of collective interstate contribution to the 2023 DVs for the five Colorado and ten California receptors. The collective interstate contribution at tagged Colorado receptors ranges from 9.32% to 10.27% of the corresponding 2023 DV (see Table 5.3

below). The collective interstate contribution at tagged California receptors ranges from 3.2% to 4.58% of the corresponding 2023 DV (see Table 5.4 below). TCEQ argues that these are small percentages (Colorado and California) and not as high as the collective interstate contribution percentages the EPA calculated for monitors in Eastern States, which ranged from 17% to 67%. TCEQ also notes that a significant portion of the tagged Colorado monitors' 2023 modeled DVs is due to background emissions (sum of contributions from to biogenic, fires, and boundary conditions). For the California receptors TCEQ argues that these percentages are small compared to Intra-State contribution.

As an initial matter, the EPA is not solely relying on TCEQ's findings of linkages to Colorado and California but is also relying on its own findings of linkages to areas in the Midwest Region. As such, TCEQ's analysis of collective contributions to Colorado and California does not provide justification for not addressing downwind impacts. Nonetheless, the EPA has found in the past that certain California receptors are so heavily impacted by local emissions, and total upwind contribution is so low, that those receptors may not be considered to be affected by interstate ozone transport. *See* 81 FR 15200 (Mar. 22, 2016). However, this is a narrow circumstance that does not apply in the vast majority of cases and has never been applied outside of California. The EPA has previously found, for instance, that receptors in Colorado are heavily impacted by upwind-state contribution. *See* 82 FR 9155 (Feb. 3, 2017); 81 FR 71991 (Oct. 19, 2016). The EPA need not draw any conclusions here regarding whether the California sites TCEQ identified should or should not be considered receptors for ozone-transport purposes. EPA affirms, contrary to TCEQ's suggestion, that the Colorado receptors TCEQ analyzed are impacted by upwind state contributions. However, the EPA's finding that Texas is linked to receptors in other states is based on still other linkages found in the EPA's modeling to receptors

in other states, which are clearly impacted by the collective contribution of multiple upwind states, including Texas. Under CAA section 110(a)(2)(D)(i)(I), downwind states are not obligated to reduce emissions on their own to resolve nonattainment or maintenance problems. Rather, states are obligated to eliminate their own significant contribution or interference with the ability of other states to attain or maintain the NAAQS.

**Table 5.3 –Collective Interstate Contribution to Future DVs at Tagged Colorado Monitors *from* TCEQ's SIP Table 3-15**

**Table 3-15: Collective Interstate Contribution to Future Design Value at Tagged Colorado Monitors**

| Site Name | AQS ID | Percentage of 2023 $DV_F$ from Background Contribution | Percentage of 2023 $DV_F$ from Collective Interstate Contribution | Percentage of 2023 $DV_F$ from Intra-State Contribution |
|---|---|---|---|---|
| Chatfield State Park | 80350004 | 62.12% | 9.86% | 25.44% |
| Rocky Flats | 80590006 | 60.57% | 10.21% | 26.88% |
| National Renewable Energy Labs-NREL | 80590011 | 60.33% | 10.27% | 27.04% |
| Fort Collins-West | 80690011 | 67.42% | 9.32% | 20.88% |
| Highland Reservoir | 80050002 | 62.47% | 9.88% | 25.28% |

**Table 5.4 –Collective Interstate Contribution to Future Design Value at Tagged California Monitors *from* TCEQ's SIP Table 3-18**

