No. 23-60069

# In the United States Court of Appeals
## for the Fifth Circuit

STATE OF TEXAS; TEXAS COMMISSION ON ENVIRONMENTAL QUALITY;
LUMINANT GENERATION COMPANY, L.L.C.; COLETO CREEK POWER, L.L.C.;
ENNIS POWER COMPANY, L.L.C.; HAYS ENERGY, L.L.C.; MIDLOTHIAN ENERGY,
L.L.C.; OAK GROVE MANAGEMENT COMPANY, L.L.C.; WISE COUNTY POWER
COMPANY, L.L.C.; ASSOCIATION OF ELECTRIC COMPANIES OF TEXAS; BCCA
APPEAL GROUP; TEXAS CHEMICAL COUNCIL; TEXAS OIL & GAS ASSOCIATION;
PUBLIC UTILITY COMMISSION OF TEXAS; RAILROAD COMMISSION OF TEXAS;
STATE OF MISSISSIPPI; MISSISSIPPI DEPARTMENT OF ENVIRONMENTAL
QUALITY; MISSISSIPPI POWER COMPANY; STATE OF LOUISIANA; LOUISIANA
DEPARTMENT OF ENVIRONMENTAL QUALITY; ENTERGY LOUISIANA, L.L.C.;
LOUISIANA CHEMICAL ASSOCIATION; MID-CONTINENT OIL AND GAS
ASSOCIATION; LOUISIANA ELECTRIC UTILITY ENVIRONMENTAL GROUP, L.L.C.;
TEXAS LEHIGH CEMENT COMPANY, LP,

*Petitioners*,

*v.*

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; MICHAEL S. REGAN,
ADMINISTRATOR, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

*Respondents*,

---

## BRIEF OF APPELLANT LOUISIANA DEPARTMENT OF ENVIRONMENTAL QUALITY AND STATE OF LOUISIANA

---

JEFF LANDRY
  Attorney General
ELIZABETH B. MURRILL (LA 20685)
  *Solicitor General*
JOSEPH S. ST. JOHN (LA 36682)
  *Deputy Solicitor General*

MACHELLE HALL (LA 31498)
  *Assistant Attorney General*
LOUISIANA DEPT. OF JUSTICE
909 Poydras Street, Suite 1850
New Orleans, LA 70112
Tel: (225) 485-2458
murrille@ag.louisiana.gov
stjohnj@ag.louisiana.gov
hallm@ag.louisiana.gov

COURTNEY J. BURDETTE (LA 30564)
  *Executive Counsel*
JILL C. CLARK (LA 33050)
  *General Counsel*
LOUISIANA DEPT. OF
 ENVIRONMENTAL QUALITY
Office of the Secretary, Legal Division
P.O. Box 4302
Baton Rouge, LA 70821-4302
Tel: (225) 219-3985
Courtney.Burdette@la.gov
Jill.Clark@la.gov

Jeffrey A. Hall
Marcella Burke
BURKE LAW GROUP
1000 Main Street, Suite 2300
Houston, Texas 77002
jeff@burkegroup.law
marcella@burkegroup.law

## CERTIFICATE OF INTERESTED PERSONS

Under the fourth sentence of Fifth Circuit Rule 28.2.1, Petitioner is a governmental party and as such does not need to furnish a certificate of interested persons.

/s/ *Joseph S. St. John*
Joseph S. St. John
*Counsel of Record for State of Louisiana*

## STATEMENT REGARDING ORAL ARGUMENT

This Petition for Review raises important questions regarding whether the federal government may reject the State of Louisiana's efforts to govern itself under a system of cooperative federalism created by Congress. The resolution of this Petition will substantially affect the State and its citizens. Oral argument would assist the Court in resolving this Petition.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ...................................... iii

STATEMENT REGARDING ORAL ARGUMENT ...............................iv

TABLE OF CONTENTS ........................................................... v

TABLE OF AUTHORITIES...................................................viii

INTRODUCTION...................................................................... 1

STATEMENT OF JURISDICTION............................................. 4

ISSUES PRESENTED ............................................................. 5

STATEMENT OF THE CASE .................................................... 6

   I.   Statutory and regulatory framework ................................. 6

     A.   The process for regulating air quality ....................... 6

     B.   The CAA's "good neighbor" provision .......................... 9

   II.   Procedural history of EPA's actions............................. 9

     A.   Prior rulemakings ........................................................ 9

     B.   2015 NAAQS for ozone ............................................. 12

     C.   Louisiana's SIP.......................................................... 14

     D.   EPA's proposed disapproval of Louisiana's SIP ....................17

     E.   EPA final action disapproving Louisiana's SIP ........................21

   III.   This litigation .......................................................... 23

SUMMARY OF ARGUMENT ................................................. 24

STANDARD OF REVIEW .................................................. 26

ARGUMENT ............................................................... 27

I.  EPA'S GENERAL APPROACH TO REVIEWING LOUISIANA'S SIP WAS
    ARBITRARY AND CAPRICIOUS AND BEYOND ITS AUTHORITY. ............... 30

    A.  The criteria EPA used to consider Louisiana's SIP disregarded
        the structure of the CAA. ........................................ 31

        i.   The framework and extra-statutory burdens of
             demonstration used to disapprove Louisiana's SIP were
             unlawful. ................................................... 31

             a.  *EPA wrongfully transplanted its framework from a
                 context where it had discretion and rulemaking power
                 to one where it had none.* ............................... 31

             b.  *EPA's presumptive framework and extra-statutory
                 burdens and considerations predetermined the
                 outcome.* ................................................ 35

        ii.  EPA's continual revision of its modeling infringed on
             Louisiana's discretion under the CAA. ....................... 42

             a.  *EPA's changes in modeling were significant.* ............ 42

             b.  *These changes disregarded the CAA's structure.* ......... 44

    B.  EPA improperly disregarded Louisiana's reliance interests. .... 48

        i.   Louisiana appropriately relied on EPA's 2018 guidance
             memoranda when creating its SIP. ............................ 49

        ii.  EPA failed to consider Louisiana's important reliance
             interests in EPA's earlier guidance. ........................ 51

C.  The central justification for EPA's approach is undermined by its own inconsistent actions. ....................................................55

II.  EPA WAS ARBITRARY AND CAPRICIOUS IN REJECTING LOUISIANA'S AIR QUALITY ANALYSIS...............................................................58

A.  Louisiana's air quality analysis did not have "technical flaws," and EPA's conclusion based on such flaws was without reason. ................................................................................................58

B.  EPA's general criticisms of Louisiana's air quality analysis are contradicted by its own words and practice.............................61

C.  To the extent EPA attempted to substantively disagree with Louisiana's analysis, it failed by not engaging with central points. .....................................................................................66

CONCLUSION ........................................................................... 69

CERTIFICATE OF SERVICE................................................... 71

CERTIFICATE OF COMPLIANCE......................................... 72

# TABLE OF AUTHORITIES

## Cases

*Am. Petroleum Inst. v. Costle,*
   665 F.2d 1176 (D.C. Cir. 1981) ................................................... 9

*BCCA Appeal Group v. EPA,*
   355 F.3d 817 (5th Cir. 2003) ......................................... 6, 7, 30

*BNSF Ry. Co. v. Fed. R.R. Admin.,*
   62 F.4th 905 (5th Cir. 2023) ................................................. 67

*Bowen v. Georgetown Univ. Hosp.,*
   488 U.S. 204 (1988) ....................................................... 29, 30

*Catawba Cnty. v EPA,*
   571 F.3d 20 (D.C. Cir. 2009) ................................................ 34

*Christopher v. Smithkline Beecham Corp.,*
   567 U.S. 142 (2012) ......................................................... 49

*Clean Wisconsin v. EPA,*
   964 F.3d 1145 (D.C. Cir. 2020) ................................... 57, 60, 63

*Dep't of Commerce v. New York,*
   139 S. Ct. 2551 (2019) ....................................................... 53

*DHS v. Regents of the Univ. of Ca.,*
   140 S. Ct. 1891 (2020) ........................................... 42, 49, 55

*Encino Motorcars, LLC v. Navarro,*
   579 U.S. 211 (2016) ............................................... 49, 54, 65

*Env't Integrity Project v. EPA,*
   969 F.3d 529 (5th Cir. 2020) ............................................... 46

*EPA v. EME Homer City Generation, L.P.,*
   572 U.S. 489 (2014) .................................................... passim

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ................................................................ 49

*FCC v. Prometheus Radio Project*,
  141 S. Ct. 1150 (2021) ........................................................... 69

*Fla. Power & Light Co. v. Costle*,
  650 F.2d 579 (5th Cir. 1981) .............................................. 6, 7

*Huawei Techs. USA, Inc. v. FCC*,
  2 F.4th 421 (5th Cir. 2021) .............................................. 68, 69

*Luminant Generation Co. v. EPA*,
  675 F.3d 917 (5th Cir. 2012) ....................................... passim

*Marsh v. Or. Nat. Res. Council*,
  490 U.S. 360 (1989) ................................................................ 24

*Michigan v. EPA*,
  213 F.3d 663 (D.C. Cir. 2000) ............................................. 10

*Michigan v. EPA*,
  268 F.3d 1075 (D.C. Cir. 2001) .......................................... 6, 7

*Michigan v. EPA*,
  576 U.S. 743 (2015) ................................................................ 25

*Mississippi Comm'n on Env't Quality v. EPA*,
  790 F.3d 138 (D.C. Cir. 2015) ............................................. 62

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ........................................................ passim

*North Carolina v. EPA*,
  531 F.3d 896 (D.C. Cir.), *on reh'g in part*, 550 F.3d 1176 (D.C. Cir. 2008) .......................................................................... 10

*R.J. Reynolds Vapor Co. v. FDA,*
   65 F.4th 182 (5th Cir. 2023) .......................................................... 54, 55

*Sierra Club v. EPA,*
   356 F.3d 296 (D.C. Cir. 2004) ........................................................ 48, 65

*Texas v. EPA,*
   690 F.3d 670 (5th Cir. 2012) .......................................................... passim

*Texas v. EPA,*
   829 F.3d 405 (5th Cir. 2016) .......................................................... passim

*Texas v. EPA,*
   983 F.3d 826 (5th Cir. 2020) .......................................................... 33, 34

*Union Elec. Co. v. EPA,*
   427 U.S. 246 (1976) ............................................................................... 7

*Univ. of Texas M.D. Anderson Cancer Ctr. v. HHS,*
   985 F.3d 472 (5th Cir. 2021) .......................................................... passim

*Wages & White Lion Invs., LLC v. FDA,*
   16 F.4th 1130 (5th Cir. 2021) ........................................................ 54, 55

*Wages & White Lion Invs., LLC v. FDA,*
   58 F.4th 233 (5th Cir. 2023) ................................................................ 54

*Westar Energy v. EPA,*
   608 Fed. App'x 1 (D.C. Cir. 2015) ...................................................... 11

**Statutes**

5 U.S.C. § 706 ........................................................................................ 24

42 U.S.C. § 7407 .................................................................................... 62

42 U.S.C. § 7408 ...................................................................................... 6

42 U.S.C. § 7409 ...................................................................................... 6

42 U.S.C. § 7410 ............................................................. passim

42 U.S.C. § 7506 ...................................................................34

42 U.S.C. § 7511 ...................................................................28

42 U.S.C. § 7602 .....................................................................8

42 U.S.C. § 7607 ..................................................... 4, 24, 30

**Other Authorities**

81 Fed. Reg. 74,504 (Oct. 26, 2016)........................................53

Air Plan Approval, 87 Fed. Reg. 7,071 (Feb. 8, 2022) ............................56

Nat'l Ambient Air Quality Standards for Ozone, 80 Fed. Reg. 65,292
(Oct. 26, 2015)......................................................................12

Responses to Significant Comments on the State and Tribal
Designation Recommendations for the 2008 Ozone National Ambient
Air Quality Standards (NAAQS) (Apr. 30, 2012) ...............................63

**Regulations**

40 CFR § 81.319 ...................................................................14

## INTRODUCTION

Louisiana has clean air.  When the federal government set new ozone standards, Louisiana met them immediately.  But areas in other States have struggled to attain or maintain those same standards. Because the chemicals that form ozone can travel with the wind, the Clean Air Act (CAA) requires States like Louisiana to submit a plan to ensure that they are not significantly contributing to those downwind problems.  In deference to the States' role in the federal system, Congress—through the CAA—vested primary responsibility and discretion for achieving federal air quality standards with the States, including by having them create the implementation plans.  After setting the new ozone standard, the Environmental Protection Agency (EPA) accordingly provided only general guidance and stressed that States had broad flexibility.

