Case No. 23-60069

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

---

State of Texas; Texas Commission on Environmental Quality; Luminant Generation Company, L.L.C.; Coleto Creek Power, L.L.C.; Ennis Power Company, L.L.C.; Hays Energy, L.L.C.; Midlothian Energy, L.L.C.; Oak Grove Management Company, L.L.C.; Wise County Power Company, L.L.C.; Association of Electric Companies of Texas; BCCA Appeal Group; Texas Chemical Council; Texas Oil & Gas Association; Public Utility Commission of Texas; Railroad Commission of Texas; State of Mississippi; Mississippi Department of Environmental Quality; Mississippi Power Company; State of Louisiana; Louisiana Department of Environmental Quality; Entergy Louisiana, L.L.C.; Louisiana Chemical Association; Mid-Continent Oil and Gas Association; Louisiana Electric Utility Environmental Group, L.L.C.; Texas Lehigh Cement Company, LP,

*Petitioners*,

v.

United States Environmental Protection Agency; Michael S. Regan, Administrator, United States Environmental Protection Agency,

*Respondents*.

---

Petition for Review
U.S. Environmental Protection Agency
88 Fed. Reg. 9336, 9356 (Feb. 13, 2023)

---

## BRIEF OF LOUISIANA INDUSTRY PETITIONERS

---

(*Counsel listed on inside cover*)

Maureen N. Harbourt
Lauren B. Rucinski
Josiah M. Kollmeyer
KEAN MILLER LLP
400 Convention Street, Suite 700
Baton Rouge, LA 70802
(225) 382-3412
maureen.harbourt@keanmiller.com

*Counsel for Petitioners Louisiana
Chemical Association, Louisiana Mid-
Continent Oil and Gas Association,
and Louisiana Electric Utility
Environmental Group LLC\**

*(\* o/b/o participating members Cleco
Corporate Holdings LLC, Louisiana
Energy & Power Authority, and
Lafayette Public Power Authority)*

Debra J. Jezouit
C. Joshua Lee
BAKER BOTTS LLP
700 K Street N.W.
Washington, DC 20001
(202) 639-7728
debra.jezouit@bakerbotts.com

*Counsel for Petitioner Entergy
Louisiana, LLC*

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

Case No. 23-60069
Petition for Review, U.S. Environmental Protection Agency
88 Fed. Reg. 9336, 9356 (Feb. 13, 2023)

The undersigned counsel of record certifies that the following listed persons

and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an

interest in the outcome of this case. These representations are made so that the

Judges of this Court may evaluate possible disqualification or recusal.

- **Air Alliance Houston** (Attempted Intervenor)

- **Baake, David R.** (Counsel for *Amicus Curiae* New Mexico Environmental Department)

- **Baake Law, LLC** (Counsel for *Amicus Curiae* New Mexico Environment Department)

- **Baker Botts L.L.P.** (Counsel for Petitioner Entergy Louisiana, LLC)

- **Burdette, Courtney** (Counsel for Petitioner, Louisiana Department of Environmental Quality)

- **Clark, Jill Carter** (Counsel for Petitioner, Louisiana Department of Environmental Quality)

- **Diaz, Daria Burgess** (Counsel for Louisiana Public Service Commission, Attempted Intervenor)

- **Downwinders at Risk** (Attempted Intervenor)

- **Entergy Corporation** (Parent company of Entergy Utility Holding Company, LLC, which is the direct holder of the common membership interests of Petitioner Entergy Louisiana, LLC)

- **Entergy Louisiana, LLC** (Petitioner)

Entergy Louisiana, LLC is an indirect subsidiary of Entergy Corporation. Entergy Corporation is the direct and indirect holder of the common membership interests of Entergy Utility Holding Company, LLC, which is the sole holder of the common membership interests of Entergy Louisiana, LLC. The common stock of Energy Corporation is publicly traded and listed on the New York Stock Exchange. Entergy Corporation has no parent company, and no publicly held company has a ten percent or greater ownership interest in Entergy Corporation.

- **Entergy Utility Holding Company, LLC** (Direct holder of the common membership interests of Petitioner Entergy Louisiana, LLC)

- **Garland, Merrick B.**, **Attorney General, United States Department of Justice** (Counsel for Respondents)

- **Hall, Machelle Rae Lee** (Counsel for Petitioners, State of Louisiana and Louisiana Department of Environmental Quality)

- **Harbourt, Maureen** (Counsel for Petitioners, Louisiana Chemical Association, Louisiana Mid-Continent Oil and Gas Association and Louisiana Electric Utility Environmental Group LLC)

- **Izfar, Sarah** (Counsel for Respondent United States Environmental Protection Agency)

- **Jezouit, Debra J.** (Counsel for Petitioner Entergy Louisiana, LLC)

- **Kean Miller LLP** (Counsel for Petitioners Louisiana Chemical Association, Louisiana Mid-Continent Oil and Gas Association, and Louisiana Electric Utility Environmental Group LLC)

- **Kim, Todd,** Assistant Attorney General, Environment and Natural Resources Division, United States Department of Justice (Counsel for Respondents)

- **Kollmeyer, Josiah**. (Counsel for Petitioners, Louisiana Chemical Association, Louisiana Mid-Continent Oil and Gas Association and Louisiana Electric Utility Environmental Group LLC)

- **Landry, Jeff, Attorney General, Louisiana Department of Justice** (Counsel for Petitioners State of Louisiana and Louisiana Department of Environmental Quality)

- **Lee, Jin Hyung** (Counsel for Respondents United States Environmental Protection Agency and Regan, Michael S.)

- **Lee, C. Joshua** (Counsel for Petitioner Entergy Louisiana, LLC)

- **Louisiana Chemical Association** (Petitioner)

The Louisiana Chemical Association is a non-profit corporation.  It does not have a parent company.  It does not have any publicly traded corporation who holds more than 10% of its stock.

- **Louisiana Department of Environmental Quality** (Petitioner)

- **Louisiana Electric Utility Environmental Group LLC, on behalf of its participating members, Cleco Corporate Holdings LLC, Louisiana Energy & Power Authority ("LEPA"), and Lafayette Public Power Authority** (Petitioner)

The Louisiana Electric Utility Environmental Group LLC is a limited liability corporation.  It does not have a parent corporation nor any publicly traded corporation who holds more than 10% of its stock.

- **Louisiana Mid-Continent Oil and Gas Association** (Petitioner)

The Louisiana Mid-Continent Oil and Gas Association is a non-profit corporation.  It does not have a parent company.  It does not have any publicly traded corporation who holds more than 10% of its stock.

- **Louisiana Public Service Commission (**Attempted Intervenor)

- **McPhee, Jr., Shae Gary** (Counsel for Petitioners, State of Louisiana and Louisiana Department of Environmental Quality)

- **Murrill, Elizabeth Baker, Solicitor General, Louisiana Department of Justice** (Counsel for Petitioners, State of Louisiana and Louisiana Department of Environmental Quality)

- **Nance, Earthea** (Regional Administrator for Respondent United States Environmental Protection Agency, Region 6)

- **New Mexico Environment Department** (*Amicus Curiae*)

- **Prieto, Jeffrey M.** (General Counsel for Respondent United States Environmental Protection Agency)

- **Regan, Michael S.,** Administrator, United States Environmental Protection Agency (Respondent)

- **Rucinski, Lauren** (Counsel for Petitioners, Louisiana Chemical Association, Louisiana Mid-Continent Oil and Gas Association and Louisiana Electric Utility Environmental Group LLC)

- **Shelton, Dana M.** (Counsel for Attempted Intervenor Louisiana Public Service Commission)

- **Sierra Club** (Attempted Intervenor)

- **Smith, Joshua** (Counsel for Attempted Intervenors Sierra Club, Air Alliance Houston, and Downwinders at Risk)

- **St. John, Joseph Scott** (Counsel for Petitioners, State of Louisiana and Louisiana Department of Environmental Quality)

- **State of Louisiana** (Petitioner)

- **Stone Pigman Walther Wittmann** (Counsel for Petitioner Louisiana Public Service Commission

- **U. S. Environmental Protection Agency** (Respondent)

Respectfully submitted,

/s/ Maureen N. Harbourt
*Counsel for Petitioners Louisiana*
*Chemical Association, Louisiana*
*Mid-Continent Oil and Gas*
*Association, and Louisiana Electric*
*Utility Environmental Group, LLC\**

*(\* o/b/o participating members Cleco*
*Corporate Holdings LLC, Louisiana*
*Energy & Power Authority, and*
*Lafayette Public Power Authority)*

/s/ Debra J. Jezouit
*Counsel for Petitioner Entergy*
*Louisiana, LLC*

## STATEMENT REGARDING ORAL ARGUMENT

Petitioners Louisiana Chemical Association, Louisiana Mid-Continent Oil and Gas Association, Louisiana Electric Utility Environmental Group (specifically for this lawsuit, consisting of Cleco Corporate Holdings LLC, Louisiana Energy & Power Authority, and Lafayette Public Power Authority), and Entergy Louisiana, LLC (collectively "Louisiana Industry Petitioners") respectfully request 25 minutes for oral argument.

Oral argument will assist full consideration of the complicated legal and factual issues in this matter, involving multiple states and a voluminous administrative record. In addition, oral argument will assist the parties in addressing any questions the Court may have concerning the Louisiana Interstate Transport State Implementation Plan.

# <u>TABLE OF CONTENTS</u>

CERTIFICATE OF INTERESTED PERSONS .......................................... i

STATEMENT REGARDING ORAL ARGUMENT ............................................ vi

TABLE OF CONTENTS................................................................. vii

TABLE OF AUTHORITIES ............................................................. ix

GLOSSARY........................................................................... xii

STATEMENT OF JURISDICTION........................................................1

STATEMENT OF ISSUES ..............................................................1

STATEMENT OF THE CASE............................................................2

   I.   Statutory Requirements ...................................................2

   II.  Factual Background ......................................................5

      A.  The Louisiana Transport SIP ...........................................5

      B.  EPA's Disapproval of the Louisiana Transport SIP ...................9

   III. Procedural History ....................................................13

SUMMARY OF ARGUMENT ............................................................14

STANDARD OF REVIEW ..............................................................17

ARGUMENT ..........................................................................19

   I.   EPA Cannot Substitute Its Judgment in Lieu of the State's Facial Compliance with the Clean Air Act's Good Neighbor Provision. ...............19

   II.  EPA Unlawfully Considered Factors Not Required by the Clean Air Act's Good Neighbor Provision. ...........................................24

   III. The Louisiana Transport SIP Was Rational, Followed EPA Guidance, and Cannot Be Rejected Merely Because EPA Favors Another Approach. ....................................................26

      A.  In Steps 1 and 2, LDEQ Followed a Rational, Acceptable Process to Screen for Potential Impacts on Downwind States. .................28

      B.  LDEQ's Use of Air Quality Factors to Assess "Significant" Contribution at Step 3 Was Rational and in Line with EPA Guidance. ................................................................30

         1.   Ozone Design Value Trends and Ozone Precursor Trends in Louisiana are Declining ...........................................32

2.   It Was Appropriate for LDEQ to Use Back Trajectory
Analysis as Part of its Multi-Factor Analysis ........................................34

C.   LDEQ's Multi-Factor Analysis Demonstrated that Louisiana
Emissions Do Not "Significantly" Contribute to Nonattainment
or Interfere with Maintenance of the 2015 Ozone NAAQS......................36

IV.  EPA Acted Arbitrary and Capriciously in Disapproving the
Louisiana Interstate Transport SIP. ...............................................37

A.   EPA Disapproved the SIP on a Modeling Platform Only
Available Long After Louisiana Submitted its SIP...................................38

B.   EPA Unduly Rejected the Weight of Evidence Adopted by
Louisiana.................................................................................42

1.   EPA Piecemeal Rejected the Evidence ....................................42

2.   EPA Had no Basis to Reject the Back Trajectory Analysis ..................46

CONCLUSION ......................................................................49

CERTIFICATE OF COMPLIANCE.......................................................50

CERTIFICATE OF SERVICE ...........................................................51

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*BCCA Appeal Grp. v. U.S. EPA*,
355 F.3d 817 (5th Cir. 2003) ................................................................18, 19, 38

*Cent. United Life Ins. Co. v. Burwell*,
827 F.3d 70 (D.C. Cir. 2016)........................................................................19

*Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*,
45 F.4th 846 (5th Cir. 2022) ........................................................................18

*EME Homer City Generation, L.P. v. EPA*,
572 U.S. 489 (2014)............................................................................. *passim*

*FCC v. Prometheus Radio Project*,
141 S. Ct. 1150 (2021)..................................................................................18

*Fla. Power & Light Co. v. Costle*,
650 F.2d 579 (5th Cir. 1981) ..........................................................................2

*Luminant Generation Co. v. EPA*,
675 F.3d 917 (5th Cir. 2012) ................................................................*passim*

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)........................................................................................18

*Texas v. EPA*,
690 F.3d 670 (5th Cir. 2012) ....................................................................3, 15

*Texas v. EPA*,
829 F.3d 405 (5th Cir. 2016) ..........................................................4, 17, 19, 23

*Texas v. EPA*,
983 F.3d 826 (5th Cir. 2020) ..................................................................16, 42

*Train v. NRDC*,
421 U.S. 60 (1975)..........................................................................................3

*Union Elec. Co. v. EPA*,
    427 U.S. 246 (1976) ................................................................... 3

*United States v. Mead Corp.*,
    533 U.S. 218 (2001) .................................................................. 24

*Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS*,
    985 F.3d 472 (5th Cir. 2021) ................................................... 40

## STATUTES AND RULES

5 U.S.C. § 706 ....................................................................... 17, 18

42 U.S.C. § 7401 ................................................................ 2, 15, 19

42 U.S.C. § 7407 ........................................................................ 4

42 U.S.C. § 7409 ........................................................................ 3

42 U.S.C. § 7410 ................................................................. *passim*

42 U.S.C. § 7415 ...................................................................... 26

42 U.S.C. § 7426 ...................................................................... 26

42 U.S.C. § 7501 ........................................................................ 4

42 U.S.C. § 7607 ........................................................................ 1

Fed. R. App. P. 17 .................................................................... 5

Fed. R. App. P. 28 ................................................................ 2, 19

5th Cir. R. 28.2.1 ....................................................................... i

5th Cir. R. 30.2(a) .................................................................... 5

## FEDERAL REGISTER

80 Fed. Reg. 65,292 (Oct. 26, 2015) ......................................... 5

81 Fed. Reg. 31,513 (May 19, 2016) ........................................ 31

82 Fed. Reg. 1733 (Jan. 6, 2017) ....................................... 17, 31

82 Fed. Reg. 9155 (Feb. 3, 2017) ...........................................................25

87 Fed. Reg. 9798 (Feb. 22, 2022) ...................................................*passim*

88 Fed. Reg. 9336 (Feb. 13, 2023) ...........................................2, 10, 48

## OTHER ADMINISTRATIVE MATERIALS

Final FIP (Mar. 15, 2023), available on EPA's website ..................................12, 13

Memorandum from Stephen Page, Director, Office of Air Quality
    Planning and Standards, *Supplemental Information on the
    Interstate Transport State Implementation Plan Submissions for
    the 2008 Ozone National Ambient Air Quality Standards Under the
    Clean Air Act Section 110(a)(2)(D)(i)(I)* (Oct. 27, 2017) .................................45

Memorandum from Peter Tsirigotis, Director, Office of Air Quality
    Planning and Standards, *Information on the Interstate Transport
    State Implementation Plan Submissions for the 2015 Ozone
    National Ambient Air Quality Standards Under Clean Air Act
    Section 110(a)(2)(D)(i)(I)* (Mar. 27, 2018) .................................................*passim*

Memorandum from Peter Tsirigotis, Director, Office of Air Quality
    Planning and Standards, *Analysis of Contribution Thresholds for
    use in Clean Air Act Section 110(a)(2)(D)(i)(I) Interstate
    Transport State Implementation Plan Submissions for the 2015
    Ozone National Ambient Air Quality Standards* (Aug. 31, 2018) .................7, 29

## SECONDARY SOURCES

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation
    of Legal Texts* (2012) ...........................................................................20

**GLOSSARY**

| | |
|---|---|
| **APA** | Administrative Procedures Act |
| **CAA or the Act** | Clean Air Act |
| **CAMx v6.40** | Comprehensive Air Quality Model with Extensions version 6.4 |
| **C.I.** | Certified Index of Record |
| **DFW** | Dallas/Fort Worth |
| **DV** | Ozone Design Value |
| **EPA** | U.S. Environmental Protection Agency |
| **FIP** | Federal Implementation Plan |
| **HGB** | Houston/Galveston/Brazoria |
| **HYSPLIT** | Hybrid Single Particle Lagrangian Integrated Trajectory |
| **LDEQ** | Louisiana Department of Environmental Quality |
| **NAAQS** | National Ambient Air Quality Standards |
| **NOx** | Nitrogen Oxides |
| **Ppb** | parts per billion |
| **RTC** | EPA's Response to Comments |
| **SIP** | State Implementation Plan |
| **SMOKE** | Sparse Matrix Operator Kernel Emissions |
| **VOC** | Volatile Organic Compound |

## STATEMENT OF JURISDICTION

This Court has jurisdiction to review the U.S. Environmental Protection Agency's ("EPA") disapproval of Louisiana's State Implementation Plan pursuant to 42 U.S.C. § 7607(b)(1). Louisiana Industry Petitioners timely filed their petitions for review of EPA's action in this Court within 60 days of publication of EPA's action. *See* ECF Nos. 213 (Entergy Louisiana, LLC), 216 (Louisiana Chemical Association, Louisiana Mid-Continent Oil and Gas Association, and Louisiana Electric Utility Environmental Group).

For the reasons stated in the Court's Order dated May 1, 2023, this Court is the correct venue. *See* ECF No. 269-1 at 6–13.

## STATEMENT OF ISSUES

I.     Did EPA act unlawfully in disapproving Louisiana's State Implementation Plan ("SIP") by exceeding its role under the Clean Air Act's SIP approval process?

II.     Did EPA act unlawfully by considering factors not included in the Clean Air Act in its disapproval of Louisiana's SIP?

III.     Did EPA act arbitrarily and capriciously in disapproving Louisiana's SIP by doing any of the following?

- Resting its disapproval almost exclusively on post hoc modeling information;

- Rejecting without explanation an analysis provided by Louisiana after urging the state to use such approach; and

- Rejecting the weight of evidence used by Louisiana, which incorporated a variety of air quality factors, in favor of EPA's approach, which relied exclusively on one set of modeling.

## STATEMENT OF THE CASE

Louisiana Industry Petitioners challenge EPA's disapproval of the State Implementation Plan ("SIP") that Louisiana submitted pursuant to the Clean Air Act ("CAA" or "Act") to address the interstate transport of ozone for the 2015 Ozone National Ambient Air Quality Standards ("NAAQS"). *See* 88 Fed. Reg. 9336, 9356 (Feb. 13, 2023) ("Louisiana SIP Disapproval"). This Court granted the motion to stay the Louisiana SIP Disapproval filed by petitioners the State of Louisiana and the Louisiana Department of Environmental Quality ("LDEQ") (collectively "State of Louisiana Petitioners"). ECF No. 269. On review, Louisiana Industry Petitioners seek to vacate EPA's Louisiana SIP Disapproval.[1]

## I.     Statutory Requirements

"Congress chose a balanced scheme of state-federal interaction to implement the goals of the [Clean Air] Act." *Fla. Power & Light Co. v. Costle*, 650 F.2d 579, 581 (5th Cir. 1981). Within this structure, "air pollution control at its source is the primary responsibility of States and local governments." 42 U.S.C. § 7401(a)(3).

---

[1] Louisiana Industry Petitioners have briefed this Court on the background that Petitioners have considered most relevant to their case. *See* Fed. R. App. P. 28(a)(6) (requiring a "concise statement of the case"). At the same time, should this Court deem other background information insightful in making its decision on the merits, Louisiana Industry Petitioners also join, adopt, and incorporate by reference the Statement of the Case presented by State of Louisiana Petitioners pursuant to Rule 28(i) of the Federal Rules of Appellate Procedure.

Putting this "cooperative federalism" framework into context, EPA first establishes NAAQS for pollutants such as ozone, the air pollutant at issue here. *See* 42 U.S.C. § 7409(a), (b). NAAQS set the acceptable concentrations for a particular air pollutant requisite to protect the "public health and welfare," and EPA must review the NAAQS every five years and revise them as appropriate. *See id.* §§ 7408(a), 7409(b), (d)(1).

Once NAAQS are established or revised by EPA, each state must submit to EPA a new or revised SIP to enforce the NAAQS. *Id.* § 7410(a)(1). But, in doing so, the CAA provides the state "wide discretion in formulating its plan" to achieve the air quality standard set by EPA. *See Union Elec. Co. v. EPA*, 427 U.S. 246, 250 (1976). Only if the SIP does not meet a **statutory requirement** may EPA disapprove the SIP and then "devise and promulgate a specific plan of its own." *Train v. NRDC*, 421 U.S. 60, 79 (1975); *see also Texas v. EPA*, 690 F.3d 670, 676 (5th Cir. 2012) ("Thus, if a SIP or a revised SIP meets the statutory criteria of the CAA, then the EPA must approve it.").

The statutory requirement most at issue here is what is commonly referred to as the CAA's "Good Neighbor" or "Interstate Transport" Provision. In general terms, SIPs must contain "adequate provisions" to prohibit in-state emission activities from hindering another state's ability to comply with the NAAQS due to the interstate transport of air pollution. *See* 42 U.S.C. § 7410(a)(2)(D)(i). Textually

speaking, the CAA requires states to prohibit in-state emissions in amounts that "contribute significantly to nonattainment in, or interfere with maintenance by, any other State with respect to any such national primary or secondary ambient air quality standard." *Id.* Importantly, neither the statute nor any EPA regulation defines the terms "contribute significantly to nonattainment"[2] and "interfere with maintenance."

Once a SIP is found to be complete, EPA "shall act" on the SIP by approving or disapproving it (either in full or in part) within 12 months. *See id.* § 7410(k)(1)–(3). To reiterate, "the Administrator *shall* approve [the SIP] as a whole if it meets all of the applicable requirements of [the CAA]." *Id.* § 7410(k)(3) (emphasis added). "Only if the state has not complied with the requirements of the Clean Air Act does EPA assume the role of primary regulator . . . ." *Texas v. EPA*, 829 F.3d 405, 412 (5th Cir. 2016). In such a case, EPA must develop a Federal Implementation Plan ("FIP") within two years to establish the state's requirements. 42 U.S.C. § 7410(c)(1). A FIP is intended "to fill all or a portion of a gap . . . in a State implementation plan." *Id.* § 7602(y).

---

[2] At best, the CAA only defines the term "nonattainment" as not meeting the NAAQS, with no further clarification on what level of emissions would constitute "contribute significantly" to such nonattainment. *See* 42 U.S.C. §§ 7407(d)(1)(A)(i), 7501(2) (defining "nonattainment area" as "an area which is designated 'nonattainment,'" in which the area "does not meet . . . the [NAAQS] for the pollutant").

## II.    Factual Background

### A.    The Louisiana Transport SIP

On October 1, 2015, EPA revised the NAAQS for ozone.  80 Fed. Reg. 65,292 (Oct. 26, 2015).  This triggered Louisiana's statutory obligation to revise its SIP.  42 U.S.C. § 7410(a)(1).

On November 13, 2019, LDEQ submitted a SIP addressing the State of Louisiana's obligations with respect to the interstate transport of ozone for the 2015 Ozone NAAQS ("Louisiana Transport SIP").  C.I. R6-04.[3]  The Louisiana Transport SIP ultimately concluded that well-controlled Louisiana emissions do not contribute significantly to nonattainment in, or interfere with maintenance by, any other state. The Louisiana Transport SIP reached this conclusion based on three key features.

**First,** the SIP implemented a 3-step framework to assess whether a state would significantly contribute to nonattainment or interfere with maintenance of a

---

[3] In this brief, "C.I." refers to the Certified Index to the Administrative Record that EPA filed on April 13, 2023, pursuant to Rule 17(b)(1)(B) of the Federal Rules of Appellate Procedure.  ECF No. 208.  Documents are identified by the EPA office listed as the custodian of the documents after the first hyphen in the "Document ID" numbers on the certified index (either "HQ" for EPA headquarters or "R" for an EPA regional office, with a number indicating which regional office), as well as the final four digits (minus leading zeros) of "Document ID" number.  For example, the first document listed in the Certified Index would be cited as C.I. HQ-20, and the second document would be cited as C.I. R2-15.  Pursuant to Fifth Circuit Rule 30.2(a), the Louisiana Industry Petitioners will file an appendix containing the portions of the record cited in their, the other parties', and any amici's briefs.  The appendix will be tabbed according to the citation format just described.

NAAQS. These three steps were: (1) "Identify monitors projected to be in nonattainment or have maintenance issues in a future year"; (2) "Identify projected nonattainment and/or maintenance monitors in other states that might be impacted by emissions from Louisiana, tagging them for further review"; and (3) "Determine if emissions from Louisiana contribute significantly to nonattainment or interfere with maintenance at the monitors tagged for review in Step 2." *Id.* at 11.

**Second,** the Louisiana Transport SIP used models, data sets, and methodologies that EPA approved and recommended through a series of Agency guidance documents. EPA had approved states using the Agency's initial modeling and historical data, gathered by EPA from the years 2009 to 2013, so the LDEQ did so. *See* Memorandum from Peter Tsirigotis, Director, Office of Air Quality Planning and Standards, *Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards Under Clean Air Act Section 110(a)(2)(D)(i)(I)* (Mar. 27, 2018) [hereinafter March 2018 Guidance], C.I. HQ-03 at 1–2, 6. And, upon assuring that states could "supplement the information provided in this memorandum," *id.* at 6, EPA later provided ozone data for the years 2014 to 2016, which the LDEQ also incorporated. *See* Louisiana Transport SIP, C.I. R6-04 at 5.

Relatedly, the Louisiana Transport SIP incorporated EPA's use of contribution thresholds to assess whether the state's emissions might affect monitors

in other states (Step 2 of the SIP) in assessing nonattainment or interference with maintenance.  To illustrate, while EPA had generally used 1% of the NAAQS as the screening threshold, the Agency also admitted: "for the 2015 Ozone NAAQS, the amount of upwind collective contribution captured using a 1 ppb [parts per billion] threshold is generally comparable to the amount captured using a threshold equivalent to 1 percent of the NAAQS."  *See* Memorandum from Peter Tsirigotis, Director, Office of Air Quality Planning and Standards, *Analysis of Contribution Thresholds for use in Clean Air Act Section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards* (Aug. 31, 2018) [hereinafter August 2018 Guidance], C.I. HQ-04 at 3–4.  Accordingly, LDEQ applied the above-mentioned "1 ppb" contribution threshold to identify potential upwind states' monitors that might be affected by Louisiana's emissions.

**Third,** the Louisiana Transport SIP incorporated feedback from EPA Region 6.  EPA Region 6 commented on a variety of issues, such as asking LDEQ to "[i]dentify the 2023 nonattainment and maintenance receptors."  C.I. R6-04 at 28.  In each of the comments, LDEQ provided its response and supplemental actions.  For example, answering EPA Region 6's request to "[i]mprove and support alternative techniques to assess the significance of contributions," LDEQ "added back trajectories for 99 exceedances at the receptors for the 2016-2018 ozone

season." *Id.* For context, a back trajectory analysis assists in ruling out areas of a state that are clearly not significantly contributing to a receptor, by showing whether an air parcel traveled over an area of a state where emissions originate. *See* 87 Fed. Reg. 9798, 9815 (Feb. 22, 2022) (discussing how back trajectory analyses "estimate the most likely route of an air parcel transported to a receptor"); *see also* Louisiana Transport SIP, C.I. R6-04 at 13–14 (ruling out the farmland areas from the model due to their "limited population and sources of [ozone] precursor pollutants").

In sum, by the time LDEQ submitted the Louisiana Transport SIP to EPA, the SIP incorporated all the methodology and data available to the state—all of which was provided and recommended by EPA. The Louisiana Transport SIP concluded, based on EPA's guidance, data, and other recommendations, that Louisiana sources were not significantly contributing to nonattainment or interfering with maintenance of a NAAQS at any of the monitors to which Louisiana sources were linked in the second step of Louisiana's analysis.

Specifically, according to the Louisiana Transport SIP, EPA modeling predicted that "Louisiana contributes approximately 1-2 ppb of ozone to the Dallas region and 3-4ppb of ozone to the Houston region." *Id.* at 13. At the same time, upon accounting for EPA's air monitoring data, declining ozone design values in the state (below the 70 ppb NAAQS), significant and continuing reductions of ozone precursors within the state, weather patterns and wind analysis, and the back

trajectory analysis recommended by EPA, Louisiana determined that its contribution was not "significant." *See id.* at 12–14.

### B.     EPA's Disapproval of the Louisiana Transport SIP

On February 22, 2022, well over a year after the Agency was statutorily required to act on the SIP, EPA sought disapproval of the Louisiana Transport SIP in a proposed rulemaking that also addressed the other SIP submittals reviewed and analyzed by EPA Region 6.  87 Fed. Reg. at 9811–16.

In proposing to disapprove the SIPs, EPA relied on a "4-Step interstate transport framework (or 4-Step framework)."  The four steps are: (1) "Identify monitoring sites that are projected to have problems attaining and/or maintaining the NAAQS"; (2) "identify states that impact those air quality problems in other (i.e., downwind) states sufficiently such that the states are considered ''linked'' and therefore warrant further review and analysis"; (3) "identify the emissions reductions necessary (if any), applying a multifactor analysis, to eliminate each linked upwind state's significant contribution to nonattainment or interference with maintenance of the NAAQS at the locations identified in Step 1"; and (4) "adopt permanent and enforceable measures needed to achieve those emissions reductions."  *Id.* at 9799. Notwithstanding the March 2018 Guidance's support for "alternative approaches to addressing [states'] interstate transport obligations," EPA now claimed, in proposing to disapprove the Louisiana Transport SIP, that deviation from this 4-step approach

9

"must be substantially justified and have a well-documented technical basis that is consistent with relevant case law." *Id.* at 9801. In addition, despite identifying no basis in the statute, the Agency explained that it was "apply[ing] a consistent set of *policy judgments* across all states for purposes of evaluating interstate transport obligations and the approvability of interstate transport SIP submittals for the 2015 ozone NAAQS." *Id.* at 9801 (emphasis added); *see also id.* at 9812–13 ("[A]llowing for alternative Step 2 thresholds may be impractical or otherwise inadvisable for a number of additional policy reasons.").

Additionally, EPA changed its modeling from what had been available to the states. The Louisiana Transport SIP relied on modeling data presented in the March 2018 Guidance, based on the October 2017 modeling announced in a Notice of Data Availability. *See id.* at 9800. Yet, for its proposed disapproval of the Louisiana Transport SIP, EPA relied upon "2016v2," a modeling platform that was not released until **over three years after** LDEQ already submitted its SIP. *See id.* at 9800, 9806, 9813. In fact, it was released only a mere month before EPA proposed to disapprove the Louisiana Transport SIP.[4] *See* 88 Fed. Reg. at 9366 (discussing model release date of January 19, 2022). Predictably, as it used a different base year, different

---

[4] Although EPA first released 2016v2 on September 21, 2021, it was still soliciting "stakeholder feedback." States could not have been expected to rely on it until, at the earliest, January 19, 2022, when EPA "released on [the Agency's] website and notified a wide range of stakeholders of the availability of both the modeling results . . . along with many key underlying input files." 88 Fed. Reg. at 9366.

emissions inventory, and other different inputs, the updated 2016v2 modeling platform changed the projected results. With different data and methodologies, EPA identified new nonattainment and maintenance monitors in Texas linked to Louisiana sources and at greater levels than the modeling available to Louisiana had demonstrated. 87 Fed. Reg. at 9812–14 (*compare* Table LA-1, *with* Table LA-2).

Louisiana Industry Petitioners and State of Louisiana Petitioners submitted comments in protest of EPA's analysis of the Louisiana Transport SIP. For example, the comments raised how EPA has a narrow role in the SIP approval process, and how the updated modeling platform used in the proposed disapproval (i.e., 2016v2) was not available at the time LDEQ submitted its SIP. In addition, the comments contested the validity of the 2016v2 model and the model's underlying assumptions, such as the model's failure to account for closed sources, emission reduction projects, or population decreases. C.I. R6-38 (comment by Cleco Corporate Holdings LLC); C.I. R6-29 (comment by Louisiana Electric Utility Environmental Group LLC); C.I. R6-35 (comment by Entergy Louisiana, LLC); C.I. R6-31 (comment by LDEQ); C.I. R6-39 (comment by Louisiana Chemical Association).

Notwithstanding the various concerns raised in the comments, EPA finalized its Louisiana SIP Disapproval on February 13, 2023, along with its disapproval of several more SIPs ("SIP Disapprovals"). EPA finalized the SIP Disapprovals more than two years after its statutory deadline to act. 88 Fed. Reg. at 9356.

11

In its final Louisiana SIP Disapproval, EPA doubled down on its position in several areas.  In finalizing the adoption of the 4-step framework, EPA once again expressed that "deviation from a nationally consistent approach . . . must be substantially justified and have a well-documented technical basis."  *Id.* at 9340.  In fact, the Agency now found the alternative frameworks referenced in EPA's own former guidance "problematic" and "outdated."  *See id.* at 9342, 9373.  And, because the Agency disagreed with Louisiana's alternative approach, EPA ignored the air quality data submitted by LDEQ, including LDEQ's back trajectory analysis despite the fact that EPA Region 6 explicitly had asked for it.  *See id.* at 9356.

As to the change in the model used to disapprove the SIPs, EPA yet again relied on data not available to LDEQ at the time it submitted the Louisiana Transport SIP.  Even worse, EPA now relied on a "2016v3" modeling platform, a further modeling revision.  *Id.*  And although the Louisiana Industry Petitioners raised a variety of concerns over the 2016v2 modeling platform, EPA largely failed to adequately address them.  *Compare* C.I. R6-39 at 10–16 ("EPA's 2016v2 model requires refining"), *with* EPA's Response to Comments ("RTC"), C.I. HQ-83, at 103–07.

Of note, EPA proposed a FIP to address interstate ozone transport for the 2015 Ozone NAAQS less than two months after the proposed Louisiana SIP Disapproval, *see* 87 Fed. Reg. 20,036 (Apr. 6, 2022), and finalized the FIP about a month after

the finalized SIP Disapprovals.[5]   The final FIP imposes emissions reductions on

several industry sectors, such as power plants, manufacturing, and refineries.   As

expressed by the State of Louisiana, the FIP will impose significant costs throughout

the state.   *See* ECF No. 112-1 at 16 (State of Louisiana Petitioners' Motion to Stay).

The requirements of the FIP will go into effect 60 days after its publication in the

*Federal Register.*

## III.   Procedural History

Starting with the State of Texas, numerous entities have filed petitions for

review of the SIP Disapprovals for their corresponding states.   *See, e.g.*, ECF Nos.

1-1 (State of Texas), 52-1 (State of Mississippi), 63-1 (State of Louisiana).

Louisiana Industry Petitioners likewise filed their respective petitions for review.

*See* ECF Nos. 213-1, 216-1.

Several petitioners, including State of Louisiana Petitioners, filed motions to

stay the SIP Disapprovals of their corresponding states pending judicial review.

*E.g.*, ECF Nos. 31-1 (State of Texas Petitioners requesting stay of the Texas SIP

Disapproval), 112-1 (State of Louisiana Petitioners requesting stay of the Louisiana

SIP Disapproval).   EPA moved to transfer the petitions for review filed by Texas

---

[5] The pre-publication version of the final FIP was released on March 15, 2023, available in EPA's website, https://www.epa.gov/system/files/documents/2023-03/FRL%208670-02-OAR_Good%20Neighbor_Final_20230314_Signature_ADMIN%20%281%29.pdf.

petitioners, Louisiana petitioners, and Mississippi petitioners to the D.C. Circuit or to dismiss the petitions for improper venue.  *See* ECF No. 50-1.

On May 1, 2023, this Court denied EPA's motion to transfer or dismiss, and granted the petitioners' motions to stay the Texas and Louisiana SIP Disapprovals pending judicial review.  ECF No. 269-1.  In granting the stay motions, this Court found a likelihood of success on the merits "in two ways":

> They (1) make a strong showing that the EPA acted unlawfully by considering factors listed nowhere in the CAA.  And they (2) are likely to prevail on the claim that the EPA arbitrarily and capriciously based its Final SIP Denial in part on information only available after Texas and Louisiana had submitted their SIPs.

*Id.* at 14.

The Court also found that Texas and Louisiana petitioners will be irreparably harmed without a stay.  The Court reasoned that the SIP Disapproval is "the statutory prerequisite" for a FIP, which will "impose [EPA's] preferred system of emissions controls and reductions on the States," and "many regulated entities have already commenced compliance efforts or will soon be required to do so."  *Id.* at 22.

## SUMMARY OF ARGUMENT

The Clean Air Act reflects a fine-tuned division of power between the states and the federal government.  When Congress intended EPA to wield more power, it made sure the text reflected so.

The Act's Good Neighbor Provision, which requires states to ensure their emissions do not "contribute significantly" or "interfere with maintenance" to prevent downwind states from reaching clean air status, 42 U.S.C. § 7410(a)(2)(D)(i), is one of the many provisions where Congress granted "primary responsibility" to the states. *See id.* § 7401(a)(3). The plain text of the statute, and all applicable case law interpreting it, indicate that so long as the state's plan to implement the Good Neighbor Provision facially complies with the statute, EPA must approve it. *See, e.g.*, *Texas v. EPA*, 690 F.3d 670, 676 (5th Cir. 2012) ("Thus, if a SIP or a revised SIP meets the statutory criteria of the CAA, then the EPA must approve it.").

The Louisiana Transport SIP facially complied with the statute. No statute or regulatory provision defines what "contribute significantly" means, so states hold greater leeway in developing SIPs that comply with this statutory obligation. LDEQ developed a 3-step regulatory framework that even EPA admitted was "similar" to what the Agency recommended to evaluate the significance of Louisiana contributions. 87 Fed. Reg. at 9811.

Moreover, LDEQ faithfully executed its 3-step framework. LDEQ adopted models, data sets, and methodologies that EPA itself had approved, and in certain cases asked for—such as a back trajectory analysis. And while LDEQ's analysis certainly identified modeled "contributions" to another state's ozone pollution, a

more nuanced, holistic analysis established that such contributions were not "significant." As one of many examples, LDEQ's back trajectory analysis filtered out areas that made no logical sense to be affecting another state's air pollution because those areas were rural and did not have emission sources that could affect another state. All these approaches were rational, let alone statutorily acceptable. This should have ended the matter.

But rather than reviewing whether the Louisiana Transport SIP facially met the statutory criteria, *Luminant Generation Co. v. EPA*, 675 F.3d 917, 921 (5th Cir. 2012) (finding EPA's role in reviewing the SIPs as "ministerial"), EPA instead imposed its own judgment. It insisted that its own 4-step framework was the only correct regulatory approach. No part of that 4-step framework was part of the statute or even a regulation concerning the CAA. This action alone violated the law.

Furthermore, EPA's Louisiana SIP Disapproval reflected multiple instances of bait-and-switch. To start, EPA used new data that became available only after states already had submitted their SIPs. EPA also brushed off LDEQ's multi-factor analysis (many factors of which were, at one point, sanctioned by EPA) by mischaracterizing them, claiming that a particular factor "alone" was insufficient despite LDEQ's evaluation of the factors in tandem. And in doing so, EPA effectively insisted on its 1% contribution threshold analysis as the end-all-be-all to define "significant" contribution. *But see Texas v. EPA*, 983 F.3d 826, 839 (5th Cir.

16

2020) ("The text of the [CAA] does not require EPA to adopt a one-percent threshold."); 82 Fed. Reg. 1733, 1740 (Jan. 6, 2017) (admitting in a prior rulemaking that "there may be geographically specific factors to consider in determining whether the 1 percent screening threshold is appropriate."). Finally, EPA post hoc rejected LDEQ's back trajectory analysis, something EPA had asked LDEQ to supplement. Such reversal was backed by little explanation, even when Louisiana commenters asked for one. Any one of these actions warrant vacatur for meeting the definition of "arbitrary and capricious."

## STANDARD OF REVIEW

Under the CAA, courts invalidate EPA's action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; or without observance of procedure required by law . . . ." *Texas v. EPA*, 829 F.3d at 425 (quoting 42 U.S.C. § 7607(d)(9)).

"If EPA's action is not permitted by the statute, [the Court] must overturn the action." *Id.* at 426 (citing 5 U.S.C. § 706(2)). An agency's attempt to "graft" additional requirements, not found in any statute, into its determinations also amounts to an action "in excess of statutory authority." *See Luminant*, 675 F.3d at 930.

EPA's actions are also constrained by the federal Administrative Procedures Act ("APA"). The APA directs courts to "hold unlawful and set aside agency action[s]" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2); *see also Luminant*, 675 F.3d at 925 (discussing how the CAA standard of review "tracks" APA's standard of review).

"The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). While judicial review under that standard is "deferential," *id.*, the Court must still address whether the agency "examined the relevant data and articulate[s] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983) (quotation omitted). This standard is "not toothless"; rather, "it has serious bite." *Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*, 45 F.4th 846, 856 (5th Cir. 2022).

A rule is arbitrary and capricious if the agency relied on "impermissible factors, failed to consider important aspects of the problem, offered an explanation for its decision that is contrary to the record evidence, or is so irrational that it could not be attributed to a difference in opinion or the result of agency expertise." *BCCA Appeal Grp. v. U.S. EPA*, 355 F.3d 817, 824 (5th Cir. 2003).

## **ARGUMENT**

### I.  **EPA Cannot Substitute Its Judgment in Lieu of the State's Facial Compliance with the Clean Air Act's Good Neighbor Provision.**

EPA's role in reviewing the SIPs is "ministerial." *Luminant*, 675 F.3d at 921. The Agency **must** approve a SIP that meets all the CAA requirements. *BCCA*, 355 F.3d at 822 (citing 42 U.S.C. § 7410(k)(3)). After all, "the CAA imposes upon the states the primary responsibility for ensuring that the ambient air meets the NAAQS." *Id.*

EPA's ministerial role over the SIP is a congressional mandate. "The structure of the Clean Air Act indicates a congressional preference that states, not EPA, drive the regulatory process." *Texas v. EPA*, 829 F.3d at 411; *see also* 42 U.S.C. § 7401(a)(3) (congressional finding on the "primary responsibility" of air pollution prevention/control given to states). Congress structured the CAA in this manner because it understood the benefits of cooperative federalism in executing contextualized air quality controls across a diverse nation.[6] "Disagreeing with Congress's expressly codified policy choices isn't a luxury administrative agencies enjoy." *Cent. United Life Ins. Co. v. Burwell*, 827 F.3d 70, 73 (D.C. Cir. 2016).

---

[6] For judicial efficiency and pursuant to Rule 28(i) of the Federal Rules of Appellate Procedure, the Louisiana Industry Petitioners join, adopt, and incorporate by reference the State of Louisiana Petitioners' arguments concerning cooperative federalism's role in the CAA.

The fact that the instant dispute concerns the CAA's Good Neighbor Provision makes no difference to EPA's ministerial role over SIPs.  Whereas EPA asserts that the Good Neighbor Provision elevates the Agency's role, *see* 88 Fed. Reg. at 9367 ("EPA does not, however, agree with . . . the EPA's role in the state-Federal relationship as being 'secondary' . . . such deference would be particularly inappropriate in the context of addressing interstate pollution."),[7] there is no CAA text supporting such a position.  The Good Neighbor Provision does not even reference federal oversight or interaction—let alone an expanded version thereof. 42 U.S.C. § 7410(a)(2)(D)(i).  This contrasts with other parts of the CAA's SIP provisions, which explicitly allow EPA to establish the standards.  *See id.* § 7410(a)(2)(F) (discussing monitoring and reporting requirements for SIPs in which the requirement "may be prescribed by the Administrator").  Given that Congress has explicitly addressed in the SIP process when federal involvement is allowed, by negative inference, federal involvement is impermissible in issues where Congress was wholly silent, such as the Good Neighbor Provision.  *See generally* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 107–11 (2012) ("The expression of one thing implies the exclusion of others").

---

[7] *See also id.* at 9375 ("And the Agency is empowered to interpret those statutory requirements and exercise both technical and policy judgment in acting on SIP submissions.  Indeed, the task for allocating responsibility for interstate pollution particularly necessitates Federal involvement.").

While it is true that the Good Neighbor Provision confers duties on the states to address the effect of their emissions beyond their borders, this does not elevate EPA's role in its review of the state's interstate transport SIP. The fact that a SIP requirement might affect multiple states offers zero textual insights on whether the federal government can play a larger role. Air quality control—by nature—presents cross-border implications, yet Congress crafted a state-by-state approach unless expressly stated otherwise. In turn, the legal standard in evaluating each SIP requirement should stay the same.

EPA cited the Supreme Court's decision in *EME Homer City Generation, L.P. v. EPA*, 572 U.S. 489 (2014), to support its position that "the task of allocating responsibility for interstate pollution particularly necessitates Federal involvement," 88 Fed. Reg. at 9375 ("EPA disagrees that it is obligated to defer to states' choices in the development of good neighbor SIP submissions."). However, *EME Homer* does not absolve EPA's textually bankrupt position. *EME Homer* exclusively governs EPA's **Federal** Implementation Plans, not SIPs. Specifically, that case merely held that once EPA disapproves a SIP, the Agency owes no duty to offer another chance for states to file a SIP. *See* 572 U.S. at 508–09. Relatedly, only after concluding that the FIP was triggered (due to uncontested SIP disapprovals) did the Supreme Court deem permissible the FIP's own approach to the Good Neighbor Provision. *See id.* at 513–20.

Indeed, the case expressly disavowed the question this Court faces, which is whether EPA's SIP disapproval with respect to Louisiana was legitimate. *Id.* at 507 ("State respondents' challenge is not that EPA's disapproval of any particular SIP was erroneous."). Even when the Supreme Court was analyzing whether deference to the FIP was appropriate, it took pains to clarify that such deference was coming into play "only after a State has failed to propose a SIP adequate for compliance with the provision is EPA called upon to act." *Id.* at 514 n.15 ("Though we speak here of 'EPA's task,' the Good Neighbor Provision is initially directed to upwind States.").

To the extent *EME Homer* is relevant at all, it favors petitioners for at least two reasons. First, *EME Homer* confirms the observation above, *supra* page 20, that Congress knows how to draft a statute when it deems federal involvement permissible or necessary. 572 U.S. at 509–10 ("When Congress elected to make EPA's input a prerequisite to state action under the Act, it did so expressly. . . . Had Congress intended similarly . . . [for] the Good Neighbor Provision, Congress, we take it, would have included a similar direction in that section."). In turn, when certain SIP provisions reference EPA's authority to set standards or establish requirements, but the Good Neighbor Provision does not, *compare* 42 U.S.C. § 7410(a)(2)(F), *with id.* § 7410(a)(2)(D), the negative inference canon—as acknowledged by *EME Homer*—informs us that EPA must keep to its ministerial role when it faces interstate transport SIP submissions.

22

Second, *EME Homer* rejects EPA's reading that the 1990 amendments to the CAA (which included the Good Neighbor Provision) somehow displaced the Act's cooperative federalism framework. *See* 88 Fed. Reg. at 9367–68 (EPA claiming that "the *Train-Virginia* line of cases . . . pre-date the CAA amendments of 1990"). *EME Homer* affirmed that the 1990 amendments have no special bearing on interpreting the statute. Rather, the Good Neighbor Provision, added in 1990, is on equal footing as every other SIP requirement—including the ones that preceded the 1990 amendments. "Nothing in the Act differentiates the Good Neighbor Provision from the several other matters a State must address in its SIP." *EME Homer*, 572 U.S. at 509. By extension, the pre-1990 precedents that interpreted SIP requirements continue to apply, and the Good Neighbor Provision is not entitled to special treatment such as generating deference to EPA's preferred policy judgments.[8] *Cf. Texas v. EPA*, 829 F.3d at 411–12 (applying the pre-1990 precedents referenced in EPA's SIP Disapproval to stay EPA's disapproval of a different SIP which also presented interstate implications).

In conclusion, both the CAA's text and numerous cases interpreting it—including one on which EPA heavily relies—bar EPA from imposing its own

---

[8] The fact that EPA issued guidance and data to support the states in their development of interstate transport SIPs also does not elevate EPA's role in its review of the SIPs. It is the states' choice whether to rely on such guidance and data.

judgment in place of what the states have developed to comply with the Good Neighbor Provision.

## II.    EPA Unlawfully Considered Factors Not Required by the Clean Air Act's Good Neighbor Provision.

As discussed above, the CAA does not define the terms "contribute significantly" or "interfere with maintenance." To the extent EPA wishes to seek deference principles in a statutory interpretation dispute, the Agency must have promulgated a regulatory provision that interpreted those terms in the first place. *See United States v. Mead Corp.*, 533 U.S. 218, 226–27 (2001) (discussing how deference to an agency's interpretation of a statute only applies if "Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority."). To put it differently—with no statute or regulation defining the terms "contribute significantly" or "interfere with maintenance," EPA cannot monopolize how to define those terms.

Yet that is exactly what EPA sought by imposing its own methodology to disapprove otherwise legitimate SIPs. "EPA used a 4-step interstate transport framework (or 4-step framework) to evaluate each state's [SIP] addressing the interstate transportation requirements." 88 Fed. Reg. at 9338. Even as EPA gave lip service to alternative approaches such as the multi-factor analysis presented by LDEQ, EPA proclaimed "that deviation from [this 4-step] approach to ozone

transport must be substantially justified and have a well-documented technical basis." *Id.* at 9340. In doing so, EPA ignored LDEQ's analysis of its emission impacts on out-of-state monitors because Louisiana did not comply with the 4-step analysis preferred by EPA. *See id.* at 9356.

No part of this 4-step framework is codified in the CAA, let alone the Good Neighbor Provision. Nor is such framework derived from any regulation that attempts to define the words used in 42 U.S.C. § 7410(a)(2)(D)(i), "contribute significantly to nonattainment in, or interfere with maintenance by, any other State." Surely EPA's 4-step framework is a "permissible" way to effectuate the CAA's Good Neighbor Provision. *See EME Homer*, 572 U.S. at 524 (holding so in the FIP context). But even EPA concedes "the statute's silence on how nonattainment and maintenance should be identified under the good neighbor provision." 82 Fed. Reg. 9155, 9156 (Feb. 3, 2017); *see also* Louisiana Transport SIP, C.I. R6-04 at 21 (including EPA Region 6's letter admitting that EPA's modeling information is only one of many factors and that it "does not address any other aspect of the methodology for determination of significant impacts.").

Under such definitional vacuum, the State of Louisiana need not follow EPA's approach. Nor can EPA's approach be the basis on which EPA evaluates and disapproves a SIP. "Only the states enjoy discretion in implementing the dictates of the CAA." *Luminant*, 675 F.3d at 928 n.8. Thus, the only relevant question in this

lawsuit is whether the Louisiana Transport SIP facially complies with the Good Neighbor Provision—not through a filter EPA imposed.

## III. The Louisiana Transport SIP Was Rational, Followed EPA Guidance, and Cannot Be Rejected Merely Because EPA Favors Another Approach.

The Louisiana Transport SIP addressed all the required statutory elements of the Good Neighbor Provision.  The SIP demonstrated that Louisiana emissions do not: (1) "contribute significantly to nonattainment" of the 2015 Ozone NAAQS for any other state, 42 U.S.C. § 7410(a)(2)(D)(i)(I); (2) "interfere with maintenance" of that NAAQS in any other state, *id.*; (3) "interfere with measures required" to meet an implementation plan for any other state to "prevent significant deterioration of air quality," *id.* § 7410(a)(2)(D)(i)(II); and (4) "interfere with measures required" to meet the implementation plan for any other state "to protect visibility," *id.*  The Louisiana Transport SIP also demonstrated compliance with the applicable requirements of 42 U.S.C. §§ 7426 and 7415 "relating to interstate and international pollution abatement."  *Id.* § 7410(a)(2)(D)(ii).  The Louisiana Transport SIP met the above requirements by implementing a 3-step framework, which incorporated data, modeling, and methodologies all proffered by EPA.

Starting with the 3-step framework, Louisiana Industry Petitioners reiterate the position that SIPs could adopt their own regulatory framework that deviates from EPA's vision, so long as the framework facially complies with the Good Neighbor Provision.  But even if one operates under EPA's 4-step framework, it is difficult to

see how exactly the Louisiana Transport SIP's 3-step framework differs from EPA's.

The table below compares the two frameworks:

| EPA Steps | LDEQ Steps |
|---|---|
| Step 1: Identify monitoring sites that are projected to have problems attaining and/or maintaining the NAAQS (i.e., nonattainment and/or maintenance receptors). | Step 1: Identify monitors projected to be in nonattainment or have maintenance issues in a future year. |
| Step 2: Identify states that impact those air quality problems in other (i.e., downwind) states sufficiently such that the states are considered "linked" and therefore warrant further review and analysis. | Step 2: Identify projected nonattainment and/or maintenance monitors in other states that might be impacted by emissions from Louisiana, tagging them for further review. |
| | Step 3: Determine if emissions from Louisiana contribute significant to nonattainment or interfere with maintenance at the monitors tagged for review in Step 2. |
| Step 3: Identify the emissions reductions necessary (if any), applying a multifactor analysis, to eliminate each linked upwind state's significant contribution to nonattainment or interference with maintenance of the NAAQS at the locations identified in Step 1. | (Steps 3 and 4 of EPA's framework become relevant only if LDEQ had determined that Louisiana's emissions contributed "significantly" or interfered with maintenance per LDEQ's Steps 1 to 3.  With no such determination by Louisiana, no further analysis was required.) |
| Step 4: Adopt the permanent and enforceable measures needed to achieve those emissions reductions. | |

*Compare* Louisiana Transport SIP, C.I. R6-04 at 11, *with* 88 Fed. Reg. at

9338.  Even EPA's proposed SIP Disapproval admitted that the two frameworks are

"similar."  *See* 87 Fed. Reg. at 9811 ("The LDEQ's SIP submission provided an

analysis of Louisiana's air emissions impact to downwind states using a 3-Step alternative framework similar to the EPA's 4-Step framework.").

And in each step of LDEQ's framework, the Louisiana Transport SIP faithfully adopted the inputs that EPA itself had proffered. Thus, collectively, LDEQ's approach was a rational, acceptable means of complying with the Good Neighbor Provision.

**A.    In Steps 1 and 2, LDEQ Followed a Rational, Acceptable Process to Screen for Potential Impacts on Downwind States.**

As the table above demonstrates, LDEQ's Steps 1 and 2 are effectively the same as EPA's first two steps in the Agency's own 4-step framework. Thus, at best, the only genuine point of contention here is whether LDEQ faithfully executed those steps. It did.

At Step 1, LDEQ used the modeling provided by EPA (referenced in the March 2018 Guidance, Appendix C to identify monitors projected to be in nonattainment or problems with maintenance in the selected future year, 2023.

At Step 2, LDEQ used the same EPA-provided modeling analysis to screen which of the monitors selected in Step 1 were modeled to contribute more than 1% of the NAAQS to evaluate those for a determination of whether Louisiana's contribution was projected to be significant or interfere with maintenance.

The modeling used by LDEQ was provided in the March 2018 Guidance and was specifically made available to "assist states' efforts to develop good neighbor

SIPs."  C.I. HQ-03 at 2.  For LDEQ's Step 2 purposes, the Agency's March 2018 Guidance identified three monitors in the Houston/Galveston/Brazoria ("HGB") area, two monitors in the Dallas/Fort Worth ("DFW") area, one monitor in Michigan, and two monitors in Wisconsin as having potential impacts from Louisiana.  These projections were based upon a modeled impact in 2023 using a screening value of 0.7 ppb, which represented 1% of the 2015 Ozone NAAQs.  *Id.* at C-1 to C-7 (Attachment C to the March 2018 Guidance).

In August 2018, EPA issued further guidance to the states concerning the Step 2 evaluation of whether air quality impacts in downwind states are linked to emissions from an upwind state.  As discussed previously, *supra* pages 6–7, although EPA had used 1% of the NAAQS as the screening level for "significant contribution," the August 2018 Guidance contained EPA's evaluation of an appropriate screening threshold among three options: 0.70 ppb (1% of the 2015 Ozone NAAQS), 1 ppb, or 2 ppb as a potentially significant contribution, based on the absolute and relative amount of total upwind "collective contribution" captured by each of these three alternative thresholds.  The guidance concluded: "for the 2015 [O]zone NAAQS, the amount of upwind collective contribution captured using a 1 ppb threshold is generally comparable to the amount captured using a threshold equivalent to 1 percent of the NAAQS."  August 2018 Guidance, C.I. HQ-04 at 4.

Relying on EPA's representation in its own guidance, LDEQ applied the 1 ppb screening limit in performing Step 2 of its analysis. Based on the 1 ppb screening value, the monitors in Michigan and Wisconsin were not flagged for further analysis, since the EPA-modeled contributions from Louisiana sources at those receptors in 2023 were projected to be less than 1 ppb.[9]

And, as further reason to discount the Michigan and Wisconsin receptors, the Louisiana Transport SIP noted: "the use of 1% of the NAAQS threshold for modeled contribution as the sole definition of significant contribution is inappropriate for the 2015 [O]zone NAAQS since the more stringent 0.7 ppb threshold is an order of magnitude smaller than the biases and errors typically documented for regional photochemical modeling." C.I. R6-04 at 12. Thus, it was reasonable for LDEQ to rely on the August 2018 Guidance's approval of the 1 ppb screening threshold to exclude these locations from further analysis.

**B.    LDEQ's Use of Air Quality Factors to Assess "Significant" Contribution at Step 3 Was Rational and in Line with EPA Guidance.**

With the Michigan and Wisconsin monitors excluded, the projected modeled impacts from Louisiana to the DFW monitors were less than 2 ppb, and the impacts

---

[9] Attachment C of the March 2018 Guidance, C.I. HQ-03 at C-1 to C-7, indicated that the 2023 modeled projection for those monitors were as follows: 0.72 ppb for Milwaukee, Wisconsin; 0.84 ppb for Sheboygan, Wisconsin; and 0.70 ppb for Allegan, Michigan.

to the HGB monitors were less than 5 ppb.  Already, both these measurements were small contributions to the 2015 Ozone NAAQS.  And in determining whether such contributions are "significant," EPA repeatedly had acknowledged that a 1% NAAQS contribution *alone* does not determine significant contribution, and that other air quality factors should factor into such determination.  *See, e.g.*, 82 Fed. Reg. at 1740 (EPA's Notice of Data Availability, citing, in part, 81 Fed. Reg. 31,513 (May 19, 2016)) (admitting "there may be geographically specific factors to consider in determining whether the 1 percent screening threshold is appropriate"); March 2018 Guidance, C.I. HQ-03 (permitting threshold flexibility); Louisiana Transport SIP, C.I. R6-04 at 12.

Thus, for Step 3—determining whether there was "significant" contribution—LDEQ focused on assessing air quality factors in addition to the projected modeled contributions that would inform the likelihood of significant contribution or interference with the 2015 Ozone NAAQS compliance at the five DFW and HGB monitors in Texas.  Considering the imprecision inherent in the modeling, LDEQ reasonably considered other air quality factors, including the ozone design value trends within Louisiana, the ozone precursor trends within Louisiana, applicable weather pattern analysis, wind rose information, a model developed by the National Oceanic and Atmospheric Administration, and back trajectory analysis—all of which tended to indicate that Louisiana emissions were not forming ozone within

the state, were declining, and were not a consistent or persistent influence on the DFW or HGB monitors.  At least two of them warrant further attention.

### 1.     Ozone Design Value Trends and Ozone Precursor Trends in Louisiana are Declining

When all factors were considered, the ozone design value information based upon actual monitoring data from the Louisiana Transport SIP confirmed significant **declines** in ozone formation throughout the state from 2002 to 2017 (the last year for which certified data was available at the time of the SIP submittal):



Louisiana Transport SIP, Fig. 2.2.1, C.I. R6-04 at 8.  For context, an "Ozone Design Value" ("DV") is the three-year average of the fourth highest ozone reading in each

of the last three years, and is the value that is used to show compliance with the NAAQS.

EPA data available at the time the Agency acted on the SIP showed that the Louisiana 2018–20 DVs had fallen to even lower levels than those included in the Louisiana Transport SIP, confirming the state's downward ozone trends. *See* 2010-2020 Design Values, C.I. HQ-10, xlxs rows 547–71.

Notably, the areas of Louisiana adjacent to Texas were among the lowest in the state, both at the time of the Louisiana Transport SIP submittal (showing DVs up to 2015-2017) and by 2018-2020, with the Shreveport area having a design value of 60 and Lake Charles having a DV of 64. *Id.* While the fact that there were low ozone values within Louisiana is not alone proof of lack of impact on Texas, such low values are indicative that Louisiana sources are well controlled and not resulting in ozone problems in the parishes along the western border with Texas.

The Louisiana Transport SIP also presented trends in the inventory of anthropogenic ozone precursor emissions to demonstrate that the primary ozone precursors, nitrogen oxides ("NOx") and volatile organic compound ("VOC") emissions decreased by 42% and 61% from 2005 to 2014, respectively, and that point source NOx and VOC emissions decreased an additional 3% between 2014 and 2017. Louisiana Transport SIP, C.I. R6-04 at 9–10 (Section 2.3.1). This information was presented to show that the decline in DVs was associated with the

significant reductions in emissions within Louisiana over the relevant time period. This adds to the weight of evidence illustrating that Louisiana's ozone precursor emissions are adequately controlled to prevent ozone issues within the state, and likely within Texas as well.

### 2.    It Was Appropriate for LDEQ to Use Back Trajectory Analysis as Part of its Multi-Factor Analysis

As explained previously, *supra* pages 7–8, a back trajectory analysis assists in ruling out areas of a state that are clearly not significantly contributing to a receptor, such as rural areas.  Specifically, the Hybrid Single Particle Lagrangian Integrated Trajectory ("HYSPLIT") Model analyzes wind patterns backwards from the affected monitors during high ozone events.  Louisiana Transport SIP, C.I. R6-04 at 3–5.  Indeed, EPA provided feedback to LDEQ to make the analysis more robust: "LDEQ's back trajectory analysis can be strengthened by plotting the back trajectories by one of the techniques above for the high ozone episodes.  To facilitate this analysis, we have attached an Air Quality System report for the highest ozone concentrations at the nonattainment and maintenance monitors in Texas during the base years." *Id.* at 5.

LDEQ took this advice and provided back trajectories for 99 ozone exceedances at the three HGB and two DFW receptors linked to Louisiana that occurred during the 2015–18 ozone seasons.  Louisiana Transport SIP, C.I. R6-04 at 13–14 (Section 3.2).  Specifically, for the days of ozone NAAQS exceedances at

these five monitors during 2016, 2017, and 2018, LDEQ used the HYSPLIT Model to illustrate backward trajectories for the air parcels present at the monitors when the exceedances occurred.  LDEQ also performed additional analysis to evaluate the exceedances that revealed trajectories originating in or crossing Louisiana to include Mixing Depth (in meters) and provide one trajectory for the beginning of each hour of the daily eight-hour ozone exceedance for the exceedance to identify the areas of the state most often impacting Texas monitor exceedances.  Louisiana Transport SIP, C.I., R6-04 at 29–321 (Appendix B).

LDEQ's HYSPLIT back trajectory analysis, using the data provided in the March 2018 Guidance, showed that, on high ozone days in Texas at the receptors identified, only 28% of the trajectories traveled in or through Louisiana.  Of that 28%, only 8% originated in Louisiana.  Moreover, only 35% of that 28% (approximately 10 trajectories in three years) originated in or crossed the industrialized part of the state.  A close review of the back trajectories on a monitor-by-monitor basis is more revealing and shows that on the few days where the monitors in Texas experienced high ozone, the air parcel travelling to that monitor crossed only rural north to north central Louisiana.

A monitor-by-monitor review over the three-year period is illuminating.  The back trajectories indicate that, for several of the monitors, there were years in which there were no air parcels traveling over Louisiana on the high ozone days

35

experienced at the monitor.  Further, some of the high ozone days' events were outside of the May-September ozone season for which the models are designed. And, as provided by LDEQ in its SIP, the days on which an air parcel originated from Arkansas, Missouri, Oklahoma, or the Gulf of Mexico and passed over portions of Louisiana, almost all passed only over the northwest portion of the state. Louisiana Transport SIP, C.I. R6-04 at 29–321 (Appendix B).

### C. LDEQ's Multi-Factor Analysis Demonstrated that Louisiana Emissions Do Not "Significantly" Contribute to Nonattainment or Interfere with Maintenance of the 2015 Ozone NAAQS.

To summarize, LDEQ reasonably relied upon the March 2018 Guidance to identify potential linkages between Louisiana emission sources and potential downwind receptors at Steps 1 and 2 of its analysis.  Such screening resulted in narrowing down potential linkages to two monitors in the DFW Area and three in the HGB area.

In Step 3, LDEQ analyzed several other factors affecting air quality.  The ozone design value trends within Louisiana confirmed that ozone formation in the relevant areas were declining.  The ozone precursor trends also demonstrated that significant reductions in ozone precursors over nearly two decades occurred due to enforceable measures imposed by both LDEQ and EPA.  The wind rose analysis showed that surface level wind direction was not predominantly from Louisiana to Texas and that weather patterns generally do not show wind movement from

Louisiana to Texas during most of the ozone season. Finally, the back trajectory analysis pursuant to the HYSPLIT Model—a model on which EPA itself had provided feedback during LDEQ's draft SIP submission—indicated that wind conditions capable of transporting Louisiana emissions existed only infrequently on the high ozone days at these five monitors, and even then, seldom travelled over industrialized areas of the state.

All these factors, together with the very low modeled projections of ozone contributions (less than 2 ppb for DFW and less than 5 ppb for HGB), supported LDEQ's conclusion that contributions of ozone from Louisiana to these five monitors were insignificant.

## IV.   EPA Acted Arbitrary and Capriciously in Disapproving the Louisiana Interstate Transport SIP.

As discussed in the Standard of Review, *supra* pages 17–18, EPA's actions are constrained by the CAA and the APA, one of the constraints being that an agency action cannot be arbitrary and capricious.

Even accounting for the deferential standard, EPA's complete about-face on data/model selection, and the Agency's insistence on its own 4-step methodology would be considered arbitrary and capricious since the Agency relied on "impermissible factors, failed to consider important aspects of the problem, offered an explanation for its decision that is contrary to the record evidence, or is so

irrational that it could not be attributed to a difference in opinion or the result of agency expertise." *BCCA*, 355 F.3d at 824.

### A.    EPA Disapproved the SIP on a Modeling Platform Only Available Long After Louisiana Submitted its SIP.

EPA proffered the March 2018 Guidance to assist states in preparing their Good Neighbor SIPs.  The guidance was based on the Comprehensive Air Quality Model with Extensions version 6.4 ("CAMx v6.40").  According to EPA:

> EPA used outputs from the 2011 and 2023 model simulations to project base period 2009-2013 average and maximum ozone design values to 2023 at monitoring sites nationwide.  [Footnote 8:]  For the updated modeling, EPA used the construct of the modeling platform (*i.e.*, modeling domain and non-emissions inputs) that [it] used for [modeling previously made public in a 2017 Notice of Data Availability], except that the photolysis rates files were updated to be consistent with CAMx v6.40.

March 2018 Guidance, C.I. HQ-03 at 4.

Soon, the Agency flip-flopped.  In proposing to disapprove the Louisiana Transport SIP, EPA used the 2016v2 platform.   In its final Louisiana SIP Disapproval, EPA used the 2016v3 platform.  This Court has already expressed its concerns:

> [EPA] relied upon various significant changes to its modeling data that it adopted long *after* the statutory deadline.  *See* Final SIP Denial at 9,366 (the "meteorology and boundary conditions used in modeling" became available in November 2020, the "updated emissions inventory files used in the current modeling were publicly released" in September 2021, and the modeling software the EPA used was not public until December 2020).

ECF No. 269-1 at 19–20 (Stay Order).

These changes were no trivial matter; it fundamentally altered LDEQ's Step 1 and 2 analyses. Whereas the Louisiana Transport SIP identified three HGB monitors and two DFW monitors, the final Louisiana SIP Disapproval identified two nonattainment monitors and four maintenance monitors in HGB, and one maintenance monitor in DFW. The following table illustrates the significant variability in the results from the modeling approaches with respect to the Texas monitoring receptors:[10]

| Monitor | March 2018 Guidance | | 2016v2 | | 2016v3 | |
|---|---|---|---|---|---|---|
| | Status | Contribution 2023 in ppb | Status | Contribution 2023 in ppb | Status | Contribution 2023 in ppb |
| Harris Co. Aldine | N | 3.06 | N | 4.31 | N | 4.75 |
| Harris Co. Durant St. | N | 4.72 | A | | A | |
| Harris-E. | A | | M | 4.93 | M | 5.62 |
| Harris Co. Clinton | A | | M | 4.84 | M | 5.44 |
| Harris Co. Park Pl. | A | | M | 5.09 | M | 4.87 |
| Harris Co. Bayland | A | | N | 5.39 | N | 5.49 |
| Brazoria Co. Croix Pkwy. | N | 3.80 | M | 7.03 | M | 5.21 |
| Galveston | A | | A | | N | 9.51 |
| Denton Co. Airport | N | 1.92 | M | 3.22 | M | 2.87 |

---

[10] The labels in the "Status" column mean the following: "A" = attainment; "N" = nonattainment; and "M" = maintenance only. The information was compiled from the following sources: Louisiana Transport SIP, C.I. R6-04 at 13–14 (Section 3.2); March 2018 Guidance, C.I. HQ-03 at C2 (Appendix C); C.I. HQ-12 (2016v1 DVs State Contributions); C.I. HQ-70 (2016v3 DVs State Contributions).

|  | **March 2018 Guidance** | | **2016v2** | | **2016v3** | |
|---|---|---|---|---|---|---|
| Tarrant FAA Alta Vista | N | 1.71 | A | | A | |

EPA's bait-and-switch makes it impossible for a state to prepare an approvable SIP. The five new receptors in the HGB area were not identified as linked receptors in the previous modeling relied upon in the Louisiana Transport SIP. Such a moving target undermines Louisiana's right to develop its own SIP, because the state was never given the opportunity to address any other monitors indicated as being linked to Louisiana in the 2016v2 or 2016v3 modeling, nor the opportunity to evaluate the changed magnitude in contributions.

EPA's rejection of a SIP that was based on the Agency's own formal guidance explicitly intended to "assist states' efforts to develop good neighbor SIPs," March 2018 Guidance, C.I. HQ-03 at 2, constitutes a "clear error of judgment." ECF No. 269-1 at 20 (Stay Order) (citing *Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS*, 985 F.3d 472, 475 (5th Cir. 2021)). At minimum, such "surprise switcheroo," *id.* (quoting *Env't Integrity Project v. EPA*, 425 F.3d 992, 996 (D.C. Cir. 2005) (Sentelle, J.); *Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1810 (2019)), is arbitrary and capricious because it undermines the reliance a state placed on a federal agency's own guidance.

Nor can EPA in good faith defend that it was merely using the most accurate, up-to-date data. EPA did not change the modeling platform in response to requests

by states to do so to assist them with their Good Neighbor SIP submittals or due to comments on the SIPs. Rather, the Agency changed modeling platforms long after the SIP submittals were due, with no prior warning to the states and no finding that the March 2018 Guidance was deficient in any regard. As this Court stated, "it was nevertheless arbitrary and capricious of the EPA to do so without giving due consideration to the reliance the EPA itself had engendered by publishing guidance and data that—in its words— was designed 'to assist [S]tates' efforts to develop [G]ood [N]eighbor SIPs for the 2015 ozone NAAQS.'" ECF No. 269-1 at 20 (Stay Order) (alterations in original) (quoting March 2018 Guidance, C.I. HQ-03 at 1–2).

True, EPA was not required to issue such guidance and modeling to the states; the Agency did so to assist the states' SIP preparations. At the same time, EPA encouraged the states to use the modeling provided with its guidance. Moreover, the modeling sets the foundation for all screenings of potential sources that contribute, and all subsequent evaluations on whether such contributions were significant or interfered with maintenance. "[W]hen the EPA *does* issue such guidance and modeling data—like it did in March 2018—it must take due account of the State's 'serious reliance interests' before 'chang[ing] course.'" *Id.* at 20–21 (citing *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020); *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016)). Thus, as this Court has

already signaled, EPA's failure to even consider the states' reliance interests would be arbitrary and capricious.

**B.     EPA Unduly Rejected the Weight of Evidence Adopted by Louisiana.**

Agency action is lawful only if it rests on a consideration of the relevant factors and must be set aside if it fails to account for those factors or evinces a clear error in judgment. *Anderson Cancer Ctr.*, 985 F.3d at 475 (citing *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989)).  EPA's Louisiana SIP Disapproval was arbitrary and capricious because the Agency considered factors wholly outside of the CAA or its implementing regulations in rejecting the weight of evidence adopted by LDEQ.

The Agency erred in at least two ways.  First, EPA insisted on the 1% screening modeling as the definitive standard—without any statutory basis for doing so—and rejected LDEQ's evidence under a "divide-and-conquer" approach, ignoring the totality of evidence articulated in the SIP.  Second, EPA rejected Louisiana's back trajectory analysis with no understandable explanation.  Either constitutes "clear error of judgment."

**1.     EPA Piecemeal Rejected the Evidence**

To repeat, neither the CAA nor its implementing regulations defines what would constitute a "significant" contribution.  "The text of the [CAA] does not require EPA to adopt a one-percent threshold." *Texas v. EPA*, 983 F.3d at 839.  In

42

turn, under such definitional vacuum on what should be considered "significant," the 1 ppb (or 1%) threshold should be a screening value used as a **starting point** for state analysis, not a presumption that the state has the burden of proof to overcome.

To put it differently—it is well accepted that photochemical air modeling can be used to "screen" for potential significant impact. *See EME Homer*, 572 U.S. at 500 ("At step one, called the 'screening' analysis, the Agency excluded as *de minimis* any upwind State that contributed less than one percent of the . . . NAAQS[] to any downwind State 'receptor . . . .'"). However, such does not require a determination that anything that is not "*de minimis*" is presumed to be "significant." No codified law requires so.

Yet that is effectively what EPA imposed on the states when the Agency relied exclusively (or nearly exclusively) on modeled projections of a 1% contribution as being the determinative factor for showing "significant contribution." While EPA may use that approach to develop a FIP, it would be arbitrary and capricious for EPA to base final decisions of significant contribution only or even primarily on such modeled projections without giving due regard to other air quality factors presented by the states in their SIPs.

This is pragmatically true especially because the models are complex, and thus nuance is required. The photochemical modeling resulting in the projection of part per billion impacts at distant monitors requires a complex development process

involving dozens, if not hundreds, of inputs (some of which are based on actual data and others on estimates or assumptions). As a necessary precursor to modeling, EPA first develops an "inventory" of all pollutant emissions that contribute to or impact ozone formation (VOC, NOx, etc. for the "baseline year") and a projected inventory for the future year by which ozone attainment is required (in this case 2023, the deadline for moderate areas to achieve attainment). Each inventory is comprised of multiple sub-inventories including emission estimates for Electric Generating Units (EGUs), non-EGU point sources, stationary nonpoint sources, on-road mobile sources, nonroad mobile sources (such as locomotives, commercial and recreational marine vessels), wildfires (both planned and unplanned) and biogenic (non-human) sources. Each sub-inventory contains a myriad of assumptions (such as population growth, vehicle miles traveled estimates, paint and solvent usage) with default data used where actual data is not available (for example default stack heights for certain types of point sources). *See* Technical Support Document, Preparation of Emissions Inventories for the 2016v1 North American Emissions Modeling Platform, C.I. HQ-07 at 12–19. The emission inventories are then processed through the most recent version of the Sparse Matrix Operator Kernel Emissions ("SMOKE") Modeling System to produce the gridded, hourly, speciated, model ready emissions for input to the CAMx air quality model that is used for the modeling. *Id.*

Ironically, EPA at one point recognized the value of accounting for factors other than the 1% threshold in evaluating SIPs:

> [S]tates may supplement the information provided in this memorandum with any additional information that they believe is relevant to addressing the good neighbor provision requirements. States may also choose to use information different from that provided in this document or on the EPA's website to identify nonattainment and maintenance receptors relevant to development of their good neighbor SIPs. If this is the case, states should submit that information along with a full explanation and technical analysis for the EPA's evaluation.

Stephen Page, Director, Office of Air Quality Planning and Standards, *Supplemental Information on the Interstate Transport State Implementation Plan Submissions for the 2008 Ozone National Ambient Air Quality Standards Under the Clean Air Act Section 110(a)(2)(D)(i)(I)* (Oct. 27, 2017), C.I. HQ-02 at 9–10.

And, as discussed above, Louisiana used such modeling to screen potential linkages from Louisiana to downwind states and identified three potential linkages for HGB and two for DFW—all with modeled contributions in the low ppb range. Louisiana then submitted additional information relevant to the determination of significant contribution or interference with maintenance consisting of ozone design value trends, ozone precursor reduction trends, weather pattern analysis, wind rose analysis, and back trajectories specific to the five receptors identified from the screening analysis.

EPA's Response to Comments makes plain that all of this nuanced approach that LDEQ had crafted was for naught:

> The EPA disagrees that the overall emissions trends or the lack of nonattainment areas in a state, **alone**, can serve as an adequate basis for determining whether a state contributes significantly to downwind receptors in other states. . . . Neither the state or other commenters supplied information that there were such a degree of additional reductions that EPA had not already characterized in the 2023 modeling that would result in changes to the impacts from Louisiana's emissions, such that the state would not be linked to receptors in Texas. Nor did the state supply a satisfactory Step 3 analysis regarding its continuing emissions.

C.I. HQ-83 at 341–42 (emphasis added). Contrary to EPA's characterization, those were not the only factors submitted, but were included along with discussions of weather patterns, wind rose patterns, and back trajectory analysis. EPA arbitrarily treated such factors in isolation rather than consistent with Louisiana's weight-of-evidence approach.

## 2.     EPA Had no Basis to Reject the Back Trajectory Analysis

EPA's post hoc rejection of the back trajectory analysis is equally puzzling. Although EPA's comments to LDEQ on its draft SIP suggested that LDEQ conduct back trajectory analysis to strengthen its SIP, in the final Louisiana SIP Disapproval, EPA opposed use of the HYSPLIT back trajectory analysis. RTC, C.I. HQ-83 at 363–65. According to EPA, back trajectory analysis is a corollary analysis along with observation-based meteorological wind fields at multiple heights to examine the general plausibility of the photochemical model linkages. But then, in its final Louisiana SIP Disapproval, EPA complained that the use of back trajectories does

46

not quantitatively evaluate the magnitude of the existing photochemical contributions.  And, in its Response to Comments, EPA expressed:

> The EPA does not believe that HYSPLIT analyses are sufficient to determine significant contribution because HYSPLIT trajectory analyses, as run by LDEQ, do not provide any quantitative measure of contribution . . . . Quantitative contributions are necessary to evaluate the magnitude of an upwind state's contribution to downwind receptors with respect to the 1 percent of the NAAQS screening threshold used in Step 2 of the 4-step interstate transport framework.  As noted in the proposal (87 FR 9815) HYSPLIT does not account for air pollution formation from emissions of pre-cursors (NOx and VOC emissions react to form ozone for example), dispersion, transformation, or removal processes as influenced by chemistry, deposition, etc., so the trajectories cannot be used to develop quantitative amounts for how much ozone was formed at the downwind receptor from emissions of pre-cursors in the state of Louisiana.  The commenter failed to provide any rationale or methodologies explaining how trajectory analyses can be used **alone** to determine significant contribution.

*Id.* at 363 (emphasis added).

Again, EPA is viewing the Louisiana Transport SIP submittal on a piecemeal basis.  Louisiana did not use back trajectory analysis alone.  EPA's own Response to Comments suggests that such analysis can be used as part of a multi-factor analysis.  Yet, EPA did not explain why the HYSPLIT analysis submitted by LDEQ cannot be relied upon as part of a multi-factor analysis to show that there are clearly areas of the state that are not contributing to ozone issues in Texas or are doing so only rarely.  Even worse, EPA never responded to the Louisiana State or Industry Petitioners' comments concerning the rural, nonindustrial nature of the areas of the state over which nearly all of the trajectories over Louisiana to one of the five target

47

monitors were linked.  Where the inventories used in the modeling show that most of the emissions originate from the non-contributing areas of the state, this casts doubt on the plausibility of the photochemical modeling linkages in which EPA placed so much stock.

Further, EPA's after-the-fact assertion that this modeling is irrelevant to significant contribution analysis was not raised during preproposal consultation or the comment period for the SIP.  In fact, the HYSPLIT analysis does provide meaningful insight as to whether the potential linkages identified by CAMx modeling are consistent and persistent, thus providing an important lens by which to evaluate the CAMx predictions.  EPA's CAMx modeling only reviewed five to ten ozone days, whereas the LDEQ's HYSPLIT analysis evaluated ninety-nine elevated ozone days over the course of a three-year period.  And, once again EPA is treating the CAMx results of predicted significance as an irrefutable presumption rather than considering the back trajectory data in the context of other air quality factors presented by LDEQ.

## **CONCLUSION**

For the above reasons, EPA's Louisiana SIP Disapproval, 88 Fed. Reg. 9336, 9356 (Feb. 13, 2023), should be vacated.


Dated:        May 30, 2023                    Respectfully submitted,


/s/ Maureen N. Harbourt                    /s/ Debra J. Jezouit
Maureen N. Harbourt                        Debra J. Jezouit
Lauren Rucinski                            C. Joshua Lee
Josiah Kollmeyer                           BAKER BOTTS LLP
KEAN MILLER LLP                            700 K Street N.W.
400 Convention Street, Suite 700           Washington, DC 20001
Baton Rouge, LA 70802                      (202) 639-7728
(225) 382-3412

*Counsel for Petitioners Louisiana*        *Counsel for Petitioner Entergy*
*Chemical Association, Louisiana Mid-*     *Louisiana, LLC*
*Continent Oil and Gas Association,*
*and Louisiana Electric Utility*
*Environmental Group, LLC\**

*(\* o/b/o participating members Cleco*
*Corporate Holdings LLC, Louisiana*
*Energy & Power Authority, and*
*Lafayette Public Power Authority)*

## CERTIFICATE OF COMPLIANCE

The undersigned counsel states that this document complies with the word limit of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Rule 32(f): This document contains **11,502** words, as counted by a word processing system.

The undersigned counsel states that this document complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) of the Federal Rules of Appellate Procedure because: This document has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-font Times New Roman style.

The undersigned counsel also certifies that, pursuant to Paragraph A(6) of this Court's ECF Filing Standards, (1) any required privacy redactions have been made, 5th Cir. R. 25.2.13; (2) the electronic submission is an exact copy of the paper document, *id.* R. 25.2.1; and (3) the document has been scanned for viruses with the most recent version of a commercial virus scanning program and is free of viruses.


Dated:      May 30, 2023                    /s/ Debra J. Jezouit

                                            *Counsel for Petitioner Entergy*
                                            *Louisiana, LLC*

## **CERTIFICATE OF SERVICE**

I hereby certify that all counsel of record who have consented to electronic service are being served a copy of this document via the Court's CM/ECF system on May 30, 2023.

/s/ Debra J. Jezouit

*Counsel for Petitioner Entergy Louisiana, LLC*