No. 23-60069

# In the United States Court of Appeals for the Fifth Circuit

STATE OF TEXAS; TEXAS COMMISSION ON ENVIRONMENTAL QUALITY; LUMINANT GENERATION COMPANY, L.L.C.; COLETO CREEK POWER, L.L.C.; ENNIS POWER COMPANY, L.L.C.; HAYS ENERGY, L.L.C.; MIDLOTHIAN ENERGY, L.L.C.; OAK GROVE MANAGEMENT COMPANY, L.L.C.; WISE COUNTY POWER COMPANY, L.L.C.; ASSOCIATION OF ELECTRIC COMPANIES OF TEXAS; BCCA APPEAL GROUP; TEXAS CHEMICAL COUNCIL; TEXAS OIL & GAS ASSOCIATION; PUBLIC UTILITY COMMISSION OF TEXAS; RAILROAD COMMISSION OF TEXAS; STATE OF MISSISSIPPI; MISSISSIPPI DEPARTMENT OF ENVIRONMENTAL QUALITY; MISSISSIPPI POWER COMPANY; STATE OF LOUISIANA; LOUISIANA DEPARTMENT OF ENVIRONMENTAL QUALITY; ENTERGY LOUISIANA, L.L.C.; LOUISIANA CHEMICAL ASSOCIATION; MID-CONTINENT OIL AND GAS ASSOCIATION; LOUISIANA ELECTRIC UTILITY ENVIRONMENTAL GROUP, L.L.C.; TEXAS LEHIGH CEMENT COMPANY, LP,

*Petitioners,*

*v.*

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; MICHAEL S. REGAN, ADMINISTRATOR, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

*Respondents.*

## MISSISSIPPI PETITIONERS' JOINT OPENING BRIEF

[Counsel listed on inside cover]

**C. Grady Moore III**
BALCH & BINGHAM LLP
1901 6th Ave. N., Ste. 1500
Birmingham, Alabama 35203
(205) 251-8100
gmoore@balch.com

**Bradley A. Ennis**
**Susan Scaggs Stutts**
BALCH & BINGHAM LLP
1310 25th Avenue
Gulfport, MS 39501
(228) 864-9900

**Shawn S. Shurden**
*General Counsel*
MISSISSIPPI POWER COMPANY
2992 West Beach Boulevard
Gulfport, MS 39502
(228) 229-0915

*Counsel for Petitioner Mississippi
Power Company*

**Lynn Fitch**
  *Attorney General of Mississippi*
**Whitney H. Lipscomb**
  *Deputy Attorney General*
**Justin L. Matheny**
  *Deputy Solicitor General*
STATE OF MISSISSIPPI OFFICE OF THE
ATTORNEY GENERAL
P.O. Box 220
Jackson, MS 39205-0220
(601) 359-3680
justin.matheny@ago.ms.gov

**Mithun Mansinghani**
LEHOTSKY KELLER COHN LLP
629 W. Main St.
Oklahoma City, OK 73102
(512) 693-8350
mithun@lkcfirm.com

**Michael B. Schon**
**Drew F. Waldbeser**
**Michael Cotton**
LEHOTSKY KELLER COHN LLP
200 Massachusetts Ave NW
Washington, DC 20001
(512) 693-8350
mike@lkcfirm.com

*Counsel for Petitioners State of Missis-
sippi and Mississippi Department of
Environmental Quality*

## CERTIFICATE OF INTERESTED PERSONS

No. 23-60069

STATE OF TEXAS; TEXAS COMMISSION ON ENVIRONMENTAL QUALITY; LUMINANT GENERATION COMPANY, L.L.C.; COLETO CREEK POWER, L.L.C.; ENNIS POWER COMPANY, L.L.C.; HAYS ENERGY, L.L.C.; MIDLOTHIAN ENERGY, L.L.C.; OAK GROVE MANAGEMENT COMPANY, L.L.C.; WISE COUNTY POWER COMPANY, L.L.C.; ASSOCIATION OF ELECTRIC COMPANIES OF TEXAS; BCCA APPEAL GROUP; TEXAS CHEMICAL COUNCIL; TEXAS OIL & GAS ASSOCIATION; PUBLIC UTILITY COMMISSION OF TEXAS; RAILROAD COMMISSION OF TEXAS; STATE OF MISSISSIPPI; MISSISSIPPI DEPARTMENT OF ENVIRONMENTAL QUALITY; MISSISSIPPI POWER COMPANY; STATE OF LOUISIANA; LOUISIANA DEPARTMENT OF ENVIRONMENTAL QUALITY; ENTERGY LOUISIANA, L.L.C.; LOUISIANA CHEMICAL ASSOCIATION; MID-CONTINENT OIL AND GAS ASSOCIATION; LOUISIANA ELECTRIC UTILITY ENVIRONMENTAL GROUP, L.L.C.; TEXAS LEHIGH CEMENT COMPANY, LP,

*Petitioners,*

*v.*

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; MICHAEL S. REGAN, ADMINISTRATOR, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

*Respondents.*

Under Circuit Rule 28.2.1, Petitioners State of Mississippi and Mississippi Department of Environmental Quality need not furnish a certificate of interested persons because they are governmental parties.

/s/ Justin L. Matheny
Justin L. Matheny

The undersigned counsel of record for Mississippi Power Company certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

- Abrams, Michael R., Assistant Solicitor General, Office of the Attorney General for the State of Texas (Counsel for Petitioners State of Texas, Texas Commission on Environmental Quality, Public Utility Commission of Texas, and Railroad Commission of Texas)

- Association of Electric Companies of Texas (Petitioner)

- Baake, David R. (Counsel for *Amicus Curiae* New Mexico Environmental Department)

- Baake Law, LLC (Counsel for *Amicus Curiae* New Mexico Environment Department)

- Balch & Bingham LLP (Counsel for Petitioners Luminant Generation Company LLC, Coleto Creek Power, LLC, Ennis Power Company, LLC, Hays Energy, LLC, Midlothian Energy, LLC, Oak Grove Management Company LLC, and Wise County Power Company, LLC and Petitioner Mississippi Power Company)

- Baker Botts L.L.P. (Counsel for Petitioners AECT, BCCA Appeal Group, TCC, and TXOGA)

- Barber, Julia B. (Counsel for Petitioners Luminant Generation Company LLC, Coleto Creek Power, LLC, Ennis Power Company, LLC, Hays Energy, LLC, Midlothian Energy, LLC, Oak Grove Management Company LLC, and Wise County Power Company, LLC)

- BCCA Appeal Group (Petitioner)

- Berge, Megan H. (Counsel for Petitioner Texas Lehigh Cement Company, LP)

- Blackman, Daniel (Region 4 Administrator, United States Environmental Protection Agency)

- Brookfield Asset Management Inc. (together with its affiliates and managed entities owns 10% or more of Vistra Corp.'s stock)

- Burdette, Courtney J., Executive Counsel, Louisiana Department of Environmental Quality (Counsel for Petitioner Louisiana Department of Environmental Quality)

- Clark, Jill C., General Counsel, Louisiana Department of Environmental Quality (Counsel for Petitioner Louisiana Department of Environmental Quality)

- Coleto Creek Power, LLC (Petitioner)

- Cole, William F., Assistant Solicitor General, Office of the Attorney General for the State of Texas (Counsel for Petitioners State of Texas, Texas Commission on Environmental Quality, Public Utility Commission of Texas, and Railroad Commission of Texas)

- Cotton, Michael (Counsel for Petitioners State of Mississippi and Mississippi Department of Environmental Quality)

- Davis, Bill, Deputy Solicitor General, Office of the Attorney General for the State of Texas (Counsel for Petitioners State of Texas, Texas Commission on Environmental Quality, Public Utility Commission of Texas, and Railroad Commission of Texas)

- Diaz, Daria Burgess (Counsel for Petitioner Louisiana Public Service Commission)

- Ennis, Bradley A. (Counsel for Mississippi Power Company)

- Ennis Power Company, LLC (Petitioner)

- Entergy Louisiana, L.L.C. (Petitioner)

- Fitch, Lynn, Attorney General, Office of the Attorney General for the State of Mississippi (Counsel for Petitioners State of Mississippi and Mississippi Department of Environmental Quality)

- Garland, Merrick B., Attorney General, United States Department of Justice (Counsel for Respondents)

- Gidiere, P. Stephen III (Counsel for Petitioners Luminant Generation Company LLC, Coleto Creek Power, LLC, Ennis Power Company, LLC, Hays Energy, LLC, Midlothian Energy, LLC, Oak Grove Management Company LLC, and Wise County Power Company, LLC)

- Hall, Machelle, Assistant Attorney General, Louisiana Department of Justice (Counsel for Petitioners State of Louisiana and Louisiana Department of Environmental Quality)

- Harbourt, Maureen N. (Counsel for Petitioners Louisiana Chemical Association, Louisiana Mid-Continent Oil and Gas Association, and Louisiana Electric Utility Environmental Group LLC)

- Hays Energy, LLC (Petitioner)

- Izfar, Sarah (Trial Attorney, United States Department of Justice, Environment & Natural Resources Division, Environmental Defense Section (Counsel for Respondents)

- Jezouit, Debra J. (Counsel for Petitioner Entergy Louisiana, L.L.C.)

- Kelly, Daniel J. (Counsel for Petitioners Luminant Generation Company LLC, Coleto Creek Power, LLC, Ennis Power Company, LLC, Hays Energy, LLC, Midlothian Energy, LLC, Oak Grove Management Company LLC, and Wise County Power Company, LLC and Senior Vice President and Deputy General Counsel for Vistra Corp.)

- Kim, Todd, Assistant Attorney General, Environment and Natural Resources Division, United States Department of Justice (Counsel for Respondents)

iv

- Kean Miller LLP (Counsel for Petitioners Louisiana Chemical Association, Louisiana Mid-Continent Oil and Gas Association, and Louisiana Electric Utility Environmental Group LLC)

- Kollmeyer, Josiah, M. (Counsel for Petitioners Louisiana Chemical Association, Louisiana Mid-Continent Oil and Gas Association, and Louisiana Electric Utility Environmental Group LLC)

- Kuryla, Matthew L. (Counsel for Petitioners AECT, BCCA Appeal Group, TCC, and TXOGA)

- Landry, Jeff, Attorney General, Louisiana Department of Justice (Counsel for Petitioners State of Louisiana and Louisiana Department of Environmental Quality)

- Lee, Jin Hyung, Trial Attorney, United States Department of Justice, Environment & Natural Resources Division, Environmental Defense Section (Counsel for Respondents)

- Lee, Joshua (Counsel for Petitioner Entergy Louisiana, L.L.C.)

- Lehotsky Keller Cohn LLP (Counsel for Petitioners State of Mississippi and Mississippi Department of Environmental Quality)

- Lipscomb, Whitney H., Deputy Attorney General, Office of the Attorney General for the State of Mississippi (Counsel for Petitioners State of Mississippi and Mississippi Department of Environmental Quality)

- Little, Mark (Counsel for Petitioner Texas Lehigh Cement Company, LP)

- Louisiana Chemical Association (Petitioner)

- Louisiana Department of Environmental Quality (Petitioner)

- Louisiana Department of Justice (Counsel for Petitioners State of Louisiana and Louisiana Department of Environmental Quality)

- Louisiana Electric Utility Environmental Group, L.L.C. (Petitioner)

- Louisiana Mid-Continent Oil and Gas Association (Petitioner)

- Luminant Generation Company LLC (Petitioner)

- Mansinghani, Mithun (Counsel for Petitioners State of Mississippi and Mississippi Department of Environmental Quality)

- Matheny, Justin L., Deputy Solicitor General, Office of the Attorney General for the State of Mississippi (Counsel for Petitioners State of Mississippi and Mississippi Department of Environmental Quality)

- Mazzara, Joseph N., Assistant Solicitor General, Office of the Attorney General for the State of Texas (Counsel for Petitioners State of Texas, Texas Commission on Environmental Quality, Public Utility Commission of Texas, and Railroad Commission of Texas)

- McPhee, Shae, Deputy Solicitor General, Louisiana Department of Justice, Office of the Attorney General (Counsel for Petitioners State of Louisiana and Louisiana Department of Environmental Quality)

- Midlothian Energy, LLC (Petitioner)

- Mississippi Department of Environmental Quality (Petitioner)

- Mississippi Power Company (Petitioner)

- Mitchell, David W. (Counsel for Petitioners Luminant Generation Company LLC, Coleto Creek Power, LLC, Ennis Power Company, LLC, Hays Energy, LLC, Midlothian Energy, LLC, Oak Grove Management Company LLC, and Wise County Power Company, LLC and Senior Counsel, Environmental for Vistra Corp.)

- Moore, C. Grady III (Counsel for Mississippi Power Company)

- Moore, Stephanie Zapata (Counsel for Petitioners Luminant Generation Company LLC, Coleto Creek Power, LLC, Ennis Power Company, LLC, Hays Energy, LLC, Midlothian Energy, LLC, Oak Grove

Management Company LLC, and Wise County Power Company, LLC and Executive Vice President and General Counsel for Vistra Corp.)

- Murrill, Elizabeth B., Solicitor General, Louisiana Department of Justice (Counsel for Petitioners State of Louisiana and Louisiana Department of Environmental Quality)

- Nance, Earthea (Regional Administrator for Respondent United States Environmental Protection Agency)

- New Mexico Environment Department (*Amicus Curiae*)

- Oak Grove Management Company LLC (Petitioner)

- Office of the Attorney General for the State of Louisiana (Counsel for Petitioners State of Louisiana and Louisiana Department of Environmental Quality)

- Office of the Attorney General for the State of Mississippi (Counsel for Petitioners State of Mississippi and Mississippi Department of Environmental Quality)

- Office of the Attorney General for the State of Texas (Counsel for Petitioners State of Texas, Texas Commission on Environmental Quality, Public Utility Commission of Texas, and Railroad Commission of Texas)

- Paxton, Ken, Attorney General of Texas (Counsel for Petitioners State of Texas, Texas Commission on Environmental Quality, Public Utility Commission of Texas, and Railroad Commission of Texas)

- Prieto, Jeffrey M. (General Counsel for Respondent United States Environmental Protection Agency)

- Public Utility Commission of Texas (Petitioner)

- Railroad Commission of Texas (Petitioner)

- Regan, Michael S., Administrator, United States Environmental Protection Agency (Respondent)

- Rucinski, Lauren (Counsel for Petitioners Louisiana Chemical Association, Louisiana Mid-Continent Oil and Gas Association, and Louisiana Electric Utility Environmental Group, LLC)

- Schon, Michael B. (Counsel for Petitioners State of Mississippi and Mississippi Department of Environmental Quality)

- Shelton, Dana M. (Counsel for Petitioner Louisiana Public Service Commission)

- Shurden, Shawn (Counsel for Petitioner Mississippi Power Company)

- Southern Company (Parent Company of Petitioner Mississippi Power Company)

- State of Louisiana (Petitioner)

- State of Mississippi (Petitioner)

- State of Texas (Petitioner)

- St. John, Joseph S., Deputy Solicitor General, Louisiana Department of Justice, Office of the Attorney General (Counsel for Petitioners State of Louisiana and Louisiana Department of Environmental Quality)

- Stone, Judd, Solicitor General, Office of the Attorney General for the State of Texas (Counsel for Petitioners State of Texas, Texas Commission on Environmental Quality, Public Utility Commission of Texas, and Railroad Commission of Texas)

- Stone Pigman Walther Wittmann (Counsel for Petitioner Louisiana Public Service Commission)

- Streett, Aaron M. (Counsel for Petitioners AECT, BCCA Appeal Group, TCC, and TXOGA)

- Stutts, Susan Scaggs (Counsel for Mississippi Power Company)

- Texas Chemical Council (Petitioner)

- Texas Commission on Environmental Quality (Petitioner)

- Texas Lehigh Cement Company, LP (Petitioner)

- Texas Oil & Gas Association (Petitioner)

- The Vanguard Group, Inc. (together with its affiliates and managed entities owns 10% or more of Vistra Corp.'s stock)

- United States Environmental Protection Agency (Respondent)

- Vistra Asset Company LLC (Parent company of Petitioners Luminant Generation Company LLC, Coleto Creek Power, LLC, Ennis Power Company, LLC, Hays Energy, LLC, Midlothian Energy, LLC, Oak Grove Management Company LLC, and Wise County Power Company, LLC)

- Vistra Corp. (Parent company of Petitioners Luminant Generation Company LLC, Coleto Creek Power, LLC, Ennis Power Company, LLC, Hays Energy, LLC, Midlothian Energy, LLC, Oak Grove Management Company LLC, and Wise County Power Company, LLC)

- Vistra Intermediate Company LLC (Parent company of Petitioners Luminant Generation Company LLC, Coleto Creek Power, LLC, Ennis Power Company, LLC, Hays Energy, LLC, Midlothian Energy, LLC, Oak Grove Management Company LLC, and Wise County Power Company, LLC)

- Vistra Operations Company LLC (Parent company of Petitioners Luminant Generation Company LLC, Coleto Creek Power, LLC, Ennis Power Company, LLC, Hays Energy, LLC, Midlothian Energy, LLC,

Oak Grove Management Company LLC, and Wise County Power Company, LLC)

- Waldbeser, Drew F. (Counsel for Petitioners State of Mississippi and Mississippi Department of Environmental Quality)

- Webster, Brent, First Assistant Attorney General, Office of the Attorney General for the State of Texas (Counsel for Petitioners State of Texas, Texas Commission on Environmental Quality, Public Utility Commission of Texas, and Railroad Commission of Texas)

- Wise County Power Company, LLC (Petitioner)

Respectfully submitted,

/s/ C. Grady Moore III
*Counsel for Petitioner Mississippi Power Company*

## STATEMENT REGARDING ORAL ARGUMENT

Petitioners respectfully request oral argument. This case presents weighty issues regarding the scope of EPA's authority under the Clean Air Act to second-guess Mississippi's state implementation plan based on non-statutory policy rationales. The Act, by contrast, unambiguously confers power on States to use their discretion in creating state implementation plans and gives EPA only a ministerial role in evaluating those plans for compliance with the minimum requirements of the Act.

This matter thus implicates important questions of federalism and statutory interpretation. And this case also carries significant practical consequences for the State of Mississippi, its citizens, and businesses, especially power generators and their ability to supply reliable and affordable electricity. In light of the importance of the issues involved, Petitioners believe that oral argument is warranted and would aid the Court's decisional process.

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTERESTED PERSONS ...................................................... i

STATEMENT REGARDING ORAL ARGUMENT .......................................... xi

TABLE OF AUTHORITIES ..................................................................... xiv

INTRODUCTION ..................................................................................... 1

STATEMENT OF JURISDICTION ............................................................... 2

ISSUES PRESENTED ............................................................................... 3

STATEMENT OF THE CASE ..................................................................... 4

    I.   Statutory Framework ............................................................. 4

    II.  Procedural History ................................................................ 7

         A.  EPA promulgates the 2015 Ozone NAAQS and issues
            guidance for state implementation plans ................................ 7

         B.  Mississippi submits a state implementation plan. ................. 10

         C.  EPA disapproves Mississippi's state plan years after the
            deadline, based on new modeling and policy
            preferences. ..................................................................... 12

SUMMARY OF THE ARGUMENT .......................................................... 16

STANDARD OF REVIEW ....................................................................... 20

ARGUMENT ....................................................................................... 21

    I.   EPA violated the Act by disapproving Mississippi's state
       plan based on EPA's own policy preferences. ........................ 21

    II.  EPA unlawfully disapproved Mississippi's plan based on
       non-statutory considerations. ............................................... 24

         A.  EPA unlawfully disapproved Mississippi's use of a 1
            ppb contribution threshold based on EPA's own
            preference for a different, nationally-uniform threshold. ......... 25

    B.   EPA improperly rejected Mississippi's technical analysis based on non-statutory factors. ...................................36

    C.   EPA's rejection of Mississippi's policy judgments was arbitrary and capricious ...................................40

III.  EPA unlawfully based its disapproval on new modeling issued after Mississippi submitted its plan. ...................................43

    A.   EPA's use of modeling unavailable to the State when it crafted its plan as a basis for disapproving that plan violated the Act. ...................................43

    B.   EPA's use of new modeling was arbitrary and capricious. ...................................49

    C.   Even under the new modeling, Mississippi's state plan should have been approved. ...................................51

CONCLUSION ...................................54

CERTIFICATE OF SERVICE ...................................56

CERTIFICATE OF COMPLIANCE ...................................56

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Alaska Dep't of Env't Conservation v. EPA,*
540 U.S. 461 (2004).................................................21, 23, 31, 39

*Appalachian Power Co. v. EPA,*
249 F.3d 1032 (D.C. Cir. 2001)...........................................48

*Azar v. Allina Health Servs.,*
139 S. Ct. 1804 (2019)...........................................................29

*BCCA Appeal Group v. EPA,*
355 F.3d 817 (5th Cir. 2003)..............................................46

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,*
467 U.S. 837 (1984)...............................................................23

*Christopher v. SmithKline Beecham Corp.,*
567 U.S. 142 (2012)...............................................................40

*Dep't of Com. v. New York,*
139 S. Ct. 2551 (2019).............................................49, 50, 51

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,*
140 S. Ct. 1891 (2020)...........................................................40

*Encino Motorcars, LLC v. Navarro,*
579 U.S. 211 (2016).........................................................40, 49

*Env't Def. Fund, Inc. v. EPA,*
82 F.3d 451 (D.C. Cir. 1996)...............................................29

*EPA v. EME Homer City Generation, L.P.,*
572 U.S. 489 (2014).........................................................*passim*

xiv

*Fla. Power & Light Co. v. Costle*,
    650 F.2d 579 (5th Cir. 1981) .............................................................6

*Hibbs v. Winn*,
    542 U.S. 88 (2004) .........................................................................30

*Loper Bright Enterprises v. Raimondo*,
    No. 22-451, 2023 WL 3158352 (May 1, 2023) ................................23

*Luminant Generation Co., L.L.C. v. EPA*,
    675 F.3d 917 (5th Cir. 2012) .........................................16, 22, 24, 47

*Maryland v. EPA*,
    958 F.3d 1185 (D.C. Cir. 2020) ......................................................42

*Mexican Gulf Fishing Co. v. United States Dep't of Com.*,
    60 F.4th 956 (5th Cir. 2023) ...........................................................53

*Michigan v. EPA*,
    213 F.3d 663 (D.C. Cir. 2000) ...........................................35, 38, 47

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto.
Ins. Co.*,
    463 U.S. 29 (1983) .........................................................................21

*New York v. EPA*,
    964 F.3d 1214 (D.C. Cir. 2020) ...............................................*passim*

*North Carolina v. EPA*,
    531 F.3d 896 (D.C. Cir. 2008) ......................................................5, 27

*Sierra Club v. Costle*,
    657 F.2d 298 (D.C. Cir. 1981) ........................................................38

*Sierra Club v. EPA*,
    356 F.3d 296 (D.C. Cir. 2004) ........................................................45

*State of Conn. v. EPA*,
  656 F.2d 902 (2d Cir. 1981) ...............................................................33

*Texas v. EPA*,
  23-6006, Slip Op. (5th Cir. May 1, 2023) ................................*passim*

*Texas v. EPA*,
  690 F.3d 670 (5th Cir. 2012) ..............................................7, 16, 33

*Texas v. EPA*,
  829 F.3d 405 (5th Cir. 2016) .....................................................*passim*

*Texas v. EPA*,
  983 F.3d 826 (5th Cir. 2020) .................................................25, 31

*Train v. Nat. Res. Def. Council, Inc.*,
  421 U.S. 60 (1975) ...................................................................*passim*

*Union Elec. Co. v. EPA*,
  427 U.S. 246 (1976) .................................................................*passim*

*Wisconsin v. EPA*,
  938 F.3d 303 (D.C. Cir. 2019) ...................................................5

## Statutes

5 U.S.C. § 706 ............................................................................22

42 U.S.C. § 7401 ................................................................1, 6, 21

42 U.S.C. § 7407 ................................................................1, 4, 21

42 U.S.C. § 7408 .......................................................................4

42 U.S.C. § 7409 .......................................................................4

42 U.S.C. § 7410 ................................................................*passim*

42 U.S.C. § 7416 .....................................................................33

42 U.S.C. § 7426 ................................................................................6, 48

42 U.S.C. § 7475 ..........................................................................11, 28, 29

42 U.S.C. § 7601 ...............................................................................33, 34

42 U.S.C. § 7607 ................................................................................2, 20

**Regulatory Authorities**

40 C.F.R. § 52.34 ....................................................................................48

40 C.F.R. Pt. 50, App'x U ......................................................................42

40 C.F.R. Pt. 53, Subpt. B, Tbl. B-1 ......................................................41

81 Fed. Reg. 59,876 (Aug. 31, 2016) .....................................................49

87 Fed. Reg. 20,036 (April 6, 2022) .......................................................15

*Air Plan Disapproval; AL, MS, TN; Interstate Transport
    Requirements for the 2015 8-Hour Ozone National Ambient Air
    Quality Standards*, 87 Fed. Reg. 9,545 (Feb. 22, 2022)...........................*passim*

*Air Plan Disapprovals; Interstate Transport of Air Pollution for the
    2015 8-Hour Ozone National Ambient Air Quality Standards*, 88
    Fed. Reg. 9,336, 9,357 (Feb. 13, 2023).......................................................*passim*

*Air Quality Modeling TSD for the Proposed Revised Cross-State Air
    Pollution Rule Update*, EPA-HQ-OAR-2020-0272-0064 (Oct.
    15, 2020) .........................................................................................................44

*Approval and Promulgation of Air Quality Implementation Plans;
    District of Columbia, Maryland, Virginia*, 68 Fed. Reg. 19,106
    (Apr. 17, 2003) ..............................................................................................46

*Determination of Attainment of the 1-Hour Ozone Standard*, 69 Fed.
    Reg. 21,717 (Apr. 22, 2004) .........................................................................45

EPA, *Air Quality Modeling Technical Support Document for the 2015 Ozone NAAQS Preliminary Interstate Transport Assessment* (Dec. 2016) ........................................................8

EPA, *Application of Significant Impact Levels in the Air Quality Demonstration for Prevention of Significant Deterioration Permitting* (April 17, 2018)................................................29

EPA, *Overview of EPA's Updates to the Air Quality Standards for Ground-Level Ozone* (Oct. 1, 2015)...................................53

*Finding of Significant Contribution and Rulemaking for Certain States*, 63 Fed. Reg. 57,356 (October 27, 1998) .............................27

*In re: Prairie State Generating Co.*, 13 E.A.D. 1 (EAB 2006) ...................................................28

*NAAQS for Ozone*, 80 Fed. Reg. 65,292 (Oct. 26, 2015)......................................7

## Other Authorities

Peter Tsirigotis, *Guidance on Significant Impact Levels for Ozone and Fine Particles in the Prevention of Significant Deterioration Permitting Program* (April 17, 2018) ....................................................11, 28, 29

*Texas v. EPA*, No. 23-60069, Motion to Transfer Venue (Mar. 15, 2023) ..........................32

## Introduction

The Clean Air Act's "Good Neighbor Provision" delegates to Mississippi the responsibility of developing a state implementation plan that ensures emissions from Mississippi do not significantly contribute to another state's inability to attain air quality standards for ozone. 42 U.S.C. § 7410(a)(2)(D)(i)(I). "Each State is given wide discretion in formulating its plan." *Union Elec. Co. v. EPA*, 427 U.S. 246, 250 (1976). EPA "shall approve" a state plan—within eighteen months—if it is consistent with the Act's statutory requirements. 42 U.S.C. § 7410(k)(1)-(3).

Mississippi prepared a state plan to address its Good Neighbor obligations. In so doing, it relied heavily on guidance and modeling that EPA had prepared to assist States with that analysis. Mississippi's plan complied with the Good Neighbor Provision because the miniscule and declining emissions projected to travel from Mississippi to other States will not contribute significantly to ozone pollution issues.

Yet almost *two years* after its deadline to act on Mississippi's plan, EPA disapproved it. EPA disapproved the plan because it disagreed with the State's regulatory judgments, not because those judgments were unreasonable or in violation of the statute. Contrary to the Act's vesting of "primary responsibility" in the States for implementing air quality standards, 42 U.S.C. §§ 7401(a)(3), 7407(a), EPA faulted Mississippi for deviating from the Agency's—not Congress's—conception of proper "national ozone policy." Even worse, EPA relied on modeling it performed *after* Mississippi

submitted its plan and *after* EPA was statutorily required to act. Now, EPA seeks to impose an onerous federal plan—its desire to do so perhaps being the only explanation for its unlawful delay, bait-and-switch tactics, abandonment of prior guidance, and repudiation of the Act's cooperative federalism.

In accordance with the Act, Mississippi reasonably determined its emissions do not "contribute significantly" to ozone pollution in other States that will exceed national air quality standards. No downwind State disputes that conclusion. But by applying extra-statutory factors, and ignoring the ministerial nature of its role, EPA rejected Mississippi's analysis and claimed federal authority to further regulate emissions in Mississippi. That action was unlawful and must be vacated.

## Statement of Jurisdiction

EPA issued its final disapproval of Mississippi's state implementation plan on February 13, 2023, *Air Plan Disapprovals; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards*, 88 Fed. Reg. 9,336, 9,357 (Feb. 13, 2023), asserting authority under 42 U.S.C. § 7410(k)(3). This Court has jurisdiction to review EPA's final action under 42 U.S.C. § 7607(b)(1), which specifies that parties must file petitions for review in the appropriate court of appeals within 60 days. Mississippi Petitioners timely filed their petitions for review in this Court on March 16, 2023 (Doc. 52-1), and on March 17, 2023 (Doc. 58-1), less than 60 days after the Final Rule's publication in the Federal Register. *See* § 7607(b)(1).

2

Additionally, on May 1, 2023, this Court held that it is the proper venue for this challenge. Doc. 269.

## ISSUES PRESENTED

1.  Did EPA unlawfully deny Mississippi's state plan based on misapprehension of its role in reviewing state plans and by applying non-statutory considerations—including by rejecting Mississippi's policy judgment to use a 1 ppb threshold for screening "contributions" to other states' ozone levels and by rejecting Mississippi's detailed analysis of downwind ozone air projections for 2023?

2.  Did EPA unlawfully reject Mississippi's state plan because it based its decision on new modeling and information EPA developed after the plan's submission and the deadline for EPA action?

3.  Did EPA act arbitrarily and capriciously by failing to provide sufficient record-based rationales for disapproving Mississippi's plan, ignoring Mississippi's reliance interests, and deploying pretextual justifications for its action?

## STATEMENT OF THE CASE

### I. Statutory Framework

"The Clean Air Act is 'an experiment in cooperative federalism.'" *Texas v. EPA*, 829 F.3d 405, 411 (5th Cir. 2016) ("*Texas 2016*") (citation omitted). Congress divided responsibility and authority for assuring air quality between EPA and the States. EPA, for example, has responsibility for establishing National Ambient Air Quality Standards ("NAAQS") for pollutants, including ozone. 42 U.S.C. §§ 7408, 7409. After EPA establishes the NAAQS, each State assumes "primary responsibility for assuring air quality." 42 U.S.C. § 7407(a). States do so by establishing state implementation plans, which "specify the manner in which [the NAAQS] will be achieved and maintained." *Id*.

These state plans must satisfy several statutory requirements, including the Act's "Good Neighbor" provision. *See* 42 U.S.C. § 7410(a)(2)(D)(i)(I). That provision delegates to upwind States the task of determining whether their emissions will contribute significantly to a downwind State's failure to attain the NAAQS and, if so, implementing measures to prohibit such contribution. *Id.*; *see also EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489, 496 (2014). Specifically, the state plan must prevent "any source or other type of emissions activity within the State from emitting any air pollutant in amounts which will … contribute significantly to nonattainment in, or interfere with maintenance by, any other State." § 7410(a)(2)(D)(i)(I). The Good Neighbor Provision is *future*-focused, requiring state plans to make predictive

judgments of whether, by the time of the statute's compliance deadline, in-state emissions "*will* … contribute significantly" to "nonattainment" in another state or "interfere with maintenance" of the NAAQS in another state. *Id.* (emphasis added); *see also North Carolina v. EPA*, 531 F.3d 896, 914 (D.C. Cir. 2008).[1]

Once a state develops and submits its plan, EPA "shall approve" the plan "if it meets all of the applicable requirements of" the Act. 42 U.S.C. § 7410(k)(3). EPA's approval decision must be made within 18 months of a state's plan submittal. *Id.* § 7410(k)(1)-(3). Only if a state plan violates the statute may EPA promulgate a "Federal implementation plan" for the State within two years of disapproving a state plan. *Id.* § 7410(c)(1). But if "the State corrects the deficiency" in its state plan first, EPA cannot issue its own federal plan. *Id*. If, after approval of a state plan, new developments or information show that the plan will no longer be consistent with the statute, the Act provides backstops. First, EPA may issue a "call[] for plan revisions" for States to submit within "reasonable deadlines … not to exceed 18 months." *Id.* § 7410(k)(5). Second, a downwind state can petition EPA to order

---

[1] A downwind site will be in "nonattainment" if it currently exceeds and is projected to exceed the NAAQS at the attainment deadline. *See Wisconsin v. EPA*, 938 F.3d 303, 312 (D.C. Cir. 2019). In the past, EPA has stated that a "maintenance" site is one that, even if currently in attainment, is projected to be in nonattainment at the attainment deadline. *Id.* at 310, 325-26.

emissions reductions from upwind sources that are significantly contributing to its nonattainment. *See Id.* § 7426(b).

The statute thus makes clear that, in implementing the Act, "states, not EPA, drive the regulatory process." *Texas 2016*, 829 F.3d at 411. After all, Congress determined that "air pollution prevention … and air pollution control at its source is the primary responsibility of States and local governments." 42 U.S.C. § 7401(a)(3). States thus enjoy "considerable latitude in determining specifically how the [NAAQS will] be met." *Train v. Nat. Res. Def. Council, Inc.*, 421 U.S. 60, 87 (1975). "Each State is given wide discretion in formulating its plan" and implementing the largely undefined terms in the Act. *Union Elec. Co.*, 427 U.S. at 250. For example, a plan must "include enforceable emissions limitations," 42 U.S.C. § 7410(a)(2), but "so long as the ultimate effect of a State's choice of emission limitations is compliance with" the "general requirements" of the Act, the state may implement "whatever mix of emissions limitations [is] best suited to its particular situation." *Train*, 421 U.S. at 79.

"The great flexibility accorded the states" is "sharply contrast[ed]" by the "narrow role to be played by EPA." *Fla. Power & Light Co. v. Costle*, 650 F.2d 579, 587 (5th Cir. 1981). "The Clean Air Act confines EPA's role in implementing air quality standards 'to the ministerial function of reviewing [state plans] for consistency with the Act's requirements.'" *Texas 2016*, 829 F.3d at 411 (citations omitted). That must be so. If EPA could "run roughshod over the procedural prerogatives that the Act has reserved to the states," the

Act's system of cooperative federalism would be empty words. *Texas v. EPA*, 690 F.3d 670, 675 (5th Cir. 2012) ("*Texas 2012*") (citation omitted).

## II. Procedural History

### A. EPA promulgates the 2015 Ozone NAAQS and issues guidance for state implementation plans.

In 2015, EPA issued an updated NAAQS for ozone, lowering the standard from 75 parts per billion ("ppb") to 70 ppb. *NAAQS for Ozone*, 80 Fed. Reg. 65,292, 65,293-94 (Oct. 26, 2015). This triggered the process for States to develop implementation plans for the revised NAAQS, including a plan for the Good Neighbor Provision. 42 U.S.C. § 7410(a)(1). EPA "did not promulgate any regulations regarding the State's Good Neighbor obligations" for the 2015 NAAQS, *Texas v. EPA*, 23-6006, Slip Op. at 5 (5th Cir. May 1, 2023) ("Stay Order"), nor does the Act contemplate such regulations or any guidance by EPA, *see EME Homer*, 572 U.S. at 509. Instead, States determine for themselves how to craft a state plan that "contain[s] adequate provisions" to show compliance with the Good Neighbor Provision. 42 U.S.C. § 7410(a)(2)(D).

EPA did issue several rounds of non-binding guidance and data in advance of state plan submissions. First, in December 2016, EPA released "air quality modeling" that "projected 2023 ozone concentrations" at various

sites across the country (the "December 2016 Model").[2] EPA intended this modeling to help upwind states "quantify projected interstate contributions from emissions" to "downwind states" at the 2023 deadline for compliance with the 2015 ozone NAAQS. *Id.*

Second, EPA issued guidance memos on March 27, 2018, August 31, 2018, and October 19, 2018. The March guidance identified "potential flexibilities in analytical approaches for developing a good neighbor [state plan]." C.I. HQ-3 at 1-2, A-2.[3] In particular, as part of determining which instate emissions "contribute significantly" (a term undefined by the Act) to another State's problems attaining the NAAQS, EPA told States they could consider "different contribution thresholds" to screen out contributions that are categorically not significant without the need for further analysis. *Id.* at A-3. Downwind sites where a state contributed above the screening threshold would be considered "linked" to the state and thus would require further analysis to determine if the contribution is significant. To determine an

---

[2] EPA, *Air Quality Modeling Technical Support Document for the 2015 Ozone NAAQS Preliminary Interstate Transport Assessment* at 1 (Dec. 2016), bit.ly/3LIohcd.

[3] In this brief, "C.I." refers to the certified index of record Respondent filed. R. 17(b)(1)(B). Documents are identified by the EPA office listed as the custodian after the first hyphen in the "Document ID" numbers on the certified index (either "HQ" for EPA headquarters or "R" for an EPA regional office, with a number indicating which regional office), as well as the final four digits (minus leading zeros) of the "Document ID" number.

appropriate screening threshold, EPA suggested "leverag[ing] some of the analytics and statistical data created" in similar contexts, like the 1 ppb "Significant Impact Level" for ozone from new power plants—*i.e.*, the level at which a new power plant may contribute to a state's ozone concentrations but avoid further complex analysis because the contribution is categorically insignificant. *Id.* at A-2.

The August guidance described additional flexibilities in determining whether emissions from a state "contribute significantly" to another state's attainment issues. C.I. HQ-4 at 2. After analyzing different potential thresholds of emissions to use when screening for which contributions may be significant, EPA suggested one percent of the NAAQS (0.7 ppb) as one potential threshold. *Id.* In the alternative, EPA explained that a 1 ppb threshold "captured a similar and only slightly lower amount of contributions," and therefore may also be appropriate. *Id.* at 4.

Finally, the October memo identified even more "potential flexibilities" States could use in their plans. C.I. HQ-5 at 4. EPA set forth considerations that could "justify exclusion of a [downwind] monitoring site" from the list of sites which a state might be considered to have affected. *Id.* States may exclude certain sites "if the site is currently measuring clean data" (*i.e.*, the data show the site is in attainment of the NAAQS). *Id.* To exclude such sites, EPA expected the state to provide information showing that (1) "meteorological conditions in the area of the monitoring site were conducive to ozone formation during the period of clean data," (2) "ozone concentrations" (and

"ozone precursor emissions") have "been trending downward at the site since 2011," and (3) "emissions are expected to continue to decline in the upwind and downwind states out to the attainment date." *Id.* And to assist with that analysis, EPA provided States with data on ozone concentrations for 2011 through 2017 and on temperature conditions during those years (because ozone is formed in warmer conditions). *Id.* at 4-5.

EPA has also, over the years, developed a more rigid four-step framework that the agency applies to its own development of *federal* implementation plans. *Id.* at 2. But this "'4-step framework' is nowhere to be found in the Good Neighbor Provision," nor is it mandated by any promulgated regulations. Stay Order at 15. States therefore need not follow it in creating their *state* plans. *Id.* at 15-16.

## B.   Mississippi submits a state implementation plan.

Mississippi relied on EPA's guidance to develop its state implementation plan to address the Good Neighbor obligation. *See* C.I. R4-9 .

As required by the text of § 7410(a)(2)(D)(i)(I), Mississippi's plan analyzed whether emissions from the State would "contribute significantly to nonattainment in … any other State." C.I. R4-9. EPA's December 2016 Model—the latest model available at the time Mississippi submitted its plan—identified only one potential downwind nonattainment site where Mississippi was projected to contribute more than one percent of the NAAQS: 0.79 ppb to the Deer Park air quality monitor (a "receptor") in Harris County, Texas. *Id.* at 4. Mississippi determined that this 0.79 ppb

contribution—just nine out of ten billion parts over EPA's preferred screening threshold of 0.70 ppb—was not a "significant contribution" for two independent reasons.

First, Mississippi agreed with EPA's August 2018 guidance that using a 1 ppb threshold to screen out insignificant contributions would be "reasonable and appropriate." *Id.* at 6. Mississippi further pointed to EPA guidance involving the analogous statutory provision for new power plants, defining what constitutes "Significant Impact" for purposes of screening whether new emissions sources must be further assessed for "contribution" to a NAAQS exceedance under 42 U.S.C. § 7475(a)(3). *Id.* That guidance provided that only ozone contributions over 1 ppb required additional analysis. C.I. R4-9 at 5-6 (referencing Peter Tsirigotis, *Guidance on Significant Impact Levels for Ozone and Fine Particles in the Prevention of Significant Deterioration Permitting Program* (April 17, 2018), bit.ly/3NgrwIM)). After applying the 1 ppb contribution threshold, Mississippi determined it would not "significantly contribute to the nonattainment of the 2015 Ozone Standard in another state." *Id.* at 6.

Second, Mississippi explained that it would reach the same conclusion even it used a more conservative one percent (0.7 ppb) screening threshold. Applying the factors and data supplied by EPA in its October 2018 guidance, *see supra* 9-10, Mississippi explained that the Deer Park receptor had been measuring ozone levels less than 70 ppb in 2015, 2016, and 2017, thus showing as "clean" under the 2015 ozone NAAQS. C.I. R4-9 at 7-9. EPA's own

data (attached to the October 2018 memo) showed that in two of those years—2015 and 2016—the temperatures had been "above average," and in 2017 the temperatures were "near normal," which means the area attained the NAAQS even in conditions that were conducive to ozone formation. *Id.* at 7. EPA's data likewise showed that ozone concentrations in Deer Park had been trending down, from 83 ppb in 2011 to 68 ppb in 2017. *Id.* at 8. The same was true of ozone emissions in both Texas and Mississippi generally. *Id.* at 8-9. And due to "national and regional emissions trends" and "current regulations," Mississippi expected ozone emissions "to continue to decline." *Id.* at 9.

Thus, based on the data and its multi-factor analysis, Mississippi projected that the Deer Park receptor will be in attainment with the 2015 NAAQS by 2023, and Mississippi therefore "does not significantly interfere with maintenance of the 2015 Ozone Standard in another state." *Id.* The Act accordingly required no further modifications to the suite of robust emissions standards already in effect in Mississippi.

## C. EPA disapproves Mississippi's state plan years after the deadline, based on new modeling and policy preferences.

Because Mississippi submitted its state plan on September 3, 2019, EPA was statutorily required to finalize action on it no later than March 3, 2021. 42 U.S.C. § 7410(k)(1)-(2). But EPA did not even *propose* to act until nearly a year after that deadline, when on February 22, 2022, it proposed disapproval of Mississippi's plan. *Air Plan Disapproval; AL, MS, TN; Interstate Transport*

*Requirements for the 2015 8-Hour Ozone National Ambient Air Quality Standards*, 87 Fed. Reg. 9,545 (Feb. 22, 2022).

This delay was not without consequence. EPA based its proposed disapproval on a new model—a model that it called "2016v2"—which it developed well after EPA's deadline to approve or disapprove the plan. 87 Fed. Reg. 9,548. The new 2016v2 modeling projected that Mississippi *would not* significantly contribute to nonattainment in the Deer Park receptor in Harris County, Texas—the only receptor EPA's original December 2016 Model had "linked" to Mississippi under a one percent screening threshold. *Id.* at 9,557. Rather, EPA's new model identified three new "linked" receptors: Houston Bayland Park in Harris County, Texas, Manvel Croix Park in Brazoria County, Texas, and Denton Airport in Denton County, Texas. *Id.* EPA's new model projected Mississippi to contribute to those receptors 1.04 ppb, .92 ppb, and 1.14 ppb, respectively.

EPA relied on its new modeling in proposing to disapprove Mississippi's plan. It pointed to the newly-claimed links as sufficient to trigger the State's "obligation to assess potential emissions reductions," even though Mississippi had no notice EPA would expect it to address projected contributions to those sites. *Id.* at 9,558. And because Mississippi had not conducted any analysis of those links, EPA "propose[d] to disapprove" the plan. *Id*.

EPA also rejected Mississippi's multi-factor analysis of Deer Park under the December 2016 Model and reliance on the "flexibilities" EPA had previously endorsed—even though it simultaneously argued that the details of

Mississippi's state plan were "inconsequential" because they had been su-
perseded by EPA's new modeling. *Id.* at 9,557.

In particular, EPA refused to honor Mississippi's 1 ppb screening thresh-
old. *Id.* at 9,557. Despite admitting it had previously advised otherwise, *id.*,
EPA asserted a newfound belief that "allowing for alternative … thresholds
may … raise[] substantial policy consistency and practical implementation
concerns," and EPA announced a new preference for a uniform "national
ozone transport policy" with a single, "stringent" threshold. *Id.* at 9,551.

Bizarrely, EPA also rejected Mississippi's determination that the Deer
Park receptor would not have future attainment issues—even though EPA's
new modeling agreed that Deer Park would be in attainment in 2023. *Id.* at
9,556; *see also* C.I. HQ-12. EPA argued that Mississippi focused too narrowly
on temperature, rather than other "meteorological indicators," when EPA's
own data from the October 2018 memo focused solely on temperature vari-
ations. *See* 87 Fed. Reg. at 9,556; C.I. HQ-5 at A-2-3, A-5-22 ("[i]n general,
below average temperatures" indicate "meteorological conditions are un-
conducive for ozone formation," while "above average temperatures" indi-
cate conducive conditions). And despite "acknowledg[ing] the general
downward trends" in emissions that lead to ozone, EPA argued that its up-
dated modeling (which, again, did not project Deer Park to be in nonattain-
ment) meant that there was not "sufficient justification to eliminate the Deer
Park monitor as a maintenance receptor." 87 Fed. Reg. at 9,556.

On April 6, 2022, before the public comment period on EPA's proposed disapproval of Mississippi's state plan had closed, EPA proposed to subject Mississippi to an onerous federal implementation plan. 87 Fed. Reg. 20,036. Meanwhile, Mississippi prepared a technical analysis of the downwind sites "linked" by EPA's new 2016v2 modeling results and submitted it with comments on EPA's proposed disapproval. C.I. R4-17. The analysis provided detailed data on wind trajectories, model limitations, and anticipated emissions reductions. Based on this holistic analysis, Mississippi explained why its emissions, which were barely above EPA's preferred 1 percent threshold, had "no correlation" to nonattainment in these newly linked Houston and Dallas areas. *Id.* at 2.

EPA nonetheless issued a final rule disapproving Mississippi's plan on February 13, 2023. 88 Fed. Reg. at 9,357. EPA's Mississippi-specific decision relied almost entirely on the assessment provided in the February 2022 proposed disapproval. *Id.* at 9,358. But in the final rule, EPA announced yet *another* new model (labeled "2016v3"). *Id.* at 9,343. Using that model, EPA concluded Mississippi would now be linked to nonattainment in Galveston, Texas—a receptor not linked by either the December 2016 model or the 2016v2 model. C.I. HQ-70. The 2016v3 model also projected Mississippi to contribute to Bayland Park and the Denton Airport, but only at levels less than 1 ppb. *Id.* Meanwhile, the 2016v3 model confirmed Mississippi's conclusion that it would not significantly contribute to the Brazoria County

receptor and that the old Deer Park receptor would be in attainment with the NAAQS in 2023. *Id.*

Petitioners here challenge EPA's disapproval and have moved for a stay of the disapproval pending a final merits determination.

### SUMMARY OF THE ARGUMENT

**I.** States have wide discretion in deciding how their state implementation plans will meet the NAAQS. *Union Elec. Co.*, 427 U.S. at 267. Meanwhile, the Clean Air Act gives EPA the nondiscretionary duty to approve state plans that are consistent with the statutory requirements, regardless of whether EPA would prefer to craft state plans in a different way. *Luminant Generation Co., L.L.C. v. EPA*, 675 F.3d 917, 926 (5th Cir. 2012). This division of authority reflects Congress's determination that States are best-suited to develop implementation plans that account for their "particular situation." *Train*, 421 U.S. at 79. That means EPA must defer to the State's reasonable and non-arbitrary judgments about how to satisfy the statutory requirements of state plans, including the State's reasonable interpretations, policy decisions, and predictive judgments. *Texas 2016*, 829 F.3d at 428. When EPA "runs roughshod" over a state's regulatory judgments, it violates the statute. *Texas 2012*, 690 F.3d at 675. EPA's review of Mississippi's state plan ignored these principles at every turn, thus exceeding its statutory authority.

**II.** EPA disapproved Mississippi's plan based on policy disagreements over how to determine whether Mississippi's emissions will "contribute significantly" to another state's future ozone pollution problems. Because the

requirements EPA imposed on Mississippi before it would approve Mississippi's plan are not found in the Act, EPA's action was unlawful.

**A.** Neither the statute nor any regulations define what makes a contribution significant. Mississippi reasonably determined, based on several justifications, including those furnished by EPA itself, that it could exclude contributions under 1 ppb as not significant.

EPA itself has recognized there are multiple reasonable ways to interpret "contribute significantly," and—in its August 2018 guidance—specifically found that either a one percent or 1 ppb threshold could be reasonable ways to screen out insignificant contributions. *See* C.I. HQ-4. EPA similarly decided that a new power plant generally does not "contribute" to noncompliance with the NAAQS unless it will produce emissions in excess of 1 ppb. Even then, its contribution only triggers additional review. Here, EPA's December 2016 Modeling found that Mississippi's greatest contribution would be only 0.79 ppb. The 0.09 ppb difference between EPA's now-preferred one percent threshold and the contribution to Deer Park is so small that it cannot be accurately measured—and certainly is within the state's discretion to exclude as insignificant.

Yet EPA argued that Mississippi failed to "substantially justify" its selection of the 1 ppb screening threshold and explained that "alternative" thresholds undermined its preference for a "national ozone transport policy" established by EPA. 87 Fed. Reg. at 9,551. That reasoning turns cooperative federalism on its head. EPA did not even attempt to argue that

Mississippi's interpretation and implementation of the Act was unreasonable. The Act nowhere requires the further technical justification EPA demanded, making EPA's demand an unlawful non-statutory reason to disapprove the plan. And Congress's decision to give each state authority to create a state plan tailored to its own needs cannot be squared with EPA's preference for a "national ozone transport policy," no matter how much EPA may wish differently.

**B.** Even using EPA's preferred threshold, EPA also improperly discarded Mississippi's detailed technical analysis of why its emissions would not significantly contribute to ozone attainment issues in Deer Park, the only downwind receptor that was linked to the State when the plan was due. Using the approach EPA endorsed in its October 2018 guidance, Mississippi explained that recent air quality measurements showed Deer Park was currently in attainment of the ozone NAAQS, ozone precursor emission levels had been trending down, and there was no reason to expect those trends to cease. *See* C.I. R4-9. Unsurprisingly, every EPA model released since 2016 *agrees* that Deer Park will attain the NAAQS. Nonetheless, EPA rejected Mississippi's analysis not because its results were wrong, but because it would have preferred Mississippi perform a different analysis. That non-statutory reason for rejecting Mississippi's plan was also unlawful.

**C.** Beyond violating the statute, EPA's rationales for disapproving Mississippi's state plan were also arbitrary and capricious. Mississippi provided detailed justifications for its analysis and relied heavily on guidance that

EPA had released precisely for this purpose. EPA then rejected every attempt by Mississippi to rely on that guidance, giving no consideration to Mississippi's weighty reliance interests. And EPA's repeated second-guessing of Mississippi's prudential judgments was equally arbitrary and capricious.

**III.** EPA compounded its error by basing its disapproval on new modeling and guidance developed *after* EPA's deadline to complete its review of Mississippi's plan.

**A.** EPA was required to approve or disapprove Mississippi's state plan within 18 months of submittal, by March 3, 2021. 42 U.S.C. § 7410(k)(1)-(3). EPA did not even propose to act until February 22, 2022. And it used that unlawful delay to develop new ozone modeling, which it then relied on to propose disapproval of Mississippi's plan. Then, after Mississippi submitted a technical analysis explaining why that new modeling did not change Mississippi's judgment that it would not significantly contribute to nonattainment in another State, EPA relied on *even* newer modeling to finalize its disapproval nearly two years late, on February 13, 2023.

In so doing, EPA abandoned its longstanding policy of requiring States to rely on the modeling available at the time they submit their plan in favor of an ever-shifting web of models. Each iteration produced dramatically different results; no two models identified the same links or the same level of contributions. This constant goal post shifting denied Mississippi any hope of crafting a plan that could guarantee EPA's approval. That complete

disregard for the Act's cooperative federalism, along with non-statutory reliance on a new model as a basis for disapproval, violated the Act.

**B.** At the very least, EPA's "surprise switcheroo" was an arbitrary and capricious way of disapproving Mississippi's implementation plan. EPA's decision to promulgate modeling knowing Mississippi would rely on it, and then to disapprove Mississippi's state plan *because* it relied on it, was capricious. And, given the circumstances, this Court should reject whatever contrived explanation the Agency offers as pretextual.

**C.** EPA should not have disapproved Mississippi's plan even if its use of new modeling was permissible. In its comments on EPA's proposed disapproval, Mississippi provided a detailed technical explanation of why the projections in that new modeling for Mississippi were inaccurate. In particular, detailed meteorological wind pattern analysis confirmed that Mississippi did not contribute ozone to the linked Texas sites on high ozone days. EPA's response to those comments only sidestepped the relevant issues. EPA's rejection of Mississippi's plan therefore was arbitrary and capricious.

## Standard of Review

"The Clean Air Act permits a reviewing court to invalidate any action taken by EPA that is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.'" *Texas 2016*, 829 F.3d at 425 (quoting 42 U.S.C. § 7607(d)(9)). When EPA acts "in excess of statutory … authority," the action must be struck down. 42 U.S.C. § 7607(d)(9). Likewise, EPA action is "arbitrary and capricious if the agency has relied on factors which

Congress has not intended it to consider," "entirely failed to consider an important aspect of the problem," or "offered an explanation for its decision that runs counter to the evidence before the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

## ARGUMENT

## I.   EPA violated the Act by disapproving Mississippi's state plan based on EPA's own policy preferences.

As this Court recently stated, "Congress gave the States 'primary' authority" to formulate their state plans to address interstate pollution. Stay Order at 3 (quoting 42 U.S.C. §§ 7401(a)(3), 7407(a)). EPA's review of those state plans is solely to confirm the plan meets the minimum statutory requirements. 42 U.S.C. § 7410(k)(3). This structure is essential to the Act's "'core principle' of cooperative federalism." *EME Homer*, 572 U.S. at 511 n.14; *see also supra* 4-7.

States thus enjoy "considerable latitude in determining specifically how the [NAAQS] would be met" in their implementation plans. *Train*, 421 U.S. at 87. And for good reason. In developing their plans, States must make "intensely factual determinations" about the "particularities of the emissions sources" in the state and other local conditions. *Texas 2016*, 829 F.3d at 421. Congress has decided that States are best suited to account for those "local conditions" and thus "strike the right balance between preserving environmental quality" and "advancing competing objectives." *Alaska Dep't of Env't Conservation v. EPA*, 540 U.S. 461, 507 (2004) (Kennedy, J., dissenting).

The "wide discretion" States have means that the Act "leaves the [EPA] no discretion to do anything other than ensure that a state's submission meets the [Act's] requirements." *Luminant*, 675 F.3d at 926. Congress confined "EPA's role in implementing air quality standards 'to the ministerial function of reviewing [state plans] for consistency with the Act's requirements.'" *Texas 2016*, 829 F.3d at 411 (citations omitted). EPA "shall approve" a state's plan so long as it is consistent with the statute, 42 U.S.C. § 7410(k)(3), and "[t]he mandatory 'shall' makes it quite clear that the Administrator is not to be concerned with factors other than those specified." *Union Elec. Co.*, 427 U.S. at 257. Thus, as EPA itself acknowledges—in word, even if not in deed—"EPA's role is to review state choices, and approve those choices if they meet the minimum criteria of the Act." 88 Fed. Reg. at 9,380.

EPA's statutory authority is thus limited to the "deferential role" of confirming a state plan is consistent with the statute, *Texas 2016*, 829 F.3d at 428, akin to a court's review of whether an agency exercising a statutory delegation has exceeded its authority, *compare* 42 U.S.C. § 7410(k)(3) *with* 5 U.S.C. § 706(a)(2)(C). EPA "has no authority to question the wisdom of a State's choices" in developing a state plan. *Train*, 421 U.S. at 79. When it comes to *state* plans, Congress delegated to States, not EPA, the power to make "legislative choices in regulating air pollution." *Union Elec. Co.*, 427 U.S. at 269; *see also Luminant*, 675 F.3d at 928 n.8 ("Only the states enjoy discretion in implementing the dictates of the CAA."). The Act does not contemplate EPA will dictate air quality modeling for States to use. *EME Homer*, 572 U.S. at

509. Nor does anything in the Act indicate Congress believed EPA to have more expertise than state regulators; instead, EPA has acknowledged "States routinely undertake technically complex air quality determinations." *Id*. at 539 (Scalia, J., dissenting).

In short, EPA "must defer to [Mississippi's state plan] so long as" it complies "with the Act." *Texas 2016*, 829 F.3d at 428. If the State's plan involves "permissible" constructions of the Good Neighbor Provision, Stay Order at 15 (quoting *EME Homer*, 572 U.S. at 524), and legislative and policy judgments are supported by a "reasoned analysis," *Alaska Dep't*, 540 U.S. at 487, neither EPA nor federal courts are permitted to second guess it. And if EPA does, it violates the Act by "invert[ing] the agency's 'ministerial function.'" Stay Order at 17 (quoting *Luminant*, 675 F.3d at 921).[4]

Here, EPA paid lip service to these principles but emphatically rejected them in practice. It agreed that the Act depends on "cooperative federalism," 88 Fed. Reg. at 9,363, but it expressly disagreed with the concept that "EPA must defer to state choices," *Id.* at 9,367; *see also id.* at 9,375. Indeed, EPA went far beyond just "question[ing] the wisdom of [Mississippi's] choices" in

---

[4] For these reasons, no deference is owed to EPA in this case under *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984). However, Petitioners note that the U.S. Supreme Court has recently granted certiorari on whether to overrule *Chevron, see Loper Bright Enterprises v. Raimondo*, No. 22-451, 2023 WL 3158352 (May 1, 2023), and hereby preserve their argument that any effort to apply *Chevron* would be unlawful.

developing its state plan. *Train*, 421 U.S. at 79. As explained below, EPA wholesale scrapped Mississippi's analysis and replaced it with an entirely different analytical framework premised on data and modeling unavailable to Mississippi. EPA's fundamental misconception of the scope of its own authority was "not in accordance with the law." *Texas 2016*, 829 F.3d at 425 (citation omitted).

## II.  EPA unlawfully disapproved Mississippi's plan based on non-statutory considerations.

EPA repeatedly exceeded its "ministerial function" in disapproving Mississippi's plan. *Luminant*, 675 F.3d at 921. It rejected key policy and technical judgments made by Mississippi because they conflicted with EPA's preferred approach, faulting the state for not "substantially justif[ying]" departures from EPA's likings, not because the state's approach violated the statute. 88 Fed. Reg. at 9,340. That turns the Act's "'core principle' of cooperative federalism" on its head, *EME Homer*, 572 U.S. at 511 n.14, and was therefore in excess of its statutory authority.

EPA's rejection of cooperative federalism was not always so. When Mississippi was preparing its state plan, EPA consistently recognized in guidance documents that Mississippi had "discretion" over how "to develop [its] good neighbor [state plan]." C.I. HQ-4 at 1. In particular, EPA recognized States could use "various analytical approaches" in developing their state plans, and that those "alternative frameworks" were valid so long as they were "consistent with the requirements of the" Act. C.I. HQ-3 at 3. But when

24

EPA ultimately acted on Mississippi's plan, its prior embrace of the States' statutory prerogatives disappeared.

For example, EPA rejected Mississippi's use of a 1 ppb screening threshold, not because that threshold violates some statutory provision, but because EPA preferred a nationally uniform one percent (0.70) threshold. Similarly, EPA rejected Mississippi's multi-factor analysis showing that, regardless of which screening threshold applied, Mississippi emissions will not in fact contribute to future nonattainment of the NAAQS in another state. EPA did not find Mississippi's technical analysis ran afoul of the Act, or even that the analysis was wrong; EPA simply preferred its own method of analysis. None of this was in accordance with EPA's ministerial role, and at the very least EPA's abandonment of prior guidance despite Mississippi's reliance on it was arbitrary and capricious. Accordingly, EPA's disapproval of Mississippi's implementation plan must be vacated.

### A. EPA unlawfully disapproved Mississippi's use of a 1 ppb contribution threshold based on EPA's own preference for a different, nationally-uniform threshold.

The Good Neighbor Provision requires States ensure their emissions do not "contribute significantly" to other States' inability to attain the NAAQS, 42 U.S.C. § 7410(a)(2)(D)(i)(I), but the Act contains no statutory definition of "contribute significantly" nor any "numerical threshold." *See Texas v. EPA*, 983 F.3d 826, 839 (5th Cir. 2020) (*"Texas 2020"*). By placing the Good Neighbor Provision within the implementation plan framework over which States

have primary responsibility, Congress vested States with the authority to make reasonable determinations of what contributions are "significant[]." *Supra* 21-24.

Yet EPA rejected Mississippi's determination that contributions less than 1 ppb were insignificant, despite EPA having repeatedly endorsed a 1 ppb threshold for the Good Neighbor Provision and for related provisions of the Act. EPA complains Mississippi did not provide a heightened "justification" for departing from EPA's preferred "analytical methods, policy judgments, and interpretation[s]." 88 Fed. Reg. at 9,337. EPA thus "improperly required" Mississippi to satisfy requirements "not found in the Act." *Texas 2016*, 829 F.3d at 428.

1. In its state plan, Mississippi exercised its statutory discretion to determine that any contributions to out-of-state ozone pollution less than 1 ppb were not "significant[]" and could thus be screened from further analysis. C.I. R4-9 at 5. Mississippi based that screening determination on several rationales.

*First*, Mississippi pointed to the "analytical information" in EPA's August 2018 memo and explained that EPA's own analysis supported its conclusion that a 1 ppb threshold is "generally comparable" to the one percent (0.7 ppb) threshold EPA preferred. *Id.* at 4. That interpretation was at least reasonable.

For one, EPA has expressly recognized that there are multiple reasonable ways to interpret "contribute significantly." *See* C.I. HQ-4 at 2-4. EPA

explained that "[e]ach time EPA sets a new or revised NAAQS, *states and EPA* can evaluate collective contribution to identify an appropriate threshold for that NAAQS." *Id.* at 2 (emphasis added).

In the past, EPA has endorsed various methods of determining what contributions are significant. For instance, in 1998, "EPA proposed a 'weight-of-evidence,' or multi-factor, approach for determining whether a contribution is 'significant,'" rather than relying on a particular threshold. *Finding of Significant Contribution and Rulemaking for Certain States*, 63 Fed. Reg. 57,356, 57,376 (October 27, 1998). And in 2005, EPA determined that a 2 ppb threshold was the appropriate "ozone significance screening criterion." *North Carolina*, 531 F.3d at 916 (quoting *Rule To Reduce Interstate Transport of Fine Particulate Matter and Ozone*, 70 Fed. Reg. 25,162, 25,191 n.42 (May 12, 2005)).

EPA then used a "1 percent contribution" screening threshold in a 2011 federal implementation plan after considering other higher and lower thresholds. 88 Fed. Reg. at 9,370 (citing *Federal Implementation Plans: Interstate Transport of Fine Particulate Matter and Ozone and Correction of SIP Approvals*, 76 Fed. Reg. 48,208, 48,237-38 (August 8, 2011)). EPA rejected a 5 percent screening threshold for not capturing enough contributions, but also rejected using a smaller 0.5 percent threshold because it would impose "emission reduction responsibilities" on upwind states that would "have a very small impact" on downwind receptors. *Id.* at 48,237. It therefore decided "the 1 percent threshold is a reasonable choice." *Id.*

For the 2015 Ozone NAAQS at issue, EPA conducted a similar analysis in its guidance to States. C.I. HQ-4. It concluded that one percent (0.7 ppb) and 1 ppb screening thresholds were "generally comparable" because a 1 ppb threshold captured a "similar and only slightly lower amount of [upwind] contribution." Therefore, EPA concluded it may be "reasonable and appropriate for states to use a 1 ppb contribution threshold." *Id.* Thus, just as the 2011 rulemaking found that the differences between 0.5 percent and 1 percent were too small to justify the additional burden imposed by a more stringent threshold, EPA recognized that the differences between 1 percent and 1 ppb were minimal.

*Second*, Mississippi's state plan noted that EPA has interpreted "contribute" in analogous parts of the Act to exclude emissions less than 1 ppb because they are insignificant. C.I. R4-9 at 5-6. Specifically, under the Prevention of Significant Deterioration Program, each new "major emitting facility" must show the facility "will not cause, or contribute to, air pollution in excess" of the NAAQS. 42 U.S.C. § 7475(a)(3). EPA created "Significant Impact Levels" to screen out emissions that would not contribute to NAAQS exceedances for purposes of this provision. *In re: Prairie State Generating Co.*, 13 E.A.D. 1, 82-83 (EAB 2006); *see also* Peter Tsirigotis, *Guidance on Significant Impact Levels of Ozone* (Aug. 17, 2018), bit.ly/3NgrwIM. In guidance released while Mississippi was preparing its state plan, EPA explained that the appropriate "Significant Impact Level" for the ozone NAAQS was 1 ppb. Tsirigotis, *Guidance on Significant Impact Levels of Ozone*, *supra*, at 15.

Accordingly, impacts below 1 ppb do not "contribute" to NAAQS exceedances. *Id.* Similar to a Good Neighbor screening threshold, even impacts above this level simply trigger a requirement to conduct additional review to determine whether they may contribute. *Id.*

In short, EPA has determined that a new source presumptively will not "contribute" to nonattainment under § 7475(a)(3) if it will cause impacts of less than 1 ppb. *See id.* And, in so deciding, EPA acknowledged that because § 7475(a)(3) uses the term "contribute," rather than "significantly contribute," *other* provisions of the Act that reference "significant contributions" — like the Good Neighbor Provision — should be interpreted as "call[ing] for a higher degree of contribution" than under § 7475. EPA, *Application of Significant Impact Levels in the Air Quality Demonstration for Prevention of Significant Deterioration Permitting* at 9 n.6 (April 17, 2018), bit.ly/3BFKlhL.

Given all this, Mississippi's selection of a 1 ppb threshold, at the least, reasonably gives effect to Congress's emphasis on *significant* contributions. To be sure, there is no single answer to "the question of how large a reduction in emissions must be to constitute a [significant] contribution." *Env't Def. Fund, Inc. v. EPA*, 82 F.3d 451, 459 (D.C. Cir. 1996). But if EPA has interpreted "contribute" in § 7475(a)(3) to mean *more* than 1 ppb for the same NAAQS at issue here, interpreting "contribute significantly" in § 7410(a)(2)(D)(i)(I) to mean *less* than 1 ppb would be incongruous. That would read similar terms in a statute inconsistently, and in a way that ignores Congress's use of "significantly" in § 7410(a)(2)(D)(i)(I). *See Azar v.*

*Allina Health Servs.*, 139 S. Ct. 1804, 1812 (2019) (explaining that statutory terms should "bear[] a consistent meaning throughout"); *Hibbs v. Winn*, 542 U.S. 88, 101 (2004) (statutory interpretation should ensure "no part will be … superfluous").

Having determined the appropriate significance screening threshold, Mississippi turned to the latest modeling of interstate ozone contributions available to it, EPA's December 2016 Model. That model identified only one potential link, of less than 1 ppb, between Mississippi and a downwind site (0.79 ppb to the Deer Park receptor in Harris County, Texas). Because none of Mississippi's contributions linked to potential nonattainment areas rose above the 1 ppb screening threshold, Mississippi determined that it was not "contributing significantly" to another state's attainment problems under the Good Neighbor Provision. C.I. R4-9 at 5-6.

2. Despite all this, EPA rejected Mississippi's analysis, saying Mississippi should have used a screening threshold of one percent of the NAAQS (0.7 ppb) rather than 1 ppb. 88 Fed. Reg. at 9,357-58. EPA argued that Mississippi did not "sufficiently justify use of an alternative 1 ppb threshold." 87 Fed. Reg. at 9,557. So although Mississippi's analysis relied on factors and guidance that EPA had expressly identified as relevant, EPA faulted Mississippi for not providing even "further technical justification." *Id.*

EPA has no authority to disapprove Mississippi's plan on that basis. Mississippi had no obligation under the statute to provide an even more exhaustive justification of the 1 ppb screening threshold than the one it offered. *See*

30

Stay Order at 16. The statute requires EPA to defer to "a State's choices" in developing its state plan. *Train*, 421 U.S. at 79. The Agency cannot "question the wisdom," *id.*, of those "legislative choices," even if it would have chosen differently, *Union Elec. Co.*, 427 U.S. at 269. Mississippi provided a "reasoned analysis" for its chosen significance threshold, and that was sufficient. *See Alaska Dep't*, 540 U.S. at 490 (citation omitted). By basing disapproval on a non-statutory factor, rather than defer to the state's methodological choices, EPA's action was not in accordance with law.

After all, the Act does not define which contributions are "significant." It "contains no numeric threshold" and certainly "does not require EPA to adopt a one-percent threshold." *Texas 2020*, 983 F.3d at 839. EPA has not even "promulgate[d] any regulations" defining when a state's emissions "contribute significantly" for purposes of the 2015 ozone NAAQS. Stay Order at 5. And while EPA has sometimes relied on a one percent threshold in the past, not even EPA believes that all contributions over one percent are necessarily significant. Rather, EPA has specifically admitted that its preferred one percent threshold is only "a screening threshold to identify states which *may* be 'contributing,'" and so "EPA does not use the 1 percent of the NAAQS threshold as the definition of 'significance.'" 88 Fed. Reg. at 9,371 (emphasis added). For contributions above one percent, EPA simply "expects states to *further* evaluate their emissions to determine whether" they constitute "significant contribution[s]." *Id.* (emphasis added); *see also* C.I. HQ-4 at 2 (explaining EPA uses "air quality screening threshold[s] to determine whether"

31

a particular link "warrant[s] further evaluation as part of a multi-factor analysis"). In short, EPA's preference for a different screening threshold was an unlawful non-statutory basis for disapproval of Mississippi's plan.

Rather than grounding its decision on an argument that a 1 ppb threshold violated the Act, EPA freely admitted its preference for a one percent threshold for every state was based on its own "policy consistency and practical implementation concerns," not a determination that Mississippi's approach was unlawful or unreasonable. 88 Fed. Reg. at 9,374; *see also id.* (expressing concern about "significant equity and consistency problems among states" if alternative thresholds were allowed); *id.* (arguing that "national ozone transport policy" is undermined by "less stringent thresholds"); *id.* at 9,337 (explaining EPA applied "uniform, nationwide analytical methods, policy judgments, and interpretation" to each state plan); *Texas v. EPA*, No. 23-60069, Motion to Transfer at 2, 6-7, 10-16 (Mar. 15, 2023) (arguing repeatedly that each state's petition must be transferred to the D.C. Circuit because EPA applied uniform policy judgments while reviewing them). But imposing a non-statutory policy preference for national uniformity only compounds EPA's error.[5]

_____

[5] EPA argues that *EME Homer*, 572 U.S. 489, supports its exercise of power here. *See, e.g.*, 88 Fed. Reg. at 9,340 (citing *EME Homer*, 572 U.S. at 519, as requiring EPA to adopt "efficient and equitable" ozone policies); *id.* at 9,362 (citing *EME Homer*, 572 U.S. at 519, for the proposition that effective ozone policy requires "a uniform framework of policy judgments"). But those

The Agency's preference for an EPA-invented "national ozone transport policy" does not make its action lawful. 88 Fed. Reg. at 9,373. By giving each individual state "virtually absolute power" in deciding how it will comply with the Act, *Union Elec. Co.*, 427 U.S. at 267, Congress necessarily rejected the idea that state plans will be uniform and consistent. For instance, States can impose more stringent restrictions than is needed to meet the NAAQS, even if this might undermine national consistency. 42 U.S.C. § 7416. Likewise, States can choose from a variety of approaches to meet the NAAQS. *See Texas 2012*, 690 F.3d at 675. One might require certain sources to install emissions reduction technology; another might require limits on operations or participation in an emissions banking and trading program. *See Train*, 421 U.S. at 79 (explaining States have the discretion to set "the specific, source-by-source emission limitations" under their plans). EPA might think this kind of state-by-state variation makes for bad "policy," but Congress took a different view. 88 Fed. Reg. at 9,373. And EPA must "follow the statute's plain meaning, 'even though effectuating that meaning may have undesirable public policy ramifications.'" *State of Conn. v. EPA*, 656 F.2d 902, 910 (2d Cir. 1981) (citation omitted).[6]

---

portions of *EME Homer* addressed EPA's promulgation of a *federal* implementation plan, not review of individual state plans. *See* 572 U.S. at 503.

[6] EPA relied on 42 U.S.C. § 7601(a)(2)(A) for the idea that it had a "general obligation" to ensure the Act's requirements were "implemented consistently across states and regions." 88 Fed. Reg. at 9,374 n.325. But that

3. In any event, Mississippi *did* provide ample justification for the 1 ppb screening threshold, in concert with EPA's guidance. As explained above, the August 2018 EPA guidance that Mississippi referenced arrived at the 1 ppb threshold using a similar, but more detailed, analysis as was used to originally prescribe the one percent threshold—making the more recent analysis *more* justified, not less. *Supra* 28. Not surprisingly, EPA still has not ever "formally rescind[ed] the August 2018 memorandum." 88 Fed. Reg. at 9,373.

Similarly, Mississippi pointed to the 1 ppb "Significant Impact" threshold EPA uses to determine if new power plants will "contribute" to ozone nonattainment. *Supra* 28-29. EPA's weak and unreasoned response was simply that this involves "a different provision" of the Act and therefore has no "relevance or applicability." 87 Fed. Reg. at 9,557. This is a textbook distinction without a difference. Both provisions involve exceedingly similar language and analysis—determining whether emissions will "contribute" to ozone NAAQS nonattainment by using a screening threshold to identify which emissions require further analysis. *See supra* 28-30. EPA specifically recognized the relevance of this guidance in the March 2018 memo, when it stated that the "analytics and statistical data" which supported a 1 ppb

_____

provision only requires that *the Agency* use uniform "criteria, procedures, and policies" to analyze state plans. § 7601(a)(2). It does not require that state plans be identical, nor would that be possible to square with the rest of the Act.

"Significant Impact Level" for new power plants were pertinent to the Good Neighbor Provision. C.I. HQ-3 at A-2.

Accordingly, EPA's claim that these justifications were insufficient and that Mississippi had to provide even "further technical justification" specific to its circumstances, 87 Fed. Reg. at 9,557, amounts to nothing more than an unlawful attempt to "simply throw[] the burden of persuasion onto the states" in ever increasing amounts, *Michigan v. EPA*, 213 F.3d 663, 683 (D.C. Cir. 2000). The statute nowhere permits that as a basis to disapprove a state plan. Moreover, EPA refuses to say what sort of state-specific technical justification it was looking for. Unsurprisingly, neither Mississippi nor any other state was able to meet EPA's mysterious standards needed to justify a 1 ppb threshold.

This case is thus like *New York v. EPA*, where "EPA denied New York's petition" under a related provision of the Act "on the ground that it failed to meet the agency's standard for establishing a violation of the Good Neighbor Provision." 964 F.3d 1214, 1217 (D.C. Cir. 2020). The D.C. Circuit invalidated that action because "EPA offered insufficient reasoning for the convoluted and seemingly unworkable showing it demanded of New York's petition." *Id.* Like here, EPA "never offered a coherent explanation for" what justification it sought from New York; EPA "never explains what 'this' analysis is or why the [State] did not meet it," "[n]or did it shed light on what 'similar analysis' would suffice." *Id.* at 1222-23. "The EPA's decision just left the court and future [States] to guess at the agency's meaning." *Id.* at 1223. Like EPA's

action in *New York*, EPA's demand for further justification "is all quite mystifying," and "we are left with no coherent explanation of what was missing from" Mississippi's plan. *Id.* at 1224. Like the D.C. Circuit, "[w]e are at a loss." *Id.* at 1223-24. And like the D.C. Circuit, this Court should invalidate EPA's decision.

### B. EPA improperly rejected Mississippi's technical analysis based on non-statutory factors.

EPA's disapproval of Mississippi's plan was unlawful for a second, independent reason. As noted, EPA's December 2016 Model projected that Mississippi would contribute more than one percent of the NAAQS to a single receptor—0.79 ppb to Deer Park in Harris County, TX. *Supra* 10-11. Under Mississippi's 1 ppb threshold, that projected contribution was not significant. But even assuming the statute somehow required Mississippi to use a one percent (0.7 ppb) screening threshold, that threshold only determines which contributions require further analysis. So for good measure, Mississippi conducted a detailed technical analysis, explaining why the Deer Park receptor was likely to be in attainment with the NAAQS in 2023. Because Deer Park would neither be in "nonattainment" nor unable to sustain "maintenance" of the NAAQS, Mississippi's Good Neighbor state plan requirements were satisfied. But again, EPA rejected *that* analysis not because it came to an incorrect conclusion, but because EPA wanted yet further justification. That bare desire for ever-more analysis exceeds EPA's statutory authority.

Mississippi's technical analysis of Deer Park tracked EPA's October 2018 guidance. *See supra* 11-12. There, EPA explained that States could determine a maintenance receptor would *not* be in future nonattainment (and thus not subject to Good Neighbor obligations) if the receptor was currently showing "clean data" (*i.e.*, in attainment of the NAAQS) and a technical analysis showed why the site's current attainment of the NAAQS was likely to continue. *See supra* 9-10. Deer Park's ozone levels were below 70 ppb in 2015, 2016, and 2017. C.I. R4-9 at 7-9. EPA's data confirmed that all three of those years were meteorologically conducive to ozone formation (2015 and 2016 actually measured above average temperatures) and that emissions in both Mississippi and Texas had been declining since 2011. *Id.* at 8-9. Thus, Mississippi concluded the Deer Park receptor would not exceed the NAAQS in 2023.

Inexplicably, even though EPA's current modeling also projects that Deer Park would be well in attainment by 2023, *see supra* 14, EPA still claimed Mississippi did not provide "sufficient justification to eliminate the Deer Park … maintenance receptor." 87 Fed. Reg. at 9,556. This was not based on the text of the Clean Air Act, which offers "no definition of 'maintenance.'" Stay Order at 17 (citing 42 U.S.C. § 7410(a)(2)(D)(i)(I)); *see also id.* (holding that EPA similarly failed to defer to Texas's "definition of maintenance receptors" (citation omitted)). Rather, EPA faulted Mississippi for addressing only temperature data, rather than every other possible meteorological factor that could impact ozone formation. 87 Fed. Reg. at 9,556. But

temperature data was the only meteorological data provided in EPA's October 2018 memo, meaning Mississippi simply followed EPA's own data and guidance. *See* C.I. HQ-5. EPA also argued that Mississippi's reliance on other factors EPA had identified as relevant—like the overall "downward trends" in emissions—was insufficient to justify excluding Deer Park. 87 Fed. Reg. at 9,556. But while EPA claims Mississippi should have considered more factors, EPA did not itself apply those factors or show application of those factors would yield a different result. Again, further modeling conducted by EPA only *confirmed* Mississippi's analysis that Deer Park was likely to be in full attainment of the NAAQS by the relevant deadline.

EPA has no authority to reject Mississippi's analysis on the grounds that it could have been more comprehensive. *See Michigan*, 213 F.3d at 683 (explaining that EPA may not "simply throw[] the burden of persuasion onto the states"); *New York*, 964 F.3d at 1222 (EPA cannot deny state petition based on undefined subjective standards). The fact that Mississippi could have considered additional factors does not mean its focus on temperature data was unreasonable. There are an almost unlimited number of factors that *could* be relevant to future ozone projections. That is why those projections are so difficult to create. *See Sierra Club v. Costle*, 657 F.2d 298, 332 (D.C. Cir. 1981). Rather, EPA would have had to show that Mississippi's analysis was

so unreasonable as to violate the statute. *See Alaska Dep't*, 540 U.S. at 490. It did not even attempt to make that showing.[7]

EPA thus exceeded its statutory authority because its rationale for disapproving Mississippi's state plan had nothing to do with the "applicable [statutory] requirements." 42 U.S.C. § 7410(k)(3). Mississippi's plan offered a reasoned explanation for why the State complied with the statutory requirements. EPA simply prefers its non-statutory policy and technical choices over Mississippi's. *Compare* 88 Fed. Reg. at 9,367 (rejecting the idea that "EPA's role in the state-federal relationship" was "secondary" or that "EPA must defer to state choices") *with Train*, 421 U.S. at 79 (explaining that EPA is "plainly … relegated by the Act to a secondary role") *and Texas 2016*, 829 F.3d at 428 ("[T]he Clean Air Act limits EPA to a deferential role" and "EPA must defer" to a state's choices so long as they "comply with the Act."). EPA's "approach inverts the [Clean Air Act] and 'reflects a misapprehension by the EPA of its authorized role in the [state plan] approval process.'" Stay Order at 16 (quoting *Luminant*, 675 F.3d at 928 n.8). It was therefore unlawful.

---

[7] EPA also faulted Mississippi for not incorporating data from 2018 in its analysis of the Deer Park receptor, 87 Fed. Reg. at 9,556, but again, even EPA's latest modeling shows Deer Park will achieve the NAAQS by 2023.

### C.  EPA's rejection of Mississippi's policy judgments was arbitrary and capricious.

At the very least, EPA's rationales for rejecting Mississippi's state plan were arbitrary and capricious. EPA's rejection of Mississippi's use of the 1 ppb threshold and prediction that Deer Park would attain the NAAQS in 2023 lacked sufficient justification in the record. And because those determinations by Mississippi relied on EPA's guidance, EPA's departure from that guidance also was arbitrary and capricious.

"[T]he Government should turn square corners." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1909 (2020) (citation omitted). That is especially true when "an agency changes course," because past policies "may have engendered serious reliance interests." *Id.* at 1913 (quotation omitted). If an agency abruptly rejects a policy that regulated parties have relied on, that "unfair surprise" is arbitrary and capricious. *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 156 (2012). The agency must provide "good reasons" for the change, including explaining why the "facts and circumstances that underlay … the prior policy" no longer apply. *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222-22 (2016). Thus, when EPA issues "guidance and modeling data—like it did in [March, August, and October] 2018—it must take due account of the State's 'serious reliance interests' before 'chang[ing] course.'" Stay Order at 21 (quoting *Regents of the Univ. of Cal.*, 140 S. Ct. at 1913).

Mississippi adopted the 1 ppb threshold in reliance on EPA's guidance on the subject and reasonably interpreted "significantly contribute." Given the substantial justifications provided by Mississippi, in addition to the justifications in EPA's guidance, EPA's disapproval of Mississippi's plan was arbitrary and capricious. Meanwhile, EPA's new emphasis on a "national ozone transport policy," 88 Fed. Reg. at 9,373, has no basis in statute and thus does not provide a "good reason" for a policy change. Moreover, EPA created a "constantly moving target," without fair warning or any serious consideration of Mississippi's reliance interests, *New York*, 964 F.3d at 1224; *see also* Stay Order at 16-17. "The reasoned agency decisionmaking that the Clean Air Act demands does not allow the EPA to keep moving the finish line" or send "contradictory messages." *New York*, 964 F.3d at 1223.

To illustrate the arbitrariness of EPA's determination, the difference between the projected contribution (0.79 ppb) and EPA's preferred one percent threshold (0.7 ppb) was less than one part per ten billion—a number far within the margin of error for EPA's modeling. *See* C.I HQ-7 at A-6 (estimating "bias and error" for the model at between 5 and 10 ppb). That miniscule contribution also pushes the distant bounds of what ozone monitors can accurately measure. *See* 88 Fed. Reg. at 9,370; 40 C.F.R. Pt. 53, Subpt. B, Tbl. B-1.[8] Mississippi's contribution was so small, in fact, that both Mississippi's

---

[8] When confronted with such tiny differences, EPA as a rule ignores projected levels of 0.9 ppb or less. *See* 88 Fed. Reg. at 9,350 (explaining only "projected design values that are greater than or equal to 71 ppb are considered

detailed analysis of Deer Park and EPA's updated modeling predicted Deer Park would be in attainment of the NAAQS by 2023.

Indeed, for Deer Park, a 1 ppb threshold rationally distinguishes between States that contribute less than minor natural occurrences (such as fires), while a one-percent threshold arbitrarily distinguishes among States with tiny contributions:



*See* C.I. HQ-3 at C-2 to C-4 (providing data for graph). At the very least, EPA's disapproval of Mississippi's plan based on the marginal difference on

---

to be violating the" NAAQS of 70 ppb); 40 C.F.R. Pt. 50, Appx. U at 3(a), 4(d) (hourly ozone concentrations "shall be reported in parts per million (ppm) to the third decimal place," and that "additional digits" should be "truncated"); *Maryland v. EPA*, 958 F.3d 1185, 1191 (D.C. Cir. 2020) (explaining that EPA similarly held that "any receptor with a projected design value of less than 76 ppb was determined to be in attainment" with the "2008 ozone NAAQS of 75 ppb").

where to draw the screening line was not dictated by statute, but was instead arbitrary.

"EPA's Delphic explanation of [Mississippi's] purported failure to carry its burden of proof—and of even what that burden is—falls far short of reasoned decisionmaking." *New York*, 964 F.3d at 1224. Such arbitrary and capricious regulation must be invalidated.

## III. EPA unlawfully based its disapproval on new modeling issued after Mississippi submitted its plan.

EPA went beyond simply refusing to defer to Mississippi's regulatory judgments—it argued that newly devised modeling made Mississippi's careful analysis of the modeling available at the time it submitted its state plan "inconsequential." 87 Fed. Reg. at 9,557. Because EPA developed this modeling long after Mississippi submitted its plan, the State had no notice of this modeling, much less an appropriate opportunity to account for it. EPA nonetheless found this new modeling sufficient, on its own, to disapprove Mississippi's plan and thereby foist a stringent federal plan on the State. This is yet another reason why EPA's disapproval was unlawful.

### A. EPA's use of modeling unavailable to the State when it crafted its plan as a basis for disapproving that plan violated the Act.

Mississippi submitted its plan on September 3, 2019, using the latest modeling available to it, EPA's December 2016 Model, and in its plan explained extensively why it complied with the Good Neighbor Provision. EPA was statutorily required to act on Mississippi's state plan by March 3,

2021, at the latest. 42 U.S.C. § 7410(k)(1)-(2). "Instead of rendering a timely decision, the EPA slow-walked … beyond [the Act's] statutory deadline—finally acting on February 13, 2022" to propose disapproval. Stay Order at 19. And when it finally did act, EPA "relied upon various significant changes to its modeling data that it adopted long *after* the statutory deadline." *Id.*

EPA announced an early version of this new modeling, called 2016v1, in October 2020, and then "made further updates" to the platform, creating the 2016v2 model, which it relied on as a basis for proposing to disapprove Mississippi's state plan. 87 Fed. Reg. at 9,548, 9,557-58. EPA then made "a number" of *further* "updates" to the "model design," resulting in the 2016v3 model, and relied on that model to finalize its disapproval of Mississippi's state plan. 88 Fed. Reg. at 9,339, 9,358. Importantly, every iteration of EPA's modeling produced materially different results:[9]

---

[9] Data for this table can be found at C.I. HQ-3 at C-2 to C-4 (Dec.2016 Model); *Air Quality Modeling TSD for the Proposed Revised Cross-State Air Pollution Rule Update*, EPA-HQ-OAR-2020-0272-0064 (Oct. 15, 2020), bit.ly/3WjboZK (2016v1 model data listed on the "2023 DVs & Contributions" tab of the "Ozone Design Values and Contributions Proposed Revised CSAPR Update" spreadsheet); 87 Fed. Reg. at 9,557 (2016v2 model); C.I. HQ-10 (2016v2 model).

| Projected Links | December 2016 Model | 2016v1 | 2016v2 | 2016v3 |
|---|---|---|---|---|
| Deer Park, Harris County | 0.79 ppb | No Link | No Link | No Link |
| Galveston County | No Link | 1.55 ppb | No Link | 1.32 ppb |
| Bayland Park, Harris County | No Link | No Link | 1.04 ppb | 0.91 ppb |
| Manvel Croix Park, Brazoria County | No Link | No Link | 0.92 ppb | No Link |
| Denton County | No Link | No Link | 1.14 ppb | 0.91 ppb |

EPA's decision to base its disapproval of Mississippi's state plan on this "constantly moving target" is fundamentally inconsistent with the Clean Air Act's system of cooperative federalism. *New York*, 964 F.3d at 1224. EPA has *admitted* that it should not evaluate a state's plan "based on information that was not available at the time of submittal" because that would "creat[e] a moving target that would be impossible to meet." *Determination of Attainment of the 1-Hour Ozone Standard*, 69 Fed. Reg. 21,717, 21,727 (Apr. 22, 2004). Because modeling methodologies and inputs are "continually being improved," EPA has—or *had*—a "longstanding policy" of only requiring "that states use the latest model available at the time a plan is developed." *Sierra Club v. EPA*, 356 F.3d 296, 308 (D.C. Cir. 2004) (citation omitted). As the D.C. Circuit held, "[t]o require states to revise completed plans every time a new model is announced would lead to significant costs and potentially endless delays in the approval processes." *Id.* Thus, EPA has explained it "would be unreasonable to require the States to" incorporate into their state plans

modeling that was released after "significant work [had] already occurred." *Approval and Promulgation of Air Quality Implementation Plans; District of Columbia, Maryland, Virginia*, 68 Fed. Reg. 19,106, 19,121 (Apr. 17, 2003). But it is precisely that unreasonable (and non-statutory) demand EPA has made to Mississippi here.

Moreover, because EPA has no obligation to promulgate any modeling or guidance for States, *see EME Homer*, 572 U.S. at 509, Mississippi had discretion to use the available modeling it determined best suited to the State's circumstances. For Mississippi to truly "have broad authority to determine the methods and particular … strategies" it will use to comply with the Good Neighbor Provision, the validity of its plan cannot depend on whether it managed to predict EPA's constantly moving *post-hoc* targets. *BCCA Appeal Group v. EPA*, 355 F.3d 817, 822 (5th Cir. 2003). Otherwise, States will *never* be able to guarantee a successful submission, no matter how faithfully they adhere to both the statute and to EPA's then-existing guidance and data. "EPA could easily flout the [Act's] deadlines with impunity, then leverage that disregard to summarily reject [plans] based on the States' failure to consider information that only became available after the []submission deadline." Stay Order at 21-22. Such acts by EPA defy the entire structure of the Act and its vesting of primary authority in the States to devise implementation plans by demanding States meet an "unattainable standard[] of proof." *New York*, 964 F.3d at 1222.

EPA actually admits that it delayed its review of Mississippi's state plan to ensure it could "act on all the states' submissions in a consistent manner." 88 Fed. Reg. at 9,365. It insists this "delay in acting caused no prejudice to" States. *Id.* But EPA's very decision to substitute its own national ozone policy for individualized review of state plans violates the statute. *See Luminant*, 675 F.3d at 928 n.8. This denied Mississippi its statutory right to make its own policy choices about how to comply with the Act.

EPA's response is that the statute does not require EPA to ignore new technical data. 88 Fed. Reg. at 9,366. But that is a red herring. The relevant question is whether a state's reliance on the data available to it makes the state's implementation plan inconsistent with the statute, such that EPA may disapprove it. As explained above, it does not.

Rather, EPA can address new data through other mechanisms. For instance, if EPA "finds that the applicable implementation plan for any area is substantially inadequate to attain or maintain the relevant" NAAQS, EPA may issue a "call[] for plan revisions." 42 U.S.C. § 7410(k)(5). EPA may issue these calls based on new "modeling" or other "data." *See Michigan*, 213 F.3d at 674. EPA may then "establish reasonable deadlines," "not to exceed 18 months," for States to submit "such plan revisions." § 7410(k)(5). This provision thus maintains the Act's structure of cooperative federalism, with States as primary regulator, and gives States adequate time to craft new plans based on new data. But what the Act does *not* do is give EPA authority to

disapprove state plans based on data States had no notice of when they submitted those plans.

Nor does an upwind state's ability to rely only on the data available to it when it submits its plan unfairly disadvantage downwind states. If a downwind state comes to believe (*e.g.*, because of new data or models) that specific upwind sources are significantly contributing to its nonattainment with the NAAQS, it can petition EPA to act. *See* 42 U.S.C. § 7426(b). EPA must then hold a public hearing and, if necessary, order the source to reduce emissions. *Id.* § 7426(b)-(c). But EPA's backstop authority is limited to actions necessary to bring that specific source into compliance. *Id.* It cannot simply discard the state's implementation plan. *See Appalachian Power Co. v. EPA*, 249 F.3d 1032, 1046 (D.C. Cir. 2001); *see also* 40 C.F.R. § 52.34(i) (EPA actions under § 7426(b) are automatically "withdrawn" when a state plan addressing the concern is approved).

Thus, at every stage, the Clean Air Act limits EPA's involvement in the state implementation plan process to the minimum intrusion required to bring the plan into compliance with the Act. Here, though, EPA did not opt for any of its statutorily prescribed avenues for addressing changed circumstances. It opted for a maximalist approach that rendered Mississippi's carefully considered state plan an exercise in futility. EPA's use of after-the-deadline modeling thus exceeded its statutory authority by "transform[ing] the EPA's statutory role from that of a 'ministerial' overseer to one of a freewheeling dictatorial regulator." Stay Order at 22.

48

## B. EPA's use of new modeling was arbitrary and capricious.

"EPA's decision to consider after-the-statutory deadline information" to reject Mississippi's technical analysis was also arbitrary and capricious. *See id.* at 21. EPA had "engendered serious reliance interests," *Encino Motorcars*, 579 U.S. at 222, in both EPA's prior modeling and its "longstanding policy" of only "requiring states to use the most current emission estimate models available at the time of SIP development," 81 Fed. Reg. 59,876, 59,878 n.15 (Aug. 31, 2016). Given those interests, EPA had an obligation to provide both fair notice of and "good reasons" for the change. *Encino Motorcars*, 579 U.S. at 221. Here, EPA did not even mention its prior, longstanding policy of allowing States to rely on the modeling available at the deadline, and it certainly did not provide "good reasons" for its application of new modeling. *Id.* at 222. EPA's "surprise switcheroo" here was especially prejudicial. Stay Order at 20 (citing *Env't Integrity Project v. EPA*, 425 F.3d 992, 996 (D.C. Cir. 2005)). EPA *knew* States would rely on its December 2016 modeling—that was the reason it promulgated that modeling in the first place. *See supra* 7-10. Its subsequent decision to "move the administrative goalpost" by rejecting Mississippi's plan *because* it relied on that modeling was arbitrary and capricious. Stay Order at 20.

Moreover, "contrived reasons" are not enough to uphold agency action—if the "explanation for agency action … is incongruent with what the record reveals about the agency's priorities and decisionmaking process," the action must be struck down. *Dep't of Com. v. New York*,

139 S. Ct. 2551, 2575-76 (2019). The facts of this case demonstrate that EPA's proffered explanation is so "incongruent with what the record reveals about the agency's priorities and decisionmaking process" as to be "pretextual." *Id.* at 2573, 2576.

Consider the record evidence:

1. EPA delayed acting on Mississippi's plan for years beyond its statutory deadline. EPA then used that unlawful delay to develop new modeling that formed the basis of its disapproval of Mississippi's plan. *Supra* III.A.

2. EPA contradicted past guidance promising Mississippi flexibility in adopting analytical frameworks best suited to its situation. *Supra* II.C.

3. EPA required further justification and analysis from Mississippi, but shrouded what justification it was looking for in mystery, *supra* 35-36, and did not even attempt to show Mississippi's analysis yielded wrong results, *supra* 38-39.

4. EPA abandoned its policy of not requiring States to use modeling and data unavailable to States when they prepared their implementation plans. *Supra* 45-46.

5. EPA denied over 20 state plans *en masse*. *See* 88 Fed. Reg. 9,336. EPA's assertion that none of these States properly exercised their "wide discretion" to create a valid state plan beggars belief. *Union Elec. Co.*, 427 U.S. at 250. States that had their plans approved did not provide EPA with a better analysis, but instead were the beneficiaries of the vagaries of EPA's ever-shifting modeling.

6. EPA then immediately promulgated a federal plan that would mandate a federal emissions program on these States. In fact, EPA admits it delayed in reviewing Mississippi's plan *so that* it could develop a federal plan. 88 Fed. Reg. at 9,365.

EPA's actions thus reveal that its "priorities and decisionmaking process" were all aimed at this final piece: denying Mississippi the ability to promulgate its own state plan *so that* it could impose a federal plan. *See Dep't of Com. v. New York*, 139 S. Ct. at 2575. It is hard to see any other reason for this course of conduct—other than pure caprice. Regardless, EPA's proffered reasons fail to explain its actions, so those actions must be invalidated. *See id*.

## C. Even under the new modeling, Mississippi's state plan should have been approved.

It was improper for EPA to delay statutory obligations and move the goal posts, but Mississippi nonetheless performed a technical analysis of the 2016v2 model and confirmed that Mississippi's plan complied with its Good Neighbor obligations. EPA arbitrarily rejected it.

The 2016v2 modeling projected Mississippi to barely contribute above 1 ppb to two receptors, and above 0.7 ppb to a third receptor, in the Houston and Dallas metro areas. *Supra* 45. As EPA itself admits, that projection is simply the starting point. *Supra* 31-32. Accordingly,  when the initial screening threshold is exceeded in a model, States must "further evaluate their

emissions to determine whether" they actually constitute "significant contributions." 88 Fed. Reg. at 9,371.

Mississippi conducted that further analysis. In its comments on the proposed disapproval, Mississippi explained that the "imperceivable contributions" above 1 ppb in the 2016v2 modeling fell "well within the error range" for the modeling. C.I. R4-17 at 2. By EPA's own admission, the model suffered from an enormous margin of error (+/- 7.8 to 9.1 ppb) that would dwarf Mississippi's projected contributions. *See id.*

Mississippi further explained why even taking the 2016v2 model as accurate, Mississippi sources would not contribute significantly to downwind receptors' inability to meet the NAAQS. First, Mississippi provided eight pages of technical meteorological analysis explaining that the actual measured data shows "no correlation" between Mississippi and high ozone levels at the three Texas sites the 2016v2 model linked to Mississippi when "easterly winds" were blowing, which "is the only time Mississippi emissions could conceivably contribute to high [ozone] in these areas" of Texas. *Id.* at 2-3. The prevailing winds in those Texas areas blow from the south, not east from Mississippi. *Id.* at 9-11. Meanwhile, when ozone levels are high in those Texas areas, winds are "under very stagnant conditions with minimal mixing, allowing [ozone] to build" from local emissions rather than those transported from Mississippi. *Id.* at 2, 4.

In support, Mississippi provided wind trajectory data for those high-ozone days at the Texas sites, measuring wind at low altitudes (10 and 50

meters), which showed that air contributions to those areas were not emanating from Mississippi. *Id.* at 4-5. And even when, at higher altitudes, some wind was blowing from Mississippi, air quality monitors in Mississippi showed that air was remarkably clean (with ozone levels around 40 ppb or less). *Id.* at 6-7.

EPA failed to provide a reasoned response that addressed the issues Mississippi flagged. It provided its own wind "back trajectories" for those Texas sites showing occasional wind from Mississippi at *high* altitudes (500m and 750m). C.I. HQ-83 at 366. But the 2015 Ozone NAAQS relates to *ground-level* ozone. *See* EPA, *Overview of EPA's Updates to the Air Quality Standards for Ground-Level Ozone* (Oct. 1, 2015), bit.ly/3qcGWEo. Mississippi's comment thus focused on wind at low altitudes (10m and 50m). EPA's response concerning winds at high altitudes, without demonstrating that those high-level concentrations are in fact migrating down to the ground-level on elevated ozone days in Texas, is unresponsive to Mississippi's comment. That failure to "sufficiently address" Mississippi's analysis was unlawful. *Mexican Gulf Fishing Co. v. United States Dep't of Com.*, 60 F.4th 956, 973 (5th Cir. 2023).

In other words, Mississippi provided a detailed technical explanation of why, despite the 2016v2 modeling, Mississippi emissions will not, in fact, significantly contribute to ozone problems in the Dallas and Houston metros. But, despite Mississippi's good faith effort to engage with EPA's 2016v2 modeling, EPA rejected that analysis yet failed to meaningfully engage with Mississippi's determinations. Thus, even when Mississippi tried to comply

with EPA's insistence on using new modeling, EPA *still* usurped the role of primary regulator from Mississippi. Indeed, EPA's insistence that it must use the newest modeling available means even a *revised* plan from Mississippi addressing the 2016v3 modeling would be futile—EPA would review that revised plan under even newer modeling and use that as a basis for disapproval. EPA's no-win framework is arbitrary and capricious.

## CONCLUSION

The Court should vacate EPA's disapproval of Mississippi's state implementation plan.

Respectfully submitted,

/s/ C. Grady Moore III

**C. Grady Moore III**
BALCH & BINGHAM LLP
1901 6th Ave. N., Ste. 1500
Birmingham, Alabama 35203
(205) 251-8100
gmoore@balch.com

**Bradley A. Ennis**
**Susan Scaggs Stutts**
BALCH & BINGHAM LLP
1310 25th Avenue
Gulfport, MS 39501
(228) 864-9900

**Shawn S. Shurden**
*General Counsel*

/s/ Justin L. Matheny

**Lynn Fitch**
  *Attorney General of Mississippi*
**Whitney H. Lipscomb**
  *Deputy Attorney General*
**Justin L. Matheny**
  *Deputy Solicitor General*
STATE OF MISSISSIPPI OFFICE OF THE
ATTORNEY GENERAL
P.O. Box 220
Jackson, MS 39205-0220
(601) 359-3680
justin.matheny@ago.ms.gov

**Mithun Mansinghani**
LEHOTSKY KELLER COHN LLP
629 W. Main St.

MISSISSIPPI POWER COMPANY
2992 West Beach Boulevard
Gulfport, MS 39502
(228) 229-0915

*Counsel for Mississippi Power Company*

Oklahoma City, OK 73102
mithun@lkcfirm.com
(512) 693-8350

**Michael B. Schon**
**Drew F. Waldbeser**
**Michael Cotton**
LEHOTSKY KELLER COHN LLP
200 Massachusetts Ave NW
Washington, DC 20001
mike@lkcfirm.com
(512) 693-8350

*Counsel for State of Mississippi and Mississippi Department of Environmental Quality*

## CERTIFICATE OF SERVICE

On May 30, 2023, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of a commercial virus scanning program and is free of viruses.

*/s/ Justin L. Matheny*
Justin L. Matheny

## CERTIFICATE OF COMPLIANCE

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,961 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Palatino Linotype) using Microsoft Word (the same program used to calculate the word count).

*/s/ Justin L. Matheny*
Justin L. Matheny