No. 23-60069

# In the United States Court of Appeals for the Fifth Circuit

STATE OF TEXAS; TEXAS COMMISSION ON ENVIRONMENTAL QUALITY; LUMINANT GENERATION COMPANY, L.L.C.; COLETO CREEK POWER, L.L.C.; ENNIS POWER COMPANY, L.L.C.; HAYS ENERGY, L.L.C.; MIDLOTHIAN ENERGY, L.L.C.; OAK GROVE MANAGEMENT COMPANY, L.L.C.; WISE COUNTY POWER COMPANY, L.L.C.; ASSOCIATION OF ELECTRIC COMPANIES OF TEXAS; BCCA APPEAL GROUP; TEXAS CHEMICAL COUNCIL; TEXAS OIL & GAS ASSOCIATION; PUBLIC UTILITY COMMISSION OF TEXAS; RAILROAD COMMISSION OF TEXAS; STATE OF MISSISSIPPI; MISSISSIPPI DEPARTMENT OF ENVIRONMENTAL QUALITY; MISSISSIPPI POWER COMPANY; STATE OF LOUISIANA; LOUISIANA DEPARTMENT OF ENVIRONMENTAL QUALITY; ENTERGY LOUISIANA, L.L.C.; LOUISIANA CHEMICAL ASSOCIATION; MID-CONTINENT OIL AND GAS ASSOCIATION; LOUISIANA ELECTRIC UTILITY ENVIRONMENTAL GROUP, L.L.C.; TEXAS LEHIGH CEMENT COMPANY, LP,

*Petitioners,*

*v.*

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; MICHAEL S. REGAN, ADMINISTRATOR, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

*Respondents.*

## MISSISSIPPI PETITIONERS' JOINT REPLY BRIEF

[Counsel listed on inside cover]

**C. Grady Moore III**
BALCH & BINGHAM LLP
1901 6th Ave. N., Ste. 1500
Birmingham, Alabama 35203
(205) 251-8100
gmoore@balch.com

**Bradley A. Ennis**
**Susan Scaggs Stutts**
BALCH & BINGHAM LLP
1310 25th Avenue
Gulfport, MS 39501
(228) 864-9900

**Shawn S. Shurden**
*General Counsel*
MISSISSIPPI POWER COMPANY
2992 West Beach Boulevard
Gulfport, MS 39502
(228) 229-0915

*Counsel for Petitioner Mississippi
Power Company*

**Lynn Fitch**
  *Attorney General of Mississippi*
**Whitney H. Lipscomb**
  *Deputy Attorney General*
**Justin L. Matheny**
  *Deputy Solicitor General*
STATE OF MISSISSIPPI OFFICE OF THE
ATTORNEY GENERAL
P.O. Box 220
Jackson, MS 39205-0220
(601) 359-3680
justin.matheny@ago.ms.gov

**Mithun Mansinghani**
LEHOTSKY KELLER COHN LLP
629 W. Main St.
Oklahoma City, OK 73102
(512) 693-8350
mithun@lkcfirm.com

**Michael B. Schon**
**Drew F. Waldbeser**
**Michael Cotton**
LEHOTSKY KELLER COHN LLP
200 Massachusetts Ave NW
Washington, DC 20001
(512) 693-8350
mike@lkcfirm.com

*Counsel for Petitioners State of Missis-
sippi and Mississippi Department of
Environmental Quality*

# Table of Contents

Page

Table of Contents ............................................................ iii

Table of Authorities ........................................................ iv

Introduction ..................................................................... 1

Argument .......................................................................... 3

   I.   The Clean Air Act required approval of Mississippi's plan if based on reasonable interpretations and policy judgments. ............................................................... 3

   II.  EPA unlawfully disapproved Mississippi's reasonable state plan. ........................................................................ 9

      A.   Mississippi reasonably selected a 1 ppb screening threshold. .......................................................... 10

      B.   Mississippi reasonably explained why Deer Park was likely to reach attainment by 2023. ................... 15

   III.  EPA's use of new modeling was unlawful. ...................... 18

      A.   EPA's use of new modeling directly conflicts with the Act. ...................................................................... 20

      B.   EPA's use of new modeling was arbitrary and capricious. ............................................................ 22

   IV.  Venue is proper in this Court. .......................................... 25

   V.  Vacatur is the appropriate remedy. ................................. 26

Conclusion ....................................................................... 28

Certificate of Service ....................................................... 30

Certificate of Compliance ............................................... 30

## TABLE OF AUTHORITIES

**Cases**

*Alabama Env't Council v. EPA,*
    711 F.3d 1277 (11th Cir. 2013)…………………………………………22

*Alaska Dep't of Env't Conservation v. EPA,*
    540 U.S. 461 (2004)…………………………………………...1, 5, 7, 14

*Arizona ex rel. Darwin v. EPA,*
    815 F.3d 519 (9th Cir. 2016)………………………………….……5, 6

*Ass'n of Irritated Residents v. EPA,*
    686 F.3d 668 (9th Cir. 2012)……………………………….……..7

*Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.,*
    462 U.S. 87 (1983)……………………………………………...……7

*BCCA Appeal Grp. v. EPA,*
    355 F.3d 817 (5th Cir. 2003)………………………………………..7

*Data Mktg. P'ship, LP v. United States Dep't of Lab.,*
    45 F.4th 846 (5th Cir. 2022)…………………………………………26

*EPA v. EME Homer City Generation, L.P.,*
    572 U.S. 489 (2014)……………………………………………...…..8

*Fla. Power & Light Co. v. Costle,*
    650 F.2d 579 (5th Cir. 1981)………………………………………..3

*Harrison v. PPG Indus., Inc.,*
    446 U.S. 578 (1980)……………………………………………..........25

*Lebron v. Nat'l R.R. Passenger Corp.*,
    513 U.S. 374 (1995)……………………………………………....…22

*Louisiana Pub. Serv. Comm'n v. FCC*,
    476 U.S. 355 (1986)……………………………………………….6

*Luminant Generation Co. v. EPA*,
    675 F.3d 917 (5th Cir. 2012)…………………………….…..…….3, 6, 7

*Mass. Bd. Of Ret. v. Murgia*,
    427 U.S. 307 (1976)……………………………………………....…11

*Michigan v. EPA*,
    213 F.3d 663 (D.C. Cir. 2000)………………………………....…15

*Nevada Cement Co. v. EPA*,
    No. 23-682, Order (9th Cir. July 3, 2023)…………………………23

*New York v. EPA*,
    964 F.3d 1214 (D.C. Cir. 2020)………………………………….....15

*Nickell v. Beau View of Biloxi, L.L.C.*,
    636 F.3d 752 (5th Cir. 2011)…………………………………..8, 9

*North Dakota v. EPA*,
    730 F.3d 750 (8th Cir. 2013)………………………………....…5, 6

*Oklahoma v. EPA*,
    723 F.3d 1201 (10th Cir. 2013)…………………………………..8

*Sierra Club v. EPA*,
    356 F.3d 296 (D.C. Cir. 2004)………………………………..17

*Sierra Club v. EPA,*
    671 F.3d 955 (9th Cir. 2012)…………………………………...…23

*Sierra Club v. EPA,*
    939 F.3d 649 (5th Cir. 2019)………………………………………..6, 7

*Sierra Club v. EPA,*
    972 F.3d 290 (3d Cir. 2020)…………………………………...…7

*State of Wisconsin v. EPA,*
    938 F.3d 303 (D.C. Cir. 2019)………………………………...…22

*Sw. Elec. Power Co. v. EPA,*
    920 F.3d 999 (5th Cir. 2019)………………………………………....22

*Texas v. EPA,*
    690 F.3d 670 (5th Cir. 2012)………………………………………....20

*Texas v. EPA,*
    829 F.3d 405 (5th Cir. 2016)………………………………....3, 7, 26

*Texas v. EPA,*
    983 F.3d 826 (5th Cir. 2020)…………………………………………..7

*Texas v. EPA,*
    No. 23-60069, Stay Order (May 1, 2023)………………………5, 20, 25

*Texas v. United States,*
    40 F.4th 205 (5th Cir. 2022)………………………………...…..27

*Texas v. United States,*
    50 F.4th 498 (5th Cir. 2022)………………………………………….27

*Train v. Nat. Res. Def. Council, Inc.*,
    421 U.S. 60 (1975)……………………………………………………..3

*Union Elec. Co. v. EPA*,
    427 U.S. 246 (1976)……………………………………….…..…3, 7, 10, 11, 14

*United States v. Mead Corp.*,
    533 U.S. 218 (2001)……………………………………………….…8, 9

*Wages & White Lion Invs., L.L.C. v. United States Food & Drug Admin.*,
    16 F.4th 1130 (5th Cir. 2021)…………………………………………..19

*Westar Energy, Inc. v. EPA*,
    608 F.App'x 1 (D.C. Cir. 2015)…………………………………………4

*Wyoming v. EPA*,
    No. 14-9529, 2023 WL 5214083 (10th Cir. Aug. 15, 2023)……..…12, 17

**Statutes**

5 U.S.C. § 706…………………………………………………………6

42 U.S.C. § 7401……………………………………………………..…..3

42 U.S.C. § 7407……………………………………………………...……3

42 U.S.C. § 7410……………………………………………….…………1, 3, 21, 22, 24

42 U.S.C. § 7426……………………………………………………………..21

42 U.S.C. § 7475……………………………………………………………13, 14

42 U.S.C § 7607…………………………………………………...…..25, 26

## Regulatory Authorities

68 Fed. Reg. 19,106 (Apr. 17, 2003)…………………………………....…23, 24

69 Fed. Reg. 21,717 (Apr. 22, 2004)…………………………………………..23

81 Fed. Reg. 74,504 (Oct. 26, 2016)…………………………………….…..22

87 Fed. Reg. 9,477 (Feb. 22, 2022)……………………………………....……..12

87 Fed. Reg. 9,545 (Feb. 22, 2022)…………………………………...……19, 24

87 Fed. Reg. 68,483 (Nov. 15, 2022)………………………….………..…..22

88 Fed. Reg. 9,336 (Feb. 13, 2023)……………………………….……16, 22

88 Fed. Reg. 36,654 (June 5, 2023)…………………………………………26

EPA, *Application of Significant Impact Levels in the Air Quality*
    *Demonstration for Prevention of Significant Deterioration*
    *Permitting under the Clean Air Act* (Apr. 17, 2018),
    bit.ly/3BFKlhL……………………………………………………13, 14

EPA, *Guidance on Significant Impact Levels for Ozone and Fine*
    *Particles in the Prevention of Significant Deterioration*
    *Permitting Program* (Apr. 17, 2018), bit.ly/3NgrwIM...………..……13

## INTRODUCTION

Mississippi's plan was among the easiest for EPA to approve under its appropriate statutory role. EPA's own data showed that Mississippi's largest downwind ozone contribution was to a single site at 0.79 ppb. This contribution was comfortably below the 1 ppb threshold that EPA guidance told states they may consider to screen downwind contributions as categorically insignificant. Thus, Mississippi straightforwardly concluded that its existing emissions controls complied with the Good Neighbor Provision's requirement that the state's emissions do not "contribute significantly" to ozone problems elsewhere. 42 U.S.C. § 7410(a)(2)(D)(i)(I).

EPA's attempts to justify its disapproval of Mississippi's state plan lack merit. To start, EPA doubles down on its claim that it may override state discretion and disapprove a state plan even if the plan reasonably shows compliance with the statute. But the Clean Air Act designates the states as "primary" and *requires* EPA to approve state plans if the plan is based "on a reasoned analysis." *Alaska Dep't of Env't Conservation v. EPA*, 540 U.S. 461, 490-91 (2004) *("ADEC")*.

EPA does not claim that Mississippi's plan was unmoored from the statute. Rather, EPA argues that Mississippi's plan lacked reasoning or technical analysis. That is belied by the record. Mississippi's detailed plan relied on EPA's own technical guidance, supplemented by Mississippi's analysis. Ultimately, EPA disapproved Mississippi's plan based on its own policy and

technical preferences, not any statutory factor and not because Mississippi's plan lacked a reasoned basis. That plainly exceeds EPA's statutory authority.

EPA now downplays its reliance on modeling results unavailable to Mississippi when it submitted its plan, arguing they "confirmed" EPA's decision but were not outcome-determinative. Resp.Br.3. That is irreconcilable with EPA's repeated statements it was disapproving Mississippi's plan *because of* the new modeling. EPA's counsel's effort to reverse field is not surprising: the agency's decision to blow past its statutory deadline, use that delay to generate new modeling results, and disapprove Mississippi's plan using that new modeling is fundamentally inconsistent with the Act's delegation of "primary" authority to the states and is prototypically arbitrary and capricious.

Finally, EPA's attempted procedural dodges fail. Venue is appropriate in this Court, as the statutory text requires and this Court's motions panel held. Vacatur is the presumptive remedy when an agency acts unlawfully and there is no reason to depart from that presumption here. EPA's disapproval will severely harm Mississippi Petitioners if allowed to go into effect despite its unlawfulness. And it cannot be salvaged on remand—EPA's action is unlawful from top to bottom.

# ARGUMENT

## I.    The Clean Air Act required approval of Mississippi's plan if based on reasonable interpretations and policy judgments.

EPA's error begins with misapprehension of its statutory role. As Mississippi Petitioners carefully explained, MS.Br.4-7,21-24, the Act explicitly vests states with "primary responsibility for assuring air quality," 42 U.S.C. § 7407(a). It thus delegates to states "considerable latitude in determining specifically how the [NAAQS will] be met." *Train v. Nat. Res. Def. Council, Inc.*, 421 U.S. 60, 87 (1975).

"The great flexibility accorded the states" is "sharply contrast[ed]" by the "narrow role to be played by EPA." *Fla. Power & Light Co. v. Costle*, 650 F.2d 579, 587 (5th Cir. 1981). EPA is "plainly … relegated by the Act to a secondary role." *Train*, 421 U.S. at 79. EPA "shall approve" a state's plan so long as it is consistent with the statute, 42 U.S.C. § 7410(k)(3), and "[t]he mandatory 'shall' makes it quite clear that the Administrator is not to be concerned with factors other than those specified." *Union Elec. Co. v. EPA*, 427 U.S. 246, 257 (1976). This is true even if EPA would have made different "legislative choices." *Id.* at 269; *see also Luminant Generation Co. v. EPA*, 675 F.3d 917, 928 n.8 (5th Cir. 2012) ("Only the states enjoy discretion in implementing the dictates of the CAA."). Thus, "the Clean Air Act limits EPA to a deferential role" and "EPA must defer" to a state's choices so long as they "comply with the Act." *Texas v. EPA*, 829 F.3d 405, 428 (5th Cir. 2016) (*Texas 2016*).

3

In over 200 pages of briefing, EPA tellingly acknowledges *none* of these statements from binding precedent. Instead, EPA espouses a position in direct conflict with the Act. While statutory provisions and caselaw cited above emphasize the state's role as "primary" and EPA's as "secondary," EPA contends that *it*, not the states, has the "primary role" in implementing the Act's state plan provisions, Resp.Br.84.

Unwilling to confront controlling authority, EPA battles strawmen. It strenuously argues the Act gives it a "meaningful role" in reviewing the substance of state submissions and states may not simply "assert" compliance or submit an entirely unreasoned state plan. Resp.Br.76-77,80-90,94,98. But Mississippi Petitioners have never argued otherwise. State plans must be based on "'permissible' constructions of the [Act]" and "supported by a 'reasoned analysis.'" MS.Br.23 (citations omitted). Courts have held that EPA may disapprove when a state plan fails "to provide any analysis at all of the downwind effect of its in-state emissions." *Westar Energy, Inc. v. EPA*, 608 F. App'x 1, 3 (D.C. Cir. 2015). But Mississippi's state plan, based on detailed analysis of downwind contributions building on EPA's own then-extant data and guidance, easily clears that hurdle. *See* MS.Br.7-12.

Perhaps recognizing this, EPA leaps to the assumption that because it has *some* substantive reviewing role, its discretion in that role is plenary. It claims *carte blanche* authority to decide "whether emissions significantly contribute to nonattainment or interfere with maintenance of the NAAQS," Resp.Br.84,86-87, even if the state's contrary analysis was reasonable,

Resp.Br.81 (asserting that EPA does not "bear[] the burden of proving a state's determinations are unreasonable").

The Act does not give EPA that kind of *de novo* authority. That would make the statute's vesting of primary authority with the states and the Supreme Court's repeated recognition of the state's discretion virtually meaningless. *See* MS.Br.21-23. As this Court has recognized, there are multiple "'permissible' ways to effectuate" the Act, and EPA may not second-guess states when they exercise reasonable "discretion in implementing the dictates of the" Act. *Texas v. EPA*, No. 23-60069, Stay Order at 15-16 (May 1, 2023) (quotation marks and citation omitted). Because the Act vests state "authorities with initial responsibility," EPA may "second guess state decisions ... *[o]nly*" when the "determination is not based on a reasoned analysis." *ADEC*, 540 U.S. at 488, 490 (quotation marks and citation omitted) (emphasis added).

EPA cannot deny that standard governs. *See* Resp.Br.98 (citing *ADEC*). In fact, EPA repeatedly cites cases that confirm EPA may only disapprove state plans when unreasoned or unmoored from the statute. For instance, EPA cites *North Dakota v. EPA*, 730 F.3d 750, 761 (8th Cir. 2013). *See* Resp.Br.80,81,86,97. That case relies on *ADEC*, holding that EPA may disapprove state plans when they are "based upon an analysis that is neither reasoned nor moored to the [Act's] provisions." *North Dakota*, 730 F.3d at 761. EPA also relies heavily on *Arizona ex rel. Darwin v. EPA*, 815 F.3d 519 (9th

Cir. 2016), Resp.Br.56,80,81,97, but *Darwin* cites both *ADEC* and *North Dakota*, and confirms "EPA may not 'second guess' reasoned, legally compliant state decisions." 815 F.3d at 532. In *Sierra Club v. EPA*, 939 F.3d 649, 686 (5th Cir. 2019), EPA *approved* a state plan because it was "based on reasoned policy decisions," even though EPA thought those decisions were "oversimplified and unrealistic." EPA's reliance on that case thus undercuts its argument. *See* Resp.Br.57,85,90,145,186.

EPA next argues that because its decisions are reviewed under the Administrative Procedure Act, the only question is whether EPA's determination was reasonable. Resp.Br.55-56. That argument conflates this Court's standard of review with the Clean Air Act's division of authority. When an agency exceeds its authority—as EPA did here—courts do not ask whether that legal error was reasonable. "[A]n agency literally has no power to act, let alone pre-empt the validly enacted [action] of a sovereign State, unless and until Congress confers power upon it." *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). Courts "*must* … set aside agency action that is 'in excess of statutory … authority'" because it is "*ultra vires*." *Luminant Generation*, 675 F.3d at 925 (quoting 5 U.S.C. § 706(2)(C)) (emphasis added).

None of EPA's cited cases hold that it may disapprove reasonable state plans based on its own policy views or discretionary judgments. EPA.Resp.56-57,85-86. As noted, *North Dakota* and *Darwin* affirmed EPA's disapproval of state plans that were unreasoned. Others upheld EPA's decision to *approve* a state plan, meaning EPA properly refused to second-guess

a state's judgments. *E.g., Sierra Club,* 939 F.3d at 686; *BCCA Appeal Group v. EPA,* 355 F.3d 817, 832-34 (5th Cir. 2003). Some involve evaluating EPA's interpretations where it has a primary regulatory role, such as in federal enforcement provisions or federal nonattainment designations. *E.g., Luminant Generation*, 714 F.3d at 856-57; *Texas v. EPA,* 983 F.3d 826, 836 (5th Cir. 2020). Similarly inapposite are cases where courts vacated because *EPA's* action was unreasoned. *E.g., Sierra Club v. EPA,* 972 F.3d 290 (3d Cir. 2020); *Ass'n of Irritated Residents v. EPA,* 686 F.3d 668, (9th Cir. 2012). And many of EPA's cases simply articulate general APA principles in cases that have nothing to do with the Clean Air Act or EPA's deferential role in reviewing state implementation plans. *E.g., Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.,* 462 U.S. 87, 103 (1983) (applying APA standards in a NEPA case). None of these cases suggest EPA has authority to reject reasonable state judgments to disapprove a state's plan.

EPA also claims it deserves deference as the "expert agency." Resp.Br.85. But here, the Act delegated to *states* the power to make "legislative choices in regulating air pollution." *Union Elec. Co.,* 427 U.S. at 269. Nothing in the Act indicates Congress believed EPA had more expertise than states when it comes to *state plans*, which necessarily involve "intensely factual determinations" about the "particularities of the emissions sources" in the state and other local conditions. *Texas 2016,* 829 F.3d at 421; *see ADEC,* 540 U.S. at 507 (Kennedy, J., dissenting). Even EPA has stressed states' expertise, stating

that "States routinely undertake technically complex air quality determinations." *EPA v. EME Homer City Generation, L.P*, 572 U.S. 489, 539 (2014) (Scalia, J., dissenting) (quoting EPA's brief).

This Court should therefore reject EPA's bid for deference. Courts sometimes defer to agency interpretations "promulgated in the exercise" of "delegated authority." *United States v. Mead Corp.*, 533 U.S. 218, 227 (2001). But as just explained, Congress did not delegate primary authority to EPA; it explicitly delegated it to states. And "where it is in doubt that Congress actually intended to delegate particular interpretive authority to an agency, *Chevron* is 'inapplicable.'" *Id.* at 230. (citation omitted). That is why the deference afforded to EPA's *federal* plan decisions in *EME Homer* is irrelevant to EPA's role in reviewing *state* plans. *Compare* Resp.Br.15,84-87,91,94 *with* MS.Br.32-33 n.5. EPA attempts to ignore the distinction, EPA.Resp.87, but *EME Homer* carefully noted that EPA is "called upon to act … only *after* a State has failed to propose a SIP" that is "adequate." *EME Homer*, 572 U.S. at 514 n.15 (emphasis added); *see also Oklahoma v. EPA*, 723 F.3d 1201, 1213 n.7 (10th Cir. 2013) ("EPA has less discretion when it takes actions to reject a SIP than it does when it promulgates a FIP."). *Homer* thus made clear that "the Good Neighbor Provision is initially directed to upwind States." *EME Homer*, 572 U.S. at 514 n.15.

Moreover, deference is particularly inappropriate where "an agency has not used a deliberative process such as notice-and-comment rulemaking" to articulate its interpretation of a statute. *Nickell v. Beau View of Biloxi, L.L.C.*,

636 F.3d 752, 755 (5th Cir. 2011) (quotations and citation omitted); *see also Mead*, 533 U.S. at 229. Here, EPA never promulgated regulations defining key terms, like "contribute significantly." MS.Br.7. Instead, EPA has repeatedly flip-flopped on its guidance. *Id.* at 40-41.

In the end, EPA is forced to admit the relevant question is whether Mississippi's state plan provided a reasoned basis for the state's conclusion that it complies with the Act. *See* Resp.Br.5 (framing the issue as whether Mississippi's plan "asserted without foundation" compliance with the Good Neighbor Provision); *id.* at 96-97 (explaining EPA evaluates whether the state's determination was "reasonably moored to the Act's provisions" (citation omitted)); *id.* at 101-02 (arguing about whether "each state unreasonably concluded it did not contribute significantly" to downwind states); *id.* at 175 (arguing that the state plans were "unsupportable and unreasonable").

EPA's effort to disapprove Mississippi's state plan, despite its reasoned basis, exceeeded the authority provided by statute.

## II.  EPA unlawfully disapproved Mississippi's reasonable state plan.

Mississippi analyzed EPA modeling data and determined that the State's sole downwind link was a tiny contribution to ozone (0.79 ppb) in a single Texas suburb (Deer Park). Meanwhile, multiple EPA guidance documents provided analyses demonstrating the propriety of screening contributions less than 1 ppb as categorically insignificant. Alternative technical analysis by Mississippi showed that Deer Park would likely attain federal ozone

standards regardless of Mississippi's (insignificant) contribution. Accordingly, Mississippi determined that its existing emissions controls were sufficient to ensure the state will not "contribute significantly" to ozone issues in other states. MS.Br.7-12, 24-43.

Approval of Mississippi's plan under the statutory standards articulated above should have been straightforward. But EPA disapproved Mississippi's plan, not because the plan failed to provide reasoned analysis, but because Mississippi's reasonable judgments deviated from EPA's analytical predilections—preferences EPA admits are not mandated by the statute. That was unlawful.

### A. Mississippi reasonably selected a 1 ppb screening threshold.

EPA's December 2016 Model linked Mississippi only to Deer Park at 0.79 ppb. Mississippi's selection of a 1 ppb screening threshold was thus dispositive: if Mississippi reasonably selected that threshold, it was not contributing significantly to ozone problems in any downwind states.

EPA's attempt to defend its rejection of Mississippi's 1 ppb threshold in favor of EPA's own 1% threshold just confirms that EPA's disapproval is based on "mere policy preference." *Contra* Resp.Br.100; *see* MS.Br.32 (collecting EPA quotes rejecting 1 ppb threshold for policy concerns); Resp.Br.127 (EPA providing its "policy-related explanations"). EPA admits that no threshold has "explicit statutory support." Resp.Br.99. Precisely. The statute grants *states* the power to make "legislative choices in regulating air pollution." *Union Elec. Co.*, 427 U.S. at 269. And "the drawing of lines that create

distinctions," such as screening contributions, "is peculiarly a legislative task." *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 314 (1976). By disapproving Mississippi's plan based on a factor EPA *admits* is not dictated by statute, EPA has necessarily exceeded its statutory authority. *Union Elec. Co.*, 427 U.S. at 257.

EPA does not contend that a 1 ppb screening threshold is categorically unreasonable. Instead, it argues that Mississippi did not provide sufficient "technical analysis or justification" for Mississippi's 1 ppb screening threshold. Resp.Br.144. Notably, however, EPA *never* articulates a technical reason why EPA's preferred 1% threshold is required, much less provides any "state-specific" technical justification that requires application of its 1% threshold to Mississippi. *Id.* EPA's use of the 1% instead of 1 ppb threshold thus not only relies on a non-statutory factor for disapproval, it fails EPA's own acid test of technical justification.

Moreover, Mississippi *did* provide a "technical analysis [and] justification" for its selection of a 1 ppb threshold. *Contra* Resp.Br.144. First, Mississippi relied on EPA's August 2018 guidance that extensively analyzed several potential alternative thresholds. C.I. R4-9 at 4-5; MS.Br.26-27. Second, Mississippi cited EPA's guidance setting the "Significant Impact Levels" of ozone at 1 ppb under another Clean Air Act permitting program that is similarly aimed at ensuring compliance with the ozone NAAQS. MS.Br.28-29.

EPA largely ignores the substance of its August 2018 memo, where it concluded that the 1 ppb and 1% thresholds were "generally comparable."

11

MS.Br.28. Instead, EPA argues that Mississippi did not provide a sufficient "state-specific analysis," which it now reads the August 2018 memo as requiring. Resp.Br.144. But the memo does not ever use the term "state-specific analysis," nor did it detail what kind of state-specific analysis would suffice. It certainly did not say that states could adopt the 1 ppb threshold *only* if they provided that kind of analysis. *See* C.I. HQ-4.[1]

At most, the guidance perfunctorily reserved, as most guidance does, that it "may not apply to the facts and circumstances underlying a particular SIP," meaning that using a 1 ppb threshold is appropriate absent special circumstances. *Id.* at 1. EPA's litigating position thus has it backwards. Instead of noting that particular facts and circumstances might prevent a state from using the generally acceptable 1 ppb threshold, EPA's reimagination of its guidance would require special state-specific justification to use a 1 ppb threshold. In short, Mississippi made a good-faith "attempt[] to follow the guidelines," irrespective of EPA's decision now to "disregard[] the state's broad discretion under the Clean Air Act." *Wyoming v. EPA*, No. 14-9529, 2023 WL 5214083, at \*5 (10th Cir. Aug. 15, 2023).

---

[1] EPA argues that it gave states "an example of what a state-specific" contribution threshold analysis "could look like" when it proposed approving Iowa's plan. Resp.Br.143-44. But that proposed approval came in 2020, after the deadline for states to submit plans. And EPA later *withdrew* that proposed approval and "repropos[ed] approval based on … a new rationale." *See* 87 Fed. Reg. 9,477, 9,483 (Feb. 22, 2022).

EPA also wrongly insists that its guidance involving ozone "Significant Impact Levels" has no connection whatsoever to significant contributions under the Good Neighbor Provision. Resp.Br.139-142. EPA's guidance documents say otherwise.

EPA's March 2018 guidance for Good Neighbor plans identified the possibility of using guidance for "the Significant Impact Level for ozone" to "[e]stablish[] a contribution threshold," as a concept "that may warrant further discussion." C.I. HQ-3 at 3, A-2. Meanwhile, EPA's Significant Impact Level guidance made the propriety of that comparison even more clear. MS.Br.28-29.

EPA attempts to erase this history by asserting that Mississippi used quotes that "appear[] nowhere" in this past guidance. Resp.Br.141 n.63. That is false. Mississippi Petitioners' brief cited two EPA documents involving the Significant Impact Level for ozone. *See* MS.Br.28-29 (citing Tsirigotis, *Guidance on Significant Impact Levels of Ozone* (Apr. 17, 2018), bit.ly/3NgrwIM and EPA, *Application of Significant Impact Levels* (Apr. 17, 2018), bit.ly/3BFKlhL). In the second document, EPA explained that § 7475(a)(3) uses the term "contribute" rather than "significantly contribute," and so when *other* provisions of the Act reference "significant contributions"—like the Good Neighbor Provision— "EPA should endeavor to read the Act in a way that gives meaning to this modifying language," which may "call for [requiring] a higher degree of contribution" than under § 7475. *Application of Significant Impact Levels*, *supra*, at 9 n.6. EPA therefore *has* acknowledged that there is a strong

textual basis to interpret "contribute significantly" in the Good Neighbor Provision as requiring a higher threshold than what is required to "contribute" under § 7475(a)(3). *Contra* Resp.Br.140. And because EPA has deemed 1 ppb an appropriate screening threshold for the latter, Mississippi was eminently justified in choosing 1 ppb for the former.

EPA's inability to track its constantly shifting guidance does not make Mississippi's plan unreasonable. Regardless, EPA's view cannot be reconciled with the statutory language. EPA argues that the two terms come from "different statutory provisions," attempting to leverage any small differences between the programs it can muster. Resp.Br.140-43. But both programs use screening thresholds to evaluate which contributions are more than *de minimis* and require further analysis to determine their effect on attainment *and maintenance* of the same ozone NAAQS. MS.Br.34-35. Indeed, the Good Neighbor Provision logically would call for a higher contribution threshold because, unlike the Prevention of Significant Deterioration Program, it prohibits only contributions that are "significant" and concerns contributions from *an entire state*, not just a single source.

Regardless of whether more than one interpretation may be permissible, it cannot be said that Mississippi plan was "not based on a reasoned analysis" or not "reasonably moored to the Act's provisions." *ADEC*, 540 U.S. at 485, 490. Instead, EPA's demand for ever-increasing technical justification unlawfully imposed a non-statutory factor as a condition of plan approval, *Union Elec. Co.*, 427 U.S. at 257, "throw[ing] the burden of persuasion onto

the states" in contravention of the state's primary role and wide discretion, *Michigan v. EPA*, 213 F.3d 663, 683 (D.C. Cir. 2000). EPA was statutorily required to approve, and its failure to do so exceeded its statutory authority.

EPA's also acted arbitrarily and capriciously. EPA's repeated assertion that "no state" satisfied the standards it demanded for departing from EPA's preferred threshold gives up the game. Resp.Br.3,98,200. It shows EPA subjected states to a "constantly moving target," *New York v. EPA*, 964 F.3d 1214, 1224 (D.C. Cir. 2020), unlawfully discounting the State's serious reliance interests, MS.Br.40-41. As EPA concedes, use of "inconsistent positions" and "near-impossible informational requirements" is arbitrary and capricious. Resp.Br.143.

## B. Mississippi reasonably explained why Deer Park was likely to reach attainment by 2023.

EPA should have also approved Mississippi's plan for an entirely independent reason: even using EPA's 1% screening threshold, the only receptor above that threshold (Deer Park) was likely to attain the NAAQS by 2023, the relevant deadline. Accordingly, Mississippi would not be contributing to downwind attainment issues. MS.Br.9-12,36-39.

While Mississippi was developing its state plan, ozone measurements from 2015-2017 showed Deer Park attaining the 2015 NAAQS. MS.Resp.Br.37. Because EPA's December 2016 Model projected the Deer Park receptor would nonetheless be at risk of nonattainment in the future, Deer Park was a "maintenance receptor" under EPA's definition: an area

15

currently measuring NAAQS attainment but projected to exceed the NAAQS in the future. 88 Fed. Reg. 9,336, 9,341 (Feb. 13, 2023).

Mississippi therefore properly applied EPA's October 2018 guidance on maintenance receptors. *Contra* Resp.Br.132. That guidance explained states could determine a maintenance receptor would not have future attainment issues, irrespective of modeling predictions, if the receptor was currently showing "clean data" (attainment of the NAAQS) and the site's current attainment of the NAAQS was likely to continue. MS.Br.37.

Mississippi relied on temperature data in concluding meteorological conditions in Deer Park from 2015-2017 were conducive to ozone formation and, because ozone levels nonetheless remained below the NAAQS, Deer Park's attainment was likely to continue. That was reasonable because temperature is a key factor for ozone formation, which is why EPA furnished states with temperature data. C.I. HQ-5 at A-2–A-3 (noting "above average temperatures are an indication that meteorology is conducive to ozone formation" and that "information [EPA provided states was] to help evaluate whether particular summers had ozone-conducive or unconducive meteorology"). Mississippi also reasonably bolstered that conclusion with declining trends in ozone levels in Texas, and ozone-precursor emissions trends in both Texas and Mississippi. MS.Br.8-9.

EPA does not and cannot argue that Mississippi failed to engage in a reasoned analysis. Rather, it again argues that Mississippi's analysis needed

more justification, ignoring the State's discretion and primary role, and unlawfully imposing a non-statutory factor on the State. Resp.Br.134 (arguing Mississippi did not consider enough meteorological factors). Once again, this "disregard[s] the state's broad discretion under the Clean Air Act." *Wyoming*, 2023 WL 5214083, at *5. Air pollution trends are exceedingly complex, and more factors could *always* conceivably improve the accuracy of a state's analysis. That does not mean a particular analysis is unreasonable for focusing on the most relevant information. MS.Br.37-39. And EPA has not claimed consideration of more meteorological factors would have yielded a different result. MS.Br.38.

EPA also faults Mississippi for not incorporating data from 2018 in its analysis. Resp.Br.137. But the final 2018 data was unavailable to Mississippi when it prepared its plan. *Id.* Mississippi could not have incorporated the new data into a revised plan and put that new plan through notice and comment before its statutory deadline. *See Sierra Club v. EPA*, 356 F.3d 296, 308 (D.C. Cir. 2004) (explaining states need not incorporate data released shortly before "the States submitted their [plans]"). Moreover, EPA's appeal to "new data" is ironic given that EPA's 2016v3 modeling results agree with Mississippi's original analysis and predicts Deer Park will meet the NAAQS in 2023. MS.Br.14.

EPA nevertheless argues that using the 2016v3 modeling to "confirm" Mississippi's state plan is contradictory. Resp.Br.131. But Mississippi has always argued its plan should have been approved regardless of the modeling

17

used. It is EPA that argues its use of new modeling is lawful because it simply "confirms" its original modeling. Resp.Br.201. Yet, when the updated modeling confirms *Mississippi's* analysis, EPA ignores it. The Clean Air Act does not permit this kind of heads-I-win-tales-you-lose decisionmaking.

Finally, EPA complains that Mississippi's analysis of emissions trends was "unacceptably sparse,"claiming that Mississippi did not "present any data," and offered only "one conclusory sentence." Resp.Br.138. In reality, Mississippi presented several tables of data on downward emissions trends in both Mississippi and Texas, and then pointed to additional data in EPA's October 2018 memo that show emissions decreasing throughout the region. C.I. R4-9 at 8-9.

Even if Mississippi's analysis did not perfectly meet EPA's own (non-statutory) technical preferences, EPA was required by the Act to approve because Mississippi obviously engaged in a reasoned analysis—just one EPA disagreed with.

### III. EPA's use of new modeling was unlawful.

Perhaps sensing that disapproving state plans based on modeling una-vailable to states at plan submission is patently unlawful, EPA now argues that its *post-hoc* modeling was not "outcome-determinative" and "only con-firmed … conclusions" based on prior models. Resp.Br.102,185-86; *see also id.* at 3, 175-76, 192, 200-04. Accepting EPA's newfound position, Mississippi's plan should have been approved. Mississippi's plan predicted that Deer

Park would be in attainment by the 2023 deadline, and EPA's 2016v2 and 2016v3 models *confirmed* that conclusion. *Supra* 9-10, 17-18.

But EPA's "confirmation-only" argument is demonstrably *post-hoc* rationalization. EPA previously found that the new modeling made Mississippi's choice of 1 ppb threshold "inconsequential." 87 Fed. Reg. 9,545,9,557 (Feb. 22, 2022). That cannot be squared with EPA's new "confirmation-only" approach. EPA likewise rejected Mississippi's analysis of emission trends for Deer Park based on the "results of EPA's 2016v2 … modeling and findings for Mississippi." *Id.* at 9,556. And after rejecting Mississippi's plan as based on modeling it considered outdated, EPA's substitute analysis "rel[ied] on the Agency's most recently available modeling to identify upwind contributions and 'linkages.'" *Id.* at 9,557. EPA thus disapproved Mississippi's plan "based on EPA's most recent modeling results for 2023." *Id.*

The proof is in the pudding: EPA disapproved plans based on the 2016v3 modeling that it admits would have been approved under the December 2016 modeling. *See* Resp.Br.191,210-211. Even in this litigation, EPA's opposition to Texas's stay motion never claimed its new modeling was used for confirmation-only. Dkt.109 at 22-25. "The very fact that [EPA] perceived the need to rehabilitate its [action] with new and different arguments before" this court "further confirms that the [disapproval] is likely arbitrary, capricious, or otherwise unlawful." *Wages & White Lion Invs., L.L.C. v. United States Food & Drug Admin.*, 16 F.4th 1130, 1140 (5th Cir. 2021).

**A. EPA's use of new modeling directly conflicts with the Act.**

EPA wrongly contends that nothing in the Act prohibits EPA from basing its disapproval on *post-hoc* data and modeling. Resp.Br.187. This conflicts with the Act and its structure in at least four ways.

*First,* the statute designates States as "primary" regulators and EPA as a secondary reviewer. *Supra* 3-9. By evaluating the State's plan based on models that did not exist when Mississippi submitted its plan, EPA functionally casts aside the State's plan, unlawfully assuming the role of "primary" regulator. MS.Br.45-47. No state can account for models that don't yet exist. If permitted, EPA will always start the state plan analysis afresh via deployment of its latest model. EPA's tactic thus "run[s] roughshod over the procedural prerogatives that the Act has reserved to the states." *Texas v. EPA*, 690 F.3d 670, 675 (5th Cir. 2012) (citation omitted).

*Second*, the Act provides that EPA may disapprove a state plan only when the plan is inconsistent with the statute, *supra* 3, but EPA never concluded that Mississippi's use of the data available to it at the time of submission violates the Act, MS.Br.47.

*Third*, EPA's actions are inconsistent with the Act's statutory deadlines. EPA's use of post-deadline modeling attempts to leverage its violation of the deadlines as a basis for disapproving Mississippi's plan. Stay Order 21-22. Meanwhile, Mississippi's reading gives meaning to the statutory deadlines for state plan submission and review by prohibiting consideration of post-deadline data as a basis for disapproval. Congress gave each State three

years to create a state plan but gave EPA only half that time to review all fifty of them. *See* 42 U.S.C. § 7410(a)(1), (k)(1)-(2). Congress's timeline does not contemplate EPA waiting years past its statutory deadline, generating completely new modeling and then starting afresh in determining a state's Good Neighbor obligations.

EPA's distinction between "procedural" and "substantive" deadlines, Resp.Br.176-179, thus misses the point. If EPA had acted within the timeframe Congress established, it would have had to use the data that Mississippi relied on. *That* is why EPA's action is unlawful, not simply because EPA missed its deadline. *Contra* Resp.Br.176.

*Fourth*, the Act provides specific mechanisms for addressing new data rather than allowing EPA to usurp state primacy by disapproving a state's plan. MS.Br.47-48. The states' primary role does not disappear simply because new modeling emerges. *Contra* Resp.Br.82-83. EPA nonetheless argues these mechanisms support its authority to reject reasonable state plans. Resp.Br.81-83,181-83. But these provisions authorize EPA to override a state plan only to the minimum extent necessary. Section 7410(k)(5) involves EPA identifying an "inadequac[y]" in state plans and giving states a "reasonable deadline[]" to address them. Section 7426 authorizes EPA to override a state plan only for a specific source and only until the state can revise its plan to address that source. MS.Br.48. And § 7410(k)(6) allows EPA only to correct an "action approving [or] disapproving" a state plan if it "*was* in error." (emphasis added). It does not authorize EPA to withdraw the approval of a state

plan that was *valid* when promulgated based on new information—that scenario is addressed by § 7410(k)(5). *See Alabama Env't Council v. EPA*, 711 F.3d 1277, 1291 (11th Cir. 2013). EPA's use of *post-hoc* modeling to disapprove Mississippi's plan remains inconsistent with every relevant provision of the statute.

### B.   EPA's use of new modeling was arbitrary and capricious.

Until recently, EPA had honored the Act's statutory structure with a longstanding policy of accepting states' use of modeling available at the time they submitted state plans. 87 Fed. Reg. 68,483, 68,486 (Nov. 15, 2022); MS.Br.49. EPA now argues this policy does not apply to the Good Neighbor provision, Resp.Br.188, but EPA has pointed to no authority saying so.[2]

EPA cites instances where it used updated data when promulgating a *federal* plan. *See State of Wisconsin v. EPA*, 938 F.3d 303, 309 (D.C. Cir. 2019); 81 Fed. Reg. 74504, 74507 (Oct. 26, 2016). EPA likewise cites rulemaking where new modeling confirmed that the state's analysis was correct and therefore provided an alternative basis to *approve* state plans.

---

[2] EPA claims this argument was waived for failure to raise it during the comment period. Resp.Br.190-91. But this Court has directly rejected that argument as inconsistent with circuit precedent. *See Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1022 n.23 (5th Cir. 2019). And, regardless, commenters repeatedly argued that EPA's use of new modeling was unlawful. 88 Fed. Reg. at 9,365-66; C.I. HQ-83 at 42-59. Because that issue was "properly presented," Mississippi is not "limited to the precise arguments … made below." *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 379 (1995).

Resp.Br.187,190. Neither of those examples violate a state's primacy to promulgate a state plan. EPA even cites *Sierra Club v. EPA*, 671 F.3d 955 (9th Cir. 2012), which the Ninth Circuit just cited as supporting a *stay* of EPA's disapproval of Nevada's Good Neighbor plan, wherein EPA similarly relied on post-submission modeling. *Nevada Cement Company v. EPA*, No. 23-682, Order (9th Cir. July 3, 2023).

By contrast, EPA's past statements have repeatedly suggested that its "long established polic[y]" applies whenever states submit state plans. 68 Fed. Reg. 19,106, 19,121 (Apr. 17, 2003) (it "would be *unreasonable* to require the States to" incorporate into their state plans modeling that was released after "significant work [had] already occurred" because that would "purposelessly contradict EPA's long established policies and guidance provided to the states with respect to use of new models" (emphasis added)).  After all, "[t]here will always be situations when new, better information is on the horizon." 69 Fed. Reg. 21,717, 21,727 (Apr. 22, 2004). None of these statements exclude Good Neighbor plans.

EPA next contends that states had "fair notice" of the new modeling. Resp.Br.179,193. But States had no notice that EPA intended to apply 2016v2 or 2016v3 modeling to its review of state plans due in 2019. That modeling did not yet exist. EPA originally developed the 2016v1 modeling for the remanded *federal* plan for the *2008* NAAQS in October 2020. MS.Br.44 n.9. EPA never suggested it intended to apply that modeling to its review of state plans under the 2015 ozone NAAQS. And even if states could have guessed,

23

they lacked notice of the modeling *results*, which differed wildly for every model iteration. MS.Br.45. These were not "logical outgrowths" of information states already had. Resp.Br.193. And EPA's "notice" in its proposed disapproval providing *60 days* for Mississippi to craft an entirely new plan based on a new model, 87 Fed. Reg. at 9,546, hardly squares with the Act's provision of *three years* for states to craft their plans, 42 U.S.C. § 7410(a)(1).

EPA's contention that states should have submitted a revised state plan in light of the new data likewise misses the point. Resp.Br.182-84. State plans typically require years to create, and EPA has already shown it has no qualms about blowing past its deadlines and basing disapprovals on modeling states could not have accounted for. The State already reasonably explained why it would not significantly contribute to any downwind state. The statute does not require it to do so twice.

Even when Mississippi offered a technical analysis of the 2016v2 modeling, EPA cast it aside. MS.Br.51-54. Rather than explain why Mississippi's updated reasoning was unreasonable, EPA simply identified areas where reasonable minds could disagree on technical details. For instance, EPA argues that wind roses and back trajectories are unreliable measures of air quality, Resp.Br.205, but EPA relied on back trajectories too. C.I. HQ-83 at 366. Likewise, EPA argues that high-altitude ozone levels are "more relevant," Resp.Br.205, but has never demonstrated that high-altitude ozone is actually migrating down to ground level in Texas, which is what the 2015

24

NAAQS is concerned with. MS.Br.53. Thus, in multiple ways, EPA's disapproval based on new modeling results was arbitrary and capricious.

## IV. Venue is proper in this Court.

With its substantive arguments faltering, EPA returns to the argument that venue lies in the D.C. Circuit. Resp.Br.58-76. The plain text of § 7607(b)(1) says otherwise. Stay Order at 2-13.

Section 7607(b)(1), "specifically enumerate[s]" a list of EPA actions that are *per se* "locally or regionally applicable." *Harrison v. PPG Indus., Inc.*, 446 U.S. 578, 584 (1980). That list includes challenges to EPA "action in approving or promulgating any implementation plan under" the Act. 42 U.S.C. § 7607(b)(1). Because "any implementation plan" necessarily includes Good Neighbor plans, EPA's disapproval of Mississippi's plan is a "locally or regionally applicable" action that belongs in this Court.

EPA tries to explain away that unambiguous language. First, it argues the action is nationally applicable because EPA addressed "the obligations of multiple states and their collective impacts on other states through one nationally applicable action." Resp.Br.61. EPA might have "discretion," *id.* at 63, to combine several distinct, inherently local actions in a single *Federal Register* notice, but that does not change the "nature of the agency action" here, *id.* at 59. EPA disapproved individual *state* plans, each of which covers one state. EPA admits that it "evaluated [each] individual state's arguments for the use of alternative approaches or data," *id.* at 62, as the Act requires. Indeed, Congress gave each state discretion to craft a state plan best suited

to its particular situation, and in doing so necessarily rejected the idea that state plans should be uniform. MS.Br.33; *contra* Resp.Br.66.

Nor may EPA simply "determine" that a locally or regionally applicable action belongs in the D.C. Circuit. Resp.Br.66-76. The "action" in question must *in fact* involve "determinations" that have "nationwide scope or effect." *Texas 2016*, 829 F.3d at 420-21. And the "relevant determinations are those that lie at the core of the agency action." *Id.* at 419. Here, EPA's core (faulty) determinations were all specific to Mississippi: that Mississippi provided no "state-specific justification" for the 1 ppb threshold, that Mississippi's receptor-specific ozone analysis was "technically deficient," and that EPA's *post-hoc* modeling identified additional links between Mississippi and Texas. Resp.Br.130,136,205. Not surprisingly, EPA's rulemaking insists that its federal plans for each disapproved state are severable from each other. 88 Fed. Reg. 36,654, 36,693 (June 5, 2023).

This Court should not reverse the motion panel's well-reasoned rejection of EPA's motion to transfer.

## V. Vacatur is the appropriate remedy.

Finally, EPA argues that "even if" its disapproval is unlawful, it should be permitted to impose a federal implementation plan on Mississippi anyway. Resp.Br.211. This is untenable.

When an agency acts unlawfully, "[t]he default rule is that vacatur is the appropriate remedy." *Data Mktg. P'ship, LP v. United States Dep't of Lab.*, 45 F.4th 846, 859 (5th Cir. 2022). EPA therefore must make a special showing

both that "the agency will be able to justify its decision on remand" and that vacatur would have "disruptive consequences." *Texas v. United States*, 50 F.4th 498, 529 (5th Cir. 2022). Here, remand without vacatur would be futile and impose—not prevent—enormous costs.

*First*, EPA is wrong that Mississippi has "primarily allege[ed] procedural defects and record-based deficiencies." Resp.Br.212. EPA's disapproval was unlawful from top to bottom. EPA's misapprehension of its statutory role permeated every part of its reasoning. EPA's unlawful use of new modeling, too, was fundamental to its disapproval. *Supra* 18-25. These are not problems that can be fixed with additional notice and comment.

*Second*, remanding without vacating would impose enormous harms on Mississippi. EPA asks this Court to authorize it to *implement* the federal plan for Mississippi while EPA decides how to disapprove Mississippi's plan yet again. Resp.Br.216. That would impose all the irreparable harm Mississippi sought a stay to prevent. MS.Stay.Mot.20-22. By contrast, vacatur would maintain "the status quo." *Texas v. United States*, 40 F.4th 205, 220 (5th Cir. 2022). EPA's disapproval has already been stayed. And because Mississippi's state plan makes abundantly clear that the state is not significantly contributing to any downwind state's failure to comply with the NAAQS, vacatur would not imperil public health. Mississippi sources are and will remain subject to a full suite of emissions regulations. *See* C.I. R4-9 at 2.

## Conclusion

The Court should vacate EPA's disapproval of Mississippi's state implementation plan.

Respectfully submitted,

/s/ C. Grady Moore III

**C. Grady Moore III**
Balch & Bingham LLP
1901 6th Ave. N., Ste. 1500
Birmingham, Alabama 35203
(205) 251-8100
gmoore@balch.com

**Bradley A. Ennis**
**Susan Scaggs Stutts**
Balch & Bingham LLP
1310 25th Avenue
Gulfport, MS 39501
(228) 864-9900

**Shawn S. Shurden**
*General Counsel*
Mississippi Power Company
2992 West Beach Boulevard
Gulfport, MS 39502
(228) 229-0915

*Counsel for Mississippi Power Company*

/s/ Justin L. Matheny

**Lynn Fitch**
 *Attorney General of Mississippi*
**Whitney H. Lipscomb**
 *Deputy Attorney General*
**Justin L. Matheny**
 *Deputy Solicitor General*
State of Mississippi Office of the
Attorney General
P.O. Box 220
Jackson, MS 39205-0220
(601) 359-3680
justin.matheny@ago.ms.gov

**Mithun Mansinghani**
Lehotsky Keller Cohn LLP
629 W. Main St.
Oklahoma City, OK 73102
mithun@lkcfirm.com
(512) 693-8350

**Michael B. Schon**
**Drew F. Waldbeser**
**Michael Cotton**
Lehotsky Keller Cohn LLP
200 Massachusetts Ave NW

Washington, DC 20001
mike@lkcfirm.com
(512) 693-8350

*Counsel for State of Mississippi and
Mississippi Department of Environ-
mental Quality*

## CERTIFICATE OF SERVICE

On September 19, 2023, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of a commercial virus scanning program and is free of viruses.

*/s/ C. Grady Moore III*
C. Grady Moore III

## CERTIFICATE OF COMPLIANCE

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,500 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Palatino Linotype) using Microsoft Word (the same program used to calculate the word count).

*/s/ C. Grady Moore III*
C. Grady Moore III