Case No. 23-60069

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

---

State of Texas; Texas Commission on Environmental Quality; Luminant Generation Company, L.L.C.; Coleto Creek Power, L.L.C.; Ennis Power Company, L.L.C.; Hays Energy, L.L.C.; Midlothian Energy, L.L.C.; Oak Grove Management Company, L.L.C.; Wise County Power Company, L.L.C.; Association of Electric Companies of Texas; BCCA Appeal Group; Texas Chemical Council; Texas Oil & Gas Association; Public Utility Commission of Texas; Railroad Commission of Texas; State of Mississippi; Mississippi Department of Environmental Quality; Mississippi Power Company; State of Louisiana; Louisiana Department of Environmental Quality; Entergy Louisiana, LLC; Louisiana Chemical Association; Mid-Continent Oil and Gas Association; Louisiana Electric Utility Environmental Group, L.L.C.; Texas Lehigh Cement Company, LP,

*Petitioners*,

v.

United States Environmental Protection Agency; Michael S. Regan, Administrator, United States Environmental Protection Agency,

*Respondents*.

---

Petition for Review
U.S. Environmental Protection Agency
88 Fed. Reg. 9336, 9356 (Feb. 13, 2023)

---

## REPLY BRIEF OF LOUISIANA INDUSTRY PETITIONERS

---

(*Counsel listed on inside cover*)

Maureen N. Harbourt
Lauren J. Rucinski
Josiah M. Kollmeyer
KEAN MILLER LLP
400 Convention Street, Suite 700
Baton Rouge, LA 70802
(225) 382-3412
maureen.harbourt@keanmiller.com

*Counsel for Petitioners Louisiana Chemical Association, Louisiana Mid-Continent Oil and Gas Association, and Louisiana Electric Utility Environmental Group LLC\**

*(\* o/b/o participating members Cleco Corporate Holdings LLC, Louisiana Energy & Power Authority, and Lafayette Public Power Authority)*

Debra J. Jezouit
C. Joshua Lee
BAKER BOTTS LLP
700 K Street N.W.
Washington, DC 20001
(202) 639-7728
debra.jezouit@bakerbotts.com

*Counsel for Petitioner Entergy Louisiana, LLC*

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ................................................................. i

TABLE OF AUTHORITIES ............................................................ ii

INTRODUCTION ......................................................................1

ARGUMENT .........................................................................2

  I.  EPA Acted Outside Any Permissible Scope of Deference. ...........................2

    A.  EPA's Response Brief Confirms the Agency's Injection of Its Own Policy Preferences...........................................................2

    B.  EPA's Injection of Its Own Policy Preferences Exceeded the Scope of Permissible Deference. ..................................................6

      1.  EPA's Justification for Deference Is Premised on a Position No One Takes. ..................................................................7

      2.  EPA's Non-Authoritative Case Law Is Distinguishable Because Louisiana's SIP Complied with the Statute............................10

      3.  EPA's Inclusion of Its Policy Preferences Exceeded Statutory Considerations and Its Scientific/Technical Expertise. ......................12

  II.  Louisiana's Approach to the SIP Was Neither "Technically Flawed" Nor "Irrelevant." ..................................................................16

    A.  Louisiana's Analysis for Screening Potential Ozone Contribution Relied on a Model Developed and Recommended by EPA....................17

    B.  LDEQ Incorporated EPA's Guidance to Assess Air Quality Factors in Addition to the Model...............................................20

      1.  Ozone Design Values and Ozone Precursor Trends............................20

      2.  Wind Rose, Weather Patterns, and Back Trajectories...........................25

CONCLUSION .......................................................................27

CERTIFICATE OF COMPLIANCE......................................................29

CERTIFICATE OF SERVICE .........................................................30

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Alaska Dep't of Env't Conservation v. EPA,*
    540 U.S. 461 (2004) ............................................................................14

*Appalachian Power Co. v. EPA,*
    249 F.3d 1032 (D.C. Cir. 2001) ........................................................14

*Arizona ex rel. Darwin v. EPA,*
    815 F.3d 519 (9th Cir. 2016) ..............................................................11

*BCCA Appeal Grp. v. EPA,*
    355 F.3d 817 (5th Cir. 2003) ...........................................................8, 9

*Burlington Truck Lines, Inc. v. United States,*
    371 U.S. 156 (1962) .........................................................................2, 3

*Citizens to Pres. Overton Park, Inc. v. Volpe,*
    401 U.S. 402 (1971) ..............................................................................6

*EPA v. EME Homer City Generation, L.P.,*
    572 U.S. 489 (2014) ............................................................................15

*Luminant Generation Co. v. EPA,*
    675 F.3d 917 (5th Cir. 2012) .........................................................11, 12

*Michigan v. EPA,*
    213 F.3d 663 (D.C. Cir. 2000) ..........................................................14

*North Carolina v. EPA,*
    531 F.3d 896 (D.C. Cir. 2008) ............................................................9

*North Dakota v. EPA,*
    730 F.3d 750 (8th Cir. 2013) ..............................................................11

*Sierra Club v. EPA,*
    939 F.3d 649 (5th Cir. 2019) ..............................................................8

*Sierra Club v. EPA,*
    972 F.3d 290 (3d Cir. 2020) ..........................................................8, 12

*Texas v. EPA*,
    829 F.3d 405 (5th Cir. 2016) .............................................................12

*Union Elec. Co. v. EPA*,
    427 U.S. 246 (1976)..................................................................9, 10, 15

*Westar Energy, Inc. v. EPA*,
    608 F. App'x 1 (D.C. Cir. 2015)........................................................10

*Wisconsin v. EPA*,
    938 F.3d 303 (D.C. Cir. 2019)...........................................................14

*Wyoming v. EPA*,
    --- F.4th ---, 2023 WL 5214083 (10th Cir. Aug. 15, 2023)................12

## STATUTES AND RULES

5 U.S.C. § 706 ...................................................................................6

42 U.S.C. § 7410 .......................................................................10, 15

42 U.S.C. § 7607 ...............................................................................6

## FEDERAL REGISTER

69 Fed. Reg. 38,958 (June 29, 2004) ................................................23

79 Fed. Reg. 23,414 (Apr. 28, 2014) ................................................23

81 Fed. Reg. 35,824 (June 3, 2016) ..................................................23

87 Fed. Reg. 9798 (Feb. 22, 2022) ..........................................4, 5, 25

88 Fed. Reg. 9336 (Feb. 13, 2023) .................................................3, 4

## OTHER ADMINISTRATIVE MATERIALS

Memorandum from Peter Tsirigotis, Director, Office of Air Quality
    Planning and Standards, *Information on the Interstate Transport
    State Implementation Plan Submissions for the 2015 Ozone
    National Ambient Air Quality Standards Under Clean Air Act
    Section 110(a)(2)(D)(i)(I)* (Mar. 27, 2018). .............................18, 20

Memorandum from Peter Tsirigotis, Director, Office of Air Quality
    Planning and Standards, *Considerations for Identifying
    Maintenance Receptors for Use in Clean Air Act Section
    110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan
    Submissions for the 2015 Ozone National Ambient Air Quality
    Standards* (Oct. 19, 2018)......................................................................18, 21, 22

## INTRODUCTION

The Louisiana State Implementation Plan ("SIP") Disapproval should be vacated. Despite lip service otherwise, the U.S. Environmental Protection Agency ("EPA" or "Agency") disregarded Louisiana's analysis to impose its own 4-Step Interstate Transport Framework ("4-Step Framework") for determining whether emissions from Louisiana sources significantly contribute to nonattainment or interfere with maintenance of the 2015 Ozone National Ambient Air Quality Standards ("NAAQS") in another State. As a result, EPA determined that, because Louisiana's emissions were modeled to exceed the threshold amount, Louisiana was obligated to consider emissions controls.

However, by conducting further analysis of the emissions modeled to exceed the threshold that Louisiana established for its own Step 2 based on EPA guidance— an analysis that included consideration of ozone precursor trends, and wind rose, weather pattern, and back trajectory analyses—Louisiana demonstrated that its emissions would not significantly contribute to nonattainment or interfere with maintenance in any other State and that no further emissions controls were required, thereby meeting its Good Neighbor obligations under Clean Air Act ("CAA") Section 110(a)(2)(D)(i)(I). By imposing its own 4-Step Framework and policy judgments on Louisiana, EPA exceeded its statutory authority in disapproving

Louisiana's SIP, making its action arbitrary, capricious, and not in accordance with law.

## ARGUMENT

## I. EPA Acted Outside Any Permissible Scope of Deference.

Notwithstanding EPA's representations otherwise, the Response Brief confirms that it was EPA's insistence on the 4-Step Framework, such as treating modeled projections as actual emissions, that was dispositive in rejecting Louisiana's SIP.  When paired with the fact that Louisiana's SIP complied with CAA Section 110(a)(2)(D)(i)(I), no authority supports the degree of deference EPA seeks for itself.

### A. EPA's Response Brief Confirms the Agency's Injection of Its Own Policy Preferences.

In confronting this challenge, the Agency now hedges, arguing that EPA did not reject Louisiana's SIP purely for diverging from the 4-Step Framework, and that it "merely confirmed" what the Agency would have concluded even after reviewing the SIP on its own terms.  *See* Resp. Br. 2–3, 54, 102–03.  *But see* La. Indus. Br. 24–25 (arguing how EPA, while averring otherwise in the Final SIP Disapproval, in effect exclusively relied on the 4-Step Framework, in particular, on its modeled projections).

To start, an agency's post hoc representation in litigation is not entitled to deference.  *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168–69

(1962) ("The courts may not accept appellate counsel's *post hoc* rationalizations for agency action . . . ."). Therefore, this Court should make an independent assessment of whether EPA in fact rejected Louisiana's SIP on its own terms.

At minimum, the Response Brief concedes that EPA applied "a consistent set of policy judgments" across all States. Resp. Br. 62 (citing 88 Fed. Reg. 9336, 9339 (Feb. 13, 2023)); *see also* La. Indus. Br. 10. Even when EPA evaluated alternative methodologies, the Agency did so "with an eye towards ensuring national consistency." *See, e.g.*, Resp. Br. 36, 62 (citing 88 Fed. Reg. at 9339, 9354, 9381). EPA's concession of accounting for "national consistency" sufficiently establishes that EPA's analysis of Louisiana's SIP was grounded in its own policy preferences that went beyond EPA's authority under the CAA—to approve a SIP that meets the requirements of the Act. This alone ends the matter.

Notwithstanding EPA's representation otherwise, the Response Brief confirms that Louisiana's deviation from the 4-Step Framework was the "outcome-determinative" issue for disapproval. In the Response Brief, even when EPA claimed that it evaluated the SIP following Louisiana's own terms, the Agency repeatedly treated the modeled screening threshold as the end-all-be-all in determining significant contribution, ignoring all the other analyses Louisiana provided. *Compare* Resp. Br. 40 ("Consequently, under Louisiana's chosen 2011-based modeling and contribution threshold, as confirmed by EPA's 2016v2

modeling in the Proposal, EPA proposed to disapprove Louisiana's submission because it did not comply with the Good Neighbor Provision."), *with id.* at 29 ("[For Step 3 of the Framework,] EPA concludes that if there are cost-effective ways to reduce emissions from sources in states above the screening threshold, then such emissions are significant.").

To illustrate, the Response Brief explains how EPA disapproved Louisiana's SIP. According to the Response Brief, first, "EPA explained that using Louisiana's chosen 2011-based modeling and 1 ppb contribution threshold, Louisiana was linked to downwind receptors . . . EPA's 2016-based modeling confirmed again that Louisiana was linked." *Id.* at 39 (citing 87 Fed. Reg. 9798, 9812–14 (Feb. 22, 2022); 88 Fed. Reg. at 9356); *see also* La. Indus. Br. 10–11 (discussing EPA's use of modeling). The Louisiana Industry Petitioners agree that modeling is important to the extent it identifies contribution that is more than *de minimis*. *See* La. Indus. Br. 27.

But then, EPA fixated on the modeling to prejudge "significant" contribution, equating all projected non-*de minimis* emissions as such. According to the Agency, even if it were to grant Louisiana's interpretation that "significant" means "persistent and consistent," EPA still would have disapproved the SIP because "Louisiana's Step 2 results already showed that its emissions had a 'persistent and consistent' pattern of contributing to linked receptors in Texas on elevated ozone days." *See*

Resp. Br. 40, 107–09.  Importantly, the Response Brief cites to specific parts of the Proposed SIP Disapproval, 87 Fed. Reg. at 9814–15, and EPA's Response to Comments ("RTC"), C.I. HQ-83 at 187, 350–54, all of which concern modeling—and modeling alone—to establish persistent and consistent emissions.  *See, e.g.*, RTC, C.I. HQ-83 at 350 ("To be clear, the modeling establishing linkages of [Louisiana] . . . already establishes that there is a consistent and persistent pattern of contribution . . . ." (quoting 87 Fed. Reg. at 9808)).[1]

EPA's Response Brief confirmed that all other air quality factors analyzed by Louisiana were outright dismissed because they did not provide a numerical reduction in modeled values.  *See* Resp. Br. 40, 110–24; *see also* RTC, C.I. HQ-83 at 363 (rejecting the HYSPLIT back trajectory analyses because they "do not provide any quantitative measure of contribution," which EPA deemed "necessary").  Section II, *infra*, explains why Louisiana's other methodologies which supplemented the modeling analysis were legitimate—and in turn, why EPA's rejection of them effectively meant "the Agency relied exclusively (or nearly

---

[1] EPA seems to contradict itself in discussing the phrase "persistent and consistent." EPA criticized Louisiana for failing to define the phrase, *see* 87 Fed. Reg. at 9814, even though Louisiana submitted data and analysis to demonstrate that the State's emission contributions were not persistent and consistent.  Then, the Agency itself, without defining persistent and consistent, claimed based on modeling that there was a persistent and consistent pattern of contribution.  *See* RTC, C.I. HQ-83 at 350.

exclusively) on modeled projections of a 1% contribution as being the determinative factor for showing 'significant contribution.'" La. Indus. Br. 42–43.

EPA's "modeling-only" shortcut attempts to force Louisiana to skip the State's own "Step 3" analysis (i.e., determine whether a contribution actually is "significant" or interferes with maintenance) and loop the State back into Steps 3 and 4 of EPA's 4-Step Framework. *See* Louisiana's SIP, C.I. R06-04 at 12 ("Steps [3] and [4] of EPA's framework are relevant only if emissions from Louisiana contribute significantly to nonattainment . . . ." (brackets in original)). In other words, EPA's approach allows the Agency to still imprint its 4-Step Framework and reach the result EPA ultimately seeks.

### B. EPA's Injection of Its Own Policy Preferences Exceeded the Scope of Permissible Deference.

Because "Petitioners challenge EPA's Disapproval of their SIP submissions," Resp. Br. 55, the parties agree the Court's inquiry focuses on whether **what EPA did** was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[2] *Id.* at 56 (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971); 5 U.S.C. § 706(2)(A)); *accord* 42 U.S.C. § 7607(d)(9) (CAA

---

[2] By extension, as "[t]he Court does not review the reasonableness of the states' SIP submissions themselves," Resp. Br. 56, EPA's collateral attack on how Louisiana's SIP would have been rejected regardless, *see id.* at 103–29, is largely irrelevant to the case's disposition. Nonetheless, prior briefings and Section II, *infra*, articulate how EPA's collateral attack still lacks merit.

standard of review which is similar to the Administrative Procedure Act ("APA") Section 706(2), including the provisions to reverse any Agency action "in excess of statutory jurisdiction, authority, or limitations").

In addressing this inquiry, EPA's answer collapses to the position that, because Congress conferred authority on the Agency to review and approve whether the SIP complies with the CAA's requirements, the Agency's independent decision on those matters receives deference. This position is unpersuasive for several reasons.

### 1.    EPA's Justification for Deference Is Premised on a Position No One Takes.

No Petitioner is asking EPA to rubberstamp a State's SIP submission just because the State represents that its sources' emissions would not "contribute significantly to nonattainment in, or interfere with maintenance" of the NAAQS in another State. Rather, if reasonable minds could differ as to what would constitute "significant contribution" or "interference with maintenance," EPA cannot interject its policy preferences because it is the State's rationale that must prevail.

Relatedly, EPA's claim that the Petitioners' logic is "circular" tackles a strawman because this Court does not face a circumstance where EPA must "automatically" accept a State's blanket assertion on these issues. *See* Resp. Br. 76–77, 94, 97–98. Louisiana offered a reasoned explanation as to why the State's emissions were not "significantly" contributing to ozone pollution or otherwise

interfering with another State's ability to maintain the 2015 Ozone NAAQS. *See also* La. Indus. Br. 5–9, 26–37 (discussing how the SIP followed EPA guidance, and considered multiple air quality factors including evidence of substantial reductions in ozone precursors that contradicted EPA's projections of increases).

Louisiana's SIP provided the explanations needed under the APA "to reasonably explain the basis for its decision," Resp. Br. 97. Indeed, EPA's own brief cites several cases in which a SIP approval passed muster where it largely incorporated the applicant State's explanations. *See, e.g.*, *Sierra Club v. EPA*, 939 F.3d 649, 672–73 (5th Cir. 2019) (affirming EPA's approval of Louisiana's SIP, "[d]espite [Louisiana's various] shortcomings," because the court's review was "limited to 'whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment'"); *BCCA Appeal Grp. v. EPA*, 355 F.3d 817, 833–34 (5th Cir. 2003) ("EPA's acceptance of Texas's photochemical grid model is supported by substantial record evidence and is otherwise in accordance with law.").[3]

---

[3] When the court did renounce EPA's SIP approvals for faulty reasoning, it was because the State's underlying data was patently contradictory to EPA's own record, yet the Agency approved the SIP anyway with no further explanation of why it overrode those contradictions. *See, e.g.*, *Sierra Club v. EPA*, 972 F.3d 290, 300–03 (3d Cir. 2020) ("EPA ignores its own Air Markets Program Data," "EPA itself acknowledges that the Pennsylvania plants are capable of achieving better [air emission control levels]," "the agency quietly concedes . . . that technological advances may allow for a more environmentally friendly standard").

Yet, by arguing against a hypothetical that does not exist in this case, EPA attempts to justify expanding the scope of its deference to a degree not authorized by the CAA. EPA appears to present two reasons as to why it is entitled to the level of deference it seeks. First is EPA's role in "independently" reviewing whether a SIP complies with the Act. *See, e.g.*, Resp. Br. 78. Second is EPA's role in making "technical" or "scientific" determinations as to what amounts to significant contribution or interference with maintenance. *See, e.g.*, *id.* at 57, 103.

This Court need not issue a definitive standard as to the level of deference to which EPA is entitled for SIP (dis)approvals because neither of EPA's reasons presented above justifies EPA's disapproval of Louisiana's SIP. There are two points that cause the instant fact pattern to fall outside any permissible scope of deference. **First,** Louisiana's SIP provided far more reasoning for its CAA Section 110(a)(2)(D)(i)(I) determination than any of the non-authoritative cases on which EPA relies. And because Louisiana's reasoning was sufficient, EPA "must" approve it. *See BCCA Appeal Grp.*, 355 F.3d at 822. **Second,** the policy judgments that EPA injected to impose the 4-Step Framework over other States' analyses included issues beyond whether the SIP complied with Section 110(a)(2)(D)(i)(I), i.e., issues the Agency was never authorized to consider. *Accord North Carolina v. EPA*, 531 F.3d 896, 908 (D.C. Cir. 2008) ("But the flow of logic only goes so far. It stops at the point where EPA is no longer effectuating its statutory mandate."). *See generally*

*Union Elec. Co. v. EPA*, 427 U.S. 246, 257 (1976) ("The mandatory 'shall' makes it quite clear that the Administrator is not to be concerned with factors other than those specified . . . .").

### 2.    EPA's Non-Authoritative Case Law Is Distinguishable Because Louisiana's SIP Complied with the Statute.

There is no comparison to the fact patterns in the cases EPA views as persuasive to Louisiana's SIP disapproval, as those cases dealt with SIPs where no justification for the State's position was provided or where the State relied on incorrect data.  In the unpublished D.C. Circuit decision in *Westar Energy, Inc. v. EPA*, the court's finding that "EPA has the authority to determine whether SIPs comply with the statutory requirements" appears rather unremarkable given that "Kansas's SIP was only one page long and failed to provide any analysis at all of the downwind effect of its in-state emissions."  608 F. App'x 1, 3 (D.C. Cir. 2015). With zero analysis of Kansas emissions' downwind effect, the State failed to comply with CAA Section 110(a)(2)(D)(i)(I) because, under that provision, States must assess whether their emissions will "contribute significantly to nonattainment in, or interfere with maintenance by, *any other State*."  42 U.S.C. § 7410(a)(2)(D)(i)(I) (italics added).

10

EPA also relied on the decision in *Arizona ex rel. Darwin v. EPA*, 815 F.3d 519 (9th Cir. 2016), to argue that the Agency's role is beyond "ministerial."[4]  *See* Resp. Br. 80.  The court sided with EPA primarily because Arizona "provided *no* reasoning or rationale to justify its ultimate BART selection" even though "under the Act and its implementing regulations, states are required in SIPs to explain the choice of BART."  815 F.3d at 537 (italics in original).  In that sense, *Arizona* is similar to *Westar* where the State plainly did not submit an analysis in its SIP—i.e., a facial violation—which made EPA's determination reasonable.  *See id.*

Lastly, EPA cited *North Dakota v. EPA*, 730 F.3d 750 (8th Cir. 2013).  Although North Dakota's SIP was not wholly devoid of a rationale, the SIP relied on a "fundamentally flawed" calculation for the cost of compliance—a statutory requirement.  *See id.* at 759–60.  Under such blatant calculation errors, EPA would

---

[4] While this case and *North Dakota v. EPA*, 730 F.3d 750, 761 (8th Cir. 2013) (referencing "ministerial" as well), may appear to counter this Circuit's authority in *Luminant Generation Co. v. EPA*, 675 F.3d 917, 921 (5th Cir. 2012) ("[T]he Act confines the EPA to the ministerial function of reviewing SIPs for consistency with the Act's requirements."), *see* Resp. Br. 80 n. 41, such characterization would be misleading because the courts are deploying the word "ministerial" in different contexts under the CAA's regulatory process.  *Arizona* warns against EPA treating SIP reviews like a SIP completion finding pursuant to CAA Section 110(k)(1)(B).  *See* 815 F.3d at 531 ("EPA is not limited to the 'ministerial' role of verifying whether a determination was made . . . .").  And *North Dakota* warns against general rubberstamping.  *See* 730 F.3d at 760–61 ("EPA is left with more than the ministerial task of routinely approving SIP submissions.").  In contrast to both, *Luminant* warns against EPA's review going beyond what is statutorily required, which is what Petitioners claim the Agency did in this case, and thus is the most apposite.

have abused its discretion if it had *approved* North Dakota's SIP anyway, similar to how the court in *Sierra Club v. EPA*, 972 F.3d 290, 301–03 (3d Cir. 2020), chastised EPA for overriding data contradictions without explanation.  *See* discussion *supra* note 3.  *North Dakota* appropriately found EPA's disapproval legitimate due to the flagrant errors.

While EPA's Response Brief attempts to present cases from sister circuits, none of them are relevant due to the fact that Louisiana's SIP does not share similarly fatal flaws.  Louisiana's SIP does not omit discussion of a key statutory factor or conduct such a faulty analysis that EPA had no choice but to disapprove the SIP. The Fifth Circuit's precedents are the most relevant here and still bind EPA.  *See, e.g.*, *Texas v. EPA*, 829 F.3d 405, 411 (5th Cir. 2016) (citing, among others, *Luminant*, 675 F.3d at 921) (discussing how EPA "shall" approve a SIP if it complies with the CAA); *see also Wyoming v. EPA*, --- F.4th ---, 2023 WL 5214083, at *6 (10th Cir. Aug. 15, 2023) ("EPA deemed the state's analyses—and the ultimate BART determination—unreasonable because of guideline noncompliance, not simply because they were otherwise unreasonable and did not follow the (helpful) guidelines.  And that violated the Clean Air Act.").

### 3.    EPA's Inclusion of Its Policy Preferences Exceeded Statutory Considerations and Its Scientific/Technical Expertise.

EPA's 4-Step Framework may be one way to interpret "significant contribution" or "interfere with maintenance," the two statutory phrases at issue.

However, it was EPA's **insistence** on this framework (including the Agency's prioritization of modeling to force Louisiana back into the 4-Step Framework, as explained *supra* Section I.A) that went beyond both the statute and the Agency's scientific/technical expertise.

EPA's references to other Sections of the CAA, *see* Resp. Br. 81–84, do not establish EPA's deference under Section 110(k)(3) to approve or disapprove a SIP. First, EPA considers Petitioners' reasoning as effectively blurring the distinction between a Section 110(k)(1)(B) completeness determination and a Section 110(k)(3) substantive review. *See id.* at 81. But again, that is a strawman. EPA's SIP review becomes a completeness determination (or "a box-checking role," *id.*) only if the SIP is truly making blanket assertions without supporting data or reasoned analysis. Clearly EPA plays a role in reviewing whether the data and analysis behind the SIP is rational and complies with the statute—i.e., more than a completeness determination under CAA Section 110(k)(1)(B). But to take this role as permission to interject EPA's own 4-Step Framework in lieu of the State's analysis goes too far.

Next, EPA argues how restricting its role in Section 110(k)(3) would conflict with other parts of the CAA, specifically Section 110(k)(5), (6) (commonly referred to as EPA's authority to issue "SIP Calls") and Section 126(b), (c) (EPA's authority to impose federal requirements based on a downwind State's petition to address interstate pollution). *See* Resp. Br. 82–83. None of those provisions demonstrate

13

how EPA has authority to commandeer the development of SIPs in a specific manner, or to reject an otherwise legitimate SIP where EPA disagrees with a given methodology. Those provisions address EPA's authority under different, particularized circumstances, such as when EPA determines a SIP is inadequate and needs to be revised (Section 110(k)(5), (6)), or when another State petitions EPA to find that a source's emissions in an upwind State are contributing to NAAQS nonattainment or interfering with NAAQS maintenance (Section 126(b), (c)).

Such differences in the codified provisions also explain why another subset of cases EPA offers is unpersuasive. In each case, the court was dealing with a separate CAA provision where Congress granted specific authority to EPA. *See, e.g.*, *Alaska Dep't of Env't Conservation v. EPA*, 540 U.S. 461, 468–69 (2004) (authorizing EPA under CAA Sections 113(a)(5) and 167 to issue an enforcement order prohibiting construction of a pollutant source); *Michigan v. EPA*, 213 F.3d 663, 676–77, 687 (D.C. Cir. 2000) (finding EPA's interpretation of "significant contribution" permissible in the SIP Call context); *Appalachian Power Co. v. EPA*, 249 F.3d 1032, 1037, 1039–40 (D.C. Cir. 2001) (discussing the *Michigan* SIP Call case in a CAA Section 126 dispute where "a downwind state may petition the Administrator for a finding" (internal quotation omitted)); *Wisconsin v. EPA*, 938 F.3d 303 (D.C. Cir. 2019) (finding EPA's approach generally permissible in a Federal Implementation Plan ("FIP")).

14

EPA cannot gloss over its statutory constraints in CAA Section 110(k)(3) by asserting that the Agency is merely exercising its technical and scientific judgment. *See* Resp. Br. 85–86, 90. There is a distinction between EPA developing the 4-Step Framework (backed by scientific/technical basis; therefore permissible, *see generally EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489 (2014)),[5] versus EPA insisting on that framework over all other methodologies (policy judgments such as national consistency, *see, e.g.*, Resp. Br. 100; therefore impermissible).

Ultimately, the Response Brief does not hide the fact that EPA's disapproval of Louisiana's SIP was driven by more than statutory factors and scientific/technical judgments. As noted *supra* page 3, EPA's injection of "national consistency" goes beyond the Agency's authority to evaluate whether a SIP contains adequate provisions prohibiting significant contribution or interference with maintenance. *See* 42 U.S.C. § 7410(a)(2)(D)(i)(I). The Supreme Court in *Union Electric*, 427 U.S. at 257–58, concluded that CAA Section 110(a)(2)(A)'s requirement for "reasonable time" could not be interpreted by the Agency to address "technological and economic infeasibility." EPA's attempt at reading in "national consistency" from the phrase "contribute significantly to nonattainment in, or interfere with maintenance by, any other State" in Section 110(a)(2)(D)(i)(I) would equally be

---

[5] EPA's counter-interpretation of this precedent, Resp. Br. 86–88, need not be re-addressed in this Reply Brief. *See* La. Indus. Br. 21–23.

unjustified.  Further, EPA's policy judgment to ensure the Agency's SIP evaluations are "consistent" cannot be considered a scientific and technological assessment.

## II.  Louisiana's Approach to the SIP Was Neither "Technically Flawed" Nor "Irrelevant."

Louisiana's SIP addressed all factors required to be considered under the CAA.  Louisiana did not err in concluding that the **actual** ozone contributions—as opposed to modeled projections thereof—would not significantly contribute to ozone nonattainment in Texas.  Indeed, while Louisiana's SIP accepted as a starting point the screening model values developed and recommended by EPA, the State then considered other air quality information to evaluate the modeled values.

Although the screening values projected that Louisiana would have some emission contribution at three monitors in the Houston/Galveston/Brazoria ("HGB") area and two monitors in the Dallas/Fort Worth ("DFW") area in 2023, these projections relied on EPA's prediction (in the model inputs) that anthropogenic ozone precursor emissions of NOx and VOC were going to increase well above the actual values shown by the Louisiana emissions inventory.  But Louisiana then provided information demonstrating that EPA's predictions were just that: projections.  Wind and weather patterns and back trajectory analyses indicated that Louisiana's emission contributions would be infrequent.  Louisiana's SIP informed that:

- The entire State of Louisiana complied with the 2015 Ozone NAAQS, with the areas closest to Texas having some of the lowest design values;

- Ozone levels (design values) in Louisiana were steadily declining;

- Emissions of ozone precursors were steadily declining;

- A number of "on-the-books" regulations would continue to reduce ozone precursors each year for multiple years both before and after 2023;

- Wind rose and weather pattern analyses showed that wind transport of ozone or ozone precursors towards Texas was generally infrequent; and

- Back trajectory analysis over a three-year period for actual high ozone episodes at the applicable monitors showed potential contribution from Louisiana sources only on an insignificant number of days, and except in a few cases, from portions of the State without significant ozone precursors.

Far from a blanket assertion that lacked any basis, Louisiana's SIP demonstrated that Louisiana already had been successful at reducing ozone to levels below the NAAQS, that such reductions were continuing, and that additional reductions would occur due to regulations already adopted but not yet fully effective. In short, Louisiana's SIP reasonably concluded that Louisiana emission sources would not contribute significantly to the HGB or DFW monitors identified in the screening analysis.

### A.  Louisiana's Analysis for Screening Potential Ozone Contribution Relied on a Model Developed and Recommended by EPA.

EPA provided States with modeling results and underlying input data for use in determining which monitors would be in nonattainment or maintenance status

17

with respect to the 2015 Ozone NAAQS (Louisiana Step 1) and for assessing the potential contribution of ozone from upwind States (Louisiana Step 2). EPA's March 2018 Guidance stated: "States may consider using this national modeling to develop SIPs that address requirements of the good neighbor provision for the 2015 ozone NAAQS." Memorandum from Peter Tsirigotis, Director, Office of Air Quality Planning and Standards, *Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards Under Clean Air Act Section 110(a)(2)(D)(i)(I)* (Mar. 27, 2018) [hereinafter March 2018 Guidance], C.I. HQ-03 at 6. The March 2018 Guidance indicated that the modeling involved used 2011 as the base year and 2023 as the future projected year.[6] *See id.* at 4.

Louisiana's SIP used this modeling provided by EPA as the basis for its initial screening of potential ozone contributions to downwind States. *See* Louisiana's SIP, C.I. R06-04 at 17. This modeling predicted that emissions from Louisiana sources and activities in future year 2023 would result in 1.71 to 1.92 ppb of ozone formation at two DFW-area monitors and 3.06 to 4.72 ppb at three HGB-area monitors. *See*

---

[6] EPA later updated the modeling as provided in its October 2018 Guidance. Memorandum from Peter Tsirigotis, Director, Office of Air Quality Planning and Standards, *Considerations for Identifying Maintenance Receptors for Use in Clean Air Act Section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards* (Oct. 19, 2018) [hereinafter October 2018 Guidance], C.I. HQ-05.

*id.* at 13.  Importantly, these are **screening** values—i.e., to determine whether a State's ozone contribution warrants additional inquiry.  The modeling showed that Louisiana's emissions might contribute to ozone in Texas, but it did not establish whether such contribution would be "significant."

EPA's SIP Disapproval relied on a completely different model platform with numerous different inputs and projections.  La. Indus. Br. 38–40.  EPA cannot substitute a different screening analysis by using a different model, such as the 2016v3 model upon which it relied to disapprove Louisiana's SIP.  EPA admits in its brief that it provided modeling to the States specifically to assist them in crafting their SIPs to meet the Good Neighbor requirements.  Resp. Br. 30.  The fact that EPA developed a different model after States submitted their SIPs does not allow the Agency to require Louisiana to evaluate any screening contributions or monitors other than those originally provided to the States.

In fact, when EPA commented on the draft SIP, the Agency did not raise any issue with the model used by Louisiana.  *See* EPA, Comments on Draft Louisiana 2015 Ozone Transport SIP (Sept. 19, 2017), C.I. HQ-58.  EPA developed the original modeling, advocated for States to use it, and cannot now substitute its judgment for Louisiana's based on the adequacy of the model used for screening purposes.  The model Louisiana used for the State's own Step 1 and 2 purposes was

legitimate and the only model available at the time Louisiana submitted its SIP to EPA.

**B.    LDEQ Incorporated EPA's Guidance to Assess Air Quality Factors in Addition to the Model.**

After obtaining the model results, Louisiana undertook a technical analysis to determine whether the State's projected 2023 contributions to either DFW or HGB were truly "significant," and concluded they were not.  Louisiana considered the factors that EPA provided in Attachment A of the March 2018 Guidance, which affirmed that States could use a variety of factors to evaluate whether potential contributions were significant.  Louisiana refers to this analysis as Step 3 of its ozone contribution review.

**1.    Ozone Design Values and Ozone Precursor Trends**

EPA characterizes Louisiana's information on improved ozone design values and decreased ozone precursor emissions as "irrelevant" as to whether Louisiana significantly contributes to ozone formation in DFW and HGB.  *See* Resp. Br. 121–23.  But, given that ground-level ozone regulated by the NAAQS is formed from precursor compounds (primarily NOx and VOCs), EPA's characterization intuitively lacks merit—ozone contributions greatly depend on the precursor emissions.  By extension, the level of ozone precursors in reported Louisiana inventories, and trends in those emissions, are highly relevant to whether the 2023 projections are reasonable.  And supplementing such ozone precursor trends, the

monitored ozone design values reflect actual data showing whether the precursor emissions in the current inventory are resulting in ozone formation.

All areas of Louisiana have ozone design values below the 70 ppb NAAQS. Louisiana's SIP provided data showing steady and significant declines from 2002 to 2017. C.I. R06-04 at 7–8. In fact, as of 2017, most of the State had design values below 65 ppb. *Id*. EPA's updated design values confirmed this trend continued through 2020. *See* EPA, 2010-2020 Design Values, C.I. HQ-10 at spreadsheet lines 547–71, columns O, P, Q. Of the 22 monitors in Louisiana, 20 had declining design values in 2018–20 compared to the 2015–17 values, one monitor remained the same, and only one increased by 1 ppb. Such actual monitored data confirm what Louisiana included in its SIP—Louisiana has maintained control over ozone precursor emissions within the State, and ozone formation has been steadily declining.

Louisiana's SIP demonstrated that reductions in ozone precursor emissions were reducing ozone formation. According to the SIP, from 2005 to 2014, ozone precursor emissions decreased substantially (NOx by 42% and VOC by 61%) and such emissions from point sources decreased another 3% from 2015 to 2017. C.I. R06-04 at 10 fig. 2.3.1-2.

Despite the data showing continuing precursor declines, EPA's model projected significant (and unrealistic) increases of ozone precursor emissions in

Louisiana by 2023.[7]  Documentation for the modeled data provided with EPA's October 2018 Guidance, *supra* note 6, summarized the total annual anthropogenic Louisiana precursors as follows (in 1000 tons):[8]

| State | Pollutant | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | | Projected 2023 |
|---|---|---|---|---|---|---|---|---|---|---|
| Louisiana | NOx | 519 | 467 | 414 | 362 | 350 | 339 | 320 | | 362 |
| Louisiana | VOC | 396 | 356 | 316 | 276 | 272 | 269 | 265 | | 289 |

Louisiana's data "unmistakably demonstrate[d]" the contrary.  *See* C.I. R06-31 at 2 (Louisiana's comments to EPA's SIP Disapproval indicated further reductions between 2017 and 2020 in precursors from point sources totaling 11,603 tons of NOx and 2,996 tons of VOCs).  It undercut EPA's projection that in just three years, there would be substantial increases in precursor emissions.  Thus, the decline in ozone design values statewide through 2020, combined with declining ozone precursor emissions, is a highly relevant factor as to whether EPA's projection

[7] *See* EPA, October 2018 Guidance, C.I. HQ-05 at 4–5 ("[A] data file containing state-level annual NOx and VOC emissions from anthropogenic sources with a breakout by major source category, for individual years from 2011 through 2017 and for 2023, based on EPA's projections.  This information is available on EPA's website at: https://www.epa.gov/airmarkets/march-2018-memo-and-supplemental-information-regarding-interstate-transport-sips-2015-0.").

[8] *See id.* (website discussed *supra* note 7, specifically under "state-sector_annual_emissions_data_1," at tabs "NOX State Totals" and "VOC State Totals").

of increased precursor emissions in 2023 from Louisiana was realistic. Such increases would be contrary to known data trends through 2020.

These data trends through 2020 are further bolstered by ozone precursor control measures already adopted and "currently in some phase of implementation," as noted by Louisiana under the SIP's significant contribution analysis (also referred to as "on-the-books" control measures). *See* C.I. R06-04 at 15. Although EPA stated that it included reductions from these on-the-books measures in its model projections up through 2023, accounting for reductions beyond 2023 would be more accurate. Indeed, considering the swath of regulatory measures projected to lower precursor emissions in 2023 and following years—several of which were referenced in Louisiana's SIP[9]—EPA's projection of significant increases in Louisiana emissions for 2023 becomes even less tenable because on-the-books emission reductions clearly support Louisiana's data.

EPA's projection of Louisiana's ozone contributions relied almost entirely on the Agency's estimates of what Louisiana's ozone precursor emissions would be in 2023. Yet the significant discrepancy between EPA's 2023 estimation and

---

[9] *See, e.g.*, 81 Fed. Reg. 35,824, 35,886 (June 3, 2016) (Oil and Gas Sector: Emission Standards for New, Reconstructed, and Modified Sources) (discussing reduction of 210,000 tons nationwide of VOC by 2025); 79 Fed. Reg. 23,414 (Apr. 28, 2014) (Tier 3 Motor Vehicle Emission and Fuel Standards, phase in 2017–30); 69 Fed. Reg. 38,958 (June 29, 2004) (Nonroad Diesel Engines and Fuels Rule, phase in 2007–30).

Louisiana's precursor data through 2020 casts significant doubt on EPA's projections. And the declining ozone design values only favor Louisiana. Nowhere did EPA address why its projections of precursors in 2023 were so much higher than its own data showed for Louisiana in 2017 and for Louisiana's data through 2020.

Thus, rather than being "irrelevant," Resp. Br. 121, Louisiana's ozone precursors data and design value trends serve two important functions. First, they once more demonstrate how EPA failed to fully evaluate Louisiana's SIP by disregarding relevant data and, once again, insisting that EPA's own 2023 model was all that mattered with no explanation of glaring discrepancies. *See* RTC, C.I. HQ-83 at 341–42 ("Neither the state or other commenters supplied information that there were such a degree of additional reductions that EPA had not already characterized in the 2023 modeling . . . ."). Indeed, EPA erroneously characterized Louisiana's steadily declining precursors as "fluctuating," when in reality the only fluctuation was the increase in the **modeled** emissions in 2023. *See* Resp. Br. 121 ("EPA explained that while Louisiana's '*overall*' ozone design value and precursor trends were declining, the *modeling* showed both 'increases and reductions in anthropogenic emissions in Louisiana.' . . . Put differently, Louisiana's ozone emissions fluctuate year-to-year . . . ." (first italics in original)). Second, Louisiana's ozone precursors and design value data provide a reasoned explanation as to why Louisiana's SIP complies with the CAA.

## 2.     Wind Rose, Weather Patterns, and Back Trajectories

EPA also characterizes the wind rose and weather pattern analysis as "technically flawed" because such analysis does not "evaluate whether contribution is significant on elevated ozone days." Resp. Br. 123. EPA misses the mark here. Such analysis was not offered to show numerical values of ozone, but rather to support the general knowledge about transport from wind and weather patterns—that ozone transport from Louisiana is sporadic.

Louisiana also followed EPA's recommendation to "strengthen" its SIP by adding back trajectory analysis to its submittal. La. Indus. Br. 7–8; *see also* C.I. R06-04 (Appendix A). EPA uses such analysis frequently. *See* La. Indus. Br. 8 (citing 87 Fed. Reg. at 9815).

Now EPA argues these EPA-advocated analyses were "technically flawed." Resp. Br. 122. But parsed carefully, the Response Brief shows that EPA's objection is the back trajectory analysis's limited utility **compared to the modeling** because according to EPA, a back trajectory analysis only shows air movement rather than quantifying the ozone contribution. *See* Resp. Br. 111, 122 ("As compared to Louisiana's chosen 2011-based photochemical modeling, back trajectories have limited utility in that they cannot quantify an upwind state's contribution to ozone in a downwind state."). Once again, the Response Brief reveals EPA's reliance on modeling being the only acceptable means to evaluate ozone contribution.

To the contrary, the back trajectories Louisiana submitted showed minimal days when the air parcels were traveling over or from Louisiana on dates when the Texas monitors experienced high ozone. The back trajectories involving the two DFW monitors showed no air parcels from Louisiana at all on any of the fifteen days of high ozone in 2017, and that there were air parcels from Louisiana on only three of twelve days in 2016, and on seven of twenty-one days in 2018. *See* C.I. R06-04 at 198–274. For the HGB area, there was only one year (2018) out of the 3-year period, at only one of the three monitors in which there were at least four days of air parcels traveling over Louisiana. *See id.* at 31–197. Overall, there were only 19 of 47 days where there was transport of air parcels over portions of Louisiana, and on many of these, the parcels did not travel over industrialized or urban centers.

The Louisiana Industry Petitioners agree with EPA's point that back trajectories only show potential for impacts due to transport from out-of-State.[10] *See* Resp. Br. 110 ("Louisiana performed back trajectories—an analysis that uses observed data from the past to estimate 'the most likely route' a parcel of air . . . traveled from a specified time—to suggest that only some of the ozone at the identified receptors came from Louisiana."). But a back trajectory analysis was always intended to **complement** the information on ozone precursors and ozone

---

[10] That there were some days where the trajectories went over Louisiana does not indicate that the State was contributing ozone precursors at the modeled 2023 values on such days.

design values. *See* Resp. Br. 117 (viewing back trajectories as a "corollary analysis" to modeling). And, based on the good air quality in Louisiana (especially in areas bordering Texas, the downwind State at issue), the infrequency of air parcels potentially bringing ozone or its precursors from Louisiana to the HGB or DFW areas, the low projected contribution, the steady decline of ozone precursors, and current and future reductions from on-the-books measures, the conclusion that Louisiana emission sources are not significant contributors to Texas would be reasonable. Relatedly, it was unreasonable for EPA to disregard Louisiana's consideration of such information in concluding that its emissions would not significantly contribute to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in any other State.

## <u>CONCLUSION</u>

For the above reasons and for reasons submitted in the Louisiana Industry Petitioners' Opening Brief, EPA's Louisiana SIP Disapproval, 88 Fed. Reg. 9336, 9356 (Feb. 13, 2023), should be vacated.

Dated:        September 19, 2023          Respectfully submitted,


/s/ Maureen N. Harbourt              /s/ Debra J. Jezouit
Maureen N. Harbourt                  Debra J. Jezouit
Lauren Rucinski                      C. Joshua Lee
Josiah Kollmeyer                     BAKER BOTTS LLP
KEAN MILLER LLP                      700 K Street N.W.
400 Convention Street, Suite 700     Washington, DC 20001
Baton Rouge, LA 70802                (202) 639-7728
(225) 382-3412

*Counsel for Petitioners Louisiana*      *Counsel for Petitioner Entergy*
*Chemical Association, Louisiana Mid-*   *Louisiana, LLC*
*Continent Oil and Gas Association,*
*and Louisiana Electric Utility*
*Environmental Group, LLC\**

*(\* o/b/o participating members Cleco*
*Corporate Holdings LLC, Louisiana*
*Energy & Power Authority, and*
*Lafayette Public Power Authority)*

## CERTIFICATE OF COMPLIANCE

The undersigned counsel states that this document complies with the word limit of Federal Rule of Appellate Procedure 32(a)(7)(B)(ii) because, excluding the parts of the document exempted by Rule 32(f): This document contains **6,320** words, as counted by a word processing system.

The undersigned counsel states that this document complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) of the Federal Rules of Appellate Procedure because: This document has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-font Times New Roman style.

The undersigned counsel also certifies that, pursuant to Paragraph A(6) of this Court's ECF Filing Standards, (1) any required privacy redactions have been made, 5th Cir. R. 25.2.13; (2) the electronic submission is an exact copy of the paper document, *id.* R. 25.2.1; and (3) the document has been scanned for viruses with the most recent version of a commercial virus scanning program and is free of viruses.


Dated:        September 19, 2023                    /s/ Debra J. Jezouit

                                                    *Counsel for Petitioner Entergy*
                                                    *Louisiana, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that all counsel of record who have consented to electronic service are being served a copy of this document via the Court's CM/ECF system on  September 19, 2023.


<u>/s/ Debra J. Jezouit</u>

*Counsel for Petitioner Entergy Louisiana, LLC*