No. 23-60069

# In the United States Court of Appeals for the Fifth Circuit

STATE OF TEXAS; TEXAS COMMISSION ON ENVIRONMENTAL QUALITY; LUMINANT GENERATION COMPANY, L.L.C.; COLETO CREEK POWER, L.L.C.; ENNIS POWER COMPANY, L.L.C.; HAYS ENERGY, L.L.C.; MIDLOTHIAN ENERGY, L.L.C.; OAK GROVE MANAGEMENT COMPANY, L.L.C.; WISE COUNTY POWER COMPANY, L.L.C.; ASSOCIATION OF ELECTRIC COMPANIES OF TEXAS; BCCA APPEAL GROUP; TEXAS CHEMICAL COUNCIL; TEXAS OIL & GAS ASSOCIATION; PUBLIC UTILITY COMMISSION OF TEXAS; RAILROAD COMMISSION OF TEXAS; STATE OF MISSISSIPPI; MISSISSIPPI DEPARTMENT OF ENVIRONMENTAL QUALITY; MISSISSIPPI POWER COMPANY; STATE OF LOUISIANA; LOUISIANA DEPARTMENT OF ENVIRONMENTAL QUALITY; ENTERGY LOUISIANA, L.L.C.; LOUISIANA CHEMICAL ASSOCIATION; MID-CONTINENT OIL AND GAS ASSOCIATION; LOUISIANA ELECTRIC UTILITY ENVIRONMENTAL GROUP, L.L.C.; TEXAS LEHIGH CEMENT COMPANY, LP,

*Petitioners*,

*v.*

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; MICHAEL S. REGAN, ADMINISTRATOR, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

*Respondents*,

---

## REPLY BRIEF OF APPELLANT LOUISIANA DEPARTMENT OF ENVIRONMENTAL QUALITY AND STATE OF LOUISIANA

---

JEFF LANDRY
  Attorney General
ELIZABETH B. MURRILL (LA 20685)
  *Solicitor General*
JOSEPH S. ST. JOHN (LA 36682)
  *Deputy Solicitor General*

MACHELLE HALL (LA 31498)
  *Assistant Attorney General*
LOUISIANA DEPT. OF JUSTICE
909 Poydras Street, Suite 1850
New Orleans, LA 70112
Tel: (225) 485-2458
murrille@ag.louisiana.gov
stjohnj@ag.louisiana.gov
hallm@ag.louisiana.gov

COURTNEY J. BURDETTE (LA 30564)
  *Executive Counsel*
JILL C. CLARK (LA 33050)
  *General Counsel*
LOUISIANA DEPT. OF
 ENVIRONMENTAL QUALITY
Office of the Secretary, Legal Division
P.O. Box 4302
Baton Rouge, LA 70821-4302
Tel: (225) 219-3985
Courtney.Burdette@la.gov
Jill.Clark@la.gov

Jeffrey A. Hall
Marcella Burke
BURKE LAW GROUP
1000 Main Street, Suite 2300
Houston, Texas 77002
jeff@burkegroup.law
marcella@burkegroup.law

# TABLE OF CONTENTS

TABLE OF CONTENTS ......................................................................... iii

TABLE OF AUTHORITIES...................................................................v

INTRODUCTION....................................................................................1

ARGUMENT ...........................................................................................2

I.   THE COURT SHOULD NOT CHANGE COURSE ON VENUE. ........................2

II.  EPA EXCEEDED ITS AUTHORITY AND ACTED CONTRARY TO THE CAA
     AND THE APA....................................................................................5

    A.  Deference under the CAA does not match how EPA describes
        it. ................................................................................................5

    B.  EPA has not justified deference for any aspect of its approach
        to evaluation, and its approach does not comport with the CAA
        or APA.................................................................................... 10

        1.  EPA offers no binding interpretation justifying *Chevron*
            deference. .................................................................... 10

        2.  EPA does not justify applying any aspect of its framework to
            disapprove Louisiana's SIP. ...................................... 12

        3.  EPA's preferred screening threshold cannot bind Louisiana... 17

        4.  EPA's criticism of Louisiana's gloss on significance is
            unfounded and not entitled to deference. ................. 19

    C.  EPA's use of post-submission data and modeling contravened
        the CAA and APA.................................................................21

    D.  EPA wrongfully rejected Louisiana's air analysis....................25

1. EPA contradicts itself in denigrating other forms of air quality analysis. ..................................................................26

2. EPA still fails to address the "central points" of Louisiana's analysis. ..................................................................29

III. THE COURT SHOULD VACATE AND REMAND. ...................................33

CONCLUSION .......................................................................34

CERTIFICATE OF SERVICE.................................................36

CERTIFICATE OF COMPLIANCE........................................37

# TABLE OF AUTHORITIES

## Cases

*Ala. Dep't of Envtl. Conservation v. EPA,*
  540 U.S. 461 (2004) ....................................................................9

*All. for Hippocratic Med. v. FDA,*
  78 F.4th 210 (5th Cir. 2023) ...................................................33

*Arkansas v. EPA,*
  No. 23-1320 (8th Cir. Apr. 25, 2023) .......................................5

*Ass'n of Irritated Residents v. EPA,*
  686 F.3d 668 (9th Cir. 2012)....................................................23

*BCCA Appeal Grp. v. EPA,*
  355 F.3d 817 (5th Cir. 2003).......................................... 7, 8, 10

*Bd. of Cnty. Commissioners of Weld Cnty. v. EPA,*
  72 F.4th 284 (D.C. Cir. 2023) ........................................... 11, 24

*Cargill v. Garland,*
  57 F.4th 447 (5th Cir. 2023) ............................................. 11, 33

*EME Homer City Generation, L.P. v. EPA,*
  795 F.3d 118 (D.C. Cir. 2015)..................................................22

*Encino Motorcars, LLC v. Navarro,*
  579 U.S. 211 (2016)....................................................................7

*EPA v. EME Homer City Generation, L.P.,*
  572 U.S. 489 (2014)............................................................ 16, 21

*Kentucky v. EPA,*
  No. 23-3216 (6th Cir. July 25, 2023) ........................................2

*Luminant Generation Co. LLC v. EPA,*
  714 F.3d 841 (5th Cir. 2013)......................................................8

*Luminant Generation Co. v. EPA,*
  675 F.3d 917 (5th Cir. 2012).....................................................8, 11, 16

*Midship Pipeline Co., LLC v. FERC,*
  45 F.4th 867 (5th Cir. 2022) ................................................................11

*Mississippi Comm'n on Env't Quality v. EPA,*
  790 F.3d 138 (D.C. Cir. 2015)..................................................26, 28, 30

*North Dakota v. EPA,*
  730 F.3d 750 (8th Cir. 2013)..............................................................9, 14

*Sierra Club v. EPA,*
  356 F.3d 296 (D.C. Cir. 2004)................................................................24

*Sierra Club v. EPA,*
  60 F.4th 1008 (6th Cir. 2023) ...............................................................22

*Sierra Club v. EPA,*
  671 F.3d 955 (9th Cir. 2012)..................................................................23

*Sierra Club v. EPA,*
  939 F.3d 649 (5th Cir. 2019)......................................................7, 8, 19

*Texas v. EPA,*
  690 F.3d 670 (5th Cir. 2012)....................................................................8

*Texas v. EPA,*
  829 F.3d 405 (5th Cir. 2016)..............................................4, 7–9, 14, 20

*Texas v. EPA,*
  983 F.3d 826 (5th Cir. 2020).................................................................28

*Wisconsin v. EPA,*
  938 F.3d 303 (D.C. Cir. 2019).............................................................22

## INTRODUCTION

The Clean Air Act (CAA) gives States discretion to reasonably interpret and apply its provisions.  The good neighbor provision supplies especially broad discretion, and there are no implementing regulations interpreting it.  So when EPA, after issuing guidance stressing State discretion, instead disapproved the good neighbor state implementation plan (SIP) submissions of Louisiana and other States, it already faced a steeply uphill task.  Yet EPA determined to impose its preferred approach and analysis as the only standard.  EPA's disapproval action gave almost no regard to Louisiana's work.  It recycled boilerplate and cast policy disagreements as "technical flaws" without explanation.  The motions panel determined that EPA likely exceeded its authority.  And by now, six other circuits have similarly stayed SIP disapprovals because the States are likely to succeed in their challenges.  Given that no rules imposed EPA's policy preferences, no court has transferred a challenge to the D.C. Circuit.  Louisiana provided a thorough accounting of how EPA violated the CAA and the Administrative Procedure Act (APA) in its opening brief.  Those serious charges merit a considered, thorough response.

EPA does not provide one. Despite its prolix response brief, EPA fails even to address many critical points, though Louisiana flagged them as "central." It tries to obfuscate unyielding evidence of its ultra vires actions, hiding the forest of its errors and abuses in trees of factual and legal irrelevancies. EPA simply asserts, when it bothers to acknowledge them, that central inconsistencies paradoxically confirm its approach. Throughout, EPA stresses that its approach was "reasonable" but fails to address how Louisiana, which had the discretion under the broad terms of the good neighbor provision, acted unreasonably. And EPA fails to justify departure from its pre-submission assurances about SIP evaluations. All told, EPA's disapproval of Louisiana's SIP cannot stand.

## ARGUMENT

### I.    THE COURT SHOULD NOT CHANGE COURSE ON VENUE.

EPA asks the Court to revisit venue and send this case to the D.C. Circuit. That would be an extraordinary and unjustified act. EPA cites no example of such a non-jurisdictional decision, separate from the merits, ever being reconsidered. The motions panel thoroughly analyzed the issue, and the Sixth Circuit relied heavily upon that analysis to also reject transfer, *Kentucky v. EPA* ("*Kentucky Op.*"), No. 23-3216, Dkt. 39-

2, at 3–6 (6th Cir. July 25, 2023). EPA's new briefing largely recites old arguments already addressed. Louisiana respectfully requests that the Court consider its previous briefing, Dkt. 151, if necessary, and will address only a few new points here.

To begin, EPA fails to address a fundamental inconsistency, arguing for venue purposes that its disapproval applied a "common core of knowledge and analysis" and "common legal interpretation" and is "based on a common core of nationwide policy judgments." Response at 61–62, 68. In its disapproval action and merits briefing, however, EPA steadfastly maintains that such "common core"—its 4-step framework, 1% threshold, and modeling—did not determine or control disapproval. Arguing that its "common core" *did determine* SIP approvability cannot help EPA with venue, for EPA maintains that "the face of the rulemaking" controls, Response at 59. But that fatal concession confirms Louisiana's merits arguments and undermines EPA's stated rationale for its disapproval.

EPA's disapproval action was not "nationally applicable." EPA's extended discussion of *Texas 2011* does not engage with the motions panel's explanation for why that unpublished case is inapt: the SIP call

at issue there "requir[ed] States to revise their SIPs in light of a new requirement that applies to *all* States," like "regulations that apply to *all* States equally." Dkt. 269 ("Stay Order") at 10. That was the core rationale, not the number of States involved. EPA also fails to address many points previously raised. *See* Dkt. 151 at 13–16. For instance, EPA fails to explain how its disapproval action is "national" when it is necessarily State-by-State and when the substantial majority of States are not affected, including the dozens with approved SIPs, some with no SIP, and some with SIPs still in limbo. At least four face uncertain fates based on conditions that EPA asserts do not apply to the States in its disapproval action. *See* Response at 210–11.

EPA's disapproval action was also not "based on a determination of nationwide scope or effect." None of EPA's four specific determinations concern Louisiana. Response at 69. On the face of the action, they did not control the approvability for many States' SIPs and cannot "lie at the core of the agency action" as required, *see Texas v. EPA*, 829 F.3d 405, 419 (5th Cir. 2016) ("*Texas 2016*"). The SIP disapprovals were instead facially "based 'on a number of intensely factual determinations' unique to each State." Stay Order at 11 (quoting *id.* at 421).

Inconsistent results may necessarily occur, Response at 73, if each SIP is evaluated on its "own merits," CI HQ-20 at 9,354. Although EPA worries that some arguments—not "determinations"—common to SIP challenges will be decided differently between circuits, that follows from there being no rules governing how States approach SIPs. Common legal errors should be overturned in multiple circuits, and likely will regardless. Seven circuits have issued stays, no circuit has transferred venue, and two other circuits have denied transfer with no plan to revisit the issue. *See Kentucky Op.*; *Arkansas v. EPA*, No. 23-1320, Dkt. 5269098 (8th Cir. Apr. 25, 2023).

## II.    EPA EXCEEDED ITS AUTHORITY AND ACTED CONTRARY TO THE CAA AND THE APA.

### A.    Deference under the CAA does not match how EPA describes it.

While EPA discusses deference at length, it fails to articulate how deference actually works within the CAA's "cooperative federalism," much less which particular determinations EPA made are due deference and why. Instead, EPA focuses on how it does *not* work, repetitively criticizing a strawman approach that would strip EPA of all authority to substantively review SIPs for compliance with the good neighbor

provision. *See, e.g.*, Response at 81 ("boxchecking role"), 82 ("reflexively defer"), 90 ("clerical review"). But for EPA, that leaves only the opposite. By arguing for deference to all of EPA's legal interpretations and technical determinations—without articulating any standard—EPA more than implies that the Court must defer to it as the final arbiter of compliance with the good neighbor provision, granting no role for States. *See, e.g.*, *id.* at 82 ("unambiguous authority to make independent findings . . . without deferring to the states").

As Louisiana has already explained, neither extreme is correct. Br. at 31–35. The cooperative federalism of the CAA means that States retain discretion in meeting the statutory standards. The good neighbor provision leaves critical terms undefined, but EPA did not even attempt to authoritatively interpret those terms before SIP submissions. *Id.* at 28. Without such authoritative interpretation, EPA lacks authority to reject a reasonable interpretation of the CAA or a reasonable application of such interpretation by Louisiana. Additionally, the CAA's cooperative federalism prevents EPA from imposing requirements beyond those in the statute, regardless of how it attempts to do so. And similarly, EPA cannot reject Louisiana's reasonable factual determinations nor

substitute its own, much less transgress the APA's requirements for decision making.

Only this position makes sense of precedent. On the one hand, this Court has given EPA substantial leeway in interpreting CAA terms and applying such interpretations when *approving* SIPs. *See BCCA Appeal Grp. v. EPA*, 355 F.3d 817, 834–36, 840–42 (5th Cir. 2003). Indeed, this Court upheld EPA's approval of another SIP even while criticizing the SIP for having minimal analysis and justification, including conclusory statements of compliance with relevant requirements. *Sierra Club v. EPA*, 939 F.3d 649, 673 (5th Cir. 2019). There, EPA itself had evaluated the SIP under arbitrary and capricious review, deferring to the *State*. *Compare id.* at 671 (noting EPA "determined that the path Louisiana took in weighing the five factors" could be "reasonably discerned from the record") *with Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) ("path may reasonably be discerned"). On the other hand, this Court has vacated SIP *disapprovals* when EPA displaced a State's reasonable interpretation and application of the CAA statutory factors without a valid binding interpretation. *See Texas 2016*, 829 F.3d at 428 (finding "EPA improperly failed to defer to Texas's application of the statutory

7

factors"). And this Court has repeatedly rejected attempts to add any "extra-statutory requirement" cutting into the "wide discretion" the CAA affords. *Luminant Generation Co. v. EPA*, 675 F.3d 917, 929 (5th Cir. 2012); *see Texas 2016*, 829 F.3d at 428; *Texas v. EPA*, 690 F.3d 670, 679–84 (5th Cir. 2012) ("*Texas 2012*"). The only controlling precedent EPA cites affirming a SIP disapproval was *Luminant 2013*—EPA's partial disapproval hinged entirely on EPA's formal legal interpretation that the CAA categorically did not allow a certain affirmative defense. *Luminant Generation Co. LLC v. EPA*, 714 F.3d 841, 856 (5th Cir. 2013). Only such a proper, formal legal interpretation can displace an otherwise reasonable application by the States of the CAA's terms. *Id.* at 857.

Similarly, although this Court has deferred to EPA's technical determinations when *approving* a SIP, *see Sierra Club*, 939 F.3d at 653, 686, it has not when EPA's determinations are not tied to demonstrating a specific violation of the CAA's terms, *Texas 2012*, 690 F.3d at 678. In a case EPA relies heavily upon, what this Court affirmed was EPA exercising its technical expertise to approve state modeling that had "shortcomings" and "discrepancies" but "provide[d] reasonable predictions." *BCCA Appeal*, 355 F.3d at 832, 834. And this Court has

8

often not even discussed such deference in rejecting EPA's analysis (*e.g.*, *Luminant 2012* and *Texas 2016*) nor affirmed EPA's disapproval of a SIP based on it.

To support EPA's preferred deference, EPA cites cases involving different CAA provisions that are inapt.[1]  While EPA cites out-of-circuit cases criticizing this Circuit's description of EPA's role as "ministerial," those cases involved detailed guidelines promulgated by regulation as required by statute, and EPA faulted States for transgressing those binding technical guidelines.[2]  *See* Response at 80 n.41 (citing *North Dakota v. EPA*, 730 F.3d 750, 761 (8th Cir. 2013)).  But those cases force EPA to acknowledge a standard consistent with the above.  They adopt language from a CAA permitting case stating that EPA's role is merely to ensure that the State's determination is "reasonably moored to the [CAA's] provisions" and based on "reasoned analysis."  *North Dakota*, 730 F.3d at 761 (quoting *Ala. Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 485, 490 (2004) ("*ADEC*")).  EPA partially quotes this standard

---

[1] The attainment designation provision supports Louisiana's view of deference.  Br. at 33.

[2] The Tenth Circuit, cited by EPA, recently vacated a SIP disapproval where those guidelines were not binding but EPA "treated [them] as binding" and "and disregarded the state's broad discretion under the [CAA]."  *Wyoming v. EPA*, No. 14-9529, 2023 WL 5214083, at *5 (10th Cir. Aug. 15, 2023) (published opinion).

9

approvingly.  Response at 96.  Thus, EPA is limited to deferential review
of SIPs and can reject only unreasoned and unreasonable choices and
determinations under the CAA.  Otherwise, EPA's action is unreasonable
and arbitrary and capricious.  Br. at 33.

> **B.   EPA has not justified deference for any aspect of its
> approach to evaluation, and its approach does not
> comport with the CAA or APA.**

> **1.   EPA offers no binding interpretation justifying
> *Chevron* deference.**

Although EPA argues that the Court should defer to its
interpretations of the good neighbor provision, no interpretation exists to
which the Court *could* defer, and EPA has made a deficient showing.
EPA's singular assertion regarding *Chevron* deference states that it
applies "to the extent [the action] involve[s] the reasonable resolution of
ambiguities in the [Act]."  Response at 91 (quoting *BCCA Appeal*, 355
F.3d at 825).  While EPA notes the determination of adequacy required
by the good neighbor provision "requires EPA to give meaning to the
[provision's] specific terms," *id.* at 92, EPA does not assert that it *gave*
meaning to any of those, much less what that meaning was.  Nowhere
did EPA reach a considered and final position on the meaning of any term
or thought that it had.  So there is no interpretation to accord *Chevron*

deference. *See Luminant*, 675 F.3d at 927 ("[N]owhere in the rulemaking record does the EPA even hint that the 'similar source' requirement reflects its interpretation of any applicable provision of the CAA."). The mere application of statutory terms in a fact-bound inquiry is not entitled to *Chevron* deference. *See Midship Pipeline Co., LLC v. FERC*, 45 F.4th 867, 874 (5th Cir. 2022). Moreover, given that EPA also does not defend any specific interpretation in its briefing, it has waived deference. *See Cargill v. Garland*, 57 F.4th 447, 465 (5th Cir. 2023) (en banc).

EPA's puzzling insistence that its action be called a "rulemaking" appears to serve this same futile goal. While a rulemaking ordinarily implies a rule, here there is none—no binding interpretation of future effect. Br. at 29. Notice-and-comment procedures and a statement that Louisiana's SIP was disapproved, CI HQ-20 at 9,382, still create no "rule." And any "rule" would be unlawfully retroactive, used to judge SIPs submitted before its creation. *See* Br. at 29 n.4; *Bd. of Cnty. Commissioners of Weld Cnty. v. EPA*, 72 F.4th 284, 294 (D.C. Cir. 2023) (noting CAA does not permit retroactive rules and reversing EPA's decision for "retroactively" adjusting legal rights by exposing State to

consequences from not meeting "already past deadline").  EPA simply ignored this point.

### 2.  EPA does not justify applying any aspect of its framework to disapprove Louisiana's SIP.

While EPA defends its 4-step framework as reasonable and well-approved, Response at 77, 95–96, that does not justify EPA imposing its framework to disapprove Louisiana's SIP.  Absent a binding framework, it is the reasonableness of the *State's* approach that matters.  EPA pointedly acknowledges that "states are not bound to follow" the 4-step framework and asserts that EPA did not hold any State to it.  Response at 95, 98; Br. at 31.  Despite situating mentions of its 4-step framework within its discussion of deference, Response at 91, 96–97, EPA does not claim *Chevron* deference.

Even so, EPA makes many misleading statements along the way, such as that petitioners did not "identify any aspect of EPA's evaluation that was not directly related to or did not give meaning to" the good neighbor provision.  Response at 96.  That response ignores much of Louisiana's brief.  Nothing about EPA's integration of a particular photochemical modeling, the intricacies of "linkages," or insistence that a State consider emissions reductions immediately after such linkages

are identified by EPA's modeling (without opportunity to interrogate the linkages' plausibility) springs from the statute.  Br. at 35–41.  The motions panel agreed.  Stay Order at 15.  By contrast, EPA has one sentence linking its steps at only a high level to the good neighbor provision.  CI HQ-83 at 431.  Such minimal discussion would be insufficient to preserve a *Chevron* argument.  But EPA made none, so it could not impose its framework or require anything more than that Louisiana's approach was also reasonable under the CAA.

Yet EPA did require more than the CAA.  EPA responds to Louisiana's arguments by simply denying that it disapproved SIPs "for failing to hew to EPA's 4-step framework."  Response at 95.  Similarly, it disputes inserting an extra-statutory burden of demonstration, asserting it simply had an "expectation" of a "baseline" justification for alternative frameworks, not required for its own 4-step framework because the Supreme Court had "approved" that.  Response at 97.  These arguments fail in many ways.  According to EPA's own words, it imposed a choice (with no justification in the CAA) *on top of* its 4-step framework: either Louisiana adopt that framework and EPA's technical conclusions wholesale or it would have to "substantially justif[y]" and provide a "well

documented technical basis" for any "deviation"—not merely demonstrate the independent adequacy of Louisiana's approach under the CAA. Br. at 32–33. EPA does not rebut EPA's own language there, much less language elsewhere faulting Louisiana for failing to follow EPA's preferred framework or for not demonstrating points to EPA's satisfaction. Indeed, the standard in EPA's action is not only inconsistent with what it now *claims* it was doing, that standard is even inconsistent with the (partial) *ADEC* standard EPA now recites approvingly— whether the State's determination "considered the necessary factors" and was "reasonably moored to the [CAA's] provisions." Response at 96–97 (quoting *North Dakota*, 730 F.3d at 766). This Court has looked past EPA's simple characterizations when EPA imposes extra-statutory burdens in the guise of finding a State's explanation insufficient. *See Texas 2016*, 829 F.3d at 427–28 (rejecting imposition of extra-statutory requirement under pretense of finding State's "estimate was inadequately supported" and State "incorrectly weighed" statutory factors).

Here, Louisiana explained in painstaking detail how EPA predetermined the disapproval by imposing a preference for its own

framework and heavy, effectively dispositive extra-statutory burdens of demonstration on Louisiana.  Such impositions include EPA simply ignoring Louisiana's description of its own framework and EPA's insistence, with no legal or technical justification, that Louisiana must have proceeded to EPA's step three after Louisiana's step two, even though Louisiana's own framework inserted additional analysis.  Br. at 37–39.  (Even now, EPA toes the line on this.[3])  They also include EPA's rejection of Louisiana's reasonable gloss on significance, discussed below, based not on unreasonableness but on Louisiana not explaining it to EPA's satisfaction.  And they include EPA's rejection of Louisiana's 1 PPB screening threshold by requiring more justification than EPA ever gave and by relying on extra-statutory policy considerations.  Br. at 36–37.

Louisiana more than "indicate[d] that EPA relied on factors unintended by Congress," Response at 96.  Unlike other CAA provisions, the good neighbor provision contains only the "barest of requirements," and there are no implementing regulations, so "the structure of the CAA

[3] EPA states it has "consistently expected" an "emissions reduction analysis at Step 3" and "consistently disapproved" SIPs without one "where states are linked through air-quality modeling."  Response at 106.

militat[ing] against reading an extra-statutory requirement into the [CAA's] limitations on state discretion" "applies with special force." *Luminant*, 675 F.3d at 922, 929.  And EPA's reference to "technical justifications," Response at 97, never explained, is just as unavailing. Except perhaps for some aspects of EPA's modeling and 1% threshold— both discussed below and unlawful for *non*-technical reasons too—EPA's framework is not a technical one, nor has EPA *technically* justified it either.

Furthermore, EPA's 4-step framework has *not* "been approved" by the Supreme Court, Response at 97.  The rule the Court reviewed had two general steps, and the Court focused on "control analysis."  *EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489, 501, 514 (2014).  The issues here—EPA's first two steps and transition to the third—were never addressed.  And the Court made clear EPA's approach was reasonable only for FIP rulemaking.  *Id.* at 514 n.15.

Given that EPA denies it imposed its framework, it still does not address that it diverged from the flexibilities promised in its March 2018 Memo.  Because EPA has not even demonstrated awareness of its change,

EPA effectively concedes that any divergence was arbitrary and capricious.  Br. at 31–32, 50.

### 3.   EPA's preferred screening threshold cannot bind Louisiana.

EPA offers no justification under the CAA for its 1% screening threshold, much less for demanding a State-specific justification for using an alternative threshold.  Louisiana thoroughly explained why requiring that extra-statutory demonstration was unlawful.   Br. at 35–37.  Nowhere does EPA demonstrate that Louisiana's 1 ppb threshold was an *un*reasonable interpretation[4] or that failing to provide a State-specific justification violates the CAA.   Regardless of whether EPA's 1% threshold is a "reasonable one," there is no unfairness, *see* Response at 99, in requiring EPA to demonstrate how the CAA compels its preferred policy before displacing Louisiana's reasonable operationalization of the good neighbor provision.

Furthermore, though EPA's brief suggests that it would explain why Louisiana's threshold was "technically [un]supportable," Response

---

[4] While EPA suggests "policy reasons" exist for why a 1 ppb threshold "may likely not comply," Br. at 127, that over-lawyered formulation exaggerates EPA's minimal statement that its national "policy" was "not well-served" by that threshold, CI HQ-20 at 9,373.

at 99, 124, it never does so.  That lacuna renders any argument waived.
But none exists either.  The August 2018 Memo's conclusion, that EPA
"believe[d] it may be reasonable and appropriate" to use a 1 ppb
threshold, was not a technical one, but a policy one—the contributions
captured by the thresholds seemed "generally comparable."  CI HQ-4
at 4.  Likewise, EPA's only reasons for requiring a State-specific
justification for using an alternative threshold are "policy reasons,"
Response at 127:  a single standard is more equitable and should be the
more protective one, CI HQ-20 at 9,374.  No "technical flaw" exists.

EPA's only arguments are defenses.  Although EPA argues that
additional linked receptors render Louisiana's threshold complaints
"irrelevant," Response at 124, the agency fails to address Louisiana's
arguments, Br. at 37 & n.7.  Louisiana welcomes an appropriate
concession.  But EPA still inconsistently and without explanation states
that Louisiana's alternative threshold served as "another ground" and
"independent reason" for disapproval.  Response at 124, 129.  That also
makes no sense; the two affected receptors dropped out in later modeling,
*see* Br. at 37; CI-HQ-12; CI-HQ-70.  Regardless, the issue elucidates

18

EPA's general approach of unlawfully imposing its policy preferences through extra-statutory burdens.

EPA also disputes that its policy changed. Response at 125. But the August 2018 Memo's statement that "EPA and air agencies should consider whether" its recommendations "are appropriate for each situation" did not make "abundantly clear" that EPA would require State-specific justifications. *Id.* at 125–26. Louisiana's analysis would suffice even if the statute required such consideration. *See Sierra Club*, 939 F.3d at 673. And EPA would equally be on the hook to "consider," which it refused to do, CI HQ-20 at 9,373. Moreover, the demonstration EPA sought was pointless as a screening tool because it was so burdensome. *See* 85 Fed. Reg. 12,232, 12,238. EPA's changed position, without justification, also violates the APA.

> **4.    EPA's criticism of Louisiana's gloss on significance is unfounded and not entitled to deference.**

EPA criticizes Louisiana's gloss on significant contribution as a "persistent and consistent pattern of contribution on several days with elevated ozone," yet EPA fails to explain why it is unreasonable. EPA still complains that Louisiana did not say enough (now, only in its brief,

also about how Louisiana's gloss matches nonattainment).  Response at 93 n.46, 108–09.  Louisiana already addressed all this.  *See* Br. at 40–41.  EPA's confusion is also feigned and irrelevant.   EPA's brief can summarize Louisiana's standard easily enough.  Response at 38.  EPA continues to argue that its modeling "established" just that "persistent and consistent" pattern, Response at 109, without explaining how EPA could know this if the term were inscrutable or why its modeling would "establish" something unrelated to the significance of contributions.  EPA's real dispute, addressed below, is instead over whether Louisiana's back-trajectory analysis refuted that pattern.   Moreover, Louisiana quantified limitations on its contribution through that analysis, rendering irrelevant any ambiguity remaining after Louisiana narrowed an even more ambiguous term.

EPA fails to demonstrate that Louisiana's approach was not a reasonable interpretation or application of the statutory factor to which it must defer.  *See Texas 2016*, 829 F.3d at 428.  And none of EPA's briefing addresses why EPA described the standard in its final action only as having "technical flaws" rather than a legal inconsistency with the CAA.  CI HQ-20 at 9,356.  Although EPA complains of the unfairness

of States "rely[ing] upon 'non-statutory' terms" when EPA cannot, Response at 93, States may reasonably interpret the CAA's terms, especially a term like "significantly" that is highly capacious, *see EME Homer*, 572 U.S. at 515–21. While EPA has interpreted that term when it has discretion in FIPs, it has not lawfully done so here.

## C.   EPA's use of post-submission data and modeling contravened the CAA and APA.

EPA attempts to divorce its revisions to modeling and delay in acting from the other issues and demote them to procedural challenges. This hand-waving misunderstands Louisiana's fundamental point. By requiring EPA to act within a limited time, Congress intended EPA's review to be limited also in scope—EPA cannot use data and modeling that could not exist at the time of SIP submission. Br. at 44–48. This Court has made similar inferences from timing before, *id.* at 45–46, and more generally from the CAA's structure. Louisiana seeks not to "punish" EPA, but to prevent it from transgressing its role by ignoring deadlines. EPA's actions deprived Louisiana of the right to consider first how to address new data and provide EPA arbitrary discretion. *Id.* at 47–48.

EPA does not squarely address any of these arguments. Its assertion that it is "required" to consider new data quickly devolves into that being not "prohibited." Response at 186–87. EPA's direct justification is that the good neighbor provision is "forward-looking," so under *Wisconsin v. EPA*, EPA cannot ignore "the most reliable data for making projections." *Id.* at 187–88. But *Wisconsin* held only that downwind contributions should be evaluated by projections for when attainment is required, rather than by data demonstrating attainment at the time of SIP submission. 938 F.3d 303, 321–22 (D.C. Cir. 2019). A downwind State had advanced the contrary argument; none do here.

Without a direct case from the text or caselaw, EPA looks to other CAA provisions—first, error correction. Response at 179. But that is appropriate only when the original approval "was in error at the time it was done." *EME Homer City Generation, L.P. v. EPA*, 795 F.3d 118, 133 (D.C. Cir. 2015); *see also Sierra Club v. EPA*, 60 F.4th 1008, 1013 (6th Cir. 2023) (collecting cases). It does not support using later modeling to undo SIP approvals, much less disapprove SIPs.

EPA also addresses arguments that it should have issued a call for SIP revisions under Section 7410(k)(5). While it is not Louisiana's

burden to navigate EPA out of the quandary EPA created, EPA fails to demonstrate why a SIP call does not fix timing difficulties.   States already have good neighbor implementation plans from previous rulemakings, and attainment deadlines have passed.   *See* Response at 16–17, 22.    EPA does not explain why, if those are "substantially inadequate" under new data and modeling, EPA cannot request revised plans taking that into account.   EPA has taken similar action to obviate past SIP submission deadlines before.   *See Sierra Club v. EPA* (*"Sierra Club 2012"*), 671 F.3d 955, 960 (9th Cir. 2012).   Had EPA done so once new modeling became available (around 2021), its re-evaluation could already be finished.

Out-of-circuit cases about attainment plan submissions support Louisiana's positions.   *Sierra Club 2012* does not support using post-SIP submission data to disapprove SIPs.   Rather, while the Ninth Circuit disallowed *approving* a SIP when later data submitted by the same State undermined it, that court did not suggest that EPA should *disapprove* it. *Id.* at 967.   Instead, the court relied on another case holding that EPA's authority to consider new data comes from its SIP call authority.   *Id.*; *Ass'n of Irritated Residents v. EPA*, 686 F.3d 668, 676 (9th Cir. 2012).

Thus, EPA's key case implies that a SIP call, not disapproval, is the appropriate approach for using post-SIP submission data.  Two other cases affirmed EPA's reliance on data from the time of plan submissions *instead of* later data.  *See Weld Cnty.*, 72 F.4th at 290; *Sierra Club v. EPA*, 356 F.3d 296, 308 (D.C. Cir. 2004).    The more restrictive attainment/nonattainment plan requirements cannot give EPA a freer hand here to ignore States' work or interests.

EPA also cites out-of-circuit precedent, rulings, and even consent orders to paper over a fundamental inconsistency in its argument—that EPA's delay long past statutory deadlines was necessary, but any further delay would be unlawful.  While commending itself for sidelining SIP reviews, EPA admits prioritizing a "consistent" framework and omnibus final action over following statutory mandates.  *See* Response at 180.  The delay was not due to its cursory and generalized review of Louisiana's SIP.  If EPA truly required many years and consent orders to arrive at a final action, that process only bolsters the conclusion that EPA went far beyond its limited role of confirming that SIPs were "reasonable" and "adequate."  Doubly so given that EPA had sufficient time to create its FIP—an exceedingly complex and novel rule, which necessarily governed

its approach to SIP reviews—on the same timeline.   EPA's revised modeling is only one aspect of its FIP work that it imported into and imposed in its SIP evaluations.[5]

EPA's administrative law arguments fare no better.  First, while EPA argues its revised modeling "was not outcome determinative," Response at 185, Louisiana already refuted this.  If its latest modeling is unlawful, EPA has no fallback.  Br. at 42.  Second, EPA argues that the notice-and-comment process somehow prevented a "surprise switcheroo." Response at 192.  But everything EPA cites discusses *rules*; notice-and-comment rulemaking cannot address the unfairness of using new standards or information retroactively.  *See* Br. at 54–55.  Third, EPA's argument against reliance ignores language in the August 2018 Memo and again denigrates Louisiana's right to be the first address its SIP obligations.  EPA's actions were arbitrary and capricious.  Br. at 50–52.

### D.    EPA wrongfully rejected Louisiana's air analysis.

In attempting to defend its disapproval of Louisiana's air analysis for being "technically flawed," EPA continues with the fundamental

---

[5] That some SIPs are still in limbo shows EPA's light regard for delay when it allows disapproval.

errors and misunderstandings that Louisiana already identified. And it fails to respond to Louisiana's arguments, including ones Louisiana flagged as "central." EPA's sophistic submission falls short of the most basic requirements for reasoned justification.

### 1. EPA contradicts itself in denigrating other forms of air quality analysis.

EPA does not dispute any fundamentals about how air quality analysis works, so its later conclusions at odds with those fundamentals are untenable. Air carries ozone precursors and pollutants. An emissions source can contribute to measured ozone downwind only if air carries those pollutants from that source to a downwind receptor. *See* CI HQ-83 at 357–58. When air does not carry anything from that source to the downwind receptor, there is no contribution. While source-apportionment modeling can quantify an estimated downwind contribution, when air does not make its way there from where the source emitted precursors, that modeling is simply unnecessary.

EPA has therefore often relied solely on historic weather patterns and wind roses without sophisticated modeling for establishing that an area does not contribute meaningfully downwind. *See Mississippi Comm'n on Env't Quality (MCEQ) v. EPA*, 790 F.3d 138, 168–69 (D.C.

Cir. 2015). While EPA relegates HYSPLIT back trajectories to the status of "corollary analysis" to its CAMx source-apportionment modeling, EPA also consistently uses back trajectories alone for determining downwind contributions when wind patterns are insufficient, *see id.*

So when EPA asserts that back trajectories "cannot evaluate ozone contributions from upwind states to downwind receptors" because they cannot "quantity" contributions, Response at 111, EPA contradicts itself—back trajectories can establish a lack of contribution by establishing that pollutants did not come to one area from another. Indeed, EPA offered no affirmative justification for why source-apportionment modeling was *necessary* for SIP evaluations; EPA used it because EPA already had that modeling for the 2008 ozone NAAQS FIP rulemakings (where EPA needed to quantity contribution to avoid overcontrol). *See* CI HQ-3 at 3. Because EPA had already performed such modeling, Louisiana considered that alongside its own analysis. Louisiana did not simply adopt EPA's findings but rather started with those receptors EPA identified and tested the "linkages." Br. at 35 n.6.

EPA's arguments that source-apportionment modeling can be the only method to determine significant contribution fail to address its own

statements that Louisiana collected, including admissions in its action. Br. at 62–63. EPA's only specific response is to misrepresent what occurred in one case Louisiana cited. There, contrary to EPA's narrative, Response at 117, EPA sought to first use HYSPLIT back-trajectory analysis and only considered source-apportionment modeling because *Texas* used it, and then only to confirm EPA's back trajectories, *MCEQ*, 790 F.3d at 166–68. EPA used only HYSPLIT back trajectories even more recently for assessing 2015 ozone NAAQs contributions in attainment designations, and this Court approved. *Texas v. EPA*, 983 F.3d 826, 841 (5th Cir. 2020).

EPA even now admits that back trajectories can test the "general plausibility of the photochemical model 'linkages,'" Response at 116, leaving undisputed that they can render modeled linkages and contributions *im*plausible, Br. at 64. If Louisiana's back-trajectory analysis rendered EPA's linkages implausible, as Louisiana asserts, then Louisiana's remaining analysis—weather patterns, wind roses, and back trajectories—would all point toward no significant contribution. All the

evidence worth weighing would mean Louisiana's current policies are "adequate" to prevent significant contributions to downwind problems.[6]

## 2.    EPA still fails to address the "central points" of Louisiana's analysis.

Accordingly, EPA's disapproval depends on demonstrating that Louisiana's back-trajectory analysis entirely fails to show that its contribution is not significant and to undermine the plausibility of EPA's linkages.  But it is EPA that fails to address those "central points," Br. at 66.  Most critically, EPA still does not address Louisiana's key argument: it is not enough to establish a significant contribution when air comes from emissions sources in Louisiana to downwind receptors in Houston and Dallas on only 10% of high ozone days—the days EPA believes are relevant to modeling and significance.  EPA does not even mention the 10% figure.

Instead, EPA again focuses on a different, irrelevant one:  how often the entire state of Louisiana was upwind.  Under the good neighbor provision, only a "source" or "emissions activity" matters.  EPA does not even acknowledge Louisiana's discussion of this point, Br. at 68–69.

---

[6] This vitiates amici's retort that Louisiana's SIP was "do-nothing."

Being upwind 25% of time is not a "relatively large percentage," Response at 113, in any meaningful sense. And EPA addresses its related mischaracterization of the statutory standard in its proposed disapproval—that Louisiana is upwind often enough to "potentially contribute"—only in a footnote by suggesting that it was somehow referencing areas around the centerlines. Response at 112 n.51. This post-hoc addition is not connected to what EPA actually stated; even if it were what EPA meant, it would be wrong as discussed below. In sum, EPA does not dispute the fatal, central flaw Louisiana identified.

EPA's argument that its modeling "established" that Louisiana had a persistent and consistent pattern of contribution because there were a number of high ozone days on which Louisiana was modeled to contribute, *id.* at 108, neither negates EPA's failure to respond nor preempts Louisiana's back-trajectory analysis. Even if EPA's modeling was correct, the back-trajectory analysis still shows that Louisiana contributes to Texas's problems at most a very small fraction of the time, supporting a reasonable qualitative conclusion that Louisiana's contributions are insignificant. And if there is some conflict between EPA's modeled results (based on limited meteorological data) and actual

air trajectory data, Louisiana's semi-quantitative conclusion that the latter undermines the former is also reasonable. Such conclusions are appropriate for a State to make when it has discretion in interpreting an ambiguous, capacious term like "significantly." *See MCEQ*, 790 F.3d at 150 (noting where EPA has discretion, there is no "bright-line, 'objective' test" for determining contribution and EPA need not "quantify its analysis").

Moreover, EPA supports using back trajectories for both these "qualitative" and "semi-quantitative" roles. Br. at 63. That the agency failed to use its self-described "transport climatology" from 12 years of back trajectories to counter Louisiana's or for anything beyond window dressing (merely finding that sometimes the wind blows west) does not undermine Louisiana's reasonable conclusions or "confirm" the opposite. EPA at least owed an explanation for why Louisiana's conclusion, focused on actual data and the terms of the good neighbor provision, was insufficient. Without that explanation, EPA's disapproval is definitionally arbitrary and capricious. *Id.* at 69.

Instead of addressing Louisiana's core point, EPA leans further into its empty assertion that the back-trajectory analysis was "flawed"

because Louisiana did not consider areas to the side of the centerline.
(EPA still identifies no other flaws.)  It states that the 28% figure of back
trajectories passing in or through Louisiana is too low because "[m]any
more air parcels likely travel in and through Louisiana if the horizontal
areas on either side of the centerline are considered."  Response at 112.
This desperate ploy further demonstrates EPA's insistent unwillingness
to understand, much less address, Louisiana's point.

To begin, EPA mischaracterizes its prior statements.  EPA never
stated that considering side areas would have made a concrete difference
or changed any count.  Br. at 60.  Rather, EPA only generally asserted
that Louisiana did not consider that such areas existed.  CI HQ-83 at 353
(stating Louisiana did not consider "that there are areas on either side of
the centerline that would also be contributing areas").  *That* assertion
was baseless, and EPA's mischaracterization now irrelevant.  Even if
more trajectories traveled through Louisiana, that is not the critical
number.  What matters is *where* they came from within Louisiana.  And
EPA does not even assert, much less show, that the true figure of
trajectories carrying emissions to problem areas in Texas exceeds 10%.
Nor is that likely, given that Louisiana considered large areas of the

State, not narrow centerlines.  Br. at 60.  That EPA did not consider whether its own back trajectories show that Louisiana's counts were wrong underscores its unwillingness to do the most basic work required in reviewing a sovereign State's plan for governing itself.

## III.    THE COURT SHOULD VACATE AND REMAND.

Vacatur is the "default rule" and only statutorily prescribed remedy for APA violations.  *See, e.g.*, *Cargill*, 57 F.4th at 472 (plurality op.).  EPA does not justify the rare exception.

EPA's errors were not "procedural" and "record-based" defects, Response at 212, but severe substantive CAA and APA deficiencies.  It "is far from certain" that EPA could cure them.  *All. for Hippocratic Med. v. FDA*, 78 F.4th 210, 255 (5th Cir. 2023).  EPA got even the basic standard of its review wrong.  And the Court should not assume EPA could come to the same conclusion when it unlawfully pre-judged Louisiana's SIP and failed to consider the State's key points.  Put bluntly, EPA has never seriously engaged with Louisiana's arguments even once. It must do so with fresh eyes.

Remanding without vacatur would not be less disruptive.  Seven circuits have stayed SIP disapprovals, and EPA has indefinitely stayed

application of the FIP to the affected States, 88 Fed. Reg. 49,295. EPA

must comprehensively reconsider its FIP regardless of what this Court

does. And EPA will practically have to reconsider all SIP remands

together. Remand without vacatur will only promote disorder by

prompting EPA to reinstate a small portion of the total FIP prematurely.

## CONCLUSION

The Court should keep this case, grant the petition because EPA

violated the CAA and APA, vacate EPA's disapproval of Louisiana SIP,

and remand.

Respectfully Submitted,

**JEFF LANDRY**
  **Attorney General**

*/s/ Joseph S. St. John*
ELIZABETH B. MURRILL (LA 20685)
  *Solicitor General*
JOSEPH S. ST. JOHN (LA 36682)
  *Deputy Solicitor General*
MACHELLE HALL (LA 31498)
  *Assistant Attorney General*
LOUISIANA DEPT. OF JUSTICE
909 Poydras Street, Suite 1850
New Orleans, LA 70112
Tel: (225) 485-2458
murrille@ag.louisiana.gov
stjohnj@ag.louisiana.gov
hallm@ag.louisiana.gov

Courtney J. Burdette (LA 30564)
 *Executive Counsel*
Jill C. Clark, Bar (LA 33050)
 *General Counsel*
LOUISIANA DEPT. OF
 ENVIRONMENTAL QUALITY
Office of the Secretary, Legal Division
P.O. Box 4302
Baton Rouge, Louisiana 70821-4302
Tel: (225) 219-3985
Courtney.Burdette@la.gov
Jill.Clark@la.gov

Jeffrey A. Hall
Marcella Burke
BURKE LAW GROUP
1000 Main Street, Suite 2300
Houston, Texas 77002
jeff@burkegroup.law
marcella@burkegroup.law

**CERTIFICATE OF SERVICE**

I hereby certify that on September 19, 2023, a true and correct copy of the foregoing has been served on all parties in accordance with the Appellate Rules of Civil Procedure, via the Court's CM/ECF system.

*/s/ Joseph S. St. John*
Joseph S. St. John

## CERTIFICATE OF COMPLIANCE

This document complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,494 words, excluding the parts of the document exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word (the same program used to calculate the word count).

/s/ *Joseph S. St. John*
Joseph S. St. John