No. 23-60069

# In the United States Court of Appeals for the Fifth Circuit

STATE OF TEXAS; TEXAS COMMISSION ON ENVIRONMENTAL
QUALITY; LUMINANT GENERATION COMPANY, L.L.C.; COLETO
CREEK POWER, L.L.C.; ENNIS POWER COMPANY, L.L.C.; HAYS
ENERGY, L.L.C.; MIDLOTHIAN ENERGY, L.L.C.; OAK GROVE
MANAGEMENT COMPANY, L.L.C.; WISE COUNTY POWER COMPANY,
L.L.C.; ASSOCIATION OF ELECTRIC COMPANIES OF TEXAS; BCCA
APPEAL GROUP; TEXAS CHEMICAL COUNCIL; TEXAS OIL & GAS
ASSOCIATION; PUBLIC UTILITY COMMISSION OF TEXAS; RAILROAD
COMMISSION OF TEXAS; STATE OF MISSISSIPPI; MISSISSIPPI
DEPARTMENT OF ENVIRONMENTAL QUALITY; MISSISSIPPI POWER
COMPANY; STATE OF LOUISIANA; LOUISIANA DEPARTMENT OF
ENVIRONMENTAL QUALITY; ENTERGY LOUISIANA, L.L.C; LOUISIANA
CHEMICAL ASSOCIATION; MID-CONTINENT OIL AND GAS
ASSOCIATION; LOUISIANA ELECTRIC UTILITY ENVIRONMENTAL
GROUP, L.L.C.; TEXAS LEHIGH CEMENT COMPANY, LP,

*Petitioners*,

*v.*

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY;
MICHAEL S. REGAN, ADMINISTRATOR, UNITED STATES
ENVIRONMENTAL PROTECTION AGENCY,

*Respondents.*

On Petitions for Review of a Final Action
of the United States Environmental Protection Agency

## RULE 30.2(a) APPENDIX – VOLUME TWO OF SEVEN
### (C.I. NOS. HQ-15, HQ-17, HQ-20, HQ-24, HQ-29, HQ-58, HQ-70, HQ-83, HQ-85)

(*Counsel Listed on Inside Cover*)

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

LANORA C. PETTIT
Principal Deputy Solicitor General

BILL DAVIS
Deputy Solicitor General
Bill.Davis@oag.texas.gov

MICHAEL R. ABRAMS
WILLIAM F. COLE
Assistant Solicitors General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

Counsel for the State of Texas, Texas
Commission on Environmental
Quality, Public Utility Commission of
Texas, and Railroad Commission of
Texas

No. 23-60069

# In the United States Court of Appeals for the Fifth Circuit

STATE OF TEXAS; TEXAS COMMISSION ON ENVIRONMENTAL QUALITY; LUMINANT GENERATION COMPANY, L.L.C.; COLETO CREEK POWER, L.L.C.; ENNIS POWER COMPANY, L.L.C.; HAYS ENERGY, L.L.C.; MIDLOTHIAN ENERGY, L.L.C.; OAK GROVE MANAGEMENT COMPANY, L.L.C.; WISE COUNTY POWER COMPANY, L.L.C.; ASSOCIATION OF ELECTRIC COMPANIES OF TEXAS; BCCA APPEAL GROUP; TEXAS CHEMICAL COUNCIL; TEXAS OIL & GAS ASSOCIATION; PUBLIC UTILITY COMMISSION OF TEXAS; RAILROAD COMMISSION OF TEXAS; STATE OF MISSISSIPPI; MISSISSIPPI DEPARTMENT OF ENVIRONMENTAL QUALITY; MISSISSIPPI POWER COMPANY; STATE OF LOUISIANA; LOUISIANA DEPARTMENT OF ENVIRONMENTAL QUALITY; ENTERGY LOUISIANA, L.L.C; LOUISIANA CHEMICAL ASSOCIATION; MID-CONTINENT OIL AND GAS ASSOCIATION; LOUISIANA ELECTRIC UTILITY ENVIRONMENTAL GROUP, L.L.C.; TEXAS LEHIGH CEMENT COMPANY, LP,

*Petitioners*,

*v.*

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; MICHAEL S. REGAN, ADMINISTRATOR, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

*Respondents.*

On Petitions for Review of a Final Action of the United States Environmental Protection Agency

## INDEX TO RULE 30.2(a) APPENDIX (VOLUME TWO OF SEVEN) *

---

\* Consistent with how record material was cited in the briefs, appendix tab numbers correspond to the final four digits (minus leading zeros) of "Document ID" numbers on the certified index of record contents.

11.  O3-PM-RH-Modeling Guidance-2018 (Feb. 21, 2022) (EPA-HQ-OAR-2021-0663-0015) ................................................................... Tab HQ-15

12.  Air Quality Modeling Technical Support Document 2015 Ozone NAAQS Transport SIP Proposed Actions (Feb. 22, 2022) (EPA-HQ-OAR-2021-0663-0017) ........................................................... Tab HQ-17

13.  Air Quality State Implementation Plans; Approvals and Promulgations: Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards, 88 Fed. Reg. 9336 (Feb. 13, 2023) (EPA-HQ-OAR-2021-0663-0020) .............. Tab HQ-20

14.  Technical Support Document: 2015 8-Hour Ozone Transport SIP Proposal, EPA Region 6 (Feb. 1, 2022) (EPA-HQ-OAR-2021-0663-0024) ............................................................................Tab HQ-24

15.  2016v3 Emissions Modeling Technical Support Document (Jan. 29, 2023) (EPA-HQ-OAR-2021-0663-0029)......................................Tab HQ-29

16.  EPA Comments on Draft Louisiana 2015 Ozone Transport SIP 9-19-2017 (Sept. 19, 2017) (EPA-HQ-OAR-2021-0663-0058) ..........Tab HQ-58

17.  2016v3 DVs State Contributions (Jan. 31, 2023) (EPA-HQ-OAR-2021-0663-0070)................................................................Tab HQ-70

18.  2015 Ozone NAAQS Interstate Transport SIP Disapprovals - Response to Comment (RTC) Document (Jan. 31, 2023) (EPA-HQ-OAR-2021-0663-0083) ...............................................................Tab HQ-83

19.  Air Quality Modeling Technical Support Document 2015 Ozone NAAQS SIP Disapproval Final Action (Jan. 31, 2023) (EPA-HQ-OAR-2021-0663-0085) ...............................................................Tab HQ-85

*(See subsequent volumes for additional appendix documents)*

**Tab HQ-15: O3-PM-RH-Modeling Guidance-2018 (Feb. 21, 2022) (EPA-HQ-OAR-2021-0663-0015)**



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
RESEARCH TRIANGLE PARK, NC  27711

NOV 2 9 2018

OFFICE OF
AIR QUALITY PLANNING
AND STANDARDS

## MEMORANDUM

**SUBJECT:**    Modeling Guidance for Demonstrating Air Quality Goals for
Ozone, PM$_{2.5}$ and Regional Haze

**FROM:**    Richard A. Wayland, Division Director
Air Quality Assessment Division

**TO:**    Regional Air Division Directors, Regions 1 – 10

The Environmental Protection Agency (EPA) is issuing the attached *Modeling Guidance for Demonstrating Air Quality Goals for Ozone, PM$_{2.5}$ and Regional Haze*. This document reflects the EPA's recommendations for how air agencies should conduct air quality modeling and related technical analyses to satisfy model attainment demonstration requirements for the 2015 ozone and 2012 PM$_{2.5}$ National Ambient Air Quality Standards (NAAQS), as well as for regional haze reasonable progress analyses. This document updates the previous draft version of the modeling guidance, which was released in December 2014.

This document does not substitute for provisions or regulations of the Clean Air Act (CAA), nor is it a regulation itself. As the term "guidance" suggests, it provides recommendations on how to implement the modeling requirements. Thus, it does not impose binding, enforceable requirements on any party, nor does it assure that the EPA will approve all instances of its application, as the guidance may not apply to a particular situation based upon the circumstances. Final decisions by the EPA regarding a particular State Implementation Plan (SIP) demonstration will only be made based on the statute and applicable regulations and will only be made following a final submission by air agencies and after notice and opportunity for public review and comment.

In December 2014, the EPA released a draft version of this guidance for public review and comment. A total of 13 substantive comments were received. After considering the comments, the EPA made changes which are reflected in this updated version of the guidance. Major guidance updates include responding to the public comments as well as updates to reflect requirements in the most recent NAAQS implementation rules and regional haze rule.

Similar to the draft guidance, the updated guidance is divided into two main sections. The first part describes how to setup and apply a photochemical modeling platform (including meteorological, emissions, and air quality modeling), and the second part describes how to use the air quality modeling results to show whether future attainment of the ozone and/or $PM_{2.5}$ NAAQS is likely. The guidance also describes how to use photochemical grid modeling to evaluate reasonable progress goals for regional haze.

Many of guidance updates are in the form of revised and reorganized text. In addition, numerous references have been added and/or updated. The updated guidance reflects the requirements contained in the 2015 ozone NAAQS SIP requirements rule (November 2018)[1], the 2012 $PM_{2.5}$ NAAQS SIP requirements rule (August 2016)[2], and the regional haze rule (January 2017)[3].

Specific updates to the draft guidance include:

- Reorganization of the document including removal of outdated language and references.
- The 2014 draft guidance updates to the recommended 8-hour ozone attainment test (relative response factors using the top ten modeled days) were finalized, and now also apply to the 2015 ozone NAAQS.
- Consistent with the 2017 regional haze rule revisions, the reasonable progress goals methodology has been updated to reference the 20 percent "most anthropogenically impaired" days and 20 percent "clearest" days.
- The emissions modeling section has been extensively updated to account for new and improved emissions models, techniques, and input data, and has been closely coordinated with the SIP emissions inventory guidance, "*Emissions Inventory Guidance for Implementation of Ozone and Particulate Matter National Ambient Air Quality Standards (NAAQS) and Regional Haze Regulations*," available at: https://www.epa.gov/air-emissions-inventories/air-emissions-inventory-guidance-implementation-ozone-and-particulate.

Please share this guidance with air agencies in your Region. If you have any questions concerning this document, please contact Brian Timin at (919) 541-1850 or *timin.brian@epa.gov*. The guidance document is available electronically on the EPA's website: https://www3.epa.gov/ttn/scram/guidance_sip.htm.

Attachment

---

[1] *See* https://www.epa.gov/ground-level-ozone-pollution/implementation-2015-national-ambient-air-quality-standards-ozone
[2] *See* 81 FR 58101
[3] *See* 82 FR 3078



# Modeling Guidance for Demonstrating Air Quality Goals for Ozone, PM$_{2.5}$, and Regional Haze

EPA 454/R-18-009
November 2018

Modeling Guidance for Demonstrating Air Quality Goals for Ozone, PM$_{2.5}$, and Regional Haze

U.S. Environmental Protection Agency
Office of Air Quality Planning and Standards
Air Quality Assessment Division
Research Triangle Park, NC

## Table of Contents

Table of Contents ......................................................................................... 4

**1.0    Introduction ........................................................................................ 8**

1.1    What Is the Purpose of This Document? .................................................. 9

1.2    Does the Guidance in This Document Apply to Me? ................................. 9

1.3    Outline ................................................................................................. 10

**2.0    Building a Model Platform ................................................................ 12**

2.1    Conceptual Description ......................................................................... 12

2.1.1    Example Applications of Conceptual Models ................................ 14

2.2    Modeling Protocol and Supporting Documentation ............................... 14

2.2.1    Modeling Protocol .................................................................... 14

2.2.2    Attainment Demonstration and/or Reasonable Progress Goals Modeling Documentation Package ............................................................. 16

2.3    Episode Selection ................................................................................. 17

2.3.1    Choosing Time Periods to Model ............................................... 18

2.3.2    Future Year Selection ............................................................... 20

2.4    Modeling Domain Selection ................................................................. 21

2.4.1    Domain Size ............................................................................ 21

2.4.2    Vertical Layer Configuration ..................................................... 22

2.4.3    Horizontal Grid Cell Size .......................................................... 23

2.5    Air Quality Model Selection .................................................................. 24

2.6    Meteorological Inputs .......................................................................... 27

2.6.1    Developing Base Year Meteorological Fields .............................. 28

2.6.1.1    Selecting a Model Domain ............................................. 29

2.6.1.2    Selecting Physics Options ............................................. 29

2.6.1.3    Use of Data Assimilation ............................................... 30

2.6.2    Assessing Impacts of Future Year Meteorology .......................... 31

2.6.3    Evaluation of Base Year Meteorological Fields ........................... 32

2.6.3.1    Operational Evaluation ................................................. 33

2.6.3.2    Phenomenological Evaluation ....................................... 34

2.7    How Are the Emission Inputs Developed? ............................................. 34

2.7.1    What Emissions Inventory Years Should I use for Base and Future Modeling?  35

2.7.2    What Base Year Emission Inventory Data Are Needed to Support Air Quality Models? ................................................................................. 36

2.7.3    What Pollutants Should Be Included in Base Year Inventories? ...... 36

2.7.4    What Temporal Resolution Should Be Used for Base Year Inventories? 37

2.7.5    What Spatial Coverage Is Needed for Base Year Inventories? ........ 38

2.7.5.1    Areas Within the Nonattainment Area ........................... 38

2.7.5.2    Areas Outside of the Nonattainment Area ..................... 38

2.7.5.3    Areas Outside of the United States ................................ 39

2.7.6    How Can the National Emission Inventory Be Used by Air Agencies? .... 39

2.7.7    How Should Base Year Emissions Be Created? ................................................. 40
    2.7.7.1    Point Sources ...................................................................................... 41
    2.7.7.2    Nonpoint Sources ............................................................................... 42
    2.7.7.3    On-Road Mobile .................................................................................. 42
    2.7.7.4    Nonroad Mobile Equipment ............................................................... 44
    2.7.7.5    Nonroad Mobile: Commercial Marine Vessels, Locomotives, and Aircraft 45
    2.7.7.5    Biogenic Emissions ............................................................................. 46
    2.7.7.6    Geogenic and Other Natural Sources .................................................. 47
    2.7.7.7    Wildland and Cropland Fires ............................................................... 49
2.7.8    What Other Data Are Needed to Support Emissions Modeling? ..................... 50
    2.7.8.1    Temporal Allocation ........................................................................... 50
    2.7.8.2    Chemical Speciation ........................................................................... 53
    2.7.8.3    Spatial Allocation ............................................................................... 55
    2.7.8.4    Other Ancillary Inputs ........................................................................ 55
2.7.9    How Are Inventory Data Converted into Air Quality Model Input? ................ 56
    2.7.9.1    Emissions Models ............................................................................... 56
    2.7.9.2    Biogenic Emissions Models ................................................................. 57
2.7.10    Other Emissions Modeling Issues ................................................................ 58
    2.7.10.1 Elevated Point Sources ........................................................................ 59
    2.7.10.2 Treatment of 'Atypical' Sources of Emissions ..................................... 59
    2.7.10.3 Transport and Meteorology-based Reductions in Fugitive Dust Emissions ............................................................................................................. 59
    2.7.10.4 Quality Assurance ............................................................................... 60
2.7.11    How Are Emissions Estimated for Future Years? .......................................... 61
2.8    Initial and Lateral Boundary Conditions ................................................................. 62
**3.0    Evaluating Model Performance .................................................................................... 67**
3.1    Overview of Model Performance Evaluation ........................................................... 67
3.2    Operational Evaluation ........................................................................................... 69
    3.2.1    Metrics .................................................................................................... 70
    3.2.2    Plots ........................................................................................................ 73
    3.2.3    Ozone Model Performance ...................................................................... 78
    3.2.4    $PM_{2.5}$ Model Performance ...................................................................... 79
3.3    Ambient Measurement Networks ........................................................................... 81
    3.3.1    AQS ......................................................................................................... 81
    3.3.2    NCore ...................................................................................................... 82
    3.3.3    IMPROVE ................................................................................................. 82
    3.3.4    CASTNet ................................................................................................... 82
    3.3.5    CSN ......................................................................................................... 83
    3.3.6    NADP ....................................................................................................... 83
    3.3.7    SEARCH ................................................................................................... 84
    3.3.8    Speciated $PM_{2.5}$ Data Summary .......................................................... 84
3.4    Diagnostic Evaluation ............................................................................................. 90
    3.4.1    Process Analysis ...................................................................................... 91

3.4.2   Indicator Ratios..............................................................................................92

3.4.3   Source Apportionment ................................................................................95

3.4.4   Sensitivity Studies ......................................................................................96

3.4.5   Dynamic Model Evaluation ........................................................................97

3.5   Evaluation Tools ..................................................................................................98

**4.0   Assessing Modeled Attainment for Ozone and PM$_{2.5}$ .................................. 99**

4.1   Overview of Modeled Attainment Test .............................................................99

4.1.1   Establishing the Base Design Value ..........................................................101

4.1.2   Calculation of Relative Response Factors...................................................103

4.2   Modeled Attainment Test for the Primary Ozone Standard .................................103

4.2.1   Model Values to Use in the RRF Calculation ...................................................104

4.2.2   Grid Cells to Use in the RRF Calculation .....................................................106

4.2.3   Sample Modeled Attainment Test Calculation ...............................................107

4.3   Modeled Attainment Test for the Secondary Ozone Standard............................110

4.4   What is the Modeled Attainment Tests for the Annual Average PM$_{2.5}$ NAAQS?.... 111

4.4.1   Ambient PM$_{2.5}$ Data Used in the Annual PM$_{2.5}$ Attainment Test ....................113

4.4.2   FRM Monitors that Do Not Have Speciation Data ...........................................113

4.4.3   PM$_{2.5}$ Species Calculations and Definitions ...................................................115

4.4.4   Recommended Treatment of Species Data......................................................116

4.4.4.1   Retained Nitrate Mass..........................................................116

4.4.4.2   Ammonium Associated with Sulfates and Retained Nitrates ...............117

4.4.4.3   Particle Bound Water .......................................................118

4.4.4.4   Salt .....................................................................................119

4.4.4.5   Other Primary PM2.5......................................................119

4.4.4.6   Blank mass ................................................................120

4.4.4.7   Calculation of Carbonaceous Mass ................................121

4.4.4.8   Summary of PM$_{2.5}$ Composition Calculations ...........................122

4.5   What Is the Recommended Modeled Attainment Test for the 24-Hour NAAQS?..127

4.6   Local Area Analyses - Special Considerations for Primary PM$_{2.5}$............................133

4.6.1   Analysis of Primary PM$_{2.5}$ Impacts at Monitors .............................................134

4.6.2   Analysis of Primary PM$_{2.5}$ Impacts at Monitors Using a Gaussian Dispersion Model............................................................................................................135

4.6.2.1   Double Counting..........................................................137

4.6.2.2   Analysis of Primary PM$_{2.5}$ at Monitors- Quality Assurance ..................137

4.7   Estimating design values at unmonitored locations ................................................138

4.7.1   Why does the unmonitored area analysis need to use both ambient data and model output?.............................................................................................139

4.7.2   Implementation of Gradient Adjusted Spatial Fields ......................................140

4.7.3   Using the Results of the Unmonitored Area Analysis ......................................142

**5.0   What Is the Recommended Modeling Method for Developing Air Quality Goals for Regional Haze?..............................................................................................143**

5.1   Regional Haze Rule Background ..............................................................143

5.2   How is Regional Haze Measured? ...........................................................145

5.2.1   IMPROVE Algorithm...............................................................146

     5.2.2   Deciview Haze Index ........................................................ 148

     5.2.3   Estimating Mass Associated with Components of Particulate Matter ............ 148

     5.2.4   Normalizing Trends in Regional Haze - f(rh) Factors ........................................ 150

  5.3   How Do I Apply a Model to Calculate Changes in Visibility? .................................... 151

  5.4   How Do I Select Appropriate Inputs For Developing RPGs? ................................... 163

**6.0    How Can Additional Analyses Be Used to Support an Ozone or PM$_{2.5}$ Attainment Demonstration? ........................................................................................................... 169**

  6.1   What Types of Additional Analyses Should Be Completed as Part of an Ozone or PM$_{2.5}$ Attainment Demonstration? ......................................................................... 170

     6.1.1   Modeling Analyses .................................................................................... 171

     6.1.2   Analyses and Trends in Ambient Air Quality and Emissions .......................... 173

     6.1.3   Additional Emissions Controls/Reductions ................................................ 175

  6.2   Weight of Evidence Summary ............................................................................... 176

**7.0    What Role Should Additional and/or Supplemental Analyses Play in Regional Haze Modeling Demonstrations? ........................................................................................... 178**

  7.1   Additional air quality modeling .............................................................................. 178

  7.2   Review of trends ................................................................................................... 178

  7.3   Other models and tools ......................................................................................... 178

  7.4   Refinements to the recommended visibility analysis ............................................. 179

  7.5   Concerns about modeling the clearest days ......................................................... 180

**8.0    References ......................................................................................................... 181**

# 1.0   Introduction

This document describes how to estimate the impacts of an emissions control strategy on air quality for purposes of demonstrating attainment of the annual average and 24-hour average national ambient air quality standards (NAAQS) for particles smaller than 2.5 μm in diameter (*PM$_{2.5}$*) and the 8-hour NAAQS for ozone. We also describe how to use modeled and monitored air quality data to estimate future visibility conditions in *Class I areas* (e.g., national parks, wilderness areas) as part of the development of reasonable progress goals (RPGs) that reflect the long-term strategy in a regional haze state implementation plan (SIP).[1]

This document describes how to apply air quality models to generate the predictions used to evaluate attainment and/or to set RPGs for regional haze. Modeling to show attainment of the NAAQS primarily applies to nonattainment areas[2] for which modeling is required, or desired. Modeling to assess reasonable progress for regional haze applies to all states, the District of Columbia, and the U.S. Virgin Islands.[3]

This guidance is designed to implement national policy on air quality modeling requirements as embodied in the Clean Air Act (CAA), the Ozone SIP Requirements Rule[4], the PM$_{2.5}$ SIP Requirements Rule[5], and the Regional Haze Rule[6]. In addition, the United States Environmental Protection Agency (EPA) revised 40 CFR part 51, Appendix W (Guideline on Air Quality Models) (U.S. EPA, 2017a), hereafter referred to as "Appendix W," in 2017 to provide general information about the types of model approaches that may be appropriate for the purposes of demonstrating attainment with the ozone and PM$_{2.5}$ NAAQS (section 5) and projecting visibility impacts at Class I areas (section 6). Appendix W is a regulation and, as such, contains binding requirements. However, the Appendix W photochemical modeling requirements related to SIP

---

[1] Modeling to determine RPGs as described in this document is part of the development of a regional haze SIP. However, unlike the NAAQS, the Regional Haze program does not involve fixed air quality standards that must be achieved. The ways that RPGs are used in the development of a regional haze SIP are described in more detail in section 5.

[2] While this guidance document is primarily directed at modeling applications in nonattainment areas, it may also be useful as a guide for modeling to support NEPA analyses, maintenance plans or to support other rules or provisions of the Clean Air Act.

[3] *See* 40 CFR 51.300(b).

[4] *See* Implementation of the 2015 National Ambient Air Quality Standards for Ozone: Nonattainment Area State Implementation Plan Requirements; [Final rule signed November 7, 2018]

[5] *See* Fine Particulate Matter National Ambient Air Quality Standards: State Implementation Plan Requirements (PM$_{2.5}$ SIP Requirements Rule), 81 FR 58101 (Aug. 24, 2016).

[6] The Regional Haze Rule was revised by a final rule published on January 10, 2017 (82 FR 3078). This version of the modeling guidance reflects that revision of the rule. Additional revisions may be made to this guidance to be consistent with any future regional haze rule and/or guidance issued by EPA.

attainment demonstration modeling and regional haze modeling do not proscribe any particular models or modeling techniques. As such, this modeling guidance provides additional details about how to set up and run photochemical models that may be useful to air agencies that are required to submit SIP attainment demonstrations and/or regional haze modeling.

This guidance is intended for use by the EPA headquarters and Regional offices; federal land managers of mandatory Class I federal areas; state, local and tribal air quality management authorities, and the general public. This document does not substitute for provisions or regulations of the CAA enumerated above, nor is it a regulation itself. As the term "guidance" suggests, it provides recommendations on how to implement the modeling requirements. Thus, it does not impose binding, enforceable requirements on any party, nor does it assure that the EPA will approve all instances of its application, as the guidance may not apply to a particular situation based upon the circumstances.

The EPA and state, local, and tribal air agencies (hereinafter referred simply as "air agency" or "air agencies") retain the discretion to adopt approaches on a case-by-case basis that differ from this guidance where appropriate. Final decisions by the EPA regarding a particular SIP submission that includes a modeling demonstration will ultimately be made based on the statute and applicable regulations and will only be made following a final submission by air agencies and after notice and opportunity for public review and comment. Interested parties are free to raise questions and objections about the appropriateness of the application of this guidance to a particular situation; the EPA and air agencies should consider whether or not the recommendations in this guidance are appropriate in that situation.

## 1.1    What Is the Purpose of This Document?

This document has two purposes. The first purpose is to describe how to apply an air quality model to produce results needed to support an attainment demonstration or to calculate RPGs for a regional haze reasonable progress analysis in a scientifically appropriate manner. The second is to explain how to interpret whether results of modeling and other analyses support a conclusion that attainment of the ozone and/or $PM_{2.5}$ NAAQS will occur by the appropriate date for an area, and/or to assess progress towards the national visibility goal of the regional haze program.

## 1.2    Does the Guidance in This Document Apply to Me?

This guidance applies to all air agencies that are required to submit a State Implementation Plan (SIP), or Tribal Implementation Plan (TIP) submission with an attainment plan designed to

9

achieve attainment of the ozone and/or PM$_{2.5}$ NAAQS. The guidance also applies to air agency SIP submissions developed to address Regional Haze Rule requirements. Air agencies required to submit an attainment demonstration and/or a reasonable progress analysis for regional haze are encouraged to follow the procedures described in this document. Details on when a state is required to submit a modeled attainment demonstration can be found in the Ozone SIP Requirements Rule[7] and the PM$_{2.5}$ SIP Requirements Rule[8]. Details on when a state is required to submit a regional haze SIP that includes RPGs can be found in the Regional Haze Rule[9].

## 1.3   Outline

Part 1 of this guidance provides an overview of the modeling and attainment demonstration process. Part 2 describes how to build a "modeling platform" and apply air quality models. A "modeling platform" consists of the building blocks of an air quality modeling demonstration. This includes emissions modeling[10], meteorological modeling, and the development of all other inputs needed to run an air quality model. The model platform development process consists of the following steps as outlined in section 2:

|  |  |
|---|---|
| Section 2.1 | Development of a conceptual description of the problem to be addressed |
| Section 2.2 | Develop a modeling protocol |
| Section 2.3 | Select appropriate meteorological time periods to model |
| Section 2.4 | Choose an appropriate area to model with appropriate horizontal/vertical resolution |
| Section 2.5 | Select an appropriate model to support the demonstration |
| Section 2.6 | Generate meteorological inputs to the air quality model |
| Section 2.7 | Generate emissions inputs to the air quality model |
| Section 2.8 | Develop initial and lateral boundary conditions that are suitable for the application |

Typically, the air quality modeling process starts with the development of base year emissions and meteorology for input to an air quality model to evaluate model performance. Section 3

---

[7] *See* 40 CFR 51.1308.

[8] *See* 40 CFR 51.1011.

[9] *See* 40 CFR 51.308. Sections 308(d) and (e) apply for SIPs for the first implementation period only. States that followed section 51.309 (which is also part of the Regional Haze Rule) in the first implementation period were not required to develop RPGs. Section 51.308(f) applies to all Regional Haze SIPs due in 2021 and later.

[10] Additional emissions inventory requirements and details on emissions modeling are contained in "Emissions Inventory Guidance for Implementation of Ozone and Particulate Matter National Ambient Air Quality Standards (NAAQS) and Regional Haze Regulations."

describes the process for evaluating model performance and performing diagnostic analyses. After evaluating the model and making any necessary input changes or adjustments, the model is run for a future year, which corresponds to the appropriate attainment year for the area or to the future year modeled for regional haze planning purposes. Sections 2 and 3 apply to both ozone and $PM_{2.5}$ modeling and modeling to set RPGs for regional haze SIPs.

Section 4 describes how the air quality model outputs are then used to apply the modeled attainment test to support an attainment demonstration for ozone or $PM_{2.5}$. We explain what is meant by a *modeled attainment demonstration*, a *modeled attainment test*, and a *weight of evidence demonstration*. Modeled attainment tests are described for the 8-hr ozone NAAQS and the annual and 24-hour $PM_{2.5}$ NAAQS. Section 5 addresses aspects of modeling specific to regional haze SIPs.

Model applications require a substantial effort. Air agencies are encouraged to work closely with the appropriate EPA Regional office(s) in executing each step of the modeling and attainment demonstration or regional haze planning process. This will increase the likelihood of approval of the demonstration at the end of the process.

## 2.0    Building a Model Platform

## 2.1    Conceptual Description

The first step in developing an attainment demonstration is to construct a conceptual description of the problem that is being addressed. Conceptual descriptions, which are also referred to as conceptual models, are comprehensive summaries of the "state of the knowledge" regarding the influence of emissions, meteorology, transport, and other relevant atmospheric processes on air quality in the area (Vickery, 2004). For a conceptual description to be informative, it should identify what processes and sources, in the generic sense, are most responsible for the air quality issue being simulated. Well-constructed conceptual models can substantially inform the design of the attainment demonstration modeling (e.g., episode selection, choice of domain, emissions priorities, evaluation focus) and should be conducted in advance of the development of a modeling protocol. It is worth noting that conceptual descriptions can be valuable in other air quality planning efforts besides attainment demonstrations, such as determining nonattainment area boundaries, investigating emissions control program impacts, interstate transport analyses, and monitoring network design, among others.

The following bullets describe some of the key building blocks in developing a conceptual model. The process steps discussed below are meant to illustrate one possible template for building a conceptual model to inform an air quality modeling demonstration; there may be alternate approaches that better suit individual study areas or issues, which air agencies should discuss with the appropriate EPA Regional office.

- Introduce the general nature of the air quality problem addressed by the conceptual model:
    - What are the pollutants of concern in the area?
    - What are the current air quality levels in the area?
    - What is the attainment/nonattainment status of the area?
    - What is the geographical scope of poor air quality?
    - What is the temporal scope of poor air quality?
    - What are the air quality trends in the area? Is the problem getting better or worse?
    - What are the suspected mechanisms for formation of poor air quality levels?
    - What are the sources of emissions that may contribute to poor air quality?
    - Are there unique meteorological influences on local air quality levels?

- Describe the ambient monitoring network used for the conceptual model:
    - Develop a map of monitor sites and types (e.g., FRM, FEM, CSN, IMPROVE, CASTNET, etc.).

- o Describe characteristics of individual monitoring sites (scale, frequency, etc.).

- Describe the status and trends of air quality in the area:
  - o Summarize the relevant monitoring data for the air quality problem being studied.
  - o Identify locations that are in violation of the NAAQS.
  - o Describe the spatial pattern in pollutant and precursor pollutant levels.
  - o Describe the temporal pattern in pollutant and precursor pollutant levels.
  - o Describe the annual trends in concentrations over the period of interest.
  - o If appropriate, develop fused ambient/model surfaces to fill any gaps within the monitoring network.

- Investigate possible relationships between emissions and air quality:
  - o Examine emissions estimates for the main sector/source categories.
  - o Compare emission trends for annual and or seasonal/episodic periods to corresponding air quality trends.
  - o Identify key emission sources or source categories.
  - o Assess the historical effectiveness of control programs.
  - o Consider how future emissions growth or reductions may affect air quality.
  - o List control programs that are in place, or will soon be implemented, that may impact emissions sources in the area.

- Investigate possible relationships between meteorology and air quality (AQ):
  - o Describe meteorological characteristics on poor air quality days (e.g., wind speed/direction, temperatures, relative humidity levels, inversion indicators, etc.).
  - o Identify any distinct meteorological phenomena that coincide with poor air quality days.
  - o Prepare pollution roses, HYSPLIT back-trajectories (Draxler, 1998), or any other relevant analysis needed to link poor air quality days to specific meteorological patterns and sources of transported pollutants.
  - o Assess the impact from pollutant transport into area based on meteorological data and ambient air quality data.

- Synthesize all the relevant information into a detailed conceptual model:
  - o Aggregate all elements of the conceptual model and provide the key findings resulting from the analyses completed.
  - o Characterize the potential factors that influence air quality in the area and where possible rank the importance of those influences.

13

- o Identify issues that require further investigation, either in terms of data collection or chemical transport modeling.
- o Discuss how the subsequent SIP modeling and associated protocol is impacted by this conceptual description.

### 2.1.1 Example Applications of Conceptual Models

The idea of developing a modeling protocol based upon a conceptual description of the sources and processes that lead to poor air quality is well-established (U.S. EPA, 2007a). Numerous excellent conceptual models of local and regional air quality issues have been developed over the past decade. Table 2-1 provides a non-comprehensive list of example conceptual models that have been developed since the last release of the guidance that may be useful in orienting future SIP modeling applications.

**Table 2.1** Examples of recently developed conceptual models

| Air quality issue | Reference |
|---|---|
| $PM_{2.5}$ / Regional Haze (Northeast U.S.) | MANE-VU (2013) |
| $PM_{2.5}$ (Midwest U.S.) | Lake Michigan Air Directors Consortium (LADCO) (2009) |
| Ozone (Austin TX) | McGaughey *et al.* (2010) |
| Ozone (Wyoming) | Stoeckenius (2010) |
| $PM_{2.5}$ (Southeast Michigan) | Turner (2008) |

## 2.2 Modeling Protocol and Supporting Documentation

As with any technical support document designed to inform air quality planning, an attainment demonstration or regional haze analysis should be supported by documentation that sufficiently describes the procedures used in the analysis. In order to facilitate the process of EPA Regional office review and approval, we recommend the preparation of two separate supporting documents for ozone and $PM_{2.5}$ SIPs: one before the modeling analyses are initiated (modeling protocol) and one after the analyses have been completed (attainment demonstration package). We recommend a similar approach during the development of regional haze SIPs.

### 2.2.1 Modeling Protocol

Developing and implementing a modeling protocol is an important part of a modeling demonstration. The protocol should detail and formalize the procedures for conducting all

phases of the modeling study, such as describing the background and objectives for the study, creating a schedule and organizational structure for the study, selection of appropriate period(s) for modeling, developing the input data, conducting model performance evaluations, interpreting modeling results, describing procedures for using the model to demonstrate whether proposed strategies are sufficient to attain the NAAQS and/or regional haze goals, and producing documentation to be submitted for EPA Regional office review and approval. The most important function of the modeling protocol is to serve as a blueprint for planning how the modeled demonstration will be performed. The protocol should be a valuable communication device by which air agencies, EPA, and other stakeholders can assess the applicability of default recommendations and develop area-specific alternatives, where needed, prior to conducting the work to build the modeling system. A suitable protocol should lead to extensive participation by stakeholders in developing the demonstration. It should also reduce the risk of spending time and resources on efforts that are unproductive or inconsistent with EPA rules, policy, and guidance. While the modeling protocol is initially developed at the beginning of a modeling exercise to foster communication, it is advisable to modify the document as needed throughout the modeling process when alterations from the original modeling plan are necessary. Again, any changes to the protocol should be fully communicated between affected air agencies, stakeholders, and the EPA.

Meaningful protocols should fully communicate the expected scope of the analysis and provide a blueprint for carrying out the needed analyses. There is no "one-size-fits-all" format for a sufficient modeling protocol, as different individual areas may require specific points of emphasis. However, past attainment demonstrations have yielded several excellent protocol examples that could serve as templates for any groups developing new modeling protocols. While not exhaustive, potentially valuable protocol references include attainment demonstration modeling efforts completed in the Dallas/Fort Worth area (Environ, 2003), the Denver region (Morris, 2011), and the San Joaquin Valley (CARB, 2012). Based on past experience, the EPA recommends that the following topics be core elements of any modeling protocol:

- Overview of the air quality issue being considered including historical background
- List of the planned participants in the analysis and their expected roles
- Schedule for completion of key steps in the analysis and final documentation
- Description of the conceptual model for the area
- Description of periods to be modeled, how they comport with the conceptual model, and why they are sufficient
- Models to be used in the demonstration and why they are appropriate
- Description of model inputs and their expected sources (e.g., emissions, meteorology, etc.)

- Description and justification of the domain to be modeled (expanse and resolution)
- Process for evaluating base year model performance (meteorology, emissions, and air quality) and demonstrating that the model is an appropriate tool for the intended use
- Description of the future years to be modeled and how projection inputs will be prepared
- Description of the NAAQS attainment test procedures and (if known) planned weight of evidence, and/or description of the procedures for calculating RPGs from the modeling outputs, as applicable.
- Expected diagnostic or supplemental analyses needed to develop weight of evidence analyses
- Commitment to specific deliverables fully documenting the completed analysis

## 2.2.2 Attainment Demonstration and/or Reasonable Progress Goals Modeling Documentation Package

Whereas the modeling protocol describes the planned scope of the analysis, the final modeling documentation package summarizes the actual analysis conducted (including procedures used) to show that an area will likely meet the NAAQS and/or RPGs under a specific set of future conditions. This document can follow the same basic outline as the modeling protocol, highlighting those aspects of the modeling that may have changed from the original plans. Additionally, the modeling documentation package should have detailed information on any emission reduction strategies that will be implemented as part of an attainment or regional haze SIP. Ultimately, the modeling documentation package should provide a narrative that fully describes the technical rationale behind the projection of a specific air quality goal in an area. Based on past experience, the EPA recommends that the following topics be core elements of any modeling documentation package:

- Executive summary that provides an overview of the analysis and the key conclusions
- Reference to the modeling protocol noting any major deviations from the original plans
- List of the institutional participants in the attainment demonstration and their roles
- Description of air quality in the area and describe how that shaped the analysis
- Justification for the model, episodes, domain, and grid(s) used in the analysis
- Description of the development of the emissions inputs used in the base year modeling, including, at a minimum, tabular summaries by state/county, as appropriate

16

- Description of the development of meteorological inputs used in the base year modeling
- Description of all other base year modeling inputs
- Evaluation of base year model performance (meteorology, emissions, and air quality), including a description of the observational database used in the evaluation and any diagnostic or sensitivity tests used to improve the model
- Description of the strategy used to demonstrate attainment and/or RPGs, including speciated emissions summaries for the future year and identification of authority for implementing these strategies
- Description of the attainment test inputs and results
- Description of any supplemental analyses designed to bolster the original attainment test results
- Detailed summary of the entire analysis that leads to the conclusion that the selected attainment demonstration strategy is likely to produce attainment of the NAAQS by the required date and/or leads to the calculation of the RPGs
- Appendices that contain more detailed information on the model inputs and outputs (emissions, meteorology, etc.), model performance, and attainment demonstration, including charts, tables, and descriptive text

All model input and output files (in electronic format) should be made available upon request by the EPA and/or stakeholders.

## 2.3    Episode Selection

The modeled attainment test and the recommended procedure for setting RPGs for regional haze both adjust observed ambient concentrations during a base case period (e.g., 2012-2016) to a future period (e.g., 2023) using model-derived "relative response factors" (RRFs). It is important that emissions used in the attainment modeling correspond with the period reflected by the chosen baseline design value period (e.g., 2012-2016).[11] Deviations from this constraint will diminish the credibility of the RRFs. The base year modeling inventory typically corresponds to the middle year of the baseline average design value period (e.g. 2014 for a 2012-2016 average design value period). Alternatively, the base year emissions can reflect multi-year average emissions from the base year period (e.g. average emissions for the 2013-2015 period). But in

---

[11] The regional haze program does not use design values. However, in an analogous approach, this guidance recommends the use of 5 years of historical visibility data (non-weighted) in a manner similar to the approach in the modeled attainment test for ozone and $PM_{2.5}$. For this reason and for brevity, sections 2 and 3 use the "design value" terminology in some explanations that apply to both ozone and $PM_{2.5}$ attainment modeling and to the setting of regional haze RPGs. That is, for regional haze purposes, "design values" can be understood to mean "visibility data."

either case, the emissions year or years should be representative of the 5-year design value window.

There is no recommended default base year for modeling. However, it is recommended to use a relatively recent base period so that the emissions projection period is as short as possible and the base year ambient data is as current as possible. For example, projecting emissions from 2014 to 2023 (using a 2012-2016 base year average design value) should be less uncertain than projecting emissions from 2005 to 2023 (using a 2003-2007 base year average design value). The most recent ambient design values reflect actual emissions changes that have occurred over time. It is, therefore, better to use recent design values, which are actual measurements, combined with modeled emissions changes to project future concentrations, then to use older ambient data to estimate the change in design values. When selecting a base modeling year, air agencies should review recent ambient data and consider the factors in the following section.

## 2.3.1  Choosing Time Periods to Model

In the past, the choice of modeled episode days has been limited by the speed of computers and the ability to store model output files. With the advancement in computer technology over the past two decades, computer speed and storage issues are no longer an impediment to modeling long time periods. In fact, the majority of recent regulatory assessment modeling platforms have been inclusive of entire summers and/or full years (as appropriate) for ozone, $PM_{2.5}$, and regional haze (Boylan and Russell, 2006; Morris et al., 2006; Rodriguez et al., 2009; Simon et al., 2012; Tesche et al., 2006; U.S. EPA, 2011a, 2011b, 2016a).

Ozone-based research has shown that model performance evaluations and the response to emissions controls need to consider modeling results from relatively long time periods, in particular, full synoptic cycles or even full ozone seasons (Hogrefe et al., 2000; Vizuete et al., 2011). In order to examine the response to ozone control strategies, it may not be necessary to model a full ozone season (or seasons), but, at a minimum, modeling "longer" episodes that encompass full synoptic cycles is advisable. Time periods which include a ramp-up to a high ozone period and a ramp-down to cleaner conditions allow for a more complete evaluation of model performance under a variety of meteorological conditions.

Most model applications for the annual $PM_{2.5}$ NAAQS have modeled a full year (Morris et al., 2006; Tesche et al., 2006; U.S. EPA, 2011a, 2011b, 2017b). This is a logical goal since every monitored day of the year is included in the calculation of the annual NAAQS. The annual $PM_{2.5}$ NAAQS is unique because each and every ambient observation is included in the average. It is,

therefore, likely that a full year of modeled data is needed to adequately represent the annual average PM$_{2.5}$ NAAQS.

Eight-hour ozone and 24-hour PM$_{2.5}$ episode selection criteria are similar because both standards are based on short-term peak concentration periods. Regional haze calculations are based on an average of 20 or more days per year (20% clearest and 20% most impaired days). Therefore, regional haze episode selection will likely include more days throughout the year.

At a minimum, several criteria should be used to select time periods that are appropriate to model:

- Model time periods that are close to the most recently compiled and quality assured National Emission Inventory (NEI). These comprehensive inventories are typically generated every 3 years (e.g. 2011, 2014, 2017, etc.), but often contain year-specific data for the intermediate years. Since NEI years will have a nationwide complete and comprehensive inventory, selecting a base modeling year that is also an NEI year may save resources. However, other factors should be considered when selecting a base modeling year, such as the availability and magnitude of observed ambient data, meteorology, and availability of special study data. After consideration of all factors, the most appropriate base year may or may not be an NEI year. See section 2.7 for more information on base year inventory selection issues.

- Model time periods in which observed concentrations are close to the appropriate base year design value or level of visibility impairment and ensure there are a sufficient number of days so that the modeled test applied at each monitor is based on multiple days.

- Model time periods both before and following elevated pollution concentration (poor air quality) episodes to ensure the modeling system appropriately characterizes low pollution periods, development of elevated periods, and transition back to low pollution periods through synoptic cycles.

- Simulate a variety of meteorological conditions conducive to elevated/poor air quality.

> **Primary Ozone** (8-Hour Ozone) - Choose time periods which reflect a variety of meteorological conditions that frequently correspond with observed 8-hour daily maxima concentrations greater than the level of the NAAQS at monitoring sites in the nonattainment area.

**24-Hour PM$_{2.5}$** - Choose time periods that reflect a variety of meteorological conditions that frequently correspond with observed 24-hour average concentrations greater than the level of the NAAQS at monitoring sites in the nonattainment area.

**Annual PM$_{2.5}$** - The best way to represent the meteorological variability within a season and over an entire year is to model an entire year that has meteorology generally conducive to elevated PM$_{2.5}$ concentrations.

**Regional Haze** - Choose time periods that reflect the variety of meteorological conditions that represent visibility impairment on the 20% clearest and 20% most impaired days in the Class I areas being modeled (high and low concentrations necessary). This is best accomplished by modeling a full year.

**Long-term or seasonal ozone** – Since long-term (seasonal) ozone assessments are based on accumulated ozone over multiple months during the ozone season, the most appropriate way to represent the variability in high and low ozone is to model an entire ozone season that is representative of long-term values. [**Note:** This analysis is only applicable if seasonal ozone assessments are necessary (e.g. to support ozone benefits calculations). Currently, there are no long-term or seasonal ozone NAAQS (primary or secondary).]

## 2.3.2  Future Year Selection

For ozone and PM$_{2.5}$, future emissions should be projected to the attainment year or appropriate time period based on the area's classification. The Ozone SIP Requirements Rule provides a schedule for implementing emission reductions needed to ensure attainment by the area's attainment date. Specifically, it states that emission reductions needed for attainment must be implemented no later than the beginning of the attainment year ozone season.[12]  The PM$_{2.5}$ Implementation Rule contains similar provisions. It states that emissions reductions should be in place no later than the beginning of the year containing the applicable attainment date.[13]

As part of demonstrating attainment of the ozone and PM$_{2.5}$ NAAQS, air agencies are required to conduct a Reasonably Available Control Measures (RACM) analysis to determine if the attainment date can be advanced by at least a year. Since areas are required to attain as expeditiously as practicable, results of the RACM analysis may indicate attainment can be achieved earlier.

---

[12] *See* 40 CFR 51.1308(d).
[13] *See* 40 CFR 51.1011(a)(5) and 40 CFR 51.1011(b)(5).

There are varying requirements related to attainment year and RACM analyses for ozone and $PM_{2.5}$ nonattainment areas, depending on classifications and other factors. Please see the appropriate ozone and/or $PM_{2.5}$ implementation rule for more details and information.[14]

For regional haze SIPs, RPGs must reflect the visibility conditions that are projected to be achieved by the end of the applicable implementation period.[15] Therefore, the modeling should be based on emissions forecasted for the end year of the implementation period addressed by the SIP. These end years are 2018, 2028, etc.

## 2.4    Modeling Domain Selection

A modeling domain identifies the geographical bounds of the area to be modeled. Horizontal resolution is the geographic size of individual grid cells within the modeling domain. Vertical resolution is specified in terms of multiple layers of the atmosphere between the surface and top of the model (usually near the tropopause).

### 2.4.1  Domain Size

The principal determinants of model domain size are the nature of the ozone, $PM_{2.5}$ and/or regional haze problem being modeled, and the spatial scale of the emissions that impact the nonattainment or Class I area. Establishment of a sufficiently large model domain that utilizes the output from a larger regional or global modeling simulation to feed hourly lateral boundary conditions is a preferred approach (see section 2.8 for more information on boundary conditions). However, regardless of the size of the modeling domain, sources outside the modeling domain may have an important influence on concentrations within nonattainment areas or Class I areas. Therefore, boundary conditions need to be well characterized. The grid containing the key emissions sources and receptors needs to have sufficiently fine-scale to resolve local gradients and have a large enough spatial extent to capture recirculation due to shifting wind directions. An alternative to a single large domain to capture recirculation is to apply a chemical transport model with a large coarse domain with a smaller-domain, nested fine grid with feedback between the grids (i.e., 2-way nesting). This option allows pollutants from the fine grid to move into the coarser domain and back into the fine grid depending on wind patterns.

Global models are routinely used to supply regional chemical transport models with temporally and spatially variant lateral boundary conditions. Since regional and urban model applications

---

[14] *See* 40 CFR 51.1009 (moderate $PM_{2.5}$), 40 CFR 51.1010 (serious $PM_{2.5}$) and 40 CFR 51.1312 (ozone).
[15] See 40 CFR 51.308(f)(3)(i).

for attainment demonstration purposes are typically less than or equal to 12 km sized grid cells, it may be worthwhile to apply the regional scale model at a coarser grid resolution (e.g. 36 km) to downscale global model estimates to the regional model. The coarser simulation results provide a better transition from the global simulation to the nested urban or urban/regional area of interest both at the boundaries near the surface and in the free troposphere. See section 2.8 for more information on using global and/or regional models to derive initial and lateral boundary conditions.

Isolated nonattainment areas that have limited impacts from regional transport of ozone and/or $PM_{2.5}$ and its precursors may be able to use a relatively small domain. The modeling domain should be designed so that all major upwind source areas that influence the downwind nonattainment area are included in the modeling domain. It is also important to be able to directly capture the impact of future year emissions increases or decreases from upwind areas. In addition, all monitors that are currently or recently (within any of the years included in the base year period) violating the NAAQS or close to violating[16] the NAAQS in the nonattainment area should be contained in the modeling domain far enough from the edge to minimize complications associated with air mass recirculation and to minimize lateral boundary influence. Similarly, all Class I areas to be evaluated in a regional haze modeling application should be sufficiently distant from the edge of the modeling domain.

## 2.4.2  Vertical Layer Configuration

There is no correct maximum or minimum number of vertical layers needed in attainment demonstration modeling. However, the specification of the air quality model vertical layer structure should closely match the vertical layer structure of the meteorological model used to generate inputs for the air quality model. It is best to have an air quality model's vertical layers align with the layers in the meteorological model matching one-to-one. However, resource constraints sometimes preclude direct vertical layer mapping. When vertical layer collapsing is necessary, use the highest resolution where the conceptual model suggests it is most needed.

The top of the modeling domain should typically be set above the tropopause at the 50 or 100 millibar level. The lowest layer (surface layer) in the air quality model should be no more than ~40 meters thick. The vertical resolution between the surface layer and model top will vary

---

[16] A monitor that is "close to violating" the NAAQS in a base year may be modeled to violate in the future due to projected emissions increases or modeled "dis-benefits" due to non-linear chemistry. Air agencies should consult with the appropriate EPA Regional office if there are questions regarding the interpretation of "close to violating" and which monitors should be included in the modeling analysis.

depending on the application. Layer thickness should monotonically increase or be the same size as altitude increases.

In view of the importance of carefully specifying the temporal variation in mixing height, high precision below and near the anticipated maximum afternoon mixing height is ideal. In addition, near-surface vertical resolution is important to capture overnight stable conditions. Layers above the boundary layer are important for characterizing clouds and precipitation and layers near the tropopause are important to create a realistic stratification of strongly variant pollutant concentrations in the stratosphere and free troposphere (Emery et al., 2011).

There are some model applications that may not need to consider the full extent of the troposphere. These applications typically use vertical domains, which extend up to 4 or 5 km. These types of applications may cover episodes of elevated pollutant concentrations associated with strong surface-based inversions that occur in isolated areas. However, in almost all cases, the EPA encourages the use of full-scale one-atmosphere models that account for all atmospheric processes throughout the extent of the troposphere.

## 2.4.3  Horizontal Grid Cell Size

Recent chemical transport modeling applications for ozone, $PM_{2.5}$, and regional haze have commonly used grid cell sizes ranging from 4 km to 12 km resolution (Morris et al., 2006; Rodriguez et al., 2009; Simon et al., 2012; U.S. EPA, 2011b, 2016a; Vizuete et al., 2010). Urban scale assessments have used chemical transport grid models at 1 to 2 km resolution (Vizuete et al., 2011). Intuitively, one would expect to get more accurate results in urban applications with smaller grid cells (e.g., ~1 or 4 km) provided the spatial details in the emissions and meteorological inputs support making such predictions. However, model performance at 4 km resolution is not always better than 12 km resolution (Simon et al., 2012).

For coarse portions of the regional grids, a grid cell size of 12 km is generally recommended. For urban areas, it may be desirable to use grid cells sized ~1 to 4 km, but not larger than 12 km. The relative importance of using a domain with grid cells as small as ~1 km should be weighed on a case-by-case basis. If the conceptual model indicates that there are atmospheric, physical, or chemical processes related to the air quality issue that require a specific minimum resolution to simulate (e.g., localized emissions, complex terrain, land-water interfaces, etc.), then that resolution should be utilized in the model. For example, it is likely that spatial gradients in concentrations are higher for primary pollutants (e.g., primary particulate matter, or PM) than for secondary pollutants because physical processes dominate concentration rather than chemical processes. Although it is clear that spatial resolution of primary pollutants will impact

the predicted concentrations, it is not clear how it will impact the relative change in concentrations due to emissions changes. Areas that have large gradients in primary PM$_{2.5}$ may need to use finer resolution (approximately ~1 to 4 km) or may need to supplement the grid modeling with dispersion modeling. This is particularly true if violating monitors are strongly impacted by local sources of primary PM$_{2.5}$ emissions.

The most important factor to consider when establishing grid cell size is model response to emissions controls. Analysis of ambient data, sensitivity modeling, and past modeling results can be used to evaluate the expected response to emissions controls at various horizontal resolutions for ozone, PM$_{2.5}$, and regional haze. If model response is expected to be different (and presumably more accurate) at higher resolution, then higher resolution modeling should be considered. If model response is expected to be similar at both high and low(er) resolution, then high resolution modeling may not be necessary. The use of grid resolution finer than 12 km would generally be more appropriate for areas with a combination of complex meteorology, strong gradients in emissions sources, and/or land-water interfaces in or near the nonattainment area(s).

Sensitivity tests comparing relative response factors in predicted 8-hour daily maximum ozone at sites in the eastern United States indicate relatively small unbiased differences (< 4%, in RRF difference in 95% of the comparisons) using a grid with 12 km versus 4 km sized grid cells (Arunachalam, 2006). The largest difference in the relative response of secondary pollutants at varying resolution is likely to occur in oxidant limited areas (areas that are more sensitive to VOC reductions than NOx reductions). In such areas, horizontal resolution may have a large impact on the spatial distribution and magnitude of modeled NOx "disbenefits" (i.e., ozone increases in oxidant limited areas when NOx emissions are reduced).

## 2.5    Air Quality Model Selection

Chemical transport models address the physical processes and chemistry that form ozone and PM. Air quality models continue to evolve and each has its own strengths and weakness (Galmarini et al., 2012; Pirovano et al., 2012; Russell, 2008; Simon et al., 2012). The most commonly used chemical transport models for attainment demonstrations are the Community Multiscale Air Quality Model (CMAQ) (Byun and Schere, 2006; Foley et al., 2010) and the Comprehensive Air Quality Model with Extensions (CAMx) (Baker and Scheff, 2007; Vizuete et al., 2011). The mention of CMAQ and CAMx is not intended to be a comprehensive list of available chemical transport models and omittance from this discussion does not imply that a different model cannot be used to support a modeled attainment demonstration or reasonable

progress assessment. In the same way, inclusion in this discussion does not imply that a model is "preferred" for a particular type of application.

A modeling-based demonstration of the impacts of an emissions control scenario for attainment of the ozone or $PM_{2.5}$ NAAQS, or as part of a regional haze assessment, usually necessitates the application of a chemical transport grid model. However, it is not necessary to use a model that considers atmospheric chemistry in addressing changes in primary $PM_{2.5}$ components. Either a numerical grid or a Lagrangian (such as a Gaussian dispersion) model or other empirical techniques could potentially be used for this purpose. In general, modeling primary $PM_{2.5}$ components with a grid model is acceptable, but dispersion modeling may be necessary in areas with large spatial gradients of primary $PM_{2.5}$. Depending on the nature of the problem, an air agency may choose to use a regional chemical transport grid model to address both primary and secondary components of PM or they may need to use a chemical transport model to address secondary $PM_{2.5}$ and regional primary PM and an inert model applied over a more limited domain to address fine scale primary components of PM. In addition, the EPA recognizes that in some cases, more simplistic modeling techniques (such as dispersion, receptor, rollback, and/or box models) may suffice to demonstrate that an area will attain the $PM_{2.5}$ NAAQS, especially in areas that are dominated by primary $PM_{2.5}$ emissions (e.g., residential wood smoke).

A model should meet several general criteria in order to be considered for use in an attainment demonstration or reasonable progress assessment. These general criteria are consistent with requirements in Appendix W (U.S. EPA, 2017a). Appendix W does not identify a "preferred model" for use in attainment demonstrations of the NAAQS for ozone or $PM_{2.5}$ or reasonable progress assessments for regional haze. Therefore, at this time, the EPA is not recommending a specific model for use in ozone or $PM_{2.5}$ attainment demonstrations or regional haze uniform rate of progress assessments. Instead, models used for these purposes should meet requirements for "alternative models" in Appendix W, section 3.2. Air agencies should use a non-proprietary model, which is a model whose source code is available for free (or for a reasonable cost). Furthermore, the user should be able to revise the source code to perform diagnostic analyses and/or to improve the model's ability to describe observations in a credible manner. Several additional prerequisites should be met for a model to be used to support an attainment demonstration or reasonable progress assessment (see Appendix W, section 3.2.2(e), as well as sections 5 and 6 for more general secondary pollutant modeling requirements):

1) The model or technique has received a scientific peer review.

    An air quality model may be considered to have undergone "scientific peer review" if each of the major components of the modeling system has been

described and tested, and the results have been documented and reviewed by one or more disinterested third parties, and the model has been revised in response to the review. This review is not the responsibility of the EPA. Air agencies should reference available documentation to gain acceptance of an air quality model for use in a modeled attainment demonstration.

2) The model or technique can be demonstrated to be applicable to the problem on a theoretical basis.
    o The model should be scientifically appropriate and applicable for the intended purpose.

3) Databases, which are necessary to perform the analysis, are available and adequate.

4) Appropriate performance evaluations of the model or technique have shown that the model or technique is not inappropriately biased for regulatory application.
    o Prior to use of a selected model's results in an attainment demonstration or regional haze analysis, the model should be shown to perform adequately for the specific application.
    o If the application is the first for a particular model, then the air agency should demonstrate that the new model is expected to perform sufficiently. For a model to be used in an attainment demonstration, evidence should be presented that it has been found acceptable for estimating hourly and 8-hourly ozone concentrations and/or hourly and 24-hour average $PM_{2.5}$ and $PM_{2.5}$ component concentrations. In addition to ozone and/or $PM_{2.5}$, the model should be acceptable for estimating precursor species, important chemical intermediates, and in the case of $PM_{2.5}$, the main chemical constituents. Preference should be given to models exhibiting satisfactory past performance under a variety of conditions.

5) A protocol on methods and procedures to be followed has been established (such as described in section 2.2.1).

In addition to the criteria in Appendix W, the EPA also recommends the following criteria and considerations:

1) A user's guide (including a benchmark example and outputs) and technical description of the model should be available.

2) The advanced technical features available in a model could be a consideration when other criteria are satisfied. Models are often differentiated by their available advanced science features and tools. For example, some models include advanced probing tools that allow tracking of downwind impacts from upwind emissions sources. Availability of probing tools and/or science algorithms is a legitimate reason to choose one equally capable model over another.

3) When other criteria are satisfied, resource considerations may be important. This is a legitimate criterion provided the other listed criteria are met.

The EPA has prepared an "alternative model" demonstration for both CMAQ and CAMx for the purposes of supporting ozone or PM$_{2.5}$ attainment demonstrations and regional haze assessments (Fox, 2017). This document is also a useful template for others seeking to provide a similar type of demonstration for another photochemical modeling system.

## 2.6   Meteorological Inputs

In order to solve for the pollutant concentrations over time and space, air quality models require accurate meteorological inputs to properly simulate the formation, transport, and removal of pollutant material. The required meteorological inputs can vary by air quality model, but all models require parameters such as wind, vertical mixing, temperature, humidity, and solar radiation. While model inputs can be created strictly from ambient measurements, a more credible technical approach is to use off-line, dynamic, meteorological grid models to provide the necessary inputs. When these models are applied retrospectively (i.e., for historical time periods), they are able to blend ambient data with model predictions via four-dimensional data assimilation (FDDA), thereby providing temporally and spatially complete data sets that are grounded by actual observations.

This section provides recommendations for generating the meteorological data sets needed for regional air quality modeling purposes. In many ways, the development of meteorological inputs parallels the steps needed to conduct the air quality modeling. A meteorological model platform (episodes, domain, model selection, model configuration, input data, etc.) must be established and then evaluated. Because of the strong sensitivity of the eventual air quality results to the input meteorology (Appel, 2007; Appel, 2010), it is recommended that air agencies spend extensive effort in developing and evaluating the meteorological inputs.

### 2.6.1  Developing Base Year Meteorological Fields

The recommended approach for generating the base year meteorological data needed to conduct the attainment or regional haze demonstration is to apply off-line, dynamic meteorological models with FDDA. These models use the fundamental equations of momentum, thermodynamics, and moisture to determine the evolution of specific meteorological variables from a given initial state. When modeling historic episodes, the use of data assimilation helps to "nudge" solutions so that they do not diverge greatly from the actual observed meteorological fields. A major benefit of using dynamic meteorological models is that they provide a way of consistently characterizing conditions at times and locations where observations do not exist.

The Weather Research and Forecasting (WRF) (Skamarock, 2008) model is a community supported mesoscale numerical prediction model that replaced the previous community supported mesoscale meteorological model v5 (MM5) model. The MM5 model is no longer being updated or supported. Meteorological models other than the WRF can be used as long as they are appropriate for the situation being modeled and are properly evaluated. A number of recent studies (Appel et al., 2010; de Meij et al., 2009; Gilliam et al., 2010; Matichuk et al., 2017; Pleim et al., 2016) have compared the ability of the WRF and MM5 models to reproduce past meteorological conditions and their suitability for use in air quality modeling. Generally speaking, comparative evaluation efforts have shown that the WRF model outputs represent equivalent or better statistical skill over a variety of meteorological conditions. An additional advantage of the WRF model is that there is a large community of WRF users and developers. As a result, the code is both maintained and frequently updated as new science emerges. The EPA recommends the use of a well-supported gridded mesoscale meteorological model for generating meteorological inputs to regional air quality model attainment demonstrations.

In some cases, however, there may be legitimate reasons for using an approach other than well-supported gridded mesoscale meteorological models to provide the requisite meteorological data. For instance, there may be long-standing local experience for a given domain and/or episode with a different meteorological model. In other cases, dynamic meteorological models may not adequately capture key meteorological elements of an airshed's conceptual model (e.g., source-receptor transport vectors to key monitoring locations). In rare cases such as these, it may be appropriate to blend the dynamic model data with wind data from an objective analysis of observed wind fields. The guiding factor in determining which meteorological model or approach to use should be an assessment of which set of inputs will best capture the key meteorological conditions that led to poor air quality. It is recommended that a description of the methods used to generate the meteorological fields be

included in the modeling protocol. For those cases in which an off-line prognostic meteorological model is not used, it is recommended that a detailed description of the alternate technique that will be used to generate the three-dimensional meteorological fields be shared with the appropriate EPA Regional office(s) prior to conducting the meteorological analysis and air quality modeling analysis.

As with other parts of the air quality modeling system, choices made regarding how to configure the meteorological modeling can affect the quality and suitability of the air quality model predictions. Decisions regarding the configuration of complex dynamic meteorological models can be particularly challenging because of the amount of flexibility available to the user. The goal in establishing the proper configuration for meteorological modeling should be to obtain the best possible meteorological model performance, especially for those parameters identified as most important in the conceptual description. As part of the overall chemical transport modeling system evaluation process, performance issues in the chemical transport model can sometimes be explained by options chosen in the meteorological simulation. Therefore, a feedback between the meteorological model evaluation and the air quality model evaluation can be highly beneficial.

### 2.6.1.1 Selecting a Model Domain

The selection of the meteorological modeling domain should closely match the air quality domain. The outermost grid should capture all upwind areas that can reasonably be expected to influence local concentrations of ozone and/or $PM_{2.5}$. In terms of selecting an appropriate meteorological modeling domain, one should extend the grid at least 3 to 6 cells beyond the domains of each air quality modeling grid to avoid boundary effects. It is recommended that the vertical and horizontal grid structures, including geographic datum and projected coordinate definitions, be generally consistent within the meteorological and air quality models to minimize interpolation and aggregation issues associated with the post-processing of meteorological model outputs into air quality model inputs.

### 2.6.1.2 Selecting Physics Options

Meteorological models have a suite of physics options that allow users to configure how a given meteorological effect will be simulated. For example, there may be several options for specifying the planetary boundary layer scheme or how sub-grid cumulus clouds will be handled. In many situations, the "optimal" configuration cannot be determined without performing an initial series of sensitivity tests, which consider various combinations of physics options over specific time periods and regions. While these tests may not ultimately conclude that any one configuration is clearly superior at all times and in all areas, it is recommended

that these sensitivity tests be completed, as they should lead to a modeling analysis that is best suited for the domain and period being simulated. An optimal starting point of physics options may be selected from another modeling application that has a similar set of meteorological conditions that lead to elevated pollutant levels. Typically, the model configuration that yields predictions that provide the best statistical match with observed data over the most cases (episodes, regions, etc.) is the one that should be chosen, although other more qualitative information can also be considered. Additionally, model configurations should be designed to account for the pollutants and time periods that are of most interest, per the conceptual description.

### 2.6.1.3 Use of Data Assimilation

As noted above, the use of FDDA helps to keep the model predictions from widely diverging from what was actually observed to occur at a particular point in time/space. Studies have shown that the incorporation of FDDA into atmospheric models improves meteorological simulations (Otte, 2008a and b; Pleim and Gilliam, 2009; Gilliam and Pleim, 2010). In particular, these studies have shown that better representation of the atmospheric fields aloft through assimilation of data from nationwide atmospheric profiler networks can aid in reproducing certain meteorological features (e.g., low-level jets) (Godowitch et al., 2011; Gilliam et al., 2012). However, if used improperly, FDDA can significantly degrade overall model performance and introduce computational artifacts (Tesche and McNally, 2001). Inappropriately strong nudging coefficients can distort the magnitude of the physical terms in the underlying atmospheric thermodynamic equations and result in "patchwork" meteorological fields with strong gradients between near-site grid cells and the remainder of the grid. Additionally, if specific meteorological features are expected to be important for predicting the location and amount of pollution formed, based on an area's conceptual model, then the meteorological modeling should be set up to ensure that FDDA does not prevent the model from forming these features (e.g., lake/sea breeze circulations).

In general, analysis nudging strengths should be no greater than $3.0 \times 10^{-4}$ for winds and temperatures and $1.0 \times 10^{-5}$ for water vapor mixing ratio. In the case of observation nudging (i.e., FDDA based on individual observations as opposed to analysis fields), it is recommended that the resultant meteorological fields be examined to ensure that the results over the entire domain are still consistent. Further, based on past experience, we recommend against using FDDA within the boundary layer for thermodynamic variables like temperature and water vapor mixing ratio because of the potential for spurious convection. If the dynamic model is applied without FDDA, it is suggested that the simulation durations be no longer than 24 hours. As with selecting physics options, it is often valuable to conduct sensitivity testing of various FDDA approaches to help determine the optimal nudging configuration for any specific case.

Along with application of the meteorological modeling, users should be careful when translating the meteorological model outputs into air quality modeling inputs. A number of air quality model pre-processors (which are meteorological model post-processors) exist to conduct this off-line coupling, including the Meteorology-Chemistry Interface Processor (MCIP) (Otte and Pleim, 2010) and wrfcamx (Ramboll-Environ, 2017). These meteorological post-processors generate the complete set of meteorological data needed for the air quality simulation by accounting for issues related to:

1) Data format translation;
2) Conversion of parameter units;
3) Extraction of data for appropriate window domains;
4) Reconstruction of the meteorological data on different grid and layer structures; and
5) Calculation of additional variables.

As noted above, most meteorological modeling applications should be set up to minimize the influence of the pre-processing software. For instance, it is recommended that the horizontal grid structures be consistent within the meteorological and air quality models to minimize issues associated with interpolation and aggregation. While it is often not feasible to run the air quality model with the same vertical layer structure as the meteorological model, it is recommended that vertical layer collapsing between the models be minimized (preferably with no layer collapsing), to the extent possible.

While the traditional approach for attainment and regional haze demonstration modeling is to convert "off-line" meteorological model outputs into air quality model inputs via specific pre-processing tools, there have been recent efforts to couple "on-line" meteorological models within air quality model applications, such as WRF-Chem (Grell et al., 2005; Wilczak et al., 2009), NOAA-EPA CMAQ (Davidson et al., 2007), and WRF-CMAQ (Wong et al., 2012). The advantage of an on-line meteorological model is that one can simulate impacts that air quality changes might have on meteorological conditions (and vice versa) through direct and indirect feedback mechanisms. In most cases, the EPA does not expect emissions reductions from local SIP reductions to appreciably affect future meteorological conditions. Therefore, off-line meteorological approaches, where the same meteorological fields are used for multiple emissions scenarios, are expected to be sufficient for the majority of SIP modeling exercises.

## 2.6.2  Assessing Impacts of Future Year Meteorology

Traditionally, SIP meteorology simulations have not accounted for the impact of global emissions of carbon dioxide and other climate forcers on future meteorological conditions. However, ozone concentrations have a high correlation with daily maximum temperatures over many areas in the U.S. (Camalier et al., 2007), suggestive of a potential climate connection.

Recent research, taking into account temperature and other meteorological variables, indicates that in certain populated regions of the country, climate change could lead to higher future ozone concentrations (often called a "climate penalty") (Jacob and Winner, 2009; Bloomer et al., 2009; U.S. EPA, 2009; CARB 2010; Fiore, 2012; Fann, 2016). Assuming climate change does lead to higher ozone concentrations, there could potentially be a need for more stringent emissions reductions to counteract the higher ozone potential from warmer conditions. However, there are significant uncertainties regarding the precise location and timing of climate change impacts on air quality. Generally, climate projections are more robust for periods at least several decades in the future because the forcing mechanisms that drive near-term natural variability in climate patterns (e.g., El Nino, North American Oscillation) have substantially larger signals over short time spans than the driving forces related to long-term climate change. In contrast, projections for SIP purposes are generally for time spans of less than 20 years. Given the relatively short time span between base and future year meteorology in most SIP demonstrations, the EPA does not recommend that air agencies explicitly account for long-term climate change in attainment demonstrations. However, air agencies are welcome to consider potential climate impacts in their specific areas, especially where and when there is evidence of significant potential impacts.

## 2.6.3  Evaluation of Base Year Meteorological Fields

While the air quality models used in attainment and regional haze demonstrations have consistently been subjected to a rigorous performance assessment, in many cases the meteorological inputs to these models have received less rigorous evaluation, even though this component of the modeling is quite complex and has the potential to substantially affect air quality predictions (Tesche, 2002). The EPA recommends that air agencies devote appropriate effort to the process of evaluating the meteorological inputs to the air quality model as we believe good meteorological model performance will yield more confidence in predictions from the air quality model. One of the objectives of this evaluation should be to determine if the meteorological model output fields represent a reasonable approximation of the actual meteorology that occurred during the modeling period. Further, because it will never be possible to exactly simulate the actual meteorological fields at all points in space/time, a second objective of the evaluation should be to identify and quantify the existing biases and errors in the meteorological predictions in order to allow for a downstream assessment of how the air quality modeling results are affected by issues associated with the meteorological data. To address both objectives, it will be necessary to complete both an operational evaluation (i.e., quantitative, statistical, and graphical comparisons) as well as a more phenomenological assessment (i.e., generally qualitative comparisons of observed features versus their depiction in the model data).

### 2.6.3.1 Operational Evaluation

The operational evaluation results should focus on the values and distributions of specific meteorological parameters as paired with and compared to observed data. It is recommended that the observation-model matching be paired as closely as possible in space and time. Typical statistical comparisons of the key meteorological parameters will include: comparisons of the means, mean bias, normalized mean bias, mean absolute error, normalized mean error, and root mean square error. For modeling exercises over large domains and entire ozone seasons or years, it is recommended that the operational evaluation be broken into individual segments such as geographic subregions and/or months/seasons to allow for a more comprehensive assessment of the meteorological strengths and weaknesses. It may also be useful to break out model performance aloft, at the surface, during individual episodes (e.g., high ozone/$PM_{2.5}$ days), over the diurnal cycle, and as a function of synoptic regime. Modelers are also encouraged to set aside a portion of the ambient data strictly for evaluation purposes (i.e., data not used in the FDDA). Examples of observed meteorological data sets available for operational evaluations include (some of these data sets are not typically used in FDDA and, therefore, may be serve as an "independent" source of evaluation data):

1. TDL U.S and Canada Surface Hourly Observations (http://rda.ucar.edu/datasets/ds472.0);
2. Cooperative Agency Profilers (https://madis-data.noaa.gov/cap/);
3. NOAA Profiler Network (http://profiler.noaa.gov/npn/);
4. Individual State Climate Office Observation Networks; and
5. PRISM Climate Group Precipitation Analysis (http://www.prism.oregonstate.edu/).

While these data are readily available, it is up to the air agency to determine if the data have undergone appropriate quality assurance/quality control (QA/QC) procedures through the provider.

It may be helpful when calculating domainwide and/or regional summary statistics to compare the results against previously generated meteorological model performance "benchmarks" (Emery et al., 2001). However, because of concerns about potentially misleading comparisons of model performance findings across different analyses with differing model configurations and FDDA strengths, the EPA does not recommend using these benchmarks as a "pass/fail" indicator of the acceptability of a model simulation. The benchmarks should only be used as a means of assessing general confidence in the meteorological model data. Statistical results that are outside the range of the compiled benchmarks may indicate a performance issue that should be given further examination. In some cases, adjustment of input data and/or model settings may be needed in order to improve model performance. The Atmospheric Model

Evaluation Tool (AMET) was designed for use in the assessment of meteorological and chemical transport models. AMET provides a method of pairing observed and simulated values and performing common analysis techniques to evaluate the performance and suitability of atmospheric models.

### 2.6.3.2 Phenomenological Evaluation

As discussed in section 2.1, it is recommended that a conceptual description of the area's air quality problem be developed prior to the initiation of any air modeling study. Within the conceptual description, it is recommended that the specific meteorological parameters that influence air quality be identified and qualitatively ranked in importance. When evaluating meteorological models or any other source of meteorological data, the focus of the phenomenological evaluation should be on those specific meteorological phenomena that are thought to strongly affect air pollution formation and transport within the geographic area of interest. This event-oriented evaluation should summarize model performance in terms of statistical metrics such as probability of detection and false alarm rate. As an example of a potential phenomenological analysis, many regional air quality modeling exercises attempt to assess the effects of transport of pollutants from one area to a downwind area with the intent of establishing source-receptor relationships. For these types of analyses, accurate transport wind trajectories are needed to properly establish these source-receptor linkages. A useful event-based meteorological evaluation would be to compare model-derived trajectories versus those based on ambient data to determine what error distance can be associated with the model fields. Other examples of phenomenological evaluations would be the replication by the model of low level nocturnal jets, cold pool conditions, fog events, or land/sea breezes.

## 2.7    How Are the Emission Inputs Developed?

Air quality modeling for 8-hour ozone, PM$_{2.5}$, and regional haze requires emissions data for a base year and future modeling years. While not explicitly a requirement of the implementation rules, the emissions data for modeling are a necessary input to the modeling that is required by the implementation rules as part of the modeled attainment demonstration and for regional haze analyses.

A separate EPA guidance document describes the planning inventories that are specifically required for SIPs and provides an overview of all emission inventory requirements, resources, and techniques. That guidance is the "Emissions Inventory Guidance for Implementation of Ozone and Particulate Matter National Ambient Air Quality Standards (NAAQS) and Regional Haze Regulations" (U.S. EPA, 2017b), and is used as a key reference throughout this section.

Many of the issues associated with the planning inventories are also relevant for modeling inventories. We will refer to that guidance here as the "EI SIP Guidance."

Table 1 of the EI SIP Guidance provides a list of emissions estimation resources for emissions inventories. In addition to the resources listed there, the EPA also provides emissions data used in modeling analyses in support of rulemakings. The current available "emissions platforms" are based on 2005, 2007, 2008, 2011, and 2014 base years. These platforms are available publicly on the [Emissions Modeling Clearinghouse website](#). The emissions modeling data and other data included in these platforms can be a starting point for air agencies in developing their own capabilities for preparing emissions for use in air quality models.

### 2.7.1  What Emissions Inventory Years Should I use for Base and Future Modeling?

For the base year, the EPA does not require a particular modeling year for $PM_{2.5}$ and ozone SIP attainment plans, and regional haze plans. However, for several reasons, it is technically appropriate to use a recent year as the base year. In addition, there are certain regulatory requirements for selecting an appropriate base year for planning inventories. See ozone NAAQS inventory requirements at 40 CFR 51.1315 and $PM_{2.5}$ NAAQS inventory requirements at 40 CFR 51.1008.[17] Currently, the most recent base National Emissions Inventory (NEI) is 2014 (U.S. EPA 2016c), and NEI data are developed every 3 years (the next NEI year will be 2017). In most cases, the most recent NEI year will be the most appropriate year to use for base case modeling. In some cases, other years (either before or after the most recent NEI year) may be more appropriate for modeling in view of unusual meteorology, transport patterns, exceptional events (i.e. large wildfires), lack of air pollution events, or other factors that may vary from year to year. See section 2.3.1 for more information on episode selection. The choice of the base year should be discussed with the appropriate EPA Regional office as part of the SIP planning process for the attainment demonstration.

For attainment planning in particular, the choice of a future year for an inventory depends on the nonattainment classification of the nonattainment area, as described in section 2.3.2. For ozone and $PM_{2.5}$, in most cases the future modeling year will be the expected attainment year. Requirements for selecting appropriate future years for modeling are provided in the ozone and $PM_{2.5}$ NAAQS implementation rules. For regional haze, the future year will depend on the end-date of the planning period being examined.

---

[17] There are additional regulations related to reasonable further progress (RFP) requirements for both the ozone and $PM_{2.5}$ NAAQS.

## 2.7.2  What Base Year Emission Inventory Data Are Needed to Support Air Quality Models?

Air quality models require hourly emissions of modeled species for each grid cell and model layer in the modeling domain. For the base year, the inventories are called the *base year inventory for modeling*. To meet the input requirements of models, the inventory must have pollutants that are the scientific precursors (pollutants that impact the relevant chemistry) to the ozone, $PM_{2.5}$, and/or regional haze being addressed in the modeling demonstration. The time frame of the emissions inventory should be consistent with the period being modeled. The inventory should include states, counties, and tribes that are covered by the spatial extent of the modeling domain. Additionally, the emissions sources included should be comprehensive, including emissions from all source categories. As explained with additional detail below, this includes point sources, non-point stationary sources, on-road and nonroad mobile sources, fires, and biogenic sources.

## 2.7.3  What Pollutants Should Be Included in Base Year Inventories?

Because many sources emit more than one of the precursor pollutants, and because the precursor pollutants have the potential to be transported across state boundaries, the EPA encourages air agencies to develop comprehensive inventories to support integrated, regional-scale modeling, and control strategy development for ozone, $PM_{2.5}$, and regional haze. However, there are some considerations for which pollutants to include in inventories for the purpose of supporting air quality modeling.

For 8-hour ozone NAAQS modeling, the pollutants to be inventoried for modeling are VOC, $NO_x$, and CO. For $PM_{2.5}$ NAAQS modeling, the pollutants to be inventoried are primary emissions of $PM_{2.5}$ and $PM_{10}$ (including both the filterable and condensable portions) and emissions of $SO_2$, $NH_3$, VOC, $NO_x$, and CO. While certain $PM_{2.5}$ precursors may not be considered precursors for planning purposes in some nonattainment areas[18], inclusion of all precursors is a prerequisite for appropriate application of air quality models for modeled attainment demonstrations. For regional haze, the pollutants to be inventoried include all of the pollutants and precursor pollutants identified for ozone and $PM_{2.5}$. While CO does not need to be included in the *planning inventories* associated with ozone and/or $PM_{2.5}$ SIP submissions (as described in the EI SIP Guidance), it should be included for modeling purposes because CO plays an important role in atmospheric chemistry.

---

[18] See the $PM_{2.5}$ SIP requirements rule for detailed information on the definition of "planning" precursors for $PM_{2.5}$ nonattainment areas.

For modeling purposes, emissions inventories of these pollutants undergo many transformations to prepare the inventories for use in air quality models. These transformations include chemical speciation, which is described below in section 2.7.8.2. As part of the chemical transformations of VOC, in particular, total organic gases (TOG) are calculated to include lower reactivity compounds that are not included in the regulatory definition of VOC, but nonetheless have some role in ozone and/or $PM_{2.5}$ formation.

## 2.7.4  What Temporal Resolution Should Be Used for Base Year Inventories?

The emissions inventories should cover the time periods associated with the modeled time period. Different approaches to accomplishing this goal arise because of the nature of ozone, $PM_{2.5}$, and regional haze problems.

For ozone, the episodic nature of 8-hour ozone exceedances leads to inventories that may reflect a specific period being modeled. For this reason, the *planning* inventories should be provided as an ozone season day inventory[19] (as described in the EI SIP Guidance). For the nonattainment area, the planning ozone season day inventories are also often used for modeling inventories.

For $PM_{2.5}$, both annual and daily NAAQS result in different inventory temporal possibilities for the modeling episode, depending on which NAAQS a particular nonattainment area must address in the SIP. As a result, the *planning* inventories may be annual, seasonal, or both. Like ozone, the planning inventories may also be used as the starting point for the modeling inventories. For example, an annual planning inventory will need to be temporally allocated to the days and hours of the time period used for $PM_{2.5}$ modeled attainment demonstrations. This is the case for both annual modeling and when the air agency has chosen to use a seasonal demonstration as part of a 24-hour demonstration.

Modeling inventories also include areas outside the nonattainment area, for which ozone season day or average season day (for $PM_{2.5}$) emissions may not be readily available. In these instances, air agencies may elect to start with an annual inventory and use an emissions model to adjust the annual emissions to reflect the modeling period. This may not be advisable in every case; in particular, mobile source emissions are highly variable with meteorology and day of the week, and are often available on a monthly or even daily basis that reflects variability in temperature, traffic patterns, and other factors. In addition, more detailed temporal data from electric generating units (EGUs), biogenic sources, windblown dust, sea salt, lighting, wildfires,

---

[19] The definition of "ozone season day" emissions specifies weekday emissions and is intended to reflect the periods of emissions associated with monitored ambient ozone exceedances.

prescribed fires, agricultural burning, or other sources should be used when available to enhance the technical quality of the modeled attainment demonstration.

For regional haze, the use of annual emissions inventories is appropriate given the nature of the regional haze problem. However, the same considerations apply for the inventory's temporal aspects as they do in the cases above; more detailed temporal data should be used as the inventory starting point when it is available for important sources of the pollutants included in the inventory.

## 2.7.5  What Spatial Coverage Is Needed for Base Year Inventories?

Modeling inventories must cover all areas of the modeling domain, which will include areas outside of a nonattainment area and Class I areas and most often includes areas in neighboring states or tribes. This subsection addresses areas within and outside the nonattainment area separately.

### 2.7.5.1 Areas Within the Nonattainment Area

As mentioned above, planning inventories (which are a CAA and regulatory requirement for ozone and $PM_{2.5}$ SIPs) include emissions within the nonattainment area. The EPA expects that modeling inventories will be consistent with those planning inventories; however, some exceptions may exist. Where possible, the planning inventories (which are typically annual or seasonal) can be a sum (for annual data) or average (for ozone or $PM_{2.5}$ season day data) of day-specific or hour-specific data used for modeling. In some cases, however, this approach may not be sufficient for modeling purposes. For example, greater spatial and temporal detail are needed for on-road mobile modeling inventories as compared to the base year (planning) inventory for the nonattainment area. For the planning inventory, one goal is to allow for the repeatability of the approach in order to create average, seasonal, or annual inventories for use in rule requirements, such as reasonable further progress or conformity demonstrations. That goal is not necessarily compatible with the modeling need for spatial and temporal detail. In cases where some differences between planning and modeling inventories are unavoidable, air agencies should attempt to promote consistency where feasible. More information on the temporal basis of inventories is provided in section 4.5 of the EI SIP Guidance.

### 2.7.5.2 Areas Outside of the Nonattainment Area

For air quality modeling, emissions inventories are often needed for areas outside the nonattainment area. Developing modeling inventories for these areas should be relatively straightforward and can be included as part of the SIP planning inventories. For areas outside of

the air agency's jurisdiction, however, it can be more difficult for air agencies to develop the inventories themselves. In these cases, the EPA encourages participation in regional modeling efforts, which are designed to allow sharing of data and help promote consistent approaches across state boundaries. When those organizations lack the needed inventories, the EPA recommends using the EPA's publicly available emissions, as described in the next section.

### 2.7.5.3 Areas Outside of the United States

In some cases, the modeling domain may need to extend into areas of Canada and/or Mexico. In this case, emissions modelers will need to include emissions from these countries in their modeling domain. Both Canada and Mexico have emission inventory programs that provide inventories that can be used in modeling, and the EPA includes the latest available inventories from these countries in its national emissions modeling platform. States are encouraged to use the latest available data for these countries. While the EPA is one source for that data, states may work directly with other countries or work with their EPA Regional office to try to get inventories that are more current or otherwise improved over what is available directly from the EPA.

## 2.7.6  How Can the National Emission Inventory Be Used by Air Agencies?

The EPA recommends that state, local, and tribal agencies start with available inventories suitable for air quality modeling of the selected time period(s). If no such inventories are available from a prior state or tribal effort, from regional modeling groups, or from some other source, air agencies may choose to derive an inventory suitable for use with models from EPA-provided information. Two sources of information are available, as described below. In both cases, the EPA expects that air agencies will only use such data after additional review to ensure the appropriate quality of the data for SIP planning purposes.

First, the National Emission Inventory (NEI) provides criteria air pollutant and hazardous air pollutant emissions as annual emissions totals for most (if not all) sources of emissions relevant for ozone, $PM_{2.5}$, and regional haze implementation purposes. Air agencies may use the most recent public release of the NEI as a starting point for inventory development. The data and documentation are available from the NEI Website.

Additionally, the EPA provides emissions modeling "platforms" that are based on the NEI and can be a starting point for air agencies. The modeling platform data provide additional information not available from the NEI, such as daily EGU and fire emissions, monthly nonroad emissions, biogenic emissions and/or input to biogenic emissions models, and inputs to mobile source models. Furthermore, these modeling platforms usually include future-year emissions

projections. Both base and future-year data are provided in a format used by emissions models and can, therefore, be more readily adopted by air agencies that need to process emissions for use in air quality models. The data and documentation are available from the latest platform release at the Air Emissions Modeling Website.

The detail and accuracy of the EPA emissions inventories and platforms may or may not be sufficient for use in any particular SIP. Air agencies should review the emissions and associated documentation and make improvements where deficiencies exist. Such improvements will often be necessary to demonstrate appropriate model performance, as described in section 3. Additional degrees of review are needed for areas closer to the nonattainment area. For example, EPA data may be sufficient for estimating emissions in states that are hundreds of kilometers upwind or downwind of the nonattainment area, but may not be sufficient for estimating emissions closer to the nonattainment area because those emissions can have a greater impact on the final results of the attainment demonstration.

## 2.7.7  How Should Base Year Emissions Be Created?

Emission inventory data from at least five general categories are needed to support air quality modeling: stationary point-source emissions, stationary area-source emissions (also called non-point), emissions for on-road mobile sources, emissions for nonroad mobile sources (including railroad and marine vessels), and biogenic/geogenic emissions. A sixth category of wildland fires also exists and includes day-specific emissions from wildfires and prescribed burns. These fire emissions are included as an "event" source in the NEI. Emissions inventories are expected to include "all" sources of emissions; if an air agency wishes to exclude a particular source (e.g., because it is a very small contributor), then the air agency should document the reasons such omissions are acceptable. In addition, some "traditional" nonroad mobile sources (e.g., airports and rail yards) can also be included in inventories as a point source. For example, in the NEI, airports and rail yards are included as point sources and railroad and marine vessel emissions as part of the nonpoint data category.

The EI SIP Guidance (U.S. EPA, 2017b) addresses numerous details about emissions inventory development. Readers are encouraged to refer to information in that document as a resource for building base year emissions inventories. That guidance contains additional information on the definitions of the data categories (point sources, nonpoint sources, etc.), provides more information about emissions estimation for each data category, includes a process for prioritization of inventory development, and includes quality assurance recommendations. All of this information is highly relevant to inventories developed for air quality modeling. In the remainder of this section, we provide a basic description of the data categories and their base

year emissions and additional information needed for their use in modeling applications where appropriate.

### 2.7.7.1 Point Sources

Point sources are emissions sources that are attributed to specific facilities and emissions release points within those facilities. The Air Emissions Reporting Rule (AERR) provides information on how to define which sources to include as specific point sources in the inventory. This definition is the same as the New Source Review program major source definition, with a lower potential-to-emit threshold for nonattainment areas. More information on the relationship between SIP inventories and the AERR and how that affects SIP inventories is available in the EI SIP Guidance. For modeling inventories, data developers may include sources with emissions smaller than the required reporting threshold, and should be careful to prevent double counting with nonpoint source categories that may overlap with some of these smaller sources. This is especially a concern when compiling point and nonpoint inventories from different sources, because a nonpoint inventory is compiled using certain assumptions about what an associated point source inventory includes. This issue is described as "nonpoint reconciliation" and is discussed further in the EI SIP Guidance.

Point source inventories for modeling should be compiled at a minimum by country, state/tribe, county, facility, unit, process or source category code (SCC) and by "release point" or stack (see references below to point-source inventory development). The point source data should include information on the location of the sources (e.g., latitude/longitude coordinates); their stack parameters (e.g., stack diameter and height, exit gas temperature and velocity); and operating schedules (e.g., monthly, day-of-week, and diurnal). Information on existing control device types, measures and associated emissions reductions are also useful to identify sources that might be further controlled and to prepare future year inventories.

For air quality modeling purposes, the precision of the latitude/longitude values can be very important, as it will determine the modeled grid cell of the source. It is recommended to use coordinates reported to one-ten-thousandth of a degree (four digits after the decimal point) to give a precision of approximately 30 feet. In addition, metadata about the latitude/longitude should ideally be collected, such as the horizontal reference datum code used (e.g., WGS84). The EPA provides a data standard for latitude/longitude which can be considered when collecting, storing, and reporting latitude and longitude data values (see here). When working with other states to share point source data, it may be useful to use the same horizontal reference datum across states, such as the World Geodetic System of 1984 (WGS84). Other datum codes listed on the EPA Data Element Registry Services include the North American Datum of 1927 (NAD27) and the North American Datum of 1983 (NAD83).

For modeling needs, many point sources will also be post-processed for the estimation of plume rise of the emissions vertically through layers of the atmosphere as modeled by the air quality model. This plume rise depends on the stack parameters (listed above) and on meteorological conditions. Plume rise can be calculated by emissions models or as part of air quality models (either approach is acceptable and the results can be equivalent). In this latter case, inventory developers are responsible only for identifying for which sources' plume rise will be computed using tools available in emissions models.

Also, for modeling needs, hourly emissions data are usually a starting point for inventories of EGUs. In most cases, such data are readily available from Continuous Emissions Monitoring Systems (CEMS) installed as part of EPA trading programs[20] and include hourly emissions of $NO_X$, $SO_2$, $CO_2$, and heat input. The heat input data can be used to estimate hourly emissions of other pollutants (such of primary $PM_{2.5}$ emissions) using facility-specific emission factors or other emission factors. The EPA's modeling platforms also include these hourly data.

### 2.7.7.2 Nonpoint Sources

Nonpoint sources are also called "area sources." These sources collectively represent sources of emissions that have not been inventoried as specific point sources. The individual sources within the nonpoint emissions county totals are typically too small, numerous, or difficult to inventory using the methods for point sources. The nonpoint emissions data should be compiled by country, state/tribe, county, and SCC, and sometimes by emission type (e.g., hoteling and cruising for commercial marine emissions in the NEI) and Geographic Information Systems (GIS) shape (for locomotive and commercial marine emissions in the NEI). The specification of nonpoint emissions at a more detailed resolution than county is typically not necessary for modeling inventories, but can provide a more detailed spatial representation for areas where such an approach is needed. Spatial allocation of emissions with spatial surrogates (see section 2.7.8.3) can be equally effective.

### 2.7.7.3 On-Road Mobile

Emissions from on-road vehicles are the result of several emission processes, including the combustion of fuel while vehicles are starting, idling, and moving, evaporation of fuel from the fuel system and during refueling, and from brake wear and tire wear.

---

[20] CEM data are provided by the EPA's Clean Air Markets Division in a format suitable for use in emissions processing at the Air Markets Program Data Website. From this page, click the "Prepackaged data" tab and scroll to the bottom to download the data in a form that can be input into SMOKE.

Mobile source inventory modelers should use the latest version of the Motor Vehicle Emission Simulator (MOVES) for on-road mobile source emissions. They should also subscribe to the MOVES email list to be notified of any bug fixes or updates to the MOVES model. For on-road emissions in California, the most recent EPA-approved version of the EMission FACtors model (EMFAC) should be used. In addition, the Sparse Matrix Operator Kernel Emissions (SMOKE) emissions modeling system includes tools that support the use of MOVES emission factors with SMOKE, and thereby allows modelers to account for the sensitivity of on-road emissions to temperature. SMOKE uses county-specific inputs and gridded hourly temperature and other meteorological information, which is typically based on the same meteorological data used for air quality modeling.

Emissions modelers have a choice in MOVES between "inventory" mode and "emission factors" mode (which creates emission factors that can be further processed using SMOKE-MOVES). Both approaches are valid for supporting air quality modeling for SIPs. More information on the different ways of running MOVES is provided in the MOVES documentation and guidance.

Modelers should consider using a refined approach (such as the SMOKE-MOVES system, day-specific MOVES runs, or some other approach) for use in emissions modeling needed for modeled attainment demonstrations. The SMOKE-MOVES approach first generates emissions rates from MOVES by process (running, start, vapor venting, refueling, etc.), vehicle type, road type, temperature, speed, and hour of day, according to specified fuel parameters and other inputs. Then, subsequent steps apply the appropriate MOVES emissions rates along with vehicle miles traveled (VMT) and vehicle population data for the counties and grid cells in the modeling domain for each hour of the modeling episode.

The MOVES model allows modelers to override default database settings to obtain a locality-specific on-road inventory, and EPA strongly encourages data developers to develop and use MOVES input databases that are specific to the states and counties within the modeling domain. The MOVES Technical Guidance[21] discusses when local data should be used in place of model default data, as well as potential sources of local data.

For some input parameters, there is overlap with the inputs needed for other models, such as the nonroad mobile models. For example, meteorology and fuels information is needed to drive both the mobile and non-road emissions models. Efforts should be made to use the same source of data across multiple categories when the inputs are shared by multiple models. Not doing so calls into question the validity of one or both approaches. Air agencies should explain

---

[21] The most current version of this document is available on the MOVES website.

the use of shared inputs, or reasons for not using them, as part of the documentation prepared with their modeled attainment demonstration.

On-road emissions and VMT should be compiled at least at the country, state/tribe, county, and SCC level. Vehicle population data by county and vehicle type should also be compiled as well as idling hours, if available. For some inputs such as VMT, modelers may optionally compile and use data for individual road segments (called "links"). Link approaches require starting and ending coordinates for each road link. Link-based modeling is typically performed for fine scale (i.e., 4-km or finer) modeling studies. Travel Demand Models (TDMs) can be a source of data needed to develop link-based approaches. In regional scale modeling, county-level on-road emissions can be allocated onto road links using spatial surrogates that are generated based on link data and mapped into the modeling grid cells using appropriate weights.

### 2.7.7.4 Nonroad Mobile Equipment

Nonroad mobile equipment emissions result from the use of fuel in a diverse collection of vehicles and equipment, and the EPA's NONROAD emissions model estimates these emissions. The NONROAD model was originally a separate model, but has now been incorporated into the MOVES model (starting with MOVES2014a). Nonroad emissions should be compiled as country, state/tribe, county and SCC totals.

For the MOVES2014a version of MOVES and later versions, the MOVES model should be used to calculate nonroad source emissions. MOVES2014a (and newer versions) includes features not previously available in MOVES that simplify processing of emissions output and includes updated fuel input files that result in small changes in emission results. In addition, the prior tools available for nonroad emissions estimations (NONROAD2008 and NMIM2008) may no longer work with current operating systems, and the EPA cannot continue to provide technical support for these models. Therefore, the EPA recommends that for modeling nonroad emissions, MOVES2014a or newer versions be used for all new SIP development, although state and local agencies that have already completed significant work with MOVES2014, NONROAD2008, or NMIM2008 can continue to do so to allow for timely submission of the SIP. As a general matter, air agencies should review and possibly update and customize the MOVES model inputs to give better emissions estimates for their state.

Unlike models for onroad emissions, the EPA does not specifically "approve" nonroad models. However, use of alternative models can be justified as part of a SIP submission. For example, California has previously developed and used a state-specific approach for estimating its nonroad source emissions for SIP purposes, called OFFROAD2007. Although this model has now been replaced by category-specific methods for many categories, it is still the default approach for categories not listed with newer methods, as described on the OFFROAD website. Any use

of such an alternative approach is subject to review by the EPA as part of the review of the SIP, and thus states are encouraged to coordinate with Regional offices on any use of alternative models. The MOVES nonroad capabilities include more than 80 basic and 260 specific types of nonroad equipment and further stratifies equipment types by horsepower rating. Fuel types include gasoline, diesel, compressed natural gas (CNG), and liquified petroleum gas (LPG). The nonroad capabilities of the MOVES model estimates emissions for all criteria pollutant and precursors from both exhaust and non-exhaust processes (diurnal, refueling spillage, vapor displacement, hot soak, running loss, take permeation, hose permeation, and crankcase emissions). MOVES supports many SIP-related inventory development needs, including support for partial counties and seasonal emissions.

Air agencies are encouraged to replace default model inputs with more representative data. Common input adjustments include equipment population, geographic allocations, and local growth rates. If agencies make changes to default model values, the agency should submit the input files to the EPA as well as a description of why the defaults were changed. As mentioned in the previous discussion of on-road mobile emissions, for some input parameters, there is overlap with the inputs needed for other models, such as the on-road mobile models (e.g., meteorology and fuels). Efforts should be made to use the same source of data across multiple categories when the inputs are shared. Not doing so calls into question the validity of one or both approaches. Air agencies should explain the use of shared inputs, or reasons for not using them, as part of the documentation provided with their inventories.

### 2.7.7.5 Nonroad Mobile: Commercial Marine Vessels, Locomotives, and Aircraft

Emissions from commercial marine vessels, locomotives, and aircraft are estimated in other ways as described in detail in the EI SIP Guidance. These sources can be particularly important for urban areas and in some Class I areas (especially in coastal areas). The EI SIP Guidance contains information about methods available to estimate emissions from these sources.

Commercial marine vessel emissions can be a particular challenge for nonattainment areas that include ports or are adjacent to major shipping lanes. While the level of emissions from these vessels can be outside of the control of state air agencies (coming under national rather than state jurisdiction), it is still important to accurately represent these emissions when they are significant contributors in the vicinity of a nonattainment area or Class I area. Vessels are divided into the largest ocean-going "category 3" (C3) vessels and the smaller "category 1" (C1) and "category 2" (C2) vessels such as tug boats, ferries, support vessels, fishing vessels, and others. Commercial marine emissions include both in-port emissions and underway emissions, with most (~90% of nationwide emissions) emissions associated with underway activity. For the planning inventories covered by the EI SIP Guidance, air agencies need to include only those

emissions within state waters. For the modeling inventories, however, air agencies may also need to include emissions in Federal waters when the modeling domains extend more than a few miles offshore. This is especially important for coastal areas where offshore commercial marine emissions may be an important contributor to ozone and/or PM in the nonattainment area and/or visibility impairment in Class I areas.

The current EPA methods for estimating commercial marine emissions use a bottom-up approaches for C1, C2, and C3 vessels. The method uses activity data from Entrance and Clearance Waterbourne Commerce (both from the Army Corps of Engineers) and from a 2007 EPA census of C1 and C2 vessel activities. The most recent documentation for EPA methods is provided in the 2014 NEI v2 Technical Support Document, section 4.19.

Uncertainties in estimating commercial marine emissions with EPA's current methods remain. Thus, the EPA strongly encourages air agencies preparing modeling inventories to seek out, develop, and use local-specific information about their ports and waterway vessels to better compute emissions whenever possible, and particularly when the commercial marine sector is a major factor in emissions conditions that lead to nonattainment and/or visibility impairment in Class I areas.

### 2.7.7.5 Biogenic Emissions

Biogenic sources are a subset of natural emissions sources that may be an important component of the emissions inventory. Vegetation (i.e., forests and crops) is the predominant biogenic source of VOC and is typically the only source that is included in a biogenic VOC emissions inventory. Additionally, microbial activity in the soil contributes to biogenic NO emissions.

Biogenic emissions from vegetation and soils are computed using a model that utilizes spatial information on vegetation and land use and environmental conditions of temperature and solar radiation. The model inputs are typically horizontally allocated (gridded) data, and the outputs are gridded biogenic emissions which can then be speciated and utilized as input to chemical transport grid models. Several models exist, and are described more fully in section 2.7.9.2 and the EI SIP Guidance.

Modeled biogenic vegetation emissions are significant for understanding ozone formation, particularly in the Eastern U.S., and the dependence on meteorology makes using case-specific meteorology very important. In addition, the impact and model characterization of biogenic monoterpene and sequiterpene emissions on secondary aerosol formation is important in many areas of the U.S., most notably the Southeast. Therefore, biogenic emissions should be

generated using hourly meteorology reflective of the time period being modeled to best capture important relationships between temperature, solar radiation, and biogenic emissions.

### 2.7.7.6 Geogenic and Other Natural Sources

Geogenic emissions are primarily the result of oil or natural gas seeps, soil wind erosion, and sea salt spray. In addition, lightning may also be an important contributor to natural NO emissions in an inventory area. Volcanoes and fumaroles (i.e., vapor or gas vents in a volcanic region) can be additional sources of geogenic emissions. SIP developers should consider these sources as part of their conceptual description. If geogenic sources are identified as potentially contributing to air quality, such emissions should be included in the modeling.

*Oil or Natural Gas Seeps*

The U.S. Geological Survey Bureau of Ocean Energy Management (BOEM) has documented emissions from oil and gas seeps in the Gulf of Mexico. The University of California Santa Barbara also provides inventory information about California- area seeps. This is an area of ongoing research.

*Windblown Dust*

Wind erosion may contribute substantially to PM emissions in an area. Emissions from wind erosion is an area of active research and development, and multiple approaches for estimating wind-blown dust emissions are available. For example, the EPA's CMAQ model includes a module that dynamically estimates hourly natural emissions of fine and coarse dust particles due to wind action over arid and agricultural land. The windblown dust approach is based on the work of J.S. Fu et al. (2016)**.** Other examples of windblown dust approaches include Draxler, Ginoux and Stein (2010), Mansell et al. (2006), and Sundram et al. (2004).

Air agencies using any "in-line" approach for windblown dust emissions should evaluate the results of the approach to determine if it provides a reasonable representation of dust emissions in their modeling domains. Air quality models can have an option to output in-line emissions for evaluation, so that modelers can assess and quality assure the emission estimates directly.

*Sea Salt and Other Ocean Emissions*

The interaction of sea-salt particles in coastal environments with air chemistry can impact concentrations of $PM_{2.5}$ and gas-phase species in the atmosphere. Various emissions estimation methods are available to account for sea salt emissions. For example, the CMAQ model has been updated to account for these emissions, so that emission inventory developers are able to

rely primarily on the air quality model to internally calculate sea-salt emissions. Additional information for CMAQ is available in Kelly et al., (2010) and Gantt et al., (2015). For CAMx, additional information on sea salt simulations is available in Athanasopoulou et al. (2008). When an in-line approach is used, emissions should be output from the model so that modelers can assess and quality assure the emission estimates directly. When an in-line approach is not used, modelers should consider the possible need for including sea salt emissions data as an input to the air quality model.

In addition to particulate impacts, ozone in coastal areas can be affected by ocean emissions of halogen compounds including chlorine, bromine, and iodine. Many approaches could be taken to represent those emissions. For example, Yarwood et al. (2014) describes an updated chemical mechanism to include halogen chemistry and a CAMx preprocessor that was used to estimate emissions of halogen precursors in coastal areas, and Sarwar (2015) describes a similar halogen chemistry implementation that has been used in CMAQ. Numerous other references are available in the peer reviewed literature that describe halogen chemistry impacts on ozone formation and modeling of that process.

### *Lightning*

Another natural source of emissions is lightning, which produces NO that forms $NO_2$ in the presence of ozone or in a photochemically reactive atmosphere. The NO and $NO_2$ are formed in the mid-upper troposphere and can impact the vertical distribution of reactive nitrogen as well as ozone. Because lightning is not a direct source of $NO_2$, accounting for this source category is more important for air quality modeling purposes than for SIP planning inventory purposes.

Various methods for estimating lightning emissions could be used. For example, the EPA's CMAQ model includes a parameterized approach to estimate $NO_x$ emissions and the vertical distribution that is generated from lightning. The peer reviewed literature contains both a description of the approach (Allen, 2012) and a model evaluation (Appel, 2010). In addition, Koo et al. (2010) describe estimating annual total lightning NO emissions for North America and then spatially and temporally allocating those emissions to model grid cells using convective precipitation activity as a surrogate.

### *Volcanoes and Fumaroles*

Basic information on volcanic gas is available from the USGS. The USGS also has a monitoring program focused on predicting eruptions. Although this program does not include information on pollutant concentrations, the monitoring program website provides potentially useful maps of volcanos using the "Find a U.S. Volcano" pull-down menu near the top of the site. Finally, the publications related to volcanoes search allows for searching publications for pollutant

keywords such as $CO_2$, $SO_2$, gas, hydrogen sulfide, and volcanic gas. Most of these emissions-related articles focus on information in California, Washington, Hawaii, and the Yellowstone area.

### 2.7.7.7 Wildland and Cropland Fires

Wildland fires are generally defined as any non-structure fire that occurs in wildland (an area in which human activity and development are essentially non-existent, except for roads, railroads, power lines, and similar transportation facilities and structures, if any, are widely scattered). Cropland fires are any non-structure fire that occurs on croplands. The Exceptional Events Rule[22] (which applies to NAAQS implementation) and the Regional Haze Rule define two types of fire that can occur on wildland:

- *Prescribed fire* means any fire intentionally ignited by management actions in accordance with applicable laws, policies, and regulations to meet specific land or resource management objectives.
- *Wildfire* means any fire started by an unplanned ignition caused by lightning; volcanoes; other acts of nature; unauthorized activity; or accidental, human-caused actions, or a prescribed fire that has developed into a wildfire. A wildfire that predominantly occurs on wildland is a natural event.

Inventories used for ozone, $PM_{2.5}$, and regional haze modeling purposes should include wildland (wild and prescribed) and cropland fire emissions. Wildland and cropland fires can emit large amounts of primary $PM_{2.5}$ as well as precursors that can react in the atmosphere to form ozone and secondary $PM_{2.5}$ downwind potentially impacting both urban and Class I areas. Thus, wildfire and prescribed fire emissions should be included in the nonattainment area inventories when and where these emissions occur within the modeling domain during time periods being modeled. Cropland fires can also be inventoried when and where these emissions occurred or as a nonpoint source.

Detailed information about how the EPA develops wildland and cropland (Pouliot et al, 2016) fire inventories can be found in the latest version of an NEI Technical Support Document, such as that provided with the 2014 NEI. The EPA's approach for wildland fires relies on a combination of satellite detection of fires merged with on-the-ground observational data where available. The EPA encourages the use of ground-based observations and local fuel information whenever possible, as these factors can have a large impact on the emissions. One option for obtaining fire date and location information includes the latest version of the

---

[22] *See* 81 FR 68216, October 3, 2016.

Satellite Mapping Automated Reanalysis Tool for Fire Incident Reconciliation (SMARTFIRE) system (Du et al., 2013; Sullivan, et al., 2008). Detailed information on the SMARTFIRE system is available in Raffuse et al., 2007. Additional references and information are available as part of the 2014 NEI Technical Support Document. Other sources of fire location, size, duration, and emissions may be available and could be used instead of the SMARTFIRE approach. Examples of other approaches include the WRAP FETS (JFSP, 2013) and the Fire Inventory from NCAR (FINN).

Important aspects of wildland fire that impact resulting emissions estimates include the location of the fire, timing of the fire (start and end date/time), fire type (wild, prescribed, or cropland), fuel type, fuel loading, area burned, and fuel moisture. Daily emissions are allocated to hour of the day using profiles based on fire type. VOC and primary $PM_{2.5}$ emissions are speciated to specific compounds based on profiles generated from laboratory and field testing. The activity information noted is not just critically important for estimating emissions, it is also important toward estimating the heat flux of the fire and subsequent plume rise in the photochemical model. The estimated plume rise can have a large impact on how far downwind smoke can be transported (to a nonattainment area and/or Class I area). Combustion phase can also be an important consideration when modeling wildland fires in terms of emissions, plume rise, and vertical allocation of emissions. Fires that are largely smoldering (such as peat fires) can have different emission factors and have a different profile of VOC and primarily emitted $PM_{2.5}$ emissions.

Since fire emissions can be a large source of emissions, the treatment of fires should be discussed with the relevant EPA Regional office(s) as part of the modeling protocol development process.

## 2.7.8  What Other Data Are Needed to Support Emissions Modeling?

For modeling purposes, emission inventories need to be converted through emissions modeling from their original resolution (e.g., annual emissions by point source or count) to air quality model input files. Air quality models generally require emissions inputs to be specified by model grid cell, hour, and model chemical species. Modeling inventories also identify which point sources should have their plume rise computed. This section describes the ancillary data that modelers should collect and prepare to allow emissions models to convert the emission inventory data into air quality model inputs.

### 2.7.8.1 Temporal Allocation

Ancillary data for temporal allocation are necessary for stationary point, stationary area, and all mobile sources. To facilitate temporal allocation of the emissions, factors called "temporal

profiles" should be created to convert annual emissions to specific months (i.e., monthly profiles), average-day emissions to a specific day of the week (i.e., weekly profiles), and daily emissions to hours of the day (i.e., hourly profiles). Additionally, a cross-reference file is needed to assign the temporal profiles to the inventory records by SCC, facility, geographic area such as state or county, or some other inventory characteristics. Where available, the operating information that may be available from the point-source inventory should be used to create inventory-specific temporal factors. The EPA provides a starting point for the temporal profiles and cross-reference files as part of the latest modeling platforms (previously described), available at the Air Emissions Modeling website.

The EPA has developed a SMOKE utility program (Gentpro) that estimates temporal profiles for residential wood combustion (RWC), agricultural $NH_3$ from animals, and other generic (user-defined) area sources by relating meteorology to air emission fluxes. Gentpro reads in hourly gridded meteorological data (temperature and wind) from the Meteorology-Chemistry Interface Processor (MCIP)[23] and a gridded spatial surrogate to produce temporal profiles and cross-reference data. Annual MCIP input data are required to calculate temporal profiles with Gentpro and the spatial surrogates are needed to identify the grid cells for computing county-averaged meteorology variables. The Gentpro program is described in the latest SMOKE User's Manual.

For RWC, Gentpro allocates emissions to specific days from annual totals based on a regression equation that was developed by relating daily minimum temperatures and chemical tracers of RWC. This approach results in more RWC emissions assigned to periods of colder temperatures using a user-defined temperature threshold that restricts RWC emissions to days with morning lows below a specific value. Air agencies that use EPA's emissions data for this category should note that this approach has been used to temporally allocate the RWC emissions.

For agricultural $NH_3$ from animals (i.e., from concentrated animal feeding operations, or CAFOs), Gentpro allocates annual, monthly or daily emissions to hourly emissions based on empirical equations derived from investigations of emissions from animal waste decomposition as a function of temperature and wind speed. The resolution of emissions input to Gentpro for this sector depends on the available data. Air agencies that use EPA's emissions data for this category should note that this approach has been used to temporally allocate agricultural $NH_3$ emissions from CAFOs.

---

[23] MCIP is a meteorology postprocessing program. It is typically used to convert WRF meteorological model output data to CMAQ input format. The latest version of MCIP can be found here.

For point sources, hourly CEMS data are recommended for use in base year emissions modeling rather than temporal profiles, where such CEMS data are available, and with the following caveats. CEMS data are collected as part of emissions compliance and/or trading programs. Because these programs require complete hourly data, alternative emissions values are assigned to hours when CEMS devices are not functioning. These alternative values can be extremely high values (compared to actual emissions rates), in order to motivate CEMS operators to provide a complete data record to the extent possible. As a result, CEMS data may have some anomalies and should be reviewed prior to use in a modeling study. The CEMS data fields include an emissions method code, which identifies the hours with alternative values. Furthermore, CEMS data may be available for only part of a year; therefore, for annual modeling, users should be careful to ensure CEMS data are used for the appropriate periods and total annual emissions are temporally allocated to fill in the other hours of the year.

For wildland fire emissions, the EPA recommends using daily, location-specific fire data such as the NEI "events" sources. These sources can have a large impact on ambient levels of ozone and $PM_{2.5}$, and on regional haze. Although emissions from these sources are largely uncontrollable, the inclusion of all emissions sources (including biogenic and uncontrollable sources) is needed to accurately predict pollutant concentrations and derive relative response factors for both PM and ozone.

As a general matter, the temporal allocation approach should remain consistent between the base year modeling and the future year modeling. Consistency is important when using the RRF approach to make future year projections of ozone, $PM_{2.5}$ and/or visibility, because the results of that approach can be affected by changes in when emissions are modeled to occur. In general, this means that the temporal allocation will be the same between base and future years, except when an intentional change is made to reflect a real expected change in the temporal distribution. An example of such a change includes intentionally reducing emission peaks from units during incidents of poor air quality. In addition, modeling can be specially done for the current year with an emissions case which uses "typical" emissions temporal allocations for major sources, and this case may be different from the current year case, where actual source schedules are used to evaluate model performance.

For future-year modeling there are two choices for representing EGU emissions derived from CEMs data and wildfire emissions. Modelers can use day-specific emissions for both the base and future years, or a "typical year" temporal allocation (averaging) approach can be used to create representative emissions. If a typical year approach is used, it should include similar daily temporal variability as could be expected for any given year (in most cases, the daily temporal variability also needs to be consistent with the base year meteorology). Air agencies should

discuss the temporal approach to fires (see also section 2.7.11) and point sources with the appropriate EPA Regional office as part of the modeling protocol development process.

### 2.7.8.2 Chemical Speciation

The emissions models also need information about the chemical species of the VOC, NOx, and $PM_{2.5}$ emissions for all emissions sources. These data are used to disaggregate the total VOC, NOx, and $PM_{2.5}$ emissions to the chemical species expected by the air quality model and are called speciation "factors" or "profiles."

The EPA provides a starting point for the VOC, NOx, and $PM_{2.5}$ speciation data, which are available with the EPA modeling platforms (previously described). The VOC and $PM_{2.5}$ speciation profiles are based on the SPECIATE database, which is available on the SPECIATE website. In addition to the speciation profiles, a speciation cross-reference file assigns speciation profiles. The default EPA speciation cross-reference assigns profiles to sources using SCCs. These speciation profiles in many cases are highly uncertain and should be assessed and improved where possible for emissions source categories that are critical to model performance.

For large or critical VOC and $PM_{2.5}$ sources in the modeling domain, air agencies should consider determining the individual chemical compounds contributing to the total VOC and $PM_{2.5}$. If collected, this information should then be used to compile speciation profiles for the critical facilities or source categories. These speciation profiles should be assigned to the facilities by updating the speciation cross-reference file to support a facility-specific or facility-SCC-specific assignment.

For VOC, low reactivity chemical components including methane have traditionally been calculated by applying a factor to the VOC emissions to calculate total organic gases (TOG). These TOG emissions are then split during emissions processing into the VOC model species that include methane. In limited situations, air agencies may want to investigate the extent that methane emissions and low volatility compounds play a role in ozone episodes and/or secondary $PM_{2.5}$ formation. Additional efforts going beyond the use of the default VOC-to-TOG profiles from the speciation profiles may develop over time.

In some limited cases, it may be of interest to include methane emissions inputs to air quality models to achieve sufficient model performance for a modeled attainment demonstration. Approaches can include incorporating methane emissions from other sources into emissions inventories used for modeled air quality. For example, the MOVES model estimates methane emissions directly, so there would be no need to use VOC speciation to estimate those emissions. Air agencies considering methane as a contributing factor should consult with their

EPA Regional office to discuss the best sources for such data as this inventory development area is undergoing many changes at this time. Furthermore, more specific VOC-to-TOG factors and speciation profiles may be useful, particularly for analysis related to areas of very high methane emissions. Additionally, the EPA encourages the use of HAP emissions data when available to augment VOC speciation; therefore, we suggest using the inventory HAPs where criteria air pollutants (CAPs) and HAPs were provided by the same data source. When possible, the EPA's modeling platforms generally process the following HAPs rather than relying on VOC speciation:  benzene, acetaldehyde, formaldehyde and methanol. These 4 HAPs are collectively known as "BAFM" and are removed from VOC speciation calculations for the remaining VOC HAPs needed for the air quality models. Ethanol can also be added to this "VOC integration" process where ethanol emissions are available. It is entirely up to the user to determine the "integration" status of specific sources in each inventory. A simple test for possible integration of VOC HAPs is the following. For each inventory unique source (i.e., a stack or nonpoint/mobile FIPS+SCC):  1) confirm that VOC HAPs and VOC were reported by the same data provider, and 2) compute VOC HAPs to ensure they are non-zero and less than inventory VOC. A detailed methodology is provided in section 3.2.1 of the 2011 emissions modeling platform technical support document.

County-specific speciation profile combinations are also available for cases where user-defined mixtures of two or more speciation profiles are needed. The "GSPRO_COMBO" feature in SMOKE can be applied by state and county and time period (e.g., month) and is currently used for on-road and nonroad mobile and gasoline-related stationary sources where the emissions sources use fuels with varying ethanol content (e.g., E0 and E10 profiles). Ethanol content varies spatially by state and county via nonattainment areas or local programs, temporally (e.g., during ozone season months), and by modeling year because future years have more ethanol. Certain source categories will require more careful review of speciation assignments. For example, the oil and gas sector (point, area and nonroad) inventories are generally constructed for specific drilling areas (i.e., drilling basins) which may include multiple counties with unique production gas characteristics. Knowledge of the type of gas (e.g., dry, wet, coal bed methane) or oil produced, flared and vented in these basin inventories is helpful for developing basin specific speciation assignments.

$NO_x$ emission factors and, therefore, $NO_x$ inventories are developed on a $NO_2$ weight basis. For air quality modeling, emissions processors must split $NO_x$ to NO and $NO_2$ and in some cases HONO. Although emissions models allow using multiple speciation profiles for $NO_x$, historically only one split factor has been used of 90% NO and 10% $NO_2$. For mobile sources, the MOVES model calculates NO and $NO_2$ internally based on a more nuanced selection of factors and uses an $NO_2$ factor of 0.008 for onroad sources based on Sarwar (2008).

One additional $NO_x$ speciation data resource is stack test data of $NO/NO_2$ ratios for use in AERMOD modeling for the 1-hr $NO_2$ standard. These data are available here.

### 2.7.8.3 Spatial Allocation

For all source sectors that are compiled at a county resolution, the emissions models also need information about allocating the countywide emissions to individual grid cells that intersect the county boundaries. Such sectors include stationary area, nonroad mobile, and (non-link) on-road mobile sources. The spatial allocation process assigns fractions of county-total emissions to the model grid cells intersecting the county based on a "surrogate" data type (e.g., population, housing data). The appropriate types of surrogate data to use for each SCC in the inventories should be identified for this processing step. Spatial surrogates can be created using GIS to calculate the fraction of countywide emissions to allocate to each grid cell based on the surrogate type. These calculations can also be made using the EPA's Surrogate Tool, which is based on the Multimedia Integrated Modeling System (MIMS) Spatial Allocator. In addition, all SCCs needing spatial surrogates should be assigned a surrogate in a cross-reference file. Point sources do not need spatial surrogates, since the emissions models assign the grid location based on the latitude and longitude of the point sources. The EPA provides spatial surrogates and cross-references as part of its latest modeling platform. The same spatial surrogate data are normally used in both the base and future year modeling. However, emissions developers can choose to alter the spatial surrogate data based on predicted changes in land use patterns, population growth, and demographics, although the impacts and utility of such approaches are not well characterized,[24] so their use needs to be well documented and explained.

### 2.7.8.4 Other Ancillary Inputs

On-road emissions for fine-scale model grids (e.g., 4-km grid cells or smaller) may be based on a link-based approach as mentioned in section 2.7.7.3. The VMT and speed data needed for a link-based approach can be provided using a Travel Demand Model (TDM). These models require their own sets of inputs, which depend on the specific TDM used. The MOVES Technical Guidance provides general guidance on the development of MOVES inputs. Details on using TDMs for link-based on-road mobile emissions are available from the EIIP document "Use of Locality-Specific Transportation Data for the Development of Source Emission Inventories." An example of the use of TDMs can be found in "Use of Travel Demand Model Data to Improve Inventories in Philadelphia."

---

[24] At the time this document was written, tools to readily predict future-year land use patterns are not readily available in a form for use in emissions modeling.

Emissions models have other input files that must be created. Previously, we noted that for point sources, emissions developers will have to identify which sources should be treated as elevated sources by an air quality model. To do this, data developers will select criteria such as stack height or a screening plume height value to allow an emissions model to flag point sources as elevated sources. In the SMOKE modeling system for example, the Elevpoint program can be used for this purpose.

The emissions models have a large number of files and settings which work together in fairly complex ways; therefore, users should be careful to select the appropriate files needed for the emissions model, and to prepare all input files in a way that will support using the emissions model for the specific air quality model application. A possible shortcut can be starting with the emissions modeling scripts included with the EPA's modeling platforms.

## 2.7.9  How Are Inventory Data Converted into Air Quality Model Input?

Emissions models are used to convert inventory data to inputs for air quality modeling. As described in section 2.7.8, as part of the emissions modeling process, additional ancillary data are needed to augment the raw emissions inventories. The emissions data for each of the six emissions sectors (point, area, on-road mobile, nonroad mobile, biogenics, and wildland fires) are temporally allocated, chemically speciated, and spatially allocated by the emissions model. The resulting hourly, gridded, and speciated emissions from all sectors are then combined before being used by an air quality model. In this section, we will provide information on several emissions models and summarize some key issues with the application of emissions models.

### 2.7.9.1 Emissions Models

Several emissions models are available for use in developing SIPs. While no single model has been specifically created for all situations, each model is generally capable of performing the necessary emissions processing steps including temporal, chemical, and spatial allocation. Users of such models are responsible for ensuring that the emissions processing steps transform the emission inventories as intended and are not changing the emissions in any unexpected way. Each model has different capabilities, limitations, and nuances. Therefore, when choosing an emissions model, it is worthwhile to discuss the choice with the developers of these systems and/or with EPA to determine which model is best suited for a particular application. Note that there are a number of programs that process emissions for individual source sectors. These are discussed below in the sector-specific subsections. Currently, SMOKE is the primary emissions

model used to develop emissions data for input into chemical transport grid models. Other emissions models can also be used, such as the Emissions Preprocessing System (EPS).

SMOKE supports processing of criteria, mercury, and toxics inventories for stationary point, stationary area, mobile, and biogenic emissions. This emissions model can create input files for the CMAQ and CAM$_X$ air quality models. Applications of SMOKE have been presented at several of the International Emissions Inventory Workshops (Houyoux, 2000; Strum, 2003, Zubrow, 2012, Baek, 2010, Adelman, 2008, Baek, 2007a, Baek, 2007b, Baek, 2006, Eyth, 2006, Pouliot, 2005). SMOKE is available for UNIX and Linux operating systems, but is not recommended for use on PCs running Windows. It does not require third party software. The SMOKE software and User's Guide are available on the SMOKE website.

Utilities for creating speciation profiles, biogenic land use, or spatial surrogates are not included within SMOKE. However, the Speciation Tool can create speciation profile inputs for SMOKE (Eyth, 2006), and biogenic land use and spatial surrogates can be built using the MIMS Spatial Allocator Tool along with the related Surrogate Tools.

## 2.7.9.2 Biogenic Emissions Models

There are several available biogenic emissions models that can be used to develop biogenic emissions for modeled attainment demonstrations and regional haze modeling. One such model is the Biogenic Emissions Inventory System, version 3.6 (BEIS3.6) (Bash et al, 2016). This model can be run both as part of a CMAQ model run and alternatively as a module of the SMOKE system. The CMAQ approach is described here. The latest documentation on the SMOKE approach to run BEIS is available here.

Another biogenic model commonly used to support air quality model applications is the Model of Emissions of Gases and Aerosols from Nature (MEGAN). The MEGAN model also uses meteorological data including temperature and solar radiation as input to generate biogenic emissions. MEGAN is distributed with vegetation/land-use data that includes all of North America. Other biogenic emissions models have been used to support air quality modeling, such as BEIGIS, which is a GIS-based biogenic emission model developed by the California Air Resources Board.

The BEIS modeling system uses land-use data from the Biogenic Emissions Land Use Database, version 4.1 (BELD4). BELD4 data provides data on the 230 vegetation classes at 1-km resolution over most of North America. These land use data can be created with the MIMS Spatial Allocator. Based on inputs from the emissions developer, the Spatial Allocator will select the 1-km grid cells from the BELD data that intersect the modeling domain and (if necessary)

aggregate to the grid resolution of the modeling domain. Air agencies can alternatively rely on the EPA's 12-km gridded data for modeling domains that overlap with the EPA national domain, provided with the EPA's latest modeling platform on the Emissions Modeling Clearinghouse.

In situations where air agencies consider biogenic emissions important for ozone, PM, or regional haze, the data used in these biogenic emission models could be updated to provide a better representation of vegetation and vegetation specific emission factors. For future-year modeling, land use data is typically held constant (same as the base case). Emissions developers can choose to change their land cover data based on predicted changes in land use patterns, however, the impact and utility of such approaches is not well characterized, so their use needs to be well documented and explained. Where fundamental changes are made to landuse/vegetation data or emission factors, those changes should be noted in the modeling protocol and/or final documentation package along with references to the source of updated/alternative data.

The meteorological data used as input to any biogenic emission model should be consistent with the data used for the air quality model. Biogenic emissions models are generally set up to use gridded hourly meteorological data, so inventory developers should be able to convert their meteorological inputs from air quality modeling inputs for use in their selected biogenics emissions model. Surface (or canopy level) temperature and solar radiation data can be obtained from modeled meteorological data, such as the WRF Model. Alternatively, solar radiation data could be obtained from satellite products.

Biogenic emission models evolve over time, so agencies using these models should evaluate the suitability of one model over the other as part of a modeling analysis. Once a choice has been made for modeling purposes, emissions should also be summed across the NAA for inclusion in the base year inventory for the NAA and/or the attainment projected inventory for the NAA.

## 2.7.10 Other Emissions Modeling Issues

In addition to the emissions modeling process and tools described above, there are several other important issues to consider. In the remainder of this section, we briefly address each of these issues.

### 2.7.10.1 Elevated Point Sources

Point sources need to be assigned to an appropriate model layer[25] (the vertical modeling dimension). Depending on the air quality model that is being used, different emissions modeling steps can be taken. Models such as CMAQ and CAM$_X$ expect input emissions files separately for surface level emissions versus the elevated point-source emissions.

### 2.7.10.2 Treatment of 'Atypical' Sources of Emissions

In the NEI, there are several sources of emissions that are reported by only one state or a small number of states. These sources typically have very low emissions, so whether they are included in the modeling inventory typically has little impact on air quality modeling. Examples of these sources include domestic and wild animal waste emissions (primarily $NH_3$), human perspiration and cigarette smoke, and swimming pools. In some inventories, large catastrophic/accidental releases are reported (e.g., car accidents, tire fires). It is generally considered inappropriate to include these sources in emissions processing for air quality models. However, some source categories may be important or unique to a particular area. Before removing seemingly unimportant source categories, the relative importance (e.g., as a percentage of emissions in the area) of each category should be evaluated.

Air agencies should also review and consider the draft EI SIP Guidance and the Ozone Implementation Rule regarding EGU emissions during High Electric Demand Day (HEDD) periods. Such emissions can be crucial for having a complete understanding of relevant emissions sources within a modeling domain. Where these emissions are important for assessing a nonattainment problem, air agencies should consider the potential impact of HEDD emissions when selecting time periods (e.g., episodes, season, year) to model.

### 2.7.10.3 Transport and Meteorology-based Reductions in Fugitive Dust Emissions

Fugitive dust emissions are another large source of primary $PM_{2.5}$ emissions. However, past modeling experience has shown modeled $PM_{2.5}$ concentration over-predictions from these emissions (Pouliot et al, 2010). Therefore, the EPA recommends reducing area-source fugitive dust emissions prior to air quality modeling to account for "capture" by the terrain (such as deposition on vegetation and buildings), changes in the emissions potential (such as frozen ground), and removal by meteorology (such as precipitation). These two components should be accounted for when adjusting the inventory PM emissions from PM sources such as paved and unpaved roads, construction, mining, agricultural activities, and industrial dust and other low-

---

[25] Point sources generally comprise most of the elevated emissions (above layer 1), although other sources, such as fires, ships, and aircraft may also have emissions assigned to elevated layers.

level fugitive dust source categories. The "captured" portion of the reduction can be based on gridded land use data such as vegetation and building characteristics. The EPA has developed a methodology within SMOKE to adjust the fugitive dust emissions. The "meteorological" component of the reduction requires intermediate SMOKE processing scripts to merge hourly, gridded precipitation data and snow cover values to zero-out all fugitive dust emissions where appropriate. To avoid double-counting the precipitation-based reduction, the user should make sure that the inventory fugitive dust inventory does not already include a "MET-adjusted" reduction prior to these manipulations. This combined transport and met-based reduction approach is documented in Pouliot et al., 2010.

### 2.7.10.4 Quality Assurance

Quality assurance (QA) is a key component of any successful emissions modeling effort. A brief synopsis of appropriate QA approaches for emissions modeling is available in section 2.20 of the SMOKE manual. The purpose of QA for emissions modeling is to ensure that the inventories are correctly processed using the information the modeler intended. (It is assumed here that the inventory itself has already been QA'd and erroneous values and/or outliers removed through inventory QA procedures, as described in the EI SIP Guidance.)

Emissions modeling QA includes such activities as:

- Reviewing log files for errors and warnings and addressing problems;
- Comparing emissions between each of the processing stages (e.g., data import, speciation, temporal allocation) to ensure mass is conserved;
- Checking that the correct speciation, temporal allocation, and spatial allocation factors were applied; and
- Reviewing the modeling-specific parameters such as stack parameters.

It is also useful to compare air quality modeling-ready emissions summaries to previous emissions modeling efforts to verify expected emissions changes by source category(s) and geographic area(s) of interest. In addition, the process of running emissions inventories through emissions models and air quality models often provides insights into the emission inventories themselves. These insights can lead to inventory changes that improve the quality of inventories for additional modeling iterations.

In general, this guidance also encourages the use of graphical analysis and GIS for improved QA of emissions data and processing. A commonly used analysis tool for model-ready emissions data is the EPA-sponsored Visualization Environment for Rich Data Interpretation (VERDI) tool. The VERDI software package provides for efficient, flexible and modular capabilities of

overlaying meteorology, emissions and air quality modeling data with GIS shapefiles. More information on VERDI is available on the VERDI website.

## 2.7.11 How Are Emissions Estimated for Future Years?

Emissions estimates for future years are called "emissions projections." The inventory developed for modeled attainment demonstrations is called the *attainment projected inventory for modeling.* [26] These emissions projections include emissions changes (due to increased or decreased activities), facility and/or unit-level shutdowns, and emissions controls (which can be due to, among other things, regulations, settlements or fuel-switching that reduce emissions in specific ways in the future). The goal in making projections is to obtain a reasonable estimate of future-year emissions that accounts for the key variables that will affect future emissions. Each air agency is encouraged to incorporate in its analysis the variables that have historically been shown to drive the economy and emissions within the modeling domain, as well as the changes in growth patterns and regulations that are expected to take place between the time of the base year and future years.

Complete guidance on emissions projections is provided in the EI SIP Guidance, with subsections on EGUs, non-EGU stationary sources, on-road mobile sources, nonroad mobile equipment, other nonroad mobile sources, and a list of other projection resources. The EI SIP Guidance includes a lengthy discussion about considerations that should be made for models or other tools that forecast EGU emissions. As noted in that guidance, "the states are advised to make sure that the tools meet the criteria laid out in this document because EPA will use these criteria to assess any EGU projection information submitted as part of SIPs." In addition, several additional issues are listed here for consideration for modeling inventories.

Emissions models (e.g., SMOKE, EPS) provide the capability to create future-year inventories using base year inventories and projection information. Emissions modelers will need to convert the projection data into specific formats for input to these models. Inventory developers should determine which emissions model will be used to perform the calculations and make sure that the type(s) of information needed by the model is being collected.

In the context of modeling for ozone and $PM_{2.5}$ purposes, for fires, it is recommended that the base year fires be held constant for use in the future year modeling. This approach allows for

---

[26] The name applies even if it turns out that the modeling shows that the area is not able to attain the standard by the latest applicable attainment date. Note that projected inventories are also used for regional haze modeling, however, the name "attainment projected inventory for modeling" applies specifically to attainment demonstrations.

the impact of these fires to be minimized using the RRF approach, while still including realistic fire patterns that are relevant to ozone and $PM_{2.5}$ formation necessary for modeled attainment demonstrations. States have flexibility in how they estimate base year fires, but it is recommended that states should hold these constant in the future modeling case. Additional specific discussion of future-year fires as they relate to $PM_{2.5}$ SIPs is available in section IV.D.3.b of the preamble to the $PM_{2.5}$ SIP Requirements Rule. For regional haze purposes, air agencies should consult sections IV.E and IV.G of the 2017 Regional Haze Rule, 82 FR 3078 (Jan. 10, 2017), as well as their Regional EPA office as appropriate, to develop an approach for the treatment of emissions from fires.

Ancillary input files for inputs to emissions models, such as spatial surrogates, temporal allocation factors and especially speciation profiles may also need to be adjusted to reflect conditions expected in the future. The EPA modeling platforms, for example, consider the impact on speciation of fuels used in the future, which are expected to change over time due to regulations.

Once a future-year inventory and other data have been created, it should undergo the same steps as for the base-year modeling, including temporal allocation, speciation, spatial allocation, elevated source selection, special on-road mobile processing, any other custom processing steps (e.g. applying meteorology-based information to fugitive dust, agricultural $NH_3$ and residential wood combustion), and QA**.** Except where intentional, every attempt should be made to use consistent approaches between the future year and the base year for all of these modeling steps. Inconsistencies in approaches between the future-year modeling and the base-year modeling can lead to artificial differences in air quality modeling results that can affect conclusions.[27] Therefore, it is critical to avoid such differences whenever possible. If inconsistent base and future year approaches are necessary, they should be well documented and explained.

## 2.8    Initial and Lateral Boundary Conditions

Air quality models require chemical time and space boundary conditions in order to solve for concentrations within the modeled domain and time period. The time boundary or *initial condition* (IC) is provided at the beginning of the first simulated time step and the space boundary or *lateral boundary condition* (LBC) is provided at the outer edge of the modeling domain. As with other model inputs, the establishment of the IC and LBC data should be guided

---

[27] This is especially important due to the use of the "relative" change in modeled concentrations as part of the modeled attainment test. An inconsistency in base and future year emissions may lead to a very large modeled percent change in ozone and/or $PM_{2.5}$ concentrations.

by the conceptual model of the air quality issue being simulated. For instance, more attention will be needed in developing accurate LBC for cases in which ambient data analyses (or previous modeling scenarios) have indicated the potential for long-range transport of pollutant material, compared to cases in which the air quality problem has been identified as largely local in nature. Numerous studies have highlighted the importance of accurately representing LBC in optimizing model performance and identifying the most effective path to attaining the NAAQS (Jacob *et al.*, 1999; Tang *et al.*, 2009; Hogrefe *et al.*, 2011).

Given limitations in available ambient data, it is impossible to exactly specify the complex three-dimensional chemical characteristics of the IC or LBC. As a result, two basic approaches to establishing these fields have been used within the modeling community. The first and preferred approach is to characterize the IC/LBC data as accurately as possible given the existing state of knowledge about ambient conditions at those times and in those locations. The second approach is to attempt to minimize the impacts of the IC and LBC by configuring the domain and modeling period such that the air quality concentrations in the locations and times of interest are largely unaffected by the IC/LBC inputs.

The impacts of the IC are most easily minimized when they are reasonably accurate. In most cases, it will be possible to minimize the impacts of the IC data via the use of a model "spin up" period. A spin up period is defined as some number of modeling days that precede the time period of actual interest. The model outputs for this spin up period are discarded from any analytical post-processing and evaluation, as they are potentially affected by the uncertain initial conditions. The length of the needed model spin-up period will vary as a function of:  the domain size, prevailing meteorological conditions, and the chemical lifetimes of the pollutants being simulated. It is a simple modeling exercise to test the sensitivity of the key time periods to the initial conditions. Previous sensitivity modeling has determined that the IC are typically "washed out" of the system in as few as 3-5 days for a local-scale modeling analysis; approximately 10-20 days for a regional-scale analysis; and on the order of 6 months or more for a hemispheric-scale analysis (Berge *et al.*, 2001; U.S. EPA 2010; Anenberg et al., 2011). More recent work shows that 2 weeks is generally sufficient to reduce IC influence to under 1%, with more realistic IC decreasing the spin-up time (Hogrefe et al., 2017). Upper air (elevated layers in the model) takes longer to minimize the influence of IC, and as a result, some locations may require longer spin-up). If there is any question as to the appropriate length of the spin-up period, then sensitivity modeling tests should be conducted. Otherwise, the above guidelines should be sufficient for most ozone and $PM_{2.5}$ attainment demonstrations and regional haze assessments.

In many cases, it will not be feasible to build a large enough domain to minimize the impacts from emissions outside the domain. For these cases, it will be necessary to downscale the requisite species concentration data from well-performing, coarser-grid, larger domain modeling runs. (In rare cases, it may be possible to assign LBC from detailed field study species data, but most domains will not have complete chemical profiles in space and time along the domain edges.). These larger "parent" grids may be generated by the same regional scale model at coarser resolution; or they can be generated via global or hemispheric models. In the last decade, several global/hemispheric air quality models have been used to generate regional LBC inputs. A sample of models used for LBC include: GEOS-Chem (Bey et al., 2001), the AM3 atmospheric component of the GFDL global coupled model (Donner, et al., 2011), the Model for Ozone And Related Tracers (MOZART, Emmons et al, 2010), the WRF-Chem model (Zhang, et al., 2012a), and the hemispheric CMAQ model (Byun and Schere, 2006; Fu et al., 2012). The EPA does not recommend any one particular global/hemispheric model. Each regional modeling exercise should individually assess whether the chosen global/hemispheric or coarse regional model accurately captures lateral boundary conditions.

For cases in which the LBC will be extracted from larger-scale regional/hemispheric modeling, the EPA recommends two efforts to optimize the LBC characterizations. First, modelers should try to minimize any disconnects in the downscaling process. Wherever possible, one should attempt to utilize the same species, chemical mechanism, layer depths, and meteorological inputs in the regional/hemispheric model as are being used in the finer-scale attainment demonstration modeling (Lam and Fu, 2009). This will minimize the number of uncertain translations needed to convert coarse-scale outputs to finer-scale LBC inputs. In particular, careful consideration of the stratosphere in the two modeling systems will be needed to ensure that regional/hemispheric ozone that is stratospheric in origin is not excessively mixed down to the surface in the finer-scale modeling due to disconnects between the two systems.[28] Second, there should be a comprehensive evaluation of the regional/hemispheric model performance (Bey *et al.*, 2001). While there may not be a detailed data set available for model evaluation along the domain lateral boundaries in most cases, consideration of model performance across the domain will provide a first-order indication of the ability of the coarser-scale model to characterize air quality at the boundaries. Additionally, it may also be possible to infer

---

[28] In establishing the layer structure for both global and regional models, it is advisable to avoid selecting upper model layers that span both the upper troposphere and lower stratosphere. It has been seen that "hybrid" layers can allow for inappropriate diffusive mixing between those two generally decoupled sections of the atmosphere. In cases where stratospheric intrusions are not expected to influence ozone in the area, it may be appropriate to artificially cap stratospheric ozone concentrations to avoid ozone performance issues. This should be a "last resort" fix, only applied after detailed assessments of the vertical diffusion and vertical advection schemes within the model.

information about the quality of the coarse-model estimates via comparisons with satellite data (Liu *et al.*, 2006, Henderson *et al.*, 2013).

In some situations, it may be possible to construct a modeling platform in which the LBC will not substantially influence the air quality issue under consideration. For instance, areas for which there is no evidence of pollutant transport from the far edges of the model domain to the local area may be able to demonstrate that the determination of LBC data will not impact the eventual modeling demonstration. As with the IC data, this conclusion can be proven via simple sensitivity tests in which the LBC are modified from a base state and the results between the two runs are compared (e.g., Appel *et al*, 2007). For situations in which alterations to the LBC data will not impact key findings, it is acceptable to use time-invariant profiles for LBC. Because there are many publicly available sources of modeled boundary conditions, this approach should only be used only when there is good reason.

Due to the potential impact of LBCs on model response to emissions controls, it is important to accurately characterize the relative influence of LBC versus local emissions. For example, if the impacts of LBC on local air quality are overestimated, it will be more difficult than it otherwise should be to show reductions in future design values from local controls. Conversely, if the modeling system underestimates the role of inflow air quality, local emissions reductions may appear more effective in the model than they will be in reality.

The selection of future year LBCs also has potentially important ramifications on the relative response factors derived from the modeling for the various control scenarios. If LBC are known to impact local air quality, then modelers may need to consider how these contributions will change between the base year and the attainment year (Adelman *et al.*, 2011). Ambient trends analyses for 1990-2010 have indicated that free tropospheric ozone levels above the western U.S. have increased by approximately 0.5 ppb/year over those two decades with increases seen at rural surface monitors in the west (Cooper et al., 2012; Cooper et al., 2010; Lin et al., 2017). More recent analysis focusing on 2000-2016 shows mixed trends in the free troposphere with only one high altitude surface monitor with a significant increase in its median or 95th percentile concentration. The most recent trends may suggest decreasing future ozone contributions from LBC due to international controls (e.g., van der A et al., 2017). It is left to the discretion of the air agency to determine whether varying future LBC are needed as part of an attainment demonstration. Updated future boundary conditions may be needed when emissions changes are expected outside the domain that will meaningfully change the LBC and impact the area(s) of interest within the domain. This decision should consider both the length of the projection period and the potential for significant air quality changes outside the modeling domain. Additionally, careful consideration of upstream emissions will be needed as

part of any additional future-year regional/hemispheric modeling conducted to develop future LBC. If updated future year LBC are used, those data should be fully described and justified in the modeling protocol.

# 3.0   Evaluating Model Performance

## 3.1   Overview of Model Performance Evaluation

The results of a model performance evaluation (MPE) should be considered prior to using modeling to support an attainment demonstration or regional haze assessment. The objective of the MPE is to demonstrate that the base case model can simulate observed pollution concentrations during historical pollution episodes, and to develop confidence that the model can reliably predict how future pollution levels will change in response to changes in emissions. A particular concern in photochemical models is that compensating errors in the model can cause the model to reproduce observed pollution concentrations in the base case while incorrectly representing the emissions, dispersion and chemistry processes that control pollution formation. Models that achieve good performance through compensating errors may not be reliable for predicting how pollution levels will respond to future emissions reductions. However, if an operational evaluation is conducted over a large enough spatial and temporal scale to incorporate a variety of meteorology and emissions conditions, good model performance is less likely the result of compensating error. Thus, a key goal of the MPE is to demonstrate that the model is getting good results for the right reason (Russell and Dennis, 2000) and to show that the model is able to capture pollution concentrations over the range of conditions that are relevant for the regulatory application being undertaken. In addition, the MPE can provide air agencies with tools to identify and fix causes of poor model performance such as problems in the meteorological, emissions, or boundary condition input files.

Dennis et al. (2010) describe an MPE framework that includes four different approaches that can be used to evaluate air quality models:

1. Operational evaluation techniques include statistical and graphical analyses aimed at determining whether the modeled simulated variables are comparable to measurements.
2. Diagnostic evaluation focuses on process-oriented analyses that determine whether the individual processes and components of the model system are working correctly, both independently and in combination.
3. Dynamic evaluation assesses the ability of the air quality model to predict changes in air quality given changes in source emissions or meteorology, the principal forces that drive the air quality model.
4. Probabilistic evaluation attempts to assess the level of confidence in the model predictions through techniques such as ensemble model simulations.

The goal of the operational evaluation is to determine how well the model replicates observed concentrations of $PM_{2.5}$ components, ozone and their precursors. Diagnostic and dynamic evaluations are used to determine whether the model accurately represents the processes that determine pollutant concentrations, including emissions, dispersion, chemical reactions, and deposition (i.e., to determine if the model is getting good results for the right reason). For cases in which the model performs poorly in the operational evaluation, the diagnostic and dynamic evaluation can provide insights into the causes of the poor performance and to improve model performance. Ultimately, the goal of these evaluation methods is to assess the degree of confidence in the use of the model as a tool to inform the planning process, and more specifically, to determine how reliably the model predicts the response of ozone and/or $PM_{2.5}$ to changes in emissions. The modeled attainment and regional haze tests use models to predict the response of ozone and/or $PM_{2.5}$ to changes in emissions and then applies the resulting relative response factors (RRFs) to observed (rather than modeled) ambient data. Thus, while historically, most of the effort has focused on the operational evaluation, the relative test makes the diagnostic and dynamic evaluation also important.

At a minimum, a model used for air quality planning purposes should include a complete operational MPE using all available ambient monitoring data for the base case model simulation period. Section 3.2 describes the types of metrics and plots that are typically developed as part of an operational MPE, and section 3.3 describes ambient data that is available through continuously operating monitoring networks. If available, monitoring data from special field studies and other research data may also be used in the operational MPE.

Where practical, the MPE should also include some level of diagnostic evaluation. The use of sensitivity studies, process analysis, indicator ratios and source apportionment approaches for diagnostic evaluation, including dynamic and probabilistic evaluations are described in section 3.4. Given that air agencies might have limited resources and time to perform diagnostic and dynamic evaluation, the use of these methods may be limited in scope in a typical regulatory modeling application. However, more comprehensive diagnostic testing of the model can be a valuable component of the weight of evidence analysis used to support a SIP model attainment demonstration.

From an operational standpoint, the EPA recommends that air agencies compare their evaluation results against similar modeling exercises to ensure that the model performance approximates the quality of other applications. Recent literature reviews (Simon et al, 2012; Emery et al., 2017) summarize photochemical model performance for applications published in the peer-reviewed literature between 2006 and 2012. These reviews may serve as a resource for identifying typical model performance for state of the science modeling applications. It is clear that there is no single definitive test for evaluating model performance. All of the tests

mentioned here have strengths and weaknesses. Further, even with a single performance test, it is not appropriate to assign "bright line" criteria that distinguish between adequate and inadequate model performance. In this regard, the EPA recommends that a "weight of evidence" approach be used to determine whether a particular modeling application is valid for assessing the future attainment status of an area. The EPA recommends that air agencies conduct a variety of performance tests and weigh them qualitatively to assess model performance. Provided suitable databases are available, greater weight should be given to those tests which assess the model capabilities most closely related to how the model is used (i.e., tests that provide insight into the accuracy of the model's relative response to emissions reductions should be given more weight). Generally, additional confidence should be attributed to model applications in which a variety of the tests described here are applied and the results indicate that the model is performing well.

## 3.2   Operational Evaluation

An operational evaluation is used to assess how accurately the model predicts observed concentrations. The underlying rationale is that if we are able to correctly characterize historical concentrations of ozone, PM and their precursors for a variety of meteorological conditions, this gives us some confidence that we can correctly characterize future concentrations under alternative emissions levels. Typically, this type of evaluation is comprised of statistical assessments of modeled versus observed data. Operational evaluations are generally accompanied by graphical and other qualitative descriptions of the model's ability to replicate historical air quality patterns. An operational evaluation provides a benchmark for model performance and can therefore identify model limitations and uncertainties that may require further model development/improvement and/or diagnostic evaluation

The robustness of an operational evaluation is directly related to the amount and quality of the ambient data available for comparison. An operational evaluation for ozone would ideally include co-located measurements of ozone precursors NOx and VOC and vertical profile measurements that can be used to determine the extent of vertical mixing of pollutants and the concentration of ozone and precursors above the boundary layer.

An operational evaluation for $PM_{2.5}$ and regional haze is similar to that for ozone; however, an important difference is that $PM_{2.5}$ consists of many component species and is typically measured with a 24-hour averaging time. The chemical components of $PM_{2.5}$ should be evaluated individually. In fact, in undertaking an operational assessment, it is more important to evaluate the components of $PM_{2.5}$ than to evaluate total $PM_{2.5}$. Apparent "good performance" for total $PM_{2.5}$ does not indicate whether the model is predicting the proper mix of components, which is important for the modeled attainment test or regional haze

assessment. If performance of the major components is good, then it follows that performance for total $PM_{2.5}$ will also be good. In addition to measurements of VOC and NOx, which are precursors for organic aerosols and nitrate, a $PM_{2.5}$ model evaluation should also include measurements of gaseous precursors $SO_2$ and (where available) $NH_3$. Due to the influence of initial conditions, model predictions from the spin-up days should be excluded from the analysis of model performance.

## 3.2.1 Metrics

Operational evaluations quantify model performance through a variety of statistical metrics. Recommended metrics are described below and shown in Table 3.1. It is important to include multiple statistical measures in any operational evaluation to fully characterize model performance. At a minimum, we recommend evaluating: Mean Observed, Mean Model, Mean Bias, Mean Error and/or Root Mean Square Error, Normalized Mean Bias and/or Fractional Bias, Normalized Mean Error and/or Fractional Error, and the correlation coefficient. The equations for calculating each of these metrics are given in Table 3.1.

<u>Mean Observed</u>: The time-averaged mean observed value (in ppb or $\mu g/m^3$).

<u>Mean Model</u>: The time-averaged mean predicted value (in ppb or $\mu g/m^3$) paired in time and space with the observations.

<u>Mean Bias</u> (MB): This performance statistic averages the model/observation residual paired in time and space. A value of zero would indicate that the model over-predictions and model under predictions exactly cancel each other out. This metric is reported in the unit of measure (ppb or $\mu g/m^3$).

<u>Mean (Gross) Error</u> (ME/MGE): This performance statistic averages the absolute value of the model/observation residual paired in time and space. A value of zero would indicate that the model exactly matches the observed values at all points in space/time. This metric is reported in the unit of measure (ppb or $\mu g/m^3$).

<u>Root Mean Square Error</u> (RMSE): This performance statistic (in units of ppb or $ug/m^3$) is a measure of the average distance between predicted and observed values. It is calculated as the standard deviation of the difference between modeled and observed values.

<u>Normalized Mean Bias</u> (NMB): This statistic (given in units of percent) is used to normalize MB to the average observed value. NMB values range from -100% to +infinity. Consequently, negative and positive bias values using this metric are not symmetrical around 0.

<u>Normalized Mean Error</u> (NME): This performance statistic (given in units of percent) is used to normalize the mean error relative to the average observation. This statistic averages the

absolute value of the difference (model - observed) over the sum of observed values. NME values range from 0 to +infinity.

(Mean) Fractional Bias (MFB/FB):  Fractional bias is determined by normalizing the MB by the average of observed and modeled concentrations. The range of FB is -200% to +200%. The fractional bias for cases with factors of 2 under- and over-prediction are -67 and + 67 percent, respectively (as opposed to -50 and +100 percent, when using normalized bias). Fractional bias equally weights positive and negative bias estimates (underestimates and overestimates are symmetrical around 0).

(Mean) Fractional Error (MFE/FE):  Fractional error is determined by normalizing the ME by the average of observed and modeled concentrations. The range of values for FE is 0 to 200%. It is similar to the fractional bias except the absolute value of the difference is used so that the error is always positive.

Correlation Coefficient (r) and Coefficient of Determination ($R^2$): These performance statistic measures the degree to which two variables are linearly related. A correlation coefficient of 1 indicates a perfect linear relationship; whereas a correlation coefficient of 0 means that there is no linear relationship between the variables.  A correlation coefficient of less than 0 indicate anti-correlation.  The Coefficient of Determination is always positive.

**Table 3.1:** Definitions of recommended statistical metrics

| Abbreviation | Term | Definition |
|---|---|---|
| MB | mean bias | $\dfrac{1}{N}\sum (M_i - O_i)$ |
| ME | mean error | $\dfrac{1}{N}\sum |M_i - O_i|$ |
| RMSE | root mean squared error | $\sqrt{\dfrac{\sum (M_i - O_i)^2}{N}}$ |
| FB | fractional bias | $100\% \times \dfrac{2}{N}\sum \dfrac{(M_i - O_i)}{(M_i + O_i)}$ |
| FE | fractional error | $100\% \times \dfrac{2}{N}\sum \dfrac{|M_i - O_i|}{(M_i + O_i)}$ |
| NMB | normalized mean bias | $100\% \times \dfrac{\sum (M_i - O_i)}{\sum O_i}$ |

| NME | normalized mean error | $100\% \times \dfrac{\sum |M_i - O_i|}{\sum O_i}$ |
|---|---|---|
| r | Correlation coefficient | $\left( \dfrac{\sum_1^N \left( (M_i - \bar{M}) \times (O_i - \bar{O}) \right)}{\sqrt{\sum_1^N (M_i - \bar{M})^2 \sum_1^N (O_i - \bar{O})^2}} \right)$ |
| r$^2$ | coefficient of determination | $\left( \dfrac{\sum_1^N \left( (M_i - \bar{M}) \times (O_i - \bar{O}) \right)}{\sqrt{\sum_1^N (M_i - \bar{M})^2 \sum_1^N (O_i - \bar{O})^2}} \right)^2$ |

$M_i$ = modeled concentration i. $O_i$ = observed concentration i. N = number of paired obs/model concentrations. $\bar{M}$ = mean modeled concentration. $\bar{O}$ = mean observed concentration.

Observations and model predictions should initially be paired in time and space, matching the temporal resolution of the raw observation data. When matching in time, modelers should pay special attention to making sure that monitor and model data are both in local standard time. The units of time associated with model and observed concentrations can be 24-hour (usually for PM and its species), hourly (usually for species with continuous measurements, like ozone), or sometimes weekly (such as for CASTNet filter pack measurements). Temporal averaging is appropriate when used to match a relevant regulatory metric such as maximum 8-hr daily average ozone. As appropriate, air agencies should then aggregate the raw statistical results into meaningful groups of sub-regions or sub-periods. For example, examining model performance within and near the non-attainment area(s) of interest may be more important than performance in other parts of the modeling domain. For larger areas with more spatial variation, it may also be informative to evaluate sub-regions within the non-attainment area. In addition to any spatially aggregated statistics, model performance should also be evaluated at individual monitors within the nonattainment area. Similarly, priority may be placed on examination of the days that are potentially used in the attainment test (i.e., base period days with 8-hour ozone > 60 ppb). That is not to say that model performance evaluations should ignore performance on lower ozone days or in areas outside of the nonattainment areas. Model performance on lower concentration days and in areas outside of the nonattainment area are still important, but it is appropriate to give more attention to the model outputs that most directly impact the outcome of the attainment test. Unlike attainment demonstrations, model performance on days with low concentrations may be especially important for regional haze analyses. Some IMPROVE sites routinely measure extremely low PM species concentrations (even on the most impaired days).

In terms of pairing model predictions with monitored observations, the EPA recommends that the grid cell value in which the monitor resides be used for the calculations. It would also be acceptable to consider bi-linear interpolation of model predictions to specific monitoring

locations.[29] Air agencies should recognize that, even in the case of perfect model performance, model-observed residuals are unlikely to result in exact matches due to measurement uncertainty and differences in the spatial extent represented by model predictions, which are volume averages, and the observations, which are point values.

### 3.2.2  Plots

In addition to statistical summaries, graphical displays of data allow for a fuller characterization of model performance. Therefore, plots play a key role in any model performance evaluation. Below are examples of some types of plots which have been useful in past evaluations.

**Time series plots** of model and predicted hourly and/or daily concentrations (e.g., maximum 1-hour average, maximum 8-hour average, or 24-hour average) for each monitoring location in the nonattainment area, as well as key sites outside of the nonattainment area. These plots are especially important for examining performance at individual monitors and show how well the model captures temporal variations in pollutant concentrations at individual locations. Time series plots can indicate if there are particular times of day or days/episodes when the model performs especially poorly.

**Figure 3.2.1**     Example time series plot of daily 1-hour maximum ozone concentrations



**Scatter plots** of predicted and observed concentrations at each site. These plots are useful for indicating if there is a particular part of the distribution of observations that is poorly

---

[29]In certain instances, air agencies may also want to conduct performance evaluations using a "near the monitor" grid cell array (i.e., the best match within a 3X3 grid cell array centered on the monitor). A "near the monitor" analysis may be useful when strong ozone gradients are observed, such as in the presence of a sea breeze or in strongly oxidant limited conditions.

represented by the model. It may also be useful to develop separate plots for individual time periods or key sub-regions.

**Figure 3.2.2**    Example scatter plot of 8-hour daily maximum ozone concentrations



**Density plots** are a variation on scatter plots which are especially useful with large amounts of data when individual points overlap on a scatter plot. Density plots color code each point on the scatter plot based on the number of points falling in that location.

**Figure 3.2.3**    Example density plot of 8-hour daily maximum ozone concentrations



**Box plots** can be developed for model performance evaluation. These types of plots show the distribution of observations, model estimates, or performance metrics, which can be grouped

in a variety of ways, most commonly by observed ozone concentration, month, or hour of the day. Box plots can show several quantities: the 25% to 75% percentiles, the median values, and outliers. The monthly box plot can be used to quickly visualize model performance across the entire year, highlighting the seasonal change in model performance. The hourly or "diurnal" box plot is constructed using hourly data, and shows how the model predictions compare against observations throughout an entire day.

**Figure 3.2.4**    Example box plots of (a) monthly average sulfate concentrations, (b) daily diurnal average ozone concentrations, and (c) seasonal ozone bias binned by concentration range



**Spatial plots of model performance at monitor locations** provide an overall picture of the geographic patterns in model performance. Any performance metric can be plotted in this manner, but it is most common to include spatial plots of MB, ME, NMB, and NME. Spatial plots of correlation may also be useful. These plots are most useful when constructed on a monthly or seasonal basis. For ozone these plots may be constructed to include all days or only "high ozone days." For regional haze, these plots may be constructed to include only the 20% most impaired days or 20% clearest days.

**Figure 3.2.5**    Example of spatial plot of NMB at monitor locations for days with $O_3$ above 60 ppb during the 2011 ozone summer season (May-September).



**Daily gridded tile plots** of predicted concentrations across the modeling domain with the actual observations as an overlay. Plots should be prepared for relevant averaging time (i.e., 1-hour maxima, daily 8-hour maxima, 24-hour average, etc.). These plots can reveal locations where the model performs poorly. Superimposing observed concentrations on the predicted isopleths reveals useful information on the spatial alignment of predicted and observed plumes.

**Figure 3.2.6**    Example gridded tile plot of daily maximum 1-hour ozone concentrations (with overlaid observations)



**Animations of predicted hourly concentrations** for all episode days or for certain periods of interest. Animations are useful for examining the timing and location of pollutant formation. Animations may also reveal transport patterns (especially when looking at aloft layers). Animations can also be used to qualitatively compare model outputs with the conceptual model of particular pollution episodes. These plots may also reveal whether an important feature was simulated but was spatially or temporally displaced.

**The soccer plot** (Tesche et al, 2006) is so named because the dotted lines illustrating performance goals resemble a soccer goal. The plot is a convenient way to visualize model performance of both bias and error on a single plot. As bias and error approach zero, the points are plotted closer to or within the "goal," represented by the dashed boxes.

**Figure 3.2.7**    Example soccer plot of sulfate normalized mean bias and error.



**The bugle plot** (Boylan and Russell, 2006; Tesche et al., 2006), named for the shape formed by the criteria and goal lines, is another plot available for model performance evaluation. The bugle plots are shaped as such because the goal and criteria lines are adjusted based on the average concentration of the observed species. As the average concentration becomes smaller, the criteria and goal lines become larger to adjust for the model's ability to predict at low concentrations.

**Figure 3.2.8**    Example bugle plot of sulfate mean fractional bias as a function of modeled concentration.



*Source:  Morris et al, 2005*

## 3.2.3  Ozone Model Performance

It is recommended that, at a minimum, statistical performance metrics be calculated for hourly ozone and 8-hour ozone maxima for each day of the model simulation used to support the attainment demonstration. The EPA recommends that the metrics be calculated both for all pairs of modeled and observed data and for pairs in which the hourly or 8-hour daily max values are above 60 ppb. Another acceptable approach would be to estimate metrics binned by observed ozone concentration. This would allow for a thorough evaluation of the model tendencies to estimate ambient concentrations in different observed ranges of interest. Wherever possible, these types of performance measures should also be calculated for ozone precursors and related gas phase oxidants.

Ozone precursors and related gas-phase oxidants (partial list) are listed below.

- Total Volatile Organic Compounds (VOCs)
- Speciated VOC

- Nitric acid ($HNO_3$)
- Nitric oxide (NO)
- Nitrogen dioxide ($NO_2$)
- Peroxyacetyl nitrate (PAN)
- NOy (NOx=NO+$NO_2$ and other oxidized nitrogen compounds)
- Carbon monoxide (CO)

### 3.2.4  $PM_{2.5}$ Model Performance

Performance metrics for PM and regional haze are similar to those calculated for ozone. Metrics should be estimated for components of $PM_{2.5}$ and PM precursors. Since modeling for $PM_{2.5}$ and regional haze will likely require modeling different times of year, season-specific statistics and graphical displays are helpful for evaluating and diagnosing model performance. Statistics and graphics can be averaged for various time scales depending on the model application. For example, statistical metrics and scatterplots can show daily averaged ambient-modeled pairs or annual average pairs for attainment demonstration of the daily and annual $PM_{2.5}$ standards respectively. In addition, the EPA recommends that daily pairs be grouped by season or month and statistics be given for different times of the year since different processes dominated $PM_{2.5}$ formation and fate in different seasons. Note that in this case, pairings should be performed on 24-hour average concentrations and statistics may then be reported for subgroups (seasons, regions etc.) of this data. This is different than pairing monthly or seasonally averaged data since statistics and plots tend to look "better" as the averaging time increases from daily to monthly to quarterly to annual. As such, daily pairs should always be examined to ensure a detailed look at model performance on the time scale of the measurements (24-hour average). Finally, air agencies may also want to subset the 20% clearest and most impaired visibility days at IMPROVE sites or the "high" modeled $PM_{2.5}$ days (e.g. the 10% highest modeled days in each quarter) to examine model performance on the days which will potentially be used to evaluate air quality goals.

Because $PM_{2.5}$ is a mixture, a meaningful performance evaluation should include an assessment of how well the model is able to predict individual chemical components that constitute $PM_{2.5}$. Components of $PM_{2.5}$ of interest include:

- Sulfate ion ($SO_4$)
- Nitrate ion ($NO_3$)
- Ammonium ion ($NH_4$)
- Elemental Carbon (EC)

- Organic Carbon (OC) and/or Organic Carbon Mass[30]
- Crustal (weighted average of the most abundant trace elements in ambient air)
- Sea salt constituents (Na and Cl)[31]
- Other mass including Non-Carbon Organic Matter (NCOM) and metal oxides not captured by the crustal component

There are a number of gas-phase species that can be used to evaluate $PM_{2.5}$. Their presence may affect the formation of secondary PM and the response of secondary PM components to emissions strategies. Also, the model's performance in predicting certain gaseous species may provide diagnostic clues which help explain poor performance. Gas phase species of most interest for performance evaluation due to being a direct precursor to secondarily formed $PM_{2.5}$ are listed below:

- Nitric acid ($HNO_3$)
- Ammonia ($NH_3$)
- Sulfur dioxide ($SO_2$)
- Volatile Organic Compounds (VOCs)

Other related gas-phase oxidants (partial list) that indirectly influence $PM_{2.5}$ formation and destruction are listed below.

- Ozone ($O_3$)
- Nitric oxide (NO)
- Nitrogen dioxide ($NO_2$)
- Peroxyacetyl nitrate (PAN)
- NOy (sum of NOx and other oxidized compounds)
- Carbon monoxide (CO)
- Hydrogen peroxide ($H_2O_2$)

Some of the species listed above are currently available from either existing monitoring network systems and/or special studies. However, it is important to note that many of the species listed above are not routinely measured (e.g., $H_2O_2$, $HNO_3$, and $NH_3$) or measurements are not co-located with speciated PM measurements. Model performance can best be assessed using extensive databases, such as those obtained in major field studies. Where possible, model

---

[30] For predicted/observed comparisons, organic carbon is preferred over organic carbon mass to allow for transparency between model predictions and observed measurements. Ambient measurements will generally only account for the carbon portion of organic carbon. Organic carbon mass may include hydrogen, oxygen, and other components.

[31] White (2008) recommends the use of $1.8xCl^-$ to characterize ambient sea salt concentrations at coastal IMPROVE sites due to uncertainty in the XRF Na measurements.

time periods can be prioritized to correspond to periods when field study or special study data was collected. However, it is recognized that many of the precursor species will not be available for every model application.

## 3.3    Ambient Measurement Networks

Provided below is an overview of some of the various ambient air monitoring networks currently available. Network methods and procedures are subject to change annually due to systematic review and/or updates to the existing monitoring network/program. Please note, there are other available monitoring networks which are not mentioned here and more details on these networks and measurements can be obtained from other sources, if necessary.

### 3.3.1  AQS

The Air Quality System (AQS) is a repository of ambient air pollution data and related meteorological data collected by EPA, state, local and tribal air pollution control agencies from tens of thousands of monitors (it is not an actual monitoring network). The monitoring data in AQS are the result of the various CAA requirements to provide a national database of ambient air pollution data. This information management system contains data on over 1,000 pollutants from 1957 through the present day. AQS contains all the routine hourly gaseous pollutant data collected from State and Local Air Monitoring Stations (SLAMS) sites. SLAMS is a dynamic network of monitors for state and local directed monitoring objectives (e.g., control strategy development) which consists of thousands of monitoring stations. The SLAMS network includes stations classified as NCore, PAMS, and Speciation, and stations formerly categorized as NAMS, but does not include Special Purpose Monitors (SPM) and other monitors used for non-regulatory or industrial monitoring purposes. AQS also contains data from the IMPROVE monitoring network, described separately in section 3.3.3 of this document.

The AQS database includes criteria pollutant data ($SO_2$, $NO_2$, $O_3$, CO, $PM_{10}$, $PM_{2.5}$, and Pb) and speciation data of particulate matter ($SO_4$, $NO_3$, $NH_4$, EC, OC, and crustal material), air toxic data, photochemical assessment data, and meteorological data. The data are measured and reported on an hourly or daily average basis. The AQS system continues to expand to include more ambient air pollutants. An overview of the AQS can be found here. For querying the database or viewing the data one can use the EPA's AirData website, which is a collection of user-friendly visualization tools for air quality analysts. The tools generate maps, graphs, and data tables dynamically. An AQS User's Guide is also available.

### 3.3.2  NCore

The term "NCore monitoring network" (for national core) refers to a set of monitoring sites in major urban areas that generally started operating in 2011.  These sites combine several advanced measurement systems for particles, pollutant gases and meteorology. Specifically, chemical measurements at these sites includes $PM_{2.5}$ speciation, continuous mass, 24-hr filter-based mass, ozone, CO, $SO_2$, NO, NOy. More information about this network is available here.

### 3.3.3  IMPROVE

The Interagency Monitoring of PROtected Visual Environments (IMPROVE) network began in 1985 as a cooperative visibility monitoring effort between EPA, federal land management agencies, and state air agencies (IMPROVE, 2011). Data are collected at Class I areas across the U.S., mostly at national parks, national wilderness areas, and national wildlife refuges. As of 2018, there were approximately 160 IMPROVE sites that have complete annual $PM_{2.5}$ mass and/or $PM_{2.5}$ species data. There are 110 IMPROVE monitoring sites which represent air quality at the 156 designated Class I areas. The additional IMPROVE sites are "IMPROVE protocol" sites, which are generally located in rural areas throughout the U.S., although there are also a handful of urban sites in the U.S. These protocol sites provide additional spatial information across the country, being generally located in areas where there are few Class I areas. The protocol sites use the IMPROVE monitoring samplers and collection routines. In addition to IMPROVE data that is available in AQS, the IMPROVE program provides summary datasets that contains information and pre-calculated data needed for Regional Haze Rule analyses. This includes daily average and annual data for the 20% most impaired and 20% clearest visibility days. The IMPROVE documentation and data can be found here. IMPROVE data advisories are posted here.

### 3.3.4  CASTNet

Established in 1987, the Clean Air Status and Trends Network (CASTNet) is a dry deposition monitoring network where PM data are collected and reported as weekly average data (U.S. EPA, 2012a). In addition, this network measures and reports hourly ozone concentrations. CASTNet provides atmospheric data on the dry deposition component of total acid deposition, ground-level ozone and other forms of atmospheric pollution. The data (except for ozone) are collected in filter packs that sample the ambient air continuously during the week. As of 2018, CASTNet is comprised of 95 monitoring stations across the U.S. The longest data records are primarily at eastern U.S. sites. More information can be obtained through the CASTNet website.

### 3.3.5 CSN

The Chemical Speciation Network (formerly known as STN: The Speciation Trends Network) began operation in 1999 to provide nationally consistent speciated $PM_{2.5}$ data for the assessment of trends at representative sites in urban areas in the U.S. The CSN was established by regulation and is a companion network to the mass-based Federal Reference Method (FRM) network implemented in support of the $PM_{2.5}$ NAAQS. As part of a routine monitoring program, the CSN quantifies mass concentrations and $PM_{2.5}$ constituents, including numerous trace elements, ions (sulfate, nitrate, sodium, potassium, and ammonium), elemental carbon, and organic carbon. As of 2018, there were 52 trends sites in the CSN nationally. CSN trends sites are largely static urban monitoring stations with protocols for sampling methods that are dedicated to characterizing aerosol mass components in urban areas of the U.S. to discern long-term trends and provide an accountability mechanism to assess the effectiveness of control programs. In addition, in 2018, there were approximately 100 supplemental speciation sites that are also part of the CSN. The CSN data at trends sites are collected 1 in every 3 days, whereas supplemental sites collect data either 1 in every 3 days or 1 in every 6 days. Comprehensive information on the CSN and related speciation monitoring can be found here.

### 3.3.6 NADP

Initiated in the late 1970s, the National Acid Deposition Program (NADP) monitoring network began as a cooperative program between federal and state agencies, universities, electric utilities, and other industries to determine geographical patterns and trends in precipitation chemistry in the U.S. NADP collects and reports wet deposition measurements as weekly average data (NADP, 2013). The network is now known as NADP/NTN (National Trends Network), with nearly 200 sites in operation. The NADP analyzes the constituents important in precipitation chemistry, including those affecting rainfall acidity and those that may have ecological effects. The NTN measures sulfate, nitrate, hydrogen ion (measure of acidity), ammonia, chloride, and base cations (calcium, magnesium, potassium). Detailed information regarding the NADP/NTN monitoring network can be found here.

The Ammonia Monitoring Network (AMoN) is a NADP network that provides additional ambient and deposition ammonia data. The network began as part of a special study in 2007, was approved as an NADP network in 2010, and as of 2016 included approximately 50 monitoring sites across the U.S. AMoN monitors collect 2-week average data. More information can be found here.

### 3.3.7  SEARCH

The South Eastern Aerosol Research and Characterization (SEARCH) monitoring network was established in 1998 and is a coordinated effort between the public and private sector to characterize the chemical and physical composition as well as the geographical distribution and long-term trends of $PM_{2.5}$ in the Southeastern U.S. (Edgerton, 2005; Hansen, 2003) The SEARCH network officially shut down in December 2016. However, SEARCH data are still useful for evaluating model performance for any simulations that included the Southeastern U.S. between 1998 and 2016. SEARCH data were collected and reported on an hourly/daily basis. A total of eight sites were operated at one time by SEARCH, although only six operated during SEARCH's final years:  Birmingham, Alabama (urban), Centreville, Alabama (rural), Gulfport, Mississippi (urban), Jefferson Street, Atlanta, Georgia (urban), Oak Grove, Mississippi (rural) (not operational as of 2010), Yorkville, Georgia (rural) (not operational as of 2009), suburban Pensacola, Florida (suburban), and downtown Pensacola, Florida (urban). Historical SEARCH data from 1992-2016 can be accessed here.

### 3.3.8  Speciated $PM_{2.5}$ Data Summary

Speciated $PM_{2.5}$ data play an especially important role in performance evaluation, as the deterministic models predict exact chemical components which can be compared to some of the corresponding measured analytes. There are known positive and negative sampling artifacts as well as analysis artifacts associated with FRM and speciation monitors (Frank, 2006). Due to the complex nature of the measurements, a basic understanding of the various $PM_{2.5}$ and speciation monitoring technology and measurements are needed before undertaking a model evaluation.

**Table 3.2:** Known measurement artifacts for $PM_{2.5}$ and speciated PM for different monitoring networks.

| Network | Measurement | Notes | Sampling Time |
|---------|-------------|-------|---------------|
| FRM | $PM_{2.5}$ | - Negative artifacts: ammonium nitrate, organic carbon<br><br>- Positive artifacts: organic carbon, water | 24-hour average 1/3 days or 1/6 days (some daily sites) |
|  | $PM_{2.5}$ | - Negative artifacts: ammonium nitrate, organic carbon |  |

| Network | Measurement | Notes | Sampling Time |
|---|---|---|---|
| CSN (formally STN) | | - Positive artifacts: organic carbon, water<br><br>-Note that positive and negative artifacts for $PM_{2.5}$ may be different from artifacts for individual PM components because the speciated $PM_{2.5}$ samples are collected on different types of filters than are used for total $PM_{2.5}$ gravimetric measurements<br><br>-CSN $PM_{2.5}$ mass may be different from FRM measurements due to differences in handling procedures | 24-hour average 1/3 days or 1/6 days |
| | $SO_4$ | | |
| | $NO_3$ | | |
| | $NH_4$ | | |
| | OC | - Blank correction is needed to account for positive artifact [32]<br><br>- Before 2007, OC/EC split was operationally defined using Thermal Optical Transmittance (TOT) method (NIOSH). CSN monitors switched to using the Thermal Optical Reflectance (TOR) method (consistent with | |

---

[32] CSN OC measurements reported in AQS currently have artifact correction applied, although ambient data provided in SMAT-CE does already include a blank correction. The same artifact correction techniques are applied to measurements from CSN and IMPROVE networks. The CSN began implementing IMPROVE-like samplers and the IMPROVE analysis method in 2007. The implementation was fully completed in late 2009. Work by Malm et al (2011) suggests that CSN OC from 2005 and 2006 (before the switch in samplers) likely had a positive multiplicative bias of ~1.2 and a positive additive bias between 1.0 and 1.9 $\mu g/m^3$ depending on the time of year. We recommend using artifact corrected measurements where available and adjusting any uncorrected AQS CSN OC data by subtracting 1.4 $\mu g/m^3$ for measurement before the switch to IMPROVE-like measurements and by subtracting 0.12 $\mu g/m^3$ from measurements after the switch based on Frank (2012).

| Network | Measurement | Notes | Sampling Time |
|---|---|---|---|
| CSN (formerly STN) (con't.) | | IMPROVE monitors) between 2007and 2009. [33] | |
| | EC | - Before 2007, OC/EC split was operationally defined using TOT method (NIOSH). CSN monitors switched to using the TOR method (consistent with IMPROVE monitors) between 2007 and 2009(see footnote 23) | |
| CASTNet | $SO_4$ | | weekly average |
| | $NO_3$ | Split between $NO_3$ and $HNO_3$ may not be reliable in warm weather due to conversion from $NO_3$ to $HNO_3$. Recommend comparing total nitrate ($NO_3$ + $HNO_3$) between model and observations. | |
| | $NH_4$ | | |
| | $SO_2$ | | |
| | $HNO_3$ | Split between $NO_3$ and $HNO_3$ may not be reliable in warm weather due to conversion from $NO_3$ to $HNO_3$. Recommend comparing total nitrate ($NO_3$ + $HNO_3$) between model and observations. | |
| | $PM_{2.5}$ | - Negative artifacts: ammonium nitrate, organic carbon<br><br>- Positive artifacts: organic carbon, water | |

---

[33] The transition from TOT to TOR for CSN monitors occurred in shifts: 56 sites switched in May 2007, 63 sites switched in April 2009, and 78 sites switched in October 2009.

| Network | Measurement | Notes | Sampling Time |
|---------|-------------|-------|---------------|
| IMPROVE | | -Note that positive and negative artifacts for $PM_{2.5}$ may be different from artifacts for individual PM components because the speciated $PM_{2.5}$ samples are collected on different types of filters than are used for total $PM_{2.5}$ gravimetric measurements | 24-hour average 1/3 days |
| | $SO_4$ and S | -IMPROVE monitors measure both elemental S (by XRF) and ionic $SO_4^-$ by ion chromatography. Generally, either measurement is reliable and may be used for model evaluation purposes although some caveats should be noted. [34] | |
| | $NO_3$ | | |
| | $NH_4$ | -Only available at a limited number of sites for a limited number of years | |
| IMPROVE (con't.) | Organic Carbon | - OC/EC split is operationally defined using Thermal Optical Reflectance (TOR) analysis.<br><br>- Blank corrections based on a median measured positive OC artifact from back-up filters at six sites are applied on a month-specific basis to all data before they are reported (Chow et al, 2010; Watson et al., 2009). Frank (2012) recommended changing blank | |

---

[34] Hyslop et al (2012) report that XRF elemental sulfur measurements are somewhat affected by changes in XRF methodologies over time. Also, prior to 2000, filters used to collect sulfate for ion chromatography became clogged during high sulfate episodes. Changes in filter collection techniques eliminated this problem after 2000. In addition, recent literature by Tolocka and Turpin (2012) suggests that differences between XRF sulfur and ion chromatography sulfate are due to the presence of organic sulfur in aerosol (which would be measured by XRF but not IC). If this is the case, then the IC sulfate measurement is more appropriate for comparison with modeled sulfate which generally does not include formation of organic sulfur compounds.

| Network | Measurement | Notes | Sampling Time |
|---------|-------------|-------|---------------|
| | | correction procedures for both IMPROVE and STN OC measurements. These recommendations have not yet been implemented. | |
| | Elemental Carbon | - OC/EC split is operationally defined using Thermal Optical Reflectance (TOR) analysis. | |
| | Sodium | XRF analysis is not as sensitive to sodium as other methods and generally under-reports sodium concentrations. | |
| | Silicon | XRF silicon measurements are unreliable at high sulfur conditions (when S/Si > about 7) | |
| | Aluminum | Elemental concentrations above the MDL can go undetected. IMPROVE has published an alternate soil calculation which estimates Al based on Si concentrations. [35] | |

In general, the speciated $PM_{2.5}$ data can be directly compared to the model outputs. Of note, care should be taken in examining issues with blank corrections for organic carbon (especially when measured OC is low) as well as the EC/OC split. Prior to 2006, the CSN and IMPROVE networks used different analysis techniques when estimating EC and OC (CSN monitor locations switched to a similar method to IMPROVE between 2007 and 2009, depending on the monitor). The EC/OC analysis method will generally have a larger impact on EC concentrations than OC concentrations. The difference in OC/EC splits between the two techniques has been investigated in depth in the literature and by IMPROVE staff (Chow, 2001, Chow, 2010, White, 2007). It may not be appropriate to compare EC concentrations between networks for years prior to 2009 (although the data can still be used to evaluate model performance).

Total $PM_{2.5}$ mass measured gravimetrically at CSN and IMPROVE monitors is known to have several measurement artifacts (both positive and negative) (Frank, 2006, Simon et al., 2011,

---

[35] Due to difficulties in detecting Al, IMPROVE sometimes uses an alternative SOIL calculation which does not include Al: SOIL = 3.48*Si + 1.63*Ca + 2.42*Fe + 1.94*Ti (http://vista.cira.colostate.edu/improve/publications/SOPs/ucdavis_sops/sop351_V2.pdf).

Malm et al., 2011). Consequently, summing the mass of all $PM_{2.5}$ species components is not likely to give the same answer as the total measured $PM_{2.5}$ mass from a Teflon filter. Therefore, model evaluations should concentrate on comparisons with speciated $PM_{2.5}$ components at these sites, rather than total $PM_{2.5}$ mass.

FRM monitors do not measure all of the $PM_{2.5}$ in the air, and the speciation samplers don't measure $PM_{2.5}$ in the same way as the FRM monitors (Frank, 2006). Due to these positive and negative artifacts, the FRM data may not be directly comparable with model outputs without adjustment. The models predict PM species as they might be measured in the ambient air, but the FRM measurements may not always measure what is in the air (due to known positive and negative artifacts). As part of the $PM_{2.5}$ attainment test, we recommend default methodologies to adjust speciation (CSN and IMPROVE) data to better approximate the FRM data (see sections 4.4 and 4.5). A similar adjustment could be made to the model output data to allow the direct comparison to FRM measurements. However, as noted earlier, there may be limited value of information gained by evaluating daily average total measured $PM_{2.5}$ mass (as compared to $PM_{2.5}$ components). More meaningful information may be gleaned from continuous $PM_{2.5}$ ambient data.

Another issue to consider when comparing modeled and observed PM concentrations is the size definitions for PM. IMPROVE and CSN ambient monitors measure $PM_{2.5}$ using inlets which screen out any particles with aerodynamic diameters greater than 2.5 μm. Air quality models use varying schemes to characterize particulate matter size distributions. The two most common modeling schemes are the sectional treatment and the modal treatment. The default configuration for CAMx includes a sectional aerosol treatment while the default configuration for CMAQ includes a modal aerosol treatment, although other versions of these models exist with alternate aerosol treatments. Sectional aerosol modules split particles into bins defined using discrete size cut-points based on aerodynamic diameter (e.g., particles with aerodynamic diameters between 1 μm and 2.5 μm). One common sectional set-up includes 2 bins, one containing particles with aerodynamic diameters < 2.5 μm (fine PM) and one containing particles with aerodynamic diameters > 2.5 μm (coarse particles). Other models have split the fine PM into more than two bins (Nolte et al., 2008; Pandis et al., 1993). With sectional models, the comparison to measured $PM_{2.5}$ is straightforward so long as one of the PM bins has a cutoff at an aerodynamic diameter of 2.5 μm (i.e., add up PM mass in all bins less than 2.5 μm). The modal approach treats PM as occurring in distinct "modes," each one having a lognormal distribution. Each PM mode is characterized by the geometric mean diameter and the geometric standard deviation of the diameter (the geometric mean and standard deviation can be tracked for particle number, surface area, mass or all three). With modal aerosol treatment, $PM_{2.5}$ can be estimated in several ways. One method is to simply sum the mass in the modes that generally contain fine PM. Another method would be to use the geometric mean and

standard deviation to calculate the fraction of PM mass in each mode which is associated with particles less than 2.5 μm. However, there are several complicating factors with taking the second approach. First, the EPA's NEIy and many other inventories define $PM_{2.5}$ as being entirely less than 2.5 μm in diameter. If these primary emissions are injected into a modal model (generally into a fine PM mode), they are instantaneously mixed with existing aerosol mass in that mode. The tail of the fine PM mode will include particles greater than 2.5 μm. Therefore, a fraction of the PM that was operationally defined as primarily emitted $PM_{2.5}$ (diameter < 2.5 μm) would be incorrectly distributed into the > 2.5 μm size range based on the mode distribution. If primary emissions were quantified based on modes versus a discrete cut-point, then this would not be a problem. Secondly, some modal models have been shown to over-predict the peak-concentration diameter and distribution width of the fine PM mode (Kelly et al., 2011; Kelly et al., 2010). This would lead to under-predictions of the $PM_{2.5}$ fraction by increasing the mass fraction in the > 2.5 micron diameter range. Air agencies should consider these complications when deciding whether to calculate the fraction of PM mass in each mode below the 2.5 μm cut-point or to simply sum mass over the fine PM mode(s).

Finally, although we recommend weighing performance of speciated PM components more heavily than total PM, some additional insight can be gained by looking at Federal Equivalent Method (FEM) continuous $PM_{2.5}$ measurements[36]. Since speciated measurements are generally derived from filters, these measurements are usually taken as 24-hour averages. The FEM continuous measurements provide a diurnal profile of $PM_{2.5}$ concentrations that can be compared against hourly model outputs to determine whether the model is replicating the measured temporal pattern.

## 3.4   Diagnostic Evaluation

The goal of a diagnostic model evaluation is to determine whether the model correctly represents the physical and chemical processes that control the ambient concentrations of precursors and secondary pollutants. It is possible that a model can incorrectly represent the relative amount of primary emissions versus secondary production or that a model can incorrectly represent the importance of dispersion, deposition or chemical reaction as a sink. Thus, the ability of a model to accurately reproduce the observed concentration of a particular pollutant does not guarantee that the model correctly simulated the processes that determine the concentration of the pollutant. The goal of a diagnostic evaluation is to investigate the processes that determine the ambient concentrations of ozone, $PM_{2.5}$ and their precursors, and to develop confidence that the model can accurately predict how these concentrations will

---

[36] Monitoring of atmospheric air quality for purposes of determining compliance with the NAAQS generally requires the use of either Federal reference methods (FRM) or equivalent methods (FEM), as specified in Section 2.1 of Appendix C to 40 CFR part 58.

change in the future (e.g., Arnold et al., 2006). It is likely that research grade measurements needed to perform a diagnostic evaluation will not be available in many SIP modeling studies, however, it can still be valuable to perform diagnostic analyses and compare the results with previous modeling research studies.

Several different tools and analysis methods are available for use in diagnostic model evaluation including process analysis, indicator ratios, source apportionment methods, model sensitivity studies, and retrospective studies.

### 3.4.1  Process Analysis

Both the CMAQ and CAMx models include a process analysis tool (Jeffries and Tonnesen, 1994) that provides additional diagnostic information on the chemical reactions and physical processes (e.g., emissions, deposition, advection, vertical mixing, and net change from chemistry) that determine species concentrations. Chemical reaction data can be output either as the hourly integrated reaction rate (IRR) for each reaction or as a summary of key reactions in the chemical process analysis (CPA). Physical processes can be output as hourly concentration changes in the integrated process rate (IPR) file. Detailed analysis off IRR and IPR outputs have been demonstrated in research studies (Jang et al., 1995; Vizuete et al., 2008; Henderson et al., 2011), but significant time and effort are required to complete these analyses. The CPA output provides a more limited set of chemical process information that is more accessible and that can be visualized using the same tools used to analyze model concentration output files. Minimal computational cost is required to produce the CPA files, and they are in the same format as the model concentration files and can be viewed using the same visualization tools. Below are examples of these plots comparing modeled ozone concentration, daily total Ox (Ox = O3 + O3P + O1D + NO2 +2*NO3 + PNA + PAN + 3*N2O5) production, and net ozone production in NOx limited and oxidant limited chemical regimes. The CPA tool can also provide information on the chemical reactions of VOC, NOy and radical species. The need for a process analysis evaluation and the specific processes investigated should be determined on a case-by-case basis.

**Figure 3.4.1**    Chemical process analysis plots showing modeled ozone concentration, daily total Ox production, and net ozone production under VOC sensitive and NOx sensitive conditions.



## 3.4.2  Indicator Ratios

One way to evaluate the response of the model is to examine predicted and observed ratios of indicator species. Indicator species techniques have been developed for both ozone and secondary PM species (in particular nitrate) (Sillman, 1995, 1998; Ansari and Pandis, 1998;

Blanchard et al., 2000; Tonnesen and Dennis, 2000a and 2000b). If ratios of observed indicator species are very high or very low, they provide a sense of whether further ozone or secondary $PM_{2.5}$ production at the monitored location is likely to be limited by availability of NOx or VOC (or $NH_3$ in the case of particulate nitrate). Agreement between paired observed and predicted ratios suggests a model may correctly predict the sensitivity of ozone or secondary $PM_{2.5}$ at the monitored locations to emission control strategies. Thus, the use of indicator species aims to validate the modeled chemical regime and may help to build confidence in the RRFs predicted from the specific model application.

For ozone, measurements of certain "indicator species ratios" (e.g., comparisons between modeled and observed ratios: $O_3/NO_y$, $O_3/HNO_3$) are a potentially useful way to assess whether local ozone formation is VOC or $NO_x$ limited at any particular point in space and time, as well as help reveal whether the model is correctly predicting the sensitivity of ozone to VOC and/or $NO_x$ controls (Millford et al., 1994; Sillman, 1995, 1997, 1998, 2002; Lu and Chang, 1998). Tonnesen and Dennis (2000a and 2000b) distinguished between short lived indicators of instantaneous rates of production of ozone ($PO_3$) or odd oxygen ($PO_x$) versus long lived indicators of peak ozone concentration and found that the ratio of production of $H_2O_2$ to production of $HNO_3$ ($PH_2O_2/PHNO_3$) is strongly associated with $PO_x$ sensitivity to VOC and $NO_x$. Tonnesen and Dennis also found that the ratio of formaldehyde to $NO_2$ was useful as an indicator of ozone sensitivity, and this ratio can be evaluated using satellite data (Martin et al., 2004; Duncan et al., 2010). For PM, such a comparison may reveal whether the model is predicting sensitivity of secondary components of $PM_{2.5}$ to changes in $SO_2$, $NH_3$, VOC and/or $NO_x$ controls correctly (Ansari and Pandis, 1998; Blanchard et al., 2000; Pun and Seigneur, 1999, 2001). If a model accurately predicts observed indicator species relationships, then one can conclude with additional confidence that the predicted change in future year ozone or PM may be accurate.

Although ratios of indicator species have the potential to be quite useful, they should be used with caution since different studies have identified different ranges of values to characterize VOC and NOx limited regimes in different locations. Table 3.3 summarizes the range of values determined for 10 indicator species or ratios in various studies. In cases where the NOx and VOC limited ranges are broad or overlap, air agencies should attempt to use values from studies in the local area. Air agencies should be cautious with respect to the use of indicator species when the range of observed values does not provide a clear direction of control. When this occurs, agreement between predictions and observations does not necessarily imply that the response to controls as predicted by the model is correct (especially for secondary particulate matter to changes in precursors). If a model predicts observed values of indicator species relationships such that observed and predicted value fall within the same range, this provides

some confidence that the predicted change in ozone or secondary particulate matter may be accurate.

A second precaution is that this method often requires more types of measurements than are commonly available. In some cases, it may be difficult to calculate meaningful indicator ratios from relatively imprecise measurements from routine monitoring networks.

**Table 3.3:** Ranges of indicator species/ratios that have been reported for VOC and NOx limited regimes.

| indicator | median VOC-sensitive | transition | median NO$_x$-sensitive |
|---|---|---|---|
| O$_3$/NO$_y$ | 1.6 - 8.8[a,b,d,f-m] | $6 - 15$[c,d,m,n,q] | $8.8 - 26$[a,b,d,f-m] |
| O$_3$/NO$_z$ | 5.8 − 16[a,d,f,j-m] | $7 - 100$[c-f,n,q] | $10.1 - 35$[a,d,f,j-m] |
| O$_3$/NO$_x$ | < 15 | $15 - 60$[n,o,q,t] | > 40 |
| O$_3$/HNO$_3$ | 7 - 33.9[a,d,j,k,m] | $12 - 25$[c,d] | $17.2 - 62.9$[a,d,j,k,m] |
| H$_2$O$_2$/HNO$_3$ | 0.3 - 1.5[d,j-m] | 0.2 - 2.4[c,e,h,n-q] | 0.4 - 3.6[d,j-m] |
| H$_2$O$_2$/NO$_z$ | 0.2 - 1.1[a,j] | 0.2 - 0.25[c] | 0.6 - 1.3[a,j] |
| H$_2$O$_2$/NO$_y$ | 0.2 - 0.4[a,j] | 0.12 - 0.17[c] | 0.6 - 1.0[a,j] |
| HCHO/NO$_2$ | < 1 | 1-2[n,o,u] | > 2 |
| NO$_z$/NO$_y$ | < .5 | 0.5-0.6[f] | > 0.6 |
| NOy | 7.7 - 12.2[j] | 5 -2 0[c,e,f,n,r,s] | 3.2 - 5.7[j] |

[a]Castell et al., 2009; [b]Xie et al., 2011; [c]Torres-Jardon and Keener, 2006; [d]Sillman and He, 2002; [e]Sillman, 1995; [f] Lu and Chang, 1998; [g]Stein et al, 2005; [h]Sillman et al., 1997; [i]Martilli et al., 2002; [j]Jimenez and Baldasano, 2004; [k]Torres-Jardon et al, 2009; [l]Chock et al, 1999; [m]Sillman et al., 2003; [n]Zhang et al, 2009; [o]Tonnesen and Dennis, 2000a; [p]Hammer et al., 2002; [q]Liang et al., 2006; [r]Milford et al, 1994; [s]Vogel et al, 1995; [t]Tonnesen and Dennis, 2000b; [u]Martin et al., 2004

Much of the work done to date with indicator species has focused on peak concentrations of ozone. Limited research has been conducted on development of indicator ratios for secondary PM. This includes work by Blanchard et al., (2000) who examined how indicator species might be used to assess whether particulate nitrate concentrations are limited by NOx or by ammonia

emissions using mechanisms which incorporate reactions dealing with secondary PM. These authors identify several indicators which appear potentially useful for determining limiting precursors for secondary nitrate PM. The indicators include:

(1) excess $NH_3$ defined in Equation 3-1 (values greater than zero indicate NOx limited regimes and values less than 0 indicate ammonia limited regimes);

$$excess\ NH_3 = [NH3(g)] + [NH4+(a)] - 2*[SO42-(a)] - [NO3-(a)] - [HNO3(g)] \\ - [HCl(g)] + 2*[Ca2+] + 2*[Mg2+] + [Na+] + [K+] + [Cl-]$$

[3-1][37]

(2) The ratio of particulate to total nitrate. Values above 0.9 at high temperatures indicate NOx limited regimes (values below 0.3 to 0.5 were indicative of ammonia limited regimes).

Ansari and Pandis (1998) also have suggested the use of the gas ratio (GS), defined in equation 3-2, as an indicator of PM formation regimes.

$$GS = \frac{NH_3^F}{HNO_3^T}$$

[3-2][38]

In summary, major challenges in evaluating indicator species include variability in the characteristic ratios for VOC and NOx limited regimes in different locations and the availability of ambient data. Despite these caveats, comparing predicted and observed relationships of indicator species provides a means of assessing a model's ability to accurately characterize the sensitivity of predicted ozone and predicted secondary components of $PM_{2.5}$ to changes in precursors.

### 3.4.3  Source Apportionment

Source apportionment methods and model sensitivity studies are two complementary approaches that can be used to identify emissions sources that contribute to high pollutant concentrations. While these tools do not directly diagnose the model's ability to replicate the real world, they are useful in their ability to further characterize the sources that are most important to high pollutant concentrations within the model. The CMAQ and CAMx models both include options to use source apportionment tools to identify sources that contribute to

---

[37]Concentrations are in μmol/m³, (g) represent gas-phase and (a) represents aerosol phase.

[38]$NH_3^F$ is free ammonia (total ammonia – 2*sulfate). $HNO_3^T$ is total nitrate (gas + PM).

the production of ozone (Ramboll, 2018; Kwok et al, 2014) and some components of $PM_{2.5}$, including sulfate, nitrate, ammonium and primary emissions of $PM_{2.5}$ (Ramboll, 2018; Kwok et al., 2013). Source apportionment tools employ a set of model tracers to attribute pollutant concentrations to user selected emissions source sectors and geographic areas. This approach can be useful both as a diagnostic tool to identify sources that contribute to ozone and $PM_{2.5}$ and also as an aid in regulatory analysis to identify emissions control measures that will be effective for attaining air quality standards. An advantage of source apportionment approaches is that tracers attribute the mass contribution from a source to a receptor and, therefore, this approach is less susceptible to the effects of non-linear chemistry, which can complicate the interpretation of model sensitivity simulations.

### 3.4.4  Sensitivity Studies

Model sensitivity simulations can be used to identify model inputs (IC/LBC, meteorological data, chemical reactions, and emissions) that have the greatest impact on model-predicted concentrations. The objective of sensitivity tests is to identify whether the inputs have a large enough influence that errors in these inputs could be a driving influence on the model predictions. In "brute-force" sensitivity simulations, the model input data is modified directly (e.g., increasing or decreasing emissions in the model input file). Brute-force simulations are relatively easy to implement but are resource intensive when many different inputs must be evaluated. The Direct Decoupled Method (DDM) is an approach that can be used to evaluate the first order sensitivity to multiple model inputs in a single model simulation (e.g., Cohan et al., 2005; Napelenok et al., 2006). Because of non-linearity in chemical reactions, first-order sensitivity is not always sufficient, and high-order DDM (HDDM) can be used to evaluate second order sensitivities to inputs that are subject to non-linear chemistry (Zhang et al., 2012b).

In cases where the model performs poorly in the base case, sensitivity simulation may be useful to identify potential causes for poor model performance. However, caution should be used in modifying inputs to achieve good model performance because arbitrarily "tuning" of model input data to fit the observations can introduce compensating errors. For example, if a model underestimates observed ozone because the meteorological data is overly dispersive, the model performance could be improved by increasing emissions or LBC concentrations, but this model would not be reliable for predicting future concentrations because its good performance in the base case was achieved through compensating errors in the input. An appropriate use of sensitivity approaches is to identify each of the processes or inputs that has a large effect on model predictions, and then perform additional analysis of those inputs to determine if they are accurately represented in the base case model.

### 3.4.5  Dynamic Model Evaluation

A second method for assessing a model's performance in predicting the sensitivity of ozone or $PM_{2.5}$ species to changes in emissions is to perform a retrospective dynamic analysis. This involves comparing model predicted historical trends with observed trends. Retrospective analyses provide potentially useful means for diagnosing why a strategy did or did not work as expected. They also provide an important opportunity to evaluate model performance in a way that is closely related to how models are used to support an attainment demonstration.

A dynamic evaluation uses various analyses to assess the accuracy of the model in characterizing the sensitivity of ozone and/or $PM_{2.5}$ to changes in emissions. Although dynamic evaluation is always recommended, the measurements and resources needed for a dynamic evaluation may not be readily available to air agencies performing SIP modeling. Additional challenges for retrospective analyses include identifying appropriate case studies for which responses to emissions changes are large enough to be distinguished in ambient data, developing or obtaining equivalent and appropriate emissions for multiple historical years, and disentangling the confounding influences of year to year changes in meteorology and emissions.

A retrospective analysis is intended to examine the ability of the model to respond to emissions changes by comparing recent trends in observed ozone or $PM_{2.5}$ concentrations to the model-predicted trend over the same time period. The approach is a direct assessment of what is most important in an attainment demonstration: does the model accurately predict changes in air quality as a result of changes in emissions? As part of a retrospective analysis, the model is run for (a) current episodes or time periods and (b) episodes in one or more historical time periods using the emissions and meteorological inputs appropriate for each time period modeled.

While retrospective analyses may be useful, it may be difficult to obtain meteorological and emissions inputs for the historical time period(s) that are calculated using techniques and assumptions that are consistent with the calculation of these same inputs for the current time period. Using inconsistent inputs will confound the interpretation of the predicted trend. One method for ensuring consistent methodology for emissions estimates is to backcast emissions from the most recent year to the earliest year. The model should respond in a predictable way if the emissions changes are large enough. Hence, modeling an emissions change of only a few percent would not be viable. However, if NOx or $SO_2$ emissions have been reduced by a large percentage (e.g., 30% or more) over a relatively short time period, then that may be a good time period to test the response of the model.

Because differences in meteorology between years can confound the apparent change in pollutants, a complete retrospective analysis could include multiple sensitivity runs using both

97

year-specific meteorology and constant meteorology. The year-specific meteorology would allow the modeler to compare modeled and observed trends most accurately, and the constant meteorology would help inform the analysis on what portion of the change in pollutant concentrations were due to emissions versus meteorological differences.

Retrospective analyses are one of the few tools that can be used to determine if the model is responding "adequately" or "correctly" to control measures. Recent efforts to perform this type of analysis have been undertaken by Zhou et al (2013), Gilliland et al. (2008), Godowitch et al. (2010), Pierce et al. (2010) and Foley et al. (2014). These published analyses may be used to better understand the ability of certain models to properly capture relationships between ambient pollution levels and emissions.

Another dynamic evaluation approach is to look at operational performance under varying conditions (e.g., by day of the week, by season, and by region) (Marr and Harley, 2002; Murphy et al, 2007; Harley et al, 2005). The mix of pollutants vary by day of the week and from area to area; when a model shows good operational performance across these different chemical environments, it supports the assertion that it will respond appropriately to changes in emissions. Two studies have performed model evaluations that focused on the model's ability to capture weekend/weekday changes (CRC, 2011; Pierce et al, 2010).

## 3.5   Evaluation Tools

There is available software and tools that can be used to process ambient and model data to create statistical output and plots for model performance evaluations. One example is the Atmospheric Model Evaluation Tool (AMET) (Appel, 2011). AMET is built on several open-source software packages and uses the MySQL database software to store paired observation and model output data. There are modules in AMET for evaluating both meteorological and air quality model output. AMET provides a useful set of scripts for creating various types of plots and statistics.

# 4.0    Assessing Modeled Attainment for Ozone and PM2.5

A *model attainment demonstration* usually consists of two key components: a) analyses which estimate whether a set of simulated emissions reductions corresponding to a control program scenario will result in ambient concentrations that meet the NAAQS and b) an identified set of control measures which will result in the required emissions reductions. This guidance focuses on the first component of a model attainment demonstration; that is, the completion and interpretation of analyses to estimate the amount of emission reduction needed to attain the NAAQS.

Air agencies should determine whether a control program scenario will provide sufficient emission reductions to demonstrate attainment of the NAAQS using the *modeled attainment test*. The modeled attainment test is a technical procedure in which an air quality model is used to simulate base year and future air pollutant concentrations for the purpose of demonstrating attainment of the relevant NAAQS. The recommended test uses model estimates in a "relative" rather than "absolute" sense to estimate future year design values. As explained in more detail in subsequent sections, the fractional changes in air pollutant concentrations between the model future year and model base year are calculated for all valid monitors. These ratios are called *relative response factors* (RRF). Future ozone and/or PM2.5 design values are estimated at existing monitoring sites by multiplying the modeled relative response factor for each monitor by the monitor-specific base year design value. The resulting estimates of future concentrations are then compared to the NAAQS. If the future estimates of ozone and/or PM2.5 design values do not exceed the NAAQS, then this provides evidence that attainment will be reached.

In addition to the modeled attainment test, air agencies should also consider performing a set of corroboratory analyses to further assess whether a proposed set of emission reductions is likely to lead to attainment of the NAAQS. As discussed later in this section (see section 6), the modeled attainment test and these supplemental analyses should be aggregated into a *weight of evidence determination* to evaluate whether the selected emissions reductions will yield attainment. The concept of relative response factors also applies to modeling for the purpose of setting RPGs for regional haze, the subject of section 5.

## 4.1    Overview of Modeled Attainment Test

There are four reasons why the recommended modeled attainment test is based on application of the model in a relative sense. First and foremost, this approach has the effect of anchoring the future concentrations to a "real" measured ambient value, which is important given model bias and error in the base year simulation(s). It is reasoned that factors causing bias (either under or over-predictions) in the base case will also affect the future case. While good model

performance remains a prerequisite for use of a model for regulatory analyses, problems posed by imperfect model performance on individual days are expected to be reduced when using the relative approach. An internal EPA analysis (U.S. EPA, 2014a) considered whether daily ratios of model future/current maximum daily 8-hour ozone averages (MDA8) varied strongly as a function of site-specific base case model performance. This analysis was completed using a national model simulation that projected 2020 ozone concentrations from a 2007 base case. The analysis determined that when modeled, MDA8 ozone bias was relatively small (e.g., less than +/- 20 ppb), the average response ratios were not a strong function of the model MDA8 bias. This provides confidence that the model can detect the air quality response in the midst of reasonable levels of absolute bias and error. Second, the relative modeled attainment test allows for a future projection of 3-year average ozone and $PM_{2.5}$ design values or 5-year average visibility values without explicitly having to model a 3-year or 5-year period. Third, because $PM_{2.5}$ concentrations typically consist of a diverse mix of primary and secondary components, the modeled attainment test based on RRFs decreases the possibility of choosing ineffective control strategies based on inaccurate model estimations of $PM_{2.5}$ composition, by assessing component specific RRFs. Fourth, and finally, there is evidence, based on a retrospective modeling analysis of ozone changes between 2002 and 2005 (Foley et al, 2014) and 2002 and 2010 (Hogrefe et al, 2014), that using the model in a relative sense provides better estimates of future ozone design values than using the absolute future year simulation. The correlation between model-projected and actual design values, as well as the accuracy of model projections of attaining a 75 ppb NAAQS, appear to be slightly improved when a relative modeled attainment test is utilized.

Equation (4.1) describes the recommended modeled attainment test in its simplest form, which directly applies for ozone, as applied for monitoring site $i$:

$$(DVF)_i = (RRF)_i * (DVB)_i \qquad [4.1]$$

where $DVF_i$ is the estimated design value for the future year in which attainment is required at monitoring site $i$; $RRF_i$ is the relative response factor at monitoring site $i$; and $DVB_i$ is the *base design value* monitored at site $i$. Each of these terms is discussed in more detail below. For $PM_{2.5}$ and visibility, the modeled attainment test is more complicated in that each PM component (defined in a certain way) has its own RRF.

The EPA has developed the Software for Modeled Attainment Test-Community Edition (SMAT-CE) tool to enable completion of the modeled attainment tests for $PM_{2.5}$ and ozone, as well as for calculating changes in visibility in Class I areas. SMAT replaced the previous EPA attainment test software called MATS (Abt, 2014). SMAT can be found on the EPA's Support Center for Regulatory Atmospheric Modeling (SCRAM) website.

### 4.1.1  Establishing the Base Design Value

The base design value for each monitoring site ($DVB_i$) is the anchor point for estimating future year projected concentrations. Because the modeling is being used in a relative sense to determine how the modeled emissions changes will affect air quality design values in an area, it is important to match the base design value as closely as possible to the base year for which future/base ratios will be assessed. That is, if one is estimating the expected air quality change from emissions reductions between 2016 and 2030, it is important to establish an air quality anchor that represents 2016 emissions levels as closely as possible. However, it is well-established that inter-annual variability in meteorological conditions often leads to year to year differences in design values, even with static emissions levels (U.S. EPA, 2012). In addition, there is also year to year variability in emissions due to economic factors (such as recessions) and compliance with regulations. We, therefore, recommend using the base design value approach described below.

For the modeled attainment tests for ozone and PM$_{2.5}$, we recommend using the average of the three design value periods, which include the base emissions inventory year.  This average is expected to best represent the air quality resulting from base year emissions with consideration of meteorological and emissions variability. For example, if the modeled attainment test uses base year emissions from 2014, then the base design value (DVB) would be calculated as shown in equation 4.2 for each site *i*:

$$(DVB)i = \frac{((DV\ 2014)_i + (DV\ 2015)_i + (DV\ 2016)_i)}{3} \qquad [4.2]^{39}$$

This has the desired effect of weighting the projected ozone or PM$_{2.5}$ base design values towards the middle year of a five-year period (2012-2016); in this example, for a 2014 base emissions inventory year. Additionally, an average of three design values will be more stable (less year to year variability) than any single design value period. An EPA analysis of design values data at 761 ozone monitors over the period between 2002 and 2011 concluded that the median standard deviation of individual 3-year ozone design values was 5.3 ppb, whereas the standard deviation of the average of multiple 3-year ozone design values was only 4.0 ppb.

In cases in which there are less than 5 years of valid monitoring data at a site, we recommend that base design values be calculated only when there are at least 3 years of consecutive valid data (i.e., at least one complete design value). If a location has less than 3 consecutive years of

---

[39] For nomenclature purposes, the 3-year design value is referred to by the <u>last</u> year of the averaging period. That is, DV 2014 represents air quality data averaged over 2012, 2013, and 2014 for ozone and PM$_{2.5}$.

valid data, then that site should not ordinarily be used in the modeled attainment test.[40] An example calculation for DVB is shown in Table 4.1 and includes the number of significant digits to include for ozone and each form of the $PM_{2.5}$ standard.

**Table 4.1:** Example illustrating the calculation of base design values.

|  | 2014 DV | 2015 DV | 2016 DV | DVB |
|---|---|---|---|---|
| O3 NAAQS (ppb)[41] | 76 | 76 | 78 | 76.7 |
| Annual $PM_{2.5}$ NAAQS ($\mu g/m^3$) | 12.9 | 13.1 | 12.6 | 12.87 |
| 24-hour $PM_{2.5}$ NAAQS ($\mu g/m^3$) | 32 | 33 | 32 | 32.3 |

The measured 3-year average design values use the rounding/truncation rules established in 40 CFR part 50 Appendix U (8-hour ozone) and Appendix N ($PM_{2.5}$). The resultant 5-year weighted average DVB should carry one digit to the right of the decimal point for ozone and 24-hour $PM_{2.5}$ and two digits to the right of the decimal for annual $PM_{2.5}$.

The EPA also recognizes that the ambient data record may be modified under certain circumstances. For example, air agencies can request that the EPA agree to exclude event-influenced data by demonstrating that these data have been influenced by "exceptional" events and otherwise meet the criteria in the Exceptional Events Rule (81 FR 68216, October 3, 2016). Once an air agency submits an exceptional events demonstration and the EPA concurs with an air agency's request, the event-influenced data are officially noted and removed from AQS user reports (unless the AQS user specifically indicates that they should be included) and not used to calculate design values. In other cases, data may not qualify for exclusion under the Exceptional Events Rule but Appendix W to Part 51 may provide guidance on considering data which may be influenced by events that are not typical or expected to recur in the future (e.g., wildfires, construction, roadway repairs, or unusual agricultural activities) for certain modeling analyses. Potential event-influenced data may affect future year projections that are part of the modeled attainment demonstration. If potential event-influenced data from the historical

---

[40] Monitoring sites with less than 3 years of valid data cannot ordinarily be used to determine attainment status. Therefore, in most cases, those sites should not be used in the attainment demonstration or for regulatory analyses. However, there may be cases where a monitoring site with incomplete data indicates an area of high ozone or PM concentration. Further examination of the monitoring data and modeled response (RRF) in the area is recommended as part of either the monitor-based attainment test or an unmonitored area analysis, as appropriate.

[41]  The current ozone NAAQS is defined in units of ppm. However, for ease of use, this document will use ppb units.

record may affect regulatory outcomes, we encourage air agencies to consult with their EPA Regional office to determine how best to handle this situation.

In practice, the choice of the base design value can be critical to the determination of the estimated future year design values (Cohan, 2006) and careful consideration should be given to the selection of the years used in the calculation of base design values. There is no single methodology that can derive a "correct" base design value, but the 5-year weighted average value establishes a relatively stable value that is weighted towards the emissions and meteorological modeling year. In most cases, this provides an appropriate anchor point on which to base the future year design value calculations. Alternate, equally plausible, calculations of base design values may be considered with appropriate justification. Alternate base design values may also be considered as part of the corroborating analyses that comprise the aggregate weight of evidence determination. For instance, one may want to consider establishing the base design value on the highest of the relevant design values to ensure that the emissions measures will yield attainment even in periods with meteorological conditions especially conducive to poor air quality. In addition, in some cases, large year to year emissions changes or highly unusual meteorological conditions may make certain periods/years unsuitable for consideration in the base year period. Consideration of adjustments to the base design value(s) can be made, with appropriate justification, on a case-by-case basis and in consultation with the relevant EPA Regional office.

## 4.1.2  Calculation of Relative Response Factors

The relative response factor for each monitoring site $(RRF)_i$ is the fractional change in air quality concentrations that is simulated due to emissions changes between a base and a future year emissions scenario. The specific RRF calculation techniques vary by pollutant and are described in more detail in the remainder of section 4 below. The most important consideration associated with the RRF calculation is determining which model values are most representative of the expected air quality change for a given location. This requires consideration of all of the varying changes in hourly pollutant concentrations between the base and future cases and a determination of the most appropriate summary (average) value to apply to the base design value. As with the selection of a base design value, there may be plausible alternative means of calculating the RRFs that can differ from the approaches recommended below (e.g., Kulkarni et al., 2014, Porter et al., 2014). Where justified, alternate RRF calculation techniques can be included as corroborative analyses as part of a weight of evidence determination.

## 4.2    Modeled Attainment Test for the Primary Ozone Standard

The 8-hour ozone design value is currently calculated as the 3-year average of the annual fourth highest daily maximum 8-hour average concentration for a specific monitor. The standard is

considered to be attained if the observed design value does not exceed the level of the ozone NAAQS[42]. Similarly, the modeled attainment test is considered satisfied when the $(DVF)_i$ is less than or equal to the current NAAQS level. The recommended test is described below.

## 4.2.1  Model Values to Use in the RRF Calculation

Given the formulation of the modeled attainment test, it is important to identify which model days are best suited for determining the expected air quality response resulting from a set of emissions changes. On any given modeled day, meteorological conditions may or may not be conducive to high concentrations at a monitor. If ozone predicted near a monitor on any particular day is much less than the design value, the model predictions for that day could be unresponsive to controls (e.g., the location could be upwind from most of the emissions in the nonattainment area on that day). If these days are included in the RRF calculation, they will likely lead to a higher RRF (closer to one) and a potential overestimation of the future design value.

Internal EPA analyses (U.S. EPA, 2014a) have shown that model response to decreasing emissions is generally most stable when the base ozone predictions are highest. The greater model response at higher concentrations is likely due to more "controllable" ozone at higher concentrations. In addition, the high model days are selected individually for each monitor. Meteorological conditions that lead to high ozone may differ between monitors in an area. For example, monitors that are typically "upwind" or "downwind" of an area may experience high ozone on different days, depending on the prevailing wind direction. In most urban areas, on days with high ozone concentrations, there is a relatively high percentage of locally generated ozone compared to days with low base case concentrations (U.S. EPA 2014b). Days with low ozone concentrations are more likely to have a high percentage of ozone due to background and boundary conditions. Since the form of the standard is also focused on the highest days of an ozone season (i.e., the fourth highest MDA8), the RRF calculation should also focus on days when the model predicts the highest ozone concentrations.

As the ozone NAAQS has been lowered, a key question is whether the attainment test should use an average RRF based on all modeled days that are greater than the NAAQS, as in the previous guidance approach. In some areas of the country, this could lead to RRF calculations that might include upwards of 100 days per ozone season. In these cases, including too many

---

[42] At the time of publication of this guidance, the ozone NAAQS is 0.070 ppm per 40 CFR 50.19. Design values for the 0.070 ppm NAAQS are truncated to the 3rd decimal digit. Therefore, 0.0709 ppm (70.9 ppb) is considered attainment and 0.0710 (71.0 ppb) is considered nonattainment. The same rounding/truncation procedures should be applied in the modeled attainment test. A detailed description of the methodology to calculate ambient ozone design values is provided in Appendix U to Part 50.

days in the RRF calculation may lead to higher (closer to 1) RRFs. Using a reasonable number of the highest modeled days at each monitor is most likely to represent the response of the observed design value at a monitor. Since the design value is based on the seasonal 4th high observed values, we recommend selecting a set of modeled days that are likely to encompass a range of values that are somewhat higher than and somewhat lower than the 4th high value. We, therefore, recommend calculating the RRF based on the highest 10 modeled days in the simulated period (at each monitoring site). We believe this balances the desire to have enough days in the RRF to generate a robust calculation, but not so many days that the RRF does not represent days with concentrations near the observed design values. In addition, use of the highest 10 days (without an initial threshold) allows the attainment test to be easily adapted to any level of the NAAQS with little or no change in the methodology. In support of the revised recommendation, a recent assessment of modeled ozone changes between two ozone seasons (Foley et al., 2014) suggests that the use of the highest 10 days in the mean RRF calculation yields a slightly better estimate of the actual observed ozone change than the previous guidance approach.

The EPA recommends that the ozone RRF calculations be based on the 10 highest days in the base year modeling at the monitor location, as long as the base MDA8 value is greater than or equal to 60 ppb for that day. In cases for which the base model simulation does not have 10 days with MDA8 values greater than or equal to 60 ppb at a site, then EPA recommends using all days where MDA8 >= 60 ppb, as long as there are at least 5 days that meet the minimum threshold criteria. If there are less than 5 days with MDA8 >= 60 ppb, EPA recommends that air agencies do not calculate a DVF for the site.[43] If the modeled attainment test is based on less than 10 days, then other assessments in the aggregate weight of evidence demonstration will need to be more rigorous to counter the reduced robustness of the modeled attainment test.

In addition, as discussed by Vizuete et al. (2011), there can be days in which the modeled source-receptor relationships may not yield a representative response for a particular cell or array of grid cells. This can result from small inconsistencies between the model representation of transport patterns (or chemical formation) and what actually occurred on that day. In other situations, perhaps the high modeled ozone results from an atypical condition (e.g., in conjunction with a wildfire smoke plume) that is not representative of conditions that led to the area's design value. If there is compelling evidence to determine that a particular day, while being among the 10 highest MDA8 values at a location, is not representative of the expected source-receptor relationship at that location; then that day can be considered for removal from

---

[43] A scenario in which the 5th highest base model MDA8 values is less than 60 ppb either indicates an extremely low ozone site or a site with poor model performance. In either case, projections of DVF values are likely not reliable.

the RRF calculation.[44] If a day or days are removed, we recommended adding the next-highest modeled day or days from outside the top 10 to maintain the use of 10 days in the RRF calculation. Air agencies should document the evidence that argues for the exclusion of any otherwise-eligible days. As noted earlier, poor model performance on individual days can lead to ratios of future to base ozone that may be biased on those days. For example, underprediction of ozone concentrations may lead to ratios that are unresponsive to emissions controls. Air agencies may want to examine the day- and site-specific model performance for days that are part of the RRF calculation to make sure that they can be appropriately used in calculating the expected response.

## 4.2.2  Grid Cells to Use in the RRF Calculation

It is recommended that ozone RRF calculations consider model response in grid cells immediately surrounding the monitoring site along with the grid cell in which the monitor is located. There are two primary reasons why we believe it is appropriate to include predictions from grid cells near a monitor rather than just the cell containing the monitor. First, limitations in the inputs and model physics can affect model precision at the grid cell level. Allowing some leeway in the precision of the predicted location of daily maximum ozone concentrations can help assure that possibly artificial, fine scale variations do not inadvertently impact an assessment of modeled ozone response. Second, some ozone monitors and important emission sources may be located very close to the border of a grid cell. Considering multiple cells near a monitor, rather than the single cell containing the monitor, diminishes the likelihood of inappropriate results which may occur from the artificial geometry of the superimposed grid system.

Based on the above considerations, it is recommended that the RRF be based on a 3 x 3 array of cells centered on the location of the grid cell containing the monitor. This is a change from the 2007 guidance (U.S. EPA, 2007), which pre-identified 15 km as an appropriate distance for grid cell proximity to a monitor and, therefore, recommended the selection of RRF grid cells to be contingent upon the chosen model grid resolution (i.e., a finer grid resolution considered a larger array of grid cells to maintain the pre-identified 15 km distance). The revised approach allows for small spatial differences in the response to be considered in the RRF calculation and presumes that the chosen model grid resolution is able to appropriately capture model response at the location of the monitoring site. Additionally, as described in section 4.2.3, the guidance now recommends that the grid cell with the highest base year MDA8 ozone value in the 3 x 3 array be used for both the base and future components of the RRF calculation, as opposed to the 2007 guidance approach, which recommended selecting the peak value in the

---

[44] Days that have been removed from the official record as exceptional events should be considered for removal from the RRF calculations.

base and future cases even if they were in different grid cells. The rationale behind this change is that the goal of the modeling is to assess the ozone change at a specific location (i.e., a grid cell representative of a monitor location), independent of how the ozone peak may shift across an area. As the monitor location does not change between the base and future, it stands to reason that the future-year value should come from the same grid cell as the base case.

The selection of grid cells to use in the RRF calculation is especially important in "oxidant limited" areas (i.e., areas where incremental NOx decreases may lead to ozone increases) because these areas are likely to have grid cells that respond to VOC controls, with NOx sensitive grid cells nearby (perhaps even in the same 3 x 3 array). The 3 x 3 array methodology could lead to unrealistically small or large RRFs in these locations, depending on the specific case. Internal EPA analyses with a 12 km grid resolution have shown that on average, model-estimated future design values vary by less than 1 ppb when a 1x1 approach is used as opposed to the recommended array, although higher variability can occur (U.S. EPA, 2014a).

While the use of a 3 x 3 array of cells is the recommended approach for the modeled attainment test, air agencies are encouraged to consider the actual spatial scales of the monitors at which the modeled attainment test is being applied. Most ozone monitors are generally sited to be representative of an urban or neighborhood scale. In cases in which the spatial representativeness of a monitoring location is much smaller or larger than the area covered by the 3 x 3 array of cells, air agencies may consider assessing site-specific model response over an alternative grid cell array as part of corroborative analyses that inform the aggregate weight of evidence determination. Additionally, there may be cases where certain cells along the periphery of the 3 x 3 array have different modeled responses than what would be expected at the monitor location at the center of array due to a specific local topographic or geographical feature (e.g., a large water body or a significant elevation change). A potential example of this situation would be an array where several cells are over water and where the meteorological conditions and relevant emissions sources differ substantially from the land-based monitor location. Again, in these types of cases and with appropriate justification, air agencies could consider removing the unrepresentative cells from the calculation.

### 4.2.3  Sample Modeled Attainment Test Calculation

Once the appropriate RRF days are determined at each site, the calculation is straightforward. RRFs are not calculated on a daily basis, but instead are based on the mean 8-hour daily maximum values on all eligible calculation days. At the last step in the process, the final DVF should be calculated in accordance with the data handling conventions associated with the NAAQS (e.g., truncated to the third decimal in ppm units as per current Appendix U). An example is provided below for a 2016 base year and 2030 future year simulation based on an

annual model simulation. This hypothetical modeled attainment test considers an area with three ozone monitors.

**Step 1:** Compute site-specific base year design values (DVBs) from observed data at all eligible sites in the area by calculating the average of the design value periods which include the base year inventory year. All averaged values should be rounded to the tenth of a ppb. See Table 4.2 for the calculation in this sample case. The base design value is the average of the 3-year design values for 2016, 2017, and 2018.

**Table 4.2:** Ambient ozone base design values in example calculation.

| Monitoring site | 2014 DV (ppb) | 2015 DV (ppb) | 2016 DV (ppb) | Base design value (ppb) |
|---|---|---|---|---|
| A | 84 | 79 | 73 | 78.7 |
| B | N/A | 67 | 83 | 75.0 |
| C | 86 | 76 | 80 | 80.7 |

**Step 2:** Compute site-specific relative response factors (RRFs) from modeled data at all eligible sites (i.e., A, B, and C). This is done by first identifying the 10 days with the highest daily 8-hour maximum ozone concentrations greater than 60 ppb (or subset of days if there are 5-9 days greater than 60 ppb) in the base year. For each of these days, identify the grid cell with the highest base year MDA8 ozone in the 3 x 3 cell array surrounding the monitor cell location and use that value in the calculation of a multi-day average. 10-day averages (where possible) should be calculated for both the base and future simulations. The future case average should be based on MDA8 values paired to the same cell as used in the base average. Figure 4.1 below shows an abbreviated subset of the RRF calculation for 3 days at a single sample site. Model estimates of MDA8 (in ppb) should be calculated to at least four places to the right of the decimal, with the last digit truncated.

**Figure 4.1.** Example demonstration of daily selections of 8-hour maxima to be used in RRF calculation.[45]

**Base**

| 6/21/2014 | | |
|---|---|---|
| 60.24 | 68.15 | 66.20 |
| 73.41 | **76.26** | 71.27 |
| 67.62 | 74.02 | 73.24 |

**Future**

| 6/21/2014 | | |
|---|---|---|
| 56.89 | 59.22 | 58.05 |
| 63.69 | **68.46** | 63.39 |
| 61.86 | 67.16 | 66.80 |

Day 1 (6/21) is straightforward. The daily maximum 8-hour average is > 60 ppb and is in the same cell in both the base and future case.

| 6/26/2014 | | |
|---|---|---|
| 76.20 | 75.35 | 77.41 |
| **78.51** | 76.79 | 75.92 |
| 76.66 | 75.95 | 77.21 |

| 6/26/2014 | | |
|---|---|---|
| 69.84 | 67.71 | 68.14 |
| **68.30** | 66.27 | 67.95 |
| 64.28 | 65.15 | 66.58 |

For day 2 (6/26), the peak location shifts from the base to another cell in the array in the future (underlined cell). However, the center left cell is used for base and future values (paired in space).

| 7/17/2014 | | |
|---|---|---|
| 50.22 | 58.55 | 56.22 |
| 53.47 | 56.22 | 51.28 |
| 57.76 | **59.10** | 53.29 |

| 7/17/2014 | | |
|---|---|---|
| 46.80 | 49.27 | 48.55 |
| 51.91 | 50.41 | 50.34 |
| 53.62 | **54.10** | 50.62 |

Day 3 (7/17) would not be eligible for the RRF calculation because there are no base values > 60 ppb.

**Step 3:** Once the MDA8 values are selected for each appropriate day for each monitoring site, they should be averaged together over the days while maintaining at least four places to the right of the decimal. The RRF is the ratio of the average future MDA8 values to the average base MDA8 values. Table 4.3 shows an example RRF calculation, using the results from days 1 and 2 from Figure 4.1, plus the other eight (top 10) days in which the daily model predictions were deemed appropriate for RRF calculation. RRF values should be estimated to four decimal places (rounded to the 4th decimal digit).

---

[45] Figure 4.1 depicts the modeled ozone in each cell with only two digits to the right of the decimal to make the formatting simpler. The actual cell values used in the calculation should carry at least 4 digits to the right of the decimal.

**Table 4.3.** Relative response factor (RRF) calculation in example calculation.

| Date | Base (ppb) | Future (ppb) |
|------|-----------|--------------|
| 6/21/2014 | 76.2632 | 68.4626 |
| 6/26/2014 | 78.5156 | 68.3089 |
| 6/27/2014 | 75.2235 | 65.4333 |
| 6/28/2014 | 70.0509 | 62.7618 |
| 7/11/2014 | 76.3311 | 68.1865 |
| 7/12/2014 | 81.6739 | 72.6237 |
| 7/13/2014 | 78.3132 | 64.5255 |
| 8/02/2014 | 73.6956 | 69.9670 |
| 8/03/2014 | 75.8379 | 65.0507 |
| 8/21/2014 | 71.4430 | 59.3647 |
| **Average** | 75.7348 | 66.4685 |
| **RRF$_i$** | 0.8776 | |

The last step of the process is to multiply all of the site-specific RRFs by the corresponding site-specific DVBs and compare the results against the current level of the ozone NAAQS. In the final step, as noted in footnote 34, the design values are truncated to the integer ppb unit. Table 4.4 shows those results, assuming that the sample RRF shown above is for site C in the example. The final DVF for this sample site would be 70 ppb or 0.070 ppm. This would be considered a passing modeled attainment test for an ozone NAAQS of 0.070 ppm.

**Table 4.4.** Calculation of DVF$_i$ for the three sites in the sample exercise.

| Monitoring site | Base design value (ppb) | RRF | Future design value, pre-truncation (ppb) | Final Future design value (ppb) |
|-----------------|-------------------------|-----|-------------------------------------------|---------------------------------|
| A | 78.7 | 0.8933 | 70.3 | 70 |
| B | 75.0 | 0.9138 | 68.5 | 68 |
| C | 80.7 | 0.8776 | 70.8 | 70 |

**Note:** The "final" future year design value represents the truncated value to compare to the NAAQS. However, it is recommended to retain the tenths (of a ppb) digit in all documentation, so that small ozone changes can be gleaned from control strategy and sensitivity analyses.

## 4.3   Modeled Attainment Test for the Secondary Ozone Standard

At the time this guidance document was written, the secondary ozone NAAQS is the same as the primary NAAQS. However, in the past, EPA has considered setting a secondary ozone NAAQS that is based on a cumulative measure of ozone concentrations, as opposed to the 3-year average of the annual fourth-highest daily maxima. If EPA were to establish a distinct secondary standard, it is possible that air agencies would need to separately show that the planned emissions reductions would be sufficient to meet both the primary and secondary

NAAQS. If a new secondary standard is subsequently developed, EPA will provide supplemental guidance on how to assess attainment of that new standard at the time of its promulgation.

## 4.4    What is the Modeled Attainment Tests for the Annual Average PM$_{2.5}$ NAAQS?

Because ambient PM$_{2.5}$ often consists of multiple PM species, the modeled attainment test for PM$_{2.5}$ utilizes both PM$_{2.5}$ and individual PM$_{2.5}$ component species. A separate RRF and a separate concentration representing the base period is calculated for each PM$_{2.5}$ species. In order to perform the recommended modeled attainment test, air agencies should divide observed mass concentrations of PM$_{2.5}$ into 8 components (plus passive mass):

- Sulfates
- Nitrates
- Ammonium
- Organic carbon
- Elemental carbon
- Particle bound water
- Salt
- "Other" primary inorganic particulate matter
- Passively collected mass (blank mass)

To apply the attainment test, air agencies must first have outputs from air quality model simulations for a base year and a future year emissions scenario. We recommend a modeled attainment test which has four basic steps, as described in this section.

**Step 1. Compute *observed* quarterly mean PM$_{2.5}$ and quarterly mean composition for each monitor.**

Derive base year period quarterly mean concentrations[46] for each of the major components of

---

[46]Concentrations should be calculated based on calendar quarters for two reasons. First, the NAAQS is calculated as an annual average of 3 calendar years, so it would be inconsistent to average the data by season (where the winter season would span two calendar years). Second, the monitored data used to calculate design values is averaged on a calendar quarter basis before calculating annual averages.

PM$_{2.5}$.[47] This is done by multiplying the monitored quarterly mean concentration of FRM derived PM$_{2.5}$ (40 CFR part 53) by the monitored fractional composition of PM$_{2.5}$ species for each calendar quarter (e.g., 20% sulfate x 15.0 µg/m$^3$ PM$_{2.5}$ = 3.0 µg/m$^3$ sulfate).

**Step 2. Using air quality model results, derive component-specific relative response factors (RRF) at each monitor for each calendar quarter.**

Use the air quality model predictions to calculate the quarterly mean concentration for each PM$_{2.5}$ component for the base year and future year scenario.[48] Take the ratio of future to base year predictions for each component. The result is a component-specific relative response factor (RRF).

The RRF for component j at a site i is given by the following expression:

$$(RRF)_{ij} = [C_{ij,\ projected}]/[C_{ij,\ base\ year}] \hspace{3cm} [4.3]$$

where $C_{ij,\ base\ year}$ is the quarterly mean concentration predicted at or near the monitoring site[49] with emissions characteristic of the period used to calculate the base design value for annual PM$_{2.5}$.

$C_{ij,\ projected}$ is the future year quarterly mean concentration predicted at or near the monitoring site.

(e.g., given model predicted mean third quarter base year period sulfate of 10.12 µg/m$^3$ and future year mean third quarter concentration of 8.23 µg/m$^{3,}$ then the third quarter RRF for sulfate is 0.8132).

---

[47] The mean species concentrations should be representative of the base period. The default approach to calculate mean species concentrations in SMAT is to use the 3-year average, centered about the base modeling year. These values are used to calculate species fractions by quarter. This differs from the 5-year weighted average design values recommended for base year PM$_{2.5}$ values. However, it is expected that there will be less variation in the species fractions compared to the absolute measured PM$_{2.5}$ concentrations. Alternative species fractions calculations can be considered, as long as they are representative of the expected species fractions during base year period.

[48] The calculations assume that there is one full year of model outputs.

[49] For greater (coarser) than 12km grid resolution, use the single grid cell. For 12km or less grid resolution, use the mean of the 3 x 3 array of the grid cells surrounding the monitor.

**Step 3. Apply the component specific RRFs to observed air quality to obtain projected quarterly species estimates.**

For each quarter, multiply the base year period quarterly mean component concentration (step 1) times the component-specific RRF obtained in step 2. This leads to an estimated future quarterly mean concentration for each component (e.g., 3.0 µg/m$^3$ sulfate x 0.8132 = future sulfate of 2.44 µg/m$^3$).

**Step 4. Calculate a future year annual average PM$_{2.5}$ estimate.**

Sum the quarterly mean PM$_{2.5}$ components to get quarterly mean PM$_{2.5}$ values. Then average the quarterly mean PM$_{2.5}$ concentrations to get a future year annual average PM$_{2.5}$ estimate for each FRM site.

Compare the projected average annual arithmetic mean PM$_{2.5}$ concentration obtained in Step 4 with 12.0 µg/m$^3$.  If the values at all FRM sites are $\leq$ 12.0 µg/m$^3$, the test is passed.

## 4.4.1  Ambient PM$_{2.5}$ Data Used in the Annual PM$_{2.5}$ Attainment Test

PM$_{2.5}$ data collected at FRM and FEM sites are used for nonattainment designations. Therefore, we recommend using FRM and FEM data as the base data for projecting future PM$_{2.5}$ concentrations. As can be seen from the list of steps, the modeled attainment test is critically dependent on the availability of species component mass at FRM sites. This raises several issues. First, the majority of FRM sites do not have co-located chemical speciation network (CSN[50]) samplers.[51] And second, the FRM filter measurements and PM$_{2.5}$ speciation measurements do not always measure the same mass (Frank, 2006). There are numerous known issues with positive and negative sampling artifacts. These issues are addressed below.

## 4.4.2  FRM Monitors that Do Not Have Speciation Data

Species concentration data and/or species fractions are needed in order to apply the PM$_{2.5}$ attainment test. There are approximately 1200 FRM and FEM PM$_{2.5}$ monitoring sites, but only ~200 urban speciation monitoring sites. This makes it difficult to apply the attainment test at

---

[50] References to CSN monitors in this document refers to the overall speciation network which includes both trends sites and SLAMS sites.
[51] There are ~1200 FRM measurement sites and ~200-250 urban speciation sites (trends and SLAMS).

the majority of FRM/FEM sites. There are several possible ways to estimate species concentrations at FRM monitors that lack speciation data. Among them are:

1) Use concurrent data from a nearby speciation monitor to estimate species concentrations and/or fractions at one or more FRM sites.
2) Use representative speciation data (from a different time period) collected in an area to estimates species data at FRM sites.
3) Use interpolation techniques to create spatial fields using ambient speciation data.
4) Use interpolation techniques to create spatial fields using ambient speciation data **and** gridded model outputs to adjust the species concentrations based on the modeled spatial gradients.

In general, we recommend using spatial interpolation techniques to estimate species concentrations at FRM sites that do not have speciation data (numbers 3 and 4 above). But in some cases, interpolating data from nearby sites may not be appropriate, may not be feasible, or simply may not be necessary. In the EPA's SMAT, a relatively simple interpolation technique is used to estimate species concentrations at all FRM sites in the country. The analysis uses a Voronoi Neighbor Averaging (VNA) technique (consistent with approach number 3 above). Other interpolations have been done using Kriging and other more complicated methodologies such as "Downscaler" (Berrocal, 2010a and 2010b). Air agencies are encouraged to explore techniques that are most appropriate for their area and situation. EPA's SMAT software is available for air agencies to use as a default technique.

For areas that contain one or more speciation sites, and where FRM sites exhibit very little spatial gradients, it may be appropriate to assume that the speciation site(s) is/are representative of the entire area. For areas that exhibit strong spatial gradients in $PM_{2.5}$ concentrations, air agencies should strongly consider using more sophisticated techniques to estimate species concentrations. Combining ambient data with model output concentrations (number 4 above) may help adjust concentrations in areas with strong gradients, but limited speciation data. This technique has been used extensively to create spatial fields of $PM_{2.5}$ concentrations for the purpose of generating health benefits calculations and other examinations of unmonitored areas (also see section 4.6), but it has generally not been used to generate species fractions at FRM sites. The technique is further limited by uncertainties in the representativeness of the model outputs and emissions inventories.

114

### 4.4.3 PM$_{2.5}$ Species Calculations and Definitions

Data analyses (Frank, 2006) have noted that the FRM monitors do not measure the same components and do not retain all of the PM$_{2.5}$ that is measured by routine speciation samplers and, therefore, cannot be directly compared to speciation measurements from the Chemical Speciation Network (CSN).[52] The FRM mass measurement does not retain all ammonium nitrate and other semi-volatile materials (negative sampling artifacts) and includes particle bound water associated with sulfates, nitrates and other hygroscopic species (positive sampling artifacts). This results in FRM measured concentrations (and percent contributions to PM$_{2.5}$ mass), which may be different than the ambient levels of some measured PM$_{2.5}$ chemical constituents.

Because the FRM data are used to determine compliance with the NAAQS, it is critical to estimate the species composition as measured on the FRM filters. In addition, for the purposes of predicting changes in PM$_{2.5}$ components, constructed PM$_{2.5}$ mass should match the composition of mass retained by the FRM.

The goal is to reconstruct the measured species components so that they add up to the measured FRM mass. This concept can generally be represented by equation 4.4:

RCFM$_{FRM}$ = [Ammoniated Sulfate Mass] + [Retained Ammoniated Nitrate Mass] + [Retained Carbonaceous Mass] + [Other Primary PM$_{2.5}$] + [Other Components]                    [4.4]

In the above characterization, RCFM$_{FRM}$, or reconstructed fine mass, and all of the listed chemical components reflect those retained during sampling and equilibration on the FRM's Teflon filter. Sulfate and nitrate mass include associated ammonium, which may be different than assumed ammonium sulfate and ammonium nitrate compounds. Carbonaceous mass includes elemental carbon (EC), organic carbon (OC), and hundreds of different carbon compounds, which are not directly measured, and which may not match the carbon mass in speciated measurement data. Also, sulfates and nitrates include particle bound water associated with these hygroscopic aerosols. In this characterization, other primary PM$_{2.5}$ mass is intended to be a more general term that includes fine soil, and oxides that result from other PM emissions.

---

[52] The information in this section applies to the most common samplers in the CSN. The characteristics of the sampler and the analytical procedures used to produce chemical speciation data should be considered in determining which, if any, adjustments are appropriate to make the data useful for comparison to FRM and FEM data.

## 4.4.4  Recommended Treatment of Species Data

We recommend an adjustment technique based on an FRM mass construction methodology, which results in reduced nitrates (relative to the amount measured by routine speciation networks), higher mass associated with sulfates and nitrates (reflecting water included in gravimetric FRM measurements), and a measure of organic carbonaceous mass, which is derived from the difference between measured $PM_{2.5}$ and its non-organic carbon components (Frank, 2006). This characterization of $PM_{2.5}$ mass also reflects "other" primary inorganic $PM_{2.5}$ and other minor constituents. Frank (2006) terms this approach "sulfate, adjusted nitrate, derived water, inferred carbonaceous material balance approach (SANDWICH)." The resulting characterization provides a complete mass balance. It does not have any unknown mass, which is sometimes presented as the difference between measured $PM_{2.5}$ mass and the characterized chemical components derived from routine speciation measurements. The recommended SANDWICH-based characterizations should yield more accurate assessments of future $PM_{2.5}$ concentrations as measured by FRM monitors, compared to using unadjusted CSN data.

### 4.4.4.1 Retained Nitrate Mass

The first step in the procedure for identifying FRM mass components is to estimate the retained nitrate mass on the FRM filters. The FRM does not capture all of the semi-volatile components of the ambient air, such as ammonium nitrate. The retained amount of nitrate ion, however, can be estimated by a simple thermodynamic model that involves 24-hr ambient nitrate speciation concentrations (as measured by a standard speciation sampler using a nylon filter preceded by a $HNO_3$ denuder) together with hourly ambient temperature and humidity. Atmospheric nitrates are highest during the cooler months. Retention on the FRM is also higher during the cooler months and essentially all the nitrates are lost during the summer. The retention does not appear to depend on ambient $NH_3$ or $HNO_3$ concentrations. More $NO_3$ is retained at low temperatures and high humidity, which varies by sampling location and time of year.

Because nitrate retention varies by site and season, a simple ammonium nitrate equilibrium model can be used to predict the amount of nitrates retained on the FRM Teflon filter. As used by Hering (Hering, 1999; Zhang, 1992),

$$\text{delta } NO_3 \ (\mu g/m3) = 745.7/T_R * 1/24 * \sum_{i=1}^{24} (K_i^{\frac{1}{2}}) \qquad [4.5]$$

116

where delta $NO_3$ is the amount of volatilized nitrate mass, $T_R$ is the reference temperature for the sampled air volume in degrees Kelvin, and $\mathbf{K_i}$ is the dissociation constant for ammonium nitrate evaluated at the ambient temperature and relative humidity for hour i. The nitrate loss can be predicted for each day, based on hourly temperature and relative humidity data. It must be subtracted from the $NO_3$ measured at speciation sites to estimate the FRM retained nitrate. The SMAT software is populated with a speciation ambient data file with daily average retained nitrate pre-calculated for all CSN and IMPROVE sites. The analysis uses National Weather Service temperature and relative humidity data from the closest station. Other sources of meteorological data may also be appropriate. Further details on the nitrate loss calculations can be found in Frank (2006).

### 4.4.4.2 Ammonium Associated with Sulfates and Retained Nitrates

There are several ways to estimate ammonium mass for use in attainment test. The most direct way is to use measured ammonium concentrations from the CSN network (IMPROVE does not measure ammonium ion). A second, more indirect method is to estimate the ammonium associated with nitrate, and to calculate the ammonium associated with sulfate and the degree of neutralization of sulfate (DON), and then use the resulting information to calculate ammonium mass. Due to uncertainties associated with the ammonium measurements and the lack of ammonium measurements in rural areas, this indirect method is recommended as the default attainment test methodology.

To determine the mass associated with nitrates, we assume retained nitrate is all ammonium nitrate. Thus, using the ratio of the molecular weight of ammonium to that of nitrate, the ammonium associated with nitrates ($NH4_{NO3}$) can be derived directly from the estimated retained nitrate ($NO3_{FRM}$) as:

$$NH4_{NO3} = 0.29 * NO3_{FRM} \qquad [4.6]$$

The difference between total FRM $NH_4$ (amount associated with nitrates and sulfates), termed $NH4_{FRM}$, and the measured $NH_4$, termed $NH4_{CSN}$, is needed to determine the ammoniated form of sulfates as described by equation 4.4.  A measurement study by Collett (Collett, 2004) shows that $NH_4$ may not be completely retained during collection on nylon filters preceded by a nitric acid denuder, such as are used at CSN sites. At several FRM study sites, the CSN $NH_4$ which is adjusted for evaporated $NH_4NO_3$ tends to more closely correspond to the measured $NH_4$ from the FRM Teflon filter. However, for other sites, the measured CSN $NH_4$ appears to agree with FRM $NH_4$.

117

The available information suggests that using measured ammonium (assuming none is volatilized) may be the best assumption. We, therefore, recommend using unadjusted ammonium, but further analysis of this issue is warranted.

To calculate the ammonium associated with sulfate, we recommend using the degree of neutralization of sulfate (DON). This is defined as the ammonium associated with sulfate (i.e., total ammonium less the ammonium associated with nitrate), divided by sulfate. This reflects the degree to which sulfate has been neutralized by ammonium. The ambient data is such that nearly all of the ammonium data is from urban sites (CSN), but the sulfate and nitrate data is from both urban (CSN) and rural (IMPROVE) sites. This may lead to an overestimation of ammonium concentration in rural areas when ammonium is directly interpolated. Therefore, we recommend using calculated DON with $SO_4$ and $NO3_{FRM}$, and interpolating to each FRM site to get quarterly average concentrations. The interpolated DON and species concentrations are used to calculate $NH4_{FRM}$ using the following equation:

$$NH4_{FRM} = DON * SO4 + 0.29*NO3_{FRM} \qquad [4.7]$$

The indirect calculation of ammonium mass from interpolated fields tends to smooth out the gradients in mass. This is deemed to be beneficial, due to the uncertainty in the measurements.

### 4.4.4.3 Particle Bound Water

Because ammoniated sulfate and ammonium nitrate are hygroscopic, the retained sulfate and nitrate mass will include water. Particle bound water (PBW) can be estimated using an equilibrium model. The EPA developed an approach using the Aerosol Inorganic Model (AIM) (Clegg, 1998). PBW is derived from quarterly average FRM concentrations of sulfate, ammonium, and nitrate (as described above). Estimated hydronium ion, H+, needed to achieve ionic balance is derived from the latter values. The model enables the distribution of water and ions to be calculated between liquid, solid and vapor phases for specific temperature and relative humidity conditions. Typical FRM filter equilibration conditions of 35% RH and 22 deg C (295 deg K) temperature are used to estimate water concentrations at those conditions.

Application of AIM at the specified FRM filter equilibration conditions show that PBW is much more dependent on sulfate concentration compared to nitrate and that the relationship varies somewhat by season. There is proportionally less estimated PBW water for wintertime aerosol which has higher $NO_3$ and lower $SO_4$. The PBW concentrations are also sensitive to the degree

of neutralization of the sulfate particles (determined by the relative concentration of $NH4_{FRM}$).

We recommend calculating PBW as a component of $PM_{2.5}$ mass. The AIM model (or other equilibrium models) can be used, or a regression equation can be developed to simplify the process. For computational convenience, EPA derived a polynomial regression equation fit to the calculated water mass from AIM and the three input values to AIM (sulfate, nitrate and ammonium). The polynomial equation is used in the SMAT software to calculate PBW. See the SMAT User's Guide for more details on the default PBW equation.

### 4.4.4.4 Salt

In the $PM_{2.5}$ attainment test methodology, salt is represented as a species which accounts primarily for sea salt at sites near the oceans. The salt species is estimated using the CSN measured $Cl^+$ ion concentration multiplied by 1.8. The multiplier accounts for the sodium contribution to the species. In areas distant from oceans, measured $Cl^+$ may represent PM mass that is not associated with salt water. For instance, there may be chloride emissions resulting from various industrial processes. Therefore, the use of measured salt in the attainment test calculations should be evaluated on an individual area/monitor basis.

Measured salt is included by default in the SMAT species ambient data file. The inclusion of modeled salt (and hence an RRF for salt) is optional and can be included if there are accurate modeled salt concentrations. If modeled salt is not included in the SMAT input files, an RRF of 1.0 used in the SMAT calculations.

### 4.4.4.5 Other Primary PM2.5

The terms "crustal," "fine soil," "major metal oxides," "inorganic particulates," and "other PM," are sometimes used interchangeably. For $PM_{2.5}$ design value calculations we will refer to this material as "other primary $PM_{2.5}$" (OPP). For regional haze calculations, we will continue to refer to this material as "fine soil."

For the purposes of estimating OPP for the $PM_{2.5}$ attainment test, all measured non-carbon mass that is not organic in nature (not associated with sulfate and/or nitrate) should be counted. As with the other $PM_{2.5}$ components measured on the FRM filter, there is uncertainty associated with this estimate. The "crustal" or "fine soil" definition from IMPROVE can be used

to estimate OPP[53] or an alternative formula can be defined which better estimates the urban nature of the FRM measurements. The IMPROVE definition of "fine soil" accounts for the typical crustal components (and attached mass) that would be expected in remote Class I areas. Fine soil is represented as five elements (Al, Si, Fe, Ti, and Ca) with coefficients to represent various oxides and material, which may be attached to or associated with the major elements. In urban areas, inorganic PM, which is not elemental carbon or associated with sulfate or nitrate, may come from many sources such as re-suspended dust or industrial sources (stack or fugitives). It is generally "crustal" in nature (dominated by silicon), but urban PM is more likely to contain heavy metals and industrial components.

Although the composition of inorganic PM may differ between urban and rural (remote) areas, an alternative equation, similar to the IMPROVE fine soil equation, can be used to estimate OPP for the $PM_{2.5}$ attainment test. The alternative equation is suggested by (Frank, 2006) and uses only four elements. The equation removes aluminum (and accounts for associated mass by increasing the coefficient for Si), due to the fact that aluminum is often missing from the speciation measurements. This allows for more complete data.

The alternative "fine soil" equation is as follows:

Other primary $PM_{2.5}$ mass = $3.73 \times [Si] + 1.63 \times [Ca] + 2.42 \times [Fe] + 1.94 \times [Ti]$     [4.8]

### 4.4.4.6 Blank mass

The other quantifiable components of $PM_{2.5}$ mass include passively collected mass, represented by a field blank concentration (U.S. EPA, 2002). This appears to constitute a contamination of the filter resulting from handling or contact with the FRM cassette. This value is deemed to be an important constituent of $PM_{2.5}$ mass (it is assumed to not be dependent on pollutant emissions). Based on recently collected ambient QA data, we recommend using a default nominal blank mass value of 0.2 µg/m$^3$ (see the EPA QA website for more details). This value represents an approximate nationwide network median value. This value can be modified based on local FRM blank mass measurements. The blank mass is assumed to remain constant through time (RRF=1.0).

---

[53] IMPROVE estimates fine soil as:   $2.2 \times [Al] + 2.49 \times [Si] + 1.63 \times [Ca] + 2.42 \times [Fe] + 1.94 \times [Ti]$

### 4.4.4.7 Calculation of Carbonaceous Mass

Organic carbon mass is typically estimated from blank corrected speciation data, where organic carbonaceous mass is first estimated by multiplying the organic carbon concentrations by 1.4 or alternative factors to account for the oxygen, hydrogen and other elements associated with ambient carbon particles.

There are many uncertainties in estimating carbonaceous mass from carbon measurements (Turpin, 2001; Chow, 2004). Uncertainties include differences in carbon measurement protocol between urban and rural monitoring locations; a relatively "bumpy" surface of urban carbon concentrations as derived from urban and rural organic carbon measurements; and lack of carbon measurements at all FRM locations. We, therefore, recommend an alternative approach to estimate the organic carbon contribution to $PM_{2.5}$ mass.

The recommended attainment test approach estimates organic carbon by *mass balance*. Precisely measured FRM $PM_{2.5}$ mass (U.S. EPA, 2003) is compared to the sum of its non-organic carbon components. The latter are sulfates, ammonium, nitrates, estimated particle bound water, elemental carbon, estimated other primary $PM_{2.5}$ material, salt, plus 0.2 µg/m3 blank mass as discussed earlier.

This approach estimates <u>retained</u> organic carbon FRM mass and explicitly accounts for the following important and difficult to estimate carbon mass properties: 1) regional and urban-rural differences in the mix of carbonaceous aerosols (i.e., the amount of oxygen, hydrogen, etc); 2) retained water associated with hygroscopic carbon compounds (Saxena, 1996; Yua, 2004*)*; 3) volatile carbonaceous material measured by speciation samplers, but not retained in FRM mass; and 4) uncertainties associated with blank corrections of measured organic carbon.

Organic Carbon Mass by mass balance **($OCM_{mb}$)** is defined as,

$$\mathbf{OCM_{mb}} = PM_{2.5} - \{\ [SO4] + [NO3_{FRM}] + [NH4_{FRM}] + [water] + [EC] + [OPP] + [salt] + [0.2]\ \}\quad [4.9]$$

In this expression, all of the above components represent the mass <u>retained</u> on FRM Teflon filters.

This approach completely accounts for FRM mass[54] and OCMmb is often greater than the amount that would be derived directly from speciation measurements. Because of uncertainties in speciation measurements and their estimates from interpolated surfaces, setting a lower limit (floor) may be necessary so that the OCMmb is not unreasonably low. In some cases, the OCMmb could be lower than the measured OC or OCM. Since measured OC (without accounting for mass associated with OC) is a conservative minimum estimate of OC mass, we recommend setting the OCMmb "floor" to be equal to measured OC.

There may also be situations where an OCMmb "ceiling" is needed. In remote urban areas with relatively high FRM concentrations that may be surrounded by rural background concentrations, the OC by mass balance technique may apportion 95%+ of the $PM_{2.5}$ mass to OCM. If this is not a reasonable assumption, then a ceiling may be needed to cap the OCM as a percentage of $PM_{2.5}$ mass. Based on measured data (FRM sites with co-located speciation data), it appears that on a quarterly average basis, OCM is rarely more than 80% of total $PM_{2.5}$ mass. This may be a reasonable default ceiling, but a lower value (or in rare circumstances, a higher value) may be more appropriate in some regions of the country.

### 4.4.4.8 Summary of $PM_{2.5}$ Composition Calculations

The terms of equation 4.10 reflect the final estimated composition of the particles measured by the FRM (for each quarter). Quarterly average FRM mass is equal to the sum of the eight species plus blank mass.

$$PM_{2.5FRM} = \{ [OCMmb] + [EC] + [SO4] + [NO3_{FRM}] + [NH4_{FRM}] + [water] + [OPP] + [salt] + [0.2] \} \quad [4.10]$$

The recommended order to generate the data is as follows:

1) Calculate adjusted nitrate using hourly meteorology and 24-hour average nitrate measurements.

---

[54] The OC by mass balance technique assumes that all other mass is accounted for and, therefore, all remaining mass is OCM. This may not always be a good assumption. The results of the technique should be carefully evaluated to ensure that OC mass is not overestimated (and, therefore, other mass components are underestimated). This may be an issue in areas that do not have nearby speciation data and have relatively large concentrations of primary $PM_{2.5}$. The OC by mass balance technique may inadvertently apportion mass to organic carbon, which may actually be EC or "other" primary $PM_{2.5}$ mass components (such as heavy metals). All available ambient data and modeling data should be used to evaluate the species apportionment results.

2) Calculate quarterly averages for adjusted nitrate, sulfate, elemental carbon, ammonium (or degree of sulfate neutralization (DON)), OPP, salt, and measured OCM[55].

3) Quarterly average ammonium is calculated from the adjusted nitrate, sulfate, and DON values (if measured ammonium is not used directly).

4) Ammonium, sulfate, and nitrate concentrations are input into the polynomial water equation to derive particle bound water concentrations.

5) Carbon mass by difference (OMCmb) is calculated from the $PM_{2.5}$ mass, adjusted nitrate, ammonium, sulfate, water, elemental carbon, salt, other primary $PM_{2.5}$, and blank mass values. The sum of the eight species plus blank mass is equal to the FRM mass.

We illustrate application of the recommended test in example 4.4.1.

**Example 4.4.1**

<u>Given</u>: (1) Area "C" has 2 monitoring sites.

(2) Monitored FRM air quality data show the following average quarterly mean $PM_{2.5}$ concentrations based on a 5-year weighted average of observations from 2012-2016 at each site (values are in $\mu g/m^3$).

**Table 4.4.1** Quarterly average $PM_{2.5}$ FRM mass concentration ($\mu g/m^3$) at 2 example sites

| Site | Quarter 1 | Quarter 2 | Quarter 3 | Quarter 4 |
|------|-----------|-----------|-----------|-----------|
| 1 | 17.21 | 16.34 | 20.00 | 14.76 |
| 2 | 15.39 | 17.98 | 18.23 | 13.76 |

(3) The area has 1 urban speciation site, which is co-located with FRM site 2. The speciation data is available for the entire time period, but the species concentrations for the 2013-2015 time period have been deemed to be most representative of the 2012-2016 5- year weighted average. Therefore, the species data for the average 3-year period (2013-2015) has been

---

[55]The measured OCM is only used to calculate the "floor" for OCMmb.

interpolated to derive estimated species concentrations at each site. The species concentrations are matched up with FRM data for the same 2013-2015 period to derive representative species fractions. The average monitored air quality for the 3rd quarter of 2013-2015 at site 1 is as follows[56]:

**Table 4.4.2** Average monitored 3rd quarter ambient data at site 1

| FRM Mass (μg/m3) | Blank Mass (μg/m3) | Non-blank Mass (μg/m3) | Sulfate (μg/m3) | Nitrate (μg/m3) | Organic Carbon Mass (μg/m3) | Elemental Carbon (μg/m3) | Water (μg/m3) | Ammonium (μg/m3) | Salt (μg/m3) | OPP (μg/m3) |
|---|---|---|---|---|---|---|---|---|---|---|
| 22.62 | 0 .2 | 22.42 | 8.51 | 1.11 | 5.21 | 0.91 | 2.31 | 3.31 | 0.35 | 0.71 |

The blank mass is subtracted before species fractions are calculated because the blank mass is held constant at 0.2 μg/m3 throughout the analysis. In the example, the measured FRM mass for quarter 3 is 22.62 μg/m3. The non-blank FRM mass is 22.42 μg/m3. The mass of the eight species add up to the non-blank mass.

(4) Species fractions are calculated for each quarter for each species. In the example below, a fraction of non-blank mass is calculated for each of the eight species. Blank mass remains fixed at 0.2 μg/m3.

**Table 4.4.3** 3rd quarter average species fractions for 2013-2015 at site 1

| FRM Mass (μg/m3) | Blank Mass (μg/m3) | Non-blank Mass (μg/m3) | % Sulfate | % Nitrate | % Organic aerosol | % Elemental Carbon | % Water | % Ammonium | % Salt | % OPP |
|---|---|---|---|---|---|---|---|---|---|---|
| 22.62 | 0 .2 | 22.42 | 37.96 | 4.95 | 23.24 | 4.06 | 10.30 | 14.76 | 1.56 | 3.17 |

The percentages in table 4.4.3 above are the relative composition for the 3rd quarter of 2013-2015. It is assumed that these species fractions are representative of the 2012-2016 time-period.[57]

---

[56] The species concentrations can be derived from co-located speciation data, nearby speciation data or from interpolated spatial fields. FRM mass is not interpolated.

[57] The default assumption is that the average of the middle 3 years of speciation data is representative of the 5-year weighted average FRM data. However, other assumptions (number of years of speciation

(5) The weighted quarterly average FRM design values are used as the base year FRM value for each monitoring site (2012-2016). The species fractions from the 2013-2015 speciation data were used to estimate the species concentrations for the base year FRM $PM_{2.5}$ data. The percentage compositions for 2013-2015 are applied to the quarterly weighted average design values as shown in table 4.4.4. In the example below, the weighted average design value for the 3rd quarter for the site from table 4.4.1 is 20.00 μg/m3. This leads to the following concentrations of $PM_{2.5}$ species:

**Table 4.4.4** Calculation of the "base case" species concentrations at site 1

| Weighted Avg. FRM Mass (μg/m3) | Blank Mass (μg/m3) | Non-blank Mass (μg/m3) | Sulfate (μg/m3) | Nitrate (μg/m3) | Organic aerosol (μg/m3) | Elemental Carbon (μg/m3) | Water (μg/m3) | Ammonium (μg/m3) | Salt | OPP (μg/m3) |
|---|---|---|---|---|---|---|---|---|---|---|
| 20.00 | 0.2 | 19.80 | 7.52 | 0.98 | 4.60 | 0.80 | 2.04 | 2.92 | 0.31 | 0.63 |

This procedure is repeated for each $PM_{2.5}$ site and quarter to complete the calculation of base year ambient concentrations used as the basis for future estimates of $PM_{2.5}$ mass and its components.

---

data) can be used. It is generally assumed that the inter-annual variability of the species fractions is small compared to the variability of species concentrations.

(6) Modeled results show the following relative response factors (RRF) for predicted mass of 5 components of $PM_{2.5}$ for the 3rd quarter[58]:

**Table 4.4.5** 3rd quarter modeled RRFs for site 1

| RRF Sulfate | RRF Nitrate | RRF Organic aerosol | RRF Elemental Carbon | RRF Salt | RRF OPP |
|---|---|---|---|---|---|
| 0.8761 | 0.9432 | 0.9713 | 0.9324 | 1.0 | 1.0423 |

(7) The quarterly mean RRFs from table 4.4.5 are multiplied by the weighted quarterly average species concentrations from table 4.4.4 to derive future year concentrations.

From the example above, the future year 3rd quarter concentrations are:

$Sulfate_{Future}$ = 7.52 * 0.8761 = 6.58 µg/m3
$Nitrate_{Future}$= 0.98 * 0.9432 = 0.92 µg/m3
Organic carbon $mass_{Future}$= 4.60 * 0.9713 = 4.47 µg/m3
Elemental $Carbon_{Future}$= 0.80 * 0.9324 = 0.75 µg/m3
$Salt_{Future}$=0.31*1.0 = 0.31 µg/m3
$OPP_{Future}$= 0.63 * 1.0423 = 0.65 µg/m3

(8) The future year concentrations derived above are used to calculate the future year concentration of ammonium (if the direct ammonium RRF is not used) and particle bound water.

The future year ammonium concentrations are calculated from the sulfate, nitrate, and (base year) DON values. Assuming that the DON is unchanged from the base year[59], the ammonium is

---

[58] The default assumption for the annual average $PM_{2.5}$ NAAQS test is to calculate RRFs from the mean of the 3 X 3 matrix of grid cells surrounding each FRM monitoring site.

[59] Due to the uncertainty in the ammonium measurements, by default, the DON is assumed to stay constant through time. The water calculation is sensitive to the ammonium (and, therefore, the DON value) concentrations. Holding the DON constant allows for the future year ammonium and water values to be solely a function of the change in sulfate and nitrate concentrations. Otherwise, the water concentration can go up when the sulfate and nitrate concentrations go down (and vice versa). This may occur if sulfate becomes more neutralized in the future. It is a somewhat illogical outcome (although scientifically possible) and is highly dependent on an uncertain measurement (ammonium). Therefore,

calculated using the following formula:

$$NH4_{future} = DON * SO4_{future} + 0.29*NO3_{future}, \qquad\qquad [4.7]$$

In the example above, assuming the base year DON is 0.336,

$$Ammonium_{Future} = 0.336 * 6.58 + 0.29 * 0.92 = 2.48 \ \mu g/m3$$

The $NH4_{future}$, $SO4_{future,}$ and $NO3_{future}$ concentrations can then be input into an equilibrium model (AIM or another alternative model) or through a polynomial regression equation to predict future year particle bound water concentration (based on the default equation, the future year water concentration in this case is 1.73 μg/m3).

(9)  The future species concentrations at each FRM site are then summed over the eight species plus blank mass to estimate the future quarterly average $PM_{2.5}$ concentration.

In the example above, the total $PM_{2.5Future}$=
6.58 + 0.92 + 4.47 + 0.75 + 0.65 + 2.48 + 1.73 + 0.2 = 17.78 μg/m3

(10) The same calculations are completed for the other 3 quarters to get a future year $PM_{2.5}$ concentration for each quarter. The 4 quarters are then averaged to get a final future year annual average $PM_{2.5}$ concentration for each FRM site.

(11) The future year annual average concentration is compared to 12.0 μg/m$^3$.[60]

## 4.5    What Is the Recommended Modeled Attainment Test for the 24-Hour NAAQS?

Our recommended modeled attainment test for the 24-hour NAAQS for $PM_{2.5}$ is similar to the previously described test for the annual NAAQS in that it uses model predictions in a relative

_____

use of a constant DON creates a more stable set of calculations. If the measured and modeled ammonium concentrations are believed to be accurate and respond in a reasonable way to emissions controls, then it would be more scientifically credible to use the model predicted change in ammonium. Otherwise, it is a reasonable assumption to keep the DON constant over time.

[60] In the final step, the future year concentration should be rounded to the tenths digit. A (rounded) value of 12.0 μg/m3 meets the NAAQS. A value of 12.1 μg/m3 or greater violates the NAAQS.

sense to reduce site-specific *observations* (averaged over 5 years). In the test, we are interested in reducing the base year design values at each site to $\leq$ 35 $\mu g/m^3$ (the 2006 24-hour $PM_{2.5}$ NAAQS). [61]

Ideally, the modeled attainment test should reflect model results obtained for days in each season having observed $PM_{2.5}$ concentrations above the design value. Even though the 24-hour NAAQS is based on the single 98th percentile value of all days in the year, it is important to perform the test on a seasonal basis, since $PM_{2.5}$ consists of a mixture of pollutants whose composition can vary substantially from season to season. There could be a substantial amount of uncertainty associated with predictions on any single day. Thus, our test is most likely to be reliable when relative response factors (RRFs) reflect composite responses from multiple days. Therefore, we recommend modeling as many days as feasible where observed $PM_{2.5}$ is greater than 35 $\mu g/m^3$. Alternatively, the test can focus on the high end of the distribution of days in each quarter[62] (e.g., the top 10% of $PM_{2.5}$ days[63]) assuming that the high days are representative of days that violate the NAAQS. As with the annual NAAQS (and for the same reasons), the preferred approach is to develop RRFs, which are quarter specific[64].

The 24-hour $PM_{2.5}$ attainment test should be based on the same 5-year weighted average methodology that was used for the annual standard, with some slight modifications. The 24-hour design values are calculated from the 98th percentile value for each year. In the 24-hour $PM_{2.5}$ calculations, the 98th percentile value from each year is used in the final calculations. Since the 98th percentile value can come from any day in the year, all quarters and years should be carried through to near the end of the calculations. To calculate final future year design

---

[61] *See* 71 FR 61224 and 40 CFR 50.13.

[62] Similar to the annual $PM_{2.5}$ NAAQS, the default recommended procedures for the 24-hr NAAQS assume handling of the ambient data and model data on a calendar quarter basis. However, in some nonattainment areas, 24-hr $PM_{2.5}$ NAAQS exceedances may occur during a very limited time of the year or season. Processing the data (both ambient and model) on a sub-quarterly basis may be appropriate in certain circumstances.

[63] For most sites, the top 10% of monitored days per quarter will represent between 3 and 8 ambient measurement days.

[64] In some areas it may not be necessary to model and evaluate the 24-hour NAAQS for all quarters. For example, if observed $PM_{2.5}$ concentrations only exceed the NAAQS in the 1st and 4th quarters, and concentrations in the 2nd and 3rd quarters are very low, then it may not be necessary to model the full year. But for areas that have monitored violations (or high values that are close to the NAAQS) in all four seasons, the entire year should be evaluated.

values, the 98th percentile day for each year is identified and then a 5-year weighted average of the 98th percentile values for each site is calculated to derive the future year design value.[65] In nonattainment areas that measure violations of the daily $PM_{2.5}$ NAAQS in multiple seasons (most often summer and winter), the highest PM days can sometimes shift between seasons when days are projected to the future. A consequence of this shift is that a base year 98th percentile winter day may have a higher future year concentration than a summer day that started with a higher concentration in the base year. Therefore, the recommended attainment test methodology has been designed so that the temporal distribution of high days in the base and future periods can shift between quarters.

In the 24-hour attainment test methodology (described below), the eight highest ambient $PM_{2.5}$ days in each quarter at each site are projected to the future (32 days per year) using species specific quarterly RRFs. After all 32 days are projected to the future, the days are re-ranked to determine the future year 98th percentile day.[66] The rank of the future year 98th percentile day is selected based on the rank of the observed 98th percentile day in the base year ambient data (which depends on the number of valid daily samples). For example, at monitoring site A, if there are 120 observations in year 1 then the 98th percentile day is the 3rd high observation day for the year. In that case, the future year 98th percentile day is selected as the 3rd high future day for the year (out of the 32 highest days).

Similar to the annual $PM_{2.5}$ attainment test, we recommend interpolation techniques for FRM monitors that do not have co-located speciation data. Because the 24-hour standard is a 98th percentile-based value, the species composition on high concentration days may be highly variable from day to day and from site to site. Therefore, while interpolation techniques may be needed, we strongly recommend collecting speciation data at all FRM sites that violate the 24-hour NAAQS. A precise estimate of the $PM_{2.5}$ components at violating sites will help reduce uncertainty in projecting the future year concentration estimates.

---

[65] Similar to the annual average $PM_{2.5}$ attainment test, design values are calculated for consecutive 3-year periods. From the 5-year base period, three design values are calculated and then averaged together to create a 5-year weighted average.

[66] The observed 98th percentile day is always between the 1st and 8th high for the year, depending on the sampling schedule. Therefore, projecting the 8 highest days in each quarter ensures that the observed 98th percentile day is always captured. Additional days could be projected, but a maximum of 32 days per year is needed to guarantee that the 98th percentile observation day at each site is projected to the future.

We recommend a modeled attainment test for the 24-hour PM$_{2.5}$ NAAQS with the following steps.

**Step 1. Identify the high observed PM$_{2.5}$ days at each FRM monitoring site for each year.**

The first step in projecting the daily design value is to identify at each FRM site, the eight highest observed 24-hour PM$_{2.5}$ concentration days in each quarter for each year of the base period (up to 5 years), and identify the day rank of the observed 98[th] percentile value for each year based on the number of collected ambient samples (i.e., 3[rd] highest day of the year). This results in a data set containing 32 days of data for each year (for up to 5 years) for each site.[67]

The test should be performed for each monitoring site that meets the data completeness criteria for calculating a design value for the 24-hour NAAQS. There may not always be data available for all four quarters and all 5 years. We recommend using 8 days per quarter because the 98th percentile day for a year is always one of the 8 highest days of the year.[68] If all of the high days occur in a single quarter, then using the 8 highest days from each quarter will ensure that the actual 98th percentile day is always captured. This may result in processing more days than necessary, but effectively limits the future year design value calculations to a reasonably small number of days.

**Step 2. Calculate "high days" species fractions for each quarter for each FRM monitor.**

In this step, quarterly ambient species fractions on "high" days are calculated for each of the major component species of PM$_{2.5}$ (i.e., sulfate, nitrate, ammonium, elemental carbon, organic carbon mass, particle bound water, salt, and blank mass). This calculation is performed by dividing the average monitored concentrations of FRM-derived total PM$_{2.5}$ mass on the high PM$_{2.5}$ days at each site for each quarter, by the average monitored species concentration on the high PM$_{2.5}$ days for each quarter.[69] The default recommendation for identification of "high"

---

[67] The methodology does not assume that the temporal distribution of high days in the base and future periods will remain the same. We recommend projecting at least 8 ambient days per quarter from the base period to the future and then re-rank the entire set of days to find the new future year 98th percentile value (for each year).

[68] If there are 365 samples in a year, then the 98th percentile is the eighth high day.

[69] Similar to the annual average calculations, for FRM sites that do not have co-located species data, we recommend calculating the quarterly species fractions using interpolated species data. For the 24-hour species interpolations, we recommend interpolating the average of the highest 10% of monitor days in each quarter.

days is the top 10% of days in each quarter. This results in a relatively robust calculation, which typically uses between 3 and 9 days per quarter (depending on the sampling frequency). The end result is a set of quarterly "high days" species fractions for each FRM site.

**Step 3. Calculate species concentrations for each of the high ambient days.**

Multiply the quarterly "high day" species fractions from step 2 by the $PM_{2.5}$ mass concentration for the 8 high days per quarter identified in step 1. This results in a set of species concentrations for each of the 32 days per year identified in step 1.

**Step 4. Calculate component specific RRFs for the high days in each quarter.**

For each quarter, calculate the ratio of future year to base year modeled predictions for sulfate, nitrate, elemental carbon, organic carbon, salt, and OPP for the top 10 percent of modeled $PM_{2.5}$ days based on modeled concentrations of 24-hour average $PM_{2.5}$. The result is a set of species-specific "high day" RRFs for each quarter.

The relative response factor for component j at a site i is given by the following expression:

$$(RRF)_{ij} = ([C_{j,\ projected}]/[C_{j,\ base\ year}])_i$$

where $C_{j,\ base\ year}$ is the base year mean species concentration (for the high modeled $PM_{2.5}$ days for each quarter) predicted at the (single) grid cell which contains monitoring site$_i$.

$C_{j,\ projected}$ is the future year mean species concentration (for the high modeled days for each quarter) predicted at the (single) grid cell which contains monitoring site$_i$.

For example, assume that base year predicted sulfate mass on the 10 percent highest $PM_{2.5}$ days for quarter 3 for a particular location is 20.0 $\mu g/m^3$ and the future year modeled sulfate concentration is 16.0 $\mu g/m^3$, then the RRF for sulfate for quarter 3 is 16.0/20.0 or 0.80. Due to potentially large spatial and temporal gradients, we recommend 24-hour $PM_{2.5}$ NAAQS RRFs to be calculated based on the modeled concentrations at the single grid cell where the monitor is located.

**Step 5. Apply the component specific RRFs to observed air quality by quarter.**

For each of the 8 days in each quarter, multiply the daily species concentrations from step 3 by the quarterly species-specific RRFs obtained in step 4. If there is 1 modeled base year, then there will be four quarterly RRFs at each monitor. The modeled quarterly RRF for quarter 1 is multiplied by the ambient data for quarter 1 (8 days in each year) for each of the 5 years of ambient data. For example, for day A, 21.0 $\mu g/m^3$ nitrate x 0.75 = future nitrate of 15.75 $\mu g/m^3$. The same procedure is applied for the 8 high days per quarter in the other 3 quarters. This leads to an estimated future concentration for each component for each day.

**Step 6. Calculate remaining future year PM2.5 species.**

The future year concentrations for the remaining species are then calculated for each of the days.[70] Similar to the annual $PM_{2.5}$ attainment test, we recommend that the future year ammonium is calculated based on the future year sulfate and nitrate concentrations, using a constant value for the degree of neutralization of sulfate (from the ambient data). The future year particle bound water concentration is then calculated from an empirical formula derived from the AIM model. The inputs to the formula are the future year concentrations of sulfate, nitrate, and ammonium calculated in step 5.

**Step 7. Sum the species components to get total PM$_{2.5}$ concentrations for each day.**

Sum the species concentrations for each day to obtain total $PM_{2.5}$ values for the 32 days per year per site.

**Step 8. Determine future year 98th percentile concentrations for each site year.**

Sort the 32 days for each site for each year by total $PM_{2.5}$ concentration. For each site year, the monitored 98th percentile rank (for each year) is used to identify the 98th percentile rank for each year.[71] For example, if the base year 98th percentile value for year 1 was the 3rd high concentration, then the future year 98th percentile concentration is identified as the 3rd high future year $PM_{2.5}$ concentration (out of the 32 days).

---

[70] If salt is not explicitly modeled, then the salt RRF should be held constant. Blank mass is assumed to be constant between the base and future year.

[71] This assumes that the ambient sampling schedule (and number of samples) would remain the same between base and future years.

**Step 9. Calculate future 5-year weighted average 24-hour design values and compare to the NAAQS.**

The estimated 98th percentile values for each of the 5 years are averaged over 3-year intervals to create 3-year average design values (e.g., the 98th percentile values from year 1, year 2, and year 3 are averaged. Then the 98th percentile values from year 2, year 3, and year 4 are averaged, etc.). These design values (up to 3) are then averaged to create a future year 5-year weighted average design value for each monitoring site.

The preceding steps for determining future year 24-hour $PM_{2.5}$ concentrations are applied for each FRM site. The 24-hour $PM_{2.5}$ design values are truncated after the first decimal place. This approach is consistent with the truncation and rounding procedures for the 24-hour $PM_{2.5}$ NAAQS. Any value that is greater than or equal to 35.5 μg/m$^3$ is rounded to 36 μg/m$^3$ and violates the 24-hour NAAQS. Similarly, a value of 35.4 μg/m$^3$ is rounded down to 34 μg/m$^3$ and is attaining the 24-hour NAAQS.

## 4.6    Local Area Analyses - Special Considerations for Primary $PM_{2.5}$

Primary PM does not undergo chemical transformation between being emitted and its arrival at a receptor location. Thus, high concentrations of primary PM can occur without relatively lengthy travel times from source to receptor. Unlike secondary PM or ozone, we would expect concentrations of primary PM to increase the closer one gets to the source(s) of emissions. Therefore, if a designated nonattainment area contains concentrated sources of primary PM, we would expect there to be relatively large spatial gradients near sources of the primary portion of the organic carbon, elemental carbon and other PM components of ambient $PM_{2.5}$ (these localized areas of high concentrations are often called "hotspots").

Note that the $PM_{2.5}$ NAAQS ambient monitoring rule language[72] indicates that some monitoring locations may not be comparable to the annual $PM_{2.5}$ NAAQS. $PM_{2.5}$ measurement data from monitors that are not representative of "area-wide" air quality, but rather of relatively unique micro-scale, or localized hot spot, or unique middle-scale impact sites, are not eligible for comparison to the annual $PM_{2.5}$ NAAQS. The ambient air quality monitor siting rules define the appropriate scales of influence for the $PM_{2.5}$ monitoring network.[73]

---

[72] *See* 40 CFR 58.30.
[73] *See* 40 CFR part 58, Appendix E.

### 4.6.1  Analysis of Primary PM$_{2.5}$ Impacts at Monitors

The majority of FRM and FEM PM$_{2.5}$ monitors are located at "urban scale" sites. These sites tend to represent relatively large spatial scales and do not have large gradients compared to other monitors in the area. Some sites are classified as "neighborhood" scale and may be influenced by more local sources. There are also near-road sites that have specifically been sited to measure gradients that may exist near heavily travelled roads. For reasons stated above, local influences creating large spatial gradients are likely to consist mostly of primary PM$_{2.5}$ (OC, EC, and OPP). These sources may be point sources, or they may be nearby roads or other mobile or area sources.

As part of the attainment demonstration modeling, it may be necessary to evaluate the local-scale impacts of primary PM$_{2.5}$ sources for contributions to the 24-hour and/or the annual NAAQS. As stated earlier, for the purposes of determining attainment with the NAAQS, it may not always be appropriate to compare ambient data from PM$_{2.5}$ monitoring sites that are dominated by point sources to the annual NAAQS. But there are numerous cases where local source contributions may not be dominant, but are a sizable contributor to total PM$_{2.5}$ (~10-30% of total annual average PM$_{2.5}$). In these cases, a more refined analysis of the contribution of local primary PM$_{2.5}$ sources to PM$_{2.5}$ at the monitor(s) will help explain the causes of nonattainment at and near the monitor and may lead to the more efficient ways to attain the NAAQS by controlling emissions from local sources which may be important contributors to the violating area.

There are several modeling tools that can be used to evaluate contributions of local PM$_{2.5}$ sources. A grid model can be run at very high horizontal resolution (1 or 2 km or finer) or a Gaussian dispersion model can be used. Grid based models simulate chemical transformation and complex meteorological conditions, while dispersion models are generally more simplistic; being limited to a local-scale, using Gaussian approximations with little or no chemistry. Therefore, while dispersion models may not be an appropriate tool for determining secondary PM$_{2.5}$ or ozone concentrations, they work well for use in determining local primary PM$_{2.5}$ impacts. The model(s) and model setup should be evaluated to determine the most appropriate tools for a specific situation.   Regardless of which type of models are used to evaluate changes in primary PM$_{2.5}$ at monitoring locations, we recommend that the model results be used in a relative manner. This is consistent with the already described attainment tests. If a grid model is used at very high resolution, the attainment test as described in sections 4.4 and 4.5 should be followed. If a Gaussian dispersion model is used, then the application of the attainment test

134

will vary slightly. The test will need to combine results from the chemical transport grid based modeled attainment test and the results from local-scale dispersion modeling. Because each nonattainment area has unique emissions sources and source-receptor relationships, air agencies should work closely with their EPA Regional office in developing local area analysis applications. The nature of the analyses and calculations of $PM_{2.5}$ concentrations (base and future) depend on the type(s) of local sources, measured PM gradients, the NAAQS being examined, and the model(s) used.

## 4.6.2  Analysis of Primary $PM_{2.5}$ Impacts at Monitors Using a Gaussian Dispersion Model

To apply a dispersion model in an attainment test, it is important to determine the local component of primary $PM_{2.5}$ at the monitor and the sources that are contributing to this component. There is no single, simple method for quantifying this contribution, but detailed analysis of ambient data and advanced data analysis techniques such as receptor modeling may help quantify the contribution. EPA provides software and information on the CMB, UNMIX, and PMF receptor models.

The simplest method for identifying the local component of $PM_{2.5}$ is to examine local ambient $PM_{2.5}$ concentrations. For this type of analysis, it is important to identify the local contributions from as small a source area as possible. This will make it easier to identify contributing sources. One aspect of this analysis is to examine monitored concentration differences between urban monitors (with the highest concentrations) and more suburban measurements. This is likely to provide a representative indication of the excess contribution from a relatively local area. "Urban excess" calculations which pair an urban monitor with an appropriate rural background monitor (U.S. EPA, 2004b) are likely to indicate "local" contributions that may be representative of a metropolitan area. In most cases, the local component will include contributions from more than one source.

Sources identified as contributing to the monitor through emissions analysis or data analysis (such as receptor modeling) can then be modeled with a dispersion model (or alternatively, a very high resolution grid model).  It is common practice to run dispersion models for a limited number of major point sources or line sources in relatively small areas (out to a maximum

distance of ~50 km).[74] Dispersion models can also be run for all sources of primary $PM_{2.5}$ in a limited area (including mobile, non-road, and area sources).

When applying a model to evaluate the impacts from emissions of primary $PM_{2.5}$, one should determine the $PM_{2.5}$ species that make up the local primary PM.[75] We recommend that the individual components of primary $PM_{2.5}$ be tracked separately. This will allow for a more thorough evaluation of the modeling results (comparing model output to speciated ambient data) and may aid in the development of primary $PM_{2.5}$ control strategies.

The majority of the primary $PM_{2.5}$ will consist of the primary portion of the organic carbon component, elemental carbon (EC), and the general category of "other primary particulate matter" (OPP). Speciated $PM_{2.5}$ measurements may be able to identify some of the more important "other" inorganic components such as heavy metals or salt. In some cases, directly emitted sulfate (and in rare cases nitrate) may also be a significant component of the local primary $PM_{2.5}$.

As part of a local-source impact analysis, an estimated concentration or fraction of primary OC may be needed. There are several methods available for estimating the primary versus secondary portion of ambient OC. Among these are the EC tracer method and receptor modeling. The EC tracer method is the most common method used to estimate secondary and primary OC concentrations (Turpin, 1995), (Strader, 1999), (Cabada, 2004), (Chu, 2005), (Saylor, 2006). The method uses measurements of OC and EC and calculated OC to EC ratios to identify periods when OC is likely to be mostly primary. This information is then used to calculate the secondary contribution to OC. Receptor models such as CMB and PMF have also been used to estimate secondary organic concentrations (Na, 2004), (Yuan, 2006).

Because each nonattainment area has unique emissions sources and source-receptor relationships, air agencies should work closely with their EPA Regional office in developing local area analysis applications.

---

[74] This guidance document only applies to $PM_{2.5}$ attainment demonstrations to satisfy requirements in CAA Section 189. Other guidance documents and procedures are applicable for $SO_2$, $NO_2$, CO, and/or Pb attainment demonstrations and/or $PM_{2.5}$ permitting applications.

[75] The $PM_{2.5}$ emissions should be broken out into individual species using the best information available. Typically, SCC specific speciation profiles are used to "speciate" the PM into individual components. Local, source specific information should be used whenever possible.

### 4.6.2.1 Double Counting

Application of a local area analysis may result in double counting of local emissions sources and reductions. This can happen when a change in emissions is examined with both a dispersion model and a chemical transport model.

The potential for double counting can be evaluated by considering the grid resolution of the chemical transport model and the number of sources in the dispersion model. The finer the resolution of the grid model, the more double counting may be a problem (because the local sources will be more finely resolved). Additionally, the more sources that are run with the dispersion model, the more double counting may be a problem. If the grid cell size is relatively large (e.g., 12km) and the primary emissions are relatively small, it may be possible to assume that double counting is small enough to be ignored. But the nature of the issue should be evaluated on a case by case basis.

The simplest way to evaluate the magnitude of the problem is to run the chemical transport model with and without the sources from the dispersion model. This will indicate the maximum impact that the sources can have on the chemical transport modeling results. A very small impact means that double counting is not a problem. A large impact indicates that a more explicit analysis is needed in order to resolve double counting issues.

### 4.6.2.2 Analysis of Primary $PM_{2.5}$ at Monitors- Quality Assurance

As with any modeling exercise, it is important to quality assure the model inputs and outputs. In particular, we recommend focused quality assurance checks on emissions from sources flagged for a dispersion modeling analysis. Prior to applying a model, air agencies should review available information to ensure that there are no major discrepancies between modeled estimates and nearby monitored data for PM. The emission factors, activity data, and speciation profiles of the $PM_{2.5}$ emissions should also be analyzed for accuracy. If a speciation monitor exists, the speciated data from the monitor can be compared to the speciation profiles of the flagged sources. Receptor models can also be used as a QA tool. Discrepancies between receptor modeling results (which are based on analyzing ambient data) and speciated emissions may indicate a problem with the magnitude and/or the speciation of the emissions sources. If discrepancies are found, those implementing the modeling protocol (see section 2.1) should consult with the appropriate EPA Regional office to reach agreement on what, if any, adjustments should be made to the emissions estimates for the identified sources.

It is also important to quality assure the model outputs. Modeling each species of primary $PM_{2.5}$ separately within the dispersion model should aid in this analysis, especially if the selected control strategies applied in the future year do not control each primary species to the same degree. If a speciation monitor exists, the speciated data from the monitor may also help quality assure the dispersion model results. However, the application of the dispersion model results in a relative sense will help to reduce the impact of possible over- or under-estimations by the dispersion model due to emissions, meteorology, or general selection of other model input parameters.

## 4.7   Estimating design values at unmonitored locations

High ozone and/or $PM_{2.5}$ concentrations can occur at (or near) existing ambient monitors or in unmonitored areas. The modeled attainment test is primarily a monitor-based test. As such, the focus of the attainment test is whether attainment can be reached at existing monitors. An additional "unmonitored area analysis" can also be performed to examine ozone and/or $PM_{2.5}$ concentrations in unmonitored areas. The unmonitored area analysis is intended to be a means for identifying high ozone and/or $PM_{2.5}$ concentrations outside of traditionally monitored locations, particularly in nonattainment areas where modeling or other data analyses have indicated potential high concentration areas of ozone and/or $PM_{2.5}$ outside of the existing monitoring network. An unmonitored area analysis may also be more important in areas where the ozone or $PM_{2.5}$ monitoring networks just meet or minimally exceed the minimum required network in a nonattainment area.

This review can help ensure that a control strategy leads to reductions in ozone or $PM_{2.5}$ at other locations which could have base case (and future) design values exceeding the NAAQS were a monitor deployed there. In addition, analysis of concentrations in unmonitored areas may serve other purposes such as helping to site new (or move existing) monitors, examining health benefits from emissions reductions, and analyzing the impact of potential new or modified emissions sources. This document describes how an unmonitored area analysis can be performed for a particular area. See the respective ozone and $PM_{2.5}$ SIP Requirements Rules (including the preambles and response to comments documents) for more information on when an unmonitored area analysis is recommended or required.

We use the term "unmonitored area analysis" to describe an analysis that uses a combination of model output and ambient data to identify areas that might exceed the NAAQS in areas that are not currently monitored.  An unmonitored area analysis for a particular nonattainment area is intended to address the potential for air quality problems within or near that nonattainment

area. The analysis should include, at a minimum, all nonattainment counties and counties surrounding the nonattainment area, as appropriate. It is possible that unmonitored area violations may appear in counties far upwind or downwind of the local area of interest. In those cases, the distance to the nonattainment area and ability of the modeling to represent far downwind areas should be evaluated on a case-by-case basis.

The spatial resolution of the unmonitored area analysis should be consistent with the appropriate model resolution for the attainment demonstration. For example, if the attainment demonstration for ozone or $PM_{2.5}$ is conducted at 12km grid resolution, then in most cases, the unmonitored area analysis should also be performed at the same horizontal resolution.

## 4.7.1  Why does the unmonitored area analysis need to use both ambient data and model output?

When performing an unmonitored area analysis, it is recommended to use interpolated spatial fields of ambient data in combination with gridded modeled outputs (i.e., fused surfaces). Ambient data can be interpolated to provide a set of spatial fields. The resultant spatial fields will provide an indication of pollutant concentrations in monitored and unmonitored areas. But interpolated ambient data cannot identify unmonitored areas with higher concentrations than those measured at monitors. The interpolated concentration between monitors will generally be the same or lower than the measured concentration at the monitors (assuming that more sophisticated statistical techniques are not used). Simple interpolation techniques do not account for emissions or chemistry information that may be needed to identify high concentrations in unmonitored areas.

In addition to interpolated surfaces, gridded model output (absolute) concentrations (from a chemical transport model) can be used to examine unmonitored area concentrations. The model provides an hourly concentration output for every grid cell. The concentrations can be analyzed to determine unmonitored areas where the model predicts high values. But the absolute predictions from the model may not be entirely accurate (they may be biased high or low). But unlike the interpolated ambient data, the model explicitly accounts for emissions, chemistry, and meteorological processes over the entire domain.

Interpolated ambient data and absolute model outputs both have strengths and weaknesses. We can take advantage of the strengths of each dataset by combining the two types of data. Interpolated spatial fields of ambient data provide a strong basis for estimating accurate pollutant concentrations at and near monitor locations. And the model outputs can be used to

adjust the interpolated spatial fields (either up or down) so that more accurate estimates can be derived in unmonitored areas.[76] A recommended way to use the modeling in the creation of fused surfaces is to adjust the ambient spatial fields using the concentration *gradients* derived from the model predictions. It is preferable to assume that the model is accurately predicting areas of generally high or low ozone or PM, rather than to assume that the absolute predictions from the model are correct. For example, in unmonitored locations where the model predicts <u>relatively</u> high ozone or PM concentrations, the spatial fields can be adjusted upward. In unmonitored locations where the model predicts <u>relatively</u> low ozone or PM concentrations, the spatial fields can be adjusted downward. In this way, it may be possible to predict unmonitored locations that may be likely to record high concentrations (were a monitor located there). We refer to this combination of interpolated spatial fields and modeled output as "gradient adjusted spatial fields."

## 4.7.2  Implementation of Gradient Adjusted Spatial Fields

A recommended methodology for developing gradient adjusted spatial fields is to first create base year fields. Future year estimates can then be created by applying gridded RRFs to the base year gradient adjusted spatial fields. The basic steps are as follows:

1) Interpolate base year ambient data to create a set of spatial fields.
2) Adjust the spatial fields using gridded model-based spatial gradients (base year values).
3) Apply gridded model-based RRFs to the gradient adjusted spatial fields.
4) Determine if any unmonitored areas are predicted to exceed the NAAQS in the future.

EPA's <u>SMAT</u> will spatially interpolate data, adjust spatial fields based on model output gradients, and multiply the fields by model calculated RRFs (steps 1-3 above) (U.S. EPA, 2018), (ABT, 2014). Air agencies can use the EPA-provided software or may wish to develop alternative techniques that may be appropriate for their area, situation, and/or purpose. Air Agencies should consult with the appropriate EPA Regional office to determine if and how an unmonitored area analysis should be conducted.

**Step 1**

The first step in developing an unmonitored area analysis is to interpolate ambient data. Ideally, design values should be interpolated. Either the 5-year weighted average design values

---

[76] The accuracy of interpolated fields can be evaluated by removing data from monitors (either in groups or one at a time) to see how well the interpolation scheme estimates known concentrations at ambient monitoring sites. This is known as a cross-validation.

that are used in the monitor based modeled attainment test or a single design value period can be used in the development of ambient spatial fields. Care should be taken so that the interpolated fields are not unduly influenced by monitoring sites that do not have complete valid data. Since the design values can vary significantly from year to year, it is important to use a consistent set of data.

We are not recommending a single interpolation technique. EPA's SMAT uses the Voronoi Neighbor Averaging (VNA) interpolation technique. Past analyses have used a Kriging interpolation technique (U.S.EPA, 2004).

For ozone analyses, a single spatial field of ozone values is needed. But for the $PM_{2.5}$ NAAQS, the EPA recommends creating interpolated spatial fields for $PM_{2.5}$ (FRM) and for each component species of $PM_{2.5}$. For the annual $PM_{2.5}$ NAAQS, a set of quarterly average spatial fields can be created. The four quarters are averaged to get an annual average set of fields.

For the 24-hour $PM_{2.5}$ standard, a spatial field can be created using the high end of the distribution of 24-hour $PM_{2.5}$ concentrations. This is best represented by interpolating the measured high values from each quarter. For the $PM_{2.5}$ component species, we recommend interpolating the high $PM_{2.5}$ days in each quarter. This can be based on the highest monitored days in each quarter.

**Step 2**

The second step in the process involves the use of gridded model output to adjust the spatial fields derived from ambient data. SMAT uses the eVNA technique, where the VNA interpolation is "enhanced" by adjusting the interpolated values based on the modeled ozone or PM (or PM species) gradient. See the SMAT user's guide for more details (U.S. EPA, 2018), (Abt, 2014). Other "model adjusted" spatial fields techniques include Hierarchical-Bayesian (McMillan, 2010) and "Downscaler" (Berrocal, 2010a and 2010b).

A specific metric is needed to determine the model predicted gradient in concentrations for each of the NAAQS. For ozone, a logical metric is the 4th highest ozone prediction in each grid cell.[77] For the annual $PM_{2.5}$ NAAQS, the model predicted quarterly mean concentrations for $PM_{2.5}$ and $PM_{2.5}$ species can be used to adjust the ambient spatial fields. For the 24-hour $PM_{2.5}$ NAAQS, the gradient adjusted fields can be derived from the high end of the distribution of

---

[77] The metric should approximate the measured design values at monitoring sites. Depending on the days modeled, other metrics, such as the average of the top 4 modeled days may be a better proxy for the design value.

141

daily averages in each quarter. This could be for the top 10% of modeled days in each quarter or for all days with 24-hour average concentration > 35 µg/m3 (or some other relatively high value).

**Step 3**

The next step is to create future year spatial fields by multiplying the base year gradient adjusted spatial fields by model derived gridded RRFs. The RRFs for the unmonitored area analysis are calculated in the same way as the monitored based attainment test (except that the grid cell array is not typically used in the spatial fields based analysis). The future year concentrations are equal to the base year concentration multiplied by the RRF in each grid cell. For ozone, a single spatial field is multiplied by a single set of model derived RRFs. For $PM_{2.5}$, the RRFs for each of the species, for each quarter, are multiplied by the spatial fields for each species, for each year.

## 4.7.3  Using the Results of the Unmonitored Area Analysis

For ozone and/or $PM_{2.5}$ attainment demonstrations, the future year gradient adjusted spatial fields can be analyzed to determine if any grid cells are predicted to remain above the NAAQS. States should consult with their EPA Regional office to determine if an unmonitored area analysis should be conducted for a particular nonattainment area and, if so, how the analysis should be conducted and how the results should be used.

142

# 5.0    What Is the Recommended Modeling Method for Developing Air Quality Goals for Regional Haze?

This section focuses on the modeling analysis needed to set RPGs that reflect the enforceable emission limitations, compliance schedules, and other measures included in the long-term strategy of a regional haze SIP.[78] In this section, we describe the recommended modeled analysis to assess visibility conditions at the end of an implementation period (i.e., the future end-point of a multi-year planning period under the regional haze program). The visibility analysis has many similarities to the $PM_{2.5}$ attainment tests described in sections 4.4 and 4.5. The recommended visibility analysis and the attainment tests both use monitored data to define base year air quality. They divide $PM_{2.5}$ into major species, and component-specific relative response factors are multiplied by base year monitored values to estimate future concentrations.

Section 5.1 provides background information on the requirements of the Regional Haze Rule and explains how RPGs are used in the regional haze program once they are set. The rest of the section describes the recommended modeling analysis to evaluate future year changes in visibility impairment. This document does not address how a state should develop its long-term strategy of emissions controls for regional haze or determine the uniform rate of progress for a Class I area.

## 5.1    Regional Haze Rule Background

The  modeling results are used to quantify the amount of progress, expressed in deciviews of visibility improvement, anticipated to be made at individual Class I areas as of the end of an implementation period. Reasonable progress goals are calculated separately for the 20% most impaired days and the 20% clearest days at each Class I area. These values are then compared to visibility conditions in the "baseline period" (2000-2004 for most areas)[79] for the same type of

---

[78] The main regional haze section of the guidance is related to setting reasonable progress goals. However, the guidance methods may also be applicable to other regional haze related modeling, including, but not limited to, evaluation of visibility impacts from sources and/or source sectors (including international impacts).

[79] In the context of attainment demonstrations for ozone and $PM_{2.5}$, the term "baseline period" is commonly used to refer to the base period used for modeling. Because the Regional Haze Rule defines "baseline period" specifically as 2000-2004, this section uses "baseline" and "baseline period" only when referring to 2000-2004. The term "base period" is used when referring to a more recent 5-year period used in the modeling-based projection of RPGs.

days (i.e., most impaired and clearest) to verify that the SIP provides for an improvement in visibility on poor visibility days and allows no degradation in visibility on good visibility days. The RPGs for the most impaired days are also plotted against the uniform rate of progress that would be needed at individual Class I areas to achieve natural visibility conditions in 2064, starting at baseline visibility conditions for 2000-2004. The results of this comparison inform whether the SIP must contain an additional component demonstrating that no additional control measures are necessary to make reasonable progress.

Reasonable progress goals are a regulatory construction promulgated to implement the statutory requirements for visibility protection. Section 169A(a)(1) of the Clean Air Act states, "Congress hereby declares as a national goal the prevention of any future, and the remedying of any existing, impairment of visibility in mandatory class I Federal areas which impairment results from manmade air pollution." This section later directs EPA to promulgate regulations to assure reasonable progress towards meeting this goal. Section 169B calls for EPA to "carry out the Administrator's regulatory responsibilities under [Section 169A], including criteria for measuring 'reasonable progress' toward the national goal."

In response to these mandates, EPA promulgated the Regional Haze Rule on July 1, 1999.[80] The rule was revised on January 10, 2017.[81] The regulations promulgated at 40 CFR 51.308(f) contain the relevant requirements for SIPs for the second and subsequent implementation periods, which are the SIPs that this guidance document addresses. Under section 51.308(f)(2), every state must determine the emission limitations, compliance schedules, and other measures that are necessary to make reasonable progress at Class I areas in the state and other Class I areas that may be affected by sources in the state. The collection of these measures is referred to as the long-term strategy. Under section 51.308(f)(3), a state in which a mandatory Class I Federal area is located must establish RPGs, one each for the 20% most impaired days and the 20% clearest days (expressed in deciviews) for each such area. These RPGs reflect the visibility conditions that are projected to be achieved by the end of the applicable implementation period as a result of its own and other states' long-term strategies, as well as the implementation of other requirements of the CAA. They are interim goals that represent the incremental visibility improvement achieved in each implementation period toward Congress's goal of eliminating visibility impairment from manmade emissions sources. The long-term strategy and the RPGs are developed in consultation with other affected air agencies and

---

[80] *See* 64 FR 35714.
[81] *See* 82 FR 3078.

Federal Land Managers.[82]

The Regional Haze Rule contains the following requirements that involve the RPGs once they
have been set.

> The reasonable progress goals (RPGs) must provide for an improvement in visibility for
> the 20% most anthropogenically impaired days relative to baseline visibility conditions
> and ensure no degradation in visibility for the 20% clearest days relative to baseline
> visibility conditions.[83] As explained in the RHR, the baseline for each Class I area is the
> average visibility (in deciviews) for the years 2000 through 2004.[84] The visibility
> conditions in these years are the benchmark for both the "provide for an improvement"
> and "no degradation" requirements.

> States are also required to determine the rate of improvement in visibility needed to
> reach natural conditions by 2064 for the 20% most anthropogenically impaired days,
> given the starting point of the 2000-2004 baseline.[85] The "glidepath," or uniform rate of
> progress (URP), is the amount of visibility improvement needed to stay on a linear path
> from the baseline period to natural conditions. Every state must compare its RPG for the
> 20% most anthropogenically impaired days to the point on the glidepath corresponding
> to the end of the implementation period. The results of this comparison determine
> whether a SIP must contain a demonstration that no additional emission reductions are
> needed to make reasonable progress towards achieving natural visibility conditions.

This section does not address the process of calculating the glidepath or determining the
measures for inclusion in the long-term strategy.[86]

## 5.2   How is Regional Haze Measured?

Regional haze is measured by an *extinction coefficient* ($b_{ext}$) that represents light attenuation
resulting from scattering and absorption of light from ambient PM plus scattering of light due
to gas molecules in the air (i.e., Rayleigh scattering). Although $b_{ext}$ can be estimated by several

---

[82] *See* 40 CFR 51.308(f)(2)(ii) and 51.308(i).

[83] *See* 40 CFR 51.308(f)(3)(i).

[84] *See* 40 CFR 51.308(f)(1) and definitions in 51.301.

[85] *See* 40 CFR 51.308(f)(1).

[86] For more details on calculating the URP and regional haze policy guidance, see draft guidance for the
second implementation period [note that the draft guidance document will be updated in Spring 2019].

different methodologies, the RHR requires that it be estimated using measured ambient PM. This follows since, for a given set of meteorological conditions, visibility can be improved by reducing concentrations of ambient PM. Thus, deriving $b_{ext}$ in this manner provides a direct link between regional haze and related pollutant concentrations.

## 5.2.1  IMPROVE Algorithm

The IMPROVE equation or algorithm reflects empirical relationships derived between measured mass of PM components and transmissometer measurements of $b_{ext}$ at a subset of monitoring sites in Class I areas within the IMPROVE monitoring network. The IMPROVE program revised the IMPROVE algorithm in 2006 (Hand, 2006); (Pitchford, 2007). The revised algorithm is intended to reduce biases in light extinction estimates. The revised algorithm is as follows:

bext = 2.2 x $f_s$(RH) x [Small Sulfate] + 4.8 x $f_L$(RH) x [Large Sulfate]

+ 2.4 x $f_s$(RH) x [Small Nitrate] + 5.1 x $f_L$(RH) x [Large Nitrate]

+ 2.8 x [Small Organic Mass] + 6.1 x [Large Organic Mass]

+ 10 x [Elemental Carbon]

+ 1 x [Fine Soil]

+ 1.7 x $f_{ss}$(RH) x [Sea Salt]

+ 0.6 x [Coarse Mass]

+ Rayleigh Scattering (site specific)

+ 0.33 x [NO$_2$ (ppb)]                              **[5.1]**

The numerical coefficients on the right hand side of the equation represent the light scattering or absorption efficiency, m$^2$/gm of the corresponding component of particulate matter,

$f_s$(rh), $f_L$(rh), $f_{ss}$(rh) are relative humidity adjustment factors applied to the light scattering efficiency (to be described in greater detail shortly), dimensionless;

SO$_4$ is the mass associated with sulfates, μg/m$^3$;

NO$_3$ is the mass associated with nitrates, μg/m$^3$;

OC is the mass associated with organic carbon, μg/m$^3$;

EC is the mass associated with elemental carbon, μg/m$^3$;

Fine Soil is inorganic primary particulate matter (excluding primary sulfate and nitrate particles) associated with soil components with aerodynamic diameter $\leq$ 2.5 μm, μg/m$^3$;

CM is coarse PM with aerodynamic diameter > 2.5 μm, but $\leq$ 10 μm, μg/m$^3$;

$b_{rayleigh}$ is light-scattering attributable to Rayleigh scattering, Mm$^{-1}$ (i.e., inverse "mega-meters"); and

$b_{ext}$ is the estimated extinction coefficient, Mm$^{-1}$.

The total sulfate, nitrate and organic mass concentrations are each split into two fractions, representing small and large size distributions of those components. The organic mass concentration is calculated as 1.8 times the measured IMPROVE organic carbon concentration, to adjust for organic mass from elements other than carbon. Terms are included for sea salt (important for coastal locations) and for absorption by $NO_2$ (only used where $NO_2$ data are available). Site-specific Rayleigh scattering is calculated based on the elevation and annual average temperature of each IMPROVE monitoring site.

The apportionment of the total concentration of sulfate compounds into the concentrations of the small and large size fractions is accomplished using the following equations:

[Large Sulfate] = [Total Sulfate]/20 μg/m$^3$ x [Total Sulfate], for [Total Sulfate] < 20 μg/m$^3$
[Large Sulfate] = [Total Sulfate], for [Total Sulfate] $\geq$ 20 μg/m$^3$

[Small Sulfate] = [Total Sulfate] - [Large Sulfate]

The same equations are used to apportion total nitrate and total organic mass concentrations into the small and large size fractions.

Sea salt is calculated as 1.8 x [Chloride] or 1.8 x [Chlorine] if the chloride measurement is below detection limits, missing or invalid. The algorithm also uses three water growth adjustment terms. They are for use with the small size distribution and the large size distribution sulfate and nitrate compounds and for sea salt ($f_S$(RH), $f_L$(RH) and $f_{SS}$(RH) respectively).

All or nearly all states used the revised algorithm in their SIPs for the first implementation period and the IMPROVE program has stopped reporting visibility data using the original

IMPROVE equation. Therefore, we now recommend using the revised IMPROVE equation for all reasonable progress related modeling calculations.

## 5.2.2  Deciview Haze Index

The RHR requires that reasonable progress is to be measured in terms of changes in a *deciview haze index* or simply "deciviews" (dv). Deciviews are defined as the natural logarithm of the ratio of the extinction coefficient to Rayleigh scattering (Pitchford and Malm, 1994).

$$\text{Deciview} = 10 \ln(b_{ext}/10) \qquad \textbf{[5.2]}$$

Where the units of $b_{ext}$ and light scattering due to Rayleigh scattering[87] (i.e., the "10" in the denominator of the logarithmic expression) are both expressed in $Mm^{-1}$.

A *change* in deciviews, which is how progress is tracked, is given by Equation (5.3). A one deciview change is equivalent to ~10% change in $b_{ext}$.

$$\Delta dv = dv_{future} - dv_{base} \qquad \textbf{[5.3]}$$

A negative number indicates a reduction in deciviews, which is an improvement in visibility.

## 5.2.3  Estimating Mass Associated with Components of Particulate Matter

All Class I areas either have on-site speciated $PM_{2.5}$ measurements or have been assigned a representative IMPROVE monitoring site with measurements.[88] Therefore, it is generally not necessary to interpolate measured $PM_{2.5}$ species data to a site. The existing IMPROVE database of $PM_{2.5}$ measurements should be adequate to provide data for all Class I areas.[89]

FRM data is not used in the regional haze analysis and it is not necessary for the sum of species

---

[87] Even though the "revised" IMPROVE equation uses a site-specific Rayleigh scattering value, the denominator in the deciview equation should always be 10. In this way, the deciview calculation will be consistent across all Class I areas. When the site-specific Rayleigh scattering is less than 10 (at high elevation sites), the deciview value can be negative (on very clean days), but this should not be considered a problem.

[88] See U.S. EPA 2003b, Appendix A, Table A-2.

[89] There are some IMPROVE sites that do not have enough complete data to provide baseline condition information for the 2000-2004 period. Data substitution is addressed in 40 CFR 51.308(f)(1)(i) and also discussed in (U.S. EPA 2003b).

components to equal gravimetric measurements obtained with a Federal Reference or equivalent method for measuring $PM_{2.5}$. Therefore, for regional haze calculations, it is not necessary to use the speciated data adjustment procedures introduced in section 4.4 (the "SANDWICH" adjustments).

Hand (2006) has developed a set of default assumptions for mass associated with each of the components of PM for Equation (5.1). These are presented in Table 5.1. The components in Table 5.1 are similar to those used in the modeled attainment demonstrations for the $PM_{2.5}$ NAAQS. Notice, however, that sulfate and nitrate mass are assumed to be fully neutralized (therefore, ammonium is not needed as a separate component); organic carbon is assumed to be equal to 1.8 times **measured** OC mass; there is no water component; and there is a term for coarse PM.

**Table 5.1.** Default Assumptions Used to Derive Aerosol Species Concentrations from IMPROVE Data for Estimating Extinction Coefficients

| (1)<br>Species | (2)<br>Formula | (3)<br>Assumptions |
|---|---|---|
| Sulfate | 1.375 *measured SO4 | Sulfate is assumed to be fully neutralized (ammonium sulfate) |
| Nitrate | 1.29 * measured nitrate | Denuder efficiency is ~100% & all nitrate is from ammonium nitrate |
| EC | high + low temperature EC | All high temperature carbon is elemental |
| OC | 1.8 * organic carbon | Average organic molecule is 56% carbon |
| Fine Soil | 2.2*Al + 2.49*Si + 1.63*Ca + 2.42*Fe + 1.94*Ti | (Soil K)=0.6(Fe), FeO & $Fe_2O_3$ are equally abundant, a factor of 1.16 is used for MgO, $Na_2O$, $H_2O$ & $CO_3$ |
| Sea Salt | 1.8*Cl- | Sea salt is 55% chloride ion by weight |
|  |  |  |

| PM$_{2.5}$ | | -Measured gravimetrically<br>-Represents dry ambient fine aerosol mass |
|---|---|---|
| CM<br>(coarse mass) | (PM$_{10}$) - (PM$_{2.5}$) | Consists only of insoluble soil particles |

Throughout this section we make every attempt to be consistent (aside from the use of the revised IMPROVE algorithm) with corresponding parts of the "Guidance for Tracking Progress under the Regional Haze Program" (hereafter referred to as the "Tracking Guidance") (U.S. EPA, 2003b). It will be easier to interpret the modeling results and compare them to measured values if the modeled future year data are calculated in a manner similar to the ambient data.

## 5.2.4  Normalizing Trends in Regional Haze - f(rh) Factors

It is clear from equation 5.1 that relative humidity can have a substantial effect on estimated extinction coefficients, as well as the relative importance of changes in different components of PM on trends in regional haze. Because of the importance of relative humidity as a determinant of regional haze, it is necessary to normalize any apparent trend in the estimated extinction coefficient for differences in relative humidity. This enables an assessment of how much an emissions control strategy will reduce regional haze, without the confounding effects of different relative humidity levels during the base and future periods.

There are two possible approaches to normalize trends in visibility for changes in relative humidity between the past and future. The first is to assume that the same day-specific values for relative humidity which were observed in the base period calculations will occur in future years. Thus, one would use the relative humidity observations made on a specific day together with measured components of particulate matter on that day to compute the day-specific visibility extinction coefficient on that day in the future. However, the approach could lead to misleading conclusions if humidity observations were missing for some days or if the humidity observations are atypical in some way. Further, if an air agency wanted to perform visibility calculations in a number of Class I areas, it would need to obtain hourly relative humidity data for each area.

The second approach is to review relative humidity data over a long period of record to derive climatological estimates for relative humidity adjustment factors. These climatological estimates can then be used in Equation 5.1 to estimate visibility extinction coefficients. These

estimates are more likely to reflect "typical" relative humidity at different times of year and, thus, expected future visibility extinction.

There are obvious advantages in using climatological f(rh) data for tracking progress of measured data. The measured relative humidity on the 20% most impaired days in a historical period will be different than the measured relative humidity in a future period. Therefore, the only way to normalize for relative humidity between the base and future years in the context of measured data is to use a single climatological value. However, in the context of modeling, there is a choice between climatological data or modeled (or measured) relative humidity data from a meteorological model. Since the modeled meteorological data is held constant when predicting future year air quality, the modeled relative humidity values would also be constant. This would be one way to normalize the data. But since the Tracking Guidance recommends tracking visibility using climatological f(rh) values, it will be easier to interpret the modeling results and compare them to future measured values if the data are calculated in a similar manner. Therefore, we recommend using climatological f(rh) values to calculate base period and future visibility. Appendix A (Table A-1) from the Tracking Guidance displays the relationship between relative humidity and f(rh) values. The f(rh) values were calculated from relative humidity data reported by Tang (1996). The f(rh) values are 1.00 up to 36% relative humidity and grow to a maximum value of 7.40 at a relative humidity of 95%.[90] These values were calculated using 10 years of meteorological data.

For calculations with the revised IMPROVE equation, three separate f(rh) curves are needed (small, large, and sea salt). These can be found in (Hand, 2006). The monthly f(rh) values for both the old and revised IMPROVE equations have been incorporated into pre-calculated daily extinction and deciview data that can be found on the IMPROVE website. The use of pre-calculated f(rh) and visibility data makes it easier for air agencies and regional organizations to calculate visibility changes and will also provide for more consistency.

## 5.3   How Do I Apply a Model to Calculate Changes in Visibility?

The purpose of a regional haze modeling assessment is to project future visibility conditions representing the RPGs, which are used to satisfy the requirements described in section 5.1. In

---

[90]For the regional haze calculations, the f(rh) factors have been capped at the f(rh) value associated with 95% relative humidity. Relative humidity value above 95% use the same value.

the procedures below, the observed base period visibility data should be linked to the base modeling year. Similar to the ozone and $PM_{2.5}$ attainment tests, the 5-year ambient data period should be centered about the base modeling year. For example, for a base modeling year of 2014, the ambient IMPROVE data should be from the 2012-2016 period.[91] However, unlike the ozone and $PM_{2.5}$ attainment tests, the calculation is a 5-year mean where each year counts equally (unlike the 5-year weighted average values for the ozone and $PM_{2.5}$ attainment test). This is consistent with the regional haze rule ambient data calculations for the 20% most impaired days and 20% clearest days. The analysis we recommend has 6 steps.

1) For each Class I area, estimate anthropogenic impairment on each day using observed speciated $PM_{2.5}$ and $PM_{10}$ data plus climatological f(rh) and Rayleigh scattering data for each of the 5 years comprising the base period (this estimation step is not addressed in this document), and rank the days on this indicator. This ranking will determine the 20% most anthropogenically impaired days and the 20% clearest days.

2) For each of the 5 years comprising the base period, calculate the mean deciviews for the 20% most anthropogenically impaired days and 20% clearest days. For each Class I area, calculate the 5-year mean deciviews for most impaired and clearest days from the 5 year-specific values.

3) Use an air quality model to simulate base period emissions and future emissions. Use the resulting information to develop RRFs for each component of PM identified on the right-hand side of Equation (5.1).

4) Multiply the RRFs by the measured species concentration data during the base period (for the measured 20% most impaired days and 20% clearest days). This results in daily future year species concentrations data.

5) Using the results in Step 4 and the IMPROVE algorithm (equation 5.1), calculate the future daily extinction coefficients for the 20% most impaired days and 20% clearest days in each of the 5 base years.

6) Calculate daily deciview values (from total daily extinction) and then compute the future average mean deciviews for the 20% most impaired days and 20% clearest days for each

---

[91] The *baseline period* for the regional haze program continues to be 2000-2004, and the uniform rate of progress is calculated using that historical data. However, the modeled reasonable progress visibility projections should use ambient data from a 5-year *base period* that corresponds to the modeled base year meteorological and emissions data. In addition, ambient data trends for the 5-year base period should be examined to make sure the base modeling year emissions are representative of the period. In some cases, an alternative base ambient data period may be more representative of a base modeling year.

year. Average the 5 years together to get the final future year mean deciview values for the 20% most impaired days and 20% clearest days.

We describe each of these steps more fully below. The methodology follows the same basic procedures outlined in the Tracking Guidance, however, based on the revised regional haze rule, a draft methodology (for steps 1 and 2) is available for calculating the most anthropogenically impaired and clearest days (U.S. EPA, 2016d).[92] We conclude this subsection with an example illustrating the recommended modeled uniform rate of progress analysis.

*Step 1. Using monitored data, rank base period visibility for each day with $PM_{10}$, $PM_{2.5}$ and speciated $PM_{2.5}$ measurements within a Class I area.*

Ranking should be performed separately for each of the 5 years comprising the base period.[93] The deciview (dv) should serve as the basis for ranking. Day-specific observations for mass associated with $SO_4$, $NO_3$, OC, EC, soil, and CM, as defined in Table 5.1, should be used to calculate $b_{ext}$ for each day. The appropriate month- and area-specific climatological relative humidity adjustment factor(s) (*f(rh)*) should be used. Total $b_{ext}$ for all components should be converted to deciviews for each day to get a daily deciview value.

*Step 2. Calculate the average base period deciviews for the 20% most anthropogenically impaired days and 20% clearest days.*

For each of the 5 years in the base period, order all days considered in Step 1 from worst (highest deciview value) to best (lowest deciview value) visibility. For each year, note the 20% most impaired days and 20% clearest days. Calculate the arithmetic mean deciview value for the identified 20% most impaired days and 20% clearest days in each year. Average the resulting 5 yearly mean deciview values reflecting the most impaired days. This represents the value subject to improvement requirement (i.e., the value must decrease). Average the 5-yearly mean deciview values reflecting mean visibility on the clearest days. This is the value subject to the requirement of no degradation (i.e., the value cannot increase).

---

[92] A final recommendation is expected in Fall 2018.

[93] Pre-calculated and ranked anthropogenic impairment, extinction, and deciview calculations for all Class I areas is available on the <u>IMPROVE website</u>. This data can be used to satisfy steps 1 and 2. States may also choose to use an alternative methodology to calculate anthropogenic impairment for Class I areas, which may differ from the default EPA recommended methodology. States should consult with their EPA Regional office to discuss appropriate methodologies for alternative impairment calculations.

*Step 3. Estimate RRFs for each component of PM$_{2.5}$ and for CM.*

The RRFs should be determined using results from air quality modeling of base year and future year emissions. These model simulations should be performed for a large number of days (presumably at least a full year; see section 2.3.1 for more details). The (temporal) arithmetic mean concentration for each PM$_{2.5}$ component (and coarse mass) computed near the Class I monitoring site from the future year modeling is divided by the corresponding arithmetic mean concentration for each component from the base year modeling. The resulting ratios are the component-specific RRF's. A separate set of RRF values are calculated for the 20% most impaired days and 20% clearest days identified in step 2. The RRFs are calculated using the model outputs corresponding to the *monitored* 20% most impaired days and 20% clearest days at each Class I area. This will likely be a different set of days at each monitor.

*Step 4. Using the RRFs and ambient data, calculate future year daily concentration data for the clearest and most impaired days.*

Multiply the RRFs derived in Step 3 by measured daily concentration data for each component of PM$_{2.5}$ and CM to get future daily estimates of species concentrations for PM$_{2.5}$ components and CM on the 20% most impaired days and 20% clearest days. These multiplications produce future concentration estimates for SO$_4$, NO$_3$, OC, EC, soil, sea salt, and CM for each of the previously selected 20% most impaired days and 20% clearest days. This calculation is performed for the 5-year period using an RRF for each PM component (a separate set of RRFs for the 20% most impaired days and 20% clearest days).

*Step 5. Use the information developed in Step 4 to compute future year daily b$_{ext}$ values for the 20% most impaired days and 20% clearest days.*

Use the future year concentration data calculated in step 4 to calculate future year daily b$_{ext}$ values for each PM component for each of the 20% most impaired days and 20% clearest days for the 5-year period. This is accomplished by applying the revised IMPROVE visibility algorithm (equation 5.1).

*Step 6. Use the daily total b$_{ext}$ values from step 5 to calculate future mean deciview values for the 20% most impaired days and 20% clearest days .*

The total daily b$_{ext}$ for each day is converted to deciviews. This gives a future year daily deciview value for each of the 20% most impaired days and 20% clearest days.

Next, compute the arithmetic mean future deciview value for the 20% most anthropogenically

impaired days and 20% clearest days for each year. This leads to five future estimated mean deciview values for the worst and five future estimated mean deciview values for the best visibility days. Compute the arithmetic mean of the five mean values for deciviews on the 20% most anthropogenically impaired days, and the arithmetic mean of the five mean deciview values estimated for the 20% clearest days. The resulting 5-year average mean values for deciviews on 20% most impaired days and 20% clearest days will be compared to the base period mean deciview values calculated in step 2. If the resulting change in deciviews is a negative number (future - base), this represents an improvement in visibility. The future year visibility value for the 20% most impaired days will also be compared to the glidepath to determine if the Class I area is expected to be on, above, or below the glidepath in the future implementation period.

*Example 5.1*

We use example 5.1 to illustrate the modeled visibility assessment. For ease of presentation, we assume there are only 10 speciated samples for PM in each of the 5 years comprising the base period. Since sampling occurs every third day, a typical sample size is ~120 days per year. We illustrate the calculations for the first base year and then furnish information regarding mean deciviews for the other 4 base years to illustrate subsequent steps in the test.

*Given:*

Ten days have measured components of PM in a Class I area during the first year of a 5-year base period. Table 5.2 below shows the measurements (in $\mu g/m^3$) for each of the 10 days. Table 5.2 also shows the date of each measurement and the corresponding climatological relative humidity adjustment factor (made up for this example) for the appropriate month and area.

**Table 5.2** Example observed IMPROVE data at a Class I area

| Day | Date | $f_S(RH)$ | $f_L(RH)$ | $F_{SS}(RH)$ | Ammonium Sulfate ($\mu g/m3$) | SO4$_L$ ($\mu g/m3$) | SO4$_S$ ($\mu g/m3$) | Ammonium Nitrate ($\mu g/m3$) | NO3$_L$ ($\mu g/m3$) | NO3$_S$ ($\mu g/m3$) |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 1/7 | 3.82 | 2.75 | 3.91 | 2.004 | 0.201 | 1.804 | 1.050 | 0.055 | 0.995 |
| 2 | 2/24 | 3.29 | 2.46 | 3.49 | 2.290 | 0.262 | 2.028 | 0.453 | 0.010 | 0.442 |
| 3 | 4/15 | 3.73 | 2.67 | 3.68 | 2.617 | 0.342 | 2.274 | 1.206 | 0.073 | 1.134 |
| 4 | 6/20 | 3.82 | 2.73 | 3.82 | 4.580 | 1.049 | 3.531 | 0.528 | 0.014 | 0.514 |
| 5 | 7/14 | 4.29 | 3.00 | 4.20 | 2.742 | 0.376 | 2.366 | 0.416 | 0.009 | 0.407 |
| 6 | 8/10 | 4.35 | 3.04 | 4.27 | 3.512 | 0.617 | 2.896 | 0.161 | 0.001 | 0.160 |
| 7 | 8/28 | 4.35 | 3.04 | 4.27 | 2.303 | 0.265 | 2.038 | 0.224 | 0.003 | 0.221 |
| 8 | 9/18 | 4.59 | 3.17 | 4.44 | 1.759 | 0.155 | 1.604 | 0.409 | 0.008 | 0.400 |
| 9 | 10/21 | 4.11 | 2.92 | 4.13 | 1.660 | 0.138 | 1.522 | 0.159 | 0.001 | 0.158 |
| 10 | 12/14 | 4.21 | 2.97 | 4.20 | 1.975 | 0.195 | 1.780 | 0.854 | 0.036 | 0.818 |

| Day | Date | Organic Mass ($\mu$g/m3) | $OM_L$ ($\mu$g/m3) | $OM_S$ ($\mu$g/m3) | EC ($\mu$g/m3) | Soil ($\mu$g/m3) | Sea Salt ($\mu$g/m3) | CM ($\mu$g/m3) | Rayleigh $Mm^{-1}$ |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 1/7 | 3.024 | 0.457 | 2.567 | 0.345 | 0.106 | 0.214 | 1.334 | 12 |
| 2 | 2/24 | 1.073 | 0.058 | 1.016 | 0.150 | 0.058 | 0.150 | 2.004 | 12 |
| 3 | 4/15 | 2.409 | 0.290 | 2.119 | 0.241 | 0.589 | 0.357 | 5.928 | 12 |
| 4 | 6/20 | 2.482 | 0.308 | 2.174 | 0.282 | 0.367 | 0.132 | 3.549 | 12 |
| 5 | 7/14 | 3.608 | 0.651 | 2.957 | 0.297 | 0.343 | 0.157 | 6.252 | 12 |
| 6 | 8/10 | 1.768 | 0.156 | 1.612 | 0.268 | 0.134 | 0.026 | 1.989 | 12 |
| 7 | 8/28 | 1.772 | 0.157 | 1.615 | 0.162 | 0.190 | 0.165 | 2.521 | 12 |
| 8 | 9/18 | 1.049 | 0.055 | 0.994 | 0.123 | 0.112 | 0.725 | 3.880 | 12 |
| 9 | 10/21 | 1.267 | 0.080 | 1.186 | 0.094 | 0.218 | 0.086 | 1.996 | 12 |
| 10 | 12/14 | 1.454 | 0.106 | 1.348 | 0.248 | 0.170 | 0.046 | 2.081 | 12 |

Using the IMPROVE concentration data for the Class I area and modeled RRFs, calculate the future year extinction and deciview values for the 20% most impaired days and the 20% clearest days for the end of the implementation period addressed in the SIP.

*Step 1. Using monitored data, rank base period visibility for each day with $PM_{10}$, $PM_{2.5}$, and speciated $PM_{2.5}$ measurements within a Class I area.*

First, estimate the extinction coefficient for each day that has the needed PM measurements. This is done using the information in table 5.2 with Equation (5.1). For day 1 in year 1, the current extinction coefficient is:

$b_{ext}$ = (2.2*3.82*1.804) + (4.8*2.75*0.201) + (2.4*3.82*0.995) + (5.1*2.75*0.055) + (2.8*2.567) + (6.1*0.457) + (10*0.345) + (1*0.106) + (1.7*3.91*0.214) + (0.6*+ 1.334) + 12

$b_{ext}$ = 55.461 $Mm^{-1}$

Then convert extinction into deciviews:

dv = 10 * ln (55.461/10) = 17.131 dv

Base year extinction coefficients and deciviews for the remaining 9 days with monitored data in year 1 are calculated in a similar manner. The days are then ranked. The day with the highest impairment is given a rank of "1." The results of these calculations are displayed in the table 5.3 below. Based on these rankings, days 4 and 5 comprise the 20% most impaired. Days 2 and 8 comprise the 20% clearest days.[94]

---

[94] Note that this is an abbreviated example. The actual IMPROVE sampling schedule collects data every third day. Therefore, with a complete set of data, there will be ~121 samples per year at each site. Both the 20% most impaired days and 20% clearest days will be comprised of an average of ~24 sample days.

**Table 5.3** Example observed IMPROVE extinction, deciviews, and rank at a Class I area

| Day | Date | Rayleigh (Mm$^{-1}$) | SO4 (Mm$^{-1}$) | NO3 (Mm$^{-1}$) | OM (Mm$^{-1}$) | EC (Mm$^{-1}$) | Soil (Mm$^{-1}$) | CM (Mm$^{-1}$) | Sea Salt (Mm$^{-1}$) | B$_{ext}$ [base period] (Mm$^{-1}$) | Deciviews | Rank |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 1/7 | 12 | 17.809 | 9.897 | 9.975 | 3.447 | 0.106 | 0.801 | 1.425 | 55.461 | 17.131 | 5 |
| 2 | 2/24 | 12 | 17.777 | 3.621 | 3.195 | 1.500 | 0.058 | 1.203 | 0.891 | 40.244 | 13.924 | 9 |
| 3 | 4/15 | 12 | 23.049 | 11.139 | 7.702 | 2.411 | 0.589 | 3.557 | 2.231 | 62.678 | 18.354 | 3 |
| 4 | 6/20 | 12 | 43.421 | 4.905 | 7.967 | 2.815 | 0.367 | 2.129 | 0.857 | 74.460 | 20.077 | 1 |
| 5 | 7/14 | 12 | 27.743 | 4.327 | 12.249 | 2.969 | 0.343 | 3.751 | 1.118 | 64.499 | 18.641 | 2 |
| 6 | 8/10 | 12 | 36.711 | 1.687 | 5.467 | 2.680 | 0.134 | 1.194 | 0.187 | 60.061 | 17.928 | 4 |
| 7 | 8/28 | 12 | 23.369 | 2.351 | 5.481 | 1.624 | 0.190 | 1.512 | 1.199 | 47.726 | 15.629 | 7 |
| 8 | 9/18 | 12 | 18.556 | 4.546 | 3.117 | 1.234 | 0.112 | 2.328 | 5.473 | 47.366 | 15.553 | 8 |
| 9 | 10/21 | 12 | 15.695 | 1.577 | 3.811 | 0.943 | 0.218 | 1.198 | 0.607 | 36.048 | 12.823 | 10 |
| 10 | 12/14 | 12 | 19.267 | 8.817 | 4.418 | 2.475 | 0.170 | 1.248 | 0.328 | 48.723 | 15.836 | 6 |

*Step 2. Calculate the average base year deciviews for the 20% most impaired days and 20% clearest days.*

For year 1, mean deciview value for 20% most impaired days = (20.077 + 18.641) / 2 = 19.359 dv,
and mean deciview value for the 20% clearest days = (12.823 + 13.924) / 2 = 13.374 dv

Mean deciview values for the 20% most impaired and 20% clearest days for years 2-5 are provided in table 5.4.

**Table 5.4** Example mean worst days visibility and best days visibility at a Class I area

| Year | Mean dv$_{current}$ 20% Most Anthropogenically Impaired Days | Mean dv$_{current}$ 20% Clearest Days |
|---|---|---|
| 1 | 19.35 | 13.37 |
| 2 | 20.32 | 12.54 |
| 3 | 19.21 | 11.78 |
| 4 | 18.93 | 12.32 |
| 5 | 18.34 | 12.91 |

The average mean base period visibility for the 20% most impaired and for the 20% clearest days is obtained by taking the arithmetic mean of these days for the 5 years. Thus, the 5-year mean of the average visibility for the 20% most impaired days is given by

$dv_{base\ period}$ = (19.35 + 20.32 + 19.21 + 18.93 + 18.34) / 5 = **19.23 dv**

The 5-year mean of the average visibility for the 20% clearest days is

$dv_{base\ period}$ = (13.37 + 12.54 + 11.78 + 12.32 + 12.91) / 5 = **12.58 dv**

*Step 3. Apply a model to develop component specific RRF's for SO4, NO3, OC, EC, Soil and CM.*

Tables 5.5 and 5.6 show the procedure for calculating component-specific relative response factors using an air quality model. The example shows the recommended calculation of RRFs for the 20% most impaired days in the year modeled (the abbreviated example assumes that the 20% most impaired days is represented by only 5 modeled days). The same calculation is repeated for the clearest days.

**Table 5.5** Base year modeled species concentrations on the 20% most impaired days (in µg/m3)

| Modeled Output | SO$_4$ | NO$_3$ | OC | EC | Soil | CM |
|---|---|---|---|---|---|---|
| Day 1 | 3.13 | 1.02 | 3.56 | 0.87 | 0.32 | 5.43 |
| Day 2 | 5.21 | 3.11 | 4.67 | 1.23 | 0.34 | 4.68 |
| Day 3 | 4.56 | 0.59 | 6.32 | 1.45 | 0.87 | 3.58 |
| Day 4 | 5.51 | 1.67 | 4.56 | 0.54 | 1.07 | 4.67 |
| Day 5 | 3.99 | 0.57 | 4.12 | 0.69 | 1.01 | 5.21 |
| **Mean Base Concentration** | **4.48** | **1.39** | **4.65** | **0.96** | **0.72** | **4.71** |

**Table 5.6** Future year modeled species concentrations on 20% most anthropogenically impaired days (in μg/m3)

| Modeled Output | SO$_4$ | NO$_3$ | OC | EC | Soil | CM |
|---|---|---|---|---|---|---|
| Day 1 | 2.45 | 0.91 | 3.54 | 0.82 | 0.36 | 5.51 |
| Day 2 | 3.98 | 2.98 | 4.62 | 1.15 | 0.37 | 4.81 |
| Day 3 | 3.56 | 0.50 | 6.30 | 1.32 | 0.92 | 3.76 |
| Day 4 | 4.12 | 1.42 | 4.51 | 0.46 | 1.10 | 4.76 |
| Day 5 | 2.87 | 0.39 | 4.07 | 0.61 | 1.08 | 5.34 |
| **Mean Future Concentration** | **3.40** | **1.24** | **4.61** | **0.87** | **0.77** | **4.84** |

**Table 5.7** Component specific RRFs for the 20% most impaired days

| Most Impaired days RRF | SO$_4$ | NO$_3$ | OC | EC | Soil | CM |
|---|---|---|---|---|---|---|
| RRF (mean future/mean base) | 0.758 | 0.891 | 0.992 | 0.912 | 1.061 | 1.026 |

*Step 4. Multiply the relative response factors times the measured daily species concentration data during the base period to compute future daily species concentrations.*

In year 1, we previously identified days 4 and 5 as those included in the 20% most impaired days (i.e., see Step 1). Similarly, days 2 and 8 are the 20% clearest days (see Table 5.3). In this step, we estimate future concentrations for components of PM$_{2.5}$ and for CM for these two sets of days. This is done using information shown in tables presented in Steps 1 and 3 as well as the best days RRFs given in table 5.8 below:

**Table 5.8** Component specific RRFs for the 20% clearest days

| Clearest days RRF | SO$_4$ | NO$_3$ | OC | EC | Soil | CM |
|---|---|---|---|---|---|---|
| RRF (mean future/mean base) | 0.780 | 0.752 | 0.956 | 0.768 | 1.022 | 1.043 |

**Most Anthropogenically Impaired Days**

**Day 4:** $[SO_4]_{future} = (RRF)_{SO4} [SO_4]_{base\ period} = (0.758) [4.580] = 3.472\ \mu g/m^3$

$[NO_3]_{future} = (0.891) [0.528] = 0.470\ \mu g/m^3$

$[OC]_{future} = (0.992) [2.482] = 2.462\ \mu g/m^3$

$[EC]_{future} = (0.912) [0.282] = 0.257\ \mu g/m^3$

$[Soil]_{future} = (1.061) [0.367] = 0.389\ \mu g/m^3$

$[CM]_{future} = (1.026) [3.549] = 3.641\ \mu g/m^3$

$[Salt]_{future} = (1.00) [0.132] = 0.132\ \mu g/m^3$

**Day 5:** $[SO_4]_{future} = (0.758) [2.742] = 2.079\ \mu g/m^3$

$[NO_3]_{future} = (0.891) [0.416] = 0.371\ \mu g/m^3$

$[OC]_{future} = (0.992) [3.608] = 3.578\ \mu g/m^3$

$[EC]_{future} = (0.912) [0.297] = 0.271\ \mu g/m^3$

$[Soil]_{future} = (1.061) [0.343] = 0.364\ \mu g/m^3$

$[CM]_{future} = (1.026) [6.252] = 6.414\ \mu g/m^3$

$[Salt]_{future} = (1.00) [0.157] = 0.157\ \mu g/m^3$

**Clearest Days**

**Day 2:** $[SO_4]_{future} = (0.780) [2.290] = 1.786\ \mu g/m^3$

$[NO_3]_{future} = (0.752) [0.453] = 0.341\ \mu g/m^3$

$[OC]_{future} = (0.956) [1.073] = 1.026\ \mu g/m^3$

$[EC]_{future} = (0.768) [0.150] = 0.115\ \mu g/m^3$

$[Soil]_{future} = (1.022) [0.058] = 0.059\ \mu g/m^3$

$[CM]_{future} = (1.043) [2.004] = 2.090\ \mu g/m^3$

$[Salt]_{future} = (1.00) [0.150] = 0.150\ \mu g/m^3$

**Day 8:** $[SO_4]_{future} = (0.780) [1.759] = 1.372\ \mu g/m^3$

$[NO_3]_{future} = (0.752) [0.409] = 0.308\ \mu g/m^3$

$[OC]_{future} = (0.956) [1.049] = 1.003\ \mu g/m^3$

$[EC]_{future} = (0.768) [0.123] = 0.094\ \mu g/m^3$

$[Soil]_{future} = (1.022) [0.112] = 0.114\ \mu g/m^3$

$[CM]_{future} = (1.043) [3.880] = 4.047\ \mu g/m^3$

$[Salt]_{future} = (1.00) [0.725] = 0.725\ \mu g/m^3$

Similar calculations (using the same model derived component specific RRFs) are performed for each of the most impaired days and clearest days in each of the other 4 years in the base

period.[95]

*Step 5. Using the results in Step 4, calculate the future year extinction coefficients for each of the 20% most impaired days and each of the 20% clearest days in each of the 5 base years.*

Using future PM components obtained in Step 4, we can estimate future daily total $b_{ext}$.

**For year 1**

**Most Impaired Days**

**Day 4:** $b_{ext}$ = (2.2*3.82*2.869) + (4.8*2.73*0.603) + (2.4*3.82*0.459) + (5.1*2.73*0.011) + (2.8*2.159) + (6.1*0.303) + (10*0.257) + (1*0.389) + (1.7*3.91*0.132) + (0.6*3.641) + 12 = 62.288 Mm$^{-1}$

**Day 5:** $b_{ext}$ =(2.2*4.29*1.863) + (4.8*3.00*0.216) + (2.4*4.29*0.364) + (5.1*3.00*0.007) + (2.8*2.938) + (6.1*0.640) + (10*0.271) + (1*0.364) + (1.7*4.20*0.157) + (0.6*6.414) + 12 = 56.722 Mm$^{-1}$

**Clearest Days**

**Day 2**: $b_{ext}$ = (2.2*3.29*1.627) + (4.8*2.46*0.160) + (2.4*3.29*0.335) + (5.1*2.46*0.006) + (2.8*0.973) + (6.1*0.053) + (10*0.115) + (1*0.059) + (1.7*3.49*0.150) + (0.6*2.090) + 12 = 34.786 Mm$^{-1}$

**Day 8**: $b_{ext}$ = (2.2*4.59*1.278) + (4.8*3.17*0.094) + (2.4*4.59*0.303) + (5.1*3.17*0.005) + (2.8*953) + (6.1*0.050) + (10*0.094) + (1*0.114) + (1.7*4.44*0.725) + (0.6*4.047) + 12 = 41.682Mm$^{-1}$

*Step 6. Use the daily total $b_{ext}$ values from step 5 to calculate future mean deciview values for the 20% most impaired days and the 20% clearest days.*

Calculate daily deciview values (from total daily extinction) and then compute the future mean

---

[95] Unless multiple meteorological years are being modeled, the same mean RRFs (for each component) are applied to the concentrations on all of the most impaired days for each of the 5 years of data. The mean RRFs are derived from the modeled days. A separate set of RRFs are derived (in the same manner) for the clearest days.

deciviews for the 20% most impaired days and the 20% clearest days for each year. Then average the 5 years together to get the final future mean deciview value for each set of days.

**For Year 1**

**Most Impaired Days**

**Day 4**: 62.288 Mm$^{-1}$ = 10* ln (62.288/10) = 18.291 dv
**Day 5:** 56.722 Mm$^{-1}$ = 10* ln (56.722/10) = 17.355 dv

**Future mean visibility on most anthropogenically impaired days = (18.291 + 17.355) / 2 = 17.82 dv**

**Clearest Days**

**Day 2:** 34.786 Mm$^{-1}$ = 10* ln (34.786/10) = 12.466 dv
**Day 8:** 41.682 Mm$^{-1}$ = 10* ln (41.682/10) = 14.274 dv

**Future mean visibility on clearest days = (12.466 + 14.274) / 2 = 13.37 dv**

Similar calculations are performed for previously selected 20% most impaired days and the 20% clearest days in each of years 2-5. Assume these other calculations yield the following estimates for future mean dv on these sets of days.

**Table 5.9** Future year mean deciviews on the 20% most impaired days and the 20% clearest days for each of the 5 years

| Year | Future Mean dv on 20% Most Impaired Days | Future Mean dv on 20% Clearest Days |
|------|------------------------------------------|-------------------------------------|
| 1 | 17.82 | 13.37 |
| 2 | 18.17 | 12.45 |
| 3 | 16.78 | 12.91 |
| 4 | 18.65 | 11.52 |
| 5 | 18.21 | 12.31 |

Using results in table 5.9, we see that the estimated future average mean visibility for the most impaired days is

$dv_{future}$ = (17.82 + 18.17 + 16.78 + 18.65 + 18.21) / 5 = **17.92 dv**

The estimated future average mean visibility for the clearest days is

$dv_{future}$ = (13.37 + 12.45 + 12.91 + 11.52 + 12.31) / 5 = **12.51 dv**

The most impaired days result generated in step 6 can then be compared to the point on the Class I area-specific glidepath for the end of the implementation period. The most impaired days result is also compared to the baseline most impaired days to ensure that there has been improvement relative to the baseline period. The future year clearest days result is compared to the baseline (2000-2004) clearest days to ensure that visibility on the best days is not forecast to degrade relative to the same period.

This information is used to determine the predicted improvement in visibility that will result from implementation of an emissions strategy. It cannot itself determine the necessary content of the long-term strategy. See the Regional Haze Rule and related guidance documents for more information on the reasonable progress requirements.

## 5.4   How Do I Select Appropriate Inputs For Developing RPGs?

In section 5.3, we described the recommended regional modeling analysis to develop RPGs and to use them to evaluate progress relative to the glidepath and the baseline period. An important part of the analysis requires using component-specific RRFs, obtained with models, to estimate future concentrations of these components and, subsequently, future visibility. In this subsection, we address more details concerning the calculation of visibility RRFs. Additionally, there are several assumptions inherent in the recommended RPG analysis; we identify these assumptions and comment on their underlying rationale. More specifically, we address seven issues:

1. How to estimate base period air quality in a Class I area without monitored data;
2. How to handle a base year without data or with a small sample size;
3. Use of the same days to estimate changes in visibility for the most anthropogenically impaired days and a different set of same days to estimate changes in visibility for the clearest days;
4. Which predictions to use to derive RRFs;

163

5. How many and what kind of days to use to develop RRF values;

6. RRFs when modeled species concentration are very low; and

7. Alternative RRF calculations.

*Estimating baseline and base period visibility in a Class I area without monitors*

There are 156 officially designated Class I areas subject to the Regional Haze Rule and 110 IMPROVE sites in or near Class I areas. Therefore, 46 Class I areas do not have co-located IMPROVE monitors. EPA's Tracking Guidance recommends using IMPROVE data from a nearby site to represent the visibility at each Class I area that does not have ambient data. Table A-2 in Appendix A of the Tracking Guidance lists the recommended monthly f(rh) values[96] for each Class I area as well as the representative site for each Class area. The representative IMPROVE site data will be used to track regional haze progress for the Class I areas. Therefore, it follows that visibility improvement for tracking purposes should be predicted at the location of the IMPROVE monitor, not at the actual Class I area. For the purposes of deriving ambient data for modeling, we recommend following the same representative site assignments contained in the Tracking Guidance. In this way, the needed visibility values can be derived for each Class I area from the network of 110 IMPROVE sites.[97] Similarly, the modeling results should be extracted for the location of the representative monitor, not the actual location of the Class I area.[98]

*Considering a year in the base period with little or no monitored particulate matter or missing data*

The Tracking Guidance recommends calculating base period visibility values for sites with at least 3 out of 5 complete years of data. It further contains recommendations for determining if a year has complete data. In general, a site should have 50% data completeness in all quarters and meet a 75% completeness criteria for the full year. There should be no periods with more than 30 consecutive days without data. The Tracking Guidance assumes that all IMPROVE sites

---

[96] The f(rh) values in the Tracking Guidance were developed for the "original" IMPROVE algorithm and should not be used to calculate visibility using the "revised" IMPROVE algorithm.

[97] Bering Sea Wilderness (Alaska) is the only Class I area that has no IMPROVE monitor **and** no representative IMPROVE site. On-site IMPROVE or representative IMPROVE data can be found for the other 155 Class I areas.

[98] There may be other reasons to calculate visibility improvement at the actual Class I area. The SMAT provides options for calculating visibility changes at both the Class I area grid cell center and at the representative IMPROVE monitoring site. It may be informative to compare model response at the representative IMPROVE site versus the grid cell center of the Class I area. Large differences in the model response may indicate that the "representative" site may not adequately represent visibility at the Class I area or across the entire Class I area.

will have at least 3 complete years in the base period (which may or may not be true). The Tracking Guidance also contains procedures for filling in missing data.

There are several data completeness issues that may cause problems within the visibility modeling analysis. First, a site may have less than 3 years of complete data. It is possible to calculate visibility improvement based on as little as 1 year of ambient data. Additionally, the IMPROVE program has procedures to utilize substituted and/or patched data to help minimize data incompleteness. States should work with their EPA Regional office and Federal Land Managers to determine how to estimate baseline visibility for these area(s).

Another issue that is a more specific problem for modeling analyses occurs when data is missing during the meteorological time period that was modeled. It is likely that most air agencies will only be modeling a single year of meteorology and it is possible that the ambient data at one or more Class I areas is incomplete during that year. Without ambient data, it is impossible to identify the 20% most anthropogenically impaired days and 20% clearest days, which are used to calculate modeled RRFs.

Again, if this occurs, states should work with their Regional office and Federal Land Managers to determine the best way to calculate visibility on these days. Potential options are to utilize substituted and/or patched data, data from another nearby IMPROVE site, nearby data from a different ambient data network, or interpolate ambient data to the site.

*Using a constant sample of days to estimate base period and future visibility*

For a typical Class I area, there will be about 120 days per year having measurements needed to estimate $(dv)_{base\ period}$ with Equation (5.1). Thus, there should be about 24 most anthropogenically impaired and 24 clearest days for each of the 5 years in the base period. It is conceivable that the identity of these days could change if emissions were altered to reflect net effects of controls and growth. The recommended test described in section 4.8 assumes that the identity of the most impaired and clearest days remains unchanged. This is done primarily to avoid having to perform iterative analyses to identify future most impaired and clearest visibility days and to keep the test relatively simple and more readily understood. This assumption could cause improvement in visibility to be overestimated for the most anthropogenically impaired days and could also cause the test to overestimate the difficulty in preventing deterioration of visibility on the clearest days. However, for the reasons described below, we do not believe the effects of this assumption are substantial.

165

It is unlikely that there would be any wholesale change in the identity of most anthropogenically impaired or clearest days with future versus base year emissions. Analyses performed by Meyer, et al. (1997) have shown that the predicted ranked severity of high ozone days is largely unaffected by simulated controls and growth (i.e., highest days tend to remain the highest days after the effects of growth and controls are simulated). There is no reason to expect a different outcome for other secondary pollutants. If there are differences, we would expect these to occur near the borderline between the most impaired days and more moderate days.

Because the visibility analysis relies on *mean* visibility values on 20 or more most impaired visibility days and most of these days are unlikely to change, we would expect little difference in the outcome of the analysis. Further, because of the shape of the distribution of daily extinction coefficients, the mean of the most impaired days is often more heavily influenced by the very most impaired days rather than those on the borderline between 20% most impaired and more moderate light extinction. There could be differences in some of the clearest visibility days corresponding with pre- and post-control emissions. However, because the differences in concentrations of particulate matter on such days are likely to be relatively low, differences in the computed mean visibility for clearest days are likely to be small. It should be noted that any resulting difference in the projection of RPGs for clearest days would likely be in the direction of it being more difficult to pass the no degradation test compared to the baseline 2000-2004 period, in that some of the future days selected may be higher deciview-valued than they ought to be. If our recommended procedure leads to suspected problems in the outcome of a test, an air agency may wish to perform a more rigorous version of the analysis (in which the identity of pre-control and post-control days changes) as part of additional or supplemental analyses to support the RPG.

*Selecting predictions to use in deriving RRF*

RRFs should be developed for each Class I area. When a Class I area contains a monitoring site, the RRF estimates should be derived using predictions which are made "near" that site. For each day, daily average surface predictions of each component of PM made near a monitor should be estimated. Similar to the annual $PM_{2.5}$ NAAQS attainment test, nearby grid cells should be averaged. These nearby estimates should be spatially averaged to estimate a spatially representative daily concentration. For 12 km or finer resolution, we recommend averaging the modeled concentrations for a 3 x 3 array of grid cells surrounding the monitor. Note that for cells larger than 12 km on a side, no spatial averaging is necessary—states should just use the

166

prediction in the cell containing the monitor. Spatially representative daily concentrations obtained for each modeled day with monitored data should then be temporally averaged. This final average should be used to compute the RRF. Thus, component-specific RRF values for a Class I area with a monitor are the ratio of the temporally averaged spatial mean of nearby concentrations predicted with future emissions to that predicted with base year emissions.

*Selecting days to derive RRF values*

It may often happen that a planning organization or a group of states decides to model the visibility impacts of a strategy for numerous Class I areas simultaneously. As we note in section 2.3.1, this may make it advisable to simulate (at least) a full year so that RRF values for each Class I area are based on a substantial number of observed best and worst days. For the most impaired days in the chosen year, the RRF for a component of PM should be estimated as the ratio of its modeled arithmetic mean predicted value on the 20% most impaired days with future emissions to that with base year emissions. Thus, in most cases, the RRF should reflect values averaged over ~ 24 most impaired days in that year. The same procedure is followed to derive RRFs over the ~24 clearest days in the year.

Since meteorological conditions and/or emissions may be markedly different on best visibility versus worst visibility days, we recommend calculation of a separate set of RRF values for the 20% clearest days.  As with most impaired days, the preferred approach is to model an entire year and select an RRF value for concentrations averaged over the 20% clearest days for each Class I area. The RRF values are the ratios of the future to base year modeled averages. The appropriate RRF values should then be used in concert with each observed best day to estimate future concentrations for each component on each identified clearest day.

*RRFs when modeled species concentrations are very low*

In most cases, the RRFs derived for visibility components are either less than 1.0 or slightly more than 1.0. However, large RRFs (much greater than 1.0) can occur when the mean modeled concentration of a PM component on the 20% most impaired or clearest days is very small and the concentration of that component increases in the future year case. This most often occurs with the nitrate component. On both the 20% most impaired days and 20% clearest days, the modeled nitrate concentrations at Class I areas can be very small (i.e., < 0.01 $\mu g/m3$). These low modeled concentrations can sometimes increase in future year scenarios by orders of magnitude. This occurs most often in ammonia limited areas when sulfate concentrations are reduced in the future (due to $SO_2$ emissions reductions) causing nitrate

167

increases due to an increase in available ammonia. Large RRFs should be closely examined to identify the cause of the issue. In many cases, large RRFs are caused by poor model performance (i.e., underpredicted base case nitrate concentrations) or instability in one or more model components (i.e., the nitrate partitioning model). One solution is to cap the RRF at 1.0 or close to 1 in cases where nitrate (or any other $PM_{2.5}$ component) increases in the future by an unrealistic amount due to very low modeled concentrations. Any adjustments to the default calculations should be documented and discussed with the appropriate EPA Regional office and the Federal Land Managers.

*Alternative RRF calculations*

The default analysis is relatively simple in that a single mean RRF is calculated for each PM component (separate RRFs on most impaired days and clearest days). A series of tests with more complicated methods has shown that: 1) the difference between various versions of the test are usually small and 2) each of the alternative tests has limitations in its applicability (Environ, 2005). Possible variations include the use of day specific RRFs, season (or quarter) specific RRFs, or climatologically based RRFs. In some cases, these more complicated techniques may provide different answers, but sometimes not. There are specific limitations with each of these alternatives noted in the indicated reference. We have chosen to keep the single mean RRF test as the default recommendation. States are encouraged to explore other methods for estimating RRFs if it is thought that the default recommendation is too simplistic to accurately capture the change in future visibility at any particular Class I area. The SIP analysis to develop RPGs should use the most appropriate method of projecting future concentrations for the characteristics of each Class I area.[99] Alternative methods should be discussed in the modeling protocol and discussed with the appropriate EPA Regional office and Federal Land Managers.

---

[99] In particular, issues may arise when dealing with visibility contributions from fires, coarse mass and fine soil (from wind-blown dust), and international transport (and possibly other issues). Each of these issues should be addressed in the modeling protocol and solutions should be discussed with the appropriate EPA Regional office(s) and Federal Land Managers on a case-by-case basis.

# 6.0    How Can Additional Analyses Be Used to Support an Ozone or PM$_{2.5}$ Attainment Demonstration?

By definition, models are simplistic approximations of complex phenomena. The modeling analyses used to assess whether emission reduction measures will bring an individual area into attainment for the NAAQS contain many elements that are uncertain (e.g., emission projections, meteorological inputs, science formulations, etc.). These uncertain aspects of the analyses prevent definitive assessments of future attainment status. The confidence in the representativeness of the quantitative results from a modeled attainment test should be a function of the degree to which the uncertainties in the analysis were minimized. In general, by following the recommendations contained within this guidance document, EPA hopes that the attainment demonstrations will mitigate the uncertainty as much as possible given the current state of modeling inputs, procedures, and science. However, while air quality models represent the best tools for integrating emissions and meteorological information with atmospheric chemistry, and no single additional analysis can match the expected reliability of these models' results, EPA believes that all attainment demonstrations will be strengthened by additional analyses that can supplement the modeling to enhance the assessment of whether the planned emissions reductions are likely to result in attainment.

Supplemental evidence should accompany all model attainment demonstrations. Generally, those modeling analyses that show that attainment will be reached in the future with some margin of safety will need more limited supporting material. For other attainment cases in which the projected future design value is closer to the NAAQS, more rigorous supporting analyses should be completed. There may be some areas for which the supplemental evidence is persuasive enough to support a conclusion that the area can expect to achieve timely attainment despite failing the modeled attainment test, and other areas for which the modeled attainment test demonstrates attainment, but the supplemental evidence casts significant doubt on that result. This section of the guidance will discuss some specific information and additional analyses that can be used to supplement the model projections. Of particular interest are analyses that help determine whether the modeling-based projections are likely to provide a prediction of the *air quality improvement* that is likely to occur by the attainment date. Air agencies should review these supplemental analyses, in combination with the modeling analysis, in a "weight of evidence" assessment of whether each area is likely to achieve timely attainment. Again, it should be noted that no single supplemental analysis can serve as an adequate substitute for the air quality model. However, in aggregate, supplemental

169

analyses may provide information which may provide further support for the outcome of the modeled test or may indicate a different outcome than the modeled test.

In considering the use of supplemental analyses, an important factor is the time (number of years) until the attainment date. In general, modeling and related analyses are the most useful corroborative analyses for areas with attainment dates which are more than several years in the future. In contrast, ambient data and emissions trends become more important (and hence model results become less important) the closer in time the area is to its attainment date. For example, if an area is only 1 or 2 years away from its attainment date, ambient data is in most cases the best predictor of likely air quality levels in the near future. However, this may not be true if there are large emissions reductions that are expected to occur in the near-term period. In that case, modeling is needed to estimate additional ozone and/or PM reductions that are likely to occur due to the emissions controls in the short term. Similarly, if the attainment date is 5 or 10 years or more in the future, appropriate modeling will likely be the most reliable indicator of future year ozone or PM levels. Emission changes over a relatively long period are likely to overwhelm the influence of ambient data trends and meteorological variability, making ambient data and emissions trends analyses relatively less important.

## 6.1    What Types of Additional Analyses Should Be Completed as Part of an Ozone or PM$_{2.5}$ Attainment Demonstration?

There are three basic types of analyses that are recommended to supplement the primary modeling analysis. They are:

1) Additional modeling analyses;

2) Analyses of trends in ambient air quality and emissions;

3) Additional emissions controls/reductions.

 Note that air agencies are encouraged to consult with their EPA Regional office (and Federal Land Managers, when appropriate) in advance of initiating supplemental analyses to determine which additional analyses may be most appropriate for their particular area.

### 6.1.1 Modeling Analyses

The relative attainment tests described in sections 4.2, 4.4, and 4.5 are the primary modeling tools used in an attainment demonstration. The application of a chemical transport grid model on a regional or local scale is the best tool available to judge the impacts of changes in future year emissions on concentrations. In addition to this "primary" modeling analysis, there are various other models, model applications, and tools that can be used to supplement the results of the modeled attainment test. These include, but are not limited to:

- Available regional or national scale modeling applications that are suitable[100] for the local area, for example, modeling in support of EPA rulemakings or regional, multi-jurisdictional organization modeling that may be available for the appropriate future year of interest. Modeling analyses may be available that used different models and/or inputs.

- Use of other appropriate local modeling that includes the nonattainment area of interest. This may include applications using alternative models and/or inputs or research-oriented analyses.

- Use of photochemical source apportionment, DDM, and/or process analysis modeling tools to help explain why attainment is (or is not) demonstrated.

- Use of multiple air quality models / model input data sets (e.g., multiple meteorological data sets, alternative chemical mechanisms or emissions inventories, etc.). Multiple model configurations can be used to estimate sensitivity and uncertainty of future year design value predictions.
  - For results to be most relevant to the way we recommend models be applied in attainment demonstrations, it is preferable that such procedures focus on the sensitivity of estimated RRFs and resulting projected design values to the variations in inputs and/or model formulations.

- Application of the attainment test with alternative procedures compared to the default recommendations in sections 4.2, 4.4, and 4.5 of this guidance. Any alternate approaches

---

[100] The resolution, emissions, meteorology, and other model inputs should be evaluated for applicability to the local nonattainment area. Additionally, model performance for the local nonattainment area should be examined before determining whether the regional model results are suitable for use in the local attainment demonstration.

should be accompanied with a technical justification to explain why the approach is appropriate for the area in question and should be discussed with the appropriate EPA Regional office.

- o Alternative RRF calculations using non-default assumptions or more detailed temporal and spatial analysis of RRFs at one or more monitoring locations. If a sound technical argument can be made for why atypically high RRFs at any particular location are not reasonable, then these types of supplemental analyses would suggest that attainment is more likely to be achieved than the default modeling analysis alone would indicate.
- o Alternate base year design values that may differ from the 5-year weighted average value. Alternative values could include different methodologies for determining base year design values or removal of potential exceptional events data (see section 4.1.1).

- Use of dispersion models to address primary $PM_{2.5}$ contributions to $PM_{2.5}$ concentrations. In areas with large spatial gradients of primary $PM_{2.5}$, dispersion models are best suited to characterizing the change in primary $PM_{2.5}$ in the future. A local area analysis may be useful as a supplemental analysis (in either monitored or unmonitored areas, as appropriate) for areas that at least partially rely on local primary PM controls to reach attainment and did not otherwise perform and submit a local area analysis of part of the attainment demonstration.

The EPA has determined that the best approach to using models to demonstrate attainment of the NAAQS is to use a model in a relative mode. However, some types of "absolute" model results may be used to assess general progress towards attainment from the baseline inventory to the projected future inventory.[101] Example metrics include:

- Percent change in total amount of ozone or $PM_{2.5}$ >= NAAQS[102] within the nonattainment area
- Percent change in number of grid cells >= NAAQS within the nonattainment area
- Percent change in grid cell-hours (days) >= NAAQS within the nonattainment area
- Percent change in maximum modeled 8-hour ozone within the nonattainment area

---

[101] Care should be taken in interpreting absolute metrics if the model evaluation shows a large underprediction or overprediction of ozone or $PM_{2.5}$ concentrations. An underprediction of observed concentrations will make it artificially easy to show progress towards absolute attainment levels and an overprediction will make it artificially difficult to show progress towards attainment.

[102] For each of these metrics, the appropriate comparison to the level of the NAAQS is 70 ppb for 8-hour ozone; 35 µg/m3 for 24-hour $PM_{2.5}$; and 12 µg/m3 for annual $PM_{2.5}$.

While these metrics can be used to estimate the magnitude, frequency, and relative amount of ozone or $PM_{2.5}$ reductions from any given future emissions scenario, there are no threshold quantities of these metrics that can directly translate to an attainment determination. Generally, a large reduction in the frequency, magnitude, and relative amount of 8-hour ozone nonattainment (i.e., >= 71 ppb) or $PM_{2.5}$ nonattainment (24-hour and/or annual) is consistent with a conclusion that a proposed strategy would meet the NAAQS. In the context of a weight of evidence determination, these metrics could be used to suggest that a particular location may be "stiff" or relatively unresponsive to emissions controls, while the rest of the modeling domain/nonattainment area is projected to experience widespread reductions.

## 6.1.2 Analyses and Trends in Ambient Air Quality and Emissions

Generally, air quality models are regarded as the most appropriate tools for assessing the expected impacts of a change in emissions. However, it may also be possible to evaluate progress towards attainment of the ozone or $PM_{2.5}$ NAAQS based on measured historical trends of air quality and emissions. It may be possible to develop a relationship between past emissions changes and historical and current air quality. Once the relationship between past/present emissions and air quality is established, a response to the expected emissions reductions from a particular control strategy can be estimated. There are several elements to this analysis that are difficult to quantify. First, in most cases, the ambient data trends are best assessed by normalizing to account for year-to-year meteorological variations. Second, one must have an accurate accounting of the year-to-year changes in actual emissions (NOx, VOC, and/or $SO_2$ and $NH_3$) for the given area and any surrounding areas whose emissions may impact local concentrations. Third, one must have a solid conceptual model of how ozone or $PM_{2.5}$ is formed in the local area (e.g., influence of meteorology, NOx-limited, ammonia limited, transport-influenced, etc.).

 If available, meteorologically adjusted ozone and $PM_{2.5}$ concentrations can be used to establish air quality trends. There are several techniques that have been used to examine the influence of meteorology on air quality. Among them are (a) statistical modeling (U.S. EPA, 2005b); (b) filtering techniques (Rao, 1995; Flaum, 1996; Milanchus, 1998; and Hogrefe, 2000), (c) using a probability distribution of meteorological severity based on climatological data (Cox and Chu, 1993, 1996), and (d) using CART analysis to identify meteorological classes and selecting days from each year so that the underlying frequency of the identified meteorological classes remains the same (Deuel and Douglas, 1996). Most of this work has examined the relationship between ozone and meteorology. Only recently have analyses examined the relationship between meteorology and $PM_{2.5}$. Additionally, compared to $PM_{2.5}$, the established relationship

between ozone and meteorological variables is generally stronger (higher r-square values). In the case of $PM_{2.5}$, the relationship between concentration and meteorology is complicated by the fact that $PM_{2.5}$ components experience high concentrations at different times of the year and for different reasons. This makes it more difficult to meteorologically adjust $PM_{2.5}$ concentrations.

If a meteorologically adjusted trend in ozone or $PM_{2.5}$ can be estimated, then the information can be used to establish a link between emissions and air quality trends. This is not always straightforward due to the multitude of emissions precursors that may lead to high ozone and $PM_{2.5}$ concentrations. A careful analysis of (meteorologically adjusted) air quality trends and emissions trends of each of the ozone and PM precursors (as well as primary PM) is needed to fully establish relationships. Detailed emissions information as well as a solid understanding of the conceptual model of ozone or $PM_{2.5}$ formation is needed. If a trend can be established based on past emissions changes and air quality changes, then future year predicted emissions levels can be used to extrapolate future air quality.

Meteorologically adjusted trends in ozone and/or $PM_{2.5}$ attempt to adjust observed concentrations to levels which would have been observed during average meteorological conditions (Camalier, 2007). This makes it easier to observe trends primarily due to emissions changes and also allows identification of years with above average or below average meteorologically conducive conditions. Identification of "extreme" meteorological conditions, which are not likely to re-occur in a particular design value period, can be used as part of a weight of evidence analysis. For example, the presence of one or more "extreme" (high concentration) meteorological years in either the base year period or the most recent design value period may make it appear that an area is farther away from attaining the NAAQS than would otherwise be the case if more typical meteorological conditions had occurred. It is important to note that 1 or more years of meteorological conditions which are not conducive to ozone formation will have the opposite effect. An area may appear to be on track to attain the NAAQS (or close to attaining) but, in reality, may need substantial additional emissions reductions in order to attain under average or above average meteorological conditions. Meteorological adjusted concentration and/or design value calculations can help explain both of these situations. More information on meteorologically adjusted ozone trends can be found here.

A simpler (and more uncertain) way to qualitatively assess progress toward attainment is to examine recently observed air quality and emissions trends. Downward trends in observed concentrations and in emissions (past and projected) are consistent with progress towards

attainment. Strength of the evidence produced by emissions and air quality trends is increased if an extensive monitoring network exists and if there is a strong, positive and demonstrable, correlation between past emissions reductions and current trends in ozone or $PM_{2.5}$. Until recently, EPA prepared annual air quality trends reports for all criteria pollutants. The latest trends report analyzes ambient data through 2017 and can be found here.

The appropriate weight given to trend analyses depends on several factors. Analyses that use more air quality data and apply a greater variety of trend parameters typically provide more credible results. More weight can be placed on the results if the procedure used to normalize the trend for meteorological differences explains much of the variability attributable to these differences. In addition, trend analysis is usually more reliable if the extrapolation (as applicable) does not extend very far into the future. Finally, trend analysis is most credible if the contemplated strategy is similar to a past strategy (e.g., both strategies focus on reducing sulfates for PM or NOx for ozone). For example, if a past strategy focused on reducing sulfates, but a future one envisions controlling OC, there is no guarantee that ambient OC will respond similarly to changes in past emissions.

In addition to ambient data trends, further analysis of ambient data can provide information on ozone production efficiency, evidence of transport and assist in the quality assurance of emissions inputs. In particular, photochemical assessment monitoring station (PAMS) data, special study data, research and non-routine ambient data (i.e., NOy, and VOC data) can provide insights into the ozone and/or $PM_{2.5}$ concentrations observed in the nonattainment area and can help assess the accuracy of the modeling results and control strategies that are being relied upon for attainment.

### 6.1.3  Additional Emissions Controls/Reductions

Models are used to predict the future expected concentrations of ozone and/or $PM_{2.5}$, based on modeled emissions changes between a base year and future year. It is expected that emission inventories are as accurate as possible and represent emissions changes (including growth and controls) that are expected to occur. However, there may be various emissions sources and/or controls that are difficult to accurately represent in the modeling analysis, and the effects of some emissions controls may be difficult to quantify. Additionally, there may be uncertainty in how emissions controls may be implemented either in a nonattainment area, or in upwind regions which may contribute ozone to the nonattainment area.

The following are some of the types of control measures that may be appropriate to include in a weight of evidence demonstration:

- Measures that are difficult to quantify or may not be enforceable in the SIP. Examples include:
    - Energy efficiency or renewable energy (EE/RE) programs may be implemented statewide (and in fact may be enforceable). However, emissions reductions from such programs are hard to quantify and it may be difficult to assign reductions to particular utility sources. EPA has provided  an "EE/RE Roadmap Manual." The roadmap includes a weight of evidence "pathway" for air agencies that want to acknowledge the emissions benefits and potential reductions from EE/RE measures, but are unable to accurately quantify the emissions reductions in their SIP.
    - Smart growth initiatives such as land use planning and transportation planning.
    - Truck stop electrification.
    - Emissions reductions from idling regulations which may not be quantified in the mobile emissions modeling.
- Voluntary measures
    - Air agencies may have implemented voluntary measures that are not enforceable and therefore are not included in the SIP. These could include measures such as "ozone action days," voluntary no burn days, telework programs, idling reduction initiatives, etc. Even though these programs may be voluntary, they can still lead to positive actions in the nonattainment area that can lead to lower emissions. Voluntary measures should be documented to the fullest extent possible, including estimates of emissions benefits, where possible.

- Regional/super-regional and/or national programs that may not have been accounted for in the attainment demonstration.
    - Federal measures which were not accounted for in the modeling because they were proposed and/or finalized after the state modeling was completed.
    - Upwind regional, state, and/or local measures which were not known or not able to be quantified in the attainment demonstration due to timing or lack of information.

## 6.2   Weight of Evidence Summary

A weight of evidence (WOE) determination may examine results from a diverse set of analyses, including the outcome of the primary attainment test, and attempts to summarize the results into an aggregate conclusion with respect to whether a chosen set of control measures are

likely to result in an area attaining the NAAQS by the applicable attainment date, notwithstanding what the air quality modeling may suggest in isolation. The supplemental analyses discussed above can be part of a WOE determination, although the level of detail required in a WOE submittal will vary as a function of many elements of the model application (e.g., model performance, degree of residual nonattainment in the modeled attainment test, amount of uncertainty in the model and its inputs, etc.). Each WOE determination will be subject to area-specific conditions and data availability. Area-specific factors may also affect the types of analyses that are feasible for a specific nonattainment area, as well as the significance of each. Thus, decisions concerning which analyses to perform, and how much credence to give each, need to be made on a case-by-case basis by those implementing the modeling/analysis protocol. Air agencies are encouraged to consult with their EPA Regional office (and Federal Land Managers, when appropriate) in advance of initiating supplemental analyses to determine which additional analyses may be most appropriate for their particular area for potential use as part of a WOE evaluation.

The most useful supplemental analyses are those providing the best evidence as to how much air quality improvement can be expected as compared to the improvement projected by the air quality modeling analysis. Each analysis is weighed qualitatively, depending on: 1) the capacity of the analysis to address the adequacy of a strategy and 2) the technical credibility of the analysis. If the overall WOE produced by the combination of the primary modeling analysis and the various supplemental analyses supports the attainment hypothesis, then the air agency can demonstrate attainment of the NAAQS proposed control strategy. The end product of a WOE determination is a document which describes analyses performed, databases used, key assumptions and outcomes of each analysis, and why an air agency believes that the evidence, viewed as a whole, supports a conclusion that the area will, or will not, attain the NAAQS. In conclusion, the basic criteria required for an attainment demonstration based on weight of evidence are as follows:

1)  A fully-evaluated, high-quality modeling analysis that projects future values that are close to the NAAQS.
2) A description and explanation of each of the individual supplemental analyses, preferably from multiple categories. Analyses that utilize well-established analytical procedures and are grounded with sufficient data should be weighted accordingly higher.
3) A written description as to why the full set of evidence leads to a conclusive determination regarding the future attainment status of the area that differs from the results of the modeled attainment test alone.

# 7.0    What Role Should Additional and/or Supplemental Analyses Play in Regional Haze Modeling Demonstrations?

We believe additional and/or supplemental analyses can be a useful tool for air agencies when developing RPGs and applying them in the ways described in section 5. In this subsection, we note some potential supplemental analyses that may be used in this context.

## 7.1    Additional air quality modeling

Sensitivity tests can be performed to see if conclusions about trends in the 20% most anthropogenically impaired days and 20% clearest days are robust. One example of such an analysis is applying a model with and without a more finely resolved nested grid near source areas or near Class I areas. A purpose of this would be to see whether conclusions are affected by the degree of detail in which nearby sources are considered. A second example of an analysis would be to consider alternative future emissions (including lateral boundary conditions) and/or differing growth rate assumptions. This may be a particular concern for regional haze analyses because the emissions projection period is generally longer than for most ozone and $PM_{2.5}$ attainment demonstrations. Uncertainty in emissions and growth rates become more important as the projection period is lengthened.

If the outcomes of the several comparisons described in section 5.1 are similar using sensitivity tests, alternative models and/or alternative modeling approaches, this finding supports conclusions reached in the main analysis.

## 7.2    Review of trends

A review of trends generally involves a comparison, sometimes qualitative, between past trends in reconstructed visibility and estimated changes in emissions (e.g., mid '00's to mid '10's). This information could be used to confirm that additional reductions of previously controlled emissions of a component or its precursors is likely to result in the predicted visibility improvement. It may also be used to see whether certain PM components are becoming increasingly more or less important sources of light extinction.

## 7.3    Other models and tools

Trajectory models may be useful for identifying the types of meteorological conditions most often corresponding to observed worst and best visibility in various Class I areas. This, in turn,

may enable air agencies to draw inferences about the areas containing sources most likely to influence visibility in a Class I area on days with "poor" and "good" visibility. Grid model-based techniques such as DDM or source apportionment may also be useful in identifying areas and emissions sources most responsible for visibility impairment on the most anthropogenically impaired days and clearest days.

## 7.4    Refinements to the recommended visibility analysis

A state may consider refining the recommended modeling analysis in some manner. Refinements are best made if they are based on local observations/analyses which suggest that some of the underlying assumptions in the recommended assessment may not be applicable. We list some potential refinements that could be considered. The list is intended to illustrate types of additional analyses that could be performed.

- Use an alternative light extinction equation or an area-specific version.
- The 20% most anthropogenically impaired days conceptually will not include days with high impacts from fires or dust storms because anthropogenic impairment relative to natural conditions will be low on such days. However, the particular method initially applied to identify the most anthropogenically impaired days may not implement this concept perfectly at a particular Class I area. Available speciated data and other information may be reviewed to see whether the outcome of the visibility analysis is being influenced by including one or more days with extraordinary events (e.g., a major wildfire lasting a number of days or transported dust events). If convincing arguments can be made that the event is a "natural" one, changes in the initial approach to estimate daily anthropogenic versus natural light extinction should be discussed with the appropriate EPA Regional office and Federal Land Managers.
- Daily component specific RRFs can be examined to determine if one or more days are responding in a different way compared to the majority of the clearest or most impaired days. Determining why days may be more or less responsive to emissions controls may lead to conclusions regarding the suitability of particular days to be represented in the mean response. It may be appropriate, in some cases, to re-calculate mean RRFs with suspect days removed.
- Re-rank future estimated light extinction (i.e., $b_{ext}$ values) for all days that have current measurements and re-compute mean future most impaired and clearest days visibility (i.e., do not assume that the identity of clearest days remains the same between the base year and the future year).

## 7.5    Concerns about modeling the clearest days

In some parts of the U.S., concentrations of the components of PM used in visibility calculations may be very close to background levels on the clearest days. Measurements and model estimates may be subject to more relative uncertainty (i.e., lower signal to noise ratio) on days where observed concentrations of PM are very low (and light extinction is also low). The utility of a WOE determination is heightened in such cases. An air agency should see whether a model's inability to accurately predict one or more individual components of PM has a substantial effect on the extinction coefficient calculated with Equation (5.1). If it does, and diagnostic tests are unable to resolve a performance problem, an air agency may need to address the "no degradation" requirement for the clearest days in the particular Class I area(s) without using results from a grid model.

# 8.0   References

Abt, 2014. Modeled Attainment Test Software: User's Manual. MATS available at:
    https://www.epa.gov/scram/photochemical-modeling-tools

Adelman, Z., M. Fry, J.J. West, P. Dolwick, and C. Jang (2011): Background air quality in the
    United States under current and future emissions scenarios, 10th Annual CMAS
    conference, Chapel Hill NC, October 2011.

Allen, D.J., Pickering, K.E., Pinder, R.W., Henderson, B.H., Appel, K.W., and Prados, A., (2012),
    Impact of lightning-NO on eastern United States photochemistry during the summer of
    2006 as determined using the CMAQ model. Atmospheric Chemistry and Physics. 12:
    1737-1758.

Anenberg S.C., K. Talgo, S. Arunachalam, P. Dolwick, C. Jang, and J.J. West, (2011), Impacts of
    global, regional, and sectoral black carbon emission reductions on surface air quality and
    human mortality, Atmos. Chem. Phys., 11, 7253-7267.

Ansari, A.S., and S.N. Pandis, (1998), Response of Inorganic PM to Precursor Concentrations,
    *Environ. Sci. Technol.*, **32**, 2706-2714.

Appel, K. W., A. B. Gilliand, G. Sarwar, and R.C. Gilliam, (2007), Evaluation of the Community
    Multiscale Air Quality (CMAQ) model version 4.5: sensitivities impacting model
    performance, *Atmos. Environ.*, **41**, 9603–9615.

Appel, W., S. J. Roselle, R. C. Gilliam, and J. E. Pleim, (2010), Sensitivity of the Community
    Multiscale Air Quality (CMAQ) model v4.7 results for the Eastern United States to MM5
    and WRF meteorological drivers, Geoscientific Model Development 3, pp. 169-188.

Appel, K.W., Gilliam, R.C., Davis, N., Zubrow, A., Howard, S.C., (2011), Overview of the
    atmospheric model evaluation tool (AMET) v1.1 for evaluating meteorological and air
    quality models. *Environmental Modeling & Software*, 26(4), 434-443.

Arnold, J.R., R.L. Dennis, and G.S. Tonnesen, (2003), Diagnostic evaluation of numerical air
    quality models with specialized ambient observations: Testing the Community
    Multiscale Air Quality modeling system (CMAQ) at selected SOS 95 ground sites, Atmos.
    Environ., 37, 1185-1198.

Arnold, J. R., and R. L. Dennis (2006), Testing CMAQ chemistry sensitivities in base case and
    emissions control runs at SEARCH and SOS99 surface sites in the southeastern US,
    *Atmos. Environ.*, *40*(26), 5027-5040.

Arunachalam, S., Adelman, Z., Mathur, R., and Vukovich, J,M, (2002), The Impacts of Biogenic Emissions Estimates from BEIS-3 on Ozone Modeling in the Southeastern U.S., presented at the 11th Annual International Emissions Inventory Conference, Atlanta, GA, April 15-19, 2002, https://www.researchgate.net/publication/248693728_The_Impacts_of_Biogenic_Emissions_Estimates_from_BEIS-3_on_Ozone_Modeling_in_the_Southeastern_US.

Arunachalam, S., A. Holland, B. Do, and M. Abraczinskas, (2006), A Quantitative Assessment of the Influence of Grid Resolution on Predictions of Future-Year Air Quality In North Carolina, USA, *Atmospheric Environment*, **40** (26), 5010-5026.

Athanasopoulou, E., Tombrou, M., Pandis, S.N., and Russell, A.G., (2008). The role of sea-salt emissions and heterogeneous chemistry in the air quality of polluted coastal areas.

Baker, K., Scheff, P., (2007), Photochemical model performance for PM2.5 sulfate, nitrate, ammonium, and precursor species SO2, HNO3, and NH3 at background monitor locations in the central and eastern United States. Atmospheric Environment 41, 6185-6195.

Bash, J.O., Baker, K.R., Beaver, M.R., 2016. Evaluation of improved land use and canopy representation in BEIS v3. 61 with biogenic VOC measurements in California. Geoscientific Model Development 9, 2191.

Berge, E., H-C. Huang, J. Chang, and T-H. Liu, (2001), A study of the importance of initial conditions for photochemical oxidant modeling, *J. Geophys. Res.*, **106**, 1347–1363.

Berrocal, V., Gelfand, A. E. and Holland, D. M. (2010a), A bivariate space-time downscaler under space and time misalignment. *The Annals of Applied Statistics* **4**, 1942-1975.

Berrocal, V., Gelfand, A. E., and Holland, D. M. (2010b), A spatio-temporal downscaler for output from numerical models. J. of Agricultural, Biological,and Environmental Statistics **15**, 176-197.

Bey, I., D.J. Jacob, R.M. Yantosca, J.A. Logan, B. Field, A.M. Fiore, Q. Li, H. Liu., L.J. Mickley, and M. Schultz, (2001), Global modeling of tropospheric chemistry with assimilated meteorology: Model description and evaluation, *J. Geophys. Res.*, **106**, 23,073-23,096.

Blanchard, C. L., (2000), Ozone process insights from field experiments- Part III: Extent of reaction and ozone formation, *Atmospheric Environment,* **34**, 2035-2043.

Blanchard, C.L., Lurmann, F.W., Roth, P.M., Jeffries, H.E. and Korc, M. (1999), The Use of Ambient Data to Corroborate Analyses of Ozone Control Strategies. Atmos. Environ. 33: 369–381.

Blanchard, C.L. and Stoeckenius, T. (2001). Ozone Response to Precursor Controls: Comparison of Data Analysis Methods with the Predictions of Photochemical Air Quality Simulation Models. Atmos. Environ. 35: 1203–1215.

Bloomer, B. J., J. W. Stehr, C. A. Piety, R. J. Salawitch, and R. R. Dickerson, (2009), Observed relationships of ozone air pollution with temperature and emissions. Geophys. Res. Lett., 36, L09303, doi:10.1029/2009GL037308.

Boylan, J.W., Russell, A.G., (2006), PM and light extinction model performance metrics, goals, and criteria for three-dimensional air quality models. Atmospheric Environment 40, 4946-4959.

Byun, D., Schere, K.L., (2006), Review of the governing equations, computational algorithms, and other components of the models-3 Community Multiscale Air Quality (CMAQ) modeling system. Applied Mechanics Reviews 59, 51-77.

Cabada, J.C.,  S. N. Pandis, R. Subramanian., A. L. Robinson, A. Polidori, and B. Turpin, (2004), Estimating the Secondary Organic Aerosol Contribution to $PM_{2.5}$ Using the EC Tracer Method, *Aerosol Science and Technology*, 38, 140-155.

Camalier, L., Cox, W., Dolwick, P., (2007), The effects of meteorology on ozone in urban areas and their use in assessing ozone trends. Atmospheric Environment 41, pp. 7127-7137.

CARB, (California Air Resources Board), 2010. Updated economic analysis of California's climate change scoping plan, (March). Available at: http://www.arb.ca.gov/cc/scopingplan/economics-sp/updated-analysis/updated_sp_analysis.pdf .

Carlton, A. and Baker, K., (2011), Photochemical modeling of the Ozark isoprene volcano: MEGAN, BEIS, and their impacts on air quality predictions.  Environmental Science and Technology. 45(10):  4438-4445.

Castell, N., Stein, A.F., Mantilla, E., Salvador, R. and Millan, M. (2009), Evaluation of the Use of Photochemical Indicators to Assess Ozone-NOx-VOC Sensitivity in the Southwestern Iberian Peninsula. J. Atmos. Chem. 63: 73–91.

Chock, D.P., Chang, t.Y., Winkler, S.L., Nanac, B.I., (1999), The impact of an 8h ozone air quality standard on ROG and $NO_x$ controls in southern California.  *Atmos Environ*, 33, 2471-2485.

Chow, J. C., J. G. Watson, L.-W.A. Chen, J. Rice, and N. H. Frank (2010), Quantification of PM2.5 organic carbon sampling artifacts in U.S. networks, *Atmos. Chem. Phys.*, 10, 5223-5339.

Chow, J.C., Watson, J.G., Crow, D., Lowenthal, D.H., Merrifield, T. (2001), Comparison of IMPROVE and NIOSH carbon measurements, *Aerosol Science and Technology*, 34, 23-34.

Chu, S.-H., (2005), Stable estimate of primary OC/EC ratios in the EC tracer method, *Atmospheric Environment*, 39, 1383–1392.

Clegg, S.L., P. Brimblecombe, and A. S. Wexler, (1998), Aerosol Inorganics Model; A Thermodynamic Model of the System H+ - NH4+ - SO42- - NO3- - H2O at Tropospheric Temperatures. *J. Phys. Chem.*, 102A, 2137-2154. http://www.aim.env.uea.ac.uk/aim/project.htm

CMAS, (Community Modeling and Analysis System), 2008, Atmospheric Model Evaluation Tool (AMET) User's Guide. Available at: https://www.cmascenter.org/help/model_docs/amet/1.1/AMET_Users_Guide_V1.1.pdf

Cohan, D. S., Hakami, A., Hu, Y. T., and Russell, A. G., (2005), Nonlinear response of ozone to emissions: Source apportionment and sensitivity analysis, Environ. Sci. Technol., 39, 6739–6748.

Cohan D.S., D. Tian, Y. Hu, and A.G. Russell, (2006), Control strategy optimization for attainment and exposure mitigation: case study for ozone in Macon, Georgia, Environmental Management, **38**, 451-462.

Collett, Jeffrey, (2004), Technical note on IMPROVE study.

Cooper, O. R., R-S Gao, D. Tarasick, T. Leblanc, and C. Sweeney, (2012), Long term ozone trends at rural ozone monitoring sites across the United States, *J. Geophys. Res.*, **117**.

Coordinating Research Council (CRC) final report for project A-69-1. Regional modeling of weekday/weekend ozone change in the midwestern US. Prepared by Environ International. May 19, 2011: http://www.crcao.com/reports/recentstudies2011/A-69-1/CRCA-69-1_Final_Report_19May2011.pdf

Cox, W.M., and S. Chu, (1993), Meteorologically Adjusted Ozone Trends in Urban Areas: A Probabilistic Approach, *Atmospheric Environment,* **27B**, (4), 425-434.

Cox, W.M., and S. Chu, (1996), Assessment of Interannual Ozone Variation in Urban Areas from a Climatological Perspective, *Atmospheric Environment,* **30**, 2615-2625.

Davidson, J. P., McQueen, R. Mathur, R. Draxler, R. Wayland, N. Seaman, K. Carey, (2007). NOAA-EPA's National Air Quality Forecast Capability: Testing Expanded Capabilities Preprints, Ninth Conference on Atmospheric Chemistry American Meteorological Society, San Antonio, TX.

De Meij, A., A. Gzella, P. Thunis, C. Cuvelier, B. Bessagnet, J. F. Vinuesa, and L. Menut, (2009), The impact of MM5 and WRF meteorology over complex terrain on CHIMERE model calculations. Atmospheric Chemistry and Physics 9, pp. 6611-6632.

Dennis, R., Fox, T., Fuentes, M., Gilliland, A., Hanna, S., Hogrefe, C., Irwin, J., Rao, S.T., Scheffe, R., Schere, K., Steyn, D.A., Venkatram, A., (2010), A framework for evaluating regional-scale numerical photochemical modeling systems, J. Environmental Fluid Mechanics, 471-489, http://dx.doi.org/10.1007/s10652-009-9163-2

Deuel, H.P., and S.G. Douglas, (1998), Episode Selection for the Integrated Analysis of Ozone, Visibility and Acid Deposition for the Southern Appalachian Mountains, Draft Technical Report Systems Applications International, Inc. (SYSAPP-98/07), prepared for the Southern Appalachians Mountains Initiative.

Donner L.J., B.L. Wyman, R.S. Hemler, L.W. Horowitz, Y. Ming, M. Zhao, J-C Golaz, P Ginoux, S.J. Lin, M.D. Schwarzkopf, J. Austin, G. Alaka, W.F. Cooke, T.L. Delworth, S.M. Freidenreich, C.T. Gordon, S.M. Griffies, I.M. Held, W.J. Hurlin, S.A. Klein, T.R. Knutson, A.R. Langenhorst, H-C Lee, Y. Lin, B.I. Magi, S.L. Malyshev, P.C.D. Milly, V. Naik, M.J. Nath, R. Pincus, J.J. Ploshay, V. Ramaswamy, C.J. Seman, E. Shevliakova, J.J. Sirutis, W.F. Stern, R.J. Stouffer, R.J. Wilson, M. Winton, A.T. Wittenberg, and F. Zeng, (2011), The dynamical core, physical parameterizations, and basic simulation characteristics of the atmospheric component AM3 of the GFDL global coupled model CM3. *J Clim*, **24(13)**:3484–3519.

Draxler, R.R., and G.D. Hess, (1998), An overview of the HYSPLIT_4 modeling system of trajectories, dispersion, and deposition. *Aust. Meteor. Mag.*, **47**, 295-308. On-line model available at: http://ready.arl.noaa.gov/HYSPLIT.php

Draxler, R.R., P. Ginoux and A. Stein, (2010), An Empirically Derived Emissions Algorithm for Wind-Blown Dust. *J. Geo. Res.*, Vol. 115, Issue D16.27. August. (http://onlinelibrary.wiley.com/doi/10.1029/2009JD013167/abstract).

Du Y., Raffuse S.M., and Reid S.B., (2013), Technical guidance for using SmartFire2 / BlueSky Framework to develop national wildland fire emissions inventories. Draft user's guide prepared for the U.S. Environmental Protection Agency, Research Triangle Park, NC, Sonoma Technology Inc..

Duncan, B.N., et al., (2010), Application of OMI observations to a space-based indicator of NOx and VOC controls on surface ozone formation, Atmospheric Environment 44: 2213-2223.

Edgerton E.S., B.E. Hartsell, R.D. Saylor, J.J. Jansen, D.A. Hansen, and G.M. Hidy, (2005), The Southeastern Aerosol Research and Characterization Study: Part II. Filter-based measurements of fine and coarse particulate matter mass and composition, *J. Air Waste Mange. Assoc.,* **55,** 1527-1542.

Emery, C., and E. Tai, (2001), Enhanced Meteorological Modeling and Performance Evaluation for Two Texas Ozone Episodes , prepared for the Texas Near Non-Attainment Areas through the Alamo Area Council of Governments", by ENVIRON International Corp, Novato, CA., http://www.tnrcc.state.tx.us/air/aqp/airquality_contracts.html#met01

Emery, C., Tai, E., Yarwood, G., Morris, R., (2011). Investigation into approaches to reduce excessive vertical transport over complex terrain in a regional photochemical grid model. Atmospheric Environment 45, 7341-7351

Emery, C., Liu, z., Russell, A.G., Odman, M.T., Yarwood, G., Kumar, N., (2017), Recommendations on Statistics and Benchmarks to Assess Photochemical Model Performance, Journal of the Air and Waste Management Association, 67:5, 582-598, doi:/10.1080/10962247.2016.1265027

Emmons, L. K., S. Walters, P.G. Hess, J-F Lamarque, G.G. Pfister, D. Fillmore, C. Granier, A. Guenther, D. Kinnison, T. Laepple, J. Orlando, X. Tie, G. Tyndall, C. Wiedinmyer, S.L. Baughcum, and S. Kloster,(2010), Description and evaluation of the Model for Ozone and Related chemical Tracers, version 4 (MOZART-4), *Geosci. Model Dev*., **3**, 43-67.

Environ and TCEQ, (2003), Modeling Protocol – Development of Base Case Photochemical Modeling to Address 1-hour and 8-Hour Ozone Attainment in the Dallas/Fort Worth Area, http://www.tceq.texas.gov/assets/public/implementation/air/am/docs/dfw/sip-bibliography/2003a_Environ_DFW_Modeling_Protocol_Draft_Final.pdf

ENVIRON International Corporation, (2006), Guidance for the Application of the CAMx Hybrid Photochemical Grid Model to Assess Visibility Impacts of Texas BART Sources at Class I Areas, Novato, CA. Prepared for Texas Commission on Environmental Quality (TCEQ) (http://www.tceq.state.tx.us/assets/public/implementation/air/sip/bart/BART_TX_CAMx_PSAT_Guid.pdf).

Eyth, A., Ran, L., Partheepan, R, Yarwood, G., Jimenez, M., Rao, S. (2006): New Tools to Generate Spatial Surrogate and Speciation Profile Inputs to SMOKE, International Emission Inventory Conference, New Orleans, 2006.

Fann, N., T. Brennan, P. Dolwick, J.L. Gamble, V. Ilacqua, L. Kolb, C.G. Nolte, T.L. Spero, and L. Ziska, 2016: Ch. 3: Air Quality Impacts. The Impacts of Climate Change on Human Health in the United States: A Scientific Assessment. U.S. Global Change Research Program, Washington, DC, 69–98. http://dx.doi.org/10.7930/J0GQ6VP6.

Fiore, A.M., V. Naik, D.V. Spracklen, A. Steiner, N. Unger, M. Prather, D. Bergmann, P.J. Cameron-Smith, I. Cionni, W.J. Collins, S. Dalsoren, V. Eyring, G.A. Folberth, P. Ginoux, L.W. Horowitz, B. Josse, J.F. Lamarque, I.A. MacKenzie, T. Nagashima, F.M. O'Connor, M. Righi, S.T. Rumbold, D.T. Shindell, R.B. Skeie, K. Sudo, S. Szopa, T. Takemura, and G. Zeng, (2012), Global air quality and climate. Chem. Soc. Rev. 41, pp. 6663-6683.

Flaum, J. B., S.T. Rao, and I.G. Zurbenko, (1996), Moderating the influence of meteorological conditions on ambient ozone concentrations, *Journal of the Air and Waste Management Association* **46**, 35-46.

Frank, N., (2006), Retained Nitrate, Hydrated Sulfates, and Carbonaceous Mass in Federal Reference Method Fine Particulate Matter for Six Eastern U.S. Cities" *J. Air Waste Mange. Assoc.*, 56, 500-511.

Frank, N. Memo to PM NAAQS Review Docket EPA-HQ-OAR-2007-0492. Recommendations to Users of CSN and IMPROVE Speciation Data regarding Sampling Artifact Correction for PM2.5 Organic Carbon. June 14, 2012. http://www.epa.gov/ttnnaaqs/standards/pm/data/20120614Frank.pdf

Foley, K.M., Roselle, S.J., Appel, K.W., Bhave, P.V., Pleim, J.E., Otte, T.L., Mathur, R., Sarwar, G., Young, J.O., Gilliam, R.C., Nolte, C.G., Kelly, J.T., Gilliland, A.B., Bash, J.O., (2010), Incremental testing of the Community Multiscale Air Quality (CMAQ) modeling system version 4.7. Geoscientific Model Development 3, 205-226.

Foley. K., P. Dolwick, C. Hogrefe, H. Simon, B. Timin, and N. Possiel, (2014), Dynamic Evaluation of CMAQ Part II: Evaluation of relative response factor metrics for ozone attainment demonstrations, in review.

Fox, T., (2017), Use of Photochemical Grid Models for Single-Source Ozone and Secondary PM2.5 impacts for Permit Program Related Assessments and for NAAQS Attainment Demonstrations for Ozone, PM2.5, and Regional Haze. https://www3.epa.gov/ttn/scram/guidance/clarification/20170804-Photochemical_Grid_Model_Clarification_Memo.pdf

Fu, J.S., X. Dong, K. Huang, and C. Jang: Using Hemispheric-CMAQ to provide initial and boundary conditions for regional modeling, 11th Annual CMAS conference, Chapel Hill NC, October 2012.

Fu, J.S., Dong, X., Huang, K., Tong, D., and Zhuang, G.: Model development of dust emission and heterogeneous chemistry within the Community Multiscale Air Quality modeling system and its application over East Asia, Atmospheric Chemistry and Physics, 16, 8157-8180, 2016.

Galmarini, S., Rao, S.T., Steyn, D.G., (2012), AQMEII: An International Initiative for the Evaluation of Regional-Scale Air Quality Models - Phase 1 Preface. Atmospheric Environment 53, 1-3.

Gantt, B., Kelly, J. T., and Bash, J. O., (2015), Updating sea spray aerosol emissions in the Community Multiscale Air Quality (CMAQ) model version 5.0.2, Geosci. Model Dev., 8, 3733-3746, doi:10.5194/gmd-8-3733-2015.

Gilliam, R., Pleim, J., (2010), Performance Assessment of New Land Surface and Planetary Boundary Layer Physics in the WRF-ARW. *J. Appl. Meteor. Climatol.*, **49**, 760–774.

Gilliam, C. R., J. M. Godowitch, and S. T. Rao, (2012), Improving the Horizontal Transport in the Lower Troposphere with Four Dimensional Data Assimilation. Atmospheric Environment 53, pp 186-201.

Gilliland, A.B., Hogrefe, C., Pinder, R.W., Godowitch, J.M., Foley, K.L., Rao, S.T., (2008), Dynamic evaluation of regional air quality models: assessing changes in $O_3$ stemming from changes in emissions and meteorology, *Atmospheric Environment*, 42, 5110-5123.

Godowitch, J. M., R. C. Gilliam, and S. T. Rao, (2011). Diagnostic Evaluation of the chemical and transport processes in a regional photochemical air quality modeling system, Atmospheric Environment 45, pp. 3977-3987.

Godowitch, J.M., Pouliot, G.A., Rao, S.T.(2010), Assessing multi-year changes in modeled and observed urban NOx concentrations from a dynamic model evaluation perspective, *Atmospheric Environment*, 44, 2894-2901.

Grell, G. A., S. E. Peckham, R. Schmitz, S. A. McKeen, G. Frost, W. C. Skamarock, and B. Eder, (2005), Fully coupled "online" chemistry within the WRF model, Atmospheric Environment 39, pp. 6957–6975.

Grell, G.A., J. Dudhia and D.R. Stauffer, (1994), A Description of the Fifth-Generation Penn State/NCAR Mesoscale Model (MM5), NCAR/TN-398+STR, 138 pp.

Geron, C., A. Guenther and T. Pierce, (1994), An Improved Model for Estimating Emissions of Volatile Organic Compounds from Forests in the Eastern United States, *J. Geophys. Res.,* **99**, 12,773-12,791.

Guenther, A., C. Geron, T. Pierce, B. Lamb, P. Harley, and R. Fall, (2000), Natural emissions of non-methane volatile organic compounds, carbon monoxide, and oxides of nitrogen from North America, Atmospheric Environment., 34, 2205-2230.

Hammer, M.-U., Vogel, B., Vogel, H., (2002), Findings on $H_2O_2/HNO_3$ as an indicator of ozone sensitivity in Baden-Wurttemberg, Berlin-Brandenburg, and the Po valley based on numerical simulations. *J. Geophys Res*., 107(D22), 8190; doi:10.1029/2000JD00211.

Hand, J. L., and W. C. Malm (2006), Review of the IMPROVE equation for estimating ambient light extinction coefficients, CIRA Report, ISSN: 0737-5352-71, Colo. State Univ., Fort Collins. http://vista.cira.colostate.edu/improve/Publications/GrayLit/016_IMPROVEeqReview/IMPROVEeqReview.htm

Hansen, D.A., E.S. Edgerton, B.E. Hartsell, J.J.Jansen, N. Kandasamy, G.M. Hidy, and C.L. Blanchard, (2003), The Southeastern Aerosol Research and Characterization Study: Part 1 – Overview, *J. Air Waste Mange. Assoc.,* **53,** 1460-1471

Harley, R.A., Marr, L.C., Lehner, J.K. Giddings, S.N., (2005), Changes in motor vehicle emission on diurnal to decadal time scales and effects on atmospheric composition, *Environmental Science and Technology*, 39, 5356-5362, 2005.

Henderson, B.H.; Kimura, Y.; McDonald-Buller, E.; Allen, D.; Vizuete, W., (2011), Comparison of Lagrangian Process Analysis Tools for Eulerian Air Quality Models. Atmospheric Environment, 45, 5200-5211, doi:10.1016/j.atmosenv.2011.06.005

Hering, S. and G. Cass, (1999), The Magnitude of Bias in Measurement of $PM_{2.5}$ Arising from Volatilization of Particulate Nitrate from Teflon Filters. *JAWMA* 49:725-733.

Hogrefe, C., S.T. Rao, I.G. Zurbenko, and P.S. Porter, (2000), Interpreting the information in time series of ozone observations and model predictions relevant to regulatory policies in the eastern United States, *Bull. Amer. Met. Soc.,* **81**, 2083-2106.

Hogrefe C., W. Hao, E.E. Zalewsky, J-Y Ku, B. Lynn, C. Rosenzweig, M.G. Schultz, S. Rast, M.J. Newchurch, L. Wang, P.L. Kinney, and G. Sistla, (2011), An analysis of long-term regional-scale ozone simulations over the Northeastern United States: variability and trends, *Atmospheric Chemistry and Physics*, **11**, 567-582.

Hogrefe C., J. Xing, C Wei, R. Mathur, S. Roselle, S. Porter, S.T. Rao (2014), Evaluating the Impact of Emission Changes on Observed and Simulated Ozone Concentrations: Learning from the Past to Predict the Future, AWMA Annual Conference.

Hogrefe, C., Roselle, S.J., Bash, J.O., 2017. Persistence of initial conditions in continental scale air quality simulations. Atmospheric Environment 160, 36–45. https://doi.org/10.1016/j.atmosenv.2017.04.009

Hyslop, N.P., Trzepla, K., White, W.H., (2012), Reanalysis of Archived IMPROVE PM2.5 Samples Previously Analyzed over a 15-Year Period, *Environmental Science and Technology*, 46, 10106-10113.

IMPROVE, (2000), Spatial and Seasonal Patterns and Temporal Variability of Haze and its Constituents in the United States: Report III. Cooperative Institute for Research in the Atmosphere. Available at:
http://vista.cira.colostate.edu/improve/publications/Reports/2000/2000.htm

IMPROVE, (2006), Revised IMPROVE Algorithm for Estimating Light Extinction from Particle Speciation Data, January 2006,
http://vista.cira.colostate.edu/improve/Publications/GrayLit/gray_literature.htm

IMPROVE, (2011), Spatial and Seasonal Patterns and Temporal Variability of Haze and its Constituents in the United States: Report V. Cooperative Institute for Research in the Atmosphere. Available at:
http://vista.cira.colostate.edu/improve/publications/Reports/2011/2011.htm.

Isakov, V., J.S. Irwin, and J. Ching, (2007), Using CMAQ for exposure modeling and characterizing the sub-grid variability for exposure estimates", *Journal of Applied Meteorology and Climatology*, 46(9): 1354-1371.

Jacob, D. J., Logan, J.A., and Murti, P.P., (1999), Effect of rising Asian emissions on surface ozone in the United States, *Geophys. Res. Lett.*, **26**, 2175–2178.

Jacob, D.J., D.A. Winner, (2009), Effect of climate change on air quality, Atmospheric Environment 43, pp. 51–63.

Jang, J.C., Jeffries, H.E., Tonnesen, S., (1995), Sensitivity of ozone to model grid resolution-II. Detailed process analysis for ozone chemistry, Atmospheric Environment 29, 3101-3114.

Jeffries, H.E., (1994), Process Analysis for UAM Episode 287, memo to Brock Nicholson, NC DEHNR, April 8, 1994,
ftp://airsite.unc.edu/pdfs/ese_unc/jeffries/projprpt/uammodpanel287.pdf .

JFSP, (2013), DEASCO3 2008 Emissions Inventory Methodology. Prepared for Join Fire Science Program Project No. 178-13, September, (https://wraptools.org/pdf/ei_methodology_20130930.pdf).

Jimenez, P., Baldansano, J.M., (2004), Ozone response to precursor controls in very complex terrains: Use of photochemical indicators to assess $O_3$-$NO_x$-VOC sensitivity in the northeastern Iberian Peninsual. *J Geophys Res*., 109, D20309, doi:10.1029/2004JD04985.

Kelly, J.T., Avise, J., Cai, C., Kaduwela, A.P., (2011), Simulating Particle Size Distributions over California and Impact on Lung Deposition Fraction. *Aerosol Science and Technology* 45, 148-162.

Kelly, J.T., Bhave, P.V., Nolte, C.G., Shankar, U., Foley, K.M., (2010), Simulating emission and chemical evolution of coarse sea-salt particles in the Community Multiscale Air Quality (CMAQ) model. *Geoscientific Model Development* 3, 257-273.

Koo, B., Chien, C.-J., Tonnesen, G., Morris, R., Johnson, J., Sakulyanontvittaya, T., Piyachaturawat, P., and Yarwood, G., (2010), Natural emissions for regional modeling of background ozone and particulate matter and impacts on emissions control strategies, *Atmos. Environ.*, 44, 2372–2382., doi:10.1016/j.atmosenv.2010.02.041.

Kulkarni S., D. Chau, J. Avise, J. DaMassa, and A. Kaduwela, (2014), An Extended Approach to Calculate Relative Response Factors for use in the Attainment Demonstration of the Ambient Air Quality Standards for 1-hour Ozone, Submitted to Journal of the Air & Waste Management Association.

Kwok, R. H. F., Napelenok, S. L., & Baker, K. R., (2013), Implementation and evaluation of PM2.5 source contribution analysis in a photochemical model. *Atmospheric Environment*, *80*, 398-407.

Kwok, R. H. F., Baker, K. R., Napelenok, S. L., & Tonnesen, G. S., (2014), Photochemical grid model implementation of VOC, NOx, and O3 source apportionment. *Geoscientific Model Development Discussions*, *7*(5), 5791-5829.

Lake Michigan Air Directors Consortium (2009), Conceptual model of PM2.5 episodes in the Midwest, LADCO PM Data Analysis Workshop, http://www.ladco.org/reports/pm25/post08/pm25_conceptual_model.pdf

Lam, Y-F. and J. S. Fu, (2009), A novel downscaling technique for the linkage of global and regional air quality modeling, *Atmos. Chem. Phys.* **9**, 9169–9185, 2009.

Liang, J.-Y., Jackson, B., Kaduwela, A., (2006), Evaluation of the ability of indicator species ratios to determine the sensitivity of ozone to reductions in emissions of volatile organic compounds and oxides of nitrogen in northern California. *Atmos Environ*, 40, 5156-5166.

Lin, M., Horowitz, L.W., Payton, R., Fiore, A.M., Tonnesen, G., 2017. US surface ozone trends and extremes from 1980 to 2014: quantifying the roles of rising Asian emissions, domestic controls, wildfires, and climate. *Atmospheric Chemistry and Physics* 17, 2943–2970. doi: 10.5194/acp-17-2943-2017

Liu, X, K. Chance, C.E. Sioris, T.P. Kurosu, R.J.D. Spurr, R.V. Martin, T-M Fu, J.A. Logan, D.J. Jacob, P.I. Palmer, M.J. Newchurch, I.A. Megretskaia, and R.B. Chatfield, (2006), First directly retrieved global distribution of tropospheric column ozone from GOME: Comparison with the GEOS-CHEM model, *J. Geophys. Res*., **111**.

Lu, C.H., and J.S. Chang, (1998), On the Indicator-Based Approach to Assess Ozone Sensitivities and Emissions Features, *J. Geophysical Research*, **103**, 3453-3462.

Lui, X.-H., Zhang, Y., Xing, J., Zhang, Q., Wang, K., Streets, D.G., Jang, C., Wang, W.-X., Hao, J.-M., (2010), Understanding the regional air pollution over China using CMAQ, part II. Process analysis and sensitivity of ozone and particulate matter to precursor emissions, *Atmospheric Environment*, 44, 3719-3727.

Malm W.C., Schichtel B.A., Pitchford M.L. (2011), Uncertainties in PM2.5 gravimetric and speciation measurements and what we can learn from them. J Air Waste Manag Assoc, 61(11): 1131-49.

MANE-VU (2013), Future Modeling Platform Base Year Determination. http://www.otcair.org/MANEVU/Upload/Publication/Reports/Future%20Modeling%20Platform%20Base%20Year%20Selection%20Analysis%20-%20Oct%209%202013%20Final.pdf

Mansell, G.E., S. Lau, J. Russell and M. Omary, (2006), Fugitive Wind Blown Dust Emissions and Model Performance Evaluation Phase II. ENVIRON International Corporation and University of California at Riverside. May 5. (http://www.wrapair.org/forums/deif/documents/ WRAP_WBD_PhaseII_Final_Report_050506.pdf).

Marr, L.C.; Harley, R.A., (2002), Spectral analysis of weekday-weekend differences in ambient ozone, nitrogen oxide, and non-methan hydrocarbon time series in California, *Atmos. Environ*, 36, 2327-2335.

Martilli, A., Neftel, A., Favaro, G., Krichner, F., Sillman, S., Clappier, A., (2002), Simulation of the ozone formation in the northern part of the Po Valley. *J Geophys Res*, 107(D22), 8195.

Martin, R.V., Fiore, A.M., Donkelaar, A.V., (2004), Space-based diagnosis of surface ozone sensitivity to anthropogenic emissions. *Geophys Res Lett*, L06120, doi:10.1029/2004GL019416, 2004.

Matichuk, R., Tonneson, G., Luecken, D., Gilliam, R., Napelenok, S.L., Baker, K.R., Schwede, D., Murphy, B., Helmig, D., Lyman, S.N., Roselle, S., (2017), Evaluation of the Community Multiscale Air Quality Model for Simulating Winter Ozone Formation in the Uinta Basin. *J Geophys Res*, **122**, 13545-13572. https://doi.org/10.1002/2017JD027057

Meyer, E.L., K.W. Baldridge, S. Chu, and W.M. Cox, (1997), Choice of Episodes to Model: Considering Effects of Control Strategies on Ranked Severity of Prospective Episode Days, *Paper 97-MP112.01*, Presented at 97th Annual AWMA Meeting, Toronto, Ontario.

McGaughey G., C. Durrenberger, D. Allen, and E. McDonald-Buller, (2010), Conceptual model for ozone for the Austin area, prepared for the Capital Area Council of Governments and the Texas Commission on Environmental Quality, http://www.capcog.org/documents/airquality/cac/2010/september2010/Austin_CM_v er21.pdf.

McMillan, N., Holland, D. M., Morara, M., and Feng, J., (2010), Combining Numerical Model Output and Particulate Data Using Bayesian Space-Time Modeling *Environmetrics* **21**, 48-65.

Milanchus, M. L., S.T. Rao, and I.G. Zurbenko, (1998), Evaluating the effectiveness of ozone management efforts in the presence of meteorological variability, *Journal of the Air and Waste Management Association* **48,** 201-215.

Milford, J.B., Gao, D., Sillman, S., Blossey, P. and Russel, A.G., (1994), Total Reactive Nitrogen (NOy) as an Indicator of the Sensitivity of Ozone to Reduction in Hydrocarbons and NOx Emissions. J. Geophys. Res. D: Atmos. 99: 3533–3542.

Morris, R.E, McNally, D.E., Tesche, T.W., Tonnesen, G., Boylan, J.W., and Brewer, P., (2005), Preliminary Evaluation of the Community Multiscale Air Quality Model for 2002 over the Southeastern United States, Journal of the Air & Waste Management Association, 55:11, 1694-1708, DOI: 10.1080/10473289.2005.10464765

Morris, R.E., Koo, B., Guenther, A., Yarwood, G., McNally, D., Tesche, T.W., Tonnesen, G., Boylan, J., Brewer, P., (2006), Model sensitivity evaluation for organic carbon using two multi-pollutant air quality models that simulate regional haze in the southeastern United States, Atmospheric Environment 40, 4960-4972.

Morris and Tai, (2011), Attainment Demonstration Modeling for the Denver 8-Hour Ozone SIP, http://www.ozoneaware.org/postfiles/documentsandpresentations/modeling/documents/Denver_Model_Protocol_Draft3_080211.pdf

Murphy, J.G., Day, D.A., Cleary, P.A., Wooldridge, P.J., Millet, D.B., Goldstein, A.H., Cohen, R.C., (2007), The weekend effect within and downwind of Sacramento – Part 1: Observations of ozone, nitrogen oxides, and VOC reactivity, *Atmos. Chem. Phys.*, 7, 5327-5339, 2007.

Na, K. S., A.A. Sawant, C. Song, and D.R. Cocker, (2004), Primary and secondary carbonaceous species in the atmosphere of Western Riverside County, California, *Atmospheric Environment*, 38, 1345–1355.

NAPD, (2013), National Acid Deposition Program 2013 Annual Summary. Available at: http://nadp.sws.uiuc.edu/lib/data/2013as.pdf

Napelenok, S. L., Cohan, D. S., Hu, Y. T., and Russell, A. G., (2006), Decoupled direct 3D sensitivity analysis for particulate matter(DDM-3D/PM), Atmos. Environ., 40, 6112–6121.

Nolte, C.G., Bhave, P.V., Arnold, J.R., Dennis, R.L., Zhang, K.M., Wexler, A.S., (2008), Modeling urban and regional aerosols – Application of the CMAQ-UCD aerosol model to Tampa, a coastal urban site, *Atmospheric Environment*, 42, 3179-3191.

Otte, T.L., (2008a), The impact of nudging in the meteorological model for retrospective air quality simulations. part I: evaluation against national observation networks. J. Appl. Meteor. Climatol., 47, pp. 1853–1867.

Otte, T.L., (2008b), The impact of nudging in the meteorological model for retrospective air quality simulations. part II: evaluating collocated meteorological and air quality observations, J. Appl. Meteor. Climatology., 47, pp. 1868–1887.

Otte, T.L., J.E. Pleim, (2010), The meteorology-Chemistry interface processor (MCIP) for the CMAQ modeling system. Geoscientific Model Development, 3, pp. 243–256.

Pandis, S.N., Wexler, A.S., Seinfeld, J.H., (1993), Secondary organic aerosol formation and transport – II predicting the ambient secondary organic aerosol size distribution, *Atmospheric Environment*, 27A, 15, 2403-2416.

Pitchford, M.L., and W.C. Malm, (1994), Development and Applications of a Standard Visual lndex, *Atmos. Environ*., **28**(5),1049-1054.

Pitchford, M., W. Malm, B. Schichtel, N. Kumar, D. Lowenthal and J. Hand, (2007), Revised algorithm for estimating light extinction from IMPROVE particle speciation data, *J. Air & Waste Manage. Assoc., 57,* 1326-1336.

Pierce, T., Hogrefe, C., Rao, S.T., Porter, P.S., Ku, J.-Y., (2010), Dynamic evaluation of a regional air quality model: Assessing the emissions-induced weekly ozone cycle, *Atmospheric Environment*, 44, 3583-3596.

Pirovano, G., Balzarini, A., Bessagnet, B., Emery, C., Kallos, G., Meleux, F., Mitsakou, C., Nopmongcol, U., Riva, G.M., Yarwood, G., (2012), Investigating impacts of chemistry and transport model formulation on model performance at European scale. Atmospheric Environment 53, 93-109.

Pleim, J., Gilliam, R., Appel, W., Ran, L. (2016). Recent Advances in Modeling of the Atmospheric Boundary Layer and Land Surface in the Coupled WRF-CMAQ Model (2016), *Air Pollution Modeling and its Application*, XXIV, 391-396. https://doi.org/10.1007/978-3-319-24478-5_64

Pleim, J.E., R. Gilliam, (2009), An indirect data assimilation scheme for deep soil temperature in the Pleim–Xiu land Surface model, J. Appl. Meteor. Climatol., 48, pp. 1362–1376 Resources Conservation Commission, by ENVIRON, International Corp, Novato, CA

Porter S., S.T. Rao, C. Hogrefe, E. Grego, and R. Mathur (2014), Using Regional Air quality Models in Ozone Attainment Demonstrations, 9th International Conference on Air Quality, Garmisch-Partenkirchen Germany.

Pouliot and Pierce (2009), Integration of the Model of Emissions of Gases and Aerosols from Nature (MEGAN) into the CMAS Modeling System, Presented at 18th Annual International Emission Inventory Conference, Baltimore, MD, April 14-17, 2009, https://www.epa.gov/sites/production/files/2015-10/documents/pouliot.pdf.

Pouliot, G., Simon, H., Bhave P., Tong, D., Mobley, D., Pace, T., and Pierce, T., *Assessing the Anthropogenic Fugitive Dust Emission Inventory and Temporal Allocation using an Updated Speciation of Particulate Matter*, 19th Annual International Emission Inventory Conference, San Antonio, TX, September 27-30, 2010.

Pouliot, G., Rao, V., McCarty, J.L., Soja, A., (2016), Development of the Crop Residue and Rangeland Burning in the 2014 National Emissions Inventory Using Information from Multiple Sources. Journal of the Air & Waste Management Association. 67(5), 613-622

Pun, B. and C. Seigneur, (1999), Understanding particulate matter formation in the California San Joaquin Valley: Conceptual model and data needs, Atmos. Environ., 33, 4865-4875.

Pun, B.K., and C. Seigneur, (2001), Sensitivity of Particulate Matter Nitrate Formation to Precursor Emissions in the California San Joaquin Valley, *Environ. Sci. Technol*., **35** (14), 2979-2987.

Raffuse, S., D. Sullivan, L. Chinkin, S. Larkin, R. Solomon, A. Soja, (2007). Integration of Satellite-Detected and Incident Command Reported Wildfire Information into BlueSky, June 27, 2007. Available at: http://getbluesky.org/smartfire/docs.cfm

Ramboll-Environ, (2017). wrfcamx version 4.6 Release Notes. July 11, 2017.  www.camx.com Ramboll Environ International Corporation, Novato, CA.

Ramboll, (2018). User's Guide Comprehensive Air Quality Model with Extensions (CAMx) Version 6.50. www.camx.com Ramboll Environment Health, Novato, CA.

Rao, S. T., E. Zalewsky, E., and I.G. Zurbenko, (1995), Determining temporal and spatial variations in ozone air quality, *Journal of the Air and Waste Management Association* **45**, 57-61.

Rodriguez, M.A., Barna, M.G., Moore, T., (2009), Regional Impacts of Oil and Gas Development on Ozone Formation in the Western United States. J. Air Waste Manage. Assoc. 59, 1111-1118.

Russell, A., and R. Dennis, (2000), NARSTO critical review of photochemical models and modeling, *Atmospheric Environment,* **34***,* 2283-2324

Russell, A.G., (2008), EPA Supersites Program-related emissions-based particulate matter modeling: Initial applications and advances. J. Air Waste Manage. Assoc. 58, 289-302.

Sarwar, G., S. Roselle, R. Mathur, W. Apel, R. Dennis (2008), A Comparison of CMAQ HONO predictions with observations from the Northeast Oxidant and Particle Study, *Atmospheric Environment*, 42, 5760–5770.

Sarwar, G., Gantt, B., Schwede, D., Foley, K., Mathur, R., & Saiz-Lopez, A., (2015), Impact of enhanced ozone deposition and halogen chemistry on tropospheric ozone over the Northern Hemisphere. *Environmental Science & Technology, 49*(15), 9203-9211.

Saxena, P. and Hildemann, L, (1996), Water Soluble Organics in Atmospheric Particles: A Critical Review of the Literature and Application of thermodynamics to Identify Candidate Compounds, *J. Atmos. Chem*., 24:57-109.

Saylor, R. D., E. S. Edgerton, and B. E. Hartsell, (2006), Linear regression techniques for use in the EC tracer method of secondary organic aerosol estimation, *Atmospheric Environment*, 40, 7546-7556.

Seigneur, C., B. Pun, P. Pai, J. F. Louis, P. Solomon, C. Emery, R. Morris, M., Zahniser, D. Worsnop, P. Koutrakis, W. White and I. Tombach, (2000), Guidance for the performance evaluation of three-dimensional air quality modeling systems for particulate matter and visibility, J. Air Waste Manage. Assoc., 50, 588-599.

Sillman, S., (1995), The Use of NOy, $H_2O_2$, and $HNO_3$ as Indicators for O3-NOx-ROG Sensitivity in Urban Locations, *J. Geophys. Res.* **100**, 14175-14188.

Sillman, S., He, D., Cardelino, C., Imhoff, R.E., (1997),The use of photochemical indicators to evaluate ozone-$NO_x$-hydrocarbon sensitivity; Case studies from Atlanta, New York, and Los Angeles, *J. Air Waste Manage Assoc*, 47, 642-652.

Sillman, S., (1998), Evaluating the Relation Between Ozone, $NO_x$ and Hydrocarbons: The Method of Photochemical Indicators, EPA/600R-98/022, http://www-personal.engin.umich.edu/~sillman/publications.htm

Sillman, S., He, D., (2002), Some theoretical results concerning O3-$NO_x$-VOC chemistry and $NO_x$-VOC indicators, *J Geophys Res,* 107,D22, 4569; doi:10.1029/2001JD001123.

Sillman, S., Vautard, R., Menut, L., Kely, D., (2003), O3-$NO_x$-VOC sensitivity and $NO_x$-VOC indicators in Paris: Results from Models and atmospheric pollution over the Paris Area (ESQUIF) measurements. *J Geophys Res*, 108, 853, doi: 10.1029/2002JD001561.

Simon, H., Bhave, P.V., Swall, J.L., Frank, N.H., and Malm, W.C., (2011), Determining the spatial and seasonal variability in OM/OC ratios across the US using multiple regression, Atmos. Chem. Phys., 11, 2933-2949

Simon, H., Baker, K. R., Phillips, S, (2012), Compilation and interpretation of photochemical model performance statistics published between 2006 and 2012, *Atmos Environ*, 61, 124-139.

Skamarock, W. C., J. B. Klemp, J. Dudhia, D. O. Gill, D. M. Barker, M. Duda, X.-Y. Huang, W. Wang, and J.G. Powers, (2008), A Description of the Advanced Research WRF Version 3, *NCAR Technical Note* http://www.mmm.ucar.edu/wrf/users/docs/arw_v3.pdf.

Stein, A.F., Mantilla, E., Millan, M.M., (2005), Using measured and modeled indicators to assess ozone-NO$_x$-VOC sensitivity in a western Mediterranean coastal environment, *Atmos Environ*, 39, 7167-7180.

Stoeckenius T., (2010), A conceptual model of winter ozone episodes in southwest Wyoming, prepared for Wyoming Department of Environmental Quality, Cheyenne WY, http://deq.wyoming.gov/media/attachments/Air%20Quality/Winter%20Ozone/Technical%20Documents/Final_03conceptModel%20Report_Environ.pdf.

Strader, R., F. Lurmann, and S.N. Pandis, (1999), Evaluation of secondary organic aerosol formation in winter, *Atmospheric Environment*, 33, 4849–4863.

Sullivan D.C., Raffuse S.M., Pryden D.A., Craig K.J., Reid S.B., Wheeler N.J.M., Chinkin L.R., Larkin N.K., Solomon R., and Strand T., (2008), Development and applications of systems for modeling emissions and smoke from fires: the BlueSky smoke modeling framework and SMARTFIRE: 17th International Emissions Inventory Conference, Portland, OR, June 2-5. Available at: https://www3.epa.gov/ttnchie1/conference/ei17/session12/raffuse.pdf.

Sundram, I., C. Clairborn, T. Strand, B. Lamb, D. Chandler and K. Saxton, (2004), Numerical Modeling of Windblown Dust in the Pacific Northwest with Improved Meteorology and Dust Emission Models. J. Geo. Res., Vol. 109, Issue D24.27. December. (http://onlinelibrary.wiley.com/doi/10.1029/2004JD004794/full).

Tang, I., (1996), Chemical and Size Effects of Hygroscopic Aerosols on Light Scattering Coefficients, *J.Geophysical Research* 101 No.D14, pp.19,245-19,250.

Tang, Y.H., P. Lee, M. Tsidulko, H.C. Huang, J.T. McQueen, G.J. DiMego, L.K. Emmons, R.B. Pierce, A.M. Thompson, H.M. Lin, D. Kang, D. Tong, S.C. Yu, R. Mathur, J.E. Pleim, T.L. Otte, G. Pouliot, J.O. Young, K.L. Schere, P.M. Davidson, and I. Stajner, (2008), The impact of chemical lateral boundary conditions on CMAQ predictions of tropospheric ozone over the continental United States, *Environ. Fluid Mech.*, **9(1)**, 43–58.

Tesche, T. W., and D. E. McNally, (2001), Evaluation of the MM5, RAMS, and SAIMM Meteorological Model for the 6-11 September 1993 COAST and 25 August-1 September 2000 TexAQS2000 Ozone SIP Modeling Episodes, report prepared for the Business Coalition for Clean Air-Appeals Group, prepared by Alpine Geophysics, LLC, Ft. Wright, KY.

Tesche T. W., D.E. McNally, and C. Tremback, (2002), Operational evaluation of the MM5 meteorological model over the continental United States: Protocol for annual and episodic evaluation. Submitted to USEPA as part of Task Order 4TCG-68027015. July 2002.

Tesche, T.W., Morris, R., Tonnesen, G., McNally, D., Boylan, J., Brewer, P., 2006. CMAQ/CAMx annual 2002 performance evaluation over the eastern US. Atmospheric Environment 40, 4906-4919.

Tolocka, M.P., Turpin, B., (2012), Contributions of organosulfur compounds to organic aerosol mass, *Environmental Science and Technology*, 46, 7978-7983.

Tonnesen, G.S., Dennis, R.L., (2000a), Analysis of radical propagation efficiency to assess ozone sensitivity to hydrocarbons and $NO_x$: 2. Long lived species as indicators of ozone concentrations sensitivity, *J Geophys Res*, 105, 9227-9241, doi:10.1029/1999JD90372.

Tonnesen, G.S., Dennis, R.L., (2000b), Analysis of radical propagation efficiency to assess ozone sensitivity to hydrocarbons and $NO_x$: 1. Local indicators of instantaneous odd oxygen production sensitivity, *J Geophys Res*, 105,  9213-9225, doi:10.1029/1999JD900371.

Torres-Jardon, R., Garcia-Reynosos, J.A., Jazcilevich, A., Ruiz-Suarez, L.G., Keener, T.C., (2009), Assessment of the ozone-nitrogen oxide-volatile organic compound sensitivity of Mexico City through an indicator-based approach: measurements and numerical simulations comparison. *J. Air Waste Manage*, 59, 1155-1172.

Torres-Jardon, R., Keener, T.C., (2006), Evaluation of ozone-nitrogen oxides-volatile organic compound sensitivity of Cincinnati, Ohio. *J Air Waste Manage*, 56, 322-333.

Turner J., (2008), A conceptual model for ambient fine particulate matter over southeast Michigan: high concentration days, prepared for the Southeast Michigan Council of Governments, Detroit MI, https://www.michigan.gov/documents/deq/deq-aqd-air-aqe-Appendix-I-HighPM-final-report_238084_7.pdf.

Turpin, B.J., and J.J Huntzicker, (1995), Identification of secondary organic aerosol episodes and quantitation of primary and secondary organic aerosol concentrations during SCAQS, *Atmospheric Environment*, 29, 3527–3544.

Turpin, B. J. and H-J Lim, (2001), Species Contributions to $PM_{2.5}$ Mass Concentrations: Revisiting Common Assumptions for Estimating Organic Mass, *Aerosol Science and Technology* 35: 602-610.

U.S. EPA, (1997), Guidance For Network Design and Optimum Site Exposure For $PM_{2.5}$ and $PM_{10}$, OAQPS, Research Triangle Park, NC, EPA report no. EPA-454/R-99-022**.**

U.S. EPA, (2002), "3 Year Quality Assurance Report- Calendar Years 1999, 2000, and 2001-$PM_{2.5}$ Performance Evaluation Program".

U.S. EPA, (2003a), "Federal Reference Method Quality Assurance Report".

U.S. EPA (2003b) Guidance for Tracking Progress Under the Regional Haze Rule, EPA-454/B-03-004 (September 2003) available at:
www.epa.gov/ttn/oarpg/t1/memoranda/rh_tpurhr_gd.pdf,

U.S. EPA (2003c) Guidance for Estimating Natural Visibility Conditions Under the Regional Haze
    Rule, EPA-454/B-03-005 (September 2003) available at:
    www.epa.gov/ttn/oarpg/t1/memoranda/rh_envcurhr_gd.pdf.

U.S. EPA, (2004), "The Particle Pollution Report: Current Understanding of Air Quality and
    Emissions Through 2003."  EPA 454/R-04-002.
    http://www.epa.gov/air/airtrends/aqtrnd04/pm.html

U.S. EPA, (2005), "Evaluating Ozone Control Programs in the Eastern United States: Focus on
    the NOx Budget Trading Program, 2004",
    http://www.epa.gov/air/airtrends/2005/ozonenbp/

U.S. EPA (2007a), Guidance on the use of models and other analyses for demonstrating
    attainment of air quality goals for ozone, $PM_{2.5}$, and regional haze. EPA-454/B-07-002,
    Office of Air Quality Planning and Standards, Research Triangle Park, NC.

U.S. EPA. (2007b), "Guidance for Setting Reasonable Progress Goals Under the Regional Haze
    Program", June 1, 2007. Available at:
    http://www.epa.gov/ttn/naaqs/aqmguide/collection/cp2/20070601_wehrum_reasonab
    le_progress_goals_reghaze.pdf

U.S. EPA (2010a), Technical Support Documentation: The Industrial Sectors Integrated Solutions
    (ISIS) Model and the Analysis for the National Emission Standards for Hazardous Air
    Pollutants and New Source Performance Standards for the Portland Cement
    Manufacturing Industry. Research Triangle Park, NC, August 2010.

U.S. EPA (2010b), Air quality modeling technical support document: Light duty vehicle
    greenhouse gas emissions standards final rule, EPA 454/R-10-003, Office of Air Quality
    Planning and Standards, Research Triangle Park, NC, April 2010.

U.S. EPA, (2011a), Air Quality Modeling Final Rule Technical Support Document,
    http://www.epa.gov/airquality/transport/pdfs/AQModeling.pdf, Research Triangle Park,
    North Carolina.

U.S. EPA, (2011b), Air Quality Modeling Technical Support Document: Final EGU NESHAP (EPA-
    454/R-11-009), Research Triangle Park, North Carolina.

U.S. EPA, (2012a): Clean Air Status and Trends Network (CASTNet), 2012 annual report.
    Available at:  http://epa.gov/castnet/javaweb/docs/annual_report_2012.pdf

U.S. EPA (2012b), Our nation's air: status and trends through 2010, EPA-454/B-07-002, Office of
    Air Quality Planning and Standards, Research Triangle Park, February 2012.

U.S. EPA (2014a), EPA analyses to support revisions to the ozone attainment test, Office of Air Quality Planning and Standards, Research Triangle Park, May 2014.

U.S. EPA (2014b), Policy Assessment for the Review of the Ozone NAAQS, Final Report. August. Available at: http://www.epa.gov/ttn/naaqs/standards/ozone/data/20140829pa.pdf

U.S. EPA (2016a), Air Quality Modeling Technical Support Document for the Final Cross State Air Pollution Rule Update. August 2016. https://www.epa.gov/airmarkets/air-quality-modeling-technical-support-document-final-cross-state-air-pollution-rule

U.S. EPA (2016b), Emissions Inventory Guidance for Implementation of Ozone and Particulate Matter National Ambient Air Quality Standards (NAAQS) and Regional Haze Regulations https://www.epa.gov/air-emissions-inventories/air-emissions-inventory-guidance-implementation-ozone-and-particulate.

U.S. EPA (2016c), 2014 National Emissions Inventory Technical Support Document, https://www.epa.gov/air-emissions-inventories/2014-national-emissions-inventory-nei-documentation.

U.S. EPA (2016d), Draft Guidance on Progress Tracking Metrics, Long-term Strategies, Reasonable Progress Goals and Other Requirements for Regional Haze State Implementation Plans for the Second Implementation Period, July 2016. https://www.epa.gov/visibility/draft-guidance-second-implementation-period-regional-haze-rule

U.S. EPA (2017a), Revisions to the Guideline on Air Quality Models (Appendix W): Enhancements to the AERMOD Dispersion Modeling System and Incorporation of Approaches to Address Ozone and Fine Particulate Matter

U.S. EPA (2017b), Documentation for the EPA's Preliminary 2028 Regional Haze Modeling; Office of Air Quality Planning and Standards, Research Triangle Park NC, October 2017. https://www3.epa.gov/ttn/scram/reports/2028_Regional_Haze_Modeling-TSD.pdf

U.S. EPA (2018), Software for the Modeled Attainment Test- Community Edition(SMAT-CE); Office of Air Quality Planning and Standards, Research Triangle Park NC. Available at: https://www.epa.gov/scram/photochemical-modeling-tools

van der A, R. J., Mijling, B., Ding, J., Koukouli, M. E., Liu, F., Li, Q., Mao, H. and Theys, N.: Cleaning up the air: effectiveness of air quality policy for SO2 and NOx emissions in China, *Atmospheric Chemistry and Physics*, 17(3), 1775–1789, doi:10.5194/acp-17-1775-2017, 2017.

Vickery, J. (2004), Conceptual models of PM for North American regions. In: Particulate Matter Science for Policy Makers: A NARSTO Assessment, P.H. McMurry, M.F. Shepherd, J.S. Vickery, eds., Cambridge University Press.

Vizuete W., B.U. Kim, H. Jeffries, Y. Kimura, D.T. Allen, M.A. Kioumourtzoglou, L. Biton, B. Henderson, (2008), Modeling ozone formation from industrial emission events in Houston, Texas, Atmospheric Environment, 42 (33), pp. 7641–7650.

Vizuete, W., Biton, L., Jeffries, H.E., Couzo, E., (2010), Evaluation of Relative Response Factor Methodology for Demonstrating Attainment of Ozone in Houston, Texas. J. Air Waste Manage. Assoc. 60, 838-848.

Vizuete, W., Jeffries, H.E., Tesche, T.W., Olaguer, E.P., Couzo, E., (2011), Issues with Ozone Attainment Methodology for Houston, TX. J. Air Waste Manage. Assoc. 61, 238-253.

Vogel, B., Riemer, N., Vogel, H., Fiedler, F., (1999)  Findings on NOy as an indicator for ozone sensitivity based on different numerical simulations, *J Geophys Res*, 104, 3605-3620.

Vukovich, J.M., and T. Pierce, (2002), The Implementation of BEIS3 within the SMOKE modeling framework, *11th Annual Emissions Inventory Conference of the U.S. EPA,* Session 10, https://www.epa.gov/sites/production/files/2015-10/documents/vukovich.pdf.

Watson, J. G., J. C. Chow, L.-W.A. Chen, N. H. Frank (2009), Methods to assess carbonaceous aerosol sampling artifacts for IMPROVE and other long-term networks, *J. Air Waste Manage. Assoc.*, 59, 898-911.

White, W. H.: IMPROVE data advisory: Shift in EC/OC split with 1 January 2005 TOR hardware upgrade, 2007.

White, W.H. (2008), Chemical markers for sea salt in IMPROVE aerosol data, *Atmospheric Environment*, 42, 261-274.

Wilczak, J. M., Djalaova, I., McKeen, S., Bianco, L., Bao, J. W., Grell, G., Peckham, S., Mathur, R., McQueen, J., Lee, P., (2009), Analysis of regional meterology and surface ozone during the  TexAQS II field program and evaluation of the NMM-CMAQ and WRF-Chem air quality models. J. Geophys. Res. 114, pp. 1-22.

Wong, D.C., Pleim, J., Mathur, R., Binkowski, F., Otte, T., Gilliam, R., Pouliot, G., Xiu, A., Young, J.O., Kang, D. (2012) WRF-CMAQ Two-Way Coupled System with Aerosol Feedback: Software Development and Preliminary Results, *Geoscientific Model Development*, **5**, 299-312. www.geosci-model-dev.net/5/299/2012/ doi:10.5194/gmd-5-299-2012

Xie, Y., Elleman, R., Jobson, T., Lamb, B., (2011), Evaluation of O3-NOx-VOC sensitivities predicted with the CMAQ photochemical model using Pacific Northwest 2001 field observations, *JGR- Atmospheres*, 116, D20303, doi: 10.1029/2011JD015801.

Yarwood, G., T. Sakulyanontvittaya, O. Nopmongcol and B. Koo, (2014), Ozone Depletion by Bromine and Iodine over the Gulf of Mexico – Final Report. Prepared for Texas Commission on Environmental Quality. Prepared by ENVIRON International Corporation, Novato, CA. November, https://www.tceq.texas.gov/assets/public/implementation/air/am/contracts/reports/pm/5821110365FY1412-20141109-environ-bromine.pdf.

Yua, J. Z., H. Yanga, H. Zhanga, and A.K.H. Lau, (2004), Size distributions of water-soluble organic carbon in ambient aerosols and its size-resolved thermal characteristics, *Atmospheric Environment* 38,1061–1071.

Yuan., Z.B., J. Z. Yu, A. K. H. Lau, P. K. K. Louie, and J. C. H. Fung, (2006), Application of positive matrix factorization in estimating aerosol secondary organic carbon in Hong Kong and its relationship with secondary sulfate, *Atmospheric Chemistry and Physics*, 6, 25-34.

Zhang, X. and P. H. McMurry, (1992), Evaporative losses of fine particulate nitrates during sampling, *Atmospheric Environment*, 26, 3305-3312.

Zhang, Y., Wen, X.-Y., Wang, K., Vijayaraghavan, K., Jacobson, M.Z., (2009), Probing into regional O3 and particulate matter pollution in the United States: 2. An examination of formation mechanisms through a process analysis technique and sensitivity study, *JGR*, 114, D22305, doi:10.1029/2009JD011900.

Zhang, Y., P. Karamchandani, T. Glotfelty, D.G. Streets, G. Grell, A. Nenes, F. Yu, and R. Bennartz: (2012a), Development and initial application of the global-through-urban weather research and forecasting model with chemistry (GU-WRF/Chem), *J. Geophys. Res.*, **117**.

Zhang, W., S. L. Capps, Y. Hu, A. Nenes, S. Napelenok, and A. G. Russell, (2012b), Development of the High-Order Decoupled Direct Method in Three Dimensions for Particulate Matter: Enabling Advanced Sensitivity Analysis in Air Quality Models. Geoscientific Model Development . Copernicus Publications, Katlenburg-Lindau, Germany, 5(2):355-368.

Zhou, W., Cohan, D.S., Napelenok, S.L., (2013), Reconciling NOx emissions reductions and ozone trends in the U.S., 2002-2006, *Atmospheric Environment*, 70, 236-244.

Zubrow, A., Eyth, A., Michaels, H., Brzezinski, D., Allen, C., Baek, B.H., (2012), SMOKE-MOVES: Description and Recent Enhancements", International Emission Inventory Conference, Tampa, Florida 2012.

Publication No. EPA-454/R-18-009
November, 2018

Office of Air Quality Planning and Standards
Air Quality Assessment Division
Research Triangle Park, NC

United States
Environmental Protection
Agency

Tab HQ-17: Air Quality Modeling Technical Support Document 2015 Ozone NAAQS Transport SIP Proposed Actions (Feb. 22, 2022) (EPA-HQ-OAR-2021-0663-0017)



Air Quality Modeling Technical Support Document

2015 Ozone NAAQS Transport SIP Proposed Actions

Office of Air Quality Planning and Standards
United States Environmental Protection Agency

## 1. Introduction

In this technical support document (TSD) we describe the air quality modeling performed to support EPA's State Implementation Plan Addressing Regional Ozone Transport for the 2015 Ozone National Ambient Air Quality Standards proposed rulemaking. For this proposed rule, air quality modeling is used to project ozone design values[1] at individual monitoring sites to three future analytic years: 2023 and 2026[2] and to estimate state-by-state contributions to ozone design values at individual monitoring sites in these two future years.[3] The projected ozone design values are evaluated to identify ozone monitoring sites that are expected to have nonattainment or maintenance problems for the 2015 ozone National Ambient Air Quality Standards (NAAQS) in the future (i.e., nonattainment and maintenance receptors). Ozone contribution data for 2023 and 2026 is then used to quantify projected interstate contributions from emissions in each upwind state to ozone design values at projected nonattainment and maintenance receptors in other states (i.e., in downwind states). The contributions from individual states to nonattainment and maintenance receptors in other states (i.e., upwind states and downwind states, respectively) are evaluated to identify upwind states that contribute greater than or equal to 1 percent of the 2015 ozone NAAQS (i.e., 1 percent of 70 ppb which is 0.70 ppb) to one or more downwind receptors. Upwind states that contribute at or above this threshold to particular receptors are referred to as being "linked" to these receptors.

As described in this TSD, EPA performed air quality modeling for a 2016 base year and 2023, 2026, and 2032 future years to project 2016-centered base period design values to each of these future years. Ozone source apportionment modeling was performed using emissions projected to 2023 and 2026 to determine the contributions of total anthropogenic emissions from each state to projected ozone design values at individual monitoring sites nationwide for each of these years. The modeling for 2023 and 2026 was used to identify receptors and upwind/downwind linkages to inform Step 1 and Step 2 of the 4-step interstate transport framework, respectively.[4]

---

[1] The ozone design value for a monitoring site is the 3-year average of the annual fourth-highest daily maximum 8-hour average ozone concentrations at the site.

[2] The rationale for using 2023, and 2026as the applicable future analytic years for this transport assessment is described in the preamble for this proposed rule.

[3] The EPA also performed air quality modeling for 2032 which is the analytic year that corresponds to the 2033 attainment date for nonattainment areas with a Serious area classification. The results of the 2032 modeling were not used to support this proposed rule.

[4] See the preamble for a detailed description of the 4-step interstate transport framework. In summary, for Step 1: identify monitoring sites that are projected to have problems attaining and/or maintaining the NAAQS (i.e., nonattainment and/or maintenance receptors); Step 2: identify states that impact those air quality problems in other (i.e., downwind) states sufficiently such that the states are considered "linked" and therefore warrant further review and analysis; Step 3: identify the emissions reductions necessary (if any), applying a multifactor analysis, to eliminate each linked upwind state's significant contribution to nonattainment or interference with maintenance of the NAAQS at the locations identified in Step 1; and Step 4: adopt permanent and enforceable measures needed to achieve those emissions reductions.

The remaining sections of this TSD are as follows. Section 2 describes the air quality modeling platform and the evaluation of model predictions of MDA8 ozone concentrations using measured (i.e., observed) data. Section 3 describes the procedures for projecting ozone design value concentrations and the approach for identifying monitoring sites projected to have nonattainment and/or maintenance problems in the future analytic years. Section 4 describes (1) the source apportionment modeling, (2) the procedures for quantifying contributions to individual monitoring sites including nonattainment and/or maintenance sites, and (3) the evaluation of upwind state contributions to individual receptors in downwind states. To request a copy of the available air quality model input and/or output data please contact Norm Possiel at possiel.norm@epa.gov.[5]

## 2.   Air Quality Modeling Platform

The EPA used a 2016-based air quality modeling platform to provide the foundational model-input data sets for 2016 and the future analytic years. These inputs include emissions for 2016, 2023, 2026, and 2032 developed for the 2016v2 emissions modeling platform as well as meteorology, initial and boundary condition concentrations, and other inputs representative of the 2016 base year. The 2016 v2 emissions modeling platform is described in the document *Preparation of Emissions Inventories for the 2016v2 North American Emissions Modeling Platform* available at https://www.epa.gov/air-emissions-modeling/2016v2-platform. The meteorological and initial and boundary condition data used as input to the air quality modeling and the model performance evaluation for MDA8 ozone are described below.

### 2.1 Air Quality Model Configuration and Model Simulations

The photochemical model simulations performed for this proposed rule used the Comprehensive Air Quality Model with Extensions (CAMx version 7.10, Ramboll, 2021). CAMx is a three-dimensional grid-based Eulerian air quality model designed to simulate the formation and fate of oxidant precursors, primary and secondary particulate matter concentrations, and deposition over regional and urban spatial scales (e.g., the contiguous U.S.). Consideration of the different processes (e.g., transport and deposition) that affect primary (directly emitted) and secondary (formed by atmospheric processes) pollutants at the regional scale in different locations is fundamental to understanding and assessing the effects of emissions on air quality concentrations. For this proposed rulemaking, as in the CSAPR Update and Revised CSAPR Update, EPA used the CAMx Ozone

---

[5] A list of available model input and output data is provided in the file "Air Quality Modeling Files_2016v2 Platform" which can be found in the docket for this proposed rule.

Source Apportionment Technology/Anthropogenic Precursor Culpability Analysis (OSAT/APCA) technique[6] to model ozone contributions, as described below in section 4.

The geographic extent of the modeling domains that were used for air quality modeling in this analysis are shown in Figure 2-1. The large outer domain covers the 48 contiguous states along with most of Canada and all of Mexico with a horizontal resolution of 36 x 36 km (i.e., 36 km domain). The inner domain covers the 48 contiguous states along with adjacent portions of Canada and Mexico at 12 x 12 km resolution (i.e., 12 km domain).



CAMx requires a variety of input files that contain information pertaining to the modeling domain and simulation period. These include gridded, hourly emissions estimates and meteorological data, and initial and boundary concentrations. Separate emissions inventories were prepared for the 2016 base year and the 2023, 2026, and 2032 projections. All other inputs (i.e., meteorological fields, initial concentrations, ozone column, photolysis rates, and boundary concentrations) were specified for the 2016 base year model application and remained unchanged for the projection-year model simulations.[7]

---

[6] As part of this technique, ozone formed from reactions between biogenic VOC and NO$_X$ with anthropogenic NO$_X$ and VOC are assigned to the source of anthropogenic emissions.

[7] EPA used the CAMx7.1chemparam.CB6r5_CF2E chemical parameter file for all the CAMx model runs described in this TSD.

The 12 km CAMx model simulations performed for this proposed rule are listed in Table 2-1. The simulation period for each run was preceded by a 15-day ramp-up period. Note that the 2026fj case was run for January through April and October through December and the model concentration output were then combined with those from the May through September 2026fj_ussa case to create outputs for an annual time period.

Table 2-1. Model run name, case name and simulation period for each model run.[8]

| Analytic Year | Model Run | Case Name | Simulation Period |
|---|---|---|---|
| 2016 | 2016 baseline | 2016fj | Annual |
| 2023 | 2023 baseline | 2023fj | Annual |
| | 2023 state total anthropogenic contributions | 2023fj_ussa | May - September |
| 2026 | 2026 baseline | 2026fj | Annual |
| | 2026 state total anthropogenic contributions | 2026fj_ussa | May - September |
| 2032 | 2032 baseline | 2032fj | May - September |

*2.2 Meteorological Data for 2016*

This section describes the meteorological modeling that was performed to provide meteorological data for 2016 for input to air quality modeling. Note that EPA used the same meteorological data for the 2016v2 air quality modeling as was used for the 2016v1 air quality modeling.

The 2016 meteorological data were derived from running Version 3.8 of the Weather Research Forecasting Model (WRF) (Skamarock, et al., 2008). The meteorological outputs from WRF include hourly-varying horizontal wind components (i.e., speed and direction), temperature, moisture, vertical diffusion rates, and rainfall rates for each grid cell in each vertical layer. Selected physics options used in the WRF simulations include Pleim-Xiu land surface model (Xiu and Pleim, 2001; Pleim and Xiu, 2003), Asymmetric Convective Model version 2 planetary boundary layer scheme (Pleim 2007a,b), Kain-Fritsch cumulus parameterization (Kain, 2004) utilizing the moisture-advection trigger (Ma and Tan, 2009), Morrison double moment microphysics (Morrison et al., 2005; Morrison and Gettelman, 2008), and RRTMG longwave and shortwave radiation schemes (Iacono et.al., 2008).

---

[8] Because the model simulations run in Greenwich Mean Time (GMT), the actual simulation period included October 1 in order to obtain MDA8 ozone concentrations based on local time for September 30.

Both the 36 km and 12 km WRF model simulations utilize a Lambert conformal projection centered at (-97,40) with true latitudes of 33 and 45 degrees north. The 36 km domain contains 184 cells in the X direction and 160 cells in the Y direction. The 12 km domain contains 412 cells in the X direction and 372 cells in the Y direction. The atmosphere is resolved with 35 vertical layers up to 50 mb (see Table 2-2), with the thinnest layers being nearest the surface to better resolve the planetary boundary layer (PBL).

The 36 km WRF model simulation was initialized using the 0.25-degree GFS analysis and 3-hour forecast from the 00 GMT, 06 GMT, 12 GMT, and 18 GMT simulations. The 12 km model was initialized using the 12 km North American Model (12NAM) analysis product provided by National Climatic Data Center (NCDC).[9] The 40 km Eta Data Assimilation System (EDAS) analysis (ds609.2) from the National Center for Atmospheric Research (NCAR) was used where 12NAM data was unavailable.[10] Analysis nudging for temperature, wind, and moisture was applied above the boundary layer only. The model simulations were conducted continuously. The 'ipxwrf' program was used to initialize deep soil moisture at the start of the run using a 10-day spin-up period (Gilliam and Pleim, 2010). Land use and land cover data were based on the USGS for the 36NOAM simulation and the 2011 National Land Cover Database (NLCD 2011) for the 12US simulation. Sea surface temperatures were ingested from the Group for High Resolution Sea Surface Temperatures (GHRSST) (Stammer et al., 2003) 1 km SST data. Additionally, lightning data assimilation was utilized to suppress (force) deep convection where lightning is absent (present) in observational data. This method is described by Heath et al. (2016) and was employed to help improve precipitation estimates generated by the model.

Table 2-2. Vertical layers and their approximate height above ground level.

| WRF Layer | Height (m) | Pressure (mb) | Sigma |
|---|---|---|---|
| 35 | 17,556 | 5000 | 0.000 |
| 34 | 14,780 | 9750 | 0.050 |
| 33 | 12,822 | 14500 | 0.100 |
| 32 | 11,282 | 19250 | 0.150 |
| 31 | 10,002 | 24000 | 0.200 |
| 30 | 8,901 | 28750 | 0.250 |
| 29 | 7,932 | 33500 | 0.300 |
| 28 | 7,064 | 38250 | 0.350 |
| 27 | 6,275 | 43000 | 0.400 |
| 26 | 5,553 | 47750 | 0.450 |
| 25 | 4,885 | 52500 | 0.500 |

---

[9] https://www.ncdc.noaa.gov/data-access/model-data/model-datasets/north-american-mesoscale-forecast-system-nam

[10] https://www.ready.noaa.gov/edas40.php.

| WRF Layer | Height (m) | Pressure (mb) | Sigma |
|---|---|---|---|
| 24 | 4,264 | 57250 | 0.550 |
| 23 | 3,683 | 62000 | 0.600 |
| 22 | 3,136 | 66750 | 0.650 |
| 21 | 2,619 | 71500 | 0.700 |
| 20 | 2,226 | 75300 | 0.740 |
| 19 | 1,941 | 78150 | 0.770 |
| 18 | 1,665 | 81000 | 0.800 |
| 17 | 1,485 | 82900 | 0.820 |
| 16 | 1,308 | 84800 | 0.840 |
| 15 | 1,134 | 86700 | 0.860 |
| 14 | 964 | 88600 | 0.880 |
| 13 | 797 | 90500 | 0.900 |
| 12 | 714 | 91450 | 0.910 |
| 11 | 632 | 92400 | 0.920 |
| 10 | 551 | 93350 | 0.930 |
| 9 | 470 | 94300 | 0.940 |
| 8 | 390 | 95250 | 0.950 |
| 7 | 311 | 96200 | 0.960 |
| 6 | 232 | 97150 | 0.970 |
| 5 | 154 | 98100 | 0.980 |
| 4 | 115 | 98575 | 0.985 |
| 3 | 77 | 99050 | 0.990 |
| 2 | 38 | 99525 | 0.995 |
| 1 | 19 | 99763 | 0.9975 |
| Surface | 0 | 100000 | 1.000 |

Details of the annual 2016 meteorological model simulation and evaluation are provided in a separate technical support document, which can be found in the docket for this proposed rule.[11]

The meteorological data generated by the WRF simulations were processed using wrfcamx v4.7 (Ramboll 2021) meteorological data processing program to create 35-layer gridded model-ready meteorological inputs to CAMx. In running wrfcamx, vertical eddy diffusivities (Kv) were calculated using the Yonsei University (YSU) (Hong and Dudhia, 2006) mixing scheme. We used a minimum Kv of 0.1 $m^2$/sec except for urban grid cells where the minimum Kv was reset to 1.0 $m^2$/sec within the lowest 200 m of the surface in order to enhance mixing associated with the nighttime "urban heat island" effect. In addition, we invoked the subgrid convection and subgrid stratoform cloud options in our wrfcamx run for 2016.

---

[11] Meteorological Modeling for 2016.docx.

*2.3 Initial and Boundary Concentrations*

The lateral boundary and initial species concentrations for the 36 km simulations were derived from outputs of a three-dimensional hemispheric atmospheric chemistry model, the Hemispheric version of the Community Multi-scale Air Quality Model (H-CMAQ) version 3.1.1 which was run for 2016[12]. The H-CMAQ predictions were used to provide one-way dynamic boundary concentrations at one-hour intervals and an initial concentration field for the 36 km CAMx simulations for 2016 and 2023.

Air quality modeling for the 36 km domain was used to provide initial and boundary conditions for the nested 12 km domain model simulations. Both the 36 km and 12 km modeling domains have 35 vertical layers with a top at about 17,550 meters, or 50 millibars (mb). The model simulations produce hourly air quality concentrations for each grid cell across each modeling domain. Modeling for the 36 km domain was performed for 2016 and 2023. Outputs from the 2016 36 km simulation were used to provide initial and boundary conditions for the 2016 12 km model simulation. Outputs from the 2023 36 km simulation were used to provide initial and boundary conditions for the 2023, 2026, and 2032 12 km simulations.

*2.5 Air Quality Model Evaluation*

An operational model performance evaluation for ozone was conducted to examine the ability of the CAMx modeling system to simulate 2016 measured MDA8 ozone concentrations. This evaluation focused on graphical analyses and statistical metrics of model predictions versus observations. Details on the evaluation methodology, the calculation of performance statistics, and results are provided in Appendix A. Overall, the ozone model performance statistics for the CAMx 2016fj simulation are within or close to the ranges found in other recent peer-reviewed applications (e.g., Simon et al, 2012 and Emory et al, 2017). As described in Appendix A, the predictions from the 2016v2 modeling platform correspond closely to observed concentrations in terms of the magnitude, temporal fluctuations, and geographic differences for MDA8 ozone. Thus, the model performance results demonstrate the scientific credibility of our 2016v2 modeling platform. These results provide confidence in the ability of the modeling platform to provide a reasonable projection of expected future year ozone concentrations and contributions. Model performance statistics for individual

---

[12] More information about the H-CMAQ model and other applications using this tool is available at: https://www.epa.gov/cmaq/hemispheric-scale-applications. Note that EPA used the same initial and boundary conditions for the 2016v2 air quality modeling as was used for the 2016v1 air quality modeling.

monitoring sites for the period May through September are provided in a spreadsheet file in the docket for this proposed rule.[13]

## 3. Identification of Future Nonattainment and Maintenance Receptors in 2023

### 3.1 Definition of Nonattainment and Maintenance Receptors

The ozone predictions from the 2016 base year and future case CAMx model simulations were used to calculate average and maximum ozone design values for the 2023, 2026, and 2032 analytic years using the approach described in this section. Following the general approach in the Revised CSAPR Update, we evaluated projected average and maximum design values in conjunction with the most recent measured ozone design values (i.e., 2020)[14] to identify potential nonattainment or maintenance sites in each of the three future years. Those monitoring sites with future year average design values that exceed the NAAQS (i.e., average design values of 71 ppb or greater)[15] and that are currently measuring nonattainment are considered to be nonattainment receptors. Similarly, monitoring sites with a projected maximum design value that exceeds the NAAQS are projected to be maintenance receptors. As described in the preamble for this proposed rule, maintenance-only receptors include both those monitoring sites where the projected average design value is below the NAAQS, but the maximum design value is above the NAAQS, and monitoring sites with projected average design values that exceed the NAAQS, but for which current design values based on measured data do not exceed the NAAQS.[16]

The procedures for calculating projected average and maximum design values are described below. The monitoring sites that we project to be nonattainment and maintenance receptors for the ozone NAAQS in the 2023 and 2026 base case scenarios are used for assessing the contribution of emissions in upwind states to downwind nonattainment and maintenance of the 2015 ozone NAAQS as part of this proposed rule.

---

[13] CAMx 2016v2 MDA8 O3 Model Performance Stats by Site.

[14] The 2020 design values are the most current official design values available for use in this proposed rule. The 2020 ozone design values, by monitoring site, can be found in the following file in the docket: 2010 thru 2020 Ozone Design Values.

[15] In determining compliance with the NAAQS, ozone design values are truncated to integer values. For example, a design value of 70.9 parts per billion (ppb) is truncated to 70 ppb which is attainment. In this manner, design values at or above 71.0 ppb are considered to be violations of the NAAQS.

[16] EPA's modeling guidance notes that projecting the highest (i.e., maximum) design value from the base period provides an approach for evaluating attainment in periods with meteorological conditions especially conducive to high ozone concentrations.

*3.2 Approach for Projecting Ozone Design Values*

The ozone predictions from the CAMx model simulations were used to project ambient (i.e., measured) ozone design values (DVs) to 2023, 2026, and 2032 based on an approach that follows from EPA's guidance for attainment demonstration modeling (US EPA, 2018),[17] as summarized here. The modeling guidance recommends using 5-year weighted average ambient design values centered on the base modeling year as the starting point for projecting average design values to the future. Because 2016 is the base emissions year, we used the average ambient 8-hour ozone design values for the period 2014 through 2018 (i.e., the average of design values for 2014-2016, 2015-2017 and 2016-2018) to calculate the 5-year weighted average design values (i.e., 2016-centered design values). The 5-year weighted average ambient design value at each site was projected to 2023, 2026, and 2032 using the Software for Model Attainment Test Software – Community Edition (SMAT-CE)[18]. This program calculates the 5-year weighted average design value based on observed data and projects future year values using the relative response predicted by the model. Equation (3-1) describes the recommended model attainment test in its simplest form, as applied for monitoring site $i$:

$$(\text{DVF})_i = (RRF)_i * (DVB)_i \qquad\qquad \text{Equation 3-1}$$

$\text{DVF}_i$ is the estimated design value for the future year at monitoring site $i$; $RRF_i$ is the relative response factor for monitoring site $i$; and $DVB_i$ is the base period design value monitored at site $i$. The relative response factor for each monitoring site $(RRF)_i$ is the fractional change in MDA8 ozone between the base and future year. The RRF is based on the average ozone on model-predicted "high" ozone days in grid cells in the vicinity of the monitoring site. The modeling guidance recommends calculating RRFs based on the highest 10 modeled ozone days in the base year simulation at each monitoring site. Specifically, the RRF for an individual monitoring site is the ratio of the average MDA8 ozone concentration in the future year to the average MDA8 concentration in the 2016 base year. The average values are calculated using MDA8 model predictions in the future year and in 2016 for the 10 highest days in the 2016 base year modeling. For cases in which the base year model simulation does not have 10 days with ozone values >= 60 ppb at a site, we use all days with ozone >= 60 ppb, as long as there were at least 5 days that meet this criterion. At monitor locations with less than 5 days with modeled 2016 base year ozone >= 60 ppb, no RRF or DVF is calculated for the site and the monitor in question was not included in this analysis.

---

[17] EPA's ozone attainment demonstration modeling guidance is referred to as "the modeling guidance" in the remainder of this document.

[18] Software download and documentation available at https://www.epa.gov/scram/photochemical-modeling-tools

The modeling guidance recommends calculating the RRF using the base year and future year model predictions from the cells immediately surrounding the monitoring site along with the grid cell in which the monitor is located. In this approach the RRF was based on a 3 x 3 array of 12 km grid cells centered on the location of the grid cell containing the monitor.

As in the Revised CSAPR Update, EPA also projected design values based on a modified version of the "3 x 3" approach for those monitoring sites located in coastal areas. In this alternative approach, EPA eliminated from the RRF calculations the modeling data in those grid cells that are dominated by water (i.e., more than 50 percent of the area in the grid cell is water) and that do not contain a monitoring site (i.e., if a grid cell is more than 50 percent water but contains an air quality monitor, that cell would remain in the calculation). The choice of more than 50 percent of the grid cell area as water as the criteria for identifying overwater grid cells is based on the treatment of land use in the Weather Research and Forecasting model (WRF).[19] Specifically, in the WRF meteorological model those grid cells that are greater than 50 percent overwater are treated as being 100 percent overwater. In such cases the meteorological conditions in the entire grid cell reflect the vertical mixing and winds over water, even if part of the grid cell also happens to be over land with land-based emissions, as can often be the case for coastal areas. Overlaying land-based emissions with overwater meteorology may be representative of conditions at coastal monitors during times of on-shore flow associated with synoptic conditions and/or sea-breeze or lake-breeze wind flows. But there may be other times, particularly with off-shore wind flow when vertical mixing of land-based emissions may be too limited due to the presence of overwater meteorology. Thus, for our modeling EPA calculated projected average and maximum design values at individual monitoring sites based on both the "3 x 3" approach as well as the alternative approach that eliminates overwater cells in the RRF calculation for near-coastal areas (i.e., "no water" approach).

For both the "3 x 3" approach and the "no water" approach, the grid cell with the highest base year MDA8 ozone concentration on each day in the applicable array of grid cells surrounding the location of the monitoring site[20] is used for both the base and future components of the RRF calculation. That is, the base and future year data are paired in space for the grid cell that has the highest MDA8 concentration on the given day.

---

[19] https://www.mmm.ucar.edu/weather-research-and-forecasting-model.
[20] For the "3 x 3" approach the applicable array contains the 9 grid cells that surround and include the grid cell containing the monitoring site. The applicable array for the "no water" approach includes the grid cell containing the monitoring site along with the subset of the "3 x 3" grid cells that are not classified as "water" grid cells using the criteria described in this TSD.

The approach for calculating projected maximum design values is similar to the approach for calculating the projected average design values. To calculate projected maximum design values we start with the highest (i.e., maximum) ambient design value from the 2016-centered 5-year period (i.e., the maximum of design values from 2014-2016, 2014-2017, and 2016-2018). The base period maximum design value at each site was projected to 2023, 2026, and 2032 using the site-specific RRFs, as determined using the procedures for calculating RRFs described above.

For this proposed rule, EPA is relying upon design values based on the "no water" approach for identifying nonattainment and maintenance receptors and for calculating contributions, as described in section 4, below.

Consistent with the truncation and rounding procedures for the 8-hour ozone NAAQS, the projected design values are truncated to integers in units of ppb.[21] Therefore, projected design values that are greater than or equal to 71 ppb are considered to be violating the 2015 ozone NAAQS. For those sites that are projected to be violating the NAAQS based on the projected average design values, we examined the design values for 2020, which are the most recent concurred measured design values at the time of this proposed rule.[22] As noted above, we identify nonattainment receptors as those sites that are violating the NAAQS based on current measured air quality and also have projected average design values of 71 ppb or greater. Maintenance-only receptors include both (1) those sites with projected average design values above the NAAQS that are currently measuring clean data and (2) those sites with projected average design values below the level of the NAAQS, but with projected maximum design values of 71 ppb or greater.[23]

The 2016-centered base period average and maximum design values, the projected average and maximum design values for 2023 and the 2020 design values for monitoring sites that are projected to be nonattainment or maintenance-only receptors in 2023 are provided in Tables 3-1 and

---

[21] 40 CFR Part 50, Appendix U to Part 50 – Interpretation of the Primary and Secondary National Ambient Air Quality Standards for Ozone.

[22] Official, concurred ozone design values for 2010 through 2020 are provided in the file: 2020_2020 Design Values. Preliminary, un-concurred, 2021 design values are provided in the file Preliminary_2021 Design Values. Both of these files can be found in the docket for this proposed rule.

[23] In addition to the maintenance-only receptors, the projected nonattainment receptors are also maintenance receptors because the maximum design values for each of these sites is always greater than or equal to the average design value.

3-2 respectively.[24] The average and maximum design values for nonattainment and maintenance receptors in 2026 are provided in Tables 3-3 and 3-4, respectively. and 2032 are provide in Appendix B for those monitoring sites that are receptors in 2023. Projected design values for 2023, 2026, and 2032 based on both the "3 x 3" and "no water" methods for individual monitoring sites nationwide are provided in the file "2016v2_DVs_state_contributions" which can be found in the docket for this proposed rule.

Table 3-1. Average and maximum 2016-centered and 2023 base case 8-hour ozone design values and 2020 design values (ppb) at projected nonattainment receptors in 2023.[25]

| Monitor ID | State | County | 2016 Centered Average | 2016 Centered Maximum | 2023 Average | 2023 Maximum | 2020 |
|---|---|---|---|---|---|---|---|
| 060170010 | CA | El Dorado | 85.3 | 88 | 76.3 | 78.7 | 84 |
| 060170020 | CA | El Dorado | 82.0 | 84 | 74.3 | 76.2 | 80 |
| 060190007 | CA | Fresno | 87.0 | 89 | 80.4 | 82.2 | 80 |
| 060190011 | CA | Fresno | 90.0 | 91 | 82.9 | 83.8 | 84 |
| 060190242 | CA | Fresno | 84.3 | 86 | 79.5 | 81.1 | 79 |
| 060194001 | CA | Fresno | 90.3 | 92 | 82.8 | 84.4 | 81 |
| 060195001 | CA | Fresno | 91.0 | 94 | 83.7 | 86.4 | 84 |
| 060250005 | CA | Imperial | 76.7 | 77 | 76.3 | 76.6 | 78 |
| 060251003 | CA | Imperial | 76.0 | 76 | 75.4 | 75.4 | 68 |
| 060290007 | CA | Kern | 87.7 | 89 | 82.8 | 84.0 | 93 |
| 060290008 | CA | Kern | 83.0 | 85 | 79.1 | 81.0 | 85 |
| 060290011 | CA | Kern | 83.3 | 85 | 78.8 | 80.4 | 86 |
| 060290014 | CA | Kern | 86.0 | 88 | 81.3 | 83.2 | 85 |
| 060290232 | CA | Kern | 79.3 | 82 | 74.9 | 77.5 | 83 |
| 060292012 | CA | Kern | 89.3 | 90 | 84.1 | 84.7 | 85 |
| 060295002 | CA | Kern | 87.3 | 89 | 82.4 | 84.0 | 89 |
| 060296001 | CA | Kern | 80.7 | 81 | 77.1 | 77.4 | 82 |
| 060311004 | CA | Kings | 83.3 | 84 | 76.9 | 77.6 | 80 |
| 060370002 | CA | Los Angeles | 94.3 | 99 | 88.0 | 92.4 | 97 |
| 060370016 | CA | Los Angeles | 100.0 | 103 | 93.4 | 96.2 | 107 |
| 060371201 | CA | Los Angeles | 88.3 | 91 | 82.7 | 85.3 | 92 |

---

[24] Using the 2023 design values from the "3 x 3" approach, the maintenance-only receptor at site 170317002 in Cook County, IL would become a nonattainment receptor because the average design value with the "3 x 3" approach is 71.1 ppb versus 70.1 ppb with the "no water" approach. In addition, the monitor at site 170971007 in Lake County, IL which was not projected to be a receptor using the "no water" approach would be a maintenance-only receptor with the "3 x 3" approach because the maximum design value with the "no water" approach was 69.9 ppb versus a maximum design value of 71.2 ppb with the "3 x 3" approach. However, including this Lake County, Illinois site as a receptor would not affect which states are covered by this proposed rule.

[25] "N/A" is used to denote that there is no valid design value.

13

| Monitor ID | State | County | 2016 Centered Average | 2016 Centered Maximum | 2023 Average | 2023 Maximum | 2020 |
|---|---|---|---|---|---|---|---|
| 060371602 | CA | Los Angeles | 75.7 | 76 | 73.6 | 73.9 | 78 |
| 060371701 | CA | Los Angeles | 92.0 | 95 | 85.6 | 88.4 | 88 |
| 060372005 | CA | Los Angeles | 84.7 | 86 | 80.7 | 81.9 | 93 |
| 060376012 | CA | Los Angeles | 98.0 | 100 | 91.6 | 93.4 | 101 |
| 060379033 | CA | Los Angeles | 87.3 | 89 | 80.7 | 82.2 | 80 |
| 060390004 | CA | Madera | 80.3 | 83 | 75.7 | 78.3 | 76 |
| 060392010 | CA | Madera | 82.7 | 84 | 77.0 | 78.2 | 78 |
| 060430003 | CA | Mariposa | 76.0 | 79 | 74.2 | 77.1 | 79 |
| 060470003 | CA | Merced | 80.7 | 82 | 74.7 | 75.9 | 76 |
| 060570005 | CA | Nevada | 86.3 | 90 | 78.1 | 81.5 | 82 |
| 060592022 | CA | Orange | 77.7 | 78 | 72.5 | 72.8 | 82 |
| 060595001 | CA | Orange | 75.3 | 76 | 72.3 | 73.0 | 77 |
| 060610003 | CA | Placer | 85.0 | 88 | 77.1 | 79.8 | N/A |
| 060610004 | CA | Placer | 79.3 | 85 | 71.9 | 77.0 | N/A |
| 060610006 | CA | Placer | 80.0 | 81 | 72.8 | 73.7 | 72 |
| 060650008 | CA | Riverside | 76.5 | 79 | 71.0 | 73.3 | N/A |
| 060650012 | CA | Riverside | 95.3 | 98 | 85.9 | 88.3 | 99 |
| 060650016 | CA | Riverside | 79.0 | 80 | 72.0 | 72.9 | 78 |
| 060651016 | CA | Riverside | 99.7 | 101 | 89.8 | 90.9 | 99 |
| 060652002 | CA | Riverside | 82.7 | 85 | 76.4 | 78.5 | 84 |
| 060655001 | CA | Riverside | 88.7 | 91 | 80.5 | 82.6 | 88 |
| 060656001 | CA | Riverside | 92.3 | 93 | 83.5 | 84.1 | 94 |
| 060658001 | CA | Riverside | 96.7 | 98 | 89.5 | 90.7 | 96 |
| 060658005 | CA | Riverside | 95.0 | 98 | 87.9 | 90.7 | 98 |
| 060659001 | CA | Riverside | 88.7 | 91 | 80.8 | 82.9 | 87 |
| 060670002 | CA | Sacramento | 77.7 | 78 | 71.4 | 71.7 | 72 |
| 060670012 | CA | Sacramento | 82.3 | 83 | 74.8 | 75.4 | N/A |
| 060710001 | CA | San Bernardino | 79.0 | 80 | 74.5 | 75.4 | 81 |
| 060710005 | CA | San Bernardino | 110.3 | 112 | 100.3 | 101.8 | 109 |
| 060710012 | CA | San Bernardino | 95.0 | 98 | 87.3 | 90.1 | 90 |
| 060710306 | CA | San Bernardino | 84.0 | 86 | 76.8 | 78.6 | 83 |
| 060711004 | CA | San Bernardino | 105.7 | 109 | 97.2 | 100.2 | 106 |
| 060712002 | CA | San Bernardino | 97.7 | 99 | 90.1 | 91.3 | 102 |
| 060714001 | CA | San Bernardino | 90.3 | 91 | 82.6 | 83.3 | 87 |
| 060714003 | CA | San Bernardino | 104.0 | 107 | 95.2 | 98.0 | 114 |
| 060719002 | CA | San Bernardino | 87.3 | 89 | 80.1 | 81.6 | 86 |
| 060719004 | CA | San Bernardino | 108.7 | 111 | 99.5 | 101.6 | 110 |
| 060731006 | CA | San Diego | 83.0 | 84 | 76.9 | 77.9 | 79 |
| 060773005 | CA | San Joaquin | 77.3 | 79 | 71.3 | 72.8 | 70 |
| 060990005 | CA | Stanislaus | 81.0 | 82 | 75.4 | 76.3 | 79 |

| Monitor ID | State | County | 2016 Centered Average | 2016 Centered Maximum | 2023 Average | 2023 Maximum | 2020 |
|---|---|---|---|---|---|---|---|
| 060990006 | CA | Stanislaus | 83.7 | 84 | 77.5 | 77.8 | 80 |
| 061030004 | CA | Tehama | 79.7 | 81 | 72.3 | 73.4 | 74 |
| 061070006 | CA | Tulare | 84.7 | 86 | 79.1 | 80.3 | 83 |
| 061070009 | CA | Tulare | 89.0 | 89 | 82.6 | 82.6 | 88 |
| 061072002 | CA | Tulare | 82.7 | 85 | 75.5 | 77.6 | 83 |
| 061072010 | CA | Tulare | 84.0 | 86 | 77.0 | 78.8 | 80 |
| 061090005 | CA | Tuolumne | 80.7 | 83 | 75.6 | 77.8 | 77 |
| 080350004 | CO | Douglas | 77.3 | 78 | 71.7 | 72.3 | 81 |
| 080590006 | CO | Jefferson | 77.3 | 78 | 72.6 | 73.3 | 79 |
| 080590011 | CO | Jefferson | 79.3 | 80 | 73.8 | 74.4 | 80 |
| 080690011 | CO | Larimer | 75.7 | 77 | 71.3 | 72.6 | 75 |
| 090010017 | CT | Fairfield | 79.3 | 80 | 73.0 | 73.7 | 82 |
| 090013007 | CT | Fairfield | 82.0 | 83 | 74.2 | 75.1 | 80 |
| 090019003 | CT | Fairfield | 82.7 | 83 | 76.1 | 76.4 | 79 |
| 090099002 | CT | New Haven | 79.7 | 82 | 71.8 | 73.9 | 80 |
| 481671034 | TX | Galveston | 75.7 | 77 | 71.1 | 72.3 | 74 |
| 482010024 | TX | Harris | 79.3 | 81 | 75.2 | 76.8 | 79 |
| 482010055 | TX | Harris | 76.0 | 77 | 71.0 | 72.0 | 76 |
| 490110004 | UT | Davis | 75.7 | 78 | 72.9 | 75.1 | 77 |
| 490353006 | UT | Salt Lake | 76.3 | 78 | 73.6 | 75.3 | 74 |
| 490353013 | UT | Salt Lake | 76.5 | 77 | 74.4 | 74.9 | 73 |
| 550590019 | WI | Kenosha | 78.0 | 79 | 72.8 | 73.7 | 74 |
| 551010020 | WI | Racine | 76.0 | 78 | 71.3 | 73.2 | 73 |
| 551170006 | WI | Sheboygan | 80.0 | 81 | 73.6 | 74.5 | 75 |

Table 3-2. Average and maximum 2016-centered and 2023 base case 8-hour ozone design values and 2020 design values (ppb) at projected maintenance-only receptors.

| Monitor ID | State | County | 2016 Centered Average | 2016 Centered Maximum | 2023 Average | 2023 Maximum | 2020 |
|---|---|---|---|---|---|---|---|
| 040278011 | AZ | Yuma | 72.3 | 74 | 70.5 | 72.2 | 68 |
| 060070007 | CA | Butte | 76.7 | 79 | 68.9 | 71.0 | 73 |
| 060090001 | CA | Calaveras | 77.0 | 78 | 70.9 | 71.9 | 72 |
| 060371103 | CA | Los Angeles | 73.0 | 74 | 70.5 | 71.5 | 76 |
| 060430006 | CA | Mariposa | 75.0 | 76 | 70.1 | 71.0 | 79 |
| 060675003 | CA | Sacramento | 77.3 | 79 | 70.2 | 71.7 | 70 |
| 060711234 | CA | San Bernardino | 72.3 | 76 | 70.6 | 74.2 | 76 |
| 061112002 | CA | Ventura | 77.3 | 78 | 70.9 | 71.6 | 77 |

| Monitor ID | State | County | 2016 Centered Average | 2016 Centered Maximum | 2023 Average | 2023 Maximum | 2020 |
|---|---|---|---|---|---|---|---|
| 170310001 | IL | Cook | 73.0 | 77 | 69.6 | 73.4 | 75 |
| 170310032 | IL | Cook | 72.3 | 75 | 69.8 | 72.4 | 74 |
| 170310076 | IL | Cook | 72.0 | 75 | 69.3 | 72.1 | 69 |
| 170314201 | IL | Cook | 73.3 | 77 | 69.9 | 73.4 | 77 |
| 170317002 | IL | Cook | 74.0 | 77 | 70.1 | 73.0 | 75 |
| 320030075 | NV | Clark | 75.0 | 76 | 70.0 | 71.0 | 74 |
| 350130021 | NM | Dona Ana | 72.7 | 74 | 70.9 | 72.2 | 78 |
| 350130022 | NM | Dona Ana | 71.3 | 74 | 69.5 | 72.1 | 74 |
| 420170012 | PA | Bucks | 79.3 | 81 | 70.7 | 72.2 | 74 |
| 480391004 | TX | Brazoria | 74.7 | 77 | 70.1 | 72.3 | 73 |
| 481210034 | TX | Denton | 78.0 | 80 | 70.4 | 72.2 | 72 |
| 481410037 | TX | El Paso | 71.3 | 73 | 69.6 | 71.3 | 76 |
| 482011034 | TX | Harris | 73.7 | 75 | 70.3 | 71.6 | 73 |
| 482011035 | TX | Harris | 71.3 | 75 | 68.0 | 71.6 | 70 |
| 490450004 | UT | Tooele | 73.5 | 74 | 70.8 | 71.3 | 69 |
| 490570002 | UT | Weber | 73.0 | 75 | 70.6 | 72.5 | N/A |
| 490571003 | UT | Weber | 73.0 | 74 | 70.5 | 71.5 | 71 |
| 550590025 | WI | Kenosha | 73.7 | 77 | 69.2 | 72.3 | 74 |

Table 3-3. Average and maximum 2016-centered and 2026 base case 8-hour ozone design values (ppb) at projected nonattainment receptors in 2023.

| Monitor ID | State | County | 2016 Centered Average | 2016 Centered Maximum | 2026 Average | 2026 Maximum |
|---|---|---|---|---|---|---|
| 60170010 | CA | El Dorado | 85.3 | 88 | 75.0 | 77.4 |
| 60170020 | CA | El Dorado | 82.0 | 84 | 73.2 | 75.0 |
| 60190007 | CA | Fresno | 87.0 | 89 | 79.5 | 81.3 |
| 60190011 | CA | Fresno | 90.0 | 91 | 81.9 | 82.8 |
| 60190242 | CA | Fresno | 84.3 | 86 | 78.7 | 80.3 |
| 60194001 | CA | Fresno | 90.3 | 92 | 81.8 | 83.3 |
| 60195001 | CA | Fresno | 91.0 | 94 | 82.7 | 85.4 |
| 60250005 | CA | Imperial | 76.7 | 77 | 76.2 | 76.5 |
| 60251003 | CA | Imperial | 76.0 | 76 | 75.3 | 75.3 |
| 60290007 | CA | Kern | 87.7 | 89 | 82.2 | 83.4 |
| 60290008 | CA | Kern | 83.0 | 85 | 78.6 | 80.5 |
| 60290011 | CA | Kern | 83.3 | 85 | 78.3 | 79.9 |
| 60290014 | CA | Kern | 86.0 | 88 | 80.7 | 82.6 |
| 60290232 | CA | Kern | 79.3 | 82 | 74.4 | 76.9 |
| 60292012 | CA | Kern | 89.3 | 90 | 83.4 | 84.1 |

| Monitor ID | State | County | 2016 Centered Average | 2016 Centered Maximum | 2026 Average | 2026 Maximum |
|---|---|---|---|---|---|---|
| 60295002 | CA | Kern | 87.3 | 89 | 81.7 | 83.3 |
| 60296001 | CA | Kern | 80.7 | 81 | 76.5 | 76.8 |
| 60311004 | CA | Kings | 83.3 | 84 | 76.0 | 76.6 |
| 60370002 | CA | Los Angeles | 94.3 | 99 | 87.1 | 91.5 |
| 60370016 | CA | Los Angeles | 100.0 | 103 | 92.4 | 95.2 |
| 60371201 | CA | Los Angeles | 88.3 | 91 | 81.8 | 84.3 |
| 60371602 | CA | Los Angeles | 75.7 | 76 | 73.0 | 73.3 |
| 60371701 | CA | Los Angeles | 92.0 | 95 | 84.6 | 87.4 |
| 60372005 | CA | Los Angeles | 84.7 | 86 | 79.9 | 81.1 |
| 60376012 | CA | Los Angeles | 98.0 | 100 | 90.6 | 92.4 |
| 60379033 | CA | Los Angeles | 87.3 | 89 | 79.8 | 81.4 |
| 60390004 | CA | Madera | 80.3 | 83 | 75.0 | 77.5 |
| 60392010 | CA | Madera | 82.7 | 84 | 76.1 | 77.3 |
| 60430003 | CA | Mariposa | 76.0 | 79 | 74.0 | 76.9 |
| 60470003 | CA | Merced | 80.7 | 82 | 73.9 | 75.1 |
| 60570005 | CA | Nevada | 86.3 | 90 | 77.2 | 80.5 |
| 60592022 | CA | Orange | 77.7 | 78 | 71.8 | 72.1 |
| 60595001 | CA | Orange | 75.3 | 76 | 71.7 | 72.4 |
| 60610003 | CA | Placer | 85.0 | 88 | 75.9 | 78.6 |
| 60610006 | CA | Placer | 80.0 | 81 | 71.7 | 72.6 |
| 60650012 | CA | Riverside | 95.3 | 98 | 84.9 | 87.3 |
| 60650016 | CA | Riverside | 79.0 | 80 | 71.1 | 72.0 |
| 60651016 | CA | Riverside | 99.7 | 101 | 88.8 | 89.9 |
| 60652002 | CA | Riverside | 82.7 | 85 | 75.7 | 77.8 |
| 60655001 | CA | Riverside | 88.7 | 91 | 79.6 | 81.7 |
| 60656001 | CA | Riverside | 92.3 | 93 | 82.5 | 83.1 |
| 60658001 | CA | Riverside | 96.7 | 98 | 88.6 | 89.7 |
| 60658005 | CA | Riverside | 95.0 | 98 | 87.0 | 89.7 |
| 60659001 | CA | Riverside | 88.7 | 91 | 79.9 | 82.0 |
| 60670012 | CA | Sacramento | 82.3 | 83 | 73.6 | 74.3 |
| 60710001 | CA | San Bernardino | 79.0 | 80 | 74.0 | 74.9 |
| 60710005 | CA | San Bernardino | 110.3 | 112 | 99.2 | 100.7 |
| 60710012 | CA | San Bernardino | 95.0 | 98 | 86.4 | 89.2 |
| 60710306 | CA | San Bernardino | 84.0 | 86 | 76.0 | 77.8 |
| 60711004 | CA | San Bernardino | 105.7 | 109 | 96.1 | 99.1 |
| 60712002 | CA | San Bernardino | 97.7 | 99 | 89.2 | 90.4 |
| 60714001 | CA | San Bernardino | 90.3 | 91 | 81.7 | 82.4 |
| 60714003 | CA | San Bernardino | 104.0 | 107 | 94.2 | 97.0 |
| 60719002 | CA | San Bernardino | 87.3 | 89 | 79.3 | 80.9 |
| 60719004 | CA | San Bernardino | 108.7 | 111 | 98.5 | 100.6 |

| Monitor ID | State | County | 2016 Centered Average | 2016 Centered Maximum | 2026 Average | 2026 Maximum |
|---|---|---|---|---|---|---|
| 60731006 | CA | San Diego | 83.0 | 84 | 76.1 | 77.0 |
| 60990005 | CA | Stanislaus | 81.0 | 82 | 74.7 | 75.6 |
| 60990006 | CA | Stanislaus | 83.7 | 84 | 76.7 | 77.0 |
| 61030004 | CA | Tehama | 79.7 | 81 | 71.5 | 72.6 |
| 61070006 | CA | Tulare | 84.7 | 86 | 78.2 | 79.4 |
| 61070009 | CA | Tulare | 89.0 | 89 | 81.6 | 81.6 |
| 61072002 | CA | Tulare | 82.7 | 85 | 74.3 | 76.4 |
| 61072010 | CA | Tulare | 84.0 | 86 | 75.9 | 77.7 |
| 61090005 | CA | Tuolumne | 80.7 | 83 | 75.0 | 77.1 |
| 80590006 | CO | Jefferson | 77.3 | 78 | 71.7 | 72.3 |
| 80590011 | CO | Jefferson | 79.3 | 80 | 72.6 | 73.3 |
| 90010017 | CT | Fairfield | 79.3 | 80 | 71.5 | 72.2 |
| 90013007 | CT | Fairfield | 82.0 | 83 | 72.8 | 73.7 |
| 90019003 | CT | Fairfield | 82.7 | 83 | 74.6 | 74.8 |
| 482010024 | TX | Harris | 79.3 | 81 | 74.2 | 75.7 |
| 490110004 | UT | Davis | 75.7 | 78 | 71.7 | 73.9 |
| 490353006 | UT | Salt Lake | 76.3 | 78 | 72.5 | 74.1 |
| 490353013 | UT | Salt Lake | 76.5 | 77 | 73.5 | 74.0 |
| 550590019 | WI | Kenosha | 78.0 | 79 | 71.7 | 72.6 |
| 551170006 | WI | Sheboygan | 80.0 | 81 | 72.3 | 73.2 |

Table 3-4. Average and maximum 2016-centered and 2026 base case 8-hour ozone design values (ppb) at projected maintenance-only receptors.

| Monitor ID | State | County | 2016-Centered Average | 2016-Centered Maximum | 2026 Average | 2026 Maximum |
|---|---|---|---|---|---|---|
| 40278011 | AZ | Yuma | 72.3 | 74 | 70.1 | 71.8 |
| 60090001 | CA | Calaveras | 77.0 | 78 | 70.2 | 71.1 |
| 60610004 | CA | Placer | 79.3 | 85 | 70.9 | 76.0 |
| 60650008 | CA | Riverside | 76.5 | 79 | 70.4 | 72.7 |
| 60711234 | CA | San Bernardino | 72.3 | 76 | 70.3 | 74.0 |
| 60773005 | CA | San Joaquin | 77.3 | 79 | 70.8 | 72.4 |
| 80350004 | CO | Douglas | 77.3 | 78 | 70.5 | 71.1 |
| 80690011 | CO | Larimer | 75.7 | 77 | 70.6 | 71.8 |
| 90099002 | CT | New Haven | 79.7 | 82 | 70.4 | 72.4 |
| 170310001 | IL | Cook | 73.0 | 77 | 68.7 | 72.5 |
| 170310032 | IL | Cook | 72.3 | 75 | 69.1 | 71.7 |
| 170310076 | IL | Cook | 72.0 | 75 | 68.5 | 71.3 |
| 170314201 | IL | Cook | 73.3 | 77 | 68.9 | 72.4 |

| Monitor ID | State | County | 2016-Centered Average | 2016-Centered Maximum | 2026 Average | 2026 Maximum |
|---|---|---|---|---|---|---|
| 170317002 | IL | Cook | 74.0 | 77 | 69.1 | 72.0 |
| 350130021 | NM | Dona Ana | 72.7 | 74 | 70.4 | 71.7 |
| 350130022 | NM | Dona Ana | 71.3 | 74 | 69.0 | 71.6 |
| 480391004 | TX | Brazoria | 74.7 | 77 | 69.1 | 71.2 |
| 481671034 | TX | Galveston | 75.7 | 77 | 70.2 | 71.4 |
| 490570002 | UT | Weber | 73.0 | 75 | 69.8 | 71.7 |
| 550590025 | WI | Kenosha | 73.7 | 77 | 68.1 | 71.1 |
| 551010020 | WI | Racine | 76.0 | 78 | 70.2 | 72.1 |

In total, in the 2023 base case there are 111 receptors nationwide including 85 nonattainment receptors and 26 maintenance-only receptors. Of the 85 *nonattainment* receptors in 2023, 75 remain nonattainment receptors while 8 are projected to become a maintenance-only receptors and 2 are projected to be in attainment in 2026. Of the 26 *maintenance-only* receptors in 2023, 13 are projected to remain maintenance-only receptors and 13 are projected to be in attainment in 2026. In total, in the 2026 base case there are 96 receptors nationwide including 75 nonattainment receptors and 21 maintenance-only receptors.

In 2023 we also project that three monitoring sites in the Uintah Basin (i.e., monitor 490472003 in Uintah County, Utah and monitors 490130002 and 490137011 in Duchesne County, Utah) will have average design values above the NAAQS. However, these monitors are within the Uinta Basin nonattainment area which was designated as nonattainment for the 2015 ozone NAAQS not because of an ongoing problem with summertime ozone (as is usually the case in other parts of the country), but instead because it violates the ozone NAAQS in winter. The main causes of the Uinta Basin's wintertime ozone are sources located at low elevations within the Basin, the Basin's unique topography, and the influence of the wintertime meteorologic inversions that keep ozone and ozone precursors near the Basin floor and restrict air flow in the Basin. Because of the localized nature of the ozone problem at these sites we have not identified these three monitors as receptors in Step 1 of this proposed rule. Studies have found that meteorological inversion conditions and the unique topographic features of the Uinta Basin combined with local ground-level emissions of VOC and $NO_X$ result in winter conditions that aid in the formation of ozone in the Uinta Basin.[26] The Uinta Basin is a bowl surrounded by much higher mountain ranges with varying heights from over 7,500 to

---

[26] Final Report: 2014 Uinta Basin Winter Ozone Study. https://documents.deq.utah.gov/air-quality/planning/air-quality-policy/DAQ-2015-021002.pdf

13,000 feet. In environments such as this one, cooler, denser air becomes trapped in the Basin when warmer air overrides the area during high pressure events, creating an inversion. Normal atmospheric mixing does not occur in this type of environment; instead, pollutants settle due to high-pressure ridges and low surface winds within the Basin. Only when there are cooler temperatures aloft, with high winds, or when surface warming occurs, can a temperature inversion break down and allow pollutants to mix out of the Basin.

Snow cover also plays an essential role in winter ozone episodes in the Uinta Basin. Snow acts as a highly reflective surface for both visible and UV radiation, so the sun's rays cannot reach the ground covered by snow to warm the surface, thereby enhancing the stability of the inversion layer. In addition, because the UV radiation passes through the air column again as it is reflected away from the ground, the total UV flux is nearly doubled compared to conditions without snow cover, and the increased UV flux enhances the photochemical reactions of VOC and $NO_X$ that form ozone. At night, cold down-sloping winds from the surrounding mountains can strengthen the inversion. The super-stable atmosphere allows emissions to accumulate, and the sunny conditions during the daytime let photochemical reactions take place. Only emissions with enough heat, plume velocity, or stack height can escape the inversion, depending on the boundary layer height, and enter the unstable atmosphere above the inversion.

As noted above, under wintertime temperature inversion conditions, cold air pools form at the lower elevations in the Basin, and pollutants are trapped in the pooled air under the temperature inversion. Providing that snow cover is present, inversions can persist for periods longer than a week, until energetic weather systems break the temperature inversion and sweep out trapped pollutants. While trapping locally emitted pollutants under an inversion layer within the Uinta Basin, the inversion layer also limits transported pollutants from outside the Basin from entering and contributing to ozone formation, as warmer air, carrying upwind emissions, tends to pass above and across the colder air trapped below. Once a temperature inversion is present, there is limited, if any, transport of pollutants horizontally or vertically that could impact local photochemistry (Lyman, et.al., 2015). In fact, even different areas of the Basin are "relatively isolated from each other, allowing spatial factors like elevation and proximity to sources to strongly influence ozone concentrations at individual sites." *Id.*

**4. Ozone Contribution Modeling**

As noted above, EPA performed nationwide, state-level ozone source apportionment modeling using the CAMx OSAT/APCA technique to provide data on the contribution of projected 2023 and 2026 base case $NO_X$ and VOC emissions from all anthropogenic source sectors in each state. In addition, EPA also performed source apportionment modeling for 2026 to quantify the contributions from EGUs and from non-EGU point sources in each state as well as the contributions from each state for a scenario in which NOx emissions from both EGUs and non-EGU point sources are reduced by 30 percent from projected 2026 levels in each state. The state-by-state all anthropogenic source apportionment modeling is described in section 4.1. In section 4.2 we describe the method for calculating the average contribution metric for each source apportionment model run and in section 4.3 we present the results of the state-by-state all anthropogenic modeling.

*4.1 State-by-State All Anthropogenic Modeling*

In the state-by-state source apportionment model run, we tracked the ozone formed from each of the following contribution categories (i.e., "tags"):

- States – anthropogenic $NO_X$ and VOC emissions from each of the contiguous 48 states and the District of Columbia tracked individually (emissions from all anthropogenic sectors in a given state were combined);

- Biogenics – biogenic NOx and VOC emissions domain-wide;

- Initial and Boundary Concentrations – air quality concentrations used to initialize the 12 km model simulation and air quality concentrations transported into the 12 km modeling domain from the lateral boundaries;

- Tribes – the collective emissions from those tribal lands for which we have point source inventory data in the 2016 emissions platform (we did not model the contributions from individual tribes);

- Canada and Mexico – collective anthropogenic emissions from sources in the portions of Canada and Mexico included in the 12 km modeling domain (contributions from Canada and Mexico were not modeled separately);

- Fires – combined emissions from wild and prescribed fires domain-wide within the 12 km modeling; and

- Offshore – total emissions from offshore marine vessels and offshore drilling platforms.

The above-listed tagged sources account for all ozone sources simulated by the model such that the sum of tagged ozone contributions adds to the total modeled ozone at each hour and grid cell. The

21

source apportionment modeling provided hourly contributions to ozone from anthropogenic $NO_X$ and VOC emissions in each state, individually, to ozone concentrations in each model grid cell. The contributions to ozone from chemical reactions between biogenic $NO_X$ and biogenic VOC emissions were modeled and assigned to the "biogenic" category. The contributions from wildfire and prescribed fire $NO_X$ and VOC emissions were modeled and assigned to the "fires" category. The contributions from the "biogenic", "offshore", and "fires" categories are not assigned to individual states nor are they included in the state contributions.

### 4.2 Method for Calculating the Contribution Metric

As noted above, CAMx state-by-state source apportionment model runs for 2023 and 2026 were performed to obtain contributions for the period May through September using the projected 2023 and 2026 base case emissions and 2016 meteorology. The resulting hourly contributions[27] from each tag were processed to calculate an 8-hour average contribution metric value for each tag at each monitoring site. The contribution metric values at each individual monitoring site are calculated using model predictions for the grid cell containing the monitoring site. The process for calculating the average contribution metric uses the source apportionment outputs in a "relative sense" to apportion the projected average design value at each monitoring location into contributions from each individual tag. This process is similar in concept to the approach described above for using model predictions to calculate future year ozone design values.

The basic approach used to calculate the average contribution metric values for 2023 is described by the following steps:

(1) For the model grid cells containing an ozone monitoring site, calculate the 8-hour average contribution from each source tag to each monitoring site for the time period of the 2023 modeled MDA8 ozone concentration on each day;

(2) Average the MDA8 concentrations for the top 10 modeled ozone concentration days in 2023 and average the 8-hour contributions for each of these same days for each tag;

(3) Divide the 10-day average contribution for each tag by the corresponding 10-day average concentration to obtain a Relative Contribution Factor (RCF) for each tag at each monitor; and

(4) Multiply the 2023 average design values by the corresponding RCF to produce the average contribution metric value for each tag at each monitoring site in 2023.

---

[27] Contributions from anthropogenic emissions under "$NO_X$-limited" and "VOC-limited" chemical regimes were combined to obtain the net contribution from $NO_X$ and VOC anthropogenic emissions in each state.

These steps are written out mathematically in Equation 4-1 where $C_{t,i}$ represents the contribution metric value from tag, $t$, to monitor, $i$, $DVF_{2023,i}$ represents the projected 2023 future year average DV at monitor, $i$, $O3C_{t,top10,i}$ is the average ozone *contribution* to MDA8 ozone from tag, $t$, across the top-10 future year MDA8 modeled days at monitor, $i$, and, $O3_{top10,i}$ is the average ozone *concentration* across the top-10 future year MDA8 modeled days at monitor, $i$..

$$C_{t,i} = DVF_{2023,i} \times \frac{O3C_{t,top10,i}}{O3_{top10,i}}$$     Equation 4-1

The contribution metric values calculated from step 4 are truncated to two digits to the right of the decimal (e.g., a calculated contribution of 0.78963… is truncated to 0.78 ppb). As a result of truncation, the tabulated contributions may not always sum to the future year average design value at individual monitoring sites. In addition, when calculating the contribution metric values we applied a criteria that 5 or more of the top 10 model-predicted concentration days must have MDA8 concentrations >= 60 ppb in the future year in order to calculate a valid contribution metric. The criterion of having at least 5 days with MDA8 ozone concentrations >= 60 ppb was chosen to avoid including contributions on days that are well below the NAAQS in the calculation of the contribution metric. Using 5 days with MDA8 ozone >= 60 ppb aligns with recommendations in EPA's air quality modeling guidance for projecting future year design values, as described above.

To calculate contribution metric values from the 2026 source apportionment model runs, we followed the same approach as described above for 2023, except that we calculated the average contribution metric values for 2026 using the 2026 MDA8 concentrations and 2026 8-hour average contributions for the same dates that were used to calculate the contribution metric values in 2023. Even though 2026 is only 3 years beyond 2023, it is possible that changes in projected emissions between 2023 and 2026 could potentially result in a change in the ranking of days based on model-predicted MDA8 ozone concentrations in 2026 compared to 2023 at some monitoring sites. Using modeled contribution data from the same set of dates when calculating contribution metric values for 2023 and 2026 provides consistency in terms of the meteorology associated with the contributions that are used to calculate contribution metric values in both years at individual monitoring sites. The contribution metric values for monitoring sites nationwide for the 2023 and 2026 state-by-state source apportionment model runs are provided in the file "2016v2_DVs_state_contributions" which can be

found in the docket of this proposed rule. Note that this file contains data for monitoring sites that meet the criteria for calculating valid contribution metric values, as described above.[28]

### 4.3 Results of State-by-State All Anthropogenic Modeling

The contribution metric values from each state and the other source tags at individual nonattainment and maintenance-only sites in the 2023 and 2026 state-by-state all anthropogenic model runs are provided in Appendix C. In this appendix we also provide tables with the sum of upwind contributions (ppb) and the percent of ozone concentrations attributed to emissions in upwind states. The largest contribution values from each state to downwind receptors in 2023 and in 2026 are provided in Tables 4-1 and 4-2, respectively.[29]

Table 4-1. Largest contribution from each state to downwind nonattainment and maintenance-only receptors in 2023 (units are ppb).

| Upwind State | Largest Contribution to Downwind Nonattainment Receptors | Largest Contribution to Downwind Maintenance-Only Receptors |
|---|---|---|
| Alabama | 0.88 | 0.71 |
| Arizona | 0.40 | 0.21 |
| Arkansas | 1.00 | 1.39 |
| California | 34.24 | 7.44 |
| Colorado | 0.07 | 0.20 |
| Connecticut | 0.01 | 0.21 |
| Delaware | 0.53 | 1.36 |
| District of Columbia | 0.04 | 0.07 |
| Florida | 0.16 | 0.15 |
| Georgia | 0.16 | 0.17 |
| Idaho | 0.55 | 0.57 |
| Illinois | 18.13 | 18.55 |
| Indiana | 6.60 | 7.10 |

[28] Contribution metric values were not calculated for the following receptors because there were fewer than 5 days with future year MDA8 ozone concentrations >= 60 ppb at each receptor: Kern County, California (Monitor ID: 06029001), Mariposa County, California (Monitor ID: 060430006), Tehama County, California (Monitor ID: 061030004), Larimer County, Colorado (Monitor ID: 080690011), Dona Ana County, New Mexico (Monitor IDs: 350130021 and 350130022), El Paso County, Texas (Monitor ID: 481410037), Galveston County, Texas (Monitor ID: 481671034), Tooele County, Utah (Monitor ID: 490450004), and Sheboygan County, Wisconsin (Monitor ID: 551170006).

[29] For California the largest contributions to downwind nonattainment in 2023 and 2026 are the contributions to monitoring site 060651016, which is a nonattainment receptor located on the Morongo Band of Mission Indians reservation in Riverside County, California. See the preamble for information on how EPA considers transport to receptors on tribal lands in this proposed rule.

24

| Upwind State | Largest Contribution to Downwind Nonattainment Receptors | Largest Contribution to Downwind Maintenance-Only Receptors |
|---|---|---|
| Iowa | 0.64 | 0.58 |
| Kansas | 0.42 | 0.59 |
| Kentucky | 0.83 | 0.88 |
| Louisiana | 5.39 | 7.03 |
| Maine | 0.01 | 0.01 |
| Maryland | 1.29 | 2.40 |
| Massachusetts | 0.30 | 0.30 |
| Michigan | 1.27 | 1.67 |
| Minnesota | 0.50 | 0.97 |
| Mississippi | 1.04 | 1.14 |
| Missouri | 1.08 | 1.66 |
| Montana | 0.08 | 0.11 |
| Nebraska | 0.26 | 0.36 |
| Nevada | 0.89 | 0.58 |
| New Hampshire | 0.10 | 0.06 |
| New Jersey | 8.85 | 5.79 |
| New Mexico | 0.30 | 0.13 |
| New York | 16.81 | 1.80 |
| North Carolina | 0.61 | 0.33 |
| North Dakota | 0.12 | 0.37 |
| Ohio | 1.94 | 1.88 |
| Oklahoma | 0.57 | 1.19 |
| Oregon | 1.10 | 1.31 |
| Pennsylvania | 6.90 | 0.51 |
| Rhode Island | 0.04 | 0.04 |
| South Carolina | 0.19 | 0.07 |
| South Dakota | 0.05 | 0.09 |
| Tennessee | 0.60 | 0.94 |
| Texas | 1.72 | 1.81 |
| Utah | 1.37 | 0.10 |
| Vermont | 0.02 | 0.02 |
| Virginia | 1.77 | 1.63 |
| Washington | 0.34 | 0.40 |
| West Virginia | 1.45 | 1.44 |
| Wisconsin | 0.19 | 2.61 |
| Wyoming | 0.81 | 0.19 |

Table 4-2. Largest contribution from each state to downwind nonattainment and maintenance-only receptors in 2026 (units are ppb).

| Upwind State | Largest Contribution to Downwind Nonattainment Receptors | Largest Contribution to Downwind Maintenance-Only Receptors |
|---|---|---|
| Alabama | 0.17 | 0.48 |
| Arizona | 0.35 | 0.23 |
| Arkansas | 0.62 | 1.30 |
| California | 33.45 | 4.85 |
| Colorado | 0.05 | 0.08 |
| Connecticut | 0.01 | 0.01 |
| Delaware | 0.42 | 0.52 |
| District of Columbia | 0.03 | 0.04 |
| Florida | 0.10 | 0.09 |
| Georgia | 0.14 | 0.16 |
| Idaho | 0.48 | 0.48 |
| Illinois | 17.81 | 18.14 |
| Indiana | 6.43 | 6.99 |
| Iowa | 0.57 | 0.57 |
| Kansas | 0.40 | 0.57 |
| Kentucky | 0.80 | 0.80 |
| Louisiana | 4.25 | 6.97 |
| Maine | 0.01 | 0.01 |
| Maryland | 1.11 | 1.23 |
| Massachusetts | 0.29 | 0.14 |
| Michigan | 1.03 | 1.58 |
| Minnesota | 0.36 | 0.91 |
| Mississippi | 0.36 | 0.90 |
| Missouri | 0.98 | 1.53 |
| Montana | 0.07 | 0.08 |
| Nebraska | 0.11 | 0.23 |
| Nevada | 0.81 | 0.51 |
| New Hampshire | 0.09 | 0.02 |
| New Jersey | 8.54 | 5.47 |
| New Mexico | 0.29 | 0.23 |
| New York | 16.58 | 11.29 |
| North Carolina | 0.38 | 0.54 |
| North Dakota | 0.11 | 0.34 |
| Ohio | 1.78 | 1.83 |
| Oklahoma | 0.54 | 0.72 |

| Upwind State | Largest Contribution to Downwind Nonattainment Receptors | Largest Contribution to Downwind Maintenance-Only Receptors |
|---|---|---|
| Oregon | 0.98 | 0.88 |
| Pennsylvania | 6.82 | 4.74 |
| Rhode Island | 0.04 | 0.01 |
| South Carolina | 0.15 | 0.17 |
| South Dakota | 0.03 | 0.06 |
| Tennessee | 0.25 | 0.34 |
| Texas | 1.61 | 1.70 |
| Utah | 0.95 | 1.18 |
| Vermont | 0.02 | 0.01 |
| Virginia | 1.14 | 1.68 |
| Washington | 0.31 | 0.28 |
| West Virginia | 1.23 | 1.35 |
| Wisconsin | 0.15 | 2.44 |
| Wyoming | 0.46 | 0.80 |

In CSAPR, the CSAPR Update, and the Revised CSAPR Update the EPA used a contribution screening threshold of 1 percent of the NAAQS to identify upwind states that may significantly contribute to downwind nonattainment and/or maintenance problems and which warrant further analysis to determine if emissions reductions might be required from each state to address the downwind air quality problem. The EPA determined that 1 percent was an appropriate threshold to use in the analysis for those rulemakings because there were important, even if relatively small, contributions to identified nonattainment and maintenance receptors from multiple upwind states mainly in the eastern U.S. The Agency has historically found that the 1 percent threshold is appropriate for identifying interstate transport linkages for states collectively contributing to downwind ozone nonattainment or maintenance problems because that threshold captures a high percentage of the total pollution transport affecting downwind receptors.

Based on the approach used in prior interstate ozone transport rules, upwind states that contribute ozone in amounts at or above the 1 percent of the NAAQS threshold to a particular downwind nonattainment or maintenance receptor are considered to be "linked" to that receptor in Step 2 of the 4-step interstate transport framework. Each of the linked states is further analyzed in Step 3 to determine whether and what emissions from the upwind state contribute significantly to downwind nonattainment and interfere with maintenance of the NAAQS. For the 2015 ozone NAAQS the value of a 1 percent threshold is 0.70 ppb.

The maximum downwind contributions in Table 4-1 indicates that the following 22 states contribute at or above the 0.70 ppb threshold to downwind nonattainment receptors in 2023: Alabama, Arkansas, California, Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, Mississippi, Missouri, Nevada, New Jersey, New York, Ohio, Oregon, Pennsylvania, Texas, Utah, Virginia, West Virginia, and Wyoming. Also based on the maximum downwind contributions in Table 4-1, the following 23 states contribute at or above the 0.70 ppb threshold to downwind maintenance-only receptors in 2023: Alabama, Arkansas, California, Delaware, Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, Minnesota, Mississippi, Missouri, New Jersey, New York, Ohio, Oklahoma, Oregon, Tennessee, Texas, Virginia, West Virginia, and Wisconsin.

In aggregate, the following 27 states contribute at or above 0.70 ppb to a downwind receptor in 2023: Alabama, Arkansas, California, Delaware, Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, Minnesota, Mississippi, Missouri, Nevada, New Jersey, New York, Ohio, Oklahoma, Oregon, Pennsylvania, Tennessee, Texas, Utah, Virginia, West Virginia, Wisconsin, and Wyoming.

Based on the maximum downwind contributions in Table 4-2, the following 24 states contribute at or above 0.70 ppb to a downwind nonattainment and/or maintenance-only receptor in 2026: Arkansas, California, Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, Minnesota, Mississippi, Missouri, Nevada, New Jersey, New York, Ohio, Oklahoma, Oregon, Pennsylvania, Texas, Utah, Virginia, West Virginia, Wisconsin, and Wyoming. Three states, Alabama, Delaware, and Tennessee, that were linked in 2023 are not linked in 2026 because the receptor(s) to which each state was linked in 2023 are projected to attain by 2026.

In Appendix D we provide the contributions for individual upwind/downwind linkages for each upwind state. In Appendix E we identify the upwind state(s) that are linked to each receptor in 2023 and in 2026.

As noted above, when applying the 4-step interstate transport framework, an upwind state's linkage to a downwind receptor alone does not determine whether the state significantly contributes to nonattainment or interferes with maintenance of a NAAQS to a downwind state. The determination of significant contribution is made in Step 3 as part of a multi-factor analysis, as described in the Ozone Transport Policy Analysis Proposed Rule Technical Support Document for this proposed rule.

## 5. References

Emery, C., Z. Liu, A. Russell, M. T. Odom, G. Yarwood, and N. Kumar, 2017. Recommendations on Statistics and Benchmarks to Assess Photochemical Model Performance. *J. Air and Waste Management Association*, 67, 582-598.

Gilliam, R.C. and J.E. Pleim, 2010. Performance Assessment of New Land Surface and Planetary Boundary Layer Physics in the WRF-ARW. *J. Appl. Meteor. Climatol.*, **49**, 760–774.

Henderson, B.H., F. Akhtar, H.O.T. Pye, S.L. Napelenok, W.T. Hutzell, 2014. A Database and Tool for Boundary Conditions for Regional Air Quality Modeling: Description and Evaluations, *Geoscientific Model Development*, **7**, 339-360.

Hong, S-Y, Y. Noh, and J. Dudhia, 2006. A New Vertical Diffusion Package with an Explicit Treatment of Entrainment Processes. *Mon. Wea. Rev.*, 134, 2318–2341.

Houyoux, M.R., Vukovich, J.M., Coats, C.J., Wheeler, N.J.M., Kasibhatla, P.S.,2000. Emissions Inventory Development and Processing for the Seasonal Model for Regional Air Quality (SMRAQ) project, *Journal of Geophysical Research – Atmospheres*, 105(D7), 9079-9090.

Iacono, M.J., J.S. Delamere, E.J. Mlawer, M.W. Shephard, S.A Clough, and W.D. Collins, 2008. Radiative Forcing by Long-Lived Greenhouse Gases: Calculations with the AER Radiative Transfer Models, *J. Geophys. Res.,* 113, D13103.

Kain, J.S., 2004. The Kain-Fritsch Convective Parameterization: An Update, *J. Appl. Meteor.,* 43, 170-181.

Lyman, S, Trang, T. Inversion structure and winter ozone distribution in the Uintah Basin, Utah, U.S.A. Atmospheric Environment. 123 (2015) 156-165.

Ma, L-M. and Tan Z-M, 2009. Improving the Behavior of Cumulus Parameterization for Tropical Cyclone Prediction: Convective Trigger, *Atmospheric Research*, 92, 190-211.

Morrison, H.J., A. Curry, and V.I. Khvorostyanov, 2005. A New Double-Moment Microphysics Parameterization for Application in Cloud and Climate Models. Part I: Description, *J. Atmos. Sci.*, 62, 1665–1677.

Morrison, H. and A. Gettelman, 2008. A New Two-Moment Bulk Stratiform Cloud Microphysics Scheme in the Community Atmosphere Model, version 3 (CAM3). Part I: Description and Numerical Tests, *J. Climate,* 21, 3642-3659.

Pleim, J.E. and A. Xiu, 2003. Development of a Land-Surface Model. Part II: Data Assimilation, *J. Appl. Meteor.*, 42, 1811–1822

Pleim, J.E., 2007a. A Combined Local and Nonlocal Closure Model for the Atmospheric Boundary Layer. Part I: Model Description and Testing, *J. Appl. Meteor. Climatol.*, 46, 1383–1395.

Pleim, J.E., 2007b. A Combined Local and Nonlocal Closure Model for the Atmospheric Boundary Layer. Part II: Application and Evaluation in a Mesoscale Meteorological Model, *J. Appl. Meteor. Climatol.*, 46, 1396–1409.

Ramboll Environ, 2021. User's Guide Comprehensive Air Quality Model with Extensions version 7.1, www.camx.com. Ramboll Environ International Corporation, Novato, CA.

Skamarock, W.C., J.B. Klemp, J. Dudhia, et al., 2008. A Description of the Advanced Research WRF Version 3. NCAR Tech. Note NCAR/TN-475+STR. http://wwww.mmm.ucar.edu/wrf/users/docs/arw_v3.pdf

Simon, H., K.R. Baker, and S.B. Phillips, 2012. Compilation and Interpretation of Photochemical Model Performance Statistics Published between 2006 and 2012, *Atmospheric Environment*, 61, 124-139.

Stammer, D., F.J. Wentz, and C.L. Gentemann, 2003. Validation of Microwave Sea Surface Temperature Measurements for Climate Purposes, *J. of Climate*, 16(1), 73-87.

U.S. Environmental Protection Agency, 2018. Modeling Guidance for Demonstrating Attainment of Air Quality Goals for Ozone, PM2.5, and Regional Haze, Research Triangle Park, NC. https://www3.epa.gov/ttn/scram/guidance/guide/O3-PM-RH-Modeling_Guidance-2018.pdf

Xiu, A., and J.E. Pleim, 2001, Development of a Land Surface Model. Part I: Application in a Meso scale Meteorological Model, *J. Appl. Meteor.,* 40, 192-209.

Yantosca, B. 2004. GEOS-CHEMv7-01-02 User's Guide, Atmospheric Chemistry Modeling Group, Harvard University, Cambridge, MA.

Appendix A

Model Performance Evaluation for
2016v2 Base Year CAMx Simulation

I. Introduction

An operational model evaluation was conducted for the 2016 base year CAMx v7.10 simulation performed for the 12 km U.S. modeling domain. The purpose of this evaluation is to examine the ability of the 2016 air quality modeling platform to represent the magnitude and spatial and temporal variability of measured (i.e., observed) maximum daily average (i.e., MDA8) ozone concentrations within the modeling domain. The evaluation presented here is based on model simulations using the 2016v2 emissions platform (i.e., scenario name 2016fj). The model evaluation for ozone focuses on comparisons of 8-hour daily maximum (i.e., MDA8) ozone concentrations to the corresponding observed data at monitoring sites in the EPA Air Quality System (AQS). The locations of the ozone monitoring sites in this network are shown in Figure A-1.

This evaluation includes statistical measures and graphical displays of model performance based upon model-predicted versus observed concentrations. The evaluation focusses on model predicted and observed MDA8 ozone concentrations that were paired in space and time. Model performance statistics were calculated for several spatial scales and temporal periods. Statistics were calculated for individual monitoring sites and in aggregate for monitoring sites within each of nine climate regions of the 12 km U.S. modeling domain. The regions include the Northeast, Ohio Valley, (Upper) Midwest, Southeast, South, Southwest, Northern Rockies, Northwest and West[1,2], which are defined based upon the states contained within the National Oceanic and Atmospheric Administration (NOAA) climate regions (Figure A-2)[3] as defined in Karl and Koss (1984).

---

[1] The nine climate regions are defined by States where: Northeast includes CT, DE, ME, MA, MD, NH, NJ, NY, PA, RI, and VT; Ohio Valley includes IL, IN, KY, MO, OH, TN, and WV; Midwest includes IA, MI, MN, and WI; Southeast includes AL, FL, GA, NC, SC, and VA; South includes AR, KS, LA, MS, OK, and TX; Southwest includes AZ, CO, NM, and UT; Northern Rockies includes MT, NE, ND, SD, WY; Northwest includes ID, OR, and WA; and West includes CA and NV.

[2] Note most monitoring sites in the West region are located in California (see Figures A-1 and A-2), therefore the statistics for the West region will be mostly representative of model performance in California ozone.

[3] NOAA, National Centers for Environmental Information scientists have identified nine climatically consistent regions within the contiguous U.S., http://www.ncdc.noaa.gov/monitoring-references/maps/us-climate-regions.php.

II. Methodology

Model performance statistics were created for the period May through September (i.e., seasonal) and for individual months during this time period. Statistics were created using data on all days with valid observed data during this period as well as for the subset of days with observed MDA8 concentrations > 60 ppb.[4] The aggregate statistics by climate region are presented in this appendix. Model performance statistics for MDA8 ozone at individual monitoring sites based on days with observed values ≥ 60 ppb can be found in the docket in the file named "2016v2 CAMx Ozone Model Performance Statistics by Site".

In addition to the above performance statistics, we prepared several graphical presentations of model performance for MDA8 ozone. These graphical presentations include: (1) maps that show the mean bias and error as well as normalized mean bias and error calculated for MDA8 ≥ 60 ppb for May through September at individual monitoring sites; (2) bar and whisker plots that show the distribution of the predicted and observed MDA8 ozone concentrations by month (May through September) and by region; and (3) time series plots (May through September) of observed and predicted MDA8 ozone concentrations for each region and for a selected set of monitoring sites that are projected to be nonattainment or maintenance-only receptors in 2023.

The Atmospheric Model Evaluation Tool (AMET) was used to calculate the model performance statistics used in this document (Gilliam et al., 2005). For this evaluation we have selected the mean bias, mean error, normalized mean bias, and normalized mean error to characterize model performance, statistics which are consistent with the recommendations in Simon et al. (2012) and EPA's photochemical modeling guidance (U.S. EPA, 2018).

Mean bias (MB) is the average of the difference (predicted – observed) divided by the total number of replicates ($n$). Mean bias is given in units of ppb and is defined as:

$$\text{MB} = \frac{1}{n}\sum_{1}^{n}(P - O) \text{ , where P = predicted and O = observed concentrations}$$

---

[4] We limited the data to those observed and predicted pairs with observations that are ≥ 60 ppb in order to focus on concentrations at the upper portion of the distribution of values.

Mean error (ME) calculates the absolute value of the difference (predicted - observed) divided by the total number of replicates ($n$). Mean error is given in units of ppb and is defined as:

$$ME = \frac{1}{n} \sum_1^n |P - O|$$

Normalized mean bias (NMB) is the average the difference (predicted - observed) over the sum of observed values. NMB is a useful model performance indicator because it avoids over inflating the observed range of values, especially at low concentrations. Normalized mean bias is given in percentage units and is defined as:

$$NMB = \frac{\sum_1^n (P - O)}{\sum_1^n (O)} * 100$$

Normalized mean error (NME) is the absolute value of the difference (predicted - observed) over the sum of observed values. Normalized mean error is given in percentage units and is defined as:

$$NME = \frac{\sum_1^n |P - O|}{\sum_1^n (O)} * 100$$

## III. Overview of Findings

As described in more detail below, the model performance statistics indicate that the MDA8 ozone concentrations predicted by the 2016v2 CAMx modeling platform closely reflect the corresponding MDA8 observed ozone concentrations in each region of the 12 km U.S. modeling domain. The acceptability of model performance was judged by considering the 2016v2 CAMx performance results in light of the range of performance found in recent regional ozone model applications (Emery et al., 2017; NRC, 2002; Phillips et al., 2007; Simon et al., 2012; U.S. EPA, 2005; U.S. EPA, 2009; U.S. EPA, 2010).[5]  These other modeling studies

---

[5] Christopher Emery, Zhen Liu, Armistead G. Russell, M. Talat Odman, Greg Yarwood & Naresh Kumar (2017) Recommendations on statistics and benchmarks to assess photochemical model performance, Journal of the Air & Waste Management Association, 67:5, 582-598, DOI: 10.1080/10962247.2016.1265027
National Research Council (NRC), 2002. Estimating the Public Health Benefits of Proposed Air Pollution Regulations, Washington, DC: National Academies Press.
U.S. Environmental Protection Agency; Technical Support Document for the Final Clean Air Interstate Rule: Air Quality Modeling; Office of Air Quality Planning and Standards; RTP, NC; March 2005 (CAIR Docket OAR-2005-0053-2149).

represent a wide range of modeling analyses that cover various models, model configurations, domains, years and/or episodes, chemical mechanisms, and aerosol modules. In particular, Emery et.al. extend the results of Simon et.al., to include performance results from a few more recent photochemical model applications. The results in the former paper indicate that about a third of the top performing past applications have normalized mean bias and a normalized mean error statistics for MDA8 ozone of less than $\pm 5$ percent and less 15 percent, respectively. In addition, two-thirds of past applications have normalized mean bias less than $\pm 15$ percent and normalized mean error less than 25 percent. These "benchmarks" are not intended to represent "rigid pass/fail tests" but rather as "simple references to the range of recent historical performance" that can be used to understand where the performance results of a particular application "fall in the spectrum of past published results."

Overall, the ozone model performance results for the 2016v2 CAMx simulation are in large part within the range found in other recent peer-reviewed and regulatory applications. The model performance results, as described in this document, demonstrate that the predictions from the 2061v2 modeling platform correspond closely to observed concentrations in terms of the magnitude, temporal fluctuations, and geographic differences for MDA8 ozone concentrations.

IV. Analysis of Model Performance Statistics and Graphics

The MDA8 ozone model performance bias and error statistics for the period May-September for each climate region are provided in Table A-1. Performance statistics by climate region, by month are provided in Table A-2. The statistics shown in these two tables were calculated using all data pairs for May-September. Seasonal and monthly statistics based on those days with observed MDA8 ozone > 60 ppb are presented in Table A-3 and A-4, respectively.

---

U.S. Environmental Protection Agency, Proposal to Designate an Emissions Control Area for Nitrogen Oxides, Sulfur Oxides, and Particulate Matter: Technical Support Document. EPA-420-R-007, 329pp., 2009. (http://www.epa.gov/otaq/regs/nonroad/marine/ci/420r09007.pdf)

Phillips, S., K. Wang, C. Jang, N. Possiel, M. Strum, T. Fox, 2007. Evaluation of 2002 Multi-pollutant Platform: Air Toxics, Ozone, and Particulate Matter, 7th Annual CMAS Conference, Chapel Hill, NC, October 6-8, 2008. (http://www.cmascenter.org/conference/2008/agenda.cfm).

U.S. Environmental Protection Agency, 2010, Renewable Fuel Standard Program (RFS2) Regulatory Impact Analysis. EPA-420-R-10-006. February 2010. Sections 3.4.2.1.2 and 3.4.3.3. Docket EPA-HQ-OAR-2009-0472-11332. (http://www.epa.gov/oms/renewablefuels/420r10006.pdf)

Simon, H., Baker, K.R., and Phillips, S. (2012) Compilation and interpretation of photochemical model performance statistics published between 2006 and 2012. *Atmospheric Environment* **61**, 124-139.

The monthly distributions of observed and predicted MDA8 ozone for each region are shown in Figures A-3 through A-11. Spatial plots of the mean bias and error as well as the normalized mean bias and error at individual monitors nationwide are shown in Figures A-12 through A-15. Time series plots of observed and predicted MDA8 ozone during the period May through September for each region and for selected 2023 nonattainment and/or maintenance sites are provided in Figures A-16 and A-17, respectively.



CIRCLE=AQS_Daily;

Figure A-1. Location of ozone monitoring sites.



Figure A-2. NOAA climate regions (source: http://www.ncdc.noaa.gov/monitoring-references/maps/us-climate-regions.php#references)

A. Seasonal and Monthly Performance

1. Model Performance Statistics by Region

The model performance statistics provided in Table A-1 show that regional mean bias is less than $\pm$5 ppb[6] and the mean error is between 6 and 7 ppb on average for all days during the period May through September in each region. Normalized mean bias is less than $\pm$ 5 percent in the Northeast, Ohio Valley, Southeast, South, and Northwest. In the Midwest, Southwest, Northern Rockies, and West, normalized mean bias is between 7 and 8 percent. Normalized mean error is less than 15 percent in the Northeast, Ohio Valley, Southeast, Southwest, Northern Rockies, and West and less than 20 percent in the other regions.

The monthly average statistics in Table A-2 show that the mean bias is generally $\pm$5 ppb and the mean error is between 5 and 8 ppb during most months in each region. The main exceptions are in the Northeast, Southwest, and Northern Rockies in May and during both May and June in the Midwest where the mean bias is between 5 and 10 ppb and/or the mean error is >8 ppb. The normalized mean bias values are less than $\pm$ 10 percent and the normalized mean error is in the range of 10 to 20 percent in most months in each region. The main exception is the Midwest region in May and June when the normalized mean biases are -14.7 percent and -20.6 percent, respectively, and the normalized mean errors are 21.5 percent and 16.8 percent, respectively.

The model performance statistics for days with observed MDA8 ozone $\geq$60 ppb provided in Table A-3 indicates that, on average, the model under predicts concentrations above this threshold, although the bias and error are relatively low in most regions. In general, the seasonal mean bias for MDA8 ozone $\geq$ 60 ppb is close to or within $\pm$ 10 ppb in nearly all of the regions. The exceptions are the Midwest and Northern Rockies where the mean bias shows under prediction of approximately 12 ppb. The mean error is less than 10 ppb in the Northeast, Ohio Valley, Southeast, South, and Southwest and between 10 and 15 ppb in other regions. Normalized mean bias is within 10 percent for the Northeast, Southeast, and Northwest with somewhat larger under prediction in Ohio Valley, South, Southwest, and West where the normalized mean bias is between -10 and -15 percent. In the Midwest and the Northern Rockies

---

[6] Note that "within $\pm$5 ppb" includes values that are greater than or equal to -5 ppb and less than or equal to 5 ppb.

the normalized mean bias is -19 percent. The normalized mean error is less than approximately 15 percent for the Northeast, Ohio Valley, Southeast, South, and Southwest and less that 20 percent in the other regions. The model performance statistics by month, as provided in Table A-4 indicate that under prediction of days $\geq$60 ppb is evident in most months in each region. Although the amount of under prediction varies by month and by region, under prediction is most notable in May in the Northeast, Ohio Valley, Midwest, and Southeast.

2. Distribution of Observed and Predicted MDA8 Ozone by Month

The monthly distributions of MDA8 model-predicted ozone for each region are provided in Figures A-3 through A-11. In this section we focus on comparing the median and interquartile range in the observed and predicted concentrations. In the Northeast and Ohio Valley the model under predicts in May and June followed by over prediction in the remainder of the ozone season. In the Midwest, the distribution of observed concentrations is under predicted in May and June, but the median and 75th percentile values of the model generally align with the corresponding observed data in July, August, and September. Observed peak values in this region are notably under predicted in May, June, and August. In the Southeast, the distribution of predictions generally corresponds well with that of the observed concentrations in May and June with over prediction during the remainder of the ozone season. In the South, the distribution of predicted concentrations tends to close to that of the observed data at the 25th percentile, median and 75th percentile values in most months with a tendency for under-prediction of peak values in May and June. In the Southwest, the modeled values align with the median and interquartile range of the observed values in May and June, but the decline in observed concentrations after June is not as notable in the model predictions. In the Northern Rockies, the model under predicts in May, June, and July, but closely captures the distribution of observed concentrations in August and September. In the Northwest modeled MDA8 ozone under predicts the observed values in May and June, but then more closely tracks the observed values in July, August, and September. In the West region, the median and interquartile range of observed ozone is under predicted in May through September with a tendency to under predict peak values.

### 3. Spatial Variability in Model Performance

Figures A-12 through A-15 show the spatial variability in bias and error for MDA8 ozone on days with observed concentrations $\geq$ 60 ppb. Mean bias, as seen in Figure A-12, is within $\pm$ 5 ppb at many sites from portions of Texas northeastward to the Northeast Corridor. At monitors in this area the normalized mean bias is generally within $\pm$ 10 percent, the mean error is mainly less than 10 ppb and the normalized mean error is between 5 to 15 percent. At most monitoring sites across the remainder of the East the model under predicts by 5 to 10 ppb, the normalized mean bias is between -10 and -20 percent, the mean error is in the range of 10 to 15 ppb, with normalized mean error of 10 to 15 percent. The exceptions are at some monitoring sites mainly in most of Michigan, Wisconsin, the northern portions of Indiana and Illinois, and Upstate New York where the magnitude of the low bias is 10 to 15 ppb, the normalized mean bias is -10 to -30 percent, the mean error is 10 to 15 ppb, and the normalized mean error is 15 to 25 percent. Elsewhere in the U.S., the model generally under predicts MDA8 ozone $\geq$ 60 ppb by approximately 10 ppb, on average. In Arizona, Colorado, New Mexico, and Utah, there is notable spatial heterogeneity in mean bias. For example, in Denver there are some sites with mean bias within $\pm$ 5 ppb while at relatively near-by monitors the model is low-biased by 5 to 10 ppb. In California, mean bias is within $\pm$ 5 ppb with even some small overprediction at monitoring sites near the coast. In and near Los Angeles and San Francisco the model under predicts in the range of 5 to 10 ppb and 10 to 15 at monitors in these areas. In central California, however, the model under prediction is as high as 20 ppb. For most monitoring sites in the West, the normalized mean bias is -20 percent or less, except for central California where the normalized mean bias is between -20 and -30 percent. Broadly, the mean error and normalized mean error in the West are similar to monitors in the East, with mean error generally in the range of 5 to 10 and 10 to 15 ppb and normalized mean error in the range of 10 to 15 and 15 to 20 percent at individual sites. Again, the notable exceptions are monitors in central California where the mean error is 15 to 20 ppb and the normalized mean error is 20 to 25 percent.

B. Observed and Predicted Temporal Patterns

In addition to the above analysis of overall model performance, we also examine how well the modeling platform replicates day to day fluctuations in observed MDA8 ozone concentrations for the period May through September in each region and for selected 2023 nonattainment and/or maintenance receptors.

Time series of regional average MDA8 ozone concentrations are provided in Figure A-16. The plots in this figure show that the modeled concentrations closely track the corresponding observed values in terms of day-to-day fluctuations and the general magnitude of concentrations. Comparing the plots for the nine regions reveals that there are large differences in the day-to-day variability among the regions. For example, the degree of temporal variability in MDA8 ozone concentrations in the Northeast, Midwest, and Ohio Valley is much greater than in the Southeast and South. In addition, the temporal variability in the Northern Rockies and Southwest is much less than in other regions. As is evident from Figure A-16, the modeling platform captures regional differences in the degree of temporal variability in MDA8 ozone concentrations. The model performs equally as well in eastern and western regions in terms of replicating the relative magnitude of concentrations and day-to-day variability that are characteristic of observed MDA8 ozone concentrations in each region.

The time series for selected receptors, as shown in Figure A-17, indicate that, again, the modeling platform generally replicates the day-to-day variability in ozone during this time period at these sites.[7] That is, days with high modeled concentrations are generally also days with high measured concentrations and, conversely, days with low modeled concentrations are also days with low measured concentrations in most cases. Although there is a tendency for under prediction, the model predictions, as illustrated by these receptors, captures the day-to-day variability in the observations, and also generally the timing and relative magnitude of multi-day high ozone episodes. In this regard, the model captures the geographic differences in the timing, duration, and general magnitude of ozone episodes in different parts of the U.S.

---

[7] The extent to which the day-to-day variability in model-predicted MDA8 ozone matches the corresponding observations values at the receptors selected for Figure A-16 is representative of other receptors within the same areas.

At the Stratford and Madison receptors in Coastal Connecticut, the model closely replicates both the day-to-day variability and magnitude of the observed MDA8 ozone concentrations on most days. The same is true at the Philadelphia-Bristol receptor, except that the model over predicts the observed values from mid-July to mid-August. At the Chicago-Alsip and Chicago-Evanston receptors, the model closely tracks the day-to-day variability during nearly the entire period. At both receptors, the modeled concentrations are similar to the corresponding measured values except for May and June when the model under predicts the observed values at Alsip and to a lesser extent at Evanston. At the Kenosha-Water Tower monitor the model tends to under predicts the observed values on most of the measured high ozone days, most notably in May. Model predictions are lower than the corresponding observed values on nearly all days at the Sheboygan monitor.  The under prediction at the monitors in the Chicago area as well as Kenosha and Sheboygan may be due in part to an underestimate of the amount of ozone formed in the marine layer over Lake Michigan and the advection of high ozone over the lake onshore as part of the lake breeze circulation near the land-water interface. At Houston-Aldine receptor the modeled values closely track the variability and magnitude of the corresponding observed values throughout the period May through September. The most notable exceptions are on two episode-days, one in late June and another in late July, when the model notably overpredicts (June) and underpredicts (July) the observed peak values on these days. At other receptors in Texas (Dallas-Denton, Galveston, and Brazoria) the model also closely replicates the intra-seasonal variation in ozone episodes in receptors.  At the Denton and Brazoria receptors, the model predictions are similar in magnitude to the observations, but the model under predicts during May episodes at Galveston.

The day-to-day variability in observed MDA8 is significantly greater at receptors in the East compared to receptors in Denver, Salt Lake City, and Las Vegas (see, for example, the plots for Denver-Chatfield compared to the plot for Stratford). It is important to note that the model accurately captures this substantial geographical difference in the temporal nature of ozone concentrations at the receptors in Denver, Salt Lake City, and Las Vegas compared to receptors in the East. At the receptors in each of these three western areas, the model tends to under predict the corresponding observed MDA8 ozone concentrations.

A-11

C. Conclusions

In summary, the ozone model performance statistics for the CAMx 2016fj (2016v2) simulation are within or close to the ranges found in other recent peer-reviewed applications (e.g., Simon et al, 2012 and Emory et al, 2017). As described in this appendix, the predictions from the 2016v2 modeling platform generally correspond closely to observed concentrations in terms of the magnitude, temporal fluctuations, and geographic differences for MDA8 ozone concentrations. Thus, the model performance results demonstrate the scientific credibility of our 2016v2 modeling platform. These results provide confidence in the ability of the modeling platform to provide a reasonable projection of expected future year ozone concentrations and contributions.

Table A-1. Performance statistics for MDA8 ozone for the period May through September (all days).

| Climate Region | Number of Site-Days | MB (ppb) | ME (ppb) | NMB (%) | NME (%) |
|---|---|---|---|---|---|
| Northeast | 27,724 | 0.2 | 6.3 | 0.6 | 14.3 |
| Ohio Valley | 33,784 | 0.4 | 6.3 | 1.0 | 14.1 |
| Midwest | 16,279 | -2.9 | 6.3 | -6.9 | 15.2 |
| Southeast | 26,500 | 1.9 | 6.1 | 4.7 | 14.9 |
| South | 21,427 | 0.0 | 6.6 | 0.0 | 16.5 |
| Southwest | 17,469 | -3.9 | 6.9 | -7.4 | 13.4 |
| Northern Rockies | 8,608 | -3.5 | 6.2 | -8.0 | 14.0 |
| Northwest | 4,012 | 0.1 | 6.5 | 0.2 | 17.5 |
| West | 29,789 | -3.1 | 7.4 | -6.0 | 14.5 |

Table A–2. Performance statistics for each month in the period May through September (all days).

**Northeast**

| Month | Number of Site-Days | MB (ppb) | ME (ppb) | NMB (%) | NME (%) |
|---|---|---|---|---|---|
| May | 5661 | -6.1 | 7.7 | -13.6 | 17.2 |
| June | 5443 | -2.1 | 5.9 | -4.5 | 12.7 |
| July | 5647 | 3.6 | 6.4 | 7.6 | 13.6 |
| August | 5596 | 4.0 | 6.2 | 9.3 | 14.6 |
| September | 5377 | 2.0 | 5.1 | 5.1 | 13.3 |

**Southeast**

| Month | Number of Site-Days | MB (ppb) | ME (ppb) | NMB (%) | NME (%) |
|---|---|---|---|---|---|
| May | 5488 | -1.8 | 5.3 | -3.9 | 11.4 |
| June | 5192 | 0.5 | 5.4 | 1.1 | 12.0 |
| July | 5325 | 5.1 | 7.0 | 13.1 | 18.2 |
| August | 5338 | 3.2 | 6.5 | 9.2 | 18.6 |
| September | 5157 | 2.8 | 6.2 | 7.0 | 15.9 |

**Midwest**

| Month | Number of Site-Days | MB (ppb) | ME (ppb) | NMB (%) | NME (%) |
|---|---|---|---|---|---|
| May | 3332 | -9.7 | 10.1 | -20.6 | 21.5 |
| June | 3210 | -7.1 | 8.1 | -14.7 | 16.8 |
| July | 3236 | 0.4 | 4.8 | 1.1 | 11.8 |
| August | 3296 | 1.1 | 4.8 | 3.0 | 12.4 |
| September | 3205 | 1.0 | 3.7 | 3.0 | 11.1 |

**Ohio Valley**

| Month | Number of Site-Days | MB (ppb) | ME (ppb) | NMB (%) | NME (%) |
|---|---|---|---|---|---|
| May | 6543 | -4.8 | 6.9 | -10.4 | 14.7 |
| June | 6319 | -3.1 | 6.9 | -5.8 | 13.1 |
| July | 7128 | 4.0 | 6.6 | 9.2 | 15.1 |
| August | 7054 | 3.1 | 6.3 | 7.7 | 15.7 |
| September | 6740 | 2.3 | 4.8 | 5.5 | 11.8 |

**South**

| Month | Number of Site-Days | MB (ppb) | ME (ppb) | NMB (%) | NME (%) |
|---|---|---|---|---|---|
| May | 4372 | -1.2 | 7.1 | -2.7 | 15.9 |
| June | 4231 | -0.3 | 6.5 | -0.7 | 15.4 |
| July | 4260 | 0.6 | 6.5 | 1.7 | 17.6 |
| August | 4328 | -0.1 | 7.3 | -0.2 | 20.2 |
| September | 4236 | 1.0 | 5.5 | 2.6 | 13.9 |

Table A-2. Performance statistics for each month in the period May through September (continued).

Northern Rockies

| Month | Number of Site-Days | MB (ppb) | ME (ppb) | NMB (%) | NME (%) |
|---|---|---|---|---|---|
| May | 1781 | -8.0 | 8.9 | -17.2 | 19.1 |
| June | 1691 | -5.0 | 7.2 | -10.4 | 14.9 |
| July | 1694 | -2.7 | 5.6 | -6.0 | 12.1 |
| August | 1749 | -1.6 | 5.1 | -3.7 | 11.4 |
| September | 1693 | -0.1 | 4.1 | -0.4 | 11.7 |

Southwest

| Month | Number of Site-Days | MB (ppb) | ME (ppb) | NMB (%) | NME (%) |
|---|---|---|---|---|---|
| May | 3556 | -7.0 | 8.0 | -13.0 | 14.7 |
| June | 3404 | -2.5 | 6.1 | -4.5 | 11.1 |
| July | 3505 | -5.5 | 7.8 | -10.2 | 14.4 |
| August | 3552 | -4.5 | 7.5 | -8.5 | 14.2 |
| September | 3452 | 0.4 | 5.3 | 1.0 | 12.2 |

Northwest

| Month | Number of Site-Days | MB (ppb) | ME (ppb) | NMB (%) | NME (%) |
|---|---|---|---|---|---|
| May | 832 | -4.5 | 7.2 | -11.0 | 17.7 |
| June | 816 | -2.7 | 7.2 | -6.7 | 18.2 |
| July | 827 | 1.7 | 5.6 | 4.9 | 16.2 |
| August | 801 | 3.4 | 6.6 | 8.6 | 16.9 |
| September | 736 | 2.8 | 6.0 | 9.0 | 18.8 |

West

| Month | Number of Site-Days | MB (ppb) | ME (ppb) | NMB (%) | NME (%) |
|---|---|---|---|---|---|
| May | 6027 | -4.8 | 6.6 | -10.1 | 14.1 |
| June | 5841 | -3.2 | 8.0 | -6.1 | 15.1 |
| July | 6095 | -3.3 | 7.8 | -6.2 | 14.7 |
| August | 6110 | -2.1 | 8.1 | -3.9 | 15.1 |
| September | 5716 | -2.0 | 6.4 | -4.0 | 13.1 |

Table A-3. Performance statistics for days with MDA8 ozone $\geq$ 60 ppb for the period May
through September.

| Climate Region | Number of Site-Days ≥ 60 ppb | MB (ppb) | ME (ppb) | NMB (%) | NME (%) |
|---|---|---|---|---|---|
| Northeast | 2997 | -4.1 | 7.1 | -6.2 | 10.7 |
| Ohio Valley | 3211 | -7.1 | 8.7 | -10.9 | 13.3 |
| Midwest | 1134 | -12.7 | 13.0 | -19.1 | 19.5 |
| Southeast | 1477 | -2.9 | 6.1 | -4.5 | 9.4 |
| South | 993 | -7.8 | 9.1 | -12.0 | 14.1 |
| Southwest | 3054 | -8.8 | 9.7 | -13.6 | 15.1 |
| Northern Rockies | 215 | -11.9 | 12.4 | -19.0 | 19.8 |
| Northwest | 84 | -5.8 | 10.8 | -9.0 | 16.6 |
| West | 8279 | -9.7 | 11.4 | -13.8 | 16.2 |

Table A-4. Performance statistics for days with MDA8 ozone $\geq$ 60 ppb by month.

**Northeast**

| Month | Number of Site-Days | MB (ppb) | ME (ppb) | NMB (%) | NME (%) |
|---|---|---|---|---|---|
| May | 620 | -9.1 | 10.0 | -13.0 | 14.2 |
| June | 787 | -5.4 | 7.2 | -8.2 | 11.0 |
| July | 898 | -1.0 | 6.4 | -1.5 | 9.5 |
| August | 372 | -0.7 | 5.5 | -1.1 | 8.5 |
| September | 320 | -4.6 | 6.1 | -6.8 | 9.2 |

**Southeast**

| Month | Number of Site-Days | MB (ppb) | ME (ppb) | NMB (%) | NME (%) |
|---|---|---|---|---|---|
| May | 554 | -5.9 | 6.8 | -9.1 | 10.4 |
| June | 492 | -2.0 | 5.7 | -3.0 | 8.6 |
| July | 148 | 1.3 | 6.6 | 2.1 | 10.1 |
| August | 82 | 0.5 | 6.7 | 0.8 | 10.5 |
| September | 171 | -1.4 | 4.8 | -2.2 | 7.5 |

**Midwest**

| Month | Number of Site-Days | MB (ppb) | ME (ppb) | NMB (%) | NME (%) |
|---|---|---|---|---|---|
| May | 369 | -15.1 | 15.1 | -23.0 | 23.1 |
| June | 473 | -13.4 | 13.5 | -20.1 | 20.1 |
| July | 125 | -7.9 | 9.0 | -12.0 | 13.7 |
| August | 146 | -9.3 | 10.1 | -13.7 | 14.9 |
| September | 21 | -5.5 | 5.6 | -8.7 | 8.9 |

**Ohio Valley**

| Month | Number of Site-Days | MB (ppb) | ME (ppb) | NMB (%) | NME (%) |
|---|---|---|---|---|---|
| May | 601 | -10.9 | 10.9 | -16.7 | 16.8 |
| June | 1552 | -8.5 | 9.6 | -12.9 | 14.4 |
| July | 348 | -1.9 | 6.5 | -2.9 | 10.1 |
| August | 283 | -3.3 | 6.9 | -5.0 | 10.4 |
| September | 427 | -3.6 | 5.9 | -5.6 | 9.0 |

**South**

| Month | Number of Site-Days | MB (ppb) | ME (ppb) | NMB (%) | NME (%) |
|---|---|---|---|---|---|
| May | 295 | -9.1 | 9.5 | -14.0 | 14.7 |
| June | 381 | -6.4 | 8.1 | -9.7 | 12.3 |
| July | 111 | -9.0 | 11.0 | -13.8 | 16.9 |
| August | 58 | -14.3 | 14.6 | -22.0 | 22.4 |
| September | 148 | -5.7 | 8.0 | -8.9 | 12.5 |

Table A-4. Performance statistics for days with MDA8 ozone $\geq$ 60 ppb by month (continued).

**Northern Rockies**

| Month | Number of Site-Days | MB (ppb) | ME (ppb) | NMB (%) | NME (%) |
|---|---|---|---|---|---|
| May | 57 | -17.6 | 17.6 | -28.2 | 28.2 |
| June | 70 | -12.6 | 12.6 | -19.7 | 19.7 |
| July | 28 | -10.9 | 10.9 | -17.8 | 17.8 |
| August | 60 | -6.3 | 8.1 | -10.1 | 13.0 |
| September | - | - | - | - | - |

**Southwest**

| Month | Number of Site-Days | MB (ppb) | ME (ppb) | NMB (%) | NME (%) |
|---|---|---|---|---|---|
| May | 823 | -10.2 | 10.4 | -15.9 | 16.3 |
| June | 827 | -5.5 | 7.7 | -8.4 | 11.8 |
| July | 824 | -11.2 | 11.7 | -17.2 | 18.0 |
| August | 556 | -8.1 | 9.0 | -12.5 | 14.0 |
| September | 24 | -10.1 | 10.1 | -16.0 | 16.0 |

**Northwest**

| Month | Number of Site-Days | MB (ppb) | ME (ppb) | NMB (%) | NME (%) |
|---|---|---|---|---|---|
| May | 6 | -12.8 | 12.8 | -20.8 | 20.8 |
| June | 25 | -8.1 | 13.0 | -12.4 | 19.8 |
| July | 6 | -8.6 | 8.6 | -13.5 | 13.5 |
| August | 45 | -2.8 | 9.3 | -4.3 | 14.3 |
| September | 2 | -17.9 | 17.9 | -28.7 | 28.7 |

**West**

| Month | Number of Site-Days | MB (ppb) | ME (ppb) | NMB (%) | NME (%) |
|---|---|---|---|---|---|
| May | 808 | -11.4 | 11.6 | -17.4 | 17.7 |
| June | 1869 | -8.5 | 11.1 | -12.0 | 15.5 |
| July | 2226 | -10.1 | 11.4 | -14.1 | 16.0 |
| August | 2268 | -9.5 | 11.5 | -13.4 | 16.2 |
| September | 1108 | -10.2 | 11.6 | -14.9 | 17.0 |



Figure A-3. Distribution of observed and predicted MDA8 ozone by month for the period May through September for the Northeast region, [line within box = median; top/bottom of box = 75th/25th percentiles; top/bottom dots = peak/minimum values]



Figure A-4. Distribution of observed and predicted MDA8 ozone by month for the period May through September for the Ohio Valley region.



Figure A-5. Distribution of observed and predicted MDA8 ozone by month for the period May through September for the Midwest region.



Figure A-6. Distribution of observed and predicted MDA8 ozone by month for the period May through September for the Southeast region.



Figure A-7. Distribution of observed and predicted MDA8 ozone by month for the period May through September for the South region.



Figure A-8. Distribution of observed and predicted MDA8 ozone by month for the period May through September for the Southwest region.



Figure A-9. Distribution of observed and predicted MDA8 ozone by month for the period May through September for the Northern Rockies region.



Figure A-10. Distribution of observed and predicted MDA8 ozone by month for the period May through September for the Northwest region.



Figure A-11. Distribution of observed and predicted MDA8 ozone by month for the period May through September for the West region.



Figure A-12. Mean Bias (ppb) of MDA8 ozone ≥ 60 ppb over the period May-September, paired in time and space.

A-22



Figure A-13. Normalized Mean Bias (%) of MDA8 ozone ≥ 60 ppb over the period May-September 2016, paired in space and time.



Figure A-14. Mean Error (ppb) of MDA8 ozone ≥ 60 ppb over the period May-September 2016, paired in time and space.



Figure A-15. Normalized Mean Error (%) of MDA8 ozone ≥ 60 ppb over the period May-September 2016, paired in time and space.

Figure A-16. Time series of observed and predicted regional average MDA8 ozone concentrations for the period May through September 2016.





Figure A-17. Time series of observed and predicted MDA8 ozone concentrations for the period May 1 through September 2016 for selected ozone receptor sites.





A-28

Chicago – Evanston

# of Sites: 1

Site: 170317002

Kenosha – Water Tower

# of Sites: 1

Site: 550590019

A-29





A-31





A-33





A-34

Appendix B

Projected 2023, 2026, and 2032 Average and
Maximum Design Values and
2020 Measured Design Values at Monitoring Sites that are
Receptors in 2023

| Site ID | ST | County | 2016 Centered Avg | 2016 Centered Max | 2023 Avg | 2023 Max | 2026 Avg | 2026 Max | 2032 Avg | 2032 Max | 2020 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 40278011 | AZ | Yuma | 72.3 | 74 | 70.5 | 72.2 | 70.1 | 71.8 | 69.6 | 71.2 | 68 |
| 60070007 | CA | Butte | 76.7 | 79 | 68.9 | 71.0 | 68.1 | 70.1 | 65.7 | 67.7 | 73 |
| 60090001 | CA | Calaveras | 77.0 | 78 | 70.9 | 71.9 | 70.2 | 71.1 | 68.7 | 69.6 | 72 |
| 60170010 | CA | El Dorado | 85.3 | 88 | 76.3 | 78.7 | 75.0 | 77.4 | 72.9 | 75.2 | 84 |
| 60170020 | CA | El Dorado | 82.0 | 84 | 74.3 | 76.2 | 73.2 | 75.0 | 71.4 | 73.1 | 80 |
| 60190007 | CA | Fresno | 87.0 | 89 | 80.4 | 82.2 | 79.5 | 81.3 | 78.0 | 79.8 | 80 |
| 60190011 | CA | Fresno | 90.0 | 91 | 82.9 | 83.8 | 81.9 | 82.8 | 80.4 | 81.3 | 84 |
| 60190242 | CA | Fresno | 84.3 | 86 | 79.5 | 81.1 | 78.7 | 80.3 | 77.4 | 78.9 | 79 |
| 60194001 | CA | Fresno | 90.3 | 92 | 82.8 | 84.4 | 81.8 | 83.3 | 80.1 | 81.6 | 81 |
| 60195001 | CA | Fresno | 91.0 | 94 | 83.7 | 86.4 | 82.7 | 85.4 | 81.1 | 83.8 | 84 |
| 60250005 | CA | Imperial | 76.7 | 77 | 76.3 | 76.6 | 76.2 | 76.5 | 75.9 | 76.2 | 78 |
| 60251003 | CA | Imperial | 76.0 | 76 | 75.4 | 75.4 | 75.3 | 75.3 | 74.9 | 74.9 | 68 |
| 60290007 | CA | Kern | 87.7 | 89 | 82.8 | 84.0 | 82.2 | 83.4 | 80.6 | 81.8 | 93 |
| 60290008 | CA | Kern | 83.0 | 85 | 79.1 | 81.0 | 78.6 | 80.5 | 77.2 | 79.1 | 85 |
| 60290011 | CA | Kern | 83.3 | 85 | 78.8 | 80.4 | 78.3 | 79.9 | 77.4 | 79.0 | 86 |
| 60290014 | CA | Kern | 86.0 | 88 | 81.3 | 83.2 | 80.7 | 82.6 | 79.1 | 80.9 | 85 |
| 60290232 | CA | Kern | 79.3 | 82 | 74.9 | 77.5 | 74.4 | 76.9 | 72.9 | 75.4 | 83 |
| 60292012 | CA | Kern | 89.3 | 90 | 84.1 | 84.7 | 83.4 | 84.1 | 81.9 | 82.6 | 85 |
| 60295002 | CA | Kern | 87.3 | 89 | 82.4 | 84.0 | 81.7 | 83.3 | 80.2 | 81.7 | 89 |
| 60296001 | CA | Kern | 80.7 | 81 | 77.1 | 77.4 | 76.5 | 76.8 | 75.4 | 75.7 | 82 |
| 60311004 | CA | Kings | 83.3 | 84 | 76.9 | 77.6 | 76.0 | 76.6 | 74.5 | 75.1 | 80 |
| 60370002 | CA | Los Angeles | 94.3 | 99 | 88.0 | 92.4 | 87.1 | 91.5 | 85.9 | 90.2 | 97 |
| 60370016 | CA | Los Angeles | 100.0 | 103 | 93.4 | 96.2 | 92.4 | 95.2 | 91.1 | 93.8 | 107 |
| 60371103 | CA | Los Angeles | 73.0 | 74 | 70.5 | 71.5 | 69.9 | 70.9 | 69.0 | 70.0 | 76 |
| 60371201 | CA | Los Angeles | 88.3 | 91 | 82.7 | 85.3 | 81.8 | 84.3 | 80.5 | 83.0 | 92 |
| 60371602 | CA | Los Angeles | 75.7 | 76 | 73.6 | 73.9 | 73.0 | 73.3 | 72.1 | 72.4 | 78 |
| 60371701 | CA | Los Angeles | 92.0 | 95 | 85.6 | 88.4 | 84.6 | 87.4 | 83.4 | 86.1 | 88 |
| 60372005 | CA | Los Angeles | 84.7 | 86 | 80.7 | 81.9 | 79.9 | 81.1 | 78.9 | 80.1 | 93 |
| 60376012 | CA | Los Angeles | 98.0 | 100 | 91.6 | 93.4 | 90.6 | 92.4 | 89.2 | 91.1 | 101 |
| 60379033 | CA | Los Angeles | 87.3 | 89 | 80.7 | 82.2 | 79.8 | 81.4 | 78.8 | 80.3 | 80 |
| 60390004 | CA | Madera | 80.3 | 83 | 75.7 | 78.3 | 75.0 | 77.5 | 73.7 | 76.2 | 76 |

| Site ID | ST | County | 2016 Centered Avg | 2016 Centered Max | 2023 Avg | 2023 Max | 2026 Avg | 2026 Max | 2032 Avg | 2032 Max | 2020 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 60392010 | CA | Madera | 82.7 | 84 | 77.0 | 78.2 | 76.1 | 77.3 | 74.7 | 75.9 | 78 |
| 60430003 | CA | Mariposa | 76.0 | 79 | 74.2 | 77.1 | 74.0 | 76.9 | 73.6 | 76.5 | 79 |
| 60430006 | CA | Mariposa | 75.0 | 76 | 70.1 | 71.0 | 69.5 | 70.4 | 68.4 | 69.3 | 79 |
| 60470003 | CA | Merced | 80.7 | 82 | 74.7 | 75.9 | 73.9 | 75.1 | 72.3 | 73.5 | 76 |
| 60570005 | CA | Nevada | 86.3 | 90 | 78.1 | 81.5 | 77.2 | 80.5 | 75.2 | 78.4 | 82 |
| 60592022 | CA | Orange | 77.7 | 78 | 72.5 | 72.8 | 71.8 | 72.1 | 70.7 | 71.0 | 82 |
| 60595001 | CA | Orange | 75.3 | 76 | 72.3 | 73.0 | 71.7 | 72.4 | 70.8 | 71.4 | 77 |
| 60610003 | CA | Placer | 85.0 | 88 | 77.1 | 79.8 | 75.9 | 78.6 | 74.0 | 76.6 | N/A[1] |
| 60610004 | CA | Placer | 79.3 | 85 | 71.9 | 77.0 | 70.9 | 76.0 | 69.2 | 74.1 | N/A |
| 60610006 | CA | Placer | 80.0 | 81 | 72.8 | 73.7 | 71.7 | 72.6 | 69.9 | 70.7 | 72 |
| 60650008 | CA | Riverside | 76.5 | 79 | 71.0 | 73.3 | 70.4 | 72.7 | 69.7 | 72.0 | N/A |
| 60650012 | CA | Riverside | 95.3 | 98 | 85.9 | 88.3 | 84.9 | 87.3 | 83.6 | 86.0 | 99 |
| 60650016 | CA | Riverside | 79.0 | 80 | 72.0 | 72.9 | 71.1 | 72.0 | 69.9 | 70.8 | 78 |
| 60651016 | CA | Riverside | 99.7 | 101 | 89.8 | 90.9 | 88.8 | 89.9 | 87.5 | 88.6 | 99 |
| 60652002 | CA | Riverside | 82.7 | 85 | 76.4 | 78.5 | 75.7 | 77.8 | 74.9 | 77.0 | 84 |
| 60655001 | CA | Riverside | 88.7 | 91 | 80.5 | 82.6 | 79.6 | 81.7 | 78.7 | 80.7 | 88 |
| 60656001 | CA | Riverside | 92.3 | 93 | 83.5 | 84.1 | 82.5 | 83.1 | 81.3 | 81.9 | 94 |
| 60658001 | CA | Riverside | 96.7 | 98 | 89.5 | 90.7 | 88.6 | 89.7 | 87.4 | 88.6 | 96 |
| 60658005 | CA | Riverside | 95.0 | 98 | 87.9 | 90.7 | 87.0 | 89.7 | 85.9 | 88.6 | 98 |
| 60659001 | CA | Riverside | 88.7 | 91 | 80.8 | 82.9 | 79.9 | 82.0 | 78.7 | 80.7 | 87 |
| 60670002 | CA | Sacramento | 77.7 | 78 | 71.4 | 71.7 | 70.5 | 70.8 | 68.8 | 69.1 | 72 |
| 60670012 | CA | Sacramento | 82.3 | 83 | 74.8 | 75.4 | 73.6 | 74.3 | 71.8 | 72.4 | N/A |
| 60675003 | CA | Sacramento | 77.3 | 79 | 70.2 | 71.7 | 69.1 | 70.7 | 67.4 | 68.8 | 70 |
| 60710001 | CA | San Bernardino | 79.0 | 80 | 74.5 | 75.4 | 74.0 | 74.9 | 73.4 | 74.3 | 81 |
| 60710005 | CA | San Bernardino | 110.3 | 112 | 100.3 | 101.8 | 99.2 | 100.7 | 97.8 | 99.3 | 109 |
| 60710012 | CA | San Bernardino | 95.0 | 98 | 87.3 | 90.1 | 86.4 | 89.2 | 85.4 | 88.1 | 90 |
| 60710306 | CA | San Bernardino | 84.0 | 86 | 76.8 | 78.6 | 76.0 | 77.8 | 75.0 | 76.8 | 83 |
| 60711004 | CA | San Bernardino | 105.7 | 109 | 97.2 | 100.2 | 96.1 | 99.1 | 94.6 | 97.5 | 106 |
| 60711234 | CA | San Bernardino | 72.3 | 76 | 70.6 | 74.2 | 70.3 | 74.0 | 70.0 | 73.6 | 76 |
| 60712002 | CA | San Bernardino | 97.7 | 99 | 90.1 | 91.3 | 89.2 | 90.4 | 88.0 | 89.2 | 102 |
| 60714001 | CA | San Bernardino | 90.3 | 91 | 82.6 | 83.3 | 81.7 | 82.4 | 80.7 | 81.3 | 87 |

[1] No valid official 2020 design value for this monitoring site at the time this table was prepared.

| Site ID | ST | County | 2016 Centered Avg | 2016 Centered Max | 2023 Avg | 2023 Max | 2026 Avg | 2026 Max | 2032 Avg | 2032 Max | 2020 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 60714003 | CA | San Bernardino | 104.0 | 107 | 95.2 | 98.0 | 94.2 | 97.0 | 93.0 | 95.7 | 114 |
| 60719002 | CA | San Bernardino | 87.3 | 89 | 80.1 | 81.6 | 79.3 | 80.9 | 78.5 | 80.0 | 86 |
| 60719004 | CA | San Bernardino | 108.7 | 111 | 99.5 | 101.6 | 98.5 | 100.6 | 97.2 | 99.3 | 110 |
| 60731006 | CA | San Diego | 83.0 | 84 | 76.9 | 77.9 | 76.1 | 77.0 | 74.9 | 75.8 | 79 |
| 60773005 | CA | San Joaquin | 77.3 | 79 | 71.3 | 72.8 | 70.8 | 72.4 | 70.0 | 71.6 | 70 |
| 60990005 | CA | Stanislaus | 81.0 | 82 | 75.4 | 76.3 | 74.7 | 75.6 | 73.3 | 74.2 | 79 |
| 60990006 | CA | Stanislaus | 83.7 | 84 | 77.5 | 77.8 | 76.7 | 77.0 | 75.2 | 75.5 | 80 |
| 61030004 | CA | Tehama | 79.7 | 81 | 72.3 | 73.4 | 71.5 | 72.6 | 69.4 | 70.5 | 74 |
| 61070006 | CA | Tulare | 84.7 | 86 | 79.1 | 80.3 | 78.2 | 79.4 | 76.8 | 77.9 | 83 |
| 61070009 | CA | Tulare | 89.0 | 89 | 82.6 | 82.6 | 81.6 | 81.6 | 80.0 | 80.0 | 88 |
| 61072002 | CA | Tulare | 82.7 | 85 | 75.5 | 77.6 | 74.3 | 76.4 | 72.6 | 74.6 | 83 |
| 61072010 | CA | Tulare | 84.0 | 86 | 77.0 | 78.8 | 75.9 | 77.7 | 74.0 | 75.7 | 80 |
| 61090005 | CA | Tuolumne | 80.7 | 83 | 75.6 | 77.8 | 75.0 | 77.1 | 73.7 | 75.8 | 77 |
| 61112002 | CA | Ventura | 77.3 | 78 | 70.9 | 71.6 | 69.9 | 70.5 | 68.5 | 69.2 | 77 |
| 80350004 | CO | Douglas | 77.3 | 78 | 71.7 | 72.3 | 70.5 | 71.1 | 69.3 | 69.9 | 81 |
| 80590006 | CO | Jefferson | 77.3 | 78 | 72.6 | 73.3 | 71.7 | 72.3 | 70.6 | 71.3 | 79 |
| 80590011 | CO | Jefferson | 79.3 | 80 | 73.8 | 74.4 | 72.6 | 73.3 | 71.4 | 72.0 | 80 |
| 80690011 | CO | Larimer | 75.7 | 77 | 71.3 | 72.6 | 70.6 | 71.8 | 69.9 | 71.1 | 75 |
| 90010017 | CT | Fairfield | 79.3 | 80 | 73.0 | 73.7 | 71.5 | 72.2 | 69.9 | 70.5 | 82 |
| 90013007 | CT | Fairfield | 82.0 | 83 | 74.2 | 75.1 | 72.8 | 73.7 | 71.2 | 72.1 | 80 |
| 90019003 | CT | Fairfield | 82.7 | 83 | 76.1 | 76.4 | 74.6 | 74.8 | 72.9 | 73.1 | 79 |
| 90099002 | CT | New Haven | 79.7 | 82 | 71.8 | 73.9 | 70.4 | 72.4 | 68.7 | 70.7 | 80 |
| 170310001 | IL | Cook | 73.0 | 77 | 69.6 | 73.4 | 68.7 | 72.5 | 67.6 | 71.3 | 75 |
| 170310032 | IL | Cook | 72.3 | 75 | 69.8 | 72.4 | 69.1 | 71.7 | 68.1 | 70.6 | 74 |
| 170310076 | IL | Cook | 72.0 | 75 | 69.3 | 72.1 | 68.5 | 71.3 | 67.4 | 70.2 | 69 |
| 170314201 | IL | Cook | 73.3 | 77 | 69.9 | 73.4 | 68.9 | 72.4 | 67.8 | 71.2 | 77 |
| 170317002 | IL | Cook | 74.0 | 77 | 70.1 | 73.0 | 69.1 | 72.0 | 67.9 | 70.7 | 75 |
| 320030075 | NV | Clark | 75.0 | 76 | 70.0 | 71.0 | 69.0 | 69.9 | 67.8 | 68.7 | 74 |
| 350130021 | NM | Dona Ana | 72.7 | 74 | 70.9 | 72.2 | 70.4 | 71.7 | 69.6 | 70.9 | 78 |
| 350130022 | NM | Dona Ana | 71.3 | 74 | 69.5 | 72.1 | 69.0 | 71.6 | 68.1 | 70.7 | 74 |
| 420170012 | PA | Bucks | 79.3 | 81 | 70.7 | 72.2 | 69.2 | 70.7 | 67.7 | 69.1 | 74 |
| 480391004 | TX | Brazoria | 74.7 | 77 | 70.1 | 72.3 | 69.1 | 71.2 | 67.7 | 69.8 | 73 |
| 481210034 | TX | Denton | 78.0 | 80 | 70.4 | 72.2 | 69.0 | 70.8 | 67.9 | 69.6 | 72 |
| 481410037 | TX | El Paso | 71.3 | 73 | 69.6 | 71.3 | 69.2 | 70.9 | 68.6 | 70.2 | 76 |
| 481671034 | TX | Galveston | 75.7 | 77 | 71.1 | 72.3 | 70.2 | 71.4 | 69.1 | 70.3 | 74 |
| 482010024 | TX | Harris | 79.3 | 81 | 75.2 | 76.8 | 74.2 | 75.7 | 72.8 | 74.3 | 79 |

| Site ID | ST | County | 2016 Centered Avg | 2016 Centered Max | 2023 Avg | 2023 Max | 2026 Avg | 2026 Max | 2032 Avg | 2032 Max | 2020 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 482010055 | TX | Harris | 76.0 | 77 | 71.0 | 72.0 | 69.8 | 70.8 | 68.3 | 69.1 | 76 |
| 482011034 | TX | Harris | 73.7 | 75 | 70.3 | 71.6 | 69.5 | 70.7 | 68.1 | 69.3 | 73 |
| 482011035 | TX | Harris | 71.3 | 75 | 68.0 | 71.6 | 67.2 | 70.7 | 65.9 | 69.3 | 70 |
| 490110004 | UT | Davis | 75.7 | 78 | 72.9 | 75.1 | 71.7 | 73.9 | 71.1 | 73.3 | 77 |
| 490353006 | UT | Salt Lake | 76.3 | 78 | 73.6 | 75.3 | 72.5 | 74.1 | 71.9 | 73.5 | 74 |
| 490353013 | UT | Salt Lake | 76.5 | 77 | 74.4 | 74.9 | 73.5 | 74.0 | 73.0 | 73.5 | 73 |
| 490450004 | UT | Tooele | 73.5 | 74 | 70.8 | 71.3 | 69.8 | 70.3 | 69.3 | 69.7 | 69 |
| 490570002 | UT | Weber | 73.0 | 75 | 70.6 | 72.5 | 69.8 | 71.7 | 69.2 | 71.1 | N/A |
| 490571003 | UT | Weber | 73.0 | 74 | 70.5 | 71.5 | 69.7 | 70.6 | 69.2 | 70.1 | 71 |
| 550590019 | WI | Kenosha | 78.0 | 79 | 72.8 | 73.7 | 71.7 | 72.6 | 70.4 | 71.3 | 74 |
| 550590025 | WI | Kenosha | 73.7 | 77 | 69.2 | 72.3 | 68.1 | 71.1 | 66.9 | 69.9 | 74 |
| 551010020 | WI | Racine | 76.0 | 78 | 71.3 | 73.2 | 70.2 | 72.1 | 69.1 | 70.9 | 73 |
| 551170006 | WI | Sheboygan | 80.0 | 81 | 73.6 | 74.5 | 72.3 | 73.2 | 71.0 | 71.8 | 75 |

Appendix C

Ozone Contributions to
Nonattainment & Maintenance-Only Receptors
(Outside of California) in 2023 and 2026

The tables in this appendix provide projected design values and contribution metric data from each state and the other source tags to nonattainment and maintenance-only receptors outside of California in 2023 and 2026. The contributions and design values are in units of ppb. Contributions to individual monitoring sites is provided in the file: "2016v2_DVs_state_contributions" which can be found in the docket for this proposed rule.

# Design Values and Contributions for 2023 – Part 1

Contributions

| Site ID | ST | County | 2023 Avg | 2023 Max | AL | AZ | AR | CA | CO | CT | DE | DC | FL | GA | ID | IL | IN | IA | KS | KY | LA | ME | MD | MA | MI | MN | MS | MO | MT | NE | NV | NH | NJ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 40278011 | AZ | Yuma | 70.5 | 72.2 | 0.00 | 3.01 | 0.00 | 5.09 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.14 | 0.00 | 0.00 |
| 80350004 | CO | Douglas | 71.7 | 72.3 | 0.00 | 0.27 | 0.00 | 0.91 | 16.24 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.28 | 0.00 | 0.00 | 0.00 | 0.10 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.26 | 0.35 | 0.00 | 0.00 |
| 80590006 | CO | Jefferson | 72.6 | 73.3 | 0.00 | 0.37 | 0.00 | 1.03 | 17.69 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.13 | 0.00 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.05 | 0.37 | 0.00 | 0.00 |
| 80590011 | CO | Jefferson | 73.8 | 74.4 | 0.00 | 0.40 | 0.00 | 1.17 | 18.09 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.16 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.08 | 0.38 | 0.00 | 0.00 |
| 90010017 | CT | Fairfield | 73.0 | 73.7 | 0.02 | 0.00 | 0.08 | 0.02 | 0.03 | 9.53 | 0.27 | 0.01 | 0.01 | 0.03 | 0.01 | 0.46 | 0.69 | 0.10 | 0.05 | 0.54 | 0.11 | 0.00 | 0.63 | 0.05 | 1.07 | 0.13 | 0.05 | 0.20 | 0.05 | 0.04 | 0.01 | 0.01 | 6.90 |
| 90013007 | CT | Fairfield | 74.2 | 75.1 | 0.10 | 0.01 | 0.14 | 0.03 | 0.05 | 4.33 | 0.41 | 0.03 | 0.06 | 0.15 | 0.02 | 0.53 | 0.75 | 0.12 | 0.09 | 0.77 | 0.25 | 0.01 | 1.10 | 0.30 | 0.94 | 0.14 | 0.10 | 0.31 | 0.08 | 0.06 | 0.01 | 0.10 | 7.43 |
| 90019003 | CT | Fairfield | 76.1 | 76.4 | 0.11 | 0.01 | 0.14 | 0.03 | 0.05 | 2.95 | 0.43 | 0.03 | 0.06 | 0.15 | 0.02 | 0.53 | 0.76 | 0.12 | 0.09 | 0.82 | 0.25 | 0.01 | 1.13 | 0.30 | 0.92 | 0.14 | 0.09 | 0.31 | 0.08 | 0.06 | 0.01 | 0.10 | 8.85 |
| 90099002 | CT | New Haven | 71.8 | 73.9 | 0.11 | 0.01 | 0.13 | 0.02 | 0.04 | 4.05 | 0.53 | 0.04 | 0.16 | 0.16 | 0.02 | 0.66 | 0.87 | 0.18 | 0.08 | 0.83 | 0.18 | 0.01 | 1.29 | 0.15 | 1.27 | 0.23 | 0.08 | 0.29 | 0.07 | 0.08 | 0.02 | 0.00 | 5.67 |
| 170310001 | IL | Cook | 69.6 | 73.4 | 0.00 | 0.01 | 0.03 | 0.02 | 0.05 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.03 | 19.54 | 5.44 | 0.56 | 0.32 | 0.06 | 0.02 | 0.00 | 0.00 | 0.00 | 0.93 | 0.97 | 0.00 | 0.28 | 0.09 | 0.18 | 0.01 | 0.00 | 0.00 |
| 170310032 | IL | Cook | 69.8 | 72.4 | 0.00 | 0.03 | 0.07 | 0.04 | 0.08 | 0.00 | 0.00 | 0.00 | 0.06 | 0.00 | 0.03 | 16.71 | 7.03 | 0.58 | 0.59 | 0.05 | 0.08 | 0.00 | 0.00 | 0.01 | 1.21 | 0.62 | 0.00 | 0.56 | 0.07 | 0.23 | 0.01 | 0.00 | 0.01 |
| 170310076 | IL | Cook | 69.3 | 72.1 | 0.00 | 0.01 | 0.02 | 0.02 | 0.05 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.03 | 18.82 | 6.21 | 0.38 | 0.22 | 0.05 | 0.02 | 0.00 | 0.00 | 0.01 | 1.54 | 0.79 | 0.00 | 0.20 | 0.08 | 0.14 | 0.01 | 0.00 | 0.01 |
| 170314201 | IL | Cook | 69.9 | 73.4 | 0.00 | 0.01 | 0.06 | 0.05 | 0.06 | 0.00 | 0.00 | 0.00 | 0.01 | 0.01 | 0.03 | 21.58 | 4.65 | 0.36 | 0.17 | 0.05 | 0.02 | 0.00 | 0.00 | 0.01 | 1.67 | 0.47 | 0.00 | 0.56 | 0.07 | 0.09 | 0.01 | 0.00 | 0.00 |
| 170317002 | IL | Cook | 70.1 | 73.0 | 0.00 | 0.04 | 0.15 | 0.06 | 0.08 | 0.01 | 0.01 | 0.00 | 0.02 | 0.02 | 0.04 | 19.16 | 6.33 | 0.44 | 0.31 | 0.25 | 0.07 | 0.00 | 0.06 | 0.01 | 1.26 | 0.34 | 0.00 | 0.94 | 0.07 | 0.14 | 0.01 | 0.00 | 0.04 |
| 320030075 | NV | Clark | 70.0 | 71.0 | 0.00 | 0.21 | 0.00 | 7.44 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.09 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.30 | 0.75 | 0.15 | 0.03 | 0.18 | 0.06 | 0.05 | 8.46 | 0.00 | 0.00 |
| 420170012 | PA | Bucks | 70.7 | 72.2 | 0.07 | 0.01 | 0.00 | 0.04 | 0.04 | 0.21 | 1.36 | 0.07 | 0.02 | 0.08 | 0.02 | 0.42 | 0.73 | 0.09 | 0.07 | 0.88 | 0.08 | 0.01 | 2.40 | 0.30 | 0.75 | 0.15 | 0.03 | 0.18 | 0.06 | 0.05 | 0.06 | 0.06 | 5.79 |
| 480391004 | TX | Brazoria | 70.1 | 72.3 | 0.50 | 0.00 | 1.39 | 0.01 | 0.03 | 0.00 | 0.00 | 0.00 | 0.10 | 0.17 | 0.01 | 0.10 | 0.11 | 0.10 | 0.12 | 0.16 | 7.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.08 | 0.92 | 0.55 | 0.04 | 0.09 | 0.00 | 0.00 | 0.00 |
| 481210034 | TX | Denton | 70.4 | 72.2 | 0.71 | 0.05 | 0.76 | 0.06 | 0.20 | 0.00 | 0.00 | 0.00 | 0.04 | 0.07 | 0.05 | 0.36 | 0.36 | 0.22 | 0.43 | 0.54 | 3.22 | 0.00 | 0.00 | 0.00 | 0.00 | 0.11 | 1.14 | 0.53 | 0.11 | 0.36 | 0.00 | 0.00 | 0.00 |
| 482010024 | TX | Harris | 75.2 | 76.8 | 0.18 | 0.00 | 0.67 | 0.00 | 0.06 | 0.00 | 0.00 | 0.00 | 0.11 | 0.03 | 0.00 | 0.01 | 0.01 | 0.18 | 0.18 | 0.01 | 4.31 | 0.00 | 0.00 | 0.00 | 0.00 | 0.12 | 0.37 | 0.30 | 0.01 | 0.10 | 0.00 | 0.00 | 0.00 |
| 482010055 | TX | Harris | 71.0 | 72.0 | 0.88 | 0.03 | 1.00 | 0.02 | 0.07 | 0.00 | 0.00 | 0.00 | 0.16 | 0.09 | 0.01 | 0.13 | 0.19 | 0.26 | 0.28 | 0.26 | 5.39 | 0.00 | 0.00 | 0.00 | 0.00 | 0.26 | 1.04 | 0.50 | 0.04 | 0.18 | 0.00 | 0.00 | 0.00 |
| 482011034 | TX | Harris | 70.3 | 71.6 | 0.13 | 0.01 | 1.38 | 0.01 | 0.02 | 0.00 | 0.00 | 0.00 | 0.15 | 0.07 | 0.01 | 0.03 | 0.07 | 0.07 | 0.17 | 0.00 | 4.93 | 0.00 | 0.00 | 0.00 | 0.00 | 0.07 | 0.31 | 0.57 | 0.03 | 0.13 | 0.00 | 0.00 | 0.02 |
| 482011035 | TX | Harris | 68.0 | 71.6 | 0.12 | 0.01 | 1.34 | 0.01 | 0.02 | 0.00 | 0.00 | 0.00 | 0.14 | 0.07 | 0.01 | 0.01 | 0.01 | 0.06 | 0.16 | 0.00 | 4.77 | 0.00 | 0.00 | 0.00 | 0.00 | 0.07 | 0.30 | 0.55 | 0.03 | 0.09 | 0.00 | 0.00 | 0.00 |
| 490110004 | UT | Davis | 72.9 | 75.1 | 0.00 | 0.22 | 0.00 | 2.25 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.37 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.09 | 0.86 | 0.00 | 0.00 |
| 490353006 | UT | Salt Lake | 73.6 | 75.3 | 0.00 | 0.22 | 0.00 | 2.46 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.36 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.89 | 0.00 | 0.00 |
| 490353013 | UT | Salt Lake | 74.4 | 74.9 | 0.00 | 0.13 | 0.00 | 1.42 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.55 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.63 | 0.00 | 0.00 |
| 490570002 | UT | Weber | 70.6 | 72.5 | 0.00 | 0.13 | 0.00 | 2.24 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.53 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.58 | 0.00 | 0.00 |
| 490571003 | UT | Weber | 70.5 | 71.5 | 0.00 | 0.12 | 0.00 | 2.16 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.57 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.56 | 0.00 | 0.00 |
| 550590019 | WI | Kenosha | 72.8 | 73.7 | 0.01 | 0.02 | 0.19 | 0.05 | 0.06 | 0.01 | 0.00 | 0.00 | 0.04 | 0.00 | 0.02 | 18.13 | 6.60 | 0.64 | 0.41 | 0.27 | 0.13 | 0.00 | 0.05 | 0.02 | 1.07 | 0.39 | 0.01 | 1.08 | 0.05 | 0.13 | 0.01 | 0.00 | 0.04 |
| 550590025 | WI | Kenosha | 69.2 | 72.3 | 0.05 | 0.01 | 0.47 | 0.03 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 18.55 | 7.10 | 0.35 | 0.12 | 0.10 | 0.56 | 0.00 | 0.01 | 0.01 | 1.17 | 0.43 | 0.24 | 1.66 | 0.05 | 0.06 | 0.01 | 0.00 | 0.05 |
| 551010020 | WI | Racine | 71.3 | 73.2 | 0.01 | 0.21 | 0.21 | 0.05 | 0.05 | 0.01 | 0.01 | 0.00 | 0.06 | 0.00 | 0.02 | 13.86 | 6.60 | 0.63 | 0.42 | 0.38 | 0.18 | 0.00 | 0.07 | 0.03 | 1.02 | 0.50 | 0.50 | 0.92 | 0.05 | 0.14 | 0.01 | 0.00 | 0.05 |

## Design Values and Contributions for 2023 – Part 2

| Site ID | ST | County | NM | NY | NC | ND | OH | OK | OR | PA | RI | SC | SD | TN | TX | UT | VT | VA | WA | WV | WI | WY | TRIBAL | Canada & Mexico | Offshore | Fires | Initial & Boundary | Biogenic |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 40278011 | AZ | Yuma | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.09 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.10 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 7.61 | 0.38 | 3.45 | 48.69 | 1.81 |
| 80350004 | CO | Douglas | 0.25 | 0.00 | 0.00 | 0.01 | 0.00 | 0.06 | 0.20 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.16 | 1.37 | 0.00 | 0.00 | 0.09 | 0.09 | 0.00 | 0.81 | 0.05 | 0.40 | 0.04 | 1.39 | 44.50 | 3.78 |
| 80590006 | CO | Jefferson | 0.30 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 0.11 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.16 | 1.10 | 0.00 | 0.01 | 0.05 | 0.00 | 0.00 | 0.46 | 0.03 | 0.48 | 0.05 | 1.12 | 45.63 | 3.25 |
| 80590014 | CO | Jefferson | 0.25 | 0.01 | 0.00 | 0.00 | 0.00 | 0.03 | 0.15 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.08 | 1.06 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.46 | 0.04 | 0.45 | 0.05 | 1.34 | 46.16 | 3.21 |
| 90010017 | CT | Fairfield | 0.02 | 16.81 | 0.15 | 0.06 | 1.18 | 0.08 | 0.01 | 5.44 | 0.06 | 0.03 | 0.03 | 0.13 | 0.29 | 0.02 | 0.01 | 0.50 | 0.03 | 0.66 | 0.13 | 0.04 | 0.00 | 2.48 | 0.40 | 0.30 | 18.94 | 3.91 |
| 90013007 | CT | Fairfield | 0.04 | 13.56 | 0.43 | 0.10 | 1.87 | 0.14 | 0.03 | 6.37 | 0.04 | 0.16 | 0.04 | 0.26 | 0.51 | 0.03 | 0.02 | 1.19 | 0.05 | 1.30 | 0.16 | 0.06 | 0.00 | 2.02 | 0.69 | 0.24 | 21.23 | 4.97 |
| 90019003 | CT | Fairfield | 0.05 | 14.36 | 0.43 | 0.10 | 1.90 | 0.15 | 0.03 | 6.90 | 0.04 | 0.16 | 0.04 | 0.27 | 0.53 | 0.03 | 0.02 | 1.19 | 0.05 | 1.34 | 0.16 | 0.07 | 0.00 | 1.93 | 0.66 | 0.26 | 21.58 | 5.04 |
| 90099002 | CT | New Haven | 0.03 | 11.54 | 0.61 | 0.12 | 1.94 | 0.10 | 0.02 | 4.74 | 0.01 | 0.19 | 0.05 | 0.26 | 0.35 | 0.02 | 0.01 | 1.77 | 0.05 | 1.45 | 0.19 | 0.05 | 0.00 | 2.52 | 1.16 | 0.32 | 21.60 | 5.30 |
| 170310001 | IL | Cook | 0.05 | 0.09 | 0.00 | 0.37 | 0.82 | 0.55 | 0.03 | 0.20 | 0.00 | 0.00 | 0.07 | 0.00 | 0.86 | 0.02 | 0.00 | 0.02 | 0.07 | 0.11 | 2.41 | 0.05 | 0.00 | 0.87 | 0.07 | 0.17 | 26.83 | 7.16 |
| 170310032 | IL | Cook | 0.09 | 0.24 | 0.00 | 0.23 | 1.26 | 0.75 | 0.03 | 0.26 | 0.00 | 0.00 | 0.06 | 0.00 | 1.46 | 0.05 | 0.01 | 0.01 | 0.06 | 0.08 | 2.61 | 0.06 | 0.00 | 1.16 | 0.14 | 0.25 | 24.77 | 7.91 |
| 170310076 | IL | Cook | 0.04 | 0.30 | 0.00 | 0.30 | 1.23 | 0.35 | 0.03 | 0.30 | 0.00 | 0.00 | 0.06 | 0.00 | 0.59 | 0.01 | 0.01 | 0.01 | 0.06 | 0.09 | 2.47 | 0.05 | 0.00 | 1.37 | 0.05 | 0.18 | 26.32 | 6.64 |
| 170314201 | IL | Cook | 0.06 | 0.31 | 0.00 | 0.18 | 1.23 | 0.36 | 0.04 | 0.28 | 0.00 | 0.00 | 0.04 | 0.00 | 1.15 | 0.02 | 0.01 | 0.01 | 0.07 | 0.07 | 2.55 | 0.07 | 0.00 | 1.51 | 0.04 | 0.19 | 24.32 | 7.20 |
| 170317002 | IL | Cook | 0.09 | 0.30 | 0.02 | 0.14 | 1.69 | 0.52 | 0.04 | 0.51 | 0.00 | 0.01 | 0.04 | 0.02 | 1.58 | 0.06 | 0.01 | 0.11 | 0.07 | 0.26 | 1.47 | 0.08 | 0.00 | 1.31 | 0.09 | 0.25 | 22.49 | 8.83 |
| 320030075 | NV | Clark | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.07 | 0.07 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.06 | 0.00 | 1.28 | 0.34 | 0.67 | 49.59 | 1.75 |
| 420170012 | PA | Bucks | 0.03 | 1.80 | 0.33 | 0.06 | 1.88 | 0.10 | 0.02 | 18.09 | 0.04 | 0.07 | 0.03 | 0.25 | 0.27 | 0.02 | 0.02 | 1.63 | 0.03 | 1.44 | 0.13 | 0.05 | 0.00 | 1.38 | 0.20 | 0.23 | 23.24 | 5.09 |
| 480391004 | TX | Brazoria | 0.01 | 0.00 | 0.03 | 0.11 | 0.04 | 0.11 | 0.01 | 0.01 | 0.00 | 0.00 | 0.04 | 0.36 | 29.89 | 0.01 | 0.00 | 0.02 | 0.01 | 0.01 | 0.02 | 0.03 | 0.00 | 0.17 | 1.74 | 0.43 | 19.46 | 5.81 |
| 481210034 | TX | Denton | 0.13 | 0.00 | 0.00 | 0.10 | 0.11 | 1.19 | 0.02 | 0.00 | 0.00 | 0.01 | 0.09 | 0.94 | 27.30 | 0.07 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.01 | 0.00 | 0.29 | 0.18 | 1.21 | 21.94 | 7.03 |
| 482010024 | TX | Harris | 0.02 | 0.00 | 0.00 | 0.03 | 0.00 | 0.25 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.06 | 30.28 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.01 | 0.01 | 0.00 | 0.16 | 2.29 | 1.21 | 30.06 | 4.00 |
| 482010055 | TX | Harris | 0.07 | 0.00 | 0.02 | 0.06 | 0.03 | 0.30 | 0.01 | 0.00 | 0.00 | 0.01 | 0.03 | 0.60 | 28.25 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.01 | 0.01 | 0.00 | 0.43 | 1.99 | 0.89 | 21.60 | 5.67 |
| 482011034 | TX | Harris | 0.03 | 0.00 | 0.00 | 0.10 | 0.00 | 0.21 | 0.00 | 0.00 | 0.00 | 0.01 | 0.04 | 0.07 | 30.82 | 0.01 | 0.00 | 0.01 | 0.02 | 0.00 | 0.01 | 0.02 | 0.00 | 0.25 | 1.60 | 1.51 | 22.31 | 5.00 |
| 482011035 | TX | Harris | 0.03 | 0.00 | 0.02 | 0.09 | 0.00 | 0.20 | 0.00 | 0.00 | 0.00 | 0.01 | 0.04 | 0.07 | 29.81 | 0.01 | 0.00 | 0.01 | 0.02 | 0.00 | 0.01 | 0.05 | 0.00 | 0.24 | 1.55 | 1.46 | 21.58 | 4.84 |
| 490110004 | UT | Davis | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.44 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 8.82 | 0.00 | 0.00 | 0.16 | 0.00 | 0.00 | 0.05 | 0.00 | 0.49 | 0.09 | 2.90 | 52.77 | 3.26 |
| 490353006 | UT | Salt Lake | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.42 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 9.00 | 0.00 | 0.00 | 0.15 | 0.00 | 0.00 | 0.04 | 0.00 | 0.48 | 0.09 | 3.00 | 53.12 | 3.15 |
| 490353013 | UT | Salt Lake | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.58 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 9.26 | 0.00 | 0.00 | 0.21 | 0.00 | 0.00 | 0.05 | 0.00 | 0.25 | 0.05 | 3.15 | 54.94 | 2.96 |
| 490570002 | UT | Weber | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.41 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 6.85 | 0.00 | 0.00 | 0.13 | 0.00 | 0.00 | 0.07 | 0.00 | 0.57 | 0.10 | 2.50 | 53.33 | 3.01 |
| 490571003 | UT | Weber | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.40 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 6.00 | 0.00 | 0.00 | 0.13 | 0.00 | 0.00 | 0.07 | 0.00 | 0.52 | 0.10 | 2.50 | 54.28 | 2.97 |
| 550590019 | WI | Kenosha | 0.06 | 0.24 | 0.02 | 0.11 | 1.67 | 0.57 | 0.03 | 0.46 | 0.00 | 0.01 | 0.03 | 0.02 | 1.72 | 0.03 | 0.01 | 0.10 | 0.05 | 0.23 | 6.06 | 0.05 | 0.00 | 1.10 | 0.15 | 0.25 | 19.42 | 10.70 |
| 550590025 | WI | Kenosha | 0.07 | 0.27 | 0.00 | 0.14 | 1.33 | 0.41 | 0.24 | 0.24 | 0.00 | 0.00 | 0.04 | 0.13 | 1.81 | 0.02 | 0.00 | 0.00 | 0.05 | 0.04 | 2.82 | 0.06 | 0.00 | 1.50 | 0.16 | 0.22 | 19.53 | 8.98 |
| 551010020 | WI | Racine | 0.06 | 0.24 | 0.03 | 0.12 | 1.00 | 0.49 | 0.03 | 0.42 | 0.00 | 0.01 | 0.03 | 0.04 | 1.34 | 0.03 | 0.01 | 0.14 | 0.05 | 0.23 | 11.13 | 0.04 | 0.00 | 0.82 | 0.19 | 0.31 | 18.26 | 10.71 |

Design Values and Contributions for 2026 – Part 1

| Site ID | ST | County | 2026 Avg | 2026 Max | Contributions | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | AL | AZ | AR | CA | CO | CT | DE | DC | FL | GA | ID | IL | IN | IA | KS | KY | LA | ME | MD | MA | MI | MN | MS | MO | MT | NE | NV | NH | NJ |
| 40278011 | AZ | Yuma | 70.1 | 71.8 | 0.00 | 2.83 | 0.00 | 4.85 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.13 | 0.00 | 0.00 |
| 80350004 | CO | Douglas | 70.5 | 71.1 | 0.00 | 0.23 | 0.00 | 0.88 | 15.63 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.25 | 0.00 | 0.00 | 0.00 | 0.10 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.23 | 0.31 | 0.00 | 0.00 |
| 80590006 | CO | Jefferson | 71.7 | 72.3 | 0.00 | 0.32 | 0.00 | 0.99 | 17.27 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.12 | 0.00 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.05 | 0.33 | 0.00 | 0.00 |
| 80590011 | CO | Jefferson | 72.6 | 73.3 | 0.00 | 0.35 | 0.00 | 1.12 | 17.61 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.15 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.07 | 0.34 | 0.00 | 0.00 |
| 90010017 | CT | Fairfield | 71.5 | 72.2 | 0.02 | 0.00 | 0.08 | 0.01 | 0.03 | 9.34 | 0.26 | 0.01 | 0.00 | 0.02 | 0.01 | 0.44 | 0.64 | 0.09 | 0.05 | 0.11 | 0.00 | 0.00 | 0.60 | 0.05 | 1.02 | 0.12 | 0.05 | 0.18 | 0.04 | 0.04 | 0.00 | 0.01 | 6.60 |
| 90013007 | CT | Fairfield | 72.8 | 73.7 | 0.10 | 0.01 | 0.13 | 0.03 | 0.05 | 4.11 | 0.42 | 0.03 | 0.06 | 0.13 | 0.02 | 0.52 | 0.71 | 0.10 | 0.09 | 0.75 | 0.24 | 0.01 | 1.11 | 0.29 | 0.89 | 0.13 | 0.09 | 0.28 | 0.07 | 0.05 | 0.01 | 0.09 | 7.24 |
| 90019003 | CT | Fairfield | 74.6 | 74.8 | 0.10 | 0.01 | 0.13 | 0.03 | 0.05 | 2.86 | 0.42 | 0.03 | 0.06 | 0.14 | 0.02 | 0.51 | 0.71 | 0.10 | 0.09 | 0.80 | 0.25 | 0.01 | 1.08 | 0.29 | 0.88 | 0.13 | 0.09 | 0.28 | 0.07 | 0.05 | 0.01 | 0.02 | 8.54 |
| 90099002 | CT | New Haven | 70.4 | 72.4 | 0.10 | 0.01 | 0.12 | 0.01 | 0.04 | 3.88 | 0.52 | 0.04 | 0.05 | 0.15 | 0.02 | 0.64 | 0.82 | 0.17 | 0.08 | 0.80 | 0.18 | 0.01 | 1.23 | 0.14 | 1.21 | 0.21 | 0.08 | 0.27 | 0.07 | 0.07 | 0.00 | 0.02 | 5.47 |
| 170310001 | IL | Cook | 68.7 | 72.5 | 0.00 | 0.00 | 0.03 | 0.02 | 0.05 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.02 | 19.36 | 5.41 | 0.50 | 0.31 | 0.06 | 0.02 | 0.00 | 0.00 | 0.00 | 0.88 | 0.91 | 0.00 | 0.26 | 0.08 | 0.16 | 0.00 | 0.00 | 0.00 |
| 170310032 | IL | Cook | 69.1 | 71.7 | 0.00 | 0.03 | 0.07 | 0.04 | 0.07 | 0.00 | 0.00 | 0.00 | 0.05 | 0.00 | 0.02 | 16.57 | 6.99 | 0.51 | 0.57 | 0.05 | 0.08 | 0.00 | 0.00 | 0.01 | 1.15 | 0.59 | 0.00 | 0.52 | 0.07 | 0.20 | 0.01 | 0.00 | 0.01 |
| 170310076 | IL | Cook | 68.5 | 71.3 | 0.00 | 0.02 | 0.02 | 0.02 | 0.04 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.02 | 18.68 | 6.08 | 0.34 | 0.21 | 0.05 | 0.02 | 0.00 | 0.00 | 0.01 | 1.46 | 0.75 | 0.00 | 0.19 | 0.07 | 0.12 | 0.00 | 0.00 | 0.00 |
| 170314201 | IL | Cook | 68.9 | 72.4 | 0.00 | 0.01 | 0.06 | 0.05 | 0.05 | 0.00 | 0.00 | 0.01 | 0.01 | 0.00 | 0.03 | 21.38 | 4.54 | 0.32 | 0.17 | 0.05 | 0.02 | 0.00 | 0.00 | 0.01 | 1.58 | 0.44 | 0.00 | 0.51 | 0.07 | 0.08 | 0.01 | 0.00 | 0.00 |
| 170317002 | IL | Cook | 69.1 | 72.0 | 0.00 | 0.03 | 0.14 | 0.06 | 0.08 | 0.01 | 0.00 | 0.01 | 0.02 | 0.00 | 0.03 | 18.89 | 6.18 | 0.39 | 0.30 | 0.25 | 0.07 | 0.00 | 0.06 | 0.01 | 1.19 | 0.32 | 0.00 | 0.85 | 0.07 | 0.13 | 0.01 | 0.00 | 0.03 |
| 480391004 | TX | Brazoria | 69.1 | 71.2 | 0.48 | 0.00 | 1.30 | 0.01 | 0.03 | 0.00 | 0.00 | 0.00 | 0.09 | 0.16 | 0.10 | 0.10 | 0.10 | 0.10 | 0.11 | 0.15 | 6.97 | 0.00 | 0.00 | 0.00 | 0.00 | 0.08 | 0.90 | 0.50 | 0.04 | 0.08 | 0.00 | 0.00 | 0.00 |
| 482010024 | TX | Harris | 74.2 | 75.7 | 0.17 | 0.00 | 0.62 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.10 | 0.03 | 0.00 | 0.01 | 0.01 | 0.16 | 0.17 | 0.01 | 4.25 | 0.00 | 0.00 | 0.00 | 0.00 | 0.11 | 0.36 | 0.28 | 0.01 | 0.09 | 0.00 | 0.00 | 0.00 |
| 490110004 | UT | Davis | 71.7 | 73.9 | 0.00 | 0.19 | 0.00 | 2.18 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.33 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.78 | 0.00 | 0.00 |
| 490353006 | UT | Salt Lake | 72.5 | 74.1 | 0.00 | 0.00 | 0.00 | 2.38 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.31 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.81 | 0.00 | 0.00 |
| 490353013 | UT | Salt Lake | 73.5 | 74.0 | 0.00 | 0.11 | 0.00 | 1.36 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.48 | 0.48 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.56 | 0.00 | 0.00 |
| 490570002 | UT | Weber | 69.8 | 71.7 | 0.00 | 0.11 | 0.00 | 2.13 | 0.01 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.48 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.51 | 0.00 | 0.00 |
| 550590019 | WI | Kenosha | 71.7 | 72.6 | 0.00 | 0.02 | 0.18 | 0.05 | 0.05 | 0.01 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 17.81 | 6.43 | 0.57 | 0.40 | 0.26 | 0.13 | 0.00 | 0.05 | 0.02 | 1.03 | 0.36 | 0.01 | 0.98 | 0.04 | 0.11 | 0.01 | 0.00 | 0.03 |
| 550590025 | WI | Kenosha | 68.1 | 71.1 | 0.05 | 0.01 | 0.44 | 0.03 | 0.05 | 0.01 | 0.01 | 0.00 | 0.00 | 0.00 | 0.03 | 18.14 | 6.98 | 0.30 | 0.12 | 0.09 | 0.55 | 0.00 | 0.00 | 0.01 | 1.11 | 0.40 | 0.23 | 1.53 | 0.05 | 0.05 | 0.00 | 0.01 | 0.01 |
| 551010020 | WI | Racine | 70.2 | 72.1 | 0.01 | 0.02 | 0.19 | 0.05 | 0.05 | 0.01 | 0.01 | 0.00 | 0.05 | 0.00 | 0.02 | 13.54 | 6.52 | 0.57 | 0.41 | 0.36 | 0.17 | 0.00 | 0.07 | 0.03 | 0.96 | 0.46 | 0.01 | 0.84 | 0.04 | 0.12 | 0.01 | 0.01 | 0.05 |

## Design Values and Contributions for 2026 – Part 2

| Site ID | ST | County | NM | NY | NC | ND | OH | OK | OR | PA | RI | SC | SD | TN | TX | UT | VT | VA | WA | WV | WI | WY | TRIBAL | Canada & Mexico | Offshore | Fires | Initial & Boundary | Biogenic |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 40278011 | AZ | Yuma | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.08 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 7.89 | 0.35 | 3.61 | 48.29 | 1.85 |
| 80350004 | CO | Douglas | 0.23 | 0.00 | 0.00 | 0.01 | 0.00 | 0.06 | 0.17 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.15 | 1.18 | 0.00 | 0.00 | 0.08 | 0.00 | 0.00 | 0.80 | 0.05 | 0.39 | 0.04 | 1.32 | 44.39 | 3.82 |
| 80590006 | CO | Jefferson | 0.29 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 0.10 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.15 | 0.95 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.46 | 0.04 | 0.47 | 0.04 | 1.08 | 45.48 | 3.31 |
| 80590011 | CO | Jefferson | 0.24 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.13 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.08 | 0.90 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.45 | 0.04 | 0.44 | 0.05 | 1.32 | 45.81 | 3.23 |
| 90010017 | CT | Fairfield | 0.02 | 16.58 | 0.13 | 0.05 | 1.10 | 0.07 | 0.01 | 5.32 | 0.00 | 0.03 | 0.02 | 0.12 | 0.26 | 0.01 | 0.00 | 0.48 | 0.03 | 0.61 | 0.12 | 0.04 | 0.00 | 2.37 | 0.40 | 0.30 | 18.80 | 4.00 |
| 90013007 | CT | Fairfield | 0.04 | 13.28 | 0.38 | 0.09 | 1.76 | 0.13 | 0.02 | 6.36 | 0.04 | 0.15 | 0.03 | 0.24 | 0.47 | 0.02 | 0.02 | 1.14 | 0.04 | 1.19 | 0.15 | 0.06 | 0.00 | 1.93 | 0.72 | 0.24 | 21.14 | 5.12 |
| 90019003 | CT | Fairfield | 0.04 | 14.18 | 0.38 | 0.09 | 1.78 | 0.14 | 0.02 | 6.82 | 0.04 | 0.15 | 0.25 | 0.25 | 0.49 | 0.02 | 0.02 | 1.13 | 0.04 | 1.23 | 0.15 | 0.06 | 0.00 | 1.85 | 0.67 | 0.25 | 21.47 | 5.18 |
| 90099002 | CT | New Haven | 0.03 | 11.29 | 0.54 | 0.11 | 1.83 | 0.10 | 0.02 | 4.74 | 0.01 | 0.17 | 0.04 | 0.24 | 0.33 | 0.02 | 0.01 | 1.68 | 0.04 | 1.35 | 0.18 | 0.05 | 0.00 | 2.42 | 1.17 | 0.32 | 21.58 | 5.46 |
| 170310001 | IL | Cook | 0.05 | 0.09 | 0.00 | 0.34 | 0.78 | 0.52 | 0.03 | 0.20 | 0.00 | 0.00 | 0.06 | 0.00 | 0.82 | 0.01 | 0.00 | 0.01 | 0.06 | 0.09 | 2.23 | 0.05 | 0.00 | 0.83 | 0.07 | 0.17 | 26.61 | 7.32 |
| 170310032 | IL | Cook | 0.09 | 0.23 | 0.00 | 0.22 | 1.22 | 0.72 | 0.02 | 0.27 | 0.00 | 0.00 | 0.05 | 0.00 | 1.39 | 0.01 | 0.00 | 0.01 | 0.05 | 0.07 | 2.44 | 0.06 | 0.00 | 1.12 | 0.14 | 0.25 | 24.75 | 8.12 |
| 170310076 | IL | Cook | 0.04 | 0.29 | 0.00 | 0.28 | 1.18 | 0.33 | 0.02 | 0.31 | 0.00 | 0.00 | 0.05 | 0.00 | 0.57 | 0.01 | 0.01 | 0.01 | 0.06 | 0.08 | 2.29 | 0.04 | 0.00 | 1.32 | 0.05 | 0.18 | 26.25 | 6.79 |
| 170314201 | IL | Cook | 0.06 | 0.29 | 0.00 | 0.17 | 1.19 | 0.34 | 0.03 | 0.29 | 0.00 | 0.03 | 0.00 | 0.00 | 1.09 | 0.02 | 0.01 | 0.00 | 0.06 | 0.07 | 2.36 | 0.06 | 0.00 | 1.45 | 0.04 | 0.19 | 24.13 | 7.38 |
| 170317002 | IL | Cook | 0.09 | 0.29 | 0.02 | 0.13 | 1.62 | 0.49 | 0.04 | 0.51 | 0.00 | 0.00 | 0.03 | 0.01 | 1.49 | 0.05 | 0.01 | 0.10 | 0.06 | 0.24 | 1.36 | 0.08 | 0.00 | 1.26 | 0.09 | 0.25 | 22.41 | 9.06 |
| 480391004 | TX | Brazoria | 0.01 | 0.00 | 0.03 | 0.10 | 0.04 | 0.11 | 0.01 | 0.01 | 0.00 | 0.02 | 0.04 | 0.34 | 29.28 | 0.01 | 0.00 | 0.01 | 0.02 | 0.01 | 0.01 | 0.02 | 0.00 | 0.16 | 1.72 | 0.42 | 19.33 | 5.97 |
| 482010024 | TX | Harris | 0.02 | 0.00 | 0.00 | 0.03 | 0.00 | 0.24 | 0.00 | 0.00 | 0.00 | 0.00 | 0.06 | 0.06 | 29.71 | 0.00 | 0.00 | 0.00 | 0.01 | 0.01 | 0.01 | 0.01 | 0.00 | 0.15 | 2.27 | 1.17 | 29.84 | 4.09 |
| 490110004 | UT | Davis | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.39 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 8.03 | 0.00 | 0.00 | 0.15 | 0.00 | 0.00 | 0.05 | 0.00 | 0.48 | 0.08 | 2.87 | 52.64 | 3.32 |
| 490353006 | UT | Salt Lake | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.37 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 8.29 | 0.00 | 0.00 | 0.14 | 0.00 | 0.00 | 0.04 | 0.00 | 0.48 | 0.09 | 2.98 | 52.97 | 3.23 |
| 490353013 | UT | Salt Lake | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.52 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 8.90 | 0.00 | 0.00 | 0.20 | 0.00 | 0.00 | 0.05 | 0.00 | 0.24 | 0.05 | 3.14 | 54.68 | 3.01 |
| 490570002 | UT | Weber | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.35 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 6.05 | 0.00 | 0.00 | 0.12 | 0.00 | 0.00 | 0.08 | 0.00 | 0.56 | 0.10 | 2.41 | 53.77 | 3.02 |
| 550590019 | WI | Kenosha | 0.06 | 0.23 | 0.02 | 0.11 | 1.59 | 0.54 | 0.03 | 0.45 | 0.00 | 0.00 | 0.02 | 0.02 | 1.61 | 0.03 | 0.00 | 0.10 | 0.04 | 0.21 | 5.84 | 0.05 | 0.00 | 1.06 | 0.15 | 0.24 | 19.42 | 10.98 |
| 550590025 | WI | Kenosha | 0.06 | 0.26 | 0.00 | 0.13 | 1.30 | 0.38 | 0.03 | 0.24 | 0.00 | 0.00 | 0.03 | 0.12 | 1.70 | 0.01 | 0.01 | 0.01 | 0.04 | 0.04 | 2.64 | 0.06 | 0.00 | 1.45 | 0.16 | 0.22 | 19.49 | 9.25 |
| 551010020 | WI | Racine | 0.06 | 0.23 | 0.03 | 0.11 | 0.97 | 0.47 | 0.02 | 0.41 | 0.00 | 0.00 | 0.02 | 0.03 | 1.25 | 0.03 | 0.01 | 0.13 | 0.04 | 0.22 | 10.77 | 0.04 | 0.00 | 0.79 | 0.19 | 0.31 | 18.16 | 11.04 |

C-5

2023 average design values, "home state" contributions, total contributions from all upwind states, and the total upwind contribution expresses as a percent of total ozone (i.e., the 2023 average design value). (units are ppb).

| Site ID | State | County | 2023 Average DV | Home State Contribution | Upwind State Contribution | Upwind Contribution as a Percent of 2023 Average DV |
|---------|-------|--------|-----------------|-------------------------|---------------------------|------------------------------------------------------|
| 40278011 | AZ | Yuma | 70.5 | 3.01 | 5.51 | 8% |
| 60070007 | CA | Butte | 68.9 | 23.90 | 1.92 | 3% |
| 60090001 | CA | Calaveras | 70.9 | 21.86 | 0.95 | 1% |
| 60170010 | CA | El Dorado | 76.3 | 27.81 | 1.22 | 2% |
| 60170020 | CA | El Dorado | 74.3 | 29.76 | 1.41 | 2% |
| 60190007 | CA | Fresno | 80.4 | 29.81 | 1.42 | 2% |
| 60190011 | CA | Fresno | 82.9 | 31.77 | 1.54 | 2% |
| 60190242 | CA | Fresno | 79.5 | 27.81 | 1.48 | 2% |
| 60194001 | CA | Fresno | 82.8 | 28.00 | 1.08 | 1% |
| 60195001 | CA | Fresno | 83.7 | 31.01 | 1.37 | 2% |
| 60250005 | CA | Imperial | 76.3 | 6.24 | 0.38 | 0% |
| 60251003 | CA | Imperial | 75.4 | 7.44 | 0.36 | 0% |
| 60290007 | CA | Kern | 82.8 | 26.88 | 1.08 | 1% |
| 60290008 | CA | Kern | 79.1 | 21.41 | 0.78 | 1% |
| 60290011 | CA | Kern | 78.8 | 12.82 | 0.51 | 1% |
| 60290014 | CA | Kern | 81.3 | 27.26 | 0.89 | 1% |
| 60290232 | CA | Kern | 74.9 | 24.97 | 0.89 | 1% |
| 60292012 | CA | Kern | 84.1 | 29.52 | 0.99 | 1% |
| 60295002 | CA | Kern | 82.4 | 25.65 | 1.10 | 1% |
| 60311004 | CA | Kings | 76.9 | 24.20 | 0.97 | 1% |
| 60370002 | CA | Los Angeles | 88.0 | 44.96 | 0.57 | 1% |
| 60370016 | CA | Los Angeles | 93.4 | 47.72 | 0.60 | 1% |
| 60371103 | CA | Los Angeles | 70.5 | 33.04 | 0.58 | 1% |
| 60371201 | CA | Los Angeles | 82.7 | 29.22 | 1.49 | 2% |
| 60371602 | CA | Los Angeles | 73.6 | 36.80 | 0.64 | 1% |
| 60371701 | CA | Los Angeles | 85.6 | 44.86 | 0.56 | 1% |
| 60372005 | CA | Los Angeles | 80.7 | 39.95 | 0.65 | 1% |
| 60376012 | CA | Los Angeles | 91.6 | 36.57 | 0.88 | 1% |
| 60379033 | CA | Los Angeles | 80.7 | 22.84 | 0.49 | 1% |
| 60390004 | CA | Madera | 75.7 | 26.48 | 1.41 | 2% |
| 60392010 | CA | Madera | 77.0 | 25.17 | 1.20 | 2% |
| 60430003 | CA | Mariposa | 74.2 | 5.92 | 0.47 | 1% |
| 60470003 | CA | Merced | 74.7 | 24.52 | 0.88 | 1% |
| 60570005 | CA | Nevada | 78.1 | 26.15 | 1.61 | 2% |
| 60592022 | CA | Orange | 72.5 | 30.83 | 0.30 | 0% |

| Site ID | State | County | 2023 Average DV | Home State Contribution | Upwind State Contribution | Upwind Contribution as a Percent of 2023 Average DV |
|---------|-------|--------|-----------------|-------------------------|---------------------------|-----------------------------------------------------|
| 60595001 | CA | Orange | 72.3 | 36.16 | 0.58 | 1% |
| 60610003 | CA | Placer | 77.1 | 30.88 | 1.46 | 2% |
| 60610004 | CA | Placer | 71.9 | 24.73 | 1.52 | 2% |
| 60610006 | CA | Placer | 72.8 | 33.62 | 1.10 | 2% |
| 60650008 | CA | Riverside | 71.0 | 15.25 | 0.29 | 0% |
| 60650012 | CA | Riverside | 85.9 | 35.87 | 1.01 | 1% |
| 60650016 | CA | Riverside | 72.0 | 26.32 | 0.48 | 1% |
| 60651016 | CA | Riverside | 89.8 | 34.25 | 0.99 | 1% |
| 60652002 | CA | Riverside | 76.4 | 14.29 | 0.66 | 1% |
| 60655001 | CA | Riverside | 80.5 | 22.77 | 0.85 | 1% |
| 60656001 | CA | Riverside | 83.5 | 36.25 | 0.71 | 1% |
| 60658001 | CA | Riverside | 89.5 | 46.52 | 0.59 | 1% |
| 60658005 | CA | Riverside | 87.9 | 45.69 | 0.58 | 1% |
| 60659001 | CA | Riverside | 80.8 | 34.30 | 0.68 | 1% |
| 60670002 | CA | Sacramento | 71.4 | 31.12 | 1.03 | 1% |
| 60670012 | CA | Sacramento | 74.8 | 31.82 | 1.18 | 2% |
| 60675003 | CA | Sacramento | 70.2 | 28.63 | 1.02 | 1% |
| 60710001 | CA | San Bernardino | 74.5 | 13.49 | 0.47 | 1% |
| 60710005 | CA | San Bernardino | 100.3 | 45.37 | 1.13 | 1% |
| 60710012 | CA | San Bernardino | 87.3 | 26.10 | 0.54 | 1% |
| 60710306 | CA | San Bernardino | 76.8 | 27.43 | 0.97 | 1% |
| 60711004 | CA | San Bernardino | 97.2 | 49.90 | 0.65 | 1% |
| 60711234 | CA | San Bernardino | 70.6 | 7.53 | 0.61 | 1% |
| 60712002 | CA | San Bernardino | 90.1 | 45.97 | 0.79 | 1% |
| 60714001 | CA | San Bernardino | 82.6 | 37.01 | 1.27 | 2% |
| 60714003 | CA | San Bernardino | 95.2 | 48.10 | 0.91 | 1% |
| 60719002 | CA | San Bernardino | 80.1 | 19.20 | 0.29 | 0% |
| 60719004 | CA | San Bernardino | 99.5 | 50.28 | 0.95 | 1% |
| 60731006 | CA | San Diego | 76.9 | 28.76 | 0.85 | 1% |
| 60773005 | CA | San Joaquin | 71.3 | 26.61 | 1.07 | 2% |
| 60990005 | CA | Stanislaus | 75.4 | 29.73 | 1.35 | 2% |
| 60990006 | CA | Stanislaus | 77.5 | 27.86 | 1.09 | 1% |
| 61070006 | CA | Tulare | 79.1 | 12.17 | 0.80 | 1% |
| 61070009 | CA | Tulare | 82.6 | 23.16 | 1.10 | 1% |
| 61072002 | CA | Tulare | 75.5 | 27.37 | 1.10 | 1% |
| 61072010 | CA | Tulare | 77.0 | 25.97 | 1.09 | 1% |
| 61090005 | CA | Tuolumne | 75.6 | 17.96 | 1.03 | 1% |
| 61112002 | CA | Ventura | 70.9 | 25.16 | 0.68 | 1% |
| 80350004 | CO | Douglas | 71.7 | 16.25 | 5.27 | 7% |

| Site ID | State | County | 2023 Average DV | Home State Contribution | Upwind State Contribution | Upwind Contribution as a Percent of 2023 Average DV |
|---|---|---|---|---|---|---|
| 80590006 | CO | Jefferson | 72.6 | 17.70 | 4.32 | 6% |
| 80590011 | CO | Jefferson | 73.8 | 18.09 | 4.43 | 6% |
| 90010017 | CT | Fairfield | 73.0 | 9.53 | 37.41 | 51% |
| 90013007 | CT | Fairfield | 74.2 | 4.33 | 40.68 | 55% |
| 90019003 | CT | Fairfield | 76.1 | 2.96 | 43.65 | 57% |
| 90099002 | CT | New Haven | 71.8 | 4.05 | 36.83 | 51% |
| 170310001 | IL | Cook | 69.6 | 19.54 | 14.92 | 21% |
| 170310032 | IL | Cook | 69.8 | 16.71 | 18.82 | 27% |
| 170310076 | IL | Cook | 69.3 | 18.82 | 15.89 | 23% |
| 170314201 | IL | Cook | 69.9 | 21.59 | 15.02 | 21% |
| 170317002 | IL | Cook | 70.1 | 19.16 | 17.94 | 26% |
| 320030075 | NV | Clark | 70.0 | 8.47 | 7.87 | 11% |
| 420170012 | PA | Bucks | 70.7 | 18.10 | 22.43 | 32% |
| 480391004 | TX | Brazoria | 70.1 | 29.89 | 12.57 | 18% |
| 481210034 | TX | Denton | 70.4 | 27.31 | 12.41 | 18% |
| 482010024 | TX | Harris | 75.2 | 30.29 | 7.17 | 10% |
| 482010055 | TX | Harris | 71.0 | 28.25 | 12.14 | 17% |
| 482011034 | TX | Harris | 70.3 | 30.83 | 8.77 | 12% |
| 482011035 | TX | Harris | 68.0 | 29.82 | 8.49 | 12% |
| 490110004 | UT | Davis | 72.9 | 8.83 | 4.54 | 6% |
| 490353006 | UT | Salt Lake | 73.6 | 9.00 | 4.72 | 6% |
| 490353013 | UT | Salt Lake | 74.4 | 9.27 | 3.75 | 5% |
| 490570002 | UT | Weber | 70.6 | 6.86 | 4.19 | 6% |
| 490571003 | UT | Weber | 70.5 | 6.01 | 4.09 | 6% |
| 550590019 | WI | Kenosha | 72.8 | 6.06 | 35.10 | 48% |
| 550590025 | WI | Kenosha | 69.2 | 2.82 | 35.95 | 52% |
| 551010020 | WI | Racine | 71.3 | 11.13 | 29.85 | 42% |

Appendix D

Upwind/Downwind Linkages
By Upwind State

Ozone design values and contribution metric values in this appendix are in units of "ppb". Highlighted design values exceed the 2015 NAAQS.

**Upwind State: Alabama**

| Downwind States | Receptors | 2023 Avg DV | 2023 Max DV | Receptor Status | 2023 Contribution | 2026 Avg DV | 2026 Max DV | Receptor Status | 2026 Contribution |
|---|---|---|---|---|---|---|---|---|---|
| TX | Houston-Bayland Park | 71.0 | 72.0 | Nonattainment | 0.88 | 69.8 | 70.8 | No Longer a Receptor | 0.84 |
| TX | Dallas-Denton | 70.4 | 72.2 | Maintenance-Only | 0.71 | 69.0 | 70.8 | No Longer a Receptor | 0.66 |

**Upwind State: Arkansas**

| Downwind States | Receptors | 2023 Avg DV | 2023 Max DV | Receptor Status | 2023 Contribution | 2026 Avg DV | 2026 Max DV | Receptor Status | 2026 Contribution |
|---|---|---|---|---|---|---|---|---|---|
| TX | Houston-Bayland Park | 71.0 | 72.0 | Nonattainment | 1.00 | 69.8 | 70.8 | No Longer a Receptor | 0.93 |
| TX | Dallas-Denton | 70.4 | 72.2 | Maintenance-Only | 0.76 | 69.0 | 70.8 | No Longer a Receptor | 0.72 |
| TX | Houston-East | 70.3 | 71.6 | Maintenance-Only | 1.38 | 69.0 | 70.8 | No Longer a Receptor | 1.29 |
| TX | Houston-Brazoria | 70.1 | 72.3 | Maintenance-Only | 1.39 | 69.1 | 71.2 | Maintenance-Only | 1.30 |
| TX | Houston-Clinton | 68.0 | 71.6 | Maintenance-Only | 1.34 | 67.2 | 70.7 | No Longer a Receptor | 1.25 |

## Upwind State: California

| Downwind States | Receptors | 2023 Avg DV | 2023 Max DV | Receptor Status | 2023 Contribution | 2026 Avg DV | 2026 Max DV | Receptor Status | 2026 Contribution |
|---|---|---|---|---|---|---|---|---|---|
| AZ | Yuma | 70.5 | 72.2 | Maintenance-Only | 5.09 | 70.1 | 71.8 | Maintenance-Only | 4.85 |
| CA | Morongo Tribe | 89.8 | 90.9 | Nonattainment | 34.24 | 88.8 | 89.9 | Nonattainment | 33.45 |
| CO | Denver-NREL | 73.8 | 74.4 | Nonattainment | 1.17 | 72.6 | 73.3 | Nonattainment | 1.12 |
| CO | Rocky Flats | 72.6 | 73.3 | Nonattainment | 1.03 | 71.7 | 72.3 | Nonattainment | 0.99 |
| CO | Denver-Chatfield | 71.7 | 72.3 | Nonattainment | 0.91 | 70.5 | 71.1 | Maintenance-Only | 0.88 |
| NV | Las Vegas-Northwest | 70.0 | 71.0 | Maintenance-Only | 7.44 | 69.0 | 69.9 | No Longer a Receptor | 7.15 |
| UT | Salt Lake City-Herriman | 74.4 | 74.9 | Nonattainment | 1.42 | 73.5 | 74.0 | Nonattainment | 1.36 |
| UT | Salt Lake City-Hawthorne | 73.6 | 75.3 | Nonattainment | 2.46 | 72.5 | 74.1 | Nonattainment | 2.38 |
| UT | Salt Lake City-Bountiful | 72.9 | 75.1 | Nonattainment | 2.25 | 71.7 | 73.9 | Nonattainment | 2.18 |
| UT | Salt Lake City-Ogden | 70.6 | 72.5 | Maintenance-Only | 2.24 | 69.8 | 71.7 | Maintenance-Only | 2.13 |
| UT | Salt Lake City-Harrisonville | 70.5 | 71.5 | Maintenance-Only | 2.16 | 69.7 | 70.6 | No Longer a Receptor | 2.06 |

## Upwind State: Delaware

| Downwind States | Receptors | 2023 Avg DV | 2023 Max DV | Receptor Status | 2023 Contribution | 2026 Avg DV | 2026 Max DV | Receptor Status | 2026 Contribution |
|---|---|---|---|---|---|---|---|---|---|
| PA | Philadelphia-Bristol | 70.7 | 72.2 | Maintenance-Only | 1.36 | 69.2 | 70.7 | No Longer a Receptor | 1.32 |

D-2

## Upwind State: Illinois

| Downwind States | Receptors | 2023 Avg DV | 2023 Max DV | Receptor Status | 2023 Contribution | 2026 Avg DV | 2026 Max DV | Receptor Status | 2026 Contribution |
|---|---|---|---|---|---|---|---|---|---|
| WI | Kenosha-Water Tower | 72.8 | 73.7 | Nonattainment | 18.13 | 71.7 | 72.6 | Nonattainment | 17.81 |
| WI | Racine | 71.3 | 73.2 | Nonattainment | 13.86 | 70.2 | 72.1 | Maintenance-Only | 13.54 |
| WI | Kenosha-Chiwaukee | 69.2 | 72.3 | Maintenance-Only | 18.55 | 68.1 | 71.1 | Maintenance-Only | 18.14 |

## Upwind State: Indiana

| Downwind States | Receptors | 2023 Avg DV | 2023 Max DV | Receptor Status | 2023 Contribution | 2026 Avg DV | 2026 Max DV | Receptor Status | 2026 Contribution |
|---|---|---|---|---|---|---|---|---|---|
| CT | Westport | 76.1 | 76.4 | Nonattainment | 0.76 | 74.6 | 74.8 | Nonattainment | 0.71 |
| CT | Stratford | 74.2 | 75.1 | Nonattainment | 0.75 | 72.8 | 73.7 | Nonattainment | 0.71 |
| CT | Madison | 71.8 | 73.9 | Nonattainment | 0.87 | 70.4 | 72.4 | Maintenance-Only | 0.82 |
| IL | Chicago-Evanston | 70.1 | 73.0 | Maintenance-Only | 6.33 | 69.1 | 72.0 | Maintenance-Only | 6.18 |
| IL | Chicago-Northbrook | 69.9 | 73.4 | Maintenance-Only | 4.65 | 68.9 | 72.4 | Maintenance-Only | 4.54 |
| IL | Chicago-South | 69.8 | 72.4 | Maintenance-Only | 7.03 | 69.1 | 71.7 | Maintenance-Only | 6.99 |
| IL | Chicago-Alsip | 69.6 | 73.4 | Maintenance-Only | 5.44 | 68.7 | 72.5 | Maintenance-Only | 5.41 |
| IL | Chicago-ComEd | 69.3 | 72.1 | Maintenance-Only | 6.21 | 68.5 | 71.3 | Maintenance-Only | 6.08 |
| PA | Philadelphia-Bristol | 70.7 | 72.2 | Maintenance-Only | 0.73 | 69.2 | 70.7 | No Longer a Receptor | 0.69 |
| WI | Kenosha-Chiwaukee | 72.8 | 73.7 | Nonattainment | 6.60 | 71.7 | 72.6 | Nonattainment | 6.43 |
| WI | Racine | 71.3 | 73.2 | Nonattainment | 6.60 | 70.2 | 72.1 | Maintenance-Only | 6.52 |
| WI | Kenosha-Water Tower | 69.2 | 72.3 | Maintenance-Only | 7.10 | 68.1 | 71.1 | Maintenance-Only | 6.98 |

D-3

**Upwind State: Kentucky**

| Downwind States | Receptors | 2023 Avg DV | 2023 Max DV | Receptor Status | 2023 Contribution | 2026 Avg DV | 2026 Max DV | Receptor Status | 2026 Contribution |
|---|---|---|---|---|---|---|---|---|---|
| CT | Madison | 71.8 | 73.9 | Nonattainment | 0.83 | 70.4 | 72.4 | Maintenance-Only | 0.80 |
| CT | Westport | 76.1 | 76.4 | Nonattainment | 0.82 | 74.6 | 74.8 | Nonattainment | 0.80 |
| CT | Stratford | 74.2 | 75.1 | Nonattainment | 0.77 | 72.8 | 73.7 | Nonattainment | 0.75 |
| PA | Philadelphia-Bristol | 70.7 | 72.2 | Maintenance-Only | 0.88 | 69.2 | 70.7 | No Longer a Receptor | 0.85 |

**Upwind State: Louisiana**

| Downwind States | Receptors | 2023 Avg DV | 2023 Max DV | Receptor Status | 2023 Contribution | 2026 Avg DV | 2026 Max DV | Receptor Status | 2026 Contribution |
|---|---|---|---|---|---|---|---|---|---|
| TX | Houston-Brazoria | 70.1 | 72.3 | Maintenance-Only | 7.03 | 69.1 | 71.2 | Maintenance-Only | 6.97 |
| TX | Dallas-Denton | 70.4 | 72.2 | Maintenance-Only | 3.22 | 69.0 | 70.8 | No Longer a Receptor | 3.17 |
| TX | Houston-Aldine | 75.2 | 76.8 | Nonattainment | 4.31 | 74.2 | 75.7 | Nonattainment | 4.25 |
| TX | Houston-Bayland Park | 71.0 | 72.0 | Nonattainment | 5.39 | 69.8 | 70.8 | No Longer a Receptor | 5.33 |
| TX | Houston-East | 70.3 | 71.6 | Maintenance-Only | 4.93 | 69.5 | 70.7 | No Longer a Receptor | 4.89 |
| TX | Houston-Clinton | 68.0 | 71.6 | Maintenance-Only | 4.77 | 67.2 | 70.7 | No Longer a Receptor | 4.73 |

D-4

**Upwind State: Maryland**

| Downwind States | Receptors | 2023 Avg DV | 2023 Max DV | Receptor Status | 2023 Contribution | 2026 Avg DV | 2026 Max DV | Receptor Status | 2026 Contribution |
|---|---|---|---|---|---|---|---|---|---|
| CT | Stratford | 74.2 | 75.1 | Nonattainment | 1.10 | 72.8 | 73.7 | Nonattainment | 1.11 |
| CT | Westport | 76.1 | 76.4 | Nonattainment | 1.13 | 74.6 | 74.8 | Nonattainment | 1.08 |
| CT | Madison | 71.8 | 73.9 | Nonattainment | 1.29 | 70.4 | 72.4 | Maintenance-Only | 1.23 |
| PA | Philadelphia-Bristol | 70.7 | 72.2 | Maintenance-Only | 2.40 | 69.2 | 70.7 | No Longer a Receptor | 2.28 |

**Upwind State: Michigan**

| Downwind States | Receptors | 2023 Avg DV | 2023 Max DV | Receptor Status | 2023 Contribution | 2026 Avg DV | 2026 Max DV | Receptor Status | 2026 Contribution |
|---|---|---|---|---|---|---|---|---|---|
| CT | Greenwich | 73.0 | 73.7 | Nonattainment | 1.07 | 71.5 | 72.2 | Nonattainment | 1.02 |
| CT | Stratford | 74.2 | 75.1 | Nonattainment | 0.94 | 72.8 | 73.7 | Nonattainment | 0.89 |
| CT | Westport | 76.1 | 76.4 | Nonattainment | 0.92 | 74.6 | 74.8 | Nonattainment | 0.88 |
| CT | Madison | 71.8 | 73.9 | Nonattainment | 1.27 | 70.4 | 72.4 | Maintenance-Only | 1.21 |
| IL | Chicago-Alsip | 69.6 | 73.4 | Maintenance-Only | 0.93 | 68.7 | 72.5 | Maintenance-Only | 0.88 |
| IL | Chicago-South | 69.8 | 72.4 | Maintenance-Only | 1.21 | 69.1 | 71.7 | Maintenance-Only | 1.15 |
| IL | Chicago-ComEd | 69.3 | 72.1 | Maintenance-Only | 1.54 | 68.5 | 71.3 | Maintenance-Only | 1.46 |
| IL | Chicago-Northbrook | 69.9 | 73.4 | Maintenance-Only | 1.67 | 68.9 | 72.4 | Maintenance-Only | 1.58 |
| IL | Chicago-Evanston | 70.1 | 73.0 | Maintenance-Only | 1.26 | 69.1 | 72.0 | Maintenance-Only | 1.19 |
| PA | Philadelphia-Bristol | 70.7 | 72.2 | Maintenance-Only | 0.75 | 69.2 | 70.7 | No Longer a Receptor | 0.71 |
| WI | Kenosha-Water Tower | 72.8 | 73.7 | Nonattainment | 1.07 | 71.7 | 72.6 | Nonattainment | 1.03 |
| WI | Kenosha-Chiwaukee | 69.2 | 72.3 | Maintenance-Only | 1.17 | 68.1 | 71.1 | Maintenance-Only | 1.11 |
| WI | Racine | 71.3 | 73.2 | Nonattainment | 1.02 | 70.2 | 72.1 | Maintenance-Only | 0.96 |

## Upwind State: Minnesota

| Downwind States | Receptors | 2023 Avg DV | 2023 Max DV | Receptor Status | 2023 Contribution | 2026 Avg DV | 2026 Max DV | Receptor Status | 2026 Contribution |
|---|---|---|---|---|---|---|---|---|---|
| IL | Chicago-Alsip | 69.6 | 73.4 | Maintenance-Only | 0.97 | 68.7 | 72.5 | Maintenance-Only | 0.91 |
| IL | Chicago-ComEd | 69.3 | 72.1 | Maintenance-Only | 0.79 | 68.5 | 71.3 | Maintenance-Only | 0.75 |

## Upwind State: Mississippi

| Downwind States | Receptors | 2023 Avg DV | 2023 Max DV | Receptor Status | 2023 Contribution | 2026 Avg DV | 2026 Max DV | Receptor Status | 2026 Contribution |
|---|---|---|---|---|---|---|---|---|---|
| TX | Houston-Brazoria | 70.1 | 72.3 | Maintenance-Only | 0.92 | 69.1 | 71.2 | Maintenance-Only | 0.90 |
| TX | Dallas-Denton | 70.4 | 72.2 | Maintenance-Only | 1.14 | 69.0 | 70.8 | No Longer a Receptor | 1.09 |
| TX | Houston-Bayland Park | 71.0 | 72.0 | Nonattainment | 1.04 | 69.8 | 70.8 | No Longer a Receptor | 1.02 |

## Upwind State: Missouri

| Downwind States | Receptors | 2023 Avg DV | 2023 Max DV | Receptor Status | 2023 Contribution | 2026 Avg DV | 2026 Max DV | Receptor Status | 2026 Contribution |
|---|---|---|---|---|---|---|---|---|---|
| IL | Chicago-Evanston | 70.1 | 73.0 | Maintenance-Only | 0.94 | 69.1 | 72.0 | Maintenance-Only | 0.85 |
| WI | Kenosha-Water Tower | 72.8 | 73.7 | Nonattainment | 1.08 | 71.7 | 72.6 | Nonattainment | 0.98 |
| WI | Kenosha-Chiwaukee | 69.2 | 72.3 | Maintenance-Only | 1.66 | 68.1 | 71.1 | Maintenance-Only | 1.53 |
| WI | Racine | 71.3 | 73.2 | Nonattainment | 0.92 | 70.2 | 72.1 | Maintenance-Only | 0.84 |

**Upwind State: Nevada**

| Downwind States | Receptors | 2023 Avg DV | 2023 Max DV | Receptor Status | 2023 Contribution | 2026 Avg DV | 2026 Max DV | Receptor Status | 2026 Contribution |
|---|---|---|---|---|---|---|---|---|---|
| UT | Salt Lake City-Bountiful | 72.9 | 75.1 | Nonattainment | 0.86 | 71.7 | 73.9 | Nonattainment | 0.78 |
| UT | Salt Lake City-Hawthorne | 73.6 | 75.3 | Nonattainment | 0.89 | 72.5 | 74.1 | Nonattainment | 0.81 |

**Upwind State: New Jersey**

| Downwind States | Receptors | 2023 Avg DV | 2023 Max DV | Receptor Status | 2023 Contribution | 2026 Avg DV | 2026 Max DV | Receptor Status | 2026 Contribution |
|---|---|---|---|---|---|---|---|---|---|
| CT | Greenwich | 73.0 | 73.7 | Nonattainment | 6.90 | 71.5 | 72.2 | Nonattainment | 6.60 |
| CT | Stratford | 74.2 | 75.1 | Nonattainment | 7.43 | 72.8 | 73.7 | Nonattainment | 7.24 |
| CT | Westport | 76.1 | 76.4 | Nonattainment | 8.85 | 74.6 | 74.8 | Nonattainment | 8.54 |
| CT | Madison | 71.8 | 73.9 | Nonattainment | 5.67 | 70.4 | 72.4 | Maintenance-Only | 5.47 |
| PA | Philadelphia-Bristol | 70.7 | 72.2 | Maintenance-Only | 5.79 | 69.2 | 70.7 | No Longer a Receptor | 5.51 |

**Upwind State: New York**

| Downwind States | Receptors | 2023 Avg DV | 2023 Max DV | Receptor Status | 2023 Contribution | 2026 Avg DV | 2026 Max DV | Receptor Status | 2026 Contribution |
|---|---|---|---|---|---|---|---|---|---|
| CT | Greenwich | 73.0 | 73.7 | Nonattainment | 16.81 | 71.5 | 72.2 | Nonattainment | 16.58 |
| CT | Stratford | 74.2 | 75.1 | Nonattainment | 13.56 | 72.8 | 73.7 | Nonattainment | 13.28 |
| CT | Westport | 76.1 | 76.4 | Nonattainment | 14.36 | 74.6 | 74.8 | Nonattainment | 14.18 |
| CT | Madison | 71.8 | 73.9 | Nonattainment | 11.54 | 70.4 | 72.4 | Maintenance-Only | 11.29 |
| PA | Philadelphia-Bristol | 70.7 | 72.2 | Maintenance-Only | 1.80 | 69.2 | 70.7 | No Longer a Receptor | 1.73 |

**Upwind State: Ohio**

| Downwind States | Receptors | 2023 Avg DV | 2023 Max DV | Receptor Status | 2023 Contribution | 2026 Avg DV | 2026 Max DV | Receptor Status | 2026 Contribution |
|---|---|---|---|---|---|---|---|---|---|
| CT | Greenwich | 73.0 | 73.7 | Nonattainment | 1.18 | 71.5 | 72.2 | Nonattainment | 1.10 |
| CT | Stratford | 74.2 | 75.1 | Nonattainment | 1.87 | 72.8 | 73.7 | Nonattainment | 1.76 |
| CT | Westport | 76.1 | 76.4 | Nonattainment | 1.90 | 74.6 | 74.8 | Nonattainment | 1.78 |
| CT | Madison | 71.8 | 73.9 | Nonattainment | 1.94 | 70.4 | 72.4 | Maintenance-Only | 1.83 |
| IL | Chicago-Alsip | 69.6 | 73.4 | Maintenance-Only | 0.82 | 68.7 | 72.5 | Maintenance-Only | 0.78 |
| IL | Chicago-South | 69.8 | 72.4 | Maintenance-Only | 1.26 | 69.1 | 71.7 | Maintenance-Only | 1.22 |
| IL | Chicago-ComEd | 69.3 | 72.1 | Maintenance-Only | 1.23 | 68.5 | 71.3 | Maintenance-Only | 1.18 |
| IL | Chicago-Northbrook | 69.9 | 73.4 | Maintenance-Only | 1.23 | 68.9 | 72.4 | Maintenance-Only | 1.19 |
| IL | Chicago-Evanston | 70.1 | 73.0 | Maintenance-Only | 1.69 | 69.1 | 72.0 | Maintenance-Only | 1.62 |
| PA | Philadelphia-Bristol | 70.7 | 72.2 | Maintenance-Only | 1.88 | 69.2 | 70.7 | No Longer a Receptor | 1.76 |
| WI | Kenosha-Water Tower | 72.8 | 73.7 | Nonattainment | 1.67 | 71.7 | 72.6 | Nonattainment | 1.59 |
| WI | Kenosha-Chiwaukee | 69.2 | 72.3 | Maintenance-Only | 1.33 | 68.1 | 71.1 | Maintenance-Only | 1.30 |
| WI | Racine | 71.3 | 73.2 | Nonattainment | 1.00 | 70.2 | 72.1 | Maintenance-Only | 0.97 |

**Upwind State: Oklahoma**

| Downwind States | Receptors | 2023 Avg DV | 2023 Max DV | Receptor Status | 2023 Contribution | 2026 Avg DV | 2026 Max DV | Receptor Status | 2026 Contribution |
|---|---|---|---|---|---|---|---|---|---|
| IL | Chicago-South | 69.8 | 72.4 | Maintenance-Only | 0.75 | 69.1 | 71.7 | Maintenance-Only | 0.72 |
| TX | Dallas-Denton | 70.4 | 72.2 | Maintenance-Only | 1.19 | 69.0 | 70.8 | No Longer a Receptor | 1.12 |

D-8

**Upwind State: Pennsylvania**

| Downwind States | Receptors | 2023 Avg DV | 2023 Max DV | Receptor Status | 2023 Contribution | 2026 Avg DV | 2026 Max DV | Receptor Status | 2026 Contribution |
|---|---|---|---|---|---|---|---|---|---|
| CT | Greenwich | 73.0 | 73.7 | Nonattainment | 5.44 | 71.5 | 72.2 | Nonattainment | 5.32 |
| CT | Stratford | 74.2 | 75.1 | Nonattainment | 6.37 | 72.8 | 73.7 | Nonattainment | 6.36 |
| CT | Westport | 76.1 | 76.4 | Nonattainment | 6.90 | 74.6 | 74.8 | Nonattainment | 6.82 |
| CT | Madison | 71.8 | 73.9 | Nonattainment | 4.74 | 70.4 | 72.4 | Maintenance-Only | 4.74 |

**Upwind State: Tennessee**

| Downwind States | Receptors | 2023 Avg DV | 2023 Max DV | Receptor Status | 2023 Contribution | 2026 Avg DV | 2026 Max DV | Receptor Status | 2026 Contribution |
|---|---|---|---|---|---|---|---|---|---|
| TX | Dallas-Denton | 70.4 | 72.2 | Maintenance-Only | 0.94 | 69.0 | 70.8 | No Longer a Receptor | 0.87 |

**Upwind State: Texas**

| Downwind States | Receptors | 2023 Avg DV | 2023 Max DV | Receptor Status | 2023 Contribution | 2026 Avg DV | 2026 Max DV | Receptor Status | 2026 Contribution |
|---|---|---|---|---|---|---|---|---|---|
| IL | Chicago-Alsip | 69.6 | 73.4 | Maintenance-Only | 0.86 | 68.7 | 72.5 | Maintenance-Only | 0.82 |
| IL | Chicago-South | 69.8 | 72.4 | Maintenance-Only | 1.46 | 69.1 | 71.7 | Maintenance-Only | 1.39 |
| IL | Chicago-Northbrook | 69.9 | 73.4 | Maintenance-Only | 1.15 | 68.9 | 72.4 | Maintenance-Only | 1.09 |
| IL | Chicago-Evanston | 70.1 | 73.0 | Maintenance-Only | 1.58 | 69.1 | 72.0 | Maintenance-Only | 1.49 |
| WI | Kenosha-Water Tower | 72.8 | 73.7 | Nonattainment | 1.72 | 71.7 | 72.6 | Nonattainment | 1.61 |
| WI | Kenosha-Chiwaukee | 69.2 | 72.3 | Maintenance-Only | 1.81 | 68.1 | 71.1 | Maintenance-Only | 1.70 |
| WI | Racine | 71.3 | 73.2 | Nonattainment | 1.34 | 70.2 | 72.1 | Maintenance-Only | 1.25 |

D-9

## Upwind State: Utah

| Downwind States | Receptors | 2023 Avg DV | 2023 Max DV | Receptor Status | 2023 Contribution | 2026 Avg DV | 2026 Max DV | Receptor Status | 2026 Contribution |
|---|---|---|---|---|---|---|---|---|---|
| CO | Denver-Chatfield | 71.7 | 72.3 | Nonattainment | 1.37 | 70.5 | 71.1 | Maintenance-Only | 1.18 |
| CO | Rocky Flats | 72.6 | 73.3 | Nonattainment | 1.10 | 71.7 | 72.3 | Nonattainment | 0.95 |
| CO | Denver-NREL | 73.8 | 74.4 | Nonattainment | 1.06 | 72.6 | 73.3 | Nonattainment | 0.90 |

## Upwind State: Virginia

| Downwind States | Receptors | 2023 Avg DV | 2023 Max DV | Receptor Status | 2023 Contribution | 2026 Avg DV | 2026 Max DV | Receptor Status | 2026 Contribution |
|---|---|---|---|---|---|---|---|---|---|
| CT | Stratford | 74.2 | 75.1 | Nonattainment | 1.19 | 72.8 | 73.7 | Nonattainment | 1.14 |
| CT | Westport | 76.1 | 76.4 | Nonattainment | 1.19 | 74.6 | 74.8 | Nonattainment | 1.13 |
| CT | Madison | 71.8 | 73.9 | Nonattainment | 1.77 | 70.4 | 72.4 | Maintenance-Only | 1.68 |
| PA | Philadelphia-Bristol | 70.7 | 72.2 | Maintenance-Only | 1.63 | 69.2 | 70.7 | No Longer a Receptor | 1.52 |

## Upwind State: West Virginia

| Downwind States | Receptors | 2023 Avg DV | 2023 Max DV | Receptor Status | 2023 Contribution | 2026 Avg DV | 2026 Max DV | Receptor Status | 2026 Contribution |
|---|---|---|---|---|---|---|---|---|---|
| CT | Stratford | 74.2 | 75.1 | Nonattainment | 1.30 | 72.8 | 73.7 | Nonattainment | 1.19 |
| CT | Westport | 76.1 | 76.4 | Nonattainment | 1.34 | 74.6 | 74.8 | Nonattainment | 1.23 |
| CT | Madison | 71.8 | 73.9 | Nonattainment | 1.45 | 70.4 | 72.4 | Maintenance-Only | 1.35 |
| PA | Philadelphia-Bristol | 70.7 | 72.2 | Maintenance-Only | 1.44 | 69.2 | 70.7 | No Longer a Receptor | 1.34 |

| Upwind State: Wisconsin | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Downwind States | Receptors | 2023 Avg DV | 2023 Max DV | Receptor Status | 2023 Contribution | 2026 Avg DV | 2026 Max DV | Receptor Status | 2026 Contribution |
| IL | Chicago/Alsip | 69.6 | 73.4 | Maintenance-Only | 2.41 | 68.7 | 72.5 | Maintenance-Only | 2.23 |
| IL | Chicago/South | 69.8 | 72.4 | Maintenance-Only | 2.61 | 69.1 | 71.7 | Maintenance-Only | 2.44 |
| IL | Chicago/ComEd | 69.3 | 72.1 | Maintenance-Only | 2.47 | 68.5 | 71.3 | Maintenance-Only | 2.29 |
| IL | Chicago/Northbrook | 69.9 | 73.4 | Maintenance-Only | 2.55 | 68.9 | 72.4 | Maintenance-Only | 2.36 |
| IL | Chicago/Evanston | 70.1 | 73.0 | Maintenance-Only | 1.47 | 69.1 | 72.0 | Maintenance-Only | 1.36 |

| Upwind State: Wyoming | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Downwind States | Receptors | 2023 Avg DV | 2023 Max DV | Receptor Status | 2023 Contribution | 2026 Avg DV | 2026 Max DV | Receptor Status | 2026 Contribution |
| CO | Denver-Chatfield | 71.7 | 72.3 | Nonattainment | 0.81 | 70.5 | 71.1 | Maintenance-Only | 0.80 |

Appendix E

Upwind Linkages for
Individual Receptors in 2023 and 2026

| Site ID | State | County | Receptor Name | Upwind States Linked to Individual Receptors in 2023 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 40278011 | AZ | Yuma | Yuma | CA | | | | | | | | | |
| 80350004 | CO | Douglas | Denver-Chatfield | CA | UT | WY | | | | | | | |
| 80590006 | CO | Jefferson | Rocky Flats | CA | UT | | | | | | | | |
| 80590011 | CO | Jefferson | Denver-NREL | CA | UT | | | | | | | | |
| 90010017 | CT | Fairfield | Greenwich | MI | NJ | NY | OH | PA | | | | | |
| 90013007 | CT | Fairfield | Stratford | IN | KY | MD | MI | NJ | NY | OH | PA | VA | WV |
| 90019003 | CT | Fairfield | Westport | IN | KY | MD | MI | NJ | NY | OH | PA | VA | WV |
| 90099002 | CT | New Haven | Madison | IN | KY | MD | MI | NJ | NY | OH | PA | VA | WV |
| 170310001 | IL | Cook | Chicago-Alsip | IN | MI | MN | OH | TX | WI | | | | |
| 170310032 | IL | Cook | Chicago-South | IN | MI | OH | OK | TX | WI | | | | |
| 170310076 | IL | Cook | Chicago-ComEd | IN | MI | MN | OH | WI | | | | | |
| 170314201 | IL | Cook | Chicago-Northbrook | IN | MI | OH | TX | WI | | | | | |
| 170317002 | IL | Cook | Chicago-Evanston | IN | MI | MO | OH | TX | WI | | | | |
| 320030075 | NV | Clark | Las Vega-Northwest | CA | | | | | | | | | |
| 420170012 | PA | Bucks | Philadelphia-Bristol | DE | IN | KY | MD | MI | NJ | NY | OH | VA | WV |
| 480391004 | TX | Brazoria | Houston-Brazoria | AR | LA | MS | | | | | | | |
| 481210034 | TX | Denton | Dallas-Denton | AL | AR | LA | MS | OK | TN | | | | |
| 482010024 | TX | Harris | Houston-Aldine | LA | | | | | | | | | |
| 482010055 | TX | Harris | Houston-Bayland Park | AL | AR | LA | MS | | | | | | |
| 482011034 | TX | Harris | Houston-East | AR | LA | | | | | | | | |
| 482011035 | TX | Harris | Houston-Clinton | AR | LA | | | | | | | | |
| 490110004 | UT | Davis | Salt Lake City-Bountiful | CA | NV | | | | | | | | |
| 490353006 | UT | Salt Lake | Salt Lake City-Hawthorne | CA | NV | | | | | | | | |
| 490353013 | UT | Salt Lake | Salt Lake City-Herriman | CA | | | | | | | | | |
| 490570002 | UT | Weber | Salt Lake City-Ogden | CA | | | | | | | | | |
| 490571003 | UT | Weber | Salt Lake City-Harrisonville | CA | | | | | | | | | |
| 550590019 | WI | Kenosha | Kenosha-Water Tower | IL | IN | MI | MO | TX | | | | | |
| 550590025 | WI | Kenosha | Kenosha-Chiwaukee | IL | IN | MI | MO | TX | | | | | |
| 551010020 | WI | Racine | Racine | IL | IN | MI | MO | TX | | | | | |

| Site ID | State | County | Receptor Name | Upwind States Linked to Individual Receptors in 2026 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 40278011 | AZ | Yuma | Yuma | CA | | | | | | | | | |
| 80350004 | CO | Douglas | Denver-Chatfield | CA | UT | WY | | | | | | | |
| 80590006 | CO | Jefferson | Rocky Flats | CA | UT | | | | | | | | |
| 80590011 | CO | Jefferson | Denver-NREL | CA | UT | | | | | | | | |
| 90010017 | CT | Fairfield | Greenwich | MI | NJ | NY | OH | PA | | | | | |
| 90013007 | CT | Fairfield | Stratford | IN | KY | MD | MI | NJ | NY | OH | PA | VA | WV |
| 90019003 | CT | Fairfield | Westport | IN | KY | MD | MI | NJ | NY | OH | PA | VA | WV |
| 90099002 | CT | New Haven | Madison | IN | KY | MD | MI | NJ | NY | OH | PA | VA | WV |
| 170310001 | IL | Cook | Chicago-Alsip | IN | MI | MN | OH | TX | WI | | | | |
| 170310032 | IL | Cook | Chicago-South | IN | MI | OH | OK | TX | WI | | | | |
| 170310076 | IL | Cook | Chicago-ComEd | IN | MI | MN | OH | WI | | | | | |
| 170314201 | IL | Cook | Chicago-Northbrook | IN | MI | OH | TX | WI | | | | | |
| 170317002 | IL | Cook | Chicago-Evanston | IN | MI | MO | OH | TX | WI | | | | |
| 480391004 | TX | Brazoria | Houston-Brazoria | AR | LA | MS | | | | | | | |
| 482010024 | TX | Harris | Houston-Aldine | LA | | | | | | | | | |
| 490110004 | UT | Davis | Salt Lake City-Bountiful | CA | NV | | | | | | | | |
| 490353006 | UT | Salt Lake | Salt Lake City-Hawthorne | CA | NV | | | | | | | | |
| 490353013 | UT | Salt Lake | Salt Lake City-Herriman | CA | | | | | | | | | |
| 490570002 | UT | Weber | Salt Lake City-Ogden | CA | | | | | | | | | |
| 550590019 | WI | Kenosha | Kenosha-Water Tower | IL | IN | MI | MO | OH | TX | | | | |
| 550590025 | WI | Kenosha | Kenosha-Chiwaukee | IL | IN | MI | MO | OH | TX | | | | |
| 551010020 | WI | Racine | Racine | IL | IN | MI | MO | OH | TX | | | | |

TAB HQ-20: AIR QUALITY STATE IMPLEMENTATION PLANS;
APPROVALS AND PROMULGATIONS: INTERSTATE TRANSPORT OF
AIR POLLUTION FOR THE 2015 8-HOUR OZONE NATIONAL AMBIENT
AIR QUALITY STANDARDS, 88 FED. REG. 9336 (FEB. 13, 2023)
(EPA-HQ-OAR-2021-0663-0020)

**9336**    Federal Register / Vol. 88, No. 29 / Monday, February 13, 2023 / Rules and Regulations

## ENVIRONMENTAL PROTECTION AGENCY

### 40 CFR Part 52

[EPA–HQ–OAR–2021–0663; EPA–R02–OAR–2021–0673; EPA–R03–OAR–2021–0872; EPA–R03–OAR–2021–0873; EPA–R04–OAR–2021–0841; EPA–R05–OAR–2022–0006; EPA–R06–OAR–2021–0801; EPA–R07–OAR–2021–0851; EPA–R08–OAR–2022–0315; EPA–R09–OAR–2022–0394; EPA–R09–OAR–2022–0138; FRL–10209–01–OAR]

**Air Plan Disapprovals; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule; final agency action.

**SUMMARY:** Pursuant to the Federal Clean Air Act (CAA or the Act), the Environmental Protection Agency (EPA or the Agency) is finalizing the disapproval of State Implementation Plan (SIP) submissions for 19 states regarding interstate transport and finalizing a partial approval and partial disapproval of elements of the SIP submission for two states for the 2015 8-hour ozone national ambient air quality standards (NAAQS). The "good neighbor" or "interstate transport" provision requires that each state's SIP contain adequate provisions to prohibit emissions from within the state from significantly contributing to nonattainment or interfering with maintenance of the NAAQS in other states. This requirement is part of the broader set of "infrastructure" requirements, which are designed to ensure that the structural components of each state's air quality management program are adequate to meet the state's responsibilities under the CAA. Disapproving a SIP submission establishes a 2-year deadline for the EPA to promulgate Federal Implementation Plans (FIPs) to address the relevant requirements, unless the EPA approves a subsequent SIP submission that meets these requirements. Disapproval does not start a mandatory sanctions clock. The EPA is deferring final action at this time on the disapprovals it proposed for Tennessee and Wyoming.

**DATES:** The effective date of this final rule is March 15, 2023.

**ADDRESSES:** The EPA has established a docket for this action under Docket ID No. EPA–HQ–OAR–2021–0663. Additional supporting materials associated with this final action are included in certain regional dockets.

*See* the memo "Regional Dockets Containing Additional Supporting Materials for Final Action on 2015 Ozone NAAQS Good Neighbor SIP Submissions" in the docket for this action. All documents in the dockets are listed in the index. Some information is not publicly available, *i.e.*, confidential business information (CBI) or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, is not placed on the internet and will be publicly available only in hard copy form. Publicly available docket materials are available through *https://www.regulations.gov* or please contact the person identified in the **FOR FURTHER INFORMATION CONTACT** section for additional information.

**FOR FURTHER INFORMATION CONTACT:** General questions concerning this document should be addressed to Mr. Thomas Uher, Office of Air Quality Planning and Standards, Air Quality Policy Division, Mail Code C539–04, 109 TW Alexander Drive, Research Triangle Park, NC 27711; telephone number: (919) 541–5534; email address: *uher.thomas@epa.gov.*

**SUPPLEMENTARY INFORMATION:** Throughout this document "we," "us," and "our" refer to the EPA.

References to section numbers in roman numeral refer to sections of this preamble unless otherwise specified.

## I. General Information

### A. How can I get copies of this document and other related information?

The EPA established a Headquarters docket for this action under Docket ID No. EPA–HQ–OAR–2021–0663 and several regional dockets. All documents in the docket are listed in the electronic indexes, which, along with publicly available documents, are available at *https://www.regulations.gov.* Publicly available docket materials are also available in hard copy at the Air and Radiation Docket and Information Center, EPA/DC, William Jefferson Clinton West Building, Room 3334, 1301 Constitution Avenue NW, Washington, DC. Some information in the docket may not be publicly available via the online docket due to docket file size restrictions, such as certain modeling files, or content (*e.g.*, CBI). For further information on the EPA Docket Center services and the current status, please visit us online at *https://www.epa.gov/dockets.*

The EPA also established dockets in each of the EPA Regional offices to help

support the proposals that are now being finalized in this national action. These include all public comments, technical support materials, and other files associated with this final action. Each regional docket contains a memorandum directing the public to the headquarters docket for this final action. While all documents in regional dockets are listed in the electronic indexes at *https://www.regulations.gov,* some information may not be publicly available via the online dockets due to docket file size restrictions, such as certain modeling files, or content (*e.g.*, CBI). Please contact the EPA Docket Center Services for further information.

### B. How is the preamble organized?

**Table of Contents**

I. General Information
  A. How can I get copies of this document and other related information?
  B. How is the preamble organized?
  C. Where do I go if I have state-specific questions?
II. Background and Overview
  A. Description of Statutory Background
  B. Description of the EPA's 4-Step Interstate Transport Framework
  C. Background on the EPA's Ozone Transport Modeling Information
  D. The EPA's Approach to Evaluating Interstate Transport SIPs for the 2015 8-Hour Ozone NAAQS
III. The EPA's Updated Air Quality and Contribution Analysis
  A. Description of Air Quality Modeling for the Final Action
  B. Air Quality Modeling To Identify Nonattainment and Maintenance Receptors
  C. Air Quality Modeling To Quantify Upwind State Contributions
IV. Summary of Bases for Disapproval
  A. Alabama
  B. Arkansas
  C. California
  D. Illinois
  E. Indiana
  F. Kentucky
  G. Louisiana
  H. Maryland
  I. Michigan
  J. Minnesota
  K. Mississippi
  L. Missouri
  M. Nevada
  N. New Jersey
  O. New York
  P. Ohio
  Q. Oklahoma
  R. Texas
  S. Utah
  T. West Virginia
  U. Wisconsin
V. Response to Key Comments
  A. SIP Evaluation Process
  B. Application of the 4-Step Interstate Transport Framework
  C. Good Neighbor Provision Policy
VI. Statutory and Executive Orders Reviews
  A. Executive Orders 12866: Regulatory Planning and Executive Order 13563:

Improving Regulation and Regulatory Review
B. Paperwork Reduction Act (PRA)
C. Regulatory Flexibility Act (RFA)
D. Unfunded Mandates Reform Act of 1995 (UMRA)
E. Executive Order 13132: Federalism
F. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments

G. Executive Order 13045: Protection of Children From Environmental Health and Safety Risks
H. Executive Order 13211: Actions That Significantly Affect Energy Supply, Distribution or Use
I. National Technology Transfer and Advancement Act (NTTAA)
J. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations

K. Congressional Review Act (CRA)
L. Judicial Review

*C. Where do I go if I have state-specific questions?*

The following table identifies the states covered by this final action along with an EPA Regional office contact who can respond to questions about specific SIP submissions.

| Regional offices | States |
|---|---|
| EPA Region 2: Kenneth Fradkin, Air and Radiation Division/Air Programs Branch, EPA Region 2, 290 Broadway, 25th Floor, New York, NY 10007. | New Jersey, New York. |
| EPA Region 3: Mike Gordon, Planning and Implementation Branch, EPA Region III, 1600 JFK Boulevard, Philadelphia, Pennsylvania 19103. | Maryland, West Virginia. |
| EPA Region 4: Evan Adams, Air and Radiation Division/Air Planning and Implementation Branch, EPA Region IV, 61 Forsyth Street SW, Atlanta, Georgia 30303. | Alabama, Kentucky, Mississippi. |
| EPA Region 5: Olivia Davidson, Air & Radiation Division/Air Programs Branch, EPA Region V, 77 W. Jackson Boulevard, Chicago, Illinois 60604–3511. | Indiana, Illinois, Michigan, Minnesota, Ohio, Wisconsin. |
| EPA Region 6: Sherry Fuerst, Air and Radiation Division, EPA Region 6, 1201 Elm Street, Suite 500, Dallas, Texas 75270. | Arkansas, Louisiana, Oklahoma, Texas. |
| EPA Region 7: William Stone, Air and Radiation Division, Air Quality Planning Branch, EPA Region VII, 11201 Renner Boulevard, Lenexa, Kansas 66219. | Missouri. |
| EPA Region 8: Adam Clark, Air and Radiation Division, EPA, Region VIII, Mailcode 8ARD–IO, 1595 Wynkoop Street, Denver, Colorado 80202. | Utah. |
| EPA Region 9: Tom Kelly, Air and Radiation Division, EPA Region IX, 75 Hawthorne St., San Francisco, California 94105. | California, Nevada. |

## II. Background and Overview

The following provides background for the EPA's final action on these SIP submissions related to the interstate transport requirements for the 2015 8-hour ozone NAAQS (2015 ozone NAAQS).

*A. Description of Statutory Background*

On October 1, 2015, the EPA promulgated a revision to the ozone NAAQS (2015 ozone NAAQS), lowering the level of both the primary and secondary standards to 0.070 parts per million (ppm) for the 8-hour standard.[1] Section 110(a)(1) of the CAA requires states to submit, within 3 years after promulgation of a new or revised standard, SIP submissions[2] meeting the applicable requirements of section 110(a)(2).[3] One of these applicable requirements is found in CAA section 110(a)(2)(D)(i)(I), otherwise known as the "good neighbor" or "interstate

transport" provision, which generally requires SIPs to contain adequate provisions to prohibit in-state emissions activities from having certain adverse air quality effects on other states due to interstate transport of pollution. There are two so-called "prongs" within CAA section 110(a)(2)(D)(i)(I). A SIP for a new or revised NAAQS must contain adequate provisions prohibiting any source or other type of emissions activity within the state from emitting air pollutants in amounts that will significantly contribute to nonattainment of the NAAQS in another state (prong 1) or interfere with maintenance of the NAAQS in another state (prong 2). The EPA and states must give independent significance to prong 1 and prong 2 when evaluating downwind air quality problems under CAA section 110(a)(2)(D)(i)(I).[4]

On February 22, 2022, the EPA proposed to disapprove 19 good neighbor SIP submissions from the States of Alabama, Arkansas, Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, Minnesota, Mississippi, Missouri, New Jersey, New York, Ohio, Oklahoma, Tennessee, Texas, West Virginia, and Wisconsin.[5]

On May 24, 2022, the EPA proposed to disapprove four additional good neighbor SIP submissions from the States of California, Nevada, Utah, and Wyoming.[6] On October 25, 2022, the EPA proposed to disapprove a new good neighbor SIP submission from Alabama submitted on June 21, 2022.[7] The EPA is deferring action on the proposals related to the good neighbor SIP submissions from Tennessee and Wyoming at this time. As explained in the notifications of proposed disapproval, the EPA's justification for each of these proposals applies uniform, nationwide analytical methods, policy judgments, and interpretation with respect to the same CAA obligations, *i.e.,* implementation of good neighbor requirements under CAA section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS for states across the country. The EPA's final action is likewise based on this common core of determinations. As indicated at proposal, the EPA is taking a consolidated, single final action

---

[1] National Ambient Air Quality Standards for Ozone, Final Rule, 80 FR 65292 (October 26, 2015). Although the level of the standard is specified in the units of ppm, ozone concentrations are also described in parts per billion (ppb). For example, 0.070 ppm is equivalent to 70 ppb.

[2] The terms "submission," "revision," and "submittal" are used interchangeably in this document.

[3] SIP revisions that are intended to meet the applicable requirements of section 110(a)(1) and (2) of the CAA are often referred to as infrastructure SIPs and the required elements under CAA section 110(a)(2) are referred to as infrastructure requirements.

[4] *See North Carolina* v. *EPA,* 531 F.3d 896, 909–11 (D.C. Cir. 2008) (*North Carolina*).

[5] 87 FR 9545 (February 22, 2022) (Alabama, Mississippi, Tennessee); 87 FR 9798 (February 22, 2022) (Arkansas, Louisiana, Texas); 87 FR 9838 (February 22, 2022) (Illinois, Indiana, Michigan, Minnesota, Ohio, Wisconsin); 87 FR 9498 (February 22, 2022) (Kentucky); 87 FR 9484 (February 22, 2022) (New Jersey, New York); 87 FR 9463 (February 22, 2022) (Maryland); 87 FR 9533 (February 22, 2022) (Missouri); 87 FR 9516 (February 22, 2022) (West Virginia).

[6] 87 FR 31443 (May 24, 2022) (California); 87 FR 31485 (May 24, 2022) (Nevada); 87 FR 31470 (May 24, 2022) (Utah); 87 FR 31495 (May 24, 2022) (Wyoming).

[7] 87 FR 64412 (October 25, 2022) (Alabama). Alabama withdrew its original good neighbor SIP submission on April 21, 2022. *Id.* at 64419.

on the proposed SIP disapprovals.[8] Included in this document is final action on 2015 ozone NAAQS interstate transport SIPs addressing CAA section 110(a)(2)(D)(i)(I) for Alabama, Arkansas, California, Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, Minnesota, Mississippi, Missouri, Nevada, New Jersey, New York, Ohio, Oklahoma, Texas, Utah, West Virginia, and Wisconsin. The 2015 ozone NAAQS interstate transport SIP submissions addressing CAA section 110(a)(2)(D)(i)(I) for Tennessee and Wyoming will be addressed in a separate action.

## B. Description of the EPA's 4-Step Interstate Transport Framework

The EPA used a 4-step interstate transport framework (or 4-step framework) to evaluate each state's implementation plan submission addressing the interstate transport provision for the 2015 ozone NAAQS. The EPA has addressed the interstate transport requirements of CAA section 110(a)(2)(D)(i)(I) with respect to prior NAAQS in several regulatory actions, including the Cross-State Air Pollution Rule (CSAPR), which addressed interstate transport with respect to the 1997 ozone NAAQS as well as the 1997 and 2006 fine particulate matter standards,[9] the Cross-State Air Pollution Rule Update (CSAPR Update)[10] and the Revised CSAPR Update, both of which addressed the 2008 ozone NAAQS.[11]

Shaped through the years by input from state air agencies[12] and other stakeholders on EPA's prior interstate transport rulemakings and SIP actions,[13] as well as a number of court decisions, the EPA has developed and used the following 4-step interstate transport framework to evaluate a state's obligations to eliminate interstate transport emissions under the interstate transport provision for the ozone NAAQS: (1) Identify monitoring sites that are projected to have problems attaining and/or maintaining the NAAQS (*i.e.,* nonattainment and/or maintenance receptors); (2) identify states that impact those air quality problems in other (*i.e.,* downwind) states sufficiently such that the states are considered "linked" and therefore warrant further review and analysis; (3) identify the emissions reductions necessary (if any), applying a multifactor analysis, to eliminate each linked upwind state's significant contribution to nonattainment or interference with maintenance of the NAAQS at the locations identified in Step 1; and (4) adopt permanent and enforceable measures needed to achieve those emissions reductions.

The general steps of this framework allow for some methodological variation, and this can be seen in the evolution of the EPA's analytical process across its prior rulemakings. This also means states have some flexibility in developing analytical methods within this framework (and may also attempt to justify an alternative framework altogether). The four steps of the framework simply provide a reasonable organization to the analysis of the complex air quality challenge of interstate ozone transport. As discussed further throughout this document, the EPA has organized its evaluation of the states' SIP submissions around this analytical framework (including the specific methodologies within each step as evolved over the course of the CSAPR rulemakings since 2011), but where states presented alternative approaches either to the EPA's methodological approaches within the framework, or organized their analysis in some manner that differed from it entirely, we have evaluated those analyses on their merits or, in some cases, identified why even if those approaches were acceptable, the state still does not have an approvable SIP submission as a whole.

## C. Background on the EPA's Ozone Transport Modeling Information

In general, the EPA has performed nationwide air quality modeling to project ozone design values, which are used in combination with measured data to identify nonattainment and maintenance receptors at Step 1. To quantify the contribution of emissions from specific upwind states on 2023 ozone design values for the identified downwind nonattainment and maintenance receptors at Step 2, the EPA performed nationwide, state-level ozone source apportionment modeling for 2023. The source apportionment modeling projected contributions to ozone at receptors from precursor emissions of anthropogenic nitrogen oxides ($NO_X$) and volatile organic compounds (VOCs) in individual upwind states.

The EPA has released several documents containing projected design values, contributions, and information relevant to air agencies for evaluating interstate transport with respect to the 2015 ozone NAAQS. First, on January 6, 2017, the EPA published a notice of data availability (NODA) in which the Agency requested comment on preliminary interstate ozone transport data including projected ozone design values and interstate contributions for 2023 using a 2011 base year platform.[14] In the NODA, the EPA used the year 2023 as the analytic year for this preliminary modeling because that year aligns with the expected attainment year for Moderate ozone nonattainment areas for the 2015 ozone NAAQS.[15] On October 27, 2017, the EPA released a memorandum (October 2017 memorandum) containing updated modeling data for 2023, which incorporated changes made in response to comments on the NODA, and was intended to provide information to assist states' efforts to develop SIP submissions to address interstate transport obligations for the 2008 ozone NAAQS.[16] On March 27, 2018, the EPA issued a memorandum (March 2018 memorandum) noting that the same 2023 modeling data released in the

---

[8] In its proposals, the EPA stated "The EPA may take a consolidated, single final action on all the proposed SIP disapproval actions with respect to obligations under CAA section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS. Should EPA take a single final action on all such disapprovals, this action would be nationally applicable, and the EPA would also anticipate, in the alternative, making and publishing a finding that such final action is based on a determination of nationwide scope or effect." E.g., 87 FR 9463, 9475 n.51.

[9] See Federal Implementation Plans: Interstate Transport of Fine Particulate Matter and Ozone and Correction of SIP Approvals, 76 FR 48208 (August 8, 2011).

[10] Cross-State Air Pollution Rule Update for the 2008 Ozone NAAQS, 81 FR 74504 (October 26, 2016).

[11] In 2019, the United States Court of Appeals for the District of Columbia Circuit (D.C. Circuit) remanded CSAPR Update to the extent it failed to require upwind states to eliminate their significant contribution by the next applicable attainment date by which downwind states must come into compliance with the NAAQS, as established under CAA section 181(a). *Wisconsin* v. *EPA,* 938 F.3d 303, 313 (D.C. Cir. 2019) (*Wisconsin*). The Revised CSAPR Update for the 2008 Ozone NAAQS, 86 FR 23054 (April 30, 2021), responded to the remand of CSAPR Update in *Wisconsin* and the vacatur of a separate rule, the "CSAPR Close-Out," 83 FR 65878 (December 21, 2018), in *New York* v. *EPA,* 781 F. App'x. 4 (D.C. Cir. 2019).

[12] See 63 FR 57356, 57361 (October 27, 1998).

[13] In addition to CSAPR rulemakings, other regional rulemakings addressing ozone transport include the "$NO_X$ SIP Call," 63 FR 57356 (October 27, 1998), and the "Clean Air Interstate Rule" (CAIR), 70 FR 25162 (May 12, 2005).

[14] See Notice of Availability of the Environmental Protection Agency's Preliminary Interstate Ozone Transport Modeling Data for the 2015 8-hour Ozone National Ambient Air Quality Standard (NAAQS), 82 FR 1733 (January 6, 2017).

[15] See 82 FR 1733, 1735 (January 6, 2017).

[16] See Information on the Interstate Transport State Implementation Plan Submissions for the 2008 Ozone National Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I), October 27, 2017 ("October 2017 memorandum"), available in Docket No. EPA–HQ–OAR–2021–0663 or at *https://www.epa.gov/interstate-air-pollution-transport/interstate-air-pollution-transport-memos-and-notices.*

October 2017 memorandum could also be useful for identifying potential downwind air quality problems with respect to the 2015 ozone NAAQS at Step 1 of the 4-step interstate transport framework.[17] The March 2018 memorandum also included the then newly available contribution modeling data for 2023 to assist states in evaluating their impact on potential downwind air quality problems for the 2015 ozone NAAQS under Step 2 of the 4-step interstate transport framework.[18] The EPA subsequently issued two more memoranda in August and October 2018, providing additional information to states developing interstate transport SIP submissions for the 2015 ozone NAAQS concerning, respectively, potential contribution thresholds that may be appropriate to apply in Step 2 of the 4-step interstate transport framework, and considerations for identifying downwind areas that may have problems maintaining the standard at Step 1 of the 4-step interstate transport framework.[19]

Following the release of the modeling data shared in the March 2018 memorandum, the EPA performed updated modeling using a 2016-based emissions modeling platform (*i.e.,* 2016v1). This emissions platform was developed under the EPA/Multi-Jurisdictional Organization (MJO)/state collaborative project.[20] This collaborative project was a multi-year joint effort by the EPA, MJOs, and states to develop a new, more recent emissions platform for use by the EPA and states in regulatory modeling as an improvement over the dated, 2011-based platform that the EPA had used to project ozone design values and contribution data provided in the 2017 and 2018 memoranda. The EPA used the 2016v1 emissions to project ozone design values and contributions for 2023. On October 30, 2020, in the notice of proposed rulemaking for the Revised CSAPR Update, the EPA released and accepted public comment on 2023 modeling that used the 2016v1 emissions platform.[21] Although the Revised CSAPR Update addressed transport for the 2008 ozone NAAQS, the projected design values and contributions from the 2016v1 platform were also useful for identifying downwind ozone problems and linkages with respect to the 2015 ozone NAAQS.[22]

Following the final Revised CSAPR Update, the EPA made further updates to the 2016-based emissions platform to include updated onroad mobile emissions from Version 3 of the EPA's Motor Vehicle Emission Simulator (MOVES) model (MOVES3)[23] and updated emissions projections for electric generating units (EGUs) that reflect the emissions reductions from the Revised CSAPR Update, recent information on plant closures, and other inventory improvements. The construct of the updated emissions platform, 2016v2, is described in the "Technical Support Document (TSD): Preparation of Emissions Inventories for the 2016v2 North American Emissions Modeling Platform," hereafter known as the 2016v2 Emissions Modeling TSD, and is included in Docket No. EPA–HQ–OAR–2021–0663. The EPA performed air quality modeling using the 2016v2 emissions to provide projections of ozone design values and contributions in 2023 that reflect the effects on air quality of the 2016v2 emissions platform. The results of the 2016v2 modeling were used by the EPA as part of the Agency's evaluation of state SIP submissions with respect to Steps 1 and 2 of the 4-step interstate transport framework at the proposal stage of this action. By using the 2016v2 modeling results, the EPA used the most current and technically appropriate information for the proposed rulemakings that were issued earlier in 2022.

The EPA invited and received comments on the 2016v2 emissions inventories and modeling that were used to support proposals related to 2015 ozone NAAQS interstate transport. (The EPA had earlier published the emissions inventories on its website in September of 2021 and invited initial feedback from states and other interested stakeholders.[24]) In response to these comments, the EPA made a number of updates to the 2016v2 inventories and model design to construct a 2016v3 emissions platform which was used to update the air quality modeling. The EPA made additional updates to its modeling in response to comments as well. The EPA is now using this updated modeling to inform its final action on these SIP submissions. Details on the air quality modeling and the methods for projecting design values and determining contributions in 2023 are described in Section III and in the TSD titled "Air Quality Modeling TSD for the 2015 8-hour ozone NAAQS Transport SIP Final Actions," hereafter known as the Final Action AQM TSD.[25][26] Additional details related to the updated 2016v3 emissions platform are located in the TSD titled "Preparation of Emissions Inventories for the 2016v3 North American Emissions Modeling Platform," hereafter known as the 2016v3 Emissions Modeling TSD, included in Docket ID No. EPA–HQ–OAR–2021–0663.[27]

## D. The EPA's Approach To Evaluating Interstate Transport SIPs for the 2015 Ozone NAAQS

The EPA is applying a consistent set of policy judgments across all states for purposes of evaluating interstate transport obligations and the approvability of interstate transport SIP submissions for the 2015 ozone NAAQS under CAA section 110(a)(2)(D)(i)(I). These policy judgments conform with relevant case law and past agency practice as reflected in CSAPR and related rulemakings. Employing a nationally consistent approach is

[17] *See* Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I), March 27, 2018 ("March 2018 memorandum"), available in Docket No. EPA–HQ–OAR–2021–0663 or at *https://www.epa.gov/interstate-air-pollution-transport/interstate-air-pollution-transport-memos-and-notices.*

[18] The March 2018 memorandum, however, provided, "While the information in this memorandum and the associated air quality analysis data could be used to inform the development of these SIPs, the information is not a final determination regarding states' obligations under the good neighbor provision. Any such determination would be made through notice-and-comment rulemaking." March 2018 memorandum at 2.

[19] *See* Analysis of Contribution Thresholds for Use in Clean Air Act Section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards, August 31, 2018 ("August 2018 memorandum"); Considerations for Identifying Maintenance Receptors for Use in Clean Air Act Section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards, October 19, 2018 ("October 2018 memorandum"), available in Docket No. EPA–HQ–OAR–2021–0663 or at *https://www.epa.gov/airmarkets/memo-and-supplemental-information-regarding-interstate-transport-memos-2015-ozone-naaqs.*

[20] The results of this modeling, as well as the underlying modeling files, are included in Docket No. EPA–HQ–OAR–2021–0663.

[21] *See* 85 FR 68964, 68981 (October 30, 2020).

[22] *See* the Air Quality Modeling Technical Support Document for the Final Revised Cross-State Air Pollution Rule Update, included in Docket No. EPA–HQ–OAR–2021–0663.

[23] 86 FR 1106. Additional details and documentation related to the MOVES3 model can be found at *https://www.epa.gov/moves/latest-version-motor-vehicle-emission-simulator-moves.*

[24] *https://www.epa.gov/air-emissions-modeling/2016v2-platform.*

[25] *See* Final Action AQM TSD in Docket ID No. EPA–HQ–OAR–2021–0663

[26] References to section numbers in roman numeral refer to sections of this preamble unless otherwise specified, and references to section numbers in numeric form refer to the Response to Comments document for this final action included in the docket.

[27] *See* 2016v3 Emissions Modeling TSD in Docket ID No. EPA–HQ–OAR–2021–0663.

particularly important in the context of interstate ozone transport, which is a regional-scale pollution problem involving many smaller contributors. Effective policy solutions to the problem of interstate ozone transport going back to the NOₓ SIP Call have necessitated the application of a uniform framework of policy judgments to ensure an "efficient and equitable" approach. *See EPA* v. *EME Homer City Generation, LP,* 572 U.S. 489, 519 (2014) (*EME Homer City*). Some comments on EPA's proposed SIP disapprovals claim the EPA is imposing non-statutory requirements onto SIPs or that the EPA must allow states to take inconsistent approaches to implementing good neighbor requirements. Both views are incorrect; the EPA's use of its longstanding framework to evaluate these SIP submissions reflects a reasonable and consistent approach to implementing the requirements of CAA section 110(a)(2)(D)(i)(I), while remaining open to alternative approaches states may present. These comments are further addressed in Section V and the Response to Comment (RTC) document contained in the docket for this action, Docket ID No. EPA–HQ–OAR–2021–0663.

In the March, August, and October 2018 memoranda, the EPA recognized that states may be able to establish alternative approaches to addressing their interstate transport obligations for the 2015 ozone NAAQS that vary from a nationally uniform framework. The EPA emphasized in these memoranda, however, that such alternative approaches must be technically justified and appropriate in light of the facts and circumstances of each particular state's submission.[28] In general, the EPA continues to believe that deviation from a nationally consistent approach to ozone transport must be substantially justified and have a well-documented technical basis that is consistent with CAA obligations and relevant case law. Where states submitted SIP submissions that rely on any such potential concepts

as the EPA or others may have identified or suggested in the past, the EPA evaluated whether the state adequately justified the technical and legal basis for doing so. For example, the EPA has considered the arguments put forward by Alabama, Missouri, Ohio, Oklahoma, Texas, and Utah related to alternative methods of identifying receptors.[29] The EPA also has considered the arguments attempting to justify an alternative contribution threshold at Step 2 pursuant to the August 2018 memorandum made by Alabama, Arkansas, Illinois, Indiana, Kentucky, Louisiana, Michigan, Mississippi, Missouri, Oklahoma, and Utah,[30] as well as criticisms of the 1 percent of the NAAQS contribution threshold made by Nevada and Ohio.[31] These topics are further addressed in Section V.B as well as the RTC document.

The EPA notes that certain potential concepts included in an attachment to the March 2018 memorandum require unique consideration, and these ideas do not constitute agency guidance with respect to interstate transport obligations for the 2015 ozone NAAQS. Attachment A to the March 2018 memorandum identified a "Preliminary List of Potential Flexibilities" that could potentially inform SIP development. However, the EPA made clear in both the March 2018 memorandum[32] and in Attachment A that the list of ideas was not endorsed by the Agency but rather "comments provided in various forums" on which the EPA sought "feedback from interested stakeholders."[33] Further, Attachment A stated, "EPA is not at this time making any determination that the ideas discussed below are consistent with the requirements of the CAA, nor are we specifically recommending that states use these approaches."[34] Attachment A to the March 2018 memorandum, therefore, does not constitute agency

guidance, but was intended to generate further discussion around potential approaches to addressing ozone transport among interested stakeholders. To the extent states sought to develop or rely on one or more of these ideas in support of their SIP submissions, the EPA reviewed their technical and legal justifications for doing so.[35]

The remainder of this section describes the EPA's analytical framework with respect to analytic year, definition of nonattainment and maintenance receptors, selection of contribution threshold, and multifactor control strategy assessment.

### 1. Selection of Analytic Year

In general, the states and the EPA must implement the interstate transport provision in a manner "consistent with the provisions of [title I of the CAA.]" *See* CAA section 110(a)(2)(D)(i). This requires, among other things, that these obligations are addressed consistently with the timeframes for downwind areas to meet their CAA obligations. With respect to ozone NAAQS, under CAA section 181(a), this means obligations must be addressed "as expeditiously as practicable" and no later than the schedule of attainment dates provided in CAA section 181(a)(1).[36] Several D.C. Circuit court decisions address the issue of the relevant analytic year for the purposes of evaluating ozone transport air-quality problems. On September 13, 2019, the D.C. Circuit issued a decision in *Wisconsin,* remanding the CSAPR Update to the extent that it failed to require upwind states to eliminate their significant contribution by the next applicable attainment date by which downwind states must come into compliance with the NAAQS, as established under CAA section 181(a). *See* 938 F.3d 303, 313.

On May 19, 2020, the D.C. Circuit issued a decision in *Maryland* v. *EPA* that cited the *Wisconsin* decision in holding that the EPA must assess the impact of interstate transport on air quality at the next downwind attainment date, including Marginal area attainment dates, in evaluating the basis for the EPA's denial of a petition under CAA section 126(b) *Maryland* v.

---

[28] March 2018 memorandum at 3 ("EPA also notes that, in developing their own rules, states have flexibility to follow the familiar four-step transport framework (using EPA's analytical approach or somewhat different analytical approaches within this steps) or alternative framework, so long as their chosen approach has adequate technical justification and is consistent with the requirements of the CAA."); August 2018 memorandum at 1 ("The EPA and air agencies should consider whether the recommendations in this guidance are appropriate for each situation."); October 2018 memorandum at 1 ("Following the recommendations in this guidance does not ensure that EPA will approve a SIP revision in all instances where the recommendations are followed, as the guidance may not apply to the facts and circumstances underlying a particular SIP.").

[29] 87 FR 64421–64422 (Alabama); 87 FR 9540–9541 (Missouri); 87 FR 9869–9870 (Ohio); 87 FR 9820–9822 (Oklahoma); 87 FR 9826–9829 (Texas); and 87 FR 31480–31481 (Utah).

[30] 87 FR 64423–64424 (Alabama); 87 FR 9806–9807 (Arkansas); 87 FR 9852–9853 (Illinois); 87 FR 9855–9856 (Indiana); 87 FR 9509–9510 (Kentucky); 87 FR 9815–9816 (Louisiana); 87 FR 9861–9862 (Michigan); 87 FR 9557 (Mississippi); 87 FR 9541–9544 (Missouri); 87 FR 9819 (Oklahoma); 87 FR 31478 (Utah).

[31] 87 FR 31492 (Nevada); 87 FR 9871 (Ohio).

[32] "In addition, the memorandum is accompanied by Attachment A, which provides a preliminary list of potential flexibilities in analytical approaches for developing a good neighbor SIP that may warrant further discussion between EPA and states." March 2018 memorandum at 1.

[33] March 2018 memorandum, Attachment A at A–1.

[34] *Id.*

[35] E.g., 87 FR 64423–64425 (Alabama); 87 FR 31453–31454 (California); 87 FR 9852–9854 (Illinois); 87 FR 9859–9860 (Indiana); 87 FR 9508, 9515 (Kentucky); 87 FR 9861–9862 (Michigan); 87 FR 9869–9870 (Ohio); 87 FR 9798, 9818–9820 (Oklahoma); 87 FR 31477–31481 (Utah); 87 FR 9526–9527 (West Virginia).

[36] For attainment dates for the 2015 ozone NAAQS, refer to CAA section 181(a), 40 CFR 51.1303, and Additional Air Quality Designations for the 2015 Ozone National Ambient Air Quality Standards, 83 FR 25776 (June 4, 2018, effective August 3, 2018).

*EPA,* 958 F.3d 1185, 1203–04 (D.C. Cir. 2020) (*Maryland*). The court noted that "section 126(b) incorporates the Good Neighbor Provision," and, therefore, "EPA must find a violation [of section 126] if an upwind source will significantly contribute to downwind nonattainment at the *next downwind attainment deadline.* Therefore, the agency must evaluate downwind air quality at that deadline, not at some later date." *Id.* at 1204 (emphasis added). The EPA interprets the court's holding in *Maryland* as requiring the states and the Agency, under the good neighbor provision, to assess downwind air quality as expeditiously as practicable and no later than the next applicable attainment date,[37] which at the time of EPA's proposed and final actions on the SIPs addressed in this action is the Moderate area attainment date under CAA section 181 for ozone nonattainment. The Moderate area attainment date for the 2015 ozone NAAQS is August 3, 2024.[38] Thus, 2023 is now the appropriate year for analysis of interstate transport obligations for the 2015 ozone NAAQS, because the 2023 ozone season is the last relevant ozone season during which achieved emissions reductions in linked upwind states could assist downwind states with meeting the August 3, 2024, Moderate area attainment date for the 2015 ozone NAAQS.

The EPA recognizes that the attainment date for nonattainment areas classified as Marginal for the 2015 ozone NAAQS was August 3, 2021. Under the *Maryland* holding, any necessary emissions reductions to satisfy interstate transport obligations should have been implemented by no later than this date. At the time of the statutory deadline to submit interstate transport SIPs (October 1, 2018), many states relied upon the EPA's modeling of the year 2023, and no state provided an alternative analysis using a 2021 analytic year (or the prior 2020 ozone season). However, the EPA must act on SIP submissions using the information available at the time it takes such action,

and it is now past 2021. In this circumstance, the EPA does not believe it would be appropriate to evaluate states' obligations under CAA section 110(a)(2)(D)(i)(I) as of an attainment date that is wholly in the past, because the Agency interprets the interstate transport provision as forward looking. *See* 86 FR 23054, 23074; *see also Wisconsin,* 938 F.3d at 322 (rejecting Delaware's argument that the EPA should have used an analytic year of 2011 instead of 2017). Consequently, in this proposal the EPA will use the analytical year of 2023 to evaluate each state's CAA section 110(a)(2)(D)(i)(I) SIP submission with respect to the 2015 ozone NAAQS.

**2. Step 1 of the 4-Step Interstate Transport Framework**

In Step 1, the EPA identifies monitoring sites that are projected to have problems attaining and/or maintaining the NAAQS in the 2023 analytic year. Where the EPA's analysis shows that a site does not fall under the definition of a nonattainment or maintenance receptor, that site is excluded from further analysis under the EPA's 4-step interstate transport framework. For sites that are identified as a nonattainment or maintenance receptor in 2023, the EPA proceeds to the next step of the 4-step interstate transport framework by identifying which upwind states contribute to those receptors above the contribution threshold.

The EPA's approach to identifying ozone nonattainment and maintenance receptors in this action gives independent consideration to both the "contribute significantly to nonattainment" and the "interfere with maintenance" prongs of CAA section 110(a)(2)(D)(i)(I), consistent with the D.C. Circuit's direction in *North Carolina.*[39]

The EPA identifies nonattainment receptors as those monitoring sites that are projected to have average design values that exceed the NAAQS and that are also measuring nonattainment based on the most recent monitored design values. This approach is consistent with prior transport rulemakings, such as the CSAPR Update, where the EPA defined nonattainment receptors as those areas that both currently measure nonattainment and that the EPA projects will be in nonattainment in the analytic year (*i.e.,* 2023).[40]

In addition, the EPA identifies a receptor to be a "maintenance" receptor for purposes of defining interference with maintenance, consistent with the method used in CSAPR and upheld by the D.C. Circuit in *EME Homer City Generation, L.P.* v. *EPA,* 795 F.3d 118, 136 (D.C. Cir. 2015) (*EME Homer City II*).[41] Specifically, the EPA identified maintenance receptors as those receptors that would have difficulty maintaining the relevant NAAQS in a scenario that takes into account historical variability in air quality at that receptor. The variability in air quality was determined by evaluating the "maximum" future design value at each receptor based on a projection of the maximum measured design value over the relevant period. The EPA interprets the projected maximum future design value to be a potential future air quality outcome consistent with the meteorology that yielded maximum measured concentrations in the ambient data set analyzed for that receptor (*i.e.,* ozone conducive meteorology). The EPA also recognizes that previously experienced meteorological conditions (*e.g.,* dominant wind direction, temperatures, air mass patterns) promoting ozone formation that led to maximum concentrations in the measured data may reoccur in the future. The maximum design value gives a reasonable projection of future air quality at the receptor under a scenario in which such conditions do, in fact, reoccur. The projected maximum design value is used to identify upwind emissions that, under those circumstances, could interfere with the downwind area's ability to maintain the NAAQS.

Recognizing that nonattainment receptors are also, by definition, maintenance receptors, the EPA often uses the term "maintenance-only" to refer to those receptors that are not nonattainment receptors. Consistent with the concepts for maintenance receptors, as described earlier, the EPA identifies "maintenance-only" receptors as those monitoring sites that have projected average design values above the level of the applicable NAAQS, but that are not currently measuring nonattainment based on the most recent official design values. In addition, those

---

[37] The EPA notes that the court in *Maryland* did not have occasion to evaluate circumstances in which the EPA may determine that an upwind linkage to a downwind air quality problem exists at Steps 1 and 2 of the interstate transport framework by a particular attainment date, but for reasons of impossibility or profound uncertainty the Agency is unable to mandate upwind pollution controls by that date. *See Wisconsin,* 938 F.3d at 320. The D.C. Circuit noted in *Wisconsin* that upon a sufficient showing, these circumstances may warrant flexibility in effectuating the purpose of the interstate transport provision.

[38] *See* CAA section 181(a); 40 CFR 51.1303; Additional Air Quality Designations for the 2015 Ozone National Ambient Air Quality Standards, 83 FR 25776 (June 4, 2018, effective August 3, 2018).

[39] *See North Carolina,* 531 F.3d at 910–11 (holding that the EPA must give "independent significance" to each prong of CAA section 110(a)(2)(D)(i)(I)).

[40] *See* 81 FR 74504 (October 26, 2016). This same concept, relying on both current monitoring data

and modeling to define nonattainment receptor, was also applied in CAIR. *See* 70 FR 25241, 25249 (January 14, 2005); *see also North Carolina,* 531 F.3d at 913–14 (affirming as reasonable the EPA's approach to defining nonattainment in CAIR).

[41] *See* 76 FR 48208 (August 8, 2011). The CSAPR Update and Revised CSAPR Update also used this approach. *See* 81 FR 74504 (October 26, 2016) and 86 FR 23054 (April 30, 2021).

monitoring sites with projected average design values below the NAAQS, but with projected maximum design values above the NAAQS are also identified as "maintenance-only" receptors, even if they are currently measuring nonattainment based on the most recent official design values.

As discussed further in Section III.B., in response to comments, the Agency has also taken a closer look at measured ozone levels at monitoring sites in 2021 and 2022 for the purposes of informing the identification of additional receptors in 2023. We find there is a basis to consider certain sites with elevated ozone levels that are not otherwise identified as receptors to be an additional type of maintenance-only receptor given the likelihood that ozone levels above the NAAQS could persist at those locations through at least 2023. We refer to these as violating-monitor maintenance-only receptors ("violating monitors"). For purposes of this action, we use this information only in a confirmatory way for states that are otherwise found to be linked using the modeling-based methodology. The EPA intends to take separate action to address states that are linked only to one or more violating-monitor receptors.

3. Step 2 of the 4-Step Interstate Transport Framework

In Step 2, the EPA quantifies the contribution of each upwind state to each receptor in the 2023 analytic year. The contribution metric used in Step 2 is defined as the average impact from each state to each receptor on the days with the highest ozone concentrations at the receptor based on the 2023 modeling. If a state's contribution value does not equal or exceed the threshold of 1 percent of the NAAQS (*i.e.*, 0.70 ppb for the 2015 ozone NAAQS), the upwind state is not "linked" to a downwind air quality problem, and the EPA, therefore, concludes that the state does not contribute significantly to nonattainment or interfere with maintenance of the NAAQS in the downwind states. However, if a state's contribution equals or exceeds the 1 percent threshold, the state's emissions are further evaluated in Step 3, considering both air quality and cost as part of a multi-factor analysis, to determine what, if any, emissions might be deemed "significant" and, thus, must be eliminated pursuant to the requirements of CAA section 110(a)(2)(D)(i)(I).

In this final action, the EPA relies in the first instance on the 1 percent threshold for the purpose of evaluating a state's contribution to nonattainment or maintenance of the 2015 ozone

NAAQS (*i.e.*, 0.70 ppb) at downwind receptors. This is consistent with the Step 2 approach that the EPA applied in CSAPR for the 1997 ozone NAAQS, which has subsequently been applied in the CSAPR Update and Revised CSAPR Update when evaluating interstate transport obligations for the 2008 ozone NAAQS, and in the EPA's proposals for this action. The EPA continues to find 1 percent to be an appropriate threshold. For ozone, as the EPA found in the CAIR, CSAPR, and CSAPR Update, a portion of the nonattainment problems from anthropogenic sources in the U.S. result from the combined impact of relatively small contributions, typically from multiple upwind states and, in some cases, substantially larger contributions from a subset of particular upwind states, along with contributions from in-state sources. The EPA's analysis shows that much of the ozone transport problem being analyzed in this action is still the result of the collective impacts of contributions from upwind states. Therefore, application of a consistent contribution threshold is necessary to identify those upwind states that should have responsibility for addressing their contribution to the downwind nonattainment and maintenance problems to which they collectively contribute. Continuing to use 1 percent of the NAAQS as the screening metric to evaluate collective contribution from many upwind states also allows the EPA (and states) to apply a consistent framework to evaluate interstate emissions transport under the interstate transport provision from one NAAQS to the next. *See* 81 FR 74518; *see also* 86 FR 23085 (reviewing and explaining rationale from CSAPR, 76 FR 48237–38, for selection of 1 percent threshold).

The EPA's August 2018 memorandum recognizes that in certain circumstances, a state may be able to establish that an alternative contribution threshold of 1 ppb is justifiable. Where a state relies on this alternative threshold in their SIP submission, and where that state determined that it was not linked at Step 2 using the alternative threshold, the EPA evaluated whether the state provided a technically sound assessment of the appropriateness of using this alternative threshold based on the facts and circumstances underlying its application in the particular SIP submission. The states covered by this action that rely on a contribution threshold other than 1 percent of the NAAQS in their 2015 ozone NAAQS good neighbor SIP submission are Alabama, Arkansas, Illinois, Indiana, Kentucky, Louisiana, Michigan,

Mississippi, Missouri, Oklahoma, and Utah. Ohio also criticized the 1 percent of the NAAQS threshold, though it acknowledged it was linked above either a 1 percent of the NAAQS or 1 ppb contribution threshold. Nevada also criticized the 1 percent of the NAAQS contribution threshold, but ultimately relied on it to support its submission.

In the proposals for this action, the EPA evaluated each states' support for the use of an alternative threshold at Step 2 (*e.g.*, 1 ppb), and additionally shared its experience since the issuance of the August 2018 memorandum regarding use of alternative thresholds at Step 2. The EPA solicited comment on the subject as it considered the appropriateness of rescinding the memorandum.[42] The EPA received numerous comments related to both the EPA's evaluation of SIP submissions relying on an alternative threshold, and the EPA's experience with alternative thresholds. The EPA is not, at this time rescinding the August 2018 memorandum; however, for purposes of evaluating contribution thresholds for the 2015 ozone NAAQS, the EPA continues to find the use of an alternative threshold problematic for the reasons stated at proposal. Regardless of the EPA's position on the August 2018 memorandum, the EPA continues to find that the arguments put forth in the SIP submissions of by Alabama, Arkansas, Illinois, Indiana, Kentucky, Louisiana, Michigan, Mississippi, Missouri, Oklahoma, and Utah, as well as arguments in comments received on these actions, to be inadequate. *See* Section V.B.7 and the RTC Document for additional detail.

4. Step 3 of the 4-Step Interstate Transport Framework

Consistent with the EPA's longstanding approach to eliminating significant contribution and interference with maintenance, at Step 3, a multifactor assessment of potential emissions controls is conducted for states linked at Steps 1 and 2. The EPA's analysis at Step 3 in prior Federal actions addressing interstate transport requirements has primarily focused on an evaluation of cost-effectiveness of potential emissions controls (on a marginal cost-per-ton basis), the total emissions reductions that may be achieved by requiring such controls (if applied across all linked upwind states), and an evaluation of the air quality impacts such emissions reductions would have on the downwind receptors to which a state is linked; other factors may potentially be relevant if

---

[42] *See, e.g.,* 87 FR 9551.

adequately supported. In general, where the EPA's or state-provided alternative air quality and contribution modeling establishes that a state is linked at Steps 1 and 2, it will be insufficient at Step 3 for a state merely to point to its existing rules requiring control measures as a basis for SIP approval. In general, the emissions-reducing effects of all existing emissions control requirements are already reflected in the future year projected air quality results of the modeling for Steps 1 and 2. If the state is shown to still be linked to one or more downwind receptor(s) despite these existing controls, but that state believes it has no outstanding good neighbor obligations, the EPA expects the state to provide sufficient justification to support a conclusion by the EPA that the state has adequate provisions prohibiting ''any source or other type of emissions activity within the State from emitting any air pollutant in amounts which will'' ''contribute significantly to nonattainment in, or interfere with maintenance by,'' any other State with respect to the NAAQS. *See* CAA section 110(a)(2)(D)(i)(I). While the EPA has not prescribed a particular method for this assessment, as many commenters note, the EPA expects states at a minimum to present a sufficient technical evaluation. This would typically include information on emissions sources, applicable control technologies, emissions reductions, costs, cost effectiveness, and downwind air quality impacts of the estimated reductions, before concluding that no additional emissions controls should be required.[43] The EPA responds to comment on issues related to Step 3 in Section V.B.8. and in the RTC document.

5. Step 4 of the 4-Step Interstate Transport Framework

At Step 4, states (or the EPA) develop permanent and federally-enforceable control strategies to achieve the emissions reductions determined to be necessary at Step 3 to eliminate significant contribution to nonattainment or interference with

maintenance of the NAAQS.[44] For a state linked at Steps 1 and 2 to rely on an emissions control measure at Step 3 to address its interstate transport obligations, that measure must be included in the state's SIP so that it is permanent and federally enforceable. *See* CAA section 110(a)(2)(D) (''Each such [SIP] shall . . . contain adequate provisions. . . .''). *See also* CAA section 110(a)(2)(A); *Committee for a Better Arvin* v. *EPA*, 786 F.3d 1169, 1175–76 (9th Cir. 2015) (holding that measures relied on by a state to meet CAA requirements must be included in the SIP).

III. The EPA's Updated Air Quality and Contribution Analysis

As noted in Section II, the EPA relied in part on its 2016v2 emissions platform-based air quality modeling to support its proposed interstate transport actions taken in 2022. Following receipt of comments, the EPA updated this modeling, incorporating new information received to create the 2016v3 emissions inventory and making additional updates to improve model performance. Using the 2016v3 emissions inventory, the EPA evaluated modeling projections for air quality monitoring sites and considered current ozone monitoring data at these sites to identify receptors that are anticipated to have problems attaining or maintaining the 2015 ozone NAAQS.

This section presents a summary of the methodology and results of the 2016v3 modeling of 2023, along with the application of the EPA's Step 1 and Step 2 methodology for identifying receptors and upwind states that contribute to those receptors. We also explain that current measured ozone levels based on data for 2021 and preliminary data for 2022 at other monitoring sites (*i.e.*, monitoring sites that are not projected to be receptors in 2023 based on air quality modeling) confirm the likely continuation of elevated ozone levels in 2023 at these locations and confirm that nearly all upwind states in this action are also linked to above 1 percent of the NAAQS to one or more of these monitors.

While all of this information compiled by the EPA (both the modeling and monitoring data) plays a critical role in the basis for this final action, the EPA has also thoroughly evaluated the modeling information and other analyses and arguments presented by the upwind states in their SIP submittals. Our evaluation of the states' analyses was generally set forth in the

proposals, and the EPA in this final action has responded to comments on our evaluation of the various information and arguments made by states. The EPA's final decision to disapprove these states' SIP submittals is based on our evaluation of the entire record, recognizing that states possess the authority in the first instance to propose how they would address their significant contribution to air quality problems in other states. Nonetheless, as explained in the proposals, and in this document and supporting materials in the docket, we conclude that no state included in this action effectively demonstrated that it will not be linked to at least one air quality receptor in 2023, and none of these states' various arguments for alternative approaches ultimately present a satisfactory basis for the EPA to approve these states' SIP submissions.

A. Description of Air Quality Modeling for the Final Action

In this section, the Agency describes the air quality modeling performed consistent with Steps 1 and 2 of the 4-step interstate transport framework to (1) Identify locations where it expects nonattainment or maintenance problems with respect to the 2015 ozone NAAQS for the 2023 analytic year, and (2) quantify the contributions from anthropogenic emissions from upwind states to downwind ozone concentrations at monitoring sites projected to be in nonattainment or have maintenance problems for the 2015 ozone NAAQS in 2023. This section includes information on the air quality modeling platform used in support of the final SIP disapproval action with a focus on the base year and future base case emissions inventories. The EPA also provides the projection of 2023 ozone concentrations and the interstate contributions for 8-hour ozone. The Final Action AQM TSD in Docket ID No. EPA–HQ–OAR–2021–0663 contains more detailed information on the air quality modeling aspects supporting our final action on these SIP submissions.

1. Public Review of Air Quality Modeling Information for the Proposed Action

The EPA provided several opportunities to comment on the emissions modeling platform and air quality modeling results that were used for the proposed SIP submission actions. On September 20, 2021, the EPA publicly released via our web page updated emissions inventories (2016v2) and requested comment from states and

---

[43] Because no state included new enforceable emissions control measures in the submissions under review here, we focus our analysis on whether states justified that no additional controls were required. As examples of general approaches for how a Step 3 analysis could be conducted for their sources, states could look to the CSAPR Update, 81 FR 74504, 74539–51; CSAPR, 76 FR 48208, 48246–63; CAIR, 70 FR 25162, 25195–229; or the NOₓ SIP Call, 63 FR 57356, 57399–405. *See also* Revised CSAPR Update, 86 FR 23054, 23086– 23116. Consistently across these rulemakings, the EPA has developed emissions inventories, analyzed different levels of control stringency at different cost thresholds, and assessed resulting downwind air quality improvements.

[44] The EPA notes that any controls included in an approved SIP are federally-enforceable.

MJOs on these data.[45] In January 2022, the EPA released air quality modeling results including projected ozone design values and contributions from 2023 based on the 2016v2 emissions. At that time the EPA indicated its intent to use these data to support upcoming transport rulemakings. Then, on February 22, 2022, the EPA published proposed disapprovals for 19 interstate transport SIP submissions using the modeling data released in January 2022 and the emissions inventories shared in September 2021.[46] The EPA provided a 60-day comment period on these proposals. On May 24, 2022, the EPA proposed disapprovals for an additional four states' interstate transport SIP submissions using the same modeling platform, and provided a 62-day comment period.[47] The EPA provided a 30-day comment period beginning on October 25, 2022, on the proposed disapproval of Alabama's June 21, 2022, SIP submission, which relied on the same modeling platform as the other noted proposals.[48] In addition to its proposed disapprovals, the EPA also proposed approval of Iowa's, Arizona's, and Colorado's SIP submissions using the 2016v2 modeling and provided 30-day comment periods. 87 FR 9477 (February 22, 2022) (Iowa); 87 FR 37776 (June 24, 2022) (Arizona); and 87 FR 27050 (May 6, 2022) (Colorado).

## 2. Overview of Air Quality Modeling Platform

The EPA used version 3 of the 2016-based modeling platform (i.e., 2016v3) for the air quality modeling for this final SIP disapproval action. This modeling platform includes 2016 base year emissions from anthropogenic and natural sources and future year projected anthropogenic emissions for 2023.[49] The emissions data contained in the 2016v3 platform represent an update to the 2016 version 2 inventories used for the proposal modeling.

The air quality modeling for this final disapproval action was performed for a modeling region (i.e., modeling domain) that covers the contiguous 48 states using a horizontal resolution of 12 x 12 km. The EPA used the CAMx version 7.10 for air quality modeling which is the same model that the EPA used for the proposed rule air quality modeling.[50] Additional information on the 2016-based air quality modeling platform can be found in the Final Action AQM TSD.

*Comments:* Commenters noted that the 2016 base year summer maximum daily average 8-hour (MDA8) ozone predictions from the proposal modeling were biased low compared to the corresponding measured concentrations in certain locations. In this regard, commenters said that model performance statistics for a number of monitoring sites, particularly those in portions of the West and in the area around Lake Michigan, were outside the range of published performance criteria for normalized mean bias (NMB) and normalized mean error (NME) of less than plus or minus 15 percent and less than 25 percent, respectively.[51] Commenters say the EPA must investigate the factors contributing to low bias and make necessary corrections to improve model performance in the modeling supporting final SIP actions. Some commenters said that the EPA should include $NO_X$ emissions from lightning strikes and assess the treatment of other background sources of ozone to improve model performance for the final action. Additional information on the comments on model performance can be found in the RTC document for this final SIP disapproval action.

*EPA Response:* In response to these comments the EPA examined the temporal and spatial characteristics of model under prediction to investigate the possible causes of under prediction of MDA8 ozone concentrations in different regions of the U.S. in the proposal modeling. The EPA's analysis indicates that the under prediction was most extensive during May and June with less bias during July and August in most regions of the U.S. For example, in the Upper Midwest region model under prediction was larger in May and June compared to July through September. Specifically, the normalized mean bias for days with measured concentrations greater than or equal to 60 ppb improved from a 21.4 percent under prediction for May and June to a 12.6 percent under prediction in the period July through September. As described in the AQM TSD, the seasonal pattern in bias in the Upper Midwest region improves somewhat gradually with time from the middle of May to the latter part of June. In view of the seasonal pattern in bias in the Upper Midwest and in other regions of the U.S., the EPA focused its investigation of model performance on model inputs that, by their nature, have the largest temporal variation within the ozone season. These inputs include emissions from biogenic sources and lightning $NO_X$, and contributions from transport of international anthropogenic emissions and natural sources into the U.S. Both biogenic and lightning $NO_X$ emissions in the U.S. dramatically increase from spring to summer.[52][53] In contrast, ozone transported into the U.S. from international anthropogenic and natural sources peaks during the period March through June, with lower contributions during July through September.[54][55] To investigate the impacts of the sources, the EPA conducted sensitivity model runs which focused on the effects on model performance of adding $NO_X$ emissions from lightning strikes, using updated biogenic emissions, and using an alternative approach (described in more detail later in this section) for quantifying transport of ozone and precursor pollutants into the U.S. from international anthropogenic and natural sources. In the air quality modeling for proposal, the amount of transport from international sources was based on a simulation of the hemispheric version of the Community Multi-scale Air Quality

---

[45] *https://www.epa.gov/air-emissions-modeling/2016v2-platform.*

[46] These proposals are listed in footnote 5 of this action.

[47] The EPA also relied on this same modeling data to support proposed Federal Implementation Plans (FIPs) resolving interstate transport obligations for 27 states for the 2015 ozone NAAQS. 87 FR 20036 (April 6, 2022). The EPA allowed 60 days to receive comments on the proposed FIP rule, including acceptance of comment on the 2016v2 emissions inventory-based modeling platform. The EPA then allowed for an additional 15 days via an extension of the comment period. 87 FR 29108 (May 12, 2022).

[48] 87 FR 64412, 64413.

[49] The 2016v3 platform also includes projected emissions for 2026. However, the 2026 data are not applicable and were not used in this final action.

[50] Ramboll Environment and Health, January 2021, *https://www.camx.com.*

[51] Christopher Emery, Zhen Liu, Armistead G. Russell, M. Talat Odman, Greg Yarwood & Naresh Kumar (2017) Recommendations on statistics and benchmarks to assess photochemical model performance, Journal of the Air & Waste Management Association, 67:5, 582–598, DOI: 10.1080/10962247.1265027.

[52] Guenther, A.B., 1997. Seasonal and spatial variations in natural volatile organic compound emissions. Ecol. Appl. 7, 34–45. *http://dx.doi.org/10.1890/1051-0761(1997)007[0034:SASVIN]2.0.CO;2.* Guenther, A., Hewitt, C.N., Erickson, D., Fall, R.

[53] Kang D, Mathur R, Pouliot GA, Gilliam RC, Wong DC. Significant ground-level ozone attributed to lightning-induced nitrogen oxides during summertime over the Mountain West States. NPJ Clim Atmos Sci. 2020 Jan 30;3:6. doi: 10.1038/s41612–020–0108–2. PMID: 32181370; PMCID: PMC7075249.

[54] Jaffe DA, Cooper OR, Fiore AM, Henderson BH, Tonnesen GS, Russell AG, Henze DK, Langford AO, Lin M, Moore T. Scientific assessment of background ozone over the U.S.: Implications for air quality management. Elementa (Wash DC). 2018;6(1):56. doi: 10.1525/elementa.309. PMID: 30364819; PMCID: PMC6198683.

[55] Henderson, B.H., P. Dolwick, C. Jang, A., Eyth, J. Vukovich, R. Mathur, C. Hogrefe, N. Possiel, G. Pouliot, B. Timin, K.W. Appel, 2019. Global Sources of North American Ozone. Presented at the 18th Annual Conference of the UNC Institute for the Environment Community Modeling and Analysis System (CMAS) Center, October 21–23, 2019.

Model (H–CMAQ) [56] for 2016. The outputs from this hemispheric modeling were then used to provide boundary conditions for the national scale air quality modeling at proposal.[57] Overall, H–CMAQ tends to under predict daytime ozone concentrations at rural and remote monitoring sites across the U.S. during the spring of 2016 whereas the predictions from the GEOS-Chem global model [58] were generally less biased.[59] During the summer of 2016 both models showed varying degrees of over prediction with GEOS-Chem showing somewhat greater over prediction, compared to H–CMAQ. In view of those results, the EPA examined the impacts of using GEOS-Chem as an alternative to H–CMAQ for providing boundary conditions for the modeling supporting this final action.

For the lightning $NO_X$, biogenics, and GEOS-Chem sensitivity runs, the EPA reran the proposal modeling using each of these inputs, individually. Results from these sensitivity runs indicate that each of the three updates provides an improvement in model performance. However, by far the greatest improvement in modeling performance is attributable to the use of GEOS-Chem. In view of these results the EPA has included lightning $NO_X$ emissions, updated biogenic emissions, and international transport from GEOS-Chem in the air quality modeling supporting final SIP actions. Details on the results of the individual sensitivity runs can be found in the AQM TSD. For the air quality modeling supporting final SIP actions, model performance based on days in 2016 with measured MDA8 ozone greater than or equal to 60 ppb is considerably improved (*i.e.*, less bias and error) compared to the proposal modeling in nearly all regions. For example, in the Upper Midwest, which includes monitoring sites along Lake Michigan, the normalized mean bias improved from a 19 percent under prediction to a 6.9 percent under prediction and in the Southwest region, which includes monitoring sites in Denver, Las Cruces, El Paso, and Salt Lake City, normalized mean bias improved from a 13.6 percent under prediction to a 4.8 percent under prediction.[60] In all regions, the normalized mean bias and normalized mean error statistics for high ozone days based on the modeling supporting final SIP actions are within the range of performance criteria benchmarks (*i.e.*, less than plus or minus 15 percent for normalized mean bias and less than 25 percent for normalized mean error).[61] Additional information on model performance information is provided in the AQM TSD. In summary, the EPA included emissions of lightning $NO_X$, as requested by commenters, and investigated and addressed concerns about model performance for the modeling supporting final SIP actions.

### 3. Emissions Inventories

The EPA developed emissions inventories to support air quality modeling for this final action, including emissions estimates for EGUs, non-EGU point sources (*i.e.*, stationary point sources), stationary nonpoint sources, onroad mobile sources, nonroad mobile sources, other mobile sources, wildfires, prescribed fires, and biogenic emissions that are not the direct result of human activities. The EPA's air quality modeling relies on this comprehensive set of emissions inventories because emissions from multiple source categories are needed to model ambient air quality and to facilitate comparison of model outputs with ambient measurements.

Prior to the modeling of air quality, the emissions inventories must be processed into a format that is appropriate for the air quality model to use. To prepare the emissions inventories for air quality modeling, the EPA processed the emissions inventories using the Sparse Matrix Operator Kernel Emissions (SMOKE) Modeling System version 4.9 to produce the gridded, hourly, speciated, model-ready emissions for input to the air quality model. Additional information on the development of the emissions inventories and on data sets used during the emissions modeling process are provided in the document titled "Technical Support Document (TSD): Preparation of Emissions Inventories for the 2016v3 North American Emissions Modeling Platform," hereafter known as the "2016v3 Emissions Modeling TSD." This TSD is available in the docket for this action.[62]

### 4. Foundation Emissions Inventory

The 2016v3 emissions platform is comprised of data from various sources including data developed using models, methods, and source datasets that became available in calendar years 2020 through 2022, in addition to data retained from the Inventory Collaborative 2016 version 1 (2016v1) Emissions Modeling Platform, released in October 2019. The 2016v1 platform was developed through a national collaborative effort between the EPA and state and local agencies along with MJOs. The 2016v2 platform used to support the proposed action included updated data, models and methods as compared to 2016v1. The 2016v3 platform includes updates implemented in response to comments along with other updates to the 2016v2 platform such as corrections and the incorporation of updated data sources that became available prior to the 2016v3 inventories being developed. Several commenters noted that the 2016v2 platform did not include $NO_X$ emissions that resulted from lightning strikes. To address this, lightning $NO_X$ emissions were computed and included in the 2016v3 platform.

For this final action, the EPA developed emissions inventories for the base year of 2016 and the projected year of 2023. The 2023 inventories represent changes in activity data and of predicted emissions reductions from on-the-books actions, planned emissions control installations, and promulgated Federal measures that affect anthropogenic emissions. The 2016 emissions inventories for the U.S. primarily include data derived from the 2017 National Emissions Inventory (2017

[56] Mathur, R., Gilliam, R., Bullock, O.R., Roselle, S., Pleim, J., Wong, D., Binkowski, F., and 1 Streets, D.: Extending the applicability of the community multiscale air quality model to 2 hemispheric scales: motivation, challenges, and progress. In: Steyn DG, Trini S (eds) Air 3 pollution modeling and its applications, XXI. Springer, Dordrecht, pp 175–179, 2012.

[57] Boundary conditions are the concentrations of pollutants along the north, east, south, and west boundaries of the air quality modeling domain. Boundary conditions vary in space and time and are typically obtained from predictions of global or hemispheric models. Information on how boundary conditions were developed for modeling supporting EPA's final SIP actions can be found in the AQM TSD.

[58] I. Bey, D.J. Jacob, R.M. Yantosca, J.A. Logan, B.D. Field, A.M. Fiore, Q. Li, H.Y. Liu, L.J. Mickley, M.G. Schultz. Global modeling of tropospheric chemistry with assimilated meteorology: model description and evaluation. J. Geophys. Res. Atmos., 106 (2001), pp. 23073–23095, 10.1029/2001jd000807.

[59] Henderson, B.H., P. Dolwick, C. Jang, A., Eyth, J. Vukovich, R. Mathur, C. Hogrefe, G. Pouliot, N. Possiel, B. Timin, K.W. Appel, 2022. Meteorological and Emission Sensitivity of Hemispheric Ozone and $PM_{2.5}$. Presented at the 21st Annual Conference of the UNC Institute for the Environment Community Modeling and Analysis System (CMAS) Center, October 17–19, 2022.

[60] A comparison of model performance from the proposal modeling to the final modeling for individual monitoring sites can be found in the docket for this final action.

[61] Christopher Emery, Zhen Liu, Armistead G. Russell, M. Talat Odman, Greg Yarwood & Naresh Kumar (2017) Recommendations on statistics and benchmarks to assess photochemical model performance, Journal of the Air & Waste Management Association, 67:5, 582–598, DOI: 10.1080/10962247.1265027.

[62] *See* Preparation of Emissions Inventories for the 2016v3 North American Emissions Modeling Platform TSD, also available at *https://www.epa.gov/air-emissions-modeling/2016v3-platform.*

NEI [63] and data specific to the year of 2016. The following sections provide an overview of the construct of the 2016v3 emissions and projections. The fire emissions were unchanged between the 2016v2 and 2016v3 emissions platforms. For the 2016v3 platform, the biogenic emissions were updated to use the latest available versions of the Biogenic Emissions Inventory System and associated land use data to help address comments related to a degradation in model performance in the 2016v2 platform as compared to the 2016v1 platform. Details on the construction of the inventories are available in the 2016v3 Emissions Modeling TSD. Details on how the EPA responded to comments related to emissions inventories are available in the RTC document for this action.

Development of emissions inventories for annual $NO_X$ and sulfur dioxide ($SO_2$) emissions for EGUs in the 2016 base year inventory are based primarily on data from continuous emissions monitoring systems (CEMS) and other monitoring systems allowed for use by qualifying units under 40 CFR part 75, with other EGU pollutants estimated using emissions factors and annual heat input data reported to the EPA. For EGUs not reported under part 75, the EPA used data submitted to the NEI by state, local, and tribal agencies. The final action inventories include updates made in response to comments on the proposed actions including the proposed SIP submission disapprovals and the proposed FIP. The Air Emissions Reporting Rule, (80 FR 8787; February 19, 2015), requires that Type A point sources large enough to meet or exceed specific thresholds for emissions be reported to the EPA via the NEI every year, while the smaller Type B point sources must only be reported to EPA every 3 years. In response to comments, emissions data for EGUs that did not have data submitted to the NEI specific to the year 2016 were filled in with data from the 2017 NEI. For more information on the details of how the 2016 EGU emissions were developed and prepared for air quality modeling, *see* the 2016v3 Emissions Modeling TSD.

The EPA projected 2023 baseline EGU emissions using version 6 of the Integrated Planning Model (IPM) (*www.epa.gov/airmarkets/powersector-modeling*). IPM, developed by ICF Consulting, is a state-of-the-art, peer-reviewed, multi-regional, dynamic, deterministic linear programming model of the contiguous U.S. electric power sector. It provides forecasts of least cost capacity expansion, electricity dispatch, and emissions control strategies while meeting energy demand and environmental, transmission, dispatch, and reliability constraints. The EPA has used IPM for over two decades to better understand power sector behavior under future business-as-usual conditions and to evaluate the economic and emissions impacts of prospective environmental policies. The model is designed to reflect electricity markets as accurately as possible. The EPA uses the best available information from utilities, industry experts, gas and coal market experts, financial institutions, and government statistics as the basis for the detailed power sector modeling in IPM. The model documentation provides additional information on the assumptions discussed here as well as all other model assumptions and inputs. [64] The EPA relied on the same model platform as in the proposals but made substantial updates to reflect public comments on near-term fossil fuel market price volatility and updated fleet information reflecting Summer 2022 U.S. Energy Information Agency (EIA) 860 data, unit-level comments, and additional updates to the National Electric Energy Data System (NEEDS) inventory.

The IPM version 6—Updated Summer 2021 Reference Case incorporated recent updates through the summer 2022 to account for updated Federal and state environmental regulations (including Renewable Portfolio Standards (RPS), Clean Energy Standards (CES) and other state mandates), fleet changes (committed EGU retirements and new builds), electricity demand, technology cost and performance assumptions from recent data for renewables adopting from National Renewable Energy Lab (NREL's) Annual Technology Baseline 2020 and for fossil sources from the EIA's Annual Energy Outlook (AEO) 2020. Natural gas and coal price projections reflect data developed in fall 2020 but updated in summer 2022 to capture near-term price volatility and current market conditions. The inventory of EGUs provided as an input to the model was the NEEDS fall 2022 version and is available on the EPA's website. [65] This version of NEEDS reflects announced retirements and under construction new builds known as of early summer 2022. This projected base case accounts for the effects of the final Mercury and Air Toxics Standards rule, CSAPR, the CSAPR Update, the Revised CSAPR Update, New Source Review enforcement settlements, the final Effluent Limitation Guidelines (ELG) Rule, the Coal Combustion Residual (CCR) Rule, and other on-the-books Federal and state rules (including renewable energy tax credit extensions from the Consolidated Appropriations Act of 2021) through early 2021 impacting emissions of $SO_2$, $NO_X$, directly emitted particulate matter, carbon dioxide ($CO_2$), and power plant operations. It also includes final actions, up through the Summer 2022, the EPA has taken to implement the Regional Haze Rule and best available retrofit technology (BART) requirements. Documentation of IPM version 6 and NEEDS, along with updates, is in Docket ID No. EPA–HQ–OAR–2021–0663 and available online at *https://www.epa.gov/airmarkets/power-sector-modeling*.

Non-EGU point source emissions are mostly consistent with those in the proposal modeling except where they were updated in response to comments. Several commenters mentioned that point source emissions carried forward from 2014 NEI were not the best estimates of 2017 emissions. Thus, emissions sources in 2016v2 that had been projected from the 2014 NEI in the proposal were replaced with emissions based on the 2017 NEI. Point source emissions submitted to the 2016 NEI or to the 2016v1 platform development process specifically for the year 2016 were retained in 2016v3.

The 2023 non-EGU point source emissions were grown from 2016 to 2023 using factors based on AEO 2022 and reflect emissions reductions due to known national and local rules, control programs, plant closures, consent decrees, and settlements that could be computed as reductions to specific units by July 2022.

Aircraft emissions and ground support equipment at airports are represented as point sources and are based on adjustments to emissions in the January 2021 version of the 2017 NEI. The EPA developed and applied factors to adjust the 2017 airport emissions to 2016 and 2023 based on activity growth projected by the Federal Aviation Administration Terminal Area Forecast 2021, [66] the latest available version at the time the factors were developed.

---

[63] *https://www.epa.gov/air-emissions-inventories/2017-national-emissions-inventory-nei-technical-support-document-tsd.*

[64] Detailed information and documentation of the EPA's Base Case, including all the underlying assumptions, data sources, and architecture parameters can be found on the EPA's website at: *https://www.epa.gov/airmarkets/power-sector-modeling.*

[65] Available at *https://www.epa.gov/airmarkets/national-electric-energy-data-system-needs-v6.*

[66] *https://www.faa.gov/data_research/aviation/taf/.*

Emissions at rail yards were represented as point sources. The 2016 rail yard emissions are largely consistent with the 2017 NEI rail yard emissions. The 2016 and 2023 rail yard emissions were developed through the 2016v1 Inventory Collaborative process. Class I rail yard emissions were projected based on the AEO freight rail energy use growth rate projections for 2023 with the fleet mix assumed to be constant throughout the period.

The EPA made multiple updates to point source oil and gas emissions in response to comments. For the 2016v3 modeling, the point source oil and gas emissions for 2016 were based on the 2016v2 point inventory except that most 2014 NEI-based emissions were replaced with 2017 NEI emissions. Additionally, in response to comments, state-provided emissions equivalent to those in the 2016v1 platform were used for Colorado, and some New Mexico emissions were replaced with data backcast from 2020 to 2016. To develop inventories for 2023 for the 2016v3 platform, the year 2016 oil and gas point source inventories were first projected to 2021 values based on actual historical production data, then those 2021 emissions were projected to 2023 using regional projection factors based on AEO 2022 projections. This was an update from the 2016v2 approach in which actual data were used only through the year 2019, because 2021 data were not yet available. $NO_X$ and VOC reductions resulting from co-benefits for New Source Performance Standards (NSPS) for Stationary Reciprocating Internal Combustion Engines (RICE) are reflected, along with Natural Gas Turbine and Process Heater NSPS $NO_X$ controls and Oil and Gas NSPS VOC controls. In some cases, year 2019 point source inventory data were used instead of the projected future year emissions except for the Western Regional Air Partnership (WRAP) states of Colorado, New Mexico, Montana, Wyoming, Utah, North Dakota, and South Dakota. The WRAP future year inventory [67] was used in these WRAP states in all future years except in New Mexico where the WRAP base year emissions were projected using the EIA historical and AEO forecasted production data. Estimated impacts from the recent oil and gas rule in the New Mexico Administrative code 20.2.50 [68] were also included. Details on the development of the projected point

and nonpoint oil and gas emissions inventories are available in the 2016v3 Emissions Modeling TSD in Docket ID No. EPA–HQ–OAR–2021–0663.

Onroad mobile sources include exhaust, evaporative, and brake and tire wear emissions from vehicles that drive on roads, parked vehicles, and vehicle refueling. Emissions from vehicles using regular gasoline, high ethanol gasoline, diesel fuel, and electric vehicles were represented, along with buses that used compressed natural gas. The EPA developed the onroad mobile source emissions for states other than California using the EPA's Motor Vehicle Emissions Simulator (MOVES). MOVES3 was released in November 2020 and has been followed by some minor releases that improved the usage of the model but that do not have substantive impacts on the emissions estimates. For 2016v2, MOVES3 was run using inputs provided by state and local agencies through the 2017 NEI where available, in combination with nationally available data sets to develop a complete inventory. Onroad emissions were developed based on emissions factors output from MOVES3 run for the year 2016, coupled with activity data (*e.g.,* vehicle miles traveled and vehicle populations) representing the year 2016. The 2016 activity data were provided by some state and local agencies through the 2016v1 process, and the remaining activity data were derived from those used to develop the 2017 NEI. The onroad emissions were computed within SMOKE by multiplying emissions factors developed using MOVES with the appropriate activity data. Prior to computing the final action emissions for 2016, updates to some onroad inputs were made in response to comments and to implement corrections. Onroad mobile source emissions for California were consistent with the updated emissions data provided by the state for the final action.

The 2023 onroad emissions reflect projected changes to fuel properties and usage, along with the impact of the rules included in MOVES3 for each of those years. MOVES emissions factors for the year 2023 were used. A comprehensive list of control programs included for onroad mobile sources is available in the 2016v3 Emissions Modeling TSD. Year 2023 activity data for onroad mobile sources were provided by some state and local agencies, and otherwise were projected to 2023 by first projecting the 2016 activity to year 2019 based on county level vehicle miles traveled (VMT) from the Federal Highway Administration. The VMT were held flat from 2019 to 2021 to

account for pandemic impacts, and then projected from 2021 to 2023 using AEO 2022-based factors.[69] Recent updates to inspection and maintenance programs in North Carolina and Tennessee were reflected in the MOVES inputs for the modeling supporting this final action. The 2023 onroad mobile emissions were computed within SMOKE by multiplying the respective emissions factors developed using MOVES with the year-specific activity data. Prior to computing the final action emissions for 2023, the EPA made updates to some onroad inputs in response to comments and to implement corrections.

The commercial marine vessel (CMV) emissions in the 2016 base case emissions inventory for this action were based on those in the 2017 NEI. Factors were applied to adjust the 2017 NEI emissions backward to represent emissions for the year 2016. The CMV emissions are consistent with the emissions for the 2016v1 platform CMV emissions released in February 2020 although, in response to comments, the EPA implemented an improved process for spatially allocating CMV emissions along state and county boundaries for the modeling supporting this final action.

The EPA developed nonroad mobile source emissions inventories (other than CMV, locomotive, and aircraft emissions) for 2016 and 2023 from monthly, county, and process level emissions output from MOVES3. Types of nonroad equipment include recreational vehicles, pleasure craft, and construction, agricultural, mining, and lawn and garden equipment.[70] The nonroad emissions for the final action were unchanged from those at the proposal. The nonroad mobile emissions control programs include reductions to locomotives, diesel engines, and recreational marine engines, along with standards for fuel sulfur content and evaporative emissions. A comprehensive list of

[67] *http://www.wrapair2.org/pdf/WRAP_OGWG_ 2028_OTB_RevFinalReport_05March2020.pdf.*

[68] *https://www.env.nm.gov/air-quality/ozone- draft-rule/* and *https://www.srca.nm.gov/parts/ title20/20.002.0050.html.*

[69] VMT data for 2020 were the latest available at the time of final rule data development but were heavily impacted by the pandemic and unusable to project to 2023; in addition, it was determined that chaining factors based on AEO 2020 and AEO2021 obtain the needed factors led to unrealistic artifacts, thus only AEO 2022 data were used.

[70] Line haul locomotives are also considered a type of nonroad mobile source but the emissions inventories for locomotives were not developed using MOVES3. Year 2016 and 2023 locomotive emissions were developed through the 2016v1 process, and the year 2016 emissions are mostly consistent with those in the 2017 NEI. The projected locomotive emissions for 2023 were developed by applying factors to the base year emissions using activity data based on AEO freight rail energy use growth rate projections along with emissions rates adjusted to account for recent historical trends.

control programs included for mobile sources is available in the 2016v3 Emissions Modeling TSD.

For stationary nonpoint sources, some emissions in the 2016 base case emissions inventory come directly from the 2017 NEI, others were adjusted from the 2017 NEI to represent 2016 levels, and the remaining emissions including those from oil and gas, fertilizer, and solvents were computed specifically to represent 2016. Stationary nonpoint sources include evaporative sources, consumer products, fuel combustion that is not captured by point sources, agricultural livestock, agricultural fertilizer, residential wood combustion, fugitive dust, and oil and gas sources. The emissions sources derived from the 2017 NEI include agricultural livestock, fugitive dust, residential wood combustion, waste disposal (including composting), bulk gasoline terminals, and miscellaneous non-industrial sources such as cremation, hospitals, lamp breakage, and automotive repair shops. A recent method to compute solvent VOC emissions was used.[71]

Where comments were provided about projected control measures or changes in nonpoint source emissions, those inputs were first reviewed by the EPA. Those found to be based on reasonable data for affected emissions sources were incorporated into the projected inventories for 2023 to the extent possible. Where possible, projection factors based on the AEO used data from AEO 2022, the most recent AEO at the time available at the time the inventories were developed. Federal regulations that impact the nonpoint sources were reflected in the inventories. Adjustments for state fuel sulfur content rules for fuel oil in the Northeast were included along with solvent controls applicable within the northeast ozone transport region (OTR) states. Details are available in the 2016v3 Emissions Modeling TSD.

Nonpoint oil and gas emissions inventories for many states were developed based on outputs from the 2017 NEI version of the EPA Oil and Gas Tool using activity data for year 2016. Production-related emissions data from the 2017 NEI were used for Oklahoma, 2016v1 emissions were used for Colorado and Texas production-related sources to respond to comments. Data for production-related nonpoint oil and gas emissions in the States of Colorado, Montana, New Mexico, North Dakota, South Dakota, Utah, and Wyoming were obtained from the WRAP baseline inventory.[72] A California Air Resources Board-provided inventory was used for 2016 oil and gas emissions in California. Nonpoint oil and gas inventories for 2023 were developed by first projecting the 2016 oil and gas inventories to 2021 values based on actual production data. Next, those 2021 emissions were projected to 2023 using regional projection factors by product type based on AEO 2022 projections. A 2017–2019 average inventory was used for oil and natural gas exploration emissions in 2023 everywhere except for California and in the WRAP states in which data from the WRAP future year inventory[73] were used. NO$_X$ and VOC reductions that are co-benefits to the NSPS for RICE are reflected, along with Natural Gas Turbines and Process Heaters NSPS NO$_X$ controls and NSPS Oil and Gas VOC controls. The WRAP future year inventory was used for oil and natural gas production sources in 2023 except in New Mexico where the WRAP Base year emissions were projected using the EIA historical and AEO forecasted production data. Estimated impacts from the New Mexico Administrative Code 20.2.50 were included.

*B. Air Quality Modeling To Identify Nonattainment and Maintenance Receptors*

This section describes the air quality modeling and analyses that the EPA performed in Step 1 to identify locations where the Agency expects there to be nonattainment or maintenance receptors for the 2015 ozone NAAQS in 2023. Where the EPA's analysis shows that an area or site does not fall under the definition of a nonattainment or maintenance receptor in 2023, that site is excluded from further analysis under the EPA's good neighbor framework.

1. Approach for Identifying Receptors

In the proposed actions, the EPA applied the same approach used in the CSAPR Update and the Revised CSAPR Update to identify nonattainment and maintenance receptors for the 2008 ozone NAAQS.[74] The EPA's approach gives independent effect to both the "contribute significantly to nonattainment" and the "interfere with maintenance" prongs of section 110(a)(2)(D)(i)(I), consistent with the D.C. Circuit's direction in *North Carolina*. Further, in its decision on the remand of CSAPR from the Supreme Court in the *EME Homer City II* case, the D.C. Circuit confirmed that the EPA's approach to identifying maintenance receptors in CSAPR comported with the court's prior instruction to give independent meaning to the "interfere with maintenance" prong in the good neighbor provision.[75]

In the CSAPR Update and the Revised CSAPR Update, the EPA identified nonattainment receptors as those monitoring sites that are projected to have average design values that exceed the NAAQS and that are also measuring nonattainment based on the most recent monitored design values. This approach is consistent with prior transport rulemakings, such as the NO$_X$ SIP Call and CAIR, where the EPA defined nonattainment receptors as those areas that both currently monitor nonattainment and that the EPA projects will be in nonattainment in the future compliance year.

The Agency explained in the NO$_X$ SIP Call and CAIR and then reaffirmed in the CSAPR Update that the EPA has the most confidence in our projections of nonattainment for those counties that also measure nonattainment for the most recent period of available ambient data. The EPA separately identified maintenance receptors as those receptors that would have difficulty maintaining the relevant NAAQS in a scenario that accounts for historical variability in air quality at that receptor. The variability in air quality was determined by evaluating the "maximum" future design value at each receptor based on a projection of the maximum measured design value over the relevant period. The EPA interprets the projected maximum future design value to be a potential future air quality outcome consistent with the meteorology that yielded maximum measured concentrations in the ambient data set analyzed for that receptor (*i.e.,* ozone conducive meteorology). The EPA also recognizes that previously experienced meteorological conditions (*e.g.,* dominant wind direction, temperatures, and air mass patterns) promoting ozone formation that led to maximum concentrations in the measured data may reoccur in the future. The maximum design value gives a reasonable projection of future air quality at the receptor under a scenario in which such conditions do, in fact, reoccur. The projected maximum design value is used to identify upwind emissions that, under those circumstances, could interfere with the downwind area's ability to maintain the NAAQS.

---

[71] *https://doi.org/10.5194/acp-21-5079-2021.*

[72] *http://www.wrapair2.org/pdf/WRAP_OGWG_Report_Baseline_17Sep2019.pdf.*

[73] *http://www.wrapair2.org/pdf/WRAP_OGWG_2028_OTB_RevFinalReport_05March2020.pdf.*

[74] *See* 86 FR 23078–79.

[75] *EME Homer City II,* 795 F.3d at 136.

Therefore, applying this methodology for this action, the EPA assessed the magnitude of the maximum projected design values for 2023 at each receptor in relation to the 2015 ozone NAAQS and, where such a value exceeds the NAAQS, the EPA determined that receptor to be a "maintenance" receptor for purposes of defining interference with maintenance, consistent with the method used in CSAPR and upheld by the D.C. Circuit in *EME Homer City II*.[76] That is, monitoring sites with a maximum design value that exceeds the NAAQS are projected to have maintenance problems in the future analytic years.

Recognizing that nonattainment receptors are also, by definition, maintenance receptors, the EPA often uses the term "maintenance-only" to refer to receptors that are not also nonattainment receptors. Consistent with the concepts for maintenance receptors, as described earlier, the EPA identifies "maintenance-only" receptors as those monitoring sites that have projected average design values above the level of the applicable NAAQS, but that are not currently measuring nonattainment based on the most recent official design values. In addition, those monitoring sites with projected average design values below the NAAQS, but with projected maximum design values above the NAAQS are also identified as "maintenance only" receptors, even if they are currently measuring nonattainment based on the most recent official certified design values.[77]

*Comment:* The EPA received comments claiming that the projected design values for 2023 were biased low compared to recent measured data. Commenters noted that a number of monitoring sites that are projected to be below the NAAQS in 2023 based on the EPA's modeling for the proposed action are currently measuring nonattainment based on data from 2020 and 2021. One commenter requested that the EPA determine whether its past modeling tends to overestimate or underestimate actual observed design values. If EPA finds that the agency's model tends to underestimate future year design values, the commenter requests that EPA re-run its ozone modeling, incorporating parameters that account for this tendency.

*EPA Response:* In response to comments, the EPA compared the projected 2023 design values based on the proposal modeling to recent trends in measured data. As a result of this analysis, the EPA agrees that current data indicate that there are monitoring sites at risk of continued nonattainment in 2023 even though the model projected average and maximum design values at these sites are below the NAAQS (*i.e.,* these sites would not be modeling-based receptors at Step 1). While the EPA has confidence in the reliability of the modeling for projecting air quality conditions and contributions in future years, it would not be reasonable to ignore recent measured ozone levels in many areas that are clearly not fully consistent with certain concentrations in the Step 1 analysis for 2023. Therefore, the EPA has developed an additional maintenance-only receptor category, which includes what we refer to as "violating monitor" receptors, based on current ozone concentrations measured by regulatory ambient air quality monitoring sites.

Specifically, the EPA has identified monitoring sites with measured 2021 and preliminary 2022 design values *and* 4th high maximum daily 8-hour average (MDA8) ozone in both 2021 and 2022 (preliminary data) that exceed the NAAQS as having the greatest risk of continuing to have a problem attaining the standard in 2023. These criteria sufficiently consider measured air quality data so as to avoid including monitoring sites that have measured nonattainment data in recent years but could reasonably be anticipated to not have a nonattainment or maintenance problem in 2023, in line with our modeling results. Our methodology is intended only to identify those sites that have sufficiently poor ozone levels that there is clearly a reasonable expectation that an ozone nonattainment or maintenance problem will persist in the 2023 ozone season. Moreover, the 2023 ozone season is so near in time that recent measured ozone levels can be used to reasonably project whether an air quality problem is likely to persist. We view this approach to identifying additional receptors in 2023 as the best means of responding to the comments on this issue in this action, while also identifying all transport receptors.

For purposes of this action, we will treat these violating monitors as an additional type of maintenance-only receptor. We acknowledge that traditional modeling plus monitoring methodology we used at proposal and in prior ozone transport rules would otherwise have identified such sites as being in attainment in 2023. Because

our modeling did not identify these sites as receptors, we do not believe it is sufficiently certain that these sites will be in nonattainment that they should be considered nonattainment receptors. In the face of this uncertainty in the record, we regard our ability to consider such sites as receptors for purposes of good neighbor analysis under CAA section 110(a)(2)(D)(i)(I) to be a function of the requirement to prohibit emissions that interfere with maintenance of the NAAQS; even if an area may be projected to be in attainment, we have reliable information indicating that there is a clear risk that attainment will not in fact be achieved in 2023. Thus, our authority for treating these sites as receptors at Step 1 in 2023 flows from the responsibility in CAA section 110(a)(2)(i)(I) to prohibit emissions that interfere with maintenance of the NAAQS. *See, e.g., North Carolina,* 531 F.3d at 910–11 (failing to give effect to the interfere with maintenance clause "provides no protection for downwind areas that, *despite EPA's predictions,* still find themselves struggling to meet NAAQS due to upwind interference . . . .") (emphasis added). Recognizing that no modeling can perfectly forecast the future, and "a degree of imprecision is inevitable in tackling the problem of interstate air pollution," this approach in the Agency's judgement best balances the need to avoid both "under-control" and "overcontrol," *EME Homer City,* 572 U.S. at 523. The EPA's analysis of these additional receptors further is explained in Section III.C.

However, because we did not propose to apply this expansion of the basis for regulation under the good neighbor provision receptor-identification methodology as the sole basis for finding an upwind state linked, in this action we are only using this receptor category on a confirmatory basis. That is, for states that we find linked based on our traditional modeling-based methodology in 2023, we find in this final analysis that the linkage at Step 2 is strengthened and confirmed if that state is also linked to one or more "violating-monitor" receptors. If a state is only linked to a violating-monitor receptor in this final analysis, we are deferring taking final action on that state's SIP submittal. This is the case for the State of Tennessee. Among the states that previously had their transport SIPs approved for the 2015 ozone NAAQS, the EPA has also identified a linkage to violating-monitor receptors for the State of Kansas. The EPA intends to further review its air quality modeling results and recent measured ozone levels, and we intend to address these states' good

---

[76] *EME Homer City II,* 795 F.3d at 136.

[77] *See https://www.epa.gov/air-trends/air-quality-design-values* for design value reports. At the time of this action, the most recent reports of certified design values available are for the calendar year 2021. The 2022 values are considered "preliminary" and therefore subject to change before certification.

neighbor obligations as expeditiously as practicable in a future action.

## 2. Methodology for Projecting Future Year Ozone Design Values

Consistent with the EPA's modeling guidance, the 2016 base year and future year air quality modeling results were used in a relative sense to project design values for 2023.[78] That is, the ratios of future year model predictions to base year model predictions are used to adjust ambient ozone design values up or down depending on the relative (percent) change in model predictions for each location. The EPA's modeling guidance recommends using measured ozone concentrations for the 5-year period centered on the base year as the air quality data starting point for future year projections. This average design value is used to dampen the effects of inter-annual variability in meteorology on ozone concentrations and to provide a reasonable projection of future air quality at the receptor under average conditions. In addition, the Agency calculated maximum design values from within the 5-year base period to represent conditions when meteorology is more favorable than average for ozone formation. Because the base year for the air quality modeling used in this final action is 2016, measured data for 2014–2018 (i.e., design values for 2016, 2017, and 2018) were used to project average and maximum design values in 2023.

The ozone predictions from the 2016 and future year air quality model simulations were used to project 2016–2018 average and maximum ozone design values to 2023 using an approach similar to the approach in the EPA's guidance for attainment demonstration modeling. This guidance recommends using model predictions from the 3 x 3 array of grid cells surrounding the location of the monitoring site to calculate a Relative Response Factor (RRF) for that site. However, the guidance also notes that an alternative array of grid cells may be used in certain situations where local topographic or geographical feature (e.g., a large water body or a significant elevation change) may influence model response.

The 2016–2018 base period average and maximum design values were multiplied by the RRF to project each of these design values to 2023. In this manner, the projected design values are grounded in monitored data, and not the absolute model-predicted future year

concentrations. Following the approach in the CSAPR Update and the Revised CSAPR Update, the EPA also projected future year design values based on a modified version of the "3 x 3" approach for those monitoring sites located in coastal areas. In this alternative approach, the EPA eliminated from the RRF calculations the modeling data in those grid cells that are dominated by water (i.e., more than 50 percent of the area in the grid cell is water) and that do not contain a monitoring site (i.e., if a grid cell is more than 50 percent water but contains an air quality monitor, that cell would remain in the calculation). The choice of more than 50 percent of the grid cell area as water as the criteria for identifying overwater grid cells is based on the treatment of land use in the Weather Research and Forecasting model (WRF). Specifically, in the WRF meteorological model those grid cells that are greater than 50% overwater are treated as being 100 percent overwater. In such cases the meteorological conditions in the entire grid cell reflect the vertical mixing and winds over water, even if part of the grid cell also happens to be over land with land-based emissions, as can often be the case for coastal areas. Overlaying land-based emissions with overwater meteorology may be representative of conditions at coastal monitors during times of on-shore flow associated with synoptic conditions or sea-breeze or lake-breeze wind flows. But there may be other times, particularly with off-shore wind flow, when vertical mixing of land-based emissions may be too limited due to the presence of overwater meteorology. Thus, for our modeling the EPA projected average and maximum design values at individual monitoring sites based on both the "3 x 3" approach as well as the alternative approach that eliminates overwater cells in the RRF calculation for near-coastal areas (i.e., "no water" approach). The projected 2023 design values using both the "3 x 3" and "no-water" approaches are provided in the docket for this final action. Both approaches result in the same set of receptors in 2023. That is, monitoring sites that are identified as receptors in 2023 based on the "3 x 3" approach are also receptors based on the "no water" approach.

Consistent with the truncation and rounding procedures for the 8-hour ozone NAAQS, the projected design values are evaluated after truncation to integers in units of ppb. Therefore, projected design values that are greater than or equal to 71 ppb are considered to be violating the 2015 ozone NAAQS.

For those sites that are projected to be violating the NAAQS based on the average design values in 2023, the Agency examined the measured design values for 2021, which are the most recent official measured design values at the time of this final action.

As noted earlier, the Agency proposes to identify nonattainment receptors in this rulemaking as those sites that are violating the NAAQS based on current measured air quality through 2021 and have projected average design values of 71 ppb or greater. Maintenance-only receptors include both: (1) Those sites with projected average design values above the NAAQS that are currently measuring clean data (i.e., ozone design values below the level of the 2015 ozone NAAQS in 2021) and (2) those sites with projected average design values below the level of the NAAQS, but with projected maximum design values of 71 ppb or greater. In addition to the maintenance-only receptors, ozone nonattainment receptors are also maintenance receptors because the projected maximum design values for each of these sites is always greater than or equal to the average design value. Further, as explained previously in this section, the EPA identifies certain monitoring sites as "violating monitor" maintenance-only receptors based on 2021 and 2022 measured ozone levels.

The monitoring sites that the Agency projects to be nonattainment and maintenance receptors for the ozone NAAQS in the 2023 base case are used for assessing the contribution of emissions in upwind states to downwind nonattainment and maintenance of the 2015 ozone NAAQS as part of this final action.

## 3. 2023 Nonattainment and Maintenance-Only Receptors for the Final Action

In this section we provide information on modeling-based design values and measured data for monitoring sites identified as nonattainment or maintenance-only receptors in 2023 for this final action. Table III.B–1 of this action contains the 2016-centered base period average and maximum 8-hour ozone design values, the 2023 projected average and maximum design values and the measured 2021 design values for monitoring sites that are projected to be nonattainment receptors in 2023. Table III.B–2 of this action contains this same information for monitoring sites that are projected to be maintenance-only receptors in 2023, based on air quality modeling. Table III.B–3 of this action contains the 2023 projected average and maximum design values and 2021 design values and 4th high

---

[78] U.S. Environmental Protection Agency, 2018. Modeling Guidance for Demonstrating Attainment of Air Quality Goals for Ozone, $PM_{2.5}$, and Regional Haze, Research Triangle Park, NC. *https://www.epa.gov/scram/state-implementation-plan-sip-attainment-demonstration-guidance.*

MDA8 ozone concentrations and preliminary 2020 design values and 4th high MDA8 ozone concentrations for monitoring sites identified as violating monitor maintenance-only receptors. The design values for all monitoring sites in the U.S. are provided in the docket for this action. Additional details on the approach for projecting average and maximum design values are provided in the AQM TSD.

TABLE III.B–1—AVERAGE AND MAXIMUM 2016-CENTERED AND 2023 BASE CASE 8-HOUR OZONE DESIGN VALUES AND 2021 DESIGN VALUES (PPB) AT PROJECTED NONATTAINMENT RECEPTORS [a]

| Monitor ID | State | County | 2016 centered average | 2016 centered maximum | 2023 average | 2023 maximum | 2021 |
|---|---|---|---|---|---|---|---|
| 060650016 | CA | Riverside | 79.0 | 80.0 | 72.2 | 73.1 | 78 |
| 060651016 | CA | Riverside | 99.7 | 101 | 91.0 | 92.2 | 95 |
| 080350004 | CO | Douglas | 77.3 | 78 | 71.3 | 71.9 | 83 |
| 080590006 | CO | Jefferson | 77.3 | 78 | 72.8 | 73.5 | 81 |
| 080590011 | CO | Jefferson | 79.3 | 80 | 73.5 | 74.1 | 83 |
| 090010017 | CT | Fairfield | 79.3 | 80 | 71.6 | 72.2 | 79 |
| 090013007 | CT | Fairfield | 82.0 | 83 | 72.9 | 73.8 | 81 |
| 090019003 | CT | Fairfield | 82.7 | 83 | 73.3 | 73.6 | 80 |
| 481671034 | TX | Galveston | 75.7 | 77 | 71.5 | 72.8 | 72 |
| 482010024 | TX | Harris | 79.3 | 81 | 75.1 | 76.7 | 74 |
| 490110004 | UT | Davis | 75.7 | 78 | 72.0 | 74.2 | 78 |
| 490353006 | UT | Salt Lake | 76.3 | 78 | 72.6 | 74.2 | 76 |
| 490353013 | UT | Salt Lake | 76.5 | 77 | 73.3 | 73.8 | 76 |
| 551170006 | WI | Sheboygan | 80.0 | 81 | 72.7 | 73.6 | 72 |

[a] 2016-centered base period average design values and projected average and maximum design values are reported with 1 digit to the right of the decimal, as recommended in the EPA's modeling guidance. The 2016 maximum design values and 2021 design values are truncated to integer values consistent with ozone design value reporting convention in appendix U of 40 CFR part 50.

TABLE III.B–2—AVERAGE AND MAXIMUM 2016-CENTERED AND 2023 BASE CASE 8-HOUR OZONE DESIGN VALUES AND 2021 DESIGN VALUES (PPB) AT PROJECTED MAINTENANCE-ONLY RECEPTORS

| Monitor ID | State | County | 2016 centered average | 2016 centered maximum | 2023 average | 2023 maximum | 2021 |
|---|---|---|---|---|---|---|---|
| 040278011 | AZ | Yuma | 72.3 | 74 | 70.4 | 72.1 | 67 |
| 080690011 | CO | Larimer | 75.7 | 77 | 70.9 | 72.1 | 77 |
| 090099002 | CT | New Haven | 79.7 | 82 | 70.5 | 72.6 | 82 |
| 170310001 | IL | Cook | 73.0 | 77 | 68.2 | 71.9 | 71 |
| 170314201 | IL | Cook | 73.3 | 77 | 68.0 | 71.5 | 74 |
| 170317002 | IL | Cook | 74.0 | 77 | 68.5 | 71.3 | 73 |
| 350130021 | NM | Dona Ana | 72.7 | 74 | 70.8 | 72.1 | 80 |
| 350130022 | NM | Dona Ana | 71.3 | 74 | 69.7 | 72.4 | 75 |
| 350151005 | NM | Eddy | 69.7 | 74 | 69.7 | 74.1 | 77 |
| 350250008 | NM | Lea | 67.7 | 70 | 69.8 | 72.2 | 66 |
| 480391004 | TX | Brazoria | 74.7 | 77 | 70.4 | 72.5 | 75 |
| 481210034 | TX | Denton | 78.0 | 80 | 69.8 | 71.6 | 74 |
| 481410037 | TX | El Paso | 71.3 | 73 | 69.8 | 71.4 | 75 |
| 482010055 | TX | Harris | 76.0 | 77 | 70.9 | 71.9 | 77 |
| 482011034 | TX | Harris | 73.7 | 75 | 70.1 | 71.3 | 71 |
| 482011035 | TX | Harris | 71.3 | 75 | 67.8 | 71.3 | 71 |
| 530330023 | WA | King | 73.3 | 77 | 67.6 | 71.0 | 64 |
| 550590019 | WI | Kenosha | 78.0 | 79 | 70.8 | 71.7 | 74 |
| 551010020 | WI | Racine | 76.0 | 78 | 69.7 | 71.5 | 73 |

In total, in 2023 there are a total of projected 33 modeling-based receptors nationwide including 14 nonattainment receptors in 9 different counties and 19 maintenance-only receptors in 13 additional counties (Harris County, TX, has both nonattainment and maintenance-only receptors).

As shown in Table III.B–3 of this action, there are 49 monitoring sites that are identified as ''violating-monitor'' maintenance-only receptors in 2023. As noted earlier in this section, the EPA uses the approach of considering ''violating-monitor'' maintenance-only receptors as confirmatory of the proposal's identification of receptors and does not implicate additional linked states in this final action, Rather, using this approach serves to strengthen the analytical basis for our Step 2 findings by establishing that many upwind states covered in this action are also projected to contribute above 1 percent of the NAAQS to these additional ''violating monitor'' maintenance-only receptors.

TABLE III.B–3—AVERAGE AND MAXIMUM 2023 BASE CASE 8-HOUR OZONE, AND 2021 AND PRELIMINARY 2022 DESIGN VALUES (PPB) AND 4TH HIGH CONCENTRATIONS AT VIOLATING MONITORS[a]

| Monitor ID | State | County | 2023 average | 2023 maximum | 2021 | 2022 P | 2021 4th high | 2022 P 4th high |
|---|---|---|---|---|---|---|---|---|
| 40070010 ............... | AZ | Gila ...................... | 67.9 | 69.5 | 77 | 76 | 75 | 74 |
| 40130019 ............... | AZ | Maricopa ............... | 69.8 | 70.0 | 75 | 77 | 78 | 76 |
| 40131003 ............... | AZ | Maricopa ............... | 70.1 | 70.7 | 80 | 80 | 83 | 78 |
| 40131004 ............... | AZ | Maricopa ............... | 70.2 | 70.8 | 80 | 81 | 81 | 77 |
| 40131010 ............... | AZ | Maricopa ............... | 68.3 | 69.2 | 79 | 80 | 80 | 78 |
| 40132001 ............... | AZ | Maricopa ............... | 63.8 | 64.1 | 74 | 78 | 79 | 81 |
| 40132005 ............... | AZ | Maricopa ............... | 69.6 | 70.5 | 78 | 79 | 79 | 77 |
| 40133002 ............... | AZ | Maricopa ............... | 65.8 | 65.8 | 75 | 75 | 81 | 72 |
| 40134004 ............... | AZ | Maricopa ............... | 65.7 | 66.6 | 73 | 73 | 73 | 71 |
| 40134005 ............... | AZ | Maricopa ............... | 62.3 | 62.3 | 73 | 75 | 79 | 73 |
| 40134008 ............... | AZ | Maricopa ............... | 65.6 | 66.5 | 74 | 74 | 74 | 71 |
| 40134010 ............... | AZ | Maricopa ............... | 63.8 | 66.9 | 74 | 76 | 77 | 75 |
| 40137020 ............... | AZ | Maricopa ............... | 67.0 | 67.0 | 76 | 77 | 77 | 75 |
| 40137021 ............... | AZ | Maricopa ............... | 69.8 | 70.1 | 77 | 77 | 78 | 75 |
| 40137022 ............... | AZ | Maricopa ............... | 68.2 | 69.1 | 76 | 78 | 76 | 79 |
| 40137024 ............... | AZ | Maricopa ............... | 67.0 | 67.9 | 74 | 76 | 74 | 77 |
| 40139702 ............... | AZ | Maricopa ............... | 66.9 | 68.1 | 75 | 77 | 72 | 77 |
| 40139704 ............... | AZ | Maricopa ............... | 65.3 | 66.2 | 74 | 77 | 76 | 76 |
| 40139997 ............... | AZ | Maricopa ............... | 70.5 | 70.5 | 76 | 79 | 82 | 76 |
| 40218001 ............... | AZ | Pinal .................... | 67.8 | 69.0 | 75 | 76 | 73 | 77 |
| 80013001 ............... | CO | Adams ................... | 63.0 | 63.0 | 72 | 77 | 79 | 75 |
| 80050002 ............... | CO | Arapahoe ............... | 68.0 | 68.0 | 80 | 80 | 84 | 73 |
| 80310002 ............... | CO | Denver .................. | 63.6 | 64.8 | 72 | 74 | 77 | 71 |
| 80310026 ............... | CO | Denver .................. | 64.5 | 64.8 | 75 | 77 | 83 | 72 |
| 90079007 ............... | CT | Middlesex ............. | 68.7 | 69.0 | 74 | 73 | 78 | 73 |
| 90110124 ............... | CT | New London .......... | 65.5 | 67.0 | 73 | 72 | 75 | 71 |
| 170310032 ............. | IL | Cook ..................... | 67.3 | 69.8 | 75 | 75 | 77 | 72 |
| 170311601 ............. | IL | Cook ..................... | 63.8 | 64.5 | 72 | 73 | 72 | 71 |
| 181270024 ............. | IN | Porter ................... | 63.4 | 64.6 | 72 | 73 | 72 | 73 |
| 260050003 ............. | MI | Allegan ................. | 66.2 | 67.4 | 75 | 75 | 78 | 73 |
| 261210039 ............. | MI | Muskegon .............. | 67.5 | 68.4 | 74 | 79 | 75 | 82 |
| 320030043 ............. | NV | Clark .................... | 68.4 | 69.4 | 73 | 75 | 74 | 74 |
| 350011012 ............. | NM | Bernalillo .............. | 63.8 | 66.0 | 72 | 73 | 76 | 74 |
| 350130008 ............. | NM | Dona Ana .............. | 65.6 | 66.3 | 72 | 76 | 79 | 78 |
| 361030002 ............. | NY | Suffolk .................. | 66.2 | 68.0 | 73 | 74 | 79 | 74 |
| 390850003 ............. | OH | Lake ..................... | 64.3 | 64.6 | 72 | 74 | 72 | 76 |
| 480290052 ............. | TX | Bexar ................... | 67.1 | 67.8 | 73 | 74 | 78 | 72 |
| 480850005 ............. | TX | Collin ................... | 65.4 | 66.0 | 75 | 74 | 81 | 73 |
| 481130075 ............. | TX | Dallas ................... | 65.3 | 66.5 | 71 | 71 | 73 | 72 |
| 481211032 ............. | TX | Denton .................. | 65.9 | 67.7 | 76 | 77 | 85 | 77 |
| 482010051 ............. | TX | Harris ................... | 65.3 | 66.3 | 74 | 73 | 83 | 72 |
| 482010416 ............. | TX | Harris ................... | 68.8 | 70.4 | 73 | 73 | 78 | 71 |
| 484390075 ............. | TX | Tarrant ................. | 63.8 | 64.7 | 75 | 76 | 76 | 77 |
| 484391002 ............. | TX | Tarrant ................. | 64.1 | 65.7 | 72 | 77 | 76 | 80 |
| 484392003 ............. | TX | Tarrant ................. | 65.2 | 65.9 | 72 | 72 | 74 | 72 |
| 484393009 ............. | TX | Tarrant ................. | 67.5 | 68.1 | 74 | 75 | 75 | 75 |
| 490571003 ............. | UT | Weber ................... | 69.3 | 70.3 | 71 | 74 | 77 | 71 |
| 550590025 ............. | WI | Kenosha ................ | 67.6 | 70.7 | 72 | 73 | 72 | 71 |
| 550890008 ............. | WI | Ozaukee ................ | 65.2 | 65.8 | 71 | 72 | 72 | 72 |

[a] 2022 preliminary design values are based on 2022 measured MDA8 concentrations provided by state air agencies to the EPA's Air Quality System (AQS), as of January 3, 2023.

*C. Air Quality Modeling To Quantify Upwind State Contributions*

This section documents the procedures the EPA used to quantify the impact of emissions from specific upwind states on ozone design values in 2023 for the identified downwind nonattainment and maintenance receptors. The EPA used CAMx photochemical source apportionment modeling to quantify the impact of emissions in specific upwind states on downwind nonattainment and maintenance receptors for 8-hour ozone.

CAMx employs enhanced source apportionment techniques that track the formation and transport of ozone from specific emissions sources and calculates the contribution of sources and precursors to ozone for individual receptor locations. The benefit of the photochemical model source apportionment technique is that all modeled ozone at a given receptor location in the modeling domain is tracked back to specific sources of emissions and boundary conditions to fully characterize culpable sources.

The EPA performed nationwide, state-level ozone source apportionment modeling using the CAMx Ozone Source Apportionment Technology/ Anthropogenic Precursor Culpability Analysis (OSAT/APCA) technique[79] to quantify the contribution of 2023 $NO_X$ and VOC emissions from all sources in each state to the corresponding projected ozone design values in 2023 at

[79] As part of this technique, ozone formed from reactions between biogenic VOC and $NO_X$ with anthropogenic $NO_X$ and VOC are assigned to the anthropogenic emissions.

air quality monitoring sites. The CAMx OSAT/APCA model run was performed for the period May 1 through September 30 using the projected future base case emissions and 2016 meteorology for this time period. In the source apportionment modeling the Agency tracked (i.e., tagged) the amount of ozone formed from anthropogenic emissions in each state individually as well as the contributions from other sources (e.g., natural emissions).

In the state-by-state source apportionment model run, the EPA tracked the ozone formed from each of the following tags:

• States—anthropogenic $NO_X$ emissions and VOC emissions from individual state (emissions from all anthropogenic sectors in a given state were combined);

• Biogenics—biogenic $NO_X$ and VOC emissions domain-wide (i.e., not by state);

• Boundary Concentrations—concentrations transported into the air quality modeling domain;

• Tribes—the emissions from those tribal lands for which the Agency has point source data emissions modeling platform (EPA did not model the contributions from individual tribes);

• Canada and Mexico—anthropogenic emissions from those sources in the portions of Canada and Mexico included within the modeling domain (the EPA did not model the contributions from Canada and Mexico separately);

• Fires—combined emissions from wild and prescribed fires domain-wide (i.e., not by state); and

• Offshore—combined emissions from offshore marine vessels and offshore drilling platforms within the modeling domain.

The contribution modeling provided contributions to ozone from anthropogenic $NO_X$ and VOC emissions in each state, individually. The contributions to ozone from chemical reactions between biogenic $NO_X$ and VOC emissions were modeled and assigned to the "biogenic" category. The contributions from wildfire and prescribed fire $NO_X$ and VOC emissions were modeled and assigned to the "fires" category. That is, the contributions from the "biogenic" and "fires" categories are not assigned to individual states nor are they included in the state contributions.

For the Step 2 analysis, the EPA calculated a contribution metric that considers the average contribution on the 10 highest ozone concentration days (i.e., top 10 days) in 2023 using the same approach as the EPA used in the proposed action and in the Revised CSAPR Update.[80] This average contribution metric is intended to provide a reasonable representation of the contribution from individual states to projected future year design values, based on modeled transport patterns and other meteorological conditions generally associated with modeled high ozone concentrations at the receptor. An average contribution metric constructed in this manner ensures the magnitude of the contributions is directly related to the magnitude of the ozone design value at each site.

The analytic steps for calculating the contribution metric for the 2023 analytic year are as follows:

(1) Calculate the 8-hour average contribution from each source tag to individual ozone monitoring site for the time period of the 8-hour daily maximum modeled concentrations in 2023;

(2) Average the contributions and average the concentrations for the top 10 modeled ozone concentration days in 2023;

(3) Divide the average contribution by the corresponding average concentration to obtain a Relative Contribution Factor (RCF) for each monitoring site;

(4) Multiply the 2023 average design value by the 2023 RCF at each site to produce the average contribution metric values in 2023;[81]

(5) Truncate the average contribution metric values to two digits to the right of the decimal for comparison to the 1 percent of the NAAQS screening threshold (0.70 ppb)

The resulting contributions from each tag to each monitoring site in the U.S. for 2023 can be found in the docket for this final action. Additional details on the source apportionment modeling and the procedures for calculating contributions can be found in the AQM TSD. The EPA's response to comments on the method for calculating the contribution metric can be found in the RTC document for this final action.

The largest contribution from each state that is the subject of this final action to modeled 8-hour ozone nonattainment and modeling-based maintenance receptors in downwind states in 2023 are provided in Table III.C–1 of this action. The largest contribution from each state to the additional "violating monitor" maintenance-only receptors is provided in Table III.C–2 of this action. All states that are linked to one or more nonattainment or maintenance-only receptors are also linked to one or more violating monitor maintenance receptors, except for Minnesota.

TABLE III.C–1—LARGEST CONTRIBUTION BY STATE TO DOWNWIND 8-HOUR OZONE NONATTAINMENT AND MAINTENANCE RECEPTORS IN 2023 (ppb)

| Upwind state | Largest contribution to a downwind nonattainment receptor | Largest contribution to a downwind maintenance-only receptor |
|---|---|---|
| Alabama | 0.75 | 0.65 |
| Arkansas | 0.94 | 1.21 |
| California | 35.27 | 6.31 |
| Illinois | 13.89 | 19.09 |
| Indiana | 8.90 | 10.03 |
| Kentucky | 0.84 | 0.79 |
| Louisiana | 9.51 | 5.62 |

[80] The use of daily contributions on the top 10 concentration days for calculating the average contribution metric is designed to be consistent with the method specified in the modeling guidance in terms of the number of days to use when projecting future year design values.

[81] Note that a contribution metric value was not calculated for any receptor at which there were fewer than 5 days with model-predicted MDA8 ozone concentrations greater than or equal to 60 ppb in 2023. Eliminating from the Step 2 evaluation any receptors for which the modeling does not meet this criterion ensures that upwind state

contributions are based on the days with the highest ozone projections. This criterion is consistent with the criterion for projecting design values, as recommended in the EPA's modeling guidance. In the modeling for this final action, the monitoring site in Seattle, Washington (530330023), was the only receptor that did not meet this criterion.

TABLE III.C–1—LARGEST CONTRIBUTION BY STATE TO DOWNWIND 8-HOUR OZONE NONATTAINMENT AND MAINTENANCE RECEPTORS IN 2023 (ppb)—Continued

| Upwind state | Largest contribution to a downwind nonattainment receptor | Largest contribution to a downwind maintenance-only receptor |
|---|---|---|
| Maryland | 1.13 | 1.28 |
| Michigan | 1.59 | 1.56 |
| Minnesota | 0.36 | 0.85 |
| Mississippi | 1.32 | 0.91 |
| Missouri | 1.87 | 1.39 |
| Nevada | 1.11 | 1.13 |
| New Jersey | 8.38 | 5.79 |
| New York | 16.10 | 11.29 |
| Ohio | 2.05 | 1.98 |
| Oklahoma | 0.79 | 1.01 |
| Texas | 1.03 | 4.74 |
| Utah | 1.29 | 0.98 |
| West Virginia | 1.37 | 1.49 |
| Wisconsin | 0.21 | 2.86 |

TABLE III.C–2—LARGEST CONTRIBUTION TO DOWNWIND 8-HOUR OZONE "VIOLATING MONITOR" MAINTENANCE-ONLY RECEPTORS (ppb)

| Upwind State | Largest contribution to a downwind violating monitor maintenance-only receptor |
|---|---|
| Alabama | 0.79 |
| Arkansas | 1.16 |
| California | 6.97 |
| Illinois | 16.53 |
| Indiana | 9.39 |
| Kentucky | 1.57 |
| Louisiana | 5.06 |
| Maryland | 1.14 |
| Michigan | 3.47 |
| Minnesota | 0.64 |
| Mississippi | 1.02 |
| Missouri | 2.95 |
| Nevada | 1.11 |
| New Jersey | 8.00 |
| New York | 12.08 |
| Ohio | 2.25 |
| Oklahoma | 1.57 |
| Texas | 3.83 |
| Utah | 1.46 |
| West Virginia | 1.79 |
| Wisconsin | 5.10 |

## IV. Summary of Bases for Disapproval

As explained in Section II, the EPA relies on the 4-step interstate transport framework to evaluate obligations under CAA section 110(a)(2)(D)(i)(I). At proposal, the EPA used this framework to guide its evaluation of each state's SIP submission. While the EPA used this framework to maintain a nationally consistent and equitable approach to interstate transport, the contents of each individual state's submission were evaluated on their own merits, and the EPA considered the facts and information, including information from the Agency, available to the state at the time of its submission, in addition to

more recent air quality and contribution information. Here we provide a brief, high level overview of the SIP submissions and the EPA's evaluation and key bases for disapproval. These summaries are presented for ease of reference and to direct the public to the most relevant portions of the proposals and final rule record for further information. The full basis for the EPA's disapprovals is available in relevant **Federal Register** notifications of proposed disapproval for each state, in the technical support documents informing the proposed and final action, and in the responses to comments in Section V and the RTC document. In general, except as otherwise noted, the comments and updated air quality information did not convince the Agency that a change from proposal was warranted for any state. The exceptions are that the EPA is deferring action at this time on the proposed disapprovals for Tennessee and Wyoming. Further, the EPA is finalizing partial approvals of prong 1 ("significant contribution to nonattainment") for Minnesota and Wisconsin because they are linked only to maintenance-only receptors; the EPA is finalizing a partial disapproval with respect to prong 2 ("interference with maintenance") obligations for these two states.

### A. Alabama

In the 2016v3 modeling, Alabama is projected to be linked above 1 percent of the NAAQS to one nonattainment receptor. It is also linked to one violating-monitor maintenance-only receptor. Its highest-level contribution is 0.75 ppb to Galveston County, Texas (AQS Site ID 481671034).[82] A full

summary of Alabama's June 21, 2022, SIP submission, as well as Alabama's previous submission history, was provided in the proposed SIP submission disapproval.[83] In its submission, Alabama advocated for discounting maintenance receptors through use of historical data trends. The EPA finds Alabama's approach is not adequately justified.[84] The EPA disagrees with Alabama's assessment of the 2016v2 modeling,[85] and further responds to comments on model performance in Section III. The EPA disagrees with Alabama's arguments for application of a higher contribution threshold than 1 percent of the NAAQS at Step 2,[86] and further addresses the relevance of "significant impact levels" within the Prevention of Significant Deterioration program ("PSD SILs") in Section V.B.6. The EPA found technical flaws in Alabama's back trajectory analysis.[87] The State did not conduct an adequate Step 3 analysis, and the EPA identified several unsupported assertions in the SIP submission.[88] Alabama also argued in its SIP submission that it had already implemented all cost-effective controls. However, the State included an insufficient evaluation of additional emissions control opportunities to support such a conclusion.[89] The EPA further addresses arguments related to

---

[82] The highest-magnitude downwind contribution from each state is based on the contributions to

modeling-based receptors and does not consider the contributions to violating-monitor maintenance-only receptors. Each state's maximum contribution to downwind violating-monitor maintenance-only receptors is available in the Final Action AQM TSD.

[83] 87 FR 64419–64421.

[84] Id. at 64421–64422.

[85] Id. at 64422–64423.

[86] Id. at 64423–64424.

[87] Id. at 64424–64425.

[88] Id. at 64425–64426.

[89] Id.

mobile sources in Section V.C.1.[90] Additionally, as explained in Section V.B.9,[91] reliance on prior transport FIPs such as the CSAPR Update is not a sufficient analysis at Step 3. The State included no permanent and enforceable emissions controls in its SIP submission.[92] We provide further response to comments regarding Alabama's SIP submission in the RTC document. The EPA is finalizing disapproval of Alabama's interstate transport SIP submission for the 2015 ozone NAAQS.

*B. Arkansas*

In the 2016v3 modeling, Arkansas is projected to be linked above 1 percent of the NAAQS to one nonattainment receptor and five maintenance-only receptors. It is also linked to seven violating-monitor maintenance-only receptor. Its highest-level contribution is 1.21 ppb to Brazoria County Texas (AQS Site ID 480391004). A full summary of Arkansas's October 10, 2019, SIP submission was provided in the proposed SIP submission disapproval.[93] The EPA disagrees with Arkansas's arguments for application of a higher contribution threshold than 1 percent of the NAAQS at Step 2, and further addresses the relevance of PSD SILs in Section V.B.6.[94] The EPA also found technical flaws in Arkansas's ''consistent and persistent'' claims and back trajectory analysis,[95] and legal flaws in the state's arguments related to relative contribution.[96] The State did not conduct an adequate Step 3 analysis.[97] Arkansas argued in its SIP submission that it had already implemented all cost-effective controls. However, the State included an insufficient evaluation of additional emissions control opportunities to support such a conclusion.[98] Further, the State's reliance on the cost-effectiveness thresholds in the CSAPR and CSAPR Update is insufficient for the more protective 2015 ozone NAAQS.[99] The State included no permanent and enforceable controls in its SIP submission.[100] We provide further response to comments regarding Arkansas's SIP submission in the RTC document. The EPA is finalizing disapproval of Arkansas's interstate transport SIP submission for the 2015 ozone NAAQS.

*C. California*

In the 2016v3 modeling, California is projected to be linked above 1 percent of the NAAQS to eight nonattainment receptors and four maintenance-only receptors. It is also linked to 26 violating-monitor maintenance-only receptor. Its highest-level contribution is 35.27 ppb to the nonattainment receptor located on the Morongo Band of Missions Indians reservation (AQS Site ID 060651016).[101] A full summary of California's October 1, 2018, SIP submission was provided in the proposed SIP submission disapproval.[102] The EPA found technical and legal flaws in California's geographic, meteorological, wildfire, and trajectories analysis, and the State's arguments related to local, international, and non-anthropogenic emissions.[103] The EPA further addresses the topic of international emissions in Section V.C.2. The State did not conduct an adequate Step 3 analysis.[104] California in its SIP submission argued that it had already implemented all cost-effective controls. However, California provided an insufficient evaluation of additional control opportunities to support such a conclusion.[105] Further, the State's reliance on the cost-effectiveness threshold in the CSAPR Update is insufficient for the more protective 2015 ozone NAAQS.[106] California included no permanent and enforceable emissions controls in its SIP submission[107] and argued that interstate transport is fundamentally different in the western U.S. than in the eastern U.S., to which the EPA responds in Section V.C.3.[108] We provide further response to comments regarding California's SIP submission in the RTC document. The EPA is finalizing disapproval of California's interstate transport SIP submission for the 2015 ozone NAAQS.

*D. Illinois*

In the 2016v3 modeling, Illinois is projected to be linked above 1 percent of the NAAQS to two nonattainment receptors and three maintenance-only receptor. It is also linked to six violating-monitor maintenance-only receptor. Its highest-level contribution is 19.09 ppb to Kenosha County, Wisconsin (AQS Site ID 550590019). A full summary of Illinois's May 21, 2019, SIP submission was provided in the proposed SIP submission disapproval.[109] The EPA disagrees with Illinois's arguments for application of a higher contribution threshold than 1 percent of the NAAQS at Step 2.[110] The state did not conduct an adequate Step 3 analysis.[111] The State included an insufficient evaluation of additional emissions control opportunities in its SIP submission.[112] The EPA also found technical and legal flaws in Illinois' arguments related to ''on-the-way'' controls, participation in the Lake Michigan Air Directors Consortium (LADCO), and international contributions.[113] The EPA further addresses the topic of international contribution in Section V.C.2. Further, as explained in Section V.B.9., states may not rely on non-SIP measures to meet SIP requirements, and reliance on prior transport FIPs such as the CSAPR Update is not a sufficient analysis at Step 3.[114] The State included no permanent and enforceable controls in its SIP submission.[115] We provide further response to comments regarding Illinois's SIP submission in the RTC document. The EPA is finalizing disapproval of Illinois's interstate

---

[90] *See also* id. at 64425–64426.

[91] *See also* id. at 64426.

[92] Id.

[93] 87 FR 9798, 9803–9806 (February 22, 2022).

[94] Id. at 9806–9807.

[95] Id. at 9808–9809.

[96] Id. at 9809–9810.

[97] Id. at 9809–9810.

[98] Id. at 9810.

[99] Id.

[100] Id. at 9811.

[101] We note that, consistent with the EPA's prior good neighbor actions in California, the regulatory ozone monitor located on the Morongo Band of Mission Indians (''Morongo'') reservation is a projected downwind receptor in 2023. *See* monitoring site 060651016 in Table V.D–1. of this action. We also note that the Temecula, California, regulatory ozone monitor is a projected downwind receptor in 2023 and in past regulatory actions has been deemed representative of air quality on the Pechanga Band of Luiseño Indians (''Pechanga'') reservation. *See, e.g.,* Approval of Tribal Implementation Plan and Designation of Air Quality Planning Area; Pechanga Band of Luiseño Mission Indians, 80 FR 18120, at 18121–18123 (April 3, 2015); *see also* monitoring site 060650016 in Table V.D–1. of this action. The presence of receptors on, or representative of, the Morongo and Pechanga reservations do not trigger obligations for the Morongo and Pechanga Tribes. Nevertheless, these receptors are relevant to the EPA's assessment of any linked upwind states' good neighbor obligations. *See, e.g.,* Approval and Promulgation of Air Quality State Implementation Plans; California; Interstate Transport Requirements for Ozone, Fine Particulate Matter, and Sulfur Dioxide, 83 FR 65093 (December 19, 2018). Under 40 CFR 49.4(a), tribes are not subject to the specific plan submittal and implementation deadlines for NAAQS-related requirements, including deadlines for submittal of plans addressing transport impacts. We also note that California's maximum contribution to a downwind state receptor is 6.31 ppb in Yuma County, Arizona (AQS Site ID 040278011).

[102] 87 FR 31448–31452.

[103] Id. at 31454–31457, 31460.

[104] Id. at 31458–31461.

[105] Id. at 31458.

[106] Id. at 31458–31459.

[107] Id. at 31461.

[108] *See also* id. at 31453.

[109] Id. at 9845.

[110] Id. at 9852–9853.

[111] Id. at 9853–9855.

[112] Id. at 9853.

[113] Id. at 9853–9854.

[114] *See also* id. at 9854.

[115] Id. at 9855.

transport SIP submission for the 2015 ozone NAAQS.

### E. Indiana

In the 2016v3 modeling, Indiana is projected to be linked above 1 percent of the NAAQS to four nonattainment receptors and six maintenance-only receptors. It is also linked to 10 violating-monitor maintenance receptors. Its highest-level contribution is 10.03 ppb to Racine County, Wisconsin (AQS Site ID 551010020). A full summary of Indiana's November 2, 2018, SIP submission was provided in the proposed SIP submission disapproval.[116] The EPA disagrees with Indiana's arguments for application of a higher contribution threshold than 1 percent of the NAAQS at Step 2.[117] The State did not conduct an adequate Step 3 analysis.[118] The EPA found technical and legal flaws in Indiana's arguments related to ozone concentration and design value trends, the timing of expected source shutdowns, local emissions, international and offshore contributions, Indiana's portion of contribution, and Indiana's back trajectory analysis.[119] The EPA further addresses the topic of international emissions in Section V.C.2. Indiana argued that it would not be cost-effective to implement controls on non-EGUs. However, the State included an insufficient evaluation of additional emissions control opportunities, for any type of source, to support that conclusion.[120] The EPA also confirmed that EGU shutdowns identified by Indiana were included in the 2016v2 modeling,[121] and if they were valid and not included in the 2016v2 modeling, then they were incorporated into the 2016v3 modeling as explained in Section III and the 2016v3 Emissions Modeling TSD. Further, in Section V.B.9., states may not rely on non-SIP measures to meet SIP requirements.[122] The State included no permanent and enforceable emissions controls in its SIP submission.[123] We provide further response to comments regarding Indiana's SIP submission in the RTC document. The EPA is finalizing disapproval of Indiana's interstate transport SIP submission for the 2015 ozone NAAQS.

### F. Kentucky

In the 2016v3 modeling, Kentucky is projected to be linked above 1 percent of the NAAQS to two nonattainment receptors and one maintenance-only receptor. It is also linked to four violating-monitor maintenance-only receptor. Its highest-level contribution based on the 2016v3 modeling is 0.84 ppb to Fairfield County, Connecticut (AQS Site ID 090019003). A full summary of Kentucky's January 11, 2019, SIP submission was provided in the proposed SIP submission disapproval.[124] Although the EPA's 2016v3 modeling indicated a highest-level contribution below 1 ppb, the EPA disagrees with Kentucky's arguments for application of a higher contribution threshold than 1 percent of the NAAQS at Step 2.[125] Further, Kentucky is linked above 1 ppb to a violating-monitor receptor. The EPA addresses the relevance of the PSD SILs in Section V.B.6. The Commonwealth did not conduct an adequate Step 3 analysis.[126] The EPA found technical and legal flaws in Kentucky's arguments related to the level and timing of upwind versus downwind-state responsibilities, $NO_X$ emissions trends and other air quality information, and back-trajectory analyses.[127] The EPA also found technical and legal flaws in certain State-level comments submitted by Midwest Ozone Group and attached to Kentucky's submission, including arguments related to international emissions.[128] The EPA further addresses the topics of international emissions in Section V.C.2. Kentucky in its SIP submission also argued that it had already implemented all cost-effective controls. However, the Commonwealth included an insufficient evaluation of additional emissions control opportunities to support such a conclusion.[129] As explained in Section V.B.9., states may not rely on non-SIP measures to meet SIP requirements, and reliance on prior transport FIPs such as the CSAPR Update is not a sufficient analysis at Step 3.[130] The EPA also confirmed in the proposed SIP submission disapproval that EGU shutdowns identified by Kentucky were included in the 2016v2 modeling, and yet Kentucky was still linked in that

modeling.[131] Kentucky in its SIP submission advocated for lower interstate ozone transport responsibility for states linked only to maintenance-only receptors. The EPA finds Kentucky's arguments in this regard inadequately supported.[132] The Commonwealth included no permanent and enforceable emissions controls in its SIP submission.[133] We provide further response to comments regarding Kentucky's SIP submission in the RTC document. The EPA is finalizing disapproval of Kentucky's interstate transport SIP submission for the 2015 ozone NAAQS.

### G. Louisiana

In the 2016v3 modeling, Louisiana is projected to be linked above 1 percent of the NAAQS to two nonattainment receptors and five maintenance-only receptors. It is also linked to 10 violating-monitor maintenance-only receptor. Its highest-level contribution is 9.51 ppb to Galveston County Texas (AQS Site ID 481671034). A full summary of Louisiana's November 13, 2019, SIP submission was provided in the proposed SIP submission disapproval.[134] The EPA disagrees with Louisiana's arguments for application of a higher contribution threshold than 1 percent of the NAAQS and disagrees with Louisiana's criticisms of a 1 percent of the NAAQS contribution threshold at Step 2.[135] The EPA further addresses technical comments on the 1 percent of the NAAQS contribution threshold in Section V.B.4. Louisiana did not conduct an adequate Step 3 analysis.[136] The State included an insufficient evaluation of additional emissions control opportunities in its SIP submission.[137] The EPA also found technical flaws in Louisiana's "consistent and persistent" claims, assessment of seasonal weather patterns, surface wind directions, and back trajectory analysis.[138] The State included no permanent and enforceable controls in its SIP submission.[139] We provide further response to comments regarding Louisiana's SIP submission in the RTC document. The EPA is finalizing disapproval of Louisiana's interstate transport SIP submission for the 2015 ozone NAAQS.

---

[116] Id. at 9845–9847.
[117] Id. at 9855–9856.
[118] Id. at 9857–9861.
[119] Id. at 9858–9861.
[120] Id. at 9857–9858.
[121] Id. at 9858–9859.
[122] See also id. at 9861.
[123] Id.

[124] 87 FR 9498, 9503–9507 (February 22, 2022).
[125] Id. at 9509–9510.
[126] Id. at 9511–9515.
[127] Id. at 9512–9514.
[128] Id. at 9508, 9515. The state also did not explain its own views regarding the relevance of these materials to its submission. Id.
[129] Id. at 9511–9512.
[130] See also id. at 9512.

[131] Id. at 9511–9512.
[132] Id. at 9514–9515.
[133] Id. at 9515.
[134] Id. at 9811–9812.
[135] Id. at 9812, 9815–9816.
[136] Id. at 9814–9816.
[137] Id. at 9814. 9816.
[138] Id. at 9814–9816.
[139] Id. at 9816.

*H. Maryland*

In the 2016v3 modeling, Maryland is projected to be linked above 1 percent of the NAAQS to three nonattainment receptors and one maintenance-only receptor. It is also linked to three violating-monitor maintenance receptors. Its highest-level contribution is 1.28 ppb to New Haven County, Connecticut (AQS Site ID 090099002). A full summary of Maryland's October 16, 2019, SIP submission was provided in the proposed SIP submission disapproval.[140] The state did not conduct an adequate Step 3 analysis.[141] The State included an insufficient evaluation of additional emissions control opportunities in its SIP submission.[142] Further, as explained in Section V.B.9, states may not rely on non-SIP measures to meet SIP requirements, and reliance on prior transport FIPs such as the CSAPR Update is not a sufficient analysis at Step 3.[143] The EPA also confirmed the proposed SIP submission disapproval that state emissions controls and regulations identified by Maryland were generally included in the 2016v2 modeling, and yet Maryland was still linked in that modeling.[144] The State included no permanent and enforceable controls in its SIP submission.[145] We provide further response to comments regarding Maryland's SIP submission in the RTC document. The EPA is finalizing disapproval of Maryland's interstate transport SIP submission for the 2015 ozone NAAQS.

*I. Michigan*

In the 2016v3 modeling, Michigan is projected to be linked above 1 percent of the NAAQS to four nonattainment receptors and six maintenance-only receptors. It is also linked to eight violating-monitor maintenance receptors. Its highest-level contribution is 1.59 to Sheboygan County, Wisconsin (AQS Site ID 551170006). A full summary of Michigan's March 5, 2019, SIP submission was provided in the proposed SIP submission disapproval.[146] The EPA disagrees with Michigan's arguments for application of a higher contribution threshold than 1 percent of the NAAQS as well as criticisms of a 1 percent of the NAAQS contribution threshold at Step 2.[147] The

EPA further addresses technical comments on the 1 percent of the NAAQS contribution threshold in Section V.B.4 and addresses comments regarding the relevance of the PSD SILs in Section V.B.6. The State did not conduct an adequate Step 3 analysis.[148] Michigan argued in its SIP submission that additional controls would be premature and burdensome. However, the State included an insufficient evaluation of additional emissions control opportunities to support such a conclusion.[149] The EPA found technical and legal flaws in Michigan's arguments related to upwind-state obligations as to maintenance-only receptors, international emissions, relative contribution, apportionment, and upwind versus downwind-state responsibilities.[150] The EPA further addresses the topics of mobile sources and international emissions in Sections V.C.1 and V.C.2, respectively. The EPA also confirmed in the proposed SIP submission disapproval that the EGU retirements identified by Michigan as not included in the 2011-based EPA modeling, as well as various Federal rules, were included in the 2016v2 modeling, and yet Michigan was still linked in that modeling.[151] The State included no permanent and enforceable emissions controls in its SIP submission.[152] We provide further response to comments regarding Michigan's SIP submission in the RTC document. The EPA is finalizing disapproval of Michigan's interstate transport SIP submission for the 2015 ozone NAAQS.

*J. Minnesota*

In the 2016v3 modeling, Minnesota is projected to be linked above 1 percent of the NAAQS to one maintenance-only receptor. It is not linked to a violating-monitor maintenance-only receptor. Its highest-level contribution is 0.85 ppb to Cook County, Illinois (AQS Site ID 170310001). A full summary of Minnesota's October 1, 2018, SIP submission was provided in the proposed SIP submission disapproval.[153] Because Minnesota was not projected to be linked to any receptor in 2023 in the EPA's 2011-based modeling, commenters argued that the EPA must approve the SIP submission and not rely on new modeling. The EPA responds to these comments in Section V.A.4. Although

the EPA acknowledges that Minnesota's Step 3 analysis was insufficient in part because the State assumed it was not linked at Step 2, this is ultimately inadequate to support a conclusion that the State's sources do not interfere with maintenance of the 2015 ozone NAAQS in other states in light of more recent air quality analysis.[154] The State included no permanent and enforceable emissions controls in its SIP submission.[155] We provide further response to comments regarding Minnesota's SIP submission in the RTC document. Although EPA proposed to disapprove both prong 1 and prong 2 of Minnesota's SIP submission, the present record, including the results of the 2016v3 modeling, indicates that Minnesota is not linked to any nonattainment receptors.[156] The EPA is finalizing a partial approval of Minnesota's interstate transport SIP submission for the 2015 ozone NAAQS as to prong 1 and a partial disapproval as to prong 2.

*K. Mississippi*

In the 2016v3 modeling, Mississippi is projected to be linked above 1 percent of the NAAQS to one nonattainment receptor and two maintenance-only receptors. It is also linked to eight violating-monitor maintenance receptors. Its highest-level contribution is 1.32 ppb to Galveston County, Texas (AQS Site ID 481671034). A full summary of Mississippi's September 3, 2019, SIP submission was provided in the proposed SIP submission disapproval.[157] In its submission, Mississippi advocated for discounting receptors through use of historical data trends. The EPA finds Mississippi's approach is not adequately justified.[158] In the 2011-based modeling, Mississippi's contribution to receptors was above 1 percent of the NAAQS, but below 1 ppb. The EPA disagrees with Mississippi's arguments for application of a higher contribution threshold than

---

[140] Id. at 9469.
[141] Id. at 9470–9473.
[142] Id. at 9471, 9473.
[143] *See also* id. at 9471, 9473 n.46, 9474.
[144] Id. at 9472–9473.
[145] Id. at 9473–9474.
[146] Id. at 9847–9848.
[147] Id. at 9861–9862.

[148] Id. at 9863–9867.
[149] Id. at 9864.
[150] Id. at 9864–9867.
[151] Id. at 9866.
[152] Id. at 9867.
[153] Id. at 9867.

[154] Id. at 9868–9869.
[155] Id. at 9869.
[156] The EPA received a comment that it would be arbitrary and capricious for the EPA to finalize a full disapproval of Tennessee's good neighbor SIP submission (both prong 1 and prong 2) if EPA concluded the state is linked only to a maintenance-only receptor (prong 2). EPA is deferring final action on Tennessee's good neighbor SIP submission, but in reviewing linkages in the 2016v3 modeling we determined that Minnesota and Wisconsin are not linked above 1 percent of the NAAQS to any nonattainment receptors (prong 1) but are linked to maintenance-only receptors (prong 2); these states are receiving partial approvals and partial disapprovals.
[157] 87 FR 9554.
[158] Id. at 9556.

1 percent of the NAAQS at Step 2,[159] and further addresses the relevance of the PSD SILs in Section V.B.6. The state did not conduct a Step 3 analysis.[160] The State included no evaluation of additional emissions control opportunities in its SIP submission.[161] The State included no permanent and enforceable emissions controls in its SIP submission.[162] We provide further response to comments regarding Mississippi's SIP submission in the RTC document. The EPA is finalizing disapproval of Mississippi's interstate transport SIP submission for the 2015 ozone NAAQS.

### L. Missouri

In the 2016v3 modeling, Missouri is projected to be linked above 1 percent of the NAAQS to one nonattainment receptor and three maintenance-only receptors. It is also linked to five violating-monitor maintenance receptors. Its highest-level contribution is 1.87 ppb to Sheboygan County, Wisconsin (AQS Site ID 551170006). A full summary of Missouri's June 10, 2019, SIP submission was provided in the proposed SIP submission disapproval.[163] In its submission, Missouri advocated for discounting certain maintenance receptors through use of historical data trends. The EPA finds Missouri's approach is not adequately justified.[164] The EPA disagrees with Missouri's arguments for application of a higher contribution threshold than 1 percent of the NAAQS at Step 2, and further addresses comments regarding the August 2018 memorandum in Section V.B.7.[165] The State did not conduct a Step 3 analysis.[166] The State included no evaluation of additional emissions control opportunities in its SIP submission.[167] The State included no permanent and enforceable emissions controls in its SIP submission.[168] We provide further response to comments regarding Missouri's SIP submission in the RTC document. The EPA is

finalizing disapproval of Missouri's June 10, 2019, interstate transport SIP submission for the 2015 ozone NAAQS.

### M. Nevada

In the 2016v3 modeling, Nevada is projected to be linked above 1 percent of the NAAQS to three nonattainment receptors and one maintenance-only receptor. It is also linked to one violating-monitor maintenance receptor. Its highest-level contribution is 1.13 ppb to Weber County, Utah (AQS Site ID 490570002). A full summary of Nevada's October 1, 2018, SIP submission was provided in the proposed SIP submission disapproval.[169] Because Nevada was not projected to be linked to any receptor in 2023 in the EPA's 2011-based modeling, commenters on the proposed SIP submission disapproval argued that the EPA must approve the SIP submission and not rely on new modeling. The EPA responds to these comments in Section V.A.4. The EPA also responds to technical criticisms of the 1 percent of the NAAQS contribution threshold and the relevance of the PSD SILs in Section V.B.4 and in Section V.B.6, respectively. The State did not conduct a Step 3 analysis.[170] The State included no evaluation of additional emissions control opportunities in its SIP submission.[171] The State included no additional emissions controls in its SIP submission.[172] We provide response to comments specific to interstate transport policy in the western U.S. in Section V.C.3. We provide further response to comments regarding Nevada's SIP submission in the RTC document. The EPA is finalizing disapproval of Nevada's interstate transport SIP submission for the 2015 ozone NAAQS.

### N. New Jersey

In the 2016v3 modeling, New Jersey is projected to be linked above 1 percent of the NAAQS to three nonattainment receptors and one maintenance-only receptor. It is also linked to three violating-monitor maintenance receptors. Its highest-level contribution is 8.38 ppb to Fairfield County, Connecticut (AQS Site ID 090019003). A full summary of New Jersey's May 13, 2019, SIP submission was provided in the proposed SIP submission disapproval.[173] The State did not conduct an adequate Step 3 analysis.[174]

New Jersey argued in its SIP submission that existing controls were sufficient to address the State's good neighbor obligations. However, the State included an insufficient evaluation of additional emissions control opportunities to support such a conclusion.[175] The State's reliance on the cost-effectiveness threshold in the CSAPR Update is insufficient for a more protective NAAQS.[176] The State included no permanent and enforceable emissions controls in its SIP submission.[177] We provide further response to comments regarding New Jersey's SIP submission in the RTC document. The EPA is finalizing disapproval of New Jersey's interstate transport SIP submission for the 2015 ozone NAAQS.

### O. New York

In the 2016v3 modeling, New York is projected to be linked above 1 percent of the NAAQS to three nonattainment receptors and one maintenance-only receptor. It is also linked to two violating-monitor maintenance receptors. Its highest-level contribution is 16.10 ppb to Fairfield County, Connecticut (AQS Site ID 090010017). A full summary of New York's September 25, 2018, SIP submission was provided in the proposed SIP submission disapproval.[178] The state did not conduct an adequate Step 3 analysis.[179] New York argued in its SIP submission that existing controls were sufficient to address the State's good neighbor obligations. However, the state included an insufficient evaluation of additional emissions control opportunities to support such a conclusion.[180] The State's reliance on the cost-effectiveness threshold in the CSAPR Update is insufficient for the more protective 2015 ozone NAAQS.[181] The State included no permanent and enforceable emissions controls in its SIP submission.[182] We provide further response to comments regarding New York's SIP submission in the RTC document. The EPA is finalizing disapproval of New York's interstate transport SIP submission for the 2015 ozone NAAQS.

### P. Ohio

In the 2016v3 modeling, Ohio is projected to be linked above 1 percent of the NAAQS to four nonattainment receptors and five maintenance-only

[159] Id. at 9557.
[160] Id. at 9558.
[161] Id.
[162] Id.
[163] Id. at 9538–9540.
[164] Id. at 9540–9541.
[165] See also id. at 9541–9544.
[166] Id. at 9544.
[167] Id.
[168] We note that in comments, Missouri indicated its intent to submit a new SIP submission to the EPA, which would re-evaluate good neighbor obligations based on its 2016v2 linkages and provide an analysis that would include emissions reductions requirements. The EPA received this submission on November 1, 2022. The EPA explains its consideration of this new submission as separate SIP submission in the RTC document for this final action.

[169] 87 FR 31485, 31492–31493 (May 24, 2022).
[170] Id. at 31493.
[171] Id.
[172] Id.
[173] Id. at 9490–9491.
[174] Id. at 9496.

[175] Id.
[176] Id.
[177] Id. at 9496–9497.
[178] Id. at 9489–9490.
[179] Id. at 9492–9494.
[180] Id. at 9493.
[181] Id. at 9493–9494.
[182] Id. at 9494–9495.

receptors. It is also linked to nine violating-monitor maintenance receptors. Its highest-level contribution is 2.05 ppb to Fairfield County, Connecticut (AQS Site ID 090019003). A full summary of Ohio's September 28, 2018, SIP submission was provided in the proposed SIP submission disapproval.[183] In its submission, Ohio advocated for use of the Texas Commission on Environmental Quality (TCEQ)'s definition of maintenance receptors. The EPA finds that TCEQ's definition is legally and technically flawed,[184] and as a result Ohio's approach is also not adequately justified.[185] The EPA further evaluates TCEQ's technical arguments in a TSD prepared by regional modeling staff.[186] The EPA disagrees with Ohio's arguments for application of a higher contribution threshold than 1 percent of the NAAQS at Step 2.[187] The EPA responds to technical criticisms of the 1 percent of the NAAQS contribution threshold in Section V.B.4. The State did not conduct an adequate Step 3 analysis.[188] The State included an insufficient evaluation of additional emissions control opportunities in its SIP submission.[189] The EPA found technical deficiencies in Ohio's unsubstantiated claims that emissions are overestimated.[190] The EPA also confirmed in the proposed SIP submission disapproval that several EGU and non-EGUs identified by Ohio were included in the 2016v2 modeling, and yet Ohio was still linked in that modeling.[191] The EPA summarizes the emissions inventories used in the 2016v3 modeling in Section III.A. Further, as explained in Section V.B.9, states may not rely on non-SIP measures to meet SIP requirements, and reliance on prior transport FIPs such as the CSAPR Update is not a sufficient analysis at Step 3.[192] The EPA finds legal flaws and deficiencies in Ohio's arguments related to upwind versus downwind-state responsibilities, the role of international emissions, relative contribution, and overcontrol.[193] The EPA discusses international emissions in Section V.C.2. The EPA disagrees with Ohio's arguments related to mobile

sources.[194] We further address this topic in Section V.C.1. Ohio also argued in its SIP submission that it had already implemented all cost-effective controls. However, the state included no evaluation of additional emissions control opportunities to support such a claim.[195] Further, the State's reliance on the cost-effectiveness threshold in the CSAPR Update is insufficient for the more protective 2015 ozone NAAQS.[196] The State included no permanent and enforceable emissions controls in its SIP submission.[197] We provide further response to comments regarding Ohio's SIP submission in the RTC document. The EPA is finalizing disapproval of Ohio's interstate transport SIP submission for the 2015 ozone NAAQS.

### Q. Oklahoma

In the 2016v3 modeling, Oklahoma is projected to be linked above 1 percent of the NAAQS to one nonattainment receptor and one maintenance-only receptor. It is also linked to eight violating-monitor maintenance receptors. Its highest-level contribution is 1.01 ppb to Denton County, Texas (AQS Site ID 481210034). A full summary of Oklahoma's October 25, 2018, SIP submission was provided in the proposed SIP submission disapproval.[198] In its submission, Oklahoma advocated for use of TCEQ's definition of maintenance receptors and modeling to discount receptors in Texas. The EPA finds that TCEQ's definition is legally and technically flawed [199] and, as a result, Oklahoma's approach is also not adequately justified.[200] The EPA further evaluates TCEQ's technical arguments in the EPA Region 6 2015 8-Hour Ozone Transport SIP Proposal TSD (Evaluation of TCEQ Modeling TSD) prepared by regional modeling staff.[201] Comments argued against the use of updated modeling where linkages in the EPA's 2011-based modeling and later iterations of EPA modeling differ. The EPA addressed the change in identified linkages between the 2011-based modeling and the 2016v2 modeling in the proposed SIP disapproval,[202] and further responds to comments on the use of updated modeling in Section V.A.4. The EPA disagrees with Oklahoma's arguments for application of a higher contribution

threshold than 1 percent of the NAAQS at Step 2 [203] and further addresses comments regarding the relevance of the PSD SILs in Section V.B.6. The State did not conduct an adequate Step 3 analysis.[204] Oklahoma argued in its SIP submission that it had already implemented all cost-effective controls. However, the State included an insufficient evaluation of additional emissions control opportunities to support such a conclusion.[205] As explained in Section V.B.9, states may not rely on non-SIP measures to meet SIP requirements, and reliance on prior transport FIPs such as the CSAPR Update is not a sufficient analysis at Step 3.[206] Further, the State's reliance on the cost-effectiveness threshold in the CSAPR Update is insufficient for the more protective 2015 ozone NAAQS.[207] The EPA finds legal flaws in Oklahoma's argument related to collective contribution.[208] The State included no permanent and enforceable emissions controls in its SIP submission.[209] We provide further response to comments regarding Oklahoma's SIP submission in the RTC document. The EPA is finalizing disapproval of Oklahoma's interstate transport SIP submission for the 2015 ozone NAAQS.

### R. Texas

In the 2016v3 modeling, Texas is projected to be linked above 1 percent of the NAAQS to one nonattainment receptor and nine maintenance-only receptors. It is also linked to ten violating-monitor maintenance-only receptor. Its highest-level contribution is 4.74 ppb to Dona Ana County, New Mexico (AQS Site ID 350130021). A full summary of Texas's August 17, 2018, SIP submission was provided in the proposed SIP submission disapproval,[210] and additional details were provided in the Evaluation of TCEQ Modeling TSD. The EPA identified several technical flaws in TCEQ's modeling and analysis of modeling results.[211] In its submission, Texas advocated for use of its own definition of maintenance receptors and modeling. The EPA finds Texas's approach inadequately justified and

---

[183] Id. at 9849–9851.

[184] Id. at 9826–9829.

[185] Id. at 9869–9870.

[186] 2015 8-Hour Ozone Transport SIP Proposal TSD, in Docket ID No. EPA–R06–OAR–2021–0801 (hereinafter Evaluation of TCEQ Modeling TSD).

[187] Id. at 9871.

[188] Id. at 9871–9875.

[189] Id. at 9871–9875.

[190] Id. at 9872.

[191] Id.

[192] See also id. at 9874–9875.

[193] Id. at 9873–9874.

[194] Id.

[195] Id. at 9872–9873.

[196] Id. at 9874.

[197] Id. at 9875.

[198] Id. at 9816–9818.

[199] Id. at 9826–9829.

[200] Id. at 9820–9822.

[201] Evaluation of TCEQ Modeling TSD in Docket ID No. EPA–R06–OAR–2021–0801.

[202] 87 FR 9823.

[203] Id. at 9819.

[204] Id. at 9822–9824.

[205] Id. at 9822–9824.

[206] See also id. at 9822–9823.

[207] Id.

[208] Id. at 9823.

[209] Id. at 9824.

[210] Id. at 9824–9826.

[211] Id. at 9829–9830; Evaluation of TCEQ Modeling TSD.

legally and technically flawed.[212] The EPA further evaluated TCEQ's technical arguments in the Evaluation of TCEQ Modeling TSD. In comment on the proposal, Texas pointed to differences in linkages in the EPA's 2011-based modeling and 2016v2 modeling. The EPA addressed the change in identified linkages between the 2011-based modeling and the 2016v2 modeling in the proposed SIP submission disapproval,[213] and further responds to comments on the use of updated modeling in Section V.A.4. The State did not conduct an adequate Step 3 analysis.[214] The State included an insufficient evaluation of additional emissions control opportunities in its SIP submission.[215] The EPA found technical flaws in Texas's arguments related to ''consistent and persistent'' claims and its other assessments, including analysis of back trajectories.[216] The State included no permanent and enforceable emissions controls in its SIP submission.[217] We provide further response to comments regarding Texas's SIP submission in the RTC document. The EPA is finalizing disapproval of Texas's interstate transport SIP submission for the 2015 ozone NAAQS.

*S. Utah*

In the 2016v3 modeling, Utah is projected to be linked above 1 percent of the NAAQS to three nonattainment receptors and one maintenance-only receptor. It is also linked to four violating-monitor maintenance receptors. Its highest-level contribution is 1.29 ppb to Douglas County, Colorado (AQS Site ID 080350004). A full summary of Utah's January 29, 2020, SIP submission was provided in the proposed SIP submission disapproval.[218] In its submission, Utah argued that certain receptors in Colorado should not be counted as receptors for the purpose of 2015 ozone NAAQS interstate transport, but Utah's explanation is insufficient to discount those receptors.[219] The EPA disagrees with Utah's arguments for application of a higher contribution threshold than 1 percent of the NAAQS at Step 2.[220] Utah suggested in its SIP submission that interstate transport is fundamentally different in the western U.S. than in the

eastern U.S., an argument we have previously rejected and respond to further in Section V.C.3.[221] The State did not conduct an adequate Step 3 analysis.[222] The State included an insufficient evaluation of additional emissions control opportunities in its SIP submission.[223] The EPA finds technical and legal flaws in the State's arguments related to relative contribution, international and non-anthropogenic emissions, and the relationship of upwind versus downwind-state responsibilities.[224] The EPA further addresses the topics of international emissions in Section V.C.2 and wildfires in the RTC document. The EPA also confirmed in the proposed SIP submission disapproval that several anticipated controls identified by Utah were included in the 2016v2 modeling, and yet Utah was still linked in that modeling.[225] The State included no permanent and enforceable emissions controls in its SIP submission.[226] We provide further response to comments regarding Utah's SIP submission in the RTC document. The EPA is finalizing disapproval of Utah's interstate transport SIP submission for the 2015 ozone NAAQS.

*T. West Virginia*

In the 2016v3 modeling, West Virginia is projected to be linked above 1 percent of the NAAQS to three nonattainment receptors and one maintenance-only receptor. It is also linked to four violating-monitor maintenance receptors. Its highest-level contribution is 1.49 ppb to New Haven County, Connecticut (AQS Site ID 090099002). A full summary of West Virginia's February 4, 2019, SIP submission was provided in the proposed SIP submission disapproval.[227] The EPA finds technical and legal flaws in the State's examination of back trajectories and arguments related to mobile sources and international emissions.[228] The EPA further addresses the topics of mobile sources and international emissions in Section V.C.1 and in Section V.C.2, respectively. The State did not conduct an adequate Step 3 analysis.[229] West Virginia argued in its SIP submission that it had already implemented all cost-effective controls. However, the State included an insufficient evaluation of

additional emissions control opportunities to support such a conclusion.[230] The EPA also confirmed in the proposed SIP submission disapproval that specific EGU shutdowns identified by West Virginia were included in the 2016v2 modeling, which continued to show West Virginia was linked at Step 2.[231] As explained in Section V.B.9, a state may not rely on non-SIP measures to satisfy SIP requirements, and reliance on prior transport FIPs such as the CSAPR Update is not a sufficient analysis at Step 3.[232] Further, the State's reliance on the cost-effectiveness threshold in the CSAPR Update is insufficient for a more protective NAAQS.[233] The State included no permanent and enforceable emissions controls in its SIP submission.[234] We provide further response to comments regarding West Virginia's SIP submission in the RTC document. The EPA is finalizing disapproval of West Virginia's interstate transport SIP submission for the 2015 ozone NAAQS.

*U. Wisconsin*

In the 2016v3 modeling, Wisconsin is projected to be linked above 1 percent of the NAAQS to three maintenance-only receptors. It is also linked to five violating-monitor maintenance receptors. Its highest-level contribution is 2.86 ppb to Cook County, Illinois (AQS Site ID 170314201). A full summary of Wisconsin's September 14, 2018, SIP submission was provided in the proposed SIP submission disapproval.[235] The State did not assess in its SIP submission whether the state was linked at Step 2,[236] and did not conduct an adequate Step 3 analysis.[237] The State included an insufficient evaluation of additional emissions control opportunities.[238] Further, as explained in Section V.B.9, reliance on prior transport FIPs such as the CSAPR Update is not a sufficient analysis at Step 3.[239] The EPA found additional inadequacies and legal flaws in Wisconsin's SIP submission.[240] The State included no permanent and enforceable emissions controls in its SIP submission.[241] We provide further response to comments regarding

---

[212] 87 FR 9826–9829.

[213] Id. at 9831.

[214] Id. at 9831–9834.

[215] Id. at 9831, 9834.

[216] Id. at 9832–9833, Evaluation of TCEQ Modeling TSD.

[217] 87 FR 9834.

[218] Id. at 31475–31477.

[219] Id. at 31480–31481.

[220] Id. at 31478.

[221] *See also* id. at 31479–31481, 31482.

[222] Id. at 31481–31483.

[223] Id. at 31482.

[224] Id. at 31481–31483.

[225] Id. at 31483.

[226] Id.

[227] Id. at 9522–9524.

[228] Id. at 9526–9527, 9528.

[229] Id. at 9527–9532.

[230] Id. at 9528–9529.

[231] Id. at 9529–9530.

[232] *See also* id. at 9530–9532.

[233] Id. at 9531.

[234] Id. at 9532.

[235] Id. at 9851.

[236] Id. at 9875.

[237] Id. at 9875–9876.

[238] Id. at 9876.

[239] *See also* id.

[240] Id.

[241] Id. at 9876–9877.

Wisconsin's SIP submission in the RTC document. Although EPA proposed to disapprove both prong 1 and prong 2 of Wisconsin's SIP submission, the present record, including the results of the 2016v3 modeling, indicates that Wisconsin is not linked to any nonattainment receptors.[242] The EPA is finalizing a partial approval of Wisconsin's interstate transport SIP submission for the 2015 ozone NAAQS as to prong 1 and a partial disapproval as to prong 2.

## V. Response to Key Comments

The EPA received numerous comments on the proposed action which are summarized in the RTC document along with the EPA's responses to those comments in Docket ID No. EPA–HQ–OAR–2021–0663. Each comment in its entirety is available in the relevant regional docket(s) for this action.[243] The following sections summarize key comments and the EPA's responses.

### A. SIP Evaluation Process

1. Relationship Between Timing of Proposals To Disapprove SIPs and Promulgate FIPs

*Comment:* Comments alleged generally that the timing of the EPA's proposed actions on the SIP submissions in relation to proposed FIPs was unlawful, unfair, or both. Some comments claimed that the sequence of the EPA's actions is improper, unreasonable, or bad policy. Several commenters asserted that because the EPA proposed FIPs (or, according to some, promulgated FIPs, which is not factually correct) prior to finalizing disapproval of the state SIP submission, the EPA allegedly exceeded its statutory authority and overstepped the states' primary role in addressing the good neighbor provision under CAA section 110.[244]

*EPA Response:* The EPA disagrees. The EPA has followed the Clean Air Act provisions, which prescribe specified maximum amounts of time for states to make SIP submissions, for the EPA to act on those submissions, and for the EPA to promulgate FIPs if necessary, but do not prohibit the EPA from acting before that time elapses. Nothing relieves the EPA from its statutory obligation to take final action on complete SIP submissions before the Agency within the timeframes prescribed by the statute.[245] The EPA's proposed FIP does not constitute the "promulgation" of a FIP because the proposed FIP is not a final action that imposes any requirements on sources or states. And although the EPA's FIP authority is not at issue in this action, the EPA notes the Agency has been clear that it will not finalize a FIP for any state until predicate authority is established for doing so under CAA section 110(c)(1). 87 FR 20036, 20057 (April 6, 2022) ("The EPA is proposing this FIP action now to address twenty-six states' good neighbor obligations for the 2015 ozone NAAQS, but the EPA will not finalize this FIP action for any state unless and until it has issued a final finding of failure to submit or a final disapproval of that state's SIP submission."). The EPA strongly disagrees that *proposing* a FIP prior to proposing or finalizing disapproval of a SIP submission oversteps the Agency's authority. Indeed, the ability to propose a FIP before finalizing a SIP disapproval follows ineluctably from the structure of the statute, which, as the Supreme Court recognized in *EME Homer City,* does not oblige the EPA "to wait two years or postpone its [FIP] action even a single day." 572 U.S. at 509. If the EPA can finalize a FIP immediately upon disapproving a SIP, then surely the EPA must have the authority to propose that FIP before taking final action on the SIP submission. *Accord Oklahoma* v. *U.S.*

*EPA,* 723 F.3d 1201, 1223 (10th Cir. 2013).

It is true that the EPA would not be legally authorized to *finalize* a FIP for any state unless and until the EPA formally *finalizes* a disapproval of that state's SIP submission (or makes a finding of failure to submit for any state that fails to make a complete SIP submission), per CAA section 110(c), but the EPA has not yet finalized a FIP for any state for good neighbor obligations for the 2015 ozone NAAQS. Further, the sequencing of our actions here is consistent with the EPA's past practice in our efforts to timely address good neighbor obligations. For example, at the time the EPA proposed the CSAPR Update FIPs in December of 2015, we had not yet proposed action on several states' SIP submissions but finalized those SIP disapproval actions prior to finalization of the FIP.[246]

Additional comments on cooperative federalism are addressed in Section V.B.5.

Further, The D.C. Circuit in *Wisconsin* held that states and the EPA are obligated to fully address good neighbor obligations for ozone "as expeditiously as practical" and in no event later than the next relevant downwind attainment dates found in CAA section 181(a),[247] and states and the EPA may not delay implementation of measures necessary to address good neighbor requirements beyond the next applicable attainment date without a showing of impossibility or necessity.[248] It is important for the states and the EPA to assure that necessary emissions reductions are achieved, to the extent feasible, by the 2023 ozone season to assist downwind areas with meeting the August 3, 2024, attainment deadline for Moderate nonattainment areas. Further, the D.C. Circuit in *Wisconsin* emphasized that the EPA has the authority under CAA section 110 to structure its actions so as to ensure necessary reductions are achieved by the downwind attainment

---

[242] The EPA received a comment that it would be arbitrary and capricious for the EPA to finalize a full disapproval of Tennessee's good neighbor SIP submission (both prong 1 and prong 2) if EPA concluded the State is linked only to a maintenance-only receptor (prong 2).The EPA is deferring final action on Tennessee's good neighbor SIP submission, but in reviewing linkages in the 2016v3 modeling we determined that Minnesota and Wisconsin are not linked above 1 percent of the NAAQS to any nonattainment receptors (prong 1) but are linked to maintenance-only receptors (prong 2); these States are receiving partial approvals and partial disapprovals.

[243] *See* the memo "Regional Dockets Containing Additional Supporting Materials for Final Action on 2015 Ozone NAAQS Good Neighbor SIP Submissions" in the docket for this action, for a list of all regional dockets.

[244] The EPA notes the commenters' reference to FIPs is to proposed good neighbor FIPs for the 2015 ozone NAAQS that were proposed separately from this rulemaking action. 87 FR 20036 (April 6, 2022).

[245] Although the EPA anticipates responding to comments related to the EPA's FIP authority in a separate FIP rulemaking, the EPA notes with regard to the procedural timing concerns raised in comments on this action that the Supreme Court confirmed in *EME Homer City Generation,* "EPA is not obliged to wait two years or postpone its action even a single day: The Act empowers the Agency to promulgate a FIP 'at any time' within the two-year limit." 572 U.S. 489 at 509. The procedural timeframes under CAA section 110 do not function to establish a norm or expectation that the EPA must or should use the full amount of time allotted, particularly when doing so would place the Agency in conflict with the more "central" statutory objective of meeting the NAAQS attainment deadlines in the Act. *EME Homer City,* 572 U.S. 489, 509 (2014). *See also Wisconsin,* 938 F.3d at 318, 322; *Sierra Club* v. *EPA,* 294 F.3d 155, 161 (D.C. Cir. 2002) (*Sierra Club*).

[246] The proposed CSAPR Update was published on December 3, 2015, and included proposed FIPs for Indiana, Louisiana, New York, Ohio, Texas, and Wisconsin. 80 FR 75705. At that time, the EPA had not yet even proposed action on good neighbor SIP submissions for the 2008 ozone NAAQS from Indiana, Louisiana, New York, Ohio, Texas, and Wisconsin; however, the EPA subsequently proposed and finalized these disapprovals before finalizing the CSAPR Update FIPs, published on October 26, 2016 (81 FR 74504). *See* 81 FR 38957 (June 15, 2016) (Indiana); 81 FR 53308 (August 12, 2016) (Louisiana); 81 FR 58849 (August 26, 2016) (New York); 81 FR 38957 (June 15, 2016) (Ohio); 81 FR 53284 (August 12, 2016) (Texas); 81 FR 53309 (August 12, 2016) (Wisconsin).

[247] *Wisconsin,* 938 F.3d at 313–14 (citing *North Carolina,* 531 F.3d at 911–12.

[248] *See Wisconsin,* 938 F.3d at 320.

dates,[249] the next of which for the 2015 ozone NAAQS is now the Moderate area attainment date of August 3, 2024.[250] The court pointed out that the CAA section 110 schedule of SIP and FIP deadlines is procedural whereas the attainment schedule is "central to the regulatory scheme[.]"[251] Thus, the sequence and timing of the EPA's action in disapproving these SIP submissions is informed by the need to ensure that any necessary good neighbor obligations identified in the separate FIP rulemaking are implemented as expeditiously as practicable and no later than the next attainment date. As explained in our proposed disapproval, analysis (and, if possible, implementation) of good neighbor obligations should begin in the 2023 ozone season. *See, e.g.,* 87 FR 9798, 9801–02 (Feb. 22, 2022). Indeed, states' and the EPA's analysis would have been more appropriately aligned with 2020, rather than 2023 (as had been presented in the EPA's March 2018 memorandum[252]), corresponding with the 2021 Marginal area attainment date. However, that clarification in legal obligations was not established by case law until 2020. *See Maryland,* 958 F.3d at 1203–04.

In short, nothing in the language of CAA section 110(c) prohibits the EPA from proposing a FIP as a backstop, to be finalized and implemented only in the event that a SIP submission is first found to be deficient and final disapproval action on the SIP submission is taken. Such an approach is a reasonable and prudent means of assuring that the statutory obligation to reduce air pollution affecting the health and welfare of those living in downwind states is implemented without delay, either via a SIP, or where such plan is deficient, via a FIP. The sequencing of the EPA's actions here is therefore reasonably informed by its legal obligations under the CAA, including in recognition of the fact that the implementation of necessary emissions reductions to eliminate

significant contribution and thereby protect human health and welfare is already several years delayed. The EPA shares additional responses related to the timing of 2015 ozone NAAQS good neighbor actions in Section V.A.

*Comment:* Some comments allege the EPA is depriving States of the opportunity to target specific emissions reductions opportunities, or the opportunity to revise their submissions at any point in the future.

*EPA Response:* The EPA disagrees. The EPA has repeatedly emphasized that states have the freedom at any time to develop a revised SIP submission and submit that to the EPA for approval, and this remains true. *See* 87 FR 20036, 20051 (April 6, 2022); 86 FR 23054, 23062 (April 30, 2021); 81 FR 74504, 74506 (Oct. 26, 2016). In the proposed FIPs, as in prior transport actions, the EPA discusses a number of ways in which states could take over or replace a FIP, *see* 87 FR 20036, 20149–51 (Section VII.D: "Submitting A SIP"); *see also id.* at 20040 (noting as one purpose in proposing the FIP that "this proposal will provide states with as much information as the EPA can supply at this time to support their ability to submit SIP revisions to achieve the emissions reductions the EPA believes necessary to eliminate significant contribution"). If, and when, the EPA receives a SIP submission that satisfies the requirements of CAA section 110(a)(2)(D)(i)(I), the Agency will take action to approve that SIP submission.

*Comment:* Some commenters assert that the EPA is disapproving SIP submissions for the sole purpose of pursuing an alleged objective of establishing nation-wide standards in FIPs. Other commenters point to the proposed FIPs to make arguments that the EPA's decision to finalize disapproval of the SIPs is an allegedly foregone conclusion or that the EPA has allegedly failed to provide the opportunity for meaningful public engagement on the proposed disapproval of the SIPs.

*EPA Response:* The EPA disagrees as the facts do not support this assertion. To date, the EPA has approved 24 good neighbor SIPs for the 2015 ozone NAAQS: Alaska,[253] Colorado,[254] Connecticut,[255] Delaware,[256] District of Columbia,[257] Florida,[258] Georgia,[259]

Hawaii,[260] Idaho,[261] Iowa,[262] Kansas,[263] Maine,[264] Massachusetts,[265] Montana,[266] Nebraska,[267] New Hampshire,[268] North Carolina,[269] North Dakota,[270] Oregon,[271] Rhode Island,[272] South Carolina,[273] South Dakota,[274] Vermont,[275] and Washington.[276]

The policy judgments made by the EPA in all actions on 2015 ozone NAAQS good neighbor SIP submissions, including approval actions, reflect consistency with relevant good neighbor case law and past agency practice implementing the good neighbor provision as reflected in the original CSAPR, CSAPR Update, Revised CSAPR Update, and related rulemakings. Employing a nationally consistent approach is particularly important in the context of interstate ozone transport, which is a regional-scale pollution problem involving many smaller contributors. Effective policy solutions to the problem of interstate ozone transport dating back to the $NO_X$ SIP Call [63 FR 57356 (October 27, 1998)] have necessitated the application of a uniform framework of policy judgments to ensure an "efficient and equitable" approach. *See EME Homer City,* 572 U.S. at 519. In any case, the approach of the proposed transport FIP is not the subject of this SIP disapproval. This rulemaking does not impose any specific emissions control measures on the states. Nor is the EPA disapproving these SIP submittals because they did not follow exactly the control strategies in the proposed FIP—the EPA has repeatedly indicated openness to alternative approaches to addressing interstate pollution obligations, but for reasons explained elsewhere in the rulemaking record, the EPA finds that none of the states included in this action submitted approvable approaches to addressing those obligations.

The EPA disputes the contentions that the FIP proposal itself indicates that the EPA did not earnestly examine the SIP submissions for compliance with the CAA or have an appropriate rationale

[249] *Wisconsin,* 938 F.3d at 318 ("When EPA determines a State's SIP is inadequate, the EPA presumably must issue a FIP that will bring that State into compliance before upcoming attainment deadlines, even if the outer limit of the statutory timeframe gives the EPA more time to formulate the FIP.") (citing *Sierra Club,* 294 F.3d at 161).

[250] *See* CAA section 181(a); 40 CFR 51.1303; Additional Air Quality Designations for the 2015 Ozone National Ambient Air Quality Standards, 83 FR 25776 (June 4, 2018, effective August 3, 2018).

[251] *Wisconsin,* 938 F.3d at 322 ("Delaware's argument leans too heavily on the SIP submission deadline. SIP submission deadlines, unlike attainment deadlines, are 'procedural' and, therefore, not 'central to the regulatory scheme.' ") (citing *Sierra Club,* 294 F.3d at 161).

[252] *See* March 2018 memorandum.

[253] 84 FR 69331 (December 18, 2019).
[254] 87 FR 61249 (October 11, 2022).
[255] 86 FR 71830 (December 20, 2021).
[256] 85 FR 25307 (May 1, 2020).
[257] 85 FR 5570 (January 31, 2020).
[258] 86 FR 68413 (December 2, 2021).
[259] Id.

[260] 86 FR 73129 (December 27, 2021).
[261] 85 FR 65722 (October 16, 2020).
[262] 87 FR 22463 (April 15, 2022).
[263] 87 FR 19390 (April 4, 2022).
[264] 86 FR 45870 (August 17, 2021).
[265] 85 FR 5572 (January 31, 2020).
[266] 87 FR 21578 (April 12, 2022).
[267] 85 FR 21325 (April 17, 2020).
[268] 86 FR 45870 (August 17, 2021).
[269] 86 FR 68413 (December 2, 2021).
[270] 85 FR 20165 (April 10, 2020).
[271] 84 FR 22376 (May 17, 2019).
[272] 86 FR 70409 (December 10, 2021).
[273] 86 FR 68413 (December 2, 2021).
[274] 85 FR 67653 (October 26, 2020).
[275] 85 FR 34357 (June 4, 2020).
[276] 83 FR 47568 (September 20, 2018).

for proposing to disapprove certain SIP submissions. The EPA also disputes that the FIP proposal indicates that the EPA did not intend to consider comments on the proposed disapprovals. Comments making claims the EPA did not follow proper administrative procedure have been submitted utilizing the very notice and comment process these comments claim the EPA is skipping, and these claims are factually unsupported. Comments related to the length of the comment period and claims of ''pretext'' are addressed in the RTC document.

*Comment:* Several comments pointed out how hard many states have worked to develop an approvable SIP submission.

*EPA Response:* The EPA acknowledges and appreciates states' efforts to develop approvable SIPs. Cooperative federalism is a cornerstone of CAA section 110, and the EPA strives to collaborate with its state partners. The timing of the EPA's 2015 ozone NAAQS good neighbor actions is not in any way intended to call into question any state's commitment to develop approvable SIPs. The EPA evaluated each SIP submission on its merits. The EPA relies on collaboration with state air agencies to ensure SIP submissions are technically and legally defensible, and the Agency's action here is in no way meant to undermine that collaboration between state and Federal partners respecting SIP development.

*Comment:* Several comments make various arguments about when the EPA can finalize FIPs. Some commenters argue that CAA section 110(c)(1) guarantees states an additional two years to correct their SIP submissions before the EPA finalizes a FIP. Others argue that the notice and comment requirements of the Administrative Procedures Act mandate that the EPA finalize a SIP submission disapproval before proposing a FIP. One commenter suggested that a state must be allowed to fully exhaust its judicial remedies to challenge a SIP submission disapproval before the EPA can promulgate a FIP. Commenters also raise concerns about the analysis and requirements in the proposed FIPs.

*EPA Response:* Comments opining on when the EPA is legally authorized to propose or finalize a FIP are outside the scope of this action. While the EPA acknowledges that the Agency has no obligation or authority to finalize a FIP until finalizing a disapproval of a SIP submission or determining that a state failed to submit a complete SIP submission (CAA section 110(c)(1)), this action is limited to determining whether the covered SIP submissions meet the requirements of CAA section

110(a)(2)(D)(i)(I). For the same reason, comments criticizing specific substantive requirements or implementation timelines in the proposed FIPs are beyond the scope of this action.

## 2. Requests for Additional Time To Revise SIP Submissions

*Comment:* Some commenters argue that the EPA must or should delay action on these SIP submissions so that states can reexamine and resubmit SIP submissions. Other commenters argue that states must be given more time to re-examine and resubmit their SIP submission for various reasons, including the substantive requirements in the proposed FIPs.

*EPA Response:* The EPA notes that there is no support in the Clean Air Act for such a delay. CAA section 110(a)(1) requires states to adopt and submit SIP submissions meeting certain requirements including the requirements of CAA section 110(a)(2)(D)(i)(I), ''within 3 years (or such shorter period as the Administrator prescribe) after the promulgation of a national primary ambient air quality standard (or any revision thereof).'' CAA section 110(a)(1). The submission deadline clearly runs from the date of promulgation of the NAAQS, which for the 2015 ozone NAAQS was October 1, 2015. 80 FR 65291 (Oct. 26, 2015). In addition, while the Administrator is given authority to prescribe a period shorter than three years for the states to adopt and submit such SIP submissions, the Act does not give the Administrator authority to lengthen the time allowed for CAA section 110(a)(2) submissions. And the EPA would be in violation of court-ordered deadlines if it deferred taking final action beyond January 31, 2023, for all but two of the states covered by this action.[277]

Comments asserting that the EPA must give more time to states to correct deficiencies and re-submit conflict with the controlling caselaw in that they would elevate the maximum timeframes allowable within the procedural framework of CAA section 110 over the attainment schedule of CAA section 181 that the D.C. Circuit has now held multiple times must be the animating focus in the timing of good neighbor obligations. The D.C. Circuit in *Wisconsin* held that states and the EPA are obligated to fully address good neighbor obligations for ozone ''as expeditiously as practical'' and in no

event later than the next relevant downwind attainment dates found in CAA section 181(a),[278] and the EPA may not delay implementation of measures necessary to address good neighbor requirements beyond the next applicable attainment date without a showing of impossibility or necessity.[279] Further, the court pointed out that the CAA section 110 schedule of SIP and FIP deadlines is procedural, and while the EPA has complied with the mandatory sequence of actions required under section 110 here, we are mindful of the court's observation that, as compared with the fundamental substantive obligations of title I of the CAA to attain and maintain the NAAQS, the maximum timeframes allotted under section 110 are less ''central to the regulatory scheme[.]''[280]

*Comment:* Other comments take the position that states are owed a second opportunity to submit SIP submissions before the EPA takes final action for various reasons, including claims that the EPA failed to issue adequate guidance or is otherwise walking back previously issued guidance. They allege that a state cannot choose controls to eliminate significant contribution until the EPA quantifies the contribution. Other comments argue that the EPA should not or cannot base the disapprovals on alleged shifts in policy that occurred after the Agency received the SIP submissions.

*EPA Response:* The EPA disagrees that the Agency was required to issue guidance or quantify individual states' level of significant contribution for 2015 ozone NAAQS good neighbor obligations, because as noted in *EME Homer City,* the Supreme Court clearly held that ''nothing in the statute places EPA under an obligation to provide specific metrics to States before they undertake to fulfill their good neighbor obligations.''[281] The Agency issued three memoranda in 2018 to provide modeling results and some ideas to states in the development of their SIP submissions. However, certain aspects of those discussions were specifically

---

[277] The EPA has no court-ordered deadline to take final action on the good neighbor SIP submission from Alabama dated June 21, 2022, or Utah's good neighbor SIP submission.

[278] *Wisconsin,* 938 F.3d at 313–14 (citing *North Carolina,* 531 F.3d at 911–12). On May 19, 2020, the D.C. Circuit in *Maryland,* applying the *Wisconsin* decision, held that the EPA must assess air quality at the next downwind attainment date, including Marginal area attainment dates, in evaluating the basis for the EPA's denial of a petition under CAA section 126(b). *Maryland,* 958 F.3d at 1203–04.

[279] *See Wisconsin,* 938 F.3d at 320.

[280] *Wisconsin,* 938 F.3d at 322 (''Delaware's argument leans too heavily on the SIP submission deadline. SIP submission deadlines, unlike attainment deadlines, are 'procedural' and therefore not 'central to the regulatory scheme.''') (citing *Sierra Club,* 294 F.3d at 161).

[281] *EME Homer City,* 572 U.S. at 510.

identified as not constituting agency guidance (especially Attachment A to the March 2018 memorandum, which comprised an unvetted list of outside stakeholders' ideas). Further, states' submissions did not meet the terms of the August or October 2018 memoranda addressing contribution thresholds and maintenance receptors, respectively. (*See* Section V.B for further discussion of these memoranda.) We acknowledge that the EPA reassessed air quality and states' contribution levels through additional modeling before proposing action on these SIP submissions. But that is not in any way an effort to circumvent the SIP/FIP process; rather it is an outcome of the reality that the EPA updated its modeling platform from a 2011 to a 2016 base year and updated its emissions inventory information along with other updates. There is nothing improper in the Agency improving its understanding of a situation before taking action, and the Agency reasonably must be able to act on SIP submissions using the information available at the time it takes such action. Those updates have not uniformly been used to disapprove SIPs—the new modeling for instance supported the approval of Montana's and Colorado's SIPs.[282] Nor has the new modeling prevented states from submitting new SIP submissions based on that modeling. For instance, the State of Alabama withdrew its prior submission in April of 2022, following our proposed disapproval, and submitted a new submission (further updated in June of 2022) analyzing the 2016v2 modeling used at proposal. The EPA is acting on that new submission and evaluating the new arguments the State developed regarding the more recent modeling. Nonetheless, as explained in the EPA's proposed disapproval of Alabama's new submission and in Section IV.A, the new arguments that Alabama has presented in its more recent submission do not lead the EPA to a contrary conclusion that its SIP submission should be approved.[283] This demonstrates two points contrary to commenters' contentions: first, the EPA is following the science and is making nationally consistent determinations at Steps 1 and 2, based on its review of each state's submission; and second, the fact that states made submissions based on the 2011-based modeling results presented in the March 2018

memorandum rather than on the most recent modeling results is not prejudicial to the outcome of the EPA's analysis, as our action on Alabama's more recent submission evaluating the State's arguments with respect to the newer, 2016-based modeling makes clear.

Contrary to commenters' arguments, the EPA had no obligation to issue further guidance, define obligations, or otherwise clarify or attempt to interpret states' responsibilities since the issuance of the 2018 memoranda, prior to acting on these SIP submissions. States themselves were aware or should have been aware of the case law developments in *Wisconsin* and in *Maryland,* which called into question the EPA's use of 2023 as the analytical year in the March 2018 memorandum. Those decisions were issued in 2019 and 2020 respectively, yet no state moved to amend or supplement their SIP submissions with analysis of an earlier analytical year or to otherwise bring their analyses into conformance with those decisions (*e.g.,* through fuller analysis of non-EGU emissions reduction potential or through treatment of international contribution). Given the Supreme Court's 2014 holding in *EME Homer City,* 572 U.S. at 508–510, which reversed a D.C. Circuit holding that the EPA *was* obligated to define good neighbor obligations,[284] states had no reason to expect the EPA would be obligated to issue further guidance to clarify requirements in the wake of those decisions. The EPA agrees with those commenters who point out that states have the first opportunity to assess and address obligations in implementing the NAAQS, but with that understanding in mind, it is notable that prior to the proposed disapprovals in February of 2022, no state moved to amend or supplement their SIP submission as the case law on good neighbor obligations evolved or in response to new modeling information as it became available.

Further, the EPA has evaluated state SIP submissions on the merits of what is contained in the submission, not the use of any particular modeling platform. The EPA disagrees with commenters' assertions that the EPA has proposed disapproval of a state's proposed SIP due to the use of a particular modeling platform. As noted previously, the EPA approved state SIP submissions that have used the earlier modeling. The EPA did not reach its conclusion to disapprove states' SIP submissions based on the use of the 2016v2

emissions platform standing alone. Use of that platform, or any other modeling platform, is not *ipso facto* grounds for disapproval at all. As evident in the proposed disapprovals and summarized in Section IV, the EPA evaluated the SIP submissions based on the merits of the arguments put forward in each SIP submission.

3. Alleged Harm to States Caused by Time Between SIP Submission and the EPA's Action

*Comment:* Many comments pointed to the EPA's statutory deadlines to take action on the SIP submissions to argue that the EPA's delay harmed the upwind state's interests because now the EPA may conclude they need to reduce their emissions to satisfy their good neighbor obligations in the separate FIP rulemaking whereas had the EPA acted by statutory deadlines using the older modeling, they might have had their SIP submissions approved. Some commenters suggest that the EPA never gave the state SIP submissions the appropriate review or suggest that the EPA's review of the SIP submissions was prejudiced by the FIP it had proposed.

*EPA Response:* The EPA acknowledges that the Agency's statutory deadlines to take final action on these SIP submissions generally fell in 2020 and 2021. However, the delay in acting caused no prejudice to the upwind states. First, this action to disapprove SIP submissions itself will not impose any requirements or penalties on any state or sources within that state. Second, these delays have primarily had the effect of deferring relief to downwind states and their citizens from excessive levels of ozone pollution under the good neighbor provision. Further, the EPA has generally had a practice of correcting its action on good neighbor SIP submittals if later information indicates that a prior action was in error—thus, it is not the case that simply having obtained an approval based on earlier modeling would have meant a state would be forever insulated from later being subject to corrective or remedial good neighbor actions. *See, e.g.,*86 FR 23056, 23067–68 (April 30, 2021) (error correcting Kentucky's approval to a disapproval and promulgating FIP addressing Kentucky's outstanding 2008 ozone NAAQS good neighbor obligations); 87 FR 20036, 20041 (April 6, 2022) (proposing error correction for Delaware's 2015 ozone NAAQS SIP approval to a disapproval based on updated air quality modeling). Finally, there is no basis in the CAA to use the Agency's own delay as a basis to nullify

---

[282] 87 FR 6095, 6097 at n. 15 (February 3, 2022) (Montana proposal); 87 FR 27050, 27056 (May 6, 2022) (Colorado, proposal), 87 FR 61249 (October 11, 2022) (Colorado, final).

[283] 87 FR 64412 (October 25, 2022).

[284] *EME Homer City Generation, L.P.* v. *EPA,* 696 F.3d 7 (D.C. Cir. 2012) (*EME Homer City I*).

the authority granted in the Act to address the nation's air pollution problems, as the statute itself contains other forms of adequate remedy. CAA section 304(a)(2) provides for judicial recourse where there is an alleged failure by the agency to perform a nondiscretionary duty, and that recourse is for the Agency to be placed on a court-ordered deadline to address the relevant obligations. *Accord Oklahoma,* 723 F.3d at 1223–24; *Montana Sulphur and Chemical Co.* v. *U.S. EPA,* 666 F.3d 1174, 1190–91 (9th Cir. 2012).

*Comment:* Some comments contend that the EPA's delay in acting on SIP submissions was a deliberate attempt to circumvent the SIP/FIP process, unduly burden the states, or to defer making information available to states. Comments allege that the EPA intentionally stalled an evaluative action until the perceived ''facts'' of the situation changed such that the analyses submitted by states were rendered outdated.

*EPA Response:* The EPA disagrees with both allegations. In this respect, it is important to review the recent history of the EPA's regulatory actions and litigation with respect to good neighbor obligations for both the 2008 and 2015 ozone NAAQS, and in particular, the substantial additional workload the Agency took on in the wake of the remand of the CSAPR Update in *Wisconsin.* In 2018, as the EPA issued the memoranda cited by commenters and planned to shift its focus to implementing the 2015 standards, it also issued the CSAPR Close-out, which made an analytical finding that there were no further obligations for 21 states for the 2008 standards following the CSAPR Update. 83 FR 65878 (Dec. 21, 2018). However, contrary to the EPA's understanding that it had fully addressed good neighbor obligations for the 2008 ozone NAAQS, the D.C. Circuit's decisions in *Wisconsin* (remanding the CSAPR Update) and in *New York* (vacating the CSAPR Close-out), forced the Agency to quickly pivot back to addressing remaining obligations under the 2008 standards. *Wisconsin* v. *EPA,* 938 F.3d 303 (D.C. Cir. 2019); *New York* v. *EPA,* 781 F. App'x. 4 (D.C. Cir. 2019). The EPA was subject to renewed deadline suit litigation under CAA section 304, which led to a March 15, 2021, deadline to take final action on several states whose FIPs had been remanded and were incomplete in the wake of the CSAPR Close-out vacatur. *New Jersey* v. *Wheeler,* 475 F.Supp.3d 308 (S.D.N.Y. 2020). Throughout 2020 and 2021, the EPA was therefore focused on an

unexpected rulemaking obligation to complete good neighbor requirements as to the states with remanded CSAPR Update FIPs. This led to the EPA proposing and then issuing an economically significant, major rule assessing additional EGU emissions reduction obligations as well as presenting updated air quality modeling analysis using novel techniques and presenting information on a host of non-EGU industrial sources for the first time, *i.e.,* the Revised CSAPR Update, 86 FR 23054 (April 30, 2021). That rule is now currently subject to judicial review in the D.C. Circuit, *Midwest Ozone Group* v. *EPA,* No. 21–1146 (D.C. Cir. argued Sept. 28, 2022).[285] The EPA has also been in the process of reviewing and acting upon many states' good neighbor SIPs where the available information indicates that an approval of the state's submission was appropriate.[286]

Finally, the Agency needed time to review and evaluate the SIP submissions in a coordinated fashion to act on all the states' submissions in a consistent manner. As the EPA explained in the proposed disapproval action, consistency in defining CAA obligations is critically important in the context of addressing a regional-scale pollutant like ozone. *See, e.g.,* 87 FR 9807 n.48. Through coordinated development of the bases for how the Agency could act on the SIP submissions, while also evaluating the contours of a potential Federal plan to implement obligations where required, the EPA sequenced its deliberations and decision making to maximize efficient, consistent, and timely action, in recognition of the need to implement any necessary obligations ''as

expeditiously as practicable.''[287] The downsides of commenters' policy preference in favor of giving states another opportunity to develop SIP submissions, or in first acting on each SIP submission before proposing a FIP, are that such a sequence of actions would have led to multiple years of additional delay in addressing good neighbor obligations. Even if such a choice was available to the Agency using the CAA section 110(k)(5) SIP call mechanism, it was entirely reasonable for the EPA to decline to use that mechanism in this instance. (EPA further addresses comments in support of a SIP call approach in the RTC document.)

In short, commenters' notion that the EPA was deliberately or intentionally deferring or delaying action on these SIP submissions to circumvent any required legal process or reach any specific result is simply incorrect. Commenters have not supplied any evidence to support the claim either that any legal process was circumvented or that the Agency's conduct was in bad faith. *See Biden* v. *Texas,* 142 S.Ct. 2528, 2546–47 (2022) (presumption of regularity attends agency action absent a ''strong showing of bad faith or improper behavior'') (citing *Citizens to Protect Overton Park* v. *Volpe,* 401 U.S. 302, 420 (1971); *SEC* v. *Chenery,* 318 U.S. 80, 87 (1943)).

### 4. Use of Updated Modeling

*Comment:* Comments allege that by relying on modeling not available at the time of SIP submission development, the EPA ''moved the goal post.'' Comments note the timeframes set out for action on SIPs, citing section 110 of the Act, and allege that by failing to act on SIP submissions in a timely manner and basing such actions on new modeling, the EPA imposes an arbitrary and capricious standard. Comments state that the EPA should not disapprove a SIP based on data not available to states during development of the SIP submissions or to the EPA during the period statutorily allotted for the EPA to take final action on SIP submissions.

*EPA Response:* In response to comments' claims that the EPA has inappropriately changed states' obligations for interstate transport by relying on updated modeling not available to states at the time they prepared their SIP submissions, the EPA disagrees. As an initial matter, the EPA disagrees with comment's claiming that the agency expected state air agencies to develop a SIP submission based on

---

[285] During this time, the EPA also fulfilled its obligations to act on several petitions brought by downwind states under section 126(b) of the CAA. These actions culminated in litigation and ultimately adverse decisions in *Maryland* and *New York* v. *EPA. Maryland v,* 958 F.3d; *New York* v. *EPA,* 964 F.3d 1214, 2020 WL 3967838 (D.C. Cir. 2020). Further review and action on these remands remains pending before the agency.

[286] In chronological order: 83 FR 47568 (September 20, 2018) (Washington); 84 FR 69331 (December 18, 2019) (Alaska); 84 FR 22376 (May 17, 2019) (Oregon); 85 FR 5570 (January 31, 2020) (Washington, DC); 85 FR 5572 (January 31, 2020) (Massachusetts); 85 FR 20165 (April 10, 2020) (North Dakota); 85 FR 21325 (April 17, 2020) (Nebraska); 85 FR 25307 (May 1, 2020) (Delaware); 85 FR 34357 (June 4, 2020) (Vermont); 85 FR 65722 (October 16, 2020) (Idaho); 85 FR 67653 (October 26, 2020) (South Dakota); 86 FR 45870 (August 17, 2021) (Maine and New Hampshire); 86 FR 68413 (December 2, 2021) (Florida, Georgia, North Carolina, and South Carolina); 86 FR 70409 (December 10, 2021) (Rhode Island); 86 FR 71830 (December 20, 2021) (Connecticut); 86 FR 73129 (December 27, 2021) (Hawaii); 87 FR 19390 (April 4, 2022) (Kansas); 87 FR 21578 (April 12, 2022) (Montana); 87 FR 22463 (April 15, 2022) (Iowa); and 87 FR 61249 (October 11, 2022) (Colorado).

[287] CAA section 181(a); *Wisconsin,* 938 F.3d at 313–14 (citing *North Carolina,* 531 F.3d at 911–12).

some unknown future data. The EPA recognizes that states generally developed their SIP submissions with the best available information at the time of their development. As stated in the proposals, the EPA did not evaluate states' SIP submissions based solely on the 2016v2 emissions platform (or the 2016v3 platform, which incorporates comments generated during the public comment period on the proposed SIP actions and which supports these final SIP disapproval actions). We evaluated the SIP submissions based on the merits of the arguments put forward in each SIP submission, which included any analysis put forward by states to support their conclusions. Thus, we disagree with commenters who allege the Agency has ignored the information provided by the states in their submissions. Indeed, the record for this action reflects our extensive evaluation of states' air quality and contribution analyses. *See* generally Section IV, which summarizes our evaluation for each state.

We disagree with commenters who advocate that the EPA's evaluation of these submissions must be limited to the information available to states at the time they made their submissions, or information at the time of the deadline for the EPA to act on their submissions. It can hardly be the case that the EPA is prohibited from taking rulemaking action using the best information available to it at the time it takes such action. Nothing in the CAA suggests that the Agency must deviate from that general principle when acting on SIP submissions. While CAA section 110(k)(2) specifies a time period in which the Administrator is to act on a state submission, neither this provision nor any other provision of the CAA specifies that the remedy for the EPA's failure to meet a statutory deadline is to arrest or freeze the information the EPA may consider to what was available at the time of a SIP submission deadline under CAA section 110. Indeed, in the interstate transport context, this would lead to an anomalous result. For example, the D.C. Circuit rejected an argument made by Delaware against the CSAPR Update air quality analysis that the EPA was limited to reviewing air quality conditions in 2011 (rather than 2017) at the time of the statutory deadline for SIP submittals. The court explained:

Delaware's argument leans too heavily on the SIP submission deadline. SIP submission deadlines, unlike attainment deadlines, are ''procedural'' and therefore not ''central to the regulatory scheme.'' *Sierra Club,* 294 F.3d at 161. Nor can Delaware's argument be reconciled with the text of the Good Neighbor Provision, which prohibits upwind States from emitting in amounts ''which *will*'' contribute to downwind nonattainment. 42 U.S.C. 7410(a)(2)(D)(i) (emphasis added). Given the use of the future tense, it would be anomalous for EPA to subject upwind States to good neighbor obligations in 2017 by considering which downwind States were once in nonattainment in 2011.

*Wisconsin,* 903 F.3d at 322. By the same token, here, holding the EPA to a consideration only of what information states had available regarding the 2023 analytic year at the time of their SIP submissions or at the time of a deadline under CAA section 110, would likewise elevate the ''procedural'' deadlines of CAA section 110 above the substantive requirements of the CAA that are ''central to the regulatory scheme.'' Doing so here would force the Agency to act on these SIP submissions knowing that more recent refined, high quality, state-of-the-science modeling and monitoring data would produce a different result in our forward-looking analysis of 2023 than the information available in 2018. Nothing in the CAA dictates that the EPA must be forced into making substantive errors in its good neighbor analysis on this basis.

We relied on CAMx Version 7.10 and the 2016v2 emissions platform to make updated determinations regarding which receptors would likely exist in 2023 and which states are projected to contribute above the contribution threshold to those receptors. As explained in the preamble of the EPA's proposed actions and further detailed in the document titled ''Air Quality Modeling TSD: 2015 Ozone National Ambient Air Quality Standards Proposed Interstate Transport Air Plan Disapproval'' and 2016v2 Emissions Inventory TSD, both available in Docket ID no. EPA–HQ–OAR–2021–0663, the 2016v2 modeling built off previous modeling iterations used to support the EPA's action on interstate transport obligations. The EPA continuously refines its modeling to ensure the results are as indicative as possible of air quality in future years. This includes adjusting our modeling platform and updating our emissions inventories to reflect current information.

Additionally, we disagree with comments claiming that the 2016v2 modeling results were sprung upon the states with the publication of the proposed disapprovals. The EPA has been publishing a series of data and modeling releases beginning as early as the publication of the 2016v1 modeling with the proposed Revised CSAPR Update in November of 2020, which could have been used to track how the EPA's modeling updates were potentially affecting the list of possible receptors and linkages for the 2015 ozone NAAQS in the 2023 analytic year. The 2016-based meteorology and boundary conditions used in the modeling have been available through the 2016v1 platform, which was used for the Revised CSAPR Update (proposed in November of 2020, 85 FR 68964). The updated emissions inventory files used in the current modeling were publicly released September 21, 2021, for stakeholder feedback, and have been available on our website since that time.[288] The CAMx modeling software that the EPA used has likewise been publicly available for over a year. CAMx version 7.10 was released by the model developer, Ramboll, in December 2020. On January 19, 2022, we released on our website and notified a wide range of stakeholders of the availability of both the modeling results for 2023 and 2026 (including contribution data) along with many key underlying input files.[289]

By providing the 2016 meteorology and boundary conditions (used in the 2016v1 version) in fall of 2020 and by releasing updated emissions inventory information used in 2016v2 in September of 2021,[290] states and other interested parties had multiple opportunities prior to the proposed disapprovals in February of 2022 to consider how our modeling updates could affect their status for purposes of evaluating potential linkages for the 2015 ozone NAAQS. Further, by using the updated modeling results, the EPA is using the most current and technically appropriate information for this rulemaking. This modeling was not performed to ''move the goal posts'' for states but meant to provide updated emissions projections, such as additional emissions reductions for EGUs following promulgation of the Revised CSAPR Update for the 2008 ozone NAAQS, more recent information on plant closures and fuel switches, and sector trends, including non-EGU sectors. The construct of the 2016v2 emissions platform is described in the 2016v2 Emissions Modeling TSD contained in Docket ID No. EPA–HQ–OAR–2021–0663.

Finally, comments related to the timing of the EPA's action to disapprove these SIP submissions are addressed in Section V.A.1. The EPA notes the statute provides a separate remedy for agency action unlawfully delayed. In section 304 of the CAA, there is a

---

[288] See https://www.epa.gov/air-emissions-modeling/2016v2-platform.

[289] See https://www.epa.gov/scram/photochemical-modeling-applications.

[290] https://www.epa.gov/air-emissions-modeling/2016v2-platform.

process for filing suit against the EPA for its failure to comply with a non-discretionary statutory duty under the CAA. The appropriate remedy in such cases is an order to compel agency action, not a determination that the agency, by virtue of missing a deadline, has been deprived of or constrained in its authority to act. *See Oklahoma,* 723 F.3d at 1224 ("[W]hen 'there are less drastic remedies available for failure to meet a statutory deadline'—such as a motion to compel agency action— 'courts should not assume that Congress intended the agency to lose its power to act.' The Court 'would be most reluctant to conclude that every failure of an agency to observe a procedural requirement voids subsequent agency action, especially when important public rights are at stake.'") (cleaned up) (quoting *Brock* v. *Pierce County,* 476 U.S. 253, 260 (1986)).

*Comment:* Comments state that it is inappropriate for the EPA to revise its emissions inventory and to conduct new air quality modeling without allowing an appropriate opportunity for stakeholder review and comment and that the EPA must allow public comment on any updated (*i.e.,* 2016v3) modeling prior to use by the EPA in a final action. Comments claim that the EPA must withdraw the proposed disapproval and provide states time to develop new SIP submissions based on the updated information.

*EPA Response:* The EPA has evaluated a wide range of technical information and critiques of its 2016v2 emissions inventory and modeling platform following a solicitation of public feedback as well the public comment period on this action (and the proposed FIP action) and has responded to those comments and incorporated updates into the version of the modeling being used in this final action (2016v3). *See* Section III, the Final Action AQM TSD, and Section 4 of the RTC document for further discussion.

The EPA's development of and reliance on newer modeling to confirm modeling used at the proposal stage is in no way improper and is simply another iteration of the EPA's longstanding scientific and technical work to improve our understanding of air quality issues and causes going back decades. Where the 2016v3 modeling produced a potentially different outcome for states from proposal, that is reflected in this action (*e.g.,* our deferral of final action on Tennessee and Wyoming's SIP submissions).

*Comment:* Comments allege that EPA's modeling results have been inconsistent, questioning the reliability of the results.

*EPA Response:* Although some commenters indicate that our modeling iterations have provided differing outcomes and are therefore unreliable, this is not what the overall record indicates. Rather, in general, although the specifics of states' linkages may change slightly, our modeling overall has provided consistent outcomes regarding which states are linked to downwind air quality problems. For example, the EPA's modeling shows that most states that were linked to one or more receptors using the 2011-based platform (*i.e.,* the March 2018 data release) are also linked to one or more receptors using the newer 2016-based platform. Because each platform uses different meteorology (*i.e.,* 2011 and 2016) it is not at all unexpected that an upwind state could be linked to different receptors using 2011 versus 2016 meteorology.

In addition, although a state may be linked to a different set of receptors, states are often linked to receptors in the same area that has a persistent air quality problem. These differing results regarding receptors and linkages can be affected by the varying meteorology from year to year, but this does not indicate that the modeling or the EPA or the state's methodology for identifying receptors or linkages is inherently unreliable. Rather, for many states these separate modeling runs all indicated: (i) that there would be receptors in areas that would struggle with nonattainment or maintenance in the future, and (ii) that the state was linked to some set of these receptors, even if the receptors and linkages differed from one another in their specifics (*e.g.,* a different set of receptors were identified to have nonattainment or maintenance problems, or a state was linked to different receptors in one modeling run versus another).

The EPA interprets this common result as indicative that a state's emissions have been substantial enough to generate linkages at Step 2 to varying sets of downwind receptors generated under varying assumptions and meteorological conditions, even if the precise set of linkages changed between modeling runs. Under these circumstances, we think it is appropriate to proceed to a Step 3 analysis to determine what portion of a particular state's emissions should be deemed "significant." We also note that only four states included in the proposed disapprovals went from being unlinked to being linked between the 2011-based modeling provided in the March 2018 memorandum and the 2016v2-based modeling—Alabama, Minnesota, Nevada, and Tennessee.

5. Cooperative Federalism and the EPA's Authority

*Comment:* Many comments point to the concept of cooperative federalism as embodied in the CAA to make various arguments as to why the EPA cannot or should not be allowed to exercise its independent judgment in evaluating the arguments presented by the states in the SIP submissions, and some also argue that the EPA must approve each state's submission in deference to how states choose to interpret the CAA requirements they must meet.

*EPA Response:* The CAA establishes a framework for state-Federal partnership to implement the NAAQS based on cooperative federalism. Under the general model of cooperative federalism, the Federal Government establishes broad standards or goals, states are given the opportunity to determine how they wish to achieve those goals, and if states choose not to or fail to adequately implement programs to achieve those goals, a Federal agency is empowered to directly regulate to achieve the necessary ends. Under the CAA, once the EPA establishes or revises a NAAQS, states have the obligation and opportunity in the first instance to develop an implementation plan under CAA section 110 and the EPA will approve SIP submissions under CAA section 110 that fully satisfy the requirements of the CAA. This sequence of steps is not in dispute.

The EPA does not, however, agree with the comments' characterization of the EPA's role in the state-Federal relationship as being "secondary" such that the EPA must defer to state choices heedless of the substantive objectives of the Act; such deference would be particularly inappropriate in the context of addressing interstate pollution. The EPA believes that the comments fundamentally misunderstand or inaccurately describe this action, as well as the "'division of responsibilities' between the states and the federal government" they identify in CAA section 110 citing the *Train-Virginia* line of cases [291] and other cases.[292]

─────────────

[291] *See Virginia* v. *EPA,* 108 F.3d 1397, 1407 (D.C. Cir. 1997) (*Virginia*) (quoting *Train* v. *Natural Resources Defense Council, Inc.,* 421 U.S. 60, 79 (1975) (*Train*)). The "Train-Virginia line of cases" are named for the U.S. Supreme Court case *Train,* 421 U.S. and to the D.C. Circuit case *Virginia,* 108 F.3d. The D.C. Circuit has described these cases as defining a "federalism bar" that generally recognizes states' ability to select emissions control measures in their SIPs so long as CAA requirements are met. *See, e.g., Michigan* v. *EPA,* 213 F.3d 663, 687 (D.C. Cir. 2000) (*Michigan*).

[292] *Union Elec. Co.* v. *EPA,* 427 U.S. 246 (1976), *Am. Elec. Power Co.* v. *Connecticut,* 565 U.S. 410 (2011), *Fla. Power & Light* v. *Costle,* 650 F.2d 579
Continued

Those cases, some of which pre-date the CAA amendments of 1990 resulting in the current Good Neighbor Provision,[293] stand only for the proposition that the EPA must approve state plans *if they* meet the applicable CAA requirements. But these cases say nothing about what those applicable requirements are. The EPA is charged under CAA section 110 with reviewing states' plans for compliance with the CAA and approving or disapproving them based on EPA's determinations. Thus, the EPA must ultimately determine whether state plans satisfy the requirements of the Act or not. Abundant case law reflects an understanding that the EPA must evaluate SIP submissions under the CAA section 110(k)(2) and (3).[294] If they are deficient, the EPA must so find, and become subject to the obligation to directly implement the relevant requirements through a Federal implementation plan under CAA section 110(c), unless EPA approves an applicable SIP first.[295]

The EPA responds in greater detail to these comments in the RTC document.

6. Availability of Guidance for SIP Submissions

*Comment:* Comments contend the EPA failed to issue guidance in a timely fashion by releasing its August 2018 memorandum 31 days prior to when SIPs addressing interstate ozone transport were due and issuing the October 2018 memorandum 18 days

after those SIPs were due. Some comments additionally claim that it is unreasonable for the EPA to disapprove SIP submissions based on standards that were not defined, mandated, or required by official guidance.

*EPA Response:* Comments' contention is unsupported by the statute or applicable case law. Regarding the need for the EPA's guidance in addressing good neighbor obligations, in *EME Homer City,* the Supreme Court clearly held that "nothing in the statute places the EPA under an obligation to provide specific metrics to States before they undertake to fulfill their good neighbor obligations."[296]

Nonetheless, as comments point out, the EPA issued three "memoranda" in 2018 to provide some assistance to states in developing these SIP submissions. In acting on the SIP submissions in this action, the EPA is neither rescinding nor acting inconsistently with the memoranda—to the extent the memoranda constituted agency guidance (not all the information provided did constitute guidance), information or ideas in the memoranda had not at that time been superseded by case law developments, and the memoranda's air quality and contribution data had not at that time been overtaken by updated modeling and other updated air quality information. While comments specific to each of those memoranda are addressed elsewhere in this record, we note in brief that each memorandum made clear that the EPA's action on SIP submissions would be through a separate notice-and-comment rulemaking process and that SIP submissions seeking to rely on or take advantage of any information or concepts in these memoranda would be carefully reviewed against the relevant legal requirements and technical information available to the EPA at the time it would take such rulemaking action.

*B. Application of the 4-Step Interstate Transport Framework*

1. Analytic Year

*Comment:* One comment asserted that 2023 is not an appropriate analytical year because, according to the commenter, the EPA and at least some downwind states have not in fact implemented mandatory emissions control requirements associated with their nonattainment areas, and *North Carolina* and *Wisconsin* require that upwind and downwind state obligations must be implemented "on par." The

comment also characterizes the EPA's invocation of *Maryland* as an inappropriate shifting of regulatory burden to upwind states.

*EPA Response:* This is an incorrect interpretation of the D.C. Circuit's holdings in *North Carolina, Wisconsin,* and *Maryland,* which held that the EPA and the states must align good neighbor obligations to the extent possible with the downwind areas' attainment dates. These are set by the statute and remain fixed regardless of whether downwind areas are delayed in implementing their own obligations. It would be unworkable to expect that upwind states' obligations could be perfectly aligned with each downwind area's actual timetable for implementing the relevant emissions controls, and no court has held that this is the EPA's or the states' obligation under the good neighbor provision. Further, this ignores the fact that upwind states must also address their interference with maintenance of the NAAQS, as well as the *Maryland* court's holding that good neighbor obligations should be addressed by the Marginal area attainment date for ozone under subpart 2 of part D of title I of the CAA. Both circumstances may involve situations in which the home state for an identified downwind receptor does not have a specific obligation to plan for and implement specific emissions controls while an upwind state may nonetheless be found to have good neighbor obligations. But, as the *Maryland* court recognized, the absence of specific enumerated requirements does not mean the downwind state does not have a statutorily binding obligation subject to burdensome regulatory consequences: "Delaware must achieve attainment 'as expeditiously as practicable,'" and "an upgrade from a marginal to a moderate nonattainment area carries significant consequences . . . ." *Maryland,* 958 F.3d at 1204.

Further, where any downwind-state delays are unreasonable or violate statutory timeframes, the CAA provides recourse to compel the completion of such duties in CAA section 304, not to defer the elimination of significant contribution and thereby expose the public in downwind areas to the elevated pollution levels caused in part by upwind states' pollution. Regardless, in this action, 2023 aligns with the Moderate area attainment date in 2024, and all of the downwind nonattainment areas corresponding to receptor locations identified at Step 1 in this action are already classified as being in Moderate nonattainment or have been reclassified to Moderate and the relevant states face obligations to submit

(5th Cir. 1981), *Bethlehem Steel Corp.* v. *Gorsuch,* 742 F.2d 1028 (7th Cir. 1984), *Concerned Citizens of Bridesburg* v. *EPA,* 836 F.2d 777 (3d Cir. 1987), *North Carolina,* 531 F.3d 896, *Luminant,* 675 F.3d 917 (5th Cir. 2012), *Luminant Co. LLC* v. *EPA,* 714 F.3d 841 (5th. Cir. 2013), *North Dakota* v. *EPA,* 730 F.3d 750 (8th. Cir. 2013), *EME Homer City II,* 795 F.3d 118 (D.C. Cir. 2015), and *Texas* v. *USEPA,* 829 F.3d 405 (5th Cir. 2016).

[293] The 1970 version of the Act required SIPs to include "adequate provisions for intergovernmental cooperation" concerning interstate air pollution. CAA section 110(a)(2)(E), 84 Stat. 1681, 42 U.S.C. 1857c–5(a)(2)(D). In 1977, Congress amended the Good Neighbor Provision to direct States to submit SIP submissions that included provisions "adequate" to "prohibit[] any stationary source within the State from emitting any air pollutant in amounts which will . . . prevent attainment or maintenance [of air quality standards] by any other State." CAA section 108(a)(4), 91 Stat. 693, 42 U.S.C. 7410(a)(2)(E) (1976 ed., Supp. II). Congress again amended the Good Neighbor Provision in 1990 to its current form.

[294] *See, e.g., Virginia,* 108 F.3d at 1406. *See also, e.g., Westar Energy* v. *EPA,* 608 Fed. App'x 1, 3 (D.C. Cir. 2015) ("EPA acted *well within the bounds* of its delegated authority when it disapproved of Kansas's proposed [good neighbor] SIP.") (emphasis added); *Oklahoma,* 723 F.3d at 1209 (upholding the EPA's disapproval of "best available retrofit technology" (BART) SIP, noting BART "does not differ from other parts of the CAA—states have the ability to create SIPs, but they are subject to EPA review").

[295] *EME Homer City Generation,* 572 U.S. at 508–510.

[296] *EME Homer City,* 572 U.S. at 510.

SIP submissions and implement reasonably available control technologies (RACT) by January 1, 2023. *See* 87 FR 60897, 60899 (October 7, 2022). The EPA further responds to this comment in the RTC document.

2. Attachment A to the March 2018 Memorandum

*Comment:* Comments state that states conducted their analyses based on the flexibilities listed in Attachment A of the March 2018 Memorandum. Comments cite the part of the memorandum where the EPA notes that "in developing their own rules, states have flexibility to follow the familiar four-step transport framework (using [the] EPA's analytical approach or somewhat different analytical approaches within these steps) or alternative frameworks, so long as their chosen approach has adequate technical justification and is consistent with the requirements of the CAA." Comments state that the EPA's disapproval of SIP submissions that took advantage of the flexibilities is arbitrary and capricious because the EPA has changed, without communication, its consideration of what is deemed to be the "necessary provisions" required for an approvable SIP submission too late in the SIP submission process and because, in disapproving these SIPs, the EPA is applying a consistent set of policy judgments across all states.

*EPA Response:* Comments mistakenly view Attachment A to the March 2018 memorandum releasing modeling results as constituting agency guidance. The EPA further disagrees with commenters' characterization of the EPA's stance regarding the "flexibilities" listed (without analysis) in Attachment A. Attachment A to the March 2018 memorandum identified a "Preliminary List of Potential Flexibilities" that could potentially inform SIP development.[297] However, the EPA made clear in that attachment that the list of ideas were not suggestions endorsed by the Agency but rather "comments provided in various forums" from outside parties on which the EPA sought "feedback from interested stakeholders."[298] Further, Attachment A stated, "EPA is not at this time making any determination that the ideas discussed later are consistent with the requirements of the CAA, nor are we specifically recommending that states use these approaches."[299] Attachment A to the March 2018 memorandum, therefore, does not constitute agency

guidance, but was intended to generate further discussion around potential approaches to addressing ozone transport among interested stakeholders. The EPA emphasized in this memorandum that any such alternative approaches must be technically justified and appropriate in light of the facts and circumstances of each particular state's submittal.[300] As stated in the proposed SIP disapprovals,[301] the March 2018 memorandum provided that, "While the information in this memorandum and the associated air quality analysis data could be used to inform the development of these SIPs, the information is not a final determination regarding states' obligations under the good neighbor provision."[302] In this final SIP disapproval action, the EPA again affirms that certain concepts included in Attachment A to the March 2018 memorandum require unique consideration, and these ideas do not constitute agency guidance with respect to transport obligations for the 2015 ozone NAAQS.

In response to comments' claims that since the time transport SIP submissions were submitted to the EPA for review, the EPA has changed, without communication, its consideration of what is deemed to be the "necessary provisions" required for an approvable SIP submission, the EPA disagrees. As comments note, and as stated in the proposed disapproval notifications, the EPA recognizes that states have discretion to develop their own SIP transport submissions and agrees that states are not bound to using the 4-step interstate transport framework the EPA has historically used. However, states must then provide sufficient justification and reasoning to support their analytical conclusions and emissions control strategies. *See, e.g.,* 87 FR 9798, 9801. In the SIP submissions being disapproved in this action, no state provided any enforceable emissions control strategies for approval into their SIP. The EPA has evaluated the merits of each state's arguments as to why no additional emissions reduction requirements are needed to satisfy their obligations under CAA section 110(a)(2)(D)(i)(I) for the more protective 2015 ozone NAAQS. While the EPA used its own 4-step interstate

transport framework as a guide for its review to ensure a consistent and equitable evaluation of each states' submissions, the EPA has also considered states' individual arguments without predetermining the EPA's conclusions about the state's transport obligations.

It was never the Agency's intent in sharing Attachment A that states would invoke one or more of the potential "flexibilities" that outside parties advocated for as a basis for concluding that no additional emissions controls were necessary to address interstate transport for the more protective 2015 ozone NAAQS without proper justification. Nothing in Attachment A suggested that was the Agency's intended objective. Indeed, where certain approaches identified in Attachment A might have produced analytical conclusions requiring upwind states to reduce their emissions, no state invoking Attachment A followed through with implementing those controls. We observe this dynamic at work in Kentucky's submission, because Kentucky appended comments from the Midwest Ozone Group to its submission that demonstrated that applying a "weighted" approach to allocating upwind-state responsibility at Step 3 would have resulted in an emissions control obligation on Kentucky's sources, yet the State offered no explanation in its submittal why it was not adopting that approach or even what its views on that approach were. *See* 87 FR 9515. As another example, Michigan cited Attachment A to the March 2018 in developing a methodology for calculating significant contribution under which Michigan would have been responsible for eliminating up to 0.12 ppb of contribution to downwind receptors; however, the State suggested that uncertainty caused by modeling "noise" was too great to either require emissions reductions or demonstrate that Michigan had any linkages to receptors at all. *See* 87 FR 9860–9861. However, this explanation did not, as an analytical matter, demonstrate a level of scientific uncertainty which might allow for ignoring the results,[303]

---

[297] March 2018 memorandum, Attachment A.
[298] *Id.*
[299] *Id.*

[300] March 2018 memorandum.
[301] E.g., 87 FR 9487.
[302] *See* Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I), March 27, 2018, available in docket EPA–HQ–OAR–2021–0663 or at *https://www.epa.gov/interstate-air-pollution-transport/interstate-air-pollution-transport-memos-and-notices.*

[303] Scientific uncertainty may only be invoked to avoid comporting with the requirements of the CAA when "the scientific uncertainty is so profound that it precludes . . . reasoned judgment" *Massachusetts* v. *EPA,* 127 S.Ct. 1438 (2007). *See Wisconsin,* 938 F.3d at 318–19 ("Scientific uncertainty, however, does not excuse EPA's failure to align the deadline for eliminating upwind States' significant contributions with the deadline for downwind attainment of the NAAQS."). *See also EME Homer City,* 795 F.3d at 135–36 ("We will not invalidate EPA's predictions solely because there might be discrepancies between those predictions

Continued

particularly when the Agency has implemented good neighbor requirements at levels of ''significant contribution'' comparable to or even less than 0.12 ppb. *See Wisconsin,* 938 F.3d at 322–23 (rejecting Wisconsin's argument that it should not face good neighbor obligations for the 2008 ozone NAAQS on the basis that its emission reductions would only improve a downwind receptor by two ten-thousandths of a part per billion).

The EPA continues to neither endorse the ''flexibilities'' in Attachment A, nor stakes a position that states are precluded from relying on these concepts in the development of their good neighbor SIP submissions, assuming they could be adequately justified both technically and legally. This has been demonstrated through the EPA's extensive evaluation of the merits of each states' SIP submissions, including their attempted use of flexibilities and derivatives of the EPA's historically applied 4-step interstate transport framework.[304]

### 3. Step 1: October 2018 Memorandum

*Comments:* Comments claimed that the EPA is not honoring its October 2018 memorandum, which they claim would allow for certain monitoring sites identified as maintenance-only receptors in the EPA's methodology to be excluded as receptors based on historical data trends. They assert that the EPA is inappropriately disapproving SIP submissions where the state sufficiently demonstrated certain monitoring sites should not be considered to have a maintenance problem in 2023.

*EPA Response:* The October 2018 memorandum recognized that states may be able to demonstrate in their SIPs that conditions exist that would justify treating a monitoring site as not being a maintenance receptor despite results from our modeling methodology identifying it as such a receptor. The EPA explained that this demonstration could be appropriate under two circumstances: (1) the site currently has ''clean data'' indicating attainment of the 2015 ozone NAAQS based on measured air quality concentrations, or (2) the state believes there is a technical

reason to justify using a design value from the baseline period that is lower than the maximum design value based on monitored data during the same baseline period. To justify such an approach, the EPA anticipated that any such showing would be based on an analytical demonstration that: (1) Meteorological conditions in the area of the monitoring site were conducive to ozone formation during the period of clean data or during the alternative base period design value used for projections; (2) ozone concentrations have been trending downward at the site since 2011 (and ozone precursor emissions of NO$_X$ and VOC have also decreased); and (3) emissions are expected to continue to decline in the upwind and downwind states out to the attainment date of the receptor. EPA evaluated state's analyses and found no state successfully applied these criteria to justify the use of one of these alternative approaches. The air quality data and projections in Section III indicate that trends in historic measured data do not necessarily support adopting a less stringent approach for identifying maintenance receptors for purposes of the 2015 ozone NAAQS. In fact, as explained in Section III, the EPA has found in its analysis for this final action that, in general, recent measured data from regulatory ambient air quality ozone monitoring sites suggest a number of receptors with elevated ozone levels will persist in 2023 even though our traditional methodology at Step 1 did not identify these monitoring sites as receptors in 2023. Thus, the EPA is not acting inconsistently with that memorandum—the factual conditions that would need to exist for the suggested approaches of that memorandum to be applicable have not been demonstrated as being applicable or appropriate based on the relevant data.

We further respond to comments related to the identification of receptors at Step 1 the RTC document.

### 4. Step 2: Technical Merits of a 1 Percent of the NAAQS Contribution Threshold

*Comment:* Several comments contend that for technical reasons, the 0.70 ppb threshold is inappropriate for determining whether a state is linked to a downwind receptor at Step 2 of the 4-step interstate transport framework. Comments state that the degree to which errors exist in modeling ozone concentrations and contributions make it inappropriate for a threshold as low as 0.70 ppb to be used. Some comments further state that the 0.70 ppb threshold is inappropriate because the

concentration threshold is lower than what monitoring devices are capable of detecting. Comments reference the reported precision of Federal reference monitors for ozone and the rounding requirements found in 40 CFR part 50, appendix U, Interpretation of the Primary and Secondary National Ambient Air Quality Standards for Ozone, for support. Comments note that the 1 percent contribution threshold of 0.70 ppb is lower than the manufacturer's reported precision of Federal reference monitors for ozone and that the requirements found in appendix U truncates monitor values of 0.70 ppb to 0 ppb.

*EPA Response:* The EPA disagrees that a 1 percent of the NAAQS contribution threshold at Step 2 is ''inappropriate'' for the 2015 ozone NAAQS due to modeling biases and errors. The explanation for how the 1 percent contribution threshold was originally derived is available in the 2011 CSAPR rulemaking. *See* 76 FR 48208, 48236–38 (Aug. 8, 2011). The EPA has effectively applied a 1 percent of the NAAQS threshold to identify linked upwind states in three prior FIP rulemakings and numerous state-specific actions. The D.C. Circuit has declined to establish bright line criteria for model performance. In upholding the EPA's approach to evaluating interstate transport in CSAPR, the D.C. Circuit held that it would not ''invalidate EPA's predictions solely because there might be discrepancies between those predictions and the real world. That possibility is inherent in the enterprise of prediction.'' *EME Homer City II,* 795 F.3d at 135. The court continued to note that ''the fact that a 'model does not fit every application perfectly is no criticism; a model is meant to simplify reality in order to make it tractable.' '' *Id.* at 135–36 (quoting *Chemical Manufacturers Association* v. *EPA,* 28 F.3d 1259, 1264 (DC Cir. 1994). *See also Sierra Club* v. *EPA,* 939 F.3d 649, 686–87 (5th Cir. 2019) (upholding the EPA's modeling in the face of complaints regarding an alleged ''margin of error,'' noting challengers face a ''considerable burden'' in overcoming a ''presumption of regularity'' afforded ''the EPA's choice of analytical methodology'') (citing *BCCA Appeal Grp.* v. *EPA,* 355 F.3d 817, 832 (5th Cir. 2003)).

Furthermore, it is not appropriate to compare the bias/error involved in the estimation of total ozone to the potential error in the estimation of the subset of ozone that is contributed by a single state.[305] For example, on a specific day

---

and the real world. That possibility is inherent in the enterprise of prediction.'').

[304] Nor in the course of this evaluation has the EPA uniformly ruled out the concepts in Attachment A. For example, we noted at proposal that California's identification of a flexibility in Attachment A related to excluding certain air quality data associated with atypical events may be generally consistent with the EPA's modeling guidance, but this does not affect the ultimate determination that California's SIP is not approvable. *See* 87 FR 31454.

[305] See, *e.g.,* 87 FR 9798 at 9816.

the modeled versus monitored ozone value may differ by 2 ppb but that is a relatively small percentage of the total modeled ozone, which for a receptor of interest would be on the order of 70 ppb. It would be unrealistic to assign all of the 2 ppb discrepancy in the earlier example to the estimated impact from a single state because the 2 ppb error would be the combination of the error from all sources of ozone that contribute to the total, including estimated impacts from other states, the home state of the receptor, and natural background emissions.

To address comments that compare the 0.70 ppb threshold to the Federal reference monitors for ozone and the rounding requirements found in 40 CFR part 50, appendix U, the EPA notes that the comment is mistaken in applying criteria related to the precision of monitoring data to the modeling methodology by which we project contributions when quantifying and evaluating interstate transport at Step 2. Indeed, contributions by source or state cannot be derived from the total ambient concentration of ozone at a monitor at all but must be apportioned through modeling. Under our longstanding methodology for doing so, the contribution values identified from upwind states are based on a robust assessment of the average impact of each upwind state's ozone-precursor emissions over a range of scenarios, as explained in the Final Action AQM TSD. This analysis is in no way connected with or dependent on monitoring instruments' precision of measurement. *See EME Homer City II,* 795 F.3d 118, 135–36 ("'[A] model is meant to simplify reality in order to make it tractable.'").

5. Step 2: Justification of a 1 Percent of the NAAQS Contribution Threshold

*Comment:* Comments contend that the EPA has not provided enough basis for reliance on the 0.70 ppb threshold, claiming that its use is therefore arbitrary and capricious.

*EPA Response:* The EPA is finalizing its proposed approach of consistently using a 1 percent of the NAAQS contribution threshold at Step 2. This approach ensures both national consistency across all states and consistency and continuity with our prior interstate transport actions for other NAAQS. Comments have not established that this approach is either unlawful or arbitrary and capricious.

The 1 percent threshold is consistent with the Step 2 approach that the EPA applied in CSAPR for the 1997 ozone NAAQS, which has subsequently been applied in the CSAPR Update and

revised CSAPR Update when evaluating interstate transport obligations for the 2008 ozone NAAQS. The EPA continues to find 1 percent to be an appropriate threshold. For ozone, as the EPA found in CAIR, CSAPR, and CSAPR Update, a portion of the nonattainment and maintenance problems in the U.S. results from the combined impact of relatively small contributions from many upwind states, along with contributions from in-state sources and other sources. The EPA's analysis shows that much of the ozone transport problem being analyzed for purposes of evaluating 2015 ozone NAAQS SIP obligations is still the result of the collective impacts of contributions from many upwind states. Therefore, application of a consistent contribution threshold is necessary to identify those upwind states that should have responsibility for addressing their contribution to the downwind nonattainment and maintenance problems to which they collectively contribute. Where a great number of geographically dispersed emissions sources contribute to a downwind air quality problem, which is the case for ozone, EPA believes that, in the context of CAA section 110(a)(2)(D)(i)(I), a state-level threshold of 1 percent of the NAAQS is a reasonably small enough value to identify only the greater-than-de minimis contributers yet is not so large that it unfairly focuses attention for further action only on the largest single or few upwind contributers. Continuing to use 1 percent of the NAAQS as the screening metric to evaluate collective contribution from many upwind states also allows the EPA (and states) to apply a consistent framework to evaluate interstate emissions transport under the interstate transport provision from one NAAQS to the next. *See* 81 FR 74504, 74518. *See also* 86 FR 23054, 23085 (reviewing and explaining rationale from CSAPR, 76 FR 48208, 48236–38, for selection of 1 percent threshold).

Further, the EPA notes that the role of the Step 2 threshold is limited and just one step in the 4-Step interstate transport framework. It serves to screen in states for further evaluation of emissions control opportunities applying a multifactor analysis at Step 3. Thus, as the Supreme Court has recognized, the contribution threshold essentially functions to exclude states with "de minimis" impacts. *EME Homer City,* 572 U.S. at 500.

*Comment:* Commenters contend that the EPA cannot use the 1 percent threshold as a determination for significance.

*EPA Response:* To clarify, the EPA does not use the 1 percent of the NAAQS threshold as the definition of "significance." Rather, where a state's contribution equals or exceeds the 1 percent of the NAAQS threshold, the EPA expects states to further evaluate their emissions to determine whether their emissions constitute significant contribution or interference with maintenance. The contribution threshold is a screening threshold to identify states which may be "contributing" to an out of state receptor. The EPA has maintained this interpretation of the relevant statutory language across many rulemakings, though commenters continue to confuse the Step 2 threshold with a determination of "significance," which it is not. *See EME Homer City,* 572 U.S. at 500–502 (explaining the difference between the "screening" analysis at Steps 1 and 2 whereby the EPA "excluded as de minimis any upwind State that contributed less than one percent of the . . . NAAQS" and the "control" analysis at Step 3 whereby the EPA determined "cost thresholds" to define significance).

Further, the EPA's air quality and contribution modeling for ozone transport is based on application of the model in a relative sense rather than relying upon absolute model predictions. All models have limitations resulting from uncertainties in inputs and scientific formulation. To minimize the effects of these uncertainties, the modeling is anchored to base period measured data in the EPA's guidance approach for projecting design values. Notably, the EPA also uses our source apportionment modeling in a relative sense when calculating the average contribution metric (used to identify linkages). In this method the magnitude of the contribution metric is tied to the magnitude of the projected average design value which is tied to the base period average measured design value. The EPA's guidance has recommended against applying bright-line criteria for judging whether statistical measures of model performance constitute acceptable or unacceptable model performance.

The Agency continues to find that this method using the CAMx model to evaluate contributions from upwind states to downwind areas is reliable. The agency has used CAMx routinely in previous notice and comment transport rulemakings to evaluate contributions relative to the 1 percent threshold for both ozone and $PM_{2.5}$. In fact, in the original CSAPR, the EPA found that "[t]here was wide support from commenters for the use of CAMx as an

appropriate, state-of-the science air quality tool for use in the [Cross-State Air Pollution] Rule. There were no comments that suggested that the EPA should use an alternative model for quantifying interstate transport.'' 76 FR 48229 (August 8, 2011). In this action, the EPA has taken a number of steps based on comments and new information to ensure to the greatest extent the accuracy and reliability of its modeling projections at Step 1 and 2, as discussed elsewhere in this document.

6. Step 2: Prevention of Significant Deterioration Significant Impact Levels

*Comment:* Several comments insist that when identifying an appropriate linkage threshold at Step 2 of the 4-step framework, the EPA should consider or rely on the 1 ppb significant impact level (SIL) for ozone used as part of the prevention of significant deterioration PSD permitting process. Comments reference the EPA's April 17, 2018, guidance memorandum, ''Significant Impact Levels for Ozone and Fine Particles in the Prevention of Significant Deterioration Permitting Program'' (SIL guidance), as well as the EPA's March 2018 memorandum's Attachment A flexibilities to lend support to their opinion that the 1 ppb SIL should also be used to determine linkages at Step 2.

*EPA Response:* The EPA's SIL guidance relates to a different provision of the Clean Air Act regarding implementation of the prevention of significant deterioration (PSD) permitting program. This program applies in areas that have been designated attainment of the NAAQS and is intended to ensure that such areas remain in attainment even if emissions were to increase as a result of new sources or major modifications to existing sources located in those areas. This purpose is different than the purpose of the good neighbor provision, which is to assist downwind areas (in some cases hundreds or thousands of miles away) in resolving ongoing nonattainment of the NAAQS or difficulty maintaining the NAAQS through eliminating the emissions from other states that are significantly contributing to those problems. In addition, as discussed earlier, the purpose of the Step 2 threshold within the EPA's interstate transport framework for ozone is to broadly sweep in all states contributing to identified receptors above a de minimis level in recognition of the collective-contribution problem associated with regional-scale ozone transport. The threshold used in the context of PSD SIL serves an entirely different purpose, and so it does not follow that they should be

made equivalent. Further, comments incorrectly associate the EPA's Step 2 contribution threshold with the identification of ''significant'' emissions (which does not occur until Step 3), and so it is not the case that the EPA is interpreting the same term differently.

The EPA has previously explained this distinction between the good neighbor framework and PSD SILs. *See* 70 FR 25162, 25190–25191 (May 12, 2005); 76 FR 48208, 48237 (August 8, 2011). Importantly, the implication of the PSD SIL threshold is not that single-source contribution below this level indicates the absence of a contribution or that no emissions control requirements are warranted. Rather, the PSD SIL threshold addresses whether further, more comprehensive, multi-source review or analysis of air quality impacts are required of the source to support a demonstration that it meets the criteria for a permit. A source with estimated impacts below the PSD SIL may use this to demonstrate that it will not cause or contribute (as those terms are used within the PSD program) to a violation of an ambient air quality standard, but is still subject to meeting applicable control requirements, including best available control technology, designed to moderate the source's impact on air quality.

Moreover, other aspects of the technical methodology in the SIL guidance compared to the good neighbor framework make a direct comparison between these two values misleading. For instance, in PSD permit modeling using a single year of meteorology the maximum single-day 8-hour contribution is evaluated with respect to the SIL. The purpose of the contribution threshold at Step 2 of the 4-step good neighbor framework is to determine whether the average contribution from a collection of sources in a state is small enough not to warrant any additional control for the purpose of mitigating interstate transport, even if that control were highly cost effective. Using a 1 percent of the NAAQS threshold is more appropriate for evaluating multi-day average contributions from upwind states than a 1 ppb threshold applied for a single day, since that lower value of 1 percent of the NAAQS will capture variations in contribution. If EPA were to use a single day reflecting the maximum amount of contribution from an upwind state to determine whether a linkage exists at Step 2, comments' arguments for use of the PSD SIL might have more force. However, that would likely cause more states to become linked, not less. And in any case, consistent with the method in our modeling guidance for projecting

future attainment/nonattainment, the good neighbor methodology of using multiple days provides a more robust approach to establishing that a linkage exists at the state level than relying on a single day of data.

7. Step 2: August 2018 Memorandum

*Comment:* Comments assert that in the August 2018 memorandum the EPA committed itself to approving SIP submissions from states with contributions below 1 ppb, and so now the EPA should or must approve the good neighbor SIP submission from any state with a contribution below 1 ppb, either based on modeling available at the time of the state's SIP submission or at any time.

*EPA Response:* These comments mischaracterize the content and the EPA's application of August 2018 memorandum. Further, the EPA disputes that the EPA misled states or that the EPA has not appropriately reviewed SIP submissions from states that attempted to rely on an alternative contribution threshold at Step 2.

Specifically, the EPA's August 2018 memorandum provided an analysis regarding ''the degree to which certain air quality threshold amounts capture the collective amount of upwind contribution from upwind states.'' [306] It interpreted ''that information to make recommendations about what thresholds *may* be appropriate for use in'' SIP submissions (emphasis added).[307] Specifically, the August 2018 memorandum said, ''Because the amount of upwind collective contribution capture with the 1 percent and the 1 ppb thresholds is generally comparable, overall, we believe it *may* be reasonable and appropriate for states to use a 1 ppb contribution threshold, as an alternative to a 1 percent threshold, at Step 2 of the 4-step framework in developing their SIP revisions addressing the good neighbor provision for the 2015 ozone NAAQS.'' (emphasis added).[308] Thus, the text of the August 2018 memorandum does not guarantee that any state with a contribution below 1 ppb has an automatically approvable good neighbor SIP. In fact, the August 2018 memorandum indicated that ''[f]ollowing these recommendations does not ensure that EPA will approve a SIP revision in all instances where the recommendations are followed, as the guidance may not apply to the facts and circumstances underlying a particular SIP. Final decisions by the EPA to approve a particular SIP revision will

---

[306] August 2018 memorandum, page 1.
[307] August 2018 memorandum, page 1.
[308] August 2018 memorandum, page 4.

only be made based on the requirements of the statute and will only be made following an air agency's final submission of the SIP revision to the EPA, and after appropriate notice and opportunity for public review and comment.'' [309] The August 2018 memorandum also stated, ''EPA and air agencies should consider whether the recommendations in this guidance are appropriate for each situation.'' [310] The EPA's assessment of every SIP submission that invoked the August 2018 memorandum considered the particular arguments raised by the state. [311]

*Comment:* Some comments allege that the EPA representatives led the states to believe that their SIP submission would be approved on the basis of a 1 ppb contribution threshold. The comments further claim that the EPA has now since reversed course on its August 2018 memorandum and imposed new requirements on states that were not included in the EPA's guidance. One comment suggested EPA switched position without explanation from the August 2018 guidance to its proposed disapprovals, which it viewed as unlawful under *FCC* v. *Fox TV Stations, Inc.,* 556 U.S. 502 (2009).

*EPA Response:* As an initial matter, we note that the salience of these comments is limited to only a handful of states. The August 2018 memorandum made clear that the Agency had substantial doubts that any threshold greater than 1 ppb (such as 2 ppb) would be acceptable, and the Agency is affirming that a threshold higher than 1 ppb would not be justified under any circumstance for purposes of this action. No comment provided a credible basis for using a threshold even higher than 1 ppb. So this issue is primarily limited to the difference between a 0.70 ppb threshold and a 1.0 ppb threshold. Therefore, we note that this issue is only relevant to a small number of states whose only contributions to any receptor are above 1 percent of the NAAQS but lower than 1 ppb. Under the 2016v3 modeling of 2023 being used in this final action, those states with contributions that fall between 0.70 ppb and 1 ppb included in this action are Alabama, Kentucky, and Minnesota.

The EPA disagrees with comments' claims that the Agency has reversed course on applying the August 2018 memorandum. In line with the memorandum, the EPA evaluated every justification put forward by every state covered by this SIP disapproval action that attempted to justify an alternative threshold under the August 2018 memorandum, which are Alabama, [312] Arkansas, [313] Illinois, [314] Indiana, [315] Kentucky, [316] Louisiana, [317] Michigan, [318] Mississippi, [319] Missouri, [320] and Oklahoma, [321] and Utah. [322] The EPA also addressed criticisms of the 1 percent of the NAAQS contribution threshold made by Ohio [323] and Nevada. [324] (The topic of the EPA's input during state's SIP-development processes is further discussed in the RTC document.)

For this reason, the EPA disagrees with comment that case law reviewing changes in agency positions as articulated in *FCC* v. *Fox TV Stations, Inc.,* is applicable to this action. The Agency has not imposed a requirement that states must use a 1 percent of the NAAQS threshold (which would reflect a change in position from the August 2018 memorandum). Rather, under the terms of the August 2018 memorandum, the Agency has found that Alabama, Arkansas, Illinois, Indiana, Kentucky, Louisiana, Michigan, Mississippi, Missouri, Nevada, Ohio, Oklahoma, and Utah have not made a sufficient showing that the use of an alternative contribution threshold is justified for those States. Even if it were found that the Agency's position had fundamentally changed between this rulemaking action and the August 2018 memorandum (which we do not concede to be the case), we do not believe that any state had a legitimate reliance interest that would be sufficient to overcome the countervailing public interest that is served in declining to approve a state's use of the 1 ppb threshold where the state did not have adequate technical justification. First, neither states nor the emissions sources located in those states have incurred any compliance costs based on the August 2018 memorandum. Second, it

is not clear that any states invested much of their own public resources in developing state-specific arguments in support of a 1 ppb threshold. As the EPA observed at proposal, in nearly all submittals, the states did not provide the EPA with analysis specific to their state or the receptors to which its emissions are potentially linked. In one case, the EPA's proposed approval of Iowa's SIP submittal, ''the *EPA expended its own resources to attempt to supplement the information submitted by the state,* in order to more thoroughly evaluate the state-specific circumstances that could support approval.'' E.g., 87 FR 9806–07 (emphasis added). The EPA emphasizes again that it was the EPA's sole discretion to perform this analysis in support of the state's submittal, and the Agency is not obligated to conduct supplemental analysis to fill the gaps whenever it believes a state's analysis is insufficient. *Id.*

We acknowledge that certain states may have assumed the EPA would approve SIP submissions from states whose contribution to any receptor was below 1 ppb, but that assumption reflected a misunderstanding of the August 2018 memorandum, and in any case, an assumption is not, as a legal matter, the same thing as a reliance interest.

The EPA is not formally rescinding the August 2018 memorandum in this action or at this time, but since guidance memoranda are not binding in the first place, it is not required that agencies must ''rescind'' a guidance the moment it becomes outdated or called into question. As the Agency made clear in the August 2018 memorandum, all of EPA's proposals for action on interstate transport SIP submissions are subject to rulemaking procedure, including public notice and comment, before the EPA makes a final decision.

Although the EPA is not formally revoking the August 2018 memorandum at this time, and we have separately found that no state successfully established a basis for use of a 1 ppb threshold, we also continue to believe, as set forth in our proposed disapprovals, that national ozone transport policy associated with addressing obligations for the 2015 ozone NAAQS is not well-served by allowing for less protective thresholds at Step 2. Furthermore, the EPA disagrees that national consistency is an inappropriate consideration in the context of interstate ozone transport. The Good Neighbor provision, CAA section 110(a)(2)(D)(i)(I), requires to a unique degree of concern for consistency, parity, and equity across

---

[309] August 2018 memorandum, page 1.

[310] August 2018 memorandum, page 1.

[311] 87 FR 64423–64424 (Alabama); 87 FR 9806–9807 (Arkansas); 87 FR 9852–9853 (Illinois); 87 FR 9855–9856 (Indiana); 87 FR 9508–9511 (Kentucky); 87 FR 9812–9813 (Louisiana); 87 FR 9861–9862 (Michigan); 87 FR 9557 (Mississippi); 87 FR 9541–9543 (Missouri); 87 FR 31492 (Nevada); 87 FR 9870–9871 (Ohio); 87 FR 9818–9820 (Oklahoma); 87 FR 31477–31451 (Utah).

[312] 87 FR 64423–64424.

[313] 87 FR 9806–9807.

[314] 87 FR 9852–9853.

[315] 87 FR 9855–9856.

[316] 87 FR 9508–9511.

[317] 87 FR 9812–9813.

[318] 87 FR 9861–9862.

[319] 87 FR 9557.

[320] 87 FR 9541–9543.

[321] 87 FR 9818–9820.

[322] 87 FR 31477–31451.

[323] 87 FR 9870–9871.

[324] 87 FR 31492.

state lines.[325] For a regional air pollutant such as ozone, consistency in requirements and expectations across all states is essential. Based on the EPA's review of good neighbor SIP submissions to-date and after further consideration of the policy implications of attempting to recognize an alternative Step 2 threshold for certain states, the Agency now believes the attempted use of different thresholds at Step 2 with respect to the 2015 ozone NAAQS raises substantial policy consistency and practical implementation concerns. The availability of different thresholds at Step 2 has the potential to result in inconsistent application of good neighbor obligations based solely on the strength of a state's SIP submission at Step 2 of the 4-step interstate transport framework. From the perspective of ensuring effective regional implementation of good neighbor obligations, the more important analysis is the evaluation of the emissions reductions needed, if any, to address a state's significant contribution after consideration of a multifactor analysis at Step 3, including a detailed evaluation that considers air quality factors and cost. While alternative thresholds for purposes of Step 2 may be "similar" in terms of capturing the relative amount of upwind contribution (as described in the August 2018 memorandum), nonetheless, use of an alternative threshold would allow certain states to avoid further evaluation of potential emissions controls while other states with a similar level of contribution would proceed to a Step 3 analysis. This can create significant equity and consistency problems among states.

One comment suggested that the EPA could address this potentially inequitable outcome by simply adopting a 1 ppb contribution threshold for all states. However, the August 2018 memorandum did not conclude that 1 ppb would be appropriate for all states, and the EPA does not view that conclusion to be supported at present. The EPA recognized in the August 2018 memorandum that on a nationwide basis there was some similarity in the amount of total upwind contribution captured between 1 percent and 1 ppb. However, while this may be true in some sense, that is hardly a compelling basis to move to a 1 ppb threshold for

every state. Indeed, the 1 ppb threshold has the disadvantage of losing a certain amount of total upwind contribution for further evaluation at Step 3 (*e.g.,* roughly 7 percent of total upwind state contribution was lost according to the modeling underlying the August 2018 memorandum; in the EPA's 2016v2 and 2016v3 modeling, the amount lost is 5 percent). Further, this logic has no end point. A similar observation could be made with respect to any incremental change. For example, should the EPA next recognize a 1.2 ppb threshold because that would only cause some small additional loss in capture of upwind state contribution as compared to 1 ppb? If the only basis for moving to a 1 ppb threshold is that it captures a "similar" (but actually smaller) amount of upwind contribution, then there is no basis for moving to that threshold at all. Considering the core statutory objective of ensuring elimination of all significant contribution to nonattainment or interference with maintenance of the NAAQS in other states as well as the broad, regional nature of the collective contribution problem with respect to ozone, we continue to find no compelling policy reason to adopt a new threshold for all states of 1 ppb.

It also is unclear why use of a 1 ppb threshold would be appropriate for all states under a more protective NAAQS when a 1 percent of the NAAQS contribution threshold has been used for less protective NAAQS. To illustrate, a state contributing greater than 0.75 ppb but less than 1 ppb to a receptor under the 2008 ozone NAAQS was "linked" at Step 2 using the 1 percent of the NAAQS contribution threshold, but if a 1 ppb threshold were used for the 2015 ozone NAAQS, then that same state would *not* be "linked" to a receptor at Step 2 under a NAAQS that is set to be more protective of human health and the environment. Consistency with past interstate transport actions such as CSAPR, and the CSAPR Update and Revised CSAPR Update rulemakings (which used a Step 2 threshold of 1 percent of the NAAQS for two less protective ozone NAAQS), is an important consideration. Continuing to use a 1 percent of NAAQS approach ensures that if the NAAQS are revised and made more protective, an appropriate increase in stringency at Step 2 occurs, to ensure an appropriately larger amount of total upwind-state contribution is captured for purposes of fully addressing interstate transport obligations. *See* 76 FR 48208, 48237–38.

One comment identified that if the EPA were to use a 1 percent of the

NAAQS contribution threshold, the EPA would be obligated to seek feedback on that contribution threshold through a public notice and comment process. The EPA's basis and rationale for every SIP submission covered by this final SIP disapproval action, including the use of a 1 percent of the NAAQS contribution threshold, was in fact presented for public comment. The EPA received, and is addressing in this action, many detailed comments about contribution thresholds. Further, the EPA's application of a 1 percent of the NAAQS threshold has been consistently used in notice-and-comment rulemakings beginning with the CSAPR rulemaking in 2010–2011 and including both FIP actions (CSAPR Update and Revised CSAPR Update) and numerous actions on ozone transport SIP submissions. In each case, the 1 percent of the NAAQS threshold was subject to rigorous vetting through public comment and the Agency's response to those comments, including through analytical evaluations of alternative thresholds. *See, e.g.,* 81 FR 74518–19. By contrast, the August 2018 memorandum was not issued through notice-and-comment rulemaking procedures, and the EPA was careful to caveat its utility and ultimate reliability for that reason.

*Comment:* Some comments claim that the EPA is applying the August 2018 memorandum inconsistently based on the EPA's actions with regard to action good neighbor SIP submissions from Iowa and Oregon for the 2015 ozone NAAQS and Arizona's good neighbor SIP submission for the 2008 ozone NAAQS.

*EPA Response:* The EPA disagrees that there is any such inconsistency. The EPA withdrew a previously proposed approval of Iowa's SIP submission where the Agency had attempted to substantiate the use of a 1 ppb contribution threshold, and re-proposed and finalized approval of that SIP based on a different rationale using a 1 percent of the NAAQS contribution threshold. 87 FR 9477 (Feb. 22, 2022); 87 FR 22463 (April 15, 2022). As explained earlier in this section, this experience of the EPA attempting to justify 1 ppb for a state through additional air quality analysis, where the state had not conducted an analysis the Agency considered to be sufficient is part of the reason the Agency is moving away from attempting to justify use of this alternative contribution threshold.

The EPA also disputes the claim that Oregon and Arizona were the only states "allowed" to use a 1 ppb threshold. The EPA approved Oregon's SIP submission for the 2015 ozone NAAQS on May 17,

---

[325] The EPA notes that Congress has placed on the EPA a general obligation to ensure the requirements of the CAA are implemented consistently across states and regions. *See* CAA section 301(a)(2). Where the management and regulation of interstate pollution levels spanning many states is at stake, consistency in application of CAA requirements is paramount.

2019, and both Oregon and the EPA relied on a 1 percent of the NAAQS contribution threshold. 84 FR 7854, 7856 (March 5, 2019) (proposal); 84 FR 22376 (May 17, 2019) (final). In our FIP proposal for the 2015 ozone NAAQS, the EPA explained it was not proposing to conduct an error correction for Oregon even though updated modeling indicated Oregon contributed above 1 percent of the NAAQS to monitors in California, because the specific monitors in California are not interstate ozone transport "receptors" at Step 1. *See* 87 FR 20036, 20074–20075 (April 6, 2022). The EPA solicited public comment on its approach to Oregon's contribution to California receptors as part of the 2015 ozone NAAQS transport FIP development, and the Agency has not yet taken final action on that FIP. In 2016, the EPA previously approved Arizona's good neighbor SIP for the earlier 2008 ozone NAAQS based on a similar rationale with regard to certain monitors in California in 2016. 81 FR 15200 (March 22, 2016) (proposal); 81 FR 31513 (May 19, 2016) (final rule). The Agency's view with respect to its evaluation of both Arizona and Oregon is that specific monitors in California are not interstate ozone transport "receptors" at Step 1. The EPA has not approved or applied an alternative Step 2 threshold for any state.

Comments related to the specific circumstances of an individual state and/or its arguments put forth in its SIP submission as it pertains to the August 2018 Memorandum are further addressed in the RTC document.

**8. Step 3: States' Step 3 Analyses for the 2015 Ozone NAAQS**

*Comment:* Comments state that the EPA has not provided any guidance on what an appropriate Step 3 analysis would entail, and therefore any decision where the Agency rejects a Step 3 analysis is arbitrary and capricious. One comment claims that not a single state has successfully made a Step 3 demonstration leading to an approvable interstate transport SIP for the 2015 ozone NAAQS. Comments note that there is no requirement in the CAA that states must complete an analysis similar to the EPA's, and the EPA cannot substitute its own judgment for that of the state's in crafting a SIP. Rather, the EPA is obligated to defer to state choices. One comment asserts that the EPA is required to interpret the term "significant contribution" in a manner "which ties contribution to an amount which contributes significantly to downwind maintenance or nonattainment problems." Another comment claims the EPA is

intentionally exploiting the Supreme Court decision in *EME Homer City* to justify any requirements it deems necessary to further Federal policy decisions. Some comments identify that some states did not conduct a Step 3 analysis in their submitted SIPs because, using the flexibilities provided in the 2018 memoranda, these states concluded in Step 1 and Step 2 that no controls were required. One comment suggests that the EPA propose an 18-month period to allow these states to proceed with Steps 3 and 4.

*EPA Response:* The EPA disagrees that it is obligated to defer to states' choices in the development of good neighbor SIP submissions. As required by the Act, the EPA has evaluated each of the SIP submissions for compliance with the CAA, including whether an adequate Step 3 analysis was conducted—or whether states had offered an approvable alternative approach to evaluating their good neighbor obligations—and found in each case that what these states submitted was not approvable. The Supreme Court has recognized that the EPA is not obligated to provide states with guidance before taking action to disapprove a SIP submission. *EME Homer City*, 572 U.S. at 508–10. Nonetheless, throughout the entire history of the EPA's actions to implement the good neighbor provision for ozone, starting with the 1998 NO$_X$ SIP Call, we have consistently adopted a similar approach at Step 3 that evaluates emissions reduction opportunities for linked states applying a multifactor analysis. States could have performed a similar analysis of emissions control opportunities. The EPA has not directed states that they must conduct a Step 3 analysis in precisely the manner the EPA has done in its prior regional transport rulemakings; however, SIPs addressing the obligations in CAA section 110(a)(2)(D)(i)(I) must prohibit "any source or other type of emissions activity within the State" from emitting air pollutants which will contribute significantly to downwind air quality problems. Thus, States seeking to rely on an alternative approach to defining "significance" must use an approach that comports with the statute's objectives to determine whether and to what degree emissions from a state should be "prohibited" to eliminate emissions that will "contribute significantly to nonattainment in, or interfere with maintenance of" the NAAQS in any other state. Further, the approach selected must be reasonable and technically justified. Therefore,

while the EPA does not direct states to use a particular framework, nonetheless, each state must show that its decision-making was based on a "technically appropriate or justifiable" evaluation.

Further, the Agency has a statutory obligation to review and approve or disapprove SIP submittals according to the requirements of the Clean Air Act. *See* CAA section 110(k)(3). And the Agency is empowered to interpret those statutory requirements and exercise both technical and policy judgment in acting on SIP submissions. Indeed, the task of allocating responsibility for interstate pollution particularly necessitates Federal involvement. *See EME Homer City*, 572 U.S. at 514 ("The statute . . . calls upon the Agency to address a thorny causation problem: How should EPA allocate among multiple contributing upwind States responsibility for a downwind State's excess pollution?"); *see also Wisconsin*, 938 F.3d at 320. Further, we have consistently disapproved states' good neighbor SIP submissions addressing prior ozone NAAQS when we have found those states linked through our air quality modeling and yet the state failed to conduct an analysis of emissions control opportunities, or such analysis was perfunctory or otherwise unsatisfactory. We have been upheld in our judgment that such SIPs are not approvable. *See Westar Energy* v. *EPA*, 608 Fed. App'x 1, 3 (DC Cir. 2015) ("EPA acted *well within the bounds* of its delegated authority when it disapproved of Kansas's proposed SIP.") (emphasis added).

With respect to the assertion that no state has successfully avoided a FIP with an approvable Step 3 analysis, we note first that at this time, no final FIP addressing the 2015 ozone NAAQS has been promulgated. More directly to the point, no state submission that is the subject of this disapproval action offered any additional emissions control measures. While it is conceivable that a Step 3 analysis may result in a determination that no individual controls are needed, EPA expects that such circumstances will generally be rare, else the CAA's interstate transport provisions are rendered ineffective. For example, the EPA determined in the CSAPR Update that even though the District of Columbia and Delaware were linked to out of state receptors at Steps 1 and 2 of the 4-step interstate transport framework, no additional control measures were required of either jurisdiction. As to the District of Columbia, we found that there were no affected EGU sources that would fall under the CSAPR Update's control program. For Delaware, we found that

there were no emissions reductions available from any affected sources for any of the emissions control stringencies that were analyzed. *See* 81 FR 74504, 74553. No state's submission covered in this action contained an emissions control analysis that would allow for these types of conclusions to be reached for all of its sources.[326] States generally did not conduct any comparative analysis of available emissions control strategies—nor did they prohibit any additional ozone-precursor emissions.

We are unclear what another comment intends in asserting that the EPA is required to interpret "significant contribution" in a manner "which ties contribution to an amount which contributes significantly to downwind maintenance or nonattainment problems." The EPA disagrees that: (1) It has imposed or mandated a specific approach to Step 3 in this action, (2) this action established a particular level of emissions reduction that states were required to achieve, or (3) it mandated a particular methodology for making such a determination. To the extent the comment suggests that the Agency cannot mandate that states use cost as a method of allocating responsibility in their transport SIPs, first, the Agency has not done so. Further, as to whether cost could be used as a permissible method of allocating responsibility, the comment ignores the Supreme Court's holding to the contrary in *EME Homer City,* 572 U.S. at 518, and the D.C. Circuit's earlier holding to the same effect in *Michigan,* 213 F.3d at 687–88, both of which upheld the EPA's approach of using uniform cost-effectiveness thresholds to allocate upwind state responsibilities under the good neighbor provision for prior NAAQS. While this approach may be reasonable to apply again for the 2015 ozone NAAQS (and the EPA has proposed to do so in the proposed FIP action published on April 6, 2022), the EPA did not impose such a requirement on states in developing SIP submissions, nor is the EPA finding any SIP submission not approvable based on a failure to use this particular methodology.

In its March 2018 memorandum, Attachment A, the Agency acknowledged that there could be multiple ways of conducting a Step 3 analysis. The Agency did not endorse any particular approach and noted the Attachment was merely a list of stakeholder ideas that the EPA was not recommending any state follow. The apparent result of this "flexibility," however, was that no state presented a Step 3 analysis that resulted in including any enforceable emissions reductions to address good neighbor obligations for the 2015 ozone NAAQS in their interstate transport SIP submittals. Likewise, the comment here did not include information or analysis establishing that any particular alternative Step 3 approach should have been approved or that any state performed such an analysis in a manner that would have addressed "significant contribution" even in the manner the comment appears to be suggesting.

Notably, materials appended to one State's SIP submission, developed by the Midwest Ozone Group (MOG), did present an analysis applying an approach to "significant contribution" that was based on calculating a proportional share of each state's contribution to a downwind receptor, and this methodology would have imposed on that State's, Kentucky's, sources an obligation to eliminate 0.02 ppb of ozone at the relevant receptor. *See* 87 FR 9507. While the EPA does not endorse or here evaluate the merits of such an approach, it is noteworthy that the State in that instance did not adopt that approach, did not impose that obligation on its sources through enforceable measures by revising its SIP, and offered no explanation for its decision not to do so. *See id.* 9516 ("This approach would have imposed additional emissions reductions for Kentucky sources. Kentucky's final SIP did not consider MOG's proposal and did not provide an explanation for why it was rejecting this approach to allocating upwind emissions reductions, even though it appended this recommendation to its SIP submittal.").

### 9. Step 4: Attempt To Rely on FIPs in a SIP Submission

*Comment:* One comment states that FIPs or other Federal emissions control measures do not have to be incorporated into and enforceable under state law to be an approvable SIP measure. They view it as acceptable for a state to rely in its SIP Submission on the emissions reductions achieved by prior ozone transport FIPs, such as the CSAPR Update or the Revised CSAPR Update, as a permissible means of achieving emissions reductions to eliminate significant contribution for the 2015 ozone NAAQS.

*EPA Response:* The EPA disagrees. As the EPA has noted on page 16 of our September 2013 memorandum "Guidance on Infrastructure State Implementation Plan (SIP) Elements under Clean Air Act sections 110(a)(1) and 110(a)(2)" (2013 Infrastructure SIP Guidance): "a FIP is not a state plan and thus cannot serve to satisfy the state's obligation to submit a SIP." [327] Indeed, the general principle that measures relied on to meet states' CAA obligations must be part of the SIP has been recognized by courts, such as in *Committee for a Better Arvin,* 786 F.3d 1169 (9th Cir. 2015).

This principle is grounded in the recognition that if such measures are not rendered enforceable within the SIP itself, then they may be modified or amended in ways that would undermine the basis for the state's reliance on them, while the approved SIP itself would purport to have addressed the relevant obligation merely by outdated reference to that modified or nonexistent control measure residing outside the SIP. For example, to be credited for attainment demonstration purposes, requirements that may otherwise be federally enforceable (such as new source review permit limits or terms in federally enforceable consent orders), must be in the state's implementation plan so that they could not later be changed without being subject to the EPA's approval. This principle is instrumental to ensuring that states cannot take credit for control measures that might be changed (even by the EPA itself) without the EPA's required approval action under CAA section 110, which includes the obligation to ensure there is no interference or backsliding with respect to all applicable CAA requirements. *See* CAA section 110(l). *See also Montana Sulfur and Chemical Co.* v. *EPA,* 666 F.3d 1174, 1195–96 (9th Cir. 2012) ("The EPA correctly reads 42 U.S.C. 7410(a)(2) as requiring states to include enforceable emissions limits and other control measures *in the plan itself.*") (emphasis in original); 40 CFR 51.112(a) ("Each plan must demonstrate that the measures, rules, and regulations *contained in it* are adequate to provide for the timely attainment and

---

[326] We note that California's SIP submission is not approvable at Step 3, despite the fact that the EPA has not identified NOₓ emissions control opportunities at the state's EGUs. Nonetheless, the SIP submission is not approvable because the state attempted to rely on the CSAPR Update cost threshold to justify a no-control determination when that threshold was in relation to a partial remedy for a less protective NAAQS, and even if it could be reasonably concluded that no emissions reductions are appropriate at EGUs in California, the SIP submission did not conduct an adequate analysis of emissions control opportunities at its non-EGU industrial sources. *See* 87 FR 31459–60.

[327] Guidance on Infrastructure State Implementation Plan (SIP) Elements under Clean Air Act Sections 110(a)(1) and 110(a)(2), September 13, 2013 (available at *https://www.epa.gov/sites/default/files/2015-12/documents/guidance_on_infrastructure_sip_elements_multipollutant_final_sept_2013.pdf*).

maintenance of the national standard that it implements.'') (emphasis added).

The EPA has applied this same interpretation in implementing other infrastructure SIP requirements found in CAA section 110(a)(2). For example, in implementing CAA section 110(a)(2)(C), (D)(i)(II), (D)(ii), and (J) relating to the permitting program for PSD, the EPA has developed FIPs that incorporate by reference provisions codified at 40 CFR 51.21, and some states have taken delegation of that FIP to implement the relevant requirements. But the EPA does not and cannot approve the state as having met these infrastructure SIP elements, even by virtue of taking delegation of the FIP. *See, e.g.,* 83 FR 8818, 8820 (March 1, 2018). Likewise, under one of the pathways presented in our 2013 Infrastructure SIP Guidance, the EPA does not approve SIPs addressing interstate visibility transport obligations under CAA section 110(a)(2)(D)(i)(II) (''prong 4'') until the state itself has a fully approved regional haze plan, and states cannot rely on the CSAPR ''better than BART'' FIPs to meet their prong 4 requirements until they have replaced that FIP with an approved SIP. *See, e.g.,* 84 FR 13800, 13801 (April 8, 2019); 84 FR 43741, 43744 (Aug. 22, 2019).

The comment does not provide contrary examples where the EPA has approved, as a SIP-based emissions control program, requirements that are established through Federal regulation or other types of emissions control programs that are outside the SIP. It is true that in the first two steps of the 4-step interstate transport framework, the EPA conducts air quality modeling based on emissions inventories reflective of on-the-books state and Federal emissions control requirements, to make determinations about air quality conditions and contribution levels that can be anticipated *in the baseline* in a future analytic year. If the comment's examples were intended to reference this consideration of Federal measures in prior actions on SIP submittals, the EPA agrees that it does consider such measures at these steps of its analysis, and the EPA has consistently taken this approach throughout its prior ozone transport actions. But here we are discussing Step 3 and 4 of the framework, where states that have been found to contribute to downwind nonattainment and maintenance problems, *e.g.,* are linked at Steps 1 and 2 to an out of state receptor, would need to evaluate their continuing emissions to determine what if any of those emissions should be deemed ''significant'' (*e.g.,* Step 3) and eliminated through enforceable

emissions control requirements (*e.g.,* Step 4). The EPA is not aware of any good neighbor SIP submission that it has approved where a state purported to eliminate its significant contribution (*e.g.,* satisfy Steps 3 and 4) simply by referring to Federal measures that were not included in its SIP and enforceable as a matter of state law. Finally, it bears emphasizing that the EPA's assessment of the 2015 ozone transport SIPs has already accounted for the emissions-reducing effects of both the CSAPR Update and the Revised CSAPR Update in its baseline air quality modeling at Steps 1 and 2, and so pointing to either of those rules as measures that would eliminate significant contribution at Step 3, for purposes of the 2015 ozone NAAQS, would be impermissible double-counting.

## C. Good Neighbor Provision Policy

### 1. Mobile Source Emissions

*Comment:* Several comments assert that mobile source emissions within the home state of the location of receptors are the primary source of nonattainment problems in downwind areas. Some comments additionally state that a larger portion of their own upwind state emissions is from mobile source emissions. These comments request that the EPA focus on these emissions sources rather than stationary sources to reduce ongoing nonattainment problems. These comments claim mobile sources are federally regulated and, therefore, the EPA bears the responsibility to either take action to reduce mobile source emissions nationwide or encourage downwind states to implement strategies to reduce their own local mobile source emissions.

*Response:* The EPA recognizes that nationwide, mobile sources represent a large portion of ozone-precursor emissions and, as such, would be expected to have a large impact on nonattainment and maintenance receptors.

The EPA has been regulating mobile source emissions since it was established as a Federal agency in 1970 and is committed to continuing the effective implementation and enforcement of current mobile source emissions standards and evaluating the need for additional standards.[328] The

EPA believes that the $NO_X$ reductions from its Federal programs are an important reason for the historical and long-running trend of improving air quality in the United States. The trend helps explain why the overall number of receptors and severity of ozone nonattainment problems under the 1997 and 2008 ozone NAAQS have declined. As a result of this long history, $NO_X$ emissions from onroad and nonroad mobile sources have substantially decreased and are predicted to continue to decrease into the future as newer vehicles and engines that are subject to the more recent and more stringent standards replace older vehicles and engines.[329]

The EPA included mobile source emissions in the 2016v2 modeling used to support the proposal of these SIP disapproval actions to help determine state linkages at Steps 1 and 2 of the 4-step interstate transport framework and has done likewise in its 2016v3 modeling. However, whether mobile source emissions are a large portion of an upwind or downwind state's $NO_X$ emissions, and whether they represent a large portion of the contribution to downwind nonattainment and maintenance receptors, does not answer the question regarding the adequacy of an upwind state's SIP submission. The question is whether "any source or other type of emissions activity" (in the collective) in an upwind state is contributing significantly to downwind receptors, *see* CAA section 110(a)(2)(D)(i). A state's transport SIP must include a technical and adequate justification to support its conclusion that the state has satisfied its interstate transport obligations for the 2015 ozone NAAQS.

To the extent that comments argue that mobile source emissions should be the focus of emissions reductions for the purposes of resolving interstate transport obligations, states could have provided such an analysis for how mobile source reductions might achieve necessary reductions. *See, e.g.,* 70 FR 25209. However, states conducted no such analysis of methods or control techniques that could be used to reduce mobile source emissions, instead claiming that states cannot control mobile source emissions, as this is a federally-regulated sector, or states cannot reasonably control these emissions. States do have options, however, to reduce emissions from certain aspects of their mobile source

---

[328] On December 20, 2022, the EPA finalized more stringent emissions standards for $NO_X$ and other pollutants from heavy-duty vehicles and engines, beginning with model year 2027. *See https://www.epa.gov/regulations-emissions-vehicles-and-engines/final-rule-and-related-materials-control-air-pollution.* The EPA is also developing new multi-pollutant standards for light-

and medium-duty vehicles as well as options to address pollution from locomotives.

[329] *https://gispub.epa.gov/air/trendsreport/2022/#home.*

sectors, and to the extent a state is attributing its contribution to out of state receptors to its mobile sources, it could have conducted an analysis of possible programs or measures that could achieve emissions reductions from those sources. (For example, a general list of types of transportation control measures can be found in CAA section 108(f).[330])

State-specific issues raised by comments are further addressed in the RTC document.

## 2. International Contributions

*Comment:* Several comments state that international emissions contribute to nonattainment and maintenance receptors downwind, and these emissions are not within the jurisdiction of the states. They advocate for the EPA should considering this when acting on SIP submissions. Some comments claim that, in the west, international contributions are even greater than in eastern portions of the U.S. and support their notion that the EPA's evaluation of interstate transport should take special consideration of unique regional factors when determining upwind state obligations, or that the Agency should otherwise explain why it is still inappropriate to factor in higher international contributions, as the Agency has done in Oregon's case.

*Response:* The EPA responded to similar arguments related to international emissions included in the SIP submissions of Arkansas, California, Illinois, Indiana, Kentucky, Michigan, Missouri, Ohio, Utah, Wyoming, and West Virginia in the proposed disapprovals.[331] No comments on the proposed disapprovals provided new information to indicate the EPA's initial assessment was incorrect. These comments' reasoning related to international emissions is inapplicable to the requirements of CAA section 110(a)(2)(D)(i)(I). The good neighbor provision requires states and the EPA to address interstate transport of air pollution that significantly contributes

to downwind states' ability to attain and maintain the NAAQS. Whether emissions from other states or other countries also contribute to the same downwind air quality issue is typically not relevant in assessing whether a downwind state has an air quality problem, or whether an upwind state is significantly contributing to that problem. (Only in rare cases has EPA concluded that certain monitoring sites should not be considered receptors at Step 1 due to the very low collective upwind-state contribution at those receptors. *See* the RTC document.) States are not obligated under CAA section 110(a)(2)(D)(i)(I) to act alone to reduce emissions in amounts sufficient to resolve a downwind receptor's nonattainment or maintenance problem. Rather, states are obligated to eliminate their own "significant contribution" to that receptor or "interference" with the ability of other states to attain or maintain the NAAQS. The statutory standard is, fundamentally, one of contribution, not causation.

Indeed, the D.C. Circuit in *Wisconsin* specifically rejected petitioner arguments suggesting that upwind states should be excused from good neighbor obligations on the basis that some other source of emissions (whether international or another upwind state) could be considered the "but-for" cause of downwind air quality problem. *See Wisconsin,* 938 F.3d at 323–324. The court viewed petitioners' arguments as essentially an argument "that an upwind state 'contributes significantly' to downwind nonattainment only when its emissions are the sole cause of downwind nonattainment." *Id.* at 324. The court explained that "an upwind state can 'contribute' to downwind nonattainment even if its emissions are not the but-for cause." *Id.* at 324–325. *See also Catawba County* v. *EPA,* 571 F.3d 20, 39 (DC Cir. 2009) (rejecting the argument "that 'significantly contribute' unambiguously means 'strictly cause'" because there is "no reason why the statute precludes EPA from determining that [an] addition of [pollutant] into the atmosphere is significant even though a nearby county's nonattainment problem would still persist in its absence"); *Miss. Comm'n on Envtl. Quality* v. *EPA,* 790 F.3d 138, 163 n.12 (DC Cir. 2015) (observing that the argument that "there likely would have been no violation at all . . . if it were not for the emissions resulting from [another source]" is "merely a rephrasing of the but-for causation rule that we rejected in Catawba County"). Therefore, a state is not excused from eliminating its significant contribution on the basis that

international emissions also contribute some amount of pollution to the same receptors to which the state is linked.

To the extent comments compare the influence of international emissions with the EPA's treatment of receptors in California to which Oregon contributes greater than 0.70 ppb, the EPA responds to these comments in the RTC document.

## 3. Western Interstate Transport Policy

*Comment:* Several comments argue that the EPA should consider an alternative approach to evaluating interstate transport in the western U.S. Comments assert there are considerations unique to the western states, such as increased background, international, and wildfire contributions to ozone concentrations in the west. Some commenters believe a "case-by-case" assessment is more appropriate for evaluating western states' interstate transport obligations, as they claim the EPA had done for the 2008 ozone standards. They additionally argue that the EPA modeling is not able to accurately project ozone concentrations in the west because of these factors, along with the west's unique topographical influence on ozone transport.

*Response:* The EPA disagrees that either its nationwide photochemical grid modeling or the 4-step interstate transport framework for ozone cannot generally be applied to states in the western region of the U.S. and has maintained that position consistently throughout numerous actions.[332] Though at times the EPA has found it appropriate to examine more closely discreet issues for some western states,[333] the 4-step interstate transport framework itself is appropriate for assessing good neighbor obligations of western states in the absence of those circumstances. The EPA evaluated the contents of the western states' SIP submissions covered by this action on the merits of the information the states provided. As described at proposal and reiterated in Section IV, the EPA is finalizing its disapproval of California,

---

[330] In making this observation, the EPA is not suggesting that mobile source emissions reductions are necessarily required to address a state's good neighbor obligations, but merely pointing out that if the state itself attributes the problem to mobile sources, then it is reasonable to expect that further analysis of such control strategies would be explored.

[331] 87 FR 9798, 9809–9810 (Feb. 22, 2022) (Arkansas); 87 FR 31443, 31460–31461 (May 24, 2022) (California); 87 FR 9854 (Illinois); 87 FR 9859–9860 (Indiana); 87 FR 9498, 9508 (Feb. 22, 2022) (Kentucky); 87 FR 9838, 9865 (Michigan); 87 FR 9533, 9543 (Feb. 22, 2022) (Missouri); 87 FR 9838 at 9874 (Ohio); 87 FR 31470, 31482 (May 24, 2022) (Utah); 87 FR 9516, 9527 (Feb. 22, 2022) (West Virginia); 87 FR 31495, 31507 (May 24, 2022) (Wyoming).

[332] For a discussion of this history, *see* for example 87 FR 31480–81 (proposed disapproval of Utah SIP submission) and 87 FR 31453–56 (proposed disapproval of California SIP submission).

[333] *See, e.g.,* Approval of Arizona's 2008 ozone NAAQS interstate transport SIP submission, 81 FR 15200 (March 22, 2016) (Step 1 analysis concluding certain monitors in California should not be considered interstate transport receptors for purposes of the good neighbor provision for the 2008 ozone NAAQS); *see also* 87 FR 61249, 61254–55 (Oct. 11, 2022) (in approving Colorado's interstate transport SIP for the 2015 ozone NAAQS, analyzing unique issues associated with wintertime inversion conditions in certain western areas).

Nevada, and Utah's SIP submissions. This final determination is based on these evaluations, as well as the EPA's 2016v2 and 2016v3 modeling following stakeholder feedback.

The EPA continues to find it appropriate to rely on the results of its nationwide modeling in the western U.S., despite comments concerning the ability for the EPA's modeling to accurately project ozone concentrations and contributions in western states, as well as its ability to support the EPA's 4-step framework for assessing interstate transport. The EPA's nationwide photochemical grid modeling considers multiple complex factors, including those raised in comments, such as terrain complexities, variability in emissions (*e.g.*, wildfire emissions), meteorology, and topography. While the EPA continues to believe its 2016v2 modeling performs equally as well in both the west and the east, the EPA has adjusted its 2016v3 modeling to ensure its predictions more closely replicate the relative magnitude of concentrations and day-to-day variability that are characteristic of observed 8-hour daily maximum ozone concentrations in each region, as explained in Section III.A and the RTC document. As such, the EPA continues to find its modeling reliable for characterizing ozone concentrations and contribution values in the western U.S. Further responses regarding the reliability of the EPA's modeling in the western U.S. is provided in the RTC document.

The EPA disagrees with comments noting that the Agency took an alternative approach for western states when assessing interstate transport obligations under the 2008 ozone NAAQS. As explained in our proposed disapproval of California's 2015 ozone NAAQS interstate transport SIP submission, while the EPA has in limited circumstances found unique issues associated with addressing ozone transport in western states, the EPA has consistently applied the 4-step interstate transport framework in western states, as it has done here, and has identified ozone transport problems in the west that are similar to those in the east.[334][335] At proposal, the EPA addressed states' arguments regarding the impact of unique factors such as topography and, as part of the EPA's evaluation of the contents of the SIP submission, provided explanation as to why the EPA found the states' arguments did not

support their conclusions regarding long range transport of ozone in the west.[336]

While comments point to relatively higher level of contributions from non-anthropogenic, local, or international contributions in the west as reason for evaluating interstate transport differently in the west, a state is not excused from eliminating its significant contribution due to contributions from these sources, where the data shows that anthropogenic emissions from upwind states also contribute collectively to identified receptors at levels that indicate there to be an interstate contribution problem as well. As stated in Section V.C.2, a state is not excused from eliminating its significant contribution on the basis that international emissions also contribute some amount of pollution to the same receptors to which the state is linked. This same principle applies broadly to other arguments as to which emissions are the "cause" of the problem; the good neighbor provision established a contribution standard, not a but-for causation standard. *See Wisconsin,* 938 F.3d at 323–25.

## VI. Statutory and Executive Order Reviews

Additional information about these statutes and Executive orders can be found at *https://www.epa.gov/laws-regulations/laws-and-executive-orders.*

### A. Executive Orders 12866: Regulatory Planning and Executive Order 13563: Improving Regulation and Regulatory Review

This action is not a significant regulatory action and was, therefore, not submitted to the Office of Management and Budget for review.

### B. Paperwork Reduction Act (PRA)

This action does not impose an information collection burden under the provisions of the Paperwork Reduction Act. This final action does not establish any new information collection requirement apart from what is already required by law. This finding relates to the requirement in the CAA for states to submit SIPs under CAA section 110(a)(2)(D)(i)(I) addressing interstate transport obligations associated with the 2015 ozone NAAQS.

### C. Regulatory Flexibility Act (RFA)

I certify that this action will not have a significant economic impact on a substantial number of small entities under the RFA. This action will not impose any requirements on small entities. This action is disapproving SIP submissions for not containing the necessary provisions to satisfy interstate transport requirements under CAA section 110(a)(2)(D)(i)(I).

### D. Unfunded Mandates Reform Act of 1995 (UMRA)

This action does not contain any unfunded mandate as described in UMRA 2 U.S.C. 1531–1538 and does not significantly or uniquely affect small governments. The action imposes no enforceable duty on any state, local or tribal governments or the private sector.

### E. Executive Order 13132: Federalism

This action does not have federalism implications. It will not have substantial direct effects on the states, on the relationship between the National Government and the states, or on the distribution of power and responsibilities among the various levels of government.

### F. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments

This action has tribal implications. However, this action does not impose substantial direct compliance costs on federally recognized tribal governments, nor preempt tribal law. This action includes disapproving the portion of Oklahoma's SIP submission addressing the state's good neighbor obligations under CAA section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS and applies to certain areas of Indian country as discussed in Section IV.C of the proposed action, "Air Plan Disapproval; Arkansas, Louisiana, Oklahoma, and Texas; Interstate Transport of Air Pollution for the 2015 Ozone National Ambient Air Quality Standards" (87 FR 9798 at 9824, February 2, 2022). However, this action does not impose substantial direct compliance costs on federally recognized tribal governments because no actions will be required of tribal governments. This action will also not preempt tribal law as no Oklahoma tribe implements a regulatory program under the CAA, and thus does not have applicable or related tribal laws. The EPA consulted with tribal officials under the EPA Policy on Consultation and Coordination with Indian Tribes early in the process of developing this regulation to permit them to have meaningful and timely input into its development. A summary of that

---

[334] 87 FR 31443, 31453.

[335] 81 FR 74503, 74523.

[336] *See, e.g.,* 87 FR 31443, 31457. The EPA evaluated California's qualitative consideration of unique topographic factors that may influence the transport of emissions from sources within the state to downwind receptors in Colorado and Arizona. The EPA concluded that the State's arguments do not present sufficient evidence that called into question the results of the EPA's modeling.

consultation is provided in the file "2015 Ozone Transport OK Tribal Consultation Meeting Record 3–3–2022,'' in the docket for this action.

*G. Executive Order 13045: Protection of Children From Environmental Health and Safety Risks*

The EPA interprets Executive Order 13045 as applying only to those regulatory actions that concern health or safety risks that the EPA has reason to believe may disproportionately affect children, per the definition of "covered regulatory action" in section 2–202 of the Executive order. This action is not subject to Executive Order 13045 because it merely disapproves SIP submissions as not containing the necessary provisions to satisfy interstate transport requirements under CAA section 110(a)(2)(D)(i)(I).

*H. Executive Order 13211: Actions That Significantly Affect Energy Supply, Distribution or Use*

This action is not subject to Executive Order 13211, because it is not a significant regulatory action under Executive Order 12866.

*I. National Technology Transfer and Advancement Act (NTTAA)*

This rulemaking does not involve technical standards.

*J. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations*

Executive Order 12898 (Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations, 59 FR 7629, Feb. 16, 1994) directs Federal agencies to identify and address "disproportionately high and adverse human health or environmental effects" of their actions on minority populations and low-income populations to the greatest extent practicable and permitted by law. The EPA defines environmental justice (EJ) as "the fair treatment and meaningful involvement of all people regardless of race, color, national origin, or income with respect to the development, implementation, and enforcement of environmental laws, regulations, and policies." The EPA further defines the term fair treatment to mean that "no group of people should bear a disproportionate burden of environmental harms and risks, including those resulting from the negative environmental consequences of industrial, governmental, and commercial operations or programs and policies."

Under the CAA, the Administrator is required to approve a SIP submission that complies with the provisions of the Act and applicable Federal regulations. 42 U.S.C. 7410(k); 40 CFR 52.02(a). Thus, in reviewing SIP submissions, the EPA's role is to review state choices, and approve those choices if they meet the minimum criteria of the Act. As articulated in this final action, the EPA is determining that certain SIPs do not meet certain minimum requirements, and the EPA is disapproving those SIPs. Specifically, this action disapproves certain SIP submissions as not containing the necessary provisions to satisfy "good neighbor" requirements under CAA section 110(a)(2)(D)(i)(I). The EPA did not perform an EJ analysis and did not consider EJ in this action. The CAA and applicable implementing regulations neither prohibit nor require such an evaluation. In a wholly separate regulatory action, the EPA will fully address the CAA "good neighbor" requirements under section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS as it regards the SIP disapprovals included in this final action. Consideration of EJ is not required as part of this action, and there is no information in the record inconsistent with the stated goal of E.O. 12898 of achieving EJ for people of color, low-income populations, and Indigenous peoples.

*K. Congressional Review Act (CRA)*

This action is subject to the CRA, and the EPA will submit a rule report to each House of the Congress and to the Comptroller General of the United States. This action is not a "major rule" as defined by 5 U.S.C. 804(2).

*L. Judicial Review*

Section 307(b)(1) of the CAA governs judicial review of final actions by the EPA. This section provides, in part, that petitions for review must be filed in the D.C. Circuit: (i) when the agency action consists of "nationally applicable regulations promulgated, or final actions taken, by the Administrator," or (ii) when such action is locally or regionally applicable, but "such action is based on a determination of nationwide scope or effect and if in taking such action the Administrator finds and publishes that such action is based on such a determination." For locally or regionally applicable final actions, the CAA reserves to the EPA complete discretion whether to invoke the exception in (ii).[337]

This rulemaking is "nationally applicable" within the meaning of CAA section 307(b)(1). In this final action, the EPA is applying a uniform legal interpretation and common, nationwide analytical methods with respect to the requirements of CAA section 110(a)(2)(D)(i)(I) concerning interstate transport of pollution (*i.e.,* "good neighbor" requirements) to disapprove SIP submissions that fail to satisfy these requirements for the 2015 ozone NAAQS. Based on these analyses, the EPA is disapproving SIP submittals for the 2015 ozone NAAQS for 21 states located across a wide geographic area in eight of the ten EPA Regions and ten Federal judicial circuits. Given that on its face this action addresses implementation of the good neighbor requirements of CAA section 110(a)(2)(D)(i)(I) in a large number of states located across the country and given the interdependent nature of interstate pollution transport and the common core of knowledge and analysis involved in evaluating the submitted SIPs, this is a "nationally applicable" action within the meaning of CAA section 307(b)(1).

In the alternative, to the extent a court finds this action to be locally or regionally applicable, the Administrator is exercising the complete discretion afforded to him under the CAA to make and publish a finding that this action is based on a determination of "nationwide scope or effect" within the meaning of CAA section 307(b)(1). In this final action, the EPA is interpreting and applying section 110(a)(2)(D)(i)(I) of the CAA for the 2015 ozone NAAQS based on a common core of nationwide policy judgments and technical analysis concerning the interstate transport of pollutants throughout the continental U.S. In particular, the EPA is applying here the same, nationally consistent 4-step interstate transport framework for assessing obligations for the 2015 ozone NAAQS that it has applied in other nationally applicable rulemakings, such as CSAPR, the CSAPR Update, and the Revised CSAPR Update. The EPA is relying on the results from nationwide photochemical grid modeling using a 2016 base year and 2023 projection year as the primary basis for its assessment of air quality conditions and pollution contribution levels at Step 1 and Step 2 of that 4-step framework and applying a nationally uniform approach to the identification of nonattainment and

---

[337] In deciding whether to invoke the exception by making and publishing a finding that an action is based on a determination of nationwide scope or effect, the Administrator takes into account a number of policy considerations, including his judgment balancing the benefit of obtaining the D.C. Circuit's authoritative centralized review versus allowing development of the issue in other contexts and the best use of agency resources.

maintenance receptors across the entire geographic area covered by this final action.[338] The EPA has also evaluated each state's arguments for the use of alternative approaches or alternative sets of data with an eye to ensuring national consistency and avoiding inconsistent or inequitable results among upwind states (*i.e.,* those states for which good neighbor obligations are being evaluated in this action) and between upwind and downwind states (*i.e.,* those states that contain receptors signifying ozone nonattainment or maintenance problems).

The Administrator finds that this is a matter on which national uniformity in judicial resolution of any petitions for review is desirable, to take advantage of the D.C. Circuit's administrative law expertise, and to facilitate the orderly development of the basic law under the Act. The Administrator also finds that consolidated review of this action in the D.C. Circuit will avoid piecemeal litigation in the regional circuits, further judicial economy, and eliminate the risk of inconsistent results for different states, and that a nationally consistent approach to the CAA's mandate concerning interstate transport of ozone pollution constitutes the best use of agency resources. The EPA's responses to comments on the appropriate venue for petitions for review are contained in the RTC document.

For these reasons, this final action is nationally applicable or, alternatively, the Administrator is exercising the complete discretion afforded to him by the CAA and finds that this final action is based on a determination of nationwide scope or effect for purposes of CAA section 307(b)(1) and is publishing that finding in the **Federal Register**. Under section 307(b)(1) of the CAA, petitions for judicial review of this action must be filed in the United States Court of Appeals for the District of Columbia Circuit by April 14, 2023.

## List of Subjects in 40 CFR Part 52

Environmental protection, Air pollution control, Incorporation by reference, Ozone.

**Michael S. Regan,**
*Administrator.*

For the reasons set forth in the preamble, 40 CFR part 52 is amended as follows:

## PART 52—APPROVAL AND PROMULGATION OF IMPLEMENTATION PLANS

■ 1. The authority citation for part 52 continues to read as follows:

**Authority:** 42 U.S.C. 7401 *et seq.*

## Subpart B—Alabama

■ 2. Section 52.56 is added to read as follows:

## § 52.56   Control strategy: Ozone.

(a) The state implementation plan (SIP) revision submitted on June 21, 2022, addressing Clean Air Act section 110(a)(2)(D)(i)(I) (prongs 1 and 2) for the 2015 ozone national ambient air quality standards (NAAQS) is disapproved.

(b) [Reserved]

## Subpart E—Arkansas

■ 3. Section 52.174 is amended by adding paragraph (b) to read as follows:

## § 52.174   Control strategy and regulations: Ozone.

*    *    *    *    *

(b) The portion of the SIP submittal from October 10, 2019, addressing Clean Air Act section 110(a)(2)(D)(i)(I) for the 2015 ozone national ambient air quality standards (NAAQS) is disapproved.

## Subpart F—California

■ 4. Section 52.223 is amended by adding paragraph (p)(7) to read as follows:

## § 52.223   Approval status.

*    *    *    *    *

(p) *    *    *

(7) The interstate transport requirements for Significant Contribution to Nonattainment (Prong 1) and Interstate Transport—Interference with Maintenance (Prong 2) of Clean Air Act (CAA) section 110(a)(2)(D)(i)(I).

■ 5. Section 52.283 is amended by adding paragraph (h) to read as follows:

## § 52.283   Interstate Transport.

*    *    *    *    *

(h) *2015 ozone NAAQS.* The 2018 Infrastructure SIP Revision, submitted on October 1, 2018, does not meet the following specific requirements of Clean Air Act section 110(a)(2)(D)(i)(I) for the 2015 ozone national ambient air quality standards (NAAQS).

(1) The requirements of CAA section 110(a)(2)(D)(i)(I) regarding significant contribution to nonattainment of the 2015 ozone NAAQS in any other State and interference with maintenance of the 2015 ozone NAAQS by any other State.

(2) [Reserved]

## Subpart O—Illinois

■ 6. Section 52.720 is amended in the table in paragraph (e), under the heading "Section 110(a)(2) Infrastructure Requirements," by revising the entry for "2015 Ozone NAAQS Infrastructure Requirements" to read as follows:

## § 52.720   Identification of plan.

*    *    *    *    *

(e) *    *    *

### EPA-Approved Illinois Nonregulatory and Quasi-Regulatory Provisions

| Name of SIP provision | Applicable geographic or non-attainment area | State submittal date | EPA approval date | Comments |
|---|---|---|---|---|
| * | * | * | * | * |
| **Section 110(a)(2) Infrastructure Requirements** | | | | |

[338] In the report on the 1977 Amendments that revised section 307(b)(1) of the CAA, Congress noted that the Administrator's determination that the "nationwide scope or effect" exception applies would be appropriate for any action that has a scope or effect beyond a single judicial circuit. *See* H.R. Rep. No. 95–294 at 323, 324, reprinted in 1977 U.S.C.C.A.N. 1402–03.

EPA-APPROVED ILLINOIS NONREGULATORY AND QUASI-REGULATORY PROVISIONS—Continued

| Name of SIP provision | Applicable geographic or non-attainment area | State submittal date | EPA approval date | Comments |
|---|---|---|---|---|
| * | * | * | * | * |
| 2015 Ozone NAAQS Infrastructure Requirements. | Statewide ... | 5/16/2019 and 9/22/2020. | 2/13/2023, [INSERT **FEDERAL REGISTER** CITATION]. | All CAA infrastructure elements under 110(a)(2) have been approved except (D)(i)(I) Prongs 1, 2, which are disapproved, and no action has been taken on (D)(i)(II) Prong 4. |

### Subpart P—Indiana

■ 7. Section 52.770 is amended in the table in paragraph (e) by adding an entry for "Section 110(a)(2) Infrastructure Requirements for the 2015 Ozone NAAQS" after the entry for "Section 110(a)(2) Infrastructure Requirements for the 2008 8-Hour Ozone NAAQS" to read as follows:

**§ 52.770   Identification of plan.**

\* \* \* \* \*

(e) \* \* \*

EPA-APPROVED INDIANA NONREGULATORY PROVISIONS AND QUASI-REGULATORY PROVISIONS

| Title | Indiana date | EPA approval | Explanation |
|---|---|---|---|
| * | * | * | * |
| Section 110(a)(2) Infrastructure Requirements for the 2015 Ozone NAAQS. | 11/2/2018 | 2/13/2023, [INSERT **FEDERAL REGISTER** CITATION]. | All CAA infrastructure elements have been approved except (D)(i)(I) Prongs 1 and 2, which are disapproved, and no action has been taken on the visibility portion of (D)(i)(II). |
| * | * | * | * |

### Subpart S—Kentucky

■ 8. Section 52.930 is amended by adding paragraph (n) to read as follows:

**§ 52.930   Control strategy: Ozone.**

\* \* \* \* \*

(n) *Disapproval.* The state implementation plan (SIP) revision submitted on January 11, 2019, addressing Clean Air Act section 110(a)(2)(D)(i)(I) (prongs 1 and 2) for the 2015 ozone national ambient air quality standards (NAAQS) is disapproved.

### Subpart T—Louisiana

■ 9. Section 52.996 is amended by adding paragraph (b) to read as follows:

**§ 52.996   Disapprovals.**

\* \* \* \* \*

(b) The SIP submittal from November 13, 2019, addressing Clean Air Act section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS is disapproved.

### Subpart V—Maryland

■ 10. Section 52.1076 is amended by adding paragraph (gg) to read as follows:

**§ 52.1076   Control strategy plans for attainment and rate-of-progress: Ozone.**

\* \* \* \* \*

(gg) *Disapproval.* EPA is disapproving Maryland's October 16, 2019, State Implementation Plan (SIP) revision intended to address the Clean Air Act (CAA) section 110(a)(2)(D)(i)(I) interstate transport requirements for the 2015 8-hour ozone national ambient air quality standard (NAAQS).

### Subpart X—Michigan

■ 11. Section 52.1170 is amended in the table in paragraph (e), under the heading "Infrastructure," by revising the entry for "Section 110(a)(2) infrastructure requirements for the 2015 ozone NAAQS" to read as follows:

**§ 52.1170   Identification of plan.**

\* \* \* \* \*

(e) \* \* \*

EPA-APPROVED MICHIGAN NONREGULATORY AND QUASI-REGULATORY PROVISIONS

| Name of nonregulatory SIP provision | Applicable geographic or non-attainment area | State submittal date | EPA approval date | Comments |
|---|---|---|---|---|
| * | * | * | * | * |
| **Infrastructure** | | | | |

EPA-APPROVED MICHIGAN NONREGULATORY AND QUASI-REGULATORY PROVISIONS—Continued

| Name of nonregulatory SIP provision | Applicable geographic or non-attainment area | State submittal date | EPA approval date | Comments |
|---|---|---|---|---|
| * | * | * | * | * |
| Section 110(a)(2) infrastructure requirements for the 2015 ozone NAAQS. | Statewide ... | 3/8/2019 | 2/13/2023, [INSERT **FEDERAL REGISTER** CITATION]. | *Approved CAA elements:* 110(a)(2)(A), (B), (C), (D)(i)(II) Prong 3, D(ii), (E)(i), (F), (G), (H), (J), (K), (L), and (M). *Disapproved CAA elements:* 110(a)(2)(D)(i)(I) Prongs 1 and 2, and 110(a)(2)(D)(i)(II) Prong 4. No action on CAA element 110(1)(2)(E)(ii). |
| * | * | * | * | * |

## Subpart Y—Minnesota

■ 12. Section 52.1220 is amended in the table in paragraph (e) by revising the entry for ''Section 110(a)(2) Infrastructure Requirements for the 2015 Ozone NAAQS'' to read as follows:

**§ 52.1220  Identification of plan.**

\*   \*   \*   \*   \*

(e) \* \* \*

EPA-APPROVED MINNESOTA NONREGULATORY PROVISIONS

| Name of nonregulatory SIP provision | Applicable geographic or non-attainment area | State submittal date/ effective date | EPA approved date | Comments |
|---|---|---|---|---|
| * | * | * | * | * |
| Section 110(a)(2) Infrastructure Requirements for the 2015 Ozone NAAQS. | Statewide ... | 10/1/2018 | 2/13/2023, [INSERT **FEDERAL REGISTER** CITATION]. | Fully approved for all CAA elements except transport elements of (D)(i)(I) Prong 2, which are disapproved, and no action has been taken on the visibility protection requirements of (D)(i)(II). |

## Subpart Z—Mississippi

■ 13. Section 52.1273 is amended by adding paragraph (b) read as follows:

**§ 52.1273  Control strategy: Ozone.**

\*   \*   \*   \*   \*

(b) *Disapproval.* The state implementation plan (SIP) revision submitted on September 3, 2019, addressing Clean Air Act section 110(a)(2)(D)(i)(I) (prongs 1 and 2) for the 2015 ozone national ambient air quality standards (NAAQS) is disapproved.

## Subpart AA—Missouri

■ 14. Section 52.1323 is amended by adding paragraph (p) to read as follows:

**§ 52.1323  Approval status.**

\*   \*   \*   \*   \*

(p) For the 2015 8-hour ozone NAAQS:

(1) *Disapproval.* Missouri state implementation plan (SIP) revision submitted on June 10, 2019, to address the Clean Air Act (CAA) infrastructure requirements of section 110(a)(2) for the 2015 8-hour ozone NAAQS, is

disapproved for section 110(a)(2)(D)(i)(I) (prongs 1 and 2).

(2) [Reserved]

## Subpart DD—Nevada

■ 15. Section 52.1472 is amended by adding paragraph (k) to read as follows:

**§ 52.1472  Approval status.**

\*   \*   \*   \*   \*

(k) *2015 8-hour ozone NAAQS.* The SIP submittal from October 1, 2018, is disapproved for Clean Air Act (CAA) section 110(a)(2)(D)(i)(I) (prongs 1 and 2) for the NDEP, Clark County, and Washoe County portions of the Nevada SIP submission.

## Subpart FF—New Jersey

■ 16. Section 52.1586 is amended by adding paragraph (c) and reserved paragraph (d) to read as follows:

**§ 52.1586  Section 110(a)(2) infrastructure requirements.**

\*   \*   \*   \*   \*

(c) *2015 8-hour ozone NAAQS*—(1) *Disapproval.* New Jersey SIP revision submitted on May 13, 2019, to address

the CAA infrastructure requirements of section 110(a)(2) for the 2015 8-hour ozone NAAQS, is disapproved for section 110(a)(2)(D)(i)(I) (prongs 1 and 2).

(2) [Reserved]

(d) [Reserved]

## Subpart HH—New York

■ 17. Section 52.1683 is amended by adding paragraph (v) to read as follows:

**§ 52.1683  Control strategy: Ozone.**

\*   \*   \*   \*   \*

(v) *Disapproval.* The portion of the SIP revision submitted on September 25, 2018, addressing Clean Air Act section 110(a)(2)(D)(i)(I) (prongs 1 and 2) for the 2015 ozone NAAQS is disapproved.

## Subpart KK—Ohio

■ 18. Section 52.1870 is amended in the table in paragraph (e), under ''Infrastructure Requirements,'' by revising the entry for ''Section 110(a)(2) infrastructure requirements for the 2015 ozone NAAQS'' to read as follows:

**§ 52.1870  Identification of plan.**

\*    \*    \*    \*    \*

(e) \* \* \*

### EPA-APPROVED OHIO NONREGULATORY AND QUASI-REGULATORY PROVISIONS

| Title | Applicable geographic or non-attainment area | State date | EPA approval | Comments |
|---|---|---|---|---|
| \* | \* | \* | \* | \* |
| **Infrastructure Requirements** | | | | |
| Section 110(a)(2) infrastructure requirements for the 2015 ozone NAAQS. | Statewide ... | 9/28/2018 | 2/13/2023, [INSERT **FEDERAL REGISTER** CITATION]. | Approved CAA elements: 110(a)(2)(A), (B), (C), (D)(i)(II) prongs 3 and 4, (E), (F), (G), (H), (J), (K), (L), and (M). Elements (D)(i)(I) prongs 1 and 2 are disapproved. |
| \* | \* | \* | \* | \* |

## Subpart LL—Oklahoma

■ 19. Section 52.1922 is amended by adding paragraph (c) to read as follows:

**§ 52.1922  Approval status.**

\*    \*    \*    \*    \*

(c) The portion of the SIP submittal from October 25, 2018, addressing Clean Air Act section 110(a)(2)(D)(i)(I) for the 2015 ozone national ambient air quality standards (NAAQS) is disapproved.

## Subpart SS—Texas

■ 20. Section 52.2275 is amended by:
■ a. Removing the first paragraph (m); and
■ b. Adding paragraph (o).
The addition reads as follows:

**§ 52.2275  Control strategy and regulations: Ozone.**

\*    \*    \*    \*    \*

(o) *Disapproval.* The portion of the SIP submittal from September 12, 2018, addressing Clean Air Act section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS is disapproved.

## Subpart XX—West Virginia

■ 21. Section 52.2520 is amended in the table in paragraph (e) by adding the entry ''Section 110(a)(2) Infrastructure Requirements for the 2015 8-Hour Ozone NAAQS'' at the end of the table to read as follows:

**§ 52.2520  Identification of plan.**

\*    \*    \*    \*    \*

(e) \* \* \*

| Name of non-regulatory SIP revision | Applicable geographic area | State submittal date | EPA approval date | Additional explanation |
|---|---|---|---|---|
| \* | \* | \* | \* | \* |
| Section 110(a)(2) Infrastructure Requirements for the 2015 8-Hour Ozone NAAQS. | Statewide ... | 2/4/2019 | 2/13/2023, [INSERT **FEDERAL REGISTER** CITATION]. | Disapproval—EPA is disapproving West Virginia's February 4, 2019, State Implementation Plan (SIP) revision intended to address the CAA section 110(a)(2)(D)(i)(I) interstate transport requirements for the 2015 8-hour ozone national ambient air quality standard (NAAQS). |

## Subpart YY—Wisconsin

■ 22. Section 52.2591 is amended by adding paragraph (l) to read as follows:

**§ 52.2591  Section 110(a)(2) infrastructure requirements.**

\*    \*    \*    \*    \*

(l) *Partial approval/disapproval.* In a September 14, 2018, submission, WDNR certified that the State has satisfied the infrastructure SIP requirements of section 110(a)(2)(A) through (H), and (J) through (M) for the 2015 ozone NAAQS. For section 110(a)(2)(D)(i)(I), prong 1 is approved and prong 2 is disapproved.

EPA did not take action on any other elements. We will address the remaining requirements in a separate action.

[FR Doc. 2023–02407 Filed 2–10–23; 8:45 am]

**BILLING CODE 6560–50–P**

Tab HQ-24: Technical Support Document: 2015 8-Hour
Ozone Transport SIP Proposal, EPA Region 6 (Feb. 1, 2022)
(EPA-HQ-OAR-2021-0663-0024)

**EPA REGION 6**


**2015 8-HOUR OZONE TRANSPORT SIP PROPOSAL**


**TECHNICAL SUPPORT DOCUMENT**




**February 1st, 2022**



**By**

**Erik Snyder**

**Lead Regional Air Quality Modeler**

**EPA Region 6 – Dallas, TX**

# Contents

1.    Maintenance Receptor Methodology ................................................................. 3

2.    Underestimation Concerns .......................................................................... 36

   a.    Underprediction in the base case 2012 period of Texas ozone at DFW/HGB monitors ... 37

   b.    Underprediction in the TCEQ's base case 2012 period at downwind areas in Midwest and West. .................................................................................................. 52

   c.    Underestimation of Future year projections at DFW/HGB receptors ............................. 57

   d.    Underestimation in TCEQ's 2023 Future year projections at downwind areas ............... 62

   e.    Summary ................................................................................................. 70

3.    Comparison of TCEQ and EPA 2023 future modeling and identified maintenance and nonattainment receptors ............................................................................ 71

4.    Other Potential Modeling Concerns.................................................................. 82

5.    TCEQ Other Factor Analysis (Weight of Evidence) ......................................... 83

6.    EPA Summary ............................................................................................. 104

This Technical Support Document (TSD) provides additional analysis of TCEQ's air quality modeling relied upon in its August 17, 2018, SIP submission addressing interstate transport obligations for the 2015 ozone NAAQS. As discussed in the notice of proposed disapproval, EPA has identified several concerns with the reliability in TCEQ's modeling and application of those model results in assessing Texas' potential contributions to downwind ozone. States are free to develop their own modeling, but that modeling and analysis of the modeling and other technical analyses must be technically supportable, and the EPA is obligated to assess and evaluate the reliability of each state's technical demonstration when determining whether the Act's requirements are met. Based on the EPA's evaluation of the SIP submission, the EPA is proposing to find that TCEQ's August 17, 2018, SIP submission does not meet the State's obligations with respect to prohibiting emissions that contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in any other state. EPA's assessment and evaluation of the reliability of the technical demonstration in TCEQ's SIP is discussed in this document. Oklahoma also relied on TCEQ's modeling analysis in their SIP. EPA's concerns with TCEQ's SIP also impact the approvability of Oklahoma's 2015 Ozone Transport SIP.

1.      **Maintenance Receptor Methodology**

As discussed in Section V.A of this action, in addition to the use of an alternative modeling platform, TCEQ also created its own method for identifying maintenance receptors. TCEQ has not adequately explained or justified how its method for identifying maintenance receptors reasonably identifies areas that will have difficulty maintaining the NAAQS. The EPA proposes to find that TCEQ has not provided a sufficient technical basis for how its chosen methodology gives meaning to the CAA's instruction that states submit good neighbor SIPs that

prohibit their states' emissions from interfering with the maintenance of the NAAQS in another

state.

In *North Carolina v. EPA*, 531 F.3d 896, 909-11 (D.C. Cir. 2008), the D.C. Circuit

rejected the EPA's CAIR on the basis that the EPA had not adequately given meaning to the

phrase "interfere with maintenance" in the good neighbor provision. Specifically, North Carolina

argued that it had counties that were projected to attain the NAAQS in the future analytic year

but were at risk of falling back into nonattainment due to interference from upwind sources,

particularly given year-to-year variability in ozone levels. The court agreed, holding that the

EPA's rule did not adequately protect "[a]reas that find themselves barely meeting attainment."

*Id.* at 910. Consequently, the EPA has developed a methodology, as described elsewhere in this

action and used in its 2011 CSAPR and its 2016 CSAPR Update and Revised CSAPR Update,

for identifying areas that may struggle to maintain the NAAQS. *See* 76 FR at 48227-28. The

EPA's approach to addressing maintenance receptors was upheld in the *EME Homer City*

litigation. *See* 795 F.3d 118, 136-37. It was also upheld in *Wisconsin*. 938 F.3d at 325-26. In

*Wisconsin*, the court noted that four upwind states were linked only to maintenance receptors and

rejected the argument that application of the same control level as the EPA imposes for those

states linked to nonattainment receptors was unreasonable or unlawful absent a particularized

showing of overcontrol. *Id.* at 327.

To explain the differences between TCEQ's and the EPA's methodology for identifying

maintenance receptors, it is helpful to provide some additional context of how the EPA projects

future air quality. The EPA's air quality modeling guidance has long recommended developing a

base design value (DV)[1] (i.e., the design value that will be used as a starting point to model and analyze for purposes of projecting future air quality concentrations) that is the average of three DVs spanning a five-year period, centered around one year for which an emissions inventory will be submitted (e.g., if 2011 was the base emissions inventory year, a state would use monitored values from 2009-2011, 2010-2012, 2011-2013 as the starting point for projecting air quality concentrations in future years).[2] The average of these three DVs is then multiplied by a relative response factor (RRF)[3] to generate an average DV for the future year. If a receptor's average future year DV is greater than or equal to the level of the NAAQS, and the receptor has recent monitored data that violates the NAAQS, that receptor is considered a "nonattainment" receptor at Step 1. To identify maintenance receptors, the EPA's methodology looks to the highest DV of the three DVs used to calculate the 5-year weighted average design value (e.g., in the 2011 example, if 2009-2011 had the highest design value of 2009-2011, 2010-2012, and 2011-2013). The EPA then applies the same relative response factor to that highest design value to generate a projected future maximum design value. Where a receptor's maximum design value exceeds the level of the NAAQS, the EPA has deemed those receptors to be "maintenance" receptors. This methodology was designed to address the D.C. Circuit's holding that the CAA's "interference with maintenance" prong requires states and the EPA to protect areas that may

---

[1] A design value is a statistic that describes the air quality status of a given location relative to the level of the NAAQS. Design values are typically used to designate and classify nonattainment areas, as well as to assess progress towards meeting the NAAQS. *See https://www.epa.gov/air-trends/air-quality-design-values#report.*

[2] *See* "Modeling Guidance for Demonstrating Air Quality Goals for Ozone, PM2.5 and Regional Haze", Nov. 29, 2018, at 101, available at *https://www.epa.gov/sites/default/files/2020-10/documents/o3-pm-rh-modeling_guidance-2018.pdf* ("2018 Air Quality Modeling Guidance"). *See also* "Draft Modeling Guidance for Demonstrating Attainment of Air Quality Goals for Ozone, PM2.5, and Regional Haze", Dec. 3, 2014, at 97-98, available at *https://www.epa.gov/sites/default/files/2020-10/documents/draft-o3-pm-rh-modeling_guidance-2014.pdf* ("2014 Draft Air Quality Modeling Guidance").

[3] See "Modeling Guidance for Demonstrating Air Quality Goals for Ozone, PM2.5 and Regional Haze", Nov. 29, 2018, at 99-111, available at https://www.epa.gov/sites/default/files/2020-10/documents/o3-pm-rh-modeling_guidance-2018.pdf ("2018 Air Quality Modeling Guidance").

struggle with maintaining the standard in the face of inter-annual variability in ozone-conducive conditions.

In its modeling, TCEQ adopted an identical approach to the EPA's for identifying nonattainment receptors—it looked at three sets of DVs over a five-year period and averaged those DVs to generate a base year DV. TCEQ then applied a relative response factor to that base year design value to project a receptor's average design value in the future year. For its maintenance receptors, however, TCEQ used only the most recent design value of the set of three DVs, regardless of whether the most recent design value was highest or lowest, instead of considering variability in conditions over a five-year period, or using the highest DV of the three DVs making up the base year design value. TCEQ's proffered explanation for using the most recent DV to identify maintenance receptors was that the latest DV "takes into consideration . . . any emissions reductions that might have occurred."[4] However, TCEQ in its submission does not explain how this methodology takes into account meteorological variability in identifying those areas that may be meeting the NAAQS or that may be projected to meet the NAAQS but may nevertheless struggle to maintain the NAAQS.

TCEQ argued that the 3-year DV used includes some meteorological variability. Unfortunately, the three years of variation that TCEQ accounted for is already built into the structure of the standard. Thus, the TCEQ method gave no consideration to the variability between calculated DVs, which provides a direct indication of the difficulty a receptor will have in maintaining the standard. In other words, to determine whether a receptor will have difficulty maintaining the standard, one must consider the variation in the metric that will be used to

---

[4] TCEQ SIP submission at 3-39 to 3-40.

determine compliance with the standard. An indication of the variability of a metric cannot be determined by only considering a single estimate of that metric.

TCEQ's stated purpose in using the most recent DV was to capture more recent emissions reductions. TCEQ's methodology, however, limits receptors which could be identified as maintenance receptors, compared to the EPA's methodology largely because it only looks at one design value period rather than selecting the maximum of the three DV periods EPA's methodology considers. Thus, TCEQ's methodology greatly reduces the probability that meteorological conditions which make it difficult to maintain the standard will be considered. As discussed further below, the effects of emissions trends are already captured through other aspects of the methodology to identify receptors. So, in trying to give more weight to emission reductions, by selecting only one design value (2012-2014) for its base year, TCEQ's methodology did not give any consideration to interannual variability in ozone-conducive meteorology as does the EPA's method.

The EPA's methodology, using the maximum DV which accounts for the variability in ozone concentrations and DVs due to changes in meteorology over the five years of the base year DV period, was designed to identify those areas that might struggle to maintain the NAAQS in particularly ozone conducive conditions. TCEQ claimed that the EPA's method undervalues changes in air quality due to emission reductions and overvalues changes due to variation in meteorology. TCEQ pointed out that emissions nationwide are generally trending downward as a result of federal motor vehicle standards and other technological improvements. The EPA agrees that ozone levels generally trend downward, but there is not a steady decline from year to year in ozone concentrations. Rather, ozone levels tend to vary from year to year with some years showing an increase instead of a decrease mainly due to inter-annual variability in ozone-

conducive meteorology. The variation of DVs at individual monitors from year to year can be significant, even where emissions trend downwards. The EPA also assessed a number of monitored DV trends that were provided in TCEQ's SIP submission and previous TCEQ attainment demonstration SIPs indicating that there are at times large annual fluctuations upward from year to year in monitored DVs (sometimes 2-3 ppb increase in one year) that are due to variations in meteorology.[5] As discussed further below, EPA also assessed recent monitoring trends in Texas and in downwind areas identified by EPA or TCEQ's modeling.[6] This is precisely why it is important to consider highly variable meteorology and its influence on DVs—the issue at the heart of the D.C. Circuit's finding on "interference with maintenance" in *North Carolina*. Areas that are required under the Act to attain by an attainment date may fail to attain because of a combination of both local emissions, upwind emissions, and ozone conducive meteorology, among other factors. The *North Carolina* decision made clear that in interpreting the good neighbor provision, upwind state and the EPA obligations to reduce emissions must account for variable conditions that could cause an area that is sometimes attaining the NAAQS to fall out of attainment. *See also Wisconsin,* 938 F.3d at 327 ("Variations in atmospheric conditions and weather patterns can bring maintenance receptors into nonattainment even *without* elevated emissions.").

In addition, TCEQ claimed that its use of the 2012-2014 DV (i.e., the most recent in the 5-year base period it examined) is more reliable than the EPA's method because the more recent

---

[5] TCEQ's "Dallas-Fort Worth (DFW) Attainment Demonstration State Implementation Plan Revision for the 2008 Eight-Hour Ozone Standard Nonattainment Area" Adopted July 6, 2016 and TCEQ's "Houston-Galveston-Brazoria Serious Classification Attainment Demonstration State Implementation Plan Revision for the 2008 Eight-Hour Ozone National Ambient Air Quality Standard", Adopted March 4, 2020.

[6] Monitoring data from the EPA's Air Quality System (AQS) (https://www.epa.gov/aqs). 2021 monitoring data is preliminary and still has to undergo Quality Assurance/Quality Control analysis and be certified by the State of Texas, submitted to EPA, and reviewed and concurred on by EPA. 2018-2020 DVs are 72 ppb and 73 ppb at the Denton County and Tarrant County monitors/receptors respectively. Preliminary 2019-2021 DVs are 74 ppb and 72 ppb at the Denton County and Tarrant County monitors/receptors respectively.

DV accounts for both emission reductions and because there is a shorter interval between the monitored DV and the projected DV. As we note elsewhere, the TCEQ's base year modeled inventory is 2012 emissions and the TCEQ's model projections for 2023 include the expected emission reductions from 2012 thru 2014 as well as to 2023. By just using the 2012-2014 DV data, TCEQ claimed they are giving weight to emission reductions during the final base years where EPA's method does not. The effect of emission reductions, however, is already factored in the modeling analysis since the modeling projection to 2023 is explicitly designed to project the changes in ozone due to emission reductions from the 2012 base year emission levels.  So, in fact, the EPA method does give weight to emission reductions by including the 2012-2014 as one of the 3 DVs considered in EPA's maintenance methodology despite emission reductions in 2012 and 2014 are also included in the model projections from 2012 to 2023. The TCEQ's modeling includes emission reductions that occur in 2013 and 2014 that are also reflected in the monitoring values that TCEQ is using (2012-2014 monitored DVs). Thus,  in essence, TCEQ is double counting the benefit of 2013 and 2014 emission reductions. Furthermore, since TCEQ agrees that the average of the DVs based on 2010-2014 ozone levels are reliable enough to use in the identification of nonattainment receptors, it is unclear how the 2012-2014 period is deemed more reliable for the identification of maintenance receptors since the modeled emissions are still for 2012. We also note, as discussed throughout this action, the EPA has updated its modeling to use a 2016 base year—that is, a five year period spanning 2014-2018, and applied its methodology for defining maintenance receptors using that five year base period. Using a more recent base period (EPA's 2016v2) provides the most recent design values, shorter period of projection (2016 to 2023 versus a 2011 or 2012 base year), and a more accurate basis for projections of future air quality. We note that the EPA undertook a large collaborative multi-year

effort with states (including Texas) and other stakeholders input and review in developing the 2016v2 emission inventories. By virtue of this update, any monitored DV used by the EPA to identify maintenance receptors in this action accounts for more recent emission reductions and provides a shorter interval between base year monitored DV and the projected future analytic year.

The EPA has reviewed the set of 21 receptors for which Texas had contributions of 0.7 ppb or more in the EPA's 2016 base year modeling analyses, or TCEQ's modeling (2012 base year), and evaluated the results of using TCEQ's alternate maintenance methodology (see Table 1.1 below). In Table 1.1 below, the EPA compiled the 2023 Average DVs, which is the DV that is used to identify if a receptor may be a nonattainment receptor for the receptors that EPA and TCEQ identified in Illinois, Wisconsin, Colorado, Arizona, and California. TCEQ's modeling uses a base year of 2012 and the EPA's 2016v2 modeling uses a base year of 2016. EPA utilized TCEQ's modeling file outputs to obtain the data needed to calculate 2023 Average and Maintenance DVs for the receptors in Illinois and Wisconsin. For these 21 receptors, TCEQ's method resulted in 15 of the 21 2023 maintenance DVs predicted to be lower than the 2023 nonattainment DVs from the nonattainment methodology that uses the 5-year center weighted average. Of these 15 receptors, three receptors have 2023 maintenance DVs that are 3 ppb lower, five receptors have 2023 maintenance DVs that are 2 ppb lower, and seven receptors have 2023 maintenance DVs that are 1 ppb lower. In comparison, using the EPA's maintenance methodology results in all 21 2023 maintenance DVs being equal or up to 4 ppb higher than the 2023 nonattainment DVs. Again, the EPA uses the average of the three DVs that contain the base year modeled for the nonattainment methodology and the maximum of these three DVs for the maintenance methodology. Because TCEQ's maintenance methodology of just using the most

recent DV (2012-2014 DV) often results in maintenance DVs lower than the 2023 nonattainment DVs methodology results, the EPA finds that the TCEQ methodology is not adequately identifying conditions when a receptor would have more difficulty maintaining the standard. In fact, the TCEQ's method also identified one receptor in their SIP submission as a nonattainment receptor in 2023 that would not have been identified as a maintenance receptor, which further highlights the concern that TCEQ's method did not adequately identify areas that may struggle to maintain the standard. TCEQ did not address whether the three years that comprise the most recent design value (i.e., 2012, 2013, and 2014) had meteorological conditions highly conducive for formation of high ozone concentrations and thus would be an appropriate time period to assess whether area could have difficulty maintaining the standard. The EPA's analysis confirms that this time period is not highly conducive to ozone formation, at least for many receptors. The consequence of TCEQ's maintenance method is that it often results in lower DVs than the nonattainment methodology as demonstrated by our analysis, which indicates that it is often not considering conditions when an area would have difficulty maintaining the standard. It is also unreasonable to have a methodology that would not identify nonattainment receptors also as maintenance receptors.

TCEQ also made several additional assertions in support of their conclusion that their method for identifying maintenance receptors was the better reading of the CAA, compared to the EPA's. TCEQ claimed that its approach was more consistent with the CAA's concept of maintenance as areas that were formerly nonattainment and that have since attained and will continue to maintain by accounting for: (1) emissions reductions occurring in the later design values of the base DV period; (2) "commitments regarding contingency measures to address future emission reductions;" and (3) the impact of any maintenance plans that are in place.

12

TCEQ also asserted that the EPA's approach conflates the likelihood of attaining the standard in a future year and the ability of an attainment monitor to maintain that attainment status. Specifically, TCEQ argued that because any remedies devised to address nonattainment monitors would have to apply to maintenance monitors, a practical consequence of the EPA's approach is that it could lead to over-control and that it might require upwind states to consider or implement controls when the downwind state in which the monitor is located does not have any obligations to control local emissions. TCEQ argued that this "conflation" of nonattainment and maintenance results in there being no independent meaning to "maintenance."

With respect to the first of these assertions from TCEQ, we note that TCEQ's methodology for identifying receptors (like the EPA's) is entirely distinct from ozone designations under the Clean Air Act; neither TCEQ nor the EPA take current or presumed future designations of areas into account, and any implementation requirements like a maintenance plan under CAA section 175A, in identifying receptors. TCEQ's discussion, therefore, of maintenance plan contingency measures or maintenance plans generally is irrelevant and misplaced. None of the areas to which Texas is linked in the EPA 2016v2 modeling has been redesignated to attainment for the 2015 ozone NAAQS, and none of the areas to which Texas is linked in its own modeling has been redesignated to attainment for the 2015 ozone NAAQS. We also fail to see how TCEQ's approach to identifying maintenance receptors differs in any relevant respect from the EPA's approach with regard to the alleged "conflation" of projecting attainment in a future year rather than the ability of an attainment receptor to maintain attainment. Both TCEQ and the EPA identify maintenance receptors based on projections of air quality in a future year to determine whether the receptor will have difficulty attaining or maintaining the standard. TCEQ's arguments about overcontrol based on the application of a uniform remedy to states linked to

both nonattainment and maintenance receptors were also not germane; in this case, TCEQ had

identified *no* remedy to apply whatsoever because it had failed to identify that the emissions

from Texas cause a problem in the first instance. The D.C. Circuit has already rejected the idea

that the application of a uniform control to both nonattainment and maintenance receptors is on

its face overcontrol or impermissible under the interstate transport provision. *See Wisconsin*, 938

F.3d at 327. Based on our evaluation of TCEQ's approach to identify maintenance receptors for

2023, we propose to find the State's approach is inadequate as it does not sufficiently identify

maintenance receptors. Further, TCEQ had not explained how its approach meets the statutory

requirement to address areas that, even if meeting the NAAQS, may struggle to maintain the

standard in years where conditions are conducive to ozone formation. Rather, the TCEQ had

created its own approach to identify these areas that they describe as designed to account for the

most emission reductions possible—i.e., the most recent DV of the three under analysis; an

approach that likely under-identifies areas that will struggle to maintain the NAAQS and that

certainly is not designed to capture potential air quality problems.

Table 1.1 Comparison of Nonattainment methodology (Avg DV) and Maintenance methodology results for receptors identified by EPA and TCEQ in modeling of 2012 and 2016 base case years.

| Receptor (Monitor ID, County, State) | TCEQ 2023 Average DV (ppb) | TCEQ 2023 Maintenance DV (ppb) | TCEQ DV Delta (Maintenance - Average) (ppb) | EPA 2023 Avg DV/Maintenance DV (ppb) | EPA DV Delta (Maintenance - Avg) (ppb) |
|---|---|---|---|---|---|
| 80350004, Douglas, CO | 73 | 72 | -1 | 71/72 | 1 |
| 80590006, Jefferson, CO | 72 | 73 | 1 | 72/73 | 1 |
| 80590011, Jefferson, CO | 71 | 71 | 0 | 73/74 | 1 |
| 80690011, Larimer, CO | 72 | 71 | -1 | ? | ? |
| 80050002, Arapahoe, CO | 70* | 71 | 1 | 68/68 | 0 |
| 40038001, Cochise, AZ | 71 | 69** | -2 | 70/72 | 2 |
| 60371201, Los Angeles, CA | 80 | 78 | -2 | 82/85 | 3 |
| 60371701, Los Angeles, CA | 80 | 82 | 2 | 85/88 | 3 |
| 60376012, Los Angeles, CA | 87 | 86 | -1 | 91/93 | 2 |
| 60658001, Riverside, CA | 88 | 85 | -3 | 89/90 | 1 |
| 60658005, Riverside, CA | 84 | 83 | -1 | 87/90 | 1 |
| 60710001, San Bernardino, CA | 71 | 72 | 1 | 74/75 | 1 |
| 60710306, San Bernardino, CA | 76 | 77 | 1 | 76/78 | 2 |
| 60711004, San Bernardino, CA | 91 | 90 | -1 | 97/100 | 3 |
| 60714001, San Bernardino, CA | 82 | 79 | -3 | 82/83 | 1 |
| 60714003, San Bernardino, CA | 94 | 91 | -3 | 95/98 | 3 |
| 170310001, Cook County, IL | 60 | 58 | -2 | 69/73 | 4 |
| 170310032, Cook County, IL | 68 | 66 | -2 | 69/72 | 3 |
| 170314201, Cook County, IL | 64 | 62 | -2 | 69/73 | 4 |

15

| Receptor (Monitor ID, County, State) | TCEQ 2023 Average DV (ppb) | TCEQ 2023 Maintenance DV (ppb) | TCEQ DV Delta (Maintenance - Average) (ppb) | EPA 2023 Avg DV/Maintenance DV (ppb) | EPA DV Delta (Maintenance - Avg) (ppb) |
|---|---|---|---|---|---|
| 170317002, Cook County, IL | 66 | 65 | -1 | 70/73 | 3 |
| 550590019, Kenosha County, WI | 67 | 66 | -1 | 72/73 | 1 |
| 550590025, Kenosha County, WI | No data* | No data* | No data* | 69/72 | 3 |
| 551010020, Racine County, WI | No data* | No data* | No data* | 71/73 | 2 |

* Monitors were installed in 2013 and 2014 so they did not have a 3 year DV period (2012-2014) or previous years, so no projections future year DVs are possible with TCEQ's modeling. Kenosha 550590025 was installed and began operating May 13, 2013, so the first three year DV available is 2013-2015. Racine 551010020 was installed in April 14, 2014 so the first three year DV available is 2015-2017

** Calculated from the Relative Response Factor in TCEQ spreadsheet of future 2023 DVs with state contributions and the monitor's 2012-2014 DV (0.983 X 71 ppb, truncation applied).

EPA's modeling guidance for 8-hour ozone NAAQS attainment demonstrations (1999-2007)[7] initially considered using a three year period that included the modeled year (inventory year modeled) as the middle year of the three year period but the EPA ultimately went with 5 consecutive years with the modeled year being the middle year (covering the three DVs that include the base year) to address potential variability in meteorological/ozone conduciveness and emissions. EPA analyzed the variability of using this 5 years center-weighted average method compared with using a 3 year average DV and found that the 5 year center-weighted approach was more stable and had a lower standard deviation.[8] The goal of using 5 years of data as a basis for an attainment demonstration is that such demonstrations be based on an assessment of a range of meteorological conditions rather than a limited set of conditions in one 3-year DV period that may be conducive to higher or lower ozone levels. EPA's use of the highest maximum 3-year DV that includes the base modeled year is intended to provide an indication of conditions that might make it difficult for an area to maintain the ozone NAAQS. As such it accounts for potential meteorological and emissions variability that TCEQ's method does not. Also, TCEQ did not support their claim that there were large reductions in emissions that made the higher DV periods of 2010-2012 or 2011-2013 unreasonable to be used for determining a maintenance receptor. Furthermore, TCEQ did not provide sufficient data and analysis of the

---

[7] "DRAFT GUIDANCE ON THE USE OF MODELS AND OTHER ANALYSES IN ATTAINMENT DEMONSTRATIONS FOR THE 8-HOUR OZONE NAAQS", EPA-454/R-99-004, May 1999; "Guidance on the Use of Models and Other Analyses in Attainment Demonstrations for the 8-hour Ozone NAAQS", EPA-454/R-05-002, October 2005; and "Guidance on the Use of Models and Other Analyses for Demonstrating Attainment of Air Quality Goals for Ozone PM2.5, and Regional Haze", EPA-454/B-07-002, April 2007.

[8] 2007 guidance pages "Additionally, the average design value will be more stable (less year to year variability) than any single design value period. An analysis of recent ambient design value data at 471 ozone monitors, over the period 1993-2004, shows that the median standard deviation of design values was 3.3 ppb whereas the standard deviation of the 5 year weighted average design values was 2.4 ppb (Timin, 2005a). Also, moving from the period ending in 2003 to the period ending in 2004, the median change in the ozone design values was 4.0 ppb. The median change in the 5 year weighted average ozone design values was only 0.8 ppb (there was not a long enough data record to do the same analyses for PM2.5) . These analyses show that the average design values are clearly more stable and will therefore provide a "best estimate" baseline year design value (DVBI ) for use in future year model projections.

meteorology for the 2010-2014 period to support their claim that 2012-2014 period was a worst-case combination of meteorology compared to the 2010-2012 and 2011-2013 periods. If the future DV projected from this highest value is below the standard, one can be reasonably certain the receptor will not have difficulty maintaining the standard and, as such, upwind states will not interfere with maintenance in downwind states. Because the TCEQ method only looks at one DV and does not account for the variability in DVs due to meteorological conditions, it is less likely to identify maintenance receptors than the EPA method.

To further examine TCEQ's assertion that the last DV period including the modeled base year should be used in the maintenance methodology, EPA reviewed a number of ozone design value trends, including several that were included in TCEQ's SIP and in a previous attainment demonstration SIP for Dallas-Fort Worth Nonattainment Area (DFW).[9] EPA also looked at monitoring trends for the most recent 10 years of certified data (2009-2011 DV up to 2018-2020 DV) using ozone monitoring data from EPA's Air Quality System (AQS).  In general, as shown in the figures below, our evaluation of monitor data for Dallas-Fort Worth and Houston-Galveston-Brazoria as well as at at receptors that have been identified in Colorado, Arizona, Southern California, and Midwest Region (Illinois, Michigan, and Wisconsin), the long-term average annual decreases in ozone due to emissions reductions are usually on the order of 0-1 ppb/year at monitors in large metropolitan nonattainment areas. However, variations in monitored 8-hour DVs are not always negative from year to year and sometimes increase by 2 through-4 ppb from one year to the next due to meteorological variations.

---

[9] TCEQ's "Dallas-Fort Worth (DFW) Attainment Demonstration State Implementation Plan Revision for the 2008 Eight-Hour Ozone Standard Nonattainment Area" Adopted July 6, 2016 (DFW SIP) and TCEQ's "Houston-Galveston-Brazoria Serious Classification Attainment Demonstration State Implementation Plan Revision for the 2008 Eight-Hour Ozone National Ambient Air Quality Standard", Adopted March 4, 2020 (HGB SIP).

18

For the DFW area, looking at Figures 1.1 and 1.2 (From DFW AD SIP)[10] the long-term DFW DV[11] trend is less than 1 ppb/year in Figure 1.1 and 1.1 ppb/yr in Figure 1.2. For DFW, we started with the 2010-2012 DV as there were some reductions from a previous DFW ozone SIP that had compliance dates in early 2010. In Figure 1.3, the DVs at most of the higher DFW area monitors (2018-2020 DVs greater than 70 ppb) are decreasing at approximately 1 ppb/year for the last 9 years of certified DVs.[12] In evaluating Houston-Galveston-Brazoria trends, TCEQ implemented multiple emission reductions for both NOx and a subset of VOCs that resulted in large decreases of ozone from 2000 to 2007, so EPA is evaluating trends for DVs including 2007 and later as there has not been as significant emission reductions implemented by TCEQ since that time. For the Houston-Galveston-Brazoria Nonattainment area (HGB), looking at Figures 1.4, 1.5, and 1.6 (from HGB AD SIP)[13] the long-term HGB DV trend and DV trends at the monitors with higher ozone DVs from 2009 DV to current DV is less than 1.0 ppb/year. EPA evaluated the trends using the most recent DVs available in Figure 1.6. In Figure 1.7, the DVs at most of the higher HGB area monitors (2018-2020 DVs greater than 70 ppb) are decreasing at 1 ppb/year or less for the last 10 years of certified DVs (2011-2020 DVs).[14]

EPA also evaluated DV trends using the most recent DVs available for the last 10 years for receptors identified by EPA's 2011 base year modeling, the EPA's 2016 base year (2016v2) modeling analyses, or TCEQ's modeling (2012 base year), in Colorado, Arizona, Southern California and the Midwest Region including receptors in Illinois, Wisconsin and Michigan. For

---

[10] Footnote 9. TCEQ Figure 1-1 from page 1-4 and Figure 5-1 from page 5-5 of DFW AD SIP.

[11] DFW DV is the highest DV at any regulatory monitor in the DFW Nonattainment Area, so it can be a different monitor year-to-year that set the DFW Nonattainment area DV.

[12] EPA Analysis of DFW 8-hour Ozone monitor trends. Data and calculations available in "Ozone_Trends_R6_TSD.xlsx" in the docket.

[13] Footnote 9. TCEQ Figure 1-1 from page 1-11, Figure 5-1 from page 5-7 and Figure 5-5 from page 5-8 of HGB AD SIP.

[14] EPA Analysis of HGB 8-hour Ozone monitor trends. Data and calculations available in "Ozone_Trends_R6_TSD.xlsx" in the docket.

the Colorado receptors see TCEQ's SIP Figure 3-40 (included as Figure 1.8 below) that show

ozone DVs  from 2007-2016 decreased less than 1 ppb/yr on average. EPA also evaluated the

trends at the Colorado receptors using the most recent DVs available EPA in Figure 1.9, which

shows that the DVs at Colorado receptors have either increased or slightly decreased at less than

0.5 ppb/year for the last 10 years of certified DVs (2011-2020 DVs).[15] For the Arizona receptor

see TCEQ's SIP Figure 3-55 (included as Figure 1.10 below) that show ozone DVs from 2007-

2016 decreased less than 1 ppb/yr on average but had several ppb increases or decreases from

one year to the next. EPA also evaluated the trends at the Arizona receptor using the most recent

DVs available in Figure 1.11, which shows that the DVs at Arizona receptor have decreased at

less than 1.0 ppb/year on average for the last 10 years of certified DVs (2011-2020 DVs).[16]

California receptors (see TCEQ's SIP Figure 3-40 included as Figure 1.12 below) show ozone

DVs from 2007-2016 decreased less than 1 ppb/yr on average. EPA also evaluated the trends at

the California receptors using the most recent DVs available EPA in Figure 1.13 which show that

the DVs at California receptors have either increased or are slightly decreased at less than 0.5

ppb/year on average for the last 10 years of certified DVs (2011-2020 DVs).[17] EPA evaluated the

trends at the Chicago Nonattainment Area receptors (IL and WI) using the most recent DVs

available EPA in Figure 1.14, which show that the DVs at these receptors have either increased

or are slightly decreased at less than 0.7 ppb/year on average for the last 10 years of certified

DVs (2011-2020 DVs).[18] EPA also evaluated the trends at the other Wisconsin and Michigan

receptors using the most recent DVs available EPA in Figure 1.15, which show that the DVs at

---

[15] Id.
[16] Id.
[17] Id.
[18] Id.

Sheboygan Wisconsin and Allegan Michigan receptor have decreased approximately 1 ppb/year on average for the last 10 years of certified DVs (2011-2020 DVs).[19]

The long-term average annual decreases in ozone due to emissions reductions are usually on the order of 0-1 ppb/year at monitors in large metropolitan nonattainment areas such as Dallas-Fort Worth and Houston-Galveston-Brazoria, and at receptors that have been identified in Colorado, Arizona, Southern California, and Midwest Region (Illinois, Michigan, and Wisconsin) but variations in monitored 8-hour DVs are not always negative and sometimes increase by 2-4 ppb from one year to the next due to meteorological variations.  We also included TCEQ's monitored trends figure for the Arizona receptor that also shows increases of 2 ppb and 3 ppb annually, and from 2009 to 2012 the DV increased from 66 ppb to 73 ppb for a total of 7 ppb increase in 3 years. These larger annual fluctuations upward in DVs demonstrate the amount of changes possible in DV due the meteorological difference between different 3 year design value periods. TCEQ's approach fails to take the much larger influence of meteorological variability into account in their maintenance receptor test.

---

[19] Id.

Figure 1.1 - TCEQ's Figure 1-1: One-Hour and Eight-Hour Ozone Design Values and DFW Population, from DFW 2008 8-hour Attainment Demonstration SIP (July 6, 2016).



Figure 1.2 - TCEQ's Figure 5-1:One-Hour and Eight-Hour Ozone Design Values in the DFW Area from 1997 through 2014 from DFW 2008 8-hour Attainment Demonstration SIP (July 6, 2016).



that the annual average change from 2010 to 2020 DVs ranged from increasing to decreasing at most approximately 1 ppb/year, so use of 3-4 ppb is still an optimistic assessment of how much the DVs might drop between 2020 and 2023 but the trends data for these areas indicates the change will likely be less than a 3-4 ppb decrease for many monitors. To assess if TCEQ's modeling is potentially underestimating future year 2023 modeled DVs in these downwind areas, the EPA has compared 2018-2020 monitored DVs at many typically higher ozone monitors in these areas with TCEQ's projected 2023 DVs in Table 2.5, Table 2.6 and Table 2.7.

Table 2.5 TCEQ Projected Future 2023 DVs Compared to 2018-2020 Monitored DVs (IL, WI, & MI).

| Chicago and Downwind areas in Wisconsin and Michigan | | | | | |
|---|---|---|---|---|---|
| **State** | **County** | **AQS ID** | **TCEQ 2023 Future Design Value-DV (ppb)** | **EPA Monitored 2018-2020 DV (ppb)** | **Delta in 3 years 2018-2020 Monitor DV - TCEQ 2023 DV (ppb)** |
| Illinois | Cook | 170310001 | 60 | 75 | -15 |
| Illinois | Cook | 170310032 | 68 | 74 | -6 |
| Illinois | Cook | 170310076 | 61 | 69 | -8 |
| Illinois | Cook | 170311003 | 60 | 73 | -13 |
| Illinois | Cook | 170311601 | 61 | 71 | -10 |
| Illinois | Cook | 170314002 | 61 | 71 | -10 |
| Illinois | Cook | 170314007 | 57 | 71 | -14 |
| Illinois | Cook | 170314201 | 64 | 77 | -13 |
| Illinois | Cook | 170317002 | 66 | 75 | -9 |
| Michigan | Allegan | 260050003 | 71 | 73 | -2 |
| Wisconsin | Door | 550290004 | 64 | 72 | -8 |
| Wisconsin | Kenosha | 550590019 | 67 | 74 | -7 |
| Wisconsin | Manitowoc | 550710007 | 65 | 70 | -5 |
| Wisconsin | Milwaukee | 550790010 | 58 | 62 | -4 |
| Wisconsin | Milwaukee | 550790085 | 66 | 70 | -4 |
| Wisconsin | Sheboygan | 551170006 | 70 | 75 | -5 |
| | | | | Avg ALL | -8.31 |
| | | | | Avg if Current DV >= 74 ppb | -9.17 |

Table 2.6 TCEQ Projected Future 2023 DVs Compared to 2018-2020 Monitored DVs (CO).

| State | County | AQS ID | TCEQ 2023 Future Design Value-DV (ppb) | EPA Monitored 2018-2020 DV (ppb) | Delta in 3 years 2018-2020 Monitor DV - TCEQ 2023 DV (ppb) |
|---|---|---|---|---|---|
| Denver and downwind areas in Colorado | | | | | |
| Colorado | Adams | 80013001 | 65 | 69 | -4 |
| Colorado | Arapahoe | 80050002 | 70 | 77 | -7 |
| Colorado | Arapahoe | 80050006 | 66 | 71 | -5 |
| Colorado | Boulder | 80130011 | 67 | 74 | -7 |
| Colorado | Denver | 80310002 | 57 | 70 | -13 |
| Colorado | Douglas | 80350004 | 73 | 81 | -8 |
| Colorado | Jefferson | 80590005 | 68 | 71 | -3 |
| Colorado | Jefferson | 80590006 | 72 | 79 | -7 |
| Colorado | Jefferson | 80590011 | 71 | 80 | -9 |
| Colorado | Larimer | 80690007 | 69 | 70 | -1 |
| Colorado | Larimer | 80690011 | 72 | 75 | -3 |
| Colorado | Larimer | 80691004 | 65 | 67 | -2 |
| Colorado | Weld | 81230009 | 70 | 70 | 0 |
| | | | | Avg ALL | -5.31 |
| | | | | Avg if Current DV >= 74 ppb | -6.83 |

Table 2.7 TCEQ Projected Future 2023 DVs Compared to 2018-2020 Monitored DVs (AZ & CA)

Arizona and Southern California areas

| State | County | AQS ID | TCEQ 2023 Future Design Value-DV (ppb) | EPA Monitored 2018-2020 DV | Delta in 3 years 2018-2020 Monitor – TCEQ 2023 DV (ppb) |
|---|---|---|---|---|---|
| Arizona | Yuma | 40278011 | 72 | 68 | 4 |
| California | Los Angeles | 60370002 | 74 | 97 | -23 |
| California | Los Angeles | 60370016 | 87 | 107 | -20 |
| California | Los Angeles | 60370113 | 59 | 70 | -11 |
| California | Los Angeles | 60371103 | 63 | 76 | -13 |
| California | Los Angeles | 60371201 | 80 | 92 | -12 |
| California | Los Angeles | 60371302 | 52 | 64 | -12 |
| California | Los Angeles | 60371602 | 70 | 78 | -8 |
| California | Los Angeles | 60371701 | 80 | 88 | -8 |
| California | Los Angeles | 60372005 | 72 | 93 | -21 |
| California | Los Angeles | 60375005 | 57 | 62 | -5 |
| California | Los Angeles | 60376012 | 87 | 101 | -14 |
| California | Riverside | 60650012 | 85 | 99 | -14 |
| California | Riverside | 60650016 | 63 | 78 | -15 |
| California | Riverside | 60651016 | 87 | 99 | -12 |
| California | Riverside | 60652002 | 75 | 84 | -9 |
| California | Riverside | 60655001 | 78 | 88 | -10 |
| California | Riverside | 60656001 | 78 | 94 | -16 |
| California | Riverside | 60658001 | 88 | 96 | -8 |
| California | Riverside | 60658005 | 84 | 98 | -14 |
| California | Riverside | 60659001 | 73 | 87 | -14 |
| California | San Bernardino | 60710001 | 71 | 81 | -10 |
| California | San Bernardino | 60710005 | 96 | 90 | 6 |
| California | San Bernardino | 60710012 | 83 | 90 | -7 |
| California | San Bernardino | 60710306 | 76 | 83 | -7 |
| California | San Bernardino | 60711004 | 91 | 106 | -15 |
| California | San Bernardino | 60712002 | 94 | 102 | -8 |
| California | San Bernardino | 60714001 | 82 | 87 | -5 |
| California | San Bernardino | 60714003 | 94 | 114 | -20 |
| California | San Bernardino | 60719002 | 79 | 86 | -7 |
| California | San Bernardino | 60719004 | 88 | 110 | -22 |
| | | | Avg ALL CA | | -11.80 |
| | | | Avg Current DV >= 74 ppb | | -11.64 |

As can be seen in Table 2.5, there are many monitors in Illinois, Wisconsin, and Michigan that would need a drop in ozone DVs over the next 3 years of ≥ 5 ppb (values of -5 ppb or more in the far right column) to reach TCEQ's 2023 modeled projected levels. The average decrease to meet TCEQ's modeled DV projections is 8.31 ppb, which is more than the 0-4 ppb that would be typical for these areas. EPA also separately evaluated the TCEQ modeled 2023 DVs for monitors with 2018-2020 DVs of 74 ppb or greater. For these monitors, a 2023 monitored DV of ≤70 ppb would be needed to reach attainment, implying a drop of at least 3 to 4 ppb. However even if these monitors show attainment in 2023, it is likely that their DVs would be close enough to the NAAQS to still be considered maintenance receptors. For this subset of monitors with 2018-2020 DVs of 74 ppb or more, the average amount of decrease in DVs needed to match TCEQ's 2023 projection is 9.17 ppb. In EPA's modeling experience, drops in 8-hour ozone DVs on average of 9.17 ppb in three years rarely occur unless there is a very large change in emissions or large change in meteorological conduciveness for ozone generation. TCEQ did not identify any large emission reductions to be implemented in the 2021-2023 timeframe. Based on this information TCEQ's modeling is underestimating future ozone levels at monitors/receptors in Illinois, Wisconsin, and Michigan and these underestimations likely prevented TCEQ from identifying nonattainment/maintenance receptors. Furthermore, as discussed above, TCEQ's modeled underestimation of future year ozone levels in Texas and production of ozone from Texas emissions can cause an underestimation of Texas's impacts on downwind State's ozone nonattainment and maintenance receptors had they been identified by Texas as receptors. EPA's modeling results included in the March 2018 memorandum and EPA's 2016v2 modeling both identified nonattainment/maintenance receptors in the Chicago

area of Illinois and downwind areas in Wisconsin and Michigan that also had linkages to emissions from Texas (Texas' contribution was greater than 0.7 ppb).

As can be seen in Table 2.6, there are many monitors in the Denver area and downwind of Denver that would need a drop in ozone DVs the next 3 years of > 5 ppb (values of -5 ppb or more in the far right column) to reach TCEQ's 2023 modeled projected levels. The average decrease to meet TCEQ's modeled DV projections is 5.31 ppb which is more than the 0-3 ppb that would be typical for this area. EPA also evaluated just the 2023 DVs for monitors with 2018-2020 DVs of > 74 ppb. For these monitors, a 2023 monitored DV of ≤ 70 ppb would be needed to monitor attainment which would imply a drop of at least 3-4 ppb. However, even if the monitors monitor attainment in 2023, it is likely that they would be close to the NAAQS, and therefore, still be considered maintenance receptors. For this subset of monitors with 2018-2020 DVs of >74 ppb, the average amount of decrease in DVs needed to match TCEQ's 2023 projection is 6.83 ppb. In EPA's modeling experience drops in 8-hour ozone DVs on average of 6.83 ppb in three years do not typically occur unless there is a large change in emissions or large change in meteorological conduciveness for ozone generation. Based on this information, it does appear that TCEQ's modeling is underestimating future ozone levels at monitors/receptors in Denver and surrounding downwind areas of Colorado and these underestimations may have prevented TCEQ from identifying nonattainment/maintenance receptors. Furthermore, TCEQ's modeled underestimation of future year ozone levels in Texas and production of ozone from Texas emissions can also result in an underestimation of Texas's impacts on downwind ozone nonattainment and maintenance receptors in Colorado. Even with these underestimation concerns, TCEQ identified several nonattainment/maintenance receptors in Colorado with linkages to Texas based on contributions of emissions from Texas equal to or greater than 0.7

ppb. EPA's modeling results included in the March 2018 memorandum also identified

nonattainment/maintenance receptors in the greater Denver area of Colorado (Jefferson County)

that also had linkages to emissions from Texas. (Texas' contribution was greater than 0.7 ppb).

As can be seen in Table 2.7, there are many monitors in the Southern California area that

would need a drop in ozone DVs the next 3 years of more than 5 ppb (values of -5 ppb or more

in the far right column) to reach TCEQ's 2023 modeled projected levels. The average decrease to

meet TCEQ's modeled DV projections is 11.80 ppb, which is more than the 0-3 ppb that would

be typical for these areas of Southern California. EPA also evaluated a subset of these monitors,

just the 2023 DVs for monitors with 2018-2020 DVs of 74 ppb or greater.  For these monitors, a

2023 monitored DV of ≤ 70 ppb would be needed to monitor attainment which would imply a

drop of at least 3-4 ppb. However even if they monitor attainment in 2023, it is likely that they

would be close to the NAAQS, and therefore, still be considered maintenance receptors. For this

subset of monitors with 2018-2020 DVs of 74 ppb or more, the average amount of decrease in

DVs needed to match TCEQ's 2023 projection is 11.64 ppb. In EPA's modeling experience

drops in 8-hour ozone DVs on average of 11.6 ppb in three years rarely occur unless there is a

large change in emissions or large change in meteorological conduciveness for ozone generation.

Based on this information, TCEQ's modeling is underestimating future ozone levels at

monitors/receptors in Southern California area and these underestimations may have prevented

TCEQ from identifying nonattainment/maintenance receptors. Further, as discussed above,

TCEQ's modeled underestimation of future year ozone levels in Texas and production of ozone

from Texas emissions can also result in an underestimation of Texas's impacts on downwind

ozone nonattainment and maintenance receptors in California.  Even with these underestimation

concerns, TCEQ identified several nonattainment/maintenance receptors in California with linkages to Texas with contributions ≤ 0.7 ppb.

e.     Summary

TCEQ's 2012 base case modeling underestimates ozone levels in Texas at high ozone monitors in the DFW and HGB areas and also at some of the high ozone monitors in areas downwind of Texas including the Chicago, IL area and downwind receptors in Wisconsin and Michigan, the greater Denver area of Colorado, and in Southern California. TCEQ's 2023 future year projections seem to be underestimating ozone levels in Texas at high ozone monitors in DFW and HGB and also underestimating downwind ozone levels at monitors in areas downwind of Texas including the Chicago area and downwind receptors in Wisconsin and Michigan, greater Denver area of Colorado, and in Southern California, as shown above by comparing 2018-2020 monitored DVs to the projected 2023 DVs and examining the amount of ozone reductions that would be necessary to meet those projections. These underestimations likely prevented TCEQ from identifying nonattainment/maintenance receptors in the Chicago area and downwind receptors in Wisconsin and Michigan.  Furthermore, as discussed above, TCEQ's modeled underestimation of future year ozone levels in Texas and production of ozone from Texas emissions can cause an underestimation of Texas's impacts on downwind State's ozone nonattainment and maintenance receptors had they been identified by TCEQ as receptors. Despite these underprediction/underestimation biases, TCEQ's modeling did identify a number of receptors in Colorado and California that Texas emissions were linked (contribution equal or greater than 0.70 ppb).

### 3.     Comparison of TCEQ and EPA 2023 future modeling and identified maintenance and nonattainment receptors

For the EPA's 2016 base year modeling, the EPA undertook a large collaborative multi-year effort with states (including Texas) and other stakeholder input in developing the 2016 emission inventories including 2016v2, so that the EPA's modeling would be based on the best data available. Using a 2016 base year also provides a more recent platform that shortens the number of years to project emission changes, reducing uncertainties in the 2023 projection compared to TCEQ's projection from a 2012 base to 2023 or the EPA's earlier 2011 base year modeling. Use of a more recent 2016 base year also allows for the use of monitored DVs from a more recent period. The combination of these and other issues result in less model uncertainty compared to TCEQ's 2012 base year modeling and has provided a better estimate of 2023 ozone levels; and therefore, we believe a more reliable tool for predicting which areas of the country will be nonattainment or have difficulty maintaining the standard as well as assessing contributions from upwind states.

The EPA's modeling using both 2011 and 2016 base year periods identified that Texas was linked to nonattainment and/or maintenance receptors in 2023 in the Midwest Region (Illinois, Wisconsin, and Michigan), while TCEQ's modeling using a 2012 base year indicated only linkages to western receptors. As discussed above, the TCEQ's modeling is underestimating projected ozone levels in the Midwest Region for 2023. If TCEQ's 2023 modeled DVs were closer to recent observed monitoring data and anticipated 2023 monitored DVs, TCEQ would likely have also identified nonattainment and/or maintenance receptors in the Midwest Region.

EPA's base case model performance is acceptable and the base case model performance analysis is included in the Air Quality Modeling TSD[26]. As discussed in Air Quality Modeling TSD, the EPA's base case modeling model performance demonstrates the scientific credibility of EPA's 2016v2 modeling platform and provides confidence in the ability of the modeling platform to provide a reasonable projection of expected future year ozone concentrations and contributions.  In Tables 3.1 and 3.2, the EPA is evaluating TCEQ's identification of potential receptors using their 2023 model projections, including TCEQ's methodology for identifying maintenance receptors.  As discussed above, the EPA has significant concerns with the methodology TCEQ used to identify these maintenance receptors. In Tables 3.1 and 3.2, the EPA presents TCEQ's 2023 modeling projections and EPA's 2023 modeling projections (nonattainment and maintenance methodologies) and also preliminary 2019-2021 monitored DVs (subject to QA/QC by states and EPA).

In Table 3.1 EPA shows the TCEQ's list of potential receptors identified by TCEQ that are nonattainment and/or maintenance receptors with Texas linkages (Texas contributions of $\geq 0.7$ ppb) in their SIP including the 2023 average DV (nonattainment receptor if >70 ppb), 2023 Maintenance DV using TCEQ's maintenance methodology (uses only the 2012-2014 base DV). For these receptors, EPA also includes the EPA's 2023 modeling projections for both average DV and maintenance DV (using EPA's methodology) and the most recent monitor data available.[27]

---

[26] Included in the Docket ID No. EPA-HQ-OAR-2021-0663; "Air Quality Modeling for the 2016v2 Emissions Platform Technical Support Document". January 2022

[27]  EPA discusses our concerns with the inappropriateness of TCEQ's maintenance receptor methodology elsewhere in Section 1 of this TSD.

Table 3.1 Projected 2023 Nonattainment and Maintenance Receptors Identified by TCEQ Modeling Using a 2012 Base Year

| Receptor, (Monitor ID, County, State) | TCEQ 2023 Average DV (ppb) | TCEQ 2023 Maintenance DV (ppb)* | Texas Contribution (ppb) | EPA 2023 Avg DV/Maintenance DV | 2018-2020 DV/Preliminary 2019-2021 DV** (ppb) |
|---|---|---|---|---|---|
| 80350004, Douglas, CO | 73 | 72 | 1.42 | 71/72 | 81/83 |
| 80590006, Jefferson, CO | 72 | 73 | 1.26 | 72/73 | 79/81 |
| 80590011, Jefferson, CO | 71 | 71 | 1.26 | 73/74 | 80/83 |
| 80690011, Larimer, CO | 72 | 71 | 1.22 | 64/65 | 75/77 |
| 80050002, Arapahoe, CO | 70*** | 71 | 1.15 | 68/68 | 77/80 |
| 40038001, Cochise, AZ | 71 | 69**** | 1.06 | 70/72 | 66/66 |
| 60371201, Los Angeles, CA | 80 | 78 | 0.76 | 82/85 | 92/87 |
| 60371701, Los Angeles, CA | 80 | 82 | 0.72 | 85/88 | 88/90 |
| 60376012, Los Angeles, CA | 87 | 86 | 0.9 | 91/93 | 101/101 |
| 60658001, Riverside, CA | 88 | 85 | 0.73 | 89/90 | 96/95 |
| 60658005, Riverside, CA | 84 | 83 | 0.71 | 87/90 | 98/97 |

74

| Receptor, (Monitor ID, County, State) | TCEQ 2023 Average DV (ppb) | TCEQ 2023 Maintenance DV (ppb)* | Texas Contribution (ppb) | EPA 2023 Avg DV/Maintenance DV | 2018-2020 DV/Preliminary 2019-2021 DV** (ppb) |
|---|---|---|---|---|---|
| 60710001, San Bernardino, CA | 71 | 72 | 0.84 | 74/75 | 81/77 |
| 60710306, San Bernardino, CA | 76 | 77 | 0.81 | 76/78 | 83/83 |
| 60711004, San Bernardino, CA | 91 | 90 | 0.88 | 97/100 | 106/103 |
| 60714001, San Bernardino, CA | 82 | 79 | 0.86 | 82/83 | 87/87 |
| 60714003, San Bernardino, CA | 94 | 91 | 0.74 | 95/98 | 114/114 |

* Uses TCEQ's Maintenance receptor methodology that EPA has concerns (See section on maintenance receptor methodology discussion).
** 2021 monitoring data is preliminary and still has to undergo Quality Assurance/Quality Control analysis and be certified by the State of Texas, submitted to the EPA, and reviewed and concurred on by EPA.
*** From TCEQ spreadsheet of future 2023 DVs with state contributions.
**** TCEQ did not provide calculations for this receptor so EPA calculated from the Relative Response Factor in TCEQ spreadsheet of future 2023 DVs with state contributions and the monitor's 2012-2014 DV (0.983 X 71 ppb, truncation applied).

We note that this comparison combines TCEQ's 2012 base case year modeling results with EPA's 2016 base case year modeling results. As a result, we would expect some differences due to the differing meteorology of these two base years and the observed DVs in the base years that are used in both the nonattainment and maintenance receptor identification are for different periods. However, despite these differences, we can examine the potential accuracy of future year 2023 estimates by TCEQ and EPA compared to the most recent monitoring values since the 2023 DV is only 3 years away from the 2018-2020 DV and 2 years away from the preliminary 2019-2021 DVs. Meteorology can vary, so this analysis assumes that meteorology will be similar for the 2018-2020, 2019-2021, and 2021-2023 periods since future meteorology is unknown. Since EPA's 2016v2 modeling a utilizes a different base year meteorology than TCEQ, EPA's modeling results are different and did not find Texas linked to the receptors in Colorado, Arizona and Southern California with ≥ 0.7 ppb.

*Colorado*

In general EPA and TCEQ's 2023 model projections for the nonattainment receptor analysis provides generally similar results for the Colorado receptors identified by TCEQ with some variability of 1-2 ppb for some monitors and both seem to underestimate the expected DV based on recent monitoring data. It is interesting to note that TCEQ's maintenance receptor methodology resulted in a 1 ppb lower Maintenance DV than the Nonattainment DV for the Douglas County and Larimer County, Colorado receptors. EPA and TCEQ's Maintenance DVs at Colorado receptors are similar in values despite the difference in base years and methodologies with a couple of monitors varying by 3 ppb (EPA projects 3 ppb higher at one monitor and 3 ppb lower at another monitor).

*Arizona*

In general EPA and TCEQ's 2023 model projections for the nonattainment receptor analysis provides generally similar results for the Arizona receptor identified by TCEQ with some variability of 1 ppb between EPA and TCEQ's results and both seem to overestimate the expected DV based on recent monitoring data. It is interesting to note that TCEQ's maintenance receptor methodology resulted in a 2 ppb lower Maintenance DV than the Nonattainment DV for the Cochise County Arizona receptor indicating that it is nonattainment receptor but the value is lower than TCEQ's maintenance receptor methodology yields. EPA and TCEQ's Maintenance DVs at the Cochise receptor vary by 3 ppb with EPA's Maintenance DV being 3 ppb higher.

*Southern California*

TCEQ identified 10 receptors in Southern California. In general EPA and TCEQ's 2023 model projections for the nonattainment receptor analysis provides differing results with EPA's projected DVs being higher than TCEQ's for many of the receptors. EPA projected higher nonattainment DVs for five of the ten receptors with values ranging from 1 to 6 ppb higher than TCEQ's. Both TCEQ and EPA underestimate the 2023 DV based on recent monitoring, but EPA's projections are closer to recent monitoring values, therefore EPA's modeled projections seems more accurate than TCEQ's. It is interesting to note that TCEQ's maintenance receptor methodology resulted in a seven of the ten receptors having maintenance DVs lower than the nonattainment DVs (three were 1 ppb lower, one was 2 ppb lower and three were 3 ppb lower) All ten receptors were identified by EPA as potential receptors.

In Table 3.2, the EPA shows the receptors that Texas was linked as identified by EPA in EPA's 2016v2 2023 Modeling including the 2023 average DV (nonattainment receptor if >70 ppb) and 2023 Maintenance DV using TCEQ's maintenance methodology (uses only the 2012-2014 base DV).[28]

---

[28] EPA discusses our concerns with the inappropriateness of TCEQ's maintenance receptor methodology elsewhere in Section 1 of this TSD.

Table 3.2 Projected 2023 Nonattainment/Maintenance Receptors Identified by EPA Using EPA's 2016 base year modeling

| Receptor (Site ID, County, State) | Nonattainment/ Maintenance (EPA 2016v2) | EPA: 2023 Average DV/Maximum DV (ppb) | TCEQ: 2023 Average DV/ Maintenance DV (ppb) | 2018-2020 DV/Preliminary 2019-2021 DV** (ppb) | EPA: Texas Contribution (ppb) | TCEQ: Texas Contribution (ppb) |
|---|---|---|---|---|---|---|
| 170310001, Cook County, IL | Maintenance | 69.6/73.4 | 60/58 | 75/71 | 0.86 | 1.6 |
| 170310032, Cook County, IL | Maintenance | 69.8/72.4 | 68/66 | 74/75 | 1.46 | 1.31 |
| 170314201, Cook County, IL | Maintenance | 69.9/73.4 | 64/62 | 77/74 | 1.15 | 1.25 |
| 170317002, Cook County, IL | Maintenance | 70.1/73.0 | 66/65 | 75/73 | 1.58 | 1.22 |
| 550590019, Kenosha County, WI | Nonattainment | 72.8/73.7 | 67/66 | 74/74 | 1.72 | 1.44 |
| 550590025, Kenosha County, WI | Maintenance | 69.2/72.3 | No data* | 74/72 | 1.81 | No data* |
| 551010020, Racine County, WI | Nonattainment | 71.3/73.2 | No data* | 73/73 | 1.34 | No data* |

* Kenosha AQS ID 550590025 was installed and began operating May 13, 2013, so the first three year DV available is 2013-2015. Racine AQS ID 551010020 was installed in April 14, 2014 so the first three year DV available is 2015-2017. TCEQ's modeling used monitored DV data for 2010-2012, 2011-2013, and 2012-2014 to project to the future year. Since these monitors do not have valid DVs for these periods, TCEQ's modeling can't be used to project 2023 values and identify if they would be nonattainment or maintenance receptors.

** 2021 monitoring data is preliminary and still has to undergo Quality Assurance/Quality Control analysis and be certified by the State of Texas, submitted to the EPA, and reviewed and concurred on by EPA.

The underprediction in the Midwest is a significant concern, especially in light of the fact that TCEQ did not identify any receptors in the Chicago area and downwind of Chicago areas of Wisconsin and Michigan while the EPA did identify receptors in these areas.

*Cook County, IL*

In Table 3.2, EPA identified four receptors as maintenance receptors in Cook County, IL. TCEQ's 2023 nonattainment DVs are 9-15 ppb lower than recent monitoring data and TCEQ's modeling underprediction issues discussed previously are a concern. In TCEQ's modeling they project 2023 nonattainment DVs of 60 to 68 ppb, where EPA's 2023 nonattainment DVs range from 69 to 70 ppb for the four receptors. EPA's projected 2023 nonattainment DVs are much higher than TCEQ's projected 2023 nonattainment  DVs and closer to the recently monitored data. EPA identified all four receptors as maintenance receptors. TCEQ's maintenance DVs using only the 2012-2014 monitored DVs projected 2023 maintenance DVs that were 1 -2 ppb lower than the nonattainment DVs. As discussed in the maintenance receptor methodology discussion above, TCEQ's methodology does not protect areas that may struggle with maintaining the standard in the face of inter-annual variability in ozone-conducive conditions when the nonattainment receptor method would be more stringent than the maintenance receptor method. It is worth noting that if TCEQ's modeling had identified any of these four receptors as maintenance receptors, TCEQ's modeling estimates contributions from Texas sources ranging from 1.22 ppb to 1.6 ppb and therefore Texas would have been linked to these receptors for further analysis of potential emission reductions.

*Wisconsin*

In Table 3.2, EPA identified two receptors as nonattainment receptors and one as a maintenance receptor in Wisconsin. As footnoted in Table 3.2, TCEQ modeled a 2012 base case so TCEQ's modeling can only be used for monitors that had a one or more valid DVs in the 2010-2014 period. Only the Kenosha County AQS ID 550590019 monitor had a valid DV during this time, as the other two monitors were not installed until 2013-2014. EPA's modeling uses a 2016 base case, so EPA had valid DVs for all three monitors in Wisconsin to project 2023 DVs. TCEQ's projected nonattainment DV is 5 ppb lower than EPA's 2023 nonattainment DV and 7 ppb lower than recent monitored data. EPA's 2023 nonattainment DVs are 2 ppb, 5 ppb, and 2 ppb lower than recent monitoring data so EPA's modeling does not appear to be underestimating or overestimating 2023 nonattainment method DVs. Again TCEQ's maintenance methodologies prove to be less stringent than the nonattainment methodology and resulted in the maintenance methodology DV being 1 ppb lower than the nonattainment methodology DV. It is worth noting that if TCEQ's modeling had identified the one Wisconsin receptor that they had valid base DVs as nonattainment or maintenance, TCEQ's modeling indicated that contributions from Texas sources was 1.44 ppb and therefore Texas would have been linked to these receptors for further analysis of potential emission reductions.

Overall, TCEQ's modeling underestimation issues resulted in no receptors being identified in the Illinois, Wisconsin, Michigan areas in the TCEQ analysis. While the TCEQ modeling projects lower overall ozone levels for these areas in 2023, TCEQ's modeling does tend to corroborate the amount of projected impact that emissions from Texas may be contributing to 5 of the 7 nonattainment and maintenance receptors identified by EPA's most recent air quality modeling, EPA MP2016v2 modeling, as having a Texas contribution greater than or equal to one percent of the 2015 ozone NAAQS (0.7 ppb). EPA's modeling had less of

an underprediction bias for these monitors and is more reliable for projecting Future year ozone levels and contributions than TCEQ's modeling. EPA did find that Texas is linked to nonattainment and maintenance receptors in Cook County Illinois, and Wisconsin Counties (Kenosha and Racine).

4.     **Other Potential Modeling Concerns**

a.   TCEQ did not use latest EGU Emissions available at the time they proposed the SIP that incorporated reductions from CSAPR Update/ latest ERTAC projections in their modeling. It is unclear if this made any substantial changes in the modeling analysis without updating the EGU emissions and redoing the modeling.

b.   TCEQ used an alternate methodology for calculating contributions in determining contributions from Texas emissions at each monitor Texas identified as a receptor in Colorado, Arizona, and Southern California. TCEQ did not use the direct modeled impacts from Texas source apportionment for each day and average for the 5 to 10 days used to generate the Relative Response Factor (RRF) that is used for calculating the future year projected DVs. TCEQ calculated the average of the modeled contribution for the top 10 MDA8 modeled days. TCEQ then adjusted the modeled average impacts (for the 10 days used for the RRF) by multiplying by a ratio. Specifically, TCEQ calculated a ratio by using the 2012 Base Design Value and dividing by the average of the RRF's 5-10 days modeled MDA8 values and then adjusted the average contribution amount. This adjustment made small changes in the Texas contribution amounts, but these adjustments did not change the conclusion that Texas contributions were above 0.7 ppb at nonattainment/maintenance receptors in Colorado, Arizona, and Southern California.

c.   In generating their future year boundary conditions TCEQ used estimated 2023 emissions for the Representative Concentration Pathway (RCP) scenario 8.5 developed by the Intergovernmental Panel on Climate Change (IPCC). This includes some estimated changes based on climate modeling. EPA typically has not seen adjustment for climate changes included in SIP modeling; Without a modeling sensitivity analysis, the actual impact can not be quantified, but is expected to be a relatively smaller amount of the total modeled concentrations

in TCEQ's transport SIP modeling, and would not be expected to significantly change the total modeled concentrations.

### 5.     TCEQ Other Factor Analysis (Weight of Evidence)

TCEQ stated that the Texas contribution to a receptor should be deemed "significant" only if there is a persistent and consistent pattern of contribution on several days with elevated ozone. To try and assess persistent and consistent patterns, TCEQ did some additional analysis of several different factors such as DV trends, number of elevated ozone days, back trajectory analyses on elevated ozone days, modeled concentrations on future expected elevated ozone days, total interstate contributions at tagged monitors, consideration of conceptual model of downwind area, and responsiveness of ozone to emissions from Texas. Based on their assessment, TCEQ concluded that emissions from Texas do not contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS at any downwind monitors.

TCEQ Summary:

For Colorado receptors, TCEQ provided analysis of: Design value trends, number of monitored elevated ozone days, back trajectory analysis on elevated ozone days, the modeled contributions on expected elevated ozone days, total interstate contribution, and the responsiveness of ozone formation at the tagged Colorado monitors to Texas $NO_X$ emissions. TCEQ evaluated these factors in a general Weight of Evidence approach and concluded that Texas emissions do not contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS at the tagged monitors in Colorado.

For California receptors, TCEQ provided analysis of: design value trends, back trajectory analysis on elevated ozone days, average Texas modeled contributions on projected future

elevated ozone days, and collective interstate contributions to future design values, TCEQ evaluated these factors in a general Weight of Evidence approach and concluded that Texas emissions do not contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS at the tagged monitors in California.

While these additional factors can be informative to understand some of the complexities of ozone formation in downwind areas, how ozone is changing in those areas, areas that may contribute to downwind areas, modeled contributions from upwind areas, and potential responsiveness to upwind changes in emissions, most of these do not provide the quantitative assessment that chemical transport modeling with source contribution analyses provides. Chemical transport modeling is the most sophisticated tool available to project future year ozone levels, contributions from upwind states and frequency of the impacts of upwind states.

EPA has reviewed these analyses that TCEQ provided in a Weight of Evidence approach for receptors in Colorado and California and found significant concerns with some of the analyses and some analyses were not conclusive or didn't provide much information that counters the results of the photochemical modeling.  EPA's assessment of the totality of TCEQ's Weight of Evidence factors for Colorado and California receptors is that they do not provide substantial evidence that refutes the photochemical modeling analysis results including the contribution analysis using EPA's contribution methodology. EPA does not concur with TCEQ's conclusion that Texas emissions do not contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS at the tagged monitors in California.  EPA has included some comments, concerns, and limitations with using these factors that Texas used to negate the findings of the chemical transport model below.

a.   TCEQ indicated that there are problems with DV trends

TCEQ provided analyses of recent DV trends at the 4 Colorado monitors that they indicated as nonattainment/maintenance receptors. TCEQ summarized that 2013 was a high monitored ozone year but that the most recent 2016 DVs at most monitors show attainment and long-term ozone decreases are modest for the time evaluated (See Figure 1.8 above that is TCEQ's SIP Figure 3-40).

TCEQ also provided analyses of recent DV trends at the tagged California monitors along with the other monitors located in the Los Angeles CSA. These trends are displayed in TCEQ's SIP Figure 3-56: Eight-Hour Ozone Design Values for Monitors in the Los Angeles Area that is included above (See Figure 1.12 above that is TCEQ's SIP Figure 3-56). TCEQ colored the tagged California monitors and used gray coloring for the other monitors in the Los Angeles CSA.. The 10 monitors tagged had eight-hour ozone design values ranging from 101 ppb to 80 ppb in 2016. TCEQ indicated that 8-hour ozone DVs values in the area have decreased overall for the past 10 years and the 10 monitors tagged for further review have observed eight-hour ozone design value decreases from 2007 through 2016 ranging from 13% at Reseda (AQS ID: 60371201) to 5% at Victorville-Park Avenue (AQS ID: 60710306).

The most recent monitoring data and trends are useful to help identify if the monitors are still near or above the 8-hour ozone NAAQS. The historical trend data is also informative as to whether the modeled year of 2012 was a normal year or lower/higher than normal for monitored ozone levels. The Colorado data for example supports that 2012 was probably more ozone conducive than several other years, but the AQS ID 80690011 (Larimer County, Colorado) monitor 2014-2016 DV is similar to the 2012 monitor DV despite four more years of fleet turnover in the Denver area. In looking at monitoring trends and historical ozone data, 2012 did seem to favor more transport of Texas emissions to western areas. Overall, the DV trends show

that ozone levels are reducing at a slow pace. Based on the data for the AQS ID 80690011 (Larimer County, Colorado) monitor and the ten California area monitors identified by TCEQ as receptors (See receptors in Table 3.1 above), the long-term trends do not clearly show that the receptors in California or Colorado are expected to be well below the NAAQS, and thus, not be potential nonattainment or maintenance receptors in 2023. Furthermore, the photochemical modeling includes changes in emissions throughout the modeling domain to project 2023 modeling values based on changes from the base period that is more technically sophisticated than ozone monitored trends. The modeling trends analysis for California and Colorado receptors do not provide evidence to that refutes the photochemical modeling analysis results.

b. TCEQ evaluated the number of elevated ozone days (over 70 ppb) annually for monitors in the Denver and Southern California areas.

For the greater Denver area Colorado, TCEQ provided number of days over 70 ppb trends for 2007-2016 indicating decreases in days over the long-term and that 2012 was the highest year at the five monitors evaluated. However, in 2016 3 of 5 monitors had more than 10 days of monitored exceedances and one monitor had more exceedances in 2016 than it had in 2014 and 2015. TCEQ also provided a similar analysis of trends in California for 2012 thru 2016, which shows a general decrease in monitored ozone days above 70 ppb from 2012 for most of the 10 monitors tagged by TCEQ's modeling, but most monitors still have 30-95 monitored exceedance days (MDA8 > 70 ppb) in 2016. This data supports that the number of ozone exceedance days are improving but neither the Colorado or California analysis of number of exceedance days annually provide any evidence to refute the photochemical modeling analysis results.

c.   TCEQ Back Trajectory Analysis

TCEQ provided multi-year back trajectory analyses (2012-2016) for all the monitored ozone exceedance days for the five monitors in Colorado and 10 monitors in Southern California using National Oceanic and Atmospheric Administration (NOAA) HYbrid Single Particle Lagrangian Integrated Trajectory (HYSPLIT)[29] . TCEQ performed 72 hour back trajectories for both Colorado and California monitors. Given the large distance from Texas to Colorado and Texas to California, 120 hour back trajectories should have been considered. Most of the Colorado back trajectories only reached central or northern Texas so longer back trajectories should have been completed (*See* TCEQ SIP submission, Figure 3-42). TCEQ used start heights of 500 m AGL, 1000 m AGL, and 1500 m AGL. The EPA would also recommend running a 100 m AGL start height as well since both areas have complex terrain nearby or in the potential pathways that could result in different back trajectory paths due to the difference in meteorology between 100 m AGL and 500 m AGL. Another concern is that TCEQ used the 1st hour of the 8-hour exceedance as the start time instead of mid 8-hour or highest 1-hour number as the start time. The EPA typically uses a mid-8-hour or later start time, or runs multiple trajectories with varying start times as the transport patterns often change throughout the monitored 8-hour exceedance. Not running multiple hours for the start time, or at least the highest 1-hour or the middle of the 8-hour period when monitored 1-hour values are typically higher than the 1st hour of the 8-hour period, results in some uncertainty that TCEQ's trajectories fully represent transport that occurred during a monitored 8-hr ozone exceedance.

---

[29] HYbrid Single-Particle Lagrangian Integrated Trajectory (HYSPLIT) model is a complete system for computing both simple air parcel trajectories and complex dispersion and deposition simulations. The model is designed to support a wide range of simulations related to the atmospheric transport and dispersion of pollutants and hazardous materials to the Earth's surface.

TCEQ also screened the back trajectories out if they touched down at some point and also screened out any trajectories that were not below the Planetary Boundary Layer (PBL) over Texas.  TCEQ also screened out back trajectories if the back trajectory start height at the point above the receptor was above the PBL. The EPA has multiple concerns with the screening out of trajectories that TCEQ performed.

Before we explain our specific concerns with the screening out of back trajectories, it is important to understand what HYSPLIT back trajectories represent and their limitations. HYSPLIT back trajectory analyses use archived meteorological modeling that includes actual observed data (surface, upper air, airplane data, etc.) and modeled meteorological fields to estimate the most likely route of an air parcel transported to a receptor at a specified time. The method essentially follows a parcel of air backward in hourly steps for a specified length of time. HYSPLIT estimates the central path in both the vertical and horizontal planes. The HYSPLIT central path represents the centerline with the understanding that there are areas on each side horizontally and vertically that also contribute to the end point at the monitor. The horizontal and vertical areas from the centerline grow wider the further back in time the trajectory goes. Therefore, a HYSPLIT centerline does not have to pass directly over emissions sources or emission source areas, but merely relatively near emission source areas. Nor does the HYPSLIT centerline have to be below the PBL over Texas as the vertical spread area on the centerline for distances of 300 to 600 miles or more would most likely be below the PBL even if the centerline was well above the PBL. Likewise, even if a centerline is indicated as touching down, that adds some uncertainty but does not void the back trajectory. Given the distance from Texas to Colorado receptors and Texas to California receptors, it is unclear how many back trajectories TCEQ inappropriately screened out when the centerline was close to Texas such that the

horizontal spread area could encompass areas of Texas but did not directly cross any parts of Texas.  . In addition, Figure 3-42 in TCEQ's SIP submission indicates that many of the 72-hour trajectories that pass over Texas end before they have fully traversed Texas. Some of these trajectories may have been screened out because they were not below the PBL, but may have been below the mix layer in Texas and thus retained for the analysis if  longer 120 hour trajectories had been performed.  Starting the back trajectories with only the 1st hour of the 8-hour ozone exceedance means that the trajectory is started when the PBL is usually the lowest. With a later start hour (middle of the 8-hour, multiple start hours, etc.) the PBL would be higher in most cases. Thus the TCEQ only using the 1st hour may have resulted in back trajectories not being performed or screened out when a later start time would have resulted in a back trajectory that passed TCEQ's screening based on start height and PBL. Regardless, the EPA does not agree with screening out of trajectories as TCEQ has done in their analysis. The multiple ways that TCEQ inappropriately screened out trajectories, along with the several other issues mentioned above, limits the information that can be gleaned from TCEQ's HYSPLIT and Endpoint trajectory analysis for receptors in Colorado and California.

The EPA relies on back trajectory analysis as a corollary analysis along with observation-based meteorological wind fields at multiple heights to examine the general plausibility of the photochemical model "linkages." Since the back trajectory calculations do not account for any air pollution formation, dispersion, transformation, or removal processes as influenced by emissions, chemistry, deposition, etc., the trajectories cannot be used to develop quantitative contributions. Therefore, back trajectories cannot be used to quantitatively evaluate the magnitude of the existing photochemical contributions from upwind states to downwind receptors.

For Colorado, TCEQ proffered that their trajectory analysis of transport from Texas to Colorado indicates that emissions from Texas are unlikely to affect ozone concentrations in the mixing layer over Colorado on elevated ozone days. TCEQ asserted that filtering the back trajectories by only looking at trajectories during elevated ozone episodes (which EPA agrees is acceptable), that start within Colorado's mixing layer, that do not hit the surface, and that have endpoints within Texas' mixing layer is an attempt to find a clear case where emissions in Texas would affect the ozone in Colorado. TCEQ's conclusion that those filters showed that 6% of elevated ozone days in Colorado had trajectories that reached the mixing layer in Texas and that 66% of days during the 2007-2016 period evaluated where trajectories reached the Texas mixing layer occurred in 2011 and 2012 is flawed by the way TCEQ performed the HYSPLIT back trajectories and by the inappropriate screening out of back trajectories. For these reasons, EPA does not concur with TCEQ's conclusion that there are many years where no trajectories reach Texas from Colorado and that in the years where TCEQ determined that no trajectories reached Texas, the tagged monitors still observed a high number of elevated ozone days and fourth-highest eight-hour ozone concentrations above 70 ppb. EPA also disagrees with TCEQ's conclusion that Texas may not be upwind in 2015 and 2016 during any elevated ozone days at any of the five sites shown in Figure 3-44 of TCEQ's SIP submission. EPA notes that endpoint analysis and percentage of endpoints generally provides limited value but due to the concerns with the overall back trajectory analysis, the EPA finds little value in the endpoint analysis that TCEQ provided.

TCEQ did indicate that there were also many more elevated eight-hour ozone days observed in 2012 compared to other years and that this may indicate that there were some unusual meteorological patterns that occurred in 2012 that resulted in more severe ozone season. TCEQ

noted that overall, trends in the fourth-highest eight-hour ozone concentrations have only slightly decreased at the Colorado receptors that TCEQ identified. EPA concludes that TCEQ's HYSPLIT back trajectory analysis for the Colorado receptors is flawed and does not provide any evidence that Texas should not be linked to these Colorado receptors, as supported by the TCEQ photochemical modeling analysis. We note that based on EPA's analysis using a 2016 base year, Texas is not linked to these receptors likely due to differences in 2016 meteorology compared with the 2012 meteorology that TCEQ used.

For California, TCEQ performed a similar HYSPLIT back trajectory analysis for ozone exceedance days at the 10 monitors that TCEQ identified in Southern California as Texas being potentially linked. TCEQ performed the HYPSLITs the same way that they did for the Colorado receptors including the inappropriate screening of trajectories, and other issues discussed above in review of TCEQ's back trajectory and endpoint analysis for ozone exceedances for the Colorado receptors.

For the reasons mentioned above in the Colorado back trajectory and endpoint analyses, the EPA concludes that TCEQ's HYSPLIT back trajectory and endpoint analyses for the California receptors is flawed and does not provide any evidence that Texas should not be linked to these California receptors.

d. Texas contribution on high ozone days modeled greater than 70 ppb.

TCEQ evaluated contributions from Texas on projected future year elevated ozone days in their chemical transport modeling. TCEQ evaluated the subset of 2023 days with modeled MDA8 greater than 70 ppb, and TCEQ calculated the average modeled Texas contributions for this subset of days. Table 3-14 in TCEQ's SIP submission is included below as Table 5.1. TCEQ

also provided this same analysis for the receptors identified in Southern California and included

the results in in its SIP submission in Table 3-17, which is included below as Table 5.2.

Table 5.1 TCEQ evaluation of Texas contribution to 2023 modeled days with MDA8 values greater than 70 ppb at receptors in Colorado.

**Table 3-14: Modeled Elevated Ozone Days in the Future Year at the Tagged Colorado Monitors**

| Site Name | AQS ID | Number of Future Elevated Days | Average Texas Contribution on Future Elevated Ozone Days (ppb) | Average MDA8 on Future Elevated Ozone Days (ppb) | Percentage of Texas Contribution in MDA8 |
|---|---|---|---|---|---|
| Chatfield State Park | 80350004 | 9 | 0.77 | 73.05 | 1.06% |
| Rocky Flats | 80590006 | 10 | 0.89 | 73.64 | 1.21% |
| National Renewable Energy Labs-NREL | 80590011 | 11 | 0.86 | 74.09 | 1.16% |
| Fort Collins-West | 80690011 | 2 | 0.56 | 73.06 | 0.77% |
| Highland Reservoir | 80050002 | 8 | 0.52 | 73.80 | 0.71% |

TCEQ proffered in assessing this information that for the Colorado monitors, the expected average Texas contribution on projected future elevated ozone days is a small percentage of the projected average MDA8 on these days. As a result, TCEQ argued that these impacts are not significant, since the average contribution is less than one ppb for all the monitors on a relative few number of days (2-11 days), especially when considering the uncertainties associated with model predictions.

Table 5.2 TCEQ evaluation of Texas contribution to 2023 modeled days with MDA8 values greater than 70 ppb at receptors in Southern California.

| Table 3-17: Modeled Elevated Ozone Days in the Future Year | | | | | |
|---|---|---|---|---|---|
| Site Name | AQS ID | Number of Elevated Days in 2023 | Average Texas Contribution on Elevated Ozone Days in 2023 (ppb) | Average MDA8 on Elevated Ozone Days in 2023 (ppb) | Percentage of Texas Contributions in MDA8 |
| Reseda | 60371201 | 9 | 0.53 | 73.33 | 0.73% |
| Pomona | 60371701 | 60 | 0.26 | 76.87 | 0.35% |
| Santa Clarita | 60376012 | 13 | 0.41 | 73.94 | 0.56% |
| Rubidoux | 60658001 | 57 | 0.30 | 77.67 | 0.39% |
| Mira Loma (Van Buren) | 60658005 | 57 | 0.30 | 77.67 | 0.39% |
| Barstow | 60710001 | 1 | 0.00[33] | 70.82 | 0.00% |
| Victorville-Park Avenue | 60710306 | 5 | 0.19 | 72.24 | 0.27% |
| Upland | 60711004 | 57 | 0.31 | 77.21 | 0.41% |
| Hesperia-Olive Street | 60714001 | 12 | 0.23 | 73.50 | 0.32% |
| Redlands | 60714003 | 54 | 0.29 | 77.12 | 0.38% |

For California monitors, TCEQ indicated that the calculated average Texas contribution on projected future elevated ozone days (2023 modeled days with MDA8 greater than 70 ppb) is less than 1% of the projected average MDA8 at all of the monitors on these days. The EPA has concern that this is not tied to evaluating contribution on the days that are used in calculating and determining the 2023 DVs used in the nonattainment and maintenance tests. The EPA uses the same days for the test to also determine contributions from upwind states to have a clear relationship that the contributions are tied to days that determined the receptor is a nonattainment or maintenance receptor. TCEQ's alternate contribution analysis does not have this relationship and TCEQ's approach could result in averaging in days that were modeled above the standard but are not necessarily the days driving the future DV levels that indicate there are nonattainment and/or maintenance receptors. The EPA's approach uses the days that were highest in the base

year in the calculation of the future year DV and nonattainment and/or maintenance receptor identification and this process of selection of days to be used is the same process used in Attainment Demonstration SIPs for determining whether modeling projects that an area will attain the NAAQS. TCEQ's method has the potential to decouple these days by just relying on the future year modeling values regardless if those were the days that resulted in the future year DV being projected above the NAAQS. The EPA's approach targets the days driving the ability to attain the NAAQS in the future, whereas the inclusion of all days could average in many days with lesser ozone levels that are not as consequential to the area attaining as targeting the highest base case modeled days. The EPA's methodology is designed to address CAA requirements of not interfering with other State's ability to attain and maintain attainment, not address all attainment demonstration requirements of a downwind nonattainment area in another state and uses the same 5-10 days used for determining if the area will have problems attaining or maintain attainment due to upwind contributions to local ozone levels from another State.

For Colorado, TCEQ's modeling only has 2 days modeled above 70 ppb at the Fort Collins-West monitor in 2023 which does not seem reasonable considering the 2018-2020 DV is 77 and the preliminary 2019-2021 DV is 80 ppb, so this analysis is likely impacted by the underestimation issues. The EPA has concerns that TCEQ's modeling has underprediction both with base case and future ozone levels at DFW and HGB monitors (indicating underestimation of Texas emissions/ozone levels that are transported to downwind areas), concerns that there is also underestimation in the base case of higher monitored ozone levels at these Colorado and California monitors, and also an underestimation of the future year 2023 model projections at these Colorado and California monitors (see discussions in Section 2 of this document).

EPA uses at least 5 days and up to 10 days to calculate the average contributions and EPA does use values lower than 70 ppb in order to obtain 10 days for the calculation of average contribution from upwind states because of potential uncertainties in using the modeled values as a hard cut point (in TCEQ's case >70 ppb was used regardless of how many days this included in the calculations). We note that for three of the five Colorado receptors TCEQ's alternate contribution analysis does indicate an average contribution of more than 1% (0.7 ppb) using 9, 10, or 11 days in the average contribution calculation.

In addition to the concerns raise above, TCEQ's method also included many more days in the California analysis than EPA's method. Adding in all days modeled above 70 ppb greatly increases the number of days used in the contribution averages from 10 days to 50-60 days for a number of receptors. Adding in many more days that may be more locally driven and/or not have as high monitored/modeled ozone levels could result in averaging in days with lower contributions from Texas sources and that are not critical to demonstrating attainment as the days that are used in the projection of Future year DVs in the nonattainment and maintenance tests.

TCEQ's alternate contribution method analysis for California and Colorado receptors does not provide substantial evidence that refutes the photochemical modeling analysis results including the contribution analysis using EPA's contribution methodology.

e    Collective Interstate Contribution to Future DV

TCEQ provided an analysis of collective interstate contribution to the 2023 DV for the

five Colorado and ten California receptors. The collective interstate contribution at tagged

Colorado receptors ranges from 9.32% to 10.27% (See Table 5.3 below). The collective

interstate contribution at tagged California receptors ranges from 3.2% to 4.58% (See Table 5.4

below). TCEQ argues that these are small percentages (Colorado and California) and not as high

as the collective interstate contribution percentages the EPA calculated for monitors in Eastern

States, which ranged from 17% to 67%. TCEQ also notes that a significant portion of the tagged

Colorado monitors' 2023 modeled DVs is due to background emissions (sum of contributions

from to biogenic, fires, and boundary conditions). For the California receptors TCEQ argues that

these percentages are small compared to Intra-State contribution.

As an initial matter, the EPA is not solely relying on TCEQ's findings of linkages to

Colorado and California but is also relying on its own findings of linkages to areas in the

Midwest Region. As such, TCEQ's analysis of collective contributions to Colorado and

California does not provide justification for not addressing downwind impacts. Nonetheless,

EPA has found in the past that certain California receptors are so heavily impacted by local

emissions, and total upwind contribution is so low, that those receptors may not be considered to

be affected by interstate ozone transport. *See* 81 FR 15200 (Mar. 22, 2016). However, this is a

narrow circumstance that does not apply in the vast majority of cases and has never been applied

outside of California. EPA has previously found, for instance, that receptors in Colorado are

heavily impacted by upwind-state contribution. *See* 82 FR 9155 (Feb. 3, 2017); 81 FR 71991

(Oct. 19, 2016). EPA need not draw any conclusions here regarding whether the California sites

TCEQ identified should or should not be considered receptors for ozone-transport purposes. EPA

affirms, contrary to TCEQ's suggestion, that the Colorado receptors TCEQ analyzed are impacted by upwind state contributions. However, the EPA's finding that Texas is linked to receptors in other states is based on still other linkages found in EPA's modeling to receptors in other states, which are clearly impacted by the collective contribution of multiple upwind states, including Texas. Under CAA section 110(a)(2)(D)(i)(I), downwind states are not obligated to reduce emissions on their own to resolve nonattainment or maintenance problems. Rather, states are obligated to eliminate their own significant contribution or interference with the ability of other states to attain or maintain the NAAQS.

Table 5.3 – from TCEQ's SIP Table 3-15: Collective Interstate Contribution to Future Design Value at Tagged Colorado Monitors

**Table 3-15: Collective Interstate Contribution to Future Design Value at Tagged Colorado Monitors**

| Site Name | AQS ID | Percentage of 2023 $DV_F$ from Background Contribution | Percentage of 2023 $DV_F$ from Collective Interstate Contribution | Percentage of 2023 $DV_F$ from Intra-State Contribution |
|---|---|---|---|---|
| Chatfield State Park | 80350004 | 62.12% | 9.86% | 25.44% |
| Rocky Flats | 80590006 | 60.57% | 10.21% | 26.88% |
| National Renewable Energy Labs-NREL | 80590011 | 60.33% | 10.27% | 27.04% |
| Fort Collins-West | 80690011 | 67.42% | 9.32% | 20.88% |
| Highland Reservoir | 80050002 | 62.47% | 9.88% | 25.28% |

Table 5.4 – from TCEQ's SIP Table 3-18: Collective Interstate Contribution to Future
Design Value at Tagged California Monitors

**Table 3-18:   Collective Interstate Contributions to Future Design Values at Tagged California Monitors**

| AQS ID | Site Name | Percentage of 2023 $DV_F$ from Background Contribution | Percentage of 2023 $DV_F$ from Collective Interstate Contribution | Percentage of 2023 $DV_F$ from Intra-State Contribution |
|---|---|---|---|---|
| 60371201 | Reseda | 32.49% | 3.62% | 52.55% |
| 60371701 | Pomona | 30.88% | 4.05% | 54.87% |
| 60376012 | Santa Clarita | 37.41% | 3.60% | 49.00% |
| 60658001 | Rubidoux | 29.22% | 3.20% | 57.20% |
| 60658005 | Mira Loma (Van Buren) | 29.22% | 3.20% | 57.20% |
| 60710001 | Barstow | 58.53% | 4.58% | 30.64% |
| 60710306 | Victorville-Park Avenue | 36.58% | 3.98% | 49.55% |
| 60711004 | Upland | 30.74% | 4.22% | 54.69% |
| 60714001 | Hesperia-Olive Street | 32.09% | 3.97% | 53.35% |
| 60714003 | Redlands | 29.70% | 3.25% | 57.19% |

The maximum collective interstate contribution to the future design value is 4.58% at the Barstow (AQS ID: 60710001) monitor, which is insignificant compared to the intra-state contribution of 30.64%. A similar trend is seen at all 10 of the tagged monitors, thereby supporting the conclusion that interstate transport does not contribute significantly to nonattainment at these monitors.

f.   TCEQ also performed Direct Decoupled Method (DDM) modeling for receptors in Colorado.

DDM provides a first derivative of the changes in ozone (linear relationship where the DDM value is the slope of the line for changes in ozone) from changes in NOx emissions in this case.

Figure 5.1 TCEQ DDM results for select monitors



**Figure 3-45:  DDM Responsiveness of Ozone in July 2023 at Highland Reservoir**



**Figure 3-47:  DDM Responsiveness of Ozone in July 2023 at Chatfield State Park**



**Figure 3-49:  DDM Responsiveness of Ozone in July 2023 at Rocky Flats**

TCEQ indicated that Rocky Flats (AQS ID: 80590006) shows a small (approximately 2 ppb) responsiveness to Texas NOx emissions in mid to late July. However, when ozone at the monitor is responsive to Texas NOx emissions, elevated ozone was not modeled except for a minor response on one day, July 23.

TCEQ summarized their DDM modeling analysis indicating that there is some minor responsiveness to Texas' $NO_X$ emissions on two high ozone days in the third week of July, but similar to other Colorado monitors studied, the degree of responsiveness is much smaller than the responsiveness to Colorado $NO_X$ and "Other $NO_X$" emissions.

We note that TCEQ plotted modeled ozone levels in 2023, but did not provide information or analysis indicating if the 2012 base case modeling was replicating the 2012 monitored ozone or if the base case modeling had underestimation/overestimation issues on specific days/hours that Texas modeled non-zero and larger DDM values. The DDM modeling does show some response to Texas $NO_x$ emissions but from the scale it is hard to discern the level of response. The response to Texas $NO_X$ emissions appears to be in the 0-2 ppb range in general with some values in the 0.2-2 ppb range for modeled values over 60 ppb. Since the TCEQ modeling has underprediction and underestimation issues, a lower future year modeled threshold is appropriate to consider. The DDM modeling does show much more responsiveness to Colorado $NO_x$ group and Other $NO_x$ group (which represents many other states), but the responsiveness to Texas NOx group is not zero for some of the time including some days that modeled over 60 ppb. Overall, the DDM modeling is inconclusive and does not provide evidence that NOx reductions in Texas would not provide some benefit at receptors in Colorado.

g.   TCEQ briefly discussed conceptual model for ozone in Southern California indicating the topography and climate of the area's severe air pollution problem is a consequence of the

combination of emissions from the nation's second largest urban area and meteorological conditions that are adverse to the dispersion of those emissions. TCEQ asserted that the unique features of Southern California result in the Southern California basin area make it a relative isolated area. We note that TCEQ's modeling already takes into account the unique meteorological, topographical, and amount of local emissions in Southern California and in the rest of the Continental U.S. (CONUS) including Texas emissions. TCEQ's assessment of the Southern California conceptual model does not provide substantial evidence that refutes the photochemical modeling analysis results.

Overall, these additional analyses performed by TCEQ do not provide sufficient evidence to refute the modeling results that TCEQ's modeling indicates downwind nonattainment and/or maintenance receptors in Colorado and Southern California are impacted by Texas emissions and Texas' contribution is 0.7 ppb or greater.[30] In fact, the monitored ozone design value trends provide evidence that future year modeled ozone levels are underestimated by TCEQ's modeling and there are likely more receptors that should have been identified with additional potential linkages. Although Texas asserted that its additional air quality factor analysis is a permissible way to interpret which contributions are "significant" because that analysis examines whether there was a "persistent and consistent pattern of contribution on several days with elevated ozone" we find that such pattern is already established by a modeled linkage at Step 2.

In addition, EPA 2016v2 modeling using 2016 base year meteorology indicates linkages from Texas to receptors in the Midwest Region but does not indicate impacts from Texas emissions on the Colorado and other western receptors identified by TCEQ. With a different

---

[30] TCEQ also identified a monitor in Cochise County, Arizona (ID 40038001), but the monitor's recent DVs are below the NAAQS. From AQS, the 2014-2016 and 2015-2017 DVs are each 65 ppb; 2016-2018, 2017-2019, and 2018-2020 DVs are 66 ppb; and preliminary 2019-2021 DV is 66 ppb.

base period such as TCEQ's 2012 base period meteorology and the EPA's 2016 base period meteorology, it is not uncommon that the potential downwind nonattainment or maintenance receptors could change. These differing results about receptors and linkages can be affected by the varying meteorology from year to year and the selection of different base years, but we do not think the differing results mean that the modeling or the EPA methodology for identifying receptors or linkages is inherently unreliable. Rather, these separate modeling runs indicated (1) that there were receptors that would struggle with nonattainment or maintenance in the future, and (2) that Texas was linked to some set of these receptors, even if the receptors and linkages differed from one another in their specifics (e.g., a different set of receptors were identified to have nonattainment or maintenance problems, or Texas was linked to different receptors in one modeling run versus another). We think this common result indicates that Texas's emissions were substantial enough to generate linkages at Steps 1 and 2 to some set of downwind receptors, under varying assumptions and meteorological conditions, even if the precise set of linkages changed between modeling runs.

In sum, the EPA's more recent and robust 2016 base year modeling platform indicates that Texas is linked to several receptors in the Midwest Region as does the EPA's earlier 2011 base year modeling. TCEQ's 2012 base case modeling showed linkages to states in the west. As discussed, the EPA does not find the additional weight of evidence evaluations conducted by TCEQ provide compelling reasons to discount the impacts indicated in Colorado and California by the TCEQ modeling. In fact, we think TCEQ's modeling likely underestimates these issues.

6.      **EPA Summary**

EPA has reviewed TCEQ's modeling, alternate maintenance receptor methodology, recent monitoring data, underestimation concerns with TCEQ's modeling, and TCEQ's Weight of Evidence analyses (other factors analyses). Overall, we find the TCEQ's alternate maintenance receptor methodology to be flawed and not acceptable because it is not protective of receptors that may have difficulty maintaining the standard in the future. We did identify underprediction biases in TCEQ's modeling analysis including future year projections that are likely underestimating future year ozone DVs and likely have resulted in TCEQ's modeling analysis not identifying nonattainment or maintenance receptors in Illinois, Wisconsin, Michigan whereas the EPA's modeling using both 2011 and 2016 base years did find nonattainment and/or maintenance receptors with linkages to emissions from Texas.

Photochemical modeling simulations for ozone interstate transport assessment is relied upon by the EPA to simulate the formation and fate of oxidant precursors, primary and secondary particulate matter concentrations, and deposition over regional and urban spatial scales. Photochemical modeling is the most sophisticated tool available to estimate future ozone levels and contributions to those modeled future ozone levels. Consideration of the different processes that affect primary and secondary pollutants at the regional scale in different locations is fundamental to understanding and assessing the effects of emissions on air quality concentrations. For the 2015 ozone NAAQS interstate transport analysis, the EPA performed nationwide, state-level ozone source apportionment modeling using CAMx to quantify the contribution of NOx and VOC emissions from all sources in each state to project 2023 ozone concentrations at ozone monitoring sites. Detailed information for the EPA's modeling may be found in the Air Quality Modeling TSD in Docket No EPA-HQ-OAR-2021-0663.

We recognize that the results of the EPA (2011 and 2016 base year) and TCEQ (2012 base year) modeling indicated different receptors and linkages at Steps 1 and 2 of the framework. These differing results regarding receptors and linkages can be affected by the varying meteorology from year to year and base year DVs used to project future year DVs, but we do not think the differing results mean that the general modeling approach for identifying receptors or linkages is inherently unreliable.  Rather, these separate modeling runs indicated that: (1) There were receptors that would struggle with nonattainment or maintenance in the future, and (2) That Texas was linked to some set of these receptors, even if the receptors and linkages differed from one another in their specifics (e.g., a different set of receptors were identified to have nonattainment or maintenance problems, or Texas was linked to different receptors in one modeling run versus another). We think this common result indicates that Texas's emissions were substantial enough to generate linkages at Steps 1 and 2 to some downwind receptors, under varying assumptions and meteorological conditions, even if the precise set of linkages changed between modeling runs.

We propose to find that TCEQ's maintenance methodology is not sufficiently supported or protective but we do note that the maintenance receptors in Colorado and California that were identified by TCEQ would also be identified using EPA's maintenance methodology if applied to TCEQ's modeling results using the 2012 meteorology. Thus, the EPA agrees that the receptors that TCEQ identified as maintenance receptors are maintenance receptors in TCEQ's modeling analysis using the 2012 base year.  While EPA is concerned that TCEQ's modeling has some underestimation that resulted in not identifying receptors in the Midwest, TCEQ's modeling still identified receptors and identified linkages to receptors in Colorado and Southern California that EPA considers valid based on the 2012 base year modeling performed by TCEQ. EPA's primary

concern is the underestimation biases may have resulted in less receptors than if the modeling did not have the biases. TCEQ's model performance issues may have prevented TCEQ from identifying receptors in Illinois, Wisconsin and Michigan for which Texas would be linked. We acknowledge that TCEQ's modeling an alternate meteorology year (2012) that had different ozone conduciveness in separate areas of the country may also have had some impact on the 2023 projected ozone. We note that 2012 does appear to have been a higher ozone conduciveness for the Denver area than average and also the transport patterns in the 2012 ozone season were more conducive for transport from Texas to the west than in other years. Additionally, these meteorology patterns also indicate that 2012 may have had less transport from Texas to typical downwind areas in the Midwest and eastern half of the continental United States. Regardless of the meteorology and transport to downwind area differences that the different base year modeling provides, having multiple base years modeled actually provides a more robust analysis for review. These three separate modeling runs all indicated 1) that there were receptors that would struggle with nonattainment or maintenance in the future, and 2) that Texas was linked to some set of these receptors in each of the three base years modeled, even if the receptors and linkages differed from one another in their specifics (e.g., a different set of receptors were identified to have nonattainment or maintenance problems, or Texas was linked to different receptors in one modeling run versus another). We think this common result indicates that Texas' emissions were substantial enough to generate linkages at steps 1 and 2 to some set of downwind receptors, under varying assumptions and meteorological conditions, even if the precise set of linkages changed between modeling runs.

Tab HQ-29: 2016v3 Emissions Modeling Technical Support
Document (Jan. 29, 2023) (EPA-HQ-OAR-2021-0663-0029)



# Technical Support Document (TSD): Preparation of Emissions Inventories for the 2016v3 North American Emissions Modeling Platform

EPA-454/B-23-001
January 2023

Technical Support Document (TSD): Preparation of Emissions Inventories for the 2016v3 North American Emissions Modeling Platform

U.S. Environmental Protection Agency
Office of Air Quality Planning and Standards
Air Quality Assessment Division
Research Triangle Park, NC

Authors:
Alison Eyth (EPA/OAR)
Jeff Vukovich (EPA/OAR)
Caroline Farkas (EPA/OAR)
Janice Godfrey (EPA/OAR)
Karl Seltzer (EPA/OAR)

# TABLE OF CONTENTS

LIST OF TABLES..................................................................................................................... VIII

LIST OF FIGURES..................................................................................................................... XI

LIST OF APPENDICES............................................................................................................. XII

ACRONYMS............................................................................................................................... XIII

1     INTRODUCTION ................................................................................................................ 1

2     EMISSIONS INVENTORIES AND APPROACHES .................................................... 3

   2.1   2016 POINT SOURCES (PTEGU, PT_OILGAS, PTNONIPM, AIRPORTS) ................................ 8
      2.1.1   EGU sector (ptegu) ..................................................................................... 10
      2.1.2   Point source oil and gas sector (pt_oilgas) .............................................. 12
      2.1.3   Non-IPM sector (ptnonipm) ...................................................................... 15
      2.1.4   Aircraft and ground support equipment (airports) .................................. 16
   2.2   2016 NONPOINT SOURCES (AFDUST, FERTILIZER, LIVESTOCK, NP_OILGAS, NP_SOLVENTS, RWC, NONPT) .................... 18
      2.2.1   Area fugitive dust (afdust) ......................................................................... 18
      2.2.2   Agricultural Livestock (livestock) ............................................................ 25
      2.2.3   Agricultural Fertilizer (fertilizer) ............................................................. 27
      2.2.4   Nonpoint Oil and Gas (np_oilgas) ........................................................... 30
      2.2.5   Residential Wood Combustion (rwc) ......................................................... 31
      2.2.6   Solvents (np_solvents) ................................................................................ 32
      2.2.7   Nonpoint (nonpt) ....................................................................................... 34
   2.3   2016 ONROAD MOBILE SOURCES (ONROAD) ................................................................. 34
      2.3.1   Onroad Activity Data Development ............................................................ 35
      2.3.2   MOVES Emission Factor Table Development ............................................ 43
      2.3.3   Onroad California Inventory Development (onroad_ca) .......................... 46
   2.4   2016 NONROAD MOBILE SOURCES (CMV, RAIL, NONROAD).......................................... 46
      2.4.1   Category 1, Category 2 Commercial Marine Vessels (cmv_c1c2) ........... 46
      2.4.2   Category 3 Commercial Marine Vessels (cmv_c3) ................................... 50
      2.4.3   Railway Locomotives (rail) ....................................................................... 54
      2.4.4   Nonroad Mobile Equipment (nonroad) ..................................................... 64
   2.5   2016 FIRES (PTFIRE-WILD, PTFIRE-RX, PTAGFIRE)...................................................... 70
      2.5.1   Wild and Prescribed Fires (ptfire) ........................................................... 70
      2.5.2   Point Source Agricultural Fires (ptagfire) ............................................... 78
   2.6   2016 BIOGENIC SOURCES (BEIS) .................................................................................. 82
   2.7   SOURCES OUTSIDE OF THE UNITED STATES.................................................................... 85
      2.7.1   Point Sources in Canada and Mexico (othpt, canada_ag, canada_og2D) ............ 85
      2.7.2   Fugitive Dust Sources in Canada (othafdust, othptdust) ......................... 86
      2.7.3   Nonpoint and Nonroad Sources in Canada and Mexico (othar) ............. 86
      2.7.4   Onroad Sources in Canada and Mexico (onroad_can, onroad_mex) ....... 86
      2.7.5   Fires in Canada and Mexico (ptfire_othna) ............................................. 86
      2.7.6   Ocean Chlorine, Sea Salt, and Lightning NOx........................................ 87

3     EMISSIONS MODELING ................................................................................................. 88

   3.1   EMISSIONS MODELING OVERVIEW .................................................................................. 88
   3.2   CHEMICAL SPECIATION .................................................................................................. 92
      3.2.1   VOC speciation .......................................................................................... 95
         3.2.1.1   County specific profile combinations .............................................. 98
         3.2.1.2   Additional sector specific considerations for integrating HAP emissions from inventories into speciation ............ 99
         3.2.1.3   Oil and gas related speciation profiles .......................................... 101
         3.2.1.4   Mobile source related VOC speciation profiles ............................ 104
      3.2.2   PM speciation ........................................................................................... 109
         3.2.2.1   Mobile source related PM2.5 speciation profiles ......................... 111
      3.2.3   NOx speciation .......................................................................................... 112

3.2.4    *Creation of Sulfuric Acid Vapor (SULF)* ..............................................................*113*
3.3    TEMPORAL ALLOCATION ..............................................................................................114
3.3.1    *Use of FF10 format for finer than annual emissions* ........................................*116*
3.3.2    *Electric Generating Utility temporal allocation (ptegu)* ...................................*116*
    3.3.2.1    Base year temporal allocation of EGUs .....................................................116
    3.3.2.2    Analytic year temporal allocation of EGUs ................................................121
3.3.3    *Airport Temporal allocation (airports)* ...............................................................*127*
3.3.4    *Residential Wood Combustion Temporal allocation (rwc)* ................................*129*
3.3.5    *Agricultural Ammonia Temporal Profiles (ag)* ..................................................*133*
3.3.6    *Oil and gas temporal allocation (np_oilgas)* .....................................................*134*
3.3.7    *Onroad mobile temporal allocation (onroad)* .....................................................*135*
3.3.8    *Nonroad mobile temporal allocation(nonroad)* ..................................................*140*
3.3.9    *Additional sector specific details (afdust, beis, cmv, rail, nonpt, ptnonipm, ptfire)* ...*142*
3.4    SPATIAL ALLOCATION ..............................................................................................144
3.4.1    *Spatial Surrogates for U.S. emissions* ................................................................*144*
3.4.2    *Allocation method for airport-related sources in the U.S.* ..................................*151*
3.4.3    *Surrogates for Canada and Mexico emission inventories* ...................................*151*
3.5    PREPARATION OF EMISSIONS FOR THE CAMx MODEL ................................................154
3.5.1    *Development of CAMx Emissions for Standard CAMx Runs* ..............................*154*
3.5.2    *Development of CAMx Emissions for Source Apportionment CAMx Runs* ..........*156*

**4    DEVELOPMENT OF ANALYTIC YEAR EMISSIONS ........................... 159**

4.1    EGU POINT SOURCE PROJECTIONS (PTEGU) ............................................................164
4.2    NON-EGU POINT AND NONPOINT SECTOR PROJECTIONS ..........................................167
4.2.1    *Background on the Control Strategy Tool (CoST)* .............................................*168*
4.2.2    *CoST Plant CLOSURE Packet (ptnonipm, pt_oilgas)* ......................................*172*
4.2.3    *CoST PROJECTION Packets (afdust, airports, cmv, livestock, nonpt, np_oilgas, np_solvents, ptnonipm, pt_oilgas, rail, rwc)* 172
    4.2.3.1    *Fugitive dust growth (afdust)* ...............................................................*173*
    4.2.3.2    *Livestock population growth (livestock)* ...............................................*174*
    4.2.3.3    *Category 1, Category 2 Commercial Marine Vessels (cmv_c1c2)* .......*175*
    4.2.3.4    *Category 3 Commercial Marine Vessels (cmv_c3)* ...............................*176*
    4.2.3.5    *Oil and Gas Sources (pt_oilgas, np_oilgas)* .......................................*177*
    4.2.3.6    *Non-EGU point sources (ptnonipm)* .....................................................*183*
    4.2.3.7    *Airport sources (airports)* ....................................................................*184*
    4.2.3.8    *Nonpoint Sources (nonpt)* .....................................................................*185*
    4.2.3.9    *Solvents (np_solvents)* ..........................................................................*187*
    4.2.3.10    *Residential Wood Combustion (rwc)* .....................................................*189*
4.2.4    *CoST CONTROL Packets (nonpt, np_oilgas, ptnonipm, pt_oilgas, np_solvents)* ...*192*
    4.2.4.1    *Oil and Gas NSPS (np_oilgas, pt_oilgas)* ............................................*193*
    4.2.4.2    *RICE NSPS (nonpt, ptnonipm, np_oilgas, pt_oilgas)* .........................*201*
    4.2.4.3    *Fuel Sulfur Rules (nonpt, ptnonipm)* ....................................................*204*
    4.2.4.4    *Natural Gas Turbines $NO_x$ NSPS (ptnonipm, pt_oilgas)* ..................*205*
    4.2.4.5    *Process Heaters $NO_x$ NSPS (ptnonipm, pt_oilgas)* ..........................*208*
    4.2.4.6    *Ozone Transport Commission Rules (nonpt, solvents)* ..........................*211*
4.3    PROJECTIONS COMPUTED OUTSIDE OF CoST ..............................................................211
4.3.1    *Nonroad Mobile Equipment Sources (nonroad)* ................................................*211*
4.3.2    *Onroad Mobile Sources (onroad)* .......................................................................*212*
4.3.3    *Locomotives (rail, ptnonipm)* ............................................................................*216*
4.3.4    *Sources Outside of the United States (onroad_can, onroad_mex, othpt, canada_ag, canada_og2D, ptfire_othna, othar, othafdust, othptdust)* ...*218*
    4.3.4.1    *Canadian fugitive dust sources (othafdust, othptdust)* ........................*218*
    4.3.4.2    *Point Sources in Canada and Mexico (othpt, canada_ag, canada_og2D)* ...*219*
    4.3.4.3    *Nonpoint sources in Canada and Mexico (othar)* .................................*219*
    4.3.4.4    *Onroad sources in Canada and Mexico (onroad_can, onroad_mex)* ......*220*

**5    EMISSION SUMMARIES** ................................................................................................ **221**

**6    REFERENCES** .............................................................................................................. **228**

# List of Tables

Table 2-1. Platform sectors for the 2016 emissions modeling case ................................................. 5

Table 2-2. Default stack parameter replacements ........................................................................... 10

Table 2-3. Point source oil and gas sector NAICS Codes .............................................................. 12

Table 2-4. Sources removed from pt_oilgas due to Overlap with WRAP Oil and Gas Inventory ... 13

Table 2-5. 2014NEIv2-to-2016 projection factors for pt_oilgas sector for 2016v1 inventory ....... 14

Table 2-6. 2014NEI-based sources in 2016gf pt_oilgas (excluding offshore) before and after the 2014-to-2016 projections for (tons/year) ........................................................................ 15

Table 2-7.  2016v2 platform SCCs for the airports sector ............................................................. 17

Table 2-8. Afdust sector SCCs ....................................................................................................... 18

Table 2-9. Total impact of fugitive dust adjustments to the unadjusted 2016 inventory ................. 22

Table 2-10. SCCs for the livestock sector ...................................................................................... 25

Table 2-11. National back-projection factors for livestock: 2017 to 2016 ..................................... 27

Table 2-12. Source of input variables for EPIC .............................................................................. 29

Table 2-13. 2016 v1 platform SCCs for the residential wood combustion sector ........................... 31

Table 2-14. MOVES vehicle (source) types .................................................................................... 35

Table 2-15. Submitted data used to prepare 2016v2 onroad activity data ...................................... 36

Table 2-16. State total differences between 2017 NEI and 2016 VMT data ................................... 37

Table 2-17. Fraction of IHS Vehicle Populations to Retain for 2016v1 and 2017 NEI .................. 45

Table 2-18. SCCs for cmv_c1c2 sector ......................................................................................... 47

Table 2-19. Vessel groups in the cmv_c1c2 sector ........................................................................ 49

Table 2-20. SCCs for cmv_c3 sector ............................................................................................. 51

Table 2-21. 2017 to 2016 projection factors for C3 CMV ............................................................. 54

Table 2-22. 2016v1 SCCs for the Rail Sector ................................................................................ 55

Table 2-23. Class I Railroad Reported Locomotive Fuel Use Statistics for 2016 .......................... 55

Table 2-24. 2016 Line-haul Locomotive Emission Factors by Tier, AAR Fleet Mix (grams/gal) ... 57

Table 2-25. Surface Transportation Board R-1 Fuel Use Data – 2016 ........................................... 59

Table 2-26. 2016 Yard Switcher Emission Factors by Tier, AAR Fleet Mix (grams/gal)[4] ............ 59

Table 2-27. Expenditures and fuel use for commuter rail ............................................................... 61

Table 2-28. Submitted nonroad input tables by agency ................................................................... 68

Table 2-29. Alaska counties/census areas for which nonroad equipment sector-specific emissions are removed in the 2016 platforms ........................................................................................ 69

Table 2-30. SCCs included in the 2016 ptfire sector ...................................................................... 71

Table 2-31. National fire information databases used in 2016 ptfire inventory ............................... 71

Table 2-32. List of S/L/T agencies that submitted fire data for 2016v1 with types and formats. .... 73

Table 2-33. Brief description of fire information submitted for 2016v1 inventory use. .................... 74

Table 2-34. SCCs included in the 2016 ptagfire sector .................................................................. 78

Table 2-35. Assumed field size of agricultural fires per state(acres) .............................................. 80

Table 2-36.  Hourly Meteorological variables required by BEIS4 ................................................... 83

Table 3-1.  Key emissions modeling steps by sector ....................................................................... 89

Table 3-2.  Descriptions of the platform grids ................................................................................ 91

Table 3-3. Emission model species produced for CB6R3AE7 for CMAQ ....................................... 92

Table 3-4. Integration status of naphthalene, benzene, acetaldehyde, formaldehyde and methanol (NBAFM) for each platform sector ................................................................................. 97

Table 3-5. Ethanol percentages by volume by Canadian province ................................................. 99

Table 3-6. MOVES integrated species in M-profiles ...................................................................... 100

Table 3-7.  Basin/Region-specific profiles for oil and gas ............................................................. 103

Table 3-8.  TOG MOVES-SMOKE Speciation for nonroad emissions used for the 2016 Platform ........... 104

Table 3-9.  Select mobile-related VOC profiles 2016 ..................................................................... 105
Table 3-10.  Onroad M-profiles ...................................................................................................... 106
Table 3-11.  MOVES process IDs ................................................................................................... 107
Table 3-12.  MOVES Fuel subtype IDs .......................................................................................... 108
Table 3-13.  MOVES regclass IDs .................................................................................................. 108
Table 3-14.  Regional Fire Profiles ................................................................................................. 109
Table 3-15.  Brake and tire PM2.5 profiles compared to those used in the 2011v6.3 Platform ... 111
Table 3-16.  Nonroad PM2.5 profiles .............................................................................................. 112
Table 3-17.  NO$_X$ speciation profiles ............................................................................................. 113
Table 3-18.  Sulfate split factor computation ................................................................................. 113
Table 3-19.  SO$_2$ speciation profiles ............................................................................................. 114
Table 3-20.  Temporal settings used for the platform sectors in SMOKE .................................... 115
Table 3-21.  U.S. Surrogates available for the 2016 modeling platforms ...................................... 145
Table 3-22.  Off-Network Mobile Source Surrogates .................................................................... 146
Table 3-23.  Spatial Surrogates for Oil and Gas Sources .............................................................. 147
Table 3-24. Selected 2016 CAP emissions by sector for U.S. Surrogates (short tons in 12US1) .. 148
Table 3-25.  Canadian Spatial Surrogates ...................................................................................... 151
Table 3-26.  CAPs Allocated to Mexican and Canadian Spatial Surrogates (short tons in 36US3) ............ 152
Table 3-27.  Emission model species mappings for CMAQ and CAMx (for CB6R3AE7) .......... 155
Table 3-28. State tags for USA modeling ...................................................................................... 157
Table 4-1.  Overview of projection methods for the future year cases .......................................... 159
Table 4-2.  EGU sector NOx emissions by State for the 2016v3 cases ......................................... 166
Table 4-3. Subset of CoST Packet Matching Hierarchy ............................................................... 169
Table 4-4. Summary of non-EGU stationary projections subsections ........................................... 170
Table 4-5. Reductions from all facility/unit/stack-level closures in 2016v3 from 2019 emissions levels ..... 172
Table 4-6. Increase in total afdust PM$_{2.5}$ emissions from projections in 2016v3 .......................... 174
Table 4-7. National projection factors for livestock: 2017 to 2023 and 2026 .............................. 174
Table 4-8. National projection factors for cmv_c1c2 .................................................................... 175
Table 4-9. California projection factors for cmv_c1c2 .................................................................. 175
Table 4-10. 2016-to-2023 and 2016-to-2026 CMV C3 projection factors outside of California ... 177
Table 4-11. 2016-to-2023 and 2016-to-2026 CMV C3 projection factors for California ............... 177
Table 4-12.  Year 2017-2019 high-level summary of national oil and gas exploration emissions ... 180
Table 4-13. Point oil and gas sources held constant at 2018 or 2019 levels .................................. 180
Table 4-14. Annual Energy Outlook (AEO) 2022 tables used to project industrial sources ......... 184
Table 4-15. SCCs in nonpt that use Human Population Growth for Projections ............................ 187
Table 4-16. SCCs in np_solvents that use Human Population Growth for Projections .................. 188
Table 4-17. Projection factors for RWC ........................................................................................ 190
Table 4-18. Assumed retirement rates and new source emission factor ratios for NSPS rules ...... 193
Table 4-19. Non-point (np_oilgas) SCCs in 2016v3 modeling platform where Oil and Gas NSPS controls
    applied ...................................................................................................................... 194
Table 4-20. Emissions reductions for np_oilgas sector due to application of Oil and Gas NSPS ... 196
Table 4-21. Point source SCCs in pt_oilgas sector where Oil and Gas NSPS controls were applied .......... 196
Table 4-22. VOC reductions (tons/year) for the pt_oilgas sector after application of the Oil and Gas NSPS
    CONTROL packet for both analytic years 2023 and 2026 ........................................ 201
Table 4-23. SCCs and Engine Types where RICE NSPS controls applied for nonpt and ptnonipm ............ 202
Table 4-24. Non-point Oil and Gas SCCs in 2016v3 modeling platform where RICE NSPS controls applied
    ................................................................................................................................... 202
Table 4-25. Nonpoint Emissions reductions after the application of the RICE NSPS ..................... 203
Table 4-26. Ptnonipm Emissions reductions after the application of the RICE NSPS ................... 203

Table 4-27. Oil and Gas Emissions reductions for np_oilgas sector due to application of RICE NSPS ....... 204
Table 4-28. Point source SCCs in pt_oilgas sector where RICE NSPS controls applied. ............................ 204
Table 4-29. Emissions reductions (tons/year) in pt_oilgas sector after the application of the RICE NSPS CONTROL packet for analytic years 2023 and 2026. ............................................................................ 204
Table 4-30. Summary of fuel sulfur rule impacts on nonpoint SO2 emissions for 2023 ............................. 205
Table 4-31. Stationary gas turbines NSPS analysis and resulting emission rates used to compute controls . 206
Table 4-32. Ptnonipm SCCs in 2016v1 modeling platform where Natural Gas Turbines NSPS controls applied ....................................................................................................................................................... 207
Table 4-33. Ptnonipm emissions reductions after the application of the Natural Gas Turbines NSPS ......... 207
Table 4-34. Point source SCCs in pt_oilgas sector where Natural Gas Turbines NSPS control applied. ..... 207
Table 4-35. Emissions reductions (tons/year) for pt_oilgas after the application of the Natural Gas Turbines NSPS CONTROL packet for analytic years. ......................................................................................... 207
Table 4-36. Process Heaters NSPS analysis and 2016v1 new emission rates used to estimate controls ....... 208
Table 4-37. Ptnonipm SCCs in 2016v1 modeling platform where Process Heaters NSPS controls applied. 209
Table 4-38. Ptnonipm emissions reductions after the application of the Process Heaters NSPS ................. 210
Table 4-39. Point source SCCs in pt_oilgas sector where Process Heaters NSPS controls were applied ..... 210
Table 4-40.  NOx emissions reductions (tons/year) in pt_oilgas sector after the application of the Process Heaters NSPS CONTROL packet for analytics years. ........................................................................ 210
Table 4-41.  Light duty greenhouse gas rule adjustments for 2023 and 2026 onroad emissions .................. 213
Table 4-42. Factors used to Project VMT to analytic years ........................................................................ 214
Table 4-43. Class I Line-haul Fuel Projections based on 2018 AEO Data .................................................. 217
Table 4-44. Class I Line-haul Historic and Analytic Year Projected Emissions .......................................... 217
Table 4-45. 2018 AEO growth rates for rail sub-groups............................................................................. 218
Table 5-1. National by-sector CAP emissions for the 2016gf case, 12US1 grid (tons/yr) ........................... 222
Table 5-2. National by-sector CAP emissions for the 2023gf case, 12US1 grid (tons/yr) ........................... 223
Table 5-3. National by-sector CAP emissions for the 2026gf case, 12US1 grid (tons/yr) ........................... 224
Table 5-4. National by-sector CAP emissions for the 2016gf case, 36US3 grid (tons/yr) ........................... 225
Table 5-5. National by-sector CAP emissions for the 2023gf case, 36US3 grid (tons/yr) ........................... 226
Table 5-6. National by-sector Ozone Season NOx emissions summaries 12US1 grid (tons/o.s.)................. 227
Table 5-7. National by-sector Ozone Season VOC emissions summaries 12US1 grid (tons/o.s.) ............... 227

# List of Figures

Figure 2-1.  Impact of adjustments to fugitive dust emissions due to transport fraction, precipitation, and cumulative ................................................................................................................. 24
Figure 2-2. "Bidi" modeling system used to compute 2016 Fertilizer Application emissions ...................... 28
Figure 2-3. Representative Counties in 2016v2 and 2016v3 ...................................................... 44
Figure 2-4. 2017NEI/2016 platform geographical extent (solid) and U.S. ECA (dashed) ............................ 48
Figure 2-5. 2016 US Railroad Traffic Density in Millions of Gross Tons per Route Mile (MGT) ................ 56
Figure 2-6. Class I Railroads in the United States[5] .............................................................. 57
Figure 2-7. 2016-2017 Active Rail Yard Locations in the United States ........................................ 60
Figure 2-8. Class II and III Railroads in the United States[5] ...................................................... 61
Figure 2-9. Amtrak Routes with Diesel-powered Passenger Trains ................................................ 63
Figure 2-10. Processing flow for fire emission estimates in the 2016 inventory .................................. 76
Figure 2-11. Default fire type assignment by state and month where data are only from satellites. .............. 77
Figure 2-12. BlueSky Modeling Framework ........................................................................ 78
Figure 2-13. Normbeis4 data flows for 2016v3 .................................................................. 84
Figure 2-14. Tmpbeis4 data flow diagram for 2016v3 ............................................................ 85
Figure 3-1. Air quality modeling domains ........................................................................ 91
Figure 3-2. Process of integrating NBAFM with VOC for use in VOC Speciation ................................ 97
Figure 3-3.  Profiles composited for PM gas combustion related sources ........................................ 110
Figure 3-4.  Comparison of PM profiles used for Natural gas combustion related sources ........................ 110
Figure 3-5.  Eliminating unmeasured spikes in CEMS data ...................................................... 117
Figure 3-6.  Temporal Profile Input Unit Counts by Fuel and Peaking Unit Classification ........................ 119
Figure 3-7.  Example Daily Temporal Profiles for the LADCO Region and the Gas Fuel Type ................ 120
Figure 3-8.  Example Diurnal Temporal Profiles for the MANE-VU Region and the Coal Fuel Type ........ 120
Figure 3-9. Non-CEMS EGU Temporal Profile Application Counts .............................................. 121
Figure 3-10. Analytic Year Emissions Follow the Pattern of Base Year Emissions ................................ 125
Figure 3-11. Excess Emissions Apportioned to Hours Less than the Historic Maximum ............................ 125
Figure 3-12. Regional Profile Applied due to not being able to Adjust below Historic Maximum ................ 126
Figure 3-13. Regional Profile Applied, but Exceeds Historic Maximum in Some Hours ............................ 127
Figure 3-14.  Diurnal Profile for all Airport SCCs ................................................................ 128
Figure 3-15.  Weekly profile for all Airport SCCs ................................................................ 128
Figure 3-16.  Monthly Profile for all Airport SCCs .............................................................. 129
Figure 3-17.  Alaska Seaplane Profile .......................................................................... 129
Figure 3-18.  Example of RWC temporal allocation in 2007 using a 50 versus 60 ˚F threshold ................ 131
Figure 3-19.  RWC diurnal temporal profile .................................................................... 131
Figure 3-20.  Data used to produce a diurnal profile for OHH, based on heat load (BTU/hr) ...................... 132
Figure 3-21.  Day-of-week temporal profiles for OHH and Recreational RWC .................................... 133
Figure 3-22.  Annual-to-month temporal profiles for OHH and recreational RWC .................................. 133
Figure 3-23.  Example of animal $NH_3$ emissions temporal allocation approach (daily total emissions) ....... 134
Figure 3-24.  Example of temporal variability of $NO_X$ emissions ................................................ 136
Figure 3-25.  Sample onroad diurnal profiles for Fulton County, GA ............................................ 137
Figure 3-26.  Methods to Populate Onroad Speeds and Temporal Profiles by Road Type ........................ 138
Figure 3-27.  Regions for computing Region Average Speeds and Temporal Profiles ................................ 139
Figure 3-28.  Example of Temporal Profiles for Combination Trucks ............................................ 140
Figure 3-29.  Example Nonroad Day-of-week Temporal Profiles .................................................. 141
Figure 3-30.  Example Nonroad Diurnal Temporal Profiles ...................................................... 141
Figure 3-31.  Agricultural burning diurnal temporal profile .................................................... 143
Figure 3-32.  Prescribed and Wildfire diurnal temporal profiles ................................................ 143

Figure 4-1.  EIA Oil and Gas Supply Regions as of AEO2022 ...................................................................179

# List of Appendices

**Appendix A:** CB6 Assignment for New Species

**Appendix B:** Profiles (other than onroad) that are new or revised in SPECIATE versions 4.5 and later that were used in the 2016 alpha platforms

**Appendix C:** Mapping of Fuel Distribution SCCs to BTP, BPS and RBT

# Acronyms

| | |
|---|---|
| AADT | Annual average daily traffic |
| AE6 | CMAQ Aerosol Module, version 6, introduced in CMAQ v5.0 |
| AEO | Annual Energy Outlook |
| AERMOD | American Meteorological Society/Environmental Protection Agency Regulatory Model |
| AIS | Automated Identification System |
| APU | Auxiliary power unit |
| BEIS | Biogenic Emissions Inventory System |
| BELD | Biogenic Emissions Land use Database |
| BenMAP | Benefits Mapping and Analysis Program |
| BPS | Bulk Plant Storage |
| BTP | Bulk Terminal (Plant) to Pump |
| C1C2 | Category 1 and 2 commercial marine vessels |
| C3 | Category 3 (commercial marine vessels) |
| CAMD | EPA's Clean Air Markets Division |
| $CAM_X$ | Comprehensive Air Quality Model with Extensions |
| CAP | Criteria Air Pollutant |
| CARB | California Air Resources Board |
| CB05 | Carbon Bond 2005 chemical mechanism |
| CB6 | Version 6 of the Carbon Bond mechanism |
| CBM | Coal-bed methane |
| CDB | County database (input to MOVES model) |
| CEMS | Continuous Emissions Monitoring System |
| CISWI | Commercial and Industrial Solid Waste Incinerators |
| CMAQ | Community Multiscale Air Quality |
| CMV | Commercial Marine Vessel |
| CNG | Compressed natural gas |
| CO | Carbon monoxide |
| CONUS | Continental United States |
| CoST | Control Strategy Tool |
| CRC | Coordinating Research Council |
| CSAPR | Cross-State Air Pollution Rule |
| E0, E10, E85 | 0%, 10% and 85% Ethanol blend gasoline, respectively |
| ECA | Emissions Control Area |
| ECCC | Environment and Climate Change Canada |
| EF | Emission Factor |
| EGU | Electric Generating Units |
| EIA | Energy Information Administration |
| EIS | Emissions Inventory System |
| EPA | Environmental Protection Agency |
| EMFAC | EMission FACtor (California's onroad mobile model) |
| EPIC | Environmental Policy Integrated Climate modeling system |
| FAA | Federal Aviation Administration |
| FCCS | Fuel Characteristic Classification System |
| FEST-C | Fertilizer Emission Scenario Tool for CMAQ |
| FF10 | Flat File 2010 |
| FINN | Fire Inventory from the National Center for Atmospheric Research |

| | |
|---|---|
| **FIPS** | Federal Information Processing Standards |
| **FHWA** | Federal Highway Administration |
| **HAP** | Hazardous Air Pollutant |
| **HMS** | Hazard Mapping System |
| **HPMS** | Highway Performance Monitoring System |
| **ICI** | Industrial/Commercial/Institutional (boilers and process heaters) |
| **I/M** | Inspection and Maintenance |
| **IMO** | International Marine Organization |
| **IPM** | Integrated Planning Model |
| **LADCO** | Lake Michigan Air Directors Consortium |
| **LDV** | Light-Duty Vehicle |
| **LPG** | Liquified Petroleum Gas |
| **MACT** | Maximum Achievable Control Technology |
| **MARAMA** | Mid-Atlantic Regional Air Management Association |
| **MATS** | Mercury and Air Toxics Standards |
| **MCIP** | Meteorology-Chemistry Interface Processor |
| **MMS** | Minerals Management Service (now known as the Bureau of Energy Management, Regulation and Enforcement (BOEMRE) |
| **MOVES** | Motor Vehicle Emissions Simulator |
| **MSA** | Metropolitan Statistical Area |
| **MTBE** | Methyl tert-butyl ether |
| **MWC** | Municipal waste combustor |
| **MY** | Model year |
| **NAAQS** | National Ambient Air Quality Standards |
| **NAICS** | North American Industry Classification System |
| **NBAFM** | Naphthalene, Benzene, Acetaldehyde, Formaldehyde and Methanol |
| **NCAR** | National Center for Atmospheric Research |
| **NEEDS** | National Electric Energy Database System |
| **NEI** | National Emission Inventory |
| **NESCAUM** | Northeast States for Coordinated Air Use Management |
| **$NH_3$** | Ammonia |
| **NLCD** | National Land Cover Database |
| **NOAA** | National Oceanic and Atmospheric Administration |
| **NONROAD** | OTAQ's model for estimation of nonroad mobile emissions |
| **$NO_x$** | Nitrogen oxides |
| **NSPS** | New Source Performance Standards |
| **OHH** | Outdoor Hydronic Heater |
| **ONI** | Off network idling |
| **OTAQ** | EPA's Office of Transportation and Air Quality |
| **ORIS** | Office of Regulatory Information System |
| **ORD** | EPA's Office of Research and Development |
| **OSAT** | Ozone Source Apportionment Technology |
| **PFC** | Portable Fuel Container |
| **$PM_{2.5}$** | Particulate matter less than or equal to 2.5 microns |
| **$PM_{10}$** | Particulate matter less than or equal to 10 microns |
| **ppm** | Parts per million |
| **ppmv** | Parts per million by volume |
| **PSAT** | Particulate Matter Source Apportionment Technology |
| **RACT** | Reasonably Available Control Technology |

| | |
|---|---|
| **RBT** | Refinery to Bulk Terminal |
| **RIA** | Regulatory Impact Analysis |
| **RICE** | Reciprocating Internal Combustion Engine |
| **RWC** | Residential Wood Combustion |
| **RPD** | Rate-per-vehicle (emission mode used in SMOKE-MOVES) |
| **RPH** | Rate-per-hour for hoteling (emission mode used in SMOKE-MOVES) |
| **RPHO** | Rate-per-hour for off-network idling (emission mode used in SMOKE-MOVES) |
| **RPP** | Rate-per-profile (emission mode used in SMOKE-MOVES) |
| **RPS** | Rate-per-start (emission mode used in SMOKE-MOVES) |
| **RPV** | Rate-per-vehicle (emission mode used in SMOKE-MOVES) |
| **RVP** | Reid Vapor Pressure |
| **SCC** | Source Classification Code |
| **SMARTFIRE2** | Satellite Mapping Automated Reanalysis Tool for Fire Incident Reconciliation version 2 |
| **SMOKE** | Sparse Matrix Operator Kernel Emissions |
| **SO$_2$** | Sulfur dioxide |
| **SOA** | Secondary Organic Aerosol |
| **SIP** | State Implementation Plan |
| **SPDPRO** | Hourly Speed Profiles for weekday versus weekend |
| **S/L/T** | state, local, and tribal |
| **TAF** | Terminal Area Forecast |
| **TCEQ** | Texas Commission on Environmental Quality |
| **TOG** | Total Organic Gas |
| **TSD** | Technical support document |
| **USDA** | United States Department of Agriculture |
| **VIIRS** | Visible Infrared Imaging Radiometer Suite |
| **VOC** | Volatile organic compounds |
| **VMT** | Vehicle miles traveled |
| **VPOP** | Vehicle Population |
| **WRAP** | Western Regional Air Partnership |
| **WRF** | Weather Research and Forecasting Model |
| **2014NEIv2** | 2014 National Emissions Inventory (NEI), version 2 |

# 1  Introduction

The U.S. Environmental Protection Agency (EPA), has created a 2016v3 platform as an update to the 2016v2 emissions modeling platform (EPA, 2021). The 2016v3 platform includes updates in response to comments, some corrections, improved methods, and refinements to some projection factors due to newly released data. The 2016v3 platform is designed to be used studies focused on criteria air pollutants and represents the base year of 2016 and analytic years of 2023 and 2026. The 2016v3 platform primarily draws on data from the 2017 National Emissions Inventory (NEI) (EPA, 2021b), although the emissions were updated to represent the year 2016 through the incorporation of 2016-specific state and local data along with adjustment methods appropriate for each sector. The analytic year inventories were developed starting with the base year 2016 inventory using sector-specific methods as described below. The 2016v3 platform supports applications related to ozone transport and particulate matter.

The full air quality modeling platform consists of all the emissions inventories and ancillary data files used for emissions modeling, as well as the meteorological, initial condition, and boundary condition files needed to run the air quality model. This document focuses on the emissions modeling data and techniques that comprise the emission modeling platform including the emission inventories, the ancillary data files, and the approaches used to transform inventories for use in air quality modeling.

The 2016v3 platform retains some data from the National Inventory Collaborative effort to develop the 2016v1 platform (EPA, 2021c). The National Emissions Inventory Collaborative is a partnership between state emissions inventory staff, multi-jurisdictional organizations (MJOs), federal land managers (FLMs), EPA, and others to develop a North American air pollution emissions modeling platform with a base year of 2016 for use in air quality planning. The Collaborative planned for three versions of the 2016 platform: alpha, beta, and Version 1. The numbering format for the 2016 platforms is different from previous EPA platforms which had the first number based on the version of the NEI, and the second number as a platform iteration for that NEI year (e.g., v7.3 where the 7 represents 2014-2016 NEI-based platforms, and 3 means the third iteration of the platform). Using this older numbering method, the 2016v3 platform is also known as the v7.5 platform.

This emissions modeling platform includes all criteria air pollutants (CAPs) and precursors, and a group of hazardous air pollutants (HAPs). The group of HAPs are those explicitly used by the chemical mechanism in the Community Multiscale Air Quality (CMAQ) model (Appel et al., 2018) for ozone/particulate matter (PM): chlorine (Cl), hydrogen chloride (HCl), benzene, acetaldehyde, formaldehyde, methanol, naphthalene. The modeling domain includes the lower 48 states and parts of Canada and Mexico. The modeling cases for this platform were developed for studies with both the CMAQ model and with the Comprehensive Air Quality Model with Extensions (CAMx). The emissions modeling process used first prepares outputs in the format used by CMAQ, after which those emissions data are converted to the formats needed by CAMx.

The 2016v3 platform consists of cases that represent the years 2016, 2023, and 2026 with the abbreviations **2016gf_16j, 2023gf_16j,** and **2026gf_16j**, respectively. Derivatives of these cases that included source apportionment by state were also developed. This platform accounts for atmospheric chemistry and transport within a state-of-the-art photochemical grid model. In the case abbreviation 2016fh_16j, 2016 is the year represented by the emissions; the "f" represents the base year emissions modeling platform iteration, which here shows that f is the 2016 platform which started with the 2014 NEI; and the "j" stands for the tenth configuration of emissions modeled for that modeling platform.

The gridded meteorological model used to provide input data for the emissions modeling was developed using the Weather Research and Forecasting Model (WRF, https://ral.ucar.edu/solutions/products/weather-research-and-forecasting-model-wrf ) version 3.8, Advanced Research WRF core (Skamarock, et al., 2008). The WRF Model is a mesoscale numerical weather prediction system developed for both operational forecasting and atmospheric research applications. The WRF was run for 2016 over a domain covering the continental U.S. at a 12km resolution with 35 vertical layers. The run for this platform included high resolution sea surface temperature data from the Group for High Resolution Sea Surface Temperature (GHRSST) (see https://www.ghrsst.org/) and is given the EPA meteorological case label "16j." The full case abbreviation includes this suffix following the emissions portion of the case name to fully specify the abbreviation of the case as "2016gf_16j."

The emissions modeling platform includes point sources, nonpoint sources, commercial marine vessels (CMV), onroad and nonroad mobile sources, and fires for the U.S., Canada, and Mexico. Some platform categories use more disaggregated data than are made available in the NEI. For example, in the platform, onroad mobile source emissions are represented as hourly emissions by vehicle type, fuel type process and road type while the NEI emissions are aggregated to vehicle type/fuel type totals and annual temporal resolution. A full NEI was not developed for the year 2016 because only point sources above a certain potential to emit must be submitted for years between the full triennial NEI years (e.g., 2014, 2017, 2020). Emissions from Canada and Mexico are used for the modeling platform but are not part of the NEI.

The primary emissions modeling tool used to create the air quality model-ready emissions was the Sparse Matrix Operator Kernel Emissions (SMOKE) modeling system (http://www.smoke-model.org/), version 4.9 (SMOKE 4.9). Emissions files were created for a 36-km national grid and for a 12-km national grid, both of which include the contiguous states and parts of Canada and Mexico as shown in Figure 3-1. Emissions at 36-km were only created for the inventory years 2016 and 2023.

This document contains six sections and several appendices. Section 2 describes the 2016 inventories input to SMOKE. Section 3 describes the emissions modeling and the ancillary files used to process the emission inventories into air quality model-ready inputs. Methods to develop analytic year emissions are described in Section 4. Data summaries are provided in Section 5. Section 6 provides references. The Appendices provide additional details about specific technical methods or data.

# 2 Emissions Inventories and Approaches

This section summarizes the emissions data that make up the 2016v3 platform.  This section provides details about the data contained in each of the platform sectors for the base year and the analytic year. The original starting point for the emission inventories was the 2016v2 platform, which was released for comment in September of 2021 and continued to be available for comments during the comment periods following publication of EPA actions in response to state submissions of interstate transport state implementation plans (SIPs) and the comment period for the Good Neighbor Plan for the 2015 Ozone National Ambient Air Quality Standard (NAAQS). To create the 2016v3 platform, the 2016v2 inventories were updated to incorporate additional data from the 2017 NEI, implement corrections for some source categories, and to refine inventory methodologies and data in response to comments. Comments submitted through these processes through July of 2022 were considered. Details of the updates for each sector in the base and analytic years are described in this document.

Data and documentation for the 2017NEI, including a TSD, are available from https://www.epa.gov/air-emissions-inventories/2017-national-emissions-inventory-nei-data (EPA, 2021b). In addition to the NEI-based data for the broad categories of point, nonpoint, onroad, nonroad, and events (i.e., fires), emissions from the Canadian and Mexican inventories and several other non-NEI data sources are included in the 2016 platform. The Canadian and Mexican inventories were updated in the 2016v2 platform but were not changed in the 2016v3 platform.

The triennial year NEI data for CAPs are largely compiled from data submitted by state, local and tribal (S/L/T) air agencies. A large proportion of HAP emissions data in the NEI are also from the S/L/T agencies, but, are augmented by the EPA when not available from S/L/Ts.  The EPA uses the Emissions Inventory System (EIS) to compile the NEI.  The EIS includes hundreds of automated quality assurance checks to help improve data quality, and also supports tracking release point (e.g., stack) coordinates separately from facility coordinates.  The EPA collaborates extensively with S/L/T agencies to ensure a high quality of data in the NEI.  Because 2016 is not a triennial NEI year, all emissions modeling sectors were modified in some way to represent the year 2016 to the extent possible.

For interim years other than triennial NEI years, point source data are typically pulled forward from the most recent triennial NEI year for the sources that were not reported by S/L/Ts for the interim year. Thus, the 2016 point source emission inventories for the platform include emissions primarily from S/L/T-submitted data. In 2016v3, data that would have been pulled forward from 2014 were instead replaced with data from 2017 NEI, where possible, as the 2017 emissions were more current and closer to the year being modeling. Agricultural and wildland fire emissions represent the year 2016 and are consistent with those in 2016v2. In 2016v3, emissions for nonpoint source sectors started with 2017 NEI emissions and some were adjusted to better represent the year 2016. Fertilizer emissions  represent the year 2016. Some spatial reallocation was performed for CMV emissions to refine the assignment of the emissions to state waters, but otherwise the 2016v3 CMV emissions are consistent with 2016v2. 2016v3 used new data provided by California Air Resources Board (CARB) for mobile sources in California. Locomotive emissions in the rail and ptnonipm sectors are consistent with those in 2016v1 and v2, with the exception of California.  Nonpoint oil and gas emissions were developed using 2016-specific data for oil and gas wells and their 2016 production levels in conjunction with data developed by the Western Regional Air Partnership (WRAP).

Onroad and nonroad mobile source emissions were developed using the Motor Vehicle Emission Simulator (MOVES).  Onroad emissions were developed based on emissions factors output from

3

MOVES3 for the year 2016, run with inputs derived from the 2017NEI along with activity data (e.g., vehicle miles traveled and vehicle populations) provided by state and local agencies for 2016v1 or otherwise backcast to the year 2016. Updates for 2016v3 include corrected emission factors for combination trucks, corrections to road type distributions in some states, and activity data projections based on the 2022 Annual Energy Outlook (AEO). Nonroad emissions were consistent with those in 2016v2 and were generated using MOVES3, including the spatial allocation factors that were updated for the 2016v1 platform.

For the purposes of preparing the air quality model-ready emissions, emissions from the five NEI data categories are split into finer-grained sectors used for emissions modeling. The significance of an emissions modeling or "platform sector" is that the data are run through the SMOKE programs independently from the other sectors except for the final merge. The final merge program (Mrggrid) combines the sector-specific gridded, speciated, hourly emissions together to create CMAQ-ready emission inputs. For studies that use CAMx, the merged CMAQ-ready emissions inputs are converted into the file formats needed by CAMx. Elevated point sources from those are merged into files containing all sources for a given day and those files are converted into the CAMx point source format.

In addition to the NEI-based sectors, emissions for Canada and Mexico are included. In 2016v3, these emissions are based on updated data that represent the base year of 2016 for Canada from ECCC and for Mexico from SEMARNAT.

Table 2-1 presents an overview the sectors in the emissions modeling platform and how they generally relate to the NEI as their starting point. The platform sector abbreviations are provided in italics. These abbreviations are used in the SMOKE modeling scripts, inventory file names, and throughout the remainder of this document. Additional details on the changes made in the 2016v3 platform for each sector are available in the sector-specific subsections that follow.

Other natural emissions are also merged in with the sectors in Table 2-1: ocean chlorine and sea salt, and new for 2016v3: lightning NOx. The ocean chlorine gas emission estimates are based on the build-up of molecular chlorine ($Cl_2$) concentrations in oceanic air masses (Bullock and Brehme, 2002). In CMAQ, the species name is "CL2". The sea salt emissions were developed with version 4.1 of the OCEANIC pre-processor that comes with the CAMx model. The preprocessor estimates time/space-varying emissions of aerosol sodium, chloride and sulfate; gas-phase chlorine and bromine associated with sea salt; gaseous halo-methanes; and dimethyl sulfide (DMS). These additional oceanic emissions are incorporated into the final model-ready emissions files for CAMx. For more information on the natural emissions, including the lightning NOx, see Section 2.7.6.

The emission inventories in SMOKE input formats for the platform are available from EPA's Air Emissions Modeling website: https://www.epa.gov/air-emissions-modeling/2016v3-platform , The platform informational text file describes the particular zipped files associated with each platform sector and provides notes about how SMOKE should be run for each sector. A number of reports (i.e., summaries) are available in addition to the data files for the 2016 platform. The types of reports include state summaries of inventory pollutants and model species by modeling platform sector and county annual totals by modeling platform sector.

**Table 2-1. Platform sectors for the 2016 emissions modeling case**

| Platform Sector: *abbreviation* | NEI Data Category | Description and resolution of the data input to SMOKE |
|---|---|---|
| **EGU units:** *ptegu* | Point | Point source electric generating units (EGUs) for 2016 from the Emissions Inventory System (EIS), based on 2016v1 with some updates. Includes some adjustments to default stack parameters, additional closures, and a few units that were previously in ptnonipm. The inventory emissions are replaced with hourly 2016 Continuous Emissions Monitoring System (CEMS) values for nitrogen oxides ($NO_X$) and $SO_2$ for any units that are matched to the NEI, and other pollutants for matched units are scaled from the 2016 point inventory using CEMS heat input. Emissions for all sources not matched to CEMS data come from the annual inventory. For 2016v3 most 2014-projected emissions were replaced with emissions from the 2017NEI. Annual resolution for sources not matched to CEMS data, hourly for CEMS sources. |
| **Point source oil and gas:** *pt_oilgas* | Point | Point sources for 2016 including S/L/T data for oil and gas production and related processes and updated from 2016v1 with the Western Regional Air Partnership (WRAP) 2014 inventory. Includes sources from facilities with the following NAICS: 2111, 21111, 211111, 211112 (Oil and Gas Extraction); 213111 (Drilling Oil and Gas Wells); 213112 (Support Activities for Oil and Gas Operations); 2212, 22121, 221210 (Natural Gas Distribution); 48611, 486110 (Pipeline Transportation of Crude Oil); 4862, 48621, 486210 (Pipeline Transportation of Natural Gas). Includes offshore oil and gas platforms in the Gulf of Mexico (FIPS=85). For 2016v3 most emissions projected from 2014 were replaced with 2017NEI emissions. Annual resolution. |
| **Aircraft and ground support equipment:** *airports* | Point | Emissions from aircraft up to 3,000 ft elevation and emissions from ground support equipment based on the January 2021 version of 2017 NEI and backcast to 2016. For 2016v3 there were adjustments to Atlanta (ATL) and to a few specific airports in Texas based on comments. Annual resolution. |
| **Remaining non-EGU point:** *ptnonipm* | Point | All 2016 point source inventory records not matched to the ptegu, airports, or pt_oilgas sectors, including updates submitted by state and local agencies including some sources that were not operating in 2016 but did operate in later years. Year 2016 rail yard emissions were developed by the 2016v1 rail workgroup. For 2016v2 NOx control efficiencies were updated where new information was available. A few sources were moved to ptegu in 2016v2 and 2016v3. For 2016v3 most 2014-projected emissions were replaced with emissions from the 2017NEI, facilities found to overlap with the biorefinery inventory were removed along with biofuel facilities that were double counted in 2016v2, emissions were updated for five biofuel facilities, point solvents not in 2016v2 were restored, California rail yard emissions were updated to reflect new data from CARB, and some other minor changes. Annual resolution. |
| **Agricultural fertilizer:** *fertilizer* | Nonpoint | Nonpoint agricultural fertilizer application emissions of ammonia estimated for 2016 using the FEST-C model and captured from a run of CMAQ for 2016. For 2016v3 corrected to use NH3 molecular weight. County and monthly resolution. |
| **Agricultural Livestock:** *livestock* | Nonpoint | Nonpoint agricultural livestock emissions including ammonia and other pollutants (except $PM_{2.5}$) backcast from 2017NEI based on animal population data from the U.S. Department of Agriculture (USDA) National Agriculture Statistics Service Quick Stats, where available. For 2016v3 Maryland and Illinois emissions were corrected. County and annual resolution. |

| Platform Sector: *abbreviation* | NEI Data Category | Description and resolution of the data input to SMOKE |
|---|---|---|
| **Agricultural fires with point resolution:** *ptagfire* | Nonpoint | 2016 agricultural fire sources based on EPA-developed data with state updates, represented as point source day-specific emissions. They are in the nonpoint NEI data category, but in the platform, they are treated as point sources. For 2016v3 data are unchanged from 2016v2. Mostly at daily resolution with some state-submitted data at monthly resolution. |
| **Area fugitive dust:** *afdust* | Nonpoint | $PM_{10}$ and $PM_{2.5}$ fugitive dust sources based on the 2017 NEI nonpoint inventory, including building construction, road construction, agricultural dust, and road dust.  Agricultural dust, paved road dust, and unpaved road dust were backcast to 2016 levels. The NEI emissions are reduced during modeling according to a transport fraction (computed for the 2016 platform) and a meteorology-based (precipitation and snow/ice cover) zero-out. Afdust emissions from the portion of Southeast Alaska inside the 36US3 domain are processed in a separate sector called 'afdust_ak'. For 2016v3 data are unchanged from 2016v2. County and annual resolution. |
| **Biogenic:** *beis* | Nonpoint | Year 2016, hour-specific, grid cell-specific emissions generated from the BEIS4 model within SMOKE, including emissions in Canada and Mexico using BELD6 land use data. For 2016v3 the versions of BEIS and BELD were updated. Gridded and hourly resolution. |
| **Category 1, 2 CMV:** *cmv_c1c2* | Nonpoint | Category 1 and category 2 (C1C2) commercial marine vessel (CMV) emissions sources backcast to 2016 from the 2017NEI using a multiplier of 0.98. Includes C1C2 emissions in U.S. state and Federal waters, and also all non-U.S. C1C2 emissions including those in Canadian waters. For 2016v3, spatial allocation to county boundaries was improved but otherwise emissions were unchanged from 2016v2. Gridded and hourly resolution. |
| **Category 3 CMV:** *cmv_c3* | Nonpoint | Category 3 (C3) CMV emissions converted to point sources based on the center of the grid cells. Includes C3 emissions in U.S. state and Federal waters, and also all non-U.S. C3 emissions including those in Canadian waters. Emissions are backcast to 2016 from 2017NEI emissions based on factors derived from U.S. Army Corps of Engineers Entrance and Clearance data and information about the ships entering the ports. For 2016v3, spatial allocation to county boundaries was improved but otherwise emissions were unchanged from 2016v2. Gridded and hourly resolution. |
| **Locomotives :** *rail* | Nonpoint | Line haul rail locomotives emissions developed by the 2016v1 rail workgroup based on 2016 activity and emission factors. Includes freight and commuter rail emissions and incorporates state and local feedback.  For 2016v3 data are unchanged from 2016v1 and 2016v2.  County and annual resolution. |
| **Solvents :** *np_solvents* | Nonpoint (some Point) | VOC emissions from solvents for 2016 derived using the VCPy framework (Seltzer et al., 2021) along with some data from 2017 NEI.  Includes cleaners, personal care products, adhesives, architectural coatings, and aerosol coatings, industrial coatings, allied paint products, printing inks, dry-cleaning emissions, and agricultural pesticides. For 2016v3 updated methods were used in VCPy. County and annual resolution. |
| **Nonpoint source oil and gas:** *np_oilgas* | Nonpoint | 2016 nonpoint oil and gas emissions. Based on output from the 2017NEI version of the Oil and Gas tool for the year 2016 along with the 2014 WRAP oil and gas inventory for production-related emissions in those states and Pennsylvania's unconventional well inventory. Exploration-related emissions are based on the 2017NEI version of the Oil and Gas Tool run for 2016. For 2016 updated Colorado, Oklahoma, and Texas emission.  County and annual resolution |

| Platform Sector: *abbreviation* | NEI Data Category | Description and resolution of the data input to SMOKE |
|---|---|---|
| **Residential Wood Combustion:** *rwc* | Nonpoint | 2017 NEI nonpoint sources from residential wood combustion (RWC) processes backcast to the year 2016. For 2016v3 updated Idaho so use 2017 NEI emissions. County and annual resolution. |
| **Remaining nonpoint:** *nonpt* | Nonpoint | Nonpoint sources not included in other platform sectors. For 2016 updated to used 2017NEI for all sources except biomass combustion and gas stations which are backcast from 2017 to 2016. County and annual resolution. |
| **Nonroad:** *nonroad* | Nonroad | 2016 nonroad equipment emissions developed with MOVES3 using the inputs that were updated for 2016v1. MOVES was used for all states except California and Texas, which submitted emissions for 2016v1. For 2016v3 data are unchanged from 2016v2. County and monthly resolution. |
| **Onroad:** *onroad* | Onroad | 2016 onroad mobile source gasoline and diesel vehicles from moving and non-moving vehicles that drive on roads, along with vehicle refueling. Includes the following modes: exhaust, extended idle, auxiliary power units, off network idling, starts, evaporative, permeation, refueling, and brake and tire wear. For all states except California, developed using SMOKE-MOVES with emission factor tables produced by MOVES3 coupled with activity data backcast from 2017NEI to year 2016 or provided for 2016v1 by S/L/T agencies. Onroad emissions for Alaska, Hawaii, Puerto Rico and the Virgin Islands were held constant from 2016v1 (based on MOVES2014b) and are part of the onroad_nonconus sector. For 2016v3 included new starts for 20 Georgia counties, road type and hoteling changes in six states, inspection and maintenance updates in North Carolina and Tennessee and corrected emissions factors for combination trucks. County and hourly resolution. |
| **Onroad California:** *onroad_ca_adj* | Onroad | 2016 California-provided CAP onroad mobile source gasoline and diesel vehicles based on the EMFAC model, gridded and temporalized using MOVES3 outputs. Volatile organic compound (VOC) HAP emissions derived from California-provided VOC emissions and MOVES-based speciation. For 2016v3 minor updates to the NH3 and refueling emissions that are based on MOVES due to changes in combination truck emission factors. County and hourly resolution. |
| **Point source fires-** *ptfire-rx* *ptfire-wild* | Events | Point source day-specific wildfires and prescribed fires for 2016 computed using Satellite Mapping Automated Reanalysis Tool for Fire Incident Reconciliation version 2 (SMARTFIRE2) and BlueSky Framework (Sullivan, 2008 and Raffuse, 2007) for both flaming and smoldering processes (i.e., SCCs 281XXXX002). Smoldering is forced into layer 1 (by adjusting heat flux). For 2016v3 data are unchanged from 2016v2. Daily resolution. |
| **Non-US. Fires:** *ptfire_othna* | N/A | Point source day-specific wildland fires for 2016 provided by Environment Canada with data for missing months, and for Mexico and Central America, filled in using fires from the Fire Inventory (FINN) from National Center for Atmospheric Research (NCAR) fires (NCAR, 2016 and Wiedinmyer, C., 2011). Includes any prescribed fires although they are not distinguished from wildfires. For 2016v3 data are unchanged from 2016v2. Daily resolution. |
| **Other Area Fugitive dust sources not from the NEI:** *othafdust* | N/A | Fugitive dust sources of particulate matter emissions excluding land tilling from agricultural activities, from Environment and Climate Change Canada (ECCC) 2016 emission inventory updated for 2016v1. A transport fraction adjustment is applied along with a meteorology-based (precipitation and snow/ice cover) zero-out. For 2016v3 data are unchanged from 2016v2. County and annual resolution. |

| Platform Sector: *abbreviation* | NEI Data Category | Description and resolution of the data input to SMOKE |
|---|---|---|
| **Other Point Fugitive dust sources not from the NEI:** *othptdust* | N/A | Fugitive dust sources of particulate matter emissions from land tilling from agricultural activities, ECCC 2016 emission inventory updated for 2016v1, but wind erosion emissions were removed. A transport fraction adjustment is applied along with a meteorology-based (precipitation and snow/ice cover) zero-out. Data were originally provided on a rotated 10-km grid for beta, but were smoothed so as to avoid the artifact of grid lines in the processed emissions. For 2016v3 data are unchanged from 2016v2. Monthly resolution. |
| **Other point sources not from the NEI:** *othpt* | N/A | Point sources from the ECCC 2016 emission inventory updated for 2016v1. Includes Canadian sources other than agricultural ammonia and low-level oil and gas sources, along with emissions from Mexico's 2016 inventory. For 2016v3 data are unchanged from 2016v2. Monthly resolution for Canada airport emissions, annual resolution for the remainder of Canada and all of Mexico. |
| **Canada ag not from the NEI:** *canada_ag* | N/A | Agricultural point sources from the ECCC 2016 emission inventory updated from 2016v1, including agricultural ammonia. Agricultural data were originally provided on a rotated 10-km grid, but were smoothed so as to avoid the artifact of grid lines in the processed emissions. Data were forced into 2D low-level emissions to reduce the size of othpt. For 2016v3 data are unchanged from 2016v2. Monthly resolution. |
| **Canada oil and gas 2D not from the NEI:** *canada_og2D* | N/A | Low-level point oil and gas sources from the ECCC 2016 emission inventory with emissions forced into 2D low-level to reduce the size of the othpt sector. Point oil and gas sources which are subject to plume rise remain in the othpt sector. For 2016v3 data are unchanged from 2016v2. Annual resolution. |
| **Other non-NEI nonpoint and nonroad:** *othar* | N/A | Year 2016 Canada (province or sub-province resolution) emissions from the ECCC inventory updated for 2016v1. Year 2016 Mexico (municipio resolution) emissions from their 2016 inventory. For 2016v3 data are unchanged from 2016v2. Resolution: Canada monthly for nonroad sources; annual for rail and other nonpoint sectors, Mexico: annual nonpoint and nonroad mobile inventories. |
| **Other non-NEI onroad sources:** *onroad_can* | N/A | Year 2016 Canada (province resolution or sub-province resolution, depending on the province) from the ECCC onroad mobile inventory updated for 2016v1. For 2016v3 data are unchanged from 2016v2. Monthly resolution. |
| **Other non-NEI onroad sources:** *onroad_mex* | N/A | Year 2016 Mexico (municipio resolution) onroad mobile inventory based on MOVES-Mexico runs for 2014 and 2018 then interpolated to 2016 (unchanged from 2016v1). For 2016v3 data are unchanged from 2016v2. Monthly resolution. |

## 2.1     *2016 point sources (ptegu, pt_oilgas, ptnonipm, airports)*

Point sources are sources of emissions for which specific geographic coordinates (e.g., latitude/longitude) are specified, as in the case of an individual facility. A facility may have multiple emission release points that may be characterized as units such as boilers, reactors, spray booths, kilns, etc. A unit may have multiple processes (e.g., a boiler that sometimes burns residual oil and sometimes burns natural gas). This section describes NEI point sources within the contiguous U.S. and the offshore oil platforms which are processed by SMOKE as point source inventories. A full NEI is compiled every three years including 2011, 2014 and 2017. In the intervening years, emissions information about point sources that exceed

certain potential to emit threshold as defined in the Air Emissions Reporting Requirements (AERR)[1] are required to be submitted to the EIS that is used to compile the NEI. A comprehensive description of how EGU emissions were characterized and estimated in the NEI is located in Section 3.4 of the 2014 NEI TSD (EPA, 2018). The methods for emissions estimation are similar for the interim year of 2016, but there is no TSD available specific to the 2016 point source NEI. Information on state submissions for point sources through the 2016v1 collaborative process are available in the collaborative specification sheets (http://views.cira.colostate.edu/wiki/wiki/10202).

The point source file used for the modeling platform was exported from EIS into the Flat File 2010 (FF10) format that is compatible with SMOKE (see https://www.cmascenter.org/smoke/documentation/4.9/html/ch06s02s08.html). The export of point source emissions specific to 2016, including stack parameters and locations from EIS, was done on June 12, 2018, and some modifications were made since that time. For 2016v3, most sources with data not specific to the year 2016 were replaced with data from the 2017 NEI that was exported on June 18, 2020. The flat file was modified to remove sources without specific locations (i.e., their FIPS code ends in 777). Then the point source FF10 was divided into point source sectors used in the platform: the EGU sector (ptegu), point source oil and gas extraction-related emissions (pt_oilgas), airport emissions were put into the airports sector, and the remaining non-EGU sources into the non-IPM (ptnonipm) sector. The split was done at the unit level for ptegu and facility level for pt_oilgas such that a facility may have units and processes in both ptnonipm and ptegu, but units cannot be in both pt_oilgas and any other point sector.

The EGU emissions are split out from the other sources to facilitate the use of distinct SMOKE temporal processing and analytic-year projection techniques where the Integrated Planning Model (IPM) is used to project EGU emissions and other techniques are used to project non-EGU emissions. The oil and gas sector emissions (pt_oilgas) were processed separately for summary tracking purposes and distinct analytic-year projection techniques from the remaining non-EGU emissions (ptnonipm).

The inventory pollutants processed through SMOKE for all point source sectors were carbon monoxide (CO), $NO_X$, VOC, $SO_2$, ammonia ($NH_3$), particles less than 10 microns in diameter ($PM_{10}$), and particles less than 2.5 microns in diameter ($PM_{2.5}$), and all of the air toxics listed in Table 3-3. The pollutants naphthalene, benzene, acetaldehyde, formaldehyde, and methanol (NBAFM) species are based on speciation of VOCs. The resulting VOC in the modeling system may be higher or lower than the VOC emissions in the NEI; they would only be the same if the HAP inventory and speciation profiles were exactly consistent. For HAPs other than those in NBAFM, there is no concern for double-counting since CMAQ handles these outside the CB6 mechanism.

The ptnonipm and pt_oilgas sector emissions were provided to SMOKE as annual emissions. For those ptegu sources with CEMS data that could be matched to the point inventory from EIS, hourly CEMS $NO_X$ and $SO_2$ emissions were used rather than the annual total NEI emissions. For all other pollutants at matched units, the annual emissions were used as-is from the NEI, but were allocated to hourly values using heat input from the CEMS data. For the sources in the ptegu sector not matched to CEMS data, daily emissions were created using an approach described in Section 2.1.1. For non-CEMS units other than municipal waste combustors and cogeneration units, region- and pollutant-specific diurnal profiles were applied to create hourly emissions.

---

[1] 80 FR 8787 published 2/19/2015. See: https://www.federalregister.gov/documents/2015/02/19/2015-03470/revisions-to-the-air-emissions-reporting-requirements-revisions-to-lead-pb-reporting-threshold-and

While reviewing recent point source inventories it was determined that data submitted by some agencies used specific default values for certain stack parameters that are not necessarily appropriate to use for those sources.  This can impact modeling results, especially in fine scale modeling. When the stack parameters were substantially different from average values for that source type, the defaulted stack parameters were replaced with the value from the SMOKE PSTK file for that SCC. The agencies and default values that were replaced are shown in Table 2-2. Comments for any impacted inventory records were appended in the FF10 inventory files with comments of the form "stktemp replaced with ptsk default" so the updated records could be identified.

**Table 2-2. Default stack parameter replacements**

| Agency abbreviation | Stkdiam | Stkhgt | Stktemp | Stkvel |
|---|---|---|---|---|
| CODPHE | 0.1 ft | 1 ft | 70 degF or 72 degF | |
| PADEP | 0.1 ft | 1 ft | 70 degF | 0.1 ft/s or 1000 ft/s |
| LADEQ | 0.3 ft | | 70 degF or 77 degF | 0.1 ft/s |
| ILEPA | 0.33 ft | 33 ft or 35 ft | 70 degF | |
| TXCEQ | 1 ft or 3 ft | 40 ft | 72 degF | 0.1 ft/s |
| NVBAQ | | 32.8 ft | 72 degF | |
| WIDNR | | 20 ft | | 3.281 ft/s |
| MIDEQ | | | 70 degF or 72 degF | |
| MNPCA | | | 70 degF | |
| IADNR | | | 68 degF or 70 degF | |
| ORDEQ | | | 72 degF | |
| MSDEQ | | | 72 degF | |
| SCDEQ | | | 72 degF | 1 ft/s |
| NCDAQ | | | 72 degF | 0.2 ft/s |
| INDEM | | | 0 degF | 0 ft/s |
| NEDEQ | | | 350 degF | 1.6666 ft/s |
| KYDAQ | | | | 0 ft/s |
| WYDEQ | | | | 11.46 ft/s |

### 2.1.1 EGU sector (ptegu)

The ptegu sector contains emissions from EGUs in the 2016 NEI point inventory that could be matched to units found in the National Electric Energy Data System (NEEDS) v6.20 database (https://www.epa.gov/airmarkets/national-electric-energy-data-system-needs-v6 dated 8/3/2022).  The matching was prioritized according to the amount of the emissions produced by the source.  In the SMOKE point flat file, emission records for sources that have been matched to the NEEDS database have a value filled into the IPM_YN column based on the matches stored within EIS. The 2016 NEI point inventory consists of data submitted by S/L/T agencies and EPA to the EIS for Type A (i.e., large) point sources. Those EGU sources in the 2014 NEIv2 inventory that were not submitted or updated for 2016 and not identified as retired were retained in 2016, but for 2016v3 the emissions values were pulled from the 2017 NEI where possible.  For any 2014 EGU emissions that remain in the 2016v3 inventory, those from the states CT, DE, DC, ME, MD, MA, NH, NJ, NY, NC, PA, RI, VT, VA, and WV were projected

from 2014 to 2016 values using factors provided by the Mid-Atlantic Regional Air Management Association (MARAMA).

When possible, units in the ptegu sector are matched to 2016 CEMS data from EPA's Clean Air Markets Division (CAMD) via ORIS facility codes and boiler ID (see https://campd.epa.gov/). For the matched units, SMOKE replaces the 2016 emissions of $NO_X$ and $SO_2$ with the CEMS emissions, thereby ignoring the annual values specified in the NEI annual FF10 flat file. For other pollutants at matched units, the hourly CEMS heat input data are used to allocate the NEI annual emissions to hourly values. All stack parameters, stack locations, and Source Classification Codes (SCC) for these sources come from the NEI or updates provided by data submitters outside of EIS. Because these attributes are obtained from the NEI, the chemical speciation of VOC and $PM_{2.5}$ for the sources is selected based on the SCC or in some cases, based on unit-specific data. If CEMS data exists for a unit, but the unit is not matched to the NEI, the CEMS data for that unit are not used in the modeling platform. However, if the source exists in the NEI and is not matched to a CEMS unit, the emissions from that source are still modeled using the annual emission value in the NEI temporally allocated to hourly values. The EGU flat file inventory is split into a flat file with CEMS matches and a flat file without CEMS matches to support analysis and temporal allocation to hourly values.

In the SMOKE point FF10 file, emission records for point sources matched to CEMS data have values filled into the ORIS_FACILITY_CODE and ORIS_BOILER_ID columns. The CEMS data in SMOKE-ready format is available at https://gaftp.epa.gov/DMDnLoad/emissions/smoke/. Many smaller emitters in the CEMS program are not identified with ORIS facility or boiler IDs that can be matched to the NEI due to inconsistencies in the way a unit is defined between the NEI and CEMS datasets, or due to uncertainties in source identification such as inconsistent plant names in the two data systems. Also, the NEEDS database of units modeled by IPM includes many smaller emitting EGUs that do not have CEMS. Therefore, there will be more units in the NEEDS database than have CEMS data. The temporal allocation of EGU units matched to CEMS is based on the CEMS data, whereas regional profiles are used for most of the remaining units. More details can be found in Section 3.3.2.

Some EIS units match to multiple CAMD units based on cross-reference information in the EIS alternate identifier table. The multiple matches are used to take advantage of hourly CEMS data when a CAMD unit specific entry is not available in the inventory. Where a multiple match is made, the EIS unit is split and the ORIS facility and boiler IDs are replaced with the individual CAMD unit IDs. The split EIS unit NOX and SO2 emissions annual emissions are replaced with the sum of CEMS values for that respective unit. All other pollutants are scaled from the EIS unit into the split CAMD unit using the fraction of annual heat input from the CAMD unit as part of the entire EIS unit. The NEEDS ID in the "ipm_yn" column of the flat file is updated with a "_M_" between the facility and boiler identifiers to signify that the EIS unit had multiple CEMS matches. The inventory records with multiple matches had the EIS unit identifiers appended with the ORIS boiler identifier to distinguish each CEMS record in SMOKE.

For sources not matched to CEMS data, except for municipal waste combustors (MWCs) waste-to-energy and cogeneration units, daily emissions were computed from the NEI annual emissions using average CEMS data profiles specific to fuel type, pollutant,[2] and IPM region. To allocate emissions to each hour of the day, diurnal profiles were created using average CEMS data for heat input specific to fuel type and IPM region. See Section 3.3.2 for more details on the temporal allocation approach for ptegu sources.

---

[2] The year to day profiles use NOx and SO2 CEMS for NOx and SO2, respectively. For all other pollutants, they use heat input CEMS data.

MWC and cogeneration units without CEMS data available were specified to use uniform temporal allocation such that the emissions are allocated to constant levels for every hour of the year. These sources do not use hourly CEMs, and instead use a PTDAY file with the same emissions for each day, combined with a uniform hourly temporal profile applied by SMOKE.

After the completion of 2016v1, it was determined that SMOKE was having an issue properly processing CEMS emissions when there are multiple CEMS units mapped to the same NEI unit. This caused NOx and SO2 emissions in 2016v1 to be higher than they should have been at some units. This issue was corrected in 2016v2 and 2016v3.

### 2.1.2 Point source oil and gas sector (pt_oilgas)

The pt_oilgas sector consists of point source oil and gas emissions in United States, primarily pipeline-transportation and some upstream exploration and production. Sources in the pt_oilgas sector consist of sources which are not electricity generating units (EGUs) and which have a North American Industry Classification System (NAICS) code corresponding to oil and gas exploration, production, pipeline-transportation or distribution. The pt_oilgas sector was separated from the ptnonipm sector by selecting sources with specific NAICS codes shown in Table 2-3. The use of NAICS to separate out the point oil and gas emissions forces all sources within a facility to be in this sector, as opposed to ptegu where sources within a facility can be split between ptnonipm and ptegu sectors. A major update in 2016v2 was the incorporation of the WRAP oil and gas inventory for the states of Colorado, Montana, New Mexico, North Dakota, South Dakota, Utah, and Wyoming. This inventory is described in more detail below and in the WRAP Final report located here: http://www.wrapair2.org/pdf/WRAP_OGWG_Report_Baseline_17Sep2019.pdf (WRAP / Ramboll, 2019).

The 2016v3 pt_oilgas inventory includes 2017NEI emissions for many states, while others remain the same as 2016v2. Additionally, Colorado emissions were retained from 2016v1 and some New Mexico sources' emissions were replaced with 2020NEI-based emissions backcast to 2016 in response to comments. These changes are in addition those made in 2016v2, where several New Mexico sources were removed from the ptnonipm sector because it was determined they duplicated sources in the WRAP oil and gas inventory. The duplicate sources are listed in Table 2-4. Finally, following a review of the incidence of default stack parameters in recent inventories, stack parameters in the states of Louisiana, Illinois, Nebraska, Texas, Wisconsin, and Wyoming were updated in 2016v2 for sources with values found to be defaults.

**Table 2-3. Point source oil and gas sector NAICS Codes**

| NAICS | NAICS description |
|---|---|
| 2111 | Oil and Gas Extraction |
| 211111 | Crude Petroleum and Natural Gas Extraction |
| 211112 | Natural Gas Liquid Extraction |
| 21112 | Crude Petroleum Extraction |
| 211120 | Crude Petroleum Extraction |
| 21113 | Natural Gas Extraction |
| 211130 | Natural Gas Extraction |
| 213111 | Drilling Oil and Gas Wells |
| 213112 | Support Activities for Oil and Gas Operations |

| NAICS | NAICS description |
|---|---|
| 2212 | Natural Gas Distribution |
| 22121 | Natural Gas Distribution |
| 221210 | Natural Gas Distribution |
| 237120 | Oil and Gas Pipeline and Related Structures Construction |
| 4861 | Pipeline Transportation of Crude Oil |
| 48611 | Pipeline Transportation of Crude Oil |
| 486110 | Pipeline Transportation of Crude Oil |
| 4862 | Pipeline Transportation of Natural Gas |
| 48621 | Pipeline Transportation of Natural Gas |
| 486210 | Pipeline Transportation of Natural Gas |

**Table 2-4. Sources removed from pt_oilgas due to Overlap with WRAP Oil and Gas Inventory**

| State+county FIPS | Facility ID | Facility Name |
|---|---|---|
| 35015 | 7411811 | Artesia Gas Plant |
| 35015 | 17128911 | Chaparral Gas Plant |
| 35015 | 7761811 | DCP Midstream – Peco |
| 35015 | 7584511 | Empire Abo Gas Plant |
| 35015 | 7905211 | Oxy - Indian Basin G |
| 35025 | 5228911 | DCP Midstream – Euni |
| 35025 | 8091311 | Denton Gas Plant |
| 35025 | 8092311 | Eunice Gas Processing Plant |
| 35025 | 5226911 | Jal No3 Gas Plant |
| 35025 | 8241211 | Linam Ranch Gas Plant |
| 35025 | 5226611 | Maljamar Gas Plant |
| 35025 | 8241411 | Saunders Gas Plant |
| 35025 | 8241311 | Targa - Monument Gas Plant |
| 35045 | 7230311 | Kutz Canyon Processing Plant |
| 35045 | 8091911 | San Juan River Gas Plant |
| 35045 | 7992811 | Val Verde Treatment Plant |

The starting point for most states in the 2016v3 emissions platform pt_oilgas inventory was the 2016 point source NEI. The 2016 inventory includes data submitted by S/L/T agencies and EPA to the EIS for Type A (i.e., large) point sources. For the federally-owned offshore point inventory of oil and gas platforms, a 2017 inventory was developed by the U.S. Department of the Interior, Bureau of Ocean and Energy Management, Regulation, and Enforcement (BOEM) and this was used in 2016v3, along with any tribal submissions in the pt_oilgas sector.  Other states that used 2017NEI emissions for the pt_oilgas sector include Arkansas, California, Delaware, Georgia, Idaho, Indiana, Kentucky, Massachusetts,

Mississippi, Nevada, Oklahoma[3], Oregon, Pennsylvania, Rhode Island, South Carolina, Tennessee and West Virginia. Although North Dakota provided some stack parameter updates for some pt_oilgas sources, they could not be matched to the WRAP oil and gas inventory used for North Dakota, so these updates could not be implemented.

The year 2016 pt_oilgas inventory in 2016v3 includes a limited number of sources with data carried forward from the 2014NEIv2 point inventory and projected to 2016. The NEI year that the data was submitted for is indicated by the calc_year field in the FF10 inventory files. The pt_oilgas inventory was split into two components: one for 2016 sources, and one for 2014 sources. The sources with calc_year equal to 2016 were used in the platform without further modification.

For pt_oilgas emissions that were carried forward from the 2014NEIv2, those emissions were projected to represent the year 2016. Each state/SCC/NAICS combination in the inventory was classified as either an oil source, a natural gas source, a combination of oil and gas, or designated as a "no growth" source. Growth factors were based on historical state production data from the Energy Information Administration (EIA) and are listed in Table 2-5. National 2016 pt_oilgas emissions before and after application of 2014-to-2016 projections are shown in Table 2-6. The historical production data for years 2014 and 2016 for oil and natural gas were taken from the following websites:

• https://www.eia.gov/dnav/pet/pet_crd_crpdn_adc_mbbl_a.htm (Crude production)
• http://www.eia.gov/dnav/ng/ng_sum_lsum_a_epg0_fgw_mmcf_a.htm (Natural gas production)

The "no growth" sources include all offshore and tribal land emissions, and all emissions with a NAICS code associated with distribution, transportation, or support activities. As there were no 2015 production data in the EIA for Idaho, no growth was assumed for this state; the only pt_oilgas sources in Idaho were pipeline transportation related. Maryland and Oregon had no oil production data on the EIA website. The factors in Table 2-5 were applied to sources with NAICS = 2111, 21111, 211111, 211112, and 213111 and with production-related SCC processes. Table 2-5 provides a national summary of emissions before and after this two-year projection for these sources in the pt_oilgas sector. States listed with N/A as values do not have oil and gas activity data from which projection factors could be developed and therefore were held flat with no change from 2014 to 2016. Table 2-6 shows the national emissions for pt_oilgas following the projection to 2016. These numbers are smaller than in 2016v2 because more 2017 data were used in 2016v3 and the numbers only reflect the portion of the inventory projected from 2014 to 2016.

Table 2-5. 2014NEIv2-to-2016 projection factors for pt_oilgas sector for 2016v1 inventory

| State | Natural Gas growth | Oil growth | Combination gas/oil growth |
|-------|--------------------|-----------| ---------------------------|
| Alabama | -9.0% | -17.5% | -13.2% |
| Alaska | 1.9% | -1.1% | 0.4% |
| Arizona | -55.7% | -85.7% | -70.7% |
| Kansas | -15.0% | -23.4% | -19.2% |
| Louisiana | -11.0% | -17.4% | -14.2% |
| Maryland | 70.0% | N/A | N/A |
| Michigan | -12.6% | -23.4% | -18.0% |

---

[3] In Oklahoma, some facilities had significant differences between the 2016 and 2017 emissions. For those facilities, year 2016 data were used where emissions were submitted specifically for the year 2016.

| State | Natural Gas growth | Oil growth | Combination gas/oil growth |
|---|---|---|---|
| Minnesota | N/A | N/A | N/A |
| North Carolina | N/A | N/A | N/A |
| Ohio | 181.0% | 44.4% | 112.7% |
| Texas | -6.1% | 1.0% | -2.6% |
| Virginia | -10.0% | -50.0% | -30.0% |
| Wisconsin | N/A | N/A | N/A |

**Table 2-6. 2014NEI-based sources in 2016gf pt_oilgas (excluding offshore) before and after the 2014-to-2016 projections for (tons/year)**

| Pollutant | Before projections | After projections | % change 2014 to 2016 |
|---|---|---|---|
| **CO** | 7,846 | 7,662 | -2.3% |
| **NH3** | 0.0525 | 0.0527 | 0.4% |
| **NOX** | 12,927 | 12,719 | -1.6% |
| **PM10-PRI** | 529 | 528 | -0.1% |
| **PM25-PRI** | 498 | 497 | -0.4% |
| **SO2** | 1,977 | 1,911 | -3.3% |
| **VOC** | 4,857 | 4,813 | -0.9% |

## 2.1.3 Non-IPM sector (ptnonipm)

With minor exceptions, the ptnonipm sector contains point sources that are not in the airport, ptegu or pt_oilgas sectors. For the most part, the ptnonipm sector reflects the non-EGU sources of the NEI point inventory; however, it is likely that some small low-emitting EGUs not matched to the NEEDS database or to CEMS data are present in the ptnonipm sector. The ptnonipm emissions in the 2016v3 platform have been updated from the 2016 NEI point inventory and 2016v2 with the following changes.

***Updates in 2016v3 platform as compared to 2016v2***

- The point solvent emissions that had been removed in 2016v2 were added back (point source solvents have been subtracted out of VCPy / nonpoint solvents).

- Three Iowa biofuel facilities that had been supplemented with EPA data that were double counted with state-submitted data in the NEI were removed from the inventory (Facility IDs: OTAQ70212, and two with the ID OTAQ70214).

- Biorefinery emissions for five Iowa biofuel facilities were adjusted based on state-submitted emissions.

- Added three facilities in Kansas that were previously missing.

- Replaced emissions for all source-pollutants projected from 2014 to 2017 where a match could be made to 2017.

- Some facilities moved from ptnonipm to pt_oilgas due to NAICS changes between the platforms.

- Replaced release point IDs and stack parameters with 2019 release point IDs and stack parameters for those North Dakota release points that were identified by ND.

- Removed 17 biorefinery facilities that were found to overlap with the biorefinery inventory.

- Closed refineries that were not operating in 2016.

For 2016v2, A review of stack parameters (i.e., height, diameter, velocity, temperature) was performed to look for default values submitted for many stacks for the same type of source in the inventory.  When these parameters were substantially different from average values for that source type, the defaulted stack parameters were replaced with the value from the SMOKE PSTK file for that SCC as shown in Table 2-2. These stack parameter changes were retained in 2016v3.

Changes that were made in the 2016v2 ptnonipm inventory and were retained in 2016v3 are:

- Select municipal waste combustion (MWC) sources were moved from ptnonipm to ptegu as a result of better matching with NEEDS. These include EIS unit identifiers 85563113, 87378913, 119255113, 112010313.

- Sources that were identified to overlap with the WRAP oil and gas inventory including a number of gas plants were removed from ptnonipm.

- Sources that were identified as not operating in 2016 but operating in other recent years were added. These names (and EIS Facility IDs) of these sources were: COLOWYO COAL CO - COLOWYO & COLLOM MINES (1839411), Northshore Mining Co - Silver Bay (6319411), US Steel Corp – Keetac (13598411), United Taconite LLC - Fairlane Plant (6239611), MISSISSIPPI SILICON LLC (17942211), TRIDENT (7766011), and WISCONSIN RAPIDS WWTF (17658711).

- Year 2018 emissions were used for facilities 7766011, 17942211, and 1839411 because the 2018 inventory included CO and NOx, while year 2017 values were used for the others. Although two of these sources were later found to have already been in the ptnonipm inventory but with lower emissions, resulting in a double count in 2016 only.

- The Guardian Corp facility (#2989611) was removed because it closed in 2015.

- Emissions for specific rail yards in Georgia were updated at the request of the state. The specific rail yards updated were: Austell, North Doraville, Krannert, Inman, Industry, Howells, and Tilford.

- NOx control efficiencies were added to ptnonipm sources after a review of permitted limits was conducted, but this does not impact base year emissions.

### 2.1.4 Aircraft and ground support equipment (airports)

The airport sector contains emissions of all pollutants from aircraft, categorized by their itinerant class (i.e., commercial, air taxi, military, or general), as well as emissions from ground support equipment. The starting point for the 2016v2 and 2016v3 platform year 2016 airport inventories is the airport emissions from the January 2021 version of the 2017 NEI. The SCCs included in the airport sector are shown in Table 2-7.

**Table 2-7.  2016v2 platform SCCs for the airports sector**

| SCC | Tier 1 description | Tier 2 description | Tier 3 description | Tier 4 description |
|---|---|---|---|---|
| 2265008005 | Mobile Sources | Off-highway Vehicle Gasoline, 4-stroke | Airport Ground Support Equipment | Airport Ground Support Equipment |
| 2267008005 | Mobile Sources | LPG | Airport Ground Support Equipment | Airport Ground Support Equipment |
| 2268008005 | Mobile Sources | compressed natural gas (CNG) | Airport Ground Support Equipment | Airport Ground Support Equipment |
| 2270008005 | Mobile Sources | Off-highway Vehicle Diesel | Airport Ground Support Equipment | Airport Ground Support Equipment |
| 2275001000 | Mobile Sources | Aircraft | Military Aircraft | Total |
| 2275020000 | Mobile Sources | Aircraft | Commercial Aircraft | Total: All Types |
| 2275050011 | Mobile Sources | Aircraft | General Aviation | Piston |
| 2275050012 | Mobile Sources | Aircraft | General Aviation | Turbine |
| 2275060011 | Mobile Sources | Aircraft | Air Taxi | Piston |
| 2275060012 | Mobile Sources | Aircraft | Air Taxi | Turbine |
| 2275070000 | Mobile Sources | Aircraft | Aircraft Auxiliary Power Units | Total |
| 40600307 | Chemical Evaporation | Transportation and Marketing of Petroleum Products | Gasoline Retail Operations – Stage I | Underground Tank Breathing and Emptying |
| 20200102 | Internal Combustion Engines | Industrial | Distillate Oil (Diesel) | Reciprocating |

The 2016v1 airport emissions inventory was created from the 2017 NEI airport emissions that were estimated using the Federal Aviation Administration's (FAA's) Aviation Environmental Design Tool (AEDT). Additional information about the 2017NEI airport inventory and the AEDT can be found in the 2017 National Emissions Inventory Technical Support Document (EPA, 2021c). The 2017 NEI emissions were adjusted from 2017 to represent year 2016 emissions using FAA data. Adjustment factors were created using airport-specific numbers, where available, or the state default by itinerant class (commercial, air taxi, and general) where there were not airport-specific values in the FAA data. Emissions growth for facilities was capped at 500% and the state default growth was capped at 200%. Military state default values were kept flat to reflect uncertainly in the data regarding these sources.

After the release of the April 2020 version of the 2017 NEI, an error in the computation of the NEI airport emissions was identified and it was determined that they were overestimated.  The error impacted commercial aircraft emissions. The airport emissions in 2016v2 were recomputed based on corrected 2017 NEI emissions that were incorporated into the January 2021 release of 2017 NEI.

17

For the 2016v3 airport inventory, updates were made to Hartsfield Jackson airport (ATL) to remove minor double counting and to specific airports in Texas based on comments received from the Georgia Department of Environmental Protection and the Texas Commissions on Environmental Quality (TCEQ). Some airport runways cross the grid cell boundaries of the 12 km modeling domain. To provide more realistic spatial apportionment for large airports emissions were allocated by area to the intersection of the 12 km grid cells and the corresponding runway polygons.

## 2.2    2016 Nonpoint sources (afdust, fertilizer, livestock, np_oilgas, np_solvents, rwc, nonpt)

This section describes the *stationary* nonpoint sources in the NEI nonpoint data category.  Locomotives, C1 and C2 CMV, and C3 CMV are included in the NEI nonpoint data category, but are mobile sources that are described in Section 2.4.

Nonpoint tribal emissions submitted to the NEI are dropped during spatial processing with SMOKE due to the configuration of the spatial surrogates.  Part of the reason for this is to prevent possible double-counting with county-level emissions and also because spatial surrogates for tribal data are not currently available.  These omissions are not expected to have an impact on the results of the air quality modeling at the 12-km resolution used for this platform.

The following subsections describe how the sources in the NEI nonpoint inventory were separated into modeling platform sectors, along with any data that were updated replaced with non-NEI data.

### 2.2.1 Area fugitive dust (afdust)

The area-source fugitive dust (afdust) sector contains $PM_{10}$ and $PM_{2.5}$ emission estimates for nonpoint SCCs identified by EPA as dust sources.  Categories included in the afdust sector are paved roads, unpaved roads and airstrips, construction (residential, industrial, road and total), agriculture production, and mining and quarrying.  It does not include fugitive dust from grain elevators, coal handling at coal mines, or vehicular traffic on paved or unpaved roads at industrial facilities because these are treated as point sources so they are properly located. Table 2-8 is a listing of the Source Classification Codes (SCCs) in the afdust sector.  For 2016v3 no changes were made from the year 2016 afdust inventory in 2016v2.

**Table 2-8. Afdust sector SCCs**

| SCC | Tier 1 description | Tier 2 description | Tier 3 description | Tier 4 description |
|---|---|---|---|---|
| 2275085000 | Mobile Sources | Aircraft | Unpaved Airstrips | Total |
| 2294000000 | Mobile Sources | Paved Roads | All Paved Roads | Total: Fugitives |
| 2294000002 | Mobile Sources | Paved Roads | All Paved Roads | Total: Sanding/Salting - Fugitives |
| 2296000000 | Mobile Sources | Unpaved Roads | All Unpaved Roads | Total: Fugitives |
| 2311000000 | Industrial Processes | Construction: SIC 15 – 17 | All Processes | Total |
| 2311010000 | Industrial Processes | Construction: SIC 15 – 17 | Residential | Total |
| 2311010070 | Industrial Processes | Construction: SIC 15 – 17 | Residential | Vehicle Traffic |
| 2311020000 | Industrial Processes | Construction: SIC 15 – 17 | Industrial/Commercial/ Institutional | Total |

| SCC | Tier 1 description | Tier 2 description | Tier 3 description | Tier 4 description |
|---|---|---|---|---|
| 2311030000 | Industrial Processes | Construction: SIC 15 – 17 | Road Construction | Total |
| 2325000000 | Industrial Processes | Mining and Quarrying: SIC 14 | All Processes | Total |
| 2325060000 | Industrial Processes | Mining and Quarrying: SIC 10 | Lead Ore Mining and Milling | Total |
| 2801000000 | Miscellaneous Area Sources | Ag. Production – Crops | Agriculture – Crops | Total |
| 2801000003 | Miscellaneous Area Sources | Ag. Production – Crops | Agriculture – Crops | Tilling |
| 2801000005 | Miscellaneous Area Sources | Ag. Production – Crops | Agriculture – Crops | Harvesting |
| 2801000007 | Miscellaneous Area Sources | Ag. Production – Crops | Agriculture – Crops | Loading |
| 2801000008 | Miscellaneous Area Sources | Ag. Production – Crops | Agriculture - Crops | Transport |
| 2805001000 | Miscellaneous Area Sources | Ag. Production – Livestock | Beef cattle - finishing operations on feedlots (drylots) | Dust Kicked-up by Hooves (use 28-05-020, -001, -002, or -003 for Waste |
| 2805001100 | Miscellaneous Area Sources | Ag. Production – Livestock | Beef cattle - finishing operations on feedlots (drylots) | Confinement |
| 2805001200 | Miscellaneous Area Sources | Agriculture Production – Livestock | Beef cattle - finishing operations on feedlots (drylots) | Manure handling and storage |
| 2805001300 | Miscellaneous Area Sources | Agriculture Production – Livestock | Beef cattle - finishing operations on feedlots (drylots) | Land application of manure |
| 2805002000 | Miscellaneous Area Sources | Ag. Production – Livestock | Beef cattle production composite | Not Elsewhere Classified |
| 2805003100 | Miscellaneous Area Sources | Ag. Production – Livestock | Beef cattle - finishing operations on pasture/range | Confinement |
| 2805007100 | Miscellaneous Area Sources | Ag. Production – Livestock | Poultry production - layers with dry manure management systems | Confinement |
| 2805007300 | Miscellaneous Area Sources | Ag. Production – Livestock | Poultry production - layers with dry manure management systems | Land application of manure |
| 2805008100 | Miscellaneous Area Sources | Ag. Production – Livestock | Poultry production - layers with wet manure management systems | Confinement |
| 2805008200 | Miscellaneous Area Sources | Ag. Production – Livestock | Poultry production - layers with wet manure management systems | Manure handling and storage |
| 2805008300 | Miscellaneous Area Sources | Ag. Production – Livestock | Poultry production - layers with wet manure management systems | Land application of manure |
| 2805009100 | Miscellaneous Area Sources | Ag. Production – Livestock | Poultry production – broilers | Confinement |
| 2805009200 | Miscellaneous Area Sources | Ag. Production – Livestock | Poultry production - broilers | Manure handling and storage |
| 2805009300 | Miscellaneous Area Sources | Ag. Production – Livestock | Poultry production - broilers | Land application of manure |
| 2805010100 | Miscellaneous Area Sources | Ag. Production – Livestock | Poultry production - turkeys | Confinement |
| 2805010200 | Miscellaneous Area Sources | Ag. Production – Livestock | Poultry production - turkeys | Manure handling and storage |
| 2805010300 | Miscellaneous Area Sources | Ag. Production – Livestock | Poultry production - turkeys | Land application of manure |

| SCC | Tier 1 description | Tier 2 description | Tier 3 description | Tier 4 description |
|---|---|---|---|---|
| 2805018000 | Miscellaneous Area Sources | Ag. Production – Livestock | Dairy cattle composite | Not Elsewhere Classified |
| 2805019100 | Miscellaneous Area Sources | Ag. Production – Livestock | Dairy cattle - flush dairy | Confinement |
| 2805019200 | Miscellaneous Area Sources | Ag. Production – Livestock | Dairy cattle - flush dairy | Manure handling and storage |
| 2805019300 | Miscellaneous Area Sources | Ag. Production – Livestock | Dairy cattle - flush dairy | Land application of manure |
| 2805020002 | Miscellaneous Area Sources | Ag. Production – Livestock | Cattle and Calves Waste Emissions | Beef Cows |
| 2805021100 | Miscellaneous Area Sources | Ag. Production – Livestock | Dairy cattle - scrape dairy | Confinement |
| 2805021200 | Miscellaneous Area Sources | Ag. Production – Livestock | Dairy cattle - scrape dairy | Manure handling and storage |
| 2805021300 | Miscellaneous Area Sources | Ag. Production – Livestock | Dairy cattle - scrape dairy | Land application of manure |
| 2805022100 | Miscellaneous Area Sources | Ag. Production – Livestock | Dairy cattle - deep pit dairy | Confinement |
| 2805022200 | Miscellaneous Area Sources | Ag. Production – Livestock | Dairy cattle - deep pit dairy | Manure handling and storage |
| 2805022300 | Miscellaneous Area Sources | Ag. Production – Livestock | Dairy cattle - deep pit dairy | Land application of manure |
| 2805023100 | Miscellaneous Area Sources | Ag. Production – Livestock | Dairy cattle - drylot/pasture dairy | Confinement |
| 2805023200 | Miscellaneous Area Sources | Ag. Production – Livestock | Dairy cattle - drylot/pasture dairy | Manure handling and storage |
| 2805023300 | Miscellaneous Area Sources | Ag. Production – Livestock | Dairy cattle - drylot/pasture dairy | Land application of manure |
| 2805025000 | Miscellaneous Area Sources | Ag. Production – Livestock | Swine production composite | Not Elsewhere Classified (see also 28-05-039, -047, -053) |
| 2805030000 | Miscellaneous Area Sources | Ag. Production – Livestock | Poultry Waste Emissions | Not Elsewhere Classified (see also 28-05-007, -008, -009) |
| 2805030007 | Miscellaneous Area Sources | Ag. Production – Livestock | Poultry Waste Emissions | Ducks |
| 2805030008 | Miscellaneous Area Sources | Ag. Production – Livestock | Poultry Waste Emissions | Geese |
| 2805035000 | Miscellaneous Area Sources | Ag. Production – Livestock | Horses and Ponies Waste Emissions | Not Elsewhere Classified |
| 2805039100 | Miscellaneous Area Sources | Ag. Production – Livestock | Swine production - operations with lagoons (unspecified animal age) | Confinement |
| 2805039200 | Miscellaneous Area Sources | Ag. Production – Livestock | Swine production - operations with lagoons (unspecified animal age) | Manure handling and storage |
| 2805039300 | Miscellaneous Area Sources | Ag. Production – Livestock | Swine production - operations with lagoons (unspecified animal age) | Land application of manure |
| 2805040000 | Miscellaneous Area Sources | Ag. Production – Livestock | Sheep and Lambs Waste Emissions | Total |
| 2805045000 | Miscellaneous Area Sources | Ag. Production – Livestock | Goats Waste Emissions | Not Elsewhere Classified |

| SCC | Tier 1 description | Tier 2 description | Tier 3 description | Tier 4 description |
|---|---|---|---|---|
| 2805047100 | Miscellaneous Area Sources | Ag. Production – Livestock | Swine production - deep-pit house operations (unspecified animal age) | Confinement |
| 2805047300 | Miscellaneous Area Sources | Ag. Production – Livestock | Swine production - deep-pit house operations (unspecified animal age) | Land application of manure |
| 2805053100 | Miscellaneous Area Sources | Ag. Production – Livestock | Swine production - outdoor operations (unspecified animal age) | Confinement |

The starting point for the afdust emissions in 2016v3 is the 2017 NEI. The methodologies to estimate emissions for each SCC in the preceding table are described in the 2017 NEI Technical Support Document (EPA, 2021d). The 2017 afdust emissions were adjusted to better represent 2016 as described below.

For paved roads (SCC 2294000000) in non-MARAMA states, the 2017 NEI paved road emissions in afdust were projected to year 2016 based on differences in county total vehicle miles traveled (VMT) between 2017 and 2016:

*2016 afdust paved roads = 2017 afdust paved roads * (2016 county total VMT) / (2017 county total VMT)*

The development of the 2016 VMT is described in the onroad section. VMT data were updated for the 2016v3 to refine the road type distributions in the states of FL, IL, MN, MO, SC, and WV based on data available from the 2020 NEI process. This was done because the 2016v2 and earlier road type distributions had unrealistic spatial distributions of restricted roads. SCCs related to livestock production were backcast using the same factors as were used for the livestock sector. All emissions other than those for paved roads and livestock production are held constant with 2017 levels, including those from unpaved roads.

### *Area Fugitive Dust Transport Fraction*

The afdust sector is separated from other nonpoint sectors to allow for the application of a "transport fraction," and meteorological/precipitation reductions. These adjustments are applied using a script that applies land use-based gridded transport fractions based on landscape roughness, followed by another script that zeroes out emissions for days on which at least 0.01 inches of precipitation occurs or there is snow cover on the ground. The land use data used to reduce the NEI emissions determines the amount of emissions that are subject to transport. This methodology is discussed in Pouliot, et al., 2010, and in "Fugitive Dust Modeling for the 2008 Emissions Modeling Platform" (Adelman, 2012). Both the transport fraction and meteorological adjustments are based on the gridded resolution of the platform (i.e., 12km grid cells); therefore, different emissions will result if the process were applied to different grid resolutions. A limitation of the transport fraction approach is the lack of monthly variability that would be expected with seasonal changes in vegetative cover. While wind speed and direction are not accounted for in the emissions processing, the hourly variability due to soil moisture, snow cover and precipitation is accounted for in the subsequent meteorological adjustment.

For the data compiled into the 2017 NEI, meteorological adjustments are applied to paved and unpaved road SCCs but not transport adjustments. The meteorological adjustments that were applied (to paved and unpaved road SCCs) in the 2017 NEI were backed out so that the entire sector could be processed consistently in SMOKE and the same grid-specific transport fractions and meteorological adjustments could be applied sector-wide. Thus, the FF10 that is run through SMOKE consists of 100% unadjusted

emissions, and after SMOKE all afdust sources have both transport and meteorological adjustments applied. The total impacts of the transport fraction and meteorological adjustments for 2016v2 an 2016v3 are shown in Table 2-9. Note that while totals from AK, HI, PR, and VI are included at the bottom of the table, they are from non-continental U.S. (non-CONUS) modeling domains and are held constant from 2016v1.

**Table 2-9. Total impact of fugitive dust adjustments to the unadjusted 2016 inventory**

| State | Unadjusted PM$_{10}$ | Unadjusted PM$_{2.5}$ | Change in PM$_{10}$ | Change in PM$_{2.5}$ | PM$_{10}$ Reduction | PM$_{2.5}$ Reduction |
|---|---|---|---|---|---|---|
| Alabama | 301,220 | 40,516 | -206,837 | -27,820 | 69% | 69% |
| Arizona | 180,413 | 24,148 | -65,952 | -8,640 | 37% | 36% |
| Arkansas | 389,426 | 53,870 | -261,601 | -35,627 | 67% | 66% |
| California | 307,525 | 38,907 | -133,858 | -16,408 | 44% | 42% |
| Colorado | 276,798 | 40,283 | -138,818 | -19,548 | 50% | 49% |
| Connecticut | 24,307 | 4,007 | -18,293 | -3,032 | 75% | 76% |
| Delaware | 15,263 | 2,346 | -9,201 | -1,422 | 60% | 61% |
| District of Columbia | 2,882 | 406 | -1,804 | -253 | 63% | 62% |
| Florida | 390,779 | 54,511 | -208,568 | -29,187 | 53% | 54% |
| Georgia | 290,522 | 41,465 | -201,028 | -28,482 | 69% | 69% |
| Idaho | 560,472 | 64,931 | -295,880 | -33,156 | 53% | 51% |
| Illinois | 1,107,780 | 159,636 | -679,749 | -97,634 | 61% | 61% |
| Indiana | 144,272 | 26,977 | -95,341 | -17,919 | 66% | 66% |
| Iowa | 385,014 | 56,805 | -222,410 | -32,650 | 58% | 57% |
| Kansas | 668,387 | 88,915 | -300,638 | -39,593 | 45% | 45% |
| Kentucky | 177,018 | 28,904 | -128,875 | -20,989 | 73% | 73% |
| Louisiana | 180,035 | 27,399 | -115,251 | -17,368 | 64% | 63% |
| Maine | 71,295 | 8,735 | -59,096 | -7,251 | 83% | 83% |
| Maryland | 74,347 | 11,904 | -48,034 | -7,748 | 65% | 65% |
| Massachusetts | 61,438 | 9,379 | -47,183 | -7,161 | 77% | 76% |
| Michigan | 292,345 | 38,470 | -213,919 | -27,925 | 73% | 73% |
| Minnesota | 423,012 | 59,575 | -263,321 | -36,486 | 62% | 61% |
| Mississippi | 448,193 | 54,854 | -307,949 | -37,331 | 69% | 68% |
| Missouri | 1,319,996 | 156,248 | -858,902 | -101,313 | 65% | 65% |
| Montana | 501,655 | 66,435 | -277,120 | -35,529 | 55% | 53% |
| Nebraska | 515,575 | 71,436 | -246,621 | -33,630 | 48% | 47% |
| Nevada | 138,466 | 18,305 | -45,931 | -6,047 | 33% | 33% |
| New Hampshire | 20,527 | 4,310 | -16,979 | -3,560 | 83% | 83% |
| New Jersey | 32,466 | 6,059 | -21,778 | -4,015 | 67% | 66% |
| New Mexico | 205,161 | 25,615 | -80,428 | -9,987 | 39% | 39% |
| New York | 238,564 | 33,653 | -178,529 | -25,035 | 75% | 74% |

| State | Unadjusted PM$_{10}$ | Unadjusted PM$_{2.5}$ | Change in PM$_{10}$ | Change in PM$_{2.5}$ | PM$_{10}$ Reduction | PM$_{2.5}$ Reduction |
|---|---|---|---|---|---|---|
| North Carolina | 233,349 | 31,479 | -160,106 | -21,641 | 69% | 69% |
| North Dakota | 397,407 | 61,024 | -211,752 | -32,100 | 53% | 53% |
| Ohio | 273,211 | 42,880 | -182,757 | -28,709 | 67% | 67% |
| Oklahoma | 601,218 | 81,825 | -313,021 | -41,638 | 52% | 51% |
| Oregon | 605,831 | 68,330 | -404,663 | -44,666 | 67% | 65% |
| Pennsylvania | 135,564 | 24,365 | -97,991 | -17,891 | 72% | 73% |
| Rhode Island | 4,641 | 775 | -3,308 | -551 | 71% | 71% |
| South Carolina | 117,181 | 16,266 | -77,402 | -10,817 | 66% | 66% |
| South Dakota | 215,908 | 38,503 | -106,792 | -18,757 | 49% | 49% |
| Tennessee | 140,798 | 25,845 | -95,578 | -17,651 | 68% | 68% |
| Texas | 1,317,935 | 190,982 | -632,794 | -89,482 | 48% | 47% |
| Utah | 165,959 | 21,202 | -84,561 | -10,620 | 51% | 50% |
| Vermont | 76,398 | 8,509 | -65,227 | -7,237 | 85% | 85% |
| Virginia | 124,875 | 20,123 | -90,751 | -14,718 | 73% | 73% |
| Washington | 230,686 | 37,529 | -128,255 | -20,829 | 56% | 56% |
| West Virginia | 86,192 | 11,111 | -72,997 | -9,417 | 85% | 85% |
| Wisconsin | 182,302 | 30,984 | -124,770 | -21,188 | 68% | 68% |
| Wyoming | 542,620 | 60,863 | -272,862 | -30,182 | 50% | 50% |
| **Domain Total (12km CONUS)** | **15,197,226** | **2,091,599** | **-8,875,481** | **-1,210,842** | **58%** | **58%** |
| Alaska (v1) | 112,025 | 110,562 | -101,822 | -10,508 | 91% | 91% |
| Hawaii (v1) | 109,120 | 11,438 | -73,612 | -7,673 | 67% | 67% |
| Puerto Rico (v1) | 5,889 | 1,313 | -4,355 | -984 | 74% | 75% |
| Virgin Islands (v1) | 3,493 | 467 | -1,477 | -195 | 42% | 42% |

Figure 2-1 illustrates the impact of each step of the adjustment. The reductions due to the transport fraction adjustments alone are shown at the top of the figure. The reductions due to the precipitation adjustments alone are shown in the middle of the figure. The cumulative emission reductions after both transport fraction and meteorological adjustments are shown at the bottom of the figure. The top plot shows how the transport fraction has a larger reduction effect in the east, where forested areas are more effective at reducing PM transport than in many western areas. The middle plot shows how the meteorological impacts of precipitation, along with snow cover in the north, further reduce the dust emissions.

**Figure 2-1.  Impact of adjustments to fugitive dust emissions due to transport fraction, precipitation, and cumulative**





### 2.2.2 Agricultural Livestock (livestock)

The livestock sector includes NH3 emissions from fertilizer and emissions of all pollutants other than PM$_{2.5}$ from livestock in the nonpoint (county-level) data category of the 2017NEI. PM$_{2.5}$ from livestock are in the Area Fugitive Dust (afdust) sector. Combustion emissions from agricultural equipment, such as tractors, are in the nonroad sector. The livestock sector includes VOC and HAP VOC in addition to NH3. The 2016v2 and v3 use a 2016 USDA-based county-level back-projection of 2017NEI livestock emissions. The SCCs included in the ag sector are shown in Table 2-10. For 2016v3, corrections were made to the 2016 livestock emissions in Maryland and Illinois. Otherwise, the 2016 livestock emissions in 2016v3 are unchanged from those in 2016v2.

**Table 2-10. SCCs for the livestock sector**

| SCC | Tier 1 description | Tier 2 description | Tier 3 description | Tier 4 description |
|-----|--------------------|--------------------|--------------------|--------------------|
| 2805002000 | Miscellaneous Area Sources | Ag. Production – Livestock | Beef cattle production composite | Not Elsewhere Classified |
| 2805007100 | Miscellaneous Area Sources | Ag. Production – Livestock | Poultry production - layers with dry manure management systems | Confinement |
| 2805009100 | Miscellaneous Area Sources | Ag. Production – Livestock | Poultry production - broilers | Confinement |
| 2805010100 | Miscellaneous Area Sources | Ag. Production – Livestock | Poultry production - turkeys | Confinement |
| 2805018000 | Miscellaneous Area Sources | Ag. Production – Livestock | Dairy cattle composite | Not Elsewhere Classified |
| 2805025000 | Miscellaneous Area Sources | Ag. Production – Livestock | Swine production composite | Not Elsewhere Classified (see also 28-05-039, -047, -053) |

| SCC | Tier 1 description | Tier 2 description | Tier 3 description | Tier 4 description |
|---|---|---|---|---|
| 2805035000 | Miscellaneous Area Sources | Ag. Production – Livestock | Horses and Ponies Waste Emissions | Not Elsewhere Classified |
| 2805040000 | Miscellaneous Area Sources | Ag. Production – Livestock | Sheep and Lambs Waste Emissions | Total |
| 2805045000 | Miscellaneous Area Sources | Ag. Production – Livestock | Goats Waste Emissions | Not Elsewhere Classified |

The 2016v2 and v3 platform livestock emissions consist of a back-projection of 2017 NEI livestock emissions to the year 2016 and include NH3 and VOC. The livestock waste emissions from 2017 NEI contain emissions for beef cattle, dairy cattle, goats, horses, poultry, sheep, and swine. The data come from both state-submitted emissions and EPA-calculated emission estimates. Further information about the 2017 NEI emissions can be found in the 2017 National Emissions Inventory Technical Support Document (EPA, 2021d). Back-projection factors for 2016 emission estimates are based on animal population data from the USDA National Agriculture Statistics Service Quick Stats (https://www.nass.usda.gov/Quick_Stats). These estimates are developed by data collected from annual agriculture surveys and the Census of Agriculture that is completed every five years. These data include estimates for beef, layers, broilers, turkeys, dairy, swine, and sheep. Each SCC in the 2017 NEI livestock inventory, except for 2805035000 (horses and ponies) and 2805045000 (goats), was mapped to one of these USDA categories. Then, back-projection factors were calculated based on USDA animal populations for 2016 and 2017. Emissions for animal categories for which population data were not available (e.g., horses, goats) were held constant in the projection.

Maryland and Illinois year 2016 livestock emissions in 2016v3 are changed from 2016v2 but otherwise the emissions are the same in both platforms. In Maryland, livestock omissions were discovered in the 2017 NEI. The latest version of the 2017 NEI (January 2021) also includes updated Illinois emissions compared to the earlier version of 2017 NEI, resulting in slightly lower NH3 and significantly lower VOC. The 2016v3 year 2016 inventory is based on a backcast of the improved 2017 Illinois and Maryland emissions.

Back-projection factors were calculated at the county level, but only where county-level data were available for a specific animal category. County-level factors were limited to a range of 0.833 to 1.2. Data were not available for every animal category in every county. State-wide back-projection factors based on state total animal populations were calculated and applied to counties where county-specific data was not available for a given animal category. However, data were often not available for every animal category in every state. For categories other than beef and dairy, data are not available for most states. In cases of missing state-level data, a national back-projection factor was applied. Back-projection factors were not pollutant-specific and were applied to all pollutants. The national back-projection factors, which were only used when county or state data were not available, are shown in Table 2-11. The national factors were created using a ratio between animal inventory counts for 2017 and 2016 from the USDA National livestock inventory projections published in February 2018[4].

---

[4] https://www.ers.usda.gov/webdocs/outlooks/87459/oce-2018-1.pdf?v=7587.1

**Table 2-11. National back-projection factors for livestock: 2017 to 2016**

| | |
|---------|-------|
| beef | -1.8% |
| swine | -3.6% |
| broilers | -2.0% |
| turkeys | -0.3% |
| layers | -2.3% |
| dairy | -0.4% |

### 2.2.3 Agricultural Fertilizer (fertilizer)

Fertilizer emissions for 2016 are based on the Fertilizer Emission Scenario Tool for CMAQ (FEST-C) model (https://www.cmascenter.org/fest-c/). These emissions are for SCC 2801700099 (Miscellaneous Area Sources; Ag. Production – Crops; Fertilizer Application; Miscellaneous Fertilizers). The bidirectional version of CMAQ (v5.3.2) and the Fertilizer Emissions Scenario Tool for CMAQ FEST-C (v1.4) were used to estimate ammonia ($NH_3$) emissions from agricultural soils. For 2016v3, a correction to the 2016 livestock emissions was implemented by multiplying by 17/14 to reflect the correct molecular weight for $NH_3$. Otherwise, the fertilizer emissions in 2016v3 are consistent with those in 2016v2.

The approach to estimate year-specific fertilizer emissions consists of these steps:

- Run FEST-C to produce nitrate (NO3), Ammonium (NH4+, including Urea), and organic (manure) nitrogen (N) fertilizer usage estimates.

- Run the CMAQ model with bidirectional ("bidi") NH3 exchange to generate gaseous ammonia NH3 emission estimates.

- Calculate county-level emission factors as the ratio of bidirectional CMAQ NH3 fertilizer emissions to FEST-C total N fertilizer application.

FEST-C is the software program that processes land use and agricultural activity data to develop inputs for the CMAQ model when run with bidirectional exchange. FEST-C reads land use data from the Biogenic Emissions Landuse Dataset (BELD), meteorological variables from the Weather Research and Forecasting (WRF) model, and nitrogen deposition data from a previous or historical average CMAQ simulation. FEST-C, then uses the Environmental Policy Integrated Climate (EPIC) modeling system (https://epicapex.tamu.edu/epic/) to simulate the agricultural practices and soil biogeochemistry and provides information regarding fertilizer timing, composition, application method and amount.

An iterative calculation was applied to estimate fertilizer emissions for the 2016 platform. First, fertilizer application by crop type was estimated using FEST-C modeled data. Then CMAQ v5.3 was run with the Surface Tiled Aerosol and Gaseous Exchange (STAGE) deposition option with bidirectional exchange to estimate fertilizer and biogenic NH3 emissions.

**Figure 2-2. "Bidi" modeling system used to compute 2016 Fertilizer Application emissions**



### Fertilizer Activity Data

The following activity parameters were input into the EPIC model:

- Grid cell meteorological variables from WRF

- Initial soil profiles/soil selection

- Presence of 21 major crops: irrigated and rain fed hay, alfalfa, grass, barley, beans, grain corn, silage corn, cotton, oats, peanuts, potatoes, rice, rye, grain sorghum, silage sorghum, soybeans, spring wheat, winter wheat, canola, and other crops (e.g., lettuce, tomatoes, etc.)

- Fertilizer sales to establish the type/composition of nutrients applied

- Management scenarios for the 10 USDA production regions. These include irrigation, tile drainage, intervals between forage harvest, fertilizer application method (injected versus surface applied), and equipment commonly used in these production regions.

The WRF meteorological model was used to provide grid cell meteorological parameters for year 2016 using a national 12-km rectangular grid covering the continental U.S. The meteorological parameters in Table 2-12 were used as EPIC model inputs.

**Table 2-12. Source of input variables for EPIC**

| EPIC input variable | Variable Source |
|---|---|
| Daily Total Radiation (MJ/m$^2$ ) | WRF |
| Daily Maximum 2-m Temperature (C) | WRF |
| Daily minimum 2-m temperature (C) | WRF |
| Daily Total Precipitation (mm) | WRF |
| Daily Average Relative Humidity (unitless) | WRF |
| Daily Average 10-m Wind Speed (m s$^{-1}$ ) | WRF |
| Daily Total Wet Deposition Oxidized N (g/ha) | CMAQ |
| Daily Total Wet Deposition Reduced N (g/ha) | CMAQ |
| Daily Total Dry Deposition Oxidized N (g/ha) | CMAQ |
| Daily Total Dry Deposition Reduced N (g/ha) | CMAQ |
| Daily Total Wet Deposition Organic N (g/ha) | CMAQ |

Initial soil nutrient and pH conditions in EPIC were based on the 1992 USDA Soil Conservation Service (CSC) Soils-5 survey. The EPIC model then was run for 25 years using current fertilization and agricultural cropping techniques to estimate soil nutrient content and pH for the 2016 EPIC/WRF/CMAQ simulation.

The presence of crops in each model grid cell was determined using USDA Census of Agriculture data (2012) and USGS National Land Cover data (2011). These two data sources were used to compute the fraction of agricultural land in a model grid cell and the mix of crops grown on that land.

Fertilizer sales data and the 6-month period in which they were sold were extracted from the 2014 Association of American Plant Food Control Officials (AAPFCO, http://www.aapfco.org/publications.html). AAPFCO data were used to identify the composition (e.g., urea, nitrate, organic) of the fertilizer used, and the amount applied is estimated using the modeled crop demand. These data were useful in making a reasonable assignment of what kind of fertilizer is being applied to which crops.

Management activity data refers to data used to estimate representative crop management schemes. The USDA Agricultural Resource Management Survey (ARMS, https://www.nass.usda.gov/Surveys/Guide_to_NASS_Surveys/Ag_Resource_Management/) was used to provide management activity data. These data cover 10 USDA production regions and provide management schemes for irrigated and rain fed hay, alfalfa, grass, barley, beans, grain corn, silage corn, cotton, oats, peanuts, potatoes, rice, rye, grain sorghum, silage sorghum, soybeans, spring wheat, winter wheat, canola, and other crops (e.g., lettuce, tomatoes, etc.).

## 2.2.4 Nonpoint Oil and Gas (np_oilgas)

While the major emissions sources associated with oil and gas collection, processing, and distribution have traditionally been included in the National Emissions Inventory (NEI) as point sources (e.g., gas processing plants, pipeline compressor stations, and refineries), the activities occurring "upstream" of these types of facilities have not been as well characterized in the NEI. Here, upstream activities refer to emission units and processes associated with the exploration and drilling of oil and gas wells, and the equipment used at the wellsite to then extract the product from the well and deliver it to a central collection point or processing facility. The types of unit processes found at upstream sites include separators, dehydrators, storage tanks, and compressor engines.

The nonpoint oil and gas (np_oilgas) sector, which consists of oil and gas exploration and production sources, both onshore and offshore (state-owned only). For many states, these emissions are mostly based on the EPA Oil and Gas Tool run with data specific to the year 2016, while some states submitted their own inventory data. For 2016v3, updates were made to 2016 np_oilgas emissions in Colorado, Oklahoma, and Texas in response to comments. Because of the growing importance of these emissions, special consideration is given to the speciation, spatial allocation, and monthly temporalization of nonpoint oil and gas emissions, instead of relying on older, more generalized profiles.

### *EPA Oil and Gas Tool*

EPA developed the 2016 non-point oil and gas inventory for the 2016v2 and v3 platform using the 2017NEI version of the Oil and Gas Emission Estimation Tool (the "Tool") with year 2016 oil and gas production and exploration activity as input into the Tool. The Tool was previously used to estimate emissions for the 2017 NEI. Year 2016 oil and gas activity data were supplied to EPA by some state air agencies, and where state data were not supplied to EPA, EPA populated the 2016v2 inventory with the best available data. The Tool is an Access database that utilizes county-level activity data (e.g., oil production and well counts), operational characteristics (types and sizes of equipment), and emission factors to estimate emissions. The Tool creates a CSV-formatted emissions dataset covering all national nonpoint oil and gas emissions. This dataset is then converted to FF10 format for use in SMOKE modeling. A separate report named "2017 Nonpoint Oil and Gas Emission Estimation Tool Revisions_V1 4_11_2019.docx" (ERG, 2019a) was generated that provides technical details of how the tool was applied for the 2017NEI. This 2017 NEI Tool document can be found at: https://gaftp.epa.gov/air/nei/2017/doc/supporting_data/nonpoint/.

### *Nonpoint Oil and Gas Alternative Datasets*

Some states provided, or recommended use of, a separate emissions inventory for use in 2016v2 platform instead of emissions derived from the EPA Oil and Gas Tool. For example, the California Air Resources Board (CARB) developed their own np_oilgas emissions inventory for 2016 for California that were used for the 2016v1, v2, and v3 platforms.

In Pennsylvania for the 2016v2 and 2016v3 modeling platform, the emissions associated with unconventional wells for year 2016 were supplied by the Pennsylvania Department of Environmental Protection (PA DEP). The Oil and Gas Tool was used to produce the conventional well emissions for 2016. Together these unconventional and conventional well emissions represent the total non-point oil and gas emissions for Pennsylvania.

A major update in 2016v2 was the incorporation of the WRAP oil and gas inventory, which is described in more detail below and in the WRAP Final report (WRAP / Ramboll, 2019). Specifically, production-related emissions from the WRAP inventory were used, along with the exploration-related emissions from the 2017NEI Oil and Gas Tool for the following states: CO, MT, ND, NM, SD, UT, and WY.  The exploration-related emissions were used from the Tool because they likely better align with exploration activity in year 2016 vs the WRAP 2014 inventory which better represented exploration activity for year 2014.

The changes made to 2016v3 year 2016 np_oilgas emissions as compared to 2016v2 are:

- Use the 2016v1 emissions for Colorado production and exploration and continue using the WRAP spatial surrogates per Colorado's request.

- Use the 2016v1 emission for Texas production-related sources and use 2016v2 emissions for exploration-relate sources.

- Use 2017 NEI data for Oklahoma production-related sources and use 2016v2 emissions for exploration-related sources.

### 2.2.5 Residential Wood Combustion (rwc)

The RWC sector includes residential wood burning devices such as fireplaces, fireplaces with inserts, free standing woodstoves, pellet stoves, outdoor hydronic heaters (also known as outdoor wood boilers), indoor furnaces, and outdoor burning in firepits and chimneys.  Free standing woodstoves and inserts are further differentiated into three categories: 1) conventional (not EPA certified); 2) EPA certified, catalytic; and 3) EPA certified, noncatalytic. Generally, the conventional units were constructed prior to 1988.  Units constructed after 1988 had to meet EPA emission standards and they are either catalytic or non-catalytic.  The source classification codes (SCCs) in the RWC sector are listed in Table 2-13. For 2016v3, the 2016 rwc emissions for Idaho were replaced with those from the 2017 NEI, but otherwise the emissions are unchanged from 2016v2.

**Table 2-13. 2016 v1 platform SCCs for the residential wood combustion sector**

| SCC | Tier 1 Description | Tier 2 Description | Tier 3 Description | Tier 4 Description |
|---|---|---|---|---|
| 2104008100 | Stationary Source Fuel Combustion | Residential | Wood | Fireplace: general |
| 2104008210 | Stationary Source Fuel Combustion | Residential | Wood | Woodstove: fireplace inserts; non-EPA certified |
| 2104008220 | Stationary Source Fuel Combustion | Residential | Wood | Woodstove: fireplace inserts; EPA certified; non-catalytic |
| 2104008230 | Stationary Source Fuel Combustion | Residential | Wood | Woodstove: fireplace inserts; EPA certified; catalytic |
| 2104008310 | Stationary Source Fuel Combustion | Residential | Wood | Woodstove: freestanding, non-EPA certified |
| 2104008320 | Stationary Source Fuel Combustion | Residential | Wood | Woodstove: freestanding, EPA certified, non-catalytic |
| 2104008330 | Stationary Source Fuel Combustion | Residential | Wood | Woodstove: freestanding, EPA certified, catalytic |

31

| SCC | Tier 1 Description | Tier 2 Description | Tier 3 Description | Tier 4 Description |
|---|---|---|---|---|
| 2104008400 | Stationary Source Fuel Combustion | Residential | Wood | Woodstove: pellet-fired, general (freestanding or FP insert) |
| 2104008510 | Stationary Source Fuel Combustion | Residential | Wood | Furnace: Indoor, cordwood-fired, non-EPA certified |
| 2104008610 | Stationary Source Fuel Combustion | Residential | Wood | Hydronic heater: outdoor |
| 2104008700 | Stationary Source Fuel Combustion | Residential | Wood | Outdoor wood burning device, NEC (fire-pits, chimneas, etc) |
| 2104009000 | Stationary Source Fuel Combustion | Residential | Firelog | Total: All Combustor Types |

For all states except Idaho, rwc emissions from the 2017NEI were backcast to 2016 using a single projection factor (+3.254%) based on data from EIA/SEDS. Thus, rwc emissions are the same for 2016v2 and v3, with the exception of Idaho where 2017 NEI emissions were used.

## 2.2.6 Solvents (np_solvents)

The np_solvents sector is a diverse collection of emission sources for which emissions are driven by evaporation. Included in this sector are everyday items such as cleaners, personal care products, adhesives, architectural and aerosol coatings, printing inks, and pesticides. These sources exclusively emit organic gases (i.e., VOCs) with origins spanning residential, commercial, institutional, and industrial settings. The organic gases that evaporate from these sources often fulfill other functions than acting as a traditional solvent (e.g., propellants, fragrances, emollients); as such, these emissions are frequently described as volatile chemical products (VCPs).  In the 2016v2 and 2016v3 platforms, these products comprise the np_solvents sector. For 2016v3, updates to the methodology used to compute emissions in the np_solvents sector were implemented

The types of sources in the np_solvents sector include, but are not limited to, solvent utilization for the following:

- surface coatings such as architectural coatings, auto refinishing, traffic marking, textile production, furniture finishing, and coating of paper, plastic, metal, appliances, and motor vehicles;

- degreasing of furniture, metals, auto repair, electronics, and manufacturing;

- dry cleaning, graphic arts, plastics, industrial processes, personal care products, household products, adhesives and sealants; and
- asphalt application, roofing asphalt, and pesticide application.

For the 2016v3 platform, emissions for the np_solvents sector are derived using the VCPy framework (Seltzer et al., 2021).  The VCPy framework is based on the principle that the magnitude and speciation of organic emissions from this sector are directly related to (1) the mass of chemical products used, (2) the composition of these products, (3) the physiochemical properties of their constituents that govern volatilization, and (4) the timescale available for these constituents to evaporate. National product usage is preferentially estimated using economic statistics from the U.S. Census Bureau's Annual Survey of Manufacturers (U.S. Census Bureau, 2021), commodity prices from the U.S. Department of

Transportation's 2012 Commodity Flow Survey (U.S. Department of Transportation, 2015) and the U.S. Census Bureau's Paint and Allied Products Survey (U.S. Census Bureau, 2011), and producer price indices, which scale commodity prices to target years, are retrieved from the Federal Reserve Bank of St. Louis (U.S. Bureau of Labor Statistics, 2020).

In circumstances in which data are unavailable, default usage estimates were derived using functional solvent usage reported by a business research company (The Freedonia Group, 2016) or in sales reported in a California Air Resources Board (CARB) California-specific survey (CARB, 2019). The composition of products is estimated by generating composites from various CARB surveys (CARB, 2007; CARB, 2012; CARB 2014; CARB, 2018; CARB, 2019) and profiles reported in the U.S. EPA's SPECIATE database (EPA, 2019). The physiochemical properties of all organic components are generated from the quantitative structure-activity relationship model OPERA (Mansouri et al., 2018) and the characteristic evaporation timescale of each component is estimated using previously published methods (Khare and Gentner, 2018; Weschler and Nazaroff, 2008).

National-level emissions were allocated to the county-level using several proxies. Most emissions are allocated using population as an allocation surrogate. This includes all cleaners, personal care products, adhesives, architectural coatings, and aerosol coatings. Industrial coatings, allied paint products, printing inks, and dry-cleaning emissions are allocated using county-level employment statistics from the U.S. Census Bureau's County Business Patterns (U.S. Census Bureau, 2018) and follow the same mapping scheme used in the EPA's 2017 National Emissions Inventory (EPA, 2021d). Agricultural pesticides are allocated using county-level agricultural pesticide use, as taken from the 2017 NEI and traffic marking coatings are allocated using estimates of vehicular lane miles traveled on paved roads from the Federal Highway Administration and MOVES model. All activity data reflects the most recently available dataset.

Unlike the 2016v2 modeling platform, the 2016v3 reconciles point and nonpoint emissions for which SCCs overlap using point source subtraction. Point source subtraction was performed at the county-level using estimates of uncontrolled point source emissions. Uncontrolled point source emission calculations were calculated, as necessary, using the submitted point source emissions, engineering judgement, and an assumed control efficiency.

In addition, methodological updates to the underlying nonpoint solvents model made since the release of the 2016v2 modeling platform were incorporated in 2016v3 to make the methods consistent with those used to estimate emissions for the 2020 NEI. These updates include: (1) indoor usage assumptions at the product-level to modulate evaporation characteristics, and (2) control assumptions for select states that have implemented reduction strategies for select consumer and commercial products, as well as architectural and industrial maintenance coatings. Details for all methodology can be found in the Nonpoint Emissions Methodology and Operator Instructions (NEMO) document for the 2020 NEI.

Finally, remaining updates made in response to comments include: (1) reintroduction of all asphalt paving emissions from the 2017 NEI, (2) reintroduction of non-VOC CAPs and HAPs that were not included in the 2016v2 modeling platform but are included in the 2017 NEI, (3) reintroduction of CAP and HAP emissions for the SCCs 2440020000, 2401010000, 2440000000, 2461023000, 2461800001, 2461800002, 2401050000, 2401045000, 2401035000, 2461000000, and 2461160000, all of which were not included in the 2016v2 modeling platform but were included in the 2017 NEI, and (4) removal of emissions from 2420000000 and 2425000000 from Colorado, per Colorado's request to avoid double counting.

## 2.2.7 Nonpoint (nonpt)

The starting points for the 2016v3 nonpt inventories is the 2017 NEI. The nonpt sector includes all nonpoint sources that are not included in the sectors afdust, livestock, fertilizer, cmv_c1c2, cmv_c3, np_oilgas, rail, rwc, or np_solvents. The types of sources in the nonpt sector include, but are not limited to:

- stationary source fuel combustion, including industrial, commercial, and residential and orchard heaters;

- commercial sources such as commercial cooking;

- industrial processes such as chemical manufacturing, metal production, mineral processes, petroleum refining, wood products, fabricated metals, and refrigeration;

- storage and transport of petroleum for uses such as gasoline service stations, aviation, and marine vessels;

- storage and transport of chemicals;

- waste disposal (including composting);

- miscellaneous non-industrial sources such as cremation, hospitals, lamp breakage, and automotive repair shops;

- bulk gasoline terminals;

- portable gas cans;

- cellulosic biorefining;

- biomass fuel combustion;

- stage 1 refueling emissions at gas stations;

- and any construction agricultural dust or waste that is not part of the afdust or livestock sectors.

For 2016v3, all emissions in nonpt were taken from 2017 NEI, although some for some SCCs adjustments were applied to reflect 2016 levels.  For biomass fuel combustion, 2017 NEI data were backcast to 2016 by applying a 4.27% reduction for industrial emissions and a 0.15% reduction for commercial emissions. Refueling emissions at gas stations in the nonpt sector were interpolated to 2016 between 2002 NEI and 2017 NEI levels.

The use of 2017 NEI for nonpt replaced the overrides that were needed for the 2016v2 and 2016v1 platforms, including removal of emissions for SCCs for Industrial (2102004000) and Commercial/Institutional (2103004000) Distillate Oil, Total: Boilers and Internal Combustion (IC) Engines in New Jersey and removal of Industrial, Commercial, Institutional (ICI) Wood emissions (2102008000) PM2.5 emissions in Alabama. in the beta version of this emissions modeling platform and were significantly higher than other states' ICI Wood emissions, be removed from 2016v1 platform

## 2.3     2016 Onroad Mobile sources (onroad)

Onroad mobile source include emissions from motorized vehicles operating on public roadways.  These include passenger cars, motorcycles, minivans, sport-utility vehicles, light-duty trucks, heavy-duty trucks,

and buses. The sources are further divided by the fuel they use, including diesel, gasoline, E-85, and compressed natural gas (CNG) vehicles. The sector characterizes emissions from parked vehicle processes (e.g., starts, hot soak, and extended idling) as well as from on-network processes (i.e., from vehicles as they move along the roads). Except for California, all onroad emissions are generated using the SMOKE-MOVES emissions modeling framework that leverages MOVES-generated emission factors, county and SCC-specific activity data, and hourly meteorological data. The onroad source classification codes (SCCs) in the modeling platform are more finely resolved than those in the National Emissions Inventory (NEI). The NEI SCCs distinguish vehicles and fuels. The SCCs used in the modeling platform also distinguish between emissions processes (i.e., off-network, on-network, and extended idle), and road types. For 2016v3, updates from 2016v2 consisted of updated activity data for starts in 20 Georgia counties; corrected road type distributions and hoteling for Florida, Illinois, Minnesota, Missouri, South Carolina, and West Virginia; and corrected emission factors for combination long haul trucks nationwide.

Onroad emissions were computed with SMOKE-MOVES by multiplying appropriate vehicle activity data by the corresponding emission factors for the process. This section includes discussions of the activity data and the emission factor development. The vehicles (aka source types) for which MOVES3 computes emissions are shown in Table 2-14. SMOKE-MOVES was run for specific modeling grids. Emissions for the contiguous U.S. states and Washington, D.C., were computed for a grid covering those areas. For the 2016v1 platform, missions for Alaska, Hawaii, Puerto Rico, and the U.S. Virgin Islands were computed by running SMOKE-MOVES for distinct grids covering each of those regions and are included in the onroad_nonconus sector. In some summary reports these non-CONUS emissions are aggregated with emissions from the onroad sector. Onroad emissions computations outside of the contiguous U.S. were not updated in the 2016v2 or 2016v3 platforms.

**Table 2-14. MOVES vehicle (source) types**

| MOVES vehicle type | Description | HPMS vehicle type |
|:---:|:---|:---:|
| 11 | Motorcycle | 10 |
| 21 | Passenger Car | 25 |
| 31 | Passenger Truck | 25 |
| 32 | Light Commercial Truck | 25 |
| 41 | Other Bus | 40 |
| 42 | Transit Bus | 40 |
| 43 | School Bus | 40 |
| 51 | Refuse Truck | 50 |
| 52 | Single Unit Short-haul Truck | 50 |
| 53 | Single Unit Long-haul Truck | 50 |
| 54 | Motor Home | 50 |
| 61 | Combination Short-haul Truck | 60 |
| 62 | Combination Long-haul Truck | 60 |

## 2.3.1 Onroad Activity Data Development

SMOKE-MOVES uses vehicle miles traveled (VMT), vehicle population (VPOP), vehicle starts, hours of off-network idling (ONI), and hours of hoteling, to calculate emissions. These datasets are collectively known as "activity data". For each of these activity datasets, first a national dataset was developed; this national dataset is called the "EPA default" dataset. The default dataset started with the 2017 NEI activity

data, which was then scaled back to 2016 using Federal Highway Administration (FHWA) VM-2 trends. Second, data submitted by state and local agencies were incorporated where available, in place of the EPA default data. EPA default activity was used for California, but the emissions were scaled to California-supplied values during the emissions processing. The agencies for which 2016 submitted data, or 2017 submitted VMT and VPOP data backcast to 2016, were used for the 2016v2 and v3 platforms are shown in Table 2-15. The 2017 NEI submissions are shown table to indicate states for which the 2016 data were backcast from 2017 NEI activity data, in the event that no 2016-specific data were submitted.

**Table 2-15. Submitted data used to prepare 2016v2 onroad activity data**

| Agency | 2016 VMT | 2016 VPOP | 2017 NEI |
|---|---|---|---|
| Alaska | | | yes |
| Arizona – Maricopa | | | yes |
| Arizona – Pima | yes | yes | yes |
| Colorado | yes | yes | |
| Connecticut | yes | yes | yes |
| Delaware | | | yes |
| District of Columbia | | | yes |
| Florida | | | yes |
| Georgia | yes | yes | yes |
| Idaho | | | yes |
| Illinois - Chicago area | yes | yes | |
| Illinois - rest of state | yes | yes | yes |
| Indiana - Louisville area | yes | | |
| Kentucky – Jefferson | yes | yes | yes |
| Kentucky - Louisville exurbs | yes | | |
| Maine | | | yes |
| Maryland | yes | yes | yes |
| Massachusetts | yes | yes | yes |
| Michigan - Detroit area | yes | yes | |
| Michigan - rest of state | yes | yes | yes |
| Minnesota | yes | yes | yes |
| Missouri | | | yes |
| Nevada – Clark | yes | yes | yes |
| Nevada – Washoe | | | yes |
| New Hampshire | yes | yes | yes |
| New Jersey | yes | yes | yes |
| New York | | | yes |
| North Carolina | yes | yes | yes |
| Ohio | | | yes |
| Pennsylvania | yes | yes | yes |
| Rhode Island | | | yes |
| South Carolina | yes | yes | yes |
| Tennessee – Davidson | | | yes |
| Tennessee – Knox | | | yes |

| Agency | 2016 VMT | 2016 VPOP | 2017 NEI |
|---|---|---|---|
| Texas | | | yes |
| Vermont | | | yes |
| Virginia | yes | yes | yes |
| Washington | | | yes |
| West Virginia | yes | yes | yes |
| Wisconsin | yes | yes | yes |

## *Vehicle Miles Traveled (VMT)*

VMT data specific to 2016 were used where states provided it, and for the remaining states, 2016 VMT data were backcast from 2017 NEI data. To compute default 2016 data for states that did not provide 2016-specific data, EPA backcast the 2017 NEI VMT (including state submitted 2017 data) to 2016. The 2017 NEI Technical Support Document has details on the development of the 2017 VMT (EPA, 2021d). The factors to adjust VMT from 2017 to 2016 were based on VMT data from the FHWA county-level VM-2 reports similar to the state-level reports at https://www.fhwa.dot.gov/policyinformation/statistics/2016/vm2.cfm and https://www.fhwa.dot.gov/policyinformation/statistics/2017/vm2.cfm. For most states, EPA calculated county-road type adjustment factors based on FHWA VM-2 County data for 2017 and 2016. Separate adjustment factors were calculated by vehicle type for each of the four MOVES road types. Some states have a very different distribution of urban activity versus rural activity between 2017NEI and the FHWA data, due to inconsistencies in the definition of urban versus rural between the data sets. For those counties, a single county-wide projection factor based on total FHWA VMT across all road types was applied to all VMT independent of road type. County-total-based (instead of county+road-type) factors were used for all counties in IN, MS, MO, NM, TN, TX, and UT because many counties had large increases in one particular road type and decreases in another road type. State-total-based factors were used for all counties in Alaska and Puerto Rico because county level data were questionable. Note that Alaska and Hawaii emissions have not yet been recomputed using MOVES3-based emission factors. State total differences between the 2017 NEI and 2016 VMT data for all states are provided in Table 2-16.

**Table 2-16. State total differences between 2017 NEI and 2016 VMT data**

| State | 2017 NEI-2016 % | State | 2017 NEI-2016 % |
|---|---|---|---|
| Alabama | 2.1% | Montana | 0.4% |
| Alaska | 4.9% | Nebraska | 1.5% |
| Arizona | 0.5% | Nevada | -4.6% |
| Arkansas | 1.8% | New Hampshire | 1.6% |
| California | 1.1% | New Jersey | 0.8% |
| Colorado | 2.3% | New Mexico | 6.4% |
| Connecticut | 0.6% | New York | 1.3% |
| Delaware | 2.8% | North Carolina | -0.2% |
| District of Columbia | 2.5% | North Dakota | -0.2% |
| Florida | -8.4% | Ohio | 0.7% |
| Georgia | 4.2% | Oklahoma | 0.8% |
| Hawaii | 1.1% | Oregon | 0.0% |

| Idaho | 0.5% | Pennsylvania | 0.3% |
|---|---|---|---|
| Illinois | -0.8% | Rhode Island | -2.7% |
| Indiana | -1.5% | South Carolina | 0.9% |
| Iowa | 0.4% | South Dakota | 2.0% |
| Kansas | 0.5% | Tennessee | 1.4% |
| Kentucky | 0.2% | Texas | 7.0% |
| Louisiana | 0.1% | Utah | 0.5% |
| Maine | -0.7% | Vermont | 0.1% |
| Maryland | 1.6% | Virgin Islands | 0.5% |
| Massachusetts | 5.5% | Virginia | 0.0% |
| Michigan | 1.0% | Washington | 2.1% |
| Minnesota | 1.9% | West Virginia | 0.7% |
| Mississippi | 0.3% | Wisconsin | 2.3% |
| Missouri | 2.5% | Wyoming | 2.2% |

For the 2016 platforms, VMT data submitted by state and local agencies were incorporated and used in place of EPA defaults.  Note that VMT data need to be provided to SMOKE for each county and SCC. The onroad SCCs characterize vehicles by MOVES fuel type, vehicle (aka source) type, emissions process, and road type.  Any VMT provided at a different resolution than this were converted to a full county-SCC resolution to prepare the data for processing by SMOKE. Details the on pre-processing of submitted VMT and VPOP are provided in the TSD Preparation of Emissions Inventories for the 2016v1 North American Emissions Modeling Platform (EPA, 2021c). Some of the provided data were adjusted following quality assurance, as described below in the VPOP section.

To ensure consistency in the 21/31/32 splits across the country, all state-submitted VMT for MOVES vehicle types 21, 31, and 32 (all of which are part of HPMS vehicle type 25) was summed, and then re-split using the 21/31/32 splits from the EPA 2016v2 default VMT. VMT for each source type as a percentage of total 21/31/32 VMT was calculated by county from the EPA default VMT. Then, state-submitted VMT for 21/31/32 were summed and then re-split according to those percentages. This was done for all states and counties listed above which submitted VMT for 2016. Most of the states listed above did not provide VMT down to the source type, so splitting the light-duty vehicle VMT does not create an inconsistency with state-provided data in those states. Exceptions are New Hampshire and Pennsylvania: those two states provided SCC-level VMT, but these were reallocated to 21/31/32 so that the splits are performed in a consistent way across the country. The 21/31/32 splits in the EPA default VMT are based on the 2017 NEI VPOP data obtained from IHS-Polk through the Coordinating Research Council (CRC) A-115 project (CRC, 2019).

For 2016v3, total 2016 VMT is unchanged from 2016v2.  However, road type distributions were updated to be consistent with those in 2020 NEI in Florida, Illinois, Minnesota, Missouri, South Carolina, and West Virginia to correct anomalies found in the 2016v1 and 2016v2 data.

### *Speed Activity (SPEED/SPDIST)*

In SMOKE 4.7, SMOKE-MOVES was updated to use speed distributions similarly to how they are used when running MOVES in inventory mode. This new speed distribution file, called SPDIST, specifies the amount of time spent in each MOVES speed bin for each county, vehicle (aka source) type, road type,

weekday/weekend, and hour of day. This file contains the same information at the same resolution as the Speed Distribution table used by MOVES but is reformatted for SMOKE. Using the SPDIST file results in a SMOKE emissions calculation that is more consistent with MOVES than the old hourly speed profile (SPDPRO) approach, because emission factors from all speed bins can be used, rather than interpolating between the two bins surrounding the single average speed value for each hour as is done with the SPDPRO approach.

As was the case with the previous SPDPRO approach, the SPEED inventory that includes a single overall average speed for each county, SCC, and month, must still be read in by the SMOKE program Smkinven. SMOKE requires the SPEED dataset to exist even when speed distribution data are available, even though only the speed distribution data affects the selection of emission factors. The SPEED and SPDIST datasets are carried over from 2017NEI and are based on a combination of the CRC A-100 (CRC, 2017) project data and 2017 NEI MOVES CDBs. There were no changes to the speed activity from 2016v2 to 2016v3.

### *Vehicle Population (VPOP)*

The EPA default VPOP dataset was developed similarly to the default VMT dataset described above. In the areas where we backcast 2017 NEI VMT:

> 2016v2 VPOP = 2016v2 VMT * (VPOP/VMT ratio by county-SCC6).

where the ratio by county-SCC is based on 2017NEI with MOVES3 fuel splits. In the areas where 2016v1 used VMT re-split to MOVES3 fuels, 2016v3 VPOP = 2016v2 = 2016v1 VPOP with two re-splits: First, source types 21/31/32 were re-split according to 2017 NEI EPA default county-specific 21/31/32 splits so that the whole country has consistent 21/31/32 splits. Next, fuels were re-split to MOVES3 fuels. There are some areas where 2016 VMT was submitted but 2016 VPOP was not; those areas use the 2016v1 VPOP (with re-splits). The same method was applied to the 2016 EPA default VMT to produce an EPA default VPOP data set. There were no changes to the VPOP from 2016v2 to v3.

### *Hoteling Hours (HOTELING)*

Hoteling hours activity data are used to calculate emissions from extended idling and auxiliary power units (APUs) for heavy duty diesel vehicles. Previously, states have commented that EPA estimates of hoteling hours, and therefore emissions resulting from hoteling, are higher than they could be in reality given the available parking spaces in some places. Therefore, recent hoteling activity datasets, including the 2016v1, v2, and v3 platforms, incorporate reductions to hoteling activity data based on the availability of truck stop parking spaces in each county, as described below. Starting with 2016v1, hoteling hours were recomputed using a new factor identified by EPA's Office of Transportation and Air Quality as more appropriate based on recent studies.

The method used is the following:

- Start with 2016 VMT for source type 62 on restricted roads, by county.

- Multiply that by 0.007248 hours/mile (EPA, 2020). (Note that this results in about 73.5% less hoteling hours as compared to the 2014NEIv2 approach.)

- Apply parking space reductions to keep hoteling within the estimated maximum hours by county, except for states that requested we not do that (CO, ME, NJ, NY).

Hoteling hours were adjusted down in counties for which there were more hoteling hours assigned to the county than could be supported by the known parking spaces.  To compute the adjustment, the hoteling hours for the county were computed using the above method, and then reductions were applied to the 2016 hoteling hours based on known parking space availability so that there were not more hours assigned to the county than the available parking spaces could support if they were full every hour of every day of the year.

A dataset of truck stop parking space availability with the total number of parking spaces per county was used in the computation of the adjustment factors. This same dataset is used to develop the spatial surrogate for hoteling emissions. For the 2016v1 platform, the parking space dataset included several updates compared to 2016beta platform, based on information provided by some states (e.g., MD). Since there are 8,784 hours in the year 2016; the maximum number of possible hoteling hours in a particular county is equal to 8,784 * the number of parking spaces in that county. Hoteling hours for each county were capped at that theoretical maximum value for 2016 in that county, with some exceptions as outlined below. The parking space dataset used in the hoteling hour computations was unchanged in 2016v2 and 2016v3.

Because the truck stop parking space dataset may be incomplete in some areas, and trucks may sometimes idle in areas other than designated spaces, it was assumed that every county has at least 12 parking spaces, even if fewer parking spaces are found in the parking space dataset. Therefore, hoteling hours are never reduced below 105,408 hours for the year in any county. If the unreduced hoteling hours were already below that maximum, the hours were left unchanged; in other words, hoteling activity are never increased as a result of this analysis.

A handful of high activity counties that would otherwise be subject to a large reduction were analyzed individually to see if their parking space count seemed unreasonably low. In the following counties, the parking space count and/or the reduction factor was manually adjusted:

- 17043 / DuPage IL (instead of reducing hoteling by 84%, applied no adjustment)

- 39061 / Hamilton OH (parking spot count increased to 20 instead of the minimum 12)

- 47147 / Robertson TN (parking spot count increased to 52 instead of just 26)

- 51015 / Augusta VA (parking space count increased to 48 instead of the minimum 12)

- 51059 / Fairfax VA (parking spot count increased to 20 instead of the minimum 12)

Some state-specific hoteling hours data and methods were applied in the 2016 platforms:

- Georgia and New Jersey submitted hoteling activity for the 2016v1 platform, which was carried through into the 2016v2 and v3 platforms along with incorporating an updated APU factor for 2016 based on MOVES3. For these states, the EPA default hoteling hours were replaced with their state data. New Jersey provided their hoteling activity in a series of HotellingHours MOVES-formatted tables, which include separate activity for weekdays and weekends and for each month

40

and which have units of hours-per-week. These data were converted to annual totals by county so they could be used.

- Alaska Department of Natural Resources staff requested that hoteling activity be set to zero in several counties due to the nature of driving patterns in their region.

- There are no hoteling hours or other emissions from long-haul combination trucks in Hawaii, Puerto Rico, or the Virgin Islands.

- The states of Colorado, Maine, New Jersey, and New York requested that no reductions be applied to the hoteling activity based on parking space availability. For these states, we no reductions were applied based on parking space availability and in the case of New Jersey, their submitted activity data were unchanged.

Finally, the county total hoteling was split into separate values for extended idling (SCC 2202620153) and APUs (SCC 2202620191). Compared to earlier versions of MOVES, APU percentages have been lowered for MOVES3. A 5.19% APU split was used for the year 2016, meaning that APUs are used for 5.19% of the hoteling hours. This APU percentage was applied nationwide, including in states where hoteling activity was submitted.

For 2016v2, hoteling was calculated as: 2016v2 HOTELING = 2017NEI HOTELING * 2016v2 VMT/2017NEI VMT. This is effectively consistent with applying the 0.007248 factor directly to the 2016v2 VMT. Then, for counties that provided 2017 hoteling but did not have vehicle type 62 restricted VMT in 2016 – that is, counties that should have hoteling, but do not have any VMT to calculate it from – the 2017 hoteling was backcast to 2016 using the FHWA-based county total 2017 to 2016 trend. Finally, the annual parking-space-based caps for hoteling hours were applied as described above. The same caps were used as for 2017NEI, except recalculated for a leap year (multiplied by 366/365).

For the 2016v3, road type distributions and/or hoteling were adjusted in states where there was hoteling in every county in the state: FL, IL, MN, MO, SC, and WV. 2016v2 VMT in those six states was redistributed by road type based on 2020 NEI road type distributions (by county/vehicle, with county/HPMS filling in where a county/vehicle isn't available in 2020 NEI), and then hoteling was recalculated based on the new VMT in those six states using the standard VMT/HOTELING factor and parking space adjustments. Notably, this resulted in an overall increase in hoteling in Missouri, although hoteling is now in fewer counties). Hoteling hours in other states were unchanged between 2016v2 and 2016v3.

### *Starts*

Onroad "start" emissions are the instantaneous exhaust emissions that occur at the engine start (e.g., due to the fuel rich conditions in the cylinder to initiate combustion) as well as the additional running exhaust emissions that occur because the engine and emission control systems have not yet stabilized at the running operating temperature. Operationally, start emissions are defined as the difference in emissions between an exhaust emissions test with an ambient temperature start and the same test with the engine and emission control systems already at operating temperature. As such, the units for start emission rates are instantaneous: grams/start.

MOVES3 uses vehicle population information to sort the vehicle population into source bins defined by vehicle source type, fuel type (gas, diesel, etc.), regulatory class, model year and age. The model uses

default data from instrumented vehicles (or user-provided values) to estimate the number of starts for each source bin and to allocate them among eight operating mode bins defined by the amount of time parked ("soak time") prior to the start. Thus, MOVES3 accounts for different amounts of cooling of the engine and emission control systems. Each source bin and operating mode has an associated g/start emission rate. Start emissions are also adjusted to account for fuel characteristics, LD inspection and maintenance programs, and ambient temperatures.

2016 STARTS = 2016 VMT * (2017 STARTS/ 2017 VMT by county&SCC6)

For 2016v3, Georgia Environmental Protection Division provided new weekday activity for starts per day for 20 counties. These new starts were used for the weekdays for those 20 counties, while MOVES default starts/day were used for weekend days. Since annual activity data are required by the FF10 activity file format, the number of starts/day was multiplied by the number of weekdays and weekends in the year to calculate the annual total starts for the 20 counties by county and source type. The starts for light duty vehicle source types 21, 31, and 32 were summed and then re-split between the 21, 31, and 32 sources types based on splits from EPA default activity data, so that 21/31/32 splits are from a consistent data source nationwide. Since George only provided their activity data by county and vehicle type, the 2016v2 splits were used as the basis for distribution of the starts to fuel type and month. Starts outside of Georgia were unchanged in 2016v3 from 2016v2 levels.

### *Off-network Idling Hours*

Off-network idling hours (ONI) activity data were needed to support the computation of ONI emissions with MOVES3. ONI is defined in MOVES as time during which a vehicle engine is running idle and the vehicle is somewhere other than on a roadway, such as in a parking lot, a driveway, or at the side of the road. This engine activity contributes to total mobile source emissions but does not take place on the road network. Examples of when ONI activity occurs include:

- light duty passenger vehicles idling while waiting to pick up children at school or to pick up passengers at the airport or train station,

- single unit and combination trucks idling while loading or unloading cargo or making deliveries, and

- vehicles idling at drive-through restaurants.

Note that ONI does not include idling that occurs on a roadway, such as idling at traffic signals, stop signs, and in traffic—these emissions are included as part of the running and crankcase running exhaust processes on the other road types. ONI also does not include long-duration idling by long-haul combination trucks (hoteling/extended idle), as that type of long duration idling is accounted for in other MOVES processes.

ONI activity hours were calculated based on VMT. For each representative county, the ratio of ONI hours to onroad VMT (on all road types) was calculated using the MOVES ONI Tool by source type, fuel type, and month. These ratios were then multiplied by each county's total VMT (aggregated by source type, fuel type, and month) to obtain hours of ONI activity. There were no changes to the ONI activity data between 2016v2 and 2016v3.

## 2.3.2 MOVES Emission Factor Table Development

For 2016v2, MOVES3 was run in emission rate mode to create emission factor tables using CB6 speciation for the years 2016, 2023, and 2026, for all representative counties and fuel months. For 2016v3, MOVES3 was rerun for combination trucks to correct an issue with the age distribution for that source type in 2016v2. For 2016v1, MOVES2014b was run for all counties in Alaska, Hawaii, and Virgin Islands, and for a single representative county in Puerto Rico and those emissions were retained in 2016v2 and 2016v3.

The county databases CDBs used to run MOVES3 to develop the emission factor tables were derived from those used for the 2017 NEI and therefore included any updated data provided and accepted for the 2017 NEI process. The 2017 NEI development included an extensive review of the various tables including speed distributions were performed. Where state speed profiles, speed distributions. and temporal profiles data were not accepted from S/L submissions, those data were obtained from the CRC A-100 study. Once the data tables for 2017 NEI were incorporated into the CDBs, a new set of representative counties was developed as part of the EQUATES project for the years 2002-2017 and was slightly expanded for 2016v2.[5] Each county in the continental U.S. was classified according to its state, altitude (high or low), fuel region, the presence of inspection and maintenance programs, the mean light-duty age, and the fraction of ramps. A binning algorithm was executed to identify "like counties", and then specific requests for representative county groups by states for the 2017 NEI were honored. The result was 332 representative counties (up from 315 in 2016v1) as shown in Figure 2-3.
For more information on the development of the 2016 age distributions and representative counties and the review of the input data, see the memoranda "Onroad 2016-23-26-32_Documentation_20210824 _clean.docx" and "CMAQ_Representative_Counties_Analysis_20201009_addFY23-26-32 Parameters.xlsx" (ERG, 2021). There are no changes to representative counties between 2016v2 and 2016v3, although there are some changes for analytic year representative county assignments as noted above and discussed in more detail in Section 4.3.2.

Age distributions are a key input to MOVES in determining emission rates. The base year CDB age distributions were shifted back one year from 2017 to 2016 in all counties so that the recession of 2008-2009 is reflected for the 2008-2009 model years instead of being shifted by one year. The 2016 age distributions were then grown to the analytic years of 2023 and 2026 everywhere except Alaska. Alaska age distributions were not changed in the analytic year because the 2016 distributions did not show a recession dip around model year 2009 and the vehicle populations looked sparse compared to other areas. The age distributions for 2016v2 were updated based on vehicle registration data obtained from the CRC A-115 project, subject to reductions for older vehicles determined according to CRC A-115 methods but using additional age distribution data that became available as part of the 2017 NEI submitted input data. One of the findings of CRC project A-115 was that IHS data contain higher vehicle populations than state agency analyses of the same Department of Motor Vehicles data, and the discrepancies tend to increase with increasing vehicle age (i.e., there are more older vehicles in the IHS data). The CRC project dealt with the discrepancy by releasing datasets based on raw (unadjusted) information and adjusted sets of age distributions, where the adjustments reflected the differences in population by model year of 2014 IHS data and 2014 submitted data from a single state.

---

[5] One new representative county in Kentucky was added: Kenton County (FIPS code 21117) due to a change for year 2018. Four new representative counties in North Carolina were added for the 2016, 2023, and 2026 runs: 37019, 37159, 37077, and 37135 due to inspection and maintenance programs changing in future years. In addition, one Nebraska county (FIPS code 31115) was moved into a similar group (representative county 31047) due to a small vehicle population and similar mean light-duty vehicle age.

**Figure 2-3. Representative Counties in 2016v2 and 2016v3**



For the 2017 NEI, and for the 2016v2 platform, EPA repeated the CRC's assessment of IHS vs. state vehicles by age, but with updated information from the 2017 NEI and for more states.  The 2017 light-duty vehicle (LDV) populations from the CRC A-115 project were compared by model year to the populations submitted by state/local (S/L) agencies for the 2017 NEI.  The comparisons by model year were used to develop adjustment factors that remove older LDVs from the IHS dataset. Out of 31 S/L agencies that provided age distribution and vehicle population data for the 2017 NEI, sixteen agencies provided LDV population and age distributions with snapshot dates of January 2017, July 2017, or 2018.  The other fifteen agencies had either unknown or older (e.g., 2013) data pull dates, so were not compared to the 2017 IHS data.  The vehicle populations by model year were compared with IHS data for each of the sixteen agencies for source type 21 (passenger cars) and for source type 31 plus 32 (light trucks) together.  Prior to finalizing the activity data, the S/L agency populations of passenger cars (source type 21) and light trucks (source types 31 and 21) were matched to IHS car and light-duty truck splits by county so that vehicles of the same model and year were consistently classified into MOVES source types throughout the country.  The IHS population of vehicles were found to be higher than the pooled state data by 6.5 percent for cars and 5.9 percent for light trucks.

To adjust for the additional vehicles in the IHS data, vehicle age distribution adjustment factors of one (1) minus the fraction of vehicles to remove from IHS to equal the state data were applied, with two exceptions: (1) the model year range 2007 to 2017 received no adjustment and (2) the model years 1987 and earlier received a capped adjustment that equals the adjustment to 1988. Table 2-17 below shows the fraction of vehicles to keep by model year based on this analysis.  The adjustments were applied to the 2016 IHS-based age distributions from CRC project A-115 prior to their use in 2016v1. In addition, the

age distributions to ensure the "tail" of the distribution corresponding to age 30 years and older vehicles did not exceed 20% of the fleet. After limiting the age distribution tails, the age distributions were renormalized to ensure they summed to one (1). In addition, antique license plate vehicles were removed based on the registration summary from IHS. Nationally, the prevalence of antique plates is only 0.8 percent, but is as high as 6 percent in some states (e.g., Mississippi).

**Table 2-17. Fraction of IHS Vehicle Populations to Retain for 2016v1 and 2017 NEI**

| Model Year | Cars | Light |
|---|---|---|
| pre-1989 | 0.675 | 0.769 |
| 1989 | 0.730 | 0.801 |
| 1990 | 0.732 | 0.839 |
| 1991 | 0.740 | 0.868 |
| 1992 | 0.742 | 0.867 |
| 1993 | 0.763 | 0.867 |
| 1994 | 0.787 | 0.842 |
| 1995 | 0.776 | 0.865 |
| 1996 | 0.790 | 0.881 |
| 1997 | 0.808 | 0.871 |
| 1998 | 0.819 | 0.870 |
| 1999 | 0.840 | 0.874 |
| 2000 | 0.838 | 0.896 |
| 2001 | 0.839 | 0.925 |
| 2002 | 0.864 | 0.921 |
| 2003 | 0.887 | 0.942 |
| 2004 | 0.926 | 0.953 |
| 2005 | 0.941 | 0.966 |
| 2006 | 1 | 0.987 |
| 2007-2017 | 1 | 1 |

In addition to removing the older and antique plate vehicles from the IHS data, 25 counties found to be outliers because their fleet age was significantly younger than in typical counties. The outlier review was limited to LDV source types 21, 31, and 32. Many rural counties have outliers for low-population source types such as Transit Buses and Refuse Trucks due to small sample sizes, but these do not have much of an impact on the inventory overall and reflect sparse data in low-population areas and therefore do not require correction.

The most extreme examples of LDV outliers were Light Commercial Truck age distributions where over 50 percent of the population in the entire county is 0 and 1 years old. These sorts of young fleets can happen if the headquarters of a leasing or rental company is the owner/entity of a relatively large number of vehicles relative to the county-wide population. While the business owner of thousands of new vehicles may reside in a single county, the vehicles likely operate in broader areas without being registered where they drive. To avoid creating artificial low spots of LDV emissions in these outlier counties, data for all counties with more than 35% new vehicles were excluded from the final set of grouped age distributions that went into the CDBs.

The final year 2016 age distributions were then grouped using a population-weighted average of the source type populations of each county in the representative county group. The resulting end-product was age distributions for each of the 13 source types in each of the 332 representative counties for 2016v2. The long-haul truck source types 53 (Single Unit) and 62 (Combination Unit) are based on a nationwide

average due to the long-haul nature of their operation. There were no changes to the age distributions from 2016v2 to v3 except for the recomputation of combination long haul truck age distributions based on data available from the 2020 NEI process.

To create the emission factors for 2016v2, MOVES3 was run separately for each representative county and fuel month and for each temperature bin needed for calendar year 2016. For 2016v3, MOVES was rerun for combination long haul trucks (source type 62) to reflect the updated age distributions and as a result the emissions for source type 62 changed nationwide. The CDBs used to run MOVES include the state-specific control measures such as the California low emission vehicle (LEV) program and the fuels were updated to represent calendar year 2016.  In addition, the range of temperatures run along with the average humidities used were specific to the year 2016. The MOVES results were post-processed into CSV-formatted emission factor tables that can be read by SMOKE-MOVES.

### 2.3.3 Onroad California Inventory Development (onroad_ca)

The California Air Resources Board (CARB) provided their own onroad emissions inventories based on their EMFAC2017 model. EMFAC2017 was run by CARB for the years 2016, 2023, 2028, and 2035. These inventories each include separate totals for on-network and off-network emissions, but they do not include $NH_3$ or refueling.  California emissions were run through SMOKE-MOVES as a separate sector from the rest of the country.  The California onroad sector is called "onroad_ca_adj".  Changes from 2016v1 include:

- CARB refueling was backcast from 2017NEI to 2016 using MOVES trends, and then SMOKE-MOVES was adjusted to match the backcast refueling.

- California $NH_3$ was set to MOVES state total NH3, distributed to county-SCC following the distribution of carbon monoxide (CO) as a surrogate for activity.

- For source types other than 62 where CARB provided "idling" emissions, those emissions were mapped to ONI. For source type 62, the CARB-provided "idling" was split between hoteling and ONI. For all other vehicle types (where CARB did not provide "idling" – generally LD vehicles), CARB running exhaust was split between RPD and ONI. Using the updated ONI activity has some effect on distributions of CARB emissions and the non-CARB portion of the emissions (e.g., NH3).

While most source type emission factors used in California remain unchanged from 2016v2, for 2016v3 the newly available emission factors for source type 62 (combination long haul trucks) were used which impacted the emissions of $NH_3$ and refueling slightly.

## 2.4     2016 Nonroad Mobile sources (cmv, rail, nonroad)

The nonroad mobile source emission modeling sectors consist of nonroad equipment emissions (nonroad), locomotive (rail), and CMV emissions.

### 2.4.1 Category 1, Category 2 Commercial Marine Vessels (cmv_c1c2)

The 2016v3 CMV emissions are based on the emissions developed for the 2017 NEI and are the same as those used in the 2016v2 platform, except that for 2016v3 the spatial allocation to county boundaries was improved in response to comments. More specifically, in 2016v3, the CMV emissions were allocated to each county by 1-hour AIS location rather than using the centroid of the grid cell to assign the county in which the emissions occurred. The improvement to county boundary allocation impacts the assignment of the emissions to some counties, such as in the New York-New Jersey area, but the total emissions by

model grid cell are unchanged. Sulfur dioxide (SO2) emissions reflect rules that reduced sulfur emissions for CMV that took effect in the year 2015. The cmv_c1c2 inventory sector contains small to medium-size engine CMV emissions. Category 1 and Category 2 (C1C2) marine diesel engines typically range in size from about 700 to 11,000 hp. These engines are used to provide propulsion power on many kinds of vessels including tugboats, towboats, supply vessels, fishing vessels, and other commercial vessels in and around ports. They are also used as stand-alone generators for auxiliary electrical power on many types of vessels. Category 1 represents engines up to 7 liters per cylinder displacement. Category 2 includes engines from 7 to 30 liters per cylinder.

The cmv_c1c2 inventory sector contains sources that traverse state and federal waters along with emissions from surrounding areas of Canada, Mexico, and international waters. The cmv_c1c2 sources are modeled as point sources but using plume rise parameters that cause the emissions to be released in the ground layer of the air quality model.

The cmv_c1c2 sources within state waters are identified in the inventory with the Federal Information Processing Standard (FIPS) county code for the state and county in which the vessel is registered. The cmv_c1c2 sources that operate outside of state waters but within the Emissions Control Area (ECA) are encoded with a state FIPS code of 85. The ECA areas include parts of the Gulf of Mexico, and parts of the Atlantic and Pacific coasts. The cmv_c1c2 sources in the 2016 inventory are categorized as operating either in-port or underway and as main and auxiliary engines are encoded using the SCCs listed in Table 2-18.

### Table 2-18. SCCs for cmv_c1c2 sector

| SCC | Tier 1 Description | Tier 2 Description | Tier 3 Description | Tier 4 Description |
|------------|---------------------|---------------------|---------------------|---------------------|
| 2280002101 | C1/C2 | Diesel | Port | Main |
| 2280002102 | C1/C2 | Diesel | Port | Auxiliary |
| 2280002201 | C1/C2 | Diesel | Underway | Main |
| 2280002202 | C1/C2 | Diesel | Underway | Auxiliary |

Category 1 and 2 CMV emissions were developed for the 2017 NEI,[6] The 2017 NEI emissions were developed based signals from Automated Identification System (AIS) transmitters. AIS is a tracking system used by vessels to enhance navigation and avoid collision with other AIS transmitting vessels. The USEPA Office of Transportation and Air Quality received AIS data from the U.S. Coast Guard (USCG) in order to quantify all ship activity which occurred between January 1 and December 31, 2017. The provided AIS data extends beyond 200 nautical miles from the U.S. coast (Figure 2-4). This boundary is roughly equivalent to the border of the U.S Exclusive Economic Zone and the North American ECA, although some non-ECA activity are captured as well.

---

[6] Category 1 and 2 Commercial Marine Vessel 2017 Emissions Inventory (ERG, 2019b).

**Figure 2-4. 2017NEI/2016 platform geographical extent (solid) and U.S. ECA (dashed)**



The AIS data were compiled into five-minute intervals by the USCG, providing a reasonably refined assessment of a vessel's movement. For example, using a five-minute average, a vessel traveling at 25 knots would be captured every two nautical miles that the vessel travels. For slower moving vessels, the distance between transmissions would be less. The ability to track vessel movements through AIS data and link them to attribute data, has allowed for the development of an inventory of very accurate emission estimates with excellent resolution in time and space. These AIS data were used to define the locations of individual vessel movements, estimate hours of operation, and quantify propulsion engine loads. The compiled AIS data also included the vessel's International Marine Organization (IMO) number and Maritime Mobile Service Identifier (MMSI); which allowed each vessel to be matched to their characteristics obtained from the Clarksons ship registry (Clarksons, 2018).

USEPA used the engine bore and stroke data to calculate cylinder volume. Any vessel that had a calculated cylinder volume greater than 30 liters was incorporated into the USEPA's new Category 3 Commercial Marine Vessel (C3CMV) model. The remaining records were assumed to represent Category 1 and 2 (C1C2) or non-ship activity. The C1C2 AIS data were quality assured including the removal of duplicate messages, signals from pleasure craft, and signals that were not from CMV vessels (e.g., buoys, helicopters, and vessels that are not self-propelled). Following this, there were 422 million records remaining.

The emissions were calculated for each time interval between consecutive AIS messages for each vessel and allocated to the location of the message following to the interval. Emissions were calculated according to **Equation 2-1**.

$$Emissions_{interval} = Time\ (hr)_{interval} \times Power(kW) \times EF(g/kWh) \times LLAF \qquad \textbf{Equation 2-1}$$

Power is calculated for the propulsive (main), auxiliary, and auxiliary boiler engines for each interval and emission factor (EF) reflects the assigned emission factors for each engine, as described below. LLAF represents the low load adjustment factor, a unitless factor which reflects increasing propulsive emissions during low load operations. Time indicates the activity duration time between consecutive intervals.

Next, vessels were identified in order determine their vessel type, and thus their vessel group, power rating, and engine tier information which are required for the emissions calculations. See the 2017 NEI documentation for more details on this process.  Following the identification, 108 different vessel types were matched to the C1C2 vessels. Vessel attribute data was not available for all these vessel types, so the vessel types were aggregated into 13 different vessel groups for which surrogate data were available as shown in Table 2-19.  11,302 vessels were directly identified by their ship and cargo number. The remaining group of miscellaneous ships represent 13 percent of the AIS vessels (excluding recreational vessels) for which a specific vessel type could not be assigned.

**Table 2-19. Vessel groups in the cmv_c1c2 sector**

| Vessel Group | NEI Area Ship Count |
|---|---:|
| Bulk Carrier | 37 |
| Commercial Fishing | 1,147 |
| Container Ship | 7 |
| Ferry Excursion | 441 |
| General Cargo | 1,498 |
| Government | 1,338 |
| Miscellaneous | 1,475 |
| Offshore support | 1,149 |
| Reefer | 13 |
| Ro | 26 |
| Tanker | 100 |
| Tug | 3,994 |
| Work Boat | 77 |
| Total in Inventory: | 11,302 |

As shown in **Equation 2-1**, power is an important component of the emissions computation. Vessel-specific installed propulsive power ratings and service speeds were pulled from Clarksons ship registry and adopted from the Global Fishing Watch (GFW) dataset when available. However, there is limited vessel specific attribute data for most of the C1C2 fleet. This necessitated the use of surrogate engine power and load factors, which were computed for each vessel group shown in Table 2-19.  In addition to the power required by propulsive engines, power needs for auxiliary engines were also computed for each vessel group.  Emissions from main and auxiliary engines are inventoried with different SCCs as shown in Table 2-18.

The final components of the emissions computation equation are the emission factors and the low load adjustment factor.  The emission factors used in this inventory take into consideration the EPA's marine vessel fuel regulations as well as exhaust standards that are based on the year that the vessel was

manufactured to determine the appropriate regulatory tier. Emission factors in g/kWhr by tier for $NO_x$, $PM_{10}$, $PM_{2.5}$, CO, $CO_2$, $SO_2$ and VOC were developed using Tables 3-7 through 3-10 in USEPA's (2008) Regulatory Impact Analysis on engines less than 30 liters per cylinder. To compile these emissions factors, population-weighted average emission factors were calculated per tier based on C1C2 population distributions grouped by engine displacement. Boiler emission factors were obtained from an earlier Swedish Environmental Protection Agency study (Swedish EPA, 2004). If the year of manufacture was unknown then it was assumed that the vessel was Tier 0, such that actual emissions may be less than those estimated in this inventory. Without more specific data, the magnitude of this emissions difference cannot be estimated.

Propulsive emissions from low-load operations were adjusted to account for elevated emission rates associated with activities outside the engines' optimal operating range. The emission factor adjustments were applied by load and pollutant, based on the data compiled for the Port Everglades 2015 Emission Inventory.[7] Hazardous air pollutants and ammonia were added to the inventory according to multiplicative factors applied either to VOC or $PM_{2.5}$.

For more information on the emission computations for 2017, see the supporting documentation for the 2017 NEI C1C2 CMV emissions. The emissions from the 2017 NEI were adjusted to represent 2016 in the cmv_c1c2 sector using factors derived from U.S. Army Corps of Engineers national vessel Entrance and Clearance data[8] by applying a factor of 0.98 to all pollutants (based on EIA fuel use data). For consistency, the same methods were used for California, Canadian, and other non-U.S. emissions. The 2017 emissions were mapped to 2016 dates so that the activity occurred on the same day of the week in the same sequential week of the year in both years. Emissions that occurred on a federal holiday in 2017 were mapped to the same holiday on the corresponding 2016 date. Individual vessels that released emissions within the same grid cell for over 400 hours were flagged as hoteling. The emissions from the hoteling vessels were scaled to the 400-hour cap.

### 2.4.2 Category 3 Commercial Marine Vessels (cmv_c3)

The 2016v3 CMV emissions are based on the emissions developed for the 2017 NEI and are the same as those used in the 2016v2 platform, except that for 2016v3 the spatial allocation to county boundaries was improved in response to comments. The cmv_c3 inventory are the same as those in the 2016v1 platform and were developed in conjunction with the CMV inventory for the 2017 NEI. This sector contains large engine CMV emissions. Category 3 (C3) marine diesel engines are those at or above 30 liters per cylinder, typically these are the largest engines rated at 3,000 to 100,000 hp. C3 engines are typically used for propulsion on ocean-going vessels including container ships, oil tankers, bulk carriers, and cruise ships. Emissions control technologies for C3 CMV sources are limited due to the nature of the residual

---

[7] USEPA. EPA and Port Everglades Partnership: Emission Inventories and Reduction Strategies. US Environmental Protection Agency, Office of Transportation and Air Quality, June 2018. https://nepis.epa.gov/Exe/ZyPDF.cgi?Dockey=P100UKV8.pdf.

[8] U.S. Army Corps of Engineers (USACE). Foreign Waterborne Transportation: Foreign Cargo Inbound and Outbound Vessel Entrances and Clearances. US Army Corps of Engineers, 2018.

fuel used by these vessels.[9]  The cmv_c3 sector contains sources that traverse state and federal waters; along with sources in waters not covered by the NEI in surrounding areas of Canada, Mexico, and international waters.

The cmv_c3 sources that operate outside of state waters but within the federal Emissions Control Area (ECA) are encoded with a FIPS state code of 85, with the "county code" digits representing broad regions such as the Atlantic, Gulf of Mexico, and Pacific.  The ECA areas include parts of the Gulf of Mexico, and parts of the Atlantic and Pacific coasts.  CMV C3 sources around Puerto Rico, Hawaii and Alaska, which are outside the ECA areas, are included in the 2016v1 inventory but are in separate files from the emissions around the continental United States (CONUS). The cmv_c3 sources in the 2016v2 inventory are categorized as operating either in-port or underway and are encoded using the SCCs listed in Table 2-20. and distinguish between diesel and residual fuel, in port areas versus underway, and main and auxiliary engines.  In addition to C3 sources in state and federal waters, the cmv_c3 sector includes emissions in waters not covered by the NEI (FIPS = 98) and taken from the "ECA-IMO-based" C3 CMV inventory.[10] The ECA-IMO inventory is also used for allocating the FIPS-level emissions to geographic locations for regions within the domain not covered by the AIS selection boxes as described in the next section.

**Table 2-20. SCCs for cmv_c3 sector**

| SCC | Tier 1 Description | Tier 2 Description | Tier 3 Description | Tier 4 Description |
|---|---|---|---|---|
| 2280002103 | C3 | Diesel | Port | Main |
| 2280002104 | C3 | Diesel | Port | Auxiliary |
| 2280002203 | C3 | Diesel | Underway | Main |
| 2280002204 | C3 | Diesel | Underway | Auxiliary |
| 2280003103 | C3 | Residual | Port | Main |
| 2280003104 | C3 | Residual | Port | Auxiliary |
| 2280003203 | C3 | Residual | Underway | Main |
| 2280003204 | C3 | Residual | Underway | Auxiliary |

Prior to creation of the 2017 NEI, the EPA received Automated Identification System (AIS) data from United States Coast Guard (USCG) to quantify all ship activity which occurred between January 1 and December 31, 2017. The International Maritime Organization's (IMO's) International Convention for the Safety of Life at Sea (SOLAS) requires AIS to be fitted aboard all international voyaging ships with gross tonnage of 300 or more, and all passenger ships regardless of size.[11] In addition, the USCG has mandated that all commercial marine vessels continuously transmit AIS signals while transiting U.S. navigable waters. As the vast majority of C3 vessels meet these requirements, any omitted from the inventory due to lack of AIS adoption are deemed to have a negligible impact on national C3 emissions estimates. The activity described by this inventory reflects ship operations within 200 nautical miles of the official U.S.

---

[9] https://www.epa.gov/regulations-emissions-vehicles-and-engines/regulations-emissions-marine-vessels.
[10] https://www.epa.gov/sites/production/files/2017-08/documents/2014v7.0_2014_emismod_tsdv1.pdf.
[11] International Maritime Organization (IMO) Resolution MSC.99(73) adopted December 12th. 2000 and entered into force July 1st, 2002; as amended by SOLAS Resolution CONF.5/32 adopted December 13th, 2002.

baseline. This boundary is roughly equivalent to the border of the U.S Exclusive Economic Zone and the North American ECA, although some non-ECA activity is captured as well (Figure 2-4).

The 2017 NEI data were computed based on the AIS data from the USCG for the year of 2017.  The AIS data were coupled with ship registry data that contained engine parameters, vessel power parameters, and other factors such as tonnage and year of manufacture which helped to separate the C3 vessels from the C1C2 vessels.  Where specific ship parameters were not available, they were gap-filled. The types of vessels that remain in the C3 data set include bulk carrier, chemical tanker, liquified gas tanker, oil tanker, other tanker, container ship, cruise, ferry, general cargo, fishing, refrigerated vessel, roll-on/roll-off, tug, and yacht.

Prior to use, the AIS data were reviewed - data deemed to be erroneous were removed, and data found to be at intervals greater than 5 minutes were interpolated to ensure that each ship had data every five minutes. The five-minute average data provide a reasonably refined assessment of a vessel's movement. For example, using a five-minute average, a vessel traveling at 25 knots would be captured every two nautical miles that the vessel travels. For slower moving vessels, the distance between transmissions would be less.

The emissions were calculated for each C3 vessel in the dataset for each 5-minute time range and allocated to the location of the message following to the interval. Emissions were calculated according to **Equation 2-2**.

$$Emissions_{interval} = Time\ (hr)_{interval} \times Power(kW) \times EF(g/kWh) \times LLAF \qquad \textbf{Equation 2-2}$$

Power is calculated for the propulsive (main), auxiliary, and auxiliary boiler engines for each interval and emission factor (EF) reflects the assigned emission factors for each engine, as described below. LLAF represents the low load adjustment factor, a unitless factor which reflects increasing propulsive emissions during low load operations. Time indicates the activity duration time between consecutive intervals.

Emissions were computed according to a computed power need (kW) multiplied by the time (hr) and by an engine-specific emission factor (g/kWh) and finally by a low load adjustment factor that reflects increasing propulsive emissions during low load operations.

The resulting emissions were available at 5-minute intervals.  Code was developed to aggregate these emissions to modeling grid cells and up to hourly levels so that the emissions data could be input to SMOKE for emissions modeling with SMOKE.  Within SMOKE, the data were speciated into the pollutants needed by the air quality model,[12] but since the data were already in the form of point sources at the center of each grid cell, and they were already hourly, no other processing was needed within SMOKE.  SMOKE requires an annual inventory file to go along with the hourly data, so those files were also generated for each year.

---

[12] Ammonia ($NH_3$) was also added by SMOKE in the speciation step.

On January 1st, 2015, the ECA initiated a fuel sulfur standard which regulated large marine vessels to use fuel with 1,000 ppm sulfur or less. These standards are reflected in the cmv_c3 inventories.

There were some areas needed for modeling that the AIS request boxes did not cover (see Figure 2-4). These include a portion of the St. Lawrence Seaway transit to the Great Lakes, a small portion of the Pacific Ocean far offshore of Washington State, portions of the southern Pacific Ocean around off the coast of Mexico, and the southern portion of the Gulf of Mexico that is within the 36-km domain used for air quality modeling. In addition, a determination had to be made regarding whether to use the existing Canadian CMV inventory or the more detailed AIS-based inventory. The AIS-based inventory was used in the areas for which data were available, and the areas not covered were gap-filled with inventory data from the 2016beta platform, which included data from ECCC and the 2011 ECA-IMO C3 inventory.

For the gap-filled areas not covered by AIS selected data areas or the ECCC inventory, the 2016 nonpoint C3 inventory provided by ECCC was converted to a point inventory to support plume rise calculations for C3 vessels. The nonpoint emissions were allocated to point sources using a multi-step allocation process because not all of the inventory components had a complete set of county-SCC combinations. In the first step, the county-SCC sources from the nonpoint file were matched to the county-SCC points in the 2011 ECA-IMO C3 inventory. The ECA-IMO inventory contains multiple point locations for each county-SCC. The nonpoint emissions were allocated to those points using the $PM_{2.5}$ emissions at each point as a weighting factor.

For cmv_c3 underway emissions without a matching FIPS in the ECA-IMO inventory were allocated using the 12 km 2014 offshore shipping activity spatial surrogate (surrogate code 806). Each county with underway emissions in the area inventory was allocated to the centroids of the cells associated with the respective county in the surrogate. The emissions were allocated using the weighting factors in the surrogate.

The resulting point emissions centered on each grid cell were converted to an annual point 2010 flat file format (FF10). A set of standard stack parameters were assigned to each release point in the cmv_c3 inventory. The assigned stack height was 65.62 ft, the stack diameter was 2.625 ft, the stack temperature was 539.6 °F, and the velocity was 82.02 ft/s. Emissions were computed for each grid cell needed for modeling.

### _Adjustment of the 2017 NEI CMV C3 to 2016_

Because the NEI emissions data were for 2017, an analysis was performed of 2016 versus 2017 entrance and clearance data (ERG, 2019c). Annual, monthly, and daily level data were reviewed. Annual ratios of entrance and clearance activity were developed for each ship type as shown in Table 2-21. For vessel types with low populations (C3 Yacht, tug, barge, and fishing vessels), an annual ratio of 0.98 was applied. The 2017 emissions were mapped to 2016 dates so that the activity occurred on the same day of the week in the same sequential week of the year in both years. Emissions that occurred on a federal holiday in 2017 were mapped to the same holiday on the corresponding 2016 date. Individual vessels that

53

released emissions within the same grid cell for over 400 hours were flagged as hoteling. The emissions from the hoteling vessels were scaled to the 400-hour cap.

**Table 2-21. 2017 to 2016 projection factors for C3 CMV**

| Ship Type | Annual Ratio[a] |
|-----------|-----------------|
| Barge | 1.551 |
| Bulk Carrier | 1.067 |
| Chemical Tanker | 1.031 |
| Container Ship | 1.0345 |
| Cruise | 1.008 |
| Ferry Ro Pax | 1.429 |
| General Cargo | 0.888 |
| Liquified Gas Tanker | 1.192 |
| Miscellaneous Fishing | 0.932 |
| Miscellaneous Other | 1.015 |
| Offshore | 0.860 |
| Oil Tanker | 1.101 |
| Other Tanker | 1.037 |
| Reefer | 0.868 |
| Ro Ro | 1.007 |
| Service Tug | 1.074 |

[a] The above ratios were applied to the 2017 emission values to estimate 2016 values; thus ratios > 1 mean that emissions were larger in 2016

The cmv_c3 projection factors were pollutant-specific and region-specific. Most states are mapped to a single region with a few exceptions.  Pennsylvania and New York were split between the East Coast and Great Lakes, Florida was split between the Gulf Coast and East Coast, and Alaska was split between Alaska East and Alaska West. The non-federal factors listed in this table were applied to sources outside of U.S. federal waters (FIPS 98). Volatile Organic Compound (VOC) Hazardous Air Pollutant (HAP) emissions were projected using the VOC factors. NH3 emissions were computed by multiplying PM2.5 by 0.019247.

### 2.4.3 Railway Locomotives (rail)

There were no changes to the rail sector emissions inventories between 2016v1 and 2016v2 aside from updating emissions for seven rail yards in Georgia. There were no changes between the 2016v2 and 2016v3 rail emissions. The rail sector includes all locomotives in the NEI nonpoint data category. The rail sector SCCs are shown in Table 2-22.  This sector excludes railway maintenance activities.  Railway maintenance emissions are included in the nonroad sector.  The point source yard locomotives are included in the ptnonipm sector.  In 2014NEIv2, rail yard locomotive emissions were present in both the nonpoint (rail sector) and point (ptnonipm sector) inventories.  For the 2016v1 and 2016v2 platforms, rail yard locomotive emissions are only in the ptnonipm sector of the point inventory.  Therefore, SCC 2285002010 is not present in the rail sector, except in three California counties because the California Air

Resources Board (CARB) submitted rail emissions, including rail yards, for 2016v1 platform. In three counties, CARB's rail yard emissions could not be mapped to point source rail yards, and so those counties' emissions were included in the rail sector.

**Table 2-22. 2016v1 SCCs for the Rail Sector**

| SCC | Sector | Description: Mobile Sources prefix for all |
|---|---|---|
| 2285002006 | rail | Railroad Equipment; Diesel; Line Haul Locomotives: Class I Operations |
| 2285002007 | rail | Railroad Equipment; Diesel; Line Haul Locomotives: Class II / III Operations |
| 2285002008 | rail | Railroad Equipment; Diesel; Line Haul Locomotives: Passenger Trains (Amtrak) |
| 2285002009 | rail | Railroad Equipment; Diesel; Line Haul Locomotives: Commuter Lines |
| 2285002010 | rail | Railroad Equipment; Diesel; Yard Locomotives (nonpoint) |
| 28500201 | rail | Railroad Equipment; Diesel; Yard Locomotives (point) |

**Class I Line-haul Methodology**

In 2008 air quality planners in the eastern US formed the Eastern Technical Advisory Committee (ERTAC) for solving persistent emissions inventory issues. This work is the fourth inventory created by the ERTAC rail group. For the 2016 inventory, the Class I railroads granted ERTAC Rail permission to use the confidential link-level line-haul activity GIS data layer maintained by the Federal Railroad Administration (FRA). In addition, the Association of American Railroads (AAR) provided national emission tier fleet mix information. This allowed ERTAC Rail to calculate weighted emission factors for each pollutant based on the percentage of the Class I line-haul locomotives in each USEPA Tier level category. These two datasets, along with 2016 Class I line-haul fuel use data reported to the Surface Transportation Board (Table 2-23), were used to create a link-level Class I emissions inventory, based on a methodology recommended by Sierra Research. Rail Fuel Consumption Index (RFCI) is a measure of fuel use per ton mile of freight. This link-level inventory is nationwide in extent, but it can be aggregated at either the state or county level.

**Table 2-23. Class I Railroad Reported Locomotive Fuel Use Statistics for 2016**

| Class I Railroads | 2016 R-1 Reported Locomotive Fuel Use (gal/year) | | RFCI (ton-miles/gal) | Adjusted RFCI (ton-miles/gal) |
|---|---|---|---|---|
| | Line-Haul* | Switcher | | |
| BNSF | 1,243,366,255 | 40,279,454 | 972 | 904 |
| Canadian National | 102,019,995 | 6,570,898 | 1,164 | 1,081 |
| Canadian Pacific | 56,163,697 | 1,311,135 | 1,123 | 1,445 |
| CSX Transportation | 404,147,932 | 39,364,896 | 1,072 | 1,044 |
| Kansas City Southern | 60,634,689 | 3,211,538 | 989 | 995 |
| Norfolk Southern | 437,110,632 | 28,595,955 | 920 | 906 |
| Union Pacific | 900,151,933 | 85,057,080 | 1,042 | 1,095 |
| **Totals:** | **3,203,595,133** | **204,390,956** | **1,006** | **993** |

* Includes work trains; Adjusted RFCI values calculated from FRA gross ton-mile data. RFCI total is ton-mile weighted mean.

Annual default emission factors for locomotives based on operating patterns ("duty cycles") and the estimated nationwide fleet mixes for both switcher and line-haul locomotives are available.   However, Tier level fleet mixes vary significantly between the Class I and Class II/III railroads.  As can be seen in Figure 2-5 and Figure 2-6, Class I railroad activity is highly regionalized in nature and is subject to variations in terrain across the country which can have a significant impact on fuel efficiency and overall fuel consumption.

**Figure 2-5. 2016 US Railroad Traffic Density in Millions of Gross Tons per Route Mile (MGT)**



**Figure 2-6. Class I Railroads in the United States[5]**



For the 2016 inventory, the AAR provided a national line-haul Tier fleet mix profile representing the entire Class I locomotive fleet.  A locomotive's Tier level determines its allowable emission rates based on the year when it was built and/or re-manufactured.  The national fleet mix data was then used to calculate weighted average in-use emissions factors for the line-haul locomotives operated by the Class I railroads as shown in Table 2-24.

**Table 2-24. 2016 Line-haul Locomotive Emission Factors by Tier, AAR Fleet Mix (grams/gal)**

| Tier Level | AAR Fleet Mix Ratio | $PM_{10}$ | HC | $NO_x$ | CO |
|---|---|---|---|---|---|
| Uncontrolled (pre-1973) | 0.047494 | 6.656 | 9.984 | 270.4 | 26.624 |
| Tier 0 (1973-2001) | 0.188077 | 6.656 | 9.984 | 178.88 | 26.624 |
| Tier 0+ (Tier 0 rebuilds) | 0.141662 | 4.16 | 6.24 | 149.76 | 26.624 |
| Tier 1 (2002-2004) | 0.029376 | 6.656 | 9.776 | 139.36 | 26.624 |
| Tier 1+ (Tier 1 rebuilds) | 0.223147 | 4.16 | 6.032 | 139.36 | 26.624 |
| Tier 2 (2005-2011) | 0.124536 | 3.744 | 5.408 | 102.96 | 26.624 |
| Tier 2+ (Tier 2 rebuilds) | 0.093607 | 1.664 | 2.704 | 102.96 | 26.624 |
| Tier 3 (2012-2014) | 0.123113 | 1.664 | 2.704 | 102.96 | 26.624 |
| Tier 4 (2015 and later) | 0.028988 | 0.312 | 0.832 | 20.8 | 26.624 |
| **2016 Weighted EF's** | **1.000000** | **4.117** | **6.153** | **138.631** | **26.624** |

Based on values in EPA Technical Highlights:  Emission Factors for Locomotives, EPA Office of Transportation and Air Quality, EPA-420-F-09-025, April 2009.

Weighted Emission Factors (EF) per pollutant for each gallon of fuel used (grams/gal or lbs/gal) were calculated for the US Class I locomotive fleet based on the percentage of line-haul locomotives certified at each regulated Tier level (Equation 2-3).

$$EF_i = \sum_{T=1}^{10} (EF_{iT} * f_T)$$

Equation 2-3

where:

| | | |
|---|---|---|
| $EF_i$ | = | Weighted Emission Factor for pollutant $i$ for Class I locomotive fleet (g/gal). |
| $EF_{iT}$ | = | Emission Factor for pollutant $i$ for locomotives in Tier T (g/gal). |
| $f_T$ | = | Percentage of the Class I locomotive fleet in Tier T expressed as a ratio. |

While actual engine emissions will vary within Tier level categories, the approach described above likely provides reasonable emission estimates, as locomotive diesel engines are certified to meet the emission standards for each Tier. It should be noted that actual emission rates may increase over time due to engine wear and degradation of the emissions control systems. In addition, locomotives may be operated in a manner that differs significantly from the conditions used to derive line-haul duty-cycle estimates.

Emission factors for other pollutants are not Tier-specific because these pollutants are not directly regulated by USEPA's locomotive emission standards. $PM_{2.5}$ was assumed to be 97% of $PM_{10}$, the ratio of volatile organic carbon (VOC) to (hydrocarbon) HC was assumed to be 1.053, and the emission factors used for sulfur dioxide ($SO_2$) and ammonia ($NH_3$) were 0.0939 g/gal and 83.3 mg/gal, respectively. The 2016 $SO_2$ emission factor is based on the nationwide adoption of 15 ppm ultra-low sulfur diesel (ULSD) fuel by the rail industry.

The remaining steps to compute the Class I rail emissions involved calculating Class I railroad-specific rail fuel consumption index values and calculating emissions per link. The final link-level emissions for each pollutant were then aggregated by state/county FIPS code and then converted into an FF10 file format for input to SMOKE. More detail on these steps is described in the specification sheet for the 2016v1 rail sector emissions.

**Rail yard Methodology**

Rail yard emissions were computed based on fuel use and/or yard switcher locomotive counts for the class I rail companies for all of the rail yards on their systems. Three railroads provided complete rail yard datasets: BNSF, UP, and KCS. CSX provided switcher counts for its 14 largest rail yards. This reported activity data was matched to existing yard locations and data stored in USEPA's Emissions Inventory System (EIS) database. All existing EIS yards that had activity data assigned for prior years, but no reported activity data for 2016 were zeroed out. New yard data records were generated for reported locations that were not found in EIS. Special care was made to ensure that the new yards added to EIS did not duplicate existing data records. Data for non-Class I yards was carried forward from the 2014 NEI. Georgia provided updates on seven rail yards that were incorporated into 2016v2.

Since the railroads only supplied switcher counts, average fuel use per switcher values was calculated for each railroad. This was done by dividing each company's 2016 R-1 yard fuel use total by the number of switchers reported for each railroad. These values were then used to allocate fuel use to each yard based on the number of switchers reported for that location. Table 2-25 summarizes the 2016 yard fuel use and switcher data for each Class I railroad. The emission factors used for rail yard switcher engines are shown in Table 2-26.

**Table 2-25. Surface Transportation Board R-1 Fuel Use Data – 2016**

| Railroad | 2016 R-1 Yard Fuel Use (gal) | ERTAC calculated Fuel Use (gal) | Identified Switchers | ERTAC per Switcher Fuel Use (gal) |
|---|---|---|---|---|
| BNSF | 40,279,454 | 40,740,317 | 442 | 92,173 |
| CSXT | 39,364,896 | 43,054,795 | 455 | 94,626 |
| CN | 6,570,898 | 6,570,898 | 103 | 63,795 |
| KCS | 3,211,538 | 3,211,538 | 176 | 18,247 |
| NS | 28,595,955 | 28,658,528 | 458 | 62,573 |
| CPRS | 1,311,135 | 1,311,135 | 70 | 18,731 |
| UP | 85,057,080 | 85,057,080 | 1286 | 66,141 |
| **All Class I's** | **204,390,956** | **208,604,291** | **2,990** | **69,767** |

**Table 2-26. 2016 Yard Switcher Emission Factors by Tier, AAR Fleet Mix (grams/gal)[4]**

| Tier Level | AAR Fleet Mix Ratio | $PM_{10}$ | HC | $NO_x$ | CO |
|---|---|---|---|---|---|
| Uncontrolled (pre-1973) | 0.2601 | 6.688 | 15.352 | 264.48 | 27.816 |
| Tier 0 (1973-2001) | 0.2361 | 6.688 | 15.352 | 191.52 | 27.816 |
| Tier 0+ (Tier 0 rebuilds) | 0.2599 | 3.496 | 8.664 | 161.12 | 27.816 |
| Tier 1 (2002-2004) | 0.0000 | 6.536 | 15.352 | 150.48 | 27.816 |
| Tier 1+ (Tier 1 rebuilds) | 0.0476 | 3.496 | 8.664 | 150.48 | 27.816 |
| Tier 2 (2005-2011) | 0.0233 | 2.888 | 7.752 | 110.96 | 27.816 |
| Tier 2+ (Tier 2 rebuilds) | 0.0464 | 1.672 | 3.952 | 110.96 | 27.816 |
| Tier 3 (2012-2014) | 0.1018 | 1.216 | 3.952 | 68.4 | 27.816 |
| Tier 4 (2015 and later) | 0.0247 | 0.228 | 1.216 | 15.2 | 27.816 |
| **2016 Weighted EF's** | **0.9999** | **4.668** | **11.078** | **178.1195** | **27.813** |

Based on values in EPA Technical Highlights:  Emission Factors for Locomotives, EPA Office of Transportation and Air Quality, EPA-420-F-09-025, April 2009.  AAR fleet mix ratios did not add up to 1.0000, which caused a small error for the CO weighted emission factor as shown above.

In addition to the Class I rail yards, Emission estimates were calculated for four large Class III railroad hump yards which are among the largest classification facilities in the United States.  These four yards are located in Chicago (Belt Railway of Chicago-Clearing and Indiana Harbor Belt-Blue Island) and Metro-East St. Louis (Alton & Southern-Gateway and Terminal Railroad Association of St. Louis-Madison).  Figure 2-7 shows the spatial distribution of active yards in the 2016v1 and 2017 NEI inventories.

**Figure 2-7. 2016-2017 Active Rail Yard Locations in the United States**



Source: Federal Railroad Administration

## Class II and III Methodology

There are approximately 560 Class II and III Railroads operating in the United States, most of which are members of the American Short Line and Regional Railroad Association (ASLRRA). While there is a lot of information about individual Class II and III railroads available online, a significant amount of effort would be required to convert this data into a usable format for the creation of emission inventories. In addition, the Class II and III rail sector has been in a constant state of flux ever since the railroad industry was deregulated under the Staggers Act in 1980. Some states have conducted independent surveys of their Class II and III railroads and produced emission estimates, but no national level emissions inventory existed for this sector of the railroad industry prior to ERTAC Rail's work for the 2008 NEI.

Class II and III railroad activities account for nearly 4 percent of the total locomotive fuel use in the combined ERTAC Rail emission inventories and for approximately 35 percent of the industry's national freight rail track mileage. These railroads are widely dispersed across the country and often utilize older, higher emitting locomotives than their Class I counterparts. Class II and III railroads provide transportation services to a wide range of industries. Individual railroads in this sector range from small switching operations serving a single industrial plant to large regional railroads that operate hundreds of miles of track. Figure 2-8 shows the distribution of Class II and III railroads and commuter railroads across the country. This inventory will be useful for regional and local modeling, helps identify where Class II and III railroads may need to be better characterized, and provides a strong foundation for the

eventual development of a more accurate nationwide short line and regional railroad emissions inventory. The data sources, calculations, and assumptions used to develop the Class II and III inventory are described in the 2016v1 rail specification sheet.

**Figure 2-8. Class II and III Railroads in the United States[5]**



Source: Federal Railroad Administration - June 2018

**Commuter Rail Methodology**

Commuter rail emissions were calculated in the same way as the Class II and III railroads. The primary difference is that the fuel use estimates were based on data collected by the Federal Transit Administration (FTA) for the National Transit Database.  2016 fuel use was then estimated for each of the commuter railroads shown in Table 2-27 by multiplying the fuel and lube cost total by 0.95, then dividing the result by Metra's average diesel fuel cost of $1.93/gallon.  These fuel use estimates were replaced with reported fuel use statistics for MARC (Maryland), MBTA (Massachusetts), Metra (Illinois), and NJT (New Jersey). The commuter railroads were separated from the Class II and III railroads so that the appropriate SCC codes could be entered into the emissions calculation sheet.

**Table 2-27. Expenditures and fuel use for commuter rail**

| FRA Code | System | Cities Served | Propulsion Type | DOT Fuel & Lube Costs | Reported/Estimated Fuel Use |
|---|---|---|---|---|---|
| ACEX | Altamont Corridor Express | San Jose / Stockton | Diesel | $889,828 | 437,998.24 |
| CMRX | Capital MetroRail | Austin | Diesel | No data | n/a |
| DART | A-Train | Denton | Diesel | $0 | 0.00 |
| DRTD | Denver RTD: A&B Lines | Denver | Electric | $0 | 0.00 |

61

| FRA Code | System | Cities Served | Propulsion Type | DOT Fuel & Lube Costs | Reported/Estimated Fuel Use |
|---|---|---|---|---|---|
| JPBX | Caltrain | San Francisco / San Jose | Diesel | $7,002,612 | 3,446,881.55 |
| LI | MTA Long Island Rail Road | New York | Electric and Diesel | $13,072,158 | 6,434,481.92 |
| MARC | MARC Train | Baltimore / Washington, D.C. | Diesel and Electric | $4,648,060 | *4,235,297.57* |
| MBTA | MBTA Commuter Rail | Boston / Worcester / Providence | Diesel | $37,653,001 | *12,142,826.00* |
| MNCW | MTA Metro-North Railroad | New York / Yonkers / Stamford | Electric and Diesel | $13,714,839 | 6,750,827.49 |
| NICD | NICTD South Shore Line | Chicago / South Bend | Electric | $181,264 | 0.00 |
| NIRC | Metra | Chicago | Diesel and Electric | $52,460,705 | *25,757,673.57* |
| NJT | New Jersey Transit | New York / Newark / Trenton / Philadelphia | Electric and Diesel | $38,400,031 | *16,991,164.00* |
| NMRX | New Mexico Rail Runner | Albuquerque / Santa Fe | Diesel | $1,597,302 | 786,236.74 |
| CFCR | SunRail | Orlando | Diesel | $856,202 | 421,446.58 |
| MNRX | Northstar Line | Minneapolis | Diesel | $708,855 | 348,918.26 |
| Not Coded | SMART | San Rafael-Santa Rosa (Opened 2017) | Diesel | n/a | 0.00 |
| NRTX | Music City Star | Nashville | Diesel | $456,099 | 224,504.69 |
| SCAX | Metrolink | Los Angeles / San Bernardino | Diesel | $19,245,255 | 9,473,052.98 |
| SDNR | NCTD Coaster | San Diego / Oceanside | Diesel | $1,489,990 | 733,414.77 |
| SDRX | Sounder Commuter Rail | Seattle / Tacoma | Diesel | $1,868,019 | 919,491.22 |
| SEPA | SEPTA Regional Rail | Philadelphia | Electric | $483,965 | 0.00 |
| SLE | Shore Line East | New Haven | Diesel | No data | n/a |
| TCCX | Tri-Rail | Miami / Fort Lauderdale / West Palm Beach | Diesel | $5,166,685 | 2,543,186.92 |
| TREX | Trinity Railway Express | Dallas / Fort Worth | Diesel | No data | n/a |
| UTF | UTA FrontRunner | Salt Lake City / Provo | Diesel | $4,044,265 | 1,990,700.39 |
| VREX | Virginia Railway Express | Washington, D.C. | Diesel | $3,125,912 | 1,538,661.35 |
| WSTX | Westside Express Service | Beaverton | Diesel | No data | n/a |

*Reported fuel use values were used for MARC, MBTA, Metra, and New Jersey Transit.

**Intercity Passenger Methodology (Amtrak)**

2016 marked the first time that a nationwide intercity passenger rail emissions inventory was created for Amtrak. The calculation methodology mimics that used for the Class II and III and commuter railroads with a few modifications. Since link-level activity data for Amtrak was unavailable, the default assumption was made to evenly distribute Amtrak's 2016 reported fuel use across all of it diesel-powered route-miles shown in Figure 2-9. Participating states were instructed that they could alter the fuel use distribution within their jurisdictions by analyzing Amtrak's 2016 national timetable and calculating passenger train-miles for each affected route. Illinois and Connecticut chose to do this and were able to derive activity-based fuel use numbers for their states based on Amtrak's 2016 reported average fuel use of 2.2 gallons per passenger train-mile. In addition, Connecticut provided supplemental data for selected counties in Massachusetts, New Hampshire, and Vermont. Amtrak also submitted company-specific fleet mix information and company-specific weighted emission factors were derived. Amtrak's emission rates were 25% lower than the default Class II and III and commuter railroad emission rate. Details on the computation of the Amtrak emissions are available in the rail specification sheet.

**Figure 2-9. Amtrak Routes with Diesel-powered Passenger Trains**



Amtrak Diesel Passenger Routes

Source: Federal Railroad Administration - June 2018

**Other Data Sources**

The California Air Resources Board (CARB) provided rail inventories for inclusion in the 2016v1 platform. CARB's rail inventories were used in California, in place of the national dataset described above. For rail yards, the national point source rail yard dataset was used to allocate CARB-submitted rail yard emissions to point sources where possible. That is, for each California county with at least one rail yard in the national dataset, the emissions in the national rail yard dataset were adjusted so that county total rail yard emissions matched the CARB dataset. In other words, 2016v1 and 2016v2 platforms

include county total rail yard emissions from CARB, but the locations of rail yards are based on the national methodology. There are three counties with CARB-submitted rail yard emissions, but no rail yard locations in the national dataset; for those counties, the rail yard emissions were included in the rail sector using SCC 2285002010.

North Carolina separately provided passenger train (SCC 2285002008) emissions for use in the platform. We used NC's passenger train emissions instead of the corresponding emissions from the Lake Michigan Air Directors Consortium (LADCO) dataset.

None of these rail inventory sources included HAPs. For VOC speciation, the EPA preferred augmenting the inventory with HAPs and using those HAPs for integration, rather than running the sector as a no-integrate sector. So, Naphthalene, Benzene, Acetaldehyde, Formaldehyde, and Methanol (NBAFM) emissions were added to all rail inventories, including the California inventory, using the same augmentation factors as are used to augment HAPs in the NEI.

### 2.4.4 Nonroad Mobile Equipment (nonroad)

The mobile nonroad equipment sector includes all mobile source emissions that do not operate on roads, excluding commercial marine vehicles, railways, and aircraft. Types of nonroad equipment include recreational vehicles, pleasure craft, and construction, agricultural, mining, and lawn and garden equipment. Nonroad equipment emissions were computed by running the MOVES3,[13] which incorporates the NONROAD model. MOVES3 and its predecessor MOVES2014b incorporated updated nonroad engine population growth rates, nonroad Tier 4 engine emission rates, and sulfur levels of nonroad diesel fuels. MOVES3 provides a complete set of HAPs and incorporates updated nonroad emission factors for HAPs. MOVES3 was used for all states other than California and Texas, which developed their own emissions using their own tools. VOC and PM speciation profile assignments are determined by MOVES and applied by SMOKE. The fuels data in MOVES3 for nonroad vehicles is slightly updated from the MOVES2014b fuels for nonroad vehicles. 2016v2 and 2016v3 nonroad emissions are unchanged from 2016v1.

MOVES3 provides estimates of NONHAPTOG along with the speciation profile code for the NONHAPTOG emission source. This was accomplished by using NHTOG#### as the pollutant code in the Flat File 2010 (FF10) inventory file that can be read into SMOKE, where #### is a speciation profile code. One of the speciation profile codes is '95335a' (lowercase 'a'); the corresponding inventory pollutant is NONHAPTOG95335A (uppercase 'A') because SMOKE does not support inventory pollutant names with lowercase letters. Since speciation profiles are applied by SCC and pollutant, no changes to SMOKE were needed to use the inventory file with this profile information. This approach was not used for California or Texas, because the datasets in those states included VOC.

MOVES3, also provides estimates of PM2.5 by speciation profile code for the PM2.5 emission source, using PM25_#### as the pollutant code in the FF10 inventory file, where #### is a speciation profile code. To facilitate calculation of coarse particulate matter (PMC) within SMOKE, and to help create emissions summaries, an additional pollutant representing total $PM_{2.5}$ called PM25TOTAL was added to the inventory. As with VOC / TOG, this approach is not used for California or Texas.

---

[13] https://www.epa.gov/moves.

MOVES3 outputs emissions data in county-specific databases, and a post-processing script converts the data into FF10 format. Additional post-processing steps were performed as follows:

- County-specific FF10s were combined into a single FF10 file.

- Emissions were aggregated from the more detailed SCCs modeled in MOVES to the SCCs modeled in SMOKE. A list of the aggregated SMOKE SCCs is in Appendix A of the 2016v1 nonroad specification sheet.

- To reduce the size of the inventory, HAPs that are not needed for air quality modeling, such as dioxins and furans, were removed from the inventory.

- To reduce the size of the inventory further, all emissions for sources (identified by county/SCC) for which total CAP emissions are less than $1*10^{-10}$ were removed from the inventory. The MOVES model attributes a very tiny amount of emissions to sources that are actually zero, for example, snowmobile emissions in Florida. Removing these sources from the inventory reduces the total size of the inventory by about 7%.

- Gas and particulate components of HAPs that come out of MOVES separately, such as naphthalene, were combined.

- VOC was renamed VOC_INV so that SMOKE does not speciate both VOC and NONHAPTOG, which would result in a double count.

- PM25TOTAL, referenced above, was also created at this stage of the process.

- California and Texas emissions from MOVES were deleted and replaced with the CARB- and TCEQ-supplied emissions, respectively.

Emissions for airport ground support vehicles (SCCs ending in -8005), and oil field equipment (SCCs ending in -10010), were removed from the mobile nonroad inventory, to prevent a double count with the ptnonipm and np_oilgas sectors, respectively.

### **National Updates: Agricultural and Construction Equipment Allocation**

The methodology for developing agricultural equipment allocation data for the 2016v1 platform was developed by the North Carolina Department of Environmental Quality (NCDEQ). EPA updated the construction equipment allocation data used in MOVES for the 2016v1 platform and the same updated data were used in the 2016v2 and 2016v3 platforms.

NCDEQ compiled regional and state-level agricultural sector fuel expenditure data for 2016 from the US Department of Agriculture, National Agricultural Statistics Service (NASS), August 2018 publication, "Farm Production Expenditures 2017 Summary."[14] This resource provides expenditures for each of 5 major regions that cover the Continental U.S., as well as state-level data for 15 major farm producing states. Because of the limited coverage of the NASS source relative to that in MOVES, it was necessary to identify a means for estimating the 2016 agricultural sector allocation data for the following States and Territories from a different source:  Alaska, Hawaii, Puerto Rico, and U.S. Virgin Islands. The approach for these areas is described below.

---

[14] Accessed from http://usda.mannlib.cornell.edu/MannUsda/viewDocumentInfo.do?documentID=1066, November 2018.

For the Continental U.S., NCDEQ first allocated the remainder of the regional fuel expenditures to states in each region for which state-level data are not reported. For this allocation, NCDEQ relied on 2012 fuel expenditure data from NASS' 2012 Census of Agriculture (note that 2017 data were not yet available at the time of this effort).[15] The next step to developing county-level allocation data for agricultural equipment was to multiply the state-level fuel expenditure estimates by county-level allocation ratios. These allocation ratios were computed from county-level fuel expenditure data from the NASS' 2012 Census of Agriculture. There were 17 counties for which fuel expenditure data were withheld in the Census of Agriculture. For these counties, NCDEQ allocated the fuel expenditures that were not accounted for in the applicable state via a surrogate indicator of fuel expenditures. For most states, the 2012 Census of Agriculture's total machinery asset value was the surrogate indicator used to perform the allocation. This indicator was found to have the strongest correlation to agricultural sector fuel expenditures based on analysis of 2012 state-level Census of Agriculture values for variables analyzed (correlation coefficient of 0.87).[16] Because the analyzed surrogate variables were not available for the two counties in New York without fuel expenditure data, farm sales data from the 2012 Census of Agriculture were used in the allocation procedure for these counties.

For Alaska and Hawaii, NCDEQ estimated 2016 state-level fuel production expenditures by first applying the national change in fuel expenditures between 2012 and 2016 from NASS' "Farm Production Expenditures" summary publications to 2012 state expenditure data from the 2012 Census of Agriculture. Next, NCDEQ applied an adjustment factor to account for the relationship between national 2012 fuel expenditures as reported by the Census of Agriculture and those reported in the Farm Production Expenditures Summary. Hawaii's state-level fuel expenditures were allocated to counties using the same approach as the states in the Continental U.S. (i.e., county-level fuel expenditure data from the NASS' 2012 Census of Agriculture). Alaska's fuel expenditures total was allocated to counties using a different approach because the 2012 Census of Agriculture reports fuel expenditures data for a different list of counties than the one included in MOVES. To ensure consistency with MOVES, NCDEQ allocated Alaska's fuel expenditures based on the current allocation data in MOVES, which reflect 2002 harvested acreage data from the Census of Agriculture.

Because NCDEQ did not identify any source of fuel expenditures data for Puerto Rico or the U.S. Virgin Islands, the county allocation percentages that are represented by the 2002 MOVES allocation data were used for these territories.[17]

For the construction sector, by default MOVES2014b used estimates of 2003 total dollar value of construction by county to allocate national construction equipment populations to the state and local levels.[18] However, the 2016 Nonroad Collaborative Work Group sought to update the surrogate data used to geographically allocate construction equipment with a more recent data source thought to be more reflective of emissions-generating construction equipment activity at the county level: acres disturbed by residential, non-residential, and road construction activity.

The nonpoint sector of the National Emissions Inventory (NEI) includes estimates of construction dust ($PM_{2.5}$), for which acreage disturbed by residential, non-residential, and road construction activity is a

---

[15] Accessed from https://www.nass.usda.gov/Publications/AgCensus/2012/, November 2018.

[16] Other variables analyzed were inventory of tractors and inventory of trucks.

[17] For reference, these allocations were 0.0639 percent for Puerto Rico and 0.0002 percent for the U.S. Virgin Islands.

[18] https://nepis.epa.gov/Exe/ZyPDF.cgi?Dockey=P1004LDX.pdf.

function.[19] The 2017 NEI Technical Support Document (EPA, 2021d) includes a description of the methods used to estimate acreage disturbed at the county level by residential, non-residential, and road construction activity, for the 50 states.

Acreage disturbed by residential, non-residential, and road construction were summed together to arrive at a single value of acreage disturbed by construction activities at the county level. County-level acreage disturbed were then summed together to arrive at acreage disturbed at the state level. State totals were then summed to arrive at a national total of acreage disturbed by construction activities.

Puerto Rico and the U.S. Virgin Islands are not included in the construction equipment geographic allocation update, so their relative share of the national population of construction equipment remains the same as MOVES2014b defaults.

For both the agricultural and construction equipment sectors, the *surrogatequant* and *surrogateyearID* fields in the model's *nrstatesurrogate* table, which allocates equipment from the state- to the county-level, were populated with the county-level surrogates described above (fuel expenditures in 2016 for agricultural equipment; acreage disturbed by construction activity in 2014 for construction equipment). In addition, the *nrbaseyearequippopulation* table, which apportions the model's national equipment populations to the state level, was adjusted so that each state's share of the MOVES base-year national populations of agricultural and construction equipment is proportional to each state's share of national acreage disturbed by construction activity (construction equipment) and agricultural fuel expenditures (agricultural equipment). Additionally, the model's *nrsurrogate* table, which defines the surrogate data used in the *nrstatesurrogate* table, was updated to reflect the 2016v1 changes to the agricultural and construction equipment sectors.

Updated *nrsurrogate*, *nrstatesurrogate*, and *nrbaseyearequippopulation* tables, along with instructions for utilizing these tables in MOVES runs, are available for download from EPA's ftp site at https://gaftp.epa.gov/air/emismod/2016/v1/reports/nonroad/.

**State-Supplied Nonroad Data**

As shown Table 2-28., several state and local agencies provided nonroad inputs for use in the 2016v1 platform that were carried forward into the 2016v2 and 2016v3 platforms. Additionally, per the table footnotes, EPA reviewed data submitted by state and local agencies for the 2014 and 2017 National Emissions Inventories and utilized that information where appropriate (data specific to calendar years 2014 and 2017 were not used in 2016v1). The *nrfuelsupply* table from MOVES3 was used in 2016v2 and 2016v3 and is therefore not shown in this table.

---

[19] https://www.epa.gov/air-emissions-inventories/2014-national-emissions-inventory-nei-data.

**Table 2-28. Submitted nonroad input tables by agency**

| stateid | State or County(ies) in the Agency | nrbaseyearequippopulation (source populations) | nrdayallocation (allocation to day type) | nrgrowthindex (population growth) | nrhourallocation (allocation to diurnal pattern) | nrmonthallocation (seasonal allocation) | nrsourceusetype (yearly activity) | nrstatesurrogate (allocations to counties) | countyyear (Stage II information) | nrequipmenttype (surrogate selection) | nrsurrogate (surrogate identification) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 4 | ARIZONA - Maricopa Co. | A | | | | | D | D | D | D | D |
| 9 | CONNECTIC | A | | | | | | | | | |
| 13 | GEORGIA | | | | | | | D | | | |
| 16 | IDAHO | | C | | | | | | | | |
| 17 | ILLINOIS | | | | | E | | | | | |
| 18 | INDIANA | | C | | | E | | | | | |
| 19 | IOWA | | C | | | E | | | | | |
| 26 | MICHIGAN | | C | | | E | | | | | |
| 27 | MINNESOTA | | C | | | E | | | | | |
| 29 | MISSOURI | | | | | E | | | | | |
| 36 | NEW YORK | D | D | D | D | D | D | D | | | |
| 39 | OHIO | | C | | | E | | | | | |
| 49 | UTAH | B | D | D | D | | | F | | | |
| 53 | WASHINGT | | | | | | | D | | D | D |
| 55 | WISCONSIN | | | | | E | | | | | |

A Submitted data with modification: updated the year ID to 2016.
B Submitted data with modification: deleted records that were not snowmobile source types 1002-1010.
C NEI 2014v2 data used for 2016v1 platform.
D Submitted data.
E Spreadsheet "ladco_nei2017_nrmonthallocation.xlsx."
F Submitted data with modification: deleted records that were not the snowmobile surrogate ID 14.

**Emissions Inside California and Texas**

California nonroad emissions were provided by CARB for the years 2016, 2023, 2028, and 2035.

All California nonroad inventories are annual, with monthly temporalization applied in SMOKE. Emissions for oil field equipment (SCCs ending in -10010) were removed from the California inventory in order to prevent a double count with the np_oilgas sector. VOC and $PM_{2.5}$ emissions were allocated to speciation profiles, and VOC HAPs were created, using MOVES data in California. For example, ratios of VOC ($PM_{2.5}$) by speciation profile to total VOC ($PM_{2.5}$), and ratios of VOC HAPs to total VOC, were calculated by county and SCC from the MOVES run in California, and then applied CARB-provided VOC ($PM_{2.5}$) in the inventory so that California nonroad emissions could be speciated consistently with the rest of the country.

Texas nonroad emissions were provided by the Texas Commission on Environmental Quality for the years 2016, 2023, and 2028, using TCEQ's TexN2 tool.[20] This tool facilitates the use of detailed Texas-specific nonroad equipment population, activity, fuels, and related data as inputs for MOVES2014b, and accounts for Texas-specific emission adjustments such as the Texas Low Emission Diesel (TxLED) program. Texas nonroad emissions were provided seasonally; that is, total emissions for winter, spring, summer and fall; those emissions were evenly distributed between the months in each season. As in California, VOC and $PM_{2.5}$ emissions were allocated to speciation profiles, and VOC HAPs were created, using MOVES data in Texas. For example, ratios of VOC ($PM_{2.5}$) by speciation profile to total VOC ($PM_{2.5}$), and ratios of VOC HAPs to total VOC, were calculated by county and SCC from the MOVES run in Texas, and then applied TCEQ-provided VOC ($PM_{2.5}$) in the inventory so that Texas nonroad emissions could be speciated consistently with the rest of the country.

## Nonroad Updates from State Comments

The 2016 Nonroad Collaborative workgroup received a small number of comments on the 2016beta inventory, all of which were addressed and implemented in the 2016v1 nonroad inventory and carried into 2016v2:

- **Georgia Department of Natural Resources:** utilize updated geographic allocation factors (*nrstatesurrogate* table) for the Commercial, Lawn & Garden (commercial, public, and residential), Logging, Manufacturing, Golf Carts, Recreational, Railroad Maintenance Equipment and A/C/Refrigeration sectors, using data from the U.S. Census Bureau and U.S. Forest Service.

- **Lake Michigan Air Directors Consortium (LADCO):** update seasonal allocation of agricultural equipment activity (*nrmonthallocation* table) for Illinois, Indiana, Iowa, Michigan, Minnesota, Missouri, Ohio, and Wisconsin.

- **Texas Commission on Environmental Quality:** replace MOVES nonroad emissions for Texas with emissions calculated with TCEQ's TexN2 model.

- **Alaska Department of Environmental Conservation:** remove emissions as calculated by MOVES for several equipment sector-county/census areas combinations in Alaska, due to an absence of nonroad activity (see Table 2-29).

**Table 2-29. Alaska counties/census areas for which nonroad equipment sector-specific emissions are removed in the 2016 platforms**

| Nonroad Equipment Sector | Counties/Census Areas (FIPS) for which equipment sector emissions are removed in 2016 |
|---|---|
| Agricultural | Aleutians East (02013), Aleutians West (02016), Bethel Census Area (02050), Bristol Bay Borough (02060), Dillingham Census Area (02070), Haines Borough (02100), Hoonah-Angoon Census Area (02105), Ketchikan Gateway (02130), Kodiak Island Borough (02150), Lake and Peninsula (02164), Nome (02180), North Slope Borough (02185), Northwest Arctic (02188), Petersburg Borough |

---

[20] For more information on the TexN2 tool please see: https://www.tceq.texas.gov/airquality/airmod/overview/am_ei.html and the FTP site amdaftp.tceq.texas.gov/EI/nonroad/TexN2/.

| Nonroad Equipment Sector | Counties/Census Areas (FIPS) for which equipment sector emissions are removed in 2016 |
|---|---|
|  | (02195), Pr of Wales-Hyder Census Area (02198), Sitka Borough (02220), Skagway Borough (02230), Valdez-Cordova Census Area (02261), Wade Hampton Census Area (02270), Wrangell City + Borough (02275), Yakutat City + Borough (02282), Yukon-Koyukuk Census Area (02290) |
| Logging | Aleutians East (02013), Aleutians West (02016), Nome (02180), North Slope Borough (02185), Northwest Arctic (02188), Wade Hampton Census Area (02270) |
| Railway Maintenance | Aleutians East (02013), Aleutians West (02016), Bethel Census Area (02050), Bristol Bay Borough (02060), Dillingham Census Area (02070), Haines Borough (02100), Hoonah-Angoon Census Area (02105), Juneau City + Borough (02110), Ketchikan Gateway (02130), Kodiak Island Borough (02150), Lake and Peninsula (02164), Nome (02180), ), North Slope Borough (02185), Northwest Arctic (02188), Petersburg Borough (02195), Pr of Wales-Hyder Census Area (02198), Sitka Borough (02220), Southeast Fairbanks (02240), Wade Hampton Census Area (02270), Wrangell City + Borough (02275), Yakutat City + Borough (02282), Yukon-Koyukuk Census Area (02290) |

## 2.5    2016 Fires (ptfire-wild, ptfire-rx, ptagfire)

Multiple types of fires are represented in the modeling platform.  These include wild and prescribed fires that are grouped into the ptfire-wild and ptfire-rx sectors, and agricultural fires that comprise the ptagfire sector.  All ptfire and ptagfire fires are in the United States.  Fires outside of the United States are described in the ptfire_othna sector later in this document.

### 2.5.1 Wild and Prescribed Fires (ptfire)

Wildfires and prescribed burns that occurred during the inventory year are included in the year 2016 version 1 (2016v1) inventory as event and point sources. Only minor adjustments were made to ptfire for 2016v2.  These minor adjustments consisted of correcting emissions for the Soberanes fire in California that occurred in summer of 2016 and a few improvements to the spatial allocation of large wildfires (no emissions changed in the cases).  For 2016v2, the wildfires and prescribed fires were broken up into two different sectors, ptfire-wild and ptfire-rx, respectively. For 2016v3, the ptfire emissions were unchanged from those used in 2016v2. The point agricultural fires inventory (ptagfire) is described in a separate section. For purposes of emission inventory preparation, wildland fire (WLF) is defined as any non-structure fire that occurs in the wildland.  The wildland is defined an area in which human activity and development are essentially non-existent, except for roads, railroads, power lines, and similar transportation facilities.  Wildland fire activity is categorized by the conditions under which the fire occurs. These conditions influence important aspects of fire behavior, including smoke emissions.

In the 2016v2 inventory, data processing was conducted differently depending on the fire type, as defined below:

- Wildfire (WF): any fire started by an unplanned ignition caused by lightning; volcanoes; other acts of nature; unauthorized activity; or accidental, human-caused actions, or a prescribed fire that has developed into a wildfire.

- Prescribed (Rx) fire: any fire intentionally ignited by management actions in accordance with applicable laws, policies, and regulations to meet specific land or resource management objectives.  Prescribed fire is one type of fire fuels treatment. Fire fuels treatments are vegetation management activities intended to modify or reduce hazardous fuels. Fuels treatments include prescribed fires, wildland fire use, and mechanical treatment.

The SCCs used for the ptfire sources are shown in Table 2-30. The ptfire inventory includes separate SCCs for the flaming and smoldering combustion phases for wildfire and prescribed burns.  Note that prescribed grassland fires or Flint Hills, Kansas have their own SCC in the 2016v2 inventory.  The year 2016 fire season also included some major wild grassland fires. These wild grassland fires were assigned the standard wildfire SCCs shown in Table 2-30.

**Table 2-30. SCCs included in the 2016 ptfire sector**

| SCC | Description |
|---|---|
| 2801500170 | Grassland fires; prescribed |
| 2810001001 | Forest Wildfires; Smoldering; Residual smoldering only (includes grassland wildfires) |
| 2810001002 | Forest Wildfires; Flaming (includes grassland wildfires) |
| 2811015001 | Prescribed Forest Burning; Smoldering; Residual smoldering only |
| 2811015002 | Prescribed Forest Burning; Flaming |

**National Fire Information Data**

Numerous fire information databases are available from U.S. national government agencies.  Some of the databases are available via the internet while others must be obtained directly from agency staff.  Table 2-31 provides the national fire information databases that were used for the 2016v1 ptfire inventory, including the website where the 2016 data were downloaded.

**Table 2-31. National fire information databases used in 2016 ptfire inventory**

| Dataset Name | Fire Types | Format | Agency | Coverage | Source |
|---|---|---|---|---|---|
| Hazard Mapping System (HMS) | WF/RX | CSV | NOAA | North America | https://www.ospo.noaa.gov/Products/land/hms.html |
| Geospatial Multi-Agency Coordination(Geo MAC) | WF | SHP | USGS | Entire US | https://wildfire.usgs.gov/geomac/GeoMACTransition.shtml, https://data-nifc.opendata.arcgis.com/ |
| Incident Command System Form 209: Incident Status Summary (ICS-209) | WF/RX | CSV | Multi | Entire US | https://famit.nwcg.gov/applications/FAMWeb |

| Dataset Name | Fire Types | Format | Agency | Coverage | Source |
|---|---|---|---|---|---|
| National Association of State Foresters (NASF) | WF | CSV | Multi | Participating US states | https://famit.nwcg.gov/applications/FAMWeb (see Public Access Reports, Free Data Extract, then NASF State Data Extract) |
| Monitoring Trends in Burn Severity (MTBS) | WF/RX | SHP | USGS, USFS | Entire US | https://www.mtbs.gov/direct-download |
| Forest Service Activity Tracking System (FACTS) | RX | SHP | USFS | Entire US | Hazardous Fuel Treatment Reduction: Polygon at https://data.fs.usda.gov/geodata/edw/datasets.php |
| US Fish and Wildland Service (USFWS) fire database | WF/RX | CSV | USFWS | Entire US | Direct communication with USFWS |

The Hazard Mapping System (HMS) was developed in 2001 by the National Oceanic and Atmospheric Administration's (NOAA) National Environmental Satellite and Data Information Service (NESDIS) as a tool to identify fires over North America in an operational environment. The system utilizes geostationary and polar orbiting environmental satellites. Automated fire detection algorithms are employed for each of the sensors. When possible, HMS data analysts apply quality control procedures for the automated fire detections by eliminating those that are deemed to be false and adding hotspots that the algorithms have not detected via a thorough examination of the satellite imagery.

The HMS product used for the 2016v1 inventory consisted of daily comma-delimited files containing fire detect information including latitude-longitude, satellite used, time detected, and other information. The Visible Infrared Imaging Radiometer Suite (VIIRS) satellite fire detects were introduced into the HMS in late 2016. Since it was only available for a small portion of the year, the VIIRS fire detects were removed for the entire year for consistency. In the 2016alpha inventory, the grassland fire detects were put in the point agricultural fire sector (ptagfire). As there were a few significant grassland wildfires in Kansas and Oklahoma in year 2016, all grassland fire detects were included in the ptfire sector for the 2016v1 inventory. These grassland fires were processed through Satellite Mapping Automated Reanalysis Tool for Fire Incident Reconciliation version 2 (SMARTFIRE2) and BlueSky Framework.

GeoMAC (Geospatial Multi-Agency Coordination) is an online wildfire mapping application designed for fire managers to access maps of current U.S. fire locations and perimeters. The wildfire perimeter data is based upon input from incident intelligence sources from multiple agencies, GPS data, and infrared (IR) imagery from fixed wing and satellite platforms.

The Incident Status Summary, also known as the "ICS-209" is used for reporting specific information on significant fire incidents. The ICS-209 report is a critical interagency incident reporting tool giving daily 'snapshots' of the wildland fire management situation and individual incident information which include fire behavior, size, location, cost, and other information. Data from two tables in the ICS-209 database were merged and used for the 2016v1 ptfire inventory: the SIT209_HISTORY_INCIDENT_209_REPORTS table contained daily 209 data records for large fires, and the SIT209_HISTORY_INCIDENTS table contained summary data for additional smaller fires.

The National Association of State Foresters (NASF) is a non-profit organization composed of the directors of forestry agencies in the states, U.S. territories, and District of Columbia to manage and protect state and private forests, which encompass nearly two-thirds of the nation's forests. The NASF compiles fire incident reports from agencies in the organization and makes them publicly available. The NASF fire information includes dates of fire activity, acres burned, and fire location information.

Monitoring Trends in Burn Severity (MTBS) is an interagency program whose goal is to consistently map the burn severity and extent of large fires across the U.S. from 1984 to present. The MTBS data includes all fires 1,000 acres or greater in the western United States and 500 acres or greater in the eastern United States. The extent of coverage includes the continental U.S., Alaska, Hawaii, and Puerto Rico. Fire occurrence and satellite data from various sources are compiled to create numerous MTBS fire products. The MTBS Burned Areas Boundaries Dataset shapefiles include year 2016 fires and that are classified as either wildfires, prescribed burns or unknown fire types. The unknown fire type shapes were omitted in the 2016v1 inventory development due to temporal and spatial problems found when trying to use these data.

The US Forest Service (USFS) compiles a variety of fire information every year. Year 2016 data from the USFS Natural Resource Manager (NRM) Forest Activity Tracking System (FACTS) were acquired and used for 2016v1 emissions inventory development. This database includes information about activities related to fire/fuels, silviculture, and invasive species. The FACTS database consists of shapefiles for prescribed burns that provide acres burned, and start and ending time information.

The US Fish and Wildland Service (USFWS) also compiles wildfire and prescribed burn activity on their federal lands every year. Year 2016 data were acquired from USFWS through direct communication with USFWS staff and were used for 2016v1 emissions inventory development.   The USFWS fire information provided fire type, acres burned, latitude-longitude, and start and ending times.

**State/Local/Tribal Fire Information**

During the 2016 emissions modeling platform development process, S/L/T agencies were invited by EPA and 2016 Inventory Collaborative Fire Workgroup to submit all fire occurrence data for use in developing the 2016v1 fire inventory.  A template form containing the desired format for data submittals was provided to S/L/T air agencies. The list of S/L/T agencies that submitted fire data is provided in Table 2-32.  Data from nine individual states and one Indian Tribe were used for the 2016v1 ptfire inventory.

**Table 2-32. List of S/L/T agencies that submitted fire data for 2016v1 with types and formats.**

| S/L/T agency name | Fire Types | Format |
|---|---|---|
| NCDEQ | WF/RX | CSV |
| KDHE | RX/AG | CSV |
| CO Smoke Mgmt Program | RX | CSV |
| Idaho DEQ | AG | CSV |
| Nez Perce Tribe | AG | CSV |
| GA DNR | ALL | EIS |
| MN | RX/AG | CSV |
| WA ECY | AG | CSV |

| S/L/T agency name | Fire Types | Format |
|---|---|---|
| NJ DEP | WF/RX | CSV |
| Alaska DEC | WF/RX | CSV |

The data provided by S/L/T agencies were evaluated by EPA and further feedback on the data submitted by the state was requested at times. Table 2-33 provides a summary of the type of data submitted by each S/L/T agency and includes spatial, temporal, acres burned and other information provided by the agencies.

**Table 2-33. Brief description of fire information submitted for 2016v1 inventory use.**

| S/L/T agency name | Fire Types | Description |
|---|---|---|
| NCDEQ | WF/RX | Fire type, period-specific, latitude-longitude and acres burned information. Technical direction was to remove all fire detects that were not reconciled with any other national or state agency database. |
| Kansas DHE | RX/AG | Day-specific, county-centroid located, acres burned for Flint Hills prescribed burns for Feb 27-May 4 time period. Reclassified fuels for some agricultural burns.  A grassland gridding surrogate was used to spatially allocate the day-specific grassland fire emissions. |
| Colorado Smoke Mgmt Program | RX | Day-specific, latitude-longitude, and acres burned for prescribed burns |
| Idaho DEQ | AG | Day-specific, latitude-longitude, acres burned for agricultural burns. Total replacement of 2016 alpha fire inventory for Idaho. |
| Nez Perce Tribe | AG | Day-specific, latitude-longitude, acres burned for agricultural burns. Total replacement of 2016 alpha fire inventory within the tribal area boundary. |
| Georgia DNR | ALL | Data submitted included all fires types via EIS. The wildfire and prescribed burn data were provided as daily, point emissions sources. The agricultural burns were provided as day-specific point emissions sources. |
| Minnesota | RX/AG | Corrected latitude-longitude, day-specific and acres burned for some prescribed and agricultural burns. |
| Washington ECY | AG | Month-specific, latitude-longitude, acres burned, fuel loading and emissions for agricultural burns. Not day-specific so allocation to daily implemented by EPA. WA state direction included to continue to use the 2014NEIv2 pile burns that were included in the non-point sector for 2016v1. |
| New Jersey DEP | WF/RX | Day-specific, latitude-longitude, and acres burned for wildfire and prescribed burns. |
| Alaska DEC | WF/RX | Day-specific, latitude-longitude, and acres burned for wildfire and prescribed burns. |

**Fire Emissions Estimation Methodology**

The national and S/L/T data mentioned earlier were used to estimate daily wildfire and prescribed burn emissions from flaming combustion and smoldering combustion phases for the 2016v1 inventory. Flaming combustion is more complete combustion than smoldering and is more prevalent with fuels that have a high surface-to-volume ratio, a low bulk density, and low moisture content. Smoldering combustion occurs without a flame, is a less complete burn, and produces some pollutants, such as PM2.5, VOCs, and CO, at higher rates than flaming combustion. Smoldering combustion is more prevalent with fuels that have low surface-to-volume ratios, high bulk density, and high moisture content. Models sometimes differentiate between smoldering emissions that are lofted with a smoke plume and those that remain near the ground (residual emissions), but for the purposes of the 2016v1 inventory the residual smoldering emissions were allocated to the smoldering SCCs listed in Table 2-30. The lofted smoldering emissions were assigned to the flaming emissions SCCs in Table 2-30.

Figure 2-10 is a schematic of the data processing stream for the 2016v1 inventory for wildfire and prescribe burn sources. The ptfire inventory sources were estimated using Satellite Mapping Automated Reanalysis Tool for Fire Incident Reconciliation version 2 (SMARTFIRE2) and BlueSky Framework. SMARTFIRE2 is an algorithm and database system that operate within a geographic information system (GIS). SMARTFIRE2 combines multiple sources of fire information and reconciles them into a unified GIS database. It reconciles fire data from space-borne sensors and ground-based reports, thus drawing on the strengths of both data types while avoiding double-counting of fire events. At its core, SMARTFIRE2 is an association engine that links reports covering the same fire in any number of multiple databases. In this process, all input information is preserved, and no attempt is made to reconcile conflicting or potentially contradictory information (for example, the existence of a fire in one database but not another).

For the 2016v1 inventory, the national and S/L/T fire information was input into SMARTFIRE2 and then merged and associated based on user-defined weights for each fire information dataset. The output from SMARTFIRE2 was daily acres burned by fire type, and latitude-longitude coordinates for each fire. The fire type assignments were made using the fire information datasets. If the only information for a fire was a satellite detect for fire activity, then the flow described in Figure 2-11 was used to make fire type assignment by state and by month.

**Figure 2-10. Processing flow for fire emission estimates in the 2016 inventory**



**Figure 2-11. Default fire type assignment by state and month where data are only from satellites.**



The BlueSky Modeling Framework version 3.5 (revision #38169) was used to calculate fuel loading and consumption, and emissions using various models depending on the available inputs as well as the desired results. The contiguous United States and Alaska, where Fuel Characteristic Classification System (FCCS) fuel loading data are available, were processed using the modeling chain described in Figure 2-12. The Fire Emissions Production Simulator (FEPS) in the BlueSky Framework generated the CAP emission factors for wildland fires used in the 2016v1 inventory.    The HAPs were derived from regional emissions factors from Urbanski (2014).

For the 2016v1 inventory, the FCCSv2 spatial vegetation cover was upgraded to the LANDFIRE v1.4 fuel vegetation cover (See: https://www.landfire.gov/fccs.php). The FCCSv3 fuel bed characteristics were implemented along with LANDFIREv1.4 to provide better fuel classification for the BlueSky Framework. The LANDFIREv1.4 raster data were aggregated from the native resolution and projection to 200 meter resolution using a nearest-neighbor methodology. Aggregation and reprojection were required to facilitate the use of these data in the BlueSky Framework.

**Figure 2-12. BlueSky Modeling Framework**



## 2.5.2 Point Source Agricultural Fires (ptagfire)

The point source agricultural fire (ptagfire) inventory sector contains daily agricultural burning emissions. Daily fire activity was derived from the NOAA Hazard Mapping System (HMS) fire activity data. The agricultural fires sector includes SCCs starting with '28015'. The first three levels of descriptions for these SCCs are: 1) Fires - Agricultural Field Burning; Miscellaneous Area Sources; 2) Agriculture Production - Crops - as nonpoint; and 3) Agricultural Field Burning - whole field set on fire. The SCC 2801500000 does not specify the crop type or burn method, while the more specific SCCs specify field or orchard crops and, in some cases, the specific crop being grown. The SCCs for this sector listed are in Table 2-34. For 2016v3, the ptagfire data are unchanged from 2016v2.

**Table 2-34. SCCs included in the 2016 ptagfire sector**

| SCC | Description |
|-----|-------------|
| 2801500000 | Miscellaneous Area Sources;Agriculture Production - Crops - as nonpoint;Agricultural Field Burning - whole field set on fire;Unspecified crop type and Burn Method |
| 2801500100 | Miscellaneous Area Sources;Agriculture Production - Crops - as nonpoint;Agricultural Field Burning - whole field set on fire;Field Crops Unspecified |
| 2801500112 | Miscellaneous Area Sources;Agriculture Production - Crops - as nonpoint;Agricultural Field Burning - whole field set on fire;Field Crop is Alfalfa: Backfire Burning |
| 2801500130 | Miscellaneous Area Sources;Agriculture Production - Crops - as nonpoint;Agricultural Field Burning - whole field set on fire;Field Crop is Barley: Burning Techniques Not Significant |
| 2801500141 | Miscellaneous Area Sources;Agriculture Production - Crops - as nonpoint;Agricultural Field Burning - whole field set on fire;Field Crop is Bean (red): Headfire Burning |
| 2801500150 | Miscellaneous Area Sources;Agriculture Production - Crops - as nonpoint;Agricultural Field Burning - whole field set on fire;Field Crop is Corn: Burning Techniques Not Important |
| 2801500151 | Miscellaneous Area Sources;Agriculture Production - Crops - as nonpoint;Agricultural Field Burning - whole field set on fire;Double Crop Winter Wheat and Corn |

| SCC | Description |
|---|---|
| 2801500152 | Miscellaneous Area Sources;Agriculture Production - Crops - as nonpoint;Agricultural Field Burning - whole field set on fire;DoubleCrop Corn and Soybeans |
| 2801500160 | Miscellaneous Area Sources;Agriculture Production - Crops - as nonpoint;Agricultural Field Burning - whole field set on fire;Field Crop is Cotton: Burning Techniques Not Important |
| 2801500170 | Miscellaneous Area Sources;Agriculture Production - Crops - as nonpoint;Agricultural Field Burning - whole field set on fire;Field Crop is Grasses: Burning Techniques Not Important |
| 2801500171 | Miscellaneous Area Sources;Agriculture Production - Crops - as nonpoint;Agricultural Field Burning - whole field set on fire;Fallow |
| 2801500182 | Miscellaneous Area Sources;Agriculture Production - Crops - as nonpoint;Agricultural Field Burning - whole field set on fire;Field Crop is Hay (wild): Backfire Burning |
| 2801500202 | Miscellaneous Area Sources;Agriculture Production - Crops - as nonpoint;Agricultural Field Burning - whole field set on fire;Field Crop is Pea: Backfire Burning |
| 2801500220 | Miscellaneous Area Sources;Agriculture Production - Crops - as nonpoint;Agricultural Field Burning - whole field set on fire;Field Crop is Rice: Burning Techniques Not Significant |
| 2801500250 | Miscellaneous Area Sources;Agriculture Production - Crops - as nonpoint;Agricultural Field Burning - whole field set on fire;Field Crop is Sugar Cane: Burning Techniques Not Significant |
| 2801500262 | Miscellaneous Area Sources;Agriculture Production - Crops - as nonpoint;Agricultural Field Burning - whole field set on fire;Field Crop is Wheat: Backfire Burning |
| 2801500263 | Miscellaneous Area Sources;Agriculture Production - Crops - as nonpoint;Agricultural Field Burning - whole field set on fire;DoubleCrop Winter Wheat and Cotton |
| 2801500264 | Miscellaneous Area Sources;Agriculture Production - Crops - as nonpoint;Agricultural Field Burning - whole field set on fire;DoubleCrop Winter Wheat and Soybeans |
| 2801500300 | Miscellaneous Area Sources;Agriculture Production - Crops - as nonpoint;Agricultural Field Burning - whole field set on fire;Orchard Crop Unspecified |
| 2801500320 | Miscellaneous Area Sources;Agriculture Production - Crops - as nonpoint;Agricultural Field Burning - whole field set on fire;Orchard Crop is Apple |
| 2801500350 | Miscellaneous Area Sources;Agriculture Production - Crops - as nonpoint;Agricultural Field Burning - whole field set on fire;Orchard Crop is Cherry |
| 2801500410 | Miscellaneous Area Sources;Agriculture Production - Crops - as nonpoint;Agricultural Field Burning - whole field set on fire;Orchard Crop is Peach |
| 2801500420 | Miscellaneous Area Sources;Agriculture Production - Crops - as nonpoint;Agricultural Field Burning - whole field set on fire;Orchard Crop is Pear |
| 2801500500 | Miscellaneous Area Sources;Agriculture Production - Crops - as nonpoint;Agricultural Field Burning - whole field set on fire;Vine Crop Unspecified |
| 2801500600 | Miscellaneous Area Sources;Agriculture Production - Crops - as nonpoint;Agricultural Field Burning - whole field set on fire;Forest Residues Unspecified |

The EPA estimated biomass burning emissions using remote sensing data. These estimates were then reviewed by the states and revised as resources allowed. As many states did not have the resources to estimate emissions for this sector, remote sensing was necessary to fill in the gaps for regions where there was no other source of data. Crop residue emissions result from either pre-harvest or post-harvest burning of agricultural fields. The crop residue emission inventory for 2016 is day-specific and includes geolocation information by crop type. The method employed and described here is based on the same methods employed in the 2014 NEI with a few minor updates. It should be noted that grassland fires were moved from the agricultural burning inventory sector to the prescribed and wildland fire sector for 2016beta and 2016v1 inventories. This was done to prevent double-counting of fires and because the largest fire (acres burned) in 2016 was a wild grassland fire in Kansas.

Daily, year-specific agricultural burning emissions were derived from HMS fire activity data, which contains the date and location of remote-sensed anomalies. As point source inventories, the locations of the fires are identified with latitude-longitude coordinates for specific fire events. The HMS activity data were filtered using 2016 USDA cropland data layer (CDL). Satellite fire detects over agricultural lands were assumed to be agricultural burns and assigned a crop type. Detects that were not over agricultural lands were output to a separate file for use in the point source wildfire (ptfire) inventory sector. Each detect was assigned an average size of between 40 and 80 acres based on crop type. The assumed field sizes are found in Table 2-35.

**Table 2-35. Assumed field size of agricultural fires per state(acres)**

| State | Field Size |
|-------|------------|
| Alabama | 40 |
| Arizona | 80 |
| Arkansas | 40 |
| California | 120 |
| Colorado | 80 |
| Connecticut | 40 |
| Delaware | 40 |
| Florida | 60 |
| Georgia | 40 |
| Idaho | 120 |
| Illinois | 60 |
| Indiana | 60 |
| Iowa | 60 |
| Kansas | 80 |
| Kentucky | 40 |
| Louisiana | 40 |
| Maine | 40 |
| Maryland | 40 |
| Massachusetts | 40 |
| Michigan | 40 |
| Minnesota | 60 |
| Mississippi | 40 |
| Missouri | 60 |
| Montana | 120 |
| Nebraska | 60 |
| Nevada | 40 |
| New Hampshire | 40 |

| State | Field Size |
|---|---|
| New Jersey | 40 |
| New Mexico | 80 |
| New York | 40 |
| North Carolina | 40 |
| North Dakota | 60 |
| Ohio | 40 |
| Oklahoma | 80 |
| Oregon | 120 |
| Pennsylvania | 40 |
| Rhode Island | 40 |
| South Carolina | 40 |
| South Dakota | 60 |
| Tennessee | 40 |
| Texas | 80 |
| Utah | 40 |
| Vermont | 40 |
| Virginia | 40 |
| Washington | 120 |
| West Virginia | 40 |
| Wisconsin | 40 |
| Wyoming | 80 |

Another feature of the ptagfire database is that the satellite detections for 2016 were filtered out to exclude areas covered by snow during the winter months.  To do this, the daily snow cover fraction per grid cell was extracted from a 2016 meteorological Weather Research Forecast (WRF) model simulation. The locations of fire detections were then compared with this daily snow cover file. For any day in which a grid cell had snow cover, the fire detections in that grid cell on that day were excluded from the inventory.   Due to the inconsistent reporting of fire detections for year 2016 from the Visible Infrared Imaging Radiometer Suite (VIIRS) platform, any fire detections in the HMS dataset that were flagged as VIIRS or Suomi National Polar-orbiting Partnership satellite were excluded.  In addition, certain crop types (corn and soybeans) were excluded from the following states: Iowa, Kansas, Indiana, Illinois, Michigan, Missouri, Minnesota, Wisconsin, and Ohio. Kansas was not included in this list in the 2014NEI but added for 2016.   The reason for these crop types being excluded is because states have indicated that these crop types are not burned.

Crop type-specific emissions factors were applied to each daily fire to calculate criteria and hazardous pollutant emissions. In all prior NEIs for this sector, the HAP emission factors and the VOC emission factors were known to be inconsistent. The HAP emission factors were copied from the HAP emission factors for wildfires in the 2014 NEI and in the 2016 beta and version 1 modeling platforms. The VOC emission factors were scaled from the CO emission factors in the 2014 NEI and the 2016 beta and version 1 modeling platforms.  See Pouliot et al, 2017 for a complete table of emission factors and fuel loading by crop type.

Heat flux values for computing fire plume rise were calculated using the size and assumed fuel loading of each daily fire. Emission factors and fuel loading by crop type are available in Table 1 of Pouliot et al. (2017). This information is needed for a plume rise calculation within a chemical transport modeling system. In prior year modeling platforms including 2014, all the emissions were placed into layer 1 (i.e. ground level).

The daily agricultural and open burning emissions were converted from a tabular format into the SMOKE-ready daily point Flat File 2010 (FF10) format. The daily emissions were also aggregated into annual values by location and converted into the annual point flat file format.

## *2.6    2016 Biogenic Sources (beis)*

Biogenic emissions for 2016v3 were developed using the Biogenic Emission Inventory System version 4 (BEIS4) within SMOKE. BEIS4 was released with SMOKE 4.9. BEIS4 is most compatible with MCIP v5 meteorological data, although data output from MCIP v5 were not available for the year 2016. Minor modifications were made to BEIS4 to accommodate the use of the available 2016 meteorological data that was processed using MCIP v4.3. The landuse input into BEIS4 was the Biogenic Emissions Landuse Dataset (BELD) version 6. The versions of BEIS and BELD were both updated for 2016v3 platform in response to comments on air quality model performance.

The BELD6 includes the following datasets:

- High resolution tree species and biomass data from Wilson et al. 2013a, and Wilson et al. 2013b for which species names were changed from non-specific common names to scientific names;

- Tree species biogenic volatile organic carbon (BVOC) emission factors for tree species where taken from the NCAR Enclosure database ( Wiedinmyer 2001);

- Agricultural land use from US Department of Agriculture (USDA) crop data layer (https://www.nass.usda.gov/Research_and_Science/Cropland/SARS1a.php)

- Global Moderate Resolution Imaging Spectroradiometer (MODIS) 20 category data with enhanced lakes and Fraction of Photosynthetically Active Radiation (FPAR) for vegetation coverage from National Center for Atmospheric Research (NCAR) (https://www2.mmm.ucar.edu/wrf/users/download/get_sources_wps_geog.html )

- Canadian BELD land use (https://www.epa.gov/sites/default/files/2019-08/documents/800am_zhang_2_0.pdf).

BEIS4 has some important updates from earlier versions of BEIS. These include the incorporation of Version 6 of the Biogenic Emissions Landuse Database (BELD6), the option to include seasonality of emissions using the 1 meter soil temperature (SOIT2) instead of the BIOSEASON file, and canopy temperature and radiation environments are now modeled using the driving meteorological model's (WRFv3.8) representation of LAI rather than the estimated LAI values just from BELD data. See https://github.com/USEPA/CMAQ/wiki/CMAQ-Release-Notes:-Emissions-Updates:-BEIS-Biogenic-Emissions for more technical information on BEIS4.

BEIS4 includes a two-layer canopy model. Layer structure varies with light intensity and solar zenith angle. Both layers of the canopy model include estimates of sunlit and shaded leaf area based on solar zenith angle and light intensity, direct and diffuse solar radiation, and leaf temperature (Bash et al., 2016).

The new algorithm requires additional meteorological variables over previous versions of BEIS. The variables output from the Meteorology-Chemistry Interface Processor (MCIP) that are used for BEIS4 processing are shown in Table 2-36. The WSAT_PX variable was not available for the version of WRF and MCIP used in the 2016 modeling platform, as this variable became available with WRFv4 and future versions. For 2016 modeling, minor code modifications were made to BEIS4 to calculate WSAT based on soil type (SLTYP) and soil moisture (SOIM1) in a very similar manner that is done in BEIS3. The WSAT_PX variable only impacts the nitric oxide emissions from soils in BEIS models. The 2016 BEIS4 modeling for year 2016 included processing for both a 36km (36US3) and 12km domain (12US1) (see Figure 3-1). The 12US2 modeling domain can also be supported by taking a subset or window of the 12US1 BEIS4 emissions dataset.

**Table 2-36.  Hourly Meteorological variables required by BEIS4**

| Variable | Description |
| --- | --- |
| LAI | leaf-area index |
| PRSFC | surface pressure |
| Q2 | mixing ratio at 2m |
| RADYNI | inverse of aerodynamic resistance |
| RC | convective precipitation |
| RGRND | solar radiation reaching surface |
| RN | nonconvective precipitation |
| RSTOMI | inverse of bulk stomatal resistance |
| SLTYP | soil texture type by USDA category |
| SOIM1 | volumetric soil moisture in top cm |
| SOIT1 | soil temperature in top cm |
| SOIT2 | soil temperature in top m |
| TEMPG | skin temperature at ground |
| TEMP2 | Temperature at 2m |
| USTAR | cell averaged friction velocity |
| WSAT_PX | soil saturation from (Pleim-Xiu Land Surface Model) PX-LSM |

Bug fixes included in BEIS4 included the following:

- Solar radiation attenuation in the shaded portion of the canopy was using the direct beam photosynthetically active radiation (PAR) when the diffuse beam PAR attenuation coefficient should have been used.

  - This update had little impact on the total emissions but did result in slightly higher emissions in the morning and evening transition periods for isoprene, methanol and Methylbutenol (MBO).

- The fraction of solar radiation in the sunlit and shaded canopy layers, SOLSUN and SOLSHADE respectively were estimated using a planar surface. These should have been estimated based on the PAR intercepted by a hemispheric surface rather than a plane.

  - This update can result in an earlier peak in leaf temperature, approximately up to an hour.

- The quantum yield for isoprene emissions (ALPHA) was updated to the mean value in Niinemets et al. 2010a ( https://doi.org/10.1029/2010JG001436) and the integration coefficient (CL) was updated to yield 1 when PAR = 1000 following Niinemets et al 2010b ( https://doi.org/10.5194/bg-7-1809-2010).

    o This updated resulted in a slight reduction in isoprene, methanol, and MBO emissions.

The SMOKE-BEIS4 modeling system consists of two programs named: 1) Normbeis4 and 2) Tmpbeis4. Normbeis4 uses emissions factors and BELD6 landuse and gridded biomass data to compute gridded normalized emissions for chosen model domain (see Figure 2-13).  The BEIS4 emissions factor file (BEISFAC) contains leaf-area-indices (LAI), dry leaf biomass, winter biomass factor, indicator of specific leaf weight, Agricultural land type Yes/No (AG_YN), and normalized emission fluxes for 35 different species/compounds. The BELD6 file is the gridded landuse for 200+ different landuse types. The output gridded domain is the same as the input domain for the land use data. Output emission fluxes (BEIS_NORM_EMIS) are normalized to 30°C, and isoprene and methyl-butenol fluxes are also normalized to a photosynthetic active radiation of 1000 μmol/m$^2$s.

The normalized emissions output from Normbeis4 (BEIS_NORM_EMIS) are input into Tmpbeis4 along with the MCIP meteorological data, chemical speciation profile to use for desired chemical mechanism, and soil moisture data file.   Figure 2-14 illustrates the data flows for the Tmpbeis4 program.  The output from Tmpbeis includes gridded, speciated, hourly emissions both in moles/second (B4GTS_L) and tons/hour (B4GTS_S).  Biogenic emissions do not use an emissions inventory and do not have SCCs.  . Please see the SMOKEv4.9 User's Manual for more information on BEIS4 (https://www.cmascenter.org/smoke/documentation/4.9/html/ch04s19.html)

**Figure 2-13. Normbeis4 data flows for 2016v3**



**Figure 2-14. Tmpbeis4 data flow diagram for 2016v3**



.

## 2.7     Sources Outside of the United States

The emissions from Canada and Mexico and other areas outside of the U.S. are included in these emissions modeling sectors:  othpt, othar, othafdust, othptdust, onroad_can, onroad_mex, and ptfire_othna.  The "oth" refers to the fact that these emissions are usually "other" than those in the NEI, and the remaining characters provide the SMOKE source types: "pt" for point, "ar" for "area and nonroad mobile," "afdust" for area fugitive dust (Canada only), and "ptdust" for point fugitive dust. Because Canada and Mexico onroad mobile emissions are modeled differently from each other, they are separated into two sectors: onroad_can and onroad_mex.  Additional details for these sectors can be found in the 2016v1 platform specification sheets.

Canadian emissions were taken from the Environment and Climate Change Canada (ECCC) 2016 emission inventory, which was new for the 2016v2 platform.  New 2016 emissions were also provided for Mexico by SEMARNAT for 2016v2. The 2016v3 emissions for Canada and Mexico are unchanged from those in the 2016v2 platform.

### 2.7.1 Point Sources in Canada and Mexico (othpt, canada_ag, canada_og2D)

Canadian point sources were taken from the ECCC 2016 emission inventory, which was new for the 2016v2 platform.  The provided point source inventories include upstream oil and gas emissions, agricultural ammonia and VOC.  The Mexico point sources were taken from the SEMARNAT 2016 inventory.  These inventories were unchanged in the 2016v3 platform.

Due to the large number of points in the Canada inventories, for 2016v2 the agricultural sources were split into a separate sector called canada_ag so that the sources could be placed into layer 1 as plume rise calculations were not needed.  Similarly, there were a very large number of Canadian oil and gas point sources, most of which would be appropriate modeled in layer 1.  These sources were placed into the canada_og2D sector for layer 1 modeling. Reducing the size of the othpt sector sped up the air quality model run. The Canadian point source inventory is pre-speciated for the CB6 chemical mechanism.  Also for Canada, agricultural data were originally provided on a rotated 10-km grid for the 2016beta platform. These were smoothed out to avoid the artifact of grid lines in the processed emissions.  The data were

monthly resolution for Canadian agricultural and airport emissions, along with some Canadian point sources, and annual resolution for the remainder of Canada and all of Mexico.

## 2.7.2 Fugitive Dust Sources in Canada (othafdust, othptdust)

Fugitive dust sources of particulate matter emissions excluding land tilling from agricultural activities, were provided by Environment and Climate Change Canada (ECCC) as part of their 2016 emission inventory. Different source categories were provided as gridded point sources and area (nonpoint) source inventories.

Gridded point source emissions resulting from land tilling due to agricultural activities were provided as part of the ECCC 2016 emission inventory. The provided wind erosion emissions were removed. The data were originally provided on a rotated 10-km grid for the 2016 beta platform, but these were smoothed to avoid the artifact of grid lines appearing in the emissions output from SMOKE. The othptdust emissions have a monthly resolution.

A transport fraction adjustment that reduces dust emissions based on land cover types was applied to both point and nonpoint dust emissions, along with a meteorology-based (precipitation and snow/ice cover) zero-out of emissions when the ground is snow covered or wet. There were no updates made to the Canadian dust sources in the 2016v3 platform.

## 2.7.3 Nonpoint and Nonroad Sources in Canada and Mexico (othar)

ECCC provided year 2016 Canada province, and in some cases sub-province, resolution emissions from for nonpoint and nonroad sources. The nonroad sources were monthly while the nonpoint and rail emissions were annual. For Mexico, the 2016 Mexico nonpoint and nonroad inventories from SEMARNAT were used. All Mexico inventories were annual resolution. Canadian CMV inventories that had been included in the othar sector in past modeling platforms are now included in the cmv_c1c2 and cmv_c3 sectors as point sources. There were no updates made to the other sector emissions in the 2016v3 platform.

## 2.7.4 Onroad Sources in Canada and Mexico (onroad_can, onroad_mex)

ECCC provided monthly year 2016 onroad emissions for Canada at the province resolution or sub-province resolution depending on the province. For Mexico, monthly year 2016 onroad inventories at the municipio resolution unchanged from 2016v1 were used. The Mexico onroad emissions are based on MOVES-Mexico runs for 2014 and 2017 that were interpolated to 2016.

## 2.7.5 Fires in Canada and Mexico (*ptfire_othna*)

Annual point source 2016 day-specific wildland emissions for Mexico, Canada, Central America, and Caribbean nations were developed from a combination of the Fire Inventory from NCAR (FINN) daily fire emissions and fire data provided by ECCC when available. ECCC emissions were used for Canada wildland fire emissions for April through November and FINN fire emissions were used to fill in the annual gaps from January through March and December. Only CAP emissions are provided in the ptfire_othna sector inventories. In 2016v2 and 2016v3, the ptfire_othna emissions are unchanged from those used in 2016v1.

For FINN fires, listed vegetation type codes of 1 and 9 are defined as agricultural burning, all other fire detections and assumed to be wildfires. All wildland fires that are not defined as agricultural are assumed

to be wildfires rather than prescribed.  FINN fire detects less than 50 square meters (0.012 acres) are removed from the inventory.  The locations of FINN fires are geocoded from latitude and longitude to FIPS code.

## 2.7.6 Ocean Chlorine, Sea Salt, and Lightning NOx

The ocean chlorine gas emission estimates are based on the build-up of molecular chlorine ($Cl_2$) concentrations in oceanic air masses (Bullock and Brehme, 2002).  Data at 36 km and 12 km resolution were available and were not modified other than the model-species name "CHLORINE" was changed to "CL2" to support CMAQ modeling. The CL2 emissions are constant in all ocean grid cells. These data are unchanged from the data in 2016v1 and are passed to both CMAQ and CAMx.  Separately from the ocean chlorine, CMAQ computes sea salt particulate emissions inline during the model run.

For CAMx modeling, the OCEANIC preprocessor is used to compute emissions for the following pollutants over ocean water: sodium (NA), chlorine (PCL), sulfate (PSO4), dimethy sulfide (DMS), and gas phase bromine (SSBR) and chlorine (SSCL). Additional information is provided in Section 3.5.

The 2016 lightning NOx emissions were created using lightning flashes observed from the World Wide Lightning Location Network (WWLLN, operated by the University of Washington: http://www.wwlln.net). The observed lightning flashes were first gridded into the modeling grid cells as lightning flash density (flashes/km$^2$·hr), then the flash density was adjusted by applying the deMpas (http://wwlln.net/deMaps) factors to achieve a uniform global detection efficiency (DE) (Hutchins, 2012). The DE-adjusted WWLLN flash density was further scaled using factors derived based on climatological flash density ratios between lightning flashes observed from the National Lightning Detection Network (NLDN), which provides Cloud-to-Ground (CG) lightning observations with a DE of >95% and a location accuracy of about 150 m over the contiguous United States, and the lightning flashes observed from WWLLN. The scale factors vary over the month of the year and grid cell classifications (land versus ocean) (Kang, 2022). The scaled WWLLN (WWLLNs) flash densities were then used as lightning data input to a Fortran program (LNOx generator), that is part of the inline lightning NOx emissions production module in the CMAQ model since CMAQv5.2 but separated from the CMAQ code as a standalone program to generate lightning NOx emissions diagnostic files. To generate the 2D and 3D lightning NOx emissions files, the LNOx generator needs three other input files: METCRO2D to provide the surface pressure and horizontal domain configurations, METCRO3D to provide the vertical structure to distribute LNOx vertically, and a lightning parameter file that contains the geographically distributed climatological CG to cloud-to-cloud lightning flash ratios and the ocean masks (to identify grid cells over land vs over ocean).

# 3  Emissions Modeling

The CMAQ and CAMx air quality models require hourly emissions of specific gas and particle species for the horizontal and vertical grid cells contained within the modeled region (i.e., modeling domain). To provide emissions in the form and format required by the model, it is necessary to "pre-process" the "raw" emissions (i.e., emissions input to SMOKE) for the sectors described above in Section 2. In brief, the process of emissions modeling transforms the emissions inventories from their original temporal resolution, pollutant resolution, and spatial resolution into the hourly, speciated, gridded and vertical resolution required by the air quality model. Emissions modeling includes temporal allocation, spatial allocation, and pollutant speciation. Emissions modeling sometimes includes the vertical allocation (i.e., plume rise) of point sources, but many air quality models also perform this task because it greatly reduces the size of the input emissions files if the vertical layers of the sources are not included.

As discussed in Section 2, the temporal resolutions of the emissions inventories input to SMOKE vary across sectors and may be hourly, daily, monthly, or annual total emissions. The spatial resolution may be individual point sources; totals by county (U.S.), province (Canada), or municipio (Mexico); or gridded emissions. This section provides some basic information about the tools and data files used for emissions modeling as part of the modeling platform. For additional details that may not be covered in this section, see the specification sheets provided with the 2016v1 platform as many contain additional sector-specific information in spatial allocation, temporal allocation, and speciation that is still relevant for 2016v2 and 2016v3.

## 3.1     Emissions modeling Overview

SMOKE version 4.9 was used to process the raw emissions inventories into emissions inputs for each modeling sector into a format compatible with CMAQ, which were then converted to CAMx. For sectors that have plume rise, the in-line plume rise capability allows for the use of emissions files that are much smaller than full three-dimensional gridded emissions files. For quality assurance of the emissions modeling steps, emissions totals by specie for the entire model domain are output as reports that are then compared to reports generated by SMOKE on the input inventories to ensure that mass is not lost or gained during the emissions modeling process.

When preparing emissions for the air quality model, emissions for each sector are processed separately through SMOKE, and then the final merge program (Mrggrid) is run to combine the model-ready, sector-specific 2-D gridded emissions across sectors. The SMOKE settings in the run scripts and the data in the SMOKE ancillary files control the approaches used by the individual SMOKE programs for each sector. Table 3-1 summarizes the major processing steps of each platform sector with the columns as follows.

The "Spatial" column shows the spatial approach used: "point" indicates that SMOKE maps the source from a point location (i.e., latitude and longitude) to a grid cell; "surrogates" indicates that some or all of the sources use spatial surrogates to allocate county emissions to grid cells; and "area-to-point" indicates that some of the sources use the SMOKE area-to-point feature to grid the emissions (further described in Section 3.4.2).

The "Speciation" column indicates that all sectors use the SMOKE speciation step, though biogenic speciation is done within the Tmpbeis4 program and not as a separate SMOKE step.

The "Inventory resolution" column shows the inventory temporal resolution from which SMOKE needs to calculate hourly emissions.  Note that for some sectors (e.g., onroad, beis), there is no input inventory; instead, activity data and emission factors are used in combination with meteorological data to compute hourly emissions.

Finally, the "plume rise" column indicates the sectors for which the "in-line" approach is used.  These sectors are the only ones with emissions in aloft layers based on plume rise.  The term "in-line" means that the plume rise calculations are done inside of the air quality model instead of being computed by SMOKE.  In all of the "in-line" sectors, all sources are output by SMOKE into point source files which are subject to plume rise calculations in the air quality model. In other words, no emissions are output to layer 1 gridded emissions files from those sectors as has been done in past platforms. The air quality model computes the plume rise using stack parameters, the Briggs algorithm, and the hourly emissions in the SMOKE output files for each emissions sector.  The height of the plume rise determines the model layers into which the emissions are placed.  The plume top and bottom are computed, along with the plumes' distributions into the vertical layers that the plumes intersect. The pressure difference across each layer divided by the pressure difference across the entire plume is used as a weighting factor to assign the emissions to layers. This approach gives plume fractions by layer and source. Day-specific point fire emissions are treated differently in CMAQ.  After plume rise is applied, there are emissions in every layer from the ground up to the top of the plume.

**Table 3-1.  Key emissions modeling steps by sector.**

| Platform sector | Spatial | Speciation | Inventory resolution | Plume rise |
|---|---|---|---|---|
| afdust_adj | Surrogates | Yes | Annual | |
| afdust_ak_adj (36US3 only) | Surrogates | Yes | Annual | |
| airports | Point | Yes | Annual | None |
| beis | Pre-gridded land use and biomass data | in BEIS4 | computed hourly | |
| canada_ag | Point | Yes | monthly | None |
| canada_og2D | Point | Yes | Annual | None |
| cmv_c1c2 | Point | Yes | hourly | in-line |
| cmv_c3 | Point | Yes | hourly | in-line |
| fertilizer | Surrogates | No | monthly | |
| livestock | Surrogates | Yes | Annual | |
| nonpt | Surrogates & area-to-point | Yes | Annual | |
| nonroad | Surrogates | Yes | monthly | |
| np_oilgas | Surrogates | Yes | Annual | |
| np_solvents | Surrogates | Yes | annual | |
| onroad | Surrogates | Yes | monthly activity, computed hourly | |
| onroad_ca_adj | Surrogates | Yes | monthly activity, computed hourly | |
| onroad_nonconus (36US3 only) | Surrogates | Yes | monthly activity, computed hourly | |

| Platform sector | Spatial | Speciation | Inventory resolution | Plume rise |
|---|---|---|---|---|
| onroad_can | Surrogates | Yes | monthly | |
| onroad_mex | Surrogates | Yes | monthly | |
| othafdust_adj | Surrogates | Yes | annual | |
| othar | Surrogates | Yes | annual & monthly | |
| othpt | Point | Yes | annual & monthly | in-line |
| othptdust_adj | Point | Yes | monthly | None |
| ptagfire | Point | Yes | daily | in-line |
| pt_oilgas | Point | Yes | annual | in-line |
| ptegu | Point | Yes | daily & hourly | in-line |
| ptfire-rx | Point | Yes | daily | in-line |
| ptfire-wild | Point | Yes | daily | in-line |
| ptfire_othna | Point | Yes | daily | in-line |
| ptnonipm | Point | Yes | annual | in-line |
| rail | Surrogates | Yes | annual | |
| rwc | Surrogates | Yes | annual | |

Biogenic emissions can be modeled two different ways in the CMAQ model. The BEIS model in SMOKE can produce gridded biogenic emissions that are then included in the gridded CMAQ-ready emissions inputs, or alternatively, CMAQ can be configured to create "in-line" biogenic emissions within CMAQ itself. For this platform, biogenic emissions were processed in SMOKE and included in the gridded CMAQ-ready emissions. When CAMx is the targeted air quality model, BEIS is run within SMOKE and the resulting emissions are included with the ground-level emissions input to CAMx.

In 2016v3 platform for the 2016gf case, SMOKE was run in such a way that it produced both diesel and non-diesel outputs for onroad and nonroad emissions that later get merged into the low-level emissions fed into the air quality model. This facilitates advanced speciation treatments that are sometimes used in CMAQ. The onroad emissions were processed in a single sector and were not split between gas a diesel for the 2023gf and 2026gf cases.

SMOKE has the option of grouping sources so that they are treated as a single stack when computing plume rise. For this platform, no grouping was performed because grouping combined with "in-line" processing will not give identical results as "offline" processing (i.e., when SMOKE creates 3-dimensional files). This occurs when stacks with different stack parameters or latitudes/longitudes are grouped, thereby changing the parameters of one or more sources. The most straightforward way to get the same results between in-line and offline is to avoid the use of grouping.

SMOKE was run for two modeling domains: a 36-km resolution CONtinental United States "CONUS" modeling domain (36US3), and a 12-km resolution domain. Specifically, SMOKE was run on the 12US1 domain and emissions were extracted from 12US1 data files to create 12US2 emissions for 2016, 2023, and 2026. Emissions were developed for 36US3 for 2016 and 2023 only. The outputs of CAMx on the 36US3 grid are used to create boundary conditions for the 12US2 domains. For 2026 , the 2023 boundary conditions were used. The domains are shown in Figure 3-1. All grids use a Lambert-Conformal projection, with Alpha = 33º, Beta = 45º and Gamma = -97º, with a center of X = -97º and Y = 40º. Table 3-2 describes the grids for the three domains.

**Table 3-2.  Descriptions of the platform grids**

| Common Name | Grid Cell Size | Description (see Figure 3-1) | Grid name | Parameters listed in SMOKE grid description (GRIDDESC) file: projection name, xorig, yorig, xcell, ycell, ncols, nrows, nthik |
|---|---|---|---|---|
| Continental 36km grid | 36 km | Entire conterminous US, almost all of Mexico, most of Canada (south of 60°N) | 36US3 | 'LAM_40N97W', -2952000, -2772000, 36.D3, 36.D3, 172, 148, 1 |
| Continental 12km grid | 12 km | Entire conterminous US plus some of Mexico/Canada | 12US1_459X299 | 'LAM_40N97W', -2556000, -1728000, 12.D3, 12.D3, 459, 299, 1 |
| US 12 km or "smaller" CONUS-12 | 12 km | Smaller 12km CONUS plus some of Mexico/Canada | 12US2 | 'LAM_40N97W', -2412000 , -1620000, 12.D3, 12.D3, 396, 246, 1 |

**Figure 3-1. Air quality modeling domains**



## *3.2*     *Chemical Speciation*

The emissions modeling step for chemical speciation creates the "model species" needed by the air quality model for a specific chemical mechanism.  These model species are either individual chemical compounds (i.e., "explicit species") or groups of species (i.e., "lumped species").  The chemical mechanism used for the 2016 platform is the CB6R3AE7 mechanism (Yarwood, 2010, Luecken, 2019). In CB6R3AE7, additional species that are not included in the CB6 chemical mechanism include acetic acid (ACET), alpha pinene (APIN), formic acid (FACD), and intermediate volatility organic compounds (IVOC). This mapping uses a new systematic methodology for mapping low volatility compounds. Compounds with very low vapor pressure are mapped to model species NVOL and intermediate volatility compounds are mapped to a species called IVOC.  In previous mappings, some of these low vapor pressure compounds were mapped to CB6 species. The mechanism and mapping are described in more detail in a memorandum (Ramboll, 2020) describing the mechanism files supplied with the Speciation Tool, the software used to create the CB6 profiles used in SMOKE. It should be noted that the onroad mobile sector does not use this newer mapping because the speciation is done within MOVES and the mapping change was made after MOVES had been run.  This platform generates the $PM_{2.5}$ model species associated with the CMAQ Aerosol Module version 7 (AE7).

For 2016v3, the key changes to speciation involved updating some speciation cross references and using newly available speciation profiles for solvents, oil and gas, and some point source SCCs. In addition, the mapping for SOAALK species were updated to exclusively include linear and branched alkanes with more than 8 carbons or cyclic alkanes with more than 6 carbons (Pye, 2012).

Table 3-3 lists the model species produced by SMOKE in the platform used for this study.  Updates to species assignments for CB05 and CB6 were made for the 2014v7.1 platform.  These continue to be used in the 2016v3 platform and are described in Appendix A.

**Table 3-3. Emission model species produced for CB6R3AE7 for CMAQ**

| Inventory Pollutant | Model Species | Model species description |
|---|---|---|
| $Cl_2$ | CL2 | Atomic gas-phase chlorine |
| HCl | HCL | Hydrogen Chloride (hydrochloric acid) gas |
| CO | CO | Carbon monoxide |
| $NO_X$ | NO | Nitrogen oxide |
| $NO_X$ | NO2 | Nitrogen dioxide |
| $NO_X$ | HONO | Nitrous acid |
| $SO_2$ | SO2 | Sulfur dioxide |
| $SO_2$ | SULF | Sulfuric acid vapor |
| $NH_3$ | NH3 | Ammonia |
| $NH_3$ | NH3_FERT | Ammonia from fertilizer |
| VOC | AACD | Acetic acid |
| VOC | ACET | Acetone |
| VOC | ALD2 | Acetaldehyde |
| VOC | ALDX | Propionaldehyde and higher aldehydes |
| VOC | APIN | Alpha pinene |
| VOC | BENZ | Benzene (not part of CB05) |
| VOC | CH4 | Methane |
| VOC | ETH | Ethene |

| Inventory Pollutant | Model Species | Model species description |
|---|---|---|
| VOC | ETHA | Ethane |
| VOC | ETHY | Ethyne |
| VOC | ETOH | Ethanol |
| VOC | FACD | Formic acid |
| VOC | FORM | Formaldehyde |
| VOC | IOLE | Internal olefin carbon bond (R-C=C-R) |
| VOC | ISOP | Isoprene |
| VOC | IVOC | Intermediate volatility organic compounds |
| VOC | KET | Ketone Groups |
| VOC | MEOH | Methanol |
| VOC | NAPH | Naphthalene |
| VOC | NVOL | Non-volatile compounds |
| VOC | OLE | Terminal olefin carbon bond (R-C=C) |
| VOC | PAR | Paraffin carbon bond |
| VOC | PRPA | Propane |
| VOC | SESQ | Sesquiterpenes (from biogenics only) |
| VOC | SOAALK | Secondary Organic Aerosol (SOA) tracer |
| VOC | TERP | Terpenes (from biogenics only) |
| VOC | TOL | Toluene and other monoalkyl aromatics |
| VOC | UNR | Unreactive |
| VOC | XYLMN | Xylene and other polyalkyl aromatics, minus naphthalene |
| Naphthalene | NAPH | Naphthalene from inventory |
| Benzene | BENZ | Benzene from the inventory |
| Acetaldehyde | ALD2 | Acetaldehyde from inventory |
| Formaldehyde | FORM | Formaldehyde from inventory |
| Methanol | MEOH | Methanol from inventory |
| $PM_{10}$ | PMC | Coarse PM > 2.5 microns and ≤ 10 microns |
| $PM_{2.5}$ | PEC | Particulate elemental carbon ≤ 2.5 microns |
| $PM_{2.5}$ | PNO3 | Particulate nitrate ≤ 2.5 microns |
| $PM_{2.5}$ | POC | Particulate organic carbon (carbon only) ≤ 2.5 microns |
| $PM_{2.5}$ | PSO4 | Particulate Sulfate ≤ 2.5 microns |
| $PM_{2.5}$ | PAL | Aluminum |
| $PM_{2.5}$ | PCA | Calcium |
| $PM_{2.5}$ | PCL | Chloride |
| $PM_{2.5}$ | PFE | Iron |
| $PM_{2.5}$ | PK | Potassium |
| $PM_{2.5}$ | PH2O | Water |
| $PM_{2.5}$ | PMG | Magnesium |
| $PM_{2.5}$ | PMN | Manganese |
| $PM_{2.5}$ | PMOTHR | $PM_{2.5}$ not in other AE6 species |
| $PM_{2.5}$ | PNA | Sodium |
| $PM_{2.5}$ | PNCOM | Non-carbon organic matter |
| $PM_{2.5}$ | PNH4 | Ammonium |
| $PM_{2.5}$ | PSI | Silica |
| $PM_{2.5}$ | PTI | Titanium |

One additional species in the emissions files but not in the above table is non-methane organic gases (NMOG). This facilitates ongoing advanced work in speciation and is created using an additional GSPRO component that creates NMOG for all TOG and NONHAPTOG profiles plus all integrate HAPs. This species is not used for traditional ozone and particulate matter-focused modeling applications.

The TOG and $PM_{2.5}$ speciation factors that are the basis of the chemical speciation approach for 2016v3 were developed from the SPECIATE 5.2 database ([https://www.epa.gov/air-emissions-modeling/speciate-2](https://www.epa.gov/air-emissions-modeling/speciate-2)), the EPA's repository of TOG and PM speciation profiles of air pollution sources. Noting that the 2016v2 platform used profiles from a draft of SPECIATE 5.2. The SPECIATE database development and maintenance is a collaboration involving the EPA's Office of Research and Development (ORD), Office of Transportation and Air Quality (OTAQ), and the Office of Air Quality Planning and Standards (OAQPS), in cooperation with ECCC (EPA, 2016).    The SPECIATE database contains speciation profiles for TOG, speciated into individual chemical compounds, VOC-to-TOG conversion factors associated with the TOG profiles, and speciation profiles for $PM_{2.5}$.

As with previous platforms, some Canadian point source inventories are provided from ECCC as pre-speciated emissions; although not all CB6 species are provided, the inventories were not supplemented with missing species due to the minimal impact of supplementation.

Speciation updates made for 2016v3 platform included:

- Updated assignments to VOC profiles for 6 SCCs (all pulp and paper) and PM2.5 profiles for 3 SCCs (2 pulp and paper, 1 natural gas).

- Updated profile assignments for solvents.

- Re-mapped the profile for SCC 2310010200 from 2487 to 95247.

- Remapped all point and nonpoint SCCs that were mapped to profile 1011 to 95404. The major SCCs mapped to this profile are associated with oil production processes related fugitive leaks/venting. Profile 95404 is a composite profile from untreated oil wells.

- Remapped all point and nonpoint SCCs that were mapped to profile 1207 to profile 95782 (a profile for produced water for non-coal bed methane). These are for non-CBM produced water. We note that CBM produced water is using a Wyoming profile and 95782 is a non-CBM produced water profile also sampled in Wyoming.

Some updates to speciation profiles from previous platforms include the following:

- Additional oil and gas profiles were added (e.g., UTUBOGC, UTUBOGE, UTUBOGF);

- WRAP oil and gas profiles were used for the WRAP oil and gas inventory, although many WRAP profiles were also used in the 2016v1 platform.

Updates to the VOC speciation cross reference implemented in 2016v2 and carried into 2016v3 included:

- changed all 8746 to G8746 (Profile name: Rice Straw and Wheat Straw Burning Composite of G4420 and G4421);

- changed 2104008230/330 from 1084 to 4642 to match all other RWC SCCs (corrections_changes .docx said 4462 but this was an obvious typo and should be 4642);

- changed 2680001000 from 0000 to G95241TOG;

- updated cross reference to use Uinta Basin oil/gas profiles

- substituted profile 95417 with either UTUBOGC (2310010300, 2310011500, 2310111401, 2310010700, 2310010400, 31000107) or UTUBOGD (other SCCs);

- substituted profile 95418 with UTUBOGF;

- substituted profile 95419 with UTUBOGE;

- for Pennsylvania oil and gas profiles, substituted all 8949 with PAGAS01 (FIPS 42059 only), PAGAS02 (FIPS 42019 only), PAGAS03 (FIPS 42125 only);

- for Colorado SCC 2310030300:,Set Archuleta/La Plata to SUIROGWT (counties are in Southern Ute reservation), rest of Colorado to DJTFLR95;

- for Colorado SCC 2310030220: Set to DJTFLR95 (formerly FLR99);

- for Colorado 2310021010: Set Archuleta/La Plata to SUIROGCT (counties are in Southern Ute reservation), rest of Colorado to 95398;

- for SCC 2310000551 (CBM produced water) use the new profile CBMPWWY.

Updates to PM speciation cross references implemented in 2016v2 and carried into 2016v3 included:

- where the comment says the "Heat Treating" profile should be used, changed the profile code to 91123 which is the actual Heat Treating profile;

- for SCC 2801500250, changed to profile SUGP02 (a new sugar cane burning profile);

- for SCC 30400740, changed to profile 95475;

- used new fire profiles for fire PM. Note that all US states (not DC/HI/PR/VI) now use one of the new profiles for all fire SCCs, including grassland fires. The profiles themselves aren't entirely state-specific; there are four representative states for forest fires and two representative states for grass fires, and all states are mapped to one of the four representative forest states and one of the two representative grass states. The GSREFs still have a non-FIPS-specific assignment to the previous profile 3766AE6 for fires outside of the United States.

Speciation profiles and cross-references for this study platform are available in the SMOKE input files for the 2016 platform. Emissions of VOC and $PM_{2.5}$ emissions by county, sector and profile for all sectors other than onroad mobile can be found in the sector summaries for the case. Totals of each model species by state and sector can be found in the state-sector totals workbook for this case.

### 3.2.1 VOC speciation

The speciation of VOC includes HAP emissions from the NEI in the speciation process. Instead of speciating VOC to generate all species listed in Table 3-3, emissions of five specific HAPs from the NEI were "integrated" with the NEI VOC. These HAPs include naphthalene, benzene, acetaldehyde, formaldehyde and methanol (collectively known as "NBAFM"). The integration combines these HAPs with the VOC in a way that does not double count emissions and uses the HAP inventory directly in the speciation process. The basic process is to subtract the specified HAPs emissions mass from the VOC emissions mass, and to use a special "integrated" profile to speciate the remainder of VOC to the model species excluding the specific HAPs. The EPA believes that the HAP emissions in the NEI are often

more representative of emissions than HAP emissions generated via VOC speciation, although this varies by sector.

The NBAFM HAPs were chosen for integration because they are the only explicit VOC HAPs in the CMAQ version 5.2. Explicit means that they are not lumped chemical groups like PAR, IOLE and several other CB6 model species. These "explicit VOC HAPs" are model species that participate in the modeled chemistry using the CB6 chemical mechanism. The use of inventory HAP emissions along with VOC is called "HAP-CAP integration."

The integration of HAPs with VOC is a feature available in SMOKE for all inventory formats, including PTDAY (the format used for the ptfire and ptagfire sectors). The ability to use integration with the PTDAY format is used for the ptfire-rx and ptfire-wild sectors in the 2016 platform, but not for the ptagfire sector which does not include HAPs. SMOKE allows the user to specify the particular HAPs to integrate via the INVTABLE. This is done by setting the "VOC or TOG component" field to "V" for all HAP pollutants chosen for integration. SMOKE allows the user to also choose the particular sources to integrate via the NHAPEXCLUDE file (which actually provides the sources to be *excluded* from integration[21]). For the "integrated" sources, SMOKE subtracts the "integrated" HAPs from the VOC (at the source level) to compute emissions for the new pollutant "NONHAPVOC." The user provides NONHAPVOC-to-NONHAPTOG factors and NONHAPTOG speciation profiles.[22] SMOKE computes NONHAPTOG and then applies the speciation profiles to allocate the NONHAPTOG to the other air quality model VOC species not including the integrated HAPs. After determining if a sector is to be integrated, if all sources have the appropriate HAP emissions, then the sector is considered fully integrated and does not need a NHAPEXCLUDE file. If, on the other hand, certain sources do not have the necessary HAPs, then an NHAPEXCLUDE file must be provided based on the evaluation of each source's pollutant mix. The EPA considered CAP-HAP integration for all sectors in determining whether sectors would have full, no or partial integration (see Figure 3-2). For sectors with partial integration, all sources are integrated other than those that have either the sum of NBAFM > VOC or the sum of NBAFM = 0.

In this platform, NBAFM species are created from the no-integrate source VOC emissions using speciation profiles and do not use HAPs from the inventory. Figure 3-2 illustrates the integrate and no-integrate processes for U.S. Sources. Since Canada and Mexico inventories do not contain HAPs, we use the approach of generating the HAPs via speciation, except for Mexico onroad mobile sources where emissions for integrate HAPs were available.

It should be noted that even though NBAFM were removed from the SPECIATE profiles used to create the GSPRO for both the NONHAPTOG TOG profiles, there still may be small fractions for "BENZ", "FORM", "ALD2", and "MEOH" present. This is because these model species may have come from species in SPECIATE that are mixtures. The quantity of these model species is expected to be very small compared to the BAFM in the NEI. There are no NONHAPTOG profiles that produce "NAPH."

---

[21] Since SMOKE version 3.7, the options to specify sources for integration are expanded so that a user can specify the particular sources to include or exclude from integration, and there are settings to include or exclude all sources within a sector. In addition, the error checking is significantly stricter for integrated sources. If a source is supposed to be integrated, but it is missing NBAFM or VOC, SMOKE will now raise an error.

[22] These ratios and profiles are typically generated from the Speciation Tool when it is run with integration of a specified list of pollutants, for example NBAFM.

In SMOKE, the INVTABLE allows the user to specify the HAPs to integrate. Two different INVTABLE files were used for different sectors of the platform. For sectors that had no integration across the entire sector (see Table 3-4), a "no HAP use" INVTABLE in which the "KEEP" flag was set to "N" for NBAFM pollutants was used. Thus, any NBAFM pollutants in the inventory input into SMOKE are automatically dropped. This approach both avoids double-counting of these species and assumes that the VOC speciation is the best available approach for these species for sectors using this approach. The second INVTABLE, used for sectors in which one or more sources are integrated, causes SMOKE to keep the inventory NBAFM pollutants and indicates that they are to be integrated with VOC. This is done by setting the "VOC or TOG component" field to "V" for all five HAP pollutants. For the onroad and nonroad sectors, "full integration" includes the integration of benzene, 1,3 butadiene, formaldehyde, acetaldehyde, naphthalene, acrolein, ethyl benzene, 2,2,4-Trimethylpentane, hexane, propionaldehyde, styrene, toluene, xylene, and methyl tert-butyl ether (MTBE).

**Figure 3-2. Process of integrating NBAFM with VOC for use in VOC Speciation**



CMAQ-CB6 species

**Table 3-4. Integration status of naphthalene, benzene, acetaldehyde, formaldehyde and methanol (NBAFM) for each platform sector**

| Platform Sector | Approach for Integrating NEI emissions of Naphthalene (N), Benzene (B), Acetaldehyde (A), Formaldehyde (F) and Methanol (M) |
|---|---|
| ptegu | No integration, create NBAFM from VOC speciation |
| ptnonipm | No integration, create NBAFM from VOC speciation |
| ptfire-rx | Partial integration (NBAFM) |
| ptfire-wild | Partial integration (NBAFM) |

97

| Platform Sector | Approach for Integrating NEI emissions of Naphthalene (N), Benzene (B), Acetaldehyde (A), Formaldehyde (F) and Methanol (M) |
|---|---|
| ptfire_othna | No integration, no NBAFM in inventory, create NBAFM from VOC speciation |
| ptagfire | No integration, no NBAFM in inventory, create NBAFM from VOC speciation |
| airports | No integration, create NBAFM from VOC speciation |
| afdust | N/A – sector contains no VOC |
| beis | N/A – sector contains no inventory pollutant "VOC"; but rather specific VOC species |
| cmv_c1c2 | Full integration (NBAFM) |
| cmv_c3 | Full integration (NBAFM) |
| fertilizer | N/A – sector contains no VOC |
| livestock | Partial integration (NBAFM) |
| rail | Full integration (NBAFM) |
| nonpt | Partial integration (NBAFM) |
| np_solvents | Partial integration (NBAFM) |
| nonroad | Full integration (internal to MOVES) |
| np_oilgas | Partial integration (NBAFM) |
| othpt | No integration, no NBAFM in inventory, create NBAFM from VOC speciation |
| pt_oilgas | No integration, create NBAFM from VOC speciation |
| rwc | Partial integration (NBAFM) |
| onroad | Full integration (internal to MOVES); however, MOVES2014a speciation was CB6-CAMx, not CB6-CMAQ, so post-SMOKE emissions were converted to CB6-CMAQ |
| onroad_can | No integration, no NBAFM in inventory, create NBAFM from speciation |
| onroad_mex | Full integration (internal to MOVES-Mexico); however, MOVES-MEXICO speciation was CB6-CAMx, not CB6-CMAQ, so post-SMOKE emissions were converted to CB6-CMAQ |
| othafdust | N/A – sector contains no VOC |
| othptdust | N/A – sector contains no VOC |
| othar | No integration, no NBAFM in inventory, create NBAFM from VOC speciation |
| canada_ag | No integration, no NBAFM in inventory, create NBAFM from speciation |
| canada_og2D | No integration, no NBAFM in inventory, create NBAFM from speciation |

Integration for the mobile sources estimated from MOVES (onroad and nonroad sectors, other than for California) is done differently. Briefly, there are three major differences: 1) for these sources integration is done using more than just NBAFM, 2) all sources from the MOVES model are integrated, and 3) integration is done fully or partially within MOVES. For onroad mobile, speciation is done fully within MOVES3 such that the MOVES model outputs emission factors for individual VOC model species along with the HAPs. This requires MOVES to be run for a specific chemical mechanism. For this platform MOVES was run for the CB6R3AE7 mechanism. Following the run of SMOKE-MOVES, NMOG emissions were added to the data files through a post-SMOKE processor.

For nonroad mobile, speciation is partially done within MOVES such that it does not need to be run for a specific chemical mechanism. For nonroad, MOVES outputs emissions of HAPs and NONHAPTOG are split by speciation profile. Taking into account that integrated species were subtracted out by MOVES already, the appropriate speciation profiles are then applied in SMOKE to get the VOC model species. HAP integration for nonroad uses the same additional HAPs and ethanol as for onroad.

### 3.2.1.1   County specific profile combinations

SMOKE can compute speciation profiles from mixtures of other profiles in user-specified proportions via two different methods. The first method, which uses a GSPRO_COMBO file, has been in use since the 2005 platform; the second method (GSPRO with fraction) was used for the first time in the 2014v7.0

platform.  The GSPRO_COMBO method uses profile combinations specified in the GSPRO_COMBO ancillary file by pollutant (which can include emissions mode, e.g., EXH__VOC), state and county (i.e., state/county FIPS code) and time period (i.e., month).  Different GSPRO_COMBO files can be used by sector, allowing for different combinations to be used for different sectors; but within a sector, different profiles cannot be applied based on SCC.  The GSREF file indicates that a specific source uses a combination file with the profile code "COMBO."  SMOKE computes the resultant profile using the fraction of each specific profile assigned by county, month and pollutant.

Starting with the 2016v7.2 beta and regional haze platforms, a GSPRO_COMBO is used to specify a mix of E0 and E10 fuels in Canada. ECCC provided percentages of ethanol use by province, and these were converted into E0 and E10 splits. For example, Alberta has 4.91% ethanol in its fuel, so we applied a mix of 49.1% E10 profiles (4.91% times 10, since 10% ethanol would mean 100% E10), and 50.9% E0 fuel. Ethanol splits for all provinces in Canada are listed in Table 3-5. The Canadian onroad inventory includes four distinct FIPS codes in Ontario, allowing for application of different E0/E10 splits in Southern Ontario versus Northern Ontario. In Mexico, only E0 profiles are used.

**Table 3-5. Ethanol percentages by volume by Canadian province**

| Province | Ethanol % by volume (E10 = 10%) |
|---|---|
| Alberta | 4.91% |
| British Columbia | 5.57% |
| Manitoba | 9.12% |
| New Brunswick | 4.75% |
| Newfoundland & Labrador | 0.00% |
| Nova Scotia | 0.00% |
| NW Territories | 0.00% |
| Nunavut | 0.00% |
| Ontario (Northern) | 0.00% |
| Ontario (Southern) | 7.93% |
| Prince Edward Island | 0.00% |
| Québec | 3.36% |
| Saskatchewan | 7.73% |
| Yukon | 0.00% |

A new method to combine multiple profiles became available in SMOKE4.5.  It allows multiple profiles to be combined by pollutant, state and county (i.e., state/county FIPS code) and SCC.  This was used specifically for the oil and gas sectors (pt_oilgas and np_oilgas) because SCCs include both controlled and uncontrolled oil and gas operations which use different profiles.

### 3.2.1.2  Additional sector specific considerations for integrating HAP emissions from inventories into speciation

The decision to integrate HAP emissions into the speciation was made on a sector-by-sector basis.  For some sectors, there is no integration and VOC is speciated directly; for some sectors, there is full integration meaning all sources are integrated; and for other sectors, there is partial integration, meaning some sources are not integrated and other sources are integrated.  The integrated HAPs are either NBAFM or, in the case of MOVES (onroad, nonroad, and MOVES-Mexico), a larger set of HAPs plus ethanol are integrated.  Table 3-4 above summarizes the integration method for each platform sector.

Speciation for the onroad sector is unique.  First, SMOKE-MOVES is used to create emissions for these sectors and both the MEPROC and INVTABLE files are involved in controlling which pollutants are processed.  Second, the speciation occurs within MOVES itself, not within SMOKE.  The advantage of using MOVES to speciate VOC is that during the internal calculation of MOVES, the model has complete information on the characteristics of the fleet and fuels (e.g., model year, ethanol content, process, etc.), thereby allowing it to more accurately make use of specific speciation profiles.  This means that MOVES produces emission factor tables that include inventory pollutants (e.g., TOG) and model-ready species (e.g., PAR, OLE, etc).[23]  SMOKE essentially calculates the model-ready species by using the appropriate emission factor without further speciation.[24]  Third, MOVES' internal speciation uses full integration of an extended list of HAPs beyond NBAFM (called "M-profiles").  The M-profiles integration is very similar to NBAFM integration explained above except that the integration calculation (see Figure 3-2) is performed on emissions factors instead of on emissions, and a much larger set of pollutants are integrated besides NBAFM.  The list of integrated pollutants is described in Table 3-6.  An additional run of the Speciation Tool was necessary to create the M-profiles that were then loaded into the MOVES default database.  Fourth, for California, the EPA applied adjustment factors to SMOKE-MOVES to produce California adjusted model-ready files.  By applying the ratios through SMOKE-MOVES, the CARB inventories are essentially speciated to match EPA estimated speciation.  This resulted in changes to the VOC HAPs from what CARB submitted to the EPA.

### Table 3-6.  MOVES integrated species in M-profiles

| MOVES ID | Pollutant Name |
|---|---|
| 5 | Methane (CH4) |
| 20 | Benzene |
| 21 | Ethanol |
| 22 | MTBE |
| 24 | 1,3-Butadiene |
| 25 | Formaldehyde |
| 26 | Acetaldehyde |
| 27 | Acrolein |
| 40 | 2,2,4-Trimethylpentane |
| 41 | Ethyl Benzene |
| 42 | Hexane |
| 43 | Propionaldehyde |
| 44 | Styrene |
| 45 | Toluene |
| 46 | Xylene |
| 185 | Naphthalene gas |

---

[23] Because the EF table has the speciation "baked" into the factors, all counties that are in the county group (i.e., are mapped to that representative county) will have the same speciation.

[24] For more details on the use of model-ready EF, see the SMOKE 3.7 documentation: https://www.cmascenter.org/smoke/documentation/3.7/html/.

For the nonroad sector, all sources are integrated using the same list of integrated pollutants as shown in Table 3-6. The integration calculations are performed within MOVES. For California and Texas, all VOC HAPs were recalculated using MOVES HAP/VOC ratios based on the MOVES run so that VOC speciation methodology would be consistent across the country. NONHAPTOG emissions by speciation profile were also calculated based on MOVES data in California in Texas.

For nonroad emissions in California and Texas, where state-provided emissions were used, MOVES-style speciation has been implemented in 2016v2 and carried into 2016v3, with NONHAPTOG and PM2.5 pre-split by profiles and with all the HAPs needed for VOC speciation augmented based on MOVES data in CA and TX. This means in 2016v2 and 2016v3, onroad emissions in California and Texas are speciated consistently with the rest of the country, while in 2016v1 they were speciated using older speciation profiles.

MOVES-MEXICO for onroad used the same speciation approach as for the U.S. in that the larger list of species shown in Table 3-6 was used. However, MOVES-MEXICO used an older version of the CB6 mechanism sometimes referred to as "CB6-CAMx". That mechanism is missing the model species XYLMN and SOAALK and were added post-SMOKE as follows:

- XYLMN = XYL[1]-0.966*NAPHTHALENE[1]
- PAR = PAR[1]-0.00001*NAPHTHALENE[1]
- SOAALK = 0.108*PAR[1]

The CB6R3AE7 mechanism includes other new species which are not part of CB6-CAMx, such as IVOC. CB6R3AE7-specific species were not added to the MOVES-MEXICO emissions because those extra species would be expected to have only a minor impact.

For the beis sector, the speciation profiles used by BEIS are not included in SPECIATE. BEIS4 includes the species (SESQ) that is mapped to the BEIS model species SESQT (Sesquiterpenes). The profile code associated with BEIS4 for use with CB05 is "B10C5," while the profile for use with CB6 is "B10C6." The main difference between the profiles is the explicit treatment of acetone emissions in B10C6. The biogenic speciation files are managed in the CMAQ Github repository [25].

### 3.2.1.3   Oil and gas related speciation profiles

Several oil and gas profiles were developed or assigned to sources in np_oilgas and pt_oilgas to better reflect region-specific differences in VOC composition and whether the process SCC would include controlled emissions, considering the controls are not part of the SCC. For example, SCC 2310030300 (Gas Well Water Tank Losses) in Colorado are controlled by a 95% efficient flare, so a profile (DJTFLR95) was developed to represent the composition of the VOC exiting the flare. Region-specific profiles were also available for several areas, some of which were included in SPECIATE5.1 and others added to SPECIATE v5.2. These profiles are used in the 2016v3 platform and are listed in Appendix B. Additional documentation is available in the SPECIATE database.

For the profiles in SPECIATE v5.2:

- The Southern Ute profiles (SUIROGCT and SUIROGWT) applied to Archuleta and La Plata counties in southwestern Colorado were developed from data provided in Tables 19 and 20 of the report by Oakley Hayes, Matt Wampler, Danny Powers (December 2019), "Final Report for 2017

---

[25] https://github.com/USEPA/CMAQ/blob/main/CCTM/src/biog/beis4/gspro_biogenics.txt.

Southern Ute Indian Tribe Comprehensive Emissions Inventory for Criteria Pollutants, Hazardous Air Pollutants, and Greenhouse Gases."[26]

- A composite coal bed methane produced water profile, CBMPWWY, was developed by compositing a subset of the SPECIATE 5.0 pond profiles associated with coal bed methane wells. The SPECIATE 5.0 pond profiles were developed based on the publication: "Lyman, Seth N, Marc L Mansfield, Huy NQ Tran, Jordan D Evans, Colleen Jones, Trevor O'Neil, Ric Bowers, Ann Smith, and Cara Keslar. 2018. 'Emissions of Organic Compounds from Produced Water Ponds I: Characteristics and Speciation', Science of the Total Environment, 619: 896-905[27]." Note that the pond profiles from this publication are included in SPECIATE 5.0; but a composite to represent coal bed methane wells had not been developed for SPECIATE 5.0 and this new profile is in SPECIATE 5.2.

- The DJTFLR95 profile, DJ Condensate Flare Profile with DRE 95%, filled a need for the flared condensate and produced water tanks for Colorado's oil and gas operations. This profile was developed using the same approach as was used for the FLR99 (and other FLR**) SPECIATE 4.5 profiles, but instead of using profile 8949 for the uncombusted gas, it uses the Denver-Julesburg Basin Condensate composite (95398) and it quantifies the combustion by-products based on a 95% DRE. The approach for combining profile 95398 with combustion by-products based on the TCEQ's flare study (Allen, David T, and Vincent M Torres, University of Texas, Austin. 2011. 'TCEQ 2010 Flare Study Final Report', Texas Commission on Environmental Quality[28]) is the same as used in the workbook for the FLR** SPECIATE4.5 profiles and can be found in the flr99 zip file referenced in the SPECIATE database. The approach uses the analysis developed by Ramboll (Ramboll and EPA, 2017).

In addition to region-specific assignments, multiple profiles were assigned to select county/SCC combinations using the SMOKE feature discussed in 3.2.1.1. Oil and gas SCCs for associated gas, condensate tanks, crude oil tanks, dehydrators, liquids unloading and well completions represent the total VOC from the process, including the portions of process that may be flared or directed to a reboiler. For example, SCC 2310021400 (gas well dehydrators) consists of process, reboiler, and/or flaring emissions. There are not separate SCCs for the flared portion of the process or the reboiler. However, the VOC associated with these three portions can have very different speciation profiles. Therefore, it is necessary to have an estimate of the amount of VOC from each of the portions (process, flare, reboiler) so that the appropriate speciation profiles can be applied to each portion. The Nonpoint Oil and Gas Emission Estimation Tool generates an intermediate file which provides flare, non-flare (process), and reboiler (for dehydrators) emissions for six source categories that have flare emissions: by county FIPS and SCC code for the U.S. From these emissions the fraction of the emissions to assign to each profile was computed and incorporated into the 2016v2 and v3 platforms. These fractions can vary by county FIPS, because they depend on the level of controls, which is an input to the Speciation Tool.

---

[26] https://www.southernute-nsn.gov/wp-content/uploads/sites/15/2019/12/191203-SUIT-CY2017-Emissions-Inventory-Report-FINAL.pdf.
[27] http://doi.org/10.1016/j.scitotenv.2017.11.161.
[28] https://downloads.regulations.gov/EPA-HQ-OAR-2012-0133-0047/attachment_32.pdf

**Table 3-7.  Basin/Region-specific profiles for oil and gas**

| Profile Code | Description | Region (if not in profile name) |
|---|---|---|
| DJVNT_R | Denver-Julesburg Basin Produced Gas Composition from Non-CBM Gas Wells | |
| PNC01_R | Piceance Basin Produced Gas Composition from Non-CBM Gas Wells | |
| PNC02_R | Piceance Basin Produced Gas Composition from Oil Wells | |
| PNC03_R | Piceance Basin Flash Gas Composition for Condensate Tank | |
| PNCDH | Piceance Basin, Glycol Dehydrator | |
| PRBCB_R | Powder River Basin Produced Gas Composition from CBM Wells | |
| PRBCO_R | Powder River Basin Produced Gas Composition from Non-CBM Wells | |
| PRM01_R | Permian Basin Produced Gas Composition for Non-CBM Wells | |
| SSJCB_R | South San Juan Basin Produced Gas Composition from CBM Wells | |
| SSJCO_R | South San Juan Basin Produced Gas Composition from Non-CBM Gas Wells | |
| SWFLA_R | SW Wyoming Basin Flash Gas Composition for Condensate Tanks | |
| SWVNT_R | SW Wyoming Basin Produced Gas Composition from Non-CBM Wells | |
| UNT01_R | Uinta Basin Produced Gas Composition from CBM Wells | |
| WRBCO_R | Wind River Basin Produced Gagres Composition from Non-CBM Gas Wells | |
| 95087a | Oil and Gas - Composite - Oil Field - Oil Tank Battery Vent Gas | East Texas |
| 95109a | Oil and Gas - Composite - Oil Field - Condensate Tank Battery Vent Gas | East Texas |
| 95417 | Uinta Basin, Untreated Natural Gas | |
| 95418 | Uinta Basin, Condensate Tank Natural Gas | |
| 95419 | Uinta Basin, Oil Tank Natural Gas | |
| 95420 | Uinta Basin, Glycol Dehydrator | |
| 95398 | Composite Profile - Oil and Natural Gas Production - Condensate Tanks | Denver-Julesburg |
| 95399 | Composite Profile - Oil Field – Wells | California |
| 95400 | Composite Profile - Oil Field – Tanks | California |
| 95403 | Composite Profile - Gas Wells | San Joaquin |
| UTUBOGC | Raw Gas from Oil Wells - Composite Uinta basin | |
| UTUBOGD | Raw Gas from Gas Wells - Composite Uinta basin | |
| UTUBOGE | Flash Gas from Oil Tanks - including Carbonyls - Composite Uinta basin | |
| UTUBOGF | Flash Gas from Condensate Tanks - including Carbonyls - Composite Uinta basin | |
| PAGAS01 | Oil and Gas-Produced Gas Composition from Gas Wells-Greene Co, PA | |
| PAGAS02 | Oil and Gas-Produced Gas Composition from Gas Wells-Butler Co, PA | |
| PAGAS03 | Oil and Gas-Produced Gas Composition from Gas Wells-Washington Co, PA | |
| SUIROGCT | Flash Gas from Condensate Tanks - Composite Southern Ute Indian Reservation | |
| CMU01 | Oil and Gas - Produced Gas Composition from Gas Wells - Central Montana Uplift – Montana | |
| WIL01 | Oil and Gas - Flash Gas Composition from Tanks at Oil Wells - Williston Basin North Dakota | |

| Profile Code | Description | Region (if not in profile name) |
|---|---|---|
| WIL02 | Oil and Gas - Flash Gas Composition from Tanks at Oil Wells - Williston Basin Montana | |
| WIL03 | Oil and Gas - Produced Gas Composition from Oil Wells - Williston Basin North Dakota | |
| WIL04 | Oil and Gas - Produced Gas Composition from Oil Wells - Williston Basin Montana | |

### 3.2.1.4    Mobile source related VOC speciation profiles

The VOC speciation approach for mobile source and mobile source-related source categories is customized to account for the impact of fuels and engine type and technologies.  The impact of fuels also affects the parts of the nonpt and ptnonipm sectors that are related to mobile sources such as portable fuel containers and gasoline distribution.

The VOC speciation profiles for the nonroad sector other than for California are listed in Table 3-8. They include new profiles (i.e., those that begin with "953") for 2-stroke and 4-stroke gasoline engines running on E0 and E10 and compression ignition engines with different technologies developed from recent EPA test programs, which also supported the updated toxics emission factor in MOVES2014a (Reichle, 2015 and EPA, 2015b).

**Table 3-8.  TOG MOVES-SMOKE Speciation for nonroad emissions used for the 2016 Platform**

| Profile | Profile Description | Engine Type | Engine Technology | Engine Size | Horse-power category | Fuel | Fuel Sub-type | Emission Process |
|---|---|---|---|---|---|---|---|---|
| 95327 | SI 2-stroke E0 | SI 2-stroke | all | All | All | Gasoline | E0 | exhaust |
| 95328 | SI 2-stroke E10 | SI 2-stroke | all | All | All | Gasoline | E10 | exhaust |
| 95329 | SI 4-stroke E0 | SI 4-stroke | all | All | All | Gasoline | E0 | exhaust |
| 95330 | SI 4-stroke E10 | SI 4-stroke | all | All | All | Gasoline | E10 | exhaust |
| 95331 | CI Pre-Tier 1 | CI | Pre-Tier 1 | All | All | Diesel | All | exhaust |
| 95332 | CI Tier 1 | CI | Tier 1 | All | All | Diesel | All | exhaust |
| 95333 | CI Tier 2 | CI | Tier 2 and 3 | all | All | Diesel | All | exhaust |
| 95333a [29] | CI Tier 2 | CI | Tier 4 | <56 kW (75 hp) | S | Diesel | All | exhaust |
| 8775 | ACES Phase 1 Diesel Onroad | CI Tier 4 | Tier 4 | >=56 kW (75 hp) | L | Diesel | All | exhaust |
| 8753 | E0 Evap | SI | all | all | All | Gasoline | E0 | evaporative |
| 8754 | E10 Evap | SI | all | all | All | Gasoline | E10 | evaporative |
| 8766 | E0 evap permeation | SI | all | all | All | Gasoline | E0 | permeation |
| 8769 | E10 evap permeation | SI | all | all | All | Gasoline | E10 | permeation |
| 8869 | E0 Headspace | SI | all | all | All | Gasoline | E0 | headspace |
| 8870 | E10 Headspace | SI | all | all | All | Gasoline | E10 | headspace |

---

[29] 95333a replaced 95333.  This correction was made to remove alcohols due to suspected contamination. Additional information is available in SPECIATE.

| Profile | Profile Description | Engine Type | Engine Technology | Engine Size | Horse-power category | Fuel | Fuel Sub-type | Emission Process |
|---------|--------------------|-------------|-------------------|-------------|----------------------|------|---------------|------------------|
| 1001 | CNG Exhaust | All | all | all | All | CNG | All | exhaust |
| 8860 | LPG exhaust | All | all | all | All | LPG | All | exhaust |

Speciation profiles for VOC in the nonroad sector account for the ethanol content of fuels across years. A description of the actual fuel formulations can be found in the NEI TSD. For previous platforms, the EPA used "COMBO" profiles to model combinations of profiles for E0 and E10 fuel use, but beginning with 2014v7.0 platform, the appropriate allocation of E0 and E10 fuels is done by MOVES.

Combination profiles reflecting a combination of E10 and E0 fuel use ideally would be used for sources upstream of mobile sources such as portable fuel containers (PFCs) and other fuel distribution operations associated with the transfer of fuel from bulk terminals to pumps (BTP), which are in the nonpt sector. For these sources, ethanol may be mixed into the fuels, in which case speciation would change across years. The speciation changes from fuels in the ptnonipm sector include BTP distribution operations inventoried as point sources. Refinery-to-bulk terminal (RBT) fuel distribution and bulk plant storage (BPS) speciation does not change across the modeling cases because this is considered upstream from the introduction of ethanol into the fuel. The mapping of fuel distribution SCCs to PFC, BTP, BPS, and RBT emissions categories can be found in Appendix C. In 2016v3 platform, all of these sources get E10 speciation.

Table 3-9 summarizes the different profiles utilized for the fuel-related sources in each of the sectors for 2016. The term "COMBO" indicates that a combination of the profiles listed was used to speciate that subcategory using the GSPRO_COMBO file.

**Table 3-9. Select mobile-related VOC profiles 2016**

| Sector | Sub-category | Profile | |
|--------|--------------|---------|--|
| Nonroad non-US | gasoline exhaust | COMBO | |
| | | 8750a | Pre-Tier 2 E0 exhaust |
| | | 8751a | Pre-Tier 2 E10 exhaust |
| nonpt/ ptnonipm | PFC and BTP | COMBO | |
| | | 8869 | E0 Headspace |
| | | 8870 | E10 Headspace |
| nonpt/ ptnonipm | Bulk plant storage (BPS) and refine-to-bulk terminal (RBT) sources | 8870 | E10 Headspace |

The speciation of onroad VOC occurs completely within MOVES. MOVES accounts for fuel type and properties, emission standards as they affect different vehicle types and model years, and specific emission processes. Table 3-10 describes the M-profiles available to MOVES depending on the model year range, MOVES process (processID), fuel sub-type (fuelSubTypeID), and regulatory class (regClassID). m While MOVES maps the liquid diesel profile to several processes, MOVES only estimates emissions from refueling spillage loss (processID 19). The other evaporative and refueling processes from diesel vehicles have zero emissions.

Table 3-11 through Table 3-13 describe the meaning of these MOVES codes. For a specific representative county and analytic year, there will be a different mix of these profiles. For example, for HD diesel exhaust, the emissions will use a combination of profiles 8774M and 8775M depending on the proportion of HD vehicles that are pre-2007 model years (MY) in that particular county. As that county is projected farther into the future, the proportion of pre-2007 MY vehicles will decrease. A second example, for gasoline exhaust (not including E-85), the emissions will use a combination of profiles 8756M, 8757M, 8758M, 8750aM, and 8751aM. Each representative county has a different mix of these key properties and, therefore, has a unique combination of the specific M-profiles. More detailed information on how MOVES speciates VOC and the profiles used is provided in the technical document, "Speciation of Total Organic Gas and Particulate Matter Emissions from On-road Vehicles in MOVES2014" (EPA, 2015c).

**Table 3-10. Onroad M-profiles**

| Profile | Profile Description | Model Years | ProcessID | FuelSubTypeID | RegClassID |
|---------|--------------------|-------------|-----------|---------------|------------|
| 1001M | CNG Exhaust | 1940-2050 | 1,2,15,16 | 30 | 48 |
| 4547M | Diesel Headspace | 1940-2050 | 11 | 20,21,22 | 0 |
| 4547M | Diesel Headspace | 1940-2050 | 12,13,18,19 | 20,21,22 | 10,20,30,40,41, 42,46,47,48 |
| 8753M | E0 Evap | 1940-2050 | 12,13,19 | 10 | 10,20,30,40,41,42, 46,47,48 |
| 8754M | E10 Evap | 1940-2050 | 12,13,19 | 12,13,14 | 10,20,30,40,41, 42,46,47,48 |
| 8756M | Tier 2 E0 Exhaust | 2001-2050 | 1,2,15,16 | 10 | 20,30 |
| 8757M | Tier 2 E10 Exhaust | 2001-2050 | 1,2,15,16 | 12,13,14 | 20,30 |
| 8758M | Tier 2 E15 Exhaust | 1940-2050 | 1,2,15,16 | 15,18 | 10,20,30,40,41, 42,46,47,48 |
| 8766M | E0 evap permeation | 1940-2050 | 11 | 10 | 0 |
| 8769M | E10 evap permeation | 1940-2050 | 11 | 12,13,14 | 0 |
| 8770M | E15 evap permeation | 1940-2050 | 11 | 15,18 | 0 |
| 8774M | Pre-2007 MY HDD exhaust | 1940-2006 | 1,2,15,16,17,90 | 20, 21, 22 | 40,41,42,46,47, 48 |
| 8774M | Pre-2007 MY HDD exhaust | 1940-2050 | 91[30] | 20, 21, 22 | 46,47 |
| 8774M | Pre-2007 MY HDD exhaust | 1940-2006 | 1,2,15,16 | 20, 21, 22 | 20,30 |
| 8775M | 2007+ MY HDD exhaust | 2007-2050 | 1,2,15,16 | 20, 21, 22 | 20,30 |
| 8775M | 2007+ MY HDD exhaust | 2007-2050 | 1,2,15,16,17,90 | 20, 21, 22 | 40,41,42,46,47,48 |
| 8855M | Tier 2 E85 Exhaust | 1940-2050 | 1,2,15,16 | 50, 51, 52 | 10,20,30,40,41, 42,46,47,48 |
| 8869M | E0 Headspace | 1940-2050 | 18 | 10 | 10,20,30,40,41, 42,46,47,48 |
| 8870M | E10 Headspace | 1940-2050 | 18 | 12,13,14 | 10,20,30,40,41, 42,46,47,48 |

---

[30] 91 is the processed for APUs which are diesel engines not covered by the 2007 Heavy-Duty Rule, so the older technology applies to all years.

| Profile | Profile Description | Model Years | ProcessID | FuelSubTypeID | RegClassID |
|---|---|---|---|---|---|
| 8871M | E15 Headspace | 1940-2050 | 18 | 15,18 | 10,20,30,40,41, 42,46,47,48 |
| 8872M | E15 Evap | 1940-2050 | 12,13,19 | 15,18 | 10,20,30,40,41, 42,46,47,48 |
| 8934M | E85 Evap | 1940-2050 | 11 | 50,51,52 | 0 |
| 8934M | E85 Evap | 1940-2050 | 12,13,18,19 | 50,51,52 | 10,20,30,40,41, 42,46,47,48 |
| 8750aM | Pre-Tier 2 E0 exhaust | 1940-2000 | 1,2,15,16 | 10 | 20,30 |
| 8750aM | Pre-Tier 2 E0 exhaust | 1940-2050 | 1,2,15,16 | 10 | 10,40,41,42,46,47,48 |
| 8751aM | Pre-Tier 2 E10 exhaust | 1940-2000 | 1,2,15,16 | 11,12,13,14 | 20,30 |
| 8751aM | Pre-Tier 2 E10 exhaust | 1940-2050 | 1,2,15,16 | 11,12,13,14,15, 18[31] | 10,40,41,42,46,47,48 |
| 95120[m] | Liquid Diesel | 19602060 | 11 | 20,21,22 | 0 |
| 95120[m] | Liquid Diesel | 19602060 | 12,13,18,19 | 20,21,22 | 10,20,30,40,41,42,46,47,4 8 |
| 95335a | 2010+ MY HDD exhaust | 20102060 | 1,2,15,16,17,90 | 20,21,22 | 40,41,42,46,47,48 |

[m] While MOVES maps the liquid diesel profile to several processes, MOVES only estimates emissions from refueling spillage loss (processID 19). The other evaporative and refueling processes from diesel vehicles have zero emissions.

### Table 3-11.  MOVES process IDs

| Process ID | Process Name |
|---|---|
| 1 | Running Exhaust* |
| 2 | Start Exhaust |
| 9 | Brakewear |
| 10 | Tirewear |
| 11 | Evap Permeation |
| 12 | Evap Fuel Vapor Venting |
| 13 | Evap Fuel Leaks |
| 15 | Crankcase Running Exhaust* |
| 16 | Crankcase Start Exhaust |
| 17 | Crankcase Extended Idle Exhaust |
| 18 | Refueling Displacement Vapor Loss |
| 19 | Refueling Spillage Loss |
| 20 | Evap Tank Permeation |
| 21 | Evap Hose Permeation |
| 22 | Evap RecMar Neck Hose Permeation |
| 23 | Evap RecMar Supply/Ret Hose Permeation |
| 24 | Evap RecMar Vent Hose Permeation |
| 30 | Diurnal Fuel Vapor Venting |

---

[31] The profile assignments for pre-2001 gasoline vehicles fueled on E15/E20 fuels (subtypes 15 and 18) were corrected for MOVES2014a.  This model year range, process, fuelsubtype regclass combination is already assigned to profile 8758.

| | |
|---|---|
| 31 | HotSoak Fuel Vapor Venting |
| 32 | RunningLoss Fuel Vapor Venting |
| 40 | Nonroad |
| 90 | Extended Idle Exhaust |
| 91 | Auxiliary Power Exhaust |

*\* Off-network idling is a process in MOVES3 that is part of processes 1 and 15
but assigned to road type 1 (off-network) instead of types 2-5*

**Table 3-12.  MOVES Fuel subtype IDs**

| Fuel Subtype ID | Fuel Subtype Descriptions |
|---|---|
| 10 | Conventional Gasoline |
| 11 | Reformulated Gasoline (RFG) |
| 12 | Gasohol (E10) |
| 13 | Gasohol (E8) |
| 14 | Gasohol (E5) |
| 15 | Gasohol (E15) |
| 18 | Ethanol (E20) |
| 20 | Conventional Diesel Fuel |
| 21 | Biodiesel (BD20) |
| 22 | Fischer-Tropsch Diesel (FTD100) |
| 30 | Compressed Natural Gas (CNG) |
| 50 | Ethanol |
| 51 | Ethanol (E85) |
| 52 | Ethanol (E70) |

**Table 3-13.  MOVES regclass IDs**

| Reg. Class ID | Regulatory Class Description |
|---|---|
| 0 | Doesn't Matter |
| 10 | Motorcycles |
| 20 | Light Duty Vehicles |
| 30 | Light Duty Trucks |
| 40 | Class 2b Trucks with 2 Axles and 4 Tires (8,500 lbs < GVWR <= 10,000 lbs) |
| 41 | Class 2b Trucks with 2 Axles and at least 6 Tires or Class 3 Trucks (8,500 lbs < GVWR <= 14,000 lbs) |
| 42 | Class 4 and 5 Trucks (14,000 lbs < GVWR <= 19,500 lbs) |
| 46 | Class 6 and 7 Trucks (19,500 lbs < GVWR <= 33,000 lbs) |
| 47 | Class 8a and 8b Trucks (GVWR > 33,000 lbs) |
| 48 | Urban Bus (see CFR Sec 86.091 2) |

For portable fuel containers (PFCs) and fuel distribution operations associated with the bulk-plant-to-pump (BTP) distribution, a 10% ethanol mix (E10) was assumed for speciation purposes.  Refinery to bulk terminal (RBT) fuel distribution and bulk plant storage (BPS) speciation are considered upstream from the introduction of ethanol into the fuel; therefore, a single profile is sufficient for these sources.  No

refined information on potential VOC speciation differences between cellulosic diesel and cellulosic ethanol sources was available; therefore, cellulosic diesel and cellulosic ethanol sources used the same SCC (30125010: Industrial Chemical Manufacturing, Ethanol by Fermentation production) for VOC speciation as was used for corn ethanol plants.

### 3.2.2 PM speciation

In addition to VOC profiles, the SPECIATE database also contains profiles for speciating $PM_{2.5}$. $PM_{2.5}$ was speciated into the AE6 species associated with CMAQ 5.0.1 and later versions. Most of the PM profiles come from the 911XX series (Reff et. al, 2009), which include updated AE6 speciation.[32] Starting with the 2014v7.1 platform, profile 91112 (Natural Gas Combustion – Composite) was replaced with 95475 (Composite -Refinery Fuel Gas and Natural Gas Combustion). This updated profile is an AE6-ready profile based on the median of 3 SPECIATE4.5 profiles from which AE6 versions were made and the resulting profile added to SPECIATE5.0: boilers (95125a), process heaters (95126a) and internal combustion combined cycle/cogen plant exhaust (95127a). As with profile 91112, these profiles are based on tests using natural gas and refinery fuel gas (England et al., 2007). Profile 91112 which is also based on refinery gas and natural gas is thought to overestimate EC.

Profile 95475 (Composite -Refinery Fuel Gas and Natural Gas Combustion) is shown along with the underlying profiles composited in Figure 3-3. Figure 3-4 shows a comparison of the new profile as of the 2014v7.1 platform with the one that we had been using in the 2014v7.0 and earlier platforms.

The newest PM profile for the 2016v2 platform that is also included in the 2016v3 platform is the Sugar Cane Pre-Harvest Burning Mexico profile (SUGP02). This profile falls under the sector ptagfire and are included in SPECIATE 5.2.

Additionally, a series of regional fire profiles were added to SPECIATE 5.1 and used in 2016v2 and 2016v3. These fall under the sector ptfire and are as shown in Table 3-14.

**Table 3-14.   Regional Fire Profiles**

| Sector | Pollutant | Profile Code | Profile Description |
|--------|-----------|--------------|---------------------|
| Ptfire | PM | 95793 | Forest Fire-Flaming-Oregon AE6 |
| Ptfire | PM | 95794 | Forest Fire-Smoldering-Oregon AE6 |
| Ptfire | PM | 95798 | Forest Fire-Flaming-North Carolina AE6 |
| Ptfire | PM | 95799 | Forest Fire-Smoldering-North Carolina AE6 |
| Ptfire | PM | 95804 | Forest Fire-Flaming-Montana AE6 |
| Ptfire | PM | 95805 | Forest Fire-Smoldering-Montana AE6 |
| Ptfire | PM | 95807 | Forest Fire Understory-Flaming-Minnesota AE6 |
| Ptfire | PM | 95808 | Forest Fire Understory-Smoldering-Minnesota AE6 |
| Ptfire | PM | 95809 | Grass Fire-Field-Kansas AE6 |

---

[32] The exceptions are 5675AE6 (Marine Vessel – Marine Engine – Heavy Fuel Oil) used for cmv_c3 and 92018 (Draft Cigarette Smoke – Simplified) used in nonpt. 5675AE6 is an update of profile 5675 to support AE6 PM speciation.

**Figure 3-3.  Profiles composited for PM gas combustion related sources**



**Figure 3-4.  Comparison of PM profiles used for Natural gas combustion related sources**



### 3.2.2.1   Mobile source related PM2.5 speciation profiles

For the onroad sector, for all processes except brake and tire wear, PM speciation occurs within MOVES itself, not within SMOKE (similar to the VOC speciation described above).  The advantage of using MOVES to speciate PM is that during the internal calculation of MOVES, the model has complete information on the characteristics of the fleet and fuels (e.g., model year, sulfur content, process, etc.) to accurately match to specific profiles.  This means that MOVES produces EF tables that include total PM (e.g., $PM_{10}$ and $PM_{2.5}$) and speciated PM (e.g., PEC, PFE).  SMOKE essentially calculates the PM components by using the appropriate EF without further speciation.[33]  The specific profiles used within MOVES include two CNG profiles, 45219 and 45220, which were added to SPECIATE4.5.  A list of profiles is provided in the technical document, "Speciation of Total Organic Gas and Particulate Matter Emissions from On-road Vehicles in MOVES2014" (EPA, 2015c).  No changes to the mobile source PM speciation profiles were made in the 2016v3 platform.

For onroad brake and tire wear, the PM is speciated in the *moves2smk* postprocessor that prepares the emission factors for processing in SMOKE.  The formulas for this are based on the standard speciation factors from brake and tire wear profiles, which were updated from the v6.3 platform based on data from a Health Effects Institute report (Schauer, 2006).  Table 3-15 shows the differences in the v7.1 (alpha) and 2011v6.3 profiles.

**Table 3-15.  Brake and tire PM2.5 profiles compared to those used in the 2011v6.3 Platform**

| Inventory Pollutant | Model Species | V6.3 platform brakewear profile: 91134 | SPECIATE4.5 brakewear profile: 95462 from Schauer (2006) | V6.3 platform tirewear profile: 91150 | SPECIATE4.5 tirewear profile: 95460 from Schauer (2006) |
|---|---|---|---|---|---|
| PM2_5 | PAL | 0.00124 | 0.000793208 | 6.05E-04 | 3.32401E-05 |
| PM2_5 | PCA | 0.01 | 0.001692177 | 0.00112 | |
| PM2_5 | PCL | 0.001475 | | 0.0078 | |
| PM2_5 | PEC | 0.0261 | 0.012797085 | 0.22 | 0.003585907 |
| PM2_5 | PFE | 0.115 | 0.213901692 | 0.0046 | 0.00024779 |
| PM2_5 | PH2O | 0.0080232 | | 0.007506 | |
| PM2_5 | PK | 1.90E-04 | 0.000687447 | 3.80E-04 | 4.33129E-05 |
| PM2_5 | PMG | 0.1105 | 0.002961309 | 3.75E-04 | 0.000018131 |
| PM2_5 | PMN | 0.001065 | 0.001373836 | 1.00E-04 | 1.41E-06 |
| PM2_5 | PMOTHR | 0.4498 | 0.691704999 | 0.0625 | 0.100663209 |
| PM2_5 | PNA | 1.60E-04 | 0.002749787 | 6.10E-04 | 7.35312E-05 |
| PM2_5 | PNCOM | 0.0428 | 0.020115749 | 0.1886 | 0.255808124 |
| PM2_5 | PNH4 | 3.00E-05 | | 1.90E-04 | |
| PM2_5 | PNO3 | 0.0016 | | 0.0015 | |
| PM2_5 | POC | 0.107 | 0.050289372 | 0.4715 | 0.639520309 |
| PM2_5 | PSI | 0.088 | | 0.00115 | |
| PM2_5 | PSO4 | 0.0334 | | 0.0311 | |
| PM2_5 | PTI | 0.0036 | 0.000933341 | 3.60E-04 | 5.04E-06 |

---

[33] Unlike previous platforms, the PM components (e.g., POC) are now consistently defined between MOVES2014 and CMAQ. For more details on the use of model-ready EF, see the SMOKE 3.7 documentation: https://www.cmascenter.org/smoke/documentation/3.7/html/.

The formulas used based on brake wear profile 95462 and tire wear profile 95460 are as follows:

```
POC = 0.6395 * PM25TIRE + 0.0503 * PM25BRAKE
PEC = 0.0036 * PM25TIRE + 0.0128 * PM25BRAKE
PNO3 = 0.000 * PM25TIRE + 0.000 * PM25BRAKE
PSO4 = 0.0 * PM25TIRE + 0.0 * PM25BRAKE
PNH4 = 0.000 * PM25TIRE + 0.0000 * PM25BRAKE
PNCOM = 0.2558 * PM25TIRE + 0.0201 * PM25BRAKE
```

For California onroad emissions, adjustment factors were applied to SMOKE-MOVES to produce California adjusted model-ready files.  California did not supply speciated PM, therefore, the adjustment factors applied to PM2.5 were also applied to the speciated PM components.  By applying the ratios through SMOKE-MOVES, the CARB inventories are essentially speciated to match EPA estimated speciation.

For nonroad PM2.5, speciation is partially done within MOVES such that it does not need to be run for a specific chemical mechanism.  For nonroad, MOVES outputs emissions of PM2.5 split by speciation profile.  Similar to how VOC and NONHAPTOG are speciated, PM2.5 is now also speciated this way starting with MOVES2014b. For California and Texas, PM2.5 emissions split by speciation profile are estimated from total PM2.5 based on MOVES data in California and Texas, so that PM is speciated consistently across the country. The PM2.5 profiles assigned to nonroad sources are listed in Table 3-16.

**Table 3-16.  Nonroad PM2.5 profiles**

| SPECIATE4.5 Profile Code | SPECIATE4.5 Profile Name | Assigned to Nonroad sources based on Fuel Type |
|---|---|---|
| 8996 | Diesel Exhaust - Heavy-heavy duty truck - 2007 model year with NCOM | Diesel |
| 91106 | HDDV Exhaust – Composite | Diesel |
| 91113 | Nonroad Gasoline Exhaust – Composite | Gasoline |
| 95219 | CNG Transit Bus Exhaust | CNG and LPG |

### 3.2.3 NO$_X$ speciation

NOx emission factors and therefore NOx inventories are developed on a NO$_2$ weight basis. For air quality modeling, NO$_X$ is speciated into NO, NO$_2$, and/or HONO.  For the non-mobile sources, the EPA used a single profile "NHONO" to split NO$_X$ into NO and NO$_2$.

The importance of HONO chemistry, identification of its presence in ambient air and the measurements of HONO from mobile sources have prompted the inclusion of HONO in NOx speciation for mobile sources.  Based on tunnel studies, a HONO to NOx ratio of 0.008 was chosen (Sarwar, 2008).  For the mobile sources except for onroad (e.g., nonroad, cmv, rail, othon sectors), and for specific SCCs in othar and ptnonipm, the profile "HONO" is used.  Table 3-17 gives the split factor for these two profiles.  The onroad sector does not use the "HONO" profile to speciate NO$_X$.  MOVES2014 produces speciated NO, NO$_2$, and HONO by source, including emission factors for these species in the emission factor tables used by SMOKE-MOVES.  Within MOVES, the HONO fraction is a constant 0.008 of NO$_X$.  The NO fraction varies by heavy duty versus light duty, fuel type, and model year.

The $NO_2$ fraction = 1 – NO – HONO.  For more details on the $NO_X$ fractions within MOVES, see EPA report "Use of data from 'Development of Emission Rates for the MOVES Model,' Sierra Research, March 3, 2010" available at https://nepis.epa.gov/Exe/ZyPDF.cgi?Dockey=P100F1A5.pdf.

**Table 3-17.  $NO_X$ speciation profiles**

| Profile | pollutant | species | split factor |
|---------|-----------|---------|--------------|
| HONO  | NOX | NO2  | 0.092 |
| HONO  | NOX | NO   | 0.9   |
| HONO  | NOX | HONO | 0.008 |
| NHONO | NOX | NO2  | 0.1   |
| NHONO | NOX | NO   | 0.9   |

### 3.2.4 Creation of Sulfuric Acid Vapor (SULF)

Since at least the 2002 Platform, sulfuric acid vapor (SULF) has been estimated through the SMOKE speciation process for coal combustion and residual and distillate oil fuel combustion sources.  Profiles that compute SULF from $SO_2$ are assigned to coal and oil combustion SCCs in the GSREF ancillary file.  The profiles were derived from information from AP-42 (EPA, 1998), which identifies the fractions of sulfur emitted as sulfate and $SO_2$ and relates the sulfate as a function of SO2.

Sulfate is computed from $SO_2$ assuming that gaseous sulfate, which is comprised of many components, is primarily $H_2SO_4$. The equation for calculating $H_2SO_4$ is given below.

$$Emissions\ of\ SULF\ (as\ H_2SO_4) \hspace{4cm} Equation\ 3\text{-}1$$
$$= SO_2\ emissions\ \times \frac{fraction\ of\ S\ emitted\ as\ sulfate}{fraction\ of\ S\ emitted\ as\ SO_2} \times \frac{MW\ H_2SO_4}{MW\ SO_2}$$

In the above, *MW* is the molecular weight of the compound.  The molecular weights of $H_2SO_4$ and $SO_2$ are 98 g/mol and 64 g/mol, respectively.

This method does not reduce $SO_2$ emissions; it solely adds gaseous sulfate emissions as a function of SO2 emissions.  The derivation of the profiles is provided in Table 3-18; a summary of the profiles is provided in Table 3-19.

**Table 3-18.  Sulfate split factor computation**

| fuel | SCCs | Profile Code | Fraction as SO2 | Fraction as sulfate | Split factor (mass fraction) |
|------|------|--------------|-----------------|---------------------|------------------------------|
| Bituminous | 1-0X-002-YY, where X is 1, 2 or 3 and YY is 01 thru 19 and 21-ZZ-002-000 where ZZ is 02,03 or 04 | 95014 | 0.95 | 0.014 | .014/.95 * 98/64 = 0.0226 |
| Subbituminous | 1-0X-002-YY, where X is 1, 2 or 3 and YY is 21 thru 38 | 87514 | .875 | 0.014 | .014/.875 * 98/64 = 0.0245 |

| fuel | SCCs | Profile Code | Fraction as SO2 | Fraction as sulfate | Split factor (mass fraction) |
|------|------|------|------|------|------|
| Lignite | 1-0X-003-YY, where X is 1, 2 or 3 and YY is 01 thru 18 and 21-ZZ-002-000 where ZZ is 02,03 or 04 | 75014 | 0.75 | 0.014 | .014/.75 * 98/64 = 0.0286 |
| Residual oil | 1-0X-004-YY, where X is 1, 2 or 3 and YY is 01 thru 06 and 21-ZZ-005-000 where ZZ is 02,03 or 04 | 99010 | 0.99 | 0.01 | .01/.99 * 98/64 = 0.0155 |
| Distillate oil | 1-0X-005-YY, where X is 1, 2 or 3 and YY is 01 thru 06 and 21-ZZ-004-000 where ZZ is 02,03 or 04 | 99010 | 0.99 | 0.01 | Same as residual oil |

**Table 3-19.  $SO_2$ speciation profiles**

| Profile | pollutant | species | split factor |
|------|------|------|------|
| 95014 | SO2 | SULF | 0.0226 |
| 95014 | SO2 | SO2 | 1 |
| 87514 | SO2 | SULF | 0.0245 |
| 87514 | SO2 | SO2 | 1 |
| 75014 | SO2 | SULF | 0.0286 |
| 75014 | SO2 | SO2 | 1 |
| 99010 | SO2 | SULF | 0.0155 |
| 99010 | SO2 | SO2 | 1 |

## *3.3*     *Temporal Allocation*

Temporal allocation is the process of distributing aggregated emissions to a finer temporal resolution, thereby converting annual emissions to hourly emissions as is required by CMAQ.  While the total emissions are important, the timing of the occurrence of emissions is also essential for accurately simulating ozone, PM, and other pollutant concentrations in the atmosphere.  Many emissions inventories are annual or monthly in nature.  Temporal allocation takes these aggregated emissions and distributes the emissions to the hours of each day.  This process is typically done by applying temporal profiles to the inventories in this order: monthly, day of the week, and diurnal, with monthly and day-of-week profiles applied only if the inventory is not already at that level of detail.

For 2016v3, temporal profile assignments to SCCs were updated for solvents and for some point and nonpoint SCCs. The new profiles for solvents only impacted the diurnal profiles and are based on Gkatzelis et al. (2021).

The temporal factors applied to the inventory are selected using some combination of country, state, county, SCC, and pollutant.  Table 3-20 summarizes the temporal aspects of emissions modeling by comparing the key approaches used for temporal processing across the sectors.  In the table, "Daily temporal approach" refers to the temporal approach for getting daily emissions from the inventory using the SMOKE Temporal program.  The values given are the values of the SMOKE L_TYPE setting.  The "Merge processing approach" refers to the days used to represent other days in the month for the merge step.  If this is not "all," then the SMOKE merge step runs only for representative days, which could

114

include holidays as indicated by the right-most column.  The values given are those used for the SMOKE M_TYPE setting (see below for more information).

**Table 3-20.  Temporal settings used for the platform sectors in SMOKE**

| Platform sector short name | Inventory resolutions | Monthly profiles used? | Daily temporal approach | Merge processing approach | Process holidays as separate days |
|---|---|---|---|---|---|
| afdust_adj | Annual | Yes | week | All | Yes |
| afdust_ak_adj | Annual | Yes | week | All | Yes |
| airports | Annual | Yes | week | week | Yes |
| beis | Hourly | No | n/a | All | No |
| canada_ag | Monthly | No | mwdss | mwdss | No |
| canada_og2D | Annual | Yes | mwdss | mwdss | No |
| cmv_c1c2 | Annual | Yes | aveday | aveday | No |
| cmv_c3 | Annual | Yes | aveday | aveday | No |
| fertilizer | Monthly | No | All | all | No |
| livestock | Annual | Yes | All | all | No |
| nonpt | Annual | Yes | week | week | Yes |
| nonroad | Monthly | No | mwdss | mwdss | Yes |
| np_oilgas | Annual | Yes | aveday | aveday | No |
| np_solvents | Annual | Yes | aveday | aveday | No |
| onroad | Annual & monthly[1] | No | All | all | Yes |
| onroad_ca_adj | Annual & monthly[1] | No | All | all | Yes |
| onroad_nonconus | Annual & monthly[1] | No | All | all | Yes |
| othafdust_adj | Annual | Yes | week | all | No |
| othar | Annual & monthly | Yes | week | week | No |
| onroad_can | Monthly | No | week | week | No |
| onroad_mex | Monthly | No | week | week | No |
| othpt | Annual & monthly | Yes | mwdss | mwdss | No |
| othptdust_adj | Monthly | No | week | all | No |
| pt_oilgas | Annual | Yes | mwdss | mwdss | Yes |
| ptegu | Annual & hourly | Yes[2] | All | all | No |
| ptnonipm | Annual | Yes | mwdss | mwdss | Yes |
| ptagfire | Daily | No | All | all | No |
| ptfire-rx | Daily | No | All | all | No |
| ptfire-wild | Daily | No | All | all | No |
| ptfire_othna | Daily | No | All | all | No |
| rail | Annual | Yes | aveday | aveday | No |
| rwc | Annual | No[3] | met-based[3] | All | No[3] |

[1]Note the annual and monthly "inventory" actually refers to the activity data (VMT, hoteling, and VPOP) for onroad. VMT and hoteling is monthly and VPOP is annual. The actual emissions are computed on an hourly basis.
[2]Only units that do not have matching hourly CEMS data use monthly temporal profiles.
[3]Except for 2 SCCs that do not use met-based speciation

The following values are used in the table.  The value "all" means that hourly emissions are computed for every day of the year and that emissions potentially have day-of-year variation.  The value "week" means that hourly emissions computed for all days in one "representative" week, representing all weeks for each month.  This means emissions have day-of-week variation, but not week-to-week variation within the month.  The value "mwdss" means hourly emissions for one representative Monday, representative weekday (Tuesday through Friday), representative Saturday, and representative Sunday for each month.  This means emissions have variation between Mondays, other weekdays, Saturdays and Sundays within the month, but not week-to-week variation within the month.  The value "aveday" means hourly emissions computed for one representative day of each month, meaning emissions for all days within a month are the same.  Special situations with respect to temporal allocation are described in the following subsections.

In addition to the resolution, temporal processing includes a ramp-up period for several days prior to January 1, 2016, which is intended to mitigate the effects of initial condition concentrations.  The ramp-up period was 10 days (December 22-31, 2015).  For most sectors, emissions from December 2016 (representative days) were used to fill in emissions for the end of December 2015.  For biogenic emissions, December 2015 emissions were processed using 2015 meteorology.

### 3.3.1 Use of FF10 format for finer than annual emissions

The FF10 inventory format for SMOKE provides a consolidated format for monthly, daily, and hourly emissions inventories.  With the FF10 format, a single inventory file can contain emissions for all 12 months and the annual emissions in a single record.  This helps simplify the management of numerous inventories.  Similarly, daily and hourly FF10 inventories contain individual records with data for all days in a month and all hours in a day, respectively.

SMOKE prevents the application of temporal profiles on top of the "native" resolution of the inventory.  For example, a monthly inventory should not have annual-to-month temporal allocation applied to it; rather, it should only have month-to-day and diurnal temporal allocation.  This becomes particularly important when specific sectors have a mix of annual, monthly, daily, and/or hourly inventories.  The flags that control temporal allocation for a mixed set of inventories are discussed in the SMOKE documentation.  The modeling platform sectors that make use of monthly values in the FF10 files are livestock, nonroad, onroad, onroad_can, onroad_mex, othar, and othpt.

### 3.3.2 Electric Generating Utility temporal allocation (ptegu)

### 3.3.2.1     Base year temporal allocation of EGUs

The temporal allocation procedure for EGUs in the base year is differentiated by whether or not the unit could be directly matched to a unit with CEMS data via its ORIS facility code and boiler ID.  Note that for units matched to CEMS data, annual totals of their emissions input to CMAQ may be different than the annual values in the 2016 annual inventory because the CEMS data replaces the $NO_x$ and $SO_2$ annual inventory data for the seasons in which the CEMS are operating.  If a CEMS-matched unit is determined to be a partial year reporter, as can happen for sources that run CEMS only in the summer, emissions totaling the difference between the annual emissions and the total CEMS emissions are allocated to the non-summer months.  Prior to use of the CEMS data in SMOKE it is processed through the CEMCorrect tool.  The CEMCorrect tool identifies hours for which the data were not measured as indicated by the data quality flags in the CEMS data files. Unmeasured data can be filled in with maximum values and thereby cause erroneously high values in the CEMS data.  When data were flagged as unmeasured and the values

were found to be more than three times the annual mean for that unit, the data for those hours are replaced with annual mean values (Adelman et al., 2012).  These adjusted CEMS data were then used for the remainder of the temporal allocation process described below (see Figure 3-5 for an example).

**Figure 3-5.  Eliminating unmeasured spikes in CEMS data**



In modeling platforms prior to 2016 beta, unmatched EGUs were temporally allocated using daily and diurnal profiles weighted by CEMS values within an IPM region, season, and by fuel type (coal, gas, and other). All unit types (peaking and non-peaking) were given the same profile within a region, season and fuel bin. Units identified as municipal waste combustors (MWCs) or cogeneration units (cogens) were given flat daily and diurnal profiles. Beginning with the 2016 beta platform and continuing for the 2016v1, 2016v2,v2, and 2016v3 platforms, the small EGU temporalization process considers peaking units.

The region, fuel, and type (peaking or non-peaking) were identified for each input EGU with CEMS data that are used for generating profiles.  The identification of peaking units was based on hourly heat input data from the 2016 base year and the two previous years (2014 and 2015). The heat input was summed for each year. Equation 3-2 shows how the annual heat input value is converted from heat units (BTU/year) to power units (MW) using the unit-level heat rate (BTU/kWh) derived from the NEEDS v6 database. In Equation 3-3 a capacity factor is calculated by dividing the annual unit MW value by the NEEDS v6 unit capacity value (MW) multiplied by the hours in the year. A peaking unit was defined as any unit that had

a maximum capacity factor of less than 0.2 for every year (2014, 2015, and 2016) and a 3-year average capacity factor of less than 0.1.

**Annual Unit Power Output**

$$Annual\ Unit\ Output\ (MW) = \frac{\sum_{i=0}^{8760} \frac{Hourly\ HI}{(BTU)} * 1000 \left(\frac{MW}{kW}\right)}{NEEDS\ Heat\ Rate \left(\frac{BTU}{kWh}\right)}$$

Equation 3-2

**Unit Capacity Factor**

$$Annual\ Unit\ Output\ (MW) = \frac{\sum_{i=0}^{8760} \frac{Hourly\ HI}{(BTU)} * 1000 \left(\frac{MW}{kW}\right)}{NEEDS\ Heat\ Rate \left(\frac{BTU}{kWh}\right)}$$

Equation 3-3

Input regions were determined from one of the eight EGU modeling regions based on MJO and climate regions. Regions were used to group units with similar climate-based load demands. Region assignment is made on a state level, where all units within a state were assigned to the appropriate region. Unit fuel assignments were made using the primary NEEDS v6 fuel. Units fueled by bituminous, subbituminous, or lignite are assigned to the coal fuel type. Natural gas units were assigned to the gas fuel type. Distillate and residual fuel oil were assigned to the oil fuel type. Units with any other primary fuel were assigned the "other" fuel type. The number of units used to calculate the daily and diurnal EGU temporal profiles are shown in Figure 3-6 by region, fuel, and for peaking/non-peaking. Currently there are 64 unique profiles available based on 8 regions, 4 fuels, and 2 for peaking unit status (peaking and non-peaking).

**Figure 3-6.  Temporal Profile Input Unit Counts by Fuel and Peaking Unit Classification**



The daily and diurnal profiles were calculated for each region, fuel, and peaking type group from the year 2016 CEMS heat input values. The heat input values were summed for each input group to the annual level at each level of temporal resolution: monthly, month-of-day, and diurnal. The sum by temporal resolution value was then divided by the sum of annual heat input in that group to get a set of temporalization factors. Diurnal factors were created for both the summer and winter seasons to account for the variation in hourly load demands between the seasons. For example, the sum of all hour 1 heat input values in the group was divided by the sum of all heat inputs over all hours to get the hour 1 factor. Each grouping contained 12 monthly factors, up to 31 daily factors per month, and two sets of 24 hourly factors. The profiles were weighted by unit size where the units with more heat input have a greater influence on the shape of the profile. Composite profiles were created for each region and type across all fuels as a way to provide profiles for a fuel type that does not have hourly CEMS data in that region. Figure 3-7 shows peaking and non-peaking daily temporal profiles for the gas fuel type in the LADCO region. Figure 3-8 shows the diurnal profiles for the coal fuel type in the Mid-Atlantic Northeast Visibility Union (MANE-VU) region.

**Figure 3-7.  Example Daily Temporal Profiles for the LADCO Region and the Gas Fuel Type**



**Figure 3-8.  Example Diurnal Temporal Profiles for the MANE-VU Region and the Coal Fuel Type**



SMOKE uses a cross-reference file to select a monthly, daily, and diurnal profile for each source. For the 2016 platforms, the temporal profiles were assigned in the cross-reference at the unit level to EGU sources without hourly CEMS data. An inventory of all EGU sources without CEMS data was used to identify the region, fuel type, and type (peaking/non-peaking) of each source. As with the input unit the

regions are assigned using the state from the unit FIPS. The fuel was assigned by SCC to one of the four fuel types: coal, gas, oil, and other. A fuel type unit assignment is made by summing the VOC, NOX, PM2.5, and SO2 for all SCCs in the unit. The SCC that contributed the highest total emissions to the unit for selected pollutants was used to assign the unit fuel type. Peaking units were identified as any unit with an oil, gas, or oil fuel type with a NAICS of 22111 or 221112. Some units may be assigned to a fuel type within a region that does not have an available input unit with a matching fuel type in that region. These units without an available profile for their group were assigned to use the regional composite profile. MWC and cogen units were identified using the NEEDS primary fuel type and cogeneration flag, respectively, from the NEEDS v6 database. The number of EGU units assigned each profile group are shown by region in Figure 3-9.

**Figure 3-9. Non-CEMS EGU Temporal Profile Application Counts**



Small EGU 2016 Temporal Profile Application Counts

### 3.3.2.2   Analytic year temporal allocation of EGUs

For analytic year temporal allocation of unit-level EGU emissions, estimates of average winter (representing December through February), average winter shoulder (October through November and March through April), and average summer (May through September) values were provided by the IPM for all units. The winter shoulder was newly separated from the winter months starting with the 2016v2 platform and continuing for the 2016v3 platform.  The seasonal emissions for the analytic year cases were produced by post processing of the IPM outputs. The unit-level data were converted into hourly values through the temporal allocation process using a 3-step methodology:  annualized summer/winter value to month, month to day, and day to hour.  CEMS data from the air quality analysis year (e.g., 2016) is used as much as possible to temporally allocate the EGU emissions.

The goal of the temporal allocation process is to reflect the variability in the unit-level emissions that can impact air quality over seasonal, daily, or hourly time scales, in a manner compatible with incorporating analytic-year emission projections into analytic-year air quality modeling. The temporal allocation process is applied to the seasonal emission projections for the three IPM seasons: summer (May through September), winter shoulder (October through November and March through April), and winter (December through February). The Flat File used as the input to the temporal allocation process contains unit-level emissions and stack parameters (i.e., stack location and other characteristics consistent with information found in the NEI). When the Flat File is produced from post-processed IPM outputs, a cross reference is used to map the units in version 6 of the NEEDS database to the stack parameter and facility, unit, release point, and process identifiers used in the NEI. This cross reference also maps sources to the hourly CEMS data used to temporally allocate the emissions in the base year air quality modeling.

All units have seasonal information provided in the analytic year Flat File, the monthly values in the Flat File input to the temporal allocation process are computed by multiplying the average summer day, average winter shield day, and average winter day emissions by the number of days in the respective month. When generating seasonal emissions totals from the Flat File winter shield emissions are summed with the winter emissions to create a total winter season. In summary, the monthly emission values shown in the Flat File are not intended to represent an actual month-to-month emission pattern. Instead, they are interim values that have translated IPM's seasonal projections into month-level data that serve as a starting point for the temporal allocation process.

The monthly emissions within the Flat File undergo a multi-step temporal allocation process to yield the hourly emission values at each unit, as is needed for air quality modeling: summer or winter value to month, month to day, and day to hour. For sources not matched to unit-specific CEMS data, the first two steps are done outside of SMOKE and the third step to get to hourly values is done by SMOKE using the daily emissions files created from the first two steps. For each of these three temporal allocation steps, $NO_x$ and $SO_2$ CEMS data are used to allocate $NO_x$ and $SO_2$ emissions, while CEMS heat input data are used to allocate all other pollutants. The approach defined here gives priority to temporalization based on the base year CEMS data to the maximum extent possible for both base and analytic year modeling. Prior to using the 2016 CEMS data to develop monthly, daily, and hourly profiles, the CEMS data were processed through the CEMCorrect tool to make adjustments for hours for which data quality flags indicated the data were not measured and that the reported values were much larger than the annual mean emissions for the unit. These adjusted CEMS data were used to compute the monthly, daily, and hourly profiles described below.

For units that have CEMS data available and that have CEMS units matched to the NEI sources, the emissions are temporalized according to the base year (i.e., 2016) CEMS data for that unit and pollutant. For units that are not matched to the NEI or for which CEMS data are not available, the allocation of the seasonal emissions to months is done using average fuel-specific season-to-month factors for both peaking and non-peaking units generated for each of the eight regions shown in Figure 5. These factors are based on a single year of CEMS data for the modeling base year associated with the air quality modeling analysis being performed, such as 2016. The fuels used for creating the profiles for a region were coal, natural gas, oil, and "other". The "other "fuels category is a broad catchall that includes fuels such as wood and waste. Separate profiles are computed for $NO_x$, $SO_2$, and heat input, where heat input is used to temporally allocate emissions for pollutants other than $NO_x$ and $SO_2$. An overall composite profile across all fuels is also computed and can be used in the event that a region has too few units of a fuel type to make a reasonable average profile, or in the case when a unit changes fuels between the base

and analytic year and there were previously no units with that fuel in the region containing the unit. A complete description of the generation and application of these regional fuel profiles is available in the base year temporalization section.

The monthly emission values in the Flat File were first reallocated across the months in that season to align the month-to-month emission pattern at each stack with historic seasonal emission patterns. While this reallocation affects the monthly pattern of each unit's analytic-year seasonal emissions, the seasonal totals are held equal to the IPM projection for that unit and season. Second, the reallocated monthly emission values at each stack are disaggregated down to the daily level consistent with historic daily emission patterns in the given month at the given stack using separate profiles for $NO_x$, $SO_2$, and heat input. This process helps to capture the influence of meteorological episodes that cause electricity demand to vary from day-to-day, as well as weekday-weekend effects that change demand during the course of a given week. Third, this data set of emission values for each day of the year at each unit is input into SMOKE, which uses temporal profiles to disaggregate the daily values into specific values for each hour of the year.

For units without or not matched to CEMS data, or for which the CEMS data are found to be unsuitable for use in the analytic year, emissions were allocated from month to day using IPM-region and fuel-specific average month-to-day factors based on CEMS data from the base year of the air quality modeling analysis. These instances include units that did not operate in the base year or for which it may not have been possible to match the unit to a specific unit in the NEI. Regional average profiles may be used for some units with CEMS data in the base year when one of the following cases is true: (1) units are projected to have substantially increased emissions in the analytic year compared to its emissions in the base (historic) year; (2) CEMS data were only available for a limited number of hours in that base year; (3) the unit is new in the analytic year; (4) when there were no CEMS data for one season in the base year but IPM runs the unit during both seasons; or (5) units experienced atypical conditions during the base year, such as lengthy downtimes for maintenance or installation of controls.

The temporal profiles that map emissions from days to hours were computed based on the region and fuel-specific seasonal (i.e., winter and summer) average day-to-hour factors derived from the CEMS data for heat input for those fuels and regions and for that season. Heat input was used because it is the variable that is the most complete in the CEMS data and should be present for all of the hours in which the unit was operating. SMOKE uses these diurnal temporal profiles to allocate the daily emissions data to hours of each day. Note that this approach results in each unit having the same hourly temporal allocation for all the days of a season.

The emissions from units for which unit-specific profiles were not used were temporally allocated to hours reflecting patterns typical of the region in which the unit is located. Analysis of CEMS data for units in each of the 8 regions shown in Figure 3-6 revealed that there were differences in the temporal patterns of historic emission data that correlate with fuel type (e.g., coal, gas, oil, and other), time of year, pollutant, season (i.e., winter versus summer) and region of the country. The correlation of the temporal pattern with fuel type is explained by the relationship of units' operating practices with the fuel burned. For example, coal units take longer to ramp up and ramp down than natural gas units, and some oil units are used only when electricity demand cannot otherwise be met. Geographically, the patterns were less dependent on state location than they were on regional location. Figure 3-7 provides an example of daily profiles for gas fuel in the LADCO region. The EPA developed seasonal average emission profiles, each derived from base year CEMS data for each season across all units sharing both IPM region and fuel type. Figure 3-8 provides an example of seasonal profiles that allocate daily emissions to hours in the MANE-

123

VU region.  These average day-to-hour temporal profiles were also used for sources during seasons of the year for which there were no CEMS data available, but for which IPM predicted emissions in that season. This situation can occur for multiple reasons, including how the CEMS was run at each source in the base year.

For units that do have CEMS data in the base year and were matched to units in the IPM output, the base year CEMS data were scaled so that their seasonal emissions match the IPM-projected totals.  The scaling process used the fraction of the unit's seasonal emissions in the base year as computed for each hour of the season, and then applied those fractions to the seasonal emissions from the analytic year Flat File. Any pollutants other than $NO_x$ and $SO_2$ were temporally allocated using heat input.  Through the temporal allocation process, the analytic year emissions will have the same temporal pattern as the base year CEMS data, where available, while the analytic-year seasonal total emissions for each unit match the analytic-year unit-specific projection for each season (see example in Figure 3-10). The year IPM output for 2025 maps to the year 2026 and was therefore used for the 2026 modeling case.

In cases when the emissions for a particular unit are projected to be substantially higher in the analytic year than in the base year, the proportional scaling method to match the emission patterns in the base year described above can yield emissions for a unit that are much higher than the historic maximum emissions for that unit. To help address this issue in the analytic case, the maximum measured emissions of $NO_x$ and $SO_2$ in the period of 2014-2017 were computed. The temporally allocated emissions were then evaluated at each hour to determine whether they were above this maximum. The amount of "excess emissions" over the maximum were then computed.  For units for which the "excess emissions" could be reallocated to other hours, those emissions were distributed evenly to hours that were below the maximum. Those hourly emissions were then reevaluated against the maximum, and the procedure of reallocating the excess emissions to other hours was repeated until all of the hours had emissions below the maximum, whenever possible (see example in Figure 3-11).

**Figure 3-10. Analytic Year Emissions Follow the Pattern of Base Year Emissions**



**Figure 3-11. Excess Emissions Apportioned to Hours Less than the Historic Maximum**



Using the above approach, it was not always possible to reallocate excess emissions to hours below the historic maximum, such as when the total seasonal emissions of $NO_x$ or $SO_2$ for a unit divided by the number of hours of operation are greater than the 2014-2017 maximum emissions level. For these units, the regional fuel-specific average profiles were applied to all pollutants, including heat input, for the

respective season (see example in Figure 3-12). It was not possible for SMOKE to use regional profiles for some pollutants and adjusted CEMS data for other pollutants for the same unit and season, therefore, all pollutants in the unit and season are assigned to regional profiles when regional profiles are needed. For some units, hourly emissions values still exceed the 2014-2017 annual maximum for the unit even after regional profiles were applied (see example in Figure 3-13).

**Figure 3-12. Regional Profile Applied due to not being able to Adjust below Historic Maximum**



**Figure 3-13. Regional Profile Applied, but Exceeds Historic Maximum in Some Hours**



### 3.3.3 Airport Temporal allocation (airports)

Airport temporal profiles were updated in 2014v7.0 and were kept the same for the 2016v3 platform.  All airport SCCs (i.e., 2275*, 2265008005, 2267008005, 2268008005 and 2270008005) were given the same hourly, weekly and monthly profile for all airports other than Alaska seaplanes (which are not in the CMAQ modeling domain).  Hourly airport operations data were obtained from the Aviation System Performance Metrics (ASPM) Airport Analysis website (https://aspm.faa.gov/apm/sys/AnalysisAP.asp).  A report of 2014 hourly Departures and Arrivals for Metric Computation was generated.  An overview of the ASPM metrics is at http://aspmhelp.faa.gov/index.php/Aviation_Performance_Metrics_%28APM%29.  Figure 3-14 shows the diurnal airport profile.

Weekly and monthly temporal profiles are based on 2014 data from the FAA Operations Network Air Traffic Activity System (http://aspm.faa.gov/opsnet/sys/Terminal.asp).  A report of all airport operations (takeoffs and landings) by day for 2014 was generated. These data were then summed to month and day-of-week to derive the monthly and weekly temporal profiles shown in Figure 3-14, Figure 3-15, and Figure 3-16.  An overview of the Operations Network data system is at http://aspmhelp.faa.gov/index.php/Operations_Network_%28OPSNET%29. The weekly and monthly profiles from 2014 are still used in the 2016 platforms.

Alaska seaplanes, which are outside the CONUS domain use the same monthly profile as in the 2011 platform shown in Figure 3-17.  These were assigned based on the facility ID.

**Figure 3-14.  Diurnal Profile for all Airport SCCs**



**Figure 3-15.  Weekly profile for all Airport SCCs**



**Figure 3-16.  Monthly Profile for all Airport SCCs**



**Figure 3-17.  Alaska Seaplane Profile**

### 3.3.4 Residential Wood Combustion Temporal allocation (rwc)

There are many factors that impact the timing of when emissions occur, and for some sectors this includes meteorology.  The benefits of utilizing meteorology as a method for temporal allocation are: (1) a meteorological dataset consistent with that used by the AQ model is available (e.g., outputs from WRF); (2) the meteorological model data are highly resolved in terms of spatial resolution; and (3) the meteorological variables vary at hourly resolution and can, therefore, be translated into hour-specific temporal allocation.

The SMOKE program Gentpro provides a method for developing meteorology-based temporal allocation. Currently, the program can utilize three types of temporal algorithms: annual-to-day temporal allocation for residential wood combustion (RWC); month-to-hour temporal allocation for agricultural livestock

129

$NH_3$; and a generic meteorology-based algorithm for other situations.  Meteorological-based temporal allocation was used for portions of the rwc sector and for the entire ag sector.

Gentpro reads in gridded meteorological data (output from MCIP) along with spatial surrogates and uses the specified algorithm to produce a new temporal profile that can be input into SMOKE.  The meteorological variables and the resolution of the generated temporal profile (hourly, daily, etc.) depend on the selected algorithm and the run parameters.  For more details on the development of these algorithms and running Gentpro, see the Gentpro documentation and the SMOKE documentation at http://www.cmascenter.org/smoke/documentation/3.1/GenTPRO_TechnicalSummary_Aug2012_Final.pdf and https://www.cmascenter.org/smoke/documentation/4.5/html/ch05s03s05.html, respectively.

For the RWC algorithm, Gentpro uses the daily minimum temperature to determine the temporal allocation of emissions to days of the year. Gentpro was used to create an annual-to-day temporal profile for the RWC sources.  These generated profiles distribute annual RWC emissions to the coldest days of the year.  On days where the minimum temperature does not drop below a user-defined threshold, RWC emissions for most sources in the sector are zero.  Conversely, the program temporally allocates the largest percentage of emissions to the coldest days.  Similar to other temporal allocation profiles, the total annual emissions do not change, only the distribution of the emissions within the year is affected.  The temperature threshold for RWC emissions was 50 ˚F for most of the country, and 60 ˚F for the following states:  Alabama, Arizona, California, Florida, Georgia, Louisiana, Mississippi, South Carolina, and Texas.  The algorithm is as follows:

> If Td >= Tt: no emissions that day
> If Td < Tt: daily factor = 0.79*(Tt -Td)
>
> where (Td = minimum daily temperature; Tt = threshold temperature, which is 60 degrees F in southern states and 50 degrees F elsewhere).

Once computed, the factors are normalized to sum to 1 to ensure that the total annual emissions are unchanged (or minimally changed) during the temporal allocation process.

Figure 3-18 illustrates the impact of changing the temperature threshold for a warm climate county.  The plot shows the temporal fraction by day for Duval County, Florida, for the first four months of 2007.  The default 50 ˚F threshold creates large spikes on a few days, while the 60 ˚F threshold dampens these spikes and distributes a small amount of emissions to the days that have a minimum temperature between 50 and 60 ˚F.

**Figure 3-18.  Example of RWC temporal allocation in 2007 using a 50 versus 60 °F threshold**



The diurnal profile used for most RWC sources (see Figure 3-19) places more of the RWC emissions in the morning and the evening when people are typically using these sources. This profile is based on a 2004 MANE-VU survey based temporal profiles[34]. This profile was created by averaging three indoor and three RWC outdoor temporal profiles from counties in Delaware and aggregating them into a single RWC diurnal profile. This new profile was compared to a concentration-based analysis of aethalometer measurements in Rochester, New York (Wang *et al.* 2011) for various seasons and days of the week and was found that the new RWC profile generally tracked the concentration based temporal patterns.

**Figure 3-19.  RWC diurnal temporal profile**

The temporal allocation for "Outdoor Hydronic Heaters" (i.e., "OHH," SCC=2104008610) and "Outdoor wood burning device, NEC (fire-pits, chimineas, etc.)" (i.e., "recreational RWC," SCC=21040087000) is not based on temperature data, because the meteorologically-based temporal allocation used for the rest of the rwc sector did not agree with observations for how these appliances are used.

---

[34] https://s3.amazonaws.com/marama.org/wp-content/uploads/2019/11/13093804/Open_Burning_Residential_Areas_Emissions_Report-2004.pdf

For OHH, the annual-to-month, day-of-week and diurnal profiles were modified based on information in the New York State Energy Research and Development Authority's (NYSERDA) "Environmental, Energy Market, and Health Characterization of Wood-Fired Hydronic Heater Technologies, Final Report" (NYSERDA, 2012), as well a Northeast States for Coordinated Air Use Management (NESCAUM) report "Assessment of Outdoor Wood-fired Boilers" (NESCAUM, 2006).  A Minnesota 2008 Residential Fuelwood Assessment Survey of individual household responses (MDNR, 2008) provided additional annual-to-month, day-of-week, and diurnal activity information for OHH as well as recreational RWC usage.

Data used to create the diurnal profile for OHH, shown in Figure 3-20, are based on a conventional single-stage heat load unit burning red oak in Syracuse, New York.  As shown in Figure 3-21, the NESCAUM report describes how for individual units, OHH are highly variable day-to-day but that in the aggregate, these emissions have no day-of-week variation.  In contrast, the day-of-week profile for recreational RWC follows a typical "recreational" profile with emissions peaked on weekends.

Annual-to-month temporal allocation for OHH as well as recreational RWC were computed from the MDNR 2008 survey and are illustrated in Figure 3-22.  The OHH emissions still exhibit strong seasonal variability, but do not drop to zero because many units operate year-round for water and pool heating.  In contrast to all other RWC appliances, recreational RWC emissions are used far more frequently during the warm season.

**Figure 3-20.  Data used to produce a diurnal profile for OHH, based on heat load (BTU/hr)**

**Figure 3-21.  Day-of-week temporal profiles for OHH and Recreational RWC**



**Figure 3-22.  Annual-to-month temporal profiles for OHH and recreational RWC**



### 3.3.5 Agricultural Ammonia Temporal Profiles (ag)

For the agricultural livestock $NH_3$ algorithm, the GenTPRO algorithm is based on an equation derived by Jesse Bash of the EPA's ORD based on the Zhu, Henze, et al. (2013) empirical equation.  This equation is based on observations from the TES satellite instrument with the GEOS-Chem model and its adjoint to estimate diurnal $NH_3$ emission variations from livestock as a function of ambient temperature, aerodynamic resistance, and wind speed.  The equations are:

133

$$E_{i,h} = [161500/T_{i,h} \times e^{(-1380/T_{i,h})}] \times AR_{i,h} \qquad \text{Equation 3-4}$$

$$PE_{i,h} = E_{i,h} / Sum(E_{i,h}) \qquad \text{Equation 3-5}$$

where

- $PE_{i,h}$ = Percentage of emissions in county $i$ on hour $h$
- $E_{i,h}$ = Emission rate in county $i$ on hour $h$
- $T_{i,h}$ = Ambient temperature (Kelvin) in county $i$ on hour $h$
- $AR_{i,h}$ = Aerodynamic resistance in county $i$

GenTPRO was run using the "BASH_NH3" profile method to create month-to-hour temporal profiles for these sources. Because these profiles distribute to the hour based on monthly emissions, the monthly emissions are obtained from a monthly inventory, or from an annual inventory that has been temporalized to the month. Figure 3-23 compares the daily emissions for Minnesota from the "old" approach (uniform monthly profile) with the "new" approach (GenTPRO generated month-to-hour profiles) for 2014. Although the GenTPRO profiles show daily (and hourly variability), the monthly total emissions are the same between the two approaches.

**Figure 3-23.  Example of animal NH₃ emissions temporal allocation approach (daily total emissions)**



For the 2016 platform, the GenTPRO approach is applied to all sources in the livestock and fertilizer sectors, NH₃ and non- NH₃. Monthly profiles are based on the daily-based EPA livestock emissions and are the same as those used in 2014v7.0. Profiles are by state/SCC_category, where SCC_category is one of the following: beef, broilers, layers, dairy, swine.

### 3.3.6 Oil and gas temporal allocation (np_oilgas)

Monthly oil and gas temporal profiles by county and SCC were updated to use 2016 activity information for the 2016v1 platform. Weekly and diurnal profiles are flat and are based on comments received on a version of the 2011 platform.

### 3.3.7 Onroad mobile temporal allocation (onroad)

For the onroad sector, the temporal distribution of emissions is a combination of traditional temporal profiles and the influence of meteorology.  This section will discuss both the meteorological influences and the development of the temporal profiles for this platform.

The "inventories" referred to in Table 3-20 consist of activity data for the onroad sector, not emissions.  For the off-network emissions from the rate-per-profile (RPP) and rate-per-vehicle (RPV) processes, the VPOP activity data is annual and does not need temporal allocation.  For rate-per-hour (RPH) processes that result from hoteling of combination trucks, the HOTELING inventory is annual and was temporalized to month, day of the week, and hour of the day through temporal profiles. Day-of-week and hour-of-day temporal profiles are also used to temporalize the starts activity used for rate-per-start (RPS) processes, and the off-network idling (ONI) hours activity used for rate-per-hour-ONI (RPHO) processes.  The inventories for starts and ONI activity contain monthly activity so that monthly temporal profiles are not needed.

For on-roadway rate-per-distance (RPD) processes, the VMT activity data is annual for some sources and monthly for other sources, depending on the source of the data.  Sources without monthly VMT were temporalized from annual to month through temporal profiles.  VMT was also temporalized from month to day of the week, and then to hourly through temporal profiles.  The RPD processes require a speed profile (SPDPRO) that consists of vehicle speed by hour for a typical weekday and weekend day.  For onroad, the temporal profiles and SPDPRO will impact not only the distribution of emissions through time but also the total emissions.  Because SMOKE-MOVES (for RPD) calculates emissions based on the VMT, speed and meteorology, if one shifted the VMT or speed to different hours, it would align with different temperatures and hence different emission factors.  In other words, two SMOKE-MOVES runs with identical annual VMT, meteorology, and MOVES emission factors, will have different total emissions if the temporal allocation of VMT changes.  Figure 3-24 illustrates the temporal allocation of the onroad activity data (i.e., VMT) and the pattern of the emissions that result after running SMOKE-MOVES.  In this figure, it can be seen that the meteorologically varying emission factors add variation on top of the temporal allocation of the activity data.

Meteorology is not used in the development of the temporal profiles, but rather it impacts the calculation of the hourly emissions through the program Movesmrg.  The result is that the emissions vary at the hourly level by grid cell.  More specifically, the on-network (RPD) and the off-network parked vehicle (RPV, RPH, RPHO, RPS, and RPP) processes use the gridded meteorology (MCIP) either directly or indirectly.  For RPD, RPV, RPS, RPH, and RPHO, Movesmrg determines the temperature for each hour and grid cell and uses that information to select the appropriate emission factor for the specified SCC/pollutant/mode combination.  For RPP, instead of reading gridded hourly meteorology, Movesmrg reads gridded daily minimum and maximum temperatures.  The total of the emissions from the combination of these four processes (RPD, RPV, RPH, RPHO, RPS, and RPP) comprise the onroad sector emissions.  The temporal patterns of emissions in the onroad sector are influenced by meteorology.

**Figure 3-24. Example of temporal variability of NO$_X$ emissions**



New VMT day-of-week and hour-of-day temporal profiles were developed for use in the 2014NEIv2 and later platforms as part of the effort to update the inputs to MOVES and SMOKE-MOVES under CRC A-100 (Coordinating Research Council, 2017). CRC A-100 data includes profiles by region or county, road type, and broad vehicle category. There are three vehicle categories: passenger vehicles (11/21/31), commercial trucks (32/52), and combination trucks (53/61/62). CRC A-100 does not cover buses, refuse trucks, or motor homes, so those vehicle types were mapped to other vehicle types for which CRC A-100 did provide profiles as follows: 1) Intercity/transit buses were mapped to commercial trucks; 2) Motor homes were mapped to passenger vehicles for day-of-week and commercial trucks for hour-of-day; 3) School buses and refuse trucks were mapped to commercial trucks for hour-of-day and use a new custom day-of-week profile called LOWSATSUN that has a very low weekend allocation, since school buses and refuse trucks operate primarily on business days. In addition to temporal profiles, CRC A-100 data were also used to develop the average hourly speed data (SPDPRO) used by SMOKE-MOVES. In areas where CRC A-100 data does not exist, hourly speed data is based on MOVES county databases.

The CRC A-100 dataset includes temporal profiles for individual counties, Metropolitan Statistical Areas (MSAs), and entire regions (e.g., West, South). For counties without county or MSA temporal profiles specific to itself, regional temporal profiles are used. Temporal profiles also vary by each of the MOVES road types, and there are distinct hour-of-day profiles for each day of the week. Plots of hour-of-day profiles for passenger vehicles in Fulton County, GA, are shown in Figure 3-25. Separate plots are shown for Monday, Friday, Saturday, and Sunday, and each line corresponds to a particular MOVES road type (i.e., road type 2 = rural restricted, 3 = rural unrestricted, 4 = urban restricted, and 5 = urban unrestricted). Figure 3-26 shows which counties have temporal profiles specific to that county, and which counties use MSA or regional average profiles. Figure 3-27 shows the regions used to compute regional average profiles.

Figure 3-25.  Sample onroad diurnal profiles for Fulton County, GA

**Figure 3-26.  Methods to Populate Onroad Speeds and Temporal Profiles by Road Type**



**Figure 3-27.  Regions for computing Region Average Speeds and Temporal Profiles**



For hoteling, day-of-week profiles are the same as non-hoteling for combination trucks, while hour-of-day non-hoteling profiles for combination trucks were inverted to create new hoteling profiles that peak overnight instead of during the day.  The combination truck profiles for Fulton County are shown in Figure 3-28.

The CRC A-100 temporal profiles were used in the entire contiguous United States, except in California. All California temporal profiles were carried over from 2014v7.0, although California hoteling uses CRC A-100-based profiles just like the rest of the country, since CARB didn't have a hoteling-specific profile. Monthly profiles in all states (national profiles by broad vehicle type) were also carried over from 2014v7.0 and applied directly to the VMT.  For California, CARB supplied diurnal profiles that varied by vehicle type, day of the week,[35] and air basin.  These CARB-specific profiles were used in developing EPA estimates for California.  Although the EPA adjusted the total emissions to match California-submitted emissions for 2016, the temporal allocation of these emissions took into account both the state-specific VMT profiles and the SMOKE-MOVES process of incorporating meteorology.

---

[35] California's diurnal profiles varied within the week.  Monday, Friday, Saturday, and Sunday had unique profiles and Tuesday, Wednesday, Thursday had the same profile.

**Figure 3-28.  Example of Temporal Profiles for Combination Trucks**



Temporal profiles for RPHO are based on the same temporal profiles as the on-network processes in RPD, but since the on-network profiles are road-type-specific and ONI is not road-type-specific, the RPHO profiles were assigned to use rural unrestricted profiles for counties considered "rural" and urban unrestricted profiles for counties considered "urban".  RPS uses a separate set of temporal profiles specifically for starts activity. For starts, there is one day-of-week temporal profile for each source type (e.g., motorcycles, passenger cars, combination long haul trucks), and two hour-of-day temporal profiles for each source type, one for weekdays and one for weekends. The temporal profiles for starts are applied nationally and are based on the default starts-per-day-per-vehicle and starts-hour-fraction tables from MOVES.

### 3.3.8 Nonroad mobile temporal allocation(nonroad)

For nonroad mobile sources, temporal allocation is performed differently for different SCCs. Beginning with the final 2011 platform and continued into the 2016 platforms, some improvements to temporal allocation of nonroad mobile sources were made to make the temporal profiles more realistically reflect real-world practices.  Some specific updates were made for agricultural sources (e.g., tractors), construction, and commercial residential lawn and garden sources.

Figure 3-29 shows two previously existing temporal profiles (9 and 18) and a new temporal profile (19) which has lower emissions on weekends.  In the 2016 platform, construction and commercial lawn and garden sources were updated from profile 18 to the new profile 19 which has lower emissions on

weekends.  Residental lawn and garden sources continue to use profile 9 and agricultural sources continue to use profile 19.

**Figure 3-29.  Example Nonroad Day-of-week Temporal Profiles**

Figure 3-30 shows the previously existing temporal profiles 26 and 27 along with new temporal profiles (25a and 26a) which have lower emissions overnight.  In the 2016 platform, construction sources previously used profile 26 and were updated to use profile 26a.  Commercial lawn and garden and agriculture sources also previously used profile 26 but were updated to use the new profiles 26a and 25a, respectively.  Residental lawn and garden sources were updated from profile 26 to use profile 27.

**Figure 3-30.  Example Nonroad Diurnal Temporal Profiles**



### 3.3.9 Additional sector specific details (afdust, beis, cmv, rail, nonpt, ptnonipm, ptfire)

For the afdust sector, meteorology is not used in the development of the temporal profiles, but it is used to reduce the total emissions based on meteorological conditions.  These adjustments are applied through sector-specific scripts, beginning with the application of land use-based gridded transport fractions and then subsequent zero-outs for hours during which precipitation occurs or there is snow cover on the ground.  The land use data used to reduce the NEI emissions explains the amount of emissions that are subject to transport.  This methodology is discussed in (Pouliot et al., 2010), and in "Fugitive Dust Modeling for the 2008 Emissions Modeling Platform" (Adelman, 2012).  The precipitation adjustment is applied to remove all emissions for hours where measurable rain occurs, or where there is snow cover. Therefore, the afdust emissions vary day-to-day based on the precipitation and/or snow cover for each grid cell and hour.  Both the transport fraction and meteorological adjustments are based on the gridded resolution of the platform; therefore, somewhat different emissions will result from different grid resolutions.  For this reason, to ensure consistency between grid resolutions, afdust emissions for the 36US3 grid are aggregated from the 12US1 emissions. Application of the transport fraction and meteorological adjustments prevents the overestimation of fugitive dust impacts in the grid modeling as compared to ambient samples.

Biogenic emissions in the beis sector vary by every day of the year because they are developed using meteorological data including temperature, surface pressure, and radiation/cloud data.  The emissions are computed using appropriate emission factors according to the vegetation in each model grid cell, while taking the meteorological data into account.

For the cmv sectors, most areas use hourly emission inventories derived from the 5-minute AIS data.  In some areas where AIS data are not available, such as in Canada between the St. Lawrence Seaway and the Great Lakes and in the southern Caribbean, the flat temporal profiles are used for hourly and day-of-week values. Most regions without AIS data also use a flat monthly profile, with some offshore areas using an average monthly profile derived from the 2008 ECA inventory monthly values. These areas without AIS data also use flat day of week and hour of day profiles.

For the rail sector, new monthly profiles were developed for the 2016 platform.  Monthly temporal allocation for rail freight emissions is based on AAR Rail Traffic Data, Total Carloads and Intermodal, for 2016.  For passenger trains, monthly temporal allocation is flat for all months.  Rail passenger miles data is available by month for 2016 but it is not known how closely rail emissions track with passenger activity since passenger trains run on a fixed schedule regardless of how many passengers are aboard, and so a flat profile is chosen for passenger trains.  Rail emissions are allocated with flat day of week profiles, and most emissions are allocated with flat hourly profiles.

For the ptagfire sector, the inventories are in the daily point fire format FF10 PTDAY. The diurnal temporal profile for ag fires reflects the fact that burning occurs during the daylight hours - see Figure 3-31 (McCarty et al., 2009).  This puts most of the emissions during the workday and suppresses the emissions during the middle of the night.

**Figure 3-31.  Agricultural burning diurnal temporal profile**



Industrial processes that are not likely to shut down on Sundays, such as those at cement plants, use profiles that include emissions on Sundays, while those that would shut down on Sundays use profiles that reflect Sunday shutdowns.

For the ptfire sectors, the inventories are in the daily point fire format FF10 PTDAY.  Separate hourly profiles for prescribed and wildfires were used.  Figure 3-32 below shows the profiles used for each state for the 2016v2 and 2016v3 modeling platforms. The wildfire diurnal profiles are similar but vary according to the average meteorological conditions in each state. The 2016v2 and v3 platforms used diurnal profiles for prescribed profile that better reflect flaming and residual smoldering phases and average burn practices.   These flaming and residual smoldering diurnal profiles vary slightly by region.

**Figure 3-32.  Prescribed and Wildfire diurnal temporal profiles**

For the nonroad sector, while the NEI only stores the annual totals, the modeling platform uses monthly inventories from output from MOVES.  For California, CARB's annual inventory was temporalized to monthly using monthly temporal profiles applied in SMOKE by SCC.  This is an improvement over the 2011 platforms, which applied monthly temporal allocation in California at the broader SCC7 level.

## *3.4      Spatial Allocation*

The methods used to perform spatial allocation are summarized in this section.  The spatial factors are typically applied by county and SCC.  As described in Section 3.1, spatial allocation was performed for national 36-km and 12-km domains.  To accomplish this, SMOKE used national 36-km and 12-km spatial surrogates and a SMOKE area-to-point data file.  For the U.S., the spatial surrogates are based on circa 2016 to 2017 data wherever possible.  For Mexico, the spatial surrogates used as described below.  For Canada, surrogates were provided by ECCC for the 2016v7.2 (beta) platform and those continue to be used in the 2016v3 platform.  The U.S., Mexican, and Canadian 36-km and 12-km surrogates cover the entire CONUS domain 12US1 shown in Figure 3-1. The 36US3 domain includes a portion of Alaska, and since Alaska emissions are typically not included in air quality modeling for the contiguous U.S., special considerations are taken to include Alaska emissions in 36-km modeling.

2016v3 platform uses the same surrogates and surrogate assignments as 2016v2 platform, except for new SCCs introduced in the np_solvents sector which did not have an existing assignment. Documentation of the origin of the spatial surrogates for the platform is provided in the 2016v2 surrogate specifications workbook. The remainder of this subsection summarizes the data used for the spatial surrogates and the area-to-point data which is used for airport refueling.

### 3.4.1 Spatial Surrogates for U.S. emissions

There are more than 100 spatial surrogates available for spatially allocating U.S. county-level emissions to the 36-km and 12-km grid cells used by the air quality model.  As described in Section 3.4.2, an area-to-point approach overrides the use of surrogates for an airport refueling sources.  Table 3-21 lists the codes and descriptions of the surrogates.  Surrogate names and codes listed in *italics* are not directly assigned to any sources for the 2016 platforms, but they are sometimes used to gapfill other surrogates, or as an input for merging two surrogates to create a new surrogate that is used. The WRAP oil and gas surrogates used in 2016v2 and 2016v3 are not listed in Table 3-21 but are listed in Table 3-23.

Many surrogates were updated or newly developed for use in the 2014v7.0 platform (Adelman, 2016).  They include the use of the 2011 National Land Cover Database (the previous platform used 2006) and development of various development density levels such as open, low, medium high and various combinations of these.  These NLCD-based surrogates largely replaced the FEMA category (500 series) surrogates that were used in the 2011 platform.  Additionally, onroad surrogates were developed using average annual daily traffic counts from the highway monitoring performance system (HPMS).  Previously, the "activity" for the onroad surrogates was length of road miles.  These and other surrogates are described in a reference (Adelman, 2016).

Several surrogates were updated or developed as new surrogates for the 2016 platforms:

- oil and gas surrogates represent activity during the year 2016;
- onroad spatial allocation uses surrogates that do not distinguish between urban and rural road types, correcting the issue arising in some counties due to the inconsistent urban and rural

definitions between MOVES, the activity data, and the surrogate data, and were further updated for the 2016 platform;

- spatial surrogates for onroadway sources use annual average daily traffic (AADT) for 2017;

- the surrogate used for truck stops was updated in 2019;

- a public schools surrogate (#508) was added in the 2016v2 platform;

- the use of 500 series surrogates (except for the new #508) were phased out; and

- rail surrogates were updated to fix some misallocated emissions in 2016v2.

The surrogates for the U.S. were mostly generated using the Surrogate Tools DB tool. The tool and documentation for the Surrogate Tools DB is available at https://www.cmascenter.org/surrogate_tools_db/.

**Table 3-21.  U.S. Surrogates available for the 2016 modeling platforms**

| Code | Surrogate Description | Code | Surrogate Description |
|------|----------------------|------|----------------------|
| N/A | Area-to-point approach (see 3.6.2) | *318* | *NLCD Pasture Land* |
| 100 | Population | 319 | NLCD Crop Land |
| *110* | *Housing* | 320 | NLCD Forest Land |
| *131* | *urban Housing* | 321 | NLCD Recreational Land |
| *132* | *Suburban Housing* | *340* | *NLCD Land* |
| *134* | *Rural Housing* | 350 | NLCD Water |
| *137* | *Housing Change* | 508 | Public Schools |
| *140* | *Housing Change and Population* | 650 | Refineries and Tank Farms |
| 150 | Residential Heating – Natural Gas | 670 | Spud Count – CBM Wells |
| *160* | *Residential Heating – Wood* | 671 | Spud Count – Gas Wells |
| 170 | Residential Heating – Distillate Oil | *672* | *Gas Production at Oil Wells* |
| 180 | Residential Heating – Coal | *673* | *Oil Production at CBM Wells* |
| 190 | Residential Heating – LP Gas | 674 | Unconventional Well Completion Counts |
| *201* | *Urban Restricted Road Miles* | 676 | Well Count – All Producing |
| 202 | Urban Restricted AADT | *677* | *Well Count – All Exploratory* |
| 205 | Extended Idle Locations | 678 | Completions at Gas Wells |
| *211* | *Rural Restricted Road Miles* | 679 | Completions at CBM Wells |
| *212* | *Rural Restricted AADT* | 681 | Spud Count – Oil Wells |
| *221* | *Urban Unrestricted Road Miles* | 683 | Produced Water at All Wells |
| *222* | *Urban Unrestricted AADT* | 6831 | Produced water at CBM wells |
| *231* | *Rural Unrestricted Road Miles* | 6832 | Produced water at gas wells |
| *232* | *Rural Unrestricted AADT* | 6833 | Produced water at oil wells |
| 239 | Total Road AADT | 685 | Completions at Oil Wells |
| 240 | Total Road Miles | *686* | *Completions at All Wells* |
| *241* | *Total Restricted Road Miles* | 687 | Feet Drilled at All Wells |
| 242 | All Restricted AADT | 689 | Gas Produced – Total |
| *243* | *Total Unrestricted Road Miles* | 691 | Well Counts - CBM Wells |
| 244 | All Unrestricted AADT | *692* | *Spud Count – All Wells* |
| 258 | Intercity Bus Terminals | 693 | Well Count – All Wells |
| 259 | Transit Bus Terminals | 694 | Oil Production at Oil Wells |
| *260* | *Total Railroad Miles* | 695 | Well Count – Oil Wells |
| 261 | NTAD Total Railroad Density | 696 | Gas Production at Gas Wells |

| Code | Surrogate Description | Code | Surrogate Description |
|------|----------------------|------|----------------------|
| 271 | NTAD Class 1 2 3 Railroad Density | *697* | *Oil Production at Gas Wells* |
| *272* | *NTAD Amtrak Railroad Density* | 698 | Well Count – Gas Wells |
| *273* | *NTAD Commuter Railroad Density* | 699 | Gas Production at CBM Wells |
| *275* | *ERTAC Rail Yards* | *710* | *Airport Points* |
| *280* | *Class 2 and 3 Railroad Miles* | 711 | Airport Areas |
| 300 | NLCD Low Intensity Development | 801 | Port Areas |
| *301* | *NLCD Med Intensity Development* | *802* | *Shipping Lanes* |
| *302* | *NLCD High Intensity Development* | *805* | *Offshore Shipping Area* |
| *303* | *NLCD Open Space* | *806* | *Offshore Shipping NEI2014 Activity* |
| 304 | NLCD Open + Low | *807* | *Navigable Waterway Miles* |
| 305 | NLCD Low + Med | *808* | *2013 Shipping Density* |
| 306 | NLCD Med + High | *820* | *Ports NEI2014 Activity* |
| 307 | NLCD All Development | 850 | Golf Courses |
| 308 | NLCD Low + Med + High | 860 | Mines |
| 309 | NLCD Open + Low + Med | *890* | *Commercial Timber* |
| 310 | NLCD Total Agriculture | | |

For the onroad sector, the on-network (RPD) emissions were spatially allocated differently from other off-network processes (e.g., RPV, RPP, RPHO). Surrogates for on-network processes are based on AADT data and off network processes (including the off-network idling included in RPHO) are based on land use surrogates as shown in Table 3-22. Emissions from the extended (i.e., overnight) idling of trucks were assigned to surrogate 205, which is based on locations of overnight truck parking spaces. The underlying data for this surrogate were updated during the development of the 2016 platforms to include additional data sources and corrections based on comments received and these updates were carried into this platform.

**Table 3-22.  Off-Network Mobile Source Surrogates**

| Source type | Source Type name | Surrogate ID | Description |
|-------------|------------------|--------------|-------------|
| 11 | Motorcycle | 307 | NLCD All Development |
| 21 | Passenger Car | 307 | NLCD All Development |
| 31 | Passenger Truck | 307 | NLCD All Development |
| 32 | Light Commercial Truck | 308 | NLCD Low + Med + High |
| 41 | Intercity Bus | 306 | NLCD Med + High |
| 42 | Transit Bus | 259 | Transit Bus Terminals |
| 43 | School Bus | 508 | Public Schools |
| 51 | Refuse Truck | 306 | NLCD Med + High |
| 52 | Single Unit Short-haul Truck | 306 | NLCD Med + High |
| 53 | Single Unit Long-haul Truck | 306 | NLCD Med + High |
| 54 | Motor Home | 304 | NLCD Open + Low |
| 61 | Combination Short-haul Truck | 306 | NLCD Med + High |
| 62 | Combination Long-haul Truck | 306 | NLCD Med + High |

For the oil and gas sources in the np_oilgas sector, the spatial surrogates were updated to those shown in Table 3-23 using 2016 data consistent with what was used to develop the 2016v2 nonpoint oil and gas emissions. The primary activity data source used for the development of the oil and gas spatial

146

surrogates was data from Drilling Info (DI) Desktop's HPDI database (Drilling Info, 2017).  This database contains well-level location, production, and exploration statistics at the monthly level. Due to a proprietary agreement with DI Desktop, individual well locations and ancillary production cannot be made publicly available, but aggregated statistics are allowed.  These data were supplemented with data from state Oil and Gas Commission (OGC) websites (Alaska, Arizona, Idaho, Illinois, Indiana, Kentucky, Louisiana, Michigan, Mississippi, Missouri, Nevada, Oregon and Pennsylvania, Tennessee). In cases when the desired surrogate parameter was not available (e.g., feet drilled), data for an alternative surrogate parameter (e.g., number of spudded wells) was downloaded and used.  Under that methodology, both completion date and date of first production from HPDI were used to identify wells completed during 2016.  In total, over 1 million unique wells were compiled from the above data sources.  The wells cover 34 states and over 1,100 counties. (ERG, 2018).

**Table 3-23.  Spatial Surrogates for Oil and Gas Sources**

| Surrogate Code | Surrogate Description |
|---|---|
| 670 | Spud Count - CBM Wells |
| 671 | Spud Count - Gas Wells |
| 672 | Gas Production at Oil Wells |
| 673 | Oil Production at CBM Wells |
| 674 | Unconventional Well Completion Counts |
| 676 | Well Count - All Producing |
| 677 | Well Count - All Exploratory |
| 678 | Completions at Gas Wells |
| 679 | Completions at CBM Wells |
| 681 | Spud Count - Oil Wells |
| 683 | Produced Water at All Wells |
| 685 | Completions at Oil Wells |
| 686 | Completions at All Wells |
| 687 | Feet Drilled at All Wells |
| 689 | Gas Produced – Total |
| 691 | Well Counts - CBM Wells |
| 692 | Spud Count - All Wells |
| 693 | Well Count - All Wells |
| 694 | Oil Production at Oil Wells |
| 695 | Well Count - Oil Wells |
| 696 | Gas Production at Gas Wells |
| 697 | Oil Production at Gas Wells |
| 698 | Well Count - Gas Wells |
| 699 | Gas Production at CBM Wells |
| 2688 | WRAP Gas production at oil wells |
| 2689 | WRAP Gas production at all wells |
| 2691 | WRAP Well count - CBM wells |
| 2693 | WRAP Well count - all wells |

| Surrogate Code | Surrogate Description |
|---|---|
| 2694 | WRAP Oil production at oil wells |
| 2695 | WRAP Well count - oil wells |
| 2696 | WRAP Gas production at gas wells |
| 2697 | WRAP Oil production at gas wells |
| 2698 | WRAP Well count - gas wells |
| 2699 | WRAP Gas production at CBM wells |
| 6831 | Produced water at CBM wells |
| 6832 | Produced water at gas wells |
| 6833 | Produced water at oil wells |

Not all of the available surrogates are used to spatially allocate sources in the modeling platform; that is, some surrogates shown in Table 3-21 were not assigned to any SCCs, although many of the "unused" surrogates are actually used to "gap fill" other surrogates that are used. When the source data for a surrogate has no values for a particular county, gap filling is used to provide values for the surrogate in those counties to ensure that no emissions are dropped when the spatial surrogates are applied to the emission inventories. Table 3-24 shows the CAP emissions (i.e., NH₃, NOx, PM₂.₅, SO₂, and VOC) by sector assigned to each spatial surrogate.

**Table 3-24. Selected 2016 CAP emissions by sector for U.S. Surrogates (short tons in 12US1)**

| Sector | ID | Description | NH3 | NOX | PM2_5 | SO2 | VOC |
|---|---|---|---|---|---|---|---|
| afdust | 240 | Total Road Miles | 0 | 0 | 303,187 | 0 | 0 |
| afdust | 304 | NLCD Open + Low | 0 | 0 | 826,942 | 0 | 0 |
| afdust | 306 | NLCD Med + High | 0 | 0 | 52,278 | 0 | 0 |
| afdust | 308 | NLCD Low + Med + High | 0 | 0 | 117,313 | 0 | 0 |
| afdust | 310 | NLCD Total Agriculture | 0 | 0 | 788,107 | 0 | 0 |
| fertilizer | 310 | NLCD Total Agriculture | 1,436,969 | 0 | 0 | 0 | 0 |
| livestock | 310 | NLCD Total Agriculture | 2,502,587 | 0 | 0 | 0 | 219,703 |
| nonpt | 100 | Population | 34,304 | 0 | 0 | 0 | 208 |
| nonpt | 150 | Residential Heating - Natural Gas | 33,550 | 204,371 | 4,041 | 1,365 | 12,055 |
| nonpt | 170 | Residential Heating - Distillate Oil | 1,531 | 30,031 | 3,284 | 11,510 | 1,039 |
| nonpt | 180 | Residential Heating - Coal | 1 | 3 | 1 | 3 | 3 |
| nonpt | 190 | Residential Heating - LP Gas | 98 | 31,061 | 163 | 712 | 1,181 |
| nonpt | 239 | Total Road AADT | 0 | 22 | 541 | 0 | 306,341 |
| nonpt | 244 | All Unrestricted AADT | 0 | 0 | 0 | 0 | 101,255 |
| nonpt | 271 | NTAD Class 1 2 3 Railroad Density | 0 | 0 | 0 | 0 | 2,203 |
| nonpt | 300 | NLCD Low Intensity Development | 4,823 | 19,093 | 94,548 | 2,882 | 72,599 |
| nonpt | 304 | NLCD Open + Low | 0 | 0 | 0 | 0 | 0 |
| nonpt | 306 | NLCD Med + High | 23,609 | 272,532 | 241,511 | 131,494 | 112,071 |
| nonpt | 307 | NLCD All Development | 85 | 25,798 | 110,610 | 8,256 | 69,262 |
| nonpt | 308 | NLCD Low + Med + High | 885 | 156,231 | 15,679 | 10,080 | 10,047 |
| nonpt | 310 | NLCD Total Agriculture | 0 | 0 | 38 | 0 | 0 |
| nonpt | 319 | NLCD Crop Land | 0 | 0 | 97 | 72 | 299 |

| Sector | ID | Description | NH3 | NOX | PM2_5 | SO2 | VOC |
|--------|-----|-------------|-----|-----|-------|-----|-----|
| nonpt | 320 | NLCD Forest Land | 3,953 | 68 | 273 | 0 | 279 |
| nonpt | 650 | Refineries and Tank Farms | 0 | 16 | 0 | 0 | 106,401 |
| nonpt | 711 | Airport Areas | 0 | 0 | 0 | 0 | 621 |
| nonpt | 801 | Port Areas | 0 | 0 | 0 | 0 | 6,730 |
| nonroad | 261 | NTAD Total Railroad Density | 3 | 2,154 | 227 | 1 | 426 |
| nonroad | 304 | NLCD Open + Low | 4 | 1,824 | 159 | 4 | 2,761 |
| nonroad | 305 | NLCD Low + Med | 94 | 15,985 | 3,832 | 119 | 115,955 |
| nonroad | 306 | NLCD Med + High | 305 | 183,591 | 11,839 | 328 | 94,299 |
| nonroad | 307 | NLCD All Development | 99 | 31,526 | 15,338 | 108 | 170,212 |
| nonroad | 308 | NLCD Low + Med + High | 498 | 338,083 | 28,486 | 241 | 51,957 |
| nonroad | 309 | NLCD Open + Low + Med | 119 | 21,334 | 1,256 | 151 | 45,828 |
| nonroad | 310 | NLCD Total Agriculture | 422 | 378,356 | 28,344 | 214 | 40,771 |
| nonroad | 320 | NLCD Forest Land | 15 | 5,910 | 699 | 9 | 3,944 |
| nonroad | 321 | NLCD Recreational Land | 83 | 11,616 | 6,517 | 89 | 246,560 |
| nonroad | 350 | NLCD Water | 188 | 115,168 | 5,952 | 232 | 355,808 |
| nonroad | 850 | Golf Courses | 13 | 2,001 | 117 | 16 | 5,647 |
| nonroad | 860 | Mines | 2 | 2,691 | 281 | 1 | 521 |
| np_oilgas | 670 | Spud Count - CBM Wells | 0 | 0 | 0 | 0 | 97 |
| np_oilgas | 671 | Spud Count - Gas Wells | 0 | 0 | 0 | 0 | 5,925 |
| np_oilgas | 674 | Unconventional Well Completion Counts | 20 | 25,363 | 819 | 20 | 1,307 |
| np_oilgas | 678 | Completions at Gas Wells | 0 | 5,348 | 136 | 2,976 | 18,333 |
| np_oilgas | 679 | Completions at CBM Wells | 0 | 2 | 0 | 80 | 415 |
| np_oilgas | 681 | Spud Count - Oil Wells | 0 | 0 | 0 | 0 | 14,747 |
| np_oilgas | 683 | Produced Water at All Wells | 0 | 0 | 0 | 0 | 13,876 |
| np_oilgas | 685 | Completions at Oil Wells | 0 | 259 | 0 | 888 | 29,548 |
| np_oilgas | 687 | Feet Drilled at All Wells | 0 | 46,704 | 1,478 | 44 | 2,661 |
| np_oilgas | 689 | Gas Produced - Total | 0 | 1,311 | 167 | 13 | 27,266 |
| np_oilgas | 691 | Well Counts - CBM Wells | 0 | 14,390 | 264 | 6 | 16,907 |
| np_oilgas | 694 | Oil Production at Oil Wells | 0 | 603 | 0 | 11,354 | 500,150 |
| np_oilgas | 695 | Well Count - Oil Wells | 0 | 113,164 | 2,562 | 74 | 456,274 |
| np_oilgas | 696 | Gas Production at Gas Wells | 0 | 1,539 | 0 | 0 | 299,205 |
| np_oilgas | 698 | Well Count - Gas Wells | 0 | 265,108 | 4,831 | 242 | 434,613 |
| np_oilgas | 699 | Gas Production at CBM Wells | 0 | 44 | 5 | 0 | 3,373 |
| np_oilgas | 2688 | WRAP Gas production at oil wells | 0 | 7,747 | 0 | 5,487 | 221,022 |
| np_oilgas | 2689 | WRAP Gas production at all wells | 0 | 26,598 | 780 | 1,133 | 28,306 |
| np_oilgas | 2691 | WRAP Well count - CBM wells | 0 | 225 | 19 | 0 | 1,524 |
| np_oilgas | 2693 | WRAP Well count - all wells | 0 | 17,239 | 460 | 17 | 1,768 |
| np_oilgas | 2694 | WRAP Oil production at oil wells | 0 | 35,144 | 543 | 18,367 | 110,330 |
| np_oilgas | 2695 | WRAP Well count - oil wells | 0 | 2,726 | 244 | 12 | 75,349 |
| np_oilgas | 2696 | WRAP Gas production at gas wells | 0 | 4,294 | 42 | 2 | 37,580 |
| np_oilgas | 2697 | WRAP Oil production at gas wells | 0 | 551 | 0 | 10 | 75,738 |
| np_oilgas | 2698 | WRAP Well count - gas wells | 0 | 8,160 | 513 | 14 | 120,726 |

| Sector | ID | Description | NH3 | NOX | PM2_5 | SO2 | VOC |
|---|---|---|---|---|---|---|---|
| np_oilgas | 2699 | WRAP Gas production at CBM wells | 0 | 9,157 | 282 | 9 | 7,593 |
| np_oilgas | 6831 | Produced water at CBM wells | 0 | 0 | 0 | 0 | 966 |
| np_oilgas | 6832 | Produced water at gas wells | 0 | 0 | 0 | 0 | 5,742 |
| np_oilgas | 6833 | Produced water at oil wells | 0 | 0 | 0 | 0 | 21,502 |
| np_solvents | 100 | Population | 0 | 0 | 0 | 0 | 1,456,107 |
| np_solvents | 240 | Total Road Miles | 0 | 0 | 0 | 0 | 51,483 |
| np_solvents | 306 | NLCD Med + High | 33 | 27 | 300 | 1 | 493,575 |
| np_solvents | 307 | NLCD All Development | 24 | 6 | 19 | 5 | 403,847 |
| np_solvents | 308 | NLCD Low + Med + High | 0 | 0 | 129 | 0 | 29,372 |
| np_solvents | 310 | NLCD Total Agriculture | 0 | 0 | 0 | 0 | 172,111 |
| onroad | 205 | Extended Idle Locations | 318 | 41,411 | 1,094 | 17 | 5,733 |
| onroad | 242 | All Restricted AADT | 35,490 | 1,252,856 | 34,860 | 7,513 | 166,585 |
| onroad | 244 | All Unrestricted AADT | 67,069 | 1,885,571 | 65,860 | 16,707 | 459,731 |
| onroad | 259 | Transit Bus Terminals | 12 | 2,634 | 65 | 2 | 485 |
| onroad | 304 | NLCD Open + Low | 0 | 863 | 27 | 0 | 6,329 |
| onroad | 306 | NLCD Med + High | 860 | 96,718 | 4,861 | 85 | 22,594 |
| onroad | 307 | NLCD All Development | 3,768 | 237,388 | 6,263 | 1,544 | 620,009 |
| onroad | 308 | NLCD Low + Med + High | 230 | 25,814 | 534 | 94 | 35,326 |
| onroad | 508 | Public Schools | 15 | 2,396 | 126 | 2 | 687 |
| rail | 261 | NTAD Total Railroad Density | 13 | 33,389 | 996 | 15 | 1,647 |
| rail | 271 | NTAD Class 1 2 3 Railroad Density | 313 | 525,992 | 14,823 | 442 | 24,435 |
| rwc | 300 | NLCD Low Intensity Development | 16,940 | 35,198 | 308,965 | 8,247 | 334,158 |

For 36US3 modeling in the 2016 platforms, most U.S. emissions sectors were processed using 36-km spatial surrogates, and if applicable, 36-km meteorology. Exceptions include:

- For the onroad and onroad_ca_adj sectors, instead of running SMOKE-MOVES with 36km meteorological data, 36US3 emissions were aggregated from 12US1 by summing emissions from a 3x3 group of 12-km cells into a single 36-km cell. Differences in the 12-km and 36-km meteorology can introduce differences in onroad emissions, so this approach ensures that the 36-km and 12-km onroad emissions are consistent. However, this approach means that 36US3 onroad does not include emissions in Southeast Alaska; therefore, Alaska onroad emissions are included in a separate sector called onroad_nonconus that is processed for only the 36US3 domain. The 36US3 onroad_nonconus emissions are spatially allocated using 36-km surrogates and processed with 36-km meteorology.

- Similarly to onroad, because afdust emissions incorporate meteorologically-based adjustments, afdust_adj emissions for 36US3 were aggregated from 12US1 to ensure consistency in emissions between modeling domains. Again, similarly to onroad, this means 36US3 afdust does not include emissions in Southeast Alaska; therefore, Alaska afdust emissions are processed in a separate sector called afdust_ak_adj. The 36US3 afdust_ak_adj emissions are spatially allocated using 36-km surrogates and adjusted with 36-km meteorology.

- The ag and rwc sectors are processed using 36-km spatial surrogates, but using temporal profiles based on 12-km meteorology.

### 3.4.2 Allocation method for airport-related sources in the U.S.

There are numerous airport-related emission sources in the NEI, such as aircraft, airport ground support equipment, and jet refueling. The modeling platform includes the aircraft and airport ground support equipment emissions as point sources. For the modeling platform, the EPA used the SMOKE "area-to-point" approach for only jet refueling in the nonpt sector. The following SCCs use this approach: 2501080050 and 2501080100 (petroleum storage at airports), and 2810040000 (aircraft/rocket engine firing and testing). The ARTOPNT approach is described in detail in the 2002 platform documentation: https://www.epa.gov/sites/default/files/2020-10/documents/emissions_tsd_vol1_02-28-08.pdf. The ARTOPNT file that lists the nonpoint sources to locate using point data were unchanged from the 2005-based platform.

### 3.4.3 Surrogates for Canada and Mexico emission inventories

Spatial surrogates for allocating Mexico municipio level emissions were updated in the 2014v7.1 platform and carried forward into the 2016 platforms. For the 2016 beta (v7.2) platform, a set of Canada shapefiles were provided by ECCC along with cross references to spatially allocate the year 2015 Canadian emissions. Gridded surrogates were generated using the Surrogate Tool (previously referenced); Table 3-25 provides a list. For computational reasons, total roads (1263) were used instead of the unpaved rural road surrogate provided. The population surrogate for Mexico; surrogate code 11, uses 2015 population data at 1 km resolution and replaced the previous population surrogate code 10. The other surrogates for Mexico are circa 1999 and 2000 and were based on data obtained from the Sistema Municipal de Bases de Datos (SIMBAD) de INEGI and the Bases de datos del Censo Economico 1999. Most of the CAPs allocated to the Mexico and Canada surrogates are shown in Table 3-26.

**Table 3-25.  Canadian Spatial Surrogates**

| Code | Canadian Surrogate Description | Code | Description |
|---|---|---|---|
| 100 | Population | 923 | TOTAL INSTITUTIONAL AND GOVERNEMNT |
| 101 | total dwelling | 924 | Primary Industry |
| 104 | capped total dwelling | 925 | Manufacturing and Assembly |
| 106 | ALL_INDUST | 926 | Distribution and Retail (no petroleum) |
| 113 | Forestry and logging | 927 | Commercial Services |
| 200 | Urban Primary Road Miles | 932 | CANRAIL |
| 210 | Rural Primary Road Miles | 940 | PAVED ROADS NEW |
| 211 | Oil and Gas Extraction | 945 | Commercial Marine Vessels |
| 212 | Mining except oil and gas | 946 | Construction and mining |
| 220 | Urban Secondary Road Miles | 948 | Forest |
| 221 | Total Mining | 951 | Wood Consumption Percentage |
| 222 | Utilities | 955 | UNPAVED_ROADS_AND_TRAILS |
| 230 | Rural Secondary Road Miles | 960 | TOTBEEF |
| 233 | Total Land Development | 970 | TOTPOUL |
| 240 | capped population | 980 | TOTSWIN |
| 308 | Food manufacturing | 990 | TOTFERT |
| 321 | Wood product manufacturing | 996 | urban_area |
| 323 | Printing and related support activities | 1251 | OFFR_TOTFERT |
| 324 | Petroleum and coal products manufacturing | 1252 | OFFR_MINES |

| Code | Canadian Surrogate Description | Code | Description |
|---|---|---|---|
| 326 | Plastics and rubber products manufacturing | 1253 | OFFR Other Construction not Urban |
| 327 | Non-metallic mineral product manufacturing | 1254 | OFFR Commercial Services |
| 331 | Primary Metal Manufacturing | 1255 | OFFR Oil Sands Mines |
| 350 | Water | 1256 | OFFR Wood industries CANVEC |
| 412 | Petroleum product wholesaler-distributors | 1257 | OFFR UNPAVED ROADS RURAL |
| 448 | clothing and clothing accessories stores | 1258 | OFFR_Utilities |
| 482 | Rail transportation | 1259 | OFFR total dwelling |
| 562 | Waste management and remediation services | 1260 | OFFR_water |
| 901 | AIRPORT | 1261 | OFFR_ALL_INDUST |
| 902 | Military LTO | 1262 | OFFR Oil and Gas Extraction |
| 903 | Commercial LTO | 1263 | OFFR_ALLROADS |
| 904 | General Aviation LTO | 1265 | OFFR_CANRAIL |
| 921 | Commercial Fuel Combustion | 9450 | Commercial Marine Vessel Ports |

**Table 3-26. CAPs Allocated to Mexican and Canadian Spatial Surrogates (short tons in 36US3)**

| Sector | Code | Mexican / Canadian Surrogate Description | NH₃ | NOₓ | PM₂.₅ | SO₂ | VOC |
|---|---|---|---|---|---|---|---|
| othafdust | 106 | CAN ALL_INDUST | 0 | 0 | 609 | 0 | 0 |
| othafdust | 212 | CAN Mining except oil and gas | 0 | 0 | 3,142 | 0 | 0 |
| othafdust | 221 | CAN Total Mining | 0 | 0 | 17,315 | 0 | 0 |
| othafdust | 222 | CAN Utilities | 0 | 0 | 2,792 | 0 | 0 |
| othafdust | 940 | CAN Paved Roads New | 0 | 0 | 29,862 | 0 | 0 |
| othafdust | 955 | CAN UNPAVED_ROADS_AND_TRAILS | 0 | 0 | 426,511 | 0 | 0 |
| othar | 26 | MEX Total Agriculture | 560,091 | 82,958 | 48,439 | 1,987 | 18,052 |
| othar | 32 | MEX Commercial Land | 0 | 391 | 8,511 | 0 | 102,447 |
| othar | 34 | MEX Industrial Land | 164 | 4,244 | 4,135 | 11 | 102,903 |
| othar | 36 | MEX Commercial plus Industrial Land | 7 | 23,149 | 1,551 | 12 | 234,277 |
| othar | 40 | MEX Residential (RES1-4)+Comercial+Industrial+Institutional+Government | 4 | 90 | 424 | 12 | 105,233 |
| othar | 42 | MEX Personal Repair (COM3) | 0 | 0 | 0 | 0 | 25,999 |
| othar | 44 | MEX Airports Area | 0 | 16,295 | 216 | 1,183 | 6,834 |
| othar | 48 | MEX Brick Kilns | 0 | 2,778 | 55,550 | 5,031 | 1,352 |
| othar | 50 | MEX Mobile sources - Border Crossing | 3 | 71 | 2 | 0 | 57 |
| othar | 100 | CAN Population | 795 | 52 | 622 | 15 | 225 |
| othar | 101 | CAN total dwelling | 0 | 0 | 0 | 0 | 151,094 |
| othar | 104 | CAN Capped Total Dwelling | 361 | 31,746 | 2,335 | 2,671 | 1,650 |
| othar | 113 | CAN Forestry and logging | 152 | 1,818 | 9,778 | 37 | 5,140 |
| othar | 211 | CAN Oil and Gas Extraction | 1 | 43 | 433 | 74 | 2,122 |
| othar | 212 | CAN Mining except oil and gas | 0 | 0 | 11 | 0 | 0 |
| othar | 221 | CAN Total Mining | 0 | 0 | 293 | 0 | 0 |
| othar | 222 | CAN Utilities | 57 | 3,439 | 166 | 464 | 65 |
| othar | 308 | CAN Food manufacturing | 0 | 0 | 19,253 | 0 | 17,468 |
| othar | 321 | CAN Wood product manufacturing | 873 | 4,822 | 1,646 | 383 | 16,605 |

152

| Sector | Code | Mexican / Canadian Surrogate Description | NH$_3$ | NO$_X$ | PM$_{2.5}$ | SO$_2$ | VOC |
|---|---|---|---|---|---|---|---|
| othar | 323 | CAN Printing and related support activities | 0 | 0 | 0 | 0 | 11,778 |
| othar | 324 | CAN Petroleum and coal products manufacturing | 0 | 1,201 | 1,632 | 467 | 9,368 |
| othar | 326 | CAN Plastics and rubber products manufacturing | 0 | 0 | 0 | 0 | 24,270 |
| othar | 327 | CAN Non-metallic mineral product manufacturing | 0 | 0 | 6,541 | 0 | 0 |
| othar | 331 | CAN Primary Metal Manufacturing | 0 | 158 | 5,598 | 30 | 72 |
| othar | 412 | CAN Petroleum product wholesaler-distributors | 0 | 0 | 0 | 0 | 45,634 |
| othar | 448 | CAN clothing and clothing accessories stores | 0 | 0 | 0 | 0 | 143 |
| othar | 482 | CAN Rail Transportation | 1 | 4,106 | 89 | 1 | 258 |
| othar | 562 | CAN Waste management and remediation services | 247 | 1,981 | 2,747 | 2,508 | 9,654 |
| othar | 901 | CAN Airport | 0 | 108 | 10 | 0 | 11 |
| othar | 921 | CAN Commercial Fuel Combustion | 206 | 24,819 | 2,435 | 1,669 | 1,254 |
| othar | 923 | CAN TOTAL INSTITUTIONAL AND GOVERNEMNT | 0 | 0 | 0 | 0 | 14,847 |
| othar | 924 | CAN Primary Industry | 0 | 0 | 0 | 0 | 40,409 |
| othar | 925 | CAN Manufacturing and Assembly | 0 | 0 | 0 | 0 | 70,468 |
| othar | 926 | CAN Distribution and Retail (no petroleum) | 0 | 0 | 0 | 0 | 7,475 |
| othar | 927 | CAN Commercial Services | 0 | 0 | 0 | 0 | 32,096 |
| othar | 932 | CAN CANRAIL | 52 | 91,908 | 1,822 | 48 | 3,901 |
| othar | 946 | CAN Construction and Mining | 0 | 0 | 0 | 0 | 10,211 |
| othar | 951 | CAN Wood Consumption Percentage | 1,010 | 11,223 | 113,852 | 1,603 | 161,174 |
| othar | 990 | CAN TOTFERT | 49 | 4,185 | 276 | 6,834 | 160 |
| othar | 996 | CAN urban_area | 0 | 0 | 3,182 | 0 | 0 |
| othar | 1251 | CAN OFFR_TOTFERT | 79 | 65,830 | 4,646 | 54 | 6,266 |
| othar | 1252 | CAN OFFR_MINES | 1 | 905 | 67 | 1 | 134 |
| othar | 1253 | CAN OFFR Other Construction not Urban | 63 | 40,640 | 4,880 | 43 | 11,607 |
| othar | 1254 | CAN OFFR Commercial Services | 42 | 16,193 | 2,443 | 36 | 37,663 |
| othar | 1255 | CAN OFFR Oil Sands Mines | 23 | 12,478 | 410 | 12 | 1,330 |
| othar | 1256 | CAN OFFR Wood industries CANVEC | 8 | 3,180 | 288 | 6 | 1,102 |
| othar | 1257 | CAN OFFR Unpaved Roads Rural | 26 | 11,244 | 734 | 23 | 32,322 |
| othar | 1258 | CAN OFFR_Utilities | 8 | 4,471 | 229 | 6 | 930 |
| othar | 1259 | CAN OFFR total dwelling | 17 | 6,485 | 649 | 15 | 13,317 |
| othar | 1260 | CAN OFFR_water | 23 | 6,495 | 493 | 33 | 34,204 |
| othar | 1261 | CAN OFFR_ALL_INDUST | 4 | 5,654 | 185 | 2 | 1,105 |
| othar | 1262 | CAN OFFR Oil and Gas Extraction | 1 | 1,291 | 77 | 1 | 212 |
| othar | 1263 | CAN OFFR_ALLROADS | 3 | 1,826 | 185 | 2 | 494 |
| othar | 1265 | CAN OFFR_CANRAIL | 0 | 550 | 18 | 0 | 44 |
| onroad_can | 200 | CAN Urban Primary Road Miles | 1,742 | 84,596 | 2,810 | 367 | 8,888 |
| onroad_can | 210 | CAN Rural Primary Road Miles | 714 | 49,909 | 1,626 | 153 | 3,945 |
| onroad_can | 220 | CAN Urban Secondary Road Miles | 3,279 | 134,909 | 5,613 | 776 | 23,625 |
| onroad_can | 230 | CAN Rural Secondary Road Miles | 1,898 | 95,447 | 3,152 | 418 | 10,899 |
| onroad_can | 240 | CAN Total Road Miles | 346 | 63,465 | 1,500 | 88 | 117,123 |
| onroad_mex | 11 | MEX 2015 Population | 0 | 281,135 | 1,872 | 533 | 291,816 |
| onroad_mex | 22 | MEX Total Road Miles | 10,316 | 1,207,878 | 54,789 | 25,837 | 251,800 |
| onroad_mex | 36 | MEX Commercial plus Industrial Land | 0 | 7,971 | 142 | 29 | 9,187 |

## *3.5    Preparation of Emissions for the CAMx model*

### 3.5.1 Development of CAMx Emissions for Standard CAMx Runs

To perform air quality modeling with the Comprehensive Air Quality Model with Extensions (CAMx model), the gridded hourly emissions output by the SMOKE model are output in the format needed by the CMAQ model, but must be converted to the format required by CAMx. For "regular" CAMx modeling (i.e., without two-way nesting), the CAMx conversion process consists of the following:

- Convert all emissions file formats from the I/O API NetCDF format used by CMAQ to the UAM format used by CAMx, including the merged, gridded low-level emissions files that include biogenics

- Shift hourly emissions files from the 25 hour format used by CMAQ to the averaged 24 hour format used by CAMx

- Rename and aggregate model species for CAMx

- Convert 3D wildland and agricultural fire emissions into CAMx point format

- Merge all inline point source emissions files together for each day, including layered fire emissions originally from SMOKE

- Add sea salt aerosol emissions to the converted, gridded low-level emissions files

Conversion of file formats from I/O API to CAMx (i.e., UAM) format is performed using a program called "cmaq2uam". In the CAMx conversion process, all SMOKE outputs are passed through this step first. Unlike CMAQ, the CAMx model does not have an inline biogenics option, and so for the purposes of CAMx modeling, emissions from SMOKE must include biogenic emissions.

One difference between CMAQ-ready emissions files and CAMx-ready emissions files involves hourly temporalization. A daily emissions file for CMAQ includes data for 25 hours, where the first hour is 0:00 GMT of a given day, and the last hour is 0:00 GMT of the following day. For the CAMx model, a daily emissions file must only include data for 24 hours, not 25. Furthermore, to match the hourly configuration expected by CAMx, each set of consecutive hourly timesteps from CMAQ-ready emissions files must be averaged. For example, the first hour of a CAMx-ready emissions file will equal the average of the first two hours from the corresponding CMAQ-ready emissions file, and the last (24th) hour of a CAMx-ready emissions file will equal the average of the last two hours (24th and 25th) from the corresponding CMAQ-ready emissions file. This time conversion is incorporated into each step of the CAMx-ready emissions conversion process.

The CAMx model uses a slightly different version of the CB6 speciation mechanism than does the CMAQ model. SMOKE prepares emissions files for the CB6 mechanism used by the CMAQ model ("CB6-CMAQ"), and therefore, the emissions must be converted to the CB6 mechanism used by the CAMx model ("CB6-CAMx") during the CAMx conversion process. In addition to the mechanism differences, CMAQ and CAMx also occasionally use different species naming conventions. For CAMx modeling, we also create additional tracer species. A summary of the differences between CMAQ input species and CAMx input species for CB6 (VOC), AE6 (PM2.5), and other model species, is provided in Table 3-27. Each step of the CAMx-ready emissions conversion process includes conversion of CMAQ species to CAMx species using a species mapping table which includes the mappings in Table 3-27.

**Table 3-27. Emission model species mappings for CMAQ and CAMx (for CB6R3AE7)**

| Inventory Pollutant | CMAQ Model Species | CAMx Model Species |
|---|---|---|
| $Cl_2$ | CL2 | CL2 |
| HCl | HCL | HCL |
| CO | CO | CO |
| $NO_X$ | NO | NO |
| | NO2 | NO2 |
| | HONO | HONO |
| $SO_2$ | SO2 | SO2 |
| | SULF | SULF |
| $NH_3$ | NH3 | NH3 |
| | NH3_FERT | n/a (not used in CAMx) |
| VOC | AACD | AACD |
| | ACET | ACET |
| | ALD2 | ALD2 |
| | ALDX | ALDX |
| | BENZ | BENZ and BNZA (duplicate species) |
| | CH4 | CH4 |
| | ETH | ETH |
| | ETHA | ETHA |
| | ETHY | ETHY |
| | ETOH | ETOH |
| | FACD | FACD |
| | FORM | FORM |
| | IOLE | IOLE |
| | ISOP | ISOP and ISP (duplicate species) |
| | IVOC | IVOA |
| | KET | KET |
| | MEOH | MEOH |
| | NAPH + XYLMN (sum) | XYL and XYLA (duplicate species) |
| | NVOL | n/a (not used in CAMx) |
| | OLE | OLE |
| | PAR | PAR |
| | PRPA | PRPA |
| | SESQ | SQT |
| | SOAALK | n/a (not used in CAMx) |
| | TERP + APIN (sum) | TERP and TRP (duplicate species) |
| | TOL | TOL and TOLA (duplicate species) |
| | UNR + NR (sum) | NR |
| $PM_{10}$ | PMC | CPRM |
| $PM_{2.5}$ | PEC | PEC |
| | PNO3 | PNO3 |
| | POC | POC |
| | PSO4 | PSO4 |
| | PAL | PAL |
| | PCA | PCA |
| | PCL | PCL |
| | PFE | PFE |
| | PK | PK |

| Inventory Pollutant | CMAQ Model Species | CAMx Model Species |
|---|---|---|
| | PH2O | PH2O |
| | PMG | PMG |
| | PMN | PMN |
| | PMOTHR | FPRM |
| | PNA | NA |
| | PNCOM | PNCOM |
| | PNH4 | PNH4 |
| | PSI | PSI |
| | PTI | PTI |
| | POC + PNCOM (sum) | POA[1] |

[1] *The POA species, which is the sum of POC and PNCOM, is passed to the CAMx model in addition to individual species POC and PNCOM.*

One feature which is part of CMAQ and is not part of CAMx involves plume rise for fires. For CMAQ modeling, we process fire emissions through SMOKE as inline point sources, and plume rise for fires is calculated within CMAQ using parameters from the inline emissions files (heat flux, etc). This is similar to how non-fire point sources are handled, except that the fire parameters are used to calculate plume rise instead of traditional stack parameters. The CAMx model supports inline plume rise calculations using traditional stack parameters, but it does not support inline plume rise for fire sources. Therefore, for the purposes of CAMx modeling, we must have SMOKE calculate plume rise for fires using the Laypoint program. In this modeling platform, this must be done for the ptfire, ptfire_othna, and ptagfire sectors. To distinguish these layered fire emissions from inline fire emissions, layered fire emissions are processed with the sector names "ptfire-wild3D", "ptfire-rx3D", "ptfire_othna3D", and "ptagfire3D". When converting layered fire emissions files to CAMx format, stack parameters are added to the CAMx-ready fire emissions files to force the correct amount of fire emissions into each layer for each fire location.

CMAQ modeling uses one gridded low-level emissions file, plus multiple inline point source emissions files, per day. CAMx modeling also uses one gridded low-level emissions file per day - but instead of reading multiple inline point source emissions files at once, CAMx can only read a single point source file per day. Therefore, as part of the CAMx conversion process, all inline point source files are merged into a single "mrgpt" file per day using the program ptsmrg. The mrgpt file includes the layered fire emissions described in the previous paragraph, in addition to all non-fire elevated point sources from the cmv_c1c2, cmv_c3, othpt, ptegu, ptnonipm, and pt_oilgas sectors.

The remaining step in the CAMx emissions process is to generate sea salt aerosol emissions, which are distinct from ocean chlorine emissions. Sea salt emissions do not need to be included in CMAQ-ready emissions because they are calculated by the model, but they do need to be included in CAMx-ready emissions. After the merged low-level emissions are converted to CAMx format, sea salt emissions are generated using a program called "seasalt" and added to the low-level emissions. Sea salt emissions depend on meteorology, vary on a daily and hourly basis, and exist for model species sodium (NA), chlorine (PCL), sulfate (PSO4), dimethy sulfide (DMS), and gas phase bromine (SSBR) and chlorine (SSCL).

### 3.5.2 Development of CAMx Emissions for Source Apportionment CAMx Runs

The CAMx model supports source apportionment modeling for ozone and PM sources using techniques called Ozone Source Apportionment Technology (OSAT) and Particulate Matter Source Apportionment

Technology (PSAT). These source apportionment techniques allow emissions from different types of sources to be tracked through the CAMx model. Source apportionment model runs are most commonly performed using one-way nesting (i.e., the inner grid takes boundary information from the outer grid but the inner grid does not feed any concentration information back to the outer grid).

Source Apportionment modeling involves assigning tags to different categories of emissions. These tags can be applied by region (e.g., state), by emissions type (e.g., SCC or sector), or a combination of the two. For the Revised CSAPR Update study, emissions tagging was applied by state. All emissions from US states, except for biogenics, fires, and fugitive dust (afdust), were assigned a state-specific tag. Emissions from tribal lands are assigned a separate tag, as well as offshore emissions. Other tags include a tag for biogenics and afdust; a tag for all fires, both inside and outside the US; and a tag for all anthropogenic emissions from Canada and Mexico. A list of tags used in recent studies for state source apportionment modeling is provided in Table 3-28. State-level tags 2 through 51 exclude emissions from biogenics, fugitive dust, and fires, which are included in other tags.

For OSAT and PSAT modeling, all emissions must be input to CAMx in the form of a point source (mrgpt) file, including low level sources that are found in gridded files for regular CAMx runs. In addition, for any two-way nested modeling, all emissions must be input in a *single* mrgpt file, rather than separate mrgpt files for each of the domains. Note that fire emissions require special consideration in two-way nested model runs and for PSAT and OSAT modeling. That same consideration must be given to any sector in which emissions are being gridded by SMOKE.

There are two main approaches for tagging emissions for CAMx modeling. One approach is to tag emissions within SMOKE. Here, SMOKE will output tagged point source files (SGINLN files), which can then be converted to CAMx point source format with the tags applied by SMOKE carried forward into the CAMx inputs. The second approach is to, if necessary, depending on the nature of the tags, split sectors into multiple components by tag so that each sector corresponds to a single tag. Then, the gridded and/or point source format SMOKE outputs from those split sectors are converted to CAMx point source format, and then merged into the full mrgpt file, with the tags applied at that last step. In some situations, a mix of the two approaches is appropriate.

For ozone transport modeling runs, the first approach is used for most sectors, meaning tags are applied in SMOKE. The exceptions are when the entire sector receives only one tag, e.g.: afdust, beis, onroad_ca_adj, ptfire-rx, ptfire-wild, ptagfire, ptfire_othna, and all Canada and Mexico sectors. Afdust emissions are not tagged by state because the current tagging methodology does not support applying transportable fraction and meteorological adjustments to tagged emissions.

Once the individual sector tagging is complete, the point source files for all of the sectors are merged together to create the mrgpt file which includes all emissions, with the desired tags and appropriate resolution throughout the domain for OSAT or PSAT modeling.

### Table 3-28. State tags for USA modeling

| Tag | Emissions applied to tag | Tag | Emissions applied to tag |
|---|---|---|---|
| 1 | All biogenics (beis sector) and US fugitive dust (afdust sector) | 4 | Arkansas |
| | | 5 | California |
| 2 | Alabama | 6 | Colorado |
| 3 | Arizona | 7 | Connecticut |

| Tag | Emissions applied to tag |
|---|---|
| 8 | Delaware |
| 9 | District of Columbia |
| 10 | Florida |
| 11 | Georgia |
| 12 | Idaho |
| 13 | Illinois |
| 14 | Indiana |
| 15 | Iowa |
| 16 | Kansas |
| 17 | Kentucky |
| 18 | Louisiana |
| 19 | Maine |
| 20 | Maryland |
| 21 | Massachusetts |
| 22 | Michigan |
| 23 | Minnesota |
| 24 | Mississippi |
| 25 | Missouri |
| 26 | Montana |
| 27 | Nebraska |
| 28 | Nevada |
| 29 | New Hampshire |
| 30 | New Jersey |
| 31 | New Mexico |

| Tag | Emissions applied to tag |
|---|---|
| 32 | New York |
| 33 | North Carolina |
| 34 | North Dakota |
| 35 | Ohio |
| 36 | Oklahoma |
| 37 | Oregon |
| 38 | Pennsylvania |
| 39 | Rhode Island |
| 40 | South Carolina |
| 41 | South Dakota |
| 42 | Tennessee |
| 43 | Texas |
| 44 | Utah |
| 45 | Vermont |
| 46 | Virginia |
| 47 | Washington |
| 48 | West Virginia |
| 49 | Wisconsin |
| 50 | Wyoming |
| 51 | Tribal Data |
| 52 | Canada and Mexico (except fires) |
| 53 | Offshore |
| 54 | All fires from US, Canada, and Mexico, including ag fires |

# 4  Development of Analytic Year Emissions

The emission inventories for analytic years of 2023 and 2026 have been developed using projection methods that are specific to the type of emissions source. Analytic year emissions are projected from the 2016 base case either by running models to estimate analytic year emissions from specific types of emission sources (e.g., EGUs, and onroad and nonroad mobile sources), or for other types of sources by adjusting the base year emissions according to the best estimate of changes expected to occur in the intervening years (e.g., non-EGU point and nonpoint sources). For some sectors, the same emissions are used in the base and analytic years, such as biogenic, all fire sectors, and fertilizer. Emissions for these sectors are held constant in future years because the 2016 meteorological data is used for the future year air quality model runs, and emissions for these sectors are highly correlated with meteorological conditions. For the remaining sectors, rules and specific legal obligations that go into effect in the intervening years, along with changes in activity for the sector, are considered when possible. For sectors that were projected, the methods used to project those sectors to 2023 and 2026 are summarized in Table 4-1. Detailed information about the changes in the 2016v3 platform is provided in the subsections that follow.

**Table 4-1.  Overview of projection methods for the future year cases**

| Platform Sector: *abbreviation* | Description of Projection Methods for Analytic Year Inventories |
|---|---|
| **EGU units:** *ptegu* | The Integrated Planning Model (IPM) outputs from the Updated Summer 2021 version of the IPM platform were used. For 2023, the 2023 IPM output year was used and for 2026 the 2025 output year was used. Emission inventory Flat Files for input to SMOKE were generated using post-processed IPM output data. **A list of included rules is provided in Section 4.1**. |
| **Point source oil and gas:** *pt_oilgas* | First, known closures were applied to the 2016 pt_oilgas sources. Production-related sources were then grown from 2016 to 2021 using historic production data. The production-related sources were then grown to 2023 and 2026  based on growth factors derived from the Annual Energy Outlook (AEO) 2022 data for oil, natural gas, or a combination thereof.  The grown emissions were then controlled to account for the impacts of New Source Performance Standards (NSPS) for oil and gas sources, process heaters, natural gas turbines, and reciprocating internal combustion engines (RICE). Some sources were held at 2018 or 2019 levels. WRAP future year inventories are used in all of the WRAP states except for New Mexico (CO, MT, ND, SD, UT and WY). The future year WRAP inventories are the same for all analytic years. New Mexico emissions are projected from 2016 along with the non-WRAP states. |
| **Airports:** *airports* | Point source airport emissions were grown from 2016 to each analytic year using factors derived from the 2021 Terminal Area Forecast (TAF) released in June 2022 (see https://www.faa.gov/data_research/aviation/taf/). Corrections to emissions for ATL from the state of Georgia are included, as well as some corrections for specific airports in the state of Texas. |

| Platform Sector: *abbreviation* | Description of Projection Methods for Analytic Year Inventories |
|---|---|
| **Remaining non-EGU point:** *ptnonipm* | 2019 NEI data (EPA, 2022) were used for 2023 for most sources. Known closures were applied to ptnonipm sources. Closures were obtained from the Emission Inventory System (EIS) and also submitted by the states of Alabama, North Carolina, Ohio, Pennsylvania, and Virginia. Industrial emissions were grown according to factors derived from AEO2022 to reflect growth from 2023 onward. Rail yard emissions were grown using the same factors as line haul locomotives in the rail sector. Controls were applied to account for relevant NSPS for RICE, gas turbines, refineries (subpart Ja), and process heaters. The Boiler MACT is assumed to be fully implemented in 2016 except for North Carolina. Controls are reflected for the regional haze program in Arizona. Changes to ethanol plants and biorefineries are included. In 2016v3, additional closures were implemented, new sources were added based on 2019 NEI, and growth in MARAMA states was updated using MARAMA spreadsheets after incorporating AEO 2022 data. Railyards in California were updated with CARB data for 2023 and 2026. Point source solvents are based on 2019 NEI and projected to 2023 and 2026. |
| **Category 1, 2 CMV:** *cmv_c1c2* | Category 1 and category 2 (C1C2) CMV emissions sources outside of California were projected to 2023 and 2026 based on factors from the Regulatory Impact Analysis (RIA) Control of Emissions of Air Pollution from Locomotive Engines and Marine Compression Ignition Engines Less than 30 Liters per Cylinder. California emissions were projected based on factors provided by the state. Projection factors for Canada for 2026 were based on ECCC-provided 2023 and 2028 data interpolated to 2026. The 2023 and 2026 emissions are unchanged from 2016v2 except for the improved spatial allocation to counties. |
| **Category 3 CMV:** *cmv_c3* | Category 3 (C3) CMV emissions were projected to 2023 and 2026 using an EPA report on projected bunker fuel demand that projects fuel consumption by region out to the year 2026. Bunker fuel usage was used as a surrogate for marine vessel activity. Factors based on the report were used for all pollutants except NOx. The NOx growth rates from the EPA C3 Regulatory Impact Assessment (RIA) were refactored to use the new bunker fuel usage growth rates. Assumptions of changes in fleet composition and emissions rates from the C3 RIA were preserved and applied to bunker fuel demand growth rates for 2023 and 2026 to arrive at the final growth rates. Projection factors for Canada for 2026 were based on ECCC-provided 2023 and 2028 data interpolated to 2026. The 2023 and 2026 emissions are unchanged from 2016v2 except for the improved spatial allocation to counties. |
| **Locomotives:** *rail* | Passenger and freight locomotives were projected using separate factors. Freight emissions were computed for analytic years based on fuel use values for 2023 and 2026. Specifically, they were based on AEO2019 and 2020 freight rail energy use growth rate projections along with emission factors based on historic emissions trends that reflect the rate of market penetration of new locomotive engines. |
| **Area fugitive dust:** *afdust, afdust_ak* | Paved road dust was grown to 2023 and 2026 levels based on the growth in VMT from 2016. The remainder of the sector including building construction, road construction, agricultural dust, and unpaved road dust was held constant at 2016 levels, except in the MARAMA region and NC where some factors were provided for categories other than paved roads. The projected emissions were reduced during modeling (as they are for the base year) according to a transport fraction computed using a new method for the 2016 beta platform and a meteorology-based zero-out that accounts for precipitation and snow/ice cover. |

| Platform Sector: *abbreviation* | Description of Projection Methods for Analytic Year Inventories |
|---|---|
| **Livestock: *livestock*** | Livestock were projected to 2023 and 2026 based on factors created from USDA National livestock inventory projections published in 2020 (https://www.ers.usda.gov/publications/pub-details/?pubid=92599). NC and NJ projections were state provided. |
| **Nonpoint source oil and gas: *np_oilgas*** | Exploration-related sources were baed on an average of 2017 through 2019 exploration data with NSPS controls applied, where applicable. Production-related emissions were initially projected to 2021 using historical data and then grown to 2023 and 2026 based on factors generated from AEO2022 reference case. Based on the SCC, factors related to oil, gas, or combined growth were used. Coalbed methane SCCs were projected independently. Controls were then applied to account for NSPS for oil and gas and RICE. WRAP future year inventories are used in seven WRAP states for 2023 and 2026 (except for NM, which is projected based on AEO). |
| **Residential Wood Combustion: *rwc*** | The 2016v3 emissions are the same as 2016v2, with the exception of Idaho, which uses the 2017 NEI for the base year emissions. RWC emissions were projected from 2016 to 2023 and 2026 based on growth and control assumptions compatible with EPA's 2011v6.3 platform, which accounts for growth, retirements, and NSPS, although implemented in the Mid-Atlantic Regional Air Management Association (MARAMA)'s growth tool. Factors provided by North Carolina were used for that state. RWC emissions in California, Oregon, and Washington were held constant at 2017 levels. |
| **Solvents: *solvents*** | Solvents are based on an updated method for 2016v3. The same projection and control factors were applied to solvent emissions as if these SCCs were in nonpt. Additional SCCs in the new inventory that correlate with human population were also projected. Solvent emissions associated with oil and gas activity were projected using the same projection factors as the oil and gas sectors. The 2016v1 NC and NJ nonpoint packets were used for 2023 and interpolated to 2026, and updated to apply to more SCCs. OTC controls for solvents were applied – both DE and NY provided new controls. |
| **Remaining nonpoint: *nonpt*** | Industrial emissions were grown according to factors derived from AEO2022 to reflect growth from 2021 onward.  Data from earlier AEOs were used to derive factors for 2016 through 2021. Portions of the nonpt sector were grown using factors based on expected growth in human population. The MARAMA projection tool was used to project emissions to 2023 and 2026 after the AEO-based factors were updated to AEO2022. Factors provided by North Carolina and New Jersey were preserved. Controls were applied to reflect relevant NSPS rules (i.e., reciprocating internal combustion engines (RICE), natural gas turbines, and process heaters). Emissions were also reduced in 2016v2 and v3 to account for fuel sulfur rules in the mid-Atlantic and northeast not fully implemented by 2017. OTC controls for PFCs are included. |
| **Nonroad: *nonroad*** | Outside California and Texas and Texas, the MOVES3 model was run to create nonroad emissions for 2023 and 2026. The fuels used are specific to the analytic year, but the meteorological data represented the year 2016. EPA received new CARB data for analytic years for 2016v3.  Texas nonroad emissions were provided by TCEQ for 2023 and 2028, and interpolated to 2026. |

| Platform Sector: *abbreviation* | Description of Projection Methods for Analytic Year Inventories |
|---|---|
| **Onroad:** *onroad,* *onroad_nonconus* | Activity data for 2016 were backcast from the 2017 NEI then projected from 2016 to 2019 based on trends in FHWA VM-2 trends. Activity data were held flat from 2019 to 2021, and then projected from 2021 to 2023 and 2026 using factors derived from AEO2022. Where S/Ls provided activity data for 2023, those data were used. To create the emission factors, MOVES3 was run for the years 2023 and 2026 using 2016 meteorological data and fuels, but with age distributions projected to represent the analytic years and the remaining inputs consistent with those used in 2017.  The analytic year activity data and emission factors were then combined using SMOKE-MOVES to produce the 2023 and 2026 emissions. Inspection and maintenance updates were included for NC and TN (this changed the representative county groupings for analytic years). **Section 4.3.2 describes the applicable rules that were considered when projecting onroad emissions**. |
| **Onroad California:** *onroad_ca_adj* | CARB-provided emissions were used for California, but temporally allocated using MOVES3-based data. The 2016v3 platform uses new onroad emissions data provided by CARB for 2023 and 2026. |
| **Other Area Fugitive dust sources not from the NEI:** *othafdust* | Othafdust emissions for the analytic years were provided by ECCC in 2016v1. Projection factors were derived from those 2023 and 2028 inventories and applied to the 2016v2 inventory. 2026 projection factors were interpolated from 2023 and 2028. No changes were made to 2023 or 2026 othafdust emissions in 2016v3. Mexico emissions are not included in this sector. |
| **Other Point Fugitive dust sources not from the NEI:** *othptdust* | Wind erosion emissions were removed from the point fugitive dust inventories. Base year 2016 inventories with the rotated grid pattern removed were held flat for the analytic years, including the same transport fraction as the base year and the meteorology-based (precipitation and snow/ice cover) zero-out. No changes were made to 2023 or 2026 othptdust emissions between 2016v2 and 2016v3. |
| **Other point sources not from the NEI:** *othpt* | Canada emissions for analytic years were provided by ECCC for use in 2016v1. Projection factors were derived from those 2023 and 2028 inventories and applied to the 2016v2 inventory. 2026 projection factors were interpolated from 2023 and 2028. No changes were made to othpt emissions between 2016v2 and 2016v3. Canada projections were applied by province-subclass where possible (i.e., where subclasses did not change from between platforms). For inventories where that was not possible, including airports and most stationary point sources except for oil and gas, projections were applied by province. For Mexico sources, Mexico's 2016 inventory was grown using to the analytic years 2023 and 2026, using state+pollutant factors based on the 2016v1 platform inventories. |
| **Canada ag not from the NEI:** *canada_ag* | Reallocated base year emissions low-level agricultural sources that were originally developed on the rotated 10-km grid were projected to 2023 and 2026 using projection factors based on data provided by ECCC and applied by province, pollutant, and ECCC sub-class code. No changes were made to canada_ag emissions between 2016v2 and 2016v3. |
| **Canada oil and gas 2D not from the NEI:** *canada_og2D* | Low-level point oil and gas sources from the ECCC 2016 emission inventory were projected to the analytic years based on province-subclass changes in the ECCC-provided data used for 2016v1. 2026 projection factors were interpolated from 2023 and 2028. No changes were made to canada_og2D emissions between 2016v2 and 2016v3. |

| Platform Sector: *abbreviation* | Description of Projection Methods for Analytic Year Inventories |
|---|---|
| **Other non-NEI nonpoint and nonroad:** *othar* | Analytic year Canada nonpoint inventories were provided by ECCC for 2016v1. For Canadian nonroad sources, factors were provided from which the analytic year inventories could be derived.  Projection factors were derived from those 2023 and 2028 inventories and applied to the 2016v2 inventory. 2026 projection factors were interpolated from 2023 and 2028. No changes were made to othar emissions between 2016v2 and 2016v3 in either Canada or Mexico. For Mexico nonpoint and nonroad sources, state-pollutant projection factors for 2023 and 2028 were calculated from the 2016v1 inventories, and then applied to the 2016v2 base year inventories. 2026 projection factors were interpolated from 2023 and 2028 in Mexico. |
| **Other non-NEI onroad sources:** *onroad_can* | For Canadian mobile onroad sources, analytic year inventories were projected from 2016 to 2023 and 2026 using ECCC-provided projection data from v1 platform at the province and subclass (which is similar to SCC but not exactly) level, with 2026 interpolated from 2023 and 2028. No changes were made to onroad_can emissions between 2016v2 and 2016v3. |
| **Other non-NEI onroad sources:** *onroad_mex* | Monthly onroad mobile inventories were developed at municipio resolution based runs of MOVES-Mexico for 2023, 2028, and 2035. 2023 was reused from the 2016v1 platform; 2026 was interpolated between 2023 and 2028 for 2016v2. No changes were made to onroad_mex emissions between 2016v2 and 2016v3. |

## 4.1    EGU Point Source Projections (ptegu)

The 2023 and 2026 EGU emissions inventories used the outputs of the EPA's Updated Summer 2021 Reference Case of the Integrated Planning Model (IPM). IPM is a linear programming model that accounts for variables and information such as energy demand, planned unit retirements, and planned rules to forecast unit-level energy production and configurations. The following specific rules and regulations are included in the IPM v6 platform run (see the EPA's Updated Summer 2021 Reference Case web page for more details):

- The Revised Cross-State Air Pollution Rule (CSAPR) Update, a federal regulatory measure affecting EGU emissions from 12 states to address transport under the 2008 National Ambient Air Quality Standards (NAAQS) for ozone.

- The Standards of Performance for Greenhouse Gas Emissions from New, Modified, and Reconstructed Stationary Sources: Electric Utility Generating Units through rate limits.

- The Mercury and Air Toxics Rule (MATS) finalized in 2011. MATS establishes National Emissions Standards for Hazardous Air Pollutants (NESHAP) for the "electric utility steam generating unit" source category.

- Current and existing state regulations, including current and existing Renewable Portfolio Standards and Clean Energy Standards as of the summer of 2021.

- The latest actions EPA has taken to implement the Regional Haze Regulations and Guidelines for Best Available Retrofit Technology (BART) Determinations Final Rule. The BART limits approved in these plans (as of summer 2020) that will be in place for EGUs are represented in the Updated Summer 2021 Reference Case.

- California AB 32 CO2 allowance price projections and the Regional Greenhouse Gas Initiative (RGGI) rule.

- Three non-air federal rules affecting EGUs: National Pollutant Discharge Elimination System-Final Regulations to Establish Requirements for Cooling Water Intake Structures at Existing Facilities and Amend Requirements at Phase I Facilities, Hazardous, and Solid Waste Management System; Disposal of Coal Combustion Residuals from Electric Utilities; and the Effluent Limitation Guidelines and Standards for the Steam Electric Power Generating Point Source Category.

IPM is run for a set of years, including 2023 and 2025 (the latter was used for the 2026 case). All inputs, outputs and full documentation of EPA's IPM v6 Updated Summer 2021 Reference Case and the associated NEEDS version from 08-03-2022 is available on the power sector modeling website (https://www.epa.gov/power-sector-modeling/supporting-documentation-2015-ozone-naaqs-actions). Some of the key parameters used in the IPM run are:

- Demand: AEO 2020
- Gas and Coal Market assumptions: updated as of Summer 2022
- Cost and performance of fossil generation technologies: AEO 2020
- Cost and performance of renewable energy generation technologies: NREL ATG 2020 (mid-case)
- Nuclear unit operational costs: AEO 2020 with some adjustments

- Environmental rules and regulations (on-the-books): Revised CSAPR, MATS, BART, CA AB 32, RGGI, various RPS and CES, non-air rules (Cooling Water Intake, ELC, CCR), State Rules and mandates as of Summer 2022 (see supplemental documentation on Updated Summer 2021 Reference Case page)
- Financial assumptions: 2016-2020 data, reflects tax credit extensions from Consolidated Appropriations Act of 2021
- Transmission: updated data with build options
- Retrofits: carbon capture and sequestration option for CCs
- Operating reserves (in select runs): Greater detail in representing interaction of load, wind, and solar, ensuring availability of quick response of resources at higher levels of RE penetration
- Fleet: [Summer 2022 reference case NEEDS](#) (NEEDS rev: 08-03-2022)

The EGU emissions are calculated for the inventory using the output of the IPM model for the forecast year. Units that are identified to have a primary fuel of landfill gas, fossil waste, non-fossil waste, residual fuel oil, or distillate fuel oil may be missing emissions values for certain pollutants in the generated inventory flat file. Units with missing emissions values are gapfilled using projected base year values. The projections are calculated using the ratio of the analytic year seasonal generation in the IPM parsed file and the base year seasonal generation at each unit for each fuel type in the unit as derived from the 2018 EIA-923 tables and the 2018 NEI. New controls identified at a unit in the IPM parsed file are accounted for with appropriate emissions reductions in the gapfill projection values. When base year unit-level generation data cannot be obtained no gapfill value is calculated for that unit.

Once IPM has been run, a process is performed to first parse the results to unit level and then to generate a flat file in a format that SMOKE can read. To accomplish this, a cross reference file is needed to map the NEEDS IDs to NEI IDs for facility and unit and for stack parameters. The cross reference file used for the 2016v3 IPM outputs was "*NEEDS_NEI_xref_2016_2019stk_13apr22.xlsx*" and incorporates information about unit and stack configurations from the 2019 NEI Point source inventory. The flat file that results from this process includes emissions for five summer months (May to September), four "shoulder" months (March, April, October, November) and three winter months (January, February, and December). The emissions from each of these "seasons" were placed into separate flat files so that SMOKE can preserve the total emissions within each season to the extent possible within rounding errors. Large EGUs in the IPM-derived flat file inventory are associated with hourly CEMS data for NOX and SO2 emissions values in the base year. To maintain a temporal pattern consistent with the 2016 base year, the NOX and SO2 values in the hourly CEMS inventories are projected to match the total seasonal emissions values in the analytic years as described in Section 3.3.2.2.

Combined cycle units produce some of their energy from process steam that turns a steam turbine. The IPM model assigns a fraction of the total combined cycle production to the steam turbine. When the emissions are calculated these steam units are assigned emissions values that come from the combustion portion of the process. In the base year NEI steam turbines are usually implicit to the total combined cycle unit. To achieve the proper plume rise for the total combined cycle emissions, the stack parameters for the steam turbine units were updated with the parameters from the combustion release point. Additionally, some units, such as landfill gas, may not be assigned a valid SCC in the initial flat file. The SCCs for these units were updated based on the base year SCC for the unit-fuel type.

The EGU sector NO$_x$ emissions by state are listed in Table 4-2 for each of the 2016v3 cases. The state total emissions in this table may not exactly match the sum of the emissions for each state in the flat files for each season due to the process of apportioning seasonal total emissions to hours for input to SMOKE followed by summing the daily emissions back up to annual. However, any difference should be well within one percent of the state total emissions.

**Table 4-2.  EGU sector NOx emissions by State for the 2016v3 cases**

| State | 2016gf | 2023gf | 2026gf |
|---|---|---|---|
| Alabama | 28,835 | 13,389 | 11,987 |
| Arizona | 21,996 | 16,955 | 5,806 |
| Arkansas | 27,261 | 23,832 | 23,117 |
| California | 6,836 | 12,820 | 14,239 |
| Colorado | 30,243 | 15,324 | 13,584 |
| Connecticut | 4,062 | 2,772 | 2,411 |
| Delaware | 1,492 | 300 | 335 |
| District of Columbia | NA | 35 | 36 |
| Florida | 64,582 | 26,442 | 22,648 |
| Georgia | 29,359 | 29,119 | 9,594 |
| Idaho | 1,307 | 989 | 495 |
| Illinois | 32,180 | 13,598 | 8,753 |
| Indiana | 83,763 | 53,932 | 40,810 |
| Iowa | 22,950 | 23,989 | 22,944 |
| Kansas | 14,940 | 12,599 | 9,747 |
| Kentucky | 57,627 | 31,294 | 28,442 |
| Louisiana | 47,877 | 22,555 | 17,769 |
| Maine | 4,897 | 4,897 | 3,055 |
| Maryland | 10,449 | 2,895 | 2,510 |
| Massachusetts | 7,619 | 5,659 | 5,394 |
| Michigan | 43,330 | 24,830 | 22,606 |
| Minnesota | 21,646 | 19,609 | 11,961 |
| Mississippi | 16,407 | 9,913 | 3,811 |
| Missouri | 57,365 | 51,442 | 46,476 |
| Montana | 15,104 | 9,440 | 9,051 |
| Nebraska | 20,608 | 26,547 | 22,542 |
| Nevada | 3,898 | 8,367 | 2,500 |
| New Hampshire | 2,092 | 1,466 | 708 |
| New Jersey | 6,499 | 3,564 | 3,761 |
| New Mexico | 20,119 | 1,608 | 1,274 |
| New York | 18,972 | 11,108 | 10,199 |
| North Carolina | 35,329 | 38,958 | 26,228 |
| North Dakota | 38,220 | 33,180 | 30,907 |
| Ohio | 57,645 | 37,352 | 37,140 |

| State | 2016gf | 2023gf | 2026gf |
|---|---|---|---|
| Oklahoma | 25,151 | 17,221 | 12,762 |
| Oregon | 4,005 | 1,262 | 2,042 |
| Pennsylvania | 83,540 | 31,181 | 11,850 |
| Rhode Island | 548 | 565 | 512 |
| South Carolina | 14,721 | 17,262 | 15,936 |
| South Dakota | 1,060 | 1,281 | 1,216 |
| Tennessee | 19,237 | 13,202 | 4,077 |
| Texas | 110,761 | 88,633 | 54,322 |
| Tribal Areas | 35,076 | 6,276 | 5,847 |
| Utah | 26,917 | 33,823 | 18,668 |
| Vermont | 256 | 267 | 27 |
| Virginia | 27,996 | 10,012 | 7,724 |
| Washington | 8,811 | 5,222 | 1,884 |
| West Virginia | 52,332 | 34,935 | 33,712 |
| Wisconsin | 16,209 | 14,232 | 6,337 |
| Wyoming | 36,098 | 22,729 | 13,987 |

## 4.2    *Non-EGU Point and Nonpoint Sector Projections*

To project all U.S. non-EGU stationary sources, facility/unit closures information and growth (PROJECTION) factors and/or controls were applied to certain categories within the afdust, ag, cmv, rail, nonpt, np_oilgas, ptnonipm, pt_oilgas and rwc platform sectors. Some facility or sub-facility-level closure information was also applied to the point sources. There are also a handful of situations where new inventories were generated for sources that did not exist in the NEI (e.g., biodiesel and cellulosic plants, yet-to-be constructed cement kilns). This subsection provides details on the data and projection methods used for the non-EGU point and nonpoint sectors.

Because the projection and control data are developed mostly independently from how the emissions modeling sectors are defined, this section is organized primarily by the type of projections data, with secondary consideration given to the emissions modeling sector (e.g., industrial source growth factors are applicable to four emissions modeling sectors). The rest of this section is organized in the order that the EPA uses the Control Strategy Tool (CoST) in combination with other methods to produce analytic year inventories: 1) for point sources, apply facility or sub-facility-level) closure information via CoST; 2) apply all PROJECTION packets via CoST (these contain multiplicative factors that could cause increases or decreases); 3) apply all percent reduction-based CONTROL packets via CoST; and 4) append any other analytic-year inventories not generated via CoST. This organization allows consolidation of the discussion of the emissions categories that are contained in multiple sectors, because the data and approaches used across the sectors are consistent and do not need to be repeated. Sector names associated with the CoST packets are provided in parentheses following the subsection titles. The projection and control factors applied by CoST to prepare the analytic year emissions are provided with other 2016v3 input data and reports on the 2016v3 FTP site.

### 4.2.1 Background on the Control Strategy Tool (CoST)

CoST is used to apply most non-EGU projection/growth factors, controls and facility/unit/stack-level closures to the 2016-based emissions modeling inventories to create analytic year inventories for the following sectors: afdust, airports, cmv, livestock, nonpt, np_oilgas, np_solvents, pt_oilgas, ptnonipm, rail, and rwc. Information about CoST and related data sets is available from https://www.epa.gov/economic-and-cost-analysis-air-pollution-regulations/cost-analysis-modelstools-air-pollution.

CoST allows the user to apply projection (growth) factors, controls and closures at various geographic and inventory key field resolutions. Using these CoST datasets, also called "packets" or "programs," supports the process of developing and quality assuring control assessments as well as creating SMOKE-ready analytic year (i.e., projected) inventories. Analytic year inventories are created for each emissions modeling sector by applying a CoST control strategy type called "Project future year inventory" and each strategy includes all base year 2016 inventories and applicable CoST packets. For reasons to be discussed later, some emissions modeling sectors may require multiple CoST strategies to account for the compounding of control programs that impact the same type of sources. There are also available linkages to existing and user-defined control measure databases and it is up to the user to determine how control strategies are developed and applied. The EPA typically creates individual CoST packets that represent specific intended purposes (e.g., aircraft projections for airports are in a separate PROJECTION packet from residential wood combustion sales/appliance turnover-based projections). CoST uses three packet types:

- CLOSURE: Closure packets are applied first in CoST. This packet can be used to zero-out (close) point source emissions at resolutions as broad as a facility to as specific as a release point. The EPA uses these types of packets for known post-2016 controls as well as information on closures provided by states on specific facilities, units or release points. This packet type is only used for the ptnonipm and pt_oilgas sectors.

- PROJECTION: Projection packets support the increase or decrease in emissions for virtually any geographic and/or inventory source level. Projection factors are applied as multiplicative factors to the base year emissions inventories prior to the application of any possible subsequent CONTROLs. A PROJECTION packet is necessary whenever emissions increase from the base year and is also desirable when information is based more on activity assumptions rather than on known control measures. The EPA uses PROJECTION packet(s) for many modeling sectors.

- CONTROL: Control packets are applied after any/all CLOSURE and PROJECTION packet entries. They support of similar level of specificity of geographic and/or inventory source level application as PROJECTION packets. Control factors are expressed as a percent reduction (0 – meaning no reduction, to 100 – meaning full reduction) and can be applied in addition to any pre-existing inventory control, or as a replacement control. For replacement controls, any controls specified in the inventory are first backed out prior to the application of a more-stringent replacement control).

These packets use comma-delimited formats and are stored as data sets within the Emissions Modeling Framework. As mentioned above, CoST first applies any/all CLOSURE information for point sources, then applies PROJECTION packet information, followed by CONTROL packets. A hierarchy is used by CoST to separately apply PROJECTION and CONTROL packets. In short, in a separate process for PROJECTION and CONTROL packets, more specific information is applied in lieu of less-specific

information in ANY other packets. For example, a facility-level PROJECTION factor will be replaced by a unit-level, or facility and pollutant-level PROJECTION factor. It is important to note that this hierarchy does not apply between packet types (e.g., CONTROL packet entries are applied irrespective of PROJECTION packet hierarchies). A more specific example: a state/SCC-level PROJECTION factor will be applied before a stack/pollutant-level CONTROL factor that impacts the same inventory record. However, an inventory source that is subject to a CLOSURE packet record is removed from consideration of subsequent PROJECTION and CONTROL packets.

The implication for this hierarchy and intra-packet independence is important to understand and quality assure when creating future year strategies. For example, with consent decrees, settlements and state comments, the goal is typically to achieve a targeted reduction (from the base year inventory) or a targeted analytic-year emissions value. Therefore, controls due to consent decrees and state comments for specific cement kilns (expressed as CONTROL packet entries) need to be applied *instead of* (not in addition to) the more general approach of the PROJECTION packet entries for cement manufacturing. By processing CoST control strategies with PROJECTION and CONTROL packets separated by the type of broad measure/program, it is possible to show actual changes from the base year inventory to the future year inventory as a result of applying each packet.

Ultimately, CoST concatenates all PROJECTION packets into one PROJECTION dataset and uses a hierarchal matching approach to assign PROJECTION factors to the inventory. For example, a packet entry with Ranking=1 will supersede all other potential inventory matches from other packets. CoST then computes the projected emissions from all PROJECTION packet matches and then performs a similar routine for all CONTROL packets. Therefore, when summarizing "emissions reduced" from CONTROL packets, it is important to note that these reductions are not relative to the base year inventory, but rather to the intermediate inventory *after* application of any/all PROJECTION packet matches (and CLOSURES). A subset of the more than 70 hierarchy options is shown in Table 4-3, where the fields in the table are similar to those used in the SMOKE FF10 inventories. For example, "REGION_CD" is the county-state-county FIPS code (e.g., Harris county Texas is 48201) and "STATE" would be the 2-digit state FIPS code with three trailing zeroes (e.g., Texas is 48000).

**Table 4-3. Subset of CoST Packet Matching Hierarchy**

| Rank | Matching Hierarchy | Inventory Type |
|------|--------------------|----------------|
| 1 | REGION_CD, FACILITY_ID, UNIT_ID, REL_POINT_ID, PROCESS_ID, SCC, POLL | point |
| 2 | REGION_CD, FACILITY_ID, UNIT_ID, REL_POINT_ID, PROCESS_ID, POLL | point |
| 3 | REGION_CD, FACILITY_ID, UNIT_ID, REL_POINT_ID, POLL | point |
| 4 | REGION_CD, FACILITY_ID, UNIT_ID, POLL | point |
| 5 | REGION_CD, FACILITY_ID, SCC, POLL | point |
| 6 | REGION_CD, FACILITY_ID, POLL | point |
| 7 | REGION_CD, FACILITY_ID, UNIT_ID, REL_POINT_ID, PROCESS_ID, SCC | point |
| 8 | REGION_CD, FACILITY_ID, UNIT_ID, REL_POINT_ID, PROCESS_ID | point |
| 9 | REGION_CD, FACILITY_ID, UNIT_ID, REL_POINT_ID | point |
| 10 | REGION_CD, FACILITY_ID, UNIT_ID | point |
| 11 | REGION_CD, FACILITY_ID, SCC | point |
| 12 | REGION_CD, FACILITY_ID | point |
| 13 | REGION_CD, NAICS, SCC, POLL | point, nonpoint |
| 14 | REGION_CD, NAICS, POLL | point, nonpoint |
| 15 | STATE, NAICS, SCC, POLL | point, nonpoint |
| 16 | STATE, NAICS, POLL | point, nonpoint |

169

| Rank | Matching Hierarchy | Inventory Type |
|---|---|---|
| 17 | NAICS, SCC, POLL | point, nonpoint |
| 18 | NAICS, POLL | point, nonpoint |
| 19 | REGION_CD, NAICS, SCC | point, nonpoint |
| 20 | REGION_CD, NAICS | point, nonpoint |
| 21 | STATE, NAICS, SCC | point, nonpoint |
| 22 | STATE, NAICS | point, nonpoint |
| 23 | NAICS, SCC | point, nonpoint |
| 24 | NAICS | point, nonpoint |
| 25 | REGION_CD, SCC, POLL | point, nonpoint |
| 26 | STATE, SCC, POLL | point, nonpoint |
| 27 | SCC, POLL | point, nonpoint |
| 28 | REGION_CD, SCC | point, nonpoint |
| 29 | STATE, SCC | point, nonpoint |
| 30 | SCC | point, nonpoint |
| 31 | REGION_CD, POLL | point, nonpoint |
| 32 | REGION_CD | point, nonpoint |
| 33 | STATE, POLL | point, nonpoint |
| 34 | STATE | point, nonpoint |
| 35 | POLL | point, nonpoint |

The contents of the controls, local adjustments and closures for the analytic year cases are described in the following subsections. Year-specific projection factors (PROJECTION packets) for each future year were used to create the future year cases, unless noted otherwise in the specific subsections. The contents of a few of these projection packets (and control reductions) are provided in the following subsections where feasible. However, most sectors used growth or control factors that varied geographically, and their contents could not be provided in the following sections (e.g., facilities and units subject to the Boiler MACT reconsideration has thousands of records). The remainder of Section 4.2 is divided into subsections that are summarized in Table 4-4. Note that independent analytic year inventories were used rather than projection or control packets for some sources.

### Table 4-4. Summary of non-EGU stationary projections subsections

| Subsection | Title | Sector(s) | Brief Description |
|---|---|---|---|
| 4.2.2 | CoST Plant CLOSURE packet | ptnonipm, pt_oilgas | All facility/unit/stack closures information, primarily from Emissions Inventory System (EIS), but also includes information from states and other organizations. |
| 4.2.3 | CoST PROJECTION packets | All | Introduces and summarizes national impacts of all CoST PROJECTION packets to the analytic year. |
| 4.2.3.1 | Fugitive dust growth | Afdust | PROJECTION packet: county-level resolution, primarily based on VMT growth. |
| 4.2.3.2 | Livestock population growth | Livestock | PROJECTION packet: national, by-animal type resolution, based on animal population projections. |
| 4.2.3.3 | Category 1 and 2 commercial marine vessels | cmv_c1c2 | PROJECTION packet: Category 1 & 2: CMV uses SCC/poll for all states except Calif. |

| Subsection | Title | Sector(s) | Brief Description |
|---|---|---|---|
| 4.2.3.4 | Category 3 commercial marine vessels | cmv_c3 | PROJECTION packet: Category 3: region-level by-pollutant, based on cumulative growth and control impacts from rulemaking. |
| 4.2.3.5 | Oil and gas and industrial source growth | nonpt, np_oilgas, ptnonipm, pt_oilgas | Several PROJECTION packets: varying geographic resolutions from state, county, and by-process/fuel-type applications. Data derived from AEO2022 were used for nonpt, ptnonipm, np_oilgas, and pt_oilgas sectors. |
| 4.2.3.6 | Non-IPM Point Sources | Ptnonipm | Several PROJECTION packets: specific projections from MARAMA region and states, AEO-based projection factors for industrial sources for non-MARAMA states. |
| 4.2.3.7 | Airport Sources | Ptnonipm | PROJECTION packet: by-airport for all direct matches to FAA Terminal Area Forecast data, with state-level factors for non-matching NEI airports. |
| 4.2.3.8 | Nonpoint sources | nonpt | Several PROJECTION packets: MARAMA states projection for Portable Fuel Containers and for all other nonpt sources. Non-MARAMA states projected with AEO-based factors for industrial sources. Evaporative Emissions from Finished Fuels projected using AEO-based factors. Human population used as growth for applicable sources. |
| 4.2.3.9 | Solvents | np_solvents | Several PROJECTION packets including population-based, and MARAMA state factors. |
| 4.2.3.10 | Residential wood combustion | rwc | PROJECTION packet: national with exceptions, based on appliance type sales growth estimates and retirement assumptions and impacts of recent NSPS. |
| 4.2.4 | CoST CONTROL packets | ptnonipm, nonpt, np_oilgas, pt_oilgas | Introduces and summarizes national impacts of all CoST CONTROL packets to the analytic year. |
| 4.2.4.1 | Oil and Gas NSPS | np_oilgas, pt_oilgas | CONTROL packets: reflect the impacts of the NSPS for oil and gas sources. |
| 4.2.4.2 | RICE NSPS | ptnonipm, nonpt, np_oilgas, pt_oilgas | CONTROL packets apply reductions for lean burn, rich burn, and combined engines for identified SCCs. |
| 4.2.4.3 | Fuel Sulfur Rules | ptnonipm, nonpt | CONTROL packet: updated by MARAMA, applies reductions to specific units in ten states. |
| 4.2.4.4 | Natural Gas Turbines NOx NSPS | ptnonipm | CONTROL packets apply NOx emission reductions established by the NSPS for turbines. |
| 4.2.4.5 | Process Heaters NOx NSPS | ptnonipm | CONTROL packet: applies NOx emission limits established by the NSPS for process heaters. |
| 4.2.4.6 | Ozone Transport Commission Rules | nonpt, np_solvents | CONTROL packets reflecting rules for solvents and portable fuel containers. |

## 4.2.2 CoST Plant CLOSURE Packet (ptnonipm, pt_oilgas)

Packets:

CLOSURES_2016v3_platform_ptnonipm_26aug2022_nf_v1

The CLOSURES packet contains facility, unit and stack-level closure information derived from an Emissions Inventory System (EIS) unit-level report from June 9, 2021, with closure status equal to "PS" (permanent shutdown; i.e., post-2016 permanent facility/unit shutdowns known in EIS as of the date of the report). For 2016v3, additional closures were added and those are cumulative with the closures in 2016v2. Any data provided by commenters for closures were updated to match the SMOKE FF10 inventory key fields, with all duplicates removed, and a single CoST packet was generated. These changes impact sources in the ptnonipm and pt_oilgas sectors. Additional closures provided in comments on the 2016v2 inventories were incorporated in the 2016v3 platform for multiple states including Ohio, Wisconsin, North Carolina, and North Dakota. The spreadsheet in the reports folder on the 2016v3 FTP site called *point_controls_packet_2016v3.xlsx* lists all closures, while the spreadsheet called *ptnonipm_19_2023gf_new_closures.xlsx* available lists the closures there were new in 2016v3 and their impacts. The cumulative reduction in emissions for ptnonipm and pt_oilgas are shown in Table 4-5. The amount of emission reductions are from 2019 emissions levels, not 2016 emissions, because the closures were applied to the 2019 inventory that was used as the starting point for the projection to 2023.

**Table 4-5. Reductions from all facility/unit/stack-level closures in 2016v3 from 2019 emissions levels**

| Pollutant | Ptnonipm | pt_oilgas |
|-----------|----------|-----------|
| CO | 5,428 | 1,343 |
| NH3 | 631 | 0 |
| NOX | 6,652 | 2,846 |
| PM10 | 3,185 | 49 |
| PM2.5 | 2,240 | 49 |
| SO2 | 6,461 | 178 |
| VOC | 5,040 | 388 |

## 4.2.3 CoST PROJECTION Packets (afdust, airports, cmv, livestock, nonpt, np_oilgas, np_solvents, ptnonipm, pt_oilgas, rail, rwc)

For point inventories, after the application of any/all CLOSURE packet information, the next step CoST performs when running a control strategy is the application of all PROJECTION packets. Regardless of inventory type (point or nonpoint), the PROJECTION packets are applied prior to the CONTROL packets. For several emissions modeling sectors (i.e., airports, np_oilgas, pt_oilgas), there is only one PROJECTION packet applied for each analytic year. For all other sectors, there are several different sources of projection data and as a result there are multiple PROJECTION packets that are concatenated by CoST during a control strategy run and quality-assured regarding duplicates and applicability to the inventories in the CoST strategy. Similarly, CONTROL packets are kept in distinct datasets for different control programs. Having the PROJECTION (and CONTROL) packets separated into "key" projection and control programs allows for quick summaries of these distinct control programs.

For the 2016v1 platform MARAMA provided PROJECTION and CONTROL packets for years 2023 and 2028 for states including: Connecticut, Delaware, Maryland, Massachusetts, New Hampshire, New York, New Jersey, North Carolina, Pennsylvania, Rhode Island, Vermont, Virginia, West Virginia, Maine, and the District of Columbia.   MARAMA provided pt_oilgas and np_oilgas packets only for Rhode Island, Maryland and Massachusetts. For 2016v2, new spreadsheets of projection factors were provided that facilitated the incorporation of data from the AEO 2022 and other surrogate data for projection factors. The new spreadsheets also to reflect sources affected by the Pennsylvania Reasonably Available Control Technology (RACT) II including 2023 emissions for one Pennsylvania facility (Anchor Hocking LLC, Monaca Plant) affected by the rule. For that facility, emissions values were swapped in after applying all other projections and controls.  For states not covered by the MARAMA packets, projection factors were developed using nationally available data and methods.

### 4.2.3.1    Fugitive dust growth (afdust)

Packets:

> Projection_2016_2023_afdust_version1_platform_MARAMA_15jul21_v2
> Projection_2016_2023_afdust_version1_platform_NJ_20aug2021_v1
> Projection_2016_2023_afdust_version3_platform_national_03aug2022_v0
> Projection_2016_2023_all_nonpoint_version1_platform_NC_24jun2021_nf_v5
> Projection_2016_2026_afdust_version1_platform_MARAMA_nopavedroads_noNCNJ_15jul2021_v0
> Projection_2016_2026_afdust_version1_platform_NJ_nopavedroads_20jul2021_v0
> Projection_2016_2026_afdust_version3_platform_national_30aug2022_v0
> Projection_2016_2026_all_nonpoint_version2_platform_NC_30aug2022_nf_v2

**MARAMA States**

MARAMA provided a spreadsheet tool that could be used to compute projection factors for their states to project 2016 afdust emissions to analytic years 2023 and 2026. These county-specific projection factors impacted paved roads (SCC 2294000000), residential construction dust (SCC 2311010000), industrial/commercial/institutional construction dust (SCC 2311020000), road construction dust (SCC 2311030000), dust from mining and quarrying (SCC 2325000000), agricultural crop tilling dust (SCC 2801000003), and agricultural dust kick-up from beef cattle hooves (SCC 2805001000). Other afdust emissions, including unpaved road dust emissions, were held constant in analytic year projections. North Carolina and New Jersey provided their own packets for this sector for 2023 and 2028, which were interpolated to 2026. For paved roads, new VMT-based projection factors based on 2016v3 VMT were used in place of projection factors provided by MARAMA, NC, and NJ for all years, since their factors were based on older VMT.

**Non-MARAMA States**

For paved roads (SCC 2294000000), the 2016 afdust emissions were projected to analytic years 2023 and 2026 based on differences in county total VMT:

Analytic year afdust paved roads = 2016 afdust paved roads * (Analytic year county total VMT) / (2016 county total VMT)

The VMT projections are described in the onroad section. Paved road dust emissions were projected this way in all states, including MARAMA states.

In non-MARAMA states, all emissions other than paved roads are held constant in the analytic year projections.  The impacts of the projections are shown in Table 4-6.

**Table 4-6. Increase in total afdust PM$_{2.5}$ emissions from projections in 2016v3**

| 2016 Emissions | 2023 Emissions | percent Increase 2023 | 2026 Emissions | percent Increase 2026 |
|---|---|---|---|---|
| 2,254,168 | 2,296,234 | 1.87% | 2,314,652 | 2.68% |

### 4.2.3.2     Livestock population growth (livestock)

Packets:

      Projection_2016_2023_all_nonpoint_version1_platform_NC_24jun2021_nf_v5
      Projection_2016_2026_all_nonpoint_version2_platform_NC_19jul2021_nf_v1
      Projection_2017_2023_ag_livestock_version3_platform_05aug2022_v0
      Projection_2017_2023_ag_version1_platform_NJ_20aug2021_v1
      Projection_2017_2026_ag_livestock_version3_platform_30aug2022_v0
      Projection_2017_2026_livestock_version2_platform_NJ_16jul2021_v0

The 2017NEI livestock emissions were projected to year 2023 and 2026 using projection factors created from USDA National livestock inventory projections published in February 2022 (https://www.ers.usda.gov/publications/pub-details/?pubid=103309) and are shown in Table 4-7. For emission projections to 2023, a ratio was created between animal inventory counts for 2023 and 2017 to create a projection factor. This process was completed for the animal categories of beef, dairy, broilers, layers, turkeys, and swine. The projection factor was then applied to the 2017NEI base emissions for the specific animal type to estimate 2023 NH$_3$ and VOC emissions. For emission projections to 2026, the equivalent method was used to develop and apply the factors.  New Jersey (NJ) provided NJ-specific projection factors that were used to grow livestock waste emissions from 2017 to 2023 and 2028. The factors were interpolated to obtain factors for 2026. North Carolina (NC) provided NC-specific projection factors that used a 2016-based projection; therefore, NC's livestock waste emissions are projected from the 2016 base year emissions to the years 2023 and 2026.  As in New Jersey, North Carolina provided projection factors for 2023 and 2028, which were interpolated to 2026.

**Table 4-7. National projection factors for livestock: 2017 to 2023 and 2026**

| Animal | 2017-to-2023 | 2017-to-2026 |
|---|---|---|
| Beef | -1.79% | -0.32% |
| Swine | +5.73% | +6.93% |
| Broilers | +9.06% | +12.97% |
| Turkeys | -0.85% | +2.10% |
| Layers | +4.45% | +9.67% |
| Dairy | -1.06% | -0.85% |

### 4.2.3.3   Category 1, Category 2 Commercial Marine Vessels (cmv_c1c2)

Packets:

    Projection_2016_2023_cmv_c1c2_version1_platform_04oct2019_v1
    Projection_2016_2023_cmv_Canada_version1_platform_24sep2019_v0
    Projection_2016_2026_cmv_c1c2_version2_platform_14jul2021_v0
    Projection_2016_2026_cmv_Canada_version2_platform_15jul2021_v0

Category 1 and category 2 (C1C2) CMV emissions sources outside of California were projected to 2023 and 2026 based on factors derived from the Regulatory Impact Analysis (RIA) Control of Emissions of Air Pollution from Locomotive Engines and Marine Compression Ignition Engines Less than 30 Liters per Cylinder (https://www.epa.gov/regulations-emissions-vehicles-and-engines/final-rule-control-emissions-air-pollution-locomotive). The 2023 cmv_c1c2 emissions for 2016v3 are based on the same raw data as the 2016v1 and 2016v2 emissions, but an improved method to spatially allocate the emissions to counties was used.  The projection factors to obtain the 2026 emissions are equivalent to interpolating 2016v1 emissions projection factors between 2023 and 2028. California emissions were projected based on factors provided by the state. Table 4-8 lists the pollutant-specific projection factors to 2023 and 2028 that were used for cmv_c1c2 sources outside of California. California sources were projected to 2023 and 2028 using the factors in Table 4-9, which are based on data provided by CARB.

Projection factors for Canada for 2026 were based on ECCC-provided 2023 and 2028 data interpolated to 2026.

**Table 4-8. National projection factors for cmv_c1c2**

| Pollutant | 2016-to-2023 (%) | 2016-to-2026 (%) |
|---|---|---|
| CO | -1.3% | -0.4% |
| NOX | -29.3% | -39.0% |
| PM10 | -28.3% | -37.8% |
| PM2.5 | -28.3% | -37.8% |
| SO2 | -65.3% | -65.7% |
| VOC | -31.5% | -42.0% |

**Table 4-9. California projection factors for cmv_c1c2**

| Pollutant | 2016-to-2023 (%) | 2016-to-2026 (%) |
|---|---|---|
| CO | +20.1% | +23.2% |
| NOX | -15.0% | -16.6% |
| PM10 | -29.9% | -32.1% |
| PM2.5 | -29.9% | -32.1% |
| SO2 | +24.1% | +38.9% |
| VOC | +1.5% | +1.7% |

### 4.2.3.4    Category 3 Commercial Marine Vessels (cmv_c3)

Packets:

Projection_2016_2023_cmv_c3_version1_platform_04oct2019_v2_Mexico[36]
Projection_2016_2023_cmv_c3_version1_platform_24sep2019_v1
Projection_2016_2023_cmv_Canada_version1_platform_24sep2019_v0
Projection_2016_2026_cmv_c3_version2_platform_15jul2021_v0
Projection_2016_2026_cmv_Canada_version2_platform_15jul2021_v0

Growth rates for cmv_c3 emissions from 2016 to 2023, and 2026 were projected using an EPA report on projected bunker fuel demand. Bunker fuel usage was used as a surrogate for marine vessel activity. Bunker fuel usage was used as a surrogate for marine vessel activity. Factors based on the report were used for all pollutants except NOx.

Growth factors for NOx emissions were handled separately to account for the phase in of Tier 3 vessel engines. To estimate these emissions, the NOx growth rates from the EPA C3 Regulatory Impact Assessment (RIA)[37] were refactored to use the new bunker fuel usage growth rates. The assumptions of changes in fleet composition and emissions rates from the C3 RIA were preserved and applied to the new bunker fuel demand growth rates for 2023 and 2026 to arrive at the final growth rates. The Category 3 marine diesel engines Clean Air Act and International Maritime Organization standards from April, 2010 (https://www.epa.gov/regulations-emissions-vehicles-and-engines/final-rule-control-emissions-new-marine-compression-0) were also considered when computing the emissions.

The 2023 cmv_c3 emissions for 2016v3 are based on the same raw data as the 2016v1 and 2016v2 emissions, but an improved method to spatially allocate the emissions to counties using 1-hour AIS locations rather than grid cell centroids was used.  The 2026 projection factors are equivalent to interpolating the 2016v1 emissions between 2023 and 2028. Projection factors for Canada for 2026 were based on ECCC-provided 2023 and 2028 data interpolated to 2026.

The 2023 and 2026 projection factors are shown in Table 4-10. Some regions for which 2016 projection factors were available did not have 2023 or 2026 projection factors specific to that region, so factors from another region were used as follows:

- Alaska was projected using North Pacific factors.

- Hawaii was projected using South Pacific factors.

- Puerto Rico and Virgin Islands were projected using Gulf Coast factors.

- Emissions outside Federal Waters (FIPS 98) were projected using the factors given in Table 4-10 for the region "Other".

- California was projected using a separate set of state-wide projection factors based on CMV emissions data provided by the California Air Resources Board (CARB). These factors are shown in Table 4-11

---

[36] 2023 has a Mexico packet is because the Mexico CMV inventory covers some ports, but no offshore underway. This inventory has emissions in the 36US3 domain only, not 12US1 and was not projected to 2026 or 2032.
[37] https://nepis.epa.gov/Exe/ZyPURL.cgi?Dockey=P1005ZGH.TXT.

**Table 4-10. 2016-to-2023 and 2016-to-2026 CMV C3 projection factors outside of California**

| Region | 2016-to-2023 NOX | 2016-to-2023 other pollutants | 2016-to-2026 NOX | 2016-to-2026 other pollutants |
|--------|------------------|-------------------------------|------------------|-------------------------------|
| US East Coast | -6.1% | +27.7% | -6.9% | +41.4% |
| US South Pacific (ex. California) | -24.8% | +20.9% | -30.3% | +36.6% |
| US North Pacific | -3.4% | +22.6% | -3.8% | +34.6% |
| US Gulf | -6.9% | +20.8% | -10.2% | +29.8% |
| US Great Lakes | +8.7% | +14.6% | +15.4% | +22.7% |
| Other | +23.1% | +23.1% | +35.0% | +35.0% |

| Non-Federal Waters | 2016-to-2023 | 2016-to-2026 |
|--------------------|--------------|--------------|
| SO2 | -77.2% | -75.0% |
| PM (main engines) | -36.1% | -29.9% |
| PM (aux. engines) | -39.7% | -33.9% |
| Other pollutants | +23.1% | +35.0% |

**Table 4-11. 2016-to-2023 and 2016-to-2026 CMV C3 projection factors for California**

| Pollutant | 2016-to-2023 | 2016-to-2026 |
|-----------|--------------|--------------|
| CO | 1.180 | 1.276 |
| Nox | 1.156 | 1.259 |
| $PM_{10}$ / $PM_{2.5}$ | 1.205 | 1.311 |
| $SO_2$ | 1.183 | 1.272 |
| VOC | 1.242 | 1.373 |

### 4.2.3.5   Oil and Gas Sources (pt_oilgas, np_oilgas)

Packets:

Projection_2016_2023_np_oilgas_version3_platform_24aug2022_v0
Projection_2016_2023_pt_oilgas_version3_platform_24aug2022_v0
Projection_2016_2026_np_oilgas_version3_platform_24aug2022_v0
Projection_2016_2026_pt_oilgas_version3_platform_24aug2022_v0

Year 2028 inventories for seven of the WRAP states were provided by   The details about these non-point and point source oil and gas data can be found here: http://www.wrapair2.org/pdf/WRAP_OGWG_2028_OTB_RevFinalReport_05March2020.pdf (WRAP / Ramboll, 2020).   As provided, this WRAP data for np_oilgas and pt_oilgas were intended to be the same for all analytic years. Therefore emissions in 2023 are the same as in 2026 except that New Mexico np_oilgas emissions were projected and controlled using the EPA methodology of using historical production data from the state of New Mexico[38] along with AEO2022-based forecast information.

For areas outside of the WRAP states, analytic year projections for the 2016v3 platform were generated for point oil and gas sources for years 2023 and 2026.  These projections consisted of three components: (1) applying facility closures to the pt_oilgas sector using the CoST CLOSURE packet; (2) using historical and/or forecast activity data to generate analytic-year emissions before applicable control

---

[38] https://wwwapps.emnrd.nm.gov/ocd/ocdpermitting/Reporting/Production/CountyProductionInjectionSummary.aspx

technologies are applied using the CoST PROJECTION packet; and (3) estimating impacts of applicable control technologies on analytic-year emissions using the CoST CONTROL packet. Applying the CLOSURE packet to the pt_oilgas sector resulted in small emissions changes to the national summary shown in Table 4-5.  Note that the closures applied for the years 2023 and 2026 are the same.

For pt_oilgas growth to 2023 and 2026, the oil and gas sources were separated into production-related and exploration-related sources by NAICS and SCC. These sources were further subdivided by fuel-type and by NAICS and SCC into either OIL, natural gas (NGAS), BOTH (where oil or natural gas fuels are possible), or coal-bed methane (CBM).  The next two subsections describe the growth component of the process.

For np_oilgas growth to 2023 and 2026, oil and gas sources were separated into production-related and exploration-related sources. These sources were further separated into oil, natural gas or coal bed methane production related.

**Production-related Sources (pt_oilgas, np_oilgas)**

The growth factors for the production-related NAICS-SCC combinations were generated in a two-step process.   The first step used historical production data at the state-level to get state-level short-term trends or factors from 2016 to year 2021. These historical data were acquired from EIA from the following links:

- Historical Natural Gas: http://www.eia.gov/dnav/ng/ng_sum_lsum_a_epg0_fgw_mmcf_a.htm
- Historical Crude Oil: http://www.eia.gov/dnav/pet/pet_crd_crpdn_adc_mbbl_a.htm
- Historical CBM: https://www.eia.gov/dnav/ng/ng_prod_coalbed_s1_a.htm

The second step involved using the Annual Energy Outlook (AEO) 2022 reference case for the Lower 48 forecast production tables to project from the year 2021 to the years of 2023 and 2026.   Specifically, *AEO 2022 Table 58 "Lower 48 Crude Oil Production and Wellhead Prices by Supply Region"* and *AEO 2022 Table 59 "Lower 48 Natural Gas Production and Supply Prices by Supply Region"* were used in this projection process.  The AEO2022 forecast production is supplied for each EIA Oil and Gas Supply region shown in Figure 4-1.

**Figure 4-1. EIA Oil and Gas Supply Regions as of AEO2022**



The result of this second step is a growth factor for each Supply Region from 2021 to 2023 and from 2021 to 2026. A Supply Region mapping to FIPS cross-walk was developed so the regional growth factors could be applied for each FIPS (for pt_oilgas) or to the county-level np_oilgas inventories. Note that portions of Texas are in three different Supply Regions and portions of New Mexico are in two different supply regions. The state-level historical factor (from 2016 to 2021) was then multiplied by the Supply Region factor (from 2021 to the analytic years) to produce a state-level or FIPS-level factor to grow from 2016 to 2023 and from 2016 to 2026. This process was done using crude production forecast information to generate a factor to apply to oil-production related SCCs or NAICS-SCC combinations and it was also done using natural gas production forecast information to generate a factor to apply to natural gas-production related NAICS-SCC combinations. For the NAICS-SCC combinations that are designated "BOTH" the average of the oil-production and natural-gas production factors was calculated and applied to these specific combinations.

The state of Texas provided specific comments on the growth of production-related point sources. Texas provided updated basin specific production for 2016 and 2021 to allow for a better calculation of the estimated growth for this three-year period (http://webapps.rrc.texas.gov/PDQ/generalReportAction.do). The AEO2022 was used as described above for the three AEO Oil and Gas Supply Regions that include Texas counties to grow from 2021 to 2023 and 2026. However, Texas only wanted these growth factors applied to sources in the Permian and Eagle Ford basins and the oil and gas production point sources in the other basins in Texas were not grown.

The state of New Mexico is broken up into two AEO Oil and Gas Supply Regions. County production data for New Mexico was obtained from their state website (https://wwwapps.emnrd.nm.gov/ocd/ocdpermitting/Reporting/Production/CountyProductionInjectionSummary.aspx ) so that a better estimate of growth from 2016 to 2021 for the AEO Supply Regions in New Mexico could be calculated.

**Transmission-related Sources (pt_oilgas)**

Projection factors for transmissions-related sources were generated using the same AEO2022 tables used for production sources. These growth factors sources were developed solely using AEO 2022 data for the entire lower 48 states (one national factor for oil transmission and one national factor for natural gas transmission). The WRAP future year inventory was used for 6 of the 7 states in that inventory. The exception was New Mexico where the projection method described in this section was used.

**Exploration-related Sources (np_oilgas)**

Due to the year 2016 being a low exploration activity year when compared to exploration activity in other recent years, years 2017 through 2019 exploration emissions were generated using the 2017NEI version of the Oil and Gas Tool. Table 4-12 provides a high-level national summary of the emissions data for the three years. This three-year average (2017-2019) emissions data were used in 2016v3 because they reflected the most recent average of exploration activity and emissions. These averaged emissions were used for both the 2023 and 2026 analytic years. Note that CoST was not used to perform this projection step for exploration sources.

**Table 4-12. Year 2017-2019 high-level summary of national oil and gas exploration emissions**

|  | 2017 emissions (tons) | 2018 emissions (tons) | 2019 emissions (tons) | Three Year avg (2017-2019) (tons) |
|---|---|---|---|---|
| NOX | 73,992 | 123,908 | 108,957 | 102,285 |
| VOC | 118,004 | 136,916 | 106,505 | 120,474 |

**Projection overrides (pt_oilgas)**

A draft set of projected point oil and gas emissions were reviewed and compared to recent emissions data from 2018 and 2019. In cases where the recent and projected emissions were substantially different, projected emissions were instead taken from a recent year of emissions and held constant through the analytic years. The affected sources are shown in Table 4-13.

**Table 4-13. Point oil and gas sources held constant at 2018 or 2019 levels**

| Inventory year | County FIPS | State | County | Facility ID | Facility Name |
|---|---|---|---|---|---|
| 2018 | 17041 | Illinois | Douglas Co | 2749511 | Trunkline Gas Co |
| 2018 | 18003 | Indiana | Allen Co | 4544011 | PANHANDLE EASTERN PIPE LINE CO EDGERT |
| 2018 | 21197 | Kentucky | Powell Co | 5787411 | TN Gas Pipeline Co LLC - Station 106 |
| 2018 | 39039 | Ohio | Defiance Co | 7938111 | ANR Pipeline Company (0320010169) |
| 2019 | 01129 | Alabama | Washington Co | 1028711 | American Midstream Chatom, LLC |
| 2019 | 04005 | Arizona | Coconino Co | 1115011 | EPNG - WILLIAMS COMPRESSOR STATION |
| 2019 | 05083 | Arkansas | Logan Co | 973211 | DUNN COMPRESSOR STATION |
| 2019 | 05091 | Arkansas | Miller Co | 7737711 | NATURAL GAS PIPELINE CO OF AMERICA-305 |

| Inventory year | County FIPS | State | County | Facility ID | Facility Name |
|---|---|---|---|---|---|
| 2019 | 12007 | Florida | Bradford Co | 2574711 | FLORIDA GAS TRANSMISSION COMPANY |
| 2019 | 12095 | Florida | Orange Co | 845511 | FLORIDA GAS TRANSMISSION COMPANY |
| 2019 | 13195 | Georgia | Madison Co | 2803411 | Transcontinental Gas Pipe Line Company, LLC - Compressor Station 130 |
| 2019 | 17183 | Illinois | Vermilion Co | 5401911 | Midwestern Gas Transmission |
| 2019 | 18037 | Indiana | Dubois Co | 4887211 | ANR PIPELINE CO CELESTINE COMPRESSOR ST |
| 2019 | 18075 | Indiana | Jay Co | 7957111 | ANR PIPELINE COMPANY   PORTLAND COMPRES |
| 2019 | 19181 | Iowa | Warren Co | 2962011 | NATURAL GAS PIPELINE CO OF AMERICA - STATION 108 |
| 2019 | 20057 | Kansas | Ford Co | 3839911 | Natural Gas Pipeline of America - Minneola Station 103 |
| 2019 | 20067 | Kansas | Grant Co | 3508811 | Scout Energy - Ulysses West Main Station |
| 2019 | 20097 | Kansas | Kiowa Co | 5027511 | Northern Natural Gas - Mullinville Station |
| 2019 | 21089 | Kentucky | Greenup Co | 6096911 | TN Gas Pipeline Co LLC - Station 200 |
| 2019 | 21107 | Kentucky | Hopkins Co | 5830611 | ANR Pipeline Co (Madisonville Compressor Sta) |
| 2019 | 22001 | Louisiana | Acadia Par | 6082411 | ANR Pipeline Co - Eunice Compressor Station |
| 2019 | 22001 | Louisiana | Acadia Par | 7364911 | Florida Gas Transmission Co C/S 7 |
| 2019 | 22009 | Louisiana | Avoyelles Par | 5987211 | Gulf South Pipeline Co LLC - Marksville Compressor Station |
| 2019 | 22011 | Louisiana | Beauregard Par | 5998611 | Transcontinental Gas Pipe Line Co LLC (TRANSCO) - Transco Compressor Station 45 |
| 2019 | 22013 | Louisiana | Bienville Par | 6000211 | Southern Natural Gas Co - Bear Creek Storage Facility |
| 2019 | 22021 | Louisiana | Caldwell Par | 6426511 | Texas Gas Transmission LLC - Columbia Compressor Station |
| 2019 | 22023 | Louisiana | Cameron Par | 13610511 | Sabine Pass LNG LP - Sabine Pass Liquefaction LLC |
| 2019 | 22053 | Louisiana | Jefferson Davis Par | 5283311 | Tennessee Gas Pipeline Company LLC - Kinder Compressor Station 823 |
| 2019 | 22073 | Louisiana | Ouachita Par | 5735011 | Enable Mississippi River Transmission LLC - Perryville Compressor Station |
| 2019 | 22075 | Louisiana | Plaquemines Par | 7449511 | East Bay Central Facility |
| 2019 | 22079 | Louisiana | Rapides Par | 5740711 | Columbia Gulf Transmission Co - Alexandria Compressor Station |
| 2019 | 22079 | Louisiana | Rapides Par | 5740911 | Texas Gas Transmission LLC - Pineville Compressor Station |
| 2019 | 22083 | Louisiana | Richland Par | 5607811 | ANR Pipeline Co - Delhi Compressor Station |
| 2019 | 22087 | Louisiana | St Bernard Par | 5608211 | Southern Natural Gas Co - Toca Compressor Station |
| 2019 | 22113 | Louisiana | Vermilion Par | 5064311 | Sea Robin Pipeline Co LLC - Erath Compressor Station |
| 2019 | 22119 | Louisiana | Webster Par | 5357411 | ETC Texas Pipeline Ltd - Minden Gas Plant |
| 2019 | 22119 | Louisiana | Webster Par | 8019911 | XTO Energy Inc - Cotton Valley Gas Plant |

| Inventory year | County FIPS | State | County | Facility ID | Facility Name |
|---|---|---|---|---|---|
| 2019 | 26021 | Michigan | Berrien Co | 8195311 | ANR Pipeline Company - Bridgman Compressor Station |
| 2019 | 26035 | Michigan | Clare Co | 4007011 | Great Lakes Gas - Farwell Compressor Station 12 |
| 2019 | 28063 | Mississippi | Jefferson Co | 7035611 | TEXAS EASTERN TRANSMISSION LP, UNION CHU |
| 2019 | 31131 | Nebraska | Otoe Co | 7767611 | Northern Natural Gas Company |
| 2019 | 37157 | North Carolina | Rockingham Co | 8492911 | Transcontinental Gas Pipe Line Company, LLC - Station 160 |
| 2019 | 39045 | Ohio | Fairfield Co | 8259811 | CRAWFORD COMPRESSOR STATION (0123000137) |
| 2019 | 39059 | Ohio | Guernsey Co | 8008011 | Kinder MorganTennessee Gas Pipeline Station 209 (0630000001) |
| 2019 | 39157 | Ohio | Tuscarawas Co | 7996211 | Dominion Energy Transmission, Inc. - Gilmore Station (0679000075) |
| 2019 | 40007 | Oklahoma | Beaver Co | 8131911 | BEAVER COMPRESSOR STATION |
| 2019 | 40139 | Oklahoma | Texas Co | 8402511 | TYRONE CMPSR STA |
| 2019 | 47069 | Tennessee | Hardeman Co | 3787511 | TENNESSEE GAS PIPELINE COMPANY L.L.C., STATION 71 |
| 2019 | 47079 | Tennessee | Henry Co | 2896511 | ANR PIPELINE COMPANY, COTTAGE GROVE |
| 2019 | 47181 | Tennessee | Wayne Co | 4188011 | Tennessee Gas Pipeline Company, LLC - Compressor Station 555 |
| 2019 | 48003 | Texas | Andrews Co | 4171311 | ANDREWS BOOSTER |
| 2019 | 48003 | Texas | Andrews Co | 4898411 | FULLERTON GAS PLANT |
| 2019 | 48019 | Texas | Bandera Co | 4898811 | BANDERA COMPRESSOR STATION |
| 2019 | 48103 | Texas | Crane Co | 4163111 | BLOCK 31 GAS PLANT |
| 2019 | 48103 | Texas | Crane Co | 6492411 | SAND HILLS PLANT |
| 2019 | 48103 | Texas | Crane Co | 6507911 | CRANE BOOSTER STATION |
| 2019 | 48135 | Texas | Ector Co | 3968211 | ANDECTOR BOOSTER STATION |
| 2019 | 48135 | Texas | Ector Co | 6507511 | GOLDSMITH GAS PLANT |
| 2019 | 48195 | Texas | Hansford Co | 2904911 | SHERHAN GAS PLANT |
| 2019 | 48195 | Texas | Hansford Co | 6534211 | EG HILL COMPRESSOR |
| 2019 | 48227 | Texas | Howard Co | 5652011 | EAST VEALMOOR GAS PLANT |
| 2019 | 48241 | Texas | Jasper Co | 4862311 | COMPRESSOR STATION 32 |
| 2019 | 48263 | Texas | Kent Co | 6379311 | SALT CREEK FIELD GAS PLANT |
| 2019 | 48329 | Texas | Midland Co | 4832311 | PEGASUS GAS PLANT |
| 2019 | 48371 | Texas | Pecos Co | 5765911 | COYANOSA GAS PLANT |
| 2019 | 48371 | Texas | Pecos Co | 6498211 | YATES GAS PLANT |
| 2019 | 48501 | Texas | Yoakum Co | 6648711 | PLAINS COMPRESSOR STATION |
| 2019 | 54021 | West Virginia | Gilmer Co | 6256711 | Columbia Gas - GLENVILLE 4C1170 |
| 2019 | 54099 | West Virginia | Wayne Co | 6341411 | Columbia Gas - CEREDO 4C3360 |

### 4.2.3.6   Non-EGU point sources (ptnonipm)

Packets:

    Projection_2023_2026_finished_fuels_volpe_16jul2021_v0
    Projection_2023_2026_industrial_byNAICS_SCC_version3_platform_07sep2022_v0
    Projection_2023_2026_industrial_bySCC_version3_platform_09nov2022_v1
    Projection_2023_2026_ptnonipm_version2_platform_MARAMA_23jul2021_nf_v1
    projection_2023_2026interp_corn_ethanol_E0B0_Volpe_23jul2021_v0
    Projection_2023_2026interp_ptnonipm_version2_platform_NC_23jul2021_v0
    Projection_2023_2026interp_ptnonipm_version2_platform_NJ_23jul2021_v0
    Projection_2023_2026interp_ptnonipm_version2_platform_VA_23jul2021_v0

To account for many changes to point sources between 2016 and 2023, following the removal of sources known to have closed between 2019 and 2023 emissions for the 2023 ptnonipm sector were set equal to emissions from the 2019 NEI point source emissions file dated March 25, 2022. The 2019 point source inventory was the most recent complete point source inventory available at the time the projections were performed.  The 2019 emissions automatically included fuel changes and emissions controls applied during the intervening years.  Due to this change in methodology, the factors provided by Wisconsin for use in the 2016v1 and 2016v2 platforms were no longer used.

The 2026 ptnonipm projections were projected from the 2023 point source emissions and involved several growth and projection methods described here. The projection of oil and gas sources is explained in the oil and gas section.

**2023 and 2026 Point Inventory - inside MARAMA region**

2023-to-2026 projection packets for point sources were based on the projection factors provided by MARAMA for the following states: CT, DE, DC, ME, MD, MA, NH, NJ, NY, NC, PA, RI, VT, VA, and WV. The factors were developed using the MARAMA projection tool and by selecting 2023 for the base year and 2026 for the projection year.

The MARAMA projection packets were used throughout the MARAMA region, except in North Carolina, New Jersey, and Virginia. Those three states provided their own projection packets for the ptnonipm sector in 2016v1, and those projection packets were used instead of the MARAMA packets in those states in 2016v2 and v3 as well. The Virginia growth factors for one facility were edited to incorporate emissions limits provided by MARAMA for that facility. A separate adjustment was made to emissions of a Pennsylvania source (process ID 13629614) based on updated information provided by MARAMA.

**2026 Point Inventories - outside MARAMA region**

Projection factors were developed by industrial sector from AEO 2022 in order to project emissions from 2023 to 2026.  The SCCs were mapped to AEO categories and projection factors were created using a ratio between the base year and projection year estimates from each specific AEO category. Table 4-14 below details the AEO2022tables used to map SCCs to AEO categories for the projections of industrial sources. Depending on the category, a projection factor may be national or regional. The maximum projection factor for projecting from 2023 to 2026 was capped at 1.3. MARAMA states were not projected using this method. Also in 2016v2 and 2016v3, more SCCs were mapped to the AEO categories

for SCCs that had not been projected in 2016v1. For example, SCCs for the cement kilns that did not specify a fuel are now mapped to the "Value of Shipments" as a generic indicator for projected growth.

An SCC-NAICS projection was also developed using AEO2022. SCC/NAICS combinations with emissions >100tons/year for any CAP[39] were mapped to AEO sector and fuel. Projection factors for this method were capped at 1.3 for projecting emissions from 2023 to 2026.

New units were added for 2016v2 and carried into 2016v3 based on 2018NEI analysis, although these are also added in 2016 as described in Section 2.1.3. Emissions for taconite-related facilities in Minnesota were replaced with preliminary 2021 emissions obtained from the state. These emissions should reflect controls that are installed at those facilities between 2016 and 2021. In addition, reductions for the Fernley Plant in Nevada are implemented in the 2026 inventory due to the timing of the planned controls in response to the consent decree reached for EPA case number 09-2011-0506[40] expected to come online between 2023 and 2026.

Any control efficiencies that were set to 100 in the 2016 base year inventory were identified and adjusted prior to projecting the inventories. Note that a control efficiency equal to 100 means that there would be no emissions, so control efficiencies equal to 100 are assumed to be in error.

**Table 4-14. Annual Energy Outlook (AEO) 2022 tables used to project industrial sources**

| AEO 2022 Table # | AEO Table name |
|---|---|
| 2 | Energy Consumption by Sector and Source |
| 24 | Refining Industry Energy Consumption |
| 25 | Food Industry Energy Consumption |
| 26 | Paper Industry Energy Consumption |
| 27 | Bulk Chemical Industry Energy Consumption |
| 28 | Glass Industry Energy Consumption |
| 29 | Cement Industry Energy Consumption |
| 30 | Iron and Steel Industries Energy Consumption |
| 31 | Aluminum Industry Energy Consumption |
| 32 | Metal Based Durables Energy Consumption |
| 33 | Other Manufacturing Sector Energy Consumption |
| 34 | Nonmanufacturing Sector Energy Consumption |

### 4.2.3.7   Airport sources (airports)

Packets:

> airport_projections_itn_taf2021_2016_2023_25apr2022_v0
> airport_projections_itn_taf2021_2016_2026_25apr2022_v0

Airport emissions for 2016v3 were projected from the 2016 airport emissions to 2023 and 2026 using the same projection approach as for 2016v1 and 2016v2, but the factors were based on TAF 2021 based on the corrected 2017 NEI airport emissions (released in June 2022), and starting from the base year 2016

---

[39] The "100 tpy" criterion for this purpose was based on emissions in the emissions values in the 2016 beta platform.
[40] https://echo.epa.gov/enforcement-case-report?activity_id=2600059825

instead of 2017. The Terminal Area Forecast (TAF) data available from the Federal Aviation Administration (see https://www.faa.gov/data_research/aviation/taf/).

Projection factors were computed using the ratio of the itinerant (ITN) data from the Airport Operations table between the base and projection year. Where possible, airport-specific projection factors were used. For airports that could not be matched to a unit in the TAF data, state default growth factors by itinerant class (i.e., commercial, air taxi, and general) were created from the set of unmatched airports. Emission growth for facilities from 2016 to 2023 and 2026 was capped at 500% and the state default growth was capped at 200%. Military state default projection values were kept flat (i.e., equal to 1.0) to reflect uncertainly in the data regarding these sources.

### 4.2.3.8   Nonpoint Sources (nonpt)

Packets:

       Projection_2016_2023_all_nonpoint_version1_platform_NC_04oct2019_v2
       Projection_2016_2023_finished_fuels_volpe_04oct2019_v2
       Projection_2016_2023_industrial_bySCC_version3_platform_09nov2022_v1
       Projection_2016_2023_nonpt_other_version3_platform_MARAMA_22aug2022_v0
       Projection_2016_2023_nonpt_PFC_version1_platform_MARAMA_20sep2019_v1
       Projection_2016_2023_nonpt_population_beta_platform_ext_20sep2019_v1
       Projection_2016_2023_nonpt_version1_platform_NJ_04oct2019_v1
       Projection_2016_2026_all_nonpoint_version2_platform_NC_30aug2022_nf_v2
       Projection_2016_2026_finished_fuels_volpe_16jul2021_v0
       Projection_2016_2026_industrial_bySCC_version3_platform_09nov2022_v1
       Projection_2016_2026_nonpt_other_version3_platform_MARAMA_22aug2022_v0
       Projection_2016_2026_nonpt_PFC_version2_platform_MARAMA_noNC_16jul2021_v1
       Projection_2016_2026_nonpt_population_version2_platform_noMARAMA_16jul2021_v0
       Projection_2016_2026_nonpt_version2_platform_NJ_16jul2021_v0

In 2016v3, emissions sources in the nonpt sectors are based on 2017 NEI, which was determined to better represent 2017 emissions than the 2014 NEI emissions projected to 2016 using factors based on surrogates such as changes in population and employment.  Therefore, controls fully implemented by 2017, such as sulfur rules in some northeast states and boiler rules, do not need to be reflected in these projection factors. The projected 2023 and 2026 emissions were developed by applying the factors in the projection packets to the base year emissions.

**Inside MARAMA region**

2016-to-2023 and 2016-to-2026 projection packets for all nonpoint sources were provided by MARAMA for the following states and updated with data from AEO2022: CT, DE, DC, ME, MD, MA, NH, NJ, NY, NC, PA, RI, VT, VA, and WV. MARAMA provided one projection packet per year for portable fuel containers (PFCs), and a second projection packet per year for all other nonpt sources.

The MARAMA projection packets were used throughout the MARAMA region, except in North Carolina and New Jersey. Both NC and NJ provided separate projection packets for the nonpt sector for 2016v1 and those projection packets were used instead of the MARAMA packets in those two states. New Jersey did not provide projection factors for PFCs, and so NJ PFCs were projected using the MARAMA PFC growth packet.

**Industrial Sources outside MARAMA region**

Because each AEO only includes data for one or two years prior to its publication year, projection factors were developed from 2016 to 2023 and 2016 to 2026 by industrial sector using a series of AEOs to cover the period from 2016 through 2023: AEO2018 was used to go from 2016 to 2017; AEO2019 to go from 2017 to 2020; AEO2021 to go from 2020 to 2021; and AEO2022 to go from 2021 to 2023 and 2026. SCCs were mapped to AEO categories and projection factors were created using a ratio between the base year and projection year estimates from each specific AEO category. For the nonpt sector, only AEO Table 2 was used to map SCCs to AEO categories for the projections of industrial sources. Depending on the category, a projection factor may be national or regional. The maximum projection factor was capped at a factor of 1.75 for 2016 to 2023, and a factor of 2.25 for 2016 to 2026. Sources within the MARAMA region were not projected with these factors, but with the MARAMA-provided growth factors.

In response to comments, a change in the 2016v3 platform was to hold distillate emissions for SCCs 2103004000, 2103004001, and 2103004002 flat with a 1.0 projection factor instead of showing increasing emissions in 2023 and 2026.

**Evaporative Emissions from Transport of Finished Fuels outside MARAMA region**

Estimates on growth of evaporative emissions from transporting finished fuels are partially covered in the nonpoint and point oil and gas projection packets.  However, there are some processes with evaporative emissions from storing and transporting finished fuels which are not included in the nonpoint and point oil and gas projection packets, e.g., withdrawing fuel from tanks at bulk plants, filling tanks at service stations, etc., and those processes are included in nonpoint other.  AEO2018 was used as a starting point for projecting volumes of finished fuel that would be transported in analytic years.  Then these volumes were used to calculate inventories associated with evaporative emissions in 2016, 2023, and 2028 using upstream modules in the Emissions Modeling Framework.  Those emission inventories were mapped to the appropriate SCCs and projection packets were generated from 2016 to 2023 and 2016 to 2028 using the upstream modules. Inventories for 2026 were developed by interpolating between the inventories for 2023 and 2028.  Sources within the MARAMA region were not projected with these factors, but with the MARAMA-provided growth factors.

**Human Population Growth outside MARAMA region**

For SCCs that were projected based on human population growth, population projection data were available from the Benefits Mapping and Analysis Program (BenMAP) model by county for several years, including 2017, 2023, and 2026.  These human population data were used to create modified county-specific projection factors. The impacted SCCs are shown in Table 4-15. Note that 2017 is being used as the base year since 2016 human population is not available in this dataset. A newer human population dataset was assessed but it did not have realistic near-term (e.g., 2023/2026) projections, and was not used; for example, rural areas of NC were projected to have more growth than urban areas, which is the opposite of what one would expect. Growth factors were limited to 5% cumulative annual growth (e.g. 35% annual growth over 7 years), but none of the factors fell outside that range. Sources within the MARAMA region were not projected with these factors, but with the MARAMA-provided growth factors.

**Table 4-15. SCCs in nonpt that use Human Population Growth for Projections**

| SCC | Description |
|---|---|
| 2302002100 | Industrial Processes;Food and Kindred Products: SIC 20;Commercial Cooking - Charbroiling;Conveyorized Charbroiling |
| 2302002200 | Industrial Processes;Food and Kindred Products: SIC 20;Commercial Cooking - Charbroiling;Under-fired Charbroiling |
| 2302003000 | Industrial Processes;Food and Kindred Products: SIC 20;Commercial Cooking - Frying;Deep Fat Frying |
| 2302003100 | Industrial Processes;Food and Kindred Products: SIC 20;Commercial Cooking - Frying;Flat Griddle Frying |
| 2302003200 | Industrial Processes;Food and Kindred Products: SIC 20;Commercial Cooking - Frying;Clamshell Griddle Frying |
| 2501011011 | Storage and Transport;Petroleum and Petroleum Product Storage;Residential Portable Gas Cans;Permeation |
| 2501011012 | Storage and Transport;Petroleum and Petroleum Product Storage;Residential Portable Gas Cans;Evaporation (includes Diurnal losses) |
| 2501011013 | Storage and Transport;Petroleum and Petroleum Product Storage;Residential Portable Gas Cans;Spillage During Transport |
| 2501011014 | Storage and Transport;Petroleum and Petroleum Product Storage;Residential Portable Gas Cans;Refilling at the Pump - Vapor Displacement |
| 2501011015 | Storage and Transport;Petroleum and Petroleum Product Storage;Residential Portable Gas Cans;Refilling at the Pump – Spillage |
| 2501012011 | Storage and Transport;Petroleum and Petroleum Product Storage;Commercial Portable Gas Cans;Permeation |
| 2501012012 | Storage and Transport;Petroleum and Petroleum Product Storage;Commercial Portable Gas Cans;Evaporation (includes Diurnal losses) |
| 2501012013 | Storage and Transport;Petroleum and Petroleum Product Storage;Commercial Portable Gas Cans;Spillage During Transport |
| 2501012014 | Storage and Transport;Petroleum and Petroleum Product Storage;Commercial Portable Gas Cans;Refilling at the Pump - Vapor Displacement |
| 2501012015 | Storage and Transport;Petroleum and Petroleum Product Storage;Commercial Portable Gas Cans;Refilling at the Pump – Spillage |
| 2630020000 | Waste Disposal, Treatment, and Recovery;Wastewater Treatment;Public Owned;Total Processed |
| 2640000000 | Waste Disposal, Treatment, and Recovery;TSDFs;All TSDF Types;Total: All Processes |
| 2810025000 | Miscellaneous Area Sources;Other Combustion;Residential Grilling (see 23-02-002-xxx for Commercial);Total |
| 2810060100 | Miscellaneous Area Sources;Other Combustion;Cremation;Humans |

### 4.2.3.9     Solvents (np_solvents)

Packets:

        Projection_2016_2023_solvents_v2platform_MARAMA_noNCNJ_09nov2022_v2
        Projection_2016_2023_solvents_v2platform_NC_09nov2022_v2
        Projection_2016_2023_solvents_v2platform_NJ_09nov2022_v1
        Projection_2016_2023_solvents_v2platform_population_noMARAMA_09nov2022_v1
        Projection_2016_202X_solvents_v3platform_Idaho_asphalt_09aug2022_v0
        Projection_2016_2026_solvents_v2platform_MARAMA_noNCNJ_09nov2022_v1
        Projection_2016_2026_solvents_v2platform_NC_09nov2022_v1

Projection_2016_2026_solvents_v2platform_NJ_09nov2022_v1
Projection_2016_2026_solvents_v2platform_population_noMARAMA_09nov2022_v1

The projection methodology for np_solvents is similar to the method used in the 2016v2 platform. The MARAMA, NC, and NJ nonpt projection packets all affect solvents. Elsewhere, solvents are projected using human population trends for most solvent categories. All of these packets were checked to confirm they cover all SCCs in the solvents sector, and packets were supplemented with additional SCCs as needed, copied from factors for existing SCCs. The SCCs in np_solvents that are projected using human population growth are shown in Table 4-16.

The following updates were made in 2016v3 to supplement the SCCs included in the projection packets:

- all 2460- SCCs and 2402000000 use human population (copied from an existing 2460- SCC);
- most surface coating and graphic arts SCCs use either human population (MARAMA and non-MARAMA regions) or employment data (some SCCs in MARAMA region only);
- added new SCC 2460030999 (lighter fluid) to project based on human population in all regions.

The 2026 projection packets were interpolated from 2023 and 2028 for NC and NJ. Two SCCs which were projected based on VMT in North Carolina used 2016v3 VMT as the basis for those projections.

For 2016v3, Idaho asphalt emissions (SCCs = 2461021000, 2461022000) were reduced by 14.2% based on a comment from the state.

**Table 4-16. SCCs in np_solvents that use Human Population Growth for Projections**

| SCC | SCC Descriptions |
|---|---|
| 2401001000 | Solvent Utilization;Surface Coating;Architectural Coatings;Total: All Solvent Types |
| 2401005000 | Solvent Utilization;Surface Coating;Auto Refinishing: SIC 7532;Total: All Solvent Types |
| 2401005700 | Solvent Utilization;Surface Coating;Auto Refinishing: SIC 7532;Top Coats |
| 2401008000 | Solvent Utilization;Surface Coating;Traffic Markings;Total: All Solvent Types |
| 2401010000 | Solvent Utilization;Surface Coating;Textile Products: SIC 22;Total: All Solvent Types |
| 2401015000 | Solvent Utilization;Surface Coating;Factory Finished Wood: SIC 2426 thru 242;Total: All Solvent Types |
| 2401020000 | Solvent Utilization;Surface Coating;Wood Furniture: SIC 25;Total: All Solvent Types |
| 2401025000 | Solvent Utilization;Surface Coating;Metal Furniture: SIC 25;Total: All Solvent Types |
| 2401030000 | Solvent Utilization;Surface Coating;Paper: SIC 26;Total: All Solvent Types |
| 2401035000 | Solvent Utilization;Surface Coating;Plastic Products: SIC 308;Total: All Solvent Types |
| 2401040000 | Solvent Utilization;Surface Coating;Metal Cans: SIC 341;Total: All Solvent Types |
| 2401045000 | Solvent Utilization;Surface Coating;Metal Coils: SIC 3498;Total: All Solvent Types |
| 2401050000 | Solvent Utilization;Surface Coating;Miscellaneous Finished Metals: SIC 34 - (341 + 3498);Total: All Solvent Types |
| 2401055000 | Solvent Utilization;Surface Coating;Machinery and Equipment: SIC 35;Total: All Solvent Types |
| 2401060000 | Solvent Utilization;Surface Coating;Large Appliances: SIC 363;Total: All Solvent Types |
| 2401065000 | Solvent Utilization;Surface Coating;Electronic and Other Electrical: SIC 36 - 363;Total: All Solvent Types |
| 2401070000 | Solvent Utilization;Surface Coating;Motor Vehicles: SIC 371;Total: All Solvent Types |
| 2401075000 | Solvent Utilization;Surface Coating;Aircraft: SIC 372;Total: All Solvent Types |
| 2401080000 | Solvent Utilization;Surface Coating;Marine: SIC 373;Total: All Solvent Types |
| 2401085000 | Solvent Utilization;Surface Coating;Railroad: SIC 374;Total: All Solvent Types |

| SCC | SCC Descriptions |
|---|---|
| 2401090000 | Solvent Utilization;Surface Coating;Miscellaneous Manufacturing;Total: All Solvent Types |
| 2401100000 | Solvent Utilization;Surface Coating;Industrial Maintenance Coatings;Total: All Solvent Types |
| 2401200000 | Solvent Utilization;Surface Coating;Other Special Purpose Coatings;Total: All Solvent Types |
| 2425000000 | Solvent Utilization;Graphic Arts;All Processes;Total: All Solvent Types |
| 2425020000 | Solvent Utilization;Graphic Arts;Letterpress;Total: All Solvent Types |
| 2425030000 | Solvent Utilization;Graphic Arts;Rotogravure;Total: All Solvent Types |
| 2440000000 | Solvent Utilization;Miscellaneous Industrial;All Processes;Total: All Solvent Types |
| 2440020000 | Solvent Utilization;Miscellaneous Industrial;Adhesive (Industrial) Application;Total: All Solvent Types |
| 2460030999 | Solvent Utilization;Miscellaneous Non-industrial: Consumer and Commercial;Lighter Fluid, Fire Starter, Other Fuels;Total: All Volatile Chemical Product Types |
| 2460100000 | Solvent Utilization;Miscellaneous Non-industrial: Consumer and Commercial;All Personal Care Products;Total: All Solvent Types |
| 2460200000 | Solvent Utilization;Miscellaneous Non-industrial: Consumer and Commercial;All Household Products;Total: All Solvent Types |
| 2460400000 | Solvent Utilization;Miscellaneous Non-industrial: Consumer and Commercial;All Automotive Aftermarket Products;Total: All Solvent Types |
| 2460500000 | Solvent Utilization;Miscellaneous Non-industrial: Consumer and Commercial;All Coatings and Related Products;Total: All Solvent Types |
| 2460600000 | Solvent Utilization;Miscellaneous Non-industrial: Consumer and Commercial;All Adhesives and Sealants;Total: All Solvent Types |
| 2460800000 | Solvent Utilization;Miscellaneous Non-industrial: Consumer and Commercial;All FIFRA Related Products;Total: All Solvent Types |
| 2460900000 | Solvent Utilization;Miscellaneous Non-industrial: Consumer and Commercial;Miscellaneous Products (Not Otherwise Covered);Total: All Solvent Types |
| 2461800001 | Solvent Utilization;Miscellaneous Non-industrial: Commercial;Pesticide Application: All Processes;Surface Application |

## 4.2.3.10  Residential Wood Combustion (rwc)

Packets:

Projection_2016_2023_all_nonpoint_version1_platform_NC_24jun2021_nf_v5
Projection_2016_2023_rwc_version2_platform_fromMARAMA_22jun2021_v0
Projection_2016_2026_all_nonpoint_version2_platform_NC_19jul2021_nf_v1
Projection_2016_2026_rwc_version2_platform_fromMARAMA_19jul2021_v0

For residential wood combustion, the growth and control factors are computed together into merged factors in the same packets.  For states other than California, Oregon, and Washington, RWC emissions from 2016 were projected to 2023 and 2026 using projection factors derived using the MARAMA tool that is based on the projection methodology from EPA's 2011v6.3 platform. The development of projected growth in RWC emissions to year 2023 starts with the projected growth in RWC appliances derived from year 2012 appliance shipments reported in the Regulatory Impact Analysis (RIA) for Proposed Residential Wood Heaters NSPS Revision Final Report available at: http://www2.epa.gov/sites/production/files/2013-12/documents/ria-20140103.pdf.  The 2012 shipments are based on 2008 shipment data and revenue forecasts from a Frost & Sullivan Market Report (Frost &

Sullivan, 2010). Next, to be consistent with the RIA, growth rates for new appliances for certified wood stoves, pellet stoves, indoor furnaces and OHH were based on forecasted revenue (real GDP) growth rate of 2.0% per year from 2013 through 2023 and 2026 as predicted by the U.S. Bureau of Economic Analysis (BEA, 2012). While this approach is not perfectly correlated, in the absence of specific shipment projections, the RIA assumes the overall trend in the projection is reasonable. The growth rates for appliances not listed in the RIA (fireplaces, outdoor wood burning devices (not elsewhere classified) and residential fire logs) are estimated based on the average growth in the number of houses between 2002 and 2012, about 1% (U.S. Census, 2012).

In addition to new appliance sales and forecasts extrapolating beyond 2012, assumptions on the replacement of older, existing appliances are needed. Based on long lifetimes, no replacement of fireplaces, outdoor wood burning devices (not elsewhere classified) or residential fire logs is assumed. It is assumed that 95% of new woodstoves will replace older non-EPA certified freestanding stoves (pre-1988 NSPS) and 5% will replace existing EPA-certified catalytic and non-catalytic stoves that currently meet the 1988 NSPS (Houck, 2011).

Equation 4-1 was applied with RWC-specific factors from the rule. The EPA RWC NSPS experts assume that 10% of new pellet stoves and OHH replace older units and that because of their short lifespan, that 10% of indoor furnaces are replaced each year; these are the same assumptions used since the 2007 emissions modeling platform (EPA, 2012d). The resulting growth factors for these appliance types varies by appliance type and also by pollutant because the emission rates, from EPA RWC tool (EPA, 2013rwc), vary by appliance type and pollutant. For EPA certified units, the projection factors for PM are lower than those for all other pollutants. The projection factors also vary because the total number of existing units in 2016 varies greatly between appliance types. For 2016v3, the projection factors are the same as those used in 2016v2, although the rwc emissions for Idaho differ due to the 2016 emissions being updated to use data from 2017 NEI.

Table 4-17 contains the factors to adjust the emissions from 2016 to 2023 and 2026. California, Oregon, and Washington RWC were held constant at 2017 NEI levels for all of the years 2016, 2023, and 2026 due to the unique control programs that those states have in place.

### Table 4-17. Projection factors for RWC

| SCC | SCC description | Pollutant* | 2016-to-2023 | 2016-to-2026 |
|---|---|---|---|---|
| 2104008100 | Fireplace: general | | 7.19% | 10.29% |
| 2104008210 | Woodstove: fireplace inserts; non-EPA certified | | -13.92% | -17.97% |
| 2104008220 | Woodstove: fireplace inserts; EPA certified; non-catalytic | PM10-PRI | 4.09% | 5.08% |
| 2104008220 | Woodstove: fireplace inserts; EPA certified; non-catalytic | PM25-PRI | 4.09% | 5.08% |
| 2104008220 | Woodstove: fireplace inserts; EPA certified; non-catalytic | | 8.34% | 10.28% |
| 2104008230 | Woodstove: fireplace inserts; EPA certified; catalytic | PM10-PRI | 6.06% | 7.68% |
| 2104008230 | Woodstove: fireplace inserts; EPA certified; catalytic | PM25-PRI | 6.06% | 7.68% |
| 2104008230 | Woodstove: fireplace inserts; EPA certified; catalytic | | 12.08% | 15.27% |

| SCC | SCC description | Pollutant* | 2016-to-2023 | 2016-to-2026 |
|---|---|---|---|---|
| 2104008310 | Woodstove: freestanding, non-EPA certified | CO | -12.09% | -15.72% |
| 2104008310 | Woodstove: freestanding, non-EPA certified | PM10-PRI | -12.67% | -16.52% |
| 2104008310 | Woodstove: freestanding, non-EPA certified | PM25-PRI | -12.67% | -16.52% |
| 2104008310 | Woodstove: freestanding, non-EPA certified | VOC | -11.40% | -14.84% |
| 2104008310 | Woodstove: freestanding, non-EPA certified | | -12.09% | -15.72% |
| 2104008320 | Woodstove: freestanding, EPA certified, non-catalytic | PM10-PRI | 4.09% | 5.08% |
| 2104008320 | Woodstove: freestanding, EPA certified, non-catalytic | PM25-PRI | 4.09% | 5.08% |
| 2104008320 | Woodstove: freestanding, EPA certified, non-catalytic | | 8.34% | 10.28% |
| 2104008330 | Woodstove: freestanding, EPA certified, catalytic | PM10-PRI | 6.07% | 7.69% |
| 2104008330 | Woodstove: freestanding, EPA certified, catalytic | PM25-PRI | 6.07% | 7.69% |
| 2104008330 | Woodstove: freestanding, EPA certified, catalytic | | 12.08% | 15.27% |
| 2104008400 | Woodstove: pellet-fired, general (freestanding or FP insert) | PM10-PRI | 30.09% | 38.02% |
| 2104008400 | Woodstove: pellet-fired, general (freestanding or FP insert) | PM25-PRI | 30.09% | 38.02% |
| 2104008400 | Woodstove: pellet-fired, general (freestanding or FP insert) | | 26.96% | 33.85% |
| 2104008510 | Furnace: Indoor, cordwood-fired, non-EPA certified | CO | -64.93% | -84.78% |
| 2104008510 | Furnace: Indoor, cordwood-fired, non-EPA certified | PM10-PRI | -62.99% | -82.89% |
| 2104008510 | Furnace: Indoor, cordwood-fired, non-EPA certified | PM25-PRI | -62.99% | -82.89% |
| 2104008510 | Furnace: Indoor, cordwood-fired, non-EPA certified | VOC | -65.02% | -84.89% |
| 2104008510 | Furnace: Indoor, cordwood-fired, non-EPA certified | | -64.93% | -84.78% |
| 2104008530 | Furnace: Indoor, pellet-fired, general | PM10-PRI | 30.09% | 38.02% |
| 2104008530 | Furnace: Indoor, pellet-fired, general | PM25-PRI | 30.09% | 38.02% |
| 2104008530 | Furnace: Indoor, pellet-fired, general | | 26.96% | 33.85% |
| 2104008610 | Hydronic heater: outdoor | PM10-PRI | 0.06% | -0.40% |
| 2104008610 | Hydronic heater: outdoor | PM25-PRI | 0.06% | -0.40% |
| 2104008610 | Hydronic heater: outdoor | | -0.73% | -1.30% |
| 2104008620 | Hydronic heater: indoor | PM10-PRI | 0.06% | -0.40% |
| 2104008620 | Hydronic heater: indoor | PM25-PRI | 0.06% | -0.40% |
| 2104008620 | Hydronic heater: indoor | | -0.73% | -1.30% |
| 2104008630 | Hydronic heater: pellet-fired | PM10-PRI | 0.06% | -0.40% |
| 2104008630 | Hydronic heater: pellet-fired | PM25-PRI | 0.06% | -0.40% |

| SCC | SCC description | Pollutant* | 2016-to-2023 | 2016-to-2026 |
|-----|----------------|-----------|---------------|---------------|
| 2104008630 | Hydronic heater: pellet-fired | | -0.73% | -1.30% |
| 2104008700 | Outdoor wood burning device, NEC (fire-pits, chimineas, etc) | | 7.19% | 9.25% |
| 2104009000 | Fire log total | | 7.19% | 9.25% |

\* If no pollutant is specified, facture is used for any pollutants that do not have a pollutant-specific factor

## 4.2.4 CoST CONTROL Packets (nonpt, np_oilgas, ptnonipm, pt_oilgas, np_solvents)

The final step in the projection of emissions to each analytic year is the application of any control technologies or programs. For analytic-year New Source Performance Standards (NSPS) controls (e.g., oil and gas, Reciprocating Internal Combustion Engines (RICE), Natural Gas Turbines, and Process Heaters), we attempted to control only new sources/equipment using the following equation to account for growth and retirement of existing sources and the differences between the new and existing source emission rates.

$$Qn = Qo\left\{\left[(1+Pf)^{t-1}\right]Fn + (1-Ri)^t Fe + \left[1-(1-Ri)^t\right]Fn\right\}\qquad \textbf{Equation 4-1}$$

where:

Qn = emissions in projection year
Qo = emissions in base year
Pf = growth rate expressed as ratio (e.g., 1.5=50 percent cumulative growth)
t = number of years between base and analytic years
Fn = emission factor ratio for new sources
Ri = retirement rate, expressed as whole number (e.g., 3.3 percent=0.033)
Fe = emission factor ratio for existing sources

The first term in Equation 4-1 represents new source growth and controls, the second term accounts for retirement and controls for existing sources, and the third term accounts for replacement source controls. For computing the CoST % reductions (Control Efficiency), the simplified Equation 4-2 was used for 2023 and 2026 projections:

$$\text{Control Efficiency}_{202x}(\%) = 100 \times \left(1 - \frac{[(Pf_{202x}-1)\times Fn + (1-Ri)^{12} + (1-(1-Ri)^{12})\times Fn]}{Pf_{202x}}\right)\qquad \textbf{Equation 4-2}$$

For example, to compute the control efficiency for 2028 from a base year of 2015 the existing source emissions factor (Fe) is set to 1.0, 2028 (analytic year) minus 2016 (base year) is 12, and new source emission factor (Fn) is the ratio of the NSPS emission factor to the existing emission factor. Table 4-18 shows the values for Retirement rate and new source emission factors (Fn) for new sources with respect to each NSPS regulation and other conditions within. For the nonpt sector, the RICE NSPS control program was applied when estimating year 2023 and 2026 emissions for the 2016v3 modeling platform. Further information about the application of NSPS controls can be found in Section 4 of the *Additional Updates*

*to Emissions Inventories for the Version 6.3, 2011 Emissions Modeling Platform for the Year 2023* technical support document (EPA, 2017).

**Table 4-18. Assumed retirement rates and new source emission factor ratios for NSPS rules**

| NSPS Rule | Sector(s) | Retirement Rate years (%/year) | Pollutant Impacted | Applied where? | New Source Emission Factor (Fn) |
|---|---|---|---|---|---|
| Oil and Gas | np_oilgas, pt_oilgas | No assumption | VOC | Storage Tanks: 70.3% reduction in growth-only (>1.0) | 0.297 |
| | | | | Gas Well Completions: 95% control (regardless) | 0.05 |
| | | | | Pneumatic controllers, not high-bleed >6scfm or low-bleed: 77% reduction in growth-only (>1.0) | 0.23 |
| | | | | Pneumatic controllers, high-bleed >6scfm or low-bleed: 100% reduction in growth-only (>1.0) | 0.00 |
| | | | | Compressor Seals: 79.9% reduction in growth-only (>1.0) | 0.201 |
| | | | | Fugitive Emissions: 60% Valves, flanges, connections, pumps, open-ended lines, and other | 0.40 |
| | | | | Pneumatic Pumps: 71.3%; Oil and Gas | 0.287 |
| RICE | np_oilgas, pt_oilgas, nonpt, ptnonipm | 40, (2.5%) | NO$_X$ | Lean burn: PA, all other states | 0.25, 0.606 |
| | | | | Rich Burn: PA, all other states | 0.1, 0.069 |
| | | | | Combined (average) LB/RB: PA, other states | 0.175, 0.338 |
| | | | CO | Lean burn: PA, all other states | 1.0 (n/a), 0.889 |
| | | | | Rich Burn: PA, all other states | 0.15, 0.25 |
| | | | | Combined (average) LB/RB: PA, other states | 0.575, 0.569 |
| | | | VOC | Lean burn: PA, all other states | 0.125, n/a |
| | | | | Rich Burn: PA, all other states | 0.1, n/a |
| | | | | Combined (average) LB/RB: PA, other states | 0.1125, n/a |
| Gas Turbines | pt_oilgas, ptnonipm | 45 (2.2%) | NO$_X$ | California and NO$_X$ SIP Call states | 0.595 |
| | | | | All other states | 0.238 |
| Process Heaters | pt_oilgas, ptnonipm | 30 (3.3%) | NO$_X$ | Nationally to Process Heater SCCs | 0.41 |

### 4.2.4.1   Oil and Gas NSPS (np_oilgas, pt_oilgas)

Packets:

    Control_2016_2023_Oilgas_NSPS_np_oilgas_v3_platform_07sep2022_v1
    Control_2016_2023_Oilgas_NSPS_pt_oilgas_v3_platform_07sep2022_v1
    Control_2016_2026_Oilgas_NSPS_np_oilgas_v3_platform_09nov2022_v1
    Control_2016_2026_Oilgas_NSPS_pt_oilgas_v3_platform_09nov2022_v1

New packets to reflect the oil and gas NSPS were developed for the 2016v3 platform. For oil and gas NSPS controls, except for gas well completions (a 95 percent control), the assumption of no equipment

retirements through year 2026 dictates that NSPS controls are applied to the growth component only of any PROJECTION factors.  For example, if a growth factor is 1.5 for storage tanks (indicating a 50 percent increase activity), then, using Table 4-18, the 70.3 percent VOC NSPS control to this new growth will result in a 23.4 percent control: 100 *(70.3 * (1.5 -1) / 1.5); this yields an "effective" growth rate (combined PROJECTION and CONTROL) of 1.1485, or a 70.3 percent reduction from 1.5 to 1.0.  The impacts of all non-drilling completion VOC NSPS controls are therefore greater where growth in oil and gas production is assumed highest.  Conversely, for oil and gas basins with assumed negative growth in activity/production, VOC NSPS controls will be limited to well completions only.  These reductions are year-specific because projection factors for these sources are year-specific.    Table 4-19 (np_oilgas) and Table 4-21 (pt_oilgas) list the SCCs where Oil and Gas NSPS controls were applied; note controls are applied to production and exploration-related SCCs. Table 4-20 (np_oilgas) and Table 4-22 (pt_oilgas) shows the reduction in VOC emissions after the application of the Oil and Gas NSPS CONTROL packet for analytic years. The emissions totals in these tables include emissions in WRAP states, although WRAP states other than New Mexico use a separate analytic year inventory.  Additional effort was implemented to reflect New Mexico's new Oil and Gas rule as a 60% reduction to VOC for three SCCs (2310010700, 2310021509, and 2310023509). These additional controls in New Mexico Administrative code 20.2.50[41] were reflected in the overall "Oil and Gas NSPS" control packet so that they could be included in time to develop the new inventories for use in the 2016v3 emissions modeling platform.

**Table 4-19. Non-point (np_oilgas) SCCs in 2016v3 modeling platform where Oil and Gas NSPS controls applied**

| SCC | PRODUCT | OG_NSPS_SCC | TOOL OR STATE | SRC_CAT | SCC_Description |
|---|---|---|---|---|---|
| 2310010300 | OIL | 3. Pneumatic controllers: not high or low bleed | TOOL | PRODUCTION | Industrial Processes;Oil and Gas Exploration and Production;Crude Petroleum;Oil Well Pneumatic Devices;; |
| 2310010700 | OIL | 5. Fugitives | TOOL | PRODUCTION | Industrial Processes;Oil and Gas Exploration and Production;Crude Petroleum;Oil Well Fugitives;; |
| 2310011020 | OIL | 1. Storage Tanks | TOOL | PRODUCTION | Industrial Processes;Oil and Gas Exploration and Production;On-Shore Oil Production;Storage Tanks: Crude Oil;; |
| 2310011500 | OIL | 5. Fugitives | TOOL | PRODUCTION | Industrial Processes;Oil and Gas Exploration and Production;On-Shore Oil Production;Fugitives: All Processes;; |
| 2310011501 | OIL | 5. Fugitives | TOOL | PRODUCTION | Industrial Processes;Oil and Gas Exploration and Production;On-Shore Oil Production;Fugitives: Connectors;; |
| 2310011502 | OIL | 5. Fugitives | TOOL | PRODUCTION | Industrial Processes;Oil and Gas Exploration and Production;On-Shore Oil Production;Fugitives: Flanges;; |
| 2310011503 | OIL | 5. Fugitives | TOOL | PRODUCTION | Industrial Processes;Oil and Gas Exploration and Production;On-Shore Oil Production;Fugitives: Open Ended Lines;; |
| 2310011505 | OIL | 5. Fugitives | TOOL | PRODUCTION | Industrial Processes;Oil and Gas Exploration and Production;On-Shore Oil Production;Fugitives: Valves;; |
| 2310011506 | OIL | 5. Fugitives | TOOL | PRODUCTION | Industrial Processes;Oil and Gas Exploration and Production;On-Shore Oil Production;Fugitives: Other;; |

---

[41] See https://www.srca.nm.gov/parts/title20/20.002.0050.html and https://www.env.nm.gov/air-quality/compliance-and-enforcement/

| SCC | PRODUCT | OG_NSPS_SCC | TOOL OR STATE | SRC_CAT | SCC_Description |
|---|---|---|---|---|---|
| 2310020700 | NGAS | 5. Fugitives | TOOL | PRODUCTION | Industrial Processes;Oil and Gas Exploration and Production;Natural Gas;Gas Well Fugitives;; |
| 2310021010 | NGAS | 1. Storage Tanks | TOOL | PRODUCTION | Industrial Processes;Oil and Gas Exploration and Production;On-Shore Gas Production;Storage Tanks: Condensate;; |
| 2310021011 | NGAS | 1. Storage Tanks | TOOL | PRODUCTION | Industrial Processes;Oil and Gas Exploration and Production;On-Shore Gas Production;Condensate Tank Flaring;; |
| 2310021300 | NGAS | 3. Pnuematic controllers: not high or low bleed | TOOL | PRODUCTION | Industrial Processes;Oil and Gas Exploration and Production;On-Shore Gas Production;Gas Well Pneumatic Devices;; |
| 2310021310 | NGAS | 6. Pneumatic Pumps | TOOL | PRODUCTION | Industrial Processes;Oil and Gas Exploration and Production;On-Shore Gas Production;Gas Well Pneumatic Pumps;; |
| 2310021500 | NGAS | 2. Well Completions | TOOL | EXPLORATION | Industrial Processes;Oil and Gas Exploration and Production;On-Shore Gas Production;Gas Well Completion - Flaring;; |
| 2310021501 | NGAS | 5. Fugitives | TOOL | PRODUCTION | Industrial Processes;Oil and Gas Exploration and Production;On-Shore Gas Production;Fugitives: Connectors;; |
| 2310021502 | NGAS | 5. Fugitives | TOOL | PRODUCTION | Industrial Processes;Oil and Gas Exploration and Production;On-Shore Gas Production;Fugitives: Flanges;; |
| 2310021503 | NGAS | 5. Fugitives | TOOL | PRODUCTION | Industrial Processes;Oil and Gas Exploration and Production;On-Shore Gas Production;Fugitives: Open Ended Lines;; |
| 2310021505 | NGAS | 5. Fugitives | TOOL | PRODUCTION | Industrial Processes;Oil and Gas Exploration and Production;On-Shore Gas Production;Fugitives: Valves;; |
| 2310021506 | NGAS | 5. Fugitives | TOOL | PRODUCTION | Industrial Processes;Oil and Gas Exploration and Production;On-Shore Gas Production;Fugitives: Other;; |
| 2310021509 | NGAS | 5. Fugitives | TOOL | PRODUCTION | Industrial Processes;Oil and Gas Exploration and Production;On-Shore Gas Production;Fugitives: All Processes;; |
| 2310021601 | NGAS | 2. Well Completions | TOOL | EXPLORATION | Industrial Processes;Oil and Gas Exploration and Production;On-Shore Gas Production;Gas Well Venting - Initial Completions;; |
| 2310023000 | CBM | 6. Pneumatic Pumps | TOOL | PRODUCTION | Industrial Processes;Oil and Gas Exploration and Production;Coal Bed Methane Natural Gas;Dewatering Pump Engines;; |
| 2310023010 | CBM | 1. Storage Tanks | TOOL | PRODUCTION | Industrial Processes;Oil and Gas Exploration and Production;Coal Bed Methane Natural Gas;Storage Tanks: Condensate;; |
| 2310023300 | CBM | 3. Pnuematic controllers: not high or low bleed | TOOL | PRODUCTION | Industrial Processes;Oil and Gas Exploration and Production;Coal Bed Methane Natural Gas;Pneumatic Devices;; |
| 2310023310 | CBM | 6. Pneumatic Pumps | TOOL | PRODUCTION | Industrial Processes;Oil and Gas Exploration and Production;Coal Bed Methane Natural Gas;Pneumatic Pumps;; |
| 2310023509 | CBM | 5. Fugitives | TOOL | PRODUCTION | Industrial Processes;Oil and Gas Exploration and Production;Coal Bed Methane Natural Gas;Fugitives;; |
| 2310023511 | CBM | 5. Fugitives | TOOL | PRODUCTION | Industrial Processes;Oil and Gas Exploration and Production;Coal Bed Methane Natural Gas;Fugitives: Connectors;; |
| 2310023512 | CBM | 5. Fugitives | TOOL | PRODUCTION | Industrial Processes;Oil and Gas Exploration and Production;Coal Bed Methane Natural Gas;Fugitives: Flanges;; |

| SCC | PRODUCT | OG_NSPS_SCC | TOOL OR STATE | SRC_CAT | SCC_Description |
|---|---|---|---|---|---|
| 2310023513 | CBM | 5. Fugitives | TOOL | PRODUCTION | Industrial Processes;Oil and Gas Exploration and Production;Coal Bed Methane Natural Gas;Fugitives: Open Ended Lines;; |
| 2310023515 | CBM | 5. Fugitives | TOOL | PRODUCTION | Industrial Processes;Oil and Gas Exploration and Production;Coal Bed Methane Natural Gas;Fugitives: Valves;; |
| 2310023516 | CBM | 5. Fugitives | TOOL | PRODUCTION | Industrial Processes;Oil and Gas Exploration and Production;Coal Bed Methane Natural Gas;Fugitives: Other;; |
| 2310023600 | CBM | 2. Well Completions | TOOL | EXPLORATION | Industrial Processes;Oil and Gas Exploration and Production;Coal Bed Methane Natural Gas;CBM Well Completion: All Processes;; |
| 2310030220 | NGAS | 1. Storage Tanks | TOOL | PRODUCTION | Industrial Processes;Oil and Gas Exploration and Production;Natural Gas Liquids;Gas Well Tanks - Flashing & Standing/Working/Breathing, Controlled;; |
| 2310030300 | NGAS | 1. Storage Tanks | TOOL | PRODUCTION | Industrial Processes;Oil and Gas Exploration and Production;Natural Gas Liquids;Gas Well Water Tank Losses;; |
| 2310111401 | OIL | 6. Pneumatic Pumps | TOOL | PRODUCTION | Industrial Processes;Oil and Gas Exploration and Production;On-Shore Oil Exploration;Oil Well Pneumatic Pumps;; |
| 2310111700 | OIL | 2. Well Completions | TOOL | EXPLORATION | Industrial Processes;Oil and Gas Exploration and Production;On-Shore Oil Exploration;Oil Well Completion: All Processes;; |
| 2310121401 | NGAS | 6. Pneumatic Pumps | TOOL | PRODUCTION | Industrial Processes;Oil and Gas Exploration and Production;On-Shore Gas Exploration;Gas Well Pneumatic Pumps;; |
| 2310121700 | NGAS | 2. Well Completions | TOOL | EXPLORATION | Industrial Processes;Oil and Gas Exploration and Production;On-Shore Gas Exploration;Gas Well Completion: All Processes;; |
| 2310321010 | NGAS | 1. Storage Tanks | STATE | PRODUCTION | Industrial Processes;Oil and Gas Exploration and Production;On-Shore Gas Production - Conventional;Storage Tanks: Condensate;; |
| 2310421010 | NGAS | 1. Storage Tanks | STATE | PRODUCTION | Industrial Processes;Oil and Gas Exploration and Production;On-Shore Gas Production - Unconventional;Storage Tanks: Condensate;; |

**Table 4-20. Emissions reductions for np_oilgas sector due to application of Oil and Gas NSPS**

| year | poll | 2016v3 | 2016 pre-CoST emissions | emissions change from 2016 | % change |
|---|---|---|---|---|---|
| 2023 | VOC | | 2543889 | 2591022 | -666598 | -25.7% |
| 2026 | VOC | | 2543889 | 2591022 | -721370 | -27.8% |

**Table 4-21. Point source SCCs in pt_oilgas sector where Oil and Gas NSPS controls were applied**

| SCC | GAS or OIL | OG_NSPS_SCC | TOOL OR STATE | SRC_CAT | NP_PT_NPPT | SCC_Description |
|---|---|---|---|---|---|---|
| 30180010 | NGAS | 4. Compressor Seals | STATE | PRODUCTION | PT | Industrial Processes;Chemical Manufacturing;Equipment Leaks;Compressor Seals: Gas Stream;; |
| 30600801 | OIL | 5. Fugitives | STATE | PRODUCTION | PT | Industrial Processes;Petroleum Industry;Fugitive Emissions;Pipeline Valves and Flanges;; |

| SCC | GAS or OIL | OG_NSPS_SCC | TOOL OR STATE | SRC_CAT | NP_PT_NPPT | SCC_Description |
|---|---|---|---|---|---|---|
| 30600802 | OIL | 5. Fugitives | STATE | PRODUCTION | PT | Industrial Processes;Petroleum Industry;Fugitive Emissions;Vessel Relief Valves;; |
| 30600803 | OIL | 5. Fugitives | STATE | PRODUCTION | PT | Industrial Processes;Petroleum Industry;Fugitive Emissions;Pump Seals w/o Controls;; |
| 30600804 | OIL | 4. Compressor Seals | STATE | PRODUCTION | PT | Industrial Processes;Petroleum Industry;Fugitive Emissions;Compressor Seals;; |
| 30600805 | OIL | 5. Fugitives | STATE | PRODUCTION | PT | Industrial Processes;Petroleum Industry;Fugitive Emissions;Miscellaneous: Sampling/Non-Asphalt Blowing/Purging/etc.;; |
| 30600806 | OIL | 5. Fugitives | STATE | PRODUCTION | PT | Industrial Processes;Petroleum Industry;Fugitive Emissions;Pump Seals with Controls;; |
| 30600811 | OIL | 5. Fugitives | STATE | PRODUCTION | PT | Industrial Processes;Petroleum Industry;Fugitive Emissions;Pipeline Valves: Gas Streams;; |
| 30600812 | OIL | 5. Fugitives | STATE | PRODUCTION | PT | Industrial Processes;Petroleum Industry;Fugitive Emissions;Pipeline Valves: Light Liquid/Gas Streams;; |
| 30600813 | OIL | 5. Fugitives | STATE | PRODUCTION | PT | Industrial Processes;Petroleum Industry;Fugitive Emissions;Pipeline Valves: Heavy Liquid Streams;; |
| 30600815 | OIL | 5. Fugitives | STATE | PRODUCTION | PT | Industrial Processes;Petroleum Industry;Fugitive Emissions;Open-ended Valves: All Streams;; |
| 30600816 | OIL | 5. Fugitives | STATE | PRODUCTION | PT | Industrial Processes;Petroleum Industry;Fugitive Emissions;Flanges: All Streams;; |
| 30600817 | OIL | 5. Fugitives | STATE | PRODUCTION | PT | Industrial Processes;Petroleum Industry;Fugitive Emissions;Pump Seals: Light Liquid/Gas Streams;; |
| 30600818 | OIL | 5. Fugitives | STATE | PRODUCTION | PT | Industrial Processes;Petroleum Industry;Fugitive Emissions;Pump Seals: Heavy Liquid Streams;; |
| 30600819 | OIL | 4. Compressor Seals | STATE | PRODUCTION | PT | Industrial Processes;Petroleum Industry;Fugitive Emissions;Compressor Seals: Gas Streams;; |
| 30600820 | OIL | 4. Compressor Seals | STATE | PRODUCTION | PT | Industrial Processes;Petroleum Industry;Fugitive Emissions;Compressor Seals: Heavy Liquid Streams;; |
| 30600822 | OIL | 5. Fugitives | STATE | PRODUCTION | PT | Industrial Processes;Petroleum Industry;Fugitive Emissions;Vessel Relief Valves: All Streams;; |
| 30688801 | OIL | 5. Fugitives | STATE | PRODUCTION | PT | Industrial Processes;Petroleum Industry;Fugitive Emissions;Specify in Comments Field;; |
| 31000101 | OIL | 2. Well Completions | STATE | EXPLORATION | PT | Industrial Processes;Oil and Gas Production;Crude Oil Production;Well Completion;; |
| 31000130 | OIL | 4. Compressor Seals | STATE | PRODUCTION | PT | Industrial Processes;Oil and Gas Production;Crude Oil Production;Fugitives: Compressor Seals;; |
| 31000151 | OIL | 3. Pnuematic controllers: high or low bleed | STATE | PRODUCTION | PT | Industrial Processes;Oil and Gas Production;Crude Oil Production;Pneumatic Controllers, Low Bleed;; |
| 31000152 | OIL | 3. Pnuematic controllers: high or low bleed | STATE | PRODUCTION | PT | Industrial Processes;Oil and Gas Production;Crude Oil Production;Pneumatic Controllers High Bleed >6 scfh;; |
| 31000153 | OIL | 3. Pnuematic controllers: not high or low bleed | STATE | PRODUCTION | PT | Industrial Processes;Oil and Gas Production;Crude Oil Production;Pneumatic Controllers Intermittent Bleed;; |
| 31000207 | NGAS | 5. Fugitives | STATE | PRODUCTION | PT | Industrial Processes;Oil and Gas Production;Natural Gas Production;Valves: Fugitive Emissions;; |

| SCC | GAS or OIL | OG_NSPS_SCC | TOOL OR STATE | SRC_CAT | NP_PT_NPPT | SCC_Description |
|---|---|---|---|---|---|---|
| 31000220 | NGAS | 5. Fugitives | STATE | PRODUCTION | NP_AND_PT | Industrial Processes;Oil and Gas Production;Natural Gas Production;All Equipt Leak Fugitives (Valves, Flanges, Connections, Seals, Drains;; |
| 31000225 | NGAS | 4. Compressor Seals | STATE | PRODUCTION | PT | Industrial Processes;Oil and Gas Production;Natural Gas Production;Compressor Seals;; |
| 31000231 | NGAS | 5. Fugitives | STATE | PRODUCTION | PT | Industrial Processes;Oil and Gas Production;Natural Gas Production;Fugitives: Drains;; |
| 31000233 | NGAS | 3. Pnuematic controllers: high or low bleed | STATE | PRODUCTION | PT | Industrial Processes;Oil and Gas Production;Natural Gas Production;Pneumatic Controllers, Low Bleed;; |
| 31000235 | NGAS | 3. Pnuematic controllers: not high or low bleed | STATE | PRODUCTION | PT | Industrial Processes;Oil and Gas Production;Natural Gas Production;Pneumatic Controllers Intermittent Bleed;; |
| 31000309 | NGAS | 4. Compressor Seals | STATE | PRODUCTION | PT | Industrial Processes;Oil and Gas Production;Natural Gas Processing;Compressor Seals;; |
| 31000324 | NGAS | 3. Pnuematic controllers: high or low bleed | STATE | PRODUCTION | NP_AND_PT | Industrial Processes;Oil and Gas Production;Natural Gas Processing;Pneumatic Controllers Low Bleed;; |
| 31000325 | NGAS | 3. Pnuematic controllers: high or low bleed | STATE | PRODUCTION | NP_AND_PT | Industrial Processes;Oil and Gas Production;Natural Gas Processing;Pneumatic Controllers, High Bleed >6 scfh;; |
| 31000326 | NGAS | 3. Pnuematic controllers: not high or low bleed | STATE | PRODUCTION | PT | Industrial Processes;Oil and Gas Production;Natural Gas Processing;Pneumatic Controllers Intermittent Bleed;; |
| 31000506 | OIL | 1. Storage Tanks | STATE | PRODUCTION | PT | Industrial Processes;Oil and Gas Production;Liquid Waste Treatment;Oil-Water Separation Wastewater Holding Tanks;; |
| 31088801 | BOTH | 5. Fugitives | STATE | PRODUCTION | PT | Industrial Processes;Oil and Gas Production;Fugitive Emissions;Specify in Comments Field;; |
| 31088811 | BOTH | 5. Fugitives | STATE | PRODUCTION | NP_AND_PT | Industrial Processes;Oil and Gas Production;Fugitive Emissions;Fugitive Emissions;; |
| 31700101 | NGAS | 3. Pnuematic controllers: high or low bleed | STATE | PRODUCTION | PT | Industrial Processes;NGTS;Natural Gas Transmission and Storage Facilities;Pneumatic Controllers Low Bleed;; |
| 39090001 | OIL | 1. Storage Tanks | STATE | PRODUCTION | PT | Industrial Processes;In-process Fuel Use;Fuel Storage - Fixed Roof Tanks;Residual Oil: Breathing Loss;; |
| 39090002 | OIL | 1. Storage Tanks | STATE | PRODUCTION | PT | Industrial Processes;In-process Fuel Use;Fuel Storage - Fixed Roof Tanks;Residual Oil: Working Loss;; |
| 39090003 | OIL | 1. Storage Tanks | STATE | PRODUCTION | PT | Industrial Processes;In-process Fuel Use;Fuel Storage - Fixed Roof Tanks;Distillate Oil (No. 2): Breathing Loss;; |

| SCC | GAS or OIL | OG_NSPS_SCC | TOOL OR STATE | SRC_CAT | NP_PT_NPPT | SCC_Description |
|---|---|---|---|---|---|---|
| 39090004 | OIL | 1. Storage Tanks | STATE | PRODUCTION | PT | Industrial Processes;In-process Fuel Use;Fuel Storage - Fixed Roof Tanks;Distillate Oil (No. 2): Working Loss;; |
| 39090005 | OIL | 1. Storage Tanks | STATE | PRODUCTION | PT | Industrial Processes;In-process Fuel Use;Fuel Storage - Fixed Roof Tanks;Oil No. 6: Breathing Loss;; |
| 39090006 | OIL | 1. Storage Tanks | STATE | PRODUCTION | PT | Industrial Processes;In-process Fuel Use;Fuel Storage - Fixed Roof Tanks;Oil No. 6: Working Loss;; |
| 39090007 | OIL | 1. Storage Tanks | STATE | PRODUCTION | PT | Industrial Processes;In-process Fuel Use;Fuel Storage - Fixed Roof Tanks;Methanol: Breathing Loss;; |
| 39090008 | OIL | 1. Storage Tanks | STATE | PRODUCTION | PT | Industrial Processes;In-process Fuel Use;Fuel Storage - Fixed Roof Tanks;Methanol: Working Loss;; |
| 39090009 | OIL | 1. Storage Tanks | STATE | PRODUCTION | PT | Industrial Processes;In-process Fuel Use;Fuel Storage - Fixed Roof Tanks;Residual Oil/Crude Oil: Breathing Loss;; |
| 39090010 | OIL | 1. Storage Tanks | STATE | PRODUCTION | PT | Industrial Processes;In-process Fuel Use;Fuel Storage - Fixed Roof Tanks;Residual Oil/Crude Oil: Working Loss;; |
| 39090012 | OIL | 1. Storage Tanks | STATE | PRODUCTION | PT | Industrial Processes;In-process Fuel Use;Fuel Storage - Fixed Roof Tanks;Dual Fuel (Gas/Oil): Working Loss;; |
| 40301001 | OIL | 1. Storage Tanks | STATE | PRODUCTION | PT | Chemical Evaporation;Petroleum Product Storage at Refineries;Fixed Roof Tanks (Varying Sizes);Gasoline RVP 13: Breathing Loss (67000 Bbl. Tank Size);; |
| 40301002 | OIL | 1. Storage Tanks | STATE | PRODUCTION | PT | Chemical Evaporation;Petroleum Product Storage at Refineries;Fixed Roof Tanks (Varying Sizes);Gasoline RVP 10: Breathing Loss (67000 Bbl. Tank Size);; |
| 40301003 | OIL | 1. Storage Tanks | STATE | PRODUCTION | PT | Chemical Evaporation;Petroleum Product Storage at Refineries;Fixed Roof Tanks (Varying Sizes);Gasoline RVP 7: Breathing Loss (67000 Bbl. Tank Size);; |
| 40301004 | OIL | 1. Storage Tanks | STATE | PRODUCTION | PT | Chemical Evaporation;Petroleum Product Storage at Refineries;Fixed Roof Tanks (Varying Sizes);Gasoline RVP 13: Breathing Loss (250000 Bbl. Tank Size);; |
| 40301005 | OIL | 1. Storage Tanks | STATE | PRODUCTION | PT | Chemical Evaporation;Petroleum Product Storage at Refineries;Fixed Roof Tanks (Varying Sizes);Gasoline RVP 10: Breathing Loss (250000 Bbl. Tank Size);; |
| 40301007 | OIL | 1. Storage Tanks | STATE | PRODUCTION | PT | Chemical Evaporation;Petroleum Product Storage at Refineries;Fixed Roof Tanks (Varying Sizes);Gasoline RVP 13: Working Loss (Tank Diameter Independent);; |
| 40301008 | OIL | 1. Storage Tanks | STATE | PRODUCTION | PT | Chemical Evaporation;Petroleum Product Storage at Refineries;Fixed Roof Tanks (Varying Sizes);Gasoline RVP 10: Working Loss (Tank Diameter Independent);; |
| 40301009 | OIL | 1. Storage Tanks | STATE | PRODUCTION | PT | Chemical Evaporation;Petroleum Product Storage at Refineries;Fixed Roof Tanks (Varying Sizes);Gasoline RVP 7: Working Loss (Tank Diameter Independent);; |
| 40301010 | OIL | 1. Storage Tanks | STATE | PRODUCTION | PT | Chemical Evaporation;Petroleum Product Storage at Refineries;Fixed Roof Tanks (Varying Sizes);Crude Oil RVP 5: Breathing Loss (67000 Bbl. Tank Size);; |

| SCC | GAS or OIL | OG_NSPS_SCC | TOOL OR STATE | SRC_CAT | NP_PT_NPPT | SCC_Description |
|---|---|---|---|---|---|---|
| 40301011 | OIL | 1. Storage Tanks | STATE | PRODUCTION | PT | Chemical Evaporation;Petroleum Product Storage at Refineries;Fixed Roof Tanks (Varying Sizes);Crude Oil RVP 5: Breathing Loss (250000 Bbl. Tank Size);; |
| 40301012 | OIL | 1. Storage Tanks | STATE | PRODUCTION | PT | Chemical Evaporation;Petroleum Product Storage at Refineries;Fixed Roof Tanks (Varying Sizes);Crude Oil RVP 5: Working Loss (Tank Diameter Independent);; |
| 40301013 | OIL | 1. Storage Tanks | STATE | PRODUCTION | PT | Chemical Evaporation;Petroleum Product Storage at Refineries;Fixed Roof Tanks (Varying Sizes);Jet Naphtha (JP-4): Breathing Loss (67000 Bbl. Tank Size);; |
| 40301015 | OIL | 1. Storage Tanks | STATE | PRODUCTION | PT | Chemical Evaporation;Petroleum Product Storage at Refineries;Fixed Roof Tanks (Varying Sizes);Jet Naphtha (JP-4): Working Loss (Tank Diameter Independent);; |
| 40301019 | OIL | 1. Storage Tanks | STATE | PRODUCTION | PT | Chemical Evaporation;Petroleum Product Storage at Refineries;Fixed Roof Tanks (Varying Sizes);Distillate Fuel #2: Breathing Loss (67000 Bbl. Tank Size);; |
| 40301021 | OIL | 1. Storage Tanks | STATE | PRODUCTION | PT | Chemical Evaporation;Petroleum Product Storage at Refineries;Fixed Roof Tanks (Varying Sizes);Distillate Fuel #2: Working Loss (Tank Diameter Independent);; |
| 40301065 | OIL | 1. Storage Tanks | STATE | PRODUCTION | PT | Chemical Evaporation;Petroleum Product Storage at Refineries;Fixed Roof Tanks (Varying Sizes);Grade 6 Fuel Oil: Breathing Loss (250000 Bbl. Tank Size);; |
| 40301075 | OIL | 1. Storage Tanks | STATE | PRODUCTION | PT | Chemical Evaporation;Petroleum Product Storage at Refineries;Fixed Roof Tanks (Varying Sizes);Grade 6 Fuel Oil: Working Loss (Independent Tank Diameter);; |
| 40301079 | OIL | 1. Storage Tanks | STATE | PRODUCTION | PT | Chemical Evaporation;Petroleum Product Storage at Refineries;Fixed Roof Tanks (Varying Sizes);Grade 1 Fuel Oil: Working Loss (Independent Tank Diameter);; |
| 40301097 | OIL | 1. Storage Tanks | STATE | PRODUCTION | PT | Chemical Evaporation;Petroleum Product Storage at Refineries;Fixed Roof Tanks (Varying Sizes);Other Liquids: Breathing Loss (67000 Bbl. Tank Size);; |
| 40301098 | OIL | 1. Storage Tanks | STATE | PRODUCTION | PT | Chemical Evaporation;Petroleum Product Storage at Refineries;Fixed Roof Tanks (Varying Sizes);Other Liquids: Breathing Loss (250000 Bbl. Tank Size);; |
| 40301099 | OIL | 1. Storage Tanks | STATE | PRODUCTION | PT | Chemical Evaporation;Petroleum Product Storage at Refineries;Fixed Roof Tanks (Varying Sizes);Other Liquids: Working Loss (Tank Diameter Independent);; |
| 40388801 | OIL | 5. Fugitives | STATE | PRODUCTION | PT | Chemical Evaporation;Petroleum Product Storage at Refineries;Fugitive Emissions;General;; |
| 40400300 | OIL | 1. Storage Tanks | STATE | PRODUCTION | PT | Chemical Evaporation;Petroleum Liquids Storage (non-Refinery);Oil and Gas Field Storage and Working Tanks;Fixed Roof Tank: Flashing Loss;; |
| 40400301 | OIL | 1. Storage Tanks | STATE | PRODUCTION | PT | Chemical Evaporation;Petroleum Liquids Storage (non-Refinery);Oil and Gas Field Storage and Working Tanks;Fixed Roof Tank: Breathing Loss;; |
| 40400302 | OIL | 1. Storage Tanks | STATE | PRODUCTION | PT | Chemical Evaporation;Petroleum Liquids Storage (non-Refinery);Oil and Gas Field Storage and Working Tanks;Fixed Roof Tank: Working Loss;; |
| 40400311 | OIL | 1. Storage Tanks | STATE | PRODUCTION | NP_AND PT | Chemical Evaporation;Petroleum Liquids Storage (non-Refinery);Oil and Gas Field Storage and |

| SCC | GAS or OIL | OG_NSPS_SCC | TOOL OR STATE | SRC_CAT | NP_PT_NPPT | SCC_Description |
|---|---|---|---|---|---|---|
| | | | | | | Working Tanks;Fixed Roof Tank, Condensate, working+breathing+flashing losses;; |
| 40400312 | OIL | 1. Storage Tanks | STATE | PRODUCTION | NP_AND_PT | Chemical Evaporation;Petroleum Liquids Storage (non-Refinery);Oil and Gas Field Storage and Working Tanks;Fixed Roof Tank, Crude Oil, working+breathing+flashing losses;; |
| 40400313 | OIL | 1. Storage Tanks | STATE | PRODUCTION | PT | Chemical Evaporation;Petroleum Liquids Storage (non-Refinery);Oil and Gas Field Storage and Working Tanks;Fixed Roof Tank, Lube Oil, working+breathing+flashing losses;; |
| 40400314 | OIL | 1. Storage Tanks | STATE | PRODUCTION | PT | Chemical Evaporation;Petroleum Liquids Storage (non-Refinery);Oil and Gas Field Storage and Working Tanks;Fixed Roof Tank, Specialty Chem-working+breathing+flashing;; |
| 40400315 | OIL | 1. Storage Tanks | STATE | PRODUCTION | PT | Chemical Evaporation;Petroleum Liquids Storage (non-Refinery);Oil and Gas Field Storage and Working Tanks;Fixed Roof Tank, Produced Water, working+breathing+flashing;; |
| 40400316 | OIL | 1. Storage Tanks | STATE | PRODUCTION | PT | Chemical Evaporation;Petroleum Liquids Storage (non-Refinery);Oil and Gas Field Storage and Working Tanks;Fixed Roof Tank, Diesel, working+breathing+flashing losses;; |
| 40701613 | OIL | 1. Storage Tanks | STATE | PRODUCTION | PT | Chemical Evaporation;Organic Chemical Storage;Fixed Roof Tanks - Alkanes (Paraffins);Petroleum Distillate: Breathing Loss;; |
| 40701614 | OIL | 1. Storage Tanks | STATE | PRODUCTION | PT | Chemical Evaporation;Organic Chemical Storage;Fixed Roof Tanks - Alkanes (Paraffins);Petroleum Distillate: Working Loss;; |

**Table 4-22. VOC reductions (tons/year) for the pt_oilgas sector after application of the Oil and Gas NSPS CONTROL packet for both analytic years 2023 and 2026**

| Year | Pollutant | 2016v3 | Emissions Reductions | % change |
|---|---|---|---|---|
| 2023 | VOC | 240,361 | -19,141 | -8.0% |
| 2026 | VOC | 240,361 | -22,628 | -9.4% |

### 4.2.4.2    RICE NSPS (nonpt, ptnonipm, np_oilgas, pt_oilgas)

Packets:

    CONTROL_2016_2023_RICE_NSPS_nonpt_ptnonipm_beta_platform_extended_10sep2019_v0
    Control_2016_2023_RICE_NSPS_pt_oilgas_v3_platform_24aug2022_v0
    Control_2016_2023_RICE_NSPS_np_oilgas_v3_platform_23aug2022_v0
    Control_2016_2026_RICE_NSPS_nonpt_v2_platform_16jul2021_v0
    Control_2016_2026_RICE_NSPS_pt_oilgas_v3_platform_24aug2022_v0
    Control_2016_2026_RICE_NSPS_np_oilgas_v3_platform_23aug2022_v0
    Control_2023_2026interp_RICE_NSPS_ptnonipm_v2_platform_MARAMA_22jul2021_v0
    Control_2023_2026interp_RICE_NSPS_ptnonipm_v2_platform_noMARAMA_22jul2021_v0

Multiple sectors are affected by the RICE NSPS controls. The packet names include the sectors to which the specific packet applies. For the ptnonipm sector, 2023 packets for RICE NSPS were not needed for ptnonipm due to the approach in 2016v3 that used year 2019 non-EGU point source emissions for 2023.

The 2026 packets for ptnonipm and nonpt were developed by interpolating between the 2016v1 packets for 2023 and 2028.

For the pt_oilgas and np_oilgas sectors, year-specific RICE NSPS factors were generated for 2023 and 2026.  New growth factors based on AEO2022 and state-specific production data were calculated for the oil and gas sectors which were included in the calculation of the new RICE NSPS control factors, although the actual control efficiency calculation methodology did not change from 2016v2 to 2016v3. For RICE NSPS controls, the EPA emission requirements for stationary engines differ according to whether the engine is new or existing, whether the engine is located at an area source or major source, and whether the engine is a compression ignition or a spark ignition engine.  Spark ignition engines are further subdivided by power cycle, two-stroke versus four-stroke, and whether the engine is rich burn or lean burn.  The NSPS reduction was applied for lean burn, rich burn and "combined" engines using Equation 4-2 and information listed in Table 4-18.  Table 4-23, Table 4-24, and Table 4-28 list the SCCs for which RICE NSPS controls were applied for the 2016v3 platform. Table 4-25, Table 4-26, Table 4-27 and Table 4-29 show the reductions in emissions in the nonpoint, ptnonipm, and point and nonpoint oil and gas sectors after the application of the RICE NSPS CONTROL packet for the analytic years. Note that for nonpoint oil and gas, VOC reductions were only appropriate in the state of Pennsylvania.

Based on a state comment, the NOx emissions for facility 7667111 (Transcontinental Gas Pipeline – Station) in Virginia were further reduced to 70 tons per year following the applications of other controls.

**Table 4-23. SCCs and Engine Types where RICE NSPS controls applied for nonpt and ptnonipm**

| SCC | Lean, Rich, or Combined | SCCDESC |
|---|---|---|
| 20200202 | Combined | Internal Combustion Engines; Industrial; Natural Gas; Reciprocating |
| 20200253 | Rich | Internal Combustion Engines; Industrial; Natural Gas; 4-cycle Rich Burn |
| 20200254 | Lean | Internal Combustion Engines; Industrial; Natural Gas; 4-cycle Lean Burn |
| 20200256 | Lean | Internal Combustion Engines; Industrial; Natural Gas; 4-cycle Clean Burn |
| 20300201 | Combined | Internal Combustion Engines; Commercial/Institutional; Natural Gas; Reciprocating |
| 2102006000 | Combined | Stationary Source Fuel Combustion; Industrial; Natural Gas; Total: Boilers and IC Engines |
| 2102006002 | Combined | Stationary Source Fuel Combustion; Industrial; Natural Gas; All IC Engine Types |
| 2103006000 | Combined | Stationary Source Fuel Combustion; Commercial/Institutional; Natural Gas; Total: Boilers and IC Engines |

**Table 4-24. Non-point Oil and Gas SCCs in 2016v3 modeling platform where RICE NSPS controls applied**

| SCC | Lean/ Rich/ Combined | Product | Source Category | SCC_Description |
|---|---|---|---|---|
| 2310000220 | Combined | BOTH | EXPLORATION | Industrial Processes;Oil and Gas Exploration and Production;All Processes;Drill Rigs;; |
| 2310000660 | Combined | BOTH | EXPLORATION | Industrial Processes;Oil and Gas Exploration and Production;All Processes;Hydraulic Fracturing Engines;; |
| 2310020600 | Combined | NGAS | PRODUCTION | Industrial Processes;Oil and Gas Exploration and Production;Natural Gas;Compressor Engines;; |

| SCC | Lean/ Rich/ Combined | Product | Source Category | SCC_Description |
|---|---|---|---|---|
| 2310021202 | Lean | NGAS | PRODUCTION | Industrial Processes;Oil and Gas Exploration and Production;On-Shore Gas Production;Natural Gas Fired 4Cycle Lean Burn Compressor Engines 50 To 499 HP;; |
| 2310021251 | Lean | NGAS | PRODUCTION | Industrial Processes;Oil and Gas Exploration and Production;On-Shore Gas Production;Lateral Compressors 4 Cycle Lean Burn;; |
| 2310021302 | Rich | NGAS | PRODUCTION | Industrial Processes;Oil and Gas Exploration and Production;On-Shore Gas Production;Natural Gas Fired 4Cycle Rich Burn Compressor Engines 50 To 499 HP;; |
| 2310021351 | Rich | NGAS | PRODUCTION | Industrial Processes;Oil and Gas Exploration and Production;On-Shore Gas Production;Lateral Compressors 4 Cycle Rich Burn;; |
| 2310023202 | Lean | CBM | PRODUCTION | Industrial Processes;Oil and Gas Exploration and Production;Coal Bed Methane Natural Gas;CBM Fired 4Cycle Lean Burn Compressor Engines 50 To 499 HP;; |
| 2310023251 | Lean | CBM | PRODUCTION | Industrial Processes;Oil and Gas Exploration and Production;Coal Bed Methane Natural Gas;Lateral Compressors 4 Cycle Lean Burn;; |
| 2310023302 | Rich | CBM | PRODUCTION | Industrial Processes;Oil and Gas Exploration and Production;Coal Bed Methane Natural Gas;CBM Fired 4Cycle Rich Burn Compressor Engines 50 To 499 HP;; |
| 2310023351 | Rich | CBM | PRODUCTION | Industrial Processes;Oil and Gas Exploration and Production;Coal Bed Methane Natural Gas;Lateral Compressors 4 Cycle Rich Burn;; |
| 2310300220 | Combined | NGAS | EXPLORATION | Industrial Processes;Oil and Gas Exploration and Production;All Processes - Conventional;Drill Rigs;; |
| 2310400220 | Combined | BOTH | EXPLORATION | Industrial Processes;Oil and Gas Exploration and Production;All Processes - Unconventional;Drill Rigs;; |

**Table 4-25. Nonpoint Emissions reductions after the application of the RICE NSPS**

| year | Poll | 2016v3 (tons) | Emissions reductions (tons) | % change |
|---|---|---|---|---|
| 2023 | CO | 1,939,947 | -20,440 | -1.1% |
| 2023 | NOX | 750,215 | -30,573 | -4.1% |
| 2026 | CO | 1,939,947 | -25,283 | -1.3% |
| 2026 | NOX | 750,215 | -38,855 | -5.2% |

**Table 4-26. Ptnonipm Emissions reductions after the application of the RICE NSPS**

| year | poll | 2023gf (tons) | Emissions reductions (tons) | % change |
|---|---|---|---|---|
| 2026 | CO | 1,359,690 | -85 | -0.01% |
| 2026 | NOX | 848,409 | -142 | -0.02% |
| 2026 | VOC | 759,289 | -0.5 | 0.00% |

**Table 4-27. Oil and Gas Emissions reductions for np_oilgas sector due to application of RICE NSPS**

| year | Poll | 2016v3 | 2016pre-CoST emissions | Emissions reduction | % change |
|------|------|--------|-----------------------|--------------------|----------|
| 2023 | CO | 765,734 | 767,969 | -93,051 | -12.1% |
| 2023 | NOX | 587,919 | 610,402 | -86,508 | -14.2% |
| 2023 | VOC | 2,543,889 | 2,591,022 | -463 | 0.0% |
| 2026 | CO | 765,734 | 767,969 | -105,028 | -13.7% |
| 2026 | NOX | 587,919 | 610,402 | -100,126 | -16.4% |
| 2026 | VOC | 2,543,889 | 2,591,022 | -513 | 0.0% |

**Table 4-28. Point source SCCs in pt_oilgas sector where RICE NSPS controls applied.**

| SCC | Lean, Rich, or Combined | SCCDESC |
|-----|------------------------|---------|
| 20200202 | Combined | Internal Combustion Engines; Industrial; Natural Gas; Reciprocating |
| 20200253 | Rich | Internal Combustion Engines; Industrial; Natural Gas;4-cycle Rich Burn |
| 20200254 | Lean | Internal Combustion Engines; Industrial; Natural Gas;4-cycle Lean Burn |
| 20200256 | Combined | Internal Combustion Engines; Industrial; Natural Gas;4-cycle Clean Burn |
| 20300201 | Combined | Internal Combustion Engines; Commercial/Institutional; Natural Gas; Reciprocating |
| 31000203 | Combined | Industrial Processes; Oil and Gas Production; Natural Gas Production; Compressors (See also 310003-12 and -13) |

**Table 4-29. Emissions reductions (tons/year) in pt_oilgas sector after the application of the RICE NSPS CONTROL packet for analytic years 2023 and 2026.**

| Year | Pollutant | 2016v3 | Emissions Reductions | % change |
|------|-----------|--------|---------------------|----------|
| 2023 | CO | 205,468 | -23,724 | -11.5% |
| 2023 | NOX | 414,623 | -58,080 | -14.0% |
| 2023 | VOC | 240,361 | -279 | -0.1% |
| 2026 | CO | 205,468 | -29,200 | -14.2% |
| 2026 | NOX | 414,623 | -69,120 | -16.7% |
| 2026 | VOC | 240,361 | -313 | -0.1% |

### 4.2.4.3   Fuel Sulfur Rules (nonpt, ptnonipm)

Packets:

    Control_2016_202X_MANEVU_Sulfur_fromMARAMA_v1_platform_22aug2022_nf_v1

The control packet for fuel sulfur rules is the same for all analytic years. Fuel sulfur rules controls are reflected for the following states: Connecticut, Maine, Massachusetts, New Hampshire, New Jersey, Rhode Island, and Vermont. The fuel limits for these states are incremental starting after year 2012, but are fully implemented by July 1, 2018, in these states.  The control packet representing these controls was updated by MARAMA for the 2016v1 platform. For 2016v3, states that had fully implemented their controls by 2017 were removed (namely Delaware, New York, and Pennsylvania) because 2017 NEI was used for nonpoint emissions.

Summaries of the sulfur rules by state, with emissions reductions relative to the entire sector emissions and relative to the analytic year emissions for the affected SCCs are provided in Table 4-30, which reflects the impacts of the MARAMA packet only, as these reductions are not estimated in non-MARAMA states. A negligible amount of reductions occur in the pt_oilgas sector. Note that ptnonipm sources are not impacted in 2016v3 platform since the starting point for the 2023 emissions was the 2019 NEI.

**Table 4-30. Summary of fuel sulfur rule impacts on nonpoint SO2 emissions for 2023**

| Pollutant | State | 2023 pre-control Emissions (tons) | 2023 post-control Emissions (tons) | Change in emissions (tons) | Percent change |
|---|---|---|---|---|---|
| NOX | Connecticut | 3,691 | 3,424 | -268 | -7.2% |
| NOX | Maine | 6,502 | 6,150 | -353 | -5.4% |
| NOX | Massachusetts | 9,391 | 8,887 | -504 | -5.4% |
| NOX | New Hampshire | 6,480 | 6,223 | -257 | -4.0% |
| NOX | Rhode Island | 879 | 814 | -65 | -7.4% |
| NOX | Vermont | 878 | 798 | -80 | -9.1% |
| NOX | **Six state total** | **27,822** | **26,296** | **-1,526** | **-5.5%** |
| SO2 | Connecticut | 1,412 | 82 | -1,330 | -94.2% |
| SO2 | Maine | 1,220 | 35 | -1,185 | -97.1% |
| SO2 | Massachusetts | 2,251 | 88 | -2,163 | -96.1% |
| SO2 | New Hampshire | 4,142 | 21 | -4,121 | -99.5% |
| SO2 | Rhode Island | 359 | 38 | -320 | -89.3% |
| SO2 | Vermont | 399 | 26 | -374 | -93.6% |
| SO2 | **Six state total** | **9,783** | **290** | **-9,493** | **-97.0%** |
| SO2 | **ALL state total** | **167,817** | **158,324** | **-9,493** | **-5.6%** |

### 4.2.4.4   Natural Gas Turbines NO$_X$ NSPS (ptnonipm, pt_oilgas)

Packets:
>    Control_2016_2023_NG_Turbines_NSPS_pt_oilgas_v3_platform_24aug2022_v0
>    Control_2023_2026interp_NG_Turbines_NSPS_ptnonipm_v2_platform_MARAMA_22jul2021_v0
>    Control_2023_2026interp_NG_Turbines_NSPS_ptnonipm_v2_platform_nonMARAMA_22jul2021_v0
>    Control_2016_2026_NG_Turbines_NSPS_pt_oilgas_v3_platform_24aug2022_v0

For ptnonipm, the packets for 2023 were reused from the 2016v1 platform; the packets for 2026 were interpolated between the 2023 and 2028 packets for the 2016v1 platform. For pt_oilgas, the packets for 2016v3 are based on updated growth information for that sector from state-historical production data and the AEO2022 production forecast database.   The new growth factors were to calculate the new control efficiencies for all analytic years (2023 and 2026).  The control efficiency calculation methodology did not change from 2016v2 to 2016v3 modeling platform.

Natural Gas Turbines NSPS controls were generated based on examination of emission limits for stationary combustion turbines that are not in the power sector.  In 2006, the EPA promulgated standards

of performance for new stationary combustion turbines in 40 CFR part 60, subpart KKKK. The standards reflect changes in NOx emission control technologies and turbine design since standards for these units were originally promulgated in 40 CFR part 60, subpart GG. The 2006 NSPSs affecting $NO_x$ and $SO_2$ were established at levels that bring the emission limits up-to-date with the performance of current combustion turbines. Stationary combustion turbines were also regulated by the NOx State Implementation Plan (SIP) Call, which required affected gas turbines to reduce their NOx emissions by 60 percent. Table 4-31 compares the 2006 NSPS emission limits with the $NO_x$ Reasonably Available Control Technology (RACT) regulations in selected states within the $NO_x$ SIP Call region. More information on the NOx SIP call is available at: https://www.epa.gov/csapr/final-update-nox-sip-call-regulations-emissions-monitoring-provisions-state-implementation. The state $NO_x$ RACT regulations summary (Pechan, 2001) is from a year 2001 analysis, so some states may have updated their rules since that time.

**Table 4-31. Stationary gas turbines NSPS analysis and resulting emission rates used to compute controls**

| NOx Emission Limits for New Stationary Combustion Turbines | | | |
|---|---|---|---|
| Firing Natural Gas | <50 MMBTU/hr | 50-850 MMBTU/hr | >850 MMBTU/hr | |
| Federal NSPS | 100 | 25 | 15 | Ppm |
| | | | | |
| State RACT Regulations | 5-100 MMBTU/hr | 100-250 MMBTU/hr | >250 MMBTU/hr | |
| Connecticut | 225 | 75 | 75 | Ppm |
| Delaware | 42 | 42 | 42 | Ppm |
| Massachusetts | 65* | 65 | 65 | Ppm |
| New Jersey | 50* | 50 | 50 | Ppm |
| New York | 50 | 50 | 50 | Ppm |
| New Hampshire | 55 | 55 | 55 | Ppm |
| * Only applies to 25-100 MMBTU/hr | | | | |
| Notes: The above state RACT table is from a 2001 analysis. The current NY State regulations have the same emission limits. | | | | |
| New source emission rate (Fn) | | | $NO_X$ ratio (Fn) | Control (%) |
| NOx SIP Call states plus CA | = 25 / 42 = | | 0.595 | 40.5% |
| Other states | = 25 / 105 = | | 0.238 | 76.2% |

For control factor development, the existing source emission ratio was set to 1.0 for combustion turbines. The new source emission ratio for the NOx SIP Call states and California is the ratio of state NOx emission limit to the Federal NSPS. A complicating factor in the above is the lack of size information in the stationary source SCCs. Plus, the size classifications in the NSPS do not match the size differentiation used in state air emission regulations. We accepted a simplifying assumption that most industrial applications of combustion turbines are in the 100-250 MMBtu/hr size range and computed the new source emission rates as the NSPS emission limit for 50-850 MMBtu/hr units divided by the state emission limits. We used a conservative new source emission ratio by using the lowest state emission limit of 42 ppmv (Delaware). This yields a new source emission ratio of 25/42, or 0.595 (40.5 percent reduction) for states with existing combustion turbine emission limits. States without existing turbine NOx limits would have a lower new source emission ratio: the uncontrolled emission rate (105 ppmv via

AP-42) divided into 25 ppmv = 0.238 (76.2 percent reduction).  This control was then plugged into Equation 4-2 as a function of the year-specific projection factor.  Also, Natural Gas Turbines control factors supplied by MARAMA were used within the MARAMA region for 2023 and 2026.

Table 4-32 and Table 4-34 list the point source SCCs where Natural Gas Turbines NSPS controls were applied for the 2016v1 platform. Table 4-33 and Table 4-35 show the reduction in NOx emissions after the application of the Natural Gas Turbines NSPS CONTROL packet to the analytic years. The values in Table 4-33 and Table 4-35 include emissions both inside and outside the MARAMA region.

**Table 4-32. Ptnonipm SCCs in 2016v1 modeling platform where Natural Gas Turbines NSPS controls applied**

| SCC | SCC Description |
|---|---|
| 20200201 | Internal Combustion Engines; Industrial; Natural Gas; Turbine |
| 20200203 | Internal Combustion Engines; Industrial; Natural Gas; Turbine: Cogeneration |
| 20200209 | Internal Combustion Engines; Industrial; Natural Gas; Turbine: Exhaust |
| 20200701 | Internal Combustion Engines; Industrial; Process Gas; Turbine |
| 20200714 | Internal Combustion Engines; Industrial; Process Gas; Turbine: Exhaust |
| 20300203 | Internal Combustion Engines; Commercial/Institutional; Natural Gas; Turbine: Cogeneration |

**Table 4-33. Ptnonipm emissions reductions after the application of the Natural Gas Turbines NSPS**

| year | Poll | 2023gf (tons) | emissions reduction (tons) | % change |
|---|---|---|---|---|
| 2026 | NOX | 848,409 | -334 | -0.04% |

**Table 4-34. Point source SCCs in pt_oilgas sector where Natural Gas Turbines NSPS control applied.**

| SCC | SCC description |
|---|---|
| 20200201 | Internal Combustion Engines; Industrial; Natural Gas; Turbine |
| 20200209 | Internal Combustion Engines; Industrial; Natural Gas; Turbine: Exhaust |
| 20300202 | Internal Combustion Engines; Commercial/Institutional; Natural Gas; Turbine |
| 20300209 | Internal Combustion Engines; Commercial/Institutional; Natural Gas; Turbine: Exhaust |
| 20200203 | Internal Combustion Engines; Industrial; Natural Gas; Turbine: Cogeneration |
| 20200714 | Internal Combustion Engines; Industrial; Process Gas; Turbine: Exhaust |
| 20300203 | Internal Combustion Engines; Commercial/Institutional; Natural Gas; Turbine: Cogeneration |

**Table 4-35. Emissions reductions (tons/year) for pt_oilgas after the application of the Natural Gas Turbines NSPS CONTROL packet for analytic years.**

| Year | Pollutant | 2016v3 | Emissions Reduction | % change |
|---|---|---|---|---|
| 2023 | NOX | 414,623 | -12,132 | -2.9% |
| 2026 | NOX | 414,623 | -13,648 | -3.3% |

### 4.2.4.5   Process Heaters NO$_x$ NSPS (ptnonipm, pt_oilgas)

Packets:

> Control_2023_2026interp_Process_Heaters_NSPS_ptnonipm_v2_platform_22jul2021_v0
> Control_2016_2023_Process_Heaters_NSPS_pt_oilgas_v3_platform_24aug2022_v0
> Control_2016_2026_Process_Heaters_NSPS_pt_oilgas_v3_platform_24aug2022_v0

For ptnonipm, no additional controls for process heaters were applied to the 2023 emissions; the packet for 2023 to 2026 was developed based on an interpolation between the 2023 and 2028 factors for the 2016v1 platform.  For pt_oilgas, the packets were newly developed for 2016v3 based on updated information.

Process heaters are used throughout refineries and chemical plants to raise the temperature of feed materials to meet reaction or distillation requirements.  Fuels are typically residual oil, distillate oil, refinery gas, or natural gas.  In some sense, process heaters can be considered as emission control devices because they can be used to control process streams by recovering the fuel value while destroying the VOC.  The criteria pollutants of most concern for process heaters are NO$_x$ and SO$_2$. In 2016, it is assumed that process heaters have not been subject to regional control programs like the NOx SIP Call, so most of the emission controls put in-place at refineries and chemical plants have resulted from RACT regulations that were implemented as part of SIPs to achieve ozone NAAQS in specific areas, and refinery consent decrees. The boiler/process heater NSPS established NOx emission limits for new and modified process heaters. These emission limits are displayed in Table 4-36.

**Table 4-36. Process Heaters NSPS analysis and 2016v1 new emission rates used to estimate controls**

| NO$_X$ emission rate Existing PPMV (=Fe) | Natural Draft (fraction) | Forced Draft (fraction) | Average |
|---|---|---|---|
| 80 | 0.4 | 0 | |
| 100 | 0.4 | 0.5 | |
| 150 | 0.15 | 0.35 | |
| 200 | 0.05 | 0.1 | |
| 240 | 0 | 0.05 | |
| **Cumulative, weighted (=Fe)** | 104.5 | 134.5 | 119.5 |
| NSPS Standard | 40 | 60 | |
| **New Source NO$_X$ ratio (=Fn)** | 0.383 | 0.446 | **0.414** |
| **NSPS Control (%)** | 61.7 | 55.4 | 58.6 |

For computations, the existing source emission ratio (Fe) was set to 1.0. The computed (average) NO$_x$ emission factor ratio for new sources (Fn) is 0.41 (58.6 percent control). The retirement rate is the inverse of the expected unit lifetime.  There is limited information in the literature about process heater lifetimes. This information was reviewed at the time that the Western Regional Air Partnership (WRAP) developed its initial regional haze program emission projections, and energy technology models used a 20-year lifetime for most refinery equipment.  However, it was noted that in practice, heaters would probably have a lifetime that was on the order of 50 percent above that estimate.  Therefore, a 30-year lifetime was used to estimate the effects of process heater growth and retirement.  This yields a 3.3 percent retirement rate. This control was then plugged into Equation 4-2 as a function of the year-specific projection factor. Table

4-37 and Table 4-39 list the point source SCCs where Process Heaters NSPS controls were applied for the 2016v1 platform. Table 4-38 and Table 4-40 show the reduction in NOx emissions after the application of the Process Heaters NSPS CONTROL packet for the analytic years.

**Table 4-37. Ptnonipm SCCs in 2016v1 modeling platform where Process Heaters NSPS controls applied.**

| SCC | SCC Description |
|-----|-----------------|
| 30190003 | Industrial Processes; Chemical Manufacturing; Fuel Fired Equipment; Process Heater: Natural Gas |
| 30190004 | Industrial Processes; Chemical Manufacturing; Fuel Fired Equipment; Process Heater: Process Gas |
| 30590002 | Industrial Processes; Mineral Products; Fuel Fired Equipment; Residual Oil: Process Heaters |
| 30590003 | Industrial Processes; Mineral Products; Fuel Fired Equipment; Natural Gas: Process Heaters |
| 30600101 | Industrial Processes; Petroleum Industry; Process Heaters; Oil-fired |
| 30600102 | Industrial Processes; Petroleum Industry; Process Heaters; Gas-fired |
| 30600103 | Industrial Processes; Petroleum Industry; Process Heaters; Oil |
| 30600104 | Industrial Processes; Petroleum Industry; Process Heaters; Gas-fired |
| 30600105 | Industrial Processes; Petroleum Industry; Process Heaters; Natural Gas-fired |
| 30600106 | Industrial Processes; Petroleum Industry; Process Heaters; Process Gas-fired |
| 30600107 | Industrial Processes; Petroleum Industry; Process Heaters; Liquified Petroleum Gas (LPG) |
| 30600199 | Industrial Processes; Petroleum Industry; Process Heaters; Other Not Classified |
| 30990003 | Industrial Processes; Fabricated Metal Products; Fuel Fired Equipment; Natural Gas: Process Heaters |
| 31000401 | Industrial Processes; Oil and Gas Production; Process Heaters; Distillate Oil (No. 2) |
| 31000402 | Industrial Processes; Oil and Gas Production; Process Heaters; Residual Oil |
| 31000403 | Industrial Processes; Oil and Gas Production; Process Heaters; Crude Oil |
| 31000404 | Industrial Processes; Oil and Gas Production; Process Heaters; Natural Gas |
| 31000405 | Industrial Processes; Oil and Gas Production; Process Heaters; Process Gas |
| 31000406 | Industrial Processes; Oil and Gas Production; Process Heaters; Propane/Butane |
| 31000413 | Industrial Processes; Oil and Gas Production; Process Heaters; Crude Oil: Steam Generators |
| 31000414 | Industrial Processes; Oil and Gas Production; Process Heaters; Natural Gas: Steam Generators |
| 31000415 | Industrial Processes; Oil and Gas Production; Process Heaters; Process Gas: Steam Generators |
| 39900501 | Industrial Processes; Miscellaneous Manufacturing Industries; Process Heater/Furnace; Distillate Oil |
| 39900601 | Industrial Processes; Miscellaneous Manufacturing Industries; Process Heater/Furnace; Natural Gas |
| 39990003 | Industrial Processes; Miscellaneous Manufacturing Industries; Miscellaneous Manufacturing Industries; Natural Gas: Process Heaters |

**Table 4-38. Ptnonipm emissions reductions after the application of the Process Heaters NSPS**

| year | pollutant | 2023gf (tons) | emissions reduction (tons) | % change |
|------|-----------|---------------|----------------------------|----------|
| 2026 | NOX | 848,409 | -2,202 | -0.3% |

**Table 4-39. Point source SCCs in pt_oilgas sector where Process Heaters NSPS controls were applied**

| SCC | SCC Description |
|-----|-----------------|
| 30190003 | Industrial Processes; Chemical Manufacturing; Fuel Fired Equipment; Process Heater: Natural Gas |
| 30600102 | Industrial Processes; Petroleum Industry; Process Heaters; Gas-fired |
| 30600104 | Industrial Processes; Petroleum Industry; Process Heaters; Gas-fired |
| 30600105 | Industrial Processes; Petroleum Industry; Process Heaters; Natural Gas-fired |
| 30600106 | Industrial Processes; Petroleum Industry; Process Heaters; Process Gas-fired |
| 30600199 | Industrial Processes; Petroleum Industry; Process Heaters; Other Not Classified |
| 30990003 | Industrial Processes; Fabricated Metal Products; Fuel Fired Equipment; Natural Gas: Process Heaters |
| 31000401 | Industrial Processes; Oil and Gas Production; Process Heaters; Distillate Oil (No. 2) |
| 31000402 | Industrial Processes; Oil and Gas Production; Process Heaters; Residual Oil |
| 31000403 | Industrial Processes; Oil and Gas Production; Process Heaters; Crude Oil |
| 31000404 | Industrial Processes; Oil and Gas Production; Process Heaters; Natural Gas |
| 31000405 | Industrial Processes; Oil and Gas Production; Process Heaters; Process Gas |
| 31000413 | Industrial Processes; Oil and Gas Production; Process Heaters; Crude Oil: Steam Generators |
| 31000414 | Industrial Processes; Oil and Gas Production; Process Heaters; Natural Gas: Steam Generators |
| 31000415 | Industrial Processes; Oil and Gas Production; Process Heaters; Process Gas: Steam Generators |
| 39900501 | Industrial Processes; Miscellaneous Manufacturing Industries; Process Heater/Furnace; Distillate Oil |
| 39900601 | Industrial Processes; Miscellaneous Manufacturing Industries; Process Heater/Furnace; Natural Gas |

**Table 4-40. NOx emissions reductions (tons/year) in pt_oilgas sector after the application of the Process Heaters NSPS CONTROL packet for analytics years.**

| Year | Pollutant | 2016v3 | Emissions Reduction | % change |
|------|-----------|--------|---------------------|----------|
| 2023 | NOX | 414,623 | -2,234 | -0.5% |
| 2026 | NOX | 414,623 | -2,520 | -0.6% |

### 4.2.4.6   Ozone Transport Commission Rules (nonpt, solvents)

Packets:

     Control_2016_202X_solvents_OTC_v3_platform_MARAMA_30jun2022_v0
     Control_2016_202X_nonpt_PFC_v1_platform_MARAMA_04oct2019_v1

Several MARAMA states have adopted rules reflecting the recommendations of the Ozone Transport Commission (OTC) for reducing VOC emissions from consumer products, architectural and industrial maintenance coatings, and various other solvents.  The rules affected 27 different SCCs in the surface coatings (2401xxxxxx), degreasing (2415000000), graphic arts (2425010000), miscellaneous industrial (2440020000), and miscellaneous non-industrial consumer and commercial (246xxxxxxx) categories. The packet applies only to MARAMA states and not all states adopted all rules. This packet applies to emissions in the new solvents sector. The new SCCs in the solvents sector were added to the packet.

The OTC also developed a model rule to address VOC emissions from portable fuel containers (PFCs) via performance standards and phased-in PFC replacement that was implemented in two phases.  Some states adopted one or both phases of the OTC rule, while others relied on the Federal rule.  MARAMA calculated control factors to reflect each state's compliance dates and, where states implemented one or both phases of the OTC requirements prior to the Federal mandate, accounted for the early reductions in the control factors.  The rules affected permeation, evaporation, spillage, and vapor displacement for residential (2501011xxx) and commercial (2501012xxx) portable gas can SCCs. This packet applies to the nonpt sector.

MARAMA provided control packets to apply the solvent and PFC rule controls. The 2016v1 PFC packet is reused and the same for all years.  For 2016v3, the OTC solvents packet was updated to include new controls in Delaware and New York based on comments from those states.

## 4.3     Projections Computed Outside of CoST

Projections for sectors not calculated using CoST are discussed in this section.

### 4.3.1 Nonroad Mobile Equipment Sources (nonroad)

Outside of California and Texas, the MOVES3 model was run separately for each analytic year, including 2023 and 2026, resulting in a separate inventory for each year. The fuels used are specific to each analytic year, but the meteorological data represented the year 2016. The 2023 and 2026 nonroad emissions include all nonroad control programs finalized as of the date of the MOVES3.0.0 release, including most recently:

- Emissions Standards for New Nonroad Spark-Ignition Engines, Equipment, and Vessels: October 2008 (https://www.epa.gov/regulations-emissions-vehicles-and-engines/final-rule-control-emissions-nonroad-spark-ignition);

- Growth and control from Locomotives and Marine Compression-Ignition Engines Less than 30 Liters per Cylinder: March 2008 (https://www.epa.gov/regulations-emissions-vehicles-and-engines/final-rule-control-emissions-air-pollution-locomotive); and

- Clean Air Nonroad Diesel Final Rule – Tier 4: May 2004  (https://www.epa.gov/regulations-emissions-vehicles-and-engines/final-rule-control-emissions-air-pollution-nonroad-diesel).

The resulting analytic year inventories were processed into the format needed by SMOKE in the same way as the base year emissions.

Inside California and Texas, CARB and TCEQ provided separate datasets for various analytic years. For 2016v3, CARB provided new nonroad inventories for 2023 and 2026. The TCEQ inventories from 2016v1 and 2016v2 were reused in 2016v3, including a 2023 dataset, and a 2026 dataset interpolated from TCEQ-provided 2023 and 2028 inventories. VOC and $PM_{2.5}$ by speciation profile, and VOC HAPs, were added to all analytic year California and Texas nonroad inventories using the same procedure as for the 2016 inventory, but based on the analytic year MOVES runs instead of the 2016 MOVES run.

## 4.3.2 Onroad Mobile Sources (onroad)

For 2016v2, MOVES3 was run separately for 2023 and 2026, resulting in separate emission factors for each year. The 2023 and 2026 onroad emission factors account for changes in activity data and the impact of on-the-books rules that are implemented into MOVES3. These include regulations such as:

- Safer Affordable Fuel Efficient (SAFE) Vehicles Final Rule for Model Years 2021-2026 (March 2020);

- Greenhouse Gas Emissions Standards and Fuel Efficiency Standards for Medium- and Heavy-Duty Engines and Vehicles – Phase 2 (October 2016);

- Tier 3 Vehicle Emission and Fuel Standards Program (March 2014) (https://www.epa.gov/regulations-emissions-vehicles-and-engines/final-rule-control-air-pollution-motor-vehicles-tier-3);

- 2017 and Later Model Year Light-Duty Vehicle GHG Emissions and Corporate Average Fuel Economy Standards (October 2012);

- Greenhouse Gas Emissions Standards and Fuel Efficiency Standards for Medium- and Heavy-Duty Engines and Vehicles (September 2011);

- Regulation of Fuels and Fuel Additives: Modifications to Renewable Fuel Standard Program (RFS2) (December 2010); and

- Light-Duty Vehicle Greenhouse Gas Emission Standards and Corporate Average Fuel Economy Standards Final Rule for Model-Year 2012-2016 (May 2010).

Local inspection and maintenance (I/M) and other onroad mobile programs are included such as: California LEVIII, the National Low Emissions Vehicle (LEV) and Ozone Transport Commission (OTC); LEV regulations, local fuel programs, and Stage II refueling control programs. Note that MOVES3 emission rates for model years 2017 and beyond are equivalent to CA LEVIII rates for NOx and VOC. Therefore, it was not necessary to update the rates used for states that have adopted the rules in the 2020s. The emission factors used for 2016v2 and 2016v3 were the same except for combination long haul trucks. For 2016v3, MOVES3 was run for combination long haul trucks only for 2023 and 2026 using an updated age distribution and the resulting emission factors were used.  For 2016v3, representative county assignments were adjusted in three North Carolina counties (Lee, Onslow, and Rockingham) to reflect changes in inspection and maintenance programs in those counties.  Also, to reflect changes in inspection and maintenance programs in Tennessee, MOVES was rerun for three representative counties in that state (Davidson, Hamilton, and Rutherford).

The fuels used are specific to each analytic year, the age distributions were projected to the analytic year, and the meteorological data represented the year 2016. The resulting emission factors were combined with analytic year activity data using SMOKE-MOVES run in a similar way as the base year.  The development of the analytic year activity data is described later in this section. CARB provided separate emissions datasets for each analytic year. The CARB-provided emissions for 2023 and 2026 were adjusted to match the temporal and spatial patterns of the SMOKE-MOVES based emissions.

An update in 2016v3 was to apply adjustment factors to reflect the impacts of the light duty greenhouse gas rule finalized in the Revised 2023 and Later Model Year Light-Duty Vehicle Greenhouse Gas Emissions Standards, 86 FR 74434 (December 30, 2021)[42]. The adjustment factors that reflect the impacts of the rule on CAPs are shown in Table 4-41. These adjustment factors are intended to represent not only the effects of the rule on onroad emissions in 2023 and 2026, but also ancillary effects on stationary emissions such as increased electricity production for electric vehicles.

**Table 4-41.  Light duty greenhouse gas rule adjustments for 2023 and 2026 onroad emissions**

| Year | Source Type | Fuel Type | CO | VOC | NOx | SO2 | PM |
|------|-------------|-----------|-----|------|------|------|------|
| 2023 | Light Truck | Diesel | -0.04% | -0.01% | 0.83% | 12.42% | 1.29% |
| 2023 | Light Truck | E85 | 0.12% | 0.10% | 0.52% | 35.07% | 1.10% |
| 2023 | Light Truck | Gasoline | 0.06% | -0.40% | 0.24% | 10.77% | -0.04% |
| 2023 | Passenger Car | Diesel | 0.44% | 0.59% | 1.16% | 48.83% | 1.39% |
| 2023 | Passenger Car | E85 | 0.49% | 0.78% | 1.55% | 92.53% | 2.57% |
| 2023 | Passenger Car | Gasoline | 0.30% | 0.00% | 0.43% | 7.17% | 0.10% |
| 2026 | Light Truck | Diesel | -4.46% | -14.23% | -10.62% | -15.77% | -19.70% |
| 2026 | Light Truck | E85 | 0.63% | 0.94% | 3.12% | 225.12% | 6.88% |
| 2026 | Light Truck | Gasoline | 0.14% | -2.37% | 1.28% | 65.92% | 1.02% |
| 2026 | Passenger Car | Diesel | 2.05% | 2.47% | 4.81% | 206.91% | 5.12% |
| 2026 | Passenger Car | E85 | 1.83% | 2.90% | 5.92% | 373.97% | 9.77% |
| 2026 | Passenger Car | Gasoline | 0.72% | -1.86% | 0.67% | 25.86% | -1.20% |

Analytic year 2023 and 2026 VMT were developed as follows:

- VMT were projected from 2016 to 2019 using VMT data from the FHWA county-level VM-2 reports. At the time of this study, these reports were available for each year up through 2019. As with the original 2016 backcast, EPA calculated county-road type factors based on FHWA VM-2 county-level data for each of the three years, and county total factors were applied instead of county-road factors in states with significant changes in road type classifications from year to year.

- Total VMT were held flat from 2019 to 2021 to reflect impacts from the COVID-19 pandemic. For 2021, VMT was re-split by fuel type according to fuel splits from the 2020NEI VMT.  During this step, VMT totals by county, source type, and road type were preserved, but fuel splits from 2020NEI were applied and the percentage of electric vehicles increased as a result.

- VMT were then projected from 2021 to 2023 using AEO2022.

---

[42] https://www.govinfo.gov/content/pkg/FR-2021-12-30/pdf/2021-27854.pdf

- VMT data submitted by state and local agencies for the year 2023 for the 2016v1 platform were incorporated where available, in place of the EPA default 2023 projection. The following states or agencies submitted 2023 VMT: Connecticut, Georgia, Massachusetts, New Jersey, North Carolina, Ohio, Wisconsin, Louisville metro (KY/IN), Pima County AZ, and Clark County NV.

- The resulting 2023 VMT data, including VMT submitted by local agencies, were projected to 2026 using AEO2022. Thus the 2026 projected VMT used 2023 as the baseline and incorporated submitted 2023 VMT.

Annual VMT data from the AEO2022 reference case by fuel and vehicle type were used to project VMT from 2021 to the projection years. Specifically, the following two AEO2021 tables were used:

- Light Duty (LD): Light-Duty VMT by Technology Type (table #41):
  https://www.eia.gov/outlooks/aeo/data/browser/#/?id=51-AEO2021&sourcekey=0

- Heavy Duty (HD): Freight Transportation Energy Use (table #49):
  https://www.eia.gov/outlooks/aeo/data/browser/#/?id=58-AEO2021&cases=ref2021~aeo2020ref&sourcekey=0

To develop the VMT projection factors, total VMT for each MOVES fuel and vehicle grouping was calculated for the years 2021, 2023, and 2026 based on the AEO-to-MOVES mappings above. From these totals, 2021-2023 and 2023-2026 VMT trends were calculated for each fuel and vehicle grouping. Those trends became the national VMT projection factors. The AEO2022 tables include data starting from the year 2021. MOVES fuel and vehicle types were mapped to AEO fuel and vehicle classes. The resulting 2021-to-analytic year national VMT projection factors used for the 2016v3 platform are provided in Table 4-42. These factors were adjusted to prepare county-specific projection factors for light duty vehicles based on human population data available from the BenMAP model by county for the years 2023 and 2026[43] (https://www.woodsandpoole.com/, circa 2015). The purpose of this adjustment based on population changes helps account for areas of the country that are growing more than others.

**Table 4-42. Factors used to Project VMT to analytic years**

| SCC6 | description | 2021 to 2023 factor | 2023 to 2026 factor |
|------|-------------|---------------------|---------------------|
| 220111 | LD gas | 1.08 | 1.05 |
| 220121 | LD gas | 1.08 | 1.05 |
| 220131 | LD gas | 1.08 | 1.05 |
| 220132 | LD gas | 1.08 | 1.05 |
| 220141 | Buses gas | 1.03 | 1.05 |
| 220142 | Buses gas | 1.03 | 1.05 |
| 220143 | Buses gas | 1.03 | 1.05 |
| 220151 | MHD gas | 1.03 | 1.05 |
| 220152 | MHD gas | 1.03 | 1.05 |
| 220153 | MHD gas | 1.03 | 1.05 |
| 220154 | MHD gas | 1.03 | 1.05 |

---

[43] The final year of the population dataset used is 2030

| SCC6 | description | 2021 to 2023 factor | 2023 to 2026 factor |
|---|---|---|---|
| 220161 | HHD gas | 0.80 | 0.77 |
| 220221 | LD diesel | 1.09 | 1.05 |
| 220231 | LD diesel | 1.09 | 1.05 |
| 220232 | LD diesel | 1.09 | 1.05 |
| 220241 | Buses diesel | 1.04 | 1.04 |
| 220242 | Buses diesel | 1.04 | 1.04 |
| 220243 | Buses diesel | 1.04 | 1.04 |
| 220251 | MHD diesel | 1.04 | 1.04 |
| 220252 | MHD diesel | 1.04 | 1.04 |
| 220253 | MHD diesel | 1.04 | 1.04 |
| 220254 | MHD diesel | 1.04 | 1.04 |
| 220261 | HHD diesel | 1.04 | 1.03 |
| 220262 | HHD diesel | 1.04 | 1.03 |
| 220341 | Buses CNG | 1.06 | 1.02 |
| 220342 | Buses CNG | 1.06 | 1.02 |
| 220343 | Buses CNG | 1.06 | 1.02 |
| 220351 | MHD CNG | 1.06 | 1.02 |
| 220352 | MHD CNG | 1.06 | 1.02 |
| 220353 | MHD CNG | 1.06 | 1.02 |
| 220354 | MHD CNG | 1.06 | 1.02 |
| 220361 | HHD CNG | 1.04 | 1.00 |
| 220521 | LD E-85 | 1.02 | 0.93 |
| 220531 | LD E-85 | 1.02 | 0.93 |
| 220532 | LD E-85 | 1.02 | 0.93 |
| 220921 | LD Electric | 1.83 | 1.83 |
| 220931 | LD Electric | 1.83 | 1.83 |
| 220932 | LD Electric | 1.83 | 1.83 |

In areas where the EPA default analytic year VMT projection were used, analytic year VPOP data were projected using calculations of VMT/VPOP ratios for each county, based on 2017 NEI with MOVES3 fuels splits. Those ratios were then applied to the analytic year projected VMT to estimate analytic year VPOP. Analytic year VPOP data submitted by state and local agencies were incorporated into the VPOP projections for 2023. Analytic year VPOP data for 2023 were provided by state and local agencies in NH, NJ, NC, WI, Pima County, AZ, and Clark County, NV. In addition, 2023 VPOP was carried forward from the 2016v1 platform in CT, GA, MA, and the Louisville metro areas; as those areas only submitted VMT for 2023 and not VPOP, but keeping the 2016v1 VPOP in those areas ensures consistency between the VMT and VPOP. Additionally, North Carolina bus VMT and VPOP (based on EPA defaults) was carried forward from the 2016v1 platform so that all VMT and VPOP in North Carolina would be the same as 2016v1. Both VMT and VPOP were redistributed between the light duty car and truck vehicle types (21/31/32) based on light duty vehicle splits from the EPA computed default projection.

Hoteling hours were projected to the analytic years by calculating 2016 inventory HOTELING/VMT ratios for each county for combination long-haul trucks on restricted roads only.  Those ratios were then applied to the analytic year projected VMT for combination long-haul trucks on restricted roads to calculate analytic year hoteling. Some counties had hoteling activity but did not have combination long-

haul truck restricted road VMT in 2016; in those counties, the national AEO-based projection factor for diesel combination trucks was used to project 2016 hoteling to the analytic years. This procedure gives county-total hoteling for the analytic years. Each analytic year also has a distinct APU percentage based on MOVES input data that was used to split county total hoteling to each SCC: 12.91% APU for 2023, and 20.46% for 2026 .  New Jersey provided 2023 hoteling data for 2016v1 and those data were used for the 2016v3 platform although the new APU fraction for MOVES3 2023 (12.91%) was incorporated. As in the 2016 backcast, for counties that had 2017 hoteling hours, but do not have vehicle type 62 VMT on restricted road type (i.e., counties that should have hoteling, but do not have any VMT to calculate it from) we projected 2016 to 2019 using the FHWA-based county total 2016 to 2019 trend, and then used the AEO-based factors for heavy duty diesel to project beyond 2019.

Analytic year starts were calculated using 2017NEI-based VMT ratios, similar to how 2016 starts were calculated:

Analytic year STARTS = Analytic year VMT * (2017 STARTS / 2017 VMT by county+SCC6)

Analytic year ONI activity was calculated using a similar formula, but with 2016-based ratios rather than 2017-based ratios, in order to reflect the new method used to calculate ONI activity for 2016:

Analytic year ONI = Analytic year VMT * (2016 ONI / 2016 VMT by county+SCC6)

In California, onroad emissions in SMOKE-MOVES are adjusted to match CARB-provided data using the same procedure described in Section 2.3.3. For 2016v3 platform, CARB provided new EMFAC2017-based emissions for 2023 and 2026.

### 4.3.3 Locomotives (rail, ptnonipm)

Outside of California, for 2023, rail emissions are unchanged from 2016v1, including rail yards (which already included the Georgia-provided update for 2023 in 2016v1).  Rail emissions for 2026 were interpolated from the 2023 and 2028 emissions in 2016v1. Factors to compute emissions for analytic year of 2030 were based on analytic year fuel use values from the Energy Information Administration's 2018 Annual Energy Outlook (AEO) freight rail energy use growth rate projections for 2016 thru 2030 (see Table 4-43) and emission factors based on historic emissions trends that reflect the rate of market penetration of new locomotive engines.

For 2016v3, CARB provided new locomotive emissions for 2023 and 2026. In addition to updating the nonpoint rail inventory in California, the point rail yard emissions in ptnonipm were also updated to better reflect the new rail yard emissions in the California rail inventory.

A correction factor was added to adjust the AEO projected fuel use for 2017 to match the actual 2017 R-1 fuel use data.  The additive effect of this correction factor was carried forward for each subsequent year from 2018 thru 2030. The modified AEO growth rates were used to calculate analytic year Class I line-haul fuel use totals for 2020, 2023, 2026, and 2030. As shown in Table 4-43 the analytic year fuel use values ranged between 3.2 and 3.4 billion gallons, which matched up well with the long-term line-haul fuel use trend between 2005 and 2018. The emission factors for NOx, PM10 and VOC were derived from trend lines based on historic line-haul emission factors from the period of 2007 through 2017.

**Table 4-43. Class I Line-haul Fuel Projections based on 2018 AEO Data**

| Year | AEO Freight Factor | Projection Factor | Corrected AEO Fuel | Raw AEO Fuel |
|---|---|---|---|---|
| 2016 | 1 | 1 | **3,203,595,133** | **3,203,595,133** |
| 2017 | 1.0212 | 1.0346 | 3,314,384,605 | 3,271,393,249 |
| 2018 | 1.0177 | 1.0311 | *3,303,215,591* | 3,260,224,235 |
| 2019 | 1.0092 | 1.0226 | *3,275,939,538* | 3,232,948,182 |
| 2020 | 1.0128 | 1.0262 | *3,287,479,935* | 3,244,488,580 |
| 2021 | 1.0100 | 1.0235 | *3,278,759,301* | 3,235,767,945 |
| 2022 | 0.9955 | 1.0090 | *3,232,267,591* | 3,189,276,235 |
| 2023 | 0.9969 | 1.0103 | *3,236,531,624* | 3,193,540,268 |
| 2024 | 1.0221 | 1.0355 | *3,317,383,183* | 3,274,391,827 |
| 2025 | 1.0355 | 1.0489 | *3,360,367,382* | 3,317,376,026 |
| 2026 | 1.0410 | 1.0544 | *3,377,946,201* | 3,334,954,845 |
| 2027 | 1.0419 | 1.0553 | *3,380,697,189* | 3,337,705,833 |
| 2028 | 1.0356 | 1.0490 | *3,360,491,175* | 3,317,499,820 |
| 2029 | 1.0347 | 1.0529 | *3,373,114,601* | 3,314,913,891 |
| 2030 | 1.0319 | 1.0561 | *3,383,235,850* | 3,305,890,648 |

The projected fuel use data was combined with the emission factor estimates to create analytic year link-level emission inventories based on the MGT traffic density values contained in the FRA's 2016 shapefile. The link-level data created for 2020, 2023, 2026 and 2030 were aggregated to create county, state, and national emissions estimates (see Table 4-44) which were then converted into FF10 format for use in the 2016 emissions platforms.

**Table 4-44. Class I Line-haul Historic and Analytic Year Projected Emissions**

| Inventory | CO | HC | NH3 | NOx | PM10 | PM2.5 | SO2 |
|---|---|---|---|---|---|---|---|
| 2007 (2008 NEI) | 110,969 | 37,941 | 347 | 754,433 | 25,477 | 23,439 | 7,836 |
| 2014 NEI | 107,995 | 29,264 | 338 | 609,295 | 19,675 | 18,101 | 381 |
| 2016 v2 | 96,068 | 22,991 | 301 | 492,999 | 14,351 | 13,889 | 427 |
| 2017 NEI | 97,272 | 21,560 | 304 | 492,385 | 14,411 | 13,979 | 343 |
| 2023 Projected | 97,514 | 17,265 | 305 | 403,207 | 10,816 | 10,477 | 431 |
| 2026 Projected | 99,840 | 15,524 | 312 | 375,121 | 9,714 | 9,412 | 438 |
| 2030 Projected | 99,338 | 12,512 | 311 | 349,868 | 8,014 | 7,766 | 436 |

Other rail emissions were projected based on AEO growth rates as shown in Table 4-45. See the 2016v1 rail specification sheet for additional information on rail projections.

Table 4-45. 2018 AEO growth rates for rail sub-groups

| Sector | 2016 | 2023 | 2026 | 2030 |
|---|---|---|---|---|
| Rail Yards | 1.0 | 0.9969 | 1.0410 | 1.0284 |
| Class II/III Railroads | 1.0 | 0.9969 | 1.0410 | 1.0284 |
| Commuter/Passenger | 1.0 | 1.0879 | 1.1310 | 1.2220 |

## 4.3.4 Sources Outside of the United States (onroad_can, onroad_mex, othpt, canada_ag, canada_og2D, ptfire_othna, othar, othafdust, othptdust)

This section discusses the projection of emissions from Canada and Mexico. Information about the base year inventory used for these projections or the naming conventions can be found in Section 2.7. Most of the Canada and Mexico projections are based on inventories and other data from the 2016v1 platform applied to the 2016v2 platform base year inventories.

For the 2016v1 platform, ECCC provided data from which Canadian analytic year projections could be derived in a file called "Projected_CAN2015_2023_2028.xlsx", which includes emissions data for 2015, 2023, and 2028 by pollutant, province, ECCC sub-class code, and other source categories. ECCC sub-class codes are present in most Canadian inventories and are similar to SCC, but more detailed for some types of sources and less detailed for other types of sources. For most Canadian inventories, 2023 and 2026 inventories were projected from the new 2016 base year inventory using projection factors based on the ECCC sub-class level data from the 2016v1 platform, except with the 2015-to-2023 trend reduced to a 2016-to-2023 trend (i.e., reduce the total change by 1/8), and with 2026 interpolated between 2023 and 2028. Exceptions to this general procedure are noted below. For example, ECCC sub-class level data could not be used to project inventories where the sub-class codes changed from 2016v1 to 2016v2. Fire emissions in Canada and Mexico in the ptfire_othna sector were not projected.

### 4.3.4.1   Canadian fugitive dust sources (othafdust, othptdust)

**Canadian area source dust (othafdust)**

For Canadian area source dust sources, ECCC sub-class level data from 2016v1 platform was used to project the 2016v2 base year inventory to 2023 and 2028. Emissions for 2026 were interpolated between the 2023 and 2028 emissions. As with the base year, the analytic year dust emissions are pre-adjusted, so analytic year othafdust follows the same emissions processing methodology as the base year with respect to the transportable fraction and meteorological adjustments.

**Canadian point source dust (othptdust)**

In 2016v1 platform, ECCC provided sub-class level emissions data for the othptdust sector for the base and analytic years. Since the othptdust projections in 2016v1 were nearly flat, we decided to not project othptdust for the 2016v2 or 2016v3 platforms (i.e., the 2016fj othptdust emissions were reused for all analytic year cases).

### 4.3.4.2    Point Sources in Canada and Mexico (othpt, canada_ag, canada_og2D)

**Canada point agriculture and oil and gas emissions**

For Canadian agriculture and upstream oil and gas sources, ECCC sub-class level data from 2016v1 platform was used to project the 2016v2 base year inventory to 2023 and 2028. Emissions for 2026 were interpolated between 2023 and 2028. This procedure was applied to the entire canada_ag and canada_og2D sectors, and to the oil and gas elevated point source inventory in the othpt sector. For the ag inventories, the sub-class codes are similar in detail to SCCs: fertilizer has a single sub-class code, and animal emissions categories (broilers, dairy, horses, sheep, etc) each have a separate sub-class code.

**Airports and other Canada point sources**

For the Canada airports inventory in the othpt sector, the ECCC sub-class codes changed from 2016v1 to 2016v2 platform. Therefore, the ECCC sub-class level data from 2016v1 platform could not be used to project the 2016v2 base year inventory. Instead, projection factors were based on total airport emissions from the 2016v1 Canada inventory by province and pollutant. As with other sectors, 2026 emissions were interpolated between 2023 and 2028.

In the 2016v1 platform, analytic year projections for stationary point sources (excluding ag) were provided by ECCC for 2023 and 2028 rather than calculated by way of ECCC sub-class code data. Additionally, projection information for many sub-class codes in the 2016v2 base year stationary point inventories was not available in the 2016v1 sub-class code data. Therefore, sub-class code data was not used to project stationary point sources, and instead, those sources were projected using factors based on total stationary (excluding ag and upstream oil and gas) point source emissions from the 2016v1 platform for 2015, 2023, and 2028, by province and pollutant. This is the same procedure that was used for airports, except using different projection factors based on only the stationary sources.

**Mexico**

The othpt sector includes a general point source inventory in Mexico which was updated for the 2016v2 platform. Similar to the procedure for projecting Canadian stationary point sources, factors for projecting from 2016 to 2023 and 2026 were calculated from the 2016v1 platform Mexico point source inventories by state and pollutant. Mexico point source emissions for 2026 were interpolated between 2023 and 2028.

### 4.3.4.3    Nonpoint sources in Canada and Mexico (othar)

**Canadian stationary sources**

In the 2016v1 platform, analytic year projections for stationary area sources in Canada were provided by ECCC for 2023 and 2028 rather than calculated by way of ECCC sub-class code data. Additionally, projection information for many sub-class codes in the 2016v2 base year stationary area source inventory was not available in the 2016v1 sub-class code data. Therefore, sub-class code data was not used to project stationary area sources, and instead, those sources were projected using factors based on total stationary area source emissions from the 2016v1 platform for 2015, 2023, and 2028, by province and pollutant. This is the same procedure that was used for airports and stationary point sources, except using different projection factors based on only the stationary area sources. Projection factors for 2026 were interpolated from the factors for 2023 and 2028.

For the 2016v1 platform, ECCC provided an additional stationary area source inventory for 2023 and 2028 representing electric power generation (EPG). According to ECCC, this inventory's emissions do

not double count the 2023 and 2028 point source inventories, and it is appropriate to include this area source EPG inventory in the othar sector as an additional standalone inventory in the analytic years. Therefore, the 2016v1 area source EPG inventory was included in the 2016v2 platform analytic year cases. Emissions for 2026 were interpolated between 2023 and 2028.

**Canadian mobile sources**

Projection information for mobile nonroad sources, including rail and CMV, is covered by the ECCC sub-class level data for 2015, 2023, and 2028. ECCC sub-class level data from 2016v1 platform was used to project the 2016v2 base year inventory to 2023 and 2028. Emissions for 2026 were interpolated from 2023 and 2028. For the nonroad inventory, the sub-class code is analogous to the SCC7 level in U.S. inventories. For example, there are separate sub-class codes for fuels (e.g., 2-stroke gasoline, diesel, LPG) and nonroad equipment sector (e.g., construction, lawn and garden, logging, recreational marine) but not for individual vehicle types within each category (e.g., snowmobiles, tractors). For rail, the sub-class code is closer to full SCCs in the NEI.

**Mexico**

The othar sector includes two Mexico inventories, a stationary area source inventory and a nonroad inventory. Similar to point, factors for projecting the 2016v2 base year inventories to 2023 and 2028 were calculated from the 2016v1 platform Mexico area and nonroad inventories by state and pollutant. Separate projections were calculated for the area and nonroad inventories. Emissions for 2026 were interpolated between 2023 and 2028, including for nonroad (unlike in Canada).

### 4.3.4.4   Onroad sources in Canada and Mexico (onroad_can, onroad_mex)

For Canadian mobile onroad sources, projection information is covered by the ECCC sub-class level data for 2015, 2023, and 2028. ECCC sub-class level data from 2016v1 platform was used to project the 2016v2 base year inventory to 2023 and 2028. Emissions for 2026 were interpolated from 2023 and 2028. For the onroad inventory, the sub-class code is analogous to the SCC6+process level in U.S. inventories, in that it specifies fuel type, vehicle type, and process (e.g., brake, tire, exhaust, refueling), but not road type.

For Mexican mobile onroad sources, MOVES-Mexico was run to create emissions inventories for years 2023, 2028, and 2035. The emissions for 2023 were reused from the 2016v1 platform, and 2026 emissions were interpolated between 2023-2028.

# 5  Emission Summaries

Tables 5-1 through Table 5-3 summarize annual emissions by sector for the 2016gf, 2023gf, and 2026gf cases at the national level by sector for the contiguous U.S. and for the portions of Canada and Mexico inside the larger 12km domain (12US1) discussed in Section 3.1.  Table 5-4 and Table 5-5 provide similar summaries for the 36-km domain (36US3) for 2016 and 2023.  Note that totals for the 12US2 domain are not available here, but the sum of the U.S. sectors would be essentially the same and only the Canadian and Mexican emissions would change according to how far north and south the grids extend. Note that the afdust sector emissions here represent the emissions *after* application of both the land use (transport fraction) and meteorological adjustments; therefore, this sector is called "afdust_adj" in these summaries. The afdust emissions in the 36km domain are smaller than those in the 12km domain due to how the adjustment factors are computed and the size of the grid cells. The onroad sector totals are post-SMOKE-MOVES totals, representing air quality model-ready emission totals, and include CARB emissions for California. The cmv sectors include U.S. emissions within state waters only; these extend to roughly 3-5 miles offshore and include CMV emissions at U.S. ports.  "Offshore" represents CMV emissions that are outside of U.S. state waters. The total of all US sectors is listed as "Con U.S. Total."

Table 5-6 and Table 5-7 summarize ozone season NOx and VOC emissions, respectively, for the 2016gf, 2023gf, and 2026gf cases.

State totals and other summaries are available in the reports area on the FTP site for the 2016v3 platform ( https://gaftp.epa.gov/Air/emismod/2016/v3/reports).

**Table 5-1. National by-sector CAP emissions for the 2016gf case, 12US1 grid (tons/yr)**

| Sector | CO | NH3 | NOX | PM10 | PM2_5 | SO2 | VOC |
|---|---|---|---|---|---|---|---|
| afdust_adj | | | | 6,314,612 | 880,002 | | |
| airports | 479,736 | 0 | 123,838 | 9,952 | 8,675 | 14,827 | 53,420 |
| cmv_c1c2 | 23,710 | 84 | 163,598 | 4,486 | 4,348 | 636 | 6,477 |
| cmv_c3 | 14,267 | 40 | 112,701 | 2,246 | 2,066 | 4,609 | 8,822 |
| fertilizer | | 1,436,969 | | | | | |
| livestock | | 2,502,587 | | | | | 219,703 |
| nonpt | 1,921,889 | 102,840 | 739,465 | 567,555 | 470,789 | 166,391 | 827,897 |
| nonroad | 10,593,504 | 1,845 | 1,110,243 | 109,008 | 103,047 | 1,513 | 1,134,711 |
| np_oilgas | 762,177 | 20 | 585,683 | 13,236 | 13,145 | 40,748 | 2,532,881 |
| np_solvents | 36 | 58 | 34 | 469 | 448 | 5 | 2,606,495 |
| onroad | 18,313,321 | 107,991 | 3,546,597 | 233,680 | 113,716 | 25,969 | 1,317,694 |
| pt_oilgas | 195,308 | 375 | 374,037 | 13,132 | 12,736 | 42,815 | 238,673 |
| ptagfire | 262,645 | 51,276 | 10,240 | 38,688 | 26,951 | 3,694 | 17,181 |
| ptegu | 655,873 | 23,850 | 1,318,074 | 164,132 | 133,606 | 1,565,196 | 33,755 |
| ptfire-rx | 7,094,333 | 130,849 | 127,470 | 778,864 | 655,354 | 58,690 | 1,546,840 |
| ptfire-wild | 6,643,510 | 109,088 | 100,030 | 684,798 | 580,377 | 52,719 | 1,567,400 |
| ptnonipm | 1,381,321 | 64,168 | 913,795 | 390,628 | 250,076 | 636,685 | 765,281 |
| rail | 104,551 | 326 | 559,381 | 16,344 | 15,819 | 457 | 26,082 |
| rwc | 2,230,478 | 16,940 | 35,198 | 309,854 | 308,965 | 8,247 | 334,158 |
| **beis** | 3,390,977 | | 1,001,873 | | | | 31,014,251 |
| **Con. U.S. Total + beis** | **54,067,638** | **4,549,105** | **10,822,258** | **9,651,686** | **3,580,122** | **2,623,203** | **44,251,723** |
| **Can./Mex./Offshore** | | | | | | | |
| Sector | CO | NH3 | NOX | PM10 | PM2_5 | SO2 | VOC |
| Canada ag | | 491,788 | | | | | 104,968 |
| Canada oil and gas 2D | 667 | 7 | 3,241 | 186 | 186 | 3,944 | 510,623 |
| Canada othafdust | | | | 696,793 | 108,328 | | |
| Canada othar | 2,191,451 | 3,819 | 323,152 | 225,620 | 177,134 | 16,294 | 740,566 |
| Canada onroad_can | 1,849,517 | 7,685 | 407,423 | 26,017 | 14,012 | 1,739 | 158,429 |
| Canada othpt | 1,116,192 | 19,482 | 651,451 | 90,042 | 43,051 | 990,049 | 148,216 |
| Canada othptdust | | | | 152,566 | 53,684 | | |
| Canada ptfire_othna | 761,402 | 13,032 | 16,359 | 84,481 | 71,749 | 6,731 | 185,476 |
| Canada CMV | 10,587 | 36 | 92,110 | 1,641 | 1,525 | 2,807 | 5,122 |
| Mexico othar | 115,887 | 112,005 | 60,196 | 105,146 | 34,788 | 1,733 | 362,643 |
| Mexico onroad_mex | 1,828,101 | 2,789 | 442,410 | 15,151 | 10,836 | 6,247 | 158,812 |
| Mexico othpt | 109,015 | 1,096 | 190,997 | 54,044 | 37,491 | 355,883 | 35,768 |
| Mexico ptfire_othna | 383,162 | 7,436 | 16,604 | 44,994 | 38,178 | 2,785 | 131,499 |
| Mexico CMV | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Offshore cmv in Federal waters | 32,745 | 126 | 289,633 | 7,051 | 6,530 | 27,482 | 15,956 |
| Offshore cmv outside Federal waters | 23,579 | 444 | 259,993 | 25,074 | 23,074 | 183,595 | 11,207 |
| Offshore pt_oilgas | 51,872 | 8 | 49,962 | 636 | 635 | 462 | 38,833 |
| **Non-U.S. Total** | **8,474,180** | **659,754** | **2,803,533** | **1,529,440** | **621,202** | **1,599,752** | **2,608,117** |

**Table 5-2. National by-sector CAP emissions for the 2023gf case, 12US1 grid (tons/yr)**

| Sector | CO | NH3 | NOX | PM10 | PM2_5 | SO2 | VOC |
|---|---|---|---|---|---|---|---|
| afdust_adj | | | | 6,378,445 | 893,940 | | |
| airports | 497,816 | 0 | 135,028 | 9,990 | 8,731 | 16,261 | 55,592 |
| cmv_c1c2 | 23,741 | 60 | 117,171 | 3,212 | 3,113 | 243 | 4,559 |
| cmv_c3 | 17,448 | 49 | 109,834 | 2,753 | 2,533 | 5,634 | 10,876 |
| fertilizer | | 1,436,969 | | | | | |
| livestock | | 2,593,384 | | | | | 226,860 |
| nonpt | 1,920,941 | 103,603 | 725,280 | 560,108 | 474,271 | 121,178 | 789,771 |
| nonroad | 10,890,827 | 2,114 | 742,436 | 71,039 | 66,532 | 1,057 | 891,025 |
| np_oilgas | 832,845 | 22 | 605,993 | 14,702 | 14,603 | 87,319 | 2,675,843 |
| np_solvents | 37 | 61 | 36 | 499 | 476 | 6 | 2,702,053 |
| onroad | 12,803,175 | 97,304 | 1,646,377 | 188,180 | 62,338 | 11,172 | 806,689 |
| pt_oilgas | 214,732 | 357 | 393,667 | 17,484 | 16,766 | 72,802 | 217,443 |
| ptagfire | 262,645 | 51,276 | 10,240 | 38,688 | 26,951 | 3,694 | 17,181 |
| ptegu | 542,096 | 25,741 | 888,700 | 121,657 | 102,620 | 1,195,002 | 39,915 |
| ptfire-rx | 7,094,333 | 130,849 | 127,470 | 778,864 | 655,354 | 58,690 | 1,546,840 |
| ptfire-wild | 6,643,510 | 109,088 | 100,030 | 684,798 | 580,377 | 52,719 | 1,567,400 |
| ptnonipm | 1,355,805 | 67,871 | 836,547 | 371,162 | 235,390 | 495,093 | 755,852 |
| rail | 105,631 | 331 | 476,559 | 13,104 | 12,677 | 375 | 20,807 |
| rwc | 2,207,014 | 16,738 | 36,856 | 302,922 | 302,016 | 7,704 | 330,504 |
| **beis** | 3,390,977 | | 1,001,873 | | | | 31,014,251 |
| **Con. U.S. Total + beis** | **48,803,574** | **4,635,816** | **7,954,098** | **9,557,608** | **3,458,688** | **2,128,948** | **43,673,481** |
| **Can./Mex./Offshore** | | | | | | | |
| Sector | CO | NH3 | NOX | PM10 | PM2_5 | SO2 | VOC |
| Canada ag | | 583,282 | | | | | 104,584 |
| Canada oil and gas 2D | 477 | 7 | 1,920 | 128 | 128 | 3,305 | 412,111 |
| Canada othafdust | | | | 782,334 | 121,430 | | |
| Canada othar | 2,196,835 | 3,729 | 267,788 | 219,440 | 164,701 | 16,198 | 740,364 |
| Canada onroad_can | 1,590,905 | 6,850 | 254,786 | 26,537 | 11,305 | 937 | 102,118 |
| Canada othpt | 1,129,621 | 22,315 | 553,839 | 72,613 | 42,672 | 877,388 | 154,137 |
| Canada othptdust | | | | 152,566 | 53,684 | | |
| Canada ptfire_othna | 761,402 | 13,032 | 16,359 | 84,481 | 71,749 | 6,731 | 185,476 |
| Canada CMV | 11,436 | 39 | 66,994 | 1,776 | 1,650 | 2,979 | 5,461 |
| Mexico other | 126,192 | 109,995 | 69,552 | 107,496 | 36,249 | 1,953 | 404,664 |
| Mexico onroad_mex | 1,772,026 | 3,266 | 427,900 | 17,023 | 11,764 | 7,556 | 161,115 |
| Mexico othpt | 123,814 | 1,321 | 187,731 | 59,146 | 40,987 | 292,546 | 44,668 |
| Mexico ptfire_othna | 383,162 | 7,436 | 16,604 | 44,994 | 38,178 | 2,785 | 131,499 |
| Mexico CMV | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Offshore cmv in Federal waters | 39,301 | 148 | 254,448 | 8,306 | 7,673 | 34,226 | 19,059 |
| Offshore cmv outside Federal waters | 28,839 | 280 | 317,415 | 15,797 | 14,538 | 41,868 | 13,690 |
| Offshore pt_oilgas | 51,872 | 8 | 49,962 | 636 | 635 | 462 | 38,833 |
| **Non-U.S. Total** | **8,215,884** | **751,708** | **2,485,299** | **1,593,275** | **617,343** | **1,288,934** | **2,517,779** |

**Table 5-3. National by-sector CAP emissions for the 2026gf case, 12US1 grid (tons/yr)**

| Sector | CO | NH3 | NOX | PM10 | PM2_5 | SO2 | VOC |
|---|---|---|---|---|---|---|---|
| afdust_adj | | | | 6,403,935 | 899,647 | | |
| airports | 535,239 | 0 | 151,407 | 10,302 | 9,024 | 18,330 | 59,611 |
| cmv_c1c2 | 23,990 | 52 | 102,154 | 2,807 | 2,720 | 244 | 3,919 |
| cmv_c3 | 19,005 | 53 | 110,076 | 3,000 | 2,760 | 6,128 | 11,890 |
| fertilizer | | 1,436,969 | | | | | |
| livestock | | 2,629,312 | | | | | 230,160 |
| nonpt | 1,930,169 | 103,868 | 723,871 | 568,094 | 481,072 | 122,437 | 762,403 |
| nonroad | 11,081,612 | 2,159 | 657,502 | 62,218 | 58,045 | 1,075 | 850,020 |
| np_oilgas | 830,088 | 22 | 597,874 | 14,822 | 14,723 | 89,777 | 2,610,993 |
| np_solvents | 38 | 64 | 38 | 519 | 496 | 6 | 2,781,475 |
| onroad | 11,298,677 | 97,669 | 1,303,964 | 187,332 | 56,017 | 13,689 | 680,034 |
| pt_oilgas | 211,373 | 334 | 385,071 | 17,371 | 16,650 | 73,983 | 213,838 |
| ptagfire | 262,645 | 51,276 | 10,240 | 38,688 | 26,951 | 3,694 | 17,181 |
| ptegu | 410,878 | 25,514 | 663,681 | 96,276 | 83,619 | 855,909 | 35,019 |
| ptfire-rx | 7,094,333 | 130,849 | 127,470 | 778,864 | 655,354 | 58,690 | 1,546,840 |
| ptfire-wild | 6,643,510 | 109,088 | 100,030 | 684,798 | 580,377 | 52,719 | 1,567,400 |
| ptnonipm | 1,376,876 | 68,146 | 848,119 | 374,437 | 237,646 | 496,819 | 757,055 |
| rail | 108,234 | 339 | 453,446 | 12,052 | 11,657 | 384 | 19,167 |
| rwc | 2,196,869 | 16,667 | 37,258 | 300,475 | 299,564 | 7,522 | 329,113 |
| beis | 3,390,977 | | 1,001,873 | | | | 31,014,251 |
| **Con. U.S. Total + beis** | **47,414,514** | **4,672,382** | **7,274,075** | **9,555,990** | **3,436,322** | **1,801,407** | **43,490,369** |
| **Can./Mex./Offshore** | | | | | | | |
| Sector | CO | NH3 | NOX | PM10 | PM2_5 | SO2 | VOC |
| Canada ag | | 632,182 | | | | | 104,570 |
| Canada oil and gas 2D | 497 | 7 | 1,493 | 133 | 133 | 3,550 | 447,884 |
| Canada othafdust | | | | 825,908 | 128,106 | | |
| Canada other | 2,206,851 | 3,717 | 254,419 | 218,350 | 161,430 | 16,174 | 755,871 |
| Canada onroad_can | 1,504,701 | 6,461 | 210,090 | 26,684 | 10,386 | 893 | 82,677 |
| Canada othpt | 1,154,185 | 23,274 | 495,903 | 75,829 | 44,714 | 872,534 | 159,956 |
| Canada othptdust | | | | 152,566 | 53,684 | | |
| Canada ptfire_othna | 761,402 | 13,032 | 16,359 | 84,481 | 71,749 | 6,731 | 185,476 |
| Canada CMV | 11,823 | 40 | 70,103 | 1,837 | 1,706 | 3,094 | 5,644 |
| Mexico other | 130,146 | 110,429 | 73,150 | 108,612 | 36,855 | 2,038 | 423,290 |
| Mexico onroad_mex | 1,677,896 | 3,546 | 407,181 | 18,048 | 12,307 | 8,141 | 163,311 |
| Mexico othpt | 131,373 | 1,445 | 200,959 | 63,917 | 44,176 | 301,303 | 48,989 |
| Mexico ptfire_othna | 383,162 | 7,436 | 16,604 | 44,994 | 38,178 | 2,785 | 131,499 |
| Mexico CMV | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Offshore cmv in Federal waters | 42,791 | 160 | 244,576 | 9,007 | 8,313 | 37,795 | 20,739 |
| Offshore cmv outside Federal waters | 31,565 | 306 | 347,299 | 17,303 | 15,923 | 45,919 | 14,981 |
| Offshore pt_oilgas | 51,872 | 8 | 49,962 | 636 | 635 | 462 | 38,833 |
| **Non-U.S. Total** | **8,088,265** | **802,045** | **2,388,098** | **1,648,303** | **628,296** | **1,301,417** | **2,583,718** |

**Table 5-4. National by-sector CAP emissions for the 2016gf case, 36US3 grid (tons/yr)**

| Sector | CO | NH3 | NOX | PM10 | PM2_5 | SO2 | VOC |
|---|---|---|---|---|---|---|---|
| afdust_adj | | | | 6,318,693 | 880,413 | | |
| airports | 480,474 | 0 | 123,989 | 9,977 | 8,699 | 14,850 | 53,513 |
| cmv_c1c2 | 23,713 | 84 | 163,617 | 4,487 | 4,349 | 636 | 6,478 |
| cmv_c3 | 14,477 | 40 | 114,661 | 2,275 | 2,093 | 4,678 | 8,932 |
| fertilizer | | 1,436,969 | | | | | |
| livestock | | 2,502,588 | | | | | 219,703 |
| nonpt | 1,922,341 | 102,861 | 740,522 | 567,613 | 470,839 | 166,402 | 828,180 |
| nonroad | 10,598,518 | 1,845 | 1,110,424 | 109,045 | 103,082 | 1,514 | 1,135,706 |
| np_oilgas | 762,177 | 20 | 585,683 | 13,236 | 13,145 | 40,748 | 2,532,881 |
| np_solvents | 36 | 58 | 34 | 469 | 448 | 5 | 2,606,991 |
| onroad | 18,313,321 | 107,791 | 3,546,597 | 233,680 | 113,716 | 25,969 | 1,317,694 |
| pt_oilgas | 195,308 | 375 | 374,037 | 13,132 | 12,736 | 42,815 | 238,673 |
| ptagfire | 262,645 | 51,276 | 10,240 | 38,688 | 26,951 | 3,694 | 17,181 |
| ptegu | 655,909 | 23,850 | 1,318,272 | 164,137 | 133,610 | 1,565,196 | 33,760 |
| ptfire-rx | 7,094,333 | 130,849 | 127,470 | 778,864 | 655,354 | 58,690 | 1,546,840 |
| ptfire-wild | 6,643,510 | 109,088 | 100,030 | 684,798 | 580,377 | 52,719 | 1,567,400 |
| ptnonipm | 1,381,324 | 64,168 | 913,821 | 390,669 | 250,087 | 636,685 | 765,282 |
| rail | 104,551 | 326 | 559,381 | 16,344 | 15,819 | 457 | 26,082 |
| rwc | 2,255,551 | 16,969 | 35,687 | 314,299 | 313,410 | 8,324 | 334,761 |
| beis | 3,545,278 | | 1,011,401 | | | | 32,014,201 |
| **36US3 U.S. Total + beis** | **54,253,467** | **4,549,158** | **10,835,865** | **9,660,408** | **3,585,127** | **2,623,383** | **45,254,258** |
| **Can./Mex./Offshore** | | | | | | | |
| Sector | CO | NH3 | NOX | PM10 | PM2_5 | SO2 | VOC |
| Canada ag | | 507,030 | | | | | 107,661 |
| Canada oil and gas 2D | 732 | 7 | 3,548 | 203 | 203 | 4,432 | 606,218 |
| Canada othafdust | | | | 722,629 | 112,358 | | |
| Canada othar | 2,352,757 | 4,115 | 358,976 | 239,649 | 188,729 | 17,031 | 779,607 |
| Canada onroad_can | 1,926,698 | 7,980 | 428,161 | 27,152 | 14,692 | 1,802 | 164,479 |
| Canada othpt | 1,379,994 | 21,394 | 832,840 | 102,218 | 50,224 | 1,124,153 | 203,402 |
| Canada othptdust | | | | 152,834 | 52,953 | | |
| Canada ptfire_othna | 6,282,821 | 104,683 | 134,301 | 685,169 | 580,963 | 60,914 | 1,501,988 |
| Canada CMV | 13,086 | 45 | 115,294 | 2,098 | 1,946 | 4,279 | 6,439 |
| Mexico othar | 1,699,433 | 562,057 | 235,176 | 465,425 | 252,429 | 12,630 | 1,588,164 |
| Mexico onroad_mex | 6,273,194 | 10,319 | 1,497,028 | 74,169 | 56,782 | 26,400 | 552,952 |
| Mexico othpt | 319,500 | 3,314 | 485,613 | 213,413 | 141,638 | 1,453,380 | 111,716 |
| Mexico ptfire_othna | 7,133,496 | 120,584 | 346,990 | 1,155,563 | 745,860 | 45,208 | 2,259,747 |
| Mexico CMV | 64,730 | 0 | 204,997 | 16,286 | 15,087 | 109,778 | 8,817 |
| Offshore cmv in Federal waters | 34,594 | 153 | 309,815 | 8,614 | 7,969 | 38,843 | 16,798 |
| Offshore cmv outside Federal waters | 89,532 | 1,199 | 1,019,219 | 93,844 | 86,363 | 693,479 | 40,839 |
| Offshore pt_oilgas | 51,872 | 8 | 49,962 | 636 | 635 | 462 | 38,833 |
| **Annual Total** | **27,622,440** | **1,342,889** | **6,021,918** | **3,959,903** | **2,308,831** | **3,592,792** | **7,987,661** |

225

**Table 5-5. National by-sector CAP emissions for the 2023gf case, 36US3 grid (tons/yr)**

| Sector | CO | NH3 | NOX | PM10 | PM2_5 | SO2 | VOC |
|---|---|---|---|---|---|---|---|
| afdust_adj | | | | 6,382,529 | 894,351 | | |
| airports | 498,620 | 0 | 135,173 | 10,015 | 8,754 | 16,284 | 55,689 |
| cmv_c1c2 | 23,744 | 60 | 117,185 | 3,213 | 3,114 | 243 | 4,560 |
| cmv_c3 | 17,704 | 49 | 111,755 | 2,789 | 2,566 | 5,718 | 11,011 |
| fertilizer | | 1,436,969 | | | | | |
| livestock | | 2,593,386 | | | | | 226,860 |
| nonpt | 1,921,427 | 103,626 | 726,404 | 560,167 | 474,321 | 121,189 | 790,046 |
| nonroad | 10,895,359 | 2,114 | 742,572 | 71,065 | 66,556 | 1,057 | 891,713 |
| np_oilgas | 832,845 | 22 | 605,993 | 14,702 | 14,603 | 87,319 | 2,675,843 |
| np_solvents | 37 | 61 | 36 | 499 | 476 | 6 | 2,702,549 |
| onroad | 12,807,931 | 97,317 | 1,646,798 | 188,227 | 62,355 | 11,173 | 807,048 |
| pt_oilgas | 214,732 | 357 | 393,667 | 17,484 | 16,766 | 72,802 | 217,443 |
| ptagfire | 262,645 | 51,276 | 10,240 | 38,688 | 26,951 | 3,694 | 17,181 |
| ptegu | 542,096 | 25,741 | 888,700 | 121,657 | 102,620 | 1,195,002 | 39,915 |
| ptfire-rx | 7,094,333 | 130,849 | 127,470 | 778,864 | 655,354 | 58,690 | 1,546,840 |
| ptfire-wild | 6,643,510 | 109,088 | 100,030 | 684,798 | 580,377 | 52,719 | 1,567,400 |
| ptnonipm | 1,355,811 | 67,871 | 836,598 | 371,204 | 235,401 | 495,093 | 755,874 |
| rail | 105,631 | 331 | 476,559 | 13,104 | 12,677 | 375 | 20,807 |
| rwc | 2,229,572 | 16,766 | 37,295 | 306,858 | 305,951 | 7,773 | 331,081 |
| beis | 3,545,278 | | 1,011,401 | | | | 32,014,201 |
| **36US3 U.S. Total + beis** | **48,991,277** | **4,635,884** | **7,967,876** | **9,565,863** | **3,463,193** | **2,129,137** | **44,676,061** |
| **Can./Mex./Offshore** | | | | | | | |
| Sector | CO | NH3 | NOX | PM10 | PM2_5 | SO2 | VOC |
| Canada ag | | 600,883 | | | | | 107,266 |
| Canada oil and gas 2D | 527 | 7 | 2,115 | 142 | 142 | 3,714 | 489,811 |
| Canada othafdust | | | | 810,859 | 125,871 | | |
| Canada othar | 2,356,241 | 4,019 | 308,601 | 232,951 | 175,488 | 17,180 | 780,201 |
| Canada onroad_can | 1,655,613 | 7,109 | 268,025 | 27,680 | 11,859 | 971 | 106,159 |
| Canada othpt | 1,364,416 | 24,576 | 686,691 | 80,094 | 48,582 | 993,177 | 214,520 |
| Canada othptdust | | | | 152,834 | 52,953 | | |
| Canada ptfire_othna | 6,282,821 | 104,683 | 134,301 | 685,169 | 580,963 | 60,914 | 1,501,988 |
| Canada CMV | 14,048 | 49 | 83,837 | 2,264 | 2,099 | 4,599 | 6,821 |
| Mexico other | 1,821,647 | 552,207 | 263,072 | 483,534 | 266,265 | 13,459 | 1,731,394 |
| Mexico onroad_mex | 6,053,503 | 12,083 | 1,447,199 | 94,407 | 72,468 | 31,838 | 560,284 |
| Mexico othpt | 381,638 | 4,088 | 537,165 | 251,989 | 167,147 | 1,416,350 | 141,037 |
| Mexico ptfire_othna | 7,133,496 | 120,584 | 346,990 | 1,155,563 | 745,860 | 45,208 | 2,259,747 |
| Mexico CMV | 79,677 | 0 | 252,331 | 20,046 | 18,571 | 19,304 | 10,853 |
| Offshore cmv in Federal waters | 41,533 | 181 | 271,245 | 10,194 | 9,410 | 47,974 | 20,074 |
| Offshore cmv outside Federal waters | 109,733 | 756 | 1,249,272 | 59,007 | 54,301 | 157,866 | 50,170 |
| Offshore pt_oilgas | 51,872 | 8 | 49,962 | 636 | 635 | 462 | 38,833 |
| **Non-U.S. Total** | **27,346,764** | **1,431,234** | **5,900,805** | **4,067,368** | **2,332,614** | **2,813,016** | **8,019,159** |

**Table 5-6. National by-sector Ozone Season NOx emissions summaries 12US1 grid (tons/o.s.)**

| Sector | 2016gf | 2023gf | 2026gf |
|---|---|---|---|
| airports | 55,023 | 59,995 | 67,273 |
| cmv_c1c2_12 | 90,952 | 64,979 | 56,539 |
| cmv_c3_12 | 265,891 | 279,095 | 289,473 |
| nonpt | 222,645 | 216,582 | 216,691 |
| nonroad | 566,188 | 380,010 | 335,761 |
| np_oilgas | 243,554 | 251,456 | 248,158 |
| np_solvents | 14 | 15 | 16 |
| onroad | 1,425,690 | 658,513 | 512,550 |
| onroad_ca_adj | 102,061 | 45,954 | 41,631 |
| pt_oilgas | 177,844 | 186,161 | 182,555 |
| ptagfire | 3,193 | 3,193 | 3,193 |
| ptegu | 604,426 | 372,414 | 289,044 |
| ptnonipm | 383,072 | 350,480 | 355,312 |
| rail | 236,771 | 201,707 | 191,917 |
| rwc | 4,279 | 4,527 | 4,595 |
| **Total U.S. Anthro** | **4,381,606** | **3,075,082** | **2,794,707** |
| beis | 599,643 | 599,643 | 599,643 |
| ptfire-rx | 20,531 | 20,531 | 20,531 |
| ptfire-wild | 55,500 | 55,500 | 55,500 |
| **Grand Total** | **5,057,280** | **3,750,756** | **3,470,382** |

**Table 5-7. National by-sector Ozone Season VOC emissions summaries 12US1 grid (tons/o.s.)**

| Sector | 2016gf | 2023gf | 2026gf |
|---|---|---|---|
| airports | 23,735 | 24,700 | 26,486 |
| cmv_c1c2_12 | 3,550 | 2,487 | 2,132 |
| cmv_c3_12 | 14,613 | 18,040 | 19,796 |
| livestock | 152,495 | 157,531 | 159,757 |
| nonpt | 346,753 | 330,090 | 318,876 |
| nonroad | 573,637 | 435,998 | 411,793 |
| np_oilgas | 1,039,662 | 1,092,687 | 1,065,914 |
| np_solvents | 1,095,342 | 1,135,471 | 1,168,836 |
| onroad | 556,510 | 339,025 | 281,483 |
| onroad_ca_adj | 44,562 | 25,378 | 22,281 |
| pt_oilgas | 116,259 | 107,378 | 105,868 |
| ptagfire | 6,314 | 6,314 | 6,314 |
| ptegu | 16,220 | 17,993 | 16,199 |
| ptnonipm | 320,043 | 316,084 | 316,575 |
| rail | 11,039 | 8,806 | 8,112 |
| rwc | 36,547 | 37,975 | 38,354 |
| **Total U.S. Anthro** | **4,357,282** | **4,055,957** | **3,968,775** |
| beis | 24,776,664 | 24,776,664 | 24,776,664 |
| ptfire-rx | 277,019 | 277,019 | 277,019 |
| ptfire-wild | 1,005,261 | 1,005,261 | 1,005,261 |
| **Grand Total** | **30,416,226** | **30,114,902** | **30,027,720** |

# 6   References

Adelman, Z. 2012.  *Memorandum:  Fugitive Dust Modeling for the 2008 Emissions Modeling Platform*.  UNC Institute for the Environment, Chapel Hill, NC.  September 28, 2012.

Adelman, Z. 2016.  *2014 Emissions Modeling Platform Spatial Surrogate Documentation*.  UNC Institute for the Environment, Chapel Hill, NC.  October 1, 2016. Available at https://gaftp.epa.gov/Air/emismod/2014/v1/spatial_surrogates/ .

Adelman, Z., M. Omary, Q. He, J. Zhao and D. Yang, J. Boylan, 2012. "A Detailed Approach for Improving Continuous Emissions Monitoring Data for Regulatory Air Quality Modeling." Presented at the 2012 International Emission Inventory Conference, Tampa, Florida.  Available from http://www.epa.gov/ttn/chief/conference/ei20/index.html#ses-5.

Appel, K.W., Napelenok, S., Hogrefe, C., Pouliot, G., Foley, K.M., Roselle, S.J., Pleim, J.E., Bash, J., Pye, H.O.T., Heath, N., Murphy, B., Mathur, R., 2018.  Overview and evaluation of the Community Multiscale Air Quality Model (CMAQ) modeling system version 5.2. In Mensink C., Kallos G. (eds), Air Pollution Modeling and its Application XXV. ITM 2016. Springer Proceedings in Complexity. Springer, Cham. Available at https://doi.org/10.1007/978-3-319-57645-9_11.

Bash, J.O., Baker, K.R., Beaver, M.R., Park, J.-H., Goldstein, A.H., 2016. Evaluation of improved land use and canopy representation in BEIS with biogenic VOC measurements in California. Available from http://www.geosci-model-dev.net/9/2191/2016/.

BEA, 2012. "2013 Global Outlook projections prepared by the Conference Board in November 2012". U.S. Bureau of Economic Analysis. Available from: http://www.conference-board.org/data/globaloutlook.cfm.

Bullock Jr., R, and K. A. Brehme (2002) "Atmospheric mercury simulation using the CMAQ model: formulation description and analysis of wet deposition results." Atmospheric Environment 36, pp 2135–2146. Available at https://doi.org/10.1016/S1352-2310(02)00220-0.

California Air Resources Board (CARB): ORGPROF - Organic chemical profiles for source categories, 2018. https://ww2.arb.ca.gov/speciation-profiles-used-carb-modeling .

California Air Resources Board (CARB): 2005 Architectural Coatings Survey – Final Report, 2007.

California Air Resources Board (CARB): 2010 Aerosol Coatings Survey Results, 2012.

California Air Resources Board (CARB): 2014 Architectural Coatings Survey - Draft Data Summary, 2014.

California Air Resources Board (CARB): Final 2015 Consumer & Commercial Product Survey Data Summaries, 2019.

Coordinating Research Council (CRC).  Report A-100. Improvement of Default Inputs for MOVES and SMOKE-MOVES. Final Report. February 2017. Available at http://crcsite.wpengine.com/wp-content/uploads/2019/05/ERG_FinalReport_CRCA100_28Feb2017.pdf.

Coordinating Research Council (CRC). Report A-115. Developing Improved Vehicle Population Inputs for the 2017 National Emissions Inventory. Final Report. April 2019. Available at http://crcsite.wpengine.com/wp-content/uploads/2019/05/CRC-Project-A-115-Final-Report_20190411.pdf .

Drillinginfo, Inc. 2015. "DI Desktop Database powered by HPDI." Currently available from https://www.enverus.com/.

England, G., Watson, J., Chow, J., Zielenska, B., Chang, M., Loos, K., Hidy, G., 2007. "Dilution-Based Emissions Sampling from Stationary Sources: Part 2-- Gas-Fired Combustors Compared with Other Fuel-Fired Systems," Journal of the Air & Waste Management Association, 57:1, 65-78, DOI: 10.1080/10473289.2007.10465291. Available at https://www.tandfonline.com/doi/abs/10.1080/10473289.2007.10465291.

EPA, 2017. Light-Duty Vehicle, Light-Duty Truck, and Medium-Duty Passenger Vehicle Tier 2 Exhaust Emission Standards. Office of Transportation and Air Quality, Ann Arbor, MI 48105. Available at: https://www.epa.gov/emission-standards-reference-guide/epa-emission-standards-light-duty-vehicles-and-trucks-and.

EPA, 2008. Regulatory Impact Analysis: Control of Emissions of Air Pollution from Locomotive Engines and Marine Compression Ignition Engines Less than 30 Liters Per Cylinder. EPA420-R-08-001. Available at: https://nepis.epa.gov/Exe/ZyPDF.cgi/P10023S4.PDF?Dockey=P10023S4.PDF .

EPA, 2012d. Preparation of Emission Inventories for the Version 5.0, 2007 Emissions Modeling Platform Technical Support Document. Available from: https://www.epa.gov/air-emissions-modeling/2007-version-50-technical-support-document .

EPA, 2013rwc. "2011 Residential Wood Combustion Tool version 1.1, September 2013", available from US EPA, OAQPS, EIAG.

EPA, 2015b. Draft Report Speciation Profiles and Toxic Emission Factors for Nonroad Engines. EPA-420-R-14-028. Available at https://cfpub.epa.gov/si/si_public_record_Report.cfm?dirEntryId=309339&CFID=83476290&CFTOKEN=35281617.

EPA, 2015c. Speciation of Total Organic Gas and Particulate Matter Emissions from On-road Vehicles in MOVES2014. EPA-420-R-15-022. Available at https://nepis.epa.gov/Exe/ZyPDF.cgi?Dockey=P100NOJG.pdf.

EPA, 2016. SPECIATE Version 4.5 Database Development Documentation, U.S. Environmental Protection Agency, Office of Research and Development, National Risk Management Research Laboratory, Research Triangle Park, NC 27711, EPA/600/R-16/294, September 2016. Available at https://www.epa.gov/sites/production/files/2016-09/documents/speciate_4.5.pdf.

EPA, 2017. Additional Updates to Emissions Inventories for the Version 6.3, 2011 Emissions Modeling Platform for the Year 2023 technical support document. Available at: https://www.epa.gov/sites/production/files/2017-11/documents/2011v6.3_2023en_update_emismod_tsd_oct2017.pdf.

EPA, 2018. AERMOD Model Formulation and Evaluation Document. EPA-454/R-18-003. U.S. Environmental Protection Agency, Research Triangle Park, North Carolina 27711. Available at https://nepis.epa.gov/Exe/ZyPDF.cgi?Dockey=P100UT95.PDF .

EPA, 2018. 2014 National Emission Inventory, version 2 Technical Support Document.  U.S. Environmental Protection Agency, OAQPS, Research Triangle Park, NC 27711. Available at: https://www.epa.gov/air-emissions-inventories/2014-national-emissions-inventory-nei-technical-support-document-tsd.

EPA, 2019. Final Report, SPECIATE Version 5.0, Database Development Documentation, Research Triangle Park, NC, EPA/600/R-19/988. Available at https://www.epa.gov/air-emissions-modeling/speciate-51-and-50-addendum-and-final-report .

EPA, 2020. Population and Activity of Onroad Vehicles in MOVES3.  EPA-420-R-20-023. Office of Transportation and Air Quality. US Environmental Protection Agency. Ann Arbor, MI. November 2020. Available under the MOVES3 section at https://www.epa.gov/moves/moves-technical-reports

EPA, 2021. Technical Support Document (TSD) Preparation of Emissions Inventories for the 2016v2 North American Emissions Modeling Platform. Available at https://www.epa.gov/air-emissions-modeling/2016v2-platform.

EPA, 2021b. 2017 National Emission Inventory: January 2021 Updated Release, Technical Support Document.  U.S. Environmental Protection Agency, OAQPS, Research Triangle Park, NC 27711. Available at: https://www.epa.gov/air-emissions-inventories/2017-national-emissions-inventory-nei-technical-support-document-tsd.

EPA, 2021c. Technical Support Document (TSD) Preparation of Emissions Inventories for the 2016v1 North American Emissions Modeling Platform. Available at https://www.epa.gov/air-emissions-modeling/2016-version-1-technical-support-document.

EPA, 2021d. 2017 National Emissions Inventory (NEI), Research Triangle Park, NC, January 2021. https://www.epa.gov/air-emissions-inventories/2017-national-emissions-inventory-nei-data.

EPA, 2022. 2019 National Emissions Inventory (NEI) Technical Support Document: Point Data Category, Research Triangle Park, NC. EPA-454/R-22-001. Available at: https://www.epa.gov/air-emissions-modeling/2019-nei-technical-support-documentation.

ERG, 2014a. Develop Mexico Future Year Emissions Final Report. Available at https://gaftp.epa.gov/air/emismod/2011/v2platform/2011emissions/Mexico_Emissions_WA%204-09_final_report_121814.pdf .

ERG, 2016b. "Technical Memorandum: Modeling Allocation Factors for the 2014 Oil and Gas Nonpoint Tool." Available at https://gaftp.epa.gov/air/emismod/2014/v1/spatial_surrogates/oil_and_gas/ .

ERG, 2017. "Technical Report: Development of Mexico Emission Inventories for the 2014 Modeling Platform." Available at https://gaftp.epa.gov/Air/emismod/2014/v2/2014fd/emissions/EPA%205-18%20Report_Clean%20Final_01042017.pdf .

ERG, 2018. Technical Report: "2016 Nonpoint Oil and Gas Emission Estimation Tool Version 1.0". Available at https://gaftp.epa.gov/air/emismod/2016/v1/reports/2016%20Nonpoint%20Oil%20and%20Gas%20Emission%20Estimation%20Tool%20V1_0%20December_2018.pdf.

ERG, 2019a. "2017 Nonpoint Oil and Gas Emission Estimation Tool Revisions" Available from: https://gaftp.epa.gov/air/nei/2017/doc/supporting_data/nonpoint/2017%20Oil%20and%20Gas%20Memos.zip.

ERG, 2019b. Category 1 and 2 Commercial Marine Emissions Inventory. Available from: https://www.epa.gov/sites/default/files/2019-11/cmv_methodology_documentation.zip.

ERG, 2019c. 2016 versus 2017 entrance and clearance data. Available from:https://gaftp.epa.gov/Air/emismod/2016/v2/reports/cmv/EandC_2016_to_2017_Activity_Ratios.pdf .

The Freedonia Group, 2016.  Solvents, Industry Study #3429.

Frost & Sullivan, 2010. "Project: Market Research and Report on North American Residential Wood Heaters, Fireplaces, and Hearth Heating Products Market (P.O. # PO1-IMP403-F&S). Final Report April 26, 2010", pp. 31-32.  Prepared by Frost & Sullivan, Mountain View, CA 94041.

Gkatzelis, G.I., Coggon, M.M., McDonald, B.C., Peischl, J., Aikin, K.C., Gilman, J.B., Trainer, M., Warneke, C. Identifying Volatile Chemical Product Tracer Compounds in US Cities. Environ. Sci. Technol. 2021, 55 (1), 188−199.

Houck, 2011. "Dirty- vs. Clean-Burning? What percent of freestanding wood heaters in use in the U.S. today are still old, uncertified units?" Hearth and Home, December 2011.

Hutchins, M.L., Holkzworth, R.H., Brundell, J.B., and Rodger, C.J., 2012. Relative detection efficiency of the World Wide Lightning Location Network. Available from http://wwlln.net/publications/Hutchins_Detection_Efficiency_RadioSci_2012.pdf.

Kang et al., 2022. Assessing the Impact of Lightning NOx Emissions in CMAQ using Lightning Flash Data from WWLLN over the Contiguous United States.  Available from https://doi.org/10.3390/atmos13081248.

Khare, P., and Gentner, D. R., 2018. Considering the future of anthropogenic gas-phase organic compound emissions and the increasing influence of non-combustion sources on urban air quality, Atmos Chem Phys, 18, 5391-5413, 10.5194/acp-18-5391-2018.

Luecken D., Yarwood G, Hutzell WT, 2019. Multipollutant modeling of ozone, reactive nitrogen and HAPs across the continental US with CMAQ-CB6. Atmospheric environment. 2019 Mar 15;201:62-72.

Mansouri, K., Grulke, C. M., Judson, R. S., and Williams, A. J., 2018. OPERA models for predicting physicochemical properties and environmental fate endpoints, J Cheminformatics, 10, 10.1186/s13321-018-0263-1.

McCarty, J.L., Korontzi, S., Jutice, C.O., and T. Loboda. 2009. The spatial and temporal distribution of crop residue burning in the contiguous United States. Science of the Total Environment, 407 (21): 5701-5712. Available at https://www.sciencedirect.com/science/article/abs/pii/S1352231008000137?via%3Dihub .

MDNR, 2008. "A Minnesota 2008 Residential Fuelwood Assessment Survey of individual household responses".  Minnesota Department of Natural Resources. Available from http://files.dnr.state.mn.us/forestry/um/residentialfuelwoodassessment07_08.pdf.

NCAR, 2016. FIRE EMISSION FACTORS AND EMISSION INVENTORIES, FINN Data. downloaded 2014 SAPRC99 version from https://www.acom.ucar.edu/Data/fire/ .

NESCAUM, 2006. "Assessment of Outdoor Wood-fired Boilers". Northeast States for Coordinated Air Use Management (NESCAUM) report. Available from http://www.nescaum.org/documents/assessment-of-outdoor-wood-fired-boilers/2006-1031-owb-report_revised-june2006-appendix.pdf.

NYSERDA, 2012. "Environmental, Energy Market, and Health Characterization of Wood-Fired Hydronic Heater Technologies, Final Report". New York State Energy Research and Development Authority (NYSERDA). Available from: https://www-nyserda-ny-gov.webpkgcache.com/doc/-/s/www.nyserda.ny.gov/-/media/Project/Nyserda/Files/Publications/Research/Environmental/Wood-Fired-Hydronic-Heater-Tech-Summary.pdf .

Pechan, 2001. E.H. Pechan & Associates, Inc., Control Measure Development Support—Analysis of Ozone Transport Commission Model Rules, Springfield, VA, prepared for the Ozone Transport Commission, Washington, DC, March 31, 2001. Available at https://otcair.org/upload/Documents/Reports/Control%20Measure%20Development%20Support.pdf.

Pouliot, G., H. Simon, P. Bhave, D. Tong, D. Mobley, T. Pace, and T. Pierce. 2010. "Assessing the Anthropogenic Fugitive Dust Emission Inventory and Temporal Allocation Using an Updated Speciation of Particulate Matter." International Emission Inventory Conference, San Antonio, TX. Available at http://www3.epa.gov/ttn/chief/conference/ei19/session9/pouliot_pres.pdf.

Pouliot, G. and J. Bash, 2015. Updates to Version 3.61 of the Biogenic Emission Inventory System (BEIS). Presented at Air and Waste Management Association conference, Raleigh, NC, 2015.

Pouliot G, Rao V, McCarty JL, Soja A. Development of the crop residue and rangeland burning in the 2014 National Emissions Inventory using information from multiple sources. Journal of the Air & Waste Management Association. 2017 Apr 27;67(5):613-22.

Pye, H. O. T.; Pouliot, G. A., 2012. Modeling the role of alkanes, polycyclic aromatic hydrocarbons, and their oligomers in secondary organic aerosol formation. Environ. Sci. Technol. 2012, 46, 6041−6047.

Raffuse, S., D. Sullivan, L. Chinkin, S. Larkin, R. Solomon, A. Soja, 2007. Integration of Satellite-Detected and Incident Command Reported Wildfire Information into BlueSky, June 27, 2007. Available at: http://getbluesky.org/smartfire/docs.cfm.

Ramboll (Shah, T., Yarwood G.,) and EPA (Eyth, A., Strum, M), 2017. COMPOSITION OF ORGANIC GAS EMISSIONS FROM FLARING NATURAL GAS, Presented at the 2017 International Emission Inventory Conference, August 18, 2017. Available at https://www.epa.gov/sites/production/files/2017-11/documents/organic_gas.pdf. Additional Memo from Ramboll Environ to EPA (same title as presentation) dated September 23, 2016.

Ramboll, 2020. https://github.com/CMASCenter/Speciation-Tool/blob/master/docs/Ramboll_sptool_mapping_updates_AE7_AE8_24Mar2020_final_full.pdf.

Reichle, L., R. Cook, C. Yanca, D. Sonntag, 2015. "Development of organic gas exhaust speciation profiles for nonroad spark-ignition and compression-ignition engines and equipment", Journal of

the Air & Waste Management Association, 65:10, 1185-1193, DOI: 10.1080/10962247.2015.1020118. Available at https://doi.org/10.1080/10962247.2015.1020118.

Reff, A., Bhave, P., Simon, H., Pace, T., Pouliot, G., Mobley, J., Houyoux. M. "Emissions Inventory of PM2.5 Trace Elements across the United States", Environmental Science & Technology 2009 43 (15), 5790-5796, DOI: 10.1021/es802930x. Available at https://doi.org/10.1021/es802930x.

Sarwar, G., S. Roselle, R. Mathur, W. Appel, R. Dennis, "A Comparison of CMAQ HONO predictions with observations from the Northeast Oxidant and Particle Study", Atmospheric Environment 42 (2008) 5760–5770). Available at https://doi.org/10.1016/j.atmosenv.2007.12.065.

Schauer, J., G. Lough, M. Shafer, W. Christensen, M. Arndt, J. DeMinter, J. Park, "Characterization of Metals Emitted from Motor Vehicles," Health Effects Institute, Research Report 133, March 2006. Available at https://www.healtheffects.org/publication/characterization-metals-emitted-motor-vehicles.

Seltzer, K. M., Pennington, E., Rao, V., Murphy, B. N., Strum, M., Isaacs, K. K., and Pye, H. O. T., 2021. Reactive organic carbon emissions from volatile chemical products, Atmos. Chem. Phys., 21, 5079–5100, https://doi.org/10.5194/acp-21-5079-2021.

Skamarock, W., J. Klemp, J. Dudhia, D. Gill, D. Barker, M. Duda, X. Huang, W. Wang, J. Powers, 2008. A Description of the Advanced Research WRF Version 3.  NCAR Technical Note.  National Center for Atmospheric Research, Mesoscale and Microscale Meteorology Division, Boulder, CO. June 2008. Available at: https://opensky.ucar.edu/islandora/object/technotes:500 .

Sullivan D.C., Raffuse S.M., Pryden D.A., Craig K.J., Reid S.B., Wheeler N.J.M., Chinkin L.R., Larkin N.K., Solomon R., and Strand T. (2008) Development and applications of systems for modeling emissions and smoke from fires: the BlueSky smoke modeling framework and SMARTFIRE: 17th International Emissions Inventory Conference, Portland, OR, June 2-5.

Swedish Environmental Protection Agency, 2004. Swedish Methodology for Environmental Data; Methodology for Calculating Emissions from Ships: 1. Update of Emission Factors.

U.S. Census Bureau, Economy Wide Statistics Division, 2018. County Business Patterns, 2018. https://www.census.gov/programs-surveys/cbp/data/datasets.html .

U.S. Bureau of Labor Statistics, 2020. Producer Price Index by Industry, retrieved from FRED, Federal Reserve Bank of St. Louis. https://fred.stlouisfed.org/categories/31 .

U.S. Census Bureau, 2011 Paint and Allied Products - 2010, MA325F(10). https://www.census.gov/data/tables/time-series/econ/cir/ma325f.html .

U.S. Census Bureau, 2021. 2018 Annual Survey of Manufacturers (ASM), Washington D.C., USA. https://www.census.gov/data/developers/data-sets/Annual-Survey-of-Manufactures.html .

U.S. Department of Transportation and the U.S. Department of Commerce, 2015. 2012 Commodity Flow Survey, EC12TCF-US. https://www.census.gov/library/publications/2015/econ/ec12tcf-us.html .

U.S. Energy Information Administration, 2019.  The Distribution of U.S. Oil and Natural Gas Wells by Production Rate, Washington, DC. https://www.eia.gov/petroleum/wells/

Wang, Y., P. Hopke, O. V. Rattigan, X. Xia, D. C. Chalupa, M. J. Utell. (2011) "Characterization of Residential Wood Combustion Particles Using the Two-Wavelength Aethalometer", Environ. Sci. Technol., 45 (17), pp 7387–7393. Available at https://doi.org/10.1021/es2013984.

Weschler, C. J., and Nazaroff, W. W., 2008. Semivolatile organic compounds in indoor environments, Atmos Environ, 42, 9018-9040.

Wiedinmyer, C., 2001. NCAR BVOC Enclosure Database. National Center for Atmospheric Research, Boulder, CO

Wiedinmyer, C., S.K. Akagi, R.J. Yokelson, L.K. Emmons, J.A. Al-Saadi[3], J. J. Orlando[1], and A. J. Soja. (2011) "The Fire INventory from NCAR (FINN): a high resolution global model to estimate the emissions from open burning", Geosci. Model Dev., 4, 625-641. http://www.geosci-model-dev.net/4/625/2011/ doi:10.5194/gmd-4-625-2011.

Wilson, Barry Tyler; Lister, Andrew J.; Riemann, Rachel I.; Griffith, Douglas M. 2013a. Live tree species basal area of the contiguous United States (2000-2009). Newtown Square, PA: USDA Forest Service, Rocky Mountain Research Station. https://doi.org/10.2737/RDS-2013-0013

Wilson, Barry Tyler; Woodall, Christopher W.; Griffith, Douglas M. 2013b. Forest carbon stocks of the contiguous United States (2000-2009). Newtown Square, PA: U.S. Department of Agriculture, Forest Service, Northern Research Station. https://doi.org/10.2737/RDS-2013-0004

WRAP / Ramboll, 2019. Revised Final Report: Circa-2014 Baseline Oil and Gas Emission Inventory for the WESTAR-WRAP Region, September 2019. Available at: http://www.wrapair2.org/pdf/WRAP_OGWG_Report_Baseline_17Sep2019.pdf.

WRAP / Ramboll, 2020. Revised Final Report: 2028 Future Year Oil and Gas Emission Inventory for WESTAR-WRAP States – Scenario #1: Continuation of Historical Trends http://www.wrapair2.org/pdf/WRAP_OGWG_2028_OTB_RevFinalReport_05March2020.pdf .

Yarwood, G., J. Jung, , G. Whitten, G. Heo, J. Mellberg, and M. Estes,2010: Updates to the Carbon Bond Chemical Mechanism for Version 6 (CB6). Presented at the 9th Annual CMAS Conference, Chapel Hill, NC.  Available at https://www.cmascenter.org/conference/2010/abstracts/emery_updates_carbon_2010.pdf.

Zhu, Henze, et al, 2013. "Constraining U.S. Ammonia Emissions using TES Remote Sensing Observations and the GEOS-Chem adjoint model", Journal of Geophysical Research: Atmospheres, 118: 1-14.  Available at https://doi.org/10.1002/jgrd.50166.

**Appendix A**: **CB6 Assignment for New Species**



September 27, 2016

## MEMORANDUM

To: Alison Eyth and Madeleine Strum, OAQPS, EPA
From: Ross Beardsley and Greg Yarwood, Ramboll Environ
Subject: Species Mappings for CB6 and CB05 for use with SPECIATE 4.5

---

## Summary

Ramboll Environ (RE) reviewed version 4.5 of the SPECIATE database, and created CB05 and CB6 mechanism species mappings for newly added compounds. In addition, the mapping guidelines for Carbon Bond (CB) mechanisms were expanded to promote consistency in current and future work.

## Background

The Environmental Protection Agency's SPECIATE repository contains gas and particulate matter speciation profiles of air pollution sources, which are used in the generation of emissions data for air quality models (AQM) such as CMAQ (http://www.cmascenter.org/cmaq/) and CAMx (http://www.camx.com). However, the condensed chemical mechanisms used within these photochemical models utilize fewer species than SPECIATE to represent gas phase chemistry, and thus the SPECIATE compounds must be assigned to the AQM model species of the condensed mechanisms. A chemical mapping is used to show the representation of organic chemical species by the model compounds of the condensed mechanisms.

This memorandum describes how chemical mappings were developed from SPECIATE 4.5 compounds to model species of the CB mechanism, specifically CB05 (http://www.camx.com/publ/pdfs/CB05_Final_Report_120805.pdf) and CB6 (http://aqrp.ceer.utexas.edu/projectinfoFY12_13/12-012/12-012%20Final%20Report.pdf).

## Methods

### CB Model Species

Organic gases are mapped to the CB mechanism either as explicitly represented individual compounds (e.g. ALD2 for acetaldehyde), or as a combination of model species that represent common structural groups (e.g. ALDX for other aldehydes, PAR for alkyl groups). Table 1 lists all of the explicit and structural model species in CB05 and CB6 mechanisms, each of which represents a defined number of carbon atoms allowing for carbon to be conserved in all cases. CB6 contains four more explicit model species than CB05 and an additional structural group to represent ketones. The CB05 representation of the five additional CB6 species is provided in the 'included in CB05' column of Table 1.



In addition to the explicit and structural species, there are two model species that are used to represent organic gases that are not treated by the CB mechanism:

NVOL – Very low volatility SPECIATE compounds that reside predominantly in the particle phase and should be excluded from the gas phase mechanism. These compounds are mapped by setting NVOL equal to the molecular weight (e.g. decabromodiphenyl oxide is mapped as 959.2 NVOL), which allows for the total mass of all NVOL to be determined.

UNK – Compounds that are unable to be mapped to CB using the available model species. This approach should be avoided unless absolutely necessary, and will lead to a warning message in the speciation tool

Table 1.  Model species in the CB05 and CB6 chemical mechanisms.

| Model Species Name | Description | Number of Carbons | Included in CB05 (structural mapping) | Included in CB6 |
|---|---|---|---|---|
| **Explicit model species** | | | | |
| ACET | Acetone (propanone) | 3 | No (3 PAR) | Yes |
| ALD2 | Acetaldehyde (ethanal) | 2 | Yes | Yes |
| BENZ | Benzene | 6 | No (1 PAR, 5 UNR) | Yes |
| CH4 | Methane | 1 | Yes | Yes |
| ETH | Ethene (ethylene) | 2 | Yes | Yes |
| ETHA | Ethane | 2 | Yes | Yes |
| ETHY | Ethyne (acetylene) | 2 | No (1 PAR, 1 UNR) | Yes |
| ETOH | Ethanol | 2 | Yes | Yes |
| FORM | Formaldehyde (methanal) | 1 | Yes | Yes |
| ISOP | Isoprene (2-methyl-1,3-butadiene) | 5 | Yes | Yes |
| MEOH | Methanol | 1 | Yes | Yes |
| PRPA | Propane | 3 | No (1.3 PAR, 1.5 UNR) | Yes |
| **Common Structural groups** | | | | |
| ALDX | Higher aldehyde group (-C-C=O) | 2 | Yes | Yes |
| IOLE | Internal olefin group (R₁R₂>C=C<R₃R₄) | 4 | Yes | Yes |
| KET | Ketone group (R-R₂>C=O) | 1 | No (1 PAR) | Yes |
| OLE | Terminal olefin group (R-R₂>C=C) | 2 | Yes | Yes |
| PAR | Paraffinic group (R-C<R₂R₃) | 1 | Yes | Yes |
| TERP | Monoterpenes | 10 | Yes | Yes |
| TOL | Toluene and other monoalkyl aromatics | 7 | Yes | Yes |
| UNR | Unreactive carbon groups (e.g. halogenated carbons) | 1 | Yes | Yes |
| XYL | Xylene and other polyalkyl aromatics | 8 | Yes | Yes |
| **Not mapped to CB model species** | | | | |
| NVOL | Very low volatility compounds | * | Yes | Yes |
| UNK | unknown | * | Yes | Yes |

*Each NVOL represents 1 g mol⁻¹ and low volatility compounds are assigned to NVOL based on molecular weight. UNK is unmapped and thus does not represent any carbon.



## Mapping guidelines for non-explicit organic gases using CB model species

SPECIATE compounds that are not treated explicitly are mapped to CB model species that represent common structural groups. Table 2 lists the carbon number and general mapping guidelines for each of the structure model species.

**Table 2. General Guidelines for mapping using CB6 structural model species.**

| CB6 Species Name | Number of Carbon | Represents |
|---|---|---|
| ALDX | 2 | Aldehyde group. ALDX represents 2 carbons and additional carbons are represented as alkyl groups (mostly PAR), e.g. propionaldehyde is ALDX + PAR |
| IOLE | 4 | Internal olefin group. IOLE represents 4 carbons and additional carbons are represented as alkyl groups (mostly PAR), e.g. 2-pentene isomers are IOLE + PAR. *Exceptions:* • IOLE with 2 carbon branches on both sides of the double bond are downgraded to OLE |
| KET | 1 | Ketone group. KET represents 1 carbon and additional carbons are represented as alkyl groups (mostly PAR), e.g. butanone is 3 PAR + KET |
| OLE | 2 | Terminal olefin group. OLE represents 2 carbons and additional carbons are represented as alkyl groups (mostly PAR), e.g. propene is OLE + PAR. Alkyne group, e.g. butyne isomers are OLE + 2 PAR. |
| PAR | 1 | Alkanes and alkyl groups. PAR represents 1 carbon, e.g. butane is 4 PAR. See UNR for exceptions. |
| TERP | 10 | All monoterpenes are represented as 1 TERP |
| TOL | 7 | Toluene and other monoalkyl aromatics. TOL represents 7 carbons and any additional carbons are represented as alkyl groups (mostly PAR). e.g. ethylbenzene is TOL + PAR. Cresols are represented as TOL and PAR. Styrenes are represented using TOL, OLE and PAR. |
| UNR | 1 | Unreactive carbons are 1 UNR such as quaternary alkyl groups (e.g., neo-pentane is 4 PAR + UNR), carboxylic acid groups (e.g., acetic acid is PAR + UNR), ester groups (e.g., methyl acetate is 2 PAR + UNR), halogenated carbons (e.g., trichloroethane isomers are 2 UNR) carbons of nitrile groups (-C≡N) |
| XYL | 8 | Xylene isomers and other polyalkyl aromatics. XYL represents 8 carbons and any additional carbons are represented as alkyl groups (mostly PAR). e.g. trimethylbenzene isomers are XYL + PAR |

Some compounds that are multifunctional and/or include hetero-atoms lack obvious CB mappings. We developed guidelines for some of these compound classes to promote consistent representation in this work and future revisions. Approaches for several compound classes are explained in Table 3. We developed guidelines as needed to address newly added species in SPECIATE 4.5 but did not systematically review existing mappings for "difficult to assign" compounds that could benefit from developing a guideline.



Table 3.  Mapping guidelines for some difficult to map compound classes and structural groups

| Compound Class/Structural group | CB model species representation |
|---|---|
| Chlorobenzenes and other halogenated benzenes | Guideline:<br>• 3 or less halogens – 1 PAR, 5 UNR<br>• 4 or more halogens – 6 UNR<br>Examples:<br>• 1,3,5-Chlorobenzene – 1 PAR, 5 UNR<br>• Tetrachlorobenzenes – 6 UNR |
| Cyclodienes | Guideline:<br>• 1 IOLE with additional carbons represented as alkyl groups (generally PAR)<br>Examples:<br>• Methylcyclopentadiene – 1 IOLE, 2 PAR<br>• Methylcyclohexadiene – 1 IOLE, 3 PAR |
| Furans/Pyrroles | Guideline:<br>• 2 OLE with additional carbons represented as alkyl groups (generally PAR)<br>Examples:<br>• 2-Butylfuran – 2 OLE, 4 PAR<br>• 2-Pentylfuran – 2 OLE, 5 PAR<br>• Pyrrole – 2 OLE<br>• 1-Methylpyrrole – 2 OLE, 1 PAR |
| Heterocyclic aromatic compounds containing 2 non-carbon atoms | Guideline:<br>• 1 OLE with remaining carbons represented as alkyl groups (generally PAR)<br>Examples:<br>• Ethylpyrazine – 1 OLE, 4 PAR<br>• 1-methylpyrazole – 1 OLE, 2 PAR<br>• 4,5-Dimethyloxazole – 1 OLE, 3 PAR |
| Triple bond(s) | Guideline:<br>• Triple bonds are treated as PAR unless they are the only reactive functional group. If a compound contains more than one triple bond and no other reactive functional groups, then one of the triple bonds is treated as OLE with additional carbons treated as alkyl groups.<br>Examples:<br>• 1-Penten-3-yne – 1 OLE, 3 PAR<br>• 1,5-Hexadien-3-yne – 2 OLE, 2 PAR<br>• 1,6-Heptadiyne – 1 OLE, 5 PAR |

These guidelines were used to map the new species from SPEICATE4.5, and also to revise some previously mapped compounds. Overall, a total of 175 new species from SPECIATEv4.5 were mapped and 7 previously mapped species were revised based on the new guidelines.

Ramboll Environ US Corporation; 773 San Marin Drive, Suite 2115, Novato, CA 94998
+1 415 899 0700 · F +1 415 899 0707
www.ramboll-environ.com



## Recommendation

1. Complete a systematic review of the mapping of all species to ensure conformity with current mapping guidelines. The assignments of existing compounds that are similar to new species were reviewed and revised to promote consistency in mapping approaches, but the majority of existing species mappings were not reviewed as it was outside the scope of this work.

2. Develop a methodology for classifying and tracking larger organic compounds based on their volatility (semi, intermediate, or low volatility) to improve support for secondary organic aerosol (SOA) modeling using the volatility basis set (VBS) SOA model, which is available in both CMAQ and CAMx. A preliminary investigation of the possibility of doing so has been performed, and is discussed in a separate memorandum.

**Appendix B: Profiles (other than onroad) that are new or revised in SPECIATE versions 4.5 and later that were used in the 2016 platforms**

**Table B-1 Profiles first used in 2016beta, 2016v1, and 2016v2 platforms**

| Sector | Pollutant | Profile code | Profile description | SPECIATE version |
|---|---|---|---|---|
| ptfire, ptagfire | VOC | G8746 | Rice Straw and Wheat Straw Burning Composite of G4420 and G4421 | 5.0 |
| livestock | VOC | G95241TOG | Swine Farm and Animal Waste with gapfilled methane and ethane | 5.0 |
| np_oilgas, pt_oilgas | VOC | UTUBOGC | Raw Gas from Oil Wells - Composite Uinta basin | 5.1 |
| np_oilgas, pt_oilgas | VOC | UTUBOGD | Raw Gas from Gas Wells - Composite Uinta basin | 5.1 |
| np_oilgas, pt_oilgas | VOC | UTUBOGE | Flash Gas from Oil Tanks - including Carbonyls - Composite Uinta basin | 5.1 |
| np_oilgas, pt_oilgas | VOC | UTUBOGF | Flash Gas from Condensate Tanks - including Carbonyls - Composite Uinta basin | 5.1 |
| np_oilgas, pt_oilgas | VOC | PAGAS01 | Oil and Gas-Produced Gas Composition from Gas Wells-Greene Co, PA | 5.1 |
| np_oilgas, pt_oilgas | VOC | PAGAS02 | Oil and Gas-Produced Gas Composition from Gas Wells-Butler Co, PA | 5.1 |
| np_oilgas, pt_oilgas | VOC | PAGAS03 | Oil and Gas-Produced Gas Composition from Gas Wells-Washington Co, PA | 5.1 |
| np_oilgas, pt_oilgas | VOC | SUIROGCT | Flash Gas from Condensate Tanks - Composite Southern Ute Indian Reservation | 5.2 |
| np_oilgas, pt_oilgas | VOC | CBMPWWY | Coal Bed Methane Produced Water Profile - WY ponds | 5.2 |
| np_oilgas, pt_oilgas | VOC | DJTFLR95 | DJ Condensate Flare Profile with DRE 95% | 5.2 |
| np_oilgas, pt_oilgas | VOC | CMU01 | Oil and Gas - Produced Gas Composition from Gas Wells - Central Montana Uplift - Montana | 5.1 |
| np_oilgas, pt_oilgas | VOC | WIL01 | Oil and Gas - Flash Gas Composition from Tanks at Oil Wells - Williston Basin North Dakota | 5.1 |
| np_oilgas, pt_oilgas | VOC | WIL02 | Oil and Gas - Flash Gas Composition from Tanks at Oil Wells - Williston Basin Montana | 5.1 |
| np_oilgas, pt_oilgas | VOC | WIL03 | Oil and Gas - Produced Gas Composition from Oil Wells - Williston Basin North Dakota | 5.1 |
| np_oilgas, pt_oilgas | VOC | WIL04 | Oil and Gas - Produced Gas Composition from Oil Wells - Williston Basin Montana | 5.1 |
| cmv_c1c2, cmv_c3 | VOC | 95331NEIHP | Marine Vessel - 95331 blend with CMV HAP | 5.1 |
| ptagfire | PM | SUGP02 | Sugar Cane Pre-Harvest Burning Mexico | 5.1 |
| ptfire | PM | 95793 | Forest Fire-Flaming-Oregon AE6 | 5.1 |
| ptfire | PM | 95794 | Forest Fire-Smoldering-Oregon AE6 | 5.1 |
| ptfire | PM | 95798 | Forest Fire-Flaming-North Carolina AE6 | 5.1 |

| Sector | Pollutant | Profile code | Profile description | SPECIATE version |
|--------|-----------|-------------|---------------------|------------------|
| ptfire | PM | 95799 | Forest Fire-Smoldering-North Carolina AE6 | 5.1 |
| ptfire | PM | 95804 | Forest Fire-Flaming-Montana AE6 | 5.1 |
| ptfire | PM | 95805 | Forest Fire-Smoldering-Montana AE6 | 5.1 |
| ptfire | PM | 95807 | Forest Fire Understory-Flaming-Minnesota AE6 | 5.1 |
| ptfire | PM | 95808 | Forest Fire Understory-Smoldering-Minnesota AE6 | 5.1 |
| ptfire | PM | 95809 | Grass Fire-Field-Kansas AE6 | 5.1 |

**Table B-2 Profiles first used in 2016 alpha platform**

| Sector | Pollutant | Profile code | Profile description | SPECIATE version | Comment |
|--------|-----------|-------------|---------------------|------------------|---------|
| nonpt | VOC | G95223TOG | Poultry Production - Average of Production Cycle with gapfilled methane and ethane | 5.0 | Replacement for v4.5 profile 95223; Used 70% methane, 20% ethane, and the 10% remaining VOC is from profile 95223 |
| Nonpt, ptnonipm | VOC | G95240TOG | Beef Cattle Farm and Animal Waste with gapfilled methane and ethane | 5.0 | Replacement for v4.5 profile 95240. Used 70% methane, 20% ethane; the 10% remaining VOC is from profile 95240. |
| nonpt | VOC | G95241TOG | Swine Farm and Animal Waste | 5.0 | Replacement for v4.5 profile 95241. Used 70% methane, 20% ethane; the 10% remaining VOC is from profile 95241 |
| nonpt, ptnonipm, pt_oilgas, ptegu | PM2.5 | 95475 | Composite -Refinery Fuel Gas and Natural Gas Combustion | 5.0 | Composite of AE6-ready versions of SPECIATE4.5 profiles 95125, 95126, and 95127 |
| nonroad | VOC | 95328 | Spark-Ignition Exhaust Emissions from 2-stroke off-road engines  - E10 ethanol gasoline | 4.5 | |
| nonroad | VOC | 95330 | Spark-Ignition Exhaust Emissions from 4-stroke off-road engines - E10 ethanol gasoline | 4.5 | |
| nonroad | VOC | 95331 | Diesel Exhaust Emissions from Pre-Tier 1 Off-road Engines | 4.5 | |
| nonroad | VOC | 95332 | Diesel Exhaust Emissions from Tier 1 Off-road Engines | 4.5 | |
| nonroad | VOC | 95333 | Diesel Exhaust Emissions from Tier 2 Off-road Engines | 4.5 | |
| np_oilgas | VOC | 95087a | Oil and Gas - Composite - Oil Field - Oil Tank Battery Vent Gas | 4.5 | |
| np_oilgas | VOC | 95109a | Oil and Gas - Composite - Oil Field - Condensate Tank Battery Vent Gas | 4.5 | |
| np_oilgas | VOC | 95398 | Composite Profile - Oil and Natural Gas Production - Condensate Tanks | 4.5 | |

| Sector | Pollutant | Profile code | Profile description | SPECIATE version | Comment |
|--------|-----------|--------------|---------------------|------------------|---------|
| np_oilgas | VOC | 95403 | Composite Profile - Gas Wells | 4.5 | |
| np_oilgas | VOC | 95417 | Oil and Gas Production - Composite Profile - Untreated Natural Gas, Uinta Basin | 4.5 | |
| np_oilgas | VOC | 95418 | Oil and Gas Production - Composite Profile - Condensate Tank Vent Gas, Uinta Basin | 4.5 | |
| np_oilgas | VOC | 95419 | Oil and Gas Production - Composite Profile - Oil Tank Vent Gas, Uinta Basin | 4.5 | |
| np_oilgas | VOC | 95420 | Oil and Gas Production - Composite Profile - Glycol Dehydrator, Uinta Basin | 4.5 | |
| np_oilgas | VOC | DJVNT_R | Oil and Gas -Denver-Julesburg Basin Produced Gas Composition from Non-CBM Gas Wells | 4.5 | |
| np_oilgas | VOC | FLR99 | Natural Gas Flare Profile with DRE >98% | 4.5 | |
| np_oilgas | VOC | PNC01_R | Oil and Gas -Piceance Basin Produced Gas Composition from Non-CBM Gas Wells | 4.5 | |
| np_oilgas | VOC | PNC02_R | Oil and Gas -Piceance Basin Produced Gas Composition from Oil Wells | 4.5 | |
| np_oilgas | VOC | PNC03_R | Oil and Gas -Piceance Basin Flash Gas Composition for Condensate Tank | 4.5 | |
| np_oilgas | VOC | PNCDH | Oil and Gas Production - Composite Profile - Glycol Dehydrator, Piceance Basin | 4.5 | |
| np_oilgas | VOC | PRBCB_R | Oil and Gas -Powder River Basin Produced Gas Composition from CBM Wells | 4.5 | |
| np_oilgas | VOC | PRBCO_R | Oil and Gas -Powder River Basin Produced Gas Composition from Non-CBM Wells | 4.5 | |
| np_oilgas | VOC | PRM01_R | Oil and Gas -Permian Basin Produced Gas Composition for Non-CBM Wells | 4.5 | |
| np_oilgas | VOC | SSJCB_R | Oil and Gas -South San Juan Basin Produced Gas Composition from CBM Wells | 4.5 | |
| np_oilgas | VOC | SSJCO_R | Oil and Gas -South San Juan Basin Produced Gas Composition from Non-CBM Gas Wells | 4.5 | |
| np_oilgas | VOC | SWFLA_R | Oil and Gas -SW Wyoming Basin Flash Gas Composition for Condensate Tanks | 4.5 | |
| np_oilgas | VOC | SWVNT_R | Oil and Gas -SW Wyoming Basin Produced Gas Composition from Non-CBM Wells | 4.5 | |
| np_oilgas | VOC | UNT01_R | Oil and Gas -Uinta Basin Produced Gas Composition from CBM Wells | 4.5 | |
| np_oilgas | VOC | WRBCO_R | Oil and Gas -Wind River Basin Produced Gas Composition from Non-CBM Gas Wells | 4.5 | |
| pt_oilgas | VOC | 95325 | Chemical Manufacturing Industry Wide Composite | 4.5 | |
| pt_oilgas | VOC | 95326 | Pulp and Paper Industry Wide Composite | 4.5 | |
| pt_oilgas, ptnonipm | VOC | 95399 | Composite Profile - Oil Field - Wells | 4.5 | |
| pt_oilgas | VOC | 95403 | Composite Profile - Gas Wells | 4.5 | |
| pt_oilgas | VOC | 95417 | Oil and Gas Production - Composite Profile - Untreated Natural Gas, Uinta Basin | 4.5 | |

| Sector | Pollutant | Profile code | Profile description | SPECIATE version | Comment |
|--------|-----------|--------------|---------------------|------------------|---------|
| pt_oilgas | VOC | DJVNT_R | Oil and Gas -Denver-Julesburg Basin Produced Gas Composition from Non-CBM Gas Wells | 4.5 | |
| pt_oilgas, ptnonipm | VOC | FLR99 | Natural Gas Flare Profile with DRE >98% | 4.5 | |
| pt_oilgas | VOC | PNC01_R | Oil and Gas -Piceance Basin Produced Gas Composition from Non-CBM Gas Wells | 4.5 | |
| pt_oilgas | VOC | PNC02_R | Oil and Gas -Piceance Basin Produced Gas Composition from Oil Wells | 4.5 | |
| pt_oilgas | VOC | PNCDH | Oil and Gas Production - Composite Profile - Glycol Dehydrator, Piceance Basin | 4.5 | |
| pt_oilgas, ptnonipm | VOC | PRBCO_R | Oil and Gas -Powder River Basin Produced Gas Composition from Non-CBM Wells | 4.5 | |
| pt_oilgas, ptnonipm | VOC | PRM01_R | Oil and Gas -Permian Basin Produced Gas Composition for Non-CBM Wells | 4.5 | |
| pt_oilgas, ptnonipm | VOC | SSJCO_R | Oil and Gas -South San Juan Basin Produced Gas Composition from Non-CBM Gas Wells | 4.5 | |
| pt_oilgas, ptnonipm | VOC | SWVNT_R | Oil and Gas -SW Wyoming Basin Produced Gas Composition from Non-CBM Wells | 4.5 | |
| ptfire | VOC | 95421 | Composite Profile - Prescribed fire southeast conifer forest | 4.5 | |
| ptfire | VOC | 95422 | Composite Profile - Prescribed fire southwest conifer forest | 4.5 | |
| ptfire | VOC | 95423 | Composite Profile - Prescribed fire northwest conifer forest | 4.5 | |
| ptfire | VOC | 95424 | Composite Profile - Wildfire northwest conifer forest | 4.5 | |
| ptfire | VOC | 95425 | Composite Profile - Wildfire boreal forest | 4.5 | |
| ptnonipm | VOC | 95325 | Chemical Manufacturing Industry Wide Composite | 4.5 | |
| ptnonipm | VOC | 95326 | Pulp and Paper Industry Wide Composite | 4.5 | |
| onroad | PM2.5 | 95462 | Composite - Brake Wear | 4.5 | Used in SMOKE-MOVES |
| onroad | PM2.5 | 95460 | Composite - Tire Dust | 4.5 | Used in SMOKE-MOVES |

**Appendix C: Mapping of Fuel Distribution SCCs to BTP, BPS and RBT**

The table below provides a crosswalk between fuel distribution SCCs and classification type for portable fuel containers (PFC), fuel distribution operations associated with the bulk-plant-to-pump (BTP), refinery to bulk terminal (RBT) and bulk plant storage (BPS).

| SCC | Type | Description |
|---|---|---|
| 40301001 | RBT | Petroleum and Solvent Evaporation; Petroleum Product Storage at Refineries; Fixed Roof Tanks (Varying Sizes); Gasoline RVP 13: Breathing Loss (67000 Bbl. Tank Size) |
| 40301002 | RBT | Petroleum and Solvent Evaporation; Petroleum Product Storage at Refineries; Fixed Roof Tanks (Varying Sizes); Gasoline RVP 10: Breathing Loss (67000 Bbl. Tank Size) |
| 40301003 | RBT | Petroleum and Solvent Evaporation; Petroleum Product Storage at Refineries; Fixed Roof Tanks (Varying Sizes); Gasoline RVP 7: Breathing Loss (67000 Bbl. Tank Size) |
| 40301004 | RBT | Petroleum and Solvent Evaporation; Petroleum Product Storage at Refineries; Fixed Roof Tanks (Varying Sizes); Gasoline RVP 13: Breathing Loss (250000 Bbl. Tank Size) |
| 40301006 | RBT | Petroleum and Solvent Evaporation; Petroleum Product Storage at Refineries; Fixed Roof Tanks (Varying Sizes); Gasoline RVP 7: Breathing Loss (250000 Bbl. Tank Size) |
| 40301007 | RBT | Petroleum and Solvent Evaporation; Petroleum Product Storage at Refineries; Fixed Roof Tanks (Varying Sizes); Gasoline RVP 13: Working Loss (Tank Diameter Independent) |
| 40301101 | RBT | Petroleum and Solvent Evaporation; Petroleum Product Storage at Refineries; Floating Roof Tanks (Varying Sizes); Gasoline RVP 13: Standing Loss (67000 Bbl. Tank Size) |
| 40301102 | RBT | Petroleum and Solvent Evaporation; Petroleum Product Storage at Refineries; Floating Roof Tanks (Varying Sizes); Gasoline RVP 10: Standing Loss (67000 Bbl. Tank Size) |
| 40301103 | RBT | Petroleum and Solvent Evaporation; Petroleum Product Storage at Refineries; Floating Roof Tanks (Varying Sizes); Gasoline RVP 7: Standing Loss (67000 Bbl. Tank Size) |
| 40301105 | RBT | Petroleum and Solvent Evaporation; Petroleum Product Storage at Refineries; Floating Roof Tanks (Varying Sizes); Gasoline RVP 10: Standing Loss (250000 Bbl. Tank Size) |
| 40301151 | RBT | Petroleum and Solvent Evaporation; Petroleum Product Storage at Refineries; Floating Roof Tanks (Varying Sizes); Gasoline: Standing Loss - Internal |
| 40301202 | RBT | Petroleum and Solvent Evaporation; Petroleum Product Storage at Refineries; Variable Vapor Space; Gasoline RVP 10: Filling Loss |
| 40301203 | RBT | Petroleum and Solvent Evaporation; Petroleum Product Storage at Refineries; Variable Vapor Space; Gasoline RVP 7: Filling Loss |
| 40400101 | RBT | Petroleum and Solvent Evaporation; Petroleum Liquids Storage (non-Refinery); Bulk Terminals; Gasoline RVP 13: Breathing Loss (67000 Bbl Capacity) - Fixed Roof Tank |
| 40400102 | RBT | Petroleum and Solvent Evaporation; Petroleum Liquids Storage (non-Refinery); Bulk Terminals; Gasoline RVP 10: Breathing Loss (67000 Bbl Capacity) - Fixed Roof Tank |
| 40400103 | RBT | Petroleum and Solvent Evaporation; Petroleum Liquids Storage (non-Refinery); Bulk Terminals; Gasoline RVP 7: Breathing Loss (67000 Bbl. Capacity) - Fixed Roof Tank |
| 40400104 | RBT | Petroleum and Solvent Evaporation; Petroleum Liquids Storage (non-Refinery); Bulk Terminals; Gasoline RVP 13: Breathing Loss (250000 Bbl Capacity)-Fixed Roof Tank |
| 40400105 | RBT | Petroleum and Solvent Evaporation; Petroleum Liquids Storage (non-Refinery); Bulk Terminals; Gasoline RVP 10: Breathing Loss (250000 Bbl Capacity)-Fixed Roof Tank |
| 40400106 | RBT | Petroleum and Solvent Evaporation; Petroleum Liquids Storage (non-Refinery); Bulk Terminals; Gasoline RVP 7: Breathing Loss (250000 Bbl Capacity) - Fixed Roof Tank |
| 40400107 | RBT | Petroleum and Solvent Evaporation; Petroleum Liquids Storage (non-Refinery); Bulk Terminals; Gasoline RVP 13: Working Loss (Diam. Independent) - Fixed Roof Tank |
| 40400108 | RBT | Petroleum and Solvent Evaporation; Petroleum Liquids Storage (non-Refinery); Bulk Terminals; Gasoline RVP 10: Working Loss (Diameter Independent) - Fixed Roof Tank |
| 40400109 | RBT | Petroleum and Solvent Evaporation; Petroleum Liquids Storage (non-Refinery); Bulk Terminals; Gasoline RVP 7: Working Loss (Diameter Independent) - Fixed Roof Tank |
| 40400110 | RBT | Petroleum and Solvent Evaporation; Petroleum Liquids Storage (non-Refinery); Bulk Terminals; Gasoline RVP 13: Standing Loss (67000 Bbl Capacity)-Floating Roof Tank |

| SCC | Type | Description |
|---|---|---|
| 40400111 | RBT | Petroleum and Solvent Evaporation; Petroleum Liquids Storage (non-Refinery); Bulk Terminals; Gasoline RVP 10: Standing Loss (67000 Bbl Capacity)-Floating Roof Tank |
| 40400112 | RBT | Petroleum and Solvent Evaporation; Petroleum Liquids Storage (non-Refinery); Bulk Terminals; Gasoline RVP 7: Standing Loss (67000 Bbl Capacity)- Floating Roof Tank |
| 40400113 | RBT | Petroleum and Solvent Evaporation; Petroleum Liquids Storage (non-Refinery); Bulk Terminals; Gasoline RVP 13: Standing Loss (250000 Bbl Cap.) - Floating Roof Tank |
| 40400114 | RBT | Petroleum and Solvent Evaporation; Petroleum Liquids Storage (non-Refinery); Bulk Terminals; Gasoline RVP 10: Standing Loss (250000 Bbl Cap.) - Floating Roof Tank |
| 40400115 | RBT | Petroleum and Solvent Evaporation; Petroleum Liquids Storage (non-Refinery); Bulk Terminals; Gasoline RVP 7: Standing Loss (250000 Bbl Cap.) - Floating Roof Tank |
| 40400116 | RBT | Petroleum and Solvent Evaporation; Petroleum Liquids Storage (non-Refinery); Bulk Terminals; Gasoline RVP 13/10/7: Withdrawal Loss (67000 Bbl Cap.) - Float Rf Tnk |
| 40400117 | RBT | Petroleum and Solvent Evaporation; Petroleum Liquids Storage (non-Refinery); Bulk Terminals; Gasoline RVP 13/10/7: Withdrawal Loss (250000 Bbl Cap.) - Float Rf Tnk |
| 40400118 | RBT | Petroleum and Solvent Evaporation; Petroleum Liquids Storage (non-Refinery); Bulk Terminals; Gasoline RVP 13: Filling Loss (10500 Bbl Cap.) - Variable Vapor Space |
| 40400119 | RBT | Petroleum and Solvent Evaporation; Petroleum Liquids Storage (non-Refinery); Bulk Terminals; Gasoline RVP 10: Filling Loss (10500 Bbl Cap.) - Variable Vapor Space |
| 40400120 | RBT | Petroleum and Solvent Evaporation; Petroleum Liquids Storage (non-Refinery); Bulk Terminals; Gasoline RVP 7: Filling Loss (10500 Bbl Cap.) - Variable Vapor Space |
| 40400130 | RBT | Petroleum and Solvent Evaporation; Petroleum Liquids Storage (non-Refinery); Bulk Terminals; Specify Liquid: Standing Loss - External Floating Roof w/ Primary Seal |
| 40400131 | RBT | Petroleum and Solvent Evaporation; Petroleum Liquids Storage (non-Refinery); Bulk Terminals; Gasoline RVP 13: Standing Loss - Ext. Floating Roof w/ Primary Seal |
| 40400132 | RBT | Petroleum and Solvent Evaporation; Petroleum Liquids Storage (non-Refinery); Bulk Terminals; Gasoline RVP 10: Standing Loss - Ext. Floating Roof w/ Primary Seal |
| 40400133 | RBT | Petroleum and Solvent Evaporation; Petroleum Liquids Storage (non-Refinery); Bulk Terminals; Gasoline RVP 7: Standing Loss - External Floating Roof w/ Primary Seal |
| 40400140 | RBT | Petroleum and Solvent Evaporation; Petroleum Liquids Storage (non-Refinery); Bulk Terminals; Specify Liquid: Standing Loss - Ext. Float Roof Tank w/ Secondy Seal |
| 40400141 | RBT | Petroleum and Solvent Evaporation; Petroleum Liquids Storage (non-Refinery); Bulk Terminals; Gasoline RVP 13: Standing Loss - Ext. Floating Roof w/ Secondary Seal |
| 40400142 | RBT | Petroleum and Solvent Evaporation; Petroleum Liquids Storage (non-Refinery); Bulk Terminals; Gasoline RVP 10: Standing Loss - Ext. Floating Roof w/ Secondary Seal |
| 40400143 | RBT | Petroleum and Solvent Evaporation; Petroleum Liquids Storage (non-Refinery); Bulk Terminals; Gasoline RVP 7: Standing Loss - Ext. Floating Roof w/ Secondary Seal |
| 40400148 | RBT | Petroleum and Solvent Evaporation; Petroleum Liquids Storage (non-Refinery); Bulk Terminals; Gasoline RVP 13/10/7: Withdrawal Loss - Ext. Float Roof (Pri/Sec Seal) |
| 40400149 | RBT | Petroleum and Solvent Evaporation; Petroleum Liquids Storage (non-Refinery); Bulk Terminals; Specify Liquid: External Floating Roof (Primary/Secondary Seal) |
| 40400150 | RBT | Petroleum and Solvent Evaporation; Petroleum Liquids Storage (non-Refinery); Bulk Terminals; Miscellaneous Losses/Leaks: Loading Racks |
| 40400151 | RBT | Petroleum and Solvent Evaporation; Petroleum Liquids Storage (non-Refinery); Bulk Terminals; Valves, Flanges, and Pumps |
| 40400152 | RBT | Petroleum and Solvent Evaporation; Petroleum Liquids Storage (non-Refinery); Bulk Terminals; Vapor Collection Losses |
| 40400153 | RBT | Petroleum and Solvent Evaporation; Petroleum Liquids Storage (non-Refinery); Bulk Terminals; Vapor Control Unit Losses |
| 40400160 | RBT | Petroleum and Solvent Evaporation; Petroleum Liquids Storage (non-Refinery); Bulk Terminals; Specify Liquid: Standing Loss - Internal Floating Roof w/ Primary Seal |
| 40400161 | RBT | Petroleum and Solvent Evaporation; Petroleum Liquids Storage (non-Refinery); Bulk Terminals; Gasoline RVP 13: Standing Loss - Int. Floating Roof w/ Primary Seal |
| 40400162 | RBT | Petroleum and Solvent Evaporation; Petroleum Liquids Storage (non-Refinery); Bulk Terminals; Gasoline RVP 10: Standing Loss - Int. Floating Roof w/ Primary Seal |

| SCC | Type | Description |
|---|---|---|
| 40400163 | RBT | Petroleum and Solvent Evaporation; Petroleum Liquids Storage (non-Refinery); Bulk Terminals; Gasoline RVP 7: Standing Loss - Internal Floating Roof w/ Primary Seal |
| 40400170 | RBT | Petroleum and Solvent Evaporation; Petroleum Liquids Storage (non-Refinery); Bulk Terminals; Specify Liquid: Standing Loss - Int. Floating Roof w/ Secondary Seal |
| 40400171 | RBT | Petroleum and Solvent Evaporation; Petroleum Liquids Storage (non-Refinery); Bulk Terminals; Gasoline RVP 13: Standing Loss - Int. Floating Roof w/ Secondary Seal |
| 40400172 | RBT | Petroleum and Solvent Evaporation; Petroleum Liquids Storage (non-Refinery); Bulk Terminals; Gasoline RVP 10: Standing Loss - Int. Floating Roof w/ Secondary Seal |
| 40400173 | RBT | Petroleum and Solvent Evaporation; Petroleum Liquids Storage (non-Refinery); Bulk Terminals; Gasoline RVP 7: Standing Loss - Int. Floating Roof w/ Secondary Seal |
| 40400178 | RBT | Petroleum and Solvent Evaporation; Petroleum Liquids Storage (non-Refinery); Bulk Terminals; Gasoline RVP 13/10/7: Withdrawal Loss - Int. Float Roof (Pri/Sec Seal) |
| 40400179 | RBT | Petroleum and Solvent Evaporation; Petroleum Liquids Storage (non-Refinery); Bulk Terminals; Specify Liquid: Internal Floating Roof (Primary/Secondary Seal) |
| 40400199 | RBT | Petroleum and Solvent Evaporation; Petroleum Liquids Storage (non-Refinery); Bulk Terminals; |
| 40400201 | BTP /BPS | Petroleum and Solvent Evaporation; Petroleum Liquids Storage (non-Refinery); Bulk Plants; Gasoline RVP 13: Breathing Loss (67000 Bbl Capacity) - Fixed Roof Tank |
| 40400202 | BTP /BPS | Petroleum and Solvent Evaporation; Petroleum Liquids Storage (non-Refinery); Bulk Plants; Gasoline RVP 10: Breathing Loss (67000 Bbl Capacity) - Fixed Roof Tank |
| 40400203 | BTP /BPS | Petroleum and Solvent Evaporation; Petroleum Liquids Storage (non-Refinery); Bulk Plants; Gasoline RVP 7: Breathing Loss (67000 Bbl. Capacity) - Fixed Roof Tank |
| 40400204 | BTP /BPS | Petroleum and Solvent Evaporation; Petroleum Liquids Storage (non-Refinery); Bulk Plants; Gasoline RVP 13: Working Loss (67000 Bbl. Capacity) - Fixed Roof Tank |
| 40400205 | BTP /BPS | Petroleum and Solvent Evaporation; Petroleum Liquids Storage (non-Refinery); Bulk Plants; Gasoline RVP 10: Working Loss (67000 Bbl. Capacity) - Fixed Roof Tank |
| 40400206 | BTP /BPS | Petroleum and Solvent Evaporation; Petroleum Liquids Storage (non-Refinery); Bulk Plants; Gasoline RVP 7: Working Loss (67000 Bbl. Capacity) - Fixed Roof Tank |
| 40400207 | BTP /BPS | Petroleum and Solvent Evaporation; Petroleum Liquids Storage (non-Refinery); Bulk Plants; Gasoline RVP 13: Standing Loss (67000 Bbl Cap.) - Floating Roof Tank |
| 40400208 | BTP /BPS | Petroleum and Solvent Evaporation; Petroleum Liquids Storage (non-Refinery); Bulk Plants; Gasoline RVP 10: Standing Loss (67000 Bbl Cap.) - Floating Roof Tank |
| 40400210 | BTP /BPS | Petroleum and Solvent Evaporation; Petroleum Liquids Storage (non-Refinery); Bulk Plants; Gasoline RVP 13/10/7: Withdrawal Loss (67000 Bbl Cap.) - Float Rf Tnk |
| 40400211 | BTP /BPS | Petroleum and Solvent Evaporation; Petroleum Liquids Storage (non-Refinery); Bulk Plants; Gasoline RVP 13: Filling Loss (10500 Bbl Cap.) - Variable Vapor Space |
| 40400212 | BTP /BPS | Petroleum and Solvent Evaporation; Petroleum Liquids Storage (non-Refinery); Bulk Plants; Gasoline RVP 10: Filling Loss (10500 Bbl Cap.) - Variable Vapor Space |
| 40400213 | BTP /BPS | Petroleum and Solvent Evaporation; Petroleum Liquids Storage (non-Refinery); Bulk Plants; Gasoline RVP 7: Filling Loss (10500 Bbl Cap.) - Variable Vapor Space |

| SCC | Type | Description |
|---|---|---|
| 40400230 | BTP/BPS | Petroleum and Solvent Evaporation; Petroleum Liquids Storage (non-Refinery); Bulk Plants; Specify Liquid: Standing Loss - External Floating Roof w/ Primary Seal |
| 40400231 | BTP/BPS | Petroleum and Solvent Evaporation; Petroleum Liquids Storage (non-Refinery); Bulk Plants; Gasoline RVP 13: Standing Loss - Ext. Floating Roof w/ Primary Seal |
| 40400232 | BTP/BPS | Petroleum and Solvent Evaporation; Petroleum Liquids Storage (non-Refinery); Bulk Plants; Gasoline RVP 10: Standing Loss - Ext. Floating Roof w/ Primary Seal |
| 40400233 | BTP/BPS | Petroleum and Solvent Evaporation; Petroleum Liquids Storage (non-Refinery); Bulk Plants; Gasoline RVP 7: Standing Loss - External Floating Roof w/ Primary Seal |
| 40400240 | RBT | Petroleum and Solvent Evaporation; Petroleum Liquids Storage (non-Refinery); Bulk Plants; Specify Liquid: Standing Loss - Ext. Floating Roof w/ Secondary Seal |
| 40400241 | BTP/BPS | Petroleum and Solvent Evaporation; Petroleum Liquids Storage (non-Refinery); Bulk Plants; Gasoline RVP 13: Standing Loss - Ext. Floating Roof w/ Secondary Seal |
| 40400248 | BTP/BPS | Petroleum and Solvent Evaporation; Petroleum Liquids Storage (non-Refinery); Bulk Plants; Gasoline RVP 10/13/7: Withdrawal Loss - Ext. Float Roof (Pri/Sec Seal) |
| 40400249 | RBT | Petroleum and Solvent Evaporation; Petroleum Liquids Storage (non-Refinery); Bulk Plants; Specify Liquid: External Floating Roof (Primary/Secondary Seal) |
| 40400250 | BTP/BPS | Petroleum and Solvent Evaporation; Petroleum Liquids Storage (non-Refinery); Bulk Plants; Loading Racks |
| 40400251 | BTP/BPS | Petroleum and Solvent Evaporation; Petroleum Liquids Storage (non-Refinery); Bulk Plants; Valves, Flanges, and Pumps |
| 40400252 | BTP/BPS | Petroleum and Solvent Evaporation; Petroleum Liquids Storage (non-Refinery); Bulk Plants; Miscellaneous Losses/Leaks: Vapor Collection Losses |
| 40400253 | BTP/BPS | Petroleum and Solvent Evaporation; Petroleum Liquids Storage (non-Refinery); Bulk Plants; Miscellaneous Losses/Leaks: Vapor Control Unit Losses |
| 40400260 | RBT | Petroleum and Solvent Evaporation; Petroleum Liquids Storage (non-Refinery); Bulk Plants; Specify Liquid: Standing Loss - Internal Floating Roof w/ Primary Seal |
| 40400261 | BTP/BPS | Petroleum and Solvent Evaporation; Petroleum Liquids Storage (non-Refinery); Bulk Plants; Gasoline RVP 13: Standing Loss - Int. Floating Roof w/ Primary Seal |
| 40400262 | BTP/BPS | Petroleum and Solvent Evaporation; Petroleum Liquids Storage (non-Refinery); Bulk Plants; Gasoline RVP 10: Standing Loss - Int. Floating Roof w/ Primary Seal |
| 40400263 | BTP/BPS | Petroleum and Solvent Evaporation; Petroleum Liquids Storage (non-Refinery); Bulk Plants; Gasoline RVP 7: Standing Loss - Internal Floating Roof w/ Primary Seal |
| 40400270 | BTP/BPS | Petroleum and Solvent Evaporation; Petroleum Liquids Storage (non-Refinery); Bulk Plants; Specify Liquid: Standing Loss - Int. Floating Roof w/ Secondary Seal |
| 40400271 | BTP/BPS | Petroleum and Solvent Evaporation; Petroleum Liquids Storage (non-Refinery); Bulk Plants; Gasoline RVP 13: Standing Loss - Int. Floating Roof w/ Secondary Seal |
| 40400272 | BTP/BPS | Petroleum and Solvent Evaporation; Petroleum Liquids Storage (non-Refinery); Bulk Plants; Gasoline RVP 10: Standing Loss - Int. Floating Roof w/ Secondary Seal |

| SCC | Type | Description |
|---|---|---|
| 40400273 | BTP /BPS | Petroleum and Solvent Evaporation; Petroleum Liquids Storage (non-Refinery); Bulk Plants; Gasoline RVP 7: Standing Loss - Int. Floating Roof w/ Secondary Seal |
| 40400278 | BTP /BPS | Petroleum and Solvent Evaporation; Petroleum Liquids Storage (non-Refinery); Bulk Plants; Gasoline RVP 10/13/7: Withdrawal Loss - Int. Float Roof (Pri/Sec Seal) |
| 40400279 | BTP /BPS | Petroleum and Solvent Evaporation; Petroleum Liquids Storage (non-Refinery); Bulk Plants; Specify Liquid: Internal Floating Roof (Primary/Secondary Seal) |
| 40400401 | BTP /BPS | Petroleum and Solvent Evaporation; Petroleum Liquids Storage (non-Refinery); Petroleum Products - Underground Tanks; Gasoline RVP 13: Breathing Loss |
| 40400402 | BTP /BPS | Petroleum and Solvent Evaporation; Petroleum Liquids Storage (non-Refinery); Petroleum Products - Underground Tanks; Gasoline RVP 13: Working Loss |
| 40400403 | BTP /BPS | Petroleum and Solvent Evaporation; Petroleum Liquids Storage (non-Refinery); Petroleum Products - Underground Tanks; Gasoline RVP 10: Breathing Loss |
| 40400404 | BTP /BPS | Petroleum and Solvent Evaporation; Petroleum Liquids Storage (non-Refinery); Petroleum Products - Underground Tanks; Gasoline RVP 10: Working Loss |
| 40400405 | BTP /BPS | Petroleum and Solvent Evaporation; Petroleum Liquids Storage (non-Refinery); Petroleum Products - Underground Tanks; Gasoline RVP 7: Breathing Loss |
| 40400406 | BTP /BPS | Petroleum and Solvent Evaporation; Petroleum Liquids Storage (non-Refinery); Petroleum Products - Underground Tanks; Gasoline RVP 7: Working Loss |
| 40600101 | BTP /BPS | Petroleum and Solvent Evaporation; Transportation and Marketing of Petroleum Products; Tank Cars and Trucks; Gasoline: Splash Loading |
| 40600126 | BTP /BPS | Petroleum and Solvent Evaporation; Transportation and Marketing of Petroleum Products; Tank Cars and Trucks; Gasoline: Submerged Loading |
| 40600131 | BTP /BPS | Petroleum and Solvent Evaporation; Transportation and Marketing of Petroleum Products; Tank Cars and Trucks; Gasoline: Submerged Loading (Normal Service) |
| 40600136 | BTP /BPS | Petroleum and Solvent Evaporation; Transportation and Marketing of Petroleum Products; Tank Cars and Trucks; Gasoline: Splash Loading (Normal Service) |
| 40600141 | BTP /BPS | Petroleum and Solvent Evaporation; Transportation and Marketing of Petroleum Products; Tank Cars and Trucks; Gasoline: Submerged Loading (Balanced Service) |
| 40600144 | BTP /BPS | Petroleum and Solvent Evaporation; Transportation and Marketing of Petroleum Products; Tank Cars and Trucks; Gasoline: Splash Loading (Balanced Service) |
| 40600147 | BTP /BPS | Petroleum and Solvent Evaporation; Transportation and Marketing of Petroleum Products; Tank Cars and Trucks; Gasoline: Submerged Loading (Clean Tanks) |
| 40600162 | BTP /BPS | Petroleum and Solvent Evaporation; Transportation and Marketing of Petroleum Products; Tank Cars and Trucks; Gasoline: Loaded with Fuel (Transit Losses) |
| 40600163 | BTP /BPS | Petroleum and Solvent Evaporation; Transportation and Marketing of Petroleum Products; Tank Cars and Trucks; Gasoline: Return with Vapor (Transit Losses) |

| SCC | Type | Description |
|---|---|---|
| 40600199 | BTP/BPS | Petroleum and Solvent Evaporation; Transportation and Marketing of Petroleum Products; Tank Cars and Trucks; Not Classified |
| 40600231 | RBT | Petroleum and Solvent Evaporation; Transportation and Marketing of Petroleum Products; Marine Vessels; Gasoline: Loading Tankers: Cleaned and Vapor Free Tanks |
| 40600232 | RBT | Petroleum and Solvent Evaporation; Transportation and Marketing of Petroleum Products; Marine Vessels; Gasoline: Loading Tankers |
| 40600233 | BTP/BPS | Petroleum and Solvent Evaporation; Transportation and Marketing of Petroleum Products; Marine Vessels; Gasoline: Loading Barges: Cleaned and Vapor Free Tanks |
| 40600234 | RBT | Petroleum and Solvent Evaporation; Transportation and Marketing of Petroleum Products; Marine Vessels; Gasoline: Loading Tankers: Ballasted Tank |
| 40600235 | BTP/BPS | Petroleum and Solvent Evaporation; Transportation and Marketing of Petroleum Products; Marine Vessels; Gasoline: Ocean Barges Loading - Ballasted Tank |
| 40600236 | RBT | Petroleum and Solvent Evaporation; Transportation and Marketing of Petroleum Products; Marine Vessels; Gasoline: Loading Tankers: Uncleaned Tanks |
| 40600237 | RBT | Petroleum and Solvent Evaporation; Transportation and Marketing of Petroleum Products; Marine Vessels; Gasoline: Ocean Barges Loading - Uncleaned Tanks |
| 40600238 | RBT | Petroleum and Solvent Evaporation; Transportation and Marketing of Petroleum Products; Marine Vessels; Gasoline: Loading Barges: Uncleaned Tanks |
| 40600239 | RBT | Petroleum and Solvent Evaporation; Transportation and Marketing of Petroleum Products; Marine Vessels; Gasoline: Tankers: Ballasted Tank |
| 40600240 | RBT | Petroleum and Solvent Evaporation; Transportation and Marketing of Petroleum Products; Marine Vessels; Gasoline: Loading Barges: Average Tank Condition |
| 40600241 | BTP/BPS | Petroleum and Solvent Evaporation; Transportation and Marketing of Petroleum Products; Marine Vessels; Gasoline: Tanker Ballasting |
| 40600299 | RBT | Petroleum and Solvent Evaporation; Transportation and Marketing of Petroleum Products; Marine Vessels; Not Classified |
| 40600301 | BTP/BPS | Petroleum and Solvent Evaporation; Transportation and Marketing of Petroleum Products; Gasoline Retail Operations - Stage I; Splash Filling |
| 40600302 | BTP/BPS | Petroleum and Solvent Evaporation; Transportation and Marketing of Petroleum Products; Gasoline Retail Operations - Stage I; Submerged Filling w/o Controls |
| 40600305 | BTP/BPS | Petroleum and Solvent Evaporation; Transportation and Marketing of Petroleum Products; Gasoline Retail Operations - Stage I; Unloading |
| 40600306 | BTP/BPS | Petroleum and Solvent Evaporation; Transportation and Marketing of Petroleum Products; Gasoline Retail Operations - Stage I; Balanced Submerged Filling |
| 40600307 | BTP/BPS | Petroleum and Solvent Evaporation; Transportation and Marketing of Petroleum Products; Gasoline Retail Operations - Stage I; Underground Tank Breathing and Emptying |
| 40600399 | BTP/BPS | Petroleum and Solvent Evaporation; Transportation and Marketing of Petroleum Products; Gasoline Retail Operations - Stage I; Not Classified ** |
| 40600401 | BTP/BPS | Petroleum and Solvent Evaporation; Transportation and Marketing of Petroleum Products; Filling Vehicle Gas Tanks - Stage II; Vapor Loss w/o Controls |
| 40600501 | RBT | Petroleum and Solvent Evaporation; Transportation and Marketing of Petroleum Products; Pipeline Petroleum Transport - General - All Products; Pipeline Leaks |

| SCC | Type | Description |
|---|---|---|
| 40600502 | RBT | Petroleum and Solvent Evaporation; Transportation and Marketing of Petroleum Products; Pipeline Petroleum Transport - General - All Products; Pipeline Venting |
| 40600503 | RBT | Petroleum and Solvent Evaporation; Transportation and Marketing of Petroleum Products; Pipeline Petroleum Transport - General - All Products; Pump Station |
| 40600504 | RBT | Petroleum and Solvent Evaporation; Transportation and Marketing of Petroleum Products; Pipeline Petroleum Transport - General - All Products; Pump Station Leaks |
| 40600602 | BTP /BPS | Petroleum and Solvent Evaporation; Transportation and Marketing of Petroleum Products; Consumer (Corporate) Fleet Refueling - Stage II; Liquid Spill Loss w/o Controls |
| 40600701 | BTP /BPS | Petroleum and Solvent Evaporation; Transportation and Marketing of Petroleum Products; Consumer (Corporate) Fleet Refueling - Stage I; Splash Filling |
| 40600702 | BTP /BPS | Petroleum and Solvent Evaporation; Transportation and Marketing of Petroleum Products; Consumer (Corporate) Fleet Refueling - Stage I; Submerged Filling w/o Controls |
| 40600706 | BTP /BPS | Petroleum and Solvent Evaporation; Transportation and Marketing of Petroleum Products; Consumer (Corporate) Fleet Refueling - Stage I; Balanced Submerged Filling |
| 40600707 | BTP /BPS | Petroleum and Solvent Evaporation; Transportation and Marketing of Petroleum Products; Consumer (Corporate) Fleet Refueling - Stage I; Underground Tank Breathing and Emptying |
| 40688801 | BTP /BPS | Petroleum and Solvent Evaporation; Transportation and Marketing of Petroleum Products; Fugitive Emissions; Specify in Comments Field |
| 2501050120 | RBT | Storage and Transport; Petroleum and Petroleum Product Storage; Bulk Terminals: All Evaporative Losses; Gasoline |
| 2501055120 | BTP /BPS | Storage and Transport; Petroleum and Petroleum Product Storage; Bulk Plants: All Evaporative Losses; Gasoline |
| 2501060050 | BTP /BPS | Storage and Transport; Petroleum and Petroleum Product Storage; Gasoline Service Stations; Stage 1: Total |
| 2501060051 | BTP /BPS | Storage and Transport; Petroleum and Petroleum Product Storage; Gasoline Service Stations; Stage 1: Submerged Filling |
| 2501060052 | BTP /BPS | Storage and Transport; Petroleum and Petroleum Product Storage; Gasoline Service Stations; Stage 1: Splash Filling |
| 2501060053 | BTP /BPS | Storage and Transport; Petroleum and Petroleum Product Storage; Gasoline Service Stations; Stage 1: Balanced Submerged Filling |
| 2501060200 | BTP /BPS | Storage and Transport; Petroleum and Petroleum Product Storage; Gasoline Service Stations; Underground Tank: Total |
| 2501060201 | BTP /BPS | Storage and Transport; Petroleum and Petroleum Product Storage; Gasoline Service Stations; Underground Tank: Breathing and Emptying |
| 2501995000 | BTP /BPS | Storage and Transport; Petroleum and Petroleum Product Storage; All Storage Types: Working Loss; Total: All Products |
| 2505000120 | RBT | Storage and Transport; Petroleum and Petroleum Product Transport; All Transport Types; Gasoline |
| 2505020120 | RBT | Storage and Transport; Petroleum and Petroleum Product Transport; Marine Vessel; Gasoline |

| SCC | Type | Description |
|---|---|---|
| 2505020121 | RBT | Storage and Transport; Petroleum and Petroleum Product Transport; Marine Vessel; Gasoline - Barge |
| 2505030120 | BTP /BPS | Storage and Transport; Petroleum and Petroleum Product Transport; Truck; Gasoline |
| 2505040120 | RBT | Storage and Transport; Petroleum and Petroleum Product Transport; Pipeline; Gasoline |
| 2660000000 | BTP /BPS | Waste Disposal, Treatment, and Recovery; Leaking Underground Storage Tanks; Leaking Underground Storage Tanks; Total: All Storage Types |

United States
Environmental Protection
Agency

Office of Air Quality Planning and Standards
Air Quality Assessment Division
Research Triangle Park, NC

Publication No. EPA-454/B-23-001
January 2023

254

Tab HQ-58: EPA Comments on Draft Louisiana 2015 Ozone
Transport SIP 9-19-2017 (Sept. 19, 2017)
(EPA-HQ-OAR-2021-0663-0058)



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION 6
1445 ROSS AVENUE, SUITE 1200
DALLAS TX 75202-2733

September 19, 2017

Mr. Jason Meyers, Chief
Air Planning and Assessment Division
Louisiana Department of Environmental Quality
602 North Fifth Street
Baton Rouge, LA 70802

Dear Mr. Meyers:

Thank you for the opportunity to comment on the LDEQ's proposed SIP revision addressing Infrastructure and Transport for the 2015 ozone standard. We appreciate your work to meet these important Clean Air requirements. The EPA has reviewed the transport analysis contained in the proposed SIP and offers suggestions on changes and additional analyses that could be made to improve your final submittal.

As detailed below, the EPA provided extensive modeling information and analysis in a March 2018 memorandum to support the states' efforts to develop good neighbor SIPs for the 2015 ozone NAAQS to address their interstate transport obligations. While the information in our March 2018 memorandum and the associated air quality analysis data could be used to inform the development of these SIPs, the information was not a final determination regarding states' obligations under the good neighbor provision. The memorandum continues to affirm the EPA's historical four-step process for assessing transport. The memorandum also gave a list of potential flexibilities in analytic approaches different than past practices that may warrant further consideration by the states and the EPA implementing the four-step process.

The EPA provided further guidance via a teleconference with stakeholders on July 26, 2018, and recently issued a memorandum reflecting that guidance (8/31/2018 memo Analysis of Contribution Thresholds for Use in Clean Air Act Section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards). This memorandum addresses only the screening threshold value used to determine whether an upwind state contributes to a monitor and does not address any other aspect of the methodology for determination of significant impacts.

Louisiana has provided an analysis concluding that Louisiana's emissions do not interfere with any other state's ability to attain or maintain the 2015 ozone NAAQS. Based on this analysis, Louisiana did not proceed to Step 3 or 4 of the analysis which would involve the analysis of whether there are reasonable controls that could be implemented to address transport and adopting controls into the SIP as necessary. In the attachment, we provide comments on the state's analysis with suggestions for how we believe it could be improved. We note that the

EPA's analysis does indicate impacts from Louisiana on downwind states, including Texas. As a result, Louisiana may wish to consider proceeding to step 3 of the transport framework and consider whether there are reasonable controls that might be implemented to assure the state meets the Clean Air Act's transport requirements.

We offer our support as you move forward. If you have any questions about these comments or would like further explanation of our modeling, please contact me at Donaldson.guy@epa.gov or at (214) 665-7242.

Respectfully yours,

Guy Donaldson
Associate Director for
Air, Multimedia Division

cc:  Vivian H. Aucoin
     Office of Environmental Assessment

**Detailed Comments**

**Background**

On October 1, 2015, the EPA promulgated a revision to the ozone NAAQS (2015 ozone NAAQS), lowering the level of both the primary and secondary standards to 0.070 parts per million (ppm).[1] Section 110(a)(1) of the CAA requires states to submit, within 3 years after promulgation of a new or revised standard, SIPs meeting the applicable elements of section 110(a)(2).[2] One of these applicable requirements is found in section 110(a)(2)(D)(i)(I), otherwise known as the good neighbor provision, which generally requires SIPs to contain adequate provisions to eliminate in-state emissions activities that significantly contribute to nonattainment or interfere with maintenance in other states due to interstate transport of pollution.

Through the development and implementation of CSAPR, the CSAPR Update and previous rulemakings pursuant to the good neighbor provision, the EPA, working in partnership with the states, developed the following four-step interstate transport framework to address the requirements of the good neighbor provision for the ozone NAAQS: (1) Identify downwind air quality problems; (2) identify upwind states that impact those downwind air quality problems sufficiently such that they are considered "linked" and therefore warrant further review and analysis; (3) identify the emissions reductions necessary (if any), considering cost and air quality factors, to prevent linked upwind states identified in step 2 from contributing significantly to nonattainment or interfering with maintenance of the NAAQS at the locations of the downwind air quality problems; and (4) adopt permanent and enforceable measures needed to achieve those emissions reductions.

The EPA has released several documents containing information relevant to evaluating interstate transport with respect to the 2015 ozone NAAQS. First, on January 6, 2017, the EPA published a notice of data availability (NODA) with preliminary interstate ozone transport modeling with projected ozone design values for 2023, on which we requested comment. On October 27, 2017, we released a memorandum (2017 memorandum) containing updated modeling data for 2023, which incorporated changes made in response to comments on the NODA. Although the 2017 memorandum also released data for a 2023 modeling year, we specifically stated that the modeling may be useful for states developing SIPs to address remaining good neighbor obligations for the 2008 ozone NAAQS but did not address the 2015 ozone NAAQS. On March 27, 2018, we issued a memorandum (March 2018 memorandum) indicating the same 2023 modeling data released in the 2017 memorandum would also be useful for evaluating potential downwind air quality problems with respect to the 2015 ozone NAAQS (step 1 of the four-step framework). The March 2018 memorandum also included newly available contribution modeling results to assist states in evaluating their impact on potential downwind air quality problems (step 2 of the four-step framework) in their efforts to develop good neighbor SIPs for the 2015 ozone NAAQS to address their interstate transport obligations.

The March 2018 memorandum describes the process and results of the updated photochemical modeling to project ambient ozone levels for the year 2023. The memorandum explains that the selection of the 2023 analytic year aligns with the 2015 ozone NAAQS attainment year for Moderate nonattainment areas. As described in more detail in the 2017 and 2018 memoranda, the EPA used photochemical air quality modeling to project ozone concentrations at air quality

1

monitoring sites to 2023 and estimated state-by-state ozone contributions to those 2023 concentrations. This modeling used the Comprehensive Air Quality Model with Extensions (CAMx version 6.40) to model average and maximum design values in 2023 to identify potential nonattainment and maintenance receptors with respect to the 2015 ozone NAAQS.
For purposes of identifying potential nonattainment and maintenance receptors in 2023, the EPA considered a combination of monitoring data and modeling projections to identify monitoring sites that are projected to have problems attaining or maintaining the NAAQS. Specifically, the EPA identified nonattainment receptors (those monitoring sites with current measured values exceeding the NAAQS that also have projected (i.e., in 2023) average design values exceeding the NAAQS) and maintenance receptors (those monitoring sites with maximum design values exceeding the NAAQS).

The EPA next performed nationwide, state-level ozone source-apportionment modeling to estimate the expected contribution to these nonattainment and maintenance sites from each coterminous US state. While the March 2018 memorandum presented information regarding the EPA's latest analysis of ozone transport following the approaches the EPA has taken in prior regional rulemaking actions, the EPA did not make any final determinations regarding how states should identify downwind receptors with respect to the 2015 ozone NAAQS at step 1 of the four-step framework, or what threshold should be used to identify "linked" upwind states at step 2. Rather, the EPA noted that states have flexibility in developing their own SIPs to follow somewhat different analytical approaches than the EPA, so long as their chosen approach has an adequate technical justification and is consistent with the requirements of the CAA. The 2018 memorandum therefore included, as Attachment A, a preliminary list of potential flexibilities that the EPA concluded may warrant further discussion as states develop good neighbor SIPs addressing the 2015 ozone NAAQS.

On August 31, 2018, the EPA issued a memorandum, *Analysis of Contribution Thresholds for Use in Clean Air Act Section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards*, updating the information on the threshold to be used for determining a contribution to a nonattainment or maintenance receptor. By comparing the fraction of the total contribution accounted for at different threshold values the EPA concluded that it may be reasonable and appropriate for states to use a 1 ppb contribution threshold, as an alternative to a 1 percent threshold, at Step 2 of the 4-step framework in developing their SIP revisions addressing the good neighbor provision for the 2015 ozone NAAQS.

Consistency with respect to the EPA's SIP actions is legally required by the statute and regulations (see CAA§ 30l(a)(2) and 40 CFR part 56) and is a particularly acute issue with respect to regional transport issues in which multiple states may be implicated; the potential value of considering different modeling tools or analyses in addition to the EPA's, provided that any alternative modeling is performed using a credible modeling system which includes "state-of-the-science" and "fit for purpose" models, inputs, and techniques that are relevant to the nature of the ozone problem.

**Comments on Louisiana's Submission**

Step 1 – Identification of Nonattainment and Maintenance Receptors in 2023
Though not stated directly, the proposed SIP appears to rely on the EPA's modeling for 2023 to identify projected nonattainment and maintenance monitors using the approach in the CSAPR Update. It would be helpful if the SIP included a discussion of the data and methods used to identify 2023 nonattainment and maintenance receptors in downwind states.

Step 2 – Contribute to Nonattainment/Maintenance Receptors in 2023

Chapter 3.1

With respect to the threshold used to identify receptors warranting further review, Louisiana's proposal uses a threshold of 1 ppb. We note that subsequent to the submission of the LDEQ's SIP proposal, the EPA issued a memorandum on August 31, 2018, that provides additional information on the threshold that can be used for determining a contribution to a nonattainment or maintenance receptor. The memo discusses use of a 1 ppb threshold and provides analysis of that threshold, which the state should factor in to provide appropriate support as it prepares its final SIP submission.

Chapter 3.2

As noted in the SIP proposal, the EPA's modeling projected Louisiana will contribute nearly 2 ppb to the DFW area and above 3 ppb (maximum impact was 4.72 ppb) to 4 receptors in Houston/Galveston/Brazoria. The SIP proposal states that the Louisiana contribution should be deemed "significant" only if there is a persistent and consistent pattern of contribution on several days with elevated ozone. The LDEQ does not define "a persistent and consistent pattern" for contributions. It would be helpful if the SIP would explain what constitutes consistent and persistent contribution. In evaluating impacts, the EPA has focused on high ozone days in downwind states. The EPA contribution modeling provided in the March 2018 memo estimated the average contribution from each state to individual monitoring sites based the modeled contributions on the top 10 ozone days in 2023, as projected for that site. As part of the calculation of the average contribution metric, the EPA used a minimum of five days over the course of a single ozone season, i.e., at least five days out of 123 days. If there were fewer than five days with modeled ozone concentrations above 60 ppb at a particular monitoring site, then contributions were not calculated at that monitor.

Chapter 3.2 / Chapter 6.1 / Appendix B

Louisiana's alternative technique to assess the significance of contributions for step 2 is based on an analysis of seasonal weather patterns, surface wind directions, and periodic back trajectories. As detailed below, we have identified several areas where the methodology used to support the state's determination could be improved and have made suggestions to strengthen Louisiana's supplemental analysis of transport to contribute to the determination of whether emissions in Louisiana are causing or contributing to ozone exceedance in Texas.

3

1. Weather Pattern Analysis

The weather pattern analysis in the SIP proposal discusses large-scale weather patterns as they relate to commonly observed wind directions e.g. "North American atmospheric events tend to exhibit predominantly a west to east course" and "Global pressure systems create wind for Texas during the ozone season (May to September) that mostly comes from the Gulf of Mexico until near the end of the ozone season where the state receives wind from the north." Ozone exceedances do not happen every day but tend to occur during episodes of particular weather conditions that are conducive to ozone formation. Therefore, general statements about weather patterns may not be helpful in determining transport conditions during ozone episodes. It would strengthen the analysis if the SIP focused on the weather patterns that are associated with ozone episodes in DFW and Houston.

2. Wind Rose Analysis

Much of the LDEQ analysis concerns the wind roses for surface sites in the Dallas/Fort Worth and Houston/Galveston/Brazoria areas. The wind roses are cited as evidence that the wind seldom blows from Louisiana toward the Texas nonattainment areas. There are several potential limitations with this analysis: 1) wind directions measured at the surface are not necessarily good indicators of the wind direction occurring at higher elevations, which tend to have a stronger influence on interstate transport; 2) wind directions change spatially over the range of distance involved in transport from Louisiana to Texas; 3) wind directions change temporally over the range of time involved in transport from Louisiana to Texas; and 4) it appears that the wind roses are based on wind data measured throughout the year, not just during either ozone season or ozone episode days.

3. Back Trajectory Analysis

The LDEQ shows several HYSPLIT back trajectories to supplement their surface wind rose trajectory analysis. However, these are for two dates each month (the 8th and 22nd) ending at 1300 UTC. The SIP should explain why back trajectories on these days were chosen. It would strengthen the analysis to provide individual back trajectories for all high ozone days in the Houston or DFW area during the baseline period.

As a resource, the EPA's back trajectory plots are contained in the CSAPR Update AQ Modeling TSD.
https://www.epa.gov/airmarkets/air-quality-modeling-technical-support-document-final-cross-state-air-pollution-rule

Alternatively, all the back trajectories during high ozone periods can be combined into a back trajectory density plot depicting the frequency of trajectories during those conditions

There are also existing analyses that the LDEQ can draw on. The Texas Commission on Environmental Quality has done extensive analysis on the causes of ozone exceedances in Texas. (https://www.tceq.texas.gov/assets/public/implementation/air/am/modeling/hgb8h2/doc/HGB8H2_Conceptual_Model_20090519.pdf)

LDEQ's back trajectory analysis can be strengthened by plotting the back trajectories by one of the techniques above for the high ozone episodes. To facilitate this analysis, we have attached an Air Quality System report for the highest ozone concentrations at the nonattainment and maintenance monitors in Texas during the base years.

Consistent with our March 27, 2018 memo "Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I)", we suggest an evaluation of the collective contribution in the Dallas/Fort Worth and Houston areas to determine the extent to which a receptor is "transport influenced." In addition, the EPA would be interested in Louisiana's recommendations on whether different contribution thresholds are appropriate based on regional differences in the nature or extent of the transport problem.

Steps 3 and 4 –

The EPA's analysis does indicate impacts from Louisiana on downwind states including Texas. Because of these impacts, Louisiana should consider proceeding to step 3 of the transport framework. We note that our March 2018 memorandum also included a list of potential flexibilities to address step 3 (Identifying air quality, cost, and emission reductions factors to be evaluated in a multifactor test to identify emissions that significantly contribute to nonattainment or interfere with maintenance of the NAAQS downwind, if any) and step 4 (Adopt permanent and enforceable measures needed to achieve emission reductions) that the LDEQ may consider as part of a step 3 analysis.

TAB HQ-70: 2016v3 DVs STATE CONTRIBUTIONS (JAN. 31, 2023)
(EPA-HQ-OAR-2021-0663-0070)

This file contains base period and projected ozone design values and projected contributions at individual monitoring sites based upon EPA's air quality modeling for the 2016v3 Modeling Platform. Information how these data were prepared can be found in the Air Quality Modeling Technical Support Document.

The following data are provided for individual monitoring sites:
- 2023 average and maximum design values for the "3 x 3" and "no water" approaches.
- Measured 2014 – 2018 average and maximum design values (i.e., 2016 Centered Avg and Max DVs).
- 2023 ozone contribution metric values from each state and the District of Columbia, individually.
- 2023 ozone contribution metric values from emissions in the Tribal, Canada & Mexico, Offshore, Fires, Initial & Boundary Concentration, Biogenics, and Lightning NOx source tags.

Notes:
- The concentrations and contribution data in this file are in units of parts per billion (ppb).
- The contribution metric data for 2023 are based on apportioning the 2023 "no water" average design values using the modeled contribution data for each of these years, respectively.
- Data in this file are provided for those monitoring sites that meet certain criteria used for calculating the contribution metric. Specifically, the contribution metric values are calculated based on modeled contribution data for the top-10 model-predicted 8-hour daily maximum (i.e., MDA8) ozone concentration days in 2023. Monitoring sites were eliminated from the calculation of the contribution metric if there were fewer than 5 days with future year modeled-predicted MDA8 ozone concentrations greater than or equal to 60 ppb.
- Additional information on the methods for projecting design values and calculating contributions can be found in the Air Quality Modeling for the Final SIP Disapproval Action and the 2016v3 Emissions Modeling Platform Technical Support Document.
- Design values at monitoring sites with measured exceedance that are primarily associated certain wintertime meteorological conditions and ozone precursor emissions from oil and gas production and transportation have been excluded from contribution data set. This includes the monitoring sites in Duchesne and Uintah counties, UT.

**Tab HQ-83: 2015 Ozone NAAQS Interstate Transport SIP Disapprovals - Response to Comment (RTC) Document (Jan. 31, 2023) (EPA-HQ-OAR-2021-0663-0083)**

# 2015 Ozone NAAQS Interstate Transport SIP Disapprovals – Response to Comment (RTC) Document

This Response to Comments (RTC) document, together with the notice of final action titled Air Plan Disapprovals; Interstate Transport of Air Pollution for the 2015 8-hour Ozone National Ambient Air Quality Standards (NAAQS), presents the Environmental Protection Agency's (EPA) responses to public comments received on the EPA's proposal of 21 state implementation plan (SIP) actions included in this final action.

The EPA has addressed all significant issues raised in timely public comments. The EPA received 84 individual written comment submissions during the public comment periods. Table 1 provides the commenter name, the commenter abbreviated name which may also be used within this document, and links to the commenter's submission in the docket for this action. This document, together with the notice of final action, should be considered collectively as the EPA's response to all significant comments pertaining to the states included in this action.

## Table 1: Commentor Acronyms & IDs

| Commentor Name | Acronym | ID |
|---|---|---|
| Air Pollution Control Program, Missouri Department of Natural Resources | MDNR | 01 |
| Alabama Department of Environmental Management | ADEM | 02 |
| Alabama Power Company | APC | 03 |
| Alabama Power Company, Southern Power Company, and PowerSouth Energy Cooperative | APC et al. | 04 |
| Ameren Missouri | | 05 |
| Anonymous | | 06 |
| Arkansas Department of Energy and Environment, Division of Environmental Quality | ADEQ | 07 |
| Arkansas Electric Cooperative Corporation | AECC | 08 |
| Arkansas Environmental Federation | AEF | 09 |
| Arkansas Forest & Paper Council | AF&PC | 10 |
| Association of Electric Companies of Texas, BCCA Appeal Group, Texas Chemical Council and Texas Oil & Gas Association | AECT et al. | 11 |
| California Air Resources Board | CARB | 12 |
| City Utilities of Springfield, Missouri | CU | 13 |
| Cleco Corporate Holdings LLC | Cleco | 14 |
| Ducote, Samuel | | 15 |
| Eagle Materials Inc. | Eagle | 16 |
| Emley, Margaret | | 17 |
| Energy Security Partners | ESP | 18 |
| Entergy Services, LLC | ESL | 19 |
| Environmental Federation of Oklahoma | EFO | 20 |
| Evergy, Inc. | | 21 |
| Hagerty, Logan | | 22 |
| Idaho Power Company | IPC | 23 |
| Kaw Nation | | 24 |
| Kentucky Division for Air Quality | KDAQ | 25 |
| Louisiana Chemical Association | LCA | 26 |

2

| Louisiana Department of Environmental Quality | LDEQ | 27 |
|---|---|---|
| Louisiana Electric Utility Environmental Group | LEUEG | 28 |
| Maryland Department of the Environment | MDE | 29 |
| Midwest Ozone Group | MOG | 30 |
| Minnesota Pollution Control Agency | MPCA | 31 |
| Mississippi Department of Environmental Quality | MDEQ | 32 |
| Nevada Division of Environmental Protection | NDEP | 33 |
| New Jersey Department of Environmental Protection | NJDEP | 34 |
| NRG Texas Power LLC | NRG | 35 |
| Ohio Utilities and Generators Group | OUG | 36 |
| Oklahoma Department of Environmental Quality | ODEQ | 37 |
| PacifiCorp | | 38 |
| Sierra Club | | 39 |
| Southwestern Electric Power Company | SEPC | 40 |
| Tennessee Department of Environment and Conservation | TDEC | 41 |
| Texas Commission on Environmental Quality | TCEQ | 42 |
| Texas Transport Working Group | | 43 |
| The Luminant Companies | | 44 |
| United States Steel Corporation | U.S. Steel | 45 |
| Utah Associated Municipal Power System | UAMPS | 46 |
| Utah Division of Air Quality | UDAQ | 47 |
| Utah Petroleum Association and the Utah Mining Association | UPA & UMA | 48 |
| West Virginia Department of Environmental Protection | WVDEP | 49 |
| WildEarth Guardians | WEG | 50 |
| Wisconsin Department of Natural Resources | WDNR | 51 |
| Xcel Energy | | 52 |

The responses presented in this document supplement the responses to comments that appear in the notice of final action and addresses comments not discussed in the notice of final action. The EPA took great care in presenting comment excerpts accurately in this document (either verbatim or paraphrased), though did make some formatting adjustments for the ease of use of this document. Complete and original copies of the comment letters, including some footnotes, tables, charts, etc. which were not reproduced in this document are available in the dockets listed in the memo "Regional Dockets Containing Additional Supporting Materials for Final Action on 2015 Ozone NAAQS Good Neighbor SIP Submissions" found in the docket for this action. Although portions of the notice of final action are paraphrased in this response to comment (RTC) document, to the extent such paraphrasing introduces any confusion or apparent inconsistency, the notice of final action itself remains the definitive statement of the rationale for the final action. This document, together with the notice of final action, should be considered collectively as the EPA's response to all significant comments submitted on the EPA's proposed disapprovals of SIPs addressing Clean Air Act (CAA) section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS.

As stated in the preamble, the EPA is not taking final action on Tennessee's SIP submission, and the SIP submission from Alabama which EPA proposed to disapprove on February 22, 2022 has since been

withdrawn by the state. However, the docket that included the EPA's proposed action on Alabama and Tennessee's submissions also included action on other states' SIP submissions (Mississippi and Kentucky) that are being finalized in this action. In an effort to be responsive to all comments that may have broader relevance to this action, EPA has considered all comments submitted in this docket and responded as appropriate. However, where comments address EPA's proposal with respect to issues specific to Tennessee, the Agency defers responding to those comments and has made note of this in this document where appropriate. EPA has included and responds to the comments received on the EPA's proposal of Alabama's June 21, 2022 submission, proposed on October 25, 2022.

# Table of Contents

Table 1: Commentor Acronyms & IDs ........................................................................................... 2

Table 2: Abbreviations and Acronyms ......................................................................................... 8

1    Comments Related to Rulemaking Procedure ..................................................................... 12

1.1    Timing of SIP Actions ................................................................................................. 12

1.2    Guidance for SIP Submissions ................................................................................... 29

1.3    Attachment A to the March 2018 Memorandum ...................................................... 37

1.4    Use of Updated Modeling .......................................................................................... 42

1.5    States' Step 3 Analysis ............................................................................................... 62

1.6    EPA Input During SIP Submission Development ........................................................ 68

1.7    Length of Comment Period ........................................................................................ 79

1.8    Docket Document Availability ................................................................................... 86

2    Analytic Year of 2023 ......................................................................................................... 89

3    Emissions Inventories ........................................................................................................ 97

3.1    Emissions Inventory - General .................................................................................. 97

3.2    Emissions Inventory – Non-EGUs .............................................................................. 97

3.3    Emissions Inventory – EGUs .................................................................................... 120

3.3.1    Unit Corrections ............................................................................................... 120

3.3.2    EPA's Integrated Planning Model (IPM) ........................................................... 124

3.3.3    Other EGU Inventory-Related Comments ........................................................ 130

4    Air Quality Modeling ........................................................................................................ 135

4.1    Modeling Design - General ...................................................................................... 135

4.1.1    Modeling Design - Lake Michigan .................................................................... 136

4.1.2    Modeling Design - Western States ................................................................... 154

4.2    Model Performance .................................................................................................. 156

4.2.1    Model Performance at Lake Michigan .............................................................. 156

4.2.2    Model Performance at Western States ............................................................. 166

4.3    Model Error vs Contribution Threshold .................................................................. 184

5    Updates to Modeling and Changes in Linkages ............................................................... 188

6    Step 1 ............................................................................................................................... 206

6.1    Projected Air Quality Problems ............................................................................... 206

6.1.1    Western Receptors ........................................................................................... 206

6.1.2    Receptors Linked to Texas ............................................................. 209

6.1.3    Meteorologically Adjusted Ozone Trends......................................... 216

6.2    EPA Methodology for Determining Maintenance Receptors .......................... 217

6.3    TCEQ's Alternative Methodology for Determining Maintenance Receptors .......... 220

6.4    October 2018 Memorandum ........................................................... 232

6.5    Certain Monitoring Sites in California at Step 1.................................. 234

7    Step 2 ............................................................................ 238

7.1    Methodology for Determining Future Year Contributions ........................... 238

7.2    Contributions ................................................................... 251

7.3    1 Percent as a Contribution Threshold ........................................... 257

7.4    August 2018 Memorandum .......................................................... 267

7.5    Maintenance-Only Linkages ....................................................... 300

8    Step 3 ............................................................................ 303

8.1    Determination of Significant Contribution ....................................... 303

8.2    Alleged De Minimis Contribution................................................. 316

8.3    Existing and Future State Controls .............................................. 321

8.4    Modeling and CAA Section 179B Guidance .......................................... 333

8.5    Air Quality Factors............................................................. 339

8.6    Cost Thresholds................................................................. 342

8.7    "Consistent and Persistent" Contribution ........................................ 347

8.8    Hybrid Single-Particle Lagrangian Integrated Trajectory (HYSPLIT) Model ......... 354

8.9    Allegations of Inconsistency with Other Recent EPA Actions ...................... 372

9    Controls .......................................................................... 376

9.1    Supplemental Submission ......................................................... 376

9.2    Over-Control ................................................................... 377

10    Legal Comments Not Otherwise Addressed Elsewhere................................ 379

10.1    Venue ......................................................................... 379

10.2    SIP Call ...................................................................... 394

10.3    Cooperative Federalism and the EPA's Authority................................. 398

10.4    Reliance on FIP Measures ...................................................... 437

10.5    Comments Alleging "Pretext" or Intent to Require Generation Shifting........... 439

10.6    Allegation that Disapprovals of Western State SIP Submissions was Predetermined ... 440

10.7    EPA's Response to Comment on Proposed Actions Related to Alabama ................................. 446

11    Miscellaneous .................................................................................................................... 448

    11.1    Incorporation of Other's Comments by Reference .................................................. 448

    11.2    CAA Section 126 Petitions ...................................................................................... 451

    11.3    Transport Policy ..................................................................................................... 452

    11.4    Transport Policy- Western State Ozone Regulation ................................................ 458

    11.5    International Contributions ..................................................................................... 462

    11.6    Economic Impacts ................................................................................................. 463

    11.7    Environmental Justice ............................................................................................ 467

    11.8    Mobile Sources Emissions ...................................................................................... 468

    11.9    Typographical Concerns ......................................................................................... 476

    11.10    Tribal Concerns ................................................................................................... 477

    11.11    Executive Order 13132 ........................................................................................ 479

    11.12    Consent Decrees ................................................................................................. 480

    11.13    General Recommendations .................................................................................. 483

    11.14    Out of Scope ....................................................................................................... 486

    11.15    Out of Scope - Comments on the Proposed FIP ................................................... 489

## Table 2: Abbreviations and Acronyms

| | |
|---|---|
| ADEM | Alabama Department of Environmental Management |
| ADEQ | Arkansas Department of Energy and Environment, Division of Environmental Quality |
| AECC | Arkansas Electric Cooperative Corporation |
| AECT | Association of Electric Companies of Texas |
| AEF | Arkansas Environmental Federation |
| AEO | Annual Energy Outlook |
| AF&PC | Arkansas Forest & Paper Council |
| AL | Alabama |
| APA | Administrative Procedures Act |
| APC | Alabama Power Company |
| APCA | Anthropogenic Precursor Culpability Assessment |
| AQAT | Air Quality Assessment Tool |
| AQM TSD | Air Quality Modeling Technical Support Document |
| ASC | Air Stewardship Coalition |
| ASTM | American Society of Testing and Materials |
| AZ | Arizona |
| BACM | Best Available Control Measures |
| BACM | Best Available Control Measures |
| BACT | Best Available Control Technology |
| BARCT | Best Available Retrofit Control Technology |
| CA | California |
| CAA | Clean Air Act |
| CAIR | Clean Air Interstate Rule |
| CAMx | Comprehensive Air Quality Model with Extensions |
| CARB | California's Air Resources Board |
| CDPHE | Colorado Department of Public Health and Environment |
| CenSARA | Central States Air Resources Agencies |
| CH4 | Methane |
| CO | Colorado |
| COMAR | Code of Maryland Regulations |
| CSAPR | Cross-State Air Pollution Rule |
| CT | Connecticut |
| CU | City Utilities of Springfield, Missouri |
| D.C. | District of Columbia |
| DE | Delaware |
| DFW | Dallas-Fort Worth |
| DM/NFR | Denver Metro / North Front Range |
| DV | Design value |
| ECHO | Enforcement and Compliance History Online |
| EFO | Environmental Federation of Oklahoma |
| EGUs | Electric Generating Units |

| EMP | Emissions Modeling Platform |
|-----|------|
| EO | Executive Order |
| EPA | Environmental Protection Agency |
| ERTAC | Eastern Regional Technical Advisory Committee |
| ESL | Entergy Services, LLC |
| ESP | Energy Security Partners |
| FIP | Federal Implementation Plan |
| FR | Federal Register |
| GHG | Greenhouse gases |
| HEED | Electric generating unit |
| HQ | Headquarters |
| hr | Hour |
| HYSPLIT | Hybrid Single-Particle Lagrangian Integrated Trajectory |
| IL | Illinois |
| IN | Indiana |
| IPC | Idaho Power Company |
| IPM | Integrated Planning Model |
| iSIP | Infrastructure State Implementation Plan (SIP) |
| KDAQ | Kentucky Division for Air Quality |
| Km | Kilometer |
| LADCO | Lake Michigan Air Directors Consortium |
| LCA | Louisiana Chemical Association |
| LDEQ | Louisiana Department of Environmental Quality |
| LEUEG | Louisiana Electric Utility Environmental Group |
| LEV | Low-Emissions Vehicle |
| LMOS | Lake Michigan Ozone Study |
| MACT | Maximum achievable control technology |
| MARAMA | Mid-Atlantic Regional Air Management Association, Inc. |
| MDA8 | Maximum daily 8-h average |
| MDE | Maryland Department of the Environment |
| MDEQ | Mississippi Department of Environmental Quality |
| MDNR | Missouri Department of Natural Resources |
| MI | Michigan |
| MO | Missouri |
| MOG | Midwest Ozone Group |
| MOVES | Motor Vehicle Emissions Simulator |
| MPCA | Minnesota Pollution Control Agency |
| MPE | Model Performance Evaluation |
| MW | Megawatt |
| MWe | Megawatts electric |
| NAAQS | National Ambient Air Quality Standards |
| Nbias | Normalized bias |
| NDEP | Nevada Division of Environmental Protection |

9

| | |
|---|---|
| NEEDS | National Electric Energy Data System |
| NEI | National Emissions Inventory |
| NJ | New Jersey |
| NNSR | Nonattainment New Source Review |
| $NO_2$ | Nitrogen dioxide |
| NODA | Notice of Data Availability |
| NOX | Nitrogen oxides |
| NPRM | Notice of proposed rulemaking |
| NRG | NRG Texas Power LLC |
| NSR | New Source Review |
| NV | Nevada |
| NW | Northwest |
| NWF | Northern Wasatch Front |
| NYMA | New York Metropolitan Area |
| NYS DEC | New York State Department of Conservation |
| $O_3$ | Ozone |
| OAQPS | Office of Air Quality Planning and Standards |
| OAR | Office of Air and Radiation |
| ODEQ | Oklahoma Department of Environmental Quality |
| OH | Ohio |
| OK | Oklahoma |
| OTC | Ozone Transport Commission |
| OUG | Ohio Utilities and Generators Group |
| PA | Pennsylvania |
| PM | Particulate matter |
| PM2.5 | PM with a diameter of 2.5 micrometers or less; fine particulate |
| ppb | Parts per billion |
| PSD | Prevention of Significant Deterioration |
| RACT | Reasonably available control technology |
| RCF | Relative Contribution Factor |
| RCU | Revised CSAPR Update |
| RFF | Relative Response Factors |
| RFG | Reformulated gasoline |
| RTC | Response to Comments |
| SAFETEA | Safe, Accountable, Flexible, Efficient Transportation Equity Act |
| SCCT | Simple cycle and regenerative combustion turbines |
| SCR | Selective catalytic reduction |
| SEPC | Southwestern Electric Power Company |
| SIP | State Implementation Plan |
| SNCR | Selective Non-Catalytic Reduction |
| SSM | Startup, shutdown, and malfunction |
| TCEQ | Texas Commission on Environmental Quality |
| TDEC | Tennessee Department of Environmental Conservation |

10

| TIP | Tribal Implementation Plan |
| TN | Tennessee |
| tpy | Tons per year |
| TSD | Technical Support Document |
| TX | Texas |
| U.S. | United States |
| U.S.C. | United States Code |
| UAMPS | Utah Associated Municipal Power System |
| UDAQ | Utah Division of Air Quality |
| UMA | Utah Mining Association |
| UPA | Utah Petroleum Association |
| UT | Utah |
| VOC | Volatile organic compounds |
| WDNR | Wisconsin Department of Natural Resources |
| WEG | WildEarth Guardians |
| WESTAR | Western States Air Resources Council |
| WI | Wisconsin |
| WRAP | Western Regional Air Partnership |
| WVDEP | West Virginia Department of Environmental Protection |
| yr | Year |
| ZEV | Zero-Emissions Vehicle |

# 1  Comments Related to Rulemaking Procedure

## 1.1  Timing of SIP Actions

*Comments*

**Commenter:** Air Pollution Control Program, Missouri Department of Natural Resources

**Commenter ID:** 01

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

Further, EPA's proposed disapproval of Missouri's SIP and the imposition of a proposed FIP gives Missouri no real opportunity to address EPA's concerns and revise our SIP at step-3.

**Commenter:** Arkansas Environmental Federation

**Commenter ID:** 09

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

DEQ should be permitted time to analyze, address and/or correct any deficiencies identified by EPA before finalizing a FIP. Although EPA might generally have the authority under Section 7410(c)(1)(B) to issue a FIP at any time prior to the 2-year deadline after disapproval, nevertheless, CAA Section 7410(c)(1) contemplates that a state would be provided time to correct any deficiency and that EPA has the discretion to allow up to two years for correction of any deficiency.  EPA's determination about whether a FIP should be promulgated immediately as to a specific state should be based on a state-specific analysis since a State may bring a particularized, as-applied challenge to a nationwide or regional transport rule.

II. EPA's Proposed SIP Disapproval and FIP Proposal is Out of Sequence.

EPA's approach to taking action to disapprove the DEQ SIP and simultaneously promulgate a FIP, instead of allowing DEQ to submit revisions to its SIP, effectively impairs ADEQ's ability to make a state-specific over-control analysis. EPA does not have the authority to impose requirements that result in over-control, nor does it have the authority to mandate a particular control for a state.  In fact, EPA seeks comment on its proposed FIP as to whether its FIP results in over-control with respect to Arkansas.  EPA has the process backwards. Under EPA's analysis based on the 2016 modeling platform, the single Michigan maintenance receptor that Arkansas analyzed in its SIP submission is no longer an issue.  Yet now, EPA has identified receptors in Texas that it claims are adversely impacted by Arkansas emissions and has imposed control requirements without allowing Arkansas the opportunity to evaluate EPA's newly-purported linkages to Texas and determine the appropriate emissions reductions, if any,

necessary from Arkansas sources to address these purported linkages. Consequently, EPA's SIP disapproval and its proposed FIP are linked, and EPA should not finalize its FIP with respect to Arkansas until DEQ has been given a reasonable amount of time to respond.

**Commenter:** Arkansas Department of Energy and Environment, Division of Environmental Quality

**Commenter ID:** 07

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

Timing of EPA's Proposed Rule

Under the Clean Air Act §110(k), EPA has six months to determine whether or not a state's SIP submittal is complete once it is received from the state. From the time of the completeness determination, EPA has twelve months to finalize an approval or disapproval of the state's submission. For the Arkansas Transport SIP, the deadline for EPA final action was November 7, 2020. EPA failed to meet its statutory deadline for acting on the Arkansas Transport SIP. Not until EPA was sued by environmental organizations and EPA conducted new analyses to effectively supersede analyses provided by the previous EPA administration for use by states in SIP development did EPA issue a proposed action on the Arkansas Transport SIP.

EPA failed to meet its statutory deadline for acting on the Arkansas Transport SIP. Not until EPA was sued by environmental organizations and EPA conducted new analyses to effectively supersede analyses provided by the previous EPA administration for use by states in SIP development did EPA issue a proposed action on the Arkansas Transport SIP.

EPA had all of the information necessary based on the best available science to approve the interstate component of the Arkansas Transport SIP submittal when its action was due on November 7, 2020.

[...]

Simply put, EPA did not act on 2015 Ozone Transport SIPs in a timely manner. As EPA notes in the proposed disapproval, decision points are made based on information available at the time. Had EPA reviewed the SIP in the timeframe required by federal law, the information available at the time—the same information that states used to inform their decisions—would have ensured that states did not waste time on robust analyses of available data for the purposes of making sound, evidence-based decisions. EPA stalled an evaluative action until the perceived "facts" of the situation changed such that timely state analyses were rendered outdated. Because EPA did not act on SIP submissions in a timely manner as required by the Clean Air Act, and instead intended their assessment of Transport SIPs to be "forward looking," states have been put at a clear disadvantage in the final stages of the SIP process.

The Arkansas Transport SIP submittal clearly demonstrated, based on the information available at the time, that the Arkansas SIP contains adequate provisions to ensure that in-state emissions activities do not "significantly" contribute to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in any other state. DEQ requests that EPA withdraw its proposed disapproval and instead fully approve

13

the Arkansas Transport SIP. In the alternative, EPA should allow DEQ the customary two years post-disapproval to address identified deficiencies in the Arkansas Transport SIP and to resubmit to EPA, prior to issuing a federal implementation plan.

[…]

States must undertake SIP development with limited technical resources, so the states rely heavily on EPA data and EPA guidance in their decision-making. The threshold decision is fundamental to further steps in the Interstate Transport Framework analysis. Therefore, this late-stage decision by EPA is unreasonable. DEQ finds that this decision effectively forces states to fail in meeting EPA's vacillating interpretation of what is necessary for SIPs to meet interstate transport obligations.

[…]

DEQ does not believe that EPA has the information necessary to broad-stroke disapprove the Arkansas Transport SIP. DEQ requests that EPA take pause on final SIP and FIP actions for the state until DEQ (or EPA) has completed further analysis of linkages from emission sources and activities in the state to determine if there are sources or emissions activities in the state that significantly contribute to the newly identified nonattainment receptor or interfere with maintenance of the NAAQS in Texas, and if so, to adopt appropriate control strategies to prohibit the significant contribution(s).

**Commenter:** Association of Electric Companies of Texas, BCCA Appeal Group, Texas Chemical Council and Texas Oil & Gas Association

**Commenter ID:** 11

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

If EPA proceeds with disapproval on the basis of its new analysis, EPA should allow Texas to revise its SIP submission.

EPA did not act on Texas's SIP submission within the CAA's statutory timeframe. Due to EPA's own delay in acting, EPA has deviated from its long-standing practice of giving states an opportunity to address new information or analysis and, potentially, develop and submit revisions to EPA before the Agency issues a FIP. In proposing a FIP and announcing that it intends to finalize the FIP concurrently with or soon after it finalizes disapprovals of Transport SIPs, it is clear that EPA is not affording states and other commentors a meaningful opportunity to integrate their concerns into the final action.

The CAA requires that, once a SIP is deemed complete, EPA must act on the SIP within 12 months. TCEQ submitted its SIP on August 17, 2018. To comply with the CAA, EPA should have proposed to approve or disapprove the SIP by February 2020. EPA, however, did not propose to disapprove Texas's SIP submission until February 22, 2022, as the result of a consent decree. Due to EPA's own delay and the accelerated timeline required by the consent decree, EPA is proposing to deny commentors the opportunity to respond to the new data and analysis. Moreover, EPA has previously allowed states to revise disapproved SIPs, consistent with CAA Section 110(c)(1), prior to issuing a FIP. EPA's accelerated

14

timeline for issuing a FIP, which resulted from EPA's own delay, effectively penalizes Texas for timely submitting its SIP.

**Commenter:** City Utilities of Springfield, Missouri

**Commenter ID:** 13

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

EPA decision to disapprove seems arbitrary and capacious in terms of timing, implementation schedule, and level of reductions. Missouri has not been given time to redress EPA disapproval concerns within their current plans to either enhance or supplement the record. EPA changed the modeled receptors in upwind states attributed to Missouri's contribution. Changes at this point in time will unduly burden MDNR's ability to implement rule changes outside the normal review and oversight process. Missouri will be forced to absorb the Federal Plan allocation methodology without appropriate consent, comment and justification.

**Commenter:** Eagle Materials Inc.

**Commenter ID:** 16

**Docket ID:** EPA-R09-OAR-2022-0138

**Comment:**

Under CAA § 110, states retain primary authority to address their ozone transport obligations until EPA has taken *final* action on a SIP submission. If a state submits a SIP that does not adequately fulfill these obligations, EPA is required to disapprove the SIP within 18 months. Because a disapproval is a substantive rule "affecting individual rights and obligations," EPA is required to go through notice-and-comment rulemaking in finalizing its decision. Only after such disapproval is finalized, can EPA promulgate a FIP in its place, which must similarly go through notice-and-comment. Here, however, EPA issued a Proposed FIP *before* issuing its Proposed Disapproval of Nevada's SIP, based on EPA's "anticipate[d]" determination that pending SIP submissions "may not have adequate provisions… to address [the states'] interstate transport obligations for the 2015 ozone NAAQS."

For EPA to issue its Proposed FIP before fulfilling it mandatory duty to timely act on the proposed Nevada SIP is the very hallmark of unreasonable agency action. CAA § 110(k) requires EPA to take final action to approve or disapprove a state's SIP, once submitted, within 18 months. However, EPA exceeded this deadline by over 2 years. Nevada submitted a revised SIP addressing interstate transport obligations under the 2015 Ozone NAAQS on October 1, 2018. Under Section 110(k) of the CAA, EPA was required to act on this submission by April 1, 2020—instead, EPA did not issue its Proposed Disapproval until May 24, 2022.

**Commenter:** Environmental Federation of Oklahoma

**Commenter ID:** 20

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

In particular, EFO supports DEQ's assessment that EPA has overstepped its authority by circumventing the normal SIP development and approval process in a number of ways, including but not limited to: […] proposing a replacement Federal Implementation Plan (FIP) before the state even has a chance to review the proposed SIP disapproval.

**Commenter:** Idaho Power Company

**Commenter ID:** 23

**Docket ID:** EPA-R09-OAR-2022-0138

**Comment:**

The Proposed Disapproval circumvents notice-and-comment requirements.

EPA exceeded its authority under the CAA in proposing a FIP prior taking final action on the Proposed Disapproval. The CAA allows EPA to promulgate a FIP only "after the Administrator finds that a State failed to make a require submission . . . or disapproves a state implementation plan submission."

As discussed above, under the CAA, states retain primary authority to address their ozone transport obligations until EPA has taken final action on a SIP submission. If a state submits a SIP that does not adequately fulfill these obligations, EPA is required to disapprove the SIP within 18 months. Because a disapproval is a substantive rule "affecting individual rights and obligations," EPA is required to go through notice-and-comment rulemaking in finalizing its decision.[29] Only after such disapproval is finalized can EPA promulgate a FIP in its place,[30] which must similarly go through notice-and-comment.

Here, EPA proposed a FIP more than two years after it was statutorily obligated to respond to Nevada's SIP submission and more than a month before publishing the Proposed Disapproval—which is largely based on modeling and data *unavailable to Nevada at the time it developed its SIP*. In other words, Nevada held up its side of the cooperative federalism bargain struck by the Clean Air Act, but EPA did not. This is the very hallmark of unreasonable agency action. Nevada submitted a revised SIP addressing interstate transport obligations under the 2015 Ozone NAAQS on October 1, 2018. Under CAA Section 110(k), EPA was required to act on this submission by April 1, 2020, 18 months after Nevada submitted its SIP. EPA published its Proposed Disapproval more than two years after this deadline had passed, on May 24, 2022.

[29] *See, e.g.*, Chrysler Corp. v. Brown, 441 U.S. 281, 302 (1979).
[30] *See* 42 U.S.C. § 7410(c)(1) (requiring Administrator to promulgate FIP "at any time within 2 years after" disapproving a SIP). While the Supreme Court held in *EPA v. EME Homer City Generation* that, under this provision,

"EPA is not obliged to wait two years or postpone its action even a single day," the Court noted that this authority applies "[*a*]*fter* EPA has disapproved a SIP." 572 U.S. 489, 509 (2014) (emphasis added)

**Commenter:** Kentucky Division for Air Quality

**Commenter ID:** 25

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

Lack of Timeliness of EPA Action

Kentucky disagrees with EPA's proposed disapproval of its State Implementation Plan (SIP) regarding the interstate transport requirements for the 2015 8-hour ozone national ambient air quality standards (NAAQS) because EPA's inaction prohibited Kentucky from addressing any deficiencies identified or submitting a revised SIP for approval. Kentucky's final 2015 8-hour Ozone NAAQS Infrastructure SIP (I-SIP) was transmitted to EPA on January 9, 2019, and included the interstate transport requirements. EPA did not make a completeness determination within 60 days, and the SIP was deemed complete by operation of law under 42 U.S.C. § 7410(k)(1)(B) six months later, on July 9, 2019. Once a completeness determination occurs by operation of law, EPA has 12 months to take action on the SIP submittal. EPA was required to act on Kentucky's entire I-SIP by July 9, 2020. EPA approved the majority of the SIP requirements on July 1, 2020, and approved sections addressing Clean Air Act (CAA) sections 110(a)(2)(C), 110(a)(2)(D)(i) Prong 3, 110(a)(2)(J), and 110(a)(2)(K) via a second approval on October 2, 2020.  However, EPA took no action on the requirements for Interstate Transport, specifically prongs 1 and 2, until February 22, 2022, over 12 months past the statutorily required date for action.

EPA's delayed disapproval of Kentucky's I-SIP regarding prongs 1 and 2 of CAA section 110(a)(2)(D)(i)(1) prevented Kentucky from addressing deficiencies or submitting SIP revisions. Kentucky would appreciate the opportunity to address these identified deficiencies through a revised SIP submission, which may eliminate the need for a Federal Implementation Plan.

**Commenter:** Louisiana Department of Environmental Quality

**Commenter ID:** 27

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

Louisiana submitted the Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards SIP on November 12, 2019, and EPA issued a "completeness finding" on November 14, 2019. According to Federal Clean Air Act (FCAA) §110(k)(2), "within 12 months of a determination ... the [EPA] Administrator shall act on the submission in accordance with paragraph (3)." Paragraph three (3) addresses full and partial approval and disapproval. The FCAA is silent on the state's recourse if EPA fails to act, which leads us to the current proposal. In this proposed disapproval, EPA presents modeling results that change the predicted impacts on downwind states. It is important to

17

note that these modeling results were not available to states prior to the initial submittal.  If the disapproval of the proposed SIP is finalized, EPA has a two-year timeframe to develop a Federal Implementation Plan (FIP) to address the relevant interstate transport requirements. Alternatively, EPA could approve a subsequent SIP submittal that meets these requirements. EPA proposed the FIP on April 6, 2022 some 43 days later.

**Commenter:** Midwest Ozone Group

**Commenter ID:** 30

**Docket ID:** EPA-R02-OAR-2021-0673, EPA-R03-OAR-2021-0872, EPA-R03-OAR-2021-0873, EPA-R04-OAR-2021-0841, EPA-R05-OAR-2022-0006, EPA-R06-OAR-2021-0801, EPA-R07-OAR-2021-0851, EPA-R08-OAR-2022-0315, EPA-R09-OAR-2022-0394, EPA-R09-OAR-2022-0138

**Comment:**

EPA's accelerated approach to denial of these plans is inconsistent with the CAA

As evidenced by these several proposals for disapproval of Good Neighbor SIPs that accompanied this, EPA has begun an accelerated denial of the efforts of upwind states' and to implement a new transport rule and in doing so has taken an approach that is inconsistent with applicable law and appropriate science. This accelerated effort disenfranchises not only meaningful technical analysis of the agency's proposals but also curtails meaningful participation by all stakeholders.

Section 110(c) of the CAA states that "The [EPA] Administrator shall promulgate a Federal implementation plan at any time within 2 years after the Administrator" if he: (1) finds that a state has failed to make a required submission or that the state plan submitted "does not satisfy" the minimum criteria in Section 110(k)(1)(A), or (2) "disapproves a State implementation plan submission in whole or in part," unless the State corrects the deficiency and the Administrator approves the correction before the Administrator promulgates the plan.

In the event of a justified disapproval, EPA then is required to promulgate a Federal Implementation Plan ("FIP") within two years unless the State corrects the deficiency before promulgation of the FIP.  At issue in connection with the subject proposed SIP disapprovals are two initial considerations. First, EPA must offer adequate justification for the proposed disapprovals. As will be discussed extensively in these comments, EPA has not adequately demonstrated the basis for its actions.

[…]

Again, these comments will illustrate EPA is improperly advancing implementation plan denials, while threatening with an imminent FIP proposal published in the Federal Register on April 6, 2022.

[…]

The Clean Air Act does not mandate promulgation of a FIP in such an abbreviated time frame.  The CAA allows FIP action any time within 2 years after the Administrator finds that a State has failed to make a required submission or finds that the plan or plan revision submitted by the State does not satisfy the

18

minimum criteria or disapproves a state implementation plan submission in whole or in part. The CAA also specifically provides for the State to be allowed the opportunity to correct any deficiencies. We urge EPA to revise its proposals to allow States an appropriate opportunity to respond to EPS's findings of deficiency.

**Commenter:** Mississippi Department of Environmental Quality

**Commenter ID:** 32

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

However, EPA did not act on [Mississippi's] submittal for nearly two and a half years. Now, within one week of proposing to disapprove the "good neighbor" portion of Mississippi's 2015 $O_3$ NAAQS iSIP, the EPA administrator has signed a proposed Federal Implementation Plan (FIP) to impose on the state. The imposition of the FIP is premature and unnecessary as MDEQ has demonstrated its commitment to develop and submit an approvable iSIP and has historically strived to meet and exceed its obligations.

[...]

[T]he proposed FIP should not be imposed until MDEQ is given a reasonable opportunity to address the alleged deficiencies in the iSIP and to resolve the modeling errors referenced herein.

[...]

MDEQ respectfully requests that EPA work collaboratively with MDEQ, allowing appropriate time for the development and submittal of a revised iSIP, and not impose the proposed FIP on Mississippi, which would be unnecessarily burdensome to Mississippians.

**Commenter:** Nevada Division of Environmental Protection

**Commenter ID:** 33

**Docket ID:** EPA-R09-OAR-2022-0138

**Comment:**

EPA failed to act on the Nevada's iSIP by the 2020 statutory deadline. As of late 2021, despite the long-standing process for review and prioritization of the SIP backlog (namely the SIP Management Plan) EPA provided zero communication to NDEP on any significant aspect of the Nevada iSIP review and approval process nor did EPA provide any substantive feedback on Nevada's 2018 iSIP submission.

[...]

In contrast to its repeated failure for over 3 years to collaborate with NDEP on review of Nevada's 2018 iSIP, in less than 6 months:

- EPA ran and used results from a new modeling platform unavailable to NDEP at the time of the 2018 iSIP;
- Proposed a new ozone FIP; and
- Proposed to disapprove Nevada's iSIP.

EPA has taken these actions over a very short period without providing meaningful state consultation, nor providing Nevada the time and resources to consider the new modeling results in the context of the originally required 2018 iSIP submission.

[…]

NDEP requests that EPA withdraw the Proposed Regulation to provide the opportunity for NDEP to meaningfully collaborate with EPA on this important effort and to evaluate, and if appropriate, propose a revision to Nevada's ISIP to meet our interstate transport obligations for the 2015 ozone NAAQS given EPA's decision to primarily rely on the new emissions platform.

NDEP stands by its commitment to continuing to review new air quality monitoring information as it becomes available to ensure that NDEP's negative declaration in the 2018 ISIP is still supported, if given a reasonable opportunity and resources. NDEP request a reasonable opportunity to consider a) the new information about downwind contribution that is available based on the new modeling platform; b) potentially consider a demonstration of the appropriateness of a different threshold [EPA recognizes that NDEP may not have considered analyzing the reasonableness and appropriateness of a larger threshold of 1% (namely 1 ppb) in the iSIP submittal, because at the time the "State did not contribute above 1 percent of the NAAQS to a projected downwind non-attainment or maintenance receptor" (Section III.A of the proposed rule)]; and c) permanent and federally enforceable control strategies to achieve the emissions reductions determined to be necessary to eliminate downwind contribution.


**Commenter:** Oklahoma Department of Environmental Quality

**Commenter ID:** 37

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

EPA Should Allow States to Submit Revised SIPs Before Issuing a FIP

Oklahoma maintains its SIP is approvable as submitted. However, EPA should afford states the opportunity to address aspects of their SIPs that EPA has identified as deficient. EPA states on page 9801 of the proposed disapproval, "Where states submitted SIPs that rely on any such potential 'flexibilities' as may have been identified or suggested in the past, the EPA will evaluate whether the state adequately justified the technical and legal basis for doing so."  Oklahoma notes that few, if any, of the flexibilities offered by EPA in the 2018 Tsirigotis Memos have been approved when states have developed SIPs relying on those flexibilities. EPA's proposed decision to disapprove states' approaches in their SIPs warrants the opportunity for states to revise their SIPs to address deficiencies identified by EPA. Further, where EPA has decided states have failed to meet "the technical and legal basis" for the

20

flexibilities, the burden shifts and it is incumbent on EPA to more clearly articulate the justification, both technical and legal, that EPA would find acceptable. Alternatively, it may be the case that EPA finds no justification that satisfies these criteria. If that is the case, then EPA needs to say so. In any event, states should be afforded the opportunity to revise their SIPs, ideally before the proposed disapproval is noticed, but certainly before the disapproval is finalized. Now it appears that EPA is moving forward on a FIP without providing the states the opportunity to modify their SIPs to accommodate the actual policies by which EPA will review those SIPs. This is bad policy and undermines the cooperative and collaborative relationship between states and EPA.

[...]

EPA Failed to Adequately Include State Participation

Oklahoma takes issue with EPA's "wait and then hurry-up" approach to interstate air pollution transport rulemaking. The delay in EPA's evaluation of Oklahoma's ozone transport SIP in combination with the extended wait for EPA to develop the FIP, predictably ended up with EPA responding to a court order to issue a rule in a short time frame with a process that fails to adequately include state participation. To begin with, the development of the modeling platform should have concluded before EPA used the platform for this rulemaking. ODEQ and other air quality agencies worked together to develop a letter from Michael Vince (the Executive Director of the Central States Air Quality Agencies or CenSARA) to Peter Tsirigotis, dated July 29, 2021 (included as Attachment C hereto). The letter makes the point that, if air agencies are to be given the opportunity to provide meaningful feedback on the emissions inputs used by EPA in rulemaking, they should have the opportunity to review and comment on the Emissions Modeling Platform (EMP) before it is used in federal rulemaking. EPA did allow agencies the opportunity to review an updated version of the EMP, but the version that was ultimately used to develop the proposed disapproval of Oklahoma's ozone transport SIP (and to develop the proposed FIP) had not been released and did not undergo state review in advance of its deployment in support of EPA's rule development.

It should also be noted that EPA's delay shortens the lead time available to address ongoing nonattainment and maintenance problems due to upwind contributions.

[...]

Furthermore, it should be noted that the proposed disapproval was considerably late, as Section 110(k)(2) of the CAA states that EPA must take action within 12 months of a "complete" SIP submission. The maximum amount of time EPA can take to deem a SIP submittal complete is 6 months, therefore, even accounting for this timeline, EPA's action falls way behind the statutory requirement. Had EPA reviewed and approved Oklahoma's SIP submittal during its statutorily required timeframe, EPA would have been measuring Oklahoma's SIP submittal against comparable data. Because EPA took so long to act on SIP submittals, EPA created a situation where the standard under which states developed their SIPs was no longer the standard against which those SIPs were judged.

**Commenter:** PacifiCorp

**Commenter ID:** 38

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

EPA's Proposed Disapproval, and the already-published Proposed FIP, interfere with Utah's right to remedy any problems with its SIP.

In failing to observe the appropriate process, EPA has undermined the cooperative federalism underpinning Section 110 of the CAA. EPA attempts to paper over this role reversal by saying that states can always prepare a SIP later to replace the Proposed FIP. However, EPA will not approve any proposed replacement SIP prior to finalizing the Proposed FIP, and the Proposed FIP sets insurmountable standards for any subsequent SIP revision. The Proposed Disapproval will force Utah sources to begin compliance efforts almost immediately due to the incredibly tight timeframes in the Proposed FIP. The tight deadlines for compliance in the Proposed FIP essentially eliminate any reasonable opportunity for Utah to develop, and EPA to approve, a revised SIP in accordance with EPA's new approach to interstate transport, which goes beyond CAA standards.

As long as Utah can submit evidence to show that emission reductions from sources in its boundaries will not significantly impact the downwind monitors, its SIP satisfies the requirements of the good neighbor provision, and EPA must approve it. However, in the past, EPA has provided states sufficient time to make corrections or submit additional clarifications if necessary to achieve the good neighbor provision via their own SIPs.[22]  PacifiCorp asks EPA to do the same in this instance. EPA should acknowledge Utah's authority and, if necessary, allow Utah time to provide additional evidence for Step 2 and, if necessary, to re-evaluate Steps 3 and 4 of EPA's four-step methodology. Utah is uniquely positioned to identify the right mix of requirements for the unique emission sources in its jurisdiction and to determine how best to align those requirements with other regional regulatory efforts that target some of the same units and pollutants, like regional haze. EPA's extended delay in issuing the Proposed Disapproval should not serve as a pretext for preventing Utah from finalizing an approvable SIP.

[22] *See, e.g.,* 84 FR 3,389, 3,390 (Feb. 12, 2019) (approving Wyoming's good neighbor SIP after Wyoming submitted supplemental information requested by EPA).

**Commenter:** PacifiCorp (Attachment - Berkshire Hathaway Energy (BHE) Company Comments on Proposed Ozone Transport Rule)

**Commenter ID:** 38

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

EPA Should Work with Western States to Prepare SIPs that Achieve Necessary Ozone Reductions as Part of a Just and Orderly Transition.

The western states where BHE operates affected EGUs (Nevada, Wyoming, and Utah) submitted their good neighbor SIPs to EPA between October 2018 and October 2019, years in advance of EPA's Proposed Rule. Each of these SIPs, in reliance upon EPA guidance and modeling, demonstrated that there were no significant impacts on ozone nonattainment and maintenance in downwind states. Yet EPA took no action on these SIP submissions for two and a half to three and a half years. It was not until February 2022, when EPA signed the Proposed Rule imposing a FIP on these states (later publishing it for public notice and comment on April 6), that these states learned that EPA did not intend to approve their good neighbor SIPs. EPA did not even propose disapproval for these SIPs until May 23, 2022, a full month and a half after proposing its FIP. And EPA has yet to finalize disapproval (the proper legal predicate for a FIP). What's more, EPA's disapproval of these SIPs is based on a shift in its thinking in the years since the SIPs were originally submitted.

[…]

EPA attempts to paper over the role reversal of the Proposed Rule by saying that states can always prepare a SIP later for EPA approval. However, EPA has not yet finalized disapproval of the Nevada, Utah, and Wyoming SIPs. In the past, EPA has provided states sufficient time to implement the good neighbor provision via their own SIPs, even when supplemental information and analysis may have been required. BHE asks EPA to do the same in this instance. Provisions in the Proposed Rule impose SIP requirements not found in the CAA and essentially eliminate any reasonable opportunity for states to make a future SIP submission. BHE encourages EPA to respect the cooperative federalism principles in the CAA as the right way to achieve the best path forward.

[…]

EPA has now disavowed its prior guidance without allowing states an opportunity to react. In doing so, EPA has claimed for itself the authority Congress granted to states, not to EPA. EPA attempts to paper over this role reversal by saying that states can always prepare a SIP later for EPA approval. BHE supports the opportunity for states to submit their own SIP to replace the proposed FIP, but unless EPA can approve the SIP prior to finalizing the Proposed Rule, the Proposed Rule will nevertheless force covered sources to begin compliance efforts almost immediately due to the incredibly tight timeframes in the rule. The tight deadlines for compliance in the Proposed Rule will essentially eliminate any reasonable opportunity for states to develop and EPA to approve a SIP in accordance with EPA's new approach to interstate transport unless EPA can commit to a more rapid review and approval process than it has conducted in the past.

For EPA's recognition of the states' authority to submit a replacement SIP to have any real meaning, EPA would need to move at least as quickly in reviewing and approving replacement SIPs as it has moved in imposing the federal plan contained in the Proposed Rule. In addition, states would need sufficient time to develop a replacement SIP, which would require the same kinds of complex analyses EPA conducted to develop the Proposed Rule. In the past, EPA has provided states sufficient time to implement the good neighbor provision via their own SIPs, and BHE asks EPA to do the same in this instance.

Regardless of timing, EPA should also acknowledge state authority to re-evaluate steps 3 and 4 of EPA's four-step methodology by identifying and implementing the measures needed to eliminate what EPA has defined to be a significant contribution to downwind receptors, rather than requiring states to

23

demonstrate that their measures, along with federal measures, will achieve reductions commensurate with installation of SCR on coal-fired EGUs by the 2026 ozone season. States are uniquely positioned to identify the right mix of requirements for the unique emission sources in their jurisdictions and to determine how best to align those requirements with other regulatory efforts that target some of the same units and pollutants, like regional haze. As long as a state can submit modeling to show that emission reductions from sources in its state will eliminate the downwind impact that EPA has defined as significant, its SIP should satisfy the requirements of the good neighbor provision and EPA must approve it.

**Commenter:** Tennessee Department of Environment and Conservation

**Commenter ID:** 41

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

EPA has put states in an impossible position by waiting to take action on SIP submittals that occurred in 2018 and basing such actions on modeling that has been consistently changing since 2018 and is still undergoing public comment. EPA quickly followed its proposed iSIP Disapproval with the proposed Federal Implementation Plan EPA will put in place as it is highly unlikely that states will have the time to revise their SIPs and resubmit them to EPA for consideration before the final Federal Implementation Plan will take effect. EPA must respect states' role in creating a compliant SIP.

**Commenter:** Texas Commission on Environmental Quality

**Commenter ID:** 42

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

The EPA prematurely prepared a proposed FIP before finalizing action on Texas' timely submitted SIP revision to address 2015 eight-hour ozone standard interstate transport requirements. Texas submitted its 2015 Ozone NAAQS Transport SIP Revision to the EPA on August 17, 2018. The EPA had over three years to review the SIP revision prior to proposing the February 22, 2022, disapproval of the FCAA, §110(a)(2)(D)(i)(I) interstate transport elements. Further, the EPA has developed a proposed FIP before the proposed disapproval is final. Under FCAA §110(c)(1), the Administrator shall promulgate a FIP at any time within two years *after* the Administrator "disapproves a State Implementation Plan in whole or in part, unless the State corrects the deficiency, and the Administrator approves the plan or plan revisions, before the Administrator promulgates such a Federal Implementation Plan." EPA has not yet disapproved the Texas transport SIP, and yet has clearly signaled that it intends to include Texas in such a FIP directly upon finalizing the disapproval action. Although the Supreme Court has recognized that "disapproval of a SIP, without more, triggers EPA's obligation to issue a FIP" and this action can occur "at any time" within those two years (*EPA v. EME Homer City Generation LP, et. al.*, 572 US 489, 490 (2014)),

24

in this instance EPA has not disapproved Texas' SIP. And unlike the fact pattern in EME Homer, Texas has not had an opportunity to challenge the EPA's disapproval of that SIP. Although EPA is under no obligation to wait two years to issue a FIP, it does have to comply with the congressional scheme. The disapproval of the SIP triggers EPA's authority to issue the FIP. In this case, EPA is indeed "altering Congress' SIP and FIP schedule." *Id.* at 491.

The EPA has conducted extensive work to include Texas in a proposed FIP to address interstate transport for Texas under the 2015 eight-hour ozone standard before disapproval of Texas SIP. Although the EPA proposed disapproving the Texas SIP submittal one month prior to the proposed FIP, there has been no final action on that proposal. Additionally, there was no indication from EPA during the years of work that went into the development of this FIP that the Texas SIP was inadequate, nor was Texas afforded any opportunity to correct the deficiencies that EPA believes are present in the SIP. Had the EPA reviewed the 2015 Ozone NAAQS Transport SIP Revision before developing a proposed FIP, the purpose of which is to correct deficiencies in such a SIP, Texas would have had the opportunity contemplated by the FCAA to correct any problems with its SIP in a timely fashion and avoid the imposition of the FIP.

This is clearly distinguishable from the argument in *EME Homer City* that was dismissed by the Supreme Court. The Court said that EPA did not have to give states an opportunity to correct a SIP before issuing the FIP. Instead, in the present case EPA is stating that they not only can, but "must necessarily be able to" propose a FIP before taking final action to disapprove a SIP. That was not the holding in *EME Homer City* and is inconsistent with the Congress' SIP and FIP schedule in the FCAA.

[…]

If the EPA had acted on the TCEQ's SIP submission in a timely manner, the only available data would have been the EPA's 2011-base modeling. Therefore, it is arbitrary and unreasonable for the EPA to evaluate the TCEQ's submission based upon data that was unavailable to the TCEQ during the development and submittal of its SIP revision.

**Commenter:** The Luminant Companies

**Commenter ID:** 44

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

In satisfaction of its obligation under Section 110(a)(2)(D), TCEQ submitted a timely SIP revision addressing its good neighbor obligation for the 2015 ozone NAAQS on August 17, 2018. A SIP submittal is deemed complete by operation of law if EPA has not otherwise found the submittal to be insufficient within six months. Then, EPA has twelve months following a completeness determination to act on that SIP. Therefore, the Clean Air Act required EPA to approve or disapprove Texas's SIP no later than February 17, 2020. Rather than review Texas's submittal in a timely manner, EPA delayed its action beyond the statutorily prescribed deadline and developed non-statutory, post-hoc modeling and analyses by which it now proposes to judge Texas's submittal.

**Commenter:** United States Steel Corporation

**Commenter ID:** 45

**Docket ID:** EPA-R05-OAR-2022-0006

**Comment:**

U. S. Steel respectfully notes that in its proposed disapproval, U.S. EPA made some critical errors and, therefore, we believe that in the spirit of cooperative federalism, that U.S. EPA reconsider the State submittals and approve the SIP submittals; or if U.S. EPA still finds deficiencies with the SIPs, that the states be given the opportunity to correct any asserted deficiencies before U.S. EPA proceeds with promulgating a final rule disapproving the SIPs and issuing a Federal Implementation Plan (FIP). It is significant to note that Congress contemplated States be given an opportunity to correct deficiencies with SIPs (before U. S. EPA proceeds with a FIP) when enacting the Clean Air Act. The actions in disapproving the SIP and proceeding with issuing a FIP (even before the SIP is disapproved) runs afoul of the process afforded to States and federal cooperative federalism.

[...]

Even if the SIPs Did Not Satisfy EPA Approval Criteria, States Should be Given the Opportunity to Supplement the SIP Submittal or Otherwise Correct the Asserted Deficiencies Before U.S. EPA finalizes Disapproval of the SIP and Proceeds with a Federal Implementation Plan

U. S. Steel notes that U.S. EPA's action in disapproving SIPs that were submitted to U.S. EPA years ago and now years later is proposing to disapprove the SIPs and not giving the State an opportunity to supplement the SIP submittal or otherwise correct the asserted deficiencies is inconsistent with Congress' intent for the Federal government and States to work collaboratively on ensuring the NAAQS are maintained.

**Commenter:** United States Steel Corporation

**Commenter ID:** 45

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

EPA's Proposal to disapprove Arkansas's SIP while also promulgating a FIP is not the proper timing of rulemaking on this issue. EPA not allowing DEQ to submit revisions to the SIP, this action impairs the state's ability to make state specific analyses regarding over-reach on controls by EPA. DEQ should be permitted time to analyze, address and/or correct any deficiencies identified by EPA before finalizing a FIP. Although EPA might generally have the authority under Section 7410(c)(1)(B) to issue a FIP at any time prior to the 2-year deadline after disapproval (EME Homer S.Ct., 134 S.Ct. 1584 (2014)), nevertheless, CAA Section 7410(c)(1) contemplates that a state would be provided time to correct any deficiency and that EPA has the discretion to allow up to two years for correction of any deficiency.

EPA's determination about whether a FIP should be promulgated immediately as to a specific state should be based on a state-specific analysis since a State may bring a particularized, as-applied challenge to a nationwide or regional transport rule (EME Homer on remand, 795 F.3d 118 (D.C. Cir. 2015). EPA should not move to finalize the proposed FIP with respect to Arkansas until DEQ has been provided adequate time to review and respond.

**Commenter:** Utah Petroleum Association and the Utah Mining Association

**Commenter ID:** 48

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

Utah relied on the guidance in good faith and EPA should honor that in good faith. If EPA persists on disavowing its still intact guidance, it should at a minimum offer Utah an opportunity to make corrections and updates to its IT SIP before imposing a FIP.

**Commenter:** Xcel Energy

**Commenter ID:** 52

**Docket IDs:** EPA-R05-OAR-2022-0006

**Comment:**

Timeframe allowed for state response to SIP Disapproval:

While the Clean Air Act (CAA) allows states up to 2 years from SIP disapproval to issue a response to EPA, the proposed FIP, with a scheduled final date of December 15, 2022, does not allow for that two-year commitment period to take place. We believe that Congress provided for that timeline for a reason. There are cases, such as this one, where is appears there are reasonable technical disagreements that should be fully evaluated and resolved before EPA moves on to the next step in the process.

**Commenter:** Xcel Energy

**Commenter ID:** 52

**Docket IDs:** EPA-R06-OAR-2021-0801

**Comment:**

Timeframe allowed for state response to SIP Disapproval:

While the Clean Air Act (CAA) allows states up to 2 years from SIP disapproval to issue a response to EPA, the proposed FIP, with a scheduled final date of December 15, 2022, does not allow for that two-

year commitment period to take place. Xcel Energy believes that Congress provided for that timeline for a reason. There are cases, like here, where is appears there are reasonable technical disagreements that should be fully evaluated and resolved before EPA moves on to the next step in the process.

*Response*

As a general matter, the EPA disagrees that the EPA is forgoing the process required by statute, or that the EPA is taking "accelerated action" on interstate transport state implementation plans (SIPs) for the 2015 ozone NAAQS. See Section V.A.1. of the preamble for responses to comments related to the relationship between timing of proposals to disapprove SIPs and promulgate federal implementation plans (FIPs), Section V.A.2. of the preamble for responses to comments related to requests for more time to revise SIP submissions, and Section V.A.3. of the preamble for responses to comments related to alleged harms to states caused by time between SIP submission and the EPA's action.

Some commenters argue that the EPA should approve the SIP submissions. However, the EPA disagrees that the SIP submissions for any state included in this final rule provided an approvable interstate transport analysis or adequate provisions to eliminate significant contribution or interference with maintenance. Rather, following review of comments received on the proposed notices and in consideration of all additional data made available through the notice and comment process, the EPA finds the SIP submissions covered by this action are deficient to address the statutory requirements of the Clean Air Act (CAA), as detailed in the proposals and reiterated in this final action. See generally preamble Section IV.

In response to PacifiCorp's claim that EPA has historically "provided states sufficient time to make corrections or submit additional clarifications if necessary to achieve the good neighbor provision via their own SIPs" which points to the EPA's approval of Wyoming's prong 2 good neighbor SIP for the 20188 ozone NAAQS, the EPA notes that the EPA initially disapproved prong 2 of Wyoming's 2008 ozone NAAQS good neighbor SIP submission. 82 FR 9153 (February 3, 2017). EPA later approved a subsequent submission from Wyoming addressing prong 2, which the state submitted on October 17, 2018. 84 FR 3389 (February 12, 2019, signed February 6, 2019). CAA section 110(c)(1) requires EPA to promulgate a federal implementation plan (FIP) "at any time within 2 years" after disapproving a SIP submission, unless the State corrects the deficiency, and the EPA approves the plan. In the case of Wyoming for the 2008 ozone NAAQS, the state submitted, and the EPA approved, a SIP, so the EPA did not promulgate a FIP. While EPA generally seeks to work with states on the development of approvable SIPs, the timing depends on each situation and is always subject to the procedural requirements and deadlines of CAA section 110 as well as ensuring the substantive requirements of the Act will be met.

The EPA notes in response to PacifiCorp's comment that the Agency is not taking final action on Wyoming's good neighbor SIP submission for the 2015 ozone NAAQS in this action and also that the EPA is not using the proposed FIP (87 FR 20036; April 6, 2022) as a benchmark for any state in this final action.

The EPA notes in response to Xcel's comment that no consent decree established a deadline for the EPA to finalize a 2015 ozone NAAQS good neighbor FIP for any state by December 15, 2022.

Other issues raised by these comments are addressed in Sections II.C, III, and V.A.4 of the preamble and in the following sections: Sections 1.3 (Attachment A to the March 2018 Memorandum), 1.4 (Use of Updated Modeling), 1.6 (EPA Input During SIP Submission Development), 1.7 (Length of Comment Period), 4 (Air Quality Modeling), 5 (Updates to Modeling and Changes in Linkages), 9.2 (Over-Control), 10.3 (Cooperative Federalism and the EPA's Authority), 10.6 (Allegation that Disapprovals of Western State SIP Submissions was Predetermined), 11.6 (Economic Impacts), and 11.12 (Consent Decrees).

## 1.2   Guidance for SIP Submissions

*Comments*

**Commenter:** Air Pollution Control Program, Missouri Department of Natural Resources

**Commenter ID:** 01

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

[T]he Air Program notes that EPA has not ever provided any guidance on what an appropriate step-3 analysis would entail, which makes any decision where it rejects a step-3 analysis arbitrary and capricious.

[…]

EPA has offered no guidance to states on developing step-3 demonstrations in their good neighbor SIPs.

**Commenter:** Arkansas Department of Energy and Environment, Division of Environmental Quality

**Commenter ID:** 07

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

In the Proposed Rule, EPA seeks comment on rescinding recommendations presented to states in EPA's March 2018 Memorandum upon which many states relied in their analyses. By changing the rules so late in the game, EPA has left its partner states with no room for participation in the implementation process. Ultimately, a state that was unresponsive to obligations set in motion by the 2015 ozone NAAQS would be in the same position as any other state that submitted a well supported Transport Plan.

**Commenter:** Maryland Department of the Environment

**Commenter ID:** 29

**Docket ID:** EPA-R03-OAR-2021-0872

**Comment:**

EPA has not developed any official guidance on the necessary elements or analysis that a state is required to submit as part of an approvable Good Neighbor SIP. It is unreasonable for EPA to propose to disapprove Maryland's 2015 Good Neighbor SIP, in part, on the basis that Maryland did not submit a "sufficient technical evaluation" that is not defined, mandated, or required.

The Good Neighbor SIP has been a required SIP element since the implementation of the 1997 8- hour ozone standard. In the intervening 24 years, EPA has issued no official guidance for states to use in developing an approvable Good Neighbor SIP. It is unclear what standard or criteria EPA uses to determine approvability. The lack of guidance allows EPA broad latitude to disapprove SIPs for a variety of reasons and disincentivizes states from submitting a required CAA element. Inevitably, the lack of guidance creates an uneven playing field between the states.

The only direction EPA has supplied is a March 2018 memorandum entitled *Information on the Interstate Transport Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I)*. This memo included an extended discussion on potential flexibilities in analytical approaches that states *could* use in developing their Good Neighbor SIPs. EPA stated:

> ...*EPA is open to alternative frameworks to address good neighbor obligations or considerations outside the four-step process. The purpose of this attachment [Attachment A] is to identify potential flexibilities to inform SIP development and seek feedback on these concepts*. EPA is not at this time making any determination that the ideas considered below are consistent with the requirements of the CAA, nor are we specifically recommending states use these approaches. Determinations regarding states' obligations under the good neighbor provision would be made through notice-and-comment rulemaking.

The potential flexibilities included nearly 20 alternate analytical approaches for states to use in their Good Neighbor SIPs. However, as EPA made clear, the document and accompanying flexibilities was not a final determination on an approvable Good Neighbor SIP structure, and final determinations on any flexibilities in a state's SIP would be made through notice-and-comment rulemaking on that submittal.

[...]

The only thing states have to rely on is the four-step framework that EPA uses to assess interstate transport. EPA has never expounded upon what elements are required to ensure an approvable SIP in each of the four steps. States are thus left to address each of the four steps as best they can.

**Commenter:** Midwest Ozone Group

**Commenter ID:** 30

30

**Docket ID:** EPA-R02-OAR-2021-0673, EPA-R03-OAR-2021-0872, EPA-R03-OAR-2021-0873, EPA-R04-OAR-2021-0841, EPA-R05-OAR-2022-0006, EPA-R06-OAR-2021-0801, EPA-R07-OAR-2021-0851

**Comment:**

EPA improperly asserts that its three 2015 ozone NAAQS Good Neighbor SIP flexibility guidance memoranda should no longer be considered applicable to development of the SIPs that are the subject of its proposed disapprovals.

In 2018, EPA published three guidance documents describing the process by which states could incorporate various "flexibilities" into their Good Neighbor SIPs. All of the documents were issued by the USEPA, Director of Office of Air Quality Planning and Standards Peter Tsirigotis.

The March 27, 2018, Tsirigotis memo, styled "Information on Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards Under Clean Air Act Section 110(a)(2)(D)(i)(I)," was addressed to EPA Regional Air Directors in all EPA Regions.  The memo states,

> [t]he purpose of this memorandum is to provide information to states and the Environmental Protection Agency Regional offices as they develop or review state implementation plans (SIPs) that address section 110(a)(2)(D)(i)(I) of Clean Air Act (CAA), also called the "good neighbor" provision, as it pertains to the 2015 ozone National Ambient Air Quality Standards (NAAQS). Specifically, this memorandum includes EPA's air quality modeling data for ozone for the year 2023, including newly available contribution modeling results, and a discussion of elements previously used to address interstate transport. In addition, the memorandum is accompanied by Attachment A, which provides a preliminary list of potential flexibilities in analytical approaches for developing a good neighbor SIP that may warrant further discussion between EPA and states.

The August 13, 2018, Tsirigotis guidance memo, styled "Analysis of Contribution Thresholds for Use in Clean Air Act Section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards," also was addressed to EPA Regional Air Directors in all EPA Regions. The memo states,

> "[t]he purpose of this memorandum is to provide analytical information regarding the degree to which certain air quality threshold amounts capture the collective amount of upwind contribution from upwind states to downwind receptors for the 2015 ozone National Ambient Air Quality Standards (NAAQS). It also interprets that information to make recommendations about what thresholds may be appropriate for use in state implementation plan (SIP) revisions addressing the good neighbor provision for that NAAQS . . . [t]his document does not substitute for provisions or regulations of the Clean Air Act (CAA), nor is it a regulation itself. Rather, it provides recommendations for states using the included analytical information in developing SIP submissions, and for the Environmental Protection Agency (EPA) Regional offices in acting on them. Thus, it does not impose binding, enforceable requirements on any party. State air agencies retain the discretion to develop good neighbor SIP revisions that differ from this guidance.

The October 19, 2018, Tsirigotis guidance memo is titled "Considerations for Identifying Maintenance Receptors for Use in Clean Air Act Section 11 0(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards," also was addressed to EPA Regional Air Directors in all EPA Regions. As in the first two memoranda, the memo stated,

> [t]he purpose of this memorandum is to present information that states may consider as they evaluate the status of monitoring sites that the Environmental Protection Agency (EPA) identified as potential maintenance receptors with respect to the 2015 ozone national Ambient Air Quality Standards (NAAQS) based on EPA' s 2023 modeling. States may use this information when developing state implementation plans (SIPs) for the 2015 ozone AAQS addressing the good neighbor provision in Clean Air Act (CAA) section 110(a)(2)(D)(i)(I). In brief this document discusses (1) using alternative technical methods for projecting whether future air quality warrants identifying monitors as maintenance receptors and (2) considering current monitoring data when identifying monitoring sites that although projected to be in attainment as described below, should be identified as maintenance receptors because of the risk that they could exceed the NAAQS due to yearto-year (i.e., inter-annual) variability in meteorological conditions.(emphasis added).

In the ensuing two years and six months since the last guidance document was published, EPA has known that states might be incorporating the 2018 guidance into Good Neighbor SIP submittals and has made no public statement saying that it would not honor its guidance. Moreover, all of the subject 19 Good Neighbor SIPs have been pending before the Agency between two and one-half and almost four years with only one proposed action by EPA – the proposed approval of Iowa's Good Neighbor SIP that incorporated the 2018 guidance in a March 2, 2020, proposal at 85 Fed. Reg. 12,232.  Now, nearly three years after the first Tsirigotis memo was published and two and a half years after the last was published, EPA is attempting to assert that these documents are archival in nature and trying to walk back the proposed Iowa approval (*See* 87 Fed. Reg. 9,477, February 22, 2022).

As EPA states in the proposed disapproval notices for Illinois, Indiana, Michigan, Minnesota, Ohio, and Wisconsin (87 Fed. Reg. 9,838 at 9,841)):

> In the March, August, and October 2018 memoranda, the EPA recognized that states may be able to establish alternative approaches to addressing their interstate transport obligations for the 2015 8-hour ozone NAAQS that vary from a nationally uniform framework. The EPA emphasized in these memoranda, however, that such alternative approaches must be technically justified and appropriate considering the facts and circumstances of each state's submittal.  In general, the EPA continues to believe that deviation from a nationally consistent approach to ozone transport must be substantially justified and have a well-documented technical basis that is consistent with relevant case law. Where states submitted SIPs that rely on any such potential "flexibilities" as may have been identified or suggested in the past, the EPA will evaluate whether the state adequately justified the technical and legal basis for doing so.

> EPA notes that certain concepts included in an attachment to the March 2018 memorandum require unique consideration, and these ideas do not constitute Agency guidance with respect to transport obligations for the 2015 ozone NAAQS. Attachment A to the March 2018

memorandum identified a "Preliminary List of Potential Flexibilities" that could potentially inform SIP development. However, EPA made clear in that Attachment that the list of ideas were not suggestions endorsed by the Agency but rather "comments provided in various forums" on which the  EPA  sought "feedback from interested stakeholders." Further, Attachment A stated, "EPA is not at this time making any determination that the ideas discussed below are consistent with the requirements of the CAA, nor are we specifically recommending that states use these approaches." Attachment A to the March 2018 memorandum, therefore, does not constitute Agency guidance, but was intended to generate further discussion around potential approaches to addressing ozone transport among interested stakeholders.  To the extent states sought to develop or rely on these ideas in support of their SIP submittals, EPA will thoroughly review the technical and legal justifications for doing so.

This disavowal of EPA's guidance this late SIP development process is an arbitrary abuse of authority. The Administrative Procedures Act allows federal agencies such as EPA to issue guidance without following rulemaking procedures. 5 U.S.C. § 553. Although Agency guidance is not binding on regulated parties, such parties are permitted to rely on Agency guidance as the Agency's public statement of how it intends to construe the statutes and rules it governs. *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96–97 (2015). Indeed, Tsirigotis expressly notes in his 2018 memos that states could rely on the information provided in the memos, including the "alternative technical methods" authorized by the memos, when developing their SIPs in compliance with CAA Good Neighbor Provisions.

Once an agency issues guidance to regulated parties, the agency cannot "simply disregard" the substance of its guidance and rely on "post hoc justifications" when deciding whether regulated parties have acted in accordance with such guidance. *Hoosier Env't Council v. Nat. Prairie Indiana Farmland Holdings, LLC*, No. 4:19-CV-71 DRL-JEM, 2021 WL 4477152, at **13, 16 (N.D. Ind. Sept. 29, 2021). Doing so constitutes an arbitrary and capricious action by the agency. Id. at *17. By waiting for years and until after states complied with EPA's 2018 guidance to backtrack on the guidance, add a new requirement, not in the guidance, that alternative methods used by states in their SIPs must be "substantially justified and have a well-documented technical basis," and disapprove SIPs on that basis, EPA is engaging in arbitrary and capricious actions. EPA should alter its position and encourage states to take advantage of these flexibilities, as appropriate, and to incorporate these guidance flexibilities into their Good Neighbor SIPs.


**Commenter:** Midwest Ozone Group

**Commenter ID:** 30

**Docket ID:** EPA-R08-OAR-2022-0315, EPA-R09-OAR-2022-0394, EPA-R09-OAR-2022-0138

**Comment:**

In the ensuing period of time since the last guidance document was published, EPA has known that states might be incorporating the 2018 guidance into Good Neighbor SIP submittals and has made no public statement saying that it would not honor its guidance.

**Commenter:** Ohio Utilities and Generators Group

**Commenter ID:** 36

**Docket ID:** EPA-R05-OAR-2022-0006

**Comment:**

US EPA's proposed disapproval is inconsistent with its own guidance.


**Commenter:** Oklahoma Department of Environmental Quality

**Commenter ID:** 37

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

Oklahoma objects to the proposed disapproval. This objection is based on many reasons, generally including the unfair outcomes for states created by EPA's refusal to acknowledge and apply in good faith legitimate guidance memoranda issued by EPA in 2018.

[…]

In 2018, EPA's Office of Air Quality Planning and Standards Director, Peter Tsirigotis, issued three memoranda regarding SIP development for interstate transport for the 2015 ozone NAAQS. These memoranda were held out to states as providing possible guidance for development of ozone transport SIPs, and states relied on these memos accordingly. Notably, states' infrastructure SIPs for the 2015 ozone NAAQS, including the transport portion of the SIP, were due to EPA on October 1, 2018. Yet, EPA issued these memos in March, August, and October of 2018. The October EPA memo was issued *after* the deadline for SIP submittal.

[…]

EPA's failure to recognize its own guidance, and the predicament it has now put states in that face a SIP disapproval and subsequent FIP, undermines the cooperative nature of the EPA-state relationship.

[…]

EPA has, without explanation, arbitrarily and capriciously changed its policy position through its refusal to acknowledge the legitimacy of states' good faith reliance on EPA guidance memoranda.

[…]

During the preparation of its SIP, a state agency cannot move forward unless the flexibilities, design values, and general guidance offered in the memos may be relied upon

**Commenter:** PacifiCorp

**Commenter ID:** 38

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

EPA's rejection of flexibilities identified by its own Guidance is arbitrary and not well founded.

States have wide discretion in determining how to achieve the NAAQS, including their interstate transport obligations, and EPA cannot force the states to adopt approaches reflecting the Agency's policy preferences. A "SIP basically embodies a set of choices . . . that the state must make for itself in attempting to reach the NAAQS with minimum dislocation."[65] EPA also cannot substitute its own judgment or a one-size-fits-all approach for that of the states when crafting a SIP, as the courts have recognized over and over. This is especially true when a state's SIP relied on guidance put forth by EPA.

[65] *Concerned Citizens of Bridesburg v. EPA*, 836 F.2d 777, 780–81 (3rd Cir. 1987); *see also Com. of Virginia.*, 108 F.3d at 1410 (CAA Section 110 "does not enable EPA to force particular control measures on the states.").

**Commenter:** Texas Commission on Environmental Quality

**Commenter ID:** 42

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

The EPA failed to issue guidance in a timely manner for states to use in developing transport SIP revisions for the 2015 eight-hour ozone NAAQS. It is unreasonable and arbitrary for the EPA to require state SIP revisions to include recommendations from memoranda and/or guidance issued after states have submitted their revisions.

Developing a SIP revision is a years long process that requires complex technical analysis and compliance with lengthy procedural requirements. Texas timely submitted its 2015 Ozone NAAQS Transport SIP Revision on August 17, 2018, to meet the October 1, 2018, statutory deadline for states to submit infrastructure and transport SIP revisions for the 2015 eight-hour ozone NAAQS. Thirty-one days before the SIP revisions were statutorily required to be submitted, the EPA issued its Analysis of Contribution Thresholds Memo on August 31, 2018. Eighteen days after this statutory deadline, the EPA further issued its Considerations for Identifying Maintenance Receptors Memo (Maintenance Receptor Guidance) on October 18, 2018. It is unreasonable and arbitrary for the EPA to expect, much less require, that states comply with the recommendations in these guidance documents that were issued either mere days before the deadline or after the deadline considering that SIP revisions are complex and time consuming endeavors.

Texas' transport SIP revision was developed prior to these late issued EPA memos. Texas reasonably relied on EPA's September 13, 2013, guidance on development and submission of infrastructure SIPs

35

since that was the only formal guidance available at the time to assist Texas in development of its SIP revision in order to meet the statutory deadline for submittal.

In order to meet statutory deadlines, states do not have the option of waiting for the EPA to provide updated guidance before proceeding with SIP development, review, and submittal; states must proceed to develop submittals based on information available at the time. It is unreasonable to expect states to review and/or incorporate recommendations after a SIP revision has been submitted. As a result of the EPA's lack of timely updated transport guidance for the 2015 eight-hour ozone standard, Texas was forced to expend effort and resources to develop its SIP revision without fully knowing how the EPA would evaluate Texas' transport obligation.

The EPA has previously taken the position that failure to timely submit a SIP revision is sufficient reason for the EPA to issue a FIP. Therefore, states must diligently develop SIP revisions to meet those statutory deadlines. The EPA's failure to update its guidance in a timely manner for the development of transport SIP revisions was arbitrary and unreasonable because states cannot delay and must develop these revisions with guidance currently available. The EPA's actions put states in the untenable position of developing SIP revisions without knowing what the EPA might expect, or simply accepting that EPA will impose its own requirements in a potential FIP. This is an absurd result of the EPA's failure to issue timely guidance.

Finally, guidance documents are non-binding recommendations that have not gone through formal rulemaking. The EPA has consistently failed to promulgate a rule that would instruct states in how, exactly, they should evaluate and meet potential transport actions, much less provide such a rule in a timely fashion that would allow states to meet the statutory requirement to demonstrate they have met their transport obligations within three years of promulgation of a new standard. For example, the EPA could have included criteria for evaluating transport obligations in the promulgation of the 2015 ozone NAAQS itself, and yet made no mention of how states should consider or meet transport obligations. In the absence of either such a rule, or even timely guidance, states such as Texas have tried to meet a target that the EPA has not defined. Furthermore, if the EPA had proposed and finalized a rule that specified requirements for transport at the same time that it proposed or even when it finalized the 2015 ozone NAAQS, states would have been able to evaluate such requirements and provide appropriate feedback to the EPA on any such rule. That is the purpose of the rulemaking process. The EPA's failure to provide states this opportunity through the rulemaking process without the threat of an already proposed FIP continues to circumvent the cooperative federalism structure that Congress developed in the FCAA.


**Commenter:** West Virginia Department of Environmental Protection

**Commenter ID:** 49

**Docket ID:** EPA-R03-OAR-2021-0873

**Comment:**

During the three years following DAQ's SIP submittal and EPA's failure to timely review it, which culminated in this proposed disapproval, EPA reevaluated and modified without communication to states what it considers as acceptable "necessary provisions" to meet the requirements of the 2015 Ozone Good Neighbor SIP. DAQ contends it is impossible for states to predict, much less meet, SIP requirements which are in constant fluctuation, poorly or not defined, and never acted upon by EPA.

Historically DAQ prepared and assembled state implementation plans per a generally standardized acceptable structure that included the four-step interstate framework. DAQ utilized this format when it assembled the WV 2015 Ozone Good Neighbor SIP per the 2018 SIP Interstate Transport Information Memorandum. EPA's apparent abandonment of the standard in this disapproval perplexes DAQ and further underscores EPA's inability to timely communicate required shifting SIP structure to the states. This disfunction violates cooperative federalism and lends uncertainty to the states and the regulated community.

*Response*

See Section V.A.6. of the preamble for the EPA's general responses to these comments.

In response to Arkansas Department of Environmental Quality, the EPA clarifies that the EPA took comment on rescinding the August 2018 Memorandum, and that all states must comply with CAA section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS.

In response to Midwest Ozone Group, the EPA did in fact formally rescind the first proposed approval of Iowa's good neighbor SIP submission. 87 FR 9477 (February 22, 2022). The EPA re-proposed and finalized an approval of Iowa's good neighbor SIP on an entirely different basis. 87 FR 9477 (February 22, 2022); 87 FR 22463 (April 15, 2022).  This was explained at proposal. *See, e.g.*, 87 FR 9498, 9509 (February 22, 2022). Midwest Ozone Group is incorrect about the number of actions the EPA has taken through April 2022 on good neighbor SIP submissions for the 2015 ozone NAAQS; the EPA also approved 23 good neighbor SIP submissions through that time, which is detailed in Section V.A.1 of the preamble.

Other issues raised by these comments are addressed in Sections II.D., V.B.2., V.B.3. and V.B.7. of the preamble and the following sections: Sections 1.4 (Use of Updated Modeling), 5 (Updates to Modeling and Changes in Linkages), 6.4 (October 2018 Memorandum), 7.4 (August 2018 Memorandum), 8.1 (Determination of Significant Contribution), 10.2 (SIP Call), and 10.3 (Cooperative Federalism and the EPA's Authority).

## 1.3   Attachment A to the March 2018 Memorandum

*Comments*

**Commenter:** Eagle Materials Inc.

**Commenter ID:** 16

**Docket ID:** EPA-R09-OAR-2022-0138

**Comment:**

States Have Significant Discretion to Determine Measures Needed to Fulfill Their Interstate Transport Obligations.

Section 110(a)(2)(D)(i)(I) of the CAA requires states to address interstate transport by preparing SIPs that "contain adequate provisions prohibiting . . . any source or other type of emissions activity within the State from emitting any air pollutant in amounts which will contribute significantly to nonattainment in, or interfere with maintenance by, any other State with respect to any such national primary or secondary ambient air quality standard." This language leaves substantial discretion to the states in determining both their significant contributions and the reduction measures necessary to eliminate them.

EPA has recognized, in guidance, that states have discretion to apply their own analyses to both assess and address their interstate transport obligations—in its March 2018 Guidance, EPA explicitly noted that "in developing their own rules, states have flexibility to follow the familiar four-step transport framework (using EPA's analytical approach or somewhat different analytical approaches within these steps) or alternative frameworks, so long as their chosen approach has adequate technical justification and is consistent with the requirements of the CAA." EPA also evaluated certain flexibilities proposed by states and other stakeholders, consistent with EPA's "guiding principle" of "supporting states' position as 'first actors' in developing SIPs that address section 110(a)(2)(D) of the CAA." While EPA emphasized that it was not concluding that the particular flexibilities assessed were consistent with the requirements of the CAA, these flexibilities demonstrate the broad range of analyses states can conduct that can fulfill interstate transport obligations. Further, EPA recognized broad state flexibility in its Proposed Disapproval, noting that "EPA has not prescribed to states any specific methodology for developing SIP submissions."

In performing its limited oversight role under the CAA, EPA cannot substitute its own judgment for that of the states, and in particular, cannot "force particular control measures on the states."

**Commenter:** Hagerty, Logan

**Commenter ID:** 22

**Docket ID:** EPA-R05-OAR-2022-0006

**Comment:**

One common issue prevented several of the five states from drafting an adequate SIP. The states sharing this common issue were Illinois, Michigan, and Ohio. The issue was a document titled "Attachment A to the March 2018 Memorandum." The states erroneously used this EPA-provided memorandum as justification for how their SIPs met the EPA standards. The modeling data within that memorandum was only intended to "generate further discussion around potential approaches to addressing ozone transport among interested stakeholders." The proposed rule also states the

38

memorandum included a provision that the memorandum was not intended to be a formal determination in meeting required components of an SIP.

If Attachment A to the March 2018 Memorandum is easily understood to not be agency guidance in drafting an SIP, there are two explanations as to why Illinois, Michigan, and Ohio committed this large error. Either (1) state environmental offices recognized this Memorandum was not agency guidance and intentionally used it to create an invalid SIP, or (2) the state agencies unintentionally used the Memorandum as guidance owed to a lack of clarity of the part of the EPA. The latter explanation seems more likely, because all the states who misused the 2018 Memorandum are in EPA Region 5.


**Commenter:** Idaho Power Company

**Commenter ID:** 23

**Docket ID:** EPA-R09-OAR-2022-0138

**Comment:**

EPA has recognized in guidance that states have discretion to apply their own analyses to both assess and address their interstate transport obligations—in its March 2018 Guidance, EPA explicitly noted that "in developing their own rules, states have flexibility to follow the familiar four-step transport framework (using EPA's analytical approach or somewhat different analytical approaches within these steps) or alternative frameworks, so long as their chosen approach has adequate technical justification and is consistent with the requirements of the CAA."

EPA also evaluated and approved certain flexibilities proposed by states and other stakeholders, consistent with EPA's "guiding principle" of "supporting states' position as 'first actors' in developing SIPs that address section 110(a)(2)(D) of the CAA." While EPA emphasized that it was not concluding that the particular flexibilities assessed were consistent with the requirements of the CAA, these flexibilities demonstrate the broad range of analyses states can conduct that can fulfill interstate transport obligations. Further, EPA recognized broad state flexibility in its Proposed Disapproval, noting that "EPA has not prescribed to states any specific methodology for developing SIP submissions."


**Commenter:** Oklahoma Department of Environmental Quality

**Commenter ID:** 37

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

As EPA stated in the March 2018 Tsirigotis Memo, the memo was intended to be used not only by states, but as guidance for the EPA regions, as well. Generally, staff from the states and regions work together in developing SIP submittals and, accordingly, states provide EPA regional staff with periodic updates on progress toward SIP submittals. During the development process of Oklahoma's ozone transport SIP, Oklahoma discussed with EPA Region 6 its intent to use the flexibilities offered in the

Tsirigotis memos. Therefore, during the final stages of SIP development in 2018, EPA Region 6 was on notice of Oklahoma's intent to use the flexibilities offered in the Tsirigotis memos.

**Commenter:** PacifiCorp

**Commenter ID:** 38

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

EPA published the Flexibility Guidance in 2018 to assist the states with developing their SIPs, and again, Utah relied on that guidance. The Guidance emphasized that flexibility is allowed when developing a good neighbor SIP:

> states have flexibility to follow the familiar four-step transport framework (using EPA's analytical approach or somewhat different analytical approaches within these steps) or alternative frameworks, so long as their chosen approach has adequate technical justification and is consistent with the requirements of the CAA. . . . Over the next few months, EPA will be working with states to evaluate potential additional flexibilities for states to consider as they develop their good neighbor SIPs for the 2015 ozone NAAQS. Attachment A provides a preliminary list of potential flexibilities that may warrant additional discussion. *EPA looks forward to discussing these and other potential flexibilities with states over the next few months, which will help inform states' development of their good neighbor SIP submittals.* [(emphasis added)]

The list of potential flexibilities included "identify[ing] the emissions reductions (if any)" from a downwind state that could "prevent an identified upwind state from contributing significantly to those downwind air quality problems" in the Step 3 analysis. The Attachment A flexibilities also included analyzing the impact of international emissions on the downwind state.

Again, Utah (and numerous other states) followed EPA's suggestions in the Flexibility Guidance to consider "the relatively large impact of so-called 'uncontrollable' emissions (i.e., international and non-anthropogenic emissions) and home state emissions at the Colorado receptors, as well as emissions reductions already achieved as a result of other regulatory programs." EPA agrees that these factors were identified in Attachment A to the Flexibility Guidance, and EPA has recognized the flexibility afforded to states in developing good neighbor provisions in this and other guidance documents.

Nonetheless, EPA rejected Utah's analysis of each of the flexibilities without informing any of the states that it had changed course and would not accept the considerations listed in Attachment A. And this rejection came too late for Utah to make adjustments or provide additional information in response. For example, Attachment A recommended considering international emissions and "the role of background ozone levels [to] appropriately account for international transport." Attachment A also suggested that "air quality, cost, or emission reduction factors **should be weighed differently** in areas where international contributions are relatively high." Utah analyzed this factor, reasonably determining that international emissions contributed in excess of 50% of ozone at the subject monitors and that such "relatively high" international contributions should be considered in Step 3.

40

But EPA now says the "flexibilities could not be considered by the states," and specifically states that international emissions and "other non-anthropogenic" emissions are "*irrelevant*." After informing the states that they could, even should, consider international emissions, EPA now, without warning or notice, says its guidance is "irrelevant". Such actions are arbitrary and capricious.

In the Proposed Disapproval, EPA treated the other considerations Utah relied on in the Step 3 analysis in a similar fashion. Utah considered another "flexibility" from the Flexibility Guidance – the "current and projected local emissions and whether downwind areas have considered and/or used available mechanisms for regulatory relief," and determined that this factor impacted Utah's good neighbor SIP analysis. Again, EPA now finds these in-state emissions are not "relevant" for the Denver area nonattainment receptors. This about face was all the more shocking to Utah because it had worked closely with EPA throughout developing and submitting what it had been assured was an approvable SIP. EPA has rejected the use of these "flexibilities" in numerous SIP disapproval actions across the country, catching state after state by surprise.

**Commenter:** Utah Division of Air Quality

**Commenter ID:** 47

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

The UDAQ disagrees with EPA's disapproval of the SIP for the following reasons. First, through coordination with EPA Region 8, UDAQ developed and submitted what the agency thought to be a fully approvable SIP that met EPA's guidance and requirements at the time. The EPA's change of position at these late stages of the SIP process wastes the state's resources and time devoted to this rulemaking.

**Commenter:** West Virginia Department of Environmental Protection

**Commenter ID:** 49

**Docket ID:** EPA-R03-OAR-2021-0873

**Comment:**

DAQ contends that at the time of submittal the WV 2015 Ozone Good Neighbor SIP contained all "necessary provisions" as were then currently required by EPA to constitute an approvable SIP. DAQ utilized the March 27, 2018 EPA memorandum guidance from Office of Air Quality Planning and Standards ("OAQPS") Director Peter Tsirigotis titled *Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I)* ("2018 Interstate Transport SIP Information Memorandum" and included as Appendix C of the SIP) during preparation of the SIP. During the three years following DAQ's SIP submittal and EPA's failure to timely review it, which culminated in this proposed disapproval, EPA

41

reevaluated and modified without communication to states what it considers as acceptable "necessary provisions" to meet the requirements of the 2015 Ozone Good Neighbor SIP.

*Response*

Attachment A to the March 2018 Memorandum is not Agency guidance. See Sections II.D and V.B.2 of the preamble for the EPA's general response to these comments.

In response to comments from West Virginia Department of Environmental Protection, the EPA's explanation of the deficiencies in West Virginia's SIP submission were explained at proposal. See 87 FR 9524-9532 (February 22, 2022). In response to PacifiCorp, the EPA's explanation of the deficiencies in Nevada's SIP submission were explained at proposal. See 87 FR 31492-31494 (May 24, 2022).

Other issues raised by these comments are addressed in Section V.C.2. of the preamble and in Sections 1.6 (EPA Input During SIP Submission Development), 4.2 (Model Performance), 5 (Updates to Modeling and Changes in Linkages), 10.3 (Cooperative Federalism and the EPA's Authority), and 11.4 (Transport Policy – Western State Ozone Regulation).


## 1.4   Use of Updated Modeling


*Comments*


**Commenter:** Air Pollution Control Program, Missouri Department of Natural Resources

**Commenter ID:** 01

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

The Air Program notes that EPA's proposed disapproval goes on to point out that the updated modeling has identified four additional receptors (all in the Lake Michigan area) that Missouri is now linked to. These receptors were not identified as linked receptors in the previous modeling relied upon in our SIP submission. EPA uses this as further evidence to justify their proposed disapproval. This sleight-of-hand move by EPA is a direct attack on Missouri's right to develop its own SIP. If EPA is going to move the target more than two years after the submission is made and use that tactic to justify its action, then a proposed disapproval cannot be the appropriate action. […] Such action would instead favor stripping states of their rights and imposing hundreds of millions of dollars in compliance costs without adequate justification or the opportunity for states to update and retain control over their SIP. For these reasons, EPA must withdraw the proposed disapproval and take action to approve Missouri's submission.


**Commenter:** Alabama Department of Environmental Management

**Commenter ID:** 02

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

ADEM submitted its 8-hr Ozone iSIP in August 2018, and after that date several rounds of additional modeling were performed evaluating the impacts of upwind States on predicted future nonattainment and maintenance monitors, including modeling in both 2021 and 2022 for the 2023 and 2026 future years. This modeling was based on data that EPA collected, analyzed and published years after Alabama's submittal. In an effort to quickly provide a SIP based on the newer modeling (February 2022), ADEM rescinded the 2018 SIP, and presented EPA with a revised SIP, including a Weight of Evidence (WOE) argument based on the readily available data.

[…]

The revised SIP package was submitted largely because of the impossible task of evaluating the revised modeling, given the time and resources involved. EPA cannot expect States to evaluate future scenarios when submitting SIPs, especially when the modeling is performed years after the original SIP submission is made.

Additionally, it should be noted that the purpose of an iSIP is to verify that the State has the authority to address the regulations of the Clean Air Act (CAA), not to determine if, and by how much, an upwind State may impact a downwind monitor. If EPA intended to use updated modeling to assess impacts at future nonattaining and maintenance receptors, a call for plan revisions should have occurred, allowing EPA to incorporate and rely on modeling and monitoring data, while providing States the opportunity to review the data and incorporate any changes, if needed, without the need for a FIP call.

Further, based on the timeline after submittal of the 2018 SIP, EPA did not meet its statutory review time to determine completeness, which should have taken place in February 2020. Given that the modeling, which EPA is basing the disapproval on, was not available until February 2022, EPA cannot hold States to an impossible standard when developing SIPS.

**Commenter:** Alabama Power Company

**Commenter ID:** 03

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

Notably, EPA's proposal to rely on recent analysis and data not available to the state either at the time of its SIP submission or during EPA's statutory review period is unfair to the state. Just as "[a]gency actions must be assessed according to the statutes and regulations in effect at the time of the relevant activity," EPA's approval or disapproval of a SIP should adhere to the guidance, data, and evidence available and on the record at the time of EPA's timely review of the SIP.[18] Under Section 110 of the Act, EPA has 12 months after its completeness determination to fully or partially approve, disapprove, or

43

conditionally approve the SIP.[19] Taking into account the time EPA is afforded to determine "completeness" of a SIP submittal, EPA had at most until the end of February 2020 to act on ADEM's SIP. The recent modelling EPA has decided to rely on in its current review of Alabama's 2018 SIP submittal was not available in February 2020. Nor has it been available for thorough and complete review and analysis by Alabama. EPA should not disapprove a SIP based on extra-record data not available either to the state during its development of the SIP nor to EPA during the period statutorily allotted for EPA to take final action on SIP submissions.[20]

[18] *Texas v. EPA*, 829 F.3d 405, 430 (5th Cir. 2016) (citing *Caring Hearts Pers. Home Servs., Inc. v. Burwell*, No. 14-3243, 2016 WL 3064870 (10th Cir. May 31, 2016)); *see also Wisconsin v. EPA*, 938 F.3d 303, 336 (D.C. Cir. 2019) (suggesting in dicta that the state may attack EPA's "reliance on data compiled after the SIP action deadline" in challenging EPA's disapproval of a SIP (but not if challenging the subsequent FIP)).
[19] 42 U.S.C. § 7410(k)(2)
[20] *See Sierra Club v. EPA*, 356 F.3d 296, 308 (D.C. Cir. 2004) ("To require states to revise completed plans every time a new model is announced would lead to significant costs and potentially endless delays in the approval process."). Where new information arises, and if the criteria applicable to the provision are satisfied, EPA can exercise its authority under section 7410(k)(5) to ensure SIPs satisfy the Act. This procedure guarantees states the opportunity to draft SIPs in light of any such new data or analysis, which would not be available if EPA could act on post-record material to disapprove a SIP.

**Commenter:** Ameren Missouri

**Commenter ID:** 05

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

USEPA has improperly proposed to disapprove of Missouri's good neighbor SIP based on modeling which was not in the SIP submittal and was unavailable to Missouri or the public during the development of the Missouri Good Neighbor SIP.

**Commenter:** Arkansas Department of Energy and Environment, Division of Environmental Quality

**Commenter ID:** 07

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

Timing of EPA's Proposed Rule.

EPA had all of the information necessary based on the best available science to approve the interstate component of the Arkansas Transport SIP submittal when its action was due on November 7, 2020. Yet, EPA Headquarters "red-lighted" work by the EPA regions on these submittals unless EPA's 2017 modeling results indicated that a state's overall contribution to identified nonattainment and maintenance areas was less than the threshold EPA had previously used to identify linkages for its Cross-State Air Pollution Rule FIP for the 1997 ozone NAAQS. It is DEQ's understanding that EPA regions did

44

not begin drafting actions on other submittals until after Downwinders at Risk, et al., sued EPA for failure to act within Clean Air Act time frames.

Had EPA reviewed the SIP in the timeframe required by federal law, the information available at the time—the same information that states used to inform their decisions—would have ensured that states did not waste time on robust analyses of available data for the purposes of making sound, evidence-based decisions. EPA stalled an evaluative action until the perceived "facts" of the situation changed such that timely state analyses were rendered outdated.

EPA released two "updates" for modeling that were not made available to states in a timeframe reasonable for inclusion in national program goals or state plans. 2016v1 was made available two years after state plans were due to EPA, but EPA contends this data is useful for determining design values and linkages to downwind areas (Step 1 of EPA's recommended four-step framework for evaluating interstate transport). EPA's 2016v2 modeling—which EPA now purports is the measuring rod by which state plans should be evaluated—was released by EPA to the states at the same time EPA was writing its proposed disapproval and proposed FIP. EPA thus moved the target on what should be evaluated for transport SIPs one and one-half years after the AR Transport SIP was deemed complete by EPA and four years after the SIPs were due.

[…]

EPA proposes to primarily rely on a different modeling platform (EPA's 2016 v2 modeling12) for its evaluation of Arkansas's SIP submittal instead of the modeling data that EPA made available to the states for development of the Transport SIPs for the 2015 ozone NAAQS (EPA's March 2018 Memorandum). The EPA's 2016v2 modeling platform was developed as an update to EPA's 2016v1 modeling platform. A 2011 modeling platform was used to generate the data provided to states for SIP development in the March 2018 Memorandum. Among other updates to 2016v2, this platform incorporated updated emissions data, which represent emissions for the 2016 base year, as well as projected emissions for the 2023, 2026, and 2032 future years. As ADEQ pointed out in its SIP submittal, different modeling platforms and inventory assumptions can yield different results. It is no surprise then that changing the modeling platform may yield different ozone source apportionment results. ADEQ finds that it is not reasonable for EPA to provide states with modeling data for use in SIP development only to perform new modeling years later and then tell states that their decision-making, which was based on the data available to them at the time is flawed.

[…]

If EPA believes insists that it must consider newer data in its review of state Transport SIPs, then DEQ requests that EPA correct its emissions inventories, rerun the model using the updated 2016v2 platform, and issue a Notice of Data Availability based on its updated modeling prior to finalizing action on the Arkansas Transport SIP.

[…]

DEQ expended hundreds of hours of staff time and other resources to perform a robust analysis and scientifically-based evaluation of the information that was available at the time of SIP development. EPA's disapproval moves the target on nonattainment and maintenance receptors that must be

45

evaluated by primarily relying on data that was not available to the state at the time of SIP development and was not available when EPA was statutorily required to act on the Arkansas Transport SIP. This conduct is inconsistent with the cooperative federalism framework for air quality protection under the Clean Air Act.

**Commenter:** Association of Electric Companies of Texas, BCCA Appeal Group, Texas Chemical Council and Texas Oil & Gas Association

**Commenter ID:** 11

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

In the Proposed Disapproval, EPA relied on a new modeling platform that was released years after Texas's timely SIP submittal and mere months before EPA proposed to deny Texas's SIP. Texas and the public had no notice of the post-statutory period analysis EPA intended to apply to determine whether to approve the SIP and now has no opportunity to evaluate EPA's new platform and associated analytical framework. In fact, the modeling files supporting EPA's new analysis were provided just days before the comment deadline on this action.

EPA's new modeling, which EPA used in an attempt to quantify Texas's "significant contribution," is not a lawful basis for disapproving Texas's SIP. Before finalizing its disapproval, EPA should provide Texas stakeholders an opportunity to evaluate the new modeling platform. The CAA grants states the primary authority to implement the NAAQS and allows EPA to step in only where the state has failed in its duty. Here, Texas did not fail in its duty. TCEQ relied on the most current information available to it at the time the SIP was drafted and timely submitted a complete SIP meeting the CAA's requirements and EPA should judge the SIP solely on that basis.

**Commenter:** Cleco Corporate Holdings LLC

**Commenter ID:** 14

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

The Agency reviewed the Louisiana SIP, for which LDEQ relied on modeling data found in the March 27, 2018 guidance memorandum (March 27, 2018, *Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act Section (D)(i)(I)*), and used the 2016v2 emissions platform to evaluate the Louisiana SIP. The Technical Support Document for 2016v2 was not made available until 2022 which was after the Louisiana SIP submittal. In addition, EPA relied on the air quality modeling performed using CAMx version 7.10, which was released in January 2021. This release also took place after the Louisiana SIP was submitted.

46

Although EPA is issuing an invitation in the Proposal for public comment on the updated 2023 modeling, which uses the 2016v2 emissions platform, EPA should not rely on modeling and data that was not available at the time of the SIP submittal deadline and has not been updated based on public comment. Instead, EPA should evaluate the Louisiana SIP based on the modeling data referred to in the March 27, 2018 memorandum (March 27, 2018, *Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act Section (D)(i)(I)*) and subsequent 2018 guidance documents. At least, EPA should incorporate needed revisions to the 2016v2 modeling platform based on comments provided by the states and other stakeholders as provided in this docket and then re-analyze the Louisiana SIP based on the updated/corrected modeling platform before issuing a final rule on the Louisiana SIP.

**Commenter:** Eagle Materials Inc.

**Commenter ID:** 16

**Docket ID:** EPA-R09-OAR-2022-0138

**Comment:**

Nevada adopted a broad and intentionally overinclusive approach to assessing its interstate transport obligations, using EPA's latest contribution modeling, released just months prior in March 2018, "to identify and quantify contributions greater than 0.5 percent of the 2015 ozone NAAQS resulting from Nevada's anthropogenic emissions" for further analysis. [. . .] Nevada relied on EPA's modeling, emphasizing that "[a]lthough models can always be refined and there may be differences in certain approaches to technical issues as the NDEP has commented, it is the NDEP's position that the USEPA's modeling is state-of-the-science given the USEPA's constraints."

Nevada reviewed its contributions to receptors in California and Colorado under this framework, considering relative intrastate contributions and overall interstate contributions. Based on this extensive analysis, Nevada determined that "the contribution of 2023 base case anthropogenic NOx and VOC emissions from sources within Nevada to any projected 2023 nonattainment or maintenance receptor at greater than 0.5 percent of the NAAQS is limited to two states, California and Colorado." However, for each of these receptors, "Nevada's contribution… [was] less than one percent of the 2015 ozone NAAQS," meaning that under EPA's own analytical approach, Nevada was not linked to downwind air quality problems and that no further reductions measures were necessary.

Despite Nevada's highly conservative assessment of its interstate transport obligations, EPA's Proposed Disapproval nevertheless concludes, based on new air quality modeling using the 2016v2 emissions platform, that Nevada is now linked to 2 receptors in Utah. Nevada's contribution to these receptors is between 0.86 ppb and 0.89 ppb, which falls below the 1 ppb linkage threshold determined by Nevada to be more appropriate for Western states, where "interstate contributions… are relatively small, especially given the large contributions from background and intrastate emissions." EPA unreasonably imposes its own analysis in evaluating Nevada's SIP, rather than determining whether Nevada's analysis was reasonable.

Further, EPA's analysis relies on modeling that was not available until 3 years after Nevada was required to submit its SIP revision in response to EPA's revision to the ozone NAAQS on October 1, 2015. Under the CAA, states are required to submit revised SIPs within 3 years after EPA revises the NAAQS. Nevada met this 3-year deadline by submitting its revised SIP on October 1, 2018, relying on modeling that EPA released just 6 months prior. Nevada specifically determined that EPA's data represented the "best available data with which to conduct Nevada's transport analysis," which EPA does not dispute in its Proposed Disapproval. Rather, EPA asserts that "[b]y using the updated modeling results, the EPA is using the most current and technically appropriate information for this proposed rulemaking." However, EPA fails to consider whether Nevada's analysis using the best available data at the time was reasonable and fails to even acknowledge the substantial change imposed by EPA's new modeling, increasing Nevada's contribution to Utah receptors from under 0.5% of the NAAQS to above EPA's 1% threshold.

**Commenter:** Environmental Federation of Oklahoma

**Commenter ID:** 20

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

In particular, EFO supports DEQ's assessment that EPA has overstepped its authority by circumventing the normal SIP development and approval process in a number of ways, including but not limited to: … fourth, relying on data not available to the state for either review or use.

**Commenter:** Evergy, Inc.

**Commenter ID:** 21

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

EPA's updated modeling for Missouri identified four new receptors near Lake Michigan. This comes two years after the Missouri Department of Natural Resources (MDNR) Public submitted the Missouri SIP.

**Commenter:** Kentucky Division for Air Quality

**Commenter ID:** 25

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

EPA's Use of Revised Modeling Data Not Available to States prior to Deadline for 2015 Infrastructure Submittal

At the time of Kentucky's final 2015 Ozone I-SIP submittal, there were several guidance documents from EPA as well as modeling data available to review and use for the Interstate Transport demonstration. Specifically, two memos from EPA's Office of Air Quality Planning and Standards (OAQPS), dated March 27, 2018, and August 31, 2018, were available. Additionally, EPA provided updated modeling information with the March 27, 2018 memo for states to consider in developing their Interstate Transport SIPs. Kentucky used the information provided in EPA's March 27, 2018 memo and associated modeling, and the recommended 1 part per billion (ppb) threshold from the August 31, 2018 memo to evaluate the impacts that Kentucky emissions may have on downwind monitors.

In the current action, EPA has proposed disapproval of Kentucky's Interstate Transport requirements of the I-SIP submittal based on a second version of newly modeled data that was not made available to Kentucky until well past the statutory deadline for Kentucky's I-SIP submittal and EPA's action regarding that submittal. Specifically, EPA states, "EPA must act on SIP submittals using the information available at the time it takes such action." In the spirit of cooperative federalism, Kentucky would appreciate and expect the opportunity to submit a revised SIP in accordance with the revised data and modeling, rather than having the SIP disapproved after the fact.

Identification of newly impacted monitors without opportunity for States to review and develop an appropriate SIP submittal

EPA is taking action to disapprove the remaining Interstate Transport portion of Kentucky's SIP submittal using newly updated data, specifically the 2016v2 platform, which was not available at the time of Kentucky's I-SIP submittal. Additionally, the monitors previously linked as being impacted by Kentucky have changed with the newly available data. Kentucky was not afforded the opportunity to evaluate the potential linkages or provide additional information regarding these potential linkages. Specifically, using the 2016v2 platform, EPA has identified the Bucks County, PA monitor and the New Haven, CT monitor as linked to Kentucky in using the newly updated data. The Bucks County, MD monitor was not listed as either a nonattainment or maintenance monitor in the modeling data provided with the March 2018 memo. As such, Kentucky was not afforded the opportunity to evaluate the potential impact of emissions for either area prior to submitting the 2015 Ozone I-SIP. An opportunity to submit a revised SIP would provide Kentucky with the ability to review the 2016v2 platform, as well as the data and modeling associated with the platform.


**Commenter:** Louisiana Chemical Association

**Commenter ID:** 26

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

EPA failed to act on the Louisiana Transport SIP timely, which led to LDEQ and the EPA performing the required analysis under differing modeling data sets.

Pursuant to CAA §110(k), SIP submissions are deemed complete by operation of law six months after receipt by EPA. Thus, the Louisiana Transport SIP was deemed complete by operation of law on May 19,

2020. EPA must approve or disapprove, in whole or in a part, SIP submissions within 12 months of the SIP submissions being deemed complete. CAA §110(k)(2). Thus EPA was required to act on the Louisiana Transport SIP by May 19, 2021. EPA did not publish its proposed disapproval of the Louisiana Transport SIP until February 22, 2022, nearly a year after it was due. [footnote: EPA entered into a consent decree in the case of *Downwinders at Risk et al. v. Regan*, No. 21-cv-03551 (N.D. Cal), which required EPA to issue proposed rules to act on a number of pending 2015 ozone NAAQS interstate transport SIP submissions, including Louisiana's, by April 30, 2022. Under that consent decree, EPA agreed to take final action by December 15, 2022. The Consent Decree became effective upon by the Court on January 12, 2022.]. The deadlines in the CAA were purposefully enacted by Congress to prevent the exact situation that has arisen here – state reliance on current data and guidance being reviewed by an EPA that later has changed information, guidance, or methods.

The Louisiana Transport SIP relies on the 2023 modeling data released in the October 2017 Guidance and presented in the March 27, 2018 guidance document entitled: *Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act Section (D)(i)(I)* ("2015 Ozone NAAQS Memo"). The EPA issued two more guidance documents, the August 2018 and October 2018 Guidance, which provide additional information to states developing interstate transport SIP submissions for the 2015 Ozone NAAQS.

One month before LDEQ submitted the Louisiana Transport SIP, EPA released an updated modeling platform using 2016-based emissions. The platform was developed by the National Emissions Inventory Collaborative. The EPA used the 2016v1 emissions inventory in its subsequent modeling to project ozone design values and contributions for 2023. Thereafter, the platform was updated as 2016v2. In addition to reviewing the Louisiana Transport SIP under the March 2018 Guidance, EPA used the 2016v2 emissions platform to evaluate the Louisiana Transport SIP. The Technical Support Document for 2016v2 was not available until 2022. The EPA also relied on the air quality modeling performed using Comprehensive Air-quality Model with extensions (CAMx) version 7.10, which was released in January 2021, long after the Louisiana Transport SIP was submitted.

LCA supports the use of the most current and technically appropriate information in developing and reviewing SIP submissions. However, EPA is only now accepting comments on the updated 2023 modeling, which uses the 2016v2 emissions inventory platform. It is not reasonable for EPA to rely on modeling and data that (i) was not available at the time of the SIP submittal deadline and (ii) has not been updated based on public comment. EPA must evaluate the Louisiana Transport SIP based on the modeling data referred to in the *2015 Ozone NAAQS Memo* and subsequent guidance documents. At a minimum, EPA must incorporate needed revisions to the 2016v2 modeling platform based on comments provided by the states and other stakeholders as provided in this docket and then re-analyze the Louisiana Transport SIP based on the updated/corrected modeling platform before issuing a final rule on the Louisiana Transport SIP.


**Commenter:** Louisiana Department of Environmental Quality

**Commenter ID:** 27

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

LDEQ submitted the mandatory 2015 ozone transport SIP on Nov. 12, 2019, based on EPA's Model 2016v1. However, EPA unjustly and prejudicially based the disapproval on the updated version, 2016v2, which includes refinements that have not been peer reviewed. Furthermore, this modeling was performed after the SIP deadline.

Significant differences are present in EPA's modeling used for LDEQ's 2019 submittal and the modeling used to theorize the disapproval proposal. This points to substantial alterations to model inputs parameters. States were not allowed to review or comment on the newer model and or inputs prior to use in the disapproval process.

**Commenter:** Midwest Ozone Group

**Commenter ID:** 30

**Docket ID:** EPA-R02-OAR-2021-0673, EPA-R03-OAR-2021-0872, EPA-R03-OAR-2021-0873, EPA-R04-OAR-2021-0841, EPA-R05-OAR-2022-0006, EPA-R06-OAR-2021-0801, EPA-R07-OAR-2021-0851, EPA-R08-OAR-2022-0315, EPA-R09-OAR-2022-0394, EPA-R09-OAR-2022-0138

**Comment:**

EPA's intention to revise its emission inventory and to conduct new air quality modeling without allowing an appropriate opportunity for stakeholder review and comment is inappropriate

EPA notes in the proposed disapprovals that, after the modeling it conducted in support of earlier transport rules, e.g., CAIR, CSAPR, CSAPR Update, CSAPR Closeout, and Revised CSAPR Update, the agency revised the emission inventory used in the modeling to assess the efficacy of prior transport rules. EPA conducted new modeling using the revised inventory. The agency describes the process as follows:

> <u>Following the Revised CSAPR Update final rule, the EPA made further updates to the 2016 emissions platform</u> to include mobile emissions from the EPA's Motor Vehicle Emission Simulator MOVES3 model 17 and updated emissions projections for electric generating units (EGUs) that reflect the emissions reductions from the Revised CSAPR Update, recent information on plant closures, and other sector trends. The construct of the updated emissions platform, 2016v2, is described in the emissions modeling technical support document (TSD) for this proposed rule. (emphasis added).

In December 2021, MOG and other stakeholders submitted detailed comments on the 2016v2 emission inventory platform in an effort to correct errors that existed in that platform. EPA's efforts to revise this emission inventory platform at this time raises the question about whether EPA intends to update the modeling that has been used as the basis for the SIP disapprovals and the proposed FIP - but only in support of the final rule.

While MOG urges EPA to rely on modeling that accurately reflects current on-the-books regulatory requirements and up-to-date emission inventories, we strenuously object to the possibility that EPA

51

would conduct any such additional modeling to support a final rule and not provide the opportunity for that data to be reviewed, analyzed and commented on in advance of any final decision on the subject SIP disapproval (or for that matter the related proposed FIP). These concerns were also expressed earlier, in July 2021, by several MJOs (Westar, LADCO, SESARM, MARAMA, and CENSARA).

**Commenter:** Minnesota Pollution Control Agency

**Commenter ID:** 31

**Docket ID:** EPA-R05-OAR-2022-0006

**Comment:**

EPA's proposed disapproval of Minnesota's 2015 Ozone Transport SIP does not assess the quality of Minnesota's original submittal. Minnesota was identified as a non-significant contributor (below 0.7 parts per billion) to any ozone monitors in the 2018 modeling performed by both EPA and Lake Michigan Air Directors Consortium (LADCO). Minnesota did not complete steps three or four of the 2015 Ozone Transport SIP based on that information. Minnesota's original submittal should have been approved based on contribution information available from both EPA and LADCO at that time.

EPA is now proposing to use a revised 2016 modeling platform, EPA 2016 version 2 emissions modeling platform (2016v2 EMP) to support a remedy for the Interstate Transport Rule for the 2015 Ozone National Ambient Air Quality Standard (NAAQS).

**Commenter:** Maryland Department of the Environment

**Commenter ID:** 29

**Docket ID:** EPA-R03-OAR-2021-0872

**Comment:**

Additionally, MDE has been disadvantaged by EPA's delay in acting to approve or disapprove its 2015 Good Neighbor SIP, which was submitted to EPA on October 16, 2019. EPA published its proposed disapproval on February 22, 2022, and relied in part on "newer, updated modeling performed by the EPA which was not available when MDE submitted its supplemental SIP." By delaying its decision on Maryland's submittal for nearly 2.5 years, EPA moved the goal post for Maryland—an act the DC Circuit admonished in *New York v. EPA*, 964 F.3d 1214, 1223 (D.C. Cir. 2020). While MDE agrees that EPA should use current data and look toward the next applicable attainment date when approving SIPs or issuing FIPs, an over 2-year gap between submittal and approval allows for newer technology to be developed and relied upon, with no notice to states. If EPA were to review and approve or disapprove SIPs within the timeframes required by the CAA, EPA would likely conduct its review based on the same modeling and data that is available at the time SIPs are submitted by states. This would not only provide clear parameters to both EPA and states, but could also result in timely emissions reductions and attainment of the 2015 ozone NAAQS.

**Commenter:** Nevada Division of Environmental Protection

**Commenter ID:** 33

**Docket ID:** EPA-R09-OAR-2022-0138

**Comment:**

EPA then suddenly released a new modeling platform for ozone interstate transport in October 2021, and then failed to provide or allow states such as Nevada adequate time, resources, and technical support to critically review the model. Instead, EPA abruptly announced that is expected "to use this information in upcoming rulemaking actions, including ozone transport actions" and did not provide NDEP time to check critical model inputs, such as background contributions and emissions from the transportation sector.

**Commenter:** Oklahoma Department of Environmental Quality

**Commenter ID:** 37

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

EPA Has Unpredictably Changed the Rules Mid-Process

The proposed disapproval dismisses ODEQ's analysis regarding the six monitors that established the initial linkage between Oklahoma and downwind nonattainment and maintenance problems. 87 Fed. Reg. 9818. In accord with the flexibilities offered in the 2018 Tsirigotis memos, the Oklahoma SIP demonstrated that Oklahoma emissions had impacts below the significance threshold at three of the monitors. Oklahoma's SIP included a weight-of-evidence prediction that the remaining three receptors would be in attainment in 2023. In fact, EPA's more recent modeling confirms the accuracy of that prediction for two of these receptors. However, in the proposed disapproval EPA now argues Oklahoma's emissions are linked to only two monitors, one of which is completely different than any originally identified.

Notably, ODEQ relied on EPA's modeling released with its March 2018 Memo to identify the initial six impacted receptors in step 1 of the 4-step framework. Yet, in a surprising development, EPA moved the goal posts by using completely different modeling for its decision to disapprove Oklahoma's SIP and thereby identified a new receptor supposedly impacted by Oklahoma. It stands to reason that, were Oklahoma to address impacts to those monitors in a SIP modification, it is entirely possible that EPA would find one or more different monitors to establish the linkage in a future rulemaking.  This type of whiplash decision-making by EPA leaves states unable to predict the outcomes of their efforts— or even where to aim. There should be some basic measure of predictability for where the goal posts stand.

Furthermore, it should be noted that the proposed disapproval was considerably late, as Section 110(k)(2) of the CAA states that EPA must take action within 12 months of a "complete" SIP submission.

53

The maximum amount of time EPA can take to deem a SIP submittal complete is 6 months, therefore, even accounting for this timeline, EPA's action falls way behind the statutory requirement. Had EPA reviewed and approved Oklahoma's SIP submittal during its statutorily required timeframe, EPA would have been measuring Oklahoma's SIP submittal against comparable data. Because EPA took so long to act on SIP submittals, EPA created a situation where the standard under which states developed their SIPs was no longer the standard against which those SIPs were judged.

[…]

EPA failed to Adequately Include State Participation

[…] To begin with, the development of the modeling platform should have concluded before EPA used the platform for this rulemaking. ODEQ and other air quality agencies worked together to develop a letter from Michael Vince (the Executive Director of the Central States Air Quality Agencies or CenSARA) to Peter Tsirigotis, dated July 29, 2021 (included as Attachment C hereto). The letter makes the point that, if air agencies are to be given the opportunity to provide meaningful feedback on the emissions inputs used by EPA in rulemaking, they should have the opportunity to review and comment on the Emissions Modeling Platform (EMP) before it is used in federal rulemaking. EPA did allow agencies the opportunity to review an updated version of the EMP, but the version that was ultimately used to develop the proposed disapproval of Oklahoma's ozone transport SIP (and to develop the proposed FIP) had not been released and did not undergo state review in advance of its deployment in support of EPA's rule development.

**Commenter:** Tennessee Department of Environment and Conservation

**Commenter ID:** 41

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

Comment #1: EPA's Poorly Timed Model Releases Undermine States' Abilities to Demonstrate Compliance with CAA §110(a)(2)(D)

The proposed disapproval discusses EPA's modeling efforts at some length, and that discussion is informative regarding the frequency of model updates and the total amount of time required for EPA to finish its own modeling work—modeling that EPA now indicates states should have been using to develop their iSIPs.

1. January 2017- EPA Notice of Data Availability- EPA requested comment on preliminary interstate ozone transport data including projected ozone design values and interstate contributions for 2023 using a 2011 base year platform.
2. October 2017- EPA issued a memorandum containing updated modeling data "which incorporated changes made in response to comments on the [January 2017] NODA."

3. March 2018 – EPA issued a new memorandum including newly available contribution modeling data for 2023 to assist states in evaluating their impact on potential downwind air quality problems for the 2015 8-hour ozone NAAQS

EPA then states that since the release of all the modeling information noted above, and subsequent to the 2018 submittal of Tennessee's iSIP, EPA performed updated modeling using a 2016-based emissions modeling platform (2016v1) to project ozone design values and contributions for 2023. Specifically, on October 30, 2020, the Notice of Proposed Rulemaking for the Revised CSAPR Update included updated 2023 modeling that used the 2016v1 emissions platform. Following the revised CSAPR update final rule, EPA states it continued to make updates to the 2016 emission platform, updated emissions projections, etc. and performed air quality modeling of the 2016v2 emissions using the most recent version of the Comprehensive Air Quality Modeling with Extensions (CAMx) photochemical modeling version 7.10.

EPA proposes to primarily rely on modeling based on "the updated and newly available" 2016v2 emissions platform in evaluating the state iSIP submission and is, in fact, accepting public comment on this updated 2023 modeling using the 2016v2 emissions platform at the very same time EPA proposes to disapprove Tennessee's ISIP. EPA has spent the greater part of five years revising and updating the modeling that it now relies upon to disapprove Tennessee's iSIP. This approach establishes an impossible standard for states and leaves open the very real possibility that no state will be successful in developing an iSIP under future standards.

[…]

Comment #3: EPA may not disapprove Tennessee's Infrastructure SIP based on Prong 2 of CAA §110(a)(2)(D)(i)(I) because Tennessee satisfied its Good Neighbor obligations in its 2018 iSIP submission.

EPA now proposes to disapprove Tennessee's SIP submission, based on data EPA published in 2021 and 2022 finding that Tennessee is "linked" to a single maintenance receptor in Denton County, Texas. EPA is suggesting that Tennessee's 2018 technical analysis was flawed because it failed to consider future data that were not collected until years after the original submission was made, which would have required Tennessee to perform Steps 3 and 4. As EPA puts it: "Because the entire technical basis for Tennessee's submittal is that the State is not linked at Step 2, EPA proposes to disapprove Tennessee's SIP submission based on EPA's finding that a linkage does exist."

Nonetheless, EPA now proposes to disapprove Tennessee's SIP submission, based on data EPA published in 2021 and 2022 finding that Tennessee is "linked" to a single maintenance receptor in Denton County, Texas. EPA is suggesting that Tennessee's 2018 technical analysis was flawed because it failed to consider *future* data that were not collected until years after the original submission was made, which would have required Tennessee to perform Steps 3 and 4. As EPA puts it: "Because the entire technical basis for Tennessee's submittal is that the State is not linked at Step 2, EPA proposes to disapprove Tennessee's SIP submission based on EPA's finding that a linkage does exist."

As we noted in Comment #1, EPA's entire approach and rationale in this proposed disapproval makes it impossible for any SIPs a state might submit under the 2015 ozone standard or any future NAAQS to demonstrate compliance with CAA §110(a)(2)(D) because not only must a state consider the evidence available at the time of submission, but a state must also possess the ability to consider *future* evidence that might demonstrate significant contributions to downwind nonattainment or interference with

maintenance in a downwind state. The proposed disapproval of Delaware's iSIP in the *Federal Implementation Plan Addressing Regional Ozone Transport for the 2015 Ozone National Ambient Air Quality Standard* perfectly illustrates this point. In Section IV.C.1 of the preamble to the proposed rule ("Correction of EPA's Determination Regarding Delaware's SIP Submission and Its Impact on EPA's FIP Authority for Delaware"), EPA addresses Delaware's Good Neighbor obligations as follows:

> In 2020, the EPA approved an infrastructure SIP submission from Delaware for the 2015 ozone NAAQS, which in part addressed the good neighbor provision at CAA section 110(a)(2)(D)(i)(I). The EPA concluded that, based on the modeling results presented in a 2018 March memorandum and using a 2023 analytic year, Delaware's largest impact on any potential downwind nonattainment or maintenance receptor was less than 1 percent of the NAAQS. As a result, the EPA found that Delaware would not significantly contribute to nonattainment or interfere with maintenance in any other state. Therefore, ***the EPA approved the portion of Delaware's infrastructure SIP that addressed CAA section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS*** . . . .

> Subsequent to the release of the modeling data shared in the March 2018 memorandum and EPA's approval of Delaware's 2015 ozone NAAQS good neighbor SIP submission, the EPA performed updated modeling, as described in Section V of this action. The data from this updated air quality modeling now show that Delaware is projected to contribute more than 1 percent of the NAAQS to downwind receptors in Bristol, Pennsylvania, in the 2023 analytic year. Therefore, in light of the modeling data, ***EPA is proposing to find that its approval of Delaware's 2015 ozone NAAQS infrastructure SIP submission, with regard only to the portion addressing the good neighbor provision at CAA section 110(a)(2)(D)(i)(I), was in error. Section 110(k)(6) of the CAA gives the Administrator authority, without any further submission from a state, to revise certain prior actions, including actions to approve SIPs, upon determining that those actions were in error***. The modeling data demonstrate that EPA's prior conclusion that Delaware will not significantly contribute to nonattainment or interfere with maintenance in any other state in the 2023 analytic year was incorrect, which means that EPA's approval of Delaware's good neighbor SIP submission was in error. . . .

> As discussed in greater detail in the sections that follow, the EPA is proposing to determine that there are additional emissions reductions that are required for Delaware to satisfy its good neighbor obligations for the 2015 ozone NAAQS. The analysis on which the EPA proposes this conclusion for Delaware is the same, regionally consistent analytical framework25 on which the Agency proposes FIP action for the other states included in this proposal. The Agency recognizes that it is possible, based on updated information for the final rule—as applied within a regionally consistent analytical framework—that Delaware (or other states for which the EPA proposes FIPs in this action) may be found to have no further interstate transport obligation for the 2015 ozone NAAQS. If such a circumstance were to occur, the EPA anticipates that it would not finalize this proposed error correction or may modify the error correction such that the approval of Delaware's portion of the SIP as it relates to its good neighbor obligations may be affirmed.

This structure runs contrary to the principle articulated by the Supreme Court in *EPA v. EME Homer City Generation, L.P.* that EPA must work toward an "efficient and equitable solution to the allocation

56

problem the Good Neighbor Provision requires the Agency to address." Instead, EPA's imposition of such an unworkable approach is a textbook failure to comply with EPA's obligation to "select from among reasonable options" under the *Chevron* framework [footnote: 572 U.S. at 492 (citing *United States v. Mead Corp.*, 533 U.S. 218, 229 (2001))] and imposes an entirely arbitrary and capricious standard that states are effectively incapable of following.

The Clean Air Act does not envision nor suggest that states be held to an impossible standard when developing SIPs. Because EPA has provided no evidence that Tennessee was "linked" to any downwind states when it submitted its 2018 SIP revision, EPA may not disapprove Tennessee's Infrastructure SIP based on Prong 2 of CAA §110(a)(2)(D)(i)(I) and therefore should withdraw its proposed disapproval.

[…]

EPA has put states in an impossible position by waiting to take action on SIP submittals that occurred in 2018 and basing such actions on modeling that has been consistently changing since 2018 and is still undergoing public comment.

**Commenter:** The Luminant Companies

**Commenter ID:** 44

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

Rather than review Texas's submittal in a timely manner, EPA delayed its action beyond the statutorily prescribed deadline and developed non-statutory, post-hoc modeling and analyses by which it now proposes to judge Texas's submittal.

[…]

And EPA cannot consider its post-hoc modeling and analyses that were not available as of its statutory deadline to act to justify its action.[41] Accordingly, EPA must approve Texas's SIP based on the data available by the statutory deadline so long as it satisfies the statutory requirements, which it does, as discussed below.[42]

[…]

In support of Texas's SIP, consistent with its expertise, TCEQ conducted modeling to discharge its statutory duty to ensure its SIP contains adequate provisions to ensure that emissions from Texas will not "contribute significantly" to downwind nonattainment or maintenance receptors for purposes of the 2015 ozone NAAQS. It was not until after TCEQ developed and proposed its SIP revision, including its modeling, that EPA issued guidance to states on their development of interstate transport SIP revisions for the 2015 ozone NAAQS. Nonetheless Texas's SIP revision was consistent with the guidance EPA had provided at the time of TCEQ's submittal. EPA points to modeling it released in 2022, nearly four years after TCEQ submitted its SIP, to support its proposed disapproval.  EPA's post hoc modeling is not a lawful ground for disapproval.

[…]

41 *See Wisconsin v. EPA*, 938 F.3d 303, 336 (D.C. Cir. 2019) (suggesting that a state may challenge EPA's "reliance on data compiled after the SIP action deadline"); *see also Sierra Club v. EPA*, 356 F.3d 296, 308 (D.C. Cir. 2004) ("To require states to revise completed plans every time a new model is announced would lead to significant costs and potentially endless delays in the approval process.").
42 If necessary in light of new data, EPA may later issue a SIP call requiring a state to amend its SIP.

**Commenter:** PacifiCorp

**Commenter ID:** 38

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

When formulating its Interstate Transport Ozone SIP, Utah properly relied on the modeling data provided by EPA to the states in 2017-18 and the Modeling Guidance[1]. However, rather than judge Utah's SIP by using the same 2017-18 modeling data it had provided, EPA instead chose to analyze a newer data set that was unavailable to Utah at the time it developed its SIP. Notably, instead of the 2018 Modeling Guidance data, EPA relied on "the Agency's most recently available modeling (2016v2) to identify upwind contributions and linkages to downwind air quality problems in 2023." This is the same modeling EPA relied on for the Proposed FIP. This reliance is arbitrary because Utah has not been afforded a meaningful opportunity to review and incorporate the same modeling upon which EPA bases its decisions.

[…]

*EPA should not evaluate Utah by newer modeling data not available when the Utah SIP was submitted.*

Notably, EPA's reliance on recent analysis and data not available to the state at the time of Utah's SIP submission and never provided during EPA's statutory review period is unfair to the state, resulting in an arbitrary and capricious action. Just as "[a]gency actions must be assessed according to the statutes and regulations in effect at the time of the relevant activity,"[29] EPA's approval or disapproval of a SIP should adhere to the guidance, data, and evidence available and on the record at the time of a state's required submission of the SIP.

In relation to the Proposed Disapproval, Utah submitted the Utah Ozone Transport SIP to EPA on January 29, 2020. The SIP submission was determined complete by operation of law. Rather than rely on the same data and information available to Utah at the time it drafted its SIP, EPA primarily relies "on modeling based on the updated and newly available 2016v2 emissions platform in evaluating these submissions with respect to Steps 1 and 2 of the 4-step interstate transport framework." EPA's "updated" modeling wasn't even released until 2021, a year after Utah submitted its SIP. EPA should not disapprove a SIP based on extra-record data not available to the State during its development of the SIP.

[1] U.S. Environmental Protection Agency, 2018. Modeling Guidance for Demonstrating Attainment of Air Quality Goals for Ozone, PM2.5, and Regional Haze, Research Triangle Park, NC. https://www3.epa.gov/ttn/scram/guidance/guide/O3-PM-RH-Modeling_Guidance-2018.pdf

[29] *See Texas v. EPA*, 829 F.3d 405, 430 (5th Cir. 2016).

**Commenter:** Utah Division of Air Quality

**Commenter ID:** 47

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

[T]he proposed disapproval relies heavily on modeling results that were unavailable to the state during the development of the SIP.

EPA's Proposed Disapproval Relies on the Modeling Results That Were Unavailable During the SIP Development

The EPA indicates that its proposed decision to disapprove Utah's SIP relies heavily on using the updated modeling platform 2016v2. The EPA explains that "by using the updated modeling results, the EPA is using the most current and technically appropriate information for this proposed rulemaking." However, as EPA knows, these results were not available to the states during the development and submittal of the interstate transport SIPs. Because SIP planning is a lengthy process, it is unacceptable for EPA to use modeling results for their rulemaking that were developed after state SIP preparation. As with all planning, SIP revisions are a representation of the best available data and modeling at that time. Using results from a modeling effort that post-dated the states' SIP development period is an additional example of EPA changing expectations without issuing appropriate and timely guidance. By relying on modeling results not available during the time of state SIP development, EPA is setting a precedent that creates significant uncertainty for any planning effort, further eroding the trust required for effective state and federal cooperation. This is clearly inconsistent with the cooperative federalism structure of the CAA.

**Commenter:** West Virginia Department of Environmental Protection

**Commenter ID:** 49

**Docket ID:** EPA-R03-OAR-2021-0873

**Comment:**

In the WV 2015 Ozone Good Neighbor SIP, DAQ applied independent modeling performed by Alpine Geophysics utilizing 2023 projected emissions. Alpine modeled at a finer 4-km grid within the maintenance and nonattainment receptor areas rather than the 12-km grid utilized by EPA. Also, at this time, the Lake Michigan Air Directors Consortium ("LADCO") regional planning organization ("RPO") performed similar modeling. All three of these efforts modeled remarkably comparable impacts at the downwind monitor locations. As such, DAQ is further puzzled by EPA's abandonment of its own modeling results by this proposed disapproval action.

*Response*

See Section V.A.4. of the preamble for our general response to comments on the use of updated modeling to support the EPA's action. The EPA notes that the EPA is not disapproving any SIP submission for its choice of modeling. The EPA's evaluations of each SIP submission were explained at proposal. *See, e.g.,* 87 FR 9867-9869 (February 22, 2022) (Minnesota); 87 FR 9818-9824 (February 22, 2022) (Oklahoma); 87 FR 31492-31493 (May 24, 2022) (Nevada); and 87 FR 31477-31483 (May 24, 2022) (Utah). We respond to several additional specific comments here.

One commenter claimed, "By delaying its decision on Maryland's submittal for nearly 2.5 years, the EPA moved the goal post for Maryland—an act the DC Circuit admonished in *New York v. EPA*, 964 F.3d 1214, 1223 (D.C. Cir. 2020)." First, as explained in the preamble, the timing of the EPA's action is not moving the goal posts, nor does availing ourselves of the most recent 2015 ozone transport modeling and monitoring information do so. Second, *New York* is inapposite. The court there found fault with the EPA's denial of a CAA section 126(b) petition from New York, which had identified many upwind-state sources with relatively large $NO_x$ emissions that the state alleged significantly contributed in violation of the good neighbor provision. The court found the EPA's explanation for why the state had not made out at least a facially plausible showing of significant contribution to be arbitrary and capricious. The court noted that downwind petitioning states may lack the ability to conduct the kinds of analysis the Agency's denial suggested may be required and also found internal inconsistencies in the Agency's position during litigation. None of that is relevant here. First, this holding was not about air quality determinations, but rather Step 3 analysis of source emissions reduction potential. Second, upwind states are charged by the Act with evaluating, defining, and prohibiting their sources' significant contribution. Unlike a downwind jurisdiction, they possess all requisite authority to undertake an analysis of emissions and emissions reduction potential within their borders. *See generally* CAA section 110(a)(2). Nor is the Agency obligated to define "significant contribution" for upwind states before acting on these SIP submissions. *See EPA v. EME Homer City*, 572 U.S. 489, 508-09 (2014).

APC and PacifiCorp both cite *Texas v. EPA*, 829 F.3d 405 (5th Cir. 2016) to argue that "EPA's approval or disapproval of a SIP should adhere to the guidance, data, and evidence available and on the record at the time of EPA's timely review of the SIP." In *Texas*, the 5th Circuit granted a preliminary stay of the EPA's disapproval of Oklahoma's and Texas' regional haze SIP submissions and promulgation of FIPs and did not reach the merits of either the EPA's assessment of the SIP submissions' compliance with the requirements of the CAA or the FIPs.[2] Although the court noted that the EPA proposed amendments to the regional haze rule subsequent to Texas and Oklahoma submitting regional haze SIP submissions, that proposal was not relevant to the submissions before the court.[3] Moreover, the EPA has not promulgated any regulations to implement CAA section 110(a)(2)(D)(i)(I). Rather, EPA is applying its

---

[2] *Texas v. EPA*, 829 F.3d 405 (5th Cir. 2016)

[3] *See, e.g.*, Protection of Visibility: Amendments to Requirements for State Plans; Proposed Rule, 81 Fed. Reg. 26941, 26944 (May 4, 2016) (explaining that the proposed "changes would apply to periodic comprehensive state implementation plans developed for the second and subsequent implementation periods and for progress reports submitted subsequent to those plans." And that EPA "[did] not intend for the proposed changes to affect the development of state plans for the first implementation period or the first progress reports due under the existing Regional Haze Rule.")

longstanding framework for implementing CAA section 110(a)(2)(D)(i)(I) while recognizing and considering any alternative approaches states presented. EPA further notes that to the extent APC objects to EPA's consideration of 2016v2 modeling or the updated 2016v3 modeling (adjusted in response to public comment on this action), Alabama's June 21, 2022, SIP submission was submitted after the EPA made the 2016v2 modeling available and included arguments with respect to that modeling, which the EPA has evaluated in this final action.

APC, The Luminant Companies, and PacifiCorp quote *Sierra Club v. EPA*, 356 F.3d 296, 308 (D.C. Cir. 2004): "To require states to revise completed plans every time a new model is announced would lead to significant costs and potentially endless delays in the approval process." In that case, Sierra Club challenged EPA's conditional approval of Maryland, Virginia, and Washington, D.C.'s attainment plans to address the Washington, D.C. Metropolitan Area's "Severe" classification for several reasons. 356 F.3d at 300. One reason was that the rate-of-progress plans relied on an older emissions model (MOBILE5 as opposed to the more recent MOBILE6). *Id*. EPA regulation specifically required states to use the latest emission model available during the development their rate-of-progress plans for the purposes of meeting Severe requirements, CAA section 172(c)(3); 40 CFR 51.112(a)(1), but because MOBILE6 became available one month before these SIP submissions were submitted, the EPA accepted the rate-of-progress plan based on MOBILE5. 356 F.3d at 308. The court agreed it was reasonable for EPA to not require Maryland, Virginia, and Washington, D.C. to revise their rate-of-progress plans using MOBILE6. *Id*. The EPA notes the timing consideration quoted by commenters related to attainment planning in a Serious nonattainment area. Here, however, the EPA has no regulations that require any state to use any particular type of model to address statutory requirements under CAA section 110(a)(2)(D)(i)(I), nor is the EPA disapproving any SIP submission on the basis of its choice of modeling (as compared to EPA's evaluation of the *results* of the modeling). Further, the *Sierra Club* case does not stand for the proposition that EPA is prevented from considering the most up-to-date data in assessing whether upwind states may be potentially significantly contributing to downwind nonattainment or maintenance.

APC and The Luminant Companies cite *Wisconsin v. EPA*, 938 F.3d 303, 336 (D.C. Cir. 2019) for the premise that the EPA's disapproval of a SIP submission on the basis of "reliance on data compiled after the SIP action deadline" may be challenged. The EPA acknowledges that *Wisconsin* noted such was the States' argument, but the D.C. Circuit did not opine on the validity of the assertion since it was not relevant to the court's evaluation of the CSPAR Update FIP.

A comment specifically pointed to the EPA's proposed error correction of its approval of Delaware's SIP submission (which is a component of the proposed FIP rulemaking published April 6, 2022) to suggest the EPA had created an unworkable standard for states. The commenter went on to argue that the EPA must approve Tennessee's SIP submission based on the information available at the time Tennessee submitted it to the EPA. However, this argument is illogical. If the EPA were to do that, it would be treating Delaware and Tennessee dissimilarly. In fact, the proposed error correction for Delaware only illustrates the futility of commenters' arguments for using outdated information to approve their SIP submissions. Had the EPA done that, then just as it proposed for Delaware, the Agency would likely have simply conducted error corrections of those approvals in light of the updated projections of air quality and contributions in 2023 that are now available.

61

Finally, it bears observance that if the EPA's evaluation of information regarding 2023 projections was arrested at the time of some deadline in the past or with the issuance of some older set of modeling results, then the purpose of notice and comment rulemaking would itself be frustrated, because no matter what arguments commenters could make about more recent or current real-world conditions or updated projections regarding 2023, the Agency would be forced to ignore them. As an example, the EPA would be obligated to ignore many of the comments on these proposals providing updates to the EPA's emissions inventories, which we have considered in developing the 2016v3 modeling of 2023.

In response to Louisiana Chemical Association, the EPA clarifies that the Agency found Louisiana's SIP submission complete on November 15, 2019. In response to Tennessee Department of Environment and Conservation, the EPA notes that the Agency is deferring final action on Tennessee's good neighbor SIP submission at this time. In response to Midwest Ozone Group, the EPA notes that the Agency met with Multi-Jurisdictional Organizations such as Central States Air Resource Agencies and others in Summer 2021 to discuss the concerns outlined in the July 2021 letter cited in the comment.[4] The EPA subsequently made emissions data available on September 20, 2021, as discussed in more detail in the preamble in Sections II.C and III.A.1.

Other issues raised by these comments are addressed in the preamble in Sections II.C, II.D, III.A.1., V.A., and V.B.2, and V.A.6 , as well as in Section 1.2 (Guidance for SIP Submissions), Section 5 (Updates to Modeling and Changes in Linkages), 6.1.2 (Step 1 Receptors Linked to Texas), 7.4 (August 2018 Memorandum), 8.1 (Determination of Significant Contribution), 10.2 (SIP Call), and 10.3 (Cooperative Federalism and the EPA's Authority).


## 1.5   States' Step 3 Analysis


*Comments*


**Commenter:** Air Pollution Control Program, Missouri Department of Natural Resources

**Commenter ID:** 01

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

[T]he Air Program notes that EPA has not ever provided any guidance on what an appropriate step-3 analysis would entail, which makes any decision where it rejects a step-3 analysis arbitrary and capricious. The following paragraphs explain the flaws of EPA's step-3 analysis that it has proposed in the FIPs for 26 states, including Missouri.

[...] Further, EPA's step 3 process completely ignores the real question at hand with the enabling statute, which ties contribution to an amount which contributes significantly to downwind maintenance or

---

[4] See "Meeting With States and MJOs on 8-18-2021" in the docket for this action.

nonattainment problems. Instead, EPA completely ignores the statutory contribution issue and instead is imposing controls that suit federal policy choices regardless of their impact on the downwind receptors that EPA used as justification for disapproving the SIPs to begin with.

[…]

The mere fact that it appears extremely unreasonable, if not impossible, for many states to attempt to address their good neighbor obligations through application of step-3 magnifies the overreach of the federal executive branch in these actions. EPA has offered no guidance to states on developing step-3 demonstrations in their good neighbor SIPs Not a single state has successfully made a step-3 demonstration to avoid a FIP. Every single state that is contributing above the 1 percent threshold (except for Oregon, as noted previously) is having their SIP disapproved, and the proposed FIP will control and impose unnegotiable costs on citizens and sources in those states. This shows again that EPA's action will strip state energy choices from the states and place them into the hands of EPA if these disapprovals are held to stand.

**Commenter:** Arkansas Environmental Federation

**Commenter ID:** 09

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

EPA also cannot substitute its own judgement for that of the state's in crafting a SIP, as the courts have recognized.).[15] Accordingly, the fact that EPA has consistently applied Step 3 of its 4-Step framework to identify "significant" emissions contributions for its ozone transport Federal Implementation Plans ("FIPs") and "this interpretation of the statute has been upheld by the Supreme Court," has no bearing on whether a state's different choices for its own SIP are approvable under the CAA. In determining whether a state's emissions significantly contribute to nonattainment or interfere with maintenance, EPA explains that "states must complete an analysis similar to the EPA's. Yet there is no requirement in the CAA that states must complete an analysis similar to EPA's nor has EPA attempted to adopt regulatory standards that purport to define the regulatory requirements for interstate transport SIPS. The very cases cited by EPA, the Supreme Court and the D.C. Circuit Court of Appeals have ruled that such plans may not result in controls that reduce emission by more than the amount necessary to achieve attainment.[18]

[15] *Bridesburg*, 836 F.2d at 781 (quoting *Train v. Natural Res. Def. Council, Inc.*, 421 U.S. 60, 79 (1975)) (internal citations and quotations omitted) ("EPA has limited authority to reject a SIP . . . . The [CAA] gives the Agency no authority to question the wisdom of a State's choices of emission limitations if they are part of a plan which satisfies the standards of [Section 110(a)(2)], and the Agency may devise and promulgate a specific plan of its own only if a State fails to submit an implementation plan which satisfies those standards.").

[18] EPA acknowledges that pursuant to *EME Homer City* decision, it cannot "require [] an upwind state to reduce emissions by more than the amount necessary to achieve attainment in every downwind state to which it is linked" for to do so would be "over-control". 87 Fed. Reg. 200098-99. It further admits that its current modeling demonstrates weakness in its conclusions regarding Arkansas' linkages, and calls into question inclusion of non - EGUs in the state plan. *Id.* One tenet of EPA proposed disapproval is that Arkansas' analysis did not include non -

EGUs (87 Fed. Reg. 9810), yet EPA's own modeling seems to indicate that the opposite - that to go beyond is in fact over control. Id. Either way - and without waiver - this confusion regarding modeled results, ever-changing linkages, and phantom necessity of control, particularly in Arkansas, highlights the unfairness and inefficiency of EPA's chosen process for this rule making, its numerous dockets, and the companion rule making proposing to institute a FIP for Arkansas on the heels of this ill-conceived proposed disapproval.

**Commenter:** Louisiana Electric Utility Environmental Group

**Commenter ID:** 28

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

EPA also cannot substitute its own judgment for that of the state's in crafting a SIP, as the courts have recognized.[11] Accordingly, the fact that EPA has consistently applied Step 3 of its 4- Step framework to identify "significant" emissions contributions for its ozone transport Federal Implementation Plans ("FIPs") and "this interpretation of the statute has been upheld by the Supreme Court," has no bearing on whether a state's different choices for its own SIP are approvable under the CAA. In determining whether a state's emissions significantly contribute to nonattainment or interfere with maintenance, EPA explains that "states must complete an analysis similar to the EPA's (or an alternative approach to defining "significance" that comports with CAA requirements.)" Yet, there is no requirement in the CAA that states must complete an analysis similar to EPA's and EPA has not attempted to adopt regulatory standards that purport to define the regulatory requirements for interstate transport SIPs.

[11] *Bridesburg*, 836 F.2d at 781 (quoting *Train v. Natural Res. Def. Council, Inc.*, 421 U.S. 60, 79 (1975)) (internal citations and quotations omitted) ("EPA has limited authority to reject a SIP . . . . The [CAA] gives the Agency no authority to question the wisdom of a State's choices of emission limitations if they are part of a plan which satisfies the standards of [Section 110(a)(2)], and the Agency may devise and promulgate a specific plan of its own only if a State fails to submit an implementation plan which satisfies those standards.").

**Commenter:** The Luminant Companies

**Commenter ID:** 44

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

EPA proposes to go beyond the actual requirements of the Clean Air Act and evaluate Texas's SIP according to new, non-statutory standards. Specifically, EPA proposes to reject TCEQ's expert modeling projections of future design values and TCEQ's quantification and assessment of Texas's "significant contribution" in favor of its own modeling. However, EPA's quantification and assessment of a State's "significant contribution" to downwind nonattainment or maintenance issues is *not* a requirement of the Act.[30] The Clean Air Act does not provide EPA the authority to second-guess TCEQ and disapprove its SIP simply because TCEQ's modeling does not match EPA's modeling or because EPA believes TCEQ's modeling "*may* understate" projected design values or there is "*potential* underestimation."[31] The

64

standard that EPA applies to Texas's SIP and its supporting technical analysis in the Proposed Disapproval has no basis in the Clean Air Act. EPA has announced its preference for a "nationally consistent approach," but this preference cannot override the clear and settled intent of Congress that states be permitted to implement different and varying approaches if they choose. Nor can EPA's policy goal heighten or alter the standard set out in the Clean Air Act for a state's SIP submittal such that a "deviation" from EPA's preferred approach "must be substantially justified," as EPA claims. Plainly put, EPA does not write SIPs. EPA's competing view of Texas's contribution or its potential to interfere with maintenance in downwind States, and EPA's overconservative methodology for determining these things, are not requirements of the Act, nor has EPA promulgated regulations addressing this. In fact, EPA has recognized that it "has not directed states that they must conduct [their] analysis in precisely the manner the EPA has done in its prior regional transport rulemakings[.]" In fact, EPA has taken inconsistent approaches (none of which are grounded in the statute), previously stating that states must only use an assessment of significant contribution that is "comparable" to EPA's preferred approach in order to have its SIP approved.[34]

[30] [*EME Homer City Generation, L.P. v. EPA*, 696 F.3d 7 (D.C. Cir. 2012)] at 47 (Id. at 47 ("Nowhere does the [Clean Air Act] place a requirement on EPA to quantify each State's amount of 'significant contribution' to be eliminated pursuant to the 'good neighbor' provision[.]").

[31] EPA Region 6, 2015 8-Hour Ozone Transport SIP Proposal, Technical Support Document, Docket No. EPAR06-OAR-2021-0801-0002, at 39, 66 (Feb. 2022) ("Proposed TSD") (emphasis added).

[34] *See* [Guidance for State Implementation Plan (SIP) Submissions to Meet Current Outstanding Obligations Under Section 110(a)(2)(D)(i) for the 8-Hour Ozone and PM2.5 National Ambient Air Quality Standards (Aug. 15, 2006)] at 5.

**Commenter:** Oklahoma Department of Environmental Quality

**Commenter ID:** 37

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

EPA's Proposal is a Fundamental Change in Policy and is Not in Line With Previous CSAPR Policy-Making

As mentioned previously, under current EPA policy it is not possible for a state to be certain that any quantity of NOx emissions reductions will comply with the good neighbor requirements without waiting for the completion of Step 3 of the CSAPR framework. Because Step 3 is to be undertaken during the development of the FIP, the approach adopted by EPA in its proposed FIP represents a substantive change in policy, rather than an extension of the current approach. EPA's CSAPR approach was challenged in the courts and survived those challenges, giving EPA confidence in the fundamental appropriateness of actions taken previously. However, the previous CSAPR remedies constitute a different policy approach than the present EPA proposed action, which has metamorphosed into a form substantively different from its previous versions

**Commenter:** Midwest Ozone Group

**Commenter ID:** 30

**Docket ID:** EPA-R02-OAR-2021-0673, EPA-R03-OAR-2021-0872, EPA-R03-OAR-2021-0873, EPA-R04-OAR-2021-0841, EPA-R05-OAR-2022-0006, EPA-R06-OAR-2021-0801, EPA-R07-OAR-2021-0851

**Comment:**

In the absence of any guidance from EPA related to the assessment of Step 3 control measures, EPA should defer to state plans which evaluate such control measures.

While EPA's proposed disapprovals criticize states for failing to conduct an appropriate Step 3 analysis, EPA makes it clear that it has not established guidelines for how states should conduct that analysis. EPA's treatment of this issues is illustrated by the following statement made by EPA in addressing the Tennessee SIP:

> While the EPA has not directed states that they must conduct a Step 3 analysis in precisely the manner the EPA has done in its prior regional transport rulemakings, state implementation plans addressing the obligations in CAA section 110(a)(2)(D)(i)(I) must prohibit "any source or other type of emissions activity within the State" from emitting air pollutants which will contribute significantly to downwind air quality problems. Thus, states must complete something like the EPA's analysis (or an alternative approach to defining "significance" that comports with the statute's objectives) to determine whether and to what degree emissions from a state should be "prohibited" to eliminate emissions that will "contribute significantly to nonattainment in or interfere with maintenance of" the NAAQS in any other state. Tennessee did not conduct such an analysis in its SIP submission.

It is apparent that most states did little or no Step 3 analysis because, with many incorporating the 2018 flexibilities that EPA advised could be used in 2015 NAAQS Good Neighbor SIPs, they concluded in either Step 1 or 2 that no controls were required.  The proposed Good Neighbor SIP disapprovals should therefore not impose a FIP without first allowing the states, working with their respective MJOs for a regional approach, an opportunity to conduct a Step 3 analysis better tailored to their state and/or region.

Rather than a wholesale disapproval of 19 state Good Neighbor SIPs, EPA should propose an 18-month period for states to proceed with Steps 3 and 4, especially since the EGU-only approach is insufficient and the other source contributions provide even more opportunity for the development of state- and region-specific control strategies that would likely be more cost effective and avoid the over-control that occurs with a generic FIP approach.

**Commenter:** Midwest Ozone Group

**Commenter ID:** 30

**Docket ID:** EPA-R08-OAR-2022-0315, EPA-R09-OAR-2022-0394, EPA-R09-OAR-2022-0138

**Comment:**

66

Rather than a wholesale disapproval of state Good Neighbor SIPs, EPA should propose an 18-month period for states to proceed with Steps 3 and 4, especially since the EGU-only approach is insufficient and the other source contributions provide even more opportunity for the development of state- and region-specific control strategies that would likely be more cost effective and avoid the over-control that occurs with a generic FIP approach.

**Commenter:** PacifiCorp

**Commenter ID:** 38

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

The CAA does not require states to address their Good Neighbor obligations in a specific manner, nor does it "enable EPA to force particular control measures on the states." EPA has not adopted any nationwide regulatory standards that purport to define the requirements for interstate transport SIPs with respect to the 2015 ozone NAAQS. Specifically, EPA has previously explained that "[t]he precise nature and contents of such a submission is not stipulated in the statute. [Therefore,] EPA believes that the contents of the SIP submission required by section 110(a)(2)(D)(i) may vary depending upon the facts and circumstances related to the specific NAAQS." This is one of the reasons the CAA assigns development of implementation plans to the states – they are able to use their local knowledge and familiarity with regional conditions to best design the right type of plan for their location and citizens' values and priorities.

EPA claims it "has not directed states that they must conduct a Step 3 analysis in precisely the manner the EPA has done in its prior regional transport rulemakings." But EPA rejects the flexibilities it previously provided to the states and instead insists on a one-size-fits-all approach when assessing significant contribution to NAAQS. In fact, EPA's disapprovals force Utah and other states to "complete something similar to EPA's analysis" or "an alternative approach" that meets EPA's policy choices and preferred methods.

The Proposed Disapproval fails to recognize EPA's limited role and obligation: "the Administrator shall approve [a SIP or SIP revision] as a whole if it meets all of the applicable requirements of this chapter." EPA has long recognized its limited role, as stated in a recent SIP approval: [T]he Administrator is required to approve a SIP submission that complies with the provisions of the CAA and applicable Federal regulations. 42 U.S.C. 7410(k); 40 CFR 52.02(a). Thus, in reviewing SIP submissions, EPA's role is to approve state choices, provided that they meet the criteria of the CAA.

*Response*
The EPA did not define "significant contribution" for any state in this action, nor is the EPA required to do so. *EPA v. EME Homer City*, 572 U.S. 489, 508-09 (2014). See Section V.B.8. of the preamble for the EPA's general response to these comments.

A comment cites a notice in the *Federal Register* as "87 Fed. Reg. 200098-99" regarding the EPA's interpretation of the *EME Homer City* decision related to over control. Based on context, the EPA assumes the comment was referring to the proposed good neighbor FIPs for Arkansas and other states for the 2015 ozone NAAQS. *See* 87 FR 20098-99 (April 6, 2022). In that proposal the EPA stated, "Although the court described over control as going beyond what is needed to address nonattainment, EPA interprets the holding as not impacting its approach to defining and addressing both nonattainment and maintenance receptors."

In any case, this comment is inapposite as it relates to the EPA's non-final analysis of potential emissions controls in the proposed FIP rather than to the EPA's evaluation of Arkansas's SIP submission. In the proposed SIP submission disapproval, the EPA explained that Arkansas' reliance on air quality information or factors was generally not sufficient at Step 3 to establish that no further emissions controls would be appropriate in Arkansas. *See* 87 FR at 9808-10 (February 22, 2022). The EPA further explained that Arkansas' analysis was deficient for failing to fully analyze both additional electric generating unit (EGU)and non-EGU controls. *See id.* at 9810-11. While in the proposed FIP the EPA acknowledged that there was a potential for overcontrol if the full suite of the non-EGU controls as proposed were included in the FIP's control strategy for Arkansas, the EPA ultimately proposed to determine that such over-control was not sufficiently established to justify not proposing the full suite of non-EGU controls for Arkansas sources. *See* 87 FR 20099. Thus, there is no inconsistency between the two proposals: the EPA's evaluation of the SIP submission established that the state had not conducted a proper Step 3 analysis of either EGU or non-EGU control opportunities; and in the proposed FIP, the EPA proposed to apply both the EGU and non-EGU control strategies in Arkansas and proposed to find there was insufficient evidence of overcontrol. Even if the EPA were to determine in a final FIP rulemaking that no further emissions controls are warranted for some sub-set of these sources, that would not change the fact that the Arkansas SIP submission's Step 3 analysis is deficient and not approvable.

The EPA explained the deficiencies of Texas's SIP submission at proposal. *See* 87 FR 9826-9834 (February 22, 2022) and in the technical support document (TSD) titled "Region 6 2015 8-Hour Ozone Transport SIP Proposal TSD", in Docket ID No. EPA-R06-OAR-2021-0801 (hereinafter Evaluation of Texas Commission on Environmental Quality (TCEQ) Modeling TSD). The EPA is not taking final action on Tennessee's Good Neighbor SIP submission for the 2015 ozone NAAQS in this action.

Other issues raised by these comments are addressed in Sections III, V.A.2., V.A.6., V.B.2., V.B.3., and V.B.7. of the preamble and the following Sections: 4.2 (Model Performance), 6.4 (October 2018 Memorandum), 6.5 (Certain Monitoring Sites in California at Step 1) 10.2 (SIP Call), 10.3 (Cooperative Federalism and the EPA's Authority), 11.6 (Economic Impacts).


## 1.6   EPA Input During SIP Submission Development


*Comments*

**Commenter:** Air Pollution Control Program, Missouri Department of Natural Resources

**Commenter ID:** 01

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

EPA shared no information as to its basis for the SIP disapproval prior to promulgating it, and the FIP, as proposed, will impose hundreds of millions of dollars in compliance costs per year on all Missouri citizens who purchase electricity, and potentially, on any citizen of the state that may depend on power plants and other manufacturing industries in the state for their work and their livelihood. Prior to the proposed FIP, EPA has offered no indication as to what might be acceptable under a step-3 analysis. This puts states in an impossible position to submit an approvable SIP if they are unable to avoid obligations under steps 1 and 2. However, EPA's proposed FIPs shows that it is willing and eager to impose crippling costs on states to pursue federal policy choices over state-protected decisions with no regard for the impact that such costly controls have on the upwind states where EPA imposes the FIPs.

[…]

EPA should be required to submit comments on SIPs if it thinks the proposed SIPs have the potential for controversial action and explain the issues EPA has with any proposed SIP submission. It is unreasonable for EPA to sit on SIP submittals for years with no communication to states as to its intentions for disapprovals and proposed FIPs that will impose hundreds of millions of dollars in annual compliance costs that will be passed down to citizens in their state. EPA's current action with the proposed FIP shows that it intends to invoke its power from the Homer City case to impose whatever costs it determines to be reasonable on any state where it can produce modeling showing that the state hits the low and arbitrary 1 percent threshold.


**Commenter:** Arkansas Department of Energy and Environment, Division of Environmental Quality

**Commenter ID:** 07

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

Arkansas DEQ discussed methodology, modeling, and rationale with EPA early in the process and throughout SIP development. EPA offered suggestions for refinement based on initial drafts, and provided additional input during the public comment period for the 2015 Ozone Transport SIP draft and associated rulemaking. There was at no point during this process any indication from EPA that this plan or DEQ's rationale was not approvable as DEQ was developing it, as long as the state provided rational, science-based justification for the state's decisions. DEQ did so.

In addition, EPA provided input on DEQ's HYSPLIT modeling analysis during the comment period for the SIP and DEQ made adjustments to its modeling in response to EPA's comments. If EPA contends that HYSPLIT modeling is not informative for the purposes of SIP decision-making, this should have been

stated in early conversations between the agency and DEQ, before DEQ performed HYSPLIT modeling, or during the public comment period (rather than suggesting modifications to DEQ's methodology, resulting in additional state resources invested in HYSPLIT modeling to bolster the SIP submittal in response to EPA comments). See EPA comments and DEQ responses to comments on 2015 Ozone Transport SIP, included here as Appendix A.

**Commenter:** Arkansas Environmental Federation

**Commenter ID:** 09

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

[Arkansas] DEQ has worked diligently to meet the NAAQS requirements for the 2015 ozone standard, as outlined below. Significant work was required to develop the information necessary to formulate the SIP based on EPA guidance at the time as shown by the following chronology, which involved interaction with local stakeholders including AEF. Once that information was developed and a proposed plan prepared, DEQ undertook the required state-rulemaking and legislative action. DEQ worked collaboratively with EPA Region 6 throughout the process. Numerous discussions were held by DEQ and EPA Region 6 to inform DEQ's development of an appropriate SIP. DEQ responded to questions and comments from EPA Region 6 to develop the SIP. Additionally, DEQ developed additional information in response to EPA Region 6's comments in a collaborative effort that EPA has now abandoned. In spite of these efforts, EPA missed the statutorily mandated deadline to act on DEQ's SIP submission even though the SIP was approvable.

**Commenter:** Association of Electric Companies of Texas, BCCA Appeal Group, Texas Chemical Council and Texas Oil & Gas Association

**Commenter ID:** 11

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

Due to EPA's own delay and the accelerated timeline required by the consent decree, EPA is proposing to deny commentors the opportunity to respond to the new data and analysis.[29]

[29] This is further compounded by the fact that EPA did not submit comments on Texas's proposed SIP during TCEQ's public comment period. If EPA had concerns about TCEQ's SIP submission, EPA should have raised concerns during TCEQ's public comment period for the draft SIP. This would have allowed TCEQ to revise the SIP submission to address EPA's concerns prior to finalizing it and submitting it to the Agency. See EPA, SIP PROCESSING MANUAL, WHAT IS A SIP?, https://cfpub.epa.gov/oarwebadmin/sipman/sipman/mContent.cfm?chap=1&filePos=4 (last visited Apr. 25, 2022) ("EPA should prepare comments on the proposed revisions and either testify at the hearing and submit comments, or submit comments during the state's public comment period. States are required by law to provide the public and EPA 30 days to review and comment on proposed revisions to the SIP.").

**Commenter:** Environmental Federation of Oklahoma

**Commenter ID:** 20

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

In particular, EFO supports DEQ's assessment that EPA has overstepped its authority by circumventing the normal SIP development and approval process in a number of ways, including but not limited to: [...]providing no indication of the upcoming SIP disapproval[.]


**Commenter:** Evergy, Inc.

**Commenter ID:** 21

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

MDNR claims that EPA did not reach out to discuss new modeling results nor identify any issues with Missouri's SIP during the course of those two years prior to proposing to disapprove the SIP and to implement a Federal Implementation Plan (FIP).


**Commenter:** Maryland Department of the Environment

**Commenter ID:** 29

**Docket ID:** EPA-R03-OAR-2021-0872

**Comment:**

Maryland did adopt the CSAPR Update into its SIP. Maryland submitted its CSAPR Update Incorporation by Reference ("IBR") SIP #20-03 in response to direction from EPA Region 3 that Maryland could not continue to be subject to the CSAPR Update and also submit a Good Neighbor SIP. In order for the Good Neighbor SIP for the 2008 Ozone NAAQS to be approved, EPA Region 3 directed that CSAPR and the CSAPR Update must be incorporated into Maryland's regulations if MDE wanted to cite the rule(s) when addressing the state's Good Neighbor obligations.[3]

MDE committed to including the CSAPR Update in Maryland's SIP in August 2019. The regulation was proposed in December 2019, and was finalized into Maryland's regulations at COMAR 26.11.28 on March 23, 2020. Maryland's Good Neighbor SIP for the 2015 Ozone NAAQS states:

> On October 26, 2016, the EPA finalized an update to CSAPR for the 2008 ozone NAAQS by issuing the CSAPR Close-Out [text error - "CSAPR Update"]. Maryland has been complying with the CSAPR Update limits and has committed to incorporating the Federal regulation into state

71

regulations and a State SIP. This will resolve any outstanding issues related to replacement of the CSAPR Update and FIP in Maryland or additional analysis of Maryland's regulations.[4]

On October 16, 2019, Maryland submitted its 2015 Good Neighbor SIP, which committed to the CSAPR Update IBR. The incorporation was finalized within 6 months and effective for over a year and a half after Maryland's 2015 Good Neighbor SIP was submitted to EPA. It was therefore reasonable to cite it and rely on it (in part) in Maryland's 2015 Good Neighbor SIP.

On March 15, 2021, EPA finalized the Revised CSAPR Update ("RCU") in order to resolve 21 states' transport obligations for the 2008 Ozone NAAQS. EPA made a procedural error[5] by finalizing the RCU as the FIP solution prior to disapproving Good Neighbor SIPs submitted by the states. EPA realized this error and to remedy it, EPA Region 3 asked Maryland to withdraw both the Good Neighbor SIP for the 2008 Ozone NAAQS and Maryland's IBR of the CSAPR Update into the state SIP. EPA stated that Maryland's transport obligations for the 2008 Ozone NAAQS were met by the RCU and that withdrawing the SIP would not affect any other Maryland actions.

It is unreasonable for EPA to use Maryland's compliance with EPA's directive against it now. EPA is estopped from such action because Maryland reasonably relied on EPA's direction that withdrawal of the 2008 Good Neighbor SIP and IBR would not affect its pending 2015 Good Neighbor SIP submittal. At least, in the spirit of public transparency and consistent with the concept of cooperative federalism upon which the CAA is based, EPA should have acknowledged in the proposed disapproval that the IBR SIP was withdrawn at EPA's request to correct EPA's procedural error. The federal/state relationship is built on trust and that trust is jeopardized when EPA regional offices are not fully transparent with their state counterparts.

[3] See August 2019 letter from MDE to Mr. Cosmo Servidio: "EPA has informed MDE that Maryland cannot continue to be subject to the CSAPR Update and the Federal Implementation Plan (FIP) and also submit a good neighbor SIP… In an effort to expedite EPA's approval process [for SIP #18-05 - Good Neighbor SIP for the 2008 ozone NAAQS] and based on guidance of EPA Region 3 staff, MDE is currently working to incorporate by reference the federal CSAPR Update into the Code of Maryland Regulations. This should resolve any outstanding issues that were related to replacement of the CSAPR Update and the FIP in Maryland or additional analysis of Maryland's regulations."
[4] Maryland SIP #19-02: *Implementation, Maintenance, and Enforcement of the 0.070 ppm 8-hour Ozone National Ambient Air Quality Standard State Implementation Plan §110(a)(2)(D) MD 70 ppb Ozone Transport SIP*. Pg. 10
[5] See discussion related to submission of CSAPR IBR SIP #20-03 and message from C. Servidio

**Commenter:** Mississippi Department of Environmental Quality

**Commenter ID:** 32

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

MDEQ worked collaboratively with EPA Region 4 to properly respond to interstate transport, or "good neighbor," requirements and submitted what we believed EPA considered an approvable iSIP in September 2019.

**Commenter:** Nevada Division of Environmental Protection

**Commenter ID:** 33

**Docket ID:** EPA-R09-OAR-2022-0138

**Comment:**

EPA has repeatedly failed to meaningfully collaborate with NDEP on how to best address Nevada's interstate ozone transport obligations.

After EPA revised the ozone NAAQS in 2015, NDEP spent its limited resources to prepare and submit Nevada's iSIP by the required deadline of October 1, 2018, relying on EPA's March 2018 modeling results to establish that no out-of-state downwind receptors were impacted by Nevada sources.

EPA failed to act on Nevada's iSIP by the 2020 statutory deadline. As of late 2021, despite the long-standing process for review and prioritization of the SIP backlog (namely the SIP Management Plan) EPA provided zero communication to NDEP on any significant aspect of the Nevada iSIP review and approval process nor did EPA provide any substantive feedback on Nevada's 2018 iSIP submission.

**Commenter:** Oklahoma Department of Environmental Quality

**Commenter ID:** 37

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

EPA Comments on Oklahoma's SIP Submittal Did Not Reflect Its Intent to Disapprove, Indicating Implied Consent for Use of 1 ppb Significance Threshold

As EPA stated in the March 2018 Tsirigotis Memo, the memo was intended to be used not only by states, but as guidance for the EPA regions, as well. Generally, staff from the states and regions work together in developing SIP submittals and, accordingly, states provide EPA regional staff with periodic updates on progress toward SIP submittals. During the development process of Oklahoma's ozone transport SIP, Oklahoma discussed with EPA Region 6 its intent to use the flexibilities offered in the Tsirigotis memos. Therefore, during the final stages of SIP development in 2018, EPA Region 6 was on notice of Oklahoma's intent to use the flexibilities offered in the Tsirigotis memos.

On August 14, 2018, Oklahoma published for public comment Oklahoma's I-SIP Submittal, which included the ozone transport SIP. On September 17, 2018 (the final day of the comment period), Oklahoma received a letter containing comments on said SIP submittal from EPA Region 6 (Attachment B). In its comments, EPA Region 6 suggested that ODEQ incorporate information from the August 2018 Tsirigotis Memo into the SIP submittal, stating:

> We suggest you factor in information from the EPA memo of August 31, 2018, "Analysis of
> Contribution Thresholds for Use in Clean Air Act Section 110(a)(2)(D)(i)(I) Interstate Transport

State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards." The results of the analysis found in this memo would be a better justification for use of 1 parts per billion (ppb) threshold than the current narrative on a 1 ppb threshold.

Thus, not only is there an absence of comment on the record from EPA that Oklahoma should not rely on the 2018 Tsirigotis Memos or use the 1 ppb threshold, but EPA actually encouraged ODEQ to rely further on said memos to support the use of a 1 ppb threshold in the final SIP, which amounts to implied consent from EPA for the reasonableness of the 1 ppb threshold and reliance on the 2018 Tsirigotis Memos in demonstrating that reasonableness. Thus, EPA's position in the proposed SIP disapproval contradicts the 2018 Tsirigotis Memos and the comment letter from Region 6.

**Commenter:** Texas Commission on Environmental Quality

**Commenter ID:** 42

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

The EPA failed to provide Texas with formal comments on the adequacy of its analysis during the public comment period for the SIP revision.

The EPA did not comment on the adequacy of the TCEQ's analysis during the public comment period for the 2015 Ozone Transport SIP Revision. The TCEQ and EPA Region 6 participated in discussions regarding the proposed SIP revision, and the TCEQ answered questions from the EPA on the planned SIP submittal and provided additional data to the EPA. The EPA did not indicate that the information provided failed to address its concerns. The lack of EPA comment did not allow the TCEQ to address the issues outlined in the EPA's proposed disapproval in the adopted 2015 Ozone Transport SIP revision.

**Commenter:** United States Steel Corporation

**Commenter ID:** 45

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

[Arkansas] DEQ has expended an enormous amount of time and worked diligently to meet the NAAQS for ozone. DEQ worked to develop the information necessary to formulate the SIP, developed a proposed plan, and undertook the required state-rulemaking and legislative action. DEQ also worked collaboratively with EPA Region 6. Numerous discussions were held by DEQ and EPA Region 6 to inform DEQ's development of an appropriate SIP.  DEQ responded to questions and comments from EPA Region 6 to develop the SIP.  Additionally, DEQ developed additional information in response to EPA Region 6's comments as a part of a collaborative process that EPA has now abandoned.

**Commenter:** Utah Division of Air Quality

**Commenter ID:** 47

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

The benefit of cooperative federalism is having the autonomy to do what's best for the state, but do so in partnership with EPA to ensure that the CAA intent and requirements are met.

In this same spirit, UDAQ engaged early and often with our counterparts at Region 8 in the development of our interstate transport SIP. Through this collaboration and EPA's guidance, Utah selected the alternative threshold of 1 ppb. […] Thus, UDAQ was surprised when EPA proposed to include Utah in the proposed FIP, and subsequently disapproved the state's SIP based in large part on the selection of the 1 ppb over the 1% of the NAAQS threshold. If the 1 ppb threshold was in fact inappropriate for the development of this SIP, EPA should have communicated that view to UDAQ during the early engagement and development process or during the state's public comment period. Additionally, EPA released no new guidance directing states to use a 1% threshold either prior to or after SIP submittal deadlines.

*Response*

Some commenters assert that the EPA did not provide sufficient input to states during the development of the SIP submissions, while others allege that the EPA led the states astray or implied to states that the SIP submissions were approvable. The EPA is required under CAA section 110 to review a SIP submission revision that has been formally submitted; based on the EPA's determination of whether that submission meets applicable CAA requirements, the EPA must then approve or disapprove the SIP submission. There is no CAA requirement that the EPA must review, evaluate, and comment on a state's draft SIP submission revision during the state rulemaking process, and no legal basis for states to assume that the EPA's silence during a state public comment period constitutes the Agency's endorsement of such SIP submission revision. Where the EPA did communicate views to these states on draft SIP submission revisions, the EPA disagrees that such preliminary feedback should now bind the Agency, and the EPA disagrees that we could in any way lawfully provide "implied consent" to states regarding their draft SIP submissions before they have completed the required rulemaking processes at both the state and federal level. After all, EPA cannot assure any state in advance of the EPA's public notice and comment process what the EPA's final action on a SIP submission will be. *Catawba County v. EPA*, 571 F.3d 20, 34 (D.C. Cir. 2009) ("[a]n agency pronouncement is not deemed a binding regulation merely because it may have some substantive impact, as long as it leave[s] the administrator free to exercise his informed discretion.") citing *Panhandle Producers & Royalty Owners Ass'n v. Econ. Regulatory Admin.*, 822 F.2d 1105, 1110 (D.C. Cir. 1987) (quoting *Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533, 537 (D.C. Cir. 1986) (internal quotation marks omitted))).

The EPA encourages state air agencies to engage as early as possible with the Agency on the development of any SIP submission revisions in an effort to address all technical and policy approvability issues prior to submitting a final SIP submission package and appreciates states' willingness to involve

regional offices at the initial SIP submission development stage. Further, the EPA makes its best efforts to work closely with states, but EPA cannot be expected to provide states definitive guidance on what will ultimately be approvable. Nonetheless, the suggestions we made to states on their SIP submissions in this instance are not inconsistent with the final action we are now taking.

Other issues raised by these comments are addressed in Section V.A.3., V.A.6., and V.B.7. of the preamble and the following sections: 1.1 (Timing of SIP Actions), 1.2 (Guidance for SIP Submissions), 7.4 (August 2018 Memorandum), 10.3 (Cooperative Federalism and the EPA's Authority), 11.6 (Economic Impacts), and 11.12 (Consent Decrees).

We now address specific concerns about the EPA input during the SIP development process of specific states.

Arkansas

Regarding Arkansas, the EPA specifically commented on Arkansas' draft SIP submission that "EPA disagrees with ADEQ on the applicability of the prevention of significant deterioration (PSD) significant impact level (SIL) to a one parts per billion (ppb) threshold for assessing linkages to downwind receptors because EPA's analysis for the SIL did not contain information that could be used to evaluate the collective contribution from upwind states at downwind receptors, a key element for consideration given the regional nature of ozone transport." This is consistent with the EPA's position on this topic in this action. Further, in response to this comment, ADEQ made no changes to its final SIP submission. This is one example (of many) where the EPA provided feedback to a state during the SIP submission development process that the state chose not to include or act upon. It is inauthentic to characterize the disapproval of Arkansas' SIP submission as being an abandonment of collaborative process when there were specific EPA comments that went unaddressed by the state SIP submission, which contributed to the final SIP submission being deficient.

The EPA noted in our comments to ADEQ on their draft SIP submissions, the state's back trajectory analysis "would give additional perspective on the representativeness of EPA's modeling to examine the yearly frequency" and that "[c]omparing the frequency in 2011 to the other years analyzed would help determine if the frequency for 2011 was anomalous."[5] The EPA noted a number of concerns with the analysis. *Id.* The EPA's review found that Arkansas' analysis did not suggest that the modeled base year of 2011 used in EPA's 2011-based modeling was anomalous compared with other years. 87 FR 9809. We address additional comments related to the EPA's technical concerns and conclusions from ADEQ's HYSPLIT analysis in Section 8.8.

Maryland

EPA's proposed disapproval of Maryland's SIP submission made the point that "relying on a FIP at Step 3 is per se not approvable if the state has not adopted that program into its SIP . . ." 87 FR 9463, 9471 (Feb. 22, 2022). This point was made in the context of addressing Maryland's argument that the Cross-State Air Pollution Rule (CSAPR) Update FIP (which the EPA promulgated to partially address good neighbor obligations for the 2008 ozone NAAQS) satisfied the state's good neighbor obligations for the

---

[5] The EPA's comment letter on ADEQ's draft SIP submission was attached to their SIP submission and is available in Docket ID. No. EPA-R06-OAR-2021-0801 (Document ID No. EPA-R06-2021-00801-0003).

2015 ozone NAAQS The statement that the EPA made at proposal is a correct statement of the EPA's interpretation of CAA section 110(a)(2), which is that FIP provisions cannot be relied upon to meet SIP obligations unless the FIP provisions are incorporated into the SIP.  (This aspect of Maryland Department of the Environment (MDE's) comment is further responded to in Section V.B.9 of the preamble regarding reliance on FIP measures. MDE complains, however, that EPA itself encouraged the state to withdraw its August 2018 SIP submission, which would have incorporated the CSAPR Update into its SIP and replaced the CSAPR Update FIP. MDE claims the EPA's change in advice to the state leading to the withdrawal of that submission was due to our own "procedural error," and that the EPA cannot now use the lack of incorporation into its SIP submission of the CSAPR Update as a basis for disapproval. These comments reflect a misunderstanding of the procedural history and omit certain key facts.

First, to review the series of actions we took to address Maryland's good neighbor obligations for the 2008 ozone NAAQS: On December 31, 2012, Maryland submitted a SIP submission to address the requirements of CAA section 110(a)(2)(D)(i)(I) with respect to the 2008 ozone NAAQS. On April 20, 2016, Maryland withdrew its good neighbor SIP submission. On July 20, 2016, the EPA published a finding of failure to submit a complete good neighbor SIP submission to address the requirements of CAA section 110(a)(2)(D)(i)(I) with respect to the 2008 ozone NAAQS for Maryland (81 FR 47040). On October 26, 2016, the EPA published a FIP for Maryland in the CSAPR Update addressing the requirements of CAA section 110(a)(2)(D)(i)(I) with respect to the 2008 ozone NAAQS. However, the EPA did not determine that the CSAPR Update FIP fully addressed the requirements of CAA section 110(a)(2)(D)(i)(I). On August 8, 2018, Maryland submitted a new SIP submission intended to fully address good neighbor requirements for the 2008 ozone NAAQS by adopting the CSAPR Update emissions trading program into its SIP. On December 21, 2018, the EPA published a determination in the CSAPR Close-Out that the CSAPR Update FIP for Maryland fully addressed the requirements of CAA section 110(a)(2)(D)(i)(I) for the 2008 ozone NAAQS (83 FR 65878, effective February 19, 2019).

However, following the D.C. Circuit decisions in 2019 in *Wisconsin v. EPA*, 938 F.3d 303 (D.C. Cir. 2019) and *New York v. EPA*, 781 Fed. App'x 4, 7 (D.C. Cir. 2019), to remand the CSAPR Update and vacate the CSAPR Close-Out, the CSAPR Update FIP could no longer be said to fully correct the CAA section 110(a)(2)(D)(i)(I) deficiency identified in the July 20, 2016 finding of failure to submit. EPA promulgated an updated FIP for Maryland and several other states in the Revised CSAPR Update, and this FIP established a new emissions budget for Maryland's EGUs as well as a new Group 3 emissions trading program, which entirely replaced the Group 2 program that had been promulgated in the CSAPR Update. 86 FR 23054 (April 30, 2021).

At that point, Maryland's August 2018 submission adopting the CSAPR Update program was no longer approvable as a remedy to its "significant contribution" under the 2008 ozone NAAQS, because the CSAPR Update FIP for Maryland was replaced by a new, more stringent emissions control program. It was at that point that the EPA encouraged Maryland to withdraw its August 2018 submission. The withdraw of the submission saved resources for all parties as it avoided the EPA having to go through a rulemaking process to disapprove that submission. Maryland remained free to adopt the Revised CSAPR Update FIP requirements into its SIP should it have chosen to do so.

In any case, the EPA's disapproval of Maryland's 2015 ozone NAAQS good neighbor SIP submission was not based solely upon non-incorporation of the CSAPR Update requirements into Maryland's SIP. Even if

the CSAPR Update—or even the Revised CSAPR Update—had been incorporated into the SIP, it wouldn't have even *partially* satisfied an appropriate Step 3 and Step 4 analysis. This is because the EPA has already included the emissions-reducing effects of both the CSAPR Update and the Revised CSAPR Update in its baseline air quality modeling at Steps 1 and 2 (in both the 2016v2 and 2016v3 modeling), and so pointing to either of those rules as measures that would eliminate significant contribution at Step 3, for purposes of the 2015 ozone NAAQS, would be impermissible double-counting. Further, the CSAPR Update only partially addressed interstate transport obligations for the less protective 2008 ozone NAAQS. Maryland offered no explanation why those requirements would be sufficient to satisfy Maryland's good neighbor obligations for the more protective 2015 ozone NAAQS. And there are yet additional reasons cited in the EPA's proposed disapproval that this comment does not address, such as Maryland's failure to evaluate other nitrogen oxides (NOx) emitting sources at Step 3 and to analyze potential NOx emission controls, costs, and effect on downwind receptors. These were independently sufficient bases to disapprove Maryland's 2015 ozone NAAQS good neighbor SIP submission. *See* 87 FR 9463 (Feb. 22, 2022).

Mississippi

The EPA agrees with the commenter's (MDEQ) statement about the collaborative efforts from both MDEQ and EPA Region 4 (as well as headquarters) to support the state's development of their 2015 ozone NAAQS transport SIP submission in 2019. The EPA worked with MDEQ to develop their 2015 ozone NAAQS transport SIP submissions based on information available at the time that Mississippi initiated their SIP development process through the final SIP submission. At that time, it was believed based on the 2011-based modeling that Mississippi would not be linked above 1 percent of the NAAQS to any out of state receptors in 2023. However, as discussed in the proposal and elsewhere in this final action, the EPA's updated modeling now shows the state is projected to be linked.

Oklahoma

During the development of Oklahoma's SIP submission, the EPA did suggest to Oklahoma that it "factor in information" from the August 2018 memorandum in their rationale for using a 1 ppb contribution threshold at Step 2, as that would be a "better justification" than arguments the state had drafted.[6] This suggestion, standing alone, cannot reasonably be understood as a final endorsement of the appropriateness of a 1 ppb contribution threshold for Oklahoma. The EPA did not indicate that the August 2018 memorandum pre-approved the use of a 1 ppb contribution threshold. Rather, it suggested Oklahoma improve the draft rationale. The topics of the August 2018 memorandum and Oklahoma's arguments related to the appropriateness of an alternative contribution threshold for the state are addressed in more detail in the preamble in Section V.B.7 and in Section 7.4 (August 2018 Memorandum).

Texas

Commenters (AECT et al., TCEQ) claim the EPA gave no indication that TCEQ's submission may not be approvable, additionally citing the EPA's SIP Processing Manual, available on EPA's website, to support

---

[6] A copy of the EPA's comments on Oklahoma's draft SIP submission are included in Docket ID No. EPA-HQ-OAR-2021-0663.

their argument that EPA should have done so.[7]  However, as TCEQ acknowledges, the EPA staff did in fact meet with TCEQ staff to discuss the submission. As explained elsewhere in this response, there is no obligation or requirement that EPA needed to have done so. Further, given the technical complexity of TCEQ's submittal (which included its own modeling efforts), it is understandable that EPA staff would not have been able to offer views at that point as to how the Agency may ultimately act on the submission.


## 1.7   Length of Comment Period

*Comments*


**Commenter:** Alabama Power Company, Southern Power Company, and PowerSouth Energy Cooperative

**Commenter ID:** 04

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

Further, commenters note that EPA did not provide affected stakeholders sufficient time to analyze and comment on EPA's proposed disapproval. EPA provided only 30 days for comments, which ended on the Friday within the Thanksgiving holiday. The State of Alabama made a reasonable request for additional time to provide comments on this highly technical and data-intensive issue, but EPA refused to grant that or any extension. EPA offered no rationale or explanation as to why additional time could not be afforded, only claiming it was "unnecessary." But EPA should defer to the State of Alabama to determine whether additional time to prepare its comments is necessary and only deny such a request for compelling reasons. EPA offered no such reasons and none exist. By denying the State's request for an extension to the notice and comment period, EPA failed to provide stakeholders with adequate time to evaluate the proposed requirements and failed to acknowledge that this is the only opportunity for stakeholders to identify and comment on the flaws in EPA's analysis. Allowing adequate time for comments is also significant because stakeholders provide comments to EPA in order to preserve their opportunity to bring errors to the attention of a reviewing court.


**Commenter:** Ameren Missouri

**Commenter ID:** 05

---

[7] EPA SIP Manual, available at https://cfpub.epa.gov/oarwebadmin/sipman/sipman/mIntro.cfm?chap=0&i=1. Though cited by commenters for the proposition that the EPA must provide comments to states on draft SIP submissions, the page cited by commenters notes that "Drafts are not required but can benefit the State if the submittal is controversial or if the State anticipates requesting parallel processing by resolving the majority of issues up front."

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

<u>USEPA needs to provide additional time to comment on the Missouri SIP disapproval for post processing of model data review and comment per APA.</u>

**Commenter:** Arkansas Department of Energy and Environment, Divison of Environmental Quality

**Commenter ID:** 07

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

[A]DEQ has performed a preliminary review of whether additional control measures for Arkansas are necessary to fulfill its interstate obligations for the 2015 ozone NAAQS based on the new EPA identified linkages. The length of the comment period does not provide adequate time to perform HYSPLIT modeling, which based on EPA's proposal, would be dismissed without adequate consideration, or photochemical modeling.

**Commenter:** Cleco Corporate Holdings LLC

**Commenter ID:** 14

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

Cleco requests a 60-day extension of the comment period for the Proposal.

Cleco again requests a 60-day extension of the comment deadline for the Proposal. Due to the great volume of information in which EPA based its SIP disapprovals, additional time is necessary for review of the material which includes the state-specific 4-Step Interstate Transport results, the EPA's Ozone Transp01i Modeling under the 2016v2 platform, and the EPA's after-the-fact change from the EPA 2018 memorandum (2011 base year) to the 20 l 6v2 modeling (2016 base year).

Any of these reasons should be sufficient justification to extend the comment deadline. Taken together, these reasons should convince EPA to grant Cleco' s request for a 60-day extension. Cleco asks EPA to reconsider this request.

**Commenter:** Eagle Materials Inc.

**Commenter ID:** 16

**Docket ID:** EPA-R09-OAR-2022-0138

**Comment:**

EPA has unlawfully circumvented notice-and-comment requirements for its Proposed SIP Disapproval.

[…]

In addition, EPA is effectively depriving members of the public from meaningfully engaging with its Proposed Disapproval by issuing it after its Proposed FIP. The comment period for this Proposed Disapproval did not open until over a month after EPA published its Proposed FIP—the comment period for the Proposed FIP closed before *any* commenters had a chance to submit comments on the Proposed SIP Disapproval. This puts commenters in the untenable position of having to provide feedback on EPA's comprehensive and complex Proposed FIP without first understanding Nevada's obligations under the CAA.

**Commenter:** Idaho Power Company

**Commenter ID:** 23

**Docket ID:** EPA-R09-OAR-2022-0138

**Comment:**

Additionally, by proposing the FIP first, EPA has made clear that the finalization of the Proposed Disapproval was a foregone conclusion, effectively circumventing required rulemaking procedures by treating the Proposed Disapproval as final before giving any consideration to public comments. The Administrative Procedure Act's ("APA's") notice-and-comment procedures require EPA to "give interested persons an opportunity to participate in the rule making" before a rule is finalized.[32] Soliciting public comment "allow[s] the agency to benefit from the expertise and input of the parties who file comments with regard to the proposed rule" and "see[s] to it that the agency maintains a flexible and open-minded attitude towards its own rules," creating important safeguards against arbitrary or unreasonable agency action.[33] EPA cannot remain flexible and open-minded in its consideration of the Proposed Disapproval where the Proposed FIP depends on this disapproval being finalized. EPA has effectively finalized the Proposed Disapproval in a manner that circumvents its responsibility to respond to public comments.[34] Such a procedural shortcut is anathema to the APA's carefully crafted rulemaking structure.[35]

Finally, the CAA gives EPA up to *two years* after the disapproval of a SIP to promulgate a FIP. Because of EPA's own failure to act on SIP submissions in a timely manner and the resulting consent decree, the Agency has accelerated the process, issuing a proposed FIP prior to issuing proposed SIP disapprovals. The comment period for EPA's Proposed Disapproval did not open until ***over a month after*** EPA published its proposed FIP, meaning that the comment period for the proposed FIP closed before many commenters had a chance to submit comments on the Proposed Disapproval. This put commenters in the untenable position of having to provide feedback on EPA's comprehensive and complex Good Neighbor Plan without first understanding Nevada's obligations under the CAA. Such an accelerated timeline, with multiple overlapping comment periods out-of-sync with the CAA, significantly limited the public's ability to fully assess EPA's action and provide meaningful comment.

81

[29] *See, e.g.*, Chrysler Corp. v. Brown, 441 U.S. 281, 302 (1979).

[30] *See* 42 U.S.C. § 7410(c)(1) (requiring Administrator to promulgate FIP "at any time within 2 years after" disapproving a SIP). While the Supreme Court held in *EPA v. EME Homer City Generation* that, under this provision, "EPA is not obliged to wait two years or postpone its action even a single day," the Court noted that this authority applies "[*a*]*fter* EPA has disapproved a SIP." 572 U.S. 489, 509 (2014) (emphasis added)

[32] 5 U.S.C. § 553(c).

[33] *See McLouth Steel Prod. Corp. v. Thomas*, 838 F.2d 1317, 1325 (D.C. Cir. 1988) (internal citations omitted).

[34] *See City of Portland, Oregon v. EPA*, 507 F.3d 706, 715 (D.C. Cir. 2007) (emphasizing that an agency must respond to comments that "raise points relevant to the agency's decision and ... if adopted, would require a change in an agency's proposed rule").

[35] *See Metcalf v. Daley*, 214 F.3d 1135, 1142 (9th Cir. 2000) (emphasizing that agency action "must be timely, and it must be taken objectively and in good faith, not as an exercise in form over substance, and not as a subterfuge designed to rationalize a decision already made").

**Commenter:** Louisiana Electric Utility Environmental Group

**Commenter ID:** 28

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

As a part of these comments, LEUEG also requests a 60-day extension of the comment deadline for EPA's Proposed SIP Disapproval relating to Louisiana. LEUEG is aware of numerous requests for extensions by industry stakeholders and believes EPA's rejections of these requests to date is unreasonable and unwarranted under the circumstances. As noted in other requests, more time is plainly necessary for review of the 4-step Interstate Transport results, EPA's Ozone Transport Modeling under the 2016v2 platform, and EPA's after-the-fact change from its 2018 memorandum (2011 base year) to the 2016v2 modeling (2016 base year) by the state agencies and stakeholders.

**Commenter:** Midwest Ozone Group

**Commenter ID:** 30

**Docket ID:** EPA-R02-OAR-2021-0673, EPA-R03-OAR-2021-0872, EPA-R03-OAR-2021-0873, EPA-R04-OAR-2021-0841, EPA-R05-OAR-2022-0006, EPA-R06-OAR-2021-0801, EPA-R07-OAR-2021-0851

**Comment:**

This accelerated effort disenfranchises not only meaningful technical analysis of the agency's proposals but also curtails meaningful participation by all stakeholders.

[...]

Second, EPA has not provided adequate public notice and comment as required by law.

[...]

The 60-day comment period is too short to allow review and analysis of the proposed denials for multiple states.

EPA eight proposed Good Neighbor SIP disapprovals would result in disapproval of Good Neighbor SIPs submitted by 19 states regarding interstate transport for the 2015 8-hour ozone national ambient air quality standard. Significantly, EPA established a comment period of only 63 days that applies to all eight proposals for all 19 states. The sheer number of EPA proposed actions regarding these Good Neighbor SIPs alone is evidence that the comment period allowed by EPA is grossly insufficient.  Compounding the challenge for stakeholders of the inadequate comment period on these eight proposed disapprovals, EPA also proposed a 181-page transport rule on April 6, 2022, during the pendency of the comment period on these eight proposed disapprovals. The comment period on the transport rule is also 60 days, ending June 6, 2022.

MOG has been an active participant in transport rule development since the 1997 NOx SIP Call and continues to be keenly interested in the development of air pollution regulations that are based on sound science.  MOG has undertaken independent modeling and verification of EPA modeling in the past and offered comments on how to improve the accuracy and completeness of those efforts in prior comments on various transport rules.

As a result of its continued interest in the transport issue, MOG has developed technical capabilities that allow it to analyze and verify the science behind both Good Neighbor SIPs proposed by states and EPA actions to approve or disapprove them. MOG is acutely aware that preparation of proper technical analyses of Good Neighbor SIPs involves the use of complicated dispersion models that take substantial execution time.  MOG's significant experience in these matters also makes clear that simultaneous analysis of eight proposed rulemakings in addition to analyzing a 181-page transport rule that involves the same ozone NAAQS as the Good Neighbor SIPs dramatically complicates the analysis process.

The totality of these now nine pending rulemakings necessitates a period substantially longer than the allowed 63 days to allow stakeholders, including MOG, to analyze the proposed rules in parallel and prepare comprehensive comments that will better inform the rulemaking process, and EPA has utterly failed to allow sufficient time for that to happen.


**Commenter:** Midwest Ozone Group

**Commenter ID:** 30

**Docket ID:** EPA-R08-OAR-2022-0315, EPA-R09-OAR-2022-0394, EPA-R09-OAR-2022-0138

**Comment:**

The 60-day comment period is too short to allow review and analysis of the proposed denials for multiple states. EPA proposed Good Neighbor SIP disapprovals would result in disapproval of Good Neighbor SIPs submitted by states regarding interstate transport for the 2015 8-hour ozone national ambient air quality standard. Significantly, EPA established a comment period of only 60 days that applies to all proposals.

[...]

The totality of these pending rulemakings necessitates a period substantially longer than the allowed 63 days to allow stakeholders, including MOG, to analyze the proposed rules in parallel and prepare comprehensive comments that will better inform the rulemaking process, and EPA has utterly failed to allow sufficient time for that to happen.

**Commenter:** Utah Petroleum Association and the Utah Mining Association

**Commenter ID:** 48

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

Even though EPA jumped the gun, it must consider comments on this action fairly and completely.

[...]

EPA jumped the gun. The timing of this Proposed Disapproval, six weeks after proposing a FIP as part of the GNR, is out of order and contrary to the requirements of the CAA, which requires that a Disapproval **be finalized** before EPA promulgates a FIP such as the GNR.

The timeline suggests that EPA has no intention of paying heed to the comments on the Proposed Disapproval. Such disregard for comments would be a violation of required administrative procedures. EPA must fairly and completely consider all comments submitted.

Furthermore, with both actions in the proposal phase, comments on the Proposed Disapproval and the Proposed GNR are inextricably linked.

*Response*

The EPA disagrees that it provided insufficient time for public comment. The EPA has provided more than adequate time for the public to review the technical bases underlying this action. Congress' presumptive minimum period for public comment on CAA regulations is 30 days. *See* CAA section 307(h). The comment period of at least 60 days for each of the proposed disapprovals is twice that amount of time. (Due to time constraints, EPA was only able to provide a 30-day comment period on its proposed disapproval of Alabama's June 21, 2022 SIP submission—although there were 60 days to comment on the February 24, 2022 proposed disapproval of its earlier submission, which the state withdrew during the comment period). Some commenters state that that the EPA failed to provide sufficient public process, however the commenters here actually participated in this public notice and comment process, in many cases submitting detailed and lengthy comments.

Furthermore, the 2016-based meteorology and boundary conditions used in the modeling have been available through the 2016v1 platform, which was used for the Revised CSAPR Update (proposed in October of 2020, 85 FR 68964; October 30, 2020). The updated emissions inventory files used in the current modeling were publicly released September 21, 2021, for stakeholder feedback, and have been

available on our website since that time.[8] The Comprehensive Air Quality Modeling with Extensions (CAMx) modeling software that EPA used has likewise been publicly available for some time: CAMx version 7.10 was released by the model developer, Ramboll, in December 2020. And on January 19, 2022, we released on our website and notified a wide range of stakeholders of the availability of both the modeling results for 2023 and 2026 (including contribution data) along with many key underlying input files.[9]

By providing the 2016 meteorology and boundary conditions (used in the 2016v1 version) in fall of 2020, and by releasing updated emissions inventory information used in 2016v2 in September of 2021 we gave states and other interested parties multiple opportunities prior to our February 2022 proposals to consider how our modeling updates could affect their status for purposes of evaluating potential linkages for the 2015 ozone NAAQS. We also supplied the full suite of modeling files (roughly 15 terabytes) to those who requested them; while the EPA acknowledges the process of delivering such large files can take time, we do not believe having all of those files is necessary for the public to be able to comment meaningfully on the proposals here.

In any case, for those who wished to comment on the EPA's modeling through reviewing all of those files and/or through running their own modeling, we note that the EPA used the same 2016v2 modeling of 2023 for all of its proposed SIP submission actions and the proposed FIP. Commenters could comment (and did comment) through any of those public comment periods on the modeling, and the EPA has an obligation to consider such comments to the extent in-scope in taking this final action. Given the overlapping timing of most of the EPA's proposals, there was at least one public comment period open at all times on the proposals using that modeling from Feb. 22, 2022, when the first set of disapprovals were issued, through July 25, 2022 (the close of the public comment period on the proposed disapprovals of several western states). That is effectively a combined comment period of 153 days, and is more than sufficient, in the EPA's view, to allow for meaningful comment.[10]

Finally, it is true that the EPA has consent decree deadlines to take final action on most SIP submissions covered by this action by January 31, 2023 (extended by stipulation of the parties from December 15, 2022).[11] But the amount of time the EPA could provide for public comment was also informed by our substantive obligation to see that interstate transport obligations for the 2015 ozone NAAQS are addressed as expeditiously as practicable and no later than the next attainment date. *See Wisconsin*, 938 F.3d at 313-20.

---

[8] *See* https://www.epa.gov/air-emissions-modeling/2016v2-platform.

[9] *See* https://www.epa.gov/scram/photochemical-modeling-applications.

[10] Further, because EPA is acting on a new SIP submission from Alabama using the 2016v2 modeling, we note that yet another comment period was open with respect to the application of the 2016v2 modeling in assessing good neighbor obligations for the 2015 ozone NAAQS from the date of that proposal, October 25, 2022, through November 25, 2022. *See* 87 FR 64412.

[11] *New York et al. v. Regan, et al.*, No. 1:21-CV-00252 (S.D.N.Y.) (IN, KY, MI, OH, TX, WV); *Our Children's Earth Foundation v. EPA*, No. 20-8232 (S.D.N.Y.) (NY); *Downwinders at Risk et al. v. Regan*, No. 21-cv-03551 (N.D. Cal.) (AR, CA, IL, IN, KY, LA, MD, MI, MN, MS, MO, NV, NJ, NY, OH, OK, TX, WV, WI).

Under these circumstances, and mindful of the legal and procedural obligations applicable to the EPA, as established by Congress and the courts, the comment period length was appropriate and consistent with the requirements of the CAA and the Administrative Procedure Act (APA).[12]

The EPA disagrees with Arkansas Division of Environmental Quality's characterization of EPA's analysis of Arkansas's good neighbor SIP submission for the 2015 ozone NAAQS. 87 FR 9798, 9806-9811 (February 22, 2022).

Other issues raised by these comments are addressed in Section V.A.1. of the preamble and in the following sections: Sections 1.2 (Guidance for SIP Submissions), 1.5 (State's Step 3 Analysis), 1.8 (Docket Document Availability), and 10.6 (Allegation that Disapprovals of Western State SIP Submissions was Predetermined).


## 1.8   Docket Document Availability


*Comment*

**Commenter:** Ameren Missouri

**Commenter ID:** 05

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

USEPA has not made available post processing of model data from the revised modeling in the Docket for the proposed disapproval of the Missouri Good Neighbor SIP and only references the files in another docket[9] which wasn't posted until 40 days after the proposed Missouri GNS disapproval. Making matters worse, interested parties were required to request the files from USEPA directly because the files were not in the posted public docket decreasing the available review time even more. Requiring interested parties to search two dockets and then request USEPA's data and analysis underlying this action and wait for a response from USEPA fails to meet the transparency in government standard set by this administration. USEPA needs to provide additional time to comment on the Missouri SIP disapproval so that the post processing of model data can be reviewed and commented on in accordance with the intent of the Administrative Procedures Act.

[9] The modeling relied upon as further proof of Missouri being linked to nonattainment in another state was included as part of USEPA's proposed CSAPR FIP for the 2015 Ozone Standard published in the Federal Register on April 6, 2022 under a separate docket. The public docket available on the internet for the proposed FIP did not contain any of the model post processing files with modeled contribution data for Missouri so that it could be reviewed. That data had to be requested separately (after searching both dockets).

---

[12] Section 553 of the Administrative Procedure Act requires that federal agencies provide general notice of proposed rulemaking by publication in the Federal Register and to "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation." 5 U.S.C. 553(b), (c).

*Response*

All information supporting the proposed disapproval of Missouri's SIP submission, including the data to which the commenter refers, was publicly docketed on or before February 22, 2022. Because of their size (around 15 terabytes), the full modeling files could not be posted online and so were held on data drives at EPA's Docket Center, as is routine for extremely large files, where it could be requested by interested parties. See 87 FR 9534 (February 22, 2022). Comments on the length of the comment period are addressed in Section 1.7 (Length of Comment Period).

*Comment*

**Commenter:** Louisiana Department of Environmental Quality

**Commenter ID:** 27

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

EPA formulated part of their proposed disapproval on results from the journal article "Improved estimation of trends in U.S. ozone concentrations adjusted for interannual variability in meteorological conditions," authored by several EPA members/employees and one external author. This article was not peer reviewed, neither is it available without purchase. The article should be made available in the Docket with other supplementary materials. "Although this article has been reviewed by the U.S. EPA and approved for publication, it does not necessarily reflect the U.S. EPA's policies or views." Atypically, the subject matter of the article is accounted for in tweaks to the 2016v2 modeling.

*Response*

The EPA does not place certain docket materials, such as copyrighted material or documents protected as Confidential Business Information on the Internet (*i.e.*, regulations.gov), but such docket materials are available for public review in person in the EPA Regional office or at the EPA Docket Center Reading Room in Washington, D.C., as applicable.[13]  The article cited by the EPA to which the Louisiana Department of Environmental Quality (LDEQ) is referring is protected by copyright, so the article's title was listed in the online Docket (EPA-R06-OAR-2021-0801), while the hard copy of the article is available for public viewing in person at the EPA Region 6 office. Further, the preamble to the proposed rulemaking directed the public to https://www.epa.gov/dockets for further information on the EPA Docket Center Services, which include assisting the public with accessing particular documents in the docket.

---

[13] Access EPA Dockets, *available at* https://www.epa.gov/dockets/access-epa-dockets (last accessed January 31, 2023).

Regarding the comment about peer review, the article was published in the *Atmospheric Environment* journal, [14] which requires peer review. The peer review requirement for the journal is listed in their author's guide:

> This journal operates a single anonymized review process. All contributions will be initially assessed by the editor for suitability for the journal. Papers deemed suitable are then typically sent to a minimum of two independent expert reviewers to assess the scientific quality of the paper.[15]

The article in question was reviewed by three independent experts and accepted for publication with minor revisions.

---

[14] Atmospheric Environment, *available at* https://www.sciencedirect.com/journal/atmospheric-environment (last accessed January 31, 2023).

[15] Atmospheric Environment, Author Information Pack at 9, *available at* https://www.elsevier.com/wps/find/journaldescription.cws_home/246?generatepdf=true. (Last accessed January 13, 2023).

## 2   Analytic Year of 2023

*Comments*

**Commenter:** Midwest Ozone Group

**Commenter ID:** 30

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

These comments highlight the agency's failure to align the responsibilities of upwind and downwind states as it selected the analytical year for evaluating the Good Neighbor Provisions of the CAA. In the case on the Kentucky plan, this failure is even more significant because Kentucky specifically noted the disparity that exists between upwind states and those downwind states that significantly delayed the imposition of nonattainment controls on sources within their own nonattainment areas. 87 Fed. Reg. at 9505. Kentucky demonstrated emissions from local sources in nonattainment areas were not properly regulated resulting in on-going nonattainment impermissibly shifting the burden of emission controls to upwind states. EPA response to the Kentucky plan fails to address the alignment issue and defaults to the selection of 2023 as the appropriate analytic year. EPA did not assess the extent of delay of downwind states emissions reductions programs on nonattainment. *Id.* at 9512.

**Commenter:** Midwest Ozone Group

**Commenter ID:** 30

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

These comments also highlight the agency's failure to align the responsibilities of upwind and downwind states as it selected the analytical year for evaluating the Good Neighbor Provisions of the CAA. EPA's response to the Missouri plan failed to address the alignment issue defaulting to the selection of 2023 as the appropriate analytic year. EPA failed to assess the extent of delay of downwind states emissions reductions programs on nonattainment.

**Commenter:** Midwest Ozone Group

**Commenter ID:** 30

**Docket ID:** EPA-R02-OAR-2021-0673, EPA-R03-OAR-2021-0872, EPA-R03-OAR-2021-0873, EPA-R04-OAR-2021-0841, EPA-R05-OAR-2022-0006, EPA-R06-OAR-2021-0801, EPA-R07-OAR-2021-0851, EPA-R08-OAR-2022-0315, EPA-R09-OAR-2022-0394, EPA-R09-OAR-2022-0138

**Comment:**

EPA's selection of 2023 as the analytical year for its assessments of the state plans fails to align the obligation of upwind states with downwind states inasmuch as certain nonattainment areas have delayed implementation of nonattainment controls until 2025 and beyond

Comment: EPA's statutory duty is to harmonize the Good Neighbor Provision of CAA §110(a)(2)(D)(i) with nonattainment and maintenance requirements of CAA §172 so that compliance burdens are aligned among upwind and downwind states.  MOG is not critical of the downwind state plans to the extent those plans are designed and demonstrated to achieve attainment within the attainment deadlines.  MOG is, however, critical of EPA for disapproving upwind state Good Neighbor Plans without consideration of the timing of the implementation of nonattainment controls by downwind states - effectively shifting the burden of additional controls to the upwind states.

The Wisconsin remand concluded that EPA exceeded its statutory authority under the Good Neighbor Provision "by issuing a Rule that does not call for upwind States to eliminate their substantial contributions to downwind nonattainment in concert with the attainment deadlines."

Wisconsin, 938 F.3d at 318.  The Wisconsin remand directed EPA to address the downwind state "deadline" in such a manner as to "harmonize" the deadlines of upwind and downwind states and to apply "parallel timeframes." Id. at 312, 314. The D.C. Circuit repeatedly has explained the CAA directive to "harmonize" and manage the relationship described as parallel between the Good Neighbor obligations for upwind states and statutory attainment deadlines for downwind areas. That relationship is one of "par," using the Court's term, meaning to be judged on a common level with the other. With this proposed disapproval, EPA ignores the obvious relationship between the downwind states' obligation to implement controls to attain the standard relative to the obligation of an upwind state to not significantly contribute to the nonattainment at issue.

This Court in North Carolina v. EPA, 531 F.3d 896 (D.C. Cir. 2008), found that EPA did not explain why it did not coordinate the Good Neighbor Provision with the Clean Air Interstate Rule to provide a sufficient level of protection to downwind states.

Despite CAA §110(a)(2)(D)(i)'s requirement that upwind contributions to downwind nonattainment be "consistent with the provisions of [Title I]," EPA did not make any effort to harmonize CAIR's Phase Two deadline for upwind contributors to eliminate their significant contribution with the attainment deadlines for downwind areas... As a result, downwind nonattainment areas must attain NAAQS for ozone and PM2.5 without the elimination of upwind states' significant contribution to downwind nonattainment, forcing downwind areas to make greater reductions than CAA §110(a)(2)(D)(i)(I) requires. Id. (emphasis added).  The D.C. Circuit described its North Carolina ruling in the Wisconsin remand as follows:

> We explained that EPA needed to "harmonize" the "Phase Two deadline for upwind contributors to eliminate their significant contribution with the attainment deadlines for

90

> downwind areas." ...  .  Otherwise, downwind areas would need to attain the NAAQS "without the elimination of upwind states' significant contribution."

Wisconsin, 938 F.3d at 314 (emphasis added). The Wisconsin remand explained, "In sum, under our decision in North Carolina, the Good Neighbor Provision calls for elimination of upwind States' significant contributions on par with the relevant downwind attainment deadlines." Id. at 315 (emphasis added). The Wisconsin opinion explains further:

> The Good Neighbor Provision, as North Carolina emphasized, requires upwind States to eliminate their significant contributions to downwind pollution "consistent with the provisions of this subchapter," i.e., Title I of the Clean Air Act.  42 U.S.C.  §7410(a)(2). One of the "provisions of this subchapter" is §7511(a)(1), which in turn requires downwind areas in moderate non-attainment to attain the NAAQS by July 20, 2018.

Id. at 315-16. The Wisconsin remand summarizes that "it is the statutorily designed relationship between the Good Neighbor Provision's obligations for upwind states and the statutory attainment deadlines for downwind areas that generally calls for parallel timeframes." Id. at 316.

EPA, however, takes the following actions.   It interprets the court's holding in Maryland v. EPA, 958 F. 3d 1185 (D.C. Cir. 2020) as requiring the states and the Agency, under the good neighbor provision, to assess downwind air quality as expeditiously as practicable and no later than the next applicable attainment date, which is now the Moderate area attainment date under CAA §181 for ozone nonattainment. The Moderate area attainment date for the 2015 8-hour ozone NAAQS is August 3, 2024.  The EPA provides that it believes that 2023 is now the appropriate year for analysis of interstate transport obligations for the 2015 8-hour ozone NAAQS because the 2023 ozone season is the last relevant ozone season during which achieved emissions reductions in linked upwind states could assist downwind states with meeting the August 3, 2024, Moderate area attainment date for the 2015 8-hour ozone NAAQS."  87 Fed.  Reg.  9,487-8. EPA is inappropriately shifting the burden to the transport states.

For New York's disapproved transport plan, EPA offers the following criticism, "under the Wisconsin decision, states and the EPA may not delay implementation of measures necessary to address good neighbor requirements beyond the next applicable attainment date without a showing of impossibility or necessity. See 938 F.3d at 320. In those cases where the measures identified by the State had implementation timeframes beyond the next relevant attainment dates the submission did not offer a demonstration of impossibility of earlier implementation of those control measures.  Similarly, the State's submittal is insufficient to the extent the implementation timeframes for identified control measures were left unidentified, unexplained, or too uncertain to permit the EPA to form a judgment as to whether the timing requirements for good neighbor obligations have been met. 87 Fed.  Reg.  9,494. This narrative illustrates the disconnect between standards to which downwind plans are held versus the standards to which upwind plans are held.  Both plans must be aligned with the same timeframes.

Within the Clean Air Act, Subchapter 1, Part D titled "Plan Requirements for Nonattainment Areas" is found Subpart 1 titled "Nonattainment Areas in General." Subpart 1 includes Section 177 addressing new motor vehicle emissions standards in state plans for nonattainment areas. It is apparent that the CAA contemplated the option of developing nonattainment plans per Section 172 to address certain new motor vehicles or new motor vehicle emissions. For those approved downwind nonattainment

plans that include motor vehicle emissions reduction strategies for achieving attainment, delay in implementation beyond the attainment date is unacceptable under CAA §179. Delay in implementation of committed controls by a downwind state shifts the emissions reduction burdens onto upwind states if EPA fails to engage in alignment of the dates upon which each of the states must satisfy nonattainment strategy performance.

This issue of imbalance was specifically addressed by D.C. Circuit in the Wisconsin remand as an appropriate basis for extending the compliance deadline for upwind states. In that case the Court stated that: "if a modified attainment deadline applies to downwind States, EPA may be able, if justified, to make a corresponding extension for an upwind State's good neighbor obligations." Wisconsin, 938 F.3d at 317.

Nowhere in its discussion of the regulatory framework underlying these proposals does EPA recognize the alignment obligation as articulated in the Wisconsin remand.


*Response*

Although the commenter criticizes the EPA's selection of 2023 as an appropriate analytic year, they do not identify their preferred alternative, nor are their arguments against 2023 compelling. The EPA maintains its position that 2023 is an appropriate analytic year and comports with the relevant caselaw.

The commenter misreads the *North Carolina v. EPA*, 550 F.3d 1176 (D.C. 2008), *Wisconsin v. EPA*, 938 F.3d 303 (D.C. Cir. 2019), and *Maryland v. EPA*, 958 F.3d 1185 (D.C. Cir. 2020) decisions as calling for good neighbor emissions controls to be aligned with the timing of the *implementation* of nonattainment controls by downwind states. However, the D.C. Circuit has never held that, and such a requirement is both untethered to the statute and almost certainly unworkable in practice. It would necessitate coordinating the activities of multiple states with the EPA regional and headquarters offices to a level of fine-tuning that effectively could preclude the implementation of good neighbor obligations altogether. Indeed, the commenter offers no explanation how the EPA or upwind states should coordinate upwind emissions control obligations for states linked to multiple downwind receptors whose states may be implementing their requirements on different timetables. Far less drastic mechanisms than subjecting people living in downwind receptor areas to continuing high levels of air pollution caused in part by upwind-state pollution are available if the actual implementation of mandatory CAA requirements in the downwind areas is delayed: CAA section 304(a)(2) provides for judicial recourse where there is an alleged failure by the Agency to perform a nondiscretionary duty, and that recourse is for the Agency to be placed on a court-ordered deadline to address the relevant obligations. *Accord Oklahoma v. U.S. EPA*, 723 F.3d 1201, 1223-24 (10th Cir. 2013); *Montana Sulphur and Chemical Co. v. U.S. EPA*, 666 F.3d 1174, 1190-91 (9th Cir. 2012).

What in fact the D.C. Circuit has repeatedly emphasized is that the *statutory attainment dates* are the relevant downwind deadlines the EPA must align with in implementing the good neighbor provision. In *Wisconsin*, the court held, "In sum, under our decision in *North Carolina*, the Good Neighbor Provision calls for elimination of upwind States' significant contributions on par with the relevant downwind attainment deadlines." *Wisconsin*, 938 F.3d. at 321. After that decision, the EPA interpreted *Wisconsin* as limited to the attainment dates for Moderate or higher classifications under CAA section 181 on the

basis that Marginal nonattainment areas have reduced planning requirements and other considerations. *See, e.g.,* 85 FR 29882, 29888–89 (May 19, 2020) (proposed approval of South Dakota's 2015 ozone NAAQS good neighbor SIP). However, on May 19, 2020, the D.C. Circuit in *Maryland v. EPA*, 958 F.3d 1185 (D.C. Cir. 2020), applying the *Wisconsin* decision, held that the EPA must assess air quality at the next downwind attainment date, including Marginal area attainment dates under CAA section 181, in evaluating the basis for the EPA's denial of a petition under CAA section 126(b). 958 F.3d at 1203-04. After *Maryland*, the EPA acknowledged that the Marginal attainment date is the first attainment date to consider in evaluating good neighbor obligations. *See, e.g.*, 85 FR 67653, 67654 (Oct. 26, 2020) (final approval of South Dakota's 2015 ozone NAAQS good neighbor SIP).

The relevance of CAA sections 172, 177, and 179 to the selection of the analytic year in this action is not clear. The commenter cites these provisions to conclude that EPA did not appropriately consider downwind attainment deadlines and the timing of upwind good neighbor obligations. These provisions are found in subpart I, and while they may have continuing relevance or applicability to aspects of ozone nonattainment planning requirements, the nonattainment dates for the 2015 ozone NAAQS flow from subpart 2 of title I of the CAA, and specifically CAA section 181(a). Applying that statutory schedule to the designations for the 2015 ozone NAAQS, the EPA has promulgated the applicable attainment dates in its regulations at 40 CFR 51.1303. The effective date of the initial designations for the 2015 ozone NAAQS was August 3, 2018 (83 FR 25776, June 4, 2018, effective August 3, 2018).[16] Thus, the first deadline for attainment planning under the 2015 ozone NAAQS was the Marginal attainment date of August 3, 2021, and the second deadline for attainment planning is the Moderate attainment date of August 3, 2024. If a Marginal area fails to attain by the attainment date it is reclassified, or "bumped up," to Moderate. Indeed, the EPA has just completed a rulemaking action reclassifying many areas of the country from Marginal to Moderate nonattainment, including all of the areas where downwind receptors have been identified in our 2023 modeling as well as many other areas of the country. 87 FR 60897, 60899 (Oct. 7, 2022).

Other than under the narrow circumstances of CAA section 181(a)(5) (discussed further below), the EPA is not permitted under the CAA to extend the attainment dates for areas under a given classification; that is, no matter when the EPA finalizes a determination that an area failed to attain by its attainment date and reclassifies that area, the attainment date remains fixed, based on the number of years from the area's initial designation. *See, e.g.,* CAA section 182(i) (authorizing the EPA to adjust any applicable deadlines for newly reclassified areas "other than attainment dates"). As the D.C. Circuit has repeatedly made clear, the statutory attainment schedule of the downwind nonattainment areas under subpart 2 is rigorously enforced and is not subject to change based on policy considerations of the EPA or the states.

> [T]he attainment deadlines, the Supreme Court has said, are "the heart" of the Act. *Train v. Nat. Res. Def. Council*, 421 U.S. 60, 66, 95 S. Ct. 1470, 43 L.Ed.2d 731 (1975); *see Sierra Club v. EPA*, 294 F.3d 155, 161 (D.C. Cir. 2002) ("the attainment deadlines are central to the regulatory scheme") (alteration and internal quotation marks omitted). The Act's central object is the "attain[ment] [of] air quality of specified standards [within] a specified period of time." *Train*, 421 U.S. at 64–65, 95 S. Ct. 1470.

---

[16] September 24, 2018, for the San Antonio area. 83 FR 35136 (July 25, 2018).

*Wisconsin*, 938 F.3d at 316. *See also Natural Resources Defense Council v. EPA*, 777 F.3d 456, 466-68 (D.C. Cir. 2014) (*NRDC*) (holding the EPA cannot adjust the section 181 attainment schedule to run from any other date than from the date of designation). *See also id.* at 468 ("EPA identifies no statutory provision giving it free-form discretion to set Subpart 2 compliance deadlines based on its own policy assessment concerning the number of ozone seasons within which a nonattainment area should be expected to achieve compliance.") (citing and quoting *Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 484, (2001)) ("The principal distinction between Subpart 1 and Subpart 2 is that the latter eliminates regulatory discretion that the former allowed."). Furthermore, as the court in *NRDC* noted, "[T]he 'attainment deadlines ... leave no room for claims of technological or economic infeasibility.'" 777 F.3d at 488 (quoting *Sierra Club,* 294 F.3d at 161) (internal quotation marks and brackets omitted).

With the exception of the Uinta Basin, which does not have an identified receptor in this action, no Marginal nonattainment area met the conditions of CAA section 181(a)(5) to obtain a one-year extension of the Moderate area attainment date. 87 FR 60899. Thus, all Marginal areas (other than Uinta) that failed to attain have been reclassified to Moderate. *Id.* (And the New York City Metropolitan nonattainment area was initially classified as Moderate (see below for further details).). Even if the EPA had extended the attainment date for any of the downwind areas, it is not clear that it would necessarily follow that the EPA must correspondingly extend or delay the implementation of good neighbor obligations. While the *Wisconsin* court recognized extensions under CAA section 181(a)(5) as a possible source of timing flexibility in implementing the good neighbor provision, 938 F.3d at 320, the EPA and the states are still obligated to implement good neighbor reductions as expeditiously as practicable and are also obligated under the good neighbor provision to address "interference with maintenance." Areas that have obtained an extension under section 181(a)(5) or which are not designated as in nonattainment could still be identified as struggling to maintain the NAAQS, and the EPA is obligated under the good neighbor provision to eliminate upwind emissions interfering with the ability to maintain the NAAQS as well. *North Carolina*, 531 F.3d at 908-11. Thus, while an extension under CAA 181(a)(5) may be a source of *flexibility* in the timing of implementation of good neighbor obligations, as *Wisconsin* recognized, it is not the case that the EPA *must* delay or defer good neighbor obligations for that reason, and neither the D.C. Circuit nor any other court has so held.

The commenter is therefore incorrect to the extent that they argue the selection of 2023 as an analytic year for upwind obligations results in the misalignment of downwind and upwind state obligations. To the contrary, both downwind and upwind state obligations are driven by the statutory attainment date of August 3, 2024, for Moderate areas, and the last year that air quality data may impact whether nonattainment areas are found to have attained by the attainment date is 2023. That is why, in the recent final rulemaking determinations that certain Marginal areas failed to attain by the attainment date, bumping those areas up to Moderate, and giving them SIP submission deadlines and reasonably available control measures (RACM) and reasonably available control technology (RACT) implementation deadlines, the EPA set the attainment SIP submission deadlines for the bumped up Moderate areas to be January 1, 2023. *See* 87 FR 60897, 60900 (Oct. 7, 2022). The implementation deadline for RACM and RACT is also January 1, 2023. *Id.* This was in large part driven by the EPA's ozone implementation regulations, 40 CFR 51.1312(a)(3)(i), which previously established a RACT implementation deadline for initially classified Moderate as no later than January 1, 2023, and the modeling and attainment demonstration requirements in 40 CFR 51.1308(d), which requires a state to provide for implementation

94

of all control measures needed for attainment no later than the beginning of the attainment year ozone season (i.e., 2023). Given this regulatory history, the EPA can hardly be accused of letting states with nonattainment areas for the 2015 ozone NAAQS avoid or delay their mandatory CAA obligations.

The commenter focuses on the EPA's evaluation of New York's good neighbor SIP submission to argue the EPA is treating upwind and downwind states dissimilarly. The argument conflates New York's role as both a downwind and an upwind state. In evaluating the Good Neighbor SIP submission that New York submitted, the EPA identified as a basis for disapproval that the state emissions control programs New York cited included implementation timeframes to achieve the reductions, let alone ensure they were achieved by 2023. 87 FR 9484, 9494 (Feb. 22, 2022). The EPA conducted the same inquiry into other states' claims regarding their existing or proposed state laws or other emissions reductions claimed in their SIP submissions. *See, e.g.,* 87 FR at 9472-73 (evaluating claims regarding emissions reductions anticipated under Maryland's state law); 87 FR at 9854 (evaluating claims regarding emissions reductions anticipated under Illinois' state law). Consistent with its treatment of the other upwind states included in this action, the EPA is disapproving New York's good neighbor SIP submission for the 2015 ozone NAAQS because its arguments did not demonstrate that it had fully prohibited emissions significantly contributing to out of state nonattainment or maintenance problems.

The commenter attempts to contrast this evaluation with what it believes is the EPA's permissive attitude toward delays by downwind states, specifically claiming that "certain nonattainment areas have delayed implementation of nonattainment controls until 2025 and beyond." This apparently references New York's simple cycle and regenerative combustion turbines (SCCT) controls, which the commenter cited elsewhere in its comments. New York's SCCT controls were not included by New York in the submission under the EPA review in this action, nor was the prior approval of the SCCT controls reexamined by the EPA or reopened for consideration by the Agency in this action. Although not part of this rulemaking, the EPA notes that the SCCT controls were approved by the EPA as a SIP strengthening measure and not to satisfy any specific planning requirements for the 2015 ozone NAAQS under CAA section 182. 86 FR 43956, 43958 (Aug. 11, 2021). The SCCT controls submitted to the EPA were already a state rule, and the only effect under the CAA of the EPA approving them into New York's SIP was to make them federally enforceable. 86 FR 43956, 43959 (Aug. 11, 2021).  In other words, approval of the SCCT controls did not relieve New York of its nonattainment planning obligations for the 2015 ozone NAAQS.

The EPA notes that the New York-Northern New Jersey-Long Island, NY-NJ-CT nonattainment area was initially designated as in Moderate nonattainment. 83 FR 25776 (June 4, 2018). Pursuant to this designation, New York was required to submit a RACT SIP submission and an attainment demonstration no later than 24 months and 36 months, respectively, after the effective date of the Moderate designation. CAA section 182; 40 CFR 51.1308(a), 51.1312(a)(2). NY submitted a RACT SIP plan for the 2015 ozone standards on January 29, 2021,[17] and the EPA is currently evaluating that submission. New York has not yet submitted its attainment demonstration, which was due August 3, 2021. Further, the New York-Northern New Jersey-Long Island, NY-NJ-CT nonattainment area remains subject to the Moderate nonattainment area date of August 3, 2024; if it fails to attain the 2015 ozone NAAQS by

---

[17] See https://edap.epa.gov/public/extensions/S4S_Public_Dashboard_2/S4S_Public_Dashboard_2.html.

August 3, 2024, it will be reclassified to Serious nonattainment, resulting in additional requirements on the New York nonattainment area.

In any case, regardless of the status of New York's and the EPA's efforts in relation to the New York-Northern New Jersey-Long Island, NY-NJ-CT nonattainment area (which are outside the scope of this action), the EPA's evaluation of 2023 as the relevant analytic year in assessing New York's and other states' good neighbor obligations is entirely consistent with the statutory framework and court decisions calling on the agency to align these obligations with the downwind areas' statutory attainment schedule. That principle holds regardless of the specific timing of the implementation of downwind states' emissions controls.

# 3   Emissions Inventories

## 3.1   Emissions Inventory - General

*Comment*

**Commenter:** Arkansas Department of Energy and Environment, Division of Environmental Quality

**Commenter ID:** 07

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

Arkansas and more than 20 other states and regional groups submitted comments, suggestions, and corrections to EPA for the emissions inventories datasets for the 2016v2 modeling platform.[14] However, the modeling data that EPA proposes to primarily rely upon in its disapproval of the Arkansas Transport Plan does not reflect corrections to the modeling platform in response to state comments. EPA should understand that failing to incorporate state-provided corrections to that data while moving forward with issuing proposed actions essentially bars states from performing their role under the CAA.

[…]

In response to comments from the MJOs and states, EPA partially updated the 2016v2 platform emissions inventories datasets for future modeling runs.[15] However, the modeling that EPA is primarily relying upon in its disapproval was performed before states could offer feedback and still contains all the errors that states previously identified. Although DEQ disagrees with EPA's choice to substitute new modeling data for the data that was available when the state was developing its plan, EPA should understand that failing to incorporate state-provided corrections to that data while moving forward with issuing proposed actions essentially bars states from performing their role under the Clean Air Act.

[14] Index of /Air/emismod/2016/v2/reports/comments at
https://gaftp.epa.gov/Air/emismod/2016/v2/reports/comments/
[15] https://gaftp.epa.gov/Air/emismod/2016/v3/preliminary_updates/

*Response:*
The EPA has incorporated updates as appropriate into its 2016v3 modeling platform based on pre-proposal feedback and information provided in public comments on the 2016v2 platform.

## 3.2   Emissions Inventory – Non-EGUs

*Comment*

**Commenter:** Arkansas Department of Energy and Environment, Division of Environmental Quality

**Commenter ID:** 07

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

For point sources (ptnonipm) DEQ suggests that EPA consider examining the use of 2017 NEI data and adjusting the dataset to create a 2016 base year. The 2017 data is more recent and if a backward base year projection is necessary, then it would be a one year projection (2017 to 2016) and not two years (2014 to 2016).

According to EPA's 2016v2 TSD, for sources outside of the Mid-Atlantic Regional Air Management Association (MARAMA) region, the maximum future year projection factor was capped at 1.25. Also the future year projection factor was capped at a maximum of 2.5 if SCC/NAICS combinations with criteria pollutant emissions >100 tons/year for the ptnonipm sector. However, the ptnonipm includes future year projection factors that are greater than 1.25 for various facilities outside of MARAMA region where the total annual emissions are less than 100 tons, including a future year projection factor as high as 1.468. DEQ does not know the origin of these greater than 1.25 exceptions to the TSD language and whether they are possibly a result of state-submitted refinement data, which would be reliable sources.

The future year projection factor for NOx emissions from "Honeywell International Inc. – Hopewell" (unit# 20375813) in Virginia is 6.79 for 2026 in the 2016v2 platform and was 0.63 for 2028 in 2016v1 platform. DEQ conducted trend analyses to evaluate some future year projection factors and DEQ's analysis for this source does not appear to support a future year projection factor of 6.79 and may support a future year projection factor of 0.62; however, Virginia may have suggested the 6.79 as the appropriate value and, if so, would likely be the best source of this data. DEQ suggests that EPA verify the above example, possibly with Virginia if data was not already provided by Virginia, and other similar examples.  [Figure 1 available in full comment]


*Response*

The EPA concurs with the suggestion by the commenter to use 2017 National Emissions Inventory (NEI) data to represent 2016 instead of data projected from 2014. The EPA implemented this approach into the 2016v3 platform where a matching source could be identified in the 2017 NEI, however, data submitted specifically for the year 2016 are used, where available.  The EPA also updated the approach for developing 2023 non-EGU point source emissions in the 2016v3 platform to make use of 2019 NEI point source data as the basis for 2023 non-EGU point source emissions for source not related to oil and gas production. Thus, the maximum projection factor of 1.25 is no longer relevant in the 2016v3 inventory for 2023.  This approach applies to Honeywell International Inc. – Hopewell for 2023 emissions.  As the analytic year for this action is 2023, projections for years later than 2023 are not relevant for the identification of receptors and linkages at Steps 1 and 2 of the 4-step interstate transport framework.

*Comment*

**Commenter:** Cleco Corporate Holdings LLC

**Commenter ID:** 14

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

EPA should incorporate needed revisions to the 2016v2 modeling platform based on comments provided by the states and other stakeholders as provided in this docket and then re-analyze the Louisiana SIP based on the updated/corrected modeling platform before issuing a final rule on the Louisiana SIP.

*Response*

In response to the commenter's requests that the EPA reanalyze its modeling based on comments received, the EPA has re-evaluated its emissions inventories to create the 2016v3 emissions modeling platform and re-run the air quality models and related analyses using the 2016v3 inventories. Specifically, with regards to Louisiana, the state continues to have a linkage to one or more downwind receptors as indicated in the preamble in Sections III.C and IV.G.

*Comment*

**Commenter:** Eagle Materials Inc.

**Commenter ID:** 16

**Docket ID:** EPA-R09-OAR-2022-0138

**Comment:**

EPA's new modeling fails to account for significant emissions reductions that have occurred since 2016.

The Proposed SIP Disapproval is based on updated air quality modeling, using EPA's newly released 2016v2 Model. This modeling platform relies on emissions inventory data from the base year of 2016 to develop future year emissions inventories using sector-specific methods. The 2016v2 update "draws on data from the 2017 National Emissions Inventory," incorporating "2016-specific state and local data along with adjustment methods appropriate for each sector." Based on projected future emissions inventories from this model for 2023, 2026, and 2032, EPA assessed nonattainment and maintenance-only receptors, as well as linked states, for purposes of evaluating state SIP submittals. While EPA's updated modeling accounts for certain updates between 2014 and 2016 in developing its baseline emissions inventory for 2016, 2016v2 does not capture enforceable emissions limits and emissions reductions from 2016 to present in modeling emissions in 2023 and 2026. These emissions reductions significantly impact EPA's assessment of nonattainment and maintenance-only receptors in these future years, and call into question EPA's determination that Nevada remains linked to downwind air quality problems.

Since 2016, at least fifteen Nevada facilities, identified in Table 1, have entered consent decrees requiring enforceable NOx emissions reduction totaling at least 1,676 tpy, apart from additional reductions that EPA has not quantified. EPA's determination that Nevada is linked to downwind air quality problems fails to account for these enforceable emission reductions because they fall outside EPA's 2016v2 modeling update.

Eagle believes that the marginal link between Nevada and downwind receptors has been eliminated by these additional enforceable emission reductions. In its Proposed SIP Disapproval, EPA determined that Nevada was linked to downwind air quality problems based on air quality projections and state contributions identified in Table 2 [[table in full comment]], below. Nevada's maximum contribution to these receptors is 0.19 ppb above EPA's 0.70 ppb linkage threshold. Because Nevada's modeled contribution to downwind receptors is so low, even a small reduction in projected emissions could reduce Nevada's level of contribution to these receptors below the 0.70 ppb threshold. Accordingly, Eagle urges EPA account for these additional NOx reductions in evaluating Nevada's interstate transport obligations in its SIP submittal.

**Table 1: Enforceable Consent Decrees Impacting Nevada NOx Emissions, 2016 – Present**

| EPA Case No. | Facility Name | Date of Final Order | Estimated NO$_X$ Emissions Reductions |
|---|---|---|---|
| NVCCHA200162193 | Lhoist North America of Arizona – Apex Plant | 7/5/2016 | Unknown |
| NVCCHA200162109 | Titanium Metals Corp. Henderson Facility | 5/17/2017 | Unknown |
| 09-2011-0506 | Fernley Plant | 10/30/2018 | 1676 tpy |
| NVCCHA200171077 | Republic Services Renewable Energy LLC | 1/29/2019 | Unknown |
| NVCCHA200172874 | Caesars Entertainment Corp. | 3/28/2019 | Unknown |
| NVCCHA200172890 | Robertsons Ready Mix | 3/28/2019 | Unknown |
| NVCCHA200172891 | Wells Cargo Inc. | 3/28/2019 | Unknown |
| NVCCHA200179749 | Nevada Ready Mix | 9/26/2019 | Unknown |
| NVCCHA200191116 | Aggregate Industries Sloan Quarry | 7/22/2020 | Unknown |
| NVCCHA200192550 | Blue Diamond Hill Gypsum | 09/24/2020 | Unknown |
| NVCCHA200192633 | Titanium Metals Corp. Henderson Facility | 11/30/2020 | Unknown |
| NVCCHA200196170 | Pabco Building Products, LLC | 5/26/2021 | Unknown |
| NVCCHA200199608 | Robertsons Ready Mix | 08/02/2021 | Unknown |
| NVCCHA200199945 | EMD Acquisition LLC | 9/23/2021 | Unknown |
| NVCCHA200199607 | Blue Diamond Hill Gypsum | 10/1/2021 | Unknown |

*Response*

In response to commenter's claims that the EPA's emissions inventories did not include emissions reductions from the facilities identified in the comment, the EPA has evaluated the information provided by the commenter regarding these consent decrees.

Regarding commenter's statement that the EPA has not quantified Nevada facilities subject to enforcement related consent decree for $NO_X$ emissions reductions, the commenter tabulated names of these facilities and their estimated $NO_X$ emissions reductions in Table 1 of the comment letter that is duplicated above. For each row of the table, the comment document provides footnotes with web links to the EPA's database Enforcement and Compliance History Online (ECHO). However, with the exception of the Fernley Plant, the estimated $NO_X$ emissions reductions for 14 of the 15 sources in the table are reported as "Unknown". To develop the 2023 non-EGU emissions in the 2016v3 platform, the EPA started with the 2019 NEI point source inventory, as it was the latest complete point source inventory at the time of the modeling. The EPA was able to identify some of the sources in the commenter's table in the NEI, although four facilities could not be found in the NEI with $NO_X$, volatile organic compound (VOC), or particulate matter (PM) emissions. The facilities that could not be found and the civil penalty from ECHO listed in parentheses were Caesars Entertainment Corp. ($9,125), Robertsons Ready Mix ($7,250 and $3,120), Nevada Ready Mix (case not found in ECHO), and EMD Acquisition LLC ($12,640). The penalties were modest with a maximum of $12,640. For the facilities that were found in the NEI, the actual annual $NO_X$ emissions in tons from the 2016 inventory in the 2016v3 platform and the 2019 NEI point inventory plus the modeled emissions in the modeled 2016v3 2023 inventory are shown in Table 3-1. The emissions in Table 3-1 were derived from facility and unit-level summaries of 2016v3 point source emissions provided in the docket for this action.

*Table 3-1 Recent and Projected Emissions for Nevada Facilities in Table 1*

| Facility Name | 2016 NOx (tons) | 2019 NOx (tons) | 2023 NOx (tons) |
|---|---|---|---|
| Lhoist North America of Arizona – Apex Plant | 1,219 | 1,108 | 1,151 |
| Titanium Metals Corp. Henderson Facility | 10 | 24 | 24 |
| Fernley Plant | 1,090 | 1,796 | 1,796 |
| Republic Services Renewable Energy LLC | 43 | 14 | 14 |
| Wells Cargo Inc. | 20 | 7 | 7 |
| Aggregate Industries Sloan Quarry | 7 | 19 | 19 |
| Blue Diamond Hill Gypsum | N/A | 66 | 66 |
| Titanium Metals Corp. Henderson Facility | 10 | 24 | 24 |
| Pabco Building Products, LLC | 218 | 198 | 198 |

The only facilities in Table 3-1 with more than 70 tons of $NO_X$ emissions in 2019 are: Lhoist North America of Arizona – Apex Plant, Fernley Plant, and Pabco Building Products, LLC. In ECHO[18], the Lhoist case is marked as resolved as of 2/1/2017, with a civil penalty of $7,500. We presume that any resulting

---

[18] *https://echo.epa.gov/enforcement-case-report?activity_id=3601452966*

emission reductions would have been implemented in time to be reflected in the 2019 NEI. The Pabco Building Products consent decree was from 2021, so any impacts would not be reflected in the 2019 NEI. The ECHO status for Pabco[19] is listed as resolved as of 6/8/2021 and the civil penalty was $7,600.  Given the actual $NO_X$ emissions in the 2019 NEI, the likely reduction in 2023 that could have been achieved even if all emissions were eliminated in 2023 is about 200 tons per year (tpy) of $NO_X$, while the total annual modeled anthropogenic $NO_X$ in Nevada in 2023 is projected at 42,260 tons.
Thus, even a reduction of that level would not impact Nevada's contribution to other states.

The summary for the Fernley case in ECHO[20] is, "U.S. Environmental Protection Agency reached a settlement with the Nevada Cement Company to install new air pollution control technology at its Fernley, Nev. facility and replace a heavy-duty diesel truck and a diesel railcar mover at the facility with clean emissions vehicles to address alleged violations of federal CAA regulations. The pollution controls and clean emissions vehicles will reduce NOx emissions by approximately 1,140 tpy. Nevada Cement Company also paid a civil penalty of $550,000 as part of the settlement."

The EPA located the consent decree in *United States* v. *Nevada Cement Company, Inc.,* Civil Action No. 17-302 (D. Nev.), which was amended in 2018. As amended, Section V.A of the consent decree requires installation and operation either of Selective Non-Catalytic Reduction (SNCR) or catalytic filter bags with ammonia injection and provides that EPA may require installation of low NOx burners. A copy of these documents are available in the docket for this action.

A review of a June 19, 2020 issuance of two minor revisions to the operating permit for the Nevada Cement Company shows an allowance of discharge of $NO_X$ to the atmosphere that will not exceed 475.84 pounds per hour, nor more than 2,084.20 tons per 12-month rolling period from the #1 Kiln, and an allowance of discharge of $NO_X$ to the atmosphere that will not exceed 475.84 pounds per hour, nor more than 2,084.20 tons per 12-month rolling period from the #2 Kiln.  The EPA contacted the Permitting Branch, Bureau of Air Pollution Control Nevada Division of Environmental Protection, Department of Conservation and Natural Resources seeking the status of installation and operation of SNCR at the Nevada Cement Company's Fernley Plant. The supervisor promptly responded that she has confirmed with the facility that the SNCR has been installed and is operational on the kilns prior to October 2022.   A copy of this document is made available in docket for this action. We note that the actual 2019 emissions and the modeled 2023 emissions listed in Table 3-1 are about 1,800 tons, which is significantly less than the total of the modified operating permit level of 4,168 tpy total for the two kilns and is therefore a reasonable representation of the $NO_X$ emissions from this facility for 2023.

In summary, for all facilities except the Fernley Plant, the commenter has not provided adequate information regarding $NO_X$ decreases for the EPA to fully evaluate commenter's dispute of the linkage results for these sources.  Following the EPA's analysis, the civil penalties for the cases other than Fernley in the ECHO database were modest, indicating that the level of reductions would have been minimal. Furthermore, an examination of the EPA-approved Regulations at 40 CFR 52.1470(c), and the EPA-approved state source-specific permits at 40 CFR 52.1470(d) for Nevada did not show any of these sources to have made these reductions pursuant to enforceable and permanent requirements of the

---

[19] *https://echo.epa.gov/enforcement-case-report?activity_id=3602495139*
[20] *https://echo.epa.gov/enforcement-case-report?activity_id=2600059825*

state's SIP. For Fernley, the modeled emissions are substantially less than the permitted emissions, so while the installation of the SNCR will reduce emissions once they are fully installed and operating, the EPA modeled the emissions in 2023 at only 43% of the modified level in the permit and therefore was at a reasonable level to support the contribution analysis.

Given the detailed review of the consent decrees listed in Table 1 and their expected impacts all being too small to make a difference, except potentially for Fernley (which we have otherwise accounted for per above), we have sufficiently accounted for these comments in the final rule emissions inventory. Our analysis projects Nevada to contribute more than 1 percent of the NAAQS to downwind receptors, as noted in the preamble in Section III.C. and Section IV.M.

*Comment*

**Commenter:** Louisiana Chemical Association

**Commenter ID:** 26

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

EPA failed to take into account population decreases based on the 2020 census.

In addition to the inventory issues discussed above, EPA did not take into account the population decrease in Louisiana based on the 2020 census. This affects various source emission calculations, including many nonpoint source emissions. For Louisiana (and other states outside of the MARAMA), the EPA used historical census populations to project nonpoint sources.  A ratio of 2016 population to 2014 population was used to create a growth factor that was applied to certain sources. This analysis was then used to calculate census-based growth for certain sectors and certain activities, including: industrial solvent maintenance coatings, industrial adhesive applications, residential and commercial portable gas cans, wastewater treatment recovery, etc.

In performing this analysis, EPA did not consider the 2020 census which showed that Louisiana's population growth from 2010-2020 was only 2.7 percent overall.[53] The majority of parishes in Louisiana experienced decreases in population. For example, Cameron Parish, which shares a border with southeast Texas experienced a -17.9% population change from 2010 to 2020 and Caddo Parish, which shares a border with Texas near Dallas experienced a -6.7% population change over the same time period. In fact, of the seven parishes that share a border with Texas, four experienced a negative change in population and two experienced an increase less than 3%.

At a minimum, EPA must incorporate needed revisions to the 2016v2 inventory based on the population changes shown in the 2020 Census and then re-analyze the Louisiana Transport SIP based on the updated/corrected modeling platform before issuing a final rule on the Louisiana Transport SIP.

[53] *See Louisiana State Profile, 2020 Census, available at: https://www.census.gov/library/stories/state-bystate/louisiana-population-change-between-census-decade.html; see also Louisiana's population continues to shrink: Stats show nearly 13K decline between 2019, 2020*, The Advocate, January 29, 2020 (available at: https://www.theadvocate.com/baton_rouge/news/business/article_3833634c-5cdc-11eb-951d-

b39a30651d28.html); *Population declines in most Louisiana parishes, except for the suburbs, new estimates show*, Nola.com, March 25, 2022 (available at: https://www.nola.com/news/politics/article_fc5ff816-aba5-11ec-b605-234640609e50.html) ("The vast majority of Louisiana's parishes continued to shrink in the year after the 2020 census, drops that represented a continuation of a long-term trend that was exacerbated and sped up – in some cases dramatically – by the impacts of the pandemic and the devastation of Hurricane Laura, according to new estimates.").

*Response*

The EPA disagrees with the Louisiana Chemical Association's (LCA's) claim that EPA's emissions inventory projections are flawed because the EPA failed to consider that the population in Louisiana is projected to decrease, impacting the growth factor used to project non-point source emissions in the state. The population-based growth method from 2014 to 2016 for the base year was used in the 2016v2 platform used at proposal.  For the final rule modeling with 2016v3, data from 2017 NEI were used instead of using population-based factors to grow from 2014 to 2016, as 2017 NEI is a more recent inventory than 2014 NEI.  Based on U.S. Census data,[21] the population of Louisiana increased by 2% from 2010 to 2021. The commenter seems to contradict their own claim that Louisiana's population is decreasing by identifying that between 2010 and 2020, Louisiana's population increased overall by 2.7 percent. Further, and as the commenter notes, population data are only used to project emissions for a few Source Classifications Codes (SCCs) that impact $NO_x$ in the EPA's 2016v2 and 2016v3 platforms. A spreadsheet listing the SCCs that are projected based on human population is available in the docket for this action.  These factors increased Louisiana's $NO_x$ emissions in 2023 by only 2 tons statewide in 2016v2.  A spreadsheet showing state total emissions by SCC is available with the 2016v3 state total summaries in the docket for this action. Human population change is also used to project solvent VOC emissions. In the 2016v3 platform, the solvent emissions were projected to grow by 3.7% from 2016 to 2023. This is equivalent to 1,400 tons additional VOC out of 231,000 tons of anthropogenic VOC and 1.6M tons of VOC including biogenic and fire emissions. A change in VOC emissions of this magnitude would not have a noticeable result in ozone concentrations or contributions. Overall, the limited use of human population changes in projecting emissions from 2016 to 2023 does not have a significant impact on ozone precursor emissions in Louisiana.

*Comment*

**Commenter:** Louisiana Chemical Association

**Commenter ID:** 26

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

*The 2016v2 inventory contains sources that are permanently closed and fails to include emissions reduction projects in Louisiana.*

---

[21] *https://www.census.gov/quickfacts/fact/table/LA/PST045221.*

Some of the discrepancies may be explained by issues with the inventory used. According to the Technical Support Document for the 2016v2 platform ("2016v2 TSD"), the platform "draws on data from the 2017 National Emissions Inventory (NEI), although the inventory was updated to represent the year 2016 through the incorporation of 2016-specific state and local data along with adjustment methods appropriate for each sector."

For instance, the non-EGU point source sector emissions in the 2016v2 platform have been updated from the 2016 NEI point inventory and 2016v1 with certain changes. However, LCA believes that EPA has failed to include a number of federally enforceable consent decrees for non-EGUs in its model, which has served to overestimate emissions from Louisiana. In addition to the Cabot Facility consent decree referenced in the 2016v2 TSD, the following consent decrees were also entered since 2016:

[See pages 12-14 of comment letter for specific list of consent decrees and facility information identified by commenter.].

*Response*

In response to LCA's claims that the EPA's emissions inventories include emissions from sources in Louisiana that have permanently shut down, the EPA has evaluated the information provided by the commenter regarding these reductions and the status of the emissions at the facilities listed as planned closures is as follows:

> Sterlington Power is not in the 2016v3 inventories for 2023 and is therefore modeled as closed.

> US Convent Refinery has 234 tons $NO_X$ in 2016 and 290 tons $NO_X$ in 2023 in the 2016v3 platform and is not closed. The commenter claims this facility closed in 2019, although LA DEQ reported 290 tons of $NO_X$ in the preliminary 2020 NEI.  In addition, on February 24, 2022, *The Baton Rouge Advocate* reported that Shell confirmed the refinery will be revived as an alternative fuel complex,[22] and therefore it is not appropriate to remove the emissions in the 2023 modeling.

> Phillips 66 Alliance Refinery $NO_X$ emissions in the 2016v3 platform are approximately the same in 2016 at 813 tons as the modeled emissions in 2023 at 872 tons.  The commenter states that this will be converting to a terminal facility, but no details are provided on the timing for this conversion or the expected impact to the emissions and thus the emissions are retained in the 2016v3 platform.

Emissions for point sources used in the modeling by facility and unit are included in the docket for this action. Regarding reductions in emissions due to consent decrees or other enforceable measures: The installation of controls at Firestone Polymers by August 15, 2022, was too late to be reflected in the 2023 emissions used for modeling, although the 2023 NOx emissions are a minimal 44 tpy and a reduction would have virtually no impact on the contribution analysis.

The general approach used by the EPA to develop the 2016v3 platform point source emissions for 2023 was to start with the 2019 NEI point source inventory, as the most recent complete point inventory at

---

[22] *See* https://www.theadvocate.com/baton_rouge/news/business/shell-confirms-shuttered-convent-facility-will-become-an-alternative-fuels-complex/article_ad522d06-95ad-11ec-9457-bb64f61e4803.html.

the time the modeling was performed. Next, known closures were applied, and growth was reflected for some industries based on Annual Energy Outlook (AEO) 2022 industrial projections. Finally, controls from known control programs were applied.

To review the specific reductions listed in this comment, the EPA used the agency interest and document numbers provided by the commenter to download permit information from EDMS[23] for the identified facilities and specified dates. The status of the 2016v3 emissions for facilities noted as having decrees or other enforceable measures to reduce permitted emissions more than 100 tons for $NO_x$ or VOC are as follows:

The Dow Company consent decree[24] effective January 19, 2021, calls for 5,689 tpy of VOC reduction and 127 tpy of $NO_x$ reductions at Dow and Union Carbide facilities in Freeport Texas, Hahnville Louisiana, Plaquemine Louisiana, and Orange Texas. Union Carbide is a wholly owned subsidiary of Dow Chemical Co. Dow is required to install controls on covered flares to reduce emissions. The compliance deadlines in Hahnville are 12/31/2023 and 12/31/2024 for Olefins 1 and 2, respectively. The compliance deadline for Plaquemine is 10/1/2021 for the first control system, and 12/31/2025 for the second and larger control system. The distribution in the targeted reduction between the facilities and between the states of Louisiana and Texas is not clear from the consent decree. As a result, it was not possible to implement specific reductions in the 2016v3 platform. In the 2016v3 platform, non-EGU NOx emissions from The Dow Company facilities in Louisiana in 2023 are modeled as 2,763 tpy while 2019 NEI emissions are 2,703 tpy. The VOC emissions from The Dow Company facilities in the 2019 NEI are 1,294 tpy and are modeled as 1,294 tons in 2023 inventories in the 2016v3 platform.

Columbia chemicals company (aka Birla Carbon) has a consent decree effective June 1, 2018, with a targeted permit reduction of 661 tons of $NO_x$. Documentation for a permit modification provided August 26, 2022 (EDMS #13452282) shows that the permit is in the process of being updated to a total of 106 tpy, and that the current permitted value for $NO_x$ is 803 tpy. The 803 tpy permitted value was enacted March 27, 2017 (EDMS #10551099) and as of January 22, 2023 is still the most recent final permit for the facility. The emissions in 2023 in the 2016v3 platform were modeled at 632 tpy, thus the modeled emissions are within the permitted level as of January 22, 2023

The Arcosa Lightweight Aggregates – Erwinville has a permit modification effective March 24, 2020 (EDMS #12122066) with a reduction in $NO_x$ emissions of 106 tons for a final permitted level of 896 tons of $NO_x$. The emissions in 2023 for the 2016v3 platform are modeled as 363 tpy, the same as 2019 emissions and are within the permitted value.

As of August 26, 2021, Cabot Corporation at the Villa Platte Plant has permitted NOx emissions of 1565 tpy (EDMS #12874234). The emissions for this plant for 2023 in the 2016 v3 modeling platform are 1,101 tpy and are therefore within the permitted level.

---

[23] https://edms.deq.louisiana.gov/edmsv2/quick-search

[24] https://www.epa.gov/sites/default/files/2021-01/documents/thedowchemicalcompany.pdf

As of March 20, 2019, Orion Engineered Carbon at the Ivanhoe plant has a permitted level of 204tpy (EDMS #11574517), a reduction in permitted emissions of 1,156 tons. The permitted NOx emissions were later updated on July 28, 2022 to 272 tpy (EDMS #13406525). The actual emissions in 2016 were 797 tons, and the modeled emissions for 2023 in the 2016v3 platform were held constant at the 2019 level of 733 tpy. The NOx emissions were thus potentially overstated by about 460 tpy as compared to the permitted level for 2023. The total anthropogenic point source NOx from Louisiana modeled in 2016v3 for 2023 is 126,100 tons and the total anthropogenic NOx is 247,700 tons. Thus, even a 460 tpy overstatement of $NO_X$ from this facility would have virtually no impact on the contribution analysis.

Union Carbide Corp. has a planned reduction in permitted $NO_X$ at its Olefin 1 and Olefin 2 plants of 122 tons effective March 9, 2021. Based on the Louisiana EDMS system document ID #12642791, the first plant would realize the emissions reduction by fourth quarter of 2023 an the second by fourth quarter of 2024. As of January 22, 2023, the most recent permit for the facility (EDMS #13192411) allows for 2,031 tpy of $NO_X$. The amount modeled for 2023 in the 2016v3 platform is 1,655 tons, which is well within the permitted level.

The permit issued for Morehouse Bioenergy as of 10/6/2021 (EDMS #12918003) allows for 183 tons of $NO_X$ and 218 tons of VOC. The $NO_X$ modeled in 2023 for the 2016v3 platform is 114 tpy, which is within the stated value of the permit. The VOC modeled for the facility in 2023 for the 2016v3 platform is equal to the 2019 emissions level of 1,046 tons. The preliminary 2020 NEI emissions are higher than the 2019 emissions at 1,169 tons and had not yet shown the planned reduction in VOC to be effective in late 2021. The total point source VOC included in the 2016v3 platform 2023 inventory is 64,700 tpy and the total of all anthropogenic VOC from Louisiana is 231,600 tpy. Thus, the potential overstatement of 930 tons from this facility would have virtually no impact on the contribution analysis.

The permits referenced above have been downloaded from EDMS and are available in the docket for this action. The changes for the remaining sources were under 100 tons of $NO_X$ or VOC and are not reviewed in detail above, but the modeled point source emissions levels by unit as compared to 2019 and other recent-year levels are available in a unit-level comparison workbook in the docket for this action. The total annual anthropogenic $NO_X$ emissions modeled in 2023 for Louisiana is 247,700 tons and the total annual anthropogenic VOC emissions modeled is 231,600 tons. Reviewing many of the above examples shows that the permitted emissions are often substantially higher than the actual emissions. Thus, a reduction in permitted emissions does not necessarily correlate to a similar reduction in actual emissions. It is not appropriate to simply subtract the change in permit emissions from actual emissions, except in situations when the actual emissions are very close to the permitted level.

 Other issues raised by this comment related to EGUs in Louisiana are addressed in Section 3.3 (Emissions Inventory—EGUs).

*Comment*

**Commenter:** Minnesota Pollution Control Agency

**Commenter ID:** 31

**Docket ID:** EPA-R05-OAR-2022-0006

**Comment:**

EPA is now proposing to use a revised 2016 modeling platform, EPA 2016 version 2 emissions modeling platform (2016v2 EMP) to support a remedy for the Interstate Transport Rule for the 2015 Ozone National Ambient Air Quality Standard (NAAQS). EPA requested comments on the platform by December 17, 2021, and MPCA provided comments to Alison Eyth and the EmissionsModeling@epa.gov mailbox on December 15, 2021. In those comments, MPCA stated that the 2016v2 EMP and derivative modeling platforms will likely also be used by EPA for subsequent rule-making and technical evaluations for the next few years, as it is now being used in EPA's proposed disapproval of Minnesota's 2015 Ozone Transport SIP.

MPCA would like to reiterate our comments on the 2016v2 EMP for EPA's consideration based on issues identified by Minnesota and LADCO and other member states. Our comments identify three areas for improvement in the 2016v2 EMP:

1. Non-electricity generation stationary (non-EGU) point source emissions controls

2. Future year emissions projections for various point and non-point inventory sectors

[...]

Non-EGU point source emissions controls

LADCO worked with member states to identify the highest-emitting sources and applicable control technology information for non-EGU stationary point sources in the region. We generated a spreadsheet with the highest-emitting non-EGU sources in 2016 for each LADCO state. The spreadsheet includes columns for state input on emissions control information for each of the sources. The LADCO Emissions Workgroup worked to identify base year emissions controls and potential emissions controls for nonEGU point sources in the region. Given that EPA has included non-EGU point sources in the remedy for the states' obligations under the 2015 Ozone NAAQS Transport Rule, Minnesota reviewed the control information for this sector and provided information to EPA on actual, existing controls at the largest sources in the region.

The attached spreadsheet, nonegu_control_factors_survey_10252021 (MN Sources).xlsx, identifies control information and future emission rate changes for several Minnesota sources in columns S through V. The control information identified accounts for the installation of low NOX burners at the taconite facilities in Minnesota as part of the Regional Haze Taconite Federal Implementation Plan (FIP). Based on our estimates, we're expecting just under 11,000 tons per year (TPY) in NOX reductions due to the controls required by the Taconite FIP. MPCA first commented that we believed it was important to have these significant reductions included in the 2016v2 inventory for non-EGUs, and again request that EPA do so. See below for the summary of approximate emission reductions.

- 2,100 TPY at Minorca Mine

- 2,300 TPY at Hibbing Taconite

- 700 TPY at United Taconite

• 3,600 TPY at US Steel Keetac

• 2,100 TPY at US Steel Minntac

Future year emissions projections for various point and non-point inventory sectors

LADCO used EPA-generated emissions projection reports and identified a list of Source Classification Codes (SCCs) that we believe have incorrect future year projection rates. The 2016v2 EMP projection rates are not consistent either with real-world emissions trends or regional emissions projection information. We request that EPA replace the 2016v2 EMP projections for these sources with the updated rates provided by LADCO.

The attached spreadsheet, LADCO_EPA2016v2_Projections_Comments.xlsx, includes the list of the SCCs with alternative projection information and LADCO comments on the sources of the alternative information.

*Response*

In response to commenter's (Minnesota Pollution Control Agency Association (MPCA)) statement that the EPA should consider the comments it submitted on EPA's 2016v2 emissions inventories in December 2021, the EPA acknowledges receipt of MPCA's comments regarding updated emissions inventory data on point-source non-EGU sources in Minnesota, as well as data on point and non-point sources submitted in comments in the proposed action on Minnesota's SIP submission. The EPA thanks MPCA for this information and has considered, and incorporated as appropriate, this information in the 2016v3 emissions inventories.

In regard to the reflection of implemented and expected controls in the 2023 inventory, in the 2016v3 platform, the EPA started with the 2019 NEI point source inventory as the most recently available complete inventory at the time the 2016v3 platform modeling was performed, and then reflected impacts of known closures and controls in the intervening years. Specifically for the Taconite-related sources mentioned by the commenter, the EPA incorporated draft year 2021 emissions into the 2023 inventory, as these were the latest available for those sources. In the provided spreadsheet on non-EGU control factors, implementation dates for controls range from dates in 2018 through 2020 and would therefore be included in the 2021 emissions values used in the 2016v3 platform emissions for 2023.

These emissions estimates are reflective of the current status of efforts to implement best available retrofit technology (BART) FIP requirements for these sources. In particular, a revised emissions limit for the Minntac facility was finalized in March 2021, (86 FR 12095; March 2, 2021), and the emissions projections used for Minntac based on 2021 data are reflective of that limit. The EPA is still in the process of reconsidering and setting BART emissions limits for the remaining taconite facilities in Minnesota.[25] Using 2021 emissions data for these units provides the best emissions data at this time and until final BART emissions limits are set. As noted already, the EPA only considers emissions reductions

---

[25] Petitions for review and petitions for reconsideration of EPA's 2016 BART FIP, 81 FR 21672 (Apr. 12, 2016), remain pending and settlement discussions with the taconite facilities are ongoing. *See* Petition for Judicial Review, *U.S. Steel Corp. v. U.S. EPA*, No. 18-1249 (8th Cir. Feb. 2, 2018).

from rules that are final. To the extent the commenter is referencing any emissions reductions from the second planning period of the Regional Haze Program, the EPA notes that it has not yet taken final action on the second planning period Regional Haze SIP submission from the MPCA.[26] Although the EPA acknowledges the efforts the state has made to develop a SIP submission, the EPA cannot incorporate non-final or uncertain emissions reductions into its transport modeling platform.

For airports, nonroad, and oil and gas-related natural gas engines, the EPA reviewed these factors and did not accept the revised projection factors as the provided rationales were not found to be credible when the EPA explored available data sources for these source categories. The EPA did accept the revised factor of 1.0 for nonpoint distillate as we found that industrial distillate sales are flat or declining since 2016.[27] More information is available in the 2016v3 Emissions Modeling TSD (the EPA notes that the 2016v3 Emissions Modeling TSD contains information for the years 2016, 2023, and 2026; however, years after 2023 are not relevant to this action, which is focused on the 2023 analytic year).

With regard to provided alternative projection rates for commercial aircraft (a uniform factor of 1.15), and factors equal to 1.0 (i.e., constant emissions) for two-stroke pleasure craft on waterways, two-stroke snowmobiles, and industrial natural gas usage in the point oil and gas sector, the EPA disagrees with some of the provided factors following a review of the listed data sources and the emissions data. For aircraft, because it is not appropriate to use a single projection factor for all airports the EPA instead used airport-specific projection factors based on the 2021 Terminal Area Forecast released in June 2022 as the basis for the projection factors in the 2016v3 platform. With the EPA's method, projection factors are based on expected changes to traffic at major airports and expected state-level changes in traffic at smaller airports. For pleasure craft, the EPA found data from the National Marine Manufacturers Association that indicated that pleasure craft sales were not on the decline in the early 2020s and therefore retained the emissions estimates from EPA's Motor Vehicle Emission Simulator version 3 (MOVES3). The EPA agrees that snowmobile usage is flattening, but because the ozone season snowmobile emissions are minimal, the EPA retained the emissions estimates from MOVES3. The EPA disagrees that employment levels were a good surrogate for emissions from natural gas engines on pipelines and instead uses information related to expected trends in natural gas usage based on factors in the AEO 2022. The EPA agrees that the use of distillate oil is flat or declining and accepted the proposed projection factor of 1.0 for those sources. More details on the EPA projection methods and updates in the 2016v3 platform are described in the 2016v3 Emissions Modeling TSD.

A response to the portion of the comment related to the Eastern Regional Technical Advisory Committee (ERTAC) versus IPM is included in Section 3.3.2 (EPA's Integrated Planning Model (IPM)of this RTC document.

---

[26] 87 FR 52856, August 30, 2022. Minnesota was one of 15 states named in a Finding of Failure to Submit a SIP which satisfies the visibility protection requirements of the Clean Air Act (CAA), as described in implementing regulations, for the regional haze second planning period. Minnesota submitted a second planning period Regional Haze SIP submission to the EPA on December 22, 2022.

[27] https://www.eia.gov/dnav/pet/hist/LeafHandler.ashx?n=PET&s=KD0VISNUS1&f=A

*Comment*

**Commenter:** United States Steel Corporation

**Commenter ID:** 45

**Docket ID:** EPA-R05-OAR-2022-0006

**Comment:**

<u>The Proposed Disapproval is not based upon Accurate Projected Emission Estimates and the Model Over-Predicts Impacts</u>

The emission estimates from sources that would be affected by the rule are incorrect; and do not reflect the actual projected emissions. These emission estimates do not include reductions that have been and will be implemented under other actions.

For example, it does not appear that U.S. EPA has considered current and projected emission reductions that have resulted from years of effort by both U.S. EPA and the taconite industry in revising the Federal Implementation Plan (FIP) for regional haze in Minnesota. In addition, undoing or redoing the evaluations and productive efforts that have occurred for over 10 years that have resulted in significant NOx reductions that have been shown to be technologically and economically feasible is inefficient and inappropriate. In sum, these efforts, and most importantly, these reductions must be considered in U. S. EPA's evaluation.

While U. S. Steel disagrees with EPA's proposed threshold of 1 percent, if the data are corrected and incorporated into modeling for Minnesota, it would show that Minnesota's contribution impact is less than EPA's 1 percent proposed "interference" threshold as previously demonstrated by LADCO and U. S. EPA.

*Response*

In response to commenter's claim that emissions from sources in Minnesota are overestimated, because the EPA failed to consider emissions reductions from programs such as Regional Haze, in the 2016v3 emissions for 2023, EPA used actual 2021 emissions provided by the MPCA that accounted for reductions implemented as of that year. As noted already, the EPA only considers emissions reductions from rules that are final.

*Comment*

**Commenter:** Oklahoma Department of Environmental Quality

**Commenter ID:** 37

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

**Non-EGU Point Sources** – Oklahoma respectfully requests that EPA use 2017 National Emissions Inventory (NEI) data for all non-EGU point sources rather than the data currently in the 2016v2 EMP. The temporal profile for these facilities is not weather dependent as is the case for the EGU sector, and ODEQ does not think that will raise any concerns regarding the coupling of emissions data and weather that may be likely to lead to ozone formation at sites experiencing difficulties attaining or maintaining attainment of the NAAQS. In addition, a number of errors were noted during ODEQ's review of the 2016v2 EMP and the 2017 NEI data corrects those errors. For non-EGU point sources, some of the problems ODEQ observed may be associated with PM-2.5 augmentation performed by EPA on data submitted to the 2016 Emissions Inventory System (EIS). In some cases, it appears that there was an assumption that ODEQ's primary PM2.5 represented only the filterable component, but that was not the case.[12]

**Oil & Gas Sector** – For the facilities whose emissions ODEQ submitted as oil and gas sector point sources in the 2017 NEI, Oklahoma requests that EPA use the 2017 NEI data rather than the data in the 2016v2 EMP. As was the case for other non-EGU point sources, ODEQ believes that the 2017 NEI data are more representative of actual facility emissions. With regard to area oil and gas emissions, ODEQ recommends use of the 2017 NEI data for the production segment.

[12] Primary fine particulate matter with an aerodynamic diameter less than or equal to 2.5 micrometers (PM-2.5) is composed of filterable and condensable components. If a state agency supplies only the filterable component in its submission to the EIS, EPA will augment those data to yield total PM-2.5. In Oklahoma's case, ODEQ submitted total PM-2.5 and no augmentation should have been performed.

*Response*

In response to commenter's request that the EPA use 2017 NEI data for all non-EGU point sources instead of 2016v2 EMP data, the EPA has updated the point source inventories to use 2017 NEI for emissions projected from 2014, although the 2016 point source emissions were retained where they reflected year 2016-specific data. Similarly, the EPA has accepted the Oklahoma Department of Environmental Quality's (DEQ's) request to use 2017 NEI for emissions from point source oil and gas sources. In response to commenter's claims that issues with inventory data may be associated with PM2.5 augmentation completed by EPA, the EPA notes that PM augmentation is not relevant for ozone-focused modeling. Finally, the EPA accepted the comment to use 2017 data for production-related area (i.e., nonpoint) oil and gas emissions in Oklahoma in the 2016v3 platform.

*Comment*

**Commenter:** PacifiCorp (Attachment – Ramboll Evaluation)

**Commenter ID:** 38

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

Missing Anthropogenic Emission Controls in the DM/NFR NAA Will Result in Reductions in Future Year Ozone Design Values

EPA used the MOVES3 mobile source emissions model to define mobile source emissions for the 2016, 2023 and 2026 emission scenarios. MOVES3 uses vehicle sales through 2020 to define the level of Electric Vehicle (EV) sales penetration for each year. However, MOVES3 assumes zero EV sales in Colorado for year 2021 and newer years, presumably because EV sales are not a federally enforceable control measure. This is clearly an incorrect assumption as EV sales in 2021 were greater than previous years.

On January 17, 2019, the Governor of Colorado issued Executive Order B 2019 00221 to support a transition to zero emission vehicles. The Colorado Electric Vehicle Plan 2020 lays out the blueprint for increasing sales of EVs stablishing a target of almost a million EVs in the state by 2030, which is approximately half of how many vehicles are currently in Colorado. Thus, increased EV sales are a reality in Colorado and assuming no EV sales from 2021 on in MOVES3 will overstate future year NOX and VOC emissions in the DM/NFR NAA and other areas in Colorado resulting in EPA overstating the 2023 and 2026 ozone design values in their Proposed Transport Rule.

The Clean Air Act (CAA) allows California to set its own motor vehicle emission emissions standards provided they are no less stringent than the Federal standards. Under Section 177 of the CAA (42 U.S.C. 7507), states are allowed to opt-in to California's Low-Emissions Vehicle (LEV) criteria pollutants and greenhouse gas (GHG) emissions regulations and Zero Emissions Vehicle (ZEV) regulations. Colorado is one of 14 Section 177 states that have adopted the California motor vehicle emission standards, which includes a ZEV mandate that is mainly EVs. Thus, EV sales in Colorado from 2021 are a reality and legally binding under Section 177 of the CAA and assuming there are none, as in the Proposed Transport Rule, is incorrect and will overstate Colorado VOC and NOX emissions in 2023 and 2026 resulting in overstating 2023 and 2026 ozone design values at nonattainment/maintenance receptors in the DM/NFR NAA.

On April 13, 2022, EPA proposed to redesignate the DM/NFR ozone NAA from Serious to Severe under the 2008 ozone NAAQS due to failure to attain by the July 20, 2021 attainment date for a Serious ozone NAA. As a Severe ozone NAA, the DM/NFR NAA will be subject to additional requirements that will reduce NOX and VOC emissions. One such mandatory requirement for a Severe ozone NAA is the implementation of reformulated gasoline (RFG) in the NAA that will reduce NOX and VOC emissions resulting in reduced ozone concentrations. The Proposed Transport Rule 2026 ozone design value projections did not account for the fact that RFG will be mandatory in the DM/NFR NAA resulting in an overstatement of 2026 emissions and 2026 ozone design values.

*Response*

The commenter mentions the impact of the California's CAA waiver on other states like Colorado and noted that those emissions must be accounted for accurately. Any state that had adopted California's Low-Emissions Vehicle LEV criteria pollutant and Zero-Emissions Vehicle (ZEV) regulations at the time the EPA was building its 2016v2 emission profiles and projections would have seen those emissions changes included in the modeling. Specifically, because Colorado adopted the LEV rule prior to 2019,

113

this is reflected in the modeling. Because Colorado did not adopt its ZEV regulations until after 2019, these programs are not accounted for in the 2016v2 modeling.

The Colorado Electric Vehicle Plan 2020[28] says that by "achieving its goal of 940,000 EVs by 2030, the state could see significant environmental benefits that include emission reductions. As noted in the 2018 Colorado Electric Vehicle Plan, Colorado could experience an annual reduction of ozone forming pollutants estimated at 800 tons of NOx, 800 tons of volatile organic compounds (VOC)." If these numbers are correct, the ozone season ozone-precursor emissions would be reduced by approximately 600 tons, which is only 0.6 percent of the total ozone-precursor emissions projected for Colorado, and only by 2030, well after the 2023 analytic year. These changes, alone, are unlikely to bring the state of Colorado back into attainment for the 2015 ozone NAAQS. Emission reductions that will come from forthcoming reformulated gasoline (RFG) requirements will most likely be too small on their own, or in combination with other planned vehicle programs in the state, to change the attainment status of Denver.  We note that the emission rates included in MOVES3 reflect the national Tier 3 program, which harmonizes emission rates for $NO_X$ and VOC with the California LEV program starting with model year 2017 and are applied in all states.

For the 2016v3 modeling platform, the EPA used actual vehicle populations by fuel type (e.g., gasoline, diesel, electric) and by county for all states, not the assumptions of these populations in MOVES3.  For the proposal modeling, the populations based on registration data from the calendar year 2017 and for the final rule modeling the starting populations for future years were initially populated from actual registration data for the year 2020 and were then projected to the modeling year 2023 using fuel-specific trends based on the AEO 2022.


*Comment*

**Commenter:** United States Steel Corporation

**Commenter ID:** 45

**Docket ID:** EPA-R05-OAR-2022-0006

**Comment:**

The emission estimates from other sources, including those in Illinois, Indiana, Ohio and Michigan – and in particular, emissions from the iron and steel sources in those states, are overstated and are inconsistent with prior state submittals.


*Response*

The EPA disagrees with the commenter that iron and steel emissions have been overstated in its modeling. Further, the commenter has not provided data suggesting why it believes emissions from iron and steel sources in Illinois, Indiana, Ohio, and Michigan are overstated, nor has the commenter

---

[28] The Colorado Electric Vehicle Plan 2020 can be accessed via *https://energyoffice.colorado.gov/zero-emission-vehicles/colorado-ev-plan-2020.*

explained how the EPA's modeling overstates these emissions. In the 2016v3 platform, EPA based 2023 non-EGU point emissions for facilities other than Taconite facilities on actual 2019 emissions as these are state-submitted data for the NEI and are consistent with operations in recent years. Any closures known to take effect by 2023 were applied along with the impacts of known control programs.

*Comment*

**Commenter:** Utah Petroleum Association and the Utah Mining Association

**Commenter ID:** 48

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

The 2011 base emissions year in the modeling provided by EPA to use in IT SIPs is out of date and not predictive of current downwind influences.

In its IT SIP, Utah documented its substantial emission reductions occurring after the baseline model year, a 30% reduction in VOC emissions and a 37% reduction in NOx by 2017 based on the latest triennial emission inventory at the time of IT SIP submittal. These reductions came about at least in part due to controls implemented on sources for the PM2.5 Serious nonattainment SIP and controls implemented on oil and gas sources operating in the Uinta Basin. Some reductions resulted from ongoing motor vehicle fleet turnover and implementation of Tier 3 fuels.

Without modeling the substantial emission reductions, we cannot know how much these reductions would reduce the downwind influence. We can only consider these reductions as weight of evidence and to demonstrate that Utah has already implemented the types of controls that might be required in an IT SIP, as Utah has done in its IT SIP.

EPA should take these substantial reductions into account when it considers whether Utah has more than a threshold contribution to a downwind State.

*Response*

In response to the commenter's criticism of the EPA's 2011 base year emissions being out of date for use to support the EPA action on interstate transport, we first note that the EPA's 2016v2 modeling relied on in part at proposal, does not use 2011 as its base year, but instead uses 2016. This is for the exact reason the commenter states; 2016 provides more up-to-date data. With the collaborative development of the 2016-based inventories, the EPA believes this modeling provides up-to-date air quality projections. That said, no SIP submission is being disapproved on the grounds that the state relied on older versions of EPA or non-EPA modeling. The EPA has more recent data than the 2011 base year emissions included in the 2016v2 and 2016v3 emissions platform modeling. The EPA explained at proposal why Utah's reference to Best Available Control Technology (BACT) and Best Available Control Measures (BACM) for the Salt Lake City PM$_{2.5}$ nonattainment area, implementing controls on oil and gas sources in the Uinta Basin, and implementation of Tier 3 gasoline was insufficient to support a

115

conclusion that the state has no outstanding good neighbor obligations for the 2015 ozone NAAQS. See 87 FR 31477-31483 (May 24, 2022).

*Comment*

**Commenter:** WildEarth Guardians

**Commenter ID:** 50

**Docket ID:** EPA-R06-OAR-2021-0801-0042

**Comment:**

Thank you for the opportunity to offer public comments regarding EPA's proposed disapproval of Texas's 2015 Ozone Interstate Transport State Implementation Plan (SIP). WildEarth Guardians supports EPA's ultimate decision to disapprove the Texas SIP proposal. However, because neither Texas's nor EPA's ozone modeling results appear to accurately reflect the true impact of emissions from Texas on ozone pollution levels in New Mexico, we request that EPA take a closer look at this issue as it finalizes its SIP disapproval and formulates a Federal Implementation Plan (FIP) for Texas. In particular, we request that EPA ensure that ozone precursor emissions from Texas's oil and gas industry, including in the Permian Basin straddling the Texas-New Mexico border, are fully accounted for in EPA's modeling, and that EPA's FIP ensures that these emissions do not significantly contribute to future exceedances of the ozone NAAQS at monitoring sites in southeastern New Mexico. Guardians requests that EPA revisit its assumptions regarding emissions from the oil and gas industry – particularly in the booming Permian Basin – to ensure that its modeling efforts provide a realistic projection of ozone pollution levels at sites significantly impacted by such emissions.

*TCEQ Modeled 2023 Design Values in New Mexico*

With oil and gas development and production booming in the Permian Basin, it is critical that EPA fully evaluate the impact of oil and gas sector emissions on ozone pollution levels in New Mexico. With monitored design values in southern and southeastern New Mexico currently well in exceedance of the 2015 NAAQS, it is highly unlikely that these receptors will achieve attainment by 2023. As EPA explained in the Technical Support Document ("TSD") for the EPA Region 6 2015 8-Hour Ozone Transport SIP Proposal that it would not expect ozone design values to decrease by more than 0-1 ppb per year. As such, the 2020 and 2021 design values in southern and southeastern New Mexico suggest that monitors in these areas will likely see 2023 ozone design values that continue to significantly exceed the 2015 ozone NAAQS, thus warranting future year modeling and state contribution analysis to determine whether upwind states are inappropriately causing or contributing to ozone violations.

[table in full comment]

In light of the well-documented ozone pollution problem documented at monitoring sites in southern and southeastern New Mexico, we request EPA apply the analysis described in Sections 1 and 2 of the Technical Support Document (TSD) for the EPA Region 6 2015 8-Hour Ozone Transport SIP Proposal to TCEQ's modeled 2023 design values for Eddy County and Dona Ana County monitors in New Mexico, identified below.

[table in full comment]

116

Specifically, we request EPA evaluate recent design value monitored trends in Dona Ana and Eddy Counties to determine what potential design value declines – if any – could be expected by 2023. Using this information, we request EPA compare the TCEQ modeled 2023 design values for the monitors in these counties to the 2020 monitored design value and preliminary 2021 design value and determine whether TCEQ's modeling is underestimating future ozone design values in this region of New Mexico. Accurately determining whether monitors in Southern and Southeast New Mexico qualify as nonattainment or maintenance receptors is essential because TCEQ identified Texas anthropogenic emission sources as contributing well in excess of 1% of the NAAQS, or 0.70 ppb, to the vast majority of monitors in New Mexico – a potentially significant contribution to nonattainment or interference with maintenance. Accordingly, given the likelihood that these monitoring sites are likely to remain in exceedance of the 2015 NAAQS by the 2023 attainment deadline, it is critical that EPA's analysis take into account Texas's significant contribution to ozone pollution in southern and southeastern New Mexico. Understanding Texas's contribution is an essential first step towards ensuring that a Good Neighbor FIP for Texas take the steps needed to ensure that emissions from Texas – including those from the oil and gas industry – do not significantly contribute to non-attainment in New Mexico.

*Response*

In response to commenter's request that the EPA revisit its emissions inventories and projections of the oil and gas sector in the Permian Basin, the EPA notes that since the release of the 2016v2 inventories, the EPA has continued to work with the states to further refine these inventories for the 2016v3 platform. In particular, the EPA worked with New Mexico Environment Department to improve the characterization of oil and gas emissions in New Mexico in the 2016v3 platform. As a result, the EPA modified the base year inventories for New Mexico submitted by the Western Regional Air Partnership (WRAP), as well as projections for New Mexico and Texas to better reflect the emissions for the Permian Basin. Details of these changes can be found in the Emissions Modeling TSD, in the docket for this action (docket ID No. EPA-HQ-OAR-2021-0663).

The EPA addresses comments related to model performance and design in Section 4 (Air Quality Modeling) of the RTC.

*Comments*

**Commenter:** Wisconsin Department of Natural Resources

**Commenter ID:** 51

**Docket ID:** EPA-R05-OAR-2022-0006

**Comment:**

EPA should review Wisconsin's December 2021 comments on the 2016v2 emissions modeling platform and incorporate this information in future versions of the platform.

On December 15, 2021, the WDNR provided comments on EPA's draft 2016v2 emissions modeling platform. EPA has indicated that states should use this notice and comment opportunity to resubmit

these comments to EPA to ensure they are in the record. The WDNR is therefore providing those comments again as an enclosure to this letter. EPA should evaluate WDNR's comments and incorporate the suggested changes when it revises its 2016 platform for use in future regulatory actions, such as a final 2015 ozone NAAQS transport rule.

**Commenter:** Wisconsin Department of Natural Resources (Attachment – 2021 comments)

**Commenter ID:** 51

**Docket ID:** EPA-R05-OAR-2022-0006

**Comment:**

Control and Growth Assumptions for Industrial Point Sources

4. There are several industrial point source retirements and committed controls in Wisconsin that are not included in EPA's projected 2023, 2026 and 2032 emissions (see Table 2). The EPA should integrate these retirements and controls into its projected emissions.

5. The petroleum coke growth factor of 1.98 for A-M Kaukauna paper mill (Agency FID 445031180) unit B11 process #5 and unit B09 process #3 is inappropriate. The EPA should instead use a growth factor equivalent to the growth factor of coal of 0.88 for this facility. Petroleum coke throughput at this facility is expected to be proportional to coal throughput or less.

Table 2 – Wisconsin Industrial Point Source Post-2016 Retirements and Controls [available in full comment]

Control and Growth Assumptions for Mobile Sources

6. Commercial Marine Vessels. The EPA's Technical Support Document for the draft 2016v2 Platform (dated September 2021) states that the commercial marine emissions in 2016v2 are the same as those in 2016v1 (see pages 57 and 61). However, the draft 2016v1 Platform provides two sets of commercial marine emissions:

    • One nationwide, with the files dated during January and February 2020. The data for these emissions can be accessed at the following links:

    https://gaftp.epa.gov/Air/emismod/2016/v1/2016emissions/
    https://gaftp.epa.gov/Air/emismod/2016/v1/2023emissions/
    https://gaftp.epa.gov/Air/emismod/2016/v1/2028emissions/

    • A second focused on the Great Lakes area, with the files dated later, during May 2020. These files cover two modeling domains:

        o DO3: Parts of four states[6] surrounding Lake Michigan

        o DO2: A larger domain surrounding the Great Lakes, including all or parts of 16 states[7] and part of Canada

The data for these emissions can be accessed at the following link:
https://gaftp.epa.gov/Air/emismod/2016/v1/2016emissions/cmv_other_grids/

The commercial marine emissions in the draft 2016v2 Platform match those in the first (nationwide) set cited above. The emissions within the states covered in the second (Great Lakes) set are not updated to match the emissions in that set. The EPA should either update the commercial marine emissions within the DO2 and DO3 modeling domains to match the May 2020 data or document why the earlier nationwide emissions estimates are preferable.

[6] These four states are: Illinois, Indiana, Michigan, and Wisconsin.
[7] These 16 states are: Arkansas, Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota, Missouri, New York, Ohio, Oklahoma, Pennsylvania, Tennessee, West Virginia, and Wisconsin.

*Response*

The EPA acknowledges receipt of the commenter's comments on the 2016v2 emissions inventories in December 2021, which were also attached to their comment on the proposal. In the 2016v3 inventories used for the final rule modeling, the EPA has taken these comments into consideration. The EPA ensured that three units at Georgia-Pacific Consumer Products LP and specific units at Green Bay Packaging Inc. Mill Division were not included in the 2023 projected inventories in the 2016v3 platform due to unit retirements. The EPA confirmed that the specified control devices were associated with the Cardinal FG and ND Paper units in the inventories used to model 2023 in the 2016v3 platform.  Regarding the units at the A-M Kaukauna paper mill, the EPA updated its projection methods for the 2016v3 platform. The emissions in 2023 are now projected to be 91% and 92% of the 2016 emissions at the two units as opposed to having higher emissions in 2023 as was projected in the 2016v2 platform.  The emissions at these units are projected to decrease further by 2026 in the 2016v3 platform, although the 2026 emissions numbers are not relevant to this action.

Regarding the comment on the Commercial Marine Vessel (CMV) inventories, there were multiple sets of inventories in the 2016v2 platform because the EPA provided CMV emissions on finer than 12 kilometer (km) grids (D02 and D03) at the request of the Lake Michigan Air Directors Consortium (LADCO) to support air quality modeling on fine grids in their region. The D03 and D02 emissions are out of scope with respect to this action as these data were not used in the EPA modeling and were only used in LADCO modeling. However, the EPA did respond to a request by LADCO to provide emissions compatible with the 2016v3 platform on those grids.

*Comment*

**Commenter:** Xcel Energy

**Commenter ID:** 52

**Docket ID:** EPA-R05-OAR-2022-0006

**Comment:**

EPA's disapproval of the MN SIP is based on revised EPA modeling that the MPCA, in their comments, has identified flaws with (including the failure to consider substantial planned NOC emissions reductions).

*Response*

The EPA received comments from MPCA as commenter suggests and has responded to those comments in this final action. The EPA has updated its emissions inventories for Minnesota sources to reflect input MPCA provided in its comment letter, and these updates are included in the 2016v3 modeling.

## 3.3   Emissions Inventory – EGUs

### 3.3.1   Unit Corrections

*Comments*

**Commenter:** Louisiana Chemical Association

**Commenter ID**: 26

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

Finally, the following EGU sources have converted or retired coal-fired units and/or installed emissions controls to reduce emissions in Louisiana:

- Big Cajun II, Unit 2 was converted from coal to natural gas in 2015 and generates 540 megawatts. The conversion sharply reduced emissions of sulfur, mercury, nitrogen oxide and particulate matter. Other technologies installed to reduce nitrogen oxide emissions include Selective Non-Catalytic Reduction ("SNCR") technology in May 2014

- At Big Cajun II, Unit 1 and Unit 3, Selective Non-Catalytic Reduction ("SNCR") technology was installed to reduce nitrogen oxide emissions in May 2014

- Big Cajun II, Unit 1, a coal-fired unit, will retire or be refueled to natural gas by December 2025 as part of a consent decree agreement

- Planned retirement or conversion of Rodemacher Unit 2 at Brame Energy Center, which is a 523-megawatt generating unit predominately powered by coal which will retire or cease burning coal in 2028 through EPA approval of the CCR Part A Demonstration-submittal and/or Brame Energy Center's ELG Notice of Plan Participation

- Retirement of Dolet Hills Power Station, a 642-megawatt coal-fired generating unit, took place in December 2021.

Thus, the EPA inventory used for the modeling does not account for all relevant emission reductions. As discussed above, at a minimum, EPA must incorporate needed revisions to the 2016v2 inventory and then re-analyze the Louisiana Transport SIP based on the updated/corrected modeling platform before issuing a final rule on the Louisiana Transport SIP.

**Commenter:** Mississippi Department of Environmental Quality

**Commenter ID:** 32

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

EMISSION SOURCES The air quality modeling results from the 2016v2 Emissions Modeling Platform indicate that by 2026, emissions occurring in Mississippi will no longer contribute to nonattainment nor significantly contribute/interfere with maintenance at any downwind receptor, even without actions to reduce emissions from Mississippi sources. However, it is important to note that many emissions reductions are scheduled or have taken place at Mississippi facilities since 2016, which is the emissions year the 2016v2 platform is based on. These include:

- Mississippi Power Company's plan to shut down Plant Watson Unit 4, a 2,760 MMBtu natural gas fired boiler, in December 2023 and to retire all coal units at Plant Daniel no later than December 2027.
- Cooperative Energy Plant RD Morrow's retirement of all coal units in 2018 and replacement with natural gas combined cycle units.
- Entergy Mississippi Plant Baxter Wilson's retirement of Unit 2, a 6,680 MMBtu natural gas fired boiler with fuel oil backup, in 2018 and plans to shut down the remaining Unit 1, a 4,790 MMBtu natural gas fired boiler with fuel oil backup, in May 2023.
- Entergy Mississippi Plant Rex Brown's retirement of Unit 4, a 2,130 MMBtu natural gas fired boiler with fuel oil backup, in 2018 and the remaining Unit 5, a fuel oil fired combustion turbine, in 2019. Plant Rex Brown is now completely shut down.

These significant emissions reductions from Mississippi sources alone should be adequate to allow EPA to approve a revised Mississippi iSIP.


**Commenter:** Oklahoma Department of Environmental Quality

**Commenter ID:** 37

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

ODEQ has provided informal feedback to the EPA concerning the 2016 v2 EMP and those comments are also provided below.

EGU Sector - ODEQ has identified a few minor updates that should be made to Version 6 of the National Electric Energy Data System (NEEDS) and those updates are included in Attachment D.

[Attachment D is available in its entirety in the original comment letter.]


**Commenter:** PacifiCorp (Attachment - Berkshire Hathaway Energy (BHE) Company Comments on Proposed Ozone Transport Rule)

**Commenter ID:** 38

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

BHE has identified significant $NO_x$ emission reductions in Wyoming that are not taken into account by EPA's analysis. There are a number of required and planned control projects and retirements scheduled at PacifiCorp units in the coming years that will accomplish significant emission reductions that EPA should consider when determining whether it is warranted to include Wyoming in the scope of the Proposed Rule. In particular, PacifiCorp will be converting Jim Bridger Units 1 and 2 to natural gas by 2024 and has committed to retire or cease burning coal at five other units: Naughton Units 1 and 2 prior to 2026, and Dave Johnston Unit 3 by the end of 2027, and Dave Johnston Units 1 and 2 by 2028. The cessation of coal combustion on Naughton Units 1 and 2 and Dave Johnston Units 1, 2 and 3 will provide NOx reductions of 2,945 tons compared to 2021 ozone season emissions. As with Utah, EPA's underlying analysis for the Proposed Rule includes major errors in the emissions attributable to PacifiCorp's, which resulted in NOx emissions in Wyoming that are several times larger than the NOx emission estimates used in Steps 1 and 2.

[…]

1. Potential Technical Errors in Proposal – Appendix A Proposed Rule State Emissions Budget Calculations and Engineering Analytics

[…]Some 2023 allocations appear to result from the assumption that LNB/OFA have not been installed for Hunter Unit 3 and Naughton Unit 1. Both units currently utilize LNB/OFA. Additional corrections are also requested for the Jim Bridger Units 1 and 2 and the Dave Johnston Unit 1.

[…]

**iv. Wyoming Dave Johnston Unit 1 should be rated at a capacity of 93 MW**

EPA lists Dave Johnston Unit 1 with a capacity greater than 100 MW. However, the most recent data indicates the correct capacity during ozone season is 93 MW. BHE asks EPA to correct the capacity of Dave Johnston Unit 1 and adjust the associated allocations for Wyoming accordingly.


**Commenter:** Wisconsin Department of Natural Resources (Attachment – 2021 comments)

**Commenter ID:** 51

**Docket ID:** EPA-R05-OAR-2022-0006

**Comment:**

 The EPA should include the most recent information on utilities' publicly available retirement or fuel-switching plans for EGUs in the updated 2016v2 Platform. Wisconsin utilities have publicly announced shutdown dates by 2025 at three power plants (see Table 1), and EPA should ensure these shutdowns are reflected in the Power Sector Modeling Platform v6 forecasts (EPA currently forecasts these EGUs to operate through 2032). In addition, EPA should ensure its EGU model forecasts do not shut down EGUs that have not yet announced plans for retirement, including Wisconsin's Manitowoc Public Utilities (ORIS ID 4125). The WDNR is also providing this list of upcoming retirements, or continued operation, within the Clean Air Markets Power Sector Modeling Contact Form, as requested by EPA.

[…]

Table 1 – Wisconsin EGU Scheduled Retirements

| Facility | Unit ID | ORIS | Retirement Date |
|---|---|---|---|
| South Oak Creek | 5 | 4041 | 1/1/2024 |
| South Oak Creek | 6 | 4041 | 1/1/2024 |
| South Oak Creek | 7 | 4041 | 1/1/2025 |
| South Oak Creek | 8 | 4041 | 1/1/2025 |
| Weston | 2 | 4078 | 1/1/2024 |
| Columbia | 1 | 8023 | 1/1/2024 |
| Columbia | 2 | 8023 | 1/1/2025 |

*Response*

The EPA has incorporated information from these comments and additional feedback from power sector stakeholders and others into the power sector emissions projections that are used in the final photochemical grid modeling (2016v3) where the EPA has reviewed and determined that information to be sufficiently reliable and appropriate for use. We do not include in our baseline modeling projections at Steps 1 and 2 emissions changes at power plants or other emissions sources that are not sufficiently certain to occur, for example, if such projected emissions changes are only anticipated under proposed but not finalized state or federal rules, or where the potential retirement or conversion of units is not sufficiently committed to be considered reliable. A table with the units included in these comments, along with the changes, reflected in the National Electric Energy Data System (NEEDS) is included in a file titled "SIP Approval Comments – EGU Units.xls" contained in the docket for this action. We note that action on Wyoming's SIP submittal is not included in this action, and comments regarding allowance allocations or any other elements of other proposed rules are likewise outside the scope of this action.

### 3.3.2   EPA's Integrated Planning Model (IPM)

*Comments*

**Commenter:** Arkansas Department of Energy and Environment, Division of Environmental Quality

**Commenter ID:** 07

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

For the ptegu sector:

1.  For regional haze purposes, DEQ previously compared future year projections in EPA's 2016v1 platform and the v16.1 future year projections developed by the Eastern Regional Technical Advisory Committee (ERTAC), deciding ERTAC's v16.1 future year projections were more appropriate than EPA's Integrated Planning Model (IPM) future year projections that informed EPA's 2016v1 platform. So it may be informative to conduct a thorough comparison of ERTAC's v16.1(or a future update) and EPA's 2016v2 (or a future update) to evaluate future year projections if EPA continues to choose to use IPM instead of ERTAC.

2.  If EPA choses to continue to use IPM instead of ERTAC, then DEQ suggests that EPA communicate with states to seek any updates and/or corrections prior to conducting IPM modeling as is done by ERTAC.

3.  For some sectors (e.g., solvents, nonpt, nonroad), EPA's 2016v2 platform future year projections utilized Energy Information Agency's (EIA) Annual Energy Outlook (AEO) 2021 data. However, according to the TSD, the ptegu IPM modeling used AEO 2020 data (e.g., demand, gas and coal market assumptions, cost and performance of fossil generation technologies, among others). The latest AEO 2021 was released on February 3, 2021 and DEQ suggests that EPA update the 2016v2 using the latest AEO data in all sectors. Table 4.2 of EPA's 2016v2 TSD reported total 2026 NOx emission for Arkansas as 9,258 tons; however, summing the three files (summer, winter, and wintershld) for both cems and noncems data for the ptegu sector indicates the total 2026 NOx emissions for Arkansas as being 9,273 tons. DEQ did not make this comparison for others states. DEQ suggests that EPA identify the source of the discrepancy in the above example and conduct the same comparison for other states.

4.  IPM modeling for the 2032 future year includes emissions for the Entergy Arkansas White Bluff plant. However, a state and federally enforceable administrative order requires the cessation of coal-fired operations by no later than December 31, 2028 and any possible operation beyond 2028 is unknown and would require future permitting action if ambient air emissions are to be emitted. DEQ suggests that EPA zero out emissions beyond 2028 for Entergy Arkansas White Bluff.

5.  IPM modeling for the 2032 future year includes emissions for the Entergy Arkansas White Bluff plant. However, a state and federally enforceable administrative order requires the cessation of coal-fired operations by no later than December 31, 2028 and any possible operation beyond

2028 is unknown and would require future permitting actions if ambient air emissions are to be emitted. DEQ suggests that EPA zero out emissions beyond 2028 for this facility.

6. IPM 2032 projections show zero NOx emissions for the winter shoulder months (March, April, October, and November) for the Flint Creek, Plum Point, Arkansas Electric Thomas B Fitzhugh Corp, and Harry D. Mattison Power plants in Arkansas. Also, IPM projected zero SO2 emissions for Plum Point, Flint Creek, Union Power Station, and others in 2032 for the winter shoulder months. IPM projected zero NOx and SO2 emissions for Independence plant in 2026 for the same shoulder moths. Historical data consistently shows both NOx and SO2 emissions for all of these facilities in these months. DEQ suggests that EPA re-examine this data and potentially other IPM projections in Arkansas and in other states as DEQ did not evaluate this beyond the above examples.

7. IPM did not project 2026 emissions for the Flint Creek Power Plant, but did project 2032 emissions. We suggest EPA re-examining including 2026 emissions for this facility.

8. IPM did not project 2026 and 2032 ptegu sector emissions for the John W. Turk Power Plant. However, IPM did project 2026 and 2032 ptnonipm sector emissions for this facility of NOx at less than 1 ton and SO2 at less than 1 ton. Historical NOx and SO2 emissions for the John W. Turk Power Plant are presented in Figure 2. EPA should include appropriate 2026 and 2032 ptegu sector emissions and verify the 2026 and 2032 ptnonipm sector emissions for the John W. Turk Power Plant. [Figure 2 available in full comment]

9. IPM did not project 2026 ptegu sector emissions for the Plum Point Energy Station. However, IPM did project 2026 ptnonipm sector for this facility of NOx at 1.96 tons and SO2 at 0.07 ton. Historical emissions for the Plum Point Energy Station are presented in Figure 3. In addition, IPM did project 2032 ptegu emissions, although the 2032 ptegu future year projection was a 62% reduction for SO2 emissions from a 2021 baseline. For the Plum Point Energy Station, EPA should include appropriate 2026 ptegu sector emissions, verify the 2026 ptnonipm sector emissions, and verify the reasonableness of the 2032 ptegu SO2 emissions. [Figure 3 available in full comment]

10. PM 2026 projected NOx emissions from the ARK Elec Co-Op-Oswald Generating Station are Unit G7: 172 tons, Unit G6: 115 tons, and Unit G5: 115 tons. IPM 2032 projected NOx emissions are Unit G7: 160 tons, Unit G6: 107 tons, and Unit G5: 107 tons. Table 1 provides gross load from IPM future year projections and a 5-year average of historical data (2017-2021) for these units. The 2011-2021 historical NOx emissions for these units are provided in Figure 4. EPA should verify the reasonableness of projected 2026 and 2032 NOx emissions for all of this facility's units and potentially for IPM-projected emissions at other facilities. [Table 1 and Figure 4 available in full comment]

**Commenter:** Minnesota Pollution Control Agency

**Commenter ID:** 31

**Docket ID:** EPA-R05-OAR-2022-0006

**Comment:**

Stationary point EGU growth rate differences between the ERTAC vs IPM models

LADCO recognizes that EPA uses the IPM to estimate future year EGU emissions, and that the IPM projection methodology differs from the ERTAC EGU model that is endorsed by the Multi-Jurisdictional Organizations and the majority of the states in the eastern half of the country. Minnesota would also like to indicate our support for the use of ERTAC EGU projections in the 2016v2 EMP and ask EPA to consider replacing IPM projections with ERTAC EGU projections for sources in the LADCO region in subsequent modeling platforms.


**Commenter:** Oklahoma Department of Environmental Quality

**Commenter ID:** 37

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

In addition, ODEQ suggests that EPA model future year emissions from the EGU sector using the Eastern Regional Technical Advisory Committee's (ERTAC) EGU Projections Tool rather than the Integrated Planning Model (IPM). This request is a departure for Oklahoma from our previous request when ODEQ submitted comments on the modeling platform in advance of the CSAPR Update. However, ODEQ has worked more closely with the ERTAC development team and we believe that, at this time, the ERTAC EGU Forecasting Tool does a superior job forecasting hourly emissions, especially on high electricity demand days and better meets Oklahoma's needs as well as those of our sister agencies.


**Commenter:** Texas Commission on Environmental Quality

**Commenter ID:** 42

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

The EPA did not consider all of the information provided to it by the TCEQ.

The TCEQ disagrees with the potential concerns that the EPA raises with regards to the TCEQ's modeling of electric generating units and boundary conditions. The EPA in the "*EPA Region 6 2015 8-Hour Ozone Transport SIP Proposal Technical Support Document*" discusses potential concerns about the electric generating unit (EGU) emissions and boundary conditions in TCEQ's modeling. The EPA fails to acknowledge the additional analysis provided to the EPA via email on June 6, 2016, detailing the differences in 2023 EGU emissions by state in the TCEQ modeling with the various EGU emissions projections available at the time TCEQ's SIP was developed. The comparison showed that the EGU emissions included in TCEQ's modeling were comparable to emissions in EPA's Engineering Analysis and the latest emissions available in the Air Market's Program Database.

**Commenter:** Wisconsin Department of Natural Resources (Attachment – 2021 comments)

**Commenter ID:** 51

**Docket ID:** EPA-R05-OAR-2022-0006

**Comment:**

The EPA should integrate the Eastern Region Technical Advisory Committee (ERTAC) EGU model forecasts into the updated 2016v2 Platform. The WDNR recognizes that EPA uses the Integrated Planning Model (IPM) to estimate future year EGU emissions, and that the IPM projection methodology differs from the ERTAC EGU model that is endorsed by the multi-jurisdictional organizations (MJOs) and the majority of the states in the eastern half of the country. States are using the ERTAC EGU model to consolidate and update technical information for the current State EGU fleets and to forecast the best understanding of how those fleets will change into the future in regard to planned retirements of specific units (e.g., the Wisconsin EGU retirements listed in Table 1 ), changes in fuels by specific units, responses to existing air emissions related regulations (State and Federal), and any planned new installations of retrofit emission control devices.

[(Table 1 is available in the full comment, as well as in WDNR's comment excerpt above.)]


*Response*

The EPA disagrees with commenters who suggest the Integrated Planning Model (IPM) is an inadequate or unreliable modeling tool to analyze the power sector. We conducted the air quality modeling for the final rule incorporating updated EGU emissions projections (available at: https://www.epa.gov/power-sector-modeling/supporting-documentation-2015-ozone-naaqs-actions) reflecting fleet and other input updates as of Summer 2022, which also includes updates from commenters and through the pre-proposal request for input on our emissions inventories.

Several commentors suggested EPA replace its use of the Integrated Planning Model (IPM) with ERTAC. One commentor also suggested that ERTAC is more transparent compared to IPM. IPM, developed by ICF Consulting, is a state-of-the-art, peer-reviewed,[29] multi-regional, dynamic, deterministic linear programming model of the contiguous U.S. electric power sector. It provides forecasts of least cost capacity expansion, electricity dispatch, and emission control strategies while meeting energy demand and environmental, transmission, dispatch, and reliability constraints. The EPA has used IPM for almost three decades to better understand power sector behavior under future business-as-usual conditions and to evaluate the economic and emission impacts of prospective environmental policies. The model is designed to reflect electricity markets as accurately as possible. The EPA uses the best available information from utilities, industry experts, gas and coal market experts, financial institutions, and government statistics as the basis for the detailed power sector modeling in IPM. For the modeling used

---

[29] IPM has been peer reviewed periodically evaluating transparency of inputs and documentation, adequacy of modeling capabilities, and appropriateness of the modeling platform use for regulatory and strategic power sector analysis. The modeling platform and its documentation has consistently been found appropriate and adequate for regulatory analysis by the independent peer reviewers with a lot to commend. The IPM Peer Review of v6 and the Response to Peer Review can be found at: https://www.epa.gov/power-sector-modeling/ipm-peer-reviews

127

in support of the proposed disapprovals, the EPA has provided extensive documentation[30] of the input assumptions and methodology that go into the EPA's use of IPM. For this action, the EPA used an updated version of power sector modeling.[31]

Additionally, EPA staff routinely meets with stakeholders to discuss IPM inputs and results, including comparisons to ERTAC. Therefore, EPA believes IPM, including the versions of IPM projections used at proposal and final, is both transparent and well-suited to analyze EGU emissions while reflecting the impacts of changes to the EGU fleet, projected changes to electricity demand, changes in fuel prices, and state and federal policies as of Summer 2022.

One commenter mentioned that the state's projections of the EGU emissions for 2023 are comparable to the EGU emissions from EPA's engineering analytics tool for 2023.  We agree in general that ERTAC is similar to the "engineering analysis" approach that we have used for some transport applications, such as in the Revised CSAPR Update, in that both are designed to be more rooted in recent operating behavior. However, we observe that IPM is capturing much of this behavior while also accounting for additional economic-based operational changes that may be expected in the future. Indeed, at proposal, the EPA reviewed LADCO modeling using ERTAC, which was relied on by some SIP submissions addressed in this action, particularly the Great Lakes states in Region 5, and that modeling supports the same conclusions regarding those states' linkages as our CAMx modeling using IPM. *See* 87 FR 9838.

Thus, there do not seem to be any apparent differences in the ultimate regulatory results for purposes of this action as between some states' ERTAC-based power sector modeling and the use of IPM, nor have commenters here established such a difference. This is not surprising. In EPA's Revised Cross-State Air Pollution Rule Update for the 2008 Ozone NAAQS (86 FR 23054), EPA reaffirmed its Step 1 and Step 2 findings using an EGU emissions inventory from EPA's engineering analytics tool in conjunction with its air quality assessment tool (AQAT) to estimate air quality impacts and upwind state contributions. The emissions inventory derived through the engineering analytics and subsequent AQAT sensitivity analysis led to the same Step 1 and Step 2 findings as the IPM-based EGU emissions inventory and related CAMx modeling results.

The EPA's documentation includes all the detailed assumptions and data sources that are included as input that is underlying in the version of IPM that is used to help inform power plant air regulatory and legislative efforts for more than two decades. The model has been tailored to meet the unique environmental considerations important to the EPA - including various national (legislative), federal, and state level measures - while also fully capturing the detailed and complex economic and electric dispatch dynamics of power plants across the country. The EPA's goal is to explain and document the Agency's use of the model in a transparent and publicly accessible manner, while also providing for concurrent channels for improving the model's assumptions and representation by soliciting constructive feedback to improve the model. In addition to soliciting feedback, the EPA has also commissioned peer reviews, including of the latest version IPM v6. The recommendations from these peer reviews and the EPA's

---

[30] https://www.epa.gov/power-sector-modeling/documentation-epas-power-sector-modeling-platform-v6-summer-2021-reference

[31] The updated Power Sector Modeling input data, results, and corresponding documentation used for this final action are available at https://www.epa.gov/power-sector-modeling/supporting-documentation-2015-ozone-naaqs-actions.

response are available on the EPA's website (https://www.epa.gov/power-sector-modeling/ipm-peer-reviews). These efforts include making all inputs and assumptions to the model, as well as output files from the model, publicly available on EPA's website and in the regulatory docket.

The EPA has and will continue to discuss modeling inputs and outputs of the IPM and ERTAC projections with any interested parties. We note some differences here. The EGU emissions from IPM are projected at the seasonal level based on economic dispatch, rather than historic behavior. These seasonal values are then temporally allocated (i.e., post-processing IPM outputs based on historical emission patterns) to create hourly emissions for use in the air quality modeling. The ERTAC tool assigns the hourly emissions utilizing historical emissions patterns based on different methods and makes different assumptions about which units will increase/decrease operation in individual hours based on historical operation. Consequently, even if the seasonal emission estimates are identical between IPM and ERTAC on a state, regional, or even unit basis, the final hourly projected emissions will be different and have corresponding different effects on projected air quality. Consequently, when commenters state that ERTAC should be used rather than IPM, they may be preferring the hourly emissions utilized in ERTAC rather than that used by EPA based on the seasonal IPM outputs and EPA's hourly temporal allocation methodology that is independent of IPM. These comments are not specific enough for EPA to make changes to the current temporalization methodology, which we continue to find sufficiently reliable to inform this action.

IPM creates a consistent nationwide projection and can account for effects of regulatory programs that may have differential effects on different units throughout the domain. For example, in IPM, emission budgets reflect the recently finalized Revised CSAPR Update, and account for the changes in unit dispatch relative to units that are not included in the program. The ERTAC tool, while well-refined and consistently updated for particular states or even regions (e.g., LADCO)—and may be appropriately used for air quality modeling by those entities for those areas—is not necessarily appropriate for a nationwide assessment where consistent emissions projections and air quality modeling are necessary.

Arkansas provided several comments regarding the projection of EGU emissions for 2026 and later years. In the proposed action, EPA relied on the same modeling data to support the proposed FIP for the 2015 ozone NAAQS. However, the projections of 2026 and 2032 data are not applicable and were not used for this final action. EPA did incorporate into NEEDS any changes that addressed regulatory, enforcement, permitting, or other operational data affecting EGU units. If those changes occur after 2023, they are not relevant to our action here on state SIP submissions.

ADEQ also provided comments regarding emission values included in the emissions modeling TSD. There are minor differences that transpire when emissions are processed into hourly values input to the air quality model and then summed back up again to provide the summary values in the emissions modeling TSD. This level of difference is negligible and has no impact on the final air quality modeling results.

In response to TCEQ's comment, the EPA searched for the email identified in the comment. The EPA located an email matching the description in the comment provided to EPA on June 6, 2018 (not June 6,

2016 as TCEQ commented), which was after TCEQ and EPA had verbally discussed EPA's review comments and concerns on TCEQ's proposed SIP submission.[32]

In the Evaluation of TCEQ Modeling TSD [33] for the proposed disapproval EPA indicated "TCEQ did not use latest EGU emissions available at the time they proposed the SIP that incorporated reductions from CSAPR Update/latest ERTAC projections in their modeling. It was unclear if this made any substantial changes in the modeling analysis without updating the EGU emissions and redoing the modeling."

One of the attachments to the June 6, 2018 email was a spreadsheet file showing EGU ozone season NOx emissions totals for each state for purposes of TCEQ's modeled years of 2012 and 2023. TCEQ also included in the attachment similar state-wide total EGU NOx ozone season summaries that used a newer version of ERTAC (v 2.7 that was available at the time) for 2011 and 2016; an EPA engineering analysis summary for 2016, CSAPR II Cap[34]; and 2017 Ozone season emissions summary.  TCEQ's 2012 modeled emissions for Texas EGUs that used ERTAC v2.6 is about 10% (5,563 tpy) lower than what TCEQ provided as the CSAPR Update  ozone season NOx.[35] There is also a difference between the 2023 TCEQ modeled emission rates and the 2017 ozone season emission rate-data in EPA's AMPD database, as well as EPA's engineering analysis for 2016, which are both higher than what TCEQ modeled for 2023. It appears that TCEQ subtracted emissions for some coal-fired EGUs that shut down in 2018 in Texas but did not reassess if other facilities would increase emissions due to the shutdowns. We note that there are also changes in the other state emissions totals that could also result in changes in modeled values.

Thus, there are important and unexplained differences in the modeled inventories (both base period and future) that Texas sent compared to the data available in EPA's comprehensive EGU databases. Overall, the EPA's assessment is that the data in the June 6, 2018 email does not change EPA's concerns and conclusions in the Evaluation of TCEQ Modeling TSD related to TCEQ's EGU emissions estimates for 2012 and 2023 in their modeling.

### 3.3.3   Other EGU Inventory-Related Comments

*Comment*

**Commenter:** Midwest Ozone Group

---

[32] Email from TCEQ to EPA June 6, 2018 and attachments have been added to this Docket ID No. EPA–HQ–OAR–2021–0663.

[33] Evaluation of TCEQ Modeling TSD at 71, (EPA-R06-OAR-2021-0801-0002) in Docket ID No. EPA-R06-OAR-2021-0801.

[34] TCEQ labeled as CSAPR II CAP.  It is unclear if this was the CSAPR Update CAP but the values match with information in the CSAPR Update "Allowance Allocation Final Rule TSD"; August 2016 in EPA Docket ID No. EPA-HQ-OAR-2015-0500. TCEQ did not indicate if this represented a specific year emission inventory so it is unclear what year the inventory represented.

[35] Excel Spreadsheet with EPA's review notes is added as a separate document in the docket EPA–HQ–OAR–2021–0663.

**Commenter ID:** 30

**Docket ID:** EPA-R02-OAR-2021-0673, EPA-R03-OAR-2021-0872, EPA-R03-OAR-2021-0873, EPA-R04-OAR-2021-0841, EPA-R05-OAR-2022-0006, EPA-R06-OAR-2021-0801, EPA-R07-OAR-2021-0851, EPA-R08-OAR-2022-0315*, EPA-R09-OAR-2022-0394*, EPA-R09-OAR-2022-0138*

*A condensed version of MOG's comment appears in these dockets

**Comment:**

EPA's modeling and emission inventories must include the control programs and related permitted emission limits on ozone precursors that significantly impact air quality design values in 2023 and beyond.

Downwind states and regulated entities are on an ever-changing path to manage the complex implementation of emissions reductions programs to address local and regional impacts on ambient air quality. EPA's modeling of applicable emission control programs to assess attainment strategies supports the iterative nature of these programs. 87 Fed. Reg. 9,484, 9,494 (February 22, 2022). Private sector and government investments in emission reduction strategies are considerable. As EPA engages in proposed denials of the 2015 Ozone NAAQS Good Neighbor State Implementation Plans, the agency has the burden and obligation to assess both upwind and downwind emissions reductions programs. The modeling relied upon for these proposals; however, EPA fails to provide a wholistic assessment of these emission control requirements.

The following examples are illustrative of the types of emission control programs that EPA must include in the emission inventory that is being modeled to support the proposal disapprovals:

- The Illinois Environmental Protection Agency, as reflected on its website, is currently promulgating several new and older Cook County (ozone nonattainment) pending permit applications (Title V and Federally Enforceable State Operating Permits) to address gas-fired generators, to include emergency generators that had previously not been permitted or recently had been replaced. In certain instances, enforcement actions were initiated to bring the emergency and demand response generators within the regulatory program. EPA does not explain its assessment methodology for these types of emissions reductions relative to Good Neighbor SIP review and assessment. In addition, it appears that EPA did not take into account "The Illinois Energy Law, AKA, Climate and Equitable Jobs Act (CEJA) "as an applicable control program. This new law became effective in September 2021 and significantly limits the emissions of NOx from all existing gas fired EGUs in Illinois. Each unit >25 MW cannot exceed its 3-year (2018-2020) baseline actual emissions on a 12-month rolling basis beginning Oct. 1, 2021. Significantly, the law also requires all coal fired plants to retire no later than 2030.
- The New York State Department of Environmental Conservation ("NYDEC") has developed recent controls for simple cycle and regenerative combustion turbines ("SCCT") or "peaking units" noted by the agency as being inefficient and approaching 50 years of age. Yet, while the agency has estimated controls will result in a 4.8 ppb significant air quality improvement to nonattainment monitors within the New York Metropolitan Nonattainment Area (NYMA), implementation is delayed until 2025 and beyond. NYDEC also recently has imposed NOx

131

controls on distributed generation units, which as with peaking units, has been structured to delay implementation of controls beyond the applicable attainment date as part of the attainment plan proposed for approval by EPA. 87 Fed. Reg. 4,530 (Jan. 28, 2022).

- The Wisconsin Department of Natural Resources, Air Management Program has initiated a number of permitting actions in response to designation of Kenosha County as serious nonattainment. Many of those actions have been implemented as recently as the last 24 months imposing new NOx and VOC emission reductions. It is also noteworthy that some regulated facilities are seeking relief from additional non-attainment reductions in advance of EPA approval of a partial redesignation of Kenosha County as attainment for the 2008 ozone standard. EPA does not explain its methodology for assessing these types of downwind emissions reduction strategies relative to review of Good Neighbor SIP.

EPA's attention also is directed to examples of state and federal air program elements that warrant review by EPA for impact on the efficacy of attainment strategies. The Wisconsin Department of Natural Resources regulations include Chapter NR 436 titled, "Emission Prohibition, Exceptions, Delayed Compliance Orders and Variances." NR 436.03(2)(c) provides,

> Emissions in excess of the emission limitation set in chs. NR 400 to 499 may be allowed in the following circumstances:
>
> (c) The use of emergency or reserve equipment needed for meeting high peak loads, testing of the equipment or other uses approved by the department. Such equipment must be specified in writing as emergency or reserve equipment by the department. Upon startup of this equipment notification must be given to the department which may or may not give approval for continued equipment use.

The Wisconsin regulation is just one example of an exemption that could impact attainment strategies. It is likely there are several other similar provisions in other state programs that warrant careful assessment by EPA.

Consideration of these upwind and downwind state control programs are critical not only to assure the correct modeling results in the future analytical year, but also to allow an assessment of the alignment of the emission reduction burdens of the upwind and downwind states, as will be discussed in the next comment.

*Response*

In response to the commenter's claim that the EPA should incorporate emissions reductions from Illinois's pending permitting actions, it is the EPA's standard practice to only consider emissions reductions from rulemakings or permitting actions that have been finalized. With regards to "The Illinois Energy Law, or the Climate and Equitable Jobs Act", the EPA's 2016v2 modeling used for the Notice of Proposed Rulemaking (NPRM) does not take emissions reductions from this state rule into consideration. However, we have accounted for this law in the 2016v3 modeling. The EPA also notes that the rule's requirement for all coal-fired plants to retire by 2030 would not force emissions reductions by the 2023 ozone season.

In regard to commenter's insinuation that the NYDEC's recent rule requiring controls on certain SCCT units are inappropriately misaligned with the attainment schedule of the NYMA nonattainment area, this is not a relevant comment on the inventory for 2023. However, the EPA notes that the prior approval of the SCCT controls (approved by the EPA as a SIP strengthening measure) is not reopened for consideration by the Agency in this action. The EPA previously responded to the Midwest Ozone Group's (MOG's) comments on the SCCT controls in the notice for that separate final action. *See* 86 FR 43956, 43957-43958 (August 11, 2021). We further respond to MOG's comments on this topic in Section 2 of this document.

In response to commenter's claim that the EPA should incorporate emissions reductions from Wisconsin's pending permitting actions to address the Kenosha County's nonattainment status for the 2008 ozone standard, it is the EPA's standard practice to only consider emissions reductions from rulemakings that have been finalized.

With respect to state and federal regulations that impact the efficacy of attainment strategies, the commentor provided an example of an exemption program in Wisconsin that could potentially be used under emergency or sporadic events. The commentor included text from the regulation but did not provide any examples or data on how it may have been used and its impact on ozone precursor emissions. In addition, the regulation allows for state officials to approve or deny the request. The EPA cannot determine how state officials will react or address this during these emergency or sporadic events. The EPA has incorporated any applicable EGU control programs developed by the states, including for the state of Wisconsin, into its projections and modeling. A listing and discussion of these regulations and control programs can be found in chapter three of the EPA's documentation for IPM. This can be viewed at https://www.epa.gov/system/files/documents/2021-09/table-3-30-state-power-sector-regulations-included-in-epa-platform-v6-summer-2021-refe.pdf.  For non-EGUs, the point source inventory includes state-submitted routine emissions data for calendar year 2019 is used as the basis for the projected 2023 emissions along with impacts of unit closures and control programs in the intervening years. Emissions in excess of permitted limits could occur during specific, typically short-term, periods of time and those emissions would be included in the inventories provided by the state if they were reported as routine emissions.


*Comment*


**Commenter:** Midwest Ozone Group

**Commenter ID:** 30

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

EPA's intention to revise its emission inventory and to conduct new air quality modeling without allowing an appropriate opportunity for stakeholder review and comment is inappropriate

EPA notes in the proposed disapprovals that, after the modeling it conducted in support of earlier transport rules, e.g., CAIR, CSAPR, CSAPR Update, CSAPR Closeout, and Revised CSAPR Update, the agency revised the emission inventory used in the modeling to assess the efficacy of prior transport rules. EPA conducted new modeling using the revised inventory. The agency describes the process as follows:

> Following the Revised CSAPR Update final rule, the EPA made further updates to the 2016 emissions platform to include mobile emissions from the EPA's Motor Vehicle Emission Simulator MOVES3 model 17 and updated emissions projections for electric generating units (EGUs) that reflect the emissions reductions from the Revised CSAPR Update, recent information on plant closures, and other sector trends. The construct of the updated emissions platform, 2016v2, is described in the emissions modeling technical support document (TSD) for this proposed rule. (emphasis added).

In December 2021, MOG and other stakeholders submitted detailed comments on the 2016v2 emission inventory platform in an effort to correct errors that existed in that platform. EPA's efforts to revise this emission inventory platform at this time raises the question about whether EPA intends to update the modeling that has been used as the basis for the SIP disapprovals and the proposed FIP -but only in support of the final rule.

While MOG urges EPA to rely on modeling that accurately reflects current on-the-books regulatory requirements and up-to-date emission inventories, we strenuously object to the possibility that EPA would conduct any such additional modeling to support a final rule and not provide the opportunity for that data to be reviewed, analyzed and commented on in advance of any final decision on the subject SIP disapproval (or for that matter the related proposed FIP). These concerns were also expressed earlier, in July 2021, by several MJOs (Westar, LADCO, SESARM, MARAMA, and CENSARA).

*Response*

In response to commenters' assertion that it is inappropriate for EPA to conduct new air quality modeling without allowing for an additional opportunity for stakeholder review and comment, EPA disagrees with this in a number of ways. First, as explained in Sections III.A.1. and V.A.4. of the preamble, EPA solicited comment on its inventories and modeling in a number of venues stretching from September 2021 to the close of the comment period of four disapproval actions in July 2022. EPA has, in response to the updated information received, developed an updated modeling run based on the 2016v3 emissions modeling platform, to take this updated information into consideration to inform EPA's final actions. Where EPA has felt it warranted, EPA has incorporated the updated information into its emissions inventories to best project future air quality conditions and take informed final action on the SIPs.

Other issues raised by this comment are addressed in the following sections in this RTC document: Sections 1.7 (Length of the Comment Period).

# 4   Air Quality Modeling

## 4.1   Modeling Design - General

*Comment*

**Commenter:** Texas Commission on Environmental Quality

**Commenter ID:** 42

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment**:

The EPA also fails to acknowledge that the TCEQ provided additional information summarizing the change in modeled ozone contribution at monitors attributable to boundary conditions when boundary conditions accounted for changes in future year emissions. The EPA did not request additional analyses or express concerns with TCEQ's modeling after the additional information was provided in June 2018.

*Response*

TCEQ commented that an email and two spreadsheets (one discussing statewide EGU emissions and another spreadsheet documenting 2012 and 2023 boundary conditions contributions to receptors that Texas identified in their modeling) were provided to EPA on June 6, 2016. EPA searched and found the email was actually sent June 6, 2018 after TCEQ and EPA had verbally discussed EPA's review comments and concerns on TCEQ's proposed SIP.  This information was provided before the final SIP was submitted. The EPA has reviewed these files and found this information does not result in a change in EPA's overall review of TCEQ's SIP nor does it resolve the other issues the EPA identified that make TCEQ's SIP not approvable.  TCEQ's EGU emissions spreadsheet is addressed in Section 3.3.3.

Regarding boundary conditions, we had noted in the Evaluation of TCEQ Modeling TSD[36] that TCEQ had used 2023 emissions from a modeling scenario that included some estimated changes based on climate modeling. Our analysis indicated the actual impact could not be quantified based on the information provided by TCEQ but that the actual impact of using these modified boundary conditions were expected to be a relatively small contribution to the total modeled concentrations in TCEQ's transport SIP modeling and would not be expected to significantly change the total model concentrations.

One of the attachments to the June 6, 2018 email was a spreadsheet file showing boundary condition contributions to receptors that TCEQ identified as having a greater than 0.7 ppb contribution from Texas emissions in their 2023 modeling. The boundary conditions source apportionment results provided by TCEQ to the EPA included the 2012 and 2023 average boundary conditions at each receptor identified by TCEQ in Colorado, California, and Arizona in their SIP. The 10 days modeled for the future design value calculations were used by TCEQ. The 10-day average change in contributions from boundary conditions

---

[36] Evaluation of TCEQ Modeling TSD at 76.

in 2012 compared to 2023 ranged from a 0.08 ppb decrease to a 1.11 ppb increase at these receptors.[37] The percent change (i.e., 2023 values compared to 2012 values) in boundary condition contributions on average for these 10 days ranges  from a slight decrease of 0.4% to a maximum increase of 3.9%.  While for most receptors the contribution from boundary conditions increased, overall, the increase in 2023 is relatively small compared to the total contribution from boundary conditions. These would be even smaller changes compared to the total modeled concentration taking into account all contribution sources. Thus, our assessment of these values comports with our view in the Evaluation of TCEQ Modeling TSD that we did not expect this information to result in large changes to total ozone modeled concentrations. Overall, the EPA's current assessment (Changes in total boundary conditions contribution were -0.4% to 3.9%) is that the data in the June 6, 2018 email does not change the EPA's overall assessment of TCEQ's SIP.

### 4.1.1   Modeling Design - Lake Michigan

*Comments*

**Commenter:** Air Pollution Control Program, Missouri Department of Natural Resources

**Commenter ID:** 01

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

The Air Program notes that recent studies aimed at improving the understanding of the cause of high ozone concentrations near Lake Michigan have been conducted in recent years. EPA must incorporate the knowledge learned in these studies into updated modeling before such modeling could be used for such significant regulatory determinations as the proposed disapproval of Missouri's SIP, or the proposed FIP. The Lake Michigan Ozone Study released in May of 2019, is likely the most comprehensive and current study about ozone concentrations in this region of the country. In the study, there are recommendations for a finer grid resolution in the modeling to better characterize and predict ozone concentrations in this area of the county. With the low model performance and the significant costs of the regulatory outcomes that are based on the modeling, EPA must follow this recommendation and seek to re-model this region using a finer grid than the 12 km grid currently included in EPA's updated modeling. At a minimum, EPA should use a 4 km grid and preferably a 1.33 km grid around all maintenance and nonattainment receptors in order to help improve model performance in this region of the country.

Other findings of the Lake Michigan Ozone Study reveal that NOx emissions, particularly from upwind states like Missouri, may have little to no impact on ground-level ozone concentrations in the region where the receptors that Missouri is linked to are located. This is because on high ozone days, ozone

---

[37] Excel Spreadsheet "BCAPCA-Attribution Change between Base-and-Future EPA R6 notes.xlsx" in Docket EPA–HQ–OAR–2021–0663.

levels in these areas are sensitive to changes in emissions of volatile organic compounds (VOC) and not NOx. Regions where this is the case are often referred to as being VOC-limited areas. Figure 2, from the study shows that the areas where the monitors that Missouri is linked to in the updated modeling are VOC-limited on high ozone days. This means that reductions in NOx emissions will have little-to-no impact on reducing ozone concentrations at these problem monitors. Therefore, it follows that NOx emissions from Missouri are not the cause and cannot be the basis for EPA's proposed disapproval of our SIP nor the foundations for the imposition of new NOx controls in a FIP to address Missouri's good neighbor obligations.

This technical information was available during EPA's updated modeling efforts, and calls into question EPA's typical modeling practices for this SIP disapproval action. EPA must reform the model for this region of the country before the modeling can be used to justify disapproving Missouri's SIP. Further, the proposed "fix" in the federal plan takes none of this information into account. If the receptors where Missouri is linked to are VOC-limited, as this study indicates, any assertion that NOx emissions in Missouri are significantly contributing to nonattainment or interfering with maintenance at these downwind receptors is flawed on a technical and foundational level.

**Commenter:** Ameren Missouri

**Commenter ID:** 05

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

In order to capture the inland penetration of the lake breeze (WRF-CHEM) needs accurate Lake Michigan water temps and correct model physics options. EPA's use of the Pleim-Xiu Land Service Model (LSM) (EPA, 2022) does not adequately capture the lake breeze inland penetration (Abdioskouei & et al, 2019). Use of NOAH LSM does a much better job at capturing the lake breeze inland penetration.

USEPA's proposed disapproval of the Missouri Good Neighbor SIP for the 2015 Ozone Standard errs by not evaluating and including most recent scientific studies on ozone formation along Lake Michigan (2017 Lake Michigan Ozone Study (LMOS 2017)).

[...]

Nowhere in USEPA's proposed disapproval of the Missouri Good Neighbor SIP does USEPA analyze or even mention the LMOS 2017 study or the resulting data. USEPA ignores the wealth of information collected during the LMOS 2017 study and the resulting peer reviewed research published as a result. Nowhere in the docket for the proposed disapproval of the Missouri Good Neighbor SIP (Docket ID: EPA-R07-OAR-2021-0851) does EPA mention LMOS 2017. Nowhere in the Technical Support Document for the updated modeling EPA now references as an independent basis for asserting that Missouri emissions are now linked to two nonattainment and one maintenance monitor(s) near Lake Michigan in Wisconsin and one maintenance monitor on the Chicago, IL Lakeshore does EPA discuss the implications and findings of LMOS 2017 study on the ability of the regional modeling conducted by EPA to reproduce the chemistry of ozone production at the Lake Michigan Land/Water interface.

137

[…]

USEPA fails to mention the LMOS 2017 study or its relevance to the modeling underlying this action. This failure to evaluate the results of LMOS 2017 and incorporate the scientific improvements identified by the peer reviewed and published research resulting from that study is a critical error. EPA has an obligation to evaluate LMOS 2017 as it pertains to the proposed disapproval of the Missouri Good Neighbor SIP.

USEPA's proposed disapproval of the Missouri Good Neighbor SIP for the 2015 Ozone Standard is arbitrary and capricious because it relies on Ozone Modeling inconsistent with the scientific findings from the LMOS 2017.

[…] Because the model as used by USEPA is not properly set up to handle the complex chemistry and meteorology at the shores of Lake Michigan, it cannot accurately characterize ozone concentrations at the monitors to which USEPA tries to link to Missouri emissions.

In order to capture the inland penetration of the lake breeze (WRF-CHEM) needs accurate Lake Michigan water temps and correct model physics options. EPA's use of the Pleim-Xiu Land Service Model (LSM) (EPA, 2022) does not adequately capture the lake breeze inland penetration (Abdioskouei & et al, 2019). Use of NOAH LSM does a much better job at capturing the lake breeze inland penetration.

[…]

Modeling performed by USEPA (EPA, 2022) and the LMOS 2017 study (Abdioskouei & et al, 2019) both showed a significant negative bias in predicted ozone concentrations along the Lake Michigan shoreline. LMOS 2017 study researchers/scientists have experimented with increasing anthropogenic VOC emissions and decreasing anthropogenic NOx emissions. These changes to the model emission inventory inputs improved air quality model performance reducing the negative bias. VOC speciation and spatio-temporal release patterns should also be reviewed. This evaluation by the LMOS 2017 participants indicates that the USEPA model choices result in the model being unable to properly reproduce the chemistry of ozone production and the VOC/NOx ratios at the monitors along the Lake Michigan shoreline. These are the same monitors that USEPA now proposes to determine are linked to Missouri emissions in this proposed SIP disapproval.

USEPA's failure to assess and incorporate the peer reviewed studies and scientific data resulting from the LMOS 2017 and utilize the findings from that study to properly model ozone source apportionment is arbitrary and capricious.

[…]

Peer reviewed research conducted utilizing the data collected during the LMOS study in 2017 indicates that Lake Michigan ozone episodes have a significant VOC limited component. In contrast, USEPA claims the 2016v2 air quality modeling conducted for the newly proposed FIP shows that ozone pollution is "largely NOx limited".

**Commenter:** Midwest Ozone Group

**Commenter ID:** 30

**Docket ID:** EPA-R02-OAR-2021-0673, EPA-R03-OAR-2021-0872, EPA-R03-OAR-2021-0873, EPA-R04-OAR-2021-0841, EPA-R05-OAR-2022-0006, EPA-R06-OAR-2021-0801, EPA-R07-OAR-2021-0851

**Comment:**

Furthermore, to adequately capture the inland penetration of the lake breeze, the LMOS report also cites the need for accurate Lake Michigan water temperatures and correct model physics options. EPA's use of the Pleim-Xiu Land Service Model (LSM) 15 does not adequately capture the lake breeze inland penetration. A review of wind vector observations (from the Meteorological Assimilation Data Ingest System (MADIS) network16) compared to modeled wind vectors on RRF and significantly contributing days at nonattainment monitors highlights the differences in wind direction and speed during many hours of these predicted high ozone episodes.

*Response*

The EPA disagrees with these comments.  While the Lake Michigan Ozone (LMOS) 2019 preliminary report,[38] which describes the analyses of data from the LMOS 2017 field campaign, provides valuable scientific insights into some of the fine-scale meteorological conditions and chemistry that affect the formation and advection of high ozone concentrations onshore from over Lake Michigan, the study was not designed to quantify or evaluate the impacts on ozone exceedances at monitors along the lake from more distant sources in upwind states. For instance, during the 2017 LMOS field campaign there were no upwind aircraft or land-based measurements of ozone and precursor concentrations aloft to quantify transport of pollutants into the Lake Michigan area. Also, the April 2019 report is characterized by the authors as "preliminary", and the report notes that meteorological modeling sensitivity tests are on-going. Regarding the use of the Pleim-Xiu Land Surface Model, there is no quantitative information in the report that compares the performance of this method to the NOAH LSM.[39] In view of the exploratory nature of the on-going analyses of the LMOS field campaign measurements and modeling, it would be inappropriate and impractical for the EPA to change course and change how we develop meteorology for air quality modeling for this final action based on the preliminary information in this report.

Responses to comments on the relevance of local-scale chemical regimes, fine-scale modeling, and model performance for this final action can be found in section 4.2.

*Comment*

**Commenter:** City Utilities of Springfield, Missouri

**Commenter ID:** 13

---

[38] 2017 Lake Michigan Ozone Study (LMOS) Preliminary Finding Report, April 22, 2019.
https://www.ladco.org/wp-content/uploads/Research/LMOS2017/LMOS_LADCO_report_revision_apr2019_v8.pdf
[39] National Centers for Environmental Prediction, Oregon State University, Air Force, Hydrology Lab-NWS (Noah) Land-Surface Model (LSM) User's Guide (May 2011). https://www.jsg.utexas.edu/noah-mp/files/Users_Guide_v0.pdf

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

Modeled inputs for Missouri sources should be reviewed and adequately scrutinized.

*Response*

The EPA has reviewed the base year and projected emissions from Missouri as part of our response to comments on the emissions data the EPA used as input to the air quality modeling at for the proposed SIP disapprovals. As a result of this review, the EPA has made numerous updates to the emissions inventories used as input to the final rule air quality modeling. Information on these updated emissions can be found in the 2016v3 Emissions Modeling TSD, which is in the docket for this final rule, as well as in Section 3 of this RTC and in Section III of the preamble.

*Comment*
**Commenter:** City Utilities of Springfield, Missouri

**Commenter ID:** 09

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

EPA's selection of four (4) new modeled receptor sites along the Lakeshore area should have been thoroughly vetted with the MDNR Air Program.

*Response*

See Section V.A.4. of the preamble for our general response on the use of updated modeling and responses to additional comments on the topic in Section 1.4.

*Comment*
**Commenter:** City Utilities of Springfield, Missouri

**Commenter ID:** 09

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

The SIP disapproval, and by extension the EPA's proposed FIP, overestimates MO's "good neighbor" contributions while diminishing localized anthropogenic NOx sources. Recent LADCO studies indicate problems with EPA model "over prediction" which need to be investigated and resolved.

*Response*

The commenter does not identify or provide any information to support the claim that the EPA "overestimates" Missouri's contribution while diminishing localized anthropogenic $NO_x$ sources. Although this comment did not provide any specific information to identify the "recent LADCO studies," the EPA's response to comments that rely upon the preliminary findings from the 2017 Lake Michigan Ozone Study are provided elsewhere in Section 4.1.1. Comments regarding the substance of the EPA's proposed 2015 ozone Good Neighbor Rule are beyond the scope of this action.

*Comment*

**Commenter:** City Utilities of Springfield, Missouri

**Commenter ID:** 09

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

Additional NOx reductions in Missouri and particularly southwest Missouri will not result in improved ambient concentrations in updated model runs at receptors in Wisconsin or along Lake Michigan north of Chicago, Illinois.

*Response*

We first note that this action does not impose any emissions reduction for sources in Missouri. To the extent that commenters imply that a lack of air quality impacts on downwind receptors from reduced upwind emissions in Missouri is reason to approve the State's SIP, we disagree.

The EPA disagrees that $NO_x$ emissions from Missouri are not impacting receptors along Lake Michigan or that reductions of those emissions in Missouri would not reduce ozone concentrations at those receptors. We first note that this rule does not impose any emissions reduction for sources in Missouri. To the extent that commenters imply that a lack of air quality impacts on downwind receptors from reduced upwind emissions in Missouri is reason to approve the State's SIP, we disagree. To illustrate, the EPA points to the source apportionment modeling to quantify the contributions from EGU emissions in each state in 2026, as described in the air quality modeling TSD used to support the EPA's April 2022 proposed 2015 ozone Good Neighbor Rule. Because emissions are generally projected to be higher in 2023 than 2026, and this analysis is only focused on EGU emissions (rather than all anthropogenic ozone-precursor emissions in Missouri), this analysis provides a helpful indicator of the extent of impact of $NO_x$ emissions from Missouri on other states, including receptors around Lake Michigan. Figure 4-1 shows the spatial field of average contributions from EGUs in Missouri calculated using the contributions on the top-10 ozone concentrations days in each 12x12 km model grid cell. The figure shows that emissions from EGUs in Missouri have widespread regional impacts including locations along Lake Michigan in Wisconsin and Michigan in the areas north of Chicago, Illinois, where receptors have been identified in the EPA's 2011, 2016v2, and 2016v3 based modeling. Based on this analysis, controls on

Missouri EGUs would lower the contribution from these sources and thereby improve ozone concentrations in these areas.



*Figure 4-1 Contribution from EGU emissions in Missouri on average for the top-10 ozone concentrations days in 2026*

*Comment*

**Commenter:** City Utilities of Springfield, Missouri

**Commenter ID:** 09

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

The current model runs show that Missouri's contribution to ground level ozone at these receptors is approximately 1 ppb, which is within the margin of error of the model. Assessment of significance contribution from Missouri that is tied to 1% or 0.7 ppb is beyond the model's capability.

*Response*

The response to comments on the EPA's use of a 1 percent of the 2015 Ozone NAAQS contribution screening threshold at Step 2 of the 4-step interstate transport framework can be found in Section V of the preamble for this final action and in section 4.3 of the RTC.

*Comment*

**Commenter:** City Utilities of Springfield, Missouri

**Commenter ID:** 09

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

Upon further inspection, the design value at each receptor indicates a downward trend (especially during the last two years), even as Missouri utility ozone season NOx emissions increased in 2020 and 2021. This is inconsistent with EPA's presumption that Missouri utilities contribute significantly to nonattainment or interfere with maintenance of the standard. The following table summarizes the most recent available trends.

| Monitor Receptors | 2016-2018 DV | 2017-2019 DV | 2018-2020 DV |
|---|---|---|---|
| Kenosha - Water Tower | 77 | 74 | 74 |
| Chiwaukee Prairie Stateline | 79 | 75 | 74 |
| Racine - Payne & Dolan | 78 | 74 | 73 |
| Evanston Water Plant | 77 | 75 | 75 |

*Response*

Firstly, the EPA has not found in this action that Missouri has significant contributions to downwind receptors, rather the EPA identified that Missouri is "linked" above the Step 2 contribution threshold to downwind receptors and thereby is potentially significantly contributing to nonattainment or interference with maintenance, but the state failed to properly analyze emissions reduction opportunities despite its linkage. The EPA's evaluation of Missouri's SIP submission was explained at proposal. 87 FR 9533, 9540-9544 (February 22, 2022). Second, the commenter did not provide Missouri EGU ozone season $NO_x$ emissions in 2020, 2021 or any prior years to support this comment's claim. In response to this comment the EPA analyzed the ozone season EGU $NO_x$ emissions for Missouri available from the EPA Power Sector Programs Progress Report web site.[40] The ozone season EGU $NO_x$ emissions for 2000, 2010, 2020, and 2021 are provided in Table 4-1.  These data show that EGU $NO_x$ emissions in Missouri exhibit a long-term downward trend, however that trend has flattened since 2010, with only slightly lower emissions in the 2020 ozone season compared to 2021.

---

[40] https://www3.epa.gov/airmarkets/progress/reports/index.html

143

*Table 4-1 Ozone Season NOx Emissions from EGUs in Missouri*

| 2000 | 2010 | 2020 | 2021 |
|------|------|------|------|
| 65,569 | 25,467 | 21,234 | 20,080 |

This trend alone does rebut the conclusion of the EPA's analysis at Steps 1 and 2 that Missouri is linked to one or more downwind receptors and that additional emissions reductions may be warranted to eliminate "significant contribution." Additional comments on air quality factors are addressed in Section 8.5 (Air Quality Factors).

*Comment*

**Commenter:** Midwest Ozone Group

**Commenter ID:** 30

**Docket ID:** EPA-R02-OAR-2021-0673, EPA-R03-OAR-2021-0872, EPA-R03-OAR-2021-0873, EPA-R04-OAR-2021-0841, EPA-R05-OAR-2022-0006, EPA-R06-OAR-2021-0801, EPA-R07-OAR-2021-0851

**Comment:**

EPA's modeling fails to recognize the inadequacy of EPA's approach to addressing downwind nonattainment with the 2015 ozone NAAQS.

Review of historic emission changes and observed design values at linked downwind nonattainment monitors in Connecticut and Wisconsin indicates that controls associated with recently applied regulation and strategies to reduce NOx emissions from upwind EGU sources has nominal impact on ozone formation. As seen in the Figure 1 below, the relative design values at key receptors in 2020 is about the same (ratio near 1.0) compared to 2011. In contrast, EGU NOx emissions (yellow bar) from upwind CSAPR states have been reduced by over 65 percent in this same period and onroad NOx emissions (blue bar) from these states have been reduced by over 60 percent. All other anthropogenic categories (red bar) show a NOx emission reduction of only 27 percent over this period.

[(bar chart in full comment)]
Figure 1. Relative ozone season NOx emission reduction from CSAPR identified upwind states and ozone design values at downwind receptors in Wisconsin and Connecticut between 2011 and 2020.

These data demonstrate that recent control strategies, directed toward regional EGU NOx emissions are not having the intended impact on downwind ozone concentrations. In support of this observation, recent ozone source apportionment modeling of state-source sector contribution by Alpine Geophysics shows small ozone contribution from NOx emissions from EGUs. Given the relatively small contribution of EGU NOx and even smaller contribution of non-EGU NOx to ozone concentrations at relevant monitors predicted by USEPA's modeling platform, additional control of emissions from either sector will have little, if any, impact on ozone concentrations at these downwind receptors.

Several downwind nonattainment monitors in urban areas around Lake Michigan have recently been shown to be largely unresponsive to ozone reduction strategies consisting of regional interstate NOx

control and that high ozone days in the region were predominantly VOC-limited in nature. This was demonstrated in multiple ozone episodes extensively evaluated in the Lake Michigan Air Directors Consortium (LADCO) Lake Michigan Ozone Study (LMOS) 2017 study where ozone precursor measurements indicated relative increases in VOC concentrations with increases in ozone and where biogenic VOC increases outpaced those of anthropogenic VOC.

In contrast to the peer reviewed research resulting from the 2017 LMOS data collection effort, EPA recently documented its support for additional NOx controls in stating that its "review of the portion of the ozone contribution attributable to anthropogenic NOX emissions versus VOC emissions from each linked upwind state leads the Agency to conclude that the vast majority of the downwind air quality areas addressed by the proposed rule under are primarily NOX-limited, rather than VOC-limited." [footnote: 87 Fed. Reg. 20,076 [Proposed FIP]] However, the current situation is that the modeling as conducted does not accurately characterize ozone levels on high ozone days, underpredicting by 10 + ppb, which is a huge error. Other studies indicate that, in order to better match actual conditions, the model needs less NOx and higher windspeeds at lower levels. The model is therefore telling us that *less* NOx means *more* ozone. That also means that, proportionally, the attribution of ozone to out of state NOx predicts a higher impact than is actually occurring.

The modeled VOC and NOx emission tracers in EPA's Anthropogenic Precursor Culpability Assessment (APCA) modeling can give a general indication of the VOC/NOx sensitivity, but EPA assigning definitive numerical values to that sensitivity provides inaccurate projections, especially using APCA that is known to have a bias toward attributing ozone to NOx emitting anthropogenic sources under VOC sensitive conditions. As documented in the CAMx v 7.10 User's Guide, "when ozone formation is due to biogenic VOC and anthropogenic NOx under VOC-limited conditions (a situation where OSAT would attribute ozone production to biogenic VOC), APCA attributes ozone production to the anthropogenic NOx present. Using APCA instead of OSAT results in more ozone formation attributed to anthropogenic NOx sources and less ozone formation attributed to biogenic VOC sources." Here, it is believed that as applied in this case (with biogenic emissions as an uncontrollable source group), EPA has overestimated the efficacy of NOx controls on these receptors as modeled results have a bias toward attributing more ozone formed to NOx emissions than VOC emissions.

*Response*

The commenter asserts that ozone concentrations at downwind monitoring sites in Wisconsin and Connecticut are not trending downward despite concomitant $NO_x$ emissions reductions in upwind states. In response, the EPA analyzed the ozone trends over the past 10 years (i.e., 2012 to 2021) at 8 downwind monitoring sites located along or near coastal Connecticut and 11 downwind monitoring sites along or near the shoreline of Lake Michigan, including 8 sites in Wisconsin and 3 sites in Michigan. The monitoring sites included in this analysis are identified in Table 4-2.  Each of these sites had a 2012 measured design values exceeding the 2015 ozone NAAQS. Table 4-2 also provides the percent *reduction* in ozone design values by site from 2012 to 2021.  Contrary to the claim by the commenter, the reductions are not near zero. Overall, the average reductions from 2012 to 2021 at the sites in Connecticut, Wisconsin, and Michigan are 7.3 percent, 13.1 percent, and 11.3 percent, respectively.

Each of these monitoring sites has seen a downward trend in design values over the most recent 10-year period, as illustrated in Figure 4-2, 4-3, and 4-4.

*Table 4-2 Percent reduction in design values from 2012 to 2021 at monitoring sites in coastal areas of Connecticut, Wisconsin, and Michigan*

| Connecticut Monitoring Sites | Percent Reduction in Design Value |
|---|---|
| 090010017 Greenwich | 4% |
| 090011123 Danbury | 16% |
| 090013007 Stratford | 5% |
| 090019003 Westport | 6% |
| 090079007 Middlesex | 8% |
| 090090027 New Haven | 5% |
| 090099002 Madison | 6% |
| 090110124 Groton | 10% |
| *Average* | 7% |

| Wisconsin Monitoring Sites | Percent Reduction in Design Value |
|---|---|
| 550290004 Door Co | 10% |
| 550590019 Chiwaukee | 12% |
| 550710007 Manitowoc Co | 15% |
| 550790010 Milwaukee - S Health Center | 15% |
| 550790085 Milwaukee - Bayside | 15% |
| 550890008 Milwaukee - Grafton | 11% |
| 550890009 Milwaukee - Harrington | 9% |
| 551170006 Sheboygan - Kohler Andrae | 17% |
| *Average* | 13% |

| Michigan Monitoring Sites | Percent Reduction in Design Value |
|---|---|
| 260050003 Allegan Co | 11% |
| 260210014 Berrien Co | 13% |
| 261210039 Muskegon Co | 10% |
| *Average* | 11% |

146



*Figure 4-2 Ozone design value trends (ppb) at monitoring sites near coastal Connecticut*



*Figure 4-3 Ozone design value trends (ppb) at monitoring sites near the shoreline of Lake Michigan in Wisconsin*



*Figure 4-4 Ozone design value trends (ppb) at monitoring sites near the shoreline of Lake Michigan in Michigan*

It is important to recognize that trends in ozone design values reflect the combined effects of changes in ozone precursor emissions (i.e., NO$_X$ and VOC) and interannual variability in ozone conducive meteorology. In this regard, we considered the effects of meteorology on ozone concentrations in order to reveal the response of ozone to changes in precursor emissions. A recent published analysis describes a technique to analyze trends in ozone concentrations adjusted for interannual variability in meteorological conditions (Wells, et al.).[41] This technique adjusts monitored maximum daily average 8-hour (MDA8) ozone concentrations for meteorological effects using various statistical and mathematical methods, further explained in the Well, et al. analysis, to enable the analysis of the long-term trends in ozone concentrations due to changes in precursor emissions. Specifically, the technique provides meteorological adjusted MDA8 ozone values (mean, median, 90th percentile, and 98th percentile) for monitors in the continental U.S. Of particular interest is the 98th percentile values as they generally align with 4th High MDA8 monitored ozone concentrations that are used in calculating design values.

The EPA analyzed the "met-adjusted" 98th percentile MDA8 ozone concentrations for the monitoring sites in Table 4-2 for the years 2010 through 2021. In addition, we separately analyzed the met-adjusted 98th percentile data for the 3 nonattainment receptors in Coastal Connecticut (i.e., Greenwich, Madison, Stratford, and Westport). For each of these four areas we calculate the multi-monitoring site average

---

[41] Wells, B., Dolwick, P., Eder, B., Evangelista, M., Foley, K., Mannshardt, E., et al. (2021). Improved estimation of trends in U.S. ozone concentrations adjusted for interannual variability in meteorological conditions. *Atmospheric Environment*, *248*, 118234.

measured and met-adjusted 98th percentile MDA8 ozone concentrations for each of the years from 2010 through 2021. We then used the resulting yearly average 98th percentile concentrations to calculate three-year running average measured and met-adjusted concentrations. The resulting area-wide average measured and met-adjusted 98th percentile MDA8 ozone concentrations are illustrated in Figures 4-5, 4-6, 4-7, and 4-8. The average 98th percentile trends show that the met-adjusted concentrations have much less interannual variability and exhibit a more consistent downward trend in each of the three areas. Considering that the trends in met-adjusted data provides a clear indication of the decrease in ozone concentrations from reductions in emissions, we disagree with the commenter's contention that recently applied regulation and strategies to reduce $NO_x$ emissions from upwind EGU sources has had a nominal impact on ozone formation.



*Figure 4-5 Trends in 3-year running average measured and met-adjusted 98th percentile ozone concentrations aggregated for 8 monitoring sites near the shoreline of coastal Connecticut*



*Figure 4-6 Trends in 3-year running average measured and met-adjusted 98th percentile ozone concentrations aggregated for 4 receptor sites along coastal Connecticut*



*Figure 4-7 Trends in 3-year running average measured and met-adjusted 98th percentile ozone concentrations aggregated for 8 monitoring near the shoreline of Lake Michigan in Wisconsin*



*Figure 4-8 Trends in 3-year running average measured and met-adjusted 98th percentile ozone concentrations aggregated for 3 monitoring sites near the shoreline of Lake Michigan in Michigan*

The EPA is not requiring any emissions reductions in this action, and comments on the substance of the proposed 2015 ozone Good Neighbor Rule, such as proposed $NO_x$ controls, are beyond the scope of this rulemaking. However, to the extent the commenter is making these arguments to dispute this final action, the EPA disagrees with the commenter's claims that ozone contributions from EGU and non-EGU $NO_x$ emissions are relatively small and that additional controls from either sector would have little, if any, impact on ozone concentrations at downwind receptors in Connecticut and Wisconsin. To illustrate, the EPA points to the source apportionment modeling for EGUs and for non-EGUs by state using the projected emissions for 2026 in 2016v2 (before accounting for proposed controls in the FIP), as described in the Air Quality Modeling Technical Support Document (AQM TSD) for the proposed 2015 ozone Good Neighbor Rule. Tables 4-3 and 4-4 provide the percent of anthropogenic contribution from EGU plus non-EGU emissions for each of the 13 upwind states linked to receptors in Connecticut and Wisconsin, based on the proposed 2015 ozone Good Neighbor Rule air quality modeling for 2026. The data indicate that contributions from EGUs and non-EGUs are 20 to 50 percent of the state total anthropogenic contribution for all but 3 of these states (i.e., Maryland, New Jersey, New York). Since contributions from EGUs and non-EGUs represent a non-trivial portion of the overall state total contribution, we would expect that EGU and non-EGU emissions reductions would provide meaningful improvements in ozone concentrations at downwind receptors. Nonetheless, the EPA reiterates that the proposed 2015 ozone Good Neighbor Rule is not being used as a benchmark for assessing SIP submissions in this action.

*Table 4-3 Percent Contributions from Upwind States Linked to Connecticut Receptors*

| Connecticut | IN | KY | MD | MI | NJ | NY | OH | PA | VA | WV |
|---|---|---|---|---|---|---|---|---|---|---|
| 090010017 Greenwich | - | - | - | 37% | 10% | 14% | 36% | 31% | - | - |
| 090013007 Stratford | 36% | 50% | 18% | 37% | 11% | 15% | 37% | 32% | 21% | 39% |
| 090019003 Westport | 53% | 50% | 19% | 29% | 11% | 18% | 32% | 23% | 20% | 36% |
| 090099002 Madison | 34% | 48% | 18% | 33% | 13% | 13% | 36% | 33% | 22% | 37% |

*Table 4-4 Percent Contributions from Upwind States Linked to Wisconsin Receptors*

| Wisconsin | IL | IN | MI | MO | OH | TX |
|---|---|---|---|---|---|---|
| 550590019 Chiwaukee Prairie | 24% | 33% | 32% | 37% | 35% | 22% |
| 550590025 Kenosha | 15% | 55% | 29% | 26% | 36% | 21% |
| 551010020 Racine | 16% | 54% | 30% | 36% | 35% | 21% |

The commenter refers to the 2019 preliminary report on the Lake Michigan Ozone Study (LMOS) 2017 field campaign which was conducted "to address persistent violations of the ozone NAAQS in the coastal communities along the western shore of Lake Michigan" and claim that downwind nonattainment monitors in urban areas around Lake Michigan have recently been shown to be largely unresponsive to ozone reduction strategies consisting of regional interstate $NO_x$ control and that high ozone days in the region were predominantly VOC-limited in nature.

The EPA disagrees with this comment. First, the 2017 LMOS field study supporting the LMOS 2019 preliminary report focused on local ozone production and photochemical plume transport over the lake and along the shoreline, not the effects of regional transport. While the report concluded that local ozone production at the Zion measurement site near Chicago was VOC limited, ozone production at the measurement site in Sheboygan was $NO_x$-limited on half of the days with high ozone measurements. Second, the analysis in the report identified the presence of two different *local* photochemical regimens driving ozone production at the Sheboygan LMOS site which indicates the potential for different causes of high observed ozone. The LMOS 2019 preliminary report also states, "On high ozone days, the lowest lakeshore ozone concentrations are typically found in the areas with high emissions of nitrogen oxides (NOx), such as in central Chicago and northwestern Indiana. The highest concentrations are found downwind of the high NOx sources in rural and suburban coastal areas." Third, the LMOS 2019 preliminary report notes that "regional background is characterized by elevated $H_2O_2/HNO_3$ ratios (used to infer NOx vs VOC-limited conditions), suggestive of NOx-limited ozone production." Thus, the results of the LMOS 2017 field study, as described in the report, field study actually *support* a conclusion that upwind regional $NO_x$ reductions combined with local $NO_x$ and VOC reductions would be an effective approach for reducing high ozone concentrations in this area.

Regarding the comment about "the modeling" underpredicting ozone concentrations by 10+ ppb on high ozone days, it is not clear whether the commenter is referring to modeling performed as part of the LMOS 2017 field campaign or the EPA's 2016v1 or 2016v2 modeling.  The EPA has made substantial updates to its 2016-based modeling platform in response to public comments. These updates have significantly improved model performance. The EPA's response to comments on the EPA's model performance can be found in Section III of the preamble, and in Section 4.2 (Model Performance).

The commenter also refers to "[o]ther studies" that the commenter claims indicate that, in order to better match actual conditions (i.e., improve model performance), the model needs less $NO_x$ and higher windspeeds at lower levels. However, the commenter fails to identify these other studies. The commenter concludes from these other studies that "the model is therefore telling us that less NOx means more ozone. That also means that, proportionally, the attribution of ozone to out of state NOx predicts a higher impact than is actually occurring."

Assuming the commenter may be referring to the LMOS preliminary report, the EPA recognizes that this report does describe emissions perturbation air quality model runs which show improved model performance on the June 2, 2017 high ozone day at both the Zion field study site and a monitoring site in Chicago by reducing baseline $NO_x$ emissions by 50 percent and increasing hydrocarbon (HC) emissions by a factor of 5. However, the applicability of these results is very limited and must be viewed with the understanding that the baseline emissions for the LMOS modeling were derived from emissions for 2011, not 2017 - which was when the field study was conducted. As described in the LMOS 2019 preliminary report, the 2011 NEI $NO_x$ emissions were uniformly reduced by 28 percent in an attempt to account for changes in emissions between 2011 and 2017, while VOC emissions from 2011 were used without any adjustment. A comparison of 2011 vs 2017 NEI $NO_x$ and VOC emissions for the three states within the field study modeling domain (i.e., Illinois, Indiana, and Wisconsin) indicates that 2017 $NO_x$ emissions were 38 percent lower, and VOC emissions were 18 percent lower in 2017 compared to 2011. In addition, the relative change in emissions between 2011 and 2017 varied by sector such that a uniform scaling factor applied to 2011 would not necessarily provide a representative estimate of the spatial distribution of emissions in 2017. Thus, the results of the LMOS emissions sensitivity runs are not immediately or inherently relevant to other air quality model applications, and these results, which are dependent on the emissions assumptions for the LMOS modeling and applicable to photochemistry within the local area, do not provide information to judge the attribution or impacts of upwind state $NO_x$ emissions on ozone concentrations at receptors within the Lake Michigan area.

The commenter also claims that the Anthropogenic Precursor Culpability Assessment tool (APCA) in the CAMx model, which the EPA used to quantify upwind state contributions to downwind receptors at Step 2 of the 4-step interstate framework, is biased toward attributing more ozone to $NO_x$ emissions and, as a result, EPA has overestimated the potential efficacy of $NO_x$ controls on these (Lake Michigan area) receptors. The EPA notes that the Agency is not defining "significant contribution" at Step 3 for any state covered by this action. To clarify the issue raised by the commenter, however, the EPA notes that the CAMx Ozone Source Apportionment Tool (OSAT) and APCA use the ratio of the production rates of hydrogen peroxide and nitric acid as the indicator to classify ozone formation as being limited by $NO_x$ or VOC. This ratio is used in OSAT to assign ozone production to sources of $NO_x$ versus sources of VOC depending on the magnitude of this ratio. Ozone formation is classified as being $NO_x$-limited when the

ratio is less than the 0.35 and VOC limited when the ratio is above this threshold.[42] As stated in the CAMx User's Guide, the APCA tool operates similar to OSAT, except that

> APCA recognizes that certain emissions categories are not controllable (e.g., biogenic emissions) and that apportioning ozone production to these categories does not provide information that is relevant to development of control strategies. To address this, in situations where OSAT would attribute ozone production to non-controllable emissions, APCA re-allocates that ozone production to the controllable precursors that participated in ozone formation with the non-controllable precursor. For example, when ozone formation is due to biogenic VOC and anthropogenic NOx under VOC-limited conditions (a situation where OSAT would attribute ozone production to biogenic VOC), APCA attributes ozone production to the anthropogenic NOx present. Using APCA instead of OSAT results in more ozone formation attributed to anthropogenic NOx sources and less ozone formation attributed to biogenic VOC sources.[43]

Considering the construct and purpose of APCA, as stated by the model developers, EPA does not agree with the comment that using APCA overstates the efficacy of $NO_X$ controls. *See also Wisconsin*, 938 F.3d at 323-24 (upholding use of APCA approach to apportionment).

The EPA's response to comments on model performance and fine scale modeling can be found in Section 4.2 (Model Performance).

## 4.1.2   Modeling Design - Western States

*Comment*

**Commenter:** PacifiCorp (Attachment – Ramboll Evaluation)

**Commenter ID:** 38

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

**Missing Emissions in Proposed Transport Modeling Results in Overstating Utah's and Wyoming's Ozone Contribution to Receptors in the DM/NFR NAA**

The Proposed [FIP] Transport Rule CAMx modeling failed to include $NO_X$ emissions from lightning (LNOx). This is particularly important in the Front Range area of Colorado where summer thunderstorms regularly occur. Emissions from lightning can be a significant source of $NO_X$ concentrations and resultant ozone formation. Zhang and co-workers (2003) estimate that 5% of the annual and 14% of the summer $NO_X$ emissions in the U.S. comes from lightning. Kang and co-workers (2020) analyzed the effects of

---

[42] Ramboll Environment and Health, January 2021, *http://www.camx.com*.

[43] Ramboll Environ, 2021. User's Guide Comprehensive Air Quality Model with Extensions version 7.1, www.camx.com. Ramboll Environ International Corporation, Novato, CA.

including LNOx emissions and found they were particularly important for simulating ozone in the U.S. Mountain West States (MWS), which include Colorado, Utah and Wyoming, and found LNOx emissions could increase MDA8 ozone concentrations by up to 17 ppb and concluded "summertime surface-level O3 levels in the MWS region could be significantly influenced by lightning NOx." (Kang et al., 2020). If naturally occurring LNOx emissions were included in the Proposed [FIP] Transport Rule CAMx modeling that would increase the total MDA8 ozone concentrations at the DM/NFR NAA receptors resulting in a reduced Utah and Wyoming Contributions Factors and lower Utah and Wyoming ozone contributions to 2023 and 2026 ozone design values at the DM/NFR NAA receptors.

*Response*

Although this comment is directly about the proposed 2015 ozone Good Neighbor Rule, the EPA sees it as relevant for 2016v3 modeling generally. As described in Section III.A.2 of the preamble, the EPA included $NO_x$ emissions from lightning strikes in the 2016v3 emissions inventory used for the air quality modeling of this final action. The method for including these emissions in the modeling is described in the 2016v3 Emissions Modeling TSD which can be found in the docket for this final action.

*Comment*

**Commenter:** PacifiCorp (Attachment – Ramboll Evaluation)

**Commenter ID:** 38

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

EPA developed the 2016v2 modeling platform 2016, 2023, 2026 and 2032 model-ready emissions for the CMAQ model and converted them to the CAMx format using a CMAQ2CAMx emissions converter. In doing the CMAQ to CAMx emissions conversion for the Proposed [FIP] Transport Rule CAMx modeling, EPA dropped methane (CH4) emissions and some secondary organic aerosol (SOA) precursor species. The SOA precursors probably have minimal effect on ozone formation but methane acts like a low reactive VOC in ozone formation so in higher concentrations can affect and increase ozone concentrations. Since methane is not classified as a VOC it is not included in many criteria pollutant emissions inventories. Methane is treated two ways in CAMx. First, there is a global background value of 1.75 ppm was used in CAMx v7.1, which was the version in the Proposed [FIP] Transport Rule. Note that the global background methane in CAMx was recently updated to 1.85 ppm in the April 2022 release of CAMx v7.2. Second, there is an excess methane species (ECH4) in the CAMx model that is added to the global background methane in the photochemical mechanism. When running a CMAQ2CAMx converter, the CMAQ methane species is typically mapped to the CAMx ECH4 species, but EPA failed to do this and dropped the CMAQ methane emissions. The Denver-Julesburg (D-J) Basin is a large oil and gas (O&G) development and production area that partly resides in the DM/NFR ozone NAA. The D-J basin O&G sources emit methane emissions that should have been included in the Proposed Transport Rule CAMx modeling. If EPA had included ECH4 emissions in the Proposed Transport Rule CAMx modeling that would have increased the 2023 and 2026 total MDA8 ozone concentrations at receptors in the DM/NFR

NAA thereby reducing the CF and Utah's and Wyoming's ozone contributions to 2023 and 2026 ozone design values at the three nonattainment/maintenance receptors in the DM/NFR NAA.

*Response*

The EPA disagrees with this comment. First, the comment is speculative. The commenter provided no analyses, data, or references to support their hypothesis that including a higher amount of global background methane or adding methane emissions in EPA's modeling would have increased model predicted ozone concentrations in the Denver area or decreased ozone contributions from Utah or Wyoming to those receptors. Moreover, the commenter fails to acknowledge that the ozone source apportionment tools in the latest version of CAMx are not designed to include methane emissions. Thus, it is not possible to quantify the impact of methane emissions using this model. Furthermore, the commenter is focused on the contribution to local ozone production of methane emissions from oil and gas production in Colorado but fails to consider the contributions from methane emissions from oil and gas production in both Utah and Wyoming.  Following the commenter's logic, adding methane emissions in the EPA's modeling would *increase*, not decrease the contributions from these two states to receptors in Denver.

## 4.2   Model Performance

### 4.2.1   Model Performance at Lake Michigan

*Comments*

**Commenter:** Air Pollution Control Program, Missouri Department of Natural Resources

**Commenter ID:** 01

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

The updated modeling to identify the newly linked receptors is performing outside the acceptable range for model performance and cannot be used as the basis for disapproving Missouri's SIP

Complex photochemical modeling applications must be high-performing and technically sound to make determinations at Step 1 and Step 2 of EPA's framework, where the results are used to justify billions of dollars of new regulatory costs. Without a well-performing model, the technical foundation and basis does not exist for determining: first the need for new control requirements (Steps 1 and 2), and second the stringency level of the new control requirements (Step 3).

[…]

While the updated modeling has resolved all of the linkages that Missouri was required to analyze at step 2 in our SIP submission, the updated modeling also identified four new receptors to which Missouri

is linked at Step 2. Figure 1, displays these four newly identified receptors that Missouri is linked to in the updated modeling. While EPA's model is not performing within one percent in any region of the country, as may very well be needed to justify the use of a one percent threshold at Step 2, the model is not even performing within well-establish acceptable ranges in the only region of the country (Upper Midwest) where Missouri is still linked to problem receptors in the updated modeling. All four of the newly identified receptors are located near the shoreline of Lake Michigan (one in Chicago, IL and three in Wisconsin). While EPA's model performance evaluation shows that on a nationwide basis, it meets the established acceptable criteria for model performance, in Missouri's case there is only one region of the country where there are linked receptors at Step 2, and the model performs the worst in this region and outside the acceptable range, as discussed below.

[…]

The acceptable ranges for photochemical model performance are outlined in the 2017 document titled *Recommendations on statistics and benchmarks to assess photochemical model performance*. The document includes the following recommended benchmarks for model performance statistics for MDA8 levels for ozone:

• Normal mean bias (NMB) goal: less than or equal to ±5 percent;

• NMB criteria: less than or equal to ±15 percent;

• Normal mean error (NME) goal: less than or equal to ±15 percent; and

• NME criteria: less than or equal to ±25 percent.

In January of 2022, EPA released a document to accompany the updated modeling titled *Air Quality Modeling for the 2016v2 Emissions Platform Technical Support Document*. Table A-1 of this document [available in full comment] provides the NBE and the NME associated with the updated modeling for all the climate regions of the country. In the Upper Midwest, the NMB for all days with MDA8 above 60 ppb is -19.1 percent and the NME for these days is 19.5 percent. This shows that for this region of the country the model is performing outside the both the goal and acceptable criteria for NMB and outside the goal but within the acceptable criteria for NME. In addition, in EPA's document titled *CAMx 2016v2 MDA8 O3 Model Performance Stats by Site*, it shows that the model is also severely underperforming for the four specific receptors linked to Missouri in the updated modeling. The NMB at the Cook County, IL receptor is -14.50 percent with an NME of 15.20 percent. The NMBs at the two Kenosha County, WI receptors are -24.36 percent and -18.94 percent with NMEs of 25.29 percent and 18.94 percent. The NMB for the Racine County, WI receptor is -23.49 percent with an NME of 24.16 percent. These values are all outside established model performance goals, and the model is performing outside the acceptable range at each receptor with respect to NMB (except for the Illinois receptor where the NMB is within 0.5 percent of the acceptable criteria limit). With a model that is so severely underperforming at the only receptors where Missouri is linked, it cannot be acceptable to use the modeling results as the technical foundation to establish linkages at Step 2, which will result in the imposition of billions of dollars of control costs for Missouri sources.

**Commenter:** Ameren Missouri

**Commenter ID:** 05

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

5. The modeling used to determine Missouri's "significant contribution" to nonattainment in USEPA's step 2 is shown by USEPA's own data that it cannot accurately predict ozone concentrations at the monitors critical to the Missouri SIP. This inaccuracy is significant enough that use of the model without changes to link Missouri emissions to nonattainment is arbitrary and capricious.

[Paraphrase: Modeling is too inaccurate to reliably establish a link based on an evaluation of the model outputs for the monitors critical to the MO SIP on days used to establish the relative contribution factor.

The performance of USEPA's modeling at the Lake Michigan monitors is so poor, that USEPA cannot rely on the results based on an Alpine assessment of modeling files.]9. USEPA's use of the RCF and RRF to determine MO's significant contribution compounds the modeling inaccuracies

The USEPA's post processing of model data to estimate future year design values as well as state contributions to those future years utilizes two values calculated based on model outputs for various future modeled days. The first is the Relative Reduction Factor (RRF) which the modeling TSD for the FIP describes as the fractional change in the modeled MDA8 ozone between the base and future year. The RRF is calculated as the average of the ratios of the future year modeled MDA8 ozone concentrations to the modeled top 10 base year (2016) MDA8 ozone concentrations. As detailed earlier, at monitor locations along land water interfaces like the Lake Michigan shoreline, the USEPA CTM has difficulty reproducing observed ozone concentration in the base year (2016). The inability to reproduce the actual observed concentrations in the base year is an error that is carried forward in the models calculation future year MDA8 ozone concentrations. The error can be estimated based on the normalized mean error of the base year modeled MDA8 ozone concentrations of the days used to calculate the RRF. The RRF which is the average ratio of the two modeled concentrations on the top 10 modeled base year concentrations has the same relative error. The RRF is then multiplied by the actual observed ozone design value for the base year (2016) to estimate the future year design value for that monitor location. The error in the design value calculation is equal to the normalized mean error for the RRF calculation.

Similarly, the Relative Contribution Factor (RCF) for a state is the average of the ratio of the modeled future year Ozone Source Apportionment Tool (OSAT) output for a state by the total modeled concentration for the top 10 future year modeled days. The error in the RCF calculation is similar to the RRF error. The RCF error can be estimated based on the normalized mean error of the base year modeled MDA8 ozone concentrations of the days used to calculate the RCF.

When USEPA then multiplies the RCF by the future year design value (which is based on the RRF calculation) it is compounding (multiplying) the error in the RCF by the error in the RRF. The result is that the error in the estimate of a state's contribution is larger than the sum of the errors for the RCF and the RRF.

**Commenter:** Association of Electric Companies of Texas, BCCA Appeal Group, Texas Chemical Council and Texas Oil & Gas Association

**Commenter ID:** 11

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

EPA's modeling underlying its assessment of TCEQ'S modeling is erroneous, arbitrary and capricious.

EPA's 2016v2 modeling platform demonstrates systematic bias and error in predicting ozone in the Chicago and Lake Michigan areas and is not an adequate tool to establish the purported linkage between Texas and the Chicago areas that EPA identified. EPA's 2016v2 modeling does not pass well-accepted performance standards in air quality planning, and cannot be the basis for a reasoned decision on Texas's SIP. The performance of EPA's 2016v2 modeling in the upper Midwest disqualifies it as a predictor of future design values and contributions at these sites. As noted in the attached analysis prepared by Sonoma Technology, EPA's modeling platform has dramatic bias and errors as a predictor of ozone in the Midwest. Such inaccuracies affect EPA's Relative Response Factor ("RRF"), which is then used to project future year design values, and can result in the model mistaking the response to emissions changes. In other words, a model with this level of bias and error tends to portray more controls as being needed to demonstrate modeled attainment than are actually necessary to attain or maintain the NAAQS. This is just one potential consequence of relying on a model with these performance problems. The directionality of the effects cannot be known, and thus regulatory decisions cannot reliably be based on results from such modeling. Because the model is performing so poorly, it is unreliable to determine whether any controls are necessary to address interstate transport between Texas and the upper Midwest. As the CAA only requires that a Good Neighbor SIP contain "adequate provisions" to prohibit significant contributions to nonattainment or interference with maintenance of the NAAQS, such inaccuracies in EPA's model point to overcontrol of upwind sources. Such a result is contrary to the CAA and cannot support disapproval of Texas's SIP.

**Commenter:** Association of Electric Companies of Texas, BCCA Appeal Group, Texas Chemical Council and Texas Oil & Gas Association (Attachment – Sonoma Technology)

**Commenter ID:** 11

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

The Water Tower Site in Kenosha shows that the model is not capturing the highest observed MDA8 through most of the ozone season. For example, the second-highest ozone day of the season is underestimated by approximately 30 ppb, and the model entirely missed the early season multi-day ozone episode in late-May. The Chicago-Alsip site shows a similar inability of the model to capture high ozone, but mostly in the months of May and June when a large number of the highest MDA8 ozone occur. Additionally, the model fails to capture the highest observed MDA8 concentration of the ozone

159

season and underestimates this August day by approximately 20 ppb. At the Chicago-Evanston site, the model also inaccurately predicts high ozone episodes in May and June.

The inaccuracies at these key sites in EPA's 2016v2 modeling demonstrate a systematic performance problem with the 2016v2 platform at these sites in the Chicago and Lake Michigan areas, especially during the spring. This is an important issue given that these monitors are linked to emissions from up to 6 upwind states in the proposed rulemaking. EPA concludes that the "days with high modeled concentrations are generally also days with high measured concentrations…", but this conclusion is less meaningful if the model is inaccurately predicting the MDA8 ozone on those days at these sites. The average of the top 10 MDA8 modeled ozone days is used to calculate the Relative Response Factor (RRF), which is used to project base design values to the future year. But days with modeled MDA8 ozone ≤ 60 ppb, which could be erroneously missed due to the substantial bias in EPA's model, would be excluded. Thus, for example, the ozone event at Kenosha – Water Tower in late May would be missed in the RRF calculations. As emphasized in EPA's attainment modeling guidance, the use of the model in a relative sense helps to mitigate the effect of model biases on individual days. However, negative bias in the model's ozone performance can still contribute to a bias in the RRF (Hu et al., 2021). If the RRF is biased high, the model will underpredict the response to emissions changes, and thus more emission controls would be needed to demonstrate modeled attainment. This is just one potential consequence of relying on a model with these performance problems. The magnitude and directionality of biases in the RRF (and thus the predicted future-year design values) were not evaluated for this modeling platform, but regulatory decisions cannot reliably be based on modeling results from sites in the upper Midwest that are demonstrating a systematic performance problem. Hu et al. (2021) also emphasize the importance of good model performance (particularly having a low bias) in air quality management.

In attainment planning, performance "benchmarks" are used to provide an appropriate and consistent context to assess general confidence in the modeling results and for judging the suitability of a model for a particular application. EPA does not recommend using these benchmarks as a "pass/fail" indicator, but statistical results that are outside the range of the benchmarks often indicate performance issues that call into question the suitability of the model and thus should be addressed. According to EPA, about two-thirds of other recent peer-reviewed and regulatory air quality modeling applications had NMB less than ±15% and NME less than 25% for ozone. This defines a benchmark of reasonable ozone model performance. At several upper Midwest ozone monitoring sites, the bias (NMB) is substantially greater than ±15% (and as large as -24.4%) and the error (NME) approaches 25%. In terms of ozone concentrations, the mean bias is as large as -17.1 ppb at the Kenosha Water Tower Site, which is substantial given that the mean observed ozone was 70.1 on days when MDA8 ozone was 60 ppb or greater.

In summary, EPA's 2016v2 modeling platform performs poorly at sites in the upper Midwest that are linked to Texas in the proposed disapproval. The 2016v2 platform, as presented in the proposal documentation, does not reliably predict ozone formation at these upper Midwest monitors.

Figure 1. [available in full comment]

High ozone episodes in the Great Lakes region are strongly tied to the complex lake-land breeze circulation patterns that influence the formation and transport of ozone in the region, especially at monitoring sites within a few kilometers of the lakeshore. As a result, photochemical grid models have

160

difficulties reproducing high ozone events in this region (Qin et al., 2019). A further complexity is that the Chicago area is one of the few regions in the United States where ozone is still characterized at times by "VOC-limited" chemistry, which can dampen the responsiveness of ozone to NOx emission controls (Koplitz et al., 2021). EPA's 2016v2 modeling for the proposed Transport Rule was conducted using a 12 km by 12 km spatial grid resolution. Spatial resolution of the underlying model may be one reason why EPA's 2016v2 platform performed poorly on high ozone days in the Great Lakes region. A finer resolution grid would be needed to fully resolve the atmospheric features in these complex regions (LADCO, 2017).

*Other modeling platforms [such as TCEQ's 2012 based modeling] show better model performance than EPA's 2016v2 modeling.*

Other attainment modeling platforms have outperformed EPA's 2016v2 platform in the Lake Michigan region. As an example, Table 4 shows the model performance of MDA8 ozone ≥ 60 ppb for TCEQ's 2012-based platform, used in TCEQ's Transport SIP, at the sites in the region that EPA linked to Texas using its 2016 platform. The TCEQ platform predictions show better model performance across the sites that EPA linked to Texas. NMB for these sites using the TCEQ platform ranges from -4.59 to 2.78% and NME ranges from 10.22% to 14.48%. At the Kenosha – Water Tower site specifically, the TCEQ platform shows less NMB by almost a factor of 5 (-4.59% TCEQ vs. -24.36% EPA) and less NME by a factor of 2 (11.22% TCEQ vs. 25.29% EPA).

Table 4. [available in full comment]


**Commenter:** Evergy, Inc.

**Commenter ID:** 21

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

Another major concern is underperformance of the updated modeling that links Missouri to the newly identified receptors. This model is not sufficiently accurate for the Upper Midwest when compared to the goal and acceptable criteria for the normal mean bias. Similarly, the model exceeds the goal for normal mean error outlined in the acceptable ranges for photochemical model performance in the 2017 document titled *Recommendations on statistics and benchmarks to assess photochemical model performance*. This underperformance has immense consequence when considering that a small shift in the model to move above or below the 1 percent of the 2015 ozone standard has an impact equivalent to millions of dollars on Missouri residents.


**Commenter:** Oklahoma Department of Environmental Quality

**Commenter ID:** 37

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

The table below further exemplifies the problem of modeling sensitivities. It contains data for the ozone monitors located in the Illinois portion of the Chicago, Illinois-Indiana-Wisconsin Nonattainment Area. Note that of the 12 ozone monitors, only one Site 170310032 exceeds the 1% NAAQS threshold of 0.7 ppb. This site barely exceeded the contribution threshold, measuring at 0.75 ppb. This measurement could be misleading since Site 170310032 is located less than 0.2 miles from Lake Michigan. This calls into question the accuracy of the contribution as the location could be greatly influencing the results as models often have difficulties near water-land boundaries. Furthermore, the average of the Oklahoma impact for the 12 monitors equates to 0.41 ppb, well under the 1% limit.

[Table is available in full comment]

**Commenter:** The Luminant Companies

**Commenter ID:** 44

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

Specifically, as explained in the analysis prepared by Sonoma Technology that is attached to the comments submitted by the Association of Electric Companies of Texas, BCCA Appeal Group, Texas Chemical Council, and Texas Oil & Gas Association, EPA's 2016v2 modeling has a significant bias for receptors in the Ohio Valley and Midwest, including Illinois and Wisconsin, which makes it unreliable for purposes of projecting future design values in these areas.  This bias would in turn impact EPA's Relative Response Factor ("RRF") and can cause the model to underpredict impacts from changes in emissions. Essentially, as applied to Texas, EPA's model would require emission reductions beyond those necessary to achieve attainment in downwind states because the biased RRF makes it appear that additional controls are needed when, in fact, they are not.

This constitutes unlawful overcontrol with respect to Texas and cannot form the basis for disapproval of Texas's SIP. In contrast, the modeling platform used by TCEQ has been shown to have better model performance and be more accurate for receptors in the Ohio Valley and Midwest and particularly the Lake Michigan region. Accordingly, EPA provides no technically justified basis to second-guess TCEQ's model in favor of its own flawed modeling.

**Commenter:** Midwest Ozone Group

**Commenter ID:** 30

**Docket ID:** EPA-R02-OAR-2021-0673, EPA-R03-OAR-2021-0872, EPA-R03-OAR-2021-0873, EPA-R04-OAR-2021-0841, EPA-R05-OAR-2022-0006, EPA-R06-OAR-2021-0801, EPA-R07-OAR-2021-0851

**Comment:**

The problem monitors in Connecticut, Wisconsin, and Illinois are not properly characterized by EPA's modeling since they are located at the interface between land and water.

EPA's ozone attainment modeling guidance states that:

> "[t]he most important factor to consider when establishing grid cell size is model response to emissions controls. Analysis of ambient data, sensitivity modeling, and past modeling results can be used to evaluate the expected response to emissions controls at various horizontal resolutions for both ozone and PM2.5 and regional haze. If model response is expected to be different (and presumably more accurate) at higher resolution, then higher resolution modeling should be considered. If model response is expected to be similar at both high and low(er) resolution, then high resolution modeling may not be necessary. *The use of grid resolution finer than 12 km would generally be more appropriate for areas with a combination of complex meteorology, strong gradients in emissions sources, and/or land-water interfaces in or near the nonattainment area(s)*" (emphasis added)

EPA's modeling in support of the proposed disapprovals simulated a national domain using a 12km grid resolution domain wide. While this makes running a national, regional simulation easier from a technical perspective, it neglects the important issue of the complex meteorology and/or land-water interfaces in or near the nonattainment or maintenance monitors of interest. Indeed, EPA's choice of a 12 km grid is an arbitrary choice in contravention of its own guidance when modeling Illinois, Wisconsin, and Connecticut monitors because these monitors are at landwater interfaces.

Photochemical modeling along coastlines is complex for two reasons. First, the temperature gradients along land/water interfaces can lead to localized on-shore/off-shore flows; and secondly, the photochemical model formulation spreads the emissions in a grid cell throughout the full grid volume of the cell.

Figures 4 and 5 present two unique areas in the eastern U.S. that is challenged by these complex meteorologic issues at land-water interfaces. For each monitor associated with this proposed rule and located in Connecticut along the Long Island Sound (Figure 4) and in Wisconsin and Illinois along the shore of Lake Michigan (Figure 5), EPA's published model performance evaluation (MPE) metrics for ozone have been reviewed on a day specific basis.

[image in full comment]

Figure 4. Long Island Sound shoreline monitors located on land/water interface.

[image in full comment]

Figure 5. Lake Michigan shoreline monitors located on land/water interface.

Studies indicate that air quality forecast models typically predict large summertime ozone abundances over water relative to land and that meteorology around Lake Michigan and the Long Island Sound is distinctly unique; both shortcomings warrant individualized attention and a finer grid resolution to best explore actual conditions.

The 3x3 neighborhood of grid cells used in determining the design values of the relative response factor (RRF) at land-water interface monitors extends into the noted water bodies. Under current guidance, the top ten modeled days within this 3x3 matrix are used in determining this RRF for each monitor with any cell identified as 50 percent or more water, except for cells including monitors, which are omitted from the calculations.

When the individual days selected for RRF calculation are reviewed at many of these monitors, it is seen that the performance of the model to replicate observed concentrations are outside of comparable acceptable ranges. Table 1 below provides a list of top 10 days at the Kenosha monitor in Wisconsin and comparisons of daily modeled maximum daily average 8-hour ozone concentrations (highlighted in green) and observations on the same date in 2016. These are the dates selected in EPA's modeling to represent highest modeled days used in estimating future year design values.

As can be seen in these Tables, several days selected for RRF calculation have modeled ozone concentrations that fall outside of normally acceptable normalized bias (NBias) boundaries (±15%), either because of over (positive bias) or under (negative bias) predictions compared to observed concentrations on those days. In fact, at the Kenosha monitor example below, four of the ten selected days fall outside of the ±15% bias metric (highlighted in orange in the Table below).

[Table 1 available in full comment]

The LMOS 2017 study also shows that for Lake Michigan coastal monitors the air quality model even at a 4 km resolution does not simulate the proper timing and structure of the land/lake breeze or the inland penetration of elevated ozone concentrations. A review of this LMOS study states "To reproduce the timing and magnitude of the ozone time series at coastal monitors, ozone production over the lake must be correctly simulated; furthermore, details of the lake breeze must be accurate——timing, horizontal extent, and vertical structure." Based on recommendations from the LMOS 2017 study research team, a horizontal resolution of at most 1.3 km is required to reasonably resolve the complex meteorology of the air/water interface for the great lakes and coastal ocean areas. The LMOS 2017 Study researchers believe that a 1.3 km grid spacing will assist in the resolution of the large ozone concentration gradients that often occur along the shoreline as well as the inland penetration of the lake breeze circulation.

Similar results are seen at the example Fairfield, Connecticut nonattainment monitor (Table 2) where again four of the ten days are outside of the ±15% normalized bias range; including the top modeled day at the receptor (modeled value of 91.64 ppb and an observed value of 67.13 ppb).

[Table 2 available in full comment]

As these examples show, days where modeled ozone was predicted at concentrations differing up to ± 24 ppb are being used to estimate future year ozone concentrations and to make determinations of nonattainment, maintenance, and significant contribution from upwind sources.

[…]

On many days with relatively simple meteorology, EPA-developed wind fields using the Weather Research and Forecasting (WRF) Model agree with the MADIS observed winds. However, the modeled winds have strong disagreement with the observed meteorology on June 15, July 7, July 27 and August

4, 2016, the four days when the CAMx model predicted the highest ozone concentrations and are thus used in estimating RRFs and future year ozone design values. The following presents an example on August 4, 2016, the day with the highest model estimated MDA8 ozone concentrations at the Kenosha, Wisconsin monitor.

In Figures 6 through 8 below, the black wind vectors are the wind fields used in the CAMx model. For clarity only every third grid cell is presented. The red vectors are the hourly observed wind vectors from the MADIS archive. The hourly results from 1200 CDT through 1600 CDT are presented in these Figures. The observations clearly show a broad persistent land to lake flow long the Wisconsin shoreline while the model shows a persistent lake to land flow in this same region during this same period. For this timeframe, when the model is estimating the highest ozone for the ozone season at this receptor, the model has the winds flowing from the lake to the shore while the observations are winds flowing from the shore to the lake.

[Figures 6-10 available in full comment]

In addition to grid size resolution and complex meteorology issues, modeling performed by EPA17 and the LMOS 2017 study both showed a negative bias in predicted ozone concentrations in the Lake Michigan region. LMOS 2017 study researchers have experimented with increasing anthropogenic VOC emissions and decreasing anthropogenic NOx emissions. These emission changes improved air quality model performance reducing the negative bias. VOC speciation and spatio-temporal release patterns should also be reviewed. This evaluation by the LMOS 2017 research scientists indicates there are significant errors in the quantity and speciation of the VOC/NOx emissions used in the EPA's air quality modeling platform to characterize state contribution to ozone in Step 2 of EPA's analyses linking these states to critical nonattainment monitors.

For these reasons, EPA must consider finer grid resolution modeling over the Lake Michigan domain to adequately capture ozone formation and significant contribution at receptors located on complex land-water interfaces because model evaluation shows that the model fails to adequately characterize ozone production at these monitors. Absent a wholesale revision of EPA's modeling protocol, MOG believes that EPA's use of modeling with poor performance at critical monitors amounts to an arbitrary and capricious decision when used to establish linkages under Step 2.


**Commenter:** Xcel Energy

**Commenter ID:** 52

**Docket ID:** EPA-R05-OAR-2022-0006

**Comment:**

Minnesota Pollution Control Agency (MPCA) 2015 Ozone NAAQS State Disapproval Comments:

Xcel Energy endorses the comments filed by the Minnesota Pollution Control Agency (MPCA) in response to EPA's SIP disapproval for Minnesota. In addition to EPA not including all the NOx emission reductions taking place within the state, the EPA erred in the approach taken modeling the influence

Lake Michigan has on receptor sites located near the air/water shoreline boundaries, which was factored into the modeling performed by Lake Michigan Air Directors Consortium (LADCO) supporting Minnesota's SIP submittal. We understand that other parties, such as Midwest Ozone Group (MOG), will provide more detail on this matter in their comments.

**Commenter:** Xcel Energy

**Commenter ID:** 52

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

Texas Commission on Environmental Quality (TCEQ) 2015 Ozone NAAQS State Disapproval Comments:

Xcel Energy endorses the comments filed by the Texas Commission on Environmental Quality (TCEQ) in response to EPA's SIP disapproval for Texas. The EPA erred in the approach taken to modeling the influence Lake Michigan has on the receptor sites located near the air/water shoreline boundaries in Cook County Illinois, Kenosha, and Racine Wisconsin, which was factored into the modeling performed by both TCEQ, further supported by comments filed by the Association of Electric Companies of Texas (AECT) and the associated modeling analysis performed by Sonoma Technology.

*Response*

The EPA responds to comments regarding model performance in both Section 4.2.1 and Section 4.2.2.

Comments included here in Section 4.2.1. raise issues besides model performance. Comments on the proposed FIP are out of the scope of this action. The EPA is not requiring any controls in this action. Other topics raised by these comments are addressed in the following sections of this RTC document: 1.4 (Use of Updated Modeling), 4.1.1 (Modeling Design – Lake Michigan), 5 (Updates to Modeling and Changes in Linkages), 9.2 (Over-Control), 10.3 (Cooperative Federalism and the EPA's Authority), and 11.6 (Economic Impacts).

## 4.2.2   Model Performance at Western States

*Comments*

**Commenter:** Nevada Division of Environmental Protection

**Commenter ID:** 33

**Docket ID:** EPA-R09-OAR-2022-0138

**Comment:**

As stated in NDEP's June 21, 2022 comment letter (attached) on the Proposed Federal Implementation Plan for Regional Ozone Transport for the 2015 Ozone NAAQS EPA-HQ-OAR-2021-0668 (Proposed FIP), the Proposed FIP fails to consider Nevada's (and Western States) uniqueness, including local industry, topography (including high elevations and variations), geography, population, meteorology, vast open range landscapes, and wildfires.

**Commenter:** PacifiCorp

**Commenter ID:** 38

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

The Colorado ozone SIP modeling provides more reliable and accurate 2023 and 2026 ozone projections than the new and problematic modeling EPA relied on to disapprove Utah's SIP for several reasons:

1. The Colorado SIP CAMx modeling was tailored to simulate ozone in the relevant Denver Metro area. EPA's modeling, on the other hand, was national modeling not optimized to simulate ozone in the relevant, western mountain area.

2. The Colorado SIP CAMx modeling used a higher grid resolution (4-km) while EPA's modeling relies on a national-scale coarse 12-km grid resolution that is not as effective at replicating the complicated meteorology in the Rocky Mountain region due, in part, to poor representation of terrain features that impact ozone formation and transport.

3. The Colorado SIP CAMx modeling was a better match for observed ozone. EPA's CAMx modeling has an ozone underestimation bias that falls short of EPA's own requirements.

4. The higher resolution grid size and meteorology of the Colorado ozone SIP CAMx modeling produces higher ozone due to local emissions. This also results in more ozone reductions from the local emission controls (e.g., mobile sources) and thus lower projected future-year ozone levels at the affected monitors than EPA's CAMx modeling.

**Commenter:** PacifiCorp (Attachment – Ramboll Evaluation)

**Commenter ID:** 38

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

4.5.1 Effects of Higher Resolution 4-km Grid in DM/NFR SIP Modeling

[…] In order to properly simulate ozone formation in the DM/NFR NAA, a high resolution grid cell size needs to be used. All of the Denver ozone SIPs in the past have used a 4-km grid resolution to simulate the correct meteorology and chemistry and resolve the urban plumes so that the model has a chance to

167

reproduce the highest observed ozone concentrations. Use of a coarse 12-km grid will instantaneously disperse emissions across a grid cell volume that is almost an order of magnitude larger than when a 4-km grid size is used making it difficult for the model to reproduce the high observed ozone peaks due to overdiluting the ozone concentrations and its precursors.

Note that use of a coarse 12-km grid resolution will also reduce ozone peaks due to local sources in the Upwind State due to failure to resolve urban and other highly concentrated ozone precursor emission sources (e.g., industrial facilities, O&G, etc.) and their resultant ozone plumes. However, by the time the ozone and precursor concentrations from the Upwind State travel 100s of miles to the receptor in the downwind state the "plumes" will be many 12-km grid cells across so that the effects of the coarse resolution on underestimating ozone concentrations at the receptor in the downwind state due to emissions in the Upwind State is less important.

[...]

4.5.2 Effects of Higher Resolved Meteorological Inputs on Ozone Concentrations in the DM/NFR Ozone SIP Modeling

Obtaining the correct depiction of meteorology is critically important for simulating ozone formation in the complex terrain conditions of the DM/NFR NAA. [...]

4.5.2.1 Conceptual Model of Ozone Formation in the DM/NFR NAA

The DM/NFR 2020 Serious ozone SIP for the 2008 ozone NAAQS (RAQC and CDPHE, 2020) included a report "Conceptual Model of High Ozone for the Denver Metro/North Front Range" (Ramboll, 2020). The highest ozone concentrations in the DM/NFR NAA are due to a combination of ozone transport and locally generated ozone under specific meteorological regimes that favor ozone photochemistry and limited dispersion. Reddy and Pfister (2016) explored the relationships between meteorology and ozone in the Rocky Mountain states and concluded that increases in upper-level high pressure strength "lead to high July ozone in much of the western U.S., particularly in areas of elevated terrain near urban sources with high emissions of NO2 and other ozone precursors." In addition to bringing warmer temperatures, upper-level ridges in this region reduce westerly winds at the surface and aloft to allow cyclic terrain-driven circulations that reduces transport away from sources. This includes the formation of thermally driven upslope flows along the Front Range in the Denver NAA where ozone and ozone precursors are transported up the slopes during the day and can return at night to lower elevations in large scale basin drainage (downslope) flows. Upper-level ridges can also increase background ozone concentrations within the ridge. Ozone and $NO_x$ concentrations build locally, and deeper vertical mixing in this region provides a potential mechanism for recapture of ozone in layers aloft (e.g., from transport or remnants of the previous days ozone) that are mixed down to the surface.

The three key elements of a conceptual model for high-concentration ozone episodes along Colorado's Front Range are:

1. The presence of an upper-level high pressure system or ridge.

2. Reduced westerly winds, especially during the day.

3. Thermally-driven upslope flow towards the Continental Divide during the day and downslope drainage flows into the Platte Valley at night. This diurnal cycle of winds enhances the potential for the accumulation of ozone precursors and ozone within the region, especially when this cyclic pattern recurs over a period of several days.

4.5.2.2 Requirements for WRF Meteorological Model to Reproduce DM/NFR NAA Ozone Conceptual Model

In order for the Weather Research and Forecasting (WRF) meteorological model to reproduce the meteorological conditions that lead to the highest ozone concentrations in the Denver NAA it needs to be able to simulate the high pressure system/ridge and the thermally driven slope flows. Getting the high pressure system or ridge correctly requires using analysis fields as inputs into WRF that reflects their presence that are used in the WRF initial and boundary conditions (IC/BC) and four-dimensional data assimilation (FDDA) inputs. Such analysis fields that contain the presence of the high pressure/ridges include the North American Mesoscale Forecast System (NAM[29]) analysis fields that were used in the WRF simulations to develop the CAMx 2016 meteorological inputs for both the DM/NFR 2023 Severe/Moderate ozone SIP and Proposed Transport Rule CAMx 2016 modeling platforms.

For WRF to obtain an accurate depiction of the thermally driven slope flows requires the terrain inputs for the model to be representative of actual terrain. Use of a 12-km grid resolution smooths the terrain and greatly reduces the terrain heights and the elevation differences of the "slopes" of the terrain along the Front Range. The slope between western Denver County to the continental divide spans approximately 7,800 feet in elevation using a 4-km grid resolution but only approximately 4,500 feet in elevation change using the 12-km grid resolution. Thus, WRF's ability to reproduce the thermally driven daytime upslope and nighttime downslope flows will be severely compromised using a 12-km grid resolution and simulated much more accurately using a 4-km grid resolution because a 12-km grid resolution fails to resolve the terrain in the region.

The higher resolution complex terrain in the 4-km data, and in reality, will also affect transport of ozone and precursors from Wyoming to the Denver NAA differently than if a 12-km grid resolution is used. The higher variable wind fields from more highly resolved terrain features will disperse ozone and precursors from Wyoming as they are transported to the Denver NAA than if a 12-km grid resolution is used that smooths the actual terrain features.

**[…]**

4.5.3 Comparison of CAMx Ozone Model Performance and Its Implications

[Ramboll] conducted an ozone model performance of the CAMx 2016 base case simulation used in the Proposed Transport Rule and compared it to the ozone performance of the DM/NFR 2023 Severe/Moderate ozone SIP CAMx S17 2016 base case simulation. At this time, only limited publicly available information is available on ozone model performance for the DM/NFR ozone SIP CAMx S17 2016 base case from presentations given at the May 18, 2022 RAQC Ozone Modeling Forum.

Ozone model performance goals and criteria have been established by Emery and co-workers (2016) for the Normalized Mean Bias (NMB) and Normalized Mean Error (NME) model performance metrics. The

NMB ozone model performance goal is ≤±5% and the NMB ozone performance criterion is ≤±15%. The NME ozone model performance goal and criterion are ≤15% and ≤25%, respectively.

[…]

The DM/NFR ozone SIP CAMx 2016 base case ozone performance is clearly performing better than the EPA Proposed Transport Rule CAMx 2016 base case at all four sites in the DM/NFR NAA. The EPA CAMx 2016 base case exhibits an ozone underestimation bias, which was expected given the coarse 12-km grid resolution used. At CHAT, the Proposed Transport Rule CAMx 2016 base case has an NMB underestimation of -7.6% while the DM/NFR 2023 Severe/Moderate ozone SIP has essentially zero bias (0.1%). The underestimation bias in the Proposed Transport Rule CAMx 2016 base case is even greater at the RFNO (-8.1%), NREL (-8.4%) and FTCW (-12.5%) sites while the DM/NFR ozone SIP CAMx 2016 base case bias achieves the bias performance goal by a wide margin.

[…]

Ozone attainment/nonattainment is determined by the ozone design value (DV) that is defined as the three-year average of the fourth highest maximum daily average 8-hour (MDA8) ozone concentrations. Thus, how well the model simulates the four highest observed MDA8 ozone concentrations is an important model performance attribute. The highest observed MDA8 ozone concentration at Chatfield during 2016 was 86.6 ppb that was underestimated by the Proposed Transport Rule CAMx 2016 base case (74.9 ppb) by 11.7 ppb (-13.5%). Whereas, the DM/NFR ozone SIP CAMx 2016 base case highest estimated ozone concentration at Chatfield (86.4) matched the observed value (86.6 ppb) almost exactly (within 0.2 ppb or 0.0% difference). The fourth highest observed MDA8 ozone concentration at Chatfield (78.0 ppb) is underestimated by the Proposed Transport Rule CAMx 2016 base case (71.9 ppb) by 6.1 ppb (-7.8%), while the DM/NFR ozone SIP CAMx base case fourth highest ozone at Chatfield (78.1 ppb) matches the observed fourth highest ozone very well (0.1 ppb and 0.0% difference).[…] The ozone under-prediction bias of the Proposed Transport Rule CAMx 2016 base case at RFNO is even greater than at CHAT with the four highest observed ozone concentrations underestimated by -11% to -19%. The DM/NFR ozone SIP CAMx 2016 base case also underestimates the four highest observed MDA8 ozone concentrations at RFNO but the underestimation bias (-4% to -10%) is approximately half of the Proposed Transport Rule underestimation bias. For example, the observed fourth highest MDA8 ozone at RFNO (79.5%) is underestimated by the Proposed Transport Rule by -11% (70.9 ppb) but is only underestimated by the DM/NFR ozone SIP CAMx 2016 base case by -4% (76.3 ppb), which achieves the ≤±5% ozone performance goal.

[…]

4.6 Conclusions On Future Year Projected Ozone Design Values at DM/NFR Nonattainment/Maintenance Receptors

Based on scientific technical arguments, the coarse 12-km grid resolution used in the Proposed Transport Rule CAMx modeling will likely overstate future year design value projections. This was confirmed by the DM/NFR 2023 Severe/Moderate ozone SIP CAMx 4-km grid resolution modeling that produced lower future year projected design values resulting in Chatfield and Rocky Flats North no longer being nonattainment/maintenance receptors in 2026.

[…]

Utah was linked to three receptors in the DM/NFR NAA (CHAT, RFNO and NREL). Two of these receptors (CHAT and RFNO) become attainment receptors based on the refined DM/NFR Severe/Moderate ozone SIP CAMx modeling, although NREL receptor remained a nonattainment receptor in the DM/NFR ozone SIP CAMx modeling (see Table 4-5 [available in full comment]). However, Utah has a 0.90 ppb ozone contribution to the NREL receptor in 2026 and, as discussed in Chapter 7, this contribution is not a statistically significant contribution to an ozone design value. This argues that Utah should also not be subject to the 2026 EGU and non-EGU controls in the Proposed Transport Rule.

5.2 Coarse Grid Resolution Will Understate Ozone Contributions due to Local Sources Resulting in Overstating Utah's and Wyoming's Ozone Contribution at DM/NFR NAA Receptors

For all the reasons presented in Chapter 4 of this report, the use of the coarse 12-km grid resolution in in the Proposed Transport Rule  CAMx modeling will dilute the ozone and precursor concentrations in the DM/NFR ozone NAA resulting in an understatement of modeled ozone concentrations due to local sources than if a finer grid cell size was used (e.g., 4-km).  With higher modeled ozone concentrations due to local sources at receptors in the DM/NFR NAA that would increase the total MDA8 ozone concentrations and reduce the Utah and Wyoming CF resulting in reductions in Utah's and Wyoming's contribution to 2023 and 2026 ozone design values at DM/NFR NAA receptors.

**Commenter:** Utah Division of Air Quality

**Commenter ID:** 47

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

The UDAQ has provided extensive comments on the substantial limitations and problems with the modeling used to justify the inclusion of Utah in the proposed FIP. These limitations are significant and include inappropriate modeling resolution, inadequate modeling of atmospheric transport, significant negative modeling bias, and a likely misrepresentation of the atmospheric chemical regime as a result of issues with the inventories used.

*Response*

Commenters describe the "conceptual model" of local scale meteorological conditions that are typically associated with high ozone concentrations measured in areas around Lake Michigan and in western states where the EPA has identified nonattainment and/or maintenance-only receptors in 2023. Commenters claim that the EPA's projected design values and contributions for receptors in these areas are flawed because the horizontal resolution of the EPA's modeling (i.e., 12 km) is too coarse to properly resolve the emissions and meteorological conditions that lead to locally high ozone concentrations associated with the land/water interface in coastal areas and in complex terrain. In this regard, commenters argue that EPA must use "fine scale modeling" (i.e., 4 km resolution or 1 km resolution) to

171

properly simulate ozone concentrations and the response to emissions changes, and thus provide credible projections of design values and contributions for such areas. Commenters support their claim by pointing to model performance statistics from the EPA's modeling for 2016, which commenters say is biased low compared to the corresponding measured ozone concentrations at receptors in Coastal Connecticut, the Lake Michigan area, and in Colorado and Utah. Commenters then allege that the modeled response to emissions reductions (i.e., Relative Response Factors - RRFs) is correlated with base year model bias. That is, the commenters contend that the low-bias in the 2016 base year modeling implies that the model's response to the emissions reductions between 2016 and 2023 is also underpredicted. The commenters state that underpredicting model response results in design values in 2023 that are too high and, therefore, the projected design values *overstate* the magnitude and extent of the ozone problem in 2023. Commenters support these claims by noting that fine scale modeling performed for Colorado and the Lake Michigan area has less bias and error and produces lower projected design values compared to the EPA's 12 km modeling. The commenters then allege that the error associated with underprediction in the base year is compounded in the calculation of future year contributions such that the contribution metric values calculated by the EPA overstate the magnitude of contributions from upwind states. Finally, noting that projected design values and contributions are calculated based on the top 10 modeled concentrations days, commenters say that the EPA must discard from these calculations any days that do not meet certain model performance benchmarks.

The EPA agrees that fine-scale meteorological conditions associated with the land water interface coupled with the spatial distribution of ozone precursor emissions presents a challenge for modeling ozone formation and urban scale transport that affect monitoring sites in Coastal Connecticut and near the shoreline of Lake Michigan. The EPA also agrees that modeling for areas located in complex terrain, such as Denver and Salt Lake City present a similar challenge.

As described below, the EPA disagrees with commenter's assertion that fine scale modeling is required in order to provide scientifically sound projections of ozone design values and contributions to assess interstate ozone transport for this action. In addition, the EPA disagrees that model performance benchmarks cited by commenters should be applied when identifying which days to use when calculating projected design values and contributions. The EPA also disagrees with the notion that the magnitude of model response is correlated with base year model bias and error such that modeling that underpredicted measured concentrations also underpredicts model response.

Regarding comments on the use of fine scale modeling with respect to model performance, as stated in the EPA's modeling guidance, the use of fine scale modeling should be considered for the purpose of identifying local control strategies that will provide for attainment of the NAAQS in such areas. The guidance goes on to say "If model response is expected to be different (and presumably more accurate) at higher resolution, then higher resolution modeling should be considered. If model response is expected to be similar at both high and low(er) resolution, then high resolution modeling may not be necessary."

To gauge the adequacy of model performance for regulatory applications, the EPA's modeling guidance recommends comparing model performance statistics from the base year model run (e.g., 2016) to model performance from other recent state-of-the-science model applications. Specifically, the EPA guidance recommends that "air agencies compare their evaluation results against similar modeling

exercises to ensure that the model performance approximates the quality of other applications. Recent literature reviews (Simon et al, 2012; Emery et al., 2017)[44,45] summarize photochemical model performance for applications published in the peer-reviewed literature between 2006 and 2015. These reviews may serve as a resource for identifying typical model performance for state of the science modeling applications." The EPA has followed this guidance in evaluating the adequacy of model performance for the air quality modeling performed for the proposal and final transport actions.

The model performance criteria for MDA8 ozone concentrations recommended by Emery et al., are in the table below.

*Table 4-5 Model Performance Criteria for MDA8 Ozone Concentrations*

| Metric | Criteria |
|---|---|
| Normalized Mean Bias (NMB) | ≤ ± 15% |
| Normalized Mean Error (NME) | < 25% |
| Correlation Coefficient (r) | > 0.5 |

The EPA notes that the commenter's complaints were based on model performance for the 2016v2 modeling that EPA used for the proposed disapprovals. As described in the 2016v3 Emissions Modeling TSD and the Final Action AQM TSD, for this final action the EPA is using the 2016v3 platform which includes numerous updates made in response to comments on the proposal. Model performance for ozone with the 2016v3 platform is substantially improved compared to model performance with 2016v2 (see the Final Action AQM TSD for details on modeling performance for 2016v3).

In this RTC we present a comparison of model performance and projected design values at receptors in 2023 based on the EPA's 2016v3 modeling to the corresponding model performance and projected design values from fine scale modeling covering the Lake Michigan area, Coastal Connecticut, and Denver.

The tables below provide model performance statistics based on CAMx modeling performed by LADCO,[46] the New York State Department of Conservation (NYS DEC)[47] and Ramboll for the Denver

---

[44] Simon et al Simon, H., Baker, K. R., Phillips, S, (2012), Compilation and interpretation of photochemical model performance statistics published between 2006 and 2012, *Atmos Environ*, 61, 124-139.

[45] Emery, C., Liu, z., Russell, A.G., Odman, M.T., Yarwood, G., Kumar, N., (2017), Recommendations on Statistics and Benchmarks to Assess Photochemical Model Performance, Journal of the Air and Waste Management Association, 67:5, 582-598, doi:/10.1080/10962247.2016.1265027.

[46] Attainment Demonstration Modeling for the 2015 Ozone National Ambient Air Quality Standard Technical Support Document. Lake Michigan Air Directors Consortium. September 21, 2022.

[47] Yum, J., E. Zalewsky, Y. Tian, and K. Civerolo. Comparison of the CAMx performance of 2016 based modeling platforms at 12 km and 4 km resolution. 20th Annual CMAS Conference, November 01-05, 2021.

Northern Front Range ozone implementation plan[48] along with performance statistics based on the EPA's 2016v3 modeling.[49] Normalized mean bias and normalized mean error statistics are used to compare model performance from the EPA's 12 km modeling to 4 km modeling from these other model applications.[50] Note that data from LADCO and Ramboll are based on "two-way nested" modeling in which a fine-scale grid is embedded within a coarse scale regional domain during the model simulation. With this configuration, there are no independent predictions at 12 km. The NYS DEC performed independent modeling at 4 km and at 12 km. Note also that each group calculated statistics for different time periods during the ozone season. The LADCO statistics are based on days with measured ozone concentrations above 60 ppb, whereas the Ramboll statistics are based on data for all days. Both sets of statistics (i.e., with and without using a cut-off of 60 ppb) are available for the NYS DEC modeling. In all cases, the EPA 2016v3 model performance statistics were calculated for the same days that were used by LADCO, NYS DEC, and Ramboll for their applications. Finally, the differences in model performance and projected design values between the EPA's 12 km modeling and the 4 km modeling from LADCO, NYS DEC, and Ramboll cannot be solely attributable to differences in grid resolution. Other factors, such as differences in 2016 and 2023 emissions used in each model application also have some effects on the results. In this respect, the NYS DEC modeling may provide the most consistent comparison between 4 km and 12 km modeling since both sets of modeling relied on similar emissions inputs.

*Table 4-6 Model Performance Statistics Based on LADCO's Modeling and EPA's 2016v3 Modeling*

| | | | Statistics for __April – September (Percent)__ | | | | |
|---|---|---|---|---|---|---|---|
| | | | **Normalized Mean Bias** *Days Above 60 ppb* | | | **Normalized Mean Error** *Days Above 60 ppb* | |
| Site ID | State | Receptor | **LADCO 4 km** | **EPA 12 km** | | **LADCO 4 km** | **EPA 12 km** |
| 170310001 | IL | Alsip | -12.0 | 0.2 | | 12.0 | 10.9 |
| 170314201 | IL | Northbrook | -14.5 | -3.9 | | 14.5 | 10.5 |
| 170317002 | IL | Evanston | -1.8 | -0.9 | | 13.8 | 9.6 |
| 550590019 | WI | Chiwaukee | -11.1 | -12.9 | | 15.5 | 16.9 |
| 551010020 | WI | Racine | -7.9 | -10.9 | | 14.1 | 15.2 |
| 551170006 | WI | Sheboygan | -11.4 | -11.6 | | 11.4 | 13.2 |

---

[48] Morris, R., T. Shah, M. Rodriguez, C-J Chien, and P. Vennam. Air Quality Technical Support Document (AQTSD) for the Denver Metro/North Front Range 2023 Severe/Moderate Ozone State Implementation Plan. Ramboll. August 2022.

[49] For this analysis, the EPA leveraged existing, readily available, model performance statistics based on modeling by LADCO, the NYS DEC, and Ramboll for these receptors. In this regard, the data from these organizations may, in some cases, reflect preliminary modeling.

[50] The normalized mean bias is calculated by first subtracting the modeled values from the corresponding observed values paired in space and time. Then, the sum of these differences is divided by the sum of the observed concentrations. The normalized mean error is calculated in a similar manner except that the sum of the absolute value of the differences is divided by the sum of the observations. Both normalized mean bias and normalized mean error are expressed as a percent.

*Table 4-7 Model Performance Statistics Based on NYS DEC's Modeling and EPA's 2016v3 Modeling (Percent)*

| | | | Statistics for May – June (Percent) | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | Normalized Mean Bias Days Above 60 ppb | | | | Normalized Mean Error Days Above 60 ppb | | |
| Site ID | State | Receptor | NYS DEC 4 km | NYS DEC 12 km | EPA 12 km | | NYS DEC 4 km | NYS DEC 12 km | EPA 12 km |
| 90010017 | CT | Greenwich | -12.8 | -6.5 | -7.3 | | 14.7 | 12.7 | 8.3 |
| 90013007 | CT | Stratford | -7.5 | -8.9 | -1.9 | | 9.7 | 15.7 | 13.1 |
| 90019003 | CT | Westport | -12.0 | -10.0 | -3.8 | | 12.2 | 10.7 | 7.9 |
| 90099002 | CT | Madison | -5.0 | -7.1 | -3.3 | | 7.2 | 8.7 | 7.3 |

*Table 4-8 Model Performance Statistics Based on NYS DEC's Modeling and EPA's 2016v3 Modeling (July-August)*

| | | | Statistics for July - August | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | Normalized Mean Bias Days Above 60 ppb | | | | Normalized Mean Error Days Above 60 ppb | | |
| Site ID | State | Receptor | NYS DEC 4 km | NYS DEC 12 km | EPA 12 km | | NYS DEC 4 km | NYS DEC 12 km | EPA 12 km |
| 90010017 | CT | Greenwich | -8.1 | -3.3 | -9.8 | | 11.8 | 12.8 | 11.9 |
| 90013007 | CT | Stratford | -9.7 | -5.2 | -0.3 | | 15.6 | 12.2 | 12.4 |
| 90019003 | CT | Westport | -13.0 | -3.5 | -0.1 | | 17.1 | 13.2 | 12.7 |
| 90099002 | CT | Madison | -7.2 | -3.5 | 0.4 | | 14.4 | 10.8 | 9.8 |

*Table 4-9 Model Performance Statistics Based on NYS DEC's Modeling and EPA's 2016v3 Modeling (May-June)*

| | | | Statistics for May - June | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | Normalized Mean Bias All Days (no "ppb" cut-off) | | | | Normalized Mean Error All Days (no "ppb" cut-off) | | |
| Site ID | State | Receptor | NYS DEC 4 km | NYS DEC 12 km | EPA 12 km | | NYS DEC 4 km | NYS DEC 12 km | EPA 12 km |
| 90010017 | CT | Greenwich | -5.8 | 0.0 | -0.5 | | 12.4 | 13.6 | 12.7 |
| 90013007 | CT | Stratford | -10.4 | -9.2 | -5.5 | | 14.9 | 17.3 | 15.4 |
| 90019003 | CT | Westport | -13.0 | -5.8 | -2.9 | | 17.2 | 15.3 | 12.2 |
| 90099002 | CT | Madison | -5.0 | -4.2 | -1.2 | | 9.7 | 10.8 | 9.4 |

175

*Table 4-10 Model Performance Statistics Based on Ramboll's Modeling and EPA's 2016v3 Modeling*

| | | | Statistics for <u>June 1 - August 20</u> | | | | |
|---|---|---|---|---|---|---|---|
| | | | Normalized Mean Bias *All Days* *(no "ppb" cut-off)* | | | Normalized Mean Error *All Days* *(no "ppb" cut-off)* | |
| **Site ID** | **State** | **Name** | **Denver 4 km** | **EPA 12 km** | | **Denver 4 km** | **EPA 12 km** |
| 80350004 | CO | Chatfield | 0.1 | 3.8 | | 9.2 | 10.1 |
| 80590006 | CO | Rocky Flats | -0.4 | 2.1 | | 8.8 | 9.4 |
| 80590011 | CO | NREL | -2.0 | 1.8 | | 8.6 | 10.7 |
| 80690011 | CO | Ft Collins | -2.5 | -3.0 | | 7.8 | 9.2 |

Comparing model performance using 12 km versus 4 km modeling does not support the commenter's contention that model performance using fine scale, 4 km modeling results in model performance superior to what is obtained with 12 km modeling, even at receptors where the magnitude of ozone concentrations are highly affected by complex meteorological conditions. The data in the above tables show that normalized mean bias and normalized mean error statistics for both the 4 km and 12 km modeling are well within the range of the performance criteria recommended by Emery et al., and endorsed by the commenters at nearly all of these receptors. At some of the receptors in Coastal Connecticut and near the shoreline of Lake Michigan there is notably less bias in the EPA's 12 km modeling compared to 4 km modeling at the same receptor. At the NREL and Ft Collins receptors in Denver, the bias with 12 km modeling and 4 km modeling are similar. At the other two receptors in Denver, model bias is less at 4 km. The results of this analysis indicate that model bias and error in the EPA's 2016v3 12 km modeling is comparable, overall, to model performance using 4 km modeling.

Regarding comments on the use of fine scale modeling with respect to projected design values, the EPA compared projected design values for 2023 from the 4 km modeling performed by LADCO, the NYS DEC, and Ramboll to the EPA's projections for 2023 based on the 2016v3 modeling. These data are provided in the tables below. The data from LADCO and Ramboll are based on the application of the "3 x 3" approach for projecting design values. The NYS DEC provided two sets of projected design values; one set based on the "3 x 3" approach and a second set based on the "no water, except monitor grid cell" approach. To maintain consistency in this analysis, all the design values in the tables below, including the EPA's 12 km modeling, are based on the "3 x 3" approach.

The comparison of design values based on 12 km modeling to the corresponding design values based on 4 km modeling indicates that projected average DVs from the EPA 12km modeling are similar to those from the LADCO 4 km modeling and that both the LADCO and the EPA modeling identify the same set of monitors that have projected average design values that exceed the NAAQS (i.e., Chiwaukee and Sheboygan). A comparison of 12 km and 4 km design values for receptors in Coastal Connecticut shows that 3 of the 4 Connecticut receptors have lower projected 2023 average DVs in the NYC DEC 12km modeling compared to 4 km resolution. At these receptors the EPA 12 km 2023 average design values are lower than both the 4 km and 12km based NYS DEC projected average DVs at all the Connecticut

receptors. Finally, comparing the 4 km Ramboll modeling to the 12 km EPA modeling for receptors in Colorado indicates that the projected average design values are very similar (within 1 ppb at 3 of the 4 receptors). The data show here refute the claims by commenters that 12 km modeling will lead to systematically higher projected DVs compared to modeling simulations conducted at 4 km resolution which could result in a greater potential for overcontrol using 12 km modeling.

*Table 4-11 Comparison of Design Values for 2023 from LADCO's 4 km Modeling and EPA's 2016v3 Modeling*

| | | | | | LADCO 4 km | EPA 12 km | |
| | | | | | 2023 Average DV | 2023 Average DV | 2023 Maximum DV |
| Site ID | State | Receptor | 2021 DV | Preliminary 2022 DV | | | |
|---|---|---|---|---|---|---|---|
| 170310001 | IL | Alsip | 71 | 72 | 67.5 | 68.2 | 71.9 |
| 170314201 | IL | Northbrook | 74 | 74 | 68.0 | 68.4 | 71.8 |
| 170317002 | IL | Evanston | 73 | 74 | 68.9 | 69.1 | 71.9 |
| 550590019 | WI | Chiwaukee | 74 | 75 | 71.6 | 72.0 | 73.0 |
| 551010020 | WI | Racine | 73 | 75 | 69.5 | 70.0 | 71.8 |
| 551170006 | WI | Sheboygan | 72 | 75 | 75.1 | 73.0 | 73.9 |

*Table 4-12 Comparison of Design Values for 2023 from NYS DEC's 4 km Modeling and EPA's 2016v3 Modeling*

| | | | | | NYS DEC 4 km | NYS DEC 12 km | EPA 12 km | |
| | | | | | 2023 Average DV | 2023 Average DV | 2023 Average DV | 2023 Maximum DV |
| Site ID | State | Receptor | 2021 DV | Preliminary 2022 DV | | | | |
|---|---|---|---|---|---|---|---|---|
| 090010017 | CT | Greenwich | 79 | 77 | 75.2 | 73.9 | 72.0 | 72.6 |
| 090013007 | CT | Stratford | 81 | 81 | 77.1 | 76.0 | 73.3 | 74.2 |
| 090019003 | CT | Westport | 80 | 80 | 77.9 | 78.6 | 74.3 | 74.5 |
| 090099002 | CT | Madison | 82 | 79 | 73.7 | 72.0 | 71.2 | 73.3 |

*Table 4-13 Comparison of Design Values for 2023 from Ramboll's 4 km Modeling and EPA's 2016v3 Modeling*

| | | | | | Ramboll 4 km | EPA 12 km | |
| Site ID | State | Receptor | 2021 DV | Preliminary 2022 DV[51] | 2023 Average DV | 2023 Average DV | 2023 Maximum DV |
|---|---|---|---|---|---|---|---|
| 80350004 | CO | Chatfield | 83 | 83 | 70.6 | 71.3 | 71.9 |
| 80590006 | CO | Rocky Flats | 81 | 83 | 70.3 | 72.8 | 73.5 |
| 80590011 | CO | NREL | 83 | 84 | 73.4 | 73.5 | 74.1 |
| 80690011 | CO | Ft Collins | 77 | 77 | 70.4 | 70.9 | 72.1 |

Regarding commenter's assertion that days with model performance outside the range of the performance criteria recommended by Emery, et al., should be removed from the data set used to calculate projected design values and contributions, the EPA finds this approach to be inconsistent with the intended use of these criteria. These benchmarks are based on model performance aggregated across multiple monitors and many days. In this respect, it is expected that even in model applications that meet these benchmarks there would be some monitor/days with model bias and error that is outside the range of the benchmarks. It is therefore not appropriate to use these benchmarks to screen individual sites or days. Specifically, in Emery, et al., the authors "do not make recommendations for model performance benchmarks for individual monitors, recognizing that the importance of model performance at a specific site is application-specific." In addition, the authors state "For ozone, we recommend calculating statistics over temporal scales of roughly 1 week (an episode), not to exceed 1 month."

Even though the EPA disagrees with commenter's assertion to "throw out" specific days at individual monitors for which model performance does not meet the criteria, out of an abundance of caution, the EPA performed a sensitivity analysis for selected receptors in which the projected 2023 design values and contributions were recalculated after removing individual days that fell outside the Emery et al., criteria for normalized mean bias and/or normalized mean error. The EPA chose receptors in Coastal Connecticut, the Lake Michigan area, Dallas, and Denver for this analysis. The specific receptors included in this sensitivity analysis are Stratford, Connecticut, Chicago/Evanston, Illinois, Dallas/Denton, Texas, and Denver/Rocky Flats, Colorado.

In this sensitivity analysis the EPA first examined the normalized bias and normalized error on each day to determine if model performance on the days used to project design values and/or calculations fell outside the range of the criteria. Days with performance outside the range of the criteria were removed from the calculation of project design values and contributions. Next, using data for the remaining days, the EPA recalculated Relative Response Factors (RRFs) which were then applied to the 2016-centered base period average and maximum design value to re-projected the 2023 design values. The EPA then recalculated the Relative Contribution Factor for each upwind state to downwind receptor combination.

---

[51] It should be noted that both EPA and Ramboll modeling of 2023 project ozone levels substantially lower than recent measured ozone levels at the four Colorado receptors, which are all well above the 2015 ozone NAAQS for both certified 2021 DVs and preliminary 2022 DVs.

The recalculated RCFs were then applied to the recalculated 2023 average design values to calculate a new set of contribution metric values. The number of top 10 days at each receptor that were replaced with data from other days when recalculating projected design values and contributions is given in the table below. For example, at the Stratford receptor, model performance on 4 of the top 10 days used to calculate RRFs was outside the range of the criteria. The data for these days were removed. Then the concentrations on days with performance within the range of the criteria were re-ranked to identify a new set of top 10 days. In the calculation of the average contribution metric, 5 of the original top 10 days at this receptor were replaced with data from other days.

*Table 4-14 Top 10 Days Replaced After Recalculating Projected Design Values and Contributions*

| | | Number of Original Top 10 Days Replaced in this Sensitivity Analysis | |
| Site ID | Receptor | Recalculated Design Values | Recalculated Contributions |
|---|---|---|---|
| 090013007 | Stratford | 4 | 5 |
| 170317002 | Evanston | 7 | 7 |
| 481210034 | Denton | 0 | 1 |
| 080590006 | Rocky Flats | 0 | 1 |

The table below provides the projected 2023 average and maximum design values without the removal of any days (i.e., Final Action design values) and the recalculated 2023 design values after removing days with model performance outside the range of the criteria (i.e., days commenters claim have "poor performance"). The data in the table below indicates that there is less than a ppb difference between the two sets of design values at Stratford and Evanston even though data on nearly half (Stratford) and more than half (Evanston) of the days used to project design values were replaced with data from other days.

*Table 4-15 Final Action Design Values Versus Sensitivity Scenario Design Values*

| | | | Projected 2023 Design Values (ppb) | | | |
| | | | Final Action | | Sensitivity | |
| Site ID | State | Receptor | Average DV | Maximum DV | Average DV | Maximum DV |
|---|---|---|---|---|---|---|
| 090013007 | CT | Stratford | 72.9 | 73.8 | 72.1 | 73.0 |
| 170317002 | IL | Evanston | 68.5 | 71.3 | 69.2 | 72.0 |
| 481210034 | TX | Denton Airport | 69.8 | 71.6 | 69.8 | 71.6 |
| 080590006 | CO | Rocky Flats | 72.8 | 73.5 | 72.8 | 73.5 |

The following tables provide the contribution metric values for upwind states linked to the Stratford, Connecticut, Chicago/Evanston, Illinois, Dallas/Denton, Texas, and Denver/Rocky Flats, Colorado receptors for this final action (i.e., no days removed) and the sensitivity scenario (i.e., days removed based on model performance). The highlighted contributions in these tables identify contributions that exceed the 1 percent of the NAAQS screening threshold. The data indicate that removing days with "poor performance" does not appear to result in any systematic bias in the magnitude of contributions. That is, contributions increase for some states linked to a particular receptor while contributions from other upwind states linked to that same receptor decrease. For example, at Evanston the contribution from Wisconsin dropped by 50 percent, whereas the contribution from Arkansas nearly doubled to a level above the screening threshold. In addition, after removing days with "poor performance" the contribution from Louisiana increased to above the threshold. Although the contribution from Michigan to Stratford dropped to below the screening threshold after removing days with "poor performance", the contribution from this state to Evanston more than doubled. Also, although Illinois contributes below the threshold to Stratford after removing days with "poor performance", Illinois contributes well above the threshold to receptors in Wisconsin. The results of this sensitivity analysis indicate that the EPA's findings in this final action are robust with respect to consideration of daily model performance at individual monitoring sites.

*Table 4-16 Sensitivity Analysis - Stratford, CT Receptor*

| Upwind State | Stratford, CT (090013007) | |
|---|---|---|
| | 2023 Contribution (ppb) | |
| | Final Action | Sensitivity |
| IL | **0.72** | 0.50 |
| IN | **1.18** | **0.74** |
| KY | **0.80** | **0.84** |
| MD | **0.96** | **1.12** |
| MI | **1.38** | 0.48 |
| NJ | **7.22** | **7.94** |
| NY | **12.70** | **12.66** |
| OH | **2.04** | **1.79** |
| PA | **5.43** | **6.62** |
| VA | **1.15** | **1.25** |
| WV | **1.35** | **1.68** |

*Table 4-17  Sensitivity Analysis - Evanston, IL Receptor*

| Upwind State | Evanston, IL (170317002) | |
|---|---|---|
| | 2023 Contribution (ppb) | |
| | Final Action | Sensitivity |
| AR | 0.46 | **0.88** |
| IN | **6.40** | **7.01** |
| LA | 0.14 | **0.70** |
| MI | **1.11** | **2.50** |
| MO | **1.18** | **1.04** |
| OH | **0.96** | **1.49** |
| TX | **1.85** | **0.86** |
| WI | **2.32** | **1.17** |

*Table 4-18  Sensitivity Analysis - Denton Airport, TX Receptor*

| Upwind State | Denton Airport, TX (481210034) | |
|---|---|---|
| | **2023 Contribution (ppb)** | |
| | **Final Action** | **Sensitivity** |
| AR | 0.92 | 0.89 |
| LA | 2.87 | 2.68 |
| MS | 0.91 | 0.85 |
| OK | 1.01 | 1.09 |

*Table 4-19  Sensitivity Analysis - Rocky Flats, CO Receptor*

| Upwind State | Rocky Flats, CO (080590006) | |
|---|---|---|
| | **2023 Contribution (ppb)** | |
| | **Final Action** | **Sensitivity** |
| CA | 1.44 | 1.15 |
| UT | 1.17 | 1.12 |

Finally, in response to comments that claim at the EPA's projected design values used to identify receptors are too high as a result of base year model underprediction, the EPA conducted an analysis to determine if there is any clear relationship between base year (i.e., 2016) model bias and the response of the EPA's CAMx modeling to emissions changes between 2016 and 2023. The figures below show model bias on individual days as a function of model response on the days at the Chicago/Evanston, Denver/Rocky Flats, and Dallas/Denton receptors. The plots are based on days with modeled MDA8 ozone concentrations greater than or equal to 60 ppb in the set of grid cells used to project 2023 design values. As evident from these plots, there is no discernable relationship between model bias and model response. Thus, base year model under prediction of measured data does not translate into an under prediction of model response and an over prediction of projected design values.



*Figure 4-9*



*Figure 4-10*



*Figure 4-11*

Comments on the proposed FIP are out of the scope of this action. Other topics raised by these comments are addressed in the following sections: 11.4 (Transport Policy – Western State Ozone Regulation).

## 4.3   Model Error vs Contribution Threshold

*Comments*

**Commenter:** Alabama Department of Environmental Management

**Commenter ID:** 02

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

In EPA's proposed disapproval of the revised SIP, comments were made on the model performance statistics included in the WOE analysis. The purpose of pointing out the statistics was not to evaluate the numbers themselves, but to look at the magnitude of the numbers that would be considered as acceptable performance. The idea was that performance statistics are often acceptable at 10, 20 even 30%, yet 1% (0.71) is sufficient enough to identify an upwind State as culpable to a predicted

184

nonattainment or maintenance receptor. This is a disconnect, and ADEM contends that the model cannot accurately estimate impacts at such small numbers.

**Commenter:** Alabama Power Company, Southern Power Company, and PowerSouth Energy Cooperative

**Commenter ID:** 04

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

ADEM's third factor suggests that EPA's models cannot accurately replicate monitor concentrations, given the small concentrations at issue, and, as commenters set out, the modeled contributions are less than the acceptable modeling error range.

[…]

Even when considering Alabama's SIP in the context of EPA's FIP framework, EPA's rationale for proposing to disapprove Alabama's SIP proves inadequate. Under Step 2, EPA gives little or no credence to the evidence in the record calling into question its model performance …

In evaluating EPA's model performance and contribution threshold of 0.70 ppb, levels assigned to Alabama fall within the noise of EPA's model. In the proposed disapproval, EPA discounts the modeling error and bias identified by ADEM, claiming that "base year model performance statistics that are derived from measured and modeled data strictly paired in space and time are not useful as the sole measure for gauging the ability of the model to adequately estimate future year average contributions on the order of 0.70 ppb on high ozone days representative of the magnitude of measured concentrations at the receptor." However, EPA claims the opposite in its Air Quality Modeling Technical Support Document. Specifically, EPA admits that the agency relies on the error and bias analysis, which indicates errors of 20-25% in some circumstances, to justify its "projections of expected future year ozone concentrations and contributions." Moreover, to the extent EPA was mistaken and this modeling error does not address errors in contributions, then EPA's model fails the basic bulwark against inappropriate reliance on modeling by failing to assess the potential for and rate of error.

While the 20% error in EPA's modeling may be defensible for some purposes, it is not defensible with respect to the assessment of Alabama's SIP submittal. For example, Alabama's modeled contribution to the Texas receptors lies within the modeling error range EPA identifies as acceptable. In other words, Alabama has been modeled to contribute to downwind monitors above the 1% "screening metric" by an amount that is less than the level of error that EPA has asserted is acceptable. This weighs heavily in favor of approving Alabama's SIP.

**Commenter:** Mississippi Department of Environmental Quality

**Commenter ID:** 32

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

[technical support document] shows significant levels of bias and error (+/-7.8 to 9.1 ppb) in the South region, the region which both Mississippi and Texas are considered a part of for the purpose of this model. The imperceivable contributions from Mississippi sources (i.e., ≤ 1.14 ppb) on modeled concentrations at any monitor in Texas fall well within the error range and should be further scrutinized to evaluate whether Mississippi's contribution is, in fact, significant.

**Commenter:** Utah Petroleum Association and the Utah Mining Association

**Commenter ID:** 48

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

Photochemical modeling, especially for the western United States, lacks the level of accuracy needed to reliably differentiate a contribution of 0.7 ppb hundreds of miles downwind. Utah described this in their comments on EPA's March 27, 2018, guidance memo regarding Interstate Transport SIPs for the 2015 Ozone NAAQS: Due to the complex terrain, meteorology, distance between sources and receptors, and somewhat coarse-grained modeling inputs the margin of error in the transport modeling in the Intermountain West is about 15%. If we applied this margin of error to determine those States that contribute significantly to ozone in downwind States, 15% of the 70-ppb ozone NAAQS suggests that controls would only be required in States contributing 10 ppb or more to downwind ozone. This is more in line with the contributions to downwind States in the northeastern part of the United States.

*Response*

EPA generally responds to these comments in Section V.B.4 of the preamble, and further addresses these commenters here.

Commenters indicate that when the amount of contributions calculated is within the EPA's margin of error, the EPA should apply additional scrutiny to evaluate whether the upwind contribution is deemed significant.

The EPA does consider additional factors beyond whether the state is linked at step 2 before determining what emissions, if any, are deemed significant and require emissions reductions. The EPA performs this determination at Step 3 of the 4-step interstate transport framework, where the EPA considers additional factors, such as cost and the impact of emissions reductions to identify what emissions have a significant impact on nonattainment or interference with maintenance of the NAAQS at a downwind receptor.

To the extent that commenters suggest the EPA consider a less stringent threshold as a result of modeling uncertainty at Step 2, the EPA disagrees with this notion. The Agency uses the CAMx model to evaluate contributions from upwind states to downwind areas. The Agency has used CAMx in previous notice and comment rulemakings to evaluate contributions relative to the 1 percent threshold for both

186

ozone and PM2.5. In fact, in the original CSAPR, the EPA found that "[t]here was wide support from commenters for the use of CAMx as an appropriate, state-of-the science air quality tool for use in the [Cross-State Air Pollution] Rule. There were no comments that suggested that EPA should use an alternative model for quantifying interstate transport." 75 FR 48229 (August 8, 2011).

The comments related to the EPA's action on Alabama's SIP submission do not provide any additional technical analysis that would prevent the Agency from reasonably determining that Alabama contributes above 1 percent of the NAAQS at one nonattainment receptor based on the updated 2016v3 modeling platform for 2023. Moreover, comments misunderstand the ozone model performance evaluation and how the Agency assess linkages.

As discussed in the proposal, the EPA evaluates linkages using the multi-day average contribution from each upwind state to each downwind receptor based on daily contributions from the state to the receptor for the days with the highest model-predicted future year concentrations. 87 FR 64412 at 64423, (October 25, 2022). The modeled data are intended to represent future year ozone concentrations and contributions associated with ozone conducive meteorological conditions and transport patterns typical for high ozone episodes at the receptor. In this regard, base year model performance statistics that are derived from measured and modeled data strictly paired in space and time are not useful as the sole measure for gauging the ability of the model to adequately estimate future year average contributions on the order of 0.70 ppb on high ozone days representative of the magnitude of measured concentrations at the receptor. As explained in EPA's Final Action AQM TSD in the docket for this action, the performance of our modeling is within the generally accepted performance parameters for modeling of this type.

The EPA concedes that its modeling cannot perfectly project air quality levels and contributions in a future year; however, that is not the relevant standard. *See Appalachian Power Co. v. EPA*, 135 F.3d 791, 805-6 (D.C. Cir. 1998) (explaining that a model need not perfectly fit every data point). The EPA has successfully applied its CAMx modeling platform across many CAA regulatory actions. The EPA continues to find the modeling reliable for purposes of the Step 1 and Step 2 analyses of the 4-step interstate transport framework. The EPA further responds to these and related comments in sections V.B.4-6 of the preamble.

# 5   Updates to Modeling and Changes in Linkages

*Comments*

**Commenter:** Air Pollution Control Program, Missouri Department of Natural Resources

**Commenter ID:** 01

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

Missouri is no longer linked to any of the receptors that EPA used to evaluate Missouri's good neighbor SIP submission. The downwind receptors evaluated in Missouri's good neighbor SIP submission include –

- receptor ID 260050003, Allegan, MI;
- receptor ID 261630019, Wayne, MI;
- receptor ID 480391004, Brazoria, TX;
- receptor ID 482011039, Harris, TX;
- receptor ID 550790085 Milwaukee, WI; and
- receptor ID 551170006, Sheboygan, WI.

In EPA's updated modeling used to support the disapproval of Missouri's SIP and the proposed FIP for 26 states, none of these receptors are linked to Missouri. The following paragraphs explain how this change in the technical basis for Missouri's good neighbor obligations affect the submission with respect to each of the receptors analyzed and included in Missouri's good neighbor SIP for the 2015 ozone standard that the Air Program submitted in 2019.

In Missouri's good neighbor SIP submission in 2019, the Air Program demonstrated that the Allegan, MI monitor met the conditions included in EPA's October 2018 memorandum to not be considered a maintenance receptor because the site would not be a receptor in 2023. In the proposed disapproval, EPA rejected the argument stating that the summer of 2011 was an unusually cool summer in the upper Midwest despite updated information added to the SIP to support this assertion in response to EPA comment on Missouri's SIP submission. However, as demonstrated in EPA's updated modeling, the Allegan monitor has indeed dropped off as a maintenance receptor. The maximum 2023 projected design value for that monitor in the updated modeling is 68.4 ppb, well below the threshold of 70.9 needed to escape the label of a maintenance receptor under EPA's 4-step framework. For this reason, it is clear that Missouri's analysis and demonstration held true, and EPA's denial of it in the proposed disapproval is disproved by EPA's own modeling. Therefore, EPA must accept the demonstration included in Missouri's good neighbor SIP submission for this monitor. Failure to do so would constitute arbitrary and capricious action that would ignore EPA's own data.

For the Wayne, MI monitor, EPA's updated modeling shows this receptor as no longer being a maintenance receptor. The maximum 2023 projected design value for that monitor in the updated modeling is 66.6 ppb. In Missouri's good neighbor SIP submission, this was a maintenance receptor with

a maximum 2023 design value of 71.0 ppb, which is the lowest possible maximum design value that would cause it to receive the label of a maintenance receptor. In Missouri's SIP submission, the Air Program utilized the flexibility in EPA's August memo, to avoid linkage with this receptor because Missouri's projected contribution was below 1 ppb. EPA rejected that assessment in the proposed disapproval stating that Missouri failed to provide sufficient technical justification for use of the flexibility offered in the August memo. Obviously, the fact that the maximum design value was equal to the minimum value needed to be labeled a maintenance receptor, it follows that any improvement at all would have taken care of this receptor, which is clearly supportive of a 1 ppb threshold. Nonetheless, as shown in EPA's own updated modeling, this monitor is cleared of additional analysis at Step 1. For all of these reasons, EPA's determination to not accept Missouri's demonstration for this monitor is clearly flawed, and constitutes arbitrary and capricious action by EPA since it ignores its own data that argues for approving the state's determination for this monitor.

For the Brazoria, TX monitor, EPA's updated modeling shows that Missouri is no longer linked to this monitor because Missouri's contribution is 0.55 ppb, which is below 1 percent of the 2015 ozone standard. In our SIP submission, the Air Program utilized the flexibility in EPA's August memo, to avoid linkage with this receptor because Missouri's projected contribution was below 1 ppb. In the previous modeling, Missouri's contribution to this receptor was 0.88 ppb. Our SIP submission demonstrated that this monitor was not significantly impacted by upwind state contributions, and instead the receptor status was largely the result of contribution from local sources and international (Mexico) emissions. This is substantially similar to EPA's own determination in their latest actions associated with the proposed disapproval and the proposed FIP with respect to linkages between Oregon and California, where Oregon is absolved of their linkages to California for this very reason. However, EPA treats Missouri differently by denying this same basis for the determination that a 1 ppb threshold was appropriate as stated in our SIP submission. Further, the updated modeling provides even more proof that the analysis in our SIP was appropriate for this monitor, as Missouri's upwind contribution has now fallen below the significant contribution threshold (even without the 1 ppb flexibility provided for in EPA's August memo). For all of these reasons, EPA's determination to not accept Missouri's demonstration for this monitor is clearly flawed, and constitutes arbitrary and capricious action by EPA since it ignores its own data that argues for approving the state's determination for this monitor.

For the Harris, TX monitor, EPA's updated modeling shows this receptor as no longer being a maintenance receptor. The maximum 2023 projected design value for that monitor in the updated modeling is 68.5 ppb. In Missouri's good neighbor SIP submission, this was a nonattainment receptor with a maximum 2023 design value of 73.5 ppb. Missouri's contribution to this monitor was 0.88 ppb, thus qualifying it for the use of the flexibility offered in EPA's August memo. Similarly to the Brazoria monitor, Missouri's SIP submission explained that this monitor was not significantly impacted by upwind state contributions, and instead the receptor status was largely the result of contribution from local sources and international (Mexico) emissions. While EPA uses this same basis for approving Oregon's SIP using the updated modeling when it comes to 15 separate linkages in California that are at or above the 1 percent threshold and two receptors with contributions above 1 ppb, EPA denies this basis as included in Missouri's SIP submission for justifying the removal of the Harris, TX monitor linkage with Missouri at Step 2. Further, the updated modeling does not even include upwind state contributions for this monitor because there were fewer than five days where the modeled predicted maximum daily 8-hour

189

average (MDA8) was above 60 ppb. This provides even further evidence that this is no longer a linked problem receptor for Missouri. For all of these reasons, EPA's determination to not accept Missouri's demonstration for this monitor is clearly flawed, and constitutes arbitrary and capricious action by EPA since it ignores its own data that argues for approving the state's determination for this monitor.

For the Milwaukee, WI monitor, EPA's updated modeling shows this receptor as no longer being a maintenance receptor. The maximum 2023 projected design value for that monitor in the updated modeling is 68.4 ppb. In Missouri's good neighbor SIP submission, this was a nonattainment receptor with a maximum 2023 design value of 73.0 ppb. Missouri's contribution to this monitor was 0.93 ppb, thus qualifying it for the use of the flexibility offered in EPA's August memo. Similarly to the Wayne, MI monitor, Missouri's SIP submission explained that this monitor should qualify for the flexibility afforded in EPA's August memo, because Missouri's contribution was below 1 ppb and that the use of a 1 ppb threshold for this receptor would capture 79.4 percent of the total contribution from upwind states and 83 percent of the upwind state contributions captured through the use of a 0.7 ppb threshold. These values are higher than the nationwide average values included in the August memo that were the basis for EPA stating the use of a one ppb threshold may be appropriate. However, in the proposed disapproval, EPA denied this rationale claiming that insufficient technical justification was provided for use of the 1 ppb flexibility. Now, EPA ignores their own updated modeling when evaluating Missouri's SIP, which not only no longer predicts this receptor as a nonattainment or maintenance receptor, but does not even calculate upwind state contributions for the receptor because there were fewer than five days where the modeled-predicted MDA8 was above 60 ppb. This provides even further evidence that this is no longer a linked problem receptor for Missouri. For all of these reasons, EPA's determination to not accept Missouri's demonstration for this monitor is clearly flawed, and constitutes arbitrary and capricious action by EPA since it ignores its own data that argues for approving the state's determination for this monitor.

For the Sheboygan, WI monitor, EPA's updated modeling still projects this receptor to be a nonattainment receptor, but the modeling does not include any upwind state contributions because there were fewer than five days where the model-predicted MDA8 was above 60 ppb. Clearly, the model is underperforming with respect to this receptor in the updated modeling. However, in using the rationale in Missouri's SIP submission with the previous modeling, this monitor was impacted so heavily by in-state and neighboring state emissions that the use of a threshold even higher than 1 ppb was appropriate. Where in-state and two neighboring state emissions contributed 31.9 ppb of the design value in the previous modeling, it belittles any case or justification for bringing in Missouri as a linked state to this monitor. The Air Program notes that EPA submitted no comments with regard to the use of a 2 ppb significant contribution threshold for this monitor, which implies EPA was satisfied with the rationale included in the SIP at the time of submittal, and only now, after years of sitting on the submission does EPA reverse course and explain in highly generic terms that it will not accept Missouri's demonstration for this monitor. With the low model performance at this receptor, and the substantially unique position of the level of contribution coming from the states bordering Lake Michigan, there is certainly insufficient information to conclude that this receptor should cause Missouri's SIP to be disapproved. For all of these reasons, EPA's determination to not accept Missouri's demonstration for this monitor is clearly flawed, and constitutes arbitrary and capricious action by EPA since it ignores its own data that argues for approving the state's determination for this monitor.

The fact that Missouri is no longer linked to any of the receptors analyzed in our SIP submission provides adequate cause and justification to conclude that EPA's proposed disapproval is inappropriate. EPA's updated modeling is proof that the SIP Missouri submitted adequately evaluated and demonstrated that Missouri had addressed its good neighbor SIP obligations at Step 2 for every receptor evaluated in the submission. However, EPA ignores these facts in its proposed disapproval, not even giving them lip service. This arbitrary and capricious action shows that EPA cherry-picked information to make its case, and ignored relevant, inconvenient facts in the record that do not support EPA's conclusion.

The Air Program notes that EPA's proposed disapproval goes on to point out that the updated modeling has identified four additional receptors (all in the Lake Michigan area) that Missouri is now linked to. These receptors were not identified as linked receptors in the previous modeling relied upon in our SIP submission. EPA uses this as further evidence to justify their proposed disapproval. This sleight-of-hand move by EPA is a direct attack on Missouri's right to develop its own SIP. If EPA is going to move the target more than two years after the submission is made and use that tactic to justify its action, then a proposed disapproval cannot be the appropriate action. If EPA desires to make a formal finding that Missouri's SIP is inadequate because of these newly identified receptors, it must approve our original SIP and then issue a SIP call to provide Missouri a chance to address the receptors that have been newly identified in the updated modeling. Failure to do so, would circumvent EPA's obligation to put forth any effort for cooperative federalism as envisioned in the Clean Air Act. Such action would instead favor stripping states of their rights and imposing hundreds of millions of dollars in compliance costs without adequate justification or the opportunity for states to update and retain control over their SIP. For these reasons, EPA must withdraw the proposed disapproval and take action to approve Missouri's submission.

[…]

The Air Program notes again that none of the monitors that Missouri is linked to in the updated modeling were linked monitors in the previous modeling that Missouri had evaluated and demonstrated against at step 2 in our previous SIP submission. Therefore, the Air Program objects to the use of these monitors as a basis for the SIP disapproval and the proposed imposition of a FIP.


**Commenter:** Arkansas Department of Energy and Environment, Division of Environmental Quality

**Commenter ID:** 07

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

Interstate Transport Framework Step 1: Identification of Downwind Air Quality Problems

As a result of EPA's choice to substitute new modeling for the modeling data provided to states for development of SIP submittals, the attainment and maintenance receptors identified for Step 1 of the Interstate Transport Framework differ. As specified by EPA, DEQ used 2023 future year results provided in EPA's March 2018 Memorandum to identify nonattainment and maintenance receptors. In the Proposed Rule, EPA proposes to rely primarily upon 2023 and 2026 future year results from the 2016v2

modeling platform. Based on this new modeling data, the only receptor that DEQ identified as having a potential linkage to Arkansas at Step 2 of the framework (Allegan County, MI) is no longer among the areas identified as nonattainment and maintenance receptors in Step 1. EPA's choice to primarily rely on new information instead of the demonstrations that the state made using data provided by EPA at the time of SIP development degrades ADEQ's confidence that it can rely upon technical information provided by EPA for decision-making in any future iterations. The proposed reliance by EPA on new information effectively renders the extensive analyses performed by DEQ during the development of the Arkansas Transport SIP as irrelevant. DEQ believes this erodes the cooperative federalism framework and degrades the working relationship between DEQ and EPA Region 6 and EPA Headquarters.

EPA maintains that "differing results [do not] mean that the modeling or the EPA methodology for identifying receptors or linkages is inherently unreliable," and goes on to say that "Arkansas was linked to **some set** of these receptors, even if [...] Arkansas was linked to **different receptors** in one modeling run versus another) [emphasis added]. EPA's argument is contradictory; something cannot be "inherently reliable" (i.e., "dependable") if it does not produce the same results with consistency. The inconsistency in results in EPA modeling gives further weight of support to the state utilizing resources at its disposal (including HYSPLIT modeling) to augment and ground-truth information provided by EPA to determine **which set** of receptors to evaluate for linkages in Step 2 and "significant contribution" in Step 3 of the interstate transport framework recommended by EPA for this type of analysis.

[...]

Interstate Transport Framework Step 2: Identifying Linkages

[...]

Substituting the data that Arkansas relied upon in its SIP development and the threshold that Arkansas chose to identify linkages results in a different set of linkages than DEQ identified in its SIP. In its 2019 submittal, DEQ identified one maintenance receptor, Allegan County (Arkansas projected contribution = 1.64 ppb), based on modeling results from EPA's March 2018 Memorandum. In EPA's 2022 disapproval of DEQ's 2019 submittal, based on EPA's 2016v2 modeling platform, EPA identified four maintenance receptors—481210034, Denton, TX (Arkansas projected contribution = 0.76 ppb); 480391004, Brazoria, TX (Arkansas projected contribution = 1.39 ppb,); 482011034, Harris, TX (Arkansas projected contribution = 1.38 ppb); and 482011035, Harris, TX (Arkansas projected contribution = 1.34 ppb)—and one nonattainment receptor—482010055, Harris, TX (Arkansas projected contribution = 1.00 ppb)—as linked to Arkansas. Had this updated modeling information been available at the time of SIP development, DEQ would have focused its analysis of potential linkages in Texas instead of the receptor in Michigan.

To give perspective from a state's standpoint, EPA's 2016v2 modeling indicates that one Texas monitor linked to Arkansas emissions (Brazoria County, 480391004), and projected by EPA 2016v1 modeling to be in nonattainment in 2023, is now projected to achieve attainment without further controls. DEQ did not perform an analysis for the Brazoria County monitor because Arkansas's contribution was below DEQ's analytical threshold of 1 ppb. Three Texas monitors (Denton County, 481210034; Harris County, 482011034; and Harris County, 482011035) are projected by both the 2016v1 and 2016v2 modeling to be maintenance-only in 2023. One Arkansas-linked Texas monitor (Harris County, 482010055),

previously projected by the 2016v1 modeling to be in attainment in 2023 is now projected by the updated modeling to be in nonattainment in 2023. Essentially, EPA provided states with one set of data and "linkages" upon which states based their SIP submittals, then proposed to disapprove the same SIPs based on a completely different set of data. DEQ finds that this decision is arbitrary and capricious, and amounts to a bait and switch, allowing the EPA to usurp the states.

In summary, EPA's 2016v2 modeling in support of EPA's SIP disapproval identified three receptors with "linkages" to Arkansas that were not originally identified at the time of SIP development. Of the top five linked receptors listed in the 2016v2 modeling and disapproval, only two were also listed in EPA's March 2018 Memorandum (i.e., the state was only made aware of three supposed "linkages" to downwind receptors in EPA's 2022 proposed disapproval of the state's SIP submission). The contributions for these two receptors ranked third and fifth in EPA's March 2018 Memorandum (both receptors were below DEQ's threshold), and ranked first and fifth in EPA's 2016v2 modeling, with an increase of 0.49 ppb and 0.18 ppb, respectively. This caused a receptor that was originally modeled to show a contribution that was below DEQ's threshold (0.90 ppb contribution) to sharply increase past the threshold in the updated modeling (1.39 ppb contribution). The receptor with the second-highest contribution identified in EPA's 2016v2 modeling and disapproval ranked sixth in modeling results from EPA's March 2018 Memorandum; again, a downwind receptor that was well below the threshold at the time DEQ was developing the SIP (0.54 ppb contribution) modeled with more than one and one-half times the contribution in EPA's 2016v2 modeling results (1.38 ppb contribution).  At the time of SIP development, DEQ could not predict that modeling conducted four years after the SIP submittal was due to EPA would produce such varied results on the receptors the state was analyzing in its submission; nor could DEQ appropriately focus limited state resources on the receptors with which EPA is now concerned in their disapproval. The state submitted a robust and well-justified SIP, based on information available to DEQ at the time. EPA disregards this fact.

[…]

DEQ agrees that some of the newly identified linkages now meet the state's threshold for further analysis of emissions sources in the state, and while EPA did not undertake this analysis before proposing a FIP with costly emissions reductions across broad sectors, Arkansas, now aware of a different set of linkages, is working on a new analysis based on the updated modeling results provided by EPA in the proposed disapproval.


**Commenter:** Eagle Materials Inc.

**Commenter ID:** 16

**Docket ID:** EPA-R09-OAR-2022-0138

**Comment**:

Nevada adopted a broad and intentionally overinclusive approach to assessing its interstate transport obligations, using EPA's latest contribution modeling, released just months prior in March 2018, "to identify and quantify contributions greater than 0.5 percent of the 2015 ozone NAAQS resulting from

Nevada's anthropogenic emissions" for further analysis. Despite its belief that EPA's 1% linkage threshold was inappropriate for "use in the western United States," the state applied this threshold in order to take a "very conservative approach" to determining whether Nevada was linked to any downwind air quality problems. Nevada relied on EPA's modeling, emphasizing that "[a]lthough models can always be refined and there may be differences in certain approaches to technical issues as the NDEP has commented, it is the NDEP's position that the USEPA's modeling is state-of-the-science given the USEPA's constraints."

Nevada reviewed its contributions to receptors in California and Colorado under this framework, considering relative intrastate contributions and overall interstate contributions. Based on this extensive analysis, Nevada determined that "the contribution of 2023 base case anthropogenic NOx and VOC emissions from sources within Nevada to any projected 2023 nonattainment or maintenance receptor at greater than 0.5 percent of the NAAQS is limited to two states, California and Colorado." However, for each of these receptors, "Nevada's contribution… [was] less than one percent of the 2015 ozone NAAQS," meaning that under EPA's own analytical approach, Nevada was not linked to downwind air quality problems and that no further reductions measures were necessary.

Despite Nevada's highly conservative assessment of its interstate transport obligations, EPA's Proposed Disapproval nevertheless concludes, based on new air quality modeling using the 2016v2 emissions platform, that Nevada is now linked to 2 receptors in Utah. Nevada's contribution to these receptors is between 0.86 ppb and 0.89 ppb, which falls below the 1 ppb linkage threshold determined by Nevada to be more appropriate for Western states, where "interstate contributions… are relatively small, especially given the large contributions from background and intrastate emissions." EPA unreasonably imposes its own analysis in evaluating Nevada's SIP, rather than determining whether Nevada's analysis was reasonable.

[…]

During the 2 year period in which EPA failed to perform its statutory duty to act on Nevada's SIP submission, EPA completed significant new modeling using its newly released 2016v2 Model, finalized in 2022. Based on this new model, released more than 3 years after Nevada submitted its revised SIP and nearly 2 years after EPA was required to act on this SIP submission, EPA substantially altered its analysis of downwind air quality problems and state linkages. Nevada relied on EPA's previous modeling in assessing its interstate transport obligations, concluding based on this modeling that it "would contribute below 1 percent of the NAAQS to receptors in 2023 and was therefore not 'linked' to any other state." However, EPA's new modeling completely altered this analysis, finding that Nevada is linked to two receptors in Utah, in Salt Lake County and Davis County. EPA's use of entirely new modeling moved the goal Nevada attempted to meet in good faith, well after EPA was required to take final action on the state's SIP submission.

**Commenter:** Evergy, Inc.

**Commenter ID:** 21

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

Six receptors were identified in the original modeling relied upon for the Missouri SIP submission. EPA then updated the modeling and determined that all six of these receptors are no longer linked to Missouri. The lack of any linkage with the updated modeling should be adequate to justify EPA approving the SIP. EPA's updated modeling for Missouri identified four new receptors near Lake Michigan.

**Commenter:** Idaho Power Company

**Commenter ID:** 23

**Docket ID:** EPA-R09-OAR-2022-0138

**Comment:**

Nevada's SIP fulfills the state's Good Neighbor obligations.

Nevada reasonably concluded that it is not linked to significant downwind air quality problems. Nevada adopted a broad and intentionally overinclusive approach to assessing its interstate transport obligations, using EPA's latest contribution modeling, released just months prior in March 2018, "to identify and quantify contributions greater than 0.5 percent of the 2015 ozone NAAQS resulting from Nevada's anthropogenic emissions" for further analysis. Despite its belief that EPA's 1% linkage threshold was inappropriate for "use in the western United States," the state applied this threshold in order to take a "very conservative approach" to determining whether Nevada was linked to any downwind air quality problems. Nevada relied on EPA's modeling, emphasizing that "[a]lthough models can always be refined and there may be differences in certain approaches to technical issues as the NDEP has commented, it is the NDEP's position that the USEPA's modeling is state-of-the-science given the USEPA's constraints."

Nevada reviewed its contributions to receptors in California and Colorado under this framework, considering relative intrastate contributions and overall interstate contributions. Based on this extensive analysis, Nevada determined that "the contribution of 2023 base case anthropogenic NOx and VOC emissions from sources within Nevada to any projected 2023 nonattainment or maintenance receptor at greater than 0.5 percent of the NAAQS is limited to two states, California and Colorado." However, for each of these receptors, "Nevada's contribution… [was] less than one percent of the 2015 ozone NAAQS," meaning that under EPA's own analytical approach, Nevada was not linked to downwind air quality problems and that no further reductions measures were necessary.

[…]

Despite Nevada's highly conservative assessment of its interstate transport obligations, EPA's Proposed Disapproval nevertheless concludes, based on new air quality modeling using the 2016v2 emissions platform—which was not available to Nevada when developing its SIP—that Nevada is now linked to 2 receptors in Utah. Nevada's contribution to these receptors is between 0.86 ppb and 0.89 ppb, which falls below the 1 ppb linkage threshold determined by Nevada to be more appropriate for Western

states, where "interstate contributions…are relatively small, especially given the large contributions from background and intrastate emissions." Yet, EPA arbitrarily deems these contributions "significant" for the purposes of assessing the adequacy of Nevada's SIP.

Importantly, EPA's analysis relies on modeling that was not available until <u>3 years after</u> Nevada timely submitted its revised SIP. Under the CAA, states are required to submit revised SIPs within 3 years after EPA revises the NAAQS. EPA's revision of the ozone NAAQS on October 1, 2015 triggered this obligation. Nevada submitted its revised SIP to EPA on October 1, 2018, relying on modeling that EPA released just 6 months prior. Nevada specifically determined that EPA's data represented the "best available data with which to conduct Nevada's transport analysis," which EPA does not dispute in its Proposed Disapproval. Rather, EPA asserts that "[b]y using the updated modeling results, the EPA is using the most current and technically appropriate information for this proposed rulemaking." However, EPA fails to consider whether Nevada's analysis using the best available data at the time was reasonable and fails to even acknowledge the substantial change imposed by EPA's new modeling, increasing Nevada's contribution to Utah receptors from under 0.5% of the NAAQS to above EPA's 1% threshold.

**Commenter:** Minnesota Pollution Control Agency

**Commenter ID:** 31

**Docket ID:** EPA-R05-OAR-2022-0006

**Comment:**

The MPCA supports EPA's goal of reducing ozone precursors and their transport to protect the environment and human health across states. However, EPA's proposed disapproval of Minnesota's 2015 Ozone Transport SIP does not assess the quality of Minnesota's original submittal. Minnesota was identified as a non-significant contributor (below 0.7 parts per billion) to any ozone monitors in the 2018 modeling performed by both EPA and Lake Michigan Air Directors Consortium (LADCO). Minnesota did not complete steps three or four of the 2015 Ozone Transport SIP based on that information. Minnesota's original submittal should have been approved based on contribution information available from both EPA and LADCO at that time.

EPA is now proposing to use a revised 2016 modeling platform, EPA 2016 version 2 emissions modeling platform (2016v2 EMP) to support a remedy for the Interstate Transport Rule for the 2015 Ozone National Ambient Air Quality Standard (NAAQS).

**Commenter:** Nevada Division of Environmental Protection

**Commenter ID:** 33

**Docket ID:** EPA-R09-OAR-2022-0138

**Comment:**

196

EPA has provided an unsupportable and illogical basis for disapproval of Nevada's 2018 iSIP. EPA states: "However, as mentioned above, the EPA has <u>newly available information</u> that indicates that sources in Nevada are linked to downwind air quality problems for the 2015 ozone standards. We therefore propose that Nevada <u>was required</u> to assess additional emissions control opportunities, and we propose to disapprove its submission because Nevada did not so." [(emphasis added)] EPA's basis for disapproval is rooted in a condition that would have been impossible for NDEP to meet, essentially reasoning that NDEP should have known the results of EPA's most recent modeling completed in 2021 when Nevada was preparing the 2018 iSIP.

**Commenter:** Oklahoma Department of Environmental Quality

**Commenter ID:** 37

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

Results of the EPA's Step 1 and Step 2 Modeling and Findings for Oklahoma (Modeling Sensitivities)

As stated in Section III, above, EPA identified different receptors in the proposed disapproval than were identified in the original modeling on which Oklahoma relied in its SIP. EPA states in the proposed disapproval:

> We recognize that the results of the EPA (2011 and 2016 base year) modeling indicated different receptors and linkages at Steps 1 and 2 of the 4-Step interstate transport framework. These differing results regarding receptors and linkages can be affected by the varying meteorology from year to year, but we do not think the differing results mean that the modeling or the EPA methodology for identifying receptors or linkages is inherently unreliable. 87 Fed. Reg. 9823.

It should also be specifically noted that the number of receptors EPA linked to Oklahoma decreased from six to just two. Furthermore, only one receptor remained consistent between the two modeling runs, and the expected contribution regarding that receptor decreased. This information demonstrates how sensitive the models can be to changes over time. More specifically, it exemplifies how, as time progresses and the model does not have to project as far into the future, the results change. The differences in the modeling results have skewed heavily towards a decrease in the number of (and contribution to) receptors linked to Oklahoma. Therefore, due to the discrepancies in the modeling, ODEQ argues that Oklahoma is not clearly linked to any receptors that EPA has linked to Oklahoma.

The table below further exemplifies the problem of modeling sensitivities. It contains data for the ozone monitors located in the Illinois portion of the Chicago, Illinois-Indiana-Wisconsin Nonattainment Area. Note that of the 12 monitors, only Site 170310032 exceeds the 1% NAAQS threshold of 0.7 ppb. This site barely exceeded the limit, measuring at 0.75 ppb. However, this measurement could be misleading since Site 170310032 is located less than 0.2 miles from Lake Michigan. This location could be greatly influencing the results as models often have difficulties near water-land boundaries. Furthermore, the average of the Oklahoma impact for the 12 monitors equates to 0.41 ppb, well under the 1% limit.

| Site ID | State | County | 2016-Centered Avg | 2016-Centered Max | 2020 DV | 2023 Avg No Water | 2023 Max No Water | OK 2023 |
|---------|-------|--------|------|------|------|------|------|------|
| 170310001 | Illinois | Cook | 73.0 | 77 | 75 | 69.6 | 73.4 | 0.55 |
| 170310032 | Illinois | Cook | 72.3 | 75 | 74 | 69.8 | 72.4 | 0.75 |
| 170310076 | Illinois | Cook | 72.0 | 75 | 69 | 69.3 | 72.1 | 0.35 |
| 170311003 | Illinois | Cook | 68.3 | 69 | 73 | 65.6 | 66.3 | 0.45 |
| 170311601 | Illinois | Cook | 69.3 | 70 | 71 | 65.2 | 65.8 | 0.15 |
| 170313103 | Illinois | Cook | 62.7 | 64 | 65 | 59.5 | 60.8 | 0.24 |
| 170314002 | Illinois | Cook | 68.7 | 72 | 71 | 66.5 | 69.7 | 0.33 |
| 170314007 | Illinois | Cook | 72.0 | 74 | 71 | 68.7 | 70.6 | 0.35 |
| 170314201 | Illinois | Cook | 73.3 | 77 | 77 | 69.9 | 73.4 | 0.36 |
| 170317002 | Illinois | Cook | 74.0 | 77 | 75 | 70.1 | 73.0 | 0.52 |
| 170436001 | Illinois | DuPage | 69.7 | 71 | 71 | 65.8 | 67.0 | 0.45 |
| 170971007 | Illinois | Lake | 73.7 | 75 | 72 | 68.6 | 69.9 | 0.57 |

After a monumental effort to understand ozone and precursor transport by EPA, State, and Local Air Quality Agencies, the Ozone Transport Assessment Group, published an Executive Report in 1997. In the Recommendations Section under Major Modeling/Air Quality Conclusions, it states "Regional NOx reductions are effective in producing ozone benefits, the more NOx reduced the greater the benefit. Ozone benefits are greatest where emission reductions are made and diminish with distance."

The modeling and assessment efforts for the Clean Air Interstate Rule (CAIR) and the CSAPR demonstrate that how the state of Oklahoma impacts a downwind state depends as much on the meteorology of the chosen modeling time-period as it does the emissions.

In the modeling process, measured data is input into a meteorological model, and then a combination of some measured data—but mostly calculated data—is input into an emissions model. These outputs are then input into an air quality model. Considering the variable flow and conversion of data in the process, the results become more estimation than reality.


**Commenter:** Tennessee Department of Environment and Conservation

**Commenter ID:** 41

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

EPA may not disapprove Tennessee's Infrastructure SIP based on Prong 2 of CAA §110(a)(2)(D)(i)(I) because Tennessee satisfied its Good Neighbor obligations in its 2018 iSIP submission.

As discussed in Comment #2, once an upwind state has determined that it is not "linked" to a downwind state under Framework Step 2, there is no reason to continue to Steps 3 and 4. This is precisely the conclusion that Tennessee reached in its 2018 iSIP submission to EPA, and EPA understands exactly why Tennessee did so. As EPA itself notes in the iSIP Disapproval: "the most recently available EPA modeling at the time Tennessee submitted its SIP submittal indicated the State did not contribute above 1 percent

of the NAAQS to a projected downwind nonattainment or maintenance receptor." In other words, EPA acknowledges that Tennessee was not "linked" to any downwind states in 2018 based on then-available data and modelling, and therefore would not have been required to complete Steps 3 and 4 of the interstate transport framework analysis.

Nonetheless, EPA now proposes to disapprove Tennessee's SIP submission, based on data EPA published in 2021 and 2022 finding that Tennessee is "linked" to a single maintenance receptor in Denton County, Texas. EPA is suggesting that Tennessee's 2018 technical analysis was flawed because it failed to consider *future* data that were not collected until years after the original submission was made, which would have required Tennessee to perform Steps 3 and 4. As EPA puts it: "Because the entire technical basis for Tennessee's submittal is that the State is not linked at Step 2, EPA proposes to disapprove Tennessee's SIP submission based on EPA's finding that a linkage does exist."

As we noted in Comment #1, EPA's entire approach and rationale in this proposed disapproval makes it impossible for any SIPs a state might submit under the 2015 ozone standard or any future NAAQS to demonstrate compliance with CAA §110(a)(2)(D) because not only must a state consider the evidence available at the time of submission, but a state must also possess the ability to consider *future* evidence that might demonstrate significant contributions to downwind nonattainment or interference with maintenance in a downwind state. The proposed disapproval of Delaware's iSIP in the *Federal Implementation Plan Addressing Regional Ozone Transport for the 2015 Ozone National Ambient Air Quality Standard* perfectly illustrates this point. In Section IV.C.1 of the preamble to the proposed rule ("Correction of EPA's Determination Regarding Delaware's SIP Submission and Its Impact on EPA's FIP Authority for Delaware"), EPA addresses Delaware's Good Neighbor obligations as follows:

[see full comment for comment's excerpt of 87 FR 20036 (April 6, 2022)]

This structure runs contrary to the principle articulated by the Supreme Court in *EPA v. EME Homer City Generation, L.P.* that EPA must work toward an "efficient and equitable solution to the allocation problem the Good Neighbor Provision requires the Agency to address." Instead, EPA's imposition of such an unworkable approach is a textbook failure to comply with EPA's obligation to "select from among reasonable options" under the *Chevron* framework and imposes an entirely arbitrary and capricious standard that states are effectively incapable of following.

The Clean Air Act does not envision nor suggest that states be held to an impossible standard when developing SIPs. Because EPA has provided no evidence that Tennessee was "linked" to any downwind states when it submitted its 2018 SIP revision, EPA may not disapprove Tennessee's Infrastructure SIP based on Prong 2 of CAA §110(a)(2)(D)(i)(I) and therefore should withdraw its proposed disapproval.


*Response*

The EPA explained at proposal that the EPA's proposed disapprovals relied both on an evaluation of the information supplied by the states in their submissions and on the updated version of modeling available at the time of proposal (2016v2) *see, e.g.*, 87 FR 9801, a point reiterated in the final preamble in Section V.A. EPA responds generally to comments related to the use of updated modeling in Section V.A.4 of the preamble.

In recent years, the EPA has continually leveraged public input to improve the modeling used to support its assessment of good neighbor transport obligations for the 2008 ozone NAAQS and 2015 ozone NAAQS, a process starting with the release of a notice of data availability in January 2017 and continuing through the comment period of this action, as detailed in the preamble in Sections II.C. and III.A. The 2016v2 emissions modeling files have been available for comment since September 2021,[52] and the meteorological data has been available as used in the 2016v1 platform since October of 2020 (with the release of the proposed Revised CSAPR Update) By providing the modeling platform on September 20, 2021, and requesting that comments be provided to EPA's emissions modeling group by December 17, 2021, and also providing ample time for comment on the proposals throughout 2022, the EPA gave stakeholders and interested parties sufficient opportunity to review and comment on the data used to develop the 2016v2 modeling.

The EPA incorporated public comments received on proposals related to 2015 ozone NAAQS interstate transport to update its emissions inventories and other model inputs, some examples of which are detailed in the EPA's response to comments in Section 3 (Emissions Inventories). The final rule modeling using the 2016v3 platform was performed using updated emissions projections, such as additional emissions reductions for electric generating units (EGUs) that reflect the emissions reductions following promulgation of the Revised CSAPR Update for the 2008 ozone NAAQS, more recent information on plant closures and fuel switches, and other sector trends. The construct of the updated emissions platform is described in the 2016v3 Emissions Modeling technical support document (TSD) contained in the docket of this rulemaking. The final rule modeling additionally took into consideration feedback from commenters to improve overall model performance. Thus, by using the updated modeling results based on the new 2016v3 platform, the EPA appropriately took commenter feedback into consideration when finalizing this rulemaking and used the most current and technically appropriate information to do so.

These commenters raise two distinct, but related, circumstances associated with EPA's use of updated modeling to inform its action on the SIP submittals. Commenters referring to the Arkansas, Missouri, and Oklahoma submissions generally acknowledge that these states were linked above 1 percent of the NAAQS (and also 1 ppb) to a set of receptors in the 2011-based modeling of 2023 released in the March 2018 memorandum. They complain, however, that the EPA's new modeling resulted in a new set of linkages, which the states were unable to address since these linkages were unknown at the time of SIP submission. Commenters on the Minnesota, Nevada, and Tennessee disapprovals assert that the states were not linked to any receptors above 1 percent of the NAAQS in the EPA's 2011-based modeling released in the March 2018 memorandum and so these states did not have an opportunity to address any linkages now identified in the updated EPA modeling.

The EPA will take these two sets of comments in turn, noting that the EPA responds to general claims regarding the timing of the EPA's action on SIPs and its use of updated modeling in Section V.A of the Preamble. Other issues raised by these comments are addressed in Sections V.A and V.B of the preamble and in the following sections of this RTC document: 1.1 (Timing of SIP Actions), 1.4 (Use of Updated Modeling), 4.2.1 (Model Performance at Lake Michigan), 7.1 (Methodology for Determining Future Year Contributions),  7.4 (August 2018 Memorandum), 10.2 (SIP Call),10.3 (Cooperative

---

[52] https://www.epa.gov/air-emissions-modeling/2016v2-platform.

Federalism and the EPA's Authority), 11.3 (Transport Policy), 11.4 (Transport Policy-Western State Ozone Regulation), 11.6 (Economic Impacts), and 11.15. (Out of Scope – Comments on the Proposed FIP).

Different Linkages

With regard to ADEQ's claims, we recognize that the results of the EPA's 2011-based modeling released in the March 2018 memorandum and the 2016v2 modeling (2016 base year) identified different linkages for Arkansas at Steps 1 and 2 of the 4-step framework. In Arkansas's SIP submission, based on a 1 ppb contribution threshold and relying primarily on EPA's 2011-based modeling, ADEQ identified only one projected maintenance receptor, Allegan County, MI, and no projected nonattainment receptors linked to Arkansas in 2023. The EPA summarized Arkansas's analysis of this linkage at proposal. 87 FR at 9803-05. The EPA evaluated ADEQ's analysis and identified substantial technical concerns with the basis for ADEQ's conclusions that it should not be considered linked to that receptor. 87 FR at 9808-09. In other words, the EPA finds Arkansas's submission deficient on its own terms.

ADEQ also argues that changes in linkages between modeling iterations suggests that the EPA's modeling is unreliable. Here, the EPA disagrees. When multiple rounds of modeling, each more up-to-date than the last, continue to confirm certain upwind states are linked, it actually *reinforces* the EPA's conclusion that the upwind state is contributing to receptors at Step 2 of the 4-step framework. A change in modeling output from the 2011-based modeling to the 2016-based modeling results in part from the shift to a more recent meteorological year and other updates. It is completely reasonable and acceptable for the Agency to update its modeling platform periodically, and it is imminently reasonable to do so before taking final rulemaking action.

ADEQ explains that it would have spent a greater effort examining linkages to Texas receptors if it had known the 2016v2 modeling results when it was preparing its SIP submission. The EPA responds that the 2011-based modeling, 2016v2 modeling, and 2016v3 modeling all identify that Arkansas contributes more than 1 percent of the NAAQS to the Brazoria County, Texas receptor (AQS Site ID 480391004), but Arkansas chose to apply a 1 ppb contribution threshold and did not closely examine that linkage in its submission.

We do not think the differing results between the 2011-based and 2016-based modeling of 2023 mean that the modeling or the EPA methodology for identifying Arkansas's receptors or linkages is inherently unreliable. Rather, these separate modeling runs indicated (1) that there were receptors that would struggle with nonattainment or maintenance in the future, and (2) that Arkansas was linked to some set of these receptors, even if the receptors and linkages differed from one another in their specifics (e.g., a different set of receptors were identified to have nonattainment or maintenance problems, or Arkansas was linked to different receptors in one modeling run versus another). We think this common result indicates that Arkansas's emissions were substantial enough to generate linkages at Steps 1 and 2 to some set of downwind receptors, under varying assumptions and meteorological conditions, even if the precise set of linkages changed between modeling runs. Under these circumstances, we think it would have been appropriate for the state to proceed to a Step 3 analysis to determine what portion of Arkansas's emissions should be deemed "significant." In making this observation, we do not now consider the earlier modeling results included in the EPA's March 2018 memorandum to be of equal reliability relative to the more recent EPA 2016v2 or 2016v3 modeling. However, where alternative or

older modeling generated linkages, even if those linkages differ from linkages in the EPA 2016v2 modeling, that information provides further evidence, not less, in support of a conclusion that the state is required to proceed to Step 3 to further evaluate its emissions.

Commenters on the proposal as to Missouri similarly argue that the set of receptors to which Missouri is linked changed from the 2011-based to the 2016-based modeling of 2023. But the same response applies. Missouri Department of Natural Resources (MDNR) and Evergy argue that because the 2016v2 modeling projects that Missouri does not have any of the same linkages that were identified in the 2011-based modeling, that EPA must approve Missouri's SIP submission. The EPA disagrees that the 2016v2 modeling validates the assessment of receptors Missouri made in its SIP submission. The EPA summarized Missouri's analysis of these linkages based on the EPA's 2011-based modeling at proposal. 87 FR at 9539-9540. The EPA evaluated MDNR's analysis, including its rationale for applying a 1 ppb contribution threshold, and identified substantial legal and technical concerns with the basis for MDNR's conclusions that it should not be considered linked to any receptors or that Missouri has no outstanding good neighbor obligations for the 2015 ozone NAAQS. 87 FR at 9540-9544. In other words, the EPA finds Missouri's submission deficient on its own terms. The EPA also notes that the difference between a 1 percent of the NAAQS threshold and a 1 ppb threshold is not meaningful to the conclusion that Missouri is linked at Step 2, because Missouri contributes more than 1 ppb to a downwind receptor in 2023 both in the modeling relied on by the state and in the additional modeling developed by EPA to inform both the proposed and final actions (2016v2 and 2016v3).  At proposal, the EPA analyzed MDNR's arguments attempting to establish that in spite of the EPA's modeling it was not linked to the receptors as the EPA had found in the March 2018 memorandum. The EPA found for multiple reasons that those arguments were not approvable. *See* 87 FR at 9540-43. Thus, even accepting an argument that the EPA should not consider information beyond that available to a state in the development of its SIP submission (a position we do not agree with but adopt for the sake of argument), the SIP submission would have been disapproved based on that analysis and even if there was no additional modeling for the EPA to rely on. In short, the commenter has not established that the EPA's review of the arguments advanced by MDNR, as explained in our proposal, was in error in terms of the specific reasoning that MDNR had advanced. Nonetheless, the EPA then went on to find that different linkages existed between Missouri and out of state receptors based on the updated, 2016v2 modeling, *see* 87 FR at 9543-44, which is again confirmed by the 2016v3 modeling. Commenter has not established that these modeled linkages are in error.

In response to ODEQ, the EPA agrees that both changes in emission inputs and meteorology can impact modeling results. However, the EPA does not agree that the trend in the number of linkages or levels of contribution from Oklahoma in iterations of the EPA's modeling relieves Oklahoma of further obligations, or that changes in linkages amount to "discrepancies" that support a conclusion that Oklahoma is "not clearly linked" to receptors.  We also disagree that the EPA methodology for identifying receptors or linkages is unreliable. Rather, the EPA's separate modeling runs continued to show (1) that there were receptors that would struggle to attain or maintain the NAAQS in the future, and (2) that Oklahoma was linked to some set of these receptors, even if the receptors and linkages differed from one model run to the next. This common result indicates that Oklahoma's emissions are substantial enough for EPA's contribution assessment to generate linkages at Steps 1 and 2 to some set of downwind receptors, under varying assumptions and meteorological conditions, even if the precise

set of linkages changed between modeling runs. In sum, the continued identification of Oklahoma linkages with updated modeling reinforces the conclusion that the state is potentially significantly contributing to nonattainment or interfering with maintenance in another state.

The EPA cannot accept the arguments advanced by ADEQ, Evergy, MDNR, and ODEQ that Arkansas, Missouri, and Oklahoma should not be considered linked to downwind receptors when the record as a whole establishes: both in the 2011 and 2016-based modeling of 2023, such linkages do exist, and the EPA explained in proposing this action why the states' arguments, taken on their own merits and without regard to the updated modeling, were still not approvable. This is no "sleight of hand" but simply an evaluation of the totality of the information before the Agency.

<u>Unlinked to Linked</u>

In response to comments related to states that were not considered linked to a downwind receptor (i.e., maximum contribution to a downwind receptor was less than 0.7 ppb) in the 2011-based modeling but were linked in EPA's 2016v2-based modeling, the EPA first notes that the Agency is not taking final action on its proposed disapproval of Tennessee's 2015 ozone NAAQS good neighbor SIP submission in this action, but does recognize that the comments made by Tennessee Department of Environment and Conservation regarding Tennessee are similar to those made by Eagle Materials, Idaho Power Company, Minnesota Pollution Control Agency, and Nevada Division of Environmental Protection related to Minnesota and Nevada.

Commenters particularly took issue with the EPA's discussion of the deficiencies in Minnesota and Nevada's Step 3 analyses, interpreting the language in the proposal as EPA expecting these states to predict the future. The EPA is not holding any state to such a standard. The EPA acknowledges that identified linkages and levels of contribution from Minnesota and Nevada changed between the 2011-based modeling and the 2016v2 modeling. However, given that the later iteration of modeling is more up-to-date than the 2011-based modeling, the best conclusion to derive from these differences is that Minnesota and Nevada are potentially significantly contributing to nonattainment and/or interference with maintenance receptors and, as a result, the analyses presented in the SIP submissions cannot support the states' conclusions. (It bears repeating that EPA never indicated when it released the March 2018 Memorandum providing the 2011-based modeling results for 2023 that those results would guarantee any state a SIP approval. To the contrary, the memorandum advised that EPA would evaluate and act on SIP submissions through a future rulemaking action.)

Minnesota's good neighbor SIP submission concluded based on LADCO and EPA 2011-based modeling that the state would not be linked to any other state in 2023 and that ozone trends and existing limits and controls made it "reasonably certain" that the state will not significantly contribute to nonattainment or interference with maintenance in any other state.[53] The EPA cannot agree with this conclusion on the rationale presented in the SIP submission. EPA's 2016v1 modeling, using a 2016 base year and accounting for Minnesota limits and controls, was released in 2020 and identified that

---

[53] Infrastructure/110(a) requirements for the 2015 Ozone National Ambient Air Quality Standard (October 1, 2018) at 13.

Minnesota was linked to one or more downwind receptors.[54] LADCO was an integral part of the collaborative process to develop the 2016v1 emissions inventories, and Minnesota provided input as well (for example, onroad vehicle miles traveled and populations for 2016)[55]. Minnesota's comments on the 2016v2 modeling were incorporated into 2016v3 modeling as described in Section 3 of the RTC document; both also identify that Minnesota is linked. Additional details about the development of the 2016v3 emission inventories are available in the 2016v3 Emissions Modeling TSD. The EPA described its assessment of Minnesota's SIP submission at proposal, 87 FR 9868-9869, and responds to comments in the RTC document on the topic of air quality factors in Section 8.5 and the topic of existing and future controls in Section 8.3. The EPA explains its assessment of the 2016v3 modeling in relation to Minnesota in the preamble in Section IV.J. The 2016v3 Emissions Modeling TSD contains information about the changes to the emissions inventories between the 2016v2 and 2016v3 platforms.

NDEP's good neighbor SIP submission for Nevada said that

> [a]lthough models can always be refined and there may be differences in certain approaches to technical issues as the NDEP as commented, it is the NDEP's position that the USEPA's modeling is state-of-the-science given the USEPA's constraints. It is also the NDEP's position that the USEPA's contribution modeling is the best available data with which to conduct Nevada's transport analysis.[56]

The submission examined Nevada's contribution to receptors in California and Colorado based on the EPA's 2011-based modeling at Step 2.[57] Based on the EPA's 2011-based modeling, NDEP concluded at Step 3 that Nevada was not linked and so determined, on that reason alone, that no emissions reductions were necessary for the state to resolve its good neighbor obligations for the 2015 ozone NAAQS.[58] NDEP offered no other explanation for why Nevada's SIP submissions satisfied the requirements of CAA section 110(a)(2)(D)(i)(I) .[59] NDEP also stated in its iSIP submission on the topic of CAA section 110(a)(2)(D)(i)(I) that

---

[54] 87 FR 9868 at n.94 ("These modeling results are consistent with the results of a prior round of 2023 modeling using the 2016v1 emissions platform which became available to the public in the fall of 2020 in the Revised CSAPR Update, as noted in Section I. That modeling showed that Minnesota had a maximum contribution greater than 0.70 ppb to at least one nonattainment or maintenance-only receptor in 2023. These modeling results are included in the file 'Ozone Design Values And Contributions Revised CSAPR Update.xlsx' in docket EPA–HQ– OAR–2021–0663.").

[55] See the "Emissions Modeling Technical Support Document for the 2016v1 Emissions Modeling Platform" available in the Revised CSAPR Update docket as item EPA-HQ-OAR-2020-0272-0187.

[56] The Nevada Division of Environmental Protection Portion of the Nevada State Implementation Plan for the 2015 Ozone NAAQS: Demonstration of Adequacy (October 1, 2018), Appendix E at E-5. The Clark County and Washoe County portions of Nevada's good neighbor SIP submission for the 2015 ozone NAAQS were identical to NDEP's. Clark County Portion of the Nevada State Implementation Plan to Meet the Ozone Infrastructure SIP Requirements of Clean Air Act Section 110(a)(2) (August 2018), Appendix E; The Washoe County Portion of the Nevada State Implementation Plan to Meet the Ozone Infrastructure SIP Requirements of Clean Air Act Section 110(a)(2) (July 26, 2018), Appendix E.

[57] The Nevada Division of Environmental Protection Portion of the Nevada State Implementation Plan for the 2015 Ozone NAAQS: Demonstration of Adequacy (October 1, 2018), Appendix E at at E-5 – E-10.

[58] Id. at E-11.

[59] Id.

> Nevada commits to continue to review new air quality information as it becomes available to ensure that this negative declaration is still supported by such information.[60]

As explained previously in this response and in Section V.B.4 of the preamble, the EPA's 2011-based modeling is no longer state-of-the-science, and updated modeling no longer supports NDEP's conclusion, and so the EPA cannot approve NDEP's SIP submission on the rationale provided. As for NDEP's commitment to review new air quality modeling to ensure its conclusions related to good neighbor obligations remain "supported," the EPA observes that NDEP has not submitted a subsequent SIP submission even though the EPA's updated 2016v1 modeling, released in 2020, identified Nevada was linked to one or more receptors,[61] and the 2016v2 modeling, released in February 2022, indicated the same. The EPA's incorporation of comments related to emissions inventories in Nevada for the 2016v3 modeling platform is described in Section 3 (Emissions Inventories).

Given the information available to the EPA on the record before the Agency, the EPA cannot find that Minnesota or Nevada's SIP submissions contain adequate measures sufficient to eliminate significant contribution to nonattainment (Nevada) or interference with maintenance (Minnesota and Nevada) in any other state. The basis for these disapprovals is not intended to fault state agencies for developing SIP submissions using the modeling available to them at the time the SIP submissions were developed. A SIP disapproval is not punitive in any case, and states are free to develop an approvable SIP submission following a disapproval. The disapproval is simply a determination that the submissions before the EPA do not meet the CAA's requirements, based on the record of information before it at the time it acts.

In response to the comment regarding the EPA's proposed error correction of the prior approval of Delaware's good neighbor SIP submission for the 2015 ozone NAAQS, comments on the proposed FIP are beyond the scope of this rulemaking; however, the EPA notes that an error correction under CAA section 110(k)(6) is a revision of an EPA action due to a determination that the EPA's action was in error, not that a state failed to "consider *future* evidence." *See, e.g.*, 86 FR 23056, 23067-68 (April 30, 2021) (error correcting EPA's previous approval of Kentucky's 2008 ozone NAAQS good neighbor SIP in response to the holdings of *Wisconsin* and *New York*).

---

[60] *Id.* at 9.

[61] 87 FR 31492 n. 55 ("These modeling results are consistent with the results of a prior round of 2023 modeling using the 2016v1 emissions platform which became available to the public in the fall of 2020 in the Revised CSAPR Update, as noted in Section I. That modeling showed that Nevada had a maximum contribution greater than 0.70 ppb to at least one nonattainment or maintenance-only receptor in 2023. These modeling results are included in the file 'Ozone Design Values and Contributions Revised CSAPR Update.xlsx' in docket EPA–HQ–OAR–2021–0663.").

# 6   Step 1

## 6.1   Projected Air Quality Problems

### 6.1.1   Western Receptors

*Comment*

**Commenter:** WildEarth Guardians

**Commenter ID:** 50

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

While EPA's latest ozone modeling appears to more accurately project future year ozone design values than past EPA ozone modeling iterations, EPA's modeling continues to project unusually and unrealistically high declines in ozone design values ("DVs") by 2023, particularly at monitors in states with significant oil and gas activity, such as Colorado and Texas. WEG is concerned that EPA's modeled 2023 design values underestimate future 2023 design values and, as a result, fail to properly identify nonattainment and maintenance receptors.

[…]

EPA compared recent monitoring values and reasonably anticipated decreases in ozone design values on the order of approximately 0-1 ppb/yr (i.e., at most 3-4 ppb from 2020-2023) both within Texas and in other parts of the country. Based on this and other analysis, EPA determined that monitors with 2020 design values 4 to 7 ppb above the NAAQS and preliminary 2021 design values 1 to 5 ppb above the NAAQS are unlikely to attain the NAAQS and would likely need even more ozone DV decreases to not be considered a maintenance receptor. Drops in 8-hour ozone DVs on average of 7 ppb or more in three years at multiple monitors in this Colorado Front Range area and drops in 8-hour ozone DVs on average of 7.56 ppb or more in three years at many monitors in the Texas area would not typically be expected to occur unless there is an unexpectedly large change in emissions and/or large change in meteorological conduciveness for ozone generation. And yet, EPA's own modeling continues to forecast 2023 design values that would require ozone to decline by levels well beyond 3 to 4 ppb without identifying any corresponding large emission reductions not already accounted for in the modeling to be implemented in the 2021-2023 timeframe. In particular, EPA's modeled 2023 design values in Colorado and Texas in many cases projects even greater design value declines than forecast by the Texas Council of Environmental Quality in its 2015 Ozone Interstate Transport SIP.

[…]

The significant design value reductions EPA anticipates in 2023 resulted in EPA's failure to identify (and/or correctly identify) monitors as nonattainment or maintenance receptors for purposes of ozone transport analysis.

[…]

We request EPA explain the basis for why it is reasonable to expect ozone design value declines of these magnitudes at these and other monitoring sites that recorded 2020 or 2021 design values greater than or equal to 74 ppb.

We also request EPA incorporate modeling parameters into its ozone model that appropriately cap the amount by which ozone design values decline per year, according to EPA's analysis in its TSD for the EPA Region 6 2015 8-Hour Ozone Transport SIP Proposal.8 After incorporating these modeling parameters, we request EPA re-run its ozone transport model to identify more representative and realistic future year design values. If EPA declines this request, we request EPA explain the basis for its decision.

Lastly, we request EPA conduct a comparative analysis of past EPA ozone modeling projections and the actual observed design values to determine whether EPA ozone modeling tends to overestimate or underestimate future year design values. If EPA finds that the agency's models tend to underestimate future year design values, we request EPA re-run its ozone modeling, incorporating parameters that account for this tendency. If EPA declines this request, we further request EPA explain the basis for its decision.

*Response*

The response to this comment can be found in Section III of the preamble for this final action.

*Comments*

**Commenter:** WildEarth Guardians

**Commenter ID:** 50

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

In New Mexico: WEG states that EPA either chose not to model or not to report modeled results for future year design values for some monitors in New Mexico, including the monitors in Eddy and Lea Counties. Our understanding is that this may be because EPA modeling of the 2016 base year did not result in greater than or equal to five modeled maximum daily average 8-hour ("MDA8") ozone concentrations in excess of 60 parts per billion (ppb) at these monitor sites. The 2020 and 2021 design values in southern and southeastern New Mexico suggest that monitors in these areas will likely see 2023 ozone design values that continue to significantly exceed the 2015 ozone NAAQS, thus warranting future year modeling and state contribution analysis to determine whether upwind states are inappropriately causing or contributing to ozone violations. We request that EPA confirm exactly why it chose not to model future year design values for the monitors in Eddy and Lea Counties. In doing so, we request EPA provide the MDA8 ozone concentrations it modeled for the 2016 base year for the Eddy County and Lea County monitors in New Mexico.

WEG states that if EPA's modeled 2016 base year did not produce greater than or equal to five MDA8 ozone concentration greater than 60 ppb at certain New Mexico monitors, such as those in Carlsbad and Hobbs, they ask that EPA explain why it considers this modeling accurate or representative of ozone conditions in these areas. Given actual monitoring data, any model that fails to produce at least five MDA8 ozone concentrations in Eddy and Lea Counties in 2016 likely contains significant flaws. For the past seven years, the monitors in Eddy County and Lea County have consistently recorded 8-hour ozone concentrations well above 60 ppb. Moreover, for the 2016 base year, EPA's excel file at Docket ID: EPA-HQ-OAR-2021-0663- 0013 identified 10 observed days exceeding 60 ppb at the City of Carlsbad monitor, 23 observed days exceeding 60 ppb at the Carlsbad Caverns National Park monitor, and 13 observed days exceeding 60 ppb at the City of Hobbs monitor. We request EPA help us fully understand its rationale for not modeling future year emissions at these monitors and conducting the associated state contribution analysis. If it is the case that EPA's model does not generate greater than or equal to five MDA8 ozone concentrations at these monitors, we further request EPA evaluate why its modeling protocol is generating such divergent results compared to actual monitoring data. We further ask that EPA explain its rationale for not modeling future year emissions at these monitors given the dramatic increase in ozone design values since 2016.

As we discuss further below, EPA explained in the Technical Support Document ("TSD") for the EPA Region 6 2015 8-Hour Ozone Transport SIP Proposal that it would not expect ozone design values to decrease by more than 0-1 ppb per year. As such, the 2020 and 2021 design values in Southeast New Mexico suggest that monitors in this area will likely see 2023 ozone design values that exceed the 2015 ozone NAAQS and, thus, warrant future year modeling and state contribution analysis to determine whether upwind states are inappropriately causing or contributing to ozone violations.

WEG also requests that EPA explain what legal, regulatory, or guidance provisions – if any – prohibit EPA from including Southeast New Mexico monitors from its ozone transport modeling and analysis. Absent future year modeling, EPA effectively has identified the monitors in Southeast New Mexico as attainment rather than as nonattainment or maintenance receptors. This constructive determination plainly contradicts the current ozone concentrations and design values and trends, and violates the Clean Air Act.

**Commenter:** WildEarth Guardians

**Commenter ID:** 50

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

In light of the well-documented ozone pollution problem documented at monitoring sites in southern and southeastern New Mexico, WEG requests that EPA apply the analysis described in Sections 1 and 2 of the Technical Support Document (TSD) for the EPA Region 6 2015 8-Hour Ozone Transport SIP Proposal to TCEQ's modeled 2023 design values for Eddy County and Dona Ana County monitors in New Mexico, identified below. Specifically, they request EPA evaluate recent design value monitored trends in Dona Ana and Eddy Counties to determine what potential design value declines – if any – could be

expected by 2023. Using this information, we request EPA compare the TCEQ modeled 2023 design values for the monitors in these counties to the 2020 monitored design value and preliminary 2021 design values and determine whether TCEQ's modeling is underestimating future ozone design values in this region of New Mexico. Accurately determining whether monitors in Southern and Southeast New Mexico qualify as nonattainment or maintenance receptors is essential because TCEQ identified Texas anthropogenic emission sources as contributing well in excess of 1% of the NAAQS, or 0.70 ppb, to the vast majority of monitors in New Mexico – a potentially significant contribution to nonattainment or interference with maintenance. Accordingly, given the likelihood that these monitoring sites are likely to remain in exceedance of the 2015 NAAQS by the 2023 attainment deadline, it is critical that EPA's analysis take into account Texas's significant contribution to ozone pollution in southern and southeastern New Mexico. Understanding Texas's contribution is an essential first step towards ensuring that a Good Neighbor FIP for Texas take the steps needed to ensure that emissions from Texas – including those from the oil and gas industry – do not significantly contribute to non-attainment in New Mexico.

*Response*

As described in the preamble for this final action, the EPA is relying upon projected 2023 design values and contributions based on the 2016v3 modeling platform. This platform reflects updates made in response to comments on the 2016v2 platform used for the proposed disapprovals. The final action modeling's projected 2023 average and maximum design values and the contributions from Texas to monitors in Dona Ana and Eddy counties are provided in the table below. The data in the table show that the monitors in Dona Ana and Eddy counties each have projected 2023 average design values below the NAAQS but projected maximum design values above the NAAQS. As described in the preamble, the EPA identifies such monitors as maintenance-only receptors. In addition, based on the EPA's 2016v3 modeling, emissions from Texas contribute well above the 1 percent of the NAAQS screening threshold to projected 2023 ozone design values at these four monitoring sites.

*Table 6-1 2023 Average/Maximum Design Values and Texas Contributions to Monitors in Dona Ana and Eddy Counties*

| County | AQS ID | 2023 Average/ Maximum Design Values (ppb) | 2021 Measured Design Value (ppb) | Texas Contributions (ppb) |
|---|---|---|---|---|
| Dona Ana | 350130021 | 70.8/72.1 | 80 | 4.74 |
| Dona Ana | 350130022 | 69.7/72.4 | 75 | 3.59 |
| Eddy | 350151005 | 69.7/74.1 | 77 | 1.91 |
| Lea | 350250008 | 69.8/72.2 | 66 | 2.17 |

## 6.1.2   Receptors Linked to Texas

*Comments*

**Commenter:** Association of Electric Companies of Texas, BCCA Appeal Group, Texas Chemical Council and Texas Oil & Gas Association

**Commenter ID:** 11

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

EPA's assessment of TCEQ's 2023 future year projections was arbitrary and capricious. EPA inappropriately relied on its own "ballpark" estimates of future ozone observations to assess the reliability of TCEQ's modeling of those future conditions. A non-modeled "ballpark" evaluation of future design values against estimated future year observations is not a valid technical basis to conclude that TCEQ's 2012 platform was less reliable than EPA's 2016v2 platform at predicting Chicago-region ozone.

[From Sonoma Technology Attachment:] EPA's use of estimated future ozone observations that are yet to occur is not an appropriate basis to analyze a model's reliability to project future design values. The projected 2023 design values from TCEQ's modeling (with a 2012 base year) are similar to projected 2023 design values that were estimated from two other credible air quality modeling platforms with a 2011 base year. As part of EPA's rationale for the proposed disapproval of TCEQ's Transport SIP, EPA compared TCEQ's 2023 ozone design value projections to estimated future year observations of ozone at downwind receptors in Illinois, Wisconsin, and Michigan. EPA also compared TCEQ's 2023 ozone design values at these receptors with 2023 ozone design values calculated from EPA's 2016v2 modeling. EPA concluded that TCEQ's projections likely underestimated future ozone levels and likely prevented TCEQ from identifying nonattainment/maintenance receptors in those states. While there may be some challenges to evaluating modeled estimates of future air quality concentrations, EPA's use of estimated future ozone observations that are yet to occur is not an appropriate or robust approach for such an evaluation. In assessing TCEQ's 2023 future design values, EPA analyzed observed ozone design value trends between 2011 and 2020 and used the ozone trend between those years to estimate the range of ozone design values that might be anticipated in 2023. EPA acknowledged that this approach for estimating future observed DVs is only a "ballpark" estimate, is not as exact as developing new modeling, and does not reflect any legal or policy judgements. EPA uses this estimate to conclude that ozone DVs will decrease at most by 3-4 ppb between 2020 and the 2023 future year. EPA then compares the resulting "estimated" 2023 monitor DV to the TCEQ modeled 2023 future DV. For the subset of monitors in Illinois, Wisconsin, and Michigan with 2020 DVs ≥ 74 ppb, EPA calculates the average amount of decrease in DVs needed to match TCEQ's 2023 projection is around 9 ppb, which is more than 3-4 ppb average decrease over three years that EPA estimates using its "ballpark" approach. EPA concludes that decreases in the ozone DV of 9 ppb in three years do not typically occur but for large changes in emissions and/or meteorology, and therefore proposes to find that TCEQ's model underestimates future DVs. However, long-term (10 year) trends in the ozone DV are not always indicative of how the actual DV will change in a shorter (3 year) time period. Even within EPA's 10-year analysis period, the DVs at Chicago area monitors have changed by 9 ppb or more over a three-year period (see Table 5 [available in full comment]). EPA's modeling guidance recommends a model

210

performance evaluation of the base year to establish whether an air quality model is performing acceptably and can be considered reliable for estimating future design values. EPA found that TCEQ's base year model performance evaluation was reasonable. A non-modeled "ballpark" evaluation of future design values against estimated future year observations is not a valid technical basis to conclude that TCEQ's 2012 platform was less reliable than EPA's 2016v2 platform at predicting Chicago-region ozone. Evaluations of modeled future year DVs and the air quality model's response to emissions changes are more robust and reliable when they are based on actual observed air quality data, as done by Pegues et al. (2012), Foley et al. (2015). EPA's substitution of a "ballpark" estimate of future observations departs from accepted norms for evaluating modeled future-year ozone concentrations.

EPA concluded that TCEQ's 2023 projected design values were understated, but TCEQ's projected design values were comparable to future design values projected by two other modeling platforms with a 2011 base year that were both released in 2018: one from EPA, and one from the Lake Michigan Air Directors Consortium (LADCO). Both platforms were developed in support of the Interstate Transport "Good Neighbor" Provision for the 2015 8-hour ozone NAAQS. The projected 2023 design values from these modeling platforms are compared to the 2023 projected design value from TCEQ's modeling in Table 9 [available in full comment]. The Illinois Environmental Protection Agency used the modeling results from both EPA's and LADCO's 2011-based platforms to support its maintenance plan for the Illinois portion of the Chicago ozone nonattainment areas for the 2008 NAAQS, which EPA recently proposed to approve. In its proposed approval of the maintenance plan and redesignation, EPA noted that both sets of 2023 modeling results provided evidence that ozone concentrations will continue to decrease across the Chicago nonattainment area, consistent with TCEQ's justification.

**Commenter:** The Luminant Companies

**Commenter ID:** 44

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

In an effort to manufacture errors in TCEQ's future modeling projections, EPA points not to real world data or even to competing multi-grid modeling, but to its own back of the envelope guesses about the future.  Drawing conclusions about one model by comparing its results to those of another model cannot be definitive and is only a surrogate for a comparisons of the models themselves.  Even worse, here, EPA uses what it admits is only "a ballpark estimate" to evaluate TCEQ's modeling. But in no way can EPA's "ballparking" be considered more reliable than TCEQ's sophisticated photochemical modeling. EPA's rationale is not only unlawful, but it is dangerous precedent for future SIP submissions and review.

Regardless, even using its unfounded comparison, the best EPA can say is that TCEQ's modeling is "likely underestimating future ozone levels, which "may have prevented TCEQ from identifying nonattainment/maintenance receptors."  Ultimately, EPA can only conclude that TCEQ's projections "may understate anticipated ozone levels" in certain downwind areas, which is not a valid basis for disapproval. Moreover, EPA disregards the fact that TCEQ's modeling, in fact, is conservative, as it includes NOX emissions from eight EGUs that have since shut down, totaling approximately 4,885 tons

211

of NOX for the 2023 ozone season. EPA's "ballpark estimate" approach is too flawed in its premise and too insufficient in its conclusions to discredit the highly sophisticated modeling performed by TCEQ and does not show that TCEQ has failed to satisfy any statutory standard.  Rather, TCEQ's projections of future design values appropriately identify downwind nonattainment/maintenance receptors.


**Commenter:** The Luminant Companies

**Commenter ID:** 44

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

TCEQ's projected design values, which EPA criticizes for not matching its "ballpark estimates," nevertheless align with the projections of other modeling platforms that EPA has recently endorsed. Specifically, a modeling platform developed by EPA itself that was released in 2018 and a modeling platform from the Lake Michigan Air Directors Consortium ("LADCO") produce design values comparable to that of TCEQ's. EPA has approved both of these other models for purposes of the 2015 ozone NAAQS. Therefore, it is apparent that EPA's second-guessing of TCEQ's approach by feigning concern about the results of TCEQ's modeling projections is disingenuous. EPA's inconsistent treatment of the various models is arbitrary and capricious and cannot support EPA's disapproval.


**Commenter:** Texas Commission on Environmental Quality

**Commenter ID:** 42

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

TCEQ disagrees with the EPA's use of updated 2016 base year modeling to evaluate TCEQ's Transport SIP submittal since the modeling data was unavailable at the time TCEQ developed its SIP revision. The EPA's use of modeling platform and monitoring data that was unavailable at the time TCEQ developed its Transport SIP revision is arbitrary and unreasonable. The TCEQ submitted its 2015 Ozone NAAQS Transport SIP Revision to the EPA on August 17, 2018. EPA did not issue the modeling platform it uses in this proposed disapproval until September 2021 (which included the 2016 base year), nearly three years after the statutory deadline for SIP revisions submissions. Obviously, TCEQ did not have access to this modeling platform and data when it developed its SIP revision. However, the TCEQ did use the latest modeling data it had available and made significant improvements on EPA's method. Additionally, the EPA has issued no rules regarding the use of EPA's modeling and monitoring data in the development of Transport SIP revisions.

The only other modeling data available at the time the TCEQ started developing its Transport SIP revision was the EPA's 2011-base year modeling. For monitors identified by EPA as nonattainment or maintenance and linked to Texas in 2023, the TCEQ modeled 2023 design values are similar to the

preliminary modeling EPA conducted for the 2015 Ozone NAAQS Preliminary Interstate Transport Assessment, as seen in Table 1, EPA and TCEQ Modeled Design Values in 2023 from EPA 2016, EPA 2011, and TCEQ 2012 Modeling. This 2011-base modeling by the EPA is similar to the TCEQ's modeling and also shows attainment with the 2015 NAAQS for the monitors EPA identifies as maintenance or nonattainment linkages in its 2016v2 modeling. In fact, for four of the five monitors for which comparable 2010-2012 monitoring data exist, the TCEQ modeled 2023 design values are higher than the EPA 2011-base modeled design values. The TCEQ contends that the difference in base year and increased projection time may explain the lower TCEQ 2023 design values compared with EPA 2023 design values based on 2016 base year modeling. In Table 1 below, the EPA nonattainment design value is based on the average of the three design values in the five-year base year period and the maintenance design value is based on the maximum of these three design values.

Table 1: EPA and TCEQ Modeled Design Values in 2023 from EPA 2016, EPA 2011, and TCEQ 2012 Modeling.

| Receptor (Site ID, County, State) | Nonattainment / Maintenance (EPA 2016v2 2023) | EPA 2016v2: 2023 Nonattainment/ Maintenance Design Value (ppb) | EPA 2011v6.3: 2023₃ Nonattainment/ Maintenance Design Value (ppb) | TCEQ 2012: 2023 Nonattainment/ Maintenance Design Value (ppb) |
|---|---|---|---|---|
| 170310001, Cook County, IL | Maintenance | 69.6/73.4 | 63.3/65.1 | 60/58 |
| 170310032, Cook County, IL | Maintenance | 69.6/73.4 | 57.6/60.0 | 68/66 |
| 170314201, Cook County, IL | Maintenance | 69.9/73.4 | 56.6/58.4 | 64/62 |
| 170317002, Cook County, IL | Maintenance | 70.1/73.0 | 54.1/57.0 | 66/65 |
| 550590019, Kenosha County, WI | Nonattainment | 72.8/73.7 | 59.7/61.9 | 67/66 |
| 550590025, Kenosha County, WI | Maintenance | 69.2/72.3 | No 2010-2012 monitoring data | No 2010-2012 monitoring data |
| 551010020, Racine County, WI | Nonattainment | 71.3/73.2 | No 2010-2012 monitoring data | No 2010-2012 monitoring data |

Based on this information, if the EPA had relied on modeling conducted for 2023 using emission information available when the TCEQ was required to submit its SIP revision, such as the 2011v6.3 platform, it would not have identified the monitors listed above as nonattainment or maintenance monitors because modeled 2023 design values were below 71 ppb.

Analysis of the EPA and TCEQ modeling also shows greater difference between the predicted 2023 design values and the observed 2020 design values as the prediction time lengthens. Figure 2, Difference in Design Value Predicted in 2023 versus Observed in 2020. Predictions are from the EPA 2011 modeling (upper left), TCEQ 2012 modeling (upper right), and EPA 2016 modeling (lower) shows that the mean difference across common monitors decreases from -6.20 ppb for a 12-year prediction time, to -6.08 for

an 11-year prediction, to -4.34 for a seven-year prediction time. The shaded interquartile range of the distribution also tightens with decreasing prediction time, indicating uniformly better prediction. Note that the TCEQ 2012 modeling shows a similar design value difference to the EPA 2011 modeling indicating similar performance. The difference in design values is largely explained by the shorter prediction time, as seen in Figure 2, Difference in Design Value Predicted in 2023 versus Observed in 2020 versus Length of Prediction, where the TCEQ 2012 modeling is shown as the eleven-year prediction length roughly on the linear trend of the three models. The TCEQ chose to use a 2012 base year since it was the most comprehensive, non-anomalous, and best modeling platform available when the modeling needed to commence to meet the SIP development and submittal deadlines.


**Commenter:** Xcel Energy

**Commenter ID:** 52

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

The EPA erred in the approach taken to modeling the influence Lake Michigan has on the receptor sites located near the air/water shoreline boundaries in Cook County Illinois, Kenosha, and Racine Wisconsin, which was factored into the modeling performed by TCEQ and others, further supported by comments filed by the Association of Electric Companies of Texas (AECT) and the associated modeling analysis performed by Sonoma Technology.

[...]

3. EPA's Air Plan Proposed Approval finding Illinois Portion of the Chicago-Naperville, Illinois Indiana-Wisconsin Area to Attainment of the 2008 Ozone Standard

On March 10th, 2022 EPA proposed to designate that the Illinois portion of the Chicago Naperville, IL-IN-WI area (Chicago area) in attainment for the 2008 ozone National Ambient Air Quality Standards. Cook County, the receptor area linked to Texas's designation as exceeding the contribution threshold, makes up a large portion of the Chicago area. The approval goes on to state:

*"While modeling is not required, Illinois cited photochemical modeling performed by EPA and LADCO in support of the interstate transport ''Good Neighbor'' provision of the CAA for the 2015 ozone NAAQS. These modeling results project the highest 2023 average design values to be 0.0662 and 0.0668, well below the 2008 ozone NAAQS. Compared to actual monitored 2009-2013 average design values, both sets of 2023 modeling results show large decreases in ozone concentrations, especially in the heart of the urban area and at the critical monitors at the north of the nonattainment area along the shore of Lake Michigan. These results provide evidence that ozone will continue to decrease across the entire nonattainment area."*

The region's ozone design values from both the LADCO and EPA's modeling results show the region below the 2008 standard, below the 2015 threshold of 0.070 ppb, and that ozone concentrations are expected to continue to decrease across the area. This result conflicts with the finding that Texas is

linked to contributing above the impact threshold in Illinois/Chicago in evaluating its SIP for the 2015 Ozone NAAQS. At a minimum, it raises the question as to why EPA found the 2016v2 modeling platform to be superior to the TCEQ photochemical analysis in determining Texas's contribution in modeling efforts performed for the 2015 Ozone NAAQS.

Given the adverse effects this proposed FIP has on grid reliability, and a states' economy, EPA should utilize appropriate modeling techniques, collaborative engagement with impacted states and allow states whose SIPs are disapproved adequate opportunity to respond and provide updated SIP submissions.

*Response*

In response to comments regarding projected design values for 2023 at monitoring sites in the Lake Michigan areas, as provided in Table 1 from TCEQ's comment document, the EPA compared these model-projected average and maximum design values to projected design values based on EPA's 2016v3 modeling as well as to 2021 final design values. The modeling-based design values for 2023 from TCEQ's comment document (i.e, EPA 2016v2, EPA 2011v6.3, and TCEQ 2012) along with projected average and maximum design values based on EPA's 2016v3 modeling and the 2021 design values are shown in the table below (Table 6-2). Comparing the projected maximum design values from TCEQ's 2012-based modeling to the 2021 measurement-based design values indicates that TCEQ's projections are likely to largely understate 2023 design values. The EPA's older 2011-based design values also appears to be low-biased. In contrast, the EPA's 2016-based projected maximum design values provide a more credible projection of what design values may be in 2023 at these monitoring sites. The fact that the EPA's 2016-based projections more closely align with recent measured data serves to underscore the importance of the EPA's move to this new platform to provide the most credible data for evaluating interstate contributions in this action.

215

*Table 6-2 Comparison of Modeling-based Design Values to 2021 Measured Design Values*

| Receptor (Site ID, County, state) | Nonattainment / Maintenance (EPA 2016v2 2023) | EPA 2016v2: 2023 Nonattainment/ Maintenance Design Value (ppb) | EPA 2011v6.3: 2023[3] Nonattainment/ Maintenance Design Value (ppb) | TCEQ 2012: 2023 Nonattainment/ Maintenance Design Value (ppb) | EPA 2016v3: 2023 Nonattainment/ Maintenance Design Value (ppb) | 2021 Measured Design Value (ppb) |
|---|---|---|---|---|---|---|
| 170310001, Cook County, IL | Maintenance | 69.6/73.4 | 63.3/65.1 | 60/58 | 68.2/71.9 | 71 |
| 170310032, Cook County, IL | Maintenance | 69.6/73.4 | 57.6/60.0 | 68/66 | 67.3/69.8 | 75 |
| 170314201, Cook County, IL | Maintenance | 69.9/73.4 | 56.6/58.4 | 64/62 | 68.0/71.5 | 74 |
| 170317002, Cook County, IL | Maintenance | 70.1/73.0 | 54.1/57.0 | 66/65 | 68.5/71.3 | 73 |
| 550590019, Kenosha County, WI | Nonattainment | 72.8/73.7 | 59.7/61.9 | 67/66 | 70.8/71.7 | 74 |
| 550590025, Kenosha County, WI | Maintenance | 69.2/72.3 | No 2010-2012 monitoring data | No 2010-2012 monitoring data | 67.6/70.7 | 72 |
| 551010020, Racine County, WI | Nonattainment | 71.3/73.2 | No 2010-2012 monitoring data | No 2010-2012 monitoring data | 69.7/71.5 | 73 |

Comments related to EPA's use of updated modeling can be found in Sections III and V.B.4 of the preamble and in Sections 1.4 (Use of Updated Modeling) and 5 (Updates to Modeling and Changes in Linkages). Comments related to the timing of EPA's action can be found in Section V.A of the preamble and Section 1.1 (Timing of SIP Actions).

### 6.1.3   Meteorologically Adjusted Ozone Trends
*Comment*

**Commenter:** Louisiana Department of Environmental Quality

**Commenter ID:** 27

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

EPA used variable selection and quantile regression, an unproven technique that the states were not afforded the opportunity to review and provide comment.

*Response*

The EPA disagrees with this comment. The variable selection and quantile regression technique that the EPA is using to analyze ozone trends after adjusting for the influence of interannual variability in meteorology was published in a peer-reviewed journal, Atmospheric Environment, in March 2021.[62] States and stakeholders had an opportunity to review this article during the proposal comment period of this action. The EPA responds to other comments about this document from LDEQ in Section 1.8 (Docket Document Availability).

## 6.2   EPA Methodology for Determining Maintenance Receptors

*Comment*

**Commenter:** Alabama Department of Environmental Management

**Commenter ID:** 02

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

Alabama suggests the Denton County receptor is not actually a future maintenance receptor. Had EPA followed the TSD, Alabama could not have contributed significantly at the Denton County, Texas receptor because the model results would not have identified the receptor as a future nonattainment or maintenance area, given EPA did not have ten days of "high-ozone" for the receptor.

There is some question whether the Denton County, Texas receptor (481210034) is actually a future maintenance receptor at all. When looking at EPA's modeling technical support document (TSD), the basic approach for calculating the average contribution metric includes averaging the Maximum Daily Average 8-hr concentration (MDA8) in 2023 using the following steps:

1. For the model grid cells containing an ozone monitoring site, calculate the 8-hour average contribution from each source tag to each monitoring site for the time period of the 2023 modeled MDA8 ozone concentration on each day;

2. Average the MDA8 concentrations for the top 10 modeled ozone concentration days in 2023 and average the 8-hour contributions for each of these same days for each tag (Alabama);

---

[62] Wells, B., Dolwick, P., Eder, B., Evangelista, M., Foley, K., Mannshardt, E., et al. (2021). Improved estimation of trends in U.S. ozone concentrations adjusted for interannual variability in meteorological conditions. *Atmospheric Environment*, *248*, 118234.

3. Divide the 10-day average contribution for each tag by the corresponding 10-day average concentration to obtain a Relative Contribution Factor (RCF) for each tag at each monitor; and

4. Multiply the 2023 average design values by the corresponding RCF to produce the average contribution metric value for each tag at each monitoring site in 2023.

To avoid including contributions on days that are well below the NAAQS, EPA applied a criterion that five or more of the top 10 model-predicted concentration days must have MDA8 concentrations ≥ 60 ppb in order to calculate a valid contribution metric**.** The Denton County monitor used to calculate Alabama's contribution meets this minimum criterion, but only barely– monitor ID 481210034 had only six modeled days above 60 ppb and only one day above 70 ppb (Table 5 [available in full comment]). Those six days (not 10) were used to calculate an average contribution of 0.71 ppb for Alabama. Interpreting the language in the technical support document suggests that EPA should have calculated Alabama's average contribution using all ten days. If all ten days are used, Alabama's contribution clearly falls below EPA's established 0.71 ppb threshold, with a tenth-highest value of 57.39 ppb. It is also important to note that, of 153 modeled days, only one day (September 21) exceeded 70 ppb at all.


*Response*

This comment confuses the distinct analytical steps and data sources for making determinations at Step 1 and at Step 2. As explained at proposal, at Step 1, the EPA applied the same approach used in the CSAPR Update and the Revised CSAPR Update (86 FR 23078–79) to identify nonattainment and maintenance receptors for the 2008 ozone NAAQS. *See, e.g.*, 87 FR 64416-64417 (October 25, 2022). This method at Step 1, using the 2016v2 modeling, identified the Denton receptor. Commenter does not explain why that method is improper, e.g., why the use of a relative response factor to ground future projections to historical data is not appropriate. Commenter takes issue more specifically with the Step 2 methodology for calculating contribution, which is different from Step 1. However, the EPA's approach for calculating the future year average contribution metric provides a technically reliable estimate of contributions. In calculating the average contribution metric, the EPA typically uses modeled contributions on the 10 days in the future year with the highest model-predicted concentrations. In part because the formation of ozone from precursor emissions can be nonlinear and dependent on meteorological conditions, the response of ozone to emission reductions can vary from day to day. For cases in which the base year model simulation does not have 10 days with ozone values greater than or equal to 60 ppb at a site, we use all days with ozone greater than or equal to 60 ppb, as long as there were at least 5 days that meet this criterion.  At monitor locations with less than 5 days with modeled 2016 base year ozone greater than or equal to 60 ppb, no RRF or DVF is calculated for the site and the monitor in question was not included in this analysis.

Consistent with EPA's modeling guidance, when calculating the contribution metric values, EPA applied a criterion that 5 or more of the top 10 model-predicted concentration days must have MDA8 concentrations greater than or equal to 60 ppb in the future year to calculate a valid contribution metric. The criterion of having at least 5 days with MDA8 ozone concentrations greater than or equal to 60 ppb was chosen to avoid including contributions on days that are well below the NAAQS in the calculation of the contribution metric. Using 5 days with MDA8 ozone greater than or equal to 60 ppb

218

aligns with recommendations in the EPA's air quality modeling guidance for projecting future year design values.

Thus, the EPA disagrees with the comment that the contributions to the receptor in Denton, Texas should be based on all of the top 10 days even though there were only 6 days with modeled ozone greater than or equal to 60 ppb. The EPA's response to comments on the methodology can be found in Section 7.1 (Methodology for Determining Future Year Contributions).


*Comment*

**Commenter:** Alabama Power Company, Southern Power Company, and PowerSouth Energy Cooperative

**Commenter ID:** 04

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

In criticizing Alabama's SIP as providing "limited supporting information to show that the Denton County, Texas, maintenance receptor is unlikely to violate the NAAQS in 2023," EPA points to its October 2018 memorandum providing guidance for use in evaluating maintenance receptors. In the October 2018 memorandum, EPA stated that "[m]eteorological conditions including temperature, humidity, winds, solar radiation, and vertical mixing affect the formation and transport of ambient ozone condition." Attachment A to these comments supplements the modeling provided by ADEM in its 2022 SIP and includes model runs on June 19, 2021, for the Denton County receptor that include pressure, ambient air temperature, solar radiation flux, relative humidity, mix layer depth, and rainfall.

EPA also criticized ADEM for only including a centerline; however, what ADEM provided is all that can be produced using the NOAA HYSPLIT Model. EPA suggested no potential alternatives that could be used for analysis. Instead, the back trajectories were run for each hour on June 19, 2021, from 0000 to 1800 UTC for 10, 250, and 500 meters to provide a swath of the state that air packets could have moved over.

The October 2018 Memorandum also provides the basis for using this data for analysis, stating that, "[i]n general, below average temperatures are an indication that meteorological conditions are unconducive for ozone formation, whereas above average temperatures are an indication that meteorology is conducive to ozone formation." The model shows that ambient air temperatures warmed as the air moved towards Texas from 30$^\circ$F, 65$^\circ$F, and 80$^\circ$F to 80$^\circ$F, 80$^\circ$F, and 100$^\circ$F for the 500m, 250m, and 10m trajectories, respectively. This model also shows the air stalling over southwest Texas before moving north to Denton County, especially for the 10m trajectory where the air spent nearly two and a half days in Texas. This model shows that meteorological conditions were not conducive for ozone formation in Alabama, but rather ozone was formed locally.

Again, air normally does not move westward from Alabama into Texas on high ozone days, and when it does, "significant" amounts of ozone precursors are not produced by EGUs nor is ozone formation conducive in Alabama. By removing Alabama's contribution to the Denton County, Texas monitor, such monitor would no longer be a maintenance monitor in accordance with the October 2018 Memorandum.

*Response*

In the October 2018 memorandum on page 4 the EPA states that a "state could justify exclusion of a monitoring site as a maintenance receptor, notwithstanding modeling projections showing a maximum design value exceeding the 2015 ozone NAAQS." The memorandum describes technical analyses and information that the EPA expects states to include with their SIP submission to justify excluding specific monitoring states that would otherwise be identified as maintenance receptors. As stated in the memorandum, one element of the justification should be a showing that "meteorological conditions in the area of the monitoring site were conducive to ozone formation during the period of clean data or during the alternative base period design value used for projections." Appendix A to the October 2018 Memorandum states that "Ozone is more readily formed on warm, sunny days when the air is stagnant and/or when the winds are favorable for transport from upwind source areas." Appendix A includes information that states could use to support an analysis of ozone conducive meteorological conditions.

The commenter's argument for justifying that Alabama should not be linked to the Denton County receptor was not based on an analysis of meteorological conditions *in the area of the monitoring site* in terms of whether the temperatures in the area were warmer of cooler than normal, as stated in the October 2018 memorandum. Rather, the commenter chose to examine temperatures along the path of trajectory on a particular day. The commenter used these data to claim that the air warmed along the trajectory path from Alabama to the Denton County receptor. The commenter then argued that the meteorology was unconducive to ozone formation over Alabama. This argument is technically flawed. Simply because the air parcel temperature warmed between Alabama and Denton, or that there was unconducive meteorology over Alabama, does not provide a technically sound justification that the meteorology was unconducive to ozone formation over Denton. Furthermore, it appears that the commenter made a typographical error when reporting that the air temperature was $30^\circ$F (i.e, below freezing) at 500m given that the trajectory was created for a day in June and the temperatures were $65^\circ$F and $80^\circ$F at 250m and 10m, respectively.

The EPA's response to the portion of the comment related to interpreting the centerline of the trajectory can be found in Section 8.8 (Hybrid Single-Particle Lagrangian Integrated Trajectory (HYSPLIT) Model).

## 6.3   TCEQ's Alternative Methodology for Determining Maintenance Receptors

*Comments*

**Commenter:** Association of Electric Companies of Texas, BCCA Appeal Group, Texas Chemical Council and Texas Oil & Gas Association

**Commenter ID:** 11

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

TCEQ's methodology for selecting maintenance monitors was appropriate and justified in accordance with an EPA October 2018 guidance memo that provided certain flexibilities including the use of a DV from the base period that is not the maximum design value.

TCEQ's choice to use the latest measured DV over the relevant base period instead of the maximum measured DV was reasonable given the history of ozone design values since 2012, the meteorology during the 2012-2014 period, and emissions trends from 2010-2019

The data does not support EPA's conclusion that the 2012-2014 period was "not particularly conducive to ozone formation, at least for many receptors" compared to the 2010-2012 and 2011-2013 periods (TCEQ's alternative approach for selecting maintenance receptors involved selecting the 2012-2014 DV). Nationally, 2012 was among the highest ozone years since 2005-2007 even when statistically adjusting for meteorological variability (Figure 2). Any ozone design value that included 2012 would have included at least one year with exceptionally conducive meteorology for high ozone.

Direct text: "…TCEQ's methodology for selecting maintenance monitors was appropriate and justified. As noted above, the CAA does not require a specific process for the selection of maintenance monitors. EPA's preferred approach for selecting maintenance receptors involves determining the maximum future design value ("DV") at each receptor based on a projection of the maximum measured DVs over the relevant base period. However, states are not required to utilize EPA's approach. EPA issued a memorandum in October 2018 providing guidance on potential flexibilities and alternative methods that states may use with technical justification to identify maintenance receptors, including the use of a DV from the base period that is not the maximum design value. TCEQ's choice to use the latest measured DV over the relevant base period instead of the maximum measured DV was technically justified and reasonable given the history of ozone design values since 2012, the meteorology during the 2012–2014 period, and emissions trends from 2010– 2019. TCEQ sufficiently explained these expert choices in its SIP submittal. EPA's approach for selecting maintenance monitors necessitates an overly conservative estimate of the maximum projected future-year design values and overly conservative selection of receptors.

Likewise, EPA's assessment of TCEQ's 2023 future year projections was arbitrary and capricious. EPA inappropriately relied on its own "ballpark" estimates of future ozone observations to assess the reliability of TCEQ's modeling of those future conditions. EPA cannot substitute its own simplified guesses about future conditions for TCEQ's robust modeling. EPA's "ballpark" estimate is not an objective measure of the reliability of TCEQ's modeling nor is it a valid technical or legal basis for evaluating future ozone. Such a method fails to demonstrate that TCEQ's SIP does not comply with the Act. As outlined by the Sonoma Technology analysis, sound air quality planning is based on valid and accurate modeled predictions grounded on actual observed ozone levels. Relying on its own flawed future year ozone estimates, EPA asserts that TCEQ's modeling underestimates future (2023) ozone levels and that the TCEQ method is flawed. According to EPA, these underestimations likely prevented TCEQ from identifying nonattainment and/or maintenance receptors. However, TCEQ's projected design values are comparable to future DVs projected by two other modeling platforms released in 2018 and recently embraced by EPA: one from EPA itself, and one from the Lake Michigan Air Directors Consortium ("LADCO"). Both platforms were developed and approved in support of air quality planning for interstate transport under the 2015 ozone NAAQS. The Illinois Environmental Protection Agency

used the modeling results from both the EPA and LADCO platforms to support its maintenance plan for the Illinois portion of the Chicago ozone nonattainment areas for the 2008 NAAQS. In its proposed approval of the maintenance plan and redesignation, EPA noted that both sets of 2023 ozone predictions provided evidence that ozone concentrations will continue to decrease across the Chicago region."

(From Attachment: Sonoma Technology) - In response to comments received through stakeholder outreach, EPA issued a memorandum in October 2018 ("October 2018 Memorandum" 16) providing guidance on potential flexibilities and alternative methods that states may use with technical justification to identify maintenance receptors, including the use of a DV from the base period that is not the maximum design value. TCEQ's Transport SIP used an appropriate and well-supported alternative approach for selecting maintenance receptors. Whereas EPA's approach for selecting maintenance receptors involves projecting the maximum measured DVs over the relevant base period, TCEQ's alternative approach involves projecting the latest measured DV over the relevant base period, regardless of whether that most recent DV was the highest of the three. TCEQ's analysis did not identify the monitors in Illinois and Wisconsin as maintenance (or nonattainment) receptors, in contrast to EPA's analysis based on its 2016v2 modeling platform. TCEQ's alternative approach for selecting maintenance receptors was technically credible and justified by the data. TCEQ's choice to use the latest measured DV over the relevant base period instead of the maximum measured DV was reasonable given the history of ozone design values since 2012, the meteorology during the 2012-2014 period, and emissions trends from 2010-2019.

Table 6 [available in full comment]  shows the monitored ozone design values at 7 receptors in Illinois and Wisconsin that were linked to Texas by EPA's 2016v2 modeling. In EPA's approach, the maximum future DV would have been projected from the maximum of the three design values that encompassed the 2012 base year (the base period is shaded in grey; the maximum DVs are italicized). In TCEQ's approach, the most recent DV during the base period was selected (i.e., 2012-2014 DV, shown in bold). At three of the sites (Cook – South, Cook – Evanston, and Kenosha – Chiwaukee), the 2012-2014 DV was the highest DV observed in any year since. The future-year design values projected from the 2012-2014 DVs calculated by TCEQ for these sites would have adequately captured any future high ozone years that have occurred since then in light of local and regional NOx emissions reductions that have occurred since 2010 and are expected into the future. The maximum DVs during the 2012-2014 period that would have been selected using EPA's methodology are also shown in Table 5 [available in full comment]. At the same three sites (Cook – South, Cook – Evanston, and Kenosha – Chiwaukee) the maximum DVs during this period were also the highest DV observed in any year dating back to at least 2007 (Table 6). For these three sites, using EPA's approach for selecting maintenance receptors would not be reasonable because the future DVs would be projected from a baseline DV that was historically high and unlikely to be repeated in the future regardless of meteorological conditions.

Analyzing emissions trends is important when considering whether a maintenance monitor is likely to violate the NAAQS in the future analytic year. Table 7 [available in full comment] shows the emissions in the Chicago ozone nonattainment area in 2010 and 2019, showing a substantial decrease (almost 40%) in NOx emissions in the region. Additional reductions are expected through 2035 (Table 8 [available in full comment]). In its maintenance plan for the 2008 ozone NAAQS, Illinois successfully demonstrated that the improvement in ozone air quality in the Chicago area was caused by actual emission reductions,

not by unusually favorable meteorological conditions, and that those air quality improvements were due to permanent and enforceable emissions reductions that will keep the region in attainment of the 2008 ozone NAAQS.

Finally, in its proposed disapproval of TCEQ's Transport SIP, EPA concluded that the 2012-2014 period was "not particularly conducive to ozone formation, at least for many receptors" compared to the 2010-2012 and 2011-2013 periods (TCEQ's alternative approach for selecting maintenance receptors involved selecting the 2012-2014 DV). The data does not support EPA's conclusion. Nationally, 2012 was among the highest ozone years since 2005-2007 even when statistically adjusting for meteorological variability (Figure 2). Any ozone design value that included 2012 would have included at least one year with exceptionally conducive meteorology for high ozone. As EPA notes (and as also seen in Figure 2), the meteorology in 2011 was also conducive to high ozone. However, based on the observed ozone data, the recent and future projected emissions trends in the Chicago nonattainment area, and the Illinois maintenance plan for the area that EPA is proposing to approve, it is unlikely a recurrence of exceptionally conducive meteorological conditions (even for two consecutive years) would result in a recurrence of the high ozone DVs observed in the Chicago area in 2010-2012 (the 2012 DV) and 2011-2013 (the 2013 DV).

**Commenter:** Association of Electric Companies of Texas, BCCA Appeal Group, Texas Chemical Council and Texas Oil & Gas Association

**Commenter ID:** 11

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

EPA's approach to selecting maintenance monitors is overly conservative when based on DVs that are at their historical high. When local and regional NOx emissions are declining rapidly over time, there can be circumstances when the maximum DV from the base period is no longer an appropriate basis to identify receptors that may be at risk of exceeding the NAAQS in the future, even considering inter-annual variability in meteorological conditions.

From Sonoma Technology Attachment: EPA's Approach to Selecting Maintenance Monitors is Not Supported - EPA's approach for selecting maintenance receptors involves determining the maximum future DV at each receptor based on a projection of the maximum measured DVs over the relevant base period. As it pertains to the August 17, 2018, TCEQ Transport SIP that EPA is proposing to disapprove as part of this rulemaking, the base modeling year was 2012, and thus the relevant base period for TCEQ's Transport SIP was 2012-2014.

According to EPA, the projected maximum future DV is intended to yield a reasonable projection of future air quality under a scenario in which meteorological conditions conducive to producing high ozone concentrations may reoccur. However, as discussed in more detail below, when local and regional NOx emissions are declining rapidly over time, there can be circumstances when the maximum DV from the base period is no longer an appropriate basis to identify receptors that may be at risk of exceeding

the NAAQS in the future, even considering inter-annual variability in meteorological conditions. In these circumstances, EPA's approach to selecting maintenance monitors is overly conservative when based on DVs that are at their historical high.

**Commenter:** Texas Commission on Environmental Quality

**Commenter ID:** 42

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

[T]he EPA fails to adequately justify its claim that the TCEQ did not provide sufficient technical basis for its use of an alternative methodology to identify maintenance receptors.

[…]

The TCEQ has provided a sufficient technical basis for its use of an alternative methodology to identify maintenance monitors.

The EPA claims that the TCEQ did not provide sufficient technical justification for its approach and that the TCEQ's use of the latest monitored design value did not account for inter-annual variability in ozone conducive conditions. The EPA observes that the TCEQ's maintenance monitor identification methodology accounts for variations in meteorological conditions only over a three-year period compared to the five-year period accounted for in the EPA's method. The EPA does not provide sufficient justification for why five years of meteorological conditions adequately capture interannual variability while three years cannot. The latest three years best describe the ozone conditions closest to the future year. The EPA also does not address the fact that the modeled future design values are based on a single base year that is explicitly modeled and are therefore most impacted by the meteorological conditions in that single base year. It should be noted that both the TCEQ's method and the EPA's method use a single base year. The TCEQ's method used the latest three-year design value to reflect the most recent atmospheric conditions of each area, considering meteorology and emissions information.

The EPA states that since the EPA method identifies more monitors as maintenance monitors it is the more rigorous method. However, the "Good Neighbor" provision is not intended to be an exercise to find the greatest number of monitors likely to have air quality issues but to find the monitors mostly likely to have air quality issues due to significant contribution from upwind states.

The EPA further analyzed 21 monitors that had contributions greater than 0.7 ppb in either TCEQ or EPA modeling. The EPA claims that the TCEQ's methodology was flawed because the future year nonattainment design value (determined based on the use of average of three monitored design values as base design value, DVB) is less than the future year maintenance design value (determined based on the use of the latest of three monitored design values as DVB). The EPA discusses in detail how the difference between the nonattainment and maintenance design value in TCEQ's methodology is smaller than the difference in EPA's methodology. However, the EPA fails to discuss that of the 21 monitors, 15 monitors that were identified as maintenance monitors by the EPA's methodology were also identified

as maintenance monitors by TCEQ's methodology. In addition, the EPA fails to provide justification on why maintenance design values being lower than nonattainment design values is troubling. For a monitor to have maintenance issues, the future year design value only needs to exceed the standard of 70 ppb not the nonattainment design value.

The EPA further states that the TCEQ's methodology identified a monitor that would be nonattainment but not maintenance as proof that the TCEQ methodology is flawed. However, the EPA does not provide any justification for why every monitor that is modeled nonattainment should also be a maintenance monitor. If, as the EPA contends, monitors face maintenance issues solely due to inter-annual variability of meteorological conditions, it is also possible that the monitors could attain the standard due to favorable meteorology. In practice, a maintenance monitor should only have a transport linkage if it is in an area redesignated as attainment and a subsequent exceedance was shown to be caused by a transport issue, despite local controls and contingency measures. Otherwise, any reductions that might be required from upwind states to help that particular monitor maintain the standard would be overcontrol on the part of EPA.

The EPA should not disapprove the TCEQ's Transport SIP Revision based on the TCEQ's use of an alternative methodology for identifying maintenance monitors. The TCEQ's method for identifying maintenance monitors aligns with criteria regarding monitored design value trends specified in the EPA's Maintenance Receptor Guidance Memo and is scientifically defensible.

Despite the EPA issuing the Maintenance Receptor Guidance until after the statutory SIP revision submission deadline has passed and thus, depriving the TCEQ of this information during the preparation of Texas' SIP revision, the TCEQ did show that ozone concentrations have been trending downward since 2011 at monitoring sites for which the TCEQ modeling showed linkages. Such a trend is a condition in the Maintenance Receptor Guidance for states to choose an alternative maintenance monitor selection method. The EPA's disapproval conflates instances in which a design value is greater than the previous year with lack of a downward trend. The TCEQ contends that a downward trend of design values since 2011 can have individual design values that are higher than design values in the previous year and still comprise a downward trend over a longer period. The EPA appears to have misunderstood the TCEQ's reasons for choosing the 2014 regulatory design value as the DVB when estimating modeled future year maintenance design values. The TCEQ chose the 2014 regulatory design value because it was the latest design value and best represented current conditions and not because it is the lowest.

Further, for the monitors the EPA linked to Texas based on its 2016v2 modeling, only five of the seven monitors have valid design values in 2014. Out of those five, three had their highest design values in 2014. Emissions trends from the EPA's National Emissions Inventory (NEI) in Illinois and Wisconsin, where the seven monitors are located, show consistent decreases from 2010 through 2020. The EPA's meteorologically-adjusted ozone trends show that ozone values in the Central and East North Central United States, where the linked monitors are located, are much higher in 2012 due to meteorology, which was represented explicitly in the TCEQ's modeling. However, there hasn't been a consecutive three-year period from 2000 through 2020 that has had ozone conducive conditions similar to 2012. Therefore, if TCEQ had followed the EPA's methodology, TCEQ would have used the 2012 monitored regulatory design value as the DVB, which would have ignored the downward trend in design values and resulted in the misidentification of monitors as maintenance monitors.

**Commenter:** The Luminant Companies

**Commenter ID:** 44

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

TCEQ's Maintenance Monitor Selection Properly Identified Maintenance Receptors for Purposes of the 2015 Ozone NAAQS

EPA similarly second-guesses TCEQ's maintenance receptor methodology in proposing to disapprove Texas's SIP because, EPA says, TCEQ has not adopted an identical approach to EPA. Specifically, EPA would rely on the *maximum* design value during the 5-year base period to identify future maintenance receptors, whereas TCEQ relied on the most recent design value from the relevant base period when identifying future maintenance receptors to ensure that its projection appropriately captured emission trends. EPA claims that its method of selecting maintenance receptors "was upheld in the EME Homer City litigation." But this is irrelevant for EPA's analysis of Texas's SIP—EPA's method is not codified and has not been deemed the only appropriate way to identify maintenance receptors for the 2015 ozone NAAQS or any other NAAQS for that matter. Simply because EPA would take a different approach does not mean TCEQ's approach was inappropriate or not technically sound.

Further, although EPA itself recognizes that "it is not mandatory to follow the EPA's modeling guidance," TCEQ's approach does, in fact, align with guidance EPA issued in October 2018, which recognized that the use of differing design values from the base period may be appropriate. TCEQ has provided significant technical justification for its maintenance methodology approach, and the approach provides reasonable and supportable results. EPA's complaints that the years associated with the design values used by TCEQ "*may not have* had meteorological conditions particularly conducive for formation of high ozone concentrations" or that TCEQ "*may* effectively 'double count' emission trends" are insufficient to support a finding by EPA that Texas's SIP is technically deficient under the statutory requirements of the Clean Air Act. Such speculation is not a valid basis for disapproval. Further, it is EPA's own approach to identifying maintenance receptors that is flawed, as EPA relied on design values that were historically extreme. This inappropriately inflates EPA's future projected design values. Therefore, using EPA's approach would require reductions from upwind states that are not necessary for maintenance of the NAAQS—a form of unlawful overcontrol.

Importantly, EPA's role in reviewing SIP submissions is narrowly tailored under the Clean Air Act. As EPA has previously explained, "Congress assigned to states the primary responsibility to implement the NAAQS[.]" If a SIP is deemed complete, "the Administrator shall approve such submittal as a whole if it meets all the applicable requirements of this chapter[.]" Thus, if a SIP submission "meets all of the applicable [Clean Air Act] requirements, the EPA must approve it." In the proposal here, EPA has strayed outside the statute and established court precedent to propose disapproval simply because TCEQ's modeling is not the same as EPA's.

*Response*

The EPA disagrees that the use of only the latest 3-year period (of a 5-year baseline period) for calculating a DV properly accounts for the effects of meteorological variability for the purpose of identifying projected maintenance receptors. Rather, the use of a 3-year average has the effect of discounting or even ignoring, not accounting for, the effects of inter-annual variability in ozone conducive meteorology. TCEQ'S alternative methodology for determining maintenance receptors used the most recent design value of the three DVs, regardless of whether the most recent design value was highest or lowest. The "Modeling Guidance for Demonstrating Air Quality Goals for Ozone, PM2.5, and Regional Haze" from November, 2018 notes that 1 or more years of meteorological conditions which are not conducive to ozone formation in either the base year period or the most recent design value period will have the effect of making it appear that an area is closer to attaining the NAAQS than would otherwise be the case if more typical meteorological conditions had occurred. An area may appear to be on track to attain the NAAQS (or close to attaining) but, in reality, may need substantial additional emissions reductions to attain under average or above average meteorological conditions.[63]

The EPA disagrees that the deficiencies we identified with TCEQ's approach to identifying maintenance receptors were based on speculation or that EPA proposed to disapprove TCEQ's approach because it was not identical to our approach. Rather, in our proposed disapproval we stated that TCEQ's approach to identifying maintenance receptors, which uses only the most recent design value, is flawed because it fails to adequately consider interannual variability in ozone-conducive meteorology that may cause certain receptors to struggle to maintain the NAAQS in ozone conducive years. The *North Carolina* decision made clear that in interpreting the good neighbor provision, upwind states' and the EPA's obligations to reduce emissions must account for variable conditions that could cause an area that is sometimes attaining the NAAQS to fall out of attainment. *North Carolina v. EPA*, 531 F.3d 896, 908-911 (D.C. Cir. 2008). *See also Wisconsin,* 938 F.3d at 327 ("Variations in atmospheric conditions and weather patterns can bring maintenance receptors into nonattainment even *without* elevated emissions.") In both our proposal and accompanying Evaluation of TCEQ Modeling TSD, we explained that TCEQ did not adequately demonstrate that the 2014 DV used was necessarily conducive to ozone formation. Additionally, we showed how the 2014 Design Value used by TCEQ included years where the meteorology was not particularly conducive to ozone formation as compared to other years in the 5-year base period. Thus, TCEQ's approach to identifying maintenance receptors fails to appropriately account for variable conditions that could cause an area to struggle to maintain the NAAQS in ozone conducive years.

The EPA also disagrees that its approach relies on design values that were historically extreme. Rather, the EPA's approach to identifying a "maintenance" receptor for purposes of defining interference with maintenance, is consistent with the method used in the CSAPR and upheld by the D.C. Circuit in *EME Homer City Generation, L.P. v. EPA,* 795 F.3d 118, 136 (D.C. Cir. 2015) ("With the Transport Rule, EPA created a distinct category of maintenance receptors that could independently trigger an upwind state's good neighbor obligations. Therefore, the Transport Rule complied with *North Carolina*'s requirement that EPA give the nonattainment and maintenance prongs 'independent significance.'") Specifically, the EPA identified maintenance receptors as those receptors that would have difficulty maintaining the

---

[63] *See* EPA's "Modeling Guidance for Demonstrating Air Quality Goals for Ozone, PM2.5, and Regional Haze" from November 2018, page 174.

relevant NAAQS in a scenario that takes into account historical variability in air quality at that receptor. The variability in air quality was determined by evaluating the ''maximum'' future DV at each receptor based on a projection of the maximum measured DV over the relevant period. The EPA interprets the projected maximum future DV to be a potential future air quality outcome consistent with the meteorology that yielded maximum measured concentrations in the ambient data set analyzed for that receptor (i.e., ozone conducive meteorology). The EPA also recognizes that previously experienced meteorological conditions (e.g., dominant wind direction, temperatures, air mass patterns) promoting ozone formation that led to maximum concentrations in the measured data may reoccur in the future. Thus, the EPA finds that the maximum DV gives a reasonable projection of future air quality at the receptor under a scenario in which such conditions do, in fact, reoccur.

In addition, in response to this comment and others, the EPA compared the projected 2023 maximum design values based on the 2016v3 modeling for this final action to the corresponding 2021 and preliminary 2022 design values based on measured data at individual monitoring sites nationwide. The table below provides the projected 2023 maximum design values at modeling-based receptor sites nationwide along with the difference between these maximum design value and the measured design values in 2021 and 2022 (preliminary).  The data in the table indicate that of the 33 receptors projected maximum 2023 design values are more than 1 ppb lower than the corresponding 2021 (2022) preliminary design values at 24 (22) receptors. In addition, EPA has identified 49 monitoring sites that are projected to be in attainment based on model-projected 2023 average and maximum design value but are measuring nonattainment based on 2021 and preliminary 2022 data. As described in the preamble of this final action, the EPA has identified these sites as "violating-monitor" maintenance-only receptors in 2023. Thus, current measured data indicate that EPA's method for identifying modeling-based maintenance-only receptors based on projected base period measured maximum design values does not "inflate" design values that are expected in 2023. Rather, the data suggest that the EPA's approach may actually understate the magnitude and geographic extent of the ozone nonattainment and/or maintenance problem in 2023.

The EPA has placed in the docket of this final action a data file that contains the model-projected average and maximum design values for 2023 and the 2021 and preliminary 2022 data for monitoring sites nationwide.

Other topics in these comments are addressed in Section 10.3 (Cooperative Federalism and the EPA's Authority).

*Table 6-3 Comparison of Projected 2023 Maximum Design Values and Measured Design Values in 2021 and 2022 (Preliminary)*

| AQS ID | State | County | 2023 Max DV | 2023 Max DV – 2021 DV | 2023 Max DV – 2022 DV (Preliminary) |
|---|---|---|---|---|---|
| 40278011 | Arizona | Yuma | 72.1 | 5.1 | 4.1 |
| 60650016 | California | Riverside | 73.1 | -4.9 | -3.9 |
| 60651016 | California | Riverside | 92.2 | -2.8 | 2.2 |
| 80350004 | Colorado | Douglas | 71.9 | -11.1 | -11.1 |
| 80590006 | Colorado | Jefferson | 73.5 | -7.5 | -9.5 |
| 80590011 | Colorado | Jefferson | 74.1 | -8.9 | -9.9 |
| 80690011 | Colorado | Larimer | 72.1 | -4.9 | -4.9 |
| 90010017 | Connecticut | Fairfield | 72.2 | -6.8 | -4.8 |
| 90013007 | Connecticut | Fairfield | 73.8 | -7.2 | -7.2 |
| 90019003 | Connecticut | Fairfield | 73.6 | -6.4 | -6.4 |
| 90099002 | Connecticut | New Haven | 72.6 | -9.4 | -6.4 |
| 170310001 | Illinois | Cook | 71.9 | 0.9 | -0.1 |
| 170314201 | Illinois | Cook | 71.5 | -2.5 | -2.5 |
| 170317002 | Illinois | Cook | 71.3 | -1.7 | -2.7 |
| 350130021 | New Mexico | Dona Ana | 72.1 | -7.9 | -8.9 |
| 350130022 | New Mexico | Dona Ana | 72.4 | -2.6 | -2.6 |
| 350151005 | New Mexico | Eddy | 74.1 | -2.9 | -2.9 |
| 350250008 | New Mexico | Lea | 72.2 | 6.2 | 6.2 |
| 480391004 | Texas | Brazoria | 72.5 | -2.5 | -0.5 |
| 481210034 | Texas | Denton | 71.6 | -2.4 | -4.4 |
| 481410037 | Texas | El Paso | 71.4 | -3.6 | Missing 2022 DV |
| 481671034 | Texas | Galveston | 72.8 | 0.8 | 2.8 |
| 482010024 | Texas | Harris | 76.7 | 2.7 | 7.7 |
| 482010055 | Texas | Harris | 71.9 | -5.1 | -5.1 |
| 482011034 | Texas | Harris | 71.3 | 0.3 | -0.7 |
| 482011035 | Texas | Harris | 71.3 | 0.3 | -0.7 |
| 490110004 | Utah | Davis | 74.2 | -3.8 | -4.8 |
| 490353006 | Utah | Salt Lake | 74.2 | -1.8 | -1.8 |
| 490353013 | Utah | Salt Lake | 73.8 | -2.2 | -3.2 |
| 530330023 | Washington | King | 71.0 | 7.0 | 1.0 |
| 550590019 | Wisconsin | Kenosha | 71.7 | -2.3 | -3.3 |
| 551010020 | Wisconsin | Racine | 71.5 | -1.5 | -3.5 |
| 551170006 | Wisconsin | Sheboygan | 73.6 | 1.6 | -1.4 |

*Comment*

**Commenter:** Midwest Ozone Group

**Commenter ID:** 30

**Docket ID:** EPA-R05-OAR-2022-0006

**Comment:**

MOG specifically objects to EPA's approach to implementation of the flexibility guidance issued by EPA in 2018 for the specific application by states to the development of 2015 ozone NAAQS Good Neighbor SIPs.  With respect to Ohio, we note that Ohio EPA ("OEPA") specifically provided significant technical support justifying an alternative approach for determining maintenance-only receptors. To support its justification, OEPA provided an alternate method of future design value projection using the most recent 3-year design values (DV) from the analytic years rather than the highest 3-year DVs from the 5-year period. This was further supported with declining VOC and NOx emission trends and observed air quality improvement at each of the impacted monitors. OEPA also supported its calculations with information on inter-annual meteorological variability and the divergence from long-term temperature trends in the years 2011, 2012, and 2013 (the early years of the 5-year period).  With these data and their supporting calculations, OEPA was able to demonstrate that the monitoring sites identified as maintenance are not reasonably expected to have difficulty maintaining the standards in 2023. EPA's rejection of that demonstration is clearly in error.

*Response*

The EPA disagrees that the use of only the latest three 3-year period (of a 5-year baseline period) for calculating a DV properly accounts for the effects of meteorological variability for the purpose of identifying projected maintenance receptors. Rather, the use of a 3-year average has the effect of discounting or even ignoring, not accounting for, the effects of inter-annual variability in ozone conducive meteorology. TCEQ'S alternative methodology for determining maintenance receptors used the most recent design value of the three DVs, regardless of whether the most recent design value was highest or lowest. The "Modeling Guidance for Demonstrating Air Quality Goals for Ozone, PM2.5, and Regional Haze" from November, 2018 notes that 1 or more years of meteorological conditions which are not conducive to ozone formation in either the base year period or the most recent design value period will have the effect of making it appear that an area is closer to attaining the NAAQS than would otherwise be the case if more typical meteorological conditions had occurred. An area may appear to be on track to attain the NAAQS (or close to attaining) but, in reality, may need substantial additional emissions reductions to attain under average or above average meteorological conditions.[64]

With respect to the commenter's assertions that Ohio EPA "provided significant technical support justifying an alternative approach, the EPA disagrees. As stated in the proposed rulemaking, Ohio EPA's

---

[64] *See* EPA's "Modeling Guidance for Demonstrating Air Quality Goals for Ozone, PM2.5, and Regional Haze" from November, 2018, page 174.

proffered explanation for using the most recent design value to identify maintenance receptors was that the latest design value "takes into consideration . . . any emissions reductions that might have occurred."87 FR at 9870 (citing TCEQ submission at 3–39 to 3–40.) Ohio EPA in its submission did not explain why or how this methodology identifies those areas that may be meeting the NAAQS or that may be projected to meet the NAAQS but may nevertheless struggle to maintain the NAAQS, given interannual variability in ozone conducive meteorology. In fact, because the TCEQ's methodology adopted by Ohio EPA uses the most recent design value to capture more recent emissions reductions rather than capture variable conditions, the methodology appears to be aimed at limiting receptors which could be identified as maintenance receptors, compared to EPA's methodology, which was designed to identify those areas that might struggle to maintain the NAAQS in ozone conducive conditions.

Ohio EPA provided the following ozone DV trend data for the four eliminated monitors spanning 2000-2017.[65] While the submission uses these data to show overall decreasing trends, EPA highlights that the figure provided shows stagnant or increasing ozone DVs from 2014 onward. For three out of the four maintenance receptors Ohio EPA identified via the TCEQ method, the 2013 DV was the lowest of the three DVs in the 5-year base period. While Ohio EPA attributes this to emission reduction measures, the EPA considers this to highlight the selectiveness of the TCEQ method and the aforementioned lack of accounting for meteorological variability. The figure demonstrates variability in ozone DV trends that would have been incorporated using the highest of the three DVs in the 5-year base period. Further, the meteorological plots provided in OEPA's submission show maximum temperatures from 2011 through 2013. In two of the three years used for the 2013 design value calculation, maximum temperatures were not above average in Ohio. In those years, (2011 and 2013), there are areas in Ohio that experienced less than average temperatures. The EPA does not believe these plots demonstrate that this design value period fully accounts for meteorological variability, and it would be more appropriate to use the EPA method of the maximum of the three design value periods. Ohio EPA's analysis of meteorological information did not discuss or consider how other meteorological factors that are typically associated with high ozone episodes such as humidity, solar radiation, vertical mixing, and/or other meteorological indicators such as cooling-degree days to confirm whether conditions affecting these monitors may have been conducive to ozone formation during the 2009 through 2013 base period. In addition, the ozone trends data provided in the Ohio EPA submittal indicate that several of the receptors in Coastal Connecticut to which Ohio is linked by more than 1 ppb continue to measure ozone design values close to or exceeding 80 ppb with no overall downward trend in the most recent data in the submittal.[66]

---

[65] "Figure 4. Ozone Design Value Trends- Maintenance Monitors Eliminated with Texas Approach"; "Ohio's Interstate Pollution Transport Analysis 2015 Ozone Standard", September 2018 included as Appendix 3 of Ohio 2015 Ozone Infrastructure SIP (Document ID EPA-R05-OAR-2022-006-006).
[66] *See* "2010 Thru 2021 Ozone Design Values.xlsx" in docket ID No. EPA-HQ-OAR-2021-0663.



*Figure 6-1 Ozone Trends Figure from Ohio EPA SIP Submission*

In any event, Ohio EPA's use of an alternative approach to identifying maintenance receptors does not result in a dispositive change in receptor status for purposes of EPA's evaluation of Ohio EPA's SIP submission at Step 1 because Ohio EPA did not reach the conclusion that there were no receptors in 2023 or claim at Step 2 that Ohio was not linked to any receptor on the basis of the use of an alternative definition of maintenance receptor.

## 6.4   October 2018 Memorandum

*Comments*

**Commenter:** Midwest Ozone Group

**Commenter ID:** 30

**Docket ID:** EPA-R05-OAR-2022-0006

**Comment:**

MOG specifically objects to EPA's approach to implementation of the flexibility guidance issued by EPA in 2018 for the specific application by states to the development of 2015 ozone NAAQS Good Neighbor SIPs. With respect to Ohio, we note that Ohio EPA ("OEPA") specifically provided significant technical support justifying an alternative approach for determining maintenance-only receptors. To support its justification, OEPA provided an alternate method of future design value projection using the most

232

recent 3-year design values (DV) from the analytic years rather than the highest 3-year DVs from the 5-year period. This was further supported with declining VOC and NOx emission trends and observed air quality improvement at each of the impacted monitors. OEPA also supported its calculations with information on interannual meteorological variability and the divergence from long-term temperature trends in the years 2011, 2012, and 2013 (the early years of the 5-year period). With these data and their supporting calculations, OEPA was able to demonstrate that the monitoring sites identified as maintenance are not reasonably expected to have difficulty maintaining the standards in 2023. EPA's rejection of that demonstration is clearly in error.

**Commenter:** Mississippi Department of Environmental Quality

**Commenter ID:** 32

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

Also, in EPA's proposed decision to disapprove Mississippi's iSIP, EPA suggests that MDEQ failed to use the most recent (i.e., 2018) available data. However, EPA fails to recognize that certified 2018 Texas monitor data had not been released at the time MDEQ began the public comment period for the proposed iSIP; therefore, MDEQ did in fact use the most recent certified Texas monitor data when drafting the "good neighbor" portion of the Mississippi iSIP. While it is our position that to disapprove Mississippi's iSIP on this basis is, at best, arbitrary and capricious, at the very least the proposed FIP should not be imposed until MDEQ is given a reasonable opportunity to address the alleged deficiencies in the iSIP and to resolve the modeling errors referenced herein.

*Response*

We respond to general comments about the October 2018 memorandum in Section V.B.3 of the preamble.

In response to one commenter's (MDEQ) contention that they did rely on the most recent monitoring data available at the time of its submission to support its use of an alternative maintenance receptor definition, and that EPA's evaluation of their submittal was therefore erroneous, the EPA disagrees. The Specifically, the commenter is referring to the available ozone design value for the Harris County, Texas Deer Park monitoring site (ID 482011039) in Houston and EPA's statement that the SIP submission did not meet the criteria set out in the October 2018 memorandum including an assessment of the available ozone design values at the monitor at the time. The state relied on the 2014 to 2017 design values at the Deer Park receptor (i.e., 69 ppb, 67 ppb, and 68 ppb, respectively) as the basis for stating that this receptor met EPA's definition of a maintenance receptor.

The EPA disagrees with the commenter that the 2018 design value for the Deer Park monitor was not available at the time Mississippi gave public notice of their transport SIP submission. In fact, the EPA's official comments on the draft SIP submission during the state's public comment period indicates that the 2015-2017 3-year design value of 68 ppb was not the most current available data for the Deer Park

233

monitor but rather 2016-2018 design value of 71 ppb for the site was above the 2015 standard, suggesting that the 2018 data for the monitor was in fact available at the time the state public noticed the submission in August of 2019. In addition, the 2018 data would have been certified by the time the state made its submission.

The EPA responds to APC et al.'s comment related to the October 2018 memorandum in Section 6.2. The EPA responds to comments on timing in the preamble in Section V.A.

## 6.5    Certain Monitoring Sites in California at Step 1

*Comments*

**Commenter:** Alabama Department of Environmental Management

**Commenter ID:** 02

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

EPA also argues that the threshold should not be permitted at 1 ppb to retain national consistency within the program. However, EPA's own action in its approval of the Oregon SIP negates this argument. A review of the EPA modeling data indicates that Oregon had contribution to 14 monitors in California that are predicted to exceed the standard in 2023, some with contributions greater than 1 ppb. Yet, EPA approved the Oregon SIP stating that Oregon did not significantly contribute to nonattainment or maintenance sites. National consistency was obviously not an obstacle to approval in this case.

**Commenter:** Alabama Power Company, Southern Power Company, and PowerSouth Energy Cooperative

**Commenter ID:** 04

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

Even if EPA were able to show that a 1 ppb threshold is unreasonable and unjustified, EPA could find that the Denton and Harris County monitoring sites are not properly regarded as receptors under Step 1 of its "FIP" analysis. EPA did just that for Oregon—allowing an exception to the 1 percent threshold for Oregon's transport SIP for the 2015 ozone NAAQS. As explained in EPA's recently published proposed FIP, EPA found that, although Oregon was linked above the 1 percent threshold "to several monitoring sites in California," it determined that these monitoring sites "should not be treated as receptors for purposes of determining interstate transport obligations of upwind states" because Oregon's total cumulative contribution to any of the sites was only 2.8 percent, each site only had one upwind state contribution above the 1 percent of the NAAQS, and the monitoring sites were "overwhelmingly

234

impacted by in-state emission." EPA also explained that a similar finding had been made for Arizona's 2008 ozone NAAQS transport SIP for other monitoring sites in California, where Arizona's contribution ranged from 2.5 to 4.4 percent. EPA, therefore concluded that these monitoring sites should not be considered receptors under Step 1 of the 4-step framework and that Oregon did not contribute significantly to nonattainment or interfere with maintenance of the NAAQS in any downwind state. Similarly, as set out above, Alabama's modelled contributions to the Denton and Harris sites are low—6 and 7 percent, respectively—and in-state emissions vastly outweigh upwind contributions. Thus, Alabama's contributions to these sites are not significant. EPA should address this analysis prior to any final action on Alabama's 2022 SIP.


**Commenter:** Air Pollution Control Program, Missouri Department of Natural Resources

**Commenter ID:** 01

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

For the Brazoria, TX monitor, EPA's updated modeling shows that Missouri is no longer linked to this monitor because Missouri's contribution is 0.55 ppb, which is below 1 percent of the 2015 ozone standard. In our SIP submission, the Air Program utilized the flexibility in EPA's August memo, to avoid linkage with this receptor because Missouri's projected contribution was below 1 ppb. In the previous modeling, Missouri's contribution to this receptor was 0.88 ppb. Our SIP submission demonstrated that this monitor was not significantly impacted by upwind state contributions, and instead the receptor status was largely the result of contribution from local sources and international (Mexico) emissions. This is substantially similar to EPA's own determination in their latest actions associated with the proposed disapproval and the proposed FIP with respect to linkages between Oregon and California, where Oregon is absolved of their linkages to California for this very reason. However, EPA treats Missouri differently by denying this same basis for the determination that a 1 ppb threshold was appropriate as stated in our SIP submission.

For the Harris, TX monitor, EPA's updated modeling shows this receptor as no longer being a maintenance receptor. The maximum 2023 projected design value for that monitor in the updated modeling is 68.5 ppb. In Missouri's good neighbor SIP submission, this was a nonattainment receptor with a maximum 2023 design value of 73.5 ppb. Missouri's contribution to this monitor was 0.88 ppb, thus qualifying it for the use of the flexibility offered in EPA's August memo. Similarly to the Brazoria monitor, Missouri's SIP submission explained that this monitor was not significantly impacted by upwind state contributions, and instead the receptor status was largely the result of contribution from local sources and international (Mexico) emissions. While EPA uses this same basis for approving Oregon's SIP using the updated modeling when it comes to 15 separate linkages in California that are at or above the 1 percent threshold and two receptors with contributions above 1 ppb, EPA denies this basis as included in Missouri's SIP submission for justifying the removal of the Harris, TX monitor linkage with Missouri at Step 2.

235

**Commenter:** Tennessee Department of Environment and Conservation

**Commenter ID:** 41

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

EPA's proposed action is inconsistent with EPA's prior finding for Oregon, in which it deviated from the 1% NAAQS threshold in determining that Oregon was not linked to downwind states. Approval of Oregon's SIP, while denying Tennessee's SIP, belies EPA's assertion that the Agency is applying a nationally uniform approach to nonattainment and maintenance receptors and a nationally uniform approach to contribution threshold analysis.

*Response*

The EPA approved Oregon's good neighbor SIP submission for the 2015 NAAQS on May 17, 2019 (84 FR 22376). In a separate rulemaking action from this one (87 FR 20036, April 6, 2022), the EPA explained why the Agency was not pursuing an error correction of that approval on the basis of the EPA's proposed assessment of relevant monitoring sites in California at Step 1. The EPA's proposed treatment of Oregon and assessment of certain monitors in California in that separate rulemaking action is beyond the scope of this action. Nonetheless, we respond to these comments here to the extent that the proposed FIP analysis raises, according to these commenters, a consistency issue with our treatment of states that are included in this disapproval action.

The EPA proposed in the April 2022 transport FIP that certain monitoring sites in California should not be considered receptors at Step 1 for the purpose of assessing 2015 ozone NAAQS interstate transport obligations. 87 FR 20036, 20075. The EPA did not propose a different contribution threshold at Step 2 for Oregon or for western states generally, nor did the EPA propose this conclusion based on any evaluation at Step 3 of emissions reduction opportunities in Oregon.

In the FIP proposal, we pointed out that California receptors are heavily impacted by in-state emissions. The basis for our proposed determinations with respect to these sites is not the level of in-state contribution but rather the fact that the contribution from upwind states is so low. The elevated ozone levels at these sites may be attributable to biogenic emissions, international emissions, or boundary-conditions, in addition to in-state anthropogenic emissions. Our proposal was not intended to suggest that a certain level of in-state anthropogenic emissions influenced our treatment of these sites under the good neighbor provision. Rather, the critical point was that the total level of impact from upwind states at these California sites is so low. The 4-step interstate transport framework that the Agency has applied to address interstate ozone transport is informed by the "collective contribution" problem observed throughout many areas of the country (i.e., the fact that total ozone levels are the result of many small contributors over a wide geographic area). That approach generally continues to make good sense throughout most of the country based on our air quality and contribution analysis to-date and in this final action. A limited circumstance, which we previously observed with respect to certain California

236

sites in acting on Arizona's 2008 ozone NAAQS good neighbor SIP submission, presents the exception. Where total contribution from upwind states is as low as 1.4 percent and only one state contributes above 1% of the NAAQS, that monitoring site does not, in the EPA's view, suffer from an interstate contribution problem. See the EPA's response to comments in Section 8.2 (Alleged De Minimis Contribution) for further discussion of the topic of collective contribution.

Although commenters claim that this same consideration could be applied at other receptors across the country to reach the same conclusion (i.e., eliminate other receptors outside California at Step 1), nowhere else do we project such a low total upwind contribution and with only a single upwind state contributing at or above one percent of the NAAQS.

The EPA did not view it to be necessary to establish a bright-line threshold in proposing this determination and disagrees with commenters who assert such a threshold is needed now. As we noted in the FIP proposal, the level of total upwind-state impact at the California monitoring sites at issue for Oregon (2.8 percent) is less than the amount for which we issued a similar determination in approving Arizona's good neighbor SIP submission for the 2008 ozone NAAQS (4.4 percent). 81 FR 15200 (March 22, 2016) (proposal); 81 FR 31513 (May 19, 2016) (final rule).  Thus, the proposed analysis, if finalized, is consistent with that precedent. If the proposed finding for Oregon is finalized, there would still be no other state covered by this disapproval action with linkages to receptors that fall within the analytical circumstances of the analysis for either Oregon or Arizona.

Nor does it matter that there are several monitoring sites in California for which this circumstance exists. The same observation can be made for each one of these sites: the level of total upwind-state contribution is small enough that they should not be considered interstate-transport receptors.

# 7  Step 2

## 7.1  Methodology for Determining Future Year Contributions

*Comments*

**Commenter:** Air Pollution Control Program, Missouri Department of Natural Resources

**Commenter ID:** 01

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

<u>EPA's updated modeling shows that Missouri's contribution to linked receptors is below 1 percent of the standard on all days where the modeled MDA8 is below the level of the 2015 ozone standard.</u>

In EPA's methodology for determining contributions at Step 2, it uses the average contributions from the upwind states for the top ten modeled days that are above 60 ppb for the MDA8. If there are fewer than 10 modeled days with MDA8 above 60 ppb for the receptor, then EPA uses the average of those days for however many values are available if there are at least five days with modeled MDA8 values above 60 ppb. This approach is consistent with EPA's traditional approach to the good neighbor SIP obligation to establish linkages at Step 2. However, the approach has serious flaws. Under this approach, emissions from upwind states can still be considered significant contribution even if the modeled MDA8 on a particular day is actually below the level of the 2015 ozone standard, which is what the good neighbor provision is intended to address. If a state is contributing above one percent of the level of the standard to a problem monitor on days when that same problem monitor is not having any ozone concentration concern with respect to the standard, those values should not count against the upwind state when determining whether the upwind state is linked at Step 2.

For example, even if an upwind state were contributing to ozone concentrations at a monitor at levels of 20 percent of the standard on a particular day, the good neighbor provision would not apply if the monitor didn't measure an exceedance of the standard that day. So, the good neighbor provision does not restrict contribution from upwind states at downwind monitors on days when ozone concentrations at the downwind monitor are below the health-based standard established by EPA (i.e., the NAAQS). The use of contribution data on days where the monitor is complying with the standard is therefore arbitrary and capricious action on the part of EPA that results in the addition of states that are not contributing significantly to nonattainment or interfering with maintenance.

EPA provided the Air Program with the list of the MDA8 values for all modeled days for the receptors to which Missouri is linked to in the updated modeling. The list also includes the corresponding upwind state contribution on each of the modeled days. In that dataset, there is not a single day where the modeled MDA8 value at any of the receptors linked to Missouri is both above 70 ppb and Missouri's contribution is above 1 percent of the standard (0.7 ppb). As explained in the paragraphs above, upwind state contributions on days where the model is predicting the receptor to be in compliance with the

standard cannot be used to justify a linkage with Missouri at Step 2. This is another reason why EPA's proposed disapproval of Missouri's SIP is flawed and cannot stand.

**Commenter:** Ameren Missouri

**Commenter ID:** 05

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

1. USEPA's most recent CAMX modeling platform 2016v2 referenced in USEPA's proposed disapproval of the Missouri Good Neighbor SIP for the 2015 Ozone Standard shows that the monitors to which USEPA linked to Missouri in the previous model platform (2016v1) are not actually linked to Missouri, providing independent verification that Missouri emissions are not significantly contributing to nonattainment or maintenance at those monitors and further evaluation is moot.

[...]

7. To the extent that USEPA includes Missouri emission source contributions on days when the relevant monitors were observed to be in attainment of the standard or are modeled to be in attainment of the standard, USEPA is improperly determining Missouri's "significant contribution" in Step 2 of its analysis.

[...] By including days that monitors are in attainment in the modeling analysis of a state's contribution to ozone levels, USEP A is determining the average contribution to ozone concentrations at the relevant monitor to the top ten modeled ozone concentrations in a year. But by including days monitors attain the standard, USEPA's analysis is not showing the average contribution by a state to ozone nonattainment at the monitor under Step 2 of its analysis as is required by the language in the Act. USEP A must properly calculate on a state's anthropogenic contribution to days where a monitor is both observed in the base year to exceed the standard (71 ppb or above) and is modeled in the future year to exceed the standard (71 ppb or above) in order to link a state's emissions to nonattainment.

Because only the contribution to nonattainment is required to be prohibited by Good Neighbor SIPs (GNS), EPA errs by including a contribution by a state that is not prohibited when determining state level contributions. It is not reasonable for USEPA to assume that contributions from nonadjacent states on days when the monitors show attainment of the standard can be compared to USEPA Step 2 thresholds for linking states to a monitor and thereby determining if a state's emission sources significantly contribute to nonattainment. It is not reasonable to assume that the conditions that transport NOx and/or ozone from Missouri up to Lake Michigan on days when a monitor on the Lake Michigan shore and/or the model shows the monitor is in attainment of the standard contribute to nonattainment at all without some showing in the record. It is likely that on days when ozone (in amounts above 0.70 ppb) is transported into the Chicago NAA from states like Missouri and impact the Lake Michigan shoreline monitors at issue are not the same days when stagnated air persists around the monitors and which are conducive to ozone formation and high ozone levels.

*Response*

The EPA disagrees with comments that say the average contribution metric that the EPA uses to evaluate upwind state contributions in Step 2 of the four-step transport framework should only be calculated based on days with measured exceedances or days with model-predicted exceedances in 2023. Commenters object to the EPA's methodology for calculating contribution at Step 2 because the top ten high ozone days, utilized for calculating the relative contribution factor (RCF), may include days with measured and/or future year modeled values below the NAAQS. This concern fundamentally misunderstands the intended use of modeling for projecting future year design values and contributions between Steps 1 and 2. For the purpose of projecting future design values, the EPA's modeling guidance recommends using data for the top-ten modeled ozone concentrations days using a minimum threshold of 60 ppb when calculating relative response factors (RRF). That is, any days with model-predicted MDA8 ozone concentrations below 60 ppb in the base year (e.g., 2016) are not included in the calculation of the projected design value.[67] The RRF plays an important role in projecting future year design values at Step 1. Rather than taking the projected 2023 results themselves as definitive of future air quality conditions, the RRF methodology applies the change in modeled air quality between the base and future year and then applies that to the historical monitored ozone levels at each receptor, thus grounding modeled change to real-world data.

In the contribution analysis at Step 2, we use the modeled concentrations and modeled contributions for the future year to derive a relative contribution factor (RCF) working from the *modeled* 2023 future year (not the 2016-based monitoring data). The RCF is calculated as the ratio of the 2023 average contribution to the 2023 average ozone concentration, where the averages are based on the top 10 ozone concentration days in 2023. It is important to note that the top 10 concentration days in 2023 may not be the same as the top 10 concentration days in 2016 monitoring data or 2016 base year modeling. Because the average contribution metric is intended to reflect upwind state impacts in 2023, it would be illogical to base that average value in 2023 on measured data or model predictions for the 2016 base year, 7 years earlier. The RCF is then applied to the projected 2023 average design value (taken from Step 1 following the use of RRF, not just the 2023 CAMx projection) in a manner similar, in concept, to the method for projecting design values.

Step 2 analysis starts from the premise that downwind receptors have already been properly identified using the methodology at Step 1. At Step 2, the question is who is contributing to those receptors, for which EPA's methodology provides a reliable answer using modeling and the RCF approach. As noted above, the approach for selecting days to calculate the contribution metric is designed to align with recommendations in the EPA's modeling guidance for projecting future year design values. Following the selection of days, the approach for calculating the average contribution metric then determines what proportion of the ozone formed on those days, on average, was attributable to emissions from each upwind state or other source.

Regarding the comment that that the EPA should use data on days with *measured* exceedances in 2016 when calculating the contribution metric, since the purpose of this metric is to evaluate contributions for a *future year*, for which actual measured concentrations cannot be known prior to their occurrence,

---

[67] In addition, for monitoring sites where there are fewer than 5 days with model-predicted ozone greater than or equal to 60 ppb, EPA's guidance recommends not calculating a projected design value for those monitoring sites.

it would be inappropriate to base future year contributions on days which may have relatively low model-predicted ozone even if those days happen to have measured values in 2016 that exceeded the NAAQS. The EPA addressed and rejected a substantially similar comment in the Revised CSAPR Update. *See* 86 FR 23054, 23085 (April 30, 2021).

The EPA incorporated public comments received on the proposals to update its emissions inventories and model design, as described in the preamble and in the Final Action AQM TSD. In the 2023 modeling using the v3 platform Missouri is linked above a 1 percent of the NAAQS contribution threshold to four downwind receptors (i.e., Chicago/Evanston, Kenosha/Chiwaukee, Racine, and Sheboygan). The average contribution metric values that link Missouri to these states are 1.39 ppb, 1.01 ppb, 1.19 ppb, and 1.87 ppb, respectively.

Out of an abundance of caution, the EPA performed a sensitivity analysis to examine the contribution from Missouri to these 4 receptors if the contributions were based only on those days with measured exceedances in 2016 at each receptor.  The table below provides average contribution metric values for Missouri's contributions to each of these receptors if this metric was based solely on daily modeled contributions on days with measured exceedances at each receptor. While we do not agree that this is a superior or even appropriate method of calculating contribution, the results of this sensitivity analysis indicate that even if the average contributions were based only on days with measured ozone that exceeds the NAAQS, Missouri would still be linked to all four of these receptors using the 1 percent of the NAAQS threshold (or even a 1 ppb threshold).

*Table 7-1 Sensitivity Analysis of Missouri Contributions Based on Contributions on Days with Measured Exceedances*

|  | Number of Days with Measured Exceedances in 2016 | Average Contribution Metric (ppb) |
|---|---|---|
| Evanston | 7 | 0.72 |
| Kenosha/Chiwaukee | 14 | 1.62 |
| Racine | 8 | 1.18 |
| Sheboygan | 4 | 1.59 |

The EPA performed a similar sensitivity analysis in response to commenter's concerns regarding the use of model-predicted days below the NAAQS in 2023 when calculating the average contribution metric. In this sensitivity analysis the EPA first identified all days with predicted MDA8 ozone concentrations greater than or equal to 71 ppb in 2023 at each of the four receptors to which Missouri is linked based on the EPA's 2016v3 modeling. The table below provides the average contribution metric values for Missouri's contribution to each receptor based on this analysis. Also provided in the table are the number of exceedance days in 2023 and the range in 2023 MDA8 ozone concentrations on days included in the calculations. Because there are fewer than 5 days with predicted exceedances at the Racine and Sheboygan receptors, data for additional days (2 for Racine and 3 for Sheboygan) were included in the calculations for these two receptors. While we do not agree that this is a superior or even appropriate method of calculating contribution, the results of this sensitivity analysis shows that Missouri would still be linked in 2023 to each of these four receptors even if the contribution metric was

241

based on projected exceedance days alone (Evanston and Kenosha/Chiwaukee) or on exceedance days combined with other days above 60 ppb (Racine and Sheboygan)

Table 7-2

*Table 7-2 Sensitivity Analysis of Missouri Contributions Based on Contributions on Days with Modeled Exceedances*

|  | Number of Days with Modeled Exceedances in 2023 | Range of Concentrations in 2023 in this Sensitivity Analysis | Average Contribution Metric (ppb) |
|---|---|---|---|
| Evanston | 9 | 71.6 - 83.8 | 1.06 |
| Kenosha/Chiwaukee | 6 | 71.0 - 84.1 | 0.98 |
| Racine | 3 | 69.1 - 75.8 | 1.10 |
| Sheboygan | 2 | 67.9 - 75.2 | 1.10 |

*Comment*

**Commenter:** Texas Commission on Environmental Quality

**Commenter ID:** 42

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

TCEQ's methodology for determining future contributions is consistent with EPA modeling guidance.

The EPA Modeling Guidance provides details on the model values and the grid cells to use when estimating the future year design value as part of the modeled attainment test. The TCEQ's methodology to determine a state's contribution to the future aligns with the method used to estimate future year design values. The TCEQ's methodology is internally consistent as the grid cell and top ten days used in the design value calculation are the same as those used to estimate the source (state) contribution. The TCEQ's methodology follows the EPA modeling guidance while the EPA's methodology does not. The TCEQ has repeatedly raised concerns about the EPA's method to determine future year contributions since the EPA approach does not align with the calculation of the future year nonattainment and maintenance design values with respect to the model grid cell and top ten days used.

The EPA should only use contributions from days in the calculation of the relative response factor when calculating an upwind state's contributions to future design values. Using one set of days to calculate the future year design value that is the basis for a monitor's future attainment status (attainment/maintenance/nonattainment) and a different set to determine the states' contribution to that design value is inconsistent and arbitrary.

Further, the EPA uses concentrations from the grid cell containing the monitor to determine state contributions while using concentrations at the grid cell with the maximum modeled concentration in a "3x3" array centered on the monitor when calculating design values. The EPA's approach could result in the use of modeled concentrations from different grid cell locations potentially disconnecting the future year contributions from the future year design values.

The TCEQ's approach uses modeled concentrations from the grid cell on the days that were used in the design value calculation to determine future year contributions. The TCEQ's method is consistent, and the EPA failed to provide a rational justification for its concerns with regards to the TCEQ's approach.

*Response*

As explained in the previous response, the EPA's method for calculating contribution is designed to align with recommendations in the EPA's modeling guidance for projecting future year design values and allows for the effective identification of linked upwind states at Step 2.

The EPA believes that its approach for calculating the future year average contribution metric, as described in the preamble and the Final Action AQM TSD for this final action, provides a more technically reliable estimate of contributions than the method suggested by the commenter. In calculating the average contribution metric, the EPA uses modeled contributions on the 10 days in the future year with the highest model-predicted concentrations. In part because the formation of ozone from precursor emissions can be nonlinear and dependent on meteorological conditions, the response of ozone to emission reductions can vary from day to day. In this regard, the days with the highest model-predicted ozone concentrations in the 2016 base year that are used for projecting ozone design values may not be among the highest ozone days in the future analytic year. In this situation, the calculation of the average contribution metric could inappropriately exclude days with higher concentrations in the future year in favor of lower future-concentration days that happened to correspond to the highest days in 2016. In addition, ignoring the concentrations in the future year could result in including contributions on low ozone days with modeled ozone concentrations below 60 ppb in the calculation of the average contribution metric. Among other things, this runs a risk of identifying states as linked that are, in fact, actually not linked considering contributions on high ozone days in 2023 at the receptor.

Based on the air quality modeling for this final action, Texas is linked to 10 downwind nonattainment or maintenance-only receptors.  Of these 10 receptors, the contributions from Texas to the 6 receptors in Illinois and Wisconsin are likely to be those most influenced by applying an alternative contribution calculating method since these receptors are more distant and therefore more subject to day-to-day differences in long-range transport wind flows compared to the 4 receptors in New Mexico that are located near the border with Texas. In this regard, the EPA recalculated Texas' average contribution using a method akin to the method proffered by the commenter. Specifically, in this method the average contribution metric was calculated based on the daily contributions on the same set of days used to project the 2023 design value at each of these receptors. The contributions from Texas to the receptors in Illinois and Wisconsin based on the EPA's method and the alternative method are provided in the table below. While we do not agree that the alternative approach is a superior or even

243

appropriate method of calculating contribution, the results show that Texas would still be linked to each of these receptors using the alternative method.

*Table 7-3 Comparison of Texas' Contributions Using the EPA's Method and the Alternative Method*

| AQS ID | State | Receptor | Contributions from Texas in 2023 | |
|---|---|---|---|---|
| | | | EPA Method | TCEQ Method |
| 170310001 | Illinois | Chicago/Alsip | 1.09 | 1.11 |
| 170314201 | Illinois | Chicago/Northbrook | 1.05 | 1.65 |
| 170317002 | Illinois | Chicago/Evanston | 1.95 | 1.81 |
| 550590019 | Wisconsin | Kenosha | 1.54 | 1.47 |
| 551010020 | Wisconsin | Racine | 1.57 | 1.56 |
| 551170006 | Wisconsin | Sheboygan | 1.03 | 1.02 |

It is obviously impossible for the EPA, or anyone, to predict which exact days in a future year will have high ozone levels, nor does it make sense to analyze contribution on modeled days of low ozone concentration. The EPA's methodology is reasonable in projecting where ozone problems are likely to recur in a future year (at Step 1), and, by using the highest predicted 2023 MDA8 ozone days with a minimum threshold (at Step 2), identifying who is contributing to those problems under the conditions for high ozone formation at those locations in the future.

*Comment*

**Commenter:** PacifiCorp (Attachment – Ramboll Evaluation)

**Commenter ID:** 38

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

The Proposed Transport Rule Upwind State ozone contribution metric to a downwind nonattainment/maintenance receptor used a contribution factor (CF) as the average of the Upwind State ozone contribution divided by the average total ozone at the receptor where the averaging was performed over the top 10 modeled 2023 ozone days. The CF was multiplied by the receptor's 2023 and 2026 ozone design values to obtain the Upwind State ozone contribution to the receptor (see Section 1.4 for detailed description of how Wyoming's ozone contribution to the 2023 ozone design value at Chatfield receptor was calculated). The use of 10 days in the ozone contribution metric is arbitrary and not supported by any standard, guidance or technical basis. Below we analyze alternative Upwind State ozone contribution metrics that are based on previous CSAPR rules, based on EPA guidance or based on the 2015 ozone NAAQS rather than the arbitrary selection of 10 days.[(The following comment excerpt is paraphrased.)]

EPA's use of the Anthropogenic Precursor Culpability Assessment (APCA) probing tool instead of the Ozone Source Apportionment Technology (OSAT) will overstate Utah's and Wyoming's contributions to ozone design values at downwind receptors because APCA allocates ozone formed from Utah and Wyoming anthropogenic NOx emissions reacting with biogenic VOC emissions under VOC-limited ozone formation conditions to the Wyoming NOx emissions instead of to the biogenic VOC emissions. Unlike OSAT, APCA is not a true ozone source apportionment because it expresses a bias toward assigning ozone formed to one type of Source Group over another, which is why it is called a culpability assessment and not an ozone source apportionment.

The cumulative effects of EPA missing emissions, using a coarse 12-km grid spacing and WRF meteorological inputs, and using APCA instead of OSAT would likely reduce Wyoming's contribution to 2023 and 2026 ozone design values at Chatfield to below the 1 percent of the 2015 ozone NAAQS significance threshold.

For Utah the case is not quite as clear whether the cumulative effects of all the deficiencies in the Proposed Transport Rule would be sufficient to reduce the ozone contributions at DM/NFR NAA receptors to below the significance threshold used in the Proposed Transport Rule. An explicitly CAMx ozone source apportionment simulation correcting these Proposed Transport Rule deficiencies is needed, but there was insufficient time to conduct such a simulation given the short comment period.

For all these reasons' EPA's Proposed Transport Rule overstates Utah's and Wyoming's ozone contributions.

Ramboll's Independent CAMx 2023 APCA and OSAT Source Apportionment Simulation for the Western States Lowers Utah and Wyoming contributions:

The CAMx 2023 western states APCA modeling results were processed for the three nonattainment/maintenance receptors in the DM/NFR NAA and our Upwind state ozone contribution results exactly matched those in the Proposed Transport Rule (e.g., Wyoming had a 0.81 ppb ozone contribution to 2023 ozone design value at Chatfield). Table 5-1 [available in full comment] compare the western state ozone contributions at the four key monitoring sites in the DM/NFR ozone NAA from our western states CAMx 2023 APCA and OSAT ozone source apportionment modeling. As expected, the state with the largest difference in the APCA and OSAT ozone source apportionment modeling ozone contributions was for Colorado (-18%) as there is more VOC-limited ozone formation in the Denver Metro urban area containing the receptors than in the more rural areas.

For Wyoming, the CAMx 2023 APCA ozone source apportionment had a 0.81 ppb contribution to CHAT that was 0.12 ppb above EPA's level needed to have an insignificant contribution (0.69 ppb) using the Proposed Transport Rule significant contribution threshold (0.70 ppb). Using the CAMx OSAT ozone source apportionment, Wyoming's contribution to CHAT is 0.75 ppb that is 0.06 ppb lower than APCA and half-way to being below EPA's significant contribution threshold so that is a significant effect.

For Utah, the CAMx 2023 OSAT ozone source apportionment modeling had a 0.02 to 0.04 ppb lower ozone contribution at DM/NFR NAA receptors compared to using the APCA probing tool.

*Response*

As explained elsewhere in Section 7.1, the EPA's method for calculating contribution follows the EPA's modeling guidance and is a longstanding and appropriate approach to assessing contribution at Step 2.

Based on the source apportionment modeling by the commenter using OSAT, both Wyoming and Utah remain linked to the Chatfield receptor in Denver. The EPA's response to comments regarding the use of the APCA source apportionment technique is in Section 4.1.2. We are deferring final action at this time on Wyoming's SIP submission, pending further review of the updated air quality and contribution modeling and analysis.

*Comment*

**Commenter:** PacifiCorp

**Commenter ID:** 38

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

Upwind State Ozone Contributions at Downwind State Receptors are Overstated. ([Ramboll,] Chapter 5).

The Proposed Rule overstates upwind state 2023 and 2026 ozone contributions to ozone design values at receptors in downwind states in a number of ways. For example, EPA's modeling ignored certain emissions, such as $NO_X$ formed by lightning, which occurs frequently in the Front Range area and can represent as much as 14% of summer ozone formation. EPA's coarse grid resolution, described in Chapter 4 of the Ramboll Report, also understates local emissions and ozone contributions, which has the ultimate effect of overstating upwind state contributions. Other choices made by EPA in conducting the Proposed Rule's CAMx ozone source apportionment modeling, such as the selected meteorological inputs and culpability assessment, further overstate upwind contributions.

*Response*

As described in Section III.A.2 of the preamble, and in response to this issue raised by commenters, the EPA included $NO_X$ emissions from lightning strikes in the 2016v3 emissions inventory used for the air quality modeling of this final action. *See* Preparation of Emissions Inventories for the 2016v3 North American Emissions Modeling Platform TSD (2016v3 Emissions Modeling TSD), available in the docket and at https://www.epa.gov/air-emissions-modeling/2016v3-platform. The method for including these emissions in the modeling are described in this document.

The EPA's response to comments on culpability assessment modeling can be found in Section 4.1.2.

The EPA's response to comments on model grid resolution and associated meteorology can be found in Section 4.

*Comments*

**Commenter:** Wisconsin Department of Natural Resources

**Commenter ID:** 51

**Docket ID:** EPA-R05-OAR-2022-0006

**Comment:**

1. EPA does not identify Wisconsin's Sheboygan Kohler-Andrae monitor as a 2023 nonattainment monitor in any proposal and must correct this omission.

EPA's evaluation of state transport SIPs is incomplete because it does not include the Sheboygan Kohler-Andrae monitor. As noted above, EPA's 2023 "no water" modeling results indicate that the Sheboygan monitor (Site ID 551170006) will have a 2023 average design value of 73.6 ppb and a 2023 maximum design value of 74.5 ppb. Applying EPA's CSAPR methodology, Sheboygan is considered a "nonattainment" monitor, since its average projected design value is above the 2015 ozone NAAQS. However, Sheboygan is not identified in any of EPA's proposed 2015 ozone transport SIP disapprovals (for Region 5, or any other region) as a 2023 nonattainment monitor, even as other monitors in Wisconsin (such as those in Racine and Kenosha) were properly included. Since Sheboygan clearly meets EPA's criteria as a nonattainment monitor, EPA should review all its 2015 transport SIP proposals and identify Sheboygan as a 2023 nonattainment monitor whenever appropriate.

2. EPA must identify all the states that are linked to the Sheboygan monitor in 2023.

Since Sheboygan was not identified by EPA as a nonattainment monitor in any submittal, EPA subsequently did not identify states linked to the monitor using EPA's "1% of the NAAQS" criteria (that is, a contribution equal or greater than 0.70 ppb). Based on contribution data for the Sheboygan monitor provided separately by EPA to WDNR, seven states are shown to contribute at least 0.70 ppb to Sheboygan in 2023 (Table 2). These states therefore would be linked to the monitor for transport purposes.

[Table 2 available in full comment]

To be consistent with the CSAPR four-step framework, EPA needs to identify that these states contribute to Sheboygan and therefore have transport obligations to that monitor. The WDNR also recommends that EPA independently review its contribution data for the Sheboygan monitor to confirm that no additional states should be identified as significant contributors beyond those listed above.

3. EPA must adjust its methods for selecting monitors for transport assessment to ensure monitors like Sheboygan are not omitted in the future.

[…]

EPA needs to adjust its methods for selecting monitors for transport assessment so that its transport modeling includes, by default, contribution data for <u>all</u> monitors with projected average or maximum

future year design values above the ozone standard being assessed (including Sheboygan, when that monitor so qualifies).

**Commenter:** Wisconsin Department of Natural Resources

**Commenter ID:** 51

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

1. EPA does not identify Wisconsin's Sheboygan Kohler-Andrae monitor as a 2023 nonattainment monitor in any proposal and must correct this omission.

EPA's 2023 "no water" modeling results indicate that Sheboygan monitor (Site ID 551170006) will have a 2023 average design value of 73.6 ppb and a 2023 maximum design value of 74.5 ppb. Applying EPA's CSAPR methodology, Sheboygan is considered a "nonattainment" monitor, since its average projected design value is above the 2015 ozone NAAQS. However, as noted above, Sheboygan is not identified in any of EPA's proposed 2015 ozone transport SIP disapprovals (including those in Region 7) as a 2023 nonattainment monitor, even as other monitors in Wisconsin (such as those in Racine and Kenosha) were properly included. Sheboygan is a monitor of regulatory significance that is projected to have the highest ozone design values in the Midwest. Since Sheboygan clearly meets EPA's criteria as a nonattainment monitor, EPA needs to review all of its 2015 transport SIP proposals and identify Sheboygan as a 2023 nonattainment monitor whenever appropriate.

2. EPA must identify Texas and Arkansas as states that are linked to the Sheboygan monitor in 2023.

Since Sheboygan was not identified by EPA as a nonattainment monitor in any submittal, EPA subsequently did not identify states linked to the monitor using EPA's "1% of the NAAQS" criteria (that is, a contribution equal or greater than 0.70 ppb). Based on contribution data for the Sheboygan monitor provided separately by EPA to WDNR, seven states, including Texas and Arkansas in Region 6, are shown to contribute at least 0.70 ppb to Sheboygan in 2023 (see Table). These states therefore would be linked to the monitor for transport purposes.

[Table 1 in full comment]

To be consistent with the CSAPR four-step analytic framework, EPA must identify Texas and Arkansas as states contributing to Sheboygan and that therefore having transport obligations to that monitor. The WDNR also recommends that EPA independently review its contribution data for the Sheboygan monitor to confirm that no additional states should be identified as significant contributors beyond those listed above.

*Response*

The EPA has identified the Sheboygan monitor as a nonattainment receptor in the air quality modeling for this final action, and the daily contribution data meet the criterion of a minimum of 5 days with

future year MDA8 modeled ozone concentrations greater than or equal to 60 ppb. In this regard, the EPA has calculated contributions to the Sheboygan receptor (Receptor ID: 551170006). The upwind states that contribute greater than or equal to 0.70 ppb screening threshold in this final action are Illinois, Indiana, Michigan, Missouri, Ohio, and Texas. The average contribution metric values from these states to the Sheboygan receptor can be found in the Final Action Air Quality Modeling TSD.

As explained in the Air Quality Modeling TSD for the proposal, as well as the Air Quality Modeling TSD for the final rule, both in docket No. EPA–HQ–OAR–2021–0663, the methodology for calculating contributions is based on the average of daily contributions on the days with the top 10 model-predicted MDA8 ozone concentrations greater than or equal to 60 ppb in the future year modeling. If there are fewer than 10 modeled days that meet this criterion for the given receptor, then the average contribution is calculated based on the remaining days greater than or equal to 60 ppb, providing that there are at least five days with modeled MDA8 values greater than or equal to 60 ppb. Average contribution metric values are not calculated for a receptor if there are fewer than 5 days with future year modeled MDA8 ozone concentrations at or above this threshold.

The basis for using the average contribution as the metric for evaluating upwind state contributions with respect to the 0.70 ppb screening threshold and the basis for requiring a minimum of 5 days with MDA8 ozone concentrations for calculating the average contribution metric is that the magnitude of contributions from upwind states can have very large day-to-day variability. The variability in contributions is the result of different multi-day transport wind patterns combined with the relative proximity of the upwind state to the downwind receptor.

The following tables illustrates the variability in daily contributions on the set of days used to calculate the average contribution metric values from upwind states linked to the Sheboygan receptor based on the modeling for this final action. At this receptor there are 9 days in 2023 with predicted concentrations greater than or equal to 60 ppb. The data for these 9 days are used in calculating the average contribution metric values for this receptor.

The first table provides the daily contributions by day for each upwind state. The second table provides the daily contributions for each upwind state ranked by the magnitude of the contribution. In both tables the bold/highlighted text denotes contributions greater than 0.70 ppb. Viewed together, the tables show that the upwind states closest to Sheboygan (i.e., Illinois, Indiana, and Michigan) have by far the largest contributions. For the other, more distant, upwind states, the difference in contributions across the top concentrations can be quite large. For example, the contributions from Missouri, Ohio, and Texas are each greater than 1 ppb on June 15. However, in contrast, on August 18 the contribution from Missouri is more than 5 ppb, while the contributions from both Ohio and Texas are well below the 1 percent threshold. In addition, the days with high contributions from nearby upwind states are not the same days for the more distant upwind states (i.e., Missouri, Ohio, and Texas). For example, on August 4 the contribution from Ohio is 3.65 ppb while the contributions from Missouri and Texas on this same day are much lower at 0.17 ppb and 0.34 ppb, respectively.

The ranked-ordered daily contributions in the second table illustrate the sharp contrast in the magnitude of contributions across the distribution of values. That is, the contributions from the 3 more distant states are either very high or very low. As an example, the 5th highest contribution from Missouri is 2.24 ppb, whereas the 6th highest contribution is nearly an order of magnitude lower at 0.37 ppb.

The EPA's methodology is designed to help ensure that the resulting average metric values are not biased toward only the days with the highest or lowest contributions. This provides a high degree of confidence that on average over these top days, each of these states contribute to the Sheboygan receptor's ozone concentrations.

In this regard, the EPA continues to find that its approach for calculating the average contribution metric is appropriate in that it provides a robust projection of contributions that can be expected in future years.

*Table 7-4*

| Date | Daily 8-Hour Averge Contributions (ppb) from Linked Upwind States in 2023 | | | | | |
|------|------|------|------|------|------|------|
|      | IL | IN | MI | MO | OH | TX |
| May 24 | **14.41** | **4.14** | **1.15** | **2.32** | 0.46 | **0.82** |
| June 10 | **12.58** | **4.19** | **0.82** | **2.45** | 0.06 | **3.15** |
| June 15 | **8.35** | **3.15** | 0.61 | **2.24** | **1.08** | **1.62** |
| June 19 | **7.37** | **8.19** | **0.95** | 0.13 | **2.92** | 0.11 |
| June 25 | **8.41** | **12.84** | **3.05** | 0.37 | **4.60** | 0.65 |
| July 11 | **16.25** | **11.58** | **0.90** | **2.25** | 0.00 | **0.71** |
| July 20 | **15.80** | **10.19** | **1.17** | 0.31 | 0.02 | **0.86** |
| August 04 | **15.49** | **16.20** | **4.45** | 0.17 | **3.65** | 0.34 |
| August 18 | **16.18** | **3.11** | 0.05 | **5.20** | 0.00 | 0.26 |

*Table 7-5*

| Rank | Rank-Ordered Daily 8-Hour Averge Contributions (ppb) from Linked Upwind States in 2023 | | | | | |
|------|------|------|------|------|------|------|
|      | IL | IN | MI | MO | OH | TX |
| **Highest** | **16.25** | **16.20** | **4.45** | **5.20** | **4.60** | **3.15** |
|      | **16.18** | **12.84** | **3.05** | **2.45** | **3.65** | **1.62** |
|      | **15.80** | **11.58** | **1.17** | **2.32** | **2.92** | **0.86** |
|      | **15.49** | **10.19** | **1.15** | **2.25** | **1.08** | **0.82** |
|      | **14.41** | **8.19** | **0.95** | **2.24** | 0.46 | **0.71** |
|      | **12.58** | **4.19** | **0.90** | 0.37 | 0.06 | 0.65 |
|      | **8.41** | **4.14** | **0.82** | 0.31 | 0.02 | 0.34 |
|      | **8.35** | **3.15** | 0.61 | 0.17 | 0.00 | 0.26 |
| **Lowest** | **7.37** | **3.11** | 0.05 | 0.13 | 0.00 | 0.11 |

## 7.2   Contributions

*Comment*

**Commenter:** Air Pollution Control Program, Missouri Department of Natural Resources

**Commenter ID:** 01

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

With respect to the receptor in Chicago, IL, to which the updated modeling links Missouri, no other receptors in Cook County, IL are linked to Missouri at Step 2. This calls into question the validity and assuredness of the model performance when it comes to the source apportionment techniques. In EPA's spreadsheet listing the design values and upwind state contributions, there are 10 receptors located in Cook County with available data all located in relatively close proximity to the newly identified linked receptor for Missouri. While the contribution identified from Missouri for the one linked receptor in Cook County is 0.94 ppb, the receptor with the next highest Missouri contribution is 0.56 ppb, approximately 40 percent less. From a practical standpoint it makes no sense that Missouri is contributing to this single receptor above the 1 percent threshold since there are nine other monitors in the same county where Missouri's contribution is at least 40 percent less than the modeled contribution to that problem receptor. This calls into question the ability of the model to determine significant contribution levels and the arbitrary nature of the 1 percent threshold at Step 2.

*Response*

The commenter states that in the 2016v2 modeling used for the proposed actions, Missouri was linked to only one of the five receptors in Cook County, IL. The commenter notes that the contribution to the monitor to which Missouri was linked (i.e., Evanston, monitor ID 170317002) was 0.94 ppb, but Missouri's contribution to the receptor with the next highest contribution was 0.56 ppb[68]. The commenter then claims that the large difference in the magnitude of contributions from Missouri to receptors within a single county calls into question the ability of the EPA's modeling to determine which contributions are significant. Commenters also claim the disparity in contributions underscores the arbitrary nature of the 1 percent threshold at Step 2.

The EPA disagrees with this comment. First, the EPA's average contribution metric which is used in Step 2 to evaluate each state's contribution with respect to the 1 percent of the NAAQS screening threshold is based on the multi-day average concentration and contribution on the top 10 concentration days greater than or equal to 60 ppb in 2023 at each receptor. The differences in average contributions from Missouri to the five receptors in Cook County as noted by the commenter are the result of differences in which days are used to calculate the average contribution metric. That is, because there are large spatial gradients in ozone concentrations in Cook County on some days, which may be due, either fully or in

---

[68] Missouri's average contribution to the five receptors in Cook County ranges from 0.20 ppb to 0.94 ppb at receptors in Cook County.

part, to the effects of the complex, local scale meteorological conditions associated with lake breeze from Lake Michigan, the average contribution at each receptor can be based on a different set of days. Because the magnitude of contributions from Missouri (and other upwind states) can vary by large amounts from day to day, in response to day to day differences in regional transport wind flows, the use of different days in the calculations can result in large differences in the average contribution among the five receptors.

The effects of day to day variability in the concentrations and contributions used to calculate the average contribution metric are evident from the data in the table below. This table provides the daily MDA8 ozone (i.e., O3) concentrations and contributions from Missouri to each of the five receptors in Cook County on the collective set of days used to calculate the average contribution metric at each receptor (concentrations and contributions are in units of ppb). In this table the data are ranked from highest to lowest based on the magnitude of the daily contributions from Missouri to the Evanston, Illinois receptor. The MDA8 concentrations shaded gray denote the days used to calculate the average contribution metric at each receptor. Daily contributions from Missouri that are greater than or equal to 1 percent of the NAAQS (i.e., 0.70 ppb) are shaded orange. The data in the table show that the days with the highest contributions from Missouri (i.e., contribution values shaded orange) occur on a consistent set of days at nearly all the receptors (the exception being July 23 when the contributions from Missouri to two receptors are above the threshold, whereas the contributions to the other three are below the threshold.) That is, days with high contributions from Missouri at one receptor are, with one exception, also the days with high contributions from Missouri at the other receptors. Thus, the modeling is consistent in terms of which days are most impacted by emissions from Missouri at the Cook County receptors. Looking at the concentration and contribution data on the specific days used in calculating the average contribution metric at each receptor (i.e., MDA8 concentrations shaded gray) confirms that the differences between receptors in the magnitude of daily MDA8 ozone concentrations are the cause of the large difference in the average contribution from Missouri to these receptors. For example, at the Evanston receptor, four of the days used to calculate the average contribution are well above 0.70 ppb. The Alsip receptor also has high contributions from Missouri on these same days, but the MDA8 ozone concentrations on these days are well below 60 ppb such that none of these high contribution days are included in calculating the average contribution at this receptor.[69] Thus, as this analysis clearly demonstrates, the EPA finds that its contribution modeling provides consistent results in terms of the contributions from Missouri to the receptors in Cook County and that receptor to receptor difference in the average contribution from Missouri is the result of differences in the magnitude of model-predicted ozone concentrations at individual receptor on specific days.

See also Section 4.2 for the EPA's response to comments on coarse scale (i.e., 12 km) modeling.

---

[69] Note that there are fewer than 10 days with model predicted MDA8 ozone concentrations in 2023 that meet the 60 ppb criteria. In this regard, the average contributions at this receptor are based on the data for the seven days that meet this criterion.

*Table 7-6*

| Month | Day | Evanston (170317002) MDA8 O3 | Missouri | Alsip (170310001) MDA8 O3 | Missouri | So. Water Plant (170310032) MDA8 O3 | Missouri | COM ED (170310076) MDA8 O3 | Missouri | Northbrook (170314201) MDA8 O3 | Missouri |
|---|---|---|---|---|---|---|---|---|---|---|---|
| July | 7 | 67.0 | 3.32 | 46.8 | 3.11 | 51.4 | 3.14 | 48.2 | 2.77 | 61.8 | 2.59 |
| June | 15 | 67.6 | 2.09 | 54.7 | 1.22 | 60.3 | 1.56 | 55.2 | 1.31 | 54.6 | 1.62 |
| July | 22 | 61.2 | 1.92 | 57.0 | 1.53 | 63.1 | 1.96 | 56.7 | 1.70 | 55.6 | 1.54 |
| June | 25 | 65.4 | 0.89 | 55.4 | 1.10 | 57.1 | 0.83 | 56.1 | 1.06 | 62.0 | 1.12 |
| August | 10 | 62.0 | 0.48 | 67.5 | 0.50 | 60.9 | 0.41 | 68.2 | 0.51 | 67.7 | 0.59 |
| June | 19 | 61.7 | 0.44 | 55.3 | 0.52 | 56.7 | 0.47 | 56.6 | 0.52 | 58.4 | 0.49 |
| July | 23 | 64.6 | 0.43 | 63.3 | 0.90 | 67.3 | 0.68 | 70.9 | 0.81 | 75.4 | 0.52 |
| August | 3 | 63.5 | 0.42 | 61.3 | 0.25 | 66.0 | 0.31 | 62.0 | 0.33 | 64.7 | 0.45 |
| July | 18 | 55.1 | 0.13 | 70.7 | 0.22 | 61.5 | 0.18 | 69.4 | 0.16 | 59.1 | 0.10 |
| August | 4 | 74.7 | 0.07 | 58.2 | 0.05 | 62.0 | 0.05 | 60.3 | 0.05 | 70.9 | 0.07 |
| August | 2 | 57.4 | 0.05 | 55.2 | 0.09 | 56.9 | 0.06 | 60.4 | 0.08 | 65.3 | 0.07 |
| July | 19 | 56.0 | 0.01 | 70.7 | 0.04 | 68.1 | 0.04 | 76.2 | 0.04 | 66.2 | 0.01 |
| July | 25 | 51.2 | 0.00 | 70.9 | 0.00 | 57.4 | 0.00 | 64.2 | 0.00 | 49.0 | 0.00 |
| July | 27 | 74.4 | 0.00 | 57.9 | 0.00 | 66.1 | 0.00 | 62.8 | 0.00 | 72.5 | 0.00 |
| July | 26 | 60.8 | 0.00 | 66.8 | 0.00 | 61.4 | 0.00 | 69.6 | 0.00 | 67.4 | 0.00 |

*Comment*

**Commenter:** Tennessee Department of Environment and Conservation

**Commenter ID:** 41

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

Tennessee's modeled contribution may be overstated because EPA did not have ten days of "high-ozone" for the monitor

EPA's modeling technical support document summarizes the basic approach for calculating the average contribution metric[.] […] The Denton County monitor used to calculate Tennessee's contribution meets this minimum criterion, but only barely – monitor ID 481210034 had only six modeled days above 60 ppb and only one day above 70 ppb (Table 5). Those six days (not 10) were used to calculate an average contribution of 0.94 ppb for Tennessee. Our reading of the technical support document suggests that EPA should have calculated Tennessee's average contribution using all ten days. If all ten days are used, Tennessee's contribution falls to 0.73 ppb, a value that exceeds the 1% value but only by a marginal amount. If all ten days are used, the tenth-highest value is 57.39 ppb. Tennessee also notes that of 153 modeled days, only one day (September 21) exceeded 70 ppb at all.

[Table 5 available in full comment]

*Response*

The commenter contends that, according to the approach described in the Air Quality Modeling TSD to support proposed SIP actions, the average contributions at the Denton County, TX should have been based on model predictions from the top 10 concentrations days. Instead, the EPA used the contributions on the top six modeled days above 60 ppb to calculate the avg contribution from upwind states to this receptor, because the EPA's modeling did not have at least 10 "high ozone days" in 2023. The commenter points out that there was only one day in the ozone season when the modeled concentration at this receptor was above 70 ppb. The average contribution based on six days was 0.94 ppb, whereas the contribution would be 0.73 ppb if the data on the top 10 days was used. The commenter notes that 0.73 ppb exceeds the 1 percent threshold by only a small margin.

The EPA first notes that in this action, the EPA is not taking final action on the state whose contributions are in question, Tennessee. The EPA will take final action on this state at a later point in time. However, to the extent that the commenter questions the methodology that the EPA has applied nationwide to calculate upwind state contributions, we are responding to this comment.

The EPA's methodology for projecting design values and calculating upwind contributions is explained in the 2016v2 modeling's Air Quality Modeling TSD "2015 Ozone National Ambient Air Quality Standards Proposed Interstate Transport Air Plan Disapproval," found in the docket for this action, docket ID No. EPA–HQ–OAR–2021–0663. The EPA's methodology for projecting design values and contributions is in accordance with the EPA's guidance for attainment demonstration modeling (US EPA, 2018). The criterion of having at least 5 days with MDA8 ozone concentrations greater than or equal to 60 ppb was chosen to avoid including contributions on days that are well below the NAAQS in the calculation of the contribution metric. Using 5 days with MDA8 ozone greater than or equal to 60 ppb aligns with recommendations in EPA's air quality modeling guidance for projecting future year design values. The EPA continues to find it appropriate to follow this methodology in projecting ozone concentrations and contributions in future years.

In this instance, as the commenter also points out under the alternative methodology presented, Tennessee would still contribute greater than 0.70 ppb to the Denton receptor using the 2016v2 modeling platform and, therefore, Tennessee would still be considered "linked" at step 2 of the 4-step interstate transport framework if we had continued to rely on that modeling for final action. In fact, in the sensitivity modeling completed using GEOS-Chem, there were 10 days greater than or equal to 60 ppb in 2023 at the Denton receptor. Using the data for all 10 days results in an avg contribution from Tennessee to Denton of 0.71 ppb.

*Comments*

**Commenter:** Louisiana Chemical Association

**Commenter ID:** 26

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

EPA's projected nonattainment and maintenance receptors with Louisiana linkages are different under the 2016v2 model than they were under the *2015 Ozone NAAQS Memo* model. EPA does not explain why the models produce differing linked receptors but alleges without justification that this does not call the 2016v2 model accuracy/credibility into question. The differences are summarized below. The orange cells are receptors that are identified as Louisiana linkages in the 2015 Ozone NAAQS Memo results spreadsheet but not the 2016v2 results spreadsheet, or vice versa.

[table in full comment]

The fact that every single receptor shows an increase in Louisiana's contribution ***despite a decrease in ozone precursor emissions*** in Louisiana calls into question the legitimacy of input data for the 2016v2 model.

[table in full comment]

The modeling of Texas contributions to Louisiana monitors (see table) suggests decreases in the Texas emissions inventory over time and projections of increases in the Louisiana inventories.


**Commenter:** Louisiana Department of Environmental Quality

**Commenter ID:** 27

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

Measured verifiable data shows that ozone precursor (NOx and VOC) emissions have decreased, demonstrating that existing regulations are functioning properly to ensure cleaner air for our citizens, and by extension, our state neighbors. Statewide ozone precursor levels are as follow:

[table in full comment]

The data unmistakably demonstrates that there is less transport, yet EPA has determined that EPA contributes more in the future.

[table in full comment]

This calls into question the reliability of the EPA's modeling.


*Response*

In response to commenter's claims that the EPA's modeling may be unreliable, the commenter claims unspecified modeling results demonstrate an increase in contribution from Louisiana at certain receptors between 2017 and 2028, despite a decrease in emissions between 2015 and 2020. The source

of data for both tables in this comment is not identified. It appears the commenter may be using the EPA's modeling of 2017 using a 2011-based modeling platform, and modeling of 2028 using the 2016v1 platform from the Revised CSAPR Update. We did not model 2028 using the 2016v2 platform, nor is 2028 a relevant analytic year for this action, falling five years beyond the 2023 analytic year associated with the Moderate area attainment date. In any case, the EPA notes that the correlation drawn by the commenter is flawed. The commenter's analysis fails to consider critical factors that influence the level of contributions from upwind states determined in different modeling platforms. The commenter is apparently comparing, on the one hand, contributions based on 2011 meteorology using emissions projected for 2017 from the 2011-based platform to, on the other hand, contributions based on 2016 meteorology with emissions projected for 2028 from the 2016v1 platform. The difference in contributions is a result of differences in transport wind flows in 2011 compared to 2016, as well as differences in the magnitude and spatial distribution of emissions in 2017 compared to 2028. Further, overall declines in emissions of ozone precursors in Louisiana from 2015 to 2020 do not in themselves establish that the state is not still contributing to receptors in 2023.

In the table below, to illustrate how the state's contribution would change using a consistent set of emissions inventory data and meteorology, we compare Louisiana's contributions to certain monitoring sites in 2023 and 2026 based on modeling from the 2016v3 platform. This illustrates that the contributions to receptors in eastern Texas from sources in Louisiana in 2026 are less than the contributions in 2023, but are still nonetheless well above the 1% threshold for Step 2 purposes. The EPA notes, however, that 2026 is beyond the next applicable attainment date and is not a relevant year for this action.

*Table 7-7*

| AQS ID | Location | Average Contribution from Louisiana (ppb) | | Percent Change |
|---|---|---|---|---|
| | | 2023 | 2026 | 2026 vs 2023 |
| 480391004 | Brazoria/Manvel Croix Park | 5.21 | 5.03 | -3.5% |
| 481210034 | Dallas/Denton Airport | 2.87 | 2.77 | -3.5% |
| 481671034 | Galveston | 9.51 | 9.37 | -1.5% |
| 482010024 | Houston/Aldine | 4.75 | 4.57 | -3.8% |
| 482010055 | Houston/Bayland Park | 5.49 | 5.30 | -3.5% |
| 482011034 | Houston/East | 5.62 | 5.43 | -3.4% |
| 482011035 | Houston/Clinton | 5.44 | 5.25 | -3.5% |

Other issues raised by these comments are addressed in the following sections: 1.4 (Use of Updated Modeling), 1.7 (Length of Comment Period), 5 (Updates to Modeling and Changes in Linkages), and 8.5 (Air Quality Factors).

*Comment*

**Commenter:** United States Steel Corporation

**Commenter ID:** 45

**Docket ID:** EPA-R05-OAR-2022-0006

**Comment:**

The emission estimates from other sources, including those in Illinois, Indiana, Ohio and Michigan – and in particular, emissions from the iron and steel sources in those states, are overstated and are inconsistent with prior state submittals. Finally, separate from the emission estimates, the modeling used in the disapproval over-predicts impacts from the upwind states and sources.

*Response*

The EPA's response to comments on emissions inventories can be found Section 3. The comment provided no basis for claiming that the EPA's modeling for the proposed disapproval actions over-predicts impacts from upwind states.

## 7.3   1 Percent as a Contribution Threshold

*Comments*

**Commenter:** Air Pollution Control Program, Missouri Department of Natural Resources

**Commenter ID:** 01

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

EPA's 4-step framework provides for a finding of significant contribution or linkage at a level of one percent of the 2015 ozone standard. Due to this, the 4-step framework as applied by EPA, results in decisions that some states are able to narrowly avoid or narrowly be brought in to the FIP requirements based on extremely small changes to the modeling results. Therefore, if EPA's application of step 2 holds with a one percent threshold for establishing linkages, which it should not, as discussed at length in later comments, an underperforming model is unacceptable. If EPA claims that a one percent threshold is appropriate for establishing linkages, then arguments could be made that the model should be able to predict within one percent the ozone concentrations that have been measured in the past in the base case modeling scenario (modeling using past known meteorology and emission levels and comparing it to actual measured ozone concentrations).

[…]

EPA's application of a 1 percent of the standard contribution as the threshold (1 percent threshold) to establish significant contribution is arbitrary and unjustified. In the proposed FIP, EPA states its reasoning simply as the fact that the threshold is the same value it has used in the past under previous CSAPR regulations. In EPA's original CSAPR, it justifies the use of the 1 percent contribution with a generic statement about how in many cases relatively small contributions from many states can collectively contribute in significant amounts to the downwind problem. However, the only analysis that EPA has performed in these latest CSAPR actions is in its August 2018 memo where EPA concluded and recommended that a higher threshold may be appropriate. The memo goes into great detail about the level of downwind contribution captured at various thresholds and uses this as the basis for suggesting that an alternative (higher) threshold may be appropriate.

EPA has offered no analysis in their proposed disapproval nor in their proposed FIP to justify the continued use of a 1 percent threshold. If the generic reasoning in the original CSAPR still stands that relatively small contributions from many states can collectively contribute in significant amounts, then EPA could supposedly pick an even lower threshold for significant contribution and it would assuredly prevail, and bring more states into this predicament. On the converse, EPA, despite all of the new modeling and upwind state contribution data it now has available, offers no reasoning as to why a higher threshold is not appropriate. This is a complete reversal in the stance EPA took with its August 2018 memo where thorough analysis was used to potentially justify such higher thresholds. The lack of reasoning and justification, and instead just pointing to the fact that EPA has successfully used the threshold in similar regulations before, is evidence that calls into question whether EPA is able to adequately justify the use of a 1 percent threshold in light of the data before it. EPA must adequately explain how the data from the updated modeling justifies the use of a 1 percent threshold and then re-propose and take comment on that rationale. Failure to do so before promulgating a final disapproval or final promulgation of a FIP would rob states and the public from an informed public participation process that will result in billions of dollars of costs and future policy implications that could defer even greater authority of this federal agency over state sovereign rights.

[…]

Further, the real effects of EPA using, without justification, the 1 percent threshold sheds even more light on the inappropriateness of this approach. EPA states in its disapproval that it had previously attempted to justify the use of an alternative threshold for the state of Iowa in a proposed approval of their good neighbor SIP, because Iowa had no linkage to any receptors above a 1 ppb contribution, which EPA's August memo sought to allow. In Missouri's proposed disapproval, EPA states that it attempted to augment Iowa's submission to allow for the use of the 1 ppb threshold for that state, but that it was not moving forward with that proposal. EPA offers no reasoning or justification for why it could not move forward with that proposal, and instead decided to approve Iowa's SIP because the updated modeling did not include any linked receptors to Iowa because the highest contribution from Iowa for any remaining linked receptors in the updated modeling is below the 1 percent threshold. As a result, EPA is proposing to approve Iowa's SIP, but for a different reason that what EPA proposed earlier. This determination only magnifies the arbitrary nature of the 1 percent threshold, where states can fall

in and out of billions of dollars of compliance costs that are federally mandated based on relatively minor changes in the modeling results.

**Commenter:** Alabama Department of Environmental Management

**Commenter ID:** 02

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

EPA's selection of 1% is arbitrary. It could have just as easily adopted 1 ppb as its threshold in the first place, as requested by many States, but it chose 1% apparently due to the additional 5% (7% in the 2018 modeling) of emissions reductions provided. Information is not readily available to determine if EPA actually investigated whether implementing the 1 ppb threshold in its reduction methodology in the proposed FIP would have been sufficient to address the attainment and maintenance issues in question. While EPA has the ability to set the thresholds for the program, it does not have the right to require overcontrol of source emissions purely as a method of reducing overall emissions or imposing restrictions on target source categories. If the reductions necessary could have been achieved at the 1 ppb threshold, the 1% threshold requirements clearly demonstrate an overcontrol situation.

Lastly, if the 1% threshold is considered a bright line for SIP approval, then rulemaking should be undertaken with technical supporting documentation and opportunity for notice and comment. Absent rulemaking, the States, who are responsible for the development and implementation of SIPs, will use best judgement and sound scientific principles, regarding all available information in said development and implementation.

**Commenter:** Louisiana Chemical Association

**Commenter ID:** 26

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

The use of 1% of the NAAQS threshold for modeled contribution as the sole definition of significant contribution is inappropriate for the 2015 Ozone NAAQS since the more stringent .7ppb (1%) threshold is an order of magnitude smaller than the biases and errors typically documented for regional photochemical modeling (cited Simon et al., 2012). In fact, although modeling bias (difference between monitored and modeled values) has been reduced over the last 10-15 years with updated CMAX modeling versions, summertime NOx bias still remains above the 1% threshold, particularly in the South, including Louisiana. (cited Toro, C, et al. 2021. Evaluation of 15 years of modeled atmospheric oxidized nitrogen compounds across the contiguous United States). The EPA screening level now being used to evaluate Louisiana's SIP is a fraction of a part per billion – an incredibly low value. EPA has provided no scientific support for a 1% screening level to be always applied for every NAAQS without consideration

of factors such as the ability to discern ozone impacts of precursors at such infinitesimally small values and model performance. Although EPA addresses the bias limitations of the modeling in the Proposed Rule, it does not explain why the 1 ppb threshold is arbitrary and capricious and should not be used.

**Commenter:** Louisiana Department of Environmental Quality

**Commenter ID:** 27

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

EPA's discussion of 1% of the standard (or 0.07 ppb) versus 1 part per billion (ppb) is silent on linkages to Sheboygan WI, which LDEQ used, yet dismisses the use on linkage to other monitors because the 2016v2 modeling show increased transport.

This discussion is moot. Use of 1% of the standard is problematic as EPA's own performance specifications for automated analyzers allow up to 2.5 ppb as "noise" according to Table B-1, Subpart 53.

**Commenter:** PacifiCorp

**Commenter ID:** 38

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

EPA ignores a significant EPA study supporting use of the 1 ppb threshold. Admittedly, EPA determined the one-percent threshold was appropriate when it first adopted the original CSAPR rule. This was based on 2011 modeling analysis that compared a 5% threshold, a 1% threshold, and ½% threshold. Based on this modeling analysis, EPA concluded that the upwind capture rates under the 1% and ½% threshold options were similar, indicating that little benefit would be achieved with the lower threshold. EPA did find that raising the threshold to 5% would leave too many upwind states and emission sources unregulated.

EPA conducted further analysis in 2018 when it issued the Threshold Guidance that re-analyzed the minimum threshold using a tighter range of options and more up-to-date modeling techniques and data. Specifically, EPA evaluated the difference in capture rates between the previous threshold of 0.7 ppb (1%), a threshold of 1 ppb, and a threshold of 2 ppb. Like the 2011 analysis, EPA's 2018 analysis again concluded that the difference between the two lower options—0.7 ppb and 1 ppb—was minimal, while the higher threshold of 2 ppb left too many emissions unregulated. As a result, EPA considered capture rates at the 0.7 ppb and 1 ppb thresholds to be generally comparable, and thus concluded that "it may be reasonable and appropriate for states to use a 1 ppb contribution threshold, as an alternative to a 1 percent threshold," in addressing interstate transport under the CAA good neighbor provision. Notably, a threshold of 1 ppb is just 1.4% of the ozone standard of 70 ppb, and therefore would round down to 1%.

260

[...]

*EPA's insistence on a 1 percent threshold is not based on sound reasoning or science.*

EPA engaged in robust statistical analysis in other guidance that defined a Significant Impact Level ("SIL") for ozone to be used as part of the PSD permitting process (setting it at 1 ppb) ("SILs Memo"). The purpose of the SILs Memo was to provide an ozone level "for the permitting authority to conclude that the proposed source will not cause or contribute to a violation of a National Ambient Air Quality Standard (NAAQS)." That analysis was peer-reviewed by three independent economic statisticians employed as faculty at major U.S. universities. But the SILs Memo was not just limited to PSD permitting. As stated in their associated statistical analysis report:

> The statistical methods and analysis detailed in this report focus on using the conceptual framework of *statistical significance* to calculate levels of change in air quality concentrations that have a 'significant impact' or an 'insignificant impact' on air quality degradation. *Statistical significance* is a well-established concept with a basis in commonly accepted scientific and mathematical theory. This analysis examines *statistical significance* for a range of values measured by air quality monitors. The statistical methods and data reflected in **this analysis may be applicable for multiple regulatory applications** where EPA and state agencies seek to quantify a level of impact on air quality that they consider to be either 'significant' or 'not significant'.

EPA found that the "technical analysis may have utility in several contexts." Moreover, EPA recommended in the SILs Memo that the 1 ppb SIL for ozone should "apply to the NAAQS everywhere, regardless of the class of the airshed." This statement by EPA is directly contrary to EPA's statements about use of the SILs in its disapproval of so many states' good neighbor SIPs. The SILs analysis further supports use of the 1 ppb significance threshold and undermines EPA's claim that Utah's use of a 1 ppb ozone NAAQS threshold is inconsistent with EPA's past analysis.


**Commenter:** PacifiCorp (Attachment - Berkshire Hathaway Energy (BHE) Company Comments on Proposed Ozone Transport Rule)

**Commenter ID:** 38

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

EPA determined the one-percent threshold was appropriate when it first adopted the original CSAPR rule based on a 2011 modeling analysis that compared results under a five-percent threshold, a one-percent threshold, and a half-percent threshold. EPA's analysis compared the "capture rates" for the different options—i.e., the percentage of total upwind contribution that would be regulated under the different thresholds under consideration. Based on its modeling analysis, EPA concluded that the capture rates under the one-percent and half-a-percent options were similar, indicating that little benefit would be achieved with the lower threshold, but that raising the threshold to five percent would leave too many upwind states and emission sources unregulated. BHE asks EPA to reconsider its

minimum contribution threshold. Unless EPA can identify some rational basis for preferring its older and now outdated 2011 analysis, the 2018 analysis appears superior and more appropriate for both identifying significant contributions and evaluating the possibility of over-control.

[…]

In addition, as noted above, EPA has already determined in another context that two ozone design values (DV) that differ by less than 1 ppb are not statistically significantly different from each other, based on the statistical analysis use to define 1 ppb ozone as the Significant Impact Level (SIL) for the Prevention of Significant Deterioration (PSD) program. EPA's own demonstration that 1 ppb is not statistically significant confirms that 1 ppb is an appropriate de minimis threshold. Further discussion of this point is provided in the enclosed report from Ramboll evaluating the EPA modeling analysis underlying the Proposed Rule.

**Commenter:** PacifiCorp (Attachment – Ramboll Evaluation)

**Commenter ID:** 38

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

Wyoming's and Utah's Ozone Contribution Is Not Statistically Significant According to EPA's Statistical Analysis

[…]

EPA has conducted a robust statistical analysis to demonstrate that two ozone design values (DV) that differ by less than 1 ppb are not statistically significantly different from each other. The analysis was performed to define the 1 ppb ozone Significant Impact Level (SIL) that is used as part of the Prevention of Significant Deterioration (PSD) permitting process to define an ozone level "for the permitting authority to conclude that the proposed source will not cause or contribute to a violation of a National Ambient Air Quality Standard (NAAQS)." That analysis was peer reviewed by three independent economic statisticians employed as faculty at major U.S. universities. Therefore, EPA should not consider contributions to be significant unless they are greater than 1 ppb. At that threshold, Wyoming would not significantly contribute to any downwind receptor. Also, at that threshold, Utah would not significantly contribute to any downwind receptor based on the more tailored RAQC / CDPHE modeling discussed above (Ramboll, Chapter 4).

[…]

EPA's Justification for the 1 Percent of the 2015 NAAQS Significance Threshold in the Proposed Transport Rule is Unfounded

On August 31, 2018, EPA released a Memorandum whose purpose was "*to provide analytical information regarding the degree to which certain air quality threshold amounts capture the collective amount of upwind contribution from upwind states to downwind receptors for the 2015 ozone National*

262

*Ambient Air Quality standard (NAAQS)*." (Tsirigotis, 2018b, pp. 1). The 2018 Memorandum evaluated significant ozone contribution thresholds of 1 ppb, 2 ppb and 1 percent of the 2015 ozone NAAQS (0.70 ppb) and concluded "*Based on the data and analysis summarized here, the EPA believes that a threshold of 1 ppb may be appropriate for states to use to develop SIP revisions addressing the good neighbor provision for the 2015 ozone NAAQS.*" (Tsirigotis, 2018b, pp. 3). This conclusion is technically justifiable given the statistical analysis EPA conducted to justify the 1 ppb SIL (EPA, 2018a).

In the Proposed Transport Rule, EPA discusses their 2018 Memorandum for states to use alterative ozone contribution thresholds in their good neighbor SIPs and offers a specious argument why use of a single threshold of 1 percent of the 2015 NAAQS is needed as "*the Agency now believes using different thresholds at Step 2 with respect to the 2015 ozone NAAQS raises substantial policy consistency and practical implementation concerns.*" (EPA, 2022, pp. 20073). [H]owever, EPA doesn't mention that the EPA 2018 Memorandum believed that a 1 ppb threshold is appropriate for states to use and its use as the single significance threshold would also alleviate the policy concerns of using multiple significance thresholds that EPA was concerned about. The Proposed Transport Rule then goes on to note that the 1 ppb threshold "*has the disadvantage of losing a certain amount of total upwind contribution*" compared to the 1 percent of the NAAQS threshold and "*there does not appear to be a compelling policy imperative in moving to a 1 ppb threshold.*" (EPA, 2022, pp. 20074). There is, however, a very powerful and compelling technical argument for moving to a 1 ppb significant contribution threshold based on EPA's statistical analysis to justify the 1 ppb ozone SIL that demonstrated two ozone DVs that differ by 1 ppb or less are not statistically significantly different from each other (EPA, 2018a).


**Commenter:** Sierra Club

**Commenter ID:** 39

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

First, Sierra Club strongly supports EPA's observation that "consistency in requirements and expectations across all states is essential" in regulating emissions to address a regional air pollutant such as ozone. As EPA correctly observes, utilizing different contribution thresholds for different states "would allow certain states to avoid further evaluation of potential emissions controls while other states must proceed to a Step 3 analysis," creating "significant equity and consistency problems among states." Indeed, a lack of uniformity in the stringency of control measures being applied to sources in upwind and downwind states is a significant cause of the persistent ozone nonattainment issues in many downwind areas. States that contribute above a fixed amount to a downwind nonattainment or maintenance area should, uniformly, be included in EPA's Step 3 analysis.

[…]

Third, Sierra Club agrees with EPA that consistency also counsels in favor of retention of the 1% contribution threshold. The 2018 Guidance Memorandum identified no reasoned basis for deviating from EPA's consistent prior actions and guidance on this issue, and Sierra Club perceives none other

than to simply reduce the number of states obligated to address their significant contributions to downwind nonattainment and maintenance. But shrinking the pool of states working to address regional ozone transport simply shifts the burden even more heavily to the downwind states, many of which contribute comparatively little to their own nonattainment and already control their in-state sources to a degree unmatched by their upwind counterparts.

**Commenter:** Tennessee Department of Environment and Conservation

**Commenter ID:** 41

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

EPA has not engaged in the rulemaking required under the Clean Air Act to establish 1 percent of the NAAQS as a bright-line SIP approval threshold for compliance with the 2015 8-Hour Ozone NAAQS, so EPA cannot disapprove Tennessee's SIP for a standard that has not been properly promulgated.

[N]either the 2015 8-Hour Ozone NAAQS, nor the implementation standards contain the 1% of the NAAQS compliance threshold for State SIPs.

While has EPA previously used a 1% significance threshold to address interstate transport, these metrics have been applied to issue SIP calls (e. g., the NOX SIP Call and CAIR NOX Ozone Season Trading Program) or to adopt Federal Implementation Plans in the absence of a SIP submittal. EPA's use of 1% is generally reasonable in such instances, because no state action has taken place (i. e., the state has not submitted a SIP), the state may provide comments and technical information on EPA's action (i.e., the 1% threshold is a rebuttable proposition to which the state may object), and – most importantly – the final result is a *rulemaking*, which complies with the applicable provisions of CAA section 307(d). It is well established that states have primary responsibility to develop and implement the SIP. However, in this instance EPA has decided to substitute its own judgement in place of the state's by imposing a 1% threshold on certain states (but not others as discussed in Comment #6) without engaging in the required rulemaking to impose this as a uniform standard to determine whether an upwind state is linked at Step 2 of the Framework. If, as EPA indicates, most states cannot justify or utilize an alternative standard in practice, then the 1% threshold has, by implication, become a critical approvability threshold for a SIP addressing the Good Neighbor provision and, as such, must be promulgated as a rulemaking, technically and legally supported, with an opportunity for notice and comment. If EPA wishes to establish a bright-line metric for review of infrastructure SIPs, then it should promulgate that metric through rulemaking under CAA section 307(d).

**Commenter:** United States Steel Corporation

**Commenter ID:** 45

**Docket ID:** EPA-R05-OAR-2022-0006

**Comment:**

<u>One Percent Contribution Criterion is Not Appropriate as it is Lower than What U.S. EPA Advised States and it is Lower Than What Can be Supported Based on the Precision of the Modeling</u>

U. S. Steel notes that while U.S. EPA may believe the modeling used to support its disapproval of the SIPs is accurate and precise, the accuracy and precision of the modeling does not support an impact threshold of 0.70 ppb. U.S. EPA needs to consider the accuracy and the precision of the modeling when determining an appropriate "interference" threshold. U. S. Steel acknowledges that a model cannot necessarily be "perfect" as U. S. EPA points out, but the U.S. EPA's decisions and impacts to the regulated need to reflect the model's accuracy and precision.


**Commenter:** Utah Petroleum Association and the Utah Mining Association

**Commenter ID:** 48

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

EPA should not apply the same downwind threshold contribution in the western United States that it applies in the east.

EPA judged the Utah IT SIP based on a threshold contribution of 0.7 ppb to downwind States, but numerous other influences affect ozone in the west, meaning that such a small contribution can be difficult to predict with any accuracy. In their comments on the Proposed GNR, the Western States Air Resources Council ("WESTAR") stated:

> *Air quality in the WESTAR region is influenced by both human activities and natural phenomena. Baseline air quality and the sources of impacts to that baseline differ based on local industry, geography, population, meteorology, and other state or regional conditions. Across the West, high elevations, extreme variations in topography, vast landscapes, and variable weather patterns influence air quality. The West is also disproportionately affected by wildfires, high wind dust events, volcanic activity, and international transport of pollutants. Pollutant sources, methods of dispersion, and types of affected areas in the West are quite different from those in the eastern United States.*

While EPA strives for consistency, being consistent does not always mean being the same. The differentiating factors in the WESTAR comments must be considered. At a minimum, these factors point to greater uncertainty in air quality modeling. Considering the myriad of factors lending uncertainty to modeling results, the 0.7 ppb threshold contribution is too low.


*Response*

The EPA responds to these comments in the preamble in Section V.B. Specifically, comments regarding the technical merits and justification of a 1 percent of the NAAQS contribution threshold are addressed

in Section V.B.4. and Section V.B.5. of the preamble, respectively. Comments advocating use of the Prevention of Significant Deterioration Significant Impact Level as the contribution threshold at Step 2 are addressed in Section V.B.6. of the preamble.

As the EPA recognized when it first applied this threshold in CSAPR, using a threshold expressed as a percentage of the NAAQS allows for the threshold to become more stringent in proportion to the increased protectiveness of public health and the environment when the EPA revises the NAAQS. 76 FR 48208, 48238 (Aug. 8, 2011) (The "approach is readily applicable to any current and future NAAQS and would automatically adjust the stringency of the transport threshold to maintain a constant relationship with the stringency of the relevant NAAQS as they are revised."). No state or commenter has explained why this well-considered policy is unlawful or arbitrary and capricious.

One commenter pointed to the EPA's proposed error correction of the EPA's prior approval of Delaware's SIP submission in a separate rulemaking proceeding to argue that updates to modeling make the threshold too small, as a states' contribution can change to be above or below a 1 percent of the NAAQS contribution threshold after updates are made to the modeling. But the same would be true for any threshold, including 1 ppb. Some states that would fall just above a 1 ppb threshold could be anticipated to make (and indeed, several included in this action do make) virtually identical arguments as the states that are just over the 1 percent of the NAAQS threshold.

Additionally, in the case of every state covered by this action, with the exception of Alabama, Kentucky, and Minnesota, the difference between a 1 percent threshold and a 1 ppb threshold is irrelevant to the decision here because linkages are present above the 1 ppb level in the 2016v3 modeling.

Another commenter argued that 1 percent of the NAAQS fails limits of modeling and monitoring capability and so violates the requirement from *Michigan v. EPA*, 213 F.3d 663 (D.C. Cir. 2012) for EPA to establish a "measurable contribution" before identifying the amount of "significant contribution." *Michigan*, 231 F.3d at 684. Another commenter apparently references Table B-1 to subpart B of 40 CFR Part 53 (performance limit specifications for automated methods), to make a similar argument regarding the capabilities of monitoring equipment. We address the comments on whether monitoring technology accuracy is relevant in Section V.B.4 of the preamble. There is also no conflict with *Michigan*. Contributions as low as 1 percent of the NAAQS (and impacts at even lower levels) are reliably measured through our modeling to calculating and apportioning contribution.

Other issues raised by these comments are addressed in the preamble in Sections V.A.4., V.B.2., V.B.6., V.B.7., and V.C.2. and in the following sections: Sections 1.2 (Guidance for SIP Submissions), 1.4 (Use of Updated Modeling), 4.2 (Model Performance), 5 (Updates to Modeling and Changes in Linkages), 7.2 (August 2018 Memorandum), 9.2 (Over-Control), 10.3 (Cooperative Federalism and the EPA's Authority), 11.4 (Transport Policy – Western State Ozone Regulation), and 11.5 (International Contributions). Further explanation of the EPA's contribution calculation can be found in the Final Action Air Quality Modeling TSD, in the docket for this action.

## 7.4   August 2018 Memorandum

*Comments*

**Commenter:** Air Pollution Control Program, Missouri Department of Natural Resources

**Commenter ID:** 01

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

The use of the 1 percent threshold is assuredly arbitrary and capricious, and EPA offers no justification or reasoning for its selection of that threshold in Missouri's SIP disapproval to counter this claim. EPA's disapproval only states that in light of the fact that it has not found any state's justification adequate for the use of a different threshold at step 2, it no longer thinks it is advisable to consider using different thresholds to establish linkages at step 2. However, EPA does not go on to defend its use of the 1 percent threshold, and simply assumes that because it was able to use it before, it must be able to use it again without question or any consideration of the new facts and data that are now available with the updated modeling. This assumption is flawed, and without providing this reasoning and an opportunity for public notice and comment, the proposed disapproval cannot stand without a re-proposal that clearly articulates the reasoning for the 1 percent threshold, or any other threshold EPA decides to use. Further, the real effects of EPA using, without justification, the 1 percent threshold sheds even more light on the inappropriateness of this approach. EPA states in its disapproval that it had previously attempted to justify the use of an alternative threshold for the state of Iowa in a proposed approval of their good neighbor SIP, because Iowa had no linkage to any receptors above a 1 ppb contribution, which EPA's August memo sought to allow. In Missouri's proposed disapproval, EPA states that it attempted to augment Iowa's submission to allow for the use of the 1 ppb threshold for that state, but that it was not moving forward with that proposal. EPA offers no reasoning or justification for why it could not move forward with that proposal, and instead decided to approve Iowa's SIP because the updated modeling did not include any linked receptors to Iowa because the highest contribution from Iowa for any remaining linked receptors in the updated modeling is below the 1 percent threshold. As a result, EPA is proposing to approve Iowa's SIP, but for a different reason that what EPA proposed earlier. This determination only magnifies the arbitrary nature of the 1 percent threshold, where states can fall in and out of billions of dollars of compliance costs that are federally mandated based on relatively minor changes in the modeling results. Delaware is in a similar, but completely opposite, situation as Iowa that sheds even more light on the arbitrary nature of such a low significant contribution threshold. In the previous modeling, Delaware's contribution levels were below the 1 percent threshold, and now EPA is proposing to reverse their approval of Delaware's SIP and bring them into the FIP. Such monumental changes in EPA's approval status based solely on the latest modeling analysis shows that if these proposed disapprovals and proposed FIP are allowed to stand that no state can ever be assured that their good neighbor obligations have actually been met. Delaware has not relaxed any control measures between the final approval of their SIP and the proposed reversal of that approval. Yet, EPA is now proposing to impose a FIP on Delaware. This goes to show that the significant contribution value of

267

1 percent, which either requires hundreds of millions of dollars of compliance costs, or no costs whatsoever, is not justifiable or equitable in any way. EPA states in their proposed disapproval of Missouri's SIP that consideration of alternative significant contribution thresholds would raise serious concerns about equity among states, but this action shows that such a low contribution threshold at step 2 will certainly have the same effect. States are at the mercy of the modeling, and anytime EPA wishes, it may update the modeling and reverse course on the inclusion of a state resulting in the imposition of a detrimentally costly FIP. For all of these reasons, EPA's selection for a 1 percent threshold, or any other threshold, in the proposed disapproval cannot stand without a re-proposal that clearly articulates the explanation in light of the most recent data why such a threshold is appropriate.

**Commenter:** Alabama Department of Environmental Management

**Commenter ID:** 02

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

In November 2018 Iowa submitted its 2015 ozone transport SIP which relied on EPAs 2023 modeling as presented in EPNs memorandum from March 2018 to identify downwind receptors that may be impacted by Iowa emissions. Iowa concluded that the State did not contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in any other State. Iowa referred to the analytic information in EPAs August 2018 memorandum as a basis to use a 1 ppb contribution threshold when evaluating the State contribution to downwind receptors. Iowa identified two downwind receptors to which it was contributing between 1% and 1 ppb. In the March 2020 proposed approval, EPA proposed to determine that Iowa was justified in applying a 1 ppb threshold for purposes of evaluating upwind State linkages. EPA stated that the amount of upwind contribution captured with the 1% and 1 ppb thresholds is generally comparable on average across all receptors, therefore EPA concluded that it may be reasonable and appropriate for States to use the alternate threshold of 1 ppb. This conclusion led EPA to propose approval of Iowa's transport SIP submittal, which relied on a 1 ppb contribution threshold. When the updated 2016v2 modeling was released, Iowa was shown to contribute less than the threshold of 1% of the 2015 ozone NAAQS to all downwind receptors. This finding led EPA to withdraw the March 2020 proposed approval that relied on a 1 ppb threshold and to re-propose approval based on the new modeling and on the fact that Iowa's contribution to all other States was now below 1% of the 2015 ozone NAAQS. While this action by EPA is appropriate based on the new modeling results,  the fact that EPA had full intentions to approve Iowa's November 2018 transport SIP submittal that relied on a 1 ppb threshold is an obvious indication that EPA agreed that this alternative threshold was adequate and approvable. This fact goes completely against EPAs current reasoning that the use of a 1 ppb alternate contribution threshold is unacceptable due to the negative effects it would have on national consistency and policy issues.

[…]

In response to ADEM's SIP submittal, EPA contends that ADEM did not provide sufficient technical justification for using a 1 ppb threshold instead of EPA's arbitrary 1% threshold. In fact, EPA states it was

268

not providing a methodology for justifying a 1 ppb threshold and that all States that had attempted to had not successfully demonstrated a sufficient technical justification. EPA is fully aware that few, if any, States have the resources available to provide the additional modeling necessary to demonstrate a technical justification. Additionally, EPA did not provide additional technical information for why the 1 ppb threshold is not appropriate.

EPA can update and/or revise guidance but cannot simply disregard guidance that has not been withdrawn. The August 2018 memo states that "the amount of upwind collective contribution captured with the 1% and 1 ppb thresholds is generally comparable, and that it may be reasonable and appropriate to use the 1 ppb threshold". In fact, EPA did just that when conducting the Iowa WOE analysis for the 2015 ozone NAAQS. The analysis asked the question "What are the impacts of individual upwind States linked at 1 ppb or higher to the receptor?" In evaluating individual upwind States' contributions to the Denton County and Harris County, Texas receptors, Alabama's impacts, 0.71 and 0.88 ppb, respectively, represents 9% of the impact of upwind States above 1% at the Denton County receptor, while for the Harris County receptor, the impact is 10.6% of the impact of upwind States above 1%. Said another way, the Alabama contributions of 0.71 ppb (Denton) and 0.88 ppb (Harris) represent 6% and 7% of the total impact of upwind States. Alabama is significant at neither monitor relative to the 1 ppb threshold, nor is the State significant at either threshold for the 2026 future year.

For the upwind States above 1 ppb, three States are identified for the Denton County receptor (LA, MS, OK), and three States (AR, LA, MS), likewise are identified for the Harris County receptor.

[table in full comment]

The impacts of the States above 1 ppb is 5.55 ppb (45% of total upwind contributions) for the Denton County receptor, and 7.43 ppb (63% of total up-wind contributions) for the Harris Count receptor.

The table below lists the contributions Using the two thresholds for the Denton County (481210034) and Harris County (482010055), Texas receptors, considering all upwind States' contributions as well as States with contributions of ≥1% (0.71ppb), and States with contributions ≥1 ppb.

[table in full comment]

As can be seen in the table above, the impacts of upwind State contributions, in total, are less than half the contribution from Texas. Further, the impacts of the offshore, fires and biogenic sectors exceed the contribution from Alabama sources.

[...]

EPA states in the proposed disapproval that ADEM "did not identify any periods of clean data for the Denton County, Texas maintenance receptor for which meteorological conditions could be assessed to determine whether particular summers have ozone conducive or unconducive meteorology during a period of clean data." In looking at the 8-hr design values for the Denton County receptor, the trend is downward (Figure 1).

Of even more importance are the reductions in precursor emissions (NOx) for Alabama, Louisiana, Arkansas and Mississippi. Reductions on the order of 40 - 50% have occurred since 2011 (Figure 2). Texas NOx emissions have also shown a 36% decrease over the same time period, although the

269

statewide NOx emissions in Texas in many cases dwarf the other the other states. When looking at EGU and non-EGU NOx sources, it should be noted that Texas' emissions are many orders of magnitude greater than Alabama's. This is also the case in both the on-road and non-road sectors. While the design value for the Harris County, Texas receptor remains relatively unchanged, the NOx reductions both within and at upwind States are still notable.

[Figure 1 and Figure 2 are in the full comment]

In the EPA WOE analysis that was conducted for Iowa, EPA looked at the impact of in-state emissions on ozone levels relative to the collective upwind impacts. The upwind States' contribution to the Denton County receptor (481210034) is 17% (12.2 ppb) of the 2023 average ozone design value, as compared to 39% or 27.3 ppb from in-state sources, with Alabama's contribution of 0.71 ppb only contributing 6% to the total contribution of all upwind States at the Denton County receptor.

Alabama is ranked 6th and last when using EPA's 1% significance threshold (Table 1). When looking at both the Denton and Harris County receptors, ADEM compared the year to year NOx changes at both the ozone and NOx monitors, which are co-located (Figures 3 and 4).  While statewide NOx emissions are declining, the NOx concentrations at the receptors do not reflect what is being seen across the State, indicating that local NOx sources, such as vehicles, may play a bigger role in the formation of ozone, not transported precursors.

[Table 1, Figure 3, and Figure 4 in full comment]

Another issue of note is that with the continued reductions in NOx, it is unclear how lower NOx emissions in the 2022 modeling resulted in higher concentrations relative to the 2021 modeling which assumably reflected higher NOx emissions.

Based on the assessment of NOx emissions from Alabama and other upwind States, Alabama's contribution to the 2023 average ozone design value relative to Texas and other upwind States, and supplemental NOx data, ADEM asserts that NOx emissions in 2023 will have an insignificant impact on the Denton County, Texas monitor.

[…]

In the EPA WOE analysis completed for Iowa, EPA considered the linkages between the upwind States' impact on the nonattainment or maintenance receptor, specifically in relation to the two thresholds, 1% (0.71 ppb) and 1 ppb. For the Denton County receptor, in addition to Alabama, there are two other upwind States that contribute between 0.71 and 1 ppb, Arkansas and Tennessee. The collective contribution for those two States is 14% of the total upwind contributions. While Tennessee and Alabama are not linked to any other receptor above 1 ppb, Arkansas is linked above 1 ppb to other monitors in Texas. For the Harris County receptor, Alabama is the only State with a contribution between the two thresholds, with a total contribution of 7% of the total upwind contribution. The difference between the thresholds, as shown above are 7.4% (0.88 ppb) for the Harris County receptor, and 19.7% (2.41 ppb) for the Denton County receptor. These percentages are in line with the analysis EPA completed for Iowa, which indicated that an alternative threshold could be supported.

Additionally, it is worth looking at the number of linkages for each State to 2023 nonattainment and maintenance receptors. For the Denton County receptor Alabama is only linked to two receptors, one nonattainment receptor (Harris County, Texas- 482010055) and one maintenance receptor (Denton County, Texas- 481210034). With respect to all linkages identified, Alabama is ranked 18th of 23 for non-attainment receptors, and 21st out of 27 for all linkages. At 1 ppb, Alabama is not linked to any receptors, nonattainment or maintenance, and Alabama is not linked to any receptors in 2026, regardless of the threshold.

Based on Alabama's ranking when considering which States are linked to future nonattainment and or maintenance receptors as well as the magnitude of the linkages (between 1% (0.71ppb) and 1 ppb for both receptors), this supports an alternative threshold of significance.

**Commenter:** Alabama Power Company, Southern Power Company, and PowerSouth Energy Cooperative

**Commenter ID:** 04

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

Specifically, ADEM's SIP submission package identifies multiple factors that support its analysis: […] (4) application of an alternative contribution threshold. Each of these factors suggests that Alabama sources do not contribute significantly to ozone concentrations in Texas and that further regulation of Alabama sources would not appreciably decrease ozone concentrations in Texas.

[…]

Finally, ADEM argues that 1 ppb is a reasonable and acceptable contribution threshold in this case.

[…]

EPA contends that ADEM's "arguments in support of using a 1 ppb threshold are not approvable," however, this is not the correct standard by which to review the SIP. The threshold is merely a proxy EPA has instituted in its 4-step framework in order to determine potential state linkages in step 2. Whereas EPA proposes to rely on a 1 percent (0.7 ppb) threshold for "evaluating a State's contribution to nonattainment or maintenance of the 2015 8-hour ozone NAAQS . . . at downwind receptors" based on a theory of consistency, other thresholds have been utilized in the past. EPA concedes that it previously recognized that a 1 ppb contribution threshold is "justifiable" in "certain circumstances." There is ample evidence in the record, which is ignored by EPA, that this is one of those circumstances. While EPA attempts to brush off Alabama's alternative contribution threshold by stating that "nearly every State that attempted to rely on a 1 ppb threshold did not provide sufficient information and analysis to support a determination that an alternative threshold was reasonable or appropriate," it fails to consider the evidence in the record. By ignoring that evidence, EPA has not explained why a 1 ppb threshold is not reasonable. Support, including technical analysis, for the alternative threshold proposed by ADEM is set out below.

First, despite EPA's newly articulated theory that alternative thresholds raise "policy consistency and practical implementation concerns," EPA has allowed for flexibility in determining contribution thresholds. EPA's August 2018 memorandum on contribution thresholds states that "the amount of upwind collective contribution captured using a 1 ppb threshold is generally comparable to the amount captured using a threshold equivalent to 1 percent of the NAAQS" and "[b]ecause the amount of upwind collective contribution captured with the 1 percent and 1 ppb thresholds is generally comparable, overall, we believe it may be reasonable and appropriate for states to use a 1 ppb contribution threshold, as an alternative to a 1 percent threshold." Moreover, EPA has not identified any evidence to suggest that the use of an alternative threshold would actually harm air quality; instead it seems EPA's focus is on expanding its 4-step FIP framework at the expense of cooperative federalism and the states' right to implement their own standards to ensure interstate air quality.

Furthermore, in the Iowa Infrastructure SIP for the 2015 Ozone NAAQS, EPA proposed to approve the use of a 1 ppb threshold for two downwind receptors where Iowa's contribution was between 1 percent and 1 ppb. In the proposed rule for Iowa's SIP, EPA presented an analysis to support the use of a 1 ppb contribution threshold. First, EPA considered whether, for these specific receptors, the 1 ppb threshold captures a comparable amount of upwind collective contribution as a 1 percent threshold (as stated in the August 2018 EPA memorandum). Then, EPA conducted a WOE analysis to evaluate the following three factors to determine whether a 1 ppb threshold was appropriate for the two receptors:

1. How does the impact of in-state emissions on ozone levels at this receptor compare to collective upwind impacts?

2. What are the impacts of individual upwind states linked at 1 ppb or higher to the receptor?

3. Are individual upwind states impacting this receptor between 1 percent and 1 ppb linked above 1 ppb to *other* receptors?

After applying these factors, EPA concluded that "the 1 ppb contribution threshold is reasonable and appropriate to support the conclusion that [Iowa's use] . . . will not contribute" to either receptor at issue.

According to EPA "Alabama does not provide discussion or analysis containing information specific to the State or a receptor analysis for the affected monitors . . . to evaluate whether the alternative threshold was appropriate to apply with respect to the monitors to which Alabama was linked." However, state-specific information and analysis is exactly what was included in the SIP submittal package. Alabama's proposed SIP revision package included an analysis—which was provided to EPA—assessing each of these factors for the Denton and Harris County monitors and found that a 1 ppb threshold is equally appropriate for analyzing Alabama's contribution to those areas. The following analysis applies the three factors to the Denton County monitor and the Harris County monitor and compares the results to those from the Iowa SIP approval. EPA ignores this analysis in its proposed disapproval.

*Denton County, Texas*

Applying the first factor (impact of in-state emissions on ozone levels at this receptor compared to collective upwind impacts) to data from the Denton County monitor, upwind states collectively

contribute 17% (12.2 ppb) to the 2023 average ozone design value, as compared to 39% (27.3 ppb) from in-state emissions, thus in-state emissions have a much larger impact than upwind sources on this receptor. Under the second factor (impacts of individual upwind states linked at 1 ppb or higher to the receptor), three upwind states contribute above 1 ppb to this receptor, with a collective contribution of 5.55 ppb (or 45% of all upwind contributions) versus Alabama's modelled contribution, which is 0.71 ppb, or 6% of the total contribution of all upwind states. Therefore, a significant portion of upwind contribution will be captured by states linked at or above 1 ppb. Considering the third factor (individual upwind states impacting this receptor between 1 percent and 1 ppb linked above 1 ppb *other* receptors), in addition to Alabama, there are two other upwind states—Arkansas and Tennessee—that are modelled to contribute between 1 percent and 1 ppb to this receptor. The collective contribution of these two additional states is 1.70 ppb (14% of total upwind contributions). Tennessee and Alabama are not linked to any other receptor at or above 1 ppb. However, Arkansas is linked to several other receptors in Texas at or above 1 ppb, thus, Arkansas's emission reductions for other linkage receptors would also likely benefit this receptor.

*Harris County, Texas*

Applying the three factors to the Harris County monitor, first, upwind states collectively contribute 17% (11.9 ppb) to the 2023 average ozone design value, as compared to 40% (28.3 ppb) from in-state emissions, thus in-state emissions have a much larger impact than upwind sources on this receptor. Under the second factor, three upwind states contribute 1 ppb or more to this receptor, with a collective contribution of 7.4 ppb (or 62% of all upwind contributions) versus Alabama's modelled contribution which is 0.88 ppb, or 7% of the total contribution of all upwind states. Therefore, a significant portion of upwind contribution will be captured by states linked at or above 1 ppb. Third and finally, there are no other states that contribute between 1 percent and 1 ppb to this receptor. In addition, Alabama is not linked to any other state at or above 1 ppb.

Comparing these results to those in the Iowa three-factor analysis, we see that, unlike Iowa, the first factor here highlights that in-state, not upwind, contributions have a larger impact on these receptors. In Iowa's case, upwind contributions were much higher than in-state contributions to the receptors at issue. This factor weighs in favor of a 1 ppb threshold for Alabama. Turning to the second factor, Alabama's modelled contributions to the receptors at issue are 6-7% of all upwind contributions, whereas states linked with a contribution above 1 ppb account for approximately 45-60% of all upwind contributions. Therefore, like Iowa, a substantial amount of upwind contribution from states will be captured by a 1 ppb threshold. Finally, the third factor also supports a 1 ppb threshold for Alabama in the case of Harris County since no other state contributions lie between 1 percent and 1 ppb. For Denton County, of the two states other than Alabama that are between the two thresholds, Arkansas is linked elsewhere above 1 ppb—this situation is similar to that of Iowa and the Allegan receptor, where one other state had additional linkages above 1 ppb, meaning that emission reductions by that state would benefit the receptor at issue.

In addition to these three factors, like for Iowa, collective upwind ozone contribution captured with a 1 percent threshold is comparable to the contribution captured with a 1 ppb threshold for both Denton and Harris counties. At the Denton monitor, a 1 percent threshold captures contributions of 7.96 ppb and a 1 ppb threshold captures contributions of 5.55 ppb (or 70% of the upwind contribution that would

be captured using a 1 percent threshold). At the Harris County receptor, a 1 percent threshold captures 8.31 ppb and a 1 ppb threshold captures 7.43 ppb (or 89% of upwind contributions that would be captured using a 1 percent threshold). For comparison, the 1 ppb threshold captured 83% and 94% of contributions to the receptors (Milwaukee and Allegan, respectively) at issue in the Iowa SIP. Thus, at over 89% capture, the 1 ppb threshold is easily appropriate for the Harris County receptor. Though the percentage captured by the 1 ppb threshold is slightly lower for the Denton monitor, this is because the monitor is so close to attainment. There is only a 2.4 ppb difference in the amount captured, which is also comparable to that in Iowa, where there was a 4.8 ppb difference in the amount of contributions captured using a 1 percent versus a 1 ppb threshold for Milwaukee and a 2.2 ppb difference for Allegan.

This "state specific" analysis demonstrates that, based on the factors set out by EPA, a 1 ppb significant threshold is reasonable and appropriate for Alabama, as the amount of upwind collective contribution captured with the 1 percent and 1 ppb thresholds is generally comparable and Alabama's overall modelled contributions to the receptors at issue is small. Surely, this analysis meets EPA's bar for "technical data relevant to Alabama" demonstrating why a 1 ppb threshold is reasonable.

[table in full comment]


**Commenter:** Arkansas Department of Energy and Environment, Division of Environmental Quality

**Commenter ID:** 07

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

Although EPA has not revoked the August 2018 Memorandum, EPA attempts to justify why they no longer consider this memorandum "guidance" and why they now specify that all states should conform to their policy choice with respect to the arbitrary 1% threshold. ADEQ finds that it is unreasonable for EPA to transform into a requirement that which was initially packaged and delivered to states as one of several options. This puts states at a critical disadvantage, as state rulemaking and the associated SIPs take years to develop, and early EPA guidance and conversations with EPA Regional Offices are the first pillars of state SIP development. States must undertake SIP development with limited technical resources, so the states rely heavily on EPA data and EPA guidance in their decision-making. The threshold decision is fundamental to further steps in the Interstate Transport Framework analysis. Therefore, this late-stage decision by EPA is unreasonable. DEQ finds that this decision effectively forces states to fail in meeting EPA's vacillating interpretation of what is necessary for SIPs to meet interstate transport obligations.

[...]

In the Proposed Rule, EPA proposes to substitute its arbitrary 1% threshold for the threshold used by DEQ in the Arkansas Transport SIP to identify potential linkages between Arkansas and identified nonattainment and maintenance areas. Consistent with EPA's August 2018 Memorandum, DEQ selected a 1 part per billion (ppb) threshold for identifying linkages between Arkansas and nonattainment and maintenance receptors. EPA now attempts to dismiss its own guidance by attempting to add, post hoc, a

274

requirement that DEQ should base its use of the 1 ppb threshold on "an evaluation of state specific circumstances." The August 2018 memo contains no such directive. Instead, the memo contains boilerplate language that "each state should consider whether the recommendations in this guidance are appropriate for each situation." Because of the interstate nature of the SIP, there are no "state-specific circumstances" with regard to the linkage threshold. DEQ instead chose to follow the plain meaning of the "consider" language and the spirit of guidance in the August 2018 memo. That is, it was the clear intent that the EPA, at the time of the August 2018 memo, wanted each state to exercise its rational and independent judgement as to whether the 1 ppb threshold was an appropriate measure to identify linkages. The appropriateness of this threshold was supported in ADEQ's SIP by multiple facts. First, EPA's August 2018 memorandum provided evidence that a 1 ppb threshold is generally comparable to a 1% threshold for the 2015 ozone NAAQS. Second, 1 ppb is a threshold used for another program to determine whether a PSD source has a significant impact that causes or contributes to a violation of a NAAQS or PSD increment. Third, 1 ppb is the significant digit for reporting ozone monitoring data. These three pieces of evidence support DEQ's selection of a 1 ppb threshold for determining what the state considers to be a potential linkage to nonattainment and maintenance receptors. In its proposed disapproval, EPA dismisses the weight of evidence provided by ADEQ in its choice of the 1 ppb threshold and substitutes its own policy for the state's without any evidence to support their 1% threshold other than to state that the 1% threshold captures marginally more contributions. Unlike EPA's arbitrary threshold, DEQ's threshold for evaluating linkages is based on a robust weight-of-evidence.

[…]

EPA's proposed disapproval also conflates a "linkage" based on its arbitrary 1% threshold with "significant contribution" that automatically imposes some emission reduction obligation on sources or emissions activities in a state. The threshold, whether 1% or 1 ppb, is a screening device triggering further analysis to determine whether particular emissions sources and activities within a state are "significantly" contributing to nonattainment or interfering with maintenance in another state. Arkansas's obligation is to prohibit "any source or other type of emissions activity within the State from emitting any air pollutant in amounts [that will] contribute significantly to nonattainment in, or interfere with maintenance by, any other State with respect to any such national primary or secondary ambient air quality standard." A "linkage" in and of itself is not a "source" or "emission activity" and is not a construct established under the Clean Air Act. It is a tool EPA established in guidance to assist states (and themselves) in evaluating whether there may be a source or emission activity in one state that is emitting an air pollutant(s) in an amount that may "significantly" contribute to nonattainment in or interfere with maintenance by any other State. In the Arkansas Transport SIP, DEQ made use of a 1 ppb threshold as a tool for determining whether further inquiry into potential "significant" contribution or interference by a source or emission activity is required (Step 3 of EPA's interstate transport framework).

[…]

Determination of linkages and significant contributions occurs at separate steps in the four-step analysis. DEQ does not agree that a 1% linkage to an entire state is the same as a significant contribution from a source or emissions activity. The state's obligation is not to eliminate an arbitrary threshold (or to

reduce emissions such that a neighboring state that may be its own primary contributor to nonattainment is not overburdened by their own obligations), but to determine if any emissions sources or emissions activity in the state are significantly contributing to a downwind nonattainment receptor or interfering with maintenance of the NAAQS by a downwind state and respond accordingly to mitigate significant contributions.

With respect to EPA's proposed disapproval of Arkansas's SIP, EPA is proposing to disapprove of Arkansas's use of an alternative 1 parts per billion ("ppb") threshold to identify whether Arkansas is "linked" to projected nonattainment and/or maintenance receptors in other states, in part due to EPA's determination that use of an alternative threshold "may be impractical or otherwise inadvisable for a number of additional policy reasons." EPA also claims that "it is not clear that national ozone transport policy is best served by allowing for less stringent thresholds at Step 2." Instead, EPA believes the appropriate threshold to determine linkages is 1 percent of the 2015 ozone NAAQS (i.e., 0.70 ppb).

[...]

Likewise, EPA's claim that it may be impracticable to apply an alternative threshold is an inappropriate basis for rejecting a state's choice. Impracticality, like policy reasons, plays no part in whether a SIP meets the applicable CAA requirements. EPA's analysis of whether the DEQ SIP complied with CAA requirements should have been limited to the rules, guidance and information existing at the time of DEQ's SIP submittal and not on EPA's new policy judgments.

[...]

With this proposal, EPA indicates that the agency does not support state-justified alternatives that differ from the arbitrary line drawn by EPA in the Proposed Rule. EPA's discussion in the Proposed Rule indicates that the agency does not consider the recommendations that EPA presented to states in the EPA's August 2018 guidance as viable alternatives to a one-size-fits-all EPA implementation of policy in 2022. The agency goes on to say they will "evaluate whether the state adequately justified the technical and legal basis" for any alternative compliance options that a state proposed. But, then EPA states that the August 2018 memo and its Attachment A "do not constitute agency guidance," though the title of the document in question is "Preliminary List of Potential Flexibilities." At the time the memo was released, seven months before state plans were due to EPA, it was clearly intended by EPA to provide guidance to the states. (See sentences 6 and 10 of the memo.) Four years later, EPA now rejects its former position and is attempting to substitute the states' policy judgments with its own.


**Commenter:** Arkansas Environmental Federation

**Commenter ID:** 09

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

Further, EPA cannot base disapproval of a SIP on the fact that states, even when following the 4-Step interstate transport framework that EPA has established, may apply different thresholds in Step 2 of the

framework, which would have "the potential to result in inconsistent application of interstate transport obligations based solely on the strength of a state's SIP submittal at Step 2 of the 4-Step framework." The states, in the first instance, have wide discretion in determining how to achieve the NAAQS, including their interstate transport obligations, and EPA cannot force the states to adopt approaches reflecting the Agency's policy preferences for consistency in interstate transport obligations. A "SIP basically embodies a set of choices . . . *that the state must make for itself* in attempting to reach the NAAQS with minimum dislocation."[14]

[14] *Bridesburg*, 836 F.2d at 780–81 (emphasis added); *see also Com. of Va.*, 108 F.3d at 1410 (D.C. Cir.) (CAA Section 110 "does not enable EPA to force particular control measures on the states.").

**Commenter:** Cleco Corporate Holdings LLC

**Commenter ID:** 14

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

The writer of the August 2018 memorandum provides information and argument which is summarized at the end that "*Because the amount of upwind collective contribution captured with the 1 percent and 1 ppb thresholds is generally comparable, overall, we believe it may be reasonable and appropriate for states to use a 1 ppb contribution threshold, as an alternative to a 1 percent threshold, at Step 2 of the 4-step framework in developing their SIP revisions addressing the good neighbor provision for the 2015 ozone NAAQS.*" Again, the memorandum does not call for the party utilizing the 1 ppb threshold to conduct "appropriate additional analysis". But as found in the Louisiana SIP, LDEQ did consider whether the recommendation for the August 31, 2018 guidance was appropriate for the situation and this was documented in the SIP. That is, *The LDEQ has maintained that an arbitrary threshold of 1% of the NAAQS for significant contribution to nonattainment or interference with maintenance is not applicable because the value is not detectable by the monitor and following the manner in which a design value is calculated, one percent of the standard would be truncated to zero. Therefore, Louisiana will use the flexibility allowed in the March 2018 memorandum allowing the use of 1 ppb*. In addition, LDEQ further indicated in the SIP, *the use of 1 % of the NAA QS threshold for modeled contribution as the sole definition of significant contribution is inappropriate for the 2015 ozone NAAQS since the more stringent 0. 7 ppb threshold is an order of magnitude smaller than the biases and errors typically documented for regional photochemical modeling (Simon et al., 2012)*. It's obvious that LDEQ considered whether the recommendation for this guidance was appropriate for the situation.

However, EPA goes on to indicate in the Proposal that now its position is that although it has not revoked the guidance in the August 2018 memorandum, it no longer considers the August 2018 memorandum guidance's approval of reliance on the 1 ppb screening threshold as proper. It is inappropriate for EPA to change course on what was presented in its August 2018 memorandum analysis because many in the regulated community relied upon it in the crafting of their state implementation plans. Cleco encourages the Agency to continue to support the August 2018 memorandum as written.

**Commenter:** Eagle Materials Inc.

**Commenter ID:** 16

**Docket ID:** EPA-R09-OAR-2022-0138

**Comment:**

EPA unreasonably departed from a 1 ppb linkage threshold.

EPA previously articulated a policy finding it reasonable for states to apply a 1 ppb linkage threshold in assessing their ozone transport obligations. While the APA does not prevent EPA from changing its prior policies, EPA must, at minimum, acknowledge such a change and provide a reasonable explanation. In articulating its explanation, EPA "cannot ignore its prior factual findings that contradict its new policy nor ignore reliance interests." Rather, EPA must "show that 'there are good reasons' for the new policy and 'that the agency believes it to be better, which the conscious change of course adequately indicates.'"

EPA's August 2018 Guidance specifically concluded "that a threshold of 1 ppb may be appropriate for states to use to develop SIP revisions addressing the good neighbor provision for the 2015 ozone NAAQS." In making this determination, EPA emphasized that "the amount of upwind collective contribution captured using a 1 ppb threshold is generally comparable to the amount captured using a threshold equivalent to 1 percent of the NAAQS," noting that the difference in captured emissions was only 7% when summed across all receptors and was "of a similar magnitude" at individual receptors.

However, in its Proposed SIP Disapproval, EPA notes that "its experience since the issuance of the August 2018 memorandum regarding use of alternative thresholds at Step 2… leads the Agency to now believe it may not be appropriate to continue to attempt to recognize alternative contribution thresholds at Step 2." EPA explains that a 1 ppb threshold "*may* be impractical or otherwise inadvisable" for the following reasons:

- "[C]onsistency in requirements and expectations across all states is essential,"

- "Consistency with past interstate transport actions… is also important," and

- "[T]he 1 ppb threshold has the disadvantage of losing a certain amount of total upwind contribution for further evaluation."

EPA does not adequately explain its change in position. In its August 2018 Memo, EPA determined that a 7% loss in total upwind state contribution did not interfere with state interstate transport obligations, but in the Proposed SIP Disapproval, EPA concludes that a 5% loss is unacceptable. EPA's only explanation for this about-face is "the core statutory objective of ensuring elimination of all significant contribution to nonattainment or interference of the NAAQS in other states and the broad, regional nature of the collective contribution problem with respect to ozone," which does not address why a 5% difference would not still eliminate *significant* contributions—particularly when EPA applies a marginal cost threshold as a proxy for significance at the next step of its analysis. EPA also apparently requires a

278

"compelling policy imperative" for changing this threshold from 0.70 ppb, but does not apply the same standard to changing the threshold from 1 ppb.

**Commenter:** Environmental Federation of Oklahoma

**Commenter ID:** 20

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

In particular, EFO supports DEQ's assessment that EPA has overstepped its authority by circumventing the normal SIP development and approval process in a number of ways, including but not limited to: [...] fifth, ignoring, or at least mischaracterizing, its own final guidance to the states.

**Commenter:** Idaho Power Company

**Commenter ID:** 23

**Docket ID:** EPA-R09-OAR-2022-0138

**Comment:**

Finally, EPA unreasonably departs from its own policy finding it reasonable for states to apply a 1 ppb linkage threshold in assessing their ozone transport obligations. EPA's August 2018 Guidance specifically concluded "that a threshold of 1 ppb may be appropriate for states to use to develop SIP revisions addressing the good neighbor provision for the 2015 ozone NAAQS." EPA inexplicably changes course in the Proposed Disapproval, claiming that "its experience since the issuance of the August 2018 memorandum... leads the Agency to now believe it may not be appropriate to continue to attempt to recognize alternative contribution thresholds," like the 1 ppb threshold. EPA's only explanation for this about-face is "the core statutory objective of ensuring elimination of *all* significant contribution to nonattainment or interference of the NAAQS in other states and the broad, regional nature of the collective contribution problem with respect to ozone," which is nonsensical because EPA applies a marginal cost threshold as a *proxy for significance at the next step* of its analysis.

**Commenter:** Kentucky Division for Air Quality

**Commenter ID:** 25

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

EPA Reversal on use of 1% Contribution Threshold

In the August 2018 memo, EPA states, "The data in the tables below indicate that, for the 2015 ozone NAAQS, the amount of upwind collective contribution captured using a 1 ppb threshold is generally comparable to the amount captured using a threshold equivalent to 1 percent of the NAAQS. Overall, using a 1 ppb threshold captures 70 percent, which is a similar and only slightly lower amount of contribution." Due to the close correlation between the use of a 1% threshold and a 1 ppb threshold, Kentucky chose to use the 1 ppb threshold for screening purposes in Step 2 of the framework, following EPA's published guidance. EPA has not provided any new information for rejecting the use of the 1 ppb threshold. Rather, the proposed rule states, "EPA's experience since the issuance of that [August 2018] memorandum has revealed substantial programmatic and policy difficulties in attempting to implement this approach." In this proposed action, EPA is relying on the 1% threshold to evaluate a state's contribution to a nonattainment or maintenance monitor. EPA identifies the need for consistency in its evaluation across all its Interstate Transport requirements, for all NAAQS.

**Commenter:** Louisiana Electric Utility Environmental Group

**Commenter ID:** 28

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

With respect to EPA's proposed disapproval of Louisiana's SIP, EPA is proposing to disapprove of Louisiana's use of an alternative 1 ppb threshold to identify projected nonattainment and/or maintenance receptors in other states, in part due to EPA's determination that use of an alternative threshold "may be impractical or otherwise inadvisable for a number of additional policy reasons." Impracticality, like policy reasons, play no part in whether a SIP meets the applicable CAA requirements.

Further, EPA cannot base disapproval of a SIP on the fact that states, even when following the 4-Step interstate transport framework that EPA has established, may apply different thresholds in Step 2 of the framework, which would have "the potential to result in inconsistent application of interstate transport obligations based solely on the strength of a state's SIP submittal at Step 2 of the 4-Step framework." The states, have wide discretion in determining how to achieve the NAAQS, including their interstate transport obligations and EPA cannot force the states to adopt approaches reflecting the Agency's policy preferences for consistency in interstate transport obligations. A "SIP basically embodies a set of choices . . . *that the state must make for itself* in attempting to reach the NAAQS with minimum dislocation."

**Commenter:** Louisiana Chemical Association

**Commenter ID:** 26

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

LDEQ relied on the EPA's 2018 August Guidance and applied the 1 ppb screening limit in performing Step 2 of its analysis. Based on the 1 ppb screening limit, the monitors in Michigan and Wisconsin were not flagged for further analysis as the modeled contributions from Louisiana sources at those receptors were all less than 1 ppb:

Milwaukee, WI…………………………………0.72

Sheboygan, WI………………………………..0.84

Allegan, MI…………………………………0.70

The August 2018 Guidance notes that the contribution captured with the 1 ppb threshold versus a 0.70 ppb threshold for Milwaukee, Sheboygan, and Allegan are as follows: 83.0%, 91.8%, and 94.2%. Thus, it was reasonable for the LDEQ to rely on the August 2018 Guidance approval of the 1 ppb screening threshold to exclude these locations from further analysis. Moreover, as noted by the LDEQ in the Louisiana Transport SIP: "In addition, the use of 1% of the NAAQS threshold for modeled contribution as the sole definition of significant contribution is inappropriate for the 2015 Ozone NAAQS since the more stringent 0.7 ppb threshold is an order of magnitude smaller than the biases and errors typically documented for regional photochemical modeling (Simon et al., 2012)." In fact, although modeling bias (difference between monitored and modeled values) has been reduced over the last 10-15 years with updated CMAX modeling versions, summertime NOx bias still remains above the 1% threshold, particularly in the South, including Louisiana.

Now, EPA's position, as indicated in the Proposed Rule, is that although EPA has not revoked the guidance in the August 2018 memorandum, it no longer considers the August 2018 memorandum guidance's approval of reliance on the 1 ppb screening threshold as proper. It is inappropriate for EPA to "pull the rug" out from under states who reasonably relied upon EPA guidance that was scientifically based and not arbitrary simply because EPA now believes a different approach is preferable. Based on similarities in the contributions captured using a 1 ppb threshold and the 0.07 ppb (1%) threshold and the fact that the bias in modeling is greater than 1% for this type of regional photochemical modeling (particularly, bias towards overprediction in the Southern states for summertime ozone), LDEQ's reliance on a 1 ppb threshold to screen out the Michigan and Wisconsin monitors noted above was reasonable. The EPA screening level now being used to evaluate Louisiana's SIP is a fraction of a part per billion – an incredibly low value. EPA has provided no scientific support for a 1% screening level to be always applied for every NAAQS without consideration of factors such as the ability to discern ozone impacts of precursors at such infinitesimally small values and model performance. Although EPA addresses the bias limitations of the modeling in the Proposed Rule, it does not explain why the 1 ppb threshold is arbitrary and capricious and should not be used given the similarities in results provided in the August 2018 Guidance.

Accordingly, the EPA's proposed disapproval of LDEQ's use of the 1 ppb screening threshold, including as it relates to the exclusion of the Wisconsin and Michigan monitors from further transport analysis, was unreasonable and fails to comport with the federalism principles inherent in the CAA. EPA must allow states the opportunity to use reasonable alternatives to the 1% screening threshold.

**Commenter:** Midwest Ozone Group

**Commenter ID:** 30

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

Finally, EPA misstates Missouri's argument with respect to contribution. In accordance with the flexibility provisions in the EPA's August 31, 2018, guidance memo, Missouri demonstrated that its emissions and their contribution to ozone in Wisconsin, Texas, and Michigan were not significant in comparison to local emissions. Missouri demonstrated that its emissions were less than 2% of NAAQS and were generally small in comparison with local, background and international contributions, which were larger than the Missouri emissions in some cases. EPA's failure to acknowledge that Missouri emissions were not significant in comparison to other sources exceeds the agency's discretionary authority.

**Commenter:** Midwest Ozone Group

**Commenter ID:** 30

**Docket ID:** EPA-R02-OAR-2021-0673, EPA-R03-OAR-2021-0872, EPA-R03-OAR-2021-0873, EPA-R04-OAR-2021-0841, EPA-R05-OAR-2022-0006, EPA-R06-OAR-2021-0801, EPA-R07-OAR-2021-0851

**Comment:**

The August 13, 2018, Tsirigotis guidance memo, styled "Analysis of Contribution Thresholds for Use in Clean Air Act Section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards," also was addressed to EPA Regional Air Directors in all EPA Regions.  The memo states,

> "[t]he purpose of this memorandum is to provide analytical information regarding the degree to which certain air quality threshold amounts capture the collective amount of upwind contribution from upwind states to downwind receptors for the 2015 ozone National Ambient Air Quality Standards (NAAQS). It also interprets that information to make recommendations about what thresholds may be appropriate for use in state implementation plan (SIP) revisions addressing the good neighbor provision for that NAAQS . . . [t]his document does not substitute for provisions or regulations of the Clean Air Act (CAA), nor is it a regulation itself. Rather, it provides recommendations for states using the included analytical information in developing SIP submissions, and for the Environmental Protection Agency (EPA) Regional offices in acting on them. Thus, it does not impose binding, enforceable requirements on any party.  State air agencies retain the discretion to develop good neighbor SIP revisions that differ from this guidance."

In the ensuing two years and six months since the last guidance document was published, EPA has known that states might be incorporating the 2018 guidance into Good Neighbor SIP submittals and has made no public statement saying that it would not honor its guidance. Moreover, all of the subject 19

Good Neighbor SIPs have been pending before the agency between two and one-half and almost four years with only one proposed action by EPA – the proposed approval of Iowa's Good Neighbor SIP that incorporated the 2018 guidance in a March 2, 2020, proposal at 85 Fed. Reg. 12,232.  Now, nearly three years after the first Tsirigotis memo was published and two and a half years after the last was published, EPA is attempting to assert that these documents are archival in nature and trying to walk back the proposed Iowa approval (*See* 87 Fed. Reg. 9,477, February 22, 2022).

[…]

Once an agency issues guidance to regulated parties, the agency cannot "simply disregard" the substance of its guidance and rely on "post hoc justifications" when deciding whether regulated parties have acted in accordance with such guidance. *Hoosier Env't Council v. Nat. Prairie Indiana Farmland Holdings, LLC*, No. 4:19-CV-71 DRL-JEM, 2021 WL 4477152, at **13, 16 (N.D. Ind. Sept. 29, 2021). Doing so constitutes an arbitrary and capricious action by the agency. Id. at *17. By waiting for years and until after states complied with EPA's 2018 guidance to backtrack on the guidance, add a new requirement, not in the guidance, that alternative methods used by states in their SIPs must be "substantially justified and have a well-documented technical basis," and disapprove SIPs on that basis, EPA is engaging in arbitrary and capricious actions. EPA should alter its position and encourage states to take advantage of these flexibilities, as appropriate, and to incorporate these guidance flexibilities into their Good Neighbor SIPs.

**Commenter:** Midwest Ozone Group

**Commenter ID:** 30

**Docket ID:** EPA-R08-OAR-2022-0315, EPA-R09-OAR-2022-0394, EPA-R09-OAR-2022-0138

**Comment:**

The August 13, 2018, Tsirigotis guidance memo, styled "Analysis of Contribution Thresholds for Use in Clean Air Act Section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards," also was addressed to EPA Regional Air Directors in all EPA Regions. […]

In the ensuing period of time since the last guidance document was published, EPA has known that states might be incorporating the 2018 guidance into Good Neighbor SIP submittals and has made no public statement saying that it would not honor its guidance.

**Commenter:** Oklahoma Department of Environmental Quality

**Commenter ID:** 37

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

Comment 1: States Relied in Good Faith on Flexibilities Offered in EPA Memos, but the Memos Are Not Being Honored by EPA

In developing its 2018 Ozone Infrastructure SIP, specifically the good neighbor/ozone transport provisions of said SIP, ODEQ relied on all three 2018 Tsirigotis Memos. However, ODEQ relied on the March and August 2018 Tsirigotis Memos for the flexibilities described herein, specifically the decision to use a 1 ppb significance threshold. EPA stated in the August 2018 Tsirigotis Memo, on page 4:

> Because the amount of upwind collective contribution captured with the 1 percent and 1 ppb thresholds is generally comparable, overall, we believe it may be reasonable and appropriate for states to use a 1 ppb contribution threshold, as an Page 4 of 15 alternative to a 1 percent threshold, at Step 2 of the 4-step framework in developing their SIP revisions addressing the good neighbor provision for the 2015 ozone NAAQS.

States, including Oklahoma, relied in good faith on the flexibilities that were held out by the Tsirigotis memos—and with good reason, since EPA encouraged states to rely on said memos during SIP development. Because EPA now refuses to honor the statements in said memos, EPA has created an unpredictable, uncooperative, and inequitable landscape that states now must attempt to navigate. EPA's failure to recognize its own guidance, and the predicament it has now put states in that face a SIP disapproval and subsequent FIP, undermines the cooperative nature of the EPA-state relationship.

The states' good faith reliance on EPA—not just reliance on the 2018 Tsirigotis memos, but reliance on EPA itself, through ordinary avenues of cooperative federalism—in ozone transport SIP development has now put states at a disadvantage. Oklahoma acted in good faith during its SIP development process by continually paddling the channels of communication with EPA Region 6, apprising EPA of Oklahoma's SIP development plans as both a courtesy and to avoid a disapproval. At no point during the SIP development process was Oklahoma on notice that its proposed SIP would be disapproved on the grounds that reliance on the 2018 Tsirigotis Memos was inappropriate. EPA has, without explanation, arbitrarily and capriciously changed its policy position through its refusal to acknowledge the legitimacy of states' good faith reliance on EPA guidance memoranda.

Comment 6: Oklahoma's Proposed Threshold of 1 ppb is Appropriate and Justified

EPA states in the proposed disapproval that it "recognized in the August 2018 memorandum that there was some similarity in the amount of total upwind contribution captured (on a nationwide basis) between 1 percent and 1 ppb. However, the EPA notes that while this may be true in some sense, that is hardly a compelling basis to move to a 1 ppb threshold." 87 Fed. Reg. 9819. This is a gross mischaracterization of the statements made by EPA in the August 2018 Tsirigotis Memo. The August 2018 Tsirigotis Memo concluded that "using a 1 ppb threshold is generally comparable to the amount captured using a threshold equivalent to 1 percent of the NAAQS." August 2018 Tsirigotis Memo, page 4. It further states, "The data in Table 2 indicate that the percent of upwind contribution captured by a 1 percent and 1 ppb threshold at individual receptors are also of a similar magnitude at most sites." *Id.* EPA further concluded:

> Because the amount of upwind collective contribution captured with the 1 percent and 1 ppb thresholds is generally comparable, overall, we believe it may be reasonable and appropriate for states to use a 1 ppb contribution threshold, as an alternative to a 1 percent threshold, at Step 2

of the 4-step framework in developing their SIP revisions addressing the good neighbor provision for the 2015 ozone NAAQS. *Id*. at 4.

For states like Oklahoma, with very low contributions to upwind states, the use of the 1 ppb contribution threshold versus the 1% of the NAAQS threshold is appropriate and justified based on the conclusions drawn by EPA in its August 2018 memo.

**Commenter:** Tennessee Department of Environment and Conservation

**Commenter ID:** 41

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

Comment #4: While a consistent approach is desirable for evaluating Infrastructure SIPs, EPA may not disregard its own guidance and must respect the states' role in creating a compliant SIP.

As noted in Comments #2 and #3 and conceded by EPA, Tennessee satisfied the primary (1% of NAAQS) threshold at the time of its 2018 iSIP submittal based on then-available data. However, in the iSIP Disapproval, EPA also expressed reservations about the 1 ppb (alternate) threshold that Tennessee discussed in its 2018 submittal on the grounds that "Tennessee did not provide additional discussion or analysis . . . which is necessary to evaluate the state-specific circumstances that could support approval of an alternative threshold." Therefore, while it is not necessary for Tennessee to use this alternate threshold to prove that its 2018 submission was compliant, it takes the opportunity to do so to preserve the ability to use an alternate threshold in the future, in conformance with EPA policy.

Tennessee agrees with EPA's discussion in the iSIP Disapproval that the 1 percent of the NAAQS threshold in Step 2 of the Framework is one reasonable (though not the exclusive) approach for assessing a state's contribution to downwind nonattainment, but believes that EPA's proposed disapproval fails to consider an essential issue: EPA may update or revise its previously-established guidance, but may not simply disregard its own established guidance that has not actually been withdrawn.[32]

In explaining its proposed disapproval of the use of an alternate threshold in Tennessee's 2018 SIP submission, EPA extensively discussed its August 31, 2018, memorandum on the topic (the "August 2018 memorandum"). This August 2018 memorandum, which EPA extensively cites in the iSIP Disapproval and has not been rescinded, recognized that in certain circumstances, a state may be able to establish that an alternative contribution threshold of 1 ppb is justifiable. The memorandum explains that when a state relies on this alternative threshold to determine that it is not linked to a downwind nonattainment or maintenance area, EPA will evaluate whether the state provided a technically sound assessment of the alternative threshold based on the facts and circumstances in the particular SIP submission, as follows:

> Following these recommendations does not ensure that the EPA will approve a SIP revision in all instances where the recommendations are followed, as the guidance may not apply to the facts

and circumstances underlying a particular SIP. Final decisions by the EPA to approve a particular SIP revision will only be made based on the requirements of the statute and will only be made following an air agency's final submission of the SIP revision to the EPA, and after appropriate notice and opportunity for public review and comment. Interested parties may raise comment about the appropriateness of the application of this guidance to a particular SIP revision. *The EPA and air agencies should consider whether the recommendations in this guidance are appropriate for each situation.*

The SIP Disapproval further explains that since issuing the August 2018 memorandum, EPA has identified the following substantial programmatic and policy difficulties in attempting to implement this approach:

- EPA believes, based on the review of 49 good neighbor SIP submittals for the 2015 ozone NAAQS, that nearly every state that attempted to rely on a 1 ppb threshold did not provide sufficient information and analysis to support a determination that an alternative threshold was reasonable or appropriate for that state. For instance, in nearly all submittals, the states did not provide EPA with analysis specific to their state or the receptors to which its emissions are potentially linked.

- EPA notes that for the March 2, 2020, proposed approval of Iowa's SIP submittal, the Agency expended its own resources to supplement the information submitted by the state, in order to more thoroughly evaluate the state-specific circumstances that could support approval. This analysis was performed at EPA's sole discretion, the Agency was not obligated to conduct supplemental analyses for each SIP, and the Agency no longer intends to undertake supplemental analysis of SIP submittals with respect to alternative thresholds at Step 2.

- EPA now believes that allowing for alternative Step 2 thresholds may be impractical or otherwise inadvisable for a number of additional policy reasons. For a regional air pollutant such as ozone, EPA now takes the position that consistency in requirements and expectations across all states is essential, and the availability of different thresholds at Step 2 creates the potential for inconsistent application of good neighbor obligations based solely on the strength of a state's implementation plan submittal at Step 2 of the 4-step interstate transport framework. Specifically, EPA argues that the use of an alternative threshold would allow certain states to avoid further evaluation of potential emission controls while other states must proceed to a Step 3 analysis, which EPA believes can create significant equity and consistency problems among states.

- The proposed disapproval states that it is not clear that national ozone transport policy is best served by allowing for less stringent thresholds at Step 2. EPA argues that while there is some similarity in the amount of total upwind contribution captured (on a nationwide basis) between 1% and 1 ppb, the 1 ppb threshold loses a certain amount of total upwind contribution for further evaluation at Step 3. Based on core statutory objective of eliminating all significant contribution to nonattainment or interference with maintenance, as well as the broad, regional nature of ozone transport, EPA believes, "there does not appear to be a compelling policy imperative in allowing some states to use a 1 ppb threshold while others rely on a 1 percent of the NAAQS threshold."

Notwithstanding these concerns, EPA goes out of its way to note that "EPA is not at this time rescinding the August 2018 memorandum." EPA's proposed disapproval attempts to have it both ways—by confirming that the underlying guidance has not been withdrawn, but also asserting—after-the-fact— that the Step 2 1-ppb threshold identified in the August 2018 memorandum is (almost) universally inappropriate because: (1) a number of states in this particular round of SIPs did not provide EPA with analysis specific to their state or the receptors to which its emissions are potentially linked; and (2) allowing for alternative significance thresholds may be impractical or otherwise inadvisable for a number of additional policy reasons.  For the following reasons, we believe that EPA is incorrect on both points:

1. Tennessee's 2018 iSIP submittal used then-current modeling, which indicated that Tennessee's downwind contribution was less than both appliable Step 2 thresholds: the default threshold of 1% of the ozone NAAQS and the alternate 1 ppb threshold. While EPA had the opportunity to provide comments to Tennessee's 2018 submittal during a comment period (which closed three years ago), EPA identified no inadequacy regarding the use of an alternate threshold during the original public participation process and offered no comments, during either pre-draft review or formal public participation, to indicate that an alternate threshold was problematic or that Tennessee should supplement its demonstration to account for a 1 ppb alternative threshold (see Appendix A for a copy of EPA's comment letter). Furthermore, Tennessee could not have justified an alternate significance threshold in 2018 because the data required for a proper technical analysis (i.e., model results showing downwind contributions between 0.70 ppb and 1 ppb) ***were not available*** at that time. Part II of these comments (technical comments) demonstrate, based on EPA's most recent modeling, why a 1 ppb significance threshold is appropriate for Tennessee. Since EPA did not make these data available at the time of our original submittal, EPA must fully consider an alternate threshold based on information provided at this time.

2. As discussed in more detail in comment #7, EPA itself has not consistently applied the 1% of the NAAQS threshold in determining whether upwind states are 'linked'. Instead, EPA has determined that there are circumstances in which the 1% of the NAAQS threshold should not be used, as discussed in the proposed Federal Implementation Plan that it published in connection with this rulemaking.

EPA has put states in an impossible position by waiting to act on SIP submittals that occurred in 2018 and basing such actions on modeling that has been consistently changing since 2018 and is still undergoing public comment. EPA quickly followed its proposed iSIP Disapproval with the proposed Federal Implementation Plan EPA will put in place as it is highly unlikely that states will have the time to revise their SIPs and resubmit them to EPA for consideration before the final Federal Implementation Plan will take effect.  Consistent with the 2018 memorandum that EPA has not withdrawn, Tennessee must be given the chance to have the information presented in the technical comments considered. EPA risks making an arbitrary and capricious decision by disapproving Tennessee's use of the alternate 1ppb threshold in its infrastructure iSIP without fully considering the information cited within these comments, because EPA would be disregarding its own practice and published guidance by doing so.

[...]

While Tennessee's downwind contribution is "significant" when measured by a bright-line threshold of 1% of the NAAQS, this contribution occurs at only a *single* monitor, that monitor is maintenance-only, and Tennessee's contribution, based on EPA's own modeling, is less than the 1 ppb alternative threshold established by prior EPA guidance. Tennessee believes that the attached evaluation of the modeling data for this monitor demonstrates that this contribution is not significant, in accordance with EPA's prior guidance in the August 2018 memorandum.

1. Tennessee does not contribute more than 1% of the NAAQS to any nonattaining downwind monitor.

[…]

**2**. Tennessee contributes more than 1% of the NAAQS to <u>only one</u> maintenance-only downwind monitor.

[…]

Another element to consider when evaluating the significance of upwind contributions is the total number of linkages – states with significant interstate transport problems contribute to multiple downwind states or monitoring locations.

[…]

[Table 3 in full comment]

Table 3 shows that Tennessee is ranked at the bottom with respect to nonattainment linkages (since none exist) and one step above the bottom with respect to total linkages. For the other two states with a single linkage (Delaware and Wyoming), both linkages are for nonattainment, rather than maintenance monitors. Stated more clearly, Tennessee crosses EPA's 1% contribution threshold, but that contribution is sufficiently marginal that an alternative threshold of 1 ppb is worthy of consideration. Of the 26 upwind states identified in Table 4, ten states (California, Indiana, Kentucky, Maryland, Michigan, New Jersey, New York, Ohio, Virginia, and West Virginia) are linked to two or more states with nonattaining monitors, and six states (California, Indiana, Missouri, Ohio, Oklahoma, and Texas) are linked to two or more downwind states with maintenance-only monitors. As noted above, Tennessee is linked to a single maintenance-only monitor in a single state. These facts, considered as a whole, support the consideration of a 1 ppb alternative threshold for significance.

[…]

Tennessee considered the following additional factors based on our review of EPA's 2020 proposal to approve Iowa's infrastructure SIP (85 FR 12232).

***How does the impact of in-state emissions on ozone levels at this receptor compare to collective upwind impacts?*** Tennessee reviewed the model results and determined that the cumulative upwind contribution (all upwind states with contribution greater than 0 ppb) was 12.24 ppb (17.0% of the 2023 maximum concentration) compared to in in-state contribution of 27.30 ppb from sources within Texas (37.8% of the 2023 maximum concentration). Of upwind contributors, Tennessee is ranked fourth, based on EPA's methodology for calculating the contribution (Table 8). However, Tennessee's relative contribution must be weighed against other factors, including the low number of high-ozone days and back-trajectory analyses.

[Table 8 in full comment]

***What are the impacts of individual upwind states linked at 1 ppb or higher to the receptor?*** Table 8 above indicates that three states (Louisiana, Oklahoma, and Mississippi) contribute greater than 1 ppb to the Denton County monitor, and these states account for 45.3% of the total upwind state contribution.

***Are individual upwind states impacting this receptor between 1 percent and 1 ppb linked above 1 ppb to other receptors?*** Arkansas contributes greater than 1 ppb for four other maintenance receptors in Texas. Alabama and Tennessee do not contribute 1 ppb or greater to any other nonattainment or maintenance receptors.

Tennessee believes that a 1 ppb significance threshold is justifiable in light of the facts enumerated within this document. EPA's most recent modeling data demonstrate that emission sources in Tennessee will not contribute significantly to nonattainment in another state and will not interfere with maintenance in another state. Therefore, Tennessee's SIP complies with the requirements of CAA §110(a)(2)(D) for the 2015 ozone NAAQS.

[32] See *FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 515 (2009) ("An agency may not, for example, depart from a prior policy sub silentio or simply disregard rules that are still on the books".) (citing *United States v. Nixon*, 418 U.S. 683, 696 (1974)).


**Commenter:** PacifiCorp

**Commenter ID:** 38

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

EPA's Threshold Guidance provided states a pathway to use a 1 ppb threshold for significant impacts on downwind monitors. Utah and almost every other state followed this pathway, but EPA has now changed its mind and rejects the very pathway it opened for all of these states for "policy reasons". Utah relied on the Threshold Guidance to justify using the 1 ppb threshold at Step 2 as a basis to assert that Utah would not be linked to some projected downwind nonattainment or maintenance receptors and that other linkages were not significant given other EPA-suggested considerations. See Sub-Section II.d below. In the Proposed Disapproval, EPA insists that only a 1 percent ("%") threshold, or 0.7 ppb, can be used. EPA explains it has moved on from the positions it stated in the August 2018 Threshold Guidance, and EPA ultimately applies the 1% threshold to justify the Proposed Disapproval. EPA should allow use of the 1 ppb threshold.

[…]

*i. The fact that EPA's new 1 ppb interpretation runs contrary to 49 states' understanding signals error.*

In the Proposed Disapproval EPA states:

> Following receipt and review of 49 good neighbor SIP submittals for the 2015 8-hour ozone
> NAAQS, the EPA's experience has been that nearly every state that attempted to rely on a 1 ppb
> threshold did not provide sufficient information and analysis to support a determination that an
> alternative threshold was reasonable or appropriate for that state.

The fact that nearly every state got it wrong is more an indication that EPA changed course without notice than that the states are unable to read and interpret EPA guidance. While technically retaining the Threshold Guidance, EPA proposes to disapprove numerous state submissions that relied on the guidance, including Utah's SIP, claiming that those states should have somehow done more analysis than EPA required in the memo, and asserting without explanation that consistency is needed across the country. This is an about face for EPA, which clarified in a previous ozone rulemaking that western states should not be treated the same as other areas of the country because the different geography, meteorology, background ozone levels, wildfire impacts and stratospheric ozone events in the West necessitated case-by-case treatment. To justify its about face, EPA now claims that the Threshold Guidance may only be relied on, even for high altitude western states like Utah, when a state meets its new, unannounced standards by providing "a technically sound assessment of the appropriateness of using this alternative threshold based on the facts and circumstances underlying its application in the particular SIP submission." EPA's new demand for the states to provide a technical analysis to support the use of the 1 ppb threshold identified in the August 2018 Threshold Guidance is inconsistent with EPA's earlier communications with Utah (and other states) and with the stated purpose of the Threshold Guidance, which was to "provide analytical information" and to allow states to use that "information to make recommendations about what thresholds may be appropriate for use" in SIPs. EPA is essentially punishing Utah and almost all other states for using the "recommendation" that EPA made in the Threshold Guidance.

Like so many states, Utah used the 1 ppb threshold in its Interstate Transport Ozone SIP. In fact, EPA commented on Utah's use of the 1 ppb threshold and recommended that it rely on the Threshold Guidance to do so. In EPA's comments on Utah's SIP during the state rulemaking process, EPA instructed: "[g]iven that the draft analysis makes use of the 1 ppb threshold, the EPA recommends the state review the August 31, 2018 Memo and the associated rationale for the use of this threshold." Utah did just that, providing analysis in its SIP based on the August 2018 Threshold Guidance and supporting the use of the 1 ppb threshold with data and analysis. Utah and the numerous other states were not acting unreasonably to rely on EPA's Threshold Guidance, particularly when EPA published the Threshold Guidance for that very purpose during the very time states were drafting their SIPs. EPA was aware of Utah's reliance on the Threshold Guidance, and provided direction to Utah supporting its use of the Threshold Guidance.

Despite the fact that the Threshold Guidance was based on the same principles as EPA's 2011 analysis and was improved through use of a tighter range of options and more current data and modeling, EPA now all but disavows it. Moreover, EPA is proposing to disapprove of Utah's use of an alternative 1 ppb threshold in part due to EPA's determination that use of an alternative threshold "may be impractical or otherwise inadvisable for a number of additional policy reasons." Under the appliable requirements of the CAA, changing policy reasons play no part in authorizing EPA to disapprove a SIP.

PacifiCorp asks EPA to reconsider its minimum contribution threshold because EPA has not identified any rational basis for preferring its older—and now superseded—2011 analysis. The 2018 analysis is superior and more appropriate for both identifying significant contributions and avoiding the likelihood of over-control. EPA should not disapprove Utah's Interstate Transport Ozone SIP based on an unfounded requirement to only use the 1 percent threshold.

*i. EPA's new "after-the-fact" standard on a 1 ppb threshold is arbitrary and capricious.*

While EPA may claim some deference for its decision-making, it is not unlimited. EPA cannot act in a manner that is inconsistent with the authorizing statute or that is arbitrary and capricious. The agency must "articulate . . . a rational connection between the facts found and the choice made." Particularly applicable here, when an agency's "new policy rests upon factual findings that contradict those which underlay its prior policy, or when its prior policy has engendered serious reliance interests," the Administrative Procedure Act requires an agency to provide "a more detailed justification" than it otherwise would. Here, Utah and other states undoubtedly relied on the Threshold Guidance and "engendered serious reliance interests." EPA acknowledges as much in the Proposed Disapproval. EPA's failure to acknowledge and account for Utah's "reliance interests" renders its Proposed Disapproval both arbitrary and capricious.


**Commenter:** PacifiCorp (Attachment - Berkshire Hathaway Energy (BHE) Company Comments on Proposed Ozone Transport Rule)

**Commenter ID:** 38

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

EPA Used an Arbitrary Ozone Contribution Metric. Use of Other Reliable Metrics Show Wyoming Has an Insignificant Ozone Contribution. (Chapter 6).

[...]

In 2018, EPA issued a guidance memorandum that re-analyzed the minimum threshold using a tighter range of options and more up-to-date modeling techniques and data. Specifically, EPA evaluated the difference in capture rates between the previous threshold of 0.7 ppb (one percent), a threshold of 1 ppb, and a threshold of 2 ppb. Like the 2011 analysis, EPA's 2018 analysis again concluded that the difference between the two lower options—0.7 ppb and 1 ppb—was minimal, while the higher threshold left too many emissions unregulated. As a result, EPA considered capture rates at the 0.7 ppb and 1 ppb thresholds to be generally comparable, and thus concluded that "it may be reasonable and appropriate for states to use a 1 ppb contribution threshold, as an alternative to a 1 percent threshold," in addressing interstate transport under the Clean Air Act good neighbor provision. Notably, a threshold of 1 ppb is 1.4 percent of the ozone standard of 70 ppb, and therefore rounds down to 1 percent if truncated.

Despite the fact that the 2018 analysis was based on the same principles as the 2011 analysis and was improved by use of a tighter range of options and more current data and modeling, EPA now all but disavows it. While technically retaining the 2018 memo, EPA has proposed to disapprove numerous state submissions that relied on the memo, claiming that those states should have somehow done more analysis than EPA did itself in writing the memo, and asserting without explanation that consistency is needed across the country.

**Commenter**: Sierra Club

**Commenter ID:** 39

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

EPA Should Formally Rescind Its 2018 Alternative Contribution Threshold Guidance Memorandum

For years, EPA has relied on a 1% contribution threshold for determining whether an upwind state's contribution to a downwind nonattainment or maintenance monitor was "significant" for purposes of implementing Section 110(a)(2)(D)(i)(I). EPA applied this 1% contribution threshold in the Cross-State Air Pollution Rule in 2011, again in the CSAPR Update in 2016, and in the Revised CSAPR Update in 2021.58 Sierra Club supports EPA's proposed retention of the 1% contribution threshold and, for the reasons identified below, urge EPA to formally rescind its 2018 Guidance Memorandum.

In its Proposed Disapproval, EPA reaffirmed its use of a 1% contribution threshold for Screening at Step 2 of the interstate transport framework. EPA identified several reasons the alternative contribution thresholds discussed in the 2018 Guidance Memorandum were less appropriate, explaining that "experience since the issuance of that [2018 Guidance M]emorandum has revealed substantial programmatic and policy difficulties in attempting to implement this approach." However, EPA did not propose to rescind the 2018 Guidance Memorandum. For the reasons identified by EPA itself and for additional reasons described below, the Sierra Club urges EPA to rescind the 2018 Guidance Memorandum.

[...]

Second, Sierra Club disputes the 2018 Guidance Memorandum's characterization of the upwind contribution captured by a 1 ppb threshold and a 1% threshold as "generally comparable" and agrees with the Agency's observation in its Proposed Disapproval that, even if this were "true in some sense," it "is hardly a compelling basis to move to a 1 ppb threshold." Indeed, as EPA now observes, "the core statutory objective of ensuring elimination of all significant contribution to nonattainment or interference of the NAAQS in other states and the broad, regional nature of the collective contribution problem with respect to ozone" counsel in favor of establishing a contribution threshold that pulls in more, not less, of the upwind emissions that are contributing to nonattainment and maintenance issues. Moreover, as EPA points out, an important virtue of a contribution threshold set as a percentage of the NAAQS is that, as the stringency of the NAAQS increases, "an appropriate increase in stringency at Step 2 occurs, so as to ensure an appropriately larger amount of total upwind-state contribution is captured

for purposes of fully addressing interstate transport for the more stringent NAAQS." Removing nearly 1/3 of the contributing upwind emissions at Step 2—as would occur with the use of a 1 ppb contribution threshold—as would increase the cost and challenge of ameliorating ozone nonattainment in areas affected by ozone transport.

**Commenter:** United States Steel Corporation

**Commenter ID:** 45

**Docket ID:** EPA-R05-OAR-2022-0006

**Comment:**

U. S. Steel further notes that affected states and the regulated community reasonably relied on 1 ppb threshold that U.S. EPA found to be appropriate; and it is inappropriate for U. S. EPA now to unilaterally disapprove any SIP because in its SIP submittal, the state used a 1 ppb threshold.

**Commenter:** Utah Division of Air Quality

**Commenter ID:** 47

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

The benefit of cooperative federalism is having the autonomy to do what's best for the state, but do so in partnership with EPA to ensure that the CAA intent and requirements are met.

In this same spirit, UDAQ engaged early and often with our counterparts at Region 8 in the development of our interstate transport SIP. Through this collaboration and EPA's guidance, Utah selected the alternative threshold of 1 ppb. As noted in the guidance, the use of an alternative threshold provides greater flexibility to states while SIPs are developed. Specifically, the guidance states that "a threshold of 1 ppb may be appropriate for states to use to develop SIP revisions addressing the good neighbor provision for the 2015 ozone NAAQS", since "the amount of upwind collective contribution captured with the 1 percent and 1 ppb threshold is generally comparable overall." Thus, UDAQ was surprised when EPA proposed to include Utah in the proposed FIP, and subsequently disapproved the state's SIP based in large part on the selection of the 1 ppb over the 1% of the NAAQS threshold.

**Commenter:** Utah Petroleum Association and the Utah Mining Association

**Commenter ID:** 48

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

Utah followed existing EPA guidance, which EPA has not withdrawn and should honor.

In general, EPA uses a 1% of the National Ambient Air Quality Standard ("NAAQS") contribution threshold to downwind States in evaluating IT SIPs. For the 2015 ozone NAAQS, this equates to 0.7 ppb. However, in August 2018, EPA published guidance for alternate thresholds and stated that it believes a threshold of 1 ppb may be appropriate.

In the Proposed GNR, published long after the due date for States to submit IT SIPs, EPA stated that it now believes that it may not be appropriate to recognize alternate contribution thresholds. In the Proposed Disapproval, EPA stated that it views 1% of the NAAQS to be more appropriate.

EPA cannot simply change its mind on the guidance nearly three years after issuing it and more than two years after Utah (and other states) relied on it, without providing a well-reasoned explanation and formal withdrawal of the guidance. EPA has not provided a well-reasoned explanation nor a formal withdrawal of the guidance.

[…]

Utah's IT SIP includes a lengthy weight-of-evidence analysis showing how its approach matches other interstate transport SIP approvals and EPA guidance, including the following: Analysis showing how Utah meets the recommendations of EPA's August 2018 memo discussing the possible use of different contribution thresholds.


**Commenter:** West Virginia Department of Environmental Protection

**Commenter ID:** 49

**Docket ID:** EPA-R03-OAR-2021-0873

**Comment:**

DAQ also asserts EPA is inconsistent with its definition of screening threshold impacts in relation to downwind receptor (monitor) linkage. In an August 31, 2018 memorandum from OAQPS Director Peter Tsirigotis to regional air divisions directors titled Analysis of Contribution Thresholds for Use in Clean air Act Section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards ("Threshold Memorandum"), EPA compared alternative thresholds of 1 and 2 ppb (0.001 and 0.002 ppm, respectively) to be consistent with previous thresholds of one percent of the 2015 ozone NAAQS standard (1% of 70 ppb, equal to 7 ppb or 0.0007 ppm) for the purposes of screening threshold for SIP development. EPA stated within the Threshold Memorandum, "Based on the data and analysis summarized here, the EPA believes that a threshold of 1 ppb may be appropriate for states to use to develop SIP revisions addressing the good neighbor provisions for the 2015 ozone NAAQS." In this proposed disapproval action, it appears EPA has abandoned these alternatives in favor of the one percent definition.

*Response*

Our primary response to these comments is in Section V.B.7 of the preamble. Here we address in more detail several specific arguments raised by commenters.

The EPA disagrees with some commenters' assertion that the EPA's proposed approval of Iowa's SIP submission is proof the EPA previously viewed the 1 ppb alternative threshold was "adequate and approvable" in all instances, but subsequently changed position. As the EPA explained at proposal, the first proposal for Iowa specifically examined "state-specific circumstances" as contemplated by the August 2018 Memorandum. *See, e.g.*, 87 FR 66418 (citing 87 FR 9477 (Feb. 22, 2022)) Even if the EPA had finalized the Iowa approval on the basis of the first proposal, doing so would have been specific to Iowa's state-specific circumstances. The EPA evaluated each interstate transport SIP submission based on the merits of the arguments put forward in each SIP submission. However, in all submissions that relied on the EPA's August 2018 memo—where that threshold would have been a dispositive basis to exclude the state from further analysis—the EPA determined the submissions did not provide the EPA with analysis specific to their state or the receptors to which its emissions are potentially linked. This is true even for Iowa's submission, as explained at proposal. *See, e.g.,* 87 FR 64418.

Other topics raised by these comments are addressed in the preamble in Sections V.A.4. (technical merits), V.A.5. (justification), V.A.6. (guidance), V.B.6. (PSD SILs), V.B.7. (basis for approval of Iowa's SIP), and in the following sections: Sections 1.2 (Guidance for SIP Submissions), 1.4 (Use of Updated Modeling), 1.6 (EPA Input During SIP Submission Development), 4.2 (Model Performance), 5 (Updates to Modeling and Changes in Linkages), 7.2 (Contributions), 10.3 (Cooperative Federalism and the EPA's Authority), 11.3 (Transport Policy), and 11.8 (Mobile Sources).

The EPA responds to specific issues raised by commenters about the appropriateness of an alternative contribution threshold for specific states:

<u>Alabama</u>

Alabama did not provide a sufficient technical analysis to justify the use of an alternative 1 ppb threshold in its submission. 87 FR 64423-25. Alabama's SIP submission simply states that ADEM agrees with EPA's rationale set out in the August 2018 memorandum that the amount of upwind collective contribution captured with the 1 percent and 1 ppb thresholds was generally comparable. But the August 2018 Memorandum anticipated that states would evaluate whether the alternative threshold was appropriate under their specific facts and circumstances, not that the use of the alternative threshold would be automatically approvable.

ADEM and Alabama Power Company (APC) et al. claim that 1 ppb is an appropriate contribution threshold to use for Alabama and conduct an assessment fashioned to emulate the EPA's assessment in the now withdrawn proposal related to Iowa. Concluding that 1 ppb is generally similar to 1 percent, they next examine the factors that the EPA considered in the now withdrawn proposal related to Iowa to conclude that 1 ppb is an appropriate contribution threshold for Alabama.

The EPA does not agree that this assessment justifies the use of a 1 ppb contribution threshold for Alabama. As an initial matter, ADEM did not supply anything like this analysis in their SIP submission. This highlights the potential unfairness we identified as a policy concern at proposal, in that allowing some states to attempt to justify alternative thresholds could result in inconsistent treatment of states

295

based on the quality of the analysis they conducted. Further, as EPA explained at proposal, there is an administrative cost to public agencies, including the EPA, in going through the burden of conducting this type of analysis for each state, or for each set of comments on SIP actions, where the difference being evaluated is merely between a 1% and 1 ppb threshold, and the objective of using 1 ppb for certain states and sources is to excuse themselves from further analysis, thus shifting the burden of addressing interstate transport onto other upwind states and the downwind home state. Further, although commenter attempts to replicate the *proposal* analysis for Iowa, we never finalized that analysis and withdrew it. The factors in that analysis do not constitute a final agency policy or precedent on how a state-specific, 1 ppb-threshold analysis should be conducted. At proposal for this state's disapproval and others included in this action, we explained that we would not be undertaking this analysis where states failed to conduct it themselves.

All of that said, we further conclude that these comments still fail, even under the terms of the Iowa-proposal factors, to justify the use of a 1 ppb threshold for Alabama. Alabama's contribution alone at the Denton County (Airport) and Harris County (Houston Bayland Park) receptors in Texas in the 2016v2 modeling represents about 6 and 7 percent respectively of the total upwind state contribution at either monitor. Further, the loss in capture of total upwind-state contribution at 1 ppb versus 1 percent at these receptors is not trivial and well exceeds the ~7% losses contemplated in the August 2018 memorandum. For example, as noted by these comments, two other states are identified with contribution to the Denton County, TX receptor between 1 percent of NAAQS and 1 ppb. If we were to approve a 1 ppb threshold, one of those state's contributions would go unaddressed as well (Tennessee), constituting a loss, when in addition to Alabama's, of about 18 percent of the upwind state contribution over 1 percent at this receptor. That value is more than twice the 7% loss of upwind contribution figure that was identified as *potentially* acceptable in the August 2018 memorandum. Further, the treatment of Arkansas in this analysis would discount the loss of its contribution to this receptor, solely on the basis of its linkage above 1 ppb to other receptors—the idea being that if Arkansas were required to make emissions reductions in relation to those receptors, then it might incidentally benefit this receptor. While the EPA proposed to consider contribution in this way in the Iowa proposal, this is actually not consistent with the way EPA has considered the relevance of incidental effects in prior transport actions such as CSAPR Update and the Revised CSAPR Update. Reliance on such incidental effects introduces an inequitable situation in which states may be able to evade good neighbor obligations in reliance on the incidental effects of other states' efforts. *See* 81 FR at 74550. The EPA cannot agree that it is appropriate to treat Arkansas' contribution to this receptor as irrelevant simply because it contributes above 1 ppb to other receptors. If Arkansas's contribution were to be included in this analysis, then the total loss of contribution at the Denton receptor (using 2016v2) is actually on the order of 25 percent of total upwind state contribution.

Turning to the 2016v3 modeling used for this final action, these results are reinforced. In the 2016v3 modeling Alabama is linked in 2023 to the modeling-based receptor in Galveston, Texas. The total collective contribution from all upwind states is 26 percent of total ozone at this receptor. Of the 5 upwind states linked to this receptor, 3 contribute between 1 percent and 1 ppb. Using a 1 ppb threshold would represent a loss of about 19 percent of the total upwind contribution above 1 percent. In addition, Alabama's contribution to this receptor represents 30 percent of the total contribution that would be lost using a 1 ppb threshold. In addition, in our final rule analysis we note that Alabama is also

linked to the Pilot Point violating-monitor maintenance-only receptor in Denton County, Texas at which the collective contribution from upwind states is 18 percent of the total ozone at this receptor in 2023. Of the 6 upwind states linked to this receptor, 4 contribute between 1 percent and 1 ppb. Using a 1 ppb threshold would represent a loss of about 41 percent of the total upwind contribution above 1 percent at the Denton Pilot Point receptor. In addition, Alabama's contribution to this receptor represents 25 percent of the total contribution that would be lost using a 1 ppb threshold.

As we explain in the proposals and in the preamble of the final action, interstate ozone transport remains a collective-contribution problem involving many smaller contributors, and so the effect of approving a 1 ppb threshold needs to be reviewed for its holistic impacts. In this case, we do not find that the record would support approving a 1 ppb threshold for Alabama, even if we were to apply the factors used in the withdrawn Iowa proposal. ADEM observes that "it is unclear how lower NOx emissions in the 2022 modeling resulted in higher concentrations relative to the 2021 modeling" despite "continued reductions in NOx." If ADEM meant to question the validity of EPA's modeling with this statement, the EPA responds to comments on model performance in Section 4.2. If ADEM meant to say "contributions" instead of "concentrations," the EPA addresses a similar comment in Section 7.2. In response to the claim that EPA ignored evidence in the record when evaluating Alabama's SIP submission, specifically APC's comments submitted on the draft SIP submission during the state's public notice and comment period, which were included as attachment to Alabama's submission, the EPA disagrees. As noted in the proposal, Alabama did not explicitly discuss the comments it received during their state public comment period from Alabama Power Company and Sierra Club; Alabama only identified one specific assertion from their state public comment period as part of their response to public comments. Additionally, because SIP submissions are required to include a compilation of public comments received, it is not notable that these comment letters were attached to Alabama's SIP submission. 40 CFR Part 51, Appx V, 2.1(h). Thus, the EPA determined that Alabama's June 21, 2022, SIP submission did not rely on the legal, technical, or policy arguments provided in comments except as expressly stated by Alabama. In their own comment on this action, Alabama did not indicate that the EPA's assumption of Alabama's intention regarding the purpose of the inclusion of the comments from Alabama Power Company and Sierra Club on the submission was incorrect. *See* EPA-R04-OAR-2021-0841-0033. It remains unclear what the state's view is of and whether and to what extent the comments from APC and Sierra Club constitute an expression of the state's own position on its submission. Therefore, the EPA believes that the commenter is mistaken that the APC and Sierra Club comments received during the state's public comment process were explicitly embraced by Alabama as part of the state's SIP submission package. The EPA evaluated the information the state put forth in the SIP submission package and those specific arguments the state specifically acknowledged as part of their final SIP submission package.

Arkansas

One commenter argues that Arkansas provided sufficient analysis in the state's SIP submission to justify a conclusion that a 1 ppb contribution threshold is appropriate for the state. The EPA disagrees. The EPA's August 2018 memorandum explained that a 1 ppb contribution threshold "may" be appropriate,[70] and that "air agencies should consider whether the recommendations in this guidance are appropriate

---

[70] August 2018 memorandum, page 4.

for each situation."[71] Arkansas did not do that. In the SIP submission, Arkansas Division of Environmental Quality (ADEQ) (1) concluded based on the EPA's nationwide collective contribution comparison of different thresholds in the August 2018 memorandum that 1 percent and 1 ppb are generally comparable, (2) asserted that the prevention of significant deterioration significant impact level are sufficiently analogous to Step 2 of the 4-step interstate transport framework to support 1 ppb, and (3) concluded that 40 CFR part 50, Appendix U supports truncating to 0 a value of 0.7 ppb (1 percent of the NAAQS). 87 FR 9798, 9804 (Feb. 22, 2022). Arkansas identified it contributed more than 1 percent of the NAAQS but less than 1 ppb to three receptors in Texas, 87 FR 9804, but none of its justifications for a 1 ppb contribution threshold were related to those receptors or Arkansas's contributions to them. The EPA is unpersuaded that any of Arkansas's arguments supported a conclusion that a 1 ppb threshold is appropriate for Arkansas. In response to Arkansas Environmental Federation's comment that EPA cannot disapprove a SIP submission on the basis of a state's use of alternate contribution threshold, the EPA notes that Arkansas's SIP submission identified Arkansas as contributing more than 1 ppb to one or more downwind receptors. 87 FR 9798, 9804 (Feb. 22, 2022). Thus, the difference between a 1 percent of the NAAQS threshold and a 1 ppb threshold is not meaningful to the conclusion that Arkansas is linked at Step 2, because Arkansas contributes more than 1 ppb to a downwind receptor in 2023 both in the modeling relied on by the state and in the additional modeling developed by EPA to inform both the proposed and final actions (2016v2 and 2016v3).

Kentucky

The EPA disagrees with Kentucky Division for Air Quality that Kentucky followed the August 2018 Memorandum. Kentucky identified that it contributed more than 1 percent of the NAAQS but less than 1 ppb to four receptors in Connecticut and Wisconsin (and more than 1 ppb to one receptor in Maryland), 87 FR 9504. Kentucky simply applied EPA's rationale presented in the August 2018 memorandum (i.e., that the amount of *nationwide* upwind collective contribution captured with the 1 percent and 1 ppb thresholds was generally comparable) without discussion or analysis specific to Kentucky or the receptors in Connecticut and Wisconsin, as anticipated in the August 2018 memorandum.[72] 87 FR 9509-9510. Given the absence of technical analysis to support the use of a 1 ppb threshold under the facts and circumstances relevant to Kentucky and its linked receptors, the EPA determines that Kentucky's submission does not provide a sufficient justification to support the use of a 1 ppb contribution threshold.

Louisiana

A commenter argues that a 1 ppb contribution threshold is appropriate for Louisiana, regardless of Louisiana's contributions of more than 1 percent of the NAAQS but less than 1 ppb to Milwaukee, Sheboygan, and Allegan because the contribution captured with the 1 ppb threshold at those sites would be 83.0%, 91.8%, and 94.2%, respectively. The EPA notes that Louisiana did not provide that information in its submission, and in the 2016v3 modeling for this final action, Louisiana is linked to 7 receptors in Texas, but is not linked to Milwaukee, Sheboygan, or Allegan in this updated modeling. However, the EPA disagrees with commenters that Louisiana's SIP submission supports a conclusion that

---

[71] August 2018 memorandum, page 1.

[72] *Id.* ("air agencies should consider whether the recommendations in this guidance are appropriate for each situation.")

a 1 ppb threshold is an appropriate contribution threshold for Louisiana for any receptor, because Louisiana's justification is flawed. The EPA's August 2018 memorandum explained that a 1 ppb contribution threshold "may" be appropriate,[73] and that "air agencies should consider whether the recommendations in this guidance are appropriate for each situation."[74] LDEQ's SIP submission attempted to justify the state's use of a 1 ppb threshold based on concerns over the use of a 1 percent threshold, namely alleging that it is an arbitrarily small value. *See* 87 FR 9798, 9811 (Feb. 22, 2022). In the EPA's view, a criticism of a threshold of 1 percent of the NAAQS does not constitute a state-specific justification for the use of an alternative contribution threshold. We have responded to various criticisms of the 1 percent threshold in Sections V.B.4.-V.B.7 of the preamble. Further, in the SIP submission, LDEQ identified Louisiana as contributing more than 1 ppb to one or more downwind receptors and so conceded Louisiana is linked at Step 2 in Louisiana's SIP submission. The difference between a 1 percent of the NAAQS threshold and a 1 ppb threshold is not meaningful to the conclusion that Louisiana is linked at Step 2 because Louisiana contributes more than 1 ppb to a downwind receptor both in the modeling relied on by the state and in the modeling relied on by EPA in this final action.

Oklahoma

The EPA disagrees with Oklahoma Department of Environmental Quality that Oklahoma's rationale for supporting the use of a 1 ppb contribution threshold is justified under the text of the August 2018 memorandum. The EPA's August 2018 memorandum explained that a 1 ppb contribution threshold "may" be appropriate,[75] and that "air agencies should consider whether the recommendations in this guidance are appropriate for each situation."[76] Oklahoma did not do that.

In its SIP submission, Oklahoma identified that the state contributed more than 1 percent of the NAAQS but less than 1 ppb to three receptors in Texas and Wisconsin. 87 FR 9817. Instead of considering whether a 1 ppb contribution threshold would be appropriate for Oklahoma as to these specific receptors, Oklahoma's SIP submission pointed to the EPA's PSD SILs Guidance. The EPA addresses comment related to the PSD SILs guidance in Section V.B.6. of the preamble. The EPA also does not agree with the blanket statement in the comment that the August 2018 memorandum supports a conclusion that 1 ppb contribution is appropriate for any state with "low contributions." Somewhat similar issues regarding Oklahoma are addressed in Section 11.3.

Tennessee

The EPA is not taking final action on Tennessee's submission at this time.

One commenter suggests that because Tennessee is linked to a single maintenance-only monitor in a single state above one percent compared to other upwind states linked to multiple nonattainment and maintenance receptors, this supports the consideration of a 1 ppb alternative threshold. To the extent this may be considered an issue more broadly relevant than just to Tennessee, EPA disagrees with the commenter's assumption that an upwind state's number of downwind linkages justifies an alternative

---

[73] August 2018 memorandum, page 4.
[74] August 2018 memorandum, page 1.
[75] August 2018 memorandum, page 4.
[76] August 2018 memorandum, page 1.

threshold. Tennessee's analysis of the number of upwind linkages does not provide evidence that a 1 ppb threshold would effectively capture an appropriate degree of upwind-state collective contribution, even if only to a single identified downwind receptor. The commenter also asserts that Tennessee's contribution to a downwind maintenance-only receptor is sufficiently marginal that an alternative threshold of 1 ppb should be considered. The EPA notes that the commenter does not clarify their definition of a marginal contribution in the context of a collective contribution problem, or why 1 ppb appropriately excludes "marginal" contribution in some way that 1 percent does not—indeed, as explained in Section V.B.7, while 1 ppb may be considered "similar" to 1 percent, it still causes some loss of upwind contribution from further analysis for elimination and in that respect would reflect a weakening of the Step 2 threshold for the more protective 2015 ozone NAAQS. No commenter has explained why this incongruity is an acceptable outcome in light of the purpose of the statute.

Utah

The EPA disagrees that Utah's SIP submission justified the use of a 1 ppb threshold pursuant to the August 2018 Memorandum.  The EPA reviewed the analysis UDAQ provided in its SIP submission and concluded that UDAQ did not adequately explain how a 1 ppb threshold would be justified with respect to Denver area receptors, as explained at proposal. 87 FR 31478. The difference between a 1 percent of the NAAQS threshold and a 1 ppb threshold is not meaningful to the conclusion that Utah is linked at Step 2, because Utah identified it contributes more than 1 ppb to four downwind receptors. Utah is also projected to contribute more than 1 ppb to one or more downwind receptors in the updated modeling developed by EPA to inform both the proposed and final actions (2016v2 and 2016v3).

The EPA does not agree that the recommendation it made in reviewing a pre-submission version of Utah's SIP submission, that UDAQ review the August 2018 memorandum, can reasonably be construed as an endorsement of the appropriateness of the 1 ppb threshold for the state of Utah.


## 7.5   Maintenance-Only Linkages


*Comment*

**Commenter:** Tennessee Department of Environment and Conservation

**Commenter ID:** 41

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

Tennessee contributes more than 1% of the NAAQS to <u>only one</u> maintenance-only downwind monitor.

[…]

EPA's proposed disapproval of Tennessee's Infrastructure SIP based on Prong 1of CAA §110(a)(2)(D)(i)(I) is without merit and has no factual basis or support because EPA does not allege that Tennessee emissions significantly contribute to nonattainment of the NAAQS in another state.

EPA's proposed disapproval of Tennessee's Infrastructure SIP ("iSIP") relative to Prong 1 is not only arbitrary and capricious in that it lacks any factual merit, but it also lends evidence to support Tennessee's concern, discussed throughout these comments, that EPA intends to set an impossible standard whereby states are held accountable for technical data that has yet to be produced and cannot be known to states at the time they develop and submit their iSIPs. The iSIP Disapproval discusses the two ''prongs'' contained in CAA section 110(a)(2)(D)(i)(I) used to evaluate whether a SIP satisfies the Good Neighbor provision: the SIP must contain adequate provisions prohibiting any source or other type of emissions activity within the state from emitting air pollutants in amounts that will: (i) significantly contribute to nonattainment of the NAAQS in another state (prong 1); or (ii) interfere with maintenance of the NAAQS in another state (prong 2).  Under the precedent established in *North Carolina v. EPA*, EPA and states must give independent significance to each prong when evaluating downwind air quality problems under CAA §110(a)(2)(D)(i)(I).  EPA has developed a 4-step "interstate transport framework" (the "Framework") to evaluate whether a state's SIP satisfies both prongs of its Good Neighbor obligations to eliminate interstate transport emissions.  Under Step 1, EPA identifies monitoring sites in NAAQS nonattainment or maintenance areas, then in Step 2 determines whether the emissions from states that are upwind of these sites impact the air quality in the downwind states, such that the upwind states are "linked". An upwind state is only "linked" if its contribution value equals or exceeds "the threshold of 1 percent of the NAAQS (i.e., 0.70 ppb for the 2015 8-hour ozone NAAQS)" to a downwind state.  If an upwind state is not "linked", then EPA "concludes that the state does not significantly contribute to nonattainment or interfere with maintenance of the NAAQS in the downwind states" and Steps 3 (identifying required emissions reductions) and 4 (adopting permanent and enforceable control strategies) become moot because the upwind state is not required to make any emission reductions.

In the iSIP Disapproval, EPA does not argue or present any evidence to suggest that Tennessee has or is projected to significantly contribute to nonattainment of the NAAQS in another state (prong 1) for the applicable timeframes. Instead, EPA states:

> …EPA performed updated air quality modeling to project design values and contributions for 2023. These data were examined to determine if Tennessee contributes at or above the threshold of 1 percent of the 2015 8-hour ozone NAAQS (0.70ppb) to any downwind nonattainment or maintenance receptor. As shown in Table 3 [available in full comment], the date indicated that in 2023, emissions from Tennessee contribute greater than 1 percent of the standard to the **maintenance-only** receptor in Denton County, Texas…

The Denton County, TX receptor is the sole receptor to which Tennessee is projected to be linked in 2023 and EPA provides no evidence to the contrary.  However, in Section II.C.4. of the iSIP Disapproval "EPA is proposing to find that the portion of Tennessee's September 13, 2018, SIP submission… does not meet the State's interstate transport obligations because it fails to contain the necessary provisions to eliminate emissions that ***will contribute significantly to nonattainment*** or interfere with maintenance of the 2015 8-hour ozone NAAQS in any other state." This statement is plainly false, Tennessee does not contribute significantly to nonattainment for the 2015 8-hour ozone NAAQs in any other state.

Because EPA does not allege or present any information in the iSIP Disapproval that Tennessee emissions significantly contribute to nonattainment of the NAAQS in another state, EPA may not disapprove Tennessee's Infrastructure SIP based on Prong 1 of CAA §110(a)(2)(D)(i)(I).

[...]

In the absence of a significant contribution to downwind states, Tennessee should not be required to include either Framework Step 3 (multifactor analyses) or Framework Step 4 (permanent and enforceable reductions) in its infrastructure SIP

Tennessee notes that its original 2018 infrastructure SIP submission was based upon modeling data that were current at the time of submittal, and that the submittal was made available for EPA review and comment. If EPA properly resolves the issues identified above with the alternative significance threshold, then Tennessee is not linked at step 2, making steps 3 and 4 not applicable, making the issues identified by EPA in these steps moot and therefore insufficient grounds for disapproval of the SIP.

*Response*

The EPA is deferring final action on Tennessee's good neighbor SIP submission for the 2015 ozone NAAQS at this time. As explained in Sections IV.J and IV.U of the preamble, the EPA is now finalizing partial disapprovals (i.e., at prong 2) for states included in this action that are only linked to maintenance-only receptors, which are Minnesota and Wisconsin. Other issues raised by this comment are addressed in Section 1.4 (Use of Updated Modeling) and Section 5 (Updates to Modeling and Changes in Linkages).

302

# 8  Step 3

## 8.1  Determination of Significant Contribution

*Comment*

**Commenter:** Alabama Department of Environmental Management

**Commenter ID:** 02

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

The WOE analysis presented arguments concerning the contribution threshold, an emissions evaluation, and an analysis of the meteorology, through back trajectories, which in total justified, to the State's satisfaction, that Alabama will not significantly contribute to downwind nonattainment or maintenance in 2023 or beyond.

[...]

Weight of Evidence (WOE) Analysis:

In the revised SIP submitted in April of this year, a WOE analysis was provided in an effort to highlight concerns with the modeling system and associated inputs and outputs. WOE analyses are not new and have historically been relied on when modeling predictions are close to the air quality goal, or, in this case a "significant contribution" to future NAAQS non-attainment and maintenance areas. EPA has utilized and approved the use of WOE analyses in SIP actions for years, most recently for the 2008 ozone NAAQS SIPs for New Mexico and Wyoming, as well as the 2015 ozone NAAQS for Alaska and Hawaii. As stated in the April submittal, a WOE analysis relies on assessing the <u>available</u> information and weighing the data by considering the relevance and quality of the information through <u>qualitative and quantitative analysis</u>. In the April submittal, ADEM evaluated the meteorological influence on the predicted Denton and Harris County, Texas receptors, as well as an assessment of Alabama's emissions sources, concerns over model performance and issues with the significance threshold relied on by EPA in the February modeling. As part of these comments, ADEM is submitting additional information to bolster the WOE argument presented in April, given additional time and resources. Additional analyses of emissions, linkages, meteorology and further justification for an alternate significance level are being provided below.

*Response*

With limited circumstances in which certain unique analytical needs justified it, the EPA generally has not taken an alternative approach to western states in its assessment of interstate transport under the 2015 ozone NAAQS. See Section V.C.3 of the preamble. As explained at proposal while the EPA has in limited circumstances found unique issues associated with addressing ozone transport in western states, the EPA has otherwise consistently applied the 4-step interstate transport framework in western states

and has identified ozone transport problems in the west that are similar to those in the east. *See, e.g.,* 87 FR 31453.

Commenter cites EPA's approval of the good neighbor SIP submissions from New Mexico and Wyoming for the 2008 ozone NAAQS and Alaska and Hawaii for the 2015 ozone NAAQS. It should be noted that our use of a weight of evidence approach for Alaska and Hawaii was driven by the fact that we did not have CAMx modeling that could be used to evaluate those state's emissions. *See, e.g.,* 86 FR 53571, 53574 (September 28, 2021) (Hawaii). Similarly, in our approach to Colorado for the 2015 ozone NAAQS, we used analysis beyond modeling to assess potential contribution to the Uinta Basin, again because the CAMx modeling was not designed for evaluating the wintertime inversion conditions that were at issue. 87 FR 61249, 61253-61255 (October 11, 2022). The approvals for New Mexico and Wyoming were for a less protective NAAQS, also involved somewhat unique analytical circumstances, and did not reflect a wholesale setting aside of the four-step framework. In any case, the commenter has not established that the factors that were relevant to our analysis in those actions are present with respect to Alabama.

As explained in the proposed disapproval of Alabama's April 2022 SIP submission, the EPA disagrees that Alabama's analysis, which the state characterizes as a weight of evidence analysis, is sufficient to support a conclusion that the state does not contribute significantly to nonattainment or interference with maintenance. 87 FR 64421-64426. The information provided by ADEM in comments on this action does not change the EPA's determination.

Alabama's SIP submission does not analyze future emissions reduction opportunities beyond pointing to existing $NO_X$ emission reductions from SIP-approved and Federal measures. Alabama's submission cursorily evaluates $NO_X$ emissions from point and mobile source categories from the 2017 NEI and suggests there is a steep decline in emissions from major sources in the state. However, Alabama does not include a comprehensive accounting of facilities in the state and does not include a sufficient analysis of potential $NO_X$ emissions control technologies, their associated costs, estimated emissions reductions, and downwind air quality improvements for the purpose of identifying what additional emission controls may be necessary to eliminate their significant contribution.

For example, Alabama does not provide details to demonstrate why, how, or to what magnitude NOx emissions from sources in Alabama, Louisiana, Arkansas, Mississippi, or Texas are expected to continue to decline through the next attainment date for the Dallas-Fort Worth-Arlington, Texas, area. Further, Alabama does not show how NOx reductions could potentially affect nonattainment or maintenance issues – or Alabama's contribution to such issues – in future years.

Likewise, comparisons between Alabama's emissions and other states' emissions, including home-state emissions, do not address whether some portion of Alabama's contributions to downwind receptors may be deemed significant. The ozone transport problem in the United States results from the collective impacts of relatively small contributions from a number of upwind states. As presented in the Final Action AQM TSD, a substantial fraction of ozone at nonattainment and maintenance receptors comes from this collective contribution from upwind states. The cumulative impact of emissions reductions from upwind states and sources is an important part of resolving the impact of transported emissions on downwind air quality problems.

The EPA addresses ADEM's comments related to the August 2018 memorandum in Section 7.4, air quality factors in Section 8.5, and back trajectory analyses in Section 8.8. The EPA responds to comments on the contribution threshold in Section V.B.5 of the preamble and in Sections 7.2 and 7.3, and further comments on the EPA's emissions inventories and modeling in Sections 3 and 4, respectively.

*Comment*

**Commenter:** Alabama Power Company, Southern Power Company, and PowerSouth Energy Cooperative

**Commenter ID:** 04

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

EPA proposes to disapprove Alabama's 2022 SIP submission without determining in the first instance whether Alabama's SIP is approvable under Section 110(a)(2)(D)(i)(I) of the Clean Air Act.  Instead, EPA evaluated Alabama's SIP solely with reference to EPA's "4-step interstate transport framework."  Under this framework, EPA proposed to determine that certain undefined Alabama emissions contribute significantly to nonattainment or interfere with maintenance of the 2015 8-hour ozone NAAQS in two counties in Texas.  EPA's proposal makes multiple errors.

First, as demonstrated by ADEM's 2022 SIP submittal package, based on a weight of evidence ("WOE") analysis, and by applying the requirements of the Clean Air Act, Alabama sources do not significantly contribute to nonattainment in or interfere with maintenance by any other state.  Alabama is not required to assess its emissions contribution using EPA's 4-step Federal Implementation Plan ("FIP") framework, and EPA may not disapprove Alabama's SIP relying solely on an application of the limited and outdated 4-step approach.  Instead, Alabama's SIP package demonstrates that under the plain meaning of the Act, its SIP must be approved.  EPA fails to adequately consider ADEM's WOE analysis and the evidence in the record supporting it.  As explained below, because Alabama's 2022 SIP satisfies all requirements of the Clean Air Act, EPA must approve Alabama's SIP revision.

[…]

B. ADEM's Use of a Weight of Evidence Analysis to Address the Good Neighbor Obligations for the 2015 Ozone NAAQS Satisfies the Requirements of the Clean Air Act

As noted above, Alabama advances a WOE analysis to support its determination that emissions from Alabama are not significantly contributing to downwind nonattainment or maintenance issues in downwind states. In doing so, Alabama looks at several factors and concludes they all weigh in favor of the determination that no sources in Alabama are contributing significantly to downwind ozone issues. In the proposed disapproval, EPA uses a "4-step interstate transport framework to evaluate" the State's SIP submittal; however, EPA has been clear that states may satisfy the "good neighbor" obligation in a variety of ways. EPA has explained that "[t]he precise nature and contents of such a submission is not stipulated in the statute. [Therefore,] EPA believes that the contents of the SIP submission required by section 110(a)(2)(D)(i) may vary depending upon the facts and circumstances related to the specific

NAAQS." For example, EPA "has not directed states that they must conduct a Step 3 analysis in precisely the manner the EPA has done in its prior regional transport rulemakings."

While EPA acknowledges in the proposed disapproval that Alabama's SIP submission is "not organized by EPA's 4-Step Framework for assessing good neighbor obligations," it nevertheless shoehorns Alabama's submission into that FIP framework in order to analyze it. But EPA cannot use its SIP review process (in which EPA *shall* approve a SIP if it meets the requirements of the Clean Air Act) to force this FIP framework on states. Instead, EPA should consider ADEM's WOE analysis only in the context of the requirements of the plain language of the Act. Because Congress did not define the term "contribute significantly" or mandate that EPA or the States determine whether a contribution is "significant" in any particular manner, EPA and the States have analyzed this obligation in various ways in the past. Generally, these approaches have looked to various factors impacting air quality and cost-effectiveness. For example, in prior EPA rulemakings to address the "good neighbor" obligation, to determine what states were "significant" contributors to downwind nonattainment, EPA stated that its goal was to "determine whether [each upwind State] has emissions whose contributions to downwind nonattainment problems are <u>large and/or frequent enough</u> to be of concern."[31]

EPA has utilized, and approved the use of, weight of evidence analyses in interstate transport SIP actions for years,[32] and ADEM's proposal is appropriate and consistent with the EPA's analysis for other states. Indeed, EPA recently assessed Kansas's SIP submissions addressing the "good neighbor" obligation for the 2010 sulfur dioxide ($SO_2$) NAAQS.[33] Kansas "conducted a weight of evidence analysis to examine whether . . . emissions from [that state] adversely affect attainment or maintenance of the 2010 SO2 NAAQS in downwind states."[34] EPA did not insist on reviewing the SIP under any 4-step FIP framework and instead performed an evaluation of that WOE analysis and, in fact, performed its own WOE analysis, under the two "prongs" of Section 110(a)(2)(D)(i)(I): (1) significant contribution to nonattainment of the NAAQS in another state; and (2) interference with maintenance of the NAAQS in another state.[35] EPA and Kansas considered actual monitoring data, modeling data, emissions data from sources within the relevant state, and information on mobile source emissions in border counties in their "Prong 1" analysis of significant contribution to nonattainment.[36] The "Prong 2" analysis regarding maintenance areas built on the Prong 1 analysis and further considered emission trends and regulatory programs that had already led to or were expected to lead to reductions in emissions.[37]

ADEM has relied on many of the same factors identified in its WOE analysis for its proposed SIP revision such as emissions from Alabama sources, modeling information, and regulatory programs that have led to emission reductions. EPA should weigh each factor to determine whether Alabama has satisfied the two "prongs" of its "good neighbor" obligation as it did with Kansas. Alabama's SIP satisfies all of the requirements of the Clean Air Act, and, considering the weight of the evidence, EPA should approve Alabama's SIP just as it did with Kansas's SIP.

---

[31] 63 Fed. Reg. 57,356, 57,381 (Oct. 27, 1998) (emphasis added).

[32] *See, e.g.*, Approval and Promulgation of Air Quality Implementation Plans; Wyoming; Interstate Transport for the 2008 Ozone National Ambient Air Quality Standards, 84 Fed. Reg. 3,389 (Feb. 12, 2019); Air Plan Approval; New Mexico; Interstate Transport Requirements for the 2008 Ozone NAAQS, 84 Fed. Reg. 66,098 (Dec. 3, 2019); Air Plan Approval; Hawaii; Interstate Transport for the 2015 Ozone NAAQS, 86 Fed. Reg. 53,571 (Sept. 28, 2021); Air Quality State Implementation Plans; Approvals and Promulgations: Alaska; Interstate Transport Requirements for the 2015 Ozone Standard, 84 Fed. Reg. 26,041 (June 4, 2019).

[33] 86 Fed. Reg. 31,645 (June 15, 2021).
[34] *Id.* at 31,648.
[35] *Id.*
[36] *Id.* at 31,645-52.
[37] *Id.* at 31,652-53.

*Response*

With respect to commenter's assertions that the EPA did not evaluate or determine whether Alabama's SIP submission is approvable under Section 110(a)(2)(D)(i)(I), EPA disagrees.  The EPA's notice of proposed rulemaking explains why Alabama's SIP submission did not appropriately apply a "weight of evidence" (WOE) analysis to determine Alabama will not significantly contribute to downwind nonattainment or maintenance in 2023 or beyond. *See* 87 FR 64412. The EPA assessed the details of Alabama's SIP submission on their own merits and provided explanations as to why the SIP submission did not provide analysis sufficient for the EPA to approve the submittal. *See id.* The EPA has provided additional detail with respect to the weight of evidence approach above, in response to comments by ADEM.

Similarly, the EPA has addressed comments regarding the use of a WOE approach in interstate transport submissions, as well as the weight of evidence approach used by Alabama in responding to ADEM's comments, above.

Commenter's comparisons to the Kansas 2010 sulfur dioxide ($SO_2$) analysis containing a weight of evidence approach do not persuade the EPA to adopt commenter's preferred analysis using weight of evidence for Alabama's submission as to interstate transport under the 2015 ozone NAAQS. First, as the EPA explains in the NPRM for Kansas and Nebraska: "[I]nterstate transport of $SO_2$ is unlike the transport of fine particulate matter ($PM_{2.5}$) or ozone, in that $SO_2$ is not a regional pollutant and does not commonly contribute to widespread nonattainment over a large (and often multi-state) area. . . . $SO_2$ transport is therefore a unique case and requires a different approach." 86 FR 31645 (June 15, 2021); 86 FR 43960 (August 11, 2021). Second, with respect to the $SO_2$ transport analysis for Kansas, various monitoring and modeling results indicated that there were no violations or maintenance issues in nearby states close enough to be impacted by $SO_2$ transport from Kansas (e.g., on the scale of around 50 kilometers or less), and the various additional pieces of evidence that EPA looked at supported those conclusions; in the case here, where modeling results project Alabama to contribute to downwind nonattainment and maintenance receptors, a much more robust analysis of emissions sources and emissions control opportunities would be required than what was provided by Alabama to conclude that no emissions from Alabama should be deemed "significant." *See id.*

In response to commenter's claim that the EPA is forcing a FIP framework on states or failing to limit its evaluation of ADEM's "WOE" analysis to the context of the requirements of the Act, see Section V.B.6. of the preamble. The EPA addresses comments about the EPA's statutory authority in Section 10.3.

*Comment*

**Commenter:** Arkansas Department of Energy and Environment, Division of Environmental Quality

**Commenter ID:** 07

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

In EPA's proposed disapproval, EPA purports that DEQ did not conduct an adequate analysis of emissions from the sources and other emission activity from within the state to determine whether its contributions were significant. DEQ finds that EPA is objectively wrong in this assertion. DEQ performed a robust analysis of emissions activities within the state that had the potential to significantly contribute to nonattainment or interfere with maintenance of the NAAQS in other states. This analysis covered all sources in Arkansas with elevated stacks[20] (including both EGUs another industrial sources) that are under DEQ's regulatory authority. EPA inaccurately states in the proposed disapproval that DEQ's analysis under Step 3 only focuses on EGUs. DEQ focused analysis on emissions of NOx, as most VOC emissions within Arkansas are not anthropogenic, and are therefore uncontrollable.[21]

[20] DEQ chose to focus analysis on elevated stack sources because emissions from such sources are more likely to penetrate through the atmospheric mixing layer and thus be transported long distances.
[21] According to the EPA 2014 National Emission Inventory, emissions from biogenic sources make up eighty-two percent of the Arkansas VOC emission inventory. Point sources contribute only two percent of total VOC emissions to Arkansas's VOC emission inventory, thus VOCs were not further examined.

*Response*

The EPA explained the deficiencies in Arkansas's SIP submission at proposal. 87 FR 9808-9811. Related issues raised by this commenter are addressed in Section 8.6.

*Comment*

**Commenter:** City Utilities of Springfield, Missouri

**Commenter ID:** 13

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

In essence, City Utilities (CU) believes that EPA erred in disapproving Missouri's SIPs that addressed interstate transport or the "good neighbor" provisions, for the 2015 8-hour ozone NAAQS

[…]

A. EPA failed to adequately justify why Missouri's "good neighbor" SIP was disapproved and provided no recourse to supplement the regulatory action. City Utilities generally supports efforts by the Missouri Department of Natural Resources (MDNR) Air Program to redress deficiencies EPA identified in

Missouri's SIP. EPA's burden to determine certainty that Missouri emissions are a significant contributing influence on ambient monitor receptors in downwind States has not been met.

*Response*

The EPA explained the deficiencies in Missouri's SIP submission at proposal, 87 FR 9540-9544. The commenter did not indicate with reasonable specificity their concern with the EPA's assessment. The EPA cannot legally extend Missouri's deadline to submit a SIP submission; similar comments are addressed in the preamble in Section V.A.2 and in Section 1.1. The EPA received a second good neighbor SIP submission addressing the 2015 ozone NAAQS from Missouri on November 1, 2022, as discussed in more detail in Section 9.  The EPA is not required to identify what amounts of contribution are "significant" in acting on a good neighbor SIP submission. *See EME Homer City*, 572 U.S. at 509 ("Nor does the Act condition the duty to promulgate a FIP on EPA's having first quantified an upwind state's good neighbor obligations."). The EPA has found that the Missouri SIP submission, as well as each state's submission included in this action, is deficient at Step 3 for a variety of reasons; indeed, neither Missouri nor any other state identified any emissions from its sources or emissions activity as being significant and therefore in need of prohibition. The deficiencies in these analyses could be, and have been, identified in this action, well before the need to evaluate these submissions against any specific benchmark of "significance."

*Comments*

**Commenter:** Eagle Materials Inc.

**Commenter ID:** 16

**Docket ID:** EPA-R09-OAR-2022-0138

**Comment:**

Nevada reasonably applied a technical evaluation of its significant contributions to downwind air quality problems, guided by EPA's Guidance and the requirements of the CAA. EPA cannot now impose rigid requirements using its own analysis, and must instead evaluate Nevada's chosen framework against the requirements of Section 110(a)(2)(D)(i)(I).

**Commenter:** Idaho Power Company

**Commenter ID:** 23

**Docket ID:** EPA-R09-OAR-2022-0138

**Comment:**

Nevada reasonably applied a technical evaluation of its significant contributions to downwind air quality problems, guided by EPA's Guidance and the requirements of the CAA, and *timely* submitted its SIP for approval. EPA cannot now impose requirements based on its own preferences, but must instead evaluate Nevada chosen framework against the requirements of Section 110(a)(2)(D)(i)(I).

*Response*

The EPA explained the deficiencies in Nevada's SIP submission is the proposal at 87 FR 31492-31493. The EPA responds to these and similar comments in Section V.B.8. of the preamble and Section 10.3 of the RTC document.

*Comment*

**Commenter:** Maryland Department of the Environment

**Commenter ID:** 29

**Docket ID:** EPA-R03-OAR-2021-0872

**Comment:**

EPA now proposes to disapprove Maryland's SIP, in part, because it "does not offer an alternative modeling assessment showing that projected reductions in Maryland's emissions... would eliminate the contribution Maryland's emissions make to non-attaining or maintenance monitors." This determination is arbitrary and capricious in several respects.

As an initial matter, EPA's position establishes a false requirement that EPA's own transport rules do not adhere to. It is unreasonable to require Maryland to demonstrate that its SIP "would eliminate the contribution Maryland's emissions make to non-attaining or maintenance monitors." Section 110(a)(2)(D)(i)(I) only requires that Maryland eliminate its significant contribution, not all contributions.

Second, it is unclear what "alternative modeling" would be required for SIP approval. EPA's memo does not require that "alternative modeling" be provided in each of the 20 alternate analytical approaches discussed in its memo. In apparent acknowledgement of that fact, EPA's disapproval contends that the flexibilities were only "intended to generate further discussion around potential approaches to addressing ozone transport among interested stakeholders". However this position, like its remanded decision in *New York v. EPA*, 964 F.3d 1214, 1223 (D.C. Cir. 2020), is an unreasonable moving target.

[…]

In its 2015 Good Neighbor SIP, Maryland followed EPA's four step framework (without taking advantage of any flexibilities), and conducted a thorough Step 3 analysis (as discussed in Section C) showing that it has resolved its significant contribution to downwind nonattainment and maintenance areas.

EPA states that Maryland's Step 3 analysis is insufficient, in part, because the Step 3 analysis Maryland provided was not what EPA was expecting. EPA states: At Step 3 of the 4-step interstate transport framework, Maryland did not include an accounting of all of the NOx ["Nitrogen Oxides"] emitting

310

facilities in the state along with an analysis of potential NOx emissions control technologies, their associated costs, estimated emissions reductions, and downwind air quality improvements.

However, Maryland cannot reasonably be expected to know what EPA requires when EPA has never articulated a specific set of analytical requirements. EPA acknowledges that it has issued no guidance on what elements must be required in the Good Neighbor SIP. EPA states:

> While the EPA has not prescribed a particular method for this assessment, the EPA expects states at a minimum to present a sufficient technical evaluation. This would typically include information on emissions sources, applicable control technologies, emissions reductions, costs, cost effectiveness, and downwind air quality impacts of the estimated reductions, before concluding that no additional emissions controls should be required.

Maryland provided exactly that by explaining each of the regulations on a set of sources, evaluated the expected emissions from the sources that were anticipated to provide the maximum amount of reductions at a high cost-per-ton value, and found that they were sufficient to address the state's Good Neighbor obligations. Maryland also discussed the state's other NOx (and Volatile Organic Compound ("VOC")) regulations, which provide further assurance that the state has eliminated its significant contribution to downwind nonattainment and maintenance areas. EPA is thus obligated to engage in an actual evaluation of Maryland's submittal, not simply declare it to be "insufficient" based on an amorphous set of expectations. If the EPA should finalize its disapproval of the submittal on the basis that it is insufficient, EPA must document all the metrics and analysis used in the final disapproval of Maryland's 2015 Good Neighbor SIP at Step 3 and provide official guidance that details what a "sufficient technical evaluation" entails.

> To that regard, EPA's proposed disapproval does not require states to complete a Step 3 analysis in precisely the same manner that EPA has in previous transport actions. All EPA says is necessary for a "sufficient technical evaluation" is "something similar" to EPA's analysis to determine whether and to what degree emissions should be eliminated to address significant contribution.

 As detailed in Section C, MDE has met those Step 3 requirements. MDE used the only known benchmark at the time of its submittal, a NOx mass cap of 3,828 tons per ozone season at a cost effectiveness of $1,400/ton, to demonstrate that the state's aggressive emissions reductions programs outlined in its 2015 Good Neighbor SIP have far exceeded that threshold, thereby satisfying its Good Neighbor obligations for the 2015 ozone NAAQS. It is unreasonable for EPA to propose to disapprove Maryland's 2015 Good Neighbor SIP on the basis that the elements it has not articulated, and says are not required, were not present in Maryland's SIP submission.

*Response*

The EPA agrees that the CAA does not require Maryland, or any state, to show that it has eliminated all of its contribution to downwind nonattainment.  The standard in CAA section 110(a)(2)(D)(i)(I) is that a SIP submission for a new or revised NAAQS must contain adequate provisions prohibiting any source or other type of emissions activity within the state from emitting air pollutants in amounts that will *significantly* contribute to nonattainment or interfere with maintenance of the NAAQS in another state

(emphasis added). The proposal was clear on this in its description of the 4-step interstate transport framework when it stated that "… if a state's contribution equals or exceeds the 1 percent threshold, the state's emissions are further evaluated in Step 3, considering both air quality and cost as part of a multi-factor analysis, to determine what, if any, emissions might be deemed "significant" and, thus, must be eliminated under CAA section 110(a)(2)(D)(i)(I)." 87 FR 9468.

The EPA said in full in the proposal that:

> Maryland's 2019 SIP submission lacks an analysis of the effect that Maryland's adopted emission reductions would have on the specific downwind monitors which the EPA's March 2018 memorandum modeling analysis and 2016v2 emissions platform analysis determined that Maryland sources contribute more than 1 percent to nonattainment or interference with maintenance. Maryland's SIP submission disputes neither the significant contribution from Maryland nor the ''linkages'' between Maryland emissions and these downwind nonattainment or maintenance monitors. Further, although Maryland objects to the modeling assessment included with the EPA's March 2018 Memorandum, it does not offer an alternative modeling assessment showing that projected reductions in Maryland's emissions, as outlined in its 2019 SIP submittal, would eliminate the contribution Maryland's emissions make to nonattaining or maintenance monitors identified by the EPA's 2018 memorandum modeling assessment, or to those in the more recent 2016v2 emissions platform assessment. Maryland's modeling assessment in its 2019 SIP submittal merely explores the varying effects that various emission reduction strategies in eastern states would have on ozone nonattainment in general, rather than the effect Maryland's reductions would have on non-attaining or maintenance monitors to which it is linked.

87 FR 9474. The EPA's statement about Maryland not offering alternative modeling was not a suggestion that Maryland was obligated to examine alternative modeling. Rather, the statement was intended as a factual observation that Maryland did not rebut, or attempt to rebut, the conclusion in the very modeling on which Maryland relied – that the state contributes above the contribution threshold. Thus, EPA would have expected Maryland to provide an analysis supporting a conclusion that despite those contributions Maryland was not significantly contributing to nonattainment or interference with maintenance.

Although Maryland identified a number of emissions control requirements, in general, the emissions reducing effects of all existing emissions control requirements are already reflected in the air quality results of the modeling for Steps 1 and 2. And yet Maryland was still identified as linked above 1 percent of the NAAQS contribution threshold to one or more downwind receptors at Step 2. 87 FR 9473. The EPA explained at proposal why Maryland provided an insufficient analysis at Step 3 to support a conclusion that the state's good neighbor obligations for the 2015 ozone NAAQS are resolved. 87 FR 9471. MDE's comment here does not change the EPA's assessment of Maryland's SIP submission. A related comment is addressed in Section 8.3.

The EPA address comment related to availability of guidance in Section 1.2. The EPA responds to MDE's argument based on *New York v. EPA* in Section 1.4. The EPA addresses comments about existing and future state controls in Section 8.3.

*Comment*

**Commenter:** Oklahoma Department of Environmental Quality

**Commenter ID:** 37

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

COMMENT 4: EPA's Backwards Approach to Transport SIP Approvals Renders States' Burdens Unknowable at the Time of SIP Development

As was mentioned in Section III and in Comment 1, Oklahoma relied extensively on the projected design values and guidance offered in the three 2018 Tsirigotis Memos. Theses memos coupled with the Cross-State Air Pollution Rule (CSAPR) framework establish the criteria by which EPA determines whether an upwind state is making a significant contribution to nonattainment or maintenance issues at monitors located in downwind states. As will be discussed in more detail later, there are two criteria, or "prongs" as Oklahoma has called them, both of which must be met to establish this significant contribution to nonattainment or interference with maintenance. In essence the "significant contribution" language in the Clean Air Act has been operationally defined as meeting both of the following prongs: (1) air quality modeling must show that the total anthropogenic NOx emissions from the upwind state must meet or exceed a contribution threshold at a downwind monitor that is having trouble attaining the ozone standard (i.e., steps 1 and 2 of the CSAPR 4-step framework) and (2) the upwind state must have some quantity of NOx emissions reductions available at a uniform cost threshold (i.e., steps 3 and 4 of the CSAPR 4-step framework). The determination of the quantity of emissions that must be reduced to eliminate the downwind contribution happens at Step 3 of the CSAPR framework, a step that occurs only after considerable work to model the relationship between upwind states' emissions and downwind concentrations. During the preparation of its SIP, a state agency cannot move forward unless the flexibilities, design values, and general guidance offered in the EPA memos to avoid needing to conduct a Step 3 analysis. Further, if modeling appears to show that the state's contributions meet or exceed the contribution threshold, the state cannot determine the magnitude of NOx emissions reductions needed (if any at all) until EPA completes its work on Step 3 of the CSAPR framework. These uncertainties yield a complicated and confusing burden where a state's obligations are fundamentally unknowable at the time a state is required to develop its SIP.

[…]

COMMENT 8: Demonstrating "No Linkage" Should Have Been Sufficient

As noted in the proposed disapproval at 87 Fed. Reg. 9824, the Oklahoma SIP did not identify any NOx emission reductions beyond those required by the CSAPR Update, which establishes an ozone-season NOx trading program for all Oklahoma fossil-fueled electricity generating units (EGUs) with a nameplate generating capacity of more than 25 MWe that produce electricity for sale. Oklahoma determined there was no need to identify NOx emissions reductions because demonstrating no significant contribution to a downwind monitor under prong 1 should have been sufficient on its own. This is because, as already stated above, the significance determination under the CSAPR framework is fundamentally two-pronged, and if either prong is not satisfied then the state does not contribute significantly to downwind

nonattainment or maintenance. Oklahoma's SIP addressed the first prong (i.e., Steps 1 and 2) and demonstrated that there was no linkage to a downwind monitor. Having made that demonstration, ODEQ did not need to address the second prong (i.e., Steps 3 and 4), and therefore did not need to identify additional NOx emission reductions.

Additionally, adequately addressing the second prong represents an unreasonable burden due to the complexity of Step 3 of the CSAPR framework. The level of complexity is demonstrated in this description from the "Ozone Transport Policy Analysis Proposed Rule TSD:"

> In order to establish EGU NO$_X$ emissions control stringencies for each linked upwind state, EPA first identifies various possible uniform levels of NO$_X$ control stringency based on available EGU NO$_X$ control strategies and represented by cost thresholds. The EGU emission reductions pertaining to each level of control stringency are derived using historical data, engineering analyses, and the Integrated Planning Model (IPM) for the power sector as described in sections B and C of this TSD. A similar assessment for one scenario was done for non-EGUs. Next, EPA uses the ozone Air Quality Assessment Tool (AQAT) to estimate the air quality impacts of the upwind state emissions reductions on downwind ozone pollution levels for each of the assessed cost threshold levels. Specifically, EPA looks at the magnitude of air quality improvement at each receptor at each level of control, it also examines whether receptors change status (shifting from either nonattainment to maintenance, or from maintenance to attainment), and looks at the individual contributions of each state to each of its receptors.

The photochemical modeling that is used to connect emissions from upwind states to nonattainment and maintenance receptors in downwind states is so complicated and takes so long to run that EPA uses a simpler tool, the Air Quality Assessment Tool or AQAT, to check each intermediate sub-step to see whether the emissions reductions at a particular cost threshold are sufficient to bring the downwind monitors into attainment of the NAAQS. The AQAT was not available when the Oklahoma Transport SIP was developed and submitted. In fact, the AQAT was not released until March 24, 2022. It is an unreasonable burden to expect states, with fewer resources than the EPA, to perform a level of analysis that taxes the EPA's abilities and resources.

### Response

In response to the commenter's claim that the EPA should approve Prongs 1 and 2 of CAA section 110(a)(2)(D)(i)(I) for Oklahoma, we note that in its submission ODEQ refers to Steps 1 and 2 of the 4-step interstate transport framework collectively as Prong 1 and Steps 3 and 4 of the 4-step interstate transport framework collectively as Prong 2. The EPA has consistently used the term "prongs" to refer instead to the requirements found in CAA section 110(a)(2)(D)(i). There are two so-called ''prongs'' within CAA section 110(a)(2)(D)(i)(I). A SIP submission for a new or revised NAAQS must contain adequate provisions prohibiting any source or other type of emissions activity within the state from emitting air pollutants in amounts that will significantly contribute to nonattainment of the NAAQS in another state (prong 1) or interfere with maintenance of the NAAQS in another state (prong 2).

In response to commenter's claims that the level of analysis required at Step 3 of the 4-step interstate transport framework is overly burdensome for states, the EPA disagrees this is necessarily the case, and

even if the analytical burden is great, this would not be a reason to approve deficient SIP submissions. While the EPA appreciates the work required by states in these actions, the Supreme Court confirmed that the states have the first obligation to prepare and submit state plans that prohibit the appropriate levels of emissions that significantly contribute to nonattainment or interfere with maintenance of the NAAQS in other states. In *EPA v. EME Homer City Generation, L.P.*, the Supreme Court clearly held that "nothing in the statute places the EPA under an obligation to provide specific metrics to states before they undertake to fulfill their good neighbor obligations." 572 U.S. at 509.

The EPA disagrees that the work involved in performing a Step 3 analysis necessitates the identification of so-called "flexibilities," so that states can avoid having to conduct further analysis of emissions-control opportunities or avoid imposing any emissions reduction obligations on their sources. The core statutory objective of the good neighbor provision is to ensure elimination of all significant contribution to nonattainment or interference of the NAAQS in other states. Allowing flexibility for the purpose of avoiding the work required to assess whether a state's emissions contribute significantly to downwind states is inconsistent with the requirements of the statute and would render the good neighbor provision ineffective. As noted in the preamble, the EPA's experience has been that in general, states that attempted to rely on the flexibilities mentioned in previous EPA memos did not provide sufficient state-specific analysis to justify their appropriateness.

The EPA disagrees that it must conduct its own quantification and analysis of cost-effective controls in evaluating a state's SIP submission, or do this analysis on behalf of the state. *See EME Homer City*, 572 U.S. at 509. That is the state's responsibility, and if it has not done that analysis (or an alternative analysis that comports with the Act), then the SIP submission is not approvable. This action is not determining what, if any, cost effective controls exist at Step 3 of the 4-step interstate transport framework—nor need it, if the state's submission is lacking in such an analysis. Instead, the EPA is evaluating the states' interstate transport SIP submissions to determine whether the submissions satisfy the statutory obligations at CAA section 110(a)(2)(D)(i)(I). In order for the EPA to approve a state's SIP submission, a state's chosen approach must contain an adequate technical justification and be consistent with the requirements of the CAA. ODEQ stated that controls imposed through the 2016 CSAPR Update FIP were the only reasonable controls to require. EPA noted in its proposal that the EPA's 2016v2 modeling incorporated emission reductions from prior ozone transport rulemakings, including the CSAPR Update and the Revised CSAPR Update, and even with those reductions, modeling still shows that Oklahoma is linked to downwind receptors. Where a state's submission simply relies on controls and cost thresholds from previous ozone transport actions without explaining why that cost threshold remains appropriate or evaluating other potentially cost-effective controls, it fails to provide an adequate justification and thus is deficient. Additional comments on issues raised by the comment are addressed in Sections 8.3 (Existing and Future State Controls) and 8.6 (Cost Thresholds).

*Comment*

**Commenter:** Texas Commission on Environmental Quality

**Commenter ID:** 42

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

The TCEQ disagrees with EPA's claim that it does not use the 0.7 ppb contribution threshold as the 'sole' determinant of significant contribution from upwind states because the EPA evaluated potential emission reductions in upwind states to determine whether potential emissions reductions are significant to downwind monitors.

The EPA claims that by evaluating if a state has sufficient emission reductions to remove the 0.7 ppb contribution to a downwind nonattainment or maintenance monitor, the EPA's 4-step methodology does not use the 0.7 ppb as the 'sole' determinant of significant contribution and that EPA's methodology is similar to the TCEQ's weight of evidence methodology. However, the EPA is conflating the ability to mitigate contributions with whether the contribution itself is significant in its approach. The potential for emissions reductions should not be used as justification for significant contribution. Significant contribution should be established prior to determining if emissions reductions are needed as the TCEQ did in its transport analysis.

*Response*

This comment expresses an inaccurate description of the 4-step interstate transport framework, in that the EPA does not in fact define "significance" by reference to the Step 2 "contribution" threshold. We acknowledge that TCEQ in its SIP submission attempted to provide an alternative approach in its analysis that would have concluded it does not have "significant" emissions prior to conducting any analysis of emissions reduction opportunities. Rather, the state attempted to use a variety of additional "air quality factors" to justify the non-significance of its emissions. For reasons explained in the proposed disapproval, the EPA finds TCEQ's approach is not approvable. *See* 87 FR at 9831-34. Thus, our analysis (including our evaluation of TCEQ's modeling and methodological choices) establishes that the state does contribute to receptors out of state, and the state's reasoning for why none of those contributions should be considered "significant" is not approvable.

## 8.2   Alleged De Minimis Contribution

*Comments*

**Commenter:** Alabama Power Company, Southern Power Company, and PowerSouth Energy Cooperative

**Commenter ID:** 04

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

Second, ADEM points out that statewide $NO_x$ emissions from point sources in Alabama continue to decline and most emissions are from mobile sources, which would only contribute to local ozone. This factor is further supported by the fact that Alabama is not projected by EPA's modeling to be linked to

any other state's nonattainment or maintenance in 2026, based solely on existing SIP requirements.[40] Any additional mandates for reductions in emissions from point sources in Alabama would have disproportionately small impacts on ozone concentrations in Texas. In fact, EPA only projects an improvement of 0.17 ppb and 0.36 ppb at the Denton and Harris County monitors, respectively, in 2023 as a result of emission reductions.[41] And only approximately 0.015 ppb and 0.038 ppb of those reductions might be considered attributable to Alabama.[42] These are vanishingly small amounts that do not constitute any common sense understanding of potentially significant contribution. Indeed, every other "linked" state contributes more to these monitors than Alabama.

[41] 87 Fed. Reg. at 20,092.

[42] "Linked" states are only projected to contribute 7.97 ppb and 8.34 ppb to the Denton and Harris County monitors, respectively, in 2023. *See* EPA, Ozone Air Quality Assessment Tool (AQAT), available at https://www.epa.gov/csapr/good-neighbor-plan-2015-ozone-naaqs. Alabama accounts for 9% and 11% of that total linked contribution to each receptor, respectively. Therefore, it could be assumed that 9% and 11% of the total improvement at those receptors from emission reductions at those receptors is due to Alabama. This assumption is likely conservative and the influence on the Texas receptors is actually less.

**Commenter:** Arkansas Department of Energy and Environment, Division of Environmental Quality

**Commenter ID:** 07

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

Because the modeling that EPA provided to the states at the time of SIP development did not include sector-specific tagging, DEQ examined sources with elevated stacks to determine whether any sources in Arkansas were anticipated to significantly contribute to nonattainment or interfere with maintenance. Because DEQ had additional information about EGU emissions, DEQ performed additional analysis for this source type. As previously discussed, the analysis focused solely on Allegan County, MI because that was the only receptor DEQ identified as being potentially linked to Arkansas—although DEQ's HYSPLIT analysis suggests that this linkage is not persistent or consistent. The data presented in the Arkansas Transport SIP indicates that EGUs in Arkansas are not significantly contributing to nonattainment or interfering with maintenance in Allegan County, MI. The data also show that controlling emissions activities in Arkansas would not be an effective way of reducing the ozone concentrations in Allegan County—particularly when looking at Arkansas's relative contribution to the Allegan County monitor compared to the proximity and quantity of emissions in other states near to Allegan County. DEQ did not perform similar analyses for the receptors identified by EPA in their disapproval because the data upon which those "linkages" were identified was not available and DEQ adequately justified its 1 ppb threshold.

[...]

EPA's modeling projects that the Harris County, TX monitor (482010055) will not attain the 2015 ozone NAAQS by 2023. Therefore, new control measures are necessary to bring Harris County into attainment. However, Arkansas's relatively small contribution to this monitor based on EPA's 2016v2 modeling does not indicate that new controls for Arkansas sources is an effective means of bringing this area into

attainment and that it is unlikely that a particular emission source or emission activity in Arkansas will significantly contribute to nonattainment or interfere with maintenance at that monitor.

**Commenter:** PacifiCorp (Attachment – Ramboll Evaluation)

**Commenter ID:** 38

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

Tables 1-3 and 1-4 summarize the contributions of Wyoming and Utah EGU and PacifiCorp EGU NOX emissions to 2023 ozone design values at receptors in the DM/NFR ozone NAA. The EGU contributions were obtained using the Proposed Transport Rule Step 2 CAMx 2023 APCA ozone source apportionment modeling state ozone contributions assuming that the EGU fraction of that ozone contribution was proportional to the EGU NOX emissions fraction to the state's total anthropogenic NOX emissions. The EGU fraction of the Wyoming and Utah total anthropogenic NOX emissions was taken from the pie charts above. The PacifiCorp EGU fraction of each of the states total EGU NOX emissions is from Table 3-2 in Chapter 3.

The Wyoming EGU contribution to the 2023 ozone design at the CHAT monitor is 0.14 ppb, or 0.19%. Using the Proposed Transport Rule Step 1&2 data the PacifiCorp EGUs contribution to the 2023 ozone AvgDV at CHAT is 0.05 ppb, or 0.06%.

Utah EGUs are estimated to contribution 0.22 to 0.29 ppb to the 2023 ozone design values at the three sites in the DM/NFR NAA, which represents 0.30% to 0.40% of the design value (Table 1-3). PacifiCorp EGUs are estimated to contribute 0.10-0.12 ppb or 0.13-0.17% to the 2023 ozone AvgDV at the three sies in the DM/NFR NAA.

Thus, the Wyoming and Utah EGU and PacifiCorp EGU ozone contributions to the 2023 ozone design values in the DM/NFR NAA are quite small and probably not even measurable.

Table 1-3. Contributions of Wyoming and Utah EGU NOX emissions to 2023 ozone design values at receptors in the DM / NFR ozone NAA.

| Receptor | 2023 Ozone AvgDV (ppb) | 2023 State Ozone Contribution (ppb) | 2023 State EGU Contribution | | |
|---|---|---|---|---|---|
| | | | State Total Anthropogenic NOX Emissions | EGU Ozone Contribution (ppb) | EGU Ozone Contribution (%) |
| Wyoming | | | | | |
|    CHAT | 71.7 | 0.81 | 17% | 0.14 | 0.19% |
| Utah | | | | | |
|    CHAT | 71.7 | 1.37 | 21% | 0.29 | 0.40% |
|    RFNO | 72.6 | 1.10 | 21% | 0.23 | 0.32% |
|    NREL | 73.8 | 1.06 | 21% | 0.22 | 0.30% |

Table 1-4. Contributions of Wyoming and Utah PacifiCorp EGU NOX emissions to 2023 ozone design values at receptors in the DM/NFR ozone NAA.

| Receptor | 2023 Ozone AvgDV (ppb) | 2023 State Ozone Contribution (ppb) | 2023 PacifiCorp State EGU Contribution | | |
| | | | State Total Anthropogenic NOX Emissions | EGU Ozone Contribution (ppb) | EGU Ozone Contribution (%) |
|---|---|---|---|---|---|
| Wyoming | | | | | |
| CHAT | 71.7 | 0.81 | 6% | 0.05 | 0.06% |
| Utah | | | | | |
| CHAT | 71.7 | 1.37 | 9% | 0.12 | 0.17% |
| RFNO | 72.6 | 1.10 | 9% | 0.10 | 0.14% |
| NREL | 73.8 | 1.06 | 9% | 0.10 | 0.13% |

*Response*

The contributions from no state covered by this action, including Alabama, Arkansas, or Utah, are so small that the states have proven they do not significantly contribute to nonattainment or interfere with maintenance.

In the NOX SIP Call, the EPA adopted a "collective contribution" approach to determining whether sources "contribute" to nonattainment downwind. 63 FR 57376 (Oct. 27, 1998). The EPA said that:

> EPA believes that each ozone nonattainment problem at issue in today's rulemaking is the result of emissions from numerous sources over a broad geographic area. The contribution from sources in an upwind State must be evaluated in this context. This ''collective contribution'' nature of the ozone problem supports the proposition that the solution to the problem lies in a range of controls covering sources in a broad area, including upwind sources that cause a substantial portion of the ozone problem. This upwind share is typically caused by NOx emissions from sources in numerous States. States adjacent to the State with the nonattainment problem generally make the largest contribution, but States further upwind, collectively, make a contribution that constitutes a large percentage in the context of the overall problem.

63 FR 57386.

EPA adopted the same approach to quantifying the level of states' significant contribution to downwind nonattainment areas in CAIR as it used in the NOX SIP Call, based on the determination in the NOX SIP Call that downwind ozone nonattainment is due to the impact of emissions from numerous upwind sources and states. CAIR, 70 FR 25162, 25172 (May 12, 2005).

Citing to prior determinations made in the NOX SIP Call and CAIR, EPA continued to find a collective contribution problem impacting downwind ozone nonattainment and maintenance areas in CSAPR. 76 FR 48208 (Aug. 8, 2011). Specifically, EPA found "that the total 'collective contribution' from upwind sources represents a large portion of PM2.5 and ozone at downwind locations and that the total amount of transport is composed of the individual contribution from numerous upwind states." *Id.* at 48237.

The EPA continued to hold this view in the CSAPR Update: "The EPA continues to find that the total collective contribution from upwind states' sources represent a significant portion of the ozone

319

concentrations at downwind nonattainment and maintenance receptor locations." 81 FR 74519 (Oct. 26, 2016). Further, the D.C. Circuit, in upholding EPA's approach to allocating responsibility at Step 3, rejected Wisconsin's argument that it should not face good neighbor obligations for the 2008 ozone NAAQS in the CSAPR Update on the basis that its emission reductions would only improve a downwind receptor by two ten-thousandths of a part per billion. *Wisconsin v. EPA*, 938 F.3d 303, 322–23 (D.C. Cir. 2019) (citing *EPA v. EME Homer*, 572 U.S. 489, 524 (2014)).

In evaluating ozone transport, the EPA continues to place great importance on collective contribution, including in the context of evaluating SIP submissions. For example, Alabama is linked to the Galveston, Texas receptor and also to the Denton/Pilot Point, Texas violating-monitor maintenance-only receptor. The collective upwind contribution to Galveston is 26 percent of the total ozone in 2023 at this receptor. In addition, at the Denton/Pilot Point receptor, the collective upwind contribution is 18 percent of the total ozone in 2023 at this receptor. Also, ADEQ says any reductions from Arkansas won't "be effective" at assisting Harris County, TX monitor (482010055) attain. The EPA notes that in the 2016v3 modeling, Arkansas is linked to 6 receptors in Brazoria, Denton, Galveston, and Harris counties Texas. The collective contribution from upwind states to these receptors as a percent of total ozone ranges from 14 percent to 26 percent. Utah's highest contribution is to the Chatfield receptor in Douglas County, Colorado where the collective contribution is 8 percent of the total ozone. These measures of the baseline contribution from upwind states rebut any generalized assertions that reductions in these emissions would not be impactful when implemented across the linked upwind geography.

In their comment Alabama Power Company et al. provides no basis for claiming that "additional mandates for reductions in emissions from point sources in Alabama would have disproportionately small impacts on ozone concentrations in Texas," nor do they provide a basis for claiming that mobile source emissions reductions would only reduce ozone locally. In addition, commenter's generalized assertions regarding overall emissions trends and the causes of poor air quality are not an adequate substitute for an evaluation of significant contribution in 2023. Commenter's evaluation does not reflect an adequate comparison between baseline emissions, and the air quality impacts of additional emissions control opportunities in Alabama, much less the inclusion in the SIP submission of enforceable emissions controls that would render those projected reductions permanent and enforceable. In this action, the EPA does not necessarily agree with the comment's calculation of Alabama's air quality impacts based on the estimated air quality improvements as a result of the EPA's April 2022 proposed FIP's emissions reductions and the state's proportion of overall ozone concentrations at the downwind receptors to which the state was linked based on 206v2 modeling. Even still, we note that these estimated air quality impacts alone are not reason to believe Alabama's contributions are not significant. As mentioned previously, the D.C. Circuit rejected Wisconsin's argument that it should not face good neighbor obligations for the 2008 ozone NAAQS in the CSAPR Update on the basis that its emission reductions would only improve a downwind receptor by two ten-thousandths of a part per billion. *Wisconsin v. EPA*, 938 F.3d 303, 322–23 (D.C. Cir. 2019) (citing *EPA v. EME Homer*, 572 U.S. 489, 524 (2014)).

ADEQ's argument that eliminating its own significant contribution to a linked receptor is "ineffective" is unsupported and not a convincing argument that Arkansas has resolved its good neighbor obligations for the 2015 ozone NAAQS, as explained in the proposal. *See, e.g.*, 87 FR 9809-9810. The EPA addresses comments deferring to ADEQ's existing controls to ensure the State does not violate the good neighbor

provision below, in Section 8.3. The EPA addresses comment related to updates to modeling and changes to linkages in Section 5.

In response to PacifiCorp's Ramboll Attachment, the EPA notes first that the EPA is deferring final action on Wyoming's SIP submission. Second, the EPA reiterates that the Agency is not requiring any controls on any source in this action.

The EPA addresses comments on HYSPLIT Model analysis in Section 8.8 of this RTC.

## 8.3   Existing and Future State Controls

*Comments*

**Commenter:** Alabama Power Company, Southern Power Company, and PowerSouth Energy Cooperative

**Commenter ID:** 04

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

In addition, emissions will decrease due to existing provisions of the SIP, including New Source Performance Standards (such as subpart KKKK) and existing CSAPR programs (due to retirements and new unit set aside).

[...]

ADEM clearly explains that the State of Alabama has implemented several programs in recent years that have resulted in a reduction of ozone precursor emissions, such as $NO_X$. Meanwhile, EPA admonishes ADEM for not including in its Step 3 analysis "future emissions reduction opportunities beyond pointing to $NO_X$ emission reductions from SIP-approved and Federal measures." EPA does not explain why the programs ADEM identifies—including the Tier 1 and 2 mobile source rules, the nonroad Diesel Rule, the 2007 Heavy-duty Highway Rule, New Source Performance Standards, National Emission Standards for Hazardous Air Pollutants, and CSAPR—are insufficient means by which to achieve future reduction in emissions. EPA is seemingly requiring that Alabama present new control measures to show future emissions reductions. However, it should not matter whether the control measures utilized by Alabama to achieve emissions reductions are new measures for new measures' sake or measures implemented through existing programs or the existing SIP. EPA fails to recognize this distinction and the more important fact that, under these existing programs, Alabama's emissions are already low and will continue to fall. For example, under the existing SIP, emissions from Alabama were well below levels that EPA would deem significant on the relevant dates, as shown in Section C. iii.

**Commenter:** Arkansas Department of Energy and Environment, Division of Environmental Quality

**Commenter ID:** 07

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

Four out of five of the newly-identified Arkansas linkages are projected maintenance receptors. These receptors are anticipated to attain the NAAQS based on existing control measures. Therefore, significant increases in emissions could interfere with attainment and maintenance of the NAAQS. However, DEQ's prevention of significant deterioration new source review process adequately prohibits emissions from a new source or modification to an existing source in an amount that could contribute to nonattainment or interfere with maintenance of the NAAQS. Therefore, asserting that additional control measures on existing sources are necessary to address EPA-identified linkages to those receptors is not reasonable.

**Commenter:** California Air Resources Board

**Commenter ID:** 12

**Docket ID:** EPA-R09-OAR-2022-0394

**Comment:**

The Act requires the interstate transport portion of the SIP to contain adequate provisions to prohibit emissions from within the state from significantly contributing to nonattainment or interfering with maintenance of the 2015 Ozone NAAQS due to downwind transport to impacted states, including California. CARB agrees it is important to address ozone interstate transport in order to protect public health and welfare of all. CARB also accepts the latest modeling from EPA's analysis which indicated linkages between California and eight nonattainment areas and four maintenance areas.

California has authority under the Act to set its own stricter-than-federal mobile source emissions regulations. Congress provided this authority to address the dominant role that mobile sources play in the poor air quality within the state, considering California's population, climate, and topography. California's pioneering mobile source control programs have paved the way for numerous federal mobile source control programs that have since provided national public health benefits. This additional increment of more robust mobile source controls has been implemented by CARB to expedite attainment of air quality standards within California.

California has the only two areas (Los Angeles-South Coast Air Basin and San Joaquin Valley) in the nation that are extreme nonattainment areas for the 2015 Ozone NAAQS, whereby the State and local districts are constantly looking for aggressive emissions reductions with additional benefits of reducing downwind transport of ozone and ozone precursors of Oxides of Nitrogen ($NO_X$) and Volatile Organic Compounds (VOCs). In the proposed transport FIP, EPA focuses on $NO_X$ emissions reductions, and finds that the "$NO_X$ emissions reductions required in the proposed rule would fully eliminate these states' significant contributions to downwind air quality problems for the 2015 Ozone NAAQS." California's latest statewide emissions estimates projected for the summer months of 2026 from CARB's Criteria Pollutant Emission Inventory Database (CEPAM2022 v1.01 Summer season) indicate that approximately

75 percent of anthropogenic $NO_x$ emissions in California are from mobile sources, with only approximately 15 percent being from stationary source fuel combustion categories.

In December 2021, CARB adopted a new regulation, California's Heavy-Duty Vehicle Inspection and Maintenance program which will ensure heavy-duty vehicles have properly functioning emissions control systems and that malfunction repairs are completed in a timely manner. This regulation is projected to single-handedly reduce $NO_x$ emissions by over 25,000 tpy in 2026. Additionally, CARB's 2022 State SIP Strategy lists an assortment of measures providing an additional 7,500 tpy reduction in $NO_x$ emissions in 2026. The 2022 State SIP Strategy that will be considered at a public meeting of the CARB Board later this year, together with measures from the 2016 State SIP Strategy that were very recently adopted and not accounted for in EPA's transport modeling, will result in the additional reduction of nearly 32,500 tons of $NO_x$ emissions in 2026. In contrast, the proposed FIP estimates 1,666 tpy of $NO_x$ emission reductions from non-electric generating unit (EGU) sources. CARB's new mobile source control measures will provide about 20 times more $NO_x$ emission reductions than were specified in the proposed FIP. Given California's mix of emissions sources and our unique authority, it is most appropriate for CARB to focus on reducing mobile source emissions to mitigate California's impact on downwind neighbors.

**Commenter:** Louisiana Department of Environmental Quality

**Commenter ID:** 27

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

EPA finds in its proposal that Louisiana's November 2019 submittal does not meet the obligations with respect to prohibiting emissions that contribute significantly to nonattainment or interfere with maintenance of the 2015 NAAQS in downwind states based upon EPA's 4- step interstate transport framework.

LDEQ has an established Part 70 air permitting program, approved by EPA. The program's regulations set forth obligations that industry must follow prior to construction. All permit applications must show that their potential to emit emissions meets the prevention of significant deterioration (PSD) or nonattainment new source review requirements (NNSR). To date, there have been no FCAA § 126 actions filed against Louisiana. FCAA § 126 gives a state the authority to ask EPA to set emissions limits for specific sources of air pollution in other states that significantly contribute to nonattainment or interfere with maintenance of one or more NAAQS in the petitioning state.

**Commenter:** Maryland Department of the Environment

**Commenter ID:** 29

**Docket ID:** EPA-R03-OAR-2021-0872

**Comment:**

C. The Step 3 analysis in Maryland's 2015 Good Neighbor SIP demonstrates that the State has resolved its significant contribution to downwind nonattainment and maintenance areas.

[...]

MDE disagrees that it failed to provide a well-documented evaluation of its efforts to address significant contributions to downwind states. Maryland evaluated its aggressive in-state emissions reductions programs and found that they provide all available emissions reductions at a significant cost-per-ton threshold, thus satisfying the CAA's Good Neighbor requirements. Without any guidance from EPA on what constitutes an approvable Good Neighbor SIP (as discussed in Section B), MDE used EPA's past transport actions as a guideline for how to assess its sources and what emissions reductions may be necessary.

EPA's past transport rules, CSAPR, the CSAPR Update, and the RCU all aimed to achieve reductions of ozone-forming emissions from facilities required to report emissions pursuant to EPA's Part 75 Clean Air Markets Division ("CAMD") reporters – the majority of said reductions coming from coal-fired EGU's with Selective Catalytic Reduction ("SCR") controls. As such, the main component of emissions reductions in Maryland's 2015 Good Neighbor SIP are from Maryland's coal-fired EGU's.

MDE first cited the emissions reductions from the CSAPR Update, which capped Maryland's NOx emissions at 3,828 tons per ozone season beginning in 2017. That rule established a cost-effectiveness threshold of $1,400 per ton of NOx" reduced as the point at which all significant contributions of emissions have been addressed from coal-fired EGUs with SCR controls.

MDE agrees with EPA's conclusion that the CSAPR Update was intended to provide NOx emissions reductions for a less-stringent NAAQS. MDE also agrees with EPA that the cost-effectiveness threshold for the CSAPR Update may not be sufficient for a more stringent NAAQS.16 That is why MDE did not rely solely on the CSAPR Update to satisfy its significant contribution for the lower 2015 ozone NAAQS. MDE also relies on the Maryland NOx Rule (*Control of NOx Emissions from Coal-Fired Electric Generating Units* [footnote: See Code of Maryland Regulations ("COMAR") 26.11.38.03 and 26.11.38.05.]) which sets daily unit-specific emission rate limits as well as 30-day fleet-wide emission rate limits resulting in actual emissions rates well below those achieved by either the CSAPR Update or Revised CSAPR Update FIPs. That regulation, which is part of Maryland's SIP, requires all Maryland coal-fired EGUs with post combustion controls (both SCR and Selective Non-catalytic Reduction ("SNCR") controlled units) to operate and optimize the controls for maximally practicable NOx reductions every day of the ozone season. This approach goes beyond the simple ozone season NOx mass cap provided by the CSAPR Update. This rule provides *more* NOx reductions than the CSAPR Update and requires sources to spend more than the CSAPR Update's benchmark of $1,400/ton.

By way of example, the bar chart below shows ozone season CSAPR Update budgets and ozone season NOx mass for Maryland, Pennsylvania, Virginia and West Virginia. States with emissions limited by only the CSAPR Update had consistently similar NOx emissions year-over-year, while Maryland's emissions were consistently well below the CSAPR Update budget. Pennsylvania and Virginia are, on average, 20-25% below the budget and West Virginia is almost always on budget. By contrast, Maryland is typically 30-60% below the budget. This is due, in large part, to Maryland's NOx rule, which went into place in

2015, and requires more emissions reductions than the CSAPR Update, as would be necessary for the more stringent 2015 standard.

[bar chart available in comment]

Furthermore, when Maryland's NOx Rule was implemented, it was anticipated that the affected sources would have to spend approximately $5,733 per ton of NOx reduced. This is well above EPA's minimum $1,400/ton threshold it set for the less stringent standard. In effect, Maryland requires its sources to reduce NOx by 30-60% more and spend 310% more in cost-per-ton of NOx reduced for a standard that is 5 parts per billion ("ppb") (or 6%) lower.

As EPA did not set a cost-per-ton threshold at which significant contribution for the more stringent NAAQS has been resolved, Maryland concluded that requiring more emissions reductions at a higher cost threshold is sufficient to address its significant contribution to downwind nonattainment and maintenance areas.

To further ensure that Maryland explored all possible emissions reductions, MDE also cited other emissions control programs that limit statewide emissions. Those include, but are not limited to, NOx and VOC Reasonably Available Control Technology ("RACT") regulations, as well as area, non-EGU, point, and mobile source measures.

At the time of submission, MDE concluded that its Step 3 analysis was complete and the emission reduction control programs identified in Maryland's 2015 Good Neighbor SIP fully addresses the state's significant contribution to downwind nonattainment and maintenance areas.

EPA's recently released proposed transport FIP for the 2015 Ozone NAAQS confirms this conclusion. On February 28, 2022, EPA released a pre-publication version of the FIP for the 2015 Ozone NAAQS which includes proposed seasonal emissions budgets and a cost-per-ton significant contribution level for EGUs. This included immediate optimization of installed controls as well as retrofit of new controls in 2026. EPA also proposed emission rate limits for certain other industrial stationary sources (referred to generally as non-EGUs. A comparison of the proposed FIP limits for both EGUs and non-EGUs in Maryland to the limits Maryland imposes on its sources demonstrates that Maryland's limits are more stringent.

The proposed FIP demonstrates that Maryland's aggressive EGU emissions controls are more stringent on two fronts.

First, Maryland's EGU Regulation is more stringent than the FIP. The proposed FIP establishes a seasonal emissions budget based on coal-fired EGUs with SCR's operating at an average emission rate of 0.08 pounds per million British thermal units ("lbs/mmBtu"). The FIP's emissions budgets are based on coal-fired EGUs with SCR's reducing NOx at a cost of $1,800/ton. Conversely, COMAR 26.11.38 requires daily optimization of the installed SCR and SNCR controls. Optimization is assured by requiring Maryland's SCR equipped sources to limit daily emissions to a rate no higher than 0.08 lbs/mmBtu, with most limited to 0.07 lbs/mmBtu. The only SNCR still operating in Maryland, AES Warrior Run, has a daily emissions limit of 0.10 lbs/mmBtu and almost exclusively operates below 0.08 lbs/mmBtu. COMAR 26.11.38 is estimated to cost over $5,000 per ton of NOx reduced. Therefore, Maryland's regulations are more stringent than the proposed FIP because (1) maximum practicable emissions reductions through

325

optimization of the installed controls is required every day instead of seasonally, (2) the optimized NOx emission rate is equivalent to or lower than the proposed FIP rate, and (3) the cost-per-ton of NOx reductions is significantly higher than the value in the proposed FIP. COMAR 26.11.38 has resolved significant contributions for EGUs.

Second, the proposed FIP demonstrates that there are no additional emissions reductions from Maryland's EGUs. The state budget calculations for the FIP in 2023 through 2026 does not require any additional NOx reductions from Maryland's coal-fired EGUs equipped with SCRs. EPA flagged all of Maryland's units as already optimized or retired. EPA's only EGU NOx reductions in Maryland were obtained from a single coal-fired, circulating fluidized bed EGU equipped with an SNCR (AES Warrior Run), which reduced the state's ozone season NOx by 8 tons from a 2021 level. The FIP indicates that would be achieved by requiring AES Warrior Run to meet an ozone season average NOx emission rate of 0.071 lbs/mmBtu in each of the future year ozone seasons. As EPA notes in the same analysis, 2019-2021 emissions data indicates that this unit currently achieves an ozone season average emission rate of 0.066 lbs/mmBtu. Examining all three years of data from the state budget calculations for the FIP demonstrates that AES Warrior Run is already optimized beyond EPA's expectations, and no further emissions reductions are required. Optimization in Maryland, and at this specific unit, has already been achieved through the Revised CSAPR Update and COMAR 26.11.38. Maryland has resolved significant contributions for EGUs.

Similarly, the proposed FIP demonstrates that Maryland's aggressive non-EGU emissions controls are more stringent than EPA's replacement solution. [footnote: The FIP proposed emission rate limits for multiple non-EGU source categories. MDE is only responding to the source categories where such facilities exist in the State.]

Maryland has two cement and concrete manufacturing facilities that would be subject to the limits in the Proposed FIP. Holcim Inc operates a preheater/precalciner cement kiln with a NOx limit imposed by MDE of 1.8 lbs/ton clinker, which is 35.7% lower than EPA's proposed limit of 2.8 lbs/ton clinker. Maryland's limit achieves an additional 213.59 tons of NOx reductions per year. Lehigh Cement Company operates a precalciner cement kiln with a NOx limit imposed by MDE of 2.4 lbs/ton clinker, which is 4.3% higher that EPA's proposed limit of 2.3 lbs/ton clinker. EPA's proposed limit achieves an additional 107.14 tons of NOx reductions per year. Maryland's limits on cement and concrete manufacturing facilities provide a net gain of approximately 100 tpy in emissions reductions. Maryland's regulations are more stringent than the proposed EPA FIP limit. While EPA's proposed FIP does not anticipate requiring emissions reductions from Maryland's Cement facilities at the time of proposal, Maryland has resolved significant contributions for cement and concrete manufacturing.

Maryland has two pipeline transportation of natural gas facilities that would be subject to the limits in the proposed FIP. Transcontinental Gas Pipeline Company operates seven lean burn 2-cycle engines rated at 2,050 brake horsepower and three lean burn 2-cycle engines rated at 2,100 brake horsepower. Texas Eastern Transmission, L.P. operates two lean burn 2-cycle engines rated at 5,500 brake horsepower. The EPA proposed FIP limit for this source category is 3 grams per horsepower-hour (Hp-Hr). The Maryland limit of 125 ppmv is at least 40% more stringent. The proposed FIP would not require any further reductions from this sector. Maryland has resolved significant contributions from pipeline transportation of natural gas.

EPA's proposed FIP, which is purported to completely resolve the state's significant contribution, would not require any further emissions reductions from EGU or non-EGU sources beyond what Maryland imposes on its sources. Maryland's emission reduction control programs identified in the 2015 Good Neighbor SIP are sufficient to resolve the state's significant contribution to downwind nonattainment and maintenance areas and SIP achieves more reductions than the FIP can provide.

**Commenter:** Midwest Ozone Group

**Commenter ID:** 30

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

Finally, EPA improperly dismisses Kentucky's insistence that EPA assess "on-the- books" or "on-the-way" controls. EPA's rejection is based upon Kentucky's failure to quantify these reductions "in a meaningful way or demonstrate that the downwind improvements from these regulations and programs would be sufficient to eliminate the Commonwealth's significant contribution or interference with maintenance." [87 Fed. Reg. 9505] at 9512. In doing so, EPA fails to recognize that it is EPA's burden to assure that all such control programs are properly addressed in its analysis. The agency's attempt to shift this burden to the states is inappropriate. EPA's actions are inconsistent with the concept of cooperative federalism. It is EPA's task to marshal its significant multi-state resources to assess these types of "on-the-books" and "on-the-way" programs.

**Commenter:** New Jersey Department of Environmental Protection

**Commenter ID:** 34

**Docket ID:** EPA-R02-OAR-2021-0673

**Comment:**

NJDEP acknowledges that the EPA is disapproving its SIP so that it can be fully addressed in the proposed FIP.  A review of this proposed rule indicates that many of the requirements are similar to, if not exactly the same as, control measures already implemented in New Jersey for over a decade. The reductions required for EGU's located in New Jersey are mostly attributed to currently planned unit shutdowns. New Jersey is pleased that EPA is addressing non-EGU sources in the proposed rule, which will finally bring nearby and upwind states in line with New Jersey's standards. Considering the proposed rule expects 0% emissions reductions from non-EGU sources located in New Jersey, this supports New Jersey's GN SIP as a full remedy to addressing its transport contributions well ahead of the 2015 Ozone FIP.

**Commenter:** PacifiCorp

**Commenter ID:** 38

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

In the Proposed Disapproval, EPA admits that Utah's analysis included reductions in emissions of VOCs and NOx "through a combination of regulatory actions" and EPA agrees that these reductions are "beneficial in reducing VOCs and NOx in the State. However, EPA argues that the emissions reductions have been considered in EPA's modeling as "on-the-books" controls and that most of the emissions reductions were VOCs. EPA, for the first time and without any relevant scientific analysis or CAA authority to do so, argues that NOx emissions reductions are more important than VOCs for ozone reduction. The precise mixture of NOx and VOC emissions to achieve ozone reductions is a complex and unresolved issue in the West. It is one of the reasons that EPA has recognized western ozone analyses must be determined on a case-by-case basis. EPA cannot simply reject Utah's SIP because the emissions reductions come from VOCs. If Utah's SIP is effective at reducing its ozone contribution below thresholds levels, then EPA cannot criticize how that is done.

**Commenter:** Utah Petroleum Association and the Utah Mining Association

**Commenter ID:** 48

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

Utah's IT SIP includes a lengthy weight-of-evidence analysis showing how its approach matches other interstate transport SIP approvals and EPA guidance, including the following:

[…]

- Analysis in Utah's SIP showing significant reductions in emissions in Utah after the time of EPA's modeling study quantifying impacts to downwind States, including a number of actions related to applying Best Available Control Technology and Best Available Control Measures for the Salt Lake City PM2.5 nonattainment area, implementing controls in the Uinta Basin on oil and gas sources to reduce ozone formation, and implementation of Tier 3 gasoline

Several of these show that Utah does not have a ***significant*** influence on ozone in Colorado. While EPA tries to explain in the Proposed Disapproval why it does not accept Utah's reasoning on these points, EPA's explanations ring hollow in the face of the evidence that EPA already made up its mind to disapprove the Utah IT SIP, namely that the Proposed GNR includes a FIP in lieu of the IT SIP for Utah and other States. For these reasons and the other reasons stated above, EPA should approve Utah's IT SIP.

*Response*

As explained at proposal, in general, the EPA already includes on-the-books rules in its transport modeling. *See e.g.*, 87 FR 9472. In the SIP submissions, some states pointed out existing state rules, retirements, consent decrees, etc. which they believed were not accounted for in the EPA's modeling, and the EPA determined whether the cited controls should be included in the 2016v2 modeling (and if not, the reasons for that and the EPA's explanation for why it did not change the Agency's conclusions). *See e.g.*, 87 FR 9472. Therefore, the EPA disagrees with Alabama Power Company et al., which argues that the EPA did not explain at proposal why Alabama's recitation of existing state controls was insufficient to support a conclusion the state has no outstanding good neighbor obligations for the 2015 ozone NAAAQS. The EPA did so. 87 FR 64425-64426. In response to Utah Petroleum Association and Utah Mining Association, the EPA explained at proposal why Utah's reference to then-forthcoming Best Available Control Technology (BACT) for the Salt Lake City $PM_{2.5}$ nonattainment area, implementing controls on oil and gas sources in the Uinta Basin, and implementation of Tier 3 gasoline was insufficient to support a conclusion that the state has no outstanding good neighbor obligations for the 2015 ozone NAAQS. *See* 87 FR 31482-31483.

The EPA updated emissions inventories and modeling from 2016v2 to 2016v3 in response to public comment, including comments identifying state rules, etc. commenters believed were not accounted for in the 2016v2 modeling. *See* Preamble Section III.A.; 2016v3 Emissions Modeling TSD. In response to Alabama Power Company et al., the EPA notes that the rules they identified (Tier 1 and 2 mobile source rules, the nonroad Diesel Rule, the 2007 Heavy-duty Highway Rule, New Source Performance Standards, National Emissions Standards for Hazardous Air Pollutants, and existing CSAPR Programs) as well as newer rules are included in the 2016v3 modeling. *See* 2016v3 Emissions Modeling TSD. In response to Utah Petroleum Association and Utah Mining Association, the EPA notes that the Tier 3 program is included in the EPA's 2016v3 modeling. *Id.* Moreover, as explained in Section III.A. of the Preamble, the 2016v3 modeling projects that, despite these controls, every state covered by this action is projected to contribute more than 1 percent of the NAAQS to one or more downwind receptor.

Some commenters compared some of their state rules to the proposed level of stringency in the proposed FIP. The EPA disagrees with the premise of the comment from New Jersey Department of Environmental Protection that the EPA's disapproval of New Jersey's SIP submission is motivated by including the state in a FIP. The EPA explained the deficiencies in New Jersey's SIP submission at proposal (*See* 87 FR 9484; February 22, 2022). This action does not disapprove state submissions by comparison to the proposed FIP as a benchmark. While the emissions control strategies of the proposed FIPs do not form a definitive benchmark in our evaluation of these submissions, we do note that in the proposed FIPs, despite what some commenters assert, the EPA found emissions reduction opportunities at its proposed Step 3 emissions control stringency levels for all states that are covered in this disapproval action.

EPA addresses other issues raised in these comments below and elsewhere in this Response to Comment document, including in Section 5 (Updates to Modeling and Changes in Linkages), Section 10.6 (Allegations that Disapprovals of Western State SIP Submissions was Predetermined), Section 11.2 (CAA Section 126 Petitions), and Section 11.8 (Mobile Source Emissions).

PSD Programs

In response to comments suggesting that PSD programs are sufficient to satisfy states' good neighbor obligations, the EPA disagrees, as explained at proposal in relation to existing minor source, PSD, and NNSR permitting programs:

> [T]here are likewise important distinctions between the permitting program requirements and interstate transport requirements, including but not limited to: (i) The permitting programs generally apply only to new sources or major modification of existing sources; (ii) the evaluation of impacts on attainment and maintenance in other states in the context of a permit for a single source may not be as robust and have the same geographic scope as that undertaken by states and the EPA for purposes of section 110(a)(2)(D)(i)(I); and (iii) the timing of the permitting process evaluation may have no bearing on the NAAQS at issue (i.e., a permit issued in 2005 would not have considered impacts vis a vis the 2015 8-hour ozone NAAQS). Further, existing sources may have been permitted under a new source permitting program years or even decades ago, before more effective or cheaper emissions control technologies became available.
>
> Thus, even if the permitting programs address new sources of emissions for the intended purposes of those programs, it does not necessarily follow that they automatically meet all other CAA requirements as well. The EPA disagrees, therefore, with the conclusion that the existence of these permitting programs resolves the issue of whether there are additional control measures that the State should impose specifically for purposes of eliminating significant contribution to nonattainment or interference with maintenance at downwind receptors for the 2015 8-hour ozone NAAQS.

87 FR 9529 (West Virginia) (footnote omitted).

In particular, the PSD permitting program applies in areas that have been designated as in attainment of the NAAQS and is intended to ensure that such areas remain in attainment even if emissions were to increase as a result of new sources or major modifications to existing sources located in those areas. This purpose is different than the purpose of the good neighbor provision, which is to assist downwind areas (in some cases hundreds or thousands of miles away) in resolving ongoing nonattainment of the NAAQS or difficulty maintaining the NAAQS through eliminating the emissions from other states that are significantly contributing to those problems. Although Arkansas and Louisiana may have EPA-approved PSD programs, that does not alleviate the states of their interstate transport responsibility, as these are two separate provisions under the CAA serving two separate purposes.

Further, ADEQ and LDEQ did not sufficiently explain how their states' PSD programs could eliminate Arkansas and Louisiana's potential significant contributions to downwind receptors, as these programs would only apply to potential future source emissions, as opposed to existing emissions in the state. Where sources have adopted enforceable emissions reductions, the EPA has accounted for this in its emissions inventories used as an input to its modeling, as described in the 2016v3 Emissions Modeling TSD.

330

We additionally note that the justification provided in the comment regarding Arkansas' obligations as to maintenance receptors, even if accepted as valid (which EPA does not), does not address the state's linkage to a nonattainment receptor.[77]

Mobile Source Controls

In response to CARB's claims regarding the high proportion of mobile source emissions in California, the EPA recognizes that mobile sources represent a large portion of $NO_x$ emissions in California and therefore those emissions would be expected to affect downwind nonattainment and maintenance receptors.

 However, even if mobile source emissions are a large portion of California's $NO_X$ emissions, and even if they represent a large portion of the state's contribution to downwind nonattainment and maintenance receptors, this would not support a basis to approve the adequacy of California's 2015 ozone transport SIP submission. These in-state, anthropogenic emissions are assigned to the state for purposes of determining the state's contribution to receptors at Step 2. For the 2016v3 platform, CARB provided updated onroad, nonroad, and locomotive emissions for 2023 and 2026 and these were incorporated in the modeling for Steps 1 and 2. In its comment letter, CARB states that it accepts the EPA's modeling analysis indicating that emissions from California are linked to downwind nonattainment and maintenance receptors in other states. The state's transport SIP submission also acknowledged the linkage with other states but concluded their emissions did not significantly affect nonattainment or interfere with maintenance in another state. Because the EPA's modeling showed a linkage at steps 1 and 2 between emissions in California and nonattainment or maintenance receptors in downwind areas, and CARB did not provide information to refute the EPA's analysis or provide an adequate analysis equivalent to or alternative to EPA's step 3 analysis determining whether any controls were available to eliminate any potential significant contributions, California's SIP submission remains deficient. As such, the EPA must disapprove California's SIP submission for failing to satisfy the statutory requirements of CAA section 110(a)(2)(D)(i)(I).

We commend CARB on its emissions reductions measures to reduce $NO_X$ emissions from mobile sources in the state. To the extent that CARB is arguing that $NO_X$ emissions reductions anticipated from the EPA's proposed FIP are small in comparison to newly approved and soon to-be-adopted state measures, we note that comments on the proposed FIP are outside the scope of this action. In addition, we note any emissions reductions that are anticipated beyond 2023 cannot appropriately be taken into account in evaluating contribution in this action. EPA responds to other comments about mobile sources in Section 11.8 (Mobile Source Emissions).

Maryland's $NO_X$ Rule and Limits on Certain Non-EGU Source Categories

The EPA disagrees with the claim that Maryland's step 3 analysis shows that the state has resolved its significant contribution to downwind nonattainment and maintenance-only receptors for the 2015 ozone NAAQS. 87 FR 9470-9473.  EPA's 2016v3 modeling platform accounts for actual emissions from

---

[77] Arkansas was also linked to a nonattainment receptor in EPA's proposed modeling (2016v2) in Harris County, Texas (AQS Site ID 482010055). Arkansas is linked to a nonattainment receptor in Galveston County, Texas (AQS Site ID 481671034) based on 2016v3 modeling. For further explanation of Arkansas' changed linkages between the 2016v2 and 2016v3 modeling see Sections 1.4 and 5.

Maryland's EGUs equipped with Selective Catalytic Reduction (SCR) and SNCR through 2021 and projected emissions for these EGUs in 2023 taking into account announced shutdowns and the effects of all CSAPR regulations through the Revised CSAPR Update.  Even taking into account Maryland's 2015 $NO_x$ rule, the 2016v3 modeling still projects that sources in Maryland are linked to downwind nonattainment and maintenance-receptors. Preamble Section III.C. In its SIP submission, Maryland does not dispute that it is linked at Step 2.

Regarding Maryland's claims that its existing $NO_x$ Rule at Code of Maryland Regulations (COMAR) 26.11.38 achieves more emission reductions from coal-fired EGUs equipped with SCRs than EPA's CSAPR Update, and required sources to spend more than the CSAPR Update's benchmark of $1,400/ton, as explained in the proposal the CSAPR Update is not an appropriate benchmark for measuring whether Maryland has met the good neighbor requirements of the CAA for the more protective 2015 ozone NAAQS. 87 FR 9471. Additionally, the EPA found that between the time the Agency issued the CSAPR Update and the Revised CSAPR Update, the $1,400/ton threshold used in the CSAPR update was no longer the appropriate cost threshold to eliminate significant contribution, even for the less protective [78]

To the extent that Maryland is claiming, at Step 3, that there are no further $NO_x$ emission reductions to be obtained from Maryland sources at a reasonable marginal cost per ton, the EPA disagrees that the SIP submission supports that conclusion. 87 FR 9470-9473. The substance of the proposed FIP, including proposed controls, are beyond the scope of the rulemaking, and in any event are not being used as a benchmark to disapprove any state's SIP submission in this action.

MDE believes certain requirements in MDE's state-level regulations or enforceable permit limits applicable to non-EGUs are more stringent than the limits in the proposed FIP. First, in order to be creditable under the Clean Air Act, all such emissions reductions needed to be included in the SIP submission for EPA approval and made permanent and federally enforceable; state-law requirements, permits, and other measures that are not in the SIP cannot be counted as eliminating the state's significant contribution. Further, MDE presented no analysis of the air quality impacts of these non-EGU controls on downwind receptors as part of Maryland's SIP submission. The examples identified by the commenter do not substitute for a Step 3 analysis and are insufficient to support a conclusion that Maryland has resolved its good neighbor obligations for the 2015 ozone NAAQS.

Finally, Maryland's comparison of individual source-level controls to the limits in the proposed FIP fails to take into account the overall effect of all the limits in the proposed FIP. In isolation, some of Maryland's existing limits may be more stringent than the limits used in the proposed FIP. However, applying the uniform cost-effectiveness thresholds, the proposed FIP is expected to provide a reduction of around 45 tons of ozone season $NO_x$ from the state. Although this is a potentially relatively small reduction from Maryland's sources compared to other states, it is, under the EPA's proposed approach, more enforceable emissions reductions than the state has offered beyond the current baseline. Maryland has not offered a satisfactory alternative approach to defining significance, and under the EPA's proposed approach, because the state has made relatively greater progress in reducing its

---

[78] *See* 82 FR 23054, 23088 (April 30, 2021) ("The CSAPR Update found $1,400 per ton was a level of uniform control stringency that represented turning on idled SCR controls. EPA uses the same costing methodology, but updating for input cost increases (e.g., urea reagent) to arrive at $1,600 per ton in this rule (while also updated from 2011 dollars to 2016 dollars).").

emissions compared to other states, its reduction obligation would be relatively small. While the proportion of significant contribution from a single upwind state may be relatively small, the effect of eliminating the contribution on a uniform-stringency basis from all linked upwind states can be quite large. Allowing Maryland to rely only on its existing limits in its regulations, which modeling has shown does not resolve its contribution, in the absence of an evaluation of additional emissions control opportunities, would be inconsistent with the analysis, and potential emissions control obligations, expected of other upwind contributing states. In Maryland's SIP submission, the state did not assess the availability of additional emissions controls or provide justification as to why additional air quality controls were not required. Instead, Maryland merely identified what their existing regulations currently required. Still, the Good Neighbor Plan for the 2015 8-hour Ozone NAAQS FIP is not yet final and the EPA is not using the FIP as a direct benchmark in its action on states' plans here. The limits which have been proposed for Maryland and to which the state is drawing a comparison in these comments could change. Additionally, the limits within the FIP are not within the scope of this action.

Additional topics are addressed in Section 8.6 (Cost Thresholds) and Section 10.3 (Cooperative Federalism and the EPA's Authority).

<u>VOCs</u>

The EPA does not dispute that VOCs are precursors to ozone. Revised CSAPR Update, 86 FR 83087 (April 30, 2021). The EPA does not agree that Utah's reliance on existing VOC controls measures in their SIP submission is sufficient to support a conclusion that the state has no outstanding good neighbor obligations for the 2015 ozone NAAQS, particularly in light of the fact that Utah did not examine potential emissions reduction opportunities at sources contributing greater amounts of ozone precursor emissions. *See* 87 FR 31483.


## 8.4    Modeling and CAA Section 179B Guidance


*Comments*


**Commenter:** Utah Petroleum Association and the Utah Mining Association

**Commenter ID:** 48

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

EPA's persistence in applying a 0.7 ppb contribution threshold is wholly inconsistent with EPA's proposed disapproval of the 179B demonstration for Utah's Northern Wasatch Front ozone nonattainment area ("NWF"). In the NWF case, EPA strongly criticized the modeling for underpredicting local ozone production and, as a result, EPA did not agree with the model demonstration of 6 to 8 ppb international influence on NWF ozone. On the other hand, EPA's modeling also shows significant underprediction of both Utah and Denver ozone by as much as 10 to 20 ppb on high ozone days, and yet

EPA used these model results despite the poor performance to evaluate downwind impacts of only 1 ppb or 0.7 ppb. The model simply does not have the accuracy for these small predictions to be reliable. The inconsistencies in EPA's approach between the two different but simultaneous rulemakings pose an unacceptable dichotomy.

Furthermore, EPA questioned the accuracy of 2 to 3 ppb in Texas' model for its 179B demonstration for the San Antonio ozone nonattainment area ("SAT") because the 2 to 3 ppb influence falls within the range of model uncertainty. If modeling does not have enough accuracy in the SAT case to show a 2-3 ppb impact, it also does not have enough accuracy to show a 0.7 ppb or 1 ppb impact for the IT SIPs. In fact, in the SAT case, Texas developed a model specifically for SAT, a more detailed and accurate exercise than EPA's larger modeling domain and coarser grid for the interstate transport evaluations, and the San Antonio geographical area lacks the complex terrain of Salt Lake City and Denver. Therefore, the SAT modeling likely has less inherent inaccuracy.

EPA cannot have it both ways. If a 6 to 8 ppb difference and a 2 to 3 ppb difference do not have sufficient accuracy to show upwind impacts in the NWF and SAT 179B demonstrations, respectively, then a 1 ppb or 0.7 ppb difference would not be sufficiently accurate in Utah's IT SIP, considering the magnitude of inherent error in the modeling. EPA's inconsistent approaches pose an arbitrary standard. EPA should not persist in applying the 0.7 ppb threshold. To continue to do so would go beyond the bounds of the CAA which requires addressing significant downwind contributions.

**Commenter:** PacifiCorp

**Commenter ID:** 38

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

As explained in the BHE Comments and expert analysis provided by Ramboll, EPA's chosen modeling, however, has several unexplained inconsistencies. Moreover, EPA rejected the very type of modeling it relies on to support the Proposed Disapproval when it denied the state of Utah's recent request for an ozone exception. As Utah explained, "EPA used a similar level of modeling bias [as] grounds for denying Utah's recently submitted 179B(b) demonstration. . . while simultaneously upholding an extensive federal action that has widespread national implications [based on similarly biased modeling]." It is arbitrary and capricious for EPA to reject Utah's 179B(b) demonstration due to model underperformance while simultaneously using a model with highly similar underperformance limitations as justification to disapprove Utah's Intestate Transport SIP.

**Commenter:** PacifiCorp (Attachment - Berkshire Hathaway Energy (BHE) Company Comments on Proposed Ozone Transport Rule)

**Commenter ID:** 38

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

EPA rejected the very type of modeling it relies on to support the Proposed Rule when it denied the state of Utah's recent request for an ozone exception. As the state of Utah has explained, EPA relies on the 2016v2 model, which has a high negative bias, to support the Proposed Rule. The negative bias indicates that EPA's model is underpredicting either transport or local photochemical production (or some combination of both). EPA cited a similar negative bias in Utah's recent 179B(b) demonstration as one reason for rejecting Utah's ozone demonstration. It is arbitrary and capricious for EPA to reject Utah's 179B(b) demonstration due to model underperformance while simultaneously using a model with similar underperformance limitations as justification to include Utah and other western states in the FIP.

Finally, BHE understands that because of these significant errors EPA is considering remodeling for the Proposed Rule, and BHE supports any efforts to take into account the issues presented here and in more detail in the Ramboll Report.

*Response*

Several commenters claimed that it is arbitrary and capricious for the EPA to reject Utah's 179B(b) demonstration due to model underperformance while simultaneously using a model with similar underperformance limitations as justification to include Utah and other western states in the FIP.

First, CAA sections 110(a)(2)(D)(i) and 179B are different provisions to address distinct issues and are governed by their own respective requirements. It would be unreasonable to apply the same criteria to different CAA requirements.

Second, we disapproved Utah's 179B demonstration for many different reasons, as described in detail in the TSD, RTC and final rule (*See* Technical Support Document ("TSD"), Northern Wasatch Front (NWF), Utah: Failure to Attain 2015 Ozone National Ambient Air Quality Standard by Attainment Date; Reclassification and Disapproval of International Emissions Demonstration January 2022, *found at* Regulations.gov at EPA-HQ-OAR-2021-0742-0043). The EPA will not here restate all our reasons for disapproving Utah's 179B demonstration, as that information is provided in the TSD, RTC, and final rule for that action. Comments relating to CAA section 179B are outside the scope of this action. The model performance was simply considered in the context of the information provided and in the context of the conclusion being drawn.

In addition, the EPA disagrees with the interpretation of model performance implications as stated by the commenter. With respect to model performance, the EPA notes that the type of conclusions needed for CAA section 179B and for the proposed interstate transport FIP have very different implications for the evaluation submitted by the state. The NWF submission and accompanying report suggests that US-regional and international transport of ozone to Utah is well simulated, while local contributions are likely underpredicted. The effects of an underprediction of local ozone contribution would overstate the relative role of international contributions in the context of a CAA section 179B demonstration. The same underprediction of local ozone contributions could understate the contribution of NWF emissions to ozone at monitors in other states.

335

As described in the Final Action AQM TSD for this final rule, the EPA performed air quality modeling using the 2016v3 platform which includes updates made in response to comments on the proposal modeling. The table below provides NMB and NME model performance statistics at individual monitoring sites in the NWF for June through August for both the 2016v2 and 2016v3 modeling. The EPA v3 model performance information, provided in Table 4-X is substantially improved compared to both the EPA v2 modeling and the Ramboll modeling submitted in the state's 179B demonstration. The data show that model performance improved when looking across all days and on just those days with MDA8 ozone > 60 ppb. Note that the statistics for the 2016v3 modeling are well within the range of the performance criteria for NMB (<+15%) and NME (<25%) offered by Emery et.al. (2017). In contrast to EPA's 2016v3 modeling, the 2016 Ramboll modeling presented in Utah's 179B(b) petition cited by the commenters had average NMB and NME of -6% and 10% for all days in the period June through August and -12% and 13% for those days with observed MDA8 ozone $\geq$ 60 ppb. In summary, model performance concerns for monitors in the NWF expressed by the commenters have been addressed in the EPA's 2016v3 modeling. The statistics for the updated modeling at the monitors in the table below are well within the range of performance criteria offered by Emery et.al. (2017) for NMB ($\leq$ +15%) and NME ($\leq$ 25%).

The EPA addresses other topics in Section 8.4 (Modeling and CAA Section 179B Guidance).

*Table 8-1*

| Site ID | County | Site | NMB (%) | NME (%) | NMB (%) | NME (%) |
|---|---|---|---|---|---|---|
| \multicolumn ||| June - August MDA8 O3 Stats for All Days ||||
| | | | 2016v2 Proposal Modeling | | 2016v3 Updated Modeling | |
| 490110004 | Davis | Bountiful Viewmont | -6.8 | 10.9 | 0.3 | 9.5 |
| 490353006 | Salt Lake | Hawthorne | -5.2 | 10.8 | 1.0 | 11.0 |
| 490353013 | Salt Lake | Herriman | -12.5 | 13.2 | -5.3 | 9.5 |
| 490450004 | Tooele | Erda | -7.6 | 11.0 | -0.4 | 9.3 |
| 490570002 | Weber | Ogden | -7.7 | 10.6 | -1.0 | 8.9 |
| 490571003 | Weber | Harrisville | -12.5 | 13.5 | -6.0 | 9.4 |

| Site ID | County | Site | NMB (%) | NME (%) | NMB (%) | NME (%) |
|---|---|---|---|---|---|---|
| \multicolumn ||| June - August Stats for Days with Obs MDA8 O3 > 60 ppb ||||
| | | | 2016v2 Proposal Modeling | | 2016v3 Updated Modeling | |
| 490110004 | Davis | Bountiful Viewmont | -14.0 | 14.6 | -6.8 | 9.2 |
| 490353006 | Salt Lake | Hawthorne | -14.1 | 16.4 | -8.1 | 11.1 |
| 490353013 | Salt Lake | Herriman | -16.4 | 16.6 | -9.3 | 10.9 |
| 490450004 | Tooele | Erda | -15.9 | 16.7 | -8.6 | 10.8 |
| 490570002 | Weber | Ogden | -15.5 | 15.7 | -8.2 | 9.8 |
| 490571003 | Weber | Harrisville | -16.4 | 16.5 | -9.4 | 9.9 |

*Comment*

**Commenter:** Texas Commission on Environmental Quality

**Commenter ID:** 42

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

[T]he TCEQ's use of a weight of evidence approach to determine significant contribution is consistent with the EPA's modeling guidance, "*Modeling Guidance for Demonstrating Air Quality Goals for Ozone, PM2.5, and Regional Haze*" (EPA Modeling Guidance) and the approach laid out in "*Guidance on the Preparation of Clean Air Act Section 179B Demonstrations for Nonattainment Areas Affected by International Transport of Emissions*," (179B Guidance) where a determination of significant contribution is made if sources outside of a nonattainment area impact a nonattainment area in the context of a 179B demonstration. When air quality modeling is used in the context of attainment and 179B demonstrations, the EPA requires states to provide supplemental analysis to support the modeling results, such as local factors and emission trends. However, in the context of the "Good Neighbor" provision, the EPA dismisses the additional analyses provided by the TCEQ as qualitative assessments that, while informative, do not provide quantitative assessments. The EPA's reliance on chemical transport models as the sole arbiter of significant contribution contradicts its own modeling guidance, which states that "…supplemental analyses may provide information which may provide further support for the outcome of the modeled test or *may indicate a different outcome than the modeled test*."[4] (Emphasis added.) It should be noted that the 179B Guidance is prescriptive and lays out a weight of evidence approach that relies on more than source apportionment modeling results to determine impacts from international sources. The EPA's heavy reliance on source apportionment modeling and disregard of additional evidence in the context of interstate transport is arbitrary and inconsistent with its guidance on international transport.

[4] Page 170 of the EPA Modeling Guidance, https://www.epa.gov/sites/production/files/2020- 10/documents/o3-pm-rh-modeling_guidance-2018.pdf

*Response*

In response to commenter's claims regarding TCEQ's weight of evidence approach to evaluating its significant contribution, which TCEQ indicates was based on guidance under CAA section 179B,  CAA section 110(a)(2)(D)(i)(I) and CAA section 179B are different provisions to address different problems and are governed by their own respective requirements, and as such do not require the same approach to implementation. We have addressed this previously in prior ozone transport rules. *See* CSAPR Update, 81 FR 74535-36 (Oct. 26, 2016). As we explained there:

> The specific terms of section 179B outline which nonattainment area requirements will and will not apply upon approval of a section 179B demonstration, none of which apply directly to upwind states via section 110(a)(2)(D)(i)(I). In particular, the good neighbor provision does not require upwind areas to ''demonstrate attainment and maintenance'' of the NAAQS. Rather, the statute requires upwind states to prohibit emissions which will ''contribute significantly to

nonattainment'' or ''interfere with maintenance'' of a NAAQS. While upwind states must address their fair share of downwind air quality problems, the EPA has not interpreted this provision to hold upwind areas responsible for bringing downwind areas into attainment. Therefore, the relief provided by section 179B(a) and (b) from the obligation to demonstrate attainment, extension of the attainment date, and mandatory reclassifications, is simply not applicable to downwind states. Even if section 179B were in some manner applicable to upwind states' transport obligations, the EPA does not believe that the contribution of international emissions should impact EPA's identification of downwind nonattainment and maintenance receptors affected by the interstate transport of emissions. These receptors represent areas that the EPA projects will have difficulty attaining and maintaining the NAAQS, and which therefore require adequate safeguards to protect public health and welfare. The EPA therefore does not agree that, when identifying downwind air quality problems for purposes of interstate transport, section 179B requires that we subtract the contributions of international emissions from the projected design values. This would be inconsistent with EPA's approach to area designations and is simply not required by the plain language of the statute. Moreover, such an interpretation would allow downwind and upwind areas to make no efforts to address clear violations of the NAAQS, leaving the area's citizens to suffer the health and environmental consequences of such inaction. Moreover, just as any state with a nonattainment area— including downwind states—must take reasonable steps to control emissions even where an area is impacted by international emissions, the EPA believes that it is appropriate for upwind states to also adopt reasonable emissions controls to lessen the impact of emissions generated in their state and subsequently transported to downwind areas. As noted in Section IV of the preamble, the EPA does not view the obligation under the good neighbor provision as a requirement for upwind states to bear all of the burden for resolving downwind air quality problems. Rather, it is an obligation that upwind and downwind states share responsibility for addressing air quality problems. If, after implementation of reasonable emissions reductions by an upwind state, a downwind air quality problem persists, whether due to international emissions or emissions originating within the downwind state, the EPA can relieve the upwind state of the obligation to make additional reductions to address that air quality problem. But the statute does not absolve the upwind state of the obligation to make reasonable reductions in the first instance.

We note that the EPA was upheld in its approach to the treatment of international contribution in *Wisconsin*, 938 F.3d at 323-24. See also our response to comment at Section V.C.2 in the preamble.

The EPA's CAA section 179B guidance says nothing to the contrary. As stated in the EPA's *Guidance on the Preparation of Clean Air Act Section 179B Demonstrations for Nonattainment Areas Affected by International Transport of Emissions*, "EPA notes that an upwind state that is considering or has an approved section 179B demonstration must still meet its obligations for contributions to downwind states under CAA section 110(a)(2)(D). Likewise, an upwind state that contributes to a downwind state that is considering or has an approved section 179B demonstration must still meet its obligations for contributions to that downwind state, per CAA section 110(a)(2)(D). Policy governing whether an air agency can take into account emissions emanating from outside the U.S. in developing a plan to meet its interstate transport obligation for any NAAQS is outside the scope of this guidance."

338

In response to commenters' claims that the EPA did not consider more than source apportionment modeling as part of our evaluation of TCEQ's SIP submission, we disagree that we apply source apportionment modeling as the sole determinant of "significant contribution" nor was it the only information we looked to in evaluating TCEQ's SIP submission with respect to Steps 1 or 2. For example, in projecting average and maximum design values we used the most recent measured ozone design values in conjunction with the modeling results to identify potential nonattainment or maintenance sites in the relevant future years. Further, we reviewed the "weight of evidence" analysis and information provided by TCEQ. As explained in greater detail in the Evaluation of TCEQ Modeling TSD, we did not find that the additional analyses performed by TCEQ provided sufficient evidence to refute the modeling results that indicated that emissions from Texas were linked to downwind nonattainment or maintenance receptors at contributions of 0.70 ppb or greater. Further, although Texas asserted that its weight of evidence analysis is a permissible way to interpret which contributions are "significant" because that analysis examines whether there was a ''persistent and consistent pattern of contribution on several days with elevated ozone'' we found that such pattern, as explained in detail in the Evaluation of TCEQ Modeling TSD, is already established by a modeled linkage at Step 2. See Section 8.7 ("Consistent and Persistent" Contribution) of this document. In addition, as described more fully in Section 8.8 (Hybrid Single-Particle Lagrangian Integrated Trajectory (HYSPLIT) Model) below, and in the Final Action AQM TSD, the EPA also performed a back trajectory analysis for projected receptors in 2023 that were identified based on the 2016v3 platform used for this final action. The results of this trajectory analysis confirm the EPA's modeling-based finding that Texas is linked to downwind receptors in 2023.

## 8.5   Air Quality Factors

*Comments*

**Commenter:** Alabama Power Company, Southern Power Company, and PowerSouth Energy Cooperative

**Commenter ID:** 04

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

EPA contends that, under Step 3 of its 4-step framework, Alabama does not provide sufficient evidence "regarding future emissions reduction opportunities beyond pointing to $NO_X$ emission reductions from SIP-approved and Federal measures." EPA goes on to state that Alabama "does not include a sufficient analysis of potential $NO_X$ emission control technologies, their associated costs, estimated emissions reductions, and downwind air quality improvements" to support the claim that the ongoing decline in $NO_X$ emissions from stationary sources in Alabama are sufficient to eliminate any significant contributions from the state. According to EPA, "states generally should prepare an accounting of sources and other emissions activity for relevant pollutants and access potential, additional emissions reduction opportunities." This is exactly what Alabama's SIP submittal package provides. Once again,

EPA's evaluation ignores specific evidence in the record on the continuous decline in NOX emissions expected in Alabama.

Specifically, ADEM presented evidence in comments attached to the SIP submission that $NO_X$ emissions from EGUs in Alabama have decreased from 27,674 tons in 2016 to 14,708 tons in 2021, with similar reductions during the ozone season in particular from 11,612 tons during the 2016 ozone season to 6,648 tons during the 2021 ozone season.[89] Further, the state-wide average emission rate of $NO_X$ from EGUs has dropped by over 35% during that same time period, with an average emission rate in 2021 of 0.043 lb/MMBtu.[90] This is well below EPA's backstop emission rate for coal-fired EGUs of 0.14 lb/MMBtu in its proposed FIP. Therefore, not only are overall emissions decreasing, but sources have taken measures to become better controlled for $NO_X$ in recent years. Clearly, Alabama Power and Southern Power's comments provide evidence to support ADEM's determination that the "overwhelming majority . . . of EGUs are already fully controlled for NOX[.]"

[89] Based on information provided in EPA's Clean Air Markets Database for the State of Alabama and EPA's Ozone Transport Policy Analysis Proposed Rule Technical Support Document.
[90] EPA's Clean Air Markets Database provides that Alabama's statewide $NO_X$ emissions from CSAPR $NO_X$ Annual Program sources in 2016 were 27,674 tons with a total heat input of 810,490,815 MMBtu. This equates to a statewide average emission rate of 0.068 lb/MMBtu. Alabama's statewide $NO_X$ emissions in 2021 were 14,708 tons with a total heat input of 688,699,255 MMBtu. This equates to a statewide average emission rate of 0.043 lb/MMBtu.

**Commenter:** Louisiana Chemical Association

**Commenter ID:** 26

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

It is significant that all areas of Louisiana have shown _decreases_ in eight-hour ozone design values over the past 15 years and all areas in Louisiana are below the 2015 ozone NAAQS of 70 ppb.[31] Further, annual point source category emissions inventory data collected since the last periodic emissions inventory, 2014 through 2017, indicates a continued trend of ozone precursor emissions reductions. Anthropogenic emissions have decreased a combined 3% between 2014 and 2017.[32] This fact supports the position that Louisiana sources do not pose ozone problems in state and are even less likely to do so out of state. In light of compliance with the ozone NAAQS throughout Louisiana, it is scarcely plausible that Louisiana emissions are "significantly" contributing to ozone NAAQS issues in Dallas and Houston. It is particularly notable that the design values in the western parishes of Louisiana are among the lowest in the state as show in the chart below of the 2014-2016 DV values from the _2015 Ozone NAAQS Memo_:[33]

| 220170001 | Louisiana | Caddo | ………………………… | 64 |
| 220190009 | Louisiana | Calcasieu | ………………………… | 64 |
| 220190002 | Louisiana | Calcasieu | ………………………… | 68 |

[31] La. SIP Submission, Section 2.3.1.
[32] _Id._

[33] Results spreadsheet for *2015 Ozone NAAQS* Memo model analysis, available at: https://view.officeapps.live.com/op/view.aspx?src=https%3A%2F%2Fwww.epa.gov%2Fsites%2Fdefault%2Ffiles%2F2018- 05%2Fupdated_2023_modeling_dvs_collective_contributions.xlsx&wdOrigin=BROWSELINK (last accessed 4/15/2022) and in the docket at: EPA-HQ-OAR-2021-0663-0019.

*Response*

The EPA disagrees that the overall emissions trends or the lack of nonattainment areas in a state, alone, can serve as an adequate basis for determining whether a state contributes significantly to downwind receptors in other states. The EPA's 2016v2 modeling utilized an updated emissions platform and inventory to capture more recent ozone design trends and emissions. The original starting point for the emission inventories used in the 2016v2 modeling was the 2016v1 platform. The 2016v1 data were updated with information and methods from the 2017 NEI, MOVES3, and updated inventory methodologies. Activity data and other inputs provided during the 2016v1 development process were retained in 2016v2 where appropriate.

The EPA responds to the claim that the Alabama Power Company's (and Sierra Club's) comments on Alabama's SIP submission were actually part of rationale supporting Alabama's SIP submission in Section 7.4.

In any event, the EPA does not agree that the EGU emissions trends cited by Alabama Power Company provide evidence that EGUs in Alabama are already fully controlled for $NO_X$. Many states' EGU emissions trends have been downward in recent years; that does not mean emissions from these sources are not still potentially significantly contributing to violation of the good neighbor provision. To the extent that these downwind trends are attributable to enforceable emissions controls or retirements, these changes would generally already be taken into account in EPA's modeling, which indicates that Alabama still contributes above 1 percent of the NAAQS to one or more downwind receptors. Moreover, even if the average annual emission rate for all EGUs in the state in 2021 was 0.043 lb/MMBtu, this statistic is not inherently meaningful, nor is it sufficient to support a conclusion that Alabama has no unresolved good neighbor obligations for the 2015 ozone NAAQS. Further, pointing to the backstop emission rate for coal-fired EGUs in EPA's proposed FIP is also not helpful to the commenter's case. First, the proposed FIP's level of emissions control is not used as a benchmark for our evaluation of state SIP submissions in this action. More to the point, Alabama Power is comparing an average annual emission rate for all of the EGUs in Alabama, irrespective of the fuel used (e.g., including natural gas-fired facilities), with the proposed FIP's backstop daily emission rate, which is for large coal-fired EGUs and would be applied on a unit-specific basis.

In response to Louisiana Chemical Association, the EPA does not agree that ozone design values in Louisiana or anthropogenic emission trends from 2014-2017 have not discount EPA's robust investigation into whether emissions from Louisiana are leaving the state and potentially significantly contributing to nonattainment or maintenance in other states. While the EPA acknowledges that all areas in Louisiana are currently in attainment for the 2015 ozone NAAQS and it may be the case that overall anthropogenic ozone-precursor emissions trends decreased from 2014 and 2017 in the state, the EPA disagrees that this establishes that continuing emissions from Louisiana are not significantly contributing to nonattainment or interfering with maintenance in other states. Emission inventories utilized for EPA's 2023 modeling include increases and reductions in anthropogenic emissions in

341

Louisiana. Neither the state or other commenters supplied information that there were such a degree of additional reductions that EPA had not already characterized in the 2023 modeling that would result in changes to the impacts from Louisiana's emissions, such that the state would not be linked to receptors in Texas. Nor did the state supply a satisfactory Step 3 analysis regarding its continuing emissions. 87 FR 9814-9816.

## 8.6   Cost Thresholds

*Comments*

**Commenter:** Alabama Power Company, Southern Power Company, and PowerSouth Energy Cooperative

**Commenter ID:** 04

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

Furthermore, EPA states that cost-effectiveness of available emission reductions must be evaluated at Step 3 but then ignores the discussion on the availability of cost-effective emissions reductions included in the materials attached to ADEM's SIP submission. Specifically, this evidence shows that EGUs in the state cannot make any further cost-effective NOX reductions. For example, NOX was emitted from EGUs in Alabama at an average rate of 0.04 lbs/MMBtu during the 2021 ozone season. This rate already meets the aggressive rate that EPA has Indicated would be considered cost-effective for coal units retrofitted with new selective catalytic reduction ("SCR") beginning in 2026. More specifically, only 3 of the 84 EGUs in Alabama have been identified by EPA as potentially eligible for cost-effective controls, but each of these units, as demonstrated below, is, in fact, either already controlling NOX emissions in a cost-effective manner, or will have changed to lower emitting fuel prior to the 2023 ozone season. In light of this, none of the EGUs in Alabama can reduce NOX further in a cost-effective manner.

 [Information about Plant Gaston Unit 5, Plant Barry Unit 4, and Plant Harris Unit 1A]

Because no cost-effective reductions are, in fact, available from any of these units, which are the only units from which such reductions could potentially be considered,[101] then no units in Alabama can be regarded as causing significant contribution to or interference of maintenance with downwind receptors. EPA must consider this analysis in its final action on Alabama's 2022 SIP.

[101] [EPA, Appendix A: Proposed Rule State Emission Budget Calculations and Engineering Analytics, available at https://www.epa.gov/csapr/good-neighbor-plan-2015-ozone-naaqs.]
[102] 87 Fed. Reg. at 64,420.

**Commenter:** Arkansas Department of Energy and Environment, Division of Environmental Quality

**Commenter ID:** 07

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

Although DEQ did not identify any emissions sources or activities within the state as "significantly" contributing to nonattainment or interfering with maintenance in another state, DEQ performed a cost analysis for NOx emission reductions from the highest emitting sources in Arkansas. DEQ ultimately focused its evaluation of costs of potential control strategies on EGUs, but only after evaluating NOx emissions from all elevated emission sources in Arkansas. DEQ observed during evaluation a natural break between EGUs and non-EGUs when it examined the top NOx emitting sources in the state. The highest-emitting non-EGU emitted less than half of the emissions from the lowest-emitting EGU. This was a reasonable breakpoint for emissions data. Additionally, DEQ focused the analysis in this manner using the framework EPA used for selecting sources for a reasonable progress analysis in their Regional Haze FIP for Arkansas.

For context, in the 2016 Arkansas Regional Haze FIP, now replaced by approved Arkansas SIP revisions, EPA performed a reasonable progress analysis to determine whether any additional control strategies were necessary to ensure reasonable progress towards natural visibility conditions in the 2008 – 2018 time period. In starting their analysis, EPA analyzed $SO_2$ and NOx emissions inventories for point sources and identified three facilities, which the EPA determined were the largest contributors to these emissions. Collectively, these facilities were responsible for 84% of point $SO_2$ point source emissions and, more directly related to the Arkansas Transport SIP submittal, 55% of NOx point source emissions in the state. EPA decided not to perform further evaluations of lower-emitting non-EGU sources. DEQ drew a similar line in the natural break between EGUs and non-EGUs in their contribution to NOx emissions with consideration of the fact that the lowest-emitting EGU emits over double that of the highest emitting non-EGU facility in the state. If considerations of the largest emitters and natural break points are an adequate argument for source selection for emission reduction strategy analysis when provided by EPA, then such arguments should be equally adequate when provided by the state in which the argument applies.

DEQ did not define a bright line threshold for what control strategies the state considers cost-effective. DEQ did, however, note that its cost analyses showed that the cost-effectiveness values of controls greatly exceeded metrics that EPA used in past ozone transport federal implementation plans. In DEQ's most recent Regional Haze Planning Period II SIP draft, DEQ provides updated cost-effectiveness values in 2019 dollars for SCR and SNCR at Flint Creek and at Independence Units 1 and 2 with a calculated range of $5,771 to $24,084 for implementation of these controls. In consideration of the cost-effectiveness threshold of $5,086 for EGUs in the Regional Haze context, the cost of implementing SCR and SNCR exceeds what the state considers reasonable, especially when considering the remaining life-time of facilities such as White Bluff and Independence, which are set to cease coal-fired operations in 2028 and 2030, respectively. For comparison, EPA's proposed FIP costs of control averaging $11,000 per ton (for coal-fired EGUs) and $7,700 per ton (for oil- and gas-fired EGUs) is beyond excessive and lacks consideration of factors known by EPA, such as scheduled facility closures. This is much higher than costs considered reasonable for other Clean Air Act programs. For context, refer to EPA's Regulatory Impact Analysis for the Final Revised Cross-State Air Pollution Rule (CSAPR) Update for the 2008 Ozone NAAQS 2021, Regulatory Impact Analysis of the Cross-State Air Pollution Rule (CSAPR) Update for the

343

2008 National Ambient Air Quality Standards for Ground-Level Ozone, 2016, and DEQ's compilation of costs for the Regional Haze planning period two SIP.

**Commenter:** Air Pollution Control Program, Missouri Department of Natural Resources

**Commenter ID:** 01

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

EPA is intentionally exploiting the Supreme Court decision in EME Homer City vs. EPA to justify any costs or requirements it deems necessary to further federal policy decisions. The court decision permitted EPA to impose cost effective controls on any state that was deemed to be a significant contributor so long as such controls don't result in over-control of any state. However, the decision did not indicate what might be considered "cost effective controls". For this reason, EPA is using this decision to assume new authority to implement anything it deems as a "cost effective control" requirement.

**Commenter:** Oklahoma Department of Environmental Quality

**Commenter ID:** 37

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

The Proposed Disapproval Excludes Quantification of Cost-Effective Controls and Is Therefore Deficient

EPA's proposed disapproval of the Oklahoma SIP is *prima facie* deficient because it fails to include a quantification of the cost-effective controls from Step 3 of the CSAPR framework (i.e., EPA did not complete "prong 2" in the proposed disapproval). It is impossible to determine whether a state meets or fails to meet its good neighbor obligations under Section 110(a)(2)(D)(i)(I) of the CAA without satisfying *both* prongs of the two-prong CSAPR determination (i.e., prong 1 is completion of steps 1 and 2 of the CSAPR 4-step framework, and prong 2 is completion of steps 3 and 4). EPA claims it has satisfied the first prong establishing a linkage between Oklahoma emissions and downwind air quality problems. Oklahoma disagrees with the reasoning behind that claim. However, even granting that claim (for the sake of argument only), EPA makes no attempt to complete step 3 of the CSAPR framework (i.e., prong 2). That is, in the proposed disapproval, EPA makes no effort to quantify the cost-effective NOx emissions reductions that will yield sufficient downwind air quality benefits. EPA may argue that the quantification of those NOx emission reductions occurs after the fact in the development of the FIP. However, until a FIP is finalized, EPA has failed to complete its evaluation of the Oklahoma SIP. As such EPA establishes an inappropriate burden, requiring states to look into the future, anticipate EPA's work on federal rulemaking, and incorporate those anticipated findings in a SIP submitted years before EPA is set to begin its efforts. This process is arbitrary and capricious, and it subverts the principle of cooperative federalism enshrined in the CAA.

344

EPA states in the proposed disapproval:

> The 2015 ozone NAAQS is a more stringent and more protective air quality standard, it is reasonable to expect control measures or strategies to address interstate transport under this NAAQS to reflect higher marginal control costs. As such, the marginal cost threshold of $1,400/ton for the CSAPR Update (which addresses the 2008 ozone NAAQS and is in 2011$) is not an appropriate cost threshold and cannot be approved as a benchmark to use for interstate transport SIP submissions for the 2015 ozone NAAQS. 87 Fed. Reg. 9823.

ODEQ takes exception with this statement on a fundamental level. As technological advances and innovations occur in the environmental field, it should not be considered a foregone conclusion that control equipment must increase in cost over time. EPA should not dismiss outright that control measures equivalent in cost to previous iterations of the ozone NAAQS could be sufficiently protective for downwind states, especially if EPA is also expecting non-electric generating units (non-EGUs) to be considered for possible reductions.

[...]

EPA's Proposal is a Fundamental Change in Policy and is Not in Line With Previous CSAPR Policy-Making

As mentioned previously, under current EPA policy it is not possible for a state to be certain that any quantity of NOx emissions reductions will comply with the good neighbor requirements without waiting for the completion of Step 3 of the CSAPR framework. Because Step 3 is to be undertaken during the development of the FIP, it is appropriate to note that the approach adopted by EPA in its proposed FIP represents a substantive change in policy, rather than an extension of the current approach. EPA's CSAPR approach was challenged in the courts and survived those challenges, giving EPA confidence in the fundamental appropriateness of actions taken previously. However, the previous CSAPR remedies constitute a different policy approach than the present EPA proposed action, which has metamorphosed into a form substantively different from its previous versions.

*Response*

Substantive comments on the proposed FIPs, including the proposed cost-effectiveness thresholds therein, are outside the scope of this action and will not be addressed.

This action is not determining what, if any, cost effective controls exist at Step 3 of the 4-step interstate transport framework, and the EPA disagrees that it must include a quantification of cost-effective controls to be able to disapprove the SIP submissions at issue in this action. *See EME Homer City*, 572 U.S. at 509. Instead, the EPA is evaluating the states' interstate transport SIP submissions to determine whether they satisfy the statutory obligations of CAA section 110(a)(2)(D)(i)(I). Where a state put forward an assessment of what it considered to be cost-effective, the EPA assessed that claim for approvability. *See e.g.*, 87 FR 64426 (Alabama), 87 FR 9810 (Arkansas), 87 FR 9822-9823 (Oklahoma).

EPA further disputes that the Agency is "intentionally exploiting the Supreme Court decision in EME Homer City vs. EPA to justify any costs or requirements it deems necessary to further federal policy

decisions." EPA is not promulgating any requirements in this action. If the commenter is referring to the proposed FIP, the comment is out of the scope of this action.

Alabama Power Company et al. suggest there are no cost-effective controls available from any EGUs in Alabama. The EPA disagrees with the assertion that the information provided in their comment letter is sufficient evidence to support ADEM's claim that the majority of EGUs in Alabama are already fully controlled for $NO_x$. Commenter claims that in the proposed FIP, the EPA identified only three EGUs (Plant Gaston Unit 5, Plant Barry Unit 4, Plant Harris Unit 1A) for which there are potential cost-effective controls. Commenter asserts that these units are already adequately controlling $NO_x$ emissions or will change to lower emitting fuel by 2023. First, those changes were not included in Alabama's transport SIP to be approved as permanent and enforceable emissions-control requirements so they cannot be relied upon. The Good Neighbor provision requires the "prohibition" of emissions that significantly contribute in the SIP itself. Second, these statements made about the three identified units do not satisfy a Step 3 multifactor analysis that more comprehensively analyzes emissions control opportunities across the state of Alabama. The SIP submission is insufficient to support a conclusion that Alabama has no outstanding obligations under CAA section 110(a)(2)(D)(i)(I). Whether Alabama may be shown through a full assessment of emissions control opportunities to have a substantial additional amount of emissions control opportunity or only very little, anecdotal information regarding the emissions profile of a small number of units does not replace an approvable Step 3 analysis by a state regarding the identification of emissions that significantly contribute for purposes of the 2015 ozone NAAQS. *See also* Section 8.3 addressing a similar comment raised by MDE.

The EPA explained the deficiencies with Arkansas' cost-effectiveness analysis in the proposal. 87 FR 9810. There, the EPA also emphasized that "Relying on the CSAPR Update's (or any other CAA program's) determination of cost-effectiveness without further Step 3 analysis is not approvable. Cost-effectiveness must be assessed in the context of the specific CAA program; assessing cost-effectiveness in the context of ozone transport should reflect a more comprehensive evaluation of the nature of the interstate transport problem, the total emissions reductions available at several cost thresholds, and the potential air quality impacts of those reductions at downwind receptors." *Id.* The EPA similarly disagrees with the comment that analysis conducted under the regional haze program is appropriate for conducting a cost-effectiveness analysis in the context of the good neighbor provision. Regional Haze is a different program, with a different purpose. Typically, the analysis of cost-effectiveness in the context of regional haze involves a detailed, facility-specific evaluation of multiple potential control technologies and is weighed with other statutory factors. The result of a BART five-factor or Reasonable Progress four-factor analysis is typically a control determination coupled with an enforceable emissions limit. Even if a similar approach could be applied to interstate ozone transport (and we note again there are many differences between these programs), Arkansas did nothing of this kind in its SIP submission. Finally, the "break point" that ADEQ identified between non-EGUs and EGUs was based solely on a comparison of emissions, with no examination of emissions-reduction potential or relative cost-effectiveness of such options. As such, this was not an approval basis on which to exclude non-EGU emissions sources from further analysis.

The EPA explained the deficiencies with Oklahoma's cost-effectiveness analysis in the proposal. 87 FR 9822-9823. As for the concern raised by ODEM that the marginal cost threshold for the less protective 2008 ozone NAAQS may in fact be suitable for the more protective 2015 ozone NAAQS due to advances

in technology and in consideration of reductions in emissions from non-EGUs, the commenter did not provide sufficient evidence to support a finding that a marginal cost threshold of $1,400/ton from the CSAPR Update is appropriate for EGUs in Oklahoma for the 2015 ozone NAAQS or that applying that cost-effective threshold on EGUs in the state would resolve the state's good neighbor obligations for the 2015 ozone NAAQS. In any event, states may not rely on FIPs in a SIP submission, as discussed in more detail in the preamble in Section V.B.9.

Comments on cooperative federalism are addressed in Section 10.3.

## 8.7 "Consistent and Persistent" Contribution

*Comments*

**Commenter:** Arkansas Department of Energy and Environment, Division of Environmental Quality

**Commenter ID:** 07

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

EPA's proposed disapproval points out that DEQ concluded that the CAMx modeled potential linkage to Allegan County was not "persistent or consistent" without defining what is meant by "persistent" or "consistent." Of the 608 back-trajectories evaluated for those ninety-five elevated ozone days, only 6.74% of those back-trajectories passed through Arkansas with the number varying greatly from year to year (i.e., 93% did NOT pass through Arkansas). Although DEQ did not define a bright line for "persistent and consistent," swings in linked elevated ozone day back trajectories from year to year shows a lack of consistency. The very low percentage of back trajectories' paths that passed through Arkansas prior to reaching Allegan County on high ozone days indicates that impacts from Arkansas sources to Allegan County are not persistent. DEQ did not perform this analysis for the Texas receptors because those receptors did not meet DEQ's threshold for a potential linkage based on the data available at the time of SIP development.

**Commenter:** Association of Electric Companies of Texas, BCCA Appeal Group, Texas Chemical Council and Texas Oil & Gas Association

**Commenter ID:** 11

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

D. EPA should not rely on anomalous 2012 modeling results in determining linkages between Texas and Colorado and other western states.

EPA appears to rely in part on purported linkages between Texas and Colorado and western states based on a selective interpretation of TCEQ's 2012-based platform modeling. Such an inference would be erroneous. 2012 was an extreme ozone event year for Colorado and other western states. EPA should not rely on 2012 modeling results to determine whether Texas contributes significantly to nonattainment or interferes with maintenance of NAAQS in those states. Data from 2012 shows that it was among the highest ozone years since 2005 to 2007, even when statistically adjusting for meteorological variability. [footnote: Attachment 1, at 13-14.]

In Texas's SIP submission, TCEQ identified monitors in Colorado which were appropriate for additional investigation but, based on its analysis, determined that emissions from Texas did not contribute significantly to nonattainment or interfere with maintenance at the tagged Colorado monitors. TCEQ's HYSPLIT trajectory analysis, in particular, showed that the vast majority of observed high ozone days from 2007 through 2016 at the linked Colorado monitors were not associated with transport from or near Texas, supporting TCEQ's claim that there was not a persistent and consistent pattern of contribution from Texas sources. TCEQ's conclusion that Texas does not contribute significantly or interfere with maintenance of the NAAQS at the linked Colorado monitors is consistent with EPA's modeling, using base years of 2011 and 2016, which did not link Texas to ozone monitors in Colorado.

[From Attachment 1 - Technical Comments on Air Plan Disapproval; Arkansas, Louisiana, Oklahoma, and Texas; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards; Docket No. EPA-R06-OAR-2021-0801 prepared by Sonoma Technology:]

With minor deviations, TCEQ used EPA's 4-Step Transport Framework in its Texas Transport SIP submittal. As part of "Step 1" TCEQ identified nonattainment/maintenance monitors in Colorado. In "Step 2" TCEQ reported modeling suggesting Texas' anthropogenic emissions contributing more than 0.70 ppb of ozone on high modeled ozone days. However, in "Step 3" TCEQ found the emissions from Texas did not contribute significantly to nonattainment or interfere with maintenance at the tagged Colorado receptors. In support of these observations, we note that multiple rounds of transport modeling conducted by EPA using base years of 2011 and 2016 did not link Texas to ozone monitors in Colorado, as the modeled contributions for future year 2023 were below the 0.75 ppb or 0.70 ppb thresholds (1% of the applicable NAAQS). The use of a different base year by TCEQ (2012), compared to EPA's transport modeling (2011 and 2016), was likely the biggest contributing factor as to why TCEQ's modeling showed larger ozone contributions from Texas at the Colorado monitors. Nationally, 2012 was among the highest ozone years since 2005-2007 even when statistically adjusting for meteorological variability (Figure 2). 2012 appeared to be a relatively high ozone year in Colorado as well, and there were a larger number of extreme events in Colorado in 2012 compared to other years (*see* Figure 3-41 of TCEQ's Transport SIP). The HYSPLIT trajectory analysis conducted by TCEQ as part of its SIP submittal showed that the vast majority of *observed* high ozone days from 2007 through 2016 at the tagged Colorado monitors were not associated with transport from or near Texas, supporting TCEQ's position that there was not a persistent and consistent pattern of contribution from Texas. The number of trajectories that did originate from Texas on the high *observed* ozone days was higher in 2012 compared to other years, indicating a connection between the high ozone year and anomalous regional meteorological conditions. EPA's modeling from 2011 and 2016, did not show such a pattern of transport in at least two other years that were, on average, also conducive to high ozone. Accordingly, TCEQ's 2012-based modeling results suggesting a link to Colorado and other western states appears to

be anomalous, and not reflective of a meaningful and sustained link between Texas and ozone values in those states.

**Commenter:** Cleco Corporate Holdings LLC

**Commenter ID:** 14

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

The LDEQ HYSPLIT modeling demonstrates the absence of a persistent and consistent pattern of contribution of pollutants to Texas monitors from Louisiana.

**Commenter:** Louisiana Electric Utility Environmental Group

**Commenter ID:** 28

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

EPA's analysis of Louisiana's approach for defining significant contribution with respect to whether there is a "persistent and consistent" pattern of contribution from the state appears largely focused on explaining that the state's approach is inferior to EPA's rather than on explaining why the state's determination does not comport with the CAA.

Accordingly, EPA's Proposed Disapproval of Louisiana's SIP falls short and EPA has overstepped its authority under the CAA. EPA should re-evaluate Louisiana's SIP on the basis of whether the SIP meets the applicable requirements of the CAA, not on the basis of whether Louisiana made different choices than EPA would have made had it been the decision-maker with respect to fulfilling the state's Good Neighbor obligation to address interstate transport of ozone under Section 110(a)(2)(D)(i)(I) of the CAA. EPA also must avoid any policy determinations or a desire to adopt a "national ozone transport policy" in evaluating Louisiana's SIP.

**Commenter:** Texas Commission on Environmental Quality

**Commenter ID:** 42

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

The EPA mischaracterizes the purpose and analytic details in the TCEQ's weight of evidence, invalidating the EPA's conclusions regarding the impact of Texas emissions.

In the "*EPA Region 6 2015 8-Hour Ozone Transport SIP Proposal Technical Support Document*" the EPA states that the TCEQ used its weight of evidence to counter the modeling results. This is a misinterpretation of the purpose of the weight of evidence. The TCEQ used the weight of evidence not to determine if Texas contributed *at all* to linked monitors but rather to determine if Texas contributes to those monitors *significantly and persistently*.

*Response*

In the proposed disapprovals, the EPA explained its assessment of claims at Step 3 made by several states that there is not a "persistent and consistent" level of contribution from their states to receptors. See 87 FR 9808-9809 (Arkansas); 87 FR 9812-9815 (Louisiana); 87 FR 9831-9834 (Texas). *See also* Evaluation of TCEQ Modeling TSD, at 76-100.[79] As explained at proposal, these arguments are in effect an attempt to dispute the contribution finding at Step 2.

> To be clear, the modeling establishing linkages of [Arkansas/Louisianas] to downwind nonattainment and maintenance receptors already establishes that there is a consistent and persistent pattern of contribution on elevated ozone days from [these states] to other states. That is because EPA's methodology for projecting future year ozone concentrations accounts for precisely these concerns . . . by looking only at days with elevated ozone levels.

87 FR at 9808, 9814. (The EPA has acknowledged an inadvertent error in our description of the Step 2 analysis in this language from proposal (see Section 11.9 – Typographical Concerns), but the quoted language adequately conveys the intended meaning. The EPA further explains this point below in relation to the same arguments raised by TCEQ.).

While the EPA rejects that a so-called "persistent and consistent" analysis of contribution is appropriate to excuse states from analysis of emissions control opportunities at Step 3 (again, because the fact that a state's emissions "contribute" to high ozone levels at receptors is already established at Step 2), the EPA further evaluates here several aspects of this issue as raised by commenters.

The EPA notes that ADEQ only provided a "persistent and consistent" analysis for the Allegan, Michigan receptor and did not provide a "persistent and consistent" analysis for receptors in Texas that Arkansas was linked in EPA's 2011 base year modeling that ADEQ's SIP used. The EPA notes that both the EPA's 2016v2 base year modeling used at proposal and the latest 2016v3 modeling for this final action continue to identify that Arkansas is linked to Texas receptors with a maximum contribution of 1.21 ppb to a receptor in Brazoria County Texas (AQS Site ID 480391004). As discussed in the proposed disapproval, the EPA does not agree that ADEQ's analysis for Allegan, Michigan receptor showed that Arkansas's contribution was not "persistent and consistent." Furthermore, this point is not necessary to support disapproval, because Arkansas did not present such arguments as to its linkages to multiple receptors in Texas.

The EPA disagrees that it mischaracterizes the TCEQ's weight of evidence analysis. TCEQ's comment is not exactly accurate as the EPA appreciates that the state was indeed attempting to argue at Step 3 that contributions found at Step 2 are not "significant." However, the EPA's point is that the basis for that

---

[79] Evaluation of TCEQ Modeling TSD (EPA-R06-OAR-2021-0801-0002) in Docket ID No. EPA-R06-OAR-2021-0801.

argument (i.e., the degree of persistence or consistency in the contribution) is not supportable as a Step 3 factor when the Step 2 analysis has already confirmed that the contribution from a state is in fact impacting receptors on the days when they are projected to have high ozone levels. The ozone transport modeling conducted by the TCEQ and the EPA already factors in whether contribution is sufficient to be considered "consistent and persistent" when determining projected contributions. In calculating contribution from a state to a particular receptor, the EPA averages the MDA8 concentrations for the top 10 modeled ozone concentration days in the future year (in this case 2023) at the receptor and averages the corresponding 8-hour average contributions for each of these same days from each state. Then the EPA divides the 10-day average contribution for each state by the corresponding 10-day average concentration to obtain a Relative Contribution Factor (RCF) for each state at each monitor. The EPA requires there be at least 5 days in which the model-predicted concentration days are equal to or greater than 60 ppb in the future year before determining a state's contribution. TCEQ's method for calculating contribution differs from the EPA's in the selection of days used but still uses up to 10 days (with a minimum of 5 days) for calculating the average contribution in determining linkages. Thus, both TCEQ's modeling and the EPA's modeling inherently consider whether a state's contribution is sufficiently persistent and consistent, and TCEQ's "weight of evidence" approach fails to demonstrate that contribution from Texas to downwind receptors is not consistent and persistent.

Therefore, the EPA's view is that the modeling results from multiple modeling analyses using the top 5 to 10 high-ozone days for contribution analysis already establish that a so-called "persistent and consistent" linkage exists. In addition to TCEQ's modeling showing linkages on this basis to receptors in the western U.S., in this case there is also the EPA's modeling results for 2023 working from a 2011 base period and 2016 base period that show linkages from Texas to other areas. The EPA's review in the proposal indicated that Texas' emissions have linkages to downwind receptors in other states with a variation of receptors due to different meteorology and emissions base periods resulting from the use of different modeled years (see 87 FR 9833-9834). The EPA also indicated on page 100 of the Evaluation of TCEQ Modeling TSD:

> Other factors/WOE analysis does not provide sufficient compelling technically supported information to counter the conclusions from photochemical modeling in terms of linkages from Texas to downwind receptors.

> TCEQ indicated that Texas contribution should be deemed "significant" only if there is a persistent and consistent pattern of contribution on several days with elevated ozone. We note that modeling for three different years of meteorology (2011, 2012, and 2016) have all indicated that Texas was linked to downwind nonattainment and/or maintenance receptors. We think this consistent result indicates that Texas's emissions are substantial enough to link Texas to downwind receptors, under varying assumptions and meteorological conditions which further indicates that there is a persistent pattern of Texas' emissions contributing above 1 % to ozone at downwind nonattainment and/or maintenance receptors.

The EPA evaluated each component of the analysis that TCEQ included in their weight of evidence analysis and concluded that the information was not sufficient to refute or counter the modeling results showing linkages.

Regarding comments as to whether the EPA should utilize TCEQ's 2012 based modeling results in disapproving TCEQ's SIP: As noted in the proposal (87 FR 9832-9834) and the Evaluation of TCEQ Modeling TSD, the EPA has concerns with some of the details of TCEQ's HYSPLIT back trajectories, including how some were screened out, which limits the conclusions that can be drawn from TCEQ's HYSPLIT analysis and does not refute the modeling findings indicating linkages. *See also* Section 8.8 (Hybrid Single Particle Lagrangian Integrated Trajectory (HYSPLIT) Model). Still, as at proposal, TCEQ's conclusions that 2012 had more back trajectories that reached Texas than most years for many of the Colorado monitors appears consistent with TCEQ identifying linkages to Colorado when the EPA's 2016 based modeling did not (FR 87 9833).

Based on the information available, the EPA tends to agree with the comment that the use of a different base year by TCEQ (2012), compared to the EPA's transport modeling (2011 and 2016), was likely the biggest contributing factor as to why TCEQ's modeling showed larger ozone contributions from Texas at the Colorado monitors.  EPA does not agree that 2012 was necessarily an anomalous year or was an extreme year for ozone in Denver, but meteorology did seem to favor high ozone concentrations in the west and transport of Texas' emissions to this region compared to other years that the EPA has modeled.[80] The EPA's modeling of other years has continued to show that Texas has linkages with other areas of the U.S. But for purposes of this disapproval action, the EPA does not agree that TCEQ's 2012 based modeling results indicating linkages to receptors in the western U.S. should be entirely discounted or ignored.

Overall TCEQ's modeling showed linkages for a year that may have favored higher ozone in the western U.S. and the EPA's 2011 base year modeling and EPA's 2016v2 modeling both indicated Texas had linkages to other areas of the U.S. (likely due to differing meteorology as the commenter noted) that was cited in the proposed disapproval. TCEQ's 2023 (2012 base meteorology) and the EPA's 2023 modeling (2011 and 2016 base meteorology) have consistently shown that Texas' anthropogenic emissions are large enough to result in linkages to receptors in downwind states even with differing meteorology and base periods that have resulted in different linkages. The EPA has also conducted HYPSLIT analysis for the Midwest area receptors that Texas is linked in the EPA's 2016v3 modeling (see Section 8.8) that indicates Texas is often an upwind contributing state during the 12 years of exceedances for which back trajectories were performed, thus indicating that the EPA's modeled linkages using CAMx are robust and not anomalies.

In response to LEUEG's claim that the EPA failed to appropriately demonstrate that Louisiana's Step 3 arguments were inadequate and, instead, only drew a comparison of the state's Step 3 analysis to its own Step 3 analysis the EPA typically applies when determining significant contribution, the EPA disagrees. Independent of how the EPA has typically performed a Step 3 analysis, the EPA identified critical flaws with LDEQ's Step 3 analysis. 87 FR 9812-9816. Instead of conducting analysis to determine whether and to what degree emissions from Louisiana should be prohibited to eliminate emissions that will contribute significantly to nonattainment in or interfere with maintenance of the 2015 ozone

---

[80] Even if these conditions were "extreme" or "anomalous," neither commenter or TCEQ adequately justifies why these conditions would not merit mitigation under the Good Neighbor Provision in light of the statutory obligation to resolve "interference with maintenance" of the NAAQS in other states, including through recognition of interannual variability in air quality. *See* 87 FR at 9820 (discussing *North Carolina*, 531 F.3d 896, 909-11, and subsequent case law).

NAAQS in other states, LDEQ's SIP submission attempts to downplay linkages between Louisiana and downwind receptors by alleging that Louisiana's contribution to these receptors is not sufficiently "consistent and persistent." Irrespective of the EPA's historical approach at Step 3, we reject that this can be a valid factor for analysis at Step 3 when this degree of linkage is already established at Step 2, for the same reasons as explained above in relation to TCEQ's arguments.

LDEQ relied on their HYSPLIT analysis and general wind rose analysis to support their assertion that there was not a "persistent and consistent" pattern of contribution. The EPA indicated in the proposal that LDEQ's trajectories on ozone exceedances days at receptors in Texas indicated they passed through Louisiana 28% of the time (28% of the 99 trajectories). LDEQ proffered that some of these back trajectories did not pass directly over areas with emissions, but the EPA noted that LDEQ did not consider that the back trajectories only represent a centerline and there are areas on either side of the centerline that would also be contributing areas. Further, in the EPA's view, back trajectories occurring over an upwind state 25% of the time represents a relatively large percentage of time and robustly confirms rather than calls into question the EPA's modeling results. LDEQ's analysis did not provide evidence that was contrary to the conclusions of the EPA's photochemical modeling analyses, regardless of whether this is considered relevant at Step 3 or Step 2 (though, again, the EPA views this as a Step 2 question).

As explained in the Air Quality Modeling Technical Support Document for 2015 Ozone NAAQS Transport SIP Proposed Actions included in Docket ID No. EPA-HQ-OAR-2021-0663, the modeling that both the EPA and LDEQ relied on already establishes a sufficiently persistent and consistent contribution because the contribution analysis relies on an average contribution over 10 days. Based on the 2016v3 modeling for this final action, Louisiana is linked to 7 receptors in Texas. The table below provides a count of the number of days that Louisiana contributes above 0.70 ppb, 2 ppb, 5 ppb, and 10 ppb during the top 10 concentration days used to calculate Louisiana's average contribution metric value at each of these receptors. The data indicate that Louisiana contributes at or above the 0.70 ppb screening threshold on nearly all of the top 10 concentration days at each receptor. In fact, Louisiana contributes ozone in amounts greater than or equal to 5 ppb and, in some cases greater than or equal to 10 ppb at 6 of the 7 receptors. These data serve to confirm that there is a "persistent and consistent" pattern of high contributions to receptors in Texas from emissions sources in Louisiana.

*Table 8-2*

| AQS SiteID | County | Site Name | Days Greater Than or Equal to 0.70 ppb | Days Greater Than or Equal to 2 ppb | Days Greater Than or Equal to 5 ppb | Days Greater Than or Equal to 10 ppb |
|---|---|---|---|---|---|---|
| 482010055 | Harris | Houston Bayland Park | 8 | 7 | 5 | 2 |
| 482010024 | Harris | Houston Aldine | 8 | 5 | 4 | 1 |
| 481210034 | Denton | Denton Airport | 8 | 6 | 2 | 0 |
| 481671034 | Galveston | Galveston | 8 | 8 | 7 | 5 |
| 482011035 | Harris | Clinton | 9 | 6 | 5 | 2 |
| 482011034 | Harris | Houston East | 9 | 6 | 5 | 2 |
| 480391004 | Brazoria | Manvel Croix Park | 9 | 7 | 5 | 1 |

Accordingly, LDEQ's approach is flawed, and as a result, Louisiana's SIP submission fails to support a conclusion that it satisfies the statute's requirement of prohibiting any source or other type of emissions activity within the State from emitting air pollutants which will contribute significantly to or interfere with maintenance of the NAAQS in other states. The EPA responds to comments about EPA's statutory authority under the CAA in Section 10.3 (Cooperative Federalism and the EPA's Authority).

## 8.8   Hybrid Single-Particle Lagrangian Integrated Trajectory (HYSPLIT) Model

*Comments*

**Commenter:** Alabama Department of Environmental Management

**Commenter ID:** 02

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

Meteorological Influence

Part of the WOE analysis submitted with the revised SIP in April evaluated the meteorology associated with high ozone days at the Denton and Harris County, Texas monitors. Additional analysis has been completed to attempt to further flesh out some of the issues with the meteorology.

As presented in the analysis, back trajectories were included for both the Harris County and Denton County, Texas receptors for high ozone days (8-hr ozone greater than 70 ppb). Additionally, an assessment of Alabama's air quality during and previous to those high days was provided. In part, we have modified our analysis to be consistent with the form of the standard and the resulting back trajectories are included (Figures 5 – 32). For the 4 highest 8-hr ozone days over the 2019-2021 period (27 days total for both receptors), for both areas (Denton and Harris County), on only <u>one</u> of the days

does the back trajectory pass through Alabama, specifically June 18, 2021 for the Harris County receptor, and June 19, 2021 for the Denton County receptor. On both of those days, the plume centerline passes over western and northern Alabama. Looking at the emissions sources of NOx in those areas, primarily EGU NOx, there are no large industrial NOx sources in those areas.

[Figures 5-32 available in full comment]

For the Harris County receptor, wind roses were developed for the 2016 calendar year (Figure 33), as well as the top 10 8-hr ozone days for the year. For the yearly wind rose, the Harris County receptor (482010055) wind rose is not in line with wind roses at the other monitors in the area. In particular, other Harris County monitors show a predominant north/south component, while the wind rose for the Harris County receptor (482010055) shows a distinct east/west component. Monitors closer to the bay in east Houston that would logically reflect a bay breeze don't during 2016. Subsequently, a 2017 wind rose (Figure 34) was generated for the monitors, and the Harris County receptor is more in line with the other monitors. Since the meteorology for 2016 was forecast to 2023 and beyond, the differences in the wind roses is important. Also identified on the map (Figures 43 and 44) are the maximum concentrations from Alabama NOx sources. It should be noted that the higher concentrations are on the west side of Houston, and lower on the east side, which lies closer to Alabama.

[Figures 33-34 available in full comment]

Next, wind roses were developed for the top 10 ozone days, consistent with the way EPA summarizes calculating high ozone days, to evaluate the wind flow regionally. The meteorological site is very close in proximity to the Harris County receptor (482010055). The resulting wind roses show varied wind patterns on the 10 highest days (Figures 35-44). Five of the ten days had a significant number of calms (40+%). Several of the days, five in total, appear to show wind flow patterns that do not line up with possible impacts from Alabama. On a majority of the days, the winds are generally less than 10 mph. Given the calm to low wind speeds identified on these wind roses, higher concentrations on these days are likely due to recirculation.

**Commenter:** Alabama Power Company, Southern Power Company, and PowerSouth Energy Cooperative

**Commenter ID:** 04

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

Specifically, ADEM's SIP submission package identifies multiple factors that support its analysis: (1) meteorological influence[.]

The first factor demonstrates that weather patterns do not support a finding that emissions from Alabama contributed to ozone concentrations at the Denton and Harris County monitors. Back trajectories provided by ADEM indicate that air moving over Alabama seldom moved into Denton and Harris counties, and emissions from sources in Alabama were low on the relevant days. EPA ignores the

essential point of ADEM's HYSPLIT analysis and EPA's own data confirms that contribution by Alabama to Denton and Harris counties would be insignificant and infrequent.

[…]

82. iii. HYSPLIT Trajectories Emissions from Alabama Sources Are Not Linked to Ozone Exceedances Recorded in Texas

ADEM includes in its WOE analysis a HYSPLIT model of back trajectories to demonstrate that ozone concentrations in Alabama were relatively low on the days preceding high ozone events at downwind receptors in Denton and Harris counties. EPA criticizes the back trajectory analysis on the basis that ADEM fails to consider ozone-precursor emissions in its analysis, stating "it has long been understood that ozone concentrations in downwind areas are affected . . . [by] ozone formed downwind from the ozone-precursor emissions, such as NOx, in the upwind state." EPA entirely overlooks the principal point of Alabama's HYSPLIT analysis: air rarely moves from Alabama westward into Texas. Of the 31 days that the Harris County monitor showed an ozone exceedance from 2018-2020, the HYSPLIT analysis confirms that air moved from Alabama into Harris County on only 4 occasions. Likewise, for Denton County, air travelled westward from Alabama on only 3 occasions out of 26 exceedance days. In other words, Alabama establishes convincingly that Alabama emissions are highly unlikely, just as a starting point, to contribute to ozone formation in Dallas or Houston.

EPA goes on to explain that, despite low ozone in the upwind state, "sources and other emissions activities in that State nonetheless may be emitting ozone-precursor emissions in amounts sufficient to contribute ozone above one percent of the NAAQS to the high-ozone event that occurs at the downwind receptor." However, as this section will explain, on the days leading up to the high ozone events at the Texas receptors, ozone-precursor emissions in Alabama were low.

In order to determine whether Alabama sources of $NO_x$ emissions could be considered to "significantly contribute" to ozone nonattainment or maintenance issues in Texas, the commenters evaluated statewide EGU emissions of NOX on the days that could have led to ozone formation at the Denton or Harris County monitors. The commenters used the HYSPLIT data presented in Alabama's SIP submittal to identify when air packets travelled over Alabama preceding the affected days at each monitor. EPA's own CAMD database provided the total $NO_x$ emissions for the relevant day. Each daily NOX emission total is compared to the level of $NO_x$ emissions that EPA has defined as "significant" for EGUs in Alabama. Specifically, the ozone-season $NO_x$ emissions budget proposed by EPA for Alabama in its proposed FIP was prorated across the days in the ozone season and that total was then ratioed by 75% in accordance with EPA's methodology for setting the "daily backstop" rate. Thus, for Alabama EGUs, EPA defines total daily significant contribution as 73 tons.

| Date of Monitor Exceedance (Harris County) | Date of Air Packet Over Alabama | Daily Emissions Defined as "Significant" by EPA (Tons) | Actual $NO_x$ Emissions on Relevant Date (Tons) | Percent Below Significance |
|---|---|---|---|---|
| July 26, 2019 | July 24, 2019 | 73 | 56 | **-23%** |
| July 26, 2019 | July 25, 2019 | 73 | 52 | **-29%** |
| Sept. 5, 2019 | Sept. 3, 2019 | 73 | 58 | **-21%** |

| Sept. 6, 2019 | Sept. 3, 2019 | 73 | 58 | **-21%** |
| June 18, 2021 | June 16, 2021 | 73 | 41 | **-41%** |

| Date of Monitor Exceedance (Denton County) | Date of Air Packet Over Alabama | Daily Emissions Defined as "Significant" by EPA (Tons) | Actual $NO_X$ Emissions on Relevant Date (Tons) | Percent Below Significance |
|---|---|---|---|---|
| June 19, 2021 | June 17, 2021 | 73 | 41 | **-41%** |
| Aug. 4, 2021 | Aug. 2, 2021 | 73 | 52 | **-29%** |
| Sept. 12, 2021 | Sept. 10, 2021 | 73 | 39 | **-46%** |

As these data plainly show, emissions from Alabama EGUs on the relevant days were low, and well below any reasonable conception of "significant contribution." As a result, EPA should conclude that sources in Alabama are not contributing to nonattainment or maintenance in Texas and it is plain Alabama's SIP already contains measures sufficient to prohibit actual contribution to any downwind ozone concerns.[82]

[82] In addition, while EPA points out that "vectors of [ADEM's] back trajectories only show the center line of air flow" and do not capture the full "breadth of the air currents," 87 Fed. Reg. at 64,425, EPA fails to analyze which sources are in the region these air currents pass through. Identification and consideration of the actual sources contributing to interstate transport of emissions is essential to EPA's review of SIPs under the "good neighbor" provision. *See* 42 U.S.C. § 7410(a)(2)(D)(i) ("prohibit[] . . . any source . . . from . . . contribut[ing] significantly").

*Response*

The EPA found that emissions in Alabama were linked to downwind receptors in Harris County (monitoring site 482010055) and Denton County (monitoring site 481210034) based on the 2016v2 modeling performed for the proposed disapproval. The commenters claim that Alabama should not be linked to these receptors because they claim that air rarely moves from Alabama west toward Texas on days with measured exceedance at these downwind receptors. The commenters rely upon analyses of near ground-level wind flow (i.e., wind roses) and HYSPLIT-based multi-day back trajectories on days with measured exceedances at these two receptors to support their claims that Alabama should not be linked to these receptors.

The EPA disagrees that the Agency should conclude that sources in Alabama do not contribute to nonattainment or maintenance receptors in Texas. First, regional pollutant transport occurs when ozone precursor emissions (i.e., $NO_X$ and VOCs) from sources an upwind state are emitted into the air and form ozone. The photochemical reactions that form ozone also form "by-product" pollutant that are "recycled" to form additional ozone farther downwind. The ozone and by-product pollutant species are vertically mixed due to dispersion and updrafts/downdrafts within the daytime boundary layer (i.e., the mixed layer) during the day. Variations in wind speed and direction between the ground and the mid-to top of the daytime mixed layer can result in different transport patterns aloft than near the ground. In addition, pollutants that remain aloft during the day or are emitted aloft overnight above the very shallow nighttime surface layer can be transported long distances due to the effects of the "nocturnal

357

jet" which is a high-speed ribbon of air that forms above the top of the nighttime surface layer. In addition, wind speed typically increases with height within the mixed layer, because the effects of surface roughness, which reduces wind speed near the ground, diminishes with height. Pollutants transported downwind aloft are typically brought down to the ground on subsequent days beginning in mid-morning as the height of the mixed layer rises. By this process pollutants transported aloft from upwind states can contribute to high ozone concentrations at monitoring sites in downwind states. While wind roses and trajectories based on data near or within a few hundred meters of the ground are useful for analyzing local scale transport (i.e., within an urban area) such analyses generally will not provide particularly reliable or meaningful information on long-range, multi-day transport of ozone and by-product pollutants aloft.

In the EPA's 2016v3 modeling for this final action, Alabama was found to contribute above the 0.70 ppb screening threshold to two maintenance-only receptors (i.e., Galveston, Texas and Dallas/Denton-Pilot Point).[81] The EPA ran HYSPLIT to create back trajectories from the Galveston receptor, among others, on days with measured ozone exceedances during the 12 years from 2010 through 2021. The map below shows the back trajectory analysis for the Galveston receptor-based trajectories at 500 m and 750 m (i.e., generally in the mid portion of the daytime mixed layer). The map provides a visual representation of areas typically upwind wind of Galveston on days with measured exceedances at this receptor. The trajectories indicate that the air can travel from east to west such that Alabama is upwind of Galveston on exceedance days. This result confirms the EPA's finding that Alabama is linked to receptors in Texas. The EPA's back trajectory analysis is described in the Final Action AQM TSD.



### Galveston Texas (481671034)
Backward Trajectories for Measured Exceedance Days - 12YEARS_500and750

---

[81] Note that in the 2016v2 modeling used for the proposed action, Alabama was linked to the South Airport receptor in Denton, Texas. In the final modeling Alabama is linked to the Pilot Point "violating monitor" maintenance-only receptor in Denton.

The EPA addresses comments related to existing controls in Section 8.3 (Existing and Future State Controls). It is the state's responsibility to identify and then prohibit any source or other type of emissions activity from emitting any pollutant in amounts which will contribute significantly to nonattainment or interfere with maintenance in other states in a SIP under CAA section 110(a)(2)(D)(i)(I). It is not the Agency's burden in evaluating a SIP submission for compliance with the requirements of CAA section 110(a)(2)(D)(i)(I) to conduct an analysis of which of the state's individual sources or other type of emissions activity might be deemed significant. The EPA's analysis at Step 2 measures the total anthropogenic contribution of emissions from the upwind state. Once contribution passes the threshold, we proceed to Step 3. The Alabama SIP submission's cursory discussion of emissions sources and reduction potential in the state does not constitute an adequate Step 3 analysis (or appropriate substitute or alternative to such an analysis). We do not concede commenter APC et al.'s characterization of the proposed approach to "significance" in the proposed FIPs is correct; however, the analysis is irrelevant in any case because the state itself conducted no such analysis, and that is what we are evaluating. The EPA is not requiring controls on any states or any sources in this action, and comments on the substance of the proposed FIP are beyond the scope of this rulemaking.

*Comment*

**Commenter:** Arkansas Department of Energy and Environment, Divison of Environmental Quality

**Commenter ID:** 07

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

EPA's proposed disapproval also dismisses ADEQ's HYSPLIT modeling used to identify whether a potential linkage was significant as irrelevant. While DEQ agrees that CAMx is a state-of-the science tool, this does not mean that other tools cannot be informative. In addition, EPA provided input on DEQ's HYSPLIT modeling analysis during the comment period for the SIP and DEQ made adjustments to its modeling in response to EPA's comments. If EPA contends that HYSPLIT modeling is not informative for the purposes of SIP decision-making, this should have been stated in early conversations between the agency and DEQ, before DEQ performed HYSPLIT modeling, or during the public comment period (rather than suggesting modifications to DEQ's methodology, resulting in additional state resources invested in HYSPLIT modeling to bolster the SIP submittal in response to EPA comments). See EPA comments and DEQ responses to comments on 2015 Ozone Transport SIP, included here as Appendix A.

EPA's argument regarding the HYSPLIT central path in the proposed disapproval was not raised during preproposal consultation or the comment period for the SIP. Indeed, EPA doesn't quantify the degree to which they believe a back-trajectory should pull in areas on each side horizontally and vertically in their proposed FIP. This argument by EPA in their proposed disapproval leaves DEQ with no information about what EPA believes would be an appropriate buffer around the back-trajectories if DEQ were to reevaluate how it interpreted HYSPLIT data to address EPA's alleged concern.

DEQ continues to assert that its HYSPLIT analysis provides meaningful insight as to whether the potential linkages identified by CAMx are consistent and persistent. EPA's CAMx modeling only looks at five to ten

elevated ozone days. For comparison, DEQ's HYSPLIT analysis evaluated ninety-five elevated ozone days over the course of a ten-year period.

*Response*

As noted in comments to ADEQ and in our proposal (FR 87 9804-9809) EPA has concerns with ADEQ's HYSPLIT methodologies, including screening out back trajectories based on the start height and the start time of the back trajectories. We noted these concerns in our comments on ADEQ's proposed SIP and indicated that this technique is not standard and has not been used by EPA in our trajectory analyses such as Appendix E of the CSAPR Update AQ Modeling TSD.[82] As footnoted in the proposal (FR 87 9809) both ADEQ and TCEQ both screened out back trajectories based on start height, and we discussed how this was inappropriate in the Evaluation of TCEQ Modeling TSD, pages 81-86. We also identified concerns with screening of HYSPLIT back trajectories when the centerline passed near but not through Arkansas because Arkansas has some very large point sources near the Arkansas state line that could be contributing (FR 87 9809). When using the HYSPLIT model it is understood that the HYSPLIT back trajectory results are a central path that represents the centerline of the particles' path and there are areas on each side horizontally and vertically that also contribute to the concentrations at the end point. The horizontal and vertical areas that potentially contribute to concentrations at the endpoint grow wider from the centerline the further back in time the trajectory goes. Therefore, a HYSPLIT centerline does not have to pass directly over emissions sources or emission-source areas but merely relatively near emission source areas for those areas to contribute to concentrations at the trajectory endpoint and trajectories that were close to Arkansas but did not necessarily pass through can still indicate the opportunity for contribution from Arkansas' emissions and should not necessarily be excluded from the count of trajectories that indicate Arkansas could contribute. The HYSPLIT model does have the capability to create trajectories that reflect the dispersion of pollutants based on variations in meteorology, atmospheric turbulence and other physical processes.[83] However, the back trajectories created by the commenter were not based on this version of the model.

ADEQ's SIP submission included the inappropriate screening of back trajectories based on start height and start time despite these concerns and for this reason, in addition to the centerline concerns, EPA determined that the results were not valid. EPA did not indicate in the proposal that back trajectory analyses are never useful, just that Arkansas's trajectories were flawed. The EPA finds that back trajectory analysis can be potentially useful as a corollary analysis along with observation-based meteorological wind fields at multiple heights to examine the general plausibility of the photochemical model linkages, so long as the limited utility of this analysis is fully appreciated in comparison to photochemical grid modeling for characterizing ozone transport over long distances.

We did note in the proposal that while we disagreed with ADEQ's methodologies, their results did not show that either 2011 (base year meteorology from EPA's 2011 modeling results used in ADEQ's SIP) or the newer 2016 based meteorology (EPA modeling using 2016v2 and 2016v3 emission inventories) were

---

[82] Appendix E of the Air Quality Modeling TSD for the Final CSAPR Update can be found in docket EPA-HQ-OAR-2015-0500 (Document ID is EPA-HQ-OAR-2015-0500-0575)

[83] NOAA's HYSPLIT Atmospheric Transport and Dispersion Modeling System," *Bulletin of the American Meteorological Society* 96, 12 (2015): 2059-2077.

anomalous. We note that EPA's 2011, 2016v2, and 2016v3 modeling results all indicate Arkansas is linked to receptors in Texas. In response to other comments in this Section (Section 8.8) EPA has conducted HYSPLIT back trajectories for some of the receptors in Texas to which Arkansas has been identified as linked. The results of the trajectory analysis corroborate and add confidence to the upwind/downwind linkages.


*Comments*


**Commenter:** Cleco Corporate Holdings LLC

**Commenter ID:** 14

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

The LDEQ HYSPLIT modeling demonstrates the absence of a persistent and consistent pattern of contribution of pollutants to Texas monitors from Louisiana.

For identified monitors in Texas, LDEQ performed HYSPLIT modeling to examine the significance of contribution under the 1 ppb threshold. LDEQ followed EPA's suggestion that it provide back trajectories for all high ozone days for the Texas (Houston and Dallas area) monitors. This involved the providing of back trajectories for 99 exceedances during the 2015- 2018 season. It's interesting that, while EPA suggested (perhaps requested) LDEQ to conduct back trajectory analysis, in the Proposal it now opposes LDEQ's use of the HYSPLIT back trajectory analysis. The Agency indicates that HYSPLIT is only a corollary analysis for examining the general plausibility of the photochemical model linkages and that the use of back trajectories do not quantitatively evaluate the magnitude of the existing photochemical contributions because the "calculations do not account for any air pollution formation, dispersion, transformation, or removal processes as influenced by emissions, chemistry, deposition, etc." EPA should explain why the HYSPLIT analysis cannot be relied upon due to these reasons and also more thoroughly explain why the use of back trajectories is not sufficient to determine significant contribution. Nevertheless, the back trajectory analyses showed that on high ozone days at the Texas receptors that were identified using the March 27, 2018 memorandum (March 27, 2018, *Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act Section (D)(i)(I)*), only 28% of the trajectories traveled in or through Louisiana. Of that 28%, only 8% originated in Louisiana. In addition, of the 28% of the trajectories, only 35% originated in or crossed the industrialized part of the State. Considering that EPA proposed that LDEQ conduct the HYSPLIT analyses and also considering the results of the analyses, Cleco believes the modeling demonstrates the absence of a persistent and consistent pattern of contribution and therefore the absence of contribution-significance under the 1 ppb threshold.


**Commenter:** Louisiana Chemical Association

**Commenter ID:** 26

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

b. LDEQ's use of the HYSPLIT Model to establish that there were no persistent or consistent relationships between the cited Texas receptors and Louisiana air emissions was proper.

In its significant contribution analysis, LDEQ identified monitors in the Dallas/Fort Worth and Houston/Galveston areas for further review under the 1 ppb screening standard: Denton Airport South (Dallas); FAA Site off Alta Vista Road (Dallas); Croix Parkway (Houston); Aldine Mail Road (Houston); and Durant Street (Houston). LDEQ's process for analyzing the significance of contributions in the Louisiana Transport SIP included: an applicable weather pattern analysis; wind rose analysis; and use of the Hybrid Single Particle Lagrangian Integrated Trajectory ("HYSPLIT") Model developed by the National Oceanic and Atmospheric Administration ("NOAA").

In its comments to the proposed Louisiana Transport SIP, EPA noted that to strengthen the analysis, LDEQ "should provide individual back trajectories for all high ozone days in the Houston or DFW area during the baseline period." EPA provided a link to the existing analyses from the Texas Commission on Environmental Quality. LDEQ accepted this comment and, to address EPA's recommendation, LDEQ provided back trajectories for 99 ozone exceedances at the identified receptors that occurred during the 2015-2018 ozone season with data derived from the TCEQ website.

Specifically, for the days of ozone standard exceedances at the Houston and Dallas area monitors during 2016, 2017 and 2018, LDEQ used the HYSPLIT Model to illustrate backward trajectories for the air parcels present at the monitors when the exceedances occurred. As discussed in the Louisiana Transport SIP, "the projections depict a composite of four backwards trajectories starting at the location of the monitor and tracking the air in reverse for seventy-two hours. Each projection accounts for one eight-hour exceedance period with the four trajectories beginning their routes at the six, four, two and zero hour marks." LDEQ also performed additional modeling/ to evaluate the exceedances that revealed trajectories originating in or crossing Louisiana to include Mixing Depth (in meters) and provide one trajectory for the beginning of each hour of the daily eight-hour ozone exceedance for the exceedance to identify the areas of the state most often impacting Texas monitor exceedances.

LDEQ's HYSPLIT back trajectory analysis showed that on high ozone days in Texas at the receptors identified using the *2015 Ozone NAAQS Memo*, only 28% of the trajectories traveled in or through Louisiana. Of that 28%, only 8% originated in Louisiana. Moreover, of the 28% of the trajectories, only 35% originated in or crossed the industrialized part of the State.

Although EPA requested LDEQ to conduct back trajectory analysis, in the Proposed Rule EPA now opposes LDEQ's use of the HYSPLIT back trajectory analysis. According to EPA, back trajectory analysis is a corollary analysis along with observation-based meteorological wind fields at multiple heights to examine the general plausibility of the photochemical model 'linkages.'" The EPA goes on to indicate that the use of back trajectories does not quantitatively evaluate the magnitude of the existing photochemical contributions because the "calculations do not account for any air pollution formation, dispersion, transformation, or removal processes as influenced by emissions, chemistry, deposition,

etc." Still, EPA does not explain why the HYSPLIT analysis cannot be relied upon for these reasons. EPA should more thoroughly explain why the use of back trajectories is not sufficient to determine significant contribution.

Further, the HYSPLIT back trajectories presented in the Louisiana Transport SIP call into question the plausibility of EPA's proposed linkages based on both the *2015 Ozone NAAQS Memo* and the 2016v2 model. This is especially true given Texas's large contributions to Louisiana receptors.

[…]

In sum, LDEQ's analysis based on the HYSPLIT Model and additional mixing depth models that show no likely impact from Louisiana emissions, is also consistent with Louisiana's compliant ozone design values throughout the state, the trend of decreases in ozone precursor emissions from Louisiana sources. EPA had the opportunity to disapprove of LDEQ's use of the HYSPLIT model. Instead, EPA commented on ways to strengthen the method, which LDEQ followed in developing the final Louisiana Transport SIP. LDEQ modeled the likely route of an air parcel transported to the receptors during ozone exceedance instances and demonstrated that of the 99 instances modeled, less than one third of the routes were from or through Louisiana, with a fractional amount originating in Louisiana. This is sufficient to show that there is no persistent and consistent pattern of significant contribution by Louisiana on the days with elevated ozone at the Texas area monitors. Therefore, Louisiana's contribution to the identified Texas receptors should not be deemed significant.

*Response*

The EPA evaluated Louisiana's HYSPLIT analysis in the proposal. 87 FR 9812-9815. The EPA does not believe that HYSPLIT analyses are sufficient to determine significant contribution because HYSPLIT trajectory analyses, as run by LDEQ, do not provide any quantitative measure of contribution (see responses to comments above). Quantitative contributions are necessary to evaluate the magnitude of an upwind state's contribution to downwind receptors with respect to the 1 percent of the NAAQS screening threshold used in Step 2 of the 4-step interstate transport framework. As noted in the proposal (87 FR 9815) HYSPLIT does not account for air pollution formation from emissions of pre-cursors (NOx and VOC emissions react to form ozone for example), dispersion, transformation, or removal processes as influenced by chemistry, deposition, etc., so the trajectories cannot be used to develop quantitative amounts for how much ozone was formed at the downwind receptor from emissions of pre-cursors in the state of Louisiana. The commenter failed to provide any rationale or methodologies explaining how trajectory analyses can be used alone to determine significant contribution. EPA did provide comments and recommend LDEQ perform HYSPLIT analyses to evaluate the transport meteorology as a way to refine the technical analysis that LDEQ was performing for their SIP (See responses to other comments in Section 1.6 related to EPA comments on proposed SIPs). Moreover, the EPA's Guideline on Air Quality Models[84] specifically states that "Control agencies with jurisdiction over areas with ozone problems should use photochemical grid models to evaluate the relationship between precursor species and ozone." Because the amount of interstate ozone transport is dependent in large part on the ability to credibly quantify ozone and precursor species concentrations,

---

[84] *Guideline on Air Quality Models* ("Appendix W" to 40 CFR Part 51), section 5.3.1, page 5213.

the EPA believes that photochemical grid modeling, rather than trajectories designed to track transport of non-reactive (i.e., inert) pollutants, is the appropriate method for evaluating interstate contributions.

The EPA ran HYSPLIT to create back trajectories from each of these receptors, among others, on days with measured ozone exceedances during the 12 years from 2010 through 2021. The maps below show the back trajectories from the Denton and Houston receptors for elevations of 500 m and 750 m (i.e., generally in the mid portion of the daytime mixed layer).[85] These maps provide a visual representation of areas typically upwind wind of the Denton and Houston/Bayland receptors on days with measured exceedances at these locations. The trajectories indicate that the air can travel from east to west such that Louisiana is upwind of the Denton and Houston receptors on days when ozone exceeds the NAAQS. This result confirms the EPA's finding that Louisiana is linked to these receptors in Texas.



Denton Texas (481210034)

---

[85] The back trajectory map shown here are also provided in a response to other comments in this section of the document.



The EPA addresses comments about EPA's input during SIP development in Section 1.6.

*Comment*

**Commenter:** Mississippi Department of Environmental Quality

**Commenter ID:** 32

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

METEOROLOGY/MONITORED DATA

Meteorological research regarding EPA's reliance on the air quality modeling for the 2016v2 Emissions Modeling Platform and Mississippi's alleged significant (i.e., ≥1% threshold) contributions to receptors in Texas is attached to this correspondence. This research indicates Mississippi has no significant contributions to monitors in Brazoria (Manvel Croix Park, site ID# 48031004), Denton (Denton Airport South, site ID# 481210034), or Harris County (Houston Bayland Park, site ID# 482010055), TX for nitrogen oxide ($NO_x$) and volatile organic compounds (VOC) pollutants to contribute to secondary O3 formation. In most occurrences of high $O_3$ days in Brazoria, Denton, and Harris County, TX, the Houston and/or Dallas core-based statistical areas (CBSA), as applicable, are under very stagnant conditions with minimal mixing, allowing $O_3$ to build. Thorough research shows no correlation when Brazoria, Denton, and Harris County, TX experience an easterly fetch (i.e., easterly winds), which is the only time Mississippi emissions could conceivably contribute to high $O_3$ in these areas.

[…]

Attachment: Meteorological Review of Contributions from Mississippi to Brazoria, Denton, and Harris County, TX National Ambient Air Quality Standards for Ozone Exceedances

Based upon air quality modeling for the 2016v2 Emissions Platform, the Environmental Protection Agency (EPA) has proposed that Mississippi significantly contributes to nonattainment or interferes with maintenance of the national ambient air quality standards (NAAQS) for ozone ($O_3$) for the following monitors in Texas:

- Site ID #480391004 - Manvel Croix Park in Brazoria County (located in Houston, TX core-based statistical area (CBSA))
- Site ID #481210034 - Denton Airport South in Denton County (located in Dallas, TX CBSA)
- Site ID #482010055 - Houston Bayland Park in Harris County (located in Houston, TX CBSA)

Regarding meteorological influence, Mississippi has a negligible effect on VOC/NOx transport to contribute downwind to Texas air monitoring sites. On days where Harris, Brazoria, and Denton NAAQS exceedances occur, the $O_3$ development was locally driven, as shown by the following back trajectories.

[Images in comment]

*Response*

The EPA disagrees with the commenter that Mississippi does not contribute to high ozone at downwind receptors in Texas. In the EPA's 2016v3 modeling for this final action the Agency found that Mississippi contributes above the 0.70 ppb screening threshold to three receptors in 2023: Denton County (monitor 481210034), Galveston County (monitor 481671034), and Houston/Bayland (monitor 482010055). The EPA ran HYSPLIT to create back trajectories from each of these receptors, among others, on days with measured ozone exceedances during the 12 years from 2010 through 2021. The maps below show the back trajectories from the Denton and Houston receptors for elevations of 500 m and 750 m (i.e., generally in the mid portion of the daytime mixed layer).[86] These maps provide a visual representation of areas typically upwind wind of the Denton and Houston/Bayland receptors on days with measured exceedances at these locations. The trajectories indicate that the air can travel from east to west such that Mississippi is upwind of the Denton and Houston receptors on days when ozone exceeds the NAAQS. This result confirms the EPA's finding that Mississippi is linked to these receptors in Texas.

---

[86] The back trajectory map is provided in a response to other comments in this section of the document.





*Comment*

**Commenter:** Tennessee Department of Environment and Conservation

**Commenter ID:** 41

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

4. Back-Trajectory Analysis Supports a Finding of No Significant Contribution

Tennessee reviewed the four highest ozone days (or the five highest days where there are multiple days with the same fourth-high concentration) for calendar years 2018, 2019, 2020, and 2021 at the Denton County site (Table 6) and calculated five-day back-trajectories for air parcels ending up at 10 m above ground level at the monitor. Only two of the 18 exceedance events (October 8, 2020, and June 19, 2021) had air movement tracing back to Tennessee (Figure 1, with individual back trajectories included in Appendix A). For all other high-ozone days identified in Table 6, the back-trajectory analysis indicates that Tennessee was not a contributor.

[Table 6 available in full comment]

Table 6: 2018-2021 Highest Ozone Concentrations at AQS Site ID 481210034

[Figure 1 available in full comment]

Figure 1: 2018 through 2021 Five-Day Back Trajectories, Annual Four Highest Ozone Days at 48-121-0034

Tennessee reviewed the back trajectory analyses, and the air parcels passed through west Tennessee on October 8, 2020 and June 19, 2021. For all other high-ozone days identified in Table 6, the back-trajectory analysis indicates that Tennessee was not a contributor.

- For the October 8, 2020, event, the air parcel passes through Tennessee on October 5 at just under 500 m above ground level.
- For the June 19, 2021, event, the air parcel passes through Tennessee on June 15-16. The back-trajectory analysis for this event is unusual because the air parcel passes close to ground level as it moves through Tennessee, then it is lifted upward to about 1,000 meters before gradually returning to ground level.

East-to-west travel of air masses is relatively uncommon, and Tennessee notes that both of the events identified here were associated with tropical systems to the east of Texas (Hurricane Delta on October 8, 2020, and Tropical Storm Claudette on June 19, 2021), which block a normal zonal west-east flow (Figure 2).

[Figure 2 available in full comment]

Figure 2: Hurricane Delta and Tropical Storm Claudette

*Response*
The EPA is not taking final action on Tennessee's good neighbor SIP submission for the 2015 ozone NAAQS in this action.

*Comment*
**Commenter:** Texas Commission on Environmental Quality

**Commenter ID:** 42

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

In addition, the following errors in the EPA's Technical Support Document (TSD) make its SIP disapproval invalid:

- On pages 81-86 of the TSD, the EPA states concerns with the trajectory parameters used by the TCEQ. The TCEQ's trajectory parameters were set at ranges typically used for analyses of this kind. This is not a legitimate basis for disapproval since the EPA did not provide specific guidance on acceptable parameters for this application. In other applications (for example the Guidance on the Preparation of Clean Air Act Section 179B Demonstrations for Nonattainment Areas Affected by International Transport of Emissions), the EPA has provided specific trajectory parameters required for approval.

- The EPA incorrectly describes the start time of the TCEQ's trajectories. The EPA states "TCEQ used the 1st hour of the 8-hour exceedance as the start time" (page 82 of TX TSD). The Texas SIP clearly states on page 3-53 that "The time of daily maximum one-hour ozone on the elevated eight-hour ozone day was used as the starting hour for each trajectory." The EPA's concerns regarding the start time of trajectories are based on an erroneous reading of the document and thus should not be considered in evaluating the Texas SIP revision.

- On page 82, the EPA states that the TCEQ should have also used an additional 100 meters above ground level (m AGL) start height for the trajectories; however, trajectories with too low of a start height may hit the ground. Once a trajectory hits the ground it loses accuracy and may no longer provide useful data, especially when considering the distance between the source and receptor in the TCEQ's analysis. The National Oceanic and Atmospheric Administration (NOAA) recommends start heights that are located in the middle of the planetary boundary layer. Start heights at 500 m AGL are well within these standard parameters; therefore, disagreement regarding trajectory start height is not a legitimate reason to discount the TCEQ analysis or disapprove this Texas SIP revision.

- The TCEQ used scientifically appropriate filtering criteria on its trajectories. As stated above, NOAA recommends start heights located in the middle of the mixing layer. Trajectories that hit the ground may be inaccurate and removing them to analyze more significant trajectories was appropriate in the context of the weight of evidence analysis. All trajectory endpoints that met these two criteria were presented regardless of whether they were in the mixing layer over Texas. The analysis only filtered endpoints within the mixing layer over Texas as an additional analysis to describe trajectories that show more meaningful transport patterns. The EPA has no scientific basis for concluding that the TCEQ inappropriately filtered trajectories. The analysis only filtered endpoints within the mixing layer over Texas as an additional analysis to describe trajectories that show more meaningful transport patterns.

*Response*

The EPA disagrees with the commenter that the TCEQ SIP should be approved because the commenter takes issue with some of EPA's technical comments on the trajectory analyses included as part of the information in their proposed SIP. The EPA's rationale for the disapproval of Texas's SIP Submission was

explained at proposal. *See* 87 FR 9826-9834.[87] The EPA appreciates the clarifying points from commenter regarding aspects of the HYSPLIT analysis with which the Agency took issue at proposal.

In regard to the first bullet related to trajectory parameters, as noted in the Evaluation of the TCEQ Modeling TSD we disagree that 72 hours was a long enough period to calculate back trajectories since some of the trajectories ended before fully transporting over Texas or before potentially entering Texas. In regard to the second bullet, we appreciate the clarification that we mischaracterized the start time for the HYSPLIT trajectories that they are not at the start of the 8-hour period of the MDA8 but at the hour that had the maximum 1-hour value during the eight hours in the MDA8.

In regard to the second bullet, we appreciate the clarification that we mischaracterized the start time for the HYSPLIT trajectories and that they are not at the start of the 8-hour period of the MDA8 but at the hour that had the maximum 1-hour value during the eight hours in the MDA8.  In regard to the third bullet, we often run 100 meter start heights (as is mentioned in the 179b guidance that commenter referred to in its first bullet) and felt this was especially important since TCEQ was screening out some 500 and 1000 meter start heights based on the planetary boundary layer height. Also related to the third bullet EPA does not agree that centerline trajectories that touch the ground should be screened out in this type of analysis. In regard to the fourth bullet, we disagree with screening the start height with the planetary boundary layer mix height as the MDA8 is made up of 8-hours and TCEQ's method bases dropping the trajectory for that day even though some of the hours in the MDA8 eight hour period may have been well below the mix height indicating that day should be evaluated for transport. EPA also disagrees with screening the centerline endpoints over Texas with the planetary boundary layer height as the vertical dispersion at the distances from the Colorado receptors would be expected to have contributing air from above and below the planetary boundary layer.

With the exception of the clarification of the start hour on the trajectories, the EPA continues to take issue with technical aspects of the back trajectory analysis. The commenter's points still do not resolve all of the issues that the EPA identified in its TSD, such as the need to run the trajectories for a sufficient length of time and inappropriate screening out of trajectories. *See* Evaluation of TCEQ's Modeling TSD at 81-86. Nonetheless, as these issues generally relate to TCEQ's arguments regarding potential linkages in its own modeling to Colorado and California (which are not found in EPA's modeling), these technical matters do not materially alter the bases for the EPA's disapproval as to Texas.

For this final action, the EPA conducted its own HYSPLIT back trajectory analysis for projected modeling-based nonattainment and maintenance receptors in 2023. As part of this analysis back trajectories were created for each of the 10 downwind receptors to which Texas is linked based on the 2016v3 modeling used for this final actions. EPA ran these trajectories 96 hours (longer than the 72 hours that TCEQ ran their back trajectories). These receptors are identified in the table below.

---

[87] The EPA further explained its rationale in the Evaluation of TCEQ Modeling TSD in Docket ID No. EPA-R06-OAR-2021-0801.

*Table 8-3 Receptors Linked to Texas in 2023 Based on the 2016v3 Modeling*

| AQS ID | State | County | Location |
|---|---|---|---|
| 170310001 | Illinois | Cook | Chicago/Alsip |
| 170314201 | Illinois | Cook | Chicago/Northbrook |
| 170317002 | Illinois | Cook | Chicago/Evanston |
| 350130021 | New Mexico | Dona Ana | Las Cruces/Desert View |
| 350130022 | New Mexico | Dona Ana | Las Cruces/Santa Teresa |
| 350151005 | New Mexico | Eddy | Carlsbad/BLM |
| 350250008 | New Mexico | Lea | Hobbs |
| 550590019 | Wisconsin | Kenosha | Chiwaukee Prairie |
| 551010020 | Wisconsin | Racine | Racine |
| 551170006 | Wisconsin | Sheboygan | Sheboygan |

The EPA created HYSPLIT-based back trajectories for days when measured ozone concentrations exceeded the NAAQS at each of these receptors over the 12 year period from 2010 to 2021. The maps below show the back trajectory analysis for three of these receptors, the Chicago/Northbrook, Sheboygan, and Carlsbad area receptors, based trajectories at 500 m and 750 m (i.e., generally in the mid portion of the daytime mixed layer). The maps provide a visual representation of areas typically upwind wind of the Chicago/Northbrook, Sheboygan, and Carlsbad receptors on days with measured exceedances at these receptors (trajectory paths are similar for the other receptors identified in the table above). The trajectory paths serve to reinforce the EPA's finding that Texas is linked to these receptors in this final action. The EPA's back trajectory analysis is more fully described and the results for all 10 receptors are provided in the Final Action AQM TSD.



371



## 8.9    Allegations of Inconsistency with Other Recent EPA Actions

*Comments*

**Commenter:** Association of Electric Companies of Texas, BCCA Appeal Group, Texas Chemical Council and Texas Oil & Gas Association

**Commenter ID:** 11

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

E. EPA's conclusions in its disapproval of Texas's SIP conflict with other recent EPA actions.

EPA recently proposed to redesignate the Illinois portion of the Chicago area to attainment of the 2008 ozone NAAQS[46] and finalized redesignation of the Wisconsin portion of the Chicago nonattainment area.[47] In EPA's proposed redesignation, the Agency recognized that 2011-based modeling performed by EPA and LADCO in support of the interstate transport requirements for the 2015 ozone NAAQS projected that "the highest 2023 average design values to be 0.0662 and 0.0668" for Illinois's Chicago monitors.[48] In contrast to EPA's position in the Proposed Disapproval that four of Illinois's Chicago monitors will have average DVs of 69.6 ppb to 70.1 ppb in 2023, the modeling cited in EPA's proposed redesignation projects that the Illinois's Chicago monitors will be well under the 2015 ozone NAAQS of 70 ppb in 2023.

EPA viewed this 2011-based modeling of 2023 DVs favorably and as additional support for redesignation, noting that "[t]hese results provide evidence that ozone concentrations will continue to decrease across the entire nonattainment area," despite the fact that EPA's 2016v2 modeling platform was available.  As explained by Sonoma Technology, the EPA and LADCO results agree with TCEQ's conclusion: Chicago-region monitors do not satisfy EPA's tests for "nonattainment" or "maintenance" monitors for purposes of interstate transport planning.

EPA's conflicting positions on modeling and on the Chicago-area monitors' ability to attain the 2015 ozone NAAQS further show how EPA's Proposed Disapproval is arbitrary and capricious as to EPA's determination that Texas's emissions contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS at certain Chicago-area monitors.

[46] Illinois Redesignation Proposal, 87 Fed. Reg. 13,668.
[47] Air Plan Approval; Wisconsin; Redesignation of the Wisconsin Portion of the Chicago-Naperville, Illinois-Indiana-Wisconsin Area to Attainment of the 2008 Ozone Standard, 87 Fed. Reg. 21,027 (Apr. 11, 2022).
[48] Illinois Redesignation Proposal, 87 Fed. Reg. at 13,679 n.5.

**Commenter:** Xcel Energy

**Commenter ID:** 52

**Docket ID:** EPA-R05-OAR-2022-0006

**Comment:**

3. EPA's Air Plan Proposed Approval finding Illinois Portion of the Chicago-Naperville, Illinois Indiana-Wisconsin Area to Attainment of the 2008 Ozone Standard

On March 10th, 2022 EPA proposed to designate that the Illinois portion of the Chicago Naperville, IL-IN-WI area (Chicago area) in attainment for the 2008 ozone National Ambient Air Quality Standards. Cook

County, the receptor area linked to Minnesota's designation as exceeding the contribution threshold, makes up a large portion of the Chicago area. The approval goes on to state:

*"While modeling is not required, Illinois cited photochemical modeling performed by EPA and LADCO in support of the interstate transport "Good Neighbor" provision of the CAA for the 2015 ozone NAAQS. These modeling results project the highest 2023 average design values to be 0.0662 and 0.0668, well below the 2008 ozone NAAQS. Compared to actual monitored 2009—2013 average design values, both sets of 2023 modeling results show large decreases in ozone concentrations, especially in the heart of the urban area and at the critical monitors at the north of the nonattainment area along the shore of Lake Michigan. These results provide evidence that ozone concentrations will continue to decrease across the entire nonattainment area."*

The finding that the region's ozone design values from both the LADCO and EPA s modeling results show 1. That the region is below the 2008 standard, 2. That the region is also below the 2015 threshold of 0.070ppb, and 3. that ozone concentrations are expected to continue to decrease across the region, conflicts with the finding that Minnesota is linked to contributing above the impact threshold in Illinois/Chicago for the 2015 Ozone NAAQS. At a minimum, it raises the question as to why EPA found the 2016v2 modeling platform to be superior to the LADCO photochemical analysis in determining Minnesota's contribution in modeling efforts performed for the 2015 Ozone NAAQS.

**Commenter:** Xcel Energy

**Commenter ID:** 52

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

3. EPA's Air Plan Proposed Approval finding Illinois Portion of the Chicago-Naperville, Illinois Indiana-Wisconsin Area to Attainment of the 2008 Ozone Standard

On March 10th, 2022 EPA proposed to designate that the Illinois portion of the Chicago Naperville, IL-IN-WI area (Chicago area) in attainment for the 2008 ozone National Ambient Air Quality Standards. Cook County, the receptor area linked to Texas's designation as exceeding the contribution threshold, makes up a large portion of the Chicago area. The approval goes on to state:

*"While modeling is not required, Illinois cited photochemical modeling performed by EPA and LADCO in support of the interstate transport "Good Neighbor" provision of the CAA for the 2015 ozone NAAQS. These modeling results project the highest 2023 average design values to be 0.0662 and 0.0668, well below the 2008 ozone NAAQS. Compared to actual monitored 2009—2013 average design values, both sets of 2023 modeling results show large decreases in ozone concentrations, especially in the heart of the urban area and at the critical monitors at the north of the nonattainment area along the shore of Lake Michigan. These results provide evidence that ozone concentrations will continue to decrease across the entire nonattainment area."*

The region's ozone design values from both the LADCO and EPA's modeling results show the region below the 2008 standard, below the 2015 threshold of 0.070 ppb, and that ozone concentrations are expected to continue to decrease across the area. This result conflicts with the finding that Texas is

linked to contributing above the impact threshold in Illinois/Chicago in evaluating its SIP for the 2015 Ozone NAAQS. At a minimum, it raises the question as to why EPA found the 2016v2 modeling platform to be superior to the TCEQ photochemical analysis in determining Texas's contribution in modeling efforts performed for the 2015 Ozone NAAQS.

*Response*

The EPA disagrees that there is any meaningful conflict between the air quality projections in this action and certain observations the Agency made in a footnote to a proposed action on March 10, 2022. In that notice, the EPA proposed to find that the Illinois portion of the Chicago-Naperville, IL-IN-WI area is attaining the 2008 ozone NAAQS. 87 FR 13668 (March 10, 2022). This action, as acknowledged by commenter, only applies to the 2008 ozone NAAQS. However, the EPA noted in that proposal that "while modeling is not required" to support that action, there was modeling by EPA and LADCO suggesting that average design values in 2023 may be as low as around 66 ppb. *Id.* at 13679 n.5. This observation was not necessary to support that proposal, and the Agency did not cite to or otherwise explain the basis for the statement in this footnote. However, this appears to have been in reference to the EPA's older modeling of 2023, which has of course been updated in the 2016v2 modeling used at proposal and the 2016v3 modeling used at final, both of which now project that ozone levels in the Chicago area will remain above the 2015 ozone NAAQS in 2023. In fact, when the EPA finalized this proposal, it made no further reference to that older modeling as a basis for its action or otherwise, and in response to adverse comments highlighting the EPA's updated transport modeling, we acknowledged: "EPA's ozone transport modeling indicates that, barring further emissions reductions, this area will continue to have difficulty attaining or maintaining the 2015 NAAQS in 2024." 87 FR 30821, 30826 (May 20, 2022). Subsequently, in the EPA's final "Determinations of Attainment by the Attainment Date" (DAAD) rule for the 2015 ozone NAAQS, the EPA found that the Chicago-Naperville (IL-IN-WI) nonattainment area had failed to attain the NAAQS and had design values of 79 ppb, 77 ppb, and 76 ppb for the 2018-2020 period. 87 FR 60904 (Oct. 7, 2022). As such, the EPA reclassified the area to Moderate nonattainment, and that area is now subject to a January 1, 2023, deadline among other things to submit a SIP submission revision implementing RACM/RACT. *Id.* at 60900.

Consistent with the information presented by the EPA in these final actions in May and October of this year, the EPA's latest ozone transport modeling indicates that this area will continue to have difficulty attaining or maintaining the 2015 ozone NAAQS in 2023. Further, the EPA's modeling of the contributions to that ongoing air quality problem used in this action further indicates that these elevated ozone levels are due in part to the emissions of ozone-precursor pollutants transported from upwind states, such as Minnesota and Texas.  Therefore, the EPA disagrees with commenters that our analysis in this action conflicts with other EPA actions.

# 9  Controls

## 9.1  Supplemental Submission

*Comment*

**Commenter:** Air Pollution Control Program, Missouri Department of Natural Resources

**Commenter ID:** 01

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

Although Missouri disagrees with virtually every aspect of the proposed disapproval and the proposed FIP, the Air Program is willing to supplement our SIP submission to address the comments we responded to with regards to continuous operation of NOx control equipment on our affected sources. The Air Program acknowledges that in the last three years, while EPA has not acted on our good neighbor SIP submission, that certain units have not run their NOx control technology. Our response to EPA's comments about this issue indicated that the control technology was likely to be utilized with the imposition of the CSAPR Update; however, this has not been the case in 2020 and 2021 where Missouri has exceeded its assurance level both years. EPA points to these reasons in its FIP proposal as to why EPA must impose never-before-seen stringent levels of assurance requirements in the proposed FIPs. However, the Air Program plans to develop a supplement to Missouri's SIP to ensure the continued operation of all installed NOx control technology at all power plants in the state.

In light of the intended supplement to Missouri's good neighbor SIP submission, the Air Program requests that when EPA updates the modeling for any final disapproval or final FIP, that no emission reductions between baseline levels and control case levels be included for any Missouri power plant that has a Selective Catalytic Reduction (SCR) control device currently installed. The control case levels should be assumed for any SCR controlled units in any updated modeling that EPA conducts to support these final rules. The Air Program will stay in close communication with EPA Region 7 to communicate the status of the intended SIP supplement with regard to this issue.

*Response*

The EPA is not requiring controls on sources in Missouri or any other state in this action.

The EPA received a second good neighbor SIP submission addressing the 2015 ozone NAAQS from Missouri on November 1, 2022. Although Missouri identified this submission as a "supplement," the EPA pointed out in a comment letter to Missouri DNR on a draft version of the submission that we view this submission as a separate SIP submission, which does not impact our pre-existing obligation (now subject

to court-ordered deadline) to act on Missouri's original transport submittal.[88] We further note that the letter identified several concerns the Agency had with the State's approach in its draft submission. The EPA will evaluate that submission, including how the state addressed the concerns in our letter, at the time we act on that submission.

## 9.2   Over-Control

*Comment*

**Commenter:** Alabama Power Company, Southern Power Company, and PowerSouth Energy Cooperative

**Commenter ID:** 04

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

Because no cost-effective reductions are, in fact, available from [Plant Gaston Unit 5, Plant Barry Unit 4, Plant Harris Unit 1A], which are the only units from which such reductions could potentially be considered, then no units in Alabama can be regarded as causing significant contribution to or interference of maintenance with downwind receptors. EPA must consider this analysis in its final action on Alabama's 2022 SIP. Even more, requiring Alabama to reduce emissions in 2023 would result in over-control because EPA's own modeling finds that Alabama will be in compliance with the good neighbor provision by 2026 without making any reductions.[102] Any reductions made now would be costly and would result in no real benefit to future good neighbor compliance.

[102] 87 Fed. Reg. at 64,420.

*Response*

See Section 8.6 for the EPA's response regarding Alabama Power Company et al.'s claim that there are no cost-effective reductions available at certain EGUs in Alabama and whether the information provided constitutes a satisfactory Step 3 evaluation for the state of Alabama.

The EPA disagrees with the commenter's assertion that any additional $NO_x$ emissions for EGUs in the state in 2023 results in over control because the EPA's modeling indicates no downwind contribution in 2026 and any reductions made now would be costly and no provide any benefits for future GNP obligations. The EPA's action to disapprove Alabama's transport SIP submission evaluates the state's interstate transport SIP submission to determine whether the current package satisfies the statutory obligations at CAA 110(a)(2)(D)(i)(I). This action is not determining what, if any, cost effective controls exist at Step 3 of the 4-step interstate transport framework. Rather, we find Alabama simply did not conduct an adequate analysis at Step 3.

---

[88] *See* "Comments on Missouri State Implementation Plan Revision Addressing Interstate Transport for the 2015 Ozone Standard", August 18, 2022. Available in the docket for this action.

The claim that any good neighbor emissions-reduction obligations that may be needed and achievable by 2023 are overcontrol based on projections that the state may not have a linkage by 2026 is in direct conflict with the holdings of *North Carolina*, 531 F.3d 896, 912 (D.C. Cir. 2008), *Wisconsin,* 938 F.3d 303, 313-20 (D.C. Cir. 2019), *Maryland*, 958 F.3d 1185, 1203-04 (D.C. Cir. 2020), and *New York v. EPA*, 964 F.3d 1214, 1226 (D.C. Cir. 2020), because 2026 is beyond the next attainment date, which is August 3, 2024. As explained in the preamble in Section II.D.1, 2023 is the relevant analytic year associated with that attainment date, and so the appropriate year for which the EPA conducted its evaluation of state submittals in this action.

However, the EPA is not requiring any controls from Alabama or any other state in this action. Comments on the substance of the proposed FIP action are beyond the scope of this rulemaking.

# 10  Legal Comments Not Otherwise Addressed Elsewhere

## 10.1  Venue

*Comments*

**Commenter:** Alabama Power Company

**Commenter ID:** 03

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

Lastly, if EPA were to finalize its proposal on ADEM's now withdrawn 2018 SIP submittal, EPA's belief that its action would be "nationally applicable" or, in the alternative, "based on a determination of nationwide scope or effect" is incorrect and should not be finalized. EPA's action is a locally or regionally applicable action only, and review is proper only in the appropriate regional circuit. When determining whether an action is locally or regionally applicable under Section 7607(b)(1), one must "look only to the face of the [action], rather than to its practical effects."[21] A primary consideration is whether the action's "application beyond the instant case is limited by its own terms."[22] EPA's proposal is "limited by its own terms." It applies only to three states in a single EPA region. And EPA separately reviews and addresses each state's SIP submittal and has proposed action based on the unique attributes and facts of each state.

Moreover, EPA's proposal is not "based on a determination of nationwide scope or effect" simply because "EPA interprets and applies section 110(a)(2)(d)(i)(I) . . . based on a common core of nationwide policy judgments and technical analysis[.]"[23] The actual determinations EPA relies on in its proposal are state-specific determinations related to the particularities of each state's SIP. Therefore, EPA's proposal to find that its action is "based on a determination of nationwide scope or effect" is flawed, and EPA should not finalize this proposed finding.

[21] *Am. Road & Transp. Builders Ass'n v. EPA*, 705 F.3d 453, 456 (D.C. Cir. 2013).
[22] *Sierra Club v. EPA*, 926 F.3d 844, 849 (D.C. Cir. 2019)
[23] 87 Fed. Reg. at 9,562.

**Commenter:** Alabama Power Company, Southern Power Company, and PowerSouth Energy Cooperative

**Commenter ID:** 04

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

Finally, if EPA were to finalize its proposal, EPA's belief that its action would be "nationally applicable" or, in the alternative, "based on a determination of nationwide scope or effect" is incorrect and should not be finalized.[104] EPA's action is a locally or regionally applicable action only and review is proper only

379

in the appropriate regional circuit. When determining whether an action is locally or regionally applicable under Section 7607(b)(1), one must "look only to the face of the [action], rather than to its practical effects."[105] A primary consideration is whether the action's "application beyond the instant case is limited by its own terms."[106] EPA's proposal is "limited by its own terms"—it applies only to Alabama.

Moreover, EPA's proposal is not "based on a determination of nationwide scope or effect" simply because "EPA interprets and applies section 110(a)(2)(d)(i)(I) . . . based on a common core of nationwide policy judgments and technical analysis[.]"[107] The actual determinations EPA relies on in its proposal are state-specific determinations related to the particularities of Alabama's SIP. Therefore, EPA's proposal to find that its action is "based on a determination of nationwide scope or effect" is flawed, and EPA should not finalize this proposed finding.

[104] [87 Fed. Reg.] at 64,427.
[105] *Am. Road & Transp. Builders Ass'n v. EPA*, 705 F.3d 453, 456 (D.C. Cir. 2013).
[106] *Sierra Club v. EPA*, 926 F.3d 844, 849 (D.C. Cir. 2019).
[107] 87 Fed. Reg. at 64,427.

**Commenter:** Arkansas Environmental Federation

**Commenter ID:** 09

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

III. The Appropriate Venue for Hearing Challenges to the Proposed Disapproval of Arkansas's SIP Is the Eighth Circuit.

EPA claims that the appropriate venue for challenges to EPA's final action on the interstate transport SIPs for Louisiana, Arkansas, Texas, and Oklahoma is the U.S. Court of Appeals for the District of Columbia Circuit ("D.C. Circuit").[26] Under Section 307(b)(1) of the CAA, for purposes of determining venue for challenges to EPA actions, the relevant questions are whether the action is: (1) a nationally applicable action; (2) a locally or regionally applicable action; or (3) a locally or regionally applicable action based on a determination that has nationwide scope or effect.[27]

EPA claims that the proposed rulemaking, if finalized, would be a "nationally applicable" action under CAA Section 307(b)(1) because it would address four states, located in three different Federal judicial circuits, and "would apply uniform, nationwide analytical methods, policy judgments, and interpretation with respect to the same CAA obligations."[28] EPA's reasoning is insufficient to make the final rulemaking a "nationally applicable" action and it would be inconsistent with EPA's recent final rulemaking approving the ozone interstate transport SIPs for Florida, Georgia, North Carolina, and South Carolina.[29] Despite the fact that rulemaking applied to four states located in two different Federal judicial circuits, and also relied on EPA's 4-Step interstate transport framework, EPA did not determine that action was nationally applicable, with judicial review available only in the D.C. Circuit. Instead, EPA determined that judicial review of that rule must be filed in the United States Court of Appeals *for the appropriate circuit*.[30]

In the alternative to determining that the final rulemaking would be "nationally applicable," "the Administrator intends to exercise the complete discretion afforded to him under the CAA to make and publish a finding that the final action … is based on a determination of 'nationwide scope or effect.'"[31] However, despite the Agency's unsupported claim, EPA is not afforded "complete discretion" in proposing to find that the final rulemaking would be based on a determination of "nationwide scope or effect" within the meaning of CAA Section 307(b)(1). Courts do not defer to EPA's determination of venue.[32] Likewise, there is no provision in CAA Section 307(b)(1) that gives EPA the exclusive authority to determine whether an action is based on a determination of nationwide scope or effect.[33] Rather, the CAA "provides a clear metric by which a court can assess the scope or effect of the relevant determinations. The reviewing court merely asks whether the scope or effect of the determinations is nationwide."[34]

EPA's intent to "apply uniform, nationwide analytical methods, policy judgments, and interpretation with respect to the same CAA obligations" in this and other ozone transport SIP rulemakings would not transform any of the final rulemakings into one that is "based on a determination of nationwide scope or effect." Indeed, it would be arbitrary and capricious for EPA to apply non-uniform analytical methods, inconsistent policy judgments, and inconsistent interpretations to the various state ozone transport SIP submittals.[35] If EPA relies on the same concept or interpretation in "other final agency action, it will be subject to judicial review upon challenge" to that separate action.[36] In approving the interstate transport SIPs for Georgia, Florida, North Carolina, and South Carolina, EPA relied on the same 4-Step framework on which it relied for this Proposal and yet EPA made no claim that its approval of those states' SIPs was based on a determination of nationwide scope or effect, in direct contrast to this rulemaking.[37]

Despite EPA's claim that its final rulemaking with respect to the ozone transport SIPs for Arkansas, Louisiana, Texas, and Oklahoma will be nationally applicable or based on a determination of nationwide scope or effect, EPA's final action on these states' SIPs will be locally or regionally applicable, and *not* based on a determination of nationwide scope or effect. "The question of applicability turns on the legal impact of the action as a whole."[38] Here, EPA's proposed action is limited to a single EPA region and directly impacts only four states. This is the prototypical example of a regionally applicable action. Although EPA claims to be applying uniform, nationwide analytical methods, policy judgments, and interpretations, EPA's proposed disapprovals are inherently state-specific and depend on the "facts and circumstances of each particular state's submittal."[39] Accordingly, petitions for review of EPA's final action with respect to the interstate ozone transport SIPs may be brought only in the court of appeals for the appropriate circuit. For EPA's final action with respect to Arkansas's SIP, that will be the U.S. Court of Appeals for the Eighth Circuit.

---

[26] 87 Fed. Reg. at 9835.

[27] See 42 U.S.C. § 7807(b)(1); see also Texas v. EPA, 829 F.3d 405, 418 (5th Cir. 2016)

[28] 87 Fed. Reg. at 9835.

[29] Air Plan Approval; FL, GA, NC, SC; Interstate Transport (Prongs 1 and 2) for the 2015 8-Hour Ozone Standard, 86 Fed. Reg. 68,413 (Dec. 2, 2022)

[30] 86 Fed. Reg. at 68,430.

[31] 87 Fed. Reg. at 9835

[32] *Texas v. EPA*, 829 F.3d 405, 417–18 (5th Cir. 2016).

[33] *Id* at 420.

[34] *Id*.

35 As noted above, however, policy judgments should not be a factor in whether or not an interstate transport SIP is approvable.
36 *Sierra Club v. EPA*, 926 F.3d 844, 849 (D.C. Cir. 2019).
37 *See* 86 Fed. Reg. 68,413.
38 *Texas*, 829 F.3d at 419; *accord Texas v. EPA*, No. 10-60961, 2011 WL 710598, at *2 (5th Cir. Feb. 24, 2011) (unpublished) ("Determining whether an action by the EPA is regional or local on the one hand or national on the other should depend on the location of the persons or enterprises that the actio n regulates rather than on where the effects of the action are felt." (internal quotation omitted)).
39 87 Fed. Reg. at 9801.

**Commenter:** Association of Electric Companies of Texas, BCCA Appeal Group, Texas Chemical Council and Texas Oil & Gas Association

**Commenter ID:** 11

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

EPA's claim that petitions for review of the Proposed Disapproval, if finalized, must be filed in the U.S. Court of Appeals for the D.C. Circuit is erroneous. For purposes of determining venue, the relevant questions to consider are whether the Proposed Disapproval is: 1) a nationally applicable action; 2) a locally or regionally applicable action; or 3) a locally or regionally applicable action based on a determination that has nationwide scope or effect.[52]

EPA's Proposed Disapproval is locally or regionally applicable under CAA Section 307(b)(1). "The question of applicability turns on the legal impact of the action as a whole."[53] Here, EPA's proposed disapproval of Texas's SIP applies only to Texas. EPA has cited no authority to support its apparent position that lumping multiple separate actions into one notice converts those individual actions into a single action for purposes of the statute's venue provision. Even taking EPA's entire *Federal Register* notice into account, EPA's proposed action is limited to a single EPA region and directly impacts only four states. Even together, this is the prototypical example of a regionally applicable action. Although EPA claims to be applying uniform, nationwide analytical methods, policy judgments, and interpretations, EPA's proposed disapprovals are inherently state-specific and depend on the "facts and circumstances of each particular state's submittal."[54] Accordingly, "petitions for review of SIP disapprovals may be brought only in the court of appeals 'for the *appropriate* circuit,'" that is, the regional circuit.[55]

EPA's reasoning that the proposed disapproval is nationally applicable is arbitrary and capricious. EPA previously determined that judicial review of its approval of four interstate transport SIP submissions should be filed in the U.S. Court of Appeals for the appropriate circuit, *not* the U.S. Court of Appeals for the D.C. Circuit which is the appropriate venue for nationally applicable agency actions. In December 2021, EPA approved the interstate transport SIP submissions for Florida, Georgia, North Carolina, and South Carolina.[56] This final rule applies to four states located in two different Federal judicial circuits. EPA, however, did not determine that this final rule was nationally applicable or based on a determination of nationwide scope or effect. Rather, EPA determined that judicial review of this rule must be filed in the United States Court of Appeals for the appropriate circuit.[57] Similarly, in EPA's

382

proposed approval of Iowa's interstate transport SIP, which was published on the same day as the Proposed Disapproval, EPA was silent as to whether the rule would have national applicability or be based on a determination of nationwide scope or effect.[58]

EPA's proposed disapproval is not nationally applicable nor is it based on a determination that has nationwide scope or effect. Therefore, the proper venue for judicial review of the proposed disapproval of Texas's SIP is the U.S. Court of Appeals for the Fifth Circuit. For the purposes of the CAA's venue provision, "'the relevant determinations are those that lie at the core of the agency action,' not determinations that are 'peripheral or extraneous.'"[59] "Section 7607(b)(1) . . . looks to the 'determination' that the challenged action is 'based on.' These determinations are the justifications the agency gives for the action and they can be found in the agency's explanation of its action. They are the reason the agency takes the action that it does."[60] "Determinations are not of nationwide scope or effect if they are 'intensely factual determinations such as those related to the particularities of the emissions sources in Texas.'"[61]

Even if concepts or interpretations from the proposed action are applied in other rulemakings, that is irrelevant to the venue inquiry, because it is "typical" for the "interpretative reasoning offered by [EPA] . . . [to have] precedential effect in future EPA proceedings . . . , including regionally and locally applicable ones."[62] EPA's consistent interpretation of the CAA does not transform the action into one that is "based on a determination of nationwide scope or effect." Rather, if EPA relies on the same concept or interpretation in "other final agency action, it will be subject to judicial review upon challenge" to that separate action.[63] In approving interstate transport SIPs for the 2015 ozone NAAQS for Georgia, Florida, North Carolina and South Carolina, EPA also relied on the same four-step framework on which it relied for the Proposed Disapproval, and yet, EPA made no claim that its approval of those states' SIPs was based on a determination of nationwide scope or effect, in direct contrast to the Proposed Disapproval.[64]

Furthermore, despite the Agency's unsupported claim in the Proposed Disapproval, EPA is not afforded "complete discretion" in proposing to find that the Proposed Disapproval is based on a determination of "nationwide scope or effect" within the meaning of CAA Section 307(b)(1). Courts do not defer to EPA's determination of venue.[66] Likewise, there is no provision in CAA Section 307(b)(1) that gives EPA the exclusive authority to determine whether an action is based on a determination of nationwide scope or effect.[67]

[52] 42 U.S.C. § 7807(b)(1); Texas v. EPA, 829 F.3d 405, 418 (5th Cir. 2016).

[53] *Texas*, 829 F.3d at 419; *accord Texas v. EPA*, No. 10-60961, 2011 WL 710598, at *2 (5th Cir. Feb. 24, 2011) (unpublished) ("Determining whether an action by the EPA is regional or local on the one hand or national on the other should depend on the location of the persons or enterprises that the action regulates rather than on where the effects of the action are felt." (internal quotation omitted)).

[54] Proposed Disapproval, 87 Fed. Reg. at 9,801.

[55] [*EME Homer City Generation v. EPA*], 696 F.3d [7 (D.C. Cir. 2012)] at 44 n.6 (Judge Rogers, dissenting) (emphasis in original)

[56] Air Plan Approval; FL, GA, NC, SC; Interstate Transport (Prongs 1 and 2) for the 2015 8-Hour Ozone Standard, 86 Fed. Reg. 68,413 (Dec. 2, 2022) ("FL, GA, NC, SC Approval").

[57] Id. at 68,420.

[58] Air Plan Approval; Iowa; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards, 87 Fed. Reg. 9,477 (Feb. 22, 2022).

59 Texas v. EPA, 706 Fed. Appx. 159, 164 (5th Cir. 2017) (quoting *Texas*, 829 F.3d at 419).

60 *Texas*, 829 F.3d at 419.

61 Texas, 706 Fed. Appx. at 164 (quoting *Texas*, 829 F.3d at 421).

62 *Sierra Club v. EPA*, 926 F.3d 844, 850 (D.C. Cir. 2019); *see also Texas*, 829 F.3d at 423 ("Nor are we persuaded . . . that whatever precedential effect the Final Rule has shows that it is based on determinations with nationwide scope or effect.").

63 *Sierra Club*, 926 F.3d at 849.

64 Compare FL, GA, NC, SC Approval, 86 Fed. Reg. at 68,420 ("[P]etitions for judicial review of this action must be filed in the United States Court of Appeals for the appropriate circuit by January 31, 2022.") *with* Proposed Disapproval, 87 Fed. Reg. at 9,835 ("EPA anticipates that this proposed rulemaking, if finalized, would be "nationally applicable" . . . If the EPA takes final action on this proposed rulemaking[, in the alternative,] the Administrator intends to exercise the complete discretion afforded to him under the CAA to make and publish a finding that the final action (to the extent a court finds the action to be locally or regionaly applicable is based on a determination of "nationwide scope or effect" within the meaning of CAA section 307(b)(1).").

65 Proposed Disapproval, 87 Fed. Reg. at 9,835.

66 *Texas*, 829 F.3d at 417–18.

67 *Id*. at 420 n.19.

**Commenter:** Louisiana Electric Utility Environmental Group

**Commenter ID:** 28

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

B. The Appropriate Venue for Hearing Challenges to the Proposed Disapproval of Louisiana's SIP Is the Fifth Circuit.

EPA claims that the appropriate venue for challenges to EPA's final action on the interstate transport SIPs for Louisiana, Arkansas, Texas, and Oklahoma is the U.S. Court of Appeals for the District of Columbia Circuit ("D.C. Circuit").[15] Under Section 307(b)(1) of the CAA, for purposes of determining venue for challenges to EPA actions, the relevant questions are whether the action is: (1) a nationally applicable action; (2) a locally or regionally applicable action; or (3) a locally or regionally applicable action based on a determination that has nationwide scope or effect.[16]

EPA claims that the proposed rulemaking, if finalized, would be a "nationally applicable" action under CAA Section 307(b)(1) because it would address four states, located in three different Federal judicial circuits, and "would apply uniform, nationwide analytical methods, policy judgments, and interpretation with respect to the same CAA obligations."[17] EPA's reasoning is insufficient to make the final rulemaking a "nationally applicable" action and it would be inconsistent with EPA's recent final rulemaking approving the ozone interstate transport SIPs for Florida, Georgia, North Carolina, and South Carolina.[18] Despite the fact that rulemaking applied to four states located in two different Federal judicial circuits, and also relied on EPA's 4-Step interstate transport framework, EPA did not determine that action was nationally applicable, with judicial review available only in the D.C. Circuit. Instead, EPA determined that judicial review of that rule must be filed in the United States Court of Appeals for the appropriate circuit.[19]

In the alternative to determining that the final rulemaking would be "nationally applicable," "the Administrator intends to exercise the complete discretion afforded to him under the CAA to make and publish a finding that the final action … is based on a determination of 'nationwide scope or effect.'"[20] However, despite the Agency's unsupported claim, EPA is not afforded "complete discretion" in proposing to find that the final rulemaking would be based on a determination of "nationwide scope or effect" within the meaning of CAA Section 307(b)(1). Courts do not defer to EPA's determination of venue.[21] Likewise, there is no provision in CAA Section 307(b)(1) that gives EPA the exclusive authority to determine whether an action is based on a determination of nationwide scope or effect.[22] Rather, the CAA "provides a clear metric by which a court can assess the scope or effect of the relevant determinations. The reviewing court merely asks whether the scope or effect of the determinations is nationwide."[23]

EPA's intent to "apply uniform, nationwide analytical methods, policy judgments, and interpretation with respect to the same CAA obligations" in this and other ozone transport SIP rulemakings would not transform any of the final rulemakings into one that is "based on a determination of nationwide scope or effect." Indeed, it would be arbitrary and capricious for EPA to apply non-uniform analytical methods, inconsistent policy judgments, and inconsistent interpretations to the various state ozone transport SIP submittals. If EPA relies on the same concept or interpretation in "other final agency action, it will be subject to judicial review upon challenge" to that separate action.[24] In approving the interstate transport SIPs for Georgia, Florida, North Carolina, and South Carolina, EPA relied on the same 4-Step framework on which it relied for this Proposal and yet EPA made no claim that its approval of those states' SIPs was based on a determination of nationwide scope or effect, in direct contrast to this rulemaking.[25]

Despite EPA's claim that its final rulemaking with respect to the ozone transport SIPs for Arkansas, Louisiana, Texas, and Oklahoma will be nationally applicable or based on a determination of nationwide scope or effect, EPA's final action on these states' SIPs will be locally or regionally applicable, and *not* based on a determination of nationwide scope or effect. "The question of applicability turns on the legal impact of the action as a whole."[26] Here, EPA's proposed action is limited to a single EPA region and directly impacts only four states. This is the prototypical example of a regionally applicable action. Although EPA claims to be applying uniform, nationwide analytical methods, policy judgments, and interpretations, EPA's proposed disapprovals are inherently state-specific and depend on the "facts and circumstances of each particular state's submittal."[27] Accordingly, petitions for review of EPA's final action with respect to the interstate ozone transport SIPs may be brought only in the court of appeals for the appropriate circuit. For EPA's final action with respect to Louisiana's SIP, that will be the U.S. Court of Appeals for the Fifth Circuit.

---

[15] 87 Fed. Reg. at 9835.

[16] *See* 42 U.S.C. § 7807(b)(1); *see also Texas v. EPA*, 829 F.3d 405, 418 (5th Cir. 2016).

[17] 87 Fed. Reg. at 9835.

[18] Air Plan Approval; FL, GA, NC, SC; Interstate Transport (Prongs 1 and 2) for the 2015 8-Hour Ozone Standard, 86 Fed. Reg. 68,413 (Dec. 2, 2022).

[19] 86 Fed. Reg. at 68,430;

[20] 87 Fed. Reg. at 9835.

[21] *Texas v. EPA*, 829 F.3d 405, 417–18 (5th Cir. 2016).

[22] *Id* at 420.

[23] *Id*.

[24] *Sierra Club v. EPA*, 926 F.3d 844, 849 (D.C. Cir. 2019).

[25] *See* 86 Fed. Reg. 68,413.

[26] *Texas*, 829 F.3d at 419; *accord Texas v. EPA*, No. 10-60961, 2011 WL 710598, at *2 (5th Cir. Feb. 24, 2011) (unpublished) ("Determining whether an action by the EPA is regional or local on the one hand or national on the other should depend on the location of the persons or enterprises that the action regulates rather than on where the effects of the action are felt." (internal quotation omitted)).

[27] 87 Fed. Reg. at 9801.


**Commenter:** The Luminant Companies

**Commenter ID:** 44

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

IV. EPA's Proposal Is Locally or Regionally Applicable Only and Should be Subject to Review in the "Appropriate Circuit"

The Proposed Disapproval is a locally or regionally applicable action only, and review is only proper in the appropriate regional circuit.[56] "The question of applicability turns on the legal impact of the action as a whole."[57] SIP disapprovals are the prototypical locally or regionally applicable action, and challenges "may be brought only in the court of appeals 'for the *appropriate* circuit[.]'".[58] The Proposed Disapproval, on its face, addresses Texas's SIP independently. Simply because EPA has chosen to combine its review of multiple, independent SIP submissions in a single proposal does not transform EPA's action into a "nationally applicable" action. And even looking to EPA's combined action, the Proposed Disapproval only relates to four states in a single EPA region, and EPA addresses each state's SIP independently. Specifically, the action only has legal effect in those states[59] and has no impact beyond the single EPA region. In reality, the Proposed Disapproval separately reviews and addresses each of the four states' SIP submittals and has proposed action based on the unique circumstances of each state.[60] Thus, the action is "locally or regionally applicable" under the Clean Air Act's judicial review provision.[61]

Moreover, the Proposed Disapproval is not "based on a determination of nationwide scope or effect." For the purposes of the Clean Air Act's venue provision, "'the relevant determinations are those that lie at the core of the agency action,' not determinations that are 'peripheral or extraneous.'"[62] "Section 7607(b)(1) . . . looks to the 'determination' that the challenged action is 'based on.' These determinations are the justifications the agency gives for the action and they can be found in the agency's explanation of its action. They are the reason the agency takes the action that it does."[63] "Determinations are not of nationwide scope or effect if they are 'intensely factual determinations' such as those 'related to the particularities of the emissions sources in Texas.'"[64] And, even if concepts or interpretations from the proposed action are applied in other rulemakings, that is irrelevant to the venue inquiry, because it is "typical" for "the interpretative reasoning offered by [EPA] . . . [to have] precedential effect in [other] EPA proceedings . . . , including regionally and locally applicable ones."[65] EPA's consistent interpretation of the Clean Air Act does not transform an action into one that is "based on a determination of nationwide scope or effect." Rather, if EPA relies on a concept or interpretation

set forth in "other final agency action, it will be subject to judicial review upon challenge" to that separate action. [56]

Here, the Proposed Disapproval relies on the specific details and attributes of each state's individual and unique SIP submittal. As EPA itself explained in the Proposed Disapproval, it must analyze the approach taken by a given state to determine whether it is "technically justified and appropriate in light of the facts and circumstances of each particular state's submittal."[57] And EPA has done just that—EPA's proposal with respect to Texas's SIP was "[b]ased on the EPA's evaluation of [Texas's] SIP submission[.]"[58] EPA looked to the specific modeling and weight of evidence analysis provided by TCEQ to assess the approvability of Texas's SIP.[59] EPA's claim that it is interpreting the interstate transport obligation "based on a common core of nationwide policy judgments and technical analysis"[70] is irrelevant for purposes of determining venue, as EPA's analysis as applied to the particular facts of each state is subject to review in the appropriate regional circuit. It should be expected that EPA will always act based on a common core of nationwide policy judgments at some level. It cannot be the case that venue is appropriate in the local circuits only when EPA deviates from its standard practices. The actual determinations EPA relies on in its Proposed Disapproval are "intensely factual determinations" such as those related to the particularities of each state's SIP. Therefore, the "nationwide scope or effect" "exception" to the "default presumption" of regional court review is not applicable here,[71] and EPA should not finalize its proposed finding.

[56] 42 U.S.C. § 7607(b)(1).

[57] *Texas*, 829 F.3d at 419.

[58] [*EME Homer City Generation, L.P. v. EPA*], 696 F.3d [7 (D.C. Cir. 2012)] at 44 n.6.

[59] *Texas v. EPA*, 706 Fed. Appx. 159, 164 (5th Cir. 2017).

[60] *See, e.g.*, 87 Fed. Reg. at 9,824-34 (performing Texas-specific analysis).

[61] *Texas*, 829 F.3d at 419.

[62] *Texas*, 706 Fed. Appx. at 165 (quoting *Texas*, 829 F.3d at 419).

[63] *Texas*, 829 F.3d at 419.

[64] Texas, 706 Fed. Appx. at 165 (quoting *Texas*, 829 F.3d at 421).

[65] *Sierra Club v. EPA*, 926 F.3d 844, 850 (D.C. Cir. 2019); *see also Texas*, 829 F.3d at 423 ("Nor are we persuaded . . . that whatever precedential effect the Final Rule has shows that it is based on determinations with nationwide scope or effect.").

[66] *Sierra Club*, 926 F.3d at 849.

[67] 87 Fed. Reg. at 9,801.

[68] *Id*. at 9,826.

[69] *Id*. at 9,824.

[70] *Id*. at 9,835.

[71] *Texas*, 829 F.3d at 419-21.

**Commenter:** Tennessee Department of Environment and Conservation

**Commenter ID:** 41

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

Comment #8: The iSIP Disapproval is not a Nationally Applicable Regulation and does not have nationwide scope or effect, therefore the DC Circuit is not the exclusive venue for challenge

EPA argues that the ISIP Disapproval is "nationally applicable within the meaning of CAA section 307(b)(1) because it would take final action on SIP submittals for the 2015 8-hour ozone NAAQS for the states of Alabama, Mississippi, and Tennessee, which are located in three different Federal judicial circuits."[56] However, CAA section 307(b)(1) makes it clear that a "petition for review of the Administrator's action in approving or promulgating any implementation plan under section 110 . . . which is *locally or regionally applicable* may be filed _only_ in *the United States Court of Appeals for the appropriate circuit*." And EPA has omitted to mention that all three of these states share boundaries with one another and are all located within the same EPA Region, but do happen to fall in different judicial circuits due to historical happenstance[58].

Therefore, EPA's argument is misplaced; instead, the Court of Appeals for the D.C. Circuit, where venue would be found for "nationally applicable" matters under section 307(b)(1), holds that "EPA's action in approving or promulgating any implementation plan [is] . . . the *prototypical locally or regionally applicable action that may be challenged only in the appropriate regional court of appeals*."[59] In the case of three contiguous states, venue would be improper in the D.C. Circuit because the iSIP Disapproval is a "prototypical . . . regionally applicable action".

Notwithstanding this provision, a petition for review may be filed only in the United States Court of Appeals for the District of Columbia if such action is based on a determination of nationwide scope or effect and if in taking such action the Administrator finds and publishes that such action is based on such a determination. The proposed disapproval states that this action would be "nationally applicable" within the meaning of CAA §307(b)(1) because it would take final action on SIP submittals that are located in three different Federal judicial circuits (the Eleventh Circuit, the Fifth Circuit, and the Sixth Circuit, respectively) and would apply uniform, nationwide analytical methods, policy judgments, and interpretation with respect to the same CAA obligations. EPA's proposed finding is insufficient and should be withdrawn.

---

[56] 87 FR 9545, 9561.
[57] CAA §307(b)(1) (emphasis added).
[58] Regarding the geographic split of Alabama, Mississippi, and Tennessee between different judicial circuits, Tennessee notes that EPA could have published the proposed disapprovals for all three states in separate notices but declined to do so.
[59] *Am. Rd. & Transp. Builders Ass'n v. EPA*, 705 F.3d 453, 455 (D.C. Cir. 2013).


**Commenter:** United States Steel Corporation

**Commenter ID:** 45

**Docket ID:** EPA-R05-OAR-2022-0006

**Comment:**

Judicial Review of Any Disapproved SIP Belongs in the Appropriate Circuit Court for the State

The disapproval of the individual SIPs does not have nationwide effect regardless how U.S. EPA attempts to characterize its proposed action. If finalized as proposed, the rule would result in the disapproval of SIPs for Illinois, Indiana, Michigan, Minnesota, Ohio, and Wisconsin. Each SIP has individual, unique sources, and unique air quality aspects. The SIP submittals are unique to each State. Each state has different types of sources. The issues are unique to each State. The impacts of disapproving these State SIPs are local and regional to the affected states and industries in those states. While U.S. EPA may prefer to have a "one size fits all" approach in developing a FIP to replace these SIPs; this does not change the fact that Congress gave States primary responsibility to adopt State Implementation Plans. The individual State submittals are unique to the individual State and sources; and disapproval of any SIP is presumably unique to the individual State.

*Response*

CAA section 307(b)(1) establishes two routes by which venue may be proper in the D.C. Circuit. First, the D.C. Circuit is "the exclusive venue when EPA's challenged action is 'nationally applicable' rather than 'locally or regionally applicable.'" *Sierra Club v. EPA*, 47 F.4th 738, 742-43 (D.C. Cir. 2022). "Second, and alternatively, venue also lies exclusively in [the D.C. Circuit] if an otherwise 'locally or regionally applicable' action 'is based on a determination of nationwide scope or effect' and EPA 'finds and publishes that such action is based on such a determination.'" *Id.* at 743. For the reasons provided below, this final action is nationally applicable. Alternatively, if a court finds this action to be locally or regionally applicable, the Administrator is exercising his complete discretion to find and publish that this action is based on a determination of nationwide scope or effect.

### Nationally Applicable

To determine whether an action is "nationally applicable" or "locally or regionally applicable," a court "'look[s] only to the face of the agency action, not its practical effects.'" *Chevron U.S.A. Inc. v. EPA*, 45 F.4th 380, 386 (D.C. Cir. 2022) (quoting *Sierra Club*, 926 F.3d 844, 849). Venue turns on the nature of the agency "action," not the nature of a petitioner's challenge. *ATK Launch Systems, Inc. v. EPA*, 651 F.3d 1194, 1197 (10th Cir. 2011) (holding that "this court must analyze whether the regulation itself is nationally applicable, not whether the effects complained of or the petitioner's challenge to that regulation is nationally applicable"); *Texas v. EPA*, 829 F.3d 405, 419 (5th Cir. 2016) ("The question of applicability turns on the legal impact of the action as a whole"); *S. Ill. Power Coop. v. EPA*, 863 F.3d 666, 670 (7th Cir. 2017). On its face, this final rulemaking is "nationally applicable" because it directly applies to 21 states located in ten federal judicial circuits and in eight EPA regions across the entire continental United States.

Specifically, in this action the EPA is disapproving the good neighbor SIPs submitted by Alabama, Arkansas, California, Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, Minnesota, Mississippi, Missouri, Nevada, New Jersey, New York, Ohio, Oklahoma, Texas, Utah, West Virginia, and Wisconsin based on a uniform legal interpretation and common, nationwide analytical methods with respect to the requirements of CAA section 110(a)(2)(D)(i)(I) concerning interstate transport of pollution (i.e., the EPA's 4-step interstate ozone transport framework for the 2015 ozone NAAQS). This disapproval is based on the EPA's conclusion that the good neighbor SIPs submitted by all of these states fail to contain adequate provisions to prohibit, consistent with the provisions of title I of the CAA, any source or other

389

type of emissions activity within each state from emitting any air pollutant in amounts that will contribute significantly to nonattainment in, or interfere with maintenance by, any other state with respect to the 2015 ozone NAAQS, as required by CAA section 110(a)(2)(D)(i). The immediate legal effect of this disapproval is that the EPA is now obligated under CAA section 110(c)(1) to promulgate one or more Federal implementation plans (FIPs) that satisfy the requirements of CAA section 110(a)(2)(D)(i) for the 2015 ozone NAAQS for all of these states.

The EPA is relying on the results from nationwide photochemical grid modeling using a 2016 base year and 2023 projection year as the primary basis for its assessment of air quality conditions and pollution contribution levels at Step 1 and Step 2 of the EPA's 4-step interstate transport framework and applying a nationally uniform approach to the identification of nonattainment and maintenance receptors across the entire geographic area covered by this final action. The EPA has also evaluated each state's arguments for the use of alternative approaches or alternative sets of data with an eye to ensuring national consistency and avoiding inconsistent or inequitable results among upwind states (i.e., those states for which good neighbor obligations are being evaluated in this action) and between upwind and downwind states (i.e., those states that contain receptors signifying ozone nonattainment or maintenance problems). Given that on its face this action addresses implementation of the good neighbor requirements of CAA section 110(a)(2)(D)(i)(I) in a large number of states located across the country and given the interdependent nature of interstate pollution transport and the common core of knowledge and analysis involved in evaluating the SIP submissions, this is a "nationally applicable" action within the meaning of CAA section 307(b)(1). This action derives from the EPA's "national interpretation" of CAA section 110(a)(2)(D)(i) and "any challenge thereto belongs in the D.C. Circuit." *ATK Launch Systems, Inc. v. EPA*, 651 F.3d 1194, 1200 (10th Cir. 2011).

The EPA disagrees with commenters' suggestion that all the EPA actions on implementation plans must be "locally or regionally applicable" actions subject to review in the regional circuit courts. Commenters correctly note that in *Am. Rd. & Transp. Builders Ass'n v. EPA*, 705 F.3d 453 (D.C. Cir. 2013) (hereafter *ARTBA*), the D.C. Circuit stated that "EPA's 'action in approving or promulgating any implementation plan' is the prototypical 'locally or regionally applicable action' that may be challenged only in the appropriate regional court of appeals." 705 F.3d at 455. But that case involved the EPA's approval of a SIP submission from a single state. The court in *ARTBA* did not state that *every* EPA action on an implementation plan under CAA section 110 must be a "locally or regionally applicable action," nor did the court's venue decision address any SIP action beyond the one before the court – i.e., the EPA's approval of a particular SIP submission from California. To the extent commenters intended to cite *ARTBA* for the proposition that the regional circuit courts are the exclusive venue for any challenge to any EPA "action in approving or promulgating any implementation plan under [CAA section 110]," that claim is incorrect and unsupported by the statutory text. We note that although the Administrator's promulgation of Federal implementation plans under section 110(c) for multiple states under the good neighbor provision would constitute actions "promulgating [an] implementation plan under [CAA section 110]," judicial challenges to these actions have historically been heard in the D.C. Circuit Court of Appeals. Indeed, regional courts of appeals have transferred petitions for review of those FIPs or related actions on SIPs to the D.C. Circuit on at least two occasions over petitioners' opposition. *West Virginia Chamber of Commerce v. Browner*, 1998 WL 827315, at *6 (4th Cir. 1998); *Cedar Falls Utilities v. U.S. EPA*, No. 16-4504 (8th Cir. filed Feb. 22, 2017).

The EPA also disagrees with commenters' claim that the geographic applicability of the EPA's proposed rules dictates venue, as only final actions are subject to judicial review under CAA section 307(b)(1). We note, however, that the EPA signaled its intent in each of the proposed rules to take a single, nationally applicable final action. *See, e.g.,* 87 FR 9498, 9516 n.73 (February 22, 2022). Additionally, all of the proposed rules leading to this final action were supported by a national docket maintained by the EPA Headquarters and containing the key modeling files, data, and support documents that were used in the EPA's nationwide photochemical grid modeling analysis. *See, e.g.,* 87 FR 9484, 9485 (February 22, 2022).

One commenter cited to a December 2021 EPA action approving good neighbor SIPs for Florida, Georgia, North Carolina, and South Carolina in which the EPA stated that "[u]nder section 307(b)(1) of the CAA, petitions for judicial review of this action must be filed in the United States Court of Appeals for the appropriate circuit by" a specified date (*see* 86 FR 68413, 68420 (Dec. 2, 2021)), claiming that the EPA treated this prior multi-state SIP approval action as locally or regionally applicable and that it is therefore arbitrary and capricious to treat the final rule promulgated today as nationally applicable. We note that, in the December 2021 rulemaking, the EPA stated only that venue would lie in the "appropriate circuit" and did not indicate whether the D.C. Circuit or a regional circuit court would be the appropriate circuit. In any case, commenters fail to identify anything in the December 2021 rulemaking that undermines the EPA's conclusion that the final action here is nationally applicable.

<u>Nationwide Scope or Effect</u>

Under CAA section 307(b)(1), an EPA action which is locally or regionally applicable may be filed only in the United States Court of Appeals "for the appropriate circuit" with one exception: if the locally or regionally applicable action (i) "is based on a determination of nationwide scope or effect," and (ii) the Administrator "finds and publishes that such action is based on such a determination," venue lies exclusively in the D.C. Circuit. The venue provision of the Act thus expressly grants the EPA complete discretion to determine whether to invoke an exception to the general rule that challenges to locally or regionally applicable actions be heard in the appropriate regional circuits. As the D.C. Circuit recently held in *Sierra Club v. EPA*, 47 F.4th 738 (D.C. Cir. 2022), the "EPA's decision whether to make and publish a finding of nationwide scope or effect is committed to the agency's discretion and thus is unreviewable."[89] Although "[a] court may review whether an action by EPA is nationally applicable, as well as whether locally or regionally applicable action is based on a determination of nationwide scope or effect *when EPA so finds and publishes*…. A court may not 'second-guess' the agency's discretionary decision to make and publish (or not) a finding of nationwide scope or effect."[90] For these reasons, the EPA disagrees with commenters' claim that the EPA lacks discretion to make and publish a finding that this action is based on a determination of nationwide scope or effect.

The Administrator is exercising the complete discretion afforded to him by the CAA to make and publish a finding that, if a court finds this action to be locally or regionally applicable, this action is based on a determination of "nationwide scope or effect" within the meaning of CAA section 307(b)(1). Thus, even

---

[89] 47 F.4th at 745 (D.C. Cir. 2022); *see also Texas v. EPA*, 983 F.3d 826, 835 (5th Cir. 2020) ("when a locally applicable action is based on a determination of nationwide scope or effect, the EPA has discretion to select the venue for judicial review").

[90] 47 F.4th at 746 ("The Act offers 'no basis on which a reviewing court could properly assess' the agency's discretionary decision" to make a nationwide scope or effect finding) (emphases added).

if this action is locally or regionally applicable, challenges to it may only be brought in the D.C. Circuit. All of the factors discussed above that support the EPA's conclusion that this action is nationally applicable, as explained further here, also support the Administrator's finding that this action is based on a determination of nationwide scope or effect. In this final action, the EPA is interpreting and applying CAA section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS based on a common core of nationwide policy judgments and technical analysis concerning the interstate transport of pollutants throughout the continental U.S. In particular, the EPA is applying here the same, nationally consistent 4-step interstate transport framework for assessing good neighbor obligations for the 2015 ozone NAAQS that it has applied in other nationally applicable rulemakings, such as CSAPR, the CSAPR Update, and the Revised CSAPR Update. The EPA is relying on the results from nationwide photochemical grid modeling using a 2016 base year and 2023 projection year as the primary basis for its assessment of air quality conditions and pollution contribution levels at Step 1 and Step 2 of the EPA's 4-step interstate transport framework and applying a nationally uniform approach to the identification of nonattainment and maintenance receptors across the entire geographic area covered by this final action.[91] While the commenter is correct that the EPA has evaluated the particulars of each state's submission, our findings with respect to these submissions are nationally consistent and based on determinations of nationwide scope or effect. The EPA has evaluated each state's arguments for the use of alternative approaches or alternative sets of data with an eye to ensuring national consistency and avoiding inconsistent or inequitable results among upwind states (i.e., those states for which good neighbor obligations are being evaluated in this action) and between upwind and downwind states (i.e., those states that contain receptors signifying ozone nonattainment or maintenance problems).

Additionally, the EPA in this action has set forth its views on the importance of a nationally uniform approach to contribution-threshold analysis at Step 2 and has evaluated states' arguments in support of a non-uniform approach. In this final action, we respond to these arguments in a nationally coordinated fashion, informed in part by the importance of ensuring consistency and fair and equitable treatment of both upwind contributing states and downwind states impacted by upwind pollution. Similarly, the EPA has also determined that other arguments from states regarding the other three steps of the 4-step interstate transport framework are insufficient to support approval of the SIP submissions. In many cases these arguments are highly similar to one another. The EPA's determinations with respect to these issues rest on the same or highly similar grounds, across all of the states covered by this action. Section V of the preamble presents consolidated responses to comments on these cross-cutting issues. All of these determinations have nationwide scope or effect.

The EPA therefore disagrees with commenters' claim that this action is "inherently state-specific" and dependent on the "facts and circumstances" of each particular SIP submission and the particularities of each state's air quality and emissions sources. In any case, even if this action is locally or regionally applicable, venue for any challenge to it is proper only in the D.C. Circuit because the action is based on

---

[91] In the report on the 1977 Amendments that revised section 307(b)(1) of the CAA, Congress noted that the Administrator's determination that the "nationwide scope or effect" exception applies would be appropriate for any action that has a scope or effect beyond a single judicial circuit. *See* H.R. Rep. No. 95-294 at 323, 324, reprinted in 1977 U.S.C.C.A.N. 1402-03.

one or more determinations of nationwide scope or effect and the Administrator is exercising his complete discretion to find and publish that it is based on such determinations.

Additionally, the Administrator finds that this is a matter on which national uniformity in judicial resolution of any petitions for review is desirable, to take advantage of the D.C. Circuit's administrative law expertise, and to facilitate the orderly development of the basic law under the Act. The Administrator also finds that consolidated review of this action in the D.C. Circuit will avoid piecemeal litigation in the regional circuits, further judicial economy, and eliminate the risk of inconsistent results for different states, and that a nationally consistent approach to the CAA's mandate concerning interstate transport of ozone pollution constitutes the best use of Agency resources.

Commenters fail to support their argument that "courts do not defer to EPA's determination of venue," and it is not clear what the commenters mean in asserting that CAA section 307(b)(1) does not give the EPA "exclusive authority" to find that an action is based on a determination of nationwide scope or effect. As the *Sierra Club* court noted, courts may review whether a locally or regionally applicable action is based on a determination of nationwide scope or effect *when EPA so finds and publishes.* But the decision whether to make and publish a finding of nationwide scope or effect is committed to agency discretion by law.

Finally, the EPA disagrees with commenters' claim that the EPA's decision not to publish a "nationwide scope or effect" finding in its December 2021 action approving good neighbor SIPs for Florida, Georgia, North Carolina, and South Carolina (86 FR 68413 (Dec. 2, 2021)) prohibits the EPA from making a "nationwide scope or effect" finding in this action. Whether or not the EPA invoked the exception in CAA section 307(b)(1) for transferring venue to the D.C. Circuit in a prior action, that prior action has no bearing on the EPA's discretion to invoke the exception here. The CAA allows the EPA to direct locally or regionally applicable actions that are "based on a determination of nationwide scope or effect" to the D.C. Circuit, but it does not require the EPA to send such cases there, nor does it provide any criteria for the Agency's exercise of its discretion.[92]

The commenter correctly notes that the EPA has approved interstate transport SIPs for the 2015 ozone NAAQS for many states throughout the country that were found not to contribute above the one percent of NAAQS threshold at Step 2 and, in these actions, made no finding that the actions were based on determinations of nationwide scope or effect. However, the absence of such a finding in one action provides no basis for challenging the Agency's finding in another. Given the far greater degree of technical and policy judgment with respect to numerous national-scale issues that the EPA has exercised in this action as part of the EPA's review of these SIP submissions, it is reasonable for the EPA to seek national consistency in the judicial resolution of any petitions for review of this action.

---

[92] *See Texas v. EPA*, 983 F.3d at 834-35 (5th Cir. 2020); *see also Sierra Club v. EPA,* 47 F.4th 738, 746 (D.C. Cir. 2022) (noting that "[i]n deciding whether to make and publish a finding of nationwide scope or effect—and thus to direct review to [the D.C. Circuit], as opposed to a regional circuit—EPA may weigh any number of considerations").

## 10.2 SIP Call

*Comments*

**Commenter:** Alabama Department of Environmental Management

**Commenter ID:** 02

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

Additionally, it should be noted that the purpose of an iSIP is to verify that the State has the authority to address the regulations of the Clean Air Act (CAA), not to determine if, and by how much, an upwind State may impact a downwind monitor. If EPA intended to use updated modeling to assess impacts at future nonattaining and maintenance receptors, a call for plan revisions should have occurred, allowing EPA to incorporate and rely on modeling and monitoring data, while providing States the opportunity to review the data and incorporate any changes, if needed, without the need for a FIP call.

**Commenter:** Kentucky Division for Air Quality

**Commenter ID:** 25

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

Many states that submitted a 2015 Ozone Transport SIP to EPA for approval did use the 1 ppb threshold. Given the reliance on the August 2018 memo, it would have been appropriate for EPA to, via a SIP Call, rescind the memo and request that states submit revised SIPs that did not use the 1 ppb threshold.

In this proposed action, EPA is relying on the 1% threshold to evaluate a state's contribution to a nonattainment or maintenance monitor, EPA identifies the need for consistency in its evaluation across all of its Interstate Transport requirements, for all NAAQS. Kentucky believes retraction of the August 2018 memo and issuance of a call for plan revisions under 42 U.S.C. § 7410(k)(5) would further promote consistency across states' evaluations of their SIPs,

**Commenter:** Midwest Ozone Group

**Commenter ID:** 30

**Docket ID:** EPA-R02-OAR-2021-0673, EPA-R03-OAR-2021-0872, EPA-R03-OAR-2021-0873, EPA-R04-OAR-2021-0841, EPA-R05-OAR-2022-0006, EPA-R06-OAR-2021-0801, EPA-R07-OAR-2021-0851, EPA-R08-OAR-2022-0315, EPA-R09-OAR-2022-0394, EPA-R09-OAR-2022-0138

**Comment:**

EPA does not offer explanation for not electing to work with the states to develop a state implementation plan call pursuant to 110(k)(5) which provides for up to 18 months for states to address flaws in the disapproved SIPs. These accelerated actions by the agency clearly indicate that transparency is not a priority. EPA should, instead, have provided updated guidance, updated modeling, instructions on addressing specific state deficiencies, and adequate time for state response.

**Commenter:** Air Pollution Control Program, Missouri Department of Natural Resources

**Commenter ID:** 01

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

If EPA desires to make a formal finding that Missouri's SIP is inadequate because of these newly identified receptors, it must approve our original SIP and then issue a SIP call to provide Missouri a chance to address the receptors that have been newly identified in the updated modeling. Failure to do so, would circumvent EPA's obligation to put forth any effort for cooperative federalism as envisioned in the Clean Air Act.

**Commenter:** PacifiCorp

**Commenter ID:** 38

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

Where new information arises that is critical to ensure compliance with the Act, EPA has authority under section 7410(k)(5) to ensure SIPs are revised to satisfy the Act. This procedure gives states the opportunity to re-draft SIPs in light of any such new data or analysis. By acting on post-record material to disapprove a SIP, EPA denies states this opportunity.

*Response*

The EPA disagrees that the Agency was required to explain why it did not exercise its discretion under CAA section 110(k)(5), which allows the EPA to require a state "to revise the [SIP] as necessary" [w]henever the Administrator deems a SIP is "substantially inadequate to attain or maintain the relevant [NAAQS][.]" This "SIP call" authority is discretionary with the Agency, and nothing in the statute obligates EPA to first provide states a second opportunity to submit approvable SIPs before promulgating FIPs. *See EME Homer City*, 572 U.S. at 509.

As a preliminary matter, commenters have not raised an issue that is actually within scope of the present action, which is the decision to disapprove the SIP submissions that are before the Agency as

required by CAA section 110(k)(2) and (3). The deadline established for the EPA action on a SIP submission under CAA section 110(k)(2) is not altered or displaced by the fact that the EPA has discretionary authority to issue a SIP call under CAA section 110(k)(5). Additionally, the EPA's evaluation of a SIP submission pursuant to CAA section 110(k)(3) to determine whether the submission "meets all of the applicable requirements of this chapter" is similarly not altered or displaced by the fact that the EPA has discretionary authority to issue a SIP call under CAA section 110(k)(5). The FIP that the EPA proposed in April of 2022 is not a component of this present action. Further, the larger policy considerations that may have informed the Agency's consideration of *when* to act on these SIP submissions are also not within the scope of this action.

In this action, the Agency is acting on the SIP submissions that are before it, as required by CAA section 110(k)(2) and (3), and therefore, comments urging the Agency to issue a SIP call pursuant to CAA section 110(k)(5) are effectively requesting that the Agency engage in an additional rulemaking effort separate from this action.[93] Without offering any final determination on that suggestion, which is beyond the scope of this action, a SIP call, if undertaken as an alternative to the present action, would effectively cause a delay of several years in implementing interstate transport obligations for the 2015 ozone NAAQS.  Thus, if this even were a reviewable question with respect to the Agency's action here, it is reasonable for the Agency not to embark on that course of action.

Commenters problematically prioritize giving states further opportunities to submit an approvable SIP before EPA promulgates a FIP, rather than prioritizing the statutory obligation to eliminate pollution significantly contributing to nonattainment and interfering with the NAAQS in other states as expeditiously as practicable. Commenters' policy preference is not required by the Act; importantly, it is in tension with the Act's substantive mandates. It is entirely appropriate for the Agency to not pursue a discretionary SIP call in the circumstances here, where expeditious action to address outstanding obligations is paramount, delays have already occurred, and the Agency seeks to address an area of CAA implementation (interstate air pollution at the regional scale) where EPA historically has been obligated to exercise its FIP authority to achieve necessary emissions reductions.

The EPA does not rule out the possibility of using mechanisms such as CAA section 110(k)(5) or the promulgation of an obligations rule to inform states' development of transport SIP submissions for future NAAQS revisions. In the context of this NAAQS, at this time, however, such an approach would further delay the implementation of good neighbor obligations that the courts have already found the EPA is past due in addressing. *See, e.g., Maryland v. EPA*, 958 F.3d 1185, 1203-04 (D.C. Cir. 2020). To illustrate this, under the EPA's current sequencing of actions, upon finalization of this action disapproving SIP submissions, and if the Agency finalizes the proposed FIP sometime in early 2023, the EPA will be able to ensure emissions reductions to address good neighbor obligations beginning in the

[93] We note as well that EPA is obligated to act on these SIP submissions pursuant to multiple federal consent decrees, which were entered to resolve litigation alleging that EPA had already missed statutory deadlines pursuant to CAA section 110(k)(2). EPA is aware of no authority, and commenters cite none, that would authorize EPA not to act on these submittals and instead take the alternate course of issuing a SIP call under 110(k)(5). Further, EPA has an obligation to promulgate a FIP under CAA section 110(c)(1) upon final action disapproving these SIP submittals, unless EPA first approves a SIP revision. Thus, commenters have not explained how, even if EPA issued a SIP call as a separate action in relation to good neighbor obligations for the 2015 ozone NAAQS, this would alter the schedule of actions it is obligated to undertake by virtue of 110(k)(2), (3), and (c)(1).

2023 ozone season. By contrast, even under a relatively aggressive timetable for issuing a SIP call, these emission reductions could easily be delayed by as much as three years or more. (This estimate takes into account the time needed to propose and finalize action issuing the SIP call, the time needed for states to develop, take comment on, and submit SIP revisions, the time needed for the EPA to propose and finalize action on those SIP revisions, and the time needed to propose and promulgate a FIP, if necessary.)

During the time needed to implement a SIP call as commenters suggest, the EPA would have allowed significant contribution to continue through both the 2024 Moderate area attainment date and quite possibly the 2027 Serious area attainment date, missing not one but two critical attainment dates (the "ultimate failsafe" in the words of the *Wisconsin* court, 938 F.3d at 317) in implementing CAA obligations that are at "the heart of the Act," *id.* at 316 (quoting *Train v. NRDC*, 421 U.S. 60, 66 (1975)). The EPA would have been required to proceed through not one but two additional rulemaking efforts (both the SIP call, and actions on SIP submissions in response to the SIP call). And the EPA would have allowed this to occur even though, as the *Wisconsin* court also recognized,

> When EPA determines that a State's SIP is inadequate, EPA presumably must issue a FIP that will bring that State into compliance before upcoming attainment deadlines, even if the outer limit of the statutory timeframe gives EPA more time to formulate the FIP. *See Sierra Club v. EPA*, 294 F.3d 155, 161 (D.C. Cir. 2002) ("the attainment deadlines remain intact" even if procedural deadlines are missed or changed). The same is true when a State's SIP fails to provide for the full elimination of the State's significant contributions to downwind nonattainment.

*Id.* at 318.

Consistent with the court's observations in this passage, under the EPA's approach, the EPA is able to take final action on these SIP submissions in this action, thereby establishing predicate FIP authority (as needed) before the start of the 2023 ozone season. By proposing a FIP in April of 2022, EPA is also in a position to finalize that FIP in time for the 2023 ozone season, thus beginning implementation of needed emissions reductions to eliminate significant contribution in the analytic year associated with the next relevant attainment date for the 2015 ozone NAAQS. Further, with that proposal, EPA was also able to put states and sources on notice of its proposed expectations regarding what level of emissions reductions would be needed to eliminate the amounts of emissions significantly contributing to nonattainment and interfering with maintenance. *See* 87 FR 20040, 20149-51. Following promulgation of a FIP, states may replace that FIP with a SIP so long as the substantive CAA obligations are achieved. The FIP, if finalized, would provide a degree of information comparable to what EPA would include in a SIP call in terms of identifying with specificity the level of emissions reductions each state is expected to implement.[94] Thus, the EPA's approach does not even sacrifice the key benefit commenters apparently hope to achieve via a SIP call, which is a level of certainty for states regarding their good neighbor obligations to allow them to formulate approvable SIP submissions.

---

[94] As discussed in the cited passage of the proposed FIP, EPA always allows states the opportunity to implement a different mix of emissions controls than it has implemented through a FIP so long as the overall CAA obligation is met.

We reiterate that our reasoning as to the disadvantages of conducting a SIP call—as well as the potential timing for finalizing FIP actions—is not within the scope of this action and is offered simply to illustrate the disadvantages associated with this alternative sequence of steps advocated for by many commenters. We further acknowledge that there are many circumstances under the CAA where a SIP call may be an appropriate mechanism to ensure that the SIP complies with the CAA and that states are adequately fulfilling their CAA obligations to implement the NAAQS. The EPA has even used this tool to address good neighbor obligations (as per the 1998 NOX SIP Call[95]) and may do so again under appropriate circumstances in the future. However, there is nothing in the CAA that *requires* the agency to issue SIP calls instead of acting on SIP submissions under CAA section 110(k)(2) and (3) that are not approvable. This irreducible statutory fact is not changed even if the EPA is accused of failing to issue guidance that was sufficiently clear or prescriptive to states before their original SIP submissions were due—the EPA has no such obligation. *See EME Homer City*, 572 U.S. at 508-11. Here, it is reasonable not to further delay fulfilling the EPA's mandatory duty to act on these SIP submissions by embarking on a discretionary SIP call.

## 10.3  Cooperative Federalism and the EPA's Authority

*Comments*

**Commenter:** Air Pollution Control Program, Missouri Department of Natural Resources

**Commenter ID:** 01

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

EPA is intentionally exploiting the Supreme Court decision in EME Homer City vs. EPA to justify any costs or requirements it deems necessary to further federal policy decisions.

**Commenter:** Alabama Department of Environmental Management

**Commenter ID:** 02

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

---

[95] Notably, the NOₓ SIP Call was judicially stayed by the D.C. Circuit Court of Appeals, and this led EPA to exercise its independent authority to directly federally regulate sources violating the good neighbor provision in response to petitions under CAA section 126(b), an action which that same court subsequently upheld. *See Appalachian Power Co. v. EPA*, 249 F.3d 1032, 1039 (D.C. Cir. 2001).

Absent rulemaking, the States, who are responsible for the development and implementation of SIPs, will use best judgement and sound scientific principles, regarding all available information in said development and implementation.

[...]

From a legal perspective, it is important to note that the Clean Air Act (CAA) does not mandate how States address the Good Neighbor provisions of Section 110(a)(2)(D)(i). More specifically, EPA has stated that the contents of SIP submissions "may vary depending on the facts and circumstances". Given that States have the primary responsibility to develop and implement the SIP, ADEM contends that Alabama reserves the right to submit a revised SIP, using the criteria that the State deems appropriate and consistent with the CAA.


**Commenter:** Alabama Power Company

**Commenter ID:** 03

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

However, even if ADEM had not withdrawn its 2018 SIP submittal, EPA should not finalize its proposed disapproval of Alabama's 2018 submittal. The Act "expressly gave the states initial responsibility for determining the manner in which air quality standards were to be achieved."[8] EPA must review state plans to confirm the state has discharged its obligations, but "EPA's role is to approve state choices, provided that they meet the criteria of the CAA."[9] Accordingly, if a state's submission satisfies the statutory criteria, EPA cannot disapprove its SIP submission.[10]

With specific regard for the "good neighbor" aspect of state SIPs, EPA has been clear that states may satisfy this obligation in a variety of ways. EPA has explained that "[t]he precise nature and contents of a good neighbor provision is not stipulated in the statute. [Therefore,] EPA believes that the contents of the SIP submission required by section 110(a)(2)(D)(i) may vary depending on the facts and circumstances related to the specific NAAQS."[11] For example, EPA "has not directed states that they must conduct a Step 3 analysis in precisely the manner the EPA has done in its prior regional transport rulemakings."[12]

Accordingly, EPA could not determine the adequacy of Alabama's 2018 SIP submittal based on non-statutory, policy preferences.[13] The law is well-established that states are granted this same discretion with respect to SIP provisions regarding interstate transport. In fact, a state's authority in adopting a SIP is the same as EPA's authority with regard to implementing Federal Plans.[14] Because Alabama is primarily responsible for "adequately" identifying and eliminating any "significant contribution," EPA could only disapprove Alabama's SIP if it failed to "'explain whether or not emissions from the state' significantly contribute to nonattainment in other states."[15] EPA's proposed disapproval would undermine the well-established cooperative federalism approach of the CAA, where "air pollution prevention . . . and air pollution control at its source is the primary responsibility of States and local governments."[16] On the applicable and timely record, that is, excluding the post-hoc analysis offered by

399

EPA in 2022, it is plain that Alabama's submission satisfied the statutory requirements of the CAA. Moreover, were it not moot, even in light of EPA's new analyses, Alabama's 2018 SIP submittal, when considered as a whole and in view of EPA's 2018 Guidance, should not be disapproved.[17]

[8] *See* 42 U.S.C. § 7410(a) (requiring States to submit plans to implement, maintain, and enforce NAAQS); *see also Com. of Va. v. EPA*, 108 F.3d 1397, 1407 (D.C. Cir. 1997), *modified on reh'g*, 116 F.3d 499 (D.C. Cir. 1997) (the CAA "expressly gave the states initial responsibility for determining the manner in which air quality standards were to be achieved").

[9] 87 Fed. Reg. 21,027, 21,028 (Apr. 11, 2022)

[10] *See* 42 U.S.C. § 7410(k)(3).

[11] *See* EPA, *Guidance for State Implementation Plan (SIP) Submissions to Meet Current Outstanding Obligations Under Section 110(a)(2)(D)(i) for the 8-Hour Ozone and PM2.5 National Ambient Air Quality Standards* 3 (Aug. 15, 2006),
https://www3.epa.gov/ttn/naaqs/aqmguide/collection/cp2/20060815_harnett_final_section_110(a)(2)(D)(i)_guidance.pdf ("2006 Guidance").

[12] 87 Fed. Reg. at 9,554.

[13] *See Luminant Generation Co., L.L.C. v. EPA*, 675 F.3d 917, 927-29 (5th Cir. 2012) (rejecting EPA's attempt to enforce non-statutory requirements through SIP review process); *Com. of Va.*, 108 F.3d at 1410 (stating that CAA Section 110 "does not enable EPA to force particular control measures on the states."); *see also Concerned Citizens of Bridesburg v. EPA*, 836 F.2d 777, 780-81 (3d Cir. 1987) ("[A] SIP basically embodies a set of choices . . . that the state makes for itself in attempting to reach the NAAQS with minimum dislocation.).

[14] *Cf. EME Homer City Generation v. EPA*, 696 F.3d 7, 47-48 (D.C. Cir. 2012) (Judge Rogers, dissenting), *rev'd on other grounds*, 572 U.S. 489 (2014) ("EME Homer I").

[15] *See Westar Energy, Inc. v. EPA, 608 F. App'x 1, *3 (D.C. Cir. 2015) (*quoting EPA, *Guidance on SIP Elements Required Under Sections 110(a)(1) and (2) for the 2006 24–hour Fine Particle (PM2.5) National Ambient Air Quality Standards (NAAQS)* 3 (Sept. 25, 2009)) (affirming EPA disapproval where Kansas had not analyzed the downwind impact of in-state emissions and had not concluded that its in-state emissions did not contribute).

[16] 42 U.S.C. § 7401(a)(3).

[17] See attached comments of Alabama Power and Southern Power on ADEM's proposed SIP withdrawal and replacement, April 15, 2022, which are incorporated herein by reference.

**Commenter:** Alabama Power Company, Southern Power Company, and PowerSouth Energy Cooperative

**Commenter ID:** 04

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

A. ADEM Has the Primary Authority for Addressing its "Good Neighbor" Obligation Under the Clean Air Act

Under the Clean Air Act, a state's SIP must include, among other things, provisions prohibiting emissions from sources in the state that will "contribute significantly to nonattainment in, or interfere with maintenance by, any other state with respect to" the 2015 ozone NAAQS.[15] Although EPA has the primary responsibility in establishing air quality standards, the Clean Air Act "expressly gave the states initial responsibility for determining the manner in which air quality standards were to be achieved."[16] In other words, states are given the first opportunity to create a reasonable SIP that ensures compliance with the Clean Air Act. Importantly, the Clean Air Act does not mandate that states address their "good

neighbor" obligation under any particular framework;[17] rather, states have broad discretion in developing their SIP provisions.

Moreover, although EPA has adopted regulations that govern the SIP submittal process generally, EPA has not adopted any additional regulatory standards that define the requirements for Clean Air Act Section 110(a)(2)(D)(i)(I) interstate transport SIPs related to the 2015 ozone standard.[18] Notably, EPA has established regulatory standards for other NAAQS, thus, EPA's silence here indicates there are no specific requirements states must meet in crafting their interstate transport SIPs for the 2015 ozone NAAQS. Because EPA's regulations are silent on this matter, EPA must approve of ADEM's SIP if the SIP package "explain[s] whether or not emissions for the state significantly contribute to nonattainment in other states."[19] No single approach is required, as states have taken various approaches to addressing this obligation, and EPA has approved these different approaches.[20] The "4-step framework" favored by EPA is not in the Clean Air Act, nor does the Act mandate a certain analytical approach for interstate transport. In other words, while EPA's 4-step framework may or may not be appropriate for evaluating some future EPA *FIP*, it does not apply to EPA's review of Alabama's *SIP* submittal.

Ultimately, "EPA's role is to approve state choices, provided that they meet the criteria of the CAA."[21] EPA cannot assess the adequacy of Alabama's 2022 SIP submittal based on non-statutory, policy preferences.[22] Accordingly, if a state's submission satisfies the statutory criteria, EPA must approve the SIP.[23] Rather than respect Alabama's primary role in the development of its SIP, EPA's proposed disapproval undermines the well-established cooperative federalism approach of the CAA, where "air pollution prevention . . . and air pollution control at its source is the primary responsibility of States and local governments."[24] Because Alabama's 2022 SIP satisfies the requirements of the Clean Air Act, including "'explaining whether or not emissions from the state' significantly contribute to nonattainment in other states,"[25] EPA must approve Alabama's SIP.

[15] 42 U.S.C. § 7410(a)(2)(D)(i).

[16] *Com. of Va. v. EPA*, 108 F.3d 1397, 1407 (D.C. Cir. 1997), *modified on reh'g*, 116 F.3d 499 (D.C. Cir. 1997); *see also* 42 U.S.C. § 7401(a)(3) ("[A]ir pollution control at its source is the primary responsibility of States and local governments[.]").

[17] *See* EPA, *Guidance for State Implementation Plan (SIP) Submissions to Meet Current Outstanding Obligations Under Section 110(a)(2)(D)(i) for the 8-Hour Ozone and PM2.5 National Ambient Air Quality Standards*, at 3 (Aug. 15, 2006), available at https://www3.epa.gov/ttn/naaqs/aqmguide/collection/cp2/20060815_harnett_final_section_110(a)(2)(D)(i)_guid anc e.pdf ("The precise nature and contents of [a SIP] submission [are] not stipulated in the statute.").

[18] However, EPA has done so for other NAAQS. See 40 C.F.R. §§ 51.123–.124.

[19] *Westar Energy, Inc. v. EPA*, 608 Fed. App'x 1, *3 (D.C. Cir. 2015).

[20] *See, e.g.*, Air Plan Approval; Hawaii; Interstate Transport for the 2015 Ozone NAAQS, 86 Fed. Reg. 53,571 (Sept. 28, 2021); Air Quality State Implementation Plans; Approvals and Promulgations: Alaska; Interstate Transport Requirements for the 2015 Ozone Standard, 84 Fed. Reg. 26,041 (June 4, 2019).

[21] 87 Fed. Reg. 21,027, 21,028 (Apr. 11, 2022)

[22] *See Luminant Generation Co., L.L.C. v. EPA*, 675 F.3d 917, 927-29 (5th Cir. 2012) (rejecting EPA's attempt to enforce non-statutory requirements through SIP review process); *Com. of Va.*, 108 F.3d at 1410 (stating that CAA Section 110 "does not enable EPA to force particular control measures on the states."); *see also Concerned Citizens of Bridesburg v. EPA*, 836 F.2d 777, 780-81 (3d Cir. 1987) ("[A] SIP basically embodies a set of choices . . . that the state makes for itself in attempting to reach the NAAQS with minimum dislocation.").

[23] *See* 42 U.S.C. § 7410(k)(3).

[24] 42 U.S.C. § 7401(a)(3).

[25] *See Westar Energy*, 608 Fed. App'x at *3 (quoting EPA, *Guidance on SIP Elements Required Under Sections 110(a)(1) and (2) for the 2006 24–hour Fine Particle (PM2.5) National Ambient Air Quality Standards (NAAQS)* 3 (Sept. 25, 2009)) (affirming EPA disapproval where Kansas had not analyzed the downwind impact of in-state emissions and had not concluded that its in-state emissions did not contribute).

**Commenter:** Arkansas Department of Energy and Environment, Division of Environmental Quality

**Commenter ID:** 07

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

IX. The Federal-State Partnership

One of the most important pillars of our federal-state regulatory framework under the Clean Air Act is the concept of cooperative federalism. One-size-fits-all policies are in direct conflict with cooperative federalism, as these policies do not reflect the nuances of a state's individual circumstances. By setting in place an overarching policy without attention to state individuality (such as EPA's 1% threshold or its control strategy under the proposed FIP), the federal government initiates an effort to coerce local and state entities into conformity with national policy. At minimum, if a federal agency ultimately decides to dismiss requested state input, then the federal government must take on a role in an advisory capacity and one with increasing collaboration and support, especially through provision of additional funding and technical resources.[28]

In this latest action by EPA, the agency attempts to set local policy goals by dismissing individual state analyses, and having a FIP waiting in the wings constitutes an "or else" coercive strategy by the EPA. EPA's concurrent proposal of a FIP with their proposed disapprovals instead of providing states with the customary two years to submit a corrective SIP revision is clear evidence that EPA prefers a national policy in contravention of Congress' intent that states be the primary policy makers with respect to implementing the NAAQS.

States have limited resources, and use what is at their disposal to meet requirements under the Clean Air Act. Suddenly, EPA is very specific about which tools states should use for policy assessment at the state-level, with no consideration of the resource constraints faced by state regulators. In the disapproval, EPA states that DEQ's analysis "does not consider …impacts on assessed controls at downwind receptors." This type of analysis is only possible through photochemical modeling, a method that the state was unable to do in-house at the time of SIP development, is costly, and was seemingly not necessary based on the guidance in place during the time of SIP development. Much of the technical basis for states' analyses comes from existing EPA modeling and guidance. It is not ideal, but it is what states are faced with, and historically, this has been acceptable methodology. DEQ acted in confidence, based on continued feedback from EPA at that time, that its alternative methods of analysis were sufficiently robust, and spent significant resources to reach the conclusions presented in the SIP submittal. For EPA to require an expensive modeling exercise for approvability, without providing the means to do so, is essentially creating an unfunded mandate.

[…]

Ultimately, EPA is undermining the framework of the Clean Air Act as established by Congress, and has changed direction on states after conclusion of the SIP development process. The proposed disapproval of the Arkansas Transport SIP and the proposed FIP will force installation of costly controls that are unnecessary for addressing specific Clean Air Act interstate transport requirements for the 2015 ozone NAAQS. In its disapproval, EPA dismisses sound reasoning and science-based evidence presented by the state and makes a bid to wholesale replace state rationale and policy decisions with its own. In no way is this equitable, nor is it the type of collaboration that the Clean Air Act affords state and federal partners tackling such multijurisdictional issues.

[…]

X. Conclusion

EPA's disapproval of Arkansas's 2015 Ozone Transport SIP is an example of a failure in cooperative federalism. EPA failed to meet its statutory deadline to act on Arkansas's SIP submittal. Then, after being sued for this failure, EPA moves the goal post on what they believe is required to satisfy Clean Air Act Section 110(a)(2)(D) requirements by dismissing its previous guidance without revoking it and substituting data that EPA provided in 2017 for states to rely upon in their submittals with new data. EPA further dismisses the weight of evidence used as part of Arkansas's decision-making process with respect to how the state defines a "significant contribution," how the state selected sources for a cost analysis of NOx reduction strategies, and the state's decisions on whether the cost of additional controls are reasonable. EPA then proposes to substitute its own policies for those that the state has demonstrated are reasonable and consistent with the Clean Air Act. With this action and their proposed FIP for the State of Arkansas, EPA fails to acknowledge that Congress gave states, not EPA, the primary authority in establishing plans to protect air quality standards.

[28] "The Evolution of Cooperative Federalism," April 15, 2021. https://online.law.tulane.edu/blog/the-evolution-ofcooperative-federalism

**Commenter:** Arkansas Environmental Federation

**Commenter ID:** 09

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

I. EPA Has a Narrow Role in the SIP Process

EPA's proposed disapproval of Arkansas's interstate transport SIP for the 2015 ozone NAAQS exceeds the Agency's authority under the Clean Air Act ("CAA"). The CAA creates a system of cooperative federalism whereby EPA "determines the ends—the standards of air quality—while states are given the initiative and broad responsibility to determine the means to achieve those ends."[2]  Accordingly, the CAA grants states the authority to develop plans addressing the NAAQS[3] and the states have extensive discretion in what their plans encompass.[4] The states' primary role in developing SIPs under Section 110 also extends to the "Good Neighbor" obligation in CAA Section 110(a)(2)(D)(i)(I) to develop SIPs to address interstate transport.[5]

EPA's role is limited once a state submits a SIP. According to Section 110 of the CAA, the Administrator *shall* approve [a SIP or SIP revision] as a whole if it meets all of the applicable requirements of this chapter."[6] EPA has long recognized its limited role; most recently in a SIP approval earlier this month:

> [T]he Administrator is required to approve a SIP submission that complies with the provisions of the CAA and applicable Federal regulations. 42 U.S.C. 7410(k); 40 CFR 52.02(a). Thus, in reviewing SIP submissions, EPA's role is to approve state choices, provided that they meet the criteria of the CAA.[7]

Given EPA's limited role it is inappropriate for EPA to propose "to apply a consistent set of *policy judgements* across all states for purposes of evaluating interstate transport obligations and the approvability of interstate transport SIP submittals for the 2015 ozone NAAQS,"[8] including for the proposed disapproval of Arkansas's SIP. EPA goes on to state that its

> policy judgments reflect consistency with relevant case law and past agency practice as reflected in the CSAPR and related rulemakings. Nationwide consistency in approach is particularly important in the context of interstate ozone transport, which is a regional-scale pollution problem involving many smaller contributors.[9]

Furthermore, these policy judgments, which EPA is now attempting to enforce as binding on the states and regulated facilities through EPA's actions on the SIP, have not been through proper notice and comment as required by law and thus are unenforceable.

[...]

EPA's policy judgments, upheld by courts in support of its *Federal* rulemakings to address interstate transport, have no place in determining whether a SIP meets the applicable CAA requirements. Despite the "regional-scale pollution problem" of ozone transport, Congress granted authority to the states, in the first instance, to determine how to address interstate ozone transport. Imposing EPA's policy preferences on the states improperly negates their authority to develop their own SIPs to address interstate transport and the Agency's policy preferences fail to determine whether the states have complied with the *law* in developing their interstate transport SIPs.

---

[2] *Concerned Citizens of Bridesburg v. EPA*, 836 F.2d 777, 779 (3rd. Cir. 1987) (citing *Bethlehem Steel Corp. v. Gorsuch*, 742 F.2d 1028, 1036 (7th Cir. 1984)).

[3] *See* 42 U.S.C. § 7410(a) (requiring States to submit plans to implement, maintain, and enforce NAAQS); *see also Com. of Va. v. EPA*, 108 F.3d 1397, 1407 (D.C. Cir.), decision modified on reh'g, 116 F.3d 499 (D.C. Cir. 1997) (stating that the CAA "expressly gave the states initial responsibility for determining the manner in which air quality standards were to be achieved.").

[4] *See Union Elec. Co. v. EPA*, 427 U.S. 246, 250 (1976) ("Each State is given wide discretion in formulating its plan."); *Train v. NRDC*, 412 U.S. 60, 79 (1975) ("[EPA] is relegated by the [Clean Air] Act to a secondary role in the process of determining and enforcing the specific, source-by-source emission limitations which are necessary if the national standards it has set are to be met."); *Fla. Power & Light Co. v. Costle*, 650 F.2d 579, 587 (5th Cir. 1981) ("The great flexibility accorded the states under the Clean Air Act is further illustrated by the sharply contrasting, narrow role to be played by EPA.").

[5] *See North Carolina v. EPA*, 531 F.3d 896, 923 (D.C. Cir. 2008) ("the text of section 110 . . . establishes the state as the appropriate primary administrative unit to address interstate transport of emissions.") (citations omitted); *see also Michigan v. EPA*, 213 F.3d 663, 671 (D.C. Cir. 2000).

[6] 42 U.S.C. § 7410(k)(3) (emphasis added).

[7] Air Plan Approval; Wisconsin; Redesignation of the Wisconsin Portion of the Chicago-Naperville, Illinois-IndianaWisconsin Area to Attainment of the 2008 Ozone Standard, 87 Fed. Reg. 21,027, 21,028 (Apr. 11, 2022).
[8] 87 Fed. Reg. 9798, 9801 (Feb. 22, 2022) (emphasis added).
[9] *Id.*

**Commenter:** Association of Electric Companies of Texas, BCCA Appeal Group, Texas Chemical Council and Texas Oil & Gas Association

**Commenter ID:** 11

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

A. The Texas SIP meets all statutory requirements, and EPA should approve it.

The Act gives states the authority to develop SIPs to implement the NAAQS in the first instance.[3] EPA, on the other hand, is "plainly . . . relegated by the Act to a secondary role in the process of determining and enforcing the specific, source-by-source emissions limitations."[4] While EPA is tasked with reviewing SIPs, the Agency cannot substitute its judgment for the state's.[5] "EPA's role is to approve state choices, provided that they meet the criteria of the CAA."[6]

The "Good Neighbor" or "interstate transport" provisions of the CAA require that SIPs "contain adequate provisions prohibiting . . . any source or other type of emissions activity within the State from emitting any air pollutant in amounts which will contribute significantly to nonattainment in, or interfere with maintenance by, any other State with respect to any such national primary or secondary ambient air quality standard."[7] If an interstate transport SIP meets these requirements, the Act directs the Administrator to approve the SIP revision.[8]

The CAA does not require states to address their Good Neighbor obligations in a specific manner, nor does it "enable EPA to force particular control measures on the states."[9] EPA has not attempted to adopt nationwide regulatory standards that purport to define the requirements for interstate transport SIPs with respect to the 2015 ozone NAAQS.[10] Specifically, EPA's separate quantification and assessment of a state's "significant contribution" to downwind nonattainment or maintenance issues is *not* a requirement of the Act and may not form the basis for disapproval of a SIP.[11] EPA has previously explained that "[t]he precise nature and contents of such a submission is not stipulated in the statute. [Therefore,] EPA believes that the contents of the SIP submission required by section 110(a)(2)(D)(i) may vary depending upon the facts and circumstances related to the specific NAAQS."[12]

EPA has recognized this flexibility afforded to states in its guidance documents[13] and in the Proposed Disapproval. In its 2006 Guidance, EPA asserted that states may establish their own framework for significant contribution "using considerations comparable to those used by EPA in evaluating significant contribution."[14]  The statute does not require that states use an approach "comparable" with EPA's own.[15] In recognition of state flexibility, in the Proposed Disapproval, EPA recognized that it "has not directed states that they must conduct a Step 3 analysis in precisely the manner the EPA has done in its prior regional transport rulemakings."[16] The Proposed Disapproval fails to recognize this flexibility, and instead asserts a "one-size-fits-all" approach to assessing significant contribution.

Accordingly, EPA may not require Texas to adopt EPA's non-statutory, after-the-fact policy preferences through the SIP review process.[17] States are granted this same discretion with respect to SIP provisions regarding interstate transport. EPA's reliance on the "regional nature" of ozone transport, and its desire "to apply a consistent set of *policy judgments* across all states for purposes of evaluating interstate transport obligations and the approvability of interstate transport SIP submittals for the 2015 ozone NAAQS,"[18] have no bearing on whether a state's SIP is approvable or not. States, not EPA, are primarily responsible for quantifying and preventing their own significant contribution.[19] Therefore, EPA could only disapprove Texas's SIP if it failed to explain "whether or not emissions from the state significantly contribute to nonattainment in other states."[20]

In Texas's SIP, TCEQ provided an "analysis of ozone design value and emissions trends in Texas, a modeling analysis of the impacts of Texas's emissions on other states, and a discussion of existing ozone control strategies to demonstrate that emissions from Texas do not contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in another state."[21] TCEQ explained its three-step approach to determine whether emissions from Texas contribute significantly to nonattainment or interfere with maintenance at downwind monitors in another state and provided appropriate justification – through the examination of several factors, such as "design value trends, number of elevated ozone days, back trajectory analysis on elevated ozone days, modeled concentrations on future expected elevated ozone days, total interstate contributions at tagged monitors, and responsiveness of ozone to Texas emissions"[22] – to support its determination that emissions from Texas do not contribute significantly to nonattainment or interfere with maintenance of the 2015 eight-hour ozone NAAQS at the linked downwind monitors. Texas's SIP fulfilled the requirements of the CAA by showing that the control measures currently in place are adequate to prevent in-state sources from significantly contributing or interfering with maintenance of the NAAQS. TCEQ also provided a robust technical justification for its determinations. Texas's SIP "contain[s] adequate provisions" addressing interstate transport, and EPA must approve Texas's SIP.[23]

In proposing to disapprove the SIP, EPA overstepped its statutory authority under the CAA. EPA is not authorized to judge Texas's submission based on EPA's new quantification of the State's "significant contribution" or "interference with maintenance." EPA's view of Texas's contribution or its potential to interfere with maintenance in downwind States, and EPA's methodology for determining these issues, are not requirements of the Act and thus cannot be the basis for disapproval. EPA should approve Texas's SIP based on the data available to TCEQ by the statutory deadline. EPA may not, as addressed below, disapprove Texas's SIP based on a new and deeply flawed analysis.

---

[4] Train v. Natural Res. Def. Council, Inc., 421 U.S. 60, 79 (1975); *see also* Am. Elec. Power Co. v. Connecticut, 565 U.S. 410, 428 (2011) ("The Act envisions extensive cooperation between federal and state authorities, generally permitting each State to take the first cut at determining how best to achieve EPA emissions standards within its domain.") (internal citations omitted).

[5] *See* 42 U.S.C. § 7410(k)(3) ("[T]he Administrator *shall* approve [a SIP or SIP revision] as a whole if it meets all of the applicable requirements of this chapter.") (emphasis added).

[6] Air Plan Approval; Iowa; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards, 87 Fed. Reg. 9,477, 9,483 (Feb. 22, 2022).

[7] 42 U.S.C. § 7410(a)(2)(D)(i)(I).

[8] *Id.* at § 7410(k)(3).

[9] *Com. of Va.*, 108 F.3d at 1410.

[10] Compare with 40 C.F.R. §§ 51.123, 52.124 (outlining requirements for NOx and SO2 SIPs).

[11] EME Homer City Generation v. EPA, 696 F.3d 7, 47 (D.C. Cir. 2012) (Judge Rogers, dissenting), reversed on other grounds, 134 S.Ct. 1584 (2014) ("*EME Homer I*") ("Nowhere does the CAA place a requirement on EPA to quantify each State's amount of 'significant contribution' to be eliminated pursuant to the 'good neighbor' provision[.]").

[12] EPA, GUIDANCE ON INTERSTATE TRANSPORT SIP SUBMISSIONS TO MEET CURRENT OUTSTANDING OBLIGATIONS UNDER SECTION 110(A)(2)(D)(I) FOR THE 8-HOUR OZONE AND PM2.5 NATIONAL AMBIENT AIR QUALITY STANDARDS 3 (Aug. 15, 2006), https://www3.epa.gov/ttn/naaqs/aqmguide/collection/cp2/20060815 _harnett_final_section_110(a)(2)(D)(i)_guidance.pdf ("2006 Guidance").

[13] *See* EPA, INFORMATION ON THE INTERSTATE TRANSPORT STATE IMPLEMENTATION PLAN SUBMISSIONS FOR THE 2015 OZONE NATIONAL AMBIENT AIR QUALITY STANDARDS UNDER CLEAN AIR ACT SECTION 110(A)(2)(D)(I)(I), at 6 (Mar. 27, 2018) ("March 2018 Guidance") ("States may consider using this national modeling to develop SIPs that address requirements of the good neighbor provision for the 2015 ozone NAAQS. . . . States may also choose to use other information to identify nonattainment and maintenance receptors relevant to development of their good neighbor SIPs."); EPA, CONSIDERATIONS FOR IDENTIFYING MAINTENANCE RECEPTORS FOR USE IN CLEAN AIR ACT SECTION 11 0(A)(2)(D)(I)(I) INTERSTATE TRANSPORT STATE IMPLEMENTATION PLAN SUBMISSIONS FOR THE 2015 OZONE NATIONAL AMBIENT AIR QUALITY STANDARDS 4 (Oct. 19, 2018) ("EPA has identified two potential flexibilities that states may use to identify maintenance receptors with an appropriate technical demonstration.") ("October 2018 Guidance").

[14] 2006 Guidance, at 5.

[15] *See* 42 U.S.C. § 7410(a)(2)(D)(i)(I) (only requiring that SIPs "contain adequate provisions prohibiting . . . any source or other type of emissions activity within the State from emitting any air pollutant in amounts which will contribute significantly to nonattainment in, or interfere with maintenance by, any other State with respect to any such national primary or secondary ambient air quality standard.").

[16] Proposed Disapproval, 87 Fed. Reg. at 9,810.

[17] Luminant Generation Company LLC v. EPA, 675 F.3d 917, 927–29 (5th Cir. 2012) (rejecting EPA attempt to enforce non-statutory requirements through SIP review process); *Com. of Va.*, 108 F.3d at 1410 (D.C. Cir.) (stating that CAA Section 110 "does not enable EPA to force particular control measures on the states."); *see also* Concerned Citizens of Bridesburg, 836 F.2d 777, 780–81 ("[A] SIP basically embodies a set of choices . . . that the state must make for itself in attempting to reach the NAAQS with minimum dislocation.).

[18] Proposed Disapproval, 87 Fed. Reg. at 9,801 (emphasis added).

[19] *EME Homer I*, 696 F.3d at 49 (Judge Rogers, dissenting) ("States are fully capable of measuring interstate transport of emissions by conducting modeling, and they have done so before and continue to do so[.]").

[20] *See* Westar Energy, Inc. v. EPA, 608 Fed. Appx. 1, *3 (D.C. Cir. 2015) (citing EPA, GUIDANCE ON SIP ELEMENTS REQUIRED UNDER SECTIONS 110(A)(1) AND (2) FOR THE 2006 24–HOUR FINE PARTICLE (PM2.5) NATIONAL AMBIENT AIR QUALITY STANDARDS (NAAQS) at 3 (Sept. 25, 2009) (affirming EPA disapproval where Kansas had not analyzed the downwind impact of in-state emissions and had not concluded that its in-state emissions did not contribute).

[21] TCEQ, REVISIONS TO THE STATE OF TEXAS AIR QUALITY IMPLEMENTATION PLAN CONCERNING FEDERAL CLEAN AIR ACT SECTIONS 110(A)(1) AND (2) INFRASTRUCTURE, at ES-1 (Aug. 8, 2018)

[22] Id. at 7-1.

[23] 42 U.S.C. § 7410(a)(2)(D)(i)(I); id. at § 7410(k)(3)

**Commenter:** Ducote, Samuel

**Commenter ID:** 15

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

As a resident of Louisiana, I opposed the EPA's proposed disapproval of Louisiana's SIP. Louisiana's SIP meets the standards and obligations necessary to obtain the NAAQS as set forth by the EPA. The disapproval of the SIP solely regarding the potential effect of the "Good neighbor" provisions is a demonstration of regulatory overreach. In short, the Louisiana State Implementation Plan was designed

by the Louisiana Department of Environmental Quality to meet the NAAQS 'within' state boundaries. The state SIP was designed by LDEQ to meet the NAAQS within state boundaries. Allowing the EPA disapprove Louisiana's SIP on speculative "good neighbor" grounds is not a valid exercise of regulatory authority consistent with the text and purpose of the CAA. I strongly oppose the EPA's decision here. As a region of this nation responsible for fueling the needs of the nation, the Louisiana-Texas-Arkansas-Oklahoma region needs to extend special "good neighbor" exceptions for the contribution to the nation at large, especially considering the states have valid SIPs in place that meets the NAAQS requirements within each state individually.

**Commenter:** Eagle Materials Inc.

**Commenter ID:** 16

**Docket ID:** EPA-R09-OAR-2022-0138

**Comment:**

II. Nevada's Proposed SIP Meets Statutory Requirements and EPA Must Therefore Approve It.

The CAA makes clear that *states* have the primary responsibility to develop and implement emissions control measures for sources within their jurisdiction in meeting the Act's requirements.[20] While EPA provides administrative oversight in reviewing SIPs, the Agency is also "plainly . . . relegated by the Act to a secondary role in the process of determining and enforcing the specific, source-by-source emissions limitations,"[21] and cannot instead substitute its judgment for that of the state.[22] EPA has itself recognized its limited authority, noting in a recent SIP action that "EPA's role is to approve state choices, provided that they meet the criteria of the CAA."[23] In its Proposed SIP Disapproval, however, EPA oversteps this limited oversight authority by imposing its own assessment of Nevada's interstate transport obligations, rather than appropriately limiting its review to whether the state's assessment was reasonable. Because Nevada's Proposed SIP satisfies the state's interstate transport obligations under the Act, EPA must approve it.

A. States Have Significant Discretion to Determine Measures Needed to Fulfill Their Interstate Transport Obligations.

Section 110(a)(2)(D)(i)(I) of the CAA requires states to address interstate transport by preparing SIPs that "contain adequate provisions prohibiting . . . any source or other type of emissions activity within the State from emitting any air pollutant in amounts which will contribute significantly to nonattainment in, or interfere with maintenance by, any other State with respect to any such national primary or secondary ambient air quality standard." This language leaves substantial discretion to the states in determining both their significant contributions and the reduction measures necessary to eliminate them.

[...]

In performing its limited oversight role under the CAA, EPA cannot substitute its own judgment for that of the states, and in particular, cannot "force particular control measures on the states." Nevada

reasonably applied a technical evaluation of its significant contributions to downwind air quality problems, guided by EPA's Guidance and the requirements of the CAA. EPA cannot now impose rigid requirements using its own analysis, and must instead evaluate Nevada's chosen framework against the requirements of Section 110(a)(2)(D)(i)(I).

[…]

III. EPA's Proposed Disapproval is Unreasonable and Oversteps EPA's Authority Under the Clean Air Act.

In evaluating Nevada's SIP Submittal, EPA must assess (1) whether Nevada is "linked" to downwind air quality problems, based on a reasonable linkage threshold; and (2) whether Nevada has fulfilled its ozone transport obligations by submitting an approvable SIP, based on the requirements of the CAA. EPA's evaluation is unreasonable for each of these factors.

[20] *See* 42 U.S.C. § 7410(a) (requiring States to submit plans to implement, maintain, and enforce NAAQS). *See also Com. of Va. v. EPA*, 108 F.3d 1397, 1407 (D.C. Cir.), decision modified on reh'g, 116 F.3d 499 (D.C. Cir. 1997) (stating that the CAA "expressly gave the states initial responsibility for determining the manner in which air quality standards were to be achieved."); *Am. Elec. Power Co. v. Connecticut*, 565 U.S. 410, 428 (2011) ("The Act envisions extensive cooperation between federal and state authorities, generally permitting each State to take the first cut at determining how best to achieve EPA emissions standards within its domain.") (Internal citations omitted).
[21] *Train v. Natural Res. Def. Council, Inc.*, 421 U.S. 60, 79 (1975).
[22] *See* 42 U.S.C. § 7410(k)(3) (emphasizing that EPA "shall approve [a SIP or SIP revision] as a whole if it meets all of the applicable requirements of this chapter.") (Emphasis added).
[23] Air Plan Approval; Iowa; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards, 87 Fed. Reg. 9,477, 9,483 (Feb. 22, 2022).

**Commenter:** Environmental Federation of Oklahoma

**Commenter ID:** 20

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

In particular, EFO supports DEQ's assessment that EPA has overstepped its authority by circumventing the normal SIP development and approval process in a number of ways, including but not limited to: first, by evaluating the SIP based on federal policy decisions rather than law; […] EPA's actions represent a blatant disregard for cooperative federalism and for the state's extensive efforts at developing a SIP that met all requirements in place at the time of submittal.

Moreover, EFO, along with DEQ, questions the rationality of any federal action that places any significant (relative to more localized emissions) burden on Oklahoma industry for air quality improvements in Dallas, TX and Chicago, IL. This is truly the tail wagging the dog.

**Commenter:** Evergy, Inc.

**Commenter ID:** 21

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

Evergy disagrees with EPA's proposal to disapprove the State of Missouri's June 10, 2019, Interstate Transport SIP. The primary concern with the disapproval of the Missouri SIP is EPA's disregard for the concept of cooperative federalism. In enacting the CAA, Congress emphasized that "air pollution control at its source is the primary responsibility of States and local governments," but that federal leadership "is essential for the development of cooperative Federal, State, regional, and local programs to prevent and control air pollution." 42 U.S.C. § 7401.

[...]

EPA has not provided Missouri the opportunity to update and retain control over their SIP. This goes against the policy of cooperative federalism.


**Commenter:** Idaho Power Company

**Commenter ID:** 23

**Docket ID:** EPA-R09-OAR-2022-0138

**Comment:**

A. States have substantial discretion in implementing the Good Neighbor provisions.

Section 110(a)(2)(D)(i)(I) of the CAA requires states to address interstate transport by preparing SIPs that "contain adequate provisions prohibiting . . . any source or other type of emissions activity within the State from emitting any air pollutant in amounts which will contribute significantly to nonattainment in, or interfere with maintenance by, any other State with respect to any such national primary or secondary ambient air quality standard." This language leaves substantial discretion to the states in determining both their significant contributions and the reduction measures necessary to eliminate them.

[...]

In performing its limited oversight role under the CAA, EPA cannot substitute its own judgment for that of the states, and in particular, cannot "force particular control measures on the states."[5]

[...]

C. The Proposed Disapproval oversteps EPA's statutorily assigned role.

The Proposed Disapproval boils down to EPA substituting its judgment for that of Nevada, which it may not do under the Clean Air Act. While EPA "determines the ends—the standards of air quality," the CAA *gives* states "the initiative and broad responsibility to determine the means to achieve those ends."[13] EPA, by contrast, is "relegated . . . to a secondary role" in the SIP process.[14] As EPA has acknowledged, in the Good Neighbor context, "EPA's role is to approve state choices, provided that they meet the criteria of the CAA."[15]

410

In the Proposed Disapproval, EPA oversteps its limited role by unreasonably substituting its own analysis in evaluating Nevada's SIP, rather than determining whether Nevada's analysis was reasonable.

[5] *Com. of Va. v. EPA*, 108 F.3d 1397, 1410 (D.C. Cir.), *decision modified on reh'g*, 116 F.3d 499 (D.C. Cir. 1997)

[13] *Concerned Citizens of Bridesburg v. EPA*, 836 F.2d 777, 779 (3rd. Cir. 1987) (citing *Bethlehem Steel Corp. v. Gorsuch*, 742 F.2d 1028, 1036 (7th Cir. 1984)).

[14] *Train v. Natural Res. Def. Council, Inc.*, 421 U.S. 60, 79 (1975); *see also Am. Elec. Power Co. v. Connecticut*, 565 U.S. 410, 428 (2011) ("The Act envisions extensive cooperation between federal and state authorities, generally permitting each State to take the first cut at determining how best to achieve EPA emissions standards within its domain.") (internal citations omitted).

[15] Air Plan Approval; Iowa; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards, 87 Fed. Reg. 9,477, 9,483 (Feb. 22, 2022).

**Commenter:** Kentucky Division for Air Quality

**Commenter ID:** 25

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

Since the requirement for submitting an Infrastructure SIP for each NAAQS was implemented, Kentucky has provided a document demonstrating that the state has the authority, regulations, and required programs in place to address all requirements of CAA section 110(a). Beginning with the 2008 Ozone NAAQS, EPA significantly changed their perspective regarding the purpose of the I-SIP, requiring an in-depth technical demonstration, with extensive modeling, data analysis, and demonstration of whether or not potential upwind emissions are contributing to downwind problems. Kentucky maintains that the purpose of the I-SIP is to verify that the state has the authority, regulations, and programs in place to address the requirements of the CAA, not to determine if, and how much, an upwind source may be impacting a downwind monitor.

**Commenter:** Louisiana Electric Utility Environmental Group

**Commenter ID:** 28

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

A. EPA Has a Narrow Role in the SIP Process

EPA's proposed disapproval of Louisiana's interstate transport SIP for the 2015 ozone NAAQS exceeds the Agency's authority under the Clean Air Act ("CAA"). The CAA creates a system of cooperative federalism whereby EPA "determines the ends—the standards of air quality—while states are given the initiative and broad responsibility to determine the means to achieve those ends."[1] Accordingly, the CAA grants states the authority to develop plans addressing NAAQS[2] and the states have extensive discretion in what their plans encompass.[3] The states' primary role in developing SIPs under Section 110 also

extends to the "Good Neighbor" obligation in CAA Section 110(a)(2)(D)(i)(I) to develop SIPs to address interstate transport.[4]

EPA's role is limited once a state submits a SIP. According to Section 110 of the CAA, the Administrator *shall* approve [a SIP or SIP revision] as a whole if it meets all of the applicable requirements of this chapter."[5] EPA has long recognized its limited role; most recently in a SIP approval earlier this month:

> [T]he Administrator is required to approve a SIP submission that complies with the provisions of the CAA and applicable Federal regulations. 42 U.S.C. 7410(k); 40 CFR 52.02(a). Thus, in reviewing SIP submissions, EPA's role is to approve state choices, provided that they meet the criteria of the CAA.[6]

Given EPA's limited role, it is inappropriate for EPA to propose "to apply a consistent set of *policy judgments* across all states for purposes of evaluating interstate transport obligations and the approvability of interstate transport SIP submittals for the 2015 ozone NAAQS," including for the proposed disapproval of Louisiana's SIP.

[...]

The states, in the first instance, have wide discretion in determining how to achieve the NAAQS, including their interstate transport obligations, and EPA cannot force the states to adopt approaches reflecting the Agency's policy preferences for consistency in interstate transport obligations. A "SIP basically embodies a set of choices . . . that the state must make for itself in attempting to reach the NAAQS with minimum dislocation."[10]

EPA also cannot substitute its own judgment for that of the state's in crafting a SIP, as the courts have recognized.[11]

[...]

Accordingly, EPA's Proposed Disapproval of Louisiana's SIP falls short and EPA has overstepped its authority under the CAA. EPA should re-evaluate Louisiana's SIP on the basis of whether the SIP meets the applicable requirements of the CAA, not on the basis of whether Louisiana made different choices than EPA would have made had it been the decision-maker with respect to fulfilling the state's Good Neighbor obligation to address interstate transport of ozone under Section 110(a)(2)(D)(i)(I) of the CAA. EPA also must avoid any policy determinations or a desire to adopt a "national ozone transport policy" in evaluating Louisiana's SIP.

---

[1] *Concerned Citizens of Bridesburg v. EPA*, 836 F.2d 777, 779 (3rd. Cir. 1987) (citing *Bethlehem Steel Corp. v. Gorsuch*, 742 F.2d 1028, 1036 (7th Cir. 1984)).

[2] *See* 42 U.S.C. § 7410(a) (requiring States to submit plans to implement, maintain, and enforce NAAQS); *see also Com. of Va. v. EPA*, 108 F.3d 1397, 1407 (D.C. Cir.), decision modified on reh'g, 116 F.3d 499 (D.C. Cir. 1997) (stating that the CAA "expressly gave the states initial responsibility for determining the manner in which air quality standards were to be achieved.").

[3] *See Union Elec. Co. v. EPA*, 427 U.S. 246, 250 (1976) ("Each State is given wide discretion in formulating its plan."); *Train v. NRDC*, 412 U.S. 60, 79 (1975) ("[EPA] is relegated by the [Clean Air] Act to a secondary role in the process of determining and enforcing the specific, source-by-source emission limitations which are necessary if the national standards it has set are to be met."); *Fla. Power & Light Co. v. Costle*, 650 F.2d 579, 587 (5th Cir. 1981)

("The great flexibility accorded the states under the Clean Air Act is further illustrated by the sharply contrasting, narrow role to be played by EPA.").

[4] *See North Carolina v. EPA*, 531 F.3d 896, 923 (D.C. Cir. 2008) ("the text of section 110 . . . establishes the state as the appropriate primary administrative unit to address interstate transport of emissions.") (citations omitted); *see also Michigan v. EPA*, 213 F.3d 663, 671 (D.C. Cir. 2000).

[5] 42 U.S.C. § 7410(k)(3) (emphasis added).

[6] Air Plan Approval; Wisconsin; Redesignation of the Wisconsin Portion of the Chicago-Naperville, Illinois-Indiana-Wisconsin Area to Attainment of the 2008 Ozone Standard, 87 Fed. Reg. 21027, 21028 (Apr. 11, 2022).

[10] *Bridesburg*, 836 F.2d at 780–81 (emphasis added); *see also Com. of Va.*, 108 F.3d at 1410 (D.C. Cir.) (CAA Section 110 "does not enable EPA to force particular control measures on the states.").

[11] *Bridesburg*, 836 F.2d at 781 (quoting *Train v. Natural Res. Def. Council, Inc.*, 421 U.S. 60, 79 (1975)) (internal citations and quotations omitted) ("EPA has limited authority to reject a SIP . . . . The [CAA] gives the Agency no authority to question the wisdom of a State's choices of emission limitations if they are part of a plan which satisfies the standards of [Section 110(a)(2)], and the Agency may devise and promulgate a specific plan of its own only if a State fails to submit an implementation plan which satisfies those standards.").

**Commenter:** Maryland Department of the Environment

**Commenter ID:** 29

**Docket ID:** EPA-R03-OAR-2021-0872

**Comment:**

EPA's proposed FIP, which is purported to completely resolve the state's significant contribution, would not require any further emissions reductions from EGU or non-EGU sources beyond what Maryland imposes on its sources. Maryland's emission reduction control programs identified in the 2015 Good Neighbor SIP are sufficient to resolve the state's significant contribution to downwind nonattainment and maintenance areas and SIP achieves more reductions than the FIP can provide. As such, EPA's proposed disapproval inappropriately supplants judgement for that of the state. As various courts have explained, the CAA is a cooperative federalism regime, under which the EPA sets required air quality standards but with the states holding primary responsibility to create plans which achieve them. EPA has no authority to disapprove Maryland's choices of emissions limitation in preference of its own suite of controls, where Maryland has submitted a SIP, which satisfies the requirements of CAA § 110(a)(2)(D). *Train v. Natural Resources Defense Council, Inc.*, 421 U.S. 60, 79 (1975). To the contrary, "the State is at liberty to adopt whatever mix of emission limitations it deems best suited to its particular situation." *Id.* Due to the suite of federally enforceable regulations and permits applicable to Maryland's sources already provide for greater overall emissions reductions from the EGUs and Non-EGU sources than EPA's proposed FIP, EPA's proposed disapproval of Maryland's SIP is arbitrary, capricious, and contrary to the CAA.

**Commenter:** The Luminant Companies

**Commenter ID:** 44

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

A. The Clean Air Act Gives States the Primary Authority to Address Interstate Transport

The Clean Air Act creates a cooperative federalism structure that divides authority between the federal government and the states.[5] Within this structure, EPA defines the air quality goals for the nation, and the states and local governments implement plans to achieve those standards. Accordingly, "[t]he Act assigns responsibility to the EPA for identifying air pollutants and establishing [the NAAQS.] . . . The states, by contrast, bear the primary responsibility for implementing those standards."[6] In other words, "air pollution prevention . . . and air pollution control at its source is the primary responsibility of States and local governments,"[7] and "[t]he structure of the Clean Air Act indicates a congressional preference that states, not EPA, drive the regulatory process."[8]

With respect to the NAAQS, EPA is required to review the NAAQS at five year intervals and make revisions where necessary.[9] Pursuant to this obligation, on October 1, 2015, EPA revised the primary and secondary ozone NAAQS to establish a new 8-hour average standard of 70 parts per billion (ppb).[10] The Clean Air Act then directs states to submit a revision to their SIP within three years after EPA promulgates a new or revised NAAQS in order to address the new NAAQS.[11] Among those requirements is the state's "good neighbor" or "interstate transport" obligation under 42 U.S.C. § 7410(a)(2)(D)(i)— that is, a state's SIP must "contain adequate provisions . . . prohibiting . . . any source or other type of emissions activity within the State from emitting any air pollutant in amounts which will . . . contribute significantly to nonattainment in, or interfere with maintenance by, any other state" with respect to the NAAQS.[12] Under the statute, the default is that states will address interstate transport in their SIPs, not EPA in a FIP—a concept which EPA's approach here disregards by assuming that a national approach is the only way to adequately address interstate transport.

[…]

Importantly, EPA's role in reviewing SIP submissions is narrowly tailored under the Clean Air Act. As EPA has previously explained, "Congress assigned to states the primary responsibility to implement the NAAQS[.]"[16] If a SIP is deemed complete, "the Administrator *shall* approve such submittal as a whole if it meets all the applicable requirements of this chapter[.]"[17] Thus, if a SIP submission "meets all of the applicable [Clean Air Act] requirements, the EPA must approve it."[18] In the proposal here, EPA has strayed outside the statute and established court precedent to propose disapproval simply because TCEQ's modeling is not the same as EPA's.

Although the Clean Air Act directs states to address interstate transport, the Clean Air Act does not mandate that states address this obligation in any particular manner. EPA has adopted some regulations that govern the SIP submittal process in general, but EPA has not adopted any regulatory standards that define the requirements for interstate transport SIPs related to the 2015 ozone standard.[19] And EPA itself has recognized that the Clean Air Act gives states flexibility with respect to SIP submissions. EPA has explained that "[t]he precise nature and contents of [a SIP] submission [are] not stipulated in the statute."[20] Further, "EPA believes that the contents of the SIP submission required by section 110(a)(2)(D)(i) may vary depending upon the facts and circumstances related to the specific NAAQS."[21] Accordingly, states have broad discretion in developing SIP provisions to address interstate transport, as

courts and EPA have recognized,[22] and EPA must approve state choices when reviewing SIP submissions, provided that they meet the criteria of the Clean Air Act.[23]

B. EPA's Proposal Ignores the Cooperative Federalism Approach of the Clean Air Act

In light of the states' broad discretion, EPA may not ignore the cooperative federalism structure of the Clean Air Act and ignore the statutory SIP review process in order to enforce its policy preferences or guidance on states.[24] Nor can EPA use Section 110 "to force particular control measures on the states[.]"[25] The Clean Air Act "expressly gave the states initial responsibility for determining the manner in which air quality standards were to be achieved,"[26] and the states, not EPA, are primarily responsible for quantifying and preventing their own significant contribution.[27]

The "regional nature" of ozone transport does not give EPA any greater authority over a SIP, as EPA assumes in the proposal here.[28] In fact, EPA has "unambiguously stated its interpretation that States [have] an independent obligation under section 110(a) to submit 'good neighbor' SIPs regardless of whether EPA first quantified each State's emission reduction obligations."[29] And that is precisely what TCEQ did here. Nonetheless, in the Proposed Disapproval, EPA has turned the Clean Air Act's well-established cooperative federalism regime on its head. Under EPA's approach here, a state could never issue a satisfactory interstate transport SIP, which is clearly contrary to the statute and court precedent.

EPA proposes to go beyond the actual requirements of the Clean Air Act and evaluate Texas's SIP according to new, non-statutory standards. Specifically, EPA proposes to reject TCEQ's expert modeling projections of future design values and TCEQ's quantification and assessment of Texas's "significant contribution" in favor of its own modeling. However, EPA's quantification and assessment of a State's "significant contribution" to downwind nonattainment or maintenance issues is *not* a requirement of the Act.[30] The Clean Air Act does not provide EPA the authority to second-guess TCEQ and disapprove its SIP simply because TCEQ's modeling does not match EPA's modeling or because EPA believes TCEQ's modeling "*may* understate" projected design values or there is "*potential* underestimation."[31] The standard that EPA applies to Texas's SIP and its supporting technical analysis in the Proposed Disapproval has no basis in the Clean Air Act.

EPA has announced its preference for a "nationally consistent approach," but this preference cannot override the clear and settled intent of Congress that states be permitted to implement different and varying approaches if they choose. Nor can EPA's policy goal heighten or alter the standard set out in the Clean Air Act for a state's SIP submittal such that a "deviation" from EPA's preferred approach "must be substantially justified," as EPA claims.[32] Plainly put, EPA does not write SIPs. EPA's competing view of Texas's contribution or its potential to interfere with maintenance in downwind States, and EPA's overconservative methodology for determining these things, are not requirements of the Act, nor has EPA promulgated regulations addressing this. In fact, EPA has recognized that it "has not directed states that they must conduct [their] analysis in precisely the manner the EPA has done in its prior regional transport rulemakings[.]"[33] In fact, EPA has taken inconsistent approaches (none of which are grounded in the statute), previously stating that states must only use an assessment of significant contribution that is "comparable" to EPA's preferred approach in order to have its SIP approved.[34]

Such discretion and flexibility is essential, as states must retain sufficient authority to discharge their obligations under the Clean Air Act. It would be illogical for Congress to impose a burden on the states

that they cannot reasonably discharge on their own but instead must wait for EPA let them know what precisely to do, as EPA proposes here. The Supreme Court has expressly held that this is not the case.[35] In fact, EPA has specifically expressed that the Clean Air Act "plac[es] an independent obligation" on states to address their "good neighbor" obligation "regardless of whether EPA ha[s] prospectively quantified its amount of 'significant contribution.'"[36] And EPA recognized the ability of states to undertake such an obligation, acknowledging that "[s]tates are fully capable of measuring interstate transport of emissions by conducting modeling, and they have done so before and continue to do so[.]"[37] This is logical, as "State air quality divisions are no strangers to complex air quality and meteorological modeling of interstate transport of emissions."[38] Using its expertise in modeling, Texas has discharged its obligation just as the Clean Air Act envisions here.

EPA cannot now ignore Congress's clear language in the Clean Air Act and usurp the states' role in the NAAQS process. Regardless of whether EPA prefers a nationally uniform method for addressing ozone transport, that is not what Congress mandated. As EPA has explained, "the Administrator is required to approve a SIP submission that complies with the provisions of the [Clean Air Act] and applicable Federal regulations."[39] Thus, EPA's preference for states to rely on a certain approach cannot be the basis for disapproval. Ultimately, EPA can only disapprove Texas's SIP if it "fails to explain whether or not emissions from the state significantly contribute to nonattainment in other states," as required by the Clean Air Act.[40]

[5] *Luminant Generation Co. v. EPA*, 675 F.3d 917, 921 (5th Cir. 2012).

[6] *Id.* (internal citations and quotations omitted).

[7] 42 U.S.C. § 7401(a)(3).

[8] *Texas v. EPA*, 829 F.3d 405, 411 (5th Cir. 2016).

[9] 42 U.S.C. § 7409(d).

[10] 80 Fed. Reg. 65,292, 65,292 (Oct. 26, 2015).

[11] 42 U.S.C. § 7410(a)(1).

[12] Id. § 7410(a)(2)(D).

[16] *See* Brief of EPA at 13, *Texas v. EPA*, No. 18-60606 (5th Cir. Mar. 8, 2019).

[17] *See Luminant Generation*, 675 F.3d at 921 ("With regard to implementation, the Act confines the EPA to the ministerial function of reviewing SIPs for consistency with the Act's requirements."); *see also* Brief of EPA at 14, *Texas v. EPA*, No. 18-60606 (5th Cir. Mar. 8, 2019) ("EPA must approve the SIP if it meets the Act's requirements." (citing 42 U.S.C. § 7410(k)(3) and *Union Elec. Co. v. EPA*, 427 U.S. 246, 251 (1976))).

[18] *Luminant Generation*, 675 F.3d at 922 (emphasis added).

[19] However, EPA has done so for other NAAQS. See 40 C.F.R. §§ 51.123-.124.

[20] *See* EPA, *Guidance for State Implementation Plan (SIP) Submissions to Meet Current Outstanding Obligations Under Section 110(a)(2)(D)(i) for the 8-Hour Ozone and PM2.5 National Ambient Air Quality Standards*, at 3 (Aug. 15, 2006), *available at* https://www3.epa.gov/ttn/naaqs/aqmguide/collection/cp2/20060815 _harnett_final_section_110(a)(2)(D)(i)_guidance.pdf ("2006 Guidance").

[21] Id.

[22] *See EME Homer City Generation, L.P. v. EPA*, 696 F.3d 7, 47-48 (D.C. Cir. 2012) (Rogers, J., dissenting), *reversed on other grounds*, 134 S. Ct. 1584 (2014) ("*EME Homer I*").

[23] 87 Fed. Reg. 21,027, 21,028 (Apr. 11, 2022).

[24] *Luminant Generation*, 675 F.3d at 927-29 (rejecting EPA attempt to enforce non-statutory requirements through SIP review process).

[25] *Com. of Va. v. EPA*, 108 F.3d 1397, 1410 (D.C. Cir.), *decision modified on reh'g*, 116 F.3d 499 (D.C. Cir. 1997).

[26] Id. at 1407.

[27] *EME Homer I*, 696 F.3d at 49 ("States are fully capable of measuring interstate transport of emissions by conducting modeling, and they have done so before and continue to do so[.]").

[28] Every "good neighbor" obligation is regional by definition, therefore Congress must have understood that such "regional" issues would still be primarily the subject of state responsibility, authority, and reasonable judgment.
[29] *EME Homer I*, 696 F.3d at 39; see also id. at 43.
[30] *Id*. at 47 ("Nowhere does the [Clean Air Act] place a requirement on EPA to quantify each State's amount of 'significant contribution' to be eliminated pursuant to the 'good neighbor' provision[.]").
[31] EPA Region 6, *2015 8-Hour Ozone Transport SIP Proposal, Technical Support Document*, Docket No. EPAR06-OAR-2021-0801-0002, at 39, 66 (Feb. 2022) ("Proposed TSD") (emphasis added).
[32] 87 Fed. Reg. at 9,801.
[33] *Id*. at 9,810.
[34] *See* 2006 Guidance at 5.
[35] *See EME Homer II*, 572 U.S. at 509.
[36] *EME Homer I*, 696 F.3d at 43.
[37] *Id*. at 49.
[38] *Id*.
[39] 86 Fed. Reg. 71,830, 71,830 (Dec. 20, 2021).
[40] *See Westar Energy, Inc. v. EPA*, 608 Fed. Appx. 1, *3 (D.C. Cir. 2015) (affirming EPA disapproval where Kansas had not analyzed the downwind impact of in-state emissions and had not concluded that it did not contribute).

**Commenter:** PacifiCorp

**Commenter ID:** 38

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

The good neighbor provision, at its core, is a state obligation. It is codified in Section 110 of the CAA, which is the section granting states primary decision-making authority for developing SIPs to achieve the NAAQS. EPA's role under section 110 is to review and approve those plans, not to substitute its own policy preferences or decisions for those made by the states. As long as a state's plan is reasonable and complies with the requirements of the CAA, EPA must approve it. The U.S. Supreme Court and multiple Circuit Courts have repeatedly endorsed this cooperative federalism approach codified in Section 110.[18]

[...]

States have wide discretion in determining how to achieve the NAAQS, including their interstate transport obligations, and EPA cannot force the states to adopt approaches reflecting the Agency's policy preferences. A "SIP basically embodies a set of choices . . . that the state must make for itself in attempting to reach the NAAQS with minimum dislocation."[65] EPA also cannot substitute its own judgment or a one-size-fits-all approach for that of the states when crafting a SIP, as the courts have recognized over and over.[66] This is especially true when a state's SIP relied on guidance put forth by EPA.

[...]

The CAA does not require states to address their Good Neighbor obligations in a specific manner, nor does it "enable EPA to force particular control measures on the states."[83] EPA has not adopted any nationwide regulatory standards that purport to define the requirements for interstate transport SIPs with respect to the 2015 ozone NAAQS.[84] Specifically, EPA has previously explained that "[t]he precise nature and contents of such a submission is not stipulated in the statute. [Therefore,] EPA believes that

the contents of the SIP submission required by section 110(a)(2)(D)(i) may vary depending upon the facts and circumstances related to the specific NAAQS."[85] This is one of the reasons the CAA assigns development of implementation plans to the states – they are able to use their local knowledge and familiarity with regional conditions to best design the right type of plan for their location and citizens' values and priorities.

EPA claims it "has not directed states that they must conduct a Step 3 analysis in precisely the manner the EPA has done in its prior regional transport rulemakings."[86] But EPA rejects the flexibilities it previously provided to the states and instead insists on a one-size-fits-all approach when assessing significant contribution to NAAQS. In fact, EPA's disapprovals force Utah and other states to "complete something similar to EPA's analysis" or "an alternative approach" that meets EPA's policy choices and preferred methods.[87]

The Proposed Disapproval fails to recognize EPA's limited role and obligation: "the Administrator shall approve [a SIP or SIP revision] as a whole if it meets all of the applicable requirements of this chapter."[88] EPA has long recognized its limited role, as stated in a recent SIP approval:

> [T]he Administrator is required to approve a SIP submission that complies with the provisions of the CAA and applicable Federal regulations. 42 U.S.C. 7410(k); 40 CFR 52.02(a). Thus, in reviewing SIP submissions, EPA's role is to approve state choices, provided that they meet the criteria of the CAA.[89]

It is inappropriate given the ozone situation in the West and EPA's limited role for EPA to claim in the Proposed Disapproval that it must "apply a consistent set of policy judgments across all states for purposes of evaluating interstate transport obligations and the approvability of interstate transport SIP submittals for the 2015 ozone NAAQS."[90] New policy judgments, even if labeled as uniform and nationwide, have no place in determining whether a SIP meets applicable CAA requirements (which support tailoring to the needs of the particular state), especially when those judgments contradict previous EPA policies and practices.[91]

[…]

Additionally, EPA partially based its Proposed Disapproval on its own opinion of what factors Utah should have considered:

> UDAQ's analysis failed to evaluate emissions and emissions-reduction opportunities from most of the highest emitting NOx sources in the State, including multiple electric generating units located further east of the Salt Lake City, Utah area and thus closer to the Denver area receptors to which Utah contributes greater than 1 percent of the NAAQS. A state conducting a Step 3 analysis should undertake an evaluation of these kinds of substantial and potentially cost-effective emissions reduction opportunities, and the failure to do so is grounds for disapproval.[95]

However, EPA cannot require Utah to adopt EPA's non-statutory policy preferences through the SIP review process since states, not EPA, are primarily responsible for quantifying and determining the preferred method to prevent their own significant contribution.[96]

---

[18] *See, e.g., Train*, 412 U.S. 60 (1975); *Union Elec. Co. v. EPA*, 427 U.S. 246 (1976); *Fla. Power & Light Co. v. Costle*, 650 F.2d 579 (5th Cir. 1981).

[65] *Concerned Citizens of Bridesburg v. EPA*, 836 F.2d 777, 780–81 (3rd Cir. 1987); *see also Com. of Virginia.*, 108 F.3d at 1410 (CAA Section 110 "does not enable EPA to force particular control measures on the states.").

[66] *Bridesburg*, 836 F.2d at 781 (quoting *Train v. Natural Res. Def. Council, Inc.*, 421 U.S. 60, 79 (1975)) (internal citations and quotations omitted) ("EPA has limited authority to reject a SIP . . . . The [CAA] gives the Agency no authority to question the wisdom of a State's choices of emission limitations if they are part of a plan which satisfies the standards of [Section 110(a)(2)], and the Agency may devise and promulgate a specific plan of its own only if a State fails to submit an implementation plan which satisfies those standards.").

[83] *Com. of Va. v. EPA*, 108 F.3d 1397, 1410 (D.C. Cir.), *decision modified on reh'g*, 116 F.3d 499 (D.C. Cir. 1997); *see also id.* at 1407 (stating that the CAA "expressly gave the states initial responsibility for determining the manner in which air quality standards were to be achieved.").

[84] Compare with 40 C.F.R. §§ 51.123, 52.124 (outlining requirements for NOx and SO2 SIPs).

[85] EPA, W. Harnett, Guidance For State Implementation Plan (SIP) Submissions To Meet Current Outstanding Obligations Under Section 110(A)(2)(D)(I) For The 8-Hour Ozone And Pm2.5 National Ambient Air Quality Standards (Aug. 15, 2006) at 3, available at https://www3.epa.gov/ttn/naaqs/aqmguide/collection/cp2/20060815_harnett_final_section_110(a)(2)(D)(i)_guidance.pdf ("2006 Guidance").

[86] See 87 FR at 31,481.

[87] *Id.* at 31,482.

[88] *See North Carolina v. EPA*, 531 F.3d 896, 923 (D.C. Cir. 2008) ("the text of section 110 . . . establishes the state as the appropriate primary administrative unit to address interstate transport of emissions.") (citations omitted); *see also Michigan v. EPA*, 213 F.3d 663, 671 (D.C. Cir. 2000) (affirming EPA's approach of "leav[ing] to the States the task of determining how to obtain NOx reductions).

[89] Air Plan Approval; Wisconsin; Redesignation of the Wisconsin Portion of the Chicago- Naperville, Illinois-Indiana-Wisconsin Area to Attainment of the 2008 Ozone Standard, 87 FR 21,027, 21,028 (Apr. 11, 2022).

[90] *See* 87 FR at 31,472.

[91] *See, e.g.*, 81 FR 74,504, 74,506 (October 26, 2016), EPA, Cross-State Air Pollution Rule Update for the 2008 Ozone NAAQS, Oct. 26, 2016 (declining to include western states in CSAPR program due to differences in western ozone transport); EPA, S. Page, Director, OAQPS, "Information on Interstate Transport 'Good Neighbor' Provision for the 2008 Ozone National Ambient Air Quality Standards (NAAQS) under Clean Air Act (CAA) Section 110(a)(2)(D)(i)(I)" (January 2015) at 4 (recommending ozone transport in western states should be evaluated on a case-by-case basis).

[95] 87 FR at 31,483.

[96] *See, e.g., Luminant Generation Company LLC v. EPA*, 675 F.3d 917, 927–29 (5th Cir. 2012) (rejecting EPA's attempt to enforce non-statutory requirements through SIP review process); *Com. of Va.*, 108 F.3d at 1410 (D.C. Cir.) (stating that CAA Section 110 "does not enable EPA to force particular control measures on the states."); *see also Concerned Citizens of Bridesburg*, 836 F.2d 777, 780–81 ("[A] SIP basically embodies a set of choices . . . that the state must make for itself in attempting to reach the NAAQS with minimum dislocation.); *EME Homer I*, 696 F.3d at 49 (Judge Rogers, dissenting) ("States are fully capable of measuring interstate transport of emissions by conducting modeling, and they have done so before and continue to do so[.]").

**Commenter:** PacifiCorp (Berkshire Hathaway Energy Company Proposed FIP Comments Attachment)

**Commenter ID:** 38

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

BHE supports the authority granted under the CAA to states as the entities best suited to develop and adopt implementation plans that are tailored to the geography, populations, meteorology and other localized conditions of the specific state. The "good neighbor" provision, at its core, is a state obligation.

It is codified in Section 110 of the CAA, which is the section granting states the primary decision-making authority for developing state implementation plans to achieve the NAAQS. EPA's role under section 110 is to review and approve those plans, not to substitute its own policy decisions for those made by the states. As long as a state's plan is reasonable and complies with the requirements of the CAA, EPA must approve it. The D.C. Circuit has repeatedly endorsed this cooperative federalism approach codified in Section 110.[42] However, the Proposed Rule threatens to impose a one-size-fits-all approach onto this complex program rather than working with the western states to find the best solution, which must be tailored to the conditions and resources in each state. EPA may feel backed into a corner because of legal suits and its own delays in reviewing and approving each of the western state's SIPs. BHE believes the CAA provides, and in fact requires, a different and more effective approach.

[…]

States are uniquely positioned to identify the right mix of requirements for the unique emission sources in their jurisdictions and to determine how best to align those requirements with other regulatory efforts that target some of the same units and pollutants, like regional haze. In addition, states are best positioned, and have a sovereign duty, to evaluate and implement the measures necessary to ensure they achieve the required good neighbor provisions while also not jeopardizing their coal communities and the bulk electric systems that serve their citizens.

[…]

BHE supports state authority to adopt a SIP to replace the FIP and recognizes the states' ability to ensure their SIP contains adequate provisions to prevent significant interference with attainment or maintenance of the NAAQS in a downwind state. The good neighbor provision, at its core, is a state obligation. It is codified in Section 110 of the Clean Air Act, which is the section granting states the primary decision-making authority for developing SIPs to achieve the NAAQS. EPA's role under section 110 is to review and approve those plans, not to substitute its own policy preferences or decisions for those made by the states. As long as a state's plan is reasonable and complies with the requirements of the Clean Air Act, EPA must approve it. The D.C. Circuit has repeatedly endorsed this cooperative federalism approach codified in Section 110.[110]

The D.C. Circuit and the U.S. Supreme Court have confirmed in litigation over EPA's prior transport rules that EPA has authority under Section 110 to set the basic parameters of what states must do to comply with the good neighbor provision. Those courts have also confirmed that EPA may issue a FIP only if a state's SIP is deemed to be insufficient based on EPA's parameters. In addition, provisions in the Proposed Rule dictate SIP requirements not found in the CAA and essentially eliminate any reasonable opportunity for states to make a future SIP submission. EPA has undermined the central principles underlying both Section 110 and the Administrative Procedure Act by rejecting state good neighbor SIPs that were based on EPA's own guidance at the time those SIPs were written. For some states like Nevada, Utah, and Wyoming, EPA did not even propose to reject those SIPs until after it had already proposed a federal implementation plan with explicit requirements specifically targeted at those states. Even if EPA ultimately cures its failure to observe the proper sequencing of responding to a state SIP before proposing a FIP, its actions run roughshod over the states' primary role in addressing nonattainment under Section 110 and suggest that EPA never gave the state SIP submittals a considered review, preferring instead to impose its own solution, in violation of legal principles. Agency action

"must be timely, and it must be taken objectively and in good faith, not as an exercise in form over substance, and not as a subterfuge designed to rationalize a decision already made."[111]

[42] *Train v. NRDC*, 412 U.S. 60 (1975); *Union Elec. Co. v. EPA*, 427 U.S. 246 (1976); *Fla. Power & Light Co. v. Costle*, 650 F.2d 579 (5th Cir. 1981).
[110] *Train v. NRDC*, 412 U.S. 60 (1975); *Union Elec. Co. v. EPA*, 427 U.S. 246 (1976); *Fla. Power & Light Co. v. Costle*, 650 F.2d 579 (5th Cir. 1981)
[111] *Metcalf v. Daley*, 214 F.3d 1135, 1142 (9th Cir. 2000).

**Commenter:** United States Steel Corporation

**Commenter ID:** 45

**Docket ID:** EPA-R05-OAR-2022-0006

**Comment:**

By simultaneously proceeding with a FIP, EPA's actions supplant states' rights and authority under the clean air act as Congress contemplated.

U. S. EPA Cannot Replace Sound State Decisions that Comply with the Clean Air Act with Federal "Judgment" or "Policy". It is well established that States have much latitude in developing and implementing State Implementation Plans (SIPs.) While U.S. EPA may prefer a different approach or alternative, a SIP can only be disapproved when is irrefutably shown to be inconsistent with the Clean Air Act. In the proposed disapproval, U.S. EPA has not shown that the state submittals did not comply with the Clean Air Act. The proposed disapproval of the SIPs is tied closely to EPA's proposed FIP that would have a "one-size fits all" approach that would inappropriately supplant the States' individual authority under the Clean Air Act.

**Commenter:** United States Steel Corporation

**Commenter ID:** 45

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

EPA has a role in the SIP process. However, that role should be a narrow one that gives deference to the state pursuant to the cooperative federalism system established under the Clean Air Act ("CAA"). EPA's proposal to disapprove Arkansas's interstate transport SIP for the 2015 ozone NAAQS[1] goes beyond the authority given to EPA by the CAA. State's, such as Arkansas, are given discretion under the CAA to address NAAQS through appropriate plans.[2] EPA's proposal oversteps the agency authority under the CAA. The Arkansas SIP should be re-evaluated by EPA solely on the basis of whether Arkansas has met

the applicable CAA requirements. EPA should not use the SIP disapproval process to try to create a "national ozone transport policy".

[1] *See* 42 U.S.C. § 7410(a) (requiring States to submit plans to implement, maintain, and enforce NAAQS); *see also Com. of Va. v. EPA*, 108 F.3d 1397, 1407 (D.C. Cir.), decision modified on reh'g, 116 F.3d 499 (D.C. Cir. 1997) (stating that the CAA "expressly gave the states initial responsibility for determining the manner in which air quality standards were to be achieved.").

[2] *See Union Elec. Co. v. EPA*, 427 U.S. 246, 250 (1976) ("Each State is given wide discretion in formulating its plan."); *Train v. NRDC*, 412 U.S. 60, 79 (1975) ("[EPA] is relegated by the [Clean Air] Act to a secondary role in the process of determining and enforcing the specific, source-by-source emission limitations which are necessary if the national standards it has set are to be met."); *Fla. Power & Light Co. v. Costle*, 650 F.2d 579, 587 (5th Cir. 1981) ("The great flexibility accorded the states under the Clean Air Act is further illustrated by the sharply contrasting, narrow role to be played by EPA.")

**Commenter:** Utah Division of Air Quality

**Commenter ID:** 47

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

EPA's Proposed Disapproval Goes Against the Principles of Cooperative Federalism

Prior to this proposed disapproval, UDAQ was successful in implementing the requirements of the Clean Air Act (CAA) by working closely with our co-regulatory partners at EPA's Region 8 office, as envisioned by the principles of cooperative federalism. This close working relationship directly contributed to significant recent achievements including reducing ambient PM2.5 concentrations and allowing all three of Utah's PM2.5 nonattainment areas to reach attainment by the attainment date for the current NAAQS. As the state regulatory agency, UDAQ understands the nuances of our airsheds and the people's priorities, and can create state implementation plans that are best for Utah. The benefit of cooperative federalism is having the autonomy to do what's best for the state, but do so in partnership with EPA to ensure that the CAA intent and requirements are met.

[…]

The EPA's decision to change the acceptable criteria *after* the development and submission of SIPs, and to do so with no additional guidance, puts states in the difficult position of trying to plan with a moving set of criteria. This whipsaw approach inevitably results in wasted state time and resources. It has become apparent to UDAQ that working closely with our EPA region has no bearing on the outcome of some of EPA's final regulatory actions and is inconsistent with principles of cooperative federalism. As mentioned in Utah's FIP comments, UDAQ respectfully requests EPA to consider ways to align its agency more efficiently so that the policy priorities of the current administration better align with the implementation and timing of CAA requirements at the regional and state level.

**Commenter:** Xcel Energy

**Commenter ID:** 52

**Docket ID:** EPA-R05-OAR-2022-0006

**Comment:**

Most importantly, the premature development of FIPs upsets the balance of state and federal authority under the CAA conflicting with the principals of cooperative federalism, as was intended under the Act. Congress delegated the authority to develop implementation plans to the states. EPA is only empowered to develop an implementation plan if a state fails to satisfactorily exercise this authority. The MPCA has developed a SIP which was based on guidance available at the time, taking into consideration known NOx reductions. MN was identified as a non-significant contributor (below 0.7 parts per billion) in modeling performed by both EPA and LADCO and thus the MPCA SIP was built upon that information. EPA's disapproval of the MN SIP is based on revised EPA modeling that the MPCA, in their comments, has identified flaws with (including the failure to consider substantial planned NOx emission reductions). Xcel Energy encourages the EPA to allow the SIP process to work its way through the system as provided for under the regulations - allowing for comments on, or reformulation of, the SIP before EPA proposes or implements a FIP for the state of Minnesota. EPA's premature development of FIPs intrudes on authority that Congress specifically delegated to states.

This is particularly the case where, in the highly technical world of modeling, experts may disagree. In reviewing the competing technical evaluations, it is unclear whether EPA has the more correct view. At a minimum, we believe a more detailed technical discussion is warranted to first fully understand the differences, and second, reach some technical consensus on the proper manner in which to evaluate impacts and determine whether the proposed SIP should truly not be approved.

**Commenter:** Xcel Energy

**Commenter ID:** 52

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

Most importantly, the premature development of FIPs upsets the balance of state and federal authority under the CAA conflicting with the principals of cooperative federalism, as was intended under the Act. Congress delegated the authority to develop implementation plans to the states. EPA is only empowered to develop an implementation plan if a state fails to satisfactorily exercise this authority. EPA's disapproval of the Texas SIP is based on revised EPA modeling that TCEQ, in their comments, has identified as flawed. Xcel Energy encourages the EPA to allow the SIP process to work its way through the system as provided for under the regulations - allowing for comments on, or reformulation of, the SIP before EPA proposes or implements a FIP for the state of Texas. EPA's premature development of FIPs intrudes on authority that Congress specifically delegated to states.

This is particularly the case where, in the highly technical world of modeling, experts may disagree. In reviewing the competing technical evaluations, it is unclear whether EPA has the more correct view. At a

minimum, we believe a more detailed technical discussion is warranted to first fully understand the differences, and second, reach some technical consensus on the proper manner in which to evaluate impacts and determine whether the proposed SIP is truly not approvable

*Response*

The EPA responded generally to comments related to cooperative federalism in Section V.A.5 of the preamble. Here, the EPA responds in further detail to comments related to cooperative federalism and the EPA's authority.

The EPA does not agree that it has in any way overstepped its authority in disapproving the SIP submissions in this action. Commenters offer a cavalcade of arguments as to why the EPA cannot or should not be allowed to exercise its independent judgment in evaluating the arguments presented by the states and must approve each state's submission in deference to how states choose to interpret the CAA requirements they must meet. These arguments generally fail to acknowledge the past quarter-century of the EPA's efforts to implement the good neighbor provision through an efficient and equitable allocation of states' responsibility for interstate air pollution and the related case law generally upholding that interstate transport implementation framework.  They also generally misstate the roles and responsibilities of the EPA and the states within the structure of the modern CAA as enacted by Congress in 1970 and reflected in fundamental CAA case law. Nonetheless, we will address these arguments in turn.[96]

As an initial matter, the EPA agrees that the CAA establishes a framework for state-federal partnership to implement the NAAQS based on "cooperative federalism." Under the general model of cooperative federalism, the federal government establishes broad standards or goals, states are given the opportunity to determine how they wish to achieve those goals, and if states choose not to or fail to adequately implement programs to achieve those goals, a federal agency is empowered to directly regulate to achieve the necessary ends. Thus, the EPA also agrees that states have the obligation and opportunity in the first instance to develop an implementation plan to achieve the NAAQS under CAA section 110, that state air agencies are fully capable of developing SIP submissions that satisfy the requirements of the CAA, and that the EPA will approve SIP submissions under CAA section 110 that fully satisfy the requirements of the CAA. This sequence of steps is not in dispute.

---

[96] Some topics raised by these comments are addressed in the preamble or in this RTC ("post hoc" justification, alleged changes in EPA practice and policy, CAA section 126 petitions, requests for EPA to delay final action on SIP submission disapprovals and on proposing or finalizing FIPs, EPA's modeling, TCEQ's modeling, comments about EPA's application of the guidance memoranda, and SIP calls). EPA's response to comments about the withdrawal of Alabama's first good neighbor SIP submission for the 2015 ozone NAAQS is also addressed elsewhere in this document. Some commenters argued that EPA should judge a state's SIP submission based only on the information available at some past date; some commenters pointed to the time of the statutory deadline of the state submitting a SIP submission to EPA, while others pointed to the date a date submitted a SIP submission or EPA's statutory deadline to take action on a complete SIP submission. This topic is addressed elsewhere in the preamble and RTC. Other topics raised in these comments are beyond the scope of this rulemaking (i.e., substantive requirements of proposed FIP in separate rulemaking).

The EPA does not, however, agree with the commenters' characterization of the EPA's role in the state-federal relationship as being "secondary" such that the EPA must defer to state choices heedless of the substantive objectives of the Act; such deference would be particularly inappropriate in the context of addressing interstate pollution. The EPA acknowledges that its role could be considered "secondary" in that it occurs "second" in time, after the states submit SIP submissions. The EPA believes that the commenters fundamentally misunderstand or inaccurately describe this action, as well as the "'division of responsibilities' between the states and the federal government" they identify in CAA section 110 citing the *Train-Virginia* line of cases[97] and other cases.[98] Those cases, some of which pre-date the CAA amendments of 1990 resulting in the current good neighbor provision,[99] stand only for the proposition that EPA must approve state plans *if* they meet the applicable CAA requirements. But these cases say nothing about what those applicable requirements are. The EPA is charged under CAA section 110 with reviewing states' plans and approving or disapproving them. Thus, the EPA must ultimately determine whether state plans satisfy the requirements of the Act or not. Abundant case law, including these cases themselves, reflect an understanding that the EPA must evaluate SIP submissions under CAA section 110(k)(2) and (3).[100] If they are deficient, the EPA must so find, and directly implement the relevant requirements through a federal implementation plan under CAA section 110(c).[101]

In CAA section 110(a)(1), Congress imposed the duty upon all states to have a SIP that provides for "the implementation, maintenance, and enforcement" of the NAAQS. In section 110(a)(2), Congress clearly

---

[97] *See Virginia v. EPA*, 108 F.3d 1397, 1407 (D.C. Cir. 1997) (quoting *Train v. Natural Resources Defense Council, Inc.*, 421 U.S. at 79). The "Train-Virginia line of cases" are named for the U.S. Supreme Court case *Train v. Natural Resources Defense Council, Inc.*, 421 U.S. 60 (1975) (Train) and to the D.C. Circuit case *Virginia v. EPA*, 108 F.3d 1397 (D.C. Cir. 1997). The D.C. Circuit has described these cases as defining a "federalism bar" that constrains the EPA's authority with respect to evaluation of state SIP submissions under CAA section 110. *See, e.g., Michigan v. EPA*, 213 F.3d 663, 687 (D.C. Cir. 2000).

[98] Commenters also cited the following to characterize the nature of the state-federal partnership in the CAA: *Union Elec. Co. v. EPA*, 427 U.S. 246 (1976), *Am. Elec. Power Co. v. Connecticut*, 565 U.S. 410 (2011), *Fla. Power & Light v. Costle*, 650 F.2d 579 (5th Cir. 1981), *North Carolina v. EPA*, 531 F.3d 896 (D.C. Cir. 2008), *Luminant*, 675 F.3d 917 (5th Cir. 2012), *Concerned Citizens of Bridesburg v. EPA*, 836 F.2d 777 (3d Cir. 1987), *Bethlehem Steel Corp. v. Gorsuch*, 742 F.2d 1028 (7th Cir. 1984), *Luminant Co. LLC v. EPA*, 714 F.3d 841 (5th. Cir. 2013), *North Dakota v. EPA*, 730 F.3d 750 (8th. Cir. 2013), and *Texas v. USEPA*, 829 F.3d 405 (5th. Cir. 2016).

[99] The 1970 version of the Act required SIPs to include "adequate provisions for intergovernmental cooperation" concerning interstate air pollution. CAA section 110(a)(2)(E), 84 Stat. 1681, 42 U.S.C. section 1857c–5(a)(2)(E). In 1977, Congress amended the Good Neighbor Provision to direct States to submit SIP submissions that included provisions "adequate" to "prohibi[t] any stationary source within the State from emitting any air pollutant in amounts which will ... prevent attainment or maintenance [of air quality standards] by any other State." CAA section 108(a)(4), 91 Stat. 693, 42 U.S.C. § 7410(a)(2)(E) (1976 ed., Supp. II). Congress again amended the Good Neighbor Provision in 1990. The Act, in its current form, requires SIPs to "contain adequate provisions ... prohibiting ... any source or other type of emissions activity within the State from emitting any air pollutant in amounts which will ... contribute significantly to nonattainment in, or interfere with maintenance by, any other State with respect to any ... [NAAQS]." CAA section 110(a)(2)(D)(i)(I), 42 U.S.C. § 7410(a)(2)(D)(i) (2006 ed.).

[100] *See, e.g., Virginia*, 108 F.3d at 1406. *See also, e.g., Westar Energy v. EPA*, 608 Fed. App'x 1, 3 (D.C. Cir. 2015) ("EPA acted *well within the bounds* of its delegated authority when it disapproved of Kansas's proposed [good neighbor] SIP.") (emphasis added); *Oklahoma v. EPA*, 723 F.3d 1201, 1209 (10th Cir. 2013) (upholding EPA's disapproval of "best available retrofit technology" (BART) SIP, noting BART "does not differ from other parts of the CAA—states have the ability to create SIPs, but they are subject to EPA review").

[101] *EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489, 495 (2014).

set forth the basic SIP requirements that "[e]ach such plan *shall*" satisfy.[102] By using the mandatory "shall" in section 110(a)(2), Congress established a framework of mandatory requirements *within which* states may exercise their discretion to design SIPs to provide for attainment and maintenance of the NAAQS and to meet other CAA requirements, including the good neighbor provision. In other sections of the Act, Congress also imposed additional, more specific SIP requirements (e.g., the requirements in CAA section 182 associated with ozone nonattainment areas depending on their level of classification).

The U.S. Supreme Court's review of the original CSAPR rulemaking in *EME Homer City* directly affirms the critical role the EPA plays in interpreting and, if necessary, implementing the good neighbor provision and directly contradicts commenters' assertions that the EPA has only a limited role to play in reviewing states' approaches to addressing good neighbor requirements. In the original 2012 decision of the D.C. Circuit in *EME Homer City Generation, L.P. v. EPA* (*EME Homer City I*), the D.C. Circuit vacated the Cross-State Air Pollution Rule for two reasons, one being related to statutory interpretation of CAA section 110(a)(2)(D)(i), the other being "a second, entirely independent problem" based on EPA's purported overstep of the federalism bar identified in the *Train-Virginia* line of cases.[103] After recounting a list of decisions that recognize the cooperative federalism structure of the CAA, the D.C. Circuit concluded that even though states have the "primary responsibility" for implementing the NAAQS, in this case the states had no responsibility to address interstate transport until EPA first quantified the obligations of the states.[104] The dissent, however, described the majority's application of the *Train-Virginia* cases as "a redesign of Congress's vision of cooperative federalism in implementing the CAA . . . ."[105] In reversing the *EME Homer City I* case in 2014, the U.S. Supreme Court held that the touchstone for identifying the division of responsibility between the EPA and the states is the text of CAA section 110(a)(2) itself.[106] The Court noted that pursuant to the CAA, after a NAAQS has been issued, a state must propose a SIP submission that meets the requirements of the CAA, including the good neighbor provision. [107] The Court went on to say that "nothing in the statute places EPA under an obligation to provide specific metrics to States before they undertake to fulfill their good neighbor obligations."[108] More relevant here, the Court upheld certain of EPA's interpretations of CAA section 110(a)(2)(D)(i)(I).[109]

After the U.S. Supreme Court's ruling in *EME Homer City*, the EPA's role under CAA section 110's cooperative federalism framework—as the agency charged with interpreting, applying, and, if necessary, ultimately achieving at the national level the fundamental requirements of CAA section 110(a)(2), and applying those reasonably interpreted requirements in evaluating state SIP submissions—cannot

---

[102] CAA section 110(a)(2) (emphasis added); *see EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489, 509 (2014) (holding that section 110(a)(2) "speaks without reservation" regarding what "components" a SIP "'shall' include"); H. Rept. 101–490, at 217 (calling the provisions of section 110(a)(2)(A) through (M) "the basic requirements of SIPs").

[103] *EME Homer City Generation, L.P. v. EPA*, 696 F.3d 7, 28 (D.C. Cir. 2012) (*EME Homer City I*), rev'd, 572 U.S. 489 (2014).

[104] Id at

[105] *Id.* at 38 (Rogers, J., dissenting).

[106] *EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489 (2014) at 507-510.

[107] *Id.* at 509 (citing, *inter alia*, CAA section 110(a)(2)).

[108] *Id.* at 509.

[109] *Id.* at 518-524.

reasonably be in doubt.[110] Several commenters cite the dissent in *EME Homer City I* to argue that states are primarily responsible for quantifying and preventing their own significant contribution. EPA does not dispute that the CAA requires a state to prepare a SIP submission in the first instance before the EPA reviews it, but the EPA does dispute the implication that the EPA must defer in all instances to a state's interpretation of the requirements of the CAA, including a state's determination that its own sources of emissions and other emissions activities do not significantly contribute to nonattainment or interfere with maintenance in other states. The U.S. Supreme Court in *EME Homer City* reiterated that EPA's interpretation of ambiguous statutory language is afforded deference and determined that "[t]he Good Neighbor Provision delegates authority to EPA at least as certainly as the CAA provisions involved in *Chevron*[*, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984)]."[111] EPA is therefore granted deference in its interpretation of the requirements of CAA section 110(a)(2)(D)(i)(I) and is not required to accept at face value a state's interpretation in its own SIP submission that the state has fully satisfied the requirements of the CAA. The EPA notes also that courts have been deferential to the EPA's technical expertise in evaluating scientific data, which is particularly relevant in the context of the complex analyses undertaken to implement the good neighbor provision. *Wisconsin v. EPA*, 938 F.3d 303, 328 (D.C. Cir. 2019) (citing *North Carolina v. EPA*, 531 F.3d 896, 925 (D.C. Cir. 2008) (affording "substantial deference to EPA's technical expertise"); *Westar Energy, Inc. v. EPA*, 608 F. App'x 1 (D.C. Cir. 2015) (agency action "regarding technical matters within its area of expertise warrants particular deference") (citing *Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 103 (1983); *W. Virginia v. EPA*, 361 F.3d 861, 867-68 (D.C. Cir. 2004)); *see also, e.g., Catawba County v. EPA*, 571 F.3d 20, 41 (D.C. Cir. 2009) (we give an "extreme degree of deference to [EPA] when it is evaluating scientific data within its technical expertise") citing *City of Waukesha v. EPA*, 320 F.3d 228, 247 (D.C. Cir. 2003) (internal quotation marks omitted).

Notwithstanding the directly applicable holdings in *EME Homer City* concerning EPA's authority in implementing the good neighbor provision, commenters cite several other cases for arguments that EPA cannot substantively question the conclusions a state reaches about its own good neighbor obligations in a SIP submission: *Alaska Dep't of Env't Conservation v. EPA*, 540 U.S. 461 (2004), *North Carolina v. EPA*, 531 F.3d 896 (D.C. Cir.), *modified on reh'g in part*, 550 F.3d 1176 (D.C. Cir. 2008), *Michigan v. EPA*, 213 F.3d 663 (D.C. Cir. 2000), *Virginia v. EPA*, 108 F.3d 1397 (D.C. Cir. 1997) *modified on reh'g*, 116 F.3d 499 (D.C. Cir. 1997), *Concerned Citizens of Bridesburg v. EPA*, 836 F.2d 777 (3d Cir. 1987), *Fla. Power & Light v. Costle*, 650 F.2d 579 (5th Cir. 1981), *Luminant Generation Company v. EPA*, 675 F.3d 917 (5th Cir. 2012), *Luminant Co. LLC v. EPA*, 714 F.3d 841 (5th. Cir. 2013), *Texas v. EPA*, 829 F.3d 405 (5th. Cir. 2016), *Bethlehem Steel Corp. v. Gorsuch*, 742 F.2d 1028 (7th Cir. 1984), *Oklahoma v. EPA*, 723 F.3d 1201 (10th Cir. 2013), *North Dakota v. EPA*, 730 F.3d 750, 761 (8th Cir. 2013), and *Westar Energy, Inc. v. EPA*, 608 F. App'x 1 (D.C. Cir. 2015).

None of these cases actually support this proposition.

First, *Alaska Dep't of Envt'l Conservation* does not stand for the premise that the EPA's role in the state-federal partnership is limited to rote application of the exact language of the CAA. To the contrary, the Supreme Court in that case held that the EPA's "oversight role" in CAA sections 113(a)(5) and 167

---

[110] *See id.* at 495 (citing *Chevron*, 467 U.S. 837).
[111] *Id.* at 513.

included the authority to inquire whether a state's best available control technology (BACT) determination in a prevention of significant deterioration (PSD) permit is reasonable. Under those provisions, the Court held, "[O]nly when a state agency's BACT determination is 'not based on a reasoned analysis' may EPA step in to ensure that the statutory requirements are honored."[112] The Court went on to note, however, that the EPA's discretion in issuing a "stop order" under these provisions was more constrained than issuing initial approvals or disapprovals: "in contrast, a required approval may be withheld if EPA would come to a different determination on the merits."[113] The court further elaborated that "EPA's limited but vital role in enforcing BACT is consistent with a scheme that 'places primary responsibilities and authority with the States, backed by the Federal Government.'"[114] This case only underscores the role the EPA must play in assessing whether a SIP submission satisfies the requirements of the CAA. The Court noted, "We fail to see why Congress, having expressly endorsed an expansive surveillance role for the EPA in two independent CAA provisions, would then implicitly preclude the Agency from verifying substantive compliance with the BACT provisions and, instead, limit EPA's superintendence to the insubstantial question whether the state permitting authority had uttered the key words 'BACT.'"[115]

Commenters quote *North Carolina v. EPA*, 531 F.3d 896 (D.C. Cir. 2008) *modified on reh'g in part*, 550 F.3d. 1176 (DC Cir. 2008), the D.C. Circuit's review of the Clean Air Interstate Rule, for the sentence that a state is "the appropriate primary administrative unit to address interstate transport of emissions," but that quote was used in the context of the court determining that EPA may select an entire state, as opposed to part of a state, as the "unit of measurement" in either a SIP Call or a FIP rulemaking.[116] *North Carolina* cannot fairly be described as a case holding that EPA does not have authority to interpret the requirements of CAA section 110(a)(2)(D)(i)(I) when reviewing a good neighbor SIP submission.

Commenters cite *Michigan v. EPA*, 213 F.3d 663 (D.C. Cir. 2000) to argue that states get the first opportunity to identify which sources should be controlled and to what degree under the CAA. One commenter argues that the *Michigan* holding means that EPA can only identify the level of emissions reductions to be achieved by states under CAA section 110(a)(2)(D)(i)(I) and states themselves choose the controls. The *Michigan* court found that the $NO_X$ budgets established in the $NO_X$ SIP call did not impermissibly trigger the 'federalism bar' outlined in the *Train-Virginia* line of cases in part because the action did not dictate which individual sources would be subject to controls.[117] In any event though, the action at issue in *Michigan* was a SIP call, not a SIP disapproval. In this SIP disapproval, EPA is not requiring any controls on any states. The *Michigan* case does not prohibit EPA from interpreting the requirements of CAA section 110(a)(2)(D)(i)(I) in reviewing a SIP submission. *Michigan* noted that under the state-federal partnership in the CAA, even though "states have considerable latitude in fashioning SIPs, the CAA 'nonetheless subject[s] the States to strict minimum compliance requirements' and gives EPA the authority to determine a state's compliance with the requirements."[118]

---

[112] *Alaska Dep't of Envt'l Conservation*, 540 U.S. 461, 490 (2004).

[113] *Id.* at 491.

[114] *Id.* at 491 (citing S. Rep. No. 95-217, p. 29).

[115] *Id.* at 490.

[116] *North Carolina v. EPA*, 531 F.3d 896, 923 (D.C. Cir. 2008).

[117] *Michigan*, 213 F.3d 663, 687 (D.C. Cir. 2000).

[118] *Id.* (citing *Union Elec. Co. v. EPA*, 427 US 246, 256-257 (1976)).

Commenters cite *Virginia v. EPA*, 108 F.3d 1397 (D.C. Cir. 1997), *modified on reh'g*, 116 F.3d 499 (D.C. Cir. 1997) for the arguments that states have a primary role and responsibility in implementing NAAQS, the EPA cannot substitute states' judgement with its own, and the EPA cannot require specific controls in a SIP or condition approval of a SIP on specific controls.  In *Virginia,* the Court remanded an EPA SIP call that sought to require states in the Northeast Ozone Transport Region to adopt restrictions on the sale of new cars to either match California's vehicle emission program or adopt a "Substitute Program" in their SIPs.[119] The *Virginia* court determined the Substitute Program was not a meaningful alternative and so EPA had impermissibly sought to specify particular controls in SIPs.[120] However, the D.C. Circuit clarified in *Appalachian Power Co. v. EPA*, 249 F.3d 1032 (D.C. Cir. 2001), "We did not suggest [in *Virginia*] that under § 110 states may develop their plans free of extrinsic legal constraints. Indeed, SIP development . . . commonly involves decision-making subject to various legal constraints."[121] Therefore, *Virginia* cannot be viewed as supporting an argument that EPA is not permitted to assess a state's judgements in a SIP submission for adherence with the requirements of CAA section 110(a)(2)(D)(i)(I). Furthermore, in these SIP disapprovals, EPA is not requiring any controls in any SIP.

One comment, citing *Virginia*, argued that the EPA cannot disapprove Maryland's choices of emissions limitations and replace them with EPA's preferred emissions limitations in a FIP. However, Maryland concluded in its SIP submission that the state has no obligations to reduce any emissions beyond existing levels under the good neighbor provision for the 2015 ozone NAAQS and made no choice of any emissions limitations to include in its SIP. [87 FR 9463, 9469 (February 22, 2022); *see also* Maryland's October 16, 2019, SIP submittal included in docket ID No. EPA–R03–OAR–2021– 0872. (No other state included any enforceable emissions controls in their SIP submissions either.)

Commenters cite *Concerned Citizens of Bridesburg v. EPA*, 836 F.2d 777 (3d Cir. 1987) for the argument that the EPA is not allowed to make states adopt non-statutory, after the fact policy preferences through the SIP review process. In that case, the court reviewed EPA's action to rescind certain regulations addressing odor, for which there is no NAAQS, in Pennsylvania's SIP, approved by the EPA 13 years previously.[122] The court reached a decision on procedural challenges brought against EPA's action; the court determined that the EPA's action constituted a SIP revision, under an earlier version of the CAA, which was subject to certain procedural requirements, which the EPA failed to follow.[123] However, in this action the EPA is not modifying any prior approval of a SIP addressing CAA section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS by EPA. Instead, the EPA is disapproving SIP submissions that fail to satisfy the requirements of CAA section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS. Here, the EPA is not seeking to modify any previously approved SIP to account for updated understanding of the breadth of the EPA's legal authority.

Commenters cite *Fla. Power & Light v. Costle*, 650 F.2d 579 (5th Cir. 1981) to argue states have "extensive discretion" in the contents of their SIPs. In that case, under an earlier version of the CAA, Florida submitted a PSD SIP revision submission to accommodate Florida Power & Light's request for an

---

[119] *Virginia v. EPA*, 108 F.3d 1397 (D.C. Cir. 1997).

[120] *Id at* 1415.

[121] *Appalachian Power Co. v. EPA*, 249 F.3d 1032, 1047 (D.C. Cir. 2001)

[122] *Concerned Citizens of Bridesburg v. EPA*, 836 F.2d 777 (3d Cir. 1987).

[123] *Id.* at 784, 788.

exemption from the approved SIP related to sulfur dioxide emissions.[124] A subsequent "attachment" to the SIP revision submission to the EPA contained a 2-year limit on the exemption, which the EPA approved. Florida later requested to withdraw the 2-year limit, which EPA disapproved. Citing *Train*, the 5th Circuit rejected EPA's inclusion of the 2-year limit in the SIP revision approval on the basis that a 2-year limit was not a substantive requirement of the CAA, and the court rejected EPA's interpretation of Florida law that a 2-year limit would be necessary for the SIP revision to be enforceable under state law. The court's description of the EPA's role under the CAA in that the case did not stand for the premise that the EPA is not permitted to interpret the requirements of CAA; rather that the case concluded that EPA is confined to interpreting the requirements of the CAA. Here, the EPA is not approving, or disapproving, any aspect of a SIP revision that a state no longer wishes to be part of its  SIP; the EPA is disapproving these SIP submissions for failing to demonstrate they satisfy the requirements of CAA section 110(a)(2)(D)(i)(I).

Commenters cite *Luminant Generation Company, L.L.C. et al. v. EPA*, 675 F.3d 917 (5th. Cir. 2012), for the premise that the EPA cannot disapprove SIP submissions on the basis of non-statutory policy preferences. Another version of this argument is that the EPA is not allowed to make states adopt non-statutory, after the fact policy preferences through the SIP review process. In *Luminant*, the 5th Circuit remanded the EPA's disapproval of a Texas SIP submission under CAA section 110(*l*) related to New Source Review (NSR) to consider whether the SIP submission comported with the requirements of CAA section 110(a)(2)(C) and 110(*l*); the court found it impermissible for EPA to inquire whether the SIP submission at issue comported with Texas law or satisfied "similar source" and "replicability" requirements, which the court found did not exist in the text of the CAA.

However, the EPA does not view the basis of the EPA's conclusions in the rule at issue in *Luminant* as analogous to this disapproval action. Alabama Power Company did not identify specifically what "non-statutory, policy preferences" they allege the EPA utilized in proposing to disapprove Alabama's earlier SIP submission. Association of Electric Companies of Texas, et. al. cite the EPA's methodology and quantification of Texas's "significant contribution" and "interference with maintenance" as well as EPA's rejection of Texas's analysis as non-statutory factors that cannot be used to assess Texas's SIP submission. A commenter also identifies the EPA modeling as a non-statutory requirement that cannot be used to disapprove Texas's SIP submission. They further argue that EPA has no authority to "second-guess" TCEQ's modeling, particularly because the EPA has not promulgated regulations on modeling. Commenters further argue that EPA is coercing the states to develop SIP submissions 'comparable' to the EPA's approach, which they say is not a statutory requirement.

The EPA is not disapproving any SIP submission because it did not use the EPA's modeling or methodology for assessing good neighbor obligations, nor is the EPA promulgating a SIP call seeking new SIP submissions. The EPA is disapproving the SIP submissions for failing to support a conclusion that the states have no good neighbor obligations under the 2015 ozone NAAQS. The EPA used its own modeling to inform its assessment of the SIP submissions with the requirements of CAA section 110(a)(2)(D)(i)(I).[125] Additionally, the EPA is authorized in its oversight role under the CAA to examine the analysis put forward by states, so the EPA is well within its authority to "second-guess" TCEQ's

---

[124] *See* 42 U.S.C. section 7410(a)(2) (Supp. 1979).
[125] *See, e.g.*, 87 FR 9798, 9800-9801.

modeling.[126] The EPA is not required by the CAA to promulgate regulations governing the good neighbor analysis. Further, the EPA is not required to provide guidelines for CAA section 110(a)(2)(D)(i)(I).[127] However, each step in the EPA's analysis in this action is guided by the EPA's interpretation and application of each of the key terms of the CAA in this provision, reflecting over a quarter-century of administrative and judicial precedent. The good neighbor provision remains unchanged from the statutory text the EPA first applied in the $NO_X$ SIP Call, and both the D.C. Circuit and the Supreme Court have had occasion to review the EPA's interpretation and application of those terms across several major rulemakings. In each of these rulemakings, the EPA has applied a consistent analytical approach to addressing the problem of interstate pollution, and that approach faithfully adheres to the terms of the statute as Congress enacted it. Each step of this process is tied to the statute: the identification of "nonattainment" and "maintenance" receptors (Step 1); the identification of "contribution" to those receptors by analyzing emissions from "any source or other type of emissions activity" within each state (Step 2); the analysis of what "amount" of that contribution is "significant" (or "interferes" with maintenance) (Step 3); and finally, the evaluation of whether the SIP "contains adequate provisions" "prohibiting" those emissions (Step 4).

*Luminant Co. LLC v. EPA*, 714 F.3d 841 (5th. Cir. 2013) is cited to support an argument that Congress tasked the EPA with setting NAAQS but gave states authority to implement it. Although the court in that case did say that "[T]he Act confines the EPA to the ministerial function of reviewing SIPs for consistency with the Act's requirements[,]" the court nevertheless upheld EPA's judgement of Texas's SIP submission that affirmative defenses for unplanned startup, shutdown, and maintenance/malfunction (SSM) activity conformed with the requirements of the CAA, and the EPA was afforded deference in concluding that affirmative defenses for planned SSM activity did not conform with the requirements of the CAA.[128] That court, citing *Fla. Power & Light Co.* and *Bethlehem Steel*, found the EPA was not arbitrary and capricious in partially approving and partially disapproving Texas's iSIP submission.[129] The court also found that CAA section 110(*l*) did not require EPA, in disapproving a SIP submission, to prove a violation of the NAAQS would occur if the Agency approved part of an iSIP submission; rather, the EPA needs to provide "reasoning supporting its conclusion that the disapproved provision would interfere with an applicable requirements of the Act."[130] While the court used the term "ministerial" to describe EPA's role, this case actually reinforces that EPA's role includes interpreting the requirements of the CAA to determine whether a SIP submission comports with those requirements.

Commenters cite *Texas v. EPA*, 829 F.3d 405 (5th. Cir. 2016) to argue that the structure of the CAA itself indicates Congress wanted states to drive the regulatory process, not the EPA. In *Texas*, the 5th Circuit granted a preliminary stay of the EPA's disapproval of Oklahoma's and Texas' regional haze SIP submissions and promulgation of FIPs and did not reach the merits of either the EPA's assessment of the SIP submissions' compliance with the requirements of the CAA or the FIPs.[131] The decision cannot

---

[126] For specific details on EPA's assessment of TCEQ modeling, please refer to the Evaluation of TCEQ Modeling TSD.
[127] *See EME Homer City* at 510.
[128] *Luminant Co. LLC v. EPA*, 714 F.3d 841, 846 (5th. Cir. 2013)
[129] *Id.* at 858-859.
[130] *Id*. at 858.
[131] *Texas v. EPA*, 829 F.3d 405 (5th. Cir. 2016)

reasonably be interpreted to stand for the proposition that the EPA is not authorized to interpret the requirements of CAA section 110(a)(2)(D)(i)(I) in reviewing good neighbor SIP submissions.

Commenters cite *Bethlehem Steel Corp. v. Gorsuch*, 742 F.2d 1028 (7th Cir. 1984) for the argument that the EPA is not allowed to make states adopt non-statutory, after the fact policy preferences through the SIP review process. In that case, examining an earlier version of the CAA, the court found that EPA did not follow appropriate procedure in partially approving Indiana's SIP revision but disapproving an exemption provision, because the effect of doing that increased the stringency of the SIP for certain emissions above what Indiana had intended.[132] In the court's view, the EPA could have disapproved the SIP submission and followed the required procedure to promulgate a replacement plan.[133] The case did not conclude the EPA is barred from interpreting the requirements of the CAA in determining whether a SIP submission comports with the requirements of the CAA. Further, in this action the EPA's partial approval and partial disapproval of the SIP submissions from Minnesota and Wisconsin has no effect on the stringency of the states' SIPs, since neither SIP submission included any emissions controls to begin with.

Commenters cited *North Dakota v. EPA*, 730 F.3d 750 (8th. Cir. 2013) for the premise that states have primary responsibility to address interstate transport and the EPA is limited to only reviewing a SIP submission for compliance with the CAA. In *North Dakota*, the court dismissed all challenges but one to an action that simultaneously disapproved two SIP submissions and promulgated FIPs for North Dakota under CAA sections 110 and 169A (the court remanded EPA's best available retrofit technology (BART) determination in a FIP).[134] On one of the cited pages in *North Dakota*, 730 F.3d at 757, the court cited cases including *EME Homer City I*, a case later overturned by the Supreme Court, in its background section characterizing cooperative federalism. On the other page of *North Dakota* cited by commenters, *id.* at 761, the court, citing *Oklahoma v. EPA*, 723 F.3d 1201, 1213 n. 7 (10th. Cir. 2013), said, "Although the CAA grants states the primary role of determining the appropriate pollution controls within their borders, the EPA is left with more than the ministerial task of routinely approving SIP submissions."[135] The *North Dakota* court similarly cited the reasoning in *Alaska Department of Environmental Conservation v. EPA*, 540 U.S. 461 (2004) related to the EPA's authority under CAA section 167, finding it "persuasive" in the context of CAA section 169A.[136] This case does not support an argument that the EPA is not permitted to interpret the requirements of the CAA in reviewing a SIP submission for compliance with them. On the contrary, the case reinforces that EPA may (indeed, must) do so.

Commenters cite *Oklahoma v. EPA*, 723 F.3d 1201 (10th. Cir. 2013) to argue that although SIPs are subject to federal oversight, the EPA's ability to reject a SIP submission is more limited compared to its authority to promulgate a FIP. The implication appears to be that the EPA somehow is so limited in its ability to review a SIP submission that the Agency cannot actually disapprove a SIP submission. But in that case, the court did not suggest that the EPA is barred from interpreting the requirements of the

---

[132] *Bethlehem Steel Corp. v. Gorsuch*, 742 F.2d 1028 (7th Cir. 1984).
[133] *Id*. at 1035.
[134] *North Dakota v. EPA*, 730 F.3d 750 (8th Cir. 2013).
[135] *Id.* at 760-761.
[136] *Id*. at 761.

CAA in reviewing SIP submissions.[137] On the contrary, in *Oklahoma* the court found that EPA has the authority to interpret the requirements of the CAA and review SIP submissions accordingly. The court found that EPA lawfully disapproved Oklahoma's SIP submission related to best available retrofit technology (BART) at units at two generating stations for a sulfur dioxide NAAQS on the basis that EPA concluded Oklahoma's cost estimate methodology was flawed, and that the Agency was not arbitrary and capricious in simultaneously promulgating a FIP for Oklahoma in the same action as the SIP disapproval.[138] Although the commenters cite part of footnote 7 from that case: "EPA has less discretion when it takes actions to reject a SIP than it does when it promulgates a FIP" the full footnote went on to say "However, we believe that the EPA had reason to make the adjustments described in Section IV, Part B, even under the higher standard we would apply when evaluating its actions in rejecting a SIP. OG & E has yet to provide any justification for providing estimates that departed from the [BART] guidelines."[139]

A few commenters, citing *Westar Energy, Inc. v. EPA*, 608 F. App'x 1 (D.C. Cir. 2015), argue that EPA is limited to identifying merely whether a SIP submission "explain[s] whether or not emissions from the state' significantly contribute to nonattainment in other states." That characterization of *Westar* is, however, a misleading representation. In that case, the D.C. Circuit upheld the EPA's disapproval of Kansas's good neighbor SIP submission for the 2006 24-hour $PM_{2.5}$ NAAQS.[140]  The court, noting that Agency action "regarding technical matters within its area of expertise warrants particular deference[,] *[s]ee Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 103 (1983); *W. Virginia v. EPA*, 361 F.3d 861, 867-68 (D.C. Cir. 2004) [(citations cleaned up)]," held that EPA has authority to determine whether SIP submissions comply with the requirements of the CAA and acted within the bounds of its delegated authority when it disapproved Kansas's good neighbor SIP submission.[141] The court noted that a September 2009 guidance document indicated that states "'must explain whether or not emissions from the state' significantly contribute to nonattainment in other states and if so, 'address the impact'" and "that a state's conclusion 'must be supported by an adequate technical analysis.'"[142] The court also rejected arguments from petitioners that EPA was required to provide specific metrics to states before they undertook fulfilling their good neighbor obligations, citing the Supreme Court's decision in *EME Homer City*.[143] In its SIP submission, Kansas concluded it had no good neighbor obligations for the relevant NAAQS, but did not provide an analysis of the downwind impacts of its emissions. Kansas simply pointed out that four utility companies would reduce $NO_x$ and $SO_x$ emissions due to agreements in Kansas's Regional Haze SIP submission, but Kansas did not consider the downwind impacts of these or any other sources within the state. The EPA determined that Kansas's SIP submission lacked technical justification evaluating nonattainment and maintenance problems in downwind states.[144] In upholding

---

[137] *Oklahoma v. EPA*, 723 F.3d 1201, 1209 (10th Cir. 2013) ("[S]tates have the ability to create SIPs, but they are subject to EPA review.").

[138] Id. at 1207, 1224,

[139] *Id.* at 1213, n. 7.

[140] *Westar Energy, Inc. v. EPA*, 608 F. App'x 1 at *3.

[141] *Id.* at 3.

[142] *Id.*, citing William T. Hartnett, Director, Air Quality Policy Division, *Guidance on SIP Elements Required Under Sections 110(a)(1) and (2) for the 2006 24–hour Fine Particle (PM2.5) National Ambient Air Quality Standards (NAAQS)* at 3 (Sept. 25, 2009).

[143] *Id.* at 4 citing *EME Homer City* at 509-510.

[144] *Id.* at 3.

the EPA, the court noted, "EPA acted *well within the bounds* of its delegated authority when it disapproved of Kansas's proposed [good neighbor] SIP." *Id.* at 3 (emphasis added).

Several commenters, pointing to the absence of CFR regulations for the good neighbor provisions for the 2015 ozone NAAQS, a guidance document from August 2006 for the 1997 ozone NAAQS and the 1997 PM$_{2.5}$ NAAQS,[145] the 2018 memoranda (discussed elsewhere in this action), and the text of the proposals themselves argue that the EPA has repeatedly recognized that CAA section 110(a)(2)(D)(i)(I) does not stipulate any one specific approach to addressing interstate transport but that EPA is now assessing SIP submissions against the Agency's policy preferences as opposed to the actual requirements of the CAA. One commenter argues that national consistency is not required by the CAA and so the EPA cannot consider it (or the regional nature of the ozone problem) in reviewing SIP submissions for compliance with CAA section 110(a)(2)(D)(i)(I) (conversely, another commenter says that inconsistent treatment across states would be arbitrary).

The EPA disagrees that the Agency in this action is shifting its approach to assessing SIP submissions under the good neighbor provision. The EPA has consistently analyzed good neighbor SIP submissions for compliance with the statute. As reiterated multiple times, the EPA is not required by the CAA to promulgate either regulations or guidance for good neighbor obligations in CAA section 110(a)(2)(D)(i)(I).[146] Specific comments related to the 2018 memoranda are addressed elsewhere.

The comment letter from the Association of Electric Companies of Texas, et. al. argues that the EPA's August 2006 Guidance required a "comparable" Step 3 analysis to the EPA's, but that the text of the CAA does not require this. Luminant also cites the August 2006 Guidance to argue that EPA has been inconsistent in how it has approached the good neighbor provision, pointing out that the 2006 Guidance suggested states should use a "comparable" assessment for significant contribution as the EPA. The EPA first notes the August 2006 guidance was by its own terms for the 1997 8-hour ozone NAAQS and the 1997 PM$_{2.5}$ NAAQS and in particular was written for states that were not subject to CAIR FIPs for either NAAQS. As such, the document is not applicable to the 2015 ozone NAAQS. It was also issued before the D.C. Circuit issued its opinion and remanded CAIR in *North Carolina v. EPA,* 531 F.3d 896 (DC Cir. 2008), *modified on reh'g,* 550 F.3d. 1176 (DC Cir. 2008), thus many suggestions in the guidance are likely now obsolete. To the extent commenters are suggesting the August 2006 guidance was unlawful, EPA notes that the text of the August 2006 guidance document itself said that "this document is merely guidance that States or EPA may elect to follow or deviate from …, as appropriate. The ultimate determination of whether a given SIP submission by a State meets the statutory requirements of section 110(a)(2)(D)(i)(I) will be accomplished through case-by-case notice and comment rulemaking in which the facts and circumstances of each State will be evaluated by EPA."[147] The general propositions for which

---

[145] "Guidance for State Implementation Plan (SIP) Submissions to Meet Current Outstanding Obligations Under Section 110(a)(2)(D)(i) for the 8-Hour Ozone and PM$_{2.5}$ National Ambient Air Quality Standards" *available at* https://www3.epa.gov/ttn/naaqs/aqmguide/collection/cp2/20060815_harnett_final_section_110(a)(2)(D)(i)_guidance.pdf.

[146] *See EME Homer City* at 510.

[147] "Guidance for State Implementation Plan (SIP) Submissions to Meet Current Outstanding Obligations Under Section 110(a)(2)(D)(i) for the 8-Hour Ozone and PM$_{2.5}$ National Ambient Air Quality Standards" at 2, *available at* https://www3.epa.gov/ttn/naaqs/aqmguide/collection/cp2/20060815_harnett_final_section_110(a)(2)(D)(i)_guidance.pdf.

commenters cited this guidance, that the EPA respects that states may devise their own approvable approaches to addressing good neighbor obligations, is still valid. But for the reasons explained in detail elsewhere in this record, no state that the EPA is acting on in this submission did develop an approvable approach.

The EPA also disagrees with the contention that the EPA significantly changed perspective regarding the purpose of infrastructure SIP submissions beginning with the 2008 ozone NAAQS. The EPA has always expected the portion of iSIPs that address CAA section 110(a)(2)(D)(i)(I) to provide adequate justification to support the conclusions therein. The August 2006 guidance, for the 1997 ozone NAAQS and 1997 PM2.5 NAAQS, indicated that states should submit a "technical demonstration" to support a conclusion that the state does not significantly contribute to nonattainment or interfere with maintenance in other states.[148] The September 2009 guidance, for the 2006 24-hour PM NAAQS, indicated that a "state's conclusion must be supported by an adequate technical analysis."[149] The September 2013 infrastructure SIPs guidance for the 2008 ozone NAAQS, the 2010 nitrogen dioxide NAAQS, the 2010 sulfur dioxide NAAQS, and the 2012 fine particulate matter NAAQS did not include guidance on the good neighbor provision.[150]

In evaluating the SIP submissions here, the EPA used its now well-established 4-step interstate transport framework as a guide, while recognizing that states are not necessarily bound to follow that exact framework. This is not merely the application of an arbitrary "policy preference" but the application of a judicially-tested and upheld framework that provides continuity across multiple NAAQS and provides certainty and predictability with regard to how the EPA will evaluate SIP submissions. While not codified in the CFR, the EPA has a consistent policy and practice of applying this framework both in its evaluation of SIP submissions and in the promulgation of multiple rounds of FIPs to address prior ozone transport obligations. It is altogether reasonable for the Agency to continue to use that general framework as a guide to evaluate these SIP submissions to ensure consistency both across states and with prior good neighbor actions, while continuing to recognize states' discretion to offer alternative approaches that may be satisfactory toward achieving the Act's requirements.

Thus, as explained in the proposals, in this action the EPA is not requiring states to adopt any particular emission limitation or to impose a specific control measure in a SIP submission. Rather, the EPA is determining that the SIP submissions that are the subject of this action do not support a finding that the statutory requirements of CAA section 110(a)(2)(D)(i)(I) have been met. In so doing, the EPA is acting pursuant to its supervisory role under the CAA's cooperative federalism framework, to ensure that SIPs satisfy those broad requirements that section 110(a)(2) mandates SIPs "shall" satisfy.

The EPA also disagrees with the argument that applying the consistent set of policy judgments made in this action across all states for purposes of evaluating interstate transport obligations goes against the

---

[148] *Id.* at 5.

[149] September 2009 Guidance at 3.

[150] "Guidance on Infrastructure State Implementation Plan (SIP) Elements under Clean Air Act Section 110(a)(1) and 110(a)(2)" at 30, available at https://www3.epa.gov/airquality/urbanair/sipstatus/docs/Guidance_on_Infrastructure_SIP_Elements_Multipollut ant_FINAL_Sept_2013.pdf. (EPA noted this guidance may be also informative for "infrastructure SIPs for new or reviewed NAAQS promulgated in the future.")

framework of cooperative federalism or is otherwise not permitted by the CAA. These policy judgments in interpreting the CAA reflect consistency with relevant case law and past agency practice as reflected in the CSAPR and related rulemakings. Nationwide consistency in approach is particularly important in the context of interstate ozone transport, which is a regional-scale pollution problem involving many smaller contributors. Effective policy solutions to the problem of interstate ozone transport dating back to the NO$_X$ SIP Call (63 FR 57356 (October 27, 1998)) have necessitated the application of a uniform framework of policy judgments to ensure an "efficient and equitable" approach. *See EPA v. EME Homer City Generation, LP,* 572 U.S. 489, 519 (2014). One commenter argued that the regional nature of the problem of interstate transport does not confer greater authority on the EPA to disapprove a SIP submission. However, in highlighting the regional nature of transport, the EPA is not claiming a qualitatively different authority to scrutinize SIP submissions under CAA section 110(a)(2)(D)(i)(I). The EPA's authority to assess a SIP submission for compliance with the CAA is the same for obligations associated with in-state pollution as is it for interstate pollution. But the regional, interstate nature of the ozone-transport issue simply underscores the value of the EPA's role as referee. In this regard, the EPA notes that at the time these disapprovals were proposed, not a single state out of the 49 states and Washington D.C. that had submitted a good neighbor SIP submission for the 2015 ozone NAAQS concluded that any emissions reductions beyond existing controls were necessary to satisfy CAA section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS. This fact is entirely unsurprising, but also confirms the need for federal intervention through disapprovals at this stage of the process. As the D.C. Circuit observed with respect to regional haze, which, like ozone, is another interstate, collective-action problem posed by widespread pollution emitters:

> Regional haze is a problem in which the benefits of each state's emissions controls are largely felt in other states. Without federal intervention, then, a state calculating how hard it should press in limiting pollution has no incentive to consider resulting enhancements of other states' welfare. There is no reason to believe that New Mexico, for example, would without federal pressure tighten limits for in-state polluters an extra notch so that tourists could gaze at clear skies above the Grand Canyon. Even an anti-pollution commitment demonstrated by 'numerous stakeholder meetings and public workshops across the West' does not explain why one state would, absent federal pressure, martyr itself for another, or subject its electric power users (for example) to additional costs for the benefit of out-of-state interests. *Cf. Maryland People's Counsel v. FERC,* 245 U.S. App. D.C. 365, 761 F.2d 768, 778 (D.C. Cir. 1985*)* ('It is ridiculous to assume that' a company would 'engage in . . . self-sacrificing behavior' 'simply because there is nothing that stops it from doing so').

*Center for Energy and Econ. Devel. v. EPA*, 398 F.3d 653, 657-58 (D.C. Cir. 2005) (Williams, J.).

One commenter argued that the EPA's proposed FIPs supplant states' rights and authority. Another commenter argued that by having already proposed a FIP, the EPA is attempting to "coerce" local and state entities to conform with national policy. Another commenter argued EPA was "intentionally exploiting" the *EME Homer City* case to support costly federal policy. These comments are beyond the scope of this action. The proposed FIPs, which are not final at this time, are a separate rulemaking action. In any case, the existence of the proposed FIPs does not undermine the EPA's adherence to the procedural requirements of CAA section 110. Approval of these SIP submissions is not conditioned on any specific controls of any specific sources; rather, these SIP submissions are being disapproved. If any

state were to re-submit a good neighbor SIP submission, the EPA would review it against the requirements of CAA section 110(a)(2)(D)(i)(I) pursuant to CAA section 110(k)(3).

One commenter argued that the EPA cannot use the CAA to force particular control measures on states. EPA is not requiring any control measures in this action. Another commenter cites *Arkansas Elec. Co-op. Corp. v. Arkansas Pub. Serv. Comm'n*, 461 U.S. 375 (1983) for the premise that the regulation of utilities is associated with the police power of the states. EPA is not regulating any sources in this action.

One commenter said the EPA's approach to disapproving the SIPs essentially required states to conduct expensive photochemical grid modeling and amounted to an unfunded mandate. EPA disagrees that it is necessarily required for states to conduct photochemical grid modeling to develop approvable good neighbor SIP submissions. Still, the CAA empowers states in the first instance to implement the NAAQS, as many commenters have observed. "State air quality divisions are no strangers to complex air quality and meteorological modeling of interstate transport of emissions."[151] Federal technical and financial support has always been available to states since the enactment of the modern CAA. Where states do not have or do not wish to dedicate the resources that may ultimately be required to develop an approvable SIP submission, the CAA is designed so that EPA will implement the requisite requirements through a FIP, without the state being obligated to expend its own resources. Thus, the EPA disagrees that it has in any way created an unfunded mandate through this disapproval.

For this same reason, the EPA disagrees that this action violates or implicates anti-commandeering principles. One commenter cites *District of Columbia v. Train*, 521 F.2d 971 (D.C. Cir. 1975), *vacated sub nom. EPA v. Brown*, 431 U.S. 99 (1977), for the proposition that the EPA cannot commandeer states' resources or force them to implement federal policies or programs against their consent. No such commandeering of state regulatory authority or resources is occurring by virtue of this SIP disapproval action. The only consequence of this action is that the EPA has an obligation to promulgate a FIP addressing the relevant good neighbor obligations for the covered states within two years. *See* CAA section 110(c)(1). *Cf. D.C. v. Train,* 521 F.2d at 993 ("[W]here cooperation [from states] is not forthcoming, we believe that the recourse contemplated by the commerce clause is direct federal regulation of the offending activity . . . .").

## 10.4  Reliance on FIP Measures

*Comment*

**Commenter:** Maryland Department of the Environment

**Commenter ID:** 29

**Docket ID:** EPA-R03-OAR-2021-0872

**Comment:**

---

[151] *EME Homer City I* at 50 (Rogers dissenting).

MDE objects to EPA's proposed disapproval of Maryland's 2015 Good Neighbor SIP on the basis that the state relied, in part, on the CSAPR Update, which was not adopted into Maryland' SIP. The CSAPR Update was originally incorporated into Maryland's SIP, but was subsequently withdrawn at EPA's request. Additionally, the CSAPR Update is a federal implementation plan ("FIP"), which stands in place of a SIP. Maryland is not required to submit a SIP to replace that FIP, and can instead operate under the FIP, which is federally enforceable in its own right. For that reason, EPA has historically allowed states to rely on federal measures in a SIP by simple reference, and cannot reasonably reject consideration of emissions reductions from a federal rule in a SIP.

It is unreasonable for EPA to use Maryland's compliance with EPA's directive against it now. EPA is estopped from such action because Maryland reasonably relied on EPA's direction that withdrawal of the 2008 Good Neighbor SIP and IBR would not affect its pending 2015 Good Neighbor SIP submittal. At least, in the spirit of public transparency and consistent with the concept of cooperative federalism upon which the CAA is based, EPA should have acknowledged in the proposed disapproval that the IBR SIP was withdrawn at EPA's request to correct EPA's procedural error. The federal/state relationship is built on trust and that trust is jeopardized when EPA regional offices are not fully transparent with their state counterparts.

Furthermore, the underlying premise that a state cannot rely on emissions reductions required by a FIP is legally flawed. EPA contends that:

[R]elying on a FIP at Step 3 is per se not approvable if the state has not adopted that program into its SIP and instead continues to rely on the FIP. States may not rely on non-SIP measures to meet SIP requirements. See CAA section 110(a)(2)(D) (''Each such [SIP] shall . . . contain adequate provisions . . .''). See also CAA section 110(a)(2)(A); Committee for a Better Arvin v. U.S. E.P.A., 786 F.3d 1169, 1175–76 (9th Cir. 2015) (holding that measures relied on by state to meet CAA requirements must be included in the SIP).

To the contrary, EPA has historically allowed states to meet the "adequate provisions" requirement by citing federal regulations and/or rules in their SIPs. This is true of many federal measures, including but not limited to Corporate Average Fuel Economy standards for on-road mobile vehicles, small off-road engine emission reductions, and commercial marine vessel standards under the federal Emission Control Areas standards. States routinely cite federal rules and regulations within their SIPs and EPA has not disapproved those SIPs as "per se not approvable." The EPA does not require a state to incorporate by reference every federal rule or regulation into state statutes in order for them to be utilized by the state as a federally enforceable regulatory measure to meet SIP requirements. Rather the citing of a federal rule or regulation in the SIP makes it a SIP measure. Therefore, citing a federal measure in a SIP, without incorporating the federal measure into state statute, is sufficient to make the rule or regulation a SIP measure, which allows the state to use the rule or regulation to meet SIP requirements. Moreover, a FIP may only be issued as replacement for a deficient SIP. The FIP stands in place of a SIP, and is federally enforceable by EPA and citizens alike. EPA's contention that Maryland's 2015 Good Neighbor SIP cannot rely on the emissions reductions required by a FIP (which has the same effect as a SIP) is both illogical and counterintuitive. In defense of its position, EPA cites but misapplies the holding of Committee for a Better Arvin v. EPA, 786 F.3d 1169, 1175-76 (9th Cir. 2015). In Arvin, California proposed a SIP that relied in significant part on reductions, which would be achieved through waiver measures implementing

stricter state standards for certain federal standards. Id. at 1175-76. The Ninth Circuit Court of Appeals found the SIP approval improper because the waiver measures were not part of the SIP. At issue there, the waiver measures were neither part of the SIP nor federal standards, and therefore, were not federally enforceable. Id. at 1177 ("We conclude that the enforcement gap for private citizens and EPA in the present SIP is inconsistent with the CAA's requirements and the express aims of Congress."). In contrast, Maryland relied on reductions from a FIP, which is federally enforceable to both EPA and private citizens. As such, EPA acted arbitrarily in rejecting consideration of the emissions reductions anticipated from an implementation plan issued under CAA § 110.

*Response*

These comments are responded to in Section V.B.9 of the preamble. The EPA addresses the comments regarding our correspondence with MDE regarding the withdrawal of the CSAPR Update SIP submission in Section 1.6 (EPA Input During SIP Submission Development).

## 10.5  Comments Alleging "Pretext" or Intent to Require Generation Shifting

*Comment*

**Commenter:** PacifiCorp

**Commenter ID:** 38

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

The Combined Effect of EPA's Proposed Disapproval and Proposed FIP Will Cause Major Economic and Reliability Impacts for the Western United States.

Finalization of the Proposed Disapproval and subsequent imposition of the Proposed FIP will jeopardize energy supply and reliability in the West and cause major economic impacts. The Proposed Disapproval means electric generating units ("EGUs") in Utah will be subject to the selective catalytic reduction or SCR-forcing provisions of the Proposed FIP. As outlined in comments on the Proposed FIP by the state of Utah, other western states, industry, and the BHE Comments, it is simply not possible to either install the costly SCR equipment or retire and replace the energy generated and vital ancillary services provided by so many units subject to the regulatory constraints and timelines of the Proposed FIP. The Proposed Disapproval and subsequent imposition of the Proposed FIP on Utah will also force generation shifting both explicitly and implicitly.[16]

EPA's attempt to use Utah's alleged marginal impact on a neighboring state's ozone monitors to force the state into EPA's Proposed FIP must be rejected. EPA should not use a disapproval based on improper procedures, impossible timelines and flawed reasoning as a ruse to impose the problematic Proposed FIP, with its harsh economic impacts and threats to the reliability of the western electricity system. EPA's flawed administrative procedures, reversal of established guidance and previous positions, and

the extraordinary economic and reliability impacts that will result from the combined effect of the Proposed Disapproval and imposition of the Proposed FIP counsel caution. The Supreme Court in *West Virginia v. EPA* advised EPA against "dictating the optimal mix of energy sources nationwide," even if "that sort of mandate will reduce air pollution from power plants."[17] PacifiCorp requests that EPA take a more judicious path by following its own guidance and legal procedures and working with Utah to enact an ozone transport SIP legally tailored to effectively address the ozone situation in the western region.

[16] First EPA imposes specific, pre-determined generation-shifting requirements using an opaque Integrated Planning Model ("IPM") that it did not make available for review to the states or other stakeholders. The IPM modeling is particularly impactful on Wyoming, which is expected to immediately shift approximately 10% of its generation less than a year after the Proposed FIP was issued (let alone finalized). Second, EPA implicitly forces generation shifting through the untenable uncertainty and risk created by the SCR-forcing provisions of the Proposed FIP.
[17] *West Virginia v. EPA*, 142 S. Ct. 2,587, 2,612 (June 30, 2022).

*Response*

The EPA is not finalizing a SIP submission disapproval for Wyoming in this action, and so comments that are specifically related to Wyoming's circumstances are beyond the scope of this action. In addition, we disagree that the final SIP disapprovals for other states are in any way pretextual. Their basis is grounded in the record for this action, including the EPA's reasoning and analysis as set forth in this record. Our disapprovals are in no way based on a state's failure to include generation shifting as an emissions control measure, nor do they use the proposed FIP as a benchmark or as the basis for disapproval. Nor have commenters cited evidence for these claims. The timing of our actions is addressed in Section V.A of the preamble and Section 1 (Timing of SIP Actions), as well as in the following responses to comment.


## 10.6  Allegation that Disapprovals of Western State SIP Submissions was Predetermined


*Comments*


**Commenter:** Eagle Materials Inc.

**Commenter ID:** 16

**Docket ID:** EPA-R09-OAR-2022-0138

**Comment:**

By issuing this Proposed SIP Disapproval *after* publishing a Proposed FIP, EPA is also effectively circumventing required rulemaking procedures by treating the Proposed SIP Disapproval as final, despite its failure to engage with public comments. The Administrative Procedure Act's ("APA") notice-and-comment procedures require EPA to "give interested persons an opportunity to participate in the rule making" before a rule is finalized.[52] Soliciting public comment "allow[s] the agency to benefit from the expertise and input of the parties who file comments with regard to the proposed rule" and "see[s] to it

that the agency maintains a flexible and open-minded attitude towards its own rules," creating important safeguards against arbitrary or unreasonable agency action.[53] However, EPA cannot remain flexible and open-minded in its consideration of its proposed disapproval where the validity of its Proposed FIP depends on this disapproval being finalized. Instead, EPA is effectively finalizing its Proposed SIP Disapproval in a manner that circumvents its responsibility to respond to public comments.[54] Such a procedural shortcut is anathema to the APA's carefully crafted rulemaking structure.[55]

In addition, EPA is effectively depriving members of the public from meaningfully engaging with its Proposed SIP Disapproval by issuing it after its Proposed FIP. The comment period for this Proposed Disapproval did not open until over a month after EPA published its Proposed FIP—the comment period for the Proposed FIP closed before any commenters had a chance to submit comments on the Proposed SIP Disapproval.[56] This puts commenters in the untenable position of having to provide feedback on EPA's comprehensive and complex Proposed FIP without first understanding Nevada's obligations under the CAA.

[52] 5 U.S.C. § 553(c).
[53] *See McLouth Steel Prod. Corp. v. Thomas*, 838 F.2d 1317, 1325 (D.C. Cir. 1988) (internal citations omitted).
[54] *See City of Portland, Oregon v. E.P.A.*, 507 F.3d 706, 715 (D.C. Cir. 2007) (emphasizing that an agency must respond to comments that "raise points relevant to the agency's decision and ... if adopted, would require a change in an agency's proposed rule").
[55] *See Metcalf v. Daley*, 214 F.3d 1135, 1142 (9th Cir. 2000) (emphasizing that agency action "must be timely, and it must be taken objectively and in good faith, not as an exercise in form over substance, and not as a subterfuge designed to rationalize a decision already made").
[56] See Comments, EPA-R09-OAR-2022-0138, https://www.regulations.gov/search/comment?filter=EPAR09-OAR-2022-0138.

**Commenter:** Idaho Power Company

**Commenter ID:** 23

**Docket ID:** EPA-R09-OAR-2022-0138

**Comment:**

[B]y proposing the FIP first, EPA has made clear that the finalization of the Proposed Disapproval was a foregone conclusion, effectively circumventing required rulemaking procedures by treating the Proposed Disapproval as final before giving any consideration to public comments. The Administrative Procedure Act's ("APA's") notice-and-comment procedures require EPA to "give interested persons an opportunity to participate in the rule making" before a rule is finalized.[32] Soliciting public comment "allow[s] the agency to benefit from the expertise and input of the parties who file comments with regard to the proposed rule" and "see[s] to it that the agency maintains a flexible and open-minded attitude towards its own rules," creating important safeguards against arbitrary or unreasonable agency action.[33] EPA cannot remain flexible and open-minded in its consideration of the Proposed Disapproval where the Proposed FIP depends on this disapproval being finalized. EPA has effectively finalized the Proposed Disapproval in a manner that circumvents its responsibility to respond to public comments.[34] Such a procedural shortcut is anathema to the APA's carefully crafted rulemaking structure.[35]

441

[32] 5 U.S.C. § 553(c).

[33] *See McLouth Steel Prod. Corp. v. Thomas*, 838 F.2d 1317, 1325 (D.C. Cir. 1988) (internal citations omitted).

[34] *See City of Portland, Oregon v. EPA*, 507 F.3d 706, 715 (D.C. Cir. 2007) (emphasizing that an agency must respond to comments that "raise points relevant to the agency's decision and ... if adopted, would require a change in an agency's proposed rule").

[35] *See Metcalf v. Daley*, 214 F.3d 1135, 1142 (9th Cir. 2000) (emphasizing that agency action "must be timely, and it must be taken objectively and in good faith, not as an exercise in form over substance, and not as a subterfuge designed to rationalize a decision already made").

**Commenter:** PacifiCorp

**Commenter ID:** 38

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

The Flawed Procedure and Chronology of the FIP/SIP Result in a Predetermined Outcome and an Abuse of Discretion.

The good neighbor provision, at its core, is a state obligation. It is codified in Section 110 of the CAA, which is the section granting states primary decision-making authority for developing SIPs to achieve the NAAQS. EPA's role under section 110 is to review and approve those plans, not to substitute its own policy preferences or decisions for those made by the states. As long as a state's plan is reasonable and complies with the requirements of the CAA, EPA must approve it. The U.S. Supreme Court and multiple Circuit Courts have repeatedly endorsed this cooperative federalism approach codified in Section 110.[18] Courts have also confirmed that EPA may issue a FIP *only if a state's SIP is deemed to be insufficient* according to the requirements of the CAA. EPA has undermined the central principles underlying both Section 110 and the Administrative Procedure Act by not even proposing to reject Utah's SIP until *after* it had already issued the Proposed FIP with explicit requirements specifically targeted at Utah. Even if EPA claims to cure its failure to observe the proper sequencing by projecting (and predetermining) that it will finalize its disapproval of Utah's SIP before finalizing the Proposed FIP, its actions run roughshod over both the sequence ordered by the CAA and the states' primary role in addressing nonattainment under Section 110. EPA should explain why this disapproval was issued without providing time for Utah to respond. EPA had nearly three years to do this. The flawed procedure suggests that EPA isn't giving Utah's SIP submittal a considered review, preferring instead to impose its own Proposed FIP solution in violation of legal principles. Agency action "must be timely, and it must be taken objectively and in good faith, not as an exercise in form over substance, and not as a subterfuge designed to rationalize a decision already made."[19]

By delaying the Proposed Disapproval for Utah's SIP until May 23, 2022, a full month and a half after proposing its FIP and based on a shift in its thinking in the years since the SIPs were originally submitted, EPA is trying to take over the role Congress granted to states. A logical conclusion from this series of actions, and the fact that EPA conducted extensive analysis assuming Utah is subject to the FIP, is that EPA has predetermined the outcome, even if that meant EPA took shortcuts to the required administrative procedures and disregarded the work Utah put into developing its Ozone Transport SIP

according to EPA's guidance. EPA's nonsequential process demonstrates serious disregard for Utah's well-founded determinations underlying its SIP.[20]

[18] *See, e.g., Train*, 412 U.S. 60 (1975); *Union Elec. Co. v. EPA*, 427 U.S. 246 (1976); *Fla. Power & Light Co. v. Costle*, 650 F.2d 579 (5th Cir. 1981).

[19] *Metcalf v. Daley*, 214 F.3d 1135, 1142 (9th Cir. 2000).

[20] EPA also put Utah and other stakeholders in a difficult position, forcing them to devote scarce resources to simultaneously digest and respond to the voluminous Proposed FIP and the Proposed Disapproval and denying numerous formal and informal requests for sorely needed additional time.

**Commenter:** PacifiCorp (Berkshire Hathaway Energy Company Proposed FIP Comments Attachment)

**Commenter ID:** 38

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

The western states where BHE operates affected EGUs (Nevada, Wyoming, and Utah) submitted their good neighbor SIPs to EPA between October 2018 and October 2019, years in advance of EPA's Proposed Rule. Each of these SIPs, in reliance upon EPA guidance and modeling, demonstrated that there were no significant impacts on ozone nonattainment and maintenance in downwind states. Yet EPA took no action on these SIP submissions for two and a half to three and a half years. It was not until February 2022, when EPA signed the Proposed Rule imposing a FIP on these states (later publishing it for public notice and comment on April 6), that these states learned that EPA did not intend to approve their good neighbor SIPs. EPA did not even propose disapproval for these SIPs until May 23, 2022, a full month and a half after proposing its FIP. And EPA has yet to finalize disapproval (the proper legal predicate for a FIP). What's more, EPA's disapproval of these SIPs is based on a shift in its thinking in the years since the SIPs were originally submitted.

BHE can only conclude from this series of actions that EPA predetermined that these states would be subject to this FIP as its chosen policy outcome without following the required administrative procedure or working in good faith with the states to develop their SIPs. EPA's nonsequential process demonstrates serious disregard for the well-founded state determinations underlying their good neighbor SIPs.43 In failing to observe the appropriate process, EPA has undermined western state authority in contravention of the cooperative federalism underpinning Section 110 of the Clean Air Act.

**Commenter:** Utah Division of Air Quality

**Commenter ID:** 47

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

UDAQ thinks that EPA's proposed rule to disapprove Utah's SIP is not rooted in the technically accurate analysis but instead is motivated by the desire to include Utah in the proposed interstate transport FIP:

Upon review, UDAQ finds the timing and sequence of the proposed actions in question to be highly irregular compared to a traditional rulemaking process. The fact that EPA proposed to include Utah in the broad and highly impactful FIP prior to issuing proposed disapproval of the state's SIP is unusual. This may suggest that EPA's proposed SIP disapproval aims to regulate a select set of point sources by including Utah in the proposed FIP.

The UDAQ disagrees with EPA's disapproval of the SIP for the following reasons. [...] Third, UDAQ thinks that EPA's proposed rule to disapprove Utah's SIP is not rooted in the technically accurate analysis but instead is motivated by the desire to include Utah in the proposed interstate transport FIP. Fourth, UDAQ thinks that the modeling and logic justifying Utah's inclusion in the proposed FIP are flawed. [...]

EPA's Proposed Disapproval is Motivated by the Desire to Include Utah in the FIP

Upon review, UDAQ finds the timing and sequence of the proposed actions in question to be highly irregular compared to a traditional rulemaking process. The fact that EPA proposed to include Utah in the broad and highly impactful FIP prior to issuing proposed disapproval of the state's SIP is unusual. This may suggest that EPA's proposed SIP disapproval aims to regulate a select set of point sources by including Utah in the proposed FIP.

EPA's Inclusion of Utah in the FIP Relies on Flawed Logic

As noted above and outlined in our comments related to the proposed FIP, UDAQ believes that the proposed disapproval of Utah's SIP is an effort to fulfill an agenda outside of the original intent of the interstate transport provisions of the CAA. Specifically, the intent is to force Utah's inclusion in the FIP to target emission reductions from fossil fuel-fired electric generating units (EGUs) located in the state.


**Commenter:** Utah Petroleum Association and the Utah Mining Association

**Commenter ID:** 48

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

EPA must promulgate a Federal Implementation Plan ("FIP") within two years any time that EPA finds that the State failed to make the required SIP submission, finds that the SIP submission did not meet minimum criteria, or disapproves a SIP submitted by the State unless the State corrects the deficiency and EPA approves the plan prior to promulgating the FIP.

On April 6, 2022, EPA proposed its Good Neighbor Rule ("Proposed GNR") with a finding that emissions from 25 States including Utah contribute significantly to nonattainment of the 2015 ozone NAAQS for States downwind. EPA's Proposed GNR includes a FIP to address these emissions.

EPA jumped the gun. The timing of this Proposed Disapproval, six weeks after proposing a FIP as part of the GNR, is out of order and contrary to the requirements of the CAA, which requires that a Disapproval **be finalized** before EPA promulgates a FIP such as the GNR.

The timeline suggests that EPA has no intention of paying heed to the comments on the Proposed Disapproval. Such disregard for comments would be a violation of required administrative procedures. EPA must fairly and completely consider all comments submitted.

*Response*

The sequencing of our actions here with regard to California, Nevada, and Utah is consistent with the procedural requirements of the CAA and the APA and with the EPA's past practice in our efforts to timely address good neighbor obligations. Comments pertaining to Wyoming are beyond the scope of this action. We have generally responded to comments on the timing of our action in Section V.A.1. of the preamble (comments related to the relationship between timing of proposals to disapprove SIPs and promulgate FIPs), Section V.A.2. of the preamble (comments related to requests for more time to revise SIP submissions), and Section V.A.3. of the preamble for (alleged harms to states caused by time between SIP submission and the EPA's action). .

Here, we further elaborate on those responses, specific to these comments about the timing of our western state disapproval proposals. First, neither the Act nor the APA impose any limitations on the timing for when the EPA can propose a SIP or FIP action under CAA section 110. Second, EPA's timing is motivated by the need to address good neighbor obligations as expeditiously as practicable and no later than the next attainment date. Third, allegations that the disapprovals were a foregone conclusion or otherwise prejudiced for any reason is demonstrably proven false by the fact that we are deferring action on Wyoming at this time in light of the updated air quality information. Fourth, there is nothing unprecedented in the EPA proposing FIPs in conjunction with or even before its proposed action on SIP submissions. For example, at the time the EPA proposed the CSAPR Update FIPs for the 2008 ozone NAAQS in December of 2015, we had not yet proposed action on several states' SIP submissions, but proposed and finalized those SIP disapproval actions prior to finalization of the FIPs. The proposed CSAPR Update was published on December 3, 2015, and included proposed FIPs for Indiana, Louisiana, New York, Ohio, Texas, and Wisconsin. 80 FR 75705. At that time, the EPA had not yet proposed action on good neighbor SIP submissions for the 2008 ozone NAAQS from those states; however, the EPA subsequently proposed and finalized these disapprovals. *See* 81 FR 38957 (June 15, 2016) (Indiana); 81 FR 53308 (Aug. 12, 2016) (Louisiana); 81 FR 58849 (Aug. 26, 2016) (New York); 81 FR 38957 (June 15, 2016) (Ohio); 81 FR 53284 (Aug. 12, 2016) (Texas); 81 FR 53309 (Aug. 12, 2016) (Wisconsin) before finalizing the CSAPR Update FIPs, published on October 26, 2016 (81 FR 74504).

As for Utah, the EPA has had the authority to promulgate a FIP for the state since January 6, 2020, which is the effective date of the EPA's finding of failure to submit for the state. 84 FR 66612 (December 5, 2019).

The public has been afforded an opportunity to comment on our proposed action on all three states' ozone transport SIP submissions, in addition to the opportunity to comment on the proposed FIP. The EPA has evaluated and responded to these comments as relevant and within scope of this final action. Other issues raised by these comments are addressed in the following sections of this RTC document: 10.3 (Cooperative Federalism and the EPA's Authority), 10.5 (Comments Alleging "Pretext" or Intent to Require Generation Shifting), and 11.4 (Transport Policy - Western State Ozone Regulation).

## 10.7  EPA's Response to Comment on Proposed Actions Related to Alabama

*Comments*

**Commenter:** Alabama Department of Environmental Management

**Commenter ID:** 02

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

In an effort to quickly provide a SIP based on the newer modeling (February 2022), ADEM rescinded the 2018 SIP, and presented EPA with a revised SIP, including a Weight of Evidence (WOE) argument based on the readily available data.

**Commenter:** Alabama Power Company, Southern Power Company, and PowerSouth Energy Cooperative

**Commenter ID:** 04

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

In February 2022, EPA reversed course and proposed to disapprove ADEM's 2018 Submittal. EPA explained that new modeling—not available at the time Alabama's SIP was due and developed well after the statutory deadline for review—suggested emissions from Alabama could affect ozone concentrations in Texas. In light of EPA's reliance on new 2022 modeling, ADEM withdrew its 2018 SIP submittal and, on April 21, 2022, separately submitted to EPA a new SIP package (including its SIP revisions and comments received on the SIP revision), which addressed and disputed EPA's new modeling (the "2022 SIP"). On June 14, 2022, EPA notified ADEM of minor administrative deficiencies in the 2022 SIP and, as a result of these errata, found the SIP technically "incomplete." EPA provided that ADEM may correct those deficiencies and resubmit its SIP for EPA's review, and ADEM promptly supplemented its SIP to address those minor deficiencies on June 21, 2022. EPA is now proposing to disapprove Alabama's 2022 SIP submittal.

[…]

EPA should certainly not object to comments raised herein on any claim of lack of specificity or explanation given that EPA refused to provide sufficient time to comment in the first instance and denied a reasonable request for additional time.  Notably, in its letter denying ADEM's request for an extension of the comment period, EPA states that "the technical bases underlying the EPA's proposed rationale to disapprove the June 21, 2022, SIP submittal are similar to those underlying the EPA's proposed rationale to disapprove" the prior SIP and that Alabama provided comments in that prior

446

proposed rulemaking.  Because EPA has intertwined its prior proposal to justify its denial of any extension, EPA should have addressed comments made on that prior proposal in this proposal.  As a result, EPA should re-propose its action after addressing all the comments received in its previous proposal.

*Response*

The EPA is electing to respond to comments received on the EPA's February 2022 proposed disapproval of Alabama's now-withdrawn SIP submission (submitted on August 20, 2018) and is also responding to the comments received on the October 2022 proposed disapproval of Alabama's SIP submission (submitted on June 21, 2022), to the extent these comments are relevant to this final action, within scope, and "reasonably specific." Nothing in the APA or the CAA requires the EPA to respond to comments on a notice of proposed rulemaking that is not the action being finalized, even when a second proposal is on the same or similar grounds as the first one. In this case, Alabama chose to withdraw its first SIP submission, and EPA is proposing to disapprove its SIP submission submitted on June 21, 2022.

# 11  Miscellaneous

## 11.1  Incorporation of Other's Comments by Reference

*Comments*

**Commenter:** Arkansas Electric Cooperative Corporation

**Commenter ID:** 08

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

Arkansas Electric Cooperative Corporation (AECC) shares the concerns of both the Arkansas Department of Energy and Environment, Division of Environmental Quality (DEQ) and the the Arkansas Environmental Federation (AEF)  regarding the referenced proposed rule. Therefore, AECC herein incorporates by reference the comments on the proposed rule submitted by ADEQ on April 22, 2022, and AEF on April 25, 2022.

**Commenter:** Arkansas Forest & Paper Council

**Commenter ID:** 10

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

The commenters support, non-exclusively, and incorporate by reference the comments submitted in this docket by the Arkansas Division of Environmental Quality as well that of the Midwest Ozone Group and Arkansas Environmental Federation.

**Commenter:** City Utilities of Springfield, Missouri

**Commenter ID:** 13

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

City Utilities supports the Midwest Ozone Group's comment for extension in light of technical review and resources needed to appropriately comment.

**Commenter:** Cleco Corporate Holdings LLC

**Commenter ID:** 14

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

Cleco adopts and incorporates by reference the comments submitted to EPA by Louisiana Electric Utility Environmental Group (LEUEG), dated April 25, 2022, concerning the Proposal.

**Commenter:** Louisiana Electric Utility Environmental Group

**Commenter ID:** 28

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

LEUEG adopts and incorporates by reference the comments submitted to EPA by the Louisiana Chemical Association ("LCA"), dated April 25, 2022, concerning the Proposed SIP Disapproval.

**Commenter:** Ohio Utilities and Generators Group

**Commenter ID:** 36

**Docket ID:** EPA-R05-OAR-2022-0006

**Comment:**

OUG also supports the efforts of the Midwest Ozone Group (hereinafter "MOG") and endorses the more detailed comments filed by MOG.

**Commenter:** United States Steel Corporation

**Commenter ID:** 45

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

For the reasons set forth above and those provided in the comments filed by DEQ and AEF, U. S. Steel requests EPA approve the Arkansas SIP.

**Commenter:** Utah Associated Municipal Power System

**Commenter ID:** 46

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

UAMPS supports the comments filed by the State of Utah and those comments filed by PacifiCorp opposing the Proposed Rule.


**Commenter:** Xcel Energy

**Commenter ID:** 52

**Docket ID:** EPA-R05-OAR-2022-0006

**Comment:**

Xcel Energy endorses the comments filed by the Minnesota Pollution Control Agency (MPCA) in response to EPA's SIP disapproval for Minnesota. In addition to EPA not including all the NOx emission reductions taking place within the state, the EPA erred in the approach taken modeling the influence Lake Michigan has on receptor sites located near the air/water shoreline boundaries, which was factored into the modeling performed by Lake Michigan Air Directors Consortium (LADCO) supporting Minnesota's SIP submittal. We understand that other parties, such as Midwest Ozone Group (MOG), will provide more detail on this matter in their comments.


**Commenter:** Xcel Energy

**Commenter ID:** 52

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

Xcel Energy endorses the comments filed by the Texas Commission on Environmental Quality (TCEQ) in response to EPA's SIP disapproval for Texas. The EPA erred in the approach taken to modeling the influence Lake Michigan has on the receptor sites located near the air/water shoreline boundaries in Cook County Illinois, Kenosha, and Racine Wisconsin, which was factored into the modeling performed by both TCEQ, further supported by comments filed by the Association of Electric Companies of Texas (AECT) and the associated modeling analysis performed by Sonoma Technology.


*Response*

Comments submitted on the proposed actions which have been "incorporated by reference" by other commenters are responded to elsewhere in this Response to Comments. Where commenters have "incorporated by reference" and submitted as their own attachment a comment made on the proposed FIP or other materials, the EPA has taken those materials into consideration in this rule to the extent that commenters explained with reasonable specificity how the information included in those referenced comments is relevant and within scope of this action.

## 11.2  CAA Section 126 Petitions

*Comments*

**Commenter:** Kentucky Division for Air Quality

**Commenter ID:** 25

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

In this proposed action, EPA specifies that if a state must make emission reductions to prevent emissions from impacting a downwind monitor, the state must submit a separate SIP revision that makes those emission reductions permanent and enforceable. Kentucky maintains that the purpose of the I-SIP is to verify that the state has the authority, regulations, and programs in place to address the requirements of the CAA, not to determine if, and how much, an upwind source may be impacting a downwind monitor. If an upwind state impacts a downwind state and EPA is called upon to determine the reductions necessary, then EPA's authority comes from a different section of the CAA, specifically section 126.

**Commenter:** Louisiana Department of Environmental Quality

**Commenter ID:** 27

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

To date, there have been no FCAA Section 126 actions filed against Louisiana. FCAA section 126 gives a state the authority to ask EPA to set emission limits for specific sources of air pollution in other states that significantly contribute to nonattainment or interfere with maintenance of one or more NAAQS in the petitioning state.

*Response*

The EPA's duty under CAA section 110(a)(2)(D)(i)(I) is to evaluate whether a state's SIP submission includes adequate provisions to prohibit emissions from within the state that significantly contribute to nonattainment or interfere with maintenance of the NAAQS in other states. While CAA section 126 allows downwind jurisdictions to separately petition the EPA to make a finding that upwind sources emit in violation of the good neighbor provision, such a petition is voluntary in nature and can only be initiated by the impacted state or political subdivision. *See Genon Rema v. EPA*, 722 F.3d 513, 520-22 (3d Cir. 2013) (discussing the independent nature of the processes under CAA section 110(a)(2)(D)(i)(I) and 126(b)). Thus, the lack of a petition does not demonstrate that Louisiana's SIP submission meets the

requirements of CAA section 110(a)(2)(D)(i)(I) nor is it dispositive of the existence (or lack thereof) of an interstate transport concern.

## 11.3  Transport Policy

*Comments*

**Commenter:** Ducote, Samuel

**Commenter ID:** 15

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

I strongly oppose the EPA's decision here. As a region of this nation responsible for fueling the needs of the nation, the Louisiana-Texas-Arkansas-Oklahoma region needs to extend special "good neighbor" exceptions for the contribution to the nation at large, especially considering the states have valid SIPs in place that meets the NAAQS requirements within each state individually.

**Commenter:** Midwest Ozone Group

**Commenter ID:** 30

**Docket ID:** EPA-R02-OAR-2021-0673, EPA-R03-OAR-2021-0872, EPA-R03-OAR-2021-0873, EPA-R04-OAR-2021-0841, EPA-R05-OAR-2022-0006, EPA-R06-OAR-2021-0801, EPA-R07-OAR-2021-0851, EPA-R08-OAR-2022-0315, EPA-R09-OAR-2022-0394, EPA-R09-OAR-2022-0138

**Comment:**

EPA's proposed Good Neighbor SIP disapprovals are both legally and technically flawed in that EPA seeks to advance the Good Neighbor SIP disapprovals based on incorrect air quality assumptions and calculations and in the absence of consideration of implementation of the flexibility guidance issued by EPA for application to 2015 ozone NAAQS Good Neighbor SIPs

[...]

[T]he Midwest Ozone Group urges that EPA withdraw the subject proposed SIP disapprovals in favor of correcting the legal and technical errors that have been identified in its analysis and proposing an appropriate opportunity for states to address any deficiencies EPA may find in any Good Neighbor Plans implementing the 2015 ozone NAAQS.

**Commenter:** Midwest Ozone Group

452

**Commenter ID:** 30

EPA-R08-OAR-2022-0315, EPA-R09-OAR-2022-0394, EPA-R09-OAR-2022-0138

**Comment:**

EPA's proposed Good Neighbor SIP disapprovals are both legally and technically flawed in that EPA seeks to advance the Good Neighbor SIP disapprovals based on incorrect air quality assumptions and calculations.

[…]

MOG specifically objects to EPA's approach to implementation of the flexibility guidance issued by EPA in 2018 for the specific application by states to the development of 2015 ozone NAAQS Good Neighbor SIPs.

**Commenter:** Oklahoma Department of Environmental Quality

**Commenter ID:** 37

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

Oklahoma is Being Penalized for Having Cleaner Air Than Downwind States

Oklahoma is in attainment of the NAAQS. Oklahoma stakeholders have shared concerns with ODEQ that EPA is penalizing Oklahoma sources for the interstate transport of pollutants allegedly emitted by sources in Oklahoma, but which impact receptors in the Dallas-Fort-Worth (DFW) metroplex. These stakeholders note that the emissions from the DFW metroplex impacting receptors in Oklahoma far exceed Oklahoma's impacts on receptors in Texas. While the ultimate goal of the good neighbor provision of the CAA is to ensure that everyone breathes cleaner air, it does seem that Oklahoma sources are required to install costly controls to address a much smaller quantity of emissions moving south while sources in Texas have no requirement to address emissions impacting Oklahoma receptors. Furthermore, the fact that sources in Texas will be required to control emissions to reduce impacts on receptors in Wisconsin and Illinois, but not Oklahoma (since Oklahoma is in attainment), only makes the process appear more absurd. Further, as previously stated, had EPA acted on Oklahoma's SIP in a timely manner, using the data available at the time EPA was supposed to review and approve the SIP, and honored the flexibilities it held out in the 2018 Tsirigotis Memos, it is likely Oklahoma would have already had an approved SIP in place by now. Oklahoma challenges the assumption that its sources are contributing to nonattainment in the DFW metroplex or the Chicago area. Nevertheless, it is nonsensical and unjust to force sources in Oklahoma, a state that is mostly rural, to make up for the poor air quality in the major metropolitan areas of the DFW metroplex and Chicago. The practical outcomes of EPA's decision-making in this instance are unduly burdensome and misplaced.

**Commenter:** PacifiCorp

**Commenter ID:** 38

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

*Recent modeling performed by the State of Colorado demonstrates the Proposed Disapproval is misguided.*

EPA must consider relevant Colorado emission reductions when determining Utah's impacts on Colorado monitors, as well as recent modeling performed for the State of Colorado that supports Utah's SIP. In the Proposed Disapproval, EPA states that "EPA does not find . . . the impacts of emissions from sources other than upwind states to be relevant to the analysis of interstate transport to Denver area nonattainment receptors." But this runs contrary to EPA's prior practice. In all of its prior interstate transport rules, EPA has reasonably assumed such "home states" will do their fair share in reducing ozone by employing control measures similar to those required from the upwind states significantly contributing to downwind ozone problems. For example, in the Revised CSAPR Update, which EPA adopted about a year ago, EPA maintained its long-standing position on this important point.

Assuming downwind states will pull their weight in improving air quality is reasonable. After all, the CAA requires states to attain ambient air quality standards, and nothing in the CAA requires upwind states to carry the full burden of bringing a downwind state into attainment. In that sense, the assumption that downwind states like Colorado will do their fair share is also lawful, since EPA should presume that states will meet their legal obligations under the CAA, and EPA is required by law to consider all relevant information in crafting its programs.[38] In fact, the D.C. Circuit advises EPA to recognize home-state efforts, not ignore them. In *Maryland v. EPA*, the court noted that downwind states have "the concomitant responsibility to limit their own emissions," even if their in-state monitors show attainment.[39] *Maryland* supports EPA's consideration of home states' responsibility to limit their own emissions.

The fair-share assumption is outcome-determinative for Utah when Colorado-specific data is included in the analysis. For example, Utah appropriately considered oil- and gas-related emissions reductions in Colorado that will reduce ozone in the impacted monitor areas.[40] Additionally, the Denver Regional Air Quality Council, along with the Colorado Department of Public Health and Environment is preparing a 2023 Severe/Moderate ozone SIP for the Denver Metro/Northern Front Range ("DM/NFR") ozone nonattainment area ("NAA"). The Colorado SIP analysis includes 2026 future year modeling to address attainment of the 2008 NAAQS and 2015 NAAQS. The Colorado ozone SIP modeling provides more reliable and accurate 2023 and 2026 ozone projections than the new and problematic modeling EPA relied on to disapprove Utah's SIP for several reasons[.]

---

[38] *Michigan v. EPA*, 576 U.S. 743, 750 ("agency action is lawful only if it rests on a consideration of the relevant factors") (quoting *Motor Vehicle Mfrs. Assn. v. State Farm Mut. Automobile Ins.* Co., 463 U.S. 29, 43 (1983)).
[39] 958 F.3d 1185, 1201 (D.C. Cir. 2020).
[40] *See, e.g.*, Colorado Oil & Gas Association, Comments on Proposed Reclassification of Colorado Ozone Nonattainment Areas under 2008 and 2015 NAAQS, submitted June 13, 2022, to Docket Nos. EPA-HQ-OAR-2021-0741 and EPA-HQ-OAR-2021-0742 (outlining recent applicable Colorado O&G air regulations); Proposed Consent Decree between EPA and Colorado with DCP, Civil Action No. 1: 22-cv-01829-NRN (July 25, 2022) (reporting a

proposed consent decree to cut emissions of volatile organic compounds by more than 288 tons and methane releases by some 1,300 tons in Weld County at the western border of Colorado).

*Response*

Regarding the comment that the EPA must take account of some "fair share" of emissions reductions in the downwind states where receptors are located in assessing whether upwind state contribution exists at Steps 1 and 2, the EPA disagrees. First, our consideration of home-state "fair share" emissions in the CSAPR Update and the Revised CSAPR Update takes place in the assessment of air quality impacts of emissions control strategies at Step 3, including as to the assessment of whether a FIP emissions control strategy overcontrols. *See* 86 FR at 23106; 81 at 74550. In this analysis, we assume the home state would implement emissions reductions at least up to the stringency of the control strategy we would select for upwind states. Comments regarding the FIP action proposed on April 6, 2022, are outside the scope of this action, however, it is illustrative to point out that the EPA once again made this same assumption in the proposed FIP to address the 2015 ozone NAAQS good neighbor obligations, at Step 3, consistent with prior rules, *see* 87 FR 20036, 20092 n.190.[152]

That role for "fair share" analysis is irrelevant to this action. A "fair share" assumption has never been a relevant part of the analysis at Steps 1 and 2. Indeed, a "fair share" assumption cannot even be calculated if the upwind states have not offered to implement an emissions control strategy at Step 3 against which a "fair share" for the downwind could be derived.

While we *do* take account of known on-the-books controls in downwind states, we have never assumed some additional amount of emission reduction in downwind states that has not yet occurred and is not known with certainty based on on-the-books requirements. Further, making such an assumption to conclude that a receptor will no longer exist and therefore an upwind state should not have obligations to reduce its own emissions that may be significantly contributing to that receptor is in conflict with the case law. *Wisconsin* and *North Carolina* both recognized that, regardless of other contributing factors to a downwind receptor, each state must be held responsible for its own significant contribution. 938 F.3d at 324; 531 F.3d at 921. And in *Maryland*, the court expressly recognized that upwind states must eliminate significant contribution regardless of the degree of emissions reductions the downwind state has itself achieved, holding that upwind states have an obligation to eliminate their significant contribution by the Marginal area attainment date for ozone under CAA section 181(a), even if the downwind nonattainment area faces relatively little regulatory obligation at that classification. 958 F.3d at 1204. The court observed "that does not make Delaware's obligation to attain the NAAQS by 2021 any less binding. And an upgrade from a marginal to a moderate nonattainment area carries significant consequences, such as a requirement to provide for annual emissions reductions in SIPs." *Id.*

---

[152] EPA also questioned in that proposal whether recent case law had called the need for such an assumption into question. *See id.* n. 206 ("In *Maryland*, the EPA had argued that good neighbor obligations should not be required by the Marginal area attainment deadline in part because ''marginal nonattainment areas often achieve the NAAQS without further downwind reductions, so it would be unreasonable to impose reductions on upwind sources based on the next marginal attainment deadline.'' 958 F.3d 1185, 1204. The D.C. Circuit rejected that argument, noting regulatory consequences for the downwind state for failure to attain even at the Marginal date, and, citing *Wisconsin*, the court held that upwind sources violate the good neighbor provision if they significantly contribute even at the Marginal area attainment date. *Id.*").

Commenter cites *Maryland* for a different proposition, that states in a multistate nonattainment area have "a concomitant responsibility to limit their own emissions." 958 F.3d at 1201. But commenter takes this quote out of context, putting the thrust of the observation on the downwind state rather than the upwind state. Thus, commenter derives an opposite meaning from what the court intended. In fact, the court held that Delaware had a valid basis for its Section 126(b) petition against Pennsylvania based on a monitor violating the NAAQS located in Pennsylvania but within a multistate nonattainment area that Delaware shared with Pennsylvania. *Id.* at 1200-01. The court observed that Delaware faced regulatory consequences due to the violating monitor in Pennsylvania, because "Delaware remains bound by the corresponding nonattainment designation. . . . [I]t is stuck in regulatory limbo, affected by an upwind source yet unable to avail itself of the intended remedy for addressing upwind contributions to nonattainment." *Id.* at 1200. The court rejected the EPA's arguments that Delaware could not use Section 126(b) to force emissions controls on the offending upwind sources in Pennsylvania. The court then observed:

> [C]ontrary to EPA's characterization, Delaware is not trying to 'relieve [itself] ... of the specific planning obligations associated with its inclusion in an area designated nonattainment.' Rather, it asks merely that upwind sources contributing to air quality problems in the multistate nonattainment area shoulder a comparable regulatory burden, as the section 126(b) petition process contemplates.

> In sum, states in a multistate nonattainment area share not only a nonattainment designation *but also the concomitant responsibility to limit their own emissions*. To equalize the burdens between upwind and downwind states, the Clean Air Act authorizes a state to petition the EPA for a finding that upwind emissions significantly contribute to that state's nonattainment of the ozone NAAQS.

*Id.* at 1200-01 (emphasis added).

Commenter's attempt to use this passage to argue that an upwind state like Utah should not face good neighbor obligations until a downwind state like Colorado has done its "fair share" is not availing. First, there is no multistate nonattainment at issue here, so the facts are somewhat different than what the court was analyzing in *Maryland*. Nonetheless, Colorado is still in a situation comparable to Delaware. It has a nonattainment area and faces mandatory nonattainment area planning requirements under subpart 2 of title I of the CAA (as commenter acknowledges). Colorado has taken measures to reduce emissions (and if on-the-books, these are reflected in the EPA's modeling), and Colorado may face additional requirements to further reduce its emissions if nonattainment continues to persist. But, under *Maryland* and prior cases, that does not relieve upwind states of the obligation to eliminate their own significant contribution to the air quality problem in Colorado. And without the elimination of that significant contribution, Colorado, like Delaware, faces the prospect of implementing ever more stringent and costly emissions controls on its own, while the upwind states' significant contribution to that problem goes unabated. Therefore, EPA rejects commenter's contention that we must assume some additional level of emissions reduction in Colorado at Steps 1 or 2 beyond what is already included in our baseline modeling.

Regarding the contention that Oklahoma would likely already have an approvable SIP submission had the EPA honored the flexibilities it held out in the 2018 Tsirigotis Memo and acted on Oklahoma's SIP

submission by the statutory deadline, we disagree. The EPA engaged with the justification put forward by each state that attempted to provide a rationale to support the use of an alternative contribution threshold and found each one deficient and otherwise evaluated each of the arguments put forward by the states. *See* 87 FR at 9818-22 (evaluating each of ODEQ's arguments at Steps 1 and 2). In both EPA's 2011 and 2016-based modeling of 2023, Oklahoma was projected to have at least one linkage above 1 ppb and so reliance on the August 2018 memorandum to conclude Oklahoma had no linkages would not have been availing in any case. And EPA explained in the proposal why ODEQ's reliance on TCEQ's alternative modeling was not approvable. The EPA further addresses comments related to Oklahoma and the August 2018 memorandum in Section 7.4.

As commenter points out, the modeling relied upon by Oklahoma as well as the updated modeling conducted by the EPA does not identify any nonattainment or maintenance receptors in Oklahoma. However, if nonattainment or maintenance receptors were identified in Oklahoma, states upwind to Oklahoma would have been evaluated under the same 4-step interstate transport framework the EPA is applying to states in this action. Additionally, while the good neighbor provision seeks to ensure that upwind states eliminate their own "significant contribution" to nonattainment or maintenance receptors in downwind states, other provisions of the CAA impose requirements on downwind states with nonattainment areas. *See* CAA sections 181-185. Thus, the CAA ensures that the responsibility of addressing ozone nonattainment and maintenance issues does not rest solely with the downwind or the upwind states.

Further, the EPA disagrees that it is penalizing certain upwind states or that it requires upwind states to make up for the poor air quality in certain metropolitan areas in downwind states. While it is correct that emissions from in-state sources often contribute to attainment and maintenance problems at receptors, this does not address the question of whether there is also significant contribution from emissions sources or activities in upwind states. The good neighbor provision establishes a standard of contribution, not causation. *See* CAA section 110(a)(2)(D)(i)(I). The good neighbor provision does not make upwind states solely responsible for downwind states reaching attainment, but rather requires the elimination of their own significant contribution to the problem. States are obligated to eliminate their own ''significant contribution'' or ''interference'' with the ability of other states to attain or maintain the NAAQS. The court in *Wisconsin* explained that downwind jurisdictions often may need to rely on emissions reductions from upwind states to achieve attainment of the NAAQS. *Wisconsin*, 938 F.3d at 316–17. Such states would face increased regulatory burdens including the risk of bumping up to a higher nonattainment classification if attainment is not reached. *Maryland*, 958 F.3d at 1204. Therefore, a state is not excused from eliminating its significant contribution on the basis that emissions from other states or in-state emissions also contribute some amount of pollution to the same receptors to which the state is linked.

Finally, we note that we are also finalizing a disapproval of Texas' good neighbor SIP submission in this action. While this disapproval is not premised on a linkage to receptors in Oklahoma, Texas faces the prospect of possible additional emissions controls to address its good neighbor obligations resulting from this action just as Oklahoma does. Further, Texas has three nonattainment areas that failed to attain the 2015 ozone NAAQS by 2021 and that have been "bumped-up" to Moderate nonattainment, with associated emissions reduction obligations under CAA section 182 now applicable under that classification. *See* 87 FR 60897, 60899 (Oct. 7, 2022).

Comments regarding the March, August, and October 2018 memoranda are addressed in Sections V.B.2, V.B.7, and V.B.3 of the preamble, respectively, and further addressed in Sections 1.3, 7.4, and 6.4. Comments regarding the timing of our action on the SIP submissions are addressed in Section V.A. of the preamble. Comments on economic impacts are addressed in Section 11.6.

## 11.4  Transport Policy- Western State Ozone Regulation

*Comments*

**Commenter:** Nevada Division of Environmental Protection

**Commenter ID:** 33

**Docket ID:** EPA-R09-OAR-2022-0138

**Comment:**

EPA's July 22, 2022, proposal to elevate the non-attainment status of the Las Vegas Area to Moderate from Marginal non-attainment for the 2015 ozone NAAQs as a consequence of EPA's rejection of Clark County's analysis of exceptional event demonstrations due to wildfires and stratospheric ozone intrusion underscores the need for a more strategic approach. As regulatory agencies, our collective limited resources should be spent on addressing the most significant sources of ozone formation and transport.

While NDEP acknowledges that interstate ozone transport is a regional scale pollution problem that requires an integrated approach, the proposed FIP does not adequately consider differences between Eastern states and the West. The threshold of 1% modeled ozone contribution may be appropriate for Eastern states, where ozone transport is a problem involving many smaller contributors. However, in the West, there are considerable concerns that EPA has not addressed, including the following mentioned in the June 17, 2022, letter from the Western States Air Resources Council on the FIP proposal:

> 1. Significant impact of background, interstate, and international ozone.

> 2. Significant impact from wildfire smoke.

> 3. Reliability upon a complex array of multiple models and assumptions, whose performance and limitations for the western region have been raised for more than a decade.

> 4. Expansion of the Cross-State Air Pollution Rule (CSAPR) and its emission trading program spatially (i.e., by including western states) but not in a contiguous manner, and by including separate electrical interconnections, which may make EPA's proposed remedy for interstate transport from EGU sources less effective.

**Commenter:** PacifiCorp

**Commenter ID:** 38

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

The dual benefits for both Utah and Colorado nonattainment areas of reducing ozone in the Uinta Basin merit serious consideration by EPA. Resolving ozone issues in the Uinta Basin is likely to produce better results than installing controls on EGUs that are further away from the affected monitors. A recent academic study of ozone in the Uinta Basin found that ozone-contributing emissions could be significantly reduced if oil and gas industry equipment is electrified.

**Commenter:** Utah Division of Air Quality

**Commenter ID:** 47

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

[W]e note region-specific challenges in regulating ozone pollution, which underscore a need for stronger cooperation between Utah and EPA.

Regionally-Specific Ozone Challenges

The UDAQ would also like to note the exceptional challenges of reducing ozone in the Western United States. States in the West face significant and regionally-specific challenges in meeting ozone standards including elevated natural background ozone levels, increasing instances of wildfire, significant biogenic contributions, as well as the influence of internationally transported pollutants. Beyond these regionally-specific challenges, a significant portion of the emissions of Oxides of Nitrogen ($NO_x$) in Utah comes from mobile sources, an area over which the State has limited regulatory authority. These combined regionally-specific challenges paired with the fact that a substantial portion of emissions is under federal jurisdiction make successful ozone reductions exceedingly challenging, furthering the need for strong cooperative federalism and active collaboration between our respective agencies. The actions proposed by the EPA to deny our SIP to fulfill a specific agenda undermine the trust required for successful cooperative federalism, which only serves to further complicate the shared goals of reducing ozone concentrations and protecting public health.

*Response*
We respond to comments generally asserting the need for some different or alternative treatment of ozone transport in the western U.S. elsewhere in the record, including in Section V.C.3 of the preamble and in Section 4. We further respond to several specific comments here.

In response to commenters' assertion that emissions from the Uinta Basin are more impactful on downwind ozone concentrations in Colorado than emissions from EGUs in Utah, the EPA agrees with the commenter that the Uinta Basin ozone nonattainment area is geographically closer to the Colorado

459

nonattainment receptors to which Utah is linked than the EGUs (such as Hunter and Huntington). However, we disagree that not being the nearest source to a downwind receptor might justify the lack of evaluation of emissions sources with substantial and potentially cost-effective emissions reduction opportunities in a state found to contribute to downwind nonattainment or maintenance receptor(s). Additionally, the EPA disagrees that the Uinta Basin emissions reductions the Agency recently finalized are more likely to produce significant reductions at the Colorado receptors than would reductions from the Utah EGUs. 87 FR 75334 (December 8, 2022). As stated in the FIP for the Uintah and Ouray Indian Reservation, "the EPA has concluded that winter ozone levels in the Uinta Basin are most significantly influenced by VOC emissions." 87 FR 75345. The EPA has determined that the action "will result in large reductions of VOC emissions" and "may result in very small $NO_x$ emission increases." 87 FR 75344, n. 63. These VOC reductions from the oil and gas sector are aimed to address high ozone levels during the winter in the Uinta Basin area which are associated with stagnant meteorological conditions that result in the build-up of local ozone precursor emissions and snow cover which enhances the reflectivity of solar radiation which, in turn, accelerates photochemical reactions of the trapped precursors to form locally high ozone concentrations. While the reductions of VOC emissions in the Uinta Basin will serve to address local winter ozone episodes, ozone production in the Uinta Basin in summer is expected to be $NO_x$ limited, and VOC reductions are unlikely to have nearly as pronounced an impact on reducing summer ozone transport contributions at the Colorado receptors. As stated regarding past ozone interstate transport rulemakings, "EPA and others have long regarded $NO_x$ to be the more significant ozone precursor in the context of interstate ozone transport," and "EPA's review of the data leads to the finding that, as proposed, a focus on $NO_x$ emission reductions is appropriate for the purpose of addressing interstate ozone transport." *See* 86 FR at 23087.

Nevada DEP (NDEP) argues that a 1 percent threshold is not an appropriate screening threshold for western states but that it did not include in its infrastructure SIP submission support for a 1 ppb screening threshold because its modeled contribution to downwind nonattainment or maintenance receptors was below 1 percent of the NAAQS. We acknowledge that NDEP could not have foreseen a need to include a demonstration supporting a 1 ppb screening threshold based on the modeling results available at the time of its SIP submission. Nonetheless, as we stated in the proposed action to disapprove the Nevada infrastructure SIP, "following receipt and review of 49 good neighbor SIP submittals for the 2015 8-hour ozone NAAQS, EPA's experience has been that nearly every state that attempted to rely on a 1 ppb threshold did not provide sufficient information and analysis to support a determination that an alternative threshold was reasonable or appropriate for that state." 87 FR 31490. Further, based on the 2016v3 modeling for 2023, Nevada's contribution exceeds 1 ppb to nonattainment receptors in Davis and Salt Lake Counties in Utah.

In response to comments on the impact of wildfires, the EPA agrees that there are more and larger wildfires and, therefore potentially greater impacts of wildfire emissions on ozone in the West compared to the East. Where states have provided some information in their SIP submissions to suggest that atypical events related to wildfire incidents may have impacted the EPA modeling results, the EPA engaged with these arguments. For example, in the EPA's evaluation of California's evaluation of atypical events, the Agency did not necessarily disagree on the state Agency's findings.[153] However, the

---

[153] 87 FR 31443 at 31454.

EPA found that the removal of data associated with atypical events (e.g., wildfires), as identified by the state still resulted in projected violations at downwind receptors. In addition, the EPA removed all concurred exceptional events data from the base period design values when projecting these data to 2023. To the extent commenters suggest the EPA should or is even required to complete an analysis to identify the impact of atypical events associated with wildfires, consistent with the EPA's guidance on Exceptional Events, we note that the onus is not on the EPA to complete such an analysis. In fact, the guidance commenters suggest the EPA abide by indicates that any such analysis which identifies days impacted by an atypical event needs to be initiated and completed by the state, not the Agency.[154]

Regarding commenter's calls for a unique consideration when evaluating good neighbor obligations in the western U.S., the EPA notes that emissions from wildfires were included as part of the emissions inventories used in the air quality modeling. Moreover, in the source apportionment modeling quantified the impacts of fires (wild and prescribed) on ozone concentrations at individual monitoring sites nationwide. In a similar manner, the impacts from international anthropogenic emissions outside the EPA's 12 km modeling domain are transported into the U.S. as "boundary conditions" from global scale modeling, as described in the final rule Air Quality Modeling TSD.

In response to comments, we analyzed the contributions from fires[155] and from non-US sources (i.e., anthropogenic emissions in Canada and Mexico as well as anthropogenic and natural sources outside the U.S.) to quantify and compare the contributions from these types of sources at receptors in the eastern versus western U.S. Table 11-1 below provides the contributions from fires and from non-U.S. sources on average for each receptor area.[156] In this table the receptor areas are listed based on the magnitude of the contribution from fires. Overall, the contribution from fires declines progressively from west to east. The data indicate that each receptor area appears to fall into one of three geographic bins, based on the magnitude of the contributions. In the farthest western areas (i.e., California Tribal Lands, Yuma, and Salt Lake City) fires contribute approximately 3 ppb. In the areas that include the receptors in Texas, Las Cruces/Carlsbad/Hobbs/El Paso, and Denver the contributions from fires are about 2 ppb lower than in the far western areas at approximately 1 ppb. At receptors in Chicago, Coastal Wisconsin, and Coastal Connecticut, the contributions from fires are an order of magnitude lower than the contributions from fires at the receptors in the far western areas.

Examining the contributions from non-U.S. sources indicates a clear distinction between the east and the west. For example, in western areas (i.e., California Tribal Lands, Denver, Las Cruces/Carlsbad/ Hobbs/El Paso, Salt Lake City, and Yuma) the contribution from non-U.S. sources ranges from approximately 40 ppb to 55 ppb. In contrast, in receptor areas in the East (i.e., Dallas, Houston/Brazoria/Galveston, Chicago, Coastal Wisconsin, and Coastal Connecticut) the contribution from non-US sources ranges from approximately 16 ppb to 22 ppb.

This analysis demonstrates that the EPA's modeling already captures the geographical differences between the west and the east in terms of the contributions from fires and non-U.S. sources. However,

---

[154] 81 FR 68216 (October 2016), Treatment of Data Influenced by Exceptional Events.

[155] In the source apportionment modeling the fires source tag includes emissions from fires in the U.S. as well as fires from the portions of Canada and Mexico that are inside the EPA's 12 km modeling domain.

[156] The data in this table are based on the top 10-day average contribution metric which is calculated using the same method the EPA uses to calculate this metric for upwind states.

those differences supply no inherent justification why the anthropogenic emissions of western states should be ignored or discounted in evaluating their obligations under the good neighbor provision. In view of these results, the EPA disagrees with the commenter's request that the EPA should treat western states differently than eastern states when evaluating ozone transport.

*Table 11-1*

| Receptor Area | Fires | Non-U.S. Sources |
|---|---|---|
| Yuma | 3.1 | 54.0 |
| Salt Lake City | 2.9 | 52.4 |
| California Tribal Lands | 2.9 | 40.9 |
| Denver | 1.3 | 44.1 |
| Las Cruces/Carlsbad/ Hobbs/El Paso | 1.0 | 52.7 |
| Houston/Brazoria/ Galveston | 1.0 | 22.4 |
| Dallas | 0.9 | 20.7 |
| Coastal Connecticut | 0.3 | 21.6 |
| Coastal Wisconsin | 0.2 | 16.5 |
| Chicago | 0.2 | 19.6 |

The EPA has made a number of updates and improvements to the 2016v2 modeling in response to comments and we find, as discussed in Section 4.2 (Model Performance), that 2016v3 achieves better modeling performance and can be considered reliable to inform air quality and contribution analysis at Step 1 and Step 2, including in the western regions. See Section 4.2 (Model Performance) for further discussion.

Nevada's concern with the expansion of the CSAPR trading program for power plants is beyond the scope of this rulemaking, which is focused on the adequacy of state SIP submissions in addressing the good neighbor provisions for the 2015 ozone NAAQS. Other issues raised by these comments are addressed in Section V.C.1. of the preamble (mobile sources), as well as Sections 10.6 (Comments Alleging "Pretext" or Intent to Require Generation Shifting), 10.6 (Allegations that Disapprovals of Western State SIP Submissions was Predetermined), and 11.8 (Mobile Source Emissions).

## 11.5  International Contributions

*Comment*
**Commenter:** Utah Associated Municipal Power System

**Commenter ID:** 46

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

The Proposed Rule Overlooks Factors Specific to Utah and the West

Inclusion of Utah and other western states in the Proposed Rule is inappropriate and fails to consider specific geographic factors unique to western states. EPA's analysis of Utah's upwind responsibility for downwind nonattainment under the Proposed Rule did not appropriately account for the impacts on downwind receptors of emissions from international and non-anthropogenic sources, emission reductions in the downwind state (Colorado), and emission reductions being achieved in Utah.

*Response*

See Section V.C.2. of the preamble for discussion of international contributions. The modeling accounts for all sources of contributions, including international and biogenic.

## 11.6  Economic Impacts

*Comments*

**Commenter:** Air Pollution Control Program, Missouri Department of Natural Resources

**Commenter ID:** 01

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

Every single state that is contributing above the 1 percent threshold (except for Oregon, as noted previously) is having their SIP disapproved, and the proposed FIP will control and impose unnegotiable costs on citizens and sources in those states.

**Commenter:** City Utilities of Springfield, Missouri

**Commenter ID:** 13

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

Missouri has proven to be a *Good Neighbor*, and the utilities and the citizens of Missouri have more than paid for the ambient air quality improvements realized in Missouri and in downwind states. These reductions are no small task for the customer-owners in the Springfield-Greene County area. It is inappropriate to require additional costs and economic hardships for the rate payers of CU when we

have consistently been a good actor by operating control equipment and our area has met the applicable ozone NAAQS.

**Commenter:** Evergy, Inc.

**Commenter ID:** 16

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

Further, by establishing a link between Missouri and these downwind receptors, EPA is forcing immense compliance costs onto Missouri customers.

**Commenter:** Mississippi Department of Environmental Quality

**Commenter ID:** 32

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

Disapproving Mississippi's iSIP without allowing the state adequate time to address any EPA concerns prior to imposing the proposed draconian FIP will have economic effects that disproportionally affect lower-income, disadvantaged, and minority Mississippians. In the current economic conditions (unchecked inflation, increased reliance on imported energy sources, eastern European conflicts, etc.), it is imprudent to apply such extreme and unnecessary federal restrictions on energy production and transmission, which will inevitably cause costs of essential goods and services to rise.

**Commenter:** PacifiCorp

**Commenter ID:** 38

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

The Combined Effect of EPA's Proposed Disapproval and Proposed FIP Will Cause Major Economic and Reliability Impacts for the Western United States.

Finalization of the Proposed Disapproval and subsequent imposition of the Proposed FIP will jeopardize energy supply and reliability in the West and cause major economic impacts. The Proposed Disapproval means electric generating units ("EGUs") in Utah will be subject to the selective catalytic reduction or SCR-forcing provisions of the Proposed FIP. As outlined in comments on the Proposed FIP by the state of Utah, other western states, industry, and the BHE Comments, it is simply not possible to either install

464

the costly SCR equipment or retire and replace the energy generated and vital ancillary services provided by so many units subject to the regulatory constraints and timelines of the Proposed FIP.

[…]

EPA's One-Size-Fits-All Approach Does a Disservice to Utah's Coal Communities.

The Proposed Disapproval does not give adequate consideration to the impacts the Disapproval will have on the communities surrounding the Utah Units due to the forced acceleration of coal-unit retirements that will result from the Proposed FIP. President Biden has committed that U.S. coal communities will experience a just transition as the energy economy changes: "We're never going to forget the men and women who dug the coal and built the nation. We're going to do right by them and make sure they have opportunities to keep building the nation . . ." The Proposed Disapproval is inconsistent with these principles because it will set in motion an inflexible regulatory scheme to be implemented on an unrealistic timeline with disproportionate and adverse impacts for affected communities. Under its own guidelines, EPA must meaningfully engage with affected communities to clearly understand and address the barriers to a just transition that will result from the Proposed Disapproval.

The Utah Units are very important to the local economies surrounding the power plants. The Hunter plant directly employs approximately 186 people, and the Huntington plant employs approximately 136, and thousands of other people are employed by industries that support the Utah Units. Emery and Carbon counties rely on the plants for a significant part of their tax and employment base. For example, PacifiCorp paid $22.6 million in property taxes to Emery County for 2021. This represented almost 70%, or more than two-thirds, of the county's total property tax revenues. These revenues provide funding for the county law enforcement agency, the county governmental operations, and the Emery County School District.

A new Kem Gardner study on Utah's Coal Country ("Coal Country Study") identifies Carbon and Emery counties as among the least economically diverse counties in the state. There are approximately 4,000 jobs in Emery and Carbon counties in mining and other industry services. Wages for plant workers are higher than the overall industrial workforce, and closure of a Utah Unit would have a significant impact on wages earned in the surrounding communities. Because the communities currently rely so heavily on the Utah Units and associated mining and industry services, it is especially important to balance local interests, efficiencies, economics, and impacts to people while pursuing strategies to decrease environmental impacts and grow a cleaner power system.

It is estimated that the early retirement of even a single unit at the Hunter plant would result in an approximate 20-25% employee reduction. Beyond the loss of plant jobs, any unit retirement would have broader impacts to associated industry jobs serving the plants and the local community.

The Coal Country Study explains, "These two counties form a regional economy, with a shared commuter shed, shared industries, and consumer spending patterns. Together, these counties face challenges with changing economic circumstances from declining coal production and the future closures of power plants." The report finds time is a critical factor to diversify the local economies and address the expected employment declines in the natural resource/coal sector. Both Carbon and Emery

County have experienced population loss since 2010, a significant portion of which coincided with the retirement of PacifiCorp's Carbon power plant and the closure of its Deer Creek mine in 2015.

The welfare of the affected communities, which is intertwined with and dependent upon the presence of the Utah Units, is an important factor EPA must consider when weighing the potential impact of the Proposed Disapproval.

**Commenter:** Utah Associated Municipal Power System

**Commenter ID:** 46

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

Requiring SCR will Adversely Impact UAMPS' Participating Members and Jeopardize Reliability

UAMPS opposes any regulatory requirement to install SCR on Hunter Unit 2, which would constitute overcontrol and adversely impact UAMPS and its members. EPA's required timeline of 36 months to install SCR is patently unreasonable and not feasible. In addition to owning interests in or directly operating power plants and other sources of electrical power, UAMPS and its members regularly purchase power off the grid, and are, therefore, sensitive to market and regulatory forces that impact electricity affordability and reliability. Western power markets are already being tested by retiring power generation facilities; premature closures caused by the Proposed Rule will only exacerbate the western power markets, increase wholesale prices, and result in increased costs to end-use customers within UAMPS' member communities. With an undivided 14.582% ownership interest in Hunter Unit 2, UAMPS and its participating members could face significant adverse economic impacts from a regulatory requirement for PacifiCorp to install SCR on Hunter Unit 2. Further, the Proposed Rule will likely cause early coal-unit retirements that will undermine the reliability of the bulk electric system and adversely impact affected coal communities as well as customers and electricity consumers in the West, significant factors and impacts which EPA failed to take into account.

*Response*

The EPA is sensitive to commenter's concerns regarding the economic impact of the EPA's regulatory actions.  However, these comments do not change the EPA's analysis and conclusion that the SIP submissions being disapproved in this action cannot be found to satisfy the requirements of CAA section 110(a)(2)(D)(i)(I). This final action to disapprove SIP submissions does not require any action from states or emissions sources and therefore does not impose any additional costs or economic hardships on sources or communities. Comments regarding economic and other impacts of the proposed FIP action (87 FR 20036 (April 6, 2022) (Docket ID No. EPA-HQ-OAR-2021-0668)) are outside the scope of this rulemaking.

Comments on the topic of SIP/FIP timing are addressed in Section V.A of the preamble and Section 1.1 of this RTC document. Comments on EPA's proposal in a separate rulemaking to not find error in its

previous approval of Oregon's good neighbor SIP for the 2015 ozone NAAQS is outside the scope of this action.

## 11.7  Environmental Justice

*Comments*

**Commenter:** California Air Resources Board

**Commenter ID:** 12

**Docket ID:** EPA-R09-OAR-2022-0394

**Comment:**

In summary, CARB urges the federal government to help achieve emissions reductions from sources subject to federal controls that significantly impact environmental justice communities and the State's ability to reach air quality Standards. California would like to work alongside the federal government as we all strive for cleaner air and regulatory attainment for all areas. CARB appreciates the opportunity to work with EPA to submit any additional information necessary to support the approval of the "interstate transport" portion of the California 2018 Infrastructure SIP.

**Commenter:** Midwest Ozone Group

**Commenter ID:** 30

**Docket ID:** EPA-R02-OAR-2021-0673, EPA-R03-OAR-2021-0872, EPA-R03-OAR-2021-0873, EPA-R04-OAR-2021-0841, EPA-R05-OAR-2022-0006, EPA-R06-OAR-2021-0801, EPA-R07-OAR-2021-0851, EPA-R08-OAR-2022-0315, EPA-R09-OAR-2022-0394, EPA-R09-OAR-2022-0138

**Comment:**

EPA is also obligated pursuant to Executive Orders 12898 (Feb. 11, 1994) and 14008 (Jan. 27, 2021), to ensure its actions support the principal of environmental justice, particularly in energy communities. Environmental justice is the fair treatment and meaningful involvement of all people regardless of race, color, national origin, or income, with respect to the development, implementation, and enforcement of environmental laws, regulations, and policies.

*Response*

This action disapproves SIP submissions from states under CAA section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS. EPA does not impose emissions reductions in a SIP disapproval.  As articulated in the final action, the EPA is determining that certain SIPs do not meet certain minimum requirements, and the

EPA is disapproving those SIPs. Specifically, this action disapproves certain SIP submissions as not containing the necessary provisions to satisfy good neighbor requirements under CAA section 110(a)(2)(D)(i)(I). In a wholly separate regulatory action, the EPA has proposed to address the CAA "good neighbor" requirements under section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS for these states under its CAA section 110(c) FIP authority.  The EPA acknowledges the importance of giving consideration to the impact of the EPA's actions on environmental justice communities. Although separate from this action, we note that the EPA conducted an environmental justice analysis of the EPA's proposed interstate transport FIP for the 2015 ozone NAAQS. *See* 87 FR 20036-20155 (April 6, 2022).

Executive Orders 12898 and 14008 by their own terms do not create a right to judicial review (Executive Order 12898 section 6-609 and Executive Order 14008 section 301(c)). *See Sur Contra La Contaminacion v. EPA*, 202 F.3d 443, 449-50 (1st Cir. 2000) (judicial review is not available under EO 12898); *Air Transp. Ass'n of Am. v. FAA*, 169 F.3d 1, 8-9 (D.C. Cir. 1999) (holding that a claim under another executive order with nearly identical judicial review language was not judicially reviewable and that petitioner's claim that the action at issue was arbitrary and capricious because of the Agency's alleged violation of the order was "nothing more than an indirect—and impermissible—attempt to enforce private rights under the order").

## 11.8  Mobile Sources Emissions

*Comments*

**Commenter:** California Air Resources Board

**Commenter ID:** 12

**Docket ID:** EPA-R09-OAR-2022-0394

**Comment:**

Emissions from primarily-federally regulated sources are a growing proportion of emissions in California. CARB welcomes assistance and dialogue from EPA and the U.S. government in addressing this challenge. As an example, statewide emissions from primarily federally regulated sources (aircraft, trains, ocean-going vessels, interstate trucks, and preempted off-road equipment) are projected to be the source of more than 45 percent, or approximately 450 tons per day, of anthropogenic $NO_X$ emissions in 2026 (CEPAM2022 v1.01, including ocean going vessels out to 100 nautical miles from shore). Without federal action, by 2030, $NO_X$ emissions from these primarily-federally regulated sources will be double California-regulated mobile sources. Therefore, it is imperative that the federal government act decisively to reduce emissions from air pollution sources under its control in California, as these sources contribute significantly to California's nonattainment challenges. Primarily-federally regulated mobile source emission reduction actions are critically needed alongside California's aggressive and effective control of sources under our authority.

In summary, CARB urges the federal government to help achieve emissions reductions from sources subject to federal control that significantly impact environmental justice communities and the State's ability to reach air quality standards.

**Commenter:** Midwest Ozone Group

**Commenter ID:** 30

**Docket ID:** EPA-R02-OAR-2021-0673, EPA-R03-OAR-2021-0872, EPA-R03-OAR-2021-0873, EPA-R04-OAR-2021-0841, EPA-R05-OAR-2022-0006, EPA-R06-OAR-2021-0801, EPA-R07-OAR-2021-0851

**Comment:**

Mobile sources are the primary cause of remaining air quality problems.

Available source apportionment data clearly shows that the most significant contributor of ozone in the East is mobile sources. Even EPA recognized that mobile and other local sources are the likely cause of high ozone in Connecticut. In a May 14, 2018, presentation titled "Analysis of Ozone Trends in the East in Relation to Interstate Transport," Norm Possiel of the EPA Office of Air Quality Planning and Standards showed the following slide regarding high ozone in costal Connecticut:

[slide in full comment]

More recently, in a November 9, 2021, presentation to the Ozone Transport Commission (OTC), Dr. Jeff Underhill, Chair of the OTC Modeling Committee, showed hourly source apportionment results that demonstrate that onroad and nonroad emissions dominate ozone formation in the modeled simulation at the Connecticut monitor example provided.

Alpine Geophysics, on behalf of MOG, prepared a summary of source apportionment data in March of 2022 that documents recent ozone source apportionment modeling and associated results of the EPA 2016v2 modeling platform and associated 2023fj projections. For each monitor in the modeling domain, Alpine produced a standard set of products representing the relative contribution of region and category emissions to projected 2023 ozone concentrations.

An example of the relative contribution of EGU and non-EGU point source emissions to the downwind receptor (90099002) at New Haven, Connecticut is presented in Figure 2. Note the small contribution of both EGU and non-EGU point source emissions (6 percent) toward the total contribution of emissions forming ozone in the 2023 modeled simulation.

[Figure 2 available in full comment]

Figure 2. Relative contribution of emissions (by percent) from major source sectors to modeled ozone concentrations in 2023 at the New Haven, Connecticut monitor 90099002.

A similar level of emissions from EGU and non-EGU NOx contribution is seen in Figure 3 at the Kenosha, Wisconsin nonattainment monitor (550590019), where almost 43% of NOx contributions is from mobile and area source sectors.

[Figure 3 available in full comment]

Figure 3. Relative contribution of emissions (by percent) from major source sectors to modeled ozone concentrations in 2023 at the Kenosha, Wisconsin monitor 550590019.

Based on these findings, it is questionable whether additional upwind regional ozone season NOx reductions from EGUs or non-EGU point sources would have the intended impact at downwind receptors compared to other, higher contributing, and local, source sectors.

As can easily be seen in the data, the contribution of nearby sources, and especially mobile sources, dwarfs the contribution of upwind state point sources. The data for all monitors in the Northeast are similar. Mobile sources are the dominant source of ozone in the Northeast now and are projected to continue to dominate in 2023.

The EPA Strategic Plan at page 43 states that "EPA will collect and evaluate mobile source emission data to help guide future program priorities related to reducing criteria pollutant and greenhouse gas emissions from light-duty cars and trucks, heavy-duty trucks and buses, nonroad engines and equipment, and from the fuels that power these engines. The Agency will develop the next round of multi-pollutant emission standards for light-duty and highway heavy-duty vehicles, which will improve air quality and reduce pollution near roads and other areas of high truck activity, such as warehouses and ports. EPA will also continue to work to ensure that Clean Air Act requirements are met for new transportation projects with heavy-duty diesel traffic, such that they do not worsen air quality near communities with environmental justice concerns. The Agency will address air quality concerns in these communities through implementing regulations, developing improved air quality models and mitigation measures, and collaborating with a broad range FY 2022-2026 EPA Strategic Plan – Objective 4.1 44 of stakeholders — including state air quality agencies and communities with environmental justice concerns — to develop targeted, sector-based, and place-based strategies for diesel fleets (including school buses, ports, and other goods movement facilities). EPA will support and oversee projects for the replacement of existing school buses with low- or zero-emission school buses funded under the Bipartisan Infrastructure Law, which will be implemented in alignment with Justice."

MOG notes that EPA plans to deal with mobile sources in the future and has initiated regulatory work in this regard as noted in the EPA Strategic Plan. Specifically, EPA has finalized "Late Model Year Light-Duty Vehicle Greenhouse Gas Emission Standards." 86 Fed. Reg. 74,434 (December 30, 2021). EPAS has also proposed "Control of Air Pollution From New Motor Vehicles: Heavy-Duty Engine and Vehicle Standards," 87 Fed. Reg. 17,414 (March 28, 2022). EPA revised the GHG emission standards for passenger cars and light trucks under the authority provided by section 202(a) of the CAA. This section is found within the Chapter 85 of the U.S. Code titled, "Air Pollution Prevention and Control" and is incorporated into the chapter reference found within the state implementation plan obligations found under Section 110(a)(2), Each implementation plan submitted by a State under **this chapter** shall be adopted by the State after reasonable notice and public hearing. Each such plan shall – (A) include enforceable emission limitations and other control measures, means, or techniques (including economic incentives such as fees, marketable permits, and auctions of emissions rights), as well as schedules and timetables for compliance, as may be necessary or appropriate to meet the applicable requirements of **this chapter**; (Emphasis added).

470

In summary, nonattainment plans are required to meet the applicable requirements of the Clean Air Act also described as Chapter 85 of Title 42 of the U. S. Code. Approvable NAAQS implementation plans are required to incorporate relevant sections of the Clean Air Act, to include the programs promulgated under Subchapter II – Emission Standards for Moving Sources such as the GHG emissions standards for light-duty vehicles for 2023 and later model years. The air quality impacts from this rule will have tailpipe emissions are measurable and warrant incorporation into the overall calculation of emissions reductions from CAA programs that will improve ozone air quality. 86 Fed. Reg. 74,490.

The proposed Heavy-Duty Engine and Vehicle Standards rule is anticipated to "reduce air pollution from highway heavy-duty vehicles and engines, including ozone, particulate matter, and greenhouse gases." 87 Fed. Reg. 17.414. EPA expects the standards in the proposed Options 1 and 2 to result in meaningful reductions in emissions of NOx, VOC, CO and PM2.5. 87 Fed. Reg. 17,581. Also, EPA predicts, "The proposal would reduce 8-hour ozone design values 26 significantly in 2045." Id. at 17,582. These observations support the known impact of mobile sources on ozone ambient air quality.

As stated earlier in these comments, aligning the obligations to control significant sources of ozone precursors with the upwind and downwind ozone attainment obligations is the only path that leads to successful state implementation plan development as guided by the Clean Air Act. EPA's failure to recognize the impact of the timing of mobile source controls on implementation of the Good Neighbor provisions and the disapprovals being proposed is arbitrary and capricious and exceeds EPA's authority under the CAA.

**Commenter:** Midwest Ozone Group

**Commenter ID:** 30

**Docket ID:** EPA-R08-OAR-2022-0315, EPA-R09-OAR-2022-0394, EPA-R09-OAR-2022-0138

**Comment:**

Available source apportionment data clearly shows that the most significant contributor of ozone is mobile sources.

**Commenter:** Nevada Division of Environmental Protection

**Commenter ID:** 33

**Docket ID:** EPA-R09-OAR-2022-0138

**Comment:**

While EPA has proposed to disapprove Nevada's 2018 iSIP, it has not clearly demonstrated that the proposed FIP controls on Nevada stationary sources will achieve meaningful reductions in ozone concentrations in Nevada or neighboring states. The proposed FIP fails to consider and address that in Nevada, mobile sources, not stationary sources, emit the plurality of nitrogen oxide precursors to ozone formation.

**Commenter:** New Jersey Department of Environmental Protection

**Commenter ID:** 34

**Docket ID:** EPA-R02-OAR-2021-0673

**Comment:**

EPA states that an approvable GN SIP revision must demonstrate enforceable emission control measures that achieve at least the same amount of emission reductions achieved by the FIP. With this in mind, New Jersey would like to note that its 2017 NOx annual emissions inventory indicates that 79% of the state's emissions are from mobile sources (onroad and nonroad), while EGUs make up a mere 3%, and non-EGU point sources make up 14%. This breakdown of New Jersey's NOx emissions inventory reflects not only the extensive and various control strategies implemented in New Jersey but also that EGUs and non-EGU point sources located in New Jersey are already well controlled. Considering the large contribution of NOx from onroad and nonroad mobile sources in New Jersey, it is unclear how New Jersey would demonstrate a significant reduction from the sources that make up such a small fraction of the state's NOx emissions. Additionally, New Jersey's Board of Public Utilities recently approved a plan to shut down the two-remaining coal-fired power plants in the state by the end of May 2022. Therefore, due to the large portion of mobile source emissions compared to stationary sources, and the limited authority for states to implement emission reduction strategies for mobile sources, EPA should advance measures to reduce mobile source emissions as soon as practicable including but not limited emission reductions for new medium and heavy-duty vehicles, new light duty passenger vehicles, and widescale electrification of new onroad and nonroad mobile sources.

EPA also states that New Jersey's GN SIP failed to "contain the necessary provisions to eliminate emissions in amounts that will contribute significantly to nonattainment or interfere with maintenance of the NAAQS in any other state." As noted in New Jersey's 2008 75 ppb 8- Hour Ozone Attainment Demonstration Northern New Jersey-New York-Connecticut Nonattainment Area, the 2023 Ozone Transport Commission (OTC) source apportionment modeling, using the OTC 2011 12km SIP modeling platform predicted that New Jersey's mobile sector contributed 70% of New Jersey's overall contribution to ozone nonattainment while EGUs were merely 5%.  These percentages are likely to be similar using EPA's recent 2016 modeling platform that was used to support the latest 2015 Ozone FIP, which predicts New Jersey's overall contribution to ozone nonattainment in Connecticut to be approximately 9 ppb. Therefore, it is estimated that 6.3 ppb of New Jersey's transported ozone is attributed to mobile sources and less than one-half ppb to EGUs. New Jersey has addressed the sources it can control to reduce their significant contribution to downwind nonattainment. Additionally, New Jersey continues to address emissions from mobile sources to the extent that state action is not pre-empted by the Clean Air Act. New Jersey has adopted the more-stringent California new vehicle rules for light-duty vehicles (Low Emission Vehicle and Zero Emission Vehicle programs) and medium/heavy duty vehicles (Advanced Clean Trucks) to ensure that the lowest emitting vehicles in the nation are sold in New Jersey, including increasing numbers of zero emission vehicles.  Other states have not made the same commitment. New Jersey also has some of the most stringent rules in the country for vehicle idling and heavy-duty vehicle inspection and maintenance using on-board diagnostics (OBD) technology. EPA should recognize New Jersey for these actions by approving New Jersey's GN SIP.

**Commenter:** Ohio Utilities and Generators Group

**Commenter ID:** 36

**Docket ID:** EPA-R05-OAR-2022-0006

**Comment:**

Ohio developed its proposed SIP consistent with the Act and the applicable guidance. US EPA's proposed disapproval is inconsistent with its own guidance. The purported modeling upon which US EPA relies does not accurately assess the impact of mobile sources in the nonattainment areas and arbitrarily attributes contributions from Ohio's (& other states) EGU sector. In short, the SIP proposed by Ohio EPA is appropriate and should be approved by US EPA.


**Commenter:** PacifiCorp

**Commenter ID:** 38

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

Utah's Uinta Basin borders Colorado and is closer to the affected Colorado monitors than the referenced EGUs. The Uinta Basin is currently nonattainment for ozone and significant reductions are and will be made to address its own ozone concerns. These Uinta Basin-based reductions are more likely to produce significant reductions at the impacted monitors in Colorado than EPA's EGU preferences. Recent analysis using data from EPA's 2016v2 modeling platform shows that Utah and Wyoming EGUs contribute less than 0.4% to the Colorado nonattainment monitors. Mobile sources and oil and gas sources are greater contributors (although still relatively small compared to background and natural sources).


**Commenter:** West Virginia Department of Environmental Protection

**Commenter ID:** 49

**Docket ID:** EPA-R03-OAR-2021-0873

**Comment:**

DAQ contends 2015 8-hour Ozone NAAQS design values at downwind monitors in nonattainment or maintenance areas will continue to respectively be above or near the standard whilst the instruments are adjacent to and generally downwind of major interstate highway arteries, including Interstate 95 and its various spurs and loops. Local mobile NOx sources have always been and continue to be the primary driver of nonattainment and maintenance issues in the areas of concern. This was illustrated quite clearly on page I-6 of Appendix I of the WV 2015 Ozone Good Neighbor SIP. DAQ maintains that should all upwind stationary sources of NOx cease to operate, then these monitors would continue to report much higher than background levels of ground-level ozone, with many in nonattainment. It would be considerably more prudent for EPA to encourage downwind states with nonattainment and

473

maintenance areas to implement tighter emissions limits or increased tolling for mobile sources located within their respective jurisdictions.

*Response*

The EPA responds generally to comments regarding mobile source emissions in Section V.C.1 of the preamble. Here, the EPA addresses comments raising arguments pertinent to specific states.

In response to Midwest Ozone Group, the EPA addressed the cited May 14, 2018, presentation at proposal. 87 FR 9859 (February 22, 2022); 87 FR 9873 (February 22, 2022). Substantive comments on mobile source rulemakings are outside the scope of this action.

The EPA describes the emissions inventories of mobile sources in the preamble in Section III.A.3. Additional information about emissions inventories is available in the 2016v3 Emissions Modeling TSD. The EPA addresses comments on methodology for determining future year contribution in Section 7.1 and comments related to mobile source emissions inventories in Section 3.2. Ohio Utilities and Generators Group did not specify which EPA guidance it referenced with sufficient specificity for the EPA to be able to respond, but the EPA responded to other comments related to guidance in Sections 1.2, 6.4, and 7.4 of this RTC document.

<u>California</u>

In response to one comment (CARB) regarding emissions in the state of California from sources in sectors regulated by the federal government, the EPA disagrees that emissions from mobile sources are entirely beyond the regulatory reach of the state. To the extent that CARB is suggesting that the EPA focus on reducing emissions from mobile sources of air pollution in our proposed FIP, we note that comments on the proposed FIP are outside the scope of this action on the California transport SIP submission. As previously stated, we recognize that mobile sources are important contributors to emissions of criteria pollutants and greenhouse gasses. As one commenter points out, the EPA has finalized a rulemaking to reduce emissions of several air pollutants, including $NO_X$, from heavy-duty vehicles and engines starting in model year 2027[157]. The rule is consistent with President Biden's Executive Order 14037, "Strengthening American Leadership in Clean Cars and Trucks,"[158] and helps ensure that the heavy-duty vehicles and engines that drive American commerce are as clean as possible while charting a path to advance zero-emission vehicles in the heavy-duty fleet.

The Final Rule for control of air pollution from heavy-duty engine and vehicle standards targets emissions reductions beginning in the year 2027. Therefore, these emissions reductions will not begin to take place until after 2023, the relevant analytic year used in this action and is therefore not included in the modeling for this action

---

[157] On December 20, 2022, the EPA finalized more stringent emissions standards for $NO_X$ and other pollutants from heavy-duty vehicles and engines, beginning with model year 2027. *See https://www.epa.gov/regulations-emissions-vehicles-and-engines/final-rule-and-related-materials-control-air-pollution*. EPA is also developing new multi-pollutant standards for light- and medium-duty vehicles as well as options to address pollution from locomotives.

[158] 86 FR 43583 (August 10, 2021).

New Jersey

One commenter argues that New Jersey's SIP submissions should be approved because, according to the commenter, New Jersey's sources, including mobile sources, are already strongly controlled.

The EPA acknowledges New Jersey has many emissions controls in place, however, the EPA does not view New Jersey's SIP submission as supporting a conclusion that the state has satisfied the requirements of CAA section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS. The EPA proposed to disapprove New Jersey's transport SIP submission in part because the state did not evaluate the availability of additional emissions controls to improve downwind air quality at nonattainment and/or maintenance receptors at Step 3, even though New Jersey emissions are linked to receptors at Step 2 as indicated by both the state and the EPA's air quality modeling. The comment does not change the EPA's assessment of the SIP submission. The EPA is finalizing the disapproval of New Jersey's SIP submission for the reasons in the proposal (87 FR 9484, Feb. 22, 2022) and in this final rule.

The commenter also indicated there are more $NO_x$ emissions from mobile sources than stationary sources in New Jersey, and so it is unclear to the commenter what else New Jersey can do. The EPA recognizes that mobile sources represent a large portion of $NO_x$ emissions in New Jersey and would be expected to have a large impact on downwind nonattainment and maintenance receptors in proportion to other sectors.  However, simply noting that mobile source emissions are a large portion of New Jersey's $NO_x$ emissions, noting they represent a large portion of New Jersey's contribution to downwind nonattainment and maintenance receptors, and listing existing controls, does not, as an analytical matter, support a conclusion that all necessary emission reductions have been sufficiently achieved to meet the state's interstate transport obligations. Mobile source emissions are among the types of anthropogenic "emissions activity," CAA section 110(a)(2)(D)(i), assigned to states at Step 2. Thus, the EPA includes mobile source emissions in the 2016v2 and 2016v3 modeling to identify state linkages at Steps 1 and 2.  For example, New Jersey's adoption of California's LEV criteria pollutant regulations for light-duty vehicles was reflected in the emissions inventory. MOVES3 harmonizes the emission rate standards with CA LEV for ozone precursors in all states starting with model year 2017.  ZEV programs are not explicitly modeled, but the light-duty EV population as of 2020 was reflected and grown to the future years using AEO 2022 trends. Both the 2016v2 and 2016v3 modeling indicated that New Jersey continues to be linked at Step 2 of the 4-step interstate transport framework.

Lastly, the commenter seems to be mischaracterizing statements the EPA made in the proposed FIP, separate from this rulemaking, regarding SIP submissions to replace that FIP in the event that a FIP is finalized. The EPA views comments on the proposed FIP to be outside the scope of this rulemaking. If, instead, the commenter is characterizing the EPA's disapproval of New Jersey's good neighbor SIP submissions for the 2008 ozone NAAQS, the EPA clarifies that comparison to a FIP in that action was limited to the Revised CSAPR Update, which was finalized before the EPA's action on the SIP submission and resolved good neighbor obligations for the 2008 ozone NAAQS for New Jersey. 87 FR 55692 (September 12, 2022).

Utah

Regarding the comment that mobile sources and oil and gas sources are greater contributors to Colorado ozone nonattainment than Utah and Wyoming EGUs, this does not answer the question

regarding the adequacy of the Utah's or Wyoming's SIP submissions (though we are not taking final action on Wyoming here), because both states have mobile and oil and gas sources themselves that are "sources or other type of emissions activity" under CAA section 110(a)(2)(D)(i). Utah's transport SIP submission did not include a sufficient examination or a technical justification that could support the conclusion that the state has no good neighbor obligations for the 2015 8-hour ozone NAAQS. As such, the EPA must disapprove the Utah SIP submission for failing to satisfy the statutory requirements of CAA section 110(a)(2)(D)(i)(I). Response to comments regarding oil and gas emissions reductions in the Uinta Basin are addressed in Section 11.4 (Transport Policy-Western State Ozone Regulation).

<u>West Virginia</u>

As stated in the NPRM, the "good neighbor" or "interstate transport" requirements of the CAA requires that each state's SIP contain adequate provisions to prohibit emissions from within the state from significantly contributing to nonattainment or interfering with maintenance of the NAAQS in other states. The question therefore is not whether other sources, such as mobile sources, also contribute to high ozone readings in downwind areas.  The question is whether sources in West Virginia are contributing significantly to multiple downwind receptors. The EPA considers a state to be "linked" if it has a contribution value equal to or exceeding the threshold of 1 percent of the NAAQS (i.e., 0.70 parts per billion (ppb) for the 2015 8-hour ozone NAAQS) to a downwind receptor. The EPA's 2016v2 modeling shows that sources in West Virginia are linked to ozone nonattainment and/or maintenance receptors in certain downwind areas in amounts greater than that threshold. As WVDEP mentioned in their comment, shutting down all point sources in the state may not result in the affected receptors achieving attainment, but that is not the relevant standard under the good neighbor provision. Also, the EPA does not disagree that emissions from mobile sources are an issue in ozone nonattainment areas, separate from interstate transport. The EPA has been regulating mobile source emissions since it was established as a federal agency in 1970, and all mobile source sectors are currently subject to NOX emissions standards. However, mobile source emissions remain, and are included in the identification of receptors at Step 1 and state-level contribution at Step 2. West Virginia's good neighbor SIP submission did not show that emissions from West Virginia sources were not contributing significantly to, or interfering with maintenance by, the NAAQS in certain downwind states and therefore this element of the SIP submission did not meet the requirements of CAA section 110(a)(2)(D)(i)(I).

## 11.9  Typographical Concerns

*Comment*

**Commenter:** Oklahoma Department of Environmental Quality

**Commenter ID:** 37

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

ODEQ notes that EPA Region 6 notified Oklahoma on March 2, 2022, that there was a mistake in the proposed action in the description of EPA's method for calculating 2023 contributions from upwind states, specifically in regards to the days with the highest projected ozone levels on page 9809 of the proposed disapproval. The correct description of EPA's methodology is included in at least two Technical Support Documents included in the docket. However, the correct description should be included in the proposed disapproval itself.

There is the second occurrence of the mistake in the description of EPA's method for calculating 2023 contributions from upwind states, specifically regarding the days with the highest projected ozone levels, on pages 9814-15 of the proposed disapproval.

*Response*

As the commenter notes, the preamble for the proposed action addressing the SIP submissions for states in Region 6 misstated the EPA's method for calculating future year contributions from upwind sates. The Evaluation of TCEQ Modeling TSD identified where the misstatement was specifically located in the preamble and included the correct description of the EPA's method for calculating future year contributions from upwind states. Additionally, on March 2, 2022, the EPA staff sent an email to the Region 6 states to inform them of the issue and where they could find the correct description. We also included a copy of the email in Docket No. EPA-R06-OAR-2021-0801.[159] The misstatement does not affect any aspect of EPA's action or rationale, and other materials included in this action correctly describe the method for how the EPA calculates future year contributions. Based on these actions, the EPA believes that it adequately addressed any potential issues caused by the errant language in the preamble.

## 11.10 Tribal Concerns

*Comment*

**Commenter:** Kaw Nation

**Commenter ID:** 24

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

Kaw Nation is one of the federally recognized Indian Tribes, pursuant to 25 CFR § 11.100 (x), located in Oklahoma, that has a Tribal authority and capability of qualified professionals that could manage Tribal

---

[159] *See*, Errant language in Proposed Rule; Air Plan Disapproval; Arkansas, Louisiana, Oklahoma, Texas Interstate Transport of Air Pollution 2015 Ozone NAAQS. Attachments to this EPA Region 6, Mar 2, 2022, E-Mail message, available in Docket ID No. EPA–R06–OAR–0801–0663-0011.

Air Quality. It is one of the few Tribes who met the Treatment As State (TAS) eligibility requirements under 40 CFR, 49.6 and approved for Sec. 301(d) of the CAA, 42 U.S.C § 7401 et seq., for the purpose of financial assistance under Sec. 105 of the CAA for TAS under Sec. 505 (a)(2) of the CAA.

Kaw Nation was monitoring Ozone precursors particularly Particulate matters in the Northern parts of Oklahoma for a while and it's within the Attainment zone for Ozone National Ambient Air Quality Standards (NAAQS).

Pursuant to Federal Clean Air Act (CAA), Kaw Nation would propose U.S. EPA to promulgate a federal implementation plan (FIP) than State Implementation Plan (SIP) so that Tribes can address interstate transport requirement.

Kaw Nation also propose to reconsider the approval of SAFETA and make the Oklahoma SIP to be inclusive of Indian Authority and have discussion with Tribal governments.

Kaw Nation is thankful to the U.S. EPA for inviting Tribal Authorities for government-to-government consultation to maintain our environment safe and secured for our future generation to come.

*Response*

The EPA appreciates the partnership and work that the Kaw Nation does with its air program, which includes participating in numerous regional and national workgroups, conducting an emissions inventory, reviewing air permits, and re-establishing their $PM_{2.5}$ air monitoring site.

The Kaw Nation asked that the EPA promulgate a FIP, rather than a SIP, to enable tribes to address interstate transport issues. In this action, the EPA is disapproving the portion of Oklahoma's SIP submission addressing interstate transport for the 2015 ozone NAAQS, which includes the portion of Oklahoma's SIP submission that would apply in certain areas of Indian country consistent with EPA's October 1, 2020, approval of the state's request pursuant to section 10211(a) of the Safe, Accountable, Flexible, Efficient Transportation Equity Act of 2005: A Legacy for Users, Pub. Law 109-59, 119 Stat. 1144, 1937 (August 10, 2005) ("SAFETEA"). Based on this proposed disapproval, the EPA in a separate action proposed FIPs for several states including the state of Oklahoma and for areas of Indian country within the borders of those states.[160] A tribe may seek Treatment in a Manner Similar to a State (TAS) approval to develop their own CAA regulatory program, including the implementation of a Tribal Implementation Plan (TIP) which could allow tribes to address interstate transport requirements.[161]

Although not part of this rulemaking, on December 22, 2021, the EPA proposed to withdraw and reconsider the October 1, 2020, SAFETEA approval.[162] The EPA engaged with tribes in consultations before and after the EPA's proposal to withdraw and reconsider the October 1, 2020, SAFETEA approval,

---

[160] Proposed Federal Implementation Plan Addressing Regional Ozone Transport for the 2015 Primary Ozone National Ambient Air Quality Standard, available in EPA-HQ-OAR-2021-0668. As proposed, the FIP would apply in areas of Indian Country in Oklahoma, whether by virtue of authority under CAA section 110(c) or 301(d).

[161] For Oklahoma tribes, SAFETEA 10211(b) requires that the State and Tribe enter into a cooperative agreement prior to seeking TAS approval for a regulatory program. EPA encourages and would support the Nation in seeking such a cooperative agreement and TAS approval should the Nation desire to implement a TIP.

[162] *See* https://www.epa.gov/ok/proposed-withdrawal-and-reconsideration-and-supporting-information.

and is currently considering feedback received from tribes, including the Kaw Nation. The EPA expects to engage in further discussions with tribal governments and the state of Oklahoma as part of this reconsideration.

## 11.11  Executive Order 13132

### Comment

**Commenter:** Tennessee Department of Environment and Conservation

**Commenter ID:** 41

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

Tennessee believes EPA's proposed Disapproval May Contravene Executive Order 131132 including: (1) the action directly affects the relationship between the states and national government; and (2) EPA's approach to infrastructure SIPs will have a chilling effect on states' abilities to fully develop and implement their obligations under section 110 of the Clean Air Act.

### Response

Because action on Tennessee's SIP submission is not included in this final action, to the extent this comment is relevant to Tennessee it is out of scope. The EPA disagrees that this disapproval action is inconsistent with the cooperative federalism framework of the CAA. The EPA addresses comments on cooperative federalism in Section 10.3 (Cooperative Federalism and the EPA's Authority).

Based on footnote 60 of the comment letter, the EPA believes the reference to Executive Order 131132 was a typographical error and that the comment intended to refer to Executive Order 13132. The EPA disagrees that this action contravenes the requirements of Executive Order 13132.

In CAA section 110(k)(3), Congress directed the EPA, not the states, to determine whether SIP submissions satisfy the requirements of the CAA. It is only after a SIP is approved that state measures included in a SIP submission become federally enforceable. And, by disapproving a SIP submission, EPA is not invalidating any state law or regulation. As such, the EPA's disapprovals do not take away any authority that a state would otherwise have to regulate air pollution. This rulemaking thus does not alter the legal relationship between the states and the federal government, nor does it create any substantial new burden affecting the states. Indeed, this rulemaking does not directly regulate any state or local governments at all. Accordingly, the EPA believes that this rule is consistent with the CAA and its policies as well as the Executive Order. The EPA also disagrees with the claim that the disapprovals will impact states' abilities to fully develop and implement their obligations under the CAA should they choose to do so following this action, and the EPA approves their SIP submissions.

Executive Order 13132 by its own terms does not create a right to judicial review (Executive Order 13132 section 11). *See Air Transp. Ass'n of Am. v. FAA*, 169 F.3d 1, 8-9 (D.C. Cir. 1999) (holding that a

479

claim under another executive order with nearly identical judicial review language was not judicially reviewable and that petitioner's claim that the action at issue was arbitrary and capricious because of the Agency's alleged violation of the order was "nothing more than an indirect—and impermissible—attempt to enforce private rights under the order").

## 11.12  Consent Decrees

*Comments*

**Commenter:** Midwest Ozone Group

**Commenter ID:** 30

**Docket ID:** EPA-R02-OAR-2021-0673, EPA-R03-OAR-2021-0872, EPA-R03-OAR-2021-0873, EPA-R04-OAR-2021-0841, EPA-R05-OAR-2022-0006, EPA-R06-OAR-2021-0801, EPA-R07-OAR-2021-0851, EPA-R08-OAR-2022-0315, EPA-R09-OAR-2022-0394, EPA-R09-OAR-2022-0138

**Comment:**

Pursuant to the January 12, 2022, Consent Decree entered in *Downwinders at Risk et al. v. Regan*[4] EPA must by April 30, 2022, approve or disapprove the interstate ozone state implementation plans (SIPs) of 21 states: Alabama, Arkansas, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maryland, Michigan, Minnesota, Mississippi, Missouri, New Jersey, New York, Ohio, Oklahoma, Tennessee, Texas, West Virginia and Wisconsin.  Also, if EPA by February 28, 2022, proposes full or partial disapproval of a SIP from one of the 21 states, along with a proposed FIP to directly regulate interstate ozone emissions from that state, it must finalize its full or partial disapproval of the state's own plan by December 15, 2022. MOG also notes that the proposed *Downwinders* Consent Decree was provided for comment and that the concerns of the upwind states and the regulated community were ignored.  *See* comments of Alabama, Missouri, Wyoming, and MOG in docket EPA-HQ-OGC-2021-0692.

[4] U.S. District Court for the Northern District of California, Case No. 4:21-cv-3551. [This footnote is footnote 5 in MOG's letter in EPA-R08-OAR-2022-0315, EPA-R09-OAR-2022-0394, EPA-R09-OAR-2022-0138]

**Commenter:** Air Pollution Control Program, Missouri Department of Natural Resources

**Commenter ID:** 01

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

On October 15, 2021, EPA published a proposed consent decree in the federal register that provided court enforceable timeframes for EPA to act on the good neighbor SIP submissions for the 2015 ozone standard from 32 states, including Missouri. For most of these states, including Missouri, the proposed

consent decree provided EPA with incentive, by granting it additional time, to propose SIP disapprovals and to also quickly propose federal plans for any state where it proposed a disapproval of the good neighbor SIP submission. The Air Program submitted comments to the docket on that proposed consent decree on November 8, 2021. The comments expressed concerns about the "sue and settle" process EPA was using to justify a hurried imposition of a FIP without providing states sufficient time to address any deficiencies that EPA may identify in their upcoming SIP disapprovals.

EPA never offered any summary of comments it received, nor provided any responses to any of the comments it received on the proposed consent decree. Instead, on January 12, 2022, EPA quietly executed the consent decree, as proposed, in the U.S. District Court for the Northern District of California, Oakland Division, and the U.S. Ninth Circuit Court of Appeals. EPA also never posted the final consent decree after it was executed, nor made any type of public announcement to indicate that it had executed the consent decree. Since the final consent decree and EPA's proposed disapproval of Missouri's SIP are inextricably linked, the Air Program is attaching and incorporating the comments submitted to docket on the proposed consent decree. EPA must address those comments before it can finalize this action, and EPA must explain why it decided not to provide any responses or notice that it had even considered the comments it received before executing the consent decree that impacted the rights of so many states, including Missouri.

**Commenter:** Oklahoma Department of Environmental Quality

**Commenter ID:** 37

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

It should also be noted that EPA's delay shortens the lead time available to address ongoing nonattainment and maintenance problems due to upwind contributions. Because of these delays, EPA would be advised to seek court approval to expand the review period to accommodate additional time to negotiate compromise language for SIPs proposed for disapproval as well as additional review time to address concerns raised by the substantive policy change noted in the proposed FIP.

*Response*

The commenters referenced the consent decree entered in *Downwinders at Risk, et al. v. Regan*, No. 21-cv-03551 (N.D. Cal.). They generally argue that the EPA should have provided responses to comments raised on the cited proposed consent decree. The proposed consent decree cited by the commenters, as well as two others,[163] established deadlines for the EPA to take action on the SIP submissions and do not dictate the substantive outcome of EPA's actions. The EPA views comments related to the terms of the consent decrees, and the EPA's compliance with CAA section 113(g) as related to public notice and

---

[163] EPA also solicited public comment on the other two relevant consent decrees. *New York et al. v. Regan, et al.*, No. 1:21-CV-00252 (S.D.N.Y.) (Indiana, Kentucky, Michigan, Ohio, Texas, and West Virginia); *Our Children's Earth Foundation* v. *EPA,* No. 20-8232 (S.D.N.Y.) (New York).

comment, as beyond the scope of this rulemaking, which is determining whether certain SIP submissions meet the requirements of CAA section 110(a)(2)(D)(i)(I). This rulemaking action is not the appropriate forum to bring challenges against the consent decree or EPA's compliance with CAA section 113(g) in relation to it.

While the EPA is not obligated to further respond to comments regarding these consent decrees, we note that the EPA is not required under the CAA to post a final notice regarding its legal settlements or post publicly its evaluation of comments under CAA section 113(g) for proposed consent decrees, and the EPA has never had a practice of doing so. CAA section 113(g) states in whole:

> At least 30 days before a consent order or settlement agreement of any kind under this chapter to which the United States is a party (other than enforcement actions under this section, section 7420 of this title, or subchapter II of this chapter, whether or not involving civil or criminal penalties, or judgments subject to Department of Justice policy on public participation) is final or filed with a court, the Administrator shall provide a reasonable opportunity by notice in the Federal Register to persons who are not named as parties or intervenors to the action or matter to comment in writing. The Administrator or the Attorney General, as appropriate, shall promptly consider any such written comments and may withdraw or withhold his consent to the proposed order or agreement if the comments disclose facts or considerations which indicate that such consent is inappropriate, improper, inadequate, or inconsistent with the requirements of this chapter. Nothing in this subsection shall apply to civil or criminal penalties under this chapter.

CAA section 113(g).

The EPA followed the requirements of CAA section 113(g) with regard to all three consent decrees establishing deadlines relevant to this action. Pursuant to CAA section 113(g), the EPA solicited public comment on the draft proposed consent decree in *Downwinders at Risk, et al. v. Regan*, No. 21-cv-03551 (N.D. Cal.) in the *Federal Register*. 86 FR 57423 (Oct. 15, 2022).[164] The EPA also posted information about soliciting public comment on the draft proposed consent decree on its website (https://www.epa.gov/ogc/proposed-consent-decrees-and-draft-settlement-agreements) and sent out an email notification to members of the public who had signed up for email alerts at https://www.epa.gov/ogc/email-subscriptions-notifications-about-new-litigation. The public comment period ended on November 15, 2021. 86 FR 57423 (Oct. 15, 2021).[165] All comments are available in the public docket for that notice (Docket No. EPA-HQ-OGC-2021-0692, available at regulations.gov). Consistent with the requirements of CAA section 113(g), the EPA and the United States Department of Justice reviewed the comments. As the EPA publicly stated to the court, "The comments received did not disclose facts or considerations that indicate that Defendant or the United States Department of Justice should withhold consent." Joint Motion to Enter Consent Decree, *Downwinders at Risk, et al. v.*

---

[164] The notice and docket for the *New York et al. v. Regan, et al.* consent decree can be found at 86 FR 40825 (July 29, 2021) and EPA-HQ-OGC-2021-0444 (available on regulations.gov). The notice and docket for the *Our Children's Earth Foundation v. EPA* consent decree can be found at 86 FR 66546 (Nov. 23, 2021) and EPA-HQ-OGC-2021-0800 (available on regulations.gov).

[165] The comment period for the *New York et al. v. Regan* consent decree ended on August 30, 2021. 86 FR 40825. The comment period for the *Our Children's Earth Foundation* ended on December 23, 2021. 86 FR 66546.

*Regan*, No. 21-cv-03551 (N.D. Cal.), ECF 22 at para. 4.[166] The joint motion to enter the consent decree, and the court's entry of the consent decree, are both public documents available in the docket for that litigation. *Downwinders at Risk, et al. v. Regan*, No. 21-cv-03551 (N.D. Cal.) (ECF 22 and ECF 23).

One commenter, representing Missouri, claimed that the final consent decree and the EPA's decision to *disapprove* Missouri's good neighbor SIP submission were "inextricably linked" and impacted states' rights. The EPA disputes that the consent decree requires the EPA to *disapprove* any good neighbor SIP submission, including Missouri's submission, or that it impacted any state's rights. The consent decree only establishes deadlines for EPA to take final action on various SIP submissions; by its own terms it does not predetermine whether the EPA shall approve, disapprove, conditionally approve, or approve in part and conditionally approve or disapprove in part any SIP submission. Consent Decree, *Downwinders at Risk, et al. v. Regan*, No. 21-cv-03551 (N.D. Cal.) ECF 23 at paras. 3-6. Commenters have established no evidence that these dates were negotiated in bad faith or prejudiced the Agency in its review and action on the SIP submissions. In fact, the EPA has taken action to both approve and disapprove SIP submissions covered by EPA's deadlines in the consent decree. *See e.g.*, 87 FR 19390 (April 4, 2022) (approval of Kansas's SIP); 87 FR 21578 (May 15, 2022) (approval of Montana's SIP).[167] All proposed actions on SIP submissions for which EPA had deadlines to take final action pursuant to the consent decree were put out for public comment, and the EPA evaluated those comments pursuant to CAA section 113(g). Furthermore, Missouri itself submitted lengthy comments in the course of the notice and comment procedure for the EPA's proposed action on the state's SIP submission, to which EPA is responding in this document and in the preamble. The EPA notes that for Missouri specifically, the EPA's statutory deadline to take final action on the state's good neighbor SIP submission was in November 2020, whereas the consent decrees, as modified by stipulation, now require EPA to take final action on Missouri's SIP submission by January 31, 2023.[168]

## 11.13  General Recommendations

*Comment*

**Commenter:** Anonymous

**Commenter ID:** 06

---

[166] EPA made similar statements regarding public comments to the Southern District of New York, also in public dockets containing the entered consent decrees. *See* JOINT LETTER addressed to Judge Andrew L. Carter, Jr. from Peter Aronoff dated 11/1/2021 re: seeking the entry of a proposed consent decree to resolve this matter, *New York et al. v. Regan, et al.*, No. 1:21-CV-00252 (S.D.N.Y.) (ECF 36); JOINT LETTER addressed to Judge J. Paul Oetken from Peter Aronoff dated 1/13/2022 re: joint request to enter proposed consent decree, *Our Children's Earth Foundation* v. *EPA*, No. 20-8232 (S.D.N.Y.) (ECF 30).

[167] EPA also took final action to approve several states' good neighbor SIPs after the CAA section 113(g) public comment process and before entry of the *Downwinders at Risk* consent decree, as noted in a "whereas" clause of that consent decree. These states were Florida, Georgia, North Carolina, and South Carolina (86 FR 68413, Dec. 2, 2021), Connecticut (86 FR 71830, Dec. 20, 2021), and Hawaii (86 FR 73129, Dec. 27, 2021).

[168] *Downwinders at Risk et al. v. Regan*, No. 21-cv-03551 (N.D. Cal.), Docket No. 32.

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

I recommend Utah be held to the highest standard and no extension or exclusion be given. Utah has the worst sir quality and the corrupt politicians are failing to fix this as well as any other issue that would affect their personal wealth or standing. In addition, Mike Lee attempted a coup and insurrection and shpuld not be allowed to run for office.

*Response*

This comment covers a range of topics that are generally beyond the scope of this action. It appears the comment is generally supportive of the disapproval of Utah's SIP submission.

*Comments*

**Commenter:** Hagerty, Logan

**Commenter ID:** 22

**Docket ID:** EPA-R05-OAR-2022-0006

**Comment:**

EPA Should Provide Explicit Guidance to States Drafting SIPs in the Proposed Rule

The EPA should provide closer guidance to the five states drafting future SIPs because it promotes enforcement efficiency.

If the EPA passes this rule and needs to create FIPs, the EPA must insure those FIPs are created as quickly as possible.

[…]

Thus, in the proposed rule, the EPA should provide examples of how specific procedures— like providing standardized outlines for SIPs—could be used to mitigate potential delays between SIP approval and EPA enforcement. Because the FIP process can take up to two years and because these five states are in the same Region, could the EPA draft one cohesive FIPs for these five states at the same time? The EPA could also solve future delays caused by inadequate SIP submissions by hiring or lending staff to state-level agencies that are less familiar with drafting SIPs.

In the proposed rule, the EPA had no issues with the outside data modeling group the five states used, the Lake Michigan Air Directors Consortium ("LADCO"). Still, the EPA should preemptively address the ways in which third-party data can be prevented from being incorrectly applied to states' SIPs. Moreover, if the EPA through investigation determines these five states intentionally misused the March 2018 Memorandum, the EPA should hold persons or parties accountable. The proposed rule should include: any state which intentionally drafts an inadequate SIP should be held liable for the harms

484

arising in other states, due to their lack of compliance. Here, the use of sanctions against these five states may be fair if they caused a delay in CAA enforcement which, in turn, affects neighboring states.

**Commenter:** Maryland Department of the Environment

**Commenter ID:** 29

**Docket ID:** EPA-R03-OAR-2021-0872

**Comment:**

MDE requests that EPA develop and publish official guidance that states can use in their Good Neighbor SIPs. That guidance must include the required elements and analyses EPA expects to see in every Good Neighbor SIP. Formal guidance levels the playing field by providing the same set of rules within which to work, and eliminates any confusion going forward.

*Response*

The EPA appreciates commenters' feedback and will take the suggestion to issue guidance for future good neighbor SIP development under consideration.

Comments on the proposed FIP are outside the scope of this action. Based on context of the full comment from Commenter ID 22, the EPA believes the reference to the March 2018 Memorandum by one commenter refers to Attachment A to the March 2018 Memorandum. Comments on that topic are addressed in Section 1.3 (Attachment A to the March 2018 Memorandum).

*Comment*

**Commenter:** Oklahoma Department of Environmental Quality

**Commenter ID:** 37

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

For future actions, the Oklahoma respectfully requests that EPA release the [Emissions Modeling Platform] under a Notice of Data Availability (NODA), take comment on the EMP, and resolve any outstanding issues before pursuing complex air quality modeling in support of rule development.

*Response*

The EPA will take the suggestion to issue a Notice of Data Availability for Emissions Modeling Platform releases for future actions under consideration.

## 11.14  Out of Scope

*Comment*

**Commenter**: Anonymous

**Commenter ID:** 06

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

In addition, Mike Lee attempted a coup and insurrection and shpuld not be allowed to run for office.

*Response*

This comment is out of the scope of this action.

*Comment*

**Commenter:** Emley, Margaret

**Commenter ID:** 17

**Docket ID:** EPA-R02-OAR-2021-0673

**Comment:**

Various health impacts result from air pollution exposure, including ozone and particulate matter. The evidence of public health concerns underlines the importance of each state's contribution to air quality, and its ability to take responsibility to reduce emissions that contribute to climate change.  It is important to utilize the Clean Air Act, the World Health Organization, the Paris Agreement, and 2030 sustainability goals to regulate states at an appropriate standard. The new WHO guidelines are expected to save millions of lives if countries implement the guidelines.

*Response*

The EPA agrees that ozone has a number of adverse health impacts. However, the EPA considers the comments regarding the health impacts of ozone and other pollutants to be outside the scope of this action, which evaluates whether certain SIP submissions adequately address interstate transport requirements in CAA section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS.

For clarification, the EPA notes that the evaluation of air quality standards, including the impacts to public health and welfare, are part of the standard setting process for a NAAQS, rather than a step in determining whether a state has adequate provisions in its SIP submission to address their interstate transport obligations for a particular NAAQS. Section 109(d)(1) of the Act requires periodic review and, if appropriate, revision of existing air quality criteria to reflect advances in scientific knowledge concerning

the effects of the pollutant on public health and welfare. Under the same provision, the EPA is also required to periodically review and, if appropriate, revise the NAAQS, at five-year intervals, based on the revised air quality criteria.

For informational purposes, the EPA notes that the Agency last revised the primary and secondary ozone NAAQS in October 2015.[169] In December 2020, the EPA announced its decision to retain the ozone standards without revision [170] The EPA is currently reconsidering the December 2020 final action.[171]

The commenter also states that it is important to utilize the Clean Air Act, the World Health Organization, the Paris Agreement, and 2030 sustainability goals to regulate states at an appropriate standard.  While the EPA acknowledges that there are many efforts, globally, to address air quality, the authority for this action is CAA section 110 as related to implementing the 2015 ozone NAAQS.


*Comment*

**Commenter:** Emley, Margaret

**Commenter ID:** 17

**Docket ID:** EPA-R02-OAR-2021-0673

**Comment:**

Rapid urbanization along with industrial growth is one of the major causes of elevated air pollution levels in urban areas. To manage and control deteriorating urban air quality, an efficient and effective urban air quality management plan is required consisting of systematic sampling, monitoring and analysis; modeling; and control protocols (Gulia et al, 2020). Air quality monitoring is the essential and basic step that develops the foundation of any management plan. It also describes step-by-step procedures for chemical characterization of both organic and inorganic constituents of ambient particulate matter along with molecular markers, which are essential to identify the corresponding sources of particulate matter. Additionally, an appropriate air quality management plan discusses the need for coupling low-cost wireless sensor-based stations with a limited number of real-time ambient air monitoring stations to make it cost-effective, yet robust (Gulia et al, 2020). Satellite-based remote sensing monitoring calibrated with ground-level measurement has the potential for regional-scale air quality monitoring that captures transport of transboundary pollution and makes it easier to quantify levels of pollution by state, ensuring each state can create and submit appropriate SIPs.

---

[169] 80 FR 65292 (October 26, 2015).
[170] 85 FR 87256 (December 31, 2020).
[171] https://www.epa.gov/ground-level-ozone-pollution/epa-reconsider-previous-administrations-decision-retain-2015-ozone

*Response*

The comment does not explain the relevancy of the recommendations for urban air quality management plans to the EPA's action to disapprove certain good neighbor SIP submissions for the 2015 ozone NAAQS.  The EPA considers the comment to be outside the scope of this action.


*Comment*

**Commenter:** Hagerty, Logan

**Commenter ID:** 22

**Docket ID:** EPA-R05-OAR-2022-0006

**Comment:**

EPA Should Consider the Use of Sanctions in the Proposed Rule

The proposed rule states that "[d]isapproval [of SIPs] does not start a mandatory sanctions clock." However, U.S.C. § 7413(a)(2) says that damages or sanctions should and can be triggered upon future violations of the same nature. For example, if ". . . [the EPA] Administrator finds that violations of an applicable implementation plan . . .are so widespread that such violations appear to result from a failure of the State in which the plan or permit program applies to enforce the plan or permit program effectively," the Administrator may require the state to fix its SIP through administrative penalties or civil action. In instances where a state is responsible for following an explicit instruction, it is only fair that state is held accountable. Currently, the proposed rule problematically places zero penalties on these five states for drafting inadequate SIPs. Meanwhile, other states suffer from the effects of ozone far more. For example, California and Arizona contain the top seven cities affected by ozone in our nation. It is important to note California and Arizona submitted appropriate SIPs that gained EPA approval.

Current EPA Administrator Michael S. Regan stated: "Air pollution doesn't stop at the state line. This step will help our state partners meet air quality health standards, saving lives and improving public health in smog-affected communities across the United States." Because ozone is a national concern, the EPA should consider how these five states acted unfairly towards other states like California and Arizona by drafting inappropriate SIPs. The proposed rule states that "[e]ffective policy solutions to the problem of interstate ozone transport . . . have necessitated the application of a uniform framework of policy judgments to ensure an 'efficient and equitable' approach.'" In SIP disapproval instances, the EPA has discretion to bring penalties where, as here, several states do not comply with explicit instructions to create SIPs. That is critical because noncompliant states derail national efforts under the CAA to jointly combat air pollution. Under the CAA, the EPA can bring injunctive penalties:

Whenever, on the basis of any available information, the Administrator finds that a State is not acting in compliance with any requirement or prohibition of the chapter relating to the construction of new sources or the modification of existing sources, the Administrator may—

(A) issue an order prohibiting the construction or modification of any major stationary source in any area to which such requirement applies . . .

Here, orders may be appropriate because the five states may have failed to comply with new source requirements. For example, these states may have permitted current ozone polluters to expand despite the states not holding approved SIPs. The proposed rule should prohibit these five states from approving the expansion, through construction or modification, of any ozone source that contributes to the state's current violation of the NAAQS and CAA. Specifically, the EPA should order restrictions on the modification or expansion of major power plants in these five states. This is because power plants are major stationary sources of ozone. Coal-fired power plants are major stationary sources because they create nitrogen oxides. In turn, nitrogen oxides create "lower-level ozone" pollution. Science has shown that ". . .NOx emissions could be mitigated if power plants continue to transition from coal to natural gas and renewable energy sources." Some of the nation's largest power plants are in the states the proposed rule affects – Michigan and Indiana. Michigan and Indiana contain the Monroe and Gibson power plants, respectively. These are both coal-fired power plants, owned by DTE Electric and Duke Energy. The EPA might propose these power plants cannot develop their facilities until Michigan and Indiana submit adequate SIPs. On a broader note, if the EPA is to impose penalties, the penalties should be fairly construed to target the largest producers of ozone pollution. The EPA should be careful to not burden the citizens of these states who are already harmed by ozone pollution because of these polluters.

*Response*

In this action, the EPA is finalizing disapproval and partial approval/partial disapproval for 21 good neighbor SIP submissions for the 2015 ozone NAAQS. The EPA views this recommendation as beyond the scope of this rulemaking.

## 11.15  Out of Scope - Comments on the Proposed FIP

The EPA notes initially that PacifiCorp attached two comments submitted by Berkshire Hathaway Energy Company (BHE) and Ramboll on the Proposed FIP to its own comment on this SIP action. To the extent the BHE and Ramboll attachments made comments relevant to *this* action, the EPA responded in the preamble or in this RTC document. The EPA considers the comments in the BHE and Ramboll attachments specific to the Proposed FIP to be out of the scope of this rulemaking and they will not be reproduced here, but they are available in full in the docket (and are included in the same document as PacifiCorp's comments). The EPA anticipates responding to comments on the Proposed FIP in any final rulemaking resulting from that proposal.

*Comments*

**Commenter:** Air Pollution Control Program, Missouri Department of Natural Resources

**Commenter ID:** 01

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

The following paragraphs explain the flaws of EPA's step-3 analysis that it has proposed in the FIPs for 26 states, including Missouri.

EPA is intentionally exploiting the Supreme Court decision in EME Homer City vs. EPA to jusify any costs or requirements it deems necessary to further federal policy decisions. The court decision permitted EPA to impose cost effective controls on any state that was deemed to be a significant contributor so long as such controls don't result in over-control of any state. However, the decision did not indicate what might be considered "cost effective controls". For this reason, EPA is using this decision to assume new authority to implement anything it deems as a "cost effective control" requirement. Further, EPA's step 3 process completely ignores the real question at hand with the enabling statute, which ties contribution to an amount which contributes significantly to downwind maintenance or nonattainment problems. Instead, EPA completely ignores the statutory contribution issue and instead is imposing controls that suit federal policy choices regardless of their impact on the downwind receptors that EPA used as justification for disapproving the SIPs to begin with.

EPA's decisions at step three in their proposed FIP are severely flawed. EPA completely ignores the contribution analysis and makes no attempt to address what it considers as significant contribution when it proposes new control requirements.


**Commenter:** Alabama Power Company, Southern Power Company, and PowerSouth Energy Cooperative

**Commenter ID:** 04

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

Finally, EPA should approve Alabama's SIP submittal as discussed in these comments. However, if EPA finalizes this proposed disapproval and ultimately issues a FIP for Alabama within two years of June 2022, EPA must clarify that such action relies only on the disapproval for EPA's FIP authority. At that point, EPA's prior, unlawful finding of failure to submit should effectively be rendered moot.


**Commenter:** Arkansas Department of Energy and Environment, Division of Environmental Quality

**Commenter ID:** 07

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

In their proposed FIP, EPA did not identify specific sources or emissions activities in Arkansas that significantly contribute to downwind air quality problems (as the rule requires), but instead chose from a nationwide set of sources with available control technologies as being subject to emission reduction requirements in their proposed FIP. There was no further analysis provided by EPA to show that specific sources in Arkansas are actually contributing significantly to the Harris County monitor or interfering with maintenance of the NAAQS by other receptors, thus EPA is effectively contending that a 1% linkage

490

is the same as a significant contribution, which is not consistent with their guidance or Clean Air Act 110(a)(2)(D)(i).

**Commenter:** Nevada Division of Environmental Protection

**Commenter ID:** 33

**Docket ID:** EPA-R09-OAR-2022-0138

**Comment:**

EPA's Proposed Ozone FIP jeopardizes anticipated Nevada greenhouse gas emission reductions

EPA's Proposed FIP, along with EPA's failure to meaningfully collaborate with NDEP on the Proposed FIP, may have the unintended consequence of eliminating greenhouse gas (GHG) emission reductions anticipated in Nevada's upcoming updated Regional Haze State Implementation Plan (Regional Haze SIP). The Regional Haze SIP currently anticipated shutdown of certain stationary sources to meet Regional Haze targets. However, the Proposed FIP may require these stationary sources to place pollution controls to meet short term ozone reduction requirements and maintain grid reliability. Once these controls are placed on to meet short term ozone requirements, the stationary sources may be able to meet Regional Haze requirements without shutting down. This would have the net effect of eliminating the potential future reductions in greenhouse gas emissions.

**Commenter:** Oklahoma Department of Environmental Quality

**Commenter ID:** 37

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

It should also be noted that EPA's delay shortens the lead time available to address ongoing nonattainment and maintenance problems due to upwind contributions.

[…]

The original CSAPR rule established ozone-season NOx reductions based on a $500 per ton cost threshold. The CSAPR Update increased the cost threshold to $1,400 and the Revised CSAPR Update to $1,800. For the current proposal, the cost threshold for NOx reductions ranges from $7,500 to over $11,000 per ton.9 This escalation does not constitute a simple expansion of an existing policy but, rather, constitutes a change significant enough to warrant reevaluation. In addition, the previous CSAPR rules only sought emissions reductions from EGUs. The current proposal seeks reductions from an expanded list of sectors: reciprocating internal combustion engines in pipeline transportation of natural gas; kilns in cement and cement product manufacturing; boilers and furnaces in iron and steel mills and ferroalloy manufacturing; furnaces in glass and glass product manufacturing; and high-emitting equipment and large boilers in basic chemical manufacturing, petroleum and coal products

manufacturing, and pulp, paper, and paperboard mills. By significantly increasing the cost and widely expanding the sectors subject to the remedy, the EPA has changed the policy to such a degree that a fundamental rethinking of the approach is in order.

Oklahoma asserts that if EPA moves forward with its disapproval of state SIPs (and a subsequent FIP), EPA should work with states and other air agencies to develop an approach that addresses downwind air quality in a more cost-effective manner. This approach may necessitate variable cost-effectiveness thresholds for different upwind states, but that change is warranted to avoid the significant cost increases seen in the current proposal. In working with states, EPA is encouraged to assist state agencies in the use of modeling (either the CAMx model or the AQAT) while states are preparing SIPs rather than after SIPs have been submitted and rejected. Due to these concerns, it would be appropriate for EPA to defer final action on the Oklahoma SIP until this process can be brought to a more mutually acceptable conclusion.

**Commenter:** United States Steel Corporation

**Commenter ID:** 45

**Docket ID:** EPA-R05-OAR-2022-0006

**Comment:**

Second, to the extent that U. S. EPA somehow still finds that emissions from these sources "contribute" or "interfere" with downwind states' ability to attain and maintain the ozone NAAQS [after consideration of updated emissions inventory information], which does not seem plausible, U. S. EPA will need to re-evaluate its costs determinations in the separate ozone transport FIP rulemaking.

**Commenter:** Wisconsin Department of Natural Resources

**Commenter ID:** 51

**Docket ID:** EPA-R05-OAR-2022-0006

**Comment:**

EPA must ensure its transport rule for the 2015 ozone NAAQS fully resolves upwind state obligations to Wisconsin's nonattainment areas.

On February 28, 2022, EPA proposed a transport rule to resolve "good neighbor" obligations for the 2015 ozone NAAQS for the states for which it is proposing SIP disapprovals. Based on WDNR's initial assessment, EPA will need to adjust its final rule so that it constitutes a "full remedy" for upwind state transport obligations to all of Wisconsin's nonattainment and maintenance monitors, including Sheboygan. Wisconsin will provide comments on that proposal separately.

*Response*

To the extent these comments concern the substance of the proposed FIP for the 2015 ozone NAAQS, such as the EPA's proposed determinations of cost-effective controls available in that action, or the EPA's authority to finalize FIPs, those comments are outside the scope of this action. Additionally, the EPA disagrees that the decisions proposed in the FIP necessitates any kind of delay or deferral on a state's SIP submission. This action is not determining what, if any, cost effective controls exist at Step 3 of the 4-step interstate transport framework. Instead, the EPA is evaluating the states' interstate transport SIP submissions to determine whether the submission satisfies the statutory obligations provided for in CAA section 110(a)(2)(D)(i)(I).

One commenter claims that the EPA's use of AQAT to justify the inclusion of Utah in the proposed 2015 ozone interstate transport FIP is inappropriate and goes against the EPA's own guidance. We first note that, in this action, the EPA is not using the Step 3 analysis in the proposed FIP action to support its action on the SIP submission. The EPA's reasoning for disapproving the Utah SIP submission is based on an evaluation of the SIP submission itself, as well as EPA modeling results and air quality analysis. To the extent that the commenter is implying that the EPA is using the AQAT results in any way in this action this is simply inaccurate. Nowhere in the proposed disapproval of Utah's SIP has the EPA made this claim. The EPA further addresses claims that the EPA is relying on the results of the FIP to support or pre-judge action on a state's SIP submission in Section 10.5 (Comment Alleging "Pretext" or Intent to Require Generation Shifting). Comments regarding the appropriateness of the use of the AQAT tool in the proposed FIP is outside of the scope of this action. However, we note that, regarding the alleged differences in EGU emissions projections between EPA's Step 1 and Step 2 analysis using IPM and the emissions projections using engineering analytics in the proposed FIP at Step 3, this is easily explained by the different assumptions and methodologies used. The higher emissions estimates for EGUs used to propose budgets in the FIP reflected a more conservative assessment relying only on known and historical information about fleet operation. Had the EPA used the engineering analysis values for EGUs from the Step 3 analysis of the proposed FIP in our analysis of Steps 1 and 2 in this SIP disapproval action, the effect, generally, would have been to have higher EGU emissions estimates in the baseline, which would have only served to reinforce our conclusions as to which upwind states are linked to downwind receptors.

In response to Wisconsin Department of Natural Resources' call for the EPA's proposed FIP to constitute a full remedy for all receptors in Wisconsin, we address this commenter's concern regarding the identification of the monitor in Sheboygan County, Wisconsin as a projected receptor in Section 7.1 (Methodology for Determining Future Year Contribution). The EPA is not, in this action, making a determination whether the April 2022 proposed FIP is a complete remedy for states' good neighbor obligations under the 2015 ozone NAAQS. In response to APC et al., the EPA explained the basis for the disapproval of Alabama's SIP submission, submitted on June 21, 2022, at proposal. 87 FR 64412 (October 25, 2022). The EPA is not promulgating a FIP for Alabama in this action, so comments on the EPA's FIP authority are beyond the scope of this rulemaking.

TAB HQ-85: AIR QUALITY MODELING TECHNICAL SUPPORT
DOCUMENT 2015 OZONE NAAQS SIP DISAPPROVAL FINAL ACTION
(JAN. 31, 2023) (EPA-HQ-OAR-2021-0663-0085)



Air Quality Modeling Technical Support Document
2015 Ozone NAAQS
SIP Disapproval Final Action

Office of Air Quality Planning and Standards
United States Environmental Protection Agency

## 1. Introduction

In this technical support document (TSD) we describe the air quality modeling performed to support the EPA's State Implementation Plan Addressing Regional Ozone Transport for the 2015 Ozone National Ambient Air Quality Standards final action. For this final action, air quality modeling is used to project ozone design values[1] at individual monitoring sites to the 2023 analytic year[2] and to estimate state-by-state contributions to ozone design values at individual monitoring sites in this future year. The projected ozone design values are evaluated to identify ozone monitoring sites that are expected to have nonattainment or maintenance problems for the 2015 ozone National Ambient Air Quality Standards (NAAQS) in the future (i.e., nonattainment and maintenance receptors).[3] Ozone contribution data for 2023 is used to quantify projected interstate contributions from emissions in each upwind state to ozone design values at projected nonattainment and maintenance receptors in other states (i.e., in downwind states). The contributions from individual states to nonattainment and maintenance receptors in other states (i.e., upwind states and downwind states, respectively) are evaluated to identify upwind states that contribute greater than or equal to 1 percent of the 2015 ozone NAAQS (i.e., 1 percent of 70 ppb which is 0.70 ppb) to one or more downwind receptors. Upwind states that contribute at or above this threshold to particular receptors are referred to as being "linked" to these receptors. In this action the EPA is disapproving the good neighbor SIPs submitted by Alabama, Arkansas, California, Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, Mississippi, Missouri, Nevada, New Jersey, New York, Ohio, Oklahoma, Texas, Utah, and West Virginia, and partially approving/disapproving the good neighbor SIPs submitted by Minnesota and Wisconsin. As described below, in this TSD we present the contribution data for each of these states as well as the other states included in our national scale modeling.

As described in this TSD, the EPA performed air quality modeling for the 2016 base year and 2023 future year to project 2016-centered base period design values to this future year. Ozone source apportionment modeling was performed using emissions projected to 2023 to determine the contributions of total anthropogenic emissions from each state to projected ozone design values at individual monitoring sites nationwide. The modeling for 2023 was used to identify receptors and

---

[1] The ozone design value for a monitoring site is the 3-year average of the annual fourth-highest daily maximum 8-hour average ozone concentrations at the site.
[2] The rationale for using 2023 as the applicable future analytic year for this transport assessment is described in the preamble for this final action.
[3] As described in section 3, the EPA also identified an additional type of maintenance-only receptors based on recent measured data that exceed the NAAQS.

upwind/downwind linkages to inform Step 1 and Step 2 of the 4-step interstate transport framework, respectively.[4]

The remaining sections of this TSD are as follows. Section 2 describes the air quality modeling platform and the evaluation of model predictions of maximum daily averge 8-hour (MDA8) ozone concentrations using measured (i.e., observed) data. Section 3 describes the procedures for projecting ozone design value concentrations and the approach for identifying monitoring sites projected to have nonattainment and/or maintenance problems in 2023. Section 4 describes (1) the source apportionment modeling, (2) the procedures for quantifying contributions to individual monitoring sites including nonattainment and/or maintenance sites, and (3) the evaluation of upwind state contributions to individual receptors in downwind states. Section 5 describes a back-trajectory analysis for each monitor plus modeled receptor in 2023. Appendix A describes the results of a sensitivity analysis designed to investigate the possible causes of ozone under prediction in the 2016v2 modeling for the purpose of improving model performance in the 2016v3 modeling. Appendix B provides model performance statistics and graphics for maximum daily averge 8-hour (MDA8) ozone concentrations in the 2016v3 base year modeling. Appendix C includes tables containing the ozone contributions to each receptor from each state and other individual source "tags" tracked in the source apportionment modeling for 2023. Appendix D contains tables which provide the total upwind state contribution as a percent of the 2023 ozone concentration at each monitor plus modeled receptor. Appendix E contains tables which identify which upwind states are linked to individual downwind receptors.

The input and output modeling files for the 2016 and 2023 modeling to support this final action are available on data drives in the EPA docket office.[5] A copy of the air quality model input and/or output data can also be obtained by contacting Norm Possiel at possiel.norm@epa.gov.

---

[4] See the preamble for a detailed description of the 4-step interstate transport framework. In summary, for Step 1: identify monitoring sites that are projected to have problems attaining and/or maintaining the NAAQS (i.e., nonattainment and/or maintenance receptors); Step 2: identify states that impact those air quality problems in other (i.e., downwind) states sufficiently such that the states are considered "linked" and therefore warrant further review and analysis; Step 3: identify the emissions reductions necessary (if any), applying a multifactor analysis, to eliminate each linked upwind state's significant contribution to nonattainment or interference with maintenance of the NAAQS at the locations identified in Step 1; and Step 4: adopt permanent and enforceable measures needed to achieve those emissions reductions.

[5] A list of available model input and output data is provided in the file "Air Quality Modeling Files_2016v3 Platform" which can be found in the docket for this final action.

**2. Air Quality Modeling Platform**

The EPA used version 3 of the 2016-based air quality modeling platform (i.e., 2016v3) to provide the foundational model-input data sets for 2016 and 2023. In addition to emissions data for 2016 and 2023, this platform includes meteorology, initial and boundary condition concentrations, and other inputs representative of the 2016 base year. In response to public comments on the 2016v2 base year and projected emissions inventories, the 2016v3 emissions platform includes numerous updates to both anthropogenic and biogenic emissions and the addition of NOx emissions from lightning strikes. These updates are described in the document *Preparation of Emissions Inventories for the 2016v3 North American Emissions Modeling Platform* available in the docket for this final action.

*2.1 Air Quality Model Configuration and Model Simulations*

The photochemical model simulations performed for this final action used the Comprehensive Air Quality Model with Extensions (CAMx version 7.10, Ramboll, 2021). CAMx is a three-dimensional grid-based Eulerian air quality model designed to simulate the formation and fate of oxidant precursors, primary and secondary particulate matter concentrations, and deposition over regional and urban spatial scales (e.g., the contiguous U.S.). Consideration of the different processes (e.g., transport and deposition) that affect primary (directly emitted) and secondary (formed by atmospheric processes) pollutants at the regional scale in different locations is fundamental to understanding and assessing the effects of emissions on air quality concentrations. For this final action, as in the CSAPR Update, Revised CSAPR Update, and the proposed disapprovals, the EPA used the CAMx Ozone Source Apportionment Technology/Anthropogenic Precursor Culpability Analysis (OSAT/APCA) technique[6] to model ozone contributions, as described below in section 4.

The geographic extent of the modeling domains that were used for air quality modeling in this analysis are shown in Figure 2-1. The large outer domain covers the 48 contiguous states along with most of Canada and all of Mexico with a horizontal resolution of 36 x 36 km (i.e., 36 km domain). The inner domain covers the 48 contiguous states along with adjacent portions of Canada and Mexico at 12 x 12 km resolution (i.e., 12 km domain).

---

[6] As part of this technique, ozone formed from reactions between biogenic VOC and NO$_X$ with anthropogenic NO$_X$ and VOC are assigned to the source of anthropogenic emissions.



Figure 2-1. Air quality modeling domains.

CAMx requires a variety of input files that contain information pertaining to the modeling domain and simulation period. These include gridded, hourly emissions estimates and meteorological data, and initial and boundary concentrations. Separate emissions inventories were prepared for the 2016 base year and the 2023 projection. All other inputs (i.e., meteorological fields, initial concentrations, ozone column, photolysis rates, and boundary concentrations) were specified for the 2016 base year model application and remained unchanged for the projection-year model simulation.[7]

The 12 km CAMx model simulations performed for this final action are listed in Table 2-1. The simulation period for each run was preceded by a 15-day ramp-up period.

Table 2-1. Model run name, case name and simulation period for each model run.[8]

| Analytic Year | Model Run | Case Name | Simulation Period |
|---|---|---|---|
| 2016 | 2016 baseline | 2016gf | Annual |
| 2023 | 2023 baseline | 2023gf | Annual |
| | 2023 state total anthropogenic contributions | 2023gf_ussa | May - September |

[7] The EPA used the CAMx7.1chemparam.CB6r5_CF2E chemical parameter file for all the CAMx model runs described in this TSD.

[8] Because the model simulations run in Greenwich Mean Time (GMT), the actual simulation period included October 1 in order to obtain MDA8 ozone concentrations based on local time for September 30.

*2.2 Meteorological Data for 2016*

This section describes the meteorological modeling that was performed to provide meteorological data for 2016 for input to air quality modeling. Note that the EPA used the same meteorological data for the 2016v3 air quality modeling as was used for the 2016v2 air quality modeling.

The 2016 meteorological data were derived from running Version 3.8 of the Weather Research Forecasting Model (WRF) (Skamarock, et al., 2008). The meteorological outputs from WRF include hourly-varying horizontal wind components (i.e., speed and direction), temperature, moisture, vertical diffusion rates, and rainfall rates for each grid cell in each vertical layer. Selected physics options used in the WRF simulations include Pleim-Xiu land surface model (Xiu and Pleim, 2001; Pleim and Xiu, 2003), Asymmetric Convective Model version 2 planetary boundary layer scheme (Pleim 2007a,b), Kain-Fritsch cumulus parameterization (Kain, 2004) utilizing the moisture-advection trigger (Ma and Tan, 2009), Morrison double moment microphysics (Morrison et al., 2005; Morrison and Gettelman, 2008), and RRTMG longwave and shortwave radiation schemes (Iacono et.al., 2008).

Both the 36 km and 12 km WRF model simulations utilize a Lambert conformal projection centered at (-97,40) with true latitudes of 33 and 45 degrees north. The 36 km domain contains 184 cells in the X direction and 160 cells in the Y direction. The 12 km domain contains 412 cells in the X direction and 372 cells in the Y direction. The atmosphere is resolved with 35 vertical layers up to 50 mb (see Table 2-2), with the thinnest layers being nearest the surface to better resolve the planetary boundary layer (PBL).

The 36 km WRF model simulation was initialized using the 0.25-degree GFS analysis and 3-hour forecast from the 00 GMT, 06 GMT, 12 GMT, and 18 GMT simulations. The 12 km model was initialized using the 12 km North American Model (12NAM) analysis product provided by National Climatic Data Center (NCDC).[9] The 40 km Eta Data Assimilation System (EDAS) analysis (ds609.2) from the National Center for Atmospheric Research (NCAR) was used where 12NAM data was unavailable.[10] Analysis nudging for temperature, wind, and moisture was applied above the boundary layer only. The model simulations were conducted continuously. The 'ipxwrf' program was used to initialize deep soil moisture at the start of the run using a 10-day spin-up period (Gilliam and Pleim, 2010). Land use and land cover data were based on the USGS for the 36NOAM simulation and the

---

[9] https://www.ncdc.noaa.gov/data-access/model-data/model-datasets/north-american-mesoscale-forecast-system-nam

[10] https://www.ready.noaa.gov/edas40.php.

2011 National Land Cover Database (NLCD 2011) for the 12US simulation. Sea surface temperatures were ingested from the Group for High Resolution Sea Surface Temperatures (GHRSST) (Stammer et al., 2003) 1 km SST data. Additionally, lightning data assimilation was utilized to suppress (force) deep convection where lightning is absent (present) in observational data. This method is described by Heath et al. (2016) and was employed to help improve precipitation estimates generated by the model.

Table 2-2. Vertical layers and their approximate height above ground level.

| WRF Layer | Height (m) | Pressure (mb) | Sigma |
|---|---|---|---|
| 35 | 17,556 | 5000 | 0.000 |
| 34 | 14,780 | 9750 | 0.050 |
| 33 | 12,822 | 14500 | 0.100 |
| 32 | 11,282 | 19250 | 0.150 |
| 31 | 10,002 | 24000 | 0.200 |
| 30 | 8,901 | 28750 | 0.250 |
| 29 | 7,932 | 33500 | 0.300 |
| 28 | 7,064 | 38250 | 0.350 |
| 27 | 6,275 | 43000 | 0.400 |
| 26 | 5,553 | 47750 | 0.450 |
| 25 | 4,885 | 52500 | 0.500 |
| 24 | 4,264 | 57250 | 0.550 |
| 23 | 3,683 | 62000 | 0.600 |
| 22 | 3,136 | 66750 | 0.650 |
| 21 | 2,619 | 71500 | 0.700 |
| 20 | 2,226 | 75300 | 0.740 |
| 19 | 1,941 | 78150 | 0.770 |
| 18 | 1,665 | 81000 | 0.800 |
| 17 | 1,485 | 82900 | 0.820 |
| 16 | 1,308 | 84800 | 0.840 |
| 15 | 1,134 | 86700 | 0.860 |
| 14 | 964 | 88600 | 0.880 |
| 13 | 797 | 90500 | 0.900 |
| 12 | 714 | 91450 | 0.910 |
| 11 | 632 | 92400 | 0.920 |
| 10 | 551 | 93350 | 0.930 |
| 9 | 470 | 94300 | 0.940 |
| 8 | 390 | 95250 | 0.950 |
| 7 | 311 | 96200 | 0.960 |
| 6 | 232 | 97150 | 0.970 |
| 5 | 154 | 98100 | 0.980 |
| 4 | 115 | 98575 | 0.985 |
| 3 | 77 | 99050 | 0.990 |
| 2 | 38 | 99525 | 0.995 |
| 1 | 19 | 99763 | 0.9975 |
| Surface | 0 | 100000 | 1.000 |

Details of the annual 2016 meteorological model simulation and evaluation are provided in a separate technical support document, which can be found in the docket for this final action.[11]

The meteorological data generated by the WRF simulations were processed using wrfcamx v4.7 (Ramboll 2021) meteorological data processing program to create 35-layer gridded model-ready meteorological inputs to CAMx. In running wrfcamx, vertical eddy diffusivities (Kv) were calculated using the Yonsei University (YSU) (Hong and Dudhia, 2006) mixing scheme. We used a minimum Kv of 0.1 $m^2$/sec except for urban grid cells where the minimum Kv was reset to 1.0 $m^2$/sec within the lowest 200 m of the surface in order to enhance mixing associated with the nighttime "urban heat island" effect. In addition, we invoked the subgrid convection and subgrid stratoform cloud options in our wrfcamx run for 2016.

### 2.3 Initial and Boundary Concentrations

The lateral boundary and initial species concentrations for the 36 km simulations were derived from outputs of a three-dimensional global atmospheric chemistry model, GEOS-Chem global model (I. Bey, et al., 2001) which was run for 2016.  The GEOS-Chem predictions were used to provide one-way dynamic boundary concentrations at one-hour intervals and an initial concentration field for the 36 km CAMx simulations for 2016 and 2023. In the 2016v2 modeling for the proposed actions, the EPA used the hemispheric version of the Community Multi-scale Air Quality Model (H-CMAQ).[12] The basis for selecting GEOS-Chem for the 2016v3 modeling is discussed in Appendix A.

Air quality modeling for the 36 km domain was used to provide initial and boundary conditions for the nested 12 km domain model simulations. Both the 36 km and 12 km modeling domains have 35 vertical layers with a top at about 17,550 meters, or 50 millibars (mb). The model simulations produce hourly air quality concentrations for each grid cell across each modeling domain. Modeling for the 36 km domain was performed for 2016 and 2023. Outputs from the 2016 36 km simulation were used to provide initial and boundary conditions for the 2016 12 km model simulation. Outputs from the 2023 36 km simulation were used to provide initial and boundary conditions for the 202312 km simulations.

---

[11] Meteorological Modeling for 2016.docx.

[12] More information about the H-CMAQ model and other applications using this tool is available at: https://www.epa.gov/cmaq/hemispheric-scale-applications. Note that the EPA used the same initial and boundary conditions for the 2016v2 air quality modeling as was used for the 2016v1 air quality modeling.

*2.5 Air Quality Model Evaluation*

An operational model performance evaluation for ozone was conducted to examine the ability of the 2016v3 CAMx modeling system to simulate 2016 measured MDA8 ozone concentrations. This evaluation focused on graphical analyses and statistical metrics of model predictions versus observations. Details on the evaluation methodology, the calculation of performance statistics, and results are provided in Appendix B. Overall, the ozone model performance statistics for the CAMx 2016v3 simulation are within the ranges found in other recent peer-reviewed applications (e.g., Simon et al, 2012 and Emory et al, 2017). As described in Appendix B, model performance for the 2016v3 platform is notably improved compared to model performance for the 2016v2 platform. The model performance results demonstrate the scientific credibility of our 2016v3 modeling platform. These results provide confidence in the ability of the modeling platform to provide a reasonable projection of expected future year ozone concentrations and contributions. Model performance statistics for individual monitoring sites for the period May through September are provided in a spreadsheet file in the docket for this final action.[13]

# 3. Identification of Future Nonattainment and Maintenance Receptors in 2023

*3.1 Definition of Nonattainment and Maintenance Receptors*

The ozone predictions from the 2016 base year and future case CAMx model simulations were used to calculate average and maximum ozone design values for the 2023 analytic year using the approach described in this section. Following the approach used for the proposed actions, we evaluated projected average and maximum design values in conjunction with the most recent measured ozone design values (i.e., 2021)[14] to identify nonattainment or maintenance sites in each of the three future years. Those monitoring sites with future year average design values that exceed the NAAQS (i.e., average design values of 71 ppb or greater)[15] and that are currently measuring nonattainment are considered to be nonattainment receptors. Similarly, monitoring sites with a projected maximum design value that exceeds the NAAQS are projected to be maintenance receptors. Maintenance-only receptors include those monitoring sites where the projected average design value is below the NAAQS, but the maximum design value is above the NAAQS, and

---

[13] CAMx 2016v2 MDA8 O3 Model Performance Stats by Site.

[14] The 2021 design values are the most current official design values available for use in this final action. The 2021 ozone design values, by monitoring site, can be found in the following file in the docket: 2010 thru 2021 Ozone Design Values.

[15] In determining compliance with the NAAQS, ozone design values are truncated to integer values. For example, a design value of 70.9 parts per billion (ppb) is truncated to 70 ppb which is attainment. In this manner, design values at or above 71.0 ppb are considered to be violations of the NAAQS.

monitoring sites with projected average design values that exceed the NAAQS, but for which current design values based on measured data do not exceed the NAAQS.[16] In addition, as described in the preamble for this final action, the EPA received comments stating that our methodology to identify receptors in 2023 appears overly optimistic in light of current measured data. These commenters suggest that the EPA give greater weight to current measured data as part of the method for identifying projected receptors. In response to these comments the EPA has developed an additional maintenance-only receptor category, which includes what we refer to as "violating monitor" receptors. Specifically, the EPA has identified "violating monitor" receptors as those monitoring sites with measured 2021 and preliminary 2022 design values *and* 4th high maximum daily MDA8 ozone concentrations in both 2021 and 2022 (preliminary data) that exceed the NAAQS, although model-projected design values for 2023 are below the NAAQS.[17]

The procedures for calculating projected average and maximum design values are described below. The monitoring sites that are projected to be nonattainment and/or maintenance-only receptors for the ozone NAAQS in the 2023 are used for assessing the contribution of emissions in upwind states to downwind nonattainment and maintenance of the 2015 ozone NAAQS as part of this final action.

### 3.2 Approach for Projecting Ozone Design Values

The ozone predictions from the 2016 and 2023 model simulations were used to project ambient (i.e., measured) ozone design values (DVs) to 2023 based on an approach that follows from the EPA's guidance for attainment demonstration modeling (US EPA, 2018),[18] as summarized here. The modeling guidance recommends using 5-year weighted average ambient design values centered on the base modeling year as the starting point for projecting average design values to the future. Because 2016 is the base emissions year, we used the average ambient 8-hour ozone design values for the period 2014 through 2018 (i.e., the average of design values for 2014-2016, 2015-2017 and 2016-2018) to calculate the 5-year weighted average design values (i.e., 2016-centered design values). The

---

[16] The EPA's modeling guidance notes that projecting the highest (i.e., maximum) design value from the base period provides an approach for evaluating attainment in periods with meteorological conditions especially conducive to high ozone concentrations.

[17] 2021 4th high MDA8 ozone concentrations and preliminary 2022 design values and 4th high MDA8 ozone concentrations for violating monitor receptors are provided in Table 3-3. Daily MDA8 ozone concentrations which can be used to identify the 4th high values in 2021 and the preliminary 4th high values in 2022 for other monitoring sites can be obtained from data files available for download at the following website https://www.epa.gov/outdoor-air-quality-data/download-daily-data

[18] The EPA's ozone attainment demonstration modeling guidance is referred to as "the modeling guidance" in the remainder of this document.

5-year weighted average ambient design value at each site was projected to 2023 using the Software for Model Attainment Test Software – Community Edition (SMAT-CE)[19]. This program calculates the 5-year weighted average design value based on observed data and projects future year values using the relative response predicted by the model. Equation (3-1) describes the recommended model attainment test in its simplest form, as applied for monitoring site $i$:

$$(DVF)_i = (RRF)_i * (DVB)_i \qquad \text{Equation 3-1}$$

$DVF_i$ is the estimated design value for the future year at monitoring site $i$; $RRF_i$ is the relative response factor for monitoring site $i$; and $DVB_i$ is the base period design value monitored at site $i$. The relative response factor for each monitoring site $(RRF)_i$ is the fractional change in MDA8 ozone between the base and future year. The RRF is based on the average ozone on model-predicted "high" ozone days in grid cells in the vicinity of the monitoring site. The modeling guidance recommends calculating RRFs based on the highest 10 modeled ozone days in the base year simulation at each monitoring site. Specifically, the RRF for an individual monitoring site is the ratio of the average MDA8 ozone concentration in the future year to the average MDA8 concentration in the 2016 base year. The average values are calculated using MDA8 model predictions in the future year and in 2016 for the 10 highest days in the 2016 base year modeling. For cases in which the base year model simulation does not have 10 days with ozone values >= 60 ppb at a site, we use all days with ozone >= 60 ppb, as long as there were at least 5 days that meet this criterion. At monitor locations with less than 5 days with modeled 2016 base year ozone >= 60 ppb, no RRF or DVF is calculated for the site and the monitor in question was not included in this analysis.

The modeling guidance recommends calculating the RRF using the base year and future year model predictions from the cells immediately surrounding the monitoring site along with the grid cell in which the monitor is located. In this approach the RRF was based on a 3 x 3 array of 12 km grid cells centered on the location of the grid cell containing the monitor.

As in the proposal, the EPA also projects design values based on a modified version of the "3 x 3" approach for those monitoring sites located in coastal areas. In this alternative approach, the EPA eliminated from the RRF calculations the modeling data in those grid cells that are dominated by water (i.e., more than 50 percent of the area in the grid cell is water) and that do not contain a monitoring site (i.e., if a grid cell is more than 50 percent water but contains an air quality monitor, that cell would remain in the calculation). The choice of more than 50 percent of the grid cell area as

---

[19] Software download and documentation available at https://www.epa.gov/scram/photochemical-modeling-tools

water as the criteria for identifying overwater grid cells is based on the treatment of land use in the Weather Research and Forecasting model (WRF).[20] Specifically, in the WRF meteorological model those grid cells that are greater than 50 percent overwater are treated as being 100 percent overwater. In such cases the meteorological conditions in the entire grid cell reflect the vertical mixing and winds over water, even if part of the grid cell also happens to be over land with land-based emissions, as can often be the case for coastal areas. Overlaying land-based emissions with overwater meteorology may be representative of conditions at coastal monitors during times of on-shore flow associated with synoptic conditions and/or sea-breeze or lake-breeze wind flows. But there may be other times, particularly with off-shore wind flow when vertical mixing of land-based emissions may be too limited due to the presence of overwater meteorology. Thus, for this modeling projected average and maximum design values were calculated for individual monitoring sites based on both the "3 x 3" approach as well as the alternative approach that eliminates overwater cells in the RRF calculation for near-coastal areas (i.e., "no water" approach).

For both the "3 x 3" approach and the "no water" approach, the grid cell with the highest base year MDA8 ozone concentration on each day in the applicable array of grid cells surrounding the location of the monitoring site[21] is used for both the base and future components of the RRF calculation. That is, the base and future year data are paired in space for the grid cell that has the highest MDA8 concentration on the given day.

The approach for calculating projected maximum design values is similar to the approach for calculating the projected average design values. To calculate projected maximum design values we start with the highest (i.e., maximum) ambient design value from the 2016-centered 5-year period (i.e., the maximum of design values from 2014-2016, 2014-2017, and 2016-2018). The base period maximum design value at each site was projected to 2023using the site-specific RRFs, as determined using the procedures for calculating RRFs described above.

For this final action, the EPA is relying upon design values based on the "no water" approach for identifying nonattainment and maintenance receptors and for calculating contributions, as described in section 4, below.

---

[20] https://www.mmm.ucar.edu/weather-research-and-forecasting-model.
[21] For the "3 x 3" approach the applicable array contains the 9 grid cells that surround and include the grid cell containing the monitoring site. The applicable array for the "no water" approach includes the grid cell containing the monitoring site along with the subset of the "3 x 3" grid cells that are not classified as "water" grid cells using the criteria described in this TSD.

Consistent with the truncation and rounding procedures for the 8-hour ozone NAAQS, the projected design values are truncated to integers in units of ppb.[22] Therefore, projected design values that are greater than or equal to 71 ppb are considered to be violating the 2015 ozone NAAQS. For those sites that are projected to be violating the NAAQS based on the projected average design values, we examined the design values for 2021, which are the most recent concurred measured design values at the time of this final action.[23] As noted above, we identify nonattainment receptors as those sites that are violating the NAAQS based on current measured air quality and also have projected average design values of 71 ppb or greater. Maintenance-only receptors identified based on monitoring plus modeling include both (1) those sites with projected average design values above the NAAQS that are currently measuring clean data and (2) those sites with projected average design values below the level of the NAAQS, but with projected maximum design values of 71 ppb or greater.[24] As noted above, the EPA also identified as maintenance-only receptors those monitoring sites with measured 2021 and preliminary 2022 design values *and* 4th high maximum daily MDA8 ozone concentrations in both 2021 and 2022 (preliminary data) that exceed the NAAQS, although model-projected design values for 2023 are below the NAAQS.

The 2016-centered base period average and maximum design values, the projected average and maximum design values for 2023 and the 2021 design values for monitoring sites that are projected to be nonattainment or maintenance-only receptors in 2023 based on monitoring and modeling using the "no water" approach are provided in Tables 3-1 and 3-2, respectively.[25] In total, in the 2023 base case there are a total of 33 projected modeling-based receptors nationwide including

---

[22] 40 CFR Part 50, Appendix U to Part 50 – Interpretation of the Primary and Secondary National Ambient Air Quality Standards for Ozone.
[23] Official, concurred ozone design values for 2010 through 2021 are provided in the file: 2010 Thru 2021Ozone Design Values. Preliminary, un-concurred, 2022 design values are provided in the file Preliminary_2022 Design Values. Both of these files can be found in the docket for this final action.

[24] In addition to the maintenance-only receptors, the projected nonattainment receptors are also maintenance receptors because the maximum design values for each of these sites is always greater than or equal to the average design value.
[25] The "3 x 3" approach and the "no water" approach result in the same set of receptors. That is, the receptors identified based on the "3 x 3" approach are also the receptors identified based on the "no water" approach. However, using design values from the "3 x 3" approach, the maintenance-only receptor at site 550590019 in Kenosha County, WI would become a nonattainment receptor because the average design value with the "3 x 3" approach is 72.0 ppb versus 70.8 ppb with the "no water" approach. In addition, the maintenance-only receptor at site 090099002 in New Haven County, CT would become a nonattainment receptor using the "no water" approach because the average design value with the "3 x 3" approach is 71.2 ppb versus 70.5 ppb with the "no water" approach.
Projected design values for 2023 based on both the "3 x 3" and "no water" approaches for individual monitoring sites nationwide are provided in the file "2016v3_DVs_state_contributions" which can be found in the docket for this final action.

14 nonattainment receptors in 9 different counties and 19 maintenance-only receptors in 13 additional counties (Harris County, TX has both nonattainment and maintenance-only receptors).[26]

The projected average and maximum design values for 2023 and the 2021 and preliminary 2022 design values and the 2021 and preliminary 2022 4th high values for monitoring sites that are identified as "violating monitor" maintenance-only receptors in 2023 are provided in Tables 3-3. There are 49 monitoring sites that are identified as "violating-monitor" maintenance-only receptors in 2023. As noted earlier in this section, the EPA uses the approach of considering "violating-monitor" maintenance-only receptors as confirmatory of the proposal's identification of receptors and does not implicate additional linked states in this final action. Rather, using this approach serves to strengthen the analytical basis for our Step 2 findings by establishing that many upwind states covered in this action are also projected to contribute above 1 percent of the NAAQS to these additional "violating monitor" maintenance-only receptors.

Table 3-1. Average and maximum 2016-centered and 2023 base case 8-hour ozone design values and 2021 design values (ppb) at projected nonattainment receptors in 2023.

| Monitor ID | State | County | 2016 Centered Average | 2016 Centered Maximum | 2023 Average | 2023 Maximum | 2021 |
|---|---|---|---|---|---|---|---|
| 060650016 | CA | Riverside | 79.0 | 80.0 | 72.2 | 73.1 | 78 |
| 060651016 | CA | Riverside | 99.7 | 101.0 | 91.0 | 92.2 | 95 |
| 080350004 | CO | Douglas | 77.3 | 78 | 71.3 | 71.9 | 83 |
| 080590006 | CO | Jefferson | 77.3 | 78 | 72.8 | 73.5 | 81 |
| 080590011 | CO | Jefferson | 79.3 | 80 | 73.5 | 74.1 | 83 |
| 090010017 | CT | Fairfield | 79.3 | 80 | 71.6 | 72.2 | 79 |
| 090013007 | CT | Fairfield | 82.0 | 83 | 72.9 | 73.8 | 81 |
| 090019003 | CT | Fairfield | 82.7 | 83 | 73.3 | 73.6 | 80 |
| 481671034 | TX | Galveston | 75.7 | 77 | 71.5 | 72.8 | 72 |
| 482010024 | TX | Harris | 79.3 | 81 | 75.1 | 76.7 | 74 |
| 490110004 | UT | Davis | 75.7 | 78 | 72.0 | 74.2 | 78 |
| 490353006 | UT | Salt Lake | 76.3 | 78 | 72.6 | 74.2 | 76 |

[26] The EPA's modeling also projects that three monitoring sites in the Uinta Basin (i.e., monitor 490472003 in Uintah County, Utah and monitors 490130002 and 490137011 in Duchesne County, Utah) will have average design values above the NAAQS in 2023. However, as noted in the proposed rule, the Uinta Basin nonattainment area was designated as nonattainment for the 2015 ozone NAAQS not because of an ongoing problem with summertime ozone (as is usually the case in other parts of the country), but instead because it violates the ozone NAAQS in winter. The main causes of the Uinta Basin's wintertime ozone are sources located at low elevations within the Basin, the Basin's unique topography, and the influence of the wintertime meteorologic inversions that keep ozone and ozone precursors near the Basin floor and restrict air flow in the Basin. Because of the localized nature of the ozone problem at these sites the EPA has not identified these three monitors as receptors in Step 1 of this proposed rule.

| Monitor ID | State | County | 2016 Centered Average | 2016 Centered Maximum | 2023 Average | 2023 Maximum | 2021 |
|---|---|---|---|---|---|---|---|
| 490353013 | UT | Salt Lake | 76.5 | 77 | 73.3 | 73.8 | 76 |
| 551170006 | WI | Sheboygan | 80.0 | 81 | 72.7 | 73.6 | 72 |

Table 3-2. Average and maximum 2016-centered and 2023 base case 8-hour ozone design values and 2021 design values (ppb) at projected maintenance-only receptors.

| Monitor ID | State | County | 2016 Centered Average | 2016 Centered Maximum | 2023 Average | 2023 Maximum | 2021 |
|---|---|---|---|---|---|---|---|
| 40278011 | AZ | Yuma | 72.3 | 74 | 70.4 | 72.1 | 67 |
| 80690011 | CO | Larimer | 75.7 | 77 | 70.9 | 72.1 | 77 |
| 90099002 | CT | New Haven | 79.7 | 82 | 70.5 | 72.6 | 82 |
| 170310001 | IL | Cook | 73.0 | 77 | 68.2 | 71.9 | 71 |
| 170314201 | IL | Cook | 73.3 | 77 | 68.0 | 71.5 | 74 |
| 170317002 | IL | Cook | 74.0 | 77 | 68.5 | 71.3 | 73 |
| 350130021 | NM | Dona Ana | 72.7 | 74 | 70.8 | 72.1 | 80 |
| 350130022 | NM | Dona Ana | 71.3 | 74 | 69.7 | 72.4 | 75 |
| 350151005 | NM | Eddy | 69.7 | 74 | 69.7 | 74.1 | 77 |
| 350250008 | NM | Lea | 67.7 | 70 | 69.8 | 72.2 | 66 |
| 480391004 | TX | Brazoria | 74.7 | 77 | 70.4 | 72.5 | 75 |
| 481210034 | TX | Denton | 78.0 | 80 | 69.8 | 71.6 | 74 |
| 481410037 | TX | El Paso | 71.3 | 73 | 69.8 | 71.4 | 75 |
| 482010055 | TX | Harris | 76.0 | 77 | 70.9 | 71.9 | 77 |
| 482011034 | TX | Harris | 73.7 | 75 | 70.1 | 71.3 | 71 |
| 482011035 | TX | Harris | 71.3 | 75 | 67.8 | 71.3 | 71 |
| 530330023 | WA | King | 73.3 | 77 | 67.6 | 71.0 | 64 |
| 550590019 | WI | Kenosha | 78.0 | 79 | 70.8 | 71.7 | 74 |
| 551010020 | WI | Racine | 76.0 | 78 | 69.7 | 71.5 | 73 |

Table 3-3. Average and maximum 2023 design values, and 2021 and preliminary 2022 design values and 4th high values at violating monitors (ppb).*

| Monitor ID | State | County | 2023 Average | 2023 Maximum | 2021 | 2022 P* | 2021 4th High | 2022 P 4th High |
|---|---|---|---|---|---|---|---|---|
| 040070010 | AZ | Gila | 67.9 | 69.5 | 77 | 76 | 75 | 74 |
| 040130019 | AZ | Maricopa | 69.8 | 70.0 | 75 | 77 | 78 | 76 |
| 040131003 | AZ | Maricopa | 70.1 | 70.7 | 80 | 80 | 83 | 78 |
| 040131004 | AZ | Maricopa | 70.2 | 70.8 | 80 | 81 | 81 | 77 |

| Monitor ID | State | County | 2023 Average | 2023 Maximum | 2021 | 2022 P* | 2021 4th High | 2022 P 4th High |
|---|---|---|---|---|---|---|---|---|
| 040131010 | AZ | Maricopa | 68.3 | 69.2 | 79 | 80 | 80 | 78 |
| 040132001 | AZ | Maricopa | 63.8 | 64.1 | 74 | 78 | 79 | 81 |
| 040132005 | AZ | Maricopa | 69.6 | 70.5 | 78 | 79 | 79 | 77 |
| 040133002 | AZ | Maricopa | 65.8 | 65.8 | 75 | 75 | 81 | 72 |
| 040134004 | AZ | Maricopa | 65.7 | 66.6 | 73 | 73 | 73 | 71 |
| 040134005 | AZ | Maricopa | 62.3 | 62.3 | 73 | 75 | 79 | 73 |
| 040134008 | AZ | Maricopa | 65.6 | 66.5 | 74 | 74 | 74 | 71 |
| 040134010 | AZ | Maricopa | 63.8 | 66.9 | 74 | 76 | 77 | 75 |
| 040137020 | AZ | Maricopa | 67.0 | 67.0 | 76 | 77 | 77 | 75 |
| 040137021 | AZ | Maricopa | 69.8 | 70.1 | 77 | 77 | 78 | 75 |
| 040137022 | AZ | Maricopa | 68.2 | 69.1 | 76 | 78 | 76 | 79 |
| 040137024 | AZ | Maricopa | 67.0 | 67.9 | 74 | 76 | 74 | 77 |
| 040139702 | AZ | Maricopa | 66.9 | 68.1 | 75 | 77 | 72 | 77 |
| 040139704 | AZ | Maricopa | 65.3 | 66.2 | 74 | 77 | 76 | 76 |
| 040139997 | AZ | Maricopa | 70.5 | 70.5 | 76 | 79 | 82 | 76 |
| 040218001 | AZ | Pinal | 67.8 | 69.0 | 75 | 76 | 73 | 77 |
| 080013001 | CO | Adams | 63.0 | 63.0 | 72 | 77 | 79 | 75 |
| 080050002 | CO | Arapahoe | 68.0 | 68.0 | 80 | 80 | 84 | 73 |
| 080310002 | CO | Denver | 63.6 | 64.8 | 72 | 74 | 77 | 71 |
| 080310026 | CO | Denver | 64.5 | 64.8 | 75 | 77 | 83 | 72 |
| 090079007 | CT | Middlesex | 68.7 | 69.0 | 74 | 73 | 78 | 73 |
| 090110124 | CT | New London | 65.5 | 67.0 | 73 | 72 | 75 | 71 |
| 170310032 | IL | Cook | 67.3 | 69.8 | 75 | 75 | 77 | 72 |
| 170311601 | IL | Cook | 63.8 | 64.5 | 72 | 73 | 72 | 71 |
| 181270024 | IN | Porter | 63.4 | 64.6 | 72 | 73 | 72 | 73 |
| 260050003 | MI | Allegan | 66.2 | 67.4 | 75 | 75 | 78 | 73 |
| 261210039 | MI | Muskegon | 67.5 | 68.4 | 74 | 79 | 75 | 82 |
| 320030043 | NV | Clark | 68.4 | 69.4 | 73 | 75 | 74 | 74 |
| 350011012 | NM | Bernalillo | 63.8 | 66.0 | 72 | 73 | 76 | 74 |
| 350130008 | NM | Dona Ana | 65.6 | 66.3 | 72 | 76 | 79 | 78 |
| 361030002 | NY | Suffolk | 66.2 | 68.0 | 73 | 74 | 79 | 74 |
| 390850003 | OH | Lake | 64.3 | 64.6 | 72 | 74 | 72 | 76 |
| 480290052 | TX | Bexar | 67.1 | 67.8 | 73 | 74 | 78 | 72 |
| 480850005 | TX | Collin | 65.4 | 66.0 | 75 | 74 | 81 | 73 |
| 481130075 | TX | Dallas | 65.3 | 66.5 | 71 | 71 | 73 | 72 |
| 481211032 | TX | Denton | 65.9 | 67.7 | 76 | 77 | 85 | 77 |
| 482010051 | TX | Harris | 65.3 | 66.3 | 74 | 73 | 83 | 72 |
| 482010416 | TX | Harris | 68.8 | 70.4 | 73 | 73 | 78 | 71 |
| 484390075 | TX | Tarrant | 63.8 | 64.7 | 75 | 76 | 76 | 77 |
| 484391002 | TX | Tarrant | 64.1 | 65.7 | 72 | 77 | 76 | 80 |
| 484392003 | TX | Tarrant | 65.2 | 65.9 | 72 | 72 | 74 | 72 |

| Monitor ID | State | County | 2023 Average | 2023 Maximum | 2021 | 2022 P* | 2021 4th High | 2022 P 4th High |
|---|---|---|---|---|---|---|---|---|
| 484393009 | TX | Tarrant | 67.5 | 68.1 | 74 | 75 | 75 | 75 |
| 490571003 | UT | Weber | 69.3 | 70.3 | 71 | 74 | 77 | 71 |
| 550590025 | WI | Kenosha | 67.6 | 70.7 | 72 | 73 | 72 | 71 |
| 550890008 | WI | Ozaukee | 65.2 | 65.8 | 71 | 72 | 72 | 72 |

* 2022 preliminary design values are based on 2022 measured MDA8 concentrations provided by state air agencies to the EPA's Air Quality System (AQS), as of January 3, 2023.

## 4. Ozone Contribution Modeling

As noted above, the EPA performed nationwide, state-level ozone source apportionment modeling using the CAMx OSAT/APCA technique to provide data on the contribution of projected 2023 NO$_X$ and VOC emissions from anthropogenic source sectors in each state. The state-by-state anthropogenic source apportionment modeling is described in section 4.1. In section 4.2 we describe the method for calculating the average contribution metric for each source apportionment model run and in section 4.3 we present the results of the state-by-state all anthropogenic modeling.

*4.1 State-by-State All Anthropogenic Modeling*

In the state-by-state source apportionment model run, we tracked the ozone formed from each of the following contribution categories (i.e., "tags"):

- States – anthropogenic NO$_X$ and VOC emissions from each of the contiguous 48 states and the District of Columbia tracked individually (emissions from all anthropogenic sectors in a given state were combined);

- Biogenics – biogenic NOx and VOC emissions domain-wide;

- Initial and Boundary Concentrations – air quality concentrations used to initialize the 12 km model simulation and air quality concentrations transported into the 12 km modeling domain from the lateral boundaries;

- Tribes – the collective emissions from those tribal lands for which we have point source inventory data in the 2016v3 emissions platform (we did not model the contributions from individual tribes);

- Canada and Mexico – collective anthropogenic emissions from sources in the portions of Canada and Mexico that are within the 12 km modeling domain (contributions from Canada and Mexico were not modeled separately);

- Fires – combined emissions from wild and prescribed fires domain-wide within the 12 km

17

modeling domain;

- Offshore – total emissions from offshore marine vessels and offshore drilling platforms; and
- NOx emissions from lightning strikes.

The above-listed tagged sources account for all ozone sources simulated by the model such that the sum of tagged ozone contributions adds to the total modeled ozone at each hour and grid cell. The source apportionment modeling provided hourly contributions to ozone from anthropogenic $NO_X$ and VOC emissions in each state, individually, to ozone concentrations in each model grid cell. The contributions to ozone from chemical reactions between biogenic $NO_X$ and biogenic VOC emissions were modeled and assigned to the "biogenic" category. The contributions from wildfire and prescribed fire $NO_X$ and VOC emissions were modeled and assigned to the "fires" category. The contributions from the "biogenic", "offshore", and "fires" categories are not assigned to individual states nor are they included in the state contributions.

### 4.2 Method for Calculating the Contribution Metric

As noted above, CAMx state-by-state source apportionment model runs for 2023 were performed to obtain contributions for the period May through September using the projected 2023 emissions and 2016 meteorology. The resulting hourly contributions[27] from each tag were processed to calculate an 8-hour average contribution metric value for each tag at each monitoring site. The contribution metric values at each individual monitoring site are calculated using model predictions for the grid cell containing the monitoring site. The process for calculating the average contribution metric uses the source apportionment outputs in a "relative sense" to apportion the projected average design value at each monitoring location into contributions from each individual tag. This process is similar in concept to the approach described above for using model predictions to calculate future year ozone design values.

The basic approach used to calculate the average contribution metric values for 2023 is described by the following steps:

(1) For the model grid cells containing an ozone monitoring site, calculate the 8-hour average contribution from each source tag to each monitoring site for the time period of the 2023 modeled MDA8 ozone concentration on each day:

(2) Average the MDA8 concentrations for the top 10 modeled ozone concentration days in 2023 and average the 8-hour contributions for each of these same days for each tag;

---

[27] Contributions from anthropogenic emissions under "$NO_X$-limited" and "VOC-limited" chemical regimes were combined to obtain the net contribution from $NO_X$ and VOC anthropogenic emissions in each state.

(3) Divide the 10-day average contribution for each tag by the corresponding 10-day average concentration to obtain a Relative Contribution Factor (RCF) for each tag at each monitor; and

(4) Multiply the 2023 average design values by the corresponding RCF to produce the average contribution metric value for each tag at each monitoring site in 2023.

These steps are written out mathematically in Equation 4-1 where $C_{t,i}$ represents the contribution metric value from tag, $t$, to monitor, $i$, $DVF_{2023,i}$ represents the projected 2023 future year average DV at monitor, $i$, $O3C_{t,top10,i}$ is the average ozone *contribution* to MDA8 ozone from tag, $t$, across the top-10 future year MDA8 modeled days at monitor, $i$, and, $O3_{top10,i}$ is the average ozone *concentration* across the top-10 future year MDA8 modeled days at monitor, $i$..

$$C_{t,i} = DVF_{2023,i} \times \frac{O3C_{t,top10,i}}{O3_{top10,i}} \qquad \text{Equation 4-1}$$

The contribution metric values calculated from step 4 are truncated to two digits to the right of the decimal (e.g., a calculated contribution of 0.78963… is truncated to 0.78 ppb). As a result of truncation, the tabulated contributions may not always sum to the future year average design value at individual monitoring sites. In addition, when calculating the contribution metric values we applied a criteria that 5 or more of the top 10 model-predicted concentration days must have MDA8 concentrations >= 60 ppb in the future year in order to calculate a valid contribution metric. The criterion of having at least 5 days with MDA8 ozone concentrations >= 60 ppb was chosen to avoid including contributions on days that are well below the NAAQS in the calculation of the contribution metric. Using a minimum of 5 days up to a maximum of 10 days with MDA8 ozone >= 60 ppb aligns with recommendations in the EPA's air quality modeling guidance for projecting future year design values, as described above.

The contribution metric values for monitoring sites nationwide for the 2023 state-by-state source apportionment modeling s are provided in the file "2016v3_DVs_state_contributions" which can be found in the docket of this final action. Note that this file contains data for monitoring sites that meet the criteria for calculating valid contribution metric values, as described above.[28]

---

[28] Contribution metric values were not calculated for the Seattle Washington receptor because there were fewer than 5 days with future year MDA8 ozone concentrations >= 60 ppb at this receptor.

*4.3 Results of State-by-State All Anthropogenic Modeling*

The largest contribution from each state to monitoring plus modeled downwind receptors in 2023 is provided in Table 4-1.[29] The largest contribution from each state to "violating monitor" receptors in 2023 is provided in Table 4-2.

The contribution metric values from each state and the other source tags at individual nonattainment and maintenance-only sites in the 2023 state-by-state all anthropogenic model runs are provided in Appendix C. A table with the total upwind state collective contribution expressed as the percent of the 2023 ozone design value is provided in Appendix D. The upwind states linked to each downwind receptor are identified in Appendix E.

Table 4-1. Largest contribution from each state to downwind nonattainment and maintenance-only receptors in 2023 (ppb).

| Upwind State | Largest Contribution to Downwind Nonattainment Receptors | Largest Contribution to Downwind Maintenance-Only Receptors |
|---|---|---|
| Alabama | 0.75 | 0.65 |
| Arizona | 0.54 | 1.69 |
| Arkansas | 0.94 | 1.21 |
| California | 35.27 | 6.31 |
| Colorado | 0.14 | 0.18 |
| Connecticut | 0.01 | 0.01 |
| Delaware | 0.44 | 0.56 |
| District of Columbia | 0.03 | 0.04 |
| Florida | 0.50 | 0.54 |
| Georgia | 0.18 | 0.17 |
| Idaho | 0.42 | 0.41 |
| Illinois | 13.89 | 19.09 |
| Indiana | 8.90 | 10.03 |
| Iowa | 0.67 | 0.90 |
| Kansas | 0.46 | 0.52 |
| Kentucky | 0.84 | 0.79 |
| Louisiana | 9.51 | 5.62 |

---

[29] For California the largest contribution to a downwind receptor in 2023 is the contribution to monitoring site 060651016, which is a nonattainment receptor located on the Morongo Band of Mission Indians reservation in Riverside County, California. See the preamble for information on how the EPA considers transport to receptors on tribal lands in this final action.

| Upwind State | Largest Contribution to Downwind Nonattainment Receptors | Largest Contribution to Downwind Maintenance-Only Receptors |
|---|---|---|
| Maine | 0.02 | 0.01 |
| Maryland | 1.13 | 1.28 |
| Massachusetts | 0.33 | 0.15 |
| Michigan | 1.59 | 1.56 |
| Minnesota | 0.36 | 0.85 |
| Mississippi | 1.32 | 0.91 |
| Missouri | 1.87 | 1.39 |
| Montana | 0.08 | 0.10 |
| Nebraska | 0.20 | 0.36 |
| Nevada | 1.11 | 1.13 |
| New Hampshire | 0.10 | 0.02 |
| New Jersey | 8.38 | 5.79 |
| New Mexico | 0.36 | 1.59 |
| New York | 16.10 | 11.29 |
| North Carolina | 0.45 | 0.66 |
| North Dakota | 0.18 | 0.45 |
| Ohio | 2.05 | 1.98 |
| Oklahoma | 0.79 | 1.01 |
| Oregon | 0.46 | 0.31 |
| Pennsylvania | 6.00 | 4.36 |
| Rhode Island | 0.04 | 0.01 |
| South Carolina | 0.16 | 0.18 |
| South Dakota | 0.05 | 0.08 |
| Tennessee | 0.60 | 0.68 |
| Texas | 1.03 | 4.74 |
| Utah | 1.29 | 0.98 |
| Vermont | 0.02 | 0.01 |
| Virginia | 1.16 | 1.76 |
| Washington | 0.16 | 0.09 |
| West Virginia | 1.37 | 1.49 |
| Wisconsin | 0.21 | 2.86 |
| Wyoming | 0.68 | 0.67 |

Table 4-2. Largest contribution to downwind 8-hour ozone "violating monitor" maintenance-only receptors (ppb).

| Upwind State | Largest Contribution to Downwind Violating Monitor Maintenance-Only Receptors |
|---|---|
| Alabama | 0.79 |
| Arizona | 1.62 |
| Arkansas | 1.16 |
| California | 6.97 |
| Colorado | 0.39 |
| Connecticut | 0.17 |
| Delaware | 0.42 |
| District of Columbia | 0.03 |
| Florida | 0.50 |
| Georgia | 0.31 |
| Idaho | 0.46 |
| Illinois | 16.53 |
| Indiana | 9.39 |
| Iowa | 1.13 |
| Kansas | 0.82 |
| Kentucky | 1.57 |
| Louisiana | 5.06 |
| Maine | 0.02 |
| Maryland | 1.14 |
| Massachusetts | 0.39 |
| Michigan | 3.47 |
| Minnesota | 0.64 |
| Mississippi | 1.02 |
| Missouri | 2.95 |
| Montana | 0.12 |
| Nebraska | 0.43 |
| Nevada | 1.11 |
| New Hampshire | 0.10 |
| New Jersey | 8.00 |
| New Mexico | 0.34 |
| New York | 12.08 |
| North Carolina | 0.65 |
| North Dakota | 0.35 |
| Ohio | 2.25 |
| Oklahoma | 1.57 |
| Oregon | 0.36 |

| Upwind State | Largest Contribution to Downwind Violating Monitor Maintenance-Only Receptors |
|---|---|
| Pennsylvania | 5.20 |
| Rhode Island | 0.08 |
| South Carolina | 0.23 |
| South Dakota | 0.12 |
| Tennessee | 0.86 |
| Texas | 3.83 |
| Utah | 1.46 |
| Vermont | 0.03 |
| Virginia | 1.39 |
| Washington | 0.11 |
| West Virginia | 1.79 |
| Wisconsin | 5.10 |
| Wyoming | 0.42 |

In CSAPR, the CSAPR Update, and the Revised CSAPR Update, and in the proposal for this final action the EPA used a contribution screening threshold of 1 percent of the NAAQS to identify upwind states that may significantly contribute to downwind nonattainment and/or maintenance problems and which warrant further analysis to determine if emissions reductions might be required from each state to address the downwind air quality problem. The EPA determined that 1 percent was an appropriate threshold to use in Step 2 because there were important, even if relatively small, contributions to identified nonattainment and maintenance receptors from multiple upwind states. The EPA has historically found that the 1 percent threshold is appropriate for identifying interstate transport linkages for states collectively contributing to downwind ozone nonattainment or maintenance problems because that threshold captures a high percentage of the total pollution transport affecting downwind receptors. The EPA received numerous comments on the use of the 1 percent screening threshold. Responses to these comments can be found in the preamble and Response to Comments (RTC) document for this final action.

Based on the maximum downwind contribution data in Table 4-1, the following 21 states contribute at or above the 0.70 ppb threshold to downwind nonattainment receptors in 2023: Alabama, Arkansas, California, Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, Mississippi, Missouri, Nevada, New Jersey, New York, Ohio, Oklahoma, Pennsylvania, Texas, Utah, Virginia, and West Virginia. Based on the maximum downwind contribution data also in

Table 4-1, the following 23 states contribute at or above the 0.70 ppb threshold to downwind modeling-based maintenance-only receptors in 2023: Arizona, Arkansas, California, Illinois, Indiana, Iowa, Kentucky, Louisiana, Maryland, Michigan, Minnesota, Mississippi, Missouri, Nevada, New Jersey, New Mexico, New York, Ohio, Oklahoma, Texas, Virginia, West Virginia, and Wisconsin. Finally, based on the maximum downwind contribution in Table 4-2, the following additional states contribute at or above the 0.70 ppb threshold to downwind violating monitor maintenance-only receptors in 2023: Kansas and Tennessee. The EPA notes that Arizona, Iowa, Kansas, New Mexico, Tennessee, and Wyoming fall into one of two categories: (a) not linked to downwind receptors based on the 2016v2 modeling for the proposal, but that are now linked based on the 2016v3 modeling or are linked to a violating monitor; or (b) were linked to downwind receptors based on 2016v2 modeling for the proposal, but that are now not linked to any receptors based on the 2016v3 modeling or under the definition of receptors used at proposal.

The contributions for individual upwind/downwind linkages for each upwind state are provided in Appendix D. The upwind states linked to each receptor are provided in Appendix E.

5. **Back Trajectory Analysis**

As part of the assessment of interstate transport, the EPA used the HYSPLIT model (Stein, et al., 2017) to provide a "transport climatology" for individual nonattainment and maintenance-only receptors in 2023. This "transport climatology" provides a semi-quantitative approach to identify the predominant transport patterns and interannual variability in transport for days with measured exceedances. In this regard, the information from this analysis provides a qualitative method to corroborate upwind-downwind linkages derived from the air quality contribution modeling. In this analysis the EPA ran the HYSPLIT model to construct 96-hour back trajectories for days with measured exceedances during 2010 through 2021 at individual receptors. Back trajectories were created for three start times on each exceedance day (8:00 am, 12:00 pm, and 3:00 pm Local Time for each of six vertical elevations (100 m, 250 m, 500 m, 750 m, 1000 m, and 1500 m. Meteorological data from the North American Mesoscale meteorological model (NAM) with 12 km horizontal resolution were used in the HYSPLIT runs. The HYSPLIT outputs were processed to determine the number of trajectory segments that crossed over a particular area.[30] Each HYSPLIT hourly segment

---

[30] The HYSPLIT segments were processed for a 0.25 degree (approximately 27 km) grid cell. Each grid cell constitutes a particular area.

was counted individually based on segment intersections. For visualization, the trajectory segment counts were further processed using a 7-element Hanning Function.

Plots showing the back trajectories from each receptor are provided in the following documents which can be found in the docket of this final action:

"Exceedance Day Trajectory Analysis_2010-2021_Part 1" and "Exceedance Day Trajectory Analysis_2010-2021_Part 2"

Part 1 contains composite multi-start time, multi-elevation plots of exceedance day back trajectories for each year individually for each receptor.

Part 2 contains composite multi-start time, multi-year composite plots of 500 m and 750 m exceedance day back trajectories for each receptor. These two elevations were selected as generally representative of summertime mid-boundary layer transport.

## 5. References

Emery, C., Z. Liu, A. Russell, M. T. Odom, G. Yarwood, and N. Kumar, 2017. Recommendations on Statistics and Benchmarks to Assess Photochemical Model Performance. *J. Air and Waste Management Association*, 67, 582-598.

Gilliam, R.C. and J.E. Pleim, 2010. Performance Assessment of New Land Surface and Planetary Boundary Layer Physics in the WRF-ARW. *J. Appl. Meteor. Climatol.*, **49**, 760–774.

Henderson, B.H., F. Akhtar, H.O.T. Pye, S.L. Napelenok, W.T. Hutzell, 2014. A Database and Tool for Boundary Conditions for Regional Air Quality Modeling: Description and Evaluations, *Geoscientific Model Development*, **7**, 339-360.

Hong, S-Y, Y. Noh, and J. Dudhia, 2006. A New Vertical Diffusion Package with an Explicit Treatment of Entrainment Processes. *Mon. Wea. Rev.*, 134, 2318–2341.

Houyoux, M.R., Vukovich, J.M., Coats, C.J., Wheeler, N.J.M., Kasibhatla, P.S.,2000. Emissions Inventory Development and Processing for the Seasonal Model for Regional Air Quality (SMRAQ) project, *Journal of Geophysical Research – Atmospheres*, 105(D7), 9079-9090.

Iacono, M.J., J.S. Delamere, E.J. Mlawer, M.W. Shephard, S.A Clough, and W.D. Collins, 2008. Radiative Forcing by Long-Lived Greenhouse Gases: Calculations with the AER Radiative Transfer Models, *J. Geophys. Res.,* 113, D13103.

I. Bey, D.J. Jacob, R.M. Yantosca, J.A. Logan, B.D. Field, A.M. Fiore, Q. Li, H.Y. Liu, L.J. Mickley, M.G. Schultz. Global modeling of tropospheric chemistry with assimilated meteorology: model description and evaluation. J. Geophys. Res. Atmos., 106 (2001), pp. 23073-23095, 10.1029/2001jd000807.

Kain, J.S., 2004. The Kain-Fritsch Convective Parameterization: An Update, *J. Appl. Meteor.,* 43, 170-181.

Lyman, S, Trang, T. Inversion structure and winter ozone distribution in the Uintah Basin, Utah, U.S.A. Atmospheric Environment. 123 (2015) 156-165.

Ma, L-M. and Tan Z-M, 2009. Improving the Behavior of Cumulus Parameterization for Tropical Cyclone Prediction: Convective Trigger, *Atmospheric Research*, 92, 190-211.

Morrison, H.J., A. Curry, and V.I. Khvorostyanov, 2005. A New Double-Moment Microphysics Parameterization for Application in Cloud and Climate Models. Part I: Description, *J. Atmos. Sci.*, 62, 1665–1677.

Morrison, H. and A. Gettelman, 2008. A New Two-Moment Bulk Stratiform Cloud Microphysics Scheme in the Community Atmosphere Model, version 3 (CAM3). Part I: Description and Numerical Tests, *J. Climate,* 21, 3642-3659.

Pleim, J.E. and A. Xiu, 2003. Development of a Land-Surface Model. Part II: Data Assimilation, *J. Appl. Meteor.*, 42, 1811–1822

Pleim, J.E., 2007a. A Combined Local and Nonlocal Closure Model for the Atmospheric Boundary Layer. Part I: Model Description and Testing, *J. Appl. Meteor. Climatol.*, 46, 1383–1395.

Pleim, J.E., 2007b. A Combined Local and Nonlocal Closure Model for the Atmospheric Boundary Layer. Part II: Application and Evaluation in a Mesoscale Meteorological Model, *J. Appl. Meteor. Climatol.*, 46, 1396–1409.

Ramboll Environ, 2021. User's Guide Comprehensive Air Quality Model with Extensions version 7.1, www.camx.com. Ramboll Environ International Corporation, Novato, CA.

Skamarock, W.C., J.B. Klemp, J. Dudhia, et al., 2008. A Description of the Advanced Research WRF Version 3. NCAR Tech. Note NCAR/TN-475+STR. http://wwww.mmm.ucar.edu/wrf/users/docs/arw_v3.pdf

Simon, H., K.R. Baker, and S.B. Phillips, 2012. Compilation and Interpretation of Photochemical Model Performance Statistics Published between 2006 and 2012, *Atmospheric Environment*, 61, 124-139.

Stammer, D., F.J. Wentz, and C.L. Gentemann, 2003. Validation of Microwave Sea Surface Temperature Measurements for Climate Purposes, *J. of Climate*, 16(1), 73-87.

Stein, A.F., Draxler, R.R, Rolph, G.D., Stunder, B.J.B., Cohen, M.D., and Ngan, F., (2015). NOAA's HYSPLIT atmospheric transport and dispersion modeling system, Bull. Amer. Meteor. Soc., **96**, 2059-2077, http://dx.doi.org/10.117/BAMS-D-14-0010.1

U.S. Environmental Protection Agency, 2018. Modeling Guidance for Demonstrating Attainment of Air Quality Goals for Ozone, PM2.5, and Regional Haze, Research Triangle Park, NC. https://www3.epa.gov/ttn/scram/guidance/guide/O3-PM-RH-Modeling_Guidance-2018.pdf

Xiu, A., and J.E. Pleim, 2001, Development of a Land Surface Model. Part I: Application in a Meso scale Meteorological Model, *J. Appl. Meteor.,* 40, 192-209.

Yantosca, B. 2004. GEOS-CHEMv7-01-02 User's Guide, Atmospheric Chemistry Modeling Group, Harvard University, Cambridge, MA.

Appendix A

Model Performance Sensitivity Analysis

As noted in the preamble for this final action, in response to comments the EPA examined the temporal and spatial characteristics of model under prediction in the 2016v2 modeling to investigate the possible causes of under prediction of MDA8 ozone concentrations in different regions of the U.S. The EPA's analysis indicates that the under prediction was most extensive during May and June with less bias during July and August in most regions of the U.S. For example, in the Upper Midwest region model under prediction was larger in May and June compared to July through September. Specifically, the normalized mean bias for days with measured concentrations ≥ 60 ppb improved from a 21.4 percent under prediction for May and June to a 12.6 percent under prediction in the period July through September. As highest by the presentation materials in this Appendix, the seasonal pattern in bias in the Upper Midwest region improves somewhat gradually with time from the middle of May to the latter part of June. In view of the seasonal pattern in bias in the Upper Midwest and in other regions of the U.S., EPA focused its investigation of model performance on model inputs that, by their nature, have the largest temporal variation within the ozone season. These inputs include emissions from biogenic sources and lightning NOx, and contributions from transport of international anthropogenic emissions and natural sources into the U.S. Both biogenic and lightning NOx emissions in the U.S. dramatically increase from spring to summer.[1,2] In contrast, ozone transported into the U.S. from international anthropogenic and natural sources peaks during the period March through

---

[1] Guenther, A.B., 1997. Seasonal and spatial variations in natural volatile organic compound emissions. Ecol. Appl. 7, 34–45. http://dx.doi.org/10.1890/1051- 0761(1997) 007[0034:SASVIN]2.0.CO;2. Guenther, A., Hewitt, C.N., Erickson, D., Fall, R

[2] Kang D, Mathur R, Pouliot GA, Gilliam RC, Wong DC. Significant ground-level ozone attributed to lightning-induced nitrogen oxides during summertime over the Mountain West States. NPJ Clim Atmos Sci. 2020 Jan 30;3:6. doi: 10.1038/s41612-020-0108-2. PMID: 32181370; PMCID: PMC7075249.

June, with lower contributions during July through September.[3,4] To investigate the impacts of the sources, EPA conducted sensitivity model runs which focused on the effects on model performance of adding NOx emissions from lightning strikes, updating updated biogenic emissions, and using an alternative approach for quantifying transport of ozone and precursor pollutants into the U.S. from international anthropogenic and natural sources. In the 2016v2 modeling the amount of transport from international anthropogenic and natural sources was based on a simulation of the hemispheric version of the Community Multi-scale Air Quality Model (H-CMAQ) for 2016.[5] The outputs from this hemispheric modeling were then used to provide boundary conditions for national scale air quality modeling at proposal.[6]  Overall, H-CMAQ tends to under-predict daytime ozone concentrations at rural and remote monitoring sites across the U.S. during the spring of 2016 whereas the predictions from the GEOS-Chem global

---

[3] Jaffe DA, Cooper OR, Fiore AM, Henderson BH, Tonnesen GS, Russell AG, Henze DK, Langford AO, Lin M, Moore T. Scientific assessment of background ozone over the U.S.: Implications for air quality management. Elementa (Wash D C). 2018;6(1):56. doi: 10.1525/elementa.309. PMID: 30364819; PMCID: PMC6198683.

[4] Henderson, B.H., P. Dolwick, C. Jang, A., Eyth, J. Vukovich, R. Mathur, C. Hogrefe, N. Possiel, G. Pouliot, B. Timin, K.W. Appel, 2019. Global Sources of North American Ozone. Presented at the 18th Annual Conference of the UNC Institute for the Environment Community Modeling and Analysis System (CMAS) Center, October 21-23, 2019.

[5] Mathur, R., Gilliam, R., Bullock, O.R., Roselle, S., Pleim, J., Wong, D., Binkowski, F., and 1 Streets, D.: Extending the applicability of the community multiscale air quality model to 2 hemispheric scales: motivation, challenges, and progress. In: Steyn DG, Trini S (eds) Air 3 pollution modeling and its applications, XXI. Springer, Dordrecht, pp 175–179, 2012.

[6] Boundary conditions are the concentrations of pollutants along the north, east, south, and west boundaries of the air quality modeling domain. Boundary conditions vary in space and time and are typically obtained from predictions of global or hemispheric models. Information on how boundary conditions were developed for the final rule modeling can be found in the AQM TSD.

model[7] were generally less biased.[8] During the summer of 2016 both models showed varying degrees of over prediction with GEOS-Chem showing somewhat greater over-prediction, compared to H-CMAQ. In view of those results, EPA examined the impacts of using GEOSChem as an alternative to H-CMAQ for providing boundary conditions for the final rule modeling.

For the lightning NOx, biogenics, and GEOSChem sensitivity runs, the EPA reran 2016v2 using each of these alternative inputs, individually. Results from these sensitivity runs indicate that each of the three updates provides an improvement in model performance. However, by far the greatest improvement in modeling performance is attributable to the use of GEOSChem. In view of these results the EPA has included lightning NOx emissions, updated biogenic emissions, and international transport from GEOSChem in the 2016v3 modeling used for this final action. As described in Appendix B, the model has less bias and error regionally and at individual nonattainment/maintenance receptors on high ozone days using these updates.

---

[7] I. Bey, D.J. Jacob, R.M. Yantosca, J.A. Logan, B.D. Field, A.M. Fiore, Q. Li, H.Y. Liu, L.J. Mickley, M.G. Schultz. Global modeling of tropospheric chemistry with assimilated meteorology: model description and evaluation. J. Geophys. Res. Atmos., 106 (2001), pp. 23073-23095, 10.1029/2001jd000807.

[8] Henderson, B.H., P. Dolwick, C. Jang, A., Eyth, J. Vukovich, R. Mathur, C. Hogrefe, G. Pouliot, N. Possiel, B. Timin, K.W. Appel, 2022. Meteorological and Emission Sensitivity of Hemispheric Ozone and PM2.5. Presented at the 21st Annual Conference of the UNC Institute for the Environment Community Modeling and Analysis System (CMAS) Center, October 17-19, 2022.

# 2016 Model Performance Sensitivity Analysis

Bias (ppb) in MDA8 Ozone by Day – 2016v2 Modeling

## Modeling Platform Updates Examined to Address Model Performance Concerns

- Initial & Boundary Concentrations: Use GEOSChem rather than Hemispheric CMAQ (H-CMAQ) to provide initial and boundary concentrations for the outer (36 km) modeling domain. (GEOSChem => 36US3 => 12US2 domain)

- Biogenic Emissions: Use a recently released updated version of BEIS + BELD land use (BEIS4/BELD6) which includes state-of-science emissions factors and improved land use data

- Lightning NOx: Include 3-D NOx emissions from lightning strikes using a soon-to-be published method developed by ORD.

4

# *Sensitivity Model Runs to Explore Impacts of Potential Updates*

- Model Runs for 2016

  1) GEOSChem for initial and boundary concentrations

  2) BEIS4/BELD6 Biogenics

  3) Include emissions of Lightning NOx

  4) GEOSChem + BEIS4/BELD6 + Lightning NOx

- Model Run for 2023

  5) GEOChem for projected 2023 design values and contributions



Time Series of Daily Bias in MDA8 Ozone & Bias – May Through September

2016 Obs
2016fj Base Model
2016fj GEOSChem
2016fj BEIS4/BELDN
2016fj Lightning Nox

Midwest Avg MDA8 Ozone

Midwest Avg MDA8 Bias



Bias (ppb) in MDA8 Ozone by Day –
2016v2 vs GEOSChem + BEIS + LNOx







## Regional Performance Statistics for Days with Obs MDA8 O3 ≥ 60 ppb

| | # Sites | Mean Bias (ppb) | Mean Error (ppb) | NMB (%) | NME (%) |
|---|---|---|---|---|---|
| **Northeast** | | | | | |
| 2016fj | 187 | -4.2 | 7.2 | -6.2 | 10.7 |
| 2016fj Update | 187 | 1.5 | 6.9 | 2.3 | 10.3 |
| **Ohio Valley** | | | | | |
| 2016fj | 229 | -7.1 | 8.8 | -10.8 | 13.3 |
| 2016fj Update | 229 | 1.1 | 6.3 | 1.6 | 9.5 |
| **Midwest** | | | | | |
| 2016fj | 108 | -12.7 | 13.0 | -19.1 | 19.5 |
| 2016fj Update | 108 | -4.9 | 6.9 | -7.4 | 10.3 |
| **Southeast** | | | | | |
| 2016fj | 182 | -2.9 | 6.1 | -4.5 | 9.4 |
| 2016fj Update | 182 | 2.8 | 6.4 | 4.3 | 9.8 |
| **South** | | | | | |
| 2016fj | 138 | -7.8 | 9.2 | -12.0 | 14.1 |
| 2016fj Update | 138 | -1.5 | 6.6 | -2.3 | 10.1 |
| **Southwest** | | | | | |
| 2016fj | 137 | -8.9 | 9.8 | -13.8 | 15.2 |
| 2016fj Update | 137 | -4.4 | 6.5 | -6.9 | 10.0 |
| **West** | | | | | |
| 2016fj | 187 | -9.7 | 11.4 | -13.8 | 16.2 |
| 2016fj Update | 187 | -8.1 | 9.7 | -11.6 | 13.7 |
| **Northern Rockies** | | | | | |
| 2016fj | 41 | -11.9 | 12.4 | -19.0 | 19.8 |
| 2016fj Update | 41 | -7.6 | 7.9 | -12.1 | 12.6 |

## Regional Performance Statistics Including All Days

| Region | | # Sites | Mean Bias (ppb) | Mean Error (ppb) | NMB (%) | NME (%) |
|---|---|---|---|---|---|---|
| Northeast | 2016fj | 192 | 0.2 | 6.3 | 0.6 | 14.3 |
| | 2016fj_Update | 192 | 3.8 | 6.9 | 8.7 | 15.7 |
| Ohio Valley | 2016fj | 241 | 0.4 | 6.3 | 1.0 | 14.1 |
| | 2016fj_Update | 241 | 6.0 | 7.9 | 13.4 | 17.6 |
| Midwest | 2016fj | 110 | -2.9 | 6.3 | -6.9 | 15.2 |
| | 2016fj_Update | 110 | 1.6 | 5.8 | 3.9 | 14.1 |
| Southeast | 2016fj | 186 | 1.9 | 6.1 | 4.7 | 14.9 |
| | 2016fj_Update | 186 | 5.6 | 7.7 | 13.7 | 18.8 |
| South | 2016fj | 149 | 0.0 | 6.6 | 0.0 | 16.5 |
| | 2016fj_Update | 149 | 4.8 | 7.8 | 12.1 | 19.5 |
| Southwest | 2016fj | 138 | -3.7 | 6.8 | -7.1 | 13.1 |
| | 2016fj_Update | 138 | 0.5 | 5.6 | 1.0 | 10.7 |
| West | 2016fj | 206 | -3.0 | 7.4 | -5.9 | 14.5 |
| | 2016fj_Update | 206 | -0.7 | 6.8 | -1.3 | 13.4 |
| Northern Rockies | 2016fj | 58 | -3.8 | 6.1 | -8.6 | 13.7 |
| | 2016fj_Update | 58 | -0.8 | 4.9 | -1.7 | 11.1 |

*Supplemental*

Bias (ppb) in MDA8 Ozone by Day – 2016v2 vs GEOSChem + BEIS + LNOx

14

## Avg Bias (ppb) on Days with Measured MDA8 ≥ 60 ppb at Receptor Sites (Part 1)

| Site ID | State | County | Site Name | May - June Bias (ppb) | | | July - Sept Bias (ppb) | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | 2016fj Base Case | 2016fj GEOSChem BEIS4_LNOx | Bias Diff | 2016fj Base Case | 2016fj GEOSChem BEIS4_LNOx | Bias Diff |
| 40278011 | AZ | Yuma | Supersite | -12.6 | -7.3 | -5.3 | -9.3 | -11.7 | 2.4 |
| 80350004 | CO | Douglas | Chatfield | -5.7 | 0.1 | -5.6 | -7.2 | -1.9 | -5.4 |
| 80590006 | CO | Jefferson | Rocky Flats | -6.9 | -1.7 | -5.2 | -7.2 | -2.5 | -4.7 |
| 80590011 | CO | Jefferson | NREL | -8.3 | -3.1 | -5.2 | -7.7 | -2.8 | -4.9 |
| 80690011 | CO | Larimer | Fort Collins | -10.0 | -4.5 | -5.5 | -11.5 | -7.2 | -4.3 |
| 90010017 | CT | Fairfield | Greenwich | 1.2 | -3.9 | 2.6 | -3.8 | -7.4 | 3.6 |
| 90013007 | CT | Fairfield | Stratford | -6.1 | -1.0 | -5.0 | -4.0 | -0.2 | -3.8 |
| 90019003 | CT | Fairfield | Westport | -7.7 | -2.3 | -5.4 | -3.9 | -0.6 | -3.3 |
| 90099002 | CT | New Haven | Madison | -7.0 | -2.2 | -4.8 | -4.5 | -0.6 | -3.9 |
| 170310001 | IL | Cook | Alsip | -14.5 | -5.5 | -9.0 | 0.2 | 6.7 | 6.5 |
| 170310032 | IL | Cook | South Water Plant | -17.7 | -9.3 | -8.4 | -9.6 | -0.7 | -8.8 |
| 170310076 | IL | Cook | Com Ed | -13.6 | -5.1 | -8.6 | -2.4 | 5.3 | 2.9 |
| 170314201 | IL | Cook | Northbrook | -15.2 | -6.2 | -9.0 | -2.5 | 5.9 | 3.3 |
| 170317002 | IL | Cook | Water Plant | -11.4 | -2.0 | -9.4 | -7.7 | 1.0 | -6.6 |
| 350130021 | NM | Dona Ana | Desert View | -11.5 | -6.0 | -5.6 | -13.4 | -7.3 | -6.1 |
| 350130022 | NM | Dona Ana | Santa Teresa | -10.8 | -5.0 | -5.8 | -12.1 | -5.6 | -6.5 |
| 420170012 | PA | Bucks | Bristol | -6.4 | 1.7 | -4.7 | 2.0 | 10.5 | 8.5 |

15

## Avg Bias (ppb) on Days with Measured MDA8 ≥ 60 ppb at Receptor Sites (Part 2)

| Site ID | State | County | Site Name | May - June Bias (ppb) | | | July - Sept Bias (ppb) | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | 2016fj Base Case | 2016fj GEOSChem BEIS4_LNOx | Bias Diff | 2016fj Base Case | 2016fj GEOSChem BEIS4_LNOx | Bias Diff |
| 480391004 | TX | Brazoria | Manvel Croix Park | -6.0 | 0.2 | -5.8 | -11.3 | -6.3 | -5.0 |
| 481210034 | TX | Denton | Denton | -7.2 | 0.1 | -7.1 | -9.4 | -3.2 | -6.2 |
| 481410037 | TX | El Paso | UTEP | -12.7 | -7.3 | -5.4 | -18.5 | -11.8 | -6.8 |
| 481671034 | TX | Galveston | Galveston | -16.4 | -10.3 | -6.1 | -16.0 | -12.0 | -4.0 |
| 482010024 | TX | Harris | Houston Aldine | -1.5 | 5.1 | 3.6 | -6.7 | -0.4 | -6.3 |
| 482010047 | TX | Harris | Lang | 2.8 | 9.7 | 6.9 | -6.1 | -0.3 | -5.8 |
| 482010055 | TX | Harris | Houston Bayland Park | -8.0 | -2.3 | -5.7 | -1.2 | 3.9 | 2.7 |
| 482010416 | TX | Harris | Park Place | -2.4 | 3.9 | 1.5 | -1.6 | 3.6 | 2.0 |
| 482011034 | TX | Harris | Houston East | -2.7 | 4.4 | 1.7 | -16.9 | -10.2 | -6.7 |
| 482011035 | TX | Harris | Clinton | 1.3 | 9.0 | 7.7 | 2.6 | 9.0 | 6.4 |
| 490110004 | UT | Davis | Bountiful Viewmont | -13.7 | -9.3 | -4.4 | -8.3 | -5.3 | -3.0 |
| 490353006 | UT | Salt Lake | Hawthorne | -18.7 | -15.7 | -3.0 | -8.6 | -6.0 | -2.5 |
| 490353013 | UT | Salt Lake | Herriman | -14.1 | -8.9 | -5.2 | -9.8 | -6.9 | -2.8 |
| 490450004 | UT | Tooele | Erda | -12.5 | -7.4 | -5.1 | -8.9 | -6.3 | -2.6 |
| 490571003 | UT | Weber | Harrisville | -12.8 | -8.0 | -4.9 | -10.0 | -7.3 | -2.7 |
| 550590019 | WI | Kenosha | Chiwaukee | -21.3 | -12.5 | -8.8 | -11.3 | -4.1 | -7.3 |
| 550590025 | WI | Kenosha | Kenosha - Water Tower | -15.6 | -6.3 | -9.3 | -8.8 | -0.3 | -8.6 |
| 551010020 | WI | Racine | Racine - Payne And Dolan | -18.5 | -9.3 | -9.3 | -13.4 | -4.8 | -8.6 |
| 551170006 | WI | Sheboygan | Sheboygan - Kohler Andrae | -22.9 | -13.2 | -9.8 | -14.0 | -5.5 | -8.5 |

Appendix B

Model Performance Evaluation for
2016v3 Base Year CAMx Simulation

I. Introduction

An operational model evaluation was conducted for the 2016v3 base year CAMx v7.10 simulation performed for the 12 km U.S. modeling domain. The purpose of this evaluation is to examine the ability of the 2016 air quality modeling platform to represent the magnitude and spatial and temporal variability of measured (i.e., observed) maximum daily average (i.e., MDA8) ozone concentrations within the modeling domain. The evaluation presented here is based on model simulations using the 2016v3 emissions platform (i.e., scenario name 2016gf). As part of this evaluation we compare model performance for the 2016v3 platform to model performance for the 2016v2 platform that used for the proposed disapproval actions.

The model evaluation for ozone focuses on comparing 8-hour daily maximum (i.e., MDA8) ozone concentrations to the corresponding observed data at monitoring sites in the EPA Air Quality System (AQS). The locations of the ozone monitoring sites in this network are shown in Figure B-1.

This evaluation includes statistical measures and graphical displays of model performance based upon model-predicted versus observed concentrations. The evaluation focusses on model predicted and observed MDA8 ozone concentrations that were paired in space and time. Model performance statistics were calculated for several spatial scales and temporal periods. Statistics were calculated for individual monitoring sites and in aggregate for monitoring sites within each of the nine climate regions of the 12 km U.S. modeling domain. The regions include the Northeast, Ohio Valley, (Upper) Midwest, Southeast, South, Southwest, Northern Rockies, Northwest and West[1,2], which are defined based upon the states contained within the

---

[1] The nine climate regions are defined by States where: Northeast includes CT, DE, ME, MA, MD, NH, NJ, NY, PA, RI, and VT; Ohio Valley includes IL, IN, KY, MO, OH, TN, and WV; Midwest includes IA, MI, MN, and WI; Southeast includes AL, FL, GA, NC, SC, and VA; South includes AR, KS, LA, MS, OK, and TX; Southwest includes AZ, CO, NM, and UT; Northern Rockies includes MT, NE, ND, SD, WY; Northwest includes ID, OR, and WA; and West includes CA and NV.

[2] Note most monitoring sites in the West region are located in California (see Figures B-1 and B-2), therefore the statistics for the West region will be mostly representative of model performance in California ozone.

National Oceanic and Atmospheric Administration (NOAA) climate regions (Figure B-2)[3] as defined in Karl and Koss (1984).

II. Methodology

Model performance statistics were created for the period May through September (i.e., seasonal) and for individual months during this time period. Statistics were created using data on all days with valid observed data during this period as well as for the subset of days with observed MDA8 concentrations $\geq$ 60 ppb.[4] The aggregate statistics by climate region and for the monitor plus modeled 2023 receptors are presented in this appendix. Model performance statistics for MDA8 ozone at individual monitoring sites nationwide based on days with observed values $\geq$ 60 ppb can be found in the docket in the file named "2016v3 CAMx Ozone Model Performance Statistics by Site".

In addition to the above performance statistics, we prepared several graphical presentations of model performance for MDA8 ozone. These graphical presentations include: (1) maps that show the mean bias and error as well as normalized mean bias and error calculated for MDA8 $\geq$ 60 ppb for May through September at individual monitoring sites; (2) maps that show the change in bias and error in the 2016v3 modeling compared to the 2016v2 modeling; (2) bar and whisker plots that show the distribution of the predicted and observed MDA8 ozone concentrations by month (May through September) and by region; and (3) time series plots (May through September) of observed and predicted MDA8 ozone concentrations for each region and for a selected set of monitoring sites that are projected to be nonattainment or maintenance-only receptors in 2023.

The Atmospheric Model Evaluation Tool (AMET) was used to calculate the model performance statistics used in this document (Gilliam et al., 2005). For this evaluation we have selected the mean bias, mean error, normalized mean bias, and normalized mean error to

---

[3] NOAA, National Centers for Environmental Information scientists have identified nine climatically consistent regions within the contiguous U.S., http://www.ncdc.noaa.gov/monitoring-references/maps/us-climate-regions.php.

[4] We limited the data to those observed and predicted pairs with observations that are $\geq$ 60 ppb in order to focus on concentrations at the upper portion of the distribution of values.

characterize model performance, statistics which are consistent with the recommendations in Simon et al. (2012) and EPA's photochemical modeling guidance (U.S. EPA, 2018).

Mean bias (MB) is the average of the difference (predicted – observed) divided by the total number of replicates ($n$). Mean bias is given in units of ppb and is defined as:

$$MB = \frac{1}{n}\sum_1^n (P - O) \text{ , where P = predicted and O = observed concentrations}$$

Mean error (ME) calculates the absolute value of the difference (predicted - observed) divided by the total number of replicates ($n$). Mean error is given in units of ppb and is defined as:

$$ME = \frac{1}{n}\sum_1^n |P - O|$$

Normalized mean bias (NMB) is the average the difference (predicted - observed) over the sum of observed values. NMB is a useful model performance indicator because it avoids over inflating the observed range of values, especially at low concentrations. Normalized mean bias is given in percentage units and is defined as:

$$NMB = \frac{\sum_1^n (P - O)}{\sum_1^n (O)} * 100$$

Normalized mean error (NME) is the absolute value of the difference (predicted - observed) over the sum of observed values. Normalized mean error is given in percentage units and is defined as:

$$NME = \frac{\sum_1^n |P - O|}{\sum_1^n (O)} * 100$$

## III. Overview of Findings

As described in more detail below, the model performance statistics indicate that the MDA8 ozone concentrations predicted by the 2016v2 CAMx modeling platform closely reflect the corresponding MDA8 observed ozone concentrations in each region of the 12 km U.S. modeling domain. The acceptability of model performance was judged by considering the 2016v2 CAMx performance results in light of the range of performance found in recent regional ozone model applications (Emery et al., 2017; NRC, 2002; Phillips et al., 2007; Simon et al.,

2012; U.S. EPA, 2005; U.S. EPA, 2009; U.S. EPA, 2010).[5]  These other modeling studies represent a wide range of modeling analyses that cover various models, model configurations, domains, years and/or episodes, chemical mechanisms, and aerosol modules. In particular, Emery et.al. extend the results of Simon et.al., to include performance results from a few more recent photochemical model applications. The results in the former paper indicate that about a third of the top performing past applications have normalized mean bias and a normalized mean error statistics for MDA8 ozone of less than $\pm5$ percent and less 15 percent, respectively. In addition, two-thirds of past applications have normalized mean bias less than $\pm15$ percent and normalized mean error less than 25 percent. These "benchmarks" are not intended to represent "rigid pass/fail tests" but rather as "simple references to the range of recent historical performance" that can be used to understand where the performance results of a particular application "fall in the spectrum of past published results."

Overall, the ozone model performance results for the 2016v2 CAMx simulation are in large part within the range found in other recent peer-reviewed and regulatory applications. The model performance results, as described in this document, demonstrate that the predictions from the 2016v2 modeling platform correspond closely to observed concentrations in terms of the magnitude, temporal fluctuations, and geographic differences for MDA8 ozone concentrations.

---

[5] Christopher Emery, Zhen Liu, Armistead G. Russell, M. Talat Odman, Greg Yarwood & Naresh Kumar (2017) Recommendations on statistics and benchmarks to assess photochemical model performance, Journal of the Air & Waste Management Association, 67:5, 582-598, DOI: 10.1080/10962247.2016.1265027

National Research Council (NRC), 2002. Estimating the Public Health Benefits of Proposed Air Pollution Regulations, Washington, DC:  National Academies Press.

U.S. Environmental Protection Agency; Technical Support Document for the Final Clean Air Interstate Rule: Air Quality Modeling; Office of Air Quality Planning and Standards; RTP, NC; March 2005 (CAIR Docket OAR-2005-0053-2149).

U.S. Environmental Protection Agency, Proposal to Designate an Emissions Control Area for Nitrogen Oxides, Sulfur Oxides, and Particulate Matter:  Technical Support Document. EPA-420-R-007, 329pp., 2009. (http://www.epa.gov/otaq/regs/nonroad/marine/ci/420r09007.pdf)

Phillips, S., K. Wang, C. Jang, N. Possiel, M. Strum, T. Fox, 2007. Evaluation of 2002 Multi-pollutant Platform:  Air Toxics, Ozone, and Particulate Matter, 7th Annual CMAS Conference, Chapel Hill, NC, October 6-8, 2008. (http://www.cmascenter.org/conference/2008/agenda.cfm).

U.S. Environmental Protection Agency, 2010, Renewable Fuel Standard Program (RFS2) Regulatory Impact Analysis.  EPA-420-R-10-006. February 2010. Sections 3.4.2.1.2 and 3.4.3.3.  Docket EPA-HQ-OAR-2009-0472-11332. (http://www.epa.gov/oms/renewablefuels/420r10006.pdf)

Simon, H., Baker, K.R., and Phillips, S. (2012) Compilation and interpretation of photochemical model performance statistics published between 2006 and 2012. *Atmospheric Environment* **61**, 124-139.

IV. Analysis of Model Performance Statistics and Graphics

The MDA8 ozone model performance bias and error statistics for the period May-September for each climate region are provided in Table B-1. The statistics shown in this table were calculated using all data pairs for May-September. Seasonal statistics for each region based on the subset of days with observed MDA8 ozone ≥ 60 ppb are presented in Table B-2. Seasonal statistics at each receptor on days with observed MDA8 ozone ≥ 60 ppb are presented in Table B-3 for the 2016v3 and 2016v2 modeling.

Spatial plots of the mean bias and error as well as the normalized mean bias and error at individual monitors nationwide are shown in Figures B-3 through B-8. Time series plots of observed and predicted MDA8 ozone during the period May through September for each region and for selected 2023 nonattainment and/or maintenance sites in 2023 are provided in Figures B-9 and B-10, respectively.



CIRCLE=AQS_Daily;

Figure B-1. Location of ozone monitoring sites.



Figure B-2. NOAA climate regions (source: http://www.ncdc.noaa.gov/monitoring-references/maps/us-climate-regions.php#references)

A. Seasonal and Monthly Performance

1. Model Performance Statistics by Region

The model performance statistics provided in Table B-1 show that regional mean tends to overpredict in most regions on average for all days during the period May through September in each region. Normalized mean bias is less than $\pm$ 5 percent in the Midwest, Southwest, Northern Rockies, Northwest, and West. In the other four regions, normalized mean bias is between 5 and 15 percent. Normalized mean error is less than 15 percent in the Midwest, Southwest, Northern Rockies, and West and between 15 and 20 percent in the other regions.

The model performance statistics for days with observed MDA8 ozone $\geq$60 ppb provided in Table B-2 indicates that, on average, the model is relatively unbiased in all regions. The seasonal mean bias for MDA8 ozone $\geq$ 60 ppb is within $\pm$ 5 ppb in six of the regions and within $\pm$ 10 ppb in the other three regions. The mean error is less than 10 ppb in all regions. Normalized mean bias is within 10 percent for all regions, except for the West where the normalized mean bias is -11.5 percent. The normalized mean error is less than 15 percent in each region.

The model performance statistic for individual receptors in Table B-3 indicates improved performance in the 2016v3 modeling compared to the 2016v2 modeling. The 2016v3 modeling has significantly less bias and error on days with observed MDA8 ozone $\geq$ 60 compared to the

2016v2 modeling at all receptors, except for the Greenwich and Houston/Clinton. The normalized mean bias and normalized mean error statistics are within the performance benchmarks identified above.

2. Spatial Variability in Model Performance

Figures B-3 through B-6 show the spatial variability in bias and error for MDA8 ozone on days with observed concentrations ≥ 60 ppb. Mean bias, as seen in Figure B-3, is within ± 5 ppb at many sites nationwide. The 2016v3 modeling tends to overpredict MDA8 concentrations on days ≥ 60 ppb in parts of the Southeast, Ohio Valley, and mid-Atlantic states. Biases within the range of ± 5 ppb or between -5 and -10 ppb are noted at monitoring sites elsewhere across the U.S. Figure B-4 provides a comparison of the mean bias in the 2016v3 modeling to the mean bias in the 2016v2 modeling. The figure indicates that model performance for days ≥ 60 ppb is improved at most monitoring sites nationwide, the exceptions are some of the monitoring sites in the Southeast and mid-Atlantic states. As is evident from Figure B-5, the mean error is mainly less than 10 ppb nationwide. The comparison of mean error between the 2016v3 modeling and the 2016v2 modeling, as shown in Figure B-6, shows improved performance in terms of model error with the 2016v3 modeling.

The normalized mean error on days > 60 ppb, as shown in Figure B-7, indicates that model performance using this statistic is within the range of the performance benchmark offered by Emery et al (i.e., ± 15 %) at nearly all monitoring sites. The normalized mean bias and mean bias statistics suggest a tendency for some over prediction by the model in portions of the South, Southeast, and Northeast regions. As indicated in Figure B-8, normalized mean error is less than the 25 percent benchmark at nearly all monitoring sites nationwide.

B. Observed and Predicted Temporal Patterns

In addition to the above analysis of overall model performance, we also examine how well the 2016v3 modeling platform replicates day to day fluctuations in observed MDA8 ozone concentrations for the period May through September in each region and for selected 2023 nonattainment and/or maintenance receptors.

Time series of regional average MDA8 ozone concentrations for the Northeast, Midwest, Ohio Valley, South, Southeast, Southwest, and West regions are provided in Figure B-9. The plots show that the modeled concentrations closely track the corresponding observed values in terms of day-to-day fluctuations and the general magnitude of concentrations. Comparing the

plots for these seven regions reveals that there are large differences in the day-to-day variability among the regions in both observations and predictions. For example, the degree of temporal variability in MDA8 ozone concentrations in the Northeast, Midwest, and Ohio Valley is much greater than in the Southwest and West. As is evident from Figure B-9, the modeling platform captures regional differences in the degree of temporal variability in MDA8 ozone concentrations. The model performs equally as well in eastern and western regions in terms of replicating the relative magnitude of concentrations and day-to-day variability that are characteristic of observed MDA8 ozone concentrations in each region.

The time series for selected receptors indicate that, again, the modeling platform generally replicates the day-to-day variability in ozone during this time period at these sites.[6] That is, days with high modeled concentrations are generally also days with high measured concentrations and, conversely, days with low modeled concentrations are also days with low measured concentrations in most cases. Although there is a tendency for over prediction, particularly on days with low measured ozone concentrations, the model predictions, as illustrated by these receptors, captures the day-to-day variability in the observations, and also generally the timing and relative magnitude of multi-day high ozone episodes. In this regard, the model captures the geographic differences in the timing, duration, and general magnitude of ozone episodes in different parts of the U.S.

At the Stratford and Madison receptors in Coastal Connecticut, the model closely replicates both the day-to-day variability and magnitude of the observed MDA8 ozone concentrations on most days. At the Chicago-Northbrook and Chicago-Evanston receptors, the model closely tracks the day-to-day variability during the entire 5-month period. At both receptors, the modeled concentrations are similar to the corresponding measured. At the Kenosha-Chiwaukee and Sheboygan monitors the model captures the high ozone episodes, but under predicts peak MDA8 ozone concentrations of several of the days with the highest concentrations, particularly at the Sheboygan receptor. At the Dallas/Denton, Houston, and Brazoria receptors the temporal pattern in the observed values appears to be rather "chaotic", compared to the temporal pattern at other receptors in the eastern U.S. The model predictions have a temporal pattern that is similar to the observed concentrations, but with a tendency for

---

[6] The extent to which the day-to-day variability in model-predicted MDA8 ozone matches the corresponding observations values at the receptors selected for Figure B-9 is generally representative of most other receptors within the same areas.

overprediction. In contrast to receptors in the East, the observed concentrations at receptors in the West have much less temporal variability. This difference between the observed concentrations in the East versus the West is well simulated by the model. Although the model appears to capture most of the days with high ozone at the receptors in Denver, there is a tendency for the model to under predict on the peak days at receptors in Salt Lake City.

C. Conclusions

In summary, the ozone model performance statistics for the CAMx 2016v3 (2016gf) simulation are within or close to the ranges found in other recent peer-reviewed applications (e.g., Simon et al, 2012 and Emory et al, 2017). As described in this appendix, the predictions from the 2016v3 modeling platform generally correspond closely to observed concentrations in terms of the magnitude, temporal fluctuations, and geographic differences for MDA8 ozone concentrations. Thus, the model performance results demonstrate the scientific credibility of our 2016v3 modeling platform. These results provide confidence in the ability of the modeling platform to provide a reasonable projection of expected future year ozone concentrations and contributions.

Table B-1. Performance statistics for MDA8 ozone by Region for the period May through September (all days) based on 2016v3 modeling.

| Climate Region | Number of Site-Days | MB (ppb) | ME (ppb) | NMB (%) | NME (%) |
|---|---|---|---|---|---|
| Northeast | 27,724 | 4.0 | 7.0 | 9.0 | 15.9 |
| Ohio Valley | 33,762 | 6.4 | 8.2 | 14.3 | 18.4 |
| Midwest | 16,279 | 1.9 | 6.0 | 4.5 | 14.6 |
| Southeast | 26,490 | 6.1 | 8.1 | 15.0 | 19.7 |
| South | 21,437 | 5.5 | 8.2 | 13.8 | 20.5 |
| Southwest | 19,926 | 2.0 | 5.9 | 3.8 | 11.4 |
| Northern Rockies | 8,471 | -0.3 | 5.0 | -0.6 | 11.3 |
| Northwest | 4,012 | 1.1 | 5.9 | 3.0 | 15.9 |
| West | 29,930 | -0.5 | 6.9 | -0.9 | 13.5 |

Table B-2. Performance statistics for MDA8 ozone ≥ 60 ppb by Region for the period May through September based on 2016v3 modeling.

| Climate Region | Number of Site-Days | MB (ppb) | ME (ppb) | NMB (%) | NME (%) |
|---|---|---|---|---|---|
| Northeast | 2,997 | 1.7 | 7.0 | 2.5 | 10.4 |
| Ohio Valley | 3,211 | 1.5 | 6.4 | 2.3 | 9.8 |
| Midwest | 1,134 | -4.6 | 6.8 | -7.0 | 10.2 |
| Southeast | 1,447 | 3.3 | 6.6 | 5.1 | 10.2 |
| South | 993 | -0.9 | 6.6 | -1.3 | 10.1 |
| Southwest | 3,359 | -3.2 | 5.9 | -4.9 | 9.1 |
| Northern Rockies | 215 | -6.0 | 7.1 | -9.6 | 11.3 |
| Northwest | 84 | -6.7 | 9.7 | -10.3 | 14.9 |
| West | 8,279 | -8.1 | 9.6 | -11.5 | 13.6 |

Table B-3. Performance statistics for MDA8 ozone ≥ 60 ppb for monitor plus modeled receptors for the period May through September for the 2016v2 and 2016v3 modeling.

| Site ID | State | Receptor | Mean Bias | | Mean Error | | Normalized Mean Bias | | Normalized Mean Error | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | 2016 v2 | 2016 v3 | 2016 v2 | 2016 v3 | 2016 v2 | 2016 v3 | 2016 v2 | 2016 v3 |
| 40278011 | AZ | Yuma Supersite | -12 | -8 | 13 | 9 | -19 | -11 | 20 | 13 |
| 80350004 | CO | Denver Chatfield | -7 | 0 | 8 | 5 | -10 | 0 | 12 | 7 |
| 80590006 | CO | Denver Rocky Flats | -7 | -1 | 8 | 5 | -11 | -2 | 12 | 8 |
| 80590011 | CO | Denver NREL | -8 | -2 | 9 | 5 | -12 | -3 | 13 | 8 |
| 80690011 | CO | Fort Collins | -11 | -5 | 11 | 6 | -17 | -8 | 17 | 9 |
| 90010017 | CT | Greenwich | -3 | -7 | 9 | 9 | -4 | -11 | 12 | 12 |
| 90013007 | CT | Stratford | -5 | -1 | 9 | 9 | -6 | -1 | 12 | 12 |
| 90019003 | CT | Westport | -5 | -1 | 9 | 8 | -7 | -2 | 12 | 11 |
| 90099002 | CT | Madison | -5 | -1 | 7 | 6 | -8 | -2 | 10 | 9 |
| 170310001 | IL | Chicago Alsip | -8 | 0 | 11 | 7 | -12 | 0 | 16 | 11 |
| 170314201 | IL | Chicago Northbrook | -12 | -3 | 13 | 7 | -17 | -4 | 18 | 11 |
| 170317002 | IL | Chicago Water Plant | -10 | -1 | 10 | 7 | -15 | -1 | 15 | 10 |
| 350130021 | NM | Las Cruces Desert View | -12 | -5 | 13 | 7 | -19 | -8 | 20 | 11 |
| 350130022 | NM | Las Cruces Santa Teresa | -11 | -4 | 12 | 6 | -18 | -6 | 19 | 10 |
| 350151005 | NM | Carlsbad | -12 | -5 | 13 | 7 | -19 | -8 | 20 | 11 |
| 350250008 | NM | Hobbs | -13 | -7 | 13 | 7 | -21 | -11 | 21 | 11 |
| 480391004 | TX | Brazoria | -8 | -3 | 9 | 5 | -13 | -4 | 13 | 8 |

| Site ID | State | Receptor | Mean Bias | | Mean Error | | Normalized Mean Bias | | Normalized Mean Error | |
|---------|-------|----------|-----------|---|------------|---|----------------------|---|------------------------|---|
| | | | 2016 v2 | 2016 v3 | 2016 v2 | 2016 v3 | 2016 v2 | 2016 v3 | 2016 v2 | 2016 v3 |
| 481210034 | TX | Denton | -8 | -1 | 9 | 5 | -12 | -1 | 13 | 7 |
| 481410037 | TX | El Paso UTEP | -15 | -8 | 16 | 9 | -23 | -11 | 24 | 14 |
| 481671034 | TX | Galveston | -16 | -10 | 16 | 11 | -24 | -15 | 24 | 17 |
| 482010024 | TX | Houston Aldine | -4 | 3 | 9 | 10 | -7 | 4 | 13 | 15 |
| 482010055 | TX | Houston Bayland Park | -6 | 0 | 7 | 5 | -9 | 0 | 11 | 8 |
| 482011034 | TX | Houston East | -7 | 1 | 10 | 7 | -10 | 1 | 16 | 11 |
| 482011035 | TX | Houston Clinton | 2 | 9 | 6 | 9 | 3 | 15 | 10 | 15 |
| 490110004 | UT | SLC Bountiful Viewmont | -10 | -5 | 10 | 6 | -15 | -8 | 15 | 10 |
| 490353006 | UT | SLC Hawthorne | -10 | -5 | 11 | 8 | -14 | -8 | 16 | 11 |
| 490353013 | UT | SLC Herriman | -11 | -6 | 11 | 7 | -17 | -9 | 17 | 11 |
| 550590019 | WI | Kenosha Chiwaukee | -17 | -9 | 18 | 12 | -24 | -13 | 25 | 17 |
| 551010020 | WI | Racine | -16 | -8 | 17 | 11 | -23 | -11 | 24 | 15 |
| 551170006 | WI | Sheboygan Kohler Andre | -18 | -8 | 18 | 10 | -25 | -12 | 25 | 13 |



Figure B-3. Mean Bias (ppb) of MDA8 ozone for days with observed values ≥ 60 ppb over the period May-September.



Figure B-4. Difference in Mean Bias (ppb) (2016v3 Bias – 2016v2 Bias) of MDA8 ozone for days with observed values ≥ 60 ppb over the period May-September.



Figure B-5. Mean Error (ppb) of MDA8 ozone ≥ 60 ppb over the period May-September 2016, paired in time and space.



Figure B-6. Difference in Mean Error (2016v3 Error – 2016v2 Error) of MDA8 ozone (ppb) for days with observed values ≥ 60 ppb over the period May-September.



Figure B-7. Normalized Mean Bias (ppb) of MDA8 ozone for days with observed ozone ≥ 60 ppb over the period May-September.



Figure B-8. Normalized Mean Error (ppb) of MDA8 ozone for days with observed ozone ≥ 60 ppb over the period May-September.

Figure B-9. Time series of observed and predicted regional average MDA8 ozone concentrations for the period May through September 2016.



Figure B-10. Observed and model predicted MDA8 ozone concentrations by day for the period May 1 through September at selected nonattainment/maintenance receptors in 2023 (ppb).





B-18







B-19









Las Cruces Desert View, New Mexico



Eddy County, New Mexico



Salt Lake City Bountiful Viewmont, Utah

B-21



B-22

Appendix C

Ozone Contributions to
Nonattainment & Maintenance-Only
Receptors in 2023

The tables in this appendix provide projected design values and contribution metric data from each state and the other source tags to nonattainment and maintenance-only in 2023. Highlighted values denote contributions greater than or equal to the 1 percent of the NAAQS screening threshold. The contributions and design values are in units of ppb. Contributions to individual monitoring sites is provided in the file: "2016v3_DVs_state_contributions" which can be found in the docket for this final action.

# Design Values and Contributions for Monitoring plus Modeled Receptors in 2023 – Part 1

| Site ID | ST | County | 2023 Avg | 2023 Max | Contributions | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | AL | AZ | AR | CA | CO | CT | DE | DC | FL | GA | ID | IL | IN | IA | KS | KY | LA | ME | MD | MA | MI | MN | MS | MO | MT | NE | NV | NH | NJ |
| 40278011 | AZ | Yuma | 70.4 | 72.1 | 0.00 | 2.97 | 0.00 | 6.31 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.16 | 0.00 | 0.00 |
| 60650016 | CA | Riverside | 72.2 | 73.1 | 0.00 | 0.13 | 0.00 | 27.46 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.17 | 0.00 | 0.00 |
| 60651016 | CA | Riverside | 91.0 | 92.1 | 0.00 | 0.40 | 0.00 | 35.27 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.18 | 0.00 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.11 | 0.00 | 0.00 |
| 80350004 | CO | Douglas | 71.3 | 71.9 | 0.00 | 0.48 | 0.00 | 1.60 | 15.68 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.11 | 0.00 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.05 | 0.45 | 0.00 | 0.00 |
| 80590004 | CO | Jefferson | 72.8 | 73.5 | 0.00 | 0.54 | 0.00 | 1.44 | 16.82 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.13 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.07 | 0.47 | 0.00 | 0.00 |
| 80590011 | CO | Jefferson | 73.5 | 74.1 | 0.00 | 0.49 | 0.00 | 1.31 | 17.54 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.13 | 0.00 | 0.00 | 0.00 | 0.16 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.10 | 0.31 | 0.00 | 0.00 |
| 80690011 | CO | Larimer | 70.9 | 72.1 | 0.00 | 0.86 | 0.00 | 0.90 | 13.99 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.13 | 0.00 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.10 | 0.00 | 0.00 |
| 90010017 | CT | Fairfield | 71.6 | 72.2 | 0.02 | 0.01 | 0.10 | 0.02 | 0.04 | 4.59 | 0.35 | 0.01 | 0.01 | 0.03 | 0.02 | 0.51 | 0.89 | 0.13 | 0.06 | 0.60 | 0.12 | 0.00 | 0.78 | 0.06 | 1.25 | 0.15 | 0.05 | 0.23 | 0.05 | 0.06 | 0.01 | 0.01 | 8.17 |
| 90013007 | CT | Fairfield | 72.9 | 73.8 | 0.09 | 0.01 | 0.16 | 0.03 | 0.05 | 3.94 | 0.41 | 0.02 | 0.05 | 0.15 | 0.03 | 0.72 | 1.18 | 0.16 | 0.10 | 0.80 | 0.24 | 0.02 | 0.96 | 0.33 | 1.38 | 0.18 | 0.09 | 0.34 | 0.08 | 0.07 | 0.01 | 0.10 | 7.22 |
| 90019003 | CT | Fairfield | 73.3 | 73.6 | 0.09 | 0.01 | 0.15 | 0.03 | 0.05 | 2.52 | 0.44 | 0.03 | 0.05 | 0.15 | 0.02 | 0.67 | 1.16 | 0.15 | 0.10 | 0.84 | 0.17 | 0.01 | 1.13 | 0.06 | 1.44 | 0.17 | 0.09 | 0.32 | 0.07 | 0.07 | 0.01 | 0.01 | 8.38 |
| 90099002 | CT | New Haven | 70.5 | 72.6 | 0.09 | 0.01 | 0.14 | 0.02 | 0.04 | 3.85 | 0.56 | 0.04 | 0.04 | 0.17 | 0.03 | 0.71 | 1.05 | 0.21 | 0.09 | 0.79 | 0.17 | 0.01 | 1.28 | 0.15 | 1.31 | 0.23 | 0.08 | 0.32 | 0.08 | 0.09 | 0.01 | 0.02 | 5.79 |
| 170310001 | IL | Cook | 68.2 | 71.9 | 0.00 | 0.01 | 0.06 | 0.02 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 18.80 | 7.11 | 0.90 | 0.48 | 0.04 | 0.05 | 0.00 | 0.00 | 0.00 | 1.16 | 0.85 | 0.00 | 0.37 | 0.08 | 0.29 | 0.01 | 0.00 | 0.00 |
| 170314201 | IL | Cook | 68.0 | 71.5 | 0.01 | 0.04 | 0.06 | 0.05 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.02 | 23.46 | 5.42 | 0.42 | 0.18 | 0.06 | 0.04 | 0.00 | 0.00 | 0.00 | 1.56 | 0.50 | 0.00 | 0.54 | 0.07 | 0.10 | 0.02 | 0.00 | 0.00 |
| 170317002 | IL | Cook | 68.5 | 71.3 | 0.01 | 0.19 | 0.07 | 0.09 | 0.09 | 0.00 | 0.00 | 0.00 | 0.00 | 0.05 | 0.02 | 20.58 | 6.55 | 0.69 | 0.52 | 0.18 | 0.10 | 0.00 | 0.00 | 0.00 | 1.00 | 0.38 | 0.00 | 1.39 | 0.07 | 0.19 | 0.02 | 0.00 | 0.00 |
| 350130021 | NM | Dona Ana | 70.8 | 72.1 | 0.01 | 1.04 | 0.00 | 0.31 | 0.15 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.06 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.01 | 0.05 | 0.00 | 0.00 |
| 350130022 | NM | Dona Ana | 69.7 | 72.4 | 0.00 | 1.06 | 0.00 | 0.31 | 0.18 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.02 | 0.00 | 0.00 | 0.00 | 0.05 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.01 | 0.07 | 0.08 | 0.05 | 0.00 | 0.00 |
| 350151005 | NM | Eddy | 69.7 | 74.1 | 0.00 | 1.34 | 0.02 | 0.63 | 0.18 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.04 | 0.00 | 0.00 | 0.00 | 0.10 | 0.00 | 0.03 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.01 | 0.04 | 0.00 | 0.00 |
| 350250008 | NM | Lea | 69.8 | 72.2 | 0.00 | 1.66 | 0.00 | 0.71 | 0.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.02 | 0.00 | 0.02 | 0.00 | 0.10 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.01 | 0.10 | 0.00 | 0.00 |
| 480391004 | TX | Brazoria | 70.4 | 72.5 | 0.27 | 0.06 | 1.21 | 0.01 | 0.05 | 0.00 | 0.00 | 0.00 | 0.10 | 0.10 | 0.01 | 0.07 | 0.07 | 0.25 | 0.37 | 0.09 | 5.21 | 0.00 | 0.00 | 0.00 | 0.00 | 0.14 | 0.53 | 0.64 | 0.05 | 0.21 | 0.00 | 0.00 | 0.00 |
| 481210034 | TX | Denton | 69.8 | 71.6 | 0.45 | 0.06 | 0.92 | 0.00 | 0.17 | 0.00 | 0.00 | 0.00 | 0.05 | 0.05 | 0.01 | 0.26 | 0.31 | 0.20 | 0.46 | 0.41 | 2.87 | 0.00 | 0.00 | 0.00 | 0.01 | 0.10 | 0.91 | 0.56 | 0.10 | 0.36 | 0.02 | 0.00 | 0.00 |
| 481410037 | TX | El Paso | 69.8 | 71.4 | 0.00 | 1.69 | 0.00 | 0.58 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.16 | 0.00 | 0.16 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 0.00 | 0.01 | 0.00 | 0.00 |
| 481671034 | TX | Galveston | 71.5 | 72.8 | 0.75 | 0.05 | 0.94 | 0.04 | 0.14 | 0.00 | 0.00 | 0.00 | 0.18 | 0.18 | 0.00 | 0.15 | 0.37 | 0.21 | 0.46 | 0.40 | 9.51 | 0.00 | 0.00 | 0.00 | 0.18 | 0.21 | 1.32 | 0.46 | 0.04 | 0.20 | 0.01 | 0.00 | 0.00 |
| 482010024 | TX | Harris | 75.1 | 76.7 | 0.23 | 0.00 | 0.57 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.50 | 0.05 | 0.00 | 0.01 | 0.01 | 0.03 | 0.06 | 0.16 | 4.75 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.35 | 0.35 | 0.00 | 0.10 | 0.00 | 0.00 | 0.00 |
| 482010055 | TX | Harris | 70.9 | 71.9 | 0.65 | 0.02 | 0.73 | 0.01 | 0.02 | 0.00 | 0.00 | 0.00 | 0.54 | 0.10 | 0.00 | 0.01 | 0.01 | 0.19 | 0.23 | 0.22 | 5.49 | 0.00 | 0.00 | 0.00 | 0.00 | 0.10 | 0.91 | 0.35 | 0.03 | 0.15 | 0.00 | 0.00 | 0.00 |
| 482010034 | TX | Harris | 70.1 | 71.3 | 0.33 | 0.01 | 0.93 | 0.01 | 0.02 | 0.00 | 0.00 | 0.00 | 0.18 | 0.10 | 0.01 | 0.05 | 0.06 | 0.23 | 0.22 | 0.22 | 5.62 | 0.00 | 0.00 | 0.00 | 0.00 | 0.11 | 0.47 | 0.44 | 0.02 | 0.15 | 0.00 | 0.00 | 0.00 |
| 482011035 | TX | Harris | 67.8 | 71.3 | 0.32 | 0.01 | 0.90 | 0.01 | 0.02 | 0.00 | 0.00 | 0.00 | 0.18 | 0.10 | 0.00 | 0.05 | 0.06 | 0.22 | 0.21 | 0.05 | 5.44 | 0.00 | 0.00 | 0.00 | 0.00 | 0.11 | 0.46 | 0.44 | 0.02 | 0.14 | 0.00 | 0.00 | 0.00 |
| 490110004 | UT | Davis | 72.0 | 74.2 | 0.00 | 0.28 | 0.00 | 2.46 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.42 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.08 | 0.00 | 1.00 | 0.00 | 0.00 |
| 490353006 | UT | Salt Lake | 72.6 | 74.2 | 0.00 | 0.26 | 0.00 | 2.75 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.37 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1.11 | 0.00 | 0.00 |
| 490353013 | UT | Salt Lake | 73.3 | 73.8 | 0.00 | 0.28 | 0.00 | 2.18 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.31 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.77 | 0.00 | 0.00 |
| 550590019 | WI | Kenosha | 70.8 | 71.7 | 0.00 | 0.02 | 0.18 | 0.05 | 0.05 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.03 | 19.09 | 8.06 | 0.70 | 0.25 | 0.11 | 0.11 | 0.00 | 0.05 | 0.05 | 1.02 | 0.40 | 0.00 | 1.01 | 0.05 | 0.14 | 0.01 | 0.00 | 0.03 |
| 551010020 | WI | Racine | 69.7 | 71.5 | 0.03 | 0.02 | 0.13 | 0.05 | 0.04 | 0.01 | 0.00 | 0.00 | 0.01 | 0.01 | 0.02 | 14.15 | 10.03 | 0.62 | 0.35 | 0.32 | 0.34 | 0.00 | 0.05 | 0.02 | 0.95 | 0.41 | 0.15 | 1.19 | 0.12 | 0.12 | 0.01 | 0.00 | 0.03 |
| 551170006 | WI | Sheboygan | 72.7 | 73.6 | 0.02 | 0.03 | 0.62 | 0.06 | 0.06 | 0.01 | 0.00 | 0.00 | 0.01 | 0.01 | 0.02 | 13.89 | 8.90 | 0.67 | 0.40 | 0.44 | 0.34 | 0.00 | 0.05 | 0.00 | 1.59 | 0.36 | 0.10 | 1.87 | 0.07 | 0.18 | 0.01 | 0.00 | 0.04 |

C-2

## Design Values and Contributions for Monitoring plus Modeled Receptors in 2023 – Part 2

| Site ID | ST | County | 2023 Avg | 2023 Max | NM | NY | NC | ND | OH | OK | OR | PA | RI | SC | SD | TN | TX | UT | VT | VA | WA | WV | WI | WY | TRIBAL | Canada & Mexico | Offshore | Fires | Initial & Boundary | Biogenic | Lightning NOx |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 402780111 | AZ | Yuma | 70.4 | 72.1 | 0.11 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.09 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.16 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.01 | 9.43 | 0.54 | 3.10 | 44.52 | 2.26 | 0.55 |
| 60650016 | CA | Riverside | 72.2 | 73.1 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.17 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.06 | 0.00 | 0.00 | 0.08 | 0.00 | 0.00 | 0.00 | 0.00 | 2.32 | 2.10 | 2.93 | 33.31 | 3.13 | 0.19 |
| 60651016 | CA | Riverside | 91.0 | 92.2 | 0.11 | 0.00 | 0.00 | 0.01 | 0.00 | 0.03 | 0.16 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 0.06 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 | 0.01 | 2.43 | 1.65 | 2.91 | 43.70 | 3.39 | 0.60 |
| 80350004 | CO | Douglas | 71.3 | 71.9 | 0.28 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.10 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.16 | 1.29 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.68 | 0.17 | 0.85 | 0.09 | 1.39 | 42.66 | 3.44 | 1.30 |
| 80590006 | CO | Jefferson | 72.8 | 73.5 | 0.36 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.10 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.21 | 1.17 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.46 | 0.13 | 0.61 | 0.06 | 1.25 | 44.08 | 3.38 | 1.33 |
| 80590011 | CO | Jefferson | 73.5 | 74.1 | 0.29 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.11 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.11 | 1.27 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.46 | 0.14 | 0.56 | 0.06 | 1.30 | 44.68 | 3.23 | 1.04 |
| 80690011 | CO | Larimer | 70.9 | 72.1 | 0.47 | 0.00 | 0.00 | 0.01 | 0.00 | 0.05 | 0.09 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.34 | 0.98 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.67 | 0.18 | 0.94 | 0.08 | 1.25 | 41.93 | 4.15 | 3.12 |
| 90010017 | CT | Fairfield | 71.6 | 72.2 | 0.02 | 16.10 | 0.18 | 0.08 | 1.34 | 0.09 | 0.03 | 5.83 | 0.00 | 0.00 | 0.03 | 0.17 | 0.33 | 0.02 | 0.01 | 0.59 | 0.03 | 0.79 | 0.16 | 0.06 | 0.00 | 2.86 | 0.50 | 0.32 | 18.24 | 4.66 | 0.52 |
| 90013007 | CT | Fairfield | 72.9 | 73.8 | 0.05 | 12.70 | 0.45 | 0.11 | 2.04 | 0.13 | 0.03 | 5.43 | 0.04 | 0.16 | 0.04 | 0.27 | 0.52 | 0.03 | 0.02 | 1.15 | 0.05 | 1.35 | 0.21 | 0.08 | 0.00 | 2.29 | 0.68 | 0.31 | 19.33 | 5.53 | 0.72 |
| 90019003 | CT | Fairfield | 73.3 | 73.6 | 0.04 | 12.96 | 0.44 | 0.09 | 2.05 | 0.14 | 0.02 | 6.00 | 0.00 | 0.15 | 0.04 | 0.28 | 0.52 | 0.03 | 0.01 | 1.16 | 0.04 | 1.37 | 0.20 | 0.07 | 0.00 | 2.27 | 0.64 | 0.34 | 19.42 | 5.54 | 0.73 |
| 90090002 | CT | New Haven | 70.5 | 72.6 | 0.03 | 11.29 | 0.66 | 0.14 | 1.98 | 0.10 | 0.02 | 4.36 | 0.01 | 0.18 | 0.05 | 0.26 | 0.36 | 0.02 | 0.01 | 1.76 | 0.05 | 1.49 | 0.21 | 0.07 | 0.00 | 2.58 | 1.22 | 0.30 | 19.39 | 5.74 | 0.54 |
| 170310001 | IL | Cook | 68.2 | 71.9 | 0.05 | 0.14 | 0.00 | 0.45 | 0.68 | 0.62 | 0.04 | 0.25 | 0.00 | 0.00 | 0.08 | 0.05 | 1.09 | 0.02 | 0.00 | 0.00 | 0.06 | 0.07 | 2.34 | 0.06 | 0.00 | 1.19 | 0.12 | 0.15 | 20.95 | 8.44 | 0.84 |
| 170314201 | IL | Cook | 68.0 | 71.5 | 0.06 | 0.28 | 0.00 | 0.22 | 1.21 | 0.32 | 0.04 | 0.25 | 0.00 | 0.00 | 0.04 | 0.04 | 1.95 | 0.02 | 0.00 | 0.00 | 0.06 | 0.01 | 2.86 | 0.08 | 0.00 | 1.42 | 0.04 | 0.17 | 18.18 | 7.87 | 0.94 |
| 170317002 | IL | Cook | 68.5 | 71.3 | 0.10 | 0.21 | 0.00 | 0.16 | 1.04 | 0.65 | 0.20 | 0.20 | 0.00 | 0.00 | 0.00 | 0.05 | 2.24 | 0.06 | 0.00 | 0.00 | 0.06 | 0.01 | 2.24 | 0.11 | 0.00 | 1.11 | 0.14 | 0.22 | 15.80 | 10.54 | 1.21 |
| 350130021 | NM | Dona Ana | 70.8 | 72.1 | 2.87 | 0.00 | 0.00 | 0.00 | 0.00 | 0.16 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 4.74 | 0.16 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.06 | 0.04 | 13.31 | 0.12 | 0.90 | 39.47 | 2.59 | 4.49 |
| 350130022 | NM | Dona Ana | 69.7 | 72.4 | 2.89 | 0.00 | 0.00 | 0.00 | 0.00 | 0.14 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 3.59 | 0.15 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.05 | 0.05 | 12.87 | 0.12 | 0.84 | 40.19 | 2.63 | 4.24 |
| 350151005 | NM | Eddy | 69.7 | 74.1 | 6.52 | 0.00 | 0.00 | 0.01 | 0.00 | 0.25 | 0.06 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 1.91 | 1.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.15 | 0.03 | 3.43 | 0.17 | 1.06 | 50.12 | 2.29 | 0.84 |
| 350250008 | NM | Lea | 69.8 | 72.2 | 10.23 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2.17 | 0.10 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.05 | 0.02 | 3.81 | 0.15 | 0.60 | 45.73 | 3.23 | 1.96 |
| 480391004 | TX | Brazoria | 70.4 | 72.5 | 0.03 | 0.00 | 0.02 | 0.11 | 0.09 | 0.62 | 0.02 | 0.01 | 0.00 | 0.01 | 0.05 | 0.20 | 29.21 | 0.20 | 0.00 | 0.01 | 0.02 | 0.01 | 0.01 | 0.02 | 0.01 | 0.33 | 1.40 | 0.65 | 21.70 | 5.73 | 0.54 |
| 481210034 | TX | Denton | 69.8 | 71.6 | 0.03 | 0.00 | 0.02 | 0.09 | 0.09 | 1.01 | 0.01 | 0.01 | 0.00 | 0.00 | 0.00 | 0.68 | 28.72 | 0.07 | 0.00 | 0.00 | 0.04 | 0.00 | 0.01 | 0.23 | 0.01 | 0.33 | 0.37 | 0.85 | 20.40 | 7.34 | 0.75 |
| 481410037 | TX | El Paso | 69.8 | 71.4 | 1.59 | 0.00 | 0.03 | 0.16 | 0.31 | 0.01 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 3.17 | 0.04 | 0.00 | 0.00 | 0.00 | 0.03 | 0.08 | 0.10 | 0.02 | 13.73 | 0.16 | 1.41 | 40.91 | 2.38 | 3.76 |
| 481671034 | TX | Galveston | 71.5 | 72.9 | 0.13 | 0.01 | 0.03 | 0.03 | 0.11 | 0.29 | 0.03 | 0.00 | 0.00 | 0.07 | 0.04 | 0.60 | 19.31 | 0.05 | 0.00 | 0.01 | 0.00 | 0.03 | 0.01 | 0.00 | 0.00 | 0.14 | 5.74 | 0.78 | 19.49 | 6.64 | 0.62 |
| 482010024 | TX | Harris | 75.1 | 76.7 | 0.03 | 0.00 | 0.01 | 0.03 | 0.04 | 0.20 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.47 | 31.24 | 0.04 | 0.00 | 0.00 | 0.00 | 0.01 | 0.01 | 0.01 | 0.04 | 0.14 | 2.94 | 0.91 | 27.10 | 3.96 | 0.96 |
| 482010055 | TX | Harris | 70.9 | 71.9 | 0.05 | 0.00 | 0.02 | 0.05 | 0.03 | 0.23 | 0.00 | 0.00 | 0.00 | 0.01 | 0.02 | 0.47 | 28.74 | 0.02 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.04 | 0.00 | 0.30 | 2.42 | 0.67 | 21.47 | 5.10 | 0.79 |
| 482011034 | TX | Harris | 70.1 | 71.3 | 0.02 | 0.00 | 0.02 | 0.08 | 0.01 | 0.28 | 0.00 | 0.00 | 0.00 | 0.01 | 0.04 | 0.17 | 28.33 | 0.01 | 0.00 | 0.00 | 0.01 | 0.00 | 0.01 | 0.02 | 0.00 | 0.16 | 2.97 | 1.31 | 22.05 | 4.53 | 0.64 |
| 482011035 | TX | Harris | 67.8 | 71.3 | 0.03 | 0.00 | 0.02 | 0.01 | 0.01 | 0.27 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.06 | 27.40 | 0.01 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.02 | 0.00 | 0.15 | 2.88 | 1.26 | 21.32 | 4.54 | 0.62 |
| 490110004 | UT | Davis | 72.0 | 74.2 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.46 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 8.72 | 0.00 | 0.00 | 0.16 | 0.00 | 0.00 | 0.08 | 0.01 | 0.63 | 0.11 | 2.91 | 50.76 | 3.37 | 0.36 |
| 490353006 | UT | Salt Lake | 72.6 | 74.2 | 0.09 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.45 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 9.15 | 0.00 | 0.00 | 0.16 | 0.00 | 0.00 | 0.06 | 0.01 | 0.46 | 0.11 | 3.36 | 49.89 | 3.36 | 0.59 |
| 490353013 | UT | Salt Lake | 73.3 | 73.8 | 0.09 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.29 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.05 | 7.49 | 0.00 | 0.00 | 0.11 | 0.00 | 0.00 | 0.27 | 0.00 | 0.67 | 0.11 | 2.53 | 54.71 | 2.85 | 0.33 |
| 550590019 | WI | Kenosha | 70.8 | 71.7 | 0.06 | 0.21 | 0.02 | 0.02 | 1.61 | 0.49 | 0.03 | 0.40 | 0.00 | 0.01 | 0.03 | 0.02 | 1.54 | 0.03 | 0.00 | 0.09 | 0.05 | 0.21 | 5.51 | 0.06 | 0.06 | 1.02 | 0.14 | 0.19 | 14.88 | 11.28 | 0.83 |
| 551010020 | WI | Racine | 69.7 | 71.5 | 0.06 | 0.21 | 0.02 | 0.13 | 1.24 | 0.44 | 0.03 | 0.33 | 0.00 | 0.00 | 0.03 | 0.09 | 1.57 | 0.03 | 0.00 | 0.09 | 0.04 | 0.16 | 7.98 | 0.06 | 0.00 | 0.99 | 0.18 | 0.24 | 14.02 | 11.36 | 0.80 |
| 551170006 | WI | Sheboygan | 72.7 | 73.6 | 0.05 | 0.27 | 0.02 | 0.18 | 1.55 | 0.63 | 0.01 | 0.46 | 0.00 | 0.00 | 0.05 | 0.15 | 1.03 | 0.03 | 0.00 | 0.08 | 0.04 | 0.16 | 7.22 | 0.08 | 0.00 | 1.35 | 0.09 | 0.27 | 17.35 | 10.79 | 0.83 |

C-3

# Design Values and Contributions for Violating Monitor Receptors in 2023 – Part 1

| Site ID | ST | County | 2023 Avg | 2023 Max | Contributions | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | AL | AR | AZ | CA | CO | CT | DE | DC | FL | GA | ID | IL | IN | IA | KS | KY | LA | ME | MD | MA | MI | MN | MS | MO | MT | NE | NV | NH | NJ |
| 40070010 | AZ | Gila | 67.9 | 69.5 | 0.00 | 0.00 | 7.65 | 1.55 | 0.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.47 | 0.00 | 0.00 |
| 40130019 | AZ | Maricopa | 69.8 | 70.0 | 0.00 | 0.00 | 15.32 | 1.68 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.01 | 0.30 | 0.00 | 0.00 |
| 40131003 | AZ | Maricopa | 70.1 | 70.7 | 0.00 | 0.00 | 13.83 | 2.69 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.01 | 0.46 | 0.00 | 0.00 |
| 40131004 | AZ | Maricopa | 70.2 | 70.8 | 0.00 | 0.00 | 14.56 | 1.54 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.32 | 0.00 | 0.00 |
| 40130010 | AZ | Maricopa | 68.3 | 69.2 | 0.00 | 0.00 | 13.90 | 2.65 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.49 | 0.00 | 0.00 |
| 40132001 | AZ | Maricopa | 63.8 | 64.1 | 0.00 | 0.00 | 12.84 | 1.44 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.01 | 0.27 | 0.00 | 0.00 |
| 40132005 | AZ | Maricopa | 69.6 | 70.5 | 0.00 | 0.00 | 13.81 | 1.56 | 0.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.01 | 0.38 | 0.00 | 0.00 |
| 40133002 | AZ | Maricopa | 65.8 | 65.8 | 0.00 | 0.00 | 13.59 | 1.52 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.01 | 0.29 | 0.00 | 0.00 |
| 40134004 | AZ | Maricopa | 65.7 | 66.6 | 0.00 | 0.00 | 11.01 | 2.72 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.48 | 0.00 | 0.00 |
| 40134005 | AZ | Maricopa | 62.3 | 62.3 | 0.00 | 0.00 | 12.29 | 2.39 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.41 | 0.00 | 0.00 |
| 40134008 | AZ | Maricopa | 65.6 | 66.5 | 0.00 | 0.00 | 13.06 | 1.44 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.34 | 0.00 | 0.00 |
| 40134010 | AZ | Maricopa | 63.8 | 66.9 | 0.00 | 0.00 | 12.31 | 1.47 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.01 | 0.30 | 0.00 | 0.00 |
| 40137021 | AZ | Maricopa | 69.8 | 70.1 | 0.00 | 0.00 | 14.25 | 2.14 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.41 | 0.00 | 0.00 |
| 40137022 | AZ | Maricopa | 68.2 | 69.1 | 0.00 | 0.00 | 13.92 | 2.09 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.06 | 0.40 | 0.00 | 0.00 |
| 40137024 | AZ | Maricopa | 67.0 | 67.9 | 0.00 | 0.00 | 14.42 | 1.51 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.06 | 0.29 | 0.00 | 0.00 |
| 40139702 | AZ | Maricopa | 66.9 | 68.1 | 0.00 | 0.00 | 12.53 | 2.20 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.05 | 0.34 | 0.00 | 0.00 |
| 40139704 | AZ | Maricopa | 65.3 | 66.2 | 0.00 | 0.00 | 12.20 | 1.83 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.06 | 0.40 | 0.00 | 0.00 |
| 40139997 | AZ | Maricopa | 70.5 | 70.5 | 0.00 | 0.00 | 14.56 | 1.63 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.02 | 0.31 | 0.00 | 0.00 |
| 40218001 | AZ | Pinal | 67.8 | 69.0 | 0.00 | 0.00 | 9.81 | 2.05 | 0.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.36 | 0.00 | 0.00 |
| 80030001 | CO | Adams | 63.0 | 63.0 | 0.00 | 0.00 | 0.00 | 0.64 | 13.94 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.13 | 0.00 | 0.33 | 0.05 | 0.13 | 0.32 | 0.00 | 0.00 |
| 80050002 | CO | Arapahoe | 68.0 | 68.0 | 0.00 | 0.00 | 0.00 | 0.47 | 14.72 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.15 | 0.00 | 0.38 | 0.06 | 0.15 | 0.58 | 0.00 | 0.00 |
| 80310002 | CO | Denver | 63.6 | 64.8 | 0.00 | 0.00 | 0.00 | 0.77 | 14.25 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.44 | 0.03 | 0.00 | 0.32 | 0.00 | 0.00 |
| 80310026 | CO | Denver | 64.5 | 64.8 | 0.00 | 0.00 | 0.00 | 0.66 | 14.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.32 | 0.00 | 0.00 |
| 90079007 | CT | Middlesex | 68.7 | 69.0 | 0.00 | 0.00 | 0.00 | 0.04 | 0.00 | 5.39 | 0.36 | 0.03 | 0.09 | 0.31 | 0.03 | 0.55 | 0.95 | 0.13 | 0.00 | 0.88 | 0.26 | 0.02 | 1.04 | 0.39 | 0.85 | 0.13 | 0.10 | 0.33 | 0.06 | 0.06 | 0.11 | 5.29 | 3.93 |
| 90100124 | CT | New London | 65.5 | 67.0 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 6.76 | 0.29 | 0.03 | 0.07 | 0.19 | 0.03 | 0.55 | 0.84 | 0.15 | 0.10 | 0.53 | 0.21 | 0.07 | 0.97 | 0.15 | 1.36 | 0.15 | 0.12 | 0.38 | 0.07 | 0.02 | 0.02 | 0.00 | 0.00 |
| 170310032 | IL | Cook | 67.3 | 69.8 | 0.00 | 0.00 | 0.01 | 0.03 | 0.02 | 0.00 | 0.07 | 0.00 | 0.03 | 0.00 | 0.03 | 17.27 | 8.22 | 0.61 | 0.27 | 0.62 | 0.02 | 0.00 | 0.00 | 0.07 | 2.03 | 0.59 | 0.15 | 0.35 | 0.08 | 0.26 | 0.01 | 0.00 | 0.00 |
| 170311601 | IL | Cook | 63.8 | 64.5 | 0.00 | 0.00 | 0.01 | 0.04 | 0.04 | 0.00 | 0.07 | 0.00 | 0.04 | 0.00 | 0.03 | 17.08 | 5.85 | 0.57 | 0.24 | 0.60 | 0.04 | 0.00 | 0.05 | 0.07 | 1.21 | 0.57 | 0.00 | 0.44 | 0.07 | 0.19 | 0.01 | 0.00 | 0.00 |
| 181270024 | IN | Porter | 63.4 | 64.6 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.08 | 0.00 | 0.03 | 0.01 | 0.02 | 9.11 | 15.38 | 1.13 | 0.82 | 0.74 | 0.08 | 0.00 | 0.00 | 0.08 | 2.02 | 0.64 | 0.08 | 0.44 | 0.10 | 0.26 | 0.01 | 0.00 | 0.00 |
| 260050003 | MI | Allegan | 66.2 | 67.4 | 0.00 | 0.01 | 0.04 | 0.04 | 0.04 | 0.00 | 0.06 | 0.00 | 0.03 | 0.00 | 0.04 | 10.66 | 6.47 | 0.37 | 0.24 | 0.60 | 0.36 | 0.00 | 0.00 | 0.07 | 1.98 | 0.22 | 0.08 | 2.17 | 0.08 | 0.19 | 0.03 | 0.00 | 0.00 |
| 261210039 | MI | Muskegon | 67.5 | 68.4 | 0.00 | 0.01 | 0.04 | 0.00 | 0.10 | 0.00 | 0.06 | 0.00 | 0.03 | 0.01 | 0.05 | 14.29 | 9.39 | 0.18 | 0.23 | 0.74 | 0.57 | 0.00 | 0.00 | 0.08 | 3.47 | 0.14 | 0.08 | 2.95 | 0.08 | 0.08 | 0.03 | 0.00 | 0.00 |
| 320030004 | NV | Clark | 68.4 | 69.4 | 0.00 | 0.00 | 0.27 | 0.50 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.16 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 9.05 | 0.00 | 0.00 |
| 350011012 | NM | Bernalillo | 63.8 | 66.0 | 0.00 | 0.00 | 0.16 | 0.44 | 0.39 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.18 | 0.00 | 0.00 | 0.00 | 0.05 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.05 | 0.00 | 0.02 | 0.12 | 0.00 | 0.00 |
| 350130008 | NM | Dona Ana | 65.6 | 66.3 | 0.00 | 0.00 | 0.17 | 0.60 | 0.05 | 0.00 | 0.00 | 0.00 | 0.04 | 0.00 | 0.16 | 0.00 | 0.00 | 0.21 | 0.13 | 0.00 | 0.15 | 0.00 | 0.00 | 0.00 | 0.00 | 0.10 | 0.01 | 0.05 | 0.06 | 0.35 | 0.06 | 0.00 | 0.00 |
| 361030002 | NY | Suffolk | 66.2 | 68.0 | 0.00 | 0.00 | 0.01 | 0.03 | 0.03 | 0.17 | 0.42 | 0.03 | 0.02 | 0.09 | 0.02 | 0.50 | 0.96 | 0.19 | 0.13 | 0.74 | 0.15 | 0.00 | 1.14 | 0.07 | 1.12 | 0.14 | 0.06 | 0.35 | 0.06 | 0.02 | 0.01 | 0.00 | 8.00 |
| 390850003 | OH | Lake | 64.3 | 64.6 | 0.00 | 0.00 | 0.02 | 0.03 | 0.04 | 0.00 | 0.10 | 0.03 | 0.04 | 0.13 | 0.02 | 1.33 | 1.81 | 0.21 | 0.25 | 0.53 | 0.16 | 0.00 | 0.05 | 0.07 | 0.62 | 0.10 | 0.14 | 0.45 | 0.06 | 0.13 | 0.02 | 0.00 | 0.00 |
| 480290052 | TX | Bexar | 67.1 | 67.8 | 0.00 | 0.93 | 0.09 | 0.05 | 0.04 | 0.00 | 0.01 | 0.00 | 0.03 | 0.03 | 0.01 | 0.29 | 0.35 | 0.32 | 0.61 | 0.51 | 1.02 | 0.00 | 0.00 | 0.00 | 0.01 | 0.08 | 0.15 | 0.24 | 0.08 | 0.13 | 0.02 | 0.00 | 0.00 |
| 480850005 | TX | Collin | 65.4 | 64.6 | 0.00 | 0.79 | 0.05 | 0.05 | 0.08 | 0.00 | 0.01 | 0.00 | 0.04 | 0.07 | 0.01 | 0.29 | 0.39 | 0.41 | 0.51 | 0.18 | 2.96 | 0.00 | 0.00 | 0.00 | 0.00 | 0.19 | 0.84 | 0.43 | 0.18 | 0.18 | 0.02 | 0.00 | 0.00 |
| 481130075 | TX | Dallas | 65.3 | 66.5 | 0.00 | 0.93 | 0.05 | 0.05 | 0.14 | 0.00 | 0.04 | 0.00 | 0.03 | 0.07 | 0.04 | 0.35 | 0.23 | 0.61 | 0.82 | 0.23 | 2.85 | 0.00 | 0.00 | 0.00 | 0.00 | 0.19 | 0.87 | 0.66 | 0.10 | 0.43 | 0.03 | 0.00 | 0.00 |
| 481210034 | TX | Denton | 65.9 | 65.7 | 0.00 | 1.08 | 0.05 | 0.05 | 0.17 | 0.00 | 0.06 | 0.00 | 0.04 | 0.06 | 0.04 | 0.37 | 0.23 | 0.41 | 0.74 | 0.18 | 3.54 | 0.00 | 0.00 | 0.00 | 0.00 | 0.11 | 0.32 | 0.70 | 0.08 | 0.25 | 0.03 | 0.00 | 0.00 |
| 482010024 | TX | Harris | 65.5 | 66.5 | 0.00 | 0.68 | 0.01 | 6.97 | 0.05 | 0.00 | 0.06 | 0.00 | 0.06 | 0.11 | 0.05 | 0.39 | 0.23 | 0.21 | 0.41 | 0.39 | 5.06 | 0.00 | 0.00 | 0.05 | 0.00 | 0.10 | 0.77 | 0.46 | 0.08 | 0.16 | 0.03 | 0.00 | 0.00 |
| 482010416 | TX | Harris | 68.8 | 70.4 | 0.00 | 0.60 | 0.03 | 0.00 | 0.02 | 0.00 | 0.06 | 0.00 | 0.14 | 0.11 | 0.04 | 0.08 | 0.15 | 0.21 | 0.23 | 0.18 | 4.87 | 0.00 | 0.00 | 0.01 | 0.01 | 0.09 | 0.84 | 0.46 | 0.09 | 0.16 | 0.03 | 0.00 | 0.00 |
| 484390075 | TX | Tarrant | 63.8 | 64.7 | 0.00 | 1.13 | 0.01 | 0.05 | 0.05 | 0.00 | 0.03 | 0.00 | 0.04 | 0.04 | 0.04 | 0.31 | 0.20 | 0.17 | 0.39 | 0.31 | 1.76 | 0.00 | 0.00 | 0.00 | 0.01 | 0.10 | 0.77 | 0.45 | 0.09 | 0.31 | 0.01 | 0.00 | 0.00 |
| 484391002 | TX | Tarrant | 64.1 | 65.7 | 0.00 | 0.81 | 0.05 | 0.05 | 0.04 | 0.00 | 0.03 | 0.00 | 0.05 | 0.29 | 0.05 | 0.16 | 0.20 | 0.15 | 0.21 | 0.39 | 1.83 | 0.00 | 0.00 | 0.01 | 0.00 | 0.10 | 0.69 | 0.45 | 0.09 | 0.35 | 0.01 | 0.00 | 0.00 |
| 484392003 | TX | Tarrant | 65.2 | 65.9 | 0.00 | 0.85 | 0.06 | 0.04 | 0.15 | 0.00 | 0.02 | 0.00 | 0.04 | 0.30 | 0.04 | 0.30 | 0.41 | 0.21 | 0.53 | 0.47 | 1.84 | 0.00 | 0.00 | 0.01 | 0.00 | 0.10 | 0.88 | 0.51 | 0.12 | 0.37 | 0.01 | 0.00 | 0.00 |
| 484393009 | TX | Tarrant | 67.5 | 68.1 | 0.00 | 0.65 | 0.05 | 0.00 | 0.14 | 0.00 | 0.00 | 0.00 | 0.05 | 0.24 | 0.04 | 0.24 | 0.28 | 0.21 | 0.55 | 0.38 | 2.10 | 0.00 | 0.00 | 0.01 | 0.01 | 0.10 | 0.75 | 0.54 | 0.11 | 0.37 | 0.01 | 0.00 | 0.00 |
| 495710037 | UT | Weber | 69.3 | 70.3 | 0.00 | 0.00 | 0.36 | 0.00 | 0.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.46 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.34 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1.53 | 0.08 | 0.21 | 1.11 | 0.00 | 0.00 |
| 550590025 | WI | Kenosha | 67.6 | 70.7 | 0.02 | 0.04 | 0.04 | 0.39 | 0.09 | 0.00 | 0.01 | 0.00 | 0.01 | 0.00 | 0.04 | 16.53 | 5.51 | 0.71 | 0.41 | 0.16 | 0.00 | 0.00 | 0.00 | 0.00 | 0.66 | 0.51 | 0.11 | 1.53 | 0.08 | 0.21 | 0.03 | 0.00 | 0.03 |
| 550890008 | WI | Ozaukee | 65.2 | 65.8 | 0.03 | 0.39 | 0.04 | 0.39 | 0.09 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.04 | 11.46 | 5.75 | 0.69 | 0.43 | 0.25 | 0.00 | 0.00 | 0.04 | 0.01 | 0.92 | 0.36 | 0.14 | 1.64 | 0.08 | 0.21 | 0.02 | 0.00 | 0.03 |

C-4

## Design Values and Contributions for Violating Monitor Receptors in 2023 – Part 2

Columns NM through Lightning NOx are grouped under the heading **Contributions**.

| Site ID | ST | County | 2023 Avg | 2023 Max | NM | NY | NC | ND | OH | OK | OR | PA | RI | SC | SD | TN | TX | UT | VT | VA | WA | WV | WI | WY | TRIBAL | Canada & Mexico | Offshore | Fires | Initial & Boundary | Biogenic | Lightning NOx |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 40070010 | AZ | Gila | 67.9 | 69.5 | 0.16 | 0.00 | 0.00 | 0.01 | 0.00 | 0.01 | 0.10 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.09 | 0.46 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.06 | 0.04 | 1.83 | 0.22 | 1.97 | 50.21 | 2.25 | 0.50 |
| 40130019 | AZ | Maricopa | 69.8 | 70.0 | 0.33 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.33 | 0.37 | 0.00 | 0.00 | 0.04 | 0.00 | 0.01 | 0.04 | 0.07 | 2.83 | 0.21 | 2.18 | 41.74 | 2.66 | 1.32 |
| 40131003 | AZ | Maricopa | 70.1 | 70.7 | 0.17 | 0.00 | 0.00 | 0.01 | 0.00 | 0.01 | 0.10 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.09 | 0.37 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.03 | 0.06 | 3.17 | 0.27 | 1.42 | 42.78 | 2.69 | 1.68 |
| 40131004 | AZ | Maricopa | 70.2 | 70.8 | 0.19 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.09 | 0.30 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.03 | 0.06 | 2.91 | 0.22 | 1.85 | 43.33 | 2.49 | 1.92 |
| 40131010 | AZ | Maricopa | 68.3 | 69.2 | 0.15 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.09 | 0.40 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.05 | 0.05 | 2.83 | 0.28 | 1.40 | 41.87 | 2.61 | 1.07 |
| 40132001 | AZ | Maricopa | 63.8 | 64.1 | 0.25 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.28 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.01 | 0.04 | 2.45 | 0.19 | 2.13 | 39.89 | 2.23 | 1.02 |
| 40132005 | AZ | Maricopa | 69.6 | 70.5 | 0.18 | 0.00 | 0.00 | 0.01 | 0.00 | 0.01 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.11 | 0.36 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.07 | 2.38 | 0.23 | 1.62 | 44.56 | 2.49 | 1.37 |
| 40133002 | AZ | Maricopa | 65.8 | 65.8 | 0.17 | 0.00 | 0.00 | 0.01 | 0.00 | 0.01 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.26 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.06 | 2.85 | 0.21 | 1.66 | 40.56 | 2.33 | 1.84 |
| 40134004 | AZ | Maricopa | 65.7 | 66.6 | 0.15 | 0.00 | 0.00 | 0.01 | 0.00 | 0.03 | 0.10 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.08 | 0.34 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.05 | 0.04 | 2.78 | 0.28 | 1.07 | 42.30 | 2.61 | 1.32 |
| 40134005 | AZ | Maricopa | 62.3 | 62.3 | 0.15 | 0.00 | 0.00 | 0.01 | 0.00 | 0.01 | 0.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.11 | 0.33 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.05 | 2.82 | 0.24 | 1.26 | 38.02 | 2.39 | 1.49 |
| 40134008 | AZ | Maricopa | 65.6 | 66.5 | 0.21 | 0.00 | 0.00 | 0.01 | 0.00 | 0.03 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.12 | 0.34 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.03 | 0.06 | 2.45 | 0.18 | 1.91 | 41.47 | 2.52 | 1.15 |
| 40134010 | AZ | Maricopa | 63.8 | 66.9 | 0.25 | 0.00 | 0.00 | 0.01 | 0.00 | 0.03 | 0.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.26 | 0.28 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.03 | 0.04 | 2.56 | 0.19 | 2.09 | 40.08 | 2.39 | 1.03 |
| 40134018 | AZ | Maricopa | 68.0 | 68.0 | 0.34 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.10 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.27 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.06 | 3.14 | 0.20 | 1.24 | 40.78 | 2.54 | 2.39 |
| 40137021 | AZ | Maricopa | 69.8 | 70.1 | 0.24 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.08 | 0.34 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.03 | 0.12 | 2.98 | 0.26 | 1.44 | 43.64 | 2.54 | 1.06 |
| 40137022 | AZ | Maricopa | 68.2 | 69.1 | 0.14 | 0.00 | 0.00 | 0.01 | 0.00 | 0.01 | 0.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.12 | 0.34 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.12 | 2.91 | 0.26 | 1.41 | 42.64 | 2.48 | 1.03 |
| 40137024 | AZ | Maricopa | 67.0 | 67.9 | 0.14 | 0.00 | 0.00 | 0.01 | 0.00 | 0.01 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.27 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.14 | 3.14 | 0.20 | 1.42 | 40.07 | 2.50 | 2.39 |
| 40139702 | AZ | Maricopa | 66.9 | 68.1 | 0.14 | 0.00 | 0.00 | 0.01 | 0.00 | 0.01 | 0.09 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.28 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.03 | 0.08 | 2.84 | 0.28 | 0.89 | 43.39 | 2.26 | 1.10 |
| 40139704 | AZ | Maricopa | 65.3 | 66.2 | 0.14 | 0.00 | 0.00 | 0.01 | 0.00 | 0.01 | 0.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.09 | 0.35 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.03 | 0.07 | 2.62 | 0.22 | 1.30 | 42.20 | 2.33 | 1.16 |
| 40139997 | AZ | Maricopa | 70.5 | 70.5 | 0.18 | 0.00 | 0.00 | 0.01 | 0.00 | 0.01 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.12 | 0.28 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.06 | 3.05 | 0.23 | 1.78 | 43.46 | 2.49 | 1.97 |
| 40218001 | AZ | Pinal | 67.8 | 69.0 | 0.15 | 0.00 | 0.00 | 0.01 | 0.00 | 0.02 | 0.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.09 | 0.34 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.04 | 2.70 | 0.28 | 0.90 | 47.09 | 2.31 | 1.20 |
| 80013001 | CO | Adams | 63.0 | 63.0 | 0.24 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.11 | 0.91 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.36 | 0.11 | 0.76 | 0.07 | 1.09 | 38.82 | 2.53 | 1.63 |
| 80050002 | CO | Arapahoe | 68.0 | 68.0 | 0.34 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1.46 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.42 | 0.19 | 1.81 | 0.10 | 1.24 | 40.78 | 2.39 | 1.40 |
| 80310002 | CO | Denver | 63.6 | 64.8 | 0.24 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.11 | 0.92 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.19 | 0.05 | 0.76 | 0.07 | 1.30 | 39.19 | 2.55 | 1.65 |
| 80310026 | CO | Denver | 64.5 | 64.8 | 0.25 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.93 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.37 | 0.12 | 0.77 | 0.08 | 1.11 | 39.75 | 2.59 | 1.67 |
| 90079007 | CT | Middlesex | 68.7 | 69.0 | 6.58 | 0.05 | 0.65 | 0.11 | 2.25 | 0.14 | 0.14 | 5.11 | 0.04 | 0.23 | 0.04 | 0.42 | 0.56 | 0.03 | 0.03 | 1.39 | 0.06 | 1.63 | 0.17 | 0.07 | 0.00 | 1.95 | 0.94 | 0.20 | 17.97 | 5.63 | 0.77 |
| 90110114 | CT | New London | 65.5 | 67.0 | 0.02 | 12.08 | 0.43 | 0.06 | 1.70 | 0.14 | 0.19 | 3.81 | 0.08 | 0.16 | 0.02 | 0.27 | 0.55 | 0.01 | 0.01 | 1.02 | 0.07 | 0.82 | 0.18 | 0.07 | 0.00 | 2.86 | 0.14 | 0.19 | 16.83 | 5.13 | 0.56 |
| 170310032 | IL | Cook | 67.3 | 69.8 | 0.09 | 0.22 | 0.30 | 0.35 | 1.49 | 0.72 | 0.47 | 0.25 | 0.00 | 0.00 | 0.06 | 0.23 | 1.40 | 0.05 | 0.01 | 0.07 | 0.06 | 0.00 | 2.21 | 0.08 | 0.00 | 1.15 | 0.14 | 0.21 | 18.33 | 9.07 | 0.83 |
| 170311601 | IL | Cook | 63.8 | 64.5 | 0.05 | 0.28 | 0.10 | 0.22 | 1.39 | 0.47 | 0.63 | 0.34 | 0.00 | 0.00 | 0.07 | 0.00 | 1.32 | 0.02 | 0.01 | 0.06 | 0.06 | 0.00 | 1.63 | 0.05 | 0.00 | 1.97 | 0.06 | 0.15 | 18.33 | 9.39 | 0.86 |
| 181270024 | IN | Porter | 63.4 | 64.6 | 0.08 | 0.00 | 0.10 | 0.24 | 2.90 | 0.63 | 0.03 | 0.16 | 0.00 | 0.04 | 0.06 | 0.07 | 2.25 | 0.07 | 0.00 | 0.06 | 0.07 | 0.00 | 0.85 | 0.05 | 0.00 | 0.85 | 0.13 | 0.33 | 17.02 | 9.39 | 0.86 |
| 260050003 | MI | Allegan | 66.2 | 67.4 | 0.09 | 0.00 | 0.10 | 0.26 | 0.93 | 1.14 | 0.04 | 0.10 | 0.00 | 0.00 | 0.06 | 0.21 | 1.68 | 0.11 | 0.00 | 0.07 | 0.11 | 0.00 | 5.10 | 0.20 | 0.01 | 0.45 | 0.11 | 0.30 | 16.97 | 10.93 | 0.85 |
| 261210039 | MI | Muskegon | 67.5 | 68.4 | 0.10 | 0.00 | 0.00 | 0.11 | 1.20 | 1.20 | 0.02 | 0.12 | 0.00 | 0.01 | 0.04 | 0.00 | 1.52 | 0.26 | 0.00 | 0.02 | 0.10 | 0.00 | 2.62 | 0.16 | 0.00 | 0.38 | 0.17 | 0.38 | 14.54 | 10.31 | 0.78 |
| 320030043 | NV | Clark | 68.4 | 69.4 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.13 | 0.26 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.06 | 2.23 | 0.35 | 2.13 | 42.30 | 2.26 | 1.78 |
| 350011012 | NM | Bernalillo | 63.8 | 66.0 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.28 | 0.02 | 0.00 | 0.00 | 0.00 | 0.08 | 0.00 | 0.78 | 0.18 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.08 | 0.00 | 1.66 | 0.09 | 1.26 | 45.54 | 2.12 | 2.46 |
| 350130008 | NM | Dona Ana | 65.6 | 66.3 | 1.69 | 0.00 | 0.00 | 0.14 | 0.00 | 0.12 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 3.83 | 0.08 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.02 | 0.02 | 10.77 | 0.14 | 0.84 | 39.98 | 3.99 | 3.52 |
| 361030002 | NY | Suffolk | 66.2 | 68.0 | 0.03 | 12.55 | 0.30 | 0.12 | 1.98 | 0.19 | 0.02 | 5.20 | 0.00 | 0.09 | 0.04 | 0.23 | 0.59 | 0.02 | 0.00 | 1.19 | 0.00 | 2.33 | 0.13 | 0.04 | 0.00 | 1.55 | 0.83 | 0.29 | 17.82 | 5.28 | 0.63 |
| 390850003 | OH | Lake | 64.3 | 64.6 | 0.05 | 0.30 | 0.16 | 0.03 | 18.66 | 0.09 | 0.02 | 1.63 | 0.00 | 0.15 | 0.00 | 0.70 | 0.78 | 0.00 | 0.01 | 0.14 | 0.08 | 1.79 | 0.06 | 0.14 | 0.00 | 1.55 | 0.07 | 0.17 | 17.01 | 8.36 | 0.78 |
| 480290052 | TX | Bexar | 67.1 | 67.8 | 0.19 | 0.00 | 0.00 | 0.12 | 0.08 | 0.32 | 0.02 | 0.00 | 0.00 | 0.04 | 0.01 | 0.00 | 18.42 | 0.04 | 0.00 | 0.01 | 0.03 | 0.00 | 0.01 | 0.15 | 0.01 | 0.42 | 0.50 | 0.36 | 19.80 | 6.79 | 0.89 |
| 480850005 | TX | Collin | 65.4 | 66.0 | 0.08 | 0.00 | 0.00 | 0.10 | 0.08 | 0.29 | 0.02 | 0.00 | 0.00 | 0.04 | 0.01 | 0.74 | 27.06 | 0.05 | 0.00 | 0.02 | 0.03 | 0.00 | 0.01 | 0.15 | 0.01 | 0.53 | 0.47 | 0.53 | 19.31 | 6.79 | 0.72 |
| 481130075 | TX | Dallas | 65.3 | 66.5 | 0.15 | 0.00 | 0.00 | 0.11 | 0.11 | 0.28 | 0.03 | 0.00 | 0.00 | 0.01 | 0.12 | 0.86 | 21.71 | 0.05 | 0.00 | 0.04 | 0.04 | 0.00 | 0.02 | 0.17 | 0.01 | 0.35 | 0.29 | 0.91 | 21.85 | 7.05 | 0.55 |
| 481210032 | TX | Denton | 65.9 | 66.7 | 0.19 | 0.00 | 0.00 | 0.08 | 0.06 | 0.47 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.74 | 23.85 | 0.06 | 0.00 | 0.02 | 0.02 | 0.00 | 0.02 | 0.18 | 0.00 | 0.28 | 0.41 | 0.68 | 23.27 | 7.16 | 0.75 |
| 482010051 | TX | Harris | 66.6 | 67.1 | 0.13 | 0.00 | 0.02 | 0.04 | 0.00 | 0.28 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.43 | 26.47 | 0.07 | 0.00 | 0.01 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.34 | 2.25 | 0.75 | 20.23 | 6.75 | 0.89 |
| 482010416 | TX | Harris | 68.8 | 70.4 | 0.03 | 0.00 | 0.00 | 0.14 | 0.09 | 1.34 | 0.02 | 0.00 | 0.00 | 0.00 | 0.08 | 0.41 | 28.63 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 0.00 | 0.27 | 0.25 | 0.75 | 20.23 | 6.75 | 0.78 |
| 484390075 | TX | Tarrant | 63.8 | 64.7 | 0.15 | 0.00 | 0.00 | 0.09 | 0.04 | 1.57 | 0.05 | 0.00 | 0.00 | 0.00 | 0.08 | 0.59 | 24.97 | 0.07 | 0.00 | 0.01 | 0.00 | 0.00 | 0.02 | 0.16 | 0.01 | 0.27 | 0.25 | 0.70 | 20.26 | 6.75 | 0.78 |
| 484391002 | TX | Tarrant | 64.1 | 65.7 | 0.15 | 0.04 | 0.00 | 0.16 | 0.09 | 1.57 | 0.02 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 24.06 | 0.07 | 0.00 | 0.00 | 0.01 | 0.01 | 0.02 | 0.21 | 0.01 | 0.40 | 0.17 | 0.89 | 20.50 | 6.15 | 0.86 |
| 484392003 | TX | Tarrant | 65.2 | 65.9 | 0.09 | 0.00 | 0.00 | 0.15 | 0.07 | 1.55 | 0.02 | 0.00 | 0.00 | 0.00 | 0.10 | 0.74 | 24.84 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.20 | 0.01 | 0.32 | 0.17 | 0.79 | 21.28 | 6.67 | 0.71 |
| 484393009 | TX | Tarrant | 67.5 | 68.1 | 0.09 | 0.00 | 0.00 | 0.15 | 0.00 | 1.45 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.64 | 27.69 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.30 | 0.04 | 0.32 | 0.25 | 0.88 | 21.28 | 6.32 | 0.64 |
| 490571003 | UT | Weber | 69.3 | 70.3 | 0.10 | 0.12 | 0.00 | 0.10 | 0.03 | 0.03 | 0.11 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 8.27 | 0.00 | 0.00 | 0.08 | 0.11 | 0.00 | 0.00 | 0.02 | 0.66 | 0.11 | 0.21 | 48.73 | 3.70 | 0.43 |
| 550590025 | WI | Kenosha | 67.6 | 70.7 | 0.00 | 0.12 | 0.00 | 0.20 | 0.67 | 0.56 | 0.36 | 0.05 | 0.00 | 0.00 | 0.00 | 0.11 | 0.06 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 5.37 | 0.12 | 0.10 | 0.95 | 0.17 | 0.21 | 16.06 | 11.81 | 1.20 |
| 550890008 | WI | Ozaukee | 65.2 | 65.8 | 0.17 | 0.19 | 0.02 | 0.21 | 0.95 | 0.54 | 0.04 | 0.38 | 0.00 | 0.00 | 0.00 | 0.11 | 0.06 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 8.21 | 0.21 | 0.10 | 1.02 | 0.11 | 0.21 | 15.86 | 11.31 | 1.05 |

This page is intentionally left blank

Appendix D

Upwind State Collective Contribution
in 2023

This appendix provides the 2023 average design values, "home state" contributions, total contributions from all upwind states, and the total upwind contribution expresses as a percent of total ozone (i.e., the 2023 average design value) at each receptor (ppb).

Table D-1. Monitor plus modeled receptors.

| Site ID | State | County | 2023 Average DV | Home State Contribution | Upwind State Contribution | Upwind Contribution as a Percent of 2023 Average DV |
|---|---|---|---|---|---|---|
| 40278011 | AZ | Yuma | 70.4 | 2.97 | 6.96 | 9.9% |
| 80350004 | CO | Douglas | 71.3 | 15.68 | 5.67 | 8.0% |
| 80590006 | CO | Jefferson | 72.8 | 16.82 | 5.10 | 7.0% |
| 80590011 | CO | Jefferson | 73.5 | 17.54 | 4.90 | 6.7% |
| 80690011 | CO | Larimer | 70.9 | 13.99 | 5.22 | 7.4% |
| 90010017 | CT | Fairfield | 71.6 | 4.59 | 39.86 | 55.7% |
| 90013007 | CT | Fairfield | 72.9 | 3.94 | 40.05 | 54.9% |
| 90019003 | CT | Fairfield | 73.3 | 2.52 | 41.80 | 57.0% |
| 90099002 | CT | New Haven | 70.5 | 3.85 | 36.83 | 52.2% |
| 170310001 | IL | Cook | 68.2 | 18.8 | 17.66 | 25.9% |
| 170314201 | IL | Cook | 68.0 | 23.46 | 15.88 | 23.4% |
| 170317002 | IL | Cook | 68.5 | 20.58 | 18.84 | 27.5% |
| 350130021 | NM | Dona Ana | 70.8 | 2.87 | 6.98 | 9.9% |
| 350130022 | NM | Dona Ana | 69.7 | 2.89 | 5.83 | 8.4% |
| 350151005 | NM | Eddy | 69.7 | 6.52 | 5.19 | 7.4% |
| 350250008 | NM | Lea | 69.8 | 10.23 | 5.04 | 7.2% |
| 480391004 | TX | Brazoria | 70.4 | 29.21 | 10.79 | 15.3% |
| 481210034 | TX | Denton | 69.8 | 28.72 | 10.99 | 15.7% |
| 481410037 | TX | El Paso | 69.8 | 3.17 | 4.22 | 6.0% |
| 481671034 | TX | Galveston | 71.5 | 19.31 | 18.47 | 25.8% |
| 482010024 | TX | Harris | 75.1 | 31.24 | 7.81 | 10.4% |
| 482010055 | TX | Harris | 70.9 | 28.74 | 11.23 | 15.8% |
| 482011034 | TX | Harris | 70.1 | 28.33 | 9.91 | 14.1% |
| 482011035 | TX | Harris | 67.8 | 27.4 | 9.58 | 14.1% |
| 490110004 | UT | Davis | 72.0 | 8.72 | 5.08 | 7.1% |
| 490353006 | UT | Salt Lake | 72.6 | 9.15 | 5.42 | 7.5% |
| 490353013 | UT | Salt Lake | 73.3 | 7.49 | 4.55 | 6.2% |
| 550590019 | WI | Kenosha | 70.8 | 5.51 | 36.91 | 52.1% |
| 551010020 | WI | Racine | 69.7 | 7.98 | 34.08 | 48.9% |
| 551170006 | WI | Sheboygan | 72.7 | 7.22 | 34.76 | 47.8% |

Table D-2. Violating monitor receptors.

| Site ID | State | County | 2023 Average DV | Home State Contribution | Upwind State Contribution | Upwind Contribution as a Percent of 2023 Average DV |
|---|---|---|---|---|---|---|
| 40070010 | AZ | Gila | 67.9 | 7.65 | 3.19 | 4.7% |
| 40130019 | AZ | Maricopa | 69.8 | 15.32 | 3.42 | 4.9% |
| 40131003 | AZ | Maricopa | 70.1 | 13.83 | 4.16 | 5.9% |
| 40131004 | AZ | Maricopa | 70.2 | 14.56 | 2.81 | 4.0% |
| 40131010 | AZ | Maricopa | 68.3 | 13.90 | 4.24 | 6.2% |
| 40132001 | AZ | Maricopa | 63.8 | 12.84 | 2.96 | 4.6% |
| 40132005 | AZ | Maricopa | 69.6 | 13.81 | 3.01 | 4.3% |
| 40133002 | AZ | Maricopa | 65.8 | 13.59 | 2.66 | 4.0% |
| 40134004 | AZ | Maricopa | 65.7 | 11.01 | 4.26 | 6.5% |
| 40134005 | AZ | Maricopa | 62.3 | 12.29 | 3.69 | 5.9% |
| 40134008 | AZ | Maricopa | 65.6 | 13.06 | 2.76 | 4.2% |
| 40134010 | AZ | Maricopa | 63.8 | 12.31 | 3.05 | 4.8% |
| 40137020 | AZ | Maricopa | 67.0 | 14.42 | 2.68 | 4.0% |
| 40137021 | AZ | Maricopa | 69.8 | 14.25 | 3.47 | 5.0% |
| 40137022 | AZ | Maricopa | 68.2 | 13.92 | 3.39 | 5.0% |
| 40137024 | AZ | Maricopa | 67.0 | 14.42 | 2.68 | 4.0% |
| 40139702 | AZ | Maricopa | 66.9 | 12.53 | 3.48 | 5.2% |
| 40139704 | AZ | Maricopa | 65.3 | 12.20 | 3.15 | 4.8% |
| 40139997 | AZ | Maricopa | 70.5 | 14.56 | 2.85 | 4.0% |
| 40218001 | AZ | Pinal | 67.8 | 9.81 | 3.43 | 5.1% |
| 80013001 | CO | Adams | 63.0 | 13.94 | 4.00 | 6.3% |
| 80050002 | CO | Arapahoe | 68.0 | 14.72 | 5.63 | 8.3% |
| 80310002 | CO | Denver | 63.6 | 14.08 | 4.04 | 6.4% |
| 80310026 | CO | Denver | 64.5 | 14.27 | 4.09 | 6.3% |
| 90079007 | CT | Middlesex | 68.7 | 5.39 | 35.86 | 52.2% |
| 90110124 | CT | New London | 65.5 | 6.76 | 32.19 | 49.1% |
| 170310032 | IL | Cook | 67.3 | 17.27 | 19.98 | 29.7% |
| 170311601 | IL | Cook | 63.8 | 17.08 | 16.26 | 25.5% |
| 181270024 | IN | Porter | 63.4 | 15.38 | 19.39 | 30.6% |
| 260050003 | MI | Allegan | 66.2 | 2.02 | 34.51 | 52.1% |
| 261210039 | MI | Muskegon | 67.5 | 1.98 | 38.90 | 57.6% |
| 320030043 | NV | Clark | 68.4 | 9.05 | 8.53 | 12.5% |
| 350011012 | NM | Bernalillo | 63.8 | 6.58 | 3.86 | 6.1% |
| 350130008 | NM | Dona Ana | 65.6 | 1.69 | 6.21 | 9.5% |
| 361030002 | NY | Suffolk | 66.2 | 12.55 | 26.43 | 39.9% |
| 390850003 | OH | Lake | 64.3 | 18.66 | 17.64 | 27.4% |
| 480290052 | TX | Bexar | 67.1 | 18.42 | 3.10 | 4.6% |
| 480850005 | TX | Collin | 65.4 | 27.06 | 9.74 | 14.9% |

| Site ID | State | County | 2023 Average DV | Home State Contribution | Upwind State Contribution | Upwind Contribution as a Percent of 2023 Average DV |
|---------|-------|--------|-----------------|-------------------------|---------------------------|-----------------------------------------------------|
| 481130075 | TX | Dallas | 65.3 | 21.71 | 12.54 | 19.2% |
| 481211032 | TX | Denton | 65.9 | 23.85 | 11.65 | 17.7% |
| 482010051 | TX | Harris | 65.3 | 26.47 | 10.35 | 15.8% |
| 482010416 | TX | Harris | 68.8 | 28.63 | 10.37 | 15.1% |
| 484390075 | TX | Tarrant | 63.8 | 24.97 | 9.77 | 15.3% |
| 484391002 | TX | Tarrant | 64.1 | 24.06 | 10.92 | 17.0% |
| 484392003 | TX | Tarrant | 65.2 | 24.84 | 10.66 | 16.3% |
| 484393009 | TX | Tarrant | 67.5 | 27.69 | 10.08 | 14.9% |
| 490571003 | UT | Weber | 69.3 | 8.27 | 5.58 | 8.1% |
| 550590025 | WI | Kenosha | 67.6 | 5.37 | 31.77 | 47.0% |
| 550890008 | WI | Ozaukee | 65.2 | 8.21 | 27.37 | 42.0% |

Appendix E

Upwind Linkages for
Individual Receptors in 2023

Upwind states linked to monitored plus modeled receptors in 2023.

| Site ID | State | County | Receptor | Upwind States Linked to Individual Monitor Plus Modeled Receptors in 2023 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 40278011 | AZ | Yuma | Yuma | CA | | | | | | | | | | |
| 60650016 | CA | Riverside | Temecula | CA | | | | | | | | | | |
| 60651016 | CA | Riverside | Morongo | CA | | | | | | | | | | |
| 80350004 | CO | Douglas | Chatfield | CA | UT | | | | | | | | | |
| 80590006 | CO | Jefferson | Rocky Flats | CA | UT | | | | | | | | | |
| 80590011 | CO | Jefferson | NREL | CA | UT | | | | | | | | | |
| 80690011 | CO | Larimer | Fort Collins | AZ | CA | UT | | | | | | | | |
| 90010017 | CT | Fairfield | Greenwich | IN | MD | MI | NJ | OH | PA | WV | | | | |
| 90013007 | CT | Fairfield | Stratford | IL | IN | KY | MD | MI | NJ | NY | OH | PA | VA | WV |
| 90019003 | CT | Fairfield | Westport | IN | KY | MD | MI | NJ | NY | OH | PA | VA | WV | |
| 90099002 | CT | New Haven | Madison | IL | IN | KY | MD | MI | NJ | NY | OH | PA | VA | WV |
| 170310001 | IL | Cook | Alsip | IN | IA | MI | MN | TX | WI | | | | | |
| 170314201 | IL | Cook | Northbrook | IN | MI | OH | TX | WI | | | | | | |
| 170317002 | IL | Cook | Evanston | IN | MI | MO | OH | TX | WI | | | | | |
| 350130021 | NM | Dona Ana | Las Cruces Desert View | AZ | TX | | | | | | | | | |
| 350130022 | NM | Dona Ana | Las Cruces Santa Teresa | AZ | TX | | | | | | | | | |
| 350151005 | NM | Eddy | BLM | AZ | TX | | | | | | | | | |
| 350250008 | NM | Lea | Hobbs | AZ | CA | TX | | | | | | | | |
| 480391004 | TX | Brazoria | Manvel Croix Park | AR | LA | | | | | | | | | |
| 481210034 | TX | Denton | Denton Airport | AR | LA | MS | OK | | | | | | | |
| 481410037 | TX | El Paso | UTEP | AZ | NM | | | | | | | | | |
| 481671034 | TX | Galveston | Galveston | AL | AR | LA | MS | OK | | | | | | |
| 482010024 | TX | Harris | Houston Aldine | LA | | | | | | | | | | |
| 482010055 | TX | Harris | Houston Bayland Park | AR | LA | MS | | | | | | | | |
| 482011034 | TX | Harris | Houston East | AR | LA | | | | | | | | | |

## Upwind States Linked to Individual Monitor Plus Modeled Receptors in 2023

| Site ID | State | County | Receptor | | | | | | | | | | | | | | | |
|---------|-------|--------|----------|--|--|--|--|--|--|--|--|--|--|--|--|--|--|--|
| 482011035 | TX | Harris | Houston Clinton | AR | LA | | | | | | | | | | | | | |
| 490110004 | UT | Davis | Bountiful Viewmont | CA | NV | | | | | | | | | | | | | |
| 490353006 | UT | Salt Lake | Hawthorne | CA | NV | | | | | | | | | | | | | |
| 490353013 | UT | Salt Lake | Herriman | CA | NV | | | | | | | | | | | | | |
| 550590019 | WI | Kenosha | Chiwaukee Prairie | MI | MO | OH | TX | | | | | | | | | | | |
| 551010020 | WI | Racine | Racine | MI | MO | OH | TX | | | | | | | | | | | |
| 551170006 | WI | Sheboygan | Sheboygan Kohler Andrae | MI | MO | OH | TX | | | | | | | | | | | |

E-3

Upwind states linked to violating monitor receptors in 2023.

| Site ID | State | County | Receptor | Upwind States Linked to Individual Violating Monitor Receptors in 2023 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | CA | IN | KY | MD | MI | NJ | NY | OH | PA | UT | VA | WV |
| 40070010 | AZ | Gila | Tonto National Monument | CA | | | | | | | | | | | |
| 40130019 | AZ | Maricopa | West Phoenix | CA | | | | | | | | | | | |
| 40131003 | AZ | Maricopa | Mesa | CA | | | | | | | | | | | |
| 40131004 | AZ | Maricopa | North Phoenix | CA | | | | | | | | | | | |
| 40131010 | AZ | Maricopa | Falcon Field | CA | | | | | | | | | | | |
| 40132001 | AZ | Maricopa | Glendale | CA | | | | | | | | | | | |
| 40132005 | AZ | Maricopa | Pinnacle Peak | CA | | | | | | | | | | | |
| 40133002 | AZ | Maricopa | Central Phoenix | CA | | | | | | | | | | | |
| 40134004 | AZ | Maricopa | West Chandler | CA | | | | | | | | | | | |
| 40134005 | AZ | Maricopa | Tempe | CA | | | | | | | | | | | |
| 40134008 | AZ | Maricopa | Cave Creek | CA | | | | | | | | | | | |
| 40134010 | AZ | Maricopa | Dysart | CA | | | | | | | | | | | |
| 40137020 | AZ | Maricopa | Senior Center | CA | | | | | | | | | | | |
| 40137021 | AZ | Maricopa | Red Mountain | CA | | | | | | | | | | | |
| 40137022 | AZ | Maricopa | Lehi | CA | | | | | | | | | | | |
| 40137024 | AZ | Maricopa | High School | CA | | | | | | | | | | | |
| 40139702 | AZ | Maricopa | Tonto National Forest | CA | | | | | | | | | | | |
| 40139704 | AZ | Maricopa | Fountain Hills | CA | | | | | | | | | | | |
| 40139997 | AZ | Maricopa | JLG Supersite | CA | | | | | | | | | | | |
| 40218001 | AZ | Pinal | Queen Valley | CA | | | | | | | | | | | |
| 80013001 | CO | Adams | Welby | CA | | | | | | | | | UT | | |
| 80050002 | CO | Arapahoe | Highland Reservoir | CA | | | | | | | | | UT | | |
| 80310002 | CO | Denver | Denver  Camp | CA | | | | | | | | | UT | | |
| 80310026 | CO | Denver | La Casa | CA | | | | | | | | | UT | | |
| 90079007 | CT | Middlesex | Middlesex | | IN | KY | MD | | | NY | OH | PA | | VA | WV |

| Site ID | State | County | Receptor | Upwind States Linked to Individual Violating Monitor Receptors in 2023 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 90110124 | CT | New London | Fort Griswold Park | IN | MD | MI | NJ | NY | OH | PA | VA | WV |
| 170310032 | IL | Cook | South Water Plant | IN | IA | MI | OH | OK | TX | WI | | |
| 170311601 | IL | Cook | Cook County Trailer | IN | MI | OH | TX | WI | | | | |
| 181270024 | IN | Porter | Ogden Dunes | IL | MI | OH | TX | WI | | | | |
| 260050003 | MI | Allegan | Holland | IL | IN | IA | KS | MO | OH | OK | TX | WI |
| 261210039 | MI | Muskegon | Muskegon | AR | IL | IN | KY | MO | OH | OK | TX | WI |
| 320030043 | NV | Clark | Paul Meyer | AZ | CA | | | | | | | |
| 350011012 | NM | Bernalillo | Foothills | AZ | TX | | | | | | | |
| 350130008 | NM | Dona Ana | La Union | AZ | TX | | | | | | | |
| 361030002 | NY | Suffolk | Babylon | IN | KY | MD | MI | NJ | OH | PA | VA | WV |
| 390850003 | OH | Lake | Eastlake | IL | IN | KY | MI | PA | TX | WV | | |
| 480290052 | TX | Bexar | Camp Bullis | LA | | | | | | | | |
| 480850005 | TX | Collin | Frisco | LA | MS | TN | | | | | | |
| 481130075 | TX | Dallas | Dallas North | AR | LA | MS | OK | TN | | | | |
| 481211032 | TX | Denton | Pilot Point | AL | AR | LA | MS | MO | TN | | | |
| 482010051 | TX | Harris | Houston Croquet | LA | MS | | | | | | | |
| 482010416 | TX | Harris | Park Place | AR | LA | MS | | | | | | |
| 484390075 | TX | Tarrant | Eagle Mountain Lake | AR | LA | MS | OK | TN | | | | |
| 484391002 | TX | Tarrant | Fort Worth Northwest | AR | LA | OK | | | | | | |
| 484392003 | TX | Tarrant | Keller | AR | LA | MS | OK | TN | | | | |
| 484393009 | TX | Tarrant | Grapevine | LA | MS | OK | | | | | | |
| 490571003 | UT | Weber | Harrisville | CA | NV | | | | | | | |
| 550590025 | WI | Kenosha | Kenosha Water Tower | IL | IN | IA | MO | TX | | | | |
| 550890008 | WI | Ozaukee | Grafton | IL | IN | MI | MO | OH | TX | | | |

E-5