No. 23-60069

# In the United States Court of Appeals for the Fifth Circuit

STATE OF TEXAS; TEXAS COMMISSION ON ENVIRONMENTAL QUALITY; LUMINANT GENERATION COMPANY, L.L.C.; COLETO CREEK POWER, L.L.C.; ENNIS POWER COMPANY, L.L.C.; HAYS ENERGY, L.L.C.; MIDLOTHIAN ENERGY, L.L.C.; OAK GROVE MANAGEMENT COMPANY, L.L.C.; WISE COUNTY POWER COMPANY, L.L.C.; ASSOCIATION OF ELECTRIC COMPANIES OF TEXAS; BCCA APPEAL GROUP; TEXAS CHEMICAL COUNCIL; TEXAS OIL & GAS ASSOCIATION; PUBLIC UTILITY COMMISSION OF TEXAS; RAILROAD COMMISSION OF TEXAS; STATE OF MISSISSIPPI; MISSISSIPPI DEPARTMENT OF ENVIRONMENTAL QUALITY; MISSISSIPPI POWER COMPANY; STATE OF LOUISIANA; LOUISIANA DEPARTMENT OF ENVIRONMENTAL QUALITY; ENTERGY LOUISIANA, L.L.C; LOUISIANA CHEMICAL ASSOCIATION; MID-CONTINENT OIL AND GAS ASSOCIATION; LOUISIANA ELECTRIC UTILITY ENVIRONMENTAL GROUP, L.L.C.; TEXAS LEHIGH CEMENT COMPANY, LP,

*Petitioners*,

*v.*

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; MICHAEL S. REGAN, ADMINISTRATOR, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

*Respondents.*

On Petitions for Review of a Final Action of the United States Environmental Protection Agency

## RULE 30.2(a) APPENDIX – VOLUME THREE OF SEVEN
### (C.I. Nos. HQ-110, HQ-125, HQ-367, HQ-396, HQ-546, HQ-788, R4-9, R4-10, R4-17, R6-1, R6-2)

*(Counsel Listed on Inside Cover)*

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

LANORA C. PETTIT
Principal Deputy Solicitor General

BILL DAVIS
Deputy Solicitor General
Bill.Davis@oag.texas.gov

MICHAEL R. ABRAMS
WILLIAM F. COLE
Assistant Solicitors General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

Counsel for the State of Texas, Texas
Commission on Environmental
Quality, Public Utility Commission of
Texas, and Railroad Commission of
Texas

No. 23-60069

# In the United States Court of Appeals for the Fifth Circuit

STATE OF TEXAS; TEXAS COMMISSION ON ENVIRONMENTAL QUALITY; LUMINANT GENERATION COMPANY, L.L.C.; COLETO CREEK POWER, L.L.C.; ENNIS POWER COMPANY, L.L.C.; HAYS ENERGY, L.L.C.; MIDLOTHIAN ENERGY, L.L.C.; OAK GROVE MANAGEMENT COMPANY, L.L.C.; WISE COUNTY POWER COMPANY, L.L.C.; ASSOCIATION OF ELECTRIC COMPANIES OF TEXAS; BCCA APPEAL GROUP; TEXAS CHEMICAL COUNCIL; TEXAS OIL & GAS ASSOCIATION; PUBLIC UTILITY COMMISSION OF TEXAS; RAILROAD COMMISSION OF TEXAS; STATE OF MISSISSIPPI; MISSISSIPPI DEPARTMENT OF ENVIRONMENTAL QUALITY; MISSISSIPPI POWER COMPANY; STATE OF LOUISIANA; LOUISIANA DEPARTMENT OF ENVIRONMENTAL QUALITY; ENTERGY LOUISIANA, L.L.C; LOUISIANA CHEMICAL ASSOCIATION; MID-CONTINENT OIL AND GAS ASSOCIATION; LOUISIANA ELECTRIC UTILITY ENVIRONMENTAL GROUP, L.L.C.; TEXAS LEHIGH CEMENT COMPANY, LP,

*Petitioners*,

*v.*

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; MICHAEL S. REGAN, ADMINISTRATOR, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

*Respondents.*

On Petitions for Review of a Final Action
of the United States Environmental Protection Agency

## INDEX TO RULE 30.2(a) APPENDIX (VOLUME THREE OF SEVEN)[*]

---

[*] Consistent with how record material was cited in the briefs, appendix tab numbers correspond to the final four digits (minus leading zeros) of "Document ID" numbers on the certified index of record contents.

20.  Comment submitted by Jason Meyers, Administrator, Air Planning and Assessment Division, Louisiana Departments of Environmental Quality (Dec. 14, 2020) (EPA-HQ-OAR-2020-0272-0110)......... Tab HQ-110

21.  Comment submitted by Toby Baker, Executive Director, Texas Commission on Environmental Quality (TCEQ) (Dec. 14, 2020) (EPA-HQ-OAR-2020-0272-0125).................................................. Tab HQ-125

22.  Comment submitted by Attorneys General of New York et al. (June 21, 2022) (EPA-HQ-OAR-2021-0668-0367) ............................... Tab HQ-367

23.  Comment submitted by Cleco Corporate Holdings LLC (June 21, 2022) (EPA-HQ-OAR-2021-0668-0396).................................... Tab HQ-396

24.  Comment submitted by Entergy Services, LLC (ESL) (June 21, 2022) (EPA-HQ-OAR-2021-0668-0546)................................... Tab HQ-546

25.  Comments submitted on behalf of Midcontinent Independent System Operator ("MISO") (June 21, 2022) (EPA-HQ-OAR-2021-0668-0788)................................................................Tab HQ-788

26.  Mississippi_2015 Ozone Infrastructure SIP Prongs 1 and 2 (Jan. 31, 2022) (EPA-R04-OAR-2021-0841-0009) ......................................... Tab R4-9

27.  Air Quality State Implementation Plans; Approvals and Promulgations: Alabama, Mississippi, Tennessee; Interstate Transport Requirements for the 2015 8-Hour Ozone National Ambient Air Quality Standards (Feb. 22, 2022) (EPA-R04-OAR-2021-0841-0010) ...................................................... Tab R4-10

28.  Comment submitted by Mississippi Department of Environmental Quality (Apr. 22, 2022) (EPA-R04-OAR-2021-0841-0017) ............Tab R4-17

29.  Air Quality State Implementation Plans; Approvals and Promulgations: Air Plan Disapproval; Arkansas, Louisiana, Oklahoma, Texas; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards, Proposed rule (Feb. 22, 2022) (EPA-R06-OAR-2021-0801-0001) ................... Tab R6-1

30.  EPA Region 6 2015 8-Hour Ozone Transport SIP Proposal Technical Support Document (Jan. 25, 2022) (EPA-R06-OAR-2021-0801-0002) ........................................................................... Tab R6-2

*(See subsequent volumes for additional appendix documents)*

**Tab HQ-110: Comment submitted by Jason Meyers, Administrator, Air Planning and Assessment Division, Louisiana Departments of Environmental Quality (Dec. 14, 2020) (EPA-HQ-OAR-2020-0272-0110)**



JOHN BEL EDWARDS
GOVERNOR

CHUCK CARR BROWN, PH.D.
SECRETARY

# State of Louisiana
## DEPARTMENT OF ENVIRONMENTAL QUALITY
### OFFICE OF ENVIRONMENTAL ASSESSMENT

December 14, 2020

A-and-R-Docket@epa.gov

RE:     Comments on Revised Cross-State Air Pollution Rule Update for the 2008 Ozone National Ambient Air Quality Standards

To whom it may concern:

The mission of the Louisiana Department of Environmental Quality (LDEQ) is to provide service to the people of Louisiana through comprehensive environmental protection in order to promote and protect health, safety and welfare. LDEQ is pleased to provide comments on this latest proposed revision.

EPA outlined the main rulemaking revisions in the Fact Sheet on their website as follows (emphasis added):

> On October 15, 2020, the EPA proposed the Revised Cross-State Air Pollution Rule (CSAPR) Update in order to fully address 21 states' outstanding interstate pollution transport obligations for the 2008 ozone National Ambient Air Quality Standard (NAAQS). Starting in the 2021 ozone season, the proposed rule would reduce emissions of nitrogen oxides (NOx) from power plants in 12 states, improving air quality for millions of Americans.

> The proposed rulemaking responds to a September 2019 ruling by the United States Court of Appeals for the D.C. Circuit, Wisconsin v. EPA, which remanded the 2016 CSAPR Update to EPA for failing to fully eliminate significant contribution to nonattainment and interference with maintenance of the 2008 ozone NAAQS from upwind states by downwind areas' attainment dates.

> EPA is proposing a rule that fully resolves 21 upwind states' remaining good neighbor obligations under the 2008 ozone NAAQS. Additional emissions reductions are required at power plants in 12 states based on optimization of existing, already-installed selective 2 catalytic reduction (SCR) controls for the 2021 ozone season and installation or upgrade of low NOX burners for the 2022 ozone season.

> The proposal relies on EPA's latest data and modeling to assess air quality nonattainment and maintenance for the 2008 ozone NAAQS. EPA analysis found that, for 9 out of the 21 states for which the CSAPR Update was previously found to be only a partial remedy (Alabama, Arkansas, Iowa, Kansas, Mississippi, Missouri, Oklahoma, Texas, and Wisconsin), their projected 2021 emissions do not significantly contribute to nonattainment and/or maintenance problems in downwind states. Thus, EPA proposes no further obligations for these states.

For the 12 remaining states (Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, New Jersey, New York, Ohio, Pennsylvania, Virginia, and West Virginia), their projected 2021 emissions were found to contribute at or above a threshold of 1% of the NAAQS (0.75 ppb) to the identified nonattainment and/or maintenance problems in downwind states. EPA proposes to issue new or amended Federal Implementation Plans (FIPs) to revise state emission budgets that reflect additional emissions reductions from electricity generating units (EGUs) beginning with the 2021 ozone season.

In order to respect attainment deadlines as directed by the court in *Wisconsin v. EPA*, EPA must revise the existing CSAPR NOx ozone season program as quickly as possible to enable improvements in downwind ozone and to realize associated public health benefits by the 2021 ozone season, which corresponds with the 2021 Serious area attainment date under the 2008 ozone NAAQS.

EPA also proposes to adjust these 12 states' emissions budgets for each ozone season thereafter to incentivize ongoing operation of identified emissions controls to address significant contribution, until such time that air quality projections demonstrate resolution of the downwind nonattainment and/or maintenance problems for the 2008 ozone NAAQS. As such, the proposal includes adjusting emissions budgets for each state for each ozone season for 2021 through 2024. After the 2024 ozone season, no further adjustments would be required under this proposed rulemaking.

EPA is proposing not to include limits on ozone season NOx emissions from non-EGU sources in this rulemaking. Using the best information currently available to the Agency, the proposed analysis suggests that there are relatively fewer emissions reductions available from the non-EGU controls EPA evaluated at a cost threshold comparable to the cost threshold selected for EGUs, and such reductions are estimated to have a relatively small effect on any downwind receptor in the year by which controls could likely be installed.

As of this writing, Louisiana is designated attainment for both the 2008 and 2015 Ozone NAAQS. LDEQ has worked tirelessly to reach this designation over the almost 30 years since the Clean Air Act Amendments of 1990 (the Act) were promulgated. Furthermore the state has submitted to EPA a "Good Neighbor" SIP based upon the 2015 Ozone NAAQS showing Louisiana does not transport pollution to downwind states. (See attachment) This SIP provides emissions data, weather related back trajectories as well as rule makings that show Louisiana is indeed in compliance with the Good Neighbor provisions of the Act.

Louisiana respectfully requests that EPA reconsider and reverse its findings that the state's emissions contribute to downwind state's 2008 Ozone NAAQS nonattainment problems as well as the proposed requirements on Louisiana's EGUs.

Sincerely,

Jason Meyers, Administrator
Air Planning and Assessment Division

# Interstate Transport State Implementation Plan
# 2015 Ozone National Ambient Air Quality Standards



**November 8, 2019**

**Prepared by:**
**Louisiana Department of Environmental Quality**

**Submitted to:**
**United States Environmental Protection Agency**
**Region 6**
**1201 Elm Street, Suite 500**
**Dallas, TX 75270**



**JOHN BEL EDWARDS**
GOVERNOR

**CHUCK CARR BROWN, PH.D.**
SECRETARY

# State of Louisiana
## DEPARTMENT OF ENVIRONMENTAL QUALITY
## OFFICE OF THE SECRETARY

Mr. Ken McQueen
Regional Administrator
EPA Region 6-RA
1201 Elm Street, Suite 500
Dallas, Texas 75270

RE:     State of Louisiana
        2015 Ozone National Ambient Air Quality Standards
        Interstate Transport State Implementation Plan (SIP)

Dear Mr. McQueen:

In accordance with Section 110(a)(1) and (2) of the Clean Air Act Amendments of 1990, the state of Louisiana is pleased to submit the Interstate Transport State Implementation Plan for the 2015 Ozone National Ambient Air Quality Standards (NAAQS) for approval.

If you or your staff have questions concerning this submittal, please contact Vivian Aucoin, Air Planning and Assessment Division, SIP Group at (225) 219-3482 or vivian.aucoin@la.gov.

Sincerely,

Chuck Carr Brown, Ph.D.
Secretary

Date: _11/12/15_

c:   Guy Donaldson, EPA Region 6

**Executive Summary**

This revision to the state implementation plan (SIP) is intended to meet the infrastructure and transport requirements of the Federal Clean Air Act (FCAA), §110(a). States are required by FCAA, §110(a)(1) to submit SIP revisions providing for the implementation, maintenance, and enforcement of a new or revised National Ambient Air Quality Standard (NAAQS) within three years after promulgation. On October 1, 2015, the United States Environmental Protection Agency (EPA) revised the primary and secondary NAAQS for ozone to an eight-hour standard of 0.070 parts per million.

FCAA, §110(a)(2)(A) through (M), lists the elements that infrastructure and transport SIP submissions must contain. This SIP revision specifically addresses transport requirements under FCAA, §110(a)(2)(D) for the 2015 ozone NAAQS. The remaining infrastructure requirements of FCAA, §110(a)(2)(A) through (M) are addressed in a separate SIP revision submitted concurrently. This SIP revision documents how the transport elements listed in FCAA, §110(a)(2)(D) are currently addressed in the Louisiana SIP and provides supporting information which indicated that Louisiana meets the interstate transport requirements of FCAA, §110(a)(2)(D)(i) and (ii).

Pursuant to FCAA, §110(a)(2)(D)(i), this SIP revision must contain elements that provide supporting information demonstrating that Louisiana:

- does not contribute significantly to nonattainment of the 2015 ozone NAAQS for areas in other states;
- does not interfere with the maintenance of the 2015 ozone NAAQS in any other state;
- does not interfere with measures required to meet an implementation plan for any other state related to prevention of significant deterioration (PSD); and
- does not interfere with measures required to meet the implementation plan for any other state related to regional haze and visibility.

In addition, pursuant to FCAA, §110(a)(2)(D)(ii), this SIP revision must provide information demonstrating compliance with the applicable requirements of FCAA, §126 and §115 relating to interstate and international pollution abatement.

To meet the requirements of FCAA, §110(a)(2)(D)(i)(I), this SIP revision includes an analysis of ozone design value and emissions trends in Louisiana and an analysis of the impacts of Louisiana's emissions on other states. A discussion of existing ozone control strategies is included to demonstrate emissions from Louisiana do not contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in another state.

# Table of Contents

Executive Summary

Chapter 1 General

   1.1 Background

   1.2 Public Notice and Comments

Chapter 2 Ozone Data

   2.1 Introduction

   2.2 Historical Design Value Trends

   2.3 Ozone Emissions Trends in Louisiana

      2.3.1 Historical Ozone Precursor Emissions Inventory Trends

Chapter 3 Significant Contribution to Nonattainment and Interference with Maintenance

   3.1 Introduction

   3.2 Discussion of Texas monitors

Chapter 4 Control Strategies

Chapter 5 Prevention of Significant Deterioration and Visibility

Chapter 6 Interstate Pollution Abatement

   6.1 Interstate Pollution Abatement

   6.2 International Air Pollution

Chapter 7 Conclusions

Chapter 8 Future Revisions to the National Ambient Air Quality Standards (NAAQS)

Appendix A: Potpourri Notice

Appendix B: Interstate Pollution Abatement Support Documents

Appendix C: International Air Pollution Support Documents

# Chapter 1: General

## 1.1 Background

On October 1, 2015, the United States Environmental Protection Agency (EPA) revised the primary and secondary NAAQS for ozone to an eight-hour standard of 0.070 parts per million (ppm) or 70 parts per billion (ppb) (80 *Federal Register* (FR) 65291, October 26, 2015). Within three years of the promulgation of any new or revised NAAQS, FCAA, §110(a)(1) requires states to submit a SIP revision to provide for the implementation, maintenance, and enforcement of the NAAQS. Section 110(a)(2)(A) through (M), lists the elements that the SIP submissions must contain. This SIP revision specifically addresses transport requirements under FCAA, §110(a)(2)(D). The Louisiana Department of Environmental Quality (LDEQ) addressed the infrastructure requirements of FCAA, §110(a)(2)(A) through (C) and (E) through (M) in a separate concurrent SIP. Submittal of this SIP revision and the infrastructure SIP revision covering FCAA, §110(a)(2)(A) through (C) and (E) through (M) fulfil the FCAA, §110(a)(1) requirement.

Pursuant to FCAA, §110(a)(2)(D)(i), this transport SIP revision must contain adequate provisions that prohibit any source or other type of emissions activity within the state from emitting any NAAQS pollutants in amounts that will:

- contribute significantly to nonattainment of the 2015 ozone NAAQS for areas in other states;
- interfere with the maintenance of the 2015 ozone NAAQS in any other state;
- interfere with measures required to meet an implementation plan for any other state related to prevention of significant deterioration (PSD); and
- interfere with measures required to meet the implementation plan for any other state related to regional haze and visibility.

In addition, pursuant to FCAA, §110(a)(2)(D)(ii), this SIP revision must provide information demonstrating compliance with the applicable requirements of FCAA, §126 and §115 relating to interstate and international pollution abatement.

On March 27, 2018, EPA provided projected air quality modeling results for ozone in 2023 including projected ozone concentrations at potential nonattainment and maintenance sites for the 2015 Ozone NAAQS and projected upwind state contribution data. EPA invited states to use this data to develop SIPs to assure that emissions within their jurisdictions do not contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone standards in other states. EPA included a preliminary list of potential flexibilities in analytical approaches for developing a good neighbor SIP in the memorandum. EPA then opened this matter up for discussion and comment. Following a comment period, EPA revised the contribution metric spreadsheet to include 2014-2016 design values as well as information regarding "home state" and upwind state collective contributions. EPA also published the following memorandum to assist states in constructing approvable SIPs:

- Analysis of Contribution Thresholds Memo (signed August 2018)
  - Contribution Threshold Analysis for 2015 NAAQS Ozone Transport
- Consideration for Identifying Maintenance Receptors Memo (signed October 2018)
  - Ozone Monitoring Site Design Values for 2008-2017 and for 2023
  - State-Level Annual Anthropogenic NOx and VOC Emission for 2011 through 2017 and for 2023.

This SIP revision includes an analysis of required transport elements in FCAA, §110(a)(2)(D)(i) and (ii) consistent with statutory requirements and includes a technical and regulatory provisions that support the conclusion that Louisiana meets the requirements of each section. The LDEQ acknowledges that changes to federal regulations may have future impacts on how the LDEQ meets the requirements of FCAA, §110(a)(2)(D); however, this SIP revision reflects the methods and means by which Louisiana meets these requirements at the time this SIP revision was developed. Should future federal rule changes necessitate state rule changes, the LDEQ will act appropriately at that time.


**1.2 Public Notice and Comments**


Louisiana published its Potpourri Notice in the August 20, 2018 volume of the Louisiana Register.  The public comment period closed on September 20, 2018.  EPA Region 6 submitted written comments; LDEQ did not hold a public hearing on this matter.

## Chapter 2: Ozone Data

### 2.1 Introduction

Ground-level Ozone ($O_3$), regulated by the NAAQS, is a secondary pollutant that is formed by a photochemical reaction between precursor compounds, nitrogen oxides ($NO_X$) and volatile organic compounds (VOC). Ozone is created and destroyed on a natural cycle according to atmospheric conditions and chemical concentrations of precursor compounds, $NO_X$ and VOC, from both natural and anthropogenic sources.

The concentration of ozone is determined by the balance between chemical processes that produce and destroy ozone. The balance is determined by the concentration of precursor compounds, sunlight intensity, and other meteorological conditions, such as wind direction and speed, temperature, mixing height and other parameters. The rate of ozone production can be limited by reducing the concentration of the precursor compounds available for ozone formation.

Ozone precursor compounds also exist under natural conditions. Ozone formation from naturally occurring precursor compounds is known as "background" ozone. Background ozone can be produced from natural local sources or transported via winds from distant natural sources, such as the stratosphere or another region or country. The contribution of background ozone must be considered when evaluating ozone concentrations but is difficult to quantify.

The anthropogenic precursors of ozone originate from a wide variety of stationary and mobile sources. Through the development of complete and accurate emission inventories and Photochemical Assessment Monitoring Stations (PAMS), the sources and concentrations of anthropogenic ozone and ozone precursors can be identified. This chapter will discuss trends in ozone and ozone precursor emissions in Louisiana to demonstrate the progress the state has made towards achieving the NAAQS and reducing ozone precursor pollutants.

### 2.2 Historical Design Value Trends

A design value is a statistic that is used to compare air quality data to the NAAQS. For eight-hour ozone, a design value is the three-year average of the fourth-highest daily maximum eight-hour averaged ozone concentration. The latest year in the three-year average is used to represent the design value for that three-year period. Design values are calculated at each ozone monitor within an area and the monitor with the highest design value determines the design value for the area. Although the eight-hour ozone NAAQS is reported in ppm, design values in this chapter are  displayed in parts per billion (ppb) for ease of reading.

The 2015 eight-hour primary and secondary ozone ambient air quality standards are met when the design value is less than or equal to 70 ppb. Eight-hour ozone design value trends by Louisiana area are displayed in Figure 2.2-1: *Eight-Hour Ozone Design Values in Louisiana*. Figure 2.2-1 shows that all areas of Louisiana have shown decreases in design values over the

past 15 years. As mentioned above, all areas in Louisiana are measuring below the 2015 ozone NAAQS of 70 ppb.



Figure 2.2-1: Eight-Hour Ozone Deisgn Values in Louisiana

## 2.3 Ozone Emissions Trends in Louisiana

The LDEQ, in accordance with the EPA's Air Emissions Reporting Requirements[1], develops an inventory of information for sources of ozone precursor emissions ($NO_X$ and VOC) that identifies the types of emissions sources present in the state, the amount of each pollutant emitted, and the types of processes and control devices employed at each facility. The emissions inventory provides data for a variety of air quality planning tasks, including establishing baseline emissions levels, calculating reduction targets, developing control strategies to achieve emissions reductions, developing emissions inputs for air quality models, and tracking actual emissions reductions against established emissions growth and control budgets.

---

[1] 40 Code of Federal Regulations (CFR) Part 51, Subpart A

Ten years of anthropogenic emissions data (2005 through 2014) were analyzed to develop historical trend data. During this time, the emissions inventory for Louisiana showed significant decreases in ozone precursor emissions, as detailed in Section 2.3.1 Historical Ozone Precursor Emissions Inventory Trends. In addition, detailed point source category emissions inventory data, limited to stationary point source emissions (2014 through 2017), were also analyzed for historical trends. These reductions contributed to the attainment of both the one-hour and the eight-hour ozone NAAQS.

**2.3.1 Historical Ozone Precursor Emissions Inventory Trends**

For the 10-year historical period up to and including 2014 (2005 through 2014), overall anthropogenic ozone precursor emissions in Louisiana has decreased.  As demonstrated in Figure 2.3.1-1: *Historical Ozone Precursor Trends*, anthropogenic $NO_X$ emissions decreased 42% and anthropogenic VOC emissions decreased 61% from 2005 through 2014. These emission reductions were the result of regulations implemented at the federal, state, and local levels and innovative programs implemented by the LDEQ.



Annual point source category emissions inventory data collected since the last periodic emissions inventory, 2014 through 2017, indicates a continued trend of ozone precursor emissions

reductions. As demonstrated in Figure 2.3.1-2: *Point Source Ozone Precursor Trends*, anthropogenic emissions have decreased a combined 3% between 2014 and 2017.



Figre 2.3.1-2: Point Source Ozone Precursor Trends

**Chapter 3: Significant Contribution to Nonattainment and Interference with Maintenance Areas**

**3.1 Introduction**

The Clean Air Act requires states to submit a SIP revision that contains adequate provisions to prohibit any source or other type of emissions activity within the state from emitting any air pollutants in amounts that will contribute significantly to nonattainment of the NAAQS for areas in other states or interfere with maintenance of the NAAQS in any other state. The purpose of FCAA's §110(a)(2)(D)(i)(I), also known as the "good neighbor" provision, is to ensure that emissions in one state that contribute significantly to nonattainment or interfere with maintenance in another state are addressed appropriately.

For this SIP revision, the key aspect of fulfilling this obligation is to determine if emissions from Louisiana contribute significantly to nonattainment or interfere with maintenance of the 2015 eight-hour ozone NAAQS in another state. State data analysis demonstrate that emissions from Louisiana do not contribute significantly to nonattainment or interfere with maintenance of the 2015 eight-hour ozone NAAQS in another state.

The approach used by the LDEQ to determine if emissions from Louisiana contribute significantly to nonattainment or interfere with maintenance at downwind monitors in another state is based partly on the EPA's Contribution Metric Spreadsheet, *2015 Ozone NAAQS Interstate Transport Assessment Design Values and Contributions,* published May 2018. The LDEQ used a three-step approach, detailed below, to determine if emissions from Louisiana contribute significantly to nonattainment or interfere with maintenance at downwind monitors in another state.

> **Step 1:** Identify monitors projected to be in nonattainment or have maintenance issues in a future year.
> **Step 2:** Identify projected nonattainment and/or maintenance monitors in other states that might be impacted by emissions from Louisiana, tagging them for further review.
> **Step 3:** Determine if emissions from Louisiana contribute significantly to nonattainment or interfere with maintenance at the monitors tagged for review in Step 2.

The EPA used a four-step framework, referred to as the Cross-State Air Pollution Rule (CSAPR) framework, to address the requirements of the "good neighbor" provision in the 2015 Transport Notice Of Data Availability (NODA). From the 2015 Transport NODA, the four steps in the CSAPR framework are as follows (82 FR 1735):

> "[1] Identifying downwind receptors that are expected to have problems attaining or maintaining clean air standards (i.e., NAAQS);

> [2] Determining which states contribute to these problems in amounts sufficient to "link" them to the downwind air quality problems;

[3] For states linked to downwind air quality problems, identifying upwind emissions that significantly contribute to nonattainment or interfere with maintenance of the NAAQS by quantifying upwind reductions in ozone precursor emissions and apportioning emissions reduction responsibility among upwind states; and

[4] For states that are found to have emissions that significantly contribute to nonattainment or interfere with maintenance of the NAAQS downwind, adopting SIPs or FIPs that eliminate such emissions."

The LDEQ's three-step process covers steps [1] and [2] of the four-step framework. Step 1 of the LDEQ's three-step process is the same as step [1] of the EPA's four-step framework. Steps 2 and 3 of the LDEQ's process together are equivalent to step [2] of the EPA's framework. Steps [3] and [4] of EPA's framework are relevant only if emissions from Louisiana contribute significantly to nonattainment or interfere with maintenance at downwind monitors in another state and are therefore not addressed in this SIP revision.

In the 2015 Transport NODA, upwind states with contributions greater than or equal to 0.7 ppb to a monitor's future year design value are linked to the downwind monitor. Once the linkages have been established, the portion of emissions from linked states that were determined by the EPA to have contributed significantly to nonattainment or interfere with maintenance are identified (Steps 2 and 3, respectively, of the EPA's four-step framework). The EPA's framework establishes the 1% of NAAQS threshold as the default definition of significant contribution to nonattainment or interference with maintenance. The LDEQ has maintained that an arbitrary threshold of 1% of the NAAQS for significant contribution to nonattainment or interference with maintenance is not applicable because the value is not detectable by the monitor and following the manner in which a design value is calculates, one percent of the standard would be truncated to zero. Therefore, Louisiana will use the flexibility allowed in the March 2018 memorandum allowing the use of 1 ppb. In the 2015 Transport NODA, the EPA acknowledges that a contribution of 1% of the NAAQS from an upwind state alone does not determine whether the upwind state significantly contributes to nonattainment or interferes with maintenance of a NAAQS to a downwind state (FR 82 1740). The LDEQ believes that it is critical to determine if emissions from an upwind state *contribute significantly* to nonattainment or interfere with maintenance prior to the identification (and subsequent reduction) of such emissions. Based upon this discussion, the monitors in Michigan and Wisconsin will not be discussed as the receptor value is less than 1 ppb.

Since there could be considerable variation in the characteristics of the ozone problem at each monitor, not all factors were considered or analyzed for every monitor. In addition, the use of 1% of the NAAQS threshold for modeled contribution as the sole definition of significant contribution is inappropriate for the 2015 ozone NAAQS since the more stringent 0.7 ppb threshold is an order of magnitude smaller than the biases and errors typically documented for regional photochemical modeling (Simon *et al*., 2012). The Louisiana contribution should be deemed "significant" only if there is a persistent and consistent pattern of contribution **on several days with elevated ozone**.

**3.2 Discussion of Texas monitors**

*Step 1 and 2: Identification of Projected Nonattainment and Maintenance Monitors based upon receptor values equal to or greater than 1 ppb*:

- Dallas/Fort Worth Area Monitors and modeled contribution:
    - Denton Airport South (481210034)          1.92 ppb
    - FAA Site Off Alta Vista Road (484392003)   1.71 ppb
- Houston/Galveston
    - Croix Parkway (480391004)                  3.80 ppb
    - Aldine Mail Road (482010024)               3.06 ppb
    - Durant Street  (482011039)                 4.72 ppb

*Step 3: Do emissions from Louisiana contribute significantly to nonattainment or interfere with maintenance at the monitors outlined in Steps 1 and 2:*

While Louisiana contributes to the monitors outlined in the Dallas and Houston areas, an analysis of back trajectory of air parcel movement and a review of the EPA modeling of interstate impact on air monitors indicates the contribution by Louisiana to exceedances at Texas monitors is insignificant.

*Back Trajectory Analysis*

LDEQ has performed 99 back trajectories on the most recent three years of exceedances for all of the monitors listed above.  The Hybrid Single Particle Lagrangian Integrated Trajectory (HYSPLIT) Models related to ozone standard exceedances at Houston and Dallas area monitors during the 2016, 2017 and 2018 years illustrate backwards trajectories for the air parcels present at the monitors when the exceedances occurred.  The source location for each of the models are plotted based off latitude, longitude and meters above mean sea level (AMSL) data obtained from the Texas Commission on Environmental Quality website.  The projections depict a composite of four backwards trajectories starting at the location of the monitor and tracking the air in reverse for seventy-two hours.  Each projection accounts for one eight-hour exceedance period with the four trajectories beginning their routes at the six, four, two and zero hour marks. See Appendix B.

Of the 99-exceedance trajectories performed, approximately 28% of the trajectories travel in or through Louisiana.  Only eight percent of those trajectories originate in Louisiana.  The areas in northern Louisiana are rural/farmland with limited precursor pollutants; however, the areas in south Louisiana are heavy industrial and it is highly probable that transport adds to the ozone mix.

Additional modeling was performed to evaluate the exceedances that revealed trajectories originating in or crossing Louisiana to include Mixing Depth (in meters) and provide one trajectory for the beginning of each hour of the daily eight-hour ozone exceedance for the exceedance to identify the areas of the state most often impacting Texas monitor exceedances.

Trajectories originating in and crossing Louisiana in northern and central Louisiana are rural/farmland with limited population and sources of precursor pollutants. Trajectories originating in and crossing south Louisiana are heavy industrial and it is highly probable that transport adds to the ozone mix. Only 35 percent of the trajectories originate in or cross south Louisiana. See Appendix B.

*EPA Modeling*

According to the results of EPA's <u>2015 Ozone NAAQS Interstate Transport Assessment Design Values and Contributions,</u> Louisiana contributes approximately 1-2 ppb of ozone to the Dallas region and 3-4ppb of ozone to the Houston region. Conversely, the same model results indicate that Texas contributes 5-6 ppb of ozone to Louisiana's monitors in the Shreveport area and 11 ppb of ozone to the monitors in Calcasieu Parish.

The back trajectory analysis and EPA modeling indicate that there is minimal contribution of Louisiana on Dallas and Houston, TX monitor ozone exceedances. Impact from Louisiana is insignificant to the overall attainment at the monitors at the Houston and Dallas area monitors due to the limited industrial and residential activity in the path of the air affecting the monitors. A comparison of EPA's modeled contribution between Texas and Louisiana monitors indicates that a far greater proportion of the total Ozone detected in Louisiana originates in Texas rather than vice versa.

## Chapter 4: Control Strategies

On September 29, 2016, the United States Environmental Protection Agency (EPA) made the first round of designations for the 2015 eight-hour ozone NAAQS, designating 59 of the 64 parishes in Louisiana as attainment/unclassifiable. On December 20, 2017, the EPA sent 120-day letters responding to state recommendations for remaining area designations. The remaining five parishes were designated attainment for the 2015 Ozone NAAQS.

Louisiana has implemented enforceable emission control regulations to ensure continued maintenance of the 2015 Ozone NAAQS. Control measures also have been developed, promulgated, and implemented at the federal level to reduce ozone-forming emissions of NOx and VOC. Development and subsequent implementation of other federal measures will result in additional emission reductions of NOx and VOC during the 10-year maintenance period. Federal measures which have been implemented or are currently in some phase of implementation include, but are not limited to:

- Various New Source Performance Standards (NSPS) and National Emission Standards for Hazardous Air Pollutants (NESHAP)to control NOx and VOC
- Tier 2 – Motor Vehicle Emission Standards and Gasoline Sulfur Control Requirements (65 FR 6697)
- Tier 3 – Motor Vehicle Emission and Fuel Standards (79 FR 23414)
- Tier 4 – Heavy-Duty Engine and Vehicle Standards and Highway Diesel Fuel Sulfur Control Requirements – Tier 4(66 FR 5002)
- Control of Emissions from Nonroad Diesel Engines and Fuels (69 FR 38958)
- Cross-State Air Pollution Rule (CSAPR) (79 FR 71663)
- Control of Air Pollution from Aircraft and Aircraft Engines; Proposed Emission Standards and Test Procedures (76 FR 45012)
- Carbon Pollution Emission Guidelines for Existing Stationary Sources: EGUs (electric generating units) in Indian Country and U.S. Territories (79 FR 34829)

Louisiana will continue to operate an ambient ozone monitoring network to verify continued attainment of the 8-hour Ozone NAAQS. The air monitoring results will reveal changes in the ambient air quality as well as assist Louisiana in determining whether or not implementation of any contingency measures is necessary. The state will continue to work with US EPA through the air monitoring network review process, as required by 40 CFR 58, to determine:

1) the adequacy of the ozone monitoring network;

2) if additional monitoring is needed; and

3) when monitoring can be discontinued.

Air monitoring data will continue to be quality assured according to federal requirements.

The LDEQ will continue to submit annual updates to US EPA for point sources and triennial updates for all sources in accordance with 40 CFR Part 51 Subpart A – Air Emissions Reporting Requirements (AERR). Louisiana will also make comparisons of the EI data submitted on an annual and triennial basis to the NEI with the emission growth data submitted in this plan to ensure emission reductions continue the downward trend.

## Chapter 5: Prevention of Significant Deterioration and Visibility

The FCAA, §110(a)(2)(D)(i)(II), requires states to submit a SIP revision that contains adequate provisions to prohibit any source or other type of emissions activity within the state from emitting any air pollutants in amounts that will interfere with measures required to meet an implementation plan for any other state related to prevention of significant deterioration (PSD) or interfere with measures required to meet the implementation plan for any other state related to regional haze and visibility. The following section provides information on how Louisiana meets the requirements of FCAA, §110(a)(2)(D)(i)(II).

Louisiana has a SIP-approved PSD and nonattainment New Source Review (NSR) permitting program that contains requirements for sources of air pollutants to obtain an approved permit before beginning construction of a facility and before modifying an existing facility. The LDEQ has established rules governing the enforcement of control measures, including attainment plans and permitting programs that regulate construction and modification of stationary sources.

## Chapter 6: Interstate Pollution Abatement

The requirements of FCAA, §110(a)(2)(D)(ii) are satisfied by demonstrating compliance with the applicable requirements of FCAA, §126(a), 126(b) and (c), and 115.

Under section 126(a)(1) of the FCAA, a SIP must contain provisions requiring each new or modified major source required by FCAA title I part C to be subject to prevention of significant deterioration (PSD) permitting to notify neighboring air agencies of potential impacts from the source. Per guidance on development and submission of infrastructure SIPs, issued by the United States Environmental Protection Agency (EPA) on September 13, 2013, the EPA considers the notification by the permitting authority to satisfy the requirement of FCAA, §126(a)(1)(A) that a new or modified major source subject to part C notify neighboring air agencies of its potential downwind impact. Louisiana has a SIP-approved PSD permitting program that contains requirements for the permitting authority to notify air agencies whose lands may be affected by emissions from that source.

The required content of an infrastructure SIP with respect to FCAA, §110(a)(2)(D)(ii) is affected by sections 126(b) and 126(c) of the FCAA only if: (1) the Administrator has, in response to a petition, made a finding under section 126(b) of the FCAA that emissions from a source or

sources within the air agency's jurisdiction emit prohibited amounts of air pollution relevant to the new or revised NAAQS for which the infrastructure SIP submission is being made; and (2) under section 126(c) of the FCAA, the Administrator has required the source or sources to cease construction, cease or reduce operations, or comply with emissions limitations and compliance schedule requirements for continued operation.

No source or sources within Louisiana are the subject of an active finding under section 126 of the FCAA with respect to the 2015 ozone NAAQS.

**6.1 Interstate Pollution Abatement**

The dynamic characteristic of the atmosphere that surrounds Earth seems entirely chaotic, but after extensive observation, patterns in its behavior tend to emerge. These patterns are most easily observed on a global scale with local wind characteristics reflecting the larger configuration. North American atmospheric events tend to exhibit a predominantly west to east course. Global pressure systems create wind for Texas during the ozone season (May to September) that mostly comes from the Gulf of Mexico until near the end of the ozone season where the state receives wind from the north. Air trajectory models and surface and upper air maps indicate that these conditions were also true for the 2011 ozone season, and wind roses show that these patterns are consistent with other years.

During the boreal summer months, mid-latitude cyclones in the northern hemisphere move into the upper mid-latitudes and relinquish control of the wind in the lower mid-latitudes. Global semi-permanent pressure systems begin to influence wind direction in these areas. They are not as violent as mid-latitude cyclones but they produce massive areas of relatively consistent wind patterns. The Bermuda-Azores High in the Northern Atlantic drives wind through the Gulf and on shore to the western Gulf Coast during these months and the majority of the ozone season. Wind roses from locations in the eastern half of Texas and southwestern Louisiana, indicate that a predominantly southern wind impacts these areas for the majority of the year, and gives way only occasionally to a northern wind.

Maps of the surface and lower tropospheric conditions from the National Oceanic and Atmospheric Administration (NOAA) for the 2011 ozone season show that the air impacting the eastern half of Texas most often came from the Gulf. An exception to this pattern can be seen during the last month of the ozone season where northern winds blow into East Texas. It is uncommon for the wind barbs on these maps to indicate easterly winds out of Louisiana making their way into Texas. Mass transport of air from Louisiana into Texas would be a rare occurrence. These maps show atmospheric conditions for several locations for one moment in time where NOAA models can track air from one location over time.

Being able to trace air parcel tracks from a specific location can give valuable insight on the wind patterns that affect those locations. A backwards trajectory for air present at a place, such as an ozone monitor, can be calculated by the Hybrid Single Particle Lagrangian Integrated Trajectory (HYSPLIT) Model. The backwards trajectory HYSPLIT models for air parcels present on the eastern side of Houston, Texas and the northeastern side of Dallas, Texas during the 2011 ozone season illustrate that these cities in Texas were receiving air from the Gulf and

Caribbean regions with few exceptions.  The majority of those exceptions were air parcels coming in from the north or northeast and only occurred during the end of the ozone season. Models with the same parameters from recent and previous years displayed results that were consistent with the 2011 ozone season model results.

The presence of models that display air particle trajectories support both the average and specific wind data as well as the general understandings of global relative pressure and how they dictate wind patterns.  These patterns are the outline to our guide for understanding and forecasting the atmosphere.

## 6.2 International Air Pollution

Section 115 of the FCAA authorizes the EPA Administrator to require a state to revise its SIP under certain conditions to alleviate international transport into another country. When acting on an infrastructure SIP submission for a new or revised NAAQS, the EPA will look to whether the Administrator has made a finding with respect to emissions of the particular NAAQS pollutant and its precursors, if applicable. There are no final findings under section 115 of the FCAA against the State of Louisiana with respect to the 2015 ozone NAAQS.

## Chapter 7: Conclusion

Louisiana is attainment for all ozone standards and continues to use anti-backsliding measures to ensure that the air quality remains compliant with all state and federal regulations.  Furthermore, Louisiana has an approved Regional Haze SIP, and is included in Cross State Air Pollution Rule for summertime NOx. Transport of air pollution to the reference monitors is at such a level that any further requirement for industrial controls at this point would be cost prohibitive.  In conclusion, this SIP revision demonstrates that Louisiana meets the interstate transport requirements of FCAA, §110(a)(2)(D)(i)(I) as well as the requirements of FCAA, §110(a)(2)(D)(i)(II) for prevention of significant deterioration and visibility transport and the interstate pollution abatement and international air pollution requirements of FCAA, §110(a)(2)(D)(ii).

**Appendix A: Potpourri Notice**

## POTPOURRI

### Department of Environmental Quality
### Office of the Secretary
### Legal Affairs and Criminal Investigations Division

2015 Ozone National Ambient Air Quality Standards
(NAAQS)—State Implementation Plan (SIP) Revisions

Under the authority of the Louisiana Environmental Quality Act, LA R.S. 30:2051 et seq., the secretary gives notice that the Office of Environmental Assessment, Air Analysis and Assessment Division will submit to the Environmental Protection Agency (EPA) a revision to the infrastructure, as required by section 110(a)(1) and (2) of the Clean Air Act (CAA). (1808Pot2)

On October 1, 2015, the EPA strengthened the NAAQS for ground-level ozone to 70 parts per billion (ppb). Pursuant to sections 110(a)(1) and (2) of the CAA, each state is required to submit a plan to provide for the implementation, maintenance, and enforcement of a newly promulgated or revised NAAQS.

The draft SIP will be submitted in two parts: Part I will cover all elements except sec 110(a)(2)(D); Part II will cover the good neighbor provisions in sec 110(a)(2)(D). Both Part I and Part II are covered by this notice.

If any party wishes to have a public hearing on this matter, one will be scheduled and the comments gathered at such hearing will be submitted as an addendum to the original submittal. All interested persons are invited to submit written comments concerning the revisions no later than 4:30 p.m., September 20, 2018, to Vivian H. Aucoin, Office of Environmental Assessment, P.O. Box 4314, Baton Rouge, LA. 70821-4314, or by email to vivian.aucoin@la.gov.

A copy of the SIP may be viewed online at the LDEQ Electronic Document Management System (EDMS) AI # 174156 or the LDEQ headquarters at 602 North Fifth Street, Room 530, Baton Rouge, LA.

Herman Robinson
General Counsel

1808#019

## POTPOURRI

### Department of Environmental Quality
### Office of the Secretary
### Legal Affairs and Criminal Investigations Division

Risk Evaluation/Corrective Action Program (RECAP)
Revisions (LAC 33:I.1307 and the RECAP Document)

The department has made revisions to the Risk Evaluation/Corrective Action Program (RECAP). The draft revisions amend and update the program to be consistent with the current scientific methods and recommendations. In the near future, LDEQ will begin the rulemaking process to revise LAC 33:I.1307 and the RECAP document. (1808Pot1)

The draft revision of the RECAP document is available on the department's website for review by interested parties. The URL is http://deq.louisiana.gov/page/proposed-recap.

Herman Robinson
General Counsel

1808#020

## POTPOURRI

### Department of Insurance
### Office of the Commissioner

Public Hearing—Substantive Changes to Notice of Intent
Regulation 78—Policy Form Filing Requirements
(LAC 37:XIII.Chapter 101)

The Department of Insurance published a Notice of Intent to amend Regulation 78, in the March 20, 2018, Volume 44, No. 3 edition of the *Louisiana Register*. The Department of Insurance proposes to amend §§10109.I.1.b, 10113.I.1.b, and 10119 of the Notice of Intent, along with §§10107.I.1.b and J.1, 10109.J.1, and 10113.J.1 of the current version of Regulation 78, to comport with the passage of Act 171 of the 2018 Regular Session of the Louisiana Legislature, which requires that a demand for a hearing be filed with the Commissioner of Insurance.

### Title 37
### INSURANCE
### Part XIII. Regulations
**Chapter 101.   Regulation 78—Policy Form Filing Requirements**
**§10107. Filing and Review of Health Insurance Policy Forms and Related Matters**

A. - I.1.a.   ...

b.   The affected insurer may request a hearing on the withdrawal of approval, in accordance with the provisions of Subsection J of this Chapter. The request for hearing must be made to the Department of Insurance, pursuant to R.S. 22:2191.

I.1.c. - J.   ...

1.   Any person aggrieved by a failure to approve any filing, or the disapproval of any filing, or the withdrawal of approval of any filing, or any related action taken by the department pursuant to this Section, may request an administrative hearing in accordance with the provisions of Chapter 12 of title 22 of the *Louisiana Revised Statutes*. Pursuant to R.S. 22:2191, any demand must be in writing, must specify in what respects the person is aggrieved and the grounds upon which relief should be granted at the hearing, and must be made within 30 days after the failure to approve any filing, notice of disapproval of any filing, or the notice of withdrawal of approval of any filing when such notice is mailed to the aggrieved party at his last known address or delivered to the aggrieved party.

K. - K.3.   ...

AUTHORITY NOTE:  Promulgated in accordance with R.S. 22:11, Directive 169, R.S.22:861, R.S. 22:862, and R.S. 22:974.



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION 6
1445 ROSS AVENUE, SUITE 1200
DALLAS TX 75202-2733

September 19, 2017

Mr. Jason Meyers, Chief
Air Planning and Assessment Division
Louisiana Department of Environmental Quality
602 North Fifth Street
Baton Rouge, LA 70802

Dear Mr. Meyers:

Thank you for the opportunity to comment on the LDEQ's proposed SIP revision addressing Infrastructure and Transport for the 2015 ozone standard. We appreciate your work to meet these important Clean Air requirements. The EPA has reviewed the transport analysis contained in the proposed SIP and offers suggestions on changes and additional analyses that could be made to improve your final submittal.

As detailed below, the EPA provided extensive modeling information and analysis in a March 2018 memorandum to support the states' efforts to develop good neighbor SIPs for the 2015 ozone NAAQS to address their interstate transport obligations. While the information in our March 2018 memorandum and the associated air quality analysis data could be used to inform the development of these SIPs, the information was not a final determination regarding states' obligations under the good neighbor provision. The memorandum continues to affirm the EPA's historical four-step process for assessing transport. The memorandum also gave a list of potential flexibilities in analytic approaches different than past practices that may warrant further consideration by the states and the EPA implementing the four-step process.

The EPA provided further guidance via a teleconference with stakeholders on July 26, 2018, and recently issued a memorandum reflecting that guidance (8/31/2018 memo Analysis of Contribution Thresholds for Use in Clean Air Act Section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards). This memorandum addresses only the screening threshold value used to determine whether an upwind state contributes to a monitor and does not address any other aspect of the methodology for determination of significant impacts.

Louisiana has provided an analysis concluding that Louisiana's emissions do not interfere with any other state's ability to attain or maintain the 2015 ozone NAAQS. Based on this analysis, Louisiana did not proceed to Step 3 or 4 of the analysis which would involve the analysis of whether there are reasonable controls that could be implemented to address transport and adopting controls into the SIP as necessary. In the attachment, we provide comments on the state's analysis with suggestions for how we believe it could be improved. We note that the

EPA's analysis does indicate impacts from Louisiana on downwind states, including Texas. As a result, Louisiana may wish to consider proceeding to step 3 of the transport framework and consider whether there are reasonable controls that might be implemented to assure the state meets the Clean Air Act's transport requirements.

We offer our support as you move forward. If you have any questions about these comments or would like further explanation of our modeling, please contact me at Donaldson.guy@epa.gov or at (214) 665-7242.

Respectfully yours,

Guy Donaldson
Associate Director for
Air, Multimedia Division

cc:  Vivian H. Aucoin
     Office of Environmental Assessment

**Detailed Comments**

**Background**

On October 1, 2015, the EPA promulgated a revision to the ozone NAAQS (2015 ozone NAAQS), lowering the level of both the primary and secondary standards to 0.070 parts per million (ppm).[1] Section 110(a)(1) of the CAA requires states to submit, within 3 years after promulgation of a new or revised standard, SIPs meeting the applicable elements of section 110(a)(2).[2] One of these applicable requirements is found in section 110(a)(2)(D)(i)(I), otherwise known as the good neighbor provision, which generally requires SIPs to contain adequate provisions to eliminate in-state emissions activities that significantly contribute to nonattainment or interfere with maintenance in other states due to interstate transport of pollution.

Through the development and implementation of CSAPR, the CSAPR Update and previous rulemakings pursuant to the good neighbor provision, the EPA, working in partnership with the states, developed the following four-step interstate transport framework to address the requirements of the good neighbor provision for the ozone NAAQS: (1) Identify downwind air quality problems; (2) identify upwind states that impact those downwind air quality problems sufficiently such that they are considered "linked" and therefore warrant further review and analysis; (3) identify the emissions reductions necessary (if any), considering cost and air quality factors, to prevent linked upwind states identified in step 2 from contributing significantly to nonattainment or interfering with maintenance of the NAAQS at the locations of the downwind air quality problems; and (4) adopt permanent and enforceable measures needed to achieve those emissions reductions.

The EPA has released several documents containing information relevant to evaluating interstate transport with respect to the 2015 ozone NAAQS. First, on January 6, 2017, the EPA published a notice of data availability (NODA) with preliminary interstate ozone transport modeling with projected ozone design values for 2023, on which we requested comment. On October 27, 2017, we released a memorandum (2017 memorandum) containing updated modeling data for 2023, which incorporated changes made in response to comments on the NODA. Although the 2017 memorandum also released data for a 2023 modeling year, we specifically stated that the modeling may be useful for states developing SIPs to address remaining good neighbor obligations for the 2008 ozone NAAQS but did not address the 2015 ozone NAAQS. On March 27, 2018, we issued a memorandum (March 2018 memorandum) indicating the same 2023 modeling data released in the 2017 memorandum would also be useful for evaluating potential downwind air quality problems with respect to the 2015 ozone NAAQS (step 1 of the four-step framework). The March 2018 memorandum also included newly available contribution modeling results to assist states in evaluating their impact on potential downwind air quality problems (step 2 of the four-step framework) in their efforts to develop good neighbor SIPs for the 2015 ozone NAAQS to address their interstate transport obligations.

The March 2018 memorandum describes the process and results of the updated photochemical modeling to project ambient ozone levels for the year 2023. The memorandum explains that the selection of the 2023 analytic year aligns with the 2015 ozone NAAQS attainment year for Moderate nonattainment areas. As described in more detail in the 2017 and 2018 memoranda, the EPA used photochemical air quality modeling to project ozone concentrations at air quality

1

monitoring sites to 2023 and estimated state-by-state ozone contributions to those 2023 concentrations. This modeling used the Comprehensive Air Quality Model with Extensions (CAMx version 6.40) to model average and maximum design values in 2023 to identify potential nonattainment and maintenance receptors with respect to the 2015 ozone NAAQS. For purposes of identifying potential nonattainment and maintenance receptors in 2023, the EPA considered a combination of monitoring data and modeling projections to identify monitoring sites that are projected to have problems attaining or maintaining the NAAQS. Specifically, the EPA identified nonattainment receptors (those monitoring sites with current measured values exceeding the NAAQS that also have projected (i.e., in 2023) average design values exceeding the NAAQS) and maintenance receptors (those monitoring sites with maximum design values exceeding the NAAQS).

The EPA next performed nationwide, state-level ozone source-apportionment modeling to estimate the expected contribution to these nonattainment and maintenance sites from each coterminous US state. While the March 2018 memorandum presented information regarding the EPA's latest analysis of ozone transport following the approaches the EPA has taken in prior regional rulemaking actions, the EPA did not make any final determinations regarding how states should identify downwind receptors with respect to the 2015 ozone NAAQS at step 1 of the four-step framework, or what threshold should be used to identify "linked" upwind states at step 2. Rather, the EPA noted that states have flexibility in developing their own SIPs to follow somewhat different analytical approaches than the EPA, so long as their chosen approach has an adequate technical justification and is consistent with the requirements of the CAA. The 2018 memorandum therefore included, as Attachment A, a preliminary list of potential flexibilities that the EPA concluded may warrant further discussion as states develop good neighbor SIPs addressing the 2015 ozone NAAQS.

On August 31, 2018, the EPA issued a memorandum, *Analysis of Contribution Thresholds for Use in Clean Air Act Section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards*, updating the information on the threshold to be used for determining a contribution to a nonattainment or maintenance receptor. By comparing the fraction of the total contribution accounted for at different threshold values the EPA concluded that it may be reasonable and appropriate for states to use a 1 ppb contribution threshold, as an alternative to a 1 percent threshold, at Step 2 of the 4-step framework in developing their SIP revisions addressing the good neighbor provision for the 2015 ozone NAAQS.

Consistency with respect to the EPA's SIP actions is legally required by the statute and regulations (see CAA§ 301(a)(2) and 40 CFR part 56) and is a particularly acute issue with respect to regional transport issues in which multiple states may be implicated; the potential value of considering different modeling tools or analyses in addition to the EPA's, provided that any alternative modeling is performed using a credible modeling system which includes "state-of-the-science" and "fit for purpose" models, inputs, and techniques that are relevant to the nature of the ozone problem.

**Comments on Louisiana's Submission**

Step 1 – Identification of Nonattainment and Maintenance Receptors in 2023
Though not stated directly, the proposed SIP appears to rely on the EPA's modeling for 2023 to identify projected nonattainment and maintenance monitors using the approach in the CSAPR Update. It would be helpful if the SIP included a discussion of the data and methods used to identify 2023 nonattainment and maintenance receptors in downwind states.

Step 2 – Contribute to Nonattainment/Maintenance Receptors in 2023

Chapter 3.1

With respect to the threshold used to identify receptors warranting further review, Louisiana's proposal uses a threshold of 1 ppb. We note that subsequent to the submission of the LDEQ's SIP proposal, the EPA issued a memorandum on August 31, 2018, that provides additional information on the threshold that can be used for determining a contribution to a nonattainment or maintenance receptor. The memo discusses use of a 1 ppb threshold and provides analysis of that threshold, which the state should factor in to provide appropriate support as it prepares its final SIP submission.

Chapter 3.2

As noted in the SIP proposal, the EPA's modeling projected Louisiana will contribute nearly 2 ppb to the DFW area and above 3 ppb (maximum impact was 4.72 ppb) to 4 receptors in Houston/Galveston/Brazoria. The SIP proposal states that the Louisiana contribution should be deemed "significant" only if there is a persistent and consistent pattern of contribution on several days with elevated ozone. The LDEQ does not define "a persistent and consistent pattern" for contributions. It would be helpful if the SIP would explain what constitutes consistent and persistent contribution. In evaluating impacts, the EPA has focused on high ozone days in downwind states. The EPA contribution modeling provided in the March 2018 memo estimated the average contribution from each state to individual monitoring sites based the modeled contributions on the top 10 ozone days in 2023, as projected for that site. As part of the calculation of the average contribution metric, the EPA used a minimum of five days over the course of a single ozone season, i.e., at least five days out of 123 days. If there were fewer than five days with modeled ozone concentrations above 60 ppb at a particular monitoring site, then contributions were not calculated at that monitor.

Chapter 3.2 / Chapter 6.1 / Appendix B

Louisiana's alternative technique to assess the significance of contributions for step 2 is based on an analysis of seasonal weather patterns, surface wind directions, and periodic back trajectories. As detailed below, we have identified several areas where the methodology used to support the state's determination could be improved and have made suggestions to strengthen Louisiana's supplemental analysis of transport to contribute to the determination of whether emissions in Louisiana are causing or contributing to ozone exceedance in Texas.

1.  Weather Pattern Analysis

The weather pattern analysis in the SIP proposal discusses large-scale weather patterns as they relate to commonly observed wind directions e.g. "North American atmospheric events tend to exhibit predominantly a west to east course" and "Global pressure systems create wind for Texas during the ozone season (May to September) that mostly comes from the Gulf of Mexico until near the end of the ozone season where the state receives wind from the north." Ozone exceedances do not happen every day but tend to occur during episodes of particular weather conditions that are conducive to ozone formation. Therefore, general statements about weather patterns may not be helpful in determining transport conditions during ozone episodes. It would strengthen the analysis if the SIP focused on the weather patterns that are associated with ozone episodes in DFW and Houston.

2.  Wind Rose Analysis

Much of the LDEQ analysis concerns the wind roses for surface sites in the Dallas/Fort Worth and Houston/Galveston/Brazoria areas. The wind roses are cited as evidence that the wind seldom blows from Louisiana toward the Texas nonattainment areas. There are several potential limitations with this analysis: 1) wind directions measured at the surface are not necessarily good indicators of the wind direction occurring at higher elevations, which tend to have a stronger influence on interstate transport; 2) wind directions change spatially over the range of distance involved in transport from Louisiana to Texas; 3) wind directions change temporally over the range of time involved in transport from Louisiana to Texas; and 4) it appears that the wind roses are based on wind data measured throughout the year, not just during either ozone season or ozone episode days.

3.  Back Trajectory Analysis

The LDEQ shows several HYSPLIT back trajectories to supplement their surface wind rose trajectory analysis. However, these are for two dates each month (the 8th and 22nd) ending at 1300 UTC. The SIP should explain why back trajectories on these days were chosen. It would strengthen the analysis to provide individual back trajectories for all high ozone days in the Houston or DFW area during the baseline period.

As a resource, the EPA's back trajectory plots are contained in the CSAPR Update AQ Modeling TSD.
https://www.epa.gov/airmarkets/air-quality-modeling-technical-support-document-final-cross-state-air-pollution-rule

Alternatively, all the back trajectories during high ozone periods can be combined into a back trajectory density plot depicting the frequency of trajectories during those conditions

There are also existing analyses that the LDEQ can draw on. The Texas Commission on Environmental Quality has done extensive analysis on the causes of ozone exceedances in Texas. (https://www.tceq.texas.gov/assets/public/implementation/air/am/modeling/hgb8h2/doc/HGB8H2_Conceptual_Model_20090519.pdf)

LDEQ's back trajectory analysis can be strengthened by plotting the back trajectories by one of the techniques above for the high ozone episodes. To facilitate this analysis, we have attached an Air Quality System report for the highest ozone concentrations at the nonattainment and maintenance monitors in Texas during the base years.

Consistent with our March 27, 2018 memo "Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I)", we suggest an evaluation of the collective contribution in the Dallas/Fort Worth and Houston areas to determine the extent to which a receptor is "transport influenced." In addition, the EPA would be interested in Louisiana's recommendations on whether different contribution thresholds are appropriate based on regional differences in the nature or extent of the transport problem.

Steps 3 and 4 –

The EPA's analysis does indicate impacts from Louisiana on downwind states including Texas. Because of these impacts, Louisiana should consider proceeding to step 3 of the transport framework. We note that our March 2018 memorandum also included a list of potential flexibilities to address step 3 (Identifying air quality, cost, and emission reductions factors to be evaluated in a multifactor test to identify emissions that significantly contribute to nonattainment or interfere with maintenance of the NAAQS downwind, if any) and step 4 (Adopt permanent and enforceable measures needed to achieve emission reductions) that the LDEQ may consider as part of a step 3 analysis.

Interstate Transport State Implementation Plan
Response to Comment:

Louisiana appreciates the time and effort of EPA Region 6 to make the suggestions and additional analyses that have improved this submittal. The state has relied upon all data and memorandum produced by EPA in this matter.

**Comment:**  Identify the 2023 nonattainment and maintenance receptors in downwind states.
**Response:**  Louisiana has identified the receptors in the body of the document

**Comment:** Identify whether the state will use the 1% or 1PPB threshold contribution for determining contribution to a nonattainment or maintenance receptor
**Response:**  Louisiana will use the 1 PPB threshold contribution for determining contribution to a nonattainment or maintenance receptor.

**Comment:** Define "a persistent and consistent pattern" in terms of defining impacts on downwind states.
**Response**:  Louisiana has defined the pattern and has provided back trajectories on those monitored exceedances for the 2016-2018 ozone seasons, which will show that the definition is applicable to the conclusion.

**Comment:** Improve and support alternative techniques to assess the significance of contributions for Step 2.
**Response:** The state has added back trajectories for 99 exceedances at the receptors for the 2016-2018 ozone season.  All data was derived from the TCEQ website.

**Appendix B: Interstate Pollution Abatement Support Documents**

# Back Trajectories of 2016-2018 Ozone Exceedances at Model Receptors

Louisiana Department of Environmental Quality

# NOAA HYSPLIT MODEL
## Backward trajectory ending at 1600 UTC 03 Apr 16
### GDAS Meteorological Data



Job ID: 178201          Job Start: Fri Oct 25 18:56:26 UTC 2019
Source 1     lat.: 29.901036   lon.: -95.326137   height: 24 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 1 Apr 2016 - GDAS1



NOAA HYSPLIT MODEL
Backward trajectory ending at 1900 UTC 03 Apr 16
GDAS Meteorological Data

Job ID: 176499          Job Start: Fri Oct 25 18:34:16 UTC 2019
Source 1     lat.: 29.901036   lon.: -95.326137   height: 24 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 1 Apr 2016 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectory ending at 2200 UTC 03 Apr 16
### GDAS Meteorological Data

Source ★ at 29.90 N 95.33 W

Meters AGL

Job ID: 174649          Job Start: Wed Oct 30 13:35:06 UTC 2019
Source 1     lat.: 29.901036    lon.: -95.326137    height: 24 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 1 Apr 2016 - GDAS1



NOAA HYSPLIT MODEL
Backward trajectories ending at 2200 UTC 03 Apr 16
GDAS Meteorological Data

Job ID: 11631          Job Start: Tue Nov 5 22:55:44 UTC 2019
Source 1     lat.: 29.901036     lon.: -95.326137     height: 24 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 1 Apr 2016 - GDAS1



NOAA HYSPLIT MODEL
Backward trajectory ending at 1600 UTC 23 Apr 16
GDAS Meteorological Data

Job ID: 178966          Job Start: Fri Oct 25 19:05:17 UTC 2019
Source 1    lat.: 29.901036    lon.: -95.326137    height: 24 m AMSL

Trajectory Direction: Backward    Duration: 72 hrs
Vertical Motion Calculation Method:    Model Vertical Velocity
Meteorology: 0000Z 22 Apr 2016 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectory ending at 1900 UTC 23 Apr 16
### GDAS Meteorological Data



Job ID: 183345          Job Start: Fri Oct 25 19:56:13 UTC 2019
Source 1    lat.: 29.901036    lon.: -95.326137    height: 24 m AMSL

Trajectory Direction: Backward    Duration: 72 hrs
Vertical Motion Calculation Method:    Model Vertical Velocity
Meteorology: 0000Z 22 Apr 2016 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectory ending at 2200 UTC 23 Apr 16
### GDAS Meteorological Data



Job ID: 174984          Job Start: Wed Oct 30 13:43:01 UTC 2019
Source 1    lat.: 29.901036    lon.: -95.326137    height: 24 m AMSL

Trajectory Direction: Backward      Duration: 72 hrs
Vertical Motion Calculation Method:    Model Vertical Velocity
Meteorology: 0000Z 22 Apr 2016 - GDAS1



NOAA HYSPLIT MODEL
Backward trajectories ending at 2200 UTC 23 Apr 16
GDAS Meteorological Data

Job ID: 12061          Job Start: Tue Nov  5 23:02:02 UTC 2019
Source 1    lat.: 29.901036    lon.: -95.326137    height: 24 m AMSL

Trajectory Direction: Backward      Duration: 72 hrs
Vertical Motion Calculation Method:      Model Vertical Velocity
Meteorology: 0000Z 22 Apr 2016 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectory ending at 1600 UTC 27 Apr 16
### GDAS Meteorological Data



Job ID: 175391          Job Start: Wed Oct 30 13:56:37 UTC 2019
Source 1     lat.: 29.901036   lon.: -95.326137     height: 24 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 22 Apr 2016 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectory ending at 1900 UTC 27 Apr 16
### GDAS Meteorological Data



Job ID: 175479          Job Start: Wed Oct 30 13:59:27 UTC 2019
Source 1     lat.: 29.901036    lon.: -95.326137    height: 24 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:      Model Vertical Velocity
Meteorology: 0000Z 22 Apr 2016 - GDAS1





# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2200 UTC 27 Apr 16
### GDAS Meteorological Data

Job ID: 12527            Job Start: Tue Nov  5 23:06:21 UTC 2019
Source 1    lat.: 29.901036    lon.: -95.326137    height: 24 m AMSL

Trajectory Direction: Backward      Duration: 72 hrs
Vertical Motion Calculation Method:      Model Vertical Velocity
Meteorology: 0000Z 22 Apr 2016 - GDAS1

Case: 23-60069    Document: 48-3    Page: 50    Date Filed: 09/26/2023

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2100 UTC 07 May 16
### GDAS Meteorological Data



Job ID: 130946          Job Start: Fri Nov  8 02:27:57 UTC 2019
Source 1      lat.: 29.901036      lon.: -95.326137      height: 24.1 m AMSL

Trajectory Direction: Backward      Duration: 72 hrs
Vertical Motion Calculation Method:      Model Vertical Velocity
Meteorology: 0000Z  1 May 2016 - GDAS1

Case: 23-60069     Document: 436-3     Page: 51     Date Filed: 09/26/2023

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2100 UTC 07 May 16
### GDAS Meteorological Data



Job ID: 130946          Job Start: Fri Nov  8 02:27:57 UTC 2019
Source 1      lat.: 29.901036     lon.: -95.326137     height: 24.1 m AMSL

Trajectory Direction: Backward      Duration: 72 hrs
Vertical Motion Calculation Method:      Model Vertical Velocity
Meteorology: 0000Z  1 May 2016 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectory ending at 1800 UTC 07 May 16
### GDAS Meteorological Data



Job ID: 175711          Job Start: Wed Oct 30 14:06:25 UTC 2019
Source 1     lat.: 29.901036    lon.: -95.326137    height: 24 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 1 May 2016 - GDAS1





NOAA HYSPLIT MODEL
Backward trajectories ending at 2000 UTC 07 May 16
GDAS Meteorological Data

Job ID: 13040          Job Start: Tue Nov  5 23:10:41 UTC 2019
Source 1    lat.: 29.901036    lon.: -95.326137    height: 24 m AMSL

Trajectory Direction: Backward      Duration: 72 hrs
Vertical Motion Calculation Method:      Model Vertical Velocity
Meteorology: 0000Z  1 May 2016 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectory ending at 1600 UTC 22 Jul 16
### GDAS Meteorological Data



Job ID: 176885                Job Start: Wed Oct 30 14:42:30 UTC 2019
Source 1      lat.: 29.901036    lon.: -95.326137    height: 24 m AMSL

Trajectory Direction: Backward    Duration: 72 hrs
Vertical Motion Calculation Method:    Model Vertical Velocity
Meteorology: 0000Z 22 Jul 2016 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectory ending at 1900 UTC 22 Jul 16
### GDAS Meteorological Data



Job ID: 177077          Job Start: Wed Oct 30 14:48:40 UTC 2019
Source 1     lat.: 29.901036     lon.: -95.326137     height: 24 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 22 Jul 2016 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectory ending at 2200 UTC 22 Jul 16
### GDAS Meteorological Data



Job ID: 177264          Job Start: Wed Oct 30 14:53:53 UTC 2019
Source 1     lat.: 29.901036    lon.: -95.326137    height: 24 m AMSL

Trajectory Direction: Backward    Duration: 72 hrs
Vertical Motion Calculation Method:    Model Vertical Velocity
Meteorology: 0000Z 22 Jul 2016 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2200 UTC 22 Jul 16
### GDAS Meteorological Data



Job ID: 13629          Job Start: Tue Nov  5 23:15:09 UTC 2019
Source 1    lat.: 29.901036    lon.: -95.326137    height: 24 m AMSL

Trajectory Direction: Backward    Duration: 72 hrs
Vertical Motion Calculation Method:    Model Vertical Velocity
Meteorology: 0000Z 22 Jul 2016 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2200 UTC 22 Jul 16
### GDAS Meteorological Data



Job ID: 13629          Job Start: Tue Nov  5 23:15:09 UTC 2019
Source 1    lat.: 29.901036    lon.: -95.326137    height: 24 m AMSL

Trajectory Direction: Backward      Duration: 72 hrs
Vertical Motion Calculation Method:      Model Vertical Velocity
Meteorology: 0000Z 22 Jul 2016 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectory ending at 1800 UTC 03 Aug 16
### GDAS Meteorological Data



Job ID: 177382          Job Start: Wed Oct 30 14:57:09 UTC 2019
Source 1     lat.: 29.901036   lon.: -95.326137   height: 24 m AMSL

Trajectory Direction: Backward    Duration: 72 hrs
Vertical Motion Calculation Method:    Model Vertical Velocity
Meteorology: 0000Z 1 Aug 2016 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectory ending at 2100 UTC 03 Aug 16
### GDAS Meteorological Data



Job ID: 177431          Job Start: Wed Oct 30 14:58:16 UTC 2019
Source 1     lat.: 29.901036   lon.: -95.326137   height: 24 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 1 Aug 2016 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 0000 UTC 04 Aug 16
### GDAS Meteorological Data



Job ID: 13977          Job Start: Tue Nov  5 23:17:37 UTC 2019
Source 1    lat.: 29.901036    lon.: -95.326137    height: 24 m AMSL

Trajectory Direction: Backward    Duration: 72 hrs
Vertical Motion Calculation Method:    Model Vertical Velocity
Meteorology: 0000Z  1 Aug 2016 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2200 UTC 26 Oct 16
### GDAS Meteorological Data



Job ID: 131197          Job Start: Fri Nov  8 02:33:05 UTC 2019
Source 1     lat.: 29.901036     lon.: -95.326137     height: 24.1 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 22 Oct 2016 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2200 UTC 26 Oct 16
### GDAS Meteorological Data



Job ID: 131197          Job Start: Fri Nov  8 02:33:05 UTC 2019
Source 1     lat.: 29.901036     lon.: -95.326137     height: 24.1 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 22 Oct 2016 - GDAS1





NOAA HYSPLIT MODEL
Backward trajectory ending at 1900 UTC 26 Oct 16
GDAS Meteorological Data

Job ID: 178093          Job Start: Wed Oct 30 15:15:59 UTC 2019
Source 1     lat.: 29.901036   lon.: -95.326137   height: 24 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 22 Oct 2016 - GDAS1



NOAA HYSPLIT MODEL
Backward trajectory ending at 2200 UTC 26 Oct 16
GDAS Meteorological Data

Source ★ at 29.90 N 95.33 W

Meters AGL

1500
1000
500

0

18  12  06  00  18  12  06  00  18  12  06  00
      10/26              10/25              10/24

Job ID: 178191        Job Start: Wed Oct 30 15:18:00 UTC 2019
Source 1    lat.: 29.901036   lon.: -95.326137   height: 24 m AMSL

Trajectory Direction: Backward    Duration: 72 hrs
Vertical Motion Calculation Method:    Model Vertical Velocity
Meteorology: 0000Z 22 Oct 2016 - GDAS1



NOAA HYSPLIT MODEL
Backward trajectories ending at 2100 UTC 26 Oct 16
GDAS Meteorological Data

Job ID: 14854          Job Start: Tue Nov  5 23:24:16 UTC 2019
Source 1     lat.: 29.901036     lon.: -95.326137     height: 24 m AMSL

Trajectory Direction: Backward      Duration: 72 hrs
Vertical Motion Calculation Method:      Model Vertical Velocity
Meteorology: 0000Z 22 Oct 2016 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2100 UTC 26 Oct 16
### GDAS Meteorological Data



Job ID: 14854          Job Start: Tue Nov  5 23:24:16 UTC 2019
Source 1     lat.: 29.901036     lon.: -95.326137     height: 24 m AMSL

Trajectory Direction: Backward      Duration: 72 hrs
Vertical Motion Calculation Method:      Model Vertical Velocity
Meteorology: 0000Z 22 Oct 2016 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectory ending at 1600 UTC 06 May 17
### GDAS Meteorological Data



Source ★ at 29.90 N 95.33 W

Meters AGL

Job ID: 178402        Job Start: Wed Oct 30 15:23:34 UTC 2019
Source 1    lat.: 29.901036    lon.: -95.326137    height: 24 m AMSL

Trajectory Direction: Backward    Duration: 72 hrs
Vertical Motion Calculation Method:    Model Vertical Velocity
Meteorology: 0000Z 1 May 2017 - GDAS1

## NOAA HYSPLIT MODEL
## Backward trajectory ending at 1900 UTC 06 May 17
### GDAS Meteorological Data



Job ID: 178470          Job Start: Wed Oct 30 15:25:35 UTC 2019
Source 1    lat.: 29.901036    lon.: -95.326137    height: 24 m AMSL

Trajectory Direction: Backward    Duration: 72 hrs
Vertical Motion Calculation Method:    Model Vertical Velocity
Meteorology: 0000Z 1 May 2017 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2200 UTC 06 May 17
### GDAS Meteorological Data



Job ID: 15821          Job Start: Tue Nov  5 23:33:36 UTC 2019
Source 1    lat.: 29.901036    lon.: -95.326137    height: 24 m AMSL

Trajectory Direction: Backward      Duration: 72 hrs
Vertical Motion Calculation Method:      Model Vertical Velocity
Meteorology: 0000Z  1 May 2017 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectory ending at 1400 UTC 07 May 17
### GDAS Meteorological Data



Job ID: 178621      Job Start: Wed Oct 30 15:28:52 UTC 2019
Source 1    lat.: 29.901036    lon.: -95.326137    height: 24 m AMSL

Trajectory Direction: Backward    Duration: 72 hrs
Vertical Motion Calculation Method:    Model Vertical Velocity
Meteorology: 0000Z 1 May 2017 - GDAS1





NOAA HYSPLIT MODEL
Backward trajectory ending at 2000 UTC 07 May 17
GDAS Meteorological Data

Job ID: 178756          Job Start: Wed Oct 30 15:31:34 UTC 2019
Source 1      lat.: 29.901036    lon.: -95.326137    height: 24 m AMSL

Trajectory Direction: Backward      Duration: 72 hrs
Vertical Motion Calculation Method:      Model Vertical Velocity
Meteorology: 0000Z 1 May 2017 - GDAS1



NOAA HYSPLIT MODEL
Backward trajectories ending at 2000 UTC 07 May 17
GDAS Meteorological Data

Job ID: 16607          Job Start: Tue Nov  5 23:44:29 UTC 2019
Source 1    lat.: 29.901036    lon.: -95.326137    height: 24 m AMSL

Trajectory Direction: Backward      Duration: 72 hrs
Vertical Motion Calculation Method:      Model Vertical Velocity
Meteorology: 0000Z  1 May 2017 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectory ending at 1500 UTC 14 May 17
### GDAS Meteorological Data



Job ID: 179960          Job Start: Wed Oct 30 15:56:15 UTC 2019
Source 1     lat.: 29.901036     lon.: -95.326137     height: 24 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 8 May 2017 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectory ending at 2100 UTC 14 May 17
### GDAS Meteorological Data



Job ID: 180347          Job Start: Wed Oct 30 16:02:37 UTC 2019
Source 1    lat.: 29.901036    lon.: -95.326137    height: 24 m AMSL

Trajectory Direction: Backward    Duration: 72 hrs
Vertical Motion Calculation Method:    Model Vertical Velocity
Meteorology: 0000Z 8 May 2017 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2100 UTC 14 May 17
### GDAS Meteorological Data

Job ID: 16721          Job Start: Tue Nov  5 23:47:41 UTC 2019
Source 1     lat.: 29.901036     lon.: -95.326137     height: 24 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z  8 May 2017 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2100 UTC 14 May 17
### GDAS Meteorological Data



Job ID: 16721          Job Start: Tue Nov  5 23:47:41 UTC 2019
Source 1     lat.: 29.901036     lon.: -95.326137     height: 24 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z  8 May 2017 - GDAS1







NOAA HYSPLIT MODEL
Backward trajectory ending at 2100 UTC 13 Sep 17
GDAS Meteorological Data

Job ID: 180790          Job Start: Wed Oct 30 16:12:38 UTC 2019
Source 1     lat.: 29.901036   lon.: -95.326137   height: 24 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 8 Sep 2017 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2100 UTC 13 Sep 17
### GDAS Meteorological Data



Job ID: 17008          Job Start: Tue Nov  5 23:56:41 UTC 2019
Source 1    lat.: 29.901036    lon.: -95.326137    height: 24 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z  8 Sep 2017 - GDAS1



## NOAA HYSPLIT MODEL
## Backward trajectory ending at 1500 UTC 14 Sep 17
### GDAS Meteorological Data

Job ID: 180922          Job Start: Wed Oct 30 16:14:44 UTC 2019
Source 1      lat.: 29.901036    lon.: -95.326137    height: 24 m AMSL

Trajectory Direction: Backward      Duration: 72 hrs
Vertical Motion Calculation Method:      Model Vertical Velocity
Meteorology: 0000Z 8 Sep 2017 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectory ending at 1800 UTC 14 Sep 17
### GDAS Meteorological Data



Job ID: 181060          Job Start: Wed Oct 30 16:15:43 UTC 2019
Source 1     lat.: 29.901036   lon.: -95.326137   height: 24 m AMSL

Trajectory Direction: Backward    Duration: 72 hrs
Vertical Motion Calculation Method:    Model Vertical Velocity
Meteorology: 0000Z 8 Sep 2017 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectory ending at 2100 UTC 14 Sep 17
### GDAS Meteorological Data



Job ID: 180635          Job Start: Wed Oct 30 16:09:14 UTC 2019
Source 1     lat.: 29.901036   lon.: -95.326137    height: 24 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 8 Sep 2017 - GDAS1



NOAA HYSPLIT MODEL
Backward trajectories ending at 2000 UTC 14 Sep 17
GDAS Meteorological Data

Job ID: 17194          Job Start: Wed Nov  6 00:03:08 UTC 2019
Source 1    lat.: 29.901036    lon.: -95.326137    height: 24 m AMSL

Trajectory Direction: Backward      Duration: 72 hrs
Vertical Motion Calculation Method:      Model Vertical Velocity
Meteorology: 0000Z  8 Sep 2017 - GDAS1



NOAA HYSPLIT MODEL
Backward trajectories ending at 2200 UTC 01 Oct 17
GDAS Meteorological Data

Source ★ at 29.90 N 95.33 W

MIXDEPTH

3000
2000
1000

1018

18    06    00    18    12    06    00    18    12    06    00    18
      10/01              09/30              09/29

Job ID: 131327          Job Start: Fri Nov  8 02:36:23 UTC 2019
Source 1     lat.: 29.901036     lon.: -95.326137     height: 24.1 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z  1 Oct 2017 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2200 UTC 01 Oct 17
### GDAS Meteorological Data

Job ID: 131327          Job Start: Fri Nov  8 02:36:23 UTC 2019
Source 1     lat.: 29.901036     lon.: -95.326137     height: 24.1 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z  1 Oct 2017 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectory ending at 1900 UTC 01 Oct 17
### GDAS Meteorological Data



Job ID: 181343          Job Start: Wed Oct 30 16:21:34 UTC 2019
Source 1    lat.: 29.901036   lon.: -95.326137   height: 24 m AMSL

Trajectory Direction: Backward    Duration: 72 hrs
Vertical Motion Calculation Method:    Model Vertical Velocity
Meteorology: 0000Z 1 Oct 2017 - GDAS1



NOAA HYSPLIT MODEL
Backward trajectory ending at 2200 UTC 01 Oct 17
GDAS Meteorological Data

Job ID: 181509          Job Start: Wed Oct 30 16:24:48 UTC 2019
Source 1      lat.: 29.901036    lon.: -95.326137    height: 24 m AMSL

Trajectory Direction: Backward      Duration: 72 hrs
Vertical Motion Calculation Method:      Model Vertical Velocity
Meteorology: 0000Z 1 Oct 2017 - GDAS1



NOAA HYSPLIT MODEL
Backward trajectories ending at 2100 UTC 01 Oct 17
GDAS Meteorological Data

Job ID: 17254          Job Start: Wed Nov 6 00:04:36 UTC 2019
Source 1      lat.: 29.901036     lon.: -95.326137     height: 24 m AMSL

Trajectory Direction: Backward      Duration: 72 hrs
Vertical Motion Calculation Method:      Model Vertical Velocity
Meteorology: 0000Z 1 Oct 2017 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2100 UTC 01 Oct 17
### GDAS Meteorological Data



Job ID: 17254          Job Start: Wed Nov  6 00:04:36 UTC 2019
Source 1     lat.: 29.901036     lon.: -95.326137     height: 24 m AMSL

Trajectory Direction: Backward      Duration: 72 hrs
Vertical Motion Calculation Method:      Model Vertical Velocity
Meteorology: 0000Z  1 Oct 2017 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2200 UTC 13 Oct 17
### GDAS Meteorological Data



Job ID: 131422            Job Start: Fri Nov  8 02:39:56 UTC 2019
Source 1      lat.: 29.901036    lon.: -95.326137    height: 24.1 m AMSL

Trajectory Direction: Backward      Duration: 72 hrs
Vertical Motion Calculation Method:      Model Vertical Velocity
Meteorology: 0000Z  8 Oct 2017 - GDAS1

Case: 23-60069        Document: 438-8        Page: 102        Date Filed: 09/26/2023

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2200 UTC 13 Oct 17
### GDAS Meteorological Data



Job ID: 131422          Job Start: Fri Nov  8 02:39:56 UTC 2019
Source 1      lat.: 29.901036      lon.: -95.326137      height: 24.1 m AMSL

Trajectory Direction: Backward      Duration: 72 hrs
Vertical Motion Calculation Method:      Model Vertical Velocity
Meteorology: 0000Z  8 Oct 2017 - GDAS1







# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2100 UTC 13 Oct 17
### GDAS Meteorological Data



Job ID: 17392          Job Start: Wed Nov 6 00:06:51 UTC 2019
Source 1    lat.: 29.901036    lon.: -95.326137    height: 24 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 8 Oct 2017 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2100 UTC 13 Oct 17
### GDAS Meteorological Data



Job ID: 17392          Job Start: Wed Nov  6 00:06:51 UTC 2019
Source 1     lat.: 29.901036     lon.: -95.326137     height: 24 m AMSL

Trajectory Direction: Backward       Duration: 72 hrs
Vertical Motion Calculation Method:       Model Vertical Velocity
Meteorology: 0000Z  8 Oct 2017 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2200 UTC 18 Oct 17
### GDAS Meteorological Data



Job ID: 131532          Job Start: Fri Nov 8 02:42:31 UTC 2019
Source 1     lat.: 29.901036     lon.: -95.326137     height: 24.1 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 15 Oct 2017 - GDAS1



NOAA HYSPLIT MODEL
Backward trajectories ending at 2200 UTC 18 Oct 17
GDAS Meteorological Data

Job ID: 131532          Job Start: Fri Nov 8 02:42:31 UTC 2019
Source 1      lat.: 29.901036    lon.: -95.326137    height: 24.1 m AMSL

Trajectory Direction: Backward      Duration: 72 hrs
Vertical Motion Calculation Method:      Model Vertical Velocity
Meteorology: 0000Z 15 Oct 2017 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectory ending at 1500 UTC 18 Oct 17
### GDAS Meteorological Data



Job ID: 181992          Job Start: Wed Oct 30 16:35:23 UTC 2019
Source 1     lat.: 29.901036    lon.: -95.326137    height: 24 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 15 Oct 2017 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectory ending at 1800 UTC 18 Oct 17
### GDAS Meteorological Data



Job ID: 182087                Job Start: Wed Oct 30 16:36:39 UTC 2019
Source 1     lat.: 29.901036     lon.: -95.326137     height: 24 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 15 Oct 2017 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectory ending at 2100 UTC 18 Oct 17
### GDAS Meteorological Data



Job ID: 182428          Job Start: Wed Oct 30 16:42:28 UTC 2019
Source 1      lat.: 29.901036    lon.: -95.326137    height: 24 m AMSL

Trajectory Direction: Backward      Duration: 72 hrs
Vertical Motion Calculation Method:      Model Vertical Velocity
Meteorology: 0000Z 15 Oct 2017 - GDAS1



NOAA HYSPLIT MODEL
Backward trajectories ending at 2100 UTC 18 Oct 17
GDAS Meteorological Data

Source ★ at 29.90 N 95.33 W

Meters AGL

Job ID: 18838          Job Start: Wed Nov  6 00:21:25 UTC 2019
Source 1     lat.: 29.901036     lon.: -95.326137     height: 24 m AMSL

Trajectory Direction: Backward      Duration: 72 hrs
Vertical Motion Calculation Method:      Model Vertical Velocity
Meteorology: 0000Z 15 Oct 2017 - GDAS1



NOAA HYSPLIT MODEL
Backward trajectories ending at 2100 UTC 18 Oct 17
GDAS Meteorological Data

Source ★ at 29.90 N 95.33 W

Meters AGL

Job ID: 18838          Job Start: Wed Nov  6 00:21:25 UTC 2019
Source 1    lat.: 29.901036    lon.: -95.326137    height: 24 m AMSL

Trajectory Direction: Backward      Duration: 72 hrs
Vertical Motion Calculation Method:      Model Vertical Velocity
Meteorology: 0000Z 15 Oct 2017 - GDAS1

Case: 23-60069    Document: 438-3    Page: 115    Date Filed: 09/26/2023



NOAA HYSPLIT MODEL
Backward trajectories ending at 1600 UTC 28 Apr 18
GDAS Meteorological Data

Job ID: 184433           Job Start: Wed Oct 30 17:20:49 UTC 2019
Source 1    lat.: 29.901036    lon.: -95.326137    height: 24 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:      Model Vertical Velocity
Meteorology: 0000Z 22 Apr 2018 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2200 UTC 29 Apr 18
### GDAS Meteorological Data



Job ID: 131648          Job Start: Fri Nov  8 02:45:33 UTC 2019
Source 1     lat.: 29.901036    lon.: -95.326137    height: 24.1 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 29 Apr 2018 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2200 UTC 29 Apr 18
### GDAS Meteorological Data



Job ID: 131648          Job Start: Fri Nov  8 02:45:33 UTC 2019
Source 1     lat.: 29.901036     lon.: -95.326137     height: 24.1 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 29 Apr 2018 - GDAS1

Case: 23-60069    Document: 439-8    Page: 119    Date Filed: 09/26/2023

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2100 UTC 29 Apr 18
### GDAS Meteorological Data



Job ID: 187681          Job Start: Wed Oct 30 17:43:41 UTC 2019
Source 1    lat.: 29.901036    lon.: -95.326137    height: 24 m AMSL

Trajectory Direction: Backward      Duration: 72 hrs
Vertical Motion Calculation Method:      Model Vertical Velocity
Meteorology: 0000Z 29 Apr 2018 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2100 UTC 29 Apr 18
### GDAS Meteorological Data



Job ID: 187681          Job Start: Wed Oct 30 17:43:41 UTC 2019
Source 1    lat.: 29.901036    lon.: -95.326137    height: 24 m AMSL

Trajectory Direction: Backward      Duration: 72 hrs
Vertical Motion Calculation Method:      Model Vertical Velocity
Meteorology: 0000Z 29 Apr 2018 - GDAS1

NOAA HYSPLIT MODEL
Backward trajectories ending at 2300 UTC 07 May 18
GDAS Meteorological Data



Job ID: 188517          Job Start: Wed Oct 30 17:57:36 UTC 2019
Source 1     lat.: 29.901036     lon.: -95.326137     height: 24 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 1 May 2018 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2300 UTC 17 May 18
### GDAS Meteorological Data



Job ID: 189256          Job Start: Wed Oct 30 18:09:18 UTC 2019
Source 1     lat.: 29.901036    lon.: -95.326137    height: 24 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 15 May 2018 - GDAS1

Case: 23-60069    Document: 438-8    Page: 182    Date Filed: 09/26/2023

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2100 UTC 08 Jun 18
### GDAS Meteorological Data



Job ID: 197222          Job Start: Wed Oct 30 19:49:40 UTC 2019
Source 1    lat.: 29.901036    lon.: -95.326137    height: 24 m AMSL

Trajectory Direction: Backward      Duration: 72 hrs
Vertical Motion Calculation Method:      Model Vertical Velocity
Meteorology: 0000Z  8 Jun 2018 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2100 UTC 26 Jul 18
### GDAS Meteorological Data



Job ID: 131870          Job Start: Fri Nov  8 02:52:21 UTC 2019
Source 1      lat.: 29.901036    lon.: -95.326137     height: 24.1 m AMSL

Trajectory Direction: Backward      Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 22 Jul 2018 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2100 UTC 26 Jul 18
### GDAS Meteorological Data



Job ID: 131870          Job Start: Fri Nov  8 02:52:21 UTC 2019
Source 1      lat.: 29.901036    lon.: -95.326137    height: 24.1 m AMSL

Trajectory Direction: Backward      Duration: 72 hrs
Vertical Motion Calculation Method:      Model Vertical Velocity
Meteorology: 0000Z 22 Jul 2018 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2000 UTC 26 Jul 18
### GDAS Meteorological Data



Job ID: 198272            Job Start: Wed Oct 30 20:07:11 UTC 2019
Source 1     lat.: 29.901036    lon.: -95.326137    height: 24 m AMSL

Trajectory Direction: Backward      Duration: 72 hrs
Vertical Motion Calculation Method:      Model Vertical Velocity
Meteorology: 0000Z 22 Jul 2018 - GDAS1



Case: 23-60069   Document: 438-3   Page: 126   Date Filed: 09/26/2023

NOAA HYSPLIT MODEL
Backward trajectories ending at 2000 UTC 26 Jul 18
GDAS Meteorological Data

Source ★ at 29.90 N 95.33 W

Meters AGL

Job ID: 198272          Job Start: Wed Oct 30 20:07:11 UTC 2019
Source 1     lat.: 29.901036    lon.: -95.326137    height: 24 m AMSL

Trajectory Direction: Backward      Duration: 72 hrs
Vertical Motion Calculation Method:      Model Vertical Velocity
Meteorology: 0000Z 22 Jul 2018 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2200 UTC 27 Jul 18
### GDAS Meteorological Data



Job ID: 198355          Job Start: Wed Oct 30 20:08:46 UTC 2019
Source 1    lat.: 29.901036    lon.: -95.326137    height: 24 m AMSL

Trajectory Direction: Backward      Duration: 72 hrs
Vertical Motion Calculation Method:      Model Vertical Velocity
Meteorology: 0000Z 22 Jul 2018 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2200 UTC 27 Jul 18
### GDAS Meteorological Data



Source ★ at 29.90 N 95.33 W

Meters AGL

Job ID: 198355          Job Start: Wed Oct 30 20:08:46 UTC 2019
Source 1    lat.: 29.901036    lon.: -95.326137    height: 24 m AMSL

Trajectory Direction: Backward    Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 22 Jul 2018 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2100 UTC 28 Jul 18
### GDAS Meteorological Data



Source ★ at 29.90 N 95.33 W

Meters AGL

Job ID: 198693          Job Start: Wed Oct 30 20:14:11 UTC 2019
Source 1    lat.: 29.901036    lon.: -95.326137    height: 24 m AMSL

Trajectory Direction: Backward      Duration: 72 hrs
Vertical Motion Calculation Method:      Model Vertical Velocity
Meteorology: 0000Z 22 Jul 2018 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2300 UTC 23 Aug 18
### GDAS Meteorological Data



Source ★ at 29.90 N  95.33 W

MIXDEPTH

589

3000
2000
1000

18    12    06    00    18    12    06    00    18    12    06    00    18
        08/23            08/22            08/21

Job ID: 131975              Job Start: Fri Nov  8 02:54:58 UTC 2019
Source 1    lat.: 29.901036    lon.: -95.326137    height: 24.1 m AMSL

Trajectory Direction: Backward    Duration: 72 hrs
Vertical Motion Calculation Method:    Model Vertical Velocity
Meteorology: 0000Z 22 Aug 2018 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2300 UTC 23 Aug 18
### GDAS Meteorological Data

Job ID: 131975          Job Start: Fri Nov 8 02:54:58 UTC 2019
Source 1      lat.: 29.901036      lon.: -95.326137      height: 24.1 m AMSL

Trajectory Direction: Backward      Duration: 72 hrs
Vertical Motion Calculation Method:      Model Vertical Velocity
Meteorology: 0000Z 22 Aug 2018 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2200 UTC 23 Aug 18
### GDAS Meteorological Data



Source ★ at 29.90 N 95.33 W

Meters AGL

Job ID: 198753              Job Start: Wed Oct 30 20:15:54 UTC 2019
Source 1    lat.: 29.901036    lon.: -95.326137    height: 24 m AMSL

Trajectory Direction: Backward      Duration: 72 hrs
Vertical Motion Calculation Method:      Model Vertical Velocity
Meteorology: 0000Z 22 Aug 2018 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2200 UTC 23 Aug 18
### GDAS Meteorological Data



Job ID: 198753          Job Start: Wed Oct 30 20:15:54 UTC 2019
Source 1     lat.: 29.901036     lon.: -95.326137     height: 24 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 22 Aug 2018 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2200 UTC 24 Aug 18
### GDAS Meteorological Data



Job ID: 132069          Job Start: Fri Nov  8 02:57:00 UTC 2019
Source 1    lat.: 29.901036    lon.: -95.326137    height: 24.1 m AMSL

Trajectory Direction: Backward      Duration: 72 hrs
Vertical Motion Calculation Method:      Model Vertical Velocity
Meteorology: 0000Z 22 Aug 2018 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2200 UTC 24 Aug 18
### GDAS Meteorological Data



Job ID: 132069        Job Start: Fri Nov  8 02:57:00 UTC 2019
Source 1      lat.: 29.901036    lon.: -95.326137    height: 24.1 m AMSL

Trajectory Direction: Backward      Duration: 72 hrs
Vertical Motion Calculation Method:      Model Vertical Velocity
Meteorology: 0000Z 22 Aug 2018 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2100 UTC 24 Aug 18
### GDAS Meteorological Data



Job ID: 198898          Job Start: Wed Oct 30 20:19:46 UTC 2019
Source 1     lat.: 29.901036     lon.: -95.326137     height: 24 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 22 Aug 2018 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2100 UTC 24 Aug 18
### GDAS Meteorological Data



Job ID: 198898              Job Start: Wed Oct 30 20:19:46 UTC 2019
Source 1     lat.: 29.901036     lon.: -95.326137     height: 24 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 22 Aug 2018 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2100 UTC 25 Aug 18
### GDAS Meteorological Data

Source ★ at 29.90 N 95.33 W

MIXDEPTH

1647

3000
2000
1000

18 06 00 18 12 06 00 18 12 06 00 18
08/25        08/24        08/23

Job ID: 132199            Job Start: Fri Nov 8 02:59:40 UTC 2019
Source 1    lat.: 29.901036    lon.: -95.326137    height: 24.1 m AMSL

Trajectory Direction: Backward    Duration: 72 hrs
Vertical Motion Calculation Method:    Model Vertical Velocity
Meteorology: 0000Z 22 Aug 2018 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2100 UTC 25 Aug 18
### GDAS Meteorological Data



Job ID: 132199              Job Start: Fri Nov 8 02:59:40 UTC 2019
Source 1     lat.: 29.901036     lon.: -95.326137     height: 24.1 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 22 Aug 2018 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2100 UTC 25 Aug 18
### GDAS Meteorological Data



Source ★ at 29.90 N  95.33 W

Meters AGL

Job ID: 199077              Job Start: Wed Oct 30 20:24:03 UTC 2019
Source 1    lat.: 29.901036    lon.: -95.326137    height: 24 m AMSL

Trajectory Direction: Backward      Duration: 72 hrs
Vertical Motion Calculation Method:      Model Vertical Velocity
Meteorology: 0000Z 22 Aug 2018 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2100 UTC 25 Aug 18
### GDAS Meteorological Data



Job ID: 199077          Job Start: Wed Oct 30 20:24:03 UTC 2019
Source 1     lat.: 29.901036     lon.: -95.326137     height: 24 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 22 Aug 2018 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2200 UTC 18 Sep 18
### GDAS Meteorological Data



Job ID: 199322          Job Start: Wed Oct 30 20:30:17 UTC 2019
Source 1     lat.: 29.901036    lon.: -95.326137     height: 24 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 15 Sep 2018 - GDAS1



NOAA HYSPLIT MODEL
Backward trajectories ending at 2200 UTC 19 Sep 18
GDAS Meteorological Data

Job ID: 199273          Job Start: Wed Oct 30 20:29:15 UTC 2019
Source 1    lat.: 29.901036    lon.: -95.326137    height: 24 m AMSL

Trajectory Direction: Backward      Duration: 72 hrs
Vertical Motion Calculation Method:      Model Vertical Velocity
Meteorology: 0000Z 15 Sep 2018 - GDAS1













Tab HQ-125: Comment submitted by Toby Baker, Executive Director, Texas Commission on Environmental Quality (TCEQ) (Dec. 14, 2020) (EPA-HQ-OAR-2020-0272-0125)

Jon Niermann, *Chairman*

Emily Lindley, *Commissioner*

Bobby Janecka, *Commissioner*

Toby Baker, *Executive Director*



# TEXAS COMMISSION ON ENVIRONMENTAL QUALITY

*Protecting Texas by Reducing and Preventing Pollution*

December 14, 2020

United States Environmental Protection Agency
Docket ID No. EPA-HQ-OAR-2020-0272
[Submitted electronically through www.regulations.gov]

RE: Comments on Proposed Rule; Revised Cross-State Air Pollution Rule (CSAPR)
Update for the 2008 Ozone National Ambient Air Quality Standard (NAAQS) (Docket ID
No. EPA-HQ-OAR-2020-0272)

Dear Mr. Daniel Hooper:

The Texas Commission on Environmental Quality appreciates the opportunity to
comment on the proposed Revised Cross-State Air Pollution Rule (CSAPR) Update for
the 2008 Ozone National Ambient Air Quality Standard published on October 30, 2020
(85 *Federal Register* 68964). Detailed comments are enclosed. If you have any
questions concerning the TCEQ's comments, please contact Ms. Donna F. Huff, Deputy
Director, Air Quality Division, at (512) 239-6628 or by email at
donna.huff@tceq.texas.gov.

Sincerely,

Toby Baker
Executive Director

Enclosure

**COMMENTS BY THE TEXAS COMMISSION ON ENVIRONMENTAL QUALITY PROPOSED RULE; REVISED CROSS-STATE AIR POLLUTION RULE UPDATE FOR THE 2008 OZONE NATIONAL AMBIENT AIR QUALITY STANDARD (DOCKET ID NO. EPA-HQ-OAR-2020-0272)**

## I. SUMMARY

On October 30, 2020, the United States Environmental Protection Agency (EPA) proposed the Revised Cross-State Air Pollution Rule (CSAPR) Update for the 2008 Ozone National Ambient Air Quality Standard (NAAQS) (85 *Federal Register* (FR) 68964). The EPA's CSAPR Update (81 FR 74504, October 26, 2016) finalized Federal Implementation Plans (FIPs) for 22 states, including Texas, that established nitrogen oxides ($NO_x$) ozone season emission budgets for electric generating units (EGUs) to address interstate pollution-transport obligations under the Federal Clean Air Act (FCAA) for the 2008 ozone NAAQS. The proposal also includes administrative changes to the Texas Sulfur Dioxide Trading Program to ensure consistency with the CSAPR trading programs.

## II. COMMENTS

**While the Texas Commission on Environmental Quality (TCEQ) agrees that Texas should have no further obligations for transport under the 2008 ozone NAAQS, the TCEQ maintains that Texas meets its obligations for transport under the 2008 ozone NAAQS without inclusion in the CSAPR Update.**

As the TCEQ previously commented on the EPA's July 10, 2018 Determination Regarding Good Neighbor Obligations for the 2008 Ozone National Ambient Air Quality Standard (Docket ID No. EPA–HQ–OAR–2018–0225), the TCEQ has demonstrated that Texas meets the interstate transport requirements of FCAA, §110(a)(2)(D)(i) for the more stringent 0.070 parts per million standard in the 2015 Ozone NAAQS Transport State Implementation Plan (SIP) Revision adopted by the commission on August 8, 2018. Based on the rigorous analysis provided in the SIP revision, emissions from Texas do not contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in any other state. Therefore, the CSAPR Update is no longer necessary to ensure that emissions from Texas EGUs do not significantly contribute to nonattainment or interfere with maintenance for the ozone NAAQS in areas outside of Texas due to permanent shutdowns of coal-fired units in Texas that have substantially changed the overall EGU emission performance in the state. The TCEQ encourages the EPA to consider the changes to the Texas electric utility sector, as previously commented, and reevaluate the necessity of the CSAPR Ozone Season $NO_x$ program for Texas.

**The EPA should provide a second notice and comment opportunity before revising the proposed determination regarding Texas' interstate contribution to downwind areas or the CSAPR Ozone Season $NO_x$ program budget for Texas.**

The EPA should provide a second notice and comment opportunity if it intends to revise its proposed determination that Texas is not significantly contributing to nonattainment in, or interfering with maintenance by, another state for the 2008 ozone NAAQS. While the EPA included a revised CSAPR budget for Texas with the proposal in

the event it did revise the proposed finding for Texas, Texas should be allowed to examine and comment on the modeling results and any other information the EPA might rely on to revise its proposed finding. The EPA should not revise Texas' CSAPR Ozone Season NO$_x$ program budget without providing adequate opportunity for comment on the basis of the change.

**The TCEQ supports the EPA's intention to limit this regulatory action to only the outstanding requirements related to the good neighbor obligations under the 2008 ozone NAAQS and not extend or apply it to the good neighbor provisions under the 2015 ozone NAAQS.**

The EPA has stated that it will work with states outside of this proposed action to address the good neighbor provisions for the 2015 ozone NAAQS. The TCEQ supports this approach and strongly urges the EPA to limit this regulatory action and underlying modeling, technical analysis, and methodology only to the good neighbor obligations for the 2008 ozone NAAQS. In line with the timing considerations of the FCAA, Texas and other states have already submitted SIP revisions to meet their good neighbor requirements for the 2015 ozone NAAQS. The EPA should not retroactively apply or evaluate those submitted SIP revisions based on modeling, technical analysis, or methodology utilized in this regulatory action.

**The EPA should conduct full air-quality modeling analysis for its final rule.**

The EPA's use of linear interpolation does not accurately capture impacts of changes in precursor emissions on ozone formation. The EPA has utilized a linear interpolation between 2016 and 2023 to estimate 2021 design values (both nonattainment and maintenance monitor identification) as well as individual state contributions. While the linear interpolation of design values may be necessary due to the lack of specific year modeling, impacts of changes in precursor emissions on ozone formation are not linear. Specifically, ozone response to NO$_x$ emission changes from EGUs, the sector regulated by CSAPR, is highly nonlinear. Further, the linear interpolation of source apportionment results is inappropriate since the attribution of ozone formed to a source category depends on the relative amounts of precursor emissions and do not respond in a linear fashion. The EPA should conduct photochemical modeling with a 2021 emissions inventory so the full impact of the changes in various precursor emissions are appropriately captured.

**The TCEQ appreciates the EPA's continued efforts to address the land-water interface issue for monitors located in coastal or "water"[1] cells. However, the TCEQ recommends that the EPA further refine its approach by taking into consideration factors such as model performance and land-water interfaces.**

The EPA's use of the 3x3 "no water" method to address the land-water interface issue in coastal or "water" cells should be refined.  The EPA's approach removes water cells from the design value calculation except when a monitor is located in a "water" cell. However, this methodology only partially addresses the issue because it does not account for other factors such as land-water interfaces, model performance biases, etc. The TCEQ recommends that the EPA further refine its "no water" design value

---

[1] A grid cell is characterized as a "water" cell if the cell has more than 50% water.

calculation to exclude all "water" cells including "water" cells in which a monitor is located. This refinement is based on a study by Jeongran Yun et al.[2] that compared different methods to estimate future year design values and found that the "no water 2" method that excluded all "water" cells had better agreement with observed design values than the 3x3 method or the 3x3 "no water" method used in the Revised CSAPR Update. In addition, the TCEQ also encourages the EPA to investigate additional approaches, including fine grid modeling, that account for land-water interfaces.

**The EPA's approach of using an arbitrary threshold of one percent of the NAAQS for significant contribution to nonattainment or interference with maintenance is inappropriate and incomplete.**

The EPA's continued use of the one percent of NAAQS threshold as the default definition of significant contribution to nonattainment or interference with maintenance is inappropriate because it does not recognize relevant, fact-specific circumstances. As the TCEQ has previously commented, the use of this threshold is arbitrary because the uniform and rigid application of it does not take into consideration the differing ozone chemistry and the attainment and maintenance challenges faced by different areas. The EPA should perform a more comprehensive analysis, with an approach based on weight-of-evidence, to determine if emissions from an upwind state contribute significantly to nonattainment or interfere with maintenance. Interstate transport is complex and the EPA should use a nuanced approach that recognizes this complexity by taking into consideration the factors relevant to the ozone conditions at the downwind monitors. Examples of factors that could be considered include the current attainment status of the monitors, design value trends, the meteorological conditions that lead to high ozone formation at the monitor, back trajectory analysis on elevated ozone days, and the number of days with elevated ozone (observed and modeled). The EPA's approach of using an arbitrary threshold of one percent of the NAAQS for assessing significant contribution to nonattainment or interference with maintenance is inappropriate and incomplete.

**The TCEQ disagrees with the EPA's definition of and methodology to identify "Maintenance Receptors."**

The EPA's methodology to identify maintenance monitors should give greater weight to emissions reductions. The EPA continues to use the maximum of the three consecutive regulatory design values that include the fourth highest eight-hour maximum daily ozone concentration from the base year as the baseline design value ($DV_B$) to identify maintenance monitors. This approach places more emphasis on meteorological variability and discounts the role continued emissions reductions play in bringing an area into attainment as well as maintaining its air quality status. On page 12 of the Air Quality Modeling Technical Support Document for the Proposed Revised Cross-State Air Pollution Rule Update, the EPA states "Maintenance-only receptors include…sites with projected design values above NAAQS that are currently measuring clean data…" This approach disregards possible SIP mechanisms such as contingency plans, thereby ignoring the role that emissions reductions and maintenance plan requirements play in

---

[2] Jeongran Yun et. al., 2020, "Evaluation of four different methods to calculate relative response factors and estimated future year ozone design values", 19th Annual Community Modeling and Analysis System Conference, October 2020.

the attainment and maintenance of a standard. The EPA should consider alternative methods, as discussed in *Considerations for Identifying Maintenance Receptors Memo* [3], such as the use of the latest of the three consecutive regulatory design values containing the base year as the $DV_B$, to identify maintenance monitors. Further, the EPA should account for current air quality when identifying maintenance areas and not designate a monitor as a "maintenance" monitor if it is currently attaining the standard.

**The TCEQ reiterates the need for consistency between the grid cells and episode days used in the contribution and future design value calculations.**

The EPA continues to use differing grid cells and episode days in its estimation of the future year design value and individual state contribution. While the EPA follows the modeling guidance in the choice of grid cell and episode days used in the future design value calculation, the EPA abandons these criteria when calculating individual state contributions. The EPA provides no explanation for this disconnect between the grid cells and episode days used in the estimation of the future year design value and individual state contribution. As the TCEQ has previously commented,[4] the EPA should use consistent methods to estimate these related values and follow the modeling guidance it expects states to follow.

---

[3] EPA, October 2018, available at https://www.epa.gov/sites/production/files/2018-10/documents/maintenance_receptors_flexibility_memo.pdf

[4] https://www.epa.gov/sites/production/files/2018-08/documents/tceq_comments_on_epa_march_27_2018_ozone_transport_memo.pdf

Tab HQ-367: Comment submitted by Attorneys General of New York et al. (June 21, 2022) (EPA-HQ-OAR-2021-0668-0367)

**COMMENTS OF THE ATTORNEYS GENERAL OF NEW YORK,
CONNECTICUT, DELAWARE, THE DISTRICT OF COLUMBIA,
MARYLAND, MASSACHUSETTS, AND NEW JERSEY, AND
THE CORPORATION COUNSEL OF THE CITY OF NEW YORK**

June 21, 2022

*Via Regulations.Gov and E-mail*

Ms. Elizabeth Selbst
Air Quality Policy Division
Office of Air Quality Planning and Standards (C539-01)
United States Environmental Protection Agency
109 TW Alexander Drive
Research Triangle Park, NC 27711
Selbst.elizabeth@epa.gov

**Re:     Proposed Rule "Federal Implementation Plan Addressing Regional
Ozone Transport for the 2015 Ozone National Ambient Air Quality
Standard," 87 Fed. Reg. 20,036 (Apr. 6, 2022)
Docket ID No. EPA–HQ–OAR–2021-0668**

Dear Ms. Selbst:

New York, Connecticut, Delaware, the District of Columbia, Maryland,
Massachusetts, and New Jersey, by their Attorneys General, and the City of New
York, by its Corporation Counsel (collectively, States), submit these comments on the
Environmental Protection Agency's (EPA) proposed rule "Federal Implementation
Plan Addressing Regional Ozone Transport for the 2015 Ozone National Ambient Air
Quality Standard,"[1] 87 Fed. Reg. 20,036 (Apr. 6, 2022) (Proposed Rule or Proposal).

For decades, the States have struggled to attain and maintain the federal air
quality standards for ozone, largely due to the excessive pollution from sources in
upwind states that is carried by the wind into our borders. In the Proposal, which
provides federal implementation plans (FIPs) for 26 states, EPA proposes to fully
satisfy the obligations of these states and EPA under Clean Air Act (Act) section
110(a)(2)(D)(i)(I) (the Good Neighbor Provision), eliminating the excessive ozone
pollution that has interfered with downwind states' ability to attain or maintain the
2015 ozone national ambient air quality standards (2015 ozone NAAQS), resulting in
significant harm to public health and welfare.

---

[1] The Good Neighbor Provision prohibits upwind pollution in amounts that will
"contribute significantly to nonattainment in, or interfere with maintenance by, any
other State with respect to any such national *primary or secondary* ambient air
quality standard." 42 U.S.C. § 7410(a)(2)(D)(i)(I) (emphasis added). We recommend
that EPA entitle the rule using the plural "Standards."

1

The Proposal makes critical progress towards compliance with the requirements of the Good Neighbor Provision. Of particular importance are EPA's proposals to require emissions reductions from certain non-power plant sources, to account for emission reductions available from power plants both through installation of new controls and greater use of already-installed controls, and to set daily backstop emission rates for power plants. The States have been pushing for these necessary updates for years, and laud EPA's inclusion of these methods in its Proposal. But we also urge EPA to further strengthen its rule to provide additional reductions required by the Act as expeditiously as practicable. In particular, the timeframes EPA has set for certain emission reductions should be accelerated, and existing data show that the benchmark emission rates for power plants should be tightened beyond what EPA has proposed.

**Statutory, Regulatory, and Factual Background**

**1. National Ambient Air Quality Standards for Ozone**

EPA establishes national ambient air quality standards (NAAQS) under the Act, which set maximum allowable ambient air concentrations for certain pollutants that endanger human health and welfare.[2] States must ensure that air quality meets the NAAQS by set deadlines, with EPA providing a federal "backstop."[3]

Ozone, a pollutant regulated under the Act, forms when other pollutants known as precursors—particularly oxides of nitrogen (NOx) and volatile organic compounds (VOCs)—react in the presence of sunlight.[4] EPA has found significant negative health effects in individuals exposed to elevated levels of ozone, such as asthma, bronchitis, heart disease, and emphysema.[5] Exposure to ozone has also been linked to premature mortality.[6] Children, the elderly, and those with existing lung diseases, such as asthma, are more vulnerable to ozone's harmful effects.[7] These impacts are often disproportionately severe and widespread in already overburdened communities, such as those with elevated asthma rates. *See* Comment 1(c), below. Ozone also causes negative welfare effects, particularly damage to ecosystems.

EPA promulgated a revised ozone NAAQS in 2015, setting both the primary (health-based) and secondary (welfare-based) standards at 70 ppb.[8] EPA kept the

---

[2] 42 U.S.C. §§ 7409(b)(1), 7407.

[3] *Id.* §§ 7407(a), 7511(a).

[4] *See* 87 Fed. Reg. at 20,052

[5] 80 Fed. Reg. at 65,292, 65,302-11 (Oct. 26, 2015) (effective Dec. 28, 2015); 87 Fed. Reg. at 20,039, 20,054.

[6] *Id.*

[7] 80 Fed. Reg. at 65,302-11.

[8] *Id.* at 65,292.

same ozone NAAQS in a 2020 rule,[9] which is under challenge in the D.C. Circuit.[10] EPA is currently reconsidering the 2020 rule, and the 2015 ozone NAAQS remain in effect.[11] The comments in this letter relate to the 2015 standards, which the Proposal is primarily designed to address.

The Act requires each state to meet the ozone NAAQS "as expeditiously as practicable," but no later than by specified attainment deadlines depending on the "classification" of an area based on the severity of its nonattainment.[12] The initial attainment deadlines under the 2015 ozone NAAQS for "marginal," "moderate," "serious," and "severe" nonattainment areas are August 3, 2021; August 3, 2024; August 3, 2027; and August 3, 2033, respectively.[13]

## 2. Interstate Transport of Ozone Pollution

Many states have problems attaining and maintaining the ozone NAAQS due, in significant part, to emissions transported from sources in other states. The formation and transport of ozone pollution occurs on a regional scale over "hundreds of miles" in much of the eastern United States, with ozone and its precursors traveling across state lines from "upwind sources"[14] into the air of downwind states. When emissions from upwind states compound a downwind state's pollution problems, the downwind state must regulate its own emission sources more stringently to compensate; even then, some downwind states may be unable to attain or maintain the NAAQS.

EPA has understood for decades the regional nature of the ground-level ozone air quality problem, and that pollution from sources located in multiple upwind states contributes to downwind states' problems attaining and maintaining the ozone NAAQS, with those sources in upwind states routinely contributing to multiple downwind air quality problems in varying amounts. EPA has long recognized that downwind states cannot on their own comply with the ozone NAAQS, and that reducing ozone concentrations in downwind states requires a reduction in what EPA calls the "interstate transport" of ozone precursors from upwind states.[15]

Congress enacted the "Good Neighbor Provision" of the Act to address this exact problem. The provision requires states to develop state implementation plans

---

[9] *See* 85 Fed. Reg. 87,256 (Dec. 31, 2020).

[10] *New York v. EPA*, D.C. Cir. No. 21-1028.

[11] The 2008 ozone NAAQS, set at 75 ppb, also remain in effect, and many of the states affected by the Proposal are also subject to compliance obligations under the 2008 standards on a set of overlapping deadlines.

[12] 42 U.S.C. §§ 7511(a)(1) & (b)(1).

[13] 87 Fed. Reg. at 20,057, 20,062, 20,099, 20,101 n.213.

[14] *Id.* at 20,039.

[15] *See EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489, 495 (2014).

(SIPs) that contain adequate provisions "prohibiting . . . any source or other type of emissions activity within the State from emitting any air pollutant in amounts which will contribute significantly to nonattainment in, or interfere with maintenance by, any other State with respect to any such national primary or secondary ambient air quality standard."[16] Section 110(a)(2)(A) requires that SIPs "include enforceable emission limitations and other control measures, means, or techniques . . . as well as schedules and timetables for compliance," and Section 110(a)(2)(C) requires SIPs to "include a program to provide for the enforcement of the measures described in subparagraph (A), and regulation of the modification and construction of any stationary source within the areas covered by the plan as necessary to assure that national ambient air quality standards are achieved, including a permit program . . ."[17]

Section 110(c)(1) requires EPA to promulgate a FIP within two years of its finding of a state's "failure to submit" a SIP or disapproval of a state's SIP for lack of full compliance.[18] Such FIPs must include the same provisions as a SIP, including those necessary to meet a state's Good Neighbor Provision obligations through enforceable mechanisms and timetables.

## 3. Downwind States' Ongoing Struggle to Reduce Ozone Pollution

The states in the Northeast and mid-Atlantic have struggled for decades with ozone pollution, due in large part to transported ozone pollutants from upwind states. Following EPA's promulgation of the 2015 ozone NAAQS, EPA designated the New York-Northern New Jersey-Long Island, NY-NJ-CT metropolitan area (New York Metropolitan Area) as a nonattainment area with a moderate classification.[19] This area consists of nine counties in New York (including all of New York City), twelve counties in New Jersey, and three counties in Connecticut. The inability of the New York Metropolitan Area to attain the 2015 ozone NAAQS affects the ability of all three included states to meet their relevant attainment deadlines.

New Jersey's remaining nine southern counties and New Castle County, Delaware (along with areas in Maryland and Pennsylvania) are part of another regional nonattainment area, the Philadelphia-Wilmington-Atlantic City, PA-NJ-MD-DE metropolitan area (Philadelphia Metropolitan Area), initially classified as marginal nonattainment. Connecticut's remaining five counties are part of the Greater Connecticut nonattainment area, classified in June 2018 as marginal nonattainment.

---

[16] 42 U.S.C. § 7410(a)(2)(D)(i)(I).

[17] *Id.* §§ 7410(a)(2)(A) & (C).

[18] *Id.* § 7410(c)(1).

[19] 83 Fed. Reg. 25,776, 25,821 (Jun. 4, 2018).

Based on the most recent available design values for 2019-2021,[20] monitored levels of ozone in the New York Metropolitan Area, Philadelphia Metropolitan Area, and Greater Connecticut Area remain above the 2015 ozone NAAQS. The Philadelphia Metropolitan Area and Greater Connecticut Area's attainment deadlines passed in 2021[21] without those areas attaining the standards.[22] Certified ozone data from 2018 through 2020 show that, despite Delaware, New Jersey and Connecticut's successes in cutting in-state emissions, those areas still did not attain by 2021 and may be reclassified (i.e., downgraded) to moderate nonattainment status.[23] Even outside of these formally designated nonattainment areas, ozone monitors in other locations within the States continue to measure unhealthy ozone levels that exceed the standard.[24]

The States have long devoted significant resources to reducing emissions from in-state sources of NOx and mitigating the regional transport of NOx. Where required by the Act, the States have cut ozone precursor emissions year after year to meet and exceed "reasonable further progress" targets mandated by 42 U.S.C. § 7511a, including by requiring in-state sources to meet a variety of stringent emissions standards and comply with NOx Reasonably Available Control Technology (RACT). The States have also implemented stringent emissions control measures related to mobile sources, and participated in the Ozone Transport Commission (OTC), which developed the first NOx Budget Program that dramatically reduced ozone transport within the Ozone Transport Region. The States have participated in multiple iterations of federal NOx Budget trading programs, including the 2005 Clean Air Interstate Rule (CAIR),[25] 2011 Cross-State Air Pollution Rule (CSAPR),[26] 2016

---

[20] *See* EPA, Air Quality Design Values, 2021 Design Value Reports, Ozone Design Values, 2021 (XLSX), Table 1a, *available at* https://www.epa.gov/air-trends/air-quality-design-values#report (last visited June 20, 2022).

[21] *See* EPA, Fact Sheet – Final Area Designations for the National Ambient Air Quality Standards for Ozone Established in 2015 at 7, *available at* https://www.epa.gov/sites/production/files/2018-04/documents/placeholder_0.pdf (last visited June 20, 2022).

[22] *See* EPA, Air Quality Design Values, 2020 Design Value Reports, Ozone Design Values, 2020 (XLSX), Table 1a, *available at* https://www.epa.gov/air-trends/air-quality-design-values#report (showing 2018-2020 design values for Greater Connecticut and Philadelphia nonattainment areas above the 2015 ozone NAAQS) (last visited June 20, 2022).

[23] *See* 42 U.S.C. § 7511(b)(2); 87 Fed. Reg. 21,842 (Apr. 13, 2022) (proposing reclassification).

[24] *See, e.g.*, https://www3.epa.gov/region1/airquality/ma_over.html (registering exceedances in 2021 of the ozone standards at eight different monitors across Massachusetts).

[25] 70 Fed. Reg. 25,162 (May 12, 2005).

[26] 76 Fed. Reg. 48,208 (Aug. 8, 2011).

CSAPR Update,[27] and 2021 Revised CSAPR Update.[28] However, these efforts have been insufficient to bring all downwind areas into attainment of the 2015 ozone NAAQS.

The States currently have some of the most stringent NOx and VOC control programs in the country, which aggressively regulate in-state power plants, factories, and motor vehicles. These programs include:

- Stringent Reasonably Available Control Technology (RACT) on all major NOx and VOC stationary sources, including power plants and major non-electric generating units.[29]

- In New Jersey, regulation of power plants that operate on High Electric Demand Days (HEDDs) when ozone concentrations are often elevated[30] and regulation of distributed generation/demand response internal combustion engines.[31] New Jersey's rules for stationary reciprocating internal combustion engines do not allow the use of uncontrolled engines for the purpose of distributed electric generation or demand response in nonemergency situations. Similarly, Delaware has a strong multi-pollutant rule[32] and regulates stationary generators.[33] New York stringently regulates combustion turbines and internal combustion engines used for demand response.[34]

- In New Jersey, State-of-the art (SOTA) air pollution control requirement for newly constructed, reconstructed and modified equipment and control apparatus.[35]

- Adoption of California's motor vehicle emission standards, which place more stringent controls on the amount of NOx emitted from motor vehicles than federal emission standards. New York and Connecticut have adopted the Low Emission Vehicle (LEV) III emissions standards, which apply to all 2017 through 2025 model year vehicles up to 14,000 pounds gross vehicle weight rating.[36] Massachusetts has likewise adopted LEV standards, as well as

---

[27] 81 Fed. Reg. 74,504 (Oct. 26, 2016).

[28] 86 Fed. Reg. 23,054 (Apr. 30, 2021).

[29] 6 NYCRR Parts 212-3, 220, & 227-2 (New York); RCSA 22a-174-22e, RCSA 22a-174-22f, RCSA 22a-174-20, RCSA 22a-174-32 (Connecticut); N.J. Admin. Code §§ 7:27-16 & 7:27-19 (New Jersey); 7 DE Admin. Code 1112 (Delaware).

[30] N.J. Admin. Code §§ 7:27-19.29 & -19.30.

[31] N.J. Admin. Code § 7:27-19.8.

[32] 7 DE Admin. Code 1146.

[33] 7 DE Admin. Code 1144.

[34] 6 NYCRR Part 222 ("Distributed Generation Sources").

[35] N.J. Admin. Code §§ 7:27-8.12 & -22.35.

[36] 6 NYCRR Part 218; RCSA 22a-174-36c.

aggressive Zero Emission Vehicle (ZEV) measures, with an aim of making 30 percent of all sales of new medium- and heavy-duty vehicles zero emission by 2030.[37] Beginning with model year 2009, New Jersey incorporated by reference California's Low Emission Vehicle standards, including the zero-emission sales requirements, to ensure the lowest emitting vehicles in the nation are sold in New Jersey. New Jersey also has some of the most stringent rules in the country for vehicle idling and heavy-duty vehicle inspection and maintenance using on-board diagnostics technology.[38]

- Statewide Enhanced Vehicle Inspection and Maintenance (I&M) requirements for motor vehicles that include testing of older, high-emitting vehicles to significantly reduce on-road mobile emissions.[39]

- Adoption of regional measures to reduce VOC emissions from a variety of large source categories that have been recommended by the OTC, including consumer products, architectural and industrial maintenance coatings, portable fuel containers, adhesives and sealants, asphalt paving, and solvent metal cleaning processes.[40]

- Lowest Achievable Emission Rate (LAER) standards on all new major sources of NOx or VOC, and on all existing sources that would undergo major modifications with emissions above certain project thresholds.[41]

- In New Jersey, adoption of measures to control NOx emissions from Municipal Waste Combustors[42] and natural gas pipeline compressor stations.[43] New York has also adopted regulations limiting NOx emissions from municipal solid

---

[37] 310 Code Mass. Regs. § 7.40 (adopting California's LEV standards); Multi-State Medium- and Heavy-Duty Zero Emission Vehicle Memorandum of Understanding, https://www.nescaum.org/documents/mhdv-zev-mou-20220329.pdf/ (multi-state commitment to aggressive measures to promote ZEVs).

[38] N.J. Admin. Code §§ 7:27-14.3, -14.5, -15.5 & -15.8.

[39] 6 NYCRR Part 217-6; RCSA 22a-174-27; N.J. Admin. Code §§ 7:27-14 & -15.

[40] 6 NYCRR Parts 235, 205, 239, 228, 241 & 226 (New York); RCSA 22a-l 74-40; RCSA 22a-174-41; RCSA 22a-l 74-44; RCSA 22a-174-20(k) (Connecticut); N.J. Admin. Code §§ 7:27-16.1 & -2 (New Jersey); 7 DE Admin. Code 1124 (Delaware).

[41] 6 NYCRR Part 231 (New York); RCSA 22a-174-3a (Connecticut); N.J. Admin. Code § 7:27-18 (New Jersey); 7 DE Admin. Code 1125 (Delaware) (triggered at low thresholds of 25tpy in New Castle County, Delaware and Kent County, Delaware compared to 100 tpy for most of the country).

[42] N.J. Admin. Code § 7:27-19.12.

[43] N.J. Admin. Code §§ 7:27-19.5 & -19.8.

waste combustion units.[44] Connecticut has stringent NOx limits for municipal waste combustors as well.[45]

- In New York, regulation of certain oil- and natural gas-fired combustion turbines, referred to as "peaking units," to lower their allowable NOx emissions during the ozone season.[46] Connecticut also has a rule to limit emissions from peaking units at non-major sources of NOx,[47] and stringent NOx limits for all units at major sources of NOx.[48]

- In the City of New York, adoption of significant additional measures to reduce emissions of ozone precursors within its jurisdiction.[49]

As a result of these strict programs, major power plants in New York reduced annual ozone-season NOx emissions by 72.7 percent between 2008 and 2021.[50] Connecticut's power plants and major non-EGUs reduced ozone-season NOx emissions by 75 percent between 2008 and 2021.[51] These reductions are expected to be even greater following the full retirement of Connecticut's last remaining coal-fired power plant in 2021, as well as other measures taken to comply with RACT. New Jersey's annual NOx and VOC emissions have each decreased approximately 45 percent and 37 percent, respectively, from 2008 to 2017.[52] Power plants in New Jersey reduced ozone-season NOx emissions by approximately 80 percent between 2008 and 2019.[53] And in that same stretch, Massachusetts reduced its ozone season NOx emissions by over 85 percent.[54]

Transported ozone pollution produces serious health, welfare, and practical consequences for these downwind areas and their residents, resulting in numerous days when ozone reaches hazardous levels. For example, over the last three ozone

---

[44] 6 NYCRR Part 219-10.

[45] RCSA § 22a-174-38.

[46] 6 NYCRR Part 227-3.

[47] RCSA § 22a-174-22f.

[48] RCSA § 22a-174-22e.

[49] *See* City of New York, OneNYC Initiatives 23-28, 82-85 (Apr. 2018), *available at* https://onenyc.cityofnewyork.us/wp-content/uploads/2018/04/OneNYC-Initiatives-2.pdf; *see also* City of New York, OneNYC 2019 Progress Report 36-46, 56, 64, *available at* https://onenyc.cityofnewyork.us/reports-resources.

[50] EPA, Air Markets Program Data, https://ampd.epa.gov/ampd/.

[51] *Id.*

[52] EPA, National Emissions Inventory, data downloaded 6/14/2022, (excluding biogenic, prescribed fire and wildfire emissions), https://www.epa.gov/air-emissions-inventories/national-emissions-inventory-nei.

[53] EPA, Air Markets Program Data, data downloaded 6/14/2022, https://ampd.epa.gov/ampd/.

[54] *Id.*

seasons (2019-2021), data demonstrate that New York experienced 36 days—17 days in 2021 alone—when the 2015 ozone NAAQS were exceeded at one or more monitoring locations in the New York Metropolitan Area.[55] The New York State Department of Environmental Conservation issued numerous ozone alerts, recommending that residents in the specified areas—particularly the elderly, children, and people with breathing problems such as asthma—curtail outdoor activities.

Similarly, from 2019-2021, Connecticut has recorded 59 days when ozone levels exceeded the 2015 ozone NAAQS.[56] New Jersey saw approximately 30 days statewide when the 2015 ozone NAAQS were exceeded during the same time period.[57] And in Massachusetts, over the last three ozone seasons (2019-2021), ten different monitoring locations have registered unhealthy levels of ozone exceeding the 2015 ozone NAAQS.[58]

## 4. Litigation History of the Proposal

EPA's promulgation of the 2015 ozone NAAQS on October 1, 2015, triggered states' duties to submit to EPA within three years SIPs containing adequate measures to satisfy their Good Neighbor Provision obligations. After states submitted complete SIPs, EPA was required to approve or disapprove them within one year. If states did not submit SIPs, EPA was required to make findings of failure to submit. After disapproving any SIP (in whole or in part), or making findings of failure to submit, EPA was required to promulgate FIPs within two years addressing Good Neighbor Provision obligations.

Several upwind states, including Pennsylvania and Virginia, did not timely submit SIPs, and after several of the States commenced deadline enforcement litigation,[59] EPA made the required findings of failure to submit for these states, among others, effective January 6, 2020.[60] EPA's findings of failure to submit set a

---

[55] *See* NYSDEC, Ozone Exceedances and Information, 2021 High Ozone Values – 8-Hour Averages, https://www.dec.ny.gov/chemical/38377.html#Values .

[56] https://portal.ct.gov/DEEP/Air/Monitoring/Annual-Summary-Information-for-Ozone

[57] *See* N.J. Dep't of Envtl. Protection [hereinafter NJDEP], Exceedances of Air Quality Standards (click News then "Exceedances of Air Quality Standards", then "2021 Exceedances of AQS", "2020 Exceedances of AQS", etc.), *available at* https://www.nj.gov/dep/airmon/#.

[58] *See* EPA, Region 1: New England, https://www3.epa.gov/region1/airquality/ ma_over.html.

[59] *New Jersey v. Wheeler*, Case No. 1:19-cv-03247-ABJ (D.D.C.).

[60] 84 Fed. Reg. 66,612 (Dec. 5, 2019) (effective Jan. 6, 2020). Following publication of EPA's findings, the litigation was dismissed. *See* Notice of Dismissal, *New Jersey v. Wheeler*, Case No. 1:19-cv-03247-ABJ, Doc. 9 (D.D.C. filed Jan. 3, 2020).

statutory deadline of January 6, 2022, for the agency to promulgate FIPs for states covered by the notice, unless they submitted SIPs that EPA approved in the meantime. EPA did not promulgate FIPs for all states covered by these findings, including Pennsylvania and Virginia, which also did not submit approved SIPs in the meantime. Deadline enforcement litigation brought by several citizen groups is pending.[61]

Meanwhile, other upwind states, including Indiana, Kentucky, Michigan, Ohio, Texas and West Virginia, submitted SIPs, but EPA failed to approve or disapprove them within a year as required by the statute. After several of the States commenced deadline enforcement litigation, they reached agreement with EPA on a consent decree establishing deadlines for EPA to take action on these SIPs. Notably, the consent decree included a contingency provision that extended EPA's deadline for taking final action on the SIPs to December 15, 2022, contingent on EPA proposing FIPs for these states by February 28, 2022.[62]

The Proposal includes proposed FIPs for the states for which EPA has current or anticipated obligations to promulgate FIPs as a result of these statutory and court-ordered deadlines.

## 5. Summary of the Proposal

The Proposal addresses interstate transport of ozone by proposing FIPs for 26 states for which EPA has either (i) not approved a submitted SIP, (ii) has made a finding of failure to submit, or (iii) has proposed to rescind a prior SIP approval. The Proposal would establish new ozone season emission budgets for nitrogen oxides (NOx) beginning in 2023 for power plant sources in these states, and in 2026 for other emissions sources outside the power sector.

EPA analyzed the scope and nature of the ozone transport problem and now proposes emissions budgets using its four-step CSAPR framework. As part of that analysis, EPA performed air quality modeling for 2023, 2026, and 2032 and contribution projections for 2023 and 2026.

In the Proposal, EPA sets emissions budgets for covered upwind states using a phased approach. For the first phase, effective in 2023, EPA sets budgets for each of the 26 states significantly contributing to downwind nonattainment and maintenance problems based on power plants' full operation of post-combustion controls that have already been installed at these plants—including both selective catalytic reduction (SCR) and selective non-catalytic reduction (SNCR) equipment—and that cost up to $1,800 per ton of NOx removed. For the second phase, EPA

---

[61] *Sierra Club v. Regan*, Case No. 4:22-cv-01992-DMR (N.D. Cal.).

[62] *See* Consent Decree, *New York v. Regan*, Case No. 1:21-cv-252-ALC, Doc. 38 (S.D.N.Y. filed Nov. 15, 2021).

proposes to tighten budgets based on installation of additional combustion controls at power plants by 2024 that cost up to $1,200 per ton of NOx removed. For the third phase, EPA would further tighten budgets based on installation and full operation of new post-combustion controls at power plants (primarily new SCR, but also some new SNCR) by 2026, that cost up to $11,000 per ton of NOx removed. EPA also accounts for anticipated generation shifting throughout these time periods.

For non-power plant sources, EPA's Proposal identifies significant contribution from 23 states and sets a schedule of emissions reductions beginning in 2026, based on implementation of controls costs up to $7,500 per ton. EPA focuses on two tiers of sources emitting greater than 100 tons per year of NOx, but proposes to exclude certain categories of sources, such as municipal waste combustors, that produce a substantial amount of NOx that could be reduced at marginal costs comparable to the control costs for other types of sources included in the Proposal.[63]

EPA's Proposal includes several other limitations and parameters for the proposed budgets and trading program. As in previous ozone transport rulemakings, EPA includes assurance levels set at 121 percent of states' annual ozone season emissions budgets. EPA also proposes dynamic emissions budgets, which will be reset as the emissions from sources change over time, so that the price of allowances can remain commensurate with the marginal costs of operating and installing controls as designed. Finally, EPA adds a unit-specific, daily emissions limitation of 0.14 lb/mmBtu (as a daily average) for large coal-first power plant sources with SCR, to be enforced by an allowance surrender penalty.

Overall, the cap-and-trade program is similar to prior ozone transport rulemakings, though it now includes several enhancements designed to implement long-overdue emissions controls and limits on upwind sources, including non-power plant sources; to limit excessive emissions on high-ozone days; and to maintain budget stringency for operating sources over the coming years.

## States' Comments on the Proposed Rule

The Proposal employs EPA's settled transport framework to require critical emissions reductions in upwind states using a phased approach over the coming ozone seasons and a backstop daily emissions rate for certain sources. The States support the increased stringency of emissions budgets and inclusion of non-power plant sources in the rule. However, the States have identified areas where EPA should strengthen the Proposal to require additional emissions reductions sooner, better achieving EPA's statutory mandate and upwind states' obligations under the Good Neighbor Provision to eliminate significant contribution as expeditiously as practicable.

---

[63] 87 Fed. Reg. at 20,085-86.

1. **The Proposal would be an important step toward achieving emissions reductions from upwind sources that have long burdened the States with excessive ozone pollution.**

EPA's Proposal applies a settled four-step framework using cost-effectiveness to apportion required emissions reductions among upwind states. The Proposal continues an approach upheld in *EME Homer City*[64] and *Wisconsin*.[65] In *EME Homer City*, the Supreme Court explained that EPA's four-step framework was a permissible method of apportioning the required amount of emission reductions necessary to eliminate upwind states' "significant contributions." The Court elaborated that EPA's approach reasonably allows the agency to "achieve levels of attainment . . . at a much lower overall cost."[66] If finalized, the Proposal would reduce ozone by a total of 14.13 ppb across all downwind receptors in 2026,[67] with an average improvement of 0.64 ppb.[68] The Proposal anticipates that implementation of the emissions budgets will reduce 2026 ozone season NOx emissions from power plants by approximately 90,000 tons and from non-power plant sources by about 47,000 tons.[69] The Proposal would achieve substantial progress toward downwind states' attainment and maintenance of the 2015 ozone NAAQS; although EPA must do more to fully satisfy its statutory obligations.

   a. **The Proposal requires necessary, cost-effective controls for power plants.**

The States support the proposed controls on power plant emissions. The Proposal requires sources still lacking state-of-the-art combustion control equipment to install it. These cost-effective controls are already installed on 99 percent of coal-fired power plants greater than 25 megawatts (MW)[70] and most comparable power plants in the States. Their installation will provide additional, necessary emissions reductions in upwind states.

The States also support optimizing operation of already-installed SCRs and SNCRs at a projected marginal cost of $1,800 per ton. These costs are reasonable and comparable to costs for control equipment already required in many states under the Revised CSAPR Update, the current regional ozone transport rule for the 2008 ozone NAAQS. Furthermore, these costs are still far lower than the marginal costs of additional controls in downwind states, as described below. These near-term

---

[64] *EME Homer City*, 572 U.S. at 501-03, 519-20, 524.

[65] *Wisconsin v. EPA*, 938 F.3d 303, 310-11, 323 (D.C. Cir. 2019).

[66] *EME Homer City*, 572 U.S. at 519.

[67] *See* 87 Fed. Reg. at 20,097, Table VI.D.3-1.

[68] *See id.*, Table VI.D.3-1.

[69] *See id.*

[70] *Id.* at 20,078.

requirements will produce readily achievable, necessary emissions reductions at relatively low costs.

The States also support requiring installation of new post-combustion control equipment, particularly new SCR, where appropriate. Power plants, including many coal plants and combustion turbines in the States, have adopted SCR or SNCR, which are highly effective at reducing NOx emissions.[71] These controls are also necessary in upwind states, because significant contribution from upwind states persists through 2026, the first ozone season when EPA has set emissions budgets to reflect installation of these controls across the fleet. Therefore, EPA has reasonably determined that new SCR and SNCR on upwind sources lacking these controls will be necessary to assist with eliminating this ongoing significant contribution.

Recent experience with regional ozone transport rules for the 2008 ozone NAAQS reinforces the necessity of requiring new post-combustion controls in the Proposal. Neither the CSAPR Update in 2016 nor the Revised CSAPR Update in 2021 required power plants to install new post-combustion controls; yet upwind states are projected to continue to emit ozone in such high amounts that their significant contributions to downwind nonattainment are projected to persist even under the less stringent 2008 standards through 2024. Here, where EPA is implementing the more stringent 2015 standards, and significant contribution is projected to persist into 2026, it is imperative that EPA tighten emissions budgets so that upwind sources will finally install these industry-standard controls to limit their emissions as required by the Act.

The Proposal recognizes that it is much more cost efficient for upwind states to implement additional controls at lower marginal costs than for downwind states to implement ever more stringent controls. The costs of up to $11,000 per ton of NOx removed for new SCRs and SNCRs are higher than the costs of near-term measures EPA is requiring in 2023 and 2024, but even these costs are comparable to or less than the marginal costs for additional controls in the downwind States that have long been burdened by excessive ozone pollution from upwind sources. To the extent EPA considers cost in establishing levels of control stringency to set state-specific emissions budgets, it can do so reasonably only by accounting for the much more stringent and costly controls mandated in downwind states that require their sources to employ Reasonably Available Control Technology (RACT). Downwind states in the Ozone Transport Region (OTR), including Connecticut, New York, New Jersey, Massachusetts, and Delaware, are required to implement RACT state-wide, which entails a set of controls that, in many cases, go far beyond the Proposal's control stringency.[72]

---

[71] *Id.* at 20,080.

[72] *See id.* at 20,085, 20,148, 20,097.

For example, Connecticut's emission control program for fuel-burning emission sources of NOx is based on a control stringency of $13,118 per ton of NOx emissions reductions.[73] Likewise, New York's RACT requirements correspond to approximately $5,500 per ton of NOx emissions reductions, well above the Proposed Rule's $1,800 per ton control stringency for the first few years of implementation.[74] New Jersey has also required controls that significantly exceed the Proposed Rule's 2026 $11,000 per ton control stringency, including controls for oil-fired boilers at up to $18,000 per ton of NOx emission reductions and SCR controls for natural gas turbines (compressor turbines) between $7,033 and $18,983 per ton of emissions reductions.[75] New Jersey's ozone season cost effectiveness for installing water injection on a HEDD unit is $44,000 per ton of NOx removed.[76]

Several downwind states additionally require RACT-based controls for some non-EGU emissions sources.[77] These RACT-based controls for EGU and non-EGU NOx sources in the OTR states have resulted in significant NOx reductions, as discussed above.

The Proposal is a positive first step toward equalizing upwind and downwind control costs. The far greater control stringencies downwind states must impose because of lax upwind emission budgets creates an imbalance, however, where many upwind states are permitted to under-control emissions sources in their states while downwind states are compelled to heavily control their in-state emission sources. This situation may result in greater overall control costs across the region than would be the case were EPA to impose a control stringency that brings the upwind states closer to parity with the downwind states. Just as EPA has an obligation to avoid over-control of sources in upwind states, EPA also has an obligation to avoid under-control of sources in those states.[78]

---

[73] RCSA 22a-174-22e(h)(1)(A)(iii).

[74] NYSDEC, DAR-20 Economic and Technical Analysis for Reasonably Available Control Technology (RACT) (Aug. 8, 2013), *available at* https://www.dec.ny.gov/docs/air_pdf/dar20.pdf.

[75] *See* New Jersey State Implementation Plan Revision for Infrastructure and Transport Requirements for the 70 ppb and 75 ppb 8-hour Ozone NAAQS and Negative Declaration for the Oil and Natural Gas Control Technique Guidelines (May 13, 2019), *available at* https://www.nj.gov/dep/baqp/PDF%20for%20posting/Final.pdf

[76] *Id.*

[77] *See, e.g.*, N.J. Admin. Code 7:27-19.8 (stationary reciprocating internal combustion engines); N.J. Admin. Code 7:27-19.2 (municipal waste combustors); RCSA 22a-174-20; 22e; 22f and 22a-174-32 (RACT for NOx and VOC stationary EGU and non-EGU sources); *see* 87 Fed. Reg. at 20,085-86, 20,097, 20,148.

[78] *See EME Homer City*, 572 U.S. at 523 ("[W]hile EPA has a statutory duty to avoid over-control, the Agency also has a statutory obligation to avoid 'under-control,' i.e., to maximize achievement of attainment downwind.").

Every state is required by law to fully eliminate its significant contribution to nonattainment or failure to maintain in any downwind state, and the emissions budgets must be set at levels that will realistically accomplish that. By selecting a control stringency that is far closer to parity with the higher control stringencies already implemented by several downwind states, the Proposal makes progress toward reducing the imbalance in controls costs and stringency between downwind states and upwind states that continue to have poorly controlled sources.

### b. The Proposal provides long-overdue regulation of non-power plant sources.

For non-power plant sources, the States support inclusion of major stationary sources in the emissions budgets. By requiring control equipment costing up to $7,500 per ton, EPA would impose control costs that are roughly comparable to, but lower than, costs for controls on power plants. Non-power plant sources have not been included in the most recent regional ozone transport rules, but in an earlier regional trading program, the NOx SIP Call, EPA found significant contribution from non-power plant sources.[79] EPA's analysis has reasonably identified available, cost-effective emissions reductions from these sources that can assist in reducing upwind significant contribution.

In setting emissions budgets that include reductions in non-power plant sources' emissions, EPA has reasonably relied on available data to determine the effective emissions reductions that can be achieved by these sources, even as it seeks to further refine its information. As the *Wisconsin* court held, scientific uncertainty or even administrative infeasibility would not justify declining to include these sources.[80] Therefore, EPA was not only allowed, but was required, to identify emissions reductions from non-power plant sources, and failure to do so would have been unreasonable and contrary to recent case law.

Emissions reductions from non-power plant sources are necessary to address upwind significant contribution, which persists through at least 2026, when the emission budgets first account for reductions from these sources. Upwind states—and EPA, when promulgating FIPs—are required to *eliminate*, not just reduce, upwind significant contribution as expeditiously as practicable.[81] Especially when

---

[79] *See* EPA, *Finding of Significant Contribution*, 63 Fed. Reg. 57,356, 57,358-59 (Oct. 27, 1998).

[80] 938 F.3d at 319 (finding that EPA's uncertainty about non-power plant sources did not rise to the level of an impossibility in quantifying good neighbor obligations in the CSAPR Update).

[81] *See North Carolina v. EPA*, 531 F.3d 896, 908 (D.C. Cir.), *mod. on reh'g in part*, 550 F.3d 1176 (D.C. Cir. 2008) ("Because [regional transport rulemaking] is designed as a complete remedy to section 110(a)(2)(D)(i)(I) problems, as EPA claims,

significant contribution persists long after downwind attainment deadlines, EPA must regulate sources such as major upwind non-power plant stationary sources where it has reasonably determined that meaningful emissions reductions are available, and particularly where cost-effective controls for non-power plant sources, like those imposed on power plants, can achieve such reductions.

Even though the emissions reductions achieved from regulating non-power plant sources are less than those achieved from regulating power plants, the reductions are meaningful, accounting for an additional average reduction of about 0.2 ppb at each nonattainment receptor in 2026.[82] EPA can and must reasonably regulate them. Significant contribution is comprised of many relatively small contributions from sources in upwind states that combine to prevent timely attainment and interfere with maintenance of the ozone NAAQS in downwind areas such as the States. Therefore, to eliminate significant contribution impacting downwind states, EPA must require emission reductions from a variety of sources, including categories not currently regulated. EPA has demonstrated that meaningful emission reductions from non-power plant sources are available and necessary to eliminate significant contribution, and has reasonably included such reductions in its formulation of emission budgets for the covered states.

### c. The Proposal makes progress toward addressing the impacts of ozone on overburdened communities.

Executive Order 12,898[83] directs federal agencies to identify and address disproportionately high and adverse human health or environmental effects of their programs, policies, and activities on populations of color and low-income populations. Exposure to ambient ozone causes a variety of negative effects on human health, including asthma exacerbation and premature mortality.[84] Children of color and children in families living with economic resources less than the federal poverty standard have significantly higher rates of asthma than the general population.[85] Black and Native American people in particular have significantly higher asthma

---

. . . [it] must do more than achieve something measurable; it must actually require *elimination* of emissions from sources that contribute significantly and interfere with maintenance in downwind nonattainment areas.") (emphasis added).

[82] 87 Fed. Reg. at 20,093, tbl. VI.D.1-2; *id.* at 20,097, tbl. VI-D.3-1.

[83] *See* Executive Order No. 12,898, 59 Fed. Reg. 7,629 (Feb. 16, 1994).

[84] 85 Fed. Reg. 68,974 (Oct. 30, 2020).

[85] *See* 85 Fed. Reg. 49,850 (Aug. 14, 2020).

rates than other races.[86] As a result, these groups have a greater potential for ozone-related health impacts due to the higher prevalence of asthma.

Additionally, Black persons ages 35 and older experienced up to three times as many deaths per capita from cardiovascular disease as their White counterparts between 2016 and 2018.[87] EPA has previously concluded that available evidence suggests a causal relationship between ozone exposure and cardiovascular effects.[88] EPA must consider the environmental justice implications of the Proposal, including the significant evidence suggestive of increased risks from ozone exposures based on socioeconomic status.

Further, limiting upwind significant contribution, especially on high-ozone days, is particularly important in light of the ongoing COVID-19 pandemic, as ozone exposure has been linked to worse health outcomes from COVID-19.[89] Additionally, people of color, especially Black Americans, have been found to be disproportionately affected by COVID-19.[90] The ongoing pandemic further exacerbates the disproportionate harms people of color and those living in poverty face from ambient ozone exposure, and should further motivate EPA to act as expeditiously as possible to ameliorate the problem.

In light of the evidence that ozone disproportionately harms these populations, EPA must act to eliminate significant interstate ozone transport as expeditiously as possible and particularly limit high-ozone days to address the longstanding, disproportionate risks to already overburdened communities from ozone pollution.[91] The enhanced measures in the Proposal are critical to protecting these communities, and EPA should strongly consider strengthening the Proposal to further reduce this burden.

---

[86] Center for Disease Control, Most Recent National Asthma Data, https://www.cdc.gov/asthma/most_recent_national_asthma_data.htm.

[87] Centers for Disease Control, Interactive Atlas of Heart Disease and Stroke, https://nccd.cdc.gov/DHDSPAtlas/Default.aspx?state=DC.

[88] *See* Integrated Science Assessment for Ozone and Related Photochemical Oxidants (Final Report, Apr. 2020) § 4.2.18, *available at* https://cfpub.epa.gov/ncea/isa/recordisplay.cfm?deid=348522.

[89] Xiao Wu et al., *Exposure to air pollution and COVID-19 mortality in the United States: A nationwide cross-sectional study*, MEDRXIV.

[90] *See, e.g.*, Erin K. Stokes et al., *Coronavirus Disease 2019 Case Surveillance – United States, January 22-May 30, 2020*, MMWR MORB MORTAL WKLY REP 2020, 69, 759-765; Gregorio A. Millett et al., *Assessing differential impacts of Covid-19 on black communities*, 47 ANNALS OF EPIDEMIOLOGY 37-44 (2020).

[91] *See* 87 Fed. Reg. at 20,112.

**2. Despite the substantial emissions reductions in the Proposal, EPA should strengthen the Proposal to eliminate significant contribution as expeditiously as practicable.**

The Good Neighbor Provision requires that EPA, when issuing FIPs, eliminate upwind states' significant contribution to downwind nonattainment and maintenance problems as expeditiously as practicable, and no later than downwind states' next attainment date, unless EPA can demonstrate that it is impossible to do so.[92] The marginal area attainment deadline for the 2015 ozone NAAQS passed in 2021, with several States unable to reach attainment, and the moderate area deadline is swiftly approaching in 2024. Because attainment is based on the three preceding years' ozone levels, by the time the Proposal takes effect, two of these three years (2021 and 2022) will have already passed. The Proposal makes important reductions in upwind ozone pollution, but EPA must further strengthen its requirements to eliminate upwind states' significant contribution altogether. Even if EPA can demonstrate that eliminating significant contribution by 2023 is impossible, it must eliminate it by 2024, or by 2025 if impossible in 2024, and so on. If EPA cannot eliminate significant contribution by the 2024 deadline, and downwind nonattainment persists beyond that, as projected, EPA should not wait until the next attainment deadline in 2027 to provide a full remedy, but instead should implement measures, including those described below, to eliminate significant contribution as expeditiously as practicable.

**a. The Proposal does not eliminate significant contribution within the timeframe required by the Act.**

*Wisconsin* requires EPA to eliminate, not just reduce, significant contribution.[93] The Proposal does not eliminate significant contribution by 2023 (in time for the 2024 deadline), nor as expeditiously as practicable in 2024 or 2025 or 2026 (in time for the 2027 deadline). For example, in the tri-state New York Metropolitan Area, monitors in Fairfield and New Haven, Connecticut, are projected to be in nonattainment or maintenance status in 2026, with upwind power plant sources continuing to contribute pollution in quantities amounting to more than 1 percent of the NAAQS.[94] As a result, EPA should take more aggressive steps to increase the stringency of upwind emissions budgets to reduce more pollution sooner.

---

[92] *Wisconsin*, 938 F.3d at 319.

[93] *Id.* at 317.

[94] *See, e.g.*, EPA-HQ-OAR-2021-0668-0070 "2026 EGU Contributions" tab, Cells AS150, AS152, AS153, AS158;" *see also* "2026 NonEGU Contributions" tab, Cells AS150, AS152, AS153, AS158; *see also* 87 Fed. Reg. at 20,093, Table VI.D.1-2; 87 Fed. Reg. at 20,096; Table VI.D.2-2.

In addition, even the emissions reductions achieved by 2026 are insufficient. The *Wisconsin* court remanded the CSAPR Update because "[t]he Clean Air Act requires upwind States to eliminate their significant contributions to downwind ozone nonattainment by prescribed deadlines."[95] The CSAPR Update not only failed to do so by the next attainment deadline; it did not purport to do so by *any* attainment deadline. Here, the Proposal simply relies on improving downwind air quality by 2032, not additional upwind emissions reductions after 2026, to eliminate significant contribution. This is insufficient under *Wisconsin*. Instead—and assuming elimination of significant contribution by 2026 is impossible, which EPA has not demonstrated—EPA should have modeled years between 2026 and 2032 to determine if downwind air quality problems persist in 2027, 2028, etc., and if so, whether and how to achieve additional necessary emissions reductions.

### b. Additional emissions reductions are available from greater use of already installed controls at power plants.

In the Proposal, EPA determined that reductions from optimizing installed SCR (installed on 60 percent of the coal-powered fleet) will be available in 2023 and set an emissions benchmark at 0.08 lb/mmBtu reflecting such optimized operation. While the States support EPA's determination to tighten the emissions benchmark, the new rate is still higher than the typical rate achieved by sources actually running their controls: over half of power plants during their third-best season of operation achieved a 0.068 rate or lower.[96] In 2021, 71 percent of SCR-equipped power plant sources in certain states covered by the Proposal achieved better than the 0.08 rate EPA proposes.[97] Ample data thus supports a lower benchmark rate for power plants with SCR, along with commensurately tightened upwind emissions budgets in 2023 and subsequent years.

The data EPA used to derive the 0.08 lb/mmBtu rate illustrate that the rate is too lax. EPA relied on historical data for recent years during which sources were *not* fully operating their controls, according to agency findings. EPA has repeatedly underestimated the emissions reductions available from SCRs and should not do so again. Establishing a benchmark rate that is too lenient permits upwind states to continue emitting far too much ozone precursor pollution.

### c. Additional emissions reductions are available from new SNCRs sooner than new SCRs and their timelines should be de-coupled.

The Proposal recognizes that new SNCR control equipment is cost-effective for sources emitting less than 100 tons per year of NOx, and also that such equipment

---

[95] 938 F.3d at 319.

[96] EGU NOx Mitigation Strategies Proposed Rule TSD, EPA-HQ-OAR-2021-0668-0125, at 8-9.

[97] EPA-HQ-OAR-2021-0668-0115, at Cell I4.

could be installed much sooner than 2026. However, the current Proposal unnecessarily links the timeline for new SCR and SNCR installation. For sources that will install SNCR, earlier installation could reduce NOx emissions by as much as 1,000 tons as early as 2024 because installation times are approximately 16 months, much shorter than the up to 48 months EPA believes it will take for fleetwide SCR installation. Therefore, EPA should de-couple the SCR and SNCR timelines and set emissions budgets to require SNCR sooner to comply with the statutory mandate to eliminate significant contribution as expeditiously as practicable.

> **d. Assuming new power plant controls are not possible by 2023, EPA should require additional controls as soon as they are possible.**

*Wisconsin* reaffirmed the statutory command to eliminate significant contribution as expeditiously as practicable. But EPA has postponed additional controls until the next attainment deadline for downwind states. If additional power plant controls are not possible—and EPA must first make a more complete demonstration showing this is the case—then additional controls should be required by the next possible ozone season. If power plant controls are not available by 2023, then they should be required as soon as possible thereafter: the earliest possible of 2024, 2025, or 2026. Moreover, even if controls are potentially unavailable fleetwide for the beginning of the 2023 ozone season, if they are likely to be available sometime during the season, EPA should still set emission budgets for the year based on the time when they can be installed.

EPA should set emissions budgets at a level that will require power plant combustion controls for the 2023 ozone season. Installation time is six to eight months, so even if they are not available for the beginning of the season, they could be installed during the season. Units plainly have notice that combustion controls will be required, and, indeed, many units that currently lack them are required to have them installed under the Revised CSAPR Update for the 2008 ozone NAAQS currently in force. Any units not covered by the Revised CSAPR Update, or that cannot get these controls installed, can purchase allowances, leading to generation shifting to lower-emitting sources.

Even if not all power plants can install SCR before 2026, as EPA determined, that does not mean that none can. EPA thus should consider phased emissions reductions as SCR installations become available. For example, if 30 percent of power plants can install SCR by an ozone season before 2026, emissions budgets should be reduced accordingly.

### e. EPA should not exclude certain non-power plant sources such as municipal waste combustors that produce a substantial amount of NOx that could be reduced at reasonable cost.

Finally, significant and meaningful additional reductions are available from units producing less than 25 megawatts, such as municipal solid waste combustors. As the Ozone Transport Commission recommended in 2021, EPA should include these units.[98] If NOx can be reduced at $2,900 to $6,600 per ton as estimated, these costs are well within the thresholds established for non-power plant sources. With respect to the request for comment at 87 Fed. Reg. 20,083 on whether there should be exemptions for infeasibility, the *Wisconsin* court made clear that infeasibility is not impossibility. Therefore, if any such sources seek an exemption or delay of implementation, they must demonstrate impossibility.

### 3. Dynamic budget updates and banking restrictions are necessary and required to ensure upwind states eliminate their significant contribution.

The Proposal correctly observes that emissions budgets from prior rules have proven too lenient in recent years—allowance prices plummeted and NOx emissions rose.[99] For example, EPA highlights the Miami Fort Unit, equipped with SCR, which tripled its ozone-season NOx emission rate between 2017 and 2019.[100] Therefore, the Proposal must go beyond the measures included in prior transport rules to address their shortcomings. The dynamic budget updates and restrictions on allowance banking are necessary. Maintaining the stringency of NOx reductions measures is required when, even under the current Proposal, significant contribution continues in 2026, more than a decade after promulgation of the 2015 ozone NAAQS and seven years after SIPs addressing Good Neighbor obligations were due. EPA's proposed approach to budgets and allowances is consistent with EPA's discretion, recognized in *EME Homer City* and *Wisconsin*, to define upwind significant contribution "amounts."[101]

---

[98] Ozone Transport Comm'n, Notice of Actions Taken by Ozone Transport Comm'n at Annual Public Meeting, June 15, 2021, *available at* https://otcair.org/upload/Documents/Meeting%20Materials/OTC%20Announcement %20of%20Actions%20Taken%2020210615.pdf; *see* 87 Fed. Reg. at 20,086.

[99] 87 Fed. Reg. at 20,095-96; *see* EPA, CSAPR Allowance Prices Jan. 2017 to Feb. 2022, EPA-HQ-OAR-2021-0668-0146.

[100] *Id.* at 20,045 & n16.

[101] *EME Homer City*, 572 U.S. at 519-20; *Wisconsin*, 938 F.3d at 320.

### 4. Daily emissions limits are useful as a backstop, but the proposed allowance surrender model will not ensure rates are achieved if allowance prices fall.

#### a. Downwind States have long sought daily emissions rates and support EPA's decision to adopt such measures.

Downwind states have long sought daily emissions limits as a complement to EPA's seasonal, mass-based allowance trading program. The States thus support EPA's proposal to adopt such limits. EPA has documented the need for these limits in the Proposal and supporting Technical Support Documents.[102] *Wisconsin* and *EME Homer City* bolster EPA's authority to adopt these limits in recognizing EPA's discretion to determine significant contribution.

Daily rates will particularly assist in reducing impacts on overburdened communities. In communities and neighborhoods already struggling with elevated ozone pollution, reducing the number and severity of high-ozone days is critical to reducing the impacts on children with asthma, outdoor workers, and older people, some of the people most impacted by poor air quality. As discussed above, the consequences of ozone pollution are disproportionately borne by people of color and those living below the federal poverty standard.

Additionally, as New York and other downwind states have demonstrated in petitions brought under Section 126(b) of the Act, unit-specific short-term emissions limits are a complementary tool to a regional allowance trading program that can be used to address persistent upwind significant contribution. Unit-specific short-term emissions limits for many of the sources in the upwind states covered by this Proposal are part of the relief requested in the State of New York's March 2018 Clean Air Act Section 126(b) petition, which was remanded to EPA in September 2020.[103] As with the NOx SIP Call, EPA may consider addressing its overdue action on New York's petition through action in this regional transport rulemaking. Delaware and Maryland's respective 2016 Section 126(b) petitions, which EPA denied in 2018, requested similar measures, demonstrating the need for short-term limits, particularly related to high-ozone days.[104] Therefore, EPA's inclusion of these short-term limits as a complement to the seasonal allowance trading program is a well-supported, appropriate measure long sought by downwind states.

---

[102] 87 Fed. Reg. at 20,110-11; EGU NOx Mitigation Strategies Proposed Rule Technical Support Document (TSD), EPA-HQ-OAR-2021-0125, at 29; Ozone Transport Policy Analysis TSD, EPA-HQ-OAR-2021-0668-0133, App'x G at 90.

[103] *See New York v. EPA*, 964 F.3d 1214, 1226 (D.C. Cir. 2020).

[104] *See* 83 Fed. Reg. 50,444, 50,446-47 (Oct. 5, 2018).

### b. Data on short-term emissions strongly support imposition of daily limits.

Data on short-term emissions, particularly on high-ozone days (and the few days preceding them), strongly support the imposition of daily backstop rates. The Proposal identifies sources of interstate ozone pollution in upwind states such as Missouri and Pennsylvania where SCR controls were not operating for substantial periods of recent ozone seasons.[105] The Proposal further observed that downwind states pointed to instances of elevated upwind source NOx emissions on the day of or preceding an ozone exceedance in a downwind state.[106] Because individual occurrences of high ozone are particularly dangerous to public health, and because downwind attainment and maintenance are determined based on a few days of peak levels, uneven operation of installed controls on upwind sources—even if they may comply with an overall seasonal average rate—can wreak havoc on downwind health and frustrate compliance with the NAAQS. Therefore, EPA's analysis of high daily NOx rates in later years of the CSAPR Update implementation supports the Proposal's inclusion of a backstop rate to complement seasonal emissions budgets.

### c. The compliance mechanism for daily limits should be strengthened to ensure sources meet the daily rates.

Despite the benefits of a daily emissions limit, the States have concerns about the proposed compliance mechanism's effectiveness. The allowance surrender enforcement provision will only incentivize compliance if allowance prices remain comparable with control costs. The price for surrendered allowances may also not be commensurate with harm caused to downwind populations—particularly in overburdened communities—and the price for surrendered allowances may be grossly out of proportion to the harm caused to downwind States if excess transported ozone causes continued downwind nonattainment.

Fundamentally, allowance surrender—even at a penalty ratio—is an after-the-fact penalty, not necessarily a deterrent. To give the daily limits more "teeth," EPA should strengthen the deterrence aspect. Emissions limit exceedances should only be covered by allowance surrender up to a certain percentage, similar to the assurance provisions in state emissions budgets. Anything beyond the limit should be considered a violation of the Act, subject to Clean Air Act enforcement and penalties.

---

[105] *See* Ozone Transport Policy Analysis TSD, EPA-HQ-OAR-2021-0668-0133, App'x G at 90; *see, e.g.,* 2021 NOx Rates for 234 SCR Coal Units, EPA-HQ-OAR-2021-0668-0081, at Cells E51, E61, E83, E90, E91, E115, E116, E118, E160, E162.

[106] 87 Fed. Reg. at 20,111 & n256 (citing Comment from Ben Grumbles, Secretary, Maryland Department of the Environment on the Revised CSAPR Update, EPA-HQ-OAR-2020-0272-0094).

**5. EPA should continue to use 1 percent of the NAAQS as the screening threshold at CSAPR Step 2 and should rescind its 2018 alternative thresholds memorandum.**

EPA has continued to apply a 1-percent-of-the-NAAQS screening threshold to determine which upwind states are linked to downwind receptors at CSAPR Step 2.[107] The States support continued use of this threshold, as it makes the linkage analysis more stringent as the NAAQS have become more stringent. This screening threshold appropriately captures a meaningful proportion of upwind contribution to downwind nonattainment and maintenance receptors and provides a straightforward method for separating significant contribution from amounts that are truly *de minimis*.

The States also urge EPA to rescind its 2018 memorandum[108] that suggested that alternative screening thresholds, such as 1 ppb, could be appropriate for SIPs. Allowing states or EPA to use a higher threshold, such as 1 ppb, would be a departure from EPA's longstanding precedent of using 1 percent of the ozone NAAQS.[109] Moreover, the analysis in the 2018 memo is inadequate to support a piecemeal, *ad hoc* use of different screening thresholds. The memo contains no evaluation regarding the result of such approach on downwind states' ability to attain and maintain the relevant NAAQS.

Reducing the amount of upwind contribution that must be addressed in an upwind state's SIP or FIP would necessarily increase the amount of ozone that a downwind state would be required to address on its own. This would further impede downwind states' abilities to attain the NAAQS. The increased amount of upwind pollution that the 2018 memo proposed to allow could mean the difference between attainment and nonattainment for some downwind States. The practical effect of allowing a higher contribution screening threshold would be to shift responsibility for upwind pollution from upwind to downwind states, even as the ozone NAAQS have become increasingly stringent.

Further, allowing different states contributing to a collective problem to use different air quality threshold rates to avoid regulation is inequitable, as well as arbitrary and capricious. Therefore, the States continue to support use of a threshold

---

[107] 87 Fed. Reg. at 20,074.

[108] *See* EPA, Analysis of Contribution Thresholds for Use in Clean Air Act Section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards, EPA-HQ-OAR-2018-0170-0027 (Aug. 31, 2018).

[109] Moreover, in 2009, many East Coast and Midwest States signed on to a letter to EPA supporting the 1 percent threshold, including a number of the upwind States here. *See* https://otcair.org/upload/Documents/Correspondence/Final%20 Recommendation%20Letter_090902.pdf.

of 1 percent of the NAAQS and urge EPA to rescind the 2018 alternative thresholds memorandum.

### 6. EPA's contemplation of any additional time beyond 2026 for facility-specific compliance should be extremely rare.

EPA requests comment on whether it should provide a limited amount of time beyond the 2026 ozone season for specific facilities to meet emissions limitations based on a demonstration of necessity.[110] Given EPA's delay in requiring non-power plant controls until 2026, the circumstances where EPA should even contemplate allowing more time upon a showing of "necessity" should be extremely rare. Since EPA would effectively allow a facility to continue emitting amounts of air pollution past downwind States' attainment deadline, under *Wisconsin* the showing of "necessity" must rise to the level of an actual "impossibility." If EPA does allow for this, it should set an early deadline and provide an opportunity for public notice and comment.

### Conclusion

The States are downwind areas that employ some of the strictest air pollution controls in the country, but still struggle to attain and maintain the 2015 ozone NAAQS, due in large part to the interstate transport of ozone precursors from upwind states, with significant impacts to public health and welfare. EPA must use its authority under the Act to eliminate the excessive upwind emissions that prevent the States from attaining and maintaining the standard, and it must require those emission reductions as expeditiously as practicable. The Proposal provides some welcome relief, but must be further strengthened to fully remedy upwind pollution within the timeframe required by the Act.

---

[110] 87 Fed. Reg. at 20,104.

Respectfully submitted,

FOR THE STATE OF
NEW YORK

LETITIA JAMES
Attorney General

By:    /s/Claiborne E. Walthall
    MORGAN A. COSTELLO
    Chief, Affirmative Litigation
    CLAIBORNE E. WALTHALL
    Assistant Attorney General
    Environmental Protection Bureau
    New York State Attorney General
    The Capitol
    Albany, NY 12224
    (518) 776-2380
    Morgan.Costello@ag.ny.gov
    Claiborne.Walthall@ag.ny.gov

FOR THE STATE OF
CONNECTICUT

WILLIAM TONG
Attorney General

By:    /s/Jill Lacedonia
    JILL LACEDONIA
    Assistant Attorney General
    Office of the Attorney General
    165 Capitol Avenue
    Hartford, CT 06106
    (860) 808-5250
    Jill.Lacedonia@ct.gov

FOR THE STATE OF
DELAWARE

KATHLEEN JENNINGS
Attorney General

By:    /s/Valerie S. Edge
    VALERIE S. EDGE
    Deputy Attorney General
    Delaware Department of Justice
    102 W. Water Street
    Dover, DE 19904
    302-257-3219
    valerie.edge@delaware.gov

FOR THE DISTRICT OF
COLUMBIA

KARL RACINE
Attorney General

By:    /s/ Lauren Cullum
    LAUREN CULLUM
    Special Assistant Attorney General
    Office of the Attorney General for the
    District of Columbia
    400 6th St. NW
    Washington, DC 20001
    (202) 727-3400
    lauren.cullum@dc.gov

FOR THE STATE OF MARYLAND

BRIAN E. FROSH
Attorney General of Maryland

By:  */s/ Joshua M. Segal*
    JOSHUA M. SEGAL
    Special Assistant Attorney General
    Office of the Attorney General
    200 St. Paul Place
    Baltimore, MD 21202
    (410) 576-6446
    jsegal@oag.state.md.us

FOR THE COMMONWEALTH OF
MASSACHUSETTS

MAURA HEALEY
Attorney General

By:  */s/David S. Frankel*
    DAVID S. FRANKEL
    Special Assistant Attorney General
    JILLIAN RILEY
    Assistant Attorney General
    JULIA JONAS-DAY
    Assistant Attorney General
    Environmental Protection Division
    One Ashburton Place, 18th Floor
    Boston, MA 02108
    (617) 963-2294
    david.frankel@mass.gov
    jillian.riley@mass.gov
    julia,jonas-day@mass.gov

FOR THE STATE OF
NEW JERSEY

MATTHEW J. PLATKIN
Acting Attorney General

By:  */s/Carlene J. Dooley*
    CARLENE J. DOOLEY
    Deputy Attorney General
    Environmental Enforcement &
    Environmental Justice Section
    R.J. Hughes Justice Complex
    25 Market Street, P.O. Box 083
    Trenton, NJ 08625-0093
    (609) 376-2876
    Carlene.Dooley@law.njoag.gov

FOR THE CITY OF NEW YORK

SYLVIA O. HINDS-RADIX
Corporation Counsel

By:  */s/Nathan Taylor*
    NATHAN TAYLOR
    Assistant Corporation Counsel
    Environmental Law Division
    New York City Law Department
    100 Church Street
    New York, New York 10007
    212-356-2070
    ntaylor@law.nyc.gov

**Tab HQ-396: Comment submitted by Cleco Corporate Holdings LLC (June 21, 2022) (EPA-HQ-OAR-2021-0668-0396)**



Cleco Corporate Holdings LLC
2030 Donahue Ferry Rd
P. O. Box 5000
Pineville, LA 71361-5000
318 484-7718

*SUBMITTED at [WWW.Regulations.Gov](WWW.Regulations.Gov)*

June 21, 2022

U.S. Environmental Protection Agency
EPA Docket Center ([www.regulations.gov](www.regulations.gov))
Docket:  EPA-HQ-OAR-2021-0668

**RE:     Comments by Cleco Corporate Holdings LLC on Federal Implementation Plan
          Addressing Regional Ozone Transport for the 2015 Ozone National Ambient Air
          Quality Standard, Proposed Rule, 87 Fed. Reg. 20036 (Apr. 6, 2022), EPA Docket ID
          No. EPA-HQ-OAR-2021-0668**

On April 6, 2022, EPA published a notice of proposed rulemaking to implement the "good
neighbor" provision of the Clean Air Act with respect to the 2015 national ambient air quality
standard (NAAQS) for ground-level ozone.  87 Fed. Reg. 20036 (the "Proposal").  The Clean
Air Act "good neighbor" provision, 42 U.S.C. § 7410(a)(2)(D), prohibits states from
"significantly contributing" to nonattainment of or interference with the maintenance of the
NAAQS in downwind states.  EPA's proposal would adopt an "ozone transport rule" (OTR) that
includes "enhancements" to the Cross-State Air Pollution Rule (CSAPR) that EPA promulgated
to implement the "good neighbor" provision for the 2008 ozone NAAQS.

Although CSAPR provided an effective and flexible means of reducing ozone concentrations in
downwind states for the 2008 ozone standard, EPA's proposed OTR for the 2015 ozone standard
is highly inflexible and overly stringent.  While characterized as an expansion of an existing
trading program, the "enhancements" EPA has proposed will unnecessarily constrain trading and
eliminate the ability of a functioning allowance market to form.  If finalized as proposed, the
Proposal could dramatically limit the ability of the bulk power system to continue its orderly
transition toward cleaner energy resources and will likely exacerbate significant threats to
reliability already inherent in that transition.  Accordingly, Cleco Corporate Holdings LLC
(Cleco) respectfully submits these comments to ask EPA to make critical changes to the Proposal
to minimize detrimental impacts to the power sector while still achieving its emission reduction
goals and the requirements of the Clean Air Act.

Cleco is a regional energy holding company that conducts business operations through its
subsidiaries, Cleco Power LLC and Cleco Cajun LLC.  Cleco Power is a regulated electric public
utility company that owns nine generating assets with a total nameplate capacity of 3,310 MW
serving approximately 290,000 retail customers in Louisiana and supplying wholesale power in
Louisiana and Mississippi.  Cleco Cajun is an unregulated utility company that owns eight
generating assets with a total nameplate capacity of 3,555 MW serving nine Louisiana

cooperatives, five wholesale municipal customers and one electric utility.  As a company whose operations and customers will be significantly impacted by the Proposal, Cleco appreciates the opportunity to provide the following comments to EPA.

**Comment 1**
**Incorporation of LEUEG Comments**
Cleco adopts and incorporates by reference the comments submitted to EPA by Louisiana Electric Utility Environmental Group (LEUEG), dated June 21, 2022, concerning the Proposal.

**Comment 2**
**Cleco requests a 60-day extension of the public comment period.**

As an initial matter, EPA has not provided enough time for stakeholders to review and comment on its immensely complicated Proposal.  Underlying the Proposal is a vast amount of data and information, including highly complex spreadsheet calculations, computer modeling results, and a variety of other technical and policy analyses.  The docket for the rule now contains hundreds of documents, including numerous detailed "technical support documents" (TSDs), and EPA has relied on those documents as the basis for a number of entirely new regulatory concepts that would alter CSAPR in many significant ways.  The Proposal will have dramatic impacts on states and regulated entities that must be evaluated to fully understand whether the Proposal is achievable, and if so, what the best compliance alternatives might be.  Without more time to review, digest, and vet the reams of information and analyses supporting the Proposal, the regulated community simply has not been afforded sufficient time to do more than frame high-level questions about the viability of and justification for the Proposal.

Compounding this concern is EPA's failure to take timely action on the state plans designed to address the same requirements.  The State of Louisiana submitted a state implementation plan (SIP) to EPA on November 8, 2019 demonstrating that its sources do not significantly contribute to downwind nonattainment or interfere with maintenance of ambient standards in downwind areas.  That SIP was developed pursuant to EPA guidance regarding the demonstration required under the "good neighbor" provision of the Clean Air Act.  However, EPA took no action on that SIP for over two years.  Then, six days prior to signing the Proposal to impose a federal implementation plan on Louisiana on February 28, 2022, EPA suddenly proposed to disapprove Louisiana's SIP.  EPA's failure to timely review and act on that SIP, followed by its immediate proposal of a FIP, have eliminated any real opportunity for Louisiana and the regulated community to evaluate the reasons for EPA's proposed action to disapprove Louisiana's submission and to submit a revised plan.

EPA claims that it must move quickly to meet the attainment deadlines for the 2015 ozone NAAQS.  However, EPA's failure to take timely action on Louisiana's SIP or propose a FIP sooner is no excuse for leaving states with insufficient time to evaluate EPA's decision, which essentially amounts to replacing state policy choices with its own.  The D.C. Circuit has confirmed that the Clean Air Act allows for the consideration of relevant circumstances that may require EPA to take more time when necessary.  *Wisconsin v. EPA*, 938 F.3d 303 (D.C. Cir. 2019) (confirming the "good neighbor" provision "might reasonably be read, under particular circumstances and upon a sufficient showing of necessity, to allow some deviation between the

upwind and downwind deadlines."). Here, EPA's own failure to act has resulted in the time pressure of which EPA now complains, but, regardless of the reason, states and stakeholders alike need more time to evaluate what EPA is trying to do in last-minute fashion.

While EPA agreed to a limited extension of 15 days to the original 60-day comment period, 75 days is not nearly enough time to evaluate what EPA has proposed. In comparison, EPA took more than two years to evaluate individual SIPs dealing with the same subject, and likely took more than a year to develop the Proposal itself. Under these circumstances, Cleco asks EPA to provide stakeholders another 60 days to review and comment on the Proposal.

**Comment 3**
**EPA's cost-effectiveness evaluations are incorrect.**

The foundation of EPA's Proposal is a determination that certain emission control measures are universally cost-effective for certain kinds of electric generating units (EGUs). Specifically, EPA claims that (1) selective catalytic reduction (SCR) control systems are cost-effective for all coal-fired EGUs greater than 100 MW in capacity, (2) selective non-catalytic reduction (SNCR) control systems are cost-effective for all coal-fired EGUs less than 100 MW in capacity, and (3) SCR is cost-effective for all natural gas-fired steam EGUs that emitted more than 150 tons of nitrogen oxides ($NO_x$) during any one of the ozone seasons in 2019, 2020, and 2021. EPA then defines in circular fashion the lack of these "cost-effective" controls as causing the "significant contribution" that must be eliminated to satisfy the good neighbor provision. EPA's Proposal seems to be a thinly veiled attempt to impose SCR on all coal-fired units regardless of actual air quality benefits, particularly since EPA's own cost-effectiveness analysis does not support its conclusions, and the assumptions underlying that analysis are incorrect.

EPA's own analysis, taken at face value, confirms that SCRs are not cost-effective. EPA's typical benchmark for cost-effectiveness of $NO_x$ controls is $10,000 per ton which aligns with the benchmark EPA relied upon just a year and a half ago in its Revised CSAPR Update rule.[1] It is also the benchmark EPA and states have used for decades in many other Clean Air Act programs. For example, EPA has previously stated in the context of a CSAPR rulemaking that best available control technology (BACT) determinations, which are used to regulate new sources, typically use a $10,000 per ton cost-effectiveness threshold.[2] A value of $10,000 per ton is also at the high end of what states have determined to be cost effective under the regional haze program. *See* National Park Service Comments on Draft North Dakota Regional Haze State Implementation Plan, at 10 (citing cost-effectiveness thresholds of "$5,000/ton for EGUs in AR and TX, $7,000/ton in NM, and $10,000/ton in CO and OR").

---

[1] EPA TSD for the Proposed Revised CSAPR Update for the 2008 Ozone NAAQS, EGU $NO_x$ Mitigation Strategies, EPA-HQ-OAR-2020-0272-0060, at 13 (Oct. 2020) (cost-effectiveness of retrofit SCR $9600 per ton).

[2] EPA TSD for CSAPR for the 2008 Ozone NAAQS, Assessment of Non-EGU $NO_x$ Emission Controls, EPA-HQ-OAR-2015-0500, at 18 n.16, (Aug. 2016) ("$10,000 per ton represents the cost/ton for [BACT] determinations").

Despite these prior benchmarks, EPA now asserts that the cost-effectiveness of retrofit SCRs is $11,000 per ton, well above what it has relied upon in the Clean Air Act programs noted above.[3] Moreover, EPA's cost-effectiveness value of $11,000 per ton still does not accurately represent EPA's own cost-effectiveness analysis because that value is a "weighted average." EPA claims this average is "representative" but does not explain why a weighted average is an appropriate metric for imposing a *universal* control requirement, when EPA's analysis indicates that SCR is much less cost-effective for many EGUs. In fact, the median cost-effectiveness value in EPA's analysis is $13,700, which means SCR is not cost-effective for at least half of the EGUs evaluated. EPA's analysis also indicates that the cost-effectiveness value of SCR for ten percent of the EGUs regulated under the Proposal would be $20,900 per ton, nearly twice the benchmark used by EPA and states in other programs.[4]

The high level and variability of the cost-effectiveness values EPA calculated confirms that EPA cannot reasonably conclude that SCR is universally cost-effective for all coal-fired EGUs, severely undermining the bedrock foundation of its Proposal. At a minimum, EPA's Proposal appears based on a conclusion that the controls it plans to impose on a significant number of units will exceed $20,000 per ton of $NO_x$ removed, which EPA does not and cannot claim to be cost-effective.

For EGUs already equipped with SNCR, the cost-effectiveness values are higher still. Units with existing SNCR systems have lower baseline $NO_x$ emissions, so there is less $NO_x$ remaining for an SCR to control, making the high cost of SCR even less justifiable. EPA's own analysis confirms that cost-effectiveness values for EGUs with existing SNCR systems are $13,400 per ton, even on a weighted average, with a median of $14,100 per ton and a 90th percentile of $19,000 per ton. Each of these values is well above the $10,000 benchmark that EPA has historically relied upon. In the preamble to the Proposal, EPA brushes aside any concerns regarding the cost-effectiveness of SCR for SNCR-equipped EGUs, claiming that an explanation can be found in the technical support documents,[5] but the cited document provides no explanation for EPA's erroneous conclusion that installing SCR is universally cost-effective for such units. On the contrary, EPA's technical support document merely provides the values above, which confirm installing SCR on an EGU already equipped with SNCR is *not* cost-effective. This issue is of particular concern to Cleco, given that several of its EGUs have already installed SNCR and currently operate at low $NO_x$ emission rates that would not justify the significant expense of installing SCR.

Moreover, even EPA's relatively high cost-effectiveness values significantly underestimate the true cost of installing SCR. Cleco recently prepared a four-factor analysis under the regional haze program for its Big Cajun II facility and determined that installing SCR was likely to cost well above $10,000 per ton of $NO_x$ removed. Specifically, once adjusted for the "15-year book-

---

[3] 87 Fed. Reg. at 20081.

[4] EPA TSD for the Proposed FIP for the 2015 NAAQS, EGU $NO_x$ Mitigation Strategies Proposed Rule TSD, EPA-HQ-OAR-2021-0668-0125, at 25 (Feb. 2022).

[5] 87 Fed. Reg. 20081, n.156.

life" that EPA used in its cost-effectiveness analysis,[6] Cleco determined that the cost-effectiveness of installing SCR at Big Cajun II Units 1-3 would be between $14,243 and $21,207.  EPA has made no attempt to claim that such values are "cost-effective."

EPA's cost-effectiveness analysis also fails to take into account the fact that costs are escalating more quickly than ever before.  Labor shortages, commodity prices, the cost of capital, and supply chain constraints are likely to significantly increase the cost of controls far beyond what EPA assumed in preparing its analysis.  Thus, at a minimum, Cleco asks EPA to review its cost estimates in light of more recent information on rising prices in the current market.

Not only has EPA gotten the "cost" portion of its analysis wrong, EPA has also misjudged the "effectiveness" of SCR for coal-fired units.  Furthermore, EPA's assessments of the emission achievable with SCR has been highly inconsistent.  In its cost-effectiveness analysis, EPA assumes SCR can achieve 0.07 lb/mmBtu (*see* EGU $NO_x$ Mitigation TSD), but EPA's back-stop limit (discussed in more detail below) is set at 0.14 lb/mmBtu.  Then, in setting state emission allowance budgets, EPA assumes that EGUs with existing SCR can achieve 0.08 lb/mmBtu, but EPA assumes new SCRs installed in 2026 can achieve 0.05 lb/mmBtu.  EPA does not sufficiently explain its use of four different values for the same assumption in different parts of its Proposal.

EPA must use a consistent emission rate in evaluating the cost-effectiveness of SCRs and setting state budgets, and that rate must be high enough to reflect what is actually achievable with the technology.  EPA's assumed rate for evaluating the cost-effectiveness of SCR, 0.07 lb/mmBtu, is not sufficient because it fails to account for a wide variety of factors that can result in higher emissions, including catalyst degradation over time, cycling or low-load operations in support of renewable generation resources, and startups or shutdowns during which the SCR cannot be optimized or cannot function at all.

Cleco has similar concerns regarding EPA's determination that SCR is universally cost-effective for gas steam EGUs, of which Cleco has several.  Those units already emit at a relatively low $NO_x$ rate that is unlikely to justify installation of SCR, but EPA assumes any unit that emitted more than 150 tons of $NO_x$ in one of three years (2019-2021) must install SCR.  EPA seeks to enforce that determination by setting state budgets based on an assumption that gas steam EGUs can meet an emission rate of 0.03 lb/mmBtu over the course of an entire ozone season.

Like its analysis for coal-fired EGUs, EPA's analysis for gas-fired steam EGUs actually confirms SCR is not cost-effective for many units (even though, as explained below, it is based on unrealistically optimistic assumptions).  EPA relies on the weighted average cost-effectiveness value $7,700 per ton, but the median value is actually $10,000 per ton and the 90th percentile value is $15,300 per ton, confirming that installing SCR would not be cost-effective on at least half of the gas steam EGUs evaluated.  Moreover, while EPA was at least consistent in using the same emission rate for gas steam units to set state budgets and in evaluating cost-

---

[6] EPA Retrofit Cost Analyzer, EPA-HQ-OAR-2021-0668-0118 ("capital charge" for annualizing costs based on a "15-yr book life").

effectiveness, that rate of 0.03 lb/mmBtu is far too aggressive and unlikely to be achievable long-term, particularly for converted EGUs.

EPA relied on an incorrect baseline emission rate for evaluating the cost-effectiveness of SCR for gas steam EGUs.  EPA assumed a baseline rate of 0.14 lb/mmBtu prior to the installation of controls,[7] but the data it used to develop state budgets confirms that many gas steam units already have much lower emission rates.[8]  For example, EPA recognizes that Big Cajun II Unit 2 currently emits at a $NO_x$ rate of 0.078 lb/mmBtu, about half of the amount EPA assumes in evaluating the cost effectiveness of SCR.  At that lower rate, the cost-effectiveness value for Big Cajun II Unit 2 is likely twice what EPA relies upon in its analysis.

Cleco supports EPA's decision not to apply SCR to circulating fluidized bed units.  However, for the reasons identified above, Cleco asks EPA to reconsider its conclusion that SCR is universally cost effective for coal-fired and gas steam EGUs.

**Comment 4**
**EPA has not allowed enough time for control installations.**

In crafting the Proposal, EPA not only assumed that SCR is universally cost-effective, but that that dozens of EGUs can install SCR in just a few years.  Although the SCR-forcing "back-stop" limit EPA has proposed will not become effective until the 2027 ozone season for units without an existing SCR, EPA dramatically reduces all state budgets beginning in the 2026 ozone season to reflect its assumption that SCR can be installed before May 2026.  Since the Proposal is unlikely to be finalized before early 2023, that essentially leaves just three years to construct all of the SCRs EPA has assumed in establishing state budgets.  Even within just Louisiana, EPA assumes 11 SCRs could be installed in that three-year period.  Other states must accomplish similar feats—Texas, Oklahoma, and Arkansas, for instance, are assumed to install 31, 14, and 5 SCRs, respectively, bringing the total number of SCRs that EPA claims must be installed in three years to at least 60 SCRs within EPA Region 6 alone.[9]

Installing one SCR in three years is difficult, but installing 60 SCRs in three years is fantasy.  The available supply of skilled labor and specialized materials is clearly insufficient to satisfy this wishful thinking, particularly in light of recent change in market conditions that EPA could not have anticipated when it designed the Proposal.  Specifically, EPA's timing assumptions fail to account for the current challenges associated with the COVID-19 pandemic, labor shortages,

---

[7] EPA TSD for the Proposed FIP for the 2015 NAAQS, EGU $NO_x$ Mitigation Strategies Proposed Rule TSD, EPA-HQ-OAR-2021-0668-0125, at 26 (Feb. 2022).

[8] EPA TSD for the Proposed FIP for the 2015 NAAQS, Ozone Transport Policy Analysis, Appendix A:  Proposed Rule State Emission Budget Calculations and Engineering Analytics (xls) (*available at* https://www.epa.gov/csapr/good-neighbor-plan-2015-ozone-naaqs).

[9] EPA TSD for the Proposed FIP for the 2015 NAAQS, Ozone Transport Policy Analysis, Appendix A:  Proposed Rule State Emission Budget Calculations and Engineering Analytics (xls) (*available at* https://www.epa.gov/csapr/good-neighbor-plan-2015-ozone-naaqs).

supply chain delays, inflation, and the ongoing war in Ukraine, all of which are likely to constrain the ability of sources to conduct so many massive construction projects in so little time.

Even if these new challenges had not arisen, EPA has failed to consider the impact of a rule that would force installation of so many control devices in such a short period of time. Each of the units that EPA assumes will install SCR in response to the Proposal would require a major "tie-in" outage of at between 45-90 days for the controls to be installed. These outages would all need to occur at approximately the same time near the end of the three-year compliance window in the Proposal. These outages would almost simultaneously remove 60 generation resources from the grid, resulting in a severe shortage of generation just before and likely during the 2026 ozone season. Even EPA does not appear to truly believe that so many SCRs can be installed before 2026—a close review of EPA's regulatory impact analysis confirms that EPA actually expects massive numbers of unit retirements, not SCRs, as discussed in Comment 6 below.

EPA recognizes that, in the past, the time needed to install an SCR has varied between 2-4 years and that the range depended on "the number of installations being considered."[10] Since EPA has never before expected so many SCRs to be installed so quickly, the high end of that range is the absolute minimum that would be needed for the unprecedented level of work needed to achieve EPA's aggressive assumptions. Additionally, Cleco questions the 2-4 year window EPA has estimated for SCR installation. In evaluating the feasibility and cost of various control measures as part of its four-factor analyses for the regional haze program, Cleco has closely reviewed the time needed for compliance with a requirement to install SCR, since "time to comply" is one of the four "reasonable progress" factors. Based on that comprehensive analysis, Cleco determined that installation of SCR is likely to take five years under current market conditions and given the site-specific considerations relevant to its EGUs. This conclusion is consistent with prior EPA determinations that indicate installing an SCR in five years is as expeditious as practicable in some circumstances.[11] EPA has recognized in the Proposal that site-specific considerations are relevant in evaluating the time needed to install SCR, but EPA appears to have made no effort to evaluate those considerations in assuming that all EGUs can install an SCR by May 2026, when state budgets are cut dramatically to reflect EPA's control assumptions.

While EPA may believe the trading market for allowances will provide the compliance flexibility needed by some facilities due to site specific considerations, the market for allowances is highly unlikely to be robust enough to allow all units with such constraints to comply via procuring allowances. Also, to the extent EPA expects sources to begin the work on SCR installations prior to finalization of the Proposal, that expectation is inconsistent with regulatory requirements for prudent utility planning and common business sense, given that EPA's final rules often differ from its proposals. Utility companies like Cleco are accountable to utility commissions, joint owners, and other shareholders, and they cannot gamble that the Proposal will become law until it does, particularly when the Proposal does not appear grounded in realistic assumptions.

---

[10] 87 Fed. Reg. 20080.

[11] 81 Fed. Reg. 43,894, 43,907 (July 5, 2016) ("In light of the considerable effort involved to retrofit SCR, we determine that five years is as expeditiously as practicable.").

EPA's excuse for such an unrealistic implementation timeline is that it must meet the deadlines for attainment set by the Clean Air Act. However, as noted above, the D.C. Circuit has made clear that circumstances may justify more time. EPA has already recognized its authority to miss an attainment deadline that is not possible to meet by deciding that SCR cannot be installed by 2023, the first attainment deadline for marginal nonattainment areas. Cleco agrees that SCRs cannot be installed by 2023, but asks EPA to also recognize that the number of SCRs it assumes are needed cannot be installed by 2026 either. EPA must either recognize that only a more limited set of controls will be "cost-effective," and thus fewer controls are warranted to eliminate what EPA has defined as a "significant contribution" to downwind states, or EPA must recognize that the "significant contribution" it claims to have identified cannot be eliminated by the 2026 attainment deadline.

Cleco also asks EPA to recognize that the first attainment deadline is too soon to expect sources to install combustion controls. Although combustion controls can certainly be installed more quickly than SCR, the Proposal still does not allow enough time for the work to be completed. Even assuming EPA issues a final rule in January 2023, that would only allow five months for installing the combustion controls EPA has assumed in setting state budgets. Any further delay in issuance of the final rule would leave even less time to act, and, as noted above, utility companies cannot begin their efforts to comply until EPA finishes its work, which is often later than expected.

A few months is not enough time to complete all of the stages of a combustion control project, including bid preparation and evaluation, engineering, fabrication, shipping of equipment, installation, and commissioning. EPA itself recognizes that installation of combustion controls would require 6-8 months to complete all of these activities, but the proposed rule will not allow even that amount of time unless it is finalized in September 2022, which would be an impossible task for EPA, given the need to review and respond to comments and then complete the administrative procedures needed to sign and publish a final rule. Therefore, EPA should recognize that meeting a 2023 deadline is not possible to the extent it requires any new control installations, whether combustion or post-combustion controls, and should alter its state budget assumptions accordingly.

## Comment 5
**The "enhancements" EPA proposed for CSAPR are unnecessary and overly restrictive.**

Although EPA has characterized its Proposal as an "expansion" of the CSAPR allowance trading program designed for the 2008 ozone NAAQS, EPA has proposed so many "enhancements" that the rule is unlikely to function anything like the current CSAPR program. With so many new constraints on the trading of emission allowances and far more stringent state budgets, a viable trading market appears unlikely to develop. Current reports indicate that CSAPR ozone season allowances have already skyrocketed past $25,000 per allowance in response to EPA's Proposal, likely due to how strict it suggests the CSAPR program is likely to become.

Cleco asks EPA to reconsider the components of its proposal that restrict the allowance trading needed to provide flexibility in achieving compliance. Specifically, Cleco asks EPA to abandon four of the "enhancements" in its Proposal.

First, Cleco asks EPA to remove the "back stop" limit. The daily limit of 0.14 lb/mmBtu is not a "back stop" to anything, but equates to a requirement to install SCR on all coal-fired EGUs to which it would apply. Far more than its name would suggest, the "back stop" limit serves as a separate and independent control requirement much more akin to an existing source emission standard adopted under Sections 111(d) or 112 of the Clean Air Act. Since EPA has not made the demonstrations that would be needed to set such an emission standard, it should not seek to insert one into a "good neighbor" rule under the guise of a "back stop." As a universally applicable standard, it is likely to eliminate the potential benefits of emission allowance trading, which depends on the ability of some sources to overcontrol and free up allowances for those that find it less cost-effective to install new controls.

Moreover, as noted above, 0.14 lb/mmBtu may be too low for some units to achieve even with SCR, due to cycling or low-load operation needed to support integration of renewable energy resources, as well as startup and shutdown periods when an SCR cannot fully operate. Since EPA has previously recognized that a work practice standard is more appropriate for regulating emissions during startup and shutdown of EGUs (40 CFR Part 63 Subpart UUUUU, Table 3), EPA should at a minimum incorporate the same approach here as well.

Second, Cleco asks EPA to eliminate the proposed dynamic budgeting process. That process functions to reduce a state's budget if the heat input utilized by its units drops below levels achieved in previous years, creating a perverse incentive for units to increase heat input to maintain budgets, particularly since unit allocations are also based on heat input. The dynamic budgeting process also complicates planning efforts, since the regulated community will not be able to determine the state's budget, and therefore each unit's allocation of allowances from that budget, until about a year and a half before each control period. That limited window of notice will not leave enough time for companies to make the kind of planning decisions that may be necessary to comply. It also allows too little time for states and stakeholders to review the changes to the budget for accuracy and comment on any needed revisions.

Even if EPA does not eliminate dynamic budgeting, EPA should change the calculation underlying it. As proposed, EPA would rely on a single year of heat input data to dictate the budget for each control period in 2025 and beyond. But single years may not be representative for some units or some states, particularly since the relevant period of time in each year is only five months long, during the May to September ozone season. A wide variety of factors can affect heat input levels in any given year, including dispatch constraints, fuel prices, weather, and even unanticipated unit outages. For example, the heat input for a unit with an unexpected outage during ozone season would be uncharacteristically low for that control period, which would result in an uncharacteristically low state budget two years later. Even more concerning is the possibility of an uncharacteristic year for the entire industry, such as the low demand in 2020 associated with the covid-19 pandemic. For instance, if the pandemic were to again cause demand to fall precipitously in 2023, the budget for 2025 (based on 2023 heat input) would likely be too low to meet a resurgence of demand in 2025.

EPA has already recognized that allocations for individual units should not be based on a single year of data, and instead calculates those allocations based on the average of the three highest years in the last five. A similar approach to dynamic budgeting would provide a more reasonable way to ensure state budgets are based on representative data. Alternatively, EPA should consider either adjusting budgets by only a portion of the change in heat input levels to moderate swings in budget levels or establishing a maximum percentage change to avoid setting budgets based on changes in heat input that are clearly anomalous.

Dynamic budgeting also has another negative impact on the proposed trading program—it in effect eliminates from the state's budget the allowances previously allocated to retired units just two years after the units cease operations. In the past, EPA has allowed more time for retired units to continue receiving allowances to avoid any incentive to keep a unit in operation. With dynamic budgeting, EPA not only creates the incentive for units to stay in operation, but also penalizes states in which units retire by shrinking the budget for the entire state, making compliance even more difficult for the units that remain. Cleco asks EPA to allow owners of units that retire, and states in which units retire, to benefit from those decisions, given that the resulting emission reductions will help achieve the environmental goals of the program.

Third, Cleco asks EPA to abandon its proposal to "recalibrate" banked allowances. Such "recalibrations" are nothing more than confiscation of value, regardless of what name EPA gives the process. As proposed by EPA, a unit that achieves greater emission reductions than expected, and thus retains some of its allocated allowances, could have the value of those allowances cut substantially if others in the state also undertake earlier or more significant emission reductions than expected. Like the effect dynamic budgeting has on retired units, recalibration of banked allowances will penalize those taking the very actions EPA seeks to achieve with the Proposal. Like dynamic budgeting, it also encourages increased operations, since the value of allowances will only be guaranteed in the control period for which they are originally issued. Recalibrating banking allowances also discourages trading, since it draws into serious question the value of what any purchaser might be buying.

EPA has provided little to no justification for the need to "recalibrate" banked allowances. Other than an anecdotal statement regarding EPA's concern that banks will slowly grow to the point that allowance prices drop lower than EPA would prefer, EPA has not explained why banking should be constrained. Since banked allowances represent early and more significant reductions than EPA originally deemed necessary to achieve its environmental objectives, banking allowances should be rewarded, not penalized.

Fourth, Cleco asks EPA not to finalize the "secondary emission limitation" that EPA has proposed as an additional "assurance" against unit owners relying primarily on allowance purchases instead of actual emission reductions. This proposed secondary limit is both unnecessary and unnecessarily complicated.

EPA's justification for the limit is that the "assurance" penalty imposed under CSAPR for sources that buy allowances instead of reducing emissions, although proven effective, is just "not good enough." 7 Fed. Reg. 20122. EPA cites two examples in which units increased emissions

through curtailing the operation of control equipment but were nonetheless able to comply by buying allowances. But in those cases, it appears the existing "assurance" provisions worked as designed—the sources were required to buy allowances at a higher ratio, which means even greater emission reductions must have occurred elsewhere for those allowances to be available for purchase. Rather than being evidence of a problem that needs to be addressed, EPA's examples actually show that such occurrences are not only rare, but when they occur, the program works well to maintain environmental protections. In sum, EPA fails to explain why a "secondary emission limitation" is necessary to address these limited circumstances.

Even if it were needed, the "secondary emission limit" is unnecessarily complicated because it depends on a variety of variables that cannot be predicted in advance, making it impossible for regulated sources to know whether it will apply until a violation has already occurred. In brief, the limit applies if the state exceeds its assurance level (which itself may depend on changes in heat input), and the unit contributes to that exceedance of the assurance level, and the unit would have emitted at least 50 fewer tons of $NO_x$ than if it had emitted at its benchmark emission rate, set based on historical emission rates subject to a floor. The many twists and turns in this complex formula are difficult to understand and even more difficult to apply.

If each of the myriad conditions of the secondary emission limitation is met, the source, with no advance notice or ability to adjust, is suddenly subject to enforcement and penalties, which under the Clean Air Act can reach over $100,000 per day per violation. While the only possible value of the limit would be to discourage certain behavior, the limit is designed in such a way that it cannot discourage anything because no one will know if it applies to otherwise lawful activities until well after the fact. In other words, the limit is strictly punitive. Since the limit will not accomplish the purposes for which it is designed, it is arbitrary, and it should be abandoned.

Finally, Cleco asks EPA to consider the significant legal risk it takes on by proposing all of these untested "enhancements." The D.C. Circuit and the Supreme Court have already reviewed EPA's prior CSAPR programs and provided significant guidance on what the program may include. EPA should be able to design a program more clearly within the confines of that jurisprudence and still meet the requirements of the Clean Air Act. Prior litigation over EPA's CSAPR program makes clear that EPA's creative attempts to embellish the program are invariably challenged and often rejected in court. With its proposed "enhancements" to CSAPR, EPA is risking the significant uncertainty associated with issuing a legally flawed rule, when an alternative and more clearly legal approach is available.

**Comment 6**
**EPA should reevaluate its overcontrol analysis.**

The United States Supreme Court has made clear that EPA may not require greater emission reductions under the "good neighbor" provision of the Clean Air Act than would be needed to either resolve all downwind nonattainment and maintenance concerns or reduce a state's contribution to such concerns below the level EPA has determined to be *de minimis*. In short, EPA may not "overcontrol" a state. *EPA v. EME Homer City Generation*, 572 U.S. 489, 523 (2014) ("EPA has a statutory duty to avoid over-control"). In the Proposal, EPA claims to have

performed an overcontrol analysis and determined that the program it proposes would not overcontrol any state.  However, that overcontrol analysis raises several questions.

First, Cleco asks EPA to better explain its decision to return to a one percent threshold instead of a one part per billion (1 ppb) threshold for determining contribution and overcontrol.  In 2018, EPA conducted updated modeling with more recent information and determined a *de minimis* threshold of 1 ppb threshold would still ensure nearly the same level of control as one percent.  Moreover, that modeling compared a narrower range of options than the original analysis EPA used to establish the one percent threshold.  EPA's reversion to one percent is particularly problematic for states, like Louisiana, that relied upon the new and better supported 1 ppb threshold in their "good neighbor" SIPs, which EPA has proposed to disapprove.  Although EPA may change its policies from time to time, it must provide a reasonable basis for doing so.  *FCC v. Fox TV*, 556 U.S. 502,515 (2009) (agencies must "provide a more detailed justification" "when, for example, its new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests …."). EPA has not properly explained why it reversed its 2018 decision to adopt a threshold of 1 ppb, particularly in light of the more up-to-date modeling underlying its 2018 policy.

Second, EPA's new "constant stringency" approach is likely to result in overcontrol that EPA has not properly evaluated.  Many of the proposed "enhancements" to the CSAPR trading are intended to implement this "constant stringency" approach, which EPA admits is "an adjustment in its historical approach to eliminating significant contribution."  87 Fed. Reg. at 20095.  EPA's apparent goal with the new approach is to ensure that all covered facilities meet the same level of emission control, notwithstanding that inconsistent control levels are needed to make allowance trading work (as noted above). In defense of this new concept, EPA claims that it is "consistent with the evolution of the Agency's thinking," and that EPA is not required to focus on "the mass-based reduction in emissions" that its program is expected to achieve.

However, EPA's claims fail to recognize that reductions in mass emissions are what actually improve downwind air quality, not theoretical concepts of "stringency."  As such, EPA must evaluate the mass reductions accomplished by its proposal to determine whether overcontrol may occur.  EPA's "constant stringency" concept may result in greater mass emission reductions than EPA anticipates, due in part to its stifling impact on trading, and as such its impact on the rule must be evaluated to ensure that overcontrol does not occur.

In its overcontrol analysis, EPA also requests comment on an unreasonable idea—whether to ignore emission reductions made within downwind states in determining whether an upwind state may be overcontrolled.  This concept ignores reality and law.  In the real world, downwind states are required by the Clean Air Act to reduce emissions to address nonattainment areas that lie within their borders.  Failing to account for those legally required reductions would force upwind states to do all of the work needed to improve air quality outside of their jurisdictions, since a full remedy is required by the good neighbor provision.  But forcing an upwind state to impose controls that fully remedies downwind air quality problems without any help from the downwind state itself will constitute overcontrol as soon as that downwind state actually reduces emissions as required by law.  Therefore, Cleco opposes EPA's idea of ignoring downwind efforts in evaluating overcontrol of upwind states.

EPA's only justification for the concept of ignoring downwind emission reduction efforts is found in a citation to a D.C. Circuit case in a footnote. 87 Fed. Reg. 20099, n.206 (citing *Maryland v. EPA*, 958 F.3d 1185, 1204 (D.C. Cir. 2020). But *Maryland* does not say what EPA suggests. The portion cited by EPA focused on the timing of emission reductions, not the scope of them, and it merely rejected EPA's litigation position that it could rely on downwind states efforts as an excuse to miss the deadlines for attainment in the Clean Air Act. The court's decision to hold EPA to those deadlines absent a showing of necessity, notwithstanding expected downwind efforts, is not a command for EPA to ignore those efforts. Rather, the court merely said that EPA may not rely solely on downwind efforts to miss its deadlines, an unsurprising result in light of the court's prior precedent in *Wisconsin* and other cases.

**Comment 7**
**The Proposal threatens reliability of the bulk power system.**

EPA's overly aggressive control determinations, fueled by its unrealistic cost-effectiveness and timing assumptions, threaten to impose more controls more quickly than the industry can bear. As noted above, EPA has essentially set a mandatory emission standard requiring SCR on all coal-fired EGUs greater than 100 MW in capacity, as well as many gas steam EGUs, both through its "back stop" daily limit and through dramatically reducing state budgets based on an assumption that the dozens of SCRs it wants will be installed by May 2026. In truth, many of those SCRs are unlikely to materialize, given the political and economic headwinds currently facing any significant investments in existing coal-fired EGUs.

Thus, coal-fired EGUs will be left with few choices on how to comply—curtail operations, purchase allowances, or retire. But since the curtailments would likely be too significant for an EGU to remain economically (and perhaps technically) viable, and allowances are unlikely to be available at reasonable prices (to the extent available at all), retirement will remain the only realistic option available. EPA appears to expect this result, since its regulatory impact analysis projects the retirement of 18,000 MW of coal-fired EGUs, more than quadruple the retirements EPA projected for the Mercury and Air Toxics Standards.[12] And even that stark number may be low—other reports from the power sector indicate that as much as 27,300 MW of coal-fired units may retire by 2030 within MISO alone, most of which would be expected to occur in 2026-2028 due to EPA regulations.[13]

The possibility of mass retirements comes at a time when the bulk power system cannot afford it. Numerous reports have recently chronicled the high and escalating risks to reliability presented by the rapid pace with which the bulk power system is transitioning to renewable resources. For example, the National Association of Regulatory Utility Commissioners (NARUC) published a

---

[12] *Compare Regulatory Impact Analysis for Proposed Federal Implementation Plan Addressing Regional Ozone Transport for the 2015 Ozone National Ambient Air Quality Standard*, at ES-9 (Feb. 2022) ("Under the proposed rule an incremental 18 GW of coal and 4 GW of oil/gas retirements are projected by 2030.") *with Regulatory Impact Analysis for the Final Mercury and Air Toxics Standards*, at 3-20, table 3-9 (Dec. 2011) (projecting a decrease in pulverized coal generation capacity of -3.9 GW).

[13] https://americaspower.org/miso-recent-capacity-auction/

white paper in July 2021 entitled "Resource Adequacy for State Regulators" that lays out the concerns presented by the current transition in the power sector. In that white paper, NARUC describes the "significant and ongoing changes to the resource mix and usage patterns on the U.S. power system" that have occurred over the last two decades and remain ongoing, which have "decreased significantly" the share of dispatchable generation. In particular, NARUC expresses serious concern for the Midcontinent Independent System Operator (MISO) that dispatches Cleco's generating resources:

> MISO has experienced heightened risk of capacity insufficiency in all seasons. General trends recently have included additional retirements of dispatchable fossil fuel resources in MISO and growing reliance on renewable generation, energy market imports, and emergency-only demand response. It is becoming increasingly difficult and complex for any given [load serving entity] LSE or state to gauge the reliability impacts of their plans on the region and for MISO to ensure regional capabilities are sufficient.

These concerns are echoed in recent publications from MISO itself.[14] Specifically, MISO's Reliability Imperative report identifies the complex and urgent challenges to grid reliability in the MISO region, and explains that "[e]lectric system operating conditions are more uncertain and variable than in the past, and this trend is increasing." Although MISO describes several initiatives under review to address these concerns, such as "transitioning to a seasonal resource adequacy construct, reforming accreditation, and enhancing scarcity pricing to better align system needs and capabilities during tight operating conditions," the viability and effectiveness of these measures cannot be determined at this time. MISO describes the challenges it faces as including a decline in reserve margins and fewer always-on baseload resources due to retirements of thermal units. Coal retirements in particular pose a significant challenge because "[w]ind and solar resources are not always available to provide energy during times of need," and "[t]he growing fleet of natural gas resources may not be able to procure all the fuel they need at key times." In sum, MISO concludes that "[t]he ongoing trend of conventional power plants retiring from service as intermittent renewables continue to grow is posing significant challenges to the reliability of the transmission system in the MISO Region."

MISO also explains exactly why thermal units, particularly coal-fired EGUs, are so important:

> The U.S. transmission system is designed to operate at a frequency of 60 hertz. Historically, conventional power plants have played a key role in keeping the grid stable at that level because they have heavy rotating components that are synchronized to spin at the same frequency as the grid. This rotational kinetic energy, or inertia, helps stabilize the grid when a system failure, or contingency, occurs. The new wind, solar, and battery resources that are increasingly being built in the region, however, do not inherently provide rotational inertia in the traditional sense.

---

[14] https://www.misoenergy.org/about/miso-strategy-and-value-proposition/miso-reliability-imperative/

Thus, while many factors are contributing to MISO's serious concerns regarding resource adequacy and grid reliability, "[c]hief among these risks is the region's declining levels of generation capacity and reserves." As a result, MISO noted in a recent workshop[15] that "[u]nder typical demand and outage scenarios, firm resources are projected to be insufficient to cover peak load of summer months."

*POWER* Magazine recently summarized MISO's concerns well. An article published May 6, 2022,[16] quoting Michelle Bloodworth, president and CEO of America's Power, explained:

> MISO is expecting capacity shortfalls, owing mainly to two reasons: the low capacity value of renewables (15.5% for wind) and the loss of coal-fired generation which has a much higher capacity value (90-95%). [ ] The bottom line is that MISO has lost 8,300 MW of "accredited capacity" in just the last five years. We feel this is information consumers and policymakers need to hear.

The North American Electric Reliability Corporation (NERC) also shares MISO's concerns. In its 2022 Summer Reliability Assessment,[17] NERC paints a bleak picture for the reliability in the MISO region:

> [MISO] faces a capacity shortfall in its North and Central areas, resulting in high risk of energy emergencies during peak summer conditions. … Across MISO, peak demand projections have increased by 1.7% since last summer due in part to a return to normal demand patterns that have been altered in prior years by the pandemic. However, more impactful is the drop in capacity in the most recent [planning resource auction] PRA: MISO will have 3,200 MW (2.3%) less generation capacity than in the summer of 2021. System operators in MISO are more likely to need operating mitigations, such as load modifying resources or non-firm imports, to meet reserve requirements under normal peak summer conditions. More extreme temperatures, higher generation outages, or low wind conditions expose the MISO North and Central areas to higher risk of temporary operator-initiated load shedding to maintain system reliability.

As a result of the projected lack of sufficient generating resources, S&P Global reports that capacity prices in some areas that were just $5 last year jumped to $237 this year.[18] A key reason for the jump in price, according to the report, is that there were more capacity retirements during the year than there have been for several years.

---

[15] https://www.misoenergy.org/events/2022/summer-readiness-workshop---april-28-2022/

[16] https://www.powermag.com/ercot-miso-warn-of-potential-power-supply-shortfalls/

[17] https://www.nerc.com/pa/RAPA/ra/Reliability%20Assessments%20DL/NERC_SRA_2022.pdf

[18] https://www.spglobal.com/commodityinsights/en/market-insights/latest-news/electric-power/042022-reeling-from-high-priced-miso-capacity-auction-stakeholders-seek-transparency

These warnings are unprecedented. Never before has the power sector faced such a grim outlook from the individuals and organizations in charge of maintaining reliability of the bulk power system. According to those who know reliability best, the underlying source of these risks is an industry already engaging in a transition that may be proceeding too quickly. For instance, E&E News recently quoted John Moura, director of reliability assessment and performance analysis at NERC, as recognizing that "[t]he pace of our grid transformation is a little out of synch."[19] Perhaps even more to the point, Clair Moeller, President of MISO, summed up the challenge currently facing the industry, saying, "We need to get to the future before the future gets to us."

With an industry critical to the nation's economy already at a break-neck pace in a transition that will accomplish the same goals EPA seeks to achieve with its Proposal, now is not the time to push the industry even harder. At a minimum, EPA should consider proposing a safety valve to guard against the potential impacts of its Proposal on reliability of the bulk power system. EPA has included a safety valve in many of its previous utility-related rules in response to industry concerns about reliability of the electric power grid. EPA should recognize that the risks identified above are real and modify its Proposal to avoid them by revising its Proposal to allow greater flexibility. However, in the event the industry's fears are realized, a safety valve could be critical in protecting against a shortage of generation resources that could have dramatic impacts across the country.

## Comment 8
**Both an extension of the back stop limit and adjustments to the trading program are needed for units that commit to retire by the end of 2028.**

As noted above, Cleco asks EPA to reconsider the back stop limit it has proposed, since that limit is inconsistent with the structure of the CSAPR program and unnecessary to eliminate significant contribution to downwind receptors. But, should EPA retain that limit, Cleco supports EPA's proposed extension of it to align with the deadlines imposed by other rules imposed on the power sector that will take effect in 2028. A short delay in the effectiveness of that limit is appropriate to better align the requirements of EPA's proposed interstate transport program with the deadlines imposed under other authority, including EPA's regional haze program, regulations for coal combustion residuals, and effluent limitation guidelines. 87 FR 20122. Although EPA has proposed an extension to the 2028 ozone season, an extension to the 2029 ozone season is actually needed to fully align with those other rules, some of which do not take effect until the end of 2028, not the beginning. EPA has for many years expressed a commitment to aligning the multitude of regulatory requirements imposed on electric utilities to enable the industry to make better-informed long-term planning decisions.[20] EPA extension to the 2029 ozone season of the proposed back stop limit is at least one way for EPA to follow through on that promise.

---

[19] https://www.eenews.net/articles/grid-monitor-warns-of-u-s-blackouts-in-sobering-report/

[20] See, e.g., *Carbon Pollution Emission Guidelines for Existing Stationary Sources: Electric Utility Generating Units*, 79 Fed. Reg. 34830, 34930 (June 18, 2014) ("Within the EPA, we are paying careful attention to the interrelatedness and potential impacts on the industry, reliability and cost that these various rulemakings can have.").

However, for that extension to have any practical effect, EPA must do more than just extend the back stop limit to 2029; EPA must also make adjustments to the allowance trading program. Otherwise, the program will remain too inflexible to allow source owners to align retirement decisions with the other rules slated to take effect in 2028. As proposed, EPA's assumption that dozens of SCRs will be installed by the 2026 ozone season results in dramatically reduced state emission allowance budgets beginning in that year. Any unit scheduled for retirement by the end of 2028 due to the infeasibility or cost ineffectiveness of SCR would therefore receive far too few allowances in 2026, 2027, and 2028 to comply, regardless of the effective date of the back stop limit. Therefore, without both an extension of the back stop limit and an adjustment to the proposed state budget, covered EGUs will not have the flexibility needed to commit to a retire by the end of 2028 in alignment with the other regulatory requirements. Also, a delay in the back stop limit alone would provide no additional flexibility to gas steam EGUs, since they are not subject to the back stop limit in the first place. A change to the assumptions underlying the trading program is the only way to provide gas steam units the flexibility needed to align a retirement commitment with the other rules expected to take effect in 2028.

EPA could adjust its trading program assumptions in one of two ways to address this concern. One option would be for EPA to delay until the 2029 ozone season the effectiveness of the allowance holding requirement for any EGUs that commit to retirement by the end of 2028, essentially excluding them from the program. This exclusion would be the most simple approach and the most appropriate, since such units will cease to emit at all in the near-term. An exclusion until 2029 would also be consistent with other Clean Air Act programs that allow an extension of limitations where the installation of controls cannot be completed in time,[21] which is likely to be the case for many units. Alternatively, EPA could also revise its proposed state budgeting calculation to continue using retiring units' historical emission rate in setting state budgets through the 2028 ozone season, instead of assuming those units will begin achieving the SCR-based emission rate of 0.05 lb/mmBtu in 2026. Either of these two approaches would provide the flexibility needed for coal and gas steam EGUs to conduct a more orderly transition via retirement by the end of 2028. Without one of these options, or some other similar change to the Proposal, a delay of the back stop limit alone will not provide sufficient flexibility.

**Comment 9**
**EPA should revise its evaluation for Louisiana**

Cleco also asks EPA to recognize the specific circumstances in Louisiana that warrant special consideration in designing an ozone transport plan for the state. Many of those concerns are already identified in Louisiana's interstate transport SIP, which EPA has proposed to disapprove. Cleco opposes EPA's proposed disapproval of the SIP and has separately commented on that action. Cleco incorporates those comments, as well as the analyses and determinations underlying the SIP prepared by the Louisiana Department of Environmental Quality, as they are directly relevant to EPA's Proposal—they confirm Louisiana does not significantly contribute to downwind nonattainment and maintenance areas.

---

[21] *See* 42 U.S.C. § 7412(i)(3) (allowing an extension from hazardous air pollutant standards to allow time for the installation of controls).

In particular, Cleco asks EPA to reexamine the assumptions that led EPA to conclude Louisiana significantly contributes to "downwind" air quality concerns in Texas. As an initial matter, the prevailing winds from Louisiana blow the other direction. Additionally, Louisiana is a coastal state, and the Gulf Stream flows west to east, which further suggests Louisiana emissions are unlikely to actually impact Texas receptors to the west.

Furthermore, Louisiana has already significantly reduced its emissions and its own ambient ozone levels in recent years. In fact, no area in Louisiana was designated as nonattainment for the 2015 ozone NAAQS of 70 ppb, and all areas achieved compliance with the 2008 NAAQS of 75 ppb no later than 2016, six years ago.[22] This record of success demonstrates Louisiana has already dramatically reduced its contribution to regional ozone concentrations and is unlikely to remain a significant contributor to other states' air quality issues. The recent improvements in air quality in Louisiana are directly attributable to significant steps already taken by Cleco to reduce emissions at its facilities, including installing SNCRs at six units, converting one unit from coal to gas, and retiring one of its largest coal-fired EGUs. And Cleco does not plan to stop there—other emission-reducing measures are planned in the coming years to ensure Louisiana's air remains in compliance with all Clean Air Act requirements.

Cleco also asks EPA to reconsider some of the assumptions that appear to underlie the analyses EPA used to develop the Proposal. In particular, EPA appears to have assumed that Madison Units 3-1 and 3-2 at the Brame Energy Center will retire in 2027 in response to the Proposal. That assumption is incorrect—Cleco's Madison units are some of the newest, most efficient, and lowest emitting EGUs in the country. EPA's own state budget and allocation spreadsheets confirm that Madison Units 3-1 and 3-2 have only emitted at a rate of around 0.03 lb/mmBtu, which is one of the most stringent emission rates EPA has assumed for any EGUs in its analyses. To confirm, Cleco has no plans to retire the Madison units or close the Brame Energy Center, contrary to EPA's apparent assumptions.

Many other assumptions underlying EPA's analysis are also suspect. For example, the emission inventory and modeling that EPA used in steps 1 and 2 of its four-step analysis does not match the "Engineering Analytics" that EPA used in step 3. As a result, there appears to be a substantial disconnect between the assumptions EPA used to identify covered states and the control determinations EPA proposes for those states. In specific, EPA appears to have mischaracterized several Cleco units, including the Coughlin, Teche, and Acadia Power Stations.[23] EPA's IPM model also assumes that Big Cajun II Unit 3 will retire before the 2023 ozone season, and thus assumes no emissions from the unit, whereas EPA's "Engineering Analytics" assumes that unit will emit 673 tons of $NO_x$ in the 2023 ozone season. These inconsistencies resulted in overly optimistic control determinations and underestimated state

---

[22] https://www3.epa.gov/airquality/greenbook/anayo_la.html

[23] The NEEDS database EPA used to determine NOx emissions in steps 1 and 2 indicates that the capacities of Coughlin and Acadia are 729 and 1,087 MW, respectively, but the "Engineering Analytics" EPA used in step 3 assumes those units have capacities of just 481 and 777 MW. The NEEDS database also appears to be missing Teche Unit 3 entirely, even though EPA's "Engineering Analytics" lists Teche 3 as an oil/gas steam EGU that must reduce its emissions significantly per EPA's assumption that SCR would be cost-effective.

allowance budgets. A corrected and consistent analysis is likely to confirm that the Proposal will overcontrol Louisiana.

More broadly, EPA's proposal to push Louisiana toward even more drastic emission reduction measures in spite of the great progress already made in the state threatens to upset the balance between environmental protection and a healthy economy. Unfortunately, Louisiana remains one of the poorest states in the nation, according to a recent report.[24] As such, EPA's proposal to compound the already heavy compliance burden on the utility sector threatens an already underprivileged portion of the country with even greater challenges. EPA's one-size-fits-all approach fails to recognize the impact it will have on economically disadvantaged communities.

Cleco asks EPA to maintain its commitment to environmental justice by avoiding the imposition of unnecessary requirements that are likely to close facilities that provide some of the best jobs in the state. Additionally, because Cleco Power LLC is a regulated utility, the financial burdens associated with compliance and retirements will be placed on the backs of these same low-income consumers. The marginal contributions to ozone concentrations in Texas that EPA's proposal seeks to address simply do not warrant shuttering vital resources, further burdening an already struggling state population.

Cleco is grateful for the opportunity to comment on the Proposal and appreciates EPA's serious consideration of these comments.

Respectfully Submitted,

*/s/ Bill Matthews*

Bill Matthews
Director – Environmental Policy and Planning

---

[24] https://www.roadsnacks.net/poorest-states-in-america/

Tab HQ-546: Comment submitted by Entergy Services, LLC (ESL) (June 21, 2022) (EPA-HQ-OAR-2021-0668-0546)



**Entergy Services, LLC**
2107 Research Forest Drive
Lake Front North II
The Woodlands, TX 77380

June 21, 2022

Administrator Michael Regan
C/O EPA Docket Center (EPA/DC)
Docket ID No. EPA-HQ-OAR-2021-0668
U.S. Environmental Protection Agency
*Fuerst.sherry@epa.gov*

RE:     Proposed Rule - *Federal Implementation Plan Addressing Regional Ozone Transport for the 2015 Ozone National Ambient Air Quality Standard*, 87 Fed. Reg. 20036 (April 6, 2022)

**ATTN:          Docket ID No. EPA-HQ-OAR-2021-0668**

Dear Administrator Regan,

Entergy Services, LLC (ESL), on behalf of Entergy Louisiana, LLC (ELL), Entergy Mississippi, LLC (EML), Entergy New Orleans, LLC (ENOL), Entergy Texas, Inc. (ETI), and Entergy Arkansas, LLC (EAL), submits these comments regarding EPA's Proposed Rule – *Federal Implementation Plan Addressing Regional Ozone Transport for the 2015 Ozone National Ambient Air Quality Standard*, 87 Fed. Reg. 20036 (April 6, 2022).

## EXECUTIVE SUMMARY

Entergy, a Fortune 500 company headquartered in New Orleans, powers life for 3 million customers through its operating companies primarily across Arkansas, Louisiana, Mississippi, and Texas. Entergy is creating a cleaner, more resilient energy future for everyone with the diverse power generation portfolios of its operating companies, including increasingly carbon-free energy sources. With roots in the Gulf South region for more than a century, Entergy is a recognized leader in corporate citizenship, delivering more than $100 million in economic benefits to local communities through philanthropy and advocacy efforts annually over the last several years. Our approximately 12,500 employees are dedicated to powering life today and for future generations.[1]

As a vertically-integrated electric utility, Entergy's operating companies operate both electrical generation units and the electrical transmission and distribution infrastructure necessary to

---

[1] https://www.entergy.com/about_entergy/

1



deliver power to customers in their respective service territories.  Entergy's generation fleet[2] is one of the cleanest in the nation, with a fleet-wide average $NO_x$ emission rate of less than half the national average,[3] a fleet-wide average $SO_2$ emission rate approximately one-third below the national average,[4] and a fleet-wide average $CO_2$ emission rate approximately 25% below the national average.[5]

Since 2015, the year that the current ozone standard was established, Entergy has reduced the total annual $NO_x$ emissions (tons $NO_x$ /year) from our generation fleet by more than 50%[6], and during the most recent ozone season (2021) approximately 80% of the power generated by Entergy[7] was generated at a NOx emission rate of 0.03 lb/MMBtu or less.

The Entergy operating companies are committed to improve their operations continuously by transitioning to modern low- and zero-emitting generation resources and have demonstrated this commitment by placing more than 10,800 MW of modern generation into service since 2000 and retiring thousands of MW of higher-emitting legacy generation assets over the same time period. Entergy's commitment to this fleet transformation is further demonstrated by its goal of reducing the average $CO_2$ emission rate by 50% from 2000 levels by 2030, and corresponding targets for reducing our total annual emissions of both $SO_2$ and $NO_x$ by 90% each from 2000 levels, by 2030.  As of 2021, Entergy has decreased total annual $NO_x$ emissions (tons/year) from its generation fleet by more than 80% from 2000 levels,[8] despite an approximate 20% increase in total annual generation from company-owned generating units over the same period.

The electric power sector currently is in the midst of a significant transition as utilities across the country, including Entergy, continue to integrate significant renewable generation sources into their fleets.  Entergy operating companies currently have over 5,000 MW of renewable

---

[2] Inclusive of all company-owned generation, including the fleets of Entergy's operating companies and Entergy Wholesale Commodities.

[3] Entergy fleet average $NO_x$  rate for 2021 was 0.32 lb $NO_x$ /MWh vs. the most recent (2020) available national average rate for the electric generation sector of 0.67 lb $NO_x$ /MWh.  The national average rate was calculated from annual net generation data from EIA Table 3.1.A and annual emissions from energy consumption at conventional and combined-heat-and-power plants from EIA Table 9.1.  See https://www.eia.gov/electricity/annual/

[4] The Entergy fleet average $SO_2$ rate for 2021 was 0.37 lb $SO_2$/MMBtu vs. the most recent (2020) available national average rate for the electric generation sector of 0.56 lb $SO_2$/MMBtu.  The national average rate was calculated from EIA Tables 3.1.A and 9.1.

[5] The Entergy fleet average $CO_2$ rate for 2021 was 0.62 lb $CO_2$/kWh vs. the most recent (2020) available national average rate for the electric generation sector of 0.85 lb $CO_2$/kWh.  The national average rate was calculated from EIA Tables 3.1.A and 9.1.

[6] Calculated based on CY2015 total $NO_x$ emissions of 40,272 tons and CY2021 total $NO_x$ emissions of 19,523 tons.

[7] Calculated based on 2021 ozone season generation from Entergy-owned generation assets of 52,335,205 MWh, with 41,785,713 MWh from units emitting less than 0.03 lb $NO_x$ /MWh.

[8] Calculated based on CY2000 $NO_x$ emissions of 102,522 tons and CY2021 $NO_x$ emissions of 19,523 tons.



generation in various stages of formal planning and development,[9] and have plans to develop a total of at least 11,000 MW of such generation by 2030.[10]  In addition, ETI is currently developing a 1,215 MW dual-fuel combined cycle power facility, the Orange County Advanced Power Station[11] (OCAPS), capable of co-firing hydrogen and natural gas, which will be equipped with state-of-the-art $NO_x$ emission controls.  These existing generation development and business plans will allow Entergy to continue to transition away from higher-emitting legacy generation assets to new modern generation sources and continue the existing significant downward trend in $NO_x$ emissions from Entergy's generation fleet.

As detailed below, EPA's proposed Federal Implementation Plan (FIP) relies on flawed assumptions regarding Entergy's existing business plans.  As a result, the proposed FIP jeopardizes Entergy's ability to execute these renewable and other modern generation development plans by potentially forcing Entergy operating companies to divert significant capital investment away from continued development of new generation assets to pollution control investments in aging legacy generation units, the majority of which are likely to operate for only a handful of years beyond the 2026 ozone season.

Entergy operating companies' existing legacy generation units provide critical capacity which allows them to provide affordable and reliable electrical service to their respective customers. Entergy's ability to continue to provide reliable service would be jeopardized if these legacy units were to be retired before sufficient alternative generation is placed into commercial operation.  Should EPA finalize the proposed FIP without the revisions requested below, the Entergy operating companies would be placed into a position of choosing between a limited number of unattractive options in order to meet their resulting obligations:  significant and unreasonable investments in pollution control retrofits which, in most cases, would remain in service for only a handful of years, or accelerating the retirement of or otherwise significantly limiting the operation of existing legacy generation units during the ozone season, without adequate time to place sufficient alternative generation capacity into service to ensure continued reliable service.  All of these options result in negative outcomes for the Entergy operating companies and their respective customers, which could be alleviated if EPA were to revise the final FIP consistent with the comments outlined below.

In addition to the specific comments outlined below, Entergy supports and incorporates the comments on this proposal submitted by the Class of '85 Regulatory Response Group (Class of '85), the Louisiana Electric Utility Environmental Group (LEUEG), the Energy and Environmental Alliance of Arkansas (EEAA), and the Association of Electric Companies of

---

[9] See Slide 81 at:  https://entergycorporation.gcs-web.com/static-files/2a90a616-8405-4f74-b76b-97b579dd0f18

[10] It should be noted that renewable generation is not typically capable of consistently achieving comparable capacity factors in comparison to existing fossil-fuel fired generation units, and thus new renewable generation sources do not replace the capacity of legacy generation units at a 1:1 ratio.

[11] https://www.entergy.com/entergypowerstexas/project/



Texas, BCCA Appeal Group, Texas Chemical Council, and Texas Oil & Gas Association (Texas Transport Working Group).  We also incorporate our comments submitted on the proposed SIP disapprovals in Arkansas (Attachment C) and Louisiana, Mississippi, and Texas (Attachment D).


**COMMENTS**

I.    <u>EPA's Cost Effectiveness Calculations are Flawed and Must be Revised</u>

   a. <u>EPA Should Consider the Remaining Useful Life of a Unit when Calculating Costs</u>

   EPA's cost effectiveness calculations used in the proposed FIP are flawed because they unreasonably assume that where a unit completes an SCR retrofit, the SCR would remain in-service for 15 years afterward.[12]  In the proposal and associated documents posted in the regulatory docket, EPA identifies a total of 15 Entergy-owned (or partially-owned) generating units for SCR retrofits, 6 coal-fired units and 9 gas-fired units.  Under the Entergy operating companies' existing business plans, <u>none of these units are currently expected to operate for 15 years beyond 2026.</u>  Even more significantly, only a small number of these units are currently expected to operate beyond 2030, resulting in a Remaining Useful Life (RUL), beginning in 2026, of five years or less.

   EPA's own cost estimates[13] for SCR retrofits for the 15 Entergy-owned units sum to a total capital investment of approximately $2.3 billion.  A summary of EPA's cost estimates for each of these units is provided in Attachment A to this letter.  As part of Entergy's evaluation of the proposed FIP, Entergy replicated EPA's control cost calculations with adjustment of the capital recovery factor (CRF) for each unit consistent with Entergy's existing federally-enforceable commitments which limit the RUL of certain units, along with the currently-anticipated unit retirement dates[14] from Entergy's existing business plans.  Using EPA's own cost estimation methodology, with no changes other than updating the CRF for each unit to align with the planned RULs, results in an average SCR retrofit cost effectiveness for the Entergy operating companies' fleet of over $50,000/ton of $NO_x$ removed.  Unit-specific cost-effectiveness values, utilizing EPA's approach with only the CRF adjusted, exceed $100,000/ton for certain Entergy units, with values for two units

---

[12] EPA, Retrofit Cost Analyzer (Update 1-26-2022), EPA-HQ-OAR-2021-0668-0118 (Feb. 2022) (noting that EPA used a capital charge rate of 14.3% the "avg of utility and merchant owned at 15-yr book life"); EPA, NOx Control Retrofit Cost Tool Fleetwide Assessment Proposed CSAPR 2015 NAAQS, EPA-HQ-OAR-2021-0668-0113 (Feb. 25, 2022) (same); EPA, Regulatory Impact Analysis for Proposed Federal Implementation Plan Addressing Regional Ozone Transport for the 2015 Ozone National Ambient Air Quality Standard (Feb. 2022) (assuming "the book-life of the new SCRs" is 15 years).

[13] EPA, Document ID EPA-HQ-OAR-2021-0668-0113, Total Project Cost (TPC) for SCR retrofits.

[14] These dates were established prior to the issuance of this proposed FIP and do not represent any adjustments to planned retirement dates that may occur if the FIP is finalized as proposed.



exceeding $300,000/ton. These values clearly exceed any reasonable definition of cost-effective and illustrate the significant deficiency in EPA's assumed 15-year life for SCR retrofits.

Several Entergy operating company units that were identified by EPA for SCR retrofits are subject to existing public commitments enforceable under both state and federal law which limit the remaining life of these units.[15] These units and their associated commitment dates are: Lake Catherine Unit 4 (December 31, 2027); White Bluff Units 1 & 2 (December 31, 2028); and Independence Units 1 & 2 (December 31, 2030). These existing commitments are public and should have been known to EPA at the time that the proposed FIP was developed, yet EPA did not consider these existing and enforceable dates. When these existing commitments are taken into account, the annual cost-effectiveness for SCR retrofits on these units exceeds $37,000/ton and reaches as high as $100,000+ per ton of $NO_x$ reduced.

The remaining units identified by EPA for SCR retrofits[16] are generally the oldest and least-efficient generating units in Entergy's fleet. On average, these Entergy operating company-owned units identified by EPA for SCR retrofits will be 52 years old by 2026.[17] These units will most likely retire in the near- to medium-term as the Entergy operating companies continue to modernize their generating fleets through the addition of renewable and other modern generation sources. As noted above, under the Entergy operating companies' existing business plans, all of these units are expected to retire in less than 15 years after 2026. For such units, EPA should modify the final FIP to provide a path for an owner/operator to present information on the anticipated remaining useful life of specific generating units, make an appropriate commitment to the indicated unit-specific retirement date(s), and EPA should then rely upon that information to re-assess the cost effectiveness of SCR retrofits for such units.

b. EPA Should Consider Current Inflation Data

In preparing revised cost estimates to support a final FIP, EPA should ensure that recent and significant inflation trends are incorporated into its analysis. The latest (May 2022) consumer price index reported by the US Bureau of Labor Statistics has increased by 8.6% over May 2021, which is the largest 12-month increase in over 40 years. EPA should

---

[15] *See* Settlement Agreement and Consent Judgment in *Sierra Club et al v. Entergy Arkansas, LLC et all*, No. 4:18-CV-00854 (entered by court on March 11, 2021).

[16] These remaining Entergy-owned units are: Little Gypsy 2 & 3, Ninemile Point 4 & 5, Nelson 6, Big Cajun II Unit 3, Gerald Andrus 1, and Sabine 3, 4, and 5.

[17] This represents the average age in 2026 of those Entergy units that were identified by EPA for SCR retrofits, but that are not yet subject to a firm commitment which limits the RUL of the unit.



account for current and anticipated future economic conditions, including inflation, in any cost analyses which inform the final FIP.

II.   <u>EPA Should Provide Additional Flexibility in State Emission Budgets for Units with a Limited Remaining Useful Life Beyond 2026</u>

   a. <u>EPA Should not Presume SCR Retrofits</u>

   In circumstances where a generating unit is subject to an existing enforceable commitment that limits the unit's RUL, or a unit operator is willing to make an appropriate commitment to limit the RUL of a unit, EPA should provide additional flexibility for such units[18] when establishing state $NO_x$ emission budgets in 2026 and beyond via EPA's proposed dynamic budgeting approach.  EPA should provide such flexibility for units that already have made or are willing to make a firm commitment which limits the RUL of the unit to no later than December 31, 2030.  For coal-fired units that are not already equipped with SCRs, where the owner/operator has made or is willing to make an appropriate commitment to limit the RUL of the unit to no later than December 31, 2030, EPA should exempt such units from being subject to the proposed daily backstop $NO_x$ emission rate of 0.14 lb $NO_x$ /MMBtu.

   For such units, rather than presuming SCR retrofits when establishing state budgets in 2026 and beyond, EPA should instead finalize an alternative budget-setting approach. Elements of such an approach should include more reasonable emission rate assumptions for the period of limited remaining life of such units (from 2026 through the year of commitment). For such units located in states which are predicted to remain "linked" to downwind nonattainment areas in 2026, EPA could finalize a framework which would presume more limited $NO_x$ emission reductions from such units when establishing state emission budgets for 2026 through the date of commitment for the units.  For such units located in states which are predicted to be linked only to downwind maintenance receptors in 2026, EPA should finalize an approach which does not presume any further emission reductions for the purpose of establishing state emission budgets for the 2026 ozone season through the date of commitment for the units.[19]  This approach would provide significantly more flexibility to accommodate continued operations of such units, while achieving $NO_x$ reductions in the 2026 ozone season prior to the August 2027 attainment date for serious ozone nonattainment areas, coupled with the complete elimination of emissions from such units once they are retired.

---

[18] Coal-, oil-, and gas-fired units.

[19] See comment IV below for more detail.



b. EPA's Proposed Timing for SCR Retrofits is Unreasonable

EPA's presumption of SCR retrofits prior to the 2026 ozone season, only three years after the anticipated effective date of the final FIP, is problematic in several ways. First, three years is a very aggressive schedule for installation of a SCR system on an electric generating unit, and one which fails to account for all of the variables inherent in execution of such a retrofit, including permitting, engineering, procurement, construction, and testing. EPA has recognized this in the context of prior regulatory decisions, where EPA has determined that SCR installation schedules of 4 or 5 years were as "expeditiously as practicable" under the Regional Haze program. Secondly, EPA's proposed 3-year period would significantly limit the options available to a utility to plan, develop and place into service alternative generation to allow for the replacement of legacy generation units for which an SCR retrofit is simply uneconomic. Very few types of generation can be planned, developed, and placed into service within three years, and such generation tends to be smaller-scale and unable to replace the capacity provided by the sizeable generating units identified by EPA for SCR retrofits in the proposed FIP.

Investing in costly SCR retrofits on Entergy units that, on average, will be more than 52 years old in 2026 is an unsupported and unreasonable assumption for EPA to make. Allowing an alternative and more measured approach to adjusting future-year state budgets that offers some flexibility with respect to units with a limited RUL would allow Entergy and other similarly-situated utilities sufficient time to consider all possible options for development of replacement generation capacity.

Entergy has recent experience in the development of both solar and modern combined-cycle gas generation, and ETI is currently in the process of seeking regulatory approvals for the combined-cycle OCAPS facility which will be capable of co-firing natural gas and hydrogen. Based on this experience, development and deployment of utility-scale solar generation would be expected to take 5-5.5 years, on average, from initial planning to commercial operation. Similar development and deployment of modern hydrogen-capable gas generation capacity would be expected to take up to 7 years from the date that planning for such a project was initiated. Such projects are large and complex, and require numerous permits, approvals, and authorization from both state and local regulatory authorities, along with significant engineering, procurement, construction, and equipment testing. In addition, external factors, such as the current investigation by the Department of Commerce into allegations of photovoltaic cell import tariff circumvention, can create unexpected delays in the ability to execute new generation projects.[20] Details regarding Entergy's recent experience with such projects can be found in Attachment B to this letter.

---

[20] For information regarding the investigation, *see* Memorandum from Jose Rivera, International Trade Compliance Analyst, AD/CVD Operations, Office VII, U.S. Department of Commerce, to All Interested Parties, "Circumvention



While Entergy anticipates that much of its future generation resource needs will be met via additional solar and wind resources, the dispatchable synchronous generation provided by sources such as hydrogen-capable modern gas generation units will continue to serve an important role in the overall generation resource mix.  By providing utilities with the option to make commitments to limit the RUL of units to no later than December 31, 2030, and providing a more flexible state emission budget-setting approach with respect to such units, utilities would be able to consider all possible alternatives for replacement generation capacity and place appropriate alternative capacity into service prior to deactivating units where SCR retrofits would be economically infeasible.

This approach would achieve long-term and sustainable reductions in $NO_x$ emissions, through investment in new zero- or low-emitting generation resources which would be expected to remain in-service for decades to come, rather than investment in $NO_x$ pollution control retrofits on aging generation resources which may remain in-service for only a handful of years.

As noted in more detail in Section III below, the retirement of legacy generation assets for which SCR retrofits are economically infeasible could also necessitate transmission system upgrades which can take 5-7 years to plan, develop, and implement, The proposed flexibility with respect to units which make appropriate commitments to limit their RUL to no later than December 31, 2030, seven years after the anticipated issuance of a final FIP in 2023, aligns well with this expected time to execute any necessary transmission system upgrades.

c. EPA Should Allow Operators the Flexibility to Commit to a Shortened RUL

Absent adoption of our 2030 proposal above, EPA should provide some alternative means for EGU operators to commit to a shortened remaining useful life beyond 2026 along with providing for additional state budget allotments (with respect to such units) and allowance allocations in 2026 through the year of commitment.  EPA must recognize that SCR investments could not be justified for many of the sources identified for such retrofits in the proposal and provide a reasonable alternative approach that ensures long-term $NO_x$ emission reductions while allowing utilities to continue to provide affordable and reliable electrical service to their customers.

---

Inquiries With Respect to Cambodia, Malaysia, Thailand, and Vietnam – Potential Certification Requirements" (May 2, 2022).



III. <u>This Proposal Likely Will Have Implications for Electric Reliability and EPA Should Consult with Appropriate Regional Transmission Operators ("RTOs") and Other Electric Reliability Stakeholders Prior to Issuing a Final Rule</u>

    a. <u>Allowance Availability is Essential for a Functioning Trading Program</u>

        Under both the existing and prior versions of the CSAPR trading programs, there were two significant mechanisms by which an EGU operator could generate surplus emission allowances: 1) retirement of a unit, or 2) controlling emissions from a unit to a greater extent than was contemplated by EPA in establishing the relevant state emission budgets. Either of these approaches would create surplus allowances that could be sold or traded to offset greater-than-expected emissions from another generating unit. Under EPA's proposed framework for this FIP, neither of these options are available in the same fashion as has been the case in the past.

        Three aspects of EPA's proposed FIP, when considered together, leave no obvious and sustainable source of surplus emission allowances in 2026 or beyond. These aspects are: 1) the presumed SCR retrofits at certain units, for the purpose of establishing state $NO_x$ emission budgets for the 2026 and subsequent ozone seasons, which will significantly reduce state $NO_x$ budgets; 2) the proposed annual allowance bank recalibration, which will constrain a source's ability to supplement its ozone season allowance allocation via the use of banked allowances if needed; and 3) the proposed treatment of idled, suspended, and retired units in the dynamic budget process, which would eliminate a unit from the state $NO_x$ budget two years following any ozone season in which the unit did not operate, along with the elimination of allowance allocations to such units two years after the last ozone season in which the unit operated. Furthermore, EPA's proposed dynamic budget approach would nonetheless presume an SCR retrofit for an already-retired unit if that unit was identified by EPA for such a retrofit and the unit was eligible to receive allowances in 2026 or beyond.[21]

        For a unit with a limited RUL where a major capital investment in $NO_x$ emission control retrofits is not economically feasible, the likely lack of any significant quantity of surplus allowances will significantly constrain the ability to continue to operate the unit during the 2026 or subsequent ozone seasons. For such a unit, the only viable compliance options for the 2026 and subsequent ozone seasons would appear to be either to accelerate retirement of the unit or to curtail operations significantly during the ozone season. Either of these

---

[21] An example of such a unit would be a unit without an SCR that operates during the 2025 ozone season and is retired prior to the 2026 ozone season. Under EPA's proposed dynamic budget approach, such a unit would be included in the calculation of the state $NO_x$ budget for the 2026 ozone season based on the unit's operation during the 2024 ozone season, and for the 2027 ozone season based on the unit's operation during the 2025 ozone season. However, in establishing the state $NO_x$ emission budgets for 2026 and 2027, EPA would apply an emission rate to this unit which corresponds to a presumed SCR retrofit (0.05 or 0.03 lb/mmBtu), thus leaving few surplus allowances available to provide to units that may need to increase generation as a result of the retirement.



options would limit available generation capacity during the peak summer electrical demand season.

As noted in Section II(b) above, EPA's proposed FIP significantly limits a utility's ability to plan, develop, and deploy alternative generating capacity before likely accelerated retirements are triggered as a result of the FIP occur. The North American Electric Reliability Corporation's (NERC) most recent long-term[22] and summer[23] reliability assessments identify existing reliability concerns within several RTO regions, including a high summer reliability risk in the Midcontinent Independent System Operator (MISO) region in which Entergy operates. These risks are also highlighted by the most recent OMS-MISO Survey results[24] released in June 2022, which highlight a 2.6 GW capacity deficit in 2023 that is expected to widen in future years.

Before issuance of a final FIP, EPA must consider the potential that the proposed $NO_x$ state budget presumptions and allowance constraints will cause operators to accelerate retirement decisions for units that are currently only planned to operate for a limited number of years beyond 2026, and the potential for such accelerated retirements to create issues with the reliability of the bulk electric system. EPA should consult with the RTOs and other electric reliability stakeholders on these issues and incorporate appropriate revisions into the final FIP to mitigate potential reliability issues.

b. The Majority of the Capacity Presumed for SCR Retrofits is Concentrated in Five States

For the purpose of establishing state $NO_x$ emission budgets, starting with the 2026 ozone season, EPA's proposed FIP identifies a total of 131 generating units, with a total combined capacity of approximately 58,300 MW for presumed SCR retrofits.[25] Approximately 56% of this total capacity is located in just five states in the south-central US: Arkansas, Louisiana, Mississippi, Oklahoma, and Texas. As noted above, the proposed FIP would likely incentivize some of these units to accelerate existing retirement plans and retire prior to the 2026 ozone season. With such a significant concentration of such units in these five states, including the MISO South, Electric Reliability Council of Texas (ERCOT), and portions of the Southwest Power Pool (SPP) territories, there is particular risk of regional reliability issues resulting from implementation of the proposed FIP. EPA should coordinate with the RTOs, state public service and public utility

---

[22] https://www.nerc.com/pa/RAPA/ra/Reliability%20Assessments%20DL/NERC_LTRA_2021.pdf

[23] https://www.nerc.com/pa/RAPA/ra/Reliability%20Assessments%20DL/NERC_SRA_2022.pdf

[24] https://cdn.misoenergy.org/20220610%20OMS-MISO%20Survey%20Results%20Workshop%20Presentation625148.pdf

[25] Determined based on coal- and oil/gas-fired EGUs located in states where EPA proposes to presume SCR retrofits for the purpose of establishing 2026 state budgets and flagged by EPA for SCR retrofits in the worksheet "Unit 2026" found in Appendix A to EPA's Ozone Transport Policy Analysis.



commissions, and FERC to ensure that it is considering regional reliability risks that may arise in these states/RTO territories and make appropriate adjustments to the final FIP to mitigate any identified reliability risks.

c. Unit Retirements May Necessitate Transmission Upgrades

The units identified by the EPA for SCR retrofits and located in MISO South total approximately 11,500 MW of capacity. Significant and costly transmission system upgrades would be expected to be necessary should some number of these generation resources choose to accelerate their respective retirements as part of a strategy to comply with the restrictive proposed state emission budgeting approach for the 2026 ozone season. Due to the time required to obtain all necessary external project approvals, complete material procurement, and to construct such upgrades, it is infeasible to complete significant transmission system upgrades by the time the units are subject to restrictive 2026 state $NOx$ budgets that would result from EPA's proposal, which will jeopardize system reliability. External project approvals take up to 18 months, and transformer procurement requires up to 2 years. Due to the terrain and permitting requirements, new and rebuilt transmission lines in many parts of the Entergy territory take 5 to 7 years to design and construct. EPA's proposed 2026 $NO_x$ budgeting approach simply does not allow for adequate time to execute transmission system upgrades which may be necessary to accommodate the accelerated unit retirements that would almost certainly occur should EPA finalize its proposal without changes to provide additional flexibility to the program.

d. Options to Facilitate a Functioning Trading Program

Prior to issuing a final FIP, EPA should implement options to add additional flexibility to state budgets and/or to other aspects of the trading program to ensure sufficient allowance availability to accommodate the potential dispatch of higher-emitting units at greater-than-anticipated levels during the ozone season to maintain the reliability of the bulk electric system.

Such options could include:

   i. revised and more flexible state emission budgets,
  ii. revised budget-setting assumptions for the proposed dynamic budgeting framework with respect to units with limited RULs, such as those advocated for elsewhere in these comments,
 iii. modification of the proposed dynamic budgeting approach to consider multiple years of historical operating and emissions data rather than a single historical year,
 iv. extending the period in which retired units would continue to be included in the calculation of state emission budgets and subsequent unit-level allocations, which would provide additional liquidity to the $NO_x$ allowance market,



    v.   elimination of the proposed allowance bank recalibration process, which would
provide EGUs with greater certainty in planning for future operation,

    vi.  revision to or postponement of the applicability of the proposed allowance bank
recalibration process, to smooth the transition to the significantly reduced state
budgets which would result from EPA's proposed post-2026 state budgeting
framework or,

    vii. other potential flexibilities which align with the underlying obligations imposed by
Section 110(a)(2)(D)(i)(I) of the Clean Air Act.

IV.   <u>EPA Must Reconsider the Proposed NO<sub>X</sub> Emission Reductions from Certain States, Including
Arkansas and Mississippi, to Ensure that they do not Constitute Overcontrol</u>

Section 110(a)(2)(D)(i)(I) of the Clean Air Act requires that a state, or EPA when acting in
the place of a state via a FIP, develop a plan which contains adequate provisions
"prohibiting…emissions activity within the State from emitting any air pollutant in
amounts which will contribute significantly to nonattainment in, or interfere with
maintenance by, any other State with respect to any such national primary or secondary
ambient air quality standard".  Prior court decisions have concluded that the "contribute
significantly to nonattainment" and "interfere with maintenance" provisions of this section
of the Act are independent obligations that both must be addressed in order to provide a
full remedy of a State's obligations with respect to Section 110(a)(2)(D)(i)(I).[26]  In the
proposed FIP, EPA properly gives independent consideration to predicted linkages
between emissions from upwind states and whether those emissions would "contribute
significantly to nonattainment" or "interfere with maintenance" in any downwind areas,
and EPA proposes a remedy, consisting of series of emission reductions from upwind
states, to address both circumstances.

However, neither the plain language of the Act nor subsequent court decisions compel
EPA to propose the <u>same</u> remedy for circumstances where emissions from a state are
determined to "contribute significantly to nonattainment" as for circumstances where
emissions from a state are determined to "interfere with maintenance" in one or more
downwind nonattainment areas.

In the proposed FIP, EPA proposes a phased approach to initially reduce state NOx
emission budgets for emissions from the EGU sector, with initial emission reductions to be
achieved through proposed state emission budgets for 2023 and 2024, coupled with further
reductions to be determined via a dynamic budgeting approach for the 2025 and
subsequent ozone seasons.  Beginning with the establishment of state NO<sub>x</sub> budgets for the
2026 ozone season, EPA's dynamic budgeting approach would reduce state NO<sub>x</sub> budgets
to an extraordinary extent via the application of presumed SCR retrofits for certain coal-

---

[26] *See* North Carolina v. EPA, 531 F.3d 896, 910 (D.C. Cir. 2008).



oil- and gas-fired units identified by EPA. These further substantial NO$_x$ emission reductions from the EGU sector, the most significant that have ever been proposed under the "Good Neighbor" provisions of Section 110(a)(2)(D)(i)(I), are not necessary for states which are predicted to be linked only to maintenance receptors in 2026. As documented by EPA in the proposed FIP,[27] these "maintenance-only" states in 2026 are: Arkansas, Minnesota, Mississippi, Oklahoma, Wisconsin, and Wyoming.

To require such extraordinary further emission reductions from these states in 2026 would likely constitute overcontrol, that is: a greater degree of emission reductions than are necessary to prevent emissions from these states from "interfering with maintenance" in downwind areas. Other aspects of EPA's proposed FIP, if finalized, would address the obligations of these states to prevent the interference with maintenance in downwind areas. For example, the proposed dynamic budgeting approach, absent the significant budget reductions which would occur in 2026 due to the application of presumed SCR retrofits, would still result in ongoing reductions in state EGU budgets over time, as budgets are adjusted over time to account for unit retirements and changes in unit dispatch patterns. This aspect of the program will ensure that EGU sector NOx emissions continue to decrease over time, do not interfere with maintenance in any downwind areas, and are sufficient to address the "Good Neighbor" obligations for these upwind states with regard to downwind maintenance areas. Should EPA finalize a FIP which does not contain the proposed dynamic budgeting approach, then other elements of EPA's final FIP may serve a similar function that would satisfy the obligation to prevent emissions from a state which would interfere with maintenance of the NAAQS in any downwind areas.

In issuing a final FIP, EPA should eliminate the presumed dynamic budget adjustments which correspond to presumed SCR retrofits on certain coal- oil-, or gas-fired EGUs in any states predicted to be linked only to downwind maintenance receptors in 2026 and should similarly eliminate the proposed daily backstop emission rate for coal-fired EGUs in such states which are not already equipped with SCRs. EPA should conclude that the other proposed Group 3 trading program elements, or other similar elements of the final FIP, as applied to these states, are sufficient to address their respective obligations to prohibit emissions which would interfere with maintenance in any downwind areas.

When considering appropriate revisions to state budgets for states which are predicted to be linked only to downwind maintenance receptors in 2026, EPA should be especially attentive to the risk of applying aggressive emission control retrofit presumptions to units located in such states and that have either existing commitments which limit their RUL to 2030 or sooner or which are willing to make such commitments in response to the final FIP. While comments I and II above outline the program-wide issues with presuming such commitments for units with limited RULs, such aggressive emission budget reductions

---

[27] *See* 87 Fed. Reg. at 20072 -73, Table V.E.1-2.



with respect to such units are particularly misaligned with the obligation to prohibit emissions which would interfere with maintenance in any downwind areas. For EPA to establish state NOx budgets based on a presumption of costly SCR retrofits for units with limited RULs and that are located in states which are linked only to downwind maintenance receptors in 2026 would be unreasonable and likely would constitute overcontrol.

V.    EPA Must Consider the Interconnected Nature of Generation Sources and the Impacts of Severe Weather Events

a. EPA Should Consider the Influence of Zero-Emitting Generation Units

The extent to which individual generating units dispatch at any given time is a function of the total electrical system load, the other generating units available to meet that load, and the relative cost of each available generation source. This includes both fossil fuel-fired generating units, which are the focus of EPA's proposed FIP, as well as other types of generation such as nuclear, hydroelectric, solar, and wind generation which do not create $NO_x$ emissions. When relatively more load is being served by these zero-emitting generation resources, overall EGU sector $NO_x$ emissions will be less, and when the opposite is the case, EGU sector $NO_x$ emissions will be greater. As EPA proposes significant reductions in state $NO_x$ emission budgets, the implications of these interrelationships with zero-emitting generation resources become more important to the overall functioning of the CSAPR emission trading program.

When a large zero-emitting generating unit, such as a nuclear or hydroelectric unit, is not available during a portion of the ozone season, other units will necessarily be dispatched in order to meet system reliability needs and electrical demand. Similar considerations could arise in the event that generation output remains available but is significantly reduced from a zero-emitting source. The generation resources most frequently available and dispatched in such situations are fossil fuel-fired units, thereby resulting in an increase in total $NO_x$ emissions. EPA's dynamic approach for establishing state emission budgets under the proposed FIP, which presumes the most stringent technically feasible level of $NO_x$ emission controls (i.e., SCRs) for nearly all fossil fuel-fired units and considers only a single year of historical unit operating data, would produce inflexible state emission budgets. This would result in a scenario where sufficient allowances would simply not exist to accommodate the need to run a higher-emitting unit to meet electrical demand during a period in which a zero-emitting generation resource, which typically operates to serve a portion of total electrical system demand, is unavailable during some portion of the ozone season.

Prior to issuing a final FIP, EPA should evaluate available historical generation data for nuclear, hydroelectric, and other zero-emitting generation sources and assess whether the



proposed FIP provides for adequate allowance availability in the event that a large zero-emitting unit is unavailable during the ozone season and additional fossil fuel-fired units are operated to meet electrical demand.

In addition, EPA should modify the proposed secondary emission limit for sources that contribute to an exceedance of the state's assurance level such that the secondary limit would not apply to such a source if the primary cause of the assurance provision exceedance was an unforeseeable circumstance, such as additional dispatch due to reduced availability of generation from low-or zero-emitting generation resources in the state or region, or damage to the electrical transmission or distribution system which required operation of a higher-emitting unit in order to meet local electrical demand.

b. EPA's Proposed Dynamic Budget Approach Would Penalize States Impacted by Severe Weather Events

When establishing state $NO_x$ emission budgets under the proposed dynamic budget approach, EPA must consider the impacts of severe weather events, such as hurricanes, which occur during the ozone season and which may create anomalous conditions for the bulk electric system in the regions impacted. Such weather events can cause widespread power outages, which temporarily limit electrical system demand, and can directly damage electric generating units that may remain out-of-service until necessary repairs can be completed.

This occurred within ELL's service territory in Louisiana during both the 2020 and 2021 ozone seasons due to significant impacts from tropical weather systems (hurricanes and tropical storms). For example, the Nelson 6 generating unit located in Westlake, Louisiana was damaged by Hurricane Laura on August 26, 2020, and was further impacted by Hurricane Delta approximately six weeks later. Nelson 6 did not operate again during the 2020 ozone season. Both of these storms caused damage to the electrical system in southwest Louisiana, creating anomalous system conditions in Louisiana for much of the 2020 ozone season. Similarly, portions of ELL's and ENOL's systems in southeast Louisiana were damaged by Hurricane Ida in August 2021, resulting in anomalous electrical system conditions in the region in the aftermath of that storm. These severe weather impacts resulted in less-than-usual generation and emissions from generating units located in these impacted areas in the 2020 and 2021 ozone seasons.

When establishing state $NO_x$ emission budgets, EPA should not rely solely on historical unit operating and emissions data from a single year where such severe weather impacts or other anomalous events may have occurred. Instead, EPA should modify the proposed dynamic budget approach to consider multiple years of historical operation data in setting any state budgets. EPA should also consider the potential for severe weather events to impact low- or zero-emitting generation sources, resulting in additional dispatch of higher-



emitting units to meet electrical demand.  As noted above in these comments, EPA's proposed framework for establishing state emission budgets is so restrictive that there are unlikely to be any significant number of surplus allowances available to accommodate additional and unexpected dispatch of a higher-emitting unit that may be necessary during circumstances such as those created in the aftermath of a hurricane or other severe weather event.  If EPA retains the dynamic budget approach, EPA also should not adjust the budgets on an annual basis but instead should only adjust the budgets periodically, such as every three years.

VI.     EPA Should Revise the Proposed Treatment of Idled, Suspended, and Retired Units when Establishing State NO$_x$ Budgets

   a. EPA Should not Penalize Recently Deactivated Units

EPA's proposed NO$_x$ emission state budgets for the 2023 ozone season were calculated, in part, based on excluding units that operated during the 2021 ozone season but have since been idled[28] or suspended[29] or retired[30] ("deactivated"[31]), and units that are projected to operate during the 2022 ozone season but that EPA expects to be deactivated prior to the 2023 ozone season.  For the 2024 ozone season, EPA followed this same approach, and excluded units projected to retire by January 1, 2024.  This approach unfairly penalizes the owners of such units by treating expected unit deactivations in 2023 and 2024 differently from those that were not known to EPA prior to issuance of the FIP.  The latter units would continue to be included in establishing state budgets and would continue to receive unit-level allocations for two years following the last ozone season in which the unit operated.  In contrast, EPA's proposed 2023 and 2024 budgets do not continue to include projected or recently-deactivated units in the same fashion.  This results in disparate treatment of those units that are deactivated after the 2021 ozone season but prior to the 2023 or 2024 ozone seasons by depriving them of allowance allocations for 2 years after they cease operating, as EPA is proposing for other units that retire after the start of the revised Group 3 trading program.  This disparate treatment unfairly deprives the owners of such units of allowance allocations.[32]  Prior to issuing the final FIP, EPA should revise the state budgets for 2023

---

[28] "Idled" is used in this context to refer to a unit which has not operated but for which no formal change in status notification has been submitted to an RTO or similar organization.

[29] "Suspended" is used here to refer to units which have been placed into "suspended" status via a formal notification process, such as MISO's Attachment Y notification process.  Units may be placed into "suspended" status as a precursor step to a subsequent retirement.  Such suspended units may be required by an RTO to be returned to service under certain circumstances.

[30] "Retired" is used here to refer to units which have permanently ceased operation and can no longer be returned to service.

[31] "Deactivated" is used here to include both suspended and retired units.

[32] Baxter Wilson Unit 1, which is owned by Entergy Mississippi, LLC is an example of a unit which operated during the 2021 ozone season but is not included in EPA's calculation of the 2023 state budget for Mississippi.



and 2024 to ensure that units deactivated after the 2021 ozone season continue to be included in the state budget and allowance allocation process for at least two years following the last ozone season in which the unit operates, consistent with the proposed treatment of units that announce retirements after the final FIP has been issued. In addition, and as elaborated further below, EPA should retain units in state budgets until the units are retired.

b. EIA Form 860 Retirement Information Should not be Relied Upon to Establish State Budgets

EPA's proposal identifies anticipated unit retirements based on "…a compilation of data from DOE EIA Form 860 (where facilities report their future retirement plans) and information included in the Agency's NEEDS database.".[33]  EPA further notes that the data included in these information sources provides the EPA with "high confidence" that such indicated retirements "will in fact occur".  This approach places more confidence in these information sources than is warranted.  In particular, the instructions provided by the EIA for Form 860[34] specify that the planned retirement dates reported to EIA should be based on a generating unit operator's "best estimate" of when the indicated retirement is expected to occur.  While generation operators provide a good faith "best estimate" of this value to EIA in their Form 860 responses, this value is not equivalent to a firm commitment to a specific retirement date for the indicated unit.  A generation operator may subsequently revise this date for any number of reasons, including delays to anticipated replacement generation capacity on which an operator was relying to estimate the retirement date.  The current and ongoing investigation by the Department of Commerce into allegations of photovoltaic cell tariff circumvention has resulted in unexpected delays to the implementation of utility-scale solar projects across the US, which may result in some EGU operators delaying planned retirement dates for existing generation units in order to align with revised schedules for solar generation developments.

EPA's proposal would treat these "best estimates" of likely unit retirement dates as equivalent to firm commitments and would in fact indirectly make these "best estimate" retirement dates enforceable via the elimination of these units from state allowance budgets in the years that their operators estimated that they would retire, even though this estimated retirement value is subject to change.  Prior to issuing a final FIP, EPA should revise their approach to identification of future unit retirements to rely only upon clear and firm retirement commitments, such as retirements mandated under existing regulatory programs, permits, or consent decrees.  EPA should not eliminate any generating units from state emission budgets or subsequent unit-level allowance allocations based solely on information from EIA Form 860 responses or the EPA NEEDS database.  Regardless, as

---

[33] 87 FR 20116

[34] See https://www.eia.gov/survey/form/eia_860/instructions.pdf, Instructions for Schedule 3, Part B, #8.



addressed above, EPA should continue to include firm retirement commitments in the state
budget and allowance allocation process for two ozone periods following their retirement
dates.

As an example, EPA's proposed budgets for 2023 and 2024 appear to erroneously assume
that Unit 1 at the Sabine Generating Station in Orange, TX will retire or otherwise be
deactivated prior to the 2023 ozone season. EPA may have relied upon information
provided for this unit in prior EIA Form 860 responses. As noted above, this value
represents a "best estimate" of this date and is subject to change. This unit is currently
operating during the 2022 ozone season and no final decisions have been made to
deactivate this unit in 2023. ETI is currently evaluating the appropriate deactivation timing
for this unit, which is expected to occur sometime between 2023 and the commercial
operation date of the proposed OCAPS. As such, EPA should retain Sabine Unit 1 in the
state emission budgets for Texas for 2023 and 2024 and retain consideration of this unit in
any subsequent dynamic budgeting until two years after the unit is retired consistent with
the requirements of the final FIP.

c. Idled and Suspended Units may be Returned to Service

EPA's proposed dynamic budget approach fails to adequately recognize the potential for
units to be idled or suspended such that they do not operate during two successive ozone
seasons, without being retired. Such idled or suspended units may remain available to be
dispatched during future ozone seasons in order to maintain system reliability. Under
EPA's proposed dynamic budget approach, such units would be eliminated from the state
budget calculation two years after the unit failed to operate during the ozone season and
would not receive any allowance allocations after two successive years of non-operation
during the ozone season. In the event that such a unit was returned to service and operated
in a subsequent ozone season, the unit would be able to obtain allowances from the New-
Unit Set-Aside (NUSA) for the state, but with the NUSA for most states proposed to be
established at 2% of the overall state budget, and the size of the NUSA adjusting annually
along with the state budgets, only a limited number of allowances would be made available
to such a unit via this mechanism.

Where a unit has been idled or suspended such that it does not operate during two
successive ozone seasons, but the unit has not yet been formally retired, EPA should retain
that unit in calculating the state $NO_x$ emission budget until the unit is fully and formally
retired.[35] Where such units are retained in state budgets, EPA could consider expanding
the NUSA to include that portion of the state budget attributable to the idled or suspended
but not yet retired unit. EPA should also consider reserving the resulting expanded portion

---

[35] Unit 1 at the Waterford generating station in Killona, LA and Unit 1 at the Baxter Wilson generating station in
Vicksburg, MS are both currently in suspended status and have not yet been formally retired.



of the NUSA for that state such that it could only be allocated to new generating units or to the idled/suspended unit in the event that it was subsequently returned to service and operated during the ozone season. Once such a unit was formally retired, it could then be eliminated from consideration in establishing future state budgets. This revision to the final proposal would strike a reasonable balance between EPA's intent to reduce state budgets for retired units while creating a mechanism to allocate a reasonable number of allowances to such a unit in the event that it is re-activated to meet reliability needs.

VII.    <u>EPA Should add a "Safety-Valve" Provision to Account for Potential Delays in Pollution Control Retrofits</u>

EPA's analysis of the proposed timing for installation of SCR retrofits fails to recognize significant existing supply chain issues which initially arose during the COVID-19 pandemic, and which continue to persist. These conditions are anticipated to persist through at least the remainder of 2022 and likely beyond, given other world events. In addition to these existing and economy-wide supply chain challenges, EPA's proposal could compel hundreds of individual sources, from both the EGU and non-EGU sectors, to simultaneously seek services and materials necessary to execute SCR retrofits with the goal of placing such SCRs into service prior to the 2026 ozone season. This potentially significant demand for these resources is likely to create further bottlenecks and delays for some source owners who wish to complete SCR retrofits in response to the final FIP.

EPA should consider adding a "safety valve" provision to the proposed FIP to expand a state's 2026 $NO_x$ emission budget, with respect to a unit for which an SCR retrofit was presumed and the owner/operator made a good-faith effort to complete an SCR retrofit prior to the start of the 2026 ozone season but was unable to complete such a retrofit due to supply chain or other issues outside of the control of the owner/operator. Without such a provision, the owner/operator of such a source could face a situation where operation of a unit is necessary in order to meet system demand, but the unit is not yet equipped with a functional SCR due to installation delays and would likely face a significant allowance shortfall as a result. As noted elsewhere within these comments, due to EPA's proposed approach to aggressively reduce state emission budgets in 2026, the daily backstop emission rate for large coal-fired EGUs that would result in a 3:1 allowance surrender if the rate is exceeded, along with the proposed allowance bank recalibration which is coupled to the size of the state budgets, surplus allowances would likely be difficult, if not impossible, to obtain.



VIII. **EPA Should Consider the Cost Implications of this Proposal on Low-Income Energy Consumers**

The Entergy Operating Companies' service territories includes some of the highest-poverty regions of the United States, including three[36] of the five states with the greatest percentage of population below the federal poverty line.   Approximately 25% of Entergy customers live below the poverty line, and additional generation costs associated with this FIP, especially those for units already expected to be deactivated within a handful of years after 2026, risk disproportionate economic impacts for these low-income customers.

In developing the Proposed FIP, EPA analyzed the impacts of the rulemaking on communities with environmental justice concerns and engaged with stakeholders representing these communities to seek input and feedback.[37]   Prior to taking final action on the proposed FIP, EPA should ensure that economic equity concerns also are addressed in its development of the final FIP.  The implementation of additional costly controls as a result of the proposed FIP's stringent budgets could lead either to unreasonable investment in $NO_x$ pollution control retrofits that may remain in service for only a handful of years, and/or early unit retirements, either of which can lead to increased rates for consumers.

**CONCLUSION:**

Entergy appreciates the opportunity to review EPA's proposed FIP and to provide these comments for EPA's consideration in preparation of a final rule.  As outlined above, EPA's proposal relies upon flawed cost-effectiveness calculations for proposed SCR retrofits, contains insufficient flexibility to allow for effective and efficient allowance trading, and fails to provide adequate flexibility to allow for operation of higher-emitting generating units when necessary to ensure reliable operation of the bulk electric system.  Entergy welcomes the opportunity to work with EPA to address these and other concerns outlined here in our comments.  Should you have questions regarding any of the comments provided here or wish to discuss any of these comments in more detail, please feel free to contact me at (281) 297-2308 or David Triplett, Manager Environmental Policy & Sustainability at (281) 297-1928.

Sincerely,

Charles Kominas
Entergy – Power Generation Environmental Director

---

[36] Mississippi, Louisiana, and Arkansas, source:  US Census Bureau Small Area Income and Poverty Estimates (2020).

[37] 87 Fed. Reg. at 20,153



**Attachment A:  EPA Total Project Cost Estimates for Entergy-Owned Units**



| Facility Name | Unit ID | Unit Capacity (MW) | Total Project Cost[38] ($) |
|---|---|---|---|
| Coal Units | | | |
| Big Cajun 2 | 2B3 | 580 | $  214,020,000 |
| Independence | 1 | 809 | $  285,806,000 |
| Independence | 2 | 842 | $  292,852,000 |
| R S Nelson | 6 | 550 | $  229,755,000 |
| White Bluff | 1 | 818 | $  289,033,000 |
| White Bluff | 2 | 819 | $  283,855,000 |
| Oil/Gas Units | | | |
| Gerald Andrus | 1 | 736 | $  111,290,000 |
| Lake Catherine | 4 | 522 | $   83,821,000 |
| Ninemile Point | 4 | 748 | $   93,892,000 |
| Ninemile Point | 5 | 737 | $  100,019,000 |
| Little Gypsy | 2 | 416 | $   63,952,000 |
| Little Gypsy | 3 | 524 | $   80,457,000 |
| Sabine | 3 | 411 | $   61,302,000 |
| Sabine | 4 | 533 | $   77,610,000 |
| Sabine | 5 | 448 | $   66,537,000 |
| | | **Total** | **$ 2,334,201,000** |

---

[38] All costs are as estimated by EPA and in 2021 dollars. See the file (Docket ID:  EPA-HQ-OAR-2021-0668-0113) NOx_Control_Retrofit_Cost_Tool_Fleetwide_Assessment_Proposed_CSAPR_2015_NAAQS.xlsx for additional details of these cost estimates.



**Attachment B:  Entergy Generation Development Timeline Information**



| Completed Projects | | | | |
|---|---|---|---|---|
| Operating Company | Project Name | Project Generation Type | Project Location | Approximate Project Execution Time[39] (years) |
| ELL | J. Wayne Leonard Power Station | CCGT | Montz, LA | 5 |
| ELL | Lake Charles Power Station | CCGT | Westlake, LA | 5 |
| ETI | Montgomery County Power Station | CCGT | Willis, TX | 6 |
| EML | Sunflower Solar Station | Utility-Scale Solar | Sunflower County, MS | 5 |

| Current Projects | | | | |
|---|---|---|---|---|
| Operating Company | Project Name | Project Generation Type | Project Location | Anticipated Project Execution Time[40] (years) |
| ETI | OCAPS | Hydrogen-Capable CCGT | Orange, TX | 7 |
| EAL | Current/Future Solar RFPs | Utility-Scale Solar | Various, AR | 5 |
| ELL | Current/Future Solar RFPs | Utility-Scale Solar | Various, LA | 5-5.5 |
| EML | Current/Future Solar RFPs | Utility-Scale Solar | Various, MS | 5 |
| ETI | Current/Future Solar RFPs | Utility-Scale Solar | Various, TX | 5 |

---

[39] Indicated time includes initial planning through commercial operation of the generating unit.

[40] Indicated time includes initial planning through anticipated commercial operation date of the generation unit.



**Attachment C:  Comments on Proposed Arkansas SIP Disapproval**





**Arkansas Environmental Support**
425 West Capitol Avenue
A-TCBY-22D
Little Rock, AR 72203
Cell: 501-215-0024
Email: schiver@entergy.com
Stan Chivers, Air Lead
Arkansas Environmental Support

AR-22-006

April 19, 2022

Administrator Michael Regan
C/O EPA Docket Center (EPA/DC)
Docket ID No. EPA-RO6-OAR-2021-0801
U.S. Environmental Protection Agency
*Fuerst.sherry@epa.gov*

RE:     Request for an Extension of the Comment Period for EPA's *Air Plan Disapproval; Arkansas, Louisiana, Oklahoma, and Texas; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards*, 87 Fed. Reg. 9798 (February 22, 2022)

**ATTN:   Docket ID No. EPA-RO6-OAR-2021-0801**

Dear Administrator Regan,

Entergy Services, LLC (ESL) requests a 60-day extension of the comment deadline for EPA's *Air Plan Disapproval; Arkansas, Louisiana, Oklahoma, and Texas; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards* (Proposal) on behalf of Entergy Arkansas, LLC (EAL).  Additional time is necessary to thoroughly review the voluminous record supporting the Proposal, including the state-specific 4-Step Interstate Transport results, the EPA's Ozone Transport Modeling under the 2016v2 platform, and the EPA's after-the-fact change from the EPA 2018 memorandum (2011 base year) to the 2016v2 modeling (2016 base year).  ESL requests additional time because:

(1) The modeling necessary to evaluate the information presented in support of the Proposal is incredibly detailed and time consuming and additional time is necessary for evaluating this modeling with respect to facilities' individual circumstances compared to the modeling on which Arkansas relied.

(2) EPA's deviation from the standard practice of allowing States to propose alternatives to State Implementation Plans (SIP) where EPA has proposed to disapprove a SIP submittal and to do so under a two-year time cycle prevents meaningful public input on the Proposal.  This deviation is particularly troubling given that EPA is basing its proposed disapproval of Arkansas's SIP on a modeling platform that was unavailable to Arkansas at the time it submitted its SIP to EPA.  EPA is required to approve SIPs under

the Clean Air Act if they meet the requirements of the Act, even if EPA would have made different choices. In releasing a new modeling platform only a few months before EPA's long-delayed proposed action on the SIP and deciding that modeling platform is the standard by which all interstate transport SIPs for the 2015 ozone NAAQS must be judged, EPA failed to provide the states, including Arkansas, with sufficient notice of what is required under the Act for an approvable SIP and is now failing to give the states adequate time to review and submit a SIP revision before EPA intends to promulgate a Federal Implementation Plan (FIP) that will require facilities in Arkansas to begin making NOx emission reductions.

(3) EPA's release of a proposed FIP, with a myriad of data that must be reviewed and evaluated during much of the same timeframe.

Any of these reasons should be sufficient justification to extend the comment deadline. Taken together, these reasons should compel the EPA to grant the ESL's request for a 60-day extension.

EAL operates 3 facilities in Arkansas which would be significantly affected by the proposed FIP. The duty to develop a SIP under Section 110(a) is imposed on the State of Arkansas (the "State"). ESL and the State, under the current timeline of the Proposal, do not have sufficient time to meaningfully review and provide comment on the Proposal. The importance of this public comment process — the purposes of which include ensuring informed agency decision-making, encouraging public participation in the administrative process, and ensuring that agencies keep an open mind towards their rules — "cannot be overstated." *N.C. Growers' Ass'n v. United Farm Workers*, 702 2 F.3d 755, 763 (4th Cir. 2012). To achieve these purposes, "the opportunity to comment 'must be a meaningful opportunity.'" *Id.* (quoting *Prometheus Radio Project v. FCC*, 652 F.3d 431, 450 (3d Cir. 2011)).

ESL, the State and other experts therefore need additional time to provide their best guidance. Thank you for your consideration of ESL's request for an extension of the comment period by 60 days.

Sincerely,

Stan Chivers
Air Lead, Arkansas Environmental Support
Entergy Services, LLC



**Attachment D:  Comments on Proposed Louisiana, Mississippi, and Texas SIP Disapprovals**



**Entergy Services, LLC**
639 Loyola Avenue
P. O. Box 61000
Mail Unit L-ENT-4E
New Orleans, LA 70161-1000
Tel  504 576 4928

LES-22-044

April 25, 2022

Administrator Michael Regan
C/O EPA Docket Center (EPA/DC)
Docket ID No. EPA-RO6-OAR-2021-0801-0001
Docket ID No. EPA-RO4-OAR-2021-0841-0010
U.S. Environmental Protection Agency
*Fuerst.sherry@epa.gov*

RE:     Request for an Extension of the Comment Periods for EPA's *Air Plan Disapproval; Arkansas, Louisiana, Oklahoma, and Texas; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards*, 87 Fed. Reg. 9798 (February 22, 2022), and *Air Plan Disapproval; AL, MS, and TN: Interstate Transport Requirements for the 2015 8-Hour Ozone National Ambient Air Quality Standards, 87 Fed. Reg. 9545 (February 22, 2022)*

**ATTN:**     **Docket ID No. EPA-RO6-OAR-2021-0801-0001 (USEPA Region 6)**

              **Docket ID No. EPA-RO4-OAR-2021-0841-0010 (USEPA Region 4)**

Dear Administrator Regan,

Entergy Services, LLC (ESL), on behalf of Entergy Louisiana, LLC (ELL), Entergy Mississippi, LLC (EML) and Entergy Texas, LLC (ETI) requests a 60-day extension of the comment deadline for EPA's *Air Plan Disapproval; Arkansas, Louisiana, Oklahoma, and Texas; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards*, and *Air Plan Disapproval; AL, MS, and TN: Interstate Transport Requirements for the 2015 8-Hour Ozone National Ambient Air Quality Standards* (collectively Proposals) on behalf of ELL, EMI and ETI. Additional time is necessary to thoroughly review the voluminous record supporting the Proposals, including the state-specific 4-Step Interstate Transport results, the EPA's Ozone Transport Modeling under the 2016v2 platform, and the EPA's after-the-fact change from the EPA 2018 memorandum (2011 base year) to the 2016v2 modeling (2016 base year). ESL requests additional time because:

(1) The modeling necessary to evaluate the information presented in support of the Proposals is incredibly detailed and time consuming and additional time is necessary for evaluating this modeling with respect to facilities' individual circumstances compared to the modeling on which Louisiana, Mississippi and Texas relied.

(2) EPA's deviation from the standard practice of allowing States to propose alternatives to State Implementation Plans (SIP) where EPA has proposed to disapprove a SIP submittal and to do so under a two-year time cycle prevents meaningful public input on the Proposals. This deviation is particularly



troubling given that EPA is basing its proposed disapproval of Louisiana, Mississippi and Texas SIPs on a modeling platform that was unavailable to these states at the time they submitted their SIPs to EPA. EPA is required to approve SIPs under the Clean Air Act if they meet the requirements of the Act, even if EPA would have made different choices. In releasing a new modeling platform only a few months before EPA's long-delayed proposed action on the SIPs and deciding that modeling platform is the standard by which all interstate transport SIPs for the 2015 ozone NAAQS must be judged, EPA failed to provide the states, including Louisiana, Mississippi and Texas, with sufficient notice of what is required under the Act for an approvable SIP and is now failing to give these states adequate time to review and submit a SIP revision before EPA intends to promulgate a Federal Implementation Plan (FIP) that will require facilities in Louisiana, Mississippi and Texas to begin making NOx emission reductions.

(3) EPA's release of a proposed FIP, with a myriad of data that must be reviewed and evaluated during much of the same timeframe.

Any of these reasons should be sufficient justification to extend the comment deadline. Taken together, these reasons should compel the EPA to grant ESL's request for a 60-day extension.

ELL, EML and ETI operate 21 facilities in Louisiana, Mississippi and Texas which would be significantly affected by the proposed FIP.  The duty to develop a SIP under Section 110(a) is imposed on the States of Louisiana, Mississippi and Texas (the "States").  ESL and the States, under the current timeline of the Proposals, do not have sufficient time to meaningfully review and provide comment on the Proposals. The importance of this public comment process— the purposes of which include ensuring informed agency decision-making, encouraging public participation in the administrative process, and ensuring that agencies keep an open mind towards their rules—"cannot be overstated." *N.C. Growers' Ass'n v. United Farm Workers*, 702 2 F.3d 755, 763 (4th Cir. 2012). To achieve these purposes, "the opportunity to comment 'must be a meaningful opportunity.'" *Id.* (quoting *Prometheus Radio Project v. FCC*, 652 F.3d 431, 450 (3d Cir. 2011)).

ESL, the States and other experts therefore need additional time to provide their best guidance. Thank you for your consideration of ESL's request for an extension of the comment period for the Proposals by 60 days.

Sincerely,

Charles Kominas
Entergy – Power Generation Environmental Director

Tab HQ-788: Comments submitted on behalf of
Midcontinent Independent System Operator ("MISO")
(June 21, 2022) (EPA-HQ-OAR-2021-0668-0788)



One American Square | Suite 2900 | Indianapolis, IN 46282-0200

Chicago  Columbus  DuPage County, Ill.
Indianapolis  New York  Philadelphia  Washington, D.C.

June 21, 2022

WRITER'S DIRECT NUMBER: (317) 236-5893
DIRECT FAX: (317) 592-4225
INTERNET: Freedom.Smith@icemiller.com

**Filed to:**  Docket No. EPA-HQ-OAR-2021-0668
**Email to:**  Regan.Michael@epa.gov; selbst.elizabeth@epa.gov

Michael S. Regan, Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

**RE:    Proposed  Federal  Implementation  Plan  Addressing  Regional  Ozone
Transport for the 2015 Ozone National Ambient Air Quality Standard**

Dear Administrator Regan:

Please find attached comments filed on behalf of the Midcontinent Independent System
Operator ("MISO")  on the proposal by the U.S. Environmental Protection Agency ("EPA") to
promulgate a Federal Implementation Plan ("FIP") Addressing Regional Ozone Transport for the
2015 Ozone National Ambient Air Quality Standard ("NAAQS"). 87 Fed. Reg. 20,036 (April 6,
2022). The comment period on this proposal has been extended to June 21, 2022. 87 Fed. Reg.
29,108 (May 12, 2022).    MISO is a not-for-profit, member-based regional transmission
organization ("RTO") accepted and supervised by the Federal Energy Regulatory Commission
("FERC") that serves more than 42 million customers.

Respectfully submitted,

*Freedom Smith*

Freedom Smith
ICE MILLER LLP
One American Square, Suite 2900
Indianapolis, IN  46282-0200

Legal Counsel

Midcontinent Independent System Operator

FSNS/hmsm
Enclosures

**MIDCONTINENT INDEPENDENT SYSTEM OPERATOR (MISO)**

**JUNE 21, 2022, COMMENTS ON PROPOSED FEDERAL**

**IMPLEMENTATION PLAN ADDRESSING REGIONAL OZONE**

**TRANSPORT FOR THE 2015 8-HOUR OZONE NAAQS.**

**Docket ID No. EPA-HQ-OAR-2021-0668**

**87 Federal Register 20,036 (April 6, 2022)**

The Midcontinent Independent System Operator ("MISO") offers these comments on the proposal by the United States Environmental Protection Agency ("EPA") to promulgate a Federal Implementation Plan ("FIP") Addressing Regional Ozone Transport for the 2015 Ozone National Ambient Air Quality Standard ("NAAQS"). 87 Fed. Reg. 20,036 (April 6, 2022). The comment period on this proposal has been extended to June 21, 2022. 87 Fed. Reg. 29,108 (May 12, 2022).

By way of background, MISO is a not-for-profit, member-based regional transmission organization ("RTO") accepted and supervised by the Federal Energy Regulatory Commission ("FERC") that serves more than 42 million customers. MISO's footprint ranges from Texas in the south, Montana in the west, and Ohio-Indiana line in the east.



MISO delivers power from the high-voltage transmission grid to local distribution utilities, which then are responsible for delivery to end-use customers. MISO is separate and independent

from the companies that own electric generation and transmission facilities, but is authorized to exercise "functional control" over the high voltage transmission system.   MISO is authorized by the Federal Energy Regulatory Commission ("FERC") to provide transmission service and otherwise administer the bulk electric system in its region.   One of MISO's critical functions is to facilitate and maintain the reliable delivery of electricity to those they serve.   MISO acknowledges and appreciates the role of EPA and other state and federal agencies play in addressing air quality matters. Pursuant to the Clean Air Act and its authority EPA can address interstate transport of air pollution that affects downwind states' ability to attain and maintain NAAQS. In this complex environment MISO provides these comments based in its role to provide critical function to maintain reliable service.   To MISO this proposed FIP creates significant concerns about MISO's ability to maintain electric reliability.   To this end, MISO further incorporates the joint comments of Electric Reliability Council of Texas, Inc. ("ERCOT"), Midcontinent Independent System Operator, Inc. ("MISO"), PJM Interconnection, L.L.C. ("PJM"), and Southwest Power Pool, Inc. ("SPP") as part of its own comments.   As will be pointed out in these comments, EPA's proposed FIP/transport rule, if promulgated as drafted, would yield significant, potential adverse impacts associated with grid reliability. Additionally, the EPA has not provided adequate time for thoughtful assessment of this complex, lengthy, multi-source proposal.

1. **The comment period is too short to allow review and analysis of the proposed rule.**

EPA published the proposed rule on April 6, 2022, and requested comments no later than June 6, 2022.  The comment period was subsequently extended by a modest additional  2 weeks to June 21, 2022 (87 Fed. Reg. 29108, May 12, 2022). Although the granted extension is welcome, the extension does not allow sufficient time to develop a technically robust and thorough set of comments on the proposed FIP.   EPA has sought comment on 53 specific issues raised in the proposed rule, including  an omnibus issue styled "Request for Comment on All Aspects of the Proposal." This is a complex,181-page proposed rule with supplemental docket reports, appendices, etc. A 75 day comment period granted in piecemeal fashion is not sufficient time to analyze and develop meaningful comments.

The proposed rule is broader in scope than the transport rules that have preceded it.   The proposed rule would resolve the interstate transport obligations of 26 states under CAA section 110(a)(2)(D)(i)(I), referred to as the "good neighbor provision" or the "interstate transport provision" of the Act, for the 2015 ozone NAAQS and would address nitrogen oxides emissions budgets impacting power plants in 25 states. *87 Fed. Reg. at 20036-38*.   Not only does the proposed rule cover a much larger geographic area than prior rules, but it also proposes to impose new control requirements on both Electric Generating Units ("EGUs")  and a broad category of industrial sources. The expanded scope of this rule adds yet another significant layer of complexity to the analysis of the proposed rule, making development of comprehensive comments resource intensive and time consuming.

In addition, on February 22, 2022, EPA published eight separate proposed rules that propose to disapprove Good Neighbor State Implementation Plans ("SIPs") impacting 19 states. The 19 state Good Neighbor SIPs are linked with the proposed transport rule because both target the same ambient air quality standard.  MISO's technical staff has the ability to assist the EPA and affected stakeholders in reviewing the projected impact of the proposed rule; however, the

limitation of time to do so has introduced risk to a detailed consideration of the impacts of the proposed rule on key elements such as grid reliability and the costs thereof.  These risks contribute to MISO's concern that the rule, as drafted, could have significant, potential impacts to grid reliability.

All the issues articulated above illustrate that the extended comment deadline is insufficient to develop an in-depth set of comments on the proposed transport FIP.   Notwithstanding these limitations, MISO's review of the proposed FIP has identified a number of immediate areas of concern that require further consideration before implementation in order to ensure continued reliable grid operations, particularly during this time of transition.

## 2.   The Proposed FIP threatens the reliability of the electric power grid.

The EPA projected future 2023, 2026, and 2032 baseline EGU emissions using the version 6—Summer 2021 Reference Case of the Integrated Planning Model ("IPM") provides forecasts of least cost capacity expansion, electricity dispatch, and emissions control strategies while meeting energy demand and environmental, transmission, dispatch, and reliability constraints.   *87 Fed. Reg. at 20063.*   EPA evaluated emissions reduction potential from generation shifting, *i.e.* units with lower NOX rates to increase generation, while units with higher NOX rates reduce generation. *87 Fed. Reg. at 20081.* Combining air quality factors, costs, and emissions reductions, the EPA identified a controls for EGUs that results in substantial air quality improvement from emissions controls that are available in the timeframe for which air quality problems at downwind receptors persist. *87 Fed. Reg. at 20091.*   The EPA requested comments on its identified EGU control stringencies, including its consideration of the cost, air quality impacts, and timing of such mitigation strategies**.** *87 Fed. Reg. at 20096.*

Modifications to the Proposed Rule are needed to address the potential for distinct reliability challenges resulting from the rule's implementation.

### a.   EPA has not appropriately considered resource adequacy issues and the most current information.

The proposed FIP does not address the challenge, and impacts, of maintaining resource adequacy for the power grid.  Resource adequacy, in general terms, is achieved when the accredited megawatt capacity of the generators in a particular region meets or exceeds the forecasted load, plus reserves, for that region.  Different types of resources are accredited, or count, for different amounts capacity depending on how reliable they are to be able to generate at the time they are needed.  The traditional dispatchable generators targeted by this Proposed Rule tend to have much higher accredited capacity than the replacement capacity that has been brough online in recent years.  MISO is experiencing a trending decline in reserve margin, which is largely the result of the retirement of significant amounts of dispatchable generation. As a result, MISO believes that the Proposed Rule could substantially accelerate that trend at a time when MISO is facing the need for increased reserves resulting from extreme weather, high load conditions, and generator retirements.  Replacement of retiring generation with new, mostly non-dispatchable facilities that

are not installed at the same time or valued at the same output presents its own risks.  It will take time to obtain the required regulatory approvals to construct new generation and especially any needed transmission facilities to connect that generation to the grid.  Of course, resource adequacy must be maintained, and NERC reliability standards met during this interim period.  Any final rule, both as to its design and its implementation timing, including dynamic budgeting, needs to take these factors into account.

MISO's analysis of EPA information shows that the proposed rule not only may accelerate planned retirements, but drive additional, unexpected retirements  MISO is concerned that the Proposed Rule could cause generator retirements due to the limitations on operations and/or the cost of installing Selective Catalytic Reduction ("SCR") and other technology improvements that may otherwise be required.  Furthermore, to the extent units do not retire, their ability to operate could be limited by the Proposed Rule, which depending on the region and level of flexibility within the rule, could present a distinct reliability challenge.  The Proposed Rule does not have a glide path or transition plan, and one is necessary.  The compressed timing to start the program and limit emissions in 2026 is anticipated to be a challenge in terms of facilitating replacement capacity with the necessary attributes.

MISO faces increasing challenges to system reliability and the ability to commit sufficient resources to supply electricity to customers within the Midcontinent region.  Our studies indicate that our region needs a certain level of dispatchable and flexible resources to reliably manage the transition to a decarbonized energy future.  MISO is both fuel- and technology-neutral, however MISO needs to preserve the best options to provide these needed resource capabilities and attributes to bridge the gap between retirements and replacement capabilities and attributes. MISO's challenges include declining reserve margins and fewer always-on "baseload" resources, due to retirements of thermal units.  At the same time, the installation of new capacity from other resources is not occurring at the same rate as the baseload retirements and are not always available to provide energy during times of need.   For instance, MISO expressed concern to EPA regarding issues related to the Dalman, Erickson, Meramec, Ottumwa, and Sioux power plants about the result of withdrawal of service by the five generators stating that:

> Such interruptions of service would result in localized impacts but must also be viewed by MISO for their collective effects. This is especially true since the proposed decisions could result in withdrawn generation for plants in close time proximity to one another rather than the more normal situation where generator outages result from individual decisions by their owners.
>
> …
>
> MISO respectfully requests that the EPA consider these Comments regarding the effects of generator closures on the electric transmission system in the MISO footprint. The loss of any significant portion of the 3.1 GW from the five generators considered in the above-captioned cases would push resource adequacy coverage of regional demands into dangerous territory.[1]

---

[1]Comments of Midcontinent Independent System Operator (MISO) related to EPA-HQ-OLEM-2021-0588, EPA-HQ-OLEM-2021-0589, EPA-HQ-OLEM-2021-0592, EPA-HQ-OLEM-2021-0593, and EPA-HQ-

MISO further commented that "[b]ased on the most currently available information . . . there is very little excess generating capacity (or none at all) to cover demand for electricity, plus the required reserve margin, in the immediate future."[2]  Additional closures would worsen an already difficult situation.[3] These events, which continue to place MISO in near-emergency or emergency conditions, are the result of the changing resource profile, including a significant number of thermal plant retirements and related increases in planned and unplanned outages.[4]  The Proposed Rule only exacerbates these challenges and presents risk.

These transformations in the generating fleet have resulted in numerous new issues and associated risks.  The risk of not having enough generation to meet demand shifts from the historic times of peak power demand to other periods, specifically hot summer evenings and cold winter mornings, when low availability of certain resources is coincident with high power demand.  And depending on the circumstances, the current transmission infrastructure becomes unable to deliver energy to customers.

To facilitate the residual trading of capacity among its members, and to ensure the availability of sufficient generating capacity to meet the region's needs, every year MISO holds a Planning Resource Auction (PRA).  The results of the 2022-2023 PRA were announced on April 14, 2022, and updated on May 3, 2022.[5]  The auction results reflected the industry's ongoing shift away from coal-fired generation and increasing reliance on other resources. The results showed capacity shortfalls in MISO North and Central regions to meet the projected load plus required reserves.  Clair Moeller, MISO's president and chief operating officer, said that "[t]he reality for the zones that do not have sufficient generation to cover their load plus their required reserves is that they will have increased risk of temporary, controlled outages to maintain system reliability."[6]  Moeller said further that customers in those zones "may also face higher costs to procure power when it is scarce."[7]  The capacity shortfalls were reflected in the market pricing for the capacity, which is measured in megawatt-days.  Clearing prices in zone 5 surged to $236.66 per megawatt-day compared to approximately $5 a year ago.

MISO's 2022/2023 PRA resulted in a capacity shortfall for the MISO North/Central Regions despite the fact that MISO was able to import over 3,000 MW from neighboring regions. While MISO will likely continue to rely on imports from its neighbors to help address system

OLEM-2021-0594, *available at* https://www.regulations.gov/comment/EPA-HQ-OLEM-2021-0588-0010.

[2] *Id.* at p. 6, *available at* https://www.regulations.gov/comment/EPA-HQ-OLEM-2021-0588-0010

[3] *Id.* at p. 6, *available at* https://www.regulations.gov/comment/EPA-HQ-OLEM-2021-0588-0010

[4] *Id.*

[5] MISO 2022/2023 Planning Resource Auction (PRA) Results, April 14, 2022, *available at* https://cdn.misoenergy.org/2022%20PRA%20Results624053.pdf.  *See also* MISO 2022/2023 Planning Resource Auction (PRA) Results, Revised May 3, 2022, *available at* https://cdn.misoenergy.org/20220420%20RASC%20Item%2004b%20PRA%20Results%20Supplemental624128.pdf

[6] MISO Written Statement, *Some parts of region fall short of their Resource Adequacy requirements*, April 14, 2022, https://www.misoenergy.org/about/media-center/misos-annual-planning-resource-auction-results-underscore-the-reliability-imperative/

[7] *Id.*

reliability concerns in the near term, this is not a sustainable situation for either MISO or its neighbors. As a result, MISO's North/Central Regions will experience a slightly increased risk of needing to implement temporary controlled load sheds.[8] Emergency resources and non-firm energy imports will be needed to maintain system reliability[9]; in other words MISO will need to import power from outside its region. This is further reinforced by NERC, that considers MISO a **high risk** for running short of operating reserves under normal conditions.[10]

MISO is also anticipating a warmer-than-normal-summer and probable capacity shortfalls in June, July and August. In particular, J.T. Smith, MISO's Executive Director – Market Operations noted that the "north and central regions of MISO" are "at increased risk of temporary, controlled outages to preserve the integrity of the bulk electric system[.]"[11] In its Seasonal Readiness Workshop on April 28, 2022, MISO projected the need for increased, non-firm imports and potentially emergency resources to meet the 2022 summer peak demand, because of warmer-than-normal temperatures forecasted throughout the MISO footprint.[12] MISO expects summer demand to increase to 1.7% over last summer, while generation capacity has declined 2.3%. MISO attributes the decline in generation due to fossil-fuel power plant retirements as the generation fleet continues to shift to renewable sources.[13]

The proposed FIP may alter how MISO's members and generation owners offer their resources into our markets (including run time limitations), which may further limit MISO's options when committing and dispatching resources. It is not apparent how EPA's generation shifting assumptions will play out in light of such measures.

While resource adequacy is generally the responsibility of the state regulatory authorities within the Midcontinent region, MISO is in a unique position as the grid operator to inform state and environmental regulators on the regional impact of actions on grid reliability and customer impacts. Given the changes to the generating fleet, and the potential shortfalls in generating capacity, it is imperative that reliable generating resources, like the facilities subject to the Proposed Rule, be recognized for the regional reliability value provided to the region's customers. Given the existing regional supply situation, resources need to remain online and available to provide capacity and transmission grid stability to meet the system's needs until sufficient replacement capability is brought online.

Other RTOs and similar organizations have also issued warnings of high prices and possible blackouts. MISO shares the concerns expressed by other RTO/ISOs like ERCOT, PJM, SPP as well as the concerns raised by others as to these issues. It is essential that in assessing the

---

[8] MISO 2022/2023 Planning Resource Auction (PRA) Results, April 14, 2022.

[9] MISO Summer Readiness Workshop, April 28, 2022.

[10] North American Electric Reliability Corporation (NERC), *2022 Summer Reliability assessment*, May 2022, *available at*
https://www.nerc.com/pa/RAPA/ra/Reliability%20Assessments%20DL/NERC_SRA_2022.pdf.

[11] MISO Summer Readiness Workshop Summer 2022, April 28, 2022, *available at*
https://cdn.misoenergy.org/20220428%20Summer%20Readiness%20Workshop%20Recording624371.mp4

[12] MISO Summer Readiness Workshop Summer 2022, April 28, 2022.

[13] MISO Summer Readiness Workshop, April 28, 2022.

final version of this proposal that EPA assure that its rule does not interfere with the reliability of the electric power grid.

**b.  EPA has not appropriately considered energy adequacy issues.**

MISO has conducted preliminary analysis of the impact of the proposed FIP on the energy adequacy of the system in 2026.  For this analysis, MISO utilized the EPA's forecast of impacted units and conducted hourly energy dispatch using the PROMOD tool.  Actual sub-hourly impacts may be more severe. Hours of energy insufficiency reflect an hour where a sub-region is not able to meet load, given all available generation in that area and importing as much as possible accounting for transmission constraints. This analysis is on-going and may be refined through further discussions with MISO members, states, and EPA.

According to the EPA information[14], coal and gas retirements in the MISO region will be 12,438 MW by 2026, and coal and gas retrofits will be 11,514 MW by 2026.  Based on this information, MISO conducted 3 economic analyses for 2026 – a base case with no retirements or retrofits; a 'retirement + retrofits' case as EPA has suggested; and a 'retire all affected units' case in which the units that EPA has forecasted to retrofit instead retire.  This case is consistent with conversations MISO has had with multiple member utilities based on the economic decision to not make a costly retrofit to a unit that is scheduled to retire before the assumed 20-year payback period.

Results show an increase in the number of hours of energy inadequacy of between 16 times and 80 times the base case due to the Proposed Rule.

| 2026 | | | |
|---|---|---|---|
| | MW of impacted generation | Hours of insufficient generation | Change from Base Case |
| Base Case | | 6 | |
| Retirement + Retrofits | 12,438 | 99 | 16.5 time greater |
| Retire All Affected Units | 12,438+11,514= 23,952 | 477 | 79.5 times greater |

**c.  EPA's reliance on generation shifting and dynamic budgeting and as a control mechanism is arbitrary and capricious and presents grid reliability issues.**

To implement the required emissions reductions from EGUs, the EPA has proposed generation shifting (*i.e.,* emission reductions anticipated to occur from generation shifting from higher to lower emitting units), dynamic budgeting, and changes to the existing CSAPR NOX Ozone Season Group 3 Trading Program as control mechanisms.  With regard to generation shifting, EPA asserts that managing generation shifting is both technically and legally

---

[14] *See* Analysis of the Proposed Federal Implementation Plan Addressing Regional Ozone Transport for the 2015 Ozone National Ambient Air Quality Standard | US EPA

authorized under the Clean Air Act as it is a simply a tool for implementing emissions reductions. *87 Fed. Reg. at 20,081*. EPA asserts that "if EPA did not account for generation shifting then it could result in substitution for emission reductions intended through control operations and installation, potentially lessening the implementation of those mitigation strategies." *Id.* EPA offers assurances its generation shifting is constrained, but that the "sector's unusual flexibility with respect to how emissions reductions can be achieved makes" their task difficult particularly relative to trading and generation shifting. *87 Fed. Reg. at 20,105.* Given the significance of generation shifting in affecting state budgets in some states, it is critical that EPA clearly explain how these items are executed.

In addition, EPA proposes to revise the existing CSAPR NOX Ozone Season 3 trading programs established in the Revised CSAPR Update to include a dynamic budgeting procedure. *87 Fed. Reg. at 20,105.* The proposed changes would adjust the overall quantities of allowances available for compliance in the trading program in each control period. *Id.* Starting with the 2024 control period, the EPA proposes to annually recalibrate the quantity of accumulated banked allowances under the program to prevent the quantity of allowances carried over from each control period to the next from exceeding the target bank level, which would be revised to represent 10.5 percent of the sum of the state emissions budgets. *Id.* Furthermore, calculations of emissions budgets for control periods in 2025 and later years based on more current information about the composition and utilization of the EGU fleet, specifically data available from the 2023 ozone season and following (*e.g.,* for 2025, data from 2023; for 2026, data from 2024; etc.). *Id.* EPA states that a dynamic budget approach where emissions budgets starting in the 2025 control period and beyond will be determined through ministerial actions subsequent to the proposed FIP's promulgation and based on a formula set out in the proposed FIP. *87 Fed. Reg. at 20,105 -107.* EPA further states that "[e]mission reductions derived from generation shifting will be captured in the dynamic budgets in all cases. For the pre-set budget years it is estimated and incorporated through an additional calculation step. For dynamic budget years, it is directly incorporated through the inclusion of updated heat input data reflecting observed, compliance period generation shifting." *87 Fed. Reg. at 20108, FN 231.*

EPA's proposed dynamic budgeting does not align with grid reliability practices and will undermine grid reliability as it does not appear to allow MISO or other RTO/ISOs to plan for reliability or to respond to emergency needs as they arise. Moreover, given the significance of generation shifting in affecting budgets in some states, it is critical that EPA clearly explain how this step will be executed. MISO requests a technical analysis of this aspect of the proposed FIP. The Technical Comments note in the state budget setting process, generation shifting is the third and final step in determining state budgets. Generation shifting is quantified by three IPM runs – Base Case, Run 1 and Run 2. It should be noted EPA's description of generation shifting is inadequate and lacks transparency on the steps and data used. EPA has not provided adequate information or time to properly analyze this proposal and its potential impacts.

EPA has also assigned certain idling and generation shifting assumptions to state budgets which are flawed. Underlying these flaws is an agency that has little experience or statutory jurisdiction to manage the dispatch of power through an emissions reduction program. EPA's assumptions concerning idling was raised in the *Wisconsin v. EPA* litigation. In that case,

petitioners asserted that the agency use of the IPM model assumed an unrealistic number of imminent unit retirements and circumstances of idling. The court found in the appellate review of the CSAPR rule, EPA had not improperly allowed idling to impact state budget development. Accordingly, the IPM model may not be used to accurately project the flow of short-run supply. Management of generation dispatch, whether shifting or idling, are electric power dispatch issues best left to the jurisdictions of FERC and the states.

### d. The addition of reliability exception or safety valve should be considered in the framework in some manner to allow Resource Adequacy-based decisions

MISO supports including some form of a "Reliability Safety Valve" ("RSV") or other mechanism within the CSAPR/NAAQS regulatory framework by which EPA could provide additional program flexibility which could help to alleviate reliability and adequacy concerns. The RSV would represent certain tools and processes that would be available to address reliability issues that might arise during the implementation of a final rule. The RSV would not be a blanket exemption from compliance; rather it would ensure short-term and seasonal reliability. MISO proposes that EPA create an "opt-out" option for units willing to commit to a short remaining useful life (beyond 2026) in exchange for additional consideration/allowances in setting state NOx budgets. Furthermore, MISO proposes that an RSV be available that would:

1. Permit the operation of affected units beyond the proposed rule's constraints if the ISO/RTO has an applicable and declared emergency condition under its FERC-approved Tariff; and

2. Be available for up to 90 days, Triggering and Notification Criteria are outlined that would reasonably constrain the exemption.

Alternatively, the creation of a bank of emergency reliability allowances available for units to purchase of a bank of allowances could be available for units to purchase at the start of the summer season. The bank would allow e trading program but with more allowances to be made available than the currently proposed trading program as a flexible option in emergency circumstances.

Other mechanisms to alleviate reliability and adequacy concerns could include:

1. EPA revising their proposed dynamic budgeting approach to look back at multiple years of past unit operating data (rather than a single year).

2. EPA revising their proposed dynamic budgeting approach to adjust state budgets less frequently, perhaps every 2 or 3 years rather than annually.

3. EPA retaining retired units in state budgets for a longer period than they have proposed, such that sources that do retire units as part of their CSAPR compliance strategy have more flexibility to utilize the allowances associated with the retired unit to meet their allowance surrender obligations for other units which continue to operate.

4. EPA revising or even eliminating their proposed annual "recalibration" of the number of banked allowances.

MISO also requests that EPA find that the conditions for an energy emergency resulting from a loss of necessary energy supplies under CAA section 110(f) of such severity that a temporary suspension of part of the applicable implementation plan and/or requirements under CAA section 7651j (concerning excess emissions penalties or offsets) is presumed to be necessary AND that there is no other adequate means of responding to the energy emergency would be presumed to exist when the ISO/RTO has an applicable and declared emergency condition under its FERC-approved Tariff.

### e. EPA did not appropriately consider costs related to grid reliability, additional energy usage, and potential environmental justice impacts.

As noted by the courts, the "realities of interstate air pollution ... are not so simple," and EPA faces its share of "thorny ... problem[s]" in regulating it. *EME Homer City Gen., L.P. v. EPA*, 572 U.S. 489, 514–16, 134 S.Ct. 1584 (2014) ("*EME Homer II")*. The Good Neighbor Provision authorizes EPA to regulate emissions that contribute *significantly* to nonattainment." 42 U.S.C. § 7410(a)(2)(D)(i)) (emphasis in original). In *Michigan v. EPA*, 213 F.3d 663 (D.C. Cir. 2000), the court held that EPA may consider costs in determining what contributions are "significant," *id.* at 15 (quoting *Michigan*, 213 F.3d at 675), and endorsed the principle that (in the absence of a clear legislative statement to the contrary) a regulation's benefits must be "at least roughly commensurate with [its] costs," *id.* (quoting *Michigan*, 213 at F.3d 678–79). In *Wisconsin v. EPA*, 938 F.3d 303, (D.C. Cir. 2019), the court noted that EPA

> possesses a measure of latitude in defining which upwind contribution "amounts" count as "significant[ ]" and thus must be abated. *See id.* at 518, 134 S.Ct. 1584; 520 n.21. And the Supreme Court has indicated that EPA can take into account, among other things, "the magnitude of upwind States' contributions and the cost associated with eliminating them." *Id.* at 518, 134 S.Ct. 1584. Additionally, in certain circumstances, EPA can grant one-year extensions of the nonattainment deadlines to downwind States. 42 U.S.C. § 7511(a)(5). EPA grants those extensions fairly commonly. *E.g.*, 84 Fed. Reg. 44238, 44238 (Aug. 23, 2019); 81 Fed. Reg. 26,697, 26,697 (May 4, 2016). And finally, EPA can always attempt to show "impossibility." *Sierra Club*, 719 F.2d at 462.

*State of Wisconsin v. Env't Prot. Agency*, 938 F.3d 303, 320 (D.C. Cir. 2019).

Here, EPA should further analyze whether the environmental benefits of the proposed FIP justified the costs imposed by the FIP. The proposed rule does not explore whether the emissions controls in question would endanger reliability, and the attendant costs associated thereof, or cause the closure of generating capacity. The proposed rule also does not currently contemplate a step for the Regional Transmission Organization ("RTO"), Independent System Operators, or FERC to study reliability impacts. Given the exceptional complexity of grid reliability concerns, it is noteworthy that the proposed rule does not provide a more rigorous exploration of the impact of the rule on grid reliability and the resultant costs from an environmental justice and monetary perspective. MISO also notes that EPA's control cost analysis uses an EGU inventory that is divergent from the inventory of EGUs that exist in the 25 states subject to the proposed transport

rule. All of these issues do not lead to an accurate calculations of costs and this issue needs to be re-examined.

MISO also believes that EPA's proposed backstop daily emission rate penalties, 87 Fed. Reg. at 20,121, are inappropriate because NOx budgets should be set based on achievable rates for controls without penalties for emissions occurring during high demand days when the choice is to maintain system reliability by running units with controls or shut down the units because of the backstop daily rate penalties. EPA has also acknowledged that there is "very little difference" between "NOx rates for EGUs for hours with high energy demand" and "seasonal average NOx rates." 83 Fed. Reg. at 50,466. Moreover, the *Maryland* Court recognized that "there may be valid operational reasons not to operate catalytic controls on particular days, 'e.g., to avoid damaging or plugging of the [control] or taking a forced outage where a breakdown leaves the unit unavailable to produce power.' As a result, that a source ends up emitting above 0.20 lb/mmBtu on a particular day is not necessarily evidence of a failure to optimize."[15]

EPA's operational restriction by imposing a daily limit with a substantial allowance penalty will force decisions that are contrary to the effective management of generation and emissions. Situations that may result in exceeding EPA's proposed daily limit include necessary startup or shutdown of units based on system demand, operation of units at minimum load conditions to meet grid requirements, and even short-term operation of a unit after malfunction of NOx controls. On high demand days, EGU operators and RTOs will face the choice to maintain system reliability by running units with limited NOx control or shut down the units because of the backstop daily rate penalties.

### 3. **Conclusion.**

For the reasons set forth in these comments, MISO's review of the proposed FIP has identified a number of immediate areas of concern that require further consideration before implementation in order to ensure continued reliable grid operations, particularly during this time of transition. Modifications to the Proposed Rule are needed to address the potential for distinct reliability challenges resulting from the rule's implementation.

.

---

[15] *Maryland v. EPA*, 958 F.3d 1185, 1207 (D.C. Cir. 2020).

**Tab R4-9: Mississippi_2015 Ozone Infrastructure SIP Prongs 1 and 2 (Jan. 31, 2022) (EPA-R04-OAR-2021-0841-0009)**



**STATE OF MISSISSIPPI**
PHIL BRYANT
GOVERNOR
**MISSISSIPPI DEPARTMENT OF ENVIRONMENTAL QUALITY**
GARY C. RIKARD, EXECUTIVE DIRECTOR

September 3, 2019

Ms. Mary Walker, Regional Administrator
U.S. Environmental Protection Agency
61 Forsyth Street, S.W.
Atlanta, Georgia 30303-3104

Dear Ms. Walker:

Re:   Mississippi 2015 Ozone Infrastructure SIP
Prongs 1 & 2

Enclosed are documents with additional information related to Prongs 1 and 2 of Mississippi's Infrastructure State Implementation Plan (SIP) to comply with the requirements of Section 110(a)(1) and (2) of the Federal Clean Air Act regarding the 2015 National Ambient Air Quality Standard for Ozone.

We certify that a 30-day public comment period was held regarding the SIP. The public comment period ended August 30, 2019. EPA Region 4 submitted a comment letter during the public comment period. There were no other comments received.

We feel that this revised Ozone Infrastructure SIP for Prongs 1 & 2 submittal is complete. Therefore, we are requesting EPA approval of this SIP into the federally approved Mississippi State Implementation Plan.

If you have any questions or need further information, please contact me or Keith Head of my staff at (601) 961-5577.

Very truly yours,

Gary Rikard
Executive Director

CF/KH
Enclosures

# Mississippi Certification
# Clean Air Act Section 110(a)(1) and (2)
# Ozone Requirements
# Section 110(a)(2)(D) Prongs 1 and 2

This certification addresses Mississippi's obligations under Section 110(a)(1) and (2) of the Clean Air Act for the Ozone National Ambient Air Quality Standards (NAAQS). The following state regulations are part of the State Implementation Plan (SIP) and are referred to in this document:

11 MISSISSIPPI ADMINISTRATIVE CODE, PART 2, CHAPTER 1
> Mississippi Commission on Environmental Quality
>> "Air Emission Regulations for the Prevention, Abatement, and Control of Air Contaminants"

11 MISSISSIPPI ADMINISTRATIVE CODE, PART 2, CHAPTER 2
> Mississippi Commission on Environmental Quality
>> "Permit Regulation for the Construction and/or Operation of Air Emissions Equipment"

11 MISSISSIPPI ADMINISTRATIVE CODE, PART 2, CHAPTER 3
> Mississippi Commission on Environmental Quality "Mississippi Regulations for the Prevention of Air Pollution Emergency Episodes"

11 MISSISSIPPI ADMINISTRATIVE CODE, PART 2, CHAPTER 5
> Mississippi Commission on Environmental Quality "Mississippi Regulations for the Prevention of Significant Deterioration of Air Quality"

Appendix A-9        Mississippi Code Title 49

Appendix A-10       State Ethics Law as of July 1, 2011 and Mississippi Ethics Commission Advisory Opinion No. 95-042-E, May 5, 1995

Appendix A-11       State Constitution Provisions as of July 1, 2011

Appendix R          State Implementation Plan Revision Regarding Regional Haze Program Requirements: SIP Narrative Addressing Visibility Improvement in Federal Class I Areas

## Section 110(a)(2)(D)

*Contain adequate provisions—*
*(i) prohibiting, consistent with the provisions of this subchapter, any source or other type of emissions activity within the State from emitting any air pollutant in amounts which will—*
> *(I) contribute significantly to nonattainment in, or interfere with maintenance by, any other State with respect to any such national primary or secondary ambient air quality standard, or*
> *(II) interfere with measures required to be included in the applicable implementation plan for any other State under part C of this subchapter to prevent significant deterioration of air quality or to protect visibility*

> 1. *Contribute significantly to nonattainment of NAAQS for areas in another state (Prong 1).*

On March 27, 2018, EPA issued a memorandum titled *Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under CAA §110(a)(2)(D)(i)(I).* EPA states that the information provided in the memorandum is designed to assist states in their efforts to develop good neighbor SIPs for the 2015 ozone NAAQS to address their interstate transport obligations. EPA conducted photochemical modeling to project ambient ozone levels in 2023, since this date aligns with the anticipated attainment year for Moderate ozone nonattainment areas. The Comprehensive Air Quality Model with Extensions (CAMx, version 6.4) was used with a base year of 2011, and the future year of 2023. Considering a combination of modeling projections and recent monitoring data, EPA identified projected nonattainment and maintenance receptors with respect to the 2015 NAAQS. EPA identified nonattainment receptors as those monitoring sites with current measured ozone values exceeding the NAAQS that also have projected (in 2023) average design values exceeding the NAAQS. EPA identified maintenance receptors as those monitoring sites with maximum design values exceeding the NAAQS. Outside of California, there are 26 monitoring sites that were identified as either potential nonattainment or maintenance receptors.

After identifying these receptors, EPA then performed nationwide, state-level ozone source apportionment modeling using the CAMx Anthropogenic Precursor Culpability Analysis (APCA) technique to provide information regarding the expected contribution of 2023 base case nitrogen oxides (NOx) and volatile organic compound (VOC) emissions from all sources in each state to projected 2023 ozone concentrations at each air quality monitoring site. In previous federal regulatory actions, such as the Clean Air Interstate Rule (CAIR), the Cross-State Air Pollution Rule (CSAPR), and the CSAPR Update Rule, EPA has used a threshold of 1% of the ozone NAAQS standard to determine if a state significantly contributes to nonattainment or interferes with maintenance of a downwind receptor. One percent (1%) of the 70 ppb standard is 0.70 ppb.

The following table lists Mississippi's model Ozone $O_3$ contributions (ppb) to 2023 Nonattainment and Maintenance Sites.

| Site ID | County | State | 2014-16 Design Value | Projected Status in 2023 | Mississippi O$_3$ Contribution (ppb) |
|---------|--------|-------|----------------------|--------------------------|--------------------------------------|
| 80590006 | Jefferson | CO | 77 | Nonattainment | 0.01 |
| 80590011 | Jefferson | CO | 80 | Maintenance | 0.01 |
| 81230009 | Weld | CO | 70 | Maintenance | 0.01 |
| 90010017 | Fairfield | CT | 80 | Maintenance | 0.03 |
| 90013007 | Fairfield | CT | 81 | Nonattainment | 0.07 |
| 90019003 | Fairfield | CT | 85 | Nonattainment | 0.07 |
| 90099002 | New Haven | CT | 76 | Maintenance | 0.04 |
| 240251001 | Harford | MD | 73 | Maintenance | 0.08 |
| 260050003 | Allegan | MI | 75 | Maintenance | 0.40 |
| 261630019 | Wayne | MI | 72 | Maintenance | 0.09 |
| 360810124 | Queens | NY | 69 | Maintenance | 0.04 |
| 360850067 | Richmond | NY | 76 | Maintenance | 0.08 |
| 361030002 | Suffolk | NY | 72 | Nonattainment | 0.06 |
| 480391004 | Brazoria | TX | 75 | Nonattainment | 0.63 |
| 481210034 | Denton | TX | 80 | Maintenance | 0.33 |
| 482010024 | Harris | TX | 79 | Maintenance | 0.50 |
| 482011034 | Harris | TX | 73 | Maintenance | 0.39 |
| 482011039 | Harris | TX | 67 | Nonattainment | 0.79 |
| 484392003 | Tarrant | TX | 73 | Nonattainment | 0.27 |
| 550790085 | Milwaukee | WI | 71 | Nonattainment | 0.28 |
| 551170006 | Sheboygan | WI | 79 | Nonattainment | 0.30 |

Table 1: Mississippi's model Ozone (O$_3$) contributions (ppb) to 2023 Nonattainment and Maintenance Sites.

Mississippi's modeled contributions is below 1% of the NAAQS to all monitors modeled to be in nonattainment or in maintenance of the 2015 O$_3$ NAAQS except for Site ID# 482011039 in Harris County, TX. For this monitor, Mississippi's contribution is modeled to be 0.79 ppb, which is 1.12% of the standard but below 1.0 ppb of O$_3$. It must be noted, however, that though the design value for this monitored was projected to be over the 2015 O$_3$ NAAQS, the actual design value is 68 ppb for 2015-2017. The table below lists the design values for 2015-2017.

| Years | Design Value (ppb) |
|-------|--------------------|
| 2013-2015 | 69 |
| 2014-2016 | 67 |
| 2015-2017 | 68 |

Table 2: Design Values for Site ID# 482011039 - Harris County, TX

On August 31, 2018, EPA released a memorandum titled *Analysis of Contribution Thresholds for Use in Clean Air Act Section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards*. In this memorandum, EPA provided analytical information regarding the degree to which certain air quality threshold amounts capture the collective amount of upwind contribution from upwind states to downwind receptors for the 2015 O$_3$ NAAQS. Because the amount of upwind collective contribution captured with the 1% and 1 ppb thresholds is generally comparable, EPA concluded that it may be reasonable and appropriate for states to use a 1 ppb contribution threshold

as an alternative to a 1% threshold in developing SIP revisions addressing the good neighbor provision for the 2015 O$_3$ standard.

Based on EPA's modeling, Mississippi is below the 1ppb threshold for all monitoring sites in Table 1, which are projected to be nonattainment or maintenance, indicating that Mississippi does not significantly contribute to the nonattainment of the 2015 Ozone Standard in another state. MDEQ hereby confirms that the SIP contains adequate provisions to prevent sources and other types of emissions activities within the state from contributing significantly to nonattainment in (prong 1) any other state with respect to the 2015 Ozone NAAQS.

### 2. Interfere with maintenance of NAAQS by any other State (Prong 2).

On March 27, 2018, EPA issued a memorandum titled *Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under CAA §110(a)(2)(D)(i)(I)*. EPA states that the information provided in the memorandum is designed to assist states in their efforts to develop good neighbor SIPs for the 2015 ozone NAAQS to address their interstate transport obligations. EPA conducted photochemical modeling to project ambient ozone levels in 2023, since this date aligns with the anticipated attainment year for Moderate ozone nonattainment areas. The Comprehensive Air Quality Model with Extensions (CAMx, version 6.4) was used with a base year of 2011, and the future year of 2023. Considering a combination of modeling projections and recent monitoring data, EPA identified projected nonattainment and maintenance receptors with respect to the 2015 NAAQS. EPA identified nonattainment receptors as those monitoring sites with current measured ozone values exceeding the NAAQS that also have projected (in 2023) average design values exceeding the NAAQS. EPA identified maintenance receptors as those monitoring sites with maximum design values exceeding the NAAQS. Outside of California, there are 26 monitoring sites that were identified as either potential nonattainment or maintenance receptors.

After identifying these receptors, EPA then performed nationwide, state-level ozone source apportionment modeling using the CAMx Anthropogenic Precursor Culpability Analysis (APCA) technique to provide information regarding the expected contribution of 2023 base case nitrogen oxides (NOx) and volatile organic compound (VOC) emissions from all sources in each state to projected 2023 ozone concentrations at each air quality monitoring site. In previous federal regulatory actions, such as the Clean Air Interstate Rule (CAIR), the Cross-State Air Pollution Rule (CSAPR), and the CSAPR Update Rule, EPA has used a threshold of 1% of the ozone NAAQS standard to determine if a state significantly contributes to nonattainment or interferes with maintenance of a downwind receptor. One percent (1%) of the 70 ppb standard is 0.70 ppb. Additionally, the EPA issued final guidance entitled Guidance on Significant Impact Levels for Ozone and Fine Particles in the Prevention of Significant Deterioration Permitting Program. In that guidance, the EPA recommends an ozone

significant impact level (SIL) of 1.0 ppb, based on an air quality variability analysis and the fourth highest daily maximum 8-hour concentration (averaged over three years).

Table 1 lists Mississippi's model nitrogen oxide ($NO_x$) contributions (ppb) to 2023 Nonattainment and Maintenance Sites.

Mississippi's modeled contributions is below 1% of the NAAQS to all monitors modeled to be in nonattainment or in maintenance of the 2015 $O_3$ NAAQS except for Site ID# 482011039 in Harris County, TX. For this monitor, Mississippi's contribution is modeled to be 0.79 ppb, which is 1.12% of the standard but below 1.0 ppb of $O_3$. It must be noted, however, that though the design value for this monitored was projected to be over the 2015 O3 NAAQS, the actual design value is 68 ppb for 2015-2017. The Table 2 lists the design values for 2015-2017.

On August 31, 2018, EPA released a memorandum titled *Analysis of Contribution Thresholds for Use in Clean Air Act Section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards*. In this memorandum, EPA provided analytical information regarding the degree to which certain air quality threshold amounts capture the collective amount of upwind contribution from upwind states to downwind receptors for the 2015 $O_3$ NAAQS. Because the amount of upwind collective contribution captured with the 1% and 1 ppb thresholds is generally comparable, EPA concluded that it may be reasonable and appropriate for states to use a 1 ppb contribution threshold as an alternative to a 1% threshold in developing SIP revisions addressing the good neighbor provision for the 2015 $O_3$ standard.

Based on EPA's modeling, Mississippi is below the 1ppb threshold for all monitoring sites in Table 1, which are projected to be nonattainment or maintenance, indicating that Mississippi does not significantly contribute to nonattainment or interfere with maintenance of a downwind receptor in another state.

Additionally, on October 19, 2018, EPA released a memorandum titled *Considerations for Identifying Maintenance Receptors for Use in Clean Air Act Section 11 0(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards*. In this memorandum, EPA stated its conclusion that "states may, in some cases, eliminate a site as a maintenance receptor if the site is currently measuring clean data."

Furthermore, the memo states: "EPA would expect states to include with their SIP demonstration technical analyses showing that:

(a) meteorological conditions in the area of the monitoring site were conducive to ozone formation during the period of clean data or during the alternative base period design value used for projections;

(b) ozone concentrations have been trending downward at the site since 2011 (and ozone precursor emissions of nitrogen oxide (NOx) and volatile organic compounds (VOC) have also decreased); and

(c) emissions are expected to continue to decline in the upwind and downwind states out to the attainment date of the receptor."

(a)     The ozone 8-Hour design values for Deer Park (site ID 482011039) in Houston has been meeting the 2015 ozone standard of 70ppb since 2015. In 2014, the site met attainment status for the 2008 standard of 75ppb. Analysis of additional information provided within the memorandum (Table 3) show that during the 2014-17 timeframe, two out of the four summers, temperatures were above average, specifically 2015 and 2016 while the summers of 2014 and 2017, temperatures were near normal.

| Year | Ozone DV | JJA Temp Trend |
|------|----------|----------------|
| 2014 | 72 | Near Normal |
| 2015 | 69 | Above Normal |
| 2016 | 67 | Above Normal |
| 2017 | 68 | Near Normal |

Table 3: Ozone Design Values and Temperature Anomalies for Houston, TX - Deer Park (Site ID 48201139)
Source: National Oceanic and Atmospheric Administration – National Weather Service

(b)    Ozone concentration at the Deer Park site have been trending downward since 2011.  Table 4 lists the ozone design values for the site.

| Year | Ozone DV (ppb) |
|------|----------------|
| 2011 | 83 |
| 2012 | 84 |
| 2013 | 79 |
| 2014 | 72 |
| 2015 | 69 |
| 2016 | 67 |
| 2017 | 68 |

Table 4: Ozone Design Values for Houston, TX - Deer Park
(Site ID 48201139)
Source: EPA AirNow Database

Ozone precursor emissions of nitrogen oxide (NOx) and volatile organic compounds (VOC) in Texas and in Mississippi have been trending downward since 2011.  Table 5 lists the NOx and VOC emissions for the Houston, TX Metropolitan Statistical Area (MSA).  Table 6 and Table 7 lists the NOx and VOC emissions in Texas and Mississippi.

| Houston, TX MSA Emissions | | |
|------|------|------|
| Year | NOX (tons) | VOC (tons) |
| 2008 | 196,341 | 261,388 |
| 2011 | 163,013 | 190,976 |
| 2014 | 155,620 | 166,618 |

Table 5: NOx and VOC emissions in the Houston, TX MSA
Source: EPA National Emissions Inventory

| Texas Emissions | | |
|------|------|------|
| Year | NOX (tons) | VOC (tons) |
| 2008 | 1,515,343 | 2,184,281 |
| 2011 | 1,266,530 | 1,740,849 |
| 2014 | 1,224,196 | 1,750,979 |

Table 6: NOx and VOC emissions in Texas
Source: EPA National Emissions Inventory

| Mississippi Emissions | | |
|---|---|---|
| Year | NOx (tons) | VOC (tons) |
| 2008 | 230,289 | 163,383 |
| 2011 | 196,856 | 193,753 |
| 2014 | 166,226 | 139,237 |

Table 7: NOx and VOC emissions in Mississippi
Source: EPA National Emissions Inventory

Additional resources provided with the October 18, 2018 memorandum also show analysis of emissions decreasing throughout the region.

(c)     Based on national and regional emissions trends, and current regulations on point sources and mobile sources, emissions are expected to continue to decline in the upwind and downwind states.

Therefore, under the criteria set in the October 19, 2018 memorandum, Mississippi proposes to eliminate the Deer Park site in Harris County, TX (site ID 48201139) as a maintenance receptor.

Based on the information provide above for Prong 2 (Interfere with maintenance of NAAQS by any other State), Mississippi does not significantly interfere with maintenance of the 2015 Ozone Standard in another state.  MDEQ hereby confirms that the SIP contains adequate provisions to continue maintenance of the 2015 Ozone NAAQS and prevent sources and other types of emissions activities within the state from interfering with maintenance (prong 2) in any other state with respect to the 2015 Ozone NAAQS.

*(ii) Each such Plan shall […] contain adequate provisions insuring compliance with the applicable requirements of sections 115 and 126(b) that involve ozone precursor emissions (relating to interstate and international pollution abatement)." EPA has no reason to approve or disapprove any existing state rules with regard to these provisions.*

11 MISSISSIPPI ADMINISTRATIVE CODE, PART 2, CHAPTER 5 shows where 40 CFR 51.166 was adopted by reference into the SIP.  These regulations require notification of potential impacts from new or modified sources to state and local agencies of neighboring states.  Therefore, the SIP meets the requirements of this criterion.

**<u>Response to Comments for Mississippi 2015 Ozone Infrastructure SIP
for Clean Air Act Requirements Section 110(a)(2)(D) Prongs 1 and 2.</u>**

EPA Region IV submitted a comment letter dated August 28, 2019.  No other
comments were received during the public comment period.  The EPA comment letter
follows this page.



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION 4
ATLANTA FEDERAL CENTER
61 FORSYTH STREET
ATLANTA, GEORGIA 30303-8960

August 28, 2019

Chad Lafontaine, Director
Air Division
Office of Pollution Control
Mississippi Department of
 Environmental Quality
P.O. Box 2261
Jackson, Mississippi  39225-2261

Dear Mr. Lafontaine:

Thank you for the letter dated July 30, 2019, transmitting a prehearing package regarding Mississippi's State Implementation Plan (SIP) submittal. Specifically, the prehearing package addresses the Clean Air Act Section 110(a)(2)(D)(i)(I) Interstate Transport Prongs 1 and 2 requirements for the 2015 8-hour Ozone National Ambient Air Quality Standard (NAAQS). We understand that this submittal is the subject of a public hearing that will take place on August 30, 2019, if requested, with written comments due by the close of business on August 30, 2019. We have completed our review of the prehearing submittal and offer comments in the enclosure.

We look forward to continuing to work with you and your staff. If you have any questions, please contact Ms. Lynorae Benjamin, Chief of the Air Regulatory Management Section at 404-562-9040, or have your staff contact Ms. Tiereny Bell at 404-562-9088.

Sincerely,

R. Todd Rinck
Acting Chief
Air Planning & Implementation Branch

Enclosure

cc:  Keith Head, Mississippi Department of Environmental Quality

**The U.S. Environmental Protection Agency Comments on Mississippi's Prehearing State
Implementation Plan (SIP) Submittal Addressing the Clean Air Act Section 110(a)(2)(D)(i)(I)
Interstate Transport Prongs 1 and 2 Requirements for the 2015 Ozone
National Ambient Air Quality Standard (NAAQS)**

**General Comment**

1. On page 5 of Mississippi's 2015 ozone prehearing transport SIP, the air agency notes that its modeled contribution to the Harris County, Texas nonattainment receptor is above 1 percent of the 2015 ozone national ambient air quality standards (NAAQS) but below the 1 part per billion (ppb) alternative contribution threshold discussed in the EPA's August 31, 2018 memorandum entitled *Analysis of Contribution Thresholds for Use in Clean Air Act Section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards*. The EPA believes it would be helpful if Mississippi include additional information regarding the appropriateness of the 1 ppb alternative threshold for the Harris County, Texas nonattainment receptor. The EPA is available for further discussion regarding the 1 ppb alternative contribution threshold guidance.

2. The EPA notes that the Harris County, Texas downwind receptor, to which Mississippi is linked, is a nonattainment and maintenance receptor. If a receptor meets the criteria for being a nonattainment receptor (i.e. projected average design values is above the level of the ozone standard), it, by definition, must also be a maintenance receptor since there must be a projected maximum design value above the NAAQS in order for the projected average design value to be above the ozone NAAQS. On page 7 of Mississippi's prehearing SIP the air agency states that the Harris County, Texas receptor has a 2015-2017, 3-year design value of 68 ppb. However, the current 2016-2018 3-year design value for this monitor is 71 ppb which is above the level of the 2015 8-hour ozone NAAQS. The EPA recommends Mississippi clarify in the prehearing transport SIP (page 5) that the current 2016-2018 3-year design value for the Harris County, Texas receptor is above the level of the 2015 ozone standard. The EPA is available for further discussion regarding the Harris County, Texas receptor.

3. The 2015 ozone prehearing transport SIP divides the discussion of the section 110(a)(2)(D)(I) requirements into separate sections addressing prong 1 (contribute significantly to nonattainment) and prong 2 (interfere with maintenance). The discussion of the two separate prongs, however, appears to be duplicative. The section on prong 1 discusses prong 2 issues and vice versa. For ease of reading and understanding, the EPA recommends that Mississippi either combine the two discussions to avoid duplication or refine the two sections to focus more narrowly on the prong under discussion. For example, if Mississippi chooses to retain the two separate sections, the prong 1 discussion could focus just on the monitors that were identified as potential nonattainment receptors (based on both current air quality data and the projected average design value) rather than to also discuss potential maintenance receptors (such as the Harris County, Texas receptor discussed on page 5). A prong 2 discussion could also refer back to the documents and information discussed in the prior section rather than repeat.

4. The EPA recommends Mississippi provide a list of SIP-approved provisions that regulate sources of ozone precursor emissions (i.e. nitrogen oxide and volatile organic compounds emissions) in the State. Mississippi also has the option of identifying state-only regulations that control ozone precursor emissions.

**<u>Public participation for Mississippi 2015 Ozone Infrastructure SIP</u>**
**<u>for Clean Air Act Requirements Section 110(a)(2)(D) Prongs 1 and 2.</u>**

Public participation for the above referenced infrastructure SIP was achieved by a public comment period that began on July 31, 2019 and ended on August 30, 2019. The public notice was published consistent with procedures approved by EPA.

The notice of public comment period was published on July 31, August 7 and August 14, 2019 in daily newspapers in the cities of Gulfport and Jackson in the State of Mississippi.  The notice of public hearing and the draft SIP was made available for public review in the main branches of the public libraries in Gulfport, Jackson and Tupelo, Mississippi and at the Mississippi Department of Environmental Quality, 515 E. Amite St., Jackson, Mississippi, 39201 and was also made available on the Department's website http://www.mdeq.ms.gov.

The public notice and proofs of publication follows this page.

Public Notice
Mississippi Commission on Environmental Quality
P. O. Box 2261
Jackson, MS 39225
Telephone No. (601) 961-5171

Public Notice Start Date: July 31, 2019                    MDEQ Contact: Keith Head
Deadline for Comment: August 30, 2019

Please take note that the Mississippi Commission on Environmental Quality ("Commission") is providing draft information for comment regarding the Mississippi Certification that the State Implementation Plan for the Control of Air Pollution is adequate to comply with the requirements of Section 110(a)(1) and (2) of the Federal Clean Air Act as it pertains to the National Ambient Air Quality Standards for Ozone as promulgated by the U.S. Environmental Protection Agency (EPA).

Copies of the draft certification may be obtained by writing or calling the Public Records Officer at the address and telephone number listed above.  The draft certification information is also available for public review from Wednesday, July 31, 2019, through Friday, August 30, 2019 at the main branch of public libraries in cities of Gulfport, Jackson, and Tupelo.  For those persons with internet access, the draft certification information may be found on the Mississippi Department of Environmental Quality's website at http://www.mdeq.ms.gov.

Persons wishing to comment on the draft certification are invited to submit comments in writing to Keith Head at the Commission's address shown above, no later than 5:00 p.m. on Friday, August 30, 2019.  All comments received by this date will be considered in preparation of the final submission of the certification information to EPA.  A public hearing may be held if the Commission finds a significant degree of public interest in the draft certification.

Please bring the foregoing to the attention of persons whom you know will be interested.

## AFFIDAVIT OF PUBLICATION
## THE CLARION-LEDGER

TO: MDEQ, OFFICE OF POLLUTION CONT
515 E AMITE ST
JACKSON, MS  39201
Acct# TCL-C35417

Ad Number: 0003703724

STATE OF WISCONSIN
COUNTY OF BROWN

Before the undersigned authority personally appeared, who on oath says that he or she is a Legal Advertising Representative of The Clarion-Ledger, a newspaper as defined and prescribed in Sections 13-3-31 and 13-3-32, of the Mississippi Code of 1972, as amended, who, being duly sworn, states that the notice, a true copy of which is hereto attached, appeared in the issues of said newspaper as follows:

Was published in said newspaper in the issue(s) of:

07/31/19, 08/07/19, 08/14/19

Size: 341 words / 1 col. x 56 lines
Published: 3 time(s)

Now due on said account is <u>$122.70</u>

Signed _____
Authorized Clerk of The Clarion-Ledger

SWORN to and subscribed before me on August 14, 2019.

_____
Notary Public, State of Wisconsin. County of Brown

_____5·15·23_____
My commission expires

(SEAL)

```
NANCY HEYRMAN
Notary Public
State of Wisconsin
```

MDEQ-PURCHASING
RECEIVED

2019 AUG 21  AM 10: 06

**Public Notice**
**Mississippi Commission on Environmental**
**Quality**
**P. O. Box 2261**
**Jackson, MS 39225**
**Telephone No. (601) 961-5171**

Public Notice Start Date: July 31, 2019
MDEQ Contact: Keith Head
Deadline for Comment: August 30, 2019

Please take note that the Mississippi Commission on Environmental Quality ("Commission") is providing draft information for comment regarding the Mississippi Certification that the State Implementation Plan for the Control of Air Pollution is adequate to comply with the requirements of Section 110(a)(1) and (2) of the Federal Clean Air Act as it pertains to the National Ambient Air Quality Standards for Ozone as promulgated by the U.S. Environmental Protection Agency (EPA).

Copies of the draft certification may be obtained by writing or calling the Public Records Officer at the address and telephone number listed above. The draft certification information is also available for public review from Wednesday, July 31, 2019, through Friday, August 30, 2019 at the main branch of public libraries in cities of Gulfport, Jackson, and Tupelo. For those persons with internet access the draft certification information may be found on the Mississippi Department of Environmental Quality's website at http:// www.mdeq.ms.gov.

Persons wishing to comment on the draft certification are invited to submit comments in writing to Keith Head at the Commission's address shown above, no later than 5:00 p.m. on Friday, August 30, 2019. All comments received by this date will be considered in preparation of the final submission of the certification information to EPA. A public hearing may be held if the Commission finds a significant degree of public interest in the draft certification.

Please bring the foregoing to the attention of persons whom you know will be interested.
07/31, 08/07, 08/14/19

————————0003703724-01



**2019 AUG 19 AM 9:53**

## AFFIDAVIT OF PUBLICATION RECEIVED MDEQ PURCHASING

| Account # | Ad Number | Identification | PO | Amount | Cols | Depth |
|-----------|-----------|----------------|----|--------|------|-------|
| 661741 | 0004316188 | Public Notice Mississippi Commission on Environ | Legal Notice | $91.00 | 1 | 5.30 In |

**Attention: Keith Head**

MS DEPT OF ENVIRONMENTAL QUALI
PO BOX 2369
JACKSON, MS 39225

Public Notice
Mississippi Commission on
Environmental Quality
P. O. Box 2261
Jackson, MS 39225
Telephone No. (601) 961-5171
Public Notice Start Date: July 31, 2019
Deadline for Comment:
August 30, 2019
MDEQ Contact: Keith Head
Please take note that the Mississippi
Commission on Environmental Quality
("Commission") is providing draft infor-
mation for comment regarding the
Mississippi Certification that the State
Implementation Plan for the Control of
Air Pollution is adequate to comply with
the requirements of Section 110(a)(1)
and (2) of the Federal Clean Air Act as it
pertains to the National Ambient Air
Quality Standards for Ozone as promul-
gated by the U.S. Environmental Protec-
tion Agency (EPA).
Copies of the draft certification may be
obtained by writing or calling the Public
Records Officer at the address and tele-
phone number listed above. The draft
certification information is also available
for public review from Wednesday, July
31, 2019, through Friday, August 30,
2019 at the main branch of public libra-
ries in cities of Gulfport, Jackson, and
Tupelo. For those persons with internet
access, the draft certification informa-
tion may be found on the Mississippi
Department of Environmental Quality's
website at http://www.mdeq.ms.gov.
Persons wishing to comment on the
draft certification are invited to submit
comments in writing to Keith Head at
the Commission's address shown
above, no later than 5:00 p.m. on Fri-
day, August 30, 2019. All comments re-
ceived by this date will be considered in
preparation of the final submission of
the certification information to EPA. A
public hearing may be held if the
Commission finds a significant degree
of public interest in the draft certifica-
tion.
Please bring the foregoing to the atten-
tion of persons whom you know will be
interested.

**STATE OF MISSISSIPPI**

**COUNTY OF HARRISON**

Before me, the undersigned Notary of
Dallas County, Texas personally
appeared VICTORIA RODELA, who,
being by me first duly sworn, did
depose and say that she is a clerk of
The Sun Herald, a daily newspaper
published in the city of Gulfport, in
Harrison County, Mississippi and the
publication of the notice, a copy of
which is hereto attached, has been
made in said paper in the issue(s) of:

_____ 3 _____ Insertion(s)

Published On:
July 31, 2019, August 07, 2019,
August 14, 2019

Affidavit further states on oath that said
newspaper has been established and
published continuously in said county
for a period of more than twelve months
next prior to the first publication of said
notice.

*V Rodela*

Clerk

Sworn to and subscribed before me this
14th day of August in the year of 2019



Notary Public

* The Sun Herald has been deemed eligible
for publishing legal notices in Jackson County
to meet the requirements of Miss. Code 1972
Section 13-3-31 and 13-3-32.

AMBAR LIZARRAGA
My Notary ID # 132031291
Expires May 30, 2023

**Extra charge for lost or duplicate affidavits.**
**Legal document please do not destroy!**

Tab R4-10: Air Quality State Implementation Plans; Approvals and Promulgations: Alabama, Mississippi, Tennessee; Interstate Transport Requirements for the 2015 8-Hour Ozone National Ambient Air Quality Standards (Feb. 22, 2022) (EPA-R04-OAR-2021-0841-0010)

not significantly or uniquely affect small governments. The action imposes no enforceable duty on any state, local or tribal governments or the private sector.

*E. Executive Order 13132: Federalism*

This action does not have federalism implications. It will not have substantial direct effects on the states, on the relationship between the national government and the states, or on the distribution of power and responsibilities among the various levels of government.

*F. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments*

This action does not have tribal implications as specified in Executive Order 13175. This action does not apply on any Indian reservation land, any other area where the EPA or an Indian tribe has demonstrated that a tribe has jurisdiction, or non-reservation areas of Indian country. Thus, Executive Order 13175 does not apply to this action.

*G. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks*

The EPA interprets Executive Order 13045 as applying only to those regulatory actions that concern environmental health or safety risks that the EPA has reason to believe may disproportionately affect children, per the definition of "covered regulatory action" in section 2–202 of the Executive Order. This action is not subject to Executive Order 13045 because it merely proposes to disapprove a SIP submission as not meeting the CAA.

*H. Executive Order 13211, Actions That Significantly Affect Energy Supply, Distribution or Use*

This action is not subject to Executive Order 13211, because it is not a significant regulatory action under Executive Order 12866.

*I. National Technology Transfer and Advancement Act*

This rulemaking does not involve technical standards.

*J. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations*

The EPA believes the human health or environmental risk addressed by this action will not have potential disproportionately high and adverse human health or environmental effects on minority, low-income or indigenous populations. This action merely

proposes to disapprove a SIP submission as not meeting the CAA.

*K. CAA Section 307(b)(1)*

Section 307(b)(1) of the CAA governs judicial review of final actions by the EPA. This section provides, in part, that petitions for review must be filed in the D.C. Circuit: (i) When the agency action consists of "nationally applicable regulations promulgated, or final actions taken, by the Administrator," or (ii) when such action is locally or regionally applicable, if "such action is based on a determination of nationwide scope or effect and if in taking such action the Administrator finds and publishes that such action is based on such a determination." For locally or regionally applicable final actions, the CAA reserves to the EPA complete discretion whether to invoke the exception in (ii).[37]

If the EPA takes final action on this proposed rulemaking the Administrator intends to exercise the complete discretion afforded to him under the CAA to make and publish a finding that the final action (to the extent a court finds the action to be locally or regionally applicable) is based on a determination of "nationwide scope or effect" within the meaning of CAA section 307(b)(1). Through this rulemaking action (in conjunction with a series of related actions on other SIP submissions for the same CAA obligations), the EPA interprets and applies section 110(a)(2)(d)(i)(I) of the CAA for the 2015 ozone NAAQS based on a common core of nationwide policy judgments and technical analysis concerning the interstate transport of pollutants throughout the continental U.S. In particular, the EPA is applying here (and in other proposed actions related to the same obligations) the same, nationally consistent 4-step framework for assessing good neighbor obligations for the 2015 ozone NAAQS. The EPA relies on a single set of updated, 2016-base year photochemical grid modeling results of the year 2023 as the primary basis for its assessment of air quality conditions and contributions at steps 1 and 2 of that framework. Further, the EPA proposes to determine and apply a set of nationally consistent policy judgments to apply the 4-step framework. The EPA

has selected a nationally uniform analytic year (2023) for this analysis and is applying a nationally uniform approach to nonattainment and maintenance receptors and a nationally uniform approach to contribution threshold analysis.[38] For these reasons, the Administrator intends, if this proposed action is finalized, to exercise the complete discretion afforded to him under the CAA to make and publish a finding that this action is based on one or more determinations of nationwide scope or effect for purposes of CAA section 307(b)(1).[39]

**List of Subjects in 40 CFR Part 52**

Environmental protection, Air pollution control, Incorporation by reference, Ozone.

**Authority:** 42 U.S.C. 7401 *et seq.*

Dated: February 9, 2022.

**Meghan A. McCollister,**

*Regional Administrator, Region 7.*

[FR Doc. 2022–03183 Filed 2–18–22; 8:45 am]

**BILLING CODE 6560–50–P**

---

**ENVIRONMENTAL PROTECTION AGENCY**

**40 CFR Part 52**

**[EPA–R04–OAR–2021–0841; EPA–HQ–OAR–2021–0663; FRL–9421–01–R4]**

**Air Plan Disapproval; AL, MS, TN; Interstate Transport Requirements for the 2015 8-Hour Ozone National Ambient Air Quality Standards**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Proposed rule and withdrawal of proposed rule.

---

**SUMMARY:** Pursuant to the Federal Clean Air Act (CAA or the Act), the Environmental Protection Agency (EPA or Agency) is proposing to disapprove State Implementation Plan (SIP) submittals from Alabama, Mississippi,

---

[37] In deciding whether to invoke the exception by making and publishing a finding that an action is based on a determination of nationwide scope or effect, the Administrator takes into account a number of policy considerations, including his judgment balancing the benefit of obtaining the D.C. Circuit's authoritative centralized review versus allowing development of the issue in other contexts and the best use of Agency resources.

[38] A finding of nationwide scope or effect is also appropriate for actions that cover states in multiple judicial circuits. In the report on the 1977 Amendments that revised section 307(b)(1) of the CAA, Congress noted that the Administrator's determination that the "nationwide scope or effect" exception applies would be appropriate for any action that has a scope or effect beyond a single judicial circuit. See H.R. Rep. No. 95–294 at 323, 324, reprinted in 1977 U.S.C.C.A.N. 1402–03.

[39] The EPA may take a consolidated, single final action on all of the proposed SIP disapproval actions with respect to obligations under CAA section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS. Should EPA take a single final action on all such disapprovals, this action would be nationally applicable, and the EPA would also anticipate, in the alternative, making and publishing a finding that such final action is based on a determination of nationwide scope or effect.

**9546** Federal Register / Vol. 87, No. 35 / Tuesday, February 22, 2022 / Proposed Rules

and Tennessee regarding the interstate transport requirements for the 2015 8-hour ozone national ambient air quality standards (NAAQS or standard). The "Good Neighbor" or "Interstate Transport" provision requires that each state's implementation plan contain adequate provisions to prohibit emissions from within the state from significantly contributing to nonattainment or interfering with maintenance of the NAAQS in other states. This requirement is part of the broader set of "infrastructure" requirements, which are designed to ensure that the structural components of each state's air quality management program are adequate to meet the state's responsibilities under the CAA. These disapprovals, if finalized, will establish a 2-year deadline for EPA to promulgate a Federal Implementation Plan (FIP) to address the relevant interstate transport requirements, unless EPA approves a subsequent SIP submittal that meets these requirements. Disapproval does not start a mandatory sanctions clock.

**DATES:** *Comments.* Comments on this proposed rule must be received on or before April 25, 2022.

*Withdrawal.* As of February 22, 2022, the proposed rule published December 30, 2019, at 84 FR 71854, is withdrawn.

**ADDRESSES:** You may submit comments, identified by Docket No. EPA–R04–OAR–2021–0841, through the Federal eRulemaking Portal at *https://www.regulations.gov* following the online instructions for submitting comments.

*Instructions:* All submissions received must include the Docket No. EPA–R04–OAR–2021–0841 for this rulemaking. Comments received may be posted without change to *https://www.regulations.gov/,* including any personal information provided. For detailed instructions on submitting comments and additional information on the rulemaking process, see the "Public Participation" heading of this document. Out of an abundance of caution for members of the public and staff, the EPA Docket Center and Reading Room are open to the public by appointment only to reduce the risk of transmitting COVID–19. The Docket Center staff also continues to provide remote customer service via email, phone, and webform. For further information on EPA Docket Center services and the current status, please visit EPA online at *https://www.epa.gov/dockets.*

**FOR FURTHER INFORMATION CONTACT:** Evan Adams of the Air Regulatory Management Section, Air Planning and Implementation Branch, Air and Radiation Division, U.S. Environmental Protection Agency, Region 4, 61 Forsyth Street SW, Atlanta, Georgia 30303–8960. Mr. Adams can be reached by telephone at (404) 562–9009, or via electronic mail at *adams.evan@epa.gov.*

**SUPPLEMENTARY INFORMATION:** *Public Participation:* Submit your comments, identified by Docket No. EPA–R04–OAR–2021–0841, at *https://www.regulations.gov.* Once submitted, comments cannot be edited or removed from the docket. EPA may publish any comment received to its public docket. Do not submit to EPA's docket at *https://www.regulations.gov* any information you consider to be Confidential Business Information (CBI) or other information whose disclosure is restricted by statute. Multimedia submissions (audio, video, etc.) must be accompanied by a written comment. The written comment is considered the official comment and should include discussion of all points you wish to make. EPA will generally not consider comments or comment contents located outside of the primary submission (*i.e.,* on the web, cloud, or other file sharing system).

There are two dockets supporting this action, EPA–R04–OAR–2021–0841 and EPA–HQ–OAR–2021–0663. Docket No. EPA–R04–OAR–2021–0841 contains information specific to Alabama, Mississippi, and Tennessee, including this notice of proposed rulemaking. Docket No. EPA–HQ–OAR–2021–0663 contains additional modeling files, emissions inventory files, technical support documents, and other relevant supporting documentation regarding interstate transport of emissions for the 2015 8-hour ozone NAAQS which are being used to support this action. All comments regarding information in either of these dockets are to be made in Docket No. EPA–R04–OAR–2021–0841. For the full EPA public comment policy, information about CBI or multimedia submissions, and general guidance on making effective comments, please visit *https://www.epa.gov/dockets/commenting-epa-dockets.* Due to public health concerns related to COVID–19, the EPA Docket Center and Reading Room are open to the public by appointment only. The Docket Center staff also continues to provide remote customer service via email, phone, and webform. For further information and updates on EPA Docket Center services, please visit EPA online at *https://www.epa.gov/dockets.*

EPA continues to carefully and continuously monitor information from the Centers for Disease Control and Prevention (CDC), local area health departments, and Federal partners so that EPA can respond rapidly as conditions change regarding COVID–19.

The indices to Docket No. EPA–R04–OAR–2021–0841 and Docket No. EPA–R04–OAR–2021–0841 are available electronically at *www.regulations.gov.* While all documents in each docket are listed in their respective index, some information may not be publicly available due to docket file size restrictions or content (*e.g.,* CBI).

**Table of Contents**

I. Background
    A. Description of Statutory Background
    B. Description of EPA's Four Step Interstate Transport Regulatory Process
    C. Background on EPA's Ozone Transport Modeling Information
    D. EPA's Approach To Evaluating Interstate Transport SIPs for the 2015 8-hour Ozone NAAQS
II. SIP Submissions and EPA's Evaluation
    A. Alabama
    B. Mississippi
    C. Tennessee
III. Proposed Actions
IV. Statutory and Executive Order Reviews

**I. Background**

The following provides background for EPA's proposed actions related to the interstate transport requirements for the 2015 8-hour ozone NAAQS for the states of Alabama, Mississippi, and Tennessee.

*A. Description of Statutory Background*

On October 1, 2015, EPA promulgated a revision to the ozone NAAQS (2015 8-hour ozone NAAQS), lowering the level of both the primary and secondary standards to 0.070 parts per million (ppm).[1] Section 110(a)(1) of the CAA requires states to submit, within 3 years after promulgation of a new or revised standard, SIP submissions meeting the applicable requirements of section 110(a)(2).[2] One of these applicable requirements is found in CAA section 110(a)(2)(D)(i)(I), otherwise known as the "good neighbor" or "interstate transport" provision, which generally requires SIPs to contain adequate provisions to prohibit in-state emissions activities from having certain adverse air quality effects on other states due to

[1] National Ambient Air Quality Standards for Ozone, Final Rule, 80 FR 65292 (October 26, 2015). Although the level of the standard is specified in the units of ppm, ozone concentrations are also described in parts per billion (ppb). For example, 0.070 ppm is equivalent to 70 ppb.

[2] SIP revisions that are intended to meet the applicable requirements of section 110(a)(1) and (2) of the CAA are often referred to as infrastructure SIPs and the applicable elements under section 110(a)(2) are referred to as infrastructure requirements.

interstate transport of pollution. There are two so-called "prongs" within CAA section 110(a)(2)(D)(i)(I). A SIP for a new or revised NAAQS must contain adequate provisions prohibiting any source or other type of emissions activity within the state from emitting air pollutants in amounts that will significantly contribute to nonattainment of the NAAQS in another state (prong 1) or interfere with maintenance of the NAAQS in another state (prong 2). EPA and states must give independent significance to prong 1 and prong 2 when evaluating downwind air quality problems under CAA section 110(a)(2)(D)(i)(I).[3]

## B. Description of EPA's Four Step Interstate Transport Regulatory Process

EPA is using the 4-step interstate transport framework (or 4-step framework) to evaluate the states' implementation plan submittals addressing the interstate transport provision for the 2015 8-hour ozone NAAQS. EPA has addressed the interstate transport requirements of CAA section 110(a)(2)(D)(i)(I) with respect to prior ozone NAAQS in several regional regulatory actions, including the Cross-State Air Pollution Rule (CSAPR), which addressed interstate transport with respect to the 1997 ozone NAAQS as well as the 1997 and 2006 fine particulate matter standards,[4] the Cross-State Air Pollution Rule Update (CSAPR Update)[5] and the Revised CSAPR Update, both of which addressed the 2008 ozone NAAQS.[6]

Through the development and implementation of the CSAPR rulemakings and prior regional rulemakings pursuant to the interstate transport provision,[7] EPA, working in partnership with states, developed the following 4-step interstate transport framework to evaluate a state's obligations to eliminate interstate transport emissions under the interstate transport provision for the ozone NAAQS: (1) Identify monitoring sites that are projected to have problems attaining and/or maintaining the NAAQS (*i.e.,* nonattainment and/or maintenance receptors); (2) identify states that impact those air quality problems in other (*i.e.,* downwind) states sufficiently such that the states are considered "linked" and therefore warrant further review and analysis; (3) identify the emissions reductions necessary (if any), applying a multifactor analysis, to eliminate each linked upwind state's significant contribution to nonattainment or interference with maintenance of the NAAQS at the locations identified in Step 1; and (4) adopt permanent and enforceable measures needed to achieve those emissions reductions.

## C. Background on EPA's Ozone Transport Modeling Information

In general, EPA has performed nationwide air quality modeling to project ozone design values which are used in combination with measured data to identify nonattainment and maintenance receptors. To quantify the contribution of emissions from specific upwind states on 2023 ozone design values for the identified downwind nonattainment and maintenance receptors, EPA performed nationwide, state-level ozone source apportionment modeling for 2023. The source apportionment modeling provided contributions to ozone at receptors from precursor emissions of anthropogenic nitrogen oxides ($NO_X$) and volatile organic compounds (VOCs) in individual upwind states.

EPA has released several documents containing projected design values, contributions, and information relevant to evaluating interstate transport with respect to the 2015 8-hour ozone NAAQS. First, on January 6, 2017, EPA published a notice of data availability (NODA) in which the Agency requested comment on preliminary interstate ozone transport data including projected ozone design values and interstate contributions for 2023 using a 2011 base year platform.[8] In the NODA, EPA used the year 2023 as the analytic year for this preliminary modeling because that year aligns with the expected attainment year for Moderate ozone nonattainment areas for the 2015 8-hour ozone NAAQS.[9] On October 27, 2017, EPA released a memorandum (October 2017 memorandum) containing updated modeling data for 2023, which incorporated changes made in response to comments on the NODA, and noted that the modeling may be useful for states developing SIPs to address interstate transport obligations for the 2008 ozone NAAQS.[10] On March 27, 2018, EPA issued a memorandum (March 2018 memorandum) noting that the same 2023 modeling data released in the October 2017 memorandum could also be useful for identifying potential downwind air quality problems with respect to the 2015 8-hour ozone NAAQS at Step 1 of the 4-step interstate transport framework.[11] The March 2018 memorandum also included the then newly available contribution modeling data for 2023 to assist states in evaluating their impact on potential downwind air quality problems for the 2015 8-hour ozone NAAQS under Step 2 of the 4-step interstate transport framework.[12] EPA subsequently issued two more memoranda in August and October 2018, providing additional information to states developing interstate transport SIP submissions for the 2015 8-hour ozone NAAQS concerning, respectively, potential contribution thresholds that may be appropriate to apply in Step 2 of the 4-step interstate transport framework, and considerations for identifying downwind areas that may have problems maintaining the standard at

---

[3] *See North Carolina* v. *EPA,* 531 F.3d 896, 909–11 (D.C. Cir. 2008).

[4] *See* Federal Implementation Plans: Interstate Transport of Fine Particulate Matter and Ozone and Correction of SIP Approvals, 76 FR 48208 (August 8, 2011).

[5] Cross-State Air Pollution Rule Update for the 2008 Ozone NAAQS, 81 FR 74504 (October 26, 2016).

[6] In 2019, the United States Court of Appeals for the District of Columbia Circuit (D.C. Circuit) remanded CSAPR Update to the extent it failed to require upwind states to eliminate their significant contribution by the next applicable attainment date by which downwind states must come into compliance with the NAAQS, as established under CAA section 181(a). *Wisconsin* v. *EPA,* 938 F.3d 303, 313 (D.C. Cir. 2019). The Revised CSAPR Update for the 2008 Ozone NAAQS, 86 FR 23054 (April 30, 2021), responded to the remand of CSAPR Update in *Wisconsin* and the vacatur of a separate rule, the "CSAPR Close-Out," 83 FR 65878 (December 21, 2018), in *New York* v. *EPA,* 781 F. App'x. 4 (D.C. Cir. 2019).

[7] In addition to CSAPR rulemakings, other regional rulemakings addressing ozone transport include the "$NO_X$ SIP Call," 63 FR 57356 (October 27, 1998), and the "Clean Air Interstate Rule" (CAIR), 70 FR 25162 (May 12, 2005).

[8] *See* Notice of Availability of the Environmental Protection Agency's Preliminary Interstate Ozone Transport Modeling Data for the 2015 8-hour Ozone National Ambient Air Quality Standard (NAAQS), 82 FR 1733 (January 6, 2017).

[9] *See* 82 FR 1733, 1735 (January 6, 2017).

[10] *See* Information on the Interstate Transport State Implementation Plan Submissions for the 2008 Ozone National Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I), October 27 ("October 2017 memorandum"), available in Docket No. EPA–HQ–OAR–2021–0663 or at *https://www.epa.gov/ interstate-air-pollution-transport/interstate-air-pollution-transport-memos-and-notices.*

[11] *See* Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I), March 27, 2018 ("March 2018 memorandum"), available in Docket No. EPA–HQ–OAR–2021–0663 or at *https://www.epa.gov/ interstate-air-pollution-transport/interstate-air-pollution-transport-memos-and-notices.*

[12] The March 2018 memorandum, however, provided, "While the information in this memorandum and the associated air quality analysis data could be used to inform the development of these SIPs, the information is not a final determination regarding states' obligations under the good neighbor provision. Any such determination would be made through notice-and-comment rulemaking."

Step 1 of the 4-step interstate transport framework.[13]

Since the release of the modeling data shared in the March 2018 memorandum, EPA performed updated modeling using a 2016-based emissions modeling platform (*i.e.*, 2016v1). This emissions platform was developed under the EPA/Multi-Jurisdictional Organization (MJO)/state collaborative project.[14] This collaborative project was a multi-year joint effort by EPA, MJOs, and states to develop a new, more recent emissions platform for use by EPA and states in regulatory modeling as an improvement over the dated 2011-based platform that EPA had used to project ozone design values and contribution data provided in the 2017 and 2018 memoranda. EPA used the 2016v1 emissions to project ozone design values and contributions for 2023. On October 30, 2020, in the Notice of Proposed Rulemaking for the Revised CSAPR Update, EPA released and accepted public comment on 2023 modeling that used the 2016v1 emissions platform.[15] Although the Revised CSAPR Update addressed transport for the 2008 ozone NAAQS, the projected design values and contributions from the 2016v1 platform are also useful for identifying downwind ozone problems and linkages with respect to the 2015 8-hour ozone NAAQS.[16]

Following the Revised CSAPR Update final rule, EPA made further updates to the 2016 emissions platform to include mobile emissions from EPA's Motor Vehicle Emission Simulator (MOVES) model[17] and updated emissions projections for electric generating units (EGUs) that reflect the emissions reductions from the Revised CSAPR Update, recent information on plant

closures, and other sector trends. The construct of the updated emissions platform, 2016v2, is described in the Preparation of Emissions Inventories for the 2016v2 North American Emissions Modeling Platform technical support document (TSD) for this proposed rule and is included in Docket No. EPA–HQ–OAR–2021–0663. EPA performed air quality modeling of the 2016v2 emissions using the most recent public release version of the Comprehensive Air Quality Modeling with Extensions (CAMx) photochemical modeling, version 7.10.[18] EPA proposes to primarily rely on modeling based on the updated and newly available 2016v2 emissions platform in evaluating these submissions with respect to Steps 1 and 2 of the 4-step interstate transport framework. By using the updated modeling results, EPA is using the most current and technically appropriate information for this proposed rulemaking. Section II of this notice and the Air Quality Modeling TSD included in Docket No. EPA–HQ–OAR–2021–0663 for this proposal contain additional detail on the modeling performed using the 2016v2 emissions modeling.

In this notice, EPA is accepting public comment on this updated 2023 modeling, which uses the 2016v2 emissions platform. Details on the air quality modeling and the methods for projecting design values and determining contributions in 2023 are described in the Air Quality Modeling TSD for 2015 8-hour ozone NAAQS Transport SIP Proposed Actions. Comments on EPA's air quality modeling should be submitted in Docket No. EPA–R04–OAR–2021–0841. Comments are not being accepted in Docket No. EPA–HQ–OAR–2021–0663.

States may have chosen to rely on the results of EPA modeling and/or alternative modeling performed by states or Multi-Jurisdictional Organizations (MJOs) to evaluate downwind air quality problems and contributions as part of their submissions. In Section II, EPA evaluates how Alabama, Mississippi, and Tennessee used air quality modeling information in their submissions.

*D. EPA's Approach to Evaluating Interstate Transport SIPs for the 2015 8-Hour Ozone NAAQS*

EPA proposes to apply a consistent set of policy judgments across all states for purposes of evaluating interstate transport obligations and the

approvability of interstate transport SIP submittals for the 2015 8-hour ozone NAAQS. These policy judgments reflect consistency with relevant case law and past agency practice as reflected in CSAPR and related rulemakings. Nationwide consistency in approach is particularly important in the context of interstate ozone transport, which is a regional-scale pollution problem involving many smaller contributors. Effective policy solutions to the problem of interstate ozone transport going back to the $NO_X$ SIP Call have necessitated the application of a uniform framework of policy judgments in order to ensure an ''efficient and equitable'' approach. *See EME Homer City Generation, LP* v. *EPA,* 572 U.S. 489, 519 (2014).

In the March, August, and October 2018 memoranda, EPA recognized that states may be able to establish alternative approaches to addressing their interstate transport obligations for the 2015 8-hour ozone NAAQS that vary from a nationally uniform framework. EPA emphasized in these memoranda, however, that such alternative approaches must be technically justified and appropriate in light of the facts and circumstances of each particular state's submittal. In general, EPA continues to believe that deviation from a nationally consistent approach to ozone transport must be substantially justified and have a well-documented technical basis that is consistent with relevant case law. Where states submitted SIPs that rely on any such potential concepts as may have been identified or suggested in the past, EPA will evaluate whether the state adequately justified the technical and legal basis for doing so.

EPA notes that certain potential concepts included in an attachment to the March 2018 memorandum require unique consideration, and these ideas do not constitute agency guidance with respect to transport obligations for the 2015 8-hour ozone NAAQS. Attachment A to the March 2018 memorandum identified a ''Preliminary List of Potential Flexibilities'' that could potentially inform SIP development.[19] However, EPA made clear in that attachment that the list of ideas were not suggestions endorsed by the Agency but rather ''comments provided in various forums'' on which EPA sought ''feedback from interested stakeholders.''[20] Further, Attachment A stated, ''EPA is not at this time making any determination that the ideas discussed below are consistent with the requirements of the CAA, nor is EPA specifically recommending that states

---

[13] *See* Analysis of Contribution Thresholds for Use in Clean Air Act Section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards, August 31, 2018) (''August 2018 memorandum''), and Considerations for Identifying Maintenance Receptors for Use in Clean Air Act Section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards, October 19, 2018 (''October 2018 memorandum''), available in Docket No. EPA–HQ–OAR–2021–0663 or at *https://www.epa.gov/airmarkets/memo-and-supplemental-information-regarding-interstate-transport-sips-2015-ozone-naaqs.*

[14] The results of this modeling, as well as the underlying modeling files, are included in Docket No. EPA–HQ–OAR–2021–0663.

[15] *See* 85 FR 68964, 68981 (October 30, 2020).

[16] *See* the Air Quality Modeling Technical Support Document for the Final Revised Cross-State Air Pollution Rule Update, included in Docket No. EPA–HQ–OAR–2021–0663.

[17] Additional details and documentation related to the MOVES3 model can be found at *https://www.epa.gov/moves/latest-version-motor-vehicle-emission-simulator-moves.*

[18] Ramboll Environment and Health, January 2021, *www.camx.com.*

[19] March 2018 memorandum, Attachment A.

[20] *Id.* at A–1.

use these approaches." [21] Attachment A to the March 2018 memorandum, therefore, does not constitute agency guidance, but was intended to generate further discussion around potential approaches to addressing ozone transport among interested stakeholders. To the extent states sought to develop or rely on these ideas in support of their SIP submittals, EPA will thoroughly review the technical and legal justifications for doing so.

The remainder of this section describes the EPA's proposed framework with respect to analytic year, definition of nonattainment and maintenance receptors, selection of contribution threshold, and multifactor control strategy assessment.

### 1. Selection of Analytic Year

In general, the states and EPA must implement the interstate transport provision in a manner "consistent with the provisions of [title I of the CAA.]" *See* CAA section 110(a)(2)(D)(i). This requires, among other things, that these obligations are addressed consistently with the timeframes for downwind areas to meet their CAA obligations. With respect to ozone NAAQS, under CAA section 181(a), this means obligations must be addressed "as expeditiously as practicable" and no later than the schedule of attainment dates provided in CAA section 181(a)(1).[22] Several D.C. Circuit court decisions address the issue of the relevant analytic year for the purposes of evaluating ozone transport air-quality problems. On September 13, 2019, the D.C. Circuit issued a decision in *Wisconsin* v. *EPA,* remanding the CSAPR Update to the extent that it failed to require upwind states to eliminate their significant contribution by the next applicable attainment date by which downwind states must come into compliance with the NAAQS, as established under CAA section 181(a). *See* 938 F.3d 303, 313.

On May 19, 2020, the D.C. Circuit issued a decision in *Maryland* v. *EPA* that cited the *Wisconsin* decision in holding that EPA must assess the impact of interstate transport on air quality at the next downwind attainment date, including Marginal area attainment dates, in evaluating the basis for EPA's denial of a petition under CAA section 126(b). *Maryland* v. *EPA, 958 F.3d 1185, 1203–04 (D.C. Cir. 2020).* The court noted that "section 126(b) incorporates

the Good Neighbor Provision," and, therefore, "EPA must find a violation [of section 126] if an upwind source will significantly contribute to downwind nonattainment at the *next downwind attainment deadline.* Therefore, the agency must evaluate downwind air quality at that deadline, not at some later date." *Id.* at 1204 (emphasis added). EPA interprets the court's holding in *Maryland* as requiring the states and the Agency, under the good neighbor provision, to assess downwind air quality as expeditiously as practicable and no later than the next applicable attainment date,[23] which is now the Moderate area attainment date under CAA section 181 for ozone nonattainment. The Moderate area attainment date for the 2015 8-hour ozone NAAQS is August 3, 2024.[24] EPA believes that 2023 is now the appropriate year for analysis of interstate transport obligations for the 2015 8-hour ozone NAAQS, because the 2023 ozone season is the last relevant ozone season during which achieved emissions reductions in linked upwind states could assist downwind states with meeting the August 3, 2024, Moderate area attainment date for the 2015 8-hour ozone NAAQS.

EPA recognizes that the attainment date for nonattainment areas classified as Marginal for the 2015 8-hour ozone NAAQS was August 3, 2021. Under the *Maryland* holding, any necessary emissions reductions to satisfy interstate transport obligations should have been implemented by no later than this date. At the time of the statutory deadline to submit interstate transport SIPs (October 1, 2018), many states relied upon EPA modeling of the year 2023, and no state provided an alternative analysis using a 2021 analytic year (or the prior 2020 ozone season). However, EPA must act on SIP submittals using the information available at the time it takes such action. In this circumstance, EPA does not believe it would be appropriate to evaluate states' obligations under CAA section 110(a)(2)(D)(i)(I) as of an attainment date that is wholly in the

past, because the Agency interprets the interstate transport provision as forward looking. *See* 86 FR 23054, 23074; *see also Wisconsin,* 938 F.3d at 322. Consequently, in this proposal EPA will use the analytical year of 2023 to evaluate each state's CAA section 110(a)(2)(D)(i)(I) SIP submission with respect to the 2015 8-hour ozone NAAQS.

### 2. Step 1 of the 4-Step Interstate Transport Framework

In Step 1, EPA identifies monitoring sites that are projected to have problems attaining and/or maintaining the NAAQS in the 2023 analytic year. Where EPA's analysis shows that a site does not fall under the definition of a nonattainment or maintenance receptor, that site is excluded from further analysis under EPA's 4-step interstate transport framework. For sites that are identified as a nonattainment or maintenance receptor in 2023, EPA proceeds to the next step of the 4-step interstate transport framework by identifying the upwind state's contribution to those receptors.

EPA's approach to identifying ozone nonattainment and maintenance receptors in this action is consistent with the approach used in previous transport rulemakings. EPA's approach gives independent consideration to both the "contribute significantly to nonattainment" and the "interfere with maintenance" prongs of CAA section 110(a)(2)(D)(i)(I), consistent with the D.C. Circuit's direction in *North Carolina* v. *EPA.*[25]

For the purpose of this proposal, EPA identifies nonattainment receptors as those monitoring sites that are projected to have average design values that exceed the NAAQS and that are also measuring nonattainment based on the most recent monitored design values. This approach is consistent with prior transport rulemakings, such as the CSAPR Update, where EPA defined nonattainment receptors as those areas that both currently measure nonattainment and that EPA projects will be in nonattainment in the future analytic year (*i.e.,* 2023).[26]

In addition, in this proposal, EPA identifies a receptor to be a "maintenance" receptor for purposes of

---

[21] *Id.*

[22] For attainment dates for the 2015 8-hour ozone NAAQS, refer to CAA section 181(a), 40 CFR 51.1303, and Additional Air Quality Designations for the 2015 Ozone National Ambient Air Quality Standards, 83 FR 25776 (June 4, 2018, effective August 3, 2018).

[23] EPA notes that the court in *Maryland* did not have occasion to evaluate circumstances in which EPA may determine that an upwind linkage to a downwind air quality problem exists at Steps 1 and 2 of the interstate transport framework by a particular attainment date, but for reasons of impossibility or profound uncertainty the Agency is unable to mandate upwind pollution controls by that date. *See Wisconsin,* 938 F.3d at 320. The D.C. Circuit noted in *Wisconsin* that upon a sufficient showing, these circumstances may warrant flexibility in effectuating the purpose of the interstate transport provision.

[24] *See* CAA section 181(a); 40 CFR 51.1303; Additional Air Quality Designations for the 2015 Ozone National Ambient Air Quality Standards, 83 FR 25776 (June 4, 2018, effective August 3, 2018).

[25] *See North Carolina* v. *EPA,* 531 F.3d 896, 910–11 (D.C. Cir. 2008) (holding that EPA must give "independent significance" to each prong of CAA section 110(a)(2)(D)(i)(I)).

[26] *See* 81 FR 74504 (October 26, 2016). This same concept, relying on both current monitoring data and modeling to define nonattainment receptor, was also applied in CAIR. *See* 70 FR at 25241, 25249 (January 14, 2005); *see also North Carolina,* 531 F.3d at 913–14 (affirming as reasonable EPA's approach to defining nonattainment in CAIR).

defining interference with maintenance, consistent with the method used in CSAPR and upheld by the D.C. Circuit in *EME Homer City Generation, L.P.* v. *EPA,* 795 F.3d 118, 136 (D.C. Cir. 2015).[27] Specifically, EPA identified maintenance receptors as those receptors that would have difficulty maintaining the relevant NAAQS in a scenario that takes into account historical variability in air quality at that receptor. The variability in air quality was determined by evaluating the ''maximum'' future design value at each receptor based on a projection of the maximum measured design value over the relevant period. EPA interprets the projected maximum future design value to be a potential future air quality outcome consistent with the meteorology that yielded maximum measured concentrations in the ambient data set analyzed for that receptor (*i.e.,* ozone conducive meteorology). EPA also recognizes that previously experienced meteorological conditions (*e.g.,* dominant wind direction, temperatures, air mass patterns) promoting ozone formation that led to maximum concentrations in the measured data may reoccur in the future. The maximum design value gives a reasonable projection of future air quality at the receptor under a scenario in which such conditions do, in fact, reoccur. The projected maximum design value is used to identify upwind emissions that, under those circumstances, could interfere with the downwind area's ability to maintain the NAAQS.

Recognizing that nonattainment receptors are also, by definition, maintenance receptors, the EPA often uses the term ''maintenance-only'' to refer to those receptors that are not nonattainment receptors. Consistent with the concepts for maintenance receptors, as described above, the EPA identifies ''maintenance-only'' receptors as those monitoring sites that have projected average design values above the level of the applicable NAAQS, but that are not currently measuring nonattainment based on the most recent official design values. In addition, those monitoring sites with projected average design values below the NAAQS, but with projected maximum design values above the NAAQS are also identified as ''maintenance-only'' receptors, even if they are currently measuring nonattainment based on the most recent official design values.

### 3. Step 2 of the 4-Step Interstate Transport Framework

In Step 2, EPA quantifies the contribution of each upwind state to each receptor in the 2023 analytic year. The contribution metric used in Step 2 is defined as the average impact from each state to each receptor on the days with the highest ozone concentrations at the receptor based on the 2023 modeling. If a state's contribution value does not equal or exceed the threshold of 1 percent of the NAAQS (*i.e.,* 0.70 ppb for the 2015 8-hour ozone NAAQS), the upwind state is not ''linked'' to a downwind air quality problem, and EPA, therefore, concludes that the state does not significantly contribute to nonattainment or interfere with maintenance of the NAAQS in the downwind states. However, if a state's contribution equals or exceeds the 1 percent threshold, the state's emissions are further evaluated in Step 3, considering both air quality and cost as part of a multi-factor analysis, to determine what, if any, emissions might be deemed ''significant'' and, thus, must be eliminated under CAA section 110(a)(2)(D)(i)(I).

EPA is proposing to rely in the first instance on the 1 percent threshold for the purpose of evaluating a state's contribution to nonattainment or maintenance of the 2015 8-hour ozone NAAQS (*i.e.,* 0.70 ppb) at downwind receptors. This is consistent with the Step 2 approach that EPA applied in CSAPR for the 1997 ozone NAAQS, which has subsequently been applied in the CSAPR Update when evaluating interstate transport obligations for the 2008 ozone NAAQS. EPA continues to find 1 percent to be an appropriate threshold. For ozone, as EPA found in the CAIR, CSAPR, and CSAPR Update, a portion of the nonattainment problems from anthropogenic sources in the U.S. result from the combined impact of relatively small contributions from many upwind states, along with contributions from in-state sources and, in some cases, substantially larger contributions from a subset of particular upwind states. EPA's analysis shows that much of the ozone transport problem being analyzed in this proposed rule is still the result of the collective impacts of contributions from many upwind states. Therefore, application of a consistent contribution threshold is necessary to identify those upwind states that should have responsibility for addressing their contribution to the downwind nonattainment and maintenance problems to which they collectively contribute. Continuing to use 1 percent

of the NAAQS as the screening metric to evaluate collective contribution from many upwind states also allows EPA (and states) to apply a consistent framework to evaluate interstate emissions transport under the interstate transport provision from one NAAQS to the next. *See* 81 FR at 74518; *see also* 86 FR at 23085 (reviewing and explaining rationale from CSAPR, 76 FR at 48237–38, for selection of 1 percent threshold).

#### (a) EPA's Experience With Alternative Step 2 Thresholds

EPA's August 2018 memorandum recognized that in certain circumstances, a state may be able to establish that an alternative contribution threshold of 1 ppb is justifiable. Where a state relies on this alternative threshold, and where that state determined that it was not linked at Step 2 using the alternative threshold, EPA will evaluate whether the state provided a technically sound assessment of the appropriateness of using this alternative threshold based on the facts and circumstances underlying its application in the particular SIP submission.

EPA here shares further evaluation of its experience since the issuance of the August 2018 memorandum regarding use of alternative thresholds at Step 2. This experience leads the Agency to now believe it may not be appropriate to continue to attempt to recognize alternative contribution thresholds at Step 2. The August 2018 memorandum stated that ''it may be reasonable and appropriate'' for states to rely on an alternative threshold of 1 ppb threshold at Step 2.[28] (The memorandum also indicated that any higher alternative threshold, such as 2 ppb, would likely not be appropriate.) However, EPA also provided that ''air agencies should consider whether the recommendations in this guidance are appropriate for each situation.'' Following receipt and review of 49 good neighbor SIP submittals for the 2015 8-hour ozone NAAQS, EPA's experience has been that nearly every state that attempted to rely on a 1 ppb threshold did not provide sufficient information and analysis to support a determination that an alternative threshold was reasonable or appropriate for that state.

For instance, in nearly all submittals, the states did not provide EPA with analysis specific to their state or the receptors to which its emissions are potentially linked. In one case, the proposed approval of Iowa's SIP submittal, EPA expended its own

---

[27] *See* 76 FR 48208 (August 8, 2011). The CSAPR Update and Revised CSAPR Update also used this approach. *See* 81 FR 74504 (October 26, 2016) and 86 FR 23054 (April 30, 2021).

[28] *See* August 2018 memorandum at 4.

resources to attempt to supplement the information submitted by the state, in order to more thoroughly evaluate the state-specific circumstances that could support approval.[29] It was at EPA's sole discretion to perform this analysis in support of the state's submittal, and the Agency is not obligated to conduct supplemental analysis to fill the gaps whenever it believes a state's analysis is insufficient. The Agency no longer intends to undertake supplemental analysis of SIP submittals with respect to alternative thresholds at Step 2 for purposes of the 2015 8-hour ozone NAAQS.

Furthermore, EPA's experience since 2018 is that allowing for alternative Step 2 thresholds may be impractical or otherwise inadvisable for a number of additional policy reasons. For a regional air pollutant such as ozone, consistency in requirements and expectations across all states is essential. Based on its review of submittals to-date and after further consideration of the policy implications of attempting to recognize an alternative Step 2 threshold for certain states, the Agency now believes the attempted use of different thresholds at Step 2 with respect to the 2015 8-hour ozone NAAQS raises substantial policy consistency and practical implementation concerns.[30] The availability of different thresholds at Step 2 has the potential to result in inconsistent application of good neighbor obligations based solely on the strength of a state's implementation plan submittal at Step 2 of the 4-step interstate transport framework. From the perspective of ensuring effective regional implementation of good neighbor obligations, the more important analysis is the evaluation of the emissions reductions needed, if any, to address a state's significant contribution after consideration of a multifactor analysis at Step 3, including a detailed evaluation that considers air quality factors and cost. Where alternative thresholds for purposes of Step 2 may be ''similar'' in terms of capturing the relative amount of upwind contribution (as described in the August 2018 memorandum), nonetheless, use of

an alternative threshold would allow certain states to avoid further evaluation of potential emission controls while other states must proceed to a Step 3 analysis. This can create significant equity and consistency problems among states.

Further, it is not clear that national ozone transport policy is best served by allowing for less stringent thresholds at Step 2. EPA recognized in the August 2018 memorandum that there was some similarity in the amount of total upwind contribution captured (on a nationwide basis) between 1 percent and 1 ppb. However, EPA notes that while this may be true in one sense, that is hardly a compelling basis to move to a 1 ppb threshold. Indeed, the 1 ppb threshold has the disadvantage of losing a certain amount of total upwind contribution for further evaluation at Step 3 (e.g., roughly 7 percent of total upwind state contribution was lost according to the modeling underlying the August 2018 memorandum;[31] in EPA's updated modeling, the amount lost is 5 percent). Considering the core statutory objective of ensuring elimination of all significant contribution to nonattainment or interference of the NAAQS in other states and the broad, regional nature of the collective contribution problem with respect to ozone, there does not appear to be a compelling policy imperative in allowing some states to use a 1 ppb threshold while others rely on a 1 percent of the NAAQS threshold.

Consistency with past interstate transport actions such as CSAPR, and the CSAPR Update and Revised CSAPR Update rulemakings (which used a Step 2 threshold of 1 percent of the NAAQS for two less stringent ozone NAAQS), is also important. Continuing to use a 1 percent of NAAQS approach ensures that as the NAAQS are revised and made more stringent, an appropriate increase in stringency at Step 2 occurs, so as to ensure an appropriately larger amount of total upwind-state contribution is captured for purposes of fully addressing interstate transport. See 76 FR 48208, 48237–38 (August 8, 2011).

Therefore, notwithstanding the August 2018 memorandum's recognition of the potential viability of alternative Step 2 thresholds, and in particular, a potentially applicable 1 ppb threshold, EPA's experience since the issuance of that memorandum has revealed substantial programmatic and policy difficulties in attempting to implement this approach. Nonetheless, EPA is not at this time rescinding the August 2018 memorandum. As

discussed further below, the basis for disapproval of Alabama, Mississippi, and Tennessee's SIP submissions with respect to the Step 2 analysis is, in the Agency's view, warranted even under the terms of the August 2018 memorandum. EPA invites comment on this broader discussion of issues associated with alternative thresholds at Step 2. Depending on comment and further evaluation of this issue, EPA may determine to rescind the August 2018 memorandum in the future.

**4. Step 3 of the 4-Step Interstate Transport Framework**

Consistent with EPA's longstanding approach to eliminating significant contribution or interference with maintenance, at Step 3, states linked at Steps 1 and 2 are generally expected to prepare a multifactor assessment of potential emissions controls. EPA's analysis at Step 3 in prior Federal actions addressing interstate transport requirements has primarily focused on an evaluation of cost-effectiveness of potential emissions controls (on a marginal cost-per-ton basis), the total emissions reductions that may be achieved by requiring such controls (if applied across all linked upwind states), and an evaluation of the air quality impacts such emissions reductions would have on the downwind receptors to which a state is linked; other factors may potentially be relevant if adequately supported. In general, where EPA's or alternative air quality and contribution modeling establishes that a state is linked at Steps 1 and 2, it will be insufficient at Step 3 for a state merely to point to its existing rules requiring control measures as a basis for approval. In general, the emissions-reducing effects of all existing emissions control requirements are already reflected in the air quality results of the modeling for Steps 1 and 2. If the state is shown to still be linked to one or more downwind receptor(s), states must provide a well-documented evaluation determining whether their emissions constitute significant contribution or interference with maintenance by evaluating additional available control opportunities by preparing a multifactor assessment. While EPA has not prescribed a particular method for this assessment, EPA expects states at a minimum to present a sufficient technical evaluation. This would typically include information on emissions sources, applicable control technologies, emissions reductions, costs, cost effectiveness, and downwind air quality impacts of the estimated reductions, before concluding that no

---

[29] Air Plan Approval; Iowa; Infrastructure State Implementation Plan Requirements for the 2015 Ozone National Ambient Air Quality Standard, 85 FR 12232 (March 2, 2020). The Agency received adverse comment on this proposed approval and has not taken final action with respect to this proposal.

[30] EPA notes that Congress has placed on EPA a general obligation to ensure the requirements of the CAA are implemented consistently across states and regions. See CAA section 301(a)(2). Where the management and regulation of interstate pollution levels spanning many states is at stake, consistency in application of CAA requirements is paramount.

[31] See August 2018 memorandum at 4.

additional emissions controls should be required.[32]

5. Step 4 of the 4-Step Interstate Transport Framework

At Step 4, states (or EPA) develop permanent and federally enforceable control strategies to achieve the emissions reductions determined to be necessary at Step 3 to eliminate significant contribution to nonattainment or interference with maintenance of the NAAQS. For a state linked at Steps 1 and 2 to rely on an emissions control measure at Step 3 to address its interstate transport obligations, that measure must be included in the state's implementation plan so that it is permanent and federally enforceable. *See* CAA section 110(a)(2)(D) ("Each such [SIP] shall . . . contain adequate provisions . . . ."). *See also* CAA section 110(a)(2)(A); *Committee for a Better Arvin* v. *EPA,* 786 F.3d 1169, 1175–76 (9th Cir. 2015) (holding that measures relied on by a state to meet CAA requirements must be included in the SIP).

## II. SIP Submissions and EPA's Evaluation

### A. Alabama

The following section provides information related to Alabama's SIP submission addressing interstate transport requirements for the 2015 8-hour ozone NAAQS, and EPA's analysis of Alabama's submission.

1. Summary of Alabama's 2015 Ozone Interstate Transport SIP Submission

On August 20, 2018,[33] Alabama submitted a SIP revision addressing the CAA section 110(a)(2)(D)(i)(I) good neighbor interstate transport requirements for the 2015 8-hour ozone NAAQS.[34] The SIP submission provided Alabama's analysis of its impact to downwind states and concluded that emissions from the State will not significantly contribute to nonattainment or interfere with

maintenance of the 2015 8-hour ozone NAAQS in other states, based on modeling results included in EPA's March 2018 memorandum. Alabama's submission relied on the results of EPA's modeling of 2023 using a 2011 base year, as contained in the March 2018 memorandum (which the State attached to its submittal), to identify downwind nonattainment and maintenance receptors that may be impacted by emissions from sources in the State at Step 1 of the 4-step framework.[35]

Alabama Department of Environmental Management (ADEM) reviewed this modeling, concurred with the results, and determined that the future year projections were appropriate for the purposes of evaluating Alabama's impact on nonattainment and maintenance receptors in other states at Step 1. Alabama used this information to find that emissions from Alabama would not contribute above 1 percent of the NAAQS at any projected nonattainment or maintenance receptors at Step 2 of the 4-step framework (using EPA's approach to defining such receptors).

Alabama's August 20, 2018, submittal also identified existing SIP-approved regulations and Federal programs[36] that ADEM noted regulate ozone-precursor emissions from sources in the State, including CSAPR trading programs.[37] Alabama's submission acknowledges that CSAPR does not address interstate transport for the 2015 ozone standard but does provide residual $NO_X$ emissions reductions and notes the adoption of CSAPR $NO_X$ ozone season trading programs into the Alabama SIP

on August 31, 2016, and October 6, 2017.[38] Alabama notes that the implementation of the existing SIP-approved regulations and Federal programs provide for a decline in ozone precursors emissions in the State. Alabama also stated that ozone-precursor emissions would continue to decline in the State.

Based on the information from Alabama's transport SIP, ADEM concluded that emissions from Alabama sources will not significantly contribute to nonattainment or interfere with maintenance of the 2015 8-hour ozone NAAQS in any other state.

2. Prior Notices Related to Alabama's SIP Submission

Previously, EPA proposed approval of Alabama's interstate transport provisions for the 2015 8-hour ozone NAAQS as addressed in Alabama's August 20, 2018 submission and based on the contribution modeling provided in the March 2018 memorandum. *See* 84 FR 71854 (December 30, 2019). When EPA completed updated modeling of 2023 in 2020 using a 2016-based emissions modeling platform (2016v1), it became evident that Alabama was projected to be linked to downwind nonattainment and maintenance receptors (see footnote 40 below). As a result, EPA deferred acting on Alabama's SIP submittal when it published a supplemental proposal in 2021 to approve four other southeastern states' good neighbor SIP submissions using the updated 2023 modeling. *See* 86 FR 37942, 37943 (July 19, 2021). The updated 2023 modeling using an updated 2016-based emissions modeling platform (2016v2) confirms the prior 2016-based modeling of 2023 in that it continues to show Alabama is linked to at least one downwind nonattainment or maintenance receptor. Based on this updated modeling using the 2016-based emissions modeling platform, discussed in section I.C above, EPA is now withdrawing its 2019 proposed approval on Alabama's September 13, 2018, interstate transport SIP as published on December 30, 2019, at 84 FR 71854.

3. EPA's Evaluation of Alabama's 2015 Ozone Interstate Transport SIP Submission

EPA is proposing to find that Alabama's August 20, 2018, SIP submission does not meet Alabama's obligations with respect to prohibiting emissions that contribute significantly

---

[32] As examples of general approaches for how such an analysis could be conducted for their sources, states could look to the CSAPR Update, 81 FR 74504, 74539–51; CSAPR, 76 FR 48208, 48246–63; CAIR, 70 FR 25162, 25195–229; or the $NO_X$ SIP Call, 63 FR 57356, 57399–405. *See also* Revised CSAPR Update, 86 FR 23054, 23086–23116. Consistently across these rulemakings, EPA has developed emissions inventories, analyzed different levels of control stringency at different cost thresholds, and assessed resulting downwind air quality improvements.

[33] The August 20, 2018, SIP submission provided by ADEM was received by EPA on August 27, 2018.

[34] On August 20, 2018, Alabama submitted multiple SIP revisions under one cover letter. EPA is only acting on Alabama's 2015 ozone good neighbor interstate transport SIP requirements in this notice.

[35] EPA notes that Alabama's SIP submission is not organized around EPA's 4-step framework for assessing good neighbor obligations, but EPA summarizes the submission using that framework for clarity here.

[36] Alabama's submission cites the following SIP approved regulations: Administrative Code Rule 335–3–6, "Control of Organic Emissions", 335–3–8, "Control of Nitrogen Oxides Emissions", 335–3–14–.01, "General Provisions", 335–3–14–.02, "Permit Procedures", 335–3–14–.03, "Standards for Granting Permits", 335–3–14–.04, "Air Permits Authorizing Construction in in Clean Air Areas [Prevention of Significant Deterioration Permitting (PSD)]" and 335–3–14–.05, "Air Permits Authorizing Construction in or Near Nonattainment Areas." Alabama's Submission cites the following Federal Rules: EPA's Tier 1 and 2 mobile source rules, EPA's nonroad Diesel Rule, EPA's 2007 Heavy-duty Highway Rule, New Source Performance Standards, National Emission Standards for Hazardous Air Pollutants, and CSAPR.

[37] Alabama's SIP references CSAPR, which covers the $NO_X$ ozone season trading program established in EPA's 2011 CSAPR, 76 FR 48208 (August 8, 2011). In addition, Alabama's submittal includes a reference to the SIP-approved rules that adopted the CSAPR Update, 81 FR 74504 (October 26, 2016). *See* 82 FR 46674 (October 6, 2017).

[38] *See* 81 FR 59869 (August 31, 2016), 82 FR 46674 (October 6, 2017) (adopting Alabama Administrative Code Rule 335–3–8, "Control of Nitrogen Oxides Emissions" and adopting revisions to Rule 335–3–8 into the SIP).

to nonattainment or interfere with maintenance of the 2015 8-hour ozone NAAQS in any other state based on EPA's evaluation of the SIP submission using the 4-step interstate transport framework, and EPA is therefore proposing to disapprove Alabama's SIP submission.

(a) Results of EPA's Step 1 and Step 2 Modeling and Findings for Alabama

As described in section I, EPA performed updated air quality modeling to project design values and contributions for 2023. These data were examined to determine if Alabama contributes at or above the threshold of 1 percent of the 2015 8-hour ozone

NAAQS (0.70 ppb) to any downwind nonattainment or maintenance receptor. As shown in Table 1, the data [39] indicate that in 2023, emissions from Alabama contribute greater than 1 percent of the standard to a nonattainment receptor in Harris County, Texas (ID#: 482010055) and a maintenance-only receptor in Denton County, Texas (ID#: 481210034).[40]

TABLE 1—ALABAMA LINKAGE RESULTS BASED ON EPA UPDATED 2023 MODELING

| Receptor ID | Location | Nonattainment/maintenance | 2023 Average design value (ppb) | 2023 Maximum design value (ppb) | Alabama contribution (ppb) |
|---|---|---|---|---|---|
| 482010055 ............................. | Harris County, Texas ............ | Nonattainment ...................... | 71.0 | 72.0 | 0.88 |
| 481210034 ............................. | Denton County, Texas .......... | Maintenance ........................ | 70.4 | 72.2 | 0.71 |

(b) Evaluation of Information Provided by Alabama Regarding Step 1

At Step 1 of the 4-step interstate transport framework, Alabama relied on EPA modeling included in the March 2018 memorandum to identify nonattainment and maintenance receptors in 2023. As described in section II.A.3.a, EPA has recently updated this modeling using the most current and technically appropriate information. EPA proposes to rely on EPA's most recent modeling to identify nonattainment and maintenance receptors in 2023. That information establishes that there are two receptors to which Alabama is projected to be linked in 2023.

(c) Evaluation of Information Provided by Alabama Regarding Step 2

At Step 2 of the 4-step interstate transport framework, Alabama relied on EPA modeling released in the March 2018 memorandum to identify upwind state linkages to nonattainment and maintenance receptors in 2023. As described in section I.C of this notice, EPA has recently updated modeling to identify upwind state contributions to nonattainment and maintenance receptors in 2023. In this action, EPA proposes to rely on the Agency's most recently available modeling to identify upwind contributions and "linkages" to downwind air quality problems in 2023 using a threshold of 1 percent of the NAAQS. See section I.D for a general explanation of the use of 1 percent of the NAAQS.

As shown in Table 1, updated EPA modeling identifies Alabama's maximum contribution to downwind nonattainment and maintenance receptors as greater than 1 percent of the standard (i.e., 0.70 ppb). Therefore, the State is linked to a downwind air quality problem at Steps 1 and 2. Because the entire technical basis for Alabama's interstate transport SIP submission is that Alabama is not linked at Step 2, and thus Alabama's SIP contains the necessary provisions to eliminate emissions that will contribute significantly to nonattainment or interfere with maintenance of the 2015 8-hour ozone NAAQS in any other state, EPA proposes to disapprove Alabama's SIP submission based on EPA's finding that such a linkage does exist.[41]

Although Alabama did not rely on the 1 ppb threshold in its SIP submittal, EPA recognizes that the most recently available EPA modeling at the time Alabama submitted its SIP submittal indicated that Alabama did not contribute above 1 percent of the NAAQS to a projected downwind nonattainment or maintenance receptor. Therefore, Alabama may not have considered analyzing the reasonableness and appropriateness of a 1 ppb threshold at Step 2 of the 4-step interstate transport framework per the August 2018 memorandum. However, EPA's August 2018 memorandum provided that whether use of a 1 ppb threshold is appropriate must be based on an evaluation of state-specific circumstances, and no such evaluation

was included in the submittal. EPA's experience with the alternative Step 2 thresholds is further discussed in section I.D.3.a. As discussed there, EPA is considering withdrawing the August 2018 memorandum.

(d) Evaluation of Information Provided by Alabama Regarding Step 3

At Step 3 of the 4-step interstate transport framework, a state's emissions are further evaluated, in light of multiple factors, including air quality and cost considerations, to determine what, if any, emissions significantly contribute to nonattainment or interfere with maintenance and, thus, must be eliminated under CAA section 110(a)(2)(D)(i)(I).

To effectively evaluate which emissions in the state should be deemed "significant" and therefore prohibited, states generally should prepare an accounting of sources and other emissions activity for relevant pollutants and assess potential, additional emissions reduction opportunities and resulting downwind air quality improvements. EPA has consistently applied this general approach (i.e., Step 3 of the 4-step interstate transport framework) when identifying emissions contributions that the Agency has determined to be "significant" (or interfere with maintenance) in each of its prior Federal, regional ozone transport rulemakings, and this interpretation of the statute has been upheld by the Supreme Court. See EME Homer City,

[39] The ozone design values and contributions at individual monitoring sites nationwide are provided in the file "2016v2_DVs_state_contributions.xlsx" which is included in Docket No. EPA–HQ–OAR–2021–0663.

[40] These modeling results are consistent with the results of a prior round of 2023 modeling using the

2016v1 emissions platform which became available to the public in the fall of 2020 in the Revised CSAPR Update, as noted in section I. That modeling showed that Alabama had a maximum contribution greater than 0.70 ppb to at least one nonattainment or maintenance-only receptor in 2023. The modeling results are included in the file "Ozone Design Values And Contributions Revised CSAPR

Update.xlsx" in Docket No. EPA–HQ–OAR–2021–0663.

[41] To the extent that Alabama's submittal included information regarding emissions controls that could be interpreted as relevant to a step 3 analysis, EPA evaluates that information in section II.A.3.d.

572 U.S. 489, 519 (2014). While EPA has not directed states that they must conduct a Step 3 analysis in precisely the manner EPA has done in its prior regional transport rulemakings, state implementation plans addressing the obligations in CAA section 110(a)(2)(D)(i)(I) must prohibit "any source or other type of emissions activity within the State" from emitting air pollutants which will contribute significantly to downwind air quality problems. Thus, states must complete something similar to EPA's analysis (or an alternative approach to defining "significance" that comports with the statute's objectives) to determine whether and to what degree emissions from a state should be "prohibited" to eliminate emissions that will "contribute significantly to nonattainment in or interfere with maintenance of" the NAAQS in any other state. Alabama did not conduct such an analysis in its SIP submission.

Based on Alabama's finding that emissions from Alabama do not contribute above 1 percent of the NAAQS at any monitors that are projected to be in nonattainment or maintenance, the SIP submission identified SIP-approved provisions and Federal programs in the context that no further emissions reductions were necessary, and determined that the SIP contained adequate provisions to prohibit emissions that will significantly contribute to nonattainment or interfere with maintenance of the 2015 8-hour ozone NAAQS in any other state. However, the State did not analyze total ozone precursors that continue to be emitted from sources and other emissions activity within the State, evaluate the emissions reduction potential of any additional controls using cost or other metrics, nor evaluate any resulting downwind air quality improvements that could result from such controls.

Among the Federal programs referenced in Alabama's submission was the $NO_X$ ozone season trading program of CSAPR for the 2008 ozone standard, which ADEM adopted into the Alabama SIP.[42] This reference suggests that Alabama may have intended to rely on its electric generating units (EGUs) being subject to CSAPR Update (which reflected a stringency at the nominal marginal cost threshold of $1,400/ton (in 2011 dollars) for the 2008 8-hour ozone NAAQS) to argue that it has already implemented all cost-effective emissions reductions at EGUs.

EPA does not support the concept that reliance on CSAPR Update is appropriate to conclude that no further emissions reductions are necessary under Step 3 for the 2015 8-hour ozone NAAQS. First, CSAPR Update did not regulate non-electric generating units (non-EGUs), and thus this analysis, even for the 2008 ozone NAAQS, was incomplete, and EPA acknowledged at the time that CSAPR Update was not a full remedy for interstate transport under that NAAQS. *See Wisconsin*, 938 F.3d at 318–20. Second, relying on CSAPR Update's (or any other CAA program's) determination of cost-effectiveness without further Step 3 analysis is not approvable. Cost-effectiveness must be assessed in the context of the specific CAA program; assessing cost-effectiveness in the context of ozone transport should reflect a more comprehensive evaluation of the nature of the interstate transport problem, the total emissions reductions available at several cost thresholds, and the air quality impacts of the reductions at downwind receptors. While EPA has not established a benchmark cost-effectiveness value for 2015 8-hour ozone NAAQS interstate transport obligations, it is reasonable to expect control measures or strategies to address interstate transport under this NAAQS to reflect higher marginal control costs because the 2015 8-hour ozone NAAQS is a more stringent and more protective air quality standard. As such, the marginal cost threshold of $1,400/ton for the CSAPR Update (which addresses the 2008 ozone 8-hour NAAQS and is in 2011 dollars) is not an appropriate cost threshold and cannot be approved as a benchmark to use for interstate transport SIP submissions for the 2015 8-hour ozone NAAQS. In addition, the updated EPA modeling captures all existing CSAPR trading programs in the baseline, and that modeling confirms that these control programs were not sufficient to eliminate the Alabama's linkage at Steps 1 and 2 under the 2015 8-hour ozone NAAQS even if the CSAPR Update provisions had been adopted into Alabama's SIP. The State was therefore obligated at Step 3 to assess *additional* control measures using a multifactor analysis.

As mentioned above, EPA has newly available information that indicates sources in Alabama are linked to downwind air quality problems for the 2015 ozone standard. Therefore, EPA proposes to disapprove Alabama's August 20, 2018, interstate transport SIP submission on the separate, additional basis that the SIP submittal did not assess additional emissions control opportunities.

(e) Evaluation of Information Provided by Alabama Regarding Step 4

Step 4 of the 4-step interstate transport framework calls for development of permanent and federally enforceable control strategies to achieve the emissions reductions determined to be necessary at Step 3 to eliminate significant contribution to nonattainment or interference with maintenance of the NAAQS. As mentioned in section II.A.3.d, Alabama's SIP submission did not contain an evaluation of additional emissions control opportunities (or establish that no additional controls are required), thus, no information was provided at Step 4. As a result, EPA proposes to disapprove Alabama's August 20, 2018, submittal on the separate, additional basis that the State has not developed permanent and enforceable emissions reductions necessary to meet the obligations of CAA section 110(a)(2)(D)(i)(I).

4. Conclusion for Alabama

Based on EPA's evaluation of Alabama's SIP submission and after consideration of updated EPA modeling using the 2016-based emissions modeling platform, EPA is proposing to find that the 2015 8-hour ozone NAAQS good neighbor interstate transport portion of Alabama's August 20, 2018, SIP submission addressing CAA section 110(a)(2)(D)(i)(I) does not meet the State's interstate transport obligations because it fails to contain the necessary provisions to eliminate emissions that will contribute significantly to nonattainment or interfere with maintenance of the 2015 8-hour ozone NAAQS in any other state.

*B. Mississippi*

The following section provides information related to Mississippi's SIP submission addressing interstate transport requirements for the 2015 8-hour ozone NAAQS, and EPA's analysis of Mississippi's submission.

1. Summary of Mississippi's 2015 Ozone Interstate Transport SIP Submission

On September 3, 2019, the Mississippi Department of Environmental Quality (MDEQ) submitted a SIP revision addressing the CAA section 110(a)(2)(D)(i)(I) interstate transport requirements for the 2015 8-hour ozone NAAQS.[43] The SIP

---

[42] *See* 81 FR 59869 (August 31, 2016), 82 FR 46674 (October 6, 2017) (adopting Alabama Administrative Code Rule 335–3–8, "Control of Nitrogen Oxides Emissions" and adopting revisions to Rule 335–3–8 into the SIP).

[43] The September 3, 2019, SIP submission provided by MDEQ was received by EPA on September 6, 2019.

submission provided Mississippi's analysis of its impact to downwind states and concluded that emissions from the State will not significantly contribute to nonattainment or interfere with maintenance of the 2015 8-hour ozone NAAQS in other states.

MDEQ's submission relied on the results of EPA's modeling for the 2015 8-hour ozone NAAQS, contained in the March 2018 memorandum, to identify projected downwind nonattainment and maintenance receptors and contribution linkages in 2023 that may be impacted by emissions from sources in Mississippi at Steps 1 and 2 of the 4-step interstate transport framework,[44] respectively. MDEQ reviewed EPA's March 2018 modeling and found that the modeled contributions for Mississippi were below 1 percent of the NAAQS for all nonattainment and maintenance receptors, except the Deer Park nonattainment receptor in Harris County, Texas (Monitor ID: 482011039). The SIP submission identified Mississippi as linked to the Deer Park receptor with an upwind contribution of 0.79 ppb.

In its submittal, MDEQ discussed EPA's August 2018 memorandum, explaining that 0.79 ppb is 1.12 percent of the 2015 8-hour ozone NAAQS, which is greater than the 1 percent contribution threshold of 0.70 ppb but less than a 1 ppb alternative contribution threshold. The SIP submission also states that the Deer Park receptor design value was projected to be greater than the 2015 ozone standard in 2023, but that the actual 2015–2017 design value was below the NAAQS at 68 ppb. Based on the modeling in the March 2018 memo, along with application of a 1 ppb alternative contribution threshold and information regarding 2015–2017 monitored values at the Deer Park receptor, MDEQ concluded that sources in Mississippi were not linked to downwind nonattainment or maintenance receptors at Step 2, and therefore, the State does not significantly contribute to nonattainment in another state for the 2015 ozone standard. Further, MDEQ stated that the SIP contains adequate provisions to prohibit sources and other types of emissions activities within the State from contributing to nonattainment in another state with respect to the 2015 8-hour ozone NAAQS.

In its submission, MDEQ treated the Deer Park receptor as a maintenance

receptor because the most recent measured design value at the time of its submission (i.e., the 2017 design value of 68 ppb) was below the level of the NAAQS at this monitor. Based on MDEQ's interpretation of EPA's October 19, 2018, memorandum, the State eliminated the Deer Park monitor site in Harris County, Texas, as a maintenance receptor in 2023 (although EPA's modeling of 2023 released with the October 2017 memorandum had identified this monitoring site as a nonattainment receptor).

To support eliminating the Deer Park monitor as a receptor, MDEQ's demonstration included: (1) Evaluating ozone season temperatures in the period 2014–2017 in Harris County to determine if conditions were conducive for ozone formation; (2) assessing monitored ozone design values from 2011–2017 at the Deer Park monitor; and (3) reviewing ozone precursor emission trends in the Houston Area, Texas (statewide), and Mississippi (statewide). In its demonstration, MDEQ stated that temperatures in 2015 and 2016 were above average, and in 2014 and 2017 temperatures were near normal. Based on this information, MDEQ concluded that conditions were conducive to ozone formation during this three-year time period (i.e., 2015 to 2017). MDEQ's submission also states that design values from 2011 to 2017 at the Deer Park receptor showed a downward trend and that design values have been meeting the 2015 8-hour ozone NAAQS since 2015. Further, according to the submittal, ozone precursor emissions in Texas and Mississippi both showed a downward trend based on data from 2008, 2011, and 2014. Based on the downward trend in emissions and the fact that the Deer Park monitor was measuring attainment in 2015, 2016, and 2017, MDEQ determined that the Deer Park receptor should be eliminated as a maintenance receptor. Thus, based on the elimination of the Deer Park receptor, along with application of a 1 ppb threshold, Mississippi concluded that the State did not significantly interfere with maintenance (prong 2) in another state for the 2015 ozone standard.

In summary, MDEQ concluded that sources in the State do not significantly contribute to nonattainment or interfere with maintenance in another state, that no further emission reductions were necessary, and that Mississippi's SIP contains adequate provisions to prevent sources and other types of emissions activities within the State from contributing significantly to nonattainment or interfering with maintenance in another state with

respect to the 2015 8-hour ozone NAAQS.

2. EPA's Evaluation of Mississippi's 2015 Ozone Interstate Transport SIP Submission

EPA is proposing to find that Mississippi's September 3, 2019, SIP submission does not meet Mississippi's obligations with respect to prohibiting emissions that contribute significantly to nonattainment or interfere with maintenance of the 2015 8-hour ozone NAAQS in any other state based on EPA's evaluation of the SIP submission using the 4-step interstate transport framework, and EPA is therefore proposing to disapprove Mississippi's submission.

(a) Evaluation of Information Provided by Mississippi Regarding Step 1

At Step 1 of the 4-step interstate transport framework, MDEQ relied on EPA modeling released in the March 2018 memorandum to identify nonattainment and maintenance receptors in 2023.

In its submittal, MDEQ attempted to utilize the October 2018 memorandum along with 2014 to 2017 ozone design values (the most recent data available at the time of submittal) to eliminate the Deer Park receptor in Harris County, Texas (Monitor ID: 482011039) as a maintenance receptor. Table 2 of the submittal correctly indicates that this monitoring site was a projected nonattainment receptor, not a maintenance-only receptor, in 2023 based on the EPA's modeling data included in the March 2018 memorandum. However, in its submittal, the State relied on the 2014 to 2017 design values at the Deer Park receptor (i.e., 69 ppb, 67 ppb, and 68 ppb, respectively) as the basis for stating that this receptor met EPA's definition of a maintenance receptor. Based on this information, the State applied an alternative definition of a maintenance receptor utilizing the potential concepts included in the October 2018 memorandum. This memorandum included a description of the approach that EPA has historically used to identify maintenance-only receptors [45] and identified potential alternate ways to define maintenance receptors based on certain criteria suggested in the memorandum including an evaluation of meteorology conductive to ozone formation, review of ozone monitored concentrations, and precursor emissions trends.

---

[44] EPA notes that Mississippi's September 2, 2019, SIP submission is not organized around EPA's 4-step interstate transport framework for assessing good neighbor obligations, but EPA summarizes the submission using that framework for clarity here.

[45] See section I.D, above for a discussion of EPA's approach to identify maintenance receptors.

EPA recognized in the October 2018 memorandum that states could potentially, with sufficient justification, establish an approach to addressing maintenance receptors that gives independent significance to prong 2 in some manner different than EPA's approach. In addition, the October 2018 memorandum identified two potential concepts that states could use to identify maintenance receptors: (1) States may, in some cases, eliminate a site as a maintenance receptor if the site is currently measuring clean data, or (2) in some cases, use a design value from the base period that is not the maximum design value. For either of these alternative methods, to adequately consider areas struggling to meet the NAAQS, EPA also indicated that it expects states to include with their SIP demonstration technical analyses showing that the following three criteria are met:

• Meteorological conditions in the area of the monitoring site were conducive to ozone formation during the period of clean data or during the alternative base period design value used for projections; [46]

• Ozone concentrations have been trending downward at the site since 2011 (and ozone precursor emissions of $NO_X$ and VOC have also decreased); and

• Emissions are expected to continue to decline in the upwind and downwind states out to the attainment date of the receptor.

EPA's October 2018 memorandum explained that the intent of these analyses is to demonstrate that monitoring sites that would be identified as maintenance receptors under EPA's historical approach could nonetheless be shown to be very unlikely to violate the NAAQS in the future analytic year.

However, the analysis provided by Mississippi in its submission has not met the criteria laid out in the guidance. With respect to the first criterion (meteorological conditions), MDEQ assessed ozone design values at the Deer Park site in Houston from 2014 to 2017

and anomalies (*i.e.,* difference compared to the long-term mean) of average temperatures in June, July, and August, summarized from EPA's October 2018 memorandum, to determine whether particular summers had ozone-conducive or unconducive meteorology during the period of clean data. MDEQ stated that temperatures were above average in 2015 and 2016 when the Deer Park monitor measured ozone concentrations below the 2015 8-hour ozone NAAQS and near normal in 2014 and 2017. However, MDEQ's review of meteorological conditions in the vicinity of the Deer Park monitor was limited to temperature anomalies and did not discuss or consider how other meteorological factors identified in the October 2018 memorandum (such as humidity, solar radiation, vertical mixing, and/or other meteorological indicators such as cooling-degree days) confirm whether conditions affecting the monitor may have been conducive to ozone formation in 2015 and 2016 and unconducive in 2014 and 2017.

With respect to the second criterion, MDEQ's submission included information related to ozone design values and ozone precursors. Specifically, the submission included an assessment of ozone design values at the Deer Park monitor from 2011 to 2017, which showed a downward trend in ozone concentrations. However, MDEQ's SIP submission did not include a discussion of the 2018 design value, which showed a violation of the 2015 standard at 71 ppb, even though that data was available and could have been considered in the State's analysis at the time of the submission in 2019.[47] In addition, the 2019 and 2020 design values, 75 ppb and 78 ppb, respectively, also exceeded the NAAQS. The preliminary design value for 2021 is 74 ppb.[48] Although not available at the time of the SIP submission, these more recent data suggest a continuous trend in measured ozone concentrations above the 2015 ozone standard at the Deer Park monitor. Even though MDEQ's review of ozone monitoring data may have shown a decrease in measured concentration from 2011 to 2017, EPA notes a significant increase between the 2017 and 2018 4th highest daily concentration, from 68 ppb to 85 ppb. MDEQ's SIP submission did not consider the 2018 4th high daily maximum concentration as part of its

trends analysis even though the information was available at the time the SIP was submitted to EPA. Thus, at the time of the submission, the Deer Park monitor had a 3-year design value of 71 ppb, which violated the 70 ppb ozone standard. Thus, under the terms of the October 2018 memorandum, Mississippi's SIP submission does not adequately establish a basis for eliminating the Deer Park monitoring site as an ozone transport receptor.

MDEQ also assessed total ozone precursor emissions data in 2008, 2011, and 2014, which MDEQ claimed indicated a decrease in ozone precursor ($NO_X$ and VOC) emissions in the Houston metropolitan statistical area, Texas (statewide), and Mississippi (statewide). While EPA acknowledges the general downward trends in $NO_X$ and VOC emissions, the Deer Park monitor ozone concentrations design values through 2020 show recent measured ozone concentrations that exceed the 2015 ozone standard. Further, even accounting for emissions trends, EPA's latest air quality modeling, as presented below, shows that there are now three receptors to which Mississippi contributes in 2023, not just one. Thus, the apparent downward trend in ozone precursors in Texas and Mississippi alone cannot support elimination of either the Deer Park monitor as a receptor (under the information Mississippi relied on) or the three Texas receptors to which EPA now finds Mississippi to be contributing. *See* section II.B.2.c and Table 2 below for results of EPA's 2016v2 Step 1 and Step 2 modeling and findings for Mississippi.

With respect to the third criterion, MDEQ stated that, ''[b]ased on national and regional emissions trends, and current regulations on point sources and mobile sources, emissions are expected to continue to decline in the upwind and downwind states.'' However, the State did not cite any specific regulations controlling sources of ozone precursors or mobile sources or quantify the $NO_X$ emission reduction potential of current regulations for point and mobile sources.

Based on the reasons stated above, EPA does not believe Mississippi's SIP submission provided sufficient justification to eliminate the Deer Park monitor as a maintenance receptor.

(b) Evaluation of Information Provided by Mississippi Regarding Step 2

At Step 2 of the 4-step interstate transport framework, Mississippi relied on EPA's modeling released in the March 2018 memorandum to identify upwind state linkages to nonattainment and maintenance receptors in 2023.

---

[46] *See* Attachment A of EPA's October 2018 memorandum formation to assess whether particular summers had ozone-conducive or unconducive meteorology within the 10-year period 2008 through 2017. The memorandum states that meteorological conditions including temperature, humidity, winds, solar radiation, and vertical mixing affect the formation and transport of ambient ozone concentrations. The memorandum suggests generally that above average temperatures are an indication that meteorology is conducive to ozone formation and below average temperatures indicate that conditions are unconducive to ozone formation. Within a particular summer season, the degree that meteorology is conducive for ozone formation can vary from region to region and fluctuate with time within a particular region.

[47] The data are given in ''2010_thru_2020 Ozone Design Values.xlsx,'' which is included in Docket No. EPA–HQ–OAR–2021–0663.

[48] This is based on preliminary 2021 data available from the Air Quality System (AQS) as of January 3, 2022. The design values for 2021 have not been certified by state agencies.

As described in section I.C of this notice, EPA has recently updated modeling to identify upwind state contributions to nonattainment and maintenance receptors in 2023. In this proposal, EPA relies on the Agency's most recently available modeling to identify upwind contributions and "linkages" to downwind air quality problems in 2023 using a threshold of 1 percent of the NAAQS. *See* section I.D for general explanation of the use of 1 percent of the NAAQS. As shown in Table 2, updated EPA modeling identifies Mississippi's maximum contribution to downwind nonattainment and maintenance receptors to be greater than 1 percent of the standard (*i.e.,* 0.70 ppb). Therefore, the State is linked to a downwind air quality problem at Steps 1 and 2.

MDEQ relied on EPA's August 2018 memorandum in an attempt justify using a 1 ppb alternative contribution threshold at Step 2 as a basis to assert that Mississippi would not be "linked" to any projected downwind nonattainment or maintenance receptors. As discussed in EPA's August 2018 memorandum, EPA had suggested that, with appropriate additional analysis, it may be reasonable for states to use a 1 ppb contribution threshold, as an alternative to a 1 percent threshold, at Step 2 of the 4-step interstate transport framework, for the purposes of identifying linkages to downwind receptors. However, based on EPA's updated modeling, the State is projected to contribute greater than both the 1 percent and alternative 1 ppb thresholds. While EPA does not, in this action, approve of the State's application of the 1 ppb threshold, based on its linkages greater than 1 ppb to projected downwind nonattainment or maintenance receptors, the State's use of this alternative threshold at Step 2 of the 4-step interstate framework is inconsequential to EPA's proposed action on this SIP.

In addition, MDEQ's SIP does not include a technical analysis to sufficiently justify use of an alternative 1 ppb threshold at the Deer Park monitor. Echoing EPA's August 2018 memorandum, MDEQ stated that the amount of upwind collective contribution captured with the 1 percent and 1 ppb thresholds is *generally* comparable. In this memorandum, EPA also determined

that by capturing a percentage of upwind state emissions comparable to the amount captured at 1 percent, the alternative threshold *may* be appropriate, indicating that a more determinative conclusion of appropriateness would require further analysis. In this regard, MDEQ did not provide any further technical justification to make that determination.

MDEQ also referred to an EPA Guidance on Significant Impact Levels for Ozone and Fine Particles in the Prevention of Significant Deterioration Permitting Program ("SILs Guidance") as additional justification for use of a 1 ppb threshold. However, MDEQ did not provide discussion or analysis containing information specific to Mississippi or the receptors to which its emissions are potentially linked, which is necessary to thoroughly evaluate the state-specific circumstances that could support approval. In addition, the State did not explain the relevance or applicability of a SILs Guidance to which it made reference. EPA's SILs guidance relates to a different provision of the CAA regarding implementation of the prevention of significant deterioration (PSD) permitting program, *i.e.,* a program that applies in areas that have been designated attainment[49] or unclassifiable for the NAAQS, and it is not applicable to the good neighbor provision, which requires states to eliminate significant contribution or interference with maintenance of the NAAQS at known and ongoing air quality problem areas in other states.

The analytical gaps identified indicate that the submittal's use of a 1 ppb threshold for the State is not approvable. EPA's experience with the

alternative Step 2 thresholds is further discussed in section I.D.3.a. As discussed there, EPA is considering withdrawing the August 2018 memorandum.

Despite the linkage EPA determines exists at Step 2, the State argued in its submittal that it should not be considered to significantly contribute to nonattainment or interfere with maintenance of the NAAQS in other states. EPA finds that conclusion is not approvable at Steps 1 or 2. Therefore, based on EPA's evaluation of the information submitted by Mississippi, and based on EPA's most recent modeling results for 2023, EPA proposes to find that Mississippi is linked at Steps 1 and 2 and has an obligation to assess potential emissions reductions from sources or other emissions activity at Step 3 of the 4-step framework.

(c) Results of EPA's 2016v2 Step 1 and Step 2 Modeling and Findings for Mississippi

As described in section I, EPA performed air quality modeling using the 2016v2 emissions platform to project design values and contributions for 2023. These data were examined to determine if Mississippi contributes at or above the threshold of 1 percent of the 2015 8-hour ozone NAAQS (0.70 ppb) to any downwind nonattainment or maintenance receptor. As shown in Table 2, the data[50] indicate that in 2023, emissions from Mississippi contribute greater than 1 percent of the standard to nonattainment or maintenance-only receptors in Denton County, Texas (Monitor ID: 481210034), Harris County, Texas (Monitor ID: 482010055), and Brazoria County, Texas (Monitor ID: 480391004).[51] Note that each of these monitors is currently measuring nonattainment based on 2020 design values of 72 ppb, 76 ppb, and 73 ppb at the Denton County, Harris County, and Brazoria County receptors, respectively.

---

[49] Pursuant to section 107(d) of the CAA, EPA must designate areas as either "nonattainment," "attainment," or "unclassifiable." Historically for ozone, the EPA has designated most areas that do not meet the definition of nonattainment as "unclassifiable/attainment." This category includes areas that have air quality monitoring data meeting the NAAQS and areas that do not have monitors but for which the EPA has no evidence that the areas may be violating the NAAQS or contributing to a nearby violation. In the designations for the 2015 ozone NAAQS, the EPA reversed the order of the label to be "attainment/unclassifiable" to better convey the definition of the designation category and so that the category is more easily distinguished from the separate unclassifiable category. An "attainment" designation is reserved for a previous nonattainment area that has been redesignated to attainment as a result of the EPA's approval of a CAA section 175A maintenance plan submitted by the state air agency.

[50] The ozone design values and contributions at individual monitoring sites nationwide are provided in the file "2016v2_DVs_state_ contributions.xlsx" which is included in Docket No. EPA–HQ–OAR–2021–0663.

[51] These modeling results are consistent with the results of a prior round of 2023 modeling using a the 2016v1 emissions platform that became available to the public in the fall of 2020 in the Revised CSAPR Update, as noted in section I.

Table 2—Mississippi Linkage Results Based on EPA Updated 2023 Modeling

| Receptor ID | Location | Nonattainment/ maintenance | 2023 average design value (ppb) | 2023 maximum design value (ppb) | Mississippi contribution (ppb) |
|---|---|---|---|---|---|
| 481210034 | Denton County, Texas | Maintenance | 70.4 | 72.2 | 1.14 |
| 482010055 | Harris County, Texas | Nonattainment | 71.0 | 72.0 | 1.04 |
| 480391004 | Brazoria County, Texas | Maintenance | 70.1 | 72.3 | 0.92 |

(d) Evaluation of Information Provided by Mississippi Regarding Step 3

At Step 3 of the 4-step interstate transport framework, a state's emissions are further evaluated, in light of multiple factors, including air quality and cost considerations, to determine what, if any, emissions significantly contribute to nonattainment or interfere with maintenance and, thus, must be eliminated under CAA section 110(a)(2)(D)(i)(I).

To effectively evaluate which emissions in the state should be deemed "significant," and therefore prohibited, states generally should prepare an accounting of sources and other emissions activity for relevant pollutants and assess potential, additional emissions reduction opportunities and resulting downwind air quality improvements. EPA has consistently applied this general approach (*i.e.*, Step 3 of the 4-step interstate transport framework) when identifying emissions contributions that the Agency has determined to be "significant" (or interfere with maintenance) in each of its prior Federal, regional ozone transport rulemakings, and this interpretation of the statute has been upheld by the Supreme Court. *See EME Homer City,* 572 U.S. 489, 519 (2014). While EPA has not directed states that they must conduct a Step 3 analysis in precisely the manner EPA has done in its prior regional transport rulemakings, state implementation plans addressing the obligations in CAA section 110(a)(2)(D)(i)(I) must prohibit "any source or other type of emissions activity within the State" from emitting air pollutants which will contribute significantly to downwind air quality problems. Thus, states must complete something similar to the EPA's analysis (or an alternative approach to defining "significance" that comports with the statute's objectives) to determine whether and to what degree emissions from a state should be "prohibited" to eliminate emissions that will "contribute significantly to nonattainment in or interfere with maintenance of" the NAAQS in any other state. Mississippi did not conduct

such an analysis in its SIP submission. Mississippi did not include an accounting of sources or other emissions activity in the State along with an analysis of potential $NO_X$ emissions control technologies, their associated costs, estimated emissions reductions, and downwind air quality improvements.

EPA's evaluation of Mississippi's submittal, in conjunction with its 2016-based modeling of 2023, indicates that ozone-precursor emissions from Mississippi are linked to downwind air quality problems for the 2015 ozone standard at Steps 1 and 2. However, Mississippi's SIP submittal does not include a Step 3 analysis. EPA proposes to find that Mississippi was required to analyze emissions from the sources and other emissions activity from within the State to determine whether its contributions were significant, and EPA proposes to disapprove its submission because Mississippi's submittal failed to do so.

(e) Evaluation of Information Provided by Mississippi Regarding Step 4

Step 4 of the 4-step interstate transport framework calls for development of permanent and federally enforceable control strategies to achieve the emissions reductions determined to be necessary at Step 3 to eliminate significant contribution to nonattainment or interference with maintenance of the NAAQS. As mentioned previously, Mississippi's SIP submittal did not contain an evaluation of additional emission control opportunities (or establish that no additional controls are required), thus, no information was provided at Step 4. As a result, EPA proposes to disapprove Mississippi's submittal on the separate, additional basis that the State has not developed permanent and enforceable emissions reductions necessary to meet the obligations of CAA section 110(a)(2)(d)(i)(I).

3. Conclusion for Mississippi

Based on EPA's evaluation of Mississippi's SIP submission, EPA is proposing to find that Mississippi's September 3, 2019, SIP submission

addressing CAA section 110(a)(2)(D)(i)(I) does not meet the State's interstate transport obligations because it fails to contain the necessary provisions to eliminate emissions that will contribute significantly to nonattainment or interfere with maintenance of the 2015 8-hour ozone NAAQS in any other state.

*C. Tennessee*

The following section provides information related to Tennessee's SIP submission addressing interstate transport requirements for the 2015 8-hour ozone NAAQS, and EPA's analysis of Tennessee's submission.

1. Summary of Tennessee's 2015 Ozone Interstate Transport SIP Submission

On September 13, 2018, Tennessee submitted a SIP revision addressing the CAA section 110(a)(2)(D)(i)(I) interstate transport requirements for the 2015 8-hour ozone NAAQS.[52 53] The SIP submission provided Tennessee's analysis of its impact to downwind states and concluded that emissions from the State will not significantly contribute to nonattainment or interfere with maintenance of the 2015 8-hour ozone NAAQS in other states. Tennessee's submission relied on EPA's modeling results for the 2015 8-hour ozone NAAQS, contained in the March 2018 memorandum, to identify downwind nonattainment and maintenance receptors that may be impacted by emissions from sources in the State at Steps 1 and 2 of the 4-step framework.[54] The Tennessee Department of Environmental Control (TDEC) reviewed EPA's 2023 modeling, concurred with the results, and determined that EPA's future year $NO_X$ projections were reasonable and account

---

[52] The September 13, 2019, SIP submission provided by TDEC was received by EPA on September 17, 2018.

[53] On September 18, 2018, Tennessee submitted multiple SIP revisions under one cover letter. EPA is only acting on Tennessee's 2015 ozone good neighbor interstate transport SIP requirements in this notice.

[54] EPA notes that Tennessee's SIP submission is not organized around EPA's 4-step framework for assessing good neighbor transport, but EPA summarizes the submission using that framework for clarity here.

for source shutdowns, new controls, and fuel switches. TDEC summarized the State's upwind contribution to 26 nonattainment and maintenance receptors and noted Tennessee's largest impact on any potential downwind receptor in 2023 would be 0.31 ppb and 0.65 ppb, respectively. Tennessee found that—based on EPA's 2023 modeling—emissions from Tennessee do not contribute above 1 percent of the NAAQS or above 1 ppb at any monitors that are projected to be in nonattainment or maintenance.

Tennessee's September 13, 2018, SIP submittal asserted that $NO_X$ emissions are considered the primary cause of formation of ozone in the southeast United States, and emphasized a significant reduction in $NO_X$ emissions reductions from coal-fired EGUs and other large $NO_X$ sources leading to improvements in air quality, including reductions attributable to previous transport rulemakings.[55] Additionally, TDEC identifies existing SIP-approved provisions, Federal regulations and programs, court settlements, and statewide source shutdowns that TDEC believes limit ozone precursor emissions in the State.[56]

Based on the information contained in Tennessee's transport SIP, TDEC concluded that Tennessee does not significantly contribute to nonattainment or interfere with maintenance in another state of the 2015 8-hour ozone NAAQS, and that the SIP provides for adequate measures to control ozone precursor emissions.

2. Prior Notices Related to Tennessee's SIP Submission

Previously, EPA proposed approval of Tennessee's interstate transport provisions for the 2015 8-hour ozone NAAQS as addressed in Tennessee's September 13, 2018, SIP submission and based on the contribution modeling provided in the March 2018 memorandum. *See* 84 FR 71854 (December 30, 2019). When EPA completed updated modeling of 2023 in 2020 using a 2016-based emissions modeling platform (2016v1), it became evident that Tennessee was projected to be linked to downwind nonattainment and maintenance receptors (see footnote 57 below). As a result, EPA deferred acting on Tennessee's SIP submittal when it published a supplemental proposal in 2021 to approve four other southeastern states' good neighbor SIP submissions, using the updated 2023 modeling. *See* 86 FR 37942, 37943 (July 19, 2021). The updated 2023 modeling presented in this proposal using an updated 2016-based emissions modeling platform (2016v2) confirms the prior 2016-based modeling of 2023 in that it continues to show Tennessee is linked to at least one downwind nonattainment or maintenance receptor. Based on this updated modeling using the 2016-based emissions modeling platform, discussed in section I.C above, EPA is now withdrawing its 2019 proposed approval on Tennessee's September 13, 2018, interstate transport SIP as published on December 30, 2019 at 84 FR 71854.

3. EPA's Evaluation of Tennessee's 2015 Ozone Interstate Transport SIP Submission

EPA is proposing to find that Tennessee's September 13, 2018, SIP submission does not meet the State's obligations with respect to prohibiting emissions that contribute significantly to nonattainment or interfere with maintenance of the 2015 8-hour ozone NAAQS in any other state based on EPA's evaluation of the SIP submission using the 4-step interstate transport framework, and EPA is therefore proposing to disapprove Tennessee's SIP submission.

(a) Results of EPA's Step 1 and Step 2 Modeling and Findings for Tennessee

As described in section I, EPA performed updated air quality modeling to project design values and contributions for 2023. These data were examined to determine if Tennessee contributes at or above the threshold of 1 percent of the 2015 8-hour ozone NAAQS (0.70 ppb) to any downwind nonattainment or maintenance receptor. As shown in Table 3, the data[57] indicate that in 2023, emissions from Tennessee contribute greater than 1 percent of the standard to the maintenance-only receptor in Denton County, Texas (ID#: 481210034).[58]

TABLE 3—TENNESSEE LINKAGE RESULTS BASED ON EPA UPDATED 2023 MODELING

| Receptor ID | Location | Nonattainment/maintenance | 2023 Average design value (ppb) | 2023 Maximum design value (ppb) | Tennessee contribution (ppb) |
|---|---|---|---|---|---|
| 481210034 ............................. | Denton County, Texas .......... | Maintenance ........................ | 70.4 | 72.2 | 0.94 |

(b) Evaluation of Information Provided by Tennessee Regarding Step 1

At Step 1 of the 4-step interstate transport framework, Tennessee relied on EPA modeling included in the March 2018 memorandum to identify nonattainment and maintenance receptors in 2023. As described previously in section II.C.3.a, EPA has recently updated this modeling using the most current and technically appropriate information. EPA proposes to rely on EPA's most recent modeling to identify nonattainment and maintenance receptors in 2023. That information establishes that there is one receptor to which Tennessee is projected to be linked in 2023.

(c) Evaluation of Information Provided by Tennessee Regarding Step 2

At Step 2 of the 4-step interstate transport framework, Tennessee relied on EPA modeling released in the March 2018 memorandum to identify upwind state linkages to nonattainment and maintenance receptors in 2023. As described in section I.C of this notice,

[55] The Tennessee SIP revision specifically cites the Federal $NO_X$ Budget Trading Program, CAIR, and CSAPR. In addition, the Tennessee SIP revision discusses Tennessee rule 1200–03–27–.12 ($NO_X$ SIP Call requirements for Stationary Boilers and Combustion Turbines), which had not been approved into the SIP at the time of the September 13, 2018, submittal. EPA finalized approval of TAPR 1200–03–27–.12 into the Tennessee SIP on March 2, 2021. *See* 86 FR 12092.

[56] See page 9 through 12 of Tennessee's September 13, 2018, SIP submission for a list of SIP-approved State rules and Federal rules. This can be found in Docket No. EPA–R04–OAR–2021–0841.

[57] The ozone design values and contributions at individual monitoring sites nationwide are provided in the file "2016v2_DVs_state_contributions.xlsx" which is included in Docket No. EPA–HQ–OAR–2021–0663.

[58] These modeling results are consistent with the results of a prior round of 2023 modeling using the 2016v1 emissions platform which became available to the public in the fall of 2020 in the Revised CSAPR Update, as noted in section I. That modeling showed that Tennessee had a maximum contribution greater than 0.70 ppb to at least one nonattainment or maintenance-only receptor in 2023. These modeling results are included in the file "Ozone Design Values And Contributions Revised CSAPR Update.xlsx" in Docket No. EPA–HQ–OAR–2021–0663.

EPA has recently updated modeling to identify upwind state contributions to nonattainment and maintenance receptors in 2023. In this proposal, EPA relies on the Agency's most recently available modeling to identify upwind contributions and ''linkages'' to downwind air quality problems in 2023 using a threshold of 1 percent of the NAAQS. *See* section I.D for a general explanation of the use of 1 percent of the NAAQS.

As shown in Table 3, updated EPA modeling identifies Tennessee's maximum contribution to a downwind maintenance receptor as greater than 1 percent of the standard (*i.e.,* 0.70 ppb). Therefore, the State is linked to a downwind air quality problem at Steps 1 and 2. Because the entire technical basis for Tennessee's submittal is that the State is not linked at Step 2, EPA proposes to disapprove Tennessee's SIP submission based on EPA's finding that a linkage does exist.[59]

Tennessee references a 1 ppb threshold in its submittal, citing to EPA's SILs Guidance as justification for the use of a 1 ppb threshold. However, Tennessee did not provide additional discussion or analysis containing information specific to Tennessee or the receptors to which its emissions are potentially linked, which is necessary to evaluate the state-specific circumstances that could support approval of an alternative threshold. Nevertheless, EPA recognizes that the most recently available EPA modeling at the time Tennessee submitted its SIP submittal indicated the State did not contribute above 1 percent of the NAAQS to a projected downwind nonattainment or maintenance receptor. Therefore, the State may not have considered conducting an in-depth analysis as to the reasonableness and appropriateness of a 1 ppb threshold at Step 2 of the 4-step interstate transport framework per the August 2018 memorandum. However, EPA's August 2018 memorandum provided that whether use of a 1 ppb threshold is appropriate must be based on an evaluation of state-specific circumstances. Tennessee provided no such analysis. Further, the State did not explain the relevance of the SILs Guidance to which it made reference. This guidance relates to a different provision of the CAA regarding implementation of the PSD permitting program, *i.e.,* a program that applies in areas that have been designated

attainment[60] or unclassifiable for the NAAQS, and it is not applicable to the good neighbor provision, which requires states to eliminate significant contribution or interference with maintenance of the NAAQS at known and ongoing air quality problem areas in other states.

EPA's experience with the alternative Step 2 thresholds is further discussed in section I.D.3.a above. As discussed there, EPA is considering withdrawing the August 2018 memorandum.

(d) Evaluation of Information Provided by Tennessee Regarding Step 3

At Step 3 of the 4-step interstate transport framework, a state's emissions are further evaluated, in light of multiple factors, including air quality and cost considerations, to determine what, if any, emissions significantly contribute to nonattainment or interfere with maintenance and, thus, must be eliminated under CAA section 110(a)(2)(D)(i)(I).

To effectively evaluate which emissions in the state should be deemed ''significant'' and therefore prohibited, states generally should prepare an accounting of sources and other emissions activity for relevant pollutants and assess potential, additional emissions reduction opportunities and resulting downwind air quality improvements. EPA has consistently applied this general approach (*i.e.,* Step 3 of the 4-step interstate transport framework) when identifying emissions contributions that the Agency has determined to be ''significant'' (or interfere with maintenance) in each of its prior Federal, regional ozone transport rulemakings, and this interpretation of the statute has been upheld by the Supreme Court. *See EME Homer City,* 572 U.S. 489, 519 (2014). While the EPA has not directed states that they must conduct a Step 3 analysis in precisely the manner the EPA has done in its prior regional transport rulemakings, state implementation plans addressing the obligations in CAA section 110(a)(2)(D)(i)(I) must prohibit ''any source or other type of emissions activity within the State'' from emitting air pollutants which will contribute significantly to downwind air quality problems. Thus, states must complete something similar to the EPA's analysis (or an alternative approach to defining ''significance'' that comports with the statute's objectives) to determine whether and to what degree emissions from a state should be ''prohibited'' to eliminate emissions that will

''contribute significantly to nonattainment in or interfere with maintenance of'' the NAAQS in any other state. Tennessee did not conduct such an analysis in its SIP submission.

The State did not analyze total ozone precursors that continue to be emitted from sources and other emissions activity within the State, evaluate the emissions reduction potential of any additional controls using cost or other metrics, nor evaluate any resulting downwind air quality improvements that could result from such controls. Instead, Tennessee included in its submittal a list of existing emissions control programs and measures in the State. However, EPA's modeling already takes account of such measures. Despite these existing emissions controls, the State is projected in the most recent modeling to be linked to at least one downwind nonattainment or maintenance receptor. The State was therefore obligated at Step 3 to assess *additional* control measures using a multifactor analysis.

As mentioned above, EPA has newly available information that indicates sources in Tennessee are linked to downwind air quality problems for the 2015 ozone standard. Therefore, EPA proposes to disapprove Tennessee's September 18, 2018, SIP submission on the separate, additional basis that the SIP submittal did not assess additional emissions control opportunities.

(e) Evaluation of Information Provided by Tennessee Regarding Step 4

Step 4 of the 4-step interstate transport framework calls for development of permanent and federally enforceable control strategies to achieve the emissions reductions determined to be necessary at Step 3 to eliminate significant contribution to nonattainment or interference with maintenance of the NAAQS. As mentioned in section II.C.3.d, Tennessee's SIP submission did not contain an evaluation of additional emissions control opportunities (or establish that no additional controls are required), thus, no information was provided at Step 4. As a result, EPA proposes to disapprove Tennessee's September 18, 2018, submittal on the separate, additional basis that the State has not developed permanent and enforceable emissions reductions necessary to meet the obligations of CAA section 110(a)(2)(d)(i)(I).

4. Conclusion for Tennessee

Based on EPA's evaluation of Tennessee's SIP submission and after consideration of updated EPA modeling using the 2016-based emissions

---

[59] To the extent the Tennessee submittal included information regarding emissions controls that could be interpreted as relevant to a Step 3 analysis, EPA evaluates that information in section II.C.3.d.

[60] *See* footnote 49.

modeling platform, EPA is proposing to find that the portion of Tennessee's September 13, 2018, SIP submission addressing CAA section 110(a)(2)(D)(i)(I) does not meet the State's interstate transport obligations because it fails to contain the necessary provisions to eliminate emissions that will contribute significantly to nonattainment or interfere with maintenance of the 2015 8-hour ozone NAAQS in any other state.

## III. Proposed Actions

EPA is proposing to disapprove the 2015 ozone good neighbor interstate transport SIP revisions from Alabama, dated August 20, 2018; from Mississippi, dated September 3, 2019; and from Tennessee, dated September 13, 2018. Under CAA section 110(c)(1), if finalized, these disapprovals would establish a 2-year deadline for EPA to promulgate a FIP for Alabama, Mississippi, and Tennessee to address the CAA section 110(a)(2)(D)(i)(I) interstate transport requirements pertaining to significant contribution to nonattainment and interference with maintenance of the 2015 8-hour ozone NAAQS in other states, unless EPA approves a SIP that meets these requirements. However, under the CAA, a good neighbor SIP disapproval does not start a mandatory sanctions clock.

## IV. Statutory and Executive Order Reviews

### A. Executive Order 12866: Regulatory Planning and Review and Executive Order 13563: Improving Regulation and Regulatory Review

These proposed actions are not significant regulatory actions and were therefore not submitted to the Office of Management and Budget for review.

### B. Paperwork Reduction Act (PRA)

These proposed actions do not impose an information collection burden under the PRA because they do not contain any information collection activities.

### C. Regulatory Flexibility Act (RFA)

These actions merely propose to disapprove SIP submissions as not meeting the CAA for Alabama, Mississippi, and Tennessee. EPA certifies that these proposed rules will not have a significant economic impact on a substantial number of small entities under the RFA (5 U.S.C. 601 *et seq.*)

### D. Unfunded Mandates Reform Act (UMRA)

These proposed actions do not contain any unfunded mandate as described in UMRA, 2 U.S.C. 1531–1538, and do not significantly or

uniquely affect small governments. These proposed actions impose no enforceable duty on any state, local, or tribal governments or the private sector.

### E. Executive Order 13132: Federalism

These proposed actions do not have federalism implications. They will not have substantial direct effects on the states, on the relationship between the national government and the states, or on the distribution of power and responsibilities among the various levels of government.

### F. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments

These proposed actions do not have tribal implications as specified in Executive Order 13175. These proposed actions do not apply on any Indian reservation land, any other area where EPA or an Indian tribe has demonstrated that a tribe has jurisdiction, or non-reservation areas of Indian country. Thus, Executive Order 13175 does not apply to these actions.

### G. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks

EPA interprets Executive Order 13045 as applying only to those regulatory actions that concern environmental health or safety risks that EPA has reason to believe may disproportionately affect children, per the definition of "covered regulatory action" in section 2–202 of the Executive Order. These proposed actions are not subject to Executive Order 13045 because they merely propose to disapprove SIP submissions from Alabama, Mississippi, and Tennessee as not meeting the CAA.

### H. Executive Order 13211, Actions That Significantly Affect Energy Supply, Distribution or Use

These proposed actions are not subject to Executive Order 13211, because they are not significant regulatory actions under Executive Order 12866.

### I. National Technology Transfer and Advancement Act

This proposed rulemaking does not involve technical standards.

### J. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations

EPA believes the human health or environmental risk addressed by these proposed actions will not have potential disproportionately high and adverse

human health or environmental effects on minority, low-income or indigenous populations. These proposed actions merely propose to disapprove SIP submissions as not meeting the CAA.

### K. CAA Section 307(b)(1)

Section 307(b)(1) of the CAA governs judicial review of final actions by EPA. This section provides, in part, that petitions for review must be filed in the D.C. Circuit: (i) When the agency action consists of "nationally applicable regulations promulgated, or final actions taken, by the Administrator," or (ii) when such action is locally or regionally applicable, if "such action is based on a determination of nationwide scope or effect and if in taking such action the Administrator finds and publishes that such action is based on such a determination." For locally or regionally applicable final actions, the CAA reserves to EPA complete discretion whether to invoke the exception in (ii).[61]

EPA anticipates that this proposed rulemaking, if finalized, would be "nationally applicable" within the meaning of CAA section 307(b)(1) because it would take final action on SIP submittals for the 2015 8-hour ozone NAAQS for the states of Alabama, Mississippi, and Tennessee, which are located in three different Federal judicial circuits (the Eleventh Circuit, the Fifth Circuit, and the Sixth Circuit, respectively). It would apply uniform, nationwide analytical methods, policy judgments, and interpretation with respect to the same CAA obligations, *i.e.,* implementation of good neighbor requirements under CAA section 110(a)(2)(D)(i)(I) for the 2015 8-hour ozone NAAQS for states across the country, and final action would be based on this common core of determinations, described in further detail below.

If EPA takes final action on this proposed rulemaking, in the alternative, the Administrator intends to exercise the complete discretion afforded to him under the CAA to make and publish a finding that the final action (to the extent a court finds the action to be locally or regionally applicable) is based on a determination of "nationwide scope or effect" within the meaning of CAA section 307(b)(1). Through this

---

[61] In deciding whether to invoke the exception by making and publishing a finding that an action is based on a determination of nationwide scope or effect, the Administrator takes into account a number of policy considerations, including his judgment balancing the benefit of obtaining the D.C. Circuit's authoritative centralized review versus allowing development of the issue in other contexts and the best use of agency resources.

rulemaking action (in conjunction with a series of related actions on other SIP submissions for the same CAA obligations), EPA interprets and applies section 110(a)(2)(d)(i)(I) of the CAA for the 2015 8-hour ozone NAAQS based on a common core of nationwide policy judgments and technical analysis concerning the interstate transport of pollutants throughout the continental U.S. In particular, EPA is applying here (and in other proposed actions related to the same obligations) the same, nationally consistent 4-step framework for assessing good neighbor obligations for the 2015 8-hour ozone NAAQS. EPA relies on a single set of updated, 2016-base year photochemical grid modeling results of the year 2023 as the primary basis for its assessment of air quality conditions and contributions at Steps 1 and 2 of that framework. Further, EPA proposes to determine and apply a set of nationally consistent policy

judgments to apply the 4-step framework. EPA has selected a nationally uniform analytic year (2023) for this analysis and is applying a nationally uniform approach to nonattainment and maintenance receptors and a nationally uniform approach to contribution threshold analysis.[62] For these reasons, the Administrator intends, if this proposed action is finalized, to exercise the complete discretion afforded to him under the CAA to make and publish a finding that this action is based on one or more determinations of nationwide

scope or effect for purposes of CAA section 307(b)(1).[63]

## List of Subjects in 40 CFR Part 52

Environmental protection, Air pollution control, Incorporation by reference, Ozone.

**Authority:** 42 U.S.C. 7401 *et seq.*

Dated: February 3, 2022.

**Daniel Blackman,**

*Regional Administrator, Region 4.*

[FR Doc. 2022–02948 Filed 2–18–22; 8:45 am]

**BILLING CODE 6560–50–P**

---

[62] A finding of nationwide scope or effect is also appropriate for actions that cover states in multiple judicial circuits. In the report on the 1977 Amendments that revised section 307(b)(1) of the CAA, Congress noted that the Administrator's determination that the "nationwide scope or effect" exception applies would be appropriate for any action that has a scope or effect beyond a single judicial circuit. *See* H.R. Rep. No. 95–294 at 323, 324, reprinted in 1977 U.S.C.C.A.N. 1402–03.

[63] EPA may take a consolidated, single final action on all of the proposed SIP disapproval actions with respect to obligations under CAA section 110(a)(2)(D)(i)(I) for the 2015 8-hour ozone NAAQS. Should EPA take a single final action on all such disapprovals, this action would be nationally applicable, and EPA would also anticipate, in the alternative, making and publishing a finding that such final action is based on a determination of nationwide scope or effect.

TAB R4-17: COMMENT SUBMITTED BY MISSISSIPPI DEPARTMENT
OF ENVIRONMENTAL QUALITY (APR. 22, 2022)
(EPA-R04-OAR-2021-0841-0017)



# State of Mississippi

**TATE REEVES**
Governor

## MISSISSIPPI DEPARTMENT OF ENVIRONMENTAL QUALITY

CHRIS WELLS, EXECUTIVE DIRECTOR

April 22, 2022

Docket ID Number:   EPA-R04-OAR-2021-0841
EPA-HQ-OAR-2021-0663
FRL-9421-01-R4

RE:   Air Plan Disapproval; AL, MS, TN; Interstate Transport Requirements for the 2015
8-Hour Ozone National Ambient Air Quality Standards

To whom it may concern:

On February 22, 2022, the Environmental Protection Agency (EPA) proposed to disapprove State Implementation Plan (SIP) submittals from Alabama, Mississippi, and Tennessee regarding the interstate transport requirements for the 2015 8-hour ozone ($O_3$) national ambient air quality standards (NAAQS). The Mississippi Department of Environmental Quality (MDEQ) disagrees with this proposed action on administrative, legal, and technical bases; therefore, we are providing comments on this action.

In the proposed disapproval of Mississippi's infrastructure SIP (iSIP), EPA arbitrarily, and we believe incorrectly, states that MDEQ did not adequately address all steps necessary to satisfy the Clean Air Act interstate transport provisions demonstrating emissions occurring within Mississippi do not significantly contribute to nonattainment or interfere with maintenance of the $O_3$ NAAQS in other states. MDEQ worked collaboratively with EPA Region 4 to properly respond to interstate transport, or "good neighbor," requirements and submitted what we believed EPA considered an approvable iSIP in September 2019. However, EPA did not act on that submittal for nearly two and a half years. Now, within one week of proposing to disapprove the "good neighbor" portion of Mississippi's 2015 $O_3$ NAAQS iSIP, the EPA administrator has signed a proposed Federal Implementation Plan (FIP) to impose on the state. The imposition of the FIP is premature and unnecessary as MDEQ has demonstrated its commitment to develop and submit an approvable iSIP and has historically strived to meet and exceed its obligations.

Disapproving Mississippi's iSIP without allowing the state adequate time to address any EPA concerns prior to imposing the proposed draconian FIP will disproportionally affect lower-income, disadvantaged, and minority Mississippians. In the current economic conditions (unchecked inflation, increased reliance on imported energy sources, eastern European conflicts, etc.), it is imprudent to apply such extreme and unnecessary federal restrictions on energy production and transmission, which will inevitably cause costs of essential goods and services to rise.

OFFICE OF POLLUTION CONTROL
POST OFFICE BOX 2261 • JACKSON, MISSISSIPPI 39225-2261
TEL: (601) 961-5171 • FAX: (601) 354-6612 • www.mdeq.ms.gov
Facebook: @mdeq.ms • Twitter/Instagram: @MDEQ AN
EQUAL OPPORTUNITY EMPLOYER

## AIR QUALITY MODELING ERROR/BIAS

The primary basis for EPA's proposed disapproval is the air quality modeling results from their 2016v2 Emissions Modeling Platform released earlier this year. Model performance is discussed in the technical support document, "Air Quality Modeling for the 2016v2 Emissions Platform Technical Support Document: Appendix A". This document shows significant levels of bias and error (+/-7.8 to 9.1 ppb) in the South region, the region which both Mississippi and Texas are considered a part of for the purpose of this model. The imperceivable contributions from Mississippi sources (i.e., $\leq 1.14$ ppb) on modeled concentrations at any monitor in Texas fall well within the error range and should be further scrutinized to evaluate whether Mississippi's contribution is, in fact, significant.

## METEOROLOGY/MONITORED DATA

Meteorological research regarding EPA's reliance on the air quality modeling for the 2016v2 Emissions Modeling Platform and Mississippi's alleged significant (i.e., $\geq 1\%$ threshold) contributions to receptors in Texas is attached to this correspondence. This research indicates Mississippi has no significant contributions to monitors in Brazoria (Manvel Croix Park, site ID# 48031004), Denton (Denton Airport South, site ID# 481210034), or Harris County (Houston Bayland Park, site ID# 482010055), TX for nitrogen oxide ($NO_x$) and volatile organic compounds (VOC) pollutants to contribute to secondary $O_3$ formation. In most occurrences of high $O_3$ days in Brazoria, Denton, and Harris County, TX, the Houston and/or Dallas core-based statistical areas (CBSA), as applicable, are under very stagnant conditions with minimal mixing, allowing $O_3$ to build. Thorough research shows no correlation when Brazoria, Denton, and Harris County, TX experience an easterly fetch (i.e., easterly winds), which is the only time Mississippi emissions could conceivably contribute to high $O_3$ in these areas.

Also, in EPA's proposed decision to disapprove Mississippi's iSIP, EPA suggests that MDEQ failed to use the most recent (i.e., 2018) available data. However, EPA fails to recognize that certified 2018 Texas monitor data had not been released at the time MDEQ began the public comment period for the proposed iSIP; therefore, MDEQ did in fact use the most recent certified Texas monitor data when drafting the "good neighbor" portion of the Mississippi iSIP. While it is our position that to disapprove Mississippi's iSIP on this basis is, at best, arbitrary and capricious, at the very least the proposed FIP should not be imposed until MDEQ is given a reasonable opportunity to address the alleged deficiencies in the iSIP and to resolve the modeling errors referenced herein.

## EMISSION SOURCES

The air quality modeling results from the 2016v2 Emissions Modeling Platform indicate that by 2026, emissions occurring in Mississippi will no longer contribute to nonattainment nor significantly contribute/interfere with maintenance at any downwind receptor, even without actions to reduce emissions from Mississippi sources. However, it is important to note that many emissions reductions are scheduled or have taken place at Mississippi facilities since 2016, which is the emissions year the 2016v2 platform is based on. These include:

- Mississippi Power Company's plan to shut down Plant Watson Unit 4, a 2,760 MMBtu natural gas fired boiler, in December 2023 and to retire all coal units at Plant Daniel no later than December 2027.

- Cooperative Energy Plant RD Morrow's retirement of all coal units in 2018 and replacement with natural gas combined cycle units.

OFFICE OF POLLUTION CONTROL
POST OFFICE BOX 2261 • JACKSON, MISSISSIPPI 39225-2261
TEL: (601) 961-5171 • FAX: (601) 354-6612 • www.mdeq.ms.gov
Facebook: @mdeq.ms • Twitter/Instagram: @MDEQ AN
EQUAL OPPORTUNITY EMPLOYER

- Entergy Mississippi Plant Baxter Wilson's retirement of Unit 2, a 6,680 MMBtu natural gas fired boiler with fuel oil backup, in 2018 and plans to shut down the remaining Unit 1, a 4,790 MMBtu natural gas fired boiler with fuel oil backup, in May 2023.

- Entergy Mississippi Plant Rex Brown's retirement of Unit 4, a 2,130 MMBtu natural gas fired boiler with fuel oil backup, in 2018 and the remaining Unit 5, a fuel oil fired combustion turbine, in 2019. Plant Rex Brown is now completely shut down.

These significant emissions reductions from Mississippi sources alone should be adequate to allow EPA to approve a revised Mississippi iSIP.

**CONCLUSION**

MDEQ respectfully requests that EPA work collaboratively with MDEQ, allowing appropriate time for the development and submittal of a revised iSIP, and not impose the proposed FIP on Mississippi, which would be unnecessarily burdensome to Mississippians. If you have any questions regarding this matter, you may reach me or Keith Head at 601.961.5171.

Sincerely,

Melissa Fortenberry

Digitally signed by Melissa Fortenberry
DN: cn=Melissa Fortenberry, o, ou, email=mfortenberry@mdeq.ms.gov, c=US
Date: 2022.04.22 08:11:21 -05'00'

Melissa Fortenberry, P.E.
Chief, Air Division

MISSISSIPPI DEPARTMENT OF ENVIRONMENTAL QUALITY

OFFICE OF POLLUTION CONTROL
POST OFFICE BOX 2261 • JACKSON, MISSISSIPPI 39225-2261
TEL: (601) 961-5171 • FAX: (601) 354-6612 • www.mdeq.ms.gov
Facebook: @mdeq.ms • Twitter/Instagram: @MDEQ AN
EQUAL OPPORTUNITY EMPLOYER

**Attachment: Meteorological Review of Contributions from Mississippi to Brazoria, Denton, and Harris County, TX National Ambient Air Quality Standards for Ozone Exceedances**

Based upon air quality modeling for the 2016v2 Emissions Platform, the Environmental Protection Agency (EPA) has proposed that Mississippi significantly contributes to nonattainment or interferes with maintenance of the national ambient air quality standards (NAAQS) for ozone ($O_3$) for the following monitors in Texas:

- Site ID #480391004 - Manvel Croix Park in Brazoria County (located in Houston, TX core-based statistical area (CBSA))
- Site ID #481210034 - Denton Airport South in Denton County (located in Dallas, TX CBSA)
- Site ID #482010055 - Houston Bayland Park in Harris County (located in Houston, TX CBSA)

Regarding meteorological influence, Mississippi has a negligible effect on VOC/NOx transport to contribute downwind to Texas air monitoring sites. On days where Harris, Brazoria, and Denton NAAQS exceedances occur, the $O_3$ development was locally driven, as shown by the following back trajectories.

The 72-hour back trajectories on October 6, 2020 (below), show stagnant conditions as the lowest 10m (green) and 50m (blue) parcel has traveled a minimum distance over the past 72 hours. Dallas/Fort Worth monitors show air quality in the orange category for a daily 8-Hour average.



OFFICE OF POLLUTION CONTROL
POST OFFICE BOX 2261 • JACKSON, MISSISSIPPI 39225-2261
TEL: (601) 961-5171 • FAX: (601) 354-6612 • www.mdeq.ms.gov
Facebook: @mdeq.ms • Twitter/Instagram: @MDEQ AN
EQUAL OPPORTUNITY EMPLOYER

The 72-hour back trajectories on August 18, 2020 (below), show stagnant conditions as the lowest 10m (green) and 50m (blue) parcel has traveled a minimum distance over the past 72 hours. Houston monitors show air quality in the orange category for a daily 8-Hour average.



| Agency | Site | Site AQS | Param | Param AQS | POC | Method | Duration | Date | Unit | 0 | 1 | 2 |
|--------|------|----------|-------|-----------|-----|--------|----------|------|------|---|---|---|
| TX1 | Clinton C403 | 482011035 | O3 | 44201 | 3 | | 8 Hr begin time Avg-Daily Max | 08/18/2020 | PPB | 72 | | |
| TX1 | Houston Bayland Park C53/C146/C181 | 482010055 | O3 | 44201 | 1 | | 8 Hr begin time Avg-Daily Max | 08/18/2020 | PPB | 82 | | |
| TX1 | Houston Croquet C409 | 482010051 | O3 | 44201 | 2 | | 8 Hr begin time Avg-Daily Max | 08/18/2020 | PPB | 81 | | |
| TX1 | Houston Deer Park C35 | 482011039 | O3 | 44201 | 1 | | 8 Hr begin time Avg-Daily Max | 08/18/2020 | PPB | 81 | | |
| TX1 | Houston Monroe C406 | 482010062 | O3 | 44201 | 1 | | 8 Hr begin time Avg-Daily Max | 08/18/2020 | PPB | 80 | | |
| TX1 | Houston Park Place C416 | 482010416 | O3 | 44201 | 1 | | 8 Hr begin time Avg-Daily Max | 08/18/2020 | PPB | 80 | | |
| TX1 | Houston Westhollow C410 | 482010066 | O3 | 44201 | 1 | | 8 Hr begin time Avg-Daily Max | 08/18/2020 | PPB | 74 | | |
| TX1 | Lake Jackson C1016 | 480391016 | O3 | 44201 | 1 | | 8 Hr begin time Avg-Daily Max | 08/18/2020 | PPB | 73 | | |
| TX1 | Manvel Croix Park C84 | 480391004 | O3 | 44201 | 1 | | 8 Hr begin time Avg-Daily Max | 08/18/2020 | PPB | 98 | | |

Showing 1 to 9 of 9 entries

OFFICE OF POLLUTION CONTROL
POST OFFICE BOX 2261 • JACKSON, MISSISSIPPI 39225-2261
TEL: (601) 961-5171 • FAX: (601) 354-6612 • www.mdeq.ms.gov
Facebook: @mdeq.ms • Twitter/Instagram: @MDEQ AN
EQUAL OPPORTUNITY EMPLOYER

The 72-hour back trajectories on October 5, 2020 (below), show stagnant conditions as the lowest 10m (green) and 50m (blue) parcel has traveled a minimum distance over the past 72 hours. Houston monitors show air quality in the orange category for a daily 8-Hour average.



| Agency | Site | Site AQS | Param | Param AQS | POC | Method | Duration | Date | Unit | 0 | 1 |
|--------|------|----------|-------|-----------|-----|--------|----------|------|------|---|---|
| TX1 | Clinton C403 | 482011035 | O3 | 44201 | 3 | | 8 Hr begin time Avg-Daily Max | 10/05/2020 | PPB | 71 | |
| TX1 | Houston Bayland Park C53/C146/C181 | 482010055 | O3 | 44201 | 1 | | 8 Hr begin time Avg-Daily Max | 10/05/2020 | PPB | 81 | |
| TX1 | Houston East C1 | 482011034 | O3 | 44201 | 2 | | 8 Hr begin time Avg-Daily Max | 10/05/2020 | PPB | 72 | |
| TX1 | Houston Park Place C416 | 482010416 | O3 | 44201 | 1 | | 8 Hr begin time Avg-Daily Max | 10/05/2020 | PPB | 72 | |

Showing 1 to 4 of 4 entries

Back trajectories show the red parcel originating in Mississippi and moving downwind into Texas. Ground-level 8-hour $O_3$ averages in the state of Mississippi were in the green category (i.e., good) in the previous days, as noted by MDEQ air monitoring sites.

OFFICE OF POLLUTION CONTROL
POST OFFICE BOX 2261 • JACKSON, MISSISSIPPI 39225-2261
TEL: (601) 961-5171 • FAX: (601) 354-6612 • www.mdeq.ms.gov
Facebook: @mdeq.ms • Twitter/Instagram: @MDEQ AN
EQUAL OPPORTUNITY EMPLOYER

The 72-hour back trajectories on June 6, 2020 (below), show ground-level $O_3$ in the green category over the state of Mississippi, while Houston monitors represent air quality in the orange category.



| Agency | Site | Site AQS | Param | Param AQS | POC | Method | Duration | Date | Unit | 0 | 1 |
|--------|------|----------|-------|-----------|-----|--------|----------|------|------|---|---|
| TX1 | Lang C408 | 482010047 | O3 | 44201 | 2 | | 8 Hr begin time Avg-Daily Max | 06/02/2020 | PPB | 73 | |
| TX1 | Northwest Harris Co. C26/C110/C154 | 482010029 | O3 | 44201 | 2 | | 8 Hr begin time Avg-Daily Max | 06/02/2020 | PPB | 71 | |

Showing 1 to 2 of 2 entries

OFFICE OF POLLUTION CONTROL
POST OFFICE BOX 2261 • JACKSON, MISSISSIPPI 39225-2261
TEL: (601) 961-5171 • FAX: (601) 354-6612 • www.mdeq.ms.gov
Facebook: @mdeq.ms • Twitter/Instagram: @MDEQ AN
EQUAL OPPORTUNITY EMPLOYER

The 72-hour back trajectories on August 21, 2020 (below), show ground-level O$_3$ in the green category over the state of Mississippi, while both Houston and Dallas monitors represent air quality in the orange category.



| Agency | Site | Site AQS | Param | Param AQS | POC | Method | Duration | Date | Unit | 0 | 1 |
|--------|------|----------|-------|-----------|-----|--------|----------|------|------|---|---|
| TX1 | Baytown Garth C1017 | 482011017 | O3 | 44201 | 1 | | 8 Hr begin time Avg-Daily Max | 08/21/2020 | PPB | 71 | |
| TX1 | Clinton C403 | 482011035 | O3 | 44201 | 3 | | 8 Hr begin time Avg-Daily Max | 08/21/2020 | PPB | 71 | |
| TX1 | Houston Deer Park C35 | 482011039 | O3 | 44201 | 1 | | 8 Hr begin time Avg-Daily Max | 08/21/2020 | PPB | 74 | |
| TX1 | Houston East C1 | 482011034 | O3 | 44201 | 2 | | 8 Hr begin time Avg-Daily Max | 08/21/2020 | PPB | 73 | |
| TX1 | Lynchburg Ferry C1015 | 482011015 | O3 | 44201 | 1 | | 8 Hr begin time Avg-Daily Max | 08/21/2020 | PPB | 72 | |

Showing 1 to 5 of 5 entries

OFFICE OF POLLUTION CONTROL
POST OFFICE BOX 2261 • JACKSON, MISSISSIPPI 39225-2261
TEL: (601) 961-5171 • FAX: (601) 354-6612 • www.mdeq.ms.gov
Facebook: @mdeq.ms • Twitter/Instagram: @MDEQ AN
EQUAL OPPORTUNITY EMPLOYER



Wind rose from Dallas Forth Worth (KDFW) (above) showing wind speed and direction during the three-year period 2018-2020. The majority of winds blow from the south and south/southeast. Less than 2% of the duration does the wind blow from the east (i.e., from Mississippi, geographically).

OFFICE OF POLLUTION CONTROL
POST OFFICE BOX 2261 • JACKSON, MISSISSIPPI 39225-2261
TEL: (601) 961-5171 • FAX: (601) 354-6612 • www.mdeq.ms.gov
Facebook: @mdeq.ms • Twitter/Instagram: @MDEQ AN
EQUAL OPPORTUNITY EMPLOYER



Wind rose from Houston Intercontinental Airport (KIAH) (above) showing wind speed and direction during the three-year period 2018-2020.  The majority of the winds blow from the south and south/southeast.  Less than 2% of the duration does the wind blow from the east/east-northeast (i.e., from Mississippi, geographically).

OFFICE OF POLLUTION CONTROL
POST OFFICE BOX 2261 • JACKSON, MISSISSIPPI 39225-2261
TEL: (601) 961-5171 • FAX: (601) 354-6612 • www.mdeq.ms.gov
Facebook: @mdeq.ms • Twitter/Instagram: @MDEQ AN
EQUAL OPPORTUNITY EMPLOYER



**Frequency of counts by wind direction (%)**

NOx Pollution Rose for Houston during the three-year period 2018-2020 (above) showing the majority of pollutants originating south/southeast of the Houston CBSA.

OFFICE OF POLLUTION CONTROL
POST OFFICE BOX 2261 • JACKSON, MISSISSIPPI 39225-2261
TEL: (601) 961-5171 • FAX: (601) 354-6612 • www.mdeq.ms.gov
Facebook: @mdeq.ms • Twitter/Instagram: @MDEQ AN
EQUAL OPPORTUNITY EMPLOYER

Tab R6-1: Air Quality State Implementation Plans; Approvals and Promulgations: Air Plan Disapproval; Arkansas, Louisiana, Oklahoma, Texas; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards, Proposed rule (Feb. 22, 2022) (EPA-R06-OAR-2021-0801-0001)

## ENVIRONMENTAL PROTECTION AGENCY

**40 CFR Part 52**

**[EPA–R06–OAR–2021–0801, EPA–HQ–OAR–2021–0663; FRL–9338–01–R6]**

**Air Plan Disapproval; Arkansas, Louisiana, Oklahoma, and Texas; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Proposed rule.

**SUMMARY:** Pursuant to the Federal Clean Air Act (CAA or the Act), the Environmental Protection Agency (EPA or Agency) is proposing to disapprove State Implementation Plan (SIP) submittals from Arkansas, Louisiana, Oklahoma and Texas regarding interstate transport for the 2015 8-hour ozone national ambient air quality standard (NAAQS). This provision requires that each state's SIP contain adequate provisions to prohibit emissions from within the state from significantly contributing to nonattainment or interfering with maintenance of the NAAQS in other states. The "good neighbor" or "interstate transport" requirement is part of the broader set of "infrastructure" requirements, which are designed to ensure that the structural components of each state's air quality management program are adequate to meet the state's responsibilities under the CAA. This disapproval, if finalized, will establish a 2-year deadline for the EPA to promulgate a Federal Implementation Plan (FIP) to address the relevant interstate transport requirements, unless the EPA approves a subsequent SIP submittal that meets these requirements. Disapproval does not start a mandatory sanctions clock.

**DATES:** Written comments must be received on or before April 25, 2022.

**ADDRESSES:** You may send comments, identified as Docket No. EPA–R06–OAR–2021–0801, by any of the following methods: Federal eRulemaking Portal at *https://www.regulations.gov* following the online instructions for submitting comments or via email to *fuerst.sherry@epa.gov*. Include Docket ID No. EPA–R06–OAR–2021–0801 in the subject line of the message.

*Instructions:* All comments submitted must include the Docket ID No. for this rulemaking. Comments received may be posted without change to *https://www.regulations.gov/*, including any

personal information provided. For detailed instructions on sending comments and additional information on the rulemaking process, see the "Public Participation" heading of the **SUPPLEMENTARY INFORMATION** section of this document. Out of an abundance of caution for members of the public and our staff, the EPA Docket Center and Reading Room are open to the public by appointment only to reduce the risk of transmitting COVID–19. Our Docket Center staff also continues to provide remote customer service via email, phone, and webform. For further information on the EPA Docket Center services and the current status, please visit us online at *https://www.epa.gov/dockets*.

**FOR FURTHER INFORMATION CONTACT:** Sherry Fuerst, EPA Region 6 Office, AR–SI, 214–665–6454, *fuerst.sherry@epa.gov*. We encourage the public to submit comments via *https://www.regulations.gov*, as there will be a delay in processing mail and no courier or hand deliveries will be accepted. Please call or email the contact above if you need alternative access to material indexed but not provided in the docket.

**SUPPLEMENTARY INFORMATION:** *Public Participation:* Submit your comments, identified by Docket ID No. EPA–R06–OAR–2021–0801, at *https://www.regulations.gov* (our preferred method), or the other methods identified in the **ADDRESSES** section. Once submitted, comments cannot be edited or removed from the docket. The EPA may publish any comment received to its public docket. Do not submit to the EPA's docket at *https://www.regulations.gov* any information you consider to be Confidential Business Information (CBI) or other information whose disclosure is restricted by statute. Multimedia submissions (audio, video, etc.) must be accompanied by a written comment. The written comment is considered the official comment and should include discussion of all points you wish to make. The EPA will generally not consider comments or comment contents located outside of the primary submission (*i.e.,* on the web, cloud, or other file sharing system).

There are two dockets supporting this action, EPA–R06–OAR–2021–0801 and EPA–HQ–OAR–2021–0663. Docket No. EPA–R06–OAR–2021–0801 contains information specific to Arkansas, Louisiana, Oklahoma, and Texas, including the notice of proposed rulemaking, submittals from the states, and the EPA Region 6 2015 8-Hour Ozone Transport SIP Proposal Technical Support Document (EPA Region 6 TSD).

Docket No. EPA–HQ–OAR–2021–0663 contains additional modeling files, emissions inventory files, technical support documents, and other relevant supporting documentation regarding interstate transport of emissions for the 2015 8-hour ozone NAAQS which are being used to support this action, including Preparation of Emissions Inventories for the 2016v2 North American Emissions Modeling Platform, and Air Quality Modeling TSD for 2015 ozone NAAQS Transport SIP Proposed Actions. All comments regarding information in either of these dockets are to be made in Docket No. EPA–R06–OAR–2021–0801. For additional submission methods, please contact Sherry Fuerst, 214–665–6454, *fuerst.sherry@epa.gov*. For the full EPA public comment policy, information about CBI or multimedia submissions, and general guidance on making effective comments, please visit *https://www.epa.gov/dockets/commenting-epa-dockets*. Due to public health concerns related to COVID–19, the EPA Docket Center and Reading Room are open to the public by appointment only. Our Docket Center staff also continues to provide remote customer service via email, phone, and webform. For further information and updates on EPA Docket Center services, please visit us online at *https://www.epa.gov/dockets*.

The EPA continues to carefully and continuously monitor information from the Centers for Disease Control and Prevention (CDC), local area health departments, and our Federal partners so that we can respond rapidly as conditions change regarding COVID–19.

The index to the dockets for this action, Docket No. EPA–R06–OAR–2021–0801 and EPA–HQ–OAR–2021–0663, are available electronically at *https://www.regulations.gov*. While all documents in the docket are listed in the index, some information may not be publicly available due to docket file size restrictions or content (*e.g.,* CBI).

Throughout this document, "we," "us," and "our" means the EPA.

### Table of Contents

I. Background
  A. Description of Statutory Background
  B. Description of the EPA's 4-Step Interstate Transport Regulatory Process
  C. Background on the EPA's Ozone Transport Modeling Information
  D. The EPA's Approach to Evaluating Interstate Transport SIPs for the 2015 Ozone NAAQS
    1. Selection of Analytic Year
    2. Step 1 of the 4-Step Interstate Transport Framework
    3. Step 2 of the 4-Step Interstate Transport Framework

4. Step 3 of the 4-Step Interstate Transport Framework
5. Step 4 of the 4-Step Interstate Transport Framework
II. Arkansas SIP Submission Addressing Interstate Transport of Air Pollution for the 2015 Ozone NAAQS and the EPA Evaluation of the SIP Submission
A. Summary of ADEQ SIP Submission Addressing Interstate Transport of Air Pollution for the 2015 Ozone NAAQS
B. EPA Evaluation of the ADEQ SIP Submission
1. Evaluation of Information Provided by ADEQ Regarding Step 1
2. Evaluation of Information Provided by ADEQ Regarding Step 2
3. Results of the EPA's Step 1 and Step 2 Modeling and Findings for Arkansas
4. Evaluation of Information Provided by ADEQ Regarding Step 3
5. Evaluation of Information Provided by ADEQ Regarding Step 4
6. Conclusion
III. Louisiana SIP Submission Addressing Interstate Transport of Air Pollution for the 2015 Ozone NAAQS and the EPA Evaluation of the SIP Submission
A. Summary of LDEQ SIP Submission Addressing Interstate Transport of Air Pollution for the 2015 Ozone NAAQS
B. EPA Evaluation of the LDEQ SIP Submission
1. Evaluation of Information Provided by LDEQ Regarding Steps 1 and 2
2. Results of the EPA's Step 1 and Step 2 Modeling and Findings for Louisiana
3. Evaluation of Information Provided by LDEQ Regarding Step 3
4. Evaluation of Information Provided by LDEQ Regarding Step 4
5. Conclusion
IV. Oklahoma SIP Submission Addressing Interstate Transport of Air Pollution for the 2015 Ozone NAAQS and the EPA Evaluation of the SIP Submission
A. Summary of ODEQ SIP Submission Addressing Interstate Transport of Air Pollution for the 2015 Ozone NAAQS
B. EPA Evaluation of the ODEQ SIP Submission
1. Evaluation of Information Provided by ODEQ Regarding Steps 1 and 2
2. Results of the EPA's Step 1 and Step 2 Modeling and Findings for Oklahoma
3. Evaluation of Information Provided by ODEQ Regarding Step 3
4. Evaluation of Information Provided by ODEQ Regarding Step 4
5. Conclusion
C. Impact on Areas of Indian Country
V. Texas SIP Submission Addressing Interstate Transport of Air Pollution for the 2015 Ozone NAAQS and the EPA Evaluation of the SIP Submission
A. Summary of TCEQ SIP Submission Addressing Interstate Transport of Air Pollution for the 2015 Ozone NAAQS
B. EPA Evaluation of the TCEQ SIP Submission
1. Evaluation of Information Provided by TCEQ Regarding Step 1
i. Evaluation of TCEQ's Methodology for Identifying Maintenance Receptors
ii. Evaluation of the TCEQ Modeling
2. Evaluation of Information Provided by TCEQ Regarding Step 2
3. Results of the EPA's Step 1 and Step 2 Modeling and Findings for Texas
4. Evaluation of Information Provided by TCEQ Regarding Step 3
5. Evaluation of Information Provided by TCEQ Regarding Step 4
6. Conclusion
VI. Proposed Action
VII. Statutory and Executive Order Reviews

# I. Background

## A. Description of Statutory Background

On October 1, 2015, the EPA promulgated a revision to the 2015 8-hour ozone NAAQS (2015 ozone NAAQS), lowering the level of both the primary and secondary standards to 0.070 parts per million (ppm).[1] Section 110(a)(1) of the CAA requires states to submit, within 3 years after promulgation of a new or revised standard, SIP submissions meeting the applicable requirements of section 110(a)(2).[2] One of these applicable requirements is found in CAA section 110(a)(2)(D)(i)(I), otherwise known as the ''interstate transport'' or ''good neighbor'' provision, which generally requires SIPs to contain adequate provisions to prohibit in-state emissions activities from having certain adverse air quality effects on other states due to interstate transport of pollution. There are two requirements, often referred to as ''prongs'' within CAA section 110(a)(2)(D)(i)(I). A SIP for a new or revised NAAQS must contain adequate provisions prohibiting any source or other type of emissions activity within the state from emitting air pollutants in amounts that will significantly contribute to nonattainment of the NAAQS in another state (prong 1) or interfere with maintenance of the NAAQS in another state (prong 2). The EPA and states must give independent significance to prong 1 and prong 2 when evaluating downwind air quality problems under CAA section 110(a)(2)(D)(i)(I).[3]

## B. Description of the EPA's 4-Step Interstate Transport Regulatory Process

The EPA is using the 4-Step interstate transport framework (or 4-Step framework) described in detail below to evaluate states' SIP submittals addressing the interstate transport provision for the 2015 ozone NAAQS. The EPA has addressed the interstate transport requirements of CAA section 110(a)(2)(D)(i)(I) with respect to prior ozone NAAQS in several regional regulatory actions, including the Cross-State Air Pollution Rule (CSAPR), which addressed interstate transport with respect to the 1997 ozone NAAQS as well as the 1997 and 2006 fine particulate matter standards,[4] and the Cross-State Air Pollution Rule Update (CSAPR Update)[5] and the Revised CSAPR Update, both of which addressed the 2008 ozone NAAQS.[6]

Through the development and implementation of the CSAPR rulemakings and prior regional rulemakings pursuant to the interstate transport provision,[7] the EPA, working in partnership with states, developed the following 4-Step framework to evaluate a state's obligations to eliminate interstate transport emissions under the interstate transport provision for the ozone NAAQS: (1) Identify monitoring sites that are projected to have problems attaining and/or maintaining the NAAQS (i.e., nonattainment and/or maintenance receptors); (2) identify states that impact those air quality problems in other (i.e., downwind) states sufficiently such that the states are considered ''linked'' and therefore warrant further review and analysis; (3) identify the emissions reductions necessary (if any), applying a multifactor analysis, to eliminate each linked upwind state's significant contribution to nonattainment or interference with maintenance of the NAAQS at the locations identified in Step 1; and (4) adopt permanent and enforceable measures needed to achieve those emissions reductions.

---

[1] ''National Ambient Air Quality Standards for Ozone'', Final Rule, 80 FR 65292 (October 26, 2015). Although the level of the standard is specified in the units of ppm, ozone concentrations are also described in parts per billion (ppb). For example, 0.070 ppm is equivalent to 70 ppb.

[2] SIP revisions that are intended to meet the applicable requirements of section 110(a)(1) and (2) of the CAA are often referred to as infrastructure SIPs and the applicable elements under section 110(a)(2) are referred to as infrastructure requirements.

[3] See North Carolina v. EPA, 531 F.3d 896, 909–11 (D.C. Cir. 2008).

[4] See ''Federal Implementation Plans: Interstate Transport of Fine Particulate Matter and Ozone and Correction of SIP Approvals'', 76 FR 48208 (Aug. 8, 2011).

[5] See ''Cross-State Air Pollution Rule Update for the 2008 Ozone NAAQS'', 81 FR 74504 (Oct. 26, 2016).

[6] In 2019, the D.C. Circuit Court of Appeals remanded the CSAPR Update to the extent it failed to require upwind states to eliminate their significant contribution by the next applicable attainment date by which downwind states must come into compliance with the NAAQS, as established under CAA section 181(a). Wisconsin v. EPA, 938 F.3d 303, 313 (D.C. Cir. 2019). The Revised CSAPR Update for the 2008 Ozone NAAQS, 86 FR 23054 (April 30, 2021), responded to the remand of the CSAPR Update in Wisconsin and the vacatur of a separate rule, the ''CSAPR Close-Out,'' 83 FR 65878 (December 21, 2018), in New York v. EPA, 781 F. App'x. 4 (D.C. Cir. 2019).

[7] In addition to the CSAPR rulemakings, other regional rulemakings addressing ozone transport include the ''NOₓ SIP Call,'' 63 FR 57356 (October 27, 1998), and the ''Clean Air Interstate Rule'' (CAIR), 70 FR 25162 (May 12, 2005).

*C. Background on the EPA's Ozone Transport Modeling Information*

In general, the EPA has performed nationwide air quality modeling to project ozone design values (DVs)[8] which are used in combination with measured data to identify nonattainment and maintenance receptors. To quantify the contribution of emissions from specific upwind states on 2023 ozone DVs for the identified downwind nonattainment and maintenance receptors, the EPA performed nationwide, state-level ozone source apportionment modeling for 2023. The source apportionment modeling provided contributions to ozone at receptors from precursor emissions of anthropogenic nitrogen oxides ($NO_X$) and volatile organic compounds (VOCs) in individual upwind states.

The EPA has released several documents containing projected ozone design values, contributions, and information relevant to evaluating interstate transport with respect to the 2015 ozone NAAQS. First, on January 6, 2017, the EPA published a notice of data availability (NODA) in which we requested comment on preliminary interstate ozone transport data including projected ozone DVs and interstate contributions for 2023 using a 2011 base year platform.[9] In the NODA, the EPA used the year 2023 as the analytic year for this preliminary modeling because that year aligns with the expected attainment year for Moderate ozone nonattainment areas for the 2015 NAAQS.[10] On October 27, 2017, we released a memorandum (October 2017 memorandum) containing updated modeling data for 2023, which incorporated changes made in response to comments on the NODA, and noted that the modeling may be useful for states developing SIPs to address interstate transport obligations for the 2008 ozone NAAQS.[11] On March 27,

2018, we issued a memorandum (March 2018 memorandum) noting that the same 2023 modeling data released in the October 2017 memorandum could also be useful for identifying potential downwind air quality problems with respect to the 2015 ozone NAAQS at Step 1 of the 4-Step framework.[12] The March 2018 memorandum also included the then newly available contribution modeling data to assist states in evaluating their impact on potential downwind air quality problems for the 2015 ozone NAAQS under Step 2 of the 4-Step framework.[13] The EPA subsequently issued two more memoranda in August and October 2018, providing additional information to states developing interstate transport SIP submissions for the 2015 ozone NAAQS concerning, respectively, potential contribution thresholds that may be appropriate to apply in Step 2 of the 4-Step interstate transport framework, and considerations for identifying downwind areas that may have problems maintaining the standard at Step 1 of the 4-Step interstate transport framework.[14]

Since the release of the modeling data shared in the March 2018 memorandum, the EPA performed updated modeling using a 2016-based emissions modeling platform (*i.e.,* 2016v1). This emissions platform was developed under the EPA/Multi-Jurisdictional Organization (MJO)/state

collaborative project.[15] This collaborative project was a multi-year joint effort by the EPA, MJOs, and states to develop a new, more recent emissions platform for use by the EPA and states in regulatory modeling as an improvement over the dated 2011-based platform that the EPA had used to project ozone DVs and contribution data provided in the 2017 and 2018 memoranda. The EPA used the 2016v1 emissions to project ozone DVs and contributions for 2023. On October 30, 2020, in the Notice of Proposed Rulemaking for the Revised CSAPR Update, the EPA released and accepted public comment on 2023 modeling that used the 2016v1 emissions platform.[16] *See* 85 FR 68964, 68981. Although the Revised CSAPR Update addressed transport for the 2008 ozone NAAQS, the projected DVs and contributions from the 2016v1 platform are also useful for identifying downwind ozone problems and linkages with respect to the 2015 ozone NAAQS.[17]

Following the Revised CSAPR Update final rule, the EPA made further updates to the 2016 emissions platform to include mobile emissions from the EPA's Motor Vehicle Emission Simulator MOVES3 model [18] and updated emissions projections for electric generating units (EGUs) that reflect the emissions reductions from the Revised CSAPR Update, recent information on plant closures, and other sector trends. The construct of the updated emissions platform, 2016v2, is described in the Technical Support Document (TSD) Preparation of Emissions Inventories for the 2016v2 North American Emissions Modeling Platform, which is included in Docket ID No. EPA–HQ–OAR–2021–0663. The EPA performed air quality modeling of the 2016v2 emissions using the most recent publicly released version of the Comprehensive Air-quality Model with extensions (CAMx) photochemical modeling, version 7.10.[19] The EPA now proposes to rely on the air quality modeling performed using CAMx, version 7.10, and the newly available 2016v2 emissions platform in evaluating states' submissions with respect to Steps

---

[8] A design value is a statistic that describes the air quality status of a given location relative to the level of the NAAQS. Design values are typically used to designate and classify nonattainment areas, as well as to assess progress towards meeting the NAAQS. *See https://www.epa.gov/air-trends/air-quality-design-values#report.*

[9] *See* ''Notice of Availability of the Environmental Protection Agency's Preliminary Interstate Ozone Transport Modeling Data for the 2015 8-hour Ozone National Ambient Air Quality Standard (NAAQS)'', 82 FR 1733 (January 6, 2017).

[10] 82 FR at 1735.

[11] *See* EPA memorandum, ''Information on the Interstate Transport State Implementation Plan Submissions for the 2008 Ozone National Ambient Air Quality Standards under Clean Air Act section 110(a)(2)(D)(i)(I)'', October 27, 2017, (''October 2017 memorandum'') available in Docket ID No. EPA–HQ–OAR–2021–0663 or at *https://www.epa.gov/*

*interstate-air-pollution-transport/interstate-air-pollution-transport-memos-and-notices.*

[12] *See* EPA memorandum, ''Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act section 110(a)(2)(D)(i)(I)'', March 27, 2018, (''March 2018 memorandum'') available in Docket ID No. EPA–HQ–OAR–2021–0663 or at *https://www.epa.gov/interstate-air-pollution-transport/interstate-air-pollution-transport-memos-and-notices.*

[13] The March 2018 memorandum, however, provided, ''While the information in this memorandum and the associated air quality analysis data could be used to inform the development of these SIPs, the information is not a final determination regarding states' obligations under the interstate transport provision. Any such determination would be made through notice-and-comment rulemaking.''

[14] *See* EPA memorandums, ''Analysis of Contribution Thresholds for Use in Clean Air Act section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards'', August 31, 2018 (''August 2018 memorandum''), and ''Considerations for Identifying Maintenance Receptors for Use in Clean Air Act section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards'', October 19, 2018 (''October 2018 memorandum''), available in Docket ID No. EPA–HQ–OAR–2021–0663 or at *https://www.epa.gov/airmarkets/memo-and-supplemental-information-regarding-interstate-transport-sips-2015-ozone-naaqs.*

[15] The results of this modeling, as well as the underlying modeling files, are included in Docket ID No. EPA–HQ–OAR–2021–0663.

[16] *See* 85 FR 68964, 68981 (Oct. 30, 2020).

[17] *See* the Air Quality Modeling Technical Support Document for the Final Revised Cross-State Air Pollution Rule Update, available in Docket ID No. EPA–HQ–OAR–2021–0663 for this action.

[18] Additional details and documentation related to the MOVES3 model can be found at *https://www.epa.gov/moves/latest-version-motor-vehicle-emission-simulator-moves.*

[19] Ramboll Environment and Health, January 2021, *www.camx.com.*

1 and 2 of the 4-Step framework and generally referenced within this action as 2016v2 modeling for 2023. By using the updated modeling results, the EPA is using the most current and technically appropriate information for this proposed rulemaking. Sections II–V of this action and the Air Quality Modeling TSD for 2015 ozone NAAQS Transport SIP Proposed Actions, included in Docket ID No. EPA–HQ–OAR–2021–0663 for this proposal, contain additional detail on the EPA's 2016v2 modeling. In this action, the EPA is inviting public comment on this updated 2023 modeling, which uses a 2016v2 emissions platform. Per the instructions in the Supplementary Information section above, all public comments, including comments on the EPA's air quality modeling should be submitted in the Regional docket for this action, Docket ID No. EPA–R06–OAR–2021–0801. Comments are not being accepted in Docket No. EPA–HQ–OAR–2021–0663.

States may have chosen to rely on the results of EPA modeling and/or alternative modeling performed by states or Multi-Jurisdictional Organizations (MJOs) to evaluate downwind air quality problems and contributions as part of their submissions. In Sections II–V of this action, we evaluate how the states used air quality modeling information in their submissions.

## D. The EPA's Approach to Evaluating Interstate Transport SIPs for the 2015 Ozone NAAQS

The EPA proposes to apply a consistent set of policy judgments across all states for purposes of evaluating interstate transport obligations and the approvability of interstate transport SIP submittals for the 2015 ozone NAAQS. These policy judgments reflect consistency with relevant case law and past agency practice as reflected in the CSAPR and related rulemakings. Nationwide consistency in approach is particularly important in the context of interstate ozone transport, which is a regional-scale pollution problem involving many smaller contributors. Effective policy solutions to the problem of interstate ozone transport going back to the 1998 NOₓ SIP Call[20] have necessitated the application of a uniform framework of policy judgments in order to ensure an "efficient and equitable" approach. See

*EME Homer City Generation, LP* v. *EPA,* 572 U.S. 489, 519 (2014).

In the March, August, and October 2018 memoranda, the EPA recognized that states may be able to establish alternative approaches to addressing their interstate transport obligations for the 2015 ozone NAAQS that vary from a nationally uniform framework. The EPA emphasized in these memoranda, however, that such alternative approaches must be technically justified and appropriate in light of the facts and circumstances of each particular state's submittal. In general, the EPA continues to believe that deviation from a nationally consistent approach to ozone transport must be substantially justified and have a well-documented technical basis that is consistent with relevant case law. Where states submitted SIPs that rely on any such potential "flexibilities" as may have been identified or suggested in the past, the EPA will evaluate whether the state adequately justified the technical and legal basis for doing so.

The EPA notes that certain concepts included in an attachment to the March 2018 memorandum require unique consideration, and these ideas do not constitute agency guidance with respect to transport obligations for the 2015 ozone NAAQS. Attachment A to the March 2018 memorandum identified a "Preliminary List of Potential Flexibilities" that could potentially inform SIP development.[21] However, the EPA made clear in Attachment A that the list of ideas were not suggestions endorsed by the Agency but rather "comments provided in various forums" on which the EPA sought "feedback from interested stakeholders." [22] Further, Attachment A stated, "EPA is not at this time making any determination that the ideas discussed below are consistent with the requirements of the CAA, nor are we specifically recommending that states use these approaches." [23] Attachment A to the March 2018 memorandum, therefore, does not constitute agency guidance, but was intended to generate further discussion around potential approaches to addressing ozone transport among interested stakeholders. To the extent states sought to develop or rely on these ideas in support of their SIP submittals, the EPA will review the technical and legal justifications for doing so.

The remainder of this section describes the EPA's proposed framework with respect to analytic year,

definition of nonattainment and maintenance receptors, selection of contribution threshold, and multifactor control strategy analysis.

## 1. Selection of Analytic Year

In general, the states and the EPA must implement the interstate transport provision in a manner "consistent with the provisions of [title I of the CAA.]" CAA section 110(a)(2)(D)(i). This requires, among other things, that these obligations are addressed consistently with the timeframes for downwind areas to meet their CAA obligations. With respect to ozone NAAQS, under CAA section 181(a), this means obligations must be addressed "as expeditiously as practicable" and no later than the schedule of attainment dates provided in CAA section 181(a)(1).[24] Several D.C. Circuit court decisions address the issue of the relevant analytic year for the purposes of evaluating interstate transport air quality problems. On September 13, 2019, the D.C. Circuit issued a decision in *Wisconsin* v. *EPA,* remanding the CSAPR Update to the extent that it failed to require upwind states to eliminate their significant contribution by the next applicable attainment date by which downwind states must come into compliance with the NAAQS, as established under CAA section 181(a). 938 F.3d at 313.

On May 19, 2020, the D.C. Circuit issued a decision in *Maryland* v. *EPA* that cited the *Wisconsin* decision in holding that the EPA must assess the impact of interstate transport on air quality at the next downwind attainment date, including Marginal area attainment dates, in evaluating the basis for the EPA's denial of a petition under CAA section 126(b). *Maryland* v. *EPA,* 958 F.3d 1185, 1203–04 (D.C. Cir. 2020). The court noted that "section 126(b) incorporates the Good Neighbor Provision," and, therefore, "EPA must find a violation [of section 126] if an upwind source will significantly contribute to downwind nonattainment at the *next downwind attainment deadline.* Therefore, the agency must evaluate downwind air quality at that deadline, not at some later date." *Id.* at 1204 (emphasis added). The EPA interprets the court's holding in *Maryland* as requiring the states and the Agency, under the interstate transport provision, to assess downwind air quality as expeditiously as practicable and no later than the next applicable

---

[20] *See* 63 FR 57356. The NOₓ SIP Call required 22 eastern states and the District of Columbia to submit state implementation plans (SIPs) that set statewide ozone season NOₓ budgets which would reduce emissions of NOₓ.

[21] March 2018 memorandum, Attachment A.
[22] *Id.* at A–1.
[23] *Id.*

[24] For attainment dates for the 2015 8-hour ozone NAAQS, refer to CAA section 181(a), 40 CFR 51.1303, and "Additional Air Quality Designations for the 2015 Ozone National Ambient Air Quality Standards", 83 FR 25776 (June 4, 2018, effective Aug. 3, 2018).

attainment date,[25] which is now the Moderate area attainment date under CAA section 181 for ozone nonattainment. The Moderate area attainment date for the 2015 ozone NAAQS is August 3, 2024.[26] The EPA believes that 2023 is now the appropriate year for analysis of interstate transport obligations for the 2015 ozone NAAQS, because the 2023 ozone season is the last relevant ozone season during which achieved emissions reductions in linked upwind states could assist downwind states with meeting the August 3, 2024, Moderate area attainment date for the 2015 ozone NAAQS.

The EPA recognizes that the attainment date for nonattainment areas classified as Marginal for the 2015 ozone NAAQS was August 3, 2021. Under the *Maryland* holding, any necessary emissions reductions to satisfy interstate transport obligations should have been implemented by no later than this date. At the time of the statutory deadline to submit interstate transport SIPs (October 1, 2018), many states relied upon the EPA modeling of the year 2023, and no state provided an alternative analysis using a 2021 analytic year (or the prior 2020 ozone season). However, the EPA must act on SIP submittals using the information available at the time it takes such action. In this circumstance, the EPA does not believe it would be appropriate to evaluate states' obligations under CAA section 110(a)(2)(D)(i)(I) as of an attainment date that is wholly in the past, because the Agency interprets the interstate transport provision as forward looking. *See* 86 FR at 23074; *see also Wisconsin,* 938 F.3d at 322. Consequently, in this proposal the EPA proposes to use the analytical year of 2023 to evaluate each state's CAA section 110(a)(2)(D)(i)(I) SIP submission with respect to the 2015 ozone NAAQS.

### 2. Step 1 of the 4-Step Interstate Transport Framework

In Step 1, the EPA identifies monitoring sites that are projected to have problems attaining and/or maintaining the NAAQS in the 2023 analytic year. Where the EPA's analysis shows that a site does not fall under the definition of a nonattainment or maintenance receptor, that site is excluded from further analysis under the EPA's 4-Step framework. For sites that are identified as a nonattainment or maintenance receptor in 2023, we proceed to the next step of our 4-Step framework by identifying the upwind state's contribution to those receptors.

The EPA's approach to identifying ozone nonattainment and maintenance receptors in this action is consistent with the approach used in previous transport rulemakings. The EPA's approach gives independent consideration to both the "contribute significantly to nonattainment" and the "interfere with maintenance" prongs of CAA section 110(a)(2)(D)(i)(I), consistent with the D.C. Circuit's direction in *North Carolina* v. *EPA.*[27]

For the purpose of this proposal, the EPA identifies "nonattainment" receptors as those monitoring sites that are projected to have average DVs in 2023 that exceed the NAAQS and that are also measuring nonattainment based on the most recent monitored DVs. This approach is consistent with prior transport rulemakings, such as the CSAPR Update, where the EPA defined nonattainment receptors as those areas that both currently measure nonattainment and that the EPA projects will be in nonattainment in the future analytic year (*i.e.,* 2023).[28]

In addition, in this proposal, the EPA defines a receptor to be a "maintenance" receptor for purposes of defining interference with maintenance, consistent with the method used in the CSAPR and upheld by the D.C. Circuit in *EME Homer City Generation, L.P.* v. *EPA,* 795 F.3d 118, 136 (D.C. Cir. 2015).[29] Specifically, the EPA identified maintenance receptors as those receptors that would have difficulty maintaining the relevant NAAQS in a scenario that takes into account historical variability in air quality at that receptor. The variability in air quality was determined by evaluating the "maximum" future DV at each receptor based on a projection of the maximum measured DV over the relevant period. The EPA interprets the projected maximum future DV to be a potential future air quality outcome consistent with the meteorology that yielded maximum measured concentrations in the ambient data set analyzed for that receptor (*i.e.,* ozone conducive meteorology). The EPA also recognizes that previously experienced meteorological conditions (*e.g.,* dominant wind direction, temperatures, air mass patterns) promoting ozone formation that led to maximum concentrations in the measured data may reoccur in the future. The maximum DV gives a reasonable projection of future air quality at the receptor under a scenario in which such conditions do, in fact, reoccur. The projected maximum DV is used to identify upwind emissions that, under those circumstances, could interfere with the downwind area's ability to maintain the NAAQS.

Recognizing that nonattainment receptors are also, by definition, maintenance receptors, the EPA often uses the term "maintenance-only" to refer to those receptors that are not nonattainment receptors. Consistent with the concepts for maintenance receptors, as described above, the EPA identifies "maintenance-only" receptors as those monitoring sites that have projected average DVs above the level of the applicable NAAQS, but that are not currently measuring nonattainment based on the most recent official DVs. In addition, those monitoring sites with projected average DVs below the NAAQS, but with projected maximum DVs above the NAAQS are also identified as "maintenance only" receptors, even if they are currently measuring nonattainment based on the most recent official DVs.

### 3. Step 2 of the 4-Step Interstate Transport Framework

In Step 2, the EPA quantifies the contribution of each upwind state to each receptor in the 2023 analytic year. The contribution metric used in Step 2 is defined as the average impact from each state to each receptor on the days with the highest ozone concentrations at the receptor based on the 2023 modeling. If a state's contribution value does not equal or exceed the threshold of 1 percent of the NAAQS (*i.e.,* 0.70 ppb for the 2015 ozone NAAQS), the upwind state is not "linked" to a downwind air quality problem, and the EPA, therefore, concludes that the state does not significantly contribute to

---

[25] We note that the court in *Maryland* did not have occasion to evaluate circumstances in which the EPA may determine that an upwind linkage to a downwind air quality problem exists at Steps 1 and 2 of the 4-Step interstate transport framework by a particular attainment date, but for reasons of impossibility or profound uncertainty the Agency is unable to mandate upwind pollution controls by that date. *See Wisconsin,* 938 F.3d at 320. The D.C. Circuit noted in *Wisconsin* that upon a sufficient showing, these circumstances may warrant flexibility in effectuating the purpose of the interstate transport provision.

[26] *See* CAA section 181(a); 40 CFR 51.1303; "Additional Air Quality Designations for the 2015 Ozone National Ambient Air Quality Standards", 83 FR 25776 (June 4, 2018, effective Aug. 3, 2018).

[27] *See North Carolina* v. *EPA,* 531 F.3d 896, 910–11 (D.C. Cir. 2008) (holding that the EPA must give "independent significance" to each prong of CAA section 110(a)(2)(D)(i)(I)).

[28] *See* 81 FR 74504 (October 26, 2016). This same concept, relying on both current monitoring data and modeling to define nonattainment receptor, was also applied in CAIR. *See* 70 FR at 25241, 25249 (January 14, 2005); *see also North Carolina,* 531 F.3d at 913–14 (affirming as reasonable EPA's approach to defining nonattainment in CAIR).

[29] *See* 76 FR 48208 (August 8, 2011). CSAPR Update and Revised CSAPR Update also used this approach. See 81 FR 74504 (October 26, 2016) and 86 FR 23054 (April 30, 2021).

nonattainment or interfere with maintenance of the NAAQS in the downwind states. However, if a state's contribution equals or exceeds the 1 percent threshold, the state's emissions are further evaluated in Step 3, considering both air quality and cost of controls as part of a multifactor analysis, to determine what, if any, emissions might be deemed ''significant'' and, thus, must be eliminated under CAA section 110(a)(2)(D)(i)(I). The EPA is proposing to continue to rely in the first instance on the 1 percent threshold for the purpose of evaluating a state's contribution to nonattainment or maintenance of the 2015 ozone NAAQS (*i.e.,* 0.70 ppb) at downwind receptors. This is consistent with the Step 2 approach that the EPA applied in CSAPR for the 1997 ozone NAAQS, which has subsequently been applied in the CSAPR Update when evaluating interstate transport obligations for the 2008 ozone NAAQS. For ozone, as the EPA found in the Clean Air Interstate Rule (CAIR), CSAPR, and CSAPR Update, a portion of the nonattainment problem from anthropogenic sources in the U.S. results from the combined impact of relatively small contributions from many upwind states, along with contributions from in-state sources and, in some cases, substantially larger contributions from a subset of upwind states. The EPA's analysis shows that much of the ozone transport problem being analyzed in this proposed rule is still the result of the collective impacts of contributions from many upwind states. Therefore, application of a consistent contribution threshold is necessary to identify those upwind states that should have responsibility for addressing their contribution to the downwind nonattainment and maintenance problems to which they collectively contribute. Continuing to use 1 percent of the NAAQS as the screening metric to evaluate collective contribution from many upwind states also allows the EPA (and states) to apply a consistent framework to evaluate interstate emissions transport under the interstate transport provision from one NAAQS to the next. *See* 81 FR at 74518. *See also* 86 FR at 23085 (reviewing and explaining rationale from CSAPR); 76 FR at 48237–38 (for selection of 1 percent threshold).

The EPA's August 2018 memorandum recognized that in certain circumstances, a state may be able to establish that an alternative contribution threshold of 1 ppb is justifiable. Where a state relies on this alternative threshold, and where that state determined that it was not linked at

Step 2 using the alternative threshold, the EPA will evaluate whether the state provided a technically sound assessment of the appropriateness of using this alternative threshold based on the facts and circumstances underlying its application in the particular SIP submission.

### 4. Step 3 of the 4-Step Interstate Transport Framework

Consistent with the EPA's longstanding approach to eliminating significant contribution or interference with maintenance, at Step 3, states linked at Steps 1 and 2 are generally expected to prepare a multifactor analysis of potential emissions controls. The EPA's analysis at Step 3 in prior Federal actions addressing interstate transport requirements has primarily focused on an evaluation of cost-effectiveness of potential emissions controls (on a marginal cost-per-ton basis), the total emissions reductions that may be achieved by requiring such controls (if applied across all linked upwind states), and an evaluation of the air quality impacts such emissions reductions would have on the downwind receptors to which a state is linked; other factors may potentially be relevant if adequately supported. In general, where the EPA's or alternative air quality and contribution modeling establishes that a state is linked at Steps 1 and 2, it will be insufficient at Step 3 for a state merely to point to its existing rules requiring control measures as a basis for approval. In general, the emissions-reducing effects of all existing emissions control requirements are already reflected in the air quality results of the modeling for Steps 1 and 2. If the state is shown to still be linked to one or more downwind receptor(s), states must provide a well-documented evaluation determining whether their emissions constitute significant contribution or interference with maintenance by preparing a multifactor assessment that evaluates additional available control opportunities. While the EPA has not prescribed a particular method for this assessment, the EPA expects states at a minimum to present a sufficient technical evaluation. This would typically include information on emissions sources, applicable control technologies, emissions reductions, costs, cost effectiveness, and downwind air quality impacts of the estimated reductions, before concluding that no additional emissions controls should be required.[30]

[30] As examples of general approaches for how such an analysis could be conducted for their

### 5. Step 4 of the 4-Step Interstate Transport Framework

In Step 4, states (or the EPA) develop permanent and federally enforceable control strategies to achieve the emissions reductions determined to be necessary in Step 3 to eliminate significant contribution to nonattainment or interference with maintenance of the NAAQS. For a state linked in Steps 1 and 2 to rely on an emissions control measure in Step 3 to address its interstate transport obligations, that measure must be included in the state's SIP so that it is permanent and federally enforceable. *See* CAA section 110(a)(2)(D) (''Each such [SIP] shall . . . contain adequate provisions. . . .''). *See also* CAA section 110(a)(2)(A); *Committee for a Better Arvin* v. *U.S. E.P.A.,* 786 F.3d 1169, 1175–76 (9th Cir. 2015) (holding that measures relied on by state to meet CAA requirements must be included in the SIP).

## II. Arkansas SIP Submission Addressing Interstate Transport of Air Pollution for the 2015 Ozone NAAQS and the EPA Evaluation of the SIP Submission

### A. Summary of ADEQ SIP Submission Addressing Interstate Transport of Air Pollution for the 2015 Ozone NAAQS

On October 10, 2019, the Arkansas Division of Environmental Quality (ADEQ) of the Arkansas Department of Energy and Environment made a SIP submission addressing interstate transport of air pollution for the 2015 ozone NAAQS. The ADEQ SIP submission provided an analysis of Arkansas's air emissions impact to downwind states using the EPA's 4-Step framework and an analytic year of 2023 and concluded that the State's air emissions will not contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in other states.

To identify downwind monitors projected to be in nonattainment and/or have maintenance issues in 2023 (Step 1), ADEQ relied on the EPA's interstate transport modeling results that are included as an attachment to the March 2018 memorandum. The EPA modeling results included with the March 2018 memorandum provide: (1) Projected

sources, states could look to the CSAPR Update, 81 FR 74504, 74539–51; CSAPR, 76 FR 48208, 48246–63; CAIR, 70 FR 25162, 25195–229; or the NOₓ SIP Call, 63 FR 57356, 57399–405. *See also* Revised CSAPR Update, 86 FR 23054, 23086–23116. Consistently across these rulemakings, the EPA has developed emissions inventories, analyzed different levels of control stringency at different cost thresholds, and assessed resulting downwind air quality improvements.

average DV and maximum DV for the future year 2023 (fy 2023) for ozone monitors projected to be potential nonattainment or maintenance receptors in the 48 contiguous States and (2) the expected contribution of State emissions to the projected ozone concentrations at each ozone monitor.

At Step 2, ADEQ identified those states to which Arkansas contributes emissions and then applied a 1 ppb contribution threshold to determine projected nonattainment and/or maintenance receptors in other states that might be significantly impacted by emissions from Arkansas. ADEQ provided three rationales as a basis to support their decision to rely on a 1 ppb contribution threshold. First, ADEQ cited to the August 2018 memorandum [31] that compares the collective contribution captured by

three different contribution thresholds: 1 Percent of the NAAQS, 1 ppb, and 2 ppb. ADEQ summarized the August 2018 memorandum and concluded that the 1 percent and 1 ppb contribution thresholds are generally comparable. Second, ADEQ referenced an April 2018 memorandum [32] in which the EPA examined the use of a significant impact level (SIL) value of 1 ppb for determining whether a proposed prevention of significant deterioration (PSD) source causes or contributes to a violation of the corresponding 2015 ozone NAAQS. Despite recognizing that a contribution threshold is not the same as a significance level, ADEQ claimed that a contribution threshold and significance level are sufficiently analogous to support the use of a 1 ppb contribution threshold. The final

rationale ADEQ provided was based on the consistency with the reported precision of Federal reference monitors for ozone and the rounding requirements found in 40 CFR part 50, Appendix U, Interpretation of the Primary and Secondary National Ambient Air Quality Standards for Ozone. ADEQ noted that the 1 percent contribution threshold of 0.7 ppb is lower than the manufacturer's reported precision of Federal reference monitors for ozone and that the requirements found in Appendix U truncates monitor values of 0.7 ppb to 0 ppb.

As stated previously, ADEQ identified all potential nonattainment and maintenance receptors for fy 2023 showing a contribution of emissions from Arkansas.[33] These receptors are included in Table AR–1.

TABLE AR–1—PROJECTED NONATTAINMENT AND MAINTENANCE RECEPTORS IDENTIFIED BY ARKANSAS BASED ON THE EPA'S MARCH 2018 MEMORANDUM

| Receptor (site ID, county, state) | 2023 average DV (ppb) | 2023 maximum DV (ppb) | Arkansas contribution (ppb) |
|---|---|---|---|
| 260050003, Allegan, MI | 69 | 71.7 | 1.64 |
| 482011039, Harris, TX | 71.8 | 73.5 | 0.99 |
| 480391004, Brazoria, TX | 74 | 74.9 | 0.90 |
| 484392003, Tarrant, TX | 72.5 | 74.8 | 0.78 |
| 481210034, Denton, TX | 69.7 | 72 | 0.58 |
| 482011034, Harris, TX | 70.8 | 71.6 | 0.54 |
| 551170006, Sheboygan, WI | 72.8 | 75.1 | 0.51 |
| 550790085, Milwaukee, WI | 71.2 | 73 | 0.40 |
| 482010024, Harris, TX | 70.4 | 72.8 | 0.29 |
| 261630019, Wayne, MI | 69 | 71 | 0.27 |
| 240251001, Harford, MD | 70.9 | 73.3 | 0.17 |
| 90019003, Fairfield, CT | 73 | 75.9 | 0.13 |
| 90013007, Fairfield, CT | 71 | 75 | 0.13 |
| 361030002, Suffolk, NY | 74 | 75.5 | 0.12 |
| 360810124, Queens, NY | 70.2 | 72 | 0.09 |
| 90099002, New Haven, CT | 69.9 | 72.6 | 0.08 |
| 90010017, Fairfield, CT | 68.9 | 71.2 | 0.07 |
| 80590006, Jefferson, CO | 71.3 | 73.7 | 0.03 |
| 80590011, Jefferson, CO | 70.9 | 73.9 | 0.02 |
| 81230009, Weld, CO | 70.2 | 71.4 | 0.02 |
| 80350004, Douglas, CO | 71.1 | 73.2 | 0.01 |

Based on a 1 ppb contribution threshold, ADEQ identified only one fy 2023 projected maintenance receptor, Allegan County, MI, and no fy 2023 projected nonattainment receptors linked to Arkansas. ADEQ also cited other modeling performed by TCEQ and Midwest Ozone Group, which showed

that when different modeling protocols were employed, future year DV projections and contributions could differ considerably. ADEQ therefore elected to consider other evidence regarding its linkage to air quality in Allegan County, MI. Specifically, ADEQ analyzed back trajectory information to

infer that there is no consistent or persistent relationship between elevated ozone days in Allegan County, MI and air traveling through Arkansas. ADEQ assessed wind patterns on elevated ozone days—days with a maximum daily average 8-hour ozone (MDA8) greater than 70.9 ppb in Allegan County,

[31] "Analysis of Contribution Thresholds for Use in Clean Air Act section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards", August 31, 2018, available in Docket ID No. EPA–HQ–OAR–2021–0663 or at *https://www.epa.gov/airmarkets/memo-and-supplemental-information-regarding-interstate-transport-sips-2015-ozone-naaqs*.

[32] See EPA memorandum from Peter Tsirigotis, Director of the Office of Air Quality planning and

Standards, April 17, 2018, "Guidance on Significant Impact Levels for Ozone and Fine Particles in the Prevention of Significant Deterioration Permitting Program" ("SILs Guidance" or "April 2018 memorandum"), available at: *https://www.epa.gov/sites/default/files/2018-04/documents/sils_policy_guidance_document_final_signed_4-17-18.pdf*.

[33] Table AR–1 lists all sites that the EPA projected to have a fy 2023 average DV or fy 2023 maximum DV greater than 70.9 ppb in our March 2018 memorandum. As Arkansas stated in the SIP

submission, the EPA considers sites matching these criteria to be projected nonattainment areas and projected maintenance areas, respectively. ADEQ ranked these sites by Arkansas's potential contribution, which the EPA determined based on the daily eight-hour average contributions on the top ten concentration days in 2023.

MI. ADEQ used the National Oceanic and Atmospheric Administration (NOAA) HYbrid Single Particle Lagrangian Integrated Trajectory (HYSPLIT)[34] model to evaluate wind back trajectories from over a 10-year period (2008–2017).[35] Over the course of the 10-year period, ADEQ identified 95 elevated ozone days (MDA8 > 70.9 ppb) for the Allegan County, MI monitor.[36] Next, ADEQ identified the maximum ozone value within these elevated ozone days.[37] Using HYSPLIT, ADEQ ran 72-hour back trajectories using the hour of the maximum ozone value for each elevated day as the back trajectory start time. To consider the effects of vertical variations in wind flows on transport patterns, ADEQ used the following starting heights above ground level: 100m, 500m, 1000m, and 1500m. ADEQ obtained 40 km grid meteorological data for the back trajectory analysis using Eta Data Assimilation System (EDAS) data.[38] In total, ADEQ ran 152 back trajectories for each mixing height.[39] ADEQ filtered the back trajectories to determine whether further analysis is warranted using two criteria. First, ADEQ filtered out back trajectories that had a starting hour mixing height below the back trajectory start height because ADEQ asserted these air parcels would not have reached ambient air[40] at the Allegan County, MI monitor site. Second, ADEQ filtered out any back trajectory that did not have a path through any portion of Arkansas. After ADEQ applied their filter criteria, 41 out of 608 back trajectories (6.74%) remained from 22 out of the 95 elevated ozone days (23%) examined. Of the 10 years examined, ADEQ also found that air passing through Arkansas only reached Allegan County, MI on four or more days in one year: 2012.[41] For 2012, HYSPLIT analyses indicated 14 Arkansas-Allegan County, MI linked back trajectories for 7 days in total in 2012, whereas for 2011, 2013, 2014, and 2016 the HYSPLIT analyses indicated three, two, zero and one days with Arkansas-Allegan County, MI linked back trajectories, respectively. For the 10 years ADEQ's performed HYSPLITs, ADEQ's HYSPLIT analysis indicated on average 2.2 days per year had trajectories with Arkansas-Allegan County, MI linked back trajectories. ADEQ also noted that these trajectories passed through other states and through Metropolitan Statistical Areas (MSAs)[42] both before and after traversing through Arkansas. Specifically, ADEQ stated that 37 trajectories passed through the Chicago-Naperville-Elgin, IL–IN–WI MSA prior to reaching Allegan County, MI. Based on these results, ADEQ concluded that other states and MSAs were more likely to have influenced ozone concentrations at the Allegan County, MI monitor on the days with back trajectories linked to Arkansas.

In Step 3, ADEQ also considered air quality trends in Allegan County, MI, emission trends in other upwind states, relative contribution from other upwind states, and cost factors. ADEQ presented that ozone DVs in Allegan County, MI fluctuated over the 2008–2017 period with higher concentration occurring from 2012 through 2014 but declining since 2014. ADEQ also mentioned that despite the most recent 2017 DV for the Allegan County monitor continuing to show an exceedance of the 2015 ozone NAAQS, the EPA-projected 2023 ozone average DV at the Allegan County, MI monitor, based on data provided in the March 2018 memorandum, is 69.0 ppb, which would be in attainment of the 2015 ozone NAAQS in 2023.

Next, ADEQ included an evaluation of the relative contribution and the emission trends from the eight states[43] with contributions greater than 1 ppb to the Allegan County, MI receptor. The emission trends evaluation examined ozone precursors, nitrogen oxides ($NO_X$) and volatile organic compounds (VOC), from 2011 to 2017 and the model projected fy 2023 emissions level. ADEQ noted that the two states with the highest contributions to Allegan County, MI—Illinois and Indiana—have both experienced year-over-year decreases in $NO_X$ emissions in excess of 20,000 tons of $NO_X$ reduced per year. Arkansas had also experienced decreases in $NO_X$ emissions each evaluated year and emitted less $NO_X$ than any other of the potentially linked states. In addition, ADEQ referenced the EPA projections showing that most potentially linked states will continue to realize reductions in $NO_X$, as well as VOCs, through 2023. ADEQ confirmed that based on this analysis, the overall general trends of $NO_X$ and VOC emissions are declining from Arkansas and the other linked states. The continuation of trends in the emissions reductions observed, particularly from Illinois and Indiana, are anticipated by ADEQ to result in air quality improvements in Allegan County, MI.

In terms of cost analysis, ADEQ focused only on the cost of $NO_X$ controls at electric generating units (EGUs) in the State because EGUs are the largest source of $NO_X$ emissions that ADEQ regulates. In its analysis, ADEQ found that the costs to install additional $NO_X$ controls (selective catalytic reduction, SCR and selective noncatalytic reduction, SNCR) at EGUs exceed the EPA's cost thresholds used for the CSAPR and CSAPR Update rules.[44] Based on ADEQ's evaluation of the evidence, ADEQ concluded that no additional controls beyond pre-existing

---

[34] HYbrid Single-Particle Lagrangian Integrated Trajectory (HYSPLIT) model is a complete system for computing both simple air parcel trajectories and complex dispersion and deposition simulations. The model is designed to support a wide range of simulations related to the atmospheric transport and dispersion of pollutants and hazardous materials to the Earth's surface.

[35] ADEQ analyzed ten years of HYSPLIT back trajectories to examine potential relationships between elevated ozone days at the Allegan County, MI monitor and emissions from Arkansas. In the SIP submission ADEQ stated their rationale for looking at an extended period of time is to gain a more complete picture of how Arkansas's emissions might contribute to elevated ozone in Allegan County, MI, rather than relying entirely on the EPA's modeling simulation, which is based on a single base year.

[36] See the AirNow-Tech website at *https://www.airnowtech.org/*. AirNow-Tech is a website for air quality data management analysis, and decision support used by the Federal, State, Tribal, and local air quality organizations.

[37] If the same maximum eight-hour value occurred multiple times a day, ADEQ evaluated all incidences of the value for that day.

[38] EDAS is an intermittent data assimilation system that uses successive three-hour model forecasts to generate gridded meteorological fields that reflect observations covering the continental United States. EDAS is accessible at *https://ready.arl.noaa.gov/edas40.php*.

[39] Mixing heights (m), defined as the height above ground level of the layer adjacent to the ground over which an emitted or entrained inert non-buoyant tracer will be mixed by turbulence.

[40] Ambient air is the "portion of the atmosphere, external to buildings, to which the general public has access." 40 CFR 50.1(e).

[41] The number of days in a given year and the number of consecutive years is of particular relevance for the ozone NAAQS, which is calculated based the annual fourth-highest daily maximum eight-hour concentration averaged over three consecutive years.

[42] MSA is defined as a geographic region with a high population density at its core and close economic ties throughout the area.

[43] The eight linked states include Illinois, 42%; Indiana, 15%; Michigan, 7%; Missouri, 6%; Texas, 5%; Wisconsin, 4%; Oklahoma, 3% and Arkansas, 4%. The remaining contribution is labeled at "Other". The linkages are based on the EPA's modeling results that are attached to the March 2018 memorandum.

[44] The EPA's Revised CSAPR Update, 86 FR 23054 (April 20, 2021) states ". . . EPA adjusted its representative cost for optimizing existing SNCR control to $1,800 per ton in response to comments received on the proposed rule . . . EPA views $1,600 per ton for optimization of existing SCR control and installation of state-of-the art $NO_X$ combustion controls and $1,800 per ton for optimization of existing SNCRs as comparable for policy purposes." ADEQ's screening analysis using the EPA tools (referencing the EPA's Air Pollution Control Cost Estimation Spreadsheet for SCR) shows that cost-effectiveness values for ozone-season operation of SCR and SNCR are: $12,605–$31,580/ton for SCR and $4,221–$45,581 for SNCR. ADEQ notes that any costs imposed to install controls at the examined EGUs would be passed on to Arkansas ratepayers.

state and Federal regulations were warranted for Arkansas sources to satisfy interstate transport obligations for the 2015 ozone NAAQS.

Based on the determinations made by ADEQ at Steps 1 through 3, ADEQ did not include any new control measures in the SIP submission to reduce ozone precursor emissions as part of a Step 4 analysis.

## B. EPA Evaluation of the ADEQ SIP Submission

The EPA is proposing to find that ADEQ's October 10, 2019, SIP submission does not meet the State's obligations with respect to prohibiting emissions that contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in any other state based on the EPA's evaluation of the SIP submission using the 4-Step interstate transport framework, and the EPA is therefore proposing to disapprove ADEQ's SIP submission.

### 1. Evaluation of Information Provided by ADEQ Regarding Step 1

At Step 1 of the 4-Step framework, ADEQ relied on the EPA modeling released in the March 2018 memorandum to identify nonattainment and maintenance receptors in 2023. As described in Section I of this action, the EPA has recently performed updated modeling using the 2016v2 platform to evaluate interstate transport of ozone for a fy 2023.[45] The EPA proposes to primarily rely on the EPA's modeling using the 2016v2 platform (EPA 2016v2 modeling), to identify projected nonattainment and maintenance receptors in fy 2023. Updating the base period from 2011 (base period used in data included in the March 2018 memorandum) to a more recent year (2016) allows for better projections of which monitors will have problems attaining and/or maintaining the 2015 ozone NAAQS and factors in more recent base year DVs. The EPA notes that with a switch from 2011 base period meteorology to 2016 base period meteorology, it is normal and expected that the potential downwind nonattainment or maintenance receptors would change due to the different weather patterns that occurred in the different base periods, which impacts both the transport of pollutants from upwind states and what receptors have

higher monitored values within nonattainment/maintenance regions.[46] Modeling using both the 2011 and 2016 based years consistently project that certain areas will have problems attaining and/or maintaining the 2015 ozone NAAQS including receptors in Texas.

### 2. Evaluation of Information Provided by ADEQ Regarding Step 2

As noted earlier, ADEQ utilized a 1 ppb threshold at Step 2 to identify whether the State was "linked" to a projected downwind nonattainment or maintenance receptor. ADEQ identified linkages for Arkansas to one 2023 projected maintenance receptor, Allegan County, MI, and no 2023 projected nonattainment receptors.

As discussed in the EPA's August 2018 memorandum, with appropriate additional analysis it may be reasonable for states to use a 1 ppb contribution threshold as an alternative to a 1 percent threshold, at Step 2 of the 4-Step interstate transport framework, for the purposes of identifying linkages to downwind receptors. However, the EPA's August 2018 memorandum provided that whether or not a 1 ppb threshold is appropriate must be based on an evaluation of state-specific circumstances, and no such evaluation was included in the state's submittal. Instead, ADEQ cited to the EPA's SILs Guidance as a basis to support the use of a 1 ppb threshold; however, ADEQ did not explain the relevance of the SILs Guidance to ADEQ's statutory obligation under the interstate transport provision. The SILs Guidance relates to a different provision of the Clean Air Act regarding implementation of the prevention of significant deterioration (PSD) permitting program, *i.e.,* a program that applies in areas that have been designated attainment of the NAAQS. The SILs Guidance is not applicable to

[46] We note that ADEQ identified additional modeling performed by TCEQ and Midwest Ozone Group, but simply concluded that different modeling can lead to differences in DV projections and ozone contributions of these two alternative modeling analyses, only TCEQ's modeling using a 2012 base year identified receptors in Texas that projected different DVs for the Texas receptors identified in the EPA's 2011 base year. We discuss the EPA's review of the TCEQ's modeling elsewhere in this action and the Technical Support Document for this action "EPA Region 6 2015 8-Hour Ozone Transport SIP Proposal Technical Support Document" (EPA Region 6 2015 Ozone Transport SIP TSD.pdf) included in the Regional docket for this action (Docket ID No. EPA–R06–OAR–2021–0801), but we do conclude that TCEQ and recent monitoring data indicate that there are problematic receptors that are expected to be either nonattainment or maintenance receptors in 2023 including the Texas receptors identified in our March 2018 memorandum with Arkansas linkages.

the interstate transport provision, which requires states to eliminate significant contribution or interference with maintenance of the NAAQS at known and ongoing air quality problem areas in other states. The EPA does not, in this action, agree that the State has justified its application of the 1 ppb threshold. In any case, both the EPA's most recent modeling, EPA 2016v2 modeling, and the modeling relied on by ADEQ in its SIP submittal, indicate that the State is projected to contribute greater than both the 1 percent and alternative 1 ppb thresholds. While the EPA does not, in this action, propose to approve of the State's application of the 1 ppb threshold, because the State has linkages greater than 1 ppb to projected downwind nonattainment or maintenance receptors, (as shown in Table AR–2) the State's use of this alternative threshold at Step 2 of the 4-Step interstate framework would not alter our review and proposed disapproval of this SIP submittal.

Additionally, the EPA here shares further evaluation of its experience since the issuance of the August 2018 memorandum regarding use of alternative thresholds at Step 2. This experience leads the Agency to now believe it may not be appropriate to continue to attempt to recognize alternative contribution thresholds at Step 2. The August 2018 memorandum stated that "it may be reasonable and appropriate" for states to rely on an alternative threshold of 1 ppb threshold at Step 2. (The memorandum also indicated that any higher alternative threshold, such as 2 ppb, would likely not be appropriate.) However, the EPA also provided that "air agencies should consider whether the recommendations in this guidance are appropriate for each situation." Following receipt and review of 49 interstate transport SIP submittals for the 2015 ozone NAAQS, the EPA's experience has been that nearly every state that attempted to rely on a 1 ppb threshold did not provide sufficient information and analysis to support a determination that alternative threshold was reasonable or appropriate for that state.

For instance, in nearly all submittals, the states did not provide the EPA with analysis specific to their state or the receptors to which its emissions are potentially linked. In one case, the proposed approval of Iowa's SIP submittal, the EPA expended its own resources to attempt to supplement the information submitted by the state, in order to more thoroughly evaluate the state-specific circumstances that could

support approval.[47] It was at the EPA's sole discretion to perform this analysis in support of the state's submittal, and the Agency is not obligated to conduct supplemental analysis to fill the gaps whenever it believes a state's analysis is insufficient. The Agency no longer intends to undertake supplemental analysis of SIP submittals with respect to alternative thresholds at Step 2 for purposes of the 2015 ozone NAAQS.

Furthermore, the EPA's experience since 2018 is that allowing for alternative Step 2 thresholds may be impractical or otherwise inadvisable for a number of additional policy reasons. For a regional air pollutant such as ozone, consistency in requirements and expectations across all states is essential. Based on its review of submittals to-date and after further consideration of the policy implications of attempting to recognize an alternative Step 2 threshold for certain states, the Agency now believes the attempted use of different thresholds at Step 2 with respect to the 2015 ozone NAAQS raises substantial policy consistency and practical implementation concerns.[48] The availability of different thresholds at Step 2 has the potential to result in inconsistent application of interstate transport obligations based solely on the strength of a state's SIP submittal at Step 2 of the 4-Step interstate transport framework. From the perspective of ensuring effective regional implementation of interstate transport obligations, the more important analysis is the evaluation of the emissions reductions needed, if any, to address a state's significant contribution after consideration of a multifactor analysis at Step 3, including a detailed evaluation that considers air quality factors and cost. Where alternative thresholds for purposes of Step 2 may be "similar" in terms of capturing the relative amount of upwind contribution (as described in the August 2018 memorandum), nonetheless, use of an alternative threshold would allow certain states to avoid further evaluation of potential emission controls while other states must proceed to a Step 3 analysis. This can create significant

equity and consistency problems among states.

Further, it is not clear that national ozone transport policy is best served by allowing for less stringent thresholds at Step 2. The EPA recognized in the August 2018 memorandum that there was some similarity in the amount of total upwind contribution captured (on a nationwide basis) between 1 percent and 1 ppb. However, the EPA notes that while this may be true in some sense, that is hardly a compelling basis to move to a 1 ppb threshold. Indeed, the 1 ppb threshold has the disadvantage of losing a certain amount of total upwind contribution for further evaluation at Step 3 (*e.g.*, roughly seven percent of total upwind state contribution was lost according to the modeling underlying the August 2018 memorandum;[49] in EPA 2016v2 modeling, the amount lost is five percent). Considering the core statutory objective of ensuring elimination of all significant contribution to nonattainment or interference of the NAAQS in other states and the broad, regional nature of the collective contribution problem with respect to ozone, there does not appear to be a compelling policy imperative in allowing some states to use a 1 ppb threshold while others rely on a 1 percent of NAAQS threshold.

Consistency with past interstate transport actions such as CSAPR, and the CSAPR Update and Revised CSAPR Update rulemakings (which used a Step 2 threshold of 1 percent of the NAAQS for two less stringent ozone NAAQS), is also important. Continuing to use a 1 percent of NAAQS approach ensures that as the NAAQS are revised and made more stringent, an appropriate increase in stringency at Step 2 occurs, so as to ensure an appropriately larger amount of total upwind-state contribution is captured for purposes of fully addressing interstate transport. *Accord* 76 FR 48237–38.

Therefore, notwithstanding the August 2018 memorandum's recognition of the potential viability of alternative Step 2 thresholds, and in particular, a potentially applicable 1 ppb threshold, the EPA's experience since the issuance of that memorandum has revealed substantial programmatic and policy difficulties in attempting to implement this approach. Nonetheless, the EPA is not, at this time, rescinding the August 2018 memorandum. The basis for the EPA's proposed disapproval of ADEQ's SIP submission with respect to the Step 2 analysis is, in the Agency's view, warranted even under the terms of the August 2018

memorandum. The EPA invites comment on this broader discussion of issues associated with alternative thresholds at Step 2. (See Supplementary Information section above for details and docket to submit comments). Depending on public comments received in relation to this action and further evaluation of this issue, the EPA may determine to rescind the 2018 memorandum in the future.

ADEQ included information in its SIP submission regarding back trajectories, emissions trends, and EGU source controls to conclude that emissions from Arkansas should not be considered to contribute significantly to nonattainment or interfere with maintenance of the NAAQS in other states because there is not a persistent and consistent pattern of contribution from the State. While it is not entirely clear whether ADEQ was analyzing these factors under Step 2 or Step 3, the EPA is evaluating such arguments under Step 3, as we view these statements in the SIP submission to speak to whether or not a contribution is "significant" once a linkage is established.

### 3. Results of the EPA's Step 1 and Step 2 Modeling and Findings for Arkansas

As described in Section I of this action, the EPA performed air quality modeling using the 2016v2 emissions platform to project DVs and contributions for 2023 (EPA 2016v2 modeling). This data was examined to determine if Arkansas contributes at or above the threshold of 1 percent of the 2015 ozone NAAQS (0.70 ppb) to any downwind nonattainment or maintenance receptor. As shown in Table AR–2, the data[50] indicate that in 2023, emissions from Arkansas contribute greater than 1 percent of the standards to nonattainment or maintenance-only receptors in Texas: Denton County (Monitor ID. 481210034), Brazoria County (Monitor ID. 480391004), Harris County (Monitor ID. 482010055, Monitor ID. 482011034,

---

[47] "Air Plan Approval; Iowa; Infrastructure State Implementation Plan Requirements for the 2015 Ozone National Ambient Air Quality Standard", 85 FR 12232 (March 2, 2020). The agency received adverse comments on this proposed approval and has not taken final action with respect to this proposal.

[48] We note that Congress has placed on the EPA a general obligation to ensure the requirements of the CAA are implemented consistently across states and regions. *See* CAA section 301(a)(2). Where the management and regulation of interstate pollution levels spanning many states is at stake, consistency in application of CAA requirements is paramount.

[49] *See* August 2018 memorandum, at page 4.

[50] Design values and contributions at individual monitoring sites nationwide are provided in the file: 2016v2_DVs_state_contributions.xlsx which is included in docket ID No. EPA–HQ–OAR–2021–0663.

and Monitor ID. 482011035).[51][52] Therefore, based on the EPA's evaluation of the information submitted by ADEQ, and based on the EPA model 2016v2 results for 2023, the EPA proposes to find that Arkansas is linked at Steps 1 and 2 and has an obligation to assess potential emissions reductions from sources or other emissions activity at Step 3 of the 4-Step framework.

TABLE AR–2—PROJECTED NONATTAINMENT AND MAINTENANCE RECEPTORS WITH ARKANSAS LINKAGES IN 2023 BASED ON EPA 2016v2 MODELING

| Receptor (site ID, county, state) | Nonattainment/ maintenance | 2023 average DV (ppb) | 2023 maximum DV (ppb) | Arkansas contribution (ppb) |
|---|---|---|---|---|
| 481210034, Denton, TX | Maintenance | 70.4 | 72.2 | 0.76 |
| 480391004, Brazoria, TX | Maintenance | 70.1 | 72.3 | 1.39 |
| 482010055, Harris, TX | Nonattainment | 71.0 | 72.0 | 1.00 |
| 482011034, Harris, TX | Maintenance | 70.3 | 71.6 | 1.38 |
| 482011035, Harris, TX | Maintenance | 68.0 | 71.6 | 1.34 |

We recognize that the results of the EPA modeling released in the March 2018 memorandum (2011 base year) and the EPA 2016v2 modeling (2016 base year) identified different receptors and linkages at Steps 1 and 2 of the 4-Step framework. These differing results about receptors and linkages can be affected by the varying meteorology from year to year, but we do not think the differing results mean that the modeling or the EPA methodology for identifying receptors or linkages is inherently unreliable. Rather, these separate modeling runs indicated (1) that there were receptors that would struggle with nonattainment or maintenance in the future, and (2) that Arkansas was linked to some set of these receptors, even if the receptors and linkages differed from one another in their specifics (e.g., a different set of receptors were identified to have nonattainment or maintenance problems, or Arkansas was linked to different receptors in one modeling run versus another). We think this common result indicates that Arkansas's emissions were substantial enough to generate linkages at Steps 1 and 2 to some set of downwind receptors, under varying assumptions and meteorological conditions, even if the precise set of linkages changed between modeling runs. Under these circumstances, we think it is appropriate to proceed to a Step 3 analysis to determine what portion of Arkansas's emissions should be deemed "significant." In doing so, we are not considering our own earlier modeling results included in EPA's March 2018 memorandum to be of equal reliability relative to more recent EPA 2016v2 modeling. However, where alternative or older modeling generated linkages, even if those linkages differ from linkages in EPA 2016v2 modeling, that information provides further evidence, not less, in support of a conclusion that the state is required to proceed to Step 3 to further evaluate its emissions.

4. Evaluation of Information Provided by ADEQ Regarding Step 3

At Step 3 of the 4-Step framework, a state's emissions are further evaluated, in light of multiple factors, including air quality and cost considerations, to determine what, if any, emissions contribute significantly to nonattainment or interfere with maintenance and, thus, must be eliminated under CAA section 110(a)(2)(D)(i)(I).

ADEQ included in their SIP submission a further analysis of its modeled linkage to Allegan, MI (the only linked receptor it analyzed, based on its application of a 1 ppb threshold). Arkansas stated that the purpose and its conclusion of this analysis was that it would not contribute significantly to the Allegan, MI monitor because the state's emissions did not result in a consistent and persistent pattern of ozone contribution. As stated earlier, EPA 2016v2 modeling projects that the Allegan County, MI receptor will be attaining and is not expected to have difficulty maintaining the standard in 2023. As such, the EPA is not relying on the comparative analysis of emissions trends that ADEQ provided in order to conclude that Arkansas's emissions do not contribute significantly to a nonattainment or maintenance problem in Allegan, MI. We note however, that ADEQ's SIP submission and response to comments do not clearly define what ADEQ considers to be persistent and consistent pattern of contribution. Rather, the SIP submission simply states that contribution should be deemed "significant" only if there is a persistent and consistent pattern of several days with elevated ozone.

To be clear, the modeling establishing linkages of Arkansas to downwind nonattainment and maintenance receptors already establishes that there is a consistent and persistent pattern of contribution on elevated ozone days from Arkansas to other states. That is because EPA's methodology for projecting future ozone concentrations accounts for precisely these concerns—the relative response factor [53] that is applied to historic monitored data to generate projections is calculated by looking only at days with elevated ozone levels (ten days is preferred with a minimum of five days). The EPA notes that monitored attainment with the ozone standard is determined by averaging the fourth high value recorded each year for three years. So, the EPA believes it is important to

[51] These modeling results are consistent with the results of a prior round of 2023 modeling using the 2016v1 emissions platform which became available to the public in the fall of 2020 in the Revised CSAPR Update, as noted in Section I of this action. That modeling showed that Arkansas had a maximum contribution greater than 0.70 ppb to at least one nonattainment or maintenance-only receptor in 2023. These modeling results are included in the file "Ozone Design Values And Contributions Revised CSAPR Update.xlsx" in docket EPA–HQ–OAR–2021–0663.

[52] Allegan County Monitor ID. 260050003 is not a receptor in 2023 in the EPA 2016v2 modeling. 2023 avg DV is 67.3 ppb and 2023 Max. DV is 68.4 ppb, so the Allegan County monitor is not a receptor in 2023 for nonattainment or maintenance.

[53] The relative response factor (RRF) is a ratio developed using the modeled changes between the base case and future case for high ozone modeled days. Typically, the 10 highest MDA8 modeled days in the base case are found and the maximum value from the 3x3 grid centered on the monitor for each day is used to calculate a 10-day average base case modeled value. Then a similar concentration average is developed for same 10 base case days and the same grid cell that provided the base case concentration to calculate a future year 10-day average modeled value using the future year modeling results. The RRF is then calculated by using this future year 10-day average model value divided by the base case 10-day average model value to develop a ratio representing the change in modeled ozone. The RRF is then multiplied times the base DV value to result in a projected future year DV.

estimate impacts on the days with highest projected ozone levels. The EPA's approach, as detailed in the Air Quality Modeling Technical Support Document for 2015 Ozone NAAQS Transport SIP Proposed Actions included in Docket ID No. EPA–HQ–OAR–2021–0663, does this by estimating the average fy 2023 impact from an upwind state on the days with the highest projected ozone levels at the downwind nonattainment or maintenance receptor. The days chosen to analyze the future impacts are chosen initially by the selecting the ten highest days in the base period modeling that are projected to be above 65 ppb in the base period. If there are not ten days above 65 ppb at a potential receptor, the number of days above 65 ppb are used as long as there is at least five days above 65 ppb in the base period. If the air quality modeling shows fewer than five days above 65 ppb in the base period, then the data for impacts at that receptor in fy 2023 are not calculated. The base and future year modeling for these five to ten days is then used to project fy 2023 ozone DVs to determine whether it is projected to be a nonattainment or maintenance receptor in 2023. For the same five to ten days identified, the future year modeling provides the estimated daily contribution at a potential receptor's future year daily MDA8 and these daily contributions are averaged for the five to ten days to result in the average contribution from the upwind area.

As mentioned previously, ADEQ used HYSPLIT back trajectories to assess wind patterns on elevated ozone days in an attempt to demonstrate that there is not persistent and consistent pattern of contribution from Arkansas to the Allegan County, MI receptor. HYSPLIT back trajectory analyses use archived meteorological modeling that includes actual observed data (surface, upper air, airplane data, etc.) and modeled meteorological fields to estimate the most likely route of an air parcel transported to a receptor at a specified time. The method essentially follows a parcel of air backward in hourly steps for a specified length of time. HYSPLIT estimates the central path in both the vertical and horizontal planes. The HYSPLIT central path represents the centerline with the understanding that there are areas on each side horizontally and vertically that also contribute to the concentration at the end point monitor. The horizontal and vertical areas that potentially contribute to the end point concentration grow wider from the centerline the further back in time the trajectory goes. Therefore, a HYSPLIT

centerline does not have to pass directly over emissions sources or emission source areas but merely relatively near emission source areas for those areas to contribute to concentrations at the endpoint. The EPA relies on back trajectory analysis as a corollary analysis along with observation-based meteorological wind fields at multiple heights to examine the general plausibility of the photochemical model "linkages." Since the back trajectory calculations do not account for any air pollution formation, dispersion, transformation, or removal processes as influenced by emissions, chemistry, deposition, etc., the trajectories cannot be used to develop quantitative contributions. Therefore, back trajectories cannot be used to quantitatively evaluate the magnitude of the existing photochemical contributions from upwind states to downwind receptors. Chemical transport models, such as the one relied upon by Arkansas to establish the linkage between Arkansas and those downwind receptors in the first instance, do take these factors into account and therefore provide a more robust assessment of ozone contribution.

During ADEQ's public comment period, the EPA submitted comments noting concerns regarding the methodology ADEQ used in their HYSPLIT back trajectories analysis.[54] While we are not providing a detailed evaluation of ADEQ's HYSPLIT analysis in this rulemaking, we do note that our review identified a number of concerns with how ADEQ screened out a number of back trajectories, which invalidates ADEQ's conclusions.[55] While we disagree with ADEQ's methodologies and conclusions, we note that ADEQ's

HYSPLIT back trajectory information did not show that the base years used in the EPA modeling (2011 and 2016) demonstrated an unusual amount of transport of air parcels from Arkansas to nonattainment or maintenance receptors in downwind states (*i.e.*, the modeling years used by the EPA do not skew the results toward finding linkages).[56] Therefore, although Arkansas asserted that its additional air quality factor analysis using back trajectory analysis is a permissible way to interpret which contributions are "significant" because that analysis examines whether there was a "persistent and consistent pattern of contribution on several days with elevated ozone," the modeled linkage at Step 2 is a superior approach for assessing the persistence of a state's contribution. It is superior because it is based on the average of the contributions on the five to ten highest ozone days. Considering the form of the standard, this is a sufficient number of days to determine if an impact is persistent enough to impact an area's ability to attain or maintain the standard. The modeling is also a better method because it accounts for dispersion while back trajectory analysis as performed by Arkansas only shows the centerline of air parcel travel and otherwise will leave out days when Arkansas would have contributed to downwind problems. Finally, because the modeling accounts for dispersion and chemical reactions, it can provide a quantitative estimate of contribution.

ADEQ also contested the significance of its modeled contribution above 1 ppb based on the relatively larger contributions of other upwind states to the receptor to which it was linked. The EPA disagrees that a state's small contribution relative to other upwind states is a permissible basis for finding no obligation under the interstate transport provision. CAA 110(a)(2)(D)(i)(I) requires states and the EPA to address interstate transport of air pollution that *contributes to* downwind states' ability to attain and maintain the NAAQS. Whether emissions from other states also contribute to the same downwind air quality issue is irrelevant in assessing whether a downwind state has an air quality problem, or whether an upwind state is significantly contributing to that problem. States are not obligated under CAA section 110(a)(2)(D)(i)(I) to reduce emissions sufficient on their own to resolve

[54] The EPA reviewed the ADEQ SIP submission and provided comments during the State's public comment period for the proposed SIP action. The EPA's comment letter and ADEQ's response to comments are included in ADEQ's October 19, 2019, SIP submission, which is available in the Regional docket for this action (Docket ID No. EPA–R06–OAR–2021–0801).

[55] Concerns included removing of HYSPLIT back trajectories based on start height, the start time that Arkansas used for the back trajectories and removing of back trajectories when the centerline passed near but not through Arkansas because Arkansas has some very large point sources near the Arkansas state line that could be contributing. Texas also screened their HYPSLIT back trajectories similarly to Arkansas and we have further discussed our concerns and why such screening invalidates conclusions from the HYSPLIT back trajectory analyses. *See* EPA's review and conclusions in discussion of TCEQ's HYSPLIT analyses in the "EPA Region 6 2015 8-Hour Ozone Transport SIP Proposal Technical Support Document" (EPA Region 6 2015 Ozone Transport SIP TSD.pdf) included in the Regional docket for this action (Docket ID No. EPA–R06–OAR–2021–0801).

[56] ADEQ's summary of trajectories indicated that 2011 had three linked back trajectories and 2016 had one linked back trajectories and the EPA calculated the average for 2008–2017 in ADEQ's table was 2.2 linked back trajectories per year.

downwind receptors' nonattainment or maintenance problems. Rather, states are obligated to eliminate their own ''significant contribution'' or ''interference'' with the ability of other states to attain or maintain the NAAQS. Indeed, the D.C. Circuit in *Wisconsin* specifically rejected arguments suggesting that upwind states should be excused from interstate transport obligations on the basis that some other source of emissions (whether international or another upwind state) could be considered the ''but-for'' cause of downwind air quality problem. 938 F.3d 303 at 323–324. The court viewed these arguments as essentially an argument ''that an upwind State 'contributes significantly' to downwind nonattainment only when its emissions are the sole cause of downwind nonattainment.'' 938 F.3d 303 at 324. The court explained that ''an upwind State can 'contribute' to downwind nonattainment even if its emissions are not the but-for cause.'' *Id.* At 324–325. *See also Catawba County* v. *EPA,* 571 F.3d 20, 39 (D.C. Cir. 2009) (rejecting the argument ''that 'significantly contribute' unambiguously means 'strictly cause''' because there is ''no reason why the statute precludes EPA from determining that [an] addition of [pollutant] into the atmosphere is significant even though a nearby county's nonattainment problem would still persist in its absence''); *Miss. Comm'n on Envtl. Quality* v. *EPA,* 790 F.3d 138, 163 n.12 (D.C. Cir. 2015) (observing that the argument that ''there likely would have been no violation at all . . . if it were not for the emissions resulting from [another source]'' is ''merely a rephrasing of the but-for causation rule that we rejected in *Catawba County*.''). Therefore, a state is not excused from eliminating its significant contribution on the basis that emissions from other states also contribute some amount of pollution to the same receptors to which the state is linked.

ADEQ did not provide additional analysis for other receptors to which it was linked above 1 percent in the air quality modeling upon which it relied, and to which it continues to be linked in EPA 2016v2 modeling. To effectively evaluate which emissions in the state should be deemed ''significant'' and therefore prohibited, states generally should prepare an accounting of sources and other emissions activity for relevant pollutants and assess potential, additional emissions reduction opportunities and resulting downwind air quality improvements. The EPA has consistently applied this general

approach (*i.e.,* Step 3 of the 4-Step interstate transport framework) when identifying emissions contributions that the Agency has determined to be ''significant'' (or interfere with maintenance) in each of its prior Federal, regional ozone transport rulemakings, and this interpretation of the statute has been upheld by the Supreme Court. *See EME Homer City,* 572 U.S. 489, 519 (2014). While the EPA has not directed states that they must conduct a Step 3 analysis in precisely the manner the EPA has done in its prior regional transport rulemakings, state implementation plans addressing the obligations in CAA section 110(a)(2)(D)(i)(I) must prohibit ''any source or other type of emissions activity within the State'' from emitting air pollutants which will contribute significantly to downwind air quality problems. Thus, states must complete something similar to the EPA's analysis (or an alternative approach to defining ''significance'' that comports with the statute's objectives) to determine whether and to what degree emissions from a state should be ''prohibited'' to eliminate emissions that will ''contribute significantly to nonattainment in, or interfere with maintenance of'' the NAAQS in any other state. As discussed below, ADEQ did not conduct an adequate analysis in their SIP submission. We therefore propose that ADEQ was required to analyze emissions from the sources and other emissions activity from within the State to determine whether its contributions were significant, and we propose to disapprove its submission because Arkansas failed to adequately do so.

In analyzing potential additional NO$_X$ controls, ADEQ found that additional controls on its EGUs would exceed the cost-effectiveness thresholds identified in the CSAPR and CSAPR Update rules. For the cost analysis, Arkansas only focused on the potential costs of NO$_X$ controls for EGUs. As stated above, Arkansas found that the costs to install additional NO$_X$ controls (selective catalytic reduction, SCR, and selective noncatalytic reduction, SNCR) at electric generating units (EGUs) exceed EPA's cost thresholds used for the CSAPR and CSAPR Update rules. Based on the projected cost of these controls relative to the thresholds used in those two prior EPA rules, Arkansas concluded that no new controls beyond those Federal and State regulations already in existence were cost-effective, especially considering that Allegan County, MI is projected to be in attainment with the 2015 ozone NAAQS

and Arkansas's small contribution relative to other states potentially linked to Allegan County, MI based on EPA's modeling.

Arkansas's analysis is inadequate because its focus is only on EGUs.[57] *See Wisconsin,* 938 F.3d at 318–20. We also find Arkansas's conclusions as to the availability of cost-effective controls for EGUs to be inadequate. Relying on the CSAPR Update's (or any other CAA program's) determination of cost-effectiveness without further Step 3 analysis is not approvable. Cost-effectiveness must be assessed in the context of the specific CAA program; assessing cost-effectiveness in the context of ozone transport should reflect a more comprehensive evaluation of the nature of the interstate transport problem, the total emissions reductions available at several cost thresholds, and the potential air quality impacts of those reductions at downwind receptors. While the EPA has not established a benchmark cost-effectiveness value for 2015 ozone NAAQS interstate transport obligations, because the 2015 ozone NAAQS is a more stringent and more protective air quality standard, it is reasonable to expect control measures or strategies to address interstate transport under this NAAQS to reflect higher marginal control costs. ADEQ's submission failed to provide a justification for why the $1400/ton threshold used in the CSAPR Update is appropriate to rely on for the 2015 ozone NAAQS. ADEQ's analysis does not consider any air quality impacts of assessed controls at downwind receptors. As stated above, assessing cost-effectiveness in the context of ozone transport requires more than just assessing the cost of controls per ton of NO$_X$ removed. As such, ADEQ's assessment of the cost of controls and reliance on the marginal cost threshold of $1,400/ton used for the CSAPR Update is inadequate. Furthermore, EPA 2016v2 modeling captures all existing CSAPR trading programs in the baseline and confirms that these control programs were not sufficient to eliminate Arkansas's linkage at Steps 1 and 2 under the 2015 ozone NAAQS. The State was therefore obligated at Step 3 to assess *additional* control measures using a multifactor analysis.

---

[57] In 2017, National Emission Inventory (NEI) NO$_X$ emissions from EGU sources represent 56% percent of the total NO$_X$ emissions categories in Arkansas that report emissions to the NEI. *See* AR NO$_X$.xlsx datasheet included in the Regional docket for this action (Docket ID No. EPA–R06–OAR–2021–0801).

**5. Evaluation of Information Provided by ADEQ Regarding Step 4**

Step 4 of the 4-Step interstate transport framework calls for the development of permanent and federally enforceable control strategies to achieve the emissions reductions determined to be necessary at Step 3 to eliminate significant contribution to nonattainment or interference with maintenance of the NAAQS. ADEQ's SIP submission, which looked only at additional $NO_X$ controls at EGUs and dismissed such controls as not cost-effective relative to the thresholds established in earlier EPA transport rules, did not constitute an adequate emission reduction analysis at Step 3. Based on its conclusions, ADEQ did not revise its SIP to include any emission reductions. As a result, the EPA proposes to disapprove ADEQ's submittal on the separate, additional basis that Arkansas has not developed or included permanent and enforceable emissions reductions in its SIP necessary to meet the obligations of CAA section 110(a)(2)(D)(i)(I).

**6. Conclusion**

Based on the EPA's evaluation of ADEQ's SIP submission, the EPA is proposing to find that ADEQ's October 19, 2019, SIP submission addressing CAA section 110(a)(2)(D)(i)(I) does not meet the State's interstate transport obligations because it fails to contain the necessary provisions to eliminate emissions that will contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in any other state.

**III. Louisiana SIP Submission Addressing Interstate Transport of Air Pollution for the 2015 Ozone NAAQS and the EPA Evaluation of the SIP Submission**

*A. Summary of LDEQ SIP Submission Addressing Interstate Transport of Air Pollution for the 2015 Ozone NAAQS*

On November 13, 2019, the Louisiana Department of Environmental Quality

(LDEQ) made a SIP submission addressing the State of Louisiana's interstate transport of air pollution for the 2015 ozone NAAQS. The SIP submission provided LDEQ's analysis of Louisiana's impact to downwind states and concluded that emissions from Louisiana will not contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in other states.

The LDEQ's SIP submission provided an analysis of Louisiana's air emissions impact to downwind states using a 3-Step alternative framework similar to the EPA's 4-Step framework. LDEQ's 3-Step alternative framework includes: Step 1: Identify monitors projected to be in nonattainment or have maintenance issues in a future year; Step 2: Identify projected nonattainment and/or maintenance monitors in other states that might be impacted by emissions from Louisiana, tagging them for further review; and, Step 3: Determine if emissions from Louisiana contribute significantly to nonattainment or interfere with maintenance at the monitors tagged for review in Step 2. LDEQ noted that its Step 1 is identical to the EPA's Step 1, and its Steps 2 and 3 are equivalent to the EPA's Step 2. Louisiana further noted that Steps 3 and 4 of the EPA's 4-Step framework are relevant only if emissions from Louisiana contribute significantly to nonattainment or interfere with maintenance at downwind monitors in another state.

LDEQ's Step 1 was to identify downwind monitors projected to be in nonattainment and/or have maintenance issues in future year 2023 (fy 2023). At this step, LDEQ relied on the EPA's interstate transport modeling results that are included as an attachment to the March 2018 memorandum. The EPA March 2018 modeling results provided: (1) Projected average DV and maximum DV for 2023 for the ozone monitors (or "receptors") in the 48 contiguous states and (2) the expected contribution of

state emissions to the projected ozone concentrations at each ozone monitor.

LDEQ used a contribution threshold of 1 ppb in LDEQ's Step 2 to identify projected nonattainment and/or maintenance receptors in other states that might be impacted by emissions from Louisiana and tagged them for further review. To support a 1 ppb contribution threshold, LDEQ's submission stated that a 1 percent threshold is inappropriate because that value is not detectable by a monitor and the value of 1 percent of the 2015 ozone NAAQS would be truncated to zero if calculated in accordance with the method for determining DVs for the ozone NAAQS. LDEQ also stated that the more stringent threshold of 1 percent of the NAAQS (0.7 ppb) is an order of magnitude smaller than the biases and errors typically documented for regional photochemical modeling.[58] Based on LDEQ's approach of evaluating linkages at the 1 ppb threshold, five Texas receptors were identified by Louisiana for analysis. The Texas receptors and corresponding receptor data presented in Louisiana's SIP are summarized further in this notice in Table LA–1.[59] The March 2018 memorandum identified monitors in Allegan, Michigan and Milwaukee and Sheboygan, Wisconsin as potential nonattainment and maintenance-only receptors linked to emissions from Louisiana based on 1 percent of the NAAQS threshold. However, Louisiana did not include the Allegan, Michigan and Milwaukee and Sheboygan, Wisconsin receptors in the State's analysis because the March 2018 memorandum shows that Louisiana's projected modeled contribution values to each receptor is less than 1 ppb.

Table LA–1—Projected Nonattainment and Maintenance Receptors Identified by Louisiana Based on the EPA's March 2018 Memorandum

| Receptor (site ID, county, state) | 2023 Average DV (ppb)[60] | 2023 Maximum DV (ppb)[61] | Louisiana Contribution (ppb) |
|---|---|---|---|
| 480391004, Brazoria, TX | 74.0 | 74.9 | 3.80 |

[58] The Louisiana SIP submittal did not provide a specific citation to the Simon et al., 2012 reference to support this assertion. However, we believe the reference is associated with the following article: Simon, H., Baker, K.R., Phillips, S., 2012. "Compilation and interpretation of photochemical model performance statistics published between

2006 and 2012". Atmospheric Environment 61, 124–139.

[59] The five potential nonattainment and maintenance receptor monitors identified by LDEQ are from the Dallas-Fort Worth and Houston-Galveston-Brazoria, TX nonattainment areas for the

2015 ozone NAAQS. The Louisiana SIP submittal appears to have inadvertently omitted Harris County, TX Monitor ID No. 482011034 for analysis. EPA's March 2018 memorandum identified this monitor as a maintenance receptor with a contribution of 3.38 ppb from Louisiana emissions.

TABLE LA–1—PROJECTED NONATTAINMENT AND MAINTENANCE RECEPTORS IDENTIFIED BY LOUISIANA BASED ON THE EPA'S MARCH 2018 MEMORANDUM—Continued

| Receptor (site ID, county, state) | 2023 Average DV (ppb) [60] | 2023 Maximum DV (ppb) [61] | Louisiana Contribution (ppb) |
|---|---|---|---|
| 482011039, Harris, TX | 71.8 | 73.5 | 4.72 |
| 484392003, Tarrant, TX | 72.5 | 74.8 | 1.71 |
| 481210034, Denton, TX | 69.7 | 72.0 | 1.92 |
| 482010024, Harris, TX | 70.4 | 72.8 | 4.72 |

For LDEQ's Step 3, Louisiana stated that an air emission contribution from the State should only be considered significant if there is a persistent and consistent pattern of contribution on several days with elevated ozone. In trying to determine whether there is a persistent and consistent pattern of contribution, LDEQ analyzed seasonal weather patterns, surface wind directions, and periodic back trajectories. LDEQ used the National Oceanic and Atmospheric Administration (NOAA) Hybrid Single Particle Lagrangian Integrated Trajectory (HYSPLIT) [62] model to perform 99 back trajectories for exceedances from the receptor monitors identified in Table LA–1 for 2016, 2017, and 2018. Based on an analysis of the HYSPLIT results, LDEQ stated that approximately 28% of the trajectories travel in or through Louisiana, and only 8% of those back trajectories originate in the State. The SIP submission also stated that a comparison of the EPA's modeled contribution between Texas and Louisiana monitors indicates that a far greater proportion of the total ozone detected in Louisiana originates in Texas rather than vice versa. Therefore, Louisiana concluded that the impact from the State's air emissions was insignificant to the overall attainment at the receptor monitors identified in Table LA–1 and does not significantly contribute to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in other states.

*B. EPA Evaluation of the LDEQ SIP Submission*

The EPA is proposing to find that LDEQ's November 13, 2019, SIP submission does not meet the State's obligations with respect to prohibiting emissions that contribute significantly to nonattainment or interfere with maintenance of the 2015 NAAQS in any other state based on the EPA's evaluation of the SIP submission using the 4-Step interstate transport

framework, and the EPA is therefore proposing to disapprove Louisiana's SIP submission.

1. Evaluation of Information Provided by LDEQ Regarding Steps 1 and 2

At Step 1 of the 4-Step interstate transport framework, LDEQ relied on EPA modeling released in the March 2018 memorandum to identify nonattainment and maintenance receptors in 2023. At Step 2 of the 4-Step interstate transport framework, LDEQ relied on the EPA modeling released in the March 2018 memorandum to identify upwind state linkages to nonattainment and maintenance receptors in 2023. LDEQ additionally utilized a 1 ppb threshold at Step 2 to identify whether the state was "linked" to a projected downwind nonattainment or maintenance receptor. As discussed in the EPA's August 2018 memorandum, with appropriate additional analysis it may be reasonable for states to use a 1 ppb contribution threshold, as an alternative to a 1 percent threshold, at Step 2 of the 4-Step interstate transport framework, for the purposes of identifying linkages to downwind receptors. In any case, the State is projected to contribute greater than both the 1 percent and the alternative 1 ppb thresholds to receptors in Texas, regardless of whether we look at LDEQ's analysis (which relied on the EPA's older modeling) or updated modeling the EPA has performed in advance of this proposal. As seen in the tables LA–1 and LA–2, Louisiana contributes nearly five times the 1 ppb threshold to nonattainment or maintenance receptors in Texas. Therefore, while the EPA does not, in this action, approve of the State's application of the 1 ppb threshold, because the State has linkages greater than 1 ppb to projected downwind nonattainment or maintenance receptors, the State's use of this alternative threshold at Step 2 of the 4-Step interstate framework would not alter our review and proposed disapproval of this SIP submittal.

The EPA here shares further evaluation of its experience since the

issuance of the August 2018 memorandum regarding use of alternative thresholds at Step 2. This experience leads the Agency to now believe it may not be appropriate to continue to attempt to recognize alternative contribution thresholds at Step 2. The August 2018 memorandum stated that "it may be reasonable and appropriate" for states to rely on an alternative threshold of 1 ppb threshold at Step 2.[63] (The memorandum also indicated that any higher alternative threshold, such as 2 ppb, would likely not be appropriate.) However, the EPA also provided that "air agencies should consider whether the recommendations in this guidance are appropriate for each situation." Following receipt and review of 49 interstate transport SIP submittals for the 2015 ozone NAAQS, the EPA's experience has been that nearly every state that attempted to rely on a 1 ppb threshold did not provide sufficient information and analysis to support a determination that alternative threshold was reasonable or appropriate for that state.

For instance, in nearly all submittals, the states did not provide the EPA with analysis specific to their state or the receptors to which its emissions are potentially linked. In one case, the proposed approval of Iowa's SIP submittal, the EPA expended its own resources to attempt to supplement the information submitted by the state, in order to more thoroughly evaluate the state-specific circumstances that could support approval.[64] The Agency no longer intends to undertake supplemental analysis of SIP submittals with respect to alternative thresholds at Step 2 for purposes of the 2015 ozone NAAQS.

Furthermore, the EPA's experience since 2018 is that allowing for alternative Step 2 thresholds may be

---

[60] Information added from the EPA's March 2018 memorandum.

[61] *Id.*

[62] *See* FN 34.

[63] *See* August 2018 memorandum, at page 4.

[64] "Air Plan Approval; Iowa; Infrastructure State Implementation Plan Requirements for the 2015 Ozone National Ambient Air Quality Standard", 85 FR 12232 (March 2, 2020). The Agency received adverse comments on this proposed approval and has not taken final action with respect to this proposal.

impractical or otherwise inadvisable for a number of additional policy reasons. For a regional air pollutant such as ozone, consistency in requirements and expectations across all states is essential. Based on its review of submittals to-date and after further consideration of the policy implications of attempting to recognize an alternative Step 2 threshold for certain states, the Agency now believes the attempted use of different thresholds at Step 2 with respect to the 2015 ozone NAAQS raises substantial policy consistency and practical implementation concerns.[65] The availability of different thresholds at Step 2 has the potential to result in inconsistent application of interstate transport obligations based solely on the strength of a state's SIP submittal at Step 2 of the 4-Step interstate transport framework. From the perspective of ensuring effective regional implementation of interstate transport obligations, the more important analysis is the evaluation of the emissions reductions needed, if any, to address a state's significant contribution after consideration of a multifactor analysis at Step 3, including a detailed evaluation that considers air quality factors and cost. Where alternative thresholds for purposes of Step 2 may be "similar" in terms of capturing the relative amount of upwind contribution (as described in the August 2018 memorandum), nonetheless, use of an alternative threshold would allow certain states to avoid further evaluation of potential emission controls while other states must proceed to a Step 3 analysis. This can create significant equity and consistency problems among states.

Further, it is not clear that national ozone transport policy is best served by allowing for less stringent thresholds at Step 2. The EPA recognized in the August 2018 memorandum that there was some similarity in the amount of total upwind contribution captured (on a nationwide basis) between 1 percent and 1 ppb. However, the EPA notes that while this may be true in some sense, that is not a compelling basis to move to a 1 ppb threshold. Indeed, the 1 ppb threshold has the disadvantage of losing a certain amount of total upwind contribution for further evaluation at Step 3 (e.g., roughly seven percent of total upwind state contribution was lost according to the modeling underlying the August 2018 memorandum;[66] in the EPA's updated modeling, the amount lost is five percent). Considering the core statutory objective of ensuring elimination of all significant contribution to nonattainment or interference of the NAAQS in other states and the broad, regional nature of the collective contribution problem with respect to ozone, there does not appear to be a compelling policy imperative in allowing some states to use a 1 ppb threshold while others rely on a 1 percent of NAAQS threshold.

Consistency with past interstate transport actions such as CSAPR, and the CSAPR Update and Revised CSAPR Update rulemakings (which used a Step 2 threshold of 1 percent of the NAAQS for two less stringent ozone NAAQS), is also important. Continuing to use a 1 percent of NAAQS approach ensures that as the NAAQS are revised and made more stringent, an appropriate increase in stringency at Step 2 occurs, so as to ensure an appropriately larger amount of total upwind-state contribution is captured for purposes of fully addressing interstate transport. Accord 76 FR 48237–38.

Therefore, notwithstanding the August 2018 memorandum's recognition of the potential viability of alternative Step 2 thresholds, and in particular, a potentially applicable 1 ppb threshold, the EPA's experience since the issuance of that memorandum has revealed substantial programmatic and policy difficulties in attempting to implement this approach. Nonetheless, the EPA is not at this time rescinding the August 2018 memorandum. The basis for a proposed disapproval of LDEQ's SIP submission with respect to the Step 2 analysis we believe is warranted under the terms of the August 2018 memorandum. The EPA invites comment on this broader discussion of issues associated with alternative thresholds at Step 2. Depending on public comments received and further evaluation of this issue, the EPA may determine to rescind the 2018 memorandum in the future.

2. Results of the EPA's Step 1 and Step 2 Modeling and Findings for Louisiana

As described in Section I of this action, the EPA performed air quality modeling using the 2016v2 emissions platform to project DVs and contributions for 2023.[67] This data was examined to determine if Louisiana contributes at or above the threshold of 1 percent of the 2015 ozone NAAQS (0.70 ppb) to any downwind nonattainment or maintenance receptor. As shown in Table LA–2, the data[68] indicate that in 2023, emissions from Louisiana contributed greater than 1 percent of the standards to nonattainment or maintenance-only receptors in Texas.[69] Therefore, based on the EPA's evaluation of the information submitted by LDEQ, and based on the EPA's most recent modeling results for 2023, the EPA proposes to find that Louisiana is linked at Steps 1 and 2 and has an obligation to assess potential emissions reductions from sources or other emissions activity at Step 3 of the 4-Step framework.

TABLE LA–2—PROJECTED NONATTAINMENT AND MAINTENANCE RECEPTORS WITH LOUISIANA LINKAGES BASED ON EPA 2016v2 MODELING

| Receptor (site ID, county, state) | Nonattainment/ maintenance | 2023 Average DV (ppb) | 2023 Maximum DV (ppb) | Louisiana Contribution (ppb) |
|---|---|---|---|---|
| 482010024, Harris, TX | Nonattainment | 75.2 | 76.8 | 4.31 |
| 482010055, Harris, TX | Nonattainment | 71.0 | 72.0 | 5.39 |
| 480391004, Brazoria, TX | Maintenance | 70.1 | 72.3 | 7.03 |

[65] We note that Congress has placed on the EPA a general obligation to ensure the requirements of the CAA are implemented consistently across states and regions. See CAA section 301(a)(2). Where the management and regulation of interstate pollution levels spanning many states is at stake, consistency in application of CAA requirements is paramount.

[66] See August 2018 memorandum, at page 4.

[67] Per the instructions in the Supplementary Information section above, all public comments, including comments on the EPA's air quality modeling should be submitted in the Regional docket for this action, Docket ID No. EPA–R06–OAR–2021–0801. Comments are not being accepted in Docket No. EPA–HQ–OAR–2021–0663.

[68] DVs and contributions at individual monitoring sites nationwide are provided in the file: "2016v2_DVs_state_contributions.xlsx", which is included in Docket ID No. EPA–HQ–OAR–2021–0663.

[69] These modeling results are consistent with the results of a prior round of 2023 modeling using the 2016v1 emissions platform, which became available to the public in the fall of 2020 in the Revised CSAPR Update, as noted in Section I of this action. That modeling showed that Louisiana had a maximum contribution greater than 0.70 ppb to at least one nonattainment or maintenance-only receptor in 2023. These modeling results are included in the file "Ozone DVs And Contributions Revised CSAPR Update.xlsx" in Docket ID No. EPA–HQ–OAR–2021–0663.

Table LA–2—Projected Nonattainment and Maintenance Receptors With Louisiana Linkages Based on EPA 2016v2 Modeling—Continued

| Receptor (site ID, county, state) | Nonattainment/ maintenance | 2023 Average DV (ppb) | 2023 Maximum DV (ppb) | Louisiana Contribution (ppb) |
|---|---|---|---|---|
| 481210034, Denton, TX ................................ | Maintenance ...................................................... | 70.4 | 72.2 | 3.22 |
| 482011034, Harris, TX ................................ | Maintenance ...................................................... | 70.3 | 71.6 | 4.93 |
| 482011035, Harris, TX ................................ | Maintenance ...................................................... | 68.0 | 71.6 | 4.77 |

3. Evaluation of Information Provided by LDEQ Regarding Step 3

At Step 3 of the 4-Step interstate transport framework, a state's emissions are further evaluated, in light of multiple factors, including air quality and cost considerations, to determine what, if any, emissions contribute significantly to nonattainment or interfere with maintenance and, thus, must be eliminated under CAA section 110(a)(2)(D)(i)(I).

To effectively evaluate which emissions in the state should be deemed "significant" and therefore prohibited, states generally should prepare an accounting of sources and other emissions activity for relevant pollutants and assess potential, additional emissions reduction opportunities and resulting downwind air quality improvements. The EPA has consistently applied this approach (i.e., Step 3 of the 4-Step interstate transport framework) when identifying emissions contributions that the Agency has determined to be "significant" (or interfere with maintenance) in each of its prior Federal, regional ozone transport rulemakings, and this interpretation of the statute has been upheld by the Supreme Court. See EME Homer City, 572 U.S. 489, 519 (2014). While the EPA has not directed states that they must conduct a Step 3 analysis in precisely the manner the EPA has done in its prior regional transport rulemakings, state implementation plans addressing the obligations in CAA section 110(a)(2)(D)(i)(I) must prohibit "any source or other type of emissions activity within the State" from emitting air pollutants which will contribute significantly to downwind air quality problems. Thus, states must complete an analysis similar to the EPA's (or an alternative approach to defining "significance" that comports with CAA requirements) to determine whether, and to what degree, emissions from a state should be "prohibited" to eliminate emissions that will "contribute significantly to nonattainment, or interfere with maintenance of" the NAAQS in any other state. LDEQ did not conduct such

an analysis in their SIP submission. Instead LDEQ interpreted the Act's requirements as only requiring an analysis of emission reductions where there was a "consistent and persistent" pattern of contribution and conducted an air-quality-only analysis in order to refute such a pattern. We propose to find that LDEQ was required to analyze emissions from the sources and other emissions activity from within Louisiana to determine whether its contributions were significant, and we propose to disapprove its submission because LDEQ did not do so.

As noted, LDEQ stated in its SIP submission that emissions from Louisiana should not be considered to contribute significantly to nonattainment or interfere with maintenance of the NAAQS in other states because there is not a "persistent and consistent" pattern of contribution from the State. The SIP submission does not explain what LDEQ considers to be a persistent and consistent pattern of contribution, even after the LDEQ received a comment during its state comment period that requested that the LDEQ define "persistent and consistent" in terms of impacts on downwind states. The LDEQ responded, "Louisiana has defined the pattern and has provided back trajectories on those monitored exceedances for the 2016–2018 ozone seasons, which will show that the definition is applicable to the conclusion."[70] We do not agree that this suffices as an explanation as to why LDEQ does not need to further analyze its potential emission reductions under Step 3 before determining it has no statutory obligation under the interstate transport provision. In the case of Louisiana, modeling in the March 2018 memorandum and the EPA's more recent 2016v2 modeling both project that receptors in the Houston-Galveston-Brazoria (HGB) and Dallas-Fort Worth (DFW) ozone nonattainment areas in Texas will have difficulty attaining or maintaining the 2015 ozone NAAQS, and Louisiana's contribution to these

areas exceed both a 1 percent or a 1 ppb threshold. While linkages to specific receptors may change with updated modeling, both modeling analyses consistently show emissions from Louisiana impact both downwind nonattainment receptors and downwind maintenance receptors in Texas.

The LDEQ SIP submission stated that Louisiana's contribution should be deemed "significant" per CAA section 110(a)(2)(D)(i)(I) only if there is a persistent and consistent pattern of contribution on several days with elevated ozone. LDEQ asserted that its linkages to Texas do not warrant further analysis because, according to LDEQ, emissions from Louisiana do not persistently and consistently contribute on several days of elevated ozone. However, the EPA modeling that LDEQ relied upon to demonstrate linkages in the first instance already establishes that there is a consistent and persistent pattern of contribution from Louisiana to Texas receptors on elevated ozone days. The EPA's methodology for projecting future year ozone concentrations accounts for precisely these concerns—the relative response factor[71] that is applied to historic monitored data to generate projections is calculated by looking only at days with elevated ozone levels. The EPA notes that monitored attainment with the ozone standard is determined by averaging the fourth high value recorded each year for three years. So, the EPA believes it is important to estimate impacts on the days with highest projected ozone levels. The days chosen to analyze the future impacts are chosen initially by the selecting the 10 highest days in the base period modeling that are projected to be above 65 ppb in the base period. If there are not 10 days above 65 ppb at a potential receptor, the number of days above 65 ppb are used so long as there is at least five days above 65 ppb in the base period. If the air quality modeling shows fewer than five days above 65 ppb in the base period, then the data for impacts at that receptor in 2023 are not calculated. The base and future year modeling for these

---

[70] See LDEQ SIP Submission, Appendix A, available in the Regional docket for this action (Docket ID No. EPA–R06–OAR–2021–0801).

[71] See FN 53.

5–10 days are then used to project 2023 ozone DVs to determine whether it is projected to be a nonattainment or maintenance receptor in 2023. For these same 5–10 days identified, the future year modeling provides the estimated daily contribution at a potential receptor's future year daily MDA8 and these daily contributions are averaged for the 5–10 days to result in the average contribution from the upwind area.

LDEQ's air quality analysis used to dismiss its linkages to Texas receptors as not ''significant'' consists of an evaluation of seasonal weather patterns, surface wind directions, and periodic back trajectories. The State's weather pattern analysis relied on large-scale weather patterns as they relate to commonly observed wind directions rather than weather patterns and conditions that are specifically conducive to ozone formation or tied to specific days when high ozone was monitored in the downwind areas. General weather pattern discussions that are not associated with specific ozone episodes are not generally informative of interstate transport decisions. It is necessary to investigate specific instances of high ozone, because as discussed previously, violations of the ozone standard can be driven by as few as 4 days per year because the compliance with the standard is evaluated based on the average of the fourth high value measured each of three consecutive years.

LDEQ's wind rose analysis is based on surface sites in the Dallas-Fort Worth areas, Houston-Galveston-Brazoria areas, and other areas in Texas and Louisiana, but the analysis does not address transport winds between Louisiana and the Texas areas with receptors on high ozone days at the identified receptors. There are several limitations associated with LDEQ's wind rose analysis: (1) Wind directions measured at the surface are not necessarily good indicators of the wind direction occurring at higher elevations, which tend to have a stronger influence on interstate ozone transport; (2) wind directions change spatially over the range of distance involved in transport from Louisiana to Texas; (3) wind directions change temporally over the range of time involved in ozone transport from Louisiana to Texas; and (4) the wind roses are based on wind data measured throughout the year, not just during either ozone season or monitored ozone episode days. In addition, as discussed previously, LDEQ's wind rose analysis is not limited to the wind conditions that are conducive to high ozone, so it does not

provide information directly pertinent to when ozone is high at areas in Texas and whether Louisiana is a contributing area during those specific times.

LDEQ also included 99 back trajectory analyses during the 2016, 2017, and 2018 years for the dates of ozone exceedances at the monitors referenced in Table LA–1 of this action. HYSPLIT back trajectory analyses use archived meteorological modeling that includes actual observed data (surface, upper air, airplane data, etc.) and modeled meteorological fields to estimate the most likely route of an air parcel transported to a receptor at a specified time. The method essentially follows a parcel of air backward in hourly steps for a specified length of time. HYSPLIT estimates the central path in both the vertical and horizontal planes. The HYSPLIT central path represents the centerline with the understanding that there are areas on each side horizontally and vertically that also contribute to the concentrations at the end point. The horizontal and vertical areas that potentially contribute to concentrations at the endpoint grow wider from the centerline the further back in time the trajectory goes. Therefore, a HYSPLIT centerline does not have to pass directly over emissions sources or emission source areas but merely relatively near emission source areas for those areas to contribute to concentrations at the trajectory endpoint. The EPA relies on back trajectory analysis as a corollary analysis along with observation-based meteorological wind fields at multiple heights to examine the general plausibility of the photochemical model ''linkages.'' Since the back trajectory calculations do not account for any air pollution formation, dispersion, transformation, or removal processes as influenced by emissions, chemistry, deposition, etc., the trajectories cannot be used to develop quantitative contributions. Therefore, back trajectories cannot be used to quantitatively evaluate the magnitude of the existing photochemical contributions from upwind states to downwind receptors. LDEQ's HYSPLIT back trajectory analysis for 2016, 2017, and 2018 showed that on high ozone days in Texas at the receptors identified by the EPA in the 2018 memorandum that 28% of the trajectories passed through Louisiana. LDEQ proffered that some of these back trajectories did not pass directly over areas with emissions but did not consider that the back trajectories only represent a centerline and there are areas on either side of the centerline that would be contributing areas. LDEQ's trajectory analysis

confirmed that Louisiana is an upwind area for the receptors in Texas often enough to potentially contribute to nonattainment or interfere with maintenance. The analysis did not provide evidence that was contrary to the conclusions of the EPA's photochemical modeling analyses (*i.e.,* the EPA's modeling results in the March 2018 memorandum and EPA 2016v2 model).

Photochemical modeling simulations for ozone interstate transport assessment is relied upon by the EPA to simulate the formation and fate of oxidant precursors, primary and secondary particulate matter concentrations, and deposition over regional and urban spatial scales. Photochemical modeling is the most sophisticated tool available to estimate future ozone levels and contributions to those modeled future ozone levels. Consideration of the different processes that affect primary and secondary pollutants at the regional scale in different locations is fundamental to understanding and assessing the effects of emissions on air quality concentrations. For the 2015 ozone NAAQS interstate transport analysis, the EPA performed nationwide, state-level ozone source apportionment modeling using CAMx to quantify the contribution of $NO_X$ and VOC emissions from all sources in each state to project 2023 ozone concentrations at ozone monitoring sites. Detailed information for the EPA's modeling may be found in the Air Quality Modeling TSD in Docket No. EPA–HQ–OAR–2021–0663.

LDEQ concluded in the SIP submittal, citing an article [72] published in 2012, that the use of 1 percent of the standard for modeled contribution as the sole definition of significant contribution is inappropriate for the 2015 ozone NAAQS. LDEQ's reasoning for this conclusion is that the more stringent 0.7 ppb threshold ''is an order of magnitude smaller than the biases and errors typically documented for regional photochemical modeling.'' First, the EPA does not use the 1 percent threshold as the sole definition of significant contribution; at Step 2 of the analysis, the 1 percent threshold is used to identify contributions between states and downwind problem areas for further analysis at Step 3. Second, photochemical transport models such as CAMx have been extensively peer reviewed and used to support SIPs and explore relationships between inputs and air quality impacts in the U.S. and beyond. The EPA works to continually develop and update both the guidelines

---

[72] Simon et al., *supra* FN 58.

on using modeling results and the latest versions of photochemical model platforms to support scientific assessments and regulatory determinations. Prior to using photochemical modeling to support a regulatory assessment, a model performance evaluation is completed to establish a benchmark to assess how accurately the model predicts observed concentrations and to identify model limitations. The model performance evaluation provides a better understanding of the model's limitations and biases and serves as a diagnostic evaluation for further model development and improvement. As discussed in Section I of this document and the Air Quality Modeling TSD in Docket No. EPA–HQ–OAR–2021–0663, the EPA follows the most recent established modeling guidance and provides with this action the updated modeling analysis based on the recent CAMx model update. By using the most recent 2016v2 photochemical modeling enhancements (EPA 2016v2 modeling) results are more representative of the projected local and regional air quality as it is based on more recent emission estimates with fewer years between the base case year (2016) and the future year (2023). In addition, to reduce the impact of any potential biases or errors, the EPA uses the modeling results in a relative sense rather than rely on absolute model predictions.[73]

Furthermore, it is not appropriate to compare the bias/error involved in the estimation of total ozone to the potential error in the estimation of the subset of ozone that is contributed by a single state. For example, on a specific day the modeled vs. monitored ozone value may differ by 2 ppb but that is relatively small percentage of the total modeled ozone, which for a receptor of interest would be on the order of 70 ppb. It would be unrealistic to assign all the 2 ppb, in the above example, to the estimated impact from a single state as the 2 ppb error would be the combination of the error from all sources of ozone that contribute to the total, including estimated impacts from other states, the home state of the receptor and natural background emissions.

In sum, the EPA disagrees that the estimates of potential error in the models estimates of total ozone, call into question the use of 1 percent as a threshold for linkage. As noted earlier, in the case of Louisiana, the difference between a 1 percent threshold and a 1 ppb threshold is irrelevant to the decision here because linkages are present at both threshold levels. As to Louisiana's conclusion that the impacts from Louisiana's emissions are not persistent, the contribution analysis is the average impact for at least 5 days and up to 10 days for the 2016 base period which is sufficiently persistent considering the first through fourth high monitored values set the monitored DV.

We recognize that the results of the EPA (2011 and 2016 base year) modeling indicated different receptors and linkages at Steps 1 and 2 of the 4-Step interstate transport framework. These differing results regarding receptors and linkages can be affected by the varying meteorology from year to year, but we do not think the differing results means that the modeling or the EPA or the state's methodology for identifying receptors or linkages is inherently unreliable. Rather, these separate modeling runs all indicated: (1) That there are receptors that would struggle with nonattainment or maintenance in the future; and (2) that Louisiana is linked to some set of these receptors, even if the receptors and linkages differed from one another in their specifics (*e.g.,* Louisiana was linked to a different set of receptors in one modeling run versus another). These results indicates that Louisiana's emissions were substantial enough to generate linkages at Steps 1 and 2 to at least some set of downwind receptors, under varying assumptions and meteorological conditions, even if the precise set of linkages changed between modeling runs.

### 4. Evaluation of Information Provided by LDEQ Regarding Step 4

Step 4 of the 4-Step interstate transport framework calls for development of permanent and federally enforceable control strategies to achieve the emissions reductions determined to be necessary at Step 3 to eliminate significant contribution to nonattainment or interference with maintenance of the NAAQS. As mentioned previously, LDEQ's SIP submission did not contain an evaluation of additional emission control opportunities (or establish that no additional controls are required), thus, no information was provided at Step 4. To the extent that LDEQ discussed emissions reductions, the State only provided a summary of existing already implemented enforceable control regulations. The EPA's 2016v2 modeling analyses have already accounted for the implementation of the regulations cited by LDEQ's submission—including the CSAPR rulemakings and prior regional rulemakings—and even with those reductions in place, the modeling results consistently show receptors that are projected to be in nonattainment or to struggle with maintenance, and Louisiana contributing to those receptors. Relying only on the existing enforceable control regulations is insufficient to address the Louisiana air emission contributions to linked downwind air quality problems. As a result, the EPA proposes to disapprove LDEQ's submittal on the separate, additional basis that the State has not developed permanent and enforceable emissions reductions necessary to meet the obligations of CAA section 110(a)(2)(D)(i)(I).

### 5. Conclusion

Based on the EPA's evaluation of LDEQ's SIP submission, the EPA is proposing to find that LDEQ's November 13, 2019, SIP submission pertaining to interstate transport of air pollution does not meet the State's interstate transport obligations because it fails to contain the necessary provisions to eliminate emissions that will contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in any other state.

## IV. Oklahoma SIP Submission Addressing Interstate Transport of Air Pollution for the 2015 Ozone NAAQS and the EPA Evaluation of the SIP Submission

*A. Summary of ODEQ SIP Submission Addressing Interstate Transport of Air Pollution for the 2015 Ozone NAAQS*

On October 25, 2018, the Oklahoma Department of Environmental Quality (ODEQ) made a SIP submission addressing interstate transport of air pollution for the 2015 ozone NAAQS. The SIP submission provided ODEQ's analysis of their impact to downwind states using the EPA's 4-Step framework and an analytic year of 2023 and concluded that emissions from Oklahoma will not contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in other states.

To identify downwind air quality problems that are linked to emissions

---

[73] *See* "Modeling Guidance for Demonstrating Air Quality Goals for Ozone, $PM_{2.5}$ and Regional Haze", Nov. 29, 2018, at 101, available at *https://www.epa.gov/sites/default/files/2020-10/documents/o3-pm-rh-modeling_guidance-2018.pdf* ("2018 Air Quality Modeling Guidance"). *See also* "Draft Modeling Guidance for Demonstrating Attainment of Air Quality Goals for Ozone, $PM_{2.5,}$ and Regional Haze", Dec. 3, 2014, at 97–98, available at *https://www.epa.gov/sites/default/files/2020-10/documents/draft-o3-pm-rh-modeling_guidance-2014.pdf* ("2014 Draft Air Quality Modeling Guidance").

from Oklahoma and therefore warrant further review and analysis (Steps 1 and 2), ODEQ used EPA interstate transport modeling results found in the March 2018 memorandum. The EPA modeling results projected: (1) An average DV and a maximum DV for the year 2023 for ozone monitors in the 48 contiguous States and (2) the expected contribution from emissions in each state to the ozone concentrations at each ozone monitor.

ODEQ used the information from the March 2018 EPA memorandum to

identify six downwind nonattainment and maintenance receptors[74] with a contribution from Oklahoma of 1 percent of the 2015 ozone NAAQS (0.70 parts ppb) or greater. ODEQ then applied a 1 ppb threshold to remove from further analysis three receptors with a contribution from Oklahoma of less than 1 ppb. ODEQ noted that the possibility of using an alternative contribution threshold was one of the areas of flexibility identified in the March 2018 EPA memorandum and discussed further in the August 2018

EPA memorandum. To support its alternative contribution threshold, ODEQ referenced an EPA memorandum from April 17, 2018, which recommended a Significant Impact Level (SIL) for ozone of 1.0 ppb for proposed sources subject to the Prevention of Significant Deterioration (PSD) permitting program.[75] Table OK–1 provides information on the six nonattainment and maintenance receptors identified by ODEQ, including the three receptors ODEQ identified for further analysis.

Table OK–1—Nonattainment and Maintenance Receptors Identified by ODEQ Based on the EPA's March 2018 Memorandum

| Receptor (site ID, county, state) | 2023 average DV (ppb) | 2023 maximum DV (ppb) | Oklahoma contribution (ppb) | ODEQ's step 1 and 2 determination |
|---|---|---|---|---|
| 260050003, Allegan, MI ................................. | 69.0 | 71.7 | 1.31 | Maintenance receptor identified for further analysis. |
| 481210034, Denton, TX ................................. | 69.7 | 72.0 | 1.23 | Maintenance receptor identified for further analysis. |
| 484392003, Tarrant, TX ................................. | 72.5 | 74.8 | 1.71 | Nonattainment receptor identified for further analysis. |
| 480391004, Brazoria, TX ................................. | 74.0 | 74.9 | 0.90 | Nonattainment receptor with contribution less than 1 ppb; no further analysis. |
| 550790085, Milwaukee, WI ................................. | 71.2 | 73.0 | 0.76 | Nonattainment receptor with contribution less than 1 ppb; no further analysis. |
| 551170006, Sheboygan, WI ................................. | 72.8 | 75.1 | 0.95 | Nonattainment receptor with contribution less than 1 ppb; no further analysis. |

ODEQ further evaluated the two Texas receptors (Tarrant County and Denton County) and the receptor in Allegan County, MI. ODEQ did not further evaluate the contribution from Oklahoma to the receptors in Brazoria County, TX, Milwaukee County, WI, and Sheboygan County, WI because the contributions from Oklahoma to these receptors were less than 1 ppb.

For the two remaining Texas receptors, ODEQ returned to Steps 1 and 2 of the 4-Step interstate transport framework using modeling performed by the Texas Commission on Environmental Quality (TCEQ). The TCEQ modeling results are included in the Regional docket for this action (Docket ID No. EPA–R06–OAR–2021–0801). ODEQ stated that the primary difference between the EPA modeling and the TCEQ modeling is that the TCEQ modeling used 2012 as the "base year" for assessing interstate transport

of ozone pollution in 2023 whereas the EPA modeling used 2011 as the base year for that assessment. In addition, the ODEQ stated that TCEQ used a method different from the EPA's method to identify whether a monitor would have trouble maintaining the 2015 ozone NAAQS (i.e., a maintenance receptor). To identify maintenance receptors, TCEQ calculated a "maintenance future year (fy) DV" by projecting to 2023 the most recent regulatory DV that contains the base year (i.e., the 2012–2014 DV for a base year of 2012), whereas the EPA's methodology for identifying maintenance receptors uses the maximum DV, which is the highest monitored DV from among the three DVs that contain the base year (i.e., the 2009–2011, 2010–2012 and 2011–2013 DVs for a base year of 2011).

To assess whether Oklahoma is linked to nonattainment of the 2015 ozone standard at the Denton and Tarrant

County sites, ODEQ switched to using the 2023 average DV projected by TCEQ rather than the EPA's projected average DVs. The ODEQ noted that the projected 2023 average DV was 68 ppb for the Denton County site and 66 ppb for the Tarrant County site based on the TCEQ modeling. ODEQ then claimed that these results demonstrate that both of these sites are in attainment in 2023.

To assess whether Oklahoma interferes with maintenance of the 2015 ozone standard at these two sites, ODEQ used (1) the Texas method to calculate a "maintenance future year DV" for 2023 and (2) a maximum DV calculated using the highest of the three base year DVs multiplied by a relative response factor derived from TCEQ's modeling (i.e., EPA's method for identifying maintenance receptors but using TCEQ's modeling rather than EPA's modeling). This assessment is summarized in Table OK–2.

---

[74] Nonattainment receptors are monitoring sites that are anticipated to have problems attaining and maintaining the 2015 ozone NAAQS (i.e., average

projected 2023 DV greater than 70.9 ppb). Maintenance receptors are monitoring sites that are anticipated to have problems maintaining the 2015

ozone NAAQS (i.e., maximum projected 2023 DV greater than 70.9 ppb).

[75] See FN 32.

TABLE OK–2—SUMMARY OF TCEQ MODELING (2012 BASE PERIOD) USED BY ODEQ TO ASSESS MAINTENANCE RECEPTORS

| Receptor (site ID, county, state) | 2023 average DV (ppb) | 2023 maximum DV (ppb) (EPA method)* | Maintenance DV (ppb)(TCEQ method) | ODEQ's step 1 and step 2 determination |
|---|---|---|---|---|
| 481210034 Denton, TX ................................. | 68 | 70.7 | 65.9 | Future DVs project no attainment or maintenance problems. |
| 484392003 Tarrant, TX ................................. | 66 | 69.9 | 62.4 | Future DVs project no attainment or maintenance problems. |

*These values are not based on calculations made by the EPA. ODEQ calculated these values by using the maximum DV for the 2010–2014 5-year period (i.e., the highest of the DVs in 2012, 2013, and 2014) multiplied by relative response factor for the receptor obtained from TCEQ's modeling.

ODEQ noted in their assessment that based on the TCEQ modeling and TCEQ definition of maintenance receptor, it is expected that the Denton and Tarrant sites will not experience nonattainment or maintenance problems in 2023. Because ODEQ claimed that the Denton and Tarrant County sites will not be nonattainment or maintenance receptors in 2023, ODEQ did not analyze potential emissions reductions at Step 3 to address its contribution to these two sites.

With respect to the remaining receptor at Allegan County, MI, ODEQ provided an analysis of projected 2023 DVs for this site and information on emissions trends in Oklahoma to assert that emissions from Oklahoma do not significantly contribute to nonattainment or interfere with maintenance of the 2015 ozone NAAQS at the Allegan County, MI site.

ODEQ noted that (1) the DV for the Allegan County, MI site has had a substantial reduction in the last 6 years from 84 ppb in 2012 to 73 ppb in 2017, a 1.8 ppb per year decrease, on average and (2) the Allegan County, MI site is substantially influenced by mobile sources from the Chicago area and these emissions are expected to be greatly reduced in the near future, by roughly a 1 ppb per year decrease, leading to attainment of the 2015 ozone standard. The ODEQ then calculated a projected 2023 maintenance DV for the Allegan County, MI site using the EPA's method, but assuming that the base year was 2016 rather than 2011, as in the EPA's modeling or 2012 as in the TCEQ modeling. The ODEQ noted that the maximum DV in the 2016-centered base period (i.e., 2014–2016, 2015–2017, and 2016–2018) was 75 ppb at the Allegan County, Michigan site. The ODEQ then calculated the difference between the 2011-centered base period maximum DV of 86 ppb and the 2023 projected maximum DV of 71.7 ppb, using data from the EPA's modeling. The ODEQ calculated a ''ppb per year'' reduction of 1.1917 ppb per year, based on the 14.3

ppb difference between the 2011-centered and 2023 maximum DVs over the 12 years from 2011 to 2023. Finally, ODEQ applied the 1.1917 ppb per year value to the 2016-centered maximum DV of 75 ppb to estimate a 2023 maximum DV of 66.66 ppb.

ODEQ also asserted that the relatively small contribution from Oklahoma (3% of total upwind state contributions) combined with the distance between Oklahoma sources and the Allegan County, Michigan site, warrants a focus on nearby states with greater proportional contributions as the most prudent approach to addressing interstate transport of ozone precursors for this receptor.

The ODEQ also provided the anthropogenic $NO_X$ and VOC data of Oklahoma's emission trends and modeling to demonstrate an anticipated substantial reduction of $NO_X$ and VOC from 2011 to 2023: (1) Reductions of $NO_X$ from 405,000 to 235,000 tons per year and (2) reductions of VOC from 414,000 to 295,000 tons per year.[76] ODEQ noted these reductions should result in considerable reductions in ozone concentrations. The ODEQ stated that due to the emissions reductions required by rules like CSAPR, the 2016 CSAPR Update, and the regional haze requirements, the $NO_X$ emissions from electric generation in Oklahoma have dropped significantly during the ozone season from 38,285 tons per year in 2011 to 10,435 tons per year in 2017. ODEQ also stated that changes in the Southwest Power Pool[77], building of

additional windfarms, and electric utilities installing solar generation facilities have led to Oklahoma $NO_X$ emissions reductions; and that any additional $NO_X$ reductions from the electric generation section would require more costly emissions controls. ODEQ concluded that the existing controls in Oklahoma have resulted in significant decreases in ozone DVs in Oklahoma and that additional controls would not be cost-effective. Given their conclusions, ODEQ did not adopt additional controls to reduce ozone precursor emissions (Step 4).

*B. EPA Evaluation of the ODEQ SIP Submission*

The EPA is proposing to find that ODEQ's October 25, 2018, SIP submission does not demonstrate that the State's obligations with respect to prohibiting emissions that contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in any other state based on the EPA's evaluation of the SIP submission using the 4-Step interstate transport framework have been met. The EPA is therefore proposing to disapprove ODEQ's submission.

1. Evaluation of Information Provided by ODEQ Regarding Steps 1 and 2

As noted earlier, ODEQ first used the information from the EPA's March 2018 memorandum to identify nonattainment and maintenance receptors with a contribution from Oklahoma of 0.70 ppb or greater (i.e., ODEQ identified receptors that would be deemed nonattainment and maintenance receptors under the EPA's methodology for Steps 1 and 2). ODEQ then utilized a 1 ppb threshold and elected not to further analyze any receptors to which it did not contribute greater than 1 ppb.

[76] ODEQ used the EPA's emissions data shared alongside the October 2018 memorandum, ''state-sector_annual_emissions_data_1.xlsx'' available at *https://www.epa.gov/airmarkets/memo-and-supplemental-information-regarding-interstate-transport-sips-2015-ozone-naaqs.*

[77] The Southwest Power Pool is a regional electric transmission organization regulated by the Federal Energy Regulatory Commission whose purpose is promoting efficiency and reliability in the operation and planning of the electric transmission grid and ensuring non-discrimination in the provision of electric transmission services. It manages electric

transmission in portions of fourteen states: Arkansas, Iowa, Kansas, Louisiana, Minnesota, Missouri, Montana, Nebraska, New Mexico, North Dakota, Oklahoma, South Dakota, Texas and Wyoming. See 18 CFR 35.34 and *https://www.ferc.gov/electric-power-markets.*

ODEQ provided further evaluation of the State's emissions to those receptors to which Oklahoma contributes greater than 1 ppb (*i.e.,* Allegan County, MI, Denton County, TX and Tarrant County, TX).

As discussed in the EPA's August 2018 memorandum, with appropriate additional analysis it may be reasonable for states to use a 1 ppb contribution threshold, as an alternative to a 1 percent threshold, at Step 2 of the 4-Step interstate transport framework, for the purposes of identifying linkages to downwind receptors. However, the EPA's August 2018 memorandum provided that whether or not a 1 ppb threshold is appropriate must be based on an evaluation of state-specific circumstances, and no such evaluation was included in the ODEQ's submittal. Instead, ODEQ's SIP submission justified the State's use of a 1 ppb threshold based on the threshold's use in the SILs Guidance.[78] ODEQ did not explain the relevance of the SILs Guidance to Oklahoma's statutory obligation under the interstate transport provision. The SILs Guidance relates to a different provision of the CAA regarding implementation of the prevention of significant deterioration (PSD) permitting program, *i.e.,* a program that applies in areas that have been designated attainment of the NAAQS, and it is not applicable to the interstate transport provision, which requires states to eliminate emissions that contribute significantly or interfere with maintenance of the NAAQS at known, ongoing, or projected air quality problem areas in other states. The EPA does not, in this action, agree that the State has justified its application of the 1 ppb threshold.

Additionally, the EPA here shares further evaluation of its experience since the issuance of the August 2018 memorandum regarding use of alternative thresholds at Step 2. This experience leads the Agency to now believe it may not be appropriate to continue to attempt to recognize alternative contribution thresholds at Step 2. The August 2018 memorandum stated that "it may be reasonable and appropriate" for states to rely on an alternative threshold of 1 ppb threshold at Step 2. (The memorandum also indicated that any higher alternative threshold, such as 2 ppb, would likely not be appropriate.) However, the EPA also provided that "air agencies should consider whether the recommendations in this guidance are appropriate for each situation." Following receipt and review of 49 interstate transport SIP submittals

for the 2015 ozone NAAQS, the EPA's experience has been that nearly every state that attempted to rely on a 1 ppb threshold did not provide sufficient information and analysis to support a determination that an alternative threshold was reasonable or appropriate for that state.

For instance, in nearly all submittals, the states did not provide the EPA with analysis specific to their state or the receptors to which its emissions are potentially linked. In one case, the proposed approval of Iowa's SIP submittal, the EPA expended its own resources to attempt to supplement the information submitted by the state, in order to more thoroughly evaluate the state-specific circumstances that could support approval.[79] It was at the EPA's sole discretion to perform this analysis in support of the state's submittal, and the Agency is not obligated to conduct supplemental analysis to fill the gaps whenever it believes a state's analysis is insufficient. The Agency no longer intends to undertake supplemental analysis of SIP submittals with respect to alternative thresholds at Step 2 for purposes of the 2015 ozone NAAQS.

Furthermore, the EPA's experience since 2018 is that allowing for alternative Step 2 thresholds may be impractical or otherwise inadvisable for a number of additional policy reasons. For a regional air pollutant such as ozone, consistency in requirements and expectations across all states is essential. Based on its review of submittals to-date and after further consideration of the policy implications of attempting to recognize an alternative Step 2 threshold for certain states, the Agency now believes the attempted use of different thresholds at Step 2 with respect to the 2015 ozone NAAQS raises substantial policy consistency and practical implementation concerns.[80] The availability of different thresholds at Step 2 has the potential to result in inconsistent application of interstate transport obligations based solely on the strength of a state's SIP submittal at Step 2 of the 4-Step interstate transport framework. From the perspective of ensuring effective regional

implementation of interstate transport obligations, the more important analysis is the evaluation of the emissions reductions needed, if any, to address a state's significant contribution after consideration of a multifactor analysis at Step 3, including a detailed evaluation that considers air quality factors and cost. Where alternative thresholds for purposes of Step 2 may be "similar" in terms of capturing the relative amount of upwind contribution (as described in the August 2018 memorandum), nonetheless, use of an alternative threshold would allow certain states to avoid further evaluation of potential emission controls while other states must proceed to a Step 3 analysis. This can create significant equity and consistency problems among states.

Further, it is not clear that national ozone transport policy is best served by allowing for less stringent thresholds at Step 2. The EPA recognized in the August 2018 memorandum that there was some similarity in the amount of total upwind contribution captured (on a nationwide basis) between 1 percent and 1 ppb. However, the EPA notes that while this may be true in some sense, that is hardly a compelling basis to move to a 1 ppb threshold. Indeed, the 1 ppb threshold has the disadvantage of losing a certain amount of total upwind contribution for further evaluation at Step 3 (*e.g.,* roughly seven percent of total upwind state contribution was lost according to the modeling underlying the August 2018 memorandum;[81] in EPA 2016v2 modeling, the amount lost is five percent). Considering the core statutory objective of ensuring elimination of all significant contribution to nonattainment or interference of the NAAQS in other states and the broad, regional nature of the collective contribution problem with respect to ozone, there does not appear to be a compelling policy imperative in allowing some states to use a 1 ppb threshold while others rely on a 1 percent of NAAQS threshold.

Consistency with past interstate transport actions such as CSAPR, and the CSAPR Update and Revised CSAPR Update rulemakings (which used a Step 2 threshold of 1 percent of the NAAQS for two less stringent ozone NAAQS), is also important. Continuing to use a 1 percent of NAAQS approach ensures that as the NAAQS are revised and made more stringent, an appropriate increase in stringency at Step 2 occurs, so as to ensure an appropriately larger amount of total upwind-state contribution is captured for purposes of

---

[78] *See* FN 32.

[79] "Air Plan Approval; Iowa; Infrastructure State Implementation Plan Requirements for the 2015 Ozone National Ambient Air Quality Standard", 85 FR 12232 (March 2, 2020). The agency received adverse comments on this proposed approval and has not taken final action with respect to this proposal.

[80] We note that Congress has placed on the EPA a general obligation to ensure the requirements of the CAA are implemented consistently across states and regions. *See* CAA section 301(a)(2). Where the management and regulation of interstate pollution levels spanning many states is at stake, consistency in application of CAA requirements is paramount.

[81] *See* August 2018 memorandum, at page 4.

fully addressing interstate transport. *Accord* 76 FR 48237–38.

Therefore, notwithstanding the August 2018 memorandum's recognition of the potential viability of alternative Step 2 thresholds, and in particular, a potentially applicable 1 ppb threshold, the EPA's experience since the issuance of that memorandum has revealed substantial programmatic and policy difficulties in attempting to implement this approach. Nonetheless, the EPA is not, at this time, rescinding the August 2018 memorandum. The basis for the EPA's proposed disapproval of ADEQ's SIP submission with respect to the Step 2 analysis is, in the Agency's view, warranted even under the terms of the August 2018 memorandum. The EPA invites comment on this broader discussion of issues associated with alternative thresholds at Step 2. (See Supplementary Information section above for details and docket to submit comments). Depending on public comments received in relation to this action and further evaluation of this issue, the EPA may determine to rescind the 2018 memorandum in the future.

In any case, as discussed in the following subsection, based on the EPA's most recent modeling, the State is projected to contribute greater than both the one percent and alternative 1 ppb thresholds at the Denton County, TX receptor, (Monitor ID. 481210034). Based on the EPA's modeling results included in the March 2018 memorandum, Oklahoma was also projected to contribute 1.23 ppb to the Denton County, TX receptor. (In the EPA 2016v2 modeling the Allegan County, MI and Tarrant County, TX receptors are not projected to have problems attaining or maintaining the 2015 ozone NAAQS, Even under ODEQ's own analysis, the State was linked to receptors with contributions exceeding 1 ppb. Therefore, based on Oklahoma's linkages greater than 1 ppb to projected downwind nonattainment or maintenance receptors, the State's use of this alternative threshold at Step 2 of the 4-Step interstate framework is inconsequential to our proposed action on the state's SIP.

In the remainder of this section, EPA evaluates ODEQ's conclusions that emissions from Oklahoma do not contribute to nonattainment or interfere with maintenance at receptors in Tarrant County, TX (Monitor ID. 484392003) and Denton County, TX (Monitor ID. 481210034). We evaluate ODEQ's conclusions as to the Allegan, MI (Monitor ID. 260050003) in Section IV.B.3 of this action.

With regard to the Denton County and Tarrant County, TX receptors cited in ODEQ's submission, ODEQ chose to rely on the TCEQ's modeling and methodology, instead of the EPA modeling, and trends in ozone DVs and emissions to conclude that these monitoring sites will be in attainment by 2023 and will not have a problem maintaining the 2015 ozone NAAQS. As noted in Section IV.A of this action, ODEQ used modeling results from the TCEQ along with the TCEQ alternative method for identifying maintenance receptors to claim that using the TCEQ modeling and methods, the Denton County and Tarrant County monitors would not have a problem maintaining the NAAQS in 2023. The ODEQ supplemented that analysis by citing the downward trend in $NO_X$ and VOC emissions in Oklahoma. ODEQ also provided TCEQ modeling and emissions data for the Dallas-Fort Worth nonattainment area to show that mobile sources represent the largest emissions category in this area and that emissions from this sector have declined since 2005 and are expected to continue to decline in the future. As described in Table OK–2, ODEQ (1) provided the average 2023 DV for the Denton County, TX receptor from the TCEQ modeling and (2) used TCEQ modeling data with a 2012 base year to calculate a 2023 maintenance DV of 65.9 ppb (using the TCEQ methodology for identifying maintenance receptors) and a 2023 maximum DV of 70.7 ppb (using the EPA methodology for identifying maintenance receptors, combined with TCEQ's modeling results). ODEQ relied on this information, which is based on TCEQ modeling with a 2012 base year, to conclude that the Denton County, TX and Tarrant County, TX monitors would not have problems attaining and maintaining the 2015 ozone NAAQS.

ODEQ's SIP submission (or TCEQ, to the extent that Oklahoma is merely incorporating and relying on Texas' submission) does not adequately explain or justify how relying on TCEQ's method for identifying maintenance receptors reasonably identifies areas that will have difficulty maintaining the NAAQS. EPA proposes to find that ODEQ has provided no sound technical basis (either on its own or through reliance on Texas) for how its chosen methodology gives meaning to the CAA's instruction that states submit interstate transport SIPs that prohibit their states' emissions from interfering with the maintenance of the NAAQS in another state.

In *North Carolina* v. *EPA,* 531 F.3d 896, 909–11 (D.C. Cir. 2008), the D.C. Circuit rejected the EPA's CAIR on the

basis that the EPA had not adequately given meaning to the phrase ''interfere with maintenance'' in the interstate transport provision. Specifically, North Carolina argued that it had counties that were projected to attain the NAAQS in the future analytic year, but were at risk of falling back into nonattainment due to interference from upwind sources, particularly given year-to-year variability in ozone levels. The court agreed, holding that the EPA's rule did not adequately protect ''[a]reas that find themselves barely meeting attainment.'' *Id.* at 910. Consequently, the EPA has developed a methodology, used in its 2011 CSAPR and its 2016 CSAPR Update and Revised CSAPR Update, for identifying areas that may struggle to maintain the NAAQS. *See* 76 FR at 48227–28. EPA's approach to addressing maintenance receptors was upheld in the *EME Homer City* litigation. *See* 795 F.3d 118, 136–37. It was also upheld in *Wisconsin.* 938 F.3d at 325–26. In *Wisconsin,* the court noted that four upwind states were linked only to maintenance receptors and rejected the argument that application of the same control level as EPA imposes for those states linked to nonattainment receptors was unreasonable or unlawful absent a particularized showing of overcontrol. *Id.* at 327.

In order to explain the differences between TCEQ's and the EPA's methodology for identifying maintenance receptors, it is helpful to provide some additional context of how the EPA projects future air quality.

The EPA's air quality modeling guidance has long recommended developing a base DV (*i.e.,* the DV that will be used as a starting point to model and analyze for purposes of projecting future air quality concentrations) that is the average of three DVs spanning a five-year period, centered around one year for which an emissions inventory will be submitted (*e.g.,* if 2011 was the base emissions inventory year, a state would use monitored values from 2009– 2011, 2010–2012, 2011–2013 as the starting point for projecting air quality concentrations in future years).[82] The average of these three DVs is then multiplied by a relative response factor [83] to generate an average DV for the future year.[84] If a receptor's average

---

[82] *See* FN 73.

[83] *See* FN 53.

[84] While it is not critical to this discussion, for purposes of explanation, the relative response factor is a fractional change that represents how ozone at a given receptor responds to changes in emissions when all other variables are constant. For more explanation of the RRF, please see 2018 Air Quality Modeling Guidance or 2014 Draft Air Quality Modeling Guidance.

future year DV is greater than or equal to the level of the NAAQS, and the receptor has recent monitored data that violates the NAAQS, that receptor is considered a "nonattainment" receptor at Step 1. To identify maintenance receptors, the EPA's methodology looks to the highest DV of the three DVs used to calculate the 5-year weighted average DV (e.g., in the 2011 example, if 2009–2011 had the highest DV of 2009–2011, 2010–2012, and 2011–2013). The EPA then applies the same relative response factor to that highest DV to generate a projected future maximum DV. Where a receptor's maximum DV exceeds the level of the NAAQS, the EPA has deemed those receptors to be "maintenance" receptors. This methodology was designed to address the D.C. Circuit's holding that the CAA's "interference with maintenance" prong requires states and the EPA to protect areas that may struggle with maintaining the standard in the face of variable conditions.

In its modeling, TCEQ adopted an identical approach to the EPA's for identifying nonattainment receptors—it looked at three sets of DVs over a five-year period and averaged those DVs to generate a base year DV. TCEQ then applied a relative response factor to that base year DV to project a receptor's average DV in the future year. For maintenance receptors, however, TCEQ elected not to examine variability in DVs over a five-year period by using the highest DV of the three DVs making up the base year DV. Instead, TCEQ (and by extension, ODEQ), used only the most recent DV of the three DVs, regardless of whether the most recent DV was highest or lowest. TCEQ's proffered explanation for using the most recent DV to identify maintenance receptors was that the latest DV "takes into consideration . . . any emissions reductions that might have occurred." [85] TCEQ in its submission does not explain why or how this methodology identifies those areas that may be meeting the NAAQS or that may be projected to meet the NAAQS but may nevertheless struggle to maintain the NAAQS, given meteorological variability. In fact, because TCEQ's stated purpose in using the most recent DV was to capture more recent emissions reductions, Texas' methodology appears to be aimed at *limiting* receptors which could be identified as maintenance receptors, compared to the EPA's methodology, which was designed to identify those

areas that might struggle to maintain the NAAQS in particularly ozone conducive conditions.

As discussed further in the EPA Region 6 TSD [86] for this action, the EPA has reviewed the set of 21 receptors for which Texas had contributions of 0.7 ppb or more in the EPA's 2016 base year modeling analyses, or TCEQ's modeling (2012 base year), and evaluated the results of using TCEQ's alternate maintenance methodology. For these 21 receptors, TCEQ's method resulted in 15 of the 21 2023 maintenance DVs predicted to be lower than the 2023 nonattainment DVs from the nonattainment methodology that uses the 5-year center weighted average. Of these 15 receptors, three receptors have 2023 maintenance DVs that are 3 ppb lower, five receptors have 2023 maintenance DVs that are 2 ppb lower, and seven receptors have 2023 maintenance DVs that are 1 ppb lower. In comparison, using the EPA's maintenance methodology results in all 21 2023 maintenance DVs being equal or up to 4 ppb higher than the 2023 nonattainment DVs. Again, the EPA uses the average of the three DVs that contain the base year modeled for the nonattainment methodology and the maximum of these three DVs for the maintenance methodology. Because TCEQ's maintenance methodology of just using the most recent DV (2012–2014 DV) often results in maintenance DVs lower than the 2023 nonattainment DVs methodology results, the EPA finds that the TCEQ methodology is not adequately identifying conditions when a receptor would have more difficulty maintaining the standard. In fact, the TCEQ's method also identified one receptor in their SIP submission as a nonattainment receptor in 2023 that would not have been identified as a maintenance receptor, which further highlights the concern that TCEQ's method did not adequately identify areas that may struggle to maintain the standard. TCEQ did not address whether the three years that comprise the most recent design value (i.e., 2012, 2013, and 2014) had meteorological conditions highly conducive for formation of high ozone concentrations and thus would be an appropriate time period to assess whether area could have difficulty maintaining the standard and the EPA's analysis confirms that this time period is not highly conducive to ozone formation, at least for many

receptors. The consequence of TCEQ's maintenance method is that it often results in lower DVs than the nonattainment method as demonstrated by our analysis, which indicates that it is often not considering conditions when an area would have difficulty maintaining the standard. Further, it is unreasonable to have a method that would not identify nonattainment receptors also as maintenance receptors.

Again, EPA also assessed a number of monitored DV trends that were provided in TCEQ's SIP and previous TCEQ attainment demonstration SIPs indicating that there are at times large annual fluctuations upward from year to year in monitored DVs (sometimes 2–3 ppb increase in one year) that are due to variations in meteorology. Neither TCEQ nor ODEQ addressed in their SIP submissions whether the three years that comprise the most recent DV (i.e., 2012, 2013, and 2014) had meteorological conditions conducive for formation of high ozone concentrations. On the other hand, the EPA methodology can identify variations in ozone levels that might result in difficulty in maintaining the standard over a longer period of time. The TCEQ method will only identify areas that have difficulty maintaining the standard for a single design value period and, as a result, does not address the meteorological variability issue sufficiently.

In its SIP submittal, ODEQ contended that, based on TCEQ's use of a 2012 base year, and using TCEQ's air quality modeling, even if Texas had used the EPA's method of identifying maintenance receptors, the projected maximum DV for the Denton County and Tarrant County receptors would be 70.7 ppb and 69.9 ppb, respectively, which are considered to be in attainment of the 2015 ozone NAAQS in 2023. However, this conclusion relied upon a relative response factor derived from the TCEQ modeling and TCEQ's modeling results, which are discussed in more detail in Section V of this action and in the EPA Region 6 TSD.[87] TCEQ's modeled projections for 2023 including nonattainment and maintenance values (using either TCEQ' or EPA's methodology) are much lower than recent monitored values (2018–2020 DV and preliminary 2019–2021 DVs) [88] for

---

[85] TCEQ submission at 3–39 to 3–40, available in the Regional docket for this action (Docket ID No. EPA–R06–OAR–2021–0801).

[86] "EPA Region 6 2015 8-Hour Ozone Transport SIP Proposal Technical Support Document" (EPA Region 6 2015 Ozone Transport SIP TSD.pdf) included in Docket ID No. EPA–R06–OAR–2021–0801.

[87] Id.

[88] Monitoring data from the EPA's Air Quality System (AQS) (https://www.epa.gov/aqs). 2021 monitoring data is preliminary and still has to undergo Quality Assurance/Quality Control analysis and be certified by the State of Texas, submitted to EPA, and reviewed and concurred on by EPA. 2018–2020 DVs are 72 ppb and 73 ppb at
Continued

many monitors and the amount of further DV reductions needed to match TCEQ's modeling is more than is reasonably expected to occur for many monitors/receptors. This underestimation of future DVs results in mis-identifying these two receptors and other receptors as not being nonattainment or maintenance receptors. Specifically, these two receptors would need to have at least a 3–4 ppb decrease in the next 2–3 years just to attain the 2015 Ozone NAAQS in 2023. As discussed in the EPA Region 6 TSD, TCEQ's previous DFW Attainment Demonstration SIP includes long-term DV trends analysis that indicates that DFW DVs decrease approximately 1 ppb per year.[89] Moreover, as discussed in Section IV.B.2 of this action, the EPA's updated modeling, which relies upon more recent data and the latest information on emissions reductions, indicates that the

maximum design value in 2023 for the Denton County receptor is 72.2 ppb. Recent monitored air quality data at the Denton receptor are consistent with the EPA's projections that this is an area that will struggle to maintain the 2015 ozone NAAQS in 2023; the 2020 DV for Denton was 72 ppb.[90]

Finally, in its submittal, ODEQ pointed to the significant reductions in emissions that have occurred in the State, but the EPA believes these reductions have already been accounted for in the most recent modeling; therefore, even with these reductions, the Denton County, TX receptor is projected to struggle with maintenance of the 2015 ozone NAAQS in 2023.

2. Results of the EPA's Step 1 and Step 2 Modeling and Findings for Oklahoma

As described in Section I of this action, the EPA performed air quality modeling using the 2016v2 platform to project DVs and contributions for 2023.

This data was examined to determine if Oklahoma contributes at or above the threshold of 1 percent of the 2015 ozone NAAQS (0.70 ppb) to any downwind nonattainment or maintenance receptor. As shown in Table OK–3, the most recent modeling data[91] indicate that in 2023, emissions from Oklahoma contribute greater than one percent of the standard to maintenance-only receptors in Denton County, TX and in Cook County, IL. Oklahoma is not linked to any nonattainment receptors in EPA's most recent modeling (EPA 2016v2 modeling). Therefore, based on the EPA's evaluation of the information submitted by ODEQ and based on the EPA's most recent modeling results for 2023, the EPA proposes to find that Oklahoma is linked at Steps 1 and 2 and has an obligation to assess potential emissions reductions from sources or other emissions activity at Step 3 of the 4-Step framework.

TABLE OK–3—PROJECTED NONATTAINMENT AND MAINTENANCE RECEPTORS WITH OKLAHOMA LINKAGES IN 2023 BASED ON EPA 2016V2 MODELING

| Receptor (site ID, county, state) | Nonattainment/maintenance | 2020 DV | 2023 average DV (ppb) | 2023 maximum DV (ppb) | Oklahoma contribution (ppb) |
|---|---|---|---|---|---|
| 481210034, Denton, TX | Maintenance | 72 | 70.4 | 72.2 | 1.19 |
| 170310032, Cook, IL | Maintenance | 74 | 69.8 | 72.4 | 0.75 |

3. Evaluation of Information Provided by ODEQ Regarding Step 3

At Step 3 of the 4-Step interstate transport framework, a state's emissions are further evaluated, in light of multiple factors, including air quality and cost considerations, to determine what, if any, emissions contribute significantly to nonattainment or interfere with maintenance and, thus, must be eliminated under CAA section 110(a)(2)(D)(i)(I).

To effectively evaluate which emissions in the state should be deemed "significant" and therefore prohibited, states generally should prepare an accounting of sources and other emissions activity for relevant pollutants and assess potential, additional emissions reduction opportunities and resulting downwind air quality improvements. The EPA has consistently applied this general approach (*i.e.,* Step 3 of the 4-Step

interstate transport framework) when identifying emissions contributions that the Agency has determined to be "significant" (or interfere with maintenance) in each of its prior Federal, regional ozone transport rulemakings, and this interpretation of the statute has been upheld by the Supreme Court. *See EME Homer City,* 572 U.S. at 519. While the EPA has not directed states that they must conduct a Step 3 analysis in precisely the manner the EPA has done in its prior regional transport rulemakings, state implementation plans addressing the obligations in CAA section 110(a)(2)(D)(i)(I) must prohibit "any source or other type of emissions activity within the State" from emitting air pollutants which will contribute significantly to downwind air quality problems. Thus, states must complete something similar to the EPA's analysis (or an alternative approach to defining "significance" that comports with the

statute's objectives) to determine whether and to what degree emissions from a state should be "prohibited" to eliminate emissions that will "contribute significantly to nonattainment in, or interfere with maintenance of" the NAAQS in any other state. ODEQ did not conduct such an analysis in their SIP submission.

As noted earlier, ODEQ provided some data on emissions and already implemented emissions reductions for sources in Oklahoma and stated that the 2016 CSAPR Update is the only reasonable control warranted based on Oklahoma's limited contributions to the Michigan and Texas receptors. Thus, Oklahoma relied on its EGUs being subject to the CSAPR Update (which reflected a stringency at the nominal marginal cost threshold of \$1400/ton (2011\$) for the 2008 ozone NAAQS) to argue that it had already implemented all cost-effective emissions reductions, and had no additional statutory

the Denton County and Tarrant County monitors/ receptors respectively. Preliminary 2019–2021 DVs are 74 ppb and 72 ppb at the Denton County and Tarrant County monitors/receptors respectively.

[89]EPA also analyzed trends using AQS data, See EPA Region 6 TSD.

[90]DVs and contributions at individual monitoring sites nationwide are provide in the file: "2016v2_ DVs_state_contributions.xlsx" which is included in Docket ID No. EPA–HQ–OAR–2021–0663.

[91]These modeling results are consistent with the results of a prior round of 2023 modeling using the 2016v1 emissions platform which became available to the public in the fall of 2020 in the Revised

CSAPR Update, as noted above. That modeling showed that Oklahoma had a maximum contribution greater than 0.70 ppb to at least one nonattainment or maintenance air receptor in 2023. These modeling results are included in "Ozone DVs And Contributions Revised CSAPR Update.xlsx" in Docket ID No. EPA–HQ–OAR– 2021–0663.

obligation to prohibit emissions under CAA section 110(a)(2)(D)(i)(I) with respect to the 2015 ozone NAAQS.

The EPA disagrees with ODEQ's conclusions for the following reasons: First, the CSAPR Update did not regulate non-electric generating units, and thus this analysis is incomplete. *See Wisconsin,* 938 F.3d at 318–20. Second, relying on the CSAPR Update's (or any other CAA program's) determination of cost-effectiveness without further Step 3 analysis is not approvable. Cost-effectiveness must be assessed in the context of the specific CAA program; assessing cost-effectiveness in the context of ozone transport should reflect a more comprehensive evaluation of the nature of the interstate transport problem, the total emissions reductions available at several cost thresholds, and the air quality impacts of the reductions at downwind receptors. While the EPA has not established a benchmark cost-effectiveness value for 2015 ozone NAAQS interstate transport obligations, because the 2015 ozone NAAQS is a more stringent and more protective air quality standard, it is reasonable to expect control measures or strategies to address interstate transport under this NAAQS to reflect higher marginal control costs. As such, the marginal cost threshold of $1,400/ton for the CSAPR Update (which addresses the 2008 ozone NAAQS and is in 2011$) is not an appropriate cost threshold and cannot be approved as a benchmark to use for interstate transport SIP submissions for the 2015 ozone NAAQS.

In addition, the most recent EPA modeling captures all existing CSAPR trading programs in the baseline, and that modeling confirms that these control programs were not sufficient to eliminate Oklahoma's linkage at Steps 1 and 2 under the 2015 ozone NAAQS. The State was therefore obligated at Step 3 to assess *additional* control measures using a multifactor analysis.

Finally, relying on a FIP at Step 3 is per se not approvable if the state has not adopted that program into its SIP and instead continues to rely on the FIP. States may not rely on FIP measures to meet SIP requirements. *See* CAA section 110(a)(2)(D) ("Each such [SIP] shall . . . contain adequate provisions . . . ."). *See also* CAA section 110(a)(2)(A); *Committee for a Better Arvin* v. *U.S. E.P.A.,* 786 F.3d 1169, 1175–76 (9th Cir. 2015) (holding that measures relied on by state to meet CAA requirements must be included in the SIP).

In addition, ODEQ's submission included a weight of evidence evaluation of its contribution to the Allegan County, MI receptor to conclude that it does not contribute significantly to nonattainment or maintenance at the receptor.

The EPA disagrees with respect to ODEQ's assertion regarding the relatively small contribution of emissions from Oklahoma to the Allegan County, MI receptor compared to emissions from other upwind states such as Illinois. Whether emissions from other states or countries also contribute to the same downwind air quality issue is irrelevant in assessing whether a downwind state has an air quality problem, or whether an upwind state is contributing significantly to that problem. States are not obligated under CAA section 110(a)(2)(D)(i)(I) to reduce emissions sufficient on their own to resolve downwind receptors' nonattainment or maintenance problems. Rather, states are obligated to eliminate their own significant contribution or interference with the ability of other states to attain or maintain the NAAQS.

Further, the court in *Wisconsin* explained that downwind jurisdictions often may need to heavily rely on emissions reductions from upwind states in order to achieve attainment of the NAAQS, 938 F.3d at 316–17; such states would face increased regulatory burdens including the risk of bumping up to a higher nonattainment classification if attainment is not reached by the relevant deadline, *Maryland,* 958 F.3d at 1204. Indeed, the D.C. Circuit in *Wisconsin* specifically rejected petitioner arguments suggesting that upwind states should be excused from interstate transport obligations on the basis that some other sources of emissions (whether international or another upwind state) could be considered the "but-for" cause of downwind air quality problem. 938 F.3dat 323–324. The court viewed petitioners' arguments as essentially an argument "that an upwind state 'contributes significantly' to downwind nonattainment only when its emissions are the sole cause of downwind nonattainment." 938 F.3d at 324. The court explained that "an upwind state can 'contribute' to downwind nonattainment even if its emissions are not the but-for cause." *Id.*at 324–325. *See also Catawba County* v. *EPA,* 571 F.3d 20, 39 (D.C. Cir. 2009) (rejecting the argument "that 'significantly contribute' unambiguously means 'strictly cause'" because there is "no reason why the statute precludes EPA from determining that [an] addition of [pollutant] into the atmosphere is significant even though a nearby county's nonattainment problem would still persist in its absence"); *Miss.*

*Comm'n on Envtl. Quality* v. *EPA,*790 F.3d 138, 163 n. 12 (D.C. Cir. 2015) (observing that the argument the "there likely would have been no violation at all . . . if it were not for the emissions resulting from [another source is "merely a rephrasing of the but-for causation rule that we rejected in *Catawba County*."). Therefore, a state is not excused from eliminating its significant contribution on the basis that other upwind states also contribute some amount of pollution to the same receptors to which the state is linked.

As explained in Section IV.A of this action, ODEQ's weight of evidence also concluded that the Allegan receptor would be attaining the NAAQS in 2023 based on an analysis that assumed a projection of a linear reduction in DVs across a 12-year period (2011 to projected 2023 values), and then applied that annual reduction (1.1917 ppb/year) to the receptor's 2016-centered base period maximum DV (75 ppb). The EPA does not necessarily agree that the assumptions made in Oklahoma's weight-of-evidence analysis are reasonable; however, because the updated modeling also shows that Allegan County, MI is no longer a receptor in 2023, we propose to find such assumptions are inconsequential to our action on Oklahoma's SIP.

We recognize that the results of the EPA (2011 and 2016 base year) modeling indicated different receptors and linkages at Steps 1 and 2 of the 4-Step interstate transport framework. These differing results regarding receptors and linkages can be affected by the varying meteorology from year to year, but we do not think the differing results mean that the modeling or the EPA methodology for identifying receptors or linkages is inherently unreliable. Rather, these separate modeling runs all indicated: (1) That there are receptors that would struggle with nonattainment or maintenance in the future; and (2) that Oklahoma was linked to some set of these receptors, even if the receptors and linkages differed from one another in their specifics (*e.g.,* Oklahoma was linked to a different set of receptors in one modeling run versus another). These results indicate that emissions from Oklahoma are substantial enough to generate linkages at Steps 1 and 2 to at least some downwind receptors, under varying assumptions and meteorological conditions, even if the precise set of linkages changed between modeling runs.

We therefore propose that ODEQ was required to analyze emissions from the sources and other emissions activity from within the State to determine

whether its contributions were significant. Because ODEQ failed to perform this analysis, we propose to disapprove its submission.

4. Evaluation of Information Provided by ODEQ Regarding Step 4

Step 4 of the 4-Step interstate transport framework calls for development of permanent and federally enforceable control strategies to achieve the emissions reductions determined to be necessary at Step 3 to eliminate significant contribution to nonattainment or interference with maintenance of the NAAQS. As mentioned previously, ODEQ's SIP submission did not contain an evaluation of additional emission control opportunities (or establish that no additional controls are required), thus, no information was provided at Step 4. As a result, EPA proposes to disapprove ODEQ's submittal on the separate, additional basis that the State has not developed permanent and enforceable emissions reductions necessary to meet the obligations of CAA section 110(a)(2)(d)(i)(I).

5. Conclusion

Based on the EPA's evaluation of ODEQ's SIP submission, the EPA is proposing to find that the portion of ODEQ's SIP submission addressing CAA section 110(a)(2)(D)(i)(I) does not meet the State's interstate transport obligations because it fails to contain the necessary provisions to eliminate emissions which will interfere with maintenance of the 2015 ozone NAAQS in any other state.

*C. Impact on Areas of Indian Country*

Following the U.S. Supreme Court decision in *McGirt* v *Oklahoma,* 140 S Ct. 2452 (2020), the Governor of the State of Oklahoma requested approval under Section 10211(a) of the Safe, Accountable, Flexible, Efficient Transportation Equity Act of 2005: A Legacy for Users, Public Law 109–59, 119 Stat. 1144, 1937 (August 10, 2005) ("SAFETEA"), to administer in certain areas of Indian country (as defined at 18 U.S.C. 1151) the State's environmental regulatory programs that were previously approved by the EPA for areas outside of Indian country. The State's request excluded certain areas of Indian country further described below. In addition, the State only sought approval to the extent that such approval is necessary for the State to administer a program in light of *Oklahoma Dept. of Environmental*

*Quality* v. *EPA,* 740 F.3d 185 (D.C. Cir. 2014).[92]

On October 1, 2020, the EPA approved Oklahoma's SAFETEA request to administer all of the State's EPA-approved environmental regulatory programs, including the Oklahoma SIP, in the requested areas of Indian country. As requested by Oklahoma, the EPA's approval under SAFETEA does not include Indian country lands, including rights-of-way running through the same, that: (1) Qualify as Indian allotments, the Indian titles to which have not been extinguished, under 18 U.S.C. 1151(c); (2) are held in trust by the United States on behalf of an individual Indian or Tribe; or (3) are owned in fee by a Tribe, if the Tribe (a) acquired that fee title to such land, or an area that included such land, in accordance with a treaty with the United States to which such Tribe was a party, and (b) never allotted the land to a member or citizen of the Tribe.

The EPA's approval under SAFETEA expressly provided that to the extent the EPA's prior approvals of Oklahoma's environmental programs excluded Indian country, any such exclusions are superseded for the geographic areas of Indian country covered by the EPA's approval of Oklahoma's SAFETEA request.[93] The approval also provided that future revisions or amendments to Oklahoma's approved environmental regulatory programs would extend to the covered areas of Indian country (without any further need for additional requests under SAFETEA).[94]

As explained earlier, the EPA is proposing to find that the portion of Oklahoma's SIP submission addressing CAA section 110(a)(2)(D)(i)(I) does not meet the State's interstate transport obligations, because it fails to contain the necessary provisions to eliminate emissions which will contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in any other state. Consistent with the D.C. Circuit's decision in *ODEQ* v. *EPA* and the EPA's October 1, 2020, SAFETEA approval, this disapproval if finalized as proposed will extend to areas of Indian country in Oklahoma where the State has SIP planning authority.

**V. Texas SIP Submission Addressing Interstate Transport of Air Pollution for the 2015 Ozone NAAQS and the EPA Evaluation of the SIP Submission**

*A. Summary of TCEQ SIP Submission Addressing Interstate Transport of Air Pollution for the 2015 Ozone NAAQS*

On August 17, 2018, the Texas Commission on Environmental Quality (TCEQ) made a SIP submission addressing interstate transport of air pollution for the 2015 ozone NAAQS. The SIP submission provided TCEQ's analysis of their impact to downwind states using a framework similar to EPA's 4-Step framework and concluded that emissions from Texas will not contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in other states.

In the submittal, TCEQ provided the steps they used to assess whether emissions from Texas contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in other States: (1) Identify monitors projected to be in nonattainment or have maintenance issues in future year 2023; (2) identify for further review projected nonattainment and/or maintenance monitors in other states that are impacted by emissions from Texas; and (3) determine if emissions from Texas contribute significantly to nonattainment or interfere with maintenance at the monitors identified in TCEQ Step 2. TCEQ stated that their Step 1 is the same as EPA's Step 1 and that their Steps 2 and 3 are equivalent to EPA's Step 2. TCEQ used a

---

[92] In *ODEQ* v. *EPA,* the D.C. Circuit held that under the CAA, a state has the authority to implement a SIP in non-reservation areas of Indian country in the state, where there has been no demonstration of tribal jurisdiction. Under the D.C. Circuit's decision, the CAA does not provide authority to states to implement SIPs in Indian reservations. *ODEQ* did not, however, substantively address any request under the separate authority in Indian country provided specifically to Oklahoma under SAFETEA. That separate authority was not invoked until the State submitted its request under SAFETEA, and was not approved until the EPA's decision, described in this section, on October 1, 2020.

[93] The EPA's prior approvals relating to Oklahoma's SIP frequently noted that the SIP was not approved to apply in areas of Indian country (consistent with the D.C. Circuit's decision in *ODEQ* v. *EPA*) located in the state. *See, e.g.,* 85 FR 20178, 20180 (April 10, 2020). Such prior expressed limitations are superseded by the EPA's approval of Oklahoma's SAFETEA request.

[94] On December 22, 2021, the EPA proposed to withdraw and reconsider the October 1, 2020 SAFETEA approval. *See https://www.epa.gov/ok/ proposed-withdrawal-and-reconsideration-and- supporting-information.* The EPA is engaging in further consultation with tribal governments and expects to have discussions with the State of Oklahoma as part of this reconsideration. The EPA also notes that the October 1, 2020 approval is the subject of a pending challenge in Federal court. *Pawnee Nation of Oklahoma* v *Regan,* No. 20–9635 (10th Cir.). The EPA may make further changes to

the approval of Oklahoma's program to reflect the outcome of the proposed withdrawal and reconsideration of the October 1, 2020 SAFETEA approval. To the extent any change occurs in the scope of Oklahoma's SIP authority in Indian country before the finalization of this proposed rule, such a change may affect the scope of the EPA's final action on the proposed rule.

contribution threshold of one percent of the NAAQS (0.7 ppb) in their Step 2 analysis to identify nonattainmentand/ or maintenance monitors in other states that are impacted by emissions from Texas. TCEQ further stated that EPA's Steps 3 and 4 are relevant only if emissions from Texas contribute significantly to nonattainment or interfere with maintenance at downwind monitors in another state. Because Texas TCEQ concluded that it has no such emissions, EPA's Steps 3 and 4 are not addressed in the SIP submission.

To identify monitors projected to be in nonattainment or have maintenance issues in 2023, (EPA Step 1 and TCEQ Step 1), TCEQ conducted its own regional photochemical modeling using a 2012 base year. TCEQ's modeling and EPA's modeling differ in significant respects, which are discussed in detail in the EPA Region 6 2015 8-Hour Ozone Transport SIP Proposal Technical Support Document (EPA Region 6 TSD).[95] In particular, TCEQ used a 2012 base year, stating that (1) the year 2012 had above average temperatures across most of the U.S., except in some states in the southeast and (2) the year 2011, (which was used by the EPA in the NODA published on January 6, 2017

and the October 2017 updated modeling data for 2023),[96] was a meteorologically anomalous year for Texas and surrounding states as it was the hottest year on record and the single-worst drought year recorded in Texas since 1895. TCEQ's modeling also used some different emissions estimates for the base year and future year 2023 emissions, including different future year emissions for EGUs. There were also some differences in methods used in the model results analysis and the model performance evaluation. TCEQ also used a different methodology than the EPA to identify monitors projected to be maintenance receptors in 2023. TCEQ used only the most recent DV containing the base year 2012, (*i.e.,* the monitored DV for 2012–2014), to project a 2023 "maintenance DV" for assessing whether a monitor would have maintenance issues. The EPA's methodology uses the maximum of the three consecutive regulatory DVs containing the base year, which is the highest monitored DV from among the three DVs that contain the 2011 base year (*i.e.,* the 2009–2011 DV, 2010–2012 DV or and 2011–2013 DV that all contain modeled base year of 2011), to project a 2023 maximum DV for

assessing whether a monitor would have maintenance issues. Texas explained that it chose to define maintenance receptors in this way to capture more recent emission reductions. The SIP submittal also included a discussion of why TCEQ believes their approach for identifying maintenance receptors is appropriate. The TCEQ modeling and differences with the EPA modeling is discussed in detail in the EPA Region 6 TSD for this action.

Based on their modeling, TCEQ provided: (1) A table of downwind receptors projected to be in nonattainment of the 2015 ozone NAAQS in 2023 and have a contribution from Texas emissions at a threshold of 0.7 ppb or greater and (2) a table of downwind maintenance receptors projected to have problems attaining and maintaining the 2015 ozone NAAQS in 2023 and have a contribution from Texas emissions at a threshold of 0.7 ppb or greater. TCEQ identified these receptors for further analysis. The nonattainment and maintenance receptors provided by TCEQ are listed in Table TX–1. TCEQ noted that except for Arapahoe County, CO (Monitor ID. 80050002) all the maintenance receptors are also nonattainment receptors.

TABLE TX–1—PROJECTED 2023 NONATTAINMENT AND MAINTENANCE RECEPTORS IDENTIFIED BY TCEQ MODELING USING 2012 BASE YEAR

| Receptor (site ID, county, state) | 2023 average DV (ppb) | 2023 maintenance DV (ppb) (TCEQ method) | Texas contribution (ppb) |
|---|---|---|---|
| 80350004, Douglas, CO | 73 | 72 | 1.42 |
| 80590006, Jefferson, CO | 72 | 73 | 1.26 |
| 80590011, Jefferson, CO | 71 | 71 | 1.26 |
| 80690011, Larimer, CO | 72 | 71 | 1.22 |
| 80050002, Arapahoe, CO | *70 | 71 | 1.15 |
| 40038001, Cochise, AZ | 71 | **69 | 1.06 |
| 60371201, Los Angeles, CA | 80 | 78 | 0.76 |
| 60371701, Los Angeles, CA | 80 | 82 | 0.72 |
| 60376012, Los Angeles, CA | 87 | 86 | 0.9 |
| 60658001, Riverside, CA | 88 | 85 | 0.73 |
| 60658005, Riverside, CA | 84 | 83 | 0.71 |
| 60710001, San Bernardino, CA | 71 | 72 | 0.84 |
| 60710306, San Bernardino, CA | 76 | 77 | 0.81 |
| 60711004, San Bernardino, CA | 91 | 90 | 0.88 |
| 60714001, San Bernardino, CA | 82 | 79 | 0.86 |
| 60714003, San Bernardino, CA | 94 | 91 | 0.74 |

*TCEQ did not include this value in their SIP narrative (this cell was blank). The EPA obtained this value from data that was in TCEQ's spreadsheet of future 2023 DVs with state contributions.

** TCEQ did not provide this calculation. The EPA used TCEQ's modeling information to calculate this value using the Relative Response Factor in TCEQ spreadsheet of future 2023 DVs with state contributions and the monitor's 2012–2014 DV (0.983 X 71 ppb, truncation applied).

TCEQ also noted that in the EPA's 2017 Transport NODA, the EPA's modeling linked Texas to six receptors

based on the receptors being identified as nonattainment or maintenance receptors and based on a 0.7 ppb

contribution threshold. TCEQ provided a table of those monitors along with the EPA and TCEQ modeling results for

[95] "EPA Region 6 2015 8-Hour Ozone Transport SIP Proposal Technical Support Document" (EPA Region 6 2015 Ozone Transport SIP TSD.pdf)

included in Docket ID No. EPA–R06–OAR–2021–0801.

[96] The NODA and the October 2017 modeling are discussed in Section I.C of this action.

those receptors (Table TX–2).[97] TCEQ stated that the differences are due to changes the TCEQ made to modeling inputs (primarily the different base year of 2012 versus the EPA's 2011),

analysis, and methodologies (primarily TCEQ's alternate maintenance receptor methodology), see the EPA Region 6 TSD included in the Regional docket for this action (Docket ID No. EPA–R06–

OAR–2021–0801) for more details. With exception of the Jefferson County, CO receptor (Monitor ID. 80590011) TCEQ did not further review its linkages to any of the receptors in Table TX–2.

TABLE TX–2—TCEQ INFORMATION ON RECEPTORS LINKED TO TEXAS BY EPA MODELING IN THE TRANSPORT NODA PUBLISHED ON JANUARY 6, 2017

| Receptor (site ID, county, state) | EPA 2023 average DV (ppb) | EPA Texas contribution (ppb) | TCEQ 2023 average DV (ppb) | TCEQ Texas contribution (ppb) |
|---|---|---|---|---|
| 260050003, Allegan, MI | 68.8 | 2.49 | 71 | 0.59 |
| 551170006, Sheboygan, WI | 71.0 | 1.92 | 70 | 0.73 |
| 240251001, Harford, MD | 71.3 | 0.91 | 65 | 0.69 |
| 360850067, Richmond, NY | 71.2 | 0.77 | 62 | 0.67 |
| 361030002, Suffolk, NY | 71.3 | 0.71 | 67 | 0.63 |
| 80590011, Jefferson, CO | 69.7 | 1.03 | 71 | 1.26 |

TCEQ then used a weight of evidence approach to assess whether emissions from Texas contribute significantly to nonattainment or interfere with maintenance at the receptors listed in Table TX–1. TCEQ stated that the Texas contribution to a receptor should be deemed "significant" only if there is a persistent and consistent pattern of contribution on several days with elevated ozone. Consideration was given to factors such as DV trends, number of elevated ozone days, back trajectory analysis on elevated ozone days, modeled concentrations on future expected elevated ozone days, total interstate contributions at tagged monitors, and responsiveness of ozone to emissions from Texas. Based on their assessment, TCEQ concluded that emissions from Texas do not contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS at any downwind monitors. Our evaluation of the TCEQ submission is further discussed in Section V.B and in the EPA Region 6 TSD for this action.

*B. EPA Evaluation of the TCEQ SIP Submission*

Based on the EPA's evaluation of the SIP submission, the EPA is proposing to find that TCEQ's August 17, 2018, SIP submission does not meet the State's obligations with respect to prohibiting emissions that contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in any other state.

1. Evaluation of Information Provided by TCEQ Regarding Step 1

As explained in Section I of this action, at Step 1 of the 4-Step interstate transport framework, the EPA identifies

monitoring sites that are projected to have problems attaining and/or maintaining the NAAQS (*i.e.,* nonattainment and maintenance receptors). In executing this step, TCEQ elected to rely on their own modeling and methodology for identifying receptors. The EPA is evaluating the TCEQ's modeling and methodology here at Step 1.

i. Evaluation of TCEQ's Methodology for Identifying Maintenance Receptors

As discussed in Section V.A of this action, in addition to the use of an alternative modeling platform, TCEQ also created its own method for identifying maintenance receptors. TCEQ has not adequately explained or justified how its method for identifying maintenance receptors reasonably identifies areas that will have difficulty maintaining the NAAQS. The EPA proposes to find that TCEQ has not provided a sufficient technical basis for how its chosen methodology gives meaning to the CAA's instruction that states submit good neighbor SIPs that prohibit their states' emissions from interfering with the maintenance of the NAAQS in another state.

In *North Carolina* v. *EPA,* 531 F.3d 896, 909–11 (D.C. Cir. 2008), the D.C. Circuit rejected the EPA's CAIR on the basis that the EPA had not adequately given meaning to the phrase "interfere with maintenance" in the good neighbor provision. Specifically, North Carolina argued that it had counties that were projected to attain the NAAQS in the future analytic year but were at risk of falling back into nonattainment due to interference from upwind sources, particularly given year-to-year variability in ozone levels. The court agreed, holding that the EPA's rule did

not adequately protect "[a]reas that find themselves barely meeting attainment." *Id.* at 910. Consequently, the EPA has developed a methodology, as described elsewhere in this action and used in its 2011 CSAPR and its 2016 CSAPR Update and Revised CSAPR Update, for identifying areas that may struggle to maintain the NAAQS. *See* 76 FR at 48227–28. The EPA's approach to addressing maintenance receptors was upheld in the *EME Homer City* litigation. *See* 795 F.3d 118, 136–37. It was also upheld in *Wisconsin.* 938 F.3d at 325–26. In *Wisconsin,* the court noted that four upwind states were linked only to maintenance receptors and rejected the argument that application of the same control level as the EPA imposes for those states linked to nonattainment receptors was unreasonable or unlawful absent a particularized showing of overcontrol. *Id.* at 327.

To explain the differences between TCEQ's and the EPA's methodology for identifying maintenance receptors, it is helpful to provide some additional context of how the EPA projects future air quality. The EPA's air quality modeling guidance has long recommended developing a base design value (DV) [98] (*i.e.,* the design value that will be used as a starting point to model and analyze for purposes of projecting future air quality concentrations) that is the average of three DVs spanning a five-year period, centered around one year for which an emissions inventory will be submitted (*e.g.,* if 2011 was the base emissions inventory year, a state would use monitored values from 2009–2011, 2010–2012, 2011–2013 as the starting point for projecting air quality concentrations in future years).[99] The

---

[97] TCEQ SIP Submission, at page 3–49 (Table 3–12).

[98] *See* FN 8.

[99] *See* FN 73.

average of these three DVs is then multiplied by a relative response factor (RRF)[100] to generate an average DV for the future year. If a receptor's average future year DV is greater than or equal to the level of the NAAQS, and the receptor has recent monitored data that violates the NAAQS, that receptor is considered a ''nonattainment'' receptor at Step 1. To identify maintenance receptors, the EPA's methodology looks to the highest DV of the three DVs used to calculate the 5-year weighted average design value (*e.g.,* in the 2011 example, if 2009–2011 had the highest design value of 2009–2011, 2010–2012, and 2011–2013). The EPA then applies the same relative response factor to that highest design value to generate a projected future maximum design value. Where a receptor's maximum design value exceeds the level of the NAAQS, the EPA has deemed those receptors to be ''maintenance'' receptors. This methodology was designed to address the D.C. Circuit's holding that the CAA's ''interference with maintenance'' prong requires states and the EPA to protect areas that may struggle with maintaining the standard in the face of inter-annual variability in ozone-conducive conditions.

In its modeling, TCEQ adopted an identical approach to the EPA's for identifying nonattainment receptors—it looked at three sets of DVs over a five-year period and averaged those DVs to generate a base year DV. TCEQ then applied a relative response factor to that base year design value to project a receptor's average design value in the future year. For its maintenance receptors, however, TCEQ used only the most recent design value of the set of three DVs, regardless of whether the most recent design value was highest or lowest, instead of considering variability in conditions over a five-year period, or using the highest DV of the three DVs making up the base year design value. TCEQ's proffered explanation for using the most recent DV to identify maintenance receptors was that the latest DV ''takes into consideration . . . any emissions reductions that might have occurred.''[101] However, TCEQ in its submission does not explain how this methodology takes into account meteorological variability in identifying those areas that may be meeting the NAAQS or that may be projected to meet the NAAQS but may nevertheless struggle to maintain the NAAQS.

TCEQ argued that the 3-year DV used includes some meteorological variability. Unfortunately, the three years of variation that TCEQ accounted for is already built into the structure of the standard. Thus, the TCEQ method gave no consideration to the variability between calculated DVs which provides a direct indication of the difficulty a receptor will have in maintaining the standard. In other words, to determine whether a receptor will have difficulty maintaining the standard, one must consider the variation in the metric that will be used to determine compliance with the standard. An indication of the variability of a metric cannot be determined by only considering a single estimate of that metric.

TCEQ's stated purpose in using the most recent DV was to capture more recent emissions reductions. TCEQ's methodology, however, limits receptors which could be identified as maintenance receptors, compared to the EPA's methodology largely because it only looks at one design value period rather than selecting the maximum of the three DV periods EPA's methodology considers. Thus, TCEQ's methodology greatly reduces the probability that meteorological conditions which make it difficult to maintain the standard will be considered. As discussed further below, the effects of emissions trends are already captured through other aspects of the methodology to identify receptors. So, in trying to give more weight to emission reductions, by selecting only one design value (2012–2014) for its base year, TCEQ's methodology did not give any consideration to interannual variability in ozone-conducive meteorology as does the EPA's method.

The EPA's methodology, using the maximum DV which accounts for the variability in ozone concentrations and DVs due to changes in meteorology over the five years of the base year DV period, was designed to identify those areas that might struggle to maintain the NAAQS in particularly ozone conducive conditions. TCEQ claimed that the EPA's method undervalues changes in air quality due to emission reductions and overvalues changes due to variation in meteorology. TCEQ pointed out that emissions nationwide are generally trending downward as a result of Federal motor vehicle standards and other technological improvements. The EPA agrees that ozone levels generally trend downward, but there is not a steady decline from year to year in ozone concentrations. Rather, ozone levels tend to vary from year to year with some years showing an increase instead of a decrease mainly due to inter-annual variability in ozone-conducive meteorology.[102] The variation of DVs at individual monitors from year to year can be significant, even where emissions trend downwards. The EPA also assessed a number of monitored DV trends that were provided in TCEQ's SIP submission and previous TCEQ attainment demonstration SIPs indicating that there are at times large annual fluctuations upward from year to year in monitored DVs (sometimes 2–3 ppb increase in one year) that are due to variations in meteorology.[103] This is precisely why it is important to consider highly variable meteorology and its influence on DVs—the issue at the heart of the D.C. Circuit's finding on ''interference with maintenance'' in *North Carolina.* Areas that are required under the Act to attain by an attainment date may fail to attain because of a combination of both local emissions, upwind emissions, and ozone conducive meteorology, among other factors. The *North Carolina* decision made clear that in interpreting the good neighbor provision, upwind state and the EPA obligations to reduce emissions must account for variable conditions that could cause an area that is sometimes attaining the NAAQS to fall out of attainment. *See also Wisconsin,* 938 F.3d at 327 (''Variations in atmospheric conditions and weather patterns can bring maintenance receptors into nonattainment even *without* elevated emissions.'').

In addition, TCEQ claimed that its use of the 2012–2014 DV (*i.e.,* the most recent in the 5-year base period it examined) is more reliable than the EPA's method, because that more recent DV accounts for both emission reductions and because there is a shorter interval between the monitored DV and the projected DV. As we note elsewhere, the TCEQ's base year modeled inventory is 2012 emissions and the TCEQ's model projections for 2023 include the expected emission reductions from 2012 thru 2014 and to 2023. By just using the 2012–2014 DV data, TCEQ claimed they are giving weight to emission reductions during the final base years where EPA's method does not. The effect of emission reductions, however, is already factored in the method since the modeling projection to 2023 is explicitly designed to project the changes in ozone due to emission reductions from the 2012 base year emission levels. So, in fact, the EPA method does give weight to emission reductions. Furthermore, since

---

[100] *See* FN 53.
[101] TCEQ SIP submission at 3–39 to 3–40.

[102] *See* EPA Region 6 TSD, included in Docket ID No. EPA–R06–OAR–2021–0801.
[103] *Id.*

TCEQ agrees that the average of the DVs based on 2010–2014 ozone levels are reliable enough to use in the identification of nonattainment receptors, it is unclear how the 2012–2014 period is deemed more reliable for the maintenance test since the modeled emissions are still for 2012. We also note, as discussed throughout this action, the EPA has updated its modeling to use a 2016 base year—that is, a five year period spanning 2014–2018, and applied its methodology for defining maintenance receptors using that five year base period. Using a more recent base period (EPA's 2016v2) provides the most recent design values, shorter period of projection (2016 to 2023 versus a 2011 or 2012 base year) and a more accurate basis for projections of future air quality. We note that the EPA undertook a large collaborative multi-year effort with states (including TCEQ) and other stakeholders input and review in developing the 2016v2 emission inventories. By virtue of this update, any monitored DV used by the EPA to identify maintenance receptors in this action accounts for more recent emission reductions and provides a shorter interval between base year monitored DV and the projected future analytic year.

As discussed further in the EPA Region 6 TSD [104] for this action, the EPA has reviewed the set of 21 receptors for which Texas had contributions of 0.7 ppb or more in the EPA's 2016 base year modeling analyses, or TCEQ's modeling (2012 base year), and evaluated the results of using TCEQ's alternate maintenance methodology. For these 21 receptors, TCEQ's method resulted in 15 of the 21 2023 maintenance DVs predicted to be lower than the 2023 nonattainment DVs from the nonattainment methodology that uses the 5-year cumulative weighted average. Of these 15 receptors, three receptors have 2023 maintenance DVs that are 3 ppb lower, five receptors have 2023 maintenance DVs that are 2 ppb lower, and seven receptors have 2023 maintenance DVs that are 1 ppb lower. In comparison, using the EPA's maintenance methodology results in all 21 2023 maintenance DVs being equal or up to 4 ppb higher than the 2023 nonattainment DVs. Again, the EPA uses the average of the three DVs that contain the base year modeled for the nonattainment methodology and the

maximum of these three DVs for the maintenance methodology. Because TCEQ's maintenance methodology of just using the most recent DV (2012–2014 DV) often results in maintenance DVs lower than the 2023 nonattainment DVs methodology results, the EPA finds that the TCEQ methodology is not adequately identifying conditions when a receptor would have more difficulty maintaining the standard. In fact, the TCEQ's method also identified one receptor in their SIP submission as a nonattainment receptor in 2023 that would not have been identified as a maintenance receptor, which further highlights the concern that TCEQ's method did not adequately identify areas that may struggle to maintain the standard. TCEQ did not address whether the three years that comprise the most recent design value (*i.e.,* 2012, 2013, and 2014) had meteorological conditions highly conducive for formation of high ozone concentrations and thus would be an appropriate time period to assess whether area could have difficulty maintaining the standard and the EPA's analysis confirms that this time period is not highly conducive to ozone formation, at least for many receptors. The consequence of TCEQ's maintenance method is that it often results in lower DVs than the nonattainment test as demonstrated by our analysis, which indicates that it is often not considering conditions when an area would have difficulty maintaining the standard. It is also unreasonable to have a test that would not identify nonattainment receptors also as maintenance receptors.

TCEQ also made several additional assertions in support of their conclusion that their method for identifying maintenance receptors was the better reading of the CAA, compared to the EPA's. TCEQ claimed that its approach was more consistent with the CAA's concept of maintenance as areas that were formerly nonattainment and that have since attained and will continue to maintain by accounting for: (1) Emissions reductions occurring in the later design values of the base DV period; (2) "commitments regarding contingency measures to address future emission reductions;" and (3) the impact of any maintenance plans that are in place. TCEQ also asserted that the EPA's approach conflates the likelihood of attaining the standard in a future year and the ability of an attainment monitor to maintain that attainment status. Specifically, TCEQ argued that because any remedies devised to address nonattainment monitors would have to apply to maintenance monitors, a

practical consequence of the EPA's approach is that it could lead to over-control and that it might require upwind states to consider or implement controls when the downwind state in which the monitor is located does not have any obligations to control local emissions. TCEQ argued that this "conflation" of nonattainment and maintenance results in there being no independent meaning to "maintenance."

With respect to the first of these assertions from TCEQ, we note that TCEQ's methodology for identifying receptors (like the EPA's) is entirely distinct from ozone designations under the Clean Air Act; neither TCEQ nor the EPA take current or presumed future designations of areas into account, and any implementation requirements like a maintenance plan under CAA section 175A, in identifying receptors. TCEQ's' discussion, therefore, of maintenance plan contingency measures or maintenance plans generally is irrelevant and misplaced. None of the areas to which Texas is linked in the EPA 2016v2 modeling has been redesignated to attainment for the 2015 ozone NAAQS, and none of the areas to which Texas is linked in its own modeling has been redesignated to attainment for that NAAQS. We also fail to see how TCEQ's approach to identifying maintenance receptors differs in any relevant respect from the EPA's approach with regard to the alleged "conflation" of projecting attainment in a future year rather than the ability of an attainment receptor to maintain attainment. Both TCEQ and the EPA identify maintenance receptors based on projections of air quality in a future year to determine whether the receptor will have difficulty attaining or maintaining the standard. TCEQ's arguments about overcontrol based on the application of a uniform remedy to states linked to both nonattainment and maintenance receptors were also not germane; in this case, TCEQ had identified *no* remedy to apply whatsoever because it had failed to identify that the emissions from Texas cause a problem in the first instance. The D.C. Circuit has already rejected the idea that the application of a uniform control to both nonattainment and maintenance receptors is on its face overcontrol or impermissible under the interstate transport provision. *See Wisconsin,* 938 F.3d at 327. Based on our evaluation of TCEQ's approach to identify maintenance receptors for 2023, we propose to find the State's approach is inadequate as it does not sufficiently identify maintenance receptors. Further, TCEQ had not explained how its

[104] "EPA Region 6 2015 8-Hour Ozone Transport SIP Proposal Technical Support Document" (EPA Region 6 2015 Ozone Transport SIP TSD.pdf) included in Docket ID No. EPA–R06–OAR–2021–0801.

approach meets the statutory requirement to address areas that, even if meeting the NAAQS, may struggle to maintain the standard in years where conditions are conducive to ozone formation. Rather, the TCEQ had created its own approach to identify these areas that they describe as designed to account for the most emission reductions possible—*i.e.,* the most recent DV of the three under analysis; an approach that likely under-identifies areas that will struggle to maintain the NAAQS and that certainly is not designed to capture potential air quality problems.

ii. Evaluation of the TCEQ Modeling

As discussed in Section V.A of this action, TCEQ conducted regional photochemical modeling to identify nonattainment and maintenance receptors in 2023 using a 2012 base year. As discussed further in the EPA Region 6 TSD, we have several concerns with the reliability of TCEQ's modeling results. States are free to develop their own modeling, but that modeling must be technically supportable, and the EPA is obligated to assess and evaluate the reliability of that technical demonstration when determining whether the Act's requirements are met.

The TCEQ's modeling underestimates future ozone levels. When the TCEQ 2023 projected concentrations are compared to 2020 and preliminary 2021 monitor values, it is clear that the TCEQ modeling is projecting an unusual decline in ozone levels without there being an unusual level of emission reductions to support the decline. The EPA compared recent monitoring values and reasonably anticipated decreases in DVs by 2023 both within Texas and in other parts of the country. These underestimations likely result in TCEQ's modeling not adequately identifying nonattainment and/or maintenance receptors in 2023. These underestimations also result in smaller projected contributions from Texas

emissions to downwind states. See EPA Region 6 TSD for full analysis details.

One analysis included in the EPA Region 6 TSD examined the average amount of improvement that would have to occur for the 9 monitors with the highest measured design values in the Dallas-Ft. Worth and Houston-Galveston-Brazoria nonattainment areas (those with an observed 2018–2020 DV of 74 ppb or greater) to reach the level of ozone projected by the TCEQ modeling. The average decrease needed by 2023 to meet TCEQ's 2023 projected DVs is 7.56 ppb. Improvements of this magnitude do not occur in three years unless there is an unusually large change in emissions or a large change in meteorological conduciveness for ozone generation. TCEQ did not identify any large emission reductions not already accounted for in the modeling to be implemented in the 2021–2023 timeframe nor is the EPA aware of such a change. This information supports our finding that that TCEQ's modeling is underestimating future ozone levels in the two nonattainment areas in Texas that make up a large proportion of the total ozone and a large portion of emissions of ozone pre-cursors that transport to downwind areas. This underestimation of future year ozone levels from Texas emissions can cause both an underestimation of ozone in downwind areas and also an underestimation of Texas's impact on downwind State's ozone nonattainment and maintenance receptors.

TCEQ's modeling also underestimates 2023 ozone levels outside of the State of Texas including areas of interest in California, Colorado and the Midwest Region (Illinois, Wisconsin, and Michigan). The EPA discusses this underprediction for all of these areas in the EPA Region 6 TSD. In Table TX–3, we present only the results for the Midwest Region along with the EPA's modeling prediction. We note that TCEQ's 2023 modeled DVs are significantly lower than the EPA's 2023 modeled DVs. The table also provides

recent monitored 2020 DVs and preliminary 2021 DVs, which shows that recent monitored ozone concentrations are significantly higher than TCEQ's modeling projected for 2023. TCEQ's ozone DVs for these receptors would need to drop on the order of 7–15 ppb in two to three years for TCEQ's projections to bear out. As noted previously, this would require an unusual amount of emission reductions without any control measures identified of sufficient magnitude. We note that the EPA's projected 2023 ozone DVs based on EPA 2016v2 modeling show ozone DVs that are also lower than recent monitoring data. However, EPA 2016v2 modeling projections are much closer to anticipated 2023 ozone levels as compared to TCEQ's modeling. This indicates that the EPA's modeling is more accurate in identifying nonattainment and/or maintenance receptors in the Midwest Region. While the TCEQ modeling projects much lower overall ozone levels for the Midwest Region in 2023, the modeling does tend to corroborate the projected amount emissions that Texas may be contributing to projected ozone levels at 5 of the 7 nonattainment and maintenance receptors identified in the EPA's modeling.[105] Thus, despite the differences in identification of nonattainment and maintenance receptors, both sets of modeling indicate that Texas's contribution to receptors in the Midwest Region are greater than 0.7 ppb (*i.e.,* 1 percent of the 2015 ozone NAAQS). Table TX–3 provides information on those receptors, including the amount of contribution attributed to emissions from Texas based on EPA's 2016v2 modeling and TCEQ's modeling. Despite the differences in identification of nonattainment and maintenance receptors, both sets of modeling indicate that Texas's contribution to receptors in the Midwest are greater than 0.7 ppb (*i.e.,* 1 percent of the 2015 ozone NAAQS).

TABLE TX–3—EPA AND TCEQ MODELING RESULTS FOR DOWNWIND RECEPTORS IDENTIFIED BY EPA 2016v2 MODELING

| Receptor (site ID, county, state) | 2023 nonattainment/ maintenance (EPA 2016v2) | EPA: 2023 average DV/ maximum DV (ppb) | TCEQ: 2023 average DV/ maintenance DV (ppb)* | Monitored 2018–2020 DV/preliminary 2019–2021 DV** (ppb) | EPA: Texas contribution (ppb) | TCEQ: Texas contribution (ppb) |
|---|---|---|---|---|---|---|
| 170310001, Cook, IL | Maintenance | 69.6/73.4 | 60/58 | 75/71 | 0.86 | 1.6. |
| 170310032, Cook, IL | Maintenance | 69.8/72.4 | 68/66 | 74/75 | 1.46 | 1.31. |
| 170314201, Cook, IL | Maintenance | 69.9/73.4 | 64/62 | 77/74 | 1.15 | 1.25. |
| 170317002, Cook, IL | Maintenance | 70.1/73.0 | 66/65 | 75/73 | 1.58 | 1.22. |

[105] We note that for two of the Wisconsin receptors, TCEQ's modeling does not provide information to generate 2023 DVs, so only 5 of the 7 monitors can be compared.

Table TX–3—EPA and TCEQ Modeling Results for Downwind Receptors Identified by EPA 2016v2 Modeling—Continued

| Receptor (site ID, county, state) | 2023 nonattainment/ maintenance (EPA 2016v2) | EPA: 2023 average DV/ maximum DV (ppb) | TCEQ: 2023 average DV/ maintenance DV (ppb)* | Monitored 2018–2020 DV/preliminary 2019–2021 DV** (ppb) | EPA: Texas contribution (ppb) | TCEQ: Texas contribution (ppb) |
|---|---|---|---|---|---|---|
| 550590019, Kenosha, WI .... | Nonattainment ...................... | 72.8/73.7 | 67/66 ............ | 74/74 | 1.72 | 1.44. |
| 550590025, Kenosha, WI .... | Maintenance ........................ | 69.2/72.3 | No data*** .... | 74/72 | 1.81 | No data.*** |
| 551010020, Racine, WI ....... | Nonattainment ...................... | 71.3/73.2 | No data*** .... | 73/73 | 1.34 | No data.*** |

*TCEQ did not provide sufficient data and analysis of the meteorology for the 2010–2014 period to support their claim that 2012–2014 period was a worst-case combination of meteorology compared to the 2010–2012 and 2011–2013 periods. If the future DV projected from this highest value is below the standard, one can be reasonably certain the receptor will not have difficulty maintaining the standard and, as such, upwind states will not interfere with maintenance in downwind states. Because the TCEQ method only looks at one DV and does not account for the variability in DVs due to meteorological conditions, it is less likely to identify maintenance receptors than the EPA method. *See https://www.epa.gov/air-trends/air-quality-design-values*

** Preliminary 2019–2021 DVs. Monitoring data from the EPA's Air Quality System (AQS) (*https://www.epa.gov/aqs*). 2021 monitoring data is preliminary and still has to undergo Quality Assurance/Quality Control analysis and be certified by the State of Texas, submitted to the EPA, and reviewed and concurred on by EPA. 2018–2020 DVs are 72 ppb and 73 ppb at the Denton County and Tarrant County monitors/receptors respectively. Preliminary 2019–2021 DVs are 74 ppb and 72 ppb at the Denton County and Tarrant County monitors/receptors respectively.

*** Kenosha, WI Monitor ID. 550590025 was installed and began operating May 13, 2013, so the first three year DV available is 2013–2015. Racine, WI Monitor ID. 551010020 was installed on April 14, 2014 so the first three year DV available is 2015–2017. TCEQ's modeling used monitored DV data for 2010–2012, 2011–2013, and 2012–2014 to project to the future year. Since these monitors do not have valid DVs for these periods, TCEQ's modeling can't be used to project 2023 values and identify if they would be nonattainment or maintenance receptors.

The EPA investigated TCEQs modeling and the underestimation for the future year. See the EPA Region 6 TSD for further information on our review. Our review indicated some underestimation in the base case and general model performance concerns but nothing that was a clear cause of the much lower 2023 DVs that TCEQ's modeling is projecting. For the EPA's 2016 base year modeling, the EPA undertook a large collaborative multi-year effort with states (including Texas) and other stakeholder input in developing the 2016 emission inventories including 2016v2, so that the EPA's modeling would be based on the best data available. Using a 2016 base year also provides a more recent platform that shortens the number of years to project emission changes, reducing uncertainties in the 2023 projection compared to TCEQ's projection from a 2012 base to 2023 or the EPA's earlier 2011 base year modeling. Use of a more recent 2016 base year also allows for the use of monitored DVs from a more recent period. The combination of these and other issues discussed in the EPA Region 6 TSD result in less model uncertainty compared to TCEQ's 2012 base year modeling and have provided a better estimate of 2023 ozone levels and therefore, we believe a more reliable tool for predicting which areas of the country will be nonattainment or have difficulty maintaining the standard as well as assessing contributions from upwind states.

The EPA's modeling using both 2011 and 2016 base year periods identified that Texas was linked to nonattainment and/or maintenance receptors in 2023 in the Midwest Region (Illinois, Wisconsin, and Michigan), while TCEQ's modeling using a 2012 base year indicated only linkages to western receptors. As discussed above and in the EPA Region 6 TSD, the TCEQ's modeling is underestimating projected ozone levels in the Midwest Region for 2023. If TCEQ's 2023 modeled DVs were closer to recent observed monitoring data and anticipated 2023 monitored DVs, TCEQ would likely have also identified nonattainment and/or maintenance receptors in the Midwest Region.

To summarize, TCEQ did its own modeling at Step 1. Our analysis shows that TCEQ's modeling likely underestimates ozone levels at potential receptors and that TCEQ's methodology for identifying maintenance receptors used to identify maintenance receptors fails to reasonably identify areas that will have difficulty maintaining the NAAQS.

2. Evaluation of Information Provided by TCEQ Regarding Step 2

TCEQ, like the EPA, used a 1 percent of the ozone NAAQS (or 0.7 ppb) as the "linkage" threshold to identify states as "linked" for contributions it made to areas with projected air quality problems. Although TCEQ asserted that the EPA treats the 1 percent threshold as the threshold by which the EPA determines "significant contribution" this is in fact incorrect. The EPA, like TCEQ, uses the 1 percent contribution threshold to identify those linkages between a contributing upwind state and a receptor projected to have air quality problems that warrant further review and additional analysis. We therefore endorse TCEQ' use of the 1 percent contribution threshold to identify linkages requiring further analysis. However, because we propose to disapprove TCEQ's identification of nonattainment and/or maintenance receptors (at Step 1) due to underestimations in TCEQ's modeling and their unsupported methodology of identifying maintenance receptors, their submission as to Step 2 is also flawed. We note, however, that even in its own modeling, TCEQ has identified nonattainment and/or maintenance receptors to which it contributed more than 1 percent of the NAAQS (*i.e.,* identified linkages warranting additional analysis at Step 3).

3. Results of the EPA's Step 1 and Step 2 Modeling and Findings for Texas

As described in Section I and elsewhere in this action, the EPA performed air quality modeling using the 2016v2 emissions platform to project design values and contributions for 2023. This data was examined to determine if Texas contributes at or above the threshold of 1 percent of the 2015 ozone NAAQS (0.70 ppb) to any downwind nonattainment or maintenance receptor. As shown in Table TX–4, the data [106] indicate that in 2023, emissions from Texas are projected to contribute greater than 1 percent of the standard to both

---

[106] Design values and contributions at individual monitoring sites nationwide are provided in the file: "2016v2_DVs_state_contributions.xlsx", which is included in docket ID No. EPA–HQ–OAR–2021–0663.

nonattainment and maintenance-only receptors in the Chicago, IL–IN–WI nonattainment area (4 Cook County, IL receptors and 2 Kenosha County, WI receptors) and the Milwaukee, WI nonattainment area (one Racine County receptor).[107]

TABLE TX–4—PROJECTED NONATTAINMENT AND MAINTENANCE RECEPTORS WITH TEXAS LINKAGES BASED ON EPA 2016v2

| Receptor (site ID, county, state) | Nonattainment/maintenance | 2023 average DV (ppb) | 2023 maximum DV (ppb) | Texas contribution (ppb) |
|---|---|---|---|---|
| 170310001, Cook, IL | Maintenance | 69.6 | 73.4 | 0.86 |
| 170310032, Cook, IL | Maintenance | 69.8 | 72.4 | 1.46 |
| 170314201, Cook, IL | Maintenance | 69.9 | 73.4 | 1.15 |
| 170317002, Cook, IL | Maintenance | 70.1 | 73.0 | 1.58 |
| 550590019, Kenosha, WI | Nonattainment | 72.8 | 73.7 | 1.72 |
| 550590025, Kenosha, WI | Maintenance | 69.2 | 72.3 | 1.81 |
| 551010020, Racine, WI | Nonattainment | 71.3 | 73.2 | 1.34 |

We recognize that the results of the EPA (2011 and 2016 base year) and TCEQ (2012 base year) modeling indicated different receptors and linkages at Steps 1 and 2 of the 4-Step interstate transport framework. These differing results regarding receptors and linkages can be affected by the varying meteorology from year to year, but we do not think the differing results mean that the modeling or the EPA or the State's methodology for identifying receptors or linkages is inherently unreliable. Rather, the three separate modeling runs all indicated: (1) There were receptors that would struggle with nonattainment or maintenance in the future; and (2) Texas was linked to some set of these receptors, even if the receptors and linkages differed from one another in their specifics (*e.g.*, a different set of receptors were identified to have nonattainment or maintenance problems, or Texas was linked to different receptors in one modeling run versus another). These results indicate that emissions from Texas were substantial enough to generate linkages at Steps 1 and 2 to some downwind receptors, under varying assumptions and meteorological conditions, even if the precise set of linkages changed between modeling runs. Under these circumstances, we think it is appropriate to proceed to a Step 3 analysis to determine what portion of emissions from Texas should be deemed "significant." In doing so, we are not agreeing with the methods and assumptions contained in TCEQ's modeling (see previous discussion and the EPA Region 6 TSD included in the docket for this proposal for further discussion on evaluation of that modeling), or that we consider our own

earlier modeling to be of equal reliability relative to more recent modeling. However, where alternative or older modeling generated linkages, even if those linkages differ from linkages in the EPA's most recent set of modeling (EPA 2016v2), that information provides further evidence, not less, in support of a conclusion that the State is required to proceed to Step 3 to further evaluate its emissions.

Therefore, based on the EPA's evaluation of the information submitted by TCEQ and based on the EPA 2016v2 modeling results for 2023, the EPA proposes to find that Texas is linked at Steps 1 and 2 and has an obligation to assess potential emissions reductions from sources or other emissions activity at Step 3 of the 4-Step framework.

4. Evaluation of Information Provided by TCEQ Regarding Step 3

At Step 3 of the 4-Step interstate transport framework, a state's emissions are further evaluated, considering multiple factors, including air quality and cost considerations, to determine what, if any, emissions significantly contribute to nonattainment or interfere with maintenance and, thus, must be eliminated under CAA section 110(a)(2)(D)(i)(I).

To effectively evaluate which emissions in the state should be deemed "significant" and therefore prohibited, states generally should prepare an accounting of sources and other emissions activity for relevant pollutants and assess potential additional emissions reduction opportunities and resulting downwind air quality improvements. The EPA has consistently applied this approach (*i.e.*, Step 3 of the 4-Step interstate transport

framework) when identifying emissions contributions that the Agency has determined to be "significant" (contribution to nonattainment or interfere with maintenance) in each of its prior Federal, regional ozone transport rulemakings, and this interpretation of the statute has been upheld by the Supreme Court. *See EME Homer City,* 572 U.S. 489, 519 (2014). While the EPA has not directed states that they must conduct a Step 3 analysis in precisely the manner the EPA has done in its prior regional transport rulemakings, state implementation plans addressing the obligations in CAA section 110(a)(2)(D)(i)(I) must prohibit "any source or other type of emissions activity within the State" from emitting air pollutants which will contribute significantly to downwind air quality problems. Thus, states must complete something similar to the EPA's analysis (or an alternative approach to defining "significance" that comports with the statute's objectives) to determine whether and to what degree emissions from a state should be "prohibited" to eliminate emissions that will "contribute significantly to nonattainment in, or interfere with maintenance of" the NAAQS in any other state. TCEQ did not demonstrate such an analysis in their SIP submission. We therefore propose that TCEQ was required to analyze emissions from the sources and other emissions activity from within the State to determine whether its contributions were significant, and we propose to disapprove its submission because Texas failed to do so.

Instead, as noted in Section V.A of this action, TCEQ interpreted the Act's requirements as only requiring an

---

[107] These modeling results are consistent with the results of a prior round of 2023 modeling using the 2016v1 emissions platform which became available to the public in the fall of 2020 in the Revised

CSAPR Update, as noted in Section I of this action. That modeling showed that Texas had a maximum contribution greater than 0.70 ppb to at least one nonattainment or maintenance-only receptor in

2023. These modeling results are included in the file "Ozone Design Values And Contributions Revised CSAPR Update.xlsx" in Docket No. EPA–HQ–OAR–2021–0663.

analysis of emission reductions where "there is a persistent and consistent pattern of contribution on several days with elevated ozone." TCEQ asserted that it would make the determination of whether such pattern existed based on a weight-of-evidence approach that takes into consideration air quality factors such as: Current attainment status of the monitors, design value trends, the meteorological conditions that lead to high ozone formation at the monitor, the number of days with elevated observed ozone, back trajectories, Texas' relative contribution on modeled high ozone days, Texas' contribution as part of the collective interstate contribution to future modeled DVs, alternate contribution method analysis, and model sensitivity runs to reductions of Texas' emissions on receptors. However, TCEQ stated that it did not consider or analyze all factors for every monitor. Thus, different factors were analyzed for the receptors in different regions (Colorado, Arizona, and Southern California). The EPA has reviewed the different factors that TCEQ provided for each of the regions in the EPA Region 6 TSD, but we will provide a brief summary of the evaluation below. TCEQ also asserted that use of the 1 percent threshold as the "sole" definition of significant contribution for the 2015 ozone NAAQS is inappropriate. Based on the application of selected factors for each of the monitors to which TCEQ's modeling found that it was linked, TCEQ concluded that none of its contributions to any other states were significant.

As explained above, TCEQ has mischaracterized the EPA's interpretation of the CAA in stating that the EPA defines significant contribution "solely" using a 1 percent threshold. The EPA, like TCEQ, uses the 1 percent threshold to identify areas for further analysis. The difference is that the EPA in past analyses has examined potential emission reductions in linked upwind states and the air quality impacts at downwind receptors that would result from the implementation of those reductions to assess which contributions are "significant." This interpretation of significant contribution, as discussed above, has been upheld by the Supreme Court and the D.C. Circuit.

As an initial matter, the EPA believes source apportionment modeling, as performed by the EPA and also by TCEQ, to determine which states are linked is an appropriate tool to identify impacts that are persistent enough to impact a downwind receptors ability to attain or maintain the standard. This approach is described in more detail

above in Section II.B.4 of this action, but, in summary, averages the contributions from an upwind state for up to 10 days, which is preferred, (but a minimum 5 days) at a given receptor. Given the ozone dataset is an average of the fourth high value from each of three years, the EPA technique, also used by Texas, is appropriate to identify impacts of sufficient persistence to impact a downwind receptor's ability to attain or maintain the standard.

The EPA reviewed TCEQ's evaluation of the current attainment status of the monitors and design value trends, and concludes, as described in more detail in the EPA Region 6 TSD, that the provided information does not support the large decreases in ozone levels that TCEQ's modeling projects will occur by 2023. The analysis for California and Colorado receptors provides evidence that TCEQ's photochemical modeling is overestimating the ozone reductions expected at these receptors between 2012 and 2023 and actually presents evidence that more nonattainment and/or maintenance receptors should have been identified.

The EPA also reviewed the trends in the number of high ozone days per year provided by TCEQ for Colorado and California. While this data supports that the number of ozone exceedance days is improving, neither the analysis of the number of high ozone days in Colorado or California provide any evidence to refute the TCEQ's photochemical modeling results that show these areas should be considered nonattainment and/or maintenance receptors. TCEQs modeling overestimates ozone reductions yet still shows Texas linked to receptors at both nonattainment and maintenance levels in 2023.

The TCEQ cited a conceptual model of ozone formation for areas in Southern California. TCEQ indicated that Southern California is isolated and transport into the basin is unlikely on a frequent basis, but this information does not refute the TCEQ's modeling. As discussed in Section III.B.3 of this action, photochemical modeling is the most sophisticated tool available to estimate future ozone levels and contributions to those modeled future ozone levels. Consideration of the different processes that affect primary and secondary pollutants at the regional scale in different locations is fundamental to understanding and assessing the effects of emissions on air quality concentrations. TCEQ's modeling showed transport at 10 monitors having contributions greater than 0.7 ppb on average for the 5–10 days used in the modeling analyses. Considering the form of the standard,

this is a sufficient number of days to determine if an impact is persistent enough to impact an area's ability to attain or maintain the standard.

TCEQ used the National Oceanic and Atmospheric Administration (NOAA) HYSPLIT [108] model to produce back trajectories for all the monitored ozone exceedance days (2007–2016) for the five receptors in Colorado and 10 receptors in Southern California to evaluate how many of the back trajectories went through Texas. TCEQ also used data from these back trajectories to do an endpoint count analysis. We note that we have several concerns with how TCEQ performed the back trajectories including start time and heights, length (number of hours) of the back trajectory, inappropriate removal of some back trajectories based on start height, center-line height touch down, and trajectory center-line height when over Texas, and inappropriate counting of trajectories by not considering that the center-line represents the centerline of a much wider area of air parcels that could have reached the monitor/receptor. Due to these concerns, as discussed in more detail in the EPA Region 6 TSD, the EPA finds the results of TCEQ's back trajectory and endpoint analysis flawed (underestimates back trajectories that reach Texas) and do not provide evidence that refutes the TCEQ photochemical modeling analysis results.

We note that even valid back trajectories are of limited use as HYSPLIT simply estimates the path a parcel of air backward in hourly steps for a specified length of time. HYSPLIT estimates the central path in both the vertical and horizontal planes. The HYSPLIT central path represents the centerline with the understanding that there are areas on each side horizontally and vertically that also contribute to the concentrations at the end point. The horizontal and vertical areas that potentially contribute to concentrations at the endpoint (monitor) grow wider from the centerline the further back in time the trajectory goes. Therefore, a HYSPLIT centerline does not have to pass directly over emissions sources or emission source areas, but merely relatively near emission source areas for those areas, to contribute to concentrations at the trajectory endpoint. The EPA relies on back trajectory analysis as a corollary analysis along with observation-based meteorological wind fields at multiple heights to examine the general plausibility of the photochemical model

---

[108] See FN 34.

"linkages.'' Since the back trajectory calculations do not account for any air pollution formation, dispersion, transformation, or removal processes as influenced by emissions, chemistry, deposition, etc., the trajectories cannot be used to develop quantitative contributions. Therefore, back trajectories cannot be used to quantitatively evaluate the magnitude of the existing photochemical contributions from upwind states to downwind receptors. It is interesting to note that TCEQ's analysis of the back trajectories indicates that the 2012 meteorology used by TCEQ seemed to yield more back trajectories that reach Texas than most years for many of the Colorado monitors. This seems to be consistent with TCEQ identifying linkages to Colorado when the EPA's modeling of 2016 does not.

TCEQ performed an alternate contribution analysis for the ten California receptors and the five Colorado receptors using all days modeled in 2023 that had values over 70 ppb rather than focus on just the 5–10 highest values under the EPA's technique. Particularly for California, this meant many more days could be included in the average which had the effect of showing a smaller estimated contribution. We believe it is appropriate to focus on the highest values as these are the ones that ultimately will have to be reduced for the standard to be attained. As discussed in the EPA Region 6 TSD, the EPA's review of TCEQ's alternate contribution method analysis for California and Colorado receptors is that it does not provide substantial evidence that refutes the TCEQ's photochemical modeling analysis results, including the contribution analysis using the EPA's contribution methodology.

TCEQ provided an analysis of collective interstate contribution to the 2023 DV for the five Colorado and ten California receptors. The collective interstate contribution at tagged Colorado receptors ranges from 9.32% to 10.27%. The collective interstate contribution at tagged California receptors ranges from 3.2% to 4.58%. TCEQ argues that these are small percentages (Colorado and California) and not as high as the collective interstate contribution percentages the EPA calculated for monitors in Eastern States, which ranged from 17% to 67%. TCEQ also notes that a significant portion of the tagged Colorado monitors' 2023 modeled DVs is due to background emissions (sum of contributions from to biogenic, fires, and boundary conditions). For the California receptors TCEQ argues that these percentages are

small compared to Intra-State contribution.

As an initial matter, the EPA is not solely relying on TCEQ's findings of linkages to Colorado and California but is also relying on its own findings of linkages to areas in the Midwest Region. As such, TCEQ's analysis of relative contributions to Colorado and California does not provide justification for not addressing downwind impacts. Nonetheless, EPA has found in the past that certain California receptors are so heavily impacted by local emissions, and total upwind contribution is so low, that those receptors may not be considered to be affected by interstate ozone transport. *See* 81 FR 15200 (Mar. 22, 2016). However, this is a narrow circumstance that does not apply in the vast majority of cases and has never been applied outside of California. EPA has previously found, for instance, that receptors in Colorado are heavily impacted by upwind-state contribution. *See* 82 FR 9155 (Feb. 3, 2017); 81 FR 71991 (Oct. 19, 2016). EPA need not draw any conclusions here regarding whether the California sites TCEQ identified should or should not be considered receptors for ozone-transport purposes. EPA affirms, contrary to TCEQ's suggestion, that the Colorado receptors TCEQ analyzed are impacted by upwind state contributions. However, the EPA's finding that Texas is linked to receptors in other states is based on still other linkages found in EPA's modeling to receptors in other states, which are clearly impacted by the collective contribution of multiple upwind states, including Texas. Under CAA section 110(a)(2)(D)(i)(I) downwind states are not obligated to reduce emissions on their own to resolve nonattainment or maintenance problems. Rather, states are obligated to eliminate their own significant contribution or interference with the ability of other states to attain or maintain the NAAQS.

TCEQ also performed photochemical modeling analysis using the Direct Decoupled Method (DDM) tool for receptors in Colorado. DDM provides a first derivative of the changes in ozone (linear relationship where the DDM value is the slope of the line for changes in ozone) resulting from changes in NOₓ emissions from all Texas' NOₓ emissions. The DDM modeling does show some response to Texas NOₓ emissions but from the scale it is hard to discern the level of response but it appears to be in the 0–2 ppb range in general with some values in the 0.2 –2 ppb range for modeled values over 60 ppb. Since the modeling has underprediction and underestimation

issues, these values could be higher. Not surprisingly, the DDM tool shows that monitors in Colorado are much more responsive to intra-state reductions than reductions in Texas. That said, the results of the DDM tool showing only a relatively small response to reductions is not inconsistent with the finding that Texas emissions contribute significantly to elevated readings in Colorado. As has been discussed elsewhere, the EPA believes a contribution of 1 percent of the standard is an appropriate threshold such that further analysis is warranted.

Overall, these additional analyses performed by TCEQ do not provide sufficient evidence to refute the modeling results that TCEQ's modeling indicates downwind nonattainment and/or maintenance receptors in Colorado and Southern California are impacted by Texas emissions and Texas' contribution is 0.7 ppb or greater.[109] In fact, the monitored ozone design value trends provide evidence that future year modeled ozone levels are underestimated by TCEQ's modeling and there are likely more receptors that should have been identified with additional potential linkages. Although Texas asserted that its additional air quality factor analysis is a permissible way to interpret which contributions are "significant'' because that analysis examines whether there was a "persistent and consistent pattern of contribution on several days with elevated ozone'' we find that such pattern is already established by a modeled linkage at Step 2.

In addition, EPA 2016v2 modeling using 2016 base year meteorology indicates linkages from Texas to receptors in the Midwest Region but does not indicate impacts from Texas emissions on the Colorado and other western receptors identified by TCEQ. With a different base period such as TCEQ's 2012 base period meteorology and the EPA's 2016 base period meteorology, it is not uncommon that the potential downwind nonattainment or maintenance receptors could change. These differing results about receptors and linkages can be affected by the varying meteorology from year to year and the selection of different base years, but we do not think the differing results mean that the modeling or the EPA methodology for identifying receptors or linkages is inherently unreliable. Rather, these separate modeling runs indicated (1) that there were receptors that would

---

[109] TCEQ also identified a monitor in Cochise County, Arizona (ID 40038001), but the monitor's recent DVs are below the NAAQS. From AQS, the 2014–2016 and 2015–2017 DVs are each 65 ppb; 2016–2018, 2017–2019, and 2018–2020 DVs are 66 ppb; and preliminary 2019–2021 DV is 66 ppb.

struggle with nonattainment or maintenance in the future, and (2) that Texas was linked to some set of these receptors, even if the receptors and linkages differed from one another in their specifics (*e.g.,* a different set of receptors were identified to have nonattainment or maintenance problems, or Texas was linked to different receptors in one modeling run versus another). We think this common result indicates that Texas's emissions were substantial enough to generate linkages at Steps 1 and 2 to some set of downwind receptors, under varying assumptions and meteorological conditions, even if the precise set of linkages changed between modeling runs.

In sum, the EPA's more recent and robust 2016 base year modeling platform indicates that Texas is linked to several receptors in the Midwest Region as does the EPA's earlier 2011 base year modeling. TCEQ's 2012 base case modeling showed linkages to states in the west. As discussed, the EPA does not find the additional weight of evidence evaluations conducted by TCEQ provide compelling reasons to discount the impacts indicated in Colorado and California by the TCEQ modeling. In fact, we think TCEQ's modeling likely underestimates these issues. We therefore propose that Texas was required to analyze emissions from the sources and other emissions activity from within the State to determine whether its contributions were significant, and we propose to disapprove its submission because Texas failed to do so.

5. Evaluation of Information Provided by TCEQ Regarding Step 4

Step 4 of the 4-Step interstate transport framework calls for development of permanent and federally enforceable control strategies to achieve the emissions reductions determined to be necessary at Step 3 to eliminate significant contribution to nonattainment or interference with maintenance of the NAAQS. Texas indicated that because a number of counties in its state had been designated nonattainment for the 2015 ozone NAAQS, there could be attainment demonstration and potential controls contemplated in association with those nonattainment designations.[110]

However, the State's interstate transport submission did not revise its SIP to identify any specific emission reductions, nor did it include a revision to its SIP to ensure any such reductions were permanent and enforceable. The other control measures identified in TCEQ's submission are, as noted by TCEQ, already adopted and implemented measures and do not contain an evaluation of additional emission control opportunities (or establish that no additional controls are required). As a result, the EPA proposes to disapprove TCEQ's submittal on the separate, additional basis that the Texas has not included permanent and enforceable emissions reductions in its SIP as necessary to meet the obligations of CAA section 110(a)(2)(d)(i)(I).

6. Conclusion

Based on the EPA's evaluation of TCEQ's SIP submission, the EPA is proposing to find that the Texas August 17, 2018, SIP submission pertaining to interstate transport of air pollution does not meet the State's interstate transport obligations, because it fails to contain the necessary provisions to eliminate emissions that will contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in any other state.

VI. Proposed Action

We are proposing to disapprove the SIP submissions from Arkansas, Louisiana, Oklahoma, and Texas pertaining to interstate transport of air pollution which will significantly contribute to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in other states. Under CAA section 110(c)(1), the disapprovals would establish a 2-year deadline for the EPA to promulgate FIPs for these states to address the CAA section 110(a)(2)(D)(i)(I) interstate transport requirements pertaining to significant contribution to nonattainment and interference with maintenance of the 2015 ozone NAAQS in other states, unless the EPA approves SIPs that meet these requirements. Disapproval does not start a mandatory sanctions clock for Arkansas, Louisiana, Oklahoma, or Texas.

VII. Statutory and Executive Order Reviews

*A. Executive Order 12866: Regulatory Planning and Review and Executive Order 13563: Improving Regulation and Regulatory Review*

This action is not a significant regulatory action and was therefore not submitted to the Office of Management and Budget for review

*B. Paperwork Reduction Act (PRA)*

This proposed action does not impose an information collection burden under the PRA because it does not contain any information collection activities

*C. Regulatory Flexibility Act (RFA)*

I certify that this action will not have a significant economic impact on a substantial number of small entities under the RFA. This action merely proposes to disapprove a SIP submission as not meeting the CAA.

*D. Unfunded Mandates Reform Act (UMRA)*

This action does not contain any unfunded mandate as described in UMRA, 2 U.S.C. 1531–1538, and does not significantly or uniquely affect small governments. The action imposes no enforceable duty on any state, local or tribal governments or the private sector.

*E. Executive Order 13132: Federalism*

This action does not have federalism implications. It will not have substantial direct effects on the states, on the relationship between the national government and the states, or on the distribution of power and responsibilities among the various levels of government.

*F. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments*

This proposed action disapproving the portion of Oklahoma's SIP submission addressing the State's interstate transport obligations under CAA section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS will apply to certain areas of Indian country as discussed in Section IV.C of this action, and, therefore, has tribal implications as specified in E.O. 13175 (65 FR 67249, November 9, 2000). However, this proposed action will neither impose substantial direct compliance costs on federally recognized tribal governments, nor preempt tribal law. This proposed action will not impose substantial direct compliance costs on federally recognized tribal governments because no actions will be required of tribal governments. This proposed action will

---

[110] Pointing to anticipated upcoming emission reductions, even if they were not included in the analysis at Steps 1 and 2, is not sufficient as a Step 3 analysis, for the reasons discussed in Section V.B.4 of this action. In this section, we explain that to the extent such anticipated reductions are not included in the SIP and rendered permanent and enforceable, reliance on such anticipated reductions is also insufficient at Step 4.

also not preempt tribal law as no Oklahoma tribe implements a regulatory program under the CAA, and thus does not have applicable or related tribal laws. Consistent with the EPA Policy on Consultation and Coordination with Indian Tribes (May 4, 2011), the EPA will offer consultation to tribal governments whose lands are located within the exterior boundaries of the State of Oklahoma that may be affected by this action.

## G. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks

The EPA interprets Executive Order 13045 as applying only to those regulatory actions that concern environmental health or safety risks that the EPA has reason to believe may disproportionately affect children, per the definition of "covered regulatory action" in section 2–202 of the Executive Order. This action is not subject to Executive Order 13045 because it merely proposes to disapprove a SIP submission as not meeting the CAA.

## H. Executive Order 13211, Actions That Significantly Affect Energy Supply, Distribution or Use

This action is not subject to Executive Order 13211, because it is not a significant regulatory action under Executive Order 12866.

## I. National Technology Transfer and Advancement Act

This rulemaking does not involve technical standards.

## J. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations

The EPA believes the human health or environmental risk addressed by this action will not have potential disproportionately high and adverse human health or environmental effects on minority, low-income or indigenous populations. This action merely proposes to disapprove a SIP submission as not meeting the CAA.

## K. CAA Section 307(b)(1)

Section 307(b)(1) of the CAA governs judicial review of final actions by the EPA. This section provides, in part, that petitions for review must be filed in the D.C. Circuit: (i) When the agency action consists of "nationally applicable

regulations promulgated, or final actions taken, by the Administrator," or (ii) when such action is locally or regionally applicable, if "such action is based on a determination of nationwide scope or effect and if in taking such action the Administrator finds and publishes that such action is based on such a determination." For locally or regionally applicable final actions, the CAA reserves to the EPA complete discretion whether to invoke the exception in (ii).[111]

The EPA anticipates that this proposed rulemaking, if finalized, would be "nationally applicable" within the meaning of CAA section 307(b)(1) because it would take final action on SIP submittals for the 2015 ozone NAAQS for four states, which are located in three different Federal judicial circuits. It would apply uniform, nationwide analytical methods, policy judgments, and interpretation with respect to the same CAA obligations, i.e., implementation of interstate transport requirements under CAA section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS for states across the country, and final action would be based on this common core of determinations, described in further detail below.

If the EPA takes final action on this proposed rulemaking[, in the alternative,] the Administrator intends to exercise the complete discretion afforded to him under the CAA to make and publish a finding that the final action (to the extent a court finds the action to be locally or regionally applicable) is based on a determination of "nationwide scope or effect" within the meaning of CAA section 307(b)(1). Through this rulemaking action (in conjunction with a series of related actions on other SIP submissions for the same CAA obligations), the EPA interprets and applies section 110(a)(2)(d)(i)(I) of the CAA for the 2015 ozone NAAQS based on a common core of nationwide policy judgments and technical analysis concerning the interstate transport of pollutants throughout the continental U.S. In

particular, the EPA is applying here (and in other proposed actions related to the same obligations) the same, nationally consistent 4-Step framework for assessing interstate transport obligations for the 2015 ozone NAAQS. The EPA relies on a single set of updated, 2016 base year photochemical grid modeling results of the year 2023 as the primary basis for its assessment of air quality conditions and contributions at Steps 1 and 2 of the 4-Step framework. Further, the EPA proposes to determine and apply a set of nationally consistent policy judgments to apply the 4-Step framework. The EPA has selected a nationally uniform analytic year (2023) for this analysis and is applying a nationally uniform approach to nonattainment and maintenance receptors and a nationally uniform approach to contribution threshold analysis.[112] For these reasons, the Administrator intends, if this proposed action is finalized, to exercise the complete discretion afforded to him under the CAA to make and publish a finding that this action is based on one or more determinations of nationwide scope or effect for purposes of CAA section 307(b)(1).[113]

## List of Subjects in 40 CFR Part 52

Environmental protection, Air pollution control, Incorporation by reference, Ozone.

*Authority:* 42 U.S.C. 7401 et seq.

Dated: February 1, 2022.

**Earthea Nance,**

*Regional Administrator, Region 6.*

[FR Doc. 2022–02961 Filed 2–18–22; 8:45 am]

**BILLING CODE 6560–50–P**

---

[111] In deciding whether to invoke the exception by making and publishing a finding that an action is based on a determination of nationwide scope or effect, the Administrator takes into account a number of policy considerations, including his judgment balancing the benefit of obtaining the D.C. Circuit's authoritative centralized review versus allowing development of the issue in other contexts and the best use of agency resources.

[112] A finding of nationwide scope or effect is also appropriate for actions that cover states in multiple judicial circuits. In the report on the 1977 Amendments that revised section 307(b)(1) of the CAA, Congress noted that the Administrator's determination that the "nationwide scope or effect" exception applies would be appropriate for any action that has a scope or effect beyond a single judicial circuit. See H.R. Rep. No. 95–294 at 323, 324, reprinted in 1977 U.S.C.C.A.N. 1402–03.

[113] The EPA may take a consolidated, single final action on all of the proposed SIP disapproval actions with respect to obligations under CAA section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS. Should the EPA take a single final action on all such disapprovals, this action would be nationally applicable, and the EPA would also anticipate, in the alternative, making and publishing a finding that such final action is based on a determination of nationwide scope or effect.

TAB R6-2: EPA REGION 6 2015 8-HOUR OZONE TRANSPORT SIP
PROPOSAL TECHNICAL SUPPORT DOCUMENT (JAN. 25, 2022)
(EPA-R06-OAR-2021-0801-0002)

**EPA REGION 6**

**2015 8-HOUR OZONE TRANSPORT SIP PROPOSAL**

**TECHNICAL SUPPORT DOCUMENT**

**FDMS Docket No. EPA-R06-OAR-2021-0801**

**February 2022**

**By**

**Erik Snyder**

**Lead Regional Air Quality Modeler**

**EPA Region 6 – Dallas, TX**

# Contents

Introduction ................................................................................................................. 3

1. Maintenance Receptor Methodology ..................................................................... 4

    1.a. Use of Single DV To Project Maintenance Receptors ..................................... 4

    1.b. Review of History of EPA's Guidance ........................................................... 10

    1.c. Relative Effects of Long-Term Emissions Trends ........................................... 12

    1.d. Meteorological Adjusted Trends Analysis of 2010-2014 Monitored Ozone Data ........... 31

2. Potential Underestimation of Projected Design Values and Model Performance Evaluation ......
.......................................................................................................................... 38

    2.a. Potential Underestimation in TCEQ's Modeling 2023 Future year projections at DFW &
    HGB receptors and High DV monitors ................................................................. 39

    2.b. Potential Underestimation in TCEQ's 2023 Future year projections at downwind areas . 44

    2.c. Model Performance Evaluation of TCEQ's 2012 base case at downwind areas in the
    Midwest and West ............................................................................................ 51

    2.d. Model Performance Evaluation of TCEQ's 2012 base case at DFW and HGB monitors  57

    2.e. Summary ...................................................................................................... 66

3. Comparison of TCEQ and EPA 2023 future modeling and identified maintenance and
nonattainment receptors ............................................................................................ 67

4.       Other Potential Modeling Concerns ................................................................ 72

    4.a. EGU Emissions ............................................................................................. 72

    4.b. Contribution Calculation ............................................................................... 73

    4.c. Future Year Boundary Conditions .................................................................. 76

5. TCEQ Other Factor Analysis (Weight of Evidence) ............................................. 76

    5.a. TCEQ indicated that there are problems with DV trends ................................ 78

    5.b. TCEQ evaluated the number of elevated ozone days (over 70 ppb) annually for monitors
    in the Denver and Southern California areas. .................................................... 81

    5.c. TCEQ Back Trajectory Analysis ................................................................... 81

    5.d. Texas contribution on all days in 2023 with ozone greater than 70 ppb. ......... 86

    5.e. Collective Interstate Contribution to Future DV ............................................ 89

    5.f. TCEQ also performed Direct Decoupled Method (DDM) modeling for receptors in
    Colorado ........................................................................................................ 92

    5.g. Southern California Ozone Conceptual Model ............................................... 97

    5.h. Summary ...................................................................................................... 97

6. EPA Summary ...................................................................................................... 99

**Introduction**

This Technical Support Document (TSD) provides additional analysis of the Texas Commission on Environmental Quality's (TCEQ) air quality modeling relied upon in its August 17, 2018, State Implementation Plan (SIP) submission addressing interstate transport obligations for the 2015 ozone national ambient air quality standards (NAAQS). As discussed in the notice of proposed disapproval, the EPA has identified several concerns with the reliability of TCEQ's modeling and the application of those modeling results in assessing Texas's potential contributions to downwind ozone. States are free to develop their own modeling in support of SIP submissions. That modeling, its application, and other technical analyses must be technically supportable, and the EPA is obligated to assess and evaluate the reliability of each state's technical demonstration when determining whether the Clean Air Act's (the Act, or CAA) requirements are met. Based on the EPA's evaluation of the SIP submission, the EPA is proposing to find that TCEQ's August 17, 2018, SIP submission does not meet the State's obligations with respect to prohibiting emissions that contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in any other state. *See* Federal Register Notice, "Air Plan Disapproval; Arkansas, Louisiana, Oklahoma and Texas; Interstate Transport of Air Pollution for the 2015 8-hour Ozone National Ambient Air Quality Standards" (Docket ID No. EPA-R06-OAR-2021-0801; proposed action). Certain legal, policy, and technical bases for that determination are discussed in the preamble of the notice of proposed disapproval. In addition, the Oklahoma Department of Environmental Quality (ODEQ) also relied on TCEQ's modeling analysis in their SIP. Thus, the EPA's concerns with TCEQ's modeling also impact the approvability of the Oklahoma 2015 Ozone Transport SIP. The EPA's further assessment and evaluation of the reliability of the technical demonstration in TCEQ's SIP is discussed in this

document. In Section 1, we evaluate TCEQ's maintenance receptor methodology. In Section 2, we analyze TCEQ's modeling results, both future year projections and base case model performance. In Section 3, we provide results of EPA's modeling and analyze results of TCEQ's modeling compared with recent monitoring data. In Section 4, we analyze other potential concerns with TCEQ's modeling analysis. In Section 5, we evaluate TCEQ's other factors analysis. In Section 6, we summarize our technical evaluation.

## 1.    Maintenance Receptor Methodology

As discussed in Section V.A of the notice of proposed disapproval, in addition to the use of an alternative modeling platform, TCEQ also created its own method for identifying maintenance receptors. This section of the TSD provides further discussion as to why the EPA proposes TCEQ has not provided a sufficient technical basis for its chosen method. In subsection 1.a, we evaluate the effect of using TCEQ's approach and find that it produces anomalous results. In subsection 1.b, we review the history of EPA's modeling guidance recommending the use of a 5-year (i.e., spanning three design values) rather than a 3-year (i.e., only one design value) base period. In subsection 1.c, we evaluate inter-annual variation in design values (DVs) due to meteorological variability and long-term ozone trends due to emissions trends. In subsection 1.d, we analyze meteorological adjusted ozone concentrations for the 2010-2014 period.

### *1.a. Use of Single DV To Project Maintenance Receptors*

As explained in the preamble, in defining maintenance receptors, TCEQ used only the most recent DV of the set of three DVs it relied on for its base period modeling, regardless of whether that most recent design value was the highest of the three. TCEQ's proffered explanation for using the most recent DV to identify maintenance receptors was that the latest

DV "takes into consideration both meteorological variability (since the latest regulatory design value is itself an average of the fourth highest measured concentrations for three years) and any emissions reductions that might have occurred."[1] However, as discussed below, the EPA does not believe this approach adequately takes into account meteorological variability in identifying those areas that are projected to meet the NAAQS but may nevertheless struggle to maintain the NAAQS.

To develop a better technical understanding of the effects of TCEQ's approach (in addition to those reasons presented in the preamble), the EPA conducted a review of potential receptors to which Texas has been linked in differing modeling analyses. The EPA identified 21 potential receptors to which Texas contributed 0.7 parts per billion (ppb) or more in either EPA's 2016v2-based modeling for 2023, or TCEQ's 2012-based modeling for 2023. The EPA then evaluated the results of using TCEQ's alternate maintenance methodology. To identify nonattainment receptors, the nonattainment methodology calculates 2023 average DVs (also referred to as 2023 Nonattainment DVs) using the 5-year center weighted average ambient design values centered on the base modeling years and the Relative Response factors (RRFs).[2]

In Table 1.1 below, the EPA compiled the 2023 average DVs used for identifying nonattainment receptors, for potential receptors in Illinois, Wisconsin, Colorado, Arizona, and California. The EPA then utilized TCEQ's 2012-based modeling results to obtain the data needed to calculate 2023 maintenance DVs using TCEQ's approach.

---

[1] TCEQ Interstate Transport State Implementation Plan Revision for the 2015 Ozone National Ambient Air Quality Standards, August 17, 2018 (TCEQ SIP Submission) at pages 3-39 to 3-40.

[2] The approach used by TCEQ for identifying nonattainment receptors is consistent with EPA's air quality modeling guidance. U.S. Environmental Protection Agency, 2018. Modeling Guidance for Demonstrating Attainment of Air Quality Goals for Ozone, PM2.5, and Regional Haze, Research Triangle Park, NC, included in Docket ID No. EPA-HQ-OAR-2021-0663.

Of the identified 21 receptors, 15 receptors would have 2023 DVs based on TCEQ's methodology for identifying *maintenance* receptors that are lower than the 2023 average DVs at these same locations using the methodology for identifying *nonattainment* receptors. This is highly anomalous since the maintenance methodology should result in either equal or slightly higher 2023 DVs than the methodology to identify future year nonattainment receptors in order to capture conditions under which areas expected to be in attainment may still struggle to maintain the NAAQS. The EPA found that, under TCEQ's method, of these 15 receptors, three have 2023 maintenance DVs that are 3 ppb lower than their 2023 nonattainment methodology DVs, five have 2023 maintenance DVs that are 2 ppb lower than their 2023 nonattainment methodology DVs, and seven receptors have 2023 maintenance DVs that are 1 ppb lower than their 2023 nonattainment methodology DVs. In fact, TCEQ's method identified one receptor in their SIP submission as a nonattainment receptor in 2023 that it separately characterized under its maintenance methodology as not having a problem maintaining the NAAQS.

In comparison, using the EPA's maintenance methodology and EPA's 2016v2 modeling results all 21 2023 maintenance DVs have maximum DVs that are equal to or up to 4 ppb higher than the 2023 nonattainment DVs. (Again, the EPA uses the average of the three DVs that contain the base year modeled for the nonattainment methodology and the maximum of these three DVs for the maintenance methodology.) Under the EPA's methodology all nonattainment receptors are also considered to be maintenance receptors.

**Table 1.1 Comparison of Nonattainment methodology (Avg DV) and Maintenance methodology results for receptors identified by EPA and TCEQ in modeling of 2012 and 2016 base case years.**

| Receptor (AQS Monitor ID, County, State) | TCEQ 2023 Average DV (ppb) | TCEQ 2023 Maintenance DV (ppb) | TCEQ DV Delta (Maintenance - Average) (ppb) | EPA 2023 Average DV (ppb)[3] | EPA 2023 Maximum DV (ppb)[4] | EPA DV Delta (Maximum - Avg) (ppb) |
|---|---|---|---|---|---|---|
| 80350004, Douglas, CO | 73 | 72 | -1 | 71 | 72 | 1 |
| 80590006, Jefferson, CO | 72 | 73 | 1 | 72 | 73 | 1 |
| 80590011, Jefferson, CO | 71 | 71 | 0 | 73 | 74 | 1 |
| 80690011, Larimer, CO | 72 | 71 | -1 | 71 | 72 | 1 |
| 80050002, Arapahoe, CO | 70* | 71 | 1 | 68 | 68 | 0 |
| 40038001, Cochise, AZ | 71 | 69** | -2 | - | - | - |
| 60371201, Los Angeles, CA | 80 | 78 | -2 | 82 | 85 | 3 |
| 60371701, Los Angeles, CA | 80 | 82 | 2 | 85 | 88 | 3 |
| 60376012, Los Angeles, CA | 87 | 86 | -1 | 91 | 93 | 2 |
| 60658001, Riverside, CA | 88 | 85 | -3 | 89 | 90 | 1 |
| 60658005, Riverside, CA | 84 | 83 | -1 | 87 | 90 | 3 |
| 60710001, San Bernardino, CA | 71 | 72 | 1 | 74 | 75 | 1 |
| 60710306, San Bernardino, CA | 76 | 77 | 1 | 76 | 78 | 2 |
| 60711004, San Bernardino, CA | 91 | 90 | -1 | 97 | 100 | 3 |
| 60714001, San Bernardino, CA | 82 | 79 | -3 | 82 | 83 | 1 |
| 60714003, San Bernardino, CA | 94 | 91 | -3 | 95 | 98 | 3 |
| 170310001, Cook, IL | 60 | 58 | -2 | 69 | 73 | 4 |
| 170310032, Cook, IL | 68 | 66 | -2 | 69 | 72 | 3 |
| 170314201, Cook, IL | 64 | 62 | -2 | 69 | 73 | 4 |

[3] Projected DVs were not calculated for the Cochise monitor in EPA's modeling because the 2016 base year model predictions did not meet the criteria in EPA's modeling guidance for calculating a valid RRF.
[4] Projected DVs were not calculated for the Cochise monitor in EPA's modeling because the 2016 base year model predictions did not meet the criteria in EPA's modeling guidance for calculating a valid RRF.

8

| Receptor (AQS Monitor ID, County, State) | TCEQ 2023 Average DV (ppb) | TCEQ 2023 Maintenance DV (ppb) | TCEQ DV Delta (Maintenance - Average) (ppb) | EPA 2023 Average DV (ppb)[3] | EPA 2023 Maximum DV (ppb)[4] | EPA DV Delta (Maximum - Avg) (ppb) |
|---|---|---|---|---|---|---|
| 170317002, Cook, IL | 66 | 65 | -1 | 70 | 73 | 3 |
| 550590019, Kenosha, WI | 67 | 66 | -1 | 72 | 73 | 1 |
| 550590025, Kenosha, WI | No data*** | No data*** | No data*** | 69 | 72 | 3 |
| 551010020, Racine, WI | No data*** | No data*** | No data*** | 71 | 73 | 2 |

* TCEQ did not include this value in their SIP submission narrative (this cell was blank). The EPA obtained this value from data that was in TCEQ's spreadsheet of future 2023 DVs with state contribution.

** Calculated from the Relative Response Factor in TCEQ spreadsheet of future 2023 DVs with state contributions and the monitor's 2012-2014 DV (0.983 X 71 ppb, truncation applied).

*** Monitors were installed in 2013 and 2014 so they did not have a 3-year DV period (2012-2014) or previous years, so no projections of future year DVs are possible with TCEQ's modeling. Kenosha 550590025 was installed and began operating May 13, 2013, so the first three-year DV available is 2013-2015. Racine 551010020 was installed April 14, 2014 so the first three-year DV available is 2015-2017

NOTE: TCEQ's SIP reported projected 2023 DVs as whole numbers. Consistent with the EPA's modeling guidance, the EPA reported projected DVs with one digit to the right of the decimal. For comparison with TCEQ's SIP data, the EPA DVs were truncated to whole numbers for the purpose of the analysis in this TSD. Note that including one digit to the right of the decimal in both the TCEQ and the EPA data would result in a slight difference in outcome in terms of the magnitude of the differences between the average DVs and the corresponding TCEQ maintenance DVs and the EPA's maximum DVs; however, TCEQ's maintenance methodology still results in values lower than nonattainment methodology DVs for many receptors.

In short, because TCEQ's maintenance methodology uses only the most recent DV from its base period 2014 DV (that includes 2012-2014 monitoring data)[5], this very frequently results in "maintenance" DVs at potential receptors that are lower than the 2023 "nonattainment" DVs. TCEQ did not explain this anomalous result. These findings also tend to suggest that the three years that comprise the 2014 design values (i.e., 2012, 2013, and 2014) used in TCEQ's analysis may not have had meteorological conditions particularly conducive for formation of high ozone concentrations. This calls into question whether 2012-2014 would be an appropriate time period for use in projecting whether an area could have difficulty maintaining the standard under ozone conducive meteorology. The EPA's analysis in this TSD confirms that the 2012 to 2014 time period is not particularly conducive to ozone formation, at least for many receptors compared to the other 3-year DV periods of 2012 DV (2010-2012 monitoring data) and 2013 DV (2011-2013 monitoring data). See subsection 1.d below for analysis of meteorology adjusted values for monitors in the continental U.S for 2010-2014. The consequence of TCEQ's maintenance method, as demonstrated by our analysis, is that it often results in lower projected DVs than TCEQ's nonattainment method for the same receptors. This indicates that TCEQ's method often fails to account for conditions when an area would have difficulty maintaining the standard. From a technical perspective, it is unreasonable and internally inconsistent to apply a methodology that identifies receptors as being in nonattainment while at the same time concluding that same receptor will not have a problem maintaining the NAAQS. The EPA finds that the TCEQ methodology does not adequately identify conditions when receptors would have difficulty maintaining the NAAQS.

---

[5] For nomenclature purposes, the 3-year design value is referred to by the last year of the averaging period. That is, DV 2014 represents ozone air quality data averaged over 2012, 2013, and 2014.

*1.b. Review of History of EPA's Guidance*

Since 2007 and up through its current 2018 version, the EPA's modeling guidance for attainment demonstrations and other analyses has recommended the use of a 5-year center weighted average DV (i.e., the average of the three DVs that include the modeled year). The development of this guidance reflects the EPA's longstanding understanding that meteorological variability should be accounted for in the projection of future design values for the purpose of evaluating whether or not a particular monitoring site is expected to attain the NAAQS in a future year.

The EPA's modeling guidance for 8-hour ozone NAAQS attainment demonstrations (1999-2007) initially considered using a 3-year period that included the modeled year (i.e., the emissions-inventory year modeled) as the middle year of the 3-year period.[6] However, the EPA ultimately recommended using five consecutive years with the modeled year being the middle year (i.e., covering the three DVs that include the base year) to consider potential variability in meteorological/ozone conduciveness and emissions. The EPA analyzed the variability of using this 5-year center-weighted average method compared with using a 3-year average DV and found that the 5-year center-weighted approach was more stable and had a lower standard deviation.[7] Using 5 years of measured data provides a more robust estimate of future design

---

[6] "Draft Guidance on the Use of Models and Other Analyses in Attainment Demonstrations for the 8-Hour Ozone NAAQS", EPA-454/R-99-004, May 1999; "Guidance on the Use of Models and Other Analyses in Attainment Demonstrations for the 8-hour Ozone NAAQS", EPA-454/R-05-002, October 2005; and "Guidance on the Use of Models and Other Analyses for Demonstrating Attainment of Air Quality Goals for Ozone PM2.5, and Regional Haze", EPA-454/B-07-002, April 2007.

[7] The April 2007 guidance states on page 23, "Additionally, the average design value will be more stable (less year to year variability) than any single design value period. An analysis of recent ambient design value data at 471 ozone monitors, over the period 1993-2004, shows that the median standard deviation of design values was 3.3 ppb whereas the standard deviation of the 5 year weighted average design values was 2.4 ppb (Timin, 2005a). Also, moving from the period ending in 2003 to the period ending in 2004, the median change in the ozone design values was 4.0 ppb. The median change in the 5 year weighted average ozone design values was only 0.8 ppb (there was not a long enough data record to do the same analyses for PM2.5). These analyses show that the average design values are clearly more stable and will therefore provide a 'best estimate' baseline year design value (DVBI) for use in future year model projections."

values that are not solely influenced by the particular meteorological conditions that occurred during the three years centered on the base year of emissions. In this respect, using 5 years of measured data is expected to provide ozone DVs that average out the effects of interannual variability in meteorological conditions on ozone concentrations. The guidance also notes that one may want to consider selecting a base design value this is the highest of the relevant base period design values to ensure attainment even in periods with meteorological conditions especially conducive to high ozone concentrations. Consistent with this guidance, the EPA's use of the maximum DV during the 5-year base period is intended to identify areas that may have difficulty maintaining the NAAQS under ozone conducive meteorological conditions.

While it is not mandatory to follow the EPA's modeling guidance, the different approach used by TCEQ lacked adequate justification. TCEQ did not support their claim that there were large reductions in emissions occurring between 2010 and 2014 that would yield lower DVs in 2012-2014 compared to 2010-2012 or 2011-2013 thus making these earlier DVs inappropriate to use for determining a maintenance receptor. Furthermore, TCEQ did not provide sufficient data and analysis of the 2010-2014 period to support their claim that the 2012-2014 period reflects higher ozone-conducive meteorology compared to the 2010-2012 and 2011-2013 periods. By comparison, under the EPA's approach, if the future DV projected from the maximum base period DV is below the NAAQS, one can be reasonably certain the receptor will not have difficulty maintaining the standard due to fluctuations in meteorology and, as such, upwind states will not interfere with maintenance in downwind states. Because the TCEQ method only looks at one DV and does not account for the variability in DVs due to meteorological conditions, it is less likely to successfully identify maintenance receptors than the EPA method.

### 1.c. Relative Effects of Long-Term Emissions Trends

TCEQ asserts that the EPA's maintenance methodology puts too much weight on meteorological variation and not enough weight on emissions changes (i.e., specifically, alleged emissions reductions). TCEQ asserts that the last DV in the period should be used based on the premise that ozone-precursor emissions always trend downward, and therefore, the last DV in the period will always capture the most likely emissions levels going forward. The EPA explained in the preamble why this is not necessarily justified and why TCEQ's method may effectively "double count" emissions trends (because such trends are already accounted for in making the future year projection). To further examine TCEQ's assertion that only the last DV period including the modeled base year should be used in the maintenance methodology, the EPA reviewed a number of ozone DV trends to assess long-term average changes in ozone due to emission changes, including several that were included in TCEQ's SIP submission for this action and in two previous attainment demonstration SIP submissions for the Dallas-Fort Worth Nonattainment Area (DFW) and the Houston-Galveston-Brazoria Nonattainment Area (HGB).[8] TCEQ provided ozone trends analysis in their SIP submission for this action for the areas where TCEQ's modeling identified potential receptors in Colorado, Arizona, and Southern California. TCEQ used this information to indicate that ozone levels are decreasing, as shown in the figures below, and further discussed in Section 5. The EPA also looked at monitoring trends for the most recent 10 years of data (2011 DV up to 2020 DV) using ozone monitoring data from the EPA's

---

[8] TCEQ's "Dallas-Fort Worth (DFW) Attainment Demonstration State Implementation Plan Revision for the 2008 Eight-Hour Ozone Standard Nonattainment Area" Adopted July 6, 2016 (DFW AD SIP) and TCEQ's "Houston-Galveston-Brazoria Serious Classification Attainment Demonstration State Implementation Plan Revision for the 2008 Eight-Hour Ozone National Ambient Air Quality Standard", Adopted March 4, 2020 (HGB AD SIP). The EPA, in this action, is not evaluating the suitability of the modeling presented by TCEQ for purposes of demonstrating attainment of the 2008 NAAQS. Rather, the EPA is simply examining long-term air quality trends that have occurred in both the Dallas-Fort Worth area as well as the Houston-Galveston-Brazoria area. The EPA will evaluate the suitability of modeling presented by TCEQ for purposes of demonstrating attainment of the 2008 Ozone NAAQS in a separate action.

Air Quality System (AQS). The EPA used these data to assess the magnitude of year-to-year

variation in ozone levels compared to the long-term trend in ozone levels (i.e., 9 years or more)

that may be mainly attributable to overall changes in ozone-precursor emissions.

In general, as shown in the figures below, our evaluation of monitor data for Dallas-Fort

Worth and Houston-Galveston-Brazoria as well as at receptors to which TCEQ is linked (that

have been identified either by the EPA or TCEQ) in Colorado, Arizona, Southern California, and

Midwest Region (Illinois, Michigan, and Wisconsin) demonstrates that the long-term average

annual decreases in ozone expected to be the result of emissions reductions are generally on the

order of 0-1 ppb/year at monitors in these areas. However, variations in monitored DVs do not

always trend downward from year to year and sometimes increase by 2 to 4 ppb from one year to

the next. These variations are likely due to inter-annual variations in meteorological conditions

which the EPA's method is designed to capture (although this analysis cannot rule out the

possibility that short-term increases and decreases in ozone DVs may, in part, be the result of

countervailing economic factors that affect short-term or localized emissions increases and

decreases).

*DFW and HGB Areas*

For the DFW area, looking at Figures 1.1 and 1.2 (obtained from the DFW attainment

demonstration SIP submission),[9] the long-term DFW DV[10] trend is less than 1 ppb/year[11] from

1991 to 2015 (see Figure 1.1) and 1.1 ppb/year from 1997 to 2014 (see Figure 1.2). Focusing on

these time periods is a way to assess the average change in ozone DVs due to long-term changes

---

[9] *See* DFW AD SIP, Figure 1-1 at page 1-4 and Figure 5-1 at page 5-5.

[10] DFW DV is the highest DV at any regulatory monitor in the DFW Nonattainment Area, so it can be a different monitor year-to-year that sets the DFW Nonattainment area DV.

[11] *See* DFW AD SIP, at page 1-3. 2015 DV was 83 ppb and 1991 DV was 105 ppb. (105ppb-83ppb)/(24 years)= 0.917 ppb/year.

in emissions. The EPA also evaluated trends in more recent monitoring data. For DFW, we started with the 2012 DV (2010-2012 monitoring data) as there were some emission reductions from a previous DFW ozone SIP that had compliance dates in early 2010. Based on the trends shown in Figure 1.3, the DVs at most of the monitors that are currently monitoring nonattainment, based on 2018-2020 DVs, have been decreasing at approximately 1 ppb/year for the last 9 years of DVs.[12]

---

[12] EPA Analysis of 8-hour Ozone monitor trends. Data and calculations available in "Ozone_Trends_R6_TSD.xlsx" included in Docket ID No. EPA-R06-OAR-2021-0801.

Figure 1.1 – TCEQ's Figure 1-1: One-Hour and 8-Hour Ozone Design Values
from 1991 to 2015 and Population in the DFW Area,
*from* DFW 2008 8-Hour Attainment Demonstration SIP (July 6, 2016).



Figure 1.2 – TCEQ's Figure 5-1: One-Hour and 8-Hour Ozone DVs in the DFW Area
from 1997 through 2014
*from* DFW 2008 8-hour Attainment Demonstration SIP (July 6, 2016).



Figure 1.3 – 8-hour Ozone DV trends at DFW Monitors, 2012-2020.



For the Houston-Galveston-Brazoria area, TCEQ implemented multiple emission reductions for both nitrogen oxides ($NO_X$) and a subset of volatile organic compounds (VOCs) that resulted in large decreases of ozone from 2000 to 2007 in this area. In this regard, the EPA is evaluating trends for DVs from 2010 to 2020. For HGB, looking at Figures 1.4, 1.5, and 1.6 (obtained from the HGB attainment demonstration SIP)[13] the long-term HGB DV trend at most monitors and DV trends at the monitors in the HGB area with higher ozone DVs from 2009 to 2018 shows a decline of less than 1.0 ppb/year. The EPA also evaluated the trends using the most recent DVs (2020 DVs) in Figure 1.7. In Figure 1.7, the DVs at most of the higher HGB

---

[13] *See* HGB AD SIP, Figure 1-1 at page 1-11, Figure 5-1 at page 5-7, and Figure 5-5 at page 5-8.

area monitors (2018, 2019, and 2020 DVs greater than 70 ppb) are decreasing at 1 ppb/year or

less for the last 10 years of DVs (2011-2020 DVs).[14]

Figure 1.4 – TCEQ's Figure 1-1: Ozone DVs and Population in HGB Area,
*from*
TCEQ's HGB Serious Area Attainment Demonstration SIP Revision for 2008 Ozone (2020).



Figure 1-1:  Ozone Design Values and Population in the HGB Area

---

[14] EPA Analysis of 8-hour Ozone monitor trends. Data and calculations available in "Ozone_Trends_R6_TSD.xlsx" included in Docket ID No. EPA-R06-OAR-2021-0801.

Figure 1.5 – TCEQ's Figure 5-4: 8-Hour and One-Hour Ozone DVs in the HGB Area
*from*
TCEQ's HGB Serious Area Attainment Demonstration SIP Revision for 2008 Ozone (2020)

Figure 1.6 – TCEQ's Figure 5-5: Eight-Hour Ozone DVs by Monitor in the HGB Area
*from*
HGB Serious Area Attainment Demonstration SIP Revision for 2008 Ozone (2020)



Figure 1.7 – 8-hour Ozone DV Trends at Monitors in HGB, 2011-2020



*Potential receptors outside of Texas*

As mentioned above, TCEQ provided ozone trends analysis in their SIP submission for this action for the areas where TCEQ's modeling identified potential receptors (Colorado, Arizona, and Southern California) to indicate that ozone levels are decreasing as shown in the Figures below. The EPA analyzed TCEQ's trends analysis to assess the magnitude of year-to-year variation in ozone levels compared to the long-term trend in ozone levels (i.e., 10 years or more) that may be attributed to overall changes in ozone-precursor emissions. The EPA also analyzed DV trends using the most recent DVs for the last 10 years for receptors outside the State of Texas identified by the EPA's 2011 base year modeling, the EPA's 2016 base year (2016v2) modeling analyses, and/or TCEQ's modeling (2012 base year). These potential

receptor areas are located in Colorado, Arizona, Southern California, and the Midwest Region (specifically, Illinois, Wisconsin, and Michigan).

For the Colorado receptors identified in TCEQ's modeling, this analysis shows ozone DVs from 2007-2016 decreased less than 1 ppb/year on average. See Figure 3-40 from TCEQ's transport SIP submission (included as Figure 1.8 below). The EPA also examined the trends at the Colorado receptors identified in TCEQ's modeling using the most recent DVs. This analysis is reflected in Figure 1.9, which shows that the DVs at Colorado receptors have either increased or slightly decreased at less than 0.5 ppb/year for the last 10 years of DVs (2011-2020 DVs).[15]

---

[15] EPA Analysis of 8-hour Ozone monitor trends. Data and calculations available in "Ozone_Trends_R6_TSD.xlsx" included in Docket ID No. EPA-R06-OAR-2021-0801._____

Figure 1.8 – 8-hour Ozone DVs for Monitors in the Denver-Aurora Area
*from* TCEQ's SIP Submission Figure 3-40



**Figure 3-40: Eight-Hour Ozone Design Values for Monitors in the Denver-Aurora Area**

Figure 1.9 – Denver Nonattainment Area DV Trends at Receptors Identified
in TCEQ Modeling for 2023



For the Arizona receptor identified in TCEQ's modeling, TCEQ's SIP Figure 3-55

(included as Figure 1.10 below) shows ozone DVs from 2007-2016 decreased less than 1

ppb/year on average but had increases or decreases of several ppb from one year to the next. The

EPA also examined the trends at the Arizona receptor identified in TCEQ's modeling using the

most recent DVs available (see Figure 1.11) which shows that the DVs at the Arizona receptor

have decreased at less than 1.0 ppb/year on average for the last 10 years of DVs (2011-2020

DVs).[16]

---

[16] *Id.*

Figure 1.10 DV Tends from 2007 through 2016 for Chiricahua National Monument Monitor *from* TCEQ's SIP Submission Figure 3-55



**Figure 3-55: Design Value Trends from 2007 through 2016 for Chiricahua National Monument (AQS ID: 040038001)**

Figure 1.11 – Arizona DV Trend at Receptor Identified in TCEQ Modeling for 2023



At the California receptors identified in TCEQ's modeling, TCEQ's SIP Figure 3-56 (included as Figure 1.12 below) shows ozone DVs from 2007-2016 decreased less than 1 ppb/year on average. The EPA also evaluated the trends at the California receptors identified in TCEQ's modeling using the most recent DVs (see Figure 1.13), which show that the DVs at the California receptors identified by TCEQ have either increased or slightly decreased at less than 0.5 ppb/year on average for the last 10 years of DVs (2011-2020 DVs).[17]

---

[17] *Id.*

Figure 1.12 – 8-Hour Ozone DV for Monitors in Los Angeles Area
*from* TCEQ's SIP Figure 3-56



**Figure 3-56: Eight-Hour Ozone Design Values for Monitors in the Los Angeles Area**

Figure 1.13 – Southern California Receptors DV trends at Receptors
Identified in TCEQ Modeling for 2023



Using the most recent DVs, the EPA examined the trends at the monitoring sites in the

Chicago IL-IN-WI Nonattainment Area in Illinois and in Wisconsin that were identified as

receptors in EPA's 2016v2 modeling (see Figure 1.14). This figure shows that the DVs at these

receptors have either increased or have decreased at less than 0.7 ppb/year on average for the last

10 years of DVs (2011-2020 DVs).[18]

---

[18] *Id.*

Figure 1.14 – Chicago IL-IN-WI Nonattainment Area DV Trends at Receptors
Identified in EPA's 2016v2 Modeling for 2023



The EPA evaluated the trends at the previously identified potential Wisconsin and

Michigan receptors in the EPA's March 2018 memorandum using the most recent DVs in Figure

1.15, which show that the DVs at Sheboygan County, Wisconsin and Allegan County, Michigan

receptors identified previously in EPA's 2011 modeling have decreased approximately 1

ppb/year on average for the last 10 years of DVs (2011-2020 DVs).[19]

---

[19] *Id.*

Figure 1.15 – Wisconsin and Michigan DV Trends at Receptors Identified in EPA's 2011
Base Year Modeling for 2023



Conclusions of this analysis: Reviewing this information in total, the long-term average
decreases in ozone due to emissions reductions are usually on the order of 0-1 ppb/year at
monitors in DFW and HGB, and at the receptors that have been identified in Colorado, Arizona,
Southern California, and Midwest Region (Illinois and Wisconsin). However, critically, the
evidence presented here demonstrates that there can be wide variations in monitored ozone DVs
from year to year. These year-to-year variations in DVs are not always toward lower ozone DVs,
and sometimes DVs can increase by 2-4 ppb from one year to the next. These variations may be
primarily due to meteorological variations. We note for instance that TCEQ's monitored trends
figure for the Arizona receptor it identified shows increases of 2 ppb and 3 ppb annually, from 66
ppb to 73 ppb. That is a 7 ppb increase over three years from 2009 to 2012. Large annual

fluctuations upward in DVs such as this demonstrate the degree of variation that is possible in DV due to meteorological differences between different three-year design value periods, and/or may indicate increasing emissions activity in upwind states or from local sources. In either case, however, this analysis demonstrates that it cannot simply be assumed, as TCEQ's analysis suggests, that ozone levels will only continue to decline or always track with the general, long-term emissions trends.

### 1.d. Meteorological Adjusted Trends Analysis of 2010-2014 Monitored Ozone Data

A recent analysis was published that included updated techniques to analyze trends in continental U.S ozone concentrations adjusted for interannual variability in meteorological conditions (Wells, et al.).[20] This analysis adjusted long-term trends in monitored maximum daily average 8-hour (MDA8) ozone concentrations for meteorological effects using various statistical and mathematical methods in order to get a better estimate of the long-term changes in ozone concentrations due to changes in precursor emissions such as nitrogen oxides ($NO_X$) and volatile organic compounds (VOCs). This analysis included meteorological adjusted MDA8 ozone values (mean, median, 90th percentile, and 98th percentile) for monitors in the continental U.S for each year from 2010 through 2014. Of particular note is the 98th percentile values as they would correspond with the 4th High MDA8 monitored ozone that is used in the calculation of DVs. In Figure 1.16 (a-e) below are maps showing the magnitude of the adjustments in the May to September MDA8 ozone concentrations for each year, with monitoring site locations colored according to the difference between the adjusted and observed trend values. Red dots represent

---

[20] Wells, Benjamin; Dolwick, Pat; E d e r, Brian; Evangelista, Mark; Foley, Kristen; Mannshardt, Elizabeth; Misenis, Chris; Weishampel, Anthon; "Improved Estimation of Trends in U.S. Ozone Concentrations Adjusted for Interannual Variability in Meteorological Conditions." *Atmospheric Environment* 248 (2021) 118234; Wells, Benjamin; Dolwick, Pat; E d e r, Brian; Evangelista, Mark; Foley, Kristen; Mannshardt, Elizabeth; Misenis, Chris; Weishampel, Anthon "Supplemental Information for: Improved Estimation of Trends in U.S. Ozone Concentrations Adjusted for Interannual Variability in Meteorological Conditions."

downward adjustments of MDA8 ozone concentrations when meteorological conditions were more favorable to ozone formation than normal, while blue dots represent upward adjustments of MDA8 ozone concentrations when meteorological conditions were less favorable to ozone formation than normal. Figures 1.16 (a-e) are for the years 2010, 2011, 2012, 2013 and 2014 respectively. In each Figure, 90th percentile (top), and 98th percentile (bottom) MDA8 ozone concentrations are shown. In other words, the red dots in the images below indicate when monitored ozone levels at a particular monitor are higher due to ozone conducive meteorological conditions, while blue dots indicate when monitored ozone levels are lower at a particular monitor due to meteorological conditions unfavorable for ozone formation. Since the DVs are calculated using the 98th percentile values and the 90th percentile is representative of other relatively high ozone monitored values, these are the values we focus on for this analysis as they are most relevant to the policy concerns of identifying maintenance receptors.

It is noteworthy that while 2012, the year TCEQ selected as its base year, was conducive to ozone formation in the upper Midwest area around Lake Michigan (Illinois, Wisconsin, and Michigan), 2013 and especially 2014 were not conducive to ozone formation. 2014 was the least conducive year for ozone formation in the upper Midwest area around Lake Michigan of the 2010 through 2014 period. The years 2010 and 2011 both appear to have had meteorological conditions more conducive to ozone formation in the area where the EPA has identified receptors in the EPA's 2011 base case and 2016v2 modeling compared to 2013 and 2014. The 2012 DV (2010-2012 monitoring data) or 2013 DV (2011-2013 monitoring data) both seem to have had meteorological conditions more conducive to ozone formation than the 2014 DV (2012-2014 monitoring data). This may partially explain why TCEQ's methodology, which relied solely on the 2014 DV, failed to identify receptors in this region using its maintenance methodology.

Figure 1.16(a) – Maps showing the magnitude of the adjustments in May to September 90th percentile (top), and 98th percentile (bottom) MDA8 ozone concentrations for the year 2010



Figure 1.16(b) – Maps showing the magnitude of the adjustments in May to September 90th percentile (top), and 98th percentile (bottom) MDA8 ozone concentrations for the year 2011



Figure 1.16(c) – Maps showing the magnitude of the adjustments in May to September  90th percentile (top), and 98th percentile (bottom) MDA8 ozone concentrations for the year 2012



Figure 1.16(d) – Maps showing the magnitude of the adjustments in May to September 90th percentile (top), and 98th percentile (bottom) MDA8 ozone concentrations for the year 2013



Figure 1.16(e) – Maps showing the magnitude of the adjustments in May to September  90th percentile (top), and 98th percentile (bottom) MDA8 ozone concentrations for the year 2014



## 2.    Potential Underestimation of Projected Design Values and Model Performance Evaluation

As discussed in this section and in Section 3, below, the EPA has analyzed TCEQ's future-year model projections for the DFW and HGB areas within Texas and also at downwind areas in Colorado, Arizona, Southern California, Illinois, Wisconsin, and Michigan to which Texas contributes at or above 1 percent of the NAAQS in the EPA's 2011 base case modeling, and/or the EPA's 2016v2 modeling, and/or TCEQ's modeling. The EPA also compared TCEQ's 2023 projections with recent DVs (2020) and preliminary DVs (2021) in these areas together with potential changes in DVs in the next two to three years. The results of this comparison indicate that TCEQ's projections likely underestimate future ozone levels. TCEQ's projected ozone concentrations in 2023 are much lower than measured DVs in 2020 and preliminary 2021 DVs without there being an unusual level of emission reductions to support the projected sharp decline in DVs. The EPA compared recent monitoring values and reasonably anticipated decreases (e.g., on the order of approximately 0-1 ppb/year – see discussion on ozone trends in Section 1 above) in DVs by 2023 both within Texas and in other parts of the country. These underestimations likely result in TCEQ's modeling not adequately identifying nonattainment and/or maintenance receptors in 2023.

In subsection 2.a, we evaluate the potential underestimation of TCEQ's DFW and HGB 2023 modeled DVs based on a comparison to recent monitoring and potential DV changes assuming that the average long-term trend in DVs continues over the next 2-3 years. In subsection 2.b, we evaluate the potential underestimation of TCEQ's 2023 modeled DVs in downwind areas (Chicago Nonattainment Area, Wisconsin, Colorado, Arizona, and Southern California) that have receptors identified in either the EPA or TCEQ's modeling compared with recent monitoring and potential DV changes assuming that the average long-term trend in DVs

continues over the next 2-3 years.  In subsections 2.c. and 2.d. we review TCEQ's 2012 base case model performance in the DFW and HGB areas and in downwind receptor areas (Chicago NAA, Wisconsin, Colorado, Arizona and Southern California) to assess whether TCEQ's modeling platform provides technically sound data for projecting future year ozone design values and interstate contributions. In subsection 2.e, we summarize the findings of the EPA's review in this Section 2.

### 2.a. Potential Underestimation in TCEQ's Modeling 2023 Future year projections at DFW & HGB receptors and High DV monitors

TCEQ's modeling includes projections of future year 2023 design values for monitors within the large metropolitan areas of DFW and HGB, both of which continue to monitor ozone nonattainment and have been designated as 2015 8-hour ozone nonattainment areas. TCEQ has previously developed attainment demonstration SIP submissions for both of the HGB and DFW nonattainment areas.[21] TCEQ also included in these previous attainment demonstration SIPs long-term ozone monitored DV trend analysis for both the HGB and DFW areas that indicate the average annual decrease in ozone DVs was approximately 1 to 1.2 ppb/year.[22] In Section 1, above, the EPA's analysis  in Section 1 above of the most recent 9 years of DVs in DFW and 10 years of DVs in HGB indicate a similar trend of 1 ppb/year or less. Using these DV monitored (not modeled) trends indicates that emissions decreases between 2020 and 2023 could potentially be anticipated to result in a drop in ozone concentrations of approximately 3-4 ppb at most receptors if no variability in meteorology is considered and no large emission reduction

---

[21] TCEQ's "Dallas-Fort Worth (DFW) Attainment Demonstration State Implementation Plan Revision for the 2008 Eight-Hour Ozone Standard Nonattainment Area" Adopted July 6, 2016 and TCEQ's "Houston-Galveston-Brazoria Serious Classification Attainment Demonstration State Implementation Plan Revision for the 2008 Eight-Hour Ozone National Ambient Air Quality Standard", Adopted March 4, 2020.
[22] *Id.*

programs are implemented in Texas or on a national level. [23] That is to say, without significant

unexpected reductions beyond the effects of existing control measures, a 3-4 ppb decline in

ozone concentrations during this 3-year period is the most that could be anticipated at

DFW/HGB monitors. To assess if TCEQ's ozone transport modeling is potentially

underestimating future year 2023 modeled DVs in DFW and HGB areas, the EPA compared

2020 monitored DVs (2018-2020 monitored data) at several of the typically higher ozone

monitors in the DFW and HGB area with TCEQ's projected 2023 DVs in Table 2.1. While not

as exact as developing new modeling of emission changes from 2020 to 2023 to project 2023

DVs (nor appropriate for use in any other context), using the general 3-4 ppb approximation

provides a ballpark estimate to evaluate whether TCEQ's modeling might be underestimating

2023 future DVs. As can be seen in Table 2.1, there are many monitors in DFW and HGB that

would need a drop in ozone DVs over the next 3 years of > 5 ppb (values of -5 ppb or more in

the far right column) to reach TCEQ's 2023 modeled projected levels. The EPA also evaluated

just the 2023 DVs for monitors with 2020 DVs ≥ 74 ppb (2018-2020 monitored DV), and for the

monitors that TCEQ projected to be attaining (DV < 71 ppb) EPA examined all monitors that

had a 2020 DV ≥ 71 ppb and also the subset of these monitors with a 2020 DV ≥ 74 ppb. For

monitors with a 2020 DV ≥ 74 ppb, ozone concentrations would have to drop by 3-4 ppb for

these monitors to attain by 2023. For the 15 monitors that TCEQ projected to be attaining in

2023 (red font in table) and had a 2020 DVs ≥ 71 ppb, the average amount of decrease in DVs

---

[23] We use this ballpark figure here only as a bounding assumption relevant to an analytical exercise establishing why the TCEQ modeling submitted in its transport SIP submittal likely under-projects future ozone concentrations. The 3 to 4 ppb figure does not represent any analysis or conclusions regarding actual emissions reductions in Texas or any other state. The EPA has no basis to assume even this level of reduction in ozone concentrations will actually occur, nor is this estimate based on any assessment of the effects of permanent and enforceable emissions reductions in any SIP or FIP or resulting from any other known or upcoming CAA requirements. As such, this estimate is not usable in any other CAA action, nor would it be a defensible basis on which to reach any conclusions regarding future air quality conditions, without far greater technical and legal analysis than the Agency can provide at this time.

needed to match TCEQ's 2023 projection is 8.0 ppb. For the eight monitors that TCEQ projected

to be attaining in 2023 and had a 2020 DV of ≥ 74 ppb, the average amount of decrease in DVs

needed to match TCEQ's 2023 projection is 9.25 ppb, and they would have to drop at least 3-4

ppb (up to 8-9 ppb) to have a DV of 70 ppb.[24] In other words, for all the monitors with the

highest 2020 monitored DVs, TCEQ's modeling projections of 2023 would necessitate average

reductions in DVs over this three year period of 9.25 ppb, much larger than the 3-4 ppb that

would be  considered as a possible upper bound based on an extrapolation of long-term trends.

Drops in 8-hour ozone DVs on average of 7.56 ppb over three years at many monitors in these

areas do not typically occur unless there is an unexpectedly large change in emissions and/or

large change in meteorological conduciveness for ozone generation (see multiple trends analysis

figures in Section 1). TCEQ did not identify any such large emission reductions to be

implemented in the 2021-2023 timeframe. This analysis supports a finding that TCEQ's

modeling is likely underestimating future ozone DVs in the two nonattainment areas in Texas.

---

[24] Due to the uncertainty with using the whole number DVs, the truncation method used at the end of the DV calculation impacts the exact value. For a monitor with a 2020 DV of 74 ppb it would take at least a value of 3 ppb or greater and could be 4 ppb or more prior to truncation.

**Table 2.1 TCEQ Projected Future 2023 DVs Compared to 2020 Monitored DVs**

| State | County | AQS ID | TCEQ 2023 Future Design Value-DV (ppb) | Monitored Data from AQS 2020 DV (ppb) | Delta in 3 years 2020 Monitor DV - TCEQ 2023 DV (ppb) |
|-------|--------|--------|------------|------------|------------|
| Texas | Brazoria | 480391004 | 78 | 73 | 5 |
| Texas | Brazoria | 480391016 | 60 | 65 | -5 |
| Texas | Collin | 480850005 | 66 | 75 | -9 |
| Texas | Dallas | 481130069 | 64 | 69 | -5 |
| Texas | Dallas | 481130075 | 63 | 74 | -11 |
| Texas | Dallas | 481130087 | 61 | 69 | -8 |
| Texas | Denton | 481210034 | 68 | 72 | -4 |
| Texas | Denton | 481211032 | 66 | 72 | -6 |
| Texas | Ellis | 481390016 | 60 | 64 | -4 |
| Texas | Ellis | 481391044 | 57 | 63 | -6 |
| Texas | Galveston | 481671034 | 67 | 74 | -7 |
| Texas | Harris | 482010024 | 68 | 79 | -11 |
| Texas | Harris | 482010026 | 66 | 69 | -3 |
| Texas | Harris | 482010029 | 67 | 73 | -6 |
| Texas | Harris | 482010046 | 66 | 64 | 2 |
| Texas | Harris | 482010047 | 69 | 72 | -3 |
| Texas | Harris | 482010051 | 68 | 70 | -2 |
| Texas | Harris | 482010055 | 68 | 76 | -8 |
| Texas | Harris | 482010062 | 72 | 67 | 5 |
| Texas | Harris | 482010066 | 68 | 69 | -1 |
| Texas | Harris | 482010416 | 72 | 73 | -1 |
| Texas | Harris | 482011015 | 64 | 67 | -3 |
| Texas | Harris | 482011034 | 71 | 73 | -2 |
| Texas | Harris | 482011035 | 68 | 70 | -2 |
| Texas | Harris | 482011039 | 74 | 78 | -4 |
| Texas | Harris | 482011050 | 68 | 70 | -2 |
| Texas | Johnson | 482510003 | 62 | 73 | -11 |
| Texas | Kaufman | 482570005 | 58 | 64 | -6 |
| Texas | Montgomery | 483390078 | 64 | 74 | -10 |
| Texas | Tarrant | 484390075 | 65 | 75 | -10 |
| Texas | Tarrant | 484391002 | 63 | 72 | -9 |
| Texas | Tarrant | 484392003 | 66 | 73 | -7 |
| Texas | Tarrant | 484393009 | 68 | 76 | -8 |
| Texas | Tarrant | 484393011 | 62 | 69 | -7 |
| | | | | Avg ALL | -4.97 |
| | | | | Avg if 2020 DV ≥ 74 ppb | -7.56 |
| | | | Avg if TCEQ 2023 DV <71 ppb but 2020 DV ≥71 ppb | | -8.00 |
| | | | Avg if TCEQ 2023 DV <71 ppb but 2020 DV ≥74 ppb | | -9.25 |

We also note that ODEQ relied on TCEQ's future year 2023 modeled DVs at three nonattainment/maintenance receptors in their SIP submission. Oklahoma was linked to these three receptors in the EPA's previous modeling results included in the EPA's March 2018 memorandum. These monitors included 2 monitors in the DFW area (Tarrant County AQS ID 484392003 and Denton County AQS ID 481210034) and one monitor in the HGB area (Brazoria County AQS ID 480391004). The EPA's 2016v2 modeling indicates that Oklahoma is linked to the Denton County monitor (AQS ID 48120034) that is identified as a maintenance receptor. Included as Table 2.2 is information from the Oklahoma 2015 Ozone Transport SIP submission that utilized information from the EPA's March 2018 memorandum on Transport Modeling Results.

**Table 2.2 Oklahoma's Transport SIP Information Referring to Linkages to Texas Receptors (EPA March 2018 memorandum)**

| Receptor (Site ID, County, State) | 2023 Average DV (ppb) | 2023 Maximum DV (ppb) | Oklahoma Contribution (ppb) | Oklahoma's Step 1 and 2 Determination |
|---|---|---|---|---|
| 481210034, Denton, TX | 69.7 | 72.0 | 1.23 | Maintenance receptor identified for further analysis. |
| 484392003, Tarrant, TX | 72.5 | 74.8 | 1.71 | Nonattainment receptor identified for further analysis. |
| 480391004, Brazoria, TX | 74.0 | 74.9 | 0.90 | Nonattainment receptor with contribution less than 1 ppb; no further analysis. |

From Table 2.1 we note that the two receptors in the DFW area (based on EPA's March 2018 memorandum) are currently monitoring nonattainment with a 2020 DV of 72 ppb at the Denton County maintenance receptor and a 2020 DV of 73 ppb at the Tarrant County

nonattainment receptor. TCEQ projected 2023 DVs of 68 ppb for the Denton County monitor and 66 ppb for the Tarrant County nonattainment receptor. We note that the nonattainment receptor in HGB (Brazoria County AQS ID 480391004) is currently monitoring a 73 ppb (2020 DV) but was projected to be 78 ppb in TCEQ's 2023 modeled projections. We note that in the HGB area the maximum monitored values can vacillate between monitors depending upon the variations in local and synoptic meteorology from one year to the next. Based on most recent DVs at these three monitors, it is possible that they may reach attainment by 2023; however even if they attain, it is likely that they would be close to the NAAQS, and therefore, may still be considered maintenance receptors. A drop of 3 ppb (1 ppb/year) would result in DVs of 70 ppb at two monitors and 69 ppb at the Denton monitor. As discussed above, TCEQ's 2023 model projections for these three monitors raises likely underestimation concerns for the two DFW monitors and raises concerns with the adequacy of relying on TCEQ's modeling to conclude that the two DFW monitors are not at least maintenance receptors in 2023 for which Oklahoma is linked. The EPA's more recent modeling (2016v2) also indicates Oklahoma is linked to the Denton monitor which is identified as a maintenance receptor.

### 2.b. Potential Underestimation in TCEQ's 2023 Future year projections at downwind areas

As discussed above, absent variability in meteorology and any unexpectedly large local/regional/national implementation of emission reductions, the drop in monitored ozone DVs from 2020 to 2023 would be expected to be at most 3-4 ppb, based on an assumed continuation of long-term trends at large nonattainment metropolitans that have been identified in TCEQ's modeling or the EPA's 2011 and 2016v2 modeling. (Once again, we emphasize that this estimate serves as a bounding exercise in this technical analysis and does not reflect any legal or policy judgments regarding whether even this degree of reduction in ozone concentrations is reasonable

to assume for any given receptor.) While not as exact as developing new modeling of emission changes from 2020 to 2023 to project 2023 DVs, using the general 3-4 ppb figure provides a ballpark estimate to evaluate if TCEQ's modeling might be underpredicting 2023 future DVs at areas in the Chicago, IL/Wisconsin/Michigan area; the Denver, CO area; Cochise County, AZ receptor; and Southern California areas.[25] We note that in our evaluation of the most recent DV trends in these areas that the annual average change from 2010 to 2020 DVs ranged from increasing to decreasing at most approximately 1 ppb/year, so use of 3-4 ppb is an indicator of the most by which DVs could potentially be estimated to drop between 2020 and 2023. Further, the trends data for these areas indicate the change will likely be less than a 3-4 ppb decrease for many monitors. To assess if TCEQ's modeling is potentially underestimating future year 2023 modeled DVs in these downwind areas, the EPA has compared 2020 monitored DVs at many typically higher ozone monitors in these areas with TCEQ's projected 2023 DVs in Table 2.3, Table 2.4, and Table 2.5.

---

[25] We use this ballpark figure here only as a bounding assumption relevant to an analytical exercise establishing why the TCEQ modeling submitted in its transport SIP submittal likely under-projects future ozone concentrations. The 3 to 4 ppb figure does not represent any analysis or conclusions regarding actual emissions reductions in Texas or any other state. The EPA has no basis to assume even this level of reduction in ozone concentrations will actually occur, nor is this estimate based on any assessment of the effects of permanent and enforceable emissions reductions in any SIP or FIP or resulting from any other known or upcoming CAA requirements. As such, this estimate is not usable in any other CAA action, nor would it be a defensible basis on which to reach any conclusions regarding future air quality conditions, without far greater technical and legal analysis than the Agency can provide at this time.

**Table 2.3 TCEQ Projected Future 2023 DVs Compared to 2020 Monitored DVs (IL, WI, & MI)**

| State | County | AQS ID | TCEQ 2023 Future Design Value-DV (ppb) | Monitored 2020 DV (ppb) | Delta in 3 years 2020 Monitor DV - TCEQ 2023 DV (ppb) |
|---|---|---|---|---|---|
| \multicolumn | Chicago and Downwind areas in Wisconsin and Michigan | | | | |
| Illinois | Cook | 170310001 | 60 | 75 | -15 |
| Illinois | Cook | 170310032 | 68 | 74 | -6 |
| Illinois | Cook | 170310076 | 61 | 69 | -8 |
| Illinois | Cook | 170311003 | 60 | 73 | -13 |
| Illinois | Cook | 170311601 | 61 | 71 | -10 |
| Illinois | Cook | 170314002 | 61 | 71 | -10 |
| Illinois | Cook | 170314007 | 57 | 71 | -14 |
| Illinois | Cook | 170314201 | 64 | 77 | -13 |
| Illinois | Cook | 170317002 | 66 | 75 | -9 |
| Michigan | Allegan | 260050003 | 71 | 73 | -2 |
| Wisconsin | Door | 550290004 | 64 | 72 | -8 |
| Wisconsin | Kenosha | 550590019 | 67 | 74 | -7 |
| Wisconsin | Manitowoc | 550710007 | 65 | 70 | -5 |
| Wisconsin | Milwaukee | 550790010 | 58 | 62 | -4 |
| Wisconsin | Milwaukee | 550790085 | 66 | 70 | -4 |
| Wisconsin | Sheboygan | 551170006 | 70 | 75 | -5 |
| | | | | Avg ALL | -8.31 |
| | | | | Avg if Current DV ≥ 74 ppb | -9.17 |
| | | | | Avg if TCEQ 2023 < 71 ppb but 2020 DV ≥ 71 ppb | -10.00 |
| | | | | Avg if TCEQ 2023 <71 ppb but 2020 DV ≥ 74 ppb | -9.17 |

**Table 2.4 TCEQ Projected Future 2023 DVs Compared to 2020 Monitored DVs (CO)**

| State | County | AQS ID | TCEQ 2023 Future Design Value-DV (ppb) | Monitored 2020 DV (ppb) | Delta in 3 years 2020 Monitor DV - TCEQ 2023 DV (ppb) |
|---|---|---|---|---|---|
| \multicolumn{6}{c}{Denver and downwind areas in Colorado} | | | | | |
| Colorado | Adams | 80013001 | 65 | 69 | -4 |
| Colorado | Arapahoe | 80050002 | 70 | 77 | -7 |
| Colorado | Arapahoe | 80050006 | 66 | 71 | -5 |
| Colorado | Boulder | 80130011 | 67 | 74 | -7 |
| Colorado | Denver | 80310002 | 57 | 70 | -13 |
| Colorado | Douglas | 80350004 | 73 | 81 | -8 |
| Colorado | Jefferson | 80590005 | 68 | 71 | -3 |
| Colorado | Jefferson | 80590006 | 72 | 79 | -7 |
| Colorado | Jefferson | 80590011 | 71 | 80 | -9 |
| Colorado | Larimer | 80690007 | 69 | 70 | -1 |
| Colorado | Larimer | 80690011 | 72 | 75 | -3 |
| Colorado | Larimer | 80691004 | 65 | 67 | -2 |
| Colorado | Weld | 81230009 | 70 | 70 | 0 |
| | | | | Avg ALL | -5.31 |
| | | | | Avg if Current DV ≥ 74 ppb | -6.83 |
| | | | | Avg if TCEQ 2023 < 71 ppb but 2020 DV ≥ 71 ppb | -5.50 |
| | | | | Avg if TCEQ 2023 < 71 ppb but 2020 DV ≥ 74 ppb | -7.00 |

**Table 2.5 TCEQ Projected Future 2023 DVs Compared to 2020 Monitored DVs (AZ & CA)**

| State | County | AQS ID | TCEQ 2023 Future Design Value-DV (ppb) | Monitored 2020 DV (ppb) | Delta in 3 years 2020 Monitor DV – TCEQ 2023 DV (ppb) |
|---|---|---|---|---|---|
| Arizona | Cochise | 40038001 | 71 | 66 | 4 |
| California | Los Angeles | 60370002 | 74 | 97 | -23 |
| California | Los Angeles | 60370016 | 87 | 107 | -20 |
| California | Los Angeles | 60370113 | 59 | 70 | -11 |
| California | Los Angeles | 60371103 | 63 | 76 | -13 |
| California | Los Angeles | 60371201 | 80 | 92 | -12 |
| California | Los Angeles | 60371302 | 52 | 64 | -12 |
| California | Los Angeles | 60371602 | 70 | 78 | -8 |
| California | Los Angeles | 60371701 | 80 | 88 | -8 |
| California | Los Angeles | 60372005 | 72 | 93 | -21 |
| California | Los Angeles | 60375005 | 57 | 62 | -5 |
| California | Los Angeles | 60376012 | 87 | 101 | -14 |
| California | Riverside | 60650012 | 85 | 99 | -14 |
| California | Riverside | 60650016 | 63 | 78 | -15 |
| California | Riverside | 60651016 | 87 | 99 | -12 |
| California | Riverside | 60652002 | 75 | 84 | -9 |
| California | Riverside | 60655001 | 78 | 88 | -10 |
| California | Riverside | 60656001 | 78 | 94 | -16 |
| California | Riverside | 60658001 | 88 | 96 | -8 |
| California | Riverside | 60658005 | 84 | 98 | -14 |
| California | Riverside | 60659001 | 73 | 87 | -14 |
| California | San Bernardino | 60710001 | 71 | 81 | -10 |
| California | San Bernardino | 60710005 | 96 | 90 | 6 |
| California | San Bernardino | 60710012 | 83 | 90 | -7 |
| California | San Bernardino | 60710306 | 76 | 83 | -7 |
| California | San Bernardino | 60711004 | 91 | 106 | -15 |
| California | San Bernardino | 60712002 | 94 | 102 | -8 |
| California | San Bernardino | 60714001 | 82 | 87 | -5 |
| California | San Bernardino | 60714003 | 94 | 114 | -20 |
| California | San Bernardino | 60719002 | 79 | 86 | -7 |
| California | San Bernardino | 60719004 | 88 | 110 | -22 |
| | | | | Avg ALL | -11.29 |
| | | | | Avg if Current DV ≥ 74 ppb | -12.07 |
| | | | Avg if TCEQ 2023 < 71 ppb but 2020 DV ≥ 71 ppb | | -12.00 |
| | | | Avg if TCEQ 2023 < 71 ppb but 2020 DV ≥ 74 ppb | | -12.00 |

As can be seen in Tables 2.3, 2.4, 2.5 there are many monitors in these downwind areas that would need a drop in ozone DVs over the next 3 years of ≥ 5 ppb (values of -5 ppb or more in the far-right column) to reach TCEQ's 2023 modeled projected levels. For each of these downwind areas, the EPA also examined the TCEQ modeled 2023 DVs for monitors with 2020 DVs ≥ 74 ppb, and for the monitors that TCEQ projected to be attaining (DV < 71 ppb) EPA examined all monitors that had a 2020 DV ≥ 71 ppb, and also the subset of these monitors with a 2020 DV ≥ 74 ppb. This DV concentration was chosen since a 2020 DV of 74 ppb or less would drop to a DV below the NAAQS with a 3 to 4 ppb reduction between 2020 and 2023. However even if these monitors show attainment in 2023, it is likely that their DVs would be close to the NAAQS, and therefore, may still be considered maintenance receptors.[26]

For the subset of monitors in Illinois, Wisconsin, and Michigan with 2020 DVs ≥ 74 ppb, the average amount of decrease in DVs needed to match TCEQ's 2023 projection is 9.17 ppb, which is more than the 3-4 ppb that could be anticipated at most for monitors in these areas. For the 11 monitors that TCEQ projected to be attaining in 2023 (red font in table) and had a 2020 DVs ≥ 71 ppb, the average amount of decrease in DVs needed to match TCEQ's 2023 projection is 10.0 ppb. For the six monitors that TCEQ projected to be attaining in 2023 and had a 2020 DV of ≥ 74 ppb, the average amount of decrease in DVs needed to match TCEQ's 2023 projection is 9.17 ppb, and they would have to drop a minimum of 3-4 ppb (up to 7 ppb) to have a DV of 70 ppb. Drops in 8-hour ozone DVs on average of 9.17 ppb or more in three years at many monitors in these areas do not typically occur unless there is an unexpectedly large change in emissions and/or large change in meteorological conduciveness for ozone generation (see figures in Section

[26] The EPA is not concluding that the sites identified by TCEQ are or are not "receptors" for purposes of ozone interstate transport policy. Rather, we are analyzing the technical reliability of the TCEQ modeling to project future design values.

1.c). TCEQ did not identify any such large emission reductions to be implemented in the 2021-2023 timeframe. Based on this information, TCEQ's modeling is likely underestimating future ozone levels at monitors/receptors in Illinois, Wisconsin, and Michigan. These underestimations likely prevented TCEQ from identifying nonattainment/maintenance receptors. The EPA's modeling results included in the March 2018 memorandum and/or EPA's 2016v2 modeling collectively have identified nonattainment/maintenance receptors in the Chicago area of Illinois and downwind areas in Wisconsin and Michigan that have or had projected linkages to emissions from Texas (Texas's contribution was greater than 0.7 ppb).

As can be seen in Table 2.4, for the monitors in Colorado with 2020 DVs $\geq$ 74 ppb, the average amount of decrease in DVs needed to match TCEQ's 2023 projection is 6.83 ppb, which is more than the 3-4 ppb that could be anticipated at most for monitors in these areas. For the four monitors that TCEQ projected to be attaining in 2023 (red font in table) and had a 2020 DVs $\geq$ 71 ppb, the average amount of decrease in DVs needed to match TCEQ's 2023 projection is 5.50 ppb. For the two monitors that TCEQ projected to be attaining in 2023 and had a 2020 DV of $\geq$ 74 ppb, the average amount of decrease in DVs needed to match TCEQ's 2023 projection is 7.00 ppb, and they would have to drop a minimum of 3-4 ppb (up to 7 ppb) to have a DV of 70 ppb. Drops in 8-hour ozone DVs on average of 7 ppb or more in three years at multiple monitors in this area would not typically be expected to occur unless there is an unexpectedly large change in emissions and/or large change in meteorological conduciveness for ozone generation (see Figures in Section 1.c).

As can be seen in Table 2.5, for the monitors in Southern California with 2020 DVs $\geq$ 74 ppb, the average amount of decrease in DVs needed to match TCEQ's 2023 projection is 12.07 ppb, which is more than the 3-4 ppb (see Section 1) that could be anticipated at most for

monitors in these areas. For the three monitors that TCEQ projected to be attaining in 2023 and

had a 2020 DV of ≥ 74 ppb, the average amount of decrease in DVs needed to match TCEQ's

2023 projection is 12.00 ppb, and they would have to drop a minimum of 5-6 ppb (up to 8 ppb)

to have a DV of 70 ppb. Drops in 8-hour ozone DVs on average of 9.17 ppb or more in three

years at many monitors in these areas would not typically be expected to occur unless there is an

unexpectedly large change in emissions and/or large change in meteorological conduciveness for

ozone generation (see figures in Section 1.c).

Based on this information, TCEQ's modeling appears to be underestimating future ozone

levels at monitors/receptors in Illinois, Wisconsin, Michigan, Colorado, and Southern California

areas, and these underestimations may have prevented TCEQ from identifying

nonattainment/maintenance receptors. Even with the underestimation of projected DVs, TCEQ

identified several nonattainment/maintenance receptors in Colorado and California with linkages

to Texas with contributions ≥ 0.7 ppb. The EPA's modeling results included in the March 2018

memorandum also identified nonattainment/maintenance receptors in the greater Denver area of

Colorado (Jefferson County) that also had linkages to emissions from Texas. (Texas'

contribution was greater than 0.7 ppb).

### 2.c. Model Performance Evaluation of TCEQ's 2012 base case at downwind areas in the Midwest and West.

TCEQ included a Model Performance Evaluation (MPE) analysis of their 2012 base case

modeling in their SIP submission and in an Appendix to the SIP submission "Appendix C –

Photochemical Model Performance Evaluation for the Transport State Implementation Plan

Revision for the 2015 Eight-Hour Ozone National Ambient Air Quality Standard." TCEQ

included MPE by climate regions of the U.S. Included as Figure 2.1 below is TCEQ's Table 3-7

in their SIP submission which provides statistical model performance evaluation metrics for

TCEQ's 2012 base case modeling. The EPA reviewed the information in the appendix as well as model performance information available on TCEQ's websites.[27]

The EPA agrees with findings by TCEQ in Appendix C that model performance varied across the U.S. and that TCEQ's 2012 base case under predicted the high end of the distribution of observed MDA8 ozone concentrations in the Midwest and West, including the Chicago area, Southeast Wisconsin, Denver, Arizona, and Southern California areas.[28] These areas include sites that were identified in TCEQ's modeling and in the EPA's 2016v2 modeling as nonattainment/maintenance receptors.

Overall, the modeling indicates some model underestimation in the Upper Midwest, Ohio Valley, Southwest (includes Colorado monitors), and in the West (includes Southern California) regions. While this is mostly within typical ranges seen for Continental U.S. chemical transport modeling, underestimation bias may play some role in the much lower 2023 DVs that TCEQ's modeling is projecting at a number of potential receptor sites.

---

[27] TCEQ's Model Performance Evaluation was reviewed for downwind areas using information from TCEQ's websites (hyperlinks are embedded): 2015 Ozone NAAQS Transport SIP Modeling - Interactive Bar Chart - Texas Commission on Environmental Quality - www.tceq.texas.gov and 2015 Ozone NAAQS Transport SIP Modeling - Model Performance Statistics by Area and Day - Texas Commission on Environmental Quality - www.tceq.texas.gov.
[28] TCEQ SIP Submission, Table 3-7 at page 3-32; TCEQ SIP Submission "Appendix C Photochemical Model Performance Evaluation for the Transport State Implementation Plan Revision for the 2015 Eight-Hour Ozone National Ambient Air Quality Standard."

Figure 2.1 - TCEQ's SIP Submission Table 3-7 Model performance evaluation statistical metrics by Region for TCEQ's 2012 base case

**Table 3-7: Statistical Model Performance Evaluation Metrics for TCEQ's 2015 Ozone NAAQS Transport SIP Revision Configuration**

| Climate Region | No. of Obs | MB (ppb) | ME (ppb) | NMB (%) | NME (%) | RMSE (ppb) |
|---|---|---|---|---|---|---|
| Northeast | 5281 | 4.1 | 8.4 | 5.9 | 12.2 | 11.0 |
| Ohio Valley | 9861 | -2.5 | 6.8 | -3.6 | 10.0 | 8.5 |
| Upper Midwest | 2950 | -6.2 | 8.3 | -8.9 | 11.9 | 9.9 |
| Southeast | 3203 | 3.1 | 6.8 | 4.7 | 10.2 | 8.8 |
| South | 5020 | -3.9 | 6.5 | -5.7 | 9.6 | 8.1 |
| Southwest | 7215 | -5.5 | 7.1 | -8.4 | 10.8 | 9.0 |
| Northern Rockies | 1084 | -7.5 | 8.6 | -11.8 | 13.4 | 10.4 |
| Northwest | 193 | -7.0 | 8.2 | -10.9 | 12.7 | 10.2 |
| West | 10672 | -9.2 | 10.4 | -13.1 | 14.9 | 12.7 |
| National | 45479 | -3.9 | 8.0 | -5.7 | 11.7 | 10.1 |

We have included two figures from TCEQ's SIP submission that show Mean Bias and Root Mean Square Error (RMSE) for each monitor in the domain. Included as Figure 2.2 is TCEQ's Figure 3-26 in their SIP submission, which provides mean bias for May through September 2012 at all of the EPA Air Quality System (AQS) monitoring sites for days with observed MDA8 ozone concentration ≥ 60 ppb. Figure 2.2 shows that the mean biases for days with MDA8 ozone concentrations ≥ 60 ppb differ by region, but at a number of monitors in the Chicago, southeastern Wisconsin, Denver, Arizona, and southern California areas, TCEQ's modeling has a negative mean bias.

Figure 2.3 (TCEQ's Figure 3-27 in their SIP submission) provides RMSE[29] for the May through September 2012 at AQS Monitoring Sites for each of the days with observed MDA8 > 60 ppb. The RMSE at most monitors in the modeling domain were in the range of 6 to 12 ppb. However, many monitors in the Midwest, including in the Chicago area and southeastern

---

[29] Root Mean Square Error (RMSE): This performance statistic (in units of ppb or micrograms per cubic meter($\mu$g/m$^3$)) is a measure of the average distance between predicted and observed values. It is calculated as the standard deviation of the difference between modeled and observed values

Wisconsin as well as monitors in Arizona and California, have higher deviations with RMSE in the 8 to 14 ppb range.

Figure 2.2 – TCEQ's SIP Submission Figure 3-26 showing Mean Bias at each monitor



**Figure 3-26:  Mean Bias for the May through September 2012 Episode at AQS Monitoring Sites**

Figure 2.3 – TCEQ's SIP Figure 3-27 showing Root Mean Square Error (RMSE) at each monitor



**Figure 3-27:  RMSE for May through September 2012 Episode at AQS Monitoring Sites**

The EPA examined TCEQ's model performance at monitors in Cook County, Illinois, Wisconsin, and Michigan that were identified in EPA's 2011-based modeling and its 2016v2 modeling as receptors to which Texas contributes $\geq$ 1 percent of the NAAQS. TCEQ's modeling underestimates MDA8 ozone at these monitors and TCEQ's modeling also underestimates observed values at key monitor/receptors in Colorado. Even with these underprediction concerns, TCEQ's modeling analysis still identified 4 nonattainment/maintenance receptors in Colorado including the Jefferson County (AQS ID 80590011), which the EPA also identified as a receptor with Texas linkage in modeling results included in our March 2018 memorandum. The ability of TCEQ's modeling to replicate the highest days both in Texas and at downwind areas is important to having an adequate modeling analysis to both assess potential nonattainment/maintenance receptors and linkages to upwind states. Both the EPA's modeling included in the March 2018 memorandum and TCEQ's modeling identified nonattainment/maintenance receptors in Jefferson County, CO. We also note that TCEQ's analysis also identified one additional receptor in Jefferson County, CO, one monitor in Larimer County, CO, and one receptor in Douglas County, CO with linkage impacts greater than 0.7 ppb from Texas emissions.

TCEQ's modeling also underestimates observed values at key monitor/receptors in Arizona and California that TCEQ identified as nonattainment and/or maintenance receptors with linkages to Texas. TCEQ did identify Texas emissions as having impacts of more than 0.7 ppb, and thus, linked to some nonattainment/maintenance receptors in Arizona and California.

The EPA finds that although TCEQ's modeling under predicts the highest measured MDA8 concentrations in downwind areas, including downwind areas that have been identified by TCEQ or EPA's 2016v2 modeling to have nonattainment/maintenance receptors, overall model performance does not indicate that TCEQ's modeling was egregiously flawed. That is,

the results of the base year model performance provided by TCEQ in their submittal does not appear to be a clear factor contributing to the likely underestimation of future year 2023 model-predicted DVs.

### 2.d. Model Performance Evaluation of TCEQ's 2012 base case at DFW and HGB monitors

In this section we present an evaluation of TCEQ's 2012 base case model performance in the DFW & HGB areas. We conducted this analysis to identify if there were any serious problems with TCEQ's 2012 base year model performance that might potentially affect the projection of future year DVs. TCEQ provides some model performance evaluation data for their 2012 base case modeling for this transport SIP on a website,[30] which the EPA used to generate the figures below, indicating some low bias at key monitor/receptors in the DFW and HGB area (Figures 2.4 a-f). The EPA has provided a time series using TCEQ's model performance information that indicates the observed Maximum Daily Average 8-hour ozone (MDA8) value in red and modeled value in blue for two monitors in the DFW area and one in the HGB area that were identified in the EPA's March 2018 memorandum that Oklahoma was linked (AQS ID 481210034 Denton County, AQS ID 484392003 Tarrant County, and AQS ID 480391004 Brazoria County). We also evaluated three additional monitors (Eagle Mountain Lake, Grapevine, and Frisco) in the DFW area, which are among the monitors that often have the highest DVs the DFW area. These figures also include quantile-quantile (Q-Q) scatter plots, comparing observed to modeled MDA8.In Table 2.6 the EPA provides statistical metrics for this

---

[30] TCEQ's Model Performance Evaluation was reviewed for DFW, HGB, and downwind areas using information from TCEQ's websites: 2015 Ozone NAAQS Transport SIP Modeling - Interactive Bar Chart - Texas Commission on Environmental Quality - www.tceq.texas.gov
 and 2015 Ozone NAAQS Transport SIP Modeling - Model Performance Statistics by Area and Day - Texas Commission on Environmental Quality - www.tceq.texas.gov

subset of DFW area monitors and for some of the HGB area monitors including the Manvel

Croix monitor (AQS ID 480391004) that typically have the highest DVs in the HGB area.

Figure 2.4(a) – Brazoria County – Manvel Croix Time Series MDA8
Observed (red) and Modeled (blue) and Scatter Q-Q plots





Figure 2.4(b) – Denton County – Denton Airport South Time Series MDA8
Observed (red) and Modeled (blue) and Scatter Q-Q plots





Figure 2.4(c) – Tarrant County – FAA Site Time Series MDA8
Observed (red) and Modeled (blue) and Scatter Q-Q plots





Figure 2.4(d) – Tarrant County – Eagle Mountain Lake Time Series MDA8
Observed (red) and Modeled (blue) and Scatter Q-Q plots





Figure 2.4(e) – Tarrant County – Grapevine Time Series MDA8
Observed (red) and Modeled (blue) and Scatter Q-Q plots





Figure 2.4(f) – Collin County – Frisco Time Series MDA8
Observed (red) and Modeled (blue) and Scatter Q-Q plots





Table 2.6 Model Performance Statistics for Select DFW and HGB monitors including sites identified as receptors
in EPA's March 2018 Memorandum and EPA's 2016v2 modeling

| Site | | Valid Data | Mo ppb | Mm ppb | MB ppb | ME ppb | RMSE ppb | NMB % | NME % | FB % | FE % | R2 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | **Select DFW Sites : Data with Observed ≥ 60 ppb** | | | | | | |
| Frisco | 480850005 | 68 | 69.25 | 65.49 | -3.76 | 6.43 | 7.95 | -5.43 | 9.28 | -5.66 | 9.55 | 0.345 |
| Denton Airport South | 481210034 | 51 | 69.82 | 65.92 | -3.91 | 5.20 | 6.99 | -5.60 | 7.44 | -5.86 | 7.73 | 0.529 |
| Eagle Mtn. Lake | 483670081 | 45 | 67.20 | 61.19 | -6.01 | 6.86 | 7.92 | -8.94 | 10.21 | -9.40 | 10.69 | 0.501 |
| FAA | 484390075 | 41 | 68.07 | 65.04 | -3.04 | 5.60 | 6.79 | -4.46 | 8.22 | -4.67 | 8.56 | 0.495 |
| Grapevine | 484392003 | 51 | 68.20 | 66.15 | -2.05 | 4.67 | 6.03 | -3.00 | 6.85 | -3.14 | 7.05 | 0.532 |
| | | | | | | | | | | | | |
| | | | | | | **Select HGB Sites : Data with Observed ≥ 60 ppb** | | | | | | |
| Brazoria -Manvel Croix | 480391004 | 36 | 72.25 | 66.9 | -5.35 | 8.44 | 11.08 | -7.40 | 11.68 | -6.80 | 11.39 | 0.566 |
| Harris - Aldine | 482010024 | 18 | 68.00 | 72.76 | 4.76 | 6.37 | 8.61 | 6.99 | 9.37 | 6.47 | 8.90 | 0.424 |
| Harris - Northwest | 482010029 | 24 | 70.04 | 66.2 | -3.84 | 5.10 | 7.70 | -5.49 | 7.29 | -5.74 | 7.54 | 0.547 |
| Harris - Bayland Park | 482010055 | 28 | 70.39 | 72.76 | 2.37 | 6.03 | 7.98 | 3.36 | 8.57 | 3.28 | 8.18 | 0.537 |
| Harris -Deer Park #2 | 482011035 | 20 | 68.35 | 72.35 | 4.00 | 9.19 | 10.8 | 5.85 | 13.45 | 6.13 | 13.03 | 0.215 |

The time series and scatter/Q-Q plots along with the performance statistics show that there is a tendency for some underprediction of high observed ozone levels at these DFW and HGB monitors. However, overall, the ozone model performance statistics in Table 2.6 for the TCEQ 2012 modeling at these monitors are within or close to the ranges found in other recent peer-reviewed photochemical model applications (e.g., Simon et al, 2012 and Emory et al, 2017).[31,32] In this respect, base year model performance does not appear to be a factor in the potential under prediction of 2023 DVs at DFW and HGB area monitors.

### 2.e. Summary

TCEQ's 2023 future year projections may understate anticipated ozone levels at high ozone monitors in DFW and HGB and also in areas downwind of Texas including the Chicago area and downwind receptors in Wisconsin and Michigan, greater Denver area of Colorado, and in Southern California, as shown above by comparing 2020 monitored DVs to the projected 2023 DVs and examining the amount of ozone reductions that would be necessary to meet those projections compared with reasonably anticipated DV reductions based on long-term monitored DV trends. These likely underestimations in 2023 DVs may have prevented TCEQ from identifying nonattainment/maintenance receptors in the Chicago area and downwind receptors in Wisconsin and Michigan. Despite the underprediction, TCEQ's modeling did identify a number of receptors in Colorado and California that Texas emissions were linked (contribution equal or greater than 0.70 ppb).

---

[31] Simon, H., K.R. Baker, and S.B. Phillips, 2012. Compilation and Interpretation of Photochemical Model Performance Statistics Published between 2006 and 2012, *Atmospheric Environment*, 61, 124-139.

[32] Emery, C., Z. Liu, A. Russell, M. T. Odom, G. Yarwood, and N. Kumar, 2017. Recommendations on Statistics and Benchmarks to Assess Photochemical Model Performance. *J. Air and Waste Management Association*, 67, 582-598.

TCEQ's 2012 base case modeling tends to underestimate high MDA8 ozone concentrations at ozone monitors in the DFW and HGB areas and also at monitors in the Chicago, IL area (as well as downwind receptors in Wisconsin and Michigan), the greater Denver area of Colorado, and in Southern California to which Texas is linked in TCEQ's modeling and/or EPA's modeling. However, in view EPA's modeling guidance section 4.1 and as discussed above, the magnitude of MDA8 ozone bias in TCEQ's modeling in Texas and for downwind receptors is unlikely to have been a factor in the underestimating of projected DVs by TCEQ.

**3.     Comparison of TCEQ and EPA 2023 future modeling and identified maintenance and nonattainment receptors**

As described in the notice of proposed disapproval, the EPA has recently updated its air quality modeling for transport using the 2016v2 emissions platform. Using 2016 as a base year shortens the number of years to project ozone concentrations in 2023, compared to TCEQ's projection from a 2012 base year or the EPA's earlier projection from a 2011 base year. Also, using 2016 as a base year versus 2012 or 2011 allows for the use of monitored DVs from a more recent period. The combination of starting with more recent base period DVs and shortening the length of time between the base year and the future year provides more certainty compared to TCEQ's 2012-based or the EPA's 2011-based modeling. Thus, the 2016-based modeling is expected to provide more reliable projection of receptors and contributions in 2023.

The EPA's modeling using both 2011 and 2016 base year periods identified that Texas was linked to nonattainment and/or maintenance receptors in 2023 in the Midwest Region (Illinois, Wisconsin, and Michigan), while TCEQ's modeling using a 2012 base year indicated only linkages to western receptors.

In Table 3.1, the EPA provides the projected 2023 average and maximum DVs based on

EPA's 2016v2 modeling, and projected average and maintenance DVs based on TCEQ's

modeling for the nonattainment and/or maintenance receptors to which Texas is linked (Texas

contributions of ≥ 0.7 ppb) based on EPA's 2016v2 modeling. This table also includes the

contributions to these receptors from TCEQ's modeling and EPA's 2016v2 modeling, as well as

the 2020 DVs and preliminary 2021 DVs at these receptors.[33]

---

[33] Monitoring data from the EPA's Air Quality System (AQS) (https://www.epa.gov/aqs). 2021 monitoring data is preliminary and still has to undergo Quality Assurance/Quality Control analysis and be certified by the State of Texas, submitted to the EPA, and reviewed and concurred on by the EPA.

**Table 3.1 Projected 2023 Nonattainment/Maintenance Receptors Identified by EPA Using EPA's 2016 base year modeling**

| Receptor (Site ID, County, State) | Nonattainment/Maintenance (EPA 2023) | EPA: 2023 Average DV/Maximum DV (ppb) | TCEQ: 2023 Average DV/Maintenance DV (ppb) | 2020 DV/Preliminary 2021 DV** (ppb) | EPA: Texas Contribution (ppb) | TCEQ: Texas Contribution (ppb) |
|---|---|---|---|---|---|---|
| 170310001, Cook County, IL | Maintenance | 69.6/73.4 | 60/58 | 75/71 | 0.86 | 1.6 |
| 170310032, Cook County, IL | Maintenance | 69.8/72.4 | 68/66 | 74/75 | 1.46 | 1.31 |
| 170314201, Cook County, IL | Maintenance | 69.9/73.4 | 64/62 | 77/74 | 1.15 | 1.25 |
| 170317002, Cook County, IL | Maintenance | 70.1/73.0 | 66/65 | 75/73 | 1.58 | 1.22 |
| 550590019, Kenosha County, WI | Nonattainment | 72.8/73.7 | 67/66 | 74/74 | 1.72 | 1.44 |
| 550590025, Kenosha County, WI | Maintenance | 69.2/72.3 | No data* | 74/72 | 1.81 | No data* |
| 551010020, Racine County, WI | Nonattainment | 71.3/73.2 | No data* | 73/73 | 1.34 | No data* |

* Kenosha AQS ID 55059025 was installed and began operating May 13, 2013, so the first three-year DV available is 2013-2015. Racine AQS ID 551010020 was installed on April 14, 2014 so the first three year DV available is 2015-2017. TCEQ's modeling used monitored DV data for 2010-2012, 2011-2013, and 2012-2014 to project to the future year. Since these monitors do not have valid DVs for these periods, TCEQ's modeling can't be used to project 2023 values and identify if they would be nonattainment or maintenance receptors.

** 2021 monitoring data is preliminary and still has to undergo Quality Assurance/Quality Control analysis and be certified by the State of Texas, submitted to the EPA, and reviewed and concurred on by the EPA.

The likely underestimation of anticipated 2023 DVs in the Midwest is a concern, especially in light of the fact that TCEQ did not identify any receptors in the Chicago area and downwind of Chicago areas of Wisconsin and Michigan while the EPA did identify receptors in these areas.

*Cook County, IL*

As shown in Table 3.1, the EPA identified four receptors as maintenance receptors in Cook County, IL. TCEQ's 2023 nonattainment DVs are 9-15 ppb lower than recent monitoring data. The four monitors that the EPA's 2016v2 modeling identified as maintenance receptors to which Texas is linked, all have 2020 DVs $\geq$ 74 ppb that would need their DVs to drop from a minimum 3-4 ppb up to 7 ppb in the next 3 years. Based on the trends analysis included in Section 1, typical ozone DV changes (no large changes in emissions and/or meteorology ozone conduciveness) would be anticipated to be 0-3 ppb for 3 years, indicating that it is unlikely that all these monitors will attain the NAAQS and would likely need even more ozone DV decreases to not be considered a maintenance receptor. TCEQ's modeling did not identify these four receptors as nonattainment and/or maintenance receptors. In TCEQ's modeling they project 2023 nonattainment DVs of 60 to 68 ppb for the four maintenance receptors that the EPA identified (2016v2), where EPA's 2023 nonattainment DVs range from 69 to 70 ppb for the four receptors. EPA's projected 2023 nonattainment DVs are higher than TCEQ's projected 2023 nonattainment DVs and closer to the recently monitored data. The EPA identified all four receptors as maintenance receptors. TCEQ's maintenance DVs, using only the 2012-2014 monitored DVs, projected 2023 maintenance DVs between 58 ppb and 66 ppb, which is 1 to 2 ppb lower than TCEQ's nonattainment DVs. As discussed above, TCEQ's methodology for identifying maintenance receptors does not identify areas that may struggle with maintaining the standard in

the face of inter-annual variability in ozone-conducive conditions. It is worth noting that if

TCEQ's modeling had identified any of these four receptors as maintenance receptors, TCEQ's

modeling estimates contributions from Texas sources ranging from 1.22 ppb to 1.6 ppb, and

therefore Texas would have been linked to these receptors for further analysis of potential

emission reductions.

*Wisconsin*

As shown in Table 3.1, the EPA identified two receptors as nonattainment receptors and

one as a maintenance receptor in Wisconsin. As footnoted in Table 3.1, TCEQ modeled a 2012

base case so TCEQ's modeling can only be used for monitors that had a one or more valid DVs

in the 2010-2014 period. Only the Kenosha County AQS ID 550590019 monitor had a valid DV

during this time, as the other two monitors were not installed until 2013-2014. The EPA's

modeling uses a 2016 base case, so the EPA had valid DVs for all three monitors in Wisconsin to

project 2023 DVs. TCEQ's projected nonattainment DV is 5 ppb lower than EPA's 2023

nonattainment DV and 7 ppb lower than recent monitored data. The three monitors that the

EPA's 2016v2 modeling identified as a nonattainment and/or maintenance receptors to which

Texas is linked have 2020 DVs of 73ppb, 74ppb, and 74 ppb and preliminary 2021 DV of 72

ppb, 73 ppb, and 74 ppb. TCEQ's modeling only had projections for one of these receptors but

did not identify it as a nonattainment and/or maintenance receptor. Again, TCEQ's maintenance

methodology proved to be less stringent than the nonattainment methodology and resulted in the

maintenance methodology DV being 1 ppb lower than the nonattainment methodology DV. It is

worth noting that if TCEQ's modeling had identified the one Wisconsin receptor that they had

valid base DVs as nonattainment or maintenance, TCEQ's modeling indicated that contributions

from Texas sources was 1.44 ppb and therefore Texas would have been linked to these receptors for further analysis of potential emission reductions.

Overall, TCEQ's modeling resulted in no receptors being identified in the Illinois, Wisconsin, Michigan areas. The analysis here shows that by comparing current measured DVs that are only 2 to 3 years from 2023 with the TCEQ 2023 DVs used for identifying maintenance receptors, it is clear that the TCEQ method is flawed. TCEQ claims that five receptors will not have a problem maintaining the NAAQS when, in fact, the current DVs for these five sites are 4 to 7 ppb above the NAAQS using 2020 DVs and 1 to 5 ppb above the NAAQS using preliminary 2021 DVs, indicating that it is unlikely that all these monitors will attain the NAAQS and would likely need even more ozone DV decreases to not be considered a maintenance receptor. While the TCEQ modeling projects lower overall ozone levels for these areas in 2023, TCEQ's modeling does tend to corroborate the amount of projected impact that emissions from Texas may be contributing to 5 of the 7 nonattainment and maintenance receptors identified by the EPA's most recent air quality modeling, EPA MP2016v2 modeling, as having a Texas contribution greater than or equal to one percent of the 2015 ozone NAAQS (0.7 ppb). The EPA MP2016v2 modeling found that Texas is linked to nonattainment and maintenance receptors in Cook County Illinois, and Wisconsin Counties (Kenosha and Racine).

## 4.    Other Potential Modeling Concerns

### *4.a. EGU Emissions*

TCEQ did not use the latest EGU emissions available at the time they proposed the SIP that incorporated reductions from the CSAPR Update/latest ERTAC projections in their modeling. It is unclear if this made any substantial changes in the modeling analysis without updating the EGU emissions and redoing the modeling.

*4.b. Contribution Calculation*

TCEQ used an alternate methodology for calculating contributions in determining the contributions from Texas emissions at each monitor Texas identified as a receptor in Colorado, Arizona, and Southern California.

To understand the differences, we first describe the EPA's method for calculating the contribution from an upwind state's emissions at downwind monitors. We note that in the Federal Register Notice Section II.B.4 and Section III.B.3, that is also referred to elsewhere in the Federal Register Notice, there is an error in describing how the EPA calculates future year 2023 contributions. The EPA's approach for calculating contributions is summarized below followed by a more detailed four step description of the methodology. For more details on how EPA calculates contributions see the "Air Quality Modeling TSD for 2015 Ozone NAAQS Transport SIP Proposed Actions".[34]

The EPA's approach for calculating 2023 average contribution metric values at individual monitoring sites is to first average daily contributions on the days with the highest predicted MDA8 ozone concentrations in the grid cell containing the monitor based on the air quality modeling for 2023 and then calculate the ratio of the average contribution to the corresponding average MDA8 concentration across the selected days. The resulting ratio is applied to the projected 2023 design value to provide contribution metric values for each state at each monitoring site nationwide. As part of this method, contributions and concentrations are selected from the days with the top-10 MDA8 ozone concentrations in 2023. Note that EPA does not calculate contributions for those monitoring sites where there are fewer than 5 days with 2023 MDA8 ozone concentrations $\geq$ 60 ppb for that monitor.

---

[34] This TSD can be found in Docket ID No. EPA-HQ-OAR-2021-0663

For clarity and further analysis of the differences with TCEQ's methodology we are including a more detailed four step description of the EPA's methodology (see "Air Quality Modeling TSD for 2015 Ozone NAAQS Transport SIP Proposed Actions").[35]

(1) For the model grid cells containing an ozone monitoring site, calculate the 8-hour average contribution from each source tag[36] to each monitoring site for the time period of the 8-hour daily maximum modeled (i.e., MDA8) concentration on each day in 2023;

(2) Average the MDA8 concentrations for each of the top 10 modeled ozone concentration days in 2023 and average the 8-hour contributions for each of these same days for each tag;[37]

(3) Divide the 10-day average contribution for each tag by the corresponding 10-day average concentration to obtain a Relative Contribution Factor (RCF) for each tag for each monitoring site;

(4) Multiply the 2023 average design values by the corresponding RCF to produce the average contribution metric values at each monitoring site in 2023.

TCEQ's methodology differs in that it selects 2023 contributions from the days with the highest MDA8 ozone concentrations in 2012, not 2023 as in EPA's method. In addition, TCEQ selects contributions from among the 3 x 3 set of model grid cells including and adjacent to the

---

[35] This TSD can be found in Docket ID No. EPA-HQ-OAR-2021-0663.

[36] A "tag" is a contribution category. For example, in the state-by-state source apportionment model run, we "tagged" anthropogenic NOx and VOC emissions for individual states to track the formation of ozone from these emissions.

[37] When calculating the contribution metric values EPA applied a criterion that 5 or more of the top 10 model-predicted concentration days must have MDA8 concentrations >= 60 ppb in the future year in order to calculate a valid contribution metric. The criterion of having at least 5 days with MDA8 ozone concentrations >= 60 ppb was chosen to avoid including contributions on days that are well below the NAAQS in the calculation of the contribution metric. Using 5 days with MDA8 ozone >= 60 ppb aligns with recommendations in EPA's air quality modeling guidance for projecting future year design values, as described above. The EPA did not calculate contribution metric values for any monitor that did not meet this criterion.

grid cell containing the monitor based on whatever grid cells are included in the calculation of projected design values. The EPA's method, on the other hand, uses 2023 contributions from just the grid cell containing the monitor.

More specifically, TCEQ's methodology differs from step 1, above, in that they use the contribution for the cell that had the maximum 2012 MDA8 value from a 3x3 matrix centered around the grid cell that has the monitor, whereas the EPA uses the contribution for the cell that includes the monitor. Note TCEQ is using the 2012 modeled values for selecting the MDA8 value. TCEQ's methodology differs in step 2 in that they use the 10 highest MDA8 days in the 2012 modeling instead of the EPA's method that uses the 10 highest MDA8 days in the 2023 modeling. One artifact of TCEQ's method is that the modeled contributions used to calculate the average contribution metric may be based on contributions on different days and in different grid cells than EPA's method.

TCEQ's also uses 2012 modeled values in step 3 to calculate the Relative Contribution Factor and in step 4 to produce the average contribution metric using the 2012 total modeled concentration values. Whereas the EPA uses the 2023 data in steps 3 and 4.

It is unclear how the methodological differences ultimately affect the contribution values and which receptors Texas is linked compared to the EPA's methodology. As noted in Section 3 for receptors that EPA identified in Illinois and Wisconsin, TCEQ's contribution method did result in contributions that were relatively similar in magnitude compared to EPA's 2016v2 contribution results. The EPA does not agree with TCEQ's use of the 2012 modeled days for selecting the days in 2023 to calculated contribution. Regardless of this issue, TCEQ's methodology  did identify contributions above 0.7 ppb at nonattainment/maintenance receptors in Colorado, Arizona, and Southern California.

#### 4.c. Future Year Boundary Conditions

In generating their future year boundary conditions, TCEQ used estimated 2023 emissions from the Representative Concentration Pathway (RCP) scenario 8.5 developed by the Intergovernmental Panel on Climate Change (IPCC). This includes some estimated changes based on climate modeling. The EPA typically has not seen adjustment in future year boundary conditions for climate changes included in SIP modeling; without a modeling sensitivity analysis, the actual impact cannot be quantified. The actual impact is expected to be a relatively small contribution to the total modeled concentrations in TCEQ's transport SIP modeling and would not be expected to significantly change the total modeled concentrations.

### 5.     TCEQ Other Factor Analysis (Weight of Evidence)

TCEQ stated that the Texas contribution to a receptor should be deemed "significant" only if there is a persistent and consistent pattern of contribution on several days with elevated ozone. To try and assess persistent and consistent patterns, TCEQ did some additional analysis of several different factors such as DV trends, number of elevated ozone days, back trajectory analyses on elevated ozone days, modeled concentrations on future expected elevated ozone days, total interstate contributions at tagged monitors, consideration of conceptual model of downwind area, and responsiveness of ozone to emissions from Texas. Based on their assessment, TCEQ concluded that emissions from Texas do not contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS at any downwind monitors.

#### TCEQ Summary

For Colorado receptors, TCEQ provided analysis of: current attainment status and design value trends, number of days with elevated observed ozone, back trajectory analysis on elevated

ozone days, the modeled contributions on expected elevated ozone days, collective interstate

contribution, alternate contribution method analysis, and the responsiveness of ozone formation

at the tagged Colorado monitors to Texas $NO_X$ emissions. TCEQ evaluated these factors in a

general weight of evidence approach and concluded that Texas emissions do not contribute

significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS at the

tagged monitors in Colorado.

For California receptors, TCEQ provided analysis of: current attainment status and design

value trends, number of days with elevated observed ozone, back trajectory analysis on elevated

ozone days, the modeled contributions on expected elevated ozone days, collective interstate

contribution, TCEQ evaluated these factors in a general weight of evidence approach and

concluded that Texas emissions do not contribute significantly to nonattainment or interfere with

maintenance of the 2015 ozone NAAQS at the tagged monitors in California.

While these additional factors can be informative to supplement an air quality modeling-

based analysis of some of the complexities of ozone formation in downwind areas, how ozone is

changing in those areas, areas that may contribute to downwind areas, modeled contributions

from upwind areas, and potential responsiveness to upwind changes in emissions, most of these

analyses do not provide the quantitative assessment that chemical transport modeling with source

contribution analyses that air quality modeling provides. Chemical transport modeling is the

most technically credible tool available to project future year ozone levels, contributions from

upwind states, and frequency of the impacts of upwind states.

The EPA has reviewed these analyses that TCEQ provided in a Weight of Evidence

approach for receptors in Colorado and California and found significant concerns with some of

the analyses. Specifically, the EPA's assessment of the totality of TCEQ's Weight of Evidence

factors for Colorado and California receptors is that they were in conclusive or do not provide sufficient, substantial evidence that counters the results of photochemical modeling, including the contribution analysis using EPA's contribution methodology. The EPA does not concur with TCEQ's conclusion that Texas emissions do not contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS at the tagged monitors in California. The EPA has included some comments, concerns, and limitations with using these factors that Texas used to negate the findings of the chemical transport model below.

### 5.a. TCEQ indicated that there are problems with DV trends

TCEQ provided analyses of recent DV trends at the 4 Colorado monitors that TCEQ identified as nonattainment/maintenance receptors. TCEQ stated that 2013 was a high monitored ozone year but that the most recent DVs at the time of their SIP submittal (2016 DVs) at most monitors show attainment and long-term ozone decreases are modest for the time evaluated (see Figure 1.8 above that is TCEQ's SIP Figure 3-40).

TCEQ also provided analyses of recent DV trends at the tagged California monitors along with the other monitors located in the Los Angeles CSA. These trends are displayed in TCEQ's SIP Figure 3-56: Eight-Hour Ozone Design Values for Monitors in the Los Angeles Area that is included above (see Figure 1.12 above that is TCEQ's SIP Figure 3-56). TCEQ colored the tagged California monitors and used gray coloring for the other monitors in the Los Angeles CSA. The 10 monitors tagged had eight-hour ozone design values ranging from 101 ppb to 80 ppb in 2016. TCEQ indicated that 8-hour ozone DVs values in the area have decreased overall for the past 10 years and the 10 monitors tagged for further review have observed eight-hour ozone design value decreases from 2007 through 2016 ranging from 13% at Reseda (AQS ID: 60371201) to 5% at Victorville-Park Avenue (AQS ID: 60710306).

The most recent monitoring data and trends are useful to help identify whether the monitors are currently near or above the 8-hour ozone NAAQS. See Figures 1.9 and 1.13, above, and Table 5.1 below, which includes the 2021 preliminary DV.[38] We note that the AQS ID 80590011 (Jefferson County, Colorado) monitor 2016 DV is similar to the 2012 monitor DV despite four more years of fleet turnover in the Denver area. Overall, the DV trends show that ozone levels are reducing at a slow pace. Based on the data for the Colorado monitors and the ten California area monitors identified by TCEQ as receptors, the 2020 DVs and the long-term trends do not clearly show that the receptors in California or Colorado are expected to be below the NAAQS, and thus, not be potential nonattainment or maintenance receptors in 2023. The modeling trends analysis for California and Colorado receptors do not provide evidence that these receptors will attain by 2023.

---

[38] EPA Analysis of 8-hour Ozone monitor trends. Data and calculations available in "Ozone_Trends_R6_TSD.xlsx" included in Docket ID No. EPA-R06-OAR-2021-0801.

**Table 5.1  2020 DV and Preliminary 2021 DV and TCEQ 2023 projections and contributions for receptors identified by TCEQ**

| Receptor (Monitor ID, County, State) | TCEQ 2023 Average DV (ppb) | TCEQ 2023 Maintenance DV (ppb)* | Texas Contribution (ppb) | 2020 DV / Preliminary 2021 DV** (ppb) |
|---|---|---|---|---|
| 80350004, Douglas, CO | 73 | 72 | 1.42 | 81/83 |
| 80590006, Jefferson, CO | 72 | 73 | 1.26 | 79/81 |
| 80590011, Jefferson, CO | 71 | 71 | 1.26 | 80/83 |
| 80690011, Larimer, CO | 72 | 71 | 1.22 | 75/77 |
| 80050002, Arapahoe, CO | 70*** | 71 | 1.15 | 77/80 |
| 40038001, Cochise, AZ | 71 | 69**** | 1.06 | 66/66 |
| 60371201, Los Angeles, CA | 80 | 78 | 0.76 | 92/87 |
| 60371701, Los Angeles, CA | 80 | 82 | 0.72 | 88/90 |
| 60376012, Los Angeles, CA | 87 | 86 | 0.9 | 101/101 |
| 60658001, Riverside, CA | 88 | 85 | 0.73 | 96/95 |
| 60658005, Riverside, CA | 84 | 83 | 0.71 | 98/97 |
| 60710001, San Bernardino, CA | 71 | 72 | 0.84 | 81/77 |
| 60710306, San Bernardino, CA | 76 | 77 | 0.81 | 83/83 |
| 60711004, San Bernardino, CA | 91 | 90 | 0.88 | 106/103 |
| 60714001, San Bernardino, CA | 82 | 79 | 0.86 | 87/87 |
| 60714003, San Bernardino, CA | 94 | 91 | 0.74 | 114/114 |

* Uses TCEQ's Maintenance receptor methodology that EPA has concerns (see Section 1 on maintenance receptor methodology discussion).

** 2021 monitoring data is preliminary and still has to undergo Quality Assurance/Quality Control analysis and be certified by the State of Texas, submitted to the EPA, and reviewed and concurred on by EPA.

*** From TCEQ spreadsheet of future 2023 DVs with state contributions.

**** TCEQ did not provide calculations for this receptor so EPA calculated from the Relative Response Factor in TCEQ spreadsheet of future 2023 DVs with state contributions and the monitor's 2012-2014 DV (0.983 X 71 ppb, truncation applied).

### 5.b. TCEQ evaluated the number of elevated ozone days (over 70 ppb) annually for monitors in the Denver and Southern California areas.

For the greater Denver area Colorado, TCEQ provided number of days over 70 ppb trends for 2007-2016 indicating decreases in the number of such days over the long-term and that 2012 was the highest year in terms of the number of exceedance days at the five monitors evaluated. However, in 2016 3 of 5 monitors had more than 10 days of monitored exceedances and one monitor had more exceedances in 2016 than it had in 2014 and 2015. TCEQ also provided a similar analysis of trends in California for 2012 thru 2016, which shows a general decrease in monitored ozone days above 70 ppb from 2012 for most of the 10 monitors tagged by TCEQ's modeling, but most monitors still have 30-95 monitored exceedance days (MDA8 > 70 ppb) in 2016. This data supports that the number of ozone exceedance days are improving but neither the Colorado nor California analysis of number of exceedance days annually provide any evidence to refute the photochemical modeling analysis results.

### 5.c. TCEQ Back Trajectory Analysis

TCEQ provided multi-year back trajectory analyses (2012-2016) for all the monitored ozone exceedance days at the five monitors in Colorado and at the 10 monitors in Southern California using National Oceanic and Atmospheric Administration (NOAA) HYbrid Single Particle Lagrangian Integrated Trajectory (HYSPLIT)[39]. TCEQ performed 72-hour back trajectories for both Colorado and California monitors. Given the large distance from Texas to Colorado and Texas to California, 120-hour back trajectories should have been considered. Most

---

[39] HYbrid Single-Particle Lagrangian Integrated Trajectory (HYSPLIT) model is a complete system for computing both simple air parcel trajectories and complex dispersion and deposition simulations. The model is designed to support a wide range of simulations related to the atmospheric transport and dispersion of pollutants and hazardous materials to the Earth's surface.

of the Colorado back trajectories only reached central or northern Texas so longer back trajectories should have been completed (see TCEQ SIP submission, Figure 3-42). TCEQ used start heights of 500 m Above Ground Level (AGL), 1000 m AGL, and 1500 m AGL. The EPA would also recommend running a 100 m AGL start height as well since both areas have complex terrain nearby or in the potential pathways that could result in different back trajectory paths due to the difference in meteorology between 100 m AGL and 500 m AGL. Another concern is that TCEQ used the 1st hour of the 8-hour exceedance as the start time instead of mid 8-hour or highest 1-hour number as the start time. The EPA typically uses a mid-8-hour or later start time, or runs multiple trajectories with varying start times as the transport patterns often change throughout the monitored 8-hour exceedance. Not running multiple hours for the start time, or at least the highest 1-hour or the middle of the 8-hour period when monitored 1-hour values are typically higher than the 1st hour of the 8-hour period, results in uncertainty and a general concern that the analysis is not complete. This translates into a concern that trajectories provided by TCEQ are incomplete and may not be representative of transport patterns that occurred during monitored 8-hr ozone exceedances because of the way TCEQ structured and performed the HYSPLIT analyses that results in only a limited set of trajectories. For example, just the trajectory length time results in a number of trajectories for Colorado and California that could have crossed Texas if a longer trajectory time had been used.

TCEQ also screened the back trajectories out if they touched the ground at some point and also screened out any trajectories that were not below the Planetary Boundary Layer (PBL) over Texas. TCEQ also screened out back trajectories if the back trajectory start height at the point above the receptor was above the PBL. The EPA has multiple concerns with the screening out of trajectories that TCEQ performed.

Before we explain our specific concerns with the screening out of back trajectories, it is important to understand what HYSPLIT back trajectories represent and their limitations. HYSPLIT back trajectory analyses use archived meteorological modeling that includes actual observed data (surface, upper air, airplane data, etc.) and modeled meteorological fields to estimate the most likely route of an air parcel transported from a particular location at a specified time. The method essentially follows a parcel of air backward in hourly steps for a specified length of time. HYSPLIT estimates the central path in both the vertical and horizontal planes. The HYSPLIT central path represents the centerline with the understanding that there are areas on each side horizontally and vertically that also contribute to the end point at the monitor. The horizontal and vertical areas from the centerline grow wider the further back in time the trajectory goes. Therefore, a HYSPLIT centerline does not have to pass directly over emissions sources or emission source areas, but merely relatively near emission source areas. Nor does the HYPSLIT centerline have to be below the PBL over Texas as the vertical spread area on the centerline for distances of 300 to 600 miles or more would most likely be below the PBL even if the centerline was well above the PBL. Likewise, even if a centerline is indicated as touching down, that adds some uncertainty but does not void the back trajectory. Given the distance from Texas to Colorado receptors and Texas to California receptors, it is unclear how many back trajectories TCEQ inappropriately screened out when the centerline was close to Texas such that the horizontal spread area could encompass areas of Texas but did not directly cross any parts of Texas. In addition, Figure 3-42 in TCEQ's SIP submission indicates that many of the 72-hour trajectories that pass over Texas end before they have fully traversed Texas. Some of these trajectories may have been screened out because they were not below the PBL, but may have been below the mix layer in Texas and thus retained for the analysis if longer than 72-hour

trajectories had been performed. Starting the back trajectories with only the 1st hour of the 8-hour ozone exceedance means that the trajectory is started when the PBL is usually the lowest. With a later start hour (middle of the 8-hour, multiple start hours, etc.) the PBL would be higher in most cases. Thus, the TCEQ only using the 1st hour may have resulted in back trajectories not being performed or being screened out when a later start time would have resulted in a back trajectory that passed TCEQ's screening based on start height and PBL. Regardless, the EPA does not agree with screening out of trajectories as TCEQ has done in their analysis. The multiple ways that TCEQ inappropriately screened out trajectories, along with the several other issues mentioned above, limits the information that can be gleaned from TCEQ's HYSPLIT and Endpoint trajectory analysis for receptors in Colorado and California.

The EPA finds back trajectory analysis can be potentially useful as a corollary analysis along with observation-based meteorological wind fields at multiple heights to examine the general plausibility of the photochemical model "linkages." Since the back trajectory calculations do not account for any air pollution formation, dispersion, transformation, or removal processes as influenced by emissions, chemistry, deposition, etc., the trajectories cannot be used to develop quantitative contributions. Therefore, back trajectories cannot be used to quantitatively evaluate the magnitude of contributions from upwind states to downwind receptors.

For Colorado, TCEQ proffered that their trajectory analysis of transport from Texas to Colorado indicates that emissions from Texas are unlikely to affect ozone concentrations in the mixing layer over Colorado on elevated ozone days and Texas contribution should not be deemed significant. TCEQ asserted that filtering the back trajectories by only looking at trajectories from the beginning of elevated ozone episodes, that start within Colorado's mixing

layer, that do not hit the surface, and that have endpoints within Texas' mixing layer is an attempt to find a clear case where emissions in Texas would affect the ozone in Colorado. TCEQ concluded that, using those filters, 6% of elevated ozone days in Colorado had trajectories that reached the mixing layer in Texas, and 66% of those days during the 2007-2016 period occurred in 2011 and 2012. The EPA finds this analysis is flawed by the way TCEQ performed the HYSPLIT back trajectories and by the inappropriate screening out of back trajectories. TCEQ concluded that there are many years where no back trajectories reach Texas from Colorado and that in the years where TCEQ determined that no back trajectories reached Texas, the tagged monitors still observed a high number of elevated ozone days and fourth-highest eight-hour ozone concentrations above 70 ppb. The EPA finds these conclusions to be inadequately supported due to the way TCEQ performed and generated the back trajectories and TCEQ's excessive use of filters. For these reasons, EPA also disagrees with TCEQ's conclusion that Texas may not be upwind in 2015 and 2016 during any elevated ozone days at any of the five sites shown in Figure 3-44 of TCEQ's SIP submission. The EPA notes that endpoint analysis and percentage of endpoints generally provides limited value but due to the concerns with the overall back trajectory analysis, the EPA finds little value in the endpoint analysis that TCEQ provided.

TCEQ did indicate that there were also many more elevated eight-hour ozone days observed in 2012 compared to other years and that this may indicate that there were some unusual meteorological patterns that occurred in 2012 that resulted in a more severe ozone season. TCEQ noted that overall, trends in the fourth-highest eight-hour ozone concentrations have only slightly decreased at the Colorado receptors that TCEQ identified. The EPA concludes that TCEQ's HYSPLIT back trajectory analysis for the Colorado receptors is flawed and does

not in itself provide sufficient evidence to counter the results of TCEQ's modeling regarding the downwind distance of interstate transport due to emissions from Texas.

For California, TCEQ performed a similar HYSPLIT back trajectory analysis for ozone exceedance days at the 10 monitors that TCEQ identified in Southern California to which TCEQ found Texas potentially linked. TCEQ performed the HYPSLITs the same way that they did for the Colorado receptors including the inappropriate screening of trajectories, and other issues discussed above in review of TCEQ's back trajectory and endpoint analysis for ozone exceedances for the Colorado receptors.

For the same reasons the EPA finds TCEQ's Colorado back trajectory and endpoint analyses flawed, we conclude that TCEQ's HYSPLIT back trajectory and endpoint analyses for the California receptors is flawed and does not provide evidence rebutting TCEQ's photochemical modeling that Texas may be linked to these California receptors.

### *5.d. Texas contribution on all days in 2023 with ozone greater than 70 ppb.*

TCEQ evaluated contributions from Texas on projected future year elevated ozone days in their chemical transport modeling. TCEQ evaluated the subset of 2023 days with modeled MDA8 greater than 70 ppb, and TCEQ calculated the average modeled Texas contributions for this subset of days (i.e., the "TX-ALT" method). Table 3-14 in TCEQ's SIP submission is included below as Table 5.2. TCEQ also provided this same analysis for the receptors identified in Southern California and included the results in its SIP submission in Table 3-17, which is included below as Table 5.3.

**Table 5.2 TCEQ evaluation of Texas contribution to 2023 modeled days with MDA8 values greater than 70 ppb at receptors in Colorado**

Table 3-14: Modeled Elevated Ozone Days in the Future Year at the Tagged Colorado Monitors

| Site Name | AQS ID | Number of Future Elevated Days | Average Texas Contribution on Future Elevated Ozone Days (ppb) | Average MDA8 on Future Elevated Ozone Days (ppb) | Percentage of Texas Contribution in MDA8 |
|---|---|---|---|---|---|
| Chatfield State Park | 80350004 | 9 | 0.77 | 73.05 | 1.06% |
| Rocky Flats | 80590006 | 10 | 0.89 | 73.64 | 1.21% |
| National Renewable Energy Labs-NREL | 80590011 | 11 | 0.86 | 74.09 | 1.16% |
| Fort Collins-West | 80690011 | 2 | 0.56 | 73.06 | 0.77% |
| Highland Reservoir | 80050002 | 8 | 0.52 | 73.80 | 0.71% |

TCEQ proffered in assessing this information that for the Colorado monitors, the expected average Texas contribution using all days greater than 70 ppb is a small percentage of the projected average MDA8 on these days. As a result, TCEQ argued that these impacts are not significant, since the average contribution is less than one ppb for all the monitors and high ozone occurs on relatively few days (2-11 days). TCEQ further discounted these results by alleging that there are uncertainties associated with model predictions.

**Table 5.3 TCEQ evaluation of Texas contribution to 2023 modeled days with MDA8 values greater than 70 ppb at receptors in Southern California**

| Table 3-17: Modeled Elevated Ozone Days in the Future Year | | | | | |
|---|---|---|---|---|---|
| Site Name | AQS ID | Number of Elevated Days in 2023 | Average Texas Contribution on Elevated Ozone Days in 2023 (ppb) | Average MDA8 on Elevated Ozone Days in 2023 (ppb) | Percentage of Texas Contributions in MDA8 |
| Reseda | 60371201 | 9 | 0.53 | 73.33 | 0.73% |
| Pomona | 60371701 | 60 | 0.26 | 76.87 | 0.35% |
| Santa Clarita | 60376012 | 13 | 0.41 | 73.94 | 0.56% |
| Rubidoux | 60658001 | 57 | 0.30 | 77.67 | 0.39% |
| Mira Loma (Van Buren) | 60658005 | 57 | 0.30 | 77.67 | 0.39% |
| Barstow | 60710001 | 1 | 0.00[33] | 70.82 | 0.00% |
| Victorville-Park Avenue | 60710306 | 5 | 0.19 | 72.24 | 0.27% |
| Upland | 60711004 | 57 | 0.31 | 77.21 | 0.41% |
| Hesperia-Olive Street | 60714001 | 12 | 0.23 | 73.50 | 0.32% |
| Redlands | 60714003 | 54 | 0.29 | 77.12 | 0.38% |

For California monitors, TCEQ indicated that the calculated average Texas contribution on projected future elevated ozone days (2023 modeled days with MDA8 greater than 70 ppb) is less than 1% of the projected average MDA8 at all of the monitors on these days.

As stated earlier in Section 4 of this TSD, TCEQ's methodology for calculating contributions from Texas to downwind receptors is based on the average contribution on the same days and grid cells that TCEQ used for calculating RRFs to project base period DVs to 2023. Specifically, in that method, TCEQ used the 2023 contributions for the top 10 days (with a minim of five days) in the 2012 modeling among the 3 x 3 matrix of grid cells that include and surround the location of the monitoring (i.e., the "TX-Primary" method). The EPA's concerns with this method are described in Section 4.b, above. For comparison with this alternative contribution analysis that uses all days with modeled 2023 MDA8 values over 70 ppb (TX-ALT

method), contributions based on TCEQ's TX-Primary method using 5 to 10 days for these Colorado and California receptors is included in Table 5.1 above. The EPA notes that there are large differences in contributions at individual receptors in Colorado and, in particular, California between the two methods. Both methods demonstrate that Texas contributes above the 1 percent of the NAAQS threshold to receptors Colorado. However, this is not the case for the California receptors where the contributions based on the TX-ALT method are below the 1 percent threshold to all receptors to which Texas was linked using the TX-Primary method. For example, the contributions from Texas to the Reseda, CA receptor are 0.76 ppb and 0.53 ppb using the TX-Primary and TX-ALT-based methods, respectively. In addition, the contributions to the Hesperia-Olive Street receptor are 0.86 ppb and 0.23 ppb using the TX-Primary and TX-ALT-based methods, respectively. For both receptors, the TX-Primary contributions represent the average contribution in 2023 over approximately the top-10 modeled days whereas the TX-ALT method represents the average contribution for all days with 2023 MDA8 values above 70 ppb. Thus, the only known difference between the two methods is the number of days used in calculating the average contribution and that TX-ALT only uses days with 2023 modeled MDA8 values > 70 ppb (without a minimum or maximum number of days) which is different than TX-Primary method. In their submittal, TCEQ did not provide any explanation for the large inconsistencies in contributions between the two methods at these and other sites. These inconsistencies call into question the ability of either or both of the TCEQ methods to provide technically credible robust estimates of 2023 contributions from Texas to downwind receptors.

### *5.e. Collective Interstate Contribution to Future DV*

TCEQ provided an analysis of collective interstate contribution to the 2023 DVs for the five Colorado and ten California receptors. The collective interstate contribution at tagged Colorado receptors ranges from 9.32% to 10.27% of the corresponding 2023 DV (see Table 5.3

below). The collective interstate contribution at tagged California receptors ranges from 3.2% to 4.58% of the corresponding 2023 DV (see Table 5.4 below). TCEQ argues that these are small percentages (Colorado and California) and not as high as the collective interstate contribution percentages the EPA calculated for monitors in Eastern States, which ranged from 17% to 67%. TCEQ also notes that a significant portion of the tagged Colorado monitors' 2023 modeled DVs is due to background emissions (sum of contributions from to biogenic, fires, and boundary conditions). For the California receptors TCEQ argues that these percentages are small compared to Intra-State contribution.

As an initial matter, the EPA is not solely relying on TCEQ's findings of linkages to Colorado and California but is also relying on its own findings of linkages to areas in the Midwest Region. As such, TCEQ's analysis of collective contributions to Colorado and California does not provide justification for not addressing downwind impacts. Nonetheless, the EPA has found in the past that certain California receptors are so heavily impacted by local emissions, and total upwind contribution is so low, that those receptors may not be considered to be affected by interstate ozone transport. *See* 81 FR 15200 (Mar. 22, 2016). However, this is a narrow circumstance that does not apply in the vast majority of cases and has never been applied outside of California. The EPA has previously found, for instance, that receptors in Colorado are heavily impacted by upwind-state contribution. *See* 82 FR 9155 (Feb. 3, 2017); 81 FR 71991 (Oct. 19, 2016). The EPA need not draw any conclusions here regarding whether the California sites TCEQ identified should or should not be considered receptors for ozone-transport purposes. EPA affirms, contrary to TCEQ's suggestion, that the Colorado receptors TCEQ analyzed are impacted by upwind state contributions. However, the EPA's finding that Texas is linked to receptors in other states is based on still other linkages found in the EPA's modeling to receptors

in other states, which are clearly impacted by the collective contribution of multiple upwind states, including Texas. Under CAA section 110(a)(2)(D)(i)(I), downwind states are not obligated to reduce emissions on their own to resolve nonattainment or maintenance problems. Rather, states are obligated to eliminate their own significant contribution or interference with the ability of other states to attain or maintain the NAAQS.

**Table 5.3 – Collective Interstate Contribution to Future DVs at Tagged Colorado Monitors *from* TCEQ's SIP Table 3-15**

**Table 3-15: Collective Interstate Contribution to Future Design Value at Tagged Colorado Monitors**

| Site Name | AQS ID | Percentage of 2023 $DV_F$ from Background Contribution | Percentage of 2023 $DV_F$ from Collective Interstate Contribution | Percentage of 2023 $DV_F$ from Intra-State Contribution |
|---|---|---|---|---|
| Chatfield State Park | 80350004 | 62.12% | 9.86% | 25.44% |
| Rocky Flats | 80590006 | 60.57% | 10.21% | 26.88% |
| National Renewable Energy Labs-NREL | 80590011 | 60.33% | 10.27% | 27.04% |
| Fort Collins-West | 80690011 | 67.42% | 9.32% | 20.88% |
| Highland Reservoir | 80050002 | 62.47% | 9.88% | 25.28% |

**Table 5.4 – Collective Interstate Contribution to Future Design Value at Tagged California Monitors *from* TCEQ's SIP Table 3-18**

**Table 3-18:   Collective Interstate Contributions to Future Design Values at Tagged California Monitors**

| AQS ID | Site Name | Percentage of 2023 $DV_F$ from Background Contribution | Percentage of 2023 $DV_F$ from Collective Interstate Contribution | Percentage of 2023 $DV_F$ from Intra-State Contribution |
|---|---|---|---|---|
| 60371201 | Reseda | 32.49% | 3.62% | 52.55% |
| 60371701 | Pomona | 30.88% | 4.05% | 54.87% |
| 60376012 | Santa Clarita | 37.41% | 3.60% | 49.00% |
| 60658001 | Rubidoux | 29.22% | 3.20% | 57.20% |
| 60658005 | Mira Loma (Van Buren) | 29.22% | 3.20% | 57.20% |
| 60710001 | Barstow | 58.53% | 4.58% | 30.64% |
| 60710306 | Victorville-Park Avenue | 36.58% | 3.98% | 49.55% |
| 60711004 | Upland | 30.74% | 4.22% | 54.69% |
| 60714001 | Hesperia-Olive Street | 32.09% | 3.97% | 53.35% |
| 60714003 | Redlands | 29.70% | 3.25% | 57.19% |

The maximum collective interstate contribution to the future design value is 4.58% at the Barstow (AQS ID: 60710001) monitor, which is insignificant compared to the intra-state contribution of 30.64%. A similar trend is seen at all 10 of the tagged monitors, thereby supporting the conclusion that interstate transport does not contribute significantly to nonattainment at these monitors.

### 5.f. TCEQ also performed Direct Decoupled Method (DDM) modeling for receptors in Colorado.

DDM provides a first derivative of the changes in ozone (linear relationship where the DDM value is the slope of the line for changes in ozone) from changes in $NO_X$ emissions in this case. As TCEQ noted in their SIP (page 3-60), "Ozone formation is highly non-linear and therefore DDM results are only useful for a limited range of input perturbations, about ±15% of the input parameter value in a given simulation." TCEQ indicated that they used DDM to gauge the responsiveness (i.e., percent change in ozone per percent change in emissions) of Texas NOx

emissions at tagged Colorado monitors. From the analysis provided in the SIP and spreadsheet[40] of DDM it appears that TCEQ used the DDM responsiveness factors to estimate the impacts of 100 percent of NOx emissions in Texas which is well beyond ±15% of Texas emissions which TCEQ states is the useful limit for applying DDM. DDM is typically used to see what an additional reduction in emissions might yield in ozone reductions, but not as a method to estimate the impacts from 100% of the emissions from a given state. In their SIP, TCEQ provided the DDM timeseries plots below (See Figure 5.1). Below we describe the results of the DDM analysis that TCEQ provided in their submittal. Because TCEQ's application of DDM is outside the range that would provide credible results, as indicated by TCEQ in their submittal, the EPA considers the results of the DDM analysis to be of limited value and not as technically sound as the contribution data based on source apportionment modeling.

---

[40] TCEQ_DDM_fy2023_CO_EPA_Review.xlsx

Figure 5.1 – TCEQ DDM results for select monitors



**Figure 3-51: DDM Responsiveness of Ozone in July 2023 at National Renewable Energy Labs-NREL**



**Figure 3-52: DDM Responsiveness of Ozone in August 2023 at National Renewable Energy Labs-NREL**



**Figure 3-47: DDM Responsiveness of Ozone in July 2023 at Chatfield State Park**

Figure 5.1 (continued) – TCEQ DDM results for select monitors



**Figure 3-49:  DDM Responsiveness of Ozone in July 2023 at Rocky Flats**



**Figure 3-50:  DDM Responsiveness of Ozone in August 2023 at Rocky Flats**



**Figure 3-45:  DDM Responsiveness of Ozone in July 2023 at Highland Reservoir**

In their submittal, TCEQ indicated that Rocky Flats (AQS ID: 80590006) shows approximately 2 ppb impact from Texas $NO_X$ emissions (100% of Texas NOx emissions) in mid to late July. TCEQ continued that  when ozone at the monitor is responsive to Texas $NO_X$ emissions, elevated ozone was not modeled except for a minor response on one day, July 23. TCEQ summarized their DDM modeling analysis indicating that there is some minor impacts from Texas's $NO_X$ emissions on two high ozone days in the third week of July, but similar to other Colorado monitors studied, the magnitude of the impact is much smaller than the impact from Colorado $NO_X$ and "Other $NO_X$" emissions. TCEQ also summarized that for the days with MDA8 greater than 70 ppb and at least 1 ppb or greater impact there were three days that met these criteria at 2 monitors (NREL and Rocky Flats)  these 2 criteria.

The DDM modeling does show some impact of Texas $NO_X$ emissions but from the scale in the Figures it is hard to discern the magnitude. EPA analyzed TCEQ's information and the impact from Texas $NO_X$ emissions ranges from 0 to1.89 ppb range for 2023 modeled ozone values $\geq$ 60 ppb.[41] The DDM modeling does show much larger impact from the Colorado $NO_X$ group and Other $NO_X$ group (which represents all other NOx sources in the modeling other than Texas and Colorado), but the impact from the Texas $NO_X$ group is not zero for some days with modeled MDA8 ozone over 60 ppb. TCEQ's analysis of the number of days with Texas contribution to MDA8 values over 70 ppb used a 1 ppb threshold, which is not consistent with using 0.7 ppb for contribution that TCEQ utilized in identifying receptors that are linked to Texas. Again, the EPA considers the results of the DDM analysis to be of limited value and not as technically sound as the contribution data based on source apportionment modeling.

---

[41] TCEQ_DDM_fy2023_CO_EPA_Review.xlsx

### 5.g. Southern California Ozone Conceptual Model

TCEQ briefly discussed conceptual model for ozone in Southern California indicating the topography and climate of the area's severe air pollution problem is a consequence of the combination of emissions from the nation's second largest urban area and meteorological conditions that are adverse to the dispersion of those emissions. TCEQ asserted that the unique features of Southern California result in the Southern California basin area make it a relative isolated area. We note that TCEQ's modeling already takes into account the unique meteorological, topographical, and amount of local emissions in Southern California and in the rest of the Continental U.S. (CONUS) including Texas emissions. TCEQ's assessment of the Southern California conceptual model does not provide substantial evidence that refutes the photochemical modeling analysis results.

### 5.h. Summary

TCEQ indicated that Texas contribution should be deemed "significant" only if there is a persistent and consistent pattern of contribution on several days with elevated ozone. TCEQ provided an Other Factor/Weight of Evidence analysis in support of their position that contributions from Texas were not "significant". Overall, these additional Other Factors/Weight of Evidence analyses performed by TCEQ do not provide sufficient evidence to refute the modeling results that TCEQ's modeling indicates downwind nonattainment and/or maintenance receptors in Colorado and Southern California are impacted by Texas emissions and Texas' contribution is 0.7 ppb or greater.[42] Although Texas asserted that its additional air quality factor analysis is a permissible way to interpret which contributions are "significant" because that

---

[42] TCEQ also identified a monitor in Cochise County, Arizona (ID 40038001), but the monitor's recent DVs are below the NAAQS. From AQS, the 2014-2016 and 2015-2017 DVs are each 65 ppb; 2016-2018, 2017-2019, and 2018-2020 DVs are 66 ppb; and preliminary 2019-2021 DV is 66 ppb.

analysis examines whether there was a "persistent and consistent pattern of contribution on several days with elevated ozone" we find that such pattern is already established by the EPA's and TCEQ's air quality modeling. Specifically, the EPA believes source apportionment modeling, as performed by the EPA and also by TCEQ, to determine which states are linked is an appropriate tool to identify impacts that are persistent enough to impact a downwind receptors ability to attain or maintain the standard. This approach is described in more detail above in Section 4 of this action, but, in summary, averages the contributions from an upwind state for up to 10 days, which is preferred, (but at a minimum 5 days) at a given receptor. As noted in the EPA's air quality modeling guidance, since DVs are based on the seasonal 4th high observed values, the EPA technique of using the average impacts for 5-10 days, is appropriate to identify impacts of sufficient persistence to impact a downwind receptor's ability to attain or maintain the standard. We note that TCEQ used the same methodology of up to 10 days but at a minimum of 5 days, with differing calculations methods (See Section 4) to identify nonattainment and/or maintenance receptors and contribution at those receptors.

In addition, the contributions based on the EPA's 2011-based modeling and 2016v2 modeling indicate that Texas is linked to receptors in the Midwest Region but not to receptors in Arizona and California  identified by TCEQ. Given that there are wide unexplained differences in the contributions from Texas to downwind receptors, particularly in California between the two contribution methods used by TCEQ in their SIP submittal, we cannot speculate as to the factor(s) leading to differences in contributions between the EPA's modeling and TCEQ's modeling. Regardless, the contributions to downwind receptors based on the two TCEQ methods and the EPA's modeling results are consistent in showing that Texas's emissions were substantial enough to generate linkages to downwind receptors, under varying assumptions and

meteorological conditions, even if the precise set of linkages changed between the different sets of modeling

As noted above, TCEQ indicated that Texas' contributions should be deemed "significant" only if there is a persistent and consistent pattern of contribution on several days with elevated ozone. In this regard, modeling for three different years of meteorology (2011, 2012, and 2016) have all indicated that Texas is linked to downwind nonattainment and/or maintenance receptors. We think this common result indicates that Texas's emissions were substantial enough to generate linkages to various downwind receptors, under varying assumptions and meteorological conditions which provides a further indication that there is a persistent pattern of Texas' emissions contributing above a 1% to ozone at downwind nonattainment and/or maintenance receptors. In sum, the EPA's more recent 2016 base year modeling platform (2016v2) indicates that Texas is linked to several receptors in the Midwest Region as does the EPA's earlier 2011 base year modeling. TCEQ's 2012 base case modeling showed linkages to states in the West. As discussed, the EPA does not find the additional factors/weight of evidence evaluations conducted by TCEQ provide compelling reasons to discount the impacts indicated in Colorado and California by the TCEQ modeling. In fact, we think TCEQ's modeling likely underestimates these issues.

## 6.   EPA Summary

The EPA has reviewed TCEQ's modeling, alternate maintenance receptor methodology, recent monitoring data and long-term ozone trends, whether there is underestimation bias in TCEQ's modeling, and TCEQ's Weight of Evidence analyses (or "other factors" analyses). Overall, we find the TCEQ's alternate maintenance receptor methodology to be flawed and not acceptable because it fails to identify receptors that may have difficulty maintaining the standard

in the future. We identified that TCEQ's modeling understated the magnitude of projected 2023 design values to the extent that TCEQ's analysis likely resulted in not correctly identifying nonattainment and/or maintenance receptors in Illinois, Wisconsin, Michigan. EPA 2016v2 modeling identified nonattainment and/or maintenance receptors in Illinois and Wisconsin with Texas's contributions more than 1% and TCEQ's modeling also indicated that Texas's contribution was more than 1% at these same receptors.

The contributions calculated from TCEQ's two contribution methods result in very different contribution values and is so inconsistent that it calls into question the validity of either or both methods and TCEQ provides no explanation for the large differences in the outcome of the two methods. TCEQ's Other factors/WOE analysis does not provide sufficient compelling technically supported information to counter the conclusions from photochemical modeling in terms of linkages from Texas to downwind receptors.

TCEQ indicated that Texas contribution should be deemed "significant" only if there is a persistent and consistent pattern of contribution on several days with elevated ozone. We note that modeling for three different years of meteorology (2011, 2012, and 2016) have all indicated that Texas was linked to downwind nonattainment and/or maintenance receptors. We think this consistent result indicates that Texas's emissions are substantial enough to link Texas to downwind receptors, under varying assumptions and meteorological conditions which further indicates that there is a persistent pattern of Texas' emissions contributing above 1 % to ozone at downwind nonattainment and/or maintenance receptors.