Table 3-18:   Collective Interstate Contributions to Future Design Values at Tagged California Monitors

| AQS ID | Site Name | Percentage of 2023 $DV_F$ from Background Contribution | Percentage of 2023 $DV_F$ from Collective Interstate Contribution | Percentage of 2023 $DV_F$ from Intra-State Contribution |
|--------|-----------|--------|--------|--------|
| 60371201 | Reseda | 32.49% | 3.62% | 52.55% |
| 60371701 | Pomona | 30.88% | 4.05% | 54.87% |
| 60376012 | Santa Clarita | 37.41% | 3.60% | 49.00% |
| 60658001 | Rubidoux | 29.22% | 3.20% | 57.20% |
| 60658005 | Mira Loma (Van Buren) | 29.22% | 3.20% | 57.20% |
| 60710001 | Barstow | 58.53% | 4.58% | 30.64% |
| 60710306 | Victorville-Park Avenue | 36.58% | 3.98% | 49.55% |
| 60711004 | Upland | 30.74% | 4.22% | 54.69% |
| 60714001 | Hesperia-Olive Street | 32.09% | 3.97% | 53.35% |
| 60714003 | Redlands | 29.70% | 3.25% | 57.19% |

The maximum collective interstate contribution to the future design value is 4.58% at the Barstow (AQS ID: 60710001) monitor, which is insignificant compared to the intra-state contribution of 30.64%. A similar trend is seen at all 10 of the tagged monitors, thereby supporting the conclusion that interstate transport does not contribute significantly to nonattainment at these monitors.

### 5.f. TCEQ also performed Direct Decoupled Method (DDM) modeling for receptors in Colorado.

DDM provides a first derivative of the changes in ozone (linear relationship where the DDM value is the slope of the line for changes in ozone) from changes in $NO_X$ emissions in this case. As TCEQ noted in their SIP (page 3-60), "Ozone formation is highly non-linear and therefore DDM results are only useful for a limited range of input perturbations, about ±15% of the input parameter value in a given simulation." TCEQ indicated that they used DDM to gauge the responsiveness (i.e., percent change in ozone per percent change in emissions) of Texas NOx

emissions at tagged Colorado monitors. From the analysis provided in the SIP and spreadsheet[40] of DDM it appears that TCEQ used the DDM responsiveness factors to estimate the impacts of 100 percent of NOx emissions in Texas which is well beyond ±15% of Texas emissions which TCEQ states is the useful limit for applying DDM. DDM is typically used to see what an additional reduction in emissions might yield in ozone reductions, but not as a method to estimate the impacts from 100% of the emissions from a given state. In their SIP, TCEQ provided the DDM timeseries plots below (See Figure 5.1). Below we describe the results of the DDM analysis that TCEQ provided in their submittal. Because TCEQ's application of DDM is outside the range that would provide credible results, as indicated by TCEQ in their submittal, the EPA considers the results of the DDM analysis to be of limited value and not as technically sound as the contribution data based on source apportionment modeling.

---

[40] TCEQ_DDM_fy2023_CO_EPA_Review.xlsx

Figure 5.1 – TCEQ DDM results for select monitors



**Figure 3-51:  DDM Responsiveness of Ozone in July 2023 at National Renewable Energy Labs-NREL**



**Figure 3-52:  DDM Responsiveness of Ozone in August 2023 at National Renewable Energy Labs-NREL**



**Figure 3-47:  DDM Responsiveness of Ozone in July 2023 at Chatfield State Park**

Figure 5.1 (continued) – TCEQ DDM results for select monitors



**Figure 3-49:  DDM Responsiveness of Ozone in July 2023 at Rocky Flats**



**Figure 3-50:  DDM Responsiveness of Ozone in August 2023 at Rocky Flats**



**Figure 3-45:  DDM Responsiveness of Ozone in July 2023 at Highland Reservoir**

In their submittal, TCEQ indicated that Rocky Flats (AQS ID: 80590006) shows approximately 2 ppb impact from Texas $NO_X$ emissions (100% of Texas NOx emissions) in mid to late July. TCEQ continued that when ozone at the monitor is responsive to Texas $NO_X$ emissions, elevated ozone was not modeled except for a minor response on one day, July 23. TCEQ summarized their DDM modeling analysis indicating that there is some minor impacts from Texas's $NO_X$ emissions on two high ozone days in the third week of July, but similar to other Colorado monitors studied, the magnitude of the impact is much smaller than the impact from Colorado $NO_X$ and "Other $NO_X$" emissions. TCEQ also summarized that for the days with MDA8 greater than 70 ppb and at least 1 ppb or greater impact there were three days that met these criteria at 2 monitors (NREL and Rocky Flats) these 2 criteria.

The DDM modeling does show some impact of Texas $NO_X$ emissions but from the scale in the Figures it is hard to discern the magnitude. EPA analyzed TCEQ's information and the impact from Texas $NO_X$ emissions ranges from 0 to 1.89 ppb range for 2023 modeled ozone values $\geq 60$ ppb.[41] The DDM modeling does show much larger impact from the Colorado $NO_X$ group and Other $NO_X$ group (which represents all other NOx sources in the modeling other than Texas and Colorado), but the impact from the Texas $NO_X$ group is not zero for some days with modeled MDA8 ozone over 60 ppb. TCEQ's analysis of the number of days with Texas contribution to MDA8 values over 70 ppb used a 1 ppb threshold, which is not consistent with using 0.7 ppb for contribution that TCEQ utilized in identifying receptors that are linked to Texas. Again, the EPA considers the results of the DDM analysis to be of limited value and not as technically sound as the contribution data based on source apportionment modeling.

---

[41] TCEQ_DDM_fy2023_CO_EPA_Review.xlsx

### 5.g. Southern California Ozone Conceptual Model

TCEQ briefly discussed conceptual model for ozone in Southern California indicating the topography and climate of the area's severe air pollution problem is a consequence of the combination of emissions from the nation's second largest urban area and meteorological conditions that are adverse to the dispersion of those emissions. TCEQ asserted that the unique features of Southern California result in the Southern California basin area make it a relative isolated area. We note that TCEQ's modeling already takes into account the unique meteorological, topographical, and amount of local emissions in Southern California and in the rest of the Continental U.S. (CONUS) including Texas emissions. TCEQ's assessment of the Southern California conceptual model does not provide substantial evidence that refutes the photochemical modeling analysis results.

### 5.h. Summary

TCEQ indicated that Texas contribution should be deemed "significant" only if there is a persistent and consistent pattern of contribution on several days with elevated ozone. TCEQ provided an Other Factor/Weight of Evidence analysis in support of their position that contributions from Texas were not "significant". Overall, these additional Other Factors/Weight of Evidence analyses performed by TCEQ do not provide sufficient evidence to refute the modeling results that TCEQ's modeling indicates downwind nonattainment and/or maintenance receptors in Colorado and Southern California are impacted by Texas emissions and Texas' contribution is 0.7 ppb or greater.[42] Although Texas asserted that its additional air quality factor analysis is a permissible way to interpret which contributions are "significant" because that

---

[42] TCEQ also identified a monitor in Cochise County, Arizona (ID 40038001), but the monitor's recent DVs are below the NAAQS. From AQS, the 2014-2016 and 2015-2017 DVs are each 65 ppb; 2016-2018, 2017-2019, and 2018-2020 DVs are 66 ppb; and preliminary 2019-2021 DV is 66 ppb.

analysis examines whether there was a "persistent and consistent pattern of contribution on several days with elevated ozone" we find that such pattern is already established by the EPA's and TCEQ's air quality modeling. Specifically, the EPA believes source apportionment modeling, as performed by the EPA and also by TCEQ, to determine which states are linked is an appropriate tool to identify impacts that are persistent enough to impact a downwind receptors ability to attain or maintain the standard. This approach is described in more detail above in Section 4 of this action, but, in summary, averages the contributions from an upwind state for up to 10 days, which is preferred, (but at a minimum 5 days) at a given receptor. As noted in the EPA's air quality modeling guidance, since DVs are based on the seasonal 4th high observed values, the EPA technique of using the average impacts for 5-10 days, is appropriate to identify impacts of sufficient persistence to impact a downwind receptor's ability to attain or maintain the standard. We note that TCEQ used the same methodology of up to 10 days but at a minimum of 5 days, with differing calculations methods (See Section 4) to identify nonattainment and/or maintenance receptors and contribution at those receptors.

In addition, the contributions based on the EPA's 2011-based modeling and 2016v2 modeling indicate that Texas is linked to receptors in the Midwest Region but not to receptors in Arizona and California identified by TCEQ. Given that there are wide unexplained differences in the contributions from Texas to downwind receptors, particularly in California between the two contribution methods used by TCEQ in their SIP submittal, we cannot speculate as to the factor(s) leading to differences in contributions between the EPA's modeling and TCEQ's modeling. Regardless, the contributions to downwind receptors based on the two TCEQ methods and the EPA's modeling results are consistent in showing that Texas's emissions were substantial enough to generate linkages to downwind receptors, under varying assumptions and

meteorological conditions, even if the precise set of linkages changed between the different sets of modeling

As noted above, TCEQ indicated that Texas' contributions should be deemed "significant" only if there is a persistent and consistent pattern of contribution on several days with elevated ozone. In this regard, modeling for three different years of meteorology (2011, 2012, and 2016) have all indicated that Texas is linked to downwind nonattainment and/or maintenance receptors. We think this common result indicates that Texas's emissions were substantial enough to generate linkages to various downwind receptors, under varying assumptions and meteorological conditions which provides a further indication that there is a persistent pattern of Texas' emissions contributing above a 1% to ozone at downwind nonattainment and/or maintenance receptors. In sum, the EPA's more recent 2016 base year modeling platform (2016v2) indicates that Texas is linked to several receptors in the Midwest Region as does the EPA's earlier 2011 base year modeling. TCEQ's 2012 base case modeling showed linkages to states in the West. As discussed, the EPA does not find the additional factors/weight of evidence evaluations conducted by TCEQ provide compelling reasons to discount the impacts indicated in Colorado and California by the TCEQ modeling. In fact, we think TCEQ's modeling likely underestimates these issues.

## 6.    EPA Summary

The EPA has reviewed TCEQ's modeling, alternate maintenance receptor methodology, recent monitoring data and long-term ozone trends, whether there is underestimation bias in TCEQ's modeling, and TCEQ's Weight of Evidence analyses (or "other factors" analyses). Overall, we find the TCEQ's alternate maintenance receptor methodology to be flawed and not acceptable because it fails to identify receptors that may have difficulty maintaining the standard

in the future. We identified that TCEQ's modeling understated the magnitude of projected 2023 design values to the extent that TCEQ's analysis likely resulted in not correctly identifying nonattainment and/or maintenance receptors in Illinois, Wisconsin, Michigan. EPA 2016v2 modeling identified nonattainment and/or maintenance receptors in Illinois and Wisconsin with Texas's contributions more than 1% and TCEQ's modeling also indicated that Texas's contribution was more than 1% at these same receptors.

The contributions calculated from TCEQ's two contribution methods result in very different contribution values and is so inconsistent that it calls into question the validity of either or both methods and TCEQ provides no explanation for the large differences in the outcome of the two methods. TCEQ's Other factors/WOE analysis does not provide sufficient compelling technically supported information to counter the conclusions from photochemical modeling in terms of linkages from Texas to downwind receptors.

TCEQ indicated that Texas contribution should be deemed "significant" only if there is a persistent and consistent pattern of contribution on several days with elevated ozone. We note that modeling for three different years of meteorology (2011, 2012, and 2016) have all indicated that Texas was linked to downwind nonattainment and/or maintenance receptors. We think this consistent result indicates that Texas's emissions are substantial enough to link Texas to downwind receptors, under varying assumptions and meteorological conditions which further indicates that there is a persistent pattern of Texas' emissions contributing above 1 % to ozone at downwind nonattainment and/or maintenance receptors.

**TAB 4: CERTIFICATE OF SERVICE**

## **CERTIFICATE OF SERVICE**

I hereby certify that all counsel of record who have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system on this 30th day of May, 2023.


s/ P. Stephen Gidiere III
*Counsel for Luminant Petitioners*