Louisiana considered air quality modeling that EPA included in its guidance and then performed its own using techniques that EPA has lauded.  Louisiana's submission demonstrated that even on days with high ozone at downwind monitoring stations, the air had usually not crossed Louisiana.  And even when it did, the air was rarely from areas

1

with sources of emissions that would create ozone.   So Louisiana reasonably concluded that it did not contribute significantly to downwind problems.

EPA had one year to review Louisiana's plan.   More than three years later, EPA finally disapproved it.   In the interim, EPA had changed its mind on the flexibilities it had promised and had performed multiple rounds of new modeling with data that did not exist when Louisiana submitted the plan.   Time and again, in reviewing the plan, EPA applied a heavy burden of demonstration and considered factors that were not found in the CAA.   EPA also judged Louisiana based on the new data and modeling, even though Louisiana could not have anticipated those results.   And EPA rejected Louisiana's analysis and arguments based on generalities that contradicted EPA's own positions, without ever addressing Louisiana's central points.

In short, EPA did not respect its limited role in the process of reviewing Louisiana's plan under the CAA or the flexibilities it had promised and Louisiana had relied upon.

Because EPA has transgressed its limited role under the CAA, failed to properly account for Louisiana's justified reliance interests, and

rejected Louisiana's work without reason, EPA's disapproval of Louisiana's plan should be set aside.

## STATEMENT OF JURISDICTION

The Court has jurisdiction to review EPA's disapproval of Louisiana's good neighbor state implementation plan pursuant to 42 U.S.C. § 7607(b)(1).  Notice of EPA's final action disapproving Louisiana's SIP was published in the Federal Register on February 13, 2023.  CI HQ-20 at 9,336.[1]  The State of Louisiana and the Louisiana Department of Environmental Quality (LDEQ) timely filed their Petition for Review on March 20, 2023, Dkt. 63, within sixty days of publication of the notice of the final action challenged, *see* 42 U.S.C. § 7607(b)(1).

A motions panel of this Court determined that venue for the Petition is appropriate in this Court.  Dkt. 269.

---

[1] "CI" refers to the certified index of record that EPA filed on April 13, 2023.  Dkt. 208.  Documents are uniquely identified by the EPA office listed after the first hyphen in the "Document ID" column of the certified index ("HQ" for headquarters or "R" for a numbered regional office) and the final four digits (minus leading zeros) of the "Document ID."  Louisiana will file an appendix tabbed according to this citation format.

## ISSUES PRESENTED

1. Whether EPA's final action disapproving Louisiana's "good neighbor" state implementation plan was arbitrary and capricious and beyond its authority for disregarding the Clean Air Act's structure, for not considering Louisiana's reliance interests, and for being inconsistent in its treatment of the States.

2. Whether EPA's final action was arbitrary and capricious for treating Louisiana's analyses of its downwind contribution as flawed, for failing to recognize EPA's parallel use of the same types of analysis, and for failing to address Louisiana's arguments.

## STATEMENT OF THE CASE

### I.    Statutory and regulatory framework

The Clean Air Act (CAA) is an "experiment in cooperative federalism." *Luminant Generation Co. v. EPA*, 675 F.3d 917, 921 (5th Cir. 2012) (quoting *Michigan v. EPA*, 268 F.3d 1075, 1083 (D.C. Cir. 2001)). It "establishes a comprehensive program for controlling and improving the nation's air quality," but it divides responsibility between "state and federal regulation." *BCCA Appeal Group v. EPA*, 355 F.3d 817, 821–22 (5th Cir. 2003). This division "reflects the balance of state and federal rights and responsibilities characteristic of our federal system of government." *Luminant Generation Co.*, 675 F.3d at 921 (*quoting Fla. Power & Light Co. v. Costle*, 650 F.2d 579, 581 (5th Cir. 1981)).

#### A.    The process for regulating air quality

Under the CAA, the federal government sets the maximum allowable concentration of air pollutants—the National Ambient Air Quality Standards (NAAQS).[2] *Id.* The States then "bear 'the primary responsibility' for implementing those standards" by developing and

---

[2] *See* 42 U.S.C. §§ 7408(a), 7409(a). Every five years, EPA must revise each NAAQS as appropriate. *Id.* § 7409(d)(1).

administering State Implementation Plans (SIPs) that meet certain statutory criteria. *Id. (quoting BCCA Appeal Group*, 355 F.3d at 822); *see* 42 U.S.C. § 7410(a)(2). A State has "wide discretion in formulating its plan" for achieving those standards. *See Texas v. EPA*, 829 F.3d 405, 411 (5th Cir. 2016) ("*Texas 2016*") (quoting *Union Elec. Co. v. EPA*, 427 U.S. 246, 250 (1976)).

After SIP submission, the CAA "confines the EPA to the ministerial function of reviewing SIPs for consistency with the Act's requirements." *Luminant Generation Co.*, 675 F.3d at 921. This is a "limited," "deferential role." *Texas 2016*, 829 F.3d at 428; *Texas v. EPA*, 690 F.3d 670, 675 (5th Cir. 2012) ("*Texas 2012*"). EPA "does not possess any 'discretionary authority' in [the SIP approval] process. Only the states enjoy discretion in implementing the dictates of the CAA." *Luminant Generation Co.*, 675 F.3d at 928 n.8 (citation omitted); *see also Fla. Power*, 650 F.2d at 587 ("The great flexibility accorded the states under the Clean Air Act is further illustrated by the sharply contrasting, narrow role to be played by EPA."); *Michigan*, 268 F.3d at 1083 ( EPA's "overarching role is in setting standards, not in implementation"). If a SIP meets the statutory requirements, "EPA *must* approve it." *Texas*

*2012*, 690 F.3d at 676 (emphasis added); *see also* 42 U.S.C. § 7410(k)(3) (stating EPA "shall approve" any SIP meeting all "applicable requirements" of CAA). The structure of the CAA "indicates a congressional preference that states, not EPA, drive the regulatory process." *Texas 2016*, 829 F.3d at 411.

EPA is to "assume the role of primary regulator" only if the State has "not complied with the requirements of the [CAA]." *Id.* at 412. If EPA correctly disapproves a SIP, it may promulgate a Federal Implementation Plan (FIP) to fill in any gaps. *Id.*; *see* 42 U.S.C. §§ 7410(c)(1), 7602. If EPA finds that the current implementation plan for a State is "substantially inadequate," it may issue a SIP "call" requiring SIP revision. 42 U.S.C. § 7410(k)(5).

The cooperative federalism of the CAA extends to timing. States have three years to submit a revised SIP after "any new or revised NAAQS." *EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489, 498 (2014) (citing 42 U.S.C. § 7410(a)(1)). EPA then must determine whether a submitted SIP is complete in form within six months. 42 U.S.C. § 7410(k)(1)(B). Once EPA makes its completeness finding, the

CAA provides that EPA "shall act" on the SIP within 12 months—approving or disapproving it. *Id.* § 7410(k)(2)–(3).

## B.    The CAA's "good neighbor" provision

The CAA sets requirements for the SIPs that States must submit following the promulgation of a new NAAQS. 42 U.S.C. § 7410(a)(2). These SIPs are known as "infrastructure" SIPs. *See* CI HQ-20 at 9,336. Relevant here is one component, the "good neighbor" or "interstate transport" provision. It requires "upwind States to reduce emissions to account for pollution exported beyond their borders." *EME Homer*, 572 U.S. at 499. Under that provision, a SIP "shall contain" "adequate provisions prohibiting, consistent with the provisions of [subchapter I], any source or other type of emissions activity within the State from emitting any air pollutant in amounts which will contribute significantly to nonattainment in, or interfere with maintenance by, any other State with respect to any [NAAQS]." 42 U.S.C. § 7410(a)(2)(D)(i)(I).

## II.    Procedural history of EPA's actions

### A.    Prior rulemakings

Ozone is a chemical in smog. *Am. Petroleum Inst. v. Costle*, 665 F.2d 1176, 1181 (D.C. Cir. 1981). It forms through photochemical

processes after precursors, including nitrogen oxide ($NO_x$), are emitted from various sources (such as power plants) and drift with the wind. *See EME Homer*, 572 U.S. at 497. EPA set the NAAQS for ozone at 120 parts per billion (ppb) in 1979 and has progressively reduced it. *See Michigan v. EPA*, 213 F.3d 663, 670 (D.C. Cir. 2000).

Over the years, EPA has tried multiple approaches to give content to the CAA's good neighbor provision after its revision in 1990. In 1998, EPA issued the $NO_x$ SIP Call through notice-and-comment rulemaking. *See North Carolina v. EPA*, 531 F.3d 896, 902 (D.C. Cir.), *on reh'g in part*, 550 F.3d 1176 (D.C. Cir. 2008). That rule, issued to require and guide SIP revisions, purported to interpret the good neighbor obligation for two ozone NAAQS. It required certain upwind sources to reduce their $NO_x$ emissions using controls at a cost threshold. *Id.*; *Michigan*, 213 F.3d at 669. In 2005, EPA adopted the Clean Air Interstate Rule. That rule was also issued in advance of SIP submissions and purported to again determine which sources "contributed significantly" to nonattainment and to require specific emissions reductions. *See North Carolina*, 531 F.3d at 903–05.

10

EPA then changed strategies and promulgated the Cross-State Air Pollution Rule (CSAPR). While CSAPR also determined which sources had to reduce emissions to fall within a "budget," it did so *after* states failed to submit SIPs. *See EME Homer*, 572 U.S. at 503 & n.11. EPA applied a one-percent-of-NAAQS threshold and then determined required emissions reductions based on cost for any State contributing more ozone downwind than that. *Id.* at 500–02. CSAPR simultaneously promulgated FIPs to meet those required reductions. *Id.* at 503. States challenged CSAPR, but not based on the SIPs that they failed to file.[3] They instead argued that EPA must promulgate an authoritative interpretation of the good neighbor obligation before States submit SIPs because otherwise they could not plan appropriately. The Supreme Court rejected that argument and held that EPA did not need to issue guidance before disapproving SIPs or give States a second chance. *Id.* at 508–09. Further litigation challenged other pieces of CSAPR and generated the CSAPR Update, Revised CSAPR Update, and others. CI R06-1 at 9,799.

---

[3] Three states submitted SIPs and challenged their disapprovals, *see EME Homer*, 572 U.S. at 503 n.11, but only one pressed the litigation. It lost because its SIP entirely failed to address the good neighbor obligation, *see Westar Energy v. EPA*, 608 Fed. App'x 1, 3 (D.C. Cir. 2015).

### B.    2015 NAAQS for ozone

On October 1, 2015, EPA revised the NAAQS for ozone from 75 ppb to 70 ppb.  Nat'l Ambient Air Quality Standards for Ozone, 80 Fed. Reg. 65,292 (Oct. 26, 2015).  Attainment at an individual receptor (a scientific monitoring station that measures ozone concentration) is determined by taking the average over three years of the fourth-highest daily ozone value per year.  *Id.* at 65,458.

The NAAQS revision obligated the States to submit revised SIPs. Though not required, EPA issued several guidance memoranda in 2018 in advance of SIP submissions.

A March 2018 Memorandum sought to "assist states in their efforts to develop good neighbor SIPs."  CI HQ-3.  It laid out the four-step process EPA had used to "address the requirements of the good neighbor provision" in its latest CSAPR rulemakings: (1) identify downwind air quality problems; (2) identify upwind states that contribute enough to those problems to warrant further review (were "linked" to them); (3) identify the emissions reductions necessary (if any) to prevent those upwind state from contributing significantly; and (4) adopt enforceable measures to achieve those reductions.  *Id.* at 2–3, 5.  Yet EPA also

affirmed that, in "developing their own rules," States have "flexibility" to pursue "alternative frameworks" that have "adequate technical justification" and are consistent with the CAA. *Id.* at 3. It further noted that "various analytical approaches may be used to assess each step." *Id.*

The March 2018 Memorandum also included "EPA's air quality modeling data" with "newly available contribution modeling results." *Id.* at 1. EPA modeled the 2023 ozone season using data from 2009–2013 (centered around a 2011 base year) with the Comprehensive Air Quality Model with Extensions (CAMx) v6.40. *Id.* at 4. Using that modeling, EPA identified which ozone receptors were potential "nonattainment receptors" (currently exceeding the NAAQS and modeled to exceed it on average in 2023) or "maintenance receptors" (modeled to exceed it on high ozone days in 2023). *Id.* The memorandum also provided levels of ozone in ppb that each State was modeled to contribute to each such receptor. *Id.* at 5–6.

In an August 2018 Memorandum, EPA "provide[d] recommendations for states using the included analytical information in developing SIP submissions." CI HQ-4 at 1. Those recommendations were focused on screening out small modeled contributions from further

13

analysis.  After comparing contribution thresholds, EPA concluded that "it may be reasonable and appropriate for states to use a 1 ppb contribution threshold" instead of the one percent (0.7 ppb) threshold used in previous rulemakings.  *Id.* at 2–4.

EPA also issued an October 2018 Memorandum regarding flexibilities for designating maintenance monitors.  CI HQ-5.

## C.    Louisiana's SIP

Louisiana had no trouble complying with the new ozone NAAQS. EPA agrees that all areas in Louisiana are in attainment.  *See* 40 CFR § 81.319.

Louisiana submitted most elements of its infrastructure SIP on February 7, 2019, and EPA approved it the following year.  *See* Air Plan Approval, 85 Fed. Reg. 34,106 (June 3, 2020).  Louisiana separately submitted a SIP on November 12, 2019 addressing CAA Section 7410(a)(2)(D), including the good neighbor provision.  CI R06-4.

Louisiana's good neighbor SIP used a three-step alternative framework: (1) identify projected nonattainment or maintenance monitors; (2) identify which might be impacted by emissions from Louisiana; and (3) determine if those emissions contribute significantly

14

to nonattainment or interfere with maintenance. *Id.* at 11. Louisiana characterized these three steps as covering EPA's first two steps and noted that EPA's third and fourth steps are unnecessary without a significant contribution. *Id.* at 12. Relying on the March 2018 Memorandum, Louisiana took up EPA's invitation to "states to use [the] data" in that memorandum and based its approach "partly" on EPA's contribution analysis therein. *Id.* at 5, 12.

Louisiana performed its own analysis, however, to demonstrate that Louisiana did not significantly contribute to downwind problems. To begin, in reliance on the guidance, Louisiana removed from consideration monitors in Michigan and Wisconsin to which Louisiana contributed less than 1 ppb (but purportedly more than one percent of the NAAQS). *Id.* at 12. Louisiana also explained that one percent is undetectable by monitors, far smaller than typical errors, and would be truncated from EPA's design value data. *Id.* Then, Louisiana determined that its contribution should be deemed "significant" only if there was a "persistent and consistent pattern of contribution on several days with elevated ozone," *see id.*—a reasonable gloss on that ambiguous statutory term that accounted for the complex definition of attainment.

Starting with the six remaining nonattainment and maintenance receptors EPA identified—all near Dallas or Houston, Texas—Louisiana performed several additional analyses to demonstrate that the contribution by emissions sources in Louisiana to exceedances at those receptors was "insignificant." *Id.* at 13.

Most critically, LDEQ performed 99 sets of back trajectories using the HYSPLIT system. *Id.* Those trajectories tracked air packets from the Houston and Dallas receptors backwards from the 8-hour periods in 2016–2018 when ozone exceedances occurred there—they showed where the air came from that contributed to ozone formation on high ozone days. *Id.* Only 28% of the trajectories traveled in or through Louisiana and only eight percent originated there. *Id.* Because northern and central Louisiana is rural farmland, it was likely that only trajectories crossing through south Louisiana (where there is heavy industry) would have emissions sources contributing to ozone formation, so Louisiana did more detailed modeling of trajectories crossing Louisiana. *Id.* Only 35% of those crossing Louisiana (approximately ten percent of the total trajectories) originated in or crossed *south* Louisiana. *Id.*

16

Louisiana corroborated these results.  They were consistent with historical wind roses (graphics displaying wind speed and direction over time at the relevant receptors) and seasonal weather patterns, which showed that wind to Texas monitors generally came from the Gulf of Mexico or the north (not from Louisiana), and with earlier HYSPLIT analyses.  *Id.* at 17–18.  The results were also consistent with Louisiana's downward trending ozone precursor emissions.  *Id.* at 9.  Even EPA's 2018 modeling showed that Texas contributed far more ozone to Louisiana's receptors than vice versa—including 5–6 ppb to the Shreveport area and 11 ppb to a Calcasieu receptor across the southern border compared to Louisiana's contributions of 1–2 ppb to Dallas and 3–4 ppb to Houston.  *Id.* at 14.  Louisiana concluded that its actual contribution to ozone problems in Texas was insignificant.  *Id.*

EPA issued a completeness finding on November 14, 2019.  CI R06-4 at 326.

## D.    EPA's proposed disapproval of Louisiana's SIP

EPA began approving good neighbor SIPs starting in 2019, and through 2021, EPA approved 24.  CI HQ-20 at 9,362.  For other States, including Louisiana, EPA did not act with dispatch.  On February 22,

2022, over a year after EPA was statutorily required to act, EPA finally proposed a combined disapproval of Louisiana's SIP (along with those of Texas, Oklahoma, and Arkansas—States in EPA Region 6).  CI R06-1.

In the interim, EPA had comprehensively changed its modeling but given no indication that it would judge the SIPs based on those changes. EPA had created a 2016-base-year model, using "2016-based meteorology and boundary conditions," to create the "2016v1 platform." *Id.* at 9,366.  EPA first revealed it on October 30, 2020 in a notice for a proposed CSAPR-related rulemaking.  *Id.*  EPA then switched to a new version, 7.10, of the CAMx modeling software that had been released in December 2020.  *Id.*  And EPA released "updated emissions inventory files" in September 21, 2021, when EPA announced that it would combine all these recent updates into a 2016v2 model.  *Id.*  It released results from that model on January 19, 2022, including new contribution data—again, without reference to the good neighbor SIPs.  *Id.*  It was not until EPA published its proposed SIP disapproval that EPA revealed that it was judging those SIPs using 2016v2 modeling.  *Id.*

EPA's post-submission modeling substantially changed Louisiana's purported contribution to ozone in Texas.  For instance,

18

Louisiana's contribution to a Brazoria nonattainment receptor near Houston went from 3.80 ppb under the March 2018 Memorandum to 7.03 ppb. CI R06-1 at 9,811, 9,813. Two receptors fell out but two were added, each with higher modeled contributions from Louisiana. *Id.* at 9,811, 9,813. And for two of the three remaining receptors, Louisiana's modeled contribution also rose. *Id.* at 9,813.

In a sharp reversal from its statement that the States had "flexibility," EPA determined to evaluate SIPs with a "nationally consistent approach," including its four-step framework and a "consistent set of policy judgments." *Id.* at 9,801. It declared any "deviation" from that "must be substantially justified and have a well-documented technical basis." *Id.*

When it reviewed Louisiana's SIP, EPA first criticized Louisiana for adopting a 1 ppb threshold to determine which downwind receptors were "linked" to Louisiana based on the August 2018 Memorandum. *Id.* at 9,812. EPA's thorough analysis in that memorandum (showing that a 1 ppb threshold captured similar contributions as a one percent threshold) did not, to EPA in 2022, provide a "compelling basis to move" the threshold. *Id.* at 9,813. EPA also raised "policy consistency and

19

practical implementation concerns" with a 1 ppb threshold, including consistency with prior FIP rulemakings and equity between states. *Id.* at 9,813. Regarding Louisiana's specific arguments, EPA simply "disagree[d]" with criticisms of the one-percent threshold, *id.* at 9,815–16, notwithstanding EPA's own prior statements. Because Louisiana had linkages greater than 1 ppb, EPA stated that use of the alternative threshold would not "alter" EPA's disapproval. *Id.* at 9,812.

EPA then proceeded straight to its step three, where it expected a multifactor analysis, including cost and emissions controls. *Id.* at 9,814. EPA did not consider Louisiana's framework, where its work interrogating the modeled linkages was set before EPA's step three. Instead, because Louisiana did not perform EPA's full step three, EPA determined to disapprove the SIP. *Id.*

Only then did EPA consider Louisiana's arguments, and only at a general level, while also faulting Louisiana for not explaining its choices to EPA's satisfaction. EPA declared that its 2016v2 CAMx modeling—"the most sophisticated tool available"—had proven a linkage and that Louisiana could not rebut it with any work. *Id.* at 9,815. For instance, after faulting Louisiana for not explaining its "persistent and consistent"

standard more, EPA asserted that EPA's modeling "accounts for precisely these concerns." *Id.* at 9,814. It asserted that Louisiana's HYSPLIT analysis could not, by contrast, determine the quantitative contribution to ozone formation. *Id.* 9,815. And it suggested that Louisiana had not considered that areas near the trajectories could contribute. *Id.* EPA also criticized Louisiana's wind rose and seasonal weather analysis as not accounting for wind variations, altitude, or high ozone days. *Id.*

Louisiana submitted comments regarding the proposed disapproval. CI R06-31. Louisiana objected that EPA "unjustly and prejudicially based the disapproval" on new modeling "performed after the SIP deadline." *Id.* at 2. That modeling contained "substantial alterations to model input parameters" and "refinements" that Louisiana could not reasonably review and an "unproven technique." *Id.* Louisiana also explained that the modeling yielded anomalous results, like higher ozone contributions even as precursors decreased. *Id.*

### E.    EPA final action disapproving Louisiana's SIP

On February 13, 2023, EPA published its final disapproval of Louisiana's SIP. CI HQ-20. In the interim year, EPA had further

revised its modeling to 2016v3, which included updates to the "inventories and model design" and "additional updates" based on comments. *Id* at 9,339. Some data and assumptions were from 2020 and 2021. *See* CI HQ-29 at 164, 183–84. EPA also used 2022 measurements to make determinations. CI HQ-20 at 9,350.

The new modeling further increased Louisiana's modeled ozone contributions for four of the six receptors previously at issue and designated a new Galveston receptor as nonattainment, resulting in Louisiana's highest contribution of 9.51 ppb. CI HQ-70. EPA also created a new category—never discussed before—of "violating-monitor" receptors with 2022 measurements that violated the NAAQS but 2023 projected values that did not. *Id.* at 9,349. Louisiana was linked to 10, including one near San Antonio. CI HQ-85 at C-4. EPA stated that it was using these only on a "confirmatory basis," though it deferred final action on two states based on them. CI HQ-20 at 9,349. Otherwise, EPA summarized its prior analysis to support final disapproval, but it newly characterized each of Louisiana's analyses as having unspecified "technical flaws." *Id.* at 9,356.

### III.  This litigation

The State of Louisiana and LDEQ filed a petition for review on March 20, 2023 and immediately moved for a stay pending appeal. Dkt. 63, 112.  A motions panel of this Court granted that motion on May 1 and denied EPA's motion to transfer.  Dkt. 269 ("Stay Order"). The order held that petitioners were likely to succeed on the merits because they had made "a strong showing that the EPA acted unlawfully by considering factors listed nowhere in the CAA" and "that the EPA arbitrarily and capriciously based its Final SIP Denial in part on information only available after Texas and Louisiana had submitted their SIPs."  *Id.* at 14.  By "giving undue weight to non-statutory factors"—including its four-step framework and one percent threshold, with any deviation needing to be "substantially justified"—EPA had gone beyond its "ministerial" role, inverted "the CAA's cooperative federalism framework," and failed to properly defer to the States.  *Id.* at 14–17.  EPA's decision to use new modeling data years after the SIP submission also failed to account for Louisiana's reliance interests and the CAA's cooperative federalism.  *Id.* at 19–21.

23

## SUMMARY OF ARGUMENT

The entire approach EPA adopted for evaluating Louisiana's good neighbor SIP demonstrated fundamental misconceptions about the respective roles Congress has assigned. Unlike in prior rulemakings, EPA did not adopt any purportedly authoritative interpretation of the key statutory terms. When EPA imported its framework from FIP rulemakings and imposed that as a default rule, EPA improperly failed to defer to Louisiana's reasonable choices applying the CAA. By imposing a heightened burden of demonstration to deviate from EPA's preferred framework, EPA also relied on factors beyond those in the CAA. These unlawful impositions predetermined EPA's rejection of Louisiana's work, including Louisiana's arguments for an alternative contribution threshold, an alternative framework, and a reasonable gloss on "significant contribution."

Similarly, EPA's modeling revisions also transgressed the CAA's cooperative federalism. By delaying long past the statutory deadline while revising modeling and gathering data from long after Louisiana's SIP was submitted, EPA again ignored its limited role. EPA's approach robbed Louisiana of the chance to consider what demonstration was

appropriate. And it practically gave EPA a veto over Louisiana's work, even though the CAA provides the States primary discretion.

EPA's approach also disregarded the reliance interests created by EPA's earlier guidance. Louisiana justifiably relied on EPA's promise that States had flexibility and could use alternative frameworks. But EPA used that against Louisiana when EPA rigidly imposed its own framework and punished Louisiana for failing to adhere. The revised modeling also undermined Louisiana's reliance on EPA's earlier contribution data to structure Louisiana's analysis. And in rejecting all arguments for an alternative threshold, EPA improperly failed to recognize that it had changed positions and to credit the weight Louisiana had placed upon that guidance.

Moreover, the justification for EPA's "nationally consistent" framework was undermined by inconsistent actions toward other States.

EPA also wrongfully rejected Louisiana's air quality analysis. While it first provided only general criticisms of the tools Louisiana used, EPA later mischaracterized Louisiana's work as having "technical flaws." Even EPA's general criticisms were contradicted by EPA's own work—EPA performed the same analysis as Louisiana and lauded its

utility.    Finally, EPA's critique of the substance of Louisiana's conclusions falls short because EPA never engaged with Louisiana's central argument—that the air causing problems in Texas almost never came from areas with emissions sources in Louisiana.

Accordingly, EPA's final action was arbitrary and capricious and beyond its authority.  It should be set aside.

## STANDARD OF REVIEW

When reviewing EPA's disapproval of a SIP under the CAA, the Court applies the Administrative Procedure Act and must hold unlawful and set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in excess" of statutory authority.  *Luminant Generation Co.*, 675 F.3d at 925 (quoting 5 U.S.C. § 706(2)(A), (C)); *see also* 42 U.S.C. 7607(d)(9).  An agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n v. State Farm*

*Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). A court "must set aside any action premised on reasoning that fails to account for 'relevant factors' or evinces 'a clear error of judgment.'" *Univ. of Texas M.D. Anderson Cancer Ctr. v. HHS*, 985 F.3d 472, 475 (5th Cir. 2021) (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989)); *see also Michigan v. EPA*, 576 U.S. 743, 750 (2015). The action must be evaluated solely "on the basis articulated by the agency itself." *State Farm*, 463 U.S. at 50.

## ARGUMENT

The CAA's good neighbor provision is one small piece of a larger set of requirements for "infrastructure" SIPs. Here, it requires only that Louisiana's SIP contain "adequate provisions" prohibiting any "source" or "emissions activity" from emitting precursors in amounts that would "contribute significantly to nonattainment in, or interfere with maintenance by," other States with respect to the 2015 ozone NAAQS. 42 U.S.C. § 7410(a)(2)(D)(i)(I). If the other elements of an infrastructure SIP, such as the enforceable emissions limitations in Section 7410(a)(2)(A), already perform that function, then the infrastructure SIP contains "adequate provisions" for good neighbor purposes. The good neighbor provision's limited nature extends to its key terms—Congress

left most undefined.  And unlike other SIP provisions elsewhere in the CAA, the good neighbor provision does not require any specific demonstration of compliance by States and does not authorize EPA to require any.  *Compare id. with* 42 U.S.C. § 7511a (requiring various "demonstration[s]" for attainment including "based on photochemical grid modeling or any other analytical method determined by [EPA]").

EPA has repeatedly asserted that the good neighbor provision needs interpretation "through rulemaking, or recommendations through guidance," to give meaning to its terms, such as what constitutes "significant contribution" for a specific NAAQS.  *EME Homer*, 572 U.S. at 541 (2014) (Scalia, J., dissenting) (quoting numerous EPA actions).  EPA has purported to authoritatively interpret the States' obligations under the good neighbor provision for past NAAQS while issuing FIPs.  The Supreme Court upheld some of EPA's interpretations in that context, such as considering cost alongside control strategies, as permissible choices from ambiguity.  *See id.* at 513–20.  Yet here EPA took a different path.  In the period for infrastructure SIP submissions, EPA issued only guidance stressing flexibility in the approaches that States could take for their good neighbor SIPs.

At evaluation time, EPA applied only its four-step framework and "a consistent set of policy judgments" drawn from prior FIP-related rulemakings. CI HQ-20 at 9,339. But EPA pointedly disavowed that it was authoritatively interpreting any part of the CAA, and it maintained that States continue to have flexibility.[4] *See* CI HQ-83 at 60–61. EPA thus has no claim to this Court's deference. *See Luminant Generation Co.*, 675 F.3d at 927–28 (holding that without claiming to authoritatively interpret statutory provision, EPA does not receive *Chevron* deference[5]).

EPA's action here is thus distinct from its prior "rulemakings." Although EPA approached the SIP disapproval as a "rulemaking" and called its final disapproval a "rule," that is a misconception that bleeds into EPA's evaluation. A "rule" must have a "future effect." 5 U.S.C. § 551(4); *see Bowen*, 488 U.S. at 208. The CAA called for EPA simply to approve or disapprove Louisiana's SIP as submitted, not make its own

---

[4] If EPA makes such an argument, that would raise serious questions, including about the retroactive effect of judging a SIP submitted in the past based on new criteria and then harming Louisiana's authority by triggering a FIP. *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208–09 (1988) (holding that retroactive regulations require explicit congressional authorization). And there are open questions regarding what terms EPA can interpret even in advance of SIP submissions given the CAA's "cooperative federalism."

[5] *Chevron* has been called into doubt, and the Supreme Court recently granted certiorari on whether to overrule it. *Loper Bright Enters. v. Raimondo*, No. 22-451. Louisiana accordingly preserves the question of whether EPA is entitled to deference in any respect.

rule. The CAA refers to this generically as an "other final action" as opposed to a "rulemaking." *See* 42 U.S.C. § 7607(b)(1), (d)(1). If approved, a SIP becomes enforceable federal law. *BCCA Appeal Grp.*, 355 F.3d at 826. If that SIP becomes obsolete, EPA may call for revisions. And if EPA disapproves a SIP, it may then make the law through a FIP. But when reviewing a SIP, EPA has a highly constrained role precisely because it is not making its *own* rule.

## I. EPA'S GENERAL APPROACH TO REVIEWING LOUISIANA'S SIP WAS ARBITRARY AND CAPRICIOUS AND BEYOND ITS AUTHORITY.

Despite the limited role assigned to it by Congress, EPA acted as if it were making its own law. In reviewing Louisiana's SIP, EPA imposed its own policy preferences, demanded extra-statutory demonstrations, and used its unlawful delay to ensure its complete discretion over approval. But EPA had previously, and properly, assured States that *they* would have discretion. EPA's imperious approach not only transgressed the CAA but also general administrative law principles.

**A.    The criteria EPA used to consider Louisiana's SIP disregarded the structure of the CAA.**

    **i.    The framework and extra-statutory burdens of demonstration used to disapprove Louisiana's SIP were unlawful.**

In its review of Louisiana's SIP, EPA exceeded its authority by requiring of Louisiana far more than the CAA requires.  Louisiana's SIP should have been considered on its own terms and found more than "adequate."  Instead, EPA rigidly imposed its policy preferences and heavy burdens of demonstration, which are foreign to the CAA.  EPA's failure to appropriately defer to Louisiana's reasonable application of the CAA predetermined disapproval.

      *a.    EPA wrongfully transplanted its framework from a context where it had discretion and rulemaking power to one where it had none.*

EPA ostensibly recognized that States have room to adopt an approach to the good neighbor provision that makes sense for that State. In its guidance, EPA acknowledged that (without binding interpretations) States could "develop[] their own rules" and "have flexibility" to use "EPA's analytical approach or somewhat different analytical approaches within these steps[] or alternative frameworks." CI HQ-3 at 3.  Whatever approach a State chose needed only to have

"adequate" technical justification and be consistent with the CAA, *id.*—mirroring the standard of the good neighbor provision. All this was consistent with States having inherent discretion. There was certainly no hint that EPA could require additional justification to deviate from its own preferences.

When it came time to review the SIPs, EPA paid lip service to "flexibilities" but simultaneously imposed a heavy, effectively dispositive burden on any State relying on them. EPA decreed that it would apply its 4-step framework and policy judgments and that any "deviation from [that] nationally consistent approach to ozone transport must be *substantially justified* and have a *well-documented technical basis* that is consistent with relevant case law." CI R06-1 at 9,801 (emphasis added); CI HQ-20 at 9,340. In other words, a SIP containing even an independently "adequate" showing of its compliance with the good neighbor provision would be insufficient if it did not also follow EPA's framework. A failure of that demonstration would prove dispositive for SIP disapproval.

EPA's approach, with presumptions and burdens of demonstration beyond those required by the CAA, was unlawful. EPA's general

process—importing its framework from a context in which EPA had discretion, *see EME Homer*, 572 U.S. at 503, to one in which it had none and making its policy preferences the presumptive rule (requiring substantial justification to diverge therefrom)—"reflect[ed] a misapprehension by the EPA of its authorized role in the SIP-approval process," where "EPA does not possess any discretionary authority," only the States do. *See Luminant Generation Co.*, 675 F.3d at 928 n.8. Unlike in prior rulemakings, EPA has no basis to claim the deference required to impose such preferences. Even under arbitrary and capricious review, EPA must still defer to Louisiana's reasonable application of the minimal statutory factors in the good neighbor provision. *See Texas 2016*, 829 F.3d at 428.

Other provisions of the CAA support this conclusion. Congress expressly granted EPA discretion in reviewing and rejecting a State's determination of its compliance with a NAAQS for some state submissions, but not here. *See Texas v. EPA*, 983 F.3d 826, 837 (5th Cir. 2020) ("*Texas 2020*") (holding that CAA provision allowing EPA to make changes EPA "deems necessary" to state attainment designations constitutes delegation of discretionary authority); *Catawba Cnty. v EPA*,

571 F.3d 20, 40 (D.C. Cir. 2009) (noting that absent EPA finding of necessity, EPA must give state designations substantive deference even though they concern compliance with federal standard).

At the same time, the factors in EPA's framework and all the burdens of demonstration EPA required to use "flexibilities" are absent from the CAA. *See* Stay Order at 15; *Texas 2020*, 983 F.3d at 839 (noting "one-percent threshold does not appear in the text"). Nothing in the text necessitates a "nationally consistent" framework, much less the specific one EPA imposed. (If anything, interstate ozone transport is a regional concern. *See* 42 U.S.C. § 7506a.) And the good neighbor provision imposes no burdens of demonstration at all. This Court has repeatedly held that EPA may not add such extra-statutory requirements for approval of SIPs and similar state submissions—even in a purported rulemaking. *See Texas 2016*, 829 F.3d at 428; *Luminant Generation Co.*, 675 F.3d at 929 ("[T]he structure of the CAA militates against reading an extra-statutory requirement into the Act's limitations on state discretion."); *Texas 2012*, 690 F.3d at 679 (holding EPA's imposition of its "preference" over "standards Congress provided . . . disturbs the cooperative federalism that the CAA envisions"). This is doubly true

34

given that Congress *has* authorized specific demonstrations for other portions of SIPs in the CAA. *See Luminant Generation Co.*, 675 F.3d at 929 (noting that inclusion of requirement in some parts of CAA "is strong evidence that the requirement does not apply" where it is absent).

EPA's approach thus exceeded its authority and was arbitrary and capricious. *See State Farm*, 463 U.S. at 43 (noting action is "arbitrary and capricious" if agency "has relied on factors which Congress has not intended it to consider"); *Luminant Generation Co.*, 675 F.3d at 926.

> b.    *EPA's presumptive framework and extra-statutory burdens and considerations predetermined the outcome.*

EPA's rigid adherence to its framework and its imposition of a heavy burden of justification and other non-statutory considerations prejudiced Louisiana throughout EPA's review.

At EPA's step two,[6] EPA created multiple novel burdens of demonstration. At its corresponding step two, Louisiana had relied on EPA's guidance and LDEQ's analysis to conclude that a 1 ppb threshold was appropriate. CI R06-4 at 12. EPA rejected all such conclusions

---

[6] Although Louisiana provisionally used the receptors identified in EPA's March 2018 Memorandum, it did not accept the validity of EPA's modeling by so doing. EPA's late creation of "violating-monitor" receptors further attests to EPA's willingness to create extra-statutory hurdles, even at step one.

based on its general burden of demonstration—asserting that no State provided "sufficient information and analysis"—but also because it required them (for the first time in the proposed disapproval) to demonstrate why 1 ppb was more appropriate for *that particular State*. CI R06-1 at 9,812; *see* CI HQ-20 at 9,374. Indeed, EPA even repudiated the analysis in its own August 2018 Memorandum for failing to meet EPA's later burden of demonstration. EPA determined that the memorandum did not provide a "compelling basis to move" the one-percent threshold. CI R06-1 at 9,813; *see* CI HQ-20 at 9,374. There was no need to "move" a non-authoritative threshold; only a threshold's independent consistency with the CAA mattered. But EPA also required much more justification to "move" it than EPA gave when originally adopting it in rulemaking. *See* CSAPR, 76 Fed. Reg. 48,208, 48,236–38 (Aug. 8, 2011).

EPA also further relied on non-statutory "policy consistency and practical implementation concerns," including consistency with prior FIP rulemakings and an equity concern that some states could avoid being forced to proceed to EPA's full step three analysis. CI R06-1 at 9,813; CI HQ-20 at 9,374. Its response to Louisiana's specific arguments

was simply that EPA "disagree[d]" with criticisms of the current threshold. CI R06-1 at 9,815–9,816; CI HQ-20 at 9,356. That falls far short of resolving that Louisiana's threshold violated the CAA.

Although EPA asserted that none of its threshold discussion mattered because Louisiana still had other "linkages," CI R06-1 at 9,812–13, it did matter. First, EPA's treatment of the threshold issue illustrates its general posture toward the SIP and the extra-statutory burdens and considerations it imposed. Second, EPA repeated EPA's disagreement in the final action, and it should be addressed lest EPA attempt to rely on it.[7] Third, EPA's approach to the threshold issue prejudiced its evaluation of the next step.

The SIP disapproval hinges on Louisiana's not having performed EPA's complete step three, with an emissions control and cost analysis.[8] But this conclusion was predetermined by EPA's rigid adherence to its

---

[7] EPA could attempt to rely on the threshold to again fault Louisiana on remand. And, as discuss *infra* Section I.C, EPA has withheld approval from some States even when all downwind receptors dropped below the threshold.

[8] *See* CI R06-1 at 9,814 ("LDEQ was required to analyze emissions from the sources and other emissions activity from within Louisiana to determine whether its contributions were significant, and we propose to disapprove its submission because LDEQ did not do so."); CI HQ-20 at 9,356 ("Louisiana did not conduct an adequate Step 3 analysis. The State included an insufficient evaluation of additional emissions control opportunities in its SIP submission.").

framework and its indifference to Louisiana's reasonable choices. Louisiana characterized its third step as corresponding to EPA's second—Louisiana checked whether the modeled "linkages" were correct before considering emissions controls and costs. This clashed with EPA's framework. There, a state "linked" at EPA's step two by modeling "*must* provide a well-documented evaluation . . . by preparing a multifactor assessment that evaluates additional available control opportunities." *Id.* at 9,803 (emphasis added). EPA followed through with this blinkered approach. In evaluating Louisiana's SIP, after discussing thresholds, EPA provided only one paragraph of analysis for its steps one and two. *Id.* at 9,813. It then concluded that based on "the information" (not analysis) submitted by Louisiana and EPA's "most recent modeling," Louisiana was "linked at Steps 1 and 2 and ha[d] an obligation to assess potential emissions reductions from sources or other emissions activity at [EPA's] Step 3." *Id.* This sequence makes clear that before considering Louisiana's work, EPA had already reached its conclusion.

EPA's approach to step three also demonstrated heavy prejudice against any alternative to its full multifactor test. In general comments about that step, EPA declared that it "disagree[d] that it [was] obligated

to defer to states' choices in the development of good neighbor SIP submissions." CI HQ-20 at 9,375. EPA did not, in fact, respect Louisiana's choices. From the outset of EPA's step three evaluation, before considering Louisiana's arguments rebutting EPA's modeled contribution, EPA had already described the step as its full multifactor evaluation. CI R06-1 at 9,814. "To effectively evaluate which emissions" are significant, EPA directed that "states generally should prepare an accounting of sources and other emissions activity . . . and assess potential, additional emissions reduction opportunities and resulting downwind air quality improvements." *Id.* EPA also noted that it had "consistently applied this approach" in its prior rulemakings and that the approach had been "upheld by the Supreme Court." *Id.* But EPA failed to note the different context and that its interpretation was only one of many permissible. *See EME Homer*, 572 U.S. at 514–20. And it failed to recognize that the "CAA does not make the [multifactor test] the EPA desires a standard for disapproving a SIP." *Texas 2012*, 690 F.3d at 685. EPA was resolved not to give Louisiana appropriate discretion.

When EPA finally considered Louisiana's arguments, it followed the same pattern. No statute or regulation defines significant

contribution. So Louisiana had a gloss on "significance" as a "'consistent and persistent' pattern of contribution on several days with elevated ozone." CI R06-4 at 13. This is a reasonable interpretation stemming from the NAAQS, where a nonattainment finding takes into consideration consistently high ozone values that persist for several years. CI R06-1 at 9,814. And the focus on the dynamics of ozone contribution (before considering cost) is consistent with the text. *See EME Homer*, 572 U.S. at 514–20. EPA responded that this gloss did not "comport[] with CAA requirements." CI R06-1 at 9,814. Yet it did not explain how. In fact, EPA instead based its disapproval on Louisiana's not explaining that phrase to EPA's satisfaction—again imposing a heavy burden of demonstration. EPA concluded that it "did not agree" that Louisiana's explanation "suffices as an explanation" for not proceeding to EPA's step three. *Id.* at 9,814. EPA even implied that, because Louisiana provisionally used EPA's modeling to identify receptors, it could not contest that a "consistent and persistent pattern" occurred. *See id.* at 9,815.

EPA's explanation for rejecting Louisiana's interpretation was particularly arbitrary because EPA essentially agreed with that

interpretation only a few paragraphs later. EPA asserted not only that its modeling "establishe[d] that there is a consistent and persistent pattern of contribution" but also that "EPA's methodology . . . accounts for precisely these concerns" because both the model and the NAAQS consider consistently high values over several years. *Id.* at 9,814–15. Either EPA's methodology accounts "precisely" for considerations inconsistent with the CAA, or EPA wrongfully rejected Louisiana's interpretation. Either is a "clear error of judgment," *Univ. of Texas*, 985 F.3d at 475. And either way, EPA improperly failed to defer to Louisiana's reasonable interpretation and application of the statutory standard. *See Texas 2016*, 829 F.3d at 428.

While these examples more than suffice to demonstrate that EPA's approach applied unlawful presumptions and burdens of demonstration without appropriate deference, there are many more. Those include EPA's specific errors in rejecting Louisiana's technical analysis (discussed *infra*, Section II) and EPA's failure to consider the collective sufficiency of Louisiana's analysis (rather than nitpicking each element). And these errors many times over were dispositive in ensuring that EPA disapproved Louisiana's SIP.

### ii.    EPA's continual revision of its modeling infringed on Louisiana's discretion under the CAA.

EPA's approach to the key evidence it used to disapprove Louisiana's SIP was also arbitrary and capricious.  By incorporating data that did not exist at the time of the SIP submission and using new modeling to judge the validity of Louisiana's conclusions, EPA disregarded the structure of the CAA.  Its disapproval is therefore "premised on reasoning that fails to account for 'relevant factors,'" *Univ. of Texas*, 985 F.3d at 475.

### a.    *EPA's changes in modeling were significant.*

EPA's wholesale revision of its modeling had real effects.  EPA admitted as much—it acknowledged that using data and modeling available to States at the time of their SIP submissions "would produce a different result in [EPA's] forward-looking analysis of 2023."  CI HQ-20 at 9,366.  Its final action disapproving Louisiana's SIP relied on the 2016v3 modeling platform specifically, *id.* at 9,339, and its disapproval must be set aside if it should not have used that modeling.  *See DHS v. Regents of the Univ. of Ca.*, 140 S. Ct. 1891, 1907 (2020) (noting that it

is a "foundational principle of administrative law" that judicial review of agency action is limited to "the grounds that the agency invoked").

The revisions were also practically significant. The 2016v2 modeling substantially increased the modeled contribution for most receptors that continued to be relevant, and the 2016v3 modeling did so again. *See* CI R06-1 at 9,811–14; CI HQ-70. But the revisions also changed which receptors "linked" to Louisiana were nonattainment or maintenance receptors, and the new ones had significantly higher modeled contributions. *See* CI R06-1 at 9,811–14; CI HQ-70. The effects also combined. The receptor in Brazoria went from a 3.80 ppb modeled contribution in the March 2018 Memorandum to 7.03 ppb in the 2016v2 modeling. CI-HQ 3 at C-2; CI HQ-12. But then a nearby Galveston receptor was added for 2016v3, bringing the highest contribution in the Brazoria-Galveston area to 9.51 ppb. CI HQ-70. With EPA's creation of "violating-monitor" receptors in the final action, Louisiana became linked to ten of those, including one in a new area, San Antonio. CI HQ-20 at 9,356; CI HQ-85 at C-4.

b.    *These changes disregarded the CAA's structure.*

EPA's primary justification for its comprehensive modeling revisions finds no basis in the CAA. Rather, it is a general argument about rulemaking: EPA should not be "prohibited from taking rulemaking action using the best information available to it at the time it takes such action." *Id.* This justification is "premised on reasoning that fails to account for 'relevant factors'"—the CAA—and indeed "relie[s] on factors which Congress has not intended [EPA] to consider." *See State Farm*, 463 U.S. at 43; *Univ. of Texas*, 985 F.3d at 475.

To begin, EPA misconceives the nature of its action. This is not a "rulemaking" where EPA has discretion to create law. The impetus for using new modeling and the latest data thus rests on a critical misunderstanding about EPA's role.

EPA's approach to modeling also ignores the terms of the CAA. Under those, it had 12 months, until November 14, 2020, to render a final (not merely proposed) decision. *See* 42 U.S.C. § 7410(k)(2). Almost every relevant development in EPA's modeling occurred after that deadline, and much long after. EPA did not begin creating 2016-based modeling until after Louisiana submitted its SIP. *See* CI HQ-20 at 9,365.

44

It released only a draft model with related inputs on October 30, 2020 in the separate CSAPR rulemakings. *Id.* at 9,366. Everything else happened after the one-year deadline, including EPA's adoption of new software (first released in December 2020), its creation and release of updated emissions inventory files (in 2021), its creation of the 2016v2 and then 2016v3 modeling platforms, and its incorporation of data from as late as 2021 and 2022. *Id.* at 9,350, 9,366; CI HQ-29 at 164–64, 183–84.

The CAA does not allow EPA to do this. The timing provision further evinces Congress's clear intent that EPA's role in evaluating whether SIPs are "adequate" should be limited. While the CAA provides each State three years after a new NAAQS to develop an infrastructure SIP, EPA gets only one to review. And it must review all States' entire infrastructure SIPs at nearly the same time. Practically speaking, Congress cabined EPA's ability to perform new modeling. And Congress certainly denied EPA the ability to delay its decision making for years while continuously collecting new information and revising its work. *See* Stay Order at 21–22. That inference springs even from the time provided for review. *See Env't Integrity Project v. EPA*, 969 F.3d 529, 544 (5th Cir.

2020) (finding that shorter timeline given for reviewing small permit for single source was "inconsistent with an in-depth and searching review").

EPA's explanation for its delay further underscores how unnecessary its actions were. EPA essentially asserts that it was very busy after two 2019 D.C. Circuit cases, until 2021. CI HQ-20 at 9,365. The reasonable course, in accordance with the CAA, was to use the data and modeling it already had to efficiently and timely evaluate SIPs. It did exactly that in approving many SIPs starting in 2018. *Id.* at 9,365 n.286. But for SIPs EPA disapproved, it continued to seek new data and apply multiple rounds of modeling long after the statutory deadline. EPA then disapproved Louisiana's SIP two years after EPA finished being busy and long after it could have given states a chance to update their SIPs.

EPA's major modeling changes robbed Louisiana of its ability to consider, in the first instance, what arguments and analysis were appropriate to address the evidence bearing on whether its SIP was "adequate." Without that chance, it can hardly be said that Louisiana was "driv[ing] the regulatory process," *Texas 2016*, 829 F.3d at 411. Louisiana's back trajectory analysis soundly rebutted EPA's later

modeling. But EPA's approach meant Louisiana could not consider whether additional work was useful to make its public case against the larger and different contributions modeled with later-available data and software.

The changed modeling also caused EPA to further disregard points Louisiana made. The SIP argued that a significant contribution was implausible because even EPA's model showed that most ozone comes from Texas into Louisiana, not vice versa. While this relationship remained, it was muddied in part by the Calcasieu receptor Louisiana cited dropping out from the 2016v2 modeling (because Louisiana was in attainment). *See* CI HQ-12. So EPA never bothered to address the point.

The creation of the violating-monitor receptors further sandbagged Louisiana. EPA never explained how those precisely would or did affect EPA's analysis.

By continuing to develop criteria, data, and analysis long past its statutory deadline and far beyond Louisiana's ability to do the same, EPA transgressed its limited role, ignored specific statutory limitations, and acted without authority. If EPA can blow past statutory deadlines,

47

prepare modeling with data and assumptions that did not exist when States prepared their SIPs, and then judge those SIPs with that new work, EPA can arrogate arbitrary discretion to reject States' plans and substitute its own federal plan. EPA could always add some consideration that a State did not address because the data simply did not exist. *See* Stay Order at 21–22. EPA has already recognized the impossible burden that requiring States to continually update their modeling would impose. *See Sierra Club v. EPA*, 356 F.3d 296, 308 (D.C. Cir. 2004). There would be no practical way for Louisiana to assure that its SIP could be approved because any demonstration Louisiana made could be vetoed by later work. This boundless discretion is the opposite of the limited, deferential role Congress provided to EPA in the CAA. *See, e.g.*, *Texas 2016*, 829 F.3d at 428.

## B. EPA improperly disregarded Louisiana's reliance interests.

While EPA's approach contravened the CAA's structure, it was also unlawful because EPA issued contrary guidance beforehand. An agency must give notice of conduct the agency "prohibits or requires" and cannot "surprise" a party by penalizing it for "good-faith reliance" on the agency's prior positions. *Christopher v. Smithkline Beecham Corp.*, 567

48

U.S. 142, 156–57 (2012). When it changes position, the agency must first "display awareness that it is changing position." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)). Given that Louisiana relied in good faith on the 2018 guidance memoranda, EPA was required to acknowledge its change and "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Regents*, 140 S. Ct. at 1915. The SIP disapproval was again arbitrary and capricious because EPA did not do so.

### i. Louisiana appropriately relied on EPA's 2018 guidance memoranda when creating its SIP.

Louisiana's route to creating its SIP confirms reliance on EPA's 2018 guidance documents. The SIP explained that it considered EPA's March 2018 Memorandum, including its "preliminary list of potential flexibilities in analytical approaches," as well as the August and October 2018 Memoranda. CI R06-4 at 5–6. Louisiana understood that these were published "to assist states in constructing *approvable* SIPs." *Id.* at 5 (emphasis added).

The March 2018 Memorandum assumed that States would be "developing their own *rules*"—not just demonstrations. CI HQ-3 at 1 (emphasis added). While doing so, States had "flexibility" to use "alternative frameworks" provided that those frameworks independently had "adequate technical justification" and were "consistent with the requirements of the CAA." *Id.* at 3. The memorandum betrayed no hint of later requirements to justify deviation from EPA's four-step framework or consider extra-statutory "policy concerns." Louisiana adopted its alternative three-step framework in reliance on the standard articulated in the memorandum. *See* CI R06-4 at 11. And it accordingly gave technical and CAA-based justifications for its approach but not for why it diverged from EPA's framework. *See id.* at 11–12.

Louisiana also relied on the March 2018 ozone level and contribution data. It noted that "EPA invited states to use this data to develop SIPs" and that LDEQ's approach was "based partly" on those metrics. *Id.* at 5, 11. Louisiana used that data to determine which receptors were potentially relevant for back trajectories (e.g., not San Antonio, because violating-monitor receptors did not exist) and to decide how to analyze its modeled contribution to those receptors. *Id.* at 13.

Louisiana's conclusion that its back trajectory analysis was reasonable was corroborated by the data showing that Texas contributed far more to Louisiana than vice versa. *See id.* at 13–14.

Additionally, Louisiana adopted the 1 ppb alternative threshold in reliance on the 2018 guidance memoranda and added its own technical arguments. *See id.* at 11. But it did not address points, such as a state-specific justification, that the memoranda nowhere required but EPA later demanded.

### ii. EPA failed to consider Louisiana's important reliance interests in EPA's earlier guidance.

EPA does not dispute that Louisiana relied on these memoranda. Rather, EPA largely argues that Louisiana should not have, or that EPA did not change positions, so it did not need to consider reliance. But a comparison of the memoranda with EPA's actions discredits both positions.

The March 2018 Memorandum declared itself guidance: "EPA's goal in providing this information is to assist states' efforts to develop" their SIPs. CI HQ-3 at 2. Rather than rebut that, EPA argued only that Appendix A (listing potential "flexibilities") was not "guidance" but simply "intended to generate further discussion." CI HQ-20 at 9,369.

51

This misses the mark.  Regardless of whether Appendix A was guidance (and it was[9]), EPA's key assurances—including that States could develop their own "rules" and had "flexibility" to use "alternative frameworks"—appeared in the main body of the document.  CI HQ-3 at 3.  That is also where the minimal requirements for alternative frameworks appeared, absent mention of later-required demonstrations or extra-statutory considerations.  *Id.*  EPA lacks an answer for why *that* did not generate reliance it should have considered.

The data in the March 2018 memorandum came with the same invitation to States.  EPA's exhaustive description of its modeling betrayed no hint that everything might be redone after SIP submission. Indeed, the memorandum specifically contemplates State "reliance on the 2023 modeling data."  CI HQ-3 at 6.  EPA also gave no answer regarding reliance on the data.

Furthermore, EPA changed its position even more than is apparent.  While the March 2018 Memorandum called the 4-step framework "familiar," citing previous rulemakings, that was an

---

[9] EPA completed the "discussion."  As Louisiana noted, EPA received comments, revised the contribution metric spreadsheet with more data, and issued further guidance.  CI R06-4 at 5.  Otherwise, EPA violated its promise to continue to develop the framework with the States.

overstatement. CSAPR had two steps. *EME Homer*, 572 U.S. at 500. The latest cited, the CSAPR Update, had four. 81 Fed. Reg. 74,504, 74507 (Oct. 26, 2016). But step three there was nominally "identifying upwind emissions" contributing significantly rather than "identify[ing] the emissions reductions necessary" as here. *Compare id. with* CI HQ-20 at 9,338. Louisiana focused on identifying areas of the State with significant emissions. Its step three constituted a reasonable take on the latest version of EPA's four-step framework as of the March 2018 Memorandum. When EPA insisted on proceeding to its multifactor control test, it also disregarded this reasonable interpretation.

For the August 2018 Memorandum, EPA took a different tack. EPA argued that it had not formally rejected an alternative threshold—despite finding its own and every State's arguments insufficient—so it had no obligation to conduct an analysis of its change in position. *See* CI HQ-20 at 9,373. This explanation holds no water. *See Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575 (2019) (noting that courts are "not required to exhibit a naivete from which ordinary citizens are free"). While the memorandum noted that it "may not apply" to all "facts and circumstances," it characterized itself as "guidance" and as "providing

53

*recommendations*" about other thresholds.  CI HQ-4 at 1 (emphasis added).  And it did so without requiring any State-specific justification.  The memorandum's comprehensive analysis was nationwide and more detailed than what EPA originally gave for the one percent threshold.  *Compare id.* at 3–4 *with* 76 Fed. Reg. at 48,236–38.

EPA also argues that any reliance interests for the August 2018 Memorandum were insignificant because States did not incur compliance costs or make State-specific arguments.  HQ-20 at 9,373.  This ignores that Louisiana based its analysis on not including two receptors linked at a one percent threshold but not at 1 ppb.  EPA criticized Louisiana for this even in the final action.  EPA's unwillingness to acknowledge the change and its weight further highlights EPA's general disregard of Louisiana's reliance interests.  *See Encino Motorcars*, 579 U.S. at 222.

This Court has recently rejected similar efforts by administrative agencies to disclaim reliance based on less than absolute language in guidance memoranda.  *See R.J. Reynolds Vapor Co. v. FDA*, 65 F.4th 182 (5th Cir. 2023); *Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130 (5th Cir. 2021); *see also Wages & White Lion Invs., LLC v. FDA*, 58 F.4th

54

233 (5th Cir. 2023) (vacating contrary opinion and granting rehearing en banc).   In those cases, the FDA stated that it did "not expect that applicants w[ould] need to conduct long-term studies to support an application" but then denied submissions for lacking that information. *R.J. Reynolds*, 65 F.4th 187.   This Court has repeatedly held that the FDA failed to consider reasonable reliance interests. *See id.* at 187, 189–90.

Here, the situation is far worse.   EPA affirmatively recommended reliance on flexibilities and then-available data in a context where the statute champions state discretion.   Changing the evaluation standards and modeling after submission constituted an unlawful "surprise switcheroo." *See id.* at 189 & n.6.; *Wages & White Lion*, 16 F.4th. at 1138.

Because EPA did not recognize it changed its position, did not consider reliance on the March 2018 Memorandum and failed to seriously consider reliance on the August 2018 Memorandum, its action was arbitrary and capricious. *See Regents*, 140 S. Ct. at 1913.

## C.  The central justification for EPA's approach is undermined by its own inconsistent actions.

Throughout EPA's review of the good neighbor SIPs, EPA stressed the need for a "nationally consistent 4-Step framework," "nationally

consistent policy judgments," and "nationwide air quality modeling."  CI R06-1 at 9,800, 9,835; CI HQ-20 at 9,339, 9,354.  EPA repeatedly used desire for nationwide consistency—and "equity" between States—to reject Louisiana's and other States' alternative approaches and methods of demonstrating compliance with the CAA.  *See, e.g.*, CI R06-1 at 9,807, 9,813.  Yet EPA's own actions contradicted these considerations and created significant disparity between States.

States' SIPs were approved, disapproved, or held in limbo based in substantial part on what modeling EPA used and when it reached a final decision.  For Connecticut, the March 2018 data linked it to New York by a 0.83 ppb contribution for 2023.  CI HQ-3 at C-2.  Connecticut proposed no emissions reductions, but EPA approved its SIP based on the 2016v1 modeling with a 2021 analytical year because Connecticut's contribution fell below one percent.  Air Plan Approval, 86 Fed. Reg. 48,357, 48,360–61 (Aug. 30, 2021); CI HQ-20 at 9,365.  For Kansas, its SIP argued that a below-1 ppb linkage should be ignored, but EPA approved the SIP after new modeling with a 2023 analytical year (probably 2016v2 modeling) found that the contribution had dropped

below one percent.  Air Plan Approval, 87 Fed. Reg. at 7,071, 7,072–75 (Feb. 8, 2022).

The situation was largely reversed for other states.  Delaware originally had no linkages, so EPA approved its SIP, but then the 2016v2 modeling created a one percent linkage, so EPA proposed to retroactively disapprove the SIP in its proposed FIP.  CI HQ-20 at 9,362, 9,364.  Now the 2016v3 modeling again shows no linkages, *see* CI HQ-70, and EPA has not promulgated the FIP, so the fate of that SIP is unclear.  Opposite that is the situation for Arizona's and Iowa's SIPs.  EPA proposed approving them based on 2016v2 modeling, CI HQ-20 at 9,344, but after the 2016v3 modeling demonstrated a linkage again, CI HQ-70, EPA has apparently not acted.  And EPA used its new "violating-monitor" receptor linkages to avoid acting on Tennessee's SIP; it noted that Kansas was now linked to one without indicating what would be done about that.  CI HQ-20 at 9,349.

The disparate treatment is unlawful, especially given that EPA has disclaimed any justification other than its choice to continue revising its modeling and assumptions.  *See Clean Wisconsin v. EPA*, 964 F.3d 1145, 1161 (D.C. Cir. 2020); *Univ. of Texas*, 985 F.3d at 479.  But this

haphazard approach also destroys EPA's rationale for adopting its framework in the first place, again rendering its reliance on the framework to reject Louisiana's SIP unlawful.

## II. EPA WAS ARBITRARY AND CAPRICIOUS IN REJECTING LOUISIANA'S AIR QUALITY ANALYSIS.

In proposing to reject Louisiana's analysis of the significance of its contributions, EPA relied on general criticisms of Louisiana's tools. But in the final action, EPA switched without explanation to a disapproval based on vague "technical flaws." EPA's criticisms were also contradicted by EPA's own positions—it has used the same analysis as Louisiana for the same purpose. And apart from these inconsistencies, EPA also failed to respond to the central point of Louisiana's analysis.

### A. Louisiana's air quality analysis did not have "technical flaws," and EPA's conclusion based on such flaws was without reason.

Much like EPA's approach to the framework, EPA primarily rejected Louisiana's air quality analysis in its proposed disapproval because EPA preferred its own despite nothing necessitating that. EPA did not seriously consider Louisiana's analysis, even in comparison with other States'. Yet in its final action, EPA grounded its disapproval on

unspecified "technical flaws." This change was unexplained and unjustified.

Rather than engaging with Louisiana's analysis, EPA lobbed general criticisms. EPA criticized Louisiana's HYSPLIT back trajectory analysis because, in contrast with its own CAMx photochemical modeling, back trajectories do not consider chemical processes and cannot "quantitatively evaluate" contributions from upwind states to downwind receptors. CI R06-1 at 9,815. EPA also criticized Louisiana's assessment of weather patterns and wind roses because they change over time and are not specific to high ozone days that cause NAAQS violations. *Id.*

EPA did not point to any way that Louisiana's specific analyses were technically flawed. The closest it came was to assert, in a single sentence, that "LDEQ proffered that some of these back trajectories did not pass directly over areas with emissions but did not consider that the back trajectories only represent a centerline and there are areas on either side of the centerline that would be contributing areas." *Id.* at 9,815. This critique is baseless. Nothing in Louisiana's SIP suggests that it failed to contemplate the general nature of back trajectory

modeling.   Quite the opposite.   The SIP categorized trajectories by whether they crossed broad regions of the State—northern/central versus south Louisiana, with significant emissions sources being only in south Louisiana.   CI R06-4 at 13.   EPA provided no reason that a third of the State was too granular.   And it did not assert that if areas "on the side of the centerline" were properly considered then the counting of trajectories would have differed.   EPA's assertion "runs counter to the evidence before the agency," is too "implausible" to ascribe to "the product of agency expertise," and is "a clear error of judgment." *See State Farm*, 463 U.S. at 43; *Univ. of Texas*, 985 F.3d at 475; *see also Clean Wisconsin*, 964 F.3d at 1162 (finding arbitrary and capricious EPA's failure to provide specific distances or explain their import for contribution analysis).

EPA's lack of critical technical commentary contrasted markedly with its evaluation of other States using HYSPLIT.   For example, EPA pointed to numerous ways that Arkansas's back trajectory analyses were purportedly "flawed."   CI R06-1 at 9,809 & n.55.   That included a specific example of how Arkansas used only a centerline and ignored specific contributions.   *Id.* (noting that Arkansas's removal of certain back

trajectories that "passed near but not through Arkansas" was flawed "because Arkansas has some very large point sources near the Arkansas state line that could be contributing"). EPA found no such errors in Louisiana's analysis.

Therefore, when the final action simply relied on EPA's having found unspecified "technical flaws" in each of Louisiana's "assessment of seasonal weather patterns, surface wind directions, and back trajectory analysis," CI HQ-20 at 9,356, that was *ipse dixit* and mischaracterized the record. EPA's disapproval, based on this mischaracterization, was arbitrary and capricious. *See State Farm*, 463 U.S. at 52 (holding that changed conclusion requires new reasoning).

## B. EPA's general criticisms of Louisiana's air quality analysis are contradicted by its own words and practice.

The bulk of EPA's argument against Louisiana's back trajectory analysis rested on the comparative power of CAMx photochemical source-apportionment modeling for the task at hand. EPA praised that modeling as "the most sophisticated tool available" and as "fundamental to understanding and assessing the effects of emissions on air quality concentrations." CI R06-1 at 9,815. At the same time, EPA

acknowledged that it also "relies on back trajectory analysis as a corollary analysis along with observation-based meteorological wind fields at multiple heights to examine the general plausibility of the photochemical model 'linkages.'" *Id.* But this admission dramatically understates both the utility of those tools and EPA's use of them.

EPA has used HYSPLIT and wind roses extensively, and instead of CAMx source-apportionment modeling, for NAAQS attainment designations. In that process, EPA must determine whether one area of a state "contributes" to a NAAQS violation in a "nearby area." *Mississippi Comm'n on Env't Quality v. EPA*, 790 F.3d 138, 145, 159 (D.C. Cir. 2015) (quoting 42 U.S.C. § 7407(d)(1)(A)(i)). EPA has called HYSPLIT an "excellent tool" for this. *Id.* at 167. Indeed, EPA defended in court its use of only wind rose analysis in some areas and HYSPLIT in others, including *against* Texas's use of source-apportionment analysis and *against* the argument that HYSPLIT modeling "cannot measure ozone formation or transport." *Id.* at 168–69. As part of that rulemaking, in response to a comment that "HYSPLIT modeling is not capable of reliably tracking ozone or its precursors," EPA responded that this "reflect[ed] a fundamentally incorrect view" and that HYSPLIT

"give[s] a reliable indication of the areas that could be contributing to an exceedance." Responses to Significant Comments on the State and Tribal Designation Recommendations for the 2008 Ozone National Ambient Air Quality Standards (NAAQS) at 60 (Apr. 30, 2012). And for the 2015 ozone NAAQS attainment designations, EPA also relied on HYSPLIT. *See Clean Wisconsin*, 964 F.3d at 1155. Additionally, in pre-SIP submission comments, EPA referred Louisiana specifically to HYSPLIT analyses done by EPA in its CSAPR Update rulemaking and by Texas for the Brazoria-Galveston nonattainment area as "existing analyses that the LDEQ can draw on." CI R06-4 at 26.

Yet EPA also performed HYSPLIT back trajectory analyses *here* and lauded their utility. Before final disapproval, EPA created hundreds of back trajectories from nonattainment and maintenance receptors on days with measured exceedances. This created a "transport climatology" for those receptors. CI HQ-85 at 24. A "transport climatology" provides "a semi-quantitative approach" for identifying transport patterns on days with measured exceedances and "a qualitative method to corroborate upwind-downwind linkages derived from the air quality contribution modeling." *Id.* EPA followed this same approach in the

63

CSAPR rulemaking. *See* CI R06-4 at 26. Although EPA failed to use these effectively here, *see infra*, it cannot question their obvious utility when Louisiana used them for precisely the same purpose.

Beyond EPA's example, Louisiana had good reason to use HYSPLIT as it did. As EPA has implicitly recognized, HYSPLIT is in some ways superior to CAMx. The latter uses "modeled" meteorology for a single year (here, 2016). CI HQ-85 at 6–8. HYSPLIT, however, also uses "actual observed data" to "estimate the most likely route of an air parcel transported to a receptor at a specified time." CI R06-1 at 9,815. Thus, as EPA acknowledges, HYSPLIT can test whether contributions modeled by CAMx are "plausible"—just as it can "corroborate," it can also undermine. Louisiana also performed HYSPLIT analyses for three years of actual data (2016–2018), CI R06-4 at 13, still more recent and comprehensive than in EPA's 2016-based models.

Accordingly, EPA's conclusions cannot be salvaged by its general criticisms of back trajectory and other analysis. None of those reveal "technical flaws." But if EPA seeks to denigrate the tools Louisiana used to test the plausibility of modeled ozone contributions without technical criticism specific to Louisiana's use, that also runs counter to EPA's own

statements in the same action and in other rulemakings to which EPA pointed Louisiana for guidance. That represents a failure to consider relevant factors and a clear error in judgement. But it also is an "[u]nexplained inconsistency" that again renders EPA's conclusion arbitrary and capricious. *Encino Motorcars*, 579 U.S. at 222. So too EPA's failure to consider Louisiana's reliance interest in using a well-recognized tool to perform the same analysis as EPA did even for the same NAAQS. *See id.*

Moreover, EPA's rejection of Louisiana's efforts is also arbitrary and capricious and beyond EPA's authority because it too inverts the CAA. At the time Louisiana submitted its SIP, LDEQ could not perform CAMx modeling on its own. *See Sierra Club v. EPA*, 939 F.3d 649, 661 (5th Cir. 2019). By effectively requiring use of CAMx modeling after Louisiana's SIP was submitted, EPA ensured that it could freely displace Louisiana's analysis in favor of its own. This created another unlawful requirement of demonstration, and one particularly contrary to the statute given the contrast with other CAA provisions requiring specific modeling. And that was joined by yet another when EPA required

Louisiana to affirmatively state that it was *not* making obvious errors in its back trajectory analysis.  In this too EPA transgressed the CAA.

### C.  To the extent EPA attempted to substantively disagree with Louisiana's analysis, it failed by not engaging with central points.

Even if EPA's other errors could be ignored, EPA's minimal substantive analysis of Louisiana's work would not justify the SIP disapproval.  EPA failed to engage with Louisiana's central argument that the air simply did not come from emissions sources in Louisiana on high ozone days, first in the proposed disapproval, and then after creating its "transport climatology."

In the proposed disapproval, EPA asserted that Louisiana's analysis had actually "confirmed that Louisiana is an upwind area for the receptors in Texas often enough to potentially contribute to nonattainment or interfere with maintenance" and that it did not "provide evidence that was contrary to the conclusions of the EPA's photochemical modeling analyses."  CI R06-1 at 9,815.

There are many problems with these minimal statements.  First, nothing about this is a "technical flaw" that could support its final conclusion.  Second, what EPA thought was "confirmed" is meaningless.

EPA does not even cite the right standard.  The statute requires a SIP to prohibit specific "sources" or "emissions activity" that "*will*" either "contribute *significantly* to nonattainment" or "interfere with maintenance."  42 U.S.C. § 7410(a)(2)(D)(i) (emphasis added).  No obligation exists when a State could "potentially contribute" something minimal.  EPA's own threshold ignores *likely* contributions that it deems insignificant.  If Louisiana's analysis could show that whatever likely contributions are de minimis—which EPA's statement does not rule out—then that analysis *would* provide evidence contrary to EPA's photochemical modeling conclusions.  And Louisiana's analysis *does* show that.  So EPA's conclusion does not logically follow.  Third, and relatedly, EPA's bare assertion and conclusion exhibit a "paucity of reasoning" contrary to the requirement that agency actions must be reasonable and reasonably explained.  *See BNSF Ry. Co. v. Fed. R.R. Admin.*, 62 F.4th 905, 910–11 (5th Cir. 2023).

Regarding EPA's "transport climatology," although EPA created it, EPA never discussed what it showed in any detail, even in the description of why EPA ran the back trajectories.  CI HQ-85 at 24.  EPA offered a minimal explanation in response to a comment by Louisiana

Chemical Association. That comment repeated Louisiana's back trajectory analysis, including the percentages that crossed various parts of the state. CI HQ-83 at 362–63. EPA cited its own back trajectory analysis and stated that its "trajectories indicate that the air can travel from east to west such that Louisiana is upwind of the Denton and Houston receptors on days when ozone exceeds the NAAQS. This result confirms the EPA's finding that Louisiana is linked[10] to these receptors in Texas." *Id.* at 364.

That again misses the point of Louisiana's work. Louisiana acknowledged that it is sometimes upwind of Texas when an exceedance occurs. But it concluded that, because most of the trajectories through Louisiana passed through areas with low emissions, Louisiana did not significantly contribute to those exceedances. *See* CI R06-4 at 13–14. Air coming from a state is not enough; under the good neighbor provision, it must come from "sources" or "emissions activity" to require action. Louisiana's central point is a "significant" point and requires a response because, if EPA accepted it, EPA would have to change its disapproval.

---

[10] EPA's focus on linkage demonstrates once again EPA's blinkered approach to its framework. Whether the receptor was "linked" was relevant to EPA's step two, not Louisiana's analysis of significance.

*Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 449 (5th Cir. 2021). A response was required by EPA's general responsibility to have "reasonably considered the relevant issues and reasonably explained the decision." *Id.* (quoting *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021)). Yet EPA has never provided a response. And it has not found some infirmity in Louisiana's reasoning, so there is no basis to defer to EPA's technical expertise. *See Texas 2012*, 690 F.3d at 678. That gap in reasoning renders its disapproval arbitrary and capricious. *See Huawei Techs.*, 2 F.4th at 449.

Disapproving a SIP "surely requires more than the EPA's bare conclusion." *Texas 2012*, 690 F.3d at 678. Because that is all EPA offered, its disapproval of Louisiana's SIP must be set aside.

## CONCLUSION

For the foregoing reasons, the Court should grant the petition, vacate EPA's final action disapproving Louisiana's good neighbor SIP, and remand.

Respectfully Submitted,

**JEFF LANDRY**
  **Attorney General**

/s/ *Joseph S. St. John*
ELIZABETH B. MURRILL (LA 20685)
 *Solicitor General*
JOSEPH S. ST. JOHN (LA 36682)
 *Deputy Solicitor General*
MACHELLE HALL (LA 31498)
 *Assistant Attorney General*
LOUISIANA DEPT. OF JUSTICE
909 Poydras Street, Suite 1850
New Orleans, LA 70112
Tel: (225) 485-2458
murrille@ag.louisiana.gov
stjohnj@ag.louisiana.gov
hallm@ag.louisiana.gov

Courtney J. Burdette (LA 30564)
 *Executive Counsel*
Jill C. Clark, Bar (LA 33050)
 *General Counsel*
LOUISIANA DEPT. OF
 ENVIRONMENTAL QUALITY
Office of the Secretary, Legal Division
P.O. Box 4302
Baton Rouge, Louisiana 70821-4302
Tel: (225) 219-3985
Courtney.Burdette@la.gov
Jill.Clark@la.gov

Jeffrey A. Hall
Marcella Burke
BURKE LAW GROUP
1000 Main Street, Suite 2300
Houston, Texas 77002
jeff@burkegroup.law
marcella@burkegroup.law

70

## CERTIFICATE OF SERVICE

I hereby certify that on May 30, 2023, a true and correct copy of the foregoing has been served on all parties in accordance with the Appellate Rules of Civil Procedure, via the Court's CM/ECF system.

/s/ *Joseph S. St. John*
Joseph S. St. John

## CERTIFICATE OF COMPLIANCE

This document complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,996 words, excluding the parts of the document exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word (the same program used to calculate the word count).

/s/ *Joseph S. St. John*
Joseph S. St